## Affidavit of Mark M. Noble

I, Mark M. Noble, being duly sworn upon oath, do declare and state as follows:

1. I am the president of Noble Engineering and am a mechanical engineer with expertise in automotive engineering, accident reconstruction, and fuel system design and performance. A copy of my curriculum vitae is attached hereto as Exhibit A.

2. I have been hired by BMW of North America, LLC and Bayerische Motoren Werke Aktiengesellschaft in the case of *Scheinman v. BMW NA*, et. al. Court No. 09 CV 5340, as a consulting engineer.

3. On August 30, 2011 I inspected the 2008 BMW 335i vehicle that Jeffery Scheinman was driving at the time of the accident that gives rise to the aforesaid legal matter ("the vehicle"). Mr. Scheinman was seated in his stopped BMW 335i convertible on US 41 IL when it was struck in the rear by a northbound fully loaded tractor-trailer traveling at highway speed. I was also present at Dynamic Safety, LLC in Lake Zurich Illinois on October 31, 2012 when Plaintiff's consultants sought to remove the vehicle's fuel tank. The vehicle at the time of my inspections reflected its condition following the post-collision fire that is the subject of Plaintiff's complaint. As I understand from a review of Plaintiff's complaint and the answers filed by BMW NA and BMW AG Plaintiff claims that the vehicle was unreasonably dangerous in that crash because fuel leaked from the fuel system and ignited and because the vehicle seat deflected and allowed Plaintiff's head to be struck and injured. The Defendants have answered by asserting that the forces generated in the impact by the loaded tractor trailer traveling at highway speed into the rear of the stopped BMW 335i were beyond the design limits of this

reasonably safe passenger car. Specifically, the vehicle is designed as a whole to optimize fuel system integrity and viewing the post-accident vehicle as a whole best demonstrates those design features and how they performed.

4. Based on my own experience in fuel system integrity cases generally, it is my opinion that the vehicle preserved in its post-accident condition is the most vital and important piece of evidence in the case. In fact, as Plaintiff is claiming that the vehicle provided inadequate protection in this crash, preserving the vehicle as a whole in its post-accident condition is of primary importance in the case to show how the structure and components are designed and performed in an integrated manner.

5. I attended the October 31, 2012 session at which the Plaintiff's consultants made their first effort to remove what remains of the fuel tank. The tank is constructed of polymers; and, as a result, it was partially melted away during the course of the post-collision fire burning beneath it. The majority of damage evidence, both what is gone and what remains, is visible. It appears that what is not visible could be visualized by use of scopes, mirrors and additional lighting.

6. When Plaintiff's consultants could not remove the fuel system with limited destruction, plaintiff's experts announced or demonstrated by their efforts that they intended to remove the vehicle's fuel tank by cutting out the vehicle's exhaust system and tailpipes, deforming or cutting away a substantial underbody support bracket, and using a powered metal cutting tool to cut the vehicle's drive shaft, and continue to cut any additional pieces until they got the tank out.

7. The very general protocol for the fuel tank removal was not specific enough to contemplate the destruction that Plaintiff's consultants were planning to undertake. A copy of said protocol is attached hereto as Exhibit B. The protocol also called for the "least intrusive" destructive measures only "with agreement of the parties." Before agreeing to the very intrusive destruction intended by Plaintiff's consultants, Defense counsel and I attempted to determine alternative ways to gather the evidence Plaintiff sought. We asked Plaintiff's consultants what they wanted to see that was not visible, so that I could determine if it could be visualized non-destructively or with minimal damage. They refused to respond to that request. In a further attempt to understand their planned destructive steps, Defense counsel and I asked Plaintiff's consulting expert John Stilson to specifically identify what Plaintiff's consultants needed to cut or deform to accomplish their goal, and requested a written itemization of his intended destructive measures. Mr. Stilson refused these requests.

8. Based on my inspection of the vehicle in this case, Plaintiff's consultants' November 9, 2012 protocol would cause unnecessary destruction of this most valuable piece of evidence. The ability to view the vehicle as a post-accident whole, the way it was designed, manufactured, and performed in this collision would be lost. This destruction would also result in: a) the loss of the visual evidence of dual exhaust pipes extending more than a foot beyond the crushed rear end that was overridden by the higher bumper of the tractor; b) the loss of the spatial relationship between the abrasion damage to the fuel tank and the significant amount of structure present to protect the tank which was severely abraded and damaged itself. c) the amount and severity of abrasions and grinding away of numerous underbody structural components that were located below the level of the fuel tank bottom that demonstrate that the

BMW bore the weight of the heavy tractor while it was pushed downward and forward on the road and later over a curb for several hundred feet after impact; d) the relationship of the fuel filler system and tank in their current location and compared to the pre-crash design location; e) physical debris and evidence that indicates the condition of the various components that provide separation of the occupant compartment from the fuel tank.

