IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, | ) ) ) ) ) ) ) ) | Honorable James F. Holderman<br><br>Magistrate Susan E. Cox |
| Defendants. | ) | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF
REMOVAL OF FUEL SYSTEM COMPONENT PARTS**

MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, by and through his attorneys, CLIFFORD LAW OFFICES, P.C., moves this court for an order pursuant to Federal Rule of Civil Procedure 37 authorizing the further inspection and the removal of the fuel system component parts, including the fuel tank, from Mr. Scheinman's BMW vehicle, and in support thereof, states as follows:

**I.    INTRODUCTION AND BACKGROUND**

The instant case arises out of an incident in which Jeffrey Scheinman, now a disabled person, was seated in his vehicle stopped at a red light on Route 41 in Highland Park, Illinois when it was rearended by a tractor trailer truck driven by Defendant, Samuel Franke of Martin's Bulk Milk Service. Immediately after impact Mr. Scheinman's BMW vehicle became engulfed in flames. Mr. Scheinman sustained extremely serious burn injuries, as well as permanent cognitive neurological

and ophthalmological injuries that require his confinement in a residential nursing home for the rest of his life. Heretofore, the parties have engaged in very extensive discovery in this case involving both the liability of the trucking Defendants, which include Martin's Bulk Milk Service, Inc., Samuel Franke, International Paper Company, and Universal Am Can Ltd., Successor to Overnite Express, Inc. and OX LLC, as well as the product liability claims against Bayerische Motoren Werke Aktiengesellschaft, a Corporation and BMW of North America, LLC, (hereinafter collectively referred to as BMW) the manufacturers of Mr. Scheinman's vehicle and its fuel system.

With respect to the product liability allegations, Plaintiff has specifically alleged in its Complaint (Document #168) that Defendant BMW was negligent in the design of the BMW vehicle's fuel system and seats, and that the vehicle was unreasonably dangerous because of those defects. Some representative allegations are as follows:

- e. Designed, manufactured, engineered, tested, assembled, distributed and sold the 2008 BMW vehicle without proper and safe protection and guarding of the fuel system component parts so as to prevent rupture, puncture, damage and failure during reasonably foreseeable rear end collisions;

- g. Designed, manufactured, engineered, tested, assembled, distributed and sold the 2008 BMW vehicle without adequate and safe guarding and securing of the fuel system component parts, which increased the likelihood of damage and a post-collision fire during reasonably foreseeable rear end collisions;

- k. Designed, manufactured, engineered, tested, assembled, distributed and sold the 2008 BMW vehicle in a manner and condition that caused the seat back to fail during a reasonably foreseeable rear end collision, and placed Mr. Scheinman's body in the immediate proximity of the post-collision fire.

- l. Designed, manufactured, engineered, tested, assembled, distributed and sold the 2008 BMW vehicle without safe and adequate protection against the spread of fire from the fuel system to the occupant compartment of the vehicle;

The discovery in this case necessarily involves an investigation and analysis of the cause and origin of the fire that started immediately after impact, as well as the path the fire traveled to reach the passenger compartment of the BMW where Mr. Scheinman was seated in the driver's seat. The

evidence has shown that the seatback failed, resulting in the seat collapsing backwards and placing Mr. Scheinman's body in a more prone position, rather than upright, and resulting in very extensive burns to Mr. Scheinman's face and other portions of his body. Testimony of eyewitnesses has established that Mr. Scheinman was pulled out of his car by persons who stopped at the scene while Mr. Scheinman's body, and the passenger compartment of his BMW vehicle, were engulfed in flames.

In order to properly and completely inspect, analyze and evaluate the cause and origin of the fire, and the manner and extent to which defects in the design and manufacture of the vehicle, including its fuel system, were contributing causes of the leakage of gasoline, Plaintiff's experts need to examine all aspects of the fuel system, including the fuel tank. The fuel tank is currently still positioned in the undercarriage of the vehicle, but only portions of the fuel tank can be seen. The tank is a saddle-type tank with left and right side compartments that are connected to each other. A portion of the tank on one side has been destroyed, apparently because of fire damage. The top part of the tank cannot be visualized because it is fastened in place against various components of the vehicle body that exist above the tank and are currently not visible. Accordingly, Plaintiff needs to remove the tank in order to visualize all sides of the tank, as well as to visualize the surrounding body components, including screws, bolts, fasteners, sheet metal, and other vehicle components that are known to be capable of penetrating fuel tanks and fuel lines during rearend collisions, resulting in leakage of fuel, and the spread of fire.

