IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person,<br><br>              Plaintiffs,<br><br>vs.<br><br>SAMUEL G. FRANKE, et. al.<br><br>              Defendants. | No. 09 CV 5340<br><br>Judge James Holderman<br>Judge Magistrate Susan E. Cox |

## BMW NA AND BMW AG'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S REQUEST TO USE DESTRUCTIVE MEASURES TO REMOVE FUEL SYSTEM COMPONENT PARTS

NOW COME the defendants, BMW of NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (jointly referred to hereinafter as "BMW"), by their attorneys, James K. Toohey and Timothy R. Couture, and in Response to Plaintiff's Supplemental Brief in Support of Plaintiff's Request to Use Destructive Measures to Remove Fuel System Components state as follows:

### FACTS

On July 3, 2008, Plaintiff was stopped at a red light in his BMW 335i convertible facing North on US 41 at IL 22 in Highland Park, Illinois. At that time a tractor trailer operated by Defendant Samuel Franke and weighing approximately 75,000 pounds approached from the rear at up to the 50 mph speed limit. The truck driver never applied the brakes before striking the rear of Plaintiff's approximately 4,000 pound BMW. Due to the lack of braking and bumper height differences, the tractor went over the bumper/frame of the BMW, penetrating deeply into the BMW sheet metal and pushed the rear of the Scheinman car down. Both vehicles were engaged together with the truck pushing the rear section of the BMW down into ground contact as they went through the large intersection, over a curb on the northeast corner, taking down a traffic sign

1

and continuing for several hundred feet until coming to rest. As evident from the photos presented in Plaintiff's supplemental brief, the force of the impact caused massive intrusion of the truck into the rear of plaintiff's car, resulting in the release of fuel. The effect of ground contact can be seen by massive abrasions on the undercarriage metal and tank. Franke, observing that the BMW had caught fire, backed his truck off the BMW, then did nothing further to assist Plaintiff. However, a Good Samaritan standing in a gas station located on the southwest corner of the intersection ran across the intersection and up the road to the BMW, opened the driver door and pulled Plaintiff from the car. Despite his heroic effort, Plaintiff sustained 2nd and 3rd degree burns over 16% of his body and brain injuries as described in Plaintiff's Supplemental Brief.[1] The BMW's saddle bag fuel tank is made from polymers and much of the tank melted in the ultimate burn out of the vehicle.[2] See, generally, Exhibit #1, Noble Supplemental Affidavit dated November 28, 2012, ¶¶ 15-16. (Counsel has added facts relating to what the participants at the scene did immediately after the impact based on essentially undisputed evidence learned in discovery.)

Plaintiff hired counsel within days and filed suit against the driver and trucking company and others within a week of the collision alleging negligence and willful and wanton misconduct by Franke, his employer, and others he claims bear legal responsibility as shippers of the goods with which the trailer was loaded. Plaintiff filed a separate suit against BMW a year later alleging the seat and fuel system claims identified in Plaintiff's Brief. These two separate actions are now consolidated before this Court.

The plaintiff has had custody of the vehicle since the accident, and retained consultants who inspected the vehicles before suit against BMW was filed. Plaintiff's consultants had a joint

---

[1] Plaintiff's treating burn specialist offered no opinion when asked if the burns are from radiated heat or flame contact. Despite Plaintiff's contentions that the alleged seat failure caused additional exposition to fire, burn expert Richard Gamelli specifically testified that he had no opinions on that issue.
[2] An on-site police video captures an intense inferno that erupted after Plaintiff had been removed and that consumed much of the vehicle.

inspection in August, 2011 with consultants retained by Franke and BMW and an in-house engineer from BMW.  BMW produced an undamaged exemplar vehicle for that inspection. After entry of a protective order, BMW AG produced all requested technical data and pre-production testing of the vehicle and relevant vehicle systems. Plaintiff also deposed technical representatives employed by BMW AG and BMW NA.

