# EXHIBIT 1

**Supplemental Affidavit of Mark M. Noble**

1. I am the same Mark M. Noble who submitted a prior Affidavit to the Court focused primarily upon the attempts made by John Stilson to remove the fuel tank from the subject vehicle structures.

2. I now have been provided with an affidavit executed by John Stilson. In it, he describes what he was doing at the time he was damaging the physical evidence of the vehicle's underbody by sawing surrounding parts in his attempt to remove the fuel tank. I have also reviewed the unattested representations made by Plaintiff's counsel, Richard Burke, and the Declaration of BMW counsel regarding certain discussions in which I was involved and about which these persons have commented.

**STILSON AFFIDAVIT AND PLAINTIFF'S COUNSEL'S COMMENTS**

3. Mr. Stilson is correct in stating that in post-crash situations, it is not uncommon that some parts may have to be moved or removed to gain access to a particular part for examination and/or testing. The issue arises on a case-by-case basis. Whether or how to move parts is dependent on the value of what is not otherwise reachable and the necessity of getting a part out of the vehicle for examination or testing. The Scheinman vehicle provides excellent examples of each type of evidence. The driver's seat will have to be disturbed to examine and test the seat recliner mechanisms. (*See*, Stilson Affidavit, ¶18, first and last sentences) By contrast, it is my opinion that a three dimensional viewing of the actual vehicle undercarriage with the fuel tank and surrounding parts in place is essential to the defense of this case.

4. Mr. Stilson repeatedly describes the teardown that he planned to conduct as a "joint teardown" (¶5), and that he offered an oral detailed description at the inspection to which I agreed until Mr. Couture interjected. That is simply not true. Stilson proposed the teardown. He wrote the protocol. After I reviewed the protocol, I advised BMW counsel that I had no objection, as long as I was present to assure that Stilson and his associates followed the teardown protocol. Specifically, I wanted to be assured that they would remove the designated parts by following the service manual, and only if that proved inadequate that they would use the least intrusive measures with the agreement of the parties.

5. I believe that it is important that I address three matters raised by Stilson:

   a. What do the terms "teardown" and "disassembly" mean in the context of a protocol for an examination of the vehicle in the context of post-collision analysis?

   b. What was my involvement at the first attempted disassembly?

   c. What can be done with little or no permanent destruction of the evidence?

6. Stilson describes his process as a "…teardown protocol [to] follow the service manual except where damage prevents it. In that case, the least intrusive procedure will be taken with agreement of parties."

   a. Definitions are important. In Stilson's affidavit, he seeks to blur the distinction between a teardown disassembly and destructive disassembly. (*See*, ¶¶ 5-8) They are materially different.

   b. The term "teardown", as used in automotive engineering and servicing, means disassembly according to the service manual, as, for example, an

engine teardown inspection where the engine is disassembled according to service manual procedures. This is common with cars, trucks, motorcycles, boats, and planes. It does not involve the planned destruction of anything other than incidental gaskets or other replaceable parts. The purpose is generally to be able to reassemble the engine for use. "Teardown" does not mean destroying parts.

c. In his original protocol for the October 31, 2012 inspection/disassembly, Stilson used the term "teardown" in precisely that manner, referencing a teardown according to the service manual and otherwise by the least intrusive means by agreement of the parties.

d. He lists the parts he will remove, not cut or destroy:

   i. Remove two oblique bars from their anchorages,

   ii. Remove the dual exhaust pipes forward of the tank rearward,

   iii. Remove the exhaust shield between the tanks,

   iv. Remove the driver's side and right side fuel tank straps, then

   v. Remove the fuel tank and, if loose, the filler neck.

7. Both Plaintiff's counsel and Mr. Stilson make repeated representations that Mr. Stilson described to me in detail what he planned to do at each step and that I had agreed, only to have BMW's counsel interject and object. That is not correct. Mr. Stilson offered no detailed description. Only after I asked him what he was planning to do, Mr. Stilson offered the general description that he was going to cut where he pleased, then decide what he would do next. At that point, I expressed my concerns to BMW counsel, who then objected in reliance

on my advice, expressing my concerns to Plaintiff's counsel and Mr. Stilson that what Mr. Stilson was preparing to do would not protect, but would destroy the evidence. BMW's counsel and I also reviewed the protocol and advised that Mr. Stilson's plan was not in accordance with his own protocol.

