# EXHIBIT 3

## Declaration Of BMW Counsel Timothy R Couture Regarding October 31, 2012 Destructive Testing

I Timothy R. Couture, one of the attorneys for the BMW Defendants in this case, and an officer of this Court, do declare and state as follows:

1. On October 31, 2012 I arrived at Dynamic Safety LLC at 10:00 a.m. for the planned 10:00 a.m. inspection/fuel tank removal. BMW consultant Mark Noble arrived approximately 10:15. Mr. Noble and I, along with counsel for Martin's Bulk Milk and his expert were kept waiting while Plaintiff's counsel Richard Burke, and his consultants met in a conference room until approximately 10:30 a.m.

2. Thereafter, we proceeded into Dynamic Safety's garage area. After photos were taken of the subject BMW vehicle on ground, it was raised on a lift, and more photos were taken. During that time period, Mark Noble pointed out that Plaintiff's consultants' protocol had not taken in to account that any efforts to remove the fuel tank would be impeded by the car's drive shaft.

3. Two metal cross braces were removed from the underside of the vehicle with an air powered torque wrench. Next, after the mechanic from Dynamic Safety seemed to make a few attempts at unbolting the exhaust system, Plaintiff's lead consultant, John Stilson, called for a Sawzall and said in effect "I guess we have to start cutting." Notably, despite the protocol indicating that the removal procedure would follow the service manual, no service manual appeared to be present, and there appeared to be no attempt to follow any procedure in any manual.

4. At that point, Mark Noble and I conferred, and agreed to allow the limited first set of cuts to see where Mr. Stilson was headed. The Dynamic Safety's mechanic cut the exhaust near the front end of the car. After those cuts were complete, Mark Noble and I asked Mr. Stilson what the plan was for the remaining cuts. He indicated that he planned to cut the entire exhaust system out and bend away a support bracket. Mark Noble pointed out that doing only this would not allowed removal of the fuel tank because the exhaust shield, drive shaft and fuel tank strap would still prevent the tank's removal. Mark Noble also believed that cutting further towards the front of the vehicle instead of where Stilson wanted to cut would allow the fuel tank to come out without having to remove the entire exhaust. Stilson would hear none of it.

5. At that point, Mark Noble and I expressed concern that Plaintiff's consultants' plan was to cut anything and everything that prevented access to the fuel tank. Mr. Stilson's reponse was "if you have a protocol, you can do yours. I am going to do mine. Mine says I can remove this exhaust system and get the fuel tank out." Mark Noble explained that BMW's protocol was to leave the car just like it is. I then left to consult by telephone with BMW's lead trial counsel, James K. Toohey regarding the pending disagreement.

6. Upon my return, I asked Mr. Stilson to write out a step by step plan of the cuts and destructive measures he planned to take to remove the fuel tank. That made

him angry and belligerent causing him to state that words to the effect of "I don't have to do that for you, and I won't". While Mr. Burke appeared to understand that BMW's concern was valid, and attempted to write down the steps for Mr. Stilson, Stilson would not cooperate in doing so.

7. As an alternative to cutting anything in the way of removing the tank, Mark Noble and I asked what Plaintiff and his consultants wanted to see, or what evidence they needed, that required removing the tank so that we could consider an alternative to cutting up the bottom of the car. Mark Noble suggested that a number of measures such as mirrors and scopes could be used to visualize every inch of the tank. I explained that BMW did not want to know Plaintiff's theories or consultant's opinions, but simply wanted to know what piece of evidence was needed that could not be obtained without destroying the underside of the car. Mr. Stilson and Mr. Burke, refused to answer, saying that they did not have to divulge this and that, because the protocol allowed them to take out the tank, they were going to take out the tank.

