# EXHIBIT 6

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, BMW AG, a corporation, | ) ) ) ) ) ) ) ) ) ) | Honorable James F. Holderman Magistrate Susan E. Cox |
| Defendants. | ) | |

## AFFIDAVIT OF JOHN M. STILSON

I, John M. Stilson, do declare and state as follows:

1. I am the Principal Engineer and owner of Stilson Consulting, and am a Safety and Automotive Consultant with expertise in the fields of safety engineering, automotive engineering, mechanical engineering, accident reconstruction to mention a few areas. A copy of my Curriculum Vitae is presented in Exhibit I.

2. I have been retained by the law firm of Clifford Law Offices to provide them with technical assistance in determining the performance of the subject 2008 BMW 335i under the conditions of this accident.

3. I have reviewed the police report provided in this case and the primary issue in this case is an override rear collision into the rear of the subject 2008 BMW that resulted in a post collision fire and serious injury to Jeffery Scheinman.

4. As part of my standard accident investigation process, in some cases it is necessary to conduct what is called a "teardown" of vehicle components to facilitate examination and analysis to determine the failure mode/s of the fuel system and potential cause of the leakage of gasoline from the fuel tank.

5. On July 27, 2012, I prepared and forwarded a teardown protocol to plaintiff attorney, who then advised me that it was forwarded to the defendant's in this case. I was also informed that there was no objection to my protocol by the defendants and it was agreed that a joint teardown would be performed on October 31, 2012 at the facility of Dynamic Safety where the subject vehicle is stored.

6. I have conducted over 200 joint teardowns in the presence of the defense experts, provided a protocol when required, and have followed the professional scientific method in conducting these teardowns. It is well known that a teardown may involve destructive disassembly of the vehicle components due to the damage to the vehicle, and is generally accepted by the relevant scientific community.

7. During the teardown procedure on October 31, 2012, at the very start of the teardown, I advised Mr. Mark Noble of my exact procedure to remove the subject vehicle fuel tank. He indicated to me his approval of my procedure, which followed the teardown protocol and I provided him with more detail of how I wanted to proceed. I started to proceed with the teardown procedure as described to Mark Noble, and when we had progressed to step 2 of the protocol, was interrupted by the defense attorney and told that they had thought the teardown only involved removal of components that could be reinstalled back into their original condition.

8. The reason my teardown protocol was provided is because it was obvious that to achieve the objective of the protocol to remove the fuel tank there would be certain destructive methods necessary to remove components beneath the fuel tank in order to gain access to the subject vehicle fuel tank due to the fire and impact damage. The use of the term teardown is a term of art that automatically involves potential destructive procedures to remove certain components of the vehicle. The term tear-down means disassembly, and tear means; destroy.

9. In all cases where a teardown is necessary, my intention is to always preserve, within reason, the disassembled parts involved in the potential issues under investigation. In the case of the subject 2008 BMW 335i, the fuel tank is a saddle tank design that is mounted under the vehicle floor pan forward of axle. The plastic fuel tank is configured into two joined tanks, one on the left side and the other on the right side with an integral plastic molded section connection that is routed under the vehicle drive shaft. There are several components that are installed beneath portions of the fuel tank. For example, the exhaust pipe, angled steel bars, exhaust shield, and the drive shaft are parts mounted beneath the fuel tank that must be removed before the fuel tank can be removed. My visual inspection of the subject vehicle

2

revealed that it would be necessary to remove the above identified parts, and this was stated in my protocol.

10. I have reviewed the Affidavit of Mark Noble dated November 14, 2012 presenting his sworn testimony concerning the teardown proceedings and his expert position opposing my teardown protocols.

11. The substance of Mr. Mark Nobel's affidavit does not present all of the facts associated with the events at the November 12, 2012 teardown that led to halting of the teardown proceedings. For example, the halting of the teardown proceedings occurred after Mr. Mark Noble had been advised of how I intended to proceed and he had agreed that it was acceptable.

12. The statement by Mark Noble concerning the halting of the teardown by the defense attorney and their request for me to <u>write down</u> each step and they <u>might</u> approve it. This is not an acceptable practice by experts who practice in my field, since Mark Noble and another defendant expert were present as the defense representatives to work together following the agreed upon protocol. None of the steps in the protocol involving removal of the components involved potential damage or alteration of the fuel system/tank, but were necessary to gain access for removal of the fuel tank. My teardown protocol specifically stated the final step was removal of the fuel tank.

