# EXHIBIT 7

ITHE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Plaintiffs, | ) ) ) ) ) | |
| vs. | ) ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, BMW AG, a corporation, | ) ) ) ) ) ) ) ) ) ) ) | Honorable James F. Holderman  Magistrate Susan E. Cox |
| Defendants. | ) | |

## DECLARATION OF JOHN M. STILSON

I, John M. Stilson, do declare and state as follows:

1.      I am the Principal Engineer and owner of Stilson Consulting, and am a Safety and Automotive Consultant with expertise in the fields of safety engineering, automotive engineering, mechanical engineering, accident reconstruction to mention a few areas. A copy of my Curriculum Vitae is attached as Exhibit 1.

2.      I have been retained by the law firm of Clifford Law Offices to provide them with technical assistance in determining the performance of the subject 2008 BMW 335i under the conditions of this accident.

3.      I have reviewed the police report provided in this case and the primary issue in this case is an override rear collision into the rear of the subject 2008 BMW that resulted in a post collision fire and serious injury to Jeffery Scheinman.

1

4.      As part of my standard accident investigation process, in some cases it is necessary to conduct what is called a "teardown" of vehicle components to facilitate examination and analysis to determine the failure mode/s of the fuel system and potential cause of the leakage of gasoline from the fuel tank.

5.      On July 27, 2012, I prepared and forwarded a teardown protocol to plaintiff attorney, who then advised me that it was forwarded to defendants in this case. I was also informed that there was no objection to my protocol by the defendants and it was agreed that a joint teardown would be performed on October 31, 2012 at the facility of Dynamic Safety where the subject vehicle is stored.

6.      I have conducted over 200 joint teardowns in the presence of the defense experts, provided a protocol when required, and have followed the professional scientific method in conducting these teardowns. It is well known that a teardown may involve destructive disassembly of the vehicle components due to the damage to the vehicle, and that is generally accepted by the relevant scientific community.

7.      During the teardown procedure on October 31, 2012, at the very start of the teardown, I advised Mr. Mark Noble of my exact procedure to remove the subject vehicle fuel tank. He indicated to me his approval of my procedure, which followed the teardown protocol and I provided him with more details of how I wanted to proceed. I started to proceed with the teardown procedure as described to Mark Noble, and when we had progressed to step 2 of the protocol, was interrupted by the defense attorney and told that they had thought the teardown only involved removal of components that could be reinstalled back into their original condition.

8.      The reason my teardown protocol was provided is because it was obvious that to achieve the objective of the protocol to remove the fuel tank there would be certain destructive methods necessary to remove components beneath the fuel tank in order to gain access to the subject vehicle fuel tank due to the fire and impact damage. The use of the term teardown is a term of art that automatically involves potential destructive procedures to remove certain components of the vehicle. The term tear-down means disassembly, and tear means; destroy.

9.      In all cases where a teardown is necessary, my intention is to always preserve, within reason, the disassembled parts involved in the potential issues under investigation. In the case of the subject 2008 BMW 335i, the fuel tank is a saddle tank design that is mounted under the vehicle floor pan forward of axle. The plastic fuel tank is configured into two joined tanks, one on the left side and the other on the right side with an integral plastic molded section connection that is routed under the vehicle drive shaft. There are several components that are installed beneath

2

portions of the fuel tank. For example, the exhaust pipe, angled steel bars, exhaust shield, and the drive shaft are parts mounted beneath the fuel tank that must be removed before the fuel tank can be removed. My visual inspection of the subject vehicle revealed that it would be necessary to remove the above identified parts, and this was stated in my protocol.

10.     I have reviewed the Affidavit of Mark Noble dated November 14, 2012 presenting his sworn testimony concerning the teardown proceedings and his expert position opposing my teardown protocols.

11.     The substance of Mr. Mark Nobel's affidavit does not present all of the facts associated with the events at the November 12, 2012 teardown that led to halting of the teardown proceedings. For example, the halting of the teardown proceedings occurred after Mr. Mark Noble had been advised of how I intended to proceed and he had agreed that it was acceptable.

12.     Mark Noble's Affidavit also refers to a statement by him concerning the halting of the teardown by the defense attorney and their request for me to <u>write down</u> each step and they <u>might</u> approve it. This is not an acceptable practice by experts who practice in my field, since Mark Noble and another defendant expert were present as the defense representatives to work together following the agreed upon protocol. None of the steps in the protocol involving removal of the components involved potential damage or alteration of the fuel system/tank, but were necessary to gain access for removal of the fuel tank. My teardown protocol specifically stated the final step was removal of the fuel tank.

