**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, | ) | Honorable James F. Holderman<br>Magistrate Susan E. Cox |
| Defendants. | ) | |

**PLAINTIFF'S REPLY TO BMW'S RESPONSE BRIEF CONCERNING REMOVAL OF FUEL SYSTEM COMPONENTS**

Plaintiff, MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, through his attorneys, CLIFFORD LAW OFFICES, P.C., replies to the response brief filed by Defendants, BMW of NORTH AMERICA, LLC, a corporation, and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, and BMW AG, a corporation, (hereinafter BMW), as follows:

## INTRODUCTION

The testimony of multiple eyewitnesses demonstrates one of the reasons that it is so important for Plaintiff's experts to fully evaluate all aspects of the fuel system. Virtually every witness has testified that Mr. Scheinman's BMW caught on fire immediately after impact. The BMW was on fire as Defendant FRANKE's tractor trailer truck pushed it from the stop light, through the intersection, and over to the side of the road. The fire grew and ultimately engulfed the

entire car. Which portions of the fuel system, including the fuel tank and filler neck pipe, may have been compromised as a result of the impact and crush damage to the vehicle, is exactly what Plaintiff's experts need to examine. Deposition testimony as to impact speed has varied. Truck driver Franke testified he was going 25-30 mph when his truck hit the back of Mr. Scheinman's BMW. Fuel tanks get ruptured in crashes in various ways, including by intrusion from component parts of the vehicle that are in immediate proximity to, or in contact with, the surfaces of the fuel tank and fuel system components. Without removing the fuel tank and its related components, neither Plaintiff's experts nor Defendants' experts can visualize, analyze, and evaluate whether or not there is damage to areas of the fuel system that currently cannot be seen, and the extent to which any such damage resulted in the leakage of fuel and the fire that started immediately upon impact.

## DISCUSSION

### I. Removal of the Fuel Tank for Thorough Inspection Is Reasonable, Necessary and Customary Discovery in Fuel System Defect Cases

#### A. Fuel Tank Removal Involves Minimal Alteration To The Vehicle

As an initial point, the court should recognize that throughout its response brief Defendant BMW and their counsel have engaged in repeated use of hyperbole and exaggeration. Defendant repeatedly, and without any basis, attempts to characterize the removal of the fuel tank in overly dramatic, but completely inaccurate terms. For example, Defendants argue that Plaintiff wants to "cut the vehicle undercarriage into as many pieces as possible" (BMW Response Brief, P. 9); or "cut up the undercarriage of the vehicle to remove the fuel tank merely because he wants to see it" (BMW Response Brief, P. 13); "cut out major portions of the undercarriage in an effort to remove the fuel tank" (BMW Response Brief, P. 15). Defendant BMW also claims that Plaintiff "will not even identify exactly what he wants to see, why it is important for him to see it, or what he needs to remove" (BMW Response Brief, P. 13).

Such exaggerated generalizations are simply untrue, as has been made clear by Mr. Stilson in Paragraphs 14-18 of his Declaration, which is attached as Exhibit 1 to Plaintiff's Supplemental Brief In Support Of Removal Of Fuel System Component Parts. As stated there, Plaintiff and his experts need to remove the fuel system components to see all sides of the tank and to inspect the environment surrounding the tank in order to determine how other components of the vehicle interacted with the fuel system, and may have compromised the fuel tank, resulting in leakage of fuel and the subsequent fire. (Plaintiff's Supplemental Brief, Exhibit 1, Stilson Declaration Paragraphs 14-18; Stilson Supplemental Declaration, Par. 3-7; Exhibit 1 attached hereto). Throughout its response brief, Defendant BMW makes claims that simply are untrue. Defendant completely ignores Mr. Stilson's Declaration. Furthermore, one really need not even be an engineer to understand the need for removal of the fuel tank at this stage of this case. It really is a matter of common sense. Simply put, portions of the fuel system cannot currently be seen and inspected. There are areas above and around the tank that cannot be seen. It is just plain disingenuous for defense counsel and their consultant, Mark Noble, to claim that Plaintiff and Mr. Stilson have not explained why the fuel tank needs to be removed. Defendant has not even addressed Mr. Stilson's explanation, and certainly has not rebutted the obvious need to remove the tank to fully inspect it and the areas of the vehicle structure that were in the immediate proximity of the tank before the collision, and that may have penetrated the tank during the collision.

