IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) ) ) ) ) | No. 09 CV 5340 |
| Plaintiffs, | ) | |
| vs. | ) ) | Judge James Holderman Judge Magistrate Susan E. Cox |
| SAMUEL G. FRANKE, et. al. | ) | |
| Defendants. | ) | |

**BMW REPORT TO THE COURT ON NON-DESTRUCTIVE INSPECTION**

NOW COME the Defendants BMW of NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (jointly referred to hereinafter as "BMW"), by their attorneys, James K. Toohey and Timothy R. Couture, and for their Report on Non-destructive Inspection of the BMW vehicle at issue in Plaintiff's claims against these Defendants state as follows:

On February 19, 2013, BMW presented to this Court their objections to Judge Magistrate Cox' January 28, 2013 Order which permitted Plaintiff and his expert to engage in the destructive removal of the fuel tank from the BMW in which Plaintiff was sitting when it was rammed from behind by a 74,000 pound tractor-trailer. Among other relief sought, BMW asked the Court to order that a non-destructive examination of the vehicle and fuel tank be undertaken using mirrors, lights and a scope camera. See Dkt 298.

At said hearing, Counsel for Plaintiff asserted that his expert did not believe that a scope examination would be adequate because it "doesn't permit a full and complete view of all the potential areas for holes" in the fuel tank. See Transcript of February 19, 2013 hearing, attached as Exhibit A, pp. 18-19.

1

While the Court did not overturn Judge Magistrate Cox' order, it stayed enforcement of said order so that the scope inspection occur. In so ordering, the Court stated:

> --in reviewing the materials, I actually don't even understand why the tank has to be removed if, in fact, the damage to the tank that was caused by the accident is visual. I also think that if there is a means to put a scope in the tank so that the tank can be examined from the inside, I don't know why you'd have to remove it until you have evaluated that there is some further damage that would allow an expert to opine on crashworthiness of the vehicle itself.

Id. at pp. 18-19.

In advance of the inspection, counsel for BMW sent emails confirming that the scope inspection should be both video and audio recorded to confirm that Plaintiff's experts have the full opportunity to direct how the scope is used so that they can examine every area that cannot be visualized with the naked eye. BMW's emails also indicated that, if there was anything that attendees believed was unable to be visualized using the naked eye, as supplemented by mirrors and the scope, the experts should consider the possibility of drilling small port holes to allow for assertion of the scope be able to visualize such areas with the scope. See emails between Plaintiff's counsel Richard Burke and BMW Counsel James Toohey and Timothy Couture attached as Group Exhibit B.

The parties agreed that the event would proceed on Saturday March 16, 2013 in Lake Zurich, Illinois at the facilities of Plaintiff's consultant, Dynamic Safety. BMW rented an Olympus IPlex scope with photographic and video recording capabilities to use at the inspection. The inspection commenced at 9:30 a.m. Present at the inspection on behalf of Plaintiff were attorneys Richard Burke and Shannon McNulty and consulting expert Thomas Green, an employee of Dynamic Safety. Present for BMW were attorney Timothy Couture and consulting expert Mark Noble. Present for Defendants Franke and Martin's Bulk Milk were attorney Jason Briesemeister and consulting expert Michael Sutton. Attorney William Yu was present for

2

Defendants International Paper and UACL. Notably absent was John Stilson, Plaintiff's expert who had previously provided multiple affidavits in support of Plaintiff's claim that they needed to remove the subject fuel tank. The inspection was recorded by digital videotape, and all involved were told that the camera's audio-recording function was operational[1]

BMW's expert Mark Noble operated the scope, and in doing so, was able to visualize the front, back, sides and top of the fuel tank at issue.[2] Further, he was able to operate the scope so as to visualize the top, bottom sides, front and back of the inside of the tank. See Third Affidavit of Mark Noble, attached as Exhibit C, ¶ ¶ 4-6. Each time he operated the scope, the camera view was fully visible to all present at the inspection. Mr. Noble invited input by all counsel and experts present to allow each to see any part of the tank and surrounding area he deemed relevant or necessary to evaluate the vehicle and fuel tank. Id. Each probe with the scope was recorded on video. There were initial technical difficulties with the scope equipment, specifically, the scope showed an "error" message each time it recorded for more than 2 minutes, and the video files for such scopes were not viewable.[3] This difficulty was resolved by thoroughly re-performing each such scope and recording for less than 2 minutes. See Exhibit C, ¶ 5. Seven video files were corrupted by such an "error" and 29 video files were successfully recorded.

