# JAE # 2

# Excerpts from the Transcript of Deposition of Samuel Franke, Volume I, dated January 12, 2010.

130547293v1  0903067

1    **A.**    It was July -- I think it was July 2nd, I

2    think.  It was the night of the accident.

3    **Q.**    The day of the accident?

4    **A.**    Hm-hmm.

5    **Q.**    I believe that's July 3rd, 2008.

6          At the time of -- and if I refer to "the

7    incident" or "the collision" or "the accident" or

8    "the event in question," you -- can we agree you

9    understand I'm referring to the collision between

10    your truck and Mr. Scheinman's vehicle?

11    **A.**    Yes.

12    **Q.**    On that -- on the day of that incident, by

13    whom were you employed?

14    **A.**    Martin Bulk Milk.

15    **Q.**    And for how long had you been employed by

16    Martin's Bulk Milk?

17    **A.**    It was two weeks shy of being ten years.

18    **Q.**    And are you familiar with a company called

19    MBM Logistics?

20    **A.**    Yes.

21    **Q.**    Okay.  And what's your understanding of

22    their business?

23    **A.**    They're a brokerage firm.  My

24    understanding, they get loads -- they're the ones

6

1    who you think your employer was, even if you think

2    you were employed by -- well, here.  Let me ask you

3    that first.

4               Who did you believe you were employed by

5    in July of 2008?

6        A.    Martin Bulk Milk.

7        Q.    Okay.  At any time in the past, have you

8    been employed by MBM Logistics?

9        A.    No.

10       Q.    Regardless of who you've been employed by,

11   what -- and even while you were employed by

12   Martin's Bulk Milk Service, would you ever get

13   assigned to do work for MBM Logistics?

14       A.    It's always assigned through Martin's.

15       Q.    And what type of work would you be assigned

16   to do?

17       A.    Hauling freight.

18       Q.    And would you then be hauling freight for

19   MBM Logistics?

20       A.    I don't know.  I mean, I don't know.

21       Q.    But what you're -- what you're telling us

22   is that there were times in the past that you would

23   get assigned by Martin's to haul some freight for

24   or at the request of MBM Logistics?

                                                    10

1    A.   Yes.

2    Q.   When you would do that, by whom would you

3  get paid?

4    A.   Martin Bulk Milk.

5    Q.   Was the -- was MBM Logistics involved in

6  the transportation of the paper products you were

7  hauling at the time of this incident on July 3rd?

8    A.   I don't know.

9    Q.   Did -- on July 3rd of 2008, who did you

10  consider to be your supervisor or boss?

11    A.   David Martin and the Martins, the Martin

12  Bulk Milk.

13    Q.   Did you get assigned to do a pick-up of

14  International Paper products on July 3rd, 2008?

15    A.   Yes.

16    Q.   And is that an assignment you had received

17  on other occasions prior to that day?

18    A.   Yes.

19    Q.   At the time of this incident, you were

20  driving a tract- -- on a tractor and hauling a

21  chassis with a container on it, correct?

22    A.   Yes.

23    Q.   Okay.  Do you know who owned the tractor

24  you were driving?

                                          11

1    A.    Martin Bulk Milk.

2    Q.    What -- how frequently did you work for

3    Martin's?

4          Did you have a regular work schedule?

5    A.    Yes.

6    Q.    Okay.  And what was that schedule?

7    A.    Like Monday -- I mean, it is, like, Monday

8    through Friday or Monday through -- you know,

9    Monday through Friday.  I mean, all week, like

10   full-time.

11   Q.    And at the time -- or strike that.

12         Would -- did you drive the same tractor

13   each day?

14   A.    Yes, for the most -- yes.

15   Q.    At the time of the incident, you were

16   hauling a chassis, correct?

17   A.    Yes.

18   Q.    And do you know who owned that chassis?

19   A.    No.

20   Q.    That -- did that chassis have a container

21   on it?

22   A.    Yes.

23   Q.    And inside of the container was what type

24   of goods or product?

                                                    12

1     Q.   Okay.  How about these bills of lading in

2    Exhibit 6, are you familiar with these, Mr. Franke,

3    entitled Memo Bill?

