# JAE # 4

# Excerpts from the Transcript of Deposition of David Martin, Volume I, dated January 12, 2010

130547293v1 0903067

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   MURRAY SCHEINMAN, Plenary        )
     Guardian of the Estate and       )
 4   PERSON OF JEFFREY J. SCHEINMAN,  )
     a Disabled Person,               )
 5                                    )
                Plaintiff,            )
 6                                    )
        vs.                           ) No. 09 CV 5340
 7                                    )
     MARTIN'S BULK MILK SERVICE,      )
 8   INC.; SAMUEL G. FRANKE; CSX      )
     INTERMODAL, INC.; INTERNATIONAL  )
 9   PAPER COMPANY; and OVERNITE      )
     EXPRESS, INC.,                   )
10                                    )
                Defendants.           )
11           The deposition of DAVID MARTIN, called by
```

12   the Plaintiff for examination pursuant to notice

13   and pursuant to the Rules of Civil Procedure for

14   the United States District Courts pertaining to the

15   taking of depositions, taken before Steven

16   Stefanik, a notary public within and for the County

17   of DuPage and State of Illinois, at Suite 200, 211

18   South Wheaton Avenue, Wheaton, Illinois on the 12th

19   day of January 2010.

20        APPEARANCES:

21             CLIFFORD LAW OFFICES, by
               MR. RICHARD F. BURKE, JR.
22             120 North LaSalle Street, Suite 3100
               Chicago, Illinois 60602
23             (312) 899-9090
                    for the Plaintiff;

24

                                                              1

```
 1    Q.   If I refer to "this incident" or "the
 2  occurrence of July 3rd, 2008," you understand I'm
 3  talking about the incident involving Mr. Franke and
 4  Mr. Scheinman's vehicle; is that correct?
 5    A.   Yes.
 6    Q.   Okay.  With respect to the tractor that
 7  collided with Mr. Scheinman's car, was that
 8  tractor -- or strike that.
 9         By whom was that tractor owned?
10    A.   By Martin's Bulk Milk Service,
11  Incorporated.
12    Q.   Has that tractor prior to this incident
13  been used to transport goods for MBM Logistics?
14    MR. SKRYD:   If you know.  Don't guess.
15    THE WITNESS:   I don't recall.
16  BY MR. BURKE:
17    Q.   Who -- who is the hierarchy of
18  MBM Logistics?
19         Is there a president?
20    A.   Al Martin.
21    Q.   And how about under that?
22    A.   Randy.
23    Q.   Gal- --
24    A.   Galewski.
```

15

Sullivan Reporting Company

```
 1    Q.   How would you figure that out?  What
 2  documents could you look at to determine the answer
 3  to that?
 4    A.   Franke had a dedicated run.  So he would
 5  mostly pull loads out of Arcadia to Chicago for
 6  Martin's Bulk Milk.
 7    Q.   Out of Arcadia?
 8    A.   But there's more various locations.  We --
 9  we -- our business, we have, you know, quite a few
10  customers.
11         So it just -- 90 percent the loads come
12  out of Arcadia.
13    Q.   And where is Arcadia?  In what state?
14    A.   Wisconsin.
15    Q.   From what facility or business would he
16  pull loads from normally in Arcadia?
17    A.   Mostly out of Ashley Furniture.
18    Q.   Well, was Sam Franke an employee of any of
19  the Martin's entities?
20    A.   He was an employee of Martin's Bulk Milk.
21    Q.   And did he have an employment contract with
22  Martin's, a written one?
23    A.   He had -- he got a W-2 form from Martin's
24  Bulk Milk.
```

18

