# JAE # 5

# Excerpts from the Transcript of Deposition of David Martin, Volume II, dated February 20, 2012

130547293v1 0903067

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian )
of the Estate and Person of JEFFREY)
J. SCHEINMAN, a Disabled Person,   )
                                   )
            Plaintiff,             )
                                   )
    vs.                            ) No. 09 CV 5340
                                   )
MARTIN'S BULK MILK SERVICE, INC.,  )
SAMUEL G. FRANKE, CSX INTERMODAL,  )
INC., INTERNATIONAL PAPER COMPANY, )
UNIVERSAL AM CAN, LTD., Successor  )
to OVERNITE EXPRESS, INC. and OX   )
LLC, BMW OF NORTH AMERICA, LLC, a  )
corporation, BAYERISCHE MOTOREN    )
WERKE AKTIENGESELLCHAFT, a         )
corporation, BMW AG, a corporation,)
and KARL KNAUZ MOTORS, INC., a     )
corporation,                       )
                                   )
            Defendants.            )
```

The Videotaped Deposition of DAVID V. MARTIN, taken in the above-entitled cause, before Cheri LeBeau Dubina, a notary public of DuPage County, Illinois, on the 20th day of February, 2012, commencing at 11:15 a.m., at 211 South Wheaton Avenue, Suite 200, Wheaton, Illinois, pursuant to Notice.

Reported by: Cheri LeBeau Dubina, CSR
License No.: 084-002986

204

---

1  APPEARANCES:
2  CLIFFORD LAW OFFICES
3  120 North LaSalle Street
4  31st Floor
5  Chicago, Illinois 60602
6  Tel: 312-899-9090
7  by: MR. RICHARD F. BURKE, JR. and
8  MS. SHANNON M. McNULTY,
9      On behalf of the Plaintiff;
10 MULHERIN, REHFELDT & VARCHETTO, P.C.
11 211 South Wheaton Avenue, Suite 200
12 Wheaton, Illinois 60187
13 Tel: 630-653-9300
14 by: MR. JOSEPH G. SKRYD and
15 MR. MATTHEW R. SCHRECK,
16     On behalf of Martin's Bulk Milk
17     Service and Samuel G. Franke;
18 DOWD & DOWD, LTD.
19 617 West Fulton
20 Chicago, Illinois 60661
21 Tel: 312-704-4400
22 by: MR. ROBERT J. GOLDEN,
23     On behalf of Martin's Bulk Milk
24     Service and Samuel G. Franke;

205

---

1  APPEARANCES: (Continued)
2
3  HINSHAW & CULBERTSON
4  222 North LaSalle Street
5  Suite 300
6  Chicago, Illinois 60601
7  Tel: 312-704-3000
8  by: MR. CARLTON D. FISHER,
9      On behalf of International Paper
10     Company, Overnite Express, Inc., Ox
11     LLC, Universal Am Can, Ltd. and
12     Overnite Logistics, Inc.;
13
14 JOHNSON & BELL, LTD.
15 33 West Monroe Street
16 Suite 2700
17 Chicago, Illinois 60603
18 Tel: 312-372-0770
19 by: MR. TIMOTHY R. COUTURE,
20     On behalf of BMW of North America,
21     LLC and Bayerische Motoren Werke
22     Aktiengesellchaft.
23
24 ALSO PRESENT: Dulce Rodriguez, Videographer

206

---

```
                    I N D E X
WITNESS                              Page
DAVID V. MARTIN
    Direct Exam by Mr. Fisher         211
    Cross-Exam by Mr. Couture         361
    Cross-Exam by Mr. Burke           407
    Redirect Exam by Mr. Fisher       478
    Recross Exam by Mr. Couture       506
    Recross Exam by Mr. Burke         512
                   EXHIBITS
Martin Deposition Exhibit Nos.       Page
49 - Supplemental Disclosures of Martin's
     Bulk Milk Service                218
50 - Answers of Defendant Martin's Bulk
     Milk Service                     218
51 - Supplemental and amended answers of
     Martin's Bulk Milk Service       218
52 - Response of Martin's Bulk Milk to
     production request               218
53A - Supplemental and amended response of
     Martin's Bulk Milk Service       218
53B - Supplemental and amended response of
     Martin's Bulk Milk Service       218
54 - Second supplemental and amended
     response of Martin's Bulk Milk Service  240
55 - Third supplemental and amended
     response of Martin's Bulk Milk Service  240
56 - Letter regarding Mr. Franke's driver
     qualification records            240
57 - Series of printouts of various invoices  243
58 - Memo Bill, Load and Rate Confirmation
     and invoice                      249
59 - Memo Bill, Load and Rate Confirmation
     and invoice                      249
60 - Memo Bill, Load and Rate Confirmation
     and invoice                      249
61 - Martin's Bulk Milk invoice #190383  271
62 - Invoices                         272
63 - Invoices                         272
64 - Overnite Logistics Load and Rate
     Confirmation sheets              272
65 - Broker Confirmation sheets       272
66 - Memo Bills                       272
67 - Photocopies of the markings of
     confirmation sheets              280
```

207

Page 280:

1  could give us an answer to that question?
2  A. July 2nd is the last one.
3  Q. All right. All right. Good. You can set
4  65 aside. Okay. And then, finally, look at
5  Exhibit 66. I'll represent to you, once again,
6  these are documents that came from your company
7  that you and your colleagues produced to us.
8  Do these appear to be the memo bills or
9  bills of lading pertaining to the loads that were
10 being driven by Mr. Franke from May 30th, 2008 up
11 through and including the July 2nd, 2008 memo bill
12 on the last page?
13 A. Yes.
14 Q. I'm done with that one.
15 A. And these still have Overnite Express on
16 them too.
17 Q. In deed. Old habits die hard, I guess.
18     (Whereupon, Martin Deposition
19     Exhibit No. 67 was marked for
20     identification.)
21 BY MR. FISHER:
22 Q. Just to keep the ball rolling in terms of
23 numbers -- I had a duplicate. Mr. Martin, I'll
24 represent to you that Exhibit 67 is simply

Page 281:

1  photocopies of the markings I made on all those
2  hundreds, if not thousands, of pages of documents
3  you produced to us of confirmation sheets from
4  December 29th, '06 to May 29th, '08, the invoices
5  from January 11th, '07 to June 4th, '08 and the
6  memo bills from December 29th, '06 to May 29th,
7  2008. That's the sum total of the hundreds, if not
8  thousands, of pages of documents that you and your
9  company supplemented its discovery responses in
10 early 2008, all right?
11 A. Yes.
12     MR. FISHER: Okay. Why don't we take a
13 break just for a second.
14     THE VIDEOGRAPHER: We're going off the
15 video record. The time now is 12:45 p.m.
16     (A break was taken.)
17     (Whereupon, Martin Deposition
18     Exhibit Nos. 68, 69, 70 and 71
19     were marked for identification.)
20     THE VIDEOGRAPHER: We are back on the
21 video record. The time now is 1:05 p.m.
22 BY MR. FISHER:
23 Q. All right. I'm going to change topics a
24 little bit, Mr. Martin. I'll tender to you what's

Page 282:

1  been marked as Exhibits 68, 69 and 70.
2  I will represent to you that Exhibit 68 is
3  a collection of documents that was sent to us in
4  February of this year from your attorneys' office
5  representing sort of a supplement to the documents
6  that had been produced as a part of Exhibit 69,
7  which is the next document.
8  And if you look at 69, you'll see on the
9  very front cover you see it's labeled Franke
10 Employment File, received from MBMS December 2011,
11 okay?
12 A. Okay.
13 Q. All right. And then Exhibit 70 is copies
14 of the logs that were provided to us in December of
15 2011, okay?
16 A. Okay.
17 Q. Now, today we received from your counsel
18 Exhibit 71 which, I believe, is a compilation of
19 everything that Exhibit 68, 69 and 70 is but I
20 haven't had a chance to double-check it, all
21 right.
22 So here's what I want to ask you. Exhibit
23 71 was copied today and provided to all counsel.
24 Do you know whether or not those copies that are

Page 283:

1  marked Exhibit 71 are copies of originals that you
2  brought with you today?
