# JAE # 6

# Excerpts from the Transcript of Deposition of Janet Berndt, dated September 28, 2012

130547293v1 0903067

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
MURRAY SCHEINMAN, Plenary        )
Guardian of the Estate and       )
Person of JEFFREY D. SCHEINMAN,  )
a Disabled Person                )
        Plaintiff,               )
    -vs-                         ) No. 09 CV 5340
MARTIN'S BULK MILK SERVICE,      )
INC., SAMUEL G. FRANKE,          )
CSX INTERMODAL, INC.,            )
INTERNATIONAL PAPER COMPANY,     )
et al.,                          )
        Defendants.              )
```

The discovery deposition of JANET BERNDT, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Janet M. Stanton, a notary public within and for the County of DuPage and State of Illinois, at 211 South Wheaton Avenue, Wheaton, Illinois, on the 28th day of September, 2012, at the hour of 10:17 o'clock a.m.

Reported by: Janet M. Stanton, CSR
License No.: 084-001905

**Page 2**

```
 1  APPEARANCES:
 2  CLIFFORD LAW OFFICES
    BY: MR. RICHARD F. BURKE, JR.
 3      rfb@cliffordlaw.com
    120 North LaSalle Street, Suite 3100
 4  Chicago, IL 60602
    (312) 899-9090
 5      rfb@cliffordlaw.com
        Representing the Plaintiff;
 6  MULHERIN, REHFELDT & VARCHETTO, P.C.
    BY: MR. MATTHEW R. SCHRECK
 7      mschreck@mrvlaw.com
        MR. JASON M. BRIESEMEISTER
 8      jbriesemeister@mrvlaw.com
    211 South Wheaton Avenue, Suite 200
 9  Wheaton, IL 60187
    (630) 653-9316
10      -and-
    DOWD & DOWD, LTD.
11  BY: MS. LARA R. LICKHALTER
        llickhalter@DowdandDowd.com
12  617 West Fulton Street
    Chicago, IL 60661
13  (312) 704-4400
        Representing Martin's Bulk Milk
14      Service, Inc. and Samuel G. Franke;
    HINSHAW & CULBERTSON
15  BY: MR. WILLIAM YU
        wyu@hinshawlaw.com
16  222 North LaSalle Street, Suite 300
    Chicago, IL 60601
17  (312) 704-3000
        Representing International Paper
18      Company, Overnite Express, Inc., Ox,
        LLC, Universal Am Cam, Ltd., and
19      Overnite Logistics, Inc.;
    JOHNSON & BELL, LTD.
20  BY: MR. TIMOTHY R. COUTURE
        couturet@jbltd.com
21  33 West Monroe Street, Suite 2700
    Chicago, IL 60603
22  (312) 372-0770
        Representing BMW of North America,
23      LLC and Bayerische Motoren Werke
        Aktiengesellschaft.
24
```

**Page 3**

