# JAE # 7

# Excerpts from the Transcript of Deposition of Gina Hubbs, dated April 16, 2012

130547293v1  0903067

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary
Guardian of the Estate
and Person of JEFFREY J.
SCHEINMAN, a disabled
person,

       Plaintiff,

vs.

       Case No. 09-CV-5340

MARTIN'S BULK MILK SERVICE,
INC.; SAMUEL G. FRANKE; CSX
INTERMODAL, INC.;
INTERNATIONAL PAPER COMPANY;
UNIVERSAL AM-CAN LTD.,
successor to Overnite
Express, Inc.; OX, L.L.C.;
BMW OF NORTH AMERICA,
L.L.C., a corporation;
BAYERISCHE MOTOREN
WERKEAKTIENGESELLSCHAFT, a
corporation; BMW AG, a
corporation; and KARL KNAUZ
MOTORS, INC., a corporation,

       Defendants.

DEPOSITION OF GINA HUBBS

Taken by the Plaintiff on the 16th day of April, 2012, at
24600 Schoenherr Road, Warren, Michigan 48089

APPEARANCES:

For the Plaintiff:    RICHARD F. BURKE, JR., ESQ.
               Clifford Law Offices, PC
               120 North La Salle Street
               31st Floor
               Chicago, Illinois 60602
               Telephone: (312) 899-9090

For the Defendant    CARLTON D. FISHER, ESQ.
International         Hinshaw & Culbertson, LLP
Paper Company,       222 North La Salle Street
Universal Am-Can,    Suite 300
LTD., and Ox,        Chicago, Illinois 60601
L.L.C.:              Telephone: (312) 704-3450

1

---

**Page 2**

APPEARANCES (Continued):

For the Defendants  MR. MATTHEW R. SCHRECK, ESQ.
Samuel G. Franke  Mulherin, Rehfeldt & Varchetto
and Martin's Bulk  211 South Wheaton Avenue, Suite 200
Milk Service:     Wheaton, Illinois 60187
             Telephone: (630) 517-5082

For the Defendant  MR. ROBERT J. GOLDEN, ESQ.
Martin's Bulk Milk  Dowd & Dowd
Service          617 West Fulton Street
(Via Telephone):  Chicago, Illinois 60661
             Telephone: (312) 762-9518

For the Defendant  TIMOTHY R. COUTURE, ESQ.
BMW, Bayerische,  Johnson & Bell, Ltd.
And Karl Knauz    33 West Monroe Street
Motors          Suite 2700
(Via Telephone):  Chicago, Illinois 60603
             Telephone: (312) 984-6651

Reported by:  Kathleen M. Smith (CSR-4232)
           Certified Shorthand Reporter

2

---

**Page 3**

| WITNESS | PAGE |
|---|---|
| GINA HUBBS | |
| Direct Examination by Mr. Burke | 4 |
| Cross-Examination by Mr. Schreck | 103 |
| Cross-Examination by Mr. Couture | 119 |
| Cross-Examination by Mr. Fisher | 120 |
| Redirect Examination by Mr. Burke | 123 |

E X H I B I T S

| | Marked | Admitted |
|---|---|---|
| Exhibit No. 104 | 30 | |

3

---

**Page 4**

1       Warren, Michigan

2       Monday, April 16, 2012

3       At or about 11:20 a.m.

4       -- -- --

5

6       MR. BURKE: Let the record reflect this is

7  the discovery deposition of Ms. Gina Hubbs, taken

8  pursuant to notice and in accord with the applicable

9  rules of the United States District Court for the

10  Northern District of Illinois and the 7th Circuit.

11       G I N A   H U B B S,

12  having been duly sworn at or about 11:20 a.m., called by

13  the Plaintiff, testified as follows:

14       DIRECT EXAMINATION

15  BY MR. BURKE:

16  **Q**  Good morning, Ms. Hubbs. Once again, my name is

17  Rich Burke. I'm going to ask you some questions

18  about some of your apparent work --

19       MR. COUTURE: I can't hear you at all.

20       MR. BURKE: -- at, I believe, Universal

21  Am-Can, and as I do so, if you want to look at

22  anything, tell me.

23       MR. FISHER: Are you able to hear us?

24       MR. COUTURE: I can't hear you at all.

25       MR. BURKE: How about now?

4

| | | |
|---|---|---|
| 1 | A | I think 2010, maybe, or 2009. |
| 2 | Q | Do you know who was head of safety in July of 2008? |
| 3 | | MR. FISHER: For what entity? |
| 4 | | MR. BURKE: Universal Am-Can. |
| 5 | | THE WITNESS: I don't think they had a |
| 6 | | specific safety person. I don't remember. |
| 7 | | BY MR. BURKE: |
| 8 | Q | Then Mike Peterson, you said his last job was |
| 9 | | safety? |
| 10 | A | For Universal Truckload. |
| 11 | Q | Okay. |
| 12 | A | It was safety and something else. |
| 13 | Q | Okay. Give me back that Exhibit, Ms. Hubbs. Thank |
| 14 | | you. |
| 15 | | By the way, is this actually your |
| 16 | | signature? |
| 17 | A | It is. It is. |
| 18 | Q | And that's on one of the pages of Exhibit 104. |
| 19 | | Have you discussed this lawsuit with other |
| 20 | | people at Universal Am-Can? |
| 21 | A | No. No. |
| 22 | Q | Okay. How about other people at Universal |
| 23 | | Truckload? |
| 24 | A | No. |
| 25 | Q | What's Mark Limback's job today? |

33

| | | |
|---|---|---|
| 1 | A | He's the president. |
| 2 | Q | Of what? |
| 3 | A | Universal Am-Can. |
| 4 | Q | Okay. And was he the president back in June and |
| 5 | | July of 2008? |
| 6 | A | Yes. |
| 7 | | MR. SCHRECK: I apologize. Did you say |
| 8 | | president for Universal Am-Can -- |
| 9 | | THE WITNESS: Yes. |
| 10 | | MR. SCHRECK: -- or Truckload? |
| 11 | | THE WITNESS: Universal Am-Can. |
| 12 | | MR. SCHRECK: Okay. |
| 13 | | BY MR. BURKE: |
| 14 | Q | And have you talked to him about this case at all? |
| 15 | | MR. FISHER: Outside the presence of |
| 16 | | counsel. |
| 17 | | MR. BURKE: No. Just have you talked to |
| 18 | | him at all? |
| 19 | | THE WITNESS: With? On a sidebar or with |
| 20 | | our attorneys? |
| 21 | | BY MR. BURKE: |
| 22 | Q | Who do you mean by a sidebar? I thought you told |
| 23 | | me you'd never been in court. |
| 24 | A | I'm sorry. |
| 25 | Q | Here, I don't want to know -- |

34

| | | |
|---|---|---|
| 1 | | like are we talking at the water cooler about it? |
| 2 | | No. |
| 3 | Q | Here, have you talked -- yeah, number one, have you |
| 4 | | talked at all to him, whether lawyers were present |
| 5 | | or not? |
| 6 | A | Yes, with lawyers present we have. |
| 7 | Q | Okay. And I don't want to hear what any, any |
| 8 | | lawyer's said, but -- |
| 9 | | MR. FISHER: He doesn't mean that, he |
| 10 | | would like to know but he won't ask. |
| 11 | | MR. SCHRECK: If you want to share, go |
| 12 | | ahead. |
| 13 | | BY MR. BURKE: |
| 14 | Q | I'm not asking you about what your lawyers said. |
| 15 | | And then my next question, more |
| 16 | | specifically, is have you talked to Mr. Limback |
| 17 | | about this case or your testimony outside the |
| 18 | | presence of -- |
| 19 | A | No. |
| 20 | Q | -- Mr. Fisher or any other lawyers? |
| 21 | A | No. |
| 22 | Q | Okay. Were you involved in the, in the acquisition |
| 23 | | of Overnight Express by Universal? |
| 24 | A | I was involved in once the acquisition was |
| 25 | | completed. |

