# JAE # 9

# Excerpts from the Transcript of Deposition of Mark Limback, dated April 17, 2012

130547293v1 0903067

MARK LIMBACK
April 17, 2012

1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   MURRAY SCHEINMAN, Plenary Guardian of the Estate and

 4   Person of Jeffrey J. Scheinman, a disabled person,

 5            Plaintiff,

 6     -vs-                         Case No. 09-CV-5340

 7   MARTIN'S BULK MILK SERVICE, INC.; SAMUEL G. FRANKE;

 8   CSX INTERMODAL, INC.; INTERNATIONAL PAPER COMPANY;

 9   UNIVERSAL AM CAN, LTD., successor to Overnite

10   Express, Inc.; OX, L.L.C.; BMW OF NORTH

11   AMERICAN, L.L.C., a corporation; BAYERISCHE

12   MOTOREN WERKEAKTIENGESELLSCHAFT, a corporation;

13   BMW AG, a corporation; and KARL KNAUZ

14   MOTORS, INC., a corporation,           [COPY]

15            Defendants.
     _____/
16                          .

17   The deposition of MARK LIMBACK was taken by the

18   Plaintiff on Tuesday, April 17, 2012, at 26600

19   Schoenherr Road, Warren, Michigan, at 10:15 a.m.

20   APPEARANCES:
     CLIFFORD LAW OFFICES, P.C.
21   By:  Richard F. Burke Jr.
     120 North LaSalle Street, 31st Floor
22   Chicago, Illinois  60602
     312.899.9090
23   rfb@cliffordlaw.com
     Appearing on behalf of the Plaintiff.
24
     Reported by:  Cindy A. Boedy, CSR 4696
25                 Certified Court Reporter
```

Page 14

1  Q.  And does Universal employ truck drivers?
2  A.  We do not employ them, no.
3  Q.  Does Universal have truck drivers -- Strike that.
4      Does Universal have federal motor
5      vehicle safety administration authority to
6      operate as a motor carrier?
7  A.  Yes.
8  Q.  Do you have multiple types of authority?
9  A.  Yes, we do.
10 Q.  And can you tell me what all of those different
11     authorities are?
12 A.  We have common carrier authority, contract
13     authority, and brokerage authority.
14 Q.  When you distinguish between those three,
15     Mr. Limback, what does common carrier authority
16     permit Universal to do?
17 A.  Common carrier authority would allow us to
18     utilize call for customers and utilize rates that
19     years ago were put in through the ICC, and it
20     would allow us to haul as well spot loads where
21     we can dictate the rate at the time of shipment.
22     Contract carrier would be we'd have a
23     contract with that carrier -- excuse me, with
24     that customer -- and we'd have rates in place
25     under a contract.

Page 15

1      And brokerage authority would mean that
2      we'd be able to use independent contractors who
3      met certain qualifications to haul our customers'
4      freight.
5  Q.  With respect to International Paper, Universal
6      had a contract to haul goods for them, correct?
7  A.  Yes.
8  Q.  And Universal was a contract carrier with respect
9      to International Paper?
10 A.  We were both a contract carrier and a broker.
11 Q.  And you were a contract carrier on the day of
12     this occurrence with respect to International
13     Paper based on the October 2007 contract that you
14     had with them, correct?
15 A.  We were acting as a broker on this -- in this
16     incident.
17 Q.  You had a contract on this day with International
18     Paper that you were obligated to fulfill,
19     correct?
20 A.  Yes.
21 Q.  And you were -- Universal on July 3rd had a duty
22     under that contract with International to haul
23     the load that Mr. Franke was hauling at the time
24     of this collision, correct?
25 A.  We had a duty to supply transportation-related

Page 16

1      services.
2  Q.  And that duty arose from the October 2007
3      contract, correct?
4  A.  Yes.
5  Q.  You mentioned something about being a broker on
6      the date of this occurrence too?
7  A.  Yes.
8  Q.  In what way do you believe you were -- that
9      Universal was acting as a broker?
10 A.  Because we used an independent contractor to haul
11     this load based on a master brokerage agreement
12     we had with them.
13 Q.  And the "them" that you're referring to is
14     Martin's Bulk Milk Service?
15 A.  Yes.
16 Q.  You did not have any brokerage agreement with
17     International Paper, correct?
18 A.  No, we did not.
19 Q.  In the agreement you had with International Paper
20     in that October 2007 contract, Universal was
21     identified as the carrier, correct?
22 A.  Yes. And Carrier was used -- carrier was used as
23     a label to indicate the contract, the entity,
24     with International Paper.
25 Q.  And you undertook in that contract -- Universal

Page 17

1      undertook in that October 2007 contract the
2      obligation to provide transportation services as
3      a carrier, correct?
4      MR. FISHER:  Excuse me, when you say
5      you, Rich, are you saying him or UACL?
6      MR. BURKE:  Let me repeat that. And
7      when I do say "you," I do mean Universal Am Can.
8  BY MR. BURKE:
9  Q.  In that October 2007 contract, Universal had
10     agreed to provide transportation services as a
11     carrier for International Paper, correct?
12 A.  Yes.
13 Q.  Is Universal Truckload Services a publicly traded
14     company?
15 A.  Yes.
16 Q.  Do you know its ticker symbol?
17 A.  Yes.
18 Q.  What is that?
19 A.  UACL.
20 Q.  Do you know for how long Universal Truckload
21     Service has been a publicly traded company?
22 A.  Since 2005.
23 Q.  What's your best understanding of -- Strike that.
24     With respect to Universal Am Can, do
25     you know if they are a corporation or a

**Page 46**

