# JAE # 10

# Excerpts from the Transcript of Deposition of Melody Hansen, dated July 19, 2012

130547293v1 0903067

### Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4   MURRAY SCHEINMAN, Plenary Guardian  )
 5   of the Estate and Person of         )
 6   JEFFREY J. SCHEINMAN, a Disabled    )
 7   Person                              )
 8              Plaintiff,   ) Case No.
 9      -vs-                 ) 09 CV 5340
10   MARTIN'S BULK MILK SERVICE, INC.,   )
11   SAMUEL G. FRANKE, CSX INTERMODAL,   )
12   INC., INTERNATIONAL PAPER COMPANY,  ) Hon. Judge
13   UNIVERSAL AM CAN LTD., Successor to ) James F.
14   OVERNITE EXPRESS, INC. and OX LLC,  ) Holderman
15   BMW OF NORTH AMERICA, LLC,          )
16   a corporation, BAYERISCHE MOTOREN   )
17   WERKE AKTIENGESELLSCHAFT, a         )
18   corporation, BMW AG, a corporation, )
19   and KARL KNAUZ MOTORS, INC., a      )
20   corporation,                        )
21              Defendants.  )
22
23      July 19, 2012 - 10:35 a.m.
24      THE DEPOSITION OF MELODY HANSEN
```

### Page 2

```
 1      The deposition of MELODY HANSEN, called
 2   as a witness herein for examination, taken pursuant
 3   to the Federal Rules of Civil Procedure of the
 4   United States District Courts pertaining to the
 5   taking of depositions, taken before ROSANNE M.
 6   NUZZO, a Notary Public within and for the County of
 7   Will, State of Illinois, and a Certified Shorthand
 8   Reporter of said state, at the law offices of
 9   Hinshaw & Culbertson, Suite 201, 322 Indianapolis
10   Boulevard, Schererville, Indiana on Thursday,
11   July 19, 2012, at approximately 10:35 a.m.
12
13
14   PRESENT:
15
16      CLIFFORD LAW OFFICES, P.C.,
17      (120 North LaSalle Street, 31st Floor,
18      Chicago, Illinois 60602,
19      312-899-9090), by:
20      MR. RICHARD F. BURKE, JR.,
21      rfb@cliffordlaw.com,
22         appeared on behalf of the Plaintiff;
23
24
```

### Page 3

```
 1   PRESENT (Continued):
 2      MULHERIN, REHFELDT & VARCHETTO, P.C.,
 3      (211 South Wheaton Avenue, Suite 200,
 4      Wheaton, Illinois 60187,
 5      630-653-9300), by:
 6      MR. MATTHEW R. SCHRECK,
 7      mschreck@mrvlaw.com,
 8         and
 9      DOWD AND DOWD, LTD.,
10      (617 West Fulton,
11      Chicago, Illinois 60661,
12      312-704-4400), by:
13      MR. ROBERT J. GOLDEN (via telephone),
14      rgolden@dowdanddowd.com,
15         appeared on behalf of the Defendants,
16         Martin's Bulk Milk Service, Inc. and
17         Samuel G. Franke;
```

### Page 4

```
 1   PRESENT (Continued):
 2      HINSHAW & CULBERTSON LLP,
 3      (222 North LaSalle Street, Suite 300,
 4      Chicago, Illinois 60601,
 5      312-704-3000), by:
 6      MR. CARLTON D. FISHER,
 7      cfisher@hinshawlaw.com,
 8         appeared on behalf of the Defendants,
 9         International Paper Company, Universal
10         Am Can Ltd., Successor to Overnite
11         Express, Inc. and OX, LLC;
12
13      JOHNSON AND BELL, LTD.,
14      (33 West Monroe Street, Suite 2700,
15      Chicago, Illinois 60603-5404,
16      312-372-0770), by:
17      MR. BRIAN C. LANGS (via telephone),
18      langsb@jbltd.com,
19         appeared on behalf of the Defendants,
20         BMW of North America, LLC and Bayerische
21         Motoren Werke Aktiengesellschaft.
22
23   REPORTED BY: ROSANNE M. NUZZO, CRR, RPR,
24      CSR License No. 84-1388.
```



Page 53

1 line that says "PO NBR: 34" --
2  A.  That's their purchase order number.
3  Q.  Okay. And then it indicates that
4 "Customer requested delivery date of July 7,
5 2008," correct?
