# JAE # 11

# Excerpts from the Transcript of Deposition of Joan Anderton, dated April 10, 2012

130547293v1 0903067

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person,

Plaintiffs,

vs.  Case No. 09 CV 5340

MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, CSX INTERMODAL, INC., INTERNATIONAL PAPER COMPANY and OVERNITE EXPRESS, INC.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JOAN ANDERTON

April 10th, 2012
9:08 a.m.

Marriott Kansas City Airport
775 Brasilia Avenue
Kansas City, Missouri

STACEY L. SOMMERS Registered Professional Reporter



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

### Page 13

1  Q. Okay. The ...
2  A. Can I correct that? It's definitely over 200
3     if you include Xpedx. Because they have their
4     own facilities, as well.
5  Q. Okay. Does International Paper own Xpedx?
6  A. Yes.
7         MR. SCHRECK: How do you spell that?
8         THE WITNESS: It's X-p-e-d-x.
9         MR. SCHRECK: Okay. Thanks.
10 Q. (By Mr. Fisher) And does International Paper
11    have offices outside the US?
12 A. Yes.
13 Q. Okay. And in what countries or how many,
14    approximately?
15 A. Numerous. Russia, India, China, South
16    America, Europe. I do not know all of the
17    locations.
18 Q. And can you tell me what you've reviewed in
19    anticipation of giving this deposition?
20 A. I reviewed my e-mail communications after I
21    had heard of the lawsuit. And I discussed
22    with counsel -- had discussions with counsel
23    on documents that have been produced and the
24    interrogatories that we had answered over the
25    last couple years since the first

### Page 14

1     communications.
2  Q. And the e-mail communications you refer to,
3     with whom were those communications?
4  A. A couple of internal communications and with
5     our counsel, internal counsel.
6  Q. Okay. And is that Mr. Quinlen --
7  A. No.
8  Q. -- internal counsel?
9  A. No. It would have been Gigi and -- I can't
10    recall the other woman's name.
11 Q. Okay.
12 A. I don't remember the name.
13 Q. Do you know Mr. Quinlen --
14 A. I do know Mr. Quinlen.
15 Q. -- Thomas Quinlen? Have you spoken to him?
16 A. Not on -- not regarding this case.
17 Q. The other -- not your lawyers or not attorneys
18    for International Paper, nor Mr. Fisher, but
19    the other e-mails that you reviewed, what
20    persons were you communicating with in those
21    e-mails?
22 A. There were e-mails on -- the day that I found
23    out about the incident, there was an e-mail
24    that I sent to the operations -- what's his
25    title -- Clint Diekman at Hammond and asked

### Page 15

1     him to pull the file on the shipment. And I
2     had called Steve Shores, in Memphis, who
3     supported the RDC. And I had called Fadera
4     Carter.
5  Q. And how do you spell Fadera?
6  A. F-a-e-d-r-a, Carter -- F-a-d-e-r-a.
7  Q. Is that a woman?
8  A. Yes, a woman.
9  Q. What is her job?
10 A. She is a business analyst, is I believe what
11    her title was.
12 Q. Okay. And why did you call her?
13 A. To find out about payment for the load. I
14    called them in sequence. So she had asked --
15    I had asked about payment for the shipment and
16    if there was anything unique about payment.
17 Q. Okay. And what did she tell you?
18 A. She pulled the history of the payment. And it
19    showed the total amount we paid to the
20    carrier, and it had the three stops on the
21    truck for that shipment.
22 Q. And when you say "the carrier," who are you
23    referring to?
24 A. Overnite -- the payment looked as though it
25    was to Overnite, but it was for Universal

### Page 16

1     Am-Can.
2  Q. And what do you mean when you say it looked
3     like it was to Overnite?
4  A. Because our payment would have had the SCAC
5     code of OXEN, O-X-E-N, which is Overnite
6     Express, who had been either acquired or taken
7     over by Universal Am-Can.
8  Q. So as of -- I shouldn't say as of, but on
9     July 3rd, 2008, International Paper believed
10    that the carrier they were paying for this
11    load was Universal Am-Can?
12 A. Uh-huh.
13 Q. Is that a yes?
14 A. Yes.
15 Q. Okay.
16 A. Uh-huh.
17 Q. And that's because Universal Am-Can had taken
18    over or acquired Overnite Express, to your
19    knowledge?
20 A. Yes. I'm not sure exactly what their business
21    relationship was. I know that prior -- prior
22    to this particular shipment that we were
23    paying Overnite Express. And then either they
24    acquired them or what -- however. I'm not
25    sure what the circumstances were, but we paid



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

**Page 17**

1  Universal Am-Can.
2  Q. And were you -- how would they get paid, while
3     we're on this topic?
4  A. How would they get paid?
5  Q. Yeah.
6  A. They would submit, electronically, a
7     request -- they would submit electronically
8     that they delivered the load and the time and
9     date that they delivered the shipment. And
10    then they would get -- automatically the load
11    would get calculated, and they'd get paid
12    through the SAP, which is our transaction
13    system.
14 Q. And when you say "they," you're referring to
15    Universal?
16 A. Yes.
17 Q. And does SAP stand for anything?
18 A. It probably does.
19 Q. Not that you know?
20 A. But I do not. It's a German system, it's our
21    financial system.
22 Q. In this particular circumstance, was
23    International Paper aware of any involvement
24    by Martin's Bulk Milk Service in transporting
25    International Paper's paper products?

