# JAE # 12

# Excerpts from the Transcript of Deposition of William Crawford, dated June 6, 2012

130547293v1 0903067

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY J. )
SCHEINMAN, a Disabled )
Person, )
            )
     Plaintiffs, )  Case No.: 09 cv-5340
            )
vs.         )  Honorable James F.
            )              Holderman
            )
MARTIN'S BULK MILK )  Magistrate Susan E. Cox
SERVICE, INC., SAMUEL G. )
FRANKE, CSX INTERMOD, )
INC., INTERNATIONAL PAPER )
COMPANY and OVERNITE )
EXPRESS, INC., )
            )
     Defendants. )

ORAL DEPOSITION OF
WILLIAM CRAWFORD
JUNE 6, 2012

ANSWERS AND DEPOSITION OF WILLIAM CRAWFORD, a witness called by Murray Scheinman, Plenary Guardian of the Estate and Person of Jeffrey J. Scheinman, a Disabled Person, taken before Shannon H. DeLay, Certified Shorthand Reporter for the State of Texas, on the 6th day of June, 2012, between the hours of 9:06 a.m. and 10:41 a.m., at Esquire Deposition Services, 100 Congress Ave., Suite 2020, Austin, Texas, pursuant to the agreement of counsel and the respective parties as hereinafter set forth.

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
    Mr. Richard F. Burke, Jr.
    CLIFFORD LAW OFFICES, P.C.
    120 North LaSalle Street
    31st Floor
    Chicago, Illinois 60602

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK SERVICE, INC., AND SAMUEL G. FRANKE:
    Mr. Robert J. Golden
    DOWD & DOWD, LTD.
    617 West Fulton
    Chicago, Illinois 60661

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK SERVICE, INC., AND SAMUEL G. FRANKE:

    Mr. Matthew R. Schreck
    MULHERIN, REHFELDT & VARCHETTO, P.C.
    211 South Wheaton Ave., Suite 200
    Wheaton, Illinois 60187

TELEPHONICALLY FOR THE DEFENDANT(S) INTERNATIONAL PAPER COMPANY AND UNIVERSAL AM-CAN, LTD., AND SUCCESSOR TO OVERNITE EXPRESS, INC., AND OX, LLC.:

    Mr. Carlton D. Fisher
    HINSHAW & CULBERTSON, LLP
    222 North LaSalle Street, Suite 300
    Chicago, Illinois 60601

TELEPHONICALLY FOR THE DEFENDANT(S) BMW OF NORTH AMERICA, LLC AND BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT:

    Mr. Brian Langs
    JOHNSON & BELL, LTD.
    33 West Monroe Street, Suite 2700
    Chicago, Illinois 60603

## Page 3

INDEX
                                                PAGE
Appearances ...................................   2
Stipulations ..................................  N/A
WILLIAM CRAWFORD
    Examination by Mr. Burke ................. 4, 60
    Examination by Mr. Schreck ...............   55
    Examination by Mr. Langs .................   57
    Examination by Mr. Fisher ................   57

Signature and Changes .........................  N/A

Reporter's Certificate ........................   62

## Page 4

WILLIAM CRAWFORD,
having been first duly sworn, testified as follows:
    MR. BURKE: Let the record reflect this is the discovery deposition of Mr. William Crawford, taken pursuant to notice and in the accord with the applicable rules of the United States District Court for the Northern District of Illinois.
    EXAMINATION
BY MR. BURKE:
    Q. Mr. Crawford, my name is Rich Burke. I'm sure Mr. Fisher told you I'm going to ask you some questions about some of your time and work at International Paper. And as I do so, if you want any questions repeated, or if they don't make sense, just tell me.
    If you could verbalize your "yes" and "no" answers because even though I can see you nodding your head, the court reporter has to take down an answer, and if you and I do not talk at the same time, that helps the court reporter, as well.
    And if you want to look at a document or something, just say so. It's not intended to, you know, be a memory test or anything for you. Okay.
    Would you please state your full name and spell your last name.
    A. William P. Crawford.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                                  JUNE 06, 2012

