# JAE # 13

# Excerpts from the Transcript of Deposition of Steve Mundy, dated June 12, 2012

130547293v1 0903067

STEPHEN M. MUNDY                                              June 12, 2012

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary         )
Guardian of the Estate and        )
Person of JEFFREY J.              )
SCHEINMAN, a Disabled Person,     )
                                  )
                                  )
        Plaintiffs,               )
                                  )
VS.                               ) No. 09-cv-5340
                                  )
MARTIN'S BULK MILK SERVICE,       )
INC., SAMUEL G. FRANKE, CSX       )
INTERMODAL, INC.,                 )
INTERNATIONAL PAPER COMPANY       )
and OVERNITE EXPRESS, INC.,       )
                                  )
        Defendants.               )

DEPOSITION
OF
STEPHEN M. MUNDY

JUNE 12, 2012

**Page 2**

STIPULATIONS

The deposition of Stephen M. Mundy is taken on this, the 12th day of June, 2012, on behalf of the Plaintiffs, pursuant to notice and consent of counsel, beginning at approximately 9:36 a.m. in the offices of International Paper, 6400 Poplar Avenue, Memphis, Tennessee 38197.

This deposition is taken pursuant to the terms and provisions of the Illinois Rules of Civil Procedure.

The signature of the witness is not waived.

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

    RICHARD F. BURKE, JR., ESQ.
    CLIFFORD LAW OFFICES, P.C.
    120 North LaSalle Street
    Thirty-First Floor
    Chicago, Illinois 60602
    Phone: (312) 899-9090

ON BEHALF OF INTERNATIONAL PAPER COMPANY and UNIVERSAL AM CAN, LTD., S/B/A and SUCCESSOR TO OVERNITE EXPRESS, INC., and OX, LLC:

    CARLTON D. FISHER, ESQ.
    HINSHAW & CULBERTSON, LLP
    222 North LaSalle Street
    Suite 300
    Chicago, Illinois 60601
    Phone: (312) 704-3000

ON BEHALF OF INTERNATIONAL PAPER:

    GIGI MCGOWN, ESQ.
    INTERNATIONAL PAPER
    6400 Poplar Avenue
    Tower 2, 4-025
    Memphis, Tennessee 38197
    Phone: (901) 419-3946

**Page 4**

ON BEHALF OF MARTIN'S BULK MILK SERVICE, INC. VIA TELECONFERENCE:

    MATTHEW SCHRECK, ESQ.
    JIM TEMPLE, ESQ.
    MULHERIN, REHFELDT
        & VARCHETTO, P.C.
    211 South Wheaton Avenue
    Suite 200
    Wheaton, Illinois 60187
    Phone: (630) 653-9300

ON BEHALF OF MARTIN'S BULK MILK SERVICE, INC., and SAMUEL G. FRANKE VIA TELECONFERENCE:

    ROBERT GOLDEN, ESQ.
    DOWD & DOWD, LTD
    617 West Fulton
    Chicago, Illinois 60661
    Phone: (312) 704-4400

ON BEHALF OF BMW of NORTH AMERICA, LLC, and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT VIA TELECONFERENCE:

    BRIAN LANGS, ESQ.
    JOHNSON & BELL, LTD.
    33 West Monroe Street
    Suite 2700
    Chicago, Illinois 60603
    Phone: (312) 372-0770



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                                June 12, 2012

**Page 5**

```
         EXAMINATION INDEX

STEPHEN M. MUNDY
    EXAMINATION BY MR. BURKE      6
    EXAMINATION BY MR. SCHRECK    95
    EXAMINATION BY MR. BURKE      98
    EXAMINATION BY MR. LANGS      113
    EXAMINATION BY MR. FISHER     114
```

**Page 6**

         STEPHEN M. MUNDY,
having been first duly sworn, was examined
and testified as follows:
            EXAMINATION
BY MR. BURKE:
    Q    Let the record reflect this is the
deposition of Mr. Stephen Mundy taken pursuant
to notice and in accordance with the
applicable rules of the Northern District of
Illinois, United States District Court.
         Mr. Mundy, again, my name is Rich
Burke. I represent Mr. Scheinman. I'm going
to ask you some questions about your work at
International Paper.
         As I do so, if you want to look at
any documents that are either in front of you
or some others that come to mind that are not
currently in front of you, just say so.
         If you would, verbalize your yes and
no answers. Even though we can see you
nodding your head one way or the other, the
court reporter has to take down a verbal
answer.
    A    Okay.
    Q    If you and I do not talk at the same

**Page 7**

time, that helps the court reporter if you let
me get out my whole question even if you
pretty much know where I am going. And I will
try and let you finish your answer before I
start a new question.
         That helps the court reporter as
well. Okay?
    A    Okay.
    Q    Would you please state your name and
spell both your first and last name.
    A    Stephen Michael Mundy. S-T-E-P-H-E-N
M-U-N-D-Y.
    Q    By whom are you employed, sir?
    A    International Paper.
    Q    How long have you worked for them?
    A    Since October 1985.
    Q    What is your current job title?
    A    Manager of Motor Carrier Group.
    Q    How long have you had that position?
    A    Since December, 2006.
    Q    What is your educational background?
Did you go to college?
    A    I did.
    Q    Where at?
    A    University of South Alabama.

**Page 8**

    Q    Did you get a degree?
    A    I did.
    Q    What kind?
    A    Bachelors in business administration.
    Q    What year?
    A    1985.
    Q    Any other schooling after that?
    A    No.
    Q    Have you gone to any courses or
partake in any programs that led to any type
of certificates or something not quite a
degree but some type of diploma or
certificate?
    A    No.
    Q    Do you have a commercial driver's
license?
    A    Yes.
    Q    Okay. And --
    A    I'm sorry. Explain commercial
driver's licenses.
    Q    A CDL. Are you able to drive a
truck?
    A    No. I'm sorry.
    Q    Do you have a license to drive a
tractor trailer truck?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                               June 12, 2012

