1

```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    MURRAY SCHEINMAN, Plenary Guardian )
      of the Estate also known as        )
 4    JEFFREY J. SCHEINMAN,               )
                                          )
 5                   Plaintiff,           )
                                          )
 6        vs.                             )  No. 09 C 5340
                                          )
 7    MARTIN'S BULK MILK SERVICE, INC.,   )
      et al.,                             )  Chicago, Illinois
 8                                        )  February 19, 2013
                     Defendants.          )  9:15 o'clock a.m.
 9
                    TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE JAMES F. HOLDERMAN

11
      APPEARANCES:
12
      For the Plaintiff:      CLIFFORD LAW OFFICES, P.C.
13                            BY:  MR. RICHARD F. BURKE, JR.
                              120 North LaSalle Street, 31st Floor
14                            Chicago, Illinois  60602
                              (312) 899-9090
15
      For Defendants          MULHERIN, REHFELDT & VARCHETTO, P.C.
16    Martin's Bulk Milk      BY:  MR. JASON M. BRIESEMEISTER
      and Franke:             211 South Wheaton Avenue, Suite 200
17                            Wheaton, Illinois  60187
                              (630) 653-9300
18
                              DOWD & DOWD, LTD.
19                            BY:  MR. ROBERT J. GOLDEN
                              617 West Fulton
20                            Chicago, Illinois  60661
                              (312) 704-4400
21
      For Defendants          HINSHAW & CULBERTSON
22    International Paper,     BY:  MR. CARLTON D. FISHER
      and Universal Am Can:   222 North LaSalle Street, Suite 300
23                            Chicago, Illinois  60601-1081
                              (312) 704-3000
24

25
```

**2**

1    APPEARANCES:

2

     For Defendant BMW:          JOHNSON & BELL, LTD.
3                                BY:   MR. TIMOTHY R. COUTURE
     (Via telephone)                  MR. JAMES K. TOOHEY
4                                33 West Monroe Street, Suite 2700
                                 Chicago, Illinois  60603
5                                (312) 984-6651

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                        COLLEEN M. CONWAY, CSR, RMR, CRR
23                          Official Court Reporter
                     219 South Dearborn Street, Room 2524-A
24                          Chicago, Illinois  60604
                               (312) 435-5594
25                      colleen_conway@ilnd.uscourts.gov

```
1        (Proceedings heard in open court:)
2            THE CLERK:  09 C 5340, Scheinman versus Martin's Bulk
3    Milk Service.
4            MR. COUTURE:  Good morning, Your Honor.
5            Tim Couture on behalf of Defendant/Movant BMW.
6            MR. BURKE:  Richard Burke for the plaintiff.
7            Good morning, Judge.
8            THE COURT:  Good morning.
9            MR. FISHER:  Good morning, Judge.
10           Carl Fisher for Universal Am Can, as successor to
11   Overnight Transportation, Ox, L.L.C., and International Paper.
12           MR. BRIESEMEISTER:  Good morning, Your Honor.
13           Jason Briesemeister on behalf of Defendants Martin's
14   Bulk and Sam Franke.
15           MR. GOLDEN:  Bob Golden, additional counsel for
16   Martin's, Your Honor.
17           THE COURT:  All right.  Good morning to all of you.
18           I know you have got the car sitting there.  Plaintiff
19   still has possession, right?
20           MR. BURKE:  Judge, it's actually under a protective
21   order issued by the Court.  So I think it's probably joint
22   possession, but yes --
23           THE COURT:  Okay.
24           MR. BURKE:  -- it's definitely in secure storage.
25           THE COURT:  Okay.  All right.  Well, the reason I
```

1    said that is you have the keys to the warehouse, right?

2    Defense --

3              MR. COUTURE:  It's their consultant that was hired --

4              THE COURT:  Okay.

5              MR. COUTURE:  -- and I believe they are holding the

6    car.