9. It is possible that Plaintiff's consultants have some substantial legitimate engineering basis for seeking to destroy this valuable evidence. However, to do so would affect my ability, or any other testifying expert who might be retained in my place, to adequately present to the jury a scientific analysis of the evidence of what happened in this crash. If they would explain what they need to see that cannot now be seen and how the visualization of that may be reasonably accomplished, it is quite possible that we could work together to get access with no or limited destruction of the existing evidence in such a manner that the parts could be replaced in their previous positions, e. g., the tank could be replaced in its present position and relationship with the underbody structure. Plaintiff's consultant's current approach does not establish either a legitimate need or an acceptable methodology.

10. On November 9, 2012 Plaintiff for the first time has requested an inspection specific to the subject seat that includes removal of the seat. See Paragraph "G" of Plaintiff's "Tear Down Protocol", attached hereto as Exhibit C. I have discussed this issue with David Blaisdell, whom the BMW Defendants have retained to consult regarding the seat design claim. He is concerned that the protocol for the seat inspection and seat removal is insufficiently detailed to determine whether Plaintiff's Consultants' planned steps to inspect and remove the seat would properly preserve the evidence and minimize destruction of the interior of the vehicle.

He has asked that I convey his request that a) before any debris is removed, he must get the opportunity to perform digital and laser scanning of the interior and exterior of the vehicle, b) before any removal of the driver's seat occurs, he must perform further digital and laser scanning of the interior; c) if the driver's seat is to be removed, Plaintiff's consultants must provide a detailed protocol for the removal of vehicles' driver seat to assure that it is done in a manner that best preserves the integrity of the evidence and d) if the driver's seat is to be removed, it should be removed in such a way as to allow it to be replaced in its current location.

FURTHER, AFFIANT SAYTH NAUGHT

By: _____
Mark M. Noble

Sworn and signed before me this
14th day of November 2012.

_____
NOTARY PUBLIC
David Wallace McKay
Rolak, McKay & Hawkshaw
18-467 Westney Rd. S.
Ajax, Ontario
L1S 6V8
1-905-683-6880 x225

# *NOBLE ENGINEERING*     MARK M. NOBLE

*112 E. DE LA GUERRA ST., SUITE 9    SANTA BARBARA, CALIFORNIA 93101    (805) 566 - 6672*

## CURRICULUM VITAE

**POSITION:** PRESIDENT OF THE CONSULTING FIRM OF NOBLE ENGINEERING. ACTIVITIES INCLUDE ANALYSIS AND RECONSTRUCTION OF AUTOMOTIVE ACCIDENTS. COURT APPEARANCES ARE MADE TO PROVIDE EXPERT TESTIMONY.

**AREAS OF EXPERTISE:**
- RECONSTRUCTION OF ACCIDENTS INVOLVING PASSENGER CARS, TRUCKS, RECREATIONAL VEHICLES & MOTORCYCLES
- AUTOMOTIVE COMPONENT AND SYSTEM FAILURE ANALYSIS
- OCCUPANT KINEMATICS AND INJURY CAUSATION
- FUEL SYSTEM DESIGN AND PERFORMANCE
- FIRE ANALYSIS

*[Handwritten affidavit notation: This is Exhibit "A" referred to in the affidavit of MARK NOBLE sworn before me, this 14th day of NOVEMBER, 2012. [signature] A COMMISSIONER FOR TAKING AFFIDAVITS]*

**EXPERIENCE:** PRINCIPAL RESEARCH ENGINEER WITH THE CONSULTING FIRM OF NOBLE ENGINEERING SINCE 1987. RESEARCH ENGINEER WITH THE CONSULTING FIRM OF SEVERY INCORPORATED FROM 1980 TO 1987. RECONSTRUCTED OVER 1500 ACCIDENTS AND PROVIDED COURT TESTIMONY THROUGHOUT THE COUNTRY. CONDUCTED RESEARCH AND TESTING INVOLVING: FUEL SYSTEM SAFETY, OCCUPANT KINEMATICS, VEHICLE DYNAMICS, CRASHWORTHINESS, COMPONENT FAILURE, SEAT STRENGTH, DOOR / LATCH PERFORMANCE, ROLLOVER / ROOF STRENGTH AND OCCUPANT RESTRAINT SYSTEMS.