## II. DISCUSSION

### 1. Removal of the Fuel System Component Parts Is Necessary and Reasonable Discovery That Is Authorized by Discovery Rules and Case Law

Rule 34 of the Federal Rules of Civil Procedure authorizes the inspection, testing, and

sampling of tangible things. Production for purposes of destructive testing falls well within that rule. See, *Dabney v. Montgomery Ward & Co.*, 761 F.2d 494, at 498 (8th Cir.), cert. denied, 474 U.S. 904 (1985); *Cameron v. District Court*, 565 P.2d 925, 929-30 (1977). The decision whether to allow destructive testing is within the sound discretion of the court. *Ostrander v. Cone Mills, Inc.*, 119 F.R.D. 417, 419 (D. Minn. 1988). In determining whether to permit destructive testing, "[t]he court is required to balance the interests to be served by destructive testing against the value of preservation of the evidence on behalf of the opposing party." *Ostrander* at 419. "When the proposed test will alter the original state of the object, the court must balance the costs of the alteration of the object and the benefits of getting to the truth in the case." *Nugent v. Hercules Offshore Corp.*, 1999 U.S. Dist. LEXIS 20122, 1999 WL 1277536, at *1 (E.D. La. 1999) (citing *Hawthorne v. Michelin Tire Corp.*, 100 F.3d 962 (9th Cir. 1996)). When a proposed test or inspection has the potential to "alter the original state of the object . . . a balance [must] be established based upon the particular facts of the case and the broad policies of the discovery rules." *Cameron v. District Court*, 193 Colo. 286, 291, 565 P.2d 925, 929 (1977).

While there are no hard and fast rules for evaluating requests for destructive testing, courts sometimes consider four inquiries relevant to the balancing test identified by the court in *Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. 611, 614 (D. Md. 2006) (citing *Cameron v. District Court,* 193 Colo. 286, 565 P.2d 925 (1977)). These inquiries are: 1) Whether the proposed testing is reasonable, necessary, and relevant to proving the movant's case; 2) Whether the non-movant's ability to present evidence at trial will be hindered, or whether the non-movant will be prejudiced in some other way; 3) Whether there are any less prejudicial alternative methods of obtaining the evidence sought; and 4) Whether there are adequate safeguards to minimize prejudice

4

to the non-movant, particularly the non-movant's ability to present evidence at trial." *Mirchandani* at 614.

Metallurgical testing is commonly the subject for cases involving destructive testing disputes. See *White v. Cooper Tools, Inc.*, 2010 U.S. Dist. LEXIS 33815, 7, 2010 WL 1418244 (D.S.D. Apr. 6, 2010)(testing of allegedly defective chain link); *Sarver v. Barrett Ace Hardware*, Inc., 63 Ill. 2d 454, 349 N.E.2d 28 (Ill. 1976) (holes drilled to remove a wedge from a hammer for metallurgic testing); *Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. 611 (D. Md. 2006) (bolt permanently altered during metallurgical testing); *Cameron v. the District Court In And For the First Judicial District*, 193 Colo. 286, 565 P.2d 925 (Co. 1977) (a tire was tested to see whether internal metal strands of the tire had become separated).

In this case, Plaintiff is not asking to perform any destructive testing on the fuel system components, and removal will not damage the fuel tank. Rather, Plaintiff simply requests that this Court allow his experts to remove the fuel tank from Mr. Scheinman's vehicle so that they may be able to see and inspect locations currently blocked from view that may show areas of leakage, as well as vehicle parts that may have contacted the fuel tank and caused damage. The very minimal destructive work to which Defendant BMW objects only involves cutting some non-fuel system vehicle parts in order to free up the fuel tank for removal. This work will not cause any destruction to the actual fuel system components that are in issue. This work is far less invasive than the cases cited above, which permitted destructive testing on the actual components that were the subject of the litigation.

    **2.    The Proposed Inspection Is Reasonable, Necessary, and Relevant to Proving the Plaintiff's Case.**

Despite BMW's contentions to the contrary, the proposed removal and inspection of the

5

vehicle's fuel tank is reasonable, necessary, and relevant to proving Plaintiff's case. An inspection of the non-visible portions of the fuel tank and its surrounding environment will provide Plaintiff the opportunity to identify the locations of any damage and the cause of that damage. See *Sault v. Dometic Corp.,* 2011 Conn. Super. LEXIS 2589, 8-9 (Allowing for the disassembly and inspection of an awning cylinder noting, "An inspection of the contents of the specific cylinder and any non-visible components can provide an opportunity to discover whether there are defective materials or whether a component failed.").