On or about July 27, 2012, Plaintiff provided a protocol for the proposed removal of the fuel tank. See Exhibit #2 – Stilson Protocol #1.  The BMW Defendants agreed to allow Plaintiff to proceed with the proposed protocol, but required that their fuel tank consultant, Mark Noble, be present to monitor.   The session was eventually conducted on October 31, 2012.[3]  The Stilson "teardown protocol" was to "follow the service manual procedures except where damage prevents it. In that case, the least intrusive procedure will be taken by agreement of parties."  See Ex. 2, introductory paragraph.

Mr. Noble and BMW counsel Tim Couture appeared at the October 31, 2012 session to observe.  Stilson did not have or consult the service manual.  See, Noble Supp. Affidavit Exhibit #1, ¶9.  He successfully disassembled the two oblique bars by removing the bolts.  He then asked for a power cutting tool and stated his intention to cut the dual exhaust pipes with the cutting tool. Exhibit #3, Declaration of Timothy Couture, ¶3.  See also Exhibit #4, Noble Affidavit dated November 14, 2012.  At that point, Noble expressed his concern to Couture that Stilson was not following the teardown process, but instead appeared bent on doing maximum destruction to the evidence.  After permitting Stilson to make a cut in the exhaust pipes, BMW's representatives balked when Stilson indicated he would use the cutting tool to remove any of the other parts he confronted until he was able to get to and remove the fuel tank. See Exhibit #1 ¶¶7-12, and Exhibit #3 ¶¶3-10, 13.

---

[3] Stilson's illness set the scheduling back for several months.

Mr. Noble has two opinions that are relevant to this issue: First, maintaining the integrity of the entire undercarriage of the vehicle in its post-collision condition as a unitary assembly is essential to the BMW Defendants' defense. Ex. 1, ¶3, 15-16. At trial, Mr. Noble will seek to reconstruct the effects of the crash on the fuel system as an integrated crash management system and only with such evidence maintained intact can he show the jury step-by-step how the system was intended to manage even high crash energies. Only with such evidence maintained will he be able to demonstrate for the jury the effect of this particular high speed impact by the 75,000 pound truck and the effect that override impact had on pushing the underside rear of the BMW down into abrading contact with the pavement and a road sign and curb over which it was pushed while bearing the truck weight. *Id.* at 15-16. It is BMW's and its consultant's view based on long experience in prior trials that the vehicle shown in its post-crash condition is the most reliable evidence in the case, and that the presentation of such evidence to the jury in that condition is the most compelling. *Id.* at 16. The vehicle does not forget. It does not suffer the limitations of an eye witness who witnesses an event that is complex and over within seconds, that is wrapped in associated shock and trauma of the horrific event. It is not subject to uncontrolled changes as the human mind stores and resorts its memories, elevating some and reducing others in importance and consciousness.

Second, because of the condition of the vehicle underbody, including the fact that the entire left side of the tank melted away during the post crash inferno, all parts of the fuel system are either presently visible or, at worst, will be visible by cutting a very small opening in the right side of the tank. See Exhibit #1, ¶¶ 17-18.

Faced with what appeared to be a significant corruption and loss of this evidence by Stilson's Sawzall cutting tool, BMW objected and asked Stilson to put in writing exactly what he

4

wanted to see that he could not see without major cutting and would he proposed to cut. Mr. Stilson refused. Noble proposed to Stilson alternative ways that he could gain access to and see all parts of the fuel system, including use of mirrors and scopes. Plaintiff refused to discuss or comply with that request. Instead, Mr. Stilson told Plaintiff's counsel to go to court. See Exhibit #1, ¶ 7(d). Exhibit #3, ¶8. Consistent with Plaintiff's protocol which stated that the method of "teardown" would proceed "by agreement of the parties", BMW counsel then exercised his clients' right to disagree with Plaintiff's methods. Stilson's related claim, that he explained to Noble, and Noble agreed to, each step Stilson would take and only BMW counsel objected, is equally baseless. Noble attended the teardown as technical consultant to BMW, Couture as its counsel. It was Noble who raised his technical concerns to Couture about Stilson's apparent intent to destroy evidence. Mr. Couture addressed BMW's position in reliance on Mr. Noble, stating Noble's concerns and BMW's objections to violations of Stilson's own protocol. Noble Supp. Aff. – Exhibit #1, ¶¶ 7-12, Couture Declaration, Exhibit #3 ¶¶ 3-10, 13.