8. As Mr. Stilson acknowledges (¶ 9), his practice is to preserve the "disassembled parts." In fact, in my experience with Mr. Stilson, he has attempted to do what I believe he is doing in this case – to cut evidence valuable to Defendants into a less meaningful pile of scrap pieces, then claim he did so with the agreement of the other side.[1]

9. When Stilson and his associates began the disassembly, I was surprised that none of them had the service manual to guide them, as the protocol said they would. The first request Stilson made for my agreement was for the removal of the cross brace bolts. I agreed.

10. When I asked about the next step, he indicated they wanted to cut the exhaust pipes and then determine what would be done next. I alerted Tim Couture, BMW counsel, that Stilson planned to start cutting metal without having any specific procedure. Stilson's decision to cut the exhaust pipes well forward of the tank made it clear to me that he would not use the least destructive means and he would not consult with and obtain our agreement, as he stated he would in his protocol.

---

[1] Counsel note: His offering a protocol is intended to protect him from the charge of evidence spoliation, based on criticism of him and his prior practice of disassembling parts before suit was filed by the courts in *Shimanovsky v. General Motors Corporation*, 181 Ill.2d 112, 692 N.E.2d 286, *229* (1998).

11. After Mr. Couture had called and spoken with Mr. Toohey, his partner and co-counsel for BMW, he returned and asked Stilson to write down each step he planned to take and each part he planned to cut. I advised him that if he would tell us what he wanted to achieve, I would probably have some ideas about how to get to the evidence non-destructively. Stilson advised that he would cut what and where he wanted to get the tank out and that he would not state or write his step-by-step cutting and removal plan.

12. I again stepped away and spoke to Mr. Couture privately to advise him of my concerns. When we re-entered, Mr. Couture expressed my concerns. Stilson stated that we had no role to play other than what were in my view observers of his unscripted process. When we persisted with our objections that he first write down his new plan, Mr. Stilson said to shut down the inspection and instructed Mr. Burke to take the matter to the Court because he was adamant about doing it his way without explaining anything to us and certainly not considering our suggestions. Mr. Couture suggested that because we had a camera running to record the proceedings, they should state their reasons for insisting on proceeding with this new plan to destroy evidence and we would state the bases for our concerns and objections to Mr. Stilson's new plan to destroy evidence without regard to our concerns and without our having the opportunity to propose less intrusive methods. Mr. Stilson and Mr. Burke refused.

13. Mr. Stilson raises questions in his affidavit about being able to view the top surface of the tank. It is my opinion that he should be able to see that surface

with the fuel tank in its present position. If he cannot, he should identify specifically what he wants to see then attempt the least destructive method called for in his protocol. Only after exhausting all less destructive methods, should he even consider employing a cutting tool. Before identifying exactly what he intends to cut and where he will make the cut, he should identify exactly why he needs to cut it and how that cutting is necessary to gain access to information that he needs to prove some critical point regarding a defect that caused a fuel release. If the cutting will not gain him access to such potential proof or if access can be gained without such destruction, it is unnecessary and does not outweigh the prejudice its destruction will cause.

14. The remainder of Stilson's affidavit as to his plan is completely consistent with his conduct to date. He admits that he refused to write down what he planned to cut, claiming he had already written it down in the protocol. In fact, he offered an original protocol, and then failed to adhere to its terms. At the initial disassembly attempt, he refused to set forth a revised protocol, that is, describe specifically what and where he wants to cut. He has refused to place any limits on such cutting. Yet he wants to be able to say that he has consulted with me at each step before he engages in evidence destruction. His claim that he is complying with widely accepted scientific methodology is untrue. He is either making up his methodology as he proceeds, or he is bent on damaging evidence to prejudice Defendants. The proper scientific method of gaining access to the evidence without destroying it is described below.

15. **PREJUDICE TO DEFENDANTS**

This vehicle was designed, manufactured and tested with the underbody components as an integral system for managing collision energy during crashes in which it might be expected to provide protection to the occupants. This entire system of inter-related components were subjected to the forces and energy of this extraordinarily severe collision and functioned as an integral system whose components interacted as a whole to, among other things, optimize fuel system integrity.