8. I then reminded Mr. Burke and Mr. Stilson that their protocol allowed the "least intrusive" destructive removal "will be taken **with _agreement of the parties_**" and advised that, unless they could tell what evidence could only be gathered by taking out the tank, and what specific steps they planned to take to accomplish that task, there would not be "agreement of the parties." Mr. Stilson again refused to address these issues and thereafter repeatedly told Plaintiff's counsel that he should "get the court involved." After conferring again with BMW lead trial counsel, James K. Toohey, I advised Plaintiff's counsel that BMW would not agree to their further destruction of the subject car, and the inspection and fuel tank removal was thereafter terminated. I asked that the parties take a moment to state their respective positions on the present video camera to assist in the resolution of the disagreement,. And Plaintiff's counsel refused.

9. Plaintiff's counsel asserts that the fuel tank removal was proceeding consistent with their protocol, and that its termination was "sudden" and unwarranted. As noted above, the protocol called for removal of the fuel tank using the service manual and where damage prevented that, it called for removal in the least intrusive way "with agreement of the parties." No service manual was to be seen, and after minimal attempts at non-destructive disassembly, Plaintiff's consultant quickly moved on to using the Sawzall. Such a procedure could in no way be considered the _"least intrusive measures."_ When Mark Noble and I learned that the plan was to take monumentally intrusive measures, we exercised our right, as permitted in Plaintiff's own protocol, to not agree.

10. Contrary to Plaintiff's assertions, Mark Noble and I took the reasonable steps to allow Plaintiff's consultants the opportunity to gather the evidence and information they sought from the vehicle's fuel tank including: seeking the written list of the destructive steps they planned to take so we would know what we were agreeing to before they did it; asking what evidence or information existed that could only be obtained by removing the tank; and asking what they needed to see that could only be seen by removing the tank. These questions were asked so that the parties might be able to come up with an alternative way to get that information without chopping up the

car. Plaintiff's counsel and consultants resisted all such efforts.

11. Plaintiff asserts that BMW agreed to Plaintiff's protocol, and they are correct in that regard. In fact, BMW followed the protocol to the point of exercising its right to not agree with the destructive measures proposed by Plaintiff's consultants. It is important to note that while BMW agreed to the protocol, it was Plaintiff's protocol, not BMW's, nor was it a joint protocol. Plaintiff and Plaintiff's consultant chose to make their protocol non-specific and vague, and perhaps did so in the hopes that it would allow them to do what they wish during the procedure. Moreover, the protocol failed to include important steps such as cutting or removing the drive shaft. Because their protocol did not lay out what they actually planned to do, BMW cannot be blamed for not agreeing to their "on the spot" plan.

12. Plaintiff's counsel and his consultants have had access to the subject vehicle since 2008. They also were present for an extensive inspection of the vehicle on August 30, 2011. At any time in the four years before October 31, 2012 they could have looked at the underside of the vehicle and determined that they were not going to be able to simply screw off/unbolt the artifacts that had to be removed to access the fuel tank. At any time in those four years, they could have figured out what steps they needed to take to get the fuel tank out. They simply chose not to do so.

13. Plaintiff asserts that the destruction could have/should have continued despite BMW's objections because BMW consultant Mark Noble was present. That was, in fact, why it was stopped. Mark Noble saw that there was no plan to the cutting and destruction, and disagreed any further destruction of evidence without a clear plan in place and the full consideration of non-destructive alternatives. Plaintiff's Reply notes that Mark Noble and Mr. Stilson were still discussing the location of potential further saw-cuts when I expressed BMW's disagreement with the further destruction of evidence. While Mr. Noble was still inquiring on where Plaintiff's consultant intended to make saw-cuts, he had no interest in allowing their planned further destruction.

14. Plaintiff's Reply asserts that Plaintiff's counsel and his consultants were attempting to resolve the disagreement as the inspection proceeded. The extent of their conciliatory efforts were saying "it's in the protocol" and refusing to discuss BMW's above cited attempts to reach agreement on an alternative to cutting apart the car.

                                                  Respectfully Submitted

                                                  s/ Timothy R. Couture
                                                  One of the Attorneys for BMW

James K. Toohey
Timothy R. Couture
Johnson & Bell, Ltd
33 W Monroe
Chicago IL
312 372-0770