13. Over the forty years (40) of my private consulting experience with fire cases, it is incumbent on me to follow the scientific method in determination of the existence of a defective condition, or determination of a non-defective condition, which may require a teardown to make that determination.

14. Mr. Mark Nobel's (affidavit entry No. 5) contention that the fuel tank is "visible" is only true of certain areas. The top area of the right fuel tank is burned and cannot be viewed. His suggestion that it can be visualized using optical instruments is certainly a protocol that he may want to pursue, but it does not accomplish my objective of removing the subject fuel tank to examine it, examine the underbody condition above the fuel tank, evaluating potential vehicle components that may have interacted with the fuel tank, and installing an exemplar fuel tank and filler neck to evaluate the total fuel tank environment and vehicle components that may have interacted with the fuel tank in this crash.

15. Mr. Mark Noble's (affidavit entry No. 6) misrepresents my stated disassembly procedure for what is necessary to work on the "substantial" support bracket, cutting of the drive shaft, and cutting of additional pieces prior to the fuel tank removal. In fact; a) the substantial support bracket is mounted below the exhaust pipe and due to damaged bolts that attach the support bracket it is necessary to slightly "bend" the bracket so the cut exhaust pipe can be slid under it; b) since any damage to the drive shaft connection to the rear axle cannot be viewed until the exhaust heat shield is removed, I advised Mark Noble that we <u>may</u> have to cut it; and d) any additional disassembly or cutting of "pieces" of components

3

may be necessary due to the collision and fire damage. Each decision to perform this necessary work would be discussed with Mark Noble before proceeding.

16. Mr. Mark Noble's (affidavit entry No. 7) states that my protocol was not specific enough to contemplate the destruction we were planning to undertake, but does not advise this honorable court that I had discussed the specific steps of how I intended to proceed and he approved of that procedure. In addition, I advised Mark Noble that due to damage to parts necessary for removal or alteration it would involve specific destructive methods, and specifically stated my method required to achieve the least intrusive procedure. My refusal to comply with writing down each step of my procedure is based upon the fact that they had already approved the teardown protocol before scheduling the teardown, my explanation to Mark Noble of each step before proceeding, and the standard practice of experts working together to follow the protocol and use least intrusive methods.

17. Mr. Mark Noble's (affidavit entry No. 8) does not conform with my ultimate role as a consultant for the plaintiff's under the legal requirements of "burden of proof" and the legal requirements set forth in legal statutes concerning that burden. The cutting of the dual exhaust pipe allows reinstallation using clamps if necessary, removal of the exhaust heat shield would involve the potential to reinstall it following the teardown, and the fire and abrasion damage to the fuel tank would be preserved with its removal along with the condition of the fuel tank spud that connects the filler pipe hose. Notably, the filler pipe hose has been damaged and is still connected to the fuel tank and the removal of the fuel tank would not damage this component. Photographic and video documentation of the condition of the vehicle components identified by Mark Noble would preserve the original condition of all of these components, and the defendant has the opportunity to completely map the relationship of these components prior to the teardown.

18. At the request of plaintiff attorneys, I prepared an amended teardown protocol in an attempt to provide more detail and add the removal of the driver's seat to evaluate the performance of the seat assembly under the conditions in this rear impact that caused it to fail rearward into the rear occupant compartment area. I have no issues with Mr. Blaisdell's request to perform non-destructive work prior to my removing the driver's seat assembly. It is impossible to provide a detailed protocol for the driver's seat removal, due to the level of interior fire debris surrounding the seat, in order to evaluate what steps must be taken for its removal. Again, the presence of Mr. Blaisdell or a defense expert allows working together to accomplish its removal. It is impossible to visually inspect and examine the interior of the driver's seat recliner without removing the seat from the vehicle and potentially removing the recliner mechanism.

19. In conclusion, I would advise this honorable court that my expert qualifications and experience with vehicles involved in post collision fires is extensive, and that my intention is to provide the plaintiff attorneys with technical assistance that always follows the acceptable, valid, and reliable scientific method.

4

FURTHER YOUR AFFIANT SAYETH NOT.

_____ 11/21/12
JOHN M. STILSON

[X]  Under penalties as provided by law pursuant to 735 ILCS 5/1-109 (1993), I certify that the statements set forth herein are true and correct.

5