13.     Over the forty years (40) of my private consulting experience with fire cases, it is incumbent on me to follow the scientific method in determination of the existence of a defective condition, or determination of a non-defective condition, which may require a teardown to make that determination.

14.     Mr. Mark Nobel's (affidavit entry No. 5) contention that the fuel tank is "visible" is only true of certain areas. The top area of the right fuel tank is burned and cannot be viewed. His suggestion that it can be visualized using optical instruments is certainly a protocol that he may want to pursue, but it does not accomplish my objective of removing the subject fuel tank to examine it, examine the underbody condition above the fuel tank, evaluating potential vehicle components that may have interacted with the fuel tank, and installing an exemplar fuel tank and filler neck to evaluate the total fuel tank environment and vehicle components that may have interacted with the fuel tank in this crash.

3

15.     Using a scope with a camera would accomplish nothing in terms of determining how and where the fuel tank failed. The fuel tank has extensive fire damage and some crush areas, we cannot see under the fuel tank straps, we cannot see how the fuel tank interacted with the underbody areas of the vehicle, and a portion or all of the top of the tank has been burned away. It is only with removal of the tank that we can see the entire surface areas of the remaining portion of the tank and the surrounding environment and components that may have compromised the tank and contributed to the fire. Even if we used a scope, I would still have to remove the tank to inspect it and the vehicle body components that surround the tank. Those areas could never be completely inspected with a scope. I also have to remove the fuel tank in order to position an undamaged exemplar tank in that space in order to evaluate how the vehicle components may have interacted with, and compromised, the existing fuel tank.

16.     Mr. Mark Noble's (affidavit entry No. 6) misrepresents my stated disassembly procedure for what is necessary to work on the "substantial" support bracket, cutting of the drive shaft, and cutting of additional pieces prior to the fuel tank removal. In fact; a) the substantial support bracket is mounted below the exhaust pipe and due to damaged bolts that attach the support bracket it is necessary to slightly "bend" the bracket so the cut exhaust pipe can be slid under it; b) since any damage to the drive shaft connection to the rear axle cannot be viewed until the exhaust heat shield is removed, I advised Mark Noble that we _may_ have to cut it; and d) any additional disassembly or cutting of "pieces" of components _may_ be necessary due to the collision and fire damage. Each decision to perform this necessary work would be discussed with Mark Noble before proceeding.

17.     Mr. Mark Noble's (affidavit entry No. 7) states that my protocol was not specific enough to contemplate the destruction we were planning to undertake, but does not advise this honorable court that I had discussed the specific steps of how I intended to proceed and he approved of that procedure. In addition, I advised Mark Noble that due to damage to parts necessary for removal or alteration, it would involve specific destructive methods, and specifically stated my method required to achieve the least intrusive procedure. My refusal to comply with writing down each step of my procedure is based upon the fact that they had already approved the teardown protocol before scheduling the teardown, my explanation to Mark Noble of each step before proceeding, and the standard practice of experts working together to follow the protocol and use least intrusive methods.

18.     Mr. Mark Noble's (affidavit entry No. 8) does not conform with my ultimate role as a consultant for the plaintiff under the legal requirements of "burden of proof" and the legal requirements set forth in legal statutes concerning that burden. The cutting of the dual exhaust pipe allows reinstallation using clamps if necessary, removal of the exhaust heat shield would involve the potential to reinstall it following the teardown, and the fire and abrasion damage to the fuel tank would be preserved with its removal along with the condition of the fuel tank spud that

4

connects the filler pipe hose. Notably, the filler pipe hose has been damaged and is still connected to the fuel tank and the removal of the fuel tank would not damage this component. Photographic and video documentation of the condition of the vehicle components identified by Mark Noble would preserve the original condition of all of these components, and the defendant has the opportunity to completely laser map the relationship of these components prior to the teardown.

19.     At the request of plaintiff attorneys, I prepared a revised teardown protocol on October 31, 2012 in an attempt to provide more detail and add the removal of the driver's seat to evaluate the performance of the seat assembly under the conditions in this rear impact that caused it to fail rearward into the rear occupant compartment area. I have no issues with Mr. Blaisdell's request to perform non-destructive work prior to my removing the driver's seat assembly. It is difficult to provide a more detailed protocol for the driver's seat removal, due to the level of interior fire debris surrounding the seat, in order to evaluate what steps must be taken for its removal. Again, the presence of Mr. Blaisdell or a defense expert allows working together to accomplish its removal. It is impossible to visually inspect and examine the interior of the driver's seat recliner without removing the seat from the vehicle and potentially removing the recliner mechanism.