**B. BMW and Noble's Current Objection to Fuel Tank Removal Is Disingenuous, Especially Where They Previously Agreed To Plaintiff's Removal Protocol**

Throughout their brief, Defendants are overly preoccupied with the conversation between Mr. Stilson and Mr. Noble at the time the October 31st inspection was abruptly terminated by BMW's attorneys. Their focus on those conversations appears to be an attempt to justify termination of a common type of inspection that had already been agreed to by them and their consultant, Mark

Noble. Irrespective of that fact, we now are long past the point where those conversations have any relevance. After BMW terminated the inspection, Mr. Stilson provided another even more detailed protocol, and the need for removal of the tank has been amply set forth in Mr. Stilson's original Declaration of December 7, 2012 and his attached Supplemental Declaration dated December 20, 2012.

As Mr. Stilson explains in his Declarations, the removal of the fuel tank after an initial inspection is a very common procedure. In reality, Mark Noble knows that, and defense counsel know that, despite the arguments they make in BMW's response brief. In fact, that is exactly why Mark Noble and defense counsel agreed to Mr. Stilson's original July 27, 2012 teardown protocol for removal of the fuel tank, which specifically delineated 7 steps for removing components around the tank. As discussed in Plaintiff's Supplemental Brief, BMW had completely and thoroughly inspected and documented the current condition of the vehicle on at least three occasions through visual observation, photography, videotaping and measurements. The logical next step for this type of fuel system case is to remove the tank and related components so experts for all parties can properly inspect the entire fuel system. As shown in numerous photographs, there has been substantial damage to the vehicle. Therefore, bolts, screws and nuts simply cannot be loosened in order to free up the fuel system as could be done if service work was being performed on the fuel tank in an undamaged vehicle. The original protocol, to which BMW's counsel and their consultant, Mark Noble, agreed, could not have been more clear in specifying seven steps, every single one of which required removal of some component of the vehicle in order to gain access to the fuel system:

**SCHEIMAN vs BMW/MARTIN** **7-27-2012 JMS**

**TEARDOWN PROTOCOL 2008 BMW**

**The following teardown protocol will follow the service manual procedures except where damage prevents it. In that case, the least intrusive procedure will be taken with agreement of parties. The teardown can be videotaped without sound.**

1. **Remove the two oblique metal bars from their anchorage locations.**
2. **Remove the dual exhaust pipes forward of the fuel tank area rearward.**

**3. Remove the aluminum exhaust shield between the fuel tanks.**
**4. Remove the driver side fuel tank strap and secure the fuel tank prior to removal of the right side fuel tank strap.**
**5. Remove the right side fuel tank strap.**
**6. Remove the fuel tank and filler neck assembly (if filler neck assembly is loose).**
**7. Remove any debris from the filler neck in the routing area up to the filler door.**
**All removed parts will be tagged and/or bagged for preservation and be retained by the plaintiff firm.**

Obviously, defense counsel and their consultant originally recognized that the fuel system should be removed. It is very important for the Court to recognize that at no time prior to October 31, 2012 did Defendants ever claim, as they now do, that there was no need to remove the fuel system components. That argument arose only after defense counsel terminated the removal process midstream at the October 31, 2012 teardown inspection. The fact that there was no original objection to removing the fuel tank demonstrates that Defendant's current argument that there is no need to do so, is completely disingenuous, and is simply an effort to thwart proper investigation and testimony by Plaintiff's experts. The fact that there has to be some VERY LIMITED cutting or disassembly of some vehicle components in order to free up and remove the fuel tank is not unusual or surprising to the experts. In fact, it is the norm because when the area around the fuel system has been damaged, the tank simply cannot be accessed by unscrewing and loosening bolts and fasteners that no longer are in the same condition they were in when the vehicle left the factory.

## II. <u>Mr. Stilson's Declarations and Multiple Photographs Demonstrate The Need For Removal of the Fuel Tank</u>

Defendants have failed to establish that the fuel tank need not be removed for proper inspection, or that they would be unduly prejudiced by said removal. In BMW's response brief, Defendant's consultant, Mark Noble, attached photographs to his Second Supplemental Affidavit. Plaintiff's expert John Stilson has reviewed those photos and discussed their significance in his Supplemental Declaration that is attached hereto and incorporated herein. (Exhibit 1) As Mr. Stilson explains in his Supplemental Declaration, the photos cited by Mr. Noble confirm that there are

multiple areas of the double-sided fuel tank in the Scheinman vehicle that currently cannot be seen or properly examined because they simply are not visible. For the reasons explained by Mr. Stilson in his original and Supplemental Declaration, the fuel tank needs to be removed for proper inspection and analysis, and in order for Mr. Stilson to have an adequate foundation and basis for his opinions in this case. A limited amount of alteration to some existing components that surround the fuel tank must be performed to free up the tank in light of the damage caused by the collision (Exhibit 2, Drawing of undercarriage and fuel tank; Exhibit 4, Photograph)