More than once, counsel for BMW, Timothy Couture, asked Richard Burke and Tom Green to specify any area or specific point they felt they needed to see, and specifically if there was any portion of the fuel tank or its surroundings that either believed could not be seen with the scope. On various occasions, Plaintiff's representatives pointed out areas on the scope of

---

[1] Counsel for Plaintiff asked if the audio could be turned off, and was told that, with that particular camera, it could not be turned off. Counsel for Plaintiff asked if the camera was sensitive enough to record conversations at the vehicle a distance away, and Counsel for BMW said he did not think so, but was not sure.
[2] The bottom of the tank was fully visible with the naked eye, so no scope inspection was necessary.
[3] The vendor from whom BMW rented the subject equipment, Ashtead Technology, has since indicated that these files were corrupted and cannot be viewed.

where closer examination was requested, and Mark Noble was able to operate the scope to successfully show said areas. See Exhibit C, ¶ 7.

At the end of the inspection, Timothy Couture asked Richard Burke and Tom Green if there were any portions of the car or fuel tank that Plaintiff's representatives still needed to see which they had not yet visualized with the naked eye or the scope, so that attempts could be made to view such areas with the scope. Mr. Burke first advised that there were "many areas that could not be seen." Mr. Couture pointed out that he brought Mr. Stilson's affidavits to the inspection so that the parties could examine all of the areas Mr. Stilson testified he could not see that required destructive removal of the tank, and asked Mr. Burke to be specific about what areas remained unviewed so that efforts could be undertaken to visualize each of them. Burke would not specify, and accused Mr. Couture of trying to start an argument. He disagreed that the purpose of the inspection was to allow Plaintiff's experts the opportunity to probe with the scope to see parts of the fuel tank that were not visible with the naked eye, and then determine if there were relevant locations they could not see without destructive disassembly and removal of the tank. One such exchange as recorded by the audio/video record of the inspection is as follows:

> *Mr. Couture: I understand the purpose of this scope was to figure out what you say could not be seen with the naked eye so that we could use the scope to try to see it.*
>
> *Mr. Burke: No, the purpose of the scope is that you asked for it,*
>
> *Mr. Couture: For the purpose showing you what you what you said you could not see with the naked eye.*
>
> *Mr. Burke: No, Your purpose was what for you to look at whatever you wanted to look at.*

See Recording from Digital Tape 6 of 6 from March 16, 2013 inspection, attached hereto as

4

Exhibit D, 43:40-44:08[4]. After nearly six hours, with no party seeking further examination of the subject car with the scope equipment, the inspection was ended.

The inspection was completed over the course of six hours of examination. Over the course of that time, all participants were able to visualize by use of mirrors, lights and scopes, every area of the BMW vehicle's fuel tank, both inside and outside, and the surrounding areas without exception. See Exhibit C. Plaintiff's counsel and their expert were given every opportunity to examine, visualize and record the entire tank and its surrounding environment, and any other area or location they believed necessary to their case. In light of the successful inspection of the fuel tank on March 16, 2013, there is no further need for destructive removal of the fuel tank. See Exhibit C, ¶ 9.

                                                  Respectfully submitted,

                                                  JOHNSON & BELL, LTD.

                                                  By: /s/ Timothy R. Couture
                                                  One of the Attorneys for Defendants
                                                  BMW of NORTH AMERICA, LLC and
                                                  BAYERISCHE MOTOREN WERKE AG

James K. Toohey
Timothy R. Couture
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
Telephone: 312/372-0770

---

[4] As the entire inspection was recorded on 6 1 hour digital video tapes, only the final tape is included as an exhibit. The entirety of the nearly six hours is available should it be requested or required.