4     A.   Yes.

5     Q.   Okay.  And do they bear your signature on

6    the right-hand side on each of the three pages?

7    You can take a look at them.

8     A.   Yes.

9     Q.   Okay.  What -- what does placement of your

10    signature on these pages mean on this document?

11     A.   That means that I was the driver that

12    picked the load up and I'm -- or I was responsible

13    for the load until I get to Wilton or...  So that's

14    just saying that I was the driver that picked it

15    up.

16     Q.   Okay.  And this is -- this describes the

17    load that you picked up at International Paper

18    warehouse in Hammond and was ultimately going to

19    Midland in Minneapolis, and XPEDX?

20     A.   That's --

21     Q.   And where is the last one going?  Cenveo in

22    Minneapolis, correct?

23     A.   Yes.

24     Q.   Okay.  To you -- are you familiar with the

20

1  in Highland Park, was it Mr. Dave Martin, in

2  particular, or was it some other person working

3  under his supervision who dispatched you for this

4  load, if you remember?

5  **A.**   I don't remember.  It was -- no, I don't

6  remember if it was actual Dave or -- I don't

7  remember.

8  **Q.**   Okay.  If it wasn't Dave, who would it have

9  been?

10  **A.**   Just one of the girls in the office maybe.

11  **Q.**   Are the other dispatchers in July of

12  2008 -- were they women, all women?

13  **A.**   No.

14  **Q.**   So let me ask -- you got a quizzical look

15  on your face.  Let me ask it this way:

16         Back in July of 2008, even though you

17  had been doing this run on a regular basis for a

18  number of years --

19  **A.**   Years.

20  **Q.**   -- correct?

21  **A.**   Yes.

22  **Q.**   All right.  Would you still receive a call

23  from somebody at Martin's Bulk Milk Service

24  indicating where you were to go and what you were

26

1　going to be picking up?

2　　**A.**　Yes.

3　　**Q.**　And that would occur regularly toward the

4　tail end of an afternoon?

5　　**A.**　Yes.

6　　**Q.**　On this particular date, July 3, 2008, is

7　it your testimony that you're not precisely sure

8　who it was, but whoever it was would have been

9　acting under the supervision of Dave Martin?

10　　**A.**　Yes.

11　　**Q.**　All right.

12　　MR. SKRYD:　And I think, to be fair, he said it

13　could have been Dave Martin.

14　　MR. FISHER:　And that was going to be my next

15　question.

16　　MR. SKRYD:　Right.　Okay.

17　BY MR. FISHER:

18　　**Q.**　And if it wasn't one of the people working

19　under the supervision of Dave Martin, it would most

20　likely have been Dave Martin, himself?

21　　**A.**　Yes.

22　　**Q.**　As you sit here today, you don't have a

23　memory of who it was, correct?

24　　**A.**　Yes.

27

1      Q.    Can you say, however, without a doubt that

2    the only person from whom you received an oral

3    direction that day over the telephone to go pick up

4    the load that you eventually picked up, that person

5    was employed by Martin's Bulk Milk Service?

6      A.    Yes.

7      Q.    All right.  Looking at the page that has

8    Question 11 on it, do you see where that question

9    asks for you to identify the name, address,

10   employer and job title of all persons from whom

11   you, Samuel Franke, received instructions, routing

12   directions or other information concerning all legs

13   of any trips driven by you on July 2nd or 3rd,

14   including your trip to International Paper Company?

15            Do you see that question?

16     A.    Yes.

17     Q.    And I've fairly read it to you?

18     A.    Yes.

19     Q.    Is your answer to that question, as you sit

20   here today responding to our questions under oath,

21   that the only persons you received directions from

22   concerning this trip was someone from Martin's Bulk

23   Milk Service?

24     A.    Right.

                                                    28

1   Q.   That's a correct statement?

2   A.   Yes.

3   Q.   All right.  Okay.  You can set that aside.

4   MR. FISHER:  And, Joe, do you have the exhibits

5   that I marked at the tail end?

6   MR. SKRYD:  Yeah.

7   MR. FISHER:  Okay.  Great.  Yeah.  Great.

8           If you could direct his attention to

9   No. 17, please.

10   MR. SKRYD:  17.

11   MR. FISHER:  It's the -- there you go.  We got

12   it.