```
 1            Who -- who performed the normal
 2   maintenance on that tractor?
 3       A.   Our shop in Wilton.
 4       Q.   And when you say "our," who do you mean?
 5       A.   Martin's Bulk Milk Service's own shop in
 6   Wilton, Wisconsin.
 7       Q.   Now, at the time of this incident,
 8   Mr. Franke was hauling a chassis; is that right?
 9       A.   A box and a chassis.
10       Q.   And the box was placed on top of the
11   chassis, correct?
12       A.   Correct.
13       Q.   How does the chassis and box that
14   Mr. Franke was hauling differ than what sometimes
15   might be referred to as a trailer?
16       A.   A box and chassis -- that the box can be
17   lifted off from the chassis, whereas a regular
18   trailer cannot be.  It's all one unit.  His was two
19   units.
20       Q.   This had a separate just flat chassis,
21   correct?
22       A.   Correct.
23       Q.   And onto that chassis could be placed
24   various steel box-like containers, correct?
```

25

1  coming back to Wisconsin, back to our terminal.
2     Q.   So making a delivery and coming back to the
3  Martin's terminal?
4     A.   Yes.
5     Q.   All within a certain time period or not
6  necessarily?
7     A.   Not necessarily.
8     Q.   With respect to Exhibit No. 11, the
9  confirmation sheet you got from
10 Overnite Logistics -- by the way, do you know the
11 difference between -- if any -- Overnite Logistics
12 and Overnite Express, Incorporated?
13    A.   I do not.
14    Q.   With respect to Exhibit 11, you had -- were
15 telling us that this confirmation sheet got faxed
16 to you.
17        What did you do in response to receipt
18 of this document?
19    A.   Mr. Franke is informed to pick up this
20 load, which is Exhibit 11, and dispatch from my
21 office contacts (sic) that information to him.
22    Q.   Do you know where Mr. Franke physically was
23 located when he had this information communicated
24 to him?

1    A.    Chicago.

2    Q.    Okay. And was there a dispatcher at
3 Martin's that communicated this information?

4    A.    Yes.

5    Q.    And pursuant to this request by Overnite,
6 did Mr. Franke go to the Exel Warehouse?

7    A.    Yes.

8    Q.    Did he obtain -- did he make a pick-up of
9 paper product?

10    A.    He picked up paper at -- for
11 International Paper at Exel Warehouse for
12 Overnite Logistics.

13    Q.    And what did he do with it after making
14 that pick-up?

15    A.    He made it to Highland Park, which is where
16 he had the accident.

17    Q.    Okay. And was he en route -- or strike
18 that.

19        Where -- where was Mr. Franke heading
20 to? Was he going to Minneapolis for these
21 deliveries or elsewhere?

22    A.    Wilton.

23    Q.    Wilton?

24        Okay. And what would happen -- how

57