3  A. Yes.
4  Q. Okay. And tell us what you brought with
5  you from Wisconsin today of which copies were made
6  and comprise Exhibit 71.
7  A. You had the logs before, correct?
8  Q. I think so, yes, but Exhibit 71 consists
9  of the logs again, right?
10 A. Yes.
11 Q. Okay. And what else does Exhibit 71
12 consist of?
13 A. There's logs. There's pay stubs for Sam
14 Franke. There's a copy of his medical examiner's
15 certificate.
16 Q. As you leaf through there, let me ask you
17 this. Is it fair to say that Exhibit 71 consists
18 of the following: His logs for whatever time
19 period the logs represent?
20 A. Yes.
21 Q. Okay. The pay stubs of which you just
22 mentioned?
23 A. Yes.
24 Q. And then is the balance of Exhibit 71,

**Page 284**

1 based upon what it was you brought with you, his
2 driver qualification file?
3   A. Yes.
4   Q. Now, you know, do you not, that the driver
5 qualification file, the contents of it, is defined
6 by Federal Motor Carrier Safety Regulations,
7 correct?
8   A. Yes.
9   Q. Is the information that you have provided
10 us as a part of Exhibit 71, the driver
11 qualification file plus any other documents that
12 might form the basis of a personnel or employment
13 jacket that do not technically fit under the
14 categories of what's required for a driver
15 qualification file or are there no such documents
16 that are a part of Exhibit 71?
17   A. Everything that's in here is what we -- is
18 required by us to carry on a driver.
19   Q. Does Martin's Bulk Milk keep a driver
20 qualification file on its drivers such as
21 Mr. Franke?
22   A. Yes.
23   Q. And to the best of your knowledge is the
24 driver qualification file contained among the

**Page 285**

1 exhibits -- excuse me, contained among the pieces
2 of paper that comprise Exhibit 71?
3   A. Yes.
4   Q. Is there any other file that Martin's kept
5 on Mr. Franke apart from the driver qualification
6 file, apart from any accounting records that might
7 exist for his pay?
8   A. No.
9   Q. So -- and the reason I ask this is because
10 there's some trucking companies I'm aware of that,
11 you know, maintain a separate personnel file or a
12 separate human relations file that has maybe some
13 correspondence or other documents that don't fit
14 the technical requirements of a driver
15 qualification file, and I hear you saying that
16 Martin's Bulk Milk did not keep such a file of
17 Mr. Franke; is that correct?
18   A. Correct.
19   Q. Okay. By the way, while we're talking
20 about the driver qualification file, are there --
21 if you look at Exhibit now 68, because we have
22 68 --
23     MR. SKRYD: Right here. You got 68?
24

**Page 286**

1 BY MR. FISHER:
2   Q. Okay. Do you see that the first page is
3 Violation and Review Record?
4   A. Yes.
5   Q. And then it has a D.A.C. -- D-A-C -- a
6 D.A.C. Report contained among those records?
7 Actually, it's entitled D.A.C. Services, MVR Report
8 about three or four or five pages in?
9     MR. SKRYD: I think it's four pages in.
10 BY MR. FISHER:
11   Q. Here we go. It looks like that.
12   A. Yes.
13   Q. Okay. Do you know what D.A.C. is?
14   A. I don't. I know what it is but I don't
15 know what the term of it is.
16   Q. Do you know that D.A.C. is a service
17 provided by a particular company that does MVR
18 reports?
19   A. Yes.
20   Q. And is that the service that Martin's Bulk
21 Milk uses to do its annual reviews of its drivers?
22   A. Yes.
23   Q. Who would have had the responsibility of
24 reviewing or doing the annual review of

**Page 287**

1 Mr. Franke's file at Martin's Bulk Milk?
2   A. Janet Henthorn at the time, which is Janet
3 Berndt now, had that responsibility.
4   Q. And based upon -- Strike that.
5     What is her current title?
6   A. Personnel.
7   Q. Does she also serve in any safety
8 capacity?
9   A. Personnel and payroll.
10   Q. Is there someone who has the role of
11 safety for Martin's Bulk Milk?
12   A. Bob Hahn.
13   Q. And when did Bob Hahn take on safety
14 responsibilities?
15   A. Around September of 2008.
16   Q. Who took -- who had safety
17 responsibilities for Martin's Bulk Milk before
18 September of 2008?
19   A. Janet Berndt.
20   Q. Did you -- Strike that.
21     As of 2007 and 2008 did you know Samuel
22 Franke?
23   A. Yes, just as a driver.
24   Q. And when you knew him as a driver, did you

**Page 304**

1 freight it was that Martin's Bulk Milk was hauling
2 pursuant to this Master Brokerage Agreement with
3 Universal Am Can as of 2007 and up to the middle of
4 June of 2008?
5    A. Well, this could be for -- this could be
6 for any kind of freight.
7    Q. Okay.
8    A. I mean, for any loads that they throw by
9 us, we could have taken any load that they want to
10 broker out.
11    Q. Do you have any -- Strike that.
12       Did that happen?
13    A. I don't know.
14    Q. Hold that thought.
15       THE VIDEOGRAPHER: Going off the video
16 record. The time now is 1:33 p.m.
17       (A break was taken.)
18       THE VIDEOGRAPHER: We are back on the
19 video record. The time now is 1:37 p.m.
20 BY MR. FISHER:
21    Q. In order to answer the question of whether
22 that happened, Mr. Martin, would accounting records
23 probably need to be checked?
24    A. Yes.

**Page 305**

1    Q. Okay. So if you look back at -- and I've
2 got an extra copy of it here for you to look at.
3 If you look back at Exhibit 57, which was that
4 collection of, you know, spread sheets on invoicing
5 that you said, hey, I don't know anything about
6 this, do you see where it says invoice payment
7 status for broker settlements UACL on the very,
8 very first page and it shows invoices from November
9 1st, 2008 to January 8th, 2010?
10    A. Yes.
11    Q. I presume it would be that Martin's Bulk
12 Milk would have the ability to do an invoice run
13 using this same program but go back to 2005, 2006,
14 2007 to find out if there were any loads that were
15 being pulled for Universal Am Can pursuant to such
16 an agreement, right?
17    A. Yes.
18    Q. Okay. All right. I'll just take that
19 back from you. Thanks. And the person to answer
20 such a question, who might that be if we don't
21 already have the information by just looking at
22 documents?
23    A. Joanne Biemier.
24    Q. Joanne?

**Page 306**

1    A. Biemier. You got it.
2    Q. Okay. Back to Exhibit 15 again. When --
3 Strike that. I'm going to come back to Exhibit 15
4 in a second.
5       Look at Exhibit 75 but keep 15 handy.
6 Exhibit 75 is the last of the four documents that
7 were produced to us in the last month or so.
8    A. Okay.
9    Q. All right. So that if you look at
10 Exhibits 72, 73, 74 and 75, we have agreements
11 dated in September of '02, January of '04, July
12 of '05, and then June of 2008. Do you follow me so
13 far?
14    A. Yes.
15    Q. Okay. Do you know why it is Martin's Bulk
16 Milk did not come up with and produce a copy of the
17 Universal Am Can Limited Master Brokerage Agreement
18 dated November 7th, 2007 even though as Exhibit 15
19 shows it has a fax transmission from Martin's Bulk
20 Milk to a 1-800 number?
21    A. No.
22    Q. Who physically looked for the contracts at
23 Martin's Bulk Milk?
24    A. Janet and some other personnel.

**Page 307**

1    Q. Did you yourself do that?
2    A. No, I did not.
3    Q. So would those be the persons, the persons
4 in the accounting or billing department, who would
5 be able to answer the questions of how information
6 is kept, where the contracts are, and how the
7 filing is done?
8    A. Yes.
9    Q. Okay. Now, would you agree with me, sir,
10 that on Exhibit 15 that there is language contained
11 on this November 7, 2007 agreement, specifically
12 numbered Paragraph 3, that says, among other
13 things, quote, carrier is an independent contractor
14 and is -- and this is all caps -- in no way to be
15 considered an agent, employee or joint venturer of
16 UACL in the providing of any services hereunder,
17 unquote?