```
                    I N D E X
 1
 2  WITNESS                    EXAMINATION
 3  JANET BERNDT
 4     By Mr. Couture              5
 5     By Mr. Burke               97
 6     By Mr. Yu                 130
 7     By Mr. Couture            139
 8     By Mr. Schreck            142
 9
10
11
12
13
14              E X H I B I T S
15  NUMBER                  MARKED FOR ID
16  Berndt Deposition Exhibit
17  No. 122............................ 88
```

**Page 4**

1    (Witness duly sworn.)
2    MR. COUTURE: At the request of Martin's
3 counsel we're confirming on the record that all
4 objections are waived except for form.
5    Anything else you wanted to say?
6    MR. SCHRECK: I want to say not waived.
7    MR. COUTURE: I didn't use the right word.
8    MR. BURKE: Yes.
9    MR. SCHRECK: I'll say -- I'll put on the
10 record that all objections other than form and
11 foundation are reserved --
12    MR. COUTURE: Reserved, that's what I meant to
13 say.
14    MR. SCHRECK: -- for purposes, as you said it,
15 at trial or --
16    MR. COUTURE: We're waiving the need for you to
17 make them during the questioning, how's that?
18    MR. SCHRECK: Yes.
19    MR. COUTURE: All right.

### Page 29

1 to a specific tractor?
2  A. I don't know.
3  Q. Who would know those things? Other than
4 Mr. Franke.
5  A. Dave, David Martin may possibly know.
6  Q. In your role as -- when you were safety
7 director, who was your immediate supervisor at
8 Martin's Bulk Milk?
9  A. David Martin.
10  Q. What's David Martin's job title?
11  A. Operations manager.
12  Q. And I expect he's the Martin of Martin's
13 Bulk Milk, he and his father?
14  A. Correct.
15  Q. Are there any other Martins other than
16 David Martin and his father who are involved in the
17 operation of the company?
18  A. No.
19  Q. Is David Martin still your direct boss?
20  A. Yes.
21  Q. When you say that Samuel Franke ran
22 Chicagoland daily, what do you mean?
23  A. He would leave our terminal anywhere
24 between 12:00 o'clock and 2:00 o'clock, usually,

### Page 30

1 12:00 o'clock p.m. and 2:00 o'clock p.m. daily, and
2 he would deliver -- this was at the time of the
3 accident.
4  Q. Well, let's -- let's stop, then. I want
5 to --
6  A. Okay.
7  Q. I want to start first defining our terms.
8  A. Okay.
9  Q. So instead of you telling me what
10 Mr. Franke did on the day of the occurrence, I
11 assure you we'll get there, when you say ran
12 Chicagoland daily, generally what do you mean by
13 those terms?
14  A. Pick up a load at our terminal in Wilton,
15 Wisconsin, deliver it to the Chicagoland area,
16 reload, and bring the load back to our terminal.
17  Q. Okay. Was that Mr. Franke's route, for
18 lack of a better word, when he started?
19  A. Yes.
20  Q. Were you involved in the hiring of Samuel
21 Franke?
22  A. No.
23  Q. Who hired him?
24  A. David Martin.

### Page 31

1  Q. Do you know what interview process or what
2 employment hiring process David Martin went through
3 in order to hire Samuel Franke?
4  A. Yes.
5  Q. And I just want to make it clear. I'm not
6 asking you what you expect he did because he always
7 does this with everybody. Do you know specifically
8 what he did with Samuel Franke?
9  A. Yes.
10  Q. What did he do, David Martin, to hire
11 Samuel Franke?
12  A. David Martin would have Samuel fill out an
13 application, qualification for applicant --
14 employment. At that point David would have me run
15 the MVR, motor vehicle record, complete the past
16 employer forms, and after review, then he would
17 decide whether or not he was material to be hired.
18  Q. Was there an interview?
19  A. I don't know.
20  Q. Was there a road test for Mr. Franke?
21  A. I don't know.
22  Q. Was there a drug test for Mr. Franke
23 before he was hired?
24  A. Yes.

### Page 32

1  Q. And once he was hired, was he
2 automatically -- was Mr. Franke automatically
3 placed on the Chicagoland run?
4  A. I don't know.
5  Q. Do you know when it was that Mr. Franke
6 first was assigned to the Chicagoland run?
7  A. No.
8  Q. Other than Mr. Franke, would I have to ask
9 David Martin that question?
10  A. Yes.
11  Q. When Mr. Franke started making the
12 Chicagoland run, did he always bring loads from the
13 same customer to Chicago, or was it on a day-by-day
14 basis?
15  A. I don't know.
16  Q. When Mr. Franke got to Chicago, did he
17 always have a load to bring back, or was that a
18 day-by-day basis?
19  A. Day by day.
20  Q. Depending on what the dispatcher was able
21 to get for him?
22  A. Correct.
23  Q. When Mr. -- well, strike that.
24     In July of 2008, did Mr. Franke, to your

**Page 33**

1 knowledge, have a regular load that he took from
2 Wilton to Chicago?
3    A. Yes.
4    Q. And who was that load hauled for?
5    A. To Chicago?
6    Q. Yes.
7    A. MBM Logistics. MBM Logistics,
8 Incorporated.
9    Q. And that is a different company from
10 Martin's Bulk Milk, correct?
11    A. Correct.
12    Q. But MBM stands for Martin's Bulk Milk
13 Logistics?
14    A. No.
15    Q. What does MBM stand for?
16    A. MBM.
17    Q. Okay. And are you -- do you know who the
18 owner of that company is?
19    A. Owners.
20    Q. Who are the owners?
21    A. Allan Martin, Ruth Martin, and Randy
22 Galewski.
23    Q. And do the Martins who own that company
24 have any relationship to the Martins that run

**Page 34**

1 Martin's Bulk Milk?
2    A. Yes.
3    Q. What is their relationship?
4    A. Allan and Ruth are president and vice
5 president of Martin Bulk Milk.
6    Q. Okay, thank you.
7       Is Allan David's father?
8    A. Yes.
9    Q. And Ruth is his wife?
10    A. Yes.
11    Q. Okay. And they -- who are the owners of
12 Martin's Bulk Milk?
13    A. Allan and Ruth Martin.
14    Q. Okay. So the people who own MBM Logistics
15 also own Martin's Bulk Milk?
16    A. Correct.
17    Q. And so in and around July 3rd, 2008 Samuel
18 Franke was regularly or daily bringing loads from
19 MBM Logistics to Chicago?
20    A. No.
21    Q. Okay.
22    A. From Martin Bulk Milk to Chicago.
23    Q. Thank you.
24       Loads -- he was hauling loads for MBM

**Page 35**

1 Logistics from the Martin's Bulk Milk yard to
2 Chicago?
3    A. Correct.
4    Q. And were those MBM loads always the same
5 product?
6    A. To my knowledge.
7    Q. And what was that product?
8    A. Furniture.
9    Q. Okay. So MBM Logistics had some agreement
10 with a furniture company to deliver furniture, and
11 MBM Logistics hired Martin's Bulk Milk to do that
12 delivery?
13    A. Correct.
14    Q. Were you involved in the contracts between
15 MBM Logistics and Martin's Bulk Milk to haul that
16 furniture?
17    A. No.
18    Q. Were you involved, or do you have any
19 knowledge of the contract between MBM Logistics and
20 the furniture company for those loads?
21    A. No.
22    Q. Have you ever worked for MBM Logistics?
23    A. No.
24    Q. For how long had it been Samuel Franke's

**Page 36**

1 daily work activity to haul furniture from Martin's
2 Bulk Milk to Chicago?
3    A. I don't know.
4    Q. Was it a -- had it been going on for
5 years, or was it just three days before the
6 accident, or was it a -- do you --
7    A. I don't know.
8    Q. Okay. And I asked you if it was a
9 regular, that's what he -- he did, and you said
10 yes. So can you tell me for how long it was his
11 regular load?
12       And if you can only give me your best
13 estimate, that's fine.
14    A. My best estimate would be at least one
15 year.
16    Q. Do you know what location in Chicago
17 Samuel Franke was delivering that furniture to?
18    A. On that particular date?
19       Or any --
20    Q. Any of them, any time.
21       Was it was it always the same place or did
22 he go different --
23    A. No.
24    Q. -- locations?

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