35

| | | |
|---|---|---|
| 1 | Q | And what did that involvement, in general terms, |
| 2 | | consist of? |
| 3 | A | When we acquire a company we have to integrate their |
| 4 | | business into ours, and I was the VP so I had people |
| 5 | | that were going into their offices to change over |
| 6 | | paper work and instruct them on how to handle the |
| 7 | | operations under our business model. |
| 8 | Q | Okay. Do you know how the acquisition came about, |
| 9 | | in general terms? |
| 10 | A | No. I don't know the specifics of it. |
| 11 | Q | Okay. Were you involved in drafting any part of |
| 12 | | the asset purchase agreement or acquisition |
| 13 | | documents? |
| 14 | A | No. |
| 15 | Q | Okay. Did you sign any of those documents? |
| 16 | A | Of the acquisition? |
| 17 | Q | Yeah. |
| 18 | A | I don't know. I was a signer as far as the company. |
| 19 | | I was an executive so I don't believe so. |
| 20 | Q | Why don't you tell me what your involvement with |
| 21 | | Overnight Express was once the acquisition became |
| 22 | | effective. |
| 23 | A | Mm-hmm. Well, we take their operations and their |
| 24 | | customers and integrate them into our system. So we |
| 25 | | make sure that, you know, the customers switch over |

36

1  A   Mark Limback.

2  Q   Okay. And that was one of the names I was

3      expecting had some involvement.

4  A   Okay.

5  Q   Yeah. And what I'm really asking is, you know,

6      who, who was substantially involved in making that

7      acquisition happen and putting together the

8      agreement and negotiating the acquisition?

9  A   I don't know if he was involved in that much of it,

10     but, you know, usually acquisitions are hush-hush so

11     it doesn't fall down to the lower people until much

12     later, so --

13 Q   Okay.

14 A   There's another gentleman who does acquisitions, but

15     I don't know who specifically went out.

16 Q   Okay. And the other gentleman you're thinking of

17     is whom?

18 A   Ed Brown. Ed.

19 Q   Ed Brown, okay. And basically what was his

20     position back in '08?

21 A   I don't know what his title was.

22 Q   What's your understanding of how Mark Limback was

23     involved in the acquisition of Overnight Express?

24 A   Well, he was the president of Universal Am-Can so he

25     was in charge of their integration into the

                                    41

1      Universal system.

2  Q   Okay. Is it your understanding that acquisition

3      became effective June 13th of 2008?

4  A   It is my understanding, yes.

5  Q   Okay. And as of June 13, 2008, do you, do you know

6      whether or not Overnight Express, Inc. continued to

7      exist as a corporation?

8          MR. FISHER: Objection. It calls for a

9      legal conclusion. You can go ahead and answer it.

10         THE WITNESS: Oh, I don't know. I don't

11     believe so. I believe they no longer existed.

12 BY MR. BURKE:

13 Q   Okay. And what makes you believe that?

14 A   Because when you sell your company you generally

15     cease to exist. We purchased them.

16 Q   Do you know whether or not, as of June 13th, 2008,

17     Overnight Express, Inc. continued to do business

18     under that name?

19 A   I don't believe so.

20 Q   Have you -- strike that.

21         I'm aware of one document that's been

22     produced to us that has your name on it, that's a

23     May 21st, 2008 letter; have you seen that document?

24 A   I have.

25 Q   Okay. Have you seen other documents that, that

                                    42

2          MR. FISHER: Other than answers to

3      interrogatories?

4          MR. BURKE: Other than answers to

5      interrogatories.

6          THE WITNESS: On this case?

7  BY MR. BURKE:

8  Q   Yes. Related -- well, related to this lawsuit,

9      related to the acquisition of Overnight Express.

10 A   Well, I believe there may be other documents I

11     signed related to the acquisition.

12 Q   What type?

13 A   Similar to that type of document that you have with

14     my signature on it.

15 Q   Okay. And what would those documents consist of?

16 A   Just a notification to the customer.

17 Q   Okay. And how would they differ from the May 21st

18     letter?

19 A   They probably would not. They would probably have

20     different, be addressed to a different person.

21 Q   Okay.

22 A   But the content would be similar.

23 Q   Any other types of documents that you're thinking

24     of?

25 A   Nothing off the top of my head.

                                    43

1  Q   Okay. Let me -- Carl, do you have a copy of,

2      Exhibit 1, page 67?

3          MR. FISHER: Sure.

4  BY MR. BURKE:

5  Q   And I ask you to take a look at what was previously

6      marked Exhibit 1 and Bates stamped UACL 67. Do you

7      have that in front of you?

8  A   I do.

9  Q   Okay. And you've seen that before, correct?

10 A   Yes.

11 Q   And does that document bear your signature on the

12     lower left side?

13 A   It does.

14 Q   And that document is dated May 21st, 2008, correct?

15 A   Correct.

16 Q   It's got a UACL logo in the upper left?

17 A   Correct.

18 Q   And on the upper right it's got the name of Mark

19     Limback, L-I-M-B-A-C-K, and his title as president,

20     correct?

21 A   Correct.

22 Q   And I may have said it already, but it's dated May

23     21st, 2008, right?

24 A   That's correct.

25 Q   And it's directed to International Paper in

                                    44

**49**

1  A  It states they accepted the rates but --
2  Q  Okay. Well, when, what you were telling
3     International Paper here is that this letter should
4     be considered by them as Overnight --
5  A  Changing.
6  Q  -- changing and Universal taking over all of the
7     responsibilities under the contract that Overnight
8     had with International, correct?
9  A  I don't -- no. What it said -- no. What it says is
10    that they assigned it. I don't know, meaning that
11    we switched the names from Universal, or from
12    Overnight to Universal, and that we accept the rates
13    and fuel surcharge as far as the contract. I, I
14    don't know. If they made changes, I don't know.
15 Q  Okay. When you say "Please consider this letter as
16    an assignment of the current contract you have in
17    place for Overnight Express," what were you telling
18    International Paper?
19 A  That Overnight was no longer going to be exist, in
20    existence in June, on June 13th, that they were
21    switching, and that, you know, we were going to be
22    changing the names. I don't know if -- I would
23    assume the contract was sent and it was signed.
24 Q  What contract was sent?
25 A  The contract between Overnight and International

**50**

1     Paper. -- say that again. What, what --
2  Q  The -- say that again. What, what --
3  A  So when you acquire a company, you notify customers
4     that you're going through an acquisition and that
5     their company name is going to be changing over to
6     Universal, so then --
7  Q  Right.
8  A  -- there is a document flow after that that
9     generally occurs.
10 Q  Okay. And as part of Overnight being acquired by
11    Universal, did Universal agree to take the place of
12    Overnight Express in Overnight's contract with
13    International Paper?
14        MR. FISHER: Competency, foundation. You
15    can go ahead and answer.
16        THE WITNESS: I think so.
17        MR. SCHRECK: Can you repeat the question?
18        (At or about 12:39 p.m., record read)
19 BY MR. BURKE:
20 Q  And what is your basis for thinking so?
21 A  That they signed the contract or --
22 Q  No, that Universal was taking over the
23    responsibilities of Overnight Express in the
24    contract that Overnight had had with International
25    Paper?