```
 1       her at all?
 2   A.  I had some conversations with her, but to what
 3       extent I don't recall.
 4            MR. FISHER:  Can we take a break?
 5            MR. BURKE:  Sure.
 6            (Break was taken.)
 7   BY MR. BURKE:
 8   Q.  Mr. Limback, let me tender to you a portion of
 9       Exhibit No. 1 including Bates stamp pages 109
10       through 155, which I believe you have in front of
11       you; is that correct?
12   A.  Yes, sir.
13   Q.  Is that a true and accurate copy of the asset
14       purchase agreement for Universal's purchase of
15       Overnite Express?
16   A.  Yes, based on the first page, yes.
17   Q.  Is there any other contract or agreement that
18       relates to or was entered into as part of the
19       purchase of Overnite Express by Universal?
20   A.  Can you clarify that?
21   Q.  Sure.  Is there any other contract or agreement
22       that Universal entered into in order to purchase
23       Overnite Express?
24   A.  No.
25   Q.  From the first line here, is it actually
```

**Page 47**

```
 1       Universal Am Can and UTS Leasing that purchased
 2       Overnite?
 3   A.  Universal Am Can purchased Overnite.  UTS
 4       Leasing, Inc., purchased the trailers.
 5   Q.  In general, what did Universal purchase from
 6       Overnite Express?
 7   A.  Basically the customer base, the owner operators
 8       that were associated with that office, and
 9       basically goodwill.  You know, files, furniture,
10       computers.
11   Q.  Did you also or did Universal also purchase
12       contracts that Overnite Express had with
13       customers?
14   A.  Yes.
15   Q.  And is one of the contracts that was purchased by
16       Universal the October 2007 contract that Overnite
17       Express had with International Paper?
18   A.  Yes.
19   Q.  Were there other contracts that you purchased
20       other than that one where International -- where
21       Overnite Express had contracts with customers?
22   A.  Yes.
23   Q.  And about how many others?
24   A.  I'd be guessing again.  I apologize.
25   Q.  Are we talking like ten or under or fifty or
```

**Page 48**

```
 1       under?
 2   A.  Probably ten to twenty.
 3   Q.  Are those contracts identified or specifically
 4       enumerated in the asset purchase agreement?
 5   A.  No.
 6   Q.  In paragraph -- or excuse me, on page 1 -- Strike
 7       that.
 8            On page 109 which is the page entitled
 9       "Asset Purchase Agreement," let me direct your
10       attention to paragraph 1, which is entitled "Sale
11       and Purchase of Assets."  Do you see that?
12   A.  Yes.
13   Q.  And that identifies different -- the assets that
14       Universal is purchasing, correct?
15   A.  Yes.
16   Q.  Many of which you already mentioned, furniture
17       and fixtures, things like that in paragraph A.
18            In paragraph 1B it says you were
19       purchasing all operating authority and
20       certificates, both interstate and intrastate, as
21       applicable.  What does that refer to?
22   A.  The operating authority of Overnite to operate as
23       a trucking company, and interstate would be
24       within the 48 continental United States and intra
25       would be, if they had had any, like intra
```

**Page 49**