6  A.  Correct.
7  Q.  And that is referring to International
8 Paper's customer which, in this instance, is
9 XPEDX, is that right?
10  A.  Correct.
11  Q.  And then it says "Delivery requested by
12 Rose." Who would Rose work for?
13  A.  International Paper.
14  Q.  Then it says "Call" a certain number at
15 area code 612 "for delivery appointment" and
16 specifies some receiving hours. Is the number to
17 be called for delivery appointment, is that a
18 number at XPEDX?
19  A.  Yes.
20  Q.  And then, underneath that section,
21 there's order numbers. And what's the difference
22 between "Order Number" and "Customer Order
23 Number"?
24  A.  An order number pertains to

Page 54

1 International Paper's order number. The customer
2 order number is their PO when they ordered it.
3  Q.  Meaning the -- meaning XPEDX?
4  A.  Yes.
5  Q.  All right. And then, this copy of the
6 memo bill is stamped as saying "Received at XPEDX
7 subject to final count and inspection" and bears a
8 signature. The date is July 7th, is that correct?
9  A.  Yes.
10  Q.  Would that stamp and signature normally
11 be placed by the customer who has then received
12 the goods?
13  A.  Yes.
14  Q.  Is this memo bill sometimes referred to
15 as a bill of lading?
16  A.  I believe so.
17  Q.  What involvement would you have with
18 this type of memo bill?
19  A.  Nothing.
20  Q.  Would you receive a copy of it?
21  A.  No.
22  Q.  So it would go -- International Paper
23 would, in the first instance, give it to either
24 the Universal truck driver or whatever truck

Page 55

1 driver Universal gave the load to --
2  A.  Yes.
3  Q.  -- when that driver arrived at
4 International Paper?
5  A.  Yes.
6  Q.  Would you be provided with a copy of
7 the memo bill at any time?
8  A.  No.
9  Q.  What would a Martin's driver or a
10 Universal driver have to do with their copy of the
11 memo bill after they made the load?
12   MR. SCHRECK: Object to --
13 BY MR. BURKE:
14  Q.  Or after they delivered the load,
15 I should say.
16   MR. SCHRECK: Object to foundation.
17 BY THE WITNESS:
18  A.  Well, the procedures would be different
19 for a Universal driver or a brokered driver.
20   A Martin driver or a brokered load, he
21 would obtain this bill from International Paper.
22 When it was delivered, he would get a delivery
23 signature. And then he would take this bill and
24 turn it in to Martin.

Page 56

1   Then Martin would take these bills.
2 They would keep a copy, and they would send the
3 copy -- most often, the original copy -- with a
4 copy of the broker confirmation sheet and all
5 copies -- and a copy of all stops into Warren,
6 Michigan to get paid.
7 BY MR. BURKE:
8  Q.  Into the Universal office --
9  A.  Yes.
10  Q.  -- in Warren, Michigan?
11  A.  Yes, for settlements.
12  Q.  Okay. When you use that term,
13 "settlements," in your business, that refers to
14 getting paid?
15  A.  Yes.
16   MR. FISHER: Rich, for planning purposes and
17 because now might be a good time for a break, do
18 you have -- this is not to commit you, of course,
19 at all, but I'm just wondering for, obviously,
20 Ms. Hansen's benefit and others who might want to
21 grab a bite to eat, if you think you're going to
22 be going for a while, any thoughts on how we might
23 break this up?
24   MR. BURKE: Well, you know, probably if



Page 97

1 were billed to International Paper on mileage, and
2 that particular state's mileage rate plus so much
3 per stop-off. And I don't remember the exact
4 rates, but let's say Minneapolis was $1.30 a mile
5 plus $50 for every stop-off.