**Page 18**

1        MR. FISHER: Could you read just the
2     first part of the question?
3        (The pending question was read by the
4     reporter.)
5        MR. FISHER: Objection to form.
6     Vague.
7        You can go ahead and answer.
8  A. I -- for this particular shipment, I don't
9     think we knew whether -- who they were going
10    to -- whether they were going to haul the load
11    with their own driver or broker it out to
12    another driver.
13 Q. (By Mr. Burke) Okay. You didn't know if
14    Universal was going to haul it themselves
15    or --
16 A. Correct.
17 Q. -- have some other driver haul it?
18 A. Uh-huh.
19 Q. And by the way, the -- by whom did you become
20    aware that there had been any collision
21    involving -- or strike that. Any collision
22    with a truck that was carrying International
23    Paper products?
24 A. We got a request for a legal hold from our
25    corporate legal group saying, "This particular

**Page 19**

1     shipment, any documentation, anything related
2     to this, needs to be held in legal hold,"
3     which we get a special thing in our e-mail to
4     put things in if we have anything related to
5     it.
6        I had no awareness of any exception
7     about that shipment prior to that date. It
8     was about a year, or so, after the incident.
9     So ...
10 Q. And when did you get this e-mail about the
11    legal hold?
12 A. I don't know the exact date.
13 Q. Okay.
14 A. It was -- I don't have that document. But it
15    was the same date I contacted the three
16    individuals I mentioned contacting.
17 Q. Okay. Now, maybe I misunderstood you. That
18    wasn't one year after this incident?
19 A. I believe so.
20 Q. Oh, it was?
21 A. I believe it was approximately one year.
22 Q. Okay. And why is it you were contacted? What
23    was your job or responsibility?
24 A. Because I was the IP employee responsible for
25    the operation of the Hammond RDC. And

**Page 20**

1     responsible for -- because we hired an Exel --
2     Exel Logistics to operate the facility for us,
3     and I managed our relationship with them.
4  Q. And RDC stands for?
5  A. Regional distribution center.
6  Q. Were you aware of this occurrence back in July
7     of 2008, when it happened?
8  A. No, I was not.
9  Q. I think you mentioned Clint Diekman was it?
10 A. Diekman.
11 Q. How do you spell his last name?
12 A. D-i-e-k-m-a-n.
13 Q. And what was his job?
14 A. He was -- he's the customer service
15    supervisor.
16 Q. Okay. And I believe you said you called him.
17    And for what reason did you do so?
18 A. I asked him to pull the RDC's records of that
19    shipment and see if there was any -- if it
20    delivered on time, if there was anything
21    unique about it.
22 Q. Okay.
23 A. And he confirmed that the shipment delivered
24    on time and had no -- no other information
25    about the delivery.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

**Page 21**

1  Q. And then how about Steve Shores? What was his
2     job?
3  A. Steve Shores worked for IP in Memphis and was
4     a transportation specialist.
5  Q. And why was it you called him or contacted
6     him?
7  A. To pull the records on that same shipment and
8     he confirmed the EDI transactions between
9     Universal Am-Can and IP about when the product
10    was picked up and when the product delivered.
11    And he also confirmed that everything
12    delivered on time.
13 Q. Okay. And the product here in question was
14    what?
15 A. Paper products, probably palletized carton
16    stock paper for three different customers in
17    the Minneapolis area.
18 Q. Okay. And when you say paper products, is
19    this computer paper, typing paper, or --
20 A. Yeah, 8 1/2 by 11 paper. It could be big
21    sheets. And then I think there might have
22    been skids of paper, as well, which would have
23    been for a printer, on a pallet. Just sheets
24    on a pallet.
25 Q. Okay. And had International Paper

**Page 22**

1     manufactured these paper products?
2  A. I would -- 99 percent, I would say yes. But
3     there could have been some outside purchased
4     product on that truck. I would not have
5     known.
6  Q. Okay. And if it was an outside purchase, do
7     you know, would it fall into a certain
8     category or type of paper product?
9  A. It -- our product line is very broad. So it
10    could have -- it could have been. I'm pretty
11    sure we manufactured all the paper, but it
12    could have been a rare circumstance where
13    something was not manufactured by us.
14 Q. Okay. And these paper products were paper
15    that had been sold by International Paper to
16    different customers?
17 A. That's correct.
18 Q. And this paper -- or these paper products were
19    picked up at International Paper's Hammond
20    warehouse. Correct?
21 A. Yes.
22 Q. How did the paper -- or strike that. Where
23    did the paper come from before it got to your
24    Hammond warehouse?
25 A. Multiple mills and converting facilities

**Page 23**

1     supplied paper to our regional distribution
2     center. So it could have come from any mills
3     across the country.
4  Q. Now, in July of '08, did International Paper
5     transport any of its own paper to customers?
6  A. Across the country, yes. Not from the RDC.
7  Q. Okay. So in order for paper -- like this
8     paper that was --
9  A. Uh-huh.
10 Q. -- involved here, this was being -- this was
11    not being delivered to customers by
12    International Paper trucks. Is that correct?
13 A. No.
14 Q. Okay. Does International Paper hold an
15    operating authority to operate as a common
16    carrier or a contract carrier?
17 A. Yes. I don't -- we have a private -- we have
18    private fleets in the country in different
19    parts, but not for the RDC.
20 Q. Okay. And not for the Hammond RDC?
21 A. RDC, correct.
22 Q. And the incident we're talking about here,
23    where International Paper products were on a
24    truck that was involved in a collision on
25    July 3rd of '08, that was -- that paper was

**Page 24**

1     not being transported in an International
2     Paper truck. Is that correct?
3  A. Yes.
4  Q. Now, am I correct that for this --
5  A. Can I make one correction? Because I didn't
6     think of this before.
7  Q. Sure. Go right ahead.
8  A. Xpedx would occasionally pick up product from
9     the RDC, and Xpedx is a division of
10    International Paper so -- and they have their
11    own trucks. Not related to this set of
12    deliveries at all, but I just wanted to make
13    sure. That just came to mind.
14 Q. Okay. And in this instance, Xpedx was one of
15    the customers to whom paper was being
16    delivered. Correct?
17 A. Correct. Xpedx is a customer of the RDC, as
18    well as it is a division of International
19    Paper.
20 Q. Okay. And then one of the other delivery
21    destinations I think was Midland Paper.
22    Correct?
23 A. That is correct.
24 Q. Okay. And does International Paper own
25    Midland in any manner?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 25**

1  A. No.
2  Q. And the other was ...
3     MR. FISHER: Cenveo.
4  Q. (By Mr. Burke) Cenveo.
5     MR. BURKE: Thank you.
6  A. Cenveo.
7     MR. FISHER: I've been struck down
8     twice on pronunciations today.
9     MR. SCHRECK: You going for three?
10 Q. (By Mr. Burke) Does International Paper own
11    any part of Cenveo?
12 A. Not that I'm aware of.
13 Q. Okay. Now, therefore, in this circumstance,
14    International Paper was utilizing a carrier to
15    deliver its paper to its customers. Correct?
16 A. Yes.
17 Q. And in this circumstance, did International
18    Paper believe the carrier was Universal?
19 A. Yes.
20 Q. Okay. And I think you told me a moment ago
21    International Paper did not know if Martin's
22    Bulk Milk Service was doing this delivery. Is
23    that correct?
24 A. Can you clarify that question? Can you
25    restate that question?