### Page 5

1  Q. And --
2  A. C-R-A-W-F-O-R-D.
3  Q. And -- and what -- what city do you currently
4  live in, sir?
5  A. Austin, Texas.
6  Q. Okay. And are you employed at the present
7  time?
8  A. I'm not.
9  Q. Okay. When were you last employed?
10 A. March of 2012.
11 Q. Okay. And by whom were you employed at that
12 time?
13 A. Temple-Inland.
14        UNIDENTIFIED SPEAKER: Could you say that
15 louder. I couldn't hear you.
16        THE REPORTER: Who was --
17        THE WITNESS: Temple-Inland.
18 Q. (BY MR. BURKE) And how do you spell that?
19 A. T-E-M-P-L-E, hyphen, I-N-L-A-N-D.
20 Q. Okay. And what's the nature of their
21 business?
22        UNIDENTIFIED SPEAKER: Rich?
23        MR. BURKE: Yeah.
24        UNIDENTIFIED SPEAKER: I'm having a hard
25 time hearing. Could you put the mic closer or speak up

### Page 6

1  or something?
2         MR. FISHER: It's pretty close.
3         MR. BURKE: Yeah. We've got it pretty
4  much as --
5         UNIDENTIFIED SPEAKER: I hear you, Rich.
6  Unfortunately, I can't hear Mr. Crawford.
7         MR. BURKE: Okay. We've got it right
8  between us. So -- Is there a volume on this thing?
9  Okay. I think we have it turned up as best we can.
10        MR. FISHER: Okay.
11        MR. BURKE: All right.
12 Q. (BY MR. BURKE) What's the business of
13 Temple-Inland?
14 A. They're a paper and packaging company.
15 Q. Okay. And where are they located?
16 A. Austin, Texas.
17 Q. Okay. And during what time period were you --
18 did you work for them?
19 A. From October 2009, to March 2012.
20 Q. Okay. And what was your last position with
21 them?
22 A. I was their VP of Materials.
23 Q. Okay. And what did you do on a daily basis?
24 A. We did -- we did centralized procurement for
25 the company.

### Page 7

1  Q. Okay. And that would be procurement of what?
2  A. Of primarily chemicals, transportation,
3  energy, equipment.
4  Q. Does Temple-Inland have any relationship with
5  International Paper?
6  A. Yes. International Paper acquired
7  Temple-Inland.
8  Q. Acquired Temple when?
9  A. In February of 2012.
10 Q. When did you last work for International
11 Paper?
12 A. Left International Paper in January of 2009.
13 Q. Did you leave on your own or were you asked to
14 leave or fired or...
15 A. I was given a severance package.
16 Q. And what prompted the severance package?
17 A. I think, just an organizational shift.
18 Q. Were you terminated for any misconduct or
19 wrongdoing in any way?
20 A. No.
21 Q. When you left in 2009, where did you go to
22 work? Was it Temple?
23 A. Yes.
24 Q. Okay. International Paper did not own Temple
25 at that time; is that correct?

### Page 8

1  A. That's correct.
2  Q. When you last left International Paper, what
3  was your job title or position?
4  A. VP Global Sourcing.
5  Q. Okay. And for about how long had you been in
6  that position?
7  A. 18 years.
8  Q. Okay. For how long did you work at
9  International Paper?
10 A. 18 years.
11 Q. And you started with International Paper in
12 what year?
13 A. Around April of 1990.
14 Q. Where did you work before that?
15 A. ITT Automotive.
16 Q. And where at?
17 A. Detroit.
18 Q. And for about how long?
19 A. Four years.
20 Q. And what did you do there?
21 A. VP Materials.
22 Q. What's your educational background,
23 Mr. Crawford?
24 A. I've got a mechanical engineering degree from
25 Lafayette College and an MBA from the University of



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                           JUNE 06, 2012

**17**

1  carriers to transport paper, correct?
2      A.  Yes.
3      Q.  Okay.  Did -- if -- if there was -- are you
4  familiar with terms like operation side of a business,
5  transportation side, logistics, things like that?  Are
6  those terms you'd have any general familiarity with?
7      A.  General.  Not -- not specific.
8      Q.  Okay.  What -- with respect to your job in
9  Global Sourcing, was there a side of the business
10 that -- that -- a side of the International Paper
11 business that your -- your work fell into?
12     A.  I'm not sure I understand the question.
13     Q.  Okay.  With respect to -- did you consider
14 yourself to be involved in the operation side of the
15 business?
16     A.  No.
17     Q.  Okay.  And why -- why not?
18     A.  I was in a corporate staff role.  My
19 department was -- was -- mission in life was to engage
20 our key suppliers and -- and contract for the purchases
21 that we did with our key supporters.
22     Q.  And those suppliers would be what type of
23 businesses?
24     A.  Equipment companies, chemical companies,
25 transportation companies, energy companies.