13
1  Q    That involved doing what?
2  A    It involved getting bids for the IT
3  facilities for their outbound transportation
4  needs.
5  Q    Meaning getting bids from carrier --
6  or strike that.
7       Did that include getting bids from
8  carriers, motor carriers?
9  A    Yes.
10 Q    To transport or make pick-ups and
11 deliveries of International Paper's products?
12 A    Yes.
13 Q    For about how long did you do that?
14 A    For approximately two years.
15 Q    Then where did you go?
16 A    Into our supply chain organization as
17 a project manager.
18 Q    How does supply chain -- well, strike
19 that.
20      What does the supply chain
21 organization do?
22 A    I'm not sure. Could you ask the
23 question again.
24 Q    Sure. As opposed to -- I mean,
25 transportation -- you explained you

14
1  essentially were lining up motor carriers.
2       What aspect of International Paper's
3  business is the supply chain organization
4  involved in?
5  A    In the specific job that I was in in
6  supply chain, we were in the process of moving
7  to an SAP-based operating model. I played a
8  role in the purchasing activities as it
9  related to moving to SAP.
10 Q    That stands for what?
11 A    I do not know.
12 Q    Essentially, how do you describe that
13 model? I mean, what is it used for?
14 A    It has centralized some of the
15 procurement and operational and production
16 activities of International Paper.
17 Q    Did that involve the procurement of
18 transportation services?
19 A    It did not specifically involve that,
20 no.
21 Q    Then you did that for about how long?
22 A    Approximately two years.
23 Q    Then your next position was what?
24 A    The manager of the Motor Carrier
25 Group.

15
1  Q    You began that, I think you told me,
2  in 2006.
3  A    December of '06. Yes.
4  Q    Your office at that time was here in
5  Memphis?
6  A    Yes.
7  Q    What does the Motor Carrier Group do
8  for International Paper?
9  A    We are responsible for doing the bids
10 or sourcing events for the outbound
11 transportation of our facility's finished
12 products.
13 Q    Did that include -- well, strike
14 that.
15      When you used the term "outbound
16 transportation of your products," what does
17 that encompass?
18 A    Finished products that are shipped
19 out of the facility going to a customer or --
20 to customers.
21 Q    That would include paper products
22 like we are involved in in this case that were
23 onboard the truck that was involved in this
24 collision. Correct?
25 A    Correct.

16
1  Q    In that position as manager of the
2  Motor Carrier Group, did you have involvement
3  in entering into contracts with any motor
4  carriers for transportation services of
5  International Paper's products?
6  A    Yes.
7  Q    Have you reviewed the October 20,
8  2007 contract that International Paper entered
9  into with Overnite Express?
10 A    Yes.
11 Q    Were you involved in that contract in
12 any manner?
13 A    Yes.
14 Q    In what manner?
15 A    It was a result of the sourcing
16 events that my team ran in 2007.
17 Q    You know, when you use that word
18 "sourcing," what do you mean by that in your
19 business?
20 A    A bid.
21 Q    A bid. Okay.
22      Would you make a bid for a specific
23 dollar amount to the carrier, or would you ask
24 the carrier what they are willing to accept in
25 payment for transportation services?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                                June 12, 2012

**Page 21**

```
 1   entered into -- was that one which you
 2   approved the terms of?
 3   A    I don't recall.
 4   Q    You ultimately -- or strike that.
 5        Did you work with Mr. Crawford,
 6   William Crawford?
 7   A    I did work for Bill Crawford. Yes.
 8   Q    Was he your supervisor?
 9   A    Yes.
10   Q    That --
11   A    I'm sorry. Can I back up?
12        At the beginning, when they took over
13   the position, he was not my direct supervisor.
14   Subsequently, at some point, he did become my
15   direct supervisor.
16   Q    The contract that got approved or --
17   or strike that.
18        The contract that got entered into
19   with Overnite Express in October 2007 -- who
20   approved the terms of that contract for
21   International Paper?
22   A    Bill Crawford executed the contract
23   for International Paper.
24   Q    Was a contract entered into with your
25   agreement and consent as the manager of the
```

**Page 22**

```
 1   Motor Carrier Group?
 2   A    Yes.
 3   Q    Was the purpose of that October 2007
 4   contract with Overnite Express to provide --
 5   well, strike that.
 6        Was the purpose of the October 2007
 7   contract that International Paper entered into
 8   with Overnite Express to have Overnite Express
 9   provide transportation services for the
10   pick-up and delivery of International Paper's
11   finished products?
12   A    I'm sorry. I didn't understand the
13   question.
14   Q    Was the purpose of the October 2007
15   contract that got entered into with Overnite
16   Express to have Overnite Express provide
17   transportation services to International Paper
18   for pick-up and delivery of International
19   Paper's products?
20   A    Yes.
21   Q    International Paper sold paper to
22   customers at a price that included delivery of
23   the paper products to them. Correct?
24   A    Yes.
25   Q    The delivery of International Paper's
```

**Page 23**

```
 1   finished product to its customers was
 2   certainly an essential component of
 3   International Paper's business. Correct?
 4   A    I would think so.
 5   Q    Let me ask you to look at the
 6   contract that we have already been talking
 7   about. Let me ask you to look at Exhibit
 8   Number 2, probably starting at about Page 36
 9   at the moment. Look at the preceding page,
10   Page 35. International Paper Bates Number 35
11   of Exhibit 2.
12        That is a letter from yourself.
13   Correct?
14        MR. SCHRECK: Rich, which page
15   was that?
16        MR. BURKE: Thirty-five of
17   Exhibit 2, of International Paper Bates
18   stamped.
19        MR. SCHRECK: Thank you.
20        THE WITNESS: I'm sorry. Your
21   question again?
22   BY MR. BURKE:
23   Q    That document on Page 35 is a letter
24   bearing your stamped signature. Correct?
25   A    Correct.
```

**Page 24**

```
 1   Q    It is on International Paper
 2   letterhead dated October 24, 2007?
 3   A    Correct.
 4   Q    Sent to -- or directed to Overnite
 5   Express in Saint Paul, Minnesota. Correct?
 6   A    Correct.
 7   Q    It is referring to Motor Procurement
 8   Contract Number OXEN093009. Correct?
 9   A    Correct.
10   Q    Is Oxen a designation for Overnite
11   Express?
12   A    Yes.
13   Q    Is the contract number the
14   identifying number for the contract that
15   International Paper entered into in October of
16   2007 with Overnite Express?
17   A    Yes.
18   Q    This letter is directed to Sandy
19   Herman. Do you know her?
20   A    I do not.
21   Q    Did you have any contact with her?
22   A    Not that I recall.
23   Q    In your letter, you essentially are
24   saying you are enclosing three copies of the
25   truckload contract previously agreed to.
```