7              THE COURT:  All right.  Well, let me do this.

8    Actually, I wanted to talk with you about the details of this.

9    Would you guys mind just waiting until the end of the call?  It

10   won't take too long.  But I would like to just sit down with

11   you and see if we can work out a protocol that perhaps can work

12   for everybody without any prejudice, if possible.  Okay?

13             MR. BURKE:  Sure, Judge.

14             MR. COUTURE:  Sure.

15             THE COURT:  Thank you.

16        (Whereupon, the Court heard other matters on his call.)

17        (Resumed at 9:43 a.m.)

18             THE CLERK:  Recalling 09 C 5340, Scheinman versus

19   Martin's Bulk Milk Service.

20             MR. COUTURE:  Good morning, Your Honor.

21             Tim Couture on behalf of Defendant BMW again.

22             If Your Honor is going to be discussing potential

23   agreements about this issue, my partner and lead counsel, Jim

24   Toohey, is actually available by phone, and it might be more

25   productive if he could dial in or be called because --

1           THE COURT:  Okay.

2           MR. COUTURE:  Because while I represent BMW, he is

3    the more important representative.

4           THE COURT:  All right.  Well, let's get him on the

5    phone.  What phone number should we reach him at?

6           MR. COUTURE:  One moment.  He is actually waiting for

7    the call.  It's 1-773-805-5856.

8           THE COURT:  All right.  And all other counsel who

9    were here before are here again.

10         (Phone ringing.)

11          THE COURT:  He was waiting for the call?

12          MR. COUTURE:  He was.

13         (Mr. Toohey on teleconference call.)

14          MR. TOOHEY:  Hello?

15          THE COURT:  Mr. Toohey?

16          MR. TOOHEY:  Yes.

17          THE COURT:  Yeah, this is Chief Judge Holderman.  I

18   am here in open court, and I have got a lot of your friends

19   with me.  I am going to ask them to identify themselves

20   starting with their right and moving to the left.

21          MR. GOLDEN:  Bob Golden, additional counsel for

22   Martin's Bulk, Your Honor.

23          MR. BRIESEMEISTER:  Jason Briesemeister on behalf of

24   Martin's Bulk and Sam Franke.

25          THE COURT:  I'm going to ask you to keep your voices

1  up because Mr. Toohey is getting his information through that

2  microphone that's right there on the podium.

3          MR. COUTURE:  Tim Couture on behalf of BMW, Your

4  Honor.

5          MR. BURKE:  Richard Burke for the plaintiff.

6          MR. FISHER:  Carl Fisher for International Paper,

7  Universal Am Can, as successor for Overnight Express and Ox,

8  L.L.C.

9          THE COURT:  All right.  I appreciate, Mr. Toohey,

10  your taking the time, and I appreciate everybody's evaluation

11  of this.

12          When I read the motion, I thought to myself, rather

13  than have a briefing schedule on this, which I think might

14  really not provide me the information that I need to assist you

15  in getting this information that you desire to get from the

16  disassembly of this car, I wanted to talk with you about it.

17          And so is there -- I know there is this alternative

18  proposed by the defense to modify the destructive disassembly,

19  and what can we do to try to preserve everybody's evidence?