AUTOMOTIVE ENGINEER WITH CHRYSLER CORPORATION FROM 1969 TO 1980. EXPERIENCED IN MOST ASPECTS OF AUTOMOBILE DESIGN, DEVELOPMENT, AND MANUFACTURE. HELD POSITIONS IN THE FOLLOWING DEPARTMENTS: FUEL SYSTEMS, CHASSIS DESIGN, PERFORMANCE EVALUATION, ASSEMBLY PLANT RESIDENT ENGINEERING, MECHANICAL COMPONENTS, ENGINEERING RESEARCH, EXHAUST AND EVAPORATIVE EMISSIONS, INTERNATIONAL ENGINEERING, AND PRODUCT PLANNING.

EXECUTIVE LEVEL ENGINEER RESPONSIBLE FOR THE DESIGN AND DEVELOPMENT OF ALL CHRYSLER CORPORATION PASSENGER CAR, TRUCK, AND RECREATIONAL VEHICLE FUEL SYSTEMS. CHAIRED THE CORPORATE FUEL SYSTEM INTEGRITY COMMITTEE RESPONSIBLE FOR ALL AREAS OF VEHICLE DESIGN AND DEVELOPMENT WITH REGARD TO FUEL SYSTEM SAFETY AND COMPLIANCE WITH FEDERAL MOTOR VEHICLE SAFETY STANDARD 301. ALSO CHAIRED THE CORPORATE FUEL SYSTEM WARRANTY AND RELIABILITY COMMITTEE AND SERVED ON THE CORPORATE SAFETY COMMITTEE, RESPONSIBLE FOR ALL AREAS OF VEHICLE SAFETY.

INITIATED AND DIRECTED SAFETY RESEARCH PROJECTS IN VARIOUS FIELDS, INCLUDING FIRE TEST STUDIES OF VEHICLES AND FUEL SYSTEM COMPONENTS, PLASTIC FUEL TANKS, FUEL SHUT-OFF VALVES AND BLADDER FUEL CELLS. PLANNED AND DIRECTED NUMEROUS VEHICLE IMPACT TESTS AND MANY IMPACT SIMULATOR AND LABORATORY TESTS. PARTICIPATED IN OVER 1000 FULL-SCALE VEHICLE CRASH TESTS, ANALYZING PERFORMANCE, EVALUATING CRASHWORTHINESS, AND FORMULATING DESIGN IMPROVEMENTS.

**EDUCATION:** MASTER OF SCIENCE - MECHANICAL ENGINEERING, CUM LAUDE, UNIVERSITY OF MICHIGAN, 1971. BACHELOR OF SCIENCE - MECHANICAL ENGINEERING, CUM LAUDE, UNIVERSITY OF MICHIGAN, 1968. ACCIDENT RECONSTRUCTION COURSE, NORTHWESTERN UNIVERSITY. BIOMECHANICS OF IMPACT TRAUMA COURSE, ASSOC. ADVANCE. AUTO. MEDICINE. PHOTOGRAMMETRY, ROLLOVER, RESTRAINT COURSES; SOCIETY OF AUTOMOTIVE ENGINEERS.

**SOCIETIES AND HONORS:** ASSOC. FOR THE ADVANCEMENT OF AUTOMOTIVE MEDICINE. SOCIETY OF AUTOMOTIVE ENGINEERS. NATIONAL FIRE PROTECTION ASSOC. INTERNATIONAL STANDARDS ORGANIZATION. PI TAU SIGMA (NATIONAL MECHANICAL ENGINEERING HONORARY SOCIETY) - CHAPTER PRESIDENT. TAU BETA PI (NATIONAL ENGINEERING HONORARY SOCIETY).

*AUTOMOTIVE ACCIDENT RESEARCH AND ANALYSIS*    **EXHIBIT A**

<u>SCHEIMAN vs BMW/MARTIN</u>   7-27-2012 JMS

<u>TEARDOWN PROTOCOL 2008 BMW</u>

The following teardown protocol will follow the service manual procedures except where damage prevents it. In that case, the least intrusive procedure will be taken with agreement of parties. The teardown can be videotaped without sound.

1. Remove the two oblique metal bars from their anchorage locations.
2. Remove the dual exhaust pipes forward of the fuel tank area rearward.
3. Remove the aluminum exhaust shield between the fuel tanks.
4. Remove the driver side fuel tank strap and secure the fuel tank prior to removal of the right side fuel tank strap.
5. Remove the right side fuel tank strap.
6. Remove the fuel tank and filler neck assembly (if filler neck assembly is loose).
7. Remove any debris from the filler neck in the routing area up to the filler door.

All removed parts will be tagged and/or bagged for preservation and be retained by the plaintiff firm.

EXHIBIT 13