Consistent with the rationale of the Supreme Court of Illinois, Plaintiff's proposal to remove the vehicle's fuel tank for inspection is critical to "the ascertainment of the truth and ultimate disposition of the lawsuit," which is the purpose and overriding consideration of discovery rules and procedures. *Sarver v. Barrett Ace Hardware, Inc.*, 63 Ill.2d 454, 462 (1976)(citing *Monier v. Chamberlain* 35 Ill.2d 351, 361 (1966)). In fact, the evidence sought by Plaintiff is "integral to proving [his] case." *Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. at 615; *Bostic v. Ammar's, Inc.*, 2011 U.S. Dist. LEXIS 7748, 10 (E.D. Ky. Jan. 16, 2011). Therefore, removal of the fuel tank in this case is not only relevant, but also reasonable and necessary.

As is clearly demonstrated by numerous photographs, the Scheinman vehicle sustained substantial damage, and therefore, as Mr. Stilson explains in Paragraph 9 of his attached Declaration, (Exhibit 1), his visual inspection of the vehicle confirmed that it would be necessary to remove certain identified parts in order to remove the fuel tank. He specifically explains that, in the case of the Scheinman BMW:

> "the fuel tank is a saddle-tank design that is mounted under the vehicle floor pan forward of axle. The plastic fuel tank is configured into two joined tanks, one on the left side and the other on the right side with an integral plastic molded section connection that is routed under the vehicle drive shaft. There are several components

that are installed beneath portions of the fuel tank. For example, the exhaust pipe, angled steel bars, exhaust shield, and the drive shaft, are parts mounted beneath the fuel tank that must be removed before the fuel tank can be removed."

As further stated in Paragraph 12 of Mr. Stilson's Declaration:

"none of the steps in the protocol involving removal of the components involve potential damage or alteration of the fuel system/tank, but were necessary to gain access for removal of the fuel tank."

Accordingly, for purposes of proceeding appropriately, and with notice to all parties, Plaintiff's counsel requested Mr. Stilson to prepare a protocol. That original protocol is attached to Plaintiff's Motion to Compel as Exhibit B (Document #275) and was provided to defense counsel in July of 2012. Mr. Toohey and his expert, Mark Noble, specifically agreed to that protocol as confirmed in Mr. Toohey's email of August 8, 2012 in which he said "We have no problem with the protocol for tank removal." (Exhibit A to Plaintiff's Motion to Compel) (Document #275). A review of that protocol makes it very clear that its purpose was to disassemble the fuel system for further inspection. The protocol specifically called for removal of various component parts which prevent access to the fuel tank, including removal of "the dual exhaust pipes forward of the fuel tank area rearward," "the two oblique metal bars from their anchorage locations," "the aluminum exhaust shield between the fuel tanks," and the right and left side "fuel tank strap". (Exhibit B to Document 275) The layout of the fuel system and undercarriage vehicle components is depicted in Exhibit D of Document 275. Despite agreement to this very conventional protocol, defense counsel Couture terminated the removal of the fuel tank in the midst of executing the protocol.

Thereafter, because of Defendant's objections, Plaintiff's counsel asked Mr. Stilson to prepare a revised protocol, which he did later that day on October 31, 2012. That protocol is even more detailed and is set forth as Exhibit E to Plaintiff's Motion to Compel (Document #275). As

7

explained in Paragraph A of the revised protocol, the purpose, once again, is to permit close examination and evaluation of the fuel system, and the environment and packaging surrounding the fuel system. As explained in Paragraph B, the teardown protocol will follow the service manual procedures, except where damage prevents it and in such instance, the least intrusive procedure agreed between the parties will be followed. However, there clearly is damage to the undercarriage of the vehicle that requires some disassembly and/or destructive methods, in the least intrusive manner possible, to gain access to the fuel tank. (Stilson Revised Protocol, Paragraphs A - E, Exhibit E) (Document #275) As also stated in Mr. Stilson's Affidavit in Paragraph 16, some disassembly is required because "a) the substantial support bracket is mounted below the exhaust pipe, and due to damaged bolts that attach the support bracket, it is necessary to slightly 'bend' the bracket so the cut exhaust pipe can be slid under it; b) since any damage to the drive shaft connection to the rear axle cannot be viewed until the exhaust heat shield is removed, I advised Mark Noble that we may have to cut it; and d) any additional disassembly or cutting of 'pieces' of components may be necessary due to the collision and fire damage. Each decision to perform this necessary work would be discussed with Mark Noble before proceeding."