When the impasse became obvious, BMW counsel requested that each side appear on video to explain their respective positions. Plaintiff's counsel and Mr. Stilson refused. *See*, Exhibit #1 at ¶ 7(d).

## **MOTION TO COMPEL**

Plaintiff thereafter filed the instant motion to compel. Plaintiff also offered a second protocol authored by Mr. Stilson which, while being more detailed, offered no changes or compromise on Stilson's intention to use destructive measures to remove the subject fuel tank. See Exhibit #5 – Stilson Protocol #2. Despite BMW's counsel emailing Plaintiff's counsel that his motion violated Local Rule 37.2 and that neither of BMW's attorneys were able to attend on the date and time noticed, Plaintiff insisted the motion would be presented. As events have evolved,

5

Plaintiffs' refusal to back off Stilson's demand that he have unfettered right to destroy whatever he deems necessary in order to get the tank out reveals that no effort at Rule 37.2 compliance would have changed anything. Despite BMW's repeated attempts to convince Plaintiff to seek less destructive means to visualize what his expert wants to see, even so far as providing case law and describing how far short Plaintiff has come in complying with established criteria for destructive testing, Plaintiff has rejected all alternatives. Plaintiff's counsel and Mr. Stilson repeat only their insistence that they *must* be allowed to proceed with the planned destruction without exception or alternatives. See Plaintiff's original Reply, Document #279, and the two affidavits offered by Mr. Stilson, Exhibits #6 and #7 respectively.

Recognizing that no agreement was to be reached, the Court advised that the matter would be decided based on written submissions. Plaintiff was assigned the opening brief because Plaintiff has the burden of proof in establishing Plaintiff's need for the evidence to prove his case, the fact that destruction will not unduly prejudice the opponent, and that the methods are the least destructive so as to minimize the destruction and prejudice to the opponent.

## STILSON AFFIDAVIT

Plaintiff's request to destroy the vehicle undercarriage is based solely on Stilson's affidavit, see, Exhibit #7. BMW counsel and consultant are concerned, particularly about Mr. Stilson and his insistence that BMW agree to allow him to cut apart the underbody of the vehicle, based on past experiences with him and his view of what is appropriate and what is not under good practices. See, Exhibit #1, ¶ 10, 14-18, 20.

At the last hearing, BMW counsel advised the Court that Mr. Stilson was the engineer who had destroyed evidence in a case that led to the Illinois Supreme Court establishing that pre-suit destruction of evidence without notice to and agreement of the opponent was sanctionable.

6

*Shimanovsky v. General Motors Corp.*, 181 Ill.2d 112, 692 N.E.2d 286 (1998). Plaintiff's counsel then expressed outrage at such a charge being leveled against Mr. Stilson, representing to the court that Mr. Stilson was not the expert in that case responsible for destruction of evidence, but rather he was just another expert in the case who had nothing to do with such evidence destruction. Credibility is at the heart of the issues before the Court. The respective statements of counsel must be read against the *Shimanovsky* case in light of the fact that the credibility of the expert affidavits is at the core of the parties' respective positions. Stilson makes statements throughout his affidavit that what he proposes is a "teardown," that he proposes to follow professionally accepted scientific methodologies in conducting this "teardown," and that he has done so jointly on two hundred prior occasions with defense experts who had agreed to them. By contrast, Noble[4] avers that what Stilson now proposes is not a "teardown," as that word is used in the relevant scientific community, but a destructive disassembly. Moreover, Stilson's "plan" does not follow accepted methodology, or any methodology at all, unless that methodology is one dictated to the destruction of evidence. See, Exhibit #1, ¶¶ 7-8, 10-12. 14, 18.