16. Although I have not reached my final opinions as of this time, there are certain statements that I can make based on the physical evidence that I have observed in my inspection of both vehicles and the accident site. The Scheinman BMW was struck by a 76,000 pound truck at highway speeds of up to 50 miles per hour. By reason of its location, the surrounding structures and integrated design, the Scheinman BMW's fuel tank provided exceptional management of the forces and energy applied horizontally in this rear end crash. However, in addition to the enormous energy and application of force created by the impact into the rear of the BMW, the striking tractor-trailer overrode structures of the BMW and then dropped onto the rear of the BMW. This complicating factor exerted a downward force on the BMW that compressed the rear undercarriage of the BMW down onto the pavement as the two engaged vehicles crossed the intersection, then onto and across a raised curb, into and through a metal signpost, and then a substantial distance along the curb until the vehicles came to rest. In almost all such case, the

vehicle is the single most important piece of evidence in the case. It certainly is the most important physical evidence; and, in my opinion and the opinion of most of my peers, when damage to it is examined and tested by qualified experts, it is the most reliable. With the BMW's underbody having been pushed down onto the road and curb surface and pushed along for such a distance, the major damage is to the vehicle underbody and the major collision-induced damage to the tank is to the underside, including abrasions that created at least one tank opening in the bottom of the tank. There is little or no damage visible in any of the areas Mr. Stilson seeks to view except for some melting that occurred as result of the fire and not as a cause. It is these underbody components and the underbody as an integrated unit that BMW seeks to protect from destruction and that Mr. Stilson proposes to destroy. If Mr. Stilson cuts and separates these inter-related parts, Defendants will be deprived of the best evidence available to demonstrate to a jury what happened in this collision, as the vehicle and fuel tank performed as a unit.

**FAILURE TO DEVELOP AND USE LESS INTRUSIVE MEASURES**

17. Mr. Stilson has offered no evidence demonstrating a need to destroy the integrity of this valuable physical evidence. He recently explained in his affidavit that he wants to remove the tank to view the top surface of the tank and the underbody above it for possible interactions with the tank. This almost certainly can be accomplished without removing the tank. One side or the other of almost the entire tank surface is presently visible. Any part not directly visible can be viewed with lights, mirrors or a scope (a tiny camera

inserted through a small opening through which the examiner can see what the camera sees on a video screen). If there were any collision-induced penetrations in the top of the tank that Mr. Stilson has indicated he must examine, such opening would be seen by use of these techniques. Allowing for the possibility that it may be found in the course of the examination that the entire area Mr. Stilson wants to see cannot be visualized by these procedures, for example, if the scope could not reach and be articulated to see a particular point, Mr. Stilson could drill a small diameter hole through which he could insert the scope and create a clear view of the area in question not otherwise accessible. Any puncture caused to the top surface should be visible by these methods without the necessity of removing the tank.

18. The use of a scope is essentially the same technique used by surgeons who make a tiny incision to insert a camera (scope) and sometimes a fine surgical tool to perform a repair, thereby eliminating the need to make large incisions. This technique generally results in reducing damage to surrounding tissue and dramatically reducing residual internal and external scarring, resulting in a reduced healing time. Use of that technique in this case to examine difficult to reach places would have the same benefit of causing no or minimal damage to surrounding areas. That is the generally accepted scientific approach to such product inspections under such circumstances. The technique proposed by Mr. Stilson of cutting away parts without attempting to utilize these less intrusive methods is akin to surgeries performed before antibiotics and microsurgery, when removal of limbs was routine. His proposal is not an

accepted scientific method under the circumstances of this case with the availability of present day technologies.

19. Mr. Stilson also adds a new reason why he wants to remove the tank – to replace the tank with an exemplar. This would accomplish nothing that cannot be done by measurement or observation, except to possibly present a misleading condition that never existed.

20. Mr. Stilson has never stated that after his destructive removal of parts that the fuel system and surrounding structures could be replaced in their present locations and relative positions after being cut to pieces. The inability to do so would render the destruction final and irreversibly harmful to my ability to present my analysis of the performance of the fuel system.

**STILSON'S REFUSAL TO OFFER PROTOCOL FOR SEAT REMOVAL**

21. I do not understand why Mr. Stilson makes the assertion that he cannot write out a protocol for the removal of the seat. Based upon his having seen the vehicle on multiple occasions, it should be quite apparent to him, exactly what retaining bolts need to be cut and which might be removable with tools. The procedure should not be difficult, if Mr. Stilson makes a proper effort.

FURTHER, AFFIANT SAYETH NAUGHT

By: [signature]
Mark M. Noble

Sworn and signed before me this
28TH day of November 2012

[signature]
NOTARY PUBLIC