20.     In conclusion, I would advise this honorable court that my expert qualifications and experience with vehicles involved in post collision fires is extensive, and that my intention is to provide the plaintiff attorneys with technical assistance that always follows the acceptable, valid, and reliable scientific method. For the reasons stated above, and based upon my over 40 years of experience in the fields of automotive, mechanical and safety engineering, accident reconstruction and investigation of vehicle fuel fires, in this case the fuel system components, including the fuel tank, must be removed in order for me to properly evaluate the contributing causes of the leakage of gasoline from the fuel tank in the Scheinman BMW, and to meet the requirements of Federal Rule of Civil Procedure 26(b).

I declare and certify under penalty of perjury that the foregoing is true and correct.

Executed on: 12/7/2012
Date

JOHN M. STILSON

5

**CURRICULUM VITAE**

November, 2012

**OF**

**JOHN M. STILSON**

| | |
|---|---|
| **PROFESSION:** | Consulting Engineer |
| **JOB TITLE:** | Safety and Automotive Consultant |
| **BUSINESS FIRM:** | Stilson Consulting<br>18544 Old Gages Lake Road<br>P.O. Box 367<br>Wildwood, IL  60030 (Grayslake)<br>(847) 223-3101<br>(847) 223-3180 Fax |
| **AREAS OF EXPERTISE:** | Mechanical Engineering<br>Automotive Engineering<br>Product Design Engineering<br>Product Safety Engineering<br>Product Test and Development<br>Product Quality Assurance<br>Product Problem Analysis<br>Manufacturing Processing<br>Prototype Design and Development<br>Accident Reconstruction and Cause Analysis<br>Vehicle Evaluation<br>Product Failure Mode Analysis<br>Product Reliability |
| **PREVIOUS EMPLOYMENT:** | **Polytechnic, Inc.**<br>3740 Morse Avenue<br>Lincolnwood, IL<br>1981-1983<br><br>**Ford Motor Company**<br>Building #1<br>Dearborn, MI<br>1971-1976<br>1978-1981 |

**Chrysler Corporation**
Engineering Center
Highland Park, MI
1967-1971

**Ford Motor Company**
Dearborn, MI
1965-1967

**Sunbeam Corporation**
Roosevelt Road
Chicago, IL
1964-1965

**PREVIOUS POSITIONS:**      **Polytechnic, Inc.**

Director of Vehicle Lab
Senior Mechanical Engineer

**Ford Motor Co.**

Product Chassis Design Engineer
Group Leader-Vehicle Development
Product Body Design Engineer

**Chrysler Corp.**

Group Leader - Future Concepts Committee
Program Manager
Program Coordinator
Product Design Engineer
Product Development Engineer
Engineer Trainee

**Ford Motor Co.**

Co-Op Engineer

**Sunbeam Corp.**

Co-Op Engineer

**EDUCATION:**      Masters of Science, Mechanical Engineering
University of Michigan, 1969

|  |  |
|---|---|
| | Automotive Engineering Degree<br>Chrysler Institute of Engineering, 1969 |
| | Bachelor of Science, Mechanical Engineering<br>University of Michigan, 1967 |
| **POST GRADUATE**<br>**EDUCATION:** | Professional Development Program,<br>University of Michigan |
| | Kemper-Tregoe Manager Courses |
| | Ford Supervisor Institute, Management Training |
| | Accident Reconstruction and Cause Analysis Studies<br>University of Wisconsin Extension<br>Madison, Wisconsin April 1981 |
| | Accident Reconstruction Seminar<br>University of Georgetown<br>Washington, D.C. 1989 |
| **SPECIAL**<br>**WORK**<br>**EXPERIENCE:** | Design Patent, Chrysler Corp., 1968<br>Chrysler Heat Transfer Project<br>University of Michigan Graduate Studies Instructor Assistant<br>President, University of Michigan Honor Council<br>University of Michigan Student Government Council<br>Chairman SAE Student Chapter |
| **PUBLICATIONS:** | **Accident Reconstruction,** 1984 Illinois Institute of Continuing Legal<br>**Education, Transportation and Negligence**<br>**Crashworthiness IICLE**<br>**MADD Article**<br>**National Head Injury Alliance**<br>**Effectiveness of Shielding Vehicle Hot Surfaces,** ASME Conference 2009 |
| **SEMINARS:** | The International Brain Injury Association and the Brain Injury Association<br>of Spain Second World Congress on Brain Injury, "Advances in Neurotrauma<br>from Research to Community Living" May 10-14 1997 Seville Spain. |
| **PROFESSIONAL**<br>**AND FRATERNAL** | American Society of Mechanical Engineers<br>Society of Automotive Engineers |