On Page 14 of its Brief, Defendant BMW argues that: "If Mr. Stilson wishes to determine how the vehicle components interacted with the existing fuel tank, all he needs to do is look at the existing tank and the components as they currently exist in relationship with one another." Such an assertion is both inaccurate and intentionally ignorant. As Mr. Stilson has explained in his Declarations, and as common sense dictates, the tank has to be removed in order to see the parts of the vehicle that surround the tank, and to inspect it for any type of brackets, screws, nuts, bolts, metal pieces, and other items that are known to be capable of penetrating fuel tanks. Therefore, contrary to Defendant's claims, a complete inspection of the fuel tank after removal, and inspection of its environment, is precisely the reason the tank has to be removed.

Furthermore, Defendants claim on Page 14 that "The only thing to be accomplished by removal of the subject tank and replacement with an exemplar tank is to confuse and mislead the jury" is simply uninformed and unfounded. Defendant BMW notably completely fails to explain such a statement, which they attribute to their consultant Mark Noble. Mr. Noble makes no sense when he says that replacing the damaged tank with an exemplar "would accomplish nothing....except to possibly present a misleading condition that never existed". Quite to the contrary, insertion of an undamaged exemplar tank would clearly show the location and condition of the fuel system when this vehicle left the BMW factory. It would show how the tank was positioned relative to the

surrounding environment prior to the impact. Experts then compare the pre-crash location of fuel system component parts to their post-crash position and condition to evaluate how the fuel system performed in the crash.

In fact, as Mr. Stilson has stated, removal of the fuel tank is a customary and necessary discovery procedure in cases involving alleged defects in a vehicle fuel system. Not only has Mark Noble been involved in fuel tank removal cases with Mr. Stilson, but with other experts as well. The Declaration of Plaintiff's attorney, J. Kent Emison, is attached hereto as Exhibit 3. In it he confirms that in the case of *Newton v. Ford Motor Company*, Mr. Noble participated in the removal of the fuel tank from a Ford Crown Victoria vehicle for purposes of complete examination by experts for both sides.

Similar discovery was discussed by the Court in the case of *Jablonski v. Ford Motor Co.*, 923 N.E.2d 347 (5th Dist., 2010). In *Jablonski*, plaintiffs' claims focused on the design of Ford's fuel tank system in the 1993 Town Car. *Id*. Plaintiff retained a mechanical engineer, Mark Arndt, to serve as an expert witness. *Id*. Mr. Arndt's expertise pertained to motor vehicle crashes, particularly those involving post-crash fires. Defendant, Ford, retained Mark Noble, the same expert retained by BMW in the instant case, to serve as an expert witness. Notably, after examining and photographing the fuel tank, in the *Jablonski* case Plaintiff's expert, Mr. Arndt also removed the fuel tank for inspection and analysis. (Emphasis supplied). *Id*. at 359.

Accordingly, the suggestion by BMW and its consultant, Mark Noble, that fuel tank removal is unusual or prejudicial is completely disingenuous and inaccurate. Mr. Noble has participated in numerous cases, including cases with Mr. Stilson, in which the fuel tank has been removed for inspection and analysis of fuel system performance. In fact, Defendant's retained expert, Mark Noble, could not have a valid basis and foundation for his opinions in this case if he has never fully inspected the fuel tank and its surrounding environment after tank removal.

## III. Defendant's Cited Case Law Does Not Support Their Argument Against Fuel Tank Removal

Defendant, BMW, erroneously suggests that a "survey" of cases supports BMW's position concerning removal of the fuel tank. Contrary to BMW's portrayal, the "survey" of cases supplied by BMW does not truly reflect all cases that address the issue of inspections and disassembly. Indeed, most cases involve an agreement by parties to conduct a joint inspection and/or disassembly, so there is never a court ruling, let alone a ruling that is published in a Reporter. See *Brown v. General Motors Corp. et al.*, 238 A.D.2d 884, 660 N.Y.S.2d 780 (NY App. Div. 1997). Assuredly, the "survey" supplied by BMW does not include all cases in which a court has contemplated the disassembly of a component part. Moreover, and again contrary to BMW's portrayal, the instant case does not involve destructive testing. BMW either misunderstands or mischaracterizes what Plaintiff is proposing in this case. There is no destructive testing; Plaintiff merely seeks removal of the fuel tank so as to thoroughly examine the fuel tank, which unquestionably is relevant evidence.