13   BY MR. FISHER:

14   Q.   Yeah.  Okay.  Mr. Franke, I'll -- as you

15   can see from Exhibit 17, it's two pages.  They're

16   identical pages.  They were just --

17   A.   Okay.

18   Q.   -- provided by each of my clients, all

19   right?

20   A.   All right.

21   Q.   Do you recognize Exhibit 17?

22   A.   Yes.

23   Q.   Tell us what it is.

24   A.   It's a mileage -- it tells you how many

29

1    A.    When I was in Indiana -- I mean, like I

2    said, I do it every day.  So I know it's, you know,

3    basically five and a half, five -- you know, it's

4    11 miles.  So probably when I was sitting at the --

5    International Paper waiting is probably when I

6    wrote down the entry there.

7    Q.    Okay.  Thank you.  You can set that aside.

8          Now, if you would look at Exhibits 18,

9    19 and 20.  I will represent to you that those are

10   collections of the three bills of lading or memo

11   bills for the July 3rd trip.

12   A.    Right.

13   Q.    It so happens that each collection is

14   multiple copies with notations on them that are

15   recorded at different times, I think, and I want to

16   ask you some questions, okay?

17   A.    Okay.

18   Q.    All right.  So look at Exhibit 18.

19   A.    Okay.

20   Q.    On the first three pages of Exhibit 18,

21   does that appear to be the bill of lading that has

22   your signature on it for the commodity which

23   weighed 7,668 pounds?

24   A.    Yes.

32

1    invoice with a date of 7/17/08?

2        A.    Yeah.

3        Q.    Now, that's well after you left the

4    employment of Martin's Bulk Milk, right?

5        A.    Yeah.

6        Q.    Okay.   Did you ever get involved in the

7    invoicing of any of the loads that you were

8    transporting?

9        A.    No.

10        Q.    You see the name John Moore which appears

11    in the bill to section of that invoice?   Upper

12    left.

13        A.    Yes.

14        Q.    Okay.   Do you know anyone named John Moore

15    who works with broker settlements of UACL, or

16    Universal Am-Can, Limited?

17        A.    No.

18        Q.    Did you ever have any conversations with

19    anyone at Universal Am-Can, Limited, concerning the

20    load that you were hauling on July 3, 2008?

21        A.    No.

22        Q.    Before July 3, 2008, when you would

23    routinely do these runs, these round-trip runs from

24    Wisconsin down to Chicago and Hammond and back, did

                                                    39

1    you ever have any contact, telephonic or in person,

2    with anybody who represented himself or herself to

3    be associated with Universal Am-Can, Limited?

4       **A.**    No.

5       **Q.**    My same -- this is the same question, but

6    I'm now going to change the name of the company.

7             On the day of this incident, July 3,

8    2008, did you ever have any conversations with

9    anybody at Overnite Express concerning the load

10   that you were pulling that day?

11      **A.**    No.  I don't -- I didn't -- I never talk to

12   Overnite.  Overnite would -- I get them -- all of

13   my information from Martin's.

14      **Q.**    Okay.  And so your answer to my question is

15   "no," correct?

16      **A.**    Right.

17      **Q.**    Now, I'm going to take it back.

18             Before July 3, 2008, did you ever have

19   any conversations with anybody who represented

20   himself or herself to be associated with or

21   employed by Overnite Express concerning any of the

22   loads that you were hauling?

23      **A.**    On a regular basis or --

24      **Q.**    Any contact at any time.

                                                          40

1   when I dropped the load off at Martin's, I would

2   either hang them on the other guy's clipboard or,

3   if he was there, just hand them paper bills to him.

4   And he'd take those bills up and he would have --

5   whoever he dropped them off, I suppose, would sign

6   the bills.  That's all.

7     **Q.**   Okay.  Do you know anything about a

8   transition in company name or company ownership

9   between Overnite Express and Universal Am-Can,

10   Limited?

11     **A.**   No.

12     **Q.**   Did you ever in June or July of 2008 ever

13   learn that those companies were changing their

14   relationship with each other?

15     **A.**   No.  No, I don't -- no, I don't think so.