```
 1    A.    Yes.
 2    Q.    Okay.  Okay.  Did Martin's do all of the
 3  maintenance on -- on the tractor?
 4    A.    Yes.
 5    Q.    How about the chassis that was involved in
 6  this incident, had Martin's ever maintained that
 7  chassis?
 8    A.    No.
 9    Q.    Okay.  If I could -- if you could go ahead
10  and do what I was starting to ask you.  Just tell
11  us the entries there, please, sir.
12    A.    On 4/11/08, replaced the pigtail end that
13  bolts to truck and that plugs into the trailer.
14    Q.    Okay.  What's the pigtail end refer to?
15    A.    The pigtail end is the light plug from the
16  tractor that goes into the trailer that operates
17  the lights.
18    Q.    Okay.
19    A.    On April '08 --
20    Q.    Some unspecified date -- there's a question
21  mark for the exact date in April '08; is that --
22    A.    That's correct.
23    Q.    -- what that means?
24          Okay.  Go ahead, sir.
```

77

1    A.    New steer tires, new studs and nuts on the
2 right side.  Changed out right duals on both axles,
3 adjusted alignment; new hanger bearings; adjusted
4 clutch; adjusted brakes; straightened bumper.
5    Q.    And the mileage at that time was 240,056?
6    A.    Yes.
7    Q.    Okay.  Go ahead.
8        May 10th, '08?
9    A.    Tightened step on right side.  June 2nd,
10 mileage.
11    Q.    You know, just in fairness, back to the
12 unknown date in April.
13        Did I -- it's -- did I cut you off
14 before you said adjusted brakes?
15    A.    No, I believe I said that.
16    Q.    Did you say that?  Okay.  I thought I
17 interrupted you at some point.
18        Back to May 10th, '08.
19    A.    The mileage on May 10th, '08 was 253,236.
20 Service.
21    Q.    Actually, isn't that for June 2nd, '08?
22    A.    Yes.
23    Q.    My -- okay.
24        Go ahead.

Sulivar Reporting Company

1   A.   DOT inspection.  Replaced right high beam;
2   replaced right cab turn assembly; replaced two
3   marker bulbs; replaced long hood cable; replaced
4   alternator belt.
5   Q.   The last entry for under the specified date
6   in June of '08 is what?
7   A.   Mileage on June '08 was 261,061 and a new
8   hood cable was put on.
9   Q.   Okay.  Thank you.
10          All right.  Exhibit -- I think
11  Exhibit 8, we've talked about before.  That's the
12  ITOPS Inspection, Detail Display?
13  A.   This is an end-gate out of CSX on
14  47th Street.
15  Q.   Right.
16          And that would be where you believe
17  Mr. Franke picked up the trailer, correct?
18  A.   Correct.
19  Q.   And then how about Martin Exhibit No. 4,
20  sir, what is that?
21  A.   This is an annual inspection done on the
22  chassis on May 23rd of '08 from CSX.
23  Q.   And where did you obtain a copy of this
24  inspection form?

79

1              Go ahead.

2       THE WITNESS:  We have to follow the rules of

3  hours of service and speed limits.

4  BY MR. FISHER:

5       Q.   And that's, I take it, independent of

6  whatever contractual relationship you had with

7  Universal Am-Can, correct?

8       A.   Yes.

9       Q.   Did you, as a representative of Martin's

10  Bulk Milk Service, ever represent to anyone,

11  regardless of who that person's employed by, that

12  Mr. Franke was an agent of International Paper when

13  he was doing his daily runs?

14       MR. SKRYD:  Objection to the form.

15       THE WITNESS:  No.

16  BY MR. FISHER:

17       Q.   Did you ever represent to anyone concerning

18  the daily runs that Mr. Franke would do, that he --

19  Mr. Franke was an agent of Universal Am-Can?

20       MR. SKRYD:  Again, objection to form and the

21  term "represent."

22       THE WITNESS:  No.

23  BY MR. FISHER:

24       Q.   And same question:

142

1       Did you ever represent to anyone else
2  that Mr. Franke was acting as an agent on behalf of
3  Overnite Express when he was doing his runs?
4       MR. SKRYD: Same objection. Form; the term
5  "represent."
6       THE WITNESS: No.
7  BY MR. FISHER:
8       Q. Would it be fair to say that you would
9  represent to individuals that Mr. Franke was an
10 employee of your company?
11      A. Yes.
12      Q. And that he would receive direction,
13 control, supervision and management from your
14 company when he was doing his work on the road?
15      A. Yes.
16      Q. Did International Paper ever dictate to
17 your company how Mr. Franke was to drive his motor
18 vehicle?
19      MR. SKRYD: Objection. Calls for speculation,
20 foundation as to what they did or didn't tell him.
21      THE WITNESS: Not that I recall.
22 BY MR. FISHER:
23      Q. Did Universal Am-Can ever direct Mr. Franke
24 in the way he was to drive his vehicle?

143

1       MR. SKRYD:  Same objections.
2       THE WITNESS:  Not that I recall.
3  BY MR. FISHER:
4       Q.   Same question as to Overnite Express.
5            Did they ever dictate to Mr. Franke how
6  he was to drive his vehicle on his daily runs?
7       A.   Not that I recall.
8       Q.   Did Overnite -- strike that.
9            Did International Paper ever advise you
10 that Mr. Franke was not to do any of these runs
11 that he had been doing day in, day out; week in,