18    A. I see it, yes.
19    Q. All right. Had you ever seen that
20 language before?
21    A. No.
22    Q. Look at Exhibit 75. And do you see on
23 Exhibit 75 that same identical language appears in
24 numbered Paragraph 3 on the June 12th, 2008 Master

**Page 324**

1 the accident?
2 A. Well, there was no conversation. I got it
3 off a voice mail.
4 Q. No, I understand that.
5 A. Okay. So -- go ahead.
6 Q. Here's what I'm trying to find out because
7 it's going to lead to another question. I want to
8 know what conversations or interaction you had with
9 anybody at Martin's Bulk Milk having to do with
10 investigating what happened.
11 A. The only investigation we did was go
12 through the police report just to read what had
13 happened.
14 Q. Do you know whether or not based upon
15 conversations with Martin's Bulk Milk,
16 conversations with the police, or anyone for that
17 matter, excluding consultation with your company's
18 counsel, whether or not there was any evidence that
19 Mr. Franke was fatigued or tired on the night of
20 the accident?
21 A. No.
22 Q. When you say "no," do you mean by that,
23 no, there were no such conversations, or that was a
24 subject of investigation and it was determined that

**Page 325**

1 he was not fatigued?
2 A. There was no conversations involved that
3 he was fatigued.
4 Q. Okay. I'm going through the notes from
5 your first deposition and in light of the other
6 documents, I want to just see if there's any
7 follow-up questions I've got from your first
8 deposition.
9 With respect to the distribution center in
10 Hammond to which Mr. Franke went on a regular
11 basis, did he ever share with you any information
12 about what went on at the distribution center?
13 A. No.
14 Q. Different topic now. Would you agree with
15 me that at the time of the accident Mr. Franke was
16 doing work for Martin's Bulk Milk?
17 A. Yes.
18 Q. He was Martin's Bulk Milk's employee,
19 right?
20 A. Yes.
21 Q. And would you agree with me that he was
22 driving a truck at the time of the accident?
23 A. Yes.
24 Q. That he was driving a truck with cargo?

**Page 326**

1 A. Yes.
2 Q. He was driving a truck with cargo from
3 Point A to Point B?
4 A. Yes.
5 Q. And that his job was to drive a truck with
6 cargo from Point A to Point B in a reasonable, safe
7 fashion?
8 A. Yes.
9 Q. All right. So what I want to do for the
10 purposes of my next series of questions is to
11 define his work as follows: His work is defined as
12 driving a truck with cargo from Point A to Point B
13 in a reasonable, safe manner.
14 A. Yes.
15 Q. All right. That's my definition of the
16 word "work." With me?
17 A. Yes.
18 Q. Okay. So did Universal Am Can or Overnite
19 Express or International Paper provide any
20 instructions or directions or requirements to
21 Samuel Franke on the following: The tools he was
22 to use in doing the work?
23 A. No.
24 Q. The instrumentalities that he was to use

**Page 327**

1 in performing the work?
2 A. No.
3 Q. The clothing he was to wear in doing the
4 work?
5 A. No.
6 Q. The equipment he was to use in doing the
7 work?
8 A. No.
9 Q. The logbooks he was to use in doing the
10 work?
11 A. No.
12 Q. The tractor he was to use in doing the
13 work?
14 A. No.
15 Q. The trailer he was to use in doing the
16 work?
17 A. No.
18 Q. The type of tractor or trailer he was to
19 use in doing the work?
20 A. He had to have a 53-foot trailer.
21 Q. And was that a requirement that
22 International Paper or Overnite Express or
23 Universal Am Can imposed?
24 A. It was a requirement of all three.

**Page 328**

1 Q. And was that in writing or was that an
2 expectation?
3 A. It's on the confirmation sheets, I
4 believe, that requires a 53-foot trailer.
5 Q. Okay. Did Universal Am Can, Overnite
6 Express or International Paper designate who were
7 the drivers that were to do the work?
8 A. No.
9 Q. Does Martin's Bulk Milk use co-drivers?
10 Do they use dual drivers?
11 A. We have a couple.
12 Q. Okay. Did Universal Am Can, Overnite
13 Express or International Paper ever designate who
14 the dual or co-drivers were to be in doing the
15 work?
16 A. No.
17 Q. Did Universal Am Can or Overnite Express
18 or International Paper tell Mr. Franke or -- tell
19 Mr. Franke where he had to purchase his gas in
20 doing the work?
21 A. No.
22 Q. Where he was to purchase any supplies or
23 services in doing the work?
24 A. No.

**Page 329**

1 Q. What route he was to follow in doing the
2 work?
3 A. No.
4 Q. Did Universal Am Can, Overnite Express or
5 International Paper ever measure, score or evaluate
6 any of the details of Mr. Franke doing his work?
7 MR. SKRYD: Objection to form. I think
8 it's vague. You can answer if you --
9 BY MR. FISHER:
10 Q. Yes, if you don't understand, tell me you
11 don't understand and I'll be happy to rephrase it.
12 A. They would monitor the deliveries.
13 Q. Okay.
14 A. On-time deliveries.
15 Q. Tell me what you mean by monitor on-time
16 deliveries.
17 A. If -- you had to report to them what --
18 you know, if you had a truck that was running late
19 for a pickup or a delivery.
20 Q. Is that -- in answer to my question, is
21 that the only thing you can think of in which
22 Universal Am Can, Overnite Express or International
23 Paper measured or scored or evaluated any details
24 of the work as I have defined the work?

**Page 330**

1 A. Yes.
2 Q. Okay. Now, with respect to that
3 monitoring of on-time deliveries, did they issue a
4 report on a weekly or monthly basis or what became
5 of that monitoring?
6 A. There was no reports. We just -- we had
7 to report to them if a truck was running late on a
8 pickup or delivery.
9 Q. So what would happen, for example, in May
10 of 2008 when Mr. Franke is doing his regular run
11 and he determines that because of traffic
12 congestion around Chicago he's never going to be
13 able to get back to Wilton, Wisconsin in time so
14 that he can give the load to the second driver who
15 then makes the delivery, for example, in
16 Minneapolis? What would happen in that instance?
17 A. The load would get rescheduled for the
18 next day.
19 Q. What happens if he's already on route?
20 He's on 294 on the west side of Chicago and he's
21 stuck in, you know, an incredible traffic jam and
22 knows he's not going to get back at his usual time?
23 A. When his time is up, then he needs to take
24 his break.

**Page 331**

1 Q. And then what would happen with the load?
2 A. It would get rescheduled for the next day.
3 Q. So he would take a brake, take whatever
4 hours he needed and then continue on up to Wilton
5 and who would then reschedule the delivery?
6 A. Universal Am Can or Overnite Express.
7 Q. Would Martin's Bulk Milk get involved in
8 that process with the eventual customer?
9 A. No.
10 Q. Okay. Did Universal Am Can, Overnite
11 Express or International Paper train Mr. Franke in
12 how to do the work?
13 A. I don't know.
14 Q. What type of training did Martin's Bulk
15 Milk Service provide to Mr. Franke in terms of how
16 to do the work, that is to say, how to drive his
17 truck?
18 A. We put him through a road test in the
19 beginning through orientation.
20 Q. Other than that was there any other
21 training that Martin's Bulk Milk provided to
22 Mr. Franke?
23 A. We'll help him train with his paperwork
24 and with his logging.

32 (Pages 328 to 331)

**Page 332**

1  Q. So with respect to the initial on-the-road
2  test and what you just mentioned in terms of his
3  logging and things like that, did International
4  Paper, Overnite Express or Universal Am Can provide
5  any such training to Mr. Franke?
6  A. No.
7  Q. Did Universal Am Can, Overnite Express or
8  International Paper require Franke to inspect,
9  clean or maintain the truck he was driving and its
10 equipment?
11 A. Yes.
12 Q. Tell me why you say yes.
13 A. They -- the driver has to inspect the
14 trailer.
15 Q. Where was it in writing that Universal Am
16 Can said that the driver had to inspect the
17 trailer?
18 A. Oh, it's not -- it's required by
19 International Paper when he goes to load there that
20 the driver has to inspect the trailer.