```
 1    A.  There were different rail yards.  He was
 2  delivering to rail yards.
 3    Q.  Thank you.
 4       Okay.  So he would take furniture to
 5  various rail yards?
 6    A.  Correct.
 7    Q.  Do you know what route Samuel Franke would
 8  take from Wilton, Wisconsin, the Martin's Bulk Milk
 9  yard, to the rail yards?
10    A.  Generally either I-90 or I-94.
11    Q.  Who was it who decided what route
12  Mr. Franke would take to get to the rail yards?
13    A.  Mr. Franke.
14    Q.  Did Martin's Bulk Milk ever tell
15  Mr. Franke how to get from Wilton, Wisconsin to the
16  rail yards?
17    A.  I don't know.
18    Q.  Was there a policy and procedure in place
19  at Martin's Bulk Milk to direct the drivers to take
20  a certain route, as opposed to letting them pick
21  their own?
22    A.  The shortest route.
23       And if they were unaware of the shortest
24  route to a specific city, they could call for
                                                    37
```

```
 1  routing.  But from the entrance to the city to the
 2  exact location, it was their responsibility as the
 3  driver.
 4    Q.  Was it mandated that they take the
 5  shortest route?
 6    A.  Yes, with --
 7    Q.  And -- go ahead.
 8    A.  Within reason, based on conditions.
 9    Q.  Well, and that's what I was going to ask.
10    A.  Yes.
11    Q.  When you say shortest route, do you mean
12  shortest route distance or shortest route time?
13  Because those can be different.
14    A.  Yes.  Both.
15    Q.  Both.
16    A.  We had no preference if they ran 90 or 94
17  down to Chicago, because running 94 could eliminate
18  tolls.  So the factor of the extra -- fifteen extra
19  miles outweighed a toll expense.
20    Q.  Is the toll expense the driver's
21  responsibility or Martin's?
22    A.  Martin's.
23    Q.  Was there a policy specifically to avoid
24  tolls?
                                                    38
```

```
 1    A.  No.
 2    Q.  Was there an unwritten rule that drivers
 3  should avoid tolls?
 4    A.  No.
 5    Q.  Generally, in July of 2008, after
 6  delivering furniture to the rail yards, did
 7  Mr. Franke have a regular return load?
 8    A.  Yes.
 9    Q.  And that return load was paper products
10  from Hammond, Indiana, right?
11    A.  Correct.
12    Q.  For how long had that been his regular
13  return load as of July 2008?
14    A.  I don't know.
15       Estimate, one year, at least.
16    Q.  Were you involved in coordinating
17  Mr. Franke's pickup of that load on a day-to-day
18  basis with the folks in Hammond?
19    A.  No.
20    Q.  Who at Martin's Bulk Milk would have been
21  responsible for that?
22    A.  David Martin or Pat Podlena.
23    Q.  All right.  And did you ever talk to the
24  people in Hammond, Indiana from where he was
                                                    39
```