**51**

1  A  Well, there would be a new
2        MR. FISHER: Same objections. Now you can
3     go ahead.
4        THE WITNESS: There would be a contract
5     that was sent and signed with Universal and
6     International Paper.
7  BY MR. BURKE:
8  Q  Okay. Have you ever seen such a contract?
9  A  No.
10 Q  Do you know why one was not sent?
11        MR. FISHER: Objection. Assumes facts not
12    in evidence. You can go ahead and answer.
13        THE WITNESS: Can you repeat that?
14 BY MR. BURKE:
15 Q  Sure. Did, did you say you have never seen a
16    contract --
17 A  No.
18 Q  -- between Universal and --
19 A  I have not read the contract.
20 Q  -- Overnight -- or I'm sorry. Let me repeat that.
21        You told me that usually there'd be a
22    contract sent between Universal and International
23    Paper after an acquisition like this?
24 A  Usually there would be a new contract signed between
25    any customer and our company.

**52**

1  Q  Okay.
2  A  Therefore, I assume there was one submitted.
3  Q  Okay. But you've never seen such a contract?
4  A  No. I did not read it.
5  Q  Well, no. My question is have you ever seen such a
6     contract?
7  A  I have not read it.
8  Q  Okay.
9  A  I know we have one now, going through this.
10 Q  Okay. What, and what is, who, who is that contract
11    between? Is it the amendment or is it an actual
12    contract?
13 A  I don't know.
14        MR. FISHER: Objection. Objection to
15    form.
16        THE WITNESS: I don't know. I know
17    there's a contract.
18 BY MR. BURKE:
19 Q  Okay. And when is it dated?
20 A  I don't know.
21 Q  And who, who signed that contract?
22 A  I don't know. I've not read it.
23 Q  Okay. Where did you see it?
24 A  It was noted, or we had it -- we've had discussions
25    that there's a contract.

1   Q   Okay. Can you show me a copy of whatever contract
2      you're referring to?
3   A   **No, because I haven't read it.**
4   Q   Well, I don't care if you've read it. I want, I
5      want to see a copy of whatever contract you're
6      referring to because I'm not aware of one ever
7      having been produced in this case. And Carl, if
8      you have one --
9         MR. FISHER: Yes, it was produced by
10     International Paper.
11         THE WITNESS: Yes.
12         MR. BURKE: Okay.
13         MR. FISHER: It's page number six, it's
14     the amendment.
15         MR. BURKE: Okay. Well, that's what I'm
16     getting at.
17 BY MR. BURKE:
18   Q   I just asked you that, if it was the amendment or
19      if it was a separate --
20   A   **No.**
21   Q   -- new contract?
22   A   **I don't know if it's, which one it is.**
23   Q   Okay. And the amendment I have, and is that the
24      amendment that you're referring to when you say
25      there would be a new, a contract between Universal

53

1      and International Paper?
2   A   **Am I referring to that amendment?**
3   Q   Yes.
4   A   **I didn't know it was considered an amendment, but,**
5      **yes.**
6   Q   Okay. Now, when you make reference to a current
7      contract, do you know what contract you were
8      referring to or the date of the contract that you
9      were referring to?
10   A   **No. Just the current one.**
11   Q   Okay. When you wrote this letter, had you looked
12     at what the current contract was between Overnight
13     and International Paper?
14   A   **No.**
15   Q   Okay. Have you done so at any time during the
16     pendency of this case?
17   A   **No.**
18   Q   Let me ask you to take a look at Exhibit 30, or
19     page 33 of Exhibit 1. Do you have that in front of
20     you in the items that you have there?
21         MR. FISHER: 33?
22         MR. BURKE: 33, yes.
23 BY MR. BURKE:
24   Q   And that's entitled OXEN Overnight Express, 2007,
25     outbound contract, correct?

54

1   A   **Yes.**
2   Q   Okay. Then take a look at page 35 of that exhibit,
3      and am I correct that the header for that contract
4      identifies it as an agreement dated, or effective,
5      rather, October 1st, 2007 between International
6      Paper as shipper and Overnight Express as carrier?
7   A   **That is what it states, yes.**
8   Q   Okay. Was that the contract between International
9      Paper and Overnight Express to which you made
10     reference in your letter of May 21st, 2008?
11   A   **Yes.**
12   Q   Okay. And was it your understanding that when
13     Universal purchased Overnight Express, Universal
14     took over the responsibilities of Overnight Express
15     under this contract with International Paper,
16     correct?
17         MR. FISHER: Objection. Form, competency,
18     calls for a legal conclusion. You can go ahead and
19     answer.
20         THE WITNESS: I believe so.
21 BY MR. BURKE:
22   Q   Okay. And then, back to paragraph two of your
23      letter, Ms. Hubbs -- 67, you got that there?
24   A   **Mm-hmm.**
25   Q   Okay. And then you, after you said "please

55

1      consider this letter as an assignment of the
2      current contract you have in place for Overnight
3      Express," you also wrote that "Universal Am-Can
4      Limited agrees to accept the rates and fuel
5      surcharge established between your company and
6      Overnight," correct?
7   A   **Yes.**
8   Q   Okay. And then you went on to say "Please sign
9      below as to your acceptance regarding the contract
10     and rate assignment"?
11   A   **Yes.**
12   Q   Okay. And, you know, when you use the expression
13     "rates," you know, as you did here, what's that
14     referring to?
15   A   **That's referring to the rate to move the product**
16     **between the shipper and their, and Overnight --**
17   A   Okay. So --
18   A   **-- without being Universal.**
19   Q   So it would have been the rate agreed upon between
20     International Paper with Overnight Express,
21     correct?
22   A   **Yes.**
23   Q   Okay. And now Universal was agreeing to move the
24     product for that same rate?
25   A   **Yes.**

56

1　invoices will reflect such along with our

me, but

2　remittance address," correct?

3　A　That's correct.

4　Q　Then he went on to say "following is a copy of

5　　　insurance and authority for your records"?

6　A　That's correct.

7　Q　Okay. And -- oh, by the way, down in the center of

8　　　that page it appears to be a more legible address

9　　　that we --

10　A　Yes.

11　Q　-- that I was asking you about a moment ago.

12　A　Yes.

13　Q　It looks like the Universal Am-Can Limited P.O. Box

14　　　in Warren, Michigan, correct?

15　A　That's correct.

16　Q　Do you want to look at 65, page 65 of Exhibit 1,

17　　　and that document's entitled Amendment No. 1, am I

18　　　correct?

19　A　That's correct.

20　Q　Okay. And that's a document signed by Mark Limback

21　　　on behalf of Universal Am-Can, correct?

22　A　Correct.

23　Q　And dated June 10th of '08, right?

24　A　Yes.

25　Q　Okay. And on behalf of International Paper

65

2　　　MR. FISHER: This is 104?

3　　　MR. BURKE: 104. And here, Gina, if you,

4　　　if you have a copy --

5　　　THE WITNESS: Oh, I don't know.

6　　　MR. BURKE: These are the interrogatories

7　　　again. I don't know that you have one.

8　　　MR. FISHER: Why don't you keep asking and

9　　　I'll see if I can find one.

10　　　MR. SCHRECK: Yeah, it's not going to be

11　　　in the stack of --

12　　　MR. BURKE: Yeah, it shouldn't be in

13　　　there.