```
 1       Minnesota.
 2   Q.  After you purchased Overnite as of June 13th,
 3       '08, did you utilize Overnite's operating
 4       authority?
 5   A.  No.
 6   Q.  So even though you purchased that authority, you
 7       did not operate trucks under Overnite's DOT
 8       numbers?
 9   A.  Correct.
10   Q.  And am I correct that instead what previously had
11       been Overnite's business was conducted under
12       Universal's operating authority?
13   A.  Yes.
14   Q.  Then in paragraph C it talks about the trailers
15       that you mentioned.  Paragraph D pertains to all
16       list of customers as well as all customer
17       contracts and agreements, correct?
18   A.  Correct.
19   Q.  And does paragraph 1D include the October 2007
20       contract that Overnite Express had with
21       International Paper that we talked about earlier?
22   A.  Yes.
23   Q.  Did Universal purchase any brokerage agreements
24       that Overnite might have had with any other
25       companies?
```

```
                                                        50
1   A.   No.
2   Q.   Is there a reason you did not do so?
3   A.   Because we were rolling Overnite under Universal
4        Am Can and any agreements they had for brokerage
5        would then come from Universal Am Can Limited and
6        we would pay those people direct, and Overnite
7        would no longer have that authority.
8   Q.   After June 13, 2008, did Overnite Express, Inc.,
9        cease to exist?
10              MR. FISHER:  You mean -- object to
11       form.  Calls for a legal conclusion.  You can go
12       ahead and answer.
13              THE WITNESS:  Yes.
14  BY MR. BURKE:
15  Q.   Do you know if the corporation Overnite Express,
16       Inc., was actually dissolved?
17  A.   I don't know that.
18  Q.   And then paragraph 1E, which is on Bates stamp
19       page 110, which is also marked as page 2 of the
20       contract on the bottom, you were purchasing all
21       lists of owner operators as well as all contracts
22       and agreements with owner operators, correct?
23  A.   Correct.
24  Q.   In F, Universal purchased the right to do
25       business with customers and owner operators doing
```

```
                                                        51
1        business with the seller, correct?
2   A.   Correct.
3   Q.   And Universal purchased Overnite Express's right
4        to do business with their customer International
5        Paper as part of this agreement?
6   A.   We purchased their contract with International
7        Paper.
8   Q.   And then page 133 is the signature page for the
9        contract, correct?
10  A.   Yes.
11  Q.   And you signed the agreement on behalf of
12       Universal Am Can Limited, correct?
13  A.   Yes.
14  Q.   And is that in fact your signature there?
15  A.   Yes.
16  Q.   Who signed that on behalf of UTS Leasing?
17  A.   Thomas Welsman.
18  Q.   How do you spell his last name?
19  A.   W-E-L-S-M-A-N.
20  Q.   And he was president at the time of UTS Leasing?
21  A.   Yes.
22  Q.   Is he still?
23  A.   Yes.
24  Q.   And then on behalf of Overnite Express, Inc., the
25       contract was signed by Robert Weston Elsholtz as
```

```
                                                        52
1        president, correct?
2   A.   Correct.
3   Q.   And you also purchased Ox, L.L.C., correct?
4   A.   UTS Leasing purchased the trailers.
5   Q.   And in the contract for -- what was your best
6        understanding of why the owners were identified
7        individually in both the opening paragraph as
8        sellers and on the signature page as owners of
9        Overnite Express?
10  A.   I don't know why.
11  Q.   Did you deal with Willis Elsholtz as part of your
12       acquisition?
13  A.   No.  I met him, but I didn't deal with him.
14  Q.   Do you know what his involvement or position with
15       Overnite was?
16  A.   No.
17  Q.   How about Matthew Elsholtz?
18  A.   Yes, I did deal with him.
19  Q.   And what was his job or position?
20  A.   He was brokerage manager.
21  Q.   Did any of -- Strike that.
22              How about Robert, and I don't know if
23       he's technically a junior, but Rob, the son,
24       Elsholtz, what was his position or job at
25       Overnite Express?
```