6    Q.   And when you say "stop-off," that
7 refers to --
8    A.   The other two stops.
9    Q.   Okay. So if it was -- how much did you
10 say per stop-off, in your --
11   A.   50.
12   Q.   50 in your example? So there would be
13 an additional $100 because there's two stop-offs
14 here?
15   A.   That's correct.
16   Q.   The expression "accessorial" pay, what
17 does that include?
18   A.   Charges for accessorial services, which
19 would be stop-offs, reconsignments, detention.
20   Q.   And "reconsignments" refers to what?
21   A.   So say the driver got to Midland Paper,
22 and Midland Paper said, "I told International
23 Paper I didn't want this." Then International
24 Paper would be contacted, saying, "Midland Paper

Page 98

1 is refusing this." And they might say, "All
2 right. Take that part of it to CJ Duffy."
3       Well, then, he's being reconsigned to
4 CJ Duffy. He was at Midland, didn't deliver
5 anything, and got sent someplace else.
6    Q.   And then, in that instance, Universal
7 would charge International an additional fee?
8    A.   A reconsignment fee.
9    Q.   And then Martin's would be also paid
10 some additional money?
11   A.   Yes, 80 percent of it.
12   Q.   80 percent of the reconsignment?
13   A.   Of everything.
14   Q.   And "detention pay" or "detention fee"
15 refers to what?
16   A.   If the truck is unduly detained,
17 depending on what that customer's contract is with
18 the carrier, what International Paper's agreement
19 was with UACL, they get so long to empty a truck.
20 After that, the truck line can start billing
21 detention.
22       But they never charged International
23 Paper detention because there were always multiple
24 stops, and it was in International Paper's

Page 99

1 interest to get that truck out of there so he
2 could make the rest of his deliveries.
3    Q.   All right. And then, there's a
4 typewritten paragraph then below the payment line,
5 correct?
6    A.   Um-hum. Yes.
7    Q.   Is this a form that had been -- this
8 broker confirmation sheet, is this a form prepared
9 by Universal?
10   A.   Yes.
11   Q.   And the typewritten information here,
12 the first portion of that states that:
13       "Carrier agrees that this reflects the
14 entire amount due for all services provided and
15 that no other amount will be billed to UACL."
16       The amount that's referred to there, is
17 that the $974.08?
18   A.   Correct.
19   Q.   And all the services referred to are
20 the transportation services, the hauling and
21 whatever, the stop-offs --
22   A.   Correct.
23   Q.   -- and the other aspects of the haul,
24 of the job that you mentioned?

Page 100

1    A.   Correct.
2    Q.   And then UACL goes on to specify
3 certain requirements or conditions that had to be
4 met before UACL would make payment to Martin's?
5 Is that correct?
6    A.   Correct.
7    Q.   And Martin's had to provide an original
8 signed bill of lading, correct?
9    A.   Correct.
10   Q.   As well as clear delivery receipts with
11 a legible signature?
12   A.   Correct. Now, those could be one and
13 the same.
14   Q.   Yeah, I was just going to ask you that.
15 Okay.
16       So either a delivery receipt or a
17 bill of lading stamped, indicating receipt by the
18 customer?
19   A.   Yes.
20   Q.   And then, Martin's would also have to
21 have provided a W-9 form to Universal, correct?
22   A.   Correct.
23   Q.   And Martin's would have to have a
24 signed master brokerage agreement and rate



Page 101

1 confirmation agreement, correct --
2  A.  Correct.
3  Q.  -- with Universal?
4  A.  Correct.
5  Q.  And Universal required Martin's to
6 provide evidence of their contract operating
7 authority?
8  A.  Correct.
9  Q.  And also, original certificates of
10 insurance naming Universal as a certificate holder
11 for the time period of the billed transportation,
12 is that right?
13  A.  Correct.
14  Q.  Okay. That expression, "Terms and
15 conditions of Standard Truckload Bill of Lading
16 and Carrier Rules Circular Apply," what does that
17 mean?
18  A.  To the best of my knowledge, that
19 probably refers to ICC regulations and DOT logs.