**Page 26**

1  Q. Sure. Did International Paper know that
2     Martin's Bulk Milk Service was transporting
3     this paper on July 3rd?
4  A. No. We -- we knew that Universal Am-Can used
5     their own drivers sometimes and occasionally
6     brokered out. But as far as that
7     particular -- on that day, how they chose to
8     execute the delivery, we were unaware of and
9     had no influence over.
10 Q. Did International Paper expect that any
11    carrier that Universal hired would comply with
12    the contract terms that existed between
13    International Paper and Universal?
14 A. We expected that Universal Am-Can complied to
15    the terms that we -- in our contract with
16    Universal Am-Can.
17 Q. And if they, in turn, had someone else
18    actually make the delivery, did International
19    Paper expect that other entity or driver to
20    also comply with the same contract provisions
21    that existed between International Paper and
22    Universal?
23 A. We expected that our product would be
24    delivered -- picked up and delivered based
25    upon the contract requirements.

**Page 27**

1  Q. Okay. Regardless of whether it was actually
2     Universal's driver or some other driver that
3     Universal --
4  A. Chose.
5  Q. -- hired?
6  A. Yeah.
7  Q. In this -- for these -- delivery of the paper
8     products to these three customers that you
9     referred to, Universal was performing, for
10    International Paper, the service of
11    transporting International Paper's product to
12    its actual customers. Correct?
13 A. Correct. We were --
14 Q. Okay.
15 A. Go ahead.
16 Q. Okay. And that transportation of
17    International Paper's products to its
18    customers, that was an essential part of
19    International's business. Correct?
20    MR. FISHER: Objection. Form.
21    You can go ahead and answer.
22 A. Actually can you restate that question?
23 Q. (By Mr. Burke) Sure. Getting International
24    Paper's product into the hands of its
25    customers was an essential part of

**Page 28**

1     International Paper's business. Correct?
2  A. Our product needed to be delivered on time to
3     our customers. That was the objective.
4  Q. Sure. When -- for, you know, this scenario
5     we're talking about here, the -- these -- the
6     paper products that were in the process of
7     being shipped to these three customers of
8     International Paper, I take it at some point
9     there had been a sale made by International
10    Paper to these three separate companies?
11 A. That is correct.
12 Q. Okay. And did that -- whatever sales price
13    was quoted by International Paper, did that
14    price include delivery of the paper to the
15    customers?
16 A. We did not charge our customers separately for
17    delivery.
18 Q. Okay. So when the sale was made, part of the
19    sale agreement was that International Paper
20    would have the paper delivered to those
21    customers?
22 A. Part of the service was, yes, delivery to
23    their door.
24 Q. Okay. And the -- I take it there was no
25    International Paper person on -- on this truck



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Page 33

1 lawyers said to you.
2 A. Okay.
3     MR. FISHER: I'm fine with that, as
4 long as she gives a broad description and
5 that's not going to be considered a waiver of
6 any attorney/client communications.
7     MR. BURKE: Yeah. No, no.
8     MR. FISHER: Okay.
9 Q. (By Mr. Burke) And I don't want you to say,
10 "Hey, Carl told me to do this," or, you know.
11     MR. FISHER: Gigi.
12 Q. (By Mr. Burke) Gigi or any, you know, other
13 actual lawyer --
14 A. Okay.
15 Q. -- as distinguished from non-lawyers. Okay?
16 A. Okay.
17 Q. So back to my question. Just tell me what you
18 did to try and find documents you thought
19 might be relevant to, or responsive to the
20 questions that you were trying to answer or
21 that Mr. Fisher had told you that he was
22 attempting to answer.
23 A. I either reflected on my knowledge of how the
24 process worked for shipping of goods out of
25 our facility or -- there's very limited

Page 34

1 information on that particular shipment, or I
2 reflect back to the same three individuals I
3 contacted the first time I heard about the
4 shipment and looked at the information that I
5 had on that particular shipment.
6     Other than that, I read over the
7 questions and worked with counsel on the
8 responses and agreed with the responses and
9 signed the documents.
10 Q. How about the -- it is correct that there was
11 a contract relationship between International
12 Paper and Overnite Express, correct, that
13 predated this July of 2008 occurrence?
14 A. Yes. It was a 2007 contract.
15 Q. Okay. And have you reviewed that contract?
16 A. Only recently.
17 Q. Okay.
18 A. Very recently.
19 Q. Okay. Is that something that you, on your
20 own, went looking for to find? Or was that --
21 A. It was one of the exhibits presented in the --
22 in the case.
23 Q. Okay. And did you find that or retrieve that
24 contract?
25 A. No, I did not.

Page 35

1 Q. Okay. Who -- who did from International
2 Paper?
3 A. I'm not sure exactly who did. I know that I
4 received it in our discussions, but I don't
5 know who pulled the contract.
6     MR. FISHER: Rich, I can tell you it
7 wasn't her.
8 Q. (By Mr. Burke) And how about Mr. Crawford,
9 William Crawford, does he still work at
10 International Paper?
11 A. No, he does not.
12 Q. Okay. Where does he work today?
13 A. I don't -- I don't know. I knew he had worked
14 for Temple Inland, but I don't -- I think he's
15 retired at this time. But I don't know. I
16 don't know him personally.
17 Q. Okay. And who did he last work for?
18 A. Temple Inland.
19 Q. Temple?
20 A. Inland.
21 Q. Inland?
22 A. Uh-huh.
23 Q. When did he last work for International Paper?
24 A. I don't know.
25 Q. How about Steven Mundy? Do you know him?