**18**

1      Q.  And was the contract that Mr. Fisher sent you,
2  the October 2007 contract with Overnite Express, was
3  that a contract with a transportation company?
4      A.  Yes.
5      Q.  Okay.  And that -- and that contract was
6  generally for the purpose of transporting International
7  Paper products to the customers to whom International
8  Paper was selling?
9      A.  Yes.
10     Q.  Did International Paper do any of its own
11 deliveries or make any of its own deliveries with their
12 own trucks?
13     A.  I think one business that did some of that was
14 the distribution company, Xpedx.  I think the rest of
15 the company did not.
16     Q.  Okay.
17         MR. FISHER:  Could you spell that for the
18 court reporter.
19         THE WITNESS:  It's X-P-E-D-X.
20         MR. FISHER:  Probably wouldn't find that
21 one in the dictionary.
22     Q.  (BY MR. BURKE) Okay.  And what was the
23 business of Xpedx?
24     A.  They were a distributor of paper products.
25     Q.  And did International Paper own Xpedx?

**19**

1      A.  Yes.
2      Q.  And do you know to whom Xpedx would distribute
3  paper?
4      A.  Not specifically.
5      Q.  Are -- are -- are you aware that -- that some
6  of the International Paper products on the truck at the
7  time of this collision was destined for Xpedx?
8      A.  No.  I didn't know that.
9      Q.  Okay.  Did you in your job have any
10 involvement with the -- the Hammond warehouse?
11     A.  No.
12     Q.  Would you have any contact with any person
13 from International Paper who had any managerial or
14 supervisory role at the Hammond warehouse?
15     A.  I had contact with the -- the management team
16 at Xpedx in Cincinnati, but I -- I didn't have any
17 contact with Hammond directly.
18     Q.  Did -- other than what you mentioned about
19 Xpedx, did International Paper own any of its own
20 tractors for delivery of its paper products?
21     A.  Not that I'm aware of.
22     Q.  Did they own any of their own trailers for
23 delivery of their paper products?
24     A.  Not that I'm aware of.
25     Q.  With -- with respect to -- Strike that.  With

**20**

1  respect to the paper that was being picked up at the
2  Hammond warehouse that's involved in this occurrence,
3  how did those paper products get to the Hammond
4  warehouse?
5      A.  I don't know, specifically.
6      Q.  Were you involved in that type of
7  transportation at all?
8      A.  We did contracts for transportation, but I
9  wasn't involved in the day-to-day operations of
10 shipments.
11     Q.  Okay.  You were -- Mr. Fisher -- or you
12 mentioned that Mr. Fisher gave you a copy of an October
13 2007 contract.  Do you -- do you have a copy of that in
14 front of you, Mr. Crawford?
15     A.  Yes.
16     Q.  Okay.
17         MR. SCHRECK:  And just for the record,
18 what -- what page are you looking at?  What Bates stamp
19 number?
20         MR. FISHER:  36.
21         MR. SCHRECK:  36.
22         MR. BURKE:  We're showing -- I'm going to
23 tender to Mr. Crawford a portion of Exhibit No. 2,
24 which is -- which contains at Page 35 -- well, starting
25 with 35.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                       JUNE 06, 2012

21

1    MR. FISHER: Matt and everybody else, you
2  need to say your name first.
3    MR. SCHRECK: Oh, I apologize. It was
4  Matthew Schreck. And just for the record, you're
5  looking at IP Exhibit 2 -- Excuse me -- Exhibit 2, IP
6  Page 36?
7    MR. BURKE: Well, I'm going to start with
8  35, but the contract itself starts --
9    MR. SCHRECK: Just making sure I had the
10 right spot. Thanks.
11   MR. BURKE: -- on Page -- contract starts
12 on Page 36 and runs, I believe, to about Page 75 of the
13 International Paper Bates stamped pages.
14   Q. (BY MR. BURKE) And, Mr. Crawford, just to --
15 there is on Page 35 -- and do you see the Bates stamped
16 numbers in the lower right corner, sir?
17   A. Yes.
18   Q. Okay. So when I refer you to a page number,
19 that's what I'm talking about. On Page 35, there's a
20 letter dated October 24, 2007, on International Paper
21 letterhead, from Steven Mundy; am I correct?
22   A. Yes.
23   Q. Okay. And at that time, it appears Mr. Mundy
24 was the manager of Motor Carrier Transportation
25 Sourcing?