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                              June 12, 2012

**25**
1  Correct?
2  A    Yes.  That is what it says.
3  Q    And attached to the contract were a
4  fuel index and an electronic business
5  requirements page as well.  Correct?
6  A    That is what the letter indicates.
7  Yes.
8  Q    Basically, you were sending this
9  letter to Overnite Express to have them sign.
10 Is that right?
11 A    That is what the letter indicates.
12 Yes.
13 Q    From the content of your letter, it
14 indicates that International Paper has already
15 signed this contract.  Is that right?
16 A    No.  I do not see that.
17 Q    I'm sorry.  You are correct.
18      You are asking them to sign in the
19 areas indicated.  Correct?
20 A    Correct.
21 Q    From the content of your letter, this
22 contract had already orally been agreed to.
23 Right?
24 A    I don't recall an oral confirmation
25 of this.

**26**
1  Q    Well, the first line of your letter
2  says, enclosed are three copies of the
3  truckload contract that we have previously
4  agreed to.
5       And my question is simply:  Had you
6  previously agreed to the contents of this
7  contract that you were enclosing?
8  A    That is what the letter indicates.
9  Q    Then you sent this in your capacity
10 as manager of Motor Carrier Transportation
11 Sourcing.  Correct?
12 A    Correct.
13 Q    You have used the term Motor Carrier
14 Group.
15      Was there any technical difference
16 back in 2007 and 2008 between Motor Carrier
17 Group and Motor Carrier Transportation
18 Sourcing?
19 A    No.  There is not.
20 Q    Look at Page 36, sir, that you also
21 have in front of you.  If you look on the
22 Bates stamped pages, could you tell me what is
23 the last page of the contract plus its
24 attachments.
25 A    I am sorry.  If I look on the what?

**27**
1  Q    Sure.  In the lower right corner is
2  what we call Bates stamped numbers.  It says,
3  IP, a bunch of zeros, and then starts with 36.
4  You have the page there in front of you.
5       To what number does the contract
6  extend?  I think it goes into somewhere around
7  64, 65, maybe 67.  Could you look, sir, and
8  tell me.
9  A    It looks to extend to 67.
10 Q    Page 67 -- that is confirmation that
11 Overnite Express had workers' comp insurance
12 coverage.  Is that right?
13 A    Yes.
14 Q    Had you reviewed this 2007 contract
15 prior to the deposition today?
16 A    Yes.
17 Q    Is what is contained in Exhibit 2
18 Bates Stamped Pages 36 through 67 a true and
19 accurate copy of the contract that
20 International Paper entered into in October of
21 2007 with Overnite Express?
22 A    Yes.
23 Q    That contract was made in the normal
24 course of International Paper's business.
25 Correct?

**28**
1  A    Correct.
2  Q    And the terms were true and accurate
3  when they were entered into.  Correct?
4  A    What do you mean by "true and
5  accurate"?
6  Q    I mean, the content of what you said
7  you would do and wanted done and what you --
8  the contract says that Overnite Express was
9  going to do for International Paper was
10 accurately set forth in the contract.  Is that
11 right?
12 A    Yes.
13 Q    It was part of International Paper's
14 normal business to enter into this type of
15 contract, was it not?
16 A    Yes.
17      MR. BURKE:  Do you have the
18 original, Carl, that we talked about?
19      MR. FISHER:  No.  I have this
20 copy of the original.  I don't know that
21 I have the original.  We could continue
22 looking to find the so-called original.
23 BY MR. BURKE:
24 Q    Mr. Mundy, do you know where the
25 original of this contract is?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 33**

1  A    I do not.
2  Q    Now, am I correct that you
3  subsequently -- or strike that.
4       Am I correct that International Paper
5  subsequently entered into Amendment Number One
6  of this contract?
7  A    We did enter into an amendment. I'm
8  not sure of the numbering.
9  Q    For what purpose was an amendment
10 entered into?
11 A    For this particular contract?
12 Q    Correct.
13 A    We were notified that Overnite
14 Express was selling or had been bought -- I
15 forget specifically -- by another company.
16 Q    Was that other company Universal
17 Am-Can?
18 A    Yes.
19 Q    Were you familiar with Universal
20 Am-Can when you heard they had purchased
21 Overnite Express?
22 A    No.
23 Q    Had you previously had any contracts
24 with Universal Am-Can?
25 A    Not that I recall.

**Page 34**

1  Q    Prior to this October 2007 contract
2  with Overnite Express, you had entered into
3  prior contracts with Overnite Express.
4  Correct?
5  A    I don't recall.
6  Q    Have you reviewed any prior contracts
7  as part of your preparation for this
8  deposition?
9  A    Yes.
10 Q    There were some prior contracts in
11 prior years. Correct?
12 A    That is correct. I need to back up.
13 I did review one yesterday that was prior to
14 this one with Overnite. So, yes, we did.
15 Q    What year was that contract? Was it
16 a 2005?
17 A    I don't remember.
18 Q    Do you know for about how long
19 International Paper had been doing business
20 with Overnite Express as of October of 2007
21 when you entered into that contract?
22 A    I'm sorry. Could you repeat the
23 question.
24 Q    Yeah. Do you know when Overnite
25 Express and International Paper -- strike

**Page 35**

1  that.
2       Do you know when International Paper
3  first started using Overnite Express to
4  provide transportation services to them?
5  A    No, I don't.
6  Q    It is fair to say that it certainly
7  was some number of years prior to October 7th
8  because you had at least one prior contract
9  with them. Would that be correct?
10 A    I don't know what "fair to say"
11 means.
12 Q    I just mean accurate.
13 A    We did have a prior contract with
14 them.
15 Q    Take a look at page -- actually, I am
16 switching exhibits on you, sir. Look at
17 Exhibit Number 1 and look at page -- why don't
18 you look at Page 32 first.
19      Do you know Tom Quinlan from
20 International Paper? He is in the legal
21 department.
22 A    I don't know him personally.
23 Q    Take a moment. Read that letter. It
24 is a letter from Thomas Quinlan to Carl
25 Fisher, one of your lawyers here. And just