20          So, Mr. Burke, do you have any ideas?  You have won

21  so far --

22          MR. BURKE:  Yes.

23          THE COURT:  -- and I thought I'd turn to you first.

24  Do you have any ideas?  Because what I was thinking, if there

25  is some destruction, I might have to allow at trial the defense

1    to say, "Well, we couldn't analyze it because the plaintiff's
2    expert was able to" -- "and under Court order was able to cut
3    and disassemble in a way that destroyed our ability to evaluate
4    the matter." So, do you have any thoughts?
5              MR. BURKE: Judge, I think we have to start from the
6    proposition that I honestly think their objection is rather
7    disingenuous.
8              THE COURT: Okay.
9              MR. BURKE: This is an extremely conventional
10   procedure in any fuel tank case and, quite frankly, in any
11   vehicle product liability case. Portions of vehicles are
12   removed. Because there is damage and, in this case, some
13   significant damage to the vehicle, parts cannot be removed as
14   they would in accord with the service manual.
15             THE COURT: Right.
16             MR. BURKE: And there is no damage to be done to the
17   parts that are in issue here, Judge, the fuel tank and the
18   related components of the fuel system. Rather, the only thing
19   that has to have some minimal damage, Judge, is some area
20   surrounding it that -- in order simply to free up the fuel
21   tank. Because there has been crunching of metal and some
22   damage, we -- it just can't be unscrewed as it normally would
23   if you were in a service station.
24             So whatever is, you know, being cut simply to free it
25   up I honestly don't think at all really relates to their

1  defense, nor is it the actual component parts that are at issue
2  here.
3       So I think we -- you know, I think this is a "second
4  stage" objection that the defense ultimately made.  They
5  originally agreed to removal of the tank because it, in all
6  honestly, is a really normal, conventional procedure in this
7  type of case, and then, all of a sudden, they voiced an
8  objection at the actual inspection.
9       We don't want to do any unnecessary damage, Judge.
10  There's no point in that for us.  The -- and whatever defense
11  BMW wants to maintain that requires viewing the car as it
12  currently exists, Judge, has been documented over -- multiple
13  times through videotape, countless photographs, I mean,
14  literally thousands, so --
15       THE COURT:  I have seen none of that, so I don't even
16  know what it looks like.
17       MR. BURKE:  Okay.
18       THE COURT:  I just know that this tractor-trailer hit
19  it from behind when it was stopped at a red light, crushing the
20  back part -- and I just know this from reading the materials --
21  and causing a fire to occur.
22       MR. BURKE:  Correct.  And, therefore, Judge, the --
23  when BMW's objection basically is that they feel that any
24  destruction for the purpose of removing the tank prevents them
25  from showing a jury what the tank in the car looked like right

1    after the collision -- and I think that is disingenuous because

2    it's been videotaped, photographed.  They have had their own

3    experts out there.  Not only that, BMW actually did a secret

4    inspection without telling the plaintiff before we ever saw the

5    car.  I must have a hundred photos they took.

6         So it -- the condition of the car is so well

7    documented, Judge, that any destruction -- and when we say

8    "destruction," I am using that term really loosely.  I mean,

9    we're sawing an exhaust pipe, for example, or a --

10        THE COURT:  I thought the exhaust pipe had already

11   been sawed.

12        MR. BURKE:  Well, it --

13        THE COURT:  Part of it had already been sawed.

14        MR. BURKE:  Yeah, I think that got started.  But, you

15   know, we're talking about simply very minimal things,

16   alterations for the sole purpose of freeing up this tank so

17   everybody can see the entire tank.

18        Now, if you'd like, Judge -- and I obviously

19   certainly appreciate your efforts here, but I am certainly

20   happy to file a -- you know, a motion to strike the objections,

21   or response or whatever you want to call it, in which we would

22   include all the photos that we submitted to Judge Cox that I

23   think form the basis for her proper decision here.

24        THE COURT:  Oh, you submitted them to her?  She

25   didn't transmit any of that --

1   MR. BURKE:  Oh, sure, Judge.  We --

2   THE COURT:  -- information to us, to me.

3   MR. COUTURE:  Both sides, Your Honor.

4   MR. BURKE:  We -- yes, both sides.  We had very

5   lengthy briefing, Judge, and --

6   THE COURT:  Okay.  All right.  Well --

7   MR. BURKE:  -- affidavits and photos and --

8   THE COURT:  So you have been that route.

9   MR. BURKE:  Oh, yeah.

10   THE COURT:  So what I'd like to do is see if we can

11  work out something that you could agree to.

12   And so what is it -- I guess I'll turn to Mr. Toohey

13  on the phone or anyone else who's here in the courtroom.  What

14  is it that is the real problem here?