As part of Mr. Stilson's revised October 31, 2012 protocol, in paragraph F, he sets forth a fifteen step fuel system disassembly procedure. A review of each of those fifteen steps reveals it to be an organized procedure that explains precisely what component parts need to be removed, and in some instances involves some cutting of bolts or the exhaust pipes for the purpose of accessing the fuel tank to free it up for removal. Contrary to the representations made by defense counsel and Mark Noble, there is absolutely no suggestion or desire by Mr. Stilson to engage in unlimited cutting. Furthermore, as noted in Mr. Stilson's Affidavit in Paragraph 18, "The cutting of the dual exhaust

8

pipe allows reinstallation using clamps if necessary, removal of the exhaust heat shield would involve the potential to reinstall it following the teardown, and the fire and abrasion damage to the fuel tank would be preserved with its removal along with the condition of the fuel tank spud that connects the filler pipe hose.  Notably, the filler pipe hose has been damaged, and is still connected to the fuel tank, and the removal of the fuel tank would not damage this component."  Therefore, although disassembled component parts normally are not replaced in product liability litigation, Mr. Stilson's revised protocol permits that potential if BMW so desires.  However, the very purpose of the removal is to permit experts, jurors, and the Court to be able to see all sides of the fuel tank and other fuel system components, as well as other parts of the vehicle which were in immediate proximity to the fuel tank before and after the collision and fire.

     As is apparent from John Stilson's original protocol, revised protocol, and Declaration, the Plaintiff desires to remove the fuel system component parts for the very legitimate purpose of fully inspecting all sides and aspects of the fuel system component parts, as well as to visualize and inspect the undercarriage environment surrounding the fuel tank, which simply cannot be seen without removing the tank.  Further, Mr. Stilson has set forth a very common and systematic procedure for removal of the fuel system components, and has stated his intention of doing so with the least amount of disassembly and/or destruction possible.  Plaintiff has absolutely no reason to want to disturb any portion of this vehicle other than as is essential to permit Mr. Stilson and other experts to properly inspect the fuel system as a basis for their expert opinions in this case.

     **3.    Defendant BMW Has Had Ample Opportunity to Document the Post-collision Condition of the Vehicle and Will Not Be Hindered or Prejudiced.**

Defendants would not be hindered or prejudiced, in any manner, if Plaintiff is permitted to remove the fuel tank from the subject vehicle. Hundreds of photographs and videos of Mr.

Scheinman's vehicle have been taken by the parties which accurately portray its appearance for the jury. Defendant BMW and its experts literally have now inspected, videotaped and photographed the current condition of the fuel system and the entire undercarriage of the Scheinman vehicle on three (3) separate occasions: September of 2008, August 30, 2011, and October 31, 2012. They also will participate in the removal of the fuel tank, and the removal process will be preserved by way of photographs and videotape for use as evidence.

     BMW conducted an inspection of the vehicle in September of 2008, only two months after the occurrence. BMW did so without giving any notice to Mr. Scheinman or his family, and without obtaining their permission. BMW also conducted that inspection of Mr. Scheinman's car without giving any notice to Plaintiff's attorneys, Clifford Law Offices, P.C., even though a lawsuit had been filed against Defendant Samuel Franke and Martin's Bulk Milk Service (not yet against BMW) on July 7, 2008. An employee of BMW North America, Andreas Schleich, inspected and photographed Mr. Scheinman's vehicle during this September of 2008 inspection. The full extent of that inspection is not yet currently known because Mr. Schleich is allegedly in Germany and has not yet been produced for his deposition. Some of the photographs taken by Mr. Schleich, who is an accident research engineer for BMW, are attached as Exhibit 2, and they show that Defendant BMW actually lifted up a portion of the vehicle on one or more jacks in order to gain access to the undercarriage of the vehicle. BMW took extremely close-up photographs of the fuel system, including the fuel tanks and the filler neck. In fact, Mr. Schleich's photographs specifically depict the fuel tank and the surrounding cross bars and exhaust pipes which now need to be disassembled in order to actually remove the tank. These photographs vividly establish that BMW documented the precise area which is the subject of the current dispute, even before Plaintiff's experts ever saw

the undercarriage of this vehicle. BMW cannot realistically claim any prejudice from Plaintiff's current request to remove the fuel tank to fully and properly inspect the condition of the fuel system, and to evaluate points of leakage.