Contrary to Plaintiff's counsel's representation, Stilson was not just another expert in *Shimanovsky* who had no involvement in the improper handling, disassembly and destructive testing. He was intimately involved in each step of the process from disassembly, to providing samples for metallurgical analysis with advice that he needed destructive testing to reach an opinion, to actually directing the testing (a fact disputed between Stilson and the metallurgist), to relying on the results of the testing for his defect opinion. At each step, he was in clear violation of the American Standards for Testing and Materials ("ASTM"), thus violated accepted engineering and scientific methodology. The Supreme Court noted most of these facts.

---

[4] Mr. Stilson repeatedly points out in his affidavits that he has been consulting for over 40 years. Similarly, Mark Noble has over 40 years of experience working in the field of automotive mechanics and engineering including the analysis of fuel systems and structures of automobiles. See Exhibit A to Exhibit #4.

7

*Shimanovsky v. General Motors,* 181 Ill.2d at 115-115, 692 N.E.2d at 287 (1998). The appellate court opinion provided even more details. *Shimanovsky v. General Motors Corp.*, 271 Ill. App.3d 1, 2-5, 648 N.E.2d 91, 92-93 (1994):

> On July 18, 1985, eleven days after the accident, plaintiffs' counsel retained John Stilson. . . . Stilson inspected many parts of the automobile, including the: front and rear suspension; linkage, spindles and linkage connections for the front suspension; tires; steering column shaft connector; steering gear exterior; and brakes. This inspection did not show any defect that would result in an inability to control the automobile.
>
> Stilson, however, asked plaintiffs' counsel for the authority to disassemble and inspect the steering gear itself, as the steering gear is an external component with internal systems. Stilson knew that if he found a defect after disassembling the steering gear, plaintiffs probably would file a product liability suit. Stilson did not recommend to plaintiffs' counsel that GM be notified of the disassembly of the steering gear. Stilson's firm is a member of the American Society for Testing and Materials ("ASTM"), whose guidelines require that an expert recommend to his or her client that other parties in interest be notified and afforded the opportunity to observe and record any examination likely to alter the state or condition of an item that may become involved in a product liability suit.
>
> On September 20, 1985, Stilson drained the power steering fluid from the steering gear, cut the hydraulic power steering lines and removed the steering gear from the automobile. Stilson then disassembled the steering gear. Stilson's inspection indicated that various components of the steering gear had been damaged as a result of the accident. . . . Stilson recommended to plaintiffs' counsel that a metallurgist be retained to determine whether these grooves were caused by the accident.
>
> Plaintiffs retained Lyle Jacobs as their metallurgist. On September 23, 1985, Jacobs received the steering gear housing, valve body and valve seals for analysis. Jacobs determined that the steering gear housing and valve body would need to be sectioned or cut because there was no nondestructive way to determine the cause of the grooves in the inner bore of the housing.
>
> In their discovery depositions, Stilson and Jacobs disagreed over who authorized the sectioning of the steering gear components. Stilson indicated that Jacobs and plaintiffs' counsel made the decision. Jacobs indicated that he had sought authorization from Stilson because "sometimes by court order you are prohibited from doing any destructive testing." Jacobs indicated that Stilson mentioned the possibility of litigation. Like Stilson's firm, Jacobs was a member of ASTM. Indeed, Jacobs was a member of the ASTM committee that drafted the aforementioned testing disclosure guidelines. Stilson and Jacobs, however, indicated that they were not aware of the ASTM guidelines in 1985.
>
> Jacobs performed destructive testing of the steering gear components in October 1985. The steering gear housing was sectioned. The valve body, with three attached seals, were also sectioned. Five cross-section samples of the housing and valve body were mounted in

bakelite molds. Other cross-section samples were subjected to chemical analysis. Based on the aforementioned tests, Jacobs concluded that the grooves were the result of long-term wear, as opposed to impact damage. Jacobs provided a report and 27 photographs in support of his conclusion. In turn, Stilson told plaintiffs' counsel that the wear and deterioration in the steering gear assembly caused the accident. Stilson opined that the wear marks compromised the steering gear seals, causing internal leakage of power steering fluid, resulting in the malfunction of the steering gear. Plaintiffs filed suit after receiving these opinions.