**SOCIETIES:**     American Society of Safety Engineers
University of Michigan Alumni Association
National Association of Fire Investigators

**WORK EXPERIENCE:**

**March 1, 1983**     **STILSON CONSULTING**
**to Present**

**SAFETY AND AUTOMOTIVE CONSULTANT**

Independent consulting services offered to industry, the private sector, government, and the legal profession. Project work involves all aspects of safety engineering related to vehicles, vehicle systems, and industrial machinery, including:

Product Design Performance
Product Defect Analysis
Engineering Problem Investigation
Safety Engineering
Accident Analysis
Accident Reconstruction
Failure Mode Analysis
Technical Photography
Photographic Preparation
Videotaping
Issuance of Engineering Reports
Technical Analysis and Consulting
System and Component Test
Vehicle Testing
Warning and Safety Labels
Accident Investigation

**INDEPENDENT CONSULTING TECHNICAL SERVICE OVERVIEW**

Vehicle Inspection
Vehicle Teardown
Component Failure Analysis
Design Failure Analysis
Discover Assistance
Product Design Analysis
Product Failure Mode Analysis
Vehicle System Testing / Performance
Component Testing Performance
Accident Reconstruction
Metallurgical Analysis
Accident Investigation Reports
Scene Inspections

Evidence Preservation
Affidavit Preparation
Patent Analysis
Design Process Analysis
Federal Safety Standards
Industry Safety Standards / Practice
Industry Quality Assurance / Control
Manufacturing Process Analysis / Control
Corporate Program Planning Analysis
Product Cost Analysis
Vehicle Structural Performance
Occupant Protection Systems
Warning Systems and Advisories
Depositions
Trial Testimony

**SPECIALTY AREAS INVESTIGATED**

Fuel System Integrity and Vehicle / Component Testing
General Crashworthiness and Vehicle Crash Testing
Vehicle Stability
Park - to - Reverse
Weld Quality
Seat Structural Integrity
Seat Back Strength and Vehicle / Component Testing
Steering Column Performance
Seat Belt Performance and Vehicle Belt Testing
Wheel and Tire Performance
Occupant Interior Protection in a Crash
Rollover Protection and Vehicle Stability Testing
Occupant Containment
Occupant Compartment Integrity
Vehicle Roll Away
Fuel System Guarding
Roof Structural Integrity and Vehicle Testing
Rear Wheel Separation
Brake System Performance
Passive / Air Bag System Performance
Sudden Vehicle Acceleration
Suspension System Performance
Side Impact Integrity
Delta V Calculation and Determination
Occupant Restraint System Performance and Component Testing
Machine Guarding
Motorcycle Performance
All Terrain Vehicle Stability

Three Wheeler Stability
Recreational Vehicle Performance
Slip and Fall Accidents
Mechanical Jacking Systems
Cargo Retention Systems and Sled Testing
Industrial Vehicle Performance
R.O.P.S. and F.O.P.S. Performance
Door Retention Performance and Component Testing
Window Retention Performance (Laminated Glass)
Hood Retention Performance
Child Restraint
Infant Seats
Warning Systems
Mini-Van Performance
4 x 4 Stability
Interior Padding
Steering System Performance
FMVSS Requirements
Wheel Retention
Seat Belt Inertial Release
Electronic Stability Control
Vehicle Handling Stability

**March 1, 1981**
**to March 1, 1983**    **POLYTECHNIC, INC.**

### DIRECTOR OF VEHICLE LABORATORY

Directly responsible for the management and administration of the vehicle laboratory department. Duties included directing work assignment, budgeting, maintaining the facility, purchasing equipment, establishing procedure and policy.

Consulting services encompassed vehicle engineering, vehicle safety, design and manufacturing. Vehicles evaluated included; all passenger cars, trucks, industrial machines and vehicles, special all terrain vehicles, off-road vehicles, agricultural implements, motorcycles, bicycles, construction equipment and machinery.

### SENIOR MECHANICAL ENGINEER

Responsible for engineering safety consulting on projects associated with safety, product liability, expert testimony, accident investigation, product defect analysis, failure analysis, vehicle test evaluation and material analysis.