Defendant attempts to mislead the court with its case survey. Though BMW cites cases in which testing was allowed, BMW characterizes several cases as not having allowed testing, when in fact testing was permitted. For example, BMW suggests that the court in *Guerrero v. General Motors* denied or limited testing. That is not true; the court actually permitted the disassembly of the seat belt. *Guerrero* involved an auto collision with product liability claims against the defendant seat belt manufacturer. The evidence at issue was the seat belt, which the plaintiff alleged had jammed, allowing the belt's webbing to slip off the spool and become entangled with the retractor teeth that are stamped into the retractor frame. The plaintiff claimed that the post-accident condition of the belt visibly displayed the engagement between the webbing and the retractor teeth. That condition was documented in photographs and video.

The defendant manufacturer sought to compel production of the seatbelt, because defendant

wanted to unroll the belt in order to determine whether the webbing engaged with the retractor teeth, and if the cause of any engagement was related to any twists in the webbing on the retractor spool. The inspection and disassembly proposed by the defendant would irrevocably change the condition of the belt. The court noted that the alteration would possibly reveal the presence or absence of any anomalies in the webbing and any marks or evidence of involvement of the teeth, as well as allowing for documentation and orientation of the webbing in all respects.

Despite the parties dispute as to the importance of the position of the belt, the court in *Guerrero* held that the disassembly was relevant and related to the cause(s) of the condition and operation of the belt at the time of the accident, and would tend to show whether or not there was any failure of the product. The court specifically concluded that the condition of the belt was the best available evidence from which the experts in the case could determine what transpired in the accident. Disassembly was permitted.

Similarly, BMW mischaracterizes the court's holding in *Dabney v Montgomery Ward*. In *Dabney*, which involved a furnace fire, destructive testing was permitted on the furnace, however, the court denied a request for additional destructive testing of the louvres, because it was first requested only after the first trial in the case. The proposed disassembly in the instant case is timely requested and does not involve permanent destruction of any piece of evidence. As with *Dabney*, the disassembly of the relevant component part, the fuel tank, should be permitted in the instant case.

Defendant cites *In re Newman* as having applicability, however, the patent case is not analogous to the instant set of facts. *In re Newman*, 278 F.2d 971 (Fed. Cir. 1986). Notably, the *Newman* case involves two orders in which the federal court had permitted destructive testing of a patent applicant's product. *Id*. The applicant sought a writ of mandamus to prevent the testing, because the testing would allow the National Bureau of Standards to have the device at issue for seven months; cause the device to be relinquished without any test protocols or methods having been

designed; cause that the inventor would not be informed of who would perform the tests; allow the inventor to observe testings, but not allow for an expert to be present; that the device would remain in control of the PTO after the tests and would only be returned after any trial, and that the NBS could destroy the device, with mere notice to the inventor. *Id*.

Clearly, the issues presented in *Newman* are not remotely relatable to the issues at hand. Plaintiff does not seek exclusive control of the fuel tank; there is a protocol; there is identification of the experts that will conduct the removal of the fuel tank; any party and its expert can be present; and, there is no destruction of any component part. In fact, the fuel tank can be re-affixed to the undercarriage of the vehicle. Importantly, the court in *Newman* specifically noted that "Rule 34 discovery is a common procedure, as is inter partes testing in general, arising in actions where there is a need to conduct inspections and tests for evidentiary purposes. Such tests routinely are made in the presence of the opposing party, and the test data are routinely provided to all parties." In the instant case, Rule 34 discovery, including the joint removal of the fuel tank, is a routine type of inspection for a case involving such allegations, and should be permitted.

The *Houseknecht* case involved an alleged wrongful death at a construction site at the Illinois Center. *Houseknecht v. Zagel, et al.*, 112 Ill. App.3d 284, 445 N.E.2d 402 (1st Dist. 1983). The State of Illinois investigated the occurrence, and intended to conduct testing. The plaintiff contended that the State of Illinois limited her access to the construction materials at issue; informed her of their intent to take the materials to Champaign, Illinois, in order to conduct destructive testing on them; refused to advise her of the exact nature of those proposed tests' and, refused to permit her representatives to control those tests in any manner. *Id.* The plaintiff alleged that the proposed destructive testing would alter and destroy the condition of those materials and would thus destroy evidence of vital importance to her civil lawsuit. *Id*. The specific objection was that the State's failure to notify her representatives of the testing so as to allow their presence would irreparably

harm her. *Id*. The plaintiff did not oppose testing. Rather, the plaintiff sought a preliminary injunction enjoining the defendants from removing the materials from the jurisdiction of the circuit court of Cook County, enjoining them from performing any destructive testing until further order of court, ordering them to provide the plaintiff with a list of all proposed tests on those materials fourteen days prior to testing, and barring any testing unless all parties to the suit agreed to the testing or until further order of court. *Id*. Clearly, the issues raised in *Houseknecht* are not analogous to the instant issues before this Court.