16   I don't think so.

17     **Q.**   Okay.  When you were hauling the load on

18   July 3, 2008, did you consider yourself to be an

19   employee of Martin's Bulk Milk Service?

20     **A.**   Yes.

21     **Q.**   Did you believe that you were hauling this

22   load on July 3, 2008 on behalf of Martin's Bulk

23   Milk Service, your employer?

24     **A.**   My employer, yeah.  They're in this --

44

1   Q.   Did you ever represent to anyone -- for

2   example, when you arrived at the warehouse, did you

3   ever represent to them, say to them something like,

4   Hi, I'm Sam Franke, I'm here on behalf of

5   Overnite Express, Inc.?

6   A.   I mean, to -- I mean -- I don't know that I

7   was over -- I would not -- I don't think I'd come

8   in and say it like that.  I don't know.

9   Q.   Okay.  Did you ever say, Hi, I'm Sam

10  Franke, I'm here on behalf of International Paper

11  Company?

12  A.   No.

13  Q.   Why wouldn't you do such a thing?

14  A.   Because I was there to pick up.  I was not

15  there on their behalf, you know.

16  Q.   Okay.  Did you ever represent, while doing

17  this load or any other load, to someone at the

18  warehouse, Hi, I'm Sam Franke, I'm here on behalf

19  of Universal Am-Can, Limited?

20  A.   No.

21  Q.   Did you even know that company existed?

22  A.   No.  That's the first I heard of it.

23  Q.   Did you ever have any documents that you

24  received from anyone that said that you were doing

45

1   the work for Overnite Express, Inc.?

2   **A.**   On the bills of ladings, it's on -- I think

3   it says -- has Overnite Express on them.

4   **Q.**   All right.  Other than the presence of that

5   name on bills of lading, was there any other

6   document that you ever saw that said anything about

7   Overnite Express concerning any of the loads that

8   you were hauling on your usual round-trip loads

9   every day?

10   **A.**   No, it's just that -- just that it was on

11   the bill of ladings.

12   **Q.**   Did you receive a paycheck from Martin's

13   Bulk Milk?

14   **A.**   Yes.

15   **Q.**   Were your taxes deducted on a W-2 from

16   Martin's Bulk?

17   **A.**   Yes.

18   **Q.**   You received a W-2 for tax deductions,

19   right?

20   **A.**   Yes.

21   **Q.**   And who provided you the truck with which

22   you did your work?

23   **A.**   Martin Bulk Milk.

24   **Q.**   Did you have to wear a uniform?

46

1    A.    No.

2    Q.    Did you wear anything on your person that

3    identified you as an employee of Martin's Bulk Milk

4    like a hat or a shirt?

5    A.    On occasion, I'd have a hat when it was

6    cold out.  I'd wear a Martin jacket, but...

7    Q.    Did you ever wear a Universal Am-Can

8    jacket?

9    A.    No.

10    Q.    Did you ever wear an Overnite Express

11    jacket?

12    A.    No.

13    Q.    Did you ever wear an International Paper

14    jacket?

15    A.    No.

16    Q.    Did you ever consider yourself to be an

17    employee of any of those companies?

18    A.    Just Martin Bulk Milk.

19    MR. FISHER:  Okay.  That's all I have.

20          Thanks, Mr. Franke.

21          EXAMINATION

22          BY

23          MR. BENTIVENGA:

24    Q.    Hi, Mr. Franke.  I'm Scott Bentivenga and I

47

1            And then also as part of your job for

2  Martin's Bulk Service, you then picked up an empty

3  container on a chassis at the CSX rail yard, right?

4    **A.**   Yes.

5    **Q.**   And that was all part of your job for

6  Martin's?

7    **A.**   Yes.

8    **Q.**   And then you would pull out of the CSX rail

9  yard and go pick up your next load as directed by

10  your employer, Martin's Bulk Service?

11    **A.**   Yes.

12    **Q.**   All right.  With respect to the pick-up and

13  delivery that you did on July 3, 2008, you received

14  all of your instructions and directions with

15  respect to those loads from your employer, Martin's

16  Bulk Service, correct?

17    **A.**   Right.

18    **Q.**   All right.

19    **A.**   That's -- yeah, as far as -- as far as

20  pick-up numbers and stuff like that you're talking,

21  right?