12 week out; month in, month out?
13      A.   No.
14      Q.   Did Universal Am-Can ever make such a
15 dictation or direction to your company about
16 Mr. Franke?
17      A.   No.
18      Q.   Same question as to Overnite Express.
19      A.   No.
20      Q.   Did International Paper ever pay Mr. Franke
21 directly?
22      A.   Not to my knowledge.
23      Q.   That would have been a violation of the
24 agreement that existed between your company and

144

1  Overnite Express or Universal Am-Can, correct?
2     A.   Correct.
3     Q.   Did International Paper ever provide any
4  tools, materials or equipment for Mr. Franke to do
5  his job on his usual daily runs?
6     A.   Not that I recall.
7     Q.   And what about Universal Am-Can, did they
8  ever provide any tools, equipment or materials for
9  Mr. Franke to do his daily runs?
10    A.   Not that I recall.
11    Q.   Same question as to Overnite Express?
12    A.   Not that I recall.
13    Q.   Did Mr. Franke's job ever involve the
14 brokering of loads?
15    A.   No.
16    Q.   Did Mr. Franke's job -- strike that.
17         Was Mr. Franke's income -- let me
18 rephrase my question.
19         Did International Paper,
20 Overnite Express or Universal Am-Can ever deduct
21 withholding tax from Mr. Franke's pay --
22    A.   No.
23    Q.   -- because of the runs that they did --
24 that he did?

145

1   A.   No.

2   Q.   When you were asked questions by Mr. Burke
3   before in which he suggested to you and you agreed
4   that Mr. Franke was the agent of
5   International Paper or Overnite Express or
6   Universal Am-Can, why did you say "yes" to those
7   questions?

8       MR. BURKE:  Objection to the form of the
9   question.

10      MR. SKRYD:  Go ahead.  Answer.

11      THE WITNESS:  We're all tied into the movement
12  of the load that we did day to day:  CSX,
13  Universal Am-Can, Exel, International Paper and
14  Trac Leasing.

15  BY MR. FISHER:

16  Q.   And how does that tying in or
17  interrelationship necessarily mean that Mr. Franke
18  is an agent as opposed to an independent contractor
19  of any of those other entities?

20      MR. BURKE:  Objection to the form.

21  BY MR. FISHER:

22  Q.   If you know.

23  A.   I don't know.

24  Q.   So when you answered Mr. Burke's questions

146

1  A.  Yes.

2  Q.  All right.  And that's because Mr. Samuel
3  Franke drove and operated the truck, correct?

4  A.  Yes.

5  Q.  And he did so as an employee of
6  Martin's Bulk Service, correct?

7  A.  Yes.

8  Q.  And Mr. Franke was not an employee of any
9  other entity or person other than Martin's Bulk
10 Service on July 3, 2008 when he operated that
11 tractor when he was involved in the accident on
12 July 3, 2008; is that correct?

13 A.  Correct.

14 Q.  Can you go to No. 6, Request No. 2?

15 MR. SKRYD:  One or two at a time.  Hope we're
16 skipping a little around.  I'm just kind of teasing
17 you there.

18 MR. BENTIVENGA:  Well, it's just --

19 MR. SKRYD:  I'm just teasing you.

20 MR. BENTIVENGA:  I'm not going to ask about the
21 ones --

22 MR. SKRYD:  I'm just teasing you.

23 MR. BENTIVENGA:  I'd like to get through this,
24 too.

153

1         When Mr. Franke would drive a tractor
2  and/or a tractor and trailer and/or a tractor and
3  chassis and container onto CSXI property or a CSX
4  rail yard, he did that as an employee as part of
5  his job for Martin's Bulk Service; am I right?
6     A.   Yes.
7     Q.   All right.  He did that because he was
8  making deliveries, pick-ups, drop-offs for
9  Martin's Bulk Service as part of his job, right?
10    A.   Yes.
11    Q.   And he took his instructions and his
12 direction and his jobs from Martin's Bulk Service,
13 correct?
14    A.   He took -- yeah, he took the instructions
15 from me.
16         I don't know whether -- any other
17 instructions he took from anybody else that could
18 have involved him with other than what I told him.
19    Q.   Okay.  Are you aware of any document or
20 information that would indicate that CSXI in some
21 way, shape or form indicated or held out Mr. Franke
22 as an employee of CSXI?
23    A.   No.
24    Q.   Are you aware of any document or

```
 1       MR. GOLDEN:  Said so.  Asked and answered.
 2       THE WITNESS:  I cannot say if anybody would have
 3  had any influence on Sam.  I wasn't there.
 4  BY MR. BENTIVENGA:
 5       Q.   Okay.  You -- you directed the work of
 6  Mr. Franke by dispatching him for this load,
 7  correct?
 8       A.   Yes.
 9       Q.   And you did that on behalf of Martin's Bulk
10  Service, right?
11       A.   Yes.
12       Q.   Are you aware of any document or
13  information that would indicate that CSXI had a
14  right to direct the work of Mr. Franke with respect
15  to his delivery of that load for Martin's Bulk
16  Service?
17       A.   No.
18       Q.   Do you -- are you aware of any document or
19  information that would indicate that CSXI exercised
20  any right to direct or control Samuel G. Franke
21  with respect to this delivery on July 3, 2008?
22       A.   No.
23       Q.   So based on what you know, CSXI did not
24  direct the work of Samuel G. Franke with respect to
```

164