21 Q. And by "inspect the trailer," tell me what
22 you mean by that.
23 A. That there's no leaks or no debris in the
24 trailer.

**Page 333**

1  Q. So let me make sure I understand this.
2  When Mr. Franke would bring his trailer to the
3  distribution center in Hammond and he backs the
4  truck into the dock where it's going to be loaded,
5  say, with paper products, what would -- what do you
6  think Mr. Franke would do after he gets out of his
7  tracker?
8  A. He would have to go into the dock and
9  inspect his trailer and also inspect his load
10 before they load it.
11 Q. All right. Why would he have to go into
12 the trailer to inspect his trailer?
13 A. Just to make sure there's no debris in
14 there or leaks.
15 Q. And let's assume he's gone in there and
16 determined everything's fine inside the trailer.
17 What would you expect Mr. Franke to next do -- as
18 it pertains to the loading of the trailer?
19 A. Well, he should watch them load his load
20 to make sure there's no damage on the product going
21 in.
22 Q. Okay. And what else would you expect him
23 to do, if anything?
24 A. Make sure it's loaded right where it's not

**Page 334**

1  over on its axles.
2  Q. And how would he do that?
3  A. Well, if you do the same load day in
4  and -- day after day, you should be able to figure
5  it out, but then you probably would have to go --
6  you'd have to go to a scale or a public scale or
7  something if he wasn't sure, depending on how much
8  weight he had in the trailer.
9  Q. Was Mr. Franke as of July 3rd, 2008 a
10 pretty experienced driver in terms of knowing how
11 it is that a trailer ought to be loaded and not
12 loaded?
13 A. Yes, and was a very good driver.
14 Q. So getting back to my original question.
15 Did Universal Am Can, Overnite Express or
16 International Paper impose any specific
17 requirements on inspection of the trailer?
18    I'm not talking about what you would
19 expect him to do on his own as a good truck
20 driver. What I'm asking you is whether or not
21 Universal Am Can, Overnite Express or International
22 Paper imposed any requirements on Mr. Franke for
23 the inspection of a trailer?
24 A. They would require him to inspect the

**Page 335**

1  inside of the trailer.
2  Q. And how is it you know that?
3  A. It's pretty much common for all shippers.
4  Q. And how do you know that?
5  A. Because I drove a truck for ten years and
6  it's just common that shippers want their trailers
7  clean. They don't want to get to the other end and
8  have a bunch of debris in the trailer.
9  Q. Okay.
10 A. So it's part of the job.
11 Q. Would you agree with me that cleanliness
12 of the inside of a trailer probably has nothing to
13 do with how this accident happened?
14 A. Yes.
15 Q. Okay. With respect to maintaining the
16 trailer, do you know whether or not International
17 Paper, Overnite Express or Universal Am Can imposed
18 any requirements for the maintenance of the
19 trailer?
20 A. No.
21 Q. So is your answer they made no -- they
22 imposed no requirements; is that correct?
23 A. Correct.
24 Q. And, likewise, for the tractor?

**Page 336**

```
1    A.  Correct.
2    Q.  Do you know whether or not Universal Am
3  Can, Overnite Express or International Paper
4  required Mr. Franke to follow any particular
5  driving techniques when he was doing the work?
6    A.  No.
7    Q.  And by "no" you mean they did not,
8  correct?
9    A.  Correct.
10   Q.  Did Universal Am Can, Overnite Express or
11 International Paper provide Mr. Franke with a
12 camera?
13   A.  No.
14   Q.  Did Universal Am Can, Overnite Express or
15 International Paper require Franke to report or
16 notify them of any accidents involving the load he
17 was carrying?
18   A.  Not to my knowledge.
19   Q.  A digression here for a second.  Do you
20 know how it was Universal Am Can got any notice of
21 an accident?
22   A.  I called them on -- they weren't in the
23 office.  So I called them on the first business day
24 that I could, which would have been --
```

**Page 337**

```
1    Q.  July 7th?
2    A.  Yes.
3    Q.  And any particular reason why you waited
4  so long to call them?  I'm not being critical; I'm
5  just asking why you waited until July 7th.
6    A.  Because I didn't think I'd be able to get
7  a hold of anybody.  I know they worked regular
8  business hours, there was nobody there over the
9  weekend and the accident happened late on that
10 Friday night.
11   Q.  Do you know whether or not Universal Am
12 Can, Overnite Express or International Paper
13 required Franke to call in while he was on route
14 for reasons other than that he might be late?
15   A.  No.
16   Q.  So they did not impose such requirements,
17 correct?
18   A.  Correct.
19   Q.  Did Universal Am Can, Overnite Express or
20 International Paper require Franke to provide any
21 status reports?
22   A.  Just if he was running behind on his
23 pickup or delivery schedule.
24   Q.  Did Universal Am Can, Overnite Express or
```

**Page 338**

```
1  International Paper require Franke to stay in
2  constant communication with anybody?
3    A.  No.
4    Q.  On flat bed -- does Martin's Bulk Milk
5  handle any flat bed?
6    A.  No.
7    Q.  Did you ever carry any flat bed --
8    A.  No.
9    Q.  -- loads?  Did Universal Am Can or
10 Overnite Express ever fine Mr. Franke for not being
11 in compliance with any particular edict or
12 direction?
13   A.  No.
14   Q.  Do you know whether or not Universal Am
15 Can or Overnite Express or International Paper even
16 had the authority or power to issue fines to
17 Mr. Franke?
18   A.  I don't recall.
19   Q.  Did Universal Am Can, Overnite Express or
20 International Paper dictate to Mr. Franke what his
21 work days would be or what his hours of operation
22 would be?
23   A.  They would dictate what time he needed to
24 pick the load up, which was 7:00 p.m.
```

**Page 339**

```
1    Q.  Did Universal -- to your knowledge did
2  Universal Am Can, Overnite Express or International
3  Paper ever dictate how the load that was to be
4  shipped was to be packed in the trailer?
5    A.  They were responsible for loading the
6  load.
7    Q.  When they loaded the load, would that be
8  done presumably by forklift drivers at the
9  distribution center?
10   A.  Yes.
11   Q.  Now, Mr. Franke would not have gotten
12 involved in that, correct?
13   A.  Correct.
14   Q.  And let's assume hypothetically that
15 Mr. Franke got on to a forklift, say, hey, I'm
16 going to help out, I'm in a hurry.  Would he have
17 had the authority to, you know, load the cargo on
18 to the trailer --
19   A.  No.
20   Q.  -- with the use of a forklift at the
21 distribution center?
22   A.  No.
23   Q.  Why is that?
24   A.  They wouldn't allow it down there.
```

34 (Pages 336 to 339)

**Page 340**

1  Q.  Did Universal Am Can, Overnite Express or
2  International Paper ever hire Mr. Franke?
3  A.  Not to my knowledge.
4  Q.  Did they ever discipline him?
5  A.  Not to my knowledge.
6  Q.  Did they ever counsel him?
7  A.  Not to my knowledge.
8  Q.  Did they ever qualify him to serve as a
9  driver for a motor carrier?
10  A.  Not to my knowledge.
11  Q.  Did they ever disqualify him for operating
12  as a driver for a motor carrier?
13  A.  No.
14  Q.  Did they ever fire him?
15  A.  No.
16  Q.  Do you know whether or not Mr. Franke ever
17  sought to be hired, disciplined, counseled, fired,
18  qualified or disqualified by Universal Am Can,
19  Overnite Express or International Paper?
20  A.  I don't know.
21  Q.  I need to ask Mr. Franke?
22  A.  Yes.
23  Q.  Okay.  Did Universal Am Can, Overnite
24  Express or International Paper have the right to

**Page 341**

1  your knowledge in writing or based upon anything
2  else to reject Mr. Franke as a driver?
3  A.  I'm sure they hold that right.
4  Q.  And why is it you believe that?
5  A.  Because over the years that kind of stuff
6  happens.
7  Q.  Well, under what circumstances would it
8  happen?
9  A.  If they were unprofessional when they come
10  into their building or things of that nature.
11  Q.  Tell me what that means, quote, unquote
12  unprofessional?