```
 1  picking up the load of paper?
 2    A.  No.
 3    Q.  What if any regular interaction would you
 4  have had with Samuel Franke in or around July of
 5  2008 in your job?
 6    A.  Can you re -- say that -- repeat it.
 7    Q.  Sure.
 8       I'm not asking you if when you saw him you
 9  said hi.  I'm asking about in your employment
10  capacity as safety director and office manager, did
11  you have a regular interaction or involvement with
12  Mr. Franke?
13    A.  No.
14    Q.  So it wasn't your job to see him in the
15  morning or see him when he came back from his
16  loads?
17    A.  No.
18    Q.  It wasn't your job to direct what he was
19  doing out on the road?
20    A.  No.
21    Q.  I saw in the handbook that we'll talk
22  about a little bit later that every driver is
23  required to do a check-in call.
24       Was it part of your job to be involved in
                                                    40
```

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
 1   that check-in call?
 2      A.  No.
 3      Q.  That would have been the dispatchers?
 4      A.  Correct.
 5      Q.  Which would have been David Martin and
 6   some other folks?
 7      A.  Yes.
 8      Q.  So you could go days or even weeks without
 9   seeing Mr. Franke?
10      A.  Correct.
11      Q.  Do you know when the last time prior to
12   July 3rd, 2008 it was that you saw Mr. Franke?
13      A.  No.
14      Q.  Was your relationship with Mr. Franke
15   strictly he worked for the same company you did?
16      A.  Yes.
17      Q.  You didn't go out socially or hang out or
18   anything like that?
19      A.  No.
20      Q.  Were you personally aware of Mr. Franke's
21   route when he drove from Hammond, Indiana back to
22   Wilton?
23          And I'm not asking you what you know now,
24   I'm asking about when -- before this accident did
                                                      41
```

```
 1   you know his route?
 2      A.  After the fact?
 3      Q.  Yes.
 4          And I know it's going to be a little hard
 5   to separate out what you know now from what you
 6   knew then but -- so I'll ask it again.
 7          Say July 2nd, 2008, the day before this
 8   accident --
 9      A.  Um-hum.
10      Q.  -- were you, as an employee of Martin's
11   Bulk Milk, aware of the route that Mr. Franke
12   typically took from Hammond to Wilton?
13      A.  Typically took, no.
14      Q.  Were you aware of what his options were?
15      A.  Yes.
16      Q.  Did you, personally, ever tell Mr. Franke
17   which route to take from Hammond to Wilton?
18      A.  No.
19      Q.  Did anyone from Martin's Bulk Milk tell
20   Mr. Franke what route to take from Hammond to
21   Wilton?
22      A.  Probably not.
23      Q.  Why do you say probably?
24      A.  He knew the route.
                                                      42
```

```
 1      Q.  Sure.
 2          Have you ever seen -- well, strike that.
 3          You said you saw the police report,
 4   correct?
 5      A.  Correct.
 6      Q.  Have you ever seen the statement that
 7   Mr. Franke gave to the police, the video statement?
 8      A.  Repeat that?
 9      Q.  After this accident on July 3rd, or
10   perhaps July 4th in the early morning hours,
11   Mr. Franke gave a statement to the police that was
12   videotaped.  Have you ever seen that?
13      A.  No.
14      Q.  Are you aware that Mr. Franke, in that
15   statement, said that he just was authorized -- just
16   recently was authorized to take a different route,
17   which is Route 41?
18      A.  No.
19      Q.  Do you have any knowledge or understanding
20   as to what anyone had ever said to Mr. Franke about
21   what route to take prior to the occurrence?
22      A.  No.
23      Q.  Are you familiar with the area where this
24   accident took place?
                                                      43
```

```
 1      A.  No.
 2      Q.  How was it that you first learned that
 3   Samuel Franke had been involved in an accident?
 4      A.  He called me at about 11:30 p.m. on
 5   Thursday, July 3rd, 2008.
 6      Q.  Do you know where he was when he called
 7   you?
 8      A.  At the scene of the accident.  Highland
 9   Park, Illinois, I believe it was.
10      Q.  Do you know when in relationship to the
11   accident he called you?
12          And I know it's obviously after but --
13      A.  I believe approximately fifteen minutes to
14   half an hour after the time of impact.
15      Q.  And do you know if Mr. Franke spoke to
16   anyone else at Martin's Bulk Milk before calling
17   you?
18      A.  He did not.
19      Q.  Okay.  Do you know who James Jorgenson is?
20      A.  Yes.
21      Q.  Is he an employee -- or was he an employee
22   of Martin's Bulk Milk at that time?
23      A.  Yes.
24      Q.  Is he still an employee of Martin's Bulk
                                                      44
```

**Page 57**

1  Q. Did you work at the location of Martin's
2  Bulk Milk on the 4th of July?
3  A. Not to my recollection.
4  Q. How about the 5th or the 6th, Saturday or
5  Sunday?
6  A. Not to my recollection.
7  Q. So I understand your testimony, you spoke
8  to David Martin on the phone on the 4th, and then
9  the next time you had anything to do with this
10 accident was the 7th, the following Monday?
11 A. Correct.
12 Q. Do you know what if anything was done by
13 Martin's Bulk Milk to address this accident on the
14 4th, 5th, or 6th?
15 A. Nothing that I know of.
16 Q. Do you know if anyone from Martin's Bulk
17 Milk talked to the police on the 4th, 5th, or 6th?
18 A. No. No, I don't know.
19 Q. In your role as office manager or safety
20 director, would it be your job to know the weights
21 of the loads that Martin's has on the road?
22 A. Every load?
23 Q. Yes.
24 A. No.

**Page 58**

1  Q. Do you know the weight, gross weight of
2  Mr. Franke's truck and trailer on the day of the
3  occurrence?
4  A. No.
5  Q. Was there someone at Martin's Bulk Milk
6  whose job it was to make sure that all of the loads
7  were not overly heavy?
8  A. It was the driver's responsibility, and
9  still is.
10 Q. The following Monday, July 7th, what time
11 did you get to work that day?
12 A. I don't know.
13 Q. Do you have a typical come-and-go time at
14 work?
15 A. Generally come-and-go is between 4:00 and
16 5:00 a.m. and my go time is between 5:00 and 6:00.
17 Q. You indicated that the next time you spoke
18 to anyone about this accident was July 7th.
19 Who did you speak to on July 7th about the
20 accident, the first person you spoke to?
21 A. David Martin.
22 Q. Do you remember what time that was?
23 Approximate.
24 A. 7:00 a.m.