14　BY MR. BURKE:

15　Q　Gina, here's what I'm going to ask you about your

16　　　question and answer, all I'm going to ask you about

17　　　is that an accurate answer that you gave there, so

18　　　just take a look at that and then I'll formally

19　　　read it.

20　A　Okay.

21　Q　Okay. I've tendered to you Exhibit No. 4. Am I

22　　　correct that one of the questions that Universal

23　　　was asked in this Interrogatory No. 2 is:

24　　　"Pursuant to the asset purchase agreement

25　　　between Universal and Overnight, did Universal

67

1　　　Company, it's also signed by S. M. Mundy on June

2　　　12th, '08, correct?

3　A　Correct.

4　Q　Okay. And is this the document that you a little

5　　　bit ago were referring to as a contract between, or

6　　　I should say a new contract between Universal and

7　　　International Paper?

8　A　Yes.

9　Q　Okay. Were you involved in -- or strike that.

10　　　And you said you had read a contract, I

11　　　take it this is the document you were referring to?

12　A　That I hadn't read it, but that it had been alluded

13　　　to that there was a contract.

14　Q　Right. Thank you. Yes, that is what you said.

15　　　Okay. Okay.

16　　　And did you have any involvement in

17　　　creating this contract or this Amendment No. 1

18　　　agreement?

19　A　No.

20　Q　Okay. In your answer, in the answers to

21　　　interrogatories that I showed you earlier, there

22　　　were -- strike that.

23　　　I'm going to re-tender to you Exhibit No.

24　　　4. And I apologize, I've got to stand next to you

25　　　while I read this because I only have one copy with

66

1　　　receive an assignment of and accept responsibility

2　　　for performance of all contracts entered into by

3　　　defendant Overnight, including Overnight's contract

4　　　with International Paper?"

5　　　The answer that you provided was:

6　　　"Yes, OEI agreed to sell, assign, convey,

7　　　transfer and send over and deliver to UACL certain

8　　　assets, including but not limited to, all lists of

9　　　customers as well as all customer contracts and

10　　　agreements. UACL accepted responsibility for

11　　　performance of the OEI contract with International

12　　　Paper."

13　　　That is a correct answer, correct --

14　A　Yes.

15　Q　-- to that question? Okay.

16　　　And is Amendment No. 1 that I have

17　　　tendered to you and that you have in front of you

18　　　as page 65 of Exhibit No. 1, is that a document in

19　　　which Universal agreed to accept the terms of the

20　　　previously existing contract between International

21　　　Paper and Overnight Express?

22　A　Yes.

23　Q　Okay. And about the middle of the page where it

24　　　says effective, it says that "Effective June 13,

25　　　2008, carrier will be operating under the name of

68

**Page 73**

1    that day.

2 A  I think she was.

3 Q  Okay. And I'll show them to you in a moment, you

4    know, some broker, you know, broker confirmation

5    sheet that bears her name, but did, you know -- by

6    the way, when Overnight was purchased by Universal,

7    for example at the South Holland office, did

8    Universal change any sign-age on the buildings or

9    on doors to eliminate the name Overnight and

10    replace it with Universal?

11 A  I don't recall, but I would assume.

12 Q  Okay. Do you have an understanding of what Melody

13    Hanson did or what roles she played relative to the

14    load that was being hauled at the time of this

15    collision?

16          MR. FISHER: Objection to form. You can

17    go ahead and answer.

18          THE WITNESS: Prior to this or during

19    the --

20 BY MR. BURKE:

21 Q  Right now, as you sit here today.

22 A  Right. Yes.

23 Q  Okay. And just tell me what your understanding is?

24 A  My understanding is that she did the paper work for

25    the load and then, you know, gave it, or sent it,

**Page 74**

1    faxed it, I assume, to Martin's, and that she was

2    the one who interacted with the customer,

3    International Paper.

4 Q  Okay. And when you use the word "customer," you're

5    referring to International Paper?

6 A  Correct.

7 Q  Okay. And have you spoken to Melody Hanson at all,

8    about her involvement in --

9 A  No.

10 Q  -- in those matters that you just mentioned?

11 A  No.

12 Q  Okay. Let me re-tender to you Exhibit No. 4. I

13    want to --

14          MR. FISHER: I've actually got a copy here

15    I can show her. It's not a signed copy but it's off

16    my computer since that's where it came from.

17          MR. BURKE: Oh, okay.

18          MR. FISHER: Hang on. What's the bottom

19    number?

20          MR. BURKE: 53587, or that's page two of

21    it.

22          MR. FISHER: Oh, got you. That's the

23    number I was looking for. You know what, I'm not

24    convinced this is identical, so you probably

25    need to show it to her.

**Page 75**

2 BY MR. BURKE:

3 Q  Let me re-tender to you Exhibit No. 4 and just look

4    at your, the question and answer to --

5 A  Number four?

6 Q  No, to question and answer number three, actually.

7 A  Three, okay.

8          MR. SCHRECK: And for the record, you're

9    referring to 104, not four, right?

10          MR. BURKE: 104, thank you.

11 BY MR. BURKE:

12 Q  And those, for the record are some answers to

13    interrogatories signed by Ms. Hubbs.

14 A  Okay.

15 Q  Okay. And my question simply relates to your

16    answer. Basically you indicated that at the, both

17    before and at the time of the occurrence on July

18    3rd, 2008, International Paper had contracts with

19    Overnight slash Universal for the performance of

20    transportation-related services, correct?

21          MR. FISHER: Excuse me. Objection to

22    form. That portion of the answer, "it's yours,"

23    she's the signatory. These are International's,

24    these are UACL answers. You can go ahead and

25    answer.

**Page 76**

1 BY MR. BURKE:

2 Q  Okay. These are answers that were prepared by

3    Universal Am-Can and you have verified that this

4    information is true and correct on behalf of

5    Universal Am-Can, is that true?

6 A  That's correct.

7 Q  Okay. And the, as of July 3rd, the contract

8    between International Paper was actually now with

9    Universal, am I correct, in light of the

10    acquisition and in light of the amendment, that

11    number one that was signed?

12 A  Yes.

13 Q  Okay. And, and this, and then the paper products

14    that were being moved this day were being moved as

15    part of Universal's obligations to provide

16    transportation services pursuant to the contract

17    that they had taken over that Overnight previously

18    had with International, correct?

19 A  Yes.

20 Q  Okay. And, and there was some, and as part of the

21    procedure that existed at that time, Melody Hanson,

22    on behalf of Overnight Express, would contact

23    Martin's Bulk Milk Service on a daily basis to give

24    them the specifics about the load that was to be

25    moved for International Paper; is that correct?

1  like it?

2  A  **Because of that fax up on the top.**

3  Q  Okay. And this, am I correct that the purpose of

4  this document is for Ms. Hanson, on behalf of

5  Universal, to be telling Martin's that they needed

6  to make a pickup of certain goods at International

7  Paper to be transported to three different

8  locations in the Minneapolis area?

9  A  **This is a standard broker confirmation sheet and**

10  **that, I don't know where the deliveries were at as**

11  **far as the city, but this is what we send out when**

12  **we contract a broker, this confirmation sheet.**

13  Q  Okay.

14  A  **It's basically a binding agreement.**

15  Q  Okay. And it's in this document Ms. Hanson, on

16  behalf of Universal, is giving Martin's

17  instructions on where to make the pickup, which was

18  International Paper's warehouse, correct, in

19  Hammond, Indiana?

20  A  **Correct.**

21  Q  Okay. And the pickup time was, she specified was

22  19:00 hours on July 3rd, correct?