```
                                                        53
1   A.   I think he was director of operations.
2   Q.   Did he remain or become an employee I should say
3        of Universal after the acquisition?
4   A.   Yes.
5   Q.   Does he still work for Universal?
6   A.   Yes.
7   Q.   What's his job today?
8   A.   Same position.
9   Q.   Director of operations?
10  A.   Yes.
11  Q.   For Universal?
12  A.   For St. Paul office.
13  Q.   Director of operations of St. Paul office.
14              How about did any of these -- did
15       Robert Weston Elsholtz become an employee of
16       Universal?
17  A.   No.
18  Q.   How about Matthew Elsholtz?
19  A.   Yes.
20  Q.   And is he still an employee?
21  A.   Yes.
22  Q.   Where does he work?
23  A.   The St. Paul office.
24  Q.   And do you know what he does there, what his job
25       is?
```

**Page 54**

1  A.  Brokerage manager.
2  Q.  Did Overnite Express have other offices other
3      than the St. Paul one and the South Holland one
4      when you bought them?
5  A.  No.
6  Q.  Look at page 137 if you would, sir. That's
7      entitled "Overnite Trailers to be Sold to
8      Universal Am Can Limited"? Am I correct?
9  A.  That's the title on the page, yes.
10 Q.  And I thought if I was hearing you correctly
11     earlier you said that Universal didn't actually
12     buy the trailers but UTS did?
13 A.  Yes.
14 Q.  Did Universal buy any trailers?
15 A.  No.
16 Q.  Is this title inaccurate?
17 A.  Yes.
18 Q.  And it's inaccurate because the trailers were
19     actually sold to UTS Leasing instead of
20     Universal?
21 A.  Correct.
22 Q.  After the closing of the purchase agreement, were
23     you involved in assimilating Overnite Express
24     into Universal?
25 A.  Yes.

**Page 55**

1  Q.  And how were you involved, Mr. Limback?
2  A.  I assigned several employees to go up there and
3      assist them in the transition.
4  Q.  When you say "up there," do you mean St. Paul?
5  A.  Yes, as well as South Holland.
6  Q.  And basically what did you want those employees
7      to do?
8  A.  We had to transition their owner operators over
9      to lease agreements with Universal Am Can and
10     then we had to train all their personnel on the
11     computer system and we had to get assignments on
12     the customer contracts and convert their
13     employees, the office personnel, administrative
14     people, into Universal Am Can employees as well.
15 Q.  I'm going to show you --
16         MR. BURKE: Carl, do you have page 67
17     of Exhibit 1 that's Gina Hubbs' letter?
18         MR. FISHER: All set.
19 BY MR. BURKE:
20 Q.  Mr. Limback, you have in front of you a copy of
21     Bates stamp page UACL 67, and that's a letter
22     dated May 21st, 2008, on Universal Am Can
23     letterhead, correct?
24 A.  Correct.
25 Q.  It's actually your letterhead, in fact. Am I

**Page 56**

1      right that's your name on the upper right?
2  A.  Yes.
3  Q.  This is a letter that was sent out apparently by
4      Gina Hubbs in her capacity as vice president of
5      Universal Am Can Limited, correct?
6  A.  Correct.
7  Q.  And did you ask or authorize Gina to send this
8      letter out?
9  A.  Yes.
10 Q.  And the letter was sent to International Paper,
11     correct?
12 A.  I don't know if it was directly sent to
13     International Paper or a person at Overnite.
14 Q.  It's directed to International Paper in the
15     actual letter; is that right?
16 A.  Correct.
17 Q.  In the letter it says, Dear customer, Overnite
18     Express will be operating under Universal Am Can
19     Limited's insurance and authority as of
20     June 13th, 2008, based on an agreement to partner
21     with their organization.
22          Is all of that an accurate statement?
23 A.  Yes.
24 Q.  And it actually was more than just a partnership.
25     I mean, Universal physically or actually legally

**Page 57**

1      bought Overnite, correct?
2  A.  Correct.
3  Q.  And then Gina went on to say, All bill of ladings
4      should reflect Universal Am Can Limited as the
5      carrier. Therefore, invoices for freight moved
6      will come from Universal Am Can limited with a
7      remittance address of P.O. 71296, Cincinnati,
8      Ohio. That also was information you wanted Gina
9      to communicate to International Paper; is that
10     correct?
11 A.  Yes.
12 Q.  In paragraph 2 Gina Hubbs told International
13     Paper, Please consider this letter as an
14     assignment of the current contract you have in
15     place for Overnite Express, and the current
16     contract referred to there is the October 7th --
17     or the October 1st, 2007, contract?
18 A.  Yes.
19 Q.  And you went on to say -- or Gina says, Universal
20     Am Can Limited agrees to accept the rates and
21     fuel surcharge established between your company
22     and Overnite, correct?
23 A.  Correct.
24 Q.  And part of the purchase agreement -- Well, the
25     last line says, "Please sign below as to your

**Page 62**