20 I don't really know.
21  Q.  Okay. And then, there's a box that
22 says "Mail to: Broker Settlements - UACL,
23 Attention: John Moore" in Warren, Michigan.
24     What was to be mailed to John Moore?

Page 102

1  A.  A copy of this broker confirmation
2 sheet and the original signed bills of lading
3 which, in International Paper's case, were the
4 memo bills; and clear delivery receipts, which
5 means a legible signed delivery receipt that the
6 material was delivered in good order.
7  Q.  And then, in the lower left, there's
8 another spot where it says: "Please Sign and Fax
9 to: John Moore." Who was supposed to sign this
10 broker confirmation sheet and fax it to John
11 Moore?
12  A.  The carrier could. But most of the
13 time, they would either fax it to John Moore or
14 fax it to me.
15  Q.  And this was signed by Pat Podlena for
16 Martin's, is that right?
17  A.  That's correct.
18  Q.  And then, it was signed by yourself as
19 well, correct?
20  A.  Correct.
21  Q.  In the lower left, okay.
22     Who is Ron McGinnes, whose name is on
23 the bottom margin?
24  A.  That's the delivery driver.

Page 103

1  Q.  The delivery driver for?
2  A.  This load (indicating).
3  Q.  When you say that, do you mean the
4 driver who was hauling this load?
5  A.  Making the deliveries.
6  Q.  Okay. Now, I think that was Samuel
7 Frankie.
8  A.  He was the pickup driver.
9  Q.  Okay. Oh, do you know what? Thank
10 you. You're absolutely right. He's the pickup.
11     This is the final driver that made the
12 delivery --
13  A.  Yes.
14  Q.  -- deliveries or the final dropoffs?
15  A.  Right.
16  Q.  Gotcha. Okay.
17     And then, that last typewritten line
18 says: "All Detention, Layover or Truck Ordered
19 Not Used charges will be paid when UACL collects
20 the charges."
21     By that, do you mean that Universal
22 will pay Martin's for those charges only after
23 Universal has collected from International Paper?
24  A.  Exactly.

Page 104

1  Q.  What is the last thing -- or, I should
2 say -- what is the last involvement you would have
3 with this broker confirmation sheet?
4  A.  With the sheet itself, when I faxed it
5 and got it back from Pat, Martin's, I would file
6 it.
7  Q.  File it where?
8  A.  In the file of broker confirmation
9 sheets.
10  Q.  At Universal?
11  A.  Yes, in our office.
12  Q.  Would you also fax a copy to John
13 Moore?
14  A.  I did that the day it loaded.
15  Q.  Okay.
16     MR. BURKE: Do you know what? I don't think
17 I have any other questions right at the moment.
18 I'll see if -- I'll look at my notes and see if
19 anyone else does, but thank you for your time.
20     THE WITNESS: Okay. Thank you.
21     MR. SCHRECK: Sure. Can we take a
22 couple-minute break?
23     MR. FISHER: Sure.
24



Page 125

1  A.  Yes.
2  Q.  Is there anything unusual about the
3  fact that 15 minutes before your quitting time,
4  there's a document -- well, let me strike that.
5       I will tell you this document
6  (indicating) came from Universal Am Can's
7  records --
8  A.  Okay.
9  Q.  -- because it was a UACL/OEI number.
10 A.  Um-hum.
11 Q.  Did UACL -- how, if you know, how would
12 UACL have obtained a copy of this loading sheet?
13 A.  I would have faxed it to them.
14 Q.  And is the fact that this document
15 shows a printing date and time of 4:45 on July 3rd
16 indicative of the fact that you probably got this
17 document sometime after 4:45 p.m.?
18 A.  Most likely, we did.
19 Q.  All right.  And when you received the
20 document, would it have been without the driver
21 and loader's signatures on it?
22 A.  Definitely.
23 Q.  It would have been without the start
24 loading and end loading handwritten times?

Page 126

1  A.  Correct.
2  Q.  Would it have been without the
3  notations about middle, nose and tail?
4  A.  Yes.
5  Q.  Would it have been without the loading
6  diagram numbers?