Page 36

1 A. I know Steve Mundy, yes.
2 Q. Okay. And does he still work at --
3 A. Yes.
4 Q. -- International Paper? And where does he --
5 strike that.
6     What's his position today?
7 A. People's titles change a lot. I don't know
8 what his current title is. He is -- he does
9 the contracts with our carriers.
10 Q. Okay.
11 A. Manages contracts with our carriers.
12 Q. Okay. And --
13 A. Today, I believe he's working for -- they
14 split this role between two positions. So I'm
15 not sure if he's working currently with the
16 RDCs, but he was working with the RDCs at the
17 time of this incident.
18 Q. Okay. And where is Mr. Mundy's office at
19 today?
20 A. Memphis, Tennessee.
21 Q. And when Mr. Crawford last worked for
22 International Paper, where was his office?
23 A. Memphis, Tennessee.
24 Q. How many RDCs were there back in July of '08?
25 A. Six.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

                                                                            57
1   A. On time delivery to our customers.
2   Q. Okay.
3   A. And pickup.
4   Q. Well, I know F refers to on time delivery.
5      How about E? Is that any different, "Minimum
6      Service Level Requirement"?
7   A. I do not know. I did not negotiate that one.
8      It says for a commitment. It states what it
9      states. "Meet a minimum service level of
10     98 percent for the commitments described in
11     Section 7."
12         So if Overnite was -- had a
13     commitment of, say, six trucks a week going to
14     Minneapolis, they would have to be 90 percent
15     on meeting that commitment.
16  Q. 98 percent?
17  A. 98 percent. Excuse me.
18  Q. Okay. And then Section F refers to they have
19     to meet that commitment --
20  A. From an --
21  Q. -- on time --
22  A. -- on time delivery.
23  Q. Right. And then G specifies certain
24     information about the equipment that needs to
25     be used. Correct?

                                                                            58
1   A. Yes.
2   Q. Okay. And then in Paragraph H it talks about
3      carrier personnel. Now, that carrier there is
4      referring to Overnite and then later
5      Universal. Correct?
6   A. It's -- carrier refers to Overnite and
7      Universal in the contract, throughout the
8      contract.
9   Q. Okay. And in the middle of that, in line
10     three, it states that "carrier's personnel
11     shall be fully qualified and shall procure and
12     maintain such licenses and permits as are
13     required by local, state, or federal laws and
14     regulations required to maintain and operate
15     the motor vehicle equipment." Correct?
16  A. Yes.
17  Q. And then it further states that "carrier's
18     personnel shall comply with applicable local,
19     state, and federal laws and regulations."
20     Correct?
21  A. That's what it says. Yes.
22  Q. Okay. And part of what the carrier's
23     personnel need to comply with are local,
24     state, and federal traffic regulations
25     concerning the operation of tractor-trailer

                                                                            59
1      trucks. Correct?
2           MR. FISHER: Competence. Foundation.
3           MR. SCHRECK: I'll join in that.
4           MR. FISHER: You can answer.
5   Q. (By Mr. Burke) You can answer.
6   A. Can you restate the question?
7   Q. Sure. Part of what is referred to there is
8      the carrier's personnel shall comply with
9      applicable local, state, and federal traffic
10     laws and regulations in the operation of the
11     trucks that are hauling International Paper's
12     products. Correct?
13          MR. FISHER: Excuse me. Objection.
14     Form, competency, and foundation. And also I
15     take it you were not intending to read what
16     the words were? Instead you added an
17     adjective.
18          MR. BURKE: It wasn't a specific
19     quote.
20          MR. FISHER: Okay. All right.
21     You can go ahead and answer.
22          MR. SCHRECK: I'll join.
23  A. Yeah, it doesn't state traffic federal laws.
24     It states what it states. "Carrier's
25     personnel shall comply with applicable local,

                                                                            60
1      state, and federal laws and regulations."
2   Q. (By Mr. Burke) Okay. And my question to you
3      is: Did International Paper believe that part
4      of what the -- this section included was that
5      the carrier's personnel would comply with
6      local traffic regulations with respect to
7      operating tractor-trailer trucks --
8   A. Any did.
9   Q. -- while hauling International Paper's
10     products?
11          MR. FISHER: Competence. Foundation.
12     You can go ahead and answer.
13  A. I think carrier -- a carrier has to follow the
14     regulations and traffic regulations and DOT
15     regulations of the road. So it would be our
16     expectation that they would, to provide -- to
17     deliver our product safely to our customers.
18  Q. (By Mr. Burke) And there's a section down in
19     J talking about that the carrier had to
20     provide International Paper with trailers that
21     were suitable for the safe and efficient and
22     damage-free transportation of your paper
23     products. Correct?
24  A. Yes.
25  Q. Okay. And if you read further, about three



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton April 10, 2012

**69**
and any exceptions that the customer had with
respect to the amount or condition of the
goods. Would that be correct?
A. Yes. In the EDI, they would report pickup and
delivery times to the customer. The proof of
delivery would be if there was a special
request for proof of delivery, they would have
to provide that within 24 hours. A POD would
be a special request.
Q. Let's just back up and explain those acronyms
to me again. The EDI?
A. That's the electronic communication between
our carrier and us that told -- told us when
they picked up the load and when they
delivered the load. So they needed to report
that to confirm on-time delivery.
Q. And they had to do that through the electronic
means that they were required to have.
Correct?
A. Yes.
Q. Okay. And we're talking about the carrier?
A. The carrier, yes.
Q. All right. And then -- and they had to do
that in any type of load. Correct?
A. Correct.

**70**
Q. And then the special circumstance would
require another communication to you?
A. A special circumstance might be the customer
says, "We didn't receive this pallet on the
truck," or they didn't get the delivery. Then
we'd make a special request to the carrier for
a proof of delivery. And they have 24 hours
to respond with a proof of delivery, which is
a signed document that has the customer's
signature saying that -- that shows that they
prove they delivered it to the customer.
Q. And how would that proof of delivery form be
communicated to you?
A. Electronically, typically, or a fax. E-mail
or a fax.
Q. Okay. And on page 44 of the contract, there's
various -- a provision about the carrier being
able to comply with DOT rules concerning
hazardous materials. Correct?
A. That is correct.
Q. Okay. And then you have some provisions
concerning obligations of the carrier when
there is a loss or a damage of your goods.
Correct?
A. Yes.