22

1    A. Yes.
2    Q. Okay. What was -- with respect to the
3  hierarchy of personnel, where did you and Mr. Mundy
4  fit?
5    A. Steve worked for a manager who reported to me.
6    Q. Okay. So Steve was under you?
7    A. He -- he -- he reported to one of my managers.
8  So he was part of my organization.
9    Q. Okay. And was the Motor Carrier
10 Transportation Sourcing Department within Global
11 Sourcing?
12   A. Yes.
13   Q. Who was above you in Global Sourcing?
14   A. I was the top person in Global Sourcing. I
15 reported to the CFO.
16   Q. Okay. And who was that?
17   A. Marianne Parrs.
18   Q. And how do you spell her last name?
19   A. P-A-R-R-S.
20   Q. And where was she, in Memphis?
21   A. Yes.
22   Q. Okay. And am I correct that in this letter on
23 Page 35, Steve Mundy is sending a copy of a contract
24 that International Paper entered into with Overnite
25 Express; is that correct?

23

1    A. Yes.
2    Q. Okay. And that's identified as Motor
3  Procurement Contract No. OXEN 093009?
4    A. Yes.
5    Q. And that's being sent to Sandy Herrmann?
6    A. Yes.
7    Q. Okay. Did you know Sandy Herrmann?
8    A. No.
9    Q. Okay. Did you ask Steve Mundy to send this
10 contract to Sandy Herrmann?
11   A. I don't remember.
12   Q. And let me ask you to turn to Page 36, sir.
13   A. (Witness complies.)
14   Q. Is this the beginning of what we referred to
15 as the October 1st, 2007 contract between International
16 Paper and Overnite Express?
17   A. Yes.
18   Q. And this is the contract you've reviewed,
19 correct?
20   A. Yes.
21   Q. Okay. And this contract bears your signature;
22 am I correct?
23   A. Yes.
24   Q. Okay. And, I think, I've seen your signature
25 on two places, if I recall correctly, one of which is

24

1  Page 52; is that right? Or why don't you first turn to
2  page 49.
3    A. (Witness complies.)
4    Q. I'm sorry, 48.
5    A. (Witness complies.)
6    Q. Okay. And is that your signature?
7    A. Yes.
8    Q. Okay. And am I correct you signed this
9  contract on behalf of International Paper on November
10 12th, 2007?
11   A. Yes.
12   Q. And look at Page 20 -- or, I'm sorry, Page 52.
13   A. (Witness complies.)
14   Q. And is that also your signature?
15   A. Yes.
16   Q. Okay. And also dated November 12, 2007?
17   A. Yes.
18   Q. Okay. And is Page 52, are you signing an
19 exhibit to the contract?
20   A. Yes.
21   Q. Okay. And was that the Fuel Index exhibit?
22   A. Yes.
23   Q. Okay. And, in general terms, what did the
24 Fuel Index exhibit consist of, or what was its purpose?
25   A. It was to change the price of the -- of the



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

### 29

1  Global Sourcing, did you agree with and approve of all
2  the terms and conditions of the contract?
3      A.  Yes.
4      Q.  Who did negotiate the terms of the contract?
5      A.  I don't know. I assume, it was Steven Mundy.
6      Q.  Okay. Would that have been part of his job?
7      A.  Yes.
8      Q.  Was -- was this -- this October 2007 contract
9  a -- and the provisions of it a standard type of
10 contract that International Paper would have with
11 carriers who were transporting their products?
12     A.  I believe so.
13     Q.  Other than the fuel index and surcharges,
14 were -- were most of the provisions standard provisions
15 that International Paper would utilize with all of
16 their carriers?
17     A.  I don't know.
18     Q.  In the -- are you aware that an amendment to
19 this contract was entered into in June of 2008?
20     A.  I don't know.
21     Q.  In the -- are you aware that an amendment to
22 this contract was entered into in June of 2008?
23         THE WITNESS: I don't know if -- if you
24 sent me an amendment or not.
25         MR. FISHER: Whatever documents are in