**Page 36**

1  take a minute to read it. Tell me when you
2  are done reading it.
3  A    (Witness complies.) Okay.
4  Q    Essentially, Mr. Quinlan was sending
5  Carl Fisher a copy of the October 1, 2007
6  contract between International Paper and
7  Overnite Express, along with Amendment Number
8  One to the contract that was dated June 9th
9  '08. Correct?
10 A    That is what this letter says. Yeah.
11 Q    Then in the second paragraph,
12 Mr. Quinlan says that you apparently told him
13 that you recall that upon receiving
14 correspondence from Universal Am-Can Amendment
15 Number One to the contract was drafted.
16      Do you have that same recollection?
17 A    I don't recall this correspondence
18 with Thomas Quinlan.
19 Q    Obviously, you were not a part of
20 this, but is it correct that you recall that
21 International -- or strike that. That
22 Overnite Express got purchased by Universal
23 Am-Can?
24 A    Yes.
25 Q    And subsequent to that purchase, an



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                          June 12, 2012

```
                                    37
 1   amendment was entered into that amended the
 2   terms of the contract with Overnite Express.
 3   Is that correct?
 4   A     Yes.
 5   Q     Do you know Gina Hubbs at Overnite
 6   Express -- or at Universal Am-Can?
 7   A     No.
 8   Q     Do you know Mark Limback, the
 9   president?
10   A     No.
11   Q     Take a look at Exhibit 1 that you are
12   currently in, I think, and look at Page 67.
13   Okay. And that would be Bates Stamped UACL67.
14   A     Okay.
15   Q     And that is a letter dated May 21,
16   2008. Correct?
17   A     Correct.
18   Q     Take a minute. It is from
19   International -- or it is from Mark Limback on
20   his letterhead at Universal Am-Can, and it is
21   signed by Gina Hubbs down on the bottom lower
22   left at Universal Am-Can. Is that right?
23   A     Yes.
24   Q     Take a minute to read that, sir.
25   Tell me when you are done.
```

```
                                    38
 1   A     (Witness complies.) Okay.
 2   Q     Am I correct that that letter was
 3   informing you -- strike that.
 4         Am I correct this letter was
 5   informing International Paper that Overnite
 6   Express will be operating under Universal
 7   Am-Can Limited's insurance and authority as of
 8   June 13, 2008 and that all bills of lading
 9   should reflect Universal Am-Can Limited as the
10   carrier?
11   A     That is what it says.
12   Q     And then it goes on to say that all
13   invoices for freight moved will come from
14   Universal Am-Can and told you to send your
15   remittance to an address in Cincinnati.
16   Right?
17   A     That is what it says.
18   Q     And then it says, please consider
19   this letter as an assignment of the current
20   contract you have in place for Overnite
21   Express, and Universal Am-Can agrees to accept
22   the rates and fuel surcharges established
23   between your company and Overnite. Correct?
24   A     That is what it says.
25   Q     Then it asks International Paper in
```

```
                                    39
 1   the last paragraph to sign as International
 2   Paper's acceptance regarding the contract and
 3   rate assignment. Right?
 4   A     That is what it says.
 5   Q     Then it has a line on the right with
 6   your name Stephen Mundy for signature.
 7   Correct?
 8   A     It has my typed name. Yes.
 9   Q     Yes. Your typed name. Not your
10   signature.
11   A     Correct.
12   Q     Did you ever sign this? This letter.
13   A     It does not appear that I did.
14   Q     Do you have any recollection of
15   signing the letter?
16   A     No.
17   Q     Now, go back to Mr. Quinland's letter
18   on Page 32. Do you have that there, sir?
19   A     Yes.
20   Q     In Paragraph Two, Mr. Quinlan appears
21   to be referring to the May 21, 2008 letter
22   that we were just looking at. Is that right?
23   A     This letter does reference a May 21,
24   2008 letter. Yes.
25   Q     And then, as Mr. Quinlan goes on to
```

```
                                    40
 1   say, Mr. Mundy recalls that upon receipt of
 2   the correspondence from Universal Am-Can,
 3   Amendment Number One to the contract was
 4   drafted; and thus no signed version exists.
 5   Is that correct?
 6   A     That is what it says.
 7   Q     From just a procedural standpoint,
 8   does it appear that you did not sign this
 9   May 21, 2008 letter and send it back to
10   Universal Am-Can but instead International
11   Paper prepared Amendment Number One?
12   A     That is correct.
13   Q     Why don't we look at Amendment Number
14   One.
15         MR. FISHER: I got it handy
16      here.
17         MR. BURKE: Do you want to look
18      at the IP copy, or I could give you the
19      -- what is the IP number?
20         MR. FISHER: Six.
21         MR. BURKE: Right. Okay.
22   BY MR. BURKE:
23   Q     Do you have the International Paper
24   copy in front of you --
25   A     I do.
```



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Page 41

1   Q   -- or a copy of Amendment Number One?
2       Look at Bates Stamped Page 6 then.
3   And this same amendment is found at Page 65 of
4   Exhibit 1, which are the Universal Am-Can
5   Bates Stamped documents.
6       You have read this amendment, have
7   you not, sir?
8   A   Yes.
9   Q   And it bears your signature on the
10  bottom. Is that right?
11  A   Yes.
12  Q   You signed it June 12, 2008?
13  A   Yes.
14  Q   In your capacity as manager of
15  Sourcing Motor Procurement. Correct?
16  A   Yes.
17  Q   The copy you have before you is also
18  signed by Mark Limback on June 10, 2008 in his
19  capacity as president of Universal Am-Can?
20  A   It appears so. Yes.
21  Q   Was the purpose of this amendment to
22  render the terms of the October 2007 contract
23  applicable to Universal Am-Can as of the date
24  that Universal's purchase of Overnite Express
25  became effective?