15   MR. TOOHEY:  Your Honor, the problem is -- and I

16  would like to address this argument of disingenuity by Mr.

17  Burke.

18   They made a proposal for non-destructive testing to

19  be -- the testing to be done according to the manual.  They

20  said that if there was anything else, they would confer with

21  us.

22   Our expert, when he saw that, he originally said,

23  "Well, we probably can't stop them from looking at it and

24  trying to get the tank out.  It'll be difficult, but I would

25  want to be there to make sure that they don't do anything

1    that's destructive."

2            The importance of the evidence in integrated fashion

3    to us is that the allegation is crashworthiness of the entire

4    vehicle in an accident which is enormously severe, and once you

5    start taking the vehicle apart, you lose the overall effect of

6    visualizing what it looked like immediately post-accident.

7            The other point is that in the inspection protocol,

8    we were entitled to be there, and the plaintiff's expert was

9    supposed to confer with us before doing anything outside of the

10   manual.

11           The original problem occurred at the inspection when

12   we said, "No.  You're doing too much cutting.  What do you want

13   to do?"  And he refused to do anything or say anything.  Mr.

14   Burke refused to do or say anything in a cooperative manner

15   other than to say, "We have an absolute right to do this,"

16   which, under their protocol, they proposed they did not have.

17           So we objected because it appeared to our expert at

18   that time that they were going to engage in much greater and

19   much more extensive destructive disassembly than we had

20   contemplated or that we would agree to.

21           And basically our concern and our expert's concern --

22   and it's based upon some experience that we have had and he has

23   had with Mr. Stilson specifically, the expert -- I know Judge

24   Cox didn't like to hear that, but it's true -- that Mr. Stilson

25   has a propensity to destroy evidence, to cut it all apart and

1    then say, "Look at this junk here," when it comes time to trial

2    instead of looking at it as an integrated piece of evidence.

3         Now, our expert at that time and in every subsequent

4    affidavit has said that in his view, everything that

5    Mr. Stilson wants to look at and needs to look at can be seen

6    without doing destructive tests, destructive disassembly; that

7    it can be done with probes, much like surgery is conducted

8    today.  You take a little TV, scope, and you look in there and

9    you poke it around, and you can see everything inside the tank

10   and beyond the tank, including any points of penetration of the

11   tank.

12        THE COURT:  Well, Mr. --

13        MR. TOOHEY:  And the other point is that --

14        THE COURT:  Just a second, Mr. Toohey.

15        MR. TOOHEY:  Another point is --

16        THE COURT:  If I could stop you for a second.  Mr.

17   Burke has said that there has been substantial videotaping and

18   photographic evidence acquired.

19        MR. TOOHEY:  There has been.  There's -- he's

20   absolutely correct there.

21        THE COURT:  So --

22        MR. TOOHEY:  All experts have gone out there and

23   looked at it.  But we can't present that to the jury.  I mean,

24   we can present evidence, we can present videotapes, we can

25   present it all, but it's not the same as showing it to them

1    in -- just letting them see the vehicle.

2              THE COURT:  So you are intending to bring the damaged

3    vehicle into the courtroom or take it to a location where the

4    jury will view it?

5              MR. TOOHEY:  Yes.  We have -- the last time I tried a

6    case in federal court, we had a viewing of the vehicle in the

7    basement by the jury.  We had brought --

8              THE COURT:  In the basement of the courthouse?

9              MR. TOOHEY:  We have brought portions or at least

10   portions of vehicles, quarter sections of vehicles into the

11   courtroom in the past.

12             THE COURT:  All right.  And that's what you are

13   attempting to preserve, the vehicle itself, so that it can be

14   viewed as an integrated system?

15             MR. TOOHEY:  Yes, Your Honor.  Exactly.

16             THE COURT:  Okay.

17             MR. TOOHEY:  And that is the core evidence in this

18   case.  Now, there was a leak of fuel from the fuel tank, but --

19             THE COURT:  Is that what ignited?

20             MR. TOOHEY:  -- that we can -- it can be seen.  It

21   was on the underside of the tank.