The second time that BMW and its experts had an opportunity to inspect the undercarriage of Plaintiff's car was on August 30, 2011 when all parties engaged in an inspection of the BMW vehicle at Dynamic Safety in Lake Zurich, Illinois. BMW participated in this inspection and had multiple BMW representatives, retained experts and counsel present. Mr. Toohey was present; as was Mark Noble, a fuel system engineer; David Blaisdell, a seat back expert; Dr. Elizabeth Raphael, a biomechanist; and Christian Dallmayr, a BMW engineer from Germany. BMW even brought an exemplar vehicle to the inspection so that they could make any comparisons they wanted to between an undamaged fuel system and the post-accident condition of the Scheinman BMW. At that time, all parties, including BMW, were permitted to inspect, videotape, photograph, measure and otherwise investigate and examine Mr. Scheinman's vehicle and its fuel system to the fullest extent they desired. The vehicle was elevated on a lift to permit all parties to stand underneath the undercarriage of the vehicle and engage in extremely close-up inspection, photography, videotaping and measurements of all components of the fuel system, including the tail pipes and cross beams that surround the fuel tank. BMW had ample opportunity to document the current condition of the fuel tank and its component parts, as well as all visible surrounding aspects of the vehicle.

For yet a third time, Defendant BMW and its expert inspected and photographed the vehicle and its undercarriage when the parties reconvened for a teardown inspection on October 31, 2012. The car once again was elevated on a lift so all experts, including Mark Noble for BMW, could stand under the car and examine, inspect, measure and photograph all visible aspects of the fuel system

with their face and cameras only inches away from the component parts of the fuel system. In fact, through multiple inspections, there likely are over one thousand photographs in existence between the parties and their respective experts that document the existing condition of the underbody of the fuel system. Some representative photos of Mr. Scheinman's vehicle taken by BMW, as well as BMW's exemplar vehicle, are attached as Exhibit 3.

It is also important for the court to realize that the component parts of the fuel system that are to be removed are not going to be damaged or altered in any manner. As laid out in Paragraph F, Steps 1 through 15 of Mr. Stilson's revised protocol, any so-called destruction or disassembly will be performed on the exhaust pipes or exhaust pipe heat shield, which are not components that are the subject of any defect allegations. Rather, the exhaust pipes and shield may be cut for the very purpose of permitting the fuel tank to be removed in its present condition. The removal of the fuel tank does not involve doing any damage to the fuel system components that are the subject of design defect claims. In actuality, removal of the tank and related fuel system parts operates to the benefit of experts for both Plaintiff and BMW because it will permit them to fully examine the fuel system and any damage, or lack of damage, done to the areas not currently visible. Doing so will permit experts for both sides to have a foundation and basis for whatever opinions they proffer.

Accordingly, because the subject vehicle's appearance has already been well-documented, because a lay jury cannot determine whether the vehicle was defectively designed just by looking at it, and because no damage will be done to the fuel system components that are in issue, Defendants will not be prejudiced by Plaintiff's proposed removal of the vehicle's fuel tank. However, denying Plaintiff the opportunity to remove and inspect the vehicle's fuel tank in this case would cause Plaintiff undue prejudice by preventing Plaintiff from ascertaining the truth and

hindering Plaintiff's ability to present well-founded expert opinions at trial.

The existing condition of the undercarriage of the car has been documented and preserved in great detail. However, no person can see all sides of the fuel tank as currently positioned. The tank is wedged into an area specifically designed for placement of the tank, and is completely surrounded by other component parts of the vehicle. Accordingly, removal of the fuel tank is necessary for full inspection, and doing so will not result in any legitimate prejudice to Defendant, BMW.

**4.     There Is No Realistic Alternative Method of Obtaining the Evidence Sought.**

Defendant BMW opposes removal of the vehicle's fuel tank because they claim the vehicle's unaltered condition is their best evidence that the vehicle was designed properly. However, this argument is not persuasive. The appearance of the vehicle condition has already been well-documented through photographs, videotapes, measurements and visual inspection. Defendant's argument is further flawed by the fact that it is well beyond a layperson's knowledge to determine whether the design of the vehicle was unreasonably dangerous by merely viewing the subject vehicle. See *White v. Cooper Tools, Inc.*, 2010 U.S. Dist. LEXIS 33815, 8 (D.S.D. Apr. 6, 2010) (finding plaintiff's argument that the disputed chain link itself was their best evidence of a defect unpersuasive because "it is beyond a layperson's knowledge to determine just by looking at a chain link whether the link is defective"). Federal Rule of Evidence 702 requires experts with scientific, technical, or other specialized knowledge to explain why the vehicle's design was dangerous. In fact, as discussed above, that is the very reason that the tank needs to be removed, i.e. so experts on both sides can fully and properly evaluate the performance of the fuel system during this crash. The Supreme Court of Illinois has recognized the need for this type of discovery, and has sanctioned far