That was the same John Stilson presented here as Plaintiff's sole affidavit in support of his request to cut the undercarriage of the subject vehicle to pieces. Stilson contends here that what he proposes is a simple "teardown" that he will do in exactly the manner he has done 200 prior "teardowns" following accepted scientific guidelines for "teardown procedures" to which opposing experts in those 200 cases have agreed. Exhibit #7 - Stilson Aff., ¶¶4-9. Mr. Noble disagrees. First, as noted, this is not a "joint teardown" with BMW as Stilson claims, but is a process proposed solely by and conducted to date exclusively by Plaintiff's experts. See Exhibit #1, ¶4.

Second, what Stilson describes as a "teardown" is not a teardown as defined in the automotive engineering and technical community. A teardown is non-destructive and done in accord with the service manual. Stilson's proposal is a destructive disassembly, a procedure entirely different than a teardown, as defined in the relevant community of automotive engineers and technicians.[5] See, Noble Supp. Aff. – Exhibit #1, ¶6(a)-(d). Third, Mr. Noble notes that Stilson's claim that he is following accepted methodologies is baseless. In fact, as Noble notes, either Mr. Stilson has no methodology at all or it based solely on a desire to cut the vehicle undercarriage into as many pieces as possible. *Id.* at ¶ 8.

Third, despite Stilson's refusal even to address the use of less destructive methods, Noble has made a presentation through a series of nine photographs of the critical vehicle parts with notes describing what can be seen at present and how access can be had to all areas about which Stilson

---

[5] Mr. Stilson repeatedly points out in his affidavits that he has been consulting for over 40 years. Similarly, Mark Noble has over 40 years of experience working in the field of automotive mechanics and engineering including the analysis of fuel systems and structures of automobiles. See Exhibit A to Exhibit #4.

9

has expressed interest in seeing. See Exhibit #8, Noble Presentation of Less Destructive Alternatives

## DISCUSSION

In general, production of evidence for the purpose of destructive testing falls within the purview of Federal Rule of Civil Procedure 34, which provides that: "A party may serve on any other party a request within the scope of Rule 26(b)(1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items . . . (B) any designated tangible things . . . ." *Pizza Hut, Inc. v. Midwest Mech*., Inc., 1988 U.S. Dist. LEXIS 890, at *2-3 (N.D. Ill. February 1, 1988); G*arcia v. Aartman Trans. Corp*., 2011 U.S. Dist. LEXIS 15065, at *4-6 (N.D. Ind. February 14, 2011); *Ostrander v. Cone Mills, Inc*., 119 F.R.D. 417, 419 (D. Minn. 1988).

The decision of whether to allow destructive testing is within the discretion of the trial court. *Dabney v. Montgomery Ward & Co*., 761 F.2d 494, 498 (8th Cir. 1985); G*arcia*, 2011 U.S. Dist. LEXIS 15065, at *4-6; *Ostrander*, 119 F.R.D. at 419; *Cameron v. District Court of First Judicial Dist*., 565 P.2d 925, 929 (Colo. 1977). The Court "is required to balance the interests to be served by destructive testing against the value of preservation of the evidence on behalf of the opposing party." *Ostrander*, 119 F.R.D. at 419. In making that decision, Court must exercise careful discretion by balancing rights of all parties. *Sarver v. Barrett Ace,* 1976 Ill. LEXIS 334, 63 Ill.2d 454. The guidelines outlined in G*arcia*, 2011 U.S. Dist. LEXIS 15065, at *4-6; *Mirchandani v. Home Depot USA, Inc*., 235 F.R.D. 611, 614 (D. Md. 1956)(citing *Cameron*, 565 P.2d at 929) have been applied in most cases:

**1.     Movant must show that destructive testing is necessary to prove his case – a more stringent standard than applicable to other discovery requests.** *Naresh v. Home Depot***, 235 F.R.D. 611; 2006 U.S.Dist LEXIS 35468, p. 4 (D.C. Md.)**

Necessity does not include gaining evidence to bolster an expert opinion or in search of other intriguing, albeit irrelevant information. *Id. at 4*. Courts have emphasized that the testing must be necessary to the moving party's theory of the case. *Hawthorne v. Michelin Tire Corp.*, 1996 U.S. App. LEXIS 29105, at *11-12 (9th Cir. November 5, 1996). The testing must "do more than strengthen an already established claim or defense." *Id*. Such a standard is more stringent than the standard applied to ordinary discovery requests. *Mirchandani*, 235 F.R.D. at 615.