### AUTOMOTIVE PROJECT WORK

Seating systems, restraint systems, brake systems, rear axle and suspension, power train systems, drive line, front suspension, windshield glass, power and manual steering, wheels and tires, fuel system, exhaust system, sheet metal damage, body

hardware (latches, hinges, mechanisms), electrical system, body mounts, transmission linkage, steering wheel and column, cooling and ventilating system, interior trim, engine and components, truck air brakes and truck systems, bus systems.

## SPECIAL AUTOMOTIVE PROJECTS

Off road vehicles, motorcycles, recreational vehicles, Mopeds, snowmobiles, heavy motor vehicles.

## COMMERCIAL PROJECT WORK

Truck tractors and trailers, front loaders, scrapers, graders, cranes, lift-gates, refuse trucks, pavers, ROPS.

## AGRICULTURAL PROJECT WORK

Tractors, Farm Implements

## INDUSTRIAL PROJECT WORK

Power presses, cold headers, welding, spun metal, roll presses, induction spinning, metal forming, injection molding, die casting, forging, casting, material coating, electroplating, electro-magnetic forming, screw machining, extrusions.

**1978 - 1981**     **FORD MOTOR COMPANY**

## FORD LIGHT TRUCK HIGH STRENGTH STEEL (HSLA) MATERIAL COORDINATOR

## FORD LIGHT TRUCK HEAVY DUTY TIRE AND WHEEL DESIGN RELEASE

## FMVSS 127 COORDINATOR

## FORD LIGHT TRUCK CHASSIS DESIGN ENGINEER

Responsible for component design and release of advanced wheel programs. Duties included design, packaging, cost tracking, budget and financial analysis, cost reduction, FMVSS compliance, supplier manufacturing feasibility and certification, project test conformance and specification, product assumption, product description, warranty analysis, vehicle system testing, test and design specification, product planning objectives, product description, process control, customer acceptance standards, problem resolution, production launch task force assistance, project sign-off, production validation, program status reporting, project coordination, experimental part procurement, experimental design, design and test

standards, system vehicle test sign -off, research and development and supplier sales interface.

**1976**          **FORD MOTOR COMPANY**

**FORD LIGHT TRUCK WHEEL PROGRAMS**

1978 Steel Styled Wheel
1977 ½ Aluminum Styled Wheel
16 - 16 ½ Style Wheel
16 - 16 ½ Tire Design

**FORD LIGHT TRUCK CHASSIS DESIGN ENGINEER**

Responsible for design of steel and forged aluminum styled wheels and      16 / 16.5 inch tires for the F-Series, Econoline and Bronco. Duties included design, packaging, systems test prove out, cost tracking, product, improvements, cost savings, project budgeting, safety compliance, supplier manufacturing prove-out, production feasibility, prototype procurement, prototype design, prototype test, engineering specifications, engineering drawings sign-off product description, warranty analysis, field problem resolution, process and quality control feasibility, customer acceptance specification, product problem resolution, status reporting, launch assistance,  styling feasibility.

**1975 - 1976**          **FORD MOTOR CO.**

**FORD LIGHT TRUCK FUEL ECONOMY PRODUCT ENGINEER**

Responsible for advance planning to meet corporate and mandated fuel economy objectives for light trucks. Duties included establishing fuel economy objectives for specific models, tracking and measurement of fuel economy values, coordination of objectives, coordination of objective measurement, establishment of data processing tracking and recording, evaluation of vehicle performance test standards, tracking and assistance with CAFE computation and reporting and compliance certification sign-off of vehicle and CAFE standards.

**1973 - 1975**          **FORD MOTOR CO.**

**FORD MOTOR COMPANY SENIOR DEVELOPMENT ENGINEER ON LIGHT TRUCK BODY, TRIM AND HARDWARE SYSTEMS**

1975 Light Truck Sign Off Trip
1974 Light Truck Sign Off
1974 ½ Super Cab Launch Team Captain
1974 Light Truck Press Show Preparation

Management position responsible for directing the work assignment of (5) engineers, measuring performance, providing technical assistance, administrative written test reports and establish product test and evaluation objectives and methods. Direct responsibility to test and evaluate product compliance with functional objectives. Work Assignments include GPAS sign-off, test track test performance, management reviews, trip sign-off, prototype procurement, prototype test and evaluation, manufacturing plant launch assistance, product problem determination and resolution, manufacturing plant problem resolution, GPAS issuance, design reviews, compliance vehicle preparation.