BMW also suggests that the court in *Bostic* did not permit testing, however, that is not entirely accurate. In *Bostic,* a defendant sought production of the chair from another defendant for the purpose of testing the chair's seat. *Id.* Although the court in *Bostic* did not allow for multiple "plug samples" to be taken from the seat (in part because a sample of the seat's wood had previously been taken from the chair and produced to the defendant), the court did permit total disassembly of the chair. *Id*. In the instant case, the Court should permit a disassembly of a small portion of the undercarriage so as to allow for removal of the fuel tank for purposes of expert evaluation and inspection. Consistent with the court's rationale in *Bostic*, such disassembly permits access to "the internal materials and structures, . . . to perform an internal examination." *Id*.

Defendant BMW also takes the unusual approach of claiming that the fact that Plaintiff has not proposed testing of the fuel tank is somehow supportive of their claim that there is no need to remove the tank. Defendant's argument is nonsensical because it ignores the fact that multiple courts have permitted far greater intrusion upon, and destruction of, evidence in destructive testing cases than Plaintiff desires to do here. Plaintiff Scheinman is not even asking to destroy any evidence. Rather, Plaintiff is simply asking to remove the tank in order to inspect it, as well as the environment surrounding the tank. Defendant BMW completely ignores the fact that tank removal is far less intrusive than was permitted by courts in the many destructive testing cases cited by Defendant in

its Response Brief.

**IV. Defendant's Misplaced Attempts To Criticize Plaintiff's Expert John Stilson Are Completely Unfounded**

Defendant mistakenly relies on *Shimanovsky* to suggest that Mr. Stilson should be prevented from removing the fuel tank in the instant case. *Shimanovsky v. General Motors Corp*., 692 NE 2d 286 (Ill. Sup. Ct., 1998). *Shimanovsky* is inapplicable to, and wholly distinguishable from, the instant set of facts. *Id*.

In *Shimanovsky*, plaintiff suffered injuries when her 1992 Chevrolet Caprice lost power steering function, swerved, struck a guard rail, rebounded across all traffic lanes, and struck a concrete barricade. *Id*. Prior to filing suit, in 1985, plaintiff's counsel retained Mr. Stilson to investigate potential causes of the accident, including whether a defect in the vehicle caused the accident. *Id*. Upon inspection of the vehicle, Mr. Stilson could not identify an obvious defect. Stilson then removed the power steering control, so as to determine if there was a defect in the power steering mechanism. *Id*. Mr. Stilson identified grooves in the mechanism, and recommended that a metallurgist determine whether the grooves were a result of the crash or whether they pre-dated the crash. *Id*. Thereafter, plaintiff's counsel retained a metallurgist, Lyle Jacobs. Jacobs determined that it was necessary to slice sections of the metal, so as to conclude the cause of the grooves. *Id*. Jacobs documented his tests and analysis in a written report with 27 photographs. *Id*. Mr. Stilson eventually used the report as one basis for his opinions in the case.

Notably, Jacobs' report was produced to defense counsel early in the case. *Id*. Equally notable, the defendant never asked for the component parts (although they had been preserved) until five years into litigation, and there had been no objection raised by the defendant concerning the pre-suit testing by plaintiff's metallurgist. *Id*. Only on the eve of trial did the pre-suit testing become a matter for which the defendant sought sanctions against the plaintiff. *Id*.

Importantly, Lyle Jacobs, not John Stilson, sectioned the component part. The court specifically stated that "Jacobs performed destructive testing." *Id*. Nevertheless, Defendant, BMW, overzealously and inaccurately maligns Mr. Stilson with the wholly false claim that Mr. Stilson destroyed evidence. Regardless, BMW's mischaracterization of Mr. Stilson's role in Shimanovsky is irrelevant to the true issue before this Court. Significantly, *Shimanovsky* involved pre-suit handling of evidence in the 1980's, which is entirely distinct from how evidence is managed during litigation today. Defendant, BMW's, excessive treatment of *Shimanovsky* is unrelated to the issue at hand and, therefore, irrelevant. At issue is the right of a party to engage in reasonable discovery when the condition of the evidence, in this case the fuel tank, is wholly relevant.