22    **Q.**   For the load that you were going to pick

23  up --

24    **A.**   Right.

Sullivan Reporting Company
TWO NORTH LA SALLE STREET  •  CHICAGO, ILLINOIS 60602

1     FURTHER EXAMINATION

2     BY

3     MR. BURKE:

4  Q. Mr. Franke, with respect to the

5 circumstances or business relationships that gave

6 rise to you transporting paper products at the time

7 of this collision, would it be correct to say that

8 you -- you have no knowledge or understanding of

9 the business relationships between Martin's and

10 International Paper, CSX, Universal, Overnite,

11 Trac Leasing, Celtic or anyone else?

12  MR. SKRYD: Do you have any knowledge about

13 that? That's what he wants to know.

14  THE WITNESS: No.

15 BY MR. BURKE:

16  Q. Okay. Would it be correct that Martin's

17 did not share that information with you or did not

18 involve you in those business details?

19  A. You're correct. That would be correct.

20  MR. BURKE: Nothing else.

21    Thank you.

22  MR. FISHER: 27.

23

24

                58

1      **A.**    Right.

2      **Q.**    Okay.   And you have no knowledge of what

3   information Mr. David Martin has concerning these

4   three questions, correct?

5      **A.**    Right.

6      MR. BURKE:   Nothing else.

7      MR. SKRYD:   Okay.   Now we'll reserve.

8               FURTHER DEPONENT SAYETH NOT. . .

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                              62

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   MURRAY SCHEINMAN, Plenary        )
    Guardian of the Estate and       )
4   PERSON OF JEFFREY J. SCHEINMAN,)
    a Disabled Person,               )
5                                    )
               Plaintiff,            )
6                                    )
       vs.                           ) No. 09 CV 5340
7                                    )
    MARTIN'S BULK MILK SERVICE,      )
8   INC., et al.,                    )
                                     )
9              Defendants.           )

10          This is to certify that I have read the

11   transcript of my deposition taken on the 12th day

12   of January 2010 in the foregoing cause, and that

13   the foregoing transcript accurately states the

14   questions asked and answers given by me, with the

15   changes or corrections, if any, made on the Errata

16   Sheet(s) attached hereto.

17

18

19          _____

20            **SAMUEL G. FRANKE**

21        Subscribed and sworn to
          before me this _____day
          of _____ 2010.
22

23          _____
                  Notary Public

24

                                               63

```
 1   STATE OF ILLINOIS )
                       ) SS:
 2   COUNTY OF DU PAGE )

 3        I, Steven Stefanik, a notary public in and

 4   for the County of Cook and State of Illinois, do

 5   hereby certify that SAMUEL G. FRANKE was first duly

 6   sworn to testify the whole truth, and that the

 7   above deposition was recorded stenographically by

 8   me and was reduced to computerized transcript under

 9   my personal direction.

10        I further certify that the said deposition

11   was examined and read over by said deponent and was

12   signed by him and that the said deposition

13   constitutes a true record of the testimony given by

14   the said witness.

15        I further certify that the said deposition

16   was taken at the time and place specified and that

17   the taking of said deposition commenced on the 12th

18   day of January 2010 and was completed the same day.

19        I further certify that MR. RICHARD F.

20   BURKE, JR., of the firm of CLIFFORD LAW OFFICES,

21   120 North LaSalle Street, Suite 3100, Chicago,

22   Illinois 60602, appeared as attorney for the

23   plaintiff; that MR. JOSEPH SKRYD of the law firm of

24   MULHERIN, REHFELDT & VARCHETTO, P.C., 211 South
```

64

1   Wheaton Avenue, Suite 200, Wheaton, Illinois 60187

2   appeared as attorney for the defendant.

3       I further certify that I am not a relative

4   or employee or attorney or counsel of any of the

5   parties, or a relative or employee of such attorney

6   or counsel, or financially interested directly or

7   indirectly in this action.

8       In witness whereof, I have hereunto set my

9   hand and affixed my seal of office, at Chicago,

10  Illinois, this 28th day of January 2010.

11

12

13

14               Steven T. Stefanik, CSR

15                 No. 084-003298

16

17

18

19

20

21

22

23

24

65