13  A.  Language.  Use of, you know, bad language
14  or things of that nature or the way they dressed or
15  the way they treat other people.
16  Q.  So I'm going to give you, like, four
17  hypotheticals, okay.  If Mr. Franke one day walked
18  in to the distribution center at Hammond and he
19  just started a profanity-laced tirade against one
20  of the gals there in the dispatch office -- first
21  of all, did that ever happen involving Mr. Franke?
22  A.  No.
23  Q.  Okay.  Assuming it would have happened, is
24  it your contention that somebody at

**Page 342**

1  International -- somebody there at that
2  distribution center would have been able to call
3  somebody up, for example, you, and say, hey, he's
4  not driving for us today because he's just being a
5  whatever?
6  A.  It could happen, yes.
7  Q.  And what about dress, what would be the
8  line over which you would have to cross for the
9  dress of the truck driver to allow in your judgment
10  somebody at Universal Am Can, Overnite Express or
11  International Paper to say you're not driving this
12  load today?
13  A.  I'm not sure, but if they just were, you
14  know, improperly dressed where -- I really can't
15  say.
16  Q.  No shoes, no shirt, no service?
17  A.  Exactly.
18  Q.  All right.  What about if he came in
19  unshaven?
20  A.  I'm not sure that would matter.
21  Q.  How about if he had an orange shirt on
22  instead of a blue shirt?
23  A.  It shouldn't matter.
24  Q.  Requirements on hair length, any problems?

**Page 343**

1  A.  Not that I ever heard.
2  Q.  Different -- I think we beat this to
3  death.  Let me go on to a different topic.
4      Did Universal Am Can, Overnite Express or
5  International Paper maintain a personnel file on
6  Mr. Franke?
7  A.  Not to my knowledge.
8  Q.  Is it fair to say given your understanding
9  of the transportation trucking industry, that
10  Universal Am Can, Overnite Express, and
11  International Paper had no obligations to keep a
12  driver qualification file on Mr. Franke?  Correct
13  statement?
14      MR. SKRYD:  Objection, form of the
15  question.  You can answer.
16      THE WITNESS:  They would have no
17  obligation.
18  BY MR. FISHER:
19  Q.  Do you know if they did?
20  A.  I do not.
21  Q.  Did Universal Am Can, Overnite Express or
22  International Paper ever have to reprimand
23  Mr. Franke for any citations or bad driving?
24  A.  No.

35 (Pages 340 to 343)

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

**Page 344**

1 Q. In fact, while in the last several years
2 Mr. Franke had no citations or bad driving,
3 correct?
4 A. Correct.
5 Q. Did Universal Am Can, Overnite Express or
6 International Paper even have the obligation to
7 your knowledge to insure that Mr. Franke had a
8 commercial driver's license?
9     MR. SKRYD: Same objection, form of the
10 question. You can answer.
11     THE WITNESS: I believe they -- some
12 places will make you put it on your bill of
13 lading. I don't know if I saw it on there or not.
14 But I believe they checked him down there.
15 BY MR. FISHER:
16 Q. Down there meaning?
17 A. Down at Exel at International Paper.
18 Q. So when Mr. Franke -- let's make it a
19 hypothetical driver.
20     When John Doe, our hypothetical driver,
21 arrives at the distribution center in Hammond,
22 comes in, could the people there demand to see his
23 CDL?
24 A. Yes.

**Page 345**

1 Q. Do you know if they ever did that?
2 A. I believe they did.
3 Q. For Mr. Franke or for others?
4 A. Everybody.
5 Q. And was that for purposes of just
6 identifying that he is who he claims to be or for
7 what purpose?
8 A. And security of the load.
9 Q. Did Universal Am Can, Overnite Express or
10 International Paper ever promulgate, publish or
11 distribute any rules regarding Mr. Franke's
12 personal use of his tractor?
13 A. Not to my knowledge.
14 Q. Do you know if Universal Am Can, Overnite
15 Express or International Paper ever received any or
16 took any complaints about Mr. Franke?
17 A. No.
18 Q. When you say "no," do you mean that there
19 simply were no complaints to your knowledge?
20 A. There were no complaints to my knowledge.
21 Q. Did Universal Am Can, Overnite Express or
22 International Paper keep track of Mr. Franke's
23 driving time?
24 A. No.

**Page 346**

1 Q. And I presume that they did not maintain
2 Mr. Franke's logs, correct?
3 A. Correct.
4 Q. Did Universal Am Can or Overnite Express
5 or International Paper to your knowledge have the
6 right to discipline Mr. Franke?
7 A. Not to my knowledge.
8 Q. Did they have -- the same three companies
9 I've been mentioning -- did they have the right to
10 require Mr. Franke to take a medical exam, a
11 physical?
12 A. No.
13 Q. Did Universal Am Can, Overnite Express or
14 International Paper ever provide Mr. Franke with a
15 debit card or any other card that could be used at
16 truck stops to -- you know, as currency or, you
17 know, payment?
18 A. Not to my knowledge.
19 Q. Did Universal Am Can, Overnite Express or
20 International Paper own the tractor or trailer that
21 was being used for the work?
22 A. No.
23 Q. Did they require Franke to place placards,
24 graphics, stickers or logos of the names of

**Page 347**

1 Universal Am Can, Overnite Express or International
2 Paper on the tractor or trailer?
3 A. No.
4 Q. Is it fair to say that Universal Am Can,
5 Overnite Express and International Paper were not
6 responsible for the maintenance of the tractor and
7 trailer?
8     MR. SKRYD: Objection, form. You can
9 answer.
10     THE WITNESS: Correct.
11 BY MR. FISHER:
12 Q. And, likewise, they did not pay for the
13 expenses of operation such as gas, oil, things like
14 that?
15 A. Correct.
16 Q. And is it also fair that Universal Am Can,
17 Overnite Express, International Paper did not
18 obtain any licenses or permits for the tractor and
19 trailer?
20 A. Correct.
21 Q. And is it also -- let me start again.
22     Was there any global positioning
23 technology in the tractor at the time of the
24 accident?

**Page 348**

1  A. No.
2  Q. Was there an electronic control module or
3  black box in the tractor?
4  A. Yes.
5  Q. Did Universal Am Can, Overnite Express or
6  International Paper provide any such equipment as
7  I've just mentioned in the last two questions?
8  A. No.
9  Q. Did Universal Am Can, Overnite Express or
10 International Paper pay or reimburse Franke for
11 doing the work for any of the following: His
12 driver's salary or wages?
13 A. Not to my knowledge.
14 Q. Liability insurance coverage for him?
15 A. Not to my knowledge.
16 Q. Workers compensation insurance coverage
17 for him?
18 A. Not to my knowledge.
19 Q. Cost of any repairs or cost of any
20 maintenance?
21 A. Not to my knowledge.
22 Q. Supplies, travel expenses or any equipment
23 lease costs?
24 A. Not to my knowledge.

**Page 349**

1  Q. Did Universal Am Can, Overnite Express or
2  International Paper ever pay Franke directly?
3  A. I don't know.
4  Q. Who would know the answer to that?
5  A. Frank -- Sam.
6  Q. In the documents that have been marked as
7  Exhibit 71, the big collection of the personnel and
8  driver qualification files, there's copies of pay
9  stubs, right?
10 A. Yes.
11 Q. Were those pay stubs pay stubs reflecting
12 payment from a Martin's Bulk Milk checking account?
13 A. Yes.
14 Q. Not a checking account from Universal Am
15 Can, Overnite Express or International Paper,
16 correct?
17 A. Correct.
18 Q. Did Martin's Bulk Milk lease its
19 tractor-trailer unit to Universal Am Can, Overnite
20 Express or International Paper?
21 A. No.
22 Q. Did Universal Am Can, Overnite Express or
23 International Paper pay for any of the following
24 employee benefits of Mr. Franke: Health insurance?

**Page 350**

1  A. Not to my knowledge.
2  Q. Workers compensation insurance coverage?
3  A. Not to my knowledge.
4  Q. A pension plan?
5  A. Not to my knowledge.
6  Q. Retirement accounts?
7  A. Not to my knowledge.
8  Q. Profit sharing?
9  A. Not to my knowledge.
10 Q. Vacation pay?
11 A. Not to my knowledge.
12 Q. Or sick pay?
13 A. Not to my knowledge.
14    MR. FISHER: Can we go off the record for
15 a second.