**Page 59**

1  Q. And what conversation did you have with
2  David Martin at approximately 7:00 a.m. on the 7th
3  of July 2008?
4  A. I don't recall specifically, but I do
5  recall Dave saying that we had no choice but to let
6  Sam go based on the severity of it, of the
7  accident, and that we just had to get following
8  through on insurance and everything.
9  Q. Okay. Did Mr. Martin tell you who made
10 the decision to fire Sam Franke?
11 A. No, but I know it was Dave Martin's.
12 Q. So when he said we have no choice, am I
13 correct to say Dave Martin made a decision to fire
14 Sam Franke?
15 A. Correct.
16 MR. SCHRECK: Object -- or go ahead, that's
17 fine.
18 BY MR. COUTURE:
19 Q. Do you know anyone else who had input into
20 that decision?
21 A. No.
22 Q. Do you -- strike that.
23 Have you spoken to David Martin since and
24 found out who if anyone he spoke to between the

**Page 60**

1  time of the accident and the time he told you on
2  the 7th that Franke was going to be fired?
3  A. No.
4  Q. Did he tell you why Sam Franke was going
5  to be fired?
6  A. No.
7  Q. Was it your understanding that Samuel
8  Franke was going to be fired and was fired for
9  causing an accident?
10 A. Yes.
11 MR. SCHRECK: Objection, form, foundation.
12 You can go ahead.
13 MR. COUTURE: She answered.
14 BY MR. COUTURE:
15 Q. Other than Mr. Martin telling you that Sam
16 Franke was going to be fired, did you have a
17 further conversation -- or discussions with him at
18 that time regarding this accident?
19 A. No.
20 Q. At that point did you discuss how or why
21 the accident took place with Mr. Martin?
22 A. No.
23 Q. Did you discuss the speed of the vehicles
24 or anything like that?

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

```
 1   vehicles from the rear, correct?
 2       A.  Correct.
 3       Q.  And Martin's drivers also were expected to
 4   maintain a safe speed so as to avoid striking a
 5   vehicle in of it, correct?
 6       A.  Correct.
 7       Q.  And Martin's drivers were also expected to
 8   maintain a look-out for the traffic in front of
 9   their truck in order to make sure they were able to
10   stop in time without striking the vehicle it was
11   following, correct?
12       A.  Correct.
13       Q.  There's a section in the April portion of
14   the driver handbook on page 5.
15           Do you see under operating procedures and
16   policies?
17       A.  Okay.
18       Q.  Okay.  And it says:  It shall be the
19   responsibility of the driver for the following, and
20   then it lists, oh, probably -- it looks like about
21   eleven entries with dots in front of them.
22           Do you see that?
23       A.  Yes, I do.
24       Q.  Okay.  And the Martin's drivers were
                                                    101
```

```
 1   expected to comply with those procedures and
 2   policies, correct?
 3       A.  Correct.
 4       Q.  Okay.  And policy number -- or excuse me,
 5   the second paragraph in that section states:  To
 6   comply at all times with the rules, regulations and
 7   laws of the federal, state and such other
 8   regulatory agencies having jurisdiction.
 9           Correct?
10       A.  Correct.
11       Q.  Okay.  And by that provision, Martin's was
12   expecting its drivers to comply with local, state,
13   and federal traffic regulations applicable to the
14   operation of tractor-trailer trucks, correct?
15       A.  Correct.
16       Q.  And Martin's drivers were expected to
17   comply with the provisions of the Federal Motor
18   Vehicle Safety Act, correct?
19       A.  Correct.
20       Q.  I think I recall you saying part of your
21   job was to make sure drivers got a drug and alcohol
22   test when required; is that right?
23       A.  Correct.
24       Q.  Okay.  Did Mr. Martin -- or did Mr. Franke
                                                    102
```

```
 1   undergo alcohol and drug testing?
 2       A.  At random, or at the time of the
 3   accident?
 4       Q.  No, at the time -- after the accident.
 5       A.  Yes.
 6       Q.  Okay.  And was that at your -- were you --
 7   was that done prior to you knowing about the
 8   accident or not, or do you know?
 9       A.  No, I told him it was his responsibility
10   to work with the police to make sure that got
11   done.
12       Q.  And do you have an understanding of the
13   results of that testing?
14       A.  Yes, I do.
15       Q.  Okay.  And what's that understanding?
16       A.  Negative.
17       Q.  On both alcohol and drugs?
18       A.  Yes, both parts.
19       Q.  On the day of this occurrence had
20   Mr. Franke transported a load of furniture for MBM
21   Logistics?
22       A.  To my knowledge.
23       Q.  And where did MBM Logistics operate from?
24       A.  Winona, Minnesota.
                                                    103
```

```
 1       Q.  And who -- how was that assignment
 2   communicated to Mr. Franke to transport this load
 3   of furniture?
 4       A.  Through dispatch at Martin Bulk Milk.
 5       Q.  Okay.  And how would Martin Bulk Milk
 6   receive that assignment or know it had to be done?
 7       A.  Through a confirmation from MBM Logistics.
 8       Q.  And who was the contact at MBM Logistics
 9   that would do that?
10       A.  Randy Galewski.
11       Q.  And what was your understanding of what
12   Randy's job was, or position?
13       A.  He's a load coordinator, part owner,
14   dispatcher of the brokerage.
15       Q.  And when you say the brokerage, what do
16   you mean by that?
17       A.  MBM Logistics is a load brokerage.
18       Q.  And when you refer to dispatch at Martin's
19   Bulk Milk, who are you referring to?
20       A.  Our dispatch office that is overseen by
21   David Martin, and he has anywhere from three to
22   five people in his office at any given time that he
23   gives orders to, to dispatch drivers here, there,
24   wherever.
                                                    104
```