23  A  **Correct.**

24  Q  Okay. And she identifies the commodity as paper,

25  and there's another section entitled delivery

81

1  A  **I would assume.**

2  Q  Okay. And that's at Midland?

3  A  **Yes.**

4  Q  Okay. All right. And then it says: "Total

5  payment to the carrier inclusive of accessorial is

6  $974.08," correct?

7  A  **Yes.**

8  Q  Okay. Now, would Ms. Hanson have calculated that

9  herself or somebody else?

10  A  **I would assume it was probably her.**

11  Q  Okay. And how would she have done that?

12  A  **She would, I would assume she would take the rates**

13  **that are under contract and add the fuel surcharge**

14  **and whatever other assessorial's we charge the**

15  **customer, which is International Paper for this**

16  **move, and then we give that broker carrier a certain**

17  **percentage of the overall total.**

18  Q  Okay.

19  A  **So that's how she would have calculated and whoever.**

20  Q  Okay. And then in the next paragraph, it says: "A

21  carrier agrees that this reflects the entire amount

22  due for all services provided and no other amount

23  will be billed to Universal," correct?

24  A  **Correct.**

25  Q  Okay. And then Universal -- strike that.

83

1  information, correct?

2  A  **Correct.**

3  Q  Okay. And in that there is a delivery date

4  specified of July 7th, '08, between 7:30 a.m. and

5  4:00 p.m., correct?

6  A  **Correct.**

7  Q  And there are three different locations specified,

8  correct, for where paper is to be delivered; am I

9  right?

10  A  **Yes, it appears.**

11  Q  Or to three different companies, I should say --

12  A  **Mm-hmm.**

13  Q  Cenveo, Midland Paper and Xpedx?

14  A  **Correct.**

15  Q  Okay. Now in this, do you see after the Midland

16  Paper it says MPLS?

17  A  **Mm-hmm.**

18  Q  Does that refer to Minneapolis?

19  A  **I would assume.**

20  Q  Okay. And then do you see in parenthesis where it

21  says five hyphen two; do you know what that means?

22  A  **No. I would assume it's time, the delivery time.**

23  Q  What do you mean?

24  A  **Like receiving hours five to two.**

25  Q  Between 5:00 a.m. and 2:00 p.m.?

82

1  This document says that "Universal will

2  remit payment within 30 days of receipt of original

3  signed bills of lading and clear delivery receipts

4  with a legible signature, provide a completed W-9

5  form, signed master brokerage agreement and rate

6  confirmation, contract authority and original

7  certificates of insurance naming UACL as

8  certificate holder is on file for the billed move,"

9  correct?

10  A  **Correct.**

11  Q  Okay. So am I correct that in order for Martin's

12  to get paid, they would have to provide Universal

13  with signed bills of lading?

14  A  **That is correct.**

15  Q  And how would that normally be accomplished?

16  A  **Signed bills of lading or --**

17  Q  No, how would you get, how would they provide them

18  to you?

19  A  **Oh, they would mail them, originals.**

20  Q  Okay. And the clear delivery receipts with a

21  legible signature, how do those receipts differ

22  from the bills of lading which sometimes have

23  signatures?

24  A  **Well, usually it's one and the same. One, there's**

25  **several copies of those bills of lading so what**

84

1  happens is the shipper signs it, which would be
2  **International Paper at this point, and then the**
3  **receiver would sign it. So you'd have two**
4  **signatures; your bill of lading from your customer,**
5  **and then we consider that second copy with that**
6  **signature from the receiver as the delivery receipt.**
7  Q  Okay. So those two things can be essentially one
8     and the same that are being referred to, the bills
9     of lading and the delivery receipt?
10 A  **Provided it has both signatures on it.**
11 Q  Okay.
12 A  **Along with the signature of the driver.**
13 Q  Okay. And both, when you say both signatures,
14    signature of the company, such as International
15    Paper?
16 A  **The shipper and the, what we consider the consignee,**
17    **meaning the receiver.**
18 Q  Okay. And here that's Cenveo, Midland, Xpedx,
19    correct?
20 A  **Yes.**
21 Q  Okay. And then Universal also required that
22    Martin's have on file with them a W-9 form,
23    correct?
24 A  **Yes.**
25 Q  And then, and then it also required a signed master

85

1  brokerage agreement, correct?
2  A  **Correct.**
3  Q  And rate confirmation agreement?
4  A  **Which is this, correct.**
5  Q  Okay. And -- meaning this broker confirmation
6     sheet?
7  A  **Yes.**
8  Q  And contract authority?
9  A  **Correct.**
10 Q  Okay. So meaning -- and by that, Universal
11    required Martin's to prove they had valid operating
12    authority?
13 A  **Correct.**
14 Q  And then the original certificates of insurance
15    naming Universal as a certificate holder refers to
16    the requirement that Universal had that Martin's
17    had to show they had certain insurance coverage?
18 A  **Yes.**
19 Q  Okay. If I recall -- strike that.
20       Do you know how much insurance Martin's
21    had to have?
22 A  **Which type of insurance, because they require --**
23 Q  Either general liability or commercial liability.
24 A  **The, I believe that the master agreement required**
25    **that they had a million dollars in coverage.**

86

1  Q  Okay. And then the cargo insurance was, is it
2     100,000?
3  A  **Each customer agreement is different, so dependent**
4     **upon what International Paper required, that would**
5     **be the coverage that we would require. Each**
6     **customer the contract language is different.**
7     **Industry standard is 100,000.**
8  Q  Okay. And then International Paper also had
9     certain insurance requirements that, that Universal
10    had to adhere to, correct?
11 A  **Yes.**
12 Q  Okay. And do you remember what those amounts were?
13 A  **No.**
14 Q  And those were set forth in the October 7th -- or
15    excuse -- me the October 1st, 2007 contract?
16 A  **The full body contract?**
17 Q  Yes.
18 A  **I would assume that's in there, yes.**
19 Q  Yes. The original contract that had been between
20    Overnight and International Paper?
21 A  **Right.**
22 Q  Okay. And then the next sentence here on this
23    document, Exhibit 11, says: "Terms and conditions
24    of standard truckload bill of lading and carrier
25    rules circular apply."

87

1  A  **Mm-hmm.**
2  Q  What's that refer to, Ms. Hubbs?
3  A  **It refers to the language contained on the bill of**
4     **lading. It's a standard transportation language,**
5     **you know, the specifics of it.**
6  Q  Okay. And the next line there says: "See
7     www.uacl.com." I take it that's Universal's
8     website?
9  A  **Correct.**
10 Q  Okay. When it says "see that website," for what
11    purpose?
12 A  **So that they could read the full terms of those, of**
13    **that language.**
14 Q  The bill of lading language?
15 A  **The bill of lading language, yes.**
16 Q  And then Universal went on to say that "Any
17    modifications to this agreement must be in writing
18    initialed by an authorized signatory of both
19    parties and dated," correct?
20 A  **Correct.**
21 Q  Okay. And then it says: "Sign and," or "Please
22    sign and fax to John Moorer," with a phone number.
23 A  **Mm-hmm.**
24 Q  What is it that had to be signed and faxed to John
25    Moorer? I mean, this document?