```
 1       Which one?
 2            MR. COUTURE:  Was there excess
 3       coverage.
 4            MR. FISHER:  He said no.
 5  BY MR. BURKE:
 6  Q.   Did Universal Am Can Limited's parent company
 7       have any liability insurance coverage that did or
 8       might apply to Mr. Scheinman's injuries?
 9            MR. FISHER:  Competency, foundation.
10       You can go ahead and answer.
11            THE WITNESS:  Not that I'm aware of.
12  BY MR. BURKE:
13  Q.   In this case I've been provided with answers to
14       interrogatories that indicate that there is
15       coverage through a policy of insurance for
16       $10 million that is applicable to this incident
17       after a $9 million self-retention.  Are you aware
18       of that coverage?
19  A.   No, I'm not.
20  Q.   Who would be most knowledgeable about the
21       insurance coverage that would be applicable to
22       this occurrence?
23  A.   Mike Peterson.
24  Q.   And Mike works -- he's the risk manager you said?
25  A.   Yes.
```

**Page 63**

```
 1  Q.   For Universal?
 2  A.   Universal Truckload Services.
 3  Q.   And Mike works at the Warren office, right?
 4  A.   Yes, sir.
 5  Q.   As part of this -- Strike that.
 6            As part of Universal's purchase of
 7       Overnite Express, did Universal acquire the right
 8       to any insurance coverage that Overnite Express
 9       had at the time of the purchase?
10  A.   No.
11  Q.   Why don't we talk a little bit about the
12       addendum, Mr. Limback, that is on page --
13            MR. FISHER:  65?  You mean the
14       amendment?
15            MR. BURKE:  65, Amendment No. 1.
16  BY MR. BURKE:
17  Q.   Mr. Limback, you have in front of you Bates stamp
18       page UACL 65 which is part of Exhibit No. 1.
19       That's a document entitled "Amendment No. 1,"
20       correct?
21  A.   Correct.
22  Q.   Do you have a recollection of how it was that
23       this document came into existence?
24  A.   Well, we had been asking International Paper for
25       an assignment of the contract and this is the
```

**Page 64**

```
 1       agreement they've come up with for us to assume
 2       that contract.
 3  Q.   And the contract you're referring to is the
 4       October 21st, 2007, contract between
 5       International and Overnite Express?
 6  A.   Yes.
 7  Q.   And then this contract or this Amendment No. 1,
 8       by whom was it prepared, if you recall?
 9  A.   I don't know the exact person, but International
10       Paper.
11  Q.   Did it get approved by your office?
12  A.   Yes.
13  Q.   You signed this as president of Universal Am Can,
14       correct?
15  A.   Correct.
16  Q.   It actually -- on the signature portion it says
17       Universal Am Cam, C-A-M.  Is the proper name of
18       your company actually C-A-N?
19  A.   Yes, sir.
20  Q.   And then it was signed by International Paper by
21       Mr. Mundy, correct?
22  A.   Correct.
23  Q.   On the left.  He signed June 12, '08, and you
24       signed June 10th, '08?
25  A.   Correct.
```

**Page 65**