7  A.  Yes.
8  Q.  And how about on the things that are
9  above the "Ship to" blackened row, on that, on the
10 top third, what information would have appeared
11 there when you got it?
12 A.  The "36" would not have been there.
13 Q.  All right.
14 A.  And the "44915" would not be there.
15 Q.  But how about "MNPT"?
16 A.  That could have been there.
17 Q.  And how about "7-3" for the appointment
18 time?
19 A.  That would have been there.
20 Q.  And the "Tender Accepted By:  7 PM,"
21 where that's filled in?
22 A.  Well, that goes with the 7-3.
23 Q.  Okay.
24 A.  The 7-3 at 7 p.m.

Page 127

1  Q.  So that would have been there?
2  A.  Yes.
3  Q.  Okay.  Do you know who wrote that in?
4  Would that have been Debbie?
5  A.  It could have been Debbie.
6  Q.  All right.  Looking at Exhibit 11,
7  do you see where Pat Podlena's name or signature
8  appears above the word "Carrier"?
9  A.  Yes.
10 Q.  Who did you understand Pat to be?
11 A.  An employee of Martin.
12 Q.  Do you know what his capacity was?
13 A.  No.
14 Q.  I'm going to show you a series of
15 broker confirmation sheets that have been marked
16 as Exhibit 65, and they start on June 16th, '08,
17 and they go, I think, to July 2nd, '08.
18     Does it appear as though these all have
19 not only your signature, but they also have Pat
20 Podlena's signature on them?
21 A.  Yes.
22 Q.  Now, was it your understanding that
23 Pat Podlena had authority on behalf of Martin's
24 Bulk Milk to sign these documents?

Page 128

1  A.  Yes.
2  Q.  I have to change notebooks here.
3       Earlier, you testified about some of
4  the things that were required to be sent in from
5  a brokered carrier such as Martin's Bulk Milk,
6  such as a W-9, certificates of insurance and
7  things of that like.
8  A.  Yes.
9  Q.  Do you remember that testimony?
10      Okay.  I want to show you an exhibit
11 marked 16.
12 A.  Yes.
13 Q.  Oh, wait a minute.  Let me make sure
14 that's the right number.  Yes, Exhibit 16.
15      Please, if you'd just take a chance to
16 look that over, it's just a few pages.
17 A.  Okay.
18 Q.  It might have a few more pages attached
19 to it, okay?
20 A.  Um-hum.
21 Q.  Have you had a chance to look at
22 Exhibit 16?
23 A.  Yes.
24 Q.  All right.  Now, my first question to



Page 129

1 you is: Does that appear to be the master
2 brokerage agreement dated June 12th, 2008, that at
3 least according to the first paragraph, was
4 entered into by Universal Am Can and Martin's Bulk
5 Milk?
6    A.   Yes.
7    Q.   Do you recognize the signature of
8 Pat Podlena that appears on the Bates numbered
9 page 21?
10    A.   Yes.
11    Q.   All right. To the best of your
12 knowledge, was this the same Pat Podlena with whom
13 you had been dealing when he would fill out the
14 broker confirmation sheets?
15    A.   Yes.
16    Q.   Now, do you see at the very, very top
17 of each of these pages, there appears to be a
18 series of fax transmission numbers?
19    A.   Um-hum.
20    Q.   There's upside-down fax transmission
21 numbers that appear in the bottom.
22    A.   Um-hum.
23    Q.   Take a look at those, and then I'm
24 going to have some questions to you about whether

Page 130

1 or not you know what the transmission of this
2 document may have been, as evidenced by the fax
3 transmission numbers.
4    A.   Okay.
5    Q.   Okay? Based upon your review of the
6 Overnite Logistics fax transmission numbers that
7 appear at the top, both printed and in
8 handwriting, and the fax transmission down at the
9 bottom, do you have any -- can you help us
10 interpret the sequencing of when it's likely this
11 document was faxed.
12    A.   Well, the first one says June 12th at
13 12:24, and it says this is page 3.