**71**
Q. Okay. And that's in Section 12 I should say,
under "Freight Loss or Damage." Right?
A. Yes.
Q. Okay. And then on the bottom of that Bates
Stamped page 44, there's a Section 13 entitled
"Insurance." Correct?
A. Yes.
Q. Okay. And in Section-- or the opening
paragraph requires the carrier to have the
insurance that is specified below as a minimum
amount. Correct?
A. Yes.
Q. Okay. And for Section A, it talks about
commercial auto liability insurance being
required in the amount of $1 million.
Correct?
A. That's what it states.
Q. And then on page 45, it requires cargo
insurance in Paragraph B. Right?
A. Yes.
Q. And then in Section C, there's a requirement
that the carrier have commercial general
liability insurance in an amount not less than
$1 million per occurrence. Correct?
A. The document states that, yes.

**72**
Q. Okay. And International Paper required that
the carrier also name International Paper as
an additional insured on that commercial
general liability policy. Correct?
A. That is what it states.
Q. Okay. And the carrier's policy was also to be
considered primary. Correct?
A. That's what the document states.
Q. Okay. And any other insurance that
International Paper might have was considered
to be excess, correct, excess to the carrier's
coverage?
A. I don't -- it says, "Recognizing any insurance
purchased by shipper as excess and
noncontributory."
Q. Correct. And then in Section F, there was
a -- there is a requirement that all insurance
acquired by the carrier had to be with
insurance carriers that had an A.M. Best
rating of not less than an A8. Correct?
A. I'm sorry, there was an ant on my page.
Q. Oh, okay.
A. Could you restate the question?
Q. Let me give you the question again. In
Paragraph F --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton April 10, 2012

**77**
1  A. To --
2  Q. -- from Overnite Express to Universal --
3  A. -- Am-Can, yes.
4  Q. Okay. And on the top of page 47, the sentence
5     I just quoted, that talks about carrier shall
6     solely direct all persons performing services
7     performed by carrier under this agreement and
8     such persons shall be and remain subject to
9     the exclusive control and direction of
10    carrier, that -- International Paper believed
11    that the carrier, Universal, was responsible
12    for their own employees who were making a
13    delivery or for any other persons who they
14    asked to make the delivery of your products?
15       MR. FISHER: Objection. Competency.
16    Form. Foundation.
17       You can go ahead and answer.
18 A. Yes, that would be my understanding, that they
19    took responsibility. Yes.
20 Q. (By Mr. Burke) And then this is -- page 48 is
21    the signature page that I think we may have
22    already alluded to, signed by Mr. Crawford as
23    of November 12th, 2007. Correct?
24 A. 48? Yes. Uh-huh.
25 Q. Bates Stamped 48.

**78**
1  A. Yeah. Bill Crawford. Yes.
2  Q. And then Mr. Crawford, for International
3     Paper; and then on behalf of Overnite Express,
4     Mr. Elsholtz, Kevin Hays, and Sandra Herman.
5     Correct? On the right side of the page?
6  A. Yes. That's what it states, yes.
7  Q. Okay. And there's apparent signatures of
8     those names there. Correct?
9  A. Uh-huh, yes.
10 Q. By the way, Mr. Crawford's title is described
11    as vice president of global sourcing for
12    International Paper Company. Correct?
13 A. Yes.
14 Q. Okay. Was he above or below you in the chain
15    of command?
16 A. Different organization.
17 Q. Different organization?
18 A. We had a -- yeah.
19 Q. Okay. Just in terms of -- when you say that,
20    he would be what section or department or --
21 A. I had a peer of his as my vice president, Bill
22    Merrigan. So we were the operational group.
23    They were the sourcing group.
24 Q. Okay. And sourcing, within your company,
25    referred to what?

**79**
1  A. The commercial contractual negotiation
2     purchasing function.
3  Q. Okay. And operations would refer to what?
4  A. Execution. Execution operations.
5  Q. Okay. Actually getting the product to the
6     people that --
7  A. Yeah.
8  Q. -- sourcing entered into agreements with?
9  A. State that again.
10 Q. Sure. In very general terms, did operations
11    involve actually getting the product to the
12    customers with whom sourcing had contracted?
13 A. Yes.
14 Q. Okay. And then there's various exhibits to
15    this contract. Correct?
16 A. Uh-huh.
17 Q. And on 49, the carrier had to attach a copy of
18    their permit. Correct?
19 A. Yes.
20 Q. And that's done so on page 50 for Overnite
21    Express?
22 A. Yes.
23 Q. And then B is the fuel index. Correct?
24 A. Index, uh-huh.
25 Q. We talked about C before. D is -- on page 54

**80**
1     is entitled "Motor Carrier Vendor Profile."
2     What, essentially, is that? Or what's its
3     purpose? Page 54.
4  A. Yeah, I know. I'm just wondering if this is
5     actually part of that profile.
6  Q. And is it included --
7  A. Yes.
8  Q. -- thereafter --
9  A. General information about that carrier.
10 Q. Right. And that's set forth on pages 55 --
11 A. Through 59.
12 Q. -- through 59, yes. By the way, on 59, do you
13    see that change log? That's -- that's not --
14    that's prepared by Sandy Herman of Overnite
15    Express. Correct?
16 A. I do not know. That's what it looks like, but
17    I do not know.
18 Q. It's not an International Paper document?
19 A. I do not -- I do not know, actually.
20 Q. Okay.
21 A. We do have carrier profiles. So this could
22    have been printed from them. I don't know.
23 Q. Okay. And then on page 60, the electronic
24    funds transfer, what is that and what is its
25    purpose?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                                April 10, 2012

**Page 93**

1   Am I correct that that's a letter from Gina,
2   G-i-n-a, Hubbs, H-u-b-b-s, vice president of
3   Universal Am-Can, to International Paper,
4   dated May 21st, 2008?
5   A. That's what it looks like.
6   Q. Okay. And that letter essentially, or at
7   least in part says, "Dear, customer, Overnite
8   Express will be operating under Universal
9   Am-Can, Limited's insurance and authority as
10  of June 13th, 2008, based on an agreement to
11  partner with their organization." Correct?
12  A. Yes.
13  Q. Okay. It goes on to say, "All bill of ladings
14  should reflect Universal Am-Can, Limited, as
15  the carrier." Correct?
16  A. That is what it states.
17  Q. And it goes on to say, "Therefore, invoices
18  for freight moved will come from Universal
19  Am-Can, Limited, with a remittance address in
20  Cincinnati, Ohio." Correct?
21  A. Yes.
22  Q. Am I correct that Overnite, and thereafter
23  Universal, would send International Paper an
24  invoice for the freight?
25  A. On these type of freights, they may send an