### 30

1  there is the only thing I sent you.
2      A.  Then, I guess, I don't know that.
3      Q.  (BY MR. BURKE) Okay. Did -- were -- were you
4  aware that -- Strike that. Do you -- are you familiar
5  with the business, Universal Am-Can?
6      A.  No.
7      Q.  Okay. Were you familiar with the business
8  Overnite Express?
9      A.  I've heard of them.
10     Q.  Okay. And you entered into a contract with
11 Overnite Express on behalf of International Paper,
12 correct?
13     A.  Correct.
14     Q.  Okay. And in your work at International
15 Paper, did you ever become aware of International --
16 I'm sorry. During your work at International Paper,
17 after this October 2007 contract was entered into, did
18 you ever become aware that Overnite Express was
19 purchased by or acquired by Universal Am-Can?
20     A.  I vaguely remember Steve mentioning that
21 Overnite Express had been purchased. I didn't remember
22 the name of the company.
23     Q.  Okay. Were you aware that any amendments were
24 entered into to update this October 2007 contract to
25 reflect that the carrier was, now, Universal Am-Can

### 31

1  instead of Overnite Express?
2      A.  I don't remember that.
3      Q.  Did you have any involvement in preparing this
4  amendment?
5      A.  I don't think so.
6          MR. BURKE: Guys on the phone, I'm going
7  to show Mr. Crawford Page 35 -- I'm sorry, Page 65 of
8  Exhibit No. 1, which is the -- the amendment dated June
9  10th and 12th.
10     Q.  (BY MR. BURKE) Just while -- while we're on
11 this topic, sir, let me tender to you Bates stamped
12 UACL 65 from Exhibit No. 1, and it's a document
13 entitled Amendment No. 1. Just take -- take a look at
14 that for a minute and tell me if you've ever seen it
15 before, No. 1?
16     A.  I don't remember seeing it before.
17     Q.  Okay. And that document is signed by Steve
18 Mundy, correct?
19     A.  Correct.
20     Q.  From your testimony, it's -- I -- I take it
21 you have no recollection having involvement in the
22 creation of that document?
23     A.  No, I don't.
24     Q.  Okay. Would the -- Strike that. Was this
25 type of amendment permitted in order to continue a

### 32

1  contract with a carrier in the event of -- of a
2  purchase of a carrier by another company?
3      A.  I don't remember this happening before.
4      Q.  In -- in your job as part of Global Sourcing,
5  you -- you, obviously, entered into contracts with
6  transportation carriers like Overnite Express, as -- as
7  reflected in this October contract, correct?
8      A.  Correct.
9      Q.  Okay. In addition to the requirements and
10 terms of the contract, did International Paper provide
11 any other information or brochures to its truck
12 carriers with respect to procedures and rules to be
13 followed by them while transporting International Paper
14 products?
15     A.  I don't know.
16     Q.  What department from International Paper would
17 be involved in -- in doing so, if that occurred?
18     A.  I think, it would be the local facility,
19 probably.
20     Q.  The contract that you -- you signed was with
21 Overnite Express. Did -- did you have involvement or
22 conversations with any personnel from Overnite Express?
23     A.  I don't remember.
24     Q.  Do you know Mr. Al Schultz, either of them,
25 from Overnite Express?


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

33

1  A. I don't think so.
2  Q. Okay. How about Mr. Kevin Hays from Overnite
3  Express, do you know him?
4  A. I don't think so.
5  Q. How about Sandra Herrmann, do you know her?
6  A. No.
7  Q. During your time working at International
8  Paper, were you familiar with a company called Martin's
9  Bulk Milk Service?
10 A. No.
11 Q. Had you had involvement in negotiating or
12 signing other contracts on behalf of International
13 Paper with Overnite Express?
14 A. I don't think so.
15 Q. Other than this October 2007 one, I should
16 say?
17 A. I don't remember.
18 Q. The -- was the signing of this contract on
19 behalf of International Paper, was that something you
20 had responsibility for as Vice President of Global
21 Sourcing?
22 A. Yes.
23 Q. And what was the purpose of International
24 Paper entering into this contract with Overnite
25 Express?

34

1  A. To contract for truck service at our
2  facilities.
3  Q. And truck service of -- Strike that. To
4  contract with truck carriers who would provide the
5  service of delivering your International Paper products
6  to your customers?
7  A. Yes.
8  Q. The -- Let me ask you to go back to Page 36 of
9  Exhibit No. 2 that you have in front of you,
10 Mr. Crawford.
11 A. (Witness complies.)
12 Q. That's, basically, a table of contents page;
13 is that correct?
14 A. Yes.
15 Q. Okay. That's actually entitled OXEN Overnite
16 Express 2007 Outbound Contract, correct?
17 A. Yes.
18 Q. What's that expression "outbound contract"
19 refer to?
20 A. It means shipments from IP facilities to our
21 customers.
22 Q. Okay. And then how about Page 37, which is
23 also noted as Page 2 of 24 of the contract, how come
24 that page is blank?
25 A. I don't know.