Page 42

1   A   I'm sorry. Could you repeat that.
2   Q   Was the purpose of this amendment to
3   render the terms of the October 2007 contract
4   International Paper had with Overnite Express
5   applicable to Universal Am-Can once Universal
6   had purchased Overnite Express?
7   A   Yes.
8   Q   In the very first paragraph -- by the
9   way, did International Paper prepare this
10  Amendment Number One as opposed to Universal
11  Am-Can?
12  A   Yes.
13  Q   The contents that are in this
14  Amendment Number One -- who actually prepared
15  them for International Paper?
16  A   I don't recall.
17  Q   Were you involved in that process?
18  A   I don't recall.
19  Q   It would be correct that you reviewed
20  and approved the contents prior to signing it
21  on behalf of International Paper. Correct?
22  A   Yes.
23  Q   Look at the very first top line. It
24  says, this Amendment Number One is made and
25  entered into this 9th day of June, 2008, by

Page 43

1   and between International Paper Company and
2   Overnite Express as carrier. Correct?
3   A   Yes. That is what it says.
4   Q   This contract was actually being
5   entered into by Universal Am-Can as opposed to
6   Overnite Express. Is that right?
7   A   Could you repeat that.
8   Q   Sure. I mean, the contract is signed
9   by Universal Am-Can, president Mark Limback.
10      And my question is simply: Is the
11  contract being entered into between
12  International Paper and Universal or
13  International Paper and Overnite Express?
14  A   This amendment was signed by
15  Universal Am-Can and International Paper.
16  Q   In the opening paragraph where it
17  says, the contract is being entered into
18  between International Paper and Overnite
19  Express -- is that an error? Or was that
20  intentionally worded that way?
21  A   I'm sorry. Could you repeat that.
22  Q   Sure. In the very first paragraph,
23  do you see how it says that the -- that this
24  amendment is being entered into between
25  International Paper and Overnite Express?

Page 44

1       And my question is: Did you intend
2   to say Overnite Express there, or was that an
3   error?
4       MR. FISHER: Objection to form.
5   You can go ahead and answer.
6       THE WITNESS: I don't recall
7   what the intent was at that time.
8   BY MR. BURKE:
9   Q   With respect to the next paragraph
10  that starts with "whereas the parties entered
11  into Contract Number Oxen 093009 dated
12  October 1, 2007 and whereas the parties
13  desire to amend the contract" -- that was what
14  International Paper wanted to do. Is that
15  correct? To amend the terms of the 2007
16  contract to make them applicable to Universal?
17  A   Yes. That is what that says.
18  Q   And then it goes on to say, now,
19  therefore, the parties do agree as follows:
20  Effective June 13, 2008, carrier will be
21  operating under the name of Universal Am-Can
22  Limited and SCAC -- that's S-C-A-C -- UACL.
23  Correct?
24  A   Yes. That is what it says.
25  Q   That SCAC is a code or designation


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                        June 12, 2012

Page 45

1  for UACL as opposed to an Oxen designation for
2  Overnite Express. Correct?
3  A    Correct.
4  Q    This amendment goes on to say
5  Universal Am-Can Limited agrees to honor the
6  rates and fuel surcharge established between
7  Company and Overnite. Correct?
8  A    Yes. That is what it says.
9  Q    "Company" was International Paper.
10 Right?
11 A    Correct.
12 Q    The next paragraph states that this
13 amendment in every respect meets the
14 requirements set forth in the contract
15 regarding change, modification, acceptance,
16 incorporation, and the like. Correct?
17 A    That is what it says.
18 Q    And the next paragraph states that
19 all other terms of the contract shall remain
20 and are in full force and effect. Correct?
21 A    That is what it says.
22 Q    The contract being referred to there
23 is the October 2007 contract that
24 International Paper had with Overnite Express.
25 Correct?

Page 46

1  A    Correct.
2  Q    And then it is, as we mentioned
3  earlier, signed by you for International Paper
4  and Mr. Limback for Universal Am-Can.
5  Correct?
6  A    Yes.
7  Q    After this amendment was entered
8  into, is it correct that the obligations and
9  responsibilities of Overnite Express as a
10 carrier under the October 2007 contract were
11 now the obligations and responsibilities of
12 Universal as the carrier?
13 A    Effective June 13, 2008. That is
14 correct.
15 Q    About a month later on July -- not
16 even a month.
17      A few weeks later when this incident
18 occurred involving injuries to Mr. Scheinman
19 on July 3, 2008, am I correct that
20 International Paper believed they had a
21 contract with Universal Am-Can as the carrier
22 for transportation services?
23 A    When you say International Paper, I
24 believe I can speak to what I believe.
25 Q    Okay. What --

Page 47

1  A    Effective June 13, 2008, Universal
2  Am-Can was the carrier.
3  Q    Universal Am-Can, as the carrier, had
4  to comply with the terms and provisions of
5  that October 7th contract that had been
6  entered into between International Paper and
7  Overnite Express. Correct?
8  A    That is what this amendment says.
9  Yes.
10 Q    Between the time this Amendment
11 Number One was signed by you on June 12, 2008
12 and July 3rd of 2008, just a few weeks later,
13 did International Paper enter into any other
14 contract with Universal Am-Can concerning
15 transportation services?
16 A    Not that I'm aware of.
17 Q    Then do you want to turn to Page 38
18 of Exhibit 2, the International Paper Bates
19 stamped number, Mr. Mundy.
20 A    Okay.
21 Q    That is the third -- I am sorry.
22 That is Page 3 of 24 of the contract.
23 Correct?
24 A    Correct.
25 Q    The opening paragraph of that refers

Page 48

1  to a contract that is effective October 1,
2  2007 between International Paper, as shipper,
3  and Overnite Express, as carrier. Correct?
4  A    Yes. That is what it says.
5  Q    Now, you have reviewed this contract
6  in anticipation of your deposition today.
7  Correct?
8  A    Yes.
9  Q    Throughout the contract, there are
10 many places where it says -- refers to
11 carrier. Correct?
12 A    Yes.
13 Q    As of June 13, 2008, the reference to
14 carrier meant Universal Am-Can. Correct?
15 A    Yes.
16 Q    In that second paragraph, if you look
17 at that, sir, it says that the carrier is
18 engaged in the business of transporting
19 property by motor vehicle as a contract
20 carrier in intrastate or foreign commerce
21 within North America. Correct?
22 A    That is what it says.
23 Q    Then that next paragraph says,
24 shipper, which would be you, International
25 Paper. Right?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY June 12, 2012