22             THE COURT:  Is that what ignited?

23             MR. TOOHEY:  It's immediately visible -- it's

24   immediately visible by --

25             THE COURT:  Is that what ignited?  I have been

1  talking over you, I guess, or you have been talking over me.

2  Is that what ignited?

3  MR. TOOHEY:  That -- yeah, that's -- yes, I believe

4  so.  I mean, I think that's what the expert testimony is.

5  THE COURT:  And is the --

6  MR. TOOHEY:  But the vehicle got crushed downward and

7  it was driven along for 3 or 400 feet with the truck on top of

8  it, and the underside of the vehicle got crushed down and was

9  riding along the road, kicking up sparks, and there's a cut in

10  the tank at that point.  So there's a point at which fuel

11  can -- it's the bottom of the tanks, obviously -- Bradley is

12  going to take it out -- can flow out of the tank, and there's

13  sparks being created to ignite the gas right there.

14  So I'm pretty confident that without disclosing

15  anything too far in advance that that's what the expert

16  testimony is going to be as far as the initiation of the fire.

17  Now, if there is other points of penetration in the

18  back or above the tank, wherever it is that Mr. Stilson, their

19  expert, can't see, those -- all of those points we believe can

20  be visualized with a scope.

21  And we certainly believe that if they can be

22  visualized with a scope without destructive testing, that that

23  should be tried first, and that's what we've been proposing all

24  along.  And if they can't -- and if the scope doesn't work,

25  then perhaps the next step would be a careful disassembly with

| | |
|---|---|
| 1 | as little destruction as possible to the surrounding area, but |
| 2 | only if the scope does not work to provide a full visualization |
| 3 | of everything that they need to see. |
| 4 | THE COURT:  Would your expert be willing to |
| 5 | participate in a scope review?  And would you be willing to |
| 6 | fund the scoping, Mr. Toohey? |
| 7 | MR. TOOHEY:  Well, I don't know if we talked yet |
| 8 | about the funding of scoping.  It would be -- the vehicle is at |
| 9 | their expert's facility, not Stilson, but another guy, Dynamic |
| 10 | Safety in Libertyville. |
| 11 | THE COURT:  You weren't on the phone yet.  We had a |
| 12 | brief discussion about joint custody. |
| 13 | MR. TOOHEY:  Yeah.  Well, we're all paying for it. |
| 14 | THE COURT:  I understand. |
| 15 | MR. TOOHEY:  We're paying a quarter -- you know, |
| 16 | we're paying a quarter and I think that kind of thing. |
| 17 | THE COURT:  Who's got the key? |
| 18 | MR. TOOHEY:  The plaintiffs. |
| 19 | THE COURT:  All right.  All right.  Well, Mr. Burke, |
| 20 | what do you think about trying one more technique, this scope |
| 21 | technique? |
| 22 | MR. BURKE:  Judge, that was already addressed.  My |
| 23 | expert filed an affidavit given to Judge Cox saying that it |
| 24 | wasn't adequate and that it doesn't permit a full and complete |
| 25 | view of all the potential areas for holes. |

1    THE COURT:  Did you try it?

2    MR. BURKE:  It has not been tried, Judge.  And quite

3    honestly, I don't know that that procedure has ever been used

4    in this type of case.  I think it's --

5    THE COURT:  There's a first time for everything.

6    MR. BURKE:  Well -- but, Judge, it's a proposal that

7    I -- I have to use the word again.  It's a very disingenuous

8    one to suggest that this tank can be fully and properly

9    inspected by using a scope.  It's a theory that was concocted

10   by the defense expert, Mr. Noble, in an effort to fend off what

11   he knows, and I think every lawyer standing here knows, is a

12   very reasonable and proper and conventional request to remove

13   this tank in as simple of a fashion as possible with as little

14   damage as possible to any surrounding structures.