greater destructive inspection and testing than involved here. *Sarver v. Barrett Ace Hardware,* 63 Ill.2d 454, 349 N.E. 2d 28 (1976).

Defendant BMW has argued that an alternative to removing the fuel tank is to use a scope to look at it. However, Mr. Stilson addresses this rather unusual suggestion in paragraphs 14 and 15 of his Declaration, attached hereto as Exhibit 1. As he states in paragraph 15:

> Using a scope with a camera would accomplish nothing in terms of determining how and where the fuel tank failed. The fuel tank has extensive fire damage and some crush areas, we cannot see under the fuel tank straps, we cannot see how the fuel tank interacted with the underbody areas of the vehicle, and a portion or all of the top of the tank has been burned away. It is only with removal of the tank that we can see the entire surface areas of the remaining portion of the tank and the surrounding environment and components that may have compromised the tank and contributed to the fire. Even if we used a scope, I would still have to remove the tank to inspect it and the vehicle body components that surround the tank. Those areas could never be completely inspected with a scope. I also have to remove the fuel tank in order to position an undamaged exemplar tank in that space in order to evaluate how the vehicle components may have interacted with, and compromised, the existing fuel tank.

Furthermore, as discussed above, removal of the fuel tank really does not cause any prejudice to Defendant. The fuel tank will not be damaged in any manner simply by removal, and the current appearance of the vehicle components that need to be slightly altered to permit removal has been extremely well-documented in photographs, videotapes and measurements.

As discussed at length above, Defendant BMW and its experts have viewed, inspected, measured, photographed, videotaped and documented the post-collision condition of Mr. Scheinman's BMW on three separate occasions. Plaintiff is agreeable to permitting BMW to laser map the entire car, including the undercarriage area around the fuel system, prior to removal of the fuel tank. BMW can be present for, participate in, and videotape the removal process. Courts have regarded the ability to record the procedures as a safeguard. See, e.g., Spell, 155 F.R.D. at 588; *Ostrander*, 119 F.R.D. at 421. For instance, in *Ostrander*, 119 F.R.D. at 421, the court's order

allowed the parties to videotape or photograph the destructive proceedings. Similarly, the court in *Spell*, 155 F.R.D. at 588, imposed a duty on the parties to "fully videotape each test from its inception to its conclusion." In *Home Depot*, 235 F.R.D. at 617, the original state of the object was also preserved through videotape and photography.

All of these forms of documentation can be shown to the jury at trial. BMW also has an exemplar vehicle on which Defendant BMW can demonstrate the pre-collision appearance and layout of the fuel system and entire undercarriage. BMW has numerous design drawings for every aspect of this vehicle. Under such circumstances there are ample safeguards in place to prevent any realistic prejudice to BMW's ability to present evidence at trial. To the extent there is any minimal prejudice, it is far outweighed by Plaintiff's right and responsibility to have his experts fully and properly examine the fuel system in support of their expert opinions in accord with Federal Rule of Civil Procedure 26(b).

## **CONCLUSION**

WHEREFORE, Plaintiff asks that this Court order that Plaintiff and his experts may proceed with all steps of Mr. Stilson's revised teardown protocol dated October 31, 2012 and attached as Exhibit E to Plaintiff's Motion to Compel Inspection and Removal of Fuel System Component Parts (Document 275).

|  |  |
|---|---|
|  | s// Richard F. Burke, Jr. |
| Richard F. Burke, Jr. | Richard F. Burke, Jr. Bar Number 03121588 |
| Shannon M. McNulty | Attorney for Plaintiff MURRAY SCHEINMAN, |
| Attorneys for Plaintiff | Plenary Guardian of the Estate and Person of |
| CLIFFORD LAW OFFICES, P.C. | JEFFREY J. SCHEINMAN, a Disabled Person |
| 120 North LaSalle Street, Suite 3100 |  |
| Chicago, Illinois 60602 |  |
| (312) 899-9090; (312) 251-1160 (Fax) |  |