**2. Non-movant's ability to present evidence at trial must not be substantially hindered and non-movant must not be substantially prejudiced in any other way.**

Courts have placed special emphasis on this factor, recognizing the need to protect the right of litigants to preserve evidence from unreasonable impairment. G*arcia*, 2011 U.S. Dist. LEXIS 15065, at *4-6 (citing *Sarver v. Barrett Ace Hardware, Inc.*, 349 N.E.2d 28, 31 (Ill. 1976) and *Petruk v. South Ferry Realty Co.*, 2 A.D.2d 533, 537 (N.Y. App. Div. 1956)); *Houseknecht v. Zagel*, 445 N.E.2d 402, 407-08 (Ill. App. Ct. 1983). In general, the proportion of the evidence consumed in testing is a factor in the prejudice experienced by the non-moving party. If the whole piece of evidence is consumed, the factor may well balance in favor of unacceptable prejudice. G*arcia*, 2011 U.S. Dist. LEXIS 15065, at *8; *Ostrander*, 119 F.R.D. at 419. Bad faith is also a factor in determining prejudice to the non-moving party. *Cameron*, 565 P.2d at 930.

**3. Movant *must* consider available less destructive alternatives.**

Although this requirement is an essential element of every analysis in every case, Plaintiff has been steadfast in his refusal even to address the issue. By contrast, BMW has repeatedly offered non-destructive alternatives, and Noble has presented those alternatives. *See* Exhibit #8

**4. Movant must assure adequate safeguards to minimize prejudice to non-movant's presentation at trial.**

11

A survey of the cases reflects that in almost every case in which the motion was granted, limited or denied, demonstrates that in almost every case in which destruction was allowed, it involved the need for some type of product testing to prove plaintiff's case. Here, Plaintiff does not even suggest the need for testing and has made no showing of a need for a disassembly that is destructive of valuable evidence demonstrating how and why fuel leaked:

Federal Appeals Court decisions allowing destructive testing: none.

State supreme court decisions allowing testing: Illinois Supreme Court: *Sarver v. Barrett Ace*, 1976 Ill. LEXIS 334, 63 Ill.2d 454 (1976) (cut small pie-shaped wedge from hammer face and drilled out three smalls samples from hammer side to examine structure microscopically, test for hardness, and do chemical analysis). Colorado Supreme Court: *Cameron v. District Court*, 1977 Colo. LEXIS 791, 565 P.2d 925 (1977) (cut out portions of failed tire for metallurgical exam of tire wires).

State appellate decisions allowing testing: New York Appellate: *Petruk v. South Ferry Realty*, 157 N.Y.S.2d 249 (NY App Div 1956) (anchor bolt removal and destructive excision of pieces for strength test, microscopic examination, and chemical analysis). *Foster-Lipkins v. Suburban Propane*, 339 NYS 2d 581 (NY App Div 1973) (destructive test of components of propane gas cylinder).