**1972 - 1973**         **FORD MOTOR CO.**

**FORD MOTOR COMPANY LIGHT TRUCK BODY STRUCTURAL ENGINEER**

**Acting Group Leader**
**Product Design Engineer**

Responsible for directing work activity of (5) engineers, providing technical assistance, administrate program objectives, product assumptions, design specifications, product problem resolution, plant launch assistance, design review meetings, issue design specifications, manufacturing, feasibility, prototype procurement, cost tracking, warranty analysis, program reporting, issue design release objectives.

**1972**         **FORD MOTOR COMPANY LIGHT TRUCK CHASSIS DESIGN ENGINEER**

Responsible for design release of body mounting systems for light trucks, design release, issue design specifications, release drawings, supplier contact, product problem resolution, cost tracking, warranty analysis, prototype procurement, design release objectives, plant launch assistance, supplier surveillance, product assumption, field complaint resolution, design reviews, vehicle test, product description.

**1971 - 1972**         **FORD MOTOR COMPANY LIGHT TRUCK BODY, TRIM AND HARDWARE DESIGN ENGINEER**

**1973 F Series New Program**
**1972 ½ Sliding Door Program Coordinator**
**1974 F Series Cost Reductions**

Responsible for coordination of design component, assembly processing, advanced design, product planning, development and supplier activities within production objectives. Specific responsibility for product design within established design, development and customer acceptance, Federal Regulatory compliance, corporate compliance and cost objectives.

Case: 1:09-cv-05340 Document #: 286-1 Filed: 12/07/12 Page 16 of 21 PageID #:2867

| | |
|---|---|
| **1969 - 1971** | **CHRYSLER CORPORATION** |

**CHRYSLER CORPORATION DESIGN AND DEVELOPMENT ENGINEER INSTRUMENT PANEL SYSTEM FOR PASSENGER CARS**

1970 Future Products Concepts
1968 Air Bag Production Design Project
1968 Knee Bolster Project
1970 Plastic Crash Pad Project

Responsible for design release and development of an instrument panel for A - Body. Specific duties included, design release, design studies, buck development, layout direction, product specifications, system packaging, prototype procurement and build, advance design liaison, prototype design aides, test specifications and to assist in production product problems resolution.

| | |
|---|---|
| **1967 - 1969** | **CHRYSLER CORPORATION**<br>**CHRYSLER INSTITUTE OF ENGINEERING** |

**ENGINEER TRAINEE**

Work assignments included:

Impact Laboratory - Assignment included the test and development of a new elastomeric bumper to meet a new government proposed safety standard for a 5 mph bumper. Work included testing of the bumper and the bumper retention system, pendulum impact testing to SAE procedures and prototype part design and development.

Advance Development Department - Responsible to assist in the development of a new internal caliper disc brake for Chrysler "C" body cars. Work assignment included developing a thermal energy dissipation method to simulate dynamometer braking heat transfer to resolve a thermal stress problem.

Chrysler Proving Grounds - Responsible to assist in the analysis of proving ground test vehicle reliability using test data and data reduction computer techniques to establish reliability. Also, assisted in the development of the aero-dynamic improvement of the Chrysler Charger 500 race car and development of an air foil on the rear of a station wagon to clean the rear back lite off without using mechanical devices.

Advance Design Department - Work assignment consisted of design and development of a drivers inflatable restraint system. With special consideration for the bag deployment system involving a high temperature, high speed gas generator filter device. Patent earned on a hot particle filtration system. Testing included

sled tests and laboratory simulation. Responsible to assist in the design of a steering column mounted air bag system. I received a patent for a high temperature, high speed gas filtration device.

Detroit Universal Division Assembly Plant - Assembly plant manufacturing processing of passenger car prop-shaft assembly. Work assignment included assisting in the manufacturing of a new concept magnaflux prop-shaft assembly. Assembly operations included drop forging, broaching, metal forming, arc welding, cold heading, press forming and milling operations.

Instrument Panel Design Program Coordination - Assisted in the creation of a coordination group between advance design and production design to support program timing objections.

Automatic Transmission Development - Assisted in testing of the Chrysler A-727 and A-904 3 speed automatic transmissions using a new transmission fluid and friction plate material. Conducted vehicle drive evaluation, shift quality, dynamometer testing, transmission teardown and evaluation, transmission laboratory functional tests, transmissions endurance testing and transmission cooling analysis.

| | |
|---|---|
| 1964 - 1967 | **FORD MOTOR CO. AND SUNBEAM CORPORATION** |

**COOPERATIVE WORK EXPERIENCE**

**FORD MOTOR COMPANY ENGINE AND FOUNDRY DIVISION**

**SPRING 1967**      **ADVANCE ENGINE DESIGN DEPARTMENT**

Assignment consisted of working on computer programming for weight reduced aluminum piston and steel forged connecting rods. Work also included advanced racing engine layout and testing.