Significantly, the court in *Shimanovsky* emphasized, as does Plaintiff in the instant case, that "either party may seek production of evidence for testing whenever the condition of such item is relevant." *Id.* Undisputedly, the condition of the fuel tank is relevant and significant to Plaintiff's claims. Plaintiff should not have to premise expert opinions on the limited type of discovery that BMW's expert, Mark Noble, apparently thinks is adequate. Plaintiff is entitled to access, examine and inspect the fuel tank, in its entirety, as it is relevant and probative of Plaintiff's claims.

BMW distorts the true applicability of *Shimanovsky* to the facts at hand and, in actuality, is acting in the same manner of which they are critical. In *Shimanovsky*, the conduct criticized was that the plaintiff's actions allegedly prevented the defendant from advancing defendant's case by preventing the performance of any testing on the component part central to the plaintiff's claim. Peculiarly, in the instant case, BMW and Mark Noble attempt to do the same. That is, BMW's actions, in this case, are intended to prevent the plaintiff from fully accessing (let alone performing any testing) the component part central to Plaintiff's claim. BMW's position is really no different from the conduct scrutinized in *Shimanovsky*. Neither Plaintiff, nor Plaintiff's expert, has done anything to compromise any piece of evidence in this case, pre-suit or otherwise.

Contrary to defense counsel and Mr. Noble's innuendo and mischaracterizations of case law, Mr. Stilson has done nothing to warrant malignment or suspicion. Mr. Stilson has not violated a court order. In fact, it is Mark Noble who has a history of violating a fairly obvious court order. If anyone should be concerned about the potential disregard for a court's authority, it should be Plaintiff's concern over Mr. Noble's inability to abide by court orders. Indeed, in *Gerow*, in which Mr. Stilson and Mr. Noble were both retained experts, it was Mark Noble who violated the court's order to exclude witnesses when Mr. Noble reviewed the transcript of the plaintiff's expert's trial testimony before he took the stand. *Gerow v. Mitch Crawford Holiday Motors*, 987 S.W.2d 359 (WD Mo., 1999). Contrary to his unsupported inferences, Mr. Noble has no experience with Mr. Stilson violating any court orders. Rather, it was Mr. Noble, who violated a rather obvious and important court order in the *Gerow* case.

## CONCLUSION

Plaintiff asks this court to recognize that Defendant's objection to removal of the fuel tank is simply a disingenuous attempt by both BMW's counsel and Mark Noble to prevent reasonable and necessary discovery that is entirely customary in cases involving alleged fuel system defects and fires. Defendant BMW did not originally object to removal of the fuel tank, and, in fact, agreed to Mr. Stilson's July 27, 2012 protocol. Neither BMW nor Mr. Noble claimed then that they had any need to keep the fuel tank in the vehicle in order to show how it performed during the crash.

Additionally, BMW has not established any genuine prejudice that would result to them by having the tank removed for proper inspection by experts for all parties. The undercarriage and fuel tank has been inspected, photographed, videotaped, measured, and examined at least three times by BMW and its experts prior to their termination of the removal of the tank on October 31, 2012.

The two Declarations of Plaintiff's fuel system expert, John Stilson, as well as the discussion set forth above and in Plaintiff's Supplemental Brief, establish ample basis for permitting Plaintiff

to remove the fuel tank for proper and thorough inspection. There is no legitimate basis for Defendant's current claim that the tank must be kept in place simply to show a jury how it performed in the crash. Rather the opposite is actually true, which is that the tank must be removed in order to be fully inspected, along with its currently hidden surrounding environment, in order for experts and a jury to know how the tank performed during the collision.

WHEREFORE, Plaintiff asks that this court order that Plaintiff and his experts may proceed with all steps of Mr. Stilson's revised teardown protocol dated October 31, 2012 and attached as Exhibit E to Plaintiff's Motion to Compel Inspection and Removal of Fuel System Component Parts (Document #275).

      s//Richard F. Burke, Jr.
Submitted By One of Plaintiff's Attorneys
Richard F. Burke, Jr.
ARDC No: 03121588

Robert A. Clifford
Richard F. Burke, Jr.
Shannon M. McNulty
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090 / (312) 251-1160 (Fax)