16    THE VIDEOGRAPHER: Off the record. The
17 time now is 2:59 p.m.
18       (Discussion off the record.)
19    THE VIDEOGRAPHER: We are back on the
20 video record. The time now is 3:21 p.m.
21 BY MR. FISHER:
22 Q. Okay. Mr. Martin, we've taken a break and
23 before we took the break there was a -- I think you
24 heard -- well, there was a discussion about

**Page 351**

1  expediting things for asking you questions about
2  documents and words that appear in documents, okay?
3  A. Yes.
4  Q. Now, do you remember when I showed you
5  before Exhibits in the 50s that were the requests
6  for production that my client tendered to Martin's
7  Bulk Milk asking very, very specific questions
8  about whether or not the words "principal"
9  and "agent" appeared in any documents?
10 A. Yes.
11 Q. Do you remember those requests?
12 A. Yes.
13 Q. Okay. So here's my question to you
14 because I think we can shortcut this and I'll
15 follow-up a different way.
16    Is it a fair statement to say based upon
17 your knowledge of the documents that your company
18 has produced in this litigation that the only
19 document you are aware of that has any relationship
20 to either Universal Am Can, Overnite Express, or
21 International Paper together with your company
22 Martin's Bulk Milk in which the word "agent" is
23 used, the memo bills where at the bottom of the
24 memo bills the words as follow appear: Shipper per

**Page 360**

1    A.   Yes.
2    Q.   Would you agree with me that that
3  provision says that the term automatically renews
4  year after year?
5    A.   It says the term of the agreement shall be
6  for a period of one year and automatically renew
7  after one year.
8    Q.   Until canceled upon 30 days written
9  notice --
10   A.   Yes.
11   Q.   -- of one party to the other, correct?
12   A.   Yes.
13   Q.   As of July 3, 2008 did Martin's Bulk Milk
14 ever issue a cancellation notice to Universal Am
15 Can?
16   A.   Not to my knowledge.
17   Q.   As of the beginning of June 2008 had
18 Martin's Bulk Milk issued a cancellation notice to
19 Universal Am Can?
20   A.   Not to my knowledge.
21   Q.   Would you be the person who would know the
22 answers to those two questions?
23   A.   Yes.
24        MR. FISHER:  That's all the questions I've

**Page 361**

1  got at this time.  Thank you.
2             CROSS-EXAMINATION
3  BY MR. COUTURE:
4    Q.   Hello, Mr. Martin.
5    A.   Hello.
6    Q.   My name is Tim Couture; I represent BMW
7  AG, the manufacturer of the motor vehicle in which
8  Mr. Scheinman was sitting at the time of the
9  accident, and BMW NA, the distributor of that
10 vehicle for North America.
11        I don't have nearly as many questions for
12 you as Mr. Fisher does, but because I was not at
13 and my client was not involved in the lawsuit when
14 your deposition was first taken, there may be a
15 couple of things that I ask that are duplicative
16 and I apologize for that.
17        How long did Samuel Franke -- well, strike
18 that.
19        When was Samuel Franke hired by Martin's
20 Bulk Milk?
21   A.   I believe the term he was there was 1999
22 to 2008.
23   Q.   Were you involved in his hiring?
24   A.   Yes.

**Page 362**

1    Q.   What -- back in 1999 what was the hiring
2  process for drivers in general and Mr. Franke in
3  particular?
4    A.   We do a background check.  We run the
5  MVRs.  We check with his previous employers, check
6  the dates to see how long he had worked for the
7  previous employers.
8    Q.   And the MVRs is to check his driving
9  record?
10   A.   Yes.
11   Q.   For moving violations and for accidents?
12   A.   Yes.
13   Q.   And the background check is his criminal
14 history and things of that nature?
15   A.   Yes.
16   Q.   And when you did that for Mr. Franke, what
17 did those reveal?
18   A.   Sam's records were clean.
19   Q.   Okay.  And did you have a driver interview
20 before he was hired?
21   A.   Say it again.
22   Q.   Did you interview him before he was hired?
23   A.   Yes.
24   Q.   Who did that?

**Page 363**

1    A.   I did.
2    Q.   And did you have an understanding for how
3  long Mr. Franke at that time had worked as a CDL
4  qualified driver?
5    A.   Looking back on his -- at his MVR we
6  should be able to tell how long he had his license.
7    Q.   Feel free to look at what I believe is
8  Exhibit 71 for identification.
9    A.   I'm looking for his MVR, which I have a
10 current one here but it only goes back to --
11   Q.   Let me ask you -- I don't need exact
12 numbers.  So why don't I ask you a different
13 question.
14        Can you give me a ballpark figure as to
15 how long you understand Mr. Franke had been driving
16 as a truck driver before he was hired by your
17 company?
18   A.   On his application he had -- it looks like
19 he had been driving -- the first driving job he had
20 was 11-98.
21   Q.   So that would have been right before you
22 hired -- within a year of you hiring him?
23   A.   No.  Then he's got -- well, he's got
24 another job that was at a Dairy.

**Page 364**

1  Q. Okay. Well, you told me you hired him
2  around 1999. So I'm trying to figure out what his
3  history was before he got to you. And I'll ask him
4  that tomorrow but I just want to know what you know
5  about that.
6  A. Okay. On his application it shows we
7  hired him in 11-98 -- in 11-98. At that time we
8  might have only needed a year's experience.
9  Q. Okay. Do you have an understanding as to
10 where Mr. Franke had first been trained as a
11 driver --
12 A. Yes. He --
13 Q. -- for tractor-trailers?
14 A. -- worked for MS Carriers. And, actually,
15 he had done some of the same loads through MS that
16 he had done -- was doing for us.
17 Q. MS Carriers, what company is that?
18 A. Based out of Memphis, Tennessee.
19 Q. Okay. So it's an over-the-road trucking
20 company?
21 A. Yes.
22 Q. That you were familiar with at the time
23 that you hired Mr. Franke?
24 A. I know the company.

**Page 365**

1  Q. And you had a background check that
2  included calling them to ask them what type of
3  employee he was?
4  A. Yes.
5  Q. Other than a road test and the background
6  and MVR and the face-to-face interview, did you do
7  anything else to evaluate Mr. Franke's
8  qualifications to drive for your company?
9  A. I want to make sure that he's up-to-date
10 with paperwork as far as for his logbook and
11 filling out our day-to-day paperwork.
12 Q. You trained him how to do your paperwork?
13 A. Yes.
14 Q. Logbooks are pretty standard, correct?
15 A. Yes.
16 Q. But as far as actual truck driving
17 training, did Martin's Bulk Milk provide any truck
18 driving training to Mr. Franke?
19 A. No.
20 Q. He already had that training when he got
21 to you?
22 A. Yes.
23 Q. In the approximately ten years that
24 Mr. Franke was an employee at Martin's before this

**Page 366**

1  accident are you aware whether he had any other
2  vehicle accidents?
3  A. No, he did not.
4  Q. And are you aware if he had any moving
5  violations while he was employed by your company?
6  A. No, he did not.
7  Q. Was he ever disciplined by Martin's for
8  any reason?
9  A. No.
10 Q. Was he ever the subject of any complaints
11 by any Martin's customers?
12 A. No.
13 Q. Now, just so I'm clear, Martin's Bulk Milk
14 is a hauler, they drive trucks for other people,
15 correct?
16 A. We're an over-the-road carrier.
17 Q. All right. Do they -- the name implies
18 milk. Do you guys actually do any dairy work or is
19 that just where the company began and you keep that
20 as an homage to what you used to do?
21 A. That's how we started out --
22 Q. Okay.
23 A. -- and, ironically, now we still haul milk
24 but it's in a different capacity. We had tankers

**Page 367**

1  at one time but now we haul packaged milk.
2  Q. And that's ironic because that's in your
3  name but it's not actually -- your business is not
4  a milk business?