Page 129:

1  have any recollection -- I mean in terms of -- was
2  it correspondence or was it actually a copy of a
3  lawsuit, or do you know what was in that package?
4      A.  It was a lawsuit.
5      Q.  And do you know where or how -- when you
6  say you received it, how was it received?
7          Or how did you get it, do you have any
8  recollection?
9      A.  In an envelope, a big envelope, I believe,
10 if I remember right.
11         But how it was delivered, I do not know if
12 it came Express Mail or UPS or FedEx, I do not
13 know, or if it was hand delivered. I do not know.
14 I can't recall.
15     Q.  In your job, on a daily basis would you
16 normally have any contact with anybody from
17 Overnite Express or Universal Am Cam after they
18 purchased Overnite Express?
19     A.  No.
20     Q.  Who at Martin's had involvement with
21 Overnite Express or Universal?
22     A.  David Martin and Pat Podlena.
23     MR. SCHRECK:  Okay. I don't think I have
24 anything else. Thank you for your time.
                                                  129

Page 130:

1      THE WITNESS:  You're welcome.
2                  EXAMINATION
3  BY MR. YU:
4      Q.  Hi, good afternoon now. I have a few
5  questions for you.
6          I represent several entities, so for the
7  purposes of my questioning, I represent Universal
8  Am Cam, Limited, Overnite Express, Incorporated,
9  and Ox, LLC, and I'll refer to those group of
10 defendants as UACL.
11         Have you heard of any of those entities
12 before?
13     A.  Two of them, yes.
14     Q.  Okay. Which ones?
15     A.  Overnite Express and Universal Am Cam.
16     Q.  Okay. So for all those entities I'm going
17 to call them just UACL, okay?
18     A.  Pardon me? I --
19     Q.  I'm just going to refer to those three
20 entities as UACL?
21     A.  UACL? Okay.
22     Q.  Yes. Universal Am Cam, Limited.
23         And then I also represent International
24 Paper Company. Have you heard of them?
                                                  130

Page 131:

1      A.  Yes, I have.
2      Q.  I'm going to call them IPC, okay?
3      A.  Okay.
4      Q.  So UACL and IPC?
5      A.  Okay.
6      Q.  And I'm just going to ask you some
7  questions about Dep Exhibit Number 122, which is
8  the company -- what did you call it, the Driver
9  Handbook?
10     A.  Yes.
11     Q.  Okay. Do you have that in front of you?
12     A.  Yes, I do.
13     Q.  You testified earlier that you were the
14 one that authored this document, correct?
15     A.  Correct.
16     Q.  Is it a correct statement that UACL and
17 IPC have no involvement with the creation of this
18 document?
19     A.  That is correct.
20     Q.  Okay. If you -- I'm just going to go in
21 the order of the pages that I received this
22 document, and that might be out of order.
23         On page 6 counsel asked you earlier about
24 the Safe Work Rules.
                                                  131

Page 132:

1          Do you see that paragraph?
2      MR. SCHRECK:  And, for the record, you're
3  referring to the first page 6, right?
4      MR. YU:  The first page 6 that I have, right.
5      A.  Yes.
6  BY MR. YU:
7      Q.  Safe Work Rules. Do you see that
8  paragraph?
9      A.  Yes, I do.
10     Q.  Okay. And the preamble, so to speak, it
11 says:  It is the intention of Martin's Bulk Milk
12 Service to prevent accidents and to promote and
13 provide safe operators on the road.
14         And then one of the bullet points below
15 that I think we discussed indicates:  In the event
16 of an accident such as the one in this case the
17 driver is required to contact a director of safety,
18 and that's either yourself, Janet Berndt, or Anna
19 Thurston, immediately, correct?
20     A.  Correct.
21     Q.  Is it a correct statement that this
22 document does not indicate that you should contact
23 anyone from UACL or IPC after an accident occurred?
24     A.  That is correct.
                                                  132