88

1  your equipment or you broker it out to make sure
2  that you service that customer because you've agreed
3  to service that lane, the whole lane.
4  Q  Okay.  And what you're referring to is that
5  Universal had agreed to service a whole lane of
6  transportation for International Paper, correct?
7  A  That or an origin, whatever the contract agreements
8  are.
9  Q  Okay.
10  A  And it's generally spelled out in the contract,
11  whether it be a lane, the whole warehouse.
12  Q  Okay.  And when you use that term "lane," what's
13  that mean in your business?
14  A  In our business it means, a lane is from an origin,
15  Hammond, Indiana to, let's say, Minneapolis.  We
16  consider that a lane.  It's from point A to point B.
17  Q  Okay.  And I think if I was following you a moment
18  ago, what you were saying is that Universal had the
19  contractual responsibility to provide
20  transportation services for that lane for
21  International Paper, correct?
22  A  I don't know if that's the specifics but, as far as
23  the contract, but this particular move, yes.
24  Q  Okay.  And Universal had to perform or fulfill its
25  contractual responsibility, as you said, by either

101

1  having their own drivers do it or giving the load
2  to another carrier; is that correct?
3  A  By either having their contractors, someone under
4  the Universal umbrella or, yes, brokering it out to
5  another company.
6  Q  Okay.  Do you know what amounts of insurance
7  coverage Universal had that was applicable to this
8  occurrence?
9  A  No.
10  Q  Who do you think knows that?
11  A  I would assume whoever signed the contract.
12  Q  And what contract are you referring to there?
13  A  The --
14  Q  The amendment?
15  A  Right, yes.
16  Q  Okay.  That was Mark Limback on behalf of
17  Universal?
18  A  Right, yes.
19  Q  Okay.  We were talking about, you know, some of the
20  provisions on the Exhibit 11, the broker
21  confirmation sheet, about the requirements
22  Universal had in order for Martin's to get paid; do
23  you remember that?
24  A  Yes.
25  Q  Okay.  If some requirement wasn't met, who or what

102

1  departmental takes the decision -- get in at
2  Martin's at the moment for this load"?
3  A  It would really depend on what provision wasn't met
4  who would make the decision.
5  Q  Okay.  And goods -- okay.
6          MR. BURKE:  I don't think I have anything
7  else, Ms. Hubbs.  Thank you for your time.
8          THE WITNESS:  You're welcome.
9          MR. SCHRECK:  Can we take a break real
10  quick?
11          MR. FISHER:  Sure.
12          (At or about 2:44 p.m., short recess)
13          (At or about 2:51 p.m., back on record)
14               CROSS-EXAMINATION
15  BY MR. SCHRECK:
16  Q  Okay.  Ms. Hubbs, I'm going to -- if I jump around,
17  I apologize, I just want to get a couple of things
18  background-wise before we get going here.
19          What is your date of birth?
20  A  5/24/1972.
21  Q  Okay.  And you've indicated that you worked for
22  Universal Truck Load Services?
23  A  I currently work for them.
24  Q  Correct.  And you've been with them since 2010; is
25  that right?

103

1  A  Yes.
2  Q  Okay.  Other than being the parent company of
3  Universal Am-Can and presumably others, what type
4  of company is that?  What do they do?
5  A  Same, transportation, logistics, warehousing,
6  international, that is the portfolio of their
7  subsidiaries.
8  Q  Okay.  Are you married or single?
9  A  I'm single.
10  Q  Okay.  You mentioned earlier that before you were
11  at Universal you were at Conway Transportation; is
12  that right?
13  A  That is correct.
14  Q  Okay.  And then at some point in time you left
15  there and went to Preston Trucking?
16  A  That's correct.
17  Q  And that's, you say that was in the Philadelphia
18  area?
19  A  That's correct.
20  Q  I see you've got a couple of places in the
21  Philadelphia area that you either went to school or
22  worked at.  Are you originally from there or are
23  you originally from the Michigan area?
24  A  I'm originally from here.
25  Q  You had indicated earlier that you were working on

104

**109**

1   BY MR. SCHRECK:

2   Q   Were you involved in negotiating any of those

3       agreements?

4   A   **These master broker's agreements?**

5   Q   Correct.

6   A   **They're not negotiated.**

7   Q   Were you involved in contacting Martin's and

8       discussing the agreement and the relationship

9       between the parties when they had these documents

10      executed?

11  A   **No.**

12  Q   Okay.  There are several documents that are in that

13      packet, some of which apply to Overnight Express

14      and Martin's Bulk Milk, and there's other ones from

15      Universal Am-Can and Martin's Bulk, and I'm talking

16      about the brokerage agreements.

17              In light of the fact that Overnight

18      Express acquired Universal Am-Can, do you know

19      specifically which contract or agreement would have

20      been in effect in operation on July 3rd, 2008?

21              MR. FISHER:  Can I suggest you rephrase,

22      because you said Overnight acquiring Universal

23      Am-Can.

24              MR. SCHRECK:  I'll rephrase.

25              MR. FISHER:  Okay.

**110**

1   BY MR. SCHRECK:

2   Q   In light of the fact that Overnight Express was

3       acquired by Universal Am-Can, and there are several

4       brokerage agreements between Martin's Bulk and

5       Overnight and Martin's Bulk and Universal Am-Can,

6       do you know which agreement would have been in

7       effect on July 3rd, 2008, or no?

8               MR. BURKE:  Objection to the form, which

9       assumes that any one of them might have been in

10      effect.  But subject to that, you can go ahead and

11      answer.

12  BY MR. SCHRECK:

13  Q   If any of them were in effect, do you know which

14      one it would be?

15  A   **Well, there would only be one that would be in**

16      **effect, and that would be the one between Universal**

17      **and Martin's Bulk Milk because Overnight Express**

18      **ceased to exist at that point.  So based on that,**

19      **then, the contract that would have fallen, the**

20      **broker master agreement between Universal and**

21      **Martin's Bulk Milk during that period would be the**

22      **one that would prevail.**

23  Q   Okay.  And the reason I'm asking you, and you may

24      not know this, there's timeframes in each of these

25      agreements, and they appear to overlap.  Do you

**111**

1       would have been in operation on July 3rd, 2008 or

2       no?

3

4   A   **The one, the one that is June, dated June 12th.**

5       **It's titled, or it's Exhibit 75, Universal Am-Can**

6       **Master Brokerage Agreement, dated June 12th, June,**

7       **2008.**

8   Q   Okay.  And had you ever seen a fully executed copy

9       of the June 12th, 2008 agreement that you're

10      referring to?

11  A   **You mean signed by Universal Am-Can?**

12  Q   Correct.

13  A   **I have not.**

14  Q   Okay.  Now, what is the basis of you saying that

15      the June 12th, 2008 agreement was in operation

16      versus some of the other agreements that are, have

17      been marked as exhibits that you've looked at

18      today?

19  A   **Well, the, you're talking about the date of July**

20      **3rd, 2008; is that correct?**

21  Q   Correct.  Okay.  Let me refer you to -- I don't

22      know what this was marked as far as a number goes.

23      Do you have Exhibit 1 Bates stamped 15?

24              MR. FISHER:  It's probably in that packet.

25              MR. SCHRECK:  This is the November 7th

**112**

1       one.