```
 1  Q.   And with respect to paragraph 1 of the amendment,
 2       it basically says that this amendment is entered
 3       into on June 9th between International Paper and
 4       Overnite Express as carrier, correct?
 5  A.   Yes.
 6  Q.   Why does it say Overnite Express there?  Was that
 7       intentional or should that have been Universal Am
 8       Can?
 9            MR. FISHER:  Competency, foundation.
10       You can go ahead and answer.
11            THE WITNESS:  I don't know why.
12  BY MR. BURKE:
13  Q.   Suffice it to say it was Universal Am Can that
14       was entering into this amendment with
15       International Paper as opposed to Overnite
16       Express?
17  A.   Yes.
18  Q.   And in the amendment, International Paper is
19       identified as the company and there's a second
20       paragraph or a paragraph that starts with the
21       word witnessed, and then you have a number of
22       whereas clauses, correct?
23  A.   Yes.
24  Q.   And it says the parties entered into Contract No.
25       OXEN 093009 dated October 1st, 2007, parentheses,
```

Page 82

1  Q.  When Universal would either give a load under
2      this contract to one of its leased drivers or to
3      a brokered carrier, Universal had the expectation
4      that that driver would accomplish the delivery
5      without having a collision with another motor
6      vehicle, correct?
7              MR. SCHRECK:  Same objections.
8              THE WITNESS:  We would expect our
9      driver would act in every way to drive as safely
10     as possible.
11 BY MR. BURKE:
12 Q.  And by driving as safely as possible, you had an
13     expectation that -- or strike that.
14             Universal had an expectation that those
15     drivers, whether it be a leased driver or a
16     brokered driver like Martin's, would make the
17     delivery without causing personal injury to
18     occupants of other vehicles, correct?
19             MR. SCHRECK:  Same objection.  Form and
20     foundation.  You can go ahead.
21             THE WITNESS:  Correct.
22 BY MR. BURKE:
23 Q.  Paragraph I talks about ancillary costs.
24     Universal had to assume those costs in terms of
25     maintaining equipment for good, safe, and lawful

Page 83

1      operation of equipment while carrying out this
2      contract, correct?
3  A.  Unless we brokered it to another carrier, then
4      they would be responsible for those calls.
5  Q.  And you would have the expectation that whoever
6      you brokered it -- Strike that.
7              Universal would have the expectation
8      that that brokered carrier would have equipment
9      that complied with this contract, correct?
10 A.  Correct.  Let me rephrase that.  The equipment
11     that complied with our agreement within our
12     master brokerage agreement and that trucking
13     company.  We would comply with our agreement with
14     International Paper.
15 Q.  And for you to comply with your agreement with
16     International Paper, you had to utilize a
17     brokered carrier, if that's who you chose to use,
18     that had drivers and equipment that would make
19     the delivery in accord with the terms of your
20     contract, correct?
21 A.  Well, they would make the delivery in accord with
22     the terms of our master brokerage agreement, and
23     based on their qualifications, you know, we would
24     be able to fulfill -- we would use those drivers
25     to fulfill their agreement with us and,

Page 84

1      therefore, we would comply with our terms of our
2      agreement with International Paper.
3  Q.  Those drivers that you utilized, whether it would
4      be a leased driver or a brokered carrier, they
5      would be acting on behalf of Universal in
6      Universal complying with their contract with
7      International Paper, correct?
8              MR. FISHER:  Excuse me, could you
9      reread the question for me?
10             (Requested portion read back.)
11 BY MR. BURKE:
12 Q.  In order for you to comply with the terms of your
13     contract with International Paper, you had to use
14     drivers and equipment that would also accomplish
15     the delivery of International Paper's goods in
16     accord with the terms of this contract, right?
17 A.  Correct.
18 Q.  And here on this day Universal utilized the
19     services of Martin's to actually physically make
20     the delivery of International's goods under your
21     contract, correct?
22 A.  No, they -- Martin Bulk Milk would have delivered
23     the goods under their master brokerage agreement
24     with Universal Am Can.
25 Q.  But what I'm talking about is on this day October

Page 85

1      -- excuse me.
2              On this day July 3rd, 2008, Universal
3      had a duty under this October 2007 contract in
4      Amendment No. 1 to fulfill the terms of this
5      contract, correct?
6              MR. FISHER:  Excuse me.  By "this
7      contract," you mean the IPC UACL contract?
8              MR. BURKE:  Correct.
9              THE WITNESS:  Correct.
10 BY MR. BURKE:
11 Q.  And on July 3rd, 2008, that involved making a
12     delivery of certain International Paper products
13     to three customers of International Paper, right?
14 A.  Correct.