14    Q.   Okay.
15    A.   The second one says June 17th at 13:24,
16 and this is now page 2.
17    Q.   Okay.
18    A.   So it appears to me that it was faxed
19 twice.
20    Q.   Is there anything about the handwritten
21 number that appears, 708-331-8604?
22    A.   That's Overnite's fax number.
23    Q.   At what office?
24    A.   South Holland.

Page 131

1    Q.   And then, on the bottom number where
2 the fax transmission is from --
3    A.   That's from --
4    Q.   -- Martin's?
5    A.   -- Martin's.
6    Q.   Does it have a date and time that you
7 can read?
8    A.   Not really. It's broken up there.
9    Q.   Let's see, if we go to the next two or
10 three pages, and see if it's better.
11    A.   There. June 17th.
12    Q.   All right. And do you recognize --
13 well, let me rephrase my question.
14        To the best of your knowledge, did
15 Martin's Bulk Milk fax back a signed master
16 brokerage agreement in June of 2008?
17    A.   I don't specifically recall that,
18 but this is shortly after the acquisition, when
19 Kara Fitzpatrick was attempting to get all of
20 Overnite's approved carriers set up with
21 Universal.
22    Q.   So based upon what you knew Kara was
23 doing at the time, it's not unexpected to you to
24 see --

Page 132

1    A.   No.
2    Q.   -- the twice transmission by Overnite
3 to Martin's and then a transmission back from
4 Martin's on June 17th?
5    A.   No. If Martin had said something was
6 missing from the fax, she would have refaxed a
7 whole package.
8    Q.   All right. I'm done with that.
9        And just to go over something --
10 I think it's already been emphasized with
11 Mr. Burke -- you had nothing to do with the
12 preparation of or interpretation of the master
13 brokerage agreement?
14    A.   No.
15    Q.   That's a correct statement?
16    A.   That's correct.
17    Q.   Okay. On Exhibit 5, there's a
18 reference on these memo bills -- the second one,
19 in particular -- the Cenveo bill, it says
20 "12 Boxes damaged."
21    A.   Yes.
22    Q.   Do you know whether or not the
23 damaging of the boxes even resulted in a property
24 claim or a reduction in the rate that Martin's was



Page 137
1  information -- in this case, it would have been
2  three loads, so you would have been told --
3  what? -- "I delivered the tail load at this
4  time" --
5      A.  Yes.
6      Q.  -- "the middle load at this time, and
7  the nose load at this time"?
8      A.  Exactly.
9      Q.  What would you have done with that
10 information?
11     A.  Entered them into International Paper's
12 computer system as empty.
13     Q.  And if International Paper has their
14 own computer system, it should reflect
15 approximately when it was you provided that
16 information?
17     A.  Yes.
18     Q.  Okay. When is the first time that you
19 ever knew that an accident involving this
20 July 3rd, 2008 load had happened?
21     A.  When you called me a couple months ago.
22     Q.  Okay. Until I had called you to
23 advise you that your deposition needed to take
24 place because we knew that you had prepared some

Page 138
1  documents, we knew where you lived, had you heard
2  anything from anyone --
3      A.  No.
4      Q.  -- about this accident?
5      A.  No.
6      Q.  And I think you previously said that
7  you had never, to your knowledge, ever spoken to
8  Samuel Franke?
9      A.  That's correct.
10     Q.  Would it be correct to say that you
11 provided absolutely no instructions to Samuel
12 Franke on July 3rd, 2008 concerning the loads
13 other than what he would have read on documents he
14 received that was based upon information you
15 provided to Martin's Bulk Milk?
16     A.  That's correct.
17     Q.  Okay. I want to ask you a few
18 follow-up questions.
19     A.  Okay.
20     Q.  Did you ever provide information to
21 Mr. Franke or Martin's Bulk Milk, for that matter,
22 on how it is they were to drive their trucks?
23     A.  No.
24     Q.  How it is they were to do their work

Page 139
1  when they were driving their trucks?
2      A.  No.
3      Q.  How they were to purchase supplies or
4  services in doing their work of driving a truck
5  from point A to point B?