**Page 94**

1   invoice. But we actually would auto -- auto
2   pay it.
3   Q. Okay.
4   A. So it would -- we didn't process their
5   invoices. We would process the payment. And
6   then if there was a dispute, they would ...
7   Q. And then the second paragraph of this letter,
8   which if I didn't say it, is dated May 21st,
9   2008. Am I correct it says, "Please consider
10  this letter as an assignment of the current
11  contract you have in place for Overnite
12  Express. Universal Am-Can, Limited, agrees to
13  accept the rates and fuel surcharge
14  established between your company and
15  Overnite." Is that accurate?
16  A. That's a letter that they sent, yes.
17  Q. Okay. And what I mean, is that an accurate
18  statement of what the letter says?
19  A. That's what -- that's what it says, yes.
20  Q. Okay. There's a spot where Mr. Mundy -- for
21  Mr. Mundy to sign on the right. And I -- I
22  should say the final letter -- or final line
23  of the letter says, "Please sign below as to
24  your acceptance regarding the contract and
25  rate assignment."

**Page 95**

1   Do you know if Mr. Mundy signed a
2   copy of this?
3   A. I do not know.
4   Q. Okay.
5   A. The addendum was a result of that I thought.
6   Q. Okay. The --
7   A. Not necessarily signed --
8   Q. -- the addendum or ...
9   A. The addendum to the 2007 contract.
10  Q. Right. I guess I should call it Amendment --
11  A. Amendment, sorry.
12  Q. Amendment No. 1?
13  A. Amendment, yes.
14  Q. I knew what you meant. Amendment No. 1 you
15  believe resulted from this communication?
16  A. Yeah, or something -- I can't say whether -- I
17  didn't receive this letter. Steve Mundy would
18  have received it. So I cannot say what he
19  would have done. But that's -- this would be
20  the timing of it.
21  Q. Okay. And then page 68 is an e-mail from Rory
22  Ostgulen of Overnite Express to Steve Mundy,
23  referring to attachment of a notification
24  letter and assignment letter per your request.
25  Is that right?

**Page 96**

1   A. Yeah. This looks similar to the other letter.
2   Q. Okay. And it also adds a line at the bottom
3   saying, "I'm working on the authority and
4   insurance certificates and will forward them
5   ASAP"?
6   A. Uh-huh.
7   Q. That's a yes?
8   A. Yes.
9   Q. Okay. And page 69 is a copy of that -- looks
10  like another copy of the June 6th e-mail we
11  talked about earlier --
12  A. Uh-huh.
13  Q. -- from Cathy Szwast to Mr. Mundy, attaching
14  proof of liability insurance coverage and
15  cargo coverage for Universal Am-Can?
16  A. Yeah.
17       MR. BURKE: Carl, do you know what
18  exhibit number we're on?
19       MR. FISHER: I do. 99's the next
20  one.
21       MR. BURKE: Thank you.
22       (Deposition Exhibit No. 99 was marked
23  for identification.)
24  Q. (By Mr. Burke) Ms. Anderton, let me tender to
25  you what I've marked as Exhibit No. 99, which

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

                                                                    101
1   A. Pool truck. We called it a pool truck. We
2      had several pool truck routes, and Minneapolis
3      was one of them.
4   Q. Okay. And that commitment by Universal, to
5      make a run to Minneapolis five or six times a
6      week, was for the transportation of your
7      products to multiple different customers?
8   A. In Minneapolis.
9   Q. Okay.
10  A. Multiple. And so any given day, it could have
11     been any one of them, or up to three or four
12     of them could be on the truck.
13  Q. Okay. Including the three that happened to
14     have --
15  A. Yes. Orders that day.
16  Q. Thank you. Orders that day?
17  A. Uh-huh.
18  Q. Okay. And for how long had that regular run
19     or route been in effect?
20  A. As far as I know it was in effect from the
21     time I took the position, in 2004, and it had
22     been ongoing -- ongoing for years prior to
23     that. But different carriers would be used at
24     different times for that pool truck.
25  Q. Okay.

                                                                    102
1   A. Based upon who our current contracted carrier
2      was that had the commitments.
3   Q. Okay. And for how long had Overnite been the
4      committed carrier for that run?
5   A. I don't -- I don't recall. And they may have
6      been a carrier prior to when I was in the
7      position. The facility has been in place
8      since '96 and probably shipped to Minneapolis
9      since '96. But I don't know who the
10     carrier -- the sequence of carriers were --
11  Q. Okay.
12  A. -- over that time.
13  Q. And but you know that it was Overnite going
14     back at least how far?
15  A. I know at this time Overnite was the carrier.
16     While I was in my position, we had two other
17     carriers at different times doing this run.
18     So I don't know how far Overnite went back.
19  Q. Okay.
20  A. They had been doing it for a while, but I
21     don't how -- how long.
22  Q. And it would be at least back to October of
23     2007?
24  A. Correct.
25  Q. Okay. And maybe even earlier because there

                                                                    103
1      were earlier contracts?
2   A. I mean, yeah, they were a carrier for that
3      facility or IP in 2003. But I don't know if
4      they were on and off or what the history was,
5      as far as that particular route.
6   Q. Okay. And Universal took over that -- that
7      run pursuant to their assignment of the
8      contract?
9   A. That is correct.
10  Q. Okay. And the run or route had originally
11     been created by International Paper, correct,
12     for the five or six days International Paper
13     needed to have their --
14  A. Yeah, their requirement to pick up goods from
15     Hammond, Indiana, and deliver in Minneapolis
16     was specified by International Paper.
17  Q. Okay. And then the Exel company that you
18     mentioned, what did they do for International
19     again?
20  A. They operated the Hammond RDC on behalf of IP
21     for us. They were our subcontractor that
22     operated the facility.
23  Q. Okay. And International Paper owned that
24     facility. Correct?
25  A. We leased the building and the product in the