35

1  Q. Okay. Do you know what should be there?
2  A. No.
3       MR. FISHER: Objection to form. Assumes
4  facts not in evidence.
5  Q. (BY MR. BURKE) Where's the original of -- of
6  this contract?
7  A. I don't know.
8  Q. Okay. Who would know?
9  A. I don't know.
10 Q. Who did you give the signed version to?
11 A. I don't remember.
12 Q. If -- if -- if you needed to come to court
13 with a copy of this contract that you signed for
14 International Paper, to whom would you go to to find
15 the original?
16 A. I guess, I would go to my attorney.
17 Q. Okay. And what would you tell Mr. Fisher
18 to --
19 A. Find --
20 Q. -- do or who would you tell him to talk to or
21 what department would you tell him to contact?
22 A. Global Sourcing.
23 Q. Who's the current head of Global Sourcing?
24 A. David Liebetreu.
25 Q. And how do you spell his last name?

36

1  A. L-I-E-B-E-T-R-E-U.
2  Q. Liebetreu?
3  A. Yes.
4  Q. Okay. And is he also titled Vice President?
5  A. Yes.
6  Q. Okay. Is his office in Memphis?
7  A. Yes.
8  Q. How about Page 38? Let me direct your
9  attention to the first paragraph which, basically, says
10 that this agreement is being entered into and is
11 effective the first day of October 2007, correct, right
12 up at the top?
13 A. Yes.
14 Q. Okay. And the -- the contract or agreement is
15 being entered into between International Paper, and you
16 are identified as the Shipper in -- in this agreement,
17 correct?
18 A. Yes.
19 Q. And International Paper was entering this
20 contract with Overnite Express, who was identified as
21 the Carrier in this contract, correct?
22 A. Yes.
23 Q. And the Paragraph 2 states that the Carrier is
24 engaged in the business of transporting proper by motor
25 vehicle as a contract carrier in interstate --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                    JUNE 06, 2012

### 53

1  What was Mr. Mundy's job responsibilities?
2     A.  He -- he was in charge of contracting with our
3  motor -- motor carriers.
4     Q.  And, basically, kind of as you have alluded
5  to, contracting with motor carriers for the purpose of
6  them providing delivery service for International Paper
7  of your products to your customers?
8     A.  Yes.
9     Q.  And -- and how did his job differ than -- than
10 your job in -- in what both of you did on a day-to-day
11 basis?
12    A.  Mine was a little bit broader.  So his
13 department also contracted for railroad service in
14 addition to truck service and contracted for different
15 kinds of -- of truck service.  And then there were
16 other departments that contracted for energy or
17 chemicals or equipment.
18    Q.  Okay.  And when -- when you say Mr. Mundy's
19 department, what was that department?
20    A.  As I remember it, it was the Transportation
21 Sourcing department.
22    Q.  Okay.  And I -- I think when I showed you that
23 amendment, his title was -- that Amendment No. 1 that I
24 showed you earlier, his title, at least, at -- on June
25 12th, '08, when he signed that amendment, was Manager

### 54

1  Sourcing Motor Procurement --
2     A.  Yep.
3     Q.  -- would that be right?  Okay.  And in --
4  in -- basically, what did that department do?
5     A.  They negotiated and established and monitored
6  contracts with our motor carriers.
7     Q.  Okay.  By the way, do you -- do you know
8  Martha Lindbeck at all from Universal Am-Can?
9     A.  No.
10    Q.  And then when you say your position was a
11 little broader, in what respect?  A little broader than
12 Steve Mundy's in what respect, sir?
13    A.  Well, the organization sourced and contracted
14 for all the outside procurement at International Paper,
15 with the exception of wood.  There was a separate
16 organization that did wood procurement.
17        MR. BURKE:  Carl, why don't you let me
18 look at my notes, and if anybody else has any
19 questions, they can go ahead and do so.
20        MR. FISHER:  Sure.  Anybody else have
21 questions on the phone?
22        MR. SCHRECK:  I've got a few, and let me
23 jump into it.
24        THE REPORTER:  Who is that?  Excuse me.
25        MR. FISHER:  Who are you?