Page 49

1  A   Correct.
2  Q   Desires "carrier," which would be
3  Universal, to provide certain transportation
4  related services pursuant to the rates and
5  conditions in this agreement. Correct?
6  A   At the time it was signed, it was for
7  Overnite.
8  Q   Right. Okay. Then as of the time --
9  as of June 13, after the Amendment Number One
10 was signed, then International Paper, as
11 shipper, desired Universal, as carrier, to
12 provide transportation related services.
13 Correct?
14 A   As of the time of the amendment.
15 Yes.
16 Q   That amendment was effective as of
17 June 13, 2008. Right?
18 A   I believe that is correct.
19 Q   Now, was this contract that you
20 earlier told me runs from, I think, Page 36 up
21 to about Page 67 -- was that contract
22 physically prepared by International Paper?
23 A   Yes.
24 Q   And the terms and conditions set
25 forth in the contract were also prepared by

Page 50

1  International Paper. Is that right?
2  A   That's correct.
3  Q   Then there is a Section Three on Page
4  38 that is entitled Carrier's Obligation.
5  Correct?
6  A   Yes.
7  Q   Does this section set forth
8  requirements and obligations that
9  International Paper expected Universal to
10 fulfill?
11 A   It sets forth the obligations of the
12 carrier. Yes.
13 Q   And those obligations are set forth
14 in paragraphs designated by letters A through
15 K. Is that right?
16 A   That is correct.
17 Q   Section A refers to -- is entitled
18 Services. Is that right?
19 A   Yes, it is.
20 Q   International Paper expected
21 Universal to provide services set forth in
22 Exhibit C. Is that correct?
23 A   That is what it says.
24 Q   What would Exhibit C be?
25 A   Exhibit C is the motor carrier rate

Page 51

1  and weekly commitment schedule.
2  Q   Essentially, what requirements are
3  set forth in that motor carrier rate and
4  weekly commitment schedule?
5  A   In this specific one for this
6  contract? Could you rephrase the question.
7  Q   Sure.
8  A   Or re-ask the question.
9  Q   In general terms, what information is
10 set forth in the motor carrier rate and weekly
11 commitment schedule that would be attached as
12 Exhibit C?
13 A   It shows the rates that the carrier
14 submitted and the weekly commitments that they
15 were awarded through the sourcing events.
16 Q   Those weekly commitments refer to
17 pick-ups and deliveries through a certain lane
18 of traffic for International Paper. Correct?
19 A   No. Not to a specific lane. It
20 refers to weekly shipments to a geographic
21 region.
22 Q   Those weekly commitments had been
23 awarded by International Paper originally to
24 Overnite Express. Correct?
25 A   Correct.

Page 52

1  Q   Those commitments then now were the
2  obligation of Universal, as you have
3  indicated. Correct?
4  A   Correct.
5  Q   By the way, is Exhibit C actually
6  attached?
7  A   I don't know.
8  Q   Look at Page 53.
9  A   Okay.
10 Q   The content of Exhibit 3 is not
11 actually included there, is it?
12 A   I'm sorry. Exhibit --
13 Q   I'm sorry. I made a mistake.
14     The content of Exhibit C is not
15 included there. Correct?
16 A   Correct.
17 Q   And why not?
18 A   It is shown to be as an attachment on
19 this document.
20 Q   Is it attached anywhere in the
21 documents you have in front of you in Exhibit
22 2?
23 A   I do not see it.
24 Q   You know, there is a reference in the
25 right column to it being a certain number of



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY June 12, 2012

Page 61

1  A    That is what it says.  Yes.
2  Q    It also states that the carrier's
3  personnel shall comply with applicable local,
4  state, and federal laws and regulations.
5  Correct?
6  A    That is what it says.  Yes.
7  Q    It was the expectation of
8  International Paper that the carriers comply
9  with all applicable traffic regulations that
10 would be included in local, state, and federal
11 laws.  Correct?
12 A    It does not say "traffic
13 regulations."  So I don't know what
14 International Paper's interpretation of this
15 is.
16 Q    Well, it does not exclude traffic
17 regulations.  Correct?
18 A    It does not mention traffic
19 regulations.
20 Q    Did International Paper expect its
21 carriers to operate their trucks in accord
22 with all applicable traffic rules while making
23 delivery of International Paper's products to
24 International Paper's customers?
25 A    That is what this says.  Yes.

Page 62

1  Q    And International Paper did, in fact,
2  expect that traffic laws would be complied
3  with when International Paper's carrier was
4  delivering their products to International
5  Paper's customers.  Correct?
6  A    I cannot speak for International
7  Paper.
8  Q    Well, that was certainly your
9  expectation, was it not, when you signed the
10 amendment that incorporated the terms of this
11 contract?
12 A    My expectations were that the carrier
13 that we were amending the contract to would
14 follow this contract.
15 Q    Did you believe that included
16 complying with traffic regulations?
17 A    I don't recall.
18 Q    Did International Paper require its
19 carriers to adhere to and follow the federal
20 regulations related to the operation of
21 tractor trailer trucks in a safe manner while
22 delivering International Paper's products to
23 its customers?
24 A    Yes.  It does say that.
25 Q    Did International Paper expect its

Page 63

1  carriers to avoid colliding with cars while
2  they were making deliveries for International
3  Paper?
4  A    I would expect them to avoid
5  collisions.
6  Q    This reference to trailer
7  requirements in Paragraph G, did -- I'm sorry.
8  I misspoke again.
9       In Paragraph J, this reference to
10 trailer requirements -- am I correct that
11 International Paper required the carrier to
12 utilize trailers that were suitable for safe
13 and efficient and damage-free transportation
14 of its products?
15 A    Yes.  That is what it says.
16 Q    Those trailers had to be in proper
17 condition without any mechanical defects.
18 Correct?
19 A    (No audible response.)
20 Q    It is down towards the bottom.
21 A    Yes.  That is what it says.
22 Q    It also notes in the last line, sir,
23 that International Paper required the carrier
24 to agree to pay for all claims for damage or
25 destruction of International Paper's goods