15   You know, Mr. Toohey, by the way, was not present at

16   this original attempt of removal.  Mr. Couture was there.

17   There was no vehement objection or refusal to participate in

18   removing this.

19   And Mr. Stilson was not trying to run headlong and do

20   as much damage as possible.  Every -- his original protocol

21   specifies there has to be some degree of destructive testing.

22   Everyone knows that.  It's impossible to remove this tank

23   because -- without some destruction because of the damage

24   already done to the surrounding area.

25   So, I mean, I have no objection to Mr. Stilson

1    removing it rather than the defense.  In what their objection

2    they filed to you, Judge, they don't like Judge Cox's

3    reasonable suggestion that Mr. Noble do the actual removal,

4    which I think Judge Cox did in an effort to accommodate them.

5                THE COURT:  Because they don't want the removal.

6    That's the --

7                MR. TOOHEY:  And we don't want it.  We don't want the

8    removal, the destructive disassembly, and we don't want to

9    be -- have aspersions cast on our expert later on that he

10   participated in or that he did it --

11               THE COURT:  Yeah.  What --

12               MR. TOOHEY:  -- when, in fact, we don't want it at

13   all.

14               But, Judge, I -- again, Mr. Burke is very casual and

15   very cavalier with his accusations of being disingenuous.  Mr.

16   Burke also repeatedly testifies about how ordinary and how

17   everybody agrees, and everything that he says is nonsense, and

18   it is refuted by affidavits submitted by our expert.

19               As far as Mr. Stilson's conduct at the first

20   inspection, it is refuted by an affidavit, signed by our

21   expert, and by a declaration signed by Mr. Couture.  Mr. --

22               THE COURT:  Yeah.  Mr. Toohey --

23               MR. TOOHEY:  Every time Mr. Burke comes into court,

24   he's very cavalier:  Everybody knows, everybody agrees.

25               This has never been done before.  Mr. Noble said the

1    scoping is a normal procedure that is used --

2         THE COURT:  You know --

3         MR. TOOHEY:  -- in his business in order to visualize

4    things you cannot see --

5         THE COURT:  Mr. Toohey, you are not in my courtroom,

6    and --

7         MR. TOOHEY:  Yes, Your Honor.

8         THE COURT:  I know you are not in my courtroom,

9    because you had Mr. Couture come on in today.  But I have got

10   other cases I have to deal with.  And the phrase "disingenuous"

11   is not persuasive.  Countering disingenuousness with commentary

12   really is not persuasive.

13        What I am trying to do is get to the bottom to see if

14   we can preserve everyone's evidence so that it can be properly

15   evaluated.  I mean --

16        MR. TOOHEY:  Your Honor, to respond --

17        THE COURT:  -- in reviewing the materials, I actually

18   don't even understand why the tank has to be removed if, in

19   fact, the damage to the tank that was caused by the accident is

20   visible.

21        I also think that if there is a means to put a scope

22   in the tank so that the tank can be examined from the inside, I

23   don't know why you'd have to remove it until you have evaluated

24   that there is some further damage that would allow an expert to

25   opine on the crashworthiness of the vehicle itself.  I mean --

1    MR. TOOHEY:  Your Honor, I am in 100% agreement with

2    everything you said.  I have been waiting for Mr. Stilson to

3    give us a reason why he needs to remove the tank, and all we

4    get is:  Everybody removes the tank.  We always remove the

5    tank.

6    THE COURT:  And that's what I have heard from Mr.

7    Burke:  This is just a traditional approach that we always do.

8    Well, you have been doing this for a long time, Mr.

9    Burke, and I understand that, but every case is different.

10   Every case is different.  This is a different accident than any

11   other accident that ever occurred in connection with this

12   vehicle.

13   MR. BURKE:  Judge, the reason -- and I thought I said

14   it originally -- is you can only see the bottom of the tank.