Federal District Court opinions allowing testing: *Garcia v. Ruan Transportation*, 2011 U.S.Dist. LEXIS 15065 (N.D.Ind. 2011) (4"x4"x2" piece of metal cut from ladder for hardness and metallurgical testing by SEM). *White v. Cooper Tools*, 2010 U.S. Dist. LEXIS 33815 (D.C. S.D, 2010) (unspecified destructive testing on failed chain link where no alternative less prejudicial measures were proposed). *Mirchandani v. Home Depot*, 235 F.R.D. 611; 2006 U.S.Dist LEXIS (D.C. Md.2006) (locking bolt removal from ladder for hardness and metallurgical testing). *Nugent v. Hercules Off Shore,* 1999 U.S. Dist. LEXIS 20122 (E. D. La.1999) (six inch section of a failed lanyard cut to allow for viewing under SEM). *Spell v. Kerndall-Futuro Company*, 155 F.R.D. 587 (E.D. Tex. 1994) (small section of steel cut from a crane's metal tube for tensile strength testing). *Ostrander v. Cone Mills, 1988 U.S. Dist LEXIS 3718 (D.C.Minn 1988)* (3"x10" squares *c*ut from garment to test for compliance with federal flammability standards). *Pizza Hut v. Midwest Mechanical*, 1988 U.S. Dist. LEXIS 890, Holderman, J. (ND Ill. 1988) (light fixture opened to examine wiring for correct splicing).

State trial court opinions allowing testing: *Edwardes v. Southampton Hospital Assn.,* 278 NYS 2d 283 (NY Sup Ct 1967) (destructive test of surgically inserted intramedullary rod). *Sault v. Domestic Corp.* 2011 Conn. Super. LEXIS 2589 (2011) (unreported trial court opinion from Connecticut allowed disassembly of an awning to examine component parts).

Federal Appeals Court decisions denying requests to destructively test :

*Hawthorne v. Michelin Tire*, 1996 U.S.App. LEXIS 29105 (9th Cir. 1996) (destructive testing denied because plaintiff's expert already had formed opinion).
*In re Newman,* 278 F.2d 971 (Fed. Cir. 1986) (PTO prohibited from doing destructive testing, because test did not go to issue of whether design worked and, thus, was patentable).
*Dabney v. Montgomery Ward & Co.*, 761 F.2d 494 (8th Cir. 1985) (destructive testing of furnace louvres not permitted where other portions of furnace had been destructively tested and movant did not establish that further testing would provide evidence necessary to its case).

<u>State Appellate Court decisions denying requests to destructively test</u>: Illinois: *Houseknecht v. Zagel*, 1983 Ill. App. LEXIS 1440, 445 NE2d 402 (1st Dist. Ill. 1973), (state enjoined from seizing materials from accident site and holding them to do destructive testing).

<u>Federal District Court decisions denying or limiting requests for destructive testing</u>: *Guerrero v. GM, 2007 U.S. Dist. LEXIS 831110 (E.D. Cal. 2007)* (refused to allow unspooling of seatbelt webbing until jury had opportunity to view seatbelt in its post-accident state).
*Bostic v. Ammars*, 2011 U.S. Dist. 7748 (E.D. Kent. 2011) (disallowed the destructive taking of "plug-samples", but allowed disassembly of a chair to allow examination of hidden component parts, subject to assurance that chair could be re-assembled after inspection to its original post-accident condition).

Again, unlike the cases cited above, Plaintiff proposed no testing. Worse , he will not even identify exactly what he wants to see, why it is important for him to see it, or what he needs to remove. He simply adamantly insists that he be allowed to use a metal cutter to cut up the undercarriage of the vehicle to remove the fuel tank merely because he wants to see it. In doing so, he surely will destroy the entire undercarriage, exhaust system and fuel tank as they exist post-accident despite that these are the key components at issue in this case. Plaintiff does not satisfy the first factor. He has not shown need, he has not demonstrated that pulling the tank will lead to evidence he needs to prove his case.

Plaintiff does not satisfy the second factor. To the contrary, Defendants have provided evidence that their case will be substantially prejudiced if the key parts at issue are cut to pieces or even destructively disassembled. The vehicle was designed such that its component parts would work together and an integrated unit to provide the structural integrity and crashworthiness to withstand a rear-end collision. See Ex. 1, ¶ 15. As such, Defendants need to show the jury the