**SPRING 1967**      **ENGINE DYNAMOMETER LABORATORY**

Assignment consisted of working with physical laboratory testing using a dynamometer for endurance, oil consumption, fuel economy, wide open throttle, horse power and torque output, engine calibration and spark advance testing. Work involving assisting techniques with set-up, data output, data reduction and system maintenance.

**WINTER 1966**      **FUEL SYSTEM LABORATORY**

Assignment included the testing of gasoline engine carburetors. Work involved testing under laboratory simulated flow equipment used to measure flow rates, vacuum, pressure levels, valving and porting, efficiency, fuel island data, data reduction and fuel to air ratio measurement, and fuel consumption.

Case: 1:09-cv-05340 Document #: 286-1 Filed: 12/07/12 Page 18 of 21 PageID #:2869

**WINTER 1966**  **ENGINE DRAFTING SECTION**

Assignment included engine drafting and layout work for various components; such as, pistons, connecting rods, crank shafts, valves, cams and engine accessories. Work involved application of Ford Motor Company drafting and layout procedures along with educational engineering skills. Various principles were used including true position dimensioning; drafting, standards, tolerancing sections, descriptive geometry, projections, true views along with proper engineering graphics and information that required thread sizing, surface finish and fastener design.

**SPRING 1966**  **FORD METAL STAMPING DIVISION STAFF MATERIAL HANDLING SECTION**

Assignment included design and layout of assembly and detail material handling equipment. Work included drafting of conveyors, bins, part storage containers, storage racks, die stamping of part and drafting procedures for all general part transfer mechanisms used in assembly plant operations.

**SUMMER 1965**  **FORD DEARBORN STAMPING PLANT**

Assignment included working with plant manufacturing engineering groups to learn the basic plant processing of metal formed, stamped and drawn parts. Work involved assisting a tool and die engineer in new tooling design, production volume capability and line trouble shooting. Metal stamping experience included large roof panels, hoods, body sides, pillars, floor pans, back panels, deck lids and small part operations using progressive die blanking, forming, drawing, deep drawing roll forming operations.

**WINTER 1964**  **FORD FRAME PLANT**

Assignment included working with the plant production control and material handling departments. Work involved design and processing of part distribution systems used in general material handling. Various equipment included stocking bins, racks, mobile racks and bins, conveyor and convenience devices. A portion of the work involved floor assignment as a foreman responsible for (50) employees who operated various industrial machines such as, electrical hand carts, hi-lo gas machines, overhead cranes, front end loaders, and steel coil tractors.

**1964**  **SUNBEAM CORPORATION COOPERATIVE ENGINEER**

Assignment included working with household appliances and their manufacturing process. Work included plant operational training in assembly processing of toasters, vacuum cleaners, fry pans, lawn mowers and food processors. Manufacturing processing experience involved aluminum die casting, zinc die casting, plastic injection molding, chrome plating, electrical coiling thermostat control, heli-arc welding, machining, polishing, packaging, painting, labeling, electro-static plating and general line trouble shooting and problem resolution.

## QUALIFICATIONS OF JOHN M. STILSON

Mr. Stilson is a practicing Automotive and Safety Consultant in the fields of Mechanical Engineering, Safety Engineering and Reconstruction. He worked as an automotive design and development engineer from 1965 to 1981, spanning nearly 15 years of work experience in the automotive industry. In 1981, he left the automotive industry to seek a career as an independent consultant working in the field of accident investigation. He is the owner of Stilson Consulting located in Wildwood, Illinois, North of Chicago. Mr. Stilson's work in accident investigation covers a period of almost 20 years of the 35 years of engineering and consulting work experience. He has testified as an expert witness in over forty (40) states. Over the last 20 years he has investigated thousands of accidents involving the products of several automotive and product manufacturers. He offers his independent consulting services to industry, business, government and the legal profession. He is a full member of The Society of Automotive Engineers, American Society of Safety Engineers, American Society of Mechanical Engineers and the American Society of Materials and National Association of Fire Investigators. He has published on the subjects of accident reconstruction, crashworthiness, inertia release of buckles and has been requested to speak at seminars for the National Head Injury Alliance on these subjects.