5  A. Correct.
6  Q. When Mr. Franke was first hired at
7  Martin's, how was his pay determined?
8  A. By the mile.
9  Q. At the time of this accident in July of
10 2008 what was his per mile rate?
11      MR. SKRYD: Maybe it's in here. Pay
12 stubs?
13      THE WITNESS: Yes. These aren't it. Here
14 I go. I don't have a week-to-week one in there,
15 which I should have, though.
16      All I have is the ones that show
17 year-to-date. I don't have any breakdown from
18 week-to-week. I don't know why.
19 BY MR. COUTURE:
20 Q. I believe I saw when he was hired it was
21 32 cents a mile. Did that change over the ten
22 years?
23 A. It would go up each year some. And we're
24 at 38 cents a mile now.

41 (Pages 364 to 367)

**Page 480**

1  A. Yes.
2  Q. Travel safely and at reasonable speeds
3  depending upon the weather and traffic conditions?
4  A. Yes.
5  Q. You and Martin's Bulk Milk drivers like
6  Mr. Franke didn't need to be told that by anyone,
7  did you?
8  A. No.
9  Q. So the fact that there might be a
10 provision in a contract document saying that you're
11 supposed to follow the rules of the road, that
12 didn't come as new news to you, right?
13 A. Correct.
14 Q. And it wouldn't have come as new news to
15 Mr. Franke, would it?
16 A. Correct.
17 Q. With respect to the things about which
18 Mr. Burke talked to you and the things that I
19 talked to you about in terms of certain directions
20 or requirements or instructions that came from
21 Universal Am Can or International Paper, I want to
22 ask you specifically about whether or not any of
23 these conditions or events occurred with respect to
24 Mr. Franke, okay?

**Page 481**

1  Did Mr. Franke have to keep in constant
2  contact, communication and contact, with anybody at
3  International Paper?
4  A. No.
5  Q. How about at Universal Am Can?
6  A. Well, according to their document they
7  wanted contact every day.
8  Q. Other than having a contact once a day --
9  by constant contact, I mean constant contact on the
10 hour, every hour, every half hour. Was there any
11 of that type of expectation?
12 A. No.
13 Q. Mr. Franke did not have to ask about where
14 this load of paper products was to be picked up,
15 did he?
16 A. No.
17 Q. He knew exactly where the Midwest
18 Distribution Center of International Paper was in
19 Hammond, Indiana, correct?
20 A. Correct.
21 Q. He didn't have any fines that he had to be
22 concerned about when he was driving, did he?
23 A. No.
24 Q. That's a correct statement?

**Page 482**

1  A. Correct.
2  Q. And would you have expected Mr. Franke as
3  you know him to be the type of driver that he would
4  have done absolutely anything in order to avoid
5  being late?
6  A. Yes.
7  Q. And by "anything" I mean break speed limit
8  laws, pass through stop signs, pass through
9  stoplights to make sure he got there on time.
10 Would you expect him to be willing to do anything
11 to get to a spot on time?
12     MR. SKRYD: Objection, form of the
13 question. You can answer.
14     THE WITNESS: I would not expect that.
15 BY MR. FISHER:
16 Q. And that's based upon your knowledge of
17 him as a driver?
18 A. Yes.
19 Q. And the expectations that Martin's Bulk
20 Milk Service had for its drivers?
21 A. Correct.
22 Q. Do you know whether or not Mr. Franke had
23 to call for directions to get to the intermodal
24 yard in Chicago?

**Page 483**

1  A. No.
2  Q. Did he have to ask for directions to get
3  from the intermodal yard in Chicago to the Hammond
4  Distribution Center?
5  A. No.
6  Q. Did he have to call for directions to get
7  from the Hammond Distribution Center back to
8  Wilton, Wisconsin?
9  A. No.
10 Q. Is one of the reasons, perhaps, why
11 Mr. Franke chose Route 41 as opposed to going up
12 the interstate because there are tolls on the
13 interstate?
14 A. No. It was because it was shorter.
15 Q. Shorter in terms of geographic distance or
16 shorter in terms of time?
17 A. Miles.
18 Q. So the fact that tolls would be charged on
19 a portion of the interstate highway system in
20 Illinois, that didn't have an impact upon in your
21 judgment Mr. Franke choosing 41 northbound?
22 A. No.
23 Q. Did Mr. Franke receive a direct deposit of
24 a check paying him for his share of this load from

**Page 484**

1  International Paper or Universal Am Can?
2  A. Yes.
3  Q. Was the direct deposit a check from
4  Universal Am Can?
5  A. Oh, I'm sorry. No.
6  Q. Okay. And he didn't receive a direct
7  deposit check from International Paper, did he?
8  A. No.
9  Q. And other than the directions that he
10 received on paperwork about where he was to pickup
11 a load, when he was to pickup a load, and what the
12 load would be, on July 3, 2008 were there any
13 specific written directions he received concerning
14 that load on July 3, 2008?
15 A. No.
16 Q. So the only three directions he received
17 for the July 3, 2008 load were where to pick it up,
18 when to pick it up and what it was?
19 A. And where to take it.
20 Q. I'm going to get there in a second
21 because, see, he wasn't taking that load there, was
22 he?
23 A. No, back to Wilton. No.
24 Q. But let me ask this. If the memo bill or

**Page 485**

1  bill of lading had places where the delivery was to
2  be made, three different places, three different
3  loads in the Minneapolis/St. Paul area, right?
4  A. Correct.
5  Q. Mr. Franke already knew he was never going
6  to make those deliveries at those three customers,
7  correct?
8  A. Correct.
9  Q. So the fact that on the memo, bill of
10 lading there's a destination place and some
11 information about making those deliveries and times
12 and appointment numbers, none of those directions
13 had anything to do with what Mr. Franke was doing
14 with respect to this load, fair statement?
15 A. No, it wouldn't. He had a certain time
16 that load had to be back. And on this night, it
17 was a weekend. That load didn't have to be
18 delivered until Monday.
19 Q. But he was never going to make that
20 delivery, correct?
21 A. Correct.
22 Q. So what he was going to do was -- since
23 it's over a holiday weekend -- he was going to take
24 this load with -- Strike that.

**Page 486**

1  He was going to take the trailer or,
2  excuse me, he was going to take the container
3  loaded with three different customer loads, take it
4  as far as Wilton, drop it off and then enjoy the
5  4th of July weekend?
6  A. Correct.
7  Q. So the fact that the memo, bill of lading
8  had information about directions where to take it,
9  appointment times and all that, all that
10 information meant nothing to Mr. Franke because he
11 was never going to have to abide by any of those
12 directions?
13     MR. SKRYD: Objection, form.
14 BY MR. FISHER:
15 Q. Fair statement?
16 A. For that load only. For a weekend load
17 only.
18 Q. Right. But for any other load he never
19 took it all -- he never went from Wilton up to
20 Minneapolis/St. Paul if that was the destination,
21 correct?
22 A. Correct. But he had to make his deadline.
23 Q. Mind you. But it wasn't much of a
24 deadline, was it, because within the limits

**Page 487**

1  provided for by hours of service regulations for
2  the Federal Motor Carrier Safety Regulations, he
3  could take his load, take his sweet time going all
4  the way up to Wilton?
5  A. Correct.
6  Q. All right. Would you consider Martin's
7  Bulk Milk Service to be a company that was pressing
8  its employees to getting in as many miles as they
9  could within hours?
10 A. No.
11 Q. Why -- I'm not suggesting it's not the
12 case, but why wasn't that the case?
13 A. That was a dedicated run; he knew what he
14 was doing every day. He would turn 530 to 40 miles
15 every day, which is legal under the 11-hour day.
16 Q. Okay. Different topic.
17     MR. SKRYD: You said legal, right?
18     THE WITNESS: Yes, legal.
19 BY MR. FISHER:
20 Q. Different topic. Remember we had some
21 questions before about DOT numbers and motor
22 carrier numbers and all that?
23 A. Yes.
24 Q. And on some of the documentation it

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

**Page 504**

1 be brought in.
2 BY MR. FISHER:
3    Q. That might very well be the case. Anybody
4 can be sued. But do you think that that UPS
5 driver -- you're responsible for that UPS driver's
6 negligence?