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

## Page 133

Q. Okay. Just out of curiosity, when you testified earlier, when you first learned of the accident from Mr. Franke, you testified that you were at home and received a call from him at the accident site, correct?
A. Correct.
Q. Did he have your home phone number, is that how he contacted you, or was he routed through an operator at MBMS?
How did he get in touch with you?
A. He called either my home phone number or my cell phone number, I don't recall which.
Q. Okay. So all drivers that were employed by MBMS in July of 2008 would you both your home number and your cell phone number?
A. Correct.
Q. Okay. On page 13 of the document there's a paragraph called: Handbook Amendments.
Do you see that?
A. Yes, I do.
Q. It indicates that: Our company newsletter, Martinsville News, will serve as an Employee Memo and any policy or procedure change published in the newsletter will be considered an

## Page 134

amendment to the Driver Handbook dated April, 2007.
So this is something again that is authored solely by Martin's Bulk Milk Service?
A. Correct.
Q. And who would author the Martinsville News?
A. At that time Anna Thurston did.
Q. Okay. Did you do that as well?
A. I never did Martinsville News. It has since been discontinued.
Q. Okay. How often would that have been published, since this document was created in April of 2007? If you know.
A. About once every other month.
Q. Okay. And the intent behind the newspaper, so to speak, is to provide updates to the drivers that were employed by your company, Martin's?
A. Correct.
Q. Okay. And, again, UACL or -- and/or IPC had no involvement with the creation of that periodical, right?
A. Correct.
Q. Okay. On page 5, under Operating

## Page 135

Procedures and Policies, I believe the third bullet point down, it reads: To load, transport and unload each shipment from origin to destination without delay in route unless otherwise directed by dispatch.
And dispatch refers to the dispatchers at Martin Bulk Milk Service, correct?
A. Correct.
Q. And then the last bullet point on page 5, it says: To make a minimum of one check call per day.
Can you describe to us what a check call is?
A. A check call is, for the average driver that is delivering anywhere from 7:00 o'clock a.m. to 12:00 o'clock noon, that they call in and let dispatch know we're empty, where do you want us to go, or I'm delayed because of traffic or that type of thing.
Sam was not required to make this call because he did not leave until noon or later, so he did not fall into this bullet.
Q. Okay. If he did fall into the bullet and had to make a check call, who would he make that

## Page 136

check call to?
A. To the dispatch office.
Q. Which dispatch office?
A. In Wilton, at our terminal.
Q. And when you say at our terminal, Martin Bulk Milk Service terminal?
A. Correct.
Q. Again, not UACL or IPC, correct?
A. I don't believe he called them, not to my knowledge. I don't know.
Q. Well, according to this document that you drafted, Mr. Franke was not required to call UACL or IPC, he was required to call you to follow your check-in requirements, correct?
A. That is correct.
Q. Okay. On page 6, I think it's the second page 6 that I have, it begins with bullet points.
The third bullet point down indicates: To submit complete paperwork every week no later than 10:00 o'clock a.m. on Tuesday. If paperwork is not submitted on time, there will be no payroll check issued, nor will an advance be issued.
Did this bullet point apply to Mr. Franke?
A. Yes, it did apply to him.

```
 1     Q.  Okay.  And, again, this -- the intent
 2   behind this bullet point is to get the driver to
 3   submit their paperwork in order to get paid by
 4   Martin Bulk Milk Service, correct?
 5     A.  Correct.
 6     Q.  What is the intent behind the following
 7   bullet point:  To fuel trucks at the terminal
 8   whenever possible and to fuel reefer units daily
 9   upon return to the terminal?
10     A.  The point to that is fueling trucks at the
11   terminal versus over the road averages 20 to 25
12   cents, on average, per gallon less in cost, and as
13   far as fueling the reefers, we transport primarily
14   refrigerated freight on our reefer trailers, not a
15   dry van or a rail trailer, of course, but -- so we
16   want the fuel levels to remain three-quarters to
17   full at all times.
18     Q.  Is it fair to say that this can be
19   described as a cost control measure that was
20   implemented by your company?
21     A.  Yes.
22     Q.  And, again, I think we covered this
23   already.  The final bullet point there, that kind
24   of goes to you had an unwritten rule, so to speak,
                                                    137
```

```
 1   that all the drivers should take the shortest
 2   and most direct route to their destination,
 3   correct?
 4     A.  Within -- with respect to the tolls and
 5   the cost savings, tolls versus miles, yes.
 6     Q.  Okay.  On page 9, the second full
 7   paragraph is titled:  Footwear Policy.
 8         Do you see that?
 9     A.  Yes, I do.
10     Q.  And it says:  Martin's Bulk Milk Service,
11   Inc. has implemented this policy to ensure that all
12   personnel use adequate footwear when working in
13   areas where there is a danger of personal injury
14   due to slips, trips and falls.
15         Again, this is something -- this policy
16   was drafted by your company and not UACL or IPC,
17   correct?
18     A.  That is correct.
19     Q.  On page 12 it talks about warnings, and
20   there's a list this, again, a bullet point list
21   under the paragraph that indicates:  The following
22   offenses are grounds for disciplinary action
23   ranging from verbal warnings to discharge,
24   depending on the seriousness of the situation.
                                                    138
```

```
 1         These are -- these employment rules, so to
 2   speak, were implemented by Martin Bulk Milk Service
 3   and not UACL or IPC, correct?
 4     A.  That is correct.
 5     Q.  And, finally, when you testified to the
 6   day shortly after the occurrence when Mr. Franke
 7   was brought back to Martin Bulk's office and was
 8   terminated, that decision was solely by Martin's
 9   Bulk Milk Service, and UACL and IPC had no
10   involvement with that decision, correct?
11     A.  Correct.
12         MR. YU:  Thank you, that's all I have.
13         THE WITNESS:  Thank you.
14         MR. SCHRECK:  Any follow-ups?
15         MR. COUTURE:  I have more questions.
16         MR. SCHRECK:  How many -- how much time have
17   you got just so I can get up real quick here?
18         MR. COUTURE:  Not very long.
19             FURTHER EXAMINATION
20   BY MR. COUTURE:
21     Q.  I'm very confused right now, ma'am.
22         When I asked you questions about your
23   conversations with Mr. Franke after this accident,
24   you told me that Mr. Franke said he was driving the
                                                    139
```

```
 1   speed limit.
 2         Do you remember saying that?
 3     A.  I don't recall exactly the speed limit.
 4     Q.  That's what you said.
 5     A.  Okay.
 6     Q.  Mr. Burke asked you the question and you
 7   said to him that Franke told you he was driving
 8   under the speed limit.
 9         Why -- why the change?
10         MR. BURKE:  Well, objection to the form of that
11   question, which assumes there was a change, which
12   this witness has not said there was.
13         MR. COUTURE:  And there was, and it's on the
14   transcript so --
15         MR. SCHRECK:  I'm going to join that
16   objection.
17   BY MR. COUTURE:
18     Q.  So why the change?
19     A.  I don't know.  A lot of questions are
20   being thrown out, a lot of recollection four years
21   ago.
22     Q.  So did he --
23     A.  I --
24     Q.  I'm sorry, go ahead.  I don't want to step
                                                    140
```