2               THE WITNESS:  And what number is it?

3   BY MR. SCHRECK:

4   Q   Page 15 of Exhibit 1.  It's the one that's dated

5       November 7, 2007.

6   A   **Well, I would assume -- and this one is Universal,**

7       **because the one that I just referred to, dated June**

8       **2008, follows this one from 2007.  So 2007 would no**

9       **longer be in effect because 2008 was then signed by**

10      **Martin's, which is on number 19, page 19.**

11              MR. FISHER:  Of Exhibit 1?

12              THE WITNESS:  Yes.

13  BY MR. SCHRECK:

14  Q   Okay.

15  A   **So there's changes that go on, between, you know,**

16      **for carriers when they change their contract,**

17      **there's going to be new ones that come out, and this**

18      **was a new version, and I would assume with different**

19      **language.**

20  Q   Okay.  And that's what I'm saying, you're assuming.

21      You just said, just now you said you assumed.

22  A   **Well, I agreed to it, yeah.  The dates?**

23  Q   Because each of the contracts talk about the time

24      period which they're going to apply, and they say

25      what they say.  I guess my question to you is do

**Page 121**

```
 1  A  Yes.
 2  Q  As a follow-up to those, to those questions, I
 3     think you also said that unless the brokerage
 4     agreement was signed, there would be no payment.
 5     Is that a fair assessment of what would have
 6     happened had there been no signed brokerage
 7     agreement?
 8  A  Master brokerage agreement?
 9  Q  Yes.
10  A  Yes.  If it wasn't signed by the broker carrier.  So
11     if they didn't sign our contract, we wouldn't pay
12     them until they signed it.
13  Q  Okay.  And so, in effect, had that not occurred by
14     June 12th or June 13th, 2008, that is to say, a
15     signed brokerage agreement, then Martin's Bulk Milk
16     would not have been involved at all by July 3rd,
17     assuming they had not later provided a signed
18     agreement?
19        MR. SCHRECK:  Object.  Form.  Misstates
20     her prior testimony.
21        MR. FISHER:  I'll rephrase the question.
22  BY MR. FISHER:
23  Q  Did Martin's Bulk Milk, to your knowledge, get paid
24     for the loads that it took from Hammond from June
25     16th, 2008 up through July 3rd, 2008?
```

**Page 122**

```
 1  A  I don't know.
 2  Q  Is there somebody at Universal Am-Can who might
 3     know the answer to that question?
 4  A  Yes.
 5  Q  Who might that be?
 6  A  Anyone could pull the documents and state to that
 7     effect.
 8  Q  Would John Moorer be a person who might know about
 9     that?
10  A  If Martin's was paid?
11  Q  Yes.
12  A  Yes.
13  Q  And he knows that because why?  That was a part of
14     his job?
15  A  He was responsible for brokerage and they paid the
16     carriers.
17  Q  When you earlier said that there would be no
18     payment unless there was a signed brokerage
19     agreement, what did you mean by that conclusion?
20  A  I mean, I meant that unless they signed our broker
21     agreement, they would not have been paid.
22  Q  And can you think of any trucking company who might
23     want to haul loads if they were never going to get
24     paid?
25        MR. SCHRECK:  Objection.  Calls for
```

**Page 123**

```
 1     speculation.  Form.  Foundation.
 2  BY MR. FISHER:
 3  Q  You can go ahead and answer.
 4  A  No.
 5  Q  Your answer's no?
 6  A  That's correct.
 7  Q  And you also were asked questions about whether or
 8     not you'd ever seen a signed copy by UACL of the
 9     master brokerage agreement, is that because, to the
10     best of your knowledge that you testified earlier
11     in response to Mr. Burke's questions, that only if
12     a company like Martin's Bulk Milk asked for a
13     double-signed contract or they proposed counter
14     terms that required UACL legal to get involved,
15     would there then be a second signature?
16  A  There would.
17        MR. FISHER:  That's all I have.  That's
18     all I have.
19        REDIRECT EXAMINATION
20  BY MR. BURKE:
21  Q  This agreement that we're talking about and that
22     Mr. Schreck asked you about, am I, did I follow
23     you, do you, is it your belief that the June 12th,
24     2008 master broker agreement between Martin's and
25     Universal was in force and effect on July 3rd of
```

**Page 124**

```
 1     2008?
 2  A  Yes.
 3  Q  Okay.  And you, do you still have that agreement in
 4     front of you?
 5  A  What number is it?
 6  Q  75.
 7        MR. FISHER:  It's actually, grab that one
 8     right there.  It's a little bit easier to pick it up
 9     here.
10        MR. BURKE:  The Exhibit No. 75.
11        MR. FISHER:  Okay.  We're with you.
12  BY MR. BURKE:
13  Q  Okay.  Ms. Hubbs, did you say this type of master
14     brokerage agreement is non-negotiable or not
15     negotiated?
16  A  Yeah, it's not -- he had asked me is this something
17     that you negotiate.  It's not.  It's a standard
18     contract.  It's not like I would call Martin's Bulk
19     Milk and negotiate a broker contract.  It's a
20     standard contract that any carrier that wants to be,
21     you know, brokered, accept a brokered load from
22     Universal has to sign this contract.  It lays out
23     the terms and conditions for that, you know,
24     cartage.  And so if there are changes, if a carrier
25     proposes changes, then we would give it to our legal
```

**133**

1  circumstances, too, where they can't solicit the
2  traffic, correct --
3  A  **Correct.**
4  Q  -- in the rest of paragraph seven?
5  A  **Correct.**
6  Q  And then in paragraph eight, Universal prohibited
7  Martin's -- well, strike that.
8  Universal required that Martin's actually
9  make the delivery of the, of the load that was
10  given to them, correct?
11  A  **This paragraph is -- yes, that it, they can't then**
12  **broker this load out to another party. We call it**
13  **double-brokering in the industry.**
14  Q  Right. Okay.
15  A  **So they have to transport it under their authority.**
16  Q  Okay. Martin's would have to?
17  A  **Yes.**
18  Q  Okay. And they were precluded from, as you say --
19  A  **Double-brokering.**
20  Q  -- double-brokering or hiring another carrier --
21  A  **Right.**
22  Q  -- to actually make the delivery?
23  A  **Correct.**
24  Q  And then in paragraph ten, in line three, it starts
25  with "However, carrier," do you see that?

**134**

1  A  **Yes.**
2  Q  Okay. Universal required that the carrier contact
3  Universal's designated agent with billing
4  information immediately upon completion of loading
5  and with the name of the receiver and the status of
6  delivery immediately upon completion of delivery,
7  correct?
8  A  **Well, that's because of the first part of the**
9  **paragraph it says that the carrier is solely**
10  **responsible, you know, to basically dispatch that**
11  **load, their driver, but you still have to let**
12  **Universal know that, you know, the billing**
13  **information that confirmed that the load is picked**
14  **up and that it's been delivered.**
15  Q  Okay. You know, do you, in your, the copy there,
16  do you have the -- well, strike that.
17  I mean, just back to the, these, all of
18  the provisions we've been talking about and, in
19  fact, all 14 provisions here were requirements that
20  Universal required Martin's to comply with in order
21  to haul freight for them; am I correct?
22  A  **Yes.**
23  Q  Okay. And then, you know, do you have this page
24  that's entitled "Welcome to the Universal Am-Can
25  Brokerage Division," is that -- do you have that

**135**

1  there in the version you have?
2  A  **Yes.**
3  Q  Okay. You know, in about the middle of the page --
4  MR. SCHRECK: What page do you have?
5  MR. BURKE: It's not Bates stamped, but
6  it's part of Exhibit 75.
7  MR. SCHRECK: All right.
8  MR. BURKE: Matt, do you see it, or --
9  MR. SCHRECK: Yeah. I just want to glance
10  at it before you talk about it. Okay.
11  BY MR. BURKE:
12  Q  In the middle of the page there's a line in bold
13  print with two stars next to it that says: "All
14  requirements must be met before we can dispatch
15  your truck."
16  A  **Mm-hmm.**
17  Q  Okay. And, you know, the word "dispatch" is used
18  there. What's that mean?
19  A  **It means, well, it means a bunch of different**
20  **things, but as far as this agreement it means**
21  **basically before we can assign, give you this**
22  **assignment of the broker confirmation sheet, so**
23  **before we can give you the information for the**
24  **pickup, you, we have to have a signed brokerage**
25  **agreement, you know, all of these things that we've**