15 Q.  And in order for Universal to fulfill its
16     obligation, it turned to Martin's and asked
17     Martin's to make that delivery, correct?
18 A.  Correct.
19 Q.  And that Martin's driver was acting on behalf of
20     Universal to make the delivery that Universal had
21     committed to make under this contract, correct?
22             MR. FISHER:  Objection, form.
23             THE WITNESS:  No, he wasn't.  He was
24     acting on behalf of Martin Bulk Milk based on the
25     agreement Martin Bulk Milk has with Universal Am

**Page 98**

1  Q.  And you had to have worker's compensation
2      insurance as well?
3  A.  Correct.
4  Q.  And then paragraph 14, that placed some
5      limitations on using intermodal service, correct?
6  A.  Correct.
7  Q.  And paragraph 15 is entitled "Indemnification,"
8      correct?
9  A.  Correct.
10 Q.  And paragraph -- or strike that.
11         Under the indemnification paragraph, it
12     said that Universal had to indemnify defendant,
13     hold harmless International against any liability
14     for injury arising out of the performance of this
15     agreement by Universal's employees, agents, or
16     subcontractors, correct?
17 A.  Correct. And losses/damage claims, et cetera, I
18     don't think you read that.
19 Q.  I did skip over a couple portions of it, yes.
20         And then under Section 20 down at the
21     bottom of Bates stamp page 43, that's entitled
22     "Independent Contractor," correct?
23 A.  Correct.
24 Q.  And in this section, that says Universal was
25     performing services under this agreement as an

**Page 99**

1      independent contractor, correct?
2  A.  Correct.
3  Q.  And the next sentence says that "Universal shall
4      solely direct all persons performing services
5      performed by Universal under this agreement and
6      such persons shall be and remain subject to the
7      exclusive control and direction of Universal,"
8      correct?
9  A.  That's what it states.
10 Q.  And under the terms of this paragraph, Universal
11     had an obligation to direct the people that were
12     performing services for Universal pursuant to
13     this contract, correct?
14         MR. FISHER: Objection, form and
15     foundation. It speaks for itself. You can go
16     ahead and answer.
17         THE WITNESS: We exercise our
18     responsibility by contracting with Martin Bulk
19     Milk, and they used their people to handle the
20     services provided.
21 BY MR. BURKE:
22 Q.  And under the terms of this paragraph, those
23     persons that you utilized were supposed to remain
24     subject to Universal's exclusive control and
25     direction, correct?

**Page 100**

1          MR. FISHER: Objection, same. Same
2      objections.
3          THE WITNESS: No, those persons we
4      utilized would have been controlled by the owner
5      of that company.
6  BY MR. BURKE:
7  Q.  Well, it doesn't say that here in this paragraph,
8      does it?
9          MR. FISHER: Objection, argumentative.
10     Same objections. You can go ahead and answer.
11         THE WITNESS: No, it doesn't.
12 BY MR. BURKE:
13 Q.  And then page 45 Bates stamped, that's the
14     signature pages, correct?
15 A.  Correct.
16 Q.  And then do you know Mr. Crawford at all?
17 A.  No, sir.
18 Q.  William Crawford signed on behalf of
19     International Paper on November 1st, 2007,
20     according to this page 45, correct?
21 A.  Correct.
22 Q.  And then on behalf of -- I think we already
23     covered this earlier, but Mr. Elsholtz and others
24     from Overnite signed on behalf of Overnite
25     Express on October 30th, 2007, right?

**Page 101**

1  A.  Correct.
2          MR. FISHER: Can I suggest, I think
3      probably the lunch ...
4          (Break was taken.)
5  BY MR. BURKE:
6  Q.  Do you still have that contract in front you,
7      Mr. Limback? I just want to ask you a few
8      questions about some of the exhibits to the
9      contract. How about page -- turn to page 47.
10 A.  Okay.
11 Q.  You there?
12 A.  Yes.
13 Q.  That's Overnite's operating authority, correct?
14 A.  Correct.
15 Q.  How about page 48, that's a fuel index. In a
16     nutshell, what does that address?
17 A.  Fuel surcharge and it fluctuates weekly based on
18     the price of fuel.
19 Q.  When you took over this contract, did you -- did
20     Universal utilize this same fuel index?
21 A.  Yes.
22 Q.  And how about paragraph -- or C, Exhibit C,
23     that's the motor carrier rate and weekly
24     commitment schedule, right?
25 A.  Yes.

106

1  Q. And I wasn't trying to distinguish between the
2     tender or the memo bill necessarily. My point
3     was simply the delivery instructions that
4     International would give Universal you were
5     supposed to comply with as part of your contract,
6     correct?
7  A. Correct.
8  Q. Do you remember your letter that was on your
9     letterhead -- I mean one went out by you, one
10    went out by Gina Hubbs that said that future
11    invoices should now show Universal as the
12    carrier?
13 A. Yes.
14 Q. I take it that was so Universal would now get
15    paid?
16 A. Exactly, for billing purposes and contracted
17    entity.
18 Q. You didn't want the money still going to
19    Overnite?