6      A.  No.
7      Q.  Did you ever evaluate, score or measure
8  any of the work that Mr. Franke did?
9      A.  No.
10     Q.  Did you ever train Mr. Franke to do the
11 work he was doing on July 3rd?
12     A.  No.
13     Q.  Did you ever require Mr. Franke to
14 inspect, clean or maintain the truck and its
15 equipment that he was driving?
16     A.  No.
17     Q.  Did you ever -- let me rephrase this
18 question.
19         Other than checking up on information
20 about the pickup and delivery after the fact the
21 next day, the next workday, did you ever monitor
22 the pickups and deliveries?
23     A.  No.
24     Q.  Did you ever require Mr. Franke or

Page 140
1  Martin's Bulk Milk to use any particular safety
2  precautions or any particular driving techniques
3  while they were moving a truckload of
4  International Paper product from point A to
5  point B?
6      A.  No.
7      Q.  Did you ever require Mr. Franke to call
8  in during his work?
9      A.  No.
10     Q.  Did you ever require Mr. Franke to
11 provide -- Mr. Franke himself to provide any
12 status reports about his transporting a load?
13     A.  No.
14     Q.  Did you ever stay in constant
15 communication with Mr. Franke?
16     A.  No.
17     Q.  And that would not only include
18 July 3rd, but it would also include all the
19 previous days, weeks and months when, presuming
20 Mr. Franke was the person who picked up the
21 loads, did his work?
22     A.  I had no knowledge of Mr. Franke at
23 all.
24     Q.  Did you ever fine or sanction



MELODY HANSEN  
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE  
July 19, 2012  
141–144

Page 141
1 Mr. Franke or Martin's Bulk Milk because of
2 something they did or didn't do --
3     A.    No.
4     Q.    -- in the transporting of a load?  Your
5 answer was "no"?
6     A.    No.
7     Q.    Did you ever dictate how the load in
8 the trailer was to be packed?
9     A.    Well, as we saw on the loading sheet,
10 you know, I would tell Debbie the order --
11    Q.    What the order was, and so --
12    A.    -- to load the trailer.
13    Q.    So to that extent -- well, let's assume
14 that Mr. Franke is not the one who is loading the
15 trailer.  Is it fair to say that you would not
16 have told Mr. Franke how to load the trailer?
17    A.    No, but he wasn't the one loading it,
18 anyway.
19    Q.    But you did provide information from
20 which the loader at the Midwest Distribution
21 Center could infer in which order he should put
22 the loads in?
23    A.    Right.  Debbie and I would discuss it,
24 and she would write it on that load -- loading

Page 142
1 sheet.
2     Q.    Did you ever hire, discipline, counsel,
3 fire or qualify Mr. Franke for his job?
4     A.    No.
5     Q.    Did you ever reject Mr. Franke as a
6 driver because something unusual had happened?
7     A.    No.
8     Q.    Did you maintain any particular file on
9 Mr. Franke?
10    A.    No.
11    Q.    Did you ever reprimand Mr. Franke for
12 any speeding tickets, traffic citations or other
13 bad driving evidence that you became aware of?
14    A.    No.
15    Q.    Did you ever ensure that Mr. Franke was
16 actually licensed to drive a truck?
17    A.    No.
18    Q.    Did you ever receive any complaints
19 about Mr. Franke?
20    A.    No.
21    Q.    Did you ever receive any complaints
22 about any particular driver that was picking up
23 a Minnesota pool load in Hammond and taking that
24 load toward Minneapolis?

Page 143
1     A.    Yeah.
2     Q.    Okay.  What types of complaints might
3 occur?
4     A.    Oh, a driver was rude or things like
5 that, didn't show up until, you know, 1:00 in the
6 morning or something.
7     Q.    When such a complaint might be
8 evidenced to you, what would you do about it?
9     A.    Well, honestly speaking, most of the
10 time, it was one of ours.
11    Q.    Not a Martin's driver?
12    A.    Never.
13    Q.    All right.  Because as best you know --
14 well, how would you characterize Martin's as a
15 carrier in terms of the service they provided?