                                                                    104
1      building was all ours. But we didn't own the
2      facility.
3   Q. Okay. You leased it from whom? Do you know
4      or --
5   A. The name just popped out of my head. We could
6      follow up with it but -- I can picture the
7      gentleman who represents them.
8   Q. Okay. If it comes to you later --
9   A. I don't know.
10  Q. -- tell me.
11  A. Uh-huh.
12  Q. So International Paper leased the facility
13     that they called International Paper's Hammond
14     warehouse?
15  A. Yes.
16  Q. In Hammond, Indiana?
17  A. Yes.
18  Q. And then International Paper subcontracted to
19     have Exel personnel --
20  A. Operate --
21  Q. -- operate --
22  A. -- the facility.
23  Q. -- the facility. And that -- what did that
24     operation actually consist of? What do you
25     mean by that?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 129**

1  Szwast's name. Do you know who Tracy Denkins
2  is or what she does?
3  A. I do not know Tracy.
4  Q. How about Lowell Blackham?
5  A. I know Lowell.
6  Q. What does Lowell do? Or, I'm sorry, who does
7  Lowell work for?
8  A. International Paper.
9  Q. And what is his job?
10 A. He's legal counsel for my organization at the
11 time.
12 Q. Okay. And how about Eric Johansson?
13 A. I do not know.
14 Q. Do you know who Eric works for?
15 A. I do not know.
16 Q. Could you look at page 99, please, of
17 Exhibit 1 still in front of you?
18 A. (Witness complies.)
19 Q. What is that document, Ms. Anderton?
20 A. I've never seen it before. I don't know.
21 Q. Okay.
22 A. It's got an International Paper logo, but I've
23 never seen it.
24 Q. It has what kind of logo on it?
25 A. It has International Paper logo, but I've

**Page 130**

1  never seen it.
2  Q. Do you know Marilyn Ratay, R-a-t-a-y?
3  A. No.
4  Q. And ...
5  A. This looks like it was related to the previous
6  contract. It was dated '04.
7  Q. Okay. Previous contract between International
8  Paper and Overnite Express?
9  A. I'm not sure if that's what the document is
10 before here.
11 Q. Okay. And actually look at page 57.
12 A. (Witness complies.)
13     MR. FISHER: What page is this? 57.
14     MR. BURKE: Page 57 of Exhibit 1.
15 Q. (By Mr. Burke) Okay. That's Exhibit E to the
16 contract entitled -- and it's entitled
17 "Electronic Funds Transfer Bank Information"?
18 A. I know what it says. I'm not familiar with
19 the document. I know that -- I know what bank
20 we were set up to pay them for, but I -- I was
21 not involved in this document.
22 Q. Okay. And about the -- not quite the middle
23 of the page, there's the name Marilyn Ratay
24 again, accounts receivable clerk. You don't
25 know her?

**Page 131**

1  A. I do not know her.
2  Q. Do you know, can you tell from this document,
3  does she work for Overnite or for
4  International Paper?
5  A. It looks like it's from Overnite. Because it
6  says Marilyn at Overnite Express, Inc., dot
7  com. I assume she is their accounts
8  receivable clerk. So it was related to
9  payment, yes.
10     MR. BURKE: How about -- do you have
11 88 with you, Carl? I have a copy if it's easy
12 enough to do. And if you don't --
13     MR. FISHER: What is it?
14     MR. BURKE: It's that Exel one.
15     MR. FISHER: The Exel one?
16     MR. BURKE: Here, I got it.
17 Q. (By Mr. Burke) Let me tender to you what
18 we've previously marked as Exhibit 88,
19 Ms. Anderton.
20 A. Uh-huh.
21 Q. Can you tell me what that form is? Is it one
22 you've seen or know anything about?
23 A. It must have been used in the facility, but I
24 am not familiar with it.
25 Q. Okay.

**Page 132**

1  A. Because it says Exel and it's ash paper, and
2  that's the facility they operate for us. But
3  I have not -- I wasn't involved in using that
4  in my role.
5  Q. Okay. Let me tender to you just one portion
6  of Exhibit 64, which is entitled "Overnite
7  Logistics Load and Rate Confirmation." And is
8  that a document you are familiar with?
9  A. No.
10 Q. No? Okay. Is it a document that
11 International Paper has any involvement in
12 preparing?
13 A. No.
14 Q. Okay. Do you know who does prepare that
15 document?
16 A. No.
17 Q. Okay. Is -- do you have any understanding of
18 the purpose of the document?
19 A. No.
20 Q. Okay. Am I correct that this -- on the day of
21 this incident, this load of paper was being
22 hauled to Minneapolis because International
23 Paper needed to deliver its product to its
24 three customers in the Minneapolis area?
25 A. Yes.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

173
1  MR. FISHER: Okay. Great. All
2  right. Okay. So that's 100. Now a 101 and a
3  102.
4       (Deposition Exhibit Nos. 101 and 102
5  were marked for identification.)
6       (Discussion off the record.)
7  Q. (By Mr. Fisher) Okay. Earlier, you were
8  asked questions, Ms. Anderton, about some
9  electronic funds transfers and the way that
10 payments were made by International Paper.
11 A. Yes.
12 Q. All right. Tell us what Exhibit 101 is.
13 A. Okay. Well, after I called Clint and -- Clint
14 and Steve, I was calling them about on-time
15 delivery, I called Fadera, our analyst, and
16 said, "Did we pay for this shipment and was
17 there any exception on the payment side?"
18      So I asked her to pull history on
19 Hammond's payments. And all she -- her note
20 says, "Joan, here is the information you
21 requested. Let me know if you need anything
22 else."
23      And the second page, it's a subset of
24 a much larger document. She pulled the
25 history for a long period of time, and this

174
1  was the one shipment of notes. So ...
2  Q. Okay. And so is it fair to say that this
3  electronic funds or banking document, for want
4  of a better description, shows that with
5  respect to the shipment at issue that was
6  going to Cenveo, Midland, and Xpedx, on
7  July 3rd, '08, was being paid to OXEN, the
8  SCAC code for Overnite Express, but we know on
9  July 3rd it eventually wound its way to
10 Universal Am-Can, and that the payment amounts
11 are reflected in the right column?
12 A. Okay. This is -- the other document is
13 actually the electronic funds. This is kind
14 of our internal spreadsheet that had
15 information from the system that said we would
16 have paid a total of $1,217.60 and that OXEN
17 was the SCAC code. But this wouldn't be the
18 actual financial document.
19 Q. All right. So 101 was not the actual
20 financial documents, but it's an internal
21 spreadsheet summary?
22 A. Yes. Spreadsheet of all my -- yeah, she
23 pulled all my shipments and I pulled out the
24 one that was -- all of our shipments from that
25 facility.