### 55

1         MR. SCHRECK:  This is Matthew Schreck.  I
2  apologize.
3                 EXAMINATION
4  BY MR. SCHRECK:
5     Q.  Mr. Crawford, if you could turn to Page 43 of
6  Exhibit 2.
7     A.  Okay.
8     Q.  You were asked some questions earlier by
9  Mr. Burke regarding defaults under the contract.  Do
10 you remember that?
11    A.  Yes.
12    Q.  Okay.  And one of those defaults was failure
13 to comply with safety -- the facility safety rules and
14 operating procedures, correct?
15    A.  Yes.
16    Q.  Okay.  And what that meant is if the carrier,
17 an entity that was picking up the product from
18 International Paper's facility, isn't complying with
19 whatever those particular safety rules were,
20 International Paper can kick them off the site and say
21 you're not going to do any work for us; is that
22 correct?
23    A.  That's what it says.
24    Q.  Okay.  And that would include any rules or
25 procedures that were in effect at the facility, whether

### 56

1  it be regarding wearing shirts, where trucks were
2  supposed to park, how they were supposed to load,
3  etcetera, correct?
4     A.  Well, it says facility safety rules and
5  operating procedures which, I assume, would be
6  documented.
7     Q.  Okay.  And those -- those type of things would
8  include things that would go to personal safety at the
9  facility, correct?
10    A.  I assume so.
11    Q.  As well as things that would go to safety in
12 loading and unloading trucks, correct?
13    A.  I assume so.
14    Q.  Okay.  How familiar are you, if at all, with
15 the safety rules that were in effect at the Hammond
16 facility back in '08?
17    A.  Not at all.
18    Q.  Do you know who would be familiar with that?
19    A.  No.
20    Q.  At any point during the time that you were
21 with International Paper, did you ever become aware of
22 Martin's Bulk Milk Service?
23    A.  No.
24        MR. SCHRECK:  Give me a moment.  I have no
25 further questions.  If anybody else has any questions,



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**57**

1  feel free to jump in.
2        MR. LANGS: This is Brian Langs. I just
3  have a couple questions for you, Mr. Crawford.
4        THE WITNESS: Okay.
5        MR. LANGS: I represent BMW.
6              EXAMINATION
7  BY MR. LANGS:
8    Q. Were you aware of the product liability claims
9  that the Plaintiff has alleged against the BMW entities
10 in this case?
11   A. No.
12   Q. Is it safe to say that you don't have any
13 opinions regarding the Plaintiff's allegations as to
14 the design of the BMW Plaintiff was driving at the time
15 of the accident was defective?
16   A. I have no opinion.
17   Q. All right.
18       MR. LANGS: That's all I've got for you.
19 Thank you.
20       MR. FISHER: I just have a couple
21 follow-ups.
22             EXAMINATION
23 BY MR. FISHER:
24   Q. Mr. Crawford, if you could look at Page --
25 Page 37, I will represent to you that the documents

**58**

1  that International Paper provided to me, in particular,
2  beginning at Bates numbered Page 36 that bears the
3  stamp "Original" at the top, that these are the
4  documents as I received them from International Paper.
5  All right?
6        So focusing on Page 37, which is also
7  marked as Page 2 of 24, do you know whether or not it
8  was typical in International Paper contracts that a
9  contract would, in effect, have a cover page that looks
10 like Bates number Page 36, and then the text would
11 begin on what is the third page, with the second side
12 or page being intentionally left blank? Do you have
13 any memory or knowledge of that?
14   A. No.
15   Q. Okay. So as you sit here today, you simply
16 have no knowledge as to why it is Bates Page 37, also
17 numbered as 2 of 24, simply has a horizontal line at
18 the top?
19   A. I have no knowledge.
20   Q. Okay. Second topic that I wanted to ask you
21 about goes to some questions that Mr. Burke asked you
22 concerning the timing and why it was that your
23 signature is November 12th, when the contract is dated
24 October 1st. And to focus your attention on that
25 topic, if you'd look at Bates numbered Page 35, do you