Page 64

1  that resulted from unsuitable trailers.
2  Correct?
3  A    Yes.  That is what it says.
4  Q    In Paragraph K, am I correct that
5  International Paper set forth certain trailer
6  pool requirements that the carrier had to be
7  able to meet?
8  A    Yes.  That is what that says.
9  Q    Basically, does the obligation in K
10 mean that the carrier had to have enough empty
11 trailers available to meet International
12 Paper's deliveries and pick-ups that were the
13 subject of the awards given to them?
14 A    Yes.  That is what that says.
15 Q    Paragraph Section Four addresses
16 compensation.  Correct?
17 A    Yes.
18 Q    In Paragraphs A through D,
19 International Paper sets forth various
20 provisions relating to the compensation that
21 you were willing to pay to the carrier.  Is
22 that right?
23 A    Yes.  That is what it says.
24 Q    In addition to what is set forth
25 here, the compensation was also reflected in



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                         June 12, 2012

                                                                    81
1   on that general liability policy of insurance.
2   Correct?
3   A   Yes. That is what it says.
4   Q   In Paragraph F, International Paper
5   required that the insurance be obtained by the
6   carrier through insurance companies that had
7   certain designations or classifications as to
8   their reliability as rated by the A.M. Best
9   Company. Correct?
10  A   Yes. That is what it says.
11  Q   In Paragraph G, International Paper
12  could withhold payments for transportation
13  services if the carrier did not procure the
14  proper insurance coverage or allowed it to
15  lapse or to be cancelled or failed to provide
16  evidence of such insurance. Is that correct?
17  A   Yes. That is what it says.
18  Q   In fact, any carrier such as Overnite
19  or Universal -- they actually had to provide
20  International -- I may have misspoke.
21       Any carrier such as Overnite or
22  Universal had to provide International Paper
23  with a face sheet or evidence of insurance
24  coverage. Correct?
25  A   That's correct.

                                                                    82
1   Q   Look at Page 46, sir. In Paragraph
2   15, there is a section entitled
3   Indemnification. Correct?
4   A   Yes. That is what it is entitled.
5   Q   International Paper in that section
6   required that the carrier indemnify
7   International Paper from all liability for any
8   loss or damages, claims, or suits resulting
9   from injury to any person or damage to
10  property arising out of the performance of the
11  transportation services referred to in this
12  agreement. Is that correct?
13  A   Yes. That is what it says.
14  Q   That indemnity obligation was reduced
15  to the extent that any injury to a person or
16  property resulted from the joint or concurrent
17  negligence of International Paper. Correct?
18  A   Yes. That is what it says.
19  Q   Down in Page 120, there is a section
20  entitled Independent Contractor. Do you see
21  that?
22  A   Page 20?
23  Q   I'm sorry. Section 20 on the very
24  bottom of Page iP46.
25  A   Yes. That is what it says.

                                                                    83
1   Q   In that section, it states that the
2   carrier is and shall perform services under
3   this agreement as an independent contractor.
4   Correct?
5   A   Yes. That is what it says.
6   Q   It goes on to say that the carrier
7   shall solely direct all persons performing
8   services performed by the carrier under this
9   agreement and that all such persons shall be
10  and remain subject to the exclusive control
11  and direction of carrier. Correct?
12  A   Yes. That is what it says.
13  Q   That section meant that the carrier
14  was responsible for giving direction to all
15  persons who were performing transportation
16  services contemplated by this agreement?
17       MR. FISHER: Objection to form.
18       You can go ahead and answer.
19       THE WITNESS: Can you ask the
20       question again, please.
21  BY MR. BURKE:
22  Q   Sure. In the very top of Bates
23  Stamped 47, that paragraph essentially states
24  that the carrier was responsible for directing
25  all persons who were performing services under

                                                                    84
1   this agreement. Correct?
2        MR. FISHER: Object to form.
3        THE WITNESS: It says that the
4        carrier is responsible for directing all
5        persons for services performed by the
6        carrier.
7   BY MR. BURKE:
8   Q   And the services that are referred to
9   here are the transportation of International
10  Paper's paper products. Correct?
11  A   Yes.
12  Q   Then there is an assignment section
13  in Section 21. Correct?
14  A   Yes.
15  Q   By the way, in Paragraph 22 or
16  Section 22, that is entitled Modification. It
17  says, this agreement may only be amended in
18  writing only agreed to by both parties.
19  Correct?
20  A   Yes. That is what it says.
21  Q   That Amendment Number One that we
22  spoke about earlier -- that is an example of
23  the type of amendment that was contemplated
24  under this agreement. Correct?
25  A   Yes.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY  June 12, 2012

### Page 97

1  Q  I think you indicated earlier you are
2  not familiar with the specific safety rules
3  and operating procedures for each facility.
4  Is that correct?
5  A  That is correct.
6  Q  If a driver or the carrier was not
7  complying with the facility safety rules and
8  operating procedures, would it be accurate
9  that International Paper can tell them to
10  leave and that they are not going to be able
11  to have that particular shipment?
12  A  That is not the way I understand Item
13  8A.
14  Q  The facility safety rules and
15  operating procedures -- would they vary from
16  facility to facility; or would they be the
17  same throughout all of International Paper's
18  facilities?
19  A  They would vary between facilities.
20  Q  And the purpose of those safety rules
21  and procedures is for the safety of those that
22  work for International Paper and those that
23  come on to the property such as carriers.
24  Correct?
25  A  Correct.

### Page 98

1  Q  Would it be correct then, if somebody
2  at the facility saw that the carrier or driver
3  was not complying with the safety rules and
4  operating procedures, that they could stop
5  them from whatever they were doing?
6  A  That would be my understanding. Yes.
7  Q  That would also include, if they are
8  doing something that is not following the
9  safety rules and operating procedures -- not
10  in all cases but in some cases -- they could
11  tell them they are not going to be able to go
12  forward with that shipment on that particular
13  day because they are not complying with
14  whatever particular safety rule or procedure
15  that was in place?
16  A  Yes. That could be correct.
17        MR. SCHRECK: That is all the
18     questions I have, sir. Thank you.
19        MR. FISHER: Okay. We will take
20     a quick break here.
21     (A recess was taken, and the
22     deposition continued as follows:)
23        EXAMINATION
24  BY MR. BURKE:
25  Q  Mr. Mundy, after Universal bought

### Page 99

1  Overnite and after you entered into this
2  amendment with Universal, was it International
3  Paper's expectation that Universal Am-Can was
4  going to handle the transportation commitments
5  which were the subject of the October
6  agreement and the June 2008 amendment?
7  A  Yes. That is correct.
8  Q  Under International Paper's agreement
9  with Universal, did Universal have the right
10  to have some other truck driving company make
11  the actual deliveries for them?
12  A  Could you repeat that.
13  Q  Sure.
14     Under the agreement that you had with
15  Universal as of June 13, 2008, did Universal
16  have the right to have another trucking
17  company make the actual deliveries of
18  International Paper products?
19  A  Yes.
20  Q  And even if Overnite -- strike that.
21     Even if Universal had the right to do
22  so, International Paper expected Universal to
23  fulfill all of the obligations of the contract
24  that International had with Universal.
25  Correct?