15   There's --

16   THE COURT:  Right.  You can only see the bottom of

17   the tank, but if you put a scope inside the tank, you can see

18   the entire inside of the tank.  And if there's further damage

19   that would cause further reason for you to believe and be able

20   to prove to a jury that this vehicle wasn't crashworthy, then

21   you can take further action.

22   But what I understand what the defense desires is

23   they want the jury to see the vehicle, not parts of the vehicle

24   laying around on a floor when the jury sees it.  And so my

25   question is why not try the scope route?

1    MR. BURKE:  Well, because Mr. Stilson responded and

2  gave an affidavit setting out his reasons, some of which

3  were --

4    THE COURT:  I disagree with that, then.  I want the

5  scope to be done.  Now the question is financing it.

6    Mr. Toohey?

7    MR. TOOHEY:  I believe, Judge, we will undertake -- I

8  don't have the specific authority, but I think I can speak for

9  the client.  We will undertake to have Mr. Noble come and

10  either rent or bring a scope with him, and he and Mr. Stilson

11  can jointly operate the scope, however they best see fit as

12  experts.

13    THE COURT:  When can you get that accomplished?

14    MR. TOOHEY:  I don't know.  We would get on the phone

15  with Mr. Noble as soon as the Court has adjourned, and we could

16  report back within a day or two.

17    THE COURT:  When is Mr. Stilson available?

18    MR. TOOHEY:  We'd have to find out when Mr. Stilson

19  is available, too.  So it'd have to be -- we'd have to

20  cooperate with plaintiff's counsel.

21    THE COURT:  When is Mr. --

22    MR. TOOHEY:  Mr. Noble is in California, so it might

23  be a week or two.

24    THE COURT:  When is Mr. Stilson available?

25    MR. BURKE:  Judge, I don't know, but I'd obviously

1    try to make him available as soon as possible, certainly.

2             THE COURT:  Okay.  Well, let's set the case for

3    further status at the end of March -- you certainly should be

4    able to accomplish it by then -- and we will set some further

5    dates in the case at that time.  This is going to delay things

6    a little bit.

7             I would certainly encourage you, after this scope

8    evaluation is done, to further evaluate whether it is necessary

9    to take the tank from the vehicle because the tank, of course,

10   as Mr. Burke has said, you can't follow the service manual, the

11   tank's been destroyed from the standpoint that it has been --

12   it's no longer usable as a fuel tank.  And so, consequently,

13   the question is was there sufficient protection to cause this

14   vehicle to be crashworthy or not.

15            So let's see where we are on March 28th.  And I

16   appreciate everybody's efforts on this.

17            I am going to deny the motion now, deny the motion to

18   compel, leaving Judge Cox's order in place, but staying the

19   execution of that order until we have a chance to talk about

20   what you have found out from the scoping that's going to take

21   place between now and March 28th.  Okay?

22            MR. COUTURE:  Thank you.

23            MR. TOOHEY:  Thank you, Your Honor.

24            THE COURT:  Okay.

25            MR. BURKE:  What time on the 28th, Judge?  9:00 a.m.?

1            THE COURT:  That's at 9:00 a.m.

2            MR. BURKE:  9:00 a.m.?  Thank you.

3            THE COURT:  Thank you very much.

4            MR. TOOHEY:  Thank you, Your Honor, very much.

5            THE COURT:  Thank you.

6        (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3

4

5      I, Colleen M. Conway, do hereby certify that the

6  foregoing is a complete, true, and accurate transcript of the

7  proceedings had in the above-entitled case before the

8  HONORABLE JAMES F. HOLDERMAN, Chief Judge of said Court, at

9  Chicago, Illinois, on February 19, 2013.

10

11

12    */s/ Colleen M. Conway, CSR,RMR,CRR*    *03/06/13*

13      Official Court Reporter       Date
        United States District Court

14     Northern District of Illinois
         Eastern Division

15

16

17

18

19

20

21

22

23

24

25