13

vehicle as a post-accident whole, including the spatial relation of the damaged automotive components and the positioning of undercar abrasions. They need to show the position of the tank and components and to explain what parts were damaged by the scraping of the underbody and what parts were melted away in the fire long after the initial release and fire. See Exhibit #1 ¶¶ 15-16. The importance of this is highlighted by Stilson's Affidavit in which he asserts that he intends to remove the subject fuel tank so he can "position an undamaged exemplar tank in that space in order to evaluate how the vehicle components may have interacted with, and compromised, the existing fuel tank." See Exhibit #7 ¶ 15. If Mr. Stilson wishes to determine how the vehicle components interacted with the existing fuel tank, all he needs to do is look at the existing tank and the components as they currently exist in relationship with one another. The relationship of the present tank and its environment is precisely why the tank needs to remain in that environment. The only thing to be accomplished by removal of the subject tank and replacement with an exemplar tank is to confuse and mislead the jury. *See* Exhibit 1, ¶ 19.

Photographs will not allow the jury to develop an adequate idea of the state of the post-accident vehicle. Bad faith also becomes an issue is the evaluation of this factor. Plaintiff made minimal effort to carefully remove the tank before calling for cutting tools. He and his consultant were hostile to *any* attempts to limit the destruction, and would provide little or no information to explain why the destruction was necessary.

Turning to the third factor, Plaintiff's Supplemental Brief asserts that Plaintiff and Stilson believe that their proposed destruction is necessary in order to see portions of the tank that Plaintiff claims cannot be visualized with the tank in place.[6] BMW disputes that claim. Defendants have repeatedly suggested alternative less destructive, and thus, less prejudicial, methods of examining

---

[6] As noted in both Exhibits #1 and #3, at the October 31, 2012 session and thereafter, Plaintiff's counsel and Mr. Stilson flatly refused to explain what evidence they needed that required the removal of the tank.

any area of the tank and surrounding component parts of the car that remain hidden from plain view: scopes and cameras could be utilized to visualize such areas. *See* Exhibit #1, ¶¶ 16-18; *see*, also, Exhibit #8 in which Noble demonstrates the need for the maintenance of the evidence in its present condition and the means by which Stilson can see all the parts he claims must be visualized. While Plaintiff and Stilson complain that such methods might not permit them to see all that they "need" to see, the case law leaves no doubt that the movant must attempt less destructive measures then demonstrate the inadequacy of that approach. Procedures that destroy evidence should only be considered after all other non-destructive methods are exhausted, and only when a specific necessity for the information to be obtained by that destruction outweigh the general rule for preservation.

Turning to the final factor, BMW Defendants have provided compelling evidence that the whole post-accident vehicle is crucial for Defendants use at trial. See Exhibit #1 ¶¶ 15-16. As such, allowing Plaintiff to cut out major portions of the undercarriage in an effort to remove the fuel tank does not adequately safeguard Defendants. Viewing the evidence presented against the four relevant factors, Plaintiff cannot be permitted to proceed with his plan.

WHEREFORE, Defendants BMW of NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT pray that this Honorable Court deny Plaintiffs' Motion to Compel destructive disassembly of the undercarriage and fuel system components and to deny Plaintiff's request to remove the seat unless he first submits a step-by-step protocol for doing so.

    Respectfully submitted,
    JOHNSON & BELL, LTD.

    By: /s/ James K. Toohey_____
    One of the Attorneys for BMW of NORTH AMERICA, LLC
    and BAYERISCHE MOTOREN WERKE AG

15

James K. Toohey
Timothy R. Couture
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
Telephone: 312/372-0770

**EXHIBITS TO BMW RESPONSE TO PLAINTIFF'S BRIEF**

Exhibit #1 - Supplemental Affidavit by Mark Noble dated November 28, 2012

Exhibit #2 – Stilson Protocol #1

Exhibit #3 – Declaration of Timothy Couture

Exhibit #4 – Affidavit of Mark Noble dated November 14, 2012

Exhibit#5 – Stilson Protocol #2

Exhibit#6 – Affidavit of John Stilson dated 11/21/12

Exhibit #7 – Affidavit of John Stilson dated 12/7/12 (attached to Plaintiff's Supplemental Brief)

Exhibit #8 – Noble Presentation Of Less Destructive Alternatives