Mr. Stilson has been designated in this case to testify as an expert in the area of vehicle design. His qualifications include his graduation form the University of Michigan in 1967 with a Bachelors of Science in Mechanical Engineering, graduation from the University of Michigan in 1969 with a Master of Science in Mechanical Engineering, Graduation from the Chrysler Institute of Engineering in 1969, with a Masters in automotive Engineering and two certificates in the field of accident reconstruction, 1981 from the University of Wisconsin and 1990 from the University of Georgetown, Washington DC.

In 1965, Mr. Stilson was selected by Ford Motor Company as a cooperative engineer. He worked four months for Ford Motors and them went to school four months until he earned his bachelors degree. Beginning in 1965 as a co-op student with Ford, he started out working in the metal stamping division of Ford Motor Company. His work experience involved hands on work at the plant level working in production control, production tool design and material handling. The plants made steel stamped and formed parts that were assembled into a frame for passenger cars. He also assisted in the design and manufacturing of metal stamping tools for the production of hoods, fenders, roofs, floor pans, body side panels, quarter panels and trunk lids from raw steel sheets and rolls.

Case: 1:09-cv-05340 Document #: 286-1 Filed: 12/07/12 Page 20 of 21 PageID #:2871

In 1966, Mr. Stilson selected work assignments at the Ford Motor Company Research Center Electrical and Engine Division in Dearborn, Michigan. This work involved assignments on the drafting board as a draftsman drawing parts for engine components, such as, connecting rods, crank shafts, pistons, and other engine parts. He then worked in the advanced engine group and developed computer assisted analysis of connecting rods and aluminum pistons. He also worked in the carburetor lab on the testing of this part for engines. His last assignment was work in the Engine Dynamometer Test Labs testing engines for performance and endurance conditions.

Mr. Stilson left Ford Motor Company in 1967 after being selected by Chrysler Corporation to attend the Chrysler Institute of Engineering. The Chrysler Institute taught courses including engine design, automatic transmission design, axle design, steering column design, HVAC system design, suspension design, tire design laboratory, vehicle and system testing using applied technology and procedures. While a student, he also worked in various departments at the Chrysler Corporation, Highland Park Michigan Research Facilities. He worked on the advance design of air bag systems earning a patent in 1968 for a high speed, high temperature gas filtration device. He worked in the advanced development department working on brakes and air bag testing. He also worked on the testing of the three speed automatic transmission, vehicle performance testing of the charger 500 race car and production cars at the Chrysler Chelsea proving grounds, production of passenger car and truck propellor shafts at the Chrysler Assembly plant and finished his training in the advanced program coordination group. In 1969, he took a permanent management grade engineering position in instrument panel and crash pad design and development for passenger cars.

In 1971, Mr. Stilson voluntarily resigned from Chrysler Corporation and rejoined Ford Motor Company in their light truck and recreational products division. He began his work as a product design engineer on body structure systems. This work involved the design of doors, hoods, body sides, floor pans, roofs, tail gates and front end sheet metal components that make up the complete assembly of vans, pick ups and the utility Bronco. In 1972, he was assigned as a product design engineer responsible for door latches, hood hinges, window regulators, hood latches, tail gate latches, window mechanisms and door mechanisms.

In 1972, he was assigned as acting group leader on body structure systems responsible for seven (7) engineers. In 1973, he was promoted to group leader of the body, trim and hardware development for vans, pick ups and 4 x 4's, and the utility Bronco. His duties included the supervision of engineers and evaluating the performance of vehicle systems. In 1976, Mr. Stilson was assigned the position of product engineer on light

truck fuel economy performance and then was assigned product design engineer on light truck wheels and tires in the frame, fuel and tire section.

Mr. Stilson voluntary retired from Ford Motor Company in 1981 and joined Polytechnic, Incorporated in Illinois. Polytechnic, Inc. is an independent consulting firm. Mr. Stilson started his consulting work as senior engineer assisting the president in engineering services. In 1982, he was promoted to director of the vehicle laboratory and began specializing in accident investigations. Mr. Stilson left Polytechnic , Inc. in 1983, and started his own independent consulting firm called Stilson Consulting where he has continued as the owner and principle engineer to the present. Mr. Stilson has specialized his consulting services as an automotive, safety and mechanical consulting engineer in the area of accident investigation. In recent years, his investigative work has concentrated on vehicle fires, roof construction, body construction, door retention, seat belt performance, seat system performance, structural performance, vehicle containment and general vehicle crashworthiness.