7      MR. SKRYD: Objection, form.
8      THE WITNESS: No.
9 BY MR. FISHER:
10    Q. Why don't you think that your company is
11 responsible for that UPS driver's negligence?
12      MR. SKRYD: Same objection, form.
13      THE WITNESS: For one thing the guy is
14 not -- he's not driving a truckload.
15 BY MR. FISHER:
16    Q. Okay. Any other reason?
17    A. No.
18    Q. So you think -- well, strike that.
19 Different topic. Who was driving at the time of
20 this accident?
21    A. Sam Franke.
22    Q. And it's only Samuel Franke's actions in
23 driving that day in your judgment that has brought
24 us together here for this lawsuit, fair statement?

**Page 505**

1      MR. BURKE: Objection, form.
2      MR. SKRYD: Same objection, form.
3 BY MR. FISHER:
4    Q. You can go ahead and answer.
5    A. There could have been other scenarios that
6 I don't know about. I wasn't there.
7    Q. Okay. I'm not talking about any other
8 drivers that may have been involved there at the
9 time. I'm talking about any other entities, okay.
10 My question to you is -- and let me rephrase my
11 question.
12      Samuel Franke was driving?
13    A. Yes.
14    Q. Martin's Bulk Milk Service has been sued
15 alleging that it is responsible for the actions of
16 its own employee Samuel Franke?
17    A. Yes.
18    Q. All right. And you have not been sued in
19 this lawsuit, have you, for anything other than the
20 actions of Mr. Franke, fair statement?
21    A. Yes.
22      MR. FISHER: That's all I have. Thanks.
23      MR. COUTURE: A couple more.
24

**Page 506**

1      RECROSS EXAMINATION
2 BY MR. COUTURE:
3    Q. In that same line, sir, when Mr. Franke
4 was driving northbound on 41 at the time of this
5 accident, he was doing so as an employee of
6 Martin's Bulk Milk?
7    A. Yes.
8    Q. It's a legal term but I'll ask you. Was
9 he in the course of his employment at the time of
10 the accident?
11    A. Yes.
12    Q. Was he within the scope of his employment
13 at the time of the accident?
14    A. Yes.
15    Q. Does Martin's Bulk Milk -- did they do an
16 internal accident report from this occurrence?
17    A. No. We just attached the police report to
18 his file.
19    Q. Okay. So you don't have any form
20 documents from Martin's Bulk Milk other than the
21 Highland Park Police Department to document this
22 occurrence?
23    A. Yes.
24    Q. Counsel asked you a question about the

**Page 507**

1 employment handbook. And I know you don't have it
2 in front of you so you don't know the specifics of
3 it, but can you tell me, sir, does that handbook
4 tell employees a procedure or policy on steps to
5 take if they're involved in an accident?
6    A. I can't answer that. I don't know.
7    Q. Let me ask you a more basic question. I
8 understand you said you don't know if the employee
9 handbook discusses safety and you don't know if the
10 handbook discusses steps to take with regard --
11 after an accident.
12      Can you tell me what it does include?
13    A. I'm sorry, I can't.
14    Q. I'm going to show you what was included in
15 Exhibit No. 28 for identification, Pages 42, 43 and
16 44. Have you ever seen that before, sir?
17      MR. SKRYD: Can I see it for a second?
18 I'm not quite sure --
19      MR. COUTURE: I have an extra copy.
20      MR. SKRYD: Okay. Got you. I know what
21 it is.
22 BY MR. COUTURE:
23    Q. Have you ever seen that before?
24    A. If I have, it's been a while back.

```
 1      A.  Correct.
 2      MR. BURKE:  Nothing else, sir.
 3      MR. SKRYD:  Give me 30 seconds.  I just
 4  want to talk to Bob real quick.
 5      THE VIDEOGRAPHER:  We're going off the
 6  video record.  The time now is 8:11 p.m.
 7      MR. SKRYD:  Reserve signature.
 8           (AND FURTHER DEPONENT SAITH
 9            NAUGHT.)
```

516

```
 1       IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                EASTERN DIVISION
 4  MURRAY SCHEINMAN,          )
 5       Plaintiff,            )
 6  vs.                        ) No. 09 CV 5340
 7  MARTIN'S BULK MILK SERVICE, )
 8  INC., et al.,              )
 9       Defendants.           )
10      This is to certify that I have read the
11  transcript of my deposition taken in the
12  above-entitled cause by Cheri LeBeau Dubina,
13  Certified Shorthand Reporter, on February 20, 2012,
14  and that the foregoing transcript accurately states
15  the questions asked and the answers given by me as
16  they now appear.
17      _____
18            DAVID V. MARTIN
19
20  SUBSCRIBED AND SWORN TO
21  before me this _____ day
22  of _____ 2012.
23  _____
24    Notary Public
```

517

```
 1  STATE OF ILLINOIS  )
 2                     ) SS:
 3  COUNTY OF DUPAGE   )
 4      I, CHERI LEBEAU DUBINA, a Notary Public within
 5  and for the County of DuPage and State of Illinois,
 6  do hereby certify that heretofore, to-wit, on the
 7  20th day of February, 2012, personally appeared
 8  before me DAVID V. MARTIN, a witness in a certain
 9  cause now pending and undetermined in the United
10  States District Court for the Northern District of
11  Illinois, Eastern Division, wherein Murray
12  Scheinman is the Plaintiff and Martin's Bulk Milk
13  Service, Inc., et al. are the Defendants.
14      I further certify that the said DAVID V. MARTIN
15  was by me first duly sworn to testify the truth,
16  the whole truth, and nothing but the truth in the
17  cause aforesaid; that the testimony then given by
18  said witness was reported stenographically by me in
19  the presence of said witness and afterwards reduced
20  to writing, and the foregoing is a true and
21  complete transcript of the testimony so given by
22  said witness as aforesaid.
23      I further certify that the signature to the
24  foregoing deposition was reserved by counsel for
```

518

```
 1  the respective parties.
 2      I further certify that the taking of this
 3  deposition was pursuant to Notice, and that there
 4  were present at the taking of said deposition the
 5  appearances heretofore noted.
 6      I further certify that I am not counsel for nor
 7  in any way related to any of the parties to this
 8  suit, nor am I in any way interested in the outcome
 9  thereof.
10      IN TESTIMONY WHEREOF:  I do hereunto set my
11  hand and affix my notarial seal this 5th day of
12  March, 2012.
13
14
15
16
17      Cheri LeBeau Dubina
18      _____
          NOTARY PUBLIC, DUPAGE COUNTY, ILLINOIS
```

519

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
 1            MC CORKLE LITIGATION SERVICES
              200 North LaSalle Street
 2                    Suite 2900
              Chicago, Illinois 60601-2956
 3
                      March 5, 2012
 4
     Mulherin, Rehfeldt & Varchetto, P.C.
 5   Mr. Joseph G. Skryd
     211 S. Wheaton Avenue, Suite 200
 6   Wheaton, Illinois 60187
     IN RE: Scheinman vs. Martin's Bulk Milk Service
 7   COURT NUMBER: 09 CV 5340
     DATE TAKEN: February 20, 2012
 8   DEPONENT: Mr. David V. Martin

 9
     Dear Mr. Skryd:
10
     Enclosed is the deposition transcript for the
11   aforementioned deponent in the above-entitled
     cause. Also enclosed are additional signature
12   pages, if applicable, and errata sheets.
13   Per your agreement to secure signature, please
     submit the transcript to the deponent for review
14   and signature. All changes or corrections must be
     made on the errata sheets, not on the transcript
15   itself. All errata sheets should be signed and all
     signature pages need to be signed and notarized.
16
     After the deponent has completed the above, please
17   return all signature pages and errata sheets to me
     at the above address, and I will handle
18   distribution to the respective parties.
19   If you have any questions, please call me at
     (312) 263-0052.
20
     Sincerely,
21
     Margaret Setina        Court Reporter:
22   Signature Department
23   cc: Mr. Carlton D. Fisher
         Mr. Timothy R. Couture
24       Mr. Richard F. Burke, Jr.
                                         520
```

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052