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
 1   on your answer.
 2      A.  If I can reiterate to your question or to
 3   Mr. Burke's, I would have to say that I recall Sam
 4   saying, period, he wasn't speeding.
 5      Q.  Okay.  So at or below the speed limit?
 6      A.  Correct.  If I may correct my statement.
 7   I recall him say -- saying he was not speeding.
 8      Q.  All right.  With regard to Mr. Franke's
 9   demeanor on the phone when you spoke to him on
10   the day of the occurrence, you stated that he was
11   in shock.
12          Now you're not using the medical term that
13   we all learned in grade school, where you have to
14   put blankets on them, you turn white, and you
15   sweat, you have to be taken to the hospital, right?
16      A.  Correct, I was --
17      Q.  You're talking about the fact that someone
18   who had just rammed a stopped vehicle was upset he
19   was in an accident?
20      A.  Correct.
21      Q.  Okay.  Would you agree with me that even
22   though he was upset, that he was still able to
23   discern what's true and not true?
24          MR. SCHRECK:  Objection, form, foundation,
                                                    141
```

```
 1   calls for speculation.
 2          Go ahead and answer.
 3          MR. BURKE:  Join in that.
 4      A.  Can you repeat that, please?
 5   BY MR. COUTURE:
 6      Q.  I'll ask it in a different way.
 7          Is it your belief that Mr. Franke wasn't
 8   able to tell you the truth when you spoke to him on
 9   the phone about what happened because of his
10   excited condition?
11      A.  No.
12      Q.  Okay.  You believe that what he told you
13   was true?
14      A.  Yes.
15      Q.  He was just upset about it?
16      A.  Yes.
17          MR. COUTURE:  Thank you.  That's all I've got,
18   ma'am.
19          MR. SCHRECK:  Any follow-up, Rich?
20              Anything at all?
21                  EXAMINATION
22   BY MR. SCHRECK:
23      Q.  Okay.  Just two quick follow-up questions
24   and we'll be done here.
                                                    142
```

```
 1          Mr. Burke was asking you some questions
 2   earlier regarding documentation regarding
 3   inspections, pre-trip inspections, and I just want
 4   to make it clear for the record:
 5          When you're referring to the form that the
 6   drivers fill out, you're actually talking about the
 7   log itself, that's where the notations recorded for
 8   the pre-trip inspection is done?
 9      A.  The pre-trip is done at the beginning of
10   the day, yes.
11      Q.  Okay.  The actual form, it's on the log
12   itself, the bottom of the form?
13      A.  It's actually -- the pre-trip is actually
14   post-trip from the day before, yes.
15      Q.  Okay.  You're saying it's on the same
16   piece of paper?
17      A.  Correct.
18      Q.  Okay, that's what I was getting at.
19          MR. SCHRECK:  I have nothing else.  Anybody
20   have any follow-ups?
21          We'll reserve.
22          MR. COUTURE:  E-tran only and the exhibit.
23          MR. SCHRECK:  Regular and mini.  You can send
24   me the transcript for signature.
                                                    143
```

```
 1          MR. YU:  Mini and e-tran.
 2          MR. BURKE:  E-tran and mini.
 3              (The deposition concluded at
 4               1:08 o'clock p.m.)
 5              (FURTHER DEPONENT SAITH NOT.)
                                                    144
```