**136**

1  outlined.
2  Q  Okay. And in essence, you're not, or Universal's
3  not going to give Martin's a load to haul unless
4  they have complied with these requirements,
5  correct?
6  A  **Correct.**
7  Q  Okay. And we probably touched on some of these
8  before, but number one was the freight bill and all
9  paperwork has to reference the order number,
10  correct?
11  A  **Yes.**
12  Q  Okay. And then number two --
13  MR. FISHER: Wait a minute. Rich, are you
14  now talking about before assignment or before being
15  paid?
16  MR. BURKE: Well, I'm talking about what
17  it says here. It must be met before we can dispatch
18  your truck.
19  MR. FISHER: But then it says --
20  MR. BURKE: Okay. Here, and maybe my --
21  let me clarify.
22  BY MR. BURKE:
23  Q  Ms. Hubbs, is the reference to "all the
24  requirements must be met before we can dispatch
25  your truck," are those requirements set forth up

**Page 137**

1     above that line.

2 A   Yes.

3 Q   Okay. And that's, there are six requirements set

4     forth there, are there not?

5 A   Really five, and then send it in, yes.

6 Q   Okay. And the first one is the three-page master

7     brokerage agreement has to be signed, right?

8 A   Right.

9 Q   And Martin's would have to provide a copy of a

10    contract and/or common authority to operate as a

11    motor carrier?

12 A   Yes.

13 Q   And number three, they have to provide proof of

14    proper insurance coverage, right?

15 A   Yes.

16 Q   And they have to give you a completed W-9 in number

17    four, correct?

18 A   Yes.

19 Q   And number five, they have to complete and return a

20    carrier's survey form, correct?

21 A   Yes.

22 Q   And that refers, the carrier survey is basically

23    information about Martin's?

24 A   Yes.

25 Q   Number of trucks and things like that? And there's

**Page 138**

1     actually a copy --

2 A   Yes. Yes.

3 Q   Okay. And then, as you pointed out, all of this,

4     and the number six requirement is that all of this

5     information has to be faxed to the Universal phone

6     number provided here, correct?

7 A   Yes.

8 Q   Okay. And then, then the next, the lower half of

9     the page sets forth various requirements for

10    getting paid.

11 A   Well, it says "tips," and it's really because

12    there's so many loads that if you don't have these

13    things, it can slow up the payment.

14 Q   Okay. And in reality, these items have to be

15    complied with in order to get paid, correct?

16 A   Not necessarily, no.

17 Q   No?

18 A   I mean, your order number, we can dig it up, but

19    with hundreds of thousands of loads that are being

20    moved, it's going to take us some time. So it's

21    saying, you know, for prompt payment here's some

22    tips to expedite your payment.

23 Q   Okay.

24 A   If you don't, if you don't put the order number on

25    it we're not going to not pay you, it's just going

**Page 139**

1     to, you know, it gets pulled aside and someone has

2     to work these.

3 Q   Sure. I got you. Okay. Number two, providing the

4     original paper work including bills of lading and a

5     clear delivery receipt attached to the invoice,

6     that's a requirement, correct?

7 A   That's a requirement.

8 Q   Okay. You know, you got asked, I think with Mr.

9     Schreck, about that October 1st contract or October

10    1st, 2007, contract between International Paper and

11    Overnight Express, correct; do you remember that?

12    That's the contract that --

13 A   Is that the addendum or --

14 Q   No. Well, that's the contract that Universal took

15    over, that you accepted the assignment of?

16 A   Right.

17 Q   Okay. And that contract, I think I showed you

18    earlier, it's at page 33, and if you -- do you have

19    that one in your batch or not? If that's Exhibit

20    1, look for page 33.

21 A   Okay.

22 Q   Okay. And then page three of that -- page three of

23    the contract or Bates page 35 starts the substance

24    of the contract, right?

25 A   Yes.

**Page 140**

1 Q   Okay. And this is the contract plus the amendment

2     number one that gave rise to Universal's obligation

3     to transport the loads that were being transported

4     on the day of this incident, correct?

5 A   I believe so.

6 Q   Okay. And in this contract, Overnight Express was

7     the carrier, correct?

8         MR. FISHER: Objection. Asked and

9     answered. You can go ahead and answer.

10        THE WITNESS: Well, it's, it says

11    "carrier" in quotes. That's language typical, you

12    know, contract language where they designate

13    shipper, that's why it's in quotes, and carrier in

14    quotes.

15 BY MR. BURKE:

16 Q   Okay. And Universal replaced Overnight Express as

17    the carrier in this agreement, correct?

18 A   Yes.

19 Q   Okay. And then the last thing, or last of your --

20    no.

21        MR. BURKE: I think I did cover

22    everything. Thank you.

23        THE WITNESS: You're welcome.

24        MR. SCHRECK: I don't have anything else.

25        MR. FISHER: Tim?

1    MR. COUTURE: Yeah, what's up?

2    MR. FISHER: No questions, right?

3    MR. COUTURE: Nope.

4    MR. FISHER: Signature's reserved.

5    (At or about 3:49 p.m., deposition

6    concluded)

7    - - -

141

---

1    AFFIDAVIT

2    I have read my deposition, and the same is true and

3    accurate, except for any changes and/or corrections, if

4    any, as indicated by me on the Errata sheet(s) attached

5    hereto.

6

7

8    _____

9    GINA HUBBS

10

11

12    N O T A R Y

13    Subscribed and sworn to me this _____ day of _____,

14    2012.

15

16    My commission expires _____.

17

18    _____, NOTARY PUBLIC, in and for the

19    State of Michigan.

143

---

1    ERRATA-READSIGN

2

3    ERRATA

4    SCHEINMAN VS. MARTIN'S BULK MILK SERVICE, et al

5    DEPOSITION OF GINA HUBBS - 4/16/2012

6    Page/Line #            Correction

7    _____    _____

8    _____    _____

9    _____    _____

10   _____    _____

11   _____    _____

12   _____    _____

13   _____    _____

14   _____    _____

15   _____    _____

16   _____    _____

17   _____    _____

18   _____    _____

19   _____    _____

20   _____    _____

21   _____    _____

22   _____    _____

23   _____    _____

24   _____    _____

25   _____    _____

142

---

1    CERTIFICATE OF COURT REPORTER

2    STATE OF MICHIGAN  )

3    COUNTY OF OAKLAND  )

4

5    I certify that this transcript, consisting
     of 144 pages, is a complete, true and correct record
     of the testimony of GINA HUBBS, held in this case on
6    Monday, April 16, 2012.

7    I also certify that prior to taking this
     deposition, GINA HUBBS, was duly sworn to tell the
8    truth.

9    I also certify that I am not a relative or
     employee of or an attorney for a party; or a
10   relative or employee of an attorney for a party; or
     financially interested in the action.

11

12

13   KATHLEEN M. SMITH (CSR-4232)
14   Certified Shorthand Reporter
     Notary Public, Oakland County, Michigan
15   My Commission Expires:  1/2/2016

16

17   Dated:  May 7, 2012

18

19

20

21

22

23

24

25

144

---