20 A. We would prefer it go directly to us so we don't
21    have to chase it.
22 Q. Did Universal have any brokerage agreement that
23    you believed was in force and effect with
24    Martin's Bulk Milk Service on July 3rd, 2008?
25 A. Yes.

107

1  Q. Have you reviewed any brokerage agreements?
2  A. Yes.
3  Q. What is the date of the brokerage agreement that
4     you believe was in existence?
5  A. June 12th, 2008.
6  Q. You spent a lot of time talking about these --
7     that agreement yesterday. Has Universal ever
8     signed that brokerage agreement?
9  A. No.
10 Q. Why not?
11 A. Our policy was unless the trucking company wanted
12    a signed copy back us from, we expected that they
13    would abide by our contracted terms by them
14    signing it.
15 Q. Was the July [sic] 12, 2008, brokerage agreement
16    with Martin's the only brokerage agreement with
17    Martin's that you believe was in force and effect
18    on July 3rd, 2008?
19        MR. FISHER: Excuse me, Rich, I think
20    you misspoke. You said July 12th as opposed to
21    June 12th.
22        MR. BURKE: Thank you. Let me rephrase
23    it.
24 BY MR. BURKE:
25 Q. Was the June 12th, 2008, brokerage agreement

108

1     between Universal and Martin's the only brokerage
2     agreement between those two companies that you
3     believe was in force and effect on July 3rd,
4     2008?
5  A. Yes.
6  Q. Were you personally involved in brokerage
7     agreements with carriers?
8  A. No.
9  Q. Do you know anybody from Martin's Bulk Milk
10    Service such as David Martin?
11 A. No. Nobody there, sir.
12 Q. Under that brokerage agreement you had with --
13    that Universal had with Martin's, am I correct
14    that Universal had no obligation to give Martin's
15    any loads?
16 A. Correct.
17 Q. You could use Martin's only when you wanted or
18    not at all, if you so desired?
19 A. Correct.
20 Q. I take it Universal could terminate that
21    brokerage agreement anytime they wanted to?
22 A. Correct.
23 Q. Did you ever talk to Melody Hanson about this
24    incident?
25 A. No, I did not.

109

1  Q. How did you first come to learn that this
2     collision had taken place?
3  A. I don't recall exactly. Maybe as the court
4     proceedings started or litigation, whatever.
5  Q. Were you aware of it back in 2008 when the
6     collision actually occurred?
7  A. Not that I'm aware of.
8  Q. Who at Universal would have been given notice
9     that this incident had occurred?
10        MR. FISHER: Foundation, competence,
11    speculation. You can go ahead.
12        THE WITNESS: Melody Hanson dealt with
13    Martin Bulk Milk, so I would assume that she
14    would talk to somebody at Martin Bulk Milk.
15 BY MR. BURKE:
16 Q. And then to whom would you expect Melody Hanson
17    to report the incident to within Universal?
18 A. Dave Hummel.
19 Q. What's Mr. Hummel's job?
20 A. Operations manager.
21 Q. And how does he spell his last name?
22 A. H-U-M-M-E-L.
23 Q. Was he operations manager back in 2008?
24 A. Yes, sir.
25 Q. And operations manager for Universal Am Can?

118
1    which to your knowledge Universal Am Can would
2    have done a fuel advance for a driver being used
3    by a broker carrier like Martin's Bulk Milk?
4  A. No.
5  Q. When you earlier were giving a description or an
6    answer to one of Mr. Burke's questions and you
7    were talking about the master brokerage agreement
8    and the relationship between Universal Am Can and
9    Martin's Bulk Milk, I believe you used the phrase
10   in your answer of our agreement. When you said
11   that, were you referring to the agreement that
12   existed on June 12th, 2008, between Universal Am
13   Can and Martin's Bulk Milk?
14 A. Correct.
15 Q. And finally, Mr. Schreck was asking you some
16   questions concerning whether or not under the
17   master brokerage agreement UACL was obliged to
18   give any work or any loads to Martin's Bulk Milk,
19   you gave your answer concerning that question,
20   right?
21 A. Yes.
22 Q. If, however, a load was tendered to Martin's Bulk
23   Milk by someone like Melody Hanson and the load
24   was -- and the tender or assignment was accepted
25   by Martin's Bulk Milk if a Martin's Bulk Milk

119
1    driver hauled the freight, Martin's Bulk Milk
2    would be paid by Universal Am Can for that
3    service?
4  A. Correct.
5  Q. Consistent with the terms of the master brokerage
6    agreement?
7  A. Correct.
8        MR. FISHER: I believe that's all I
9    have.
10       MR. BURKE: Nothing else. Signature is
11   reserved. Thank you all.
12       (Signature reserved.)
13       (Deposition concluded at 3:15 p.m.)
14            - - -

120
1            ERRATA
2  SCHEINMAN vs MARTIN'S BULK MILK SERVICE, et al
3       DEP OF MARK LIMBACK - 4/17/12
4  Page/Line #                           Correction

121
1            AFFIDAVIT
2       I have read my deposition, and the same is
3  true and accurate, except for any changes and/or
4  corrections, if any, as indicated by me on the
5  Errata sheet(s) attached hereto.

9            MARK LIMBACK

12           N O T A R Y

14  Subscribed and sworn to me this _____ day of
15  _____, 2012.

17  My commission expires _____.

19  _____, NOTARY PUBLIC, in and for the
20  State of Michigan.