16    A.    The best.
17    Q.    Did you ever keep track of Franke's --
18 or, for that matter, any other driver's -- driving
19 time, such as what might be required to be kept on
20 logs?
21    A.    No.
22    Q.    We have learned as a result of this
23 lawsuit that after the accident, Mr. Franke was
24 terminated by Martin's Bulk Milk.

Page 144
1        Did you have anything to do with the
2 termination of Mr. Franke?
3     A.    No.
4     MR. FISHER:  Let me just look over the rest of
5 my notes, and I think I'm done.
6        The other attorneys might have some
7 follow-up questions.
8        FURTHER EXAMINATION
9 BY MR. BURKE:
10    Q.    Ms. Hansen, just a couple.
11       Did you expect Martin's and its drivers
12 to comply with all local and state and federal
13 traffic ordinances --
14    A.    Yes.
15    Q.    -- and rules?  Okay.
16       And you expected -- and Universal and
17 yourself expected Martin's to avoid getting into
18 collisions with other vehicles while they were
19 transporting goods on behalf of Universal,
20 correct?
21    A.    Yes.
22    MR. FISHER:  Objection.  Objection to form.
23 BY MR. BURKE:
24    Q.    You did -- actually, you did --



800.211.DEPO (3376)  
EsquireSolutions.com

Page 149

1  STATE OF ILLINOIS )
2           ) SS:
3  COUNTY OF W I L L )
4       I, ROSANNE M. NUZZO, a Notary Public
5  within and for the County of Will, State of
6  Illinois, and a Certified Shorthand Reporter,
7  CSR No. 84-1388, of said state, do hereby certify:
8       That previous to the commencement of the
9  examination of the witness, the witness was duly
10 sworn to testify the whole truth concerning the
11 matters herein;
12      That the foregoing deposition
13 transcript was reported stenographically by me,
14 was thereafter reduced to typewriting under my
15 personal direction, and constitutes a true record
16 of the testimony given and the proceedings had;
17      That the said deposition was taken
18 before me at the time and place specified;
19      That I am not a relative or employee or
20 attorney or counsel, nor a relative or employee of
21 such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in
23 the outcome of this action.
24      IN WITNESS WHEREOF, I do hereunto set my

Page 150

1  hand of office at Chicago, Illinois, this 25th day
2  of July, 2012.
3
4
5       Notary Public, Will County, Illinois.
6       My commission expires May 16, 2013.
7
8
9
10 C.S.R. Certificate No. 84-1388.

Page 151

1           I N D E X
2  WITNESS:              PAGE:
3  MELODY HANSEN
4    BY MR. BURKE.................... 5
5    BY MR. SCHRECK.................. 105
6    BY MR. LANGS.................... 119
7    BY MR. FISHER................... 120
8    BY MR. BURKE.................... 144
9    BY MR. SCHRECK.................. 147
10
11              *****
12
13
14           E X H I B I T S
15     (Exhibits retained by Mr. Fisher)
16
17 EXHIBITS PREVIOUSLY MARKED     FIRST IDENTIFIED
18 DEPOSITION EXHIBITS
19 Exhibit No. 5.................... 46
20 Exhibit No. 11................... 78
21 Exhibit No. 16................... 128
22 Exhibit No. 21................... 63
23 Exhibit No. 65................... 127
24

Page 152

1           DEPOSITION ERRATA SHEET
2
3  Assignment No. 355842
4  Murray Scheinman, etc. v. Martin's Bulk Milk, et al.
5
6
7       DECLARATION UNDER PENALTY OF PERJURY
8
9       I declare under penalty of perjury that
10 I have read the entire transcript of my
11 deposition taken in the captioned matter, or the
12 same has been read to me, and the same is true
13 and accurate, save and except for changes and/or
14 corrections, if any, as indicated by me on the
15 DEPOSITION ERRATA SHEET hereof, with the
16 understanding that I offer these changes as if
17 still under oath.
18
19
20      Signed on the _____ day of
21      _____, 20_____.
22      _____
23           MELODY HANSEN
24