175
1  Q. All right. And then with respect to
2  Exhibit 102, would you take us through each of
3  the pages on Exhibit 102?
4  A. And this was pulled more recently. So those
5  two -- those two items happened in '09, 2009.
6  This I just had pulled recently to get further
7  detail on what Fadera had given me.
8  Q. Let's make sure the record's clear. What
9  you're saying is that the documents that are a
10 part of Exhibits 100, what will be marked
11 later as 100A, and 101, are documents that
12 were requested by you and created by you,
13 Fadera Carter, Clint Diekman, and Steve Shores
14 on July 21st, 2009, which was shortly after
15 you had received notice that you were on legal
16 hold because of an accident?
17 A. Yes.
18 Q. Okay. All right. Now, Exhibit 102, take us
19 through that.
20 A. And this was -- this was very recently I
21 just -- to clarify and make sure I understood
22 how the payment was made, because there was
23 some question about the Overnite versus
24 Universal Am-Can, who actually had been paid,
25 this first one says Document 1400348929 for

176
1  $1,217.60, with an invoice baseline date of
2  7/3/2008 it was for Memo Bill 128816-8658.
3  What this is saying is this particular
4  shipment was for $1,217.60.
5       The next document shows that it was
6  cleared on the electronic funds transfer,
7  which is what the EFT is, and that's the
8  electronic funds number listed there. It
9  shows that it was electronically funded to
10 Overnite Express.
11      Then that EFT number was actually for
12 a total of $17,203.75 and was paid on
13 August 20th, 2008. And that would have been
14 because our terms with them must have been a
15 net 45-day term. So it was not paid until
16 August 20th. And it shows that we paid them,
17 on that date, $17,203.
18      And then the next document shows what
19 each of those -- what comprised the 17,203.
20 So there was one -- this one shipment was one
21 of those shipments on -- out of -- that made
22 up the 17,000. So that's what that next
23 spreadsheet shows.
24 Q. And then the final two pages?
25 A. Then the final two pages are -- I did ask,

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Page 201

1  Paper, I mean, authorize Exel to utilize this
2  form of a memo bill?
3  A. Exel chose to use their warehouse management
4  system to produce a memo bill. So the major
5  contents of the information is what we would
6  provide them, and they would print this memo
7  bill up. I -- I do not know the root of the
8  standard text that's on the bottom here.
9  Q. Okay. But when you say that Exel chose to use
10 a particular form of a memo bill, is it
11 correct that Exel did so with International
12 Paper's knowledge and approval and consent?
13 A. With -- yeah, with our knowledge, they used
14 their system to produce it.
15 Q. And you were in agreement with them doing so?
16 A. I just don't -- I don't know the root of where
17 that text come from.
18 Q. Okay. But whatever form they used and
19 whatever language they used was agreeable to
20 International Paper?
21 A. This is what they used for us, yes.
22 Q. Okay. Nothing else. Thank you, Ms. Anderton.
23       MR. SCHRECK: I don't have anything
24 else.
25       MR. FISHER: Tim?

Page 202

1       EXAMINATION
2  BY MR. COUTURE:
3  Q. Yeah, I just have like three questions for
4  you, ma'am. My name is Tim Couture. I
5  represent BMW.
6  A. Hi, Tim.
7  Q. How are you? Are you aware that BMW has been
8  sued in this lawsuit, as well?
9  A. Yes.
10 Q. Okay. I take it that you have no opinions
11 regarding the product liability side of this
12 lawsuit?
13 A. I have no opinions.
14 Q. You don't know anything about the allegations
15 that Mr. Burke's client has levied against
16 BMW, that the vehicle was improperly designed
17 or manufactured. Correct?
18 A. Correct. I have no knowledge of this.
19 Q. Okay. That's all I've got for you. Thanks.
20 A. Thank you.
21       MR. FISHER: We'll show signature
22 reserved.
23       (The deposition concluded at
24 2:28 p.m.)
25

Page 203

DEPOSITION ERRATA SHEET

Assignment No. 328300
Case Caption: Scheinman
vs. Martin's Bulk Milk Svc., et al.

DECLARATION UNDER PENALTY OF PERJURY
I declare under penalty of perjury that I have
read the entire transcript of my deposition taken
in the captioned matter or the same has been read
to me, and the same is true and accurate, save and
except for changes and/or corrections, if any, as
indicated by me on the DEPOSITION ERRATA SHEET
hereof, with the understanding
that I offer these changes as if still under oath.
Signed on the ____ day of _____, 20____.

_____
Joan Anderton

Page 204

DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____

SIGNATURE:_____DATE:_____
Joan Anderton



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                                April 10, 2012

205
1      DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
            Joan Anderton
25

206
1           C E R T I F I C A T E
2
3         I, Stacey L. Sommers, a Certified Court
4    Reporter of the State of Missouri, do hereby
5    certify:
6         That prior to being examined, the witness
7    was first duly sworn;
8         That said deposition was taken down by me
9    in shorthand at the time and place hereinbefore
10   stated and was thereafter reduced to typewriting
11   under my direction;
12        That the foregoing transcript is a true
13   record of the testimony given by said witness;
14        That I am not a relative or employee or
15   attorney or counsel of any of the parties or a
16   relative or employee of such attorney or counsel
17   or financially interested in the action.
18        Witness my hand and seal this 24th day of
19   April, 2012.
20
21
22
23              Stacey L. Sommers
24              Missouri Supreme Court
25              Certified Court Reporter



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com