**59**

1  see that on that particular document, Mr. Mundy's
2  electronic signature appears at the bottom of a --
3  excuse me, the bottom of an October 24th, 2007 letter,
4  to a representative of Overnite, including copies of
5  the contract that we have previously agreed to?
6    A. Yes.
7    Q. All right. So in light of that date, does the
8  timing of the Eickholtz and Hays signature in late
9  October and your signature in early to mid November
10 make sense chronologically?
11   A. Yes.
12   Q. All right. And, finally, when Mr. Burke
13 focused your attention on the language that appears at
14 the top of Page 47, he began reading to you language
15 that starts with the word "Carrier shall solely
16 direct"?
17   A. Yes.
18   Q. This language that he read to you and to which
19 you gave answers to his questions, that's part of a
20 section that begins on the previous page, Bates
21 numbered 46, entitled Section 20, Independent
22 Contractor?
23   A. Yes.
24   Q. And so was this language to indicate that the
25 contract is stating that Overnite Express is performing

**60**

1  under this agreement as an independent contractor?
2    A. Yes.
3        MR. FISHER: That's all the questions I've
4  got.
5             FURTHER EXAMINATION
6  BY MR. BURKE:
7    Q. The section on Page 46 that Mr. Fisher just
8  asked you about entitled Independent Contractor, the
9  first sentence of that Section 20 states, am I correct,
10 "Carrier is and shall perform services under this
11 agreement as an independent contractor"?
12   A. Yes.
13   Q. Okay. And the Carrier referred to there is
14 Overnite Express at the time you signed this contract?
15   A. Yes.
16   Q. Okay. And the services being provided to
17 International Paper are the transportation of your
18 paper products, as you have previously explained?
19   A. Yes.
20   Q. Okay.
21       MR. BURKE: Nothing else.
22       MR. FISHER: Any other questions?
23       MR. SCHRECK: This is Matt. None.
24       MR. GOLDEN: Rob. No.
25       MR. FISHER: Okay. Signature is reserved,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                              JUNE 06, 2012

**61**

1  and I think we can go off the record now -- Oh, unless
2  you needed som info.
3       THE REPORTER: What I need to do, since
4  everyone is on the phone, I just need to get
5  everybody's order on the record.
6       MR. FISHER: Okay. Great. Sure. The
7  court reporter needs your orders of how you want the
8  transcript.
9       MR. SCHRECK: Are you ordering the
10 original or...
11      MR. BURKE: Yeah. I'm ordering a
12 e-transcript or whatever I order.
13      THE REPORTER: Besides the original, you
14 don't want --
15      MR. SCHRECK: This is Matt. I'm going to
16 take a regular and a mini.
17      MR. GOLDEN: I'm not going to order a
18 copy. Bob Golden.
19      MR. LANGE: And this is Brian Langs.
20 Could you just send me e-transcript, please.
21      MR. FISHER: And I'll take an e-tran in
22 mini script format.
23      (Deposition concluded at 10:42 a.m.)
24      * * * * * SIGNATURE WAIVED * * * * *
25

**62**

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  MURRAY SCHEINMAN, Plenary )
   Guardian of the Estate and )
4  Person of JEFFREY J.       )
   SCHEINMAN, a Disabled      )
5  Person,                    )
                              )
6       Plaintiffs,  ) Case No.: 09 cv-5340
                              )
7  vs.            ) Honorable James F.
                  )           Holderman
8                 )
   MARTIN'S BULK MILK    ) Magistrate Susan E. Cox
9  SERVICE, INC., SAMUEL G.   )
   FRANKE, CSX INTERMOD,      )
10 INC., INTERNATIONAL PAPER  )
   COMPANY and OVERNITE       )
11 EXPRESS, INC.,             )
                              )
12      Defendants.  )
13         REPORTER'S CERTIFICATION
         DEPOSITION OF WILLIAM CRAWFORD
14              JUNE 6, 2012
15     I, Shannon H. DeLay, Certified Shorthand Reporter
16 in and for the State of Texas, do hereby certify to the
17 following:
18     That the Witness, WILLIAM CRAWFORD, was duly
19 sworn by the Officer and that the transcript of the
20 oral deposition is a true record of the testimony given
21 by the Witness.
22     That the examination and signature of the Witness
23 is waived by the Witness and the parties, and that the
24 original deposition was delivered to MR. RICHARD F.
25 BURKE, JR. for safekeeping on

**63**

1       I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this procedure was
4  taken, and further that I am not financially or
5  otherwise interested in the outcome of the action.
6       Certified to by me this _____ day of_____,
7  2012.
8
9
   _____
   SHANNON H. DeLAY, CSR NO. 5481
10 Expiration Date: 12/31/2012
   Firm Registration No. 283
11 100 Congress Ave., Suite 2000
   Austin, Texas 78701
12 (512)634-1980



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com