### Page 100

1  A  That is correct.
2  Q  And Universal was considered to be
3  the carrier under the terms of the contract
4  International Paper had with Universal.
5  Correct?
6  A  That is correct.
7  Q  For the deliveries that were the
8  subject of this contract, which were going to
9  some locations in Minnesota, prior to this
10  crash, did International Paper know that
11  Universal was using Martin's Bulk Milk
12  Services to make delivery of your products?
13        MR. FISHER: Let me just pose an
14     objection. Is your question to him
15     personally or International Paper in
16     total?
17        MR. BURKE: The first question
18     is International Paper.
19        MR. FISHER: Okay. Go ahead.
20        THE WITNESS: I can't speak for
21     International Paper.
22  BY MR. BURKE:
23  Q  How about you personally?
24  A  I was not aware that Universal Am-Can
25  was using another carrier for our shipments.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY  June 12, 2012

**Page 113**

1  any questions. Thank you for your time.
2      MR. FISHER: Any BMW questions?
3      MR. LANGS: I have a couple of
4  questions. Brian Langs.
5      MR. FISHER: Please identify
6  yourself.
7      MR. LANGS: This is Brian Langs.
8  I represent BMW. I have like two
9  questions.
10         EXAMINATION
11 BY MR. LANGS:
12 Q    Are you aware of the plaintiffs'
13 products liability claims against BMW in this
14 case?
15 A    Could you ask that again or rephrase
16 that.
17 Q    Do you have any claims against BMW in
18 this case?
19 A    I'm aware that BMW is involved in
20 this case.
21 Q    Is it fair to say that you don't have
22 any opinions regarding the plaintiffs' claims
23 against BMW in this case alleging design and
24 defects in the car that the plaintiff was
25 driving?

**Page 114**

1  A    That is fair to say.
2      MR. LANGS: That is all I have
3  for you. Thank you very much.
4      THE WITNESS: Thank you.
5      MR. FISHER: I just have a few
6  follow-ups.
7         EXAMINATION
8  BY MR. FISHER:
9  Q    Mr. Mundy, you were asked some
10 questions by Mr. Burke concerning traffic laws
11 in the context of one of the provisions in the
12 contract. Do you remember that discussion?
13 A    Yes.
14 Q    I think he asked you whether or not
15 you expected that vehicles hauling
16 International Paper product -- you wouldn't
17 expect them to be colliding with other
18 vehicles. Correct?
19 A    Correct.
20 Q    Would the converse be likely -- would
21 the converse be exactly the same? That you
22 wouldn't expect other vehicles to run into a
23 tractor trailer rig that has International
24 Paper products in it?
25 A    That is correct.

**Page 115**

1  Q    Different subject towards the end of
2  Mr. Burke's questions of you.
3      He asked you some questions about
4  whether or not the contract prohibited -- that
5  is to say International Paper and Universal
6  Am-Can's contract prohibited Universal Am-Can
7  from using another carrier.
8      And I believe you said that UACL had
9  that right. Remember that topic?
10 A    Yes, I do. I remember the topic.
11 Q    But you also said that you personally
12 were not aware of that actually happening in
13 the case of Universal Am-Can.
14 A    That's correct.
15 Q    Was it also the case that you were
16 not aware that Overnite Express, the
17 predecessor company to Universal Am-Can, was
18 using another motor carrier to effectuate
19 deliveries of International Paper product?
20 A    That is correct. I was not aware.
21 Q    Joan Anderton, though, based upon
22 your knowledge of her, was aware of that.
23 A    Yes.
24 Q    Where did Joan Anderton fit in the
25 organization that you were a part of? Did she

**Page 116**

1  report to you? Was she a part of your group?
2  A    No. She did not report to me. She
3  was not part of my group.
4  Q    Okay.
5      MR. FISHER: That is all the
6  questions I have.
7      MR. BURKE: Nothing else.
8      MR. FISHER: Signature reserved.
9  (Deposition ended at 12:37 p.m.)



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Page 117

      C E R T I F I C A T E

STATE OF TENNESSEE:
COUNTY OF SHELBY:

    I, Takiyah Sanders, Court Reporter and Notary Public, Shelby County, Tennessee, CERTIFY:

    The foregoing proceedings were taken before me at the time and place stated in the foregoing styled cause with the appearances as noted.

    Being a Court Reporter, I then reported the proceeding in Stenotype, and the foregoing pages contain a true and correct transcript of my said Stenotype notes then and there taken.

    I am not in the employ of and am not related to any of the parties or their counsel, and I have no interest in the matter involved.

    I FURTHER CERTIFY that this transcript is the work product of this court reporting agency and any unauthorized reproduction and or transfer of it will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

    Witness my signature, this 27th day of June, 2012.

_____
Takiyah Sanders, CSR, LCR
License No. 486

Page 118

DEPOSITION ERRATA SHEET

Our Assignment No. 343628
Case Caption: SCHEINMAN
vs. MARTIN'S BULK MILK SERVICE

DECLARATION UNDER PENALTY OF PERJURY

    I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

    Signed on the _____ day of _____, 20___.

_____
STEPHEN M. MUNDY

Page 119

DEPOSITION ERRATA SHEET

Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____

SIGNATURE:_____ DATE:_____
    STEPHEN M. MUNDY

Page 120

DEPOSITION ERRATA SHEET

Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____
Page No._____ Line No._____ Change to:_____
_____
Reason for change:_____

SIGNATURE:_____ DATE:_____
    STEPHEN M. MUNDY



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com