# EXHIBIT A

```
IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
          EASTERN DIVISION
---------------------------------------
MURRAY SCHEINMAN, Plenary
Guardian of the Estate
and Person of JEFFREY D. SCHEINMAN,
a Disabled Person,

             Plaintiff,

       -vs-              Case No. 09-CV-5340

MARTIN'S BULK MILK SERVICE, INC.;
SAMUEL G. FRANKE;
CSX INTERMODAL, INC.;
INTERNATIONAL PAPER COMPANY, et al.,
             Defendants.
---------------------------------------

        Deposition of JEREMIAH PATRICK PODLENA
               Friday, March 22, 2013
                    11:02 a.m.
                       at
                CHULA VISTA RESORT
                  2501 River Road
              Wisconsin Dells, Wisconsin


        Reported by Lindsay DeWaide, RPR/CRR
```

                                                  1

```
 1        Deposition of JEREMIAH PATRICK PODLENA, a
 2  witness in the above-entitled action, taken at the
 3  instance of the Defendants, pursuant to the Federal
 4  Rules of Civil Procedure, pursuant to notice, before
 5  Lindsay DeWaide, Registered Professional Reporter,
 6  Certified Realtime Reporter, and Notary Public in and
 7  for the State of Wisconsin, at CHULA VISTA RESORT, 2501
 8  River Road, Wisconsin Dells, Wisconsin, on the 22nd day
 9  of March, 2013, commencing at 11:02 a.m. and concluding
10  at 1:58 p.m.
11
12  APPEARANCES:
13
        CLIFFORD LAW OFFICES, by
14         Mr. Richard F. Burke, Jr.
           120 North LaSalle Street, Suite 3100
15         Chicago, Illinois 60602
           Appeared on behalf of Plaintiff.
16
        MULHERIN, REHFELDT & VARCHETTO, P.C., by
17         Mr. Matthew R. Schreck
           211 South Wheaton Avenue, Suite 200
18         Wheaton, Illinois 60187
19      -and-
20      DOWD & DOWD, LTD., by
           Mr. Robert J. Golden (telephonically)
21         617 West Fulton Street
           Chicago, Illinois 60661
22         Appeared on behalf of Martin's Bulk Milk
           Service, Inc., and Samuel G. Franke.
23
24
25
```

                                                  2

```
 1  APPEARANCES: (continued)
 2
        HINSHAW & CULBERTSON LLP, by
 3         Mr. Carlton D. Fisher
           222 North LaSalle Street, Suite 300
 4         Chicago, Illinois 60601
           Appeared on behalf of International Paper
 5         Company; Overnite Express, Inc.; Ox, LLC;
           Universal Am-Can, Ltd.; and Overnite Logistics,
 6         Inc.
 7      JOHNSON & BELL, LTD., by
           Mr. Timothy R. Couture
 8         33 West Monroe Street, Suite 2700
           Chicago, Illinois 60603
 9         Appeared on behalf of BMW of North America,
           LLC, and Bayerische Motoren Werke
10         Aktiengesellschaft.
```

                                                  3

```
              E X A M I N A T I O N
                                     PAGE
    BY MR. BURKE                       5
    BY MR. FISHER                     50
    BY MR. COUTURE                   105
    BY MR. FISHER                    111
    BY MR. BURKE                     113
    BY MR. SCHRECK                   114
    BY MR. FISHER                    115


                 E X H I B I T S
              (No exhibits were marked.)

            PREVIOUSLY MARKED EXHIBITS
    NUMBER                          PAGE IDENTIFIED
    No. 1    Memo Bills                   33
    No. 11   Broker Confirmation Sheet    21
    No. 15   Master Brokerage Agreement   81
    No. 16   Universal Am-Can, Ltd., Master  37
             Brokerage Agreement

    No. 23   Broker Confirmation Sheet    20

    No. 64   Load and Rate Confirmations  67

    No. 65   Broker Confirmation Sheet    71

    No. 72   Carrier-Broker Contract      78

    No. 73   Master Brokerage Agreement   79

    No. 75   Master Brokerage Agreement   85
```

                                                  4

## Page 5

1  TRANSCRIPT OF PROCEEDINGS
2  (Witness is sworn.)
3  MR. BURKE: Let the record reflect this
4  is the deposition of Mr. Pat Podlena taken
5  pursuant to notice and in accord with the
6  applicable rules of the Northern District of
7  Illinois.
8  JEREMIAH PATRICK PODLENA, called as a
9  witness herein, having been first duly sworn on
10  oath, was examined and testified as follows:
11  EXAMINATION
12  BY MR. BURKE:
13  Q  Mr. Podlena, as I'm sure your attorney told you,
14  I'm going to ask you some questions about your
15  work at Martin's and the incident involving my
16  client, Mr. Jeffrey Scheinman. And as I do so, if
17  you need any questions repeated or they don't make
18  sense, just tell me. If you want to take a look
19  at some document that would help you answer a
20  question, just say so.
21  If you could please keep all your answers
22  verbal as opposed to nodding your head, because --
23  A  Yes.
24  Q  -- even though we can see you nodding your head,
25  the court reporter has to take down an actual

## Page 6

1  answer. And similarly, if you could verbalize
2  yeses and noes.
3  A  Okay.
4  Q  And if you and I don't talk at the same time, that
5  helps the court reporter, so try and let me get my
6  whole question out even though you may think you
7  know the full extent of the question; and I'll try
8  and let you finish your whole answer before I
9  start a new question. Okay?
10  A  Okay.
11  Q  Would you please state your full name and spell
12  your last name for us.
13  A  Jeremiah Patrick Podlena. Last name is
14  P-O-D-L-E-N-A.
15  Q  Okay. And where do you currently live, sir?
16  A  La Crescent, Minnesota.
17  Q  Okay. And at what address?
18  A  212 South Hill Street.
19  Q  And what's your date of birth?
20  A  4/28/1957.
21  Q  Okay. And tell me a little bit about your
22  educational background. Did you finish high
23  school?
24  A  Yes, I finished high school. I attended Kansas
25  State University for one year, Washburn University

## Page 7

1  for about four years part-time. And in the
2  meantime, I went to work for Fleming Food
3  Companies, and that's why I was going part-time.
4  Q  Okay. Did you receive any degree from either of
5  the --
6  A  No, I did not --
7  Q  -- universities?
8  A  -- receive a degree.
9  Q  Did not?
10  A  Did not.
11  Q  Okay. At Washburn, did you have any particular
12  course of study that you --
13  A  Business communications.
14  Q  Okay. Do you have any experience or background
15  driving a truck?
16  A  Not driving.
17  Q  Okay. Do you have a CDL license?
18  A  No, I do not.
19  Q  Have you ever had one?
20  A  No.
21  Q  You mentioned you went to work for a food company.
22  I didn't catch the name.
23  A  Fleming Companies.
24  Q  Okay. And about when was that?
25  A  That was in 1976 part-time right out of high

## Page 8

1  school. Then I went to Kansas State full-time and
2  went back to Fleming, and I was with them for 23
3  years --
4  Q  Okay.
5  A  -- in Topeka, Joplin, Oklahoma City, and
6  La Crosse.
7  Q  And what's the nature of their business, Fleming?
8  A  Distributing food products to independent grocery
9  stores.
10  Q  And when you last -- what year did you last work
11  for Fleming?
12  A  For Fleming, it was 1999.
13  Q  Okay. And what was your job title or position
14  then?
15  A  I was backhaul coordinator in La Crosse.
16  MR. FISHER: I didn't catch the word.
17  THE WITNESS: Backhaul. Backhaul
18  coordinator.
19  MR. FISHER: Thank you.
20  BY MR. BURKE:
21  Q  Okay. And for La Crosse did you --
22  A  Correct.
23  Q  Okay. And basically, that term in your business
24  means what?
25  A  That means all of our empty trucks that were out

```
 1    on a day-to-day basis in about a four-state area,
 2    it was my job to try and fill them with product
 3    coming back and make money, keep empty miles to a
 4    minimum.
 5  Q  Okay. In general, can you give us a little
 6    overview of the different types of jobs that you
 7    did at Fleming?
 8  A  Sure. Initially started out as an order selector,
 9    working full-time, going to school part-time.
10    Then I went into management and was a grocery
11    supervisor, progressing up the ladder to
12    superintendent and assistant warehouse manager in
13    Oklahoma City. That took me from Topeka, Kansas,
14    to Joplin, Missouri, to Oklahoma City, to
15    La Crosse.
16  Q  And at some point did you start another type of
17    assignment? When you said you were the backhaul
18    coordinator, is that a different type of work or
19    was that encompassed in your --
20  A  It's --
21  Q  -- grocery supervisory jobs?
22  A  It's encompassed in the warehouse. Each warehouse
23    had them, primarily. La Crosse was a much bigger
24    operation, and so it was more challenging, more
25    fun.
                                                        9
```

```
 1  Q  Okay. Were the Fleming Companies -- were they
 2    basically a trucking company?
 3  A  They were a food distribution company, primarily
 4    warehousing. They had their own semis which they
 5    delivered product with.
 6  Q  Okay. Did they manufacture any of the food
 7    product?
 8  A  No.
 9  Q  Okay. Did they store any of the food product?
10  A  Yes.
11  Q  Did they have a motor carrier license?
12  A  Yes.
13  Q  When you left Fleming in 1999, where did you go to
14    work then?
15  A  Went to Organic Valley in La Farge, Wisconsin, as
16    their logistics manager.
17  Q  And how long did you work there?
18  A  Approximately eight years. '99 to 2007.
19  Q  Okay. And in that position, basically what did
20    you do?
21  A  I covered all of their loads that were processed
22    across the United States, set up trucking with
23    individual carriers to act as a representative and
24    deliver the goods. They grew from -- initial,
25    when I started with them, they had about five
                                                       10
```

```
 1    truckloads going out a week; and when I -- when I
 2    quit, they were putting out about 150 semi loads a
 3    week.
 4  Q  Okay. And how would you describe their -- the
 5    business of Organic Valley?
 6  A  Organic food products that had to be maintained a
 7    certain temperature, cleanliness, and there was a
 8    time frame because it was dated product. So it
 9    had to deliver primarily on time or by a certain
10    date. And we had to keep a chain of command along
11    the logistics line.
12  Q  Did they manufacture these food products?
13  A  Yes, they did.
14  Q  Okay. Did they have a motor carrier license?
15  A  No. No. They did not have their own trucks.
16  Q  Okay. When you left there in 2007, where did you
17    go to work?
18  A  I went to Martin's.
19  Q  Okay. And at what location of Martin's?
20  A  That was in Wilton, Wisconsin.
21  Q  And when did you last work at Martin's?
22  A  Would have been in November of 2008, I believe. I
23    was there for almost exactly one year.
24  Q  And why did you leave?
25  A  I was driving 100 miles a day to work, 50 miles
                                                       11
```

```
 1    one way. And I got a job more so to my liking in
 2    warehousing in La Crosse, and I only had to drive
 3    about five miles, so that's primarily why.
 4  Q  Did you get fired or --
 5  A  No.
 6  Q  -- terminated for any reason?
 7  A  I've never been fired or terminated anywhere.
 8  Q  Okay. Including at Martin's?
 9  A  That's correct.
10  Q  When you started at Martin's in 2007, what was
11    your job?
12  A  Primarily looking for backhauls out of -- from a
13    distance, trucks they sent out to East or
14    West Coast.
15  Q  And did you have a particular title or position at
16    Martin's?
17  A  No. Uh-uh.
18  Q  Did that remain your job duty during the one year
19    that you worked there?
20  A  That's correct.
21  Q  Do you know Samuel Franke?
22  A  I do not believe so.
23  Q  Okay. Did you have any involvement with training
24    drivers?
25  A  No.
                                                       12
```

```
 1   Q   Did you have any job responsibilities related to
 2       safety for Martin's?
 3   A   No.
 4   Q   During the time that you worked at Martin's, did
 5       you have any contact with any people from
 6       Overnite Express or Overnite Logistics?
 7   A   I don't recall ever dealing with anyone from those
 8       places verbally. Possibly getting their paperwork
 9       and faxing back to them the confirmation sheets,
10       which I did for, you know, a number of different
11       companies. But none -- not verbally, no.
12   Q   Okay. In 2007 -- between 2007 and 2008, were you
13       involved in signing any contracts for or on behalf
14       of Martin's?
15   A   I would assume I probably was.
16   Q   Okay. And what type of contracts?
17   A   It would have been just rate confirmation sheets
18       possibly for trucking companies that -- or for
19       companies that we were going to haul -- make
20       backhaul for, return load, things like that.
21   Q   Okay. Did you have any involvement in purchasing
22       or acquiring liability insurance coverage for
23       Martin's?
24   A   No, I did not.
25   Q   Did you ever talk to Sam Franke after this
                                                          13
```

```
 1       occurrence?
 2   A   I don't ever recall talking to Sam.
 3   Q   Okay. Do you have any knowledge as to what
 4       liability insurance coverage Martin's had related
 5       to this occurrence?
 6   A   No, I do not.
 7   Q   Who handled insurance coverage at Martin's?
 8   A   I don't know for sure on that one.
 9   Q   To whom did you report when you were working at
10       Martin's?
11   A   Dave Martin.
12   Q   And what was his position?
13   A   Owner, I believe.
14   Q   Did you ever go to -- or strike that.
15           Was all of your work at Martin's Wilton
16       location?
17   A   Correct.
18   Q   Did Martin's have any other location?
19   A   Not that I'm familiar with. People got confused
20       sometimes. There's a Marten, M-A-R-T-E-N, out of
21       Mondovi, and then at one time Dan had an uncle out
22       of Tomah that had a Martin Trucking. But those
23       weren't anything to do with his company.
24   Q   What have you reviewed in anticipation of giving a
25       deposition today?
                                                          14
```

```
 1   A   Just a couple pieces of paperwork. The bill of
 2       lading, I believe, and I'm not even sure what the
 3       names of them were. They look familiar, but
 4       that's about it.
 5   Q   Okay. Did you review anything that had your name
 6       or signature on it?
 7   A   Yes, I did.
 8   Q   Okay. And what were those items?
 9   A   I'm not sure what they were called. I mean, one
10       was a rate confirmation, and I'm not sure what the
11       other one was.
12   Q   Okay.
13   A   One would have been the contract, I guess, with
14       Overnite/Al-Cam [sic], and then the other one was
15       a rate confirmation, I believe.
16   Q   I missed part of what you said. One was the --
17       might have been the contract with Overnite?
18   A   Overnite -- Overnite Express/Al-Cam.
19   Q   Oh, okay. Universal Am-Can?
20   A   Yeah. Um-hum.
21   Q   Okay. Do you know the name Melody Hansen?
22   A   No, I do not.
23   Q   During the time that you worked for Martin's, was
24       Martin's doing any hauling directly for -- or
25       strike that.
                                                          15
```

```
 1           Was Martin's in contact with International
 2       Paper concerning any hauling for International
 3       Paper?
 4   A   They would have hauled for International as a
 5       representative for Overnite Express -- whatever
 6       that -- but not directly with -- they were acting
 7       as a representative, I believe.
 8   Q   Okay. Were you familiar -- during the time you
 9       worked at Martin's, did you ever learn that there
10       was a point in time when Martin's used to haul
11       directly for International Paper?
12   A   Not that I'm aware of. It would have been as a
13       representative.
14   Q   In 2007 -- well, strike that.
15           Well, during the time you were there, 2007 to
16       2008, was Martin's regularly involved in hauling
17       paper for International Paper up to Minneapolis?
18   A   I believe so. My field of expertise was more on
19       the refrigerated loads coming back, so that's
20       where I concentrated more on, getting rates and
21       things like that. But I believe they did that as
22       a regular load.
23   Q   Okay. And were you involved in any discussions or
24       agreements related to Martin's making that regular
25       haul of International goods?
                                                          16
```

4 (Pages 13 to 16)

McCorkle Litigation Services, Inc.
Chicago, Illinois    (312) 263-0052

**Page 17**

1  A  No. I would have not been involved in that, with
2     the exception of just seeing -- as I'd check the
3     fax machine daily, signing loads and sending them
4     back. But as far as setting those loads up,
5     agreeing to them, that would have gone through
6     Dave.
7  Q  Okay. During the time that you worked there, did
8     Martin's regularly have a driver available every
9     day for the purpose of making that pickup of
10    International Paper goods?
11       MR. FISHER: Foundation.
12       THE WITNESS: Say what?
13       MR. SCHRECK: You can go ahead and
14    answer.
15 BY MR. BURKE:
16 Q  You can answer. He's just making a legal
17    objection, but you can go ahead and answer.
18 A  Whether it was on a daily basis, I don't know. As
19    far as being that familiar with the load, I'm not.
20 Q  Okay. A moment ago, you mentioned that it was
21    your knowledge that Martin's was regularly hauling
22    a load for International Paper to Minneapolis
23    during the year that you were working there,
24    correct?
25 A  That would be correct.

**Page 18**

1  Q  Okay. And was it also your knowledge that
2     Martin's would, you know, regularly make a driver
3     available for the purpose of making that regular
4     haul for International Paper?
5  A  If it was a scheduled load, then they would have
6     someone available, I would assume. Yeah.
7  Q  Was Dave Martin -- or excuse me.
8        Was Samuel Franke the driver that regularly
9     made that run of the International Paper goods to
10    Minneapolis?
11 A  That, I do not know.
12 Q  Okay. Did you engage in any dispatching duties or
13    responsibilities at Martin's during your year
14    there?
15 A  Rarely. Usually it was answer the phone, put on
16    hold until Dave, Doreen, or Nancy did that. My
17    job was more or less to arrange the loads from
18    East or West Coast.
19 Q  Okay. Who did the dispatching work?
20 A  That would have been Dave, Doreen, or Nancy.
21 Q  Okay. And what's Nancy's last name?
22 A  I do not know. I can describe her, but I don't
23    know what her last name is.
24 Q  Does she still work there?
25 A  I believe so.

**Page 19**

1  Q  And was it Doreen, did you say?
2  A  Correct.
3  Q  Okay. And what's Doreen's last name?
4  A  I'm not sure. She was married and divorced, and I
5     believe her married name was P-I-C-H-A or E. And
6     the only reason I know that is because I coached
7     AAU boys' basketball, and her son played against
8     my son's team and beat us on a last-second shot.
9        MR. SCHRECK: Not that you're bitter or
10    anything, right?
11       THE WITNESS: It was my fault. Dumb
12    coach mistake. I should've had him foul him.
13 BY MR. BURKE:
14 Q  And when was that?
15 A  That -- what? You mean coaching or --
16 Q  The game you're thinking of.
17 A  Oh. That was actually before I went to work for
18    Dave. I found out afterwards that -- he walked in
19    one day, and I thought, "You're the kid who beat
20    my team."
21 Q  Okay. Well, Matt's right. You haven't forgotten
22    that.
23       Okay. What was your understanding what
24    dispatchers did at Martin's?
25 A  They would instruct the driver as to where to go

**Page 20**

1  and give him confirmation numbers to pick up as
2  the representative agent for whoever they were
3  picking up for. Normally you can't pick up a load
4  without a confirmation number.
5  Q  Okay. Let me tender to you what was previously
6     marked as Exhibit 23, and take a look at that for
7     a moment.
8  A  Um-hum.
9  Q  Mr. Podlena --
10       MR. SCHRECK: Rich, was there another
11    copy of that that was marked that doesn't have
12    that sticker thing on top of it? I don't know if
13    you want to use that one instead.
14       MR. BURKE: That's probably 11 --
15       MR. SCHRECK: Yeah.
16       MR. BURKE: -- that you're thinking of.
17       MR. SCHRECK: Yeah. I think that's
18    probably what I was thinking of. I don't know
19    what you were going to ask him about it, but --
20       MR. BURKE: I have both. I have both,
21    actually. And, in fact, here. I'll tender you
22    Exhibit 11 as well.
23 BY MR. BURKE:
24 Q  And, I guess, number one, first with respect to --
25    take a look at 11. That's entitled "Broker

**Page 21**

1  Confirmation Sheet." Am I correct?
2  A  Correct.
3  Q  Okay. What's your understanding of what that
4     document is?
5  A  That would be a typical confirmation sheet between
6     the -- sending in a rate confirmation and the
7     pickup location and the drop location with the
8     confirmation number to Martin's, which come
9     through the fax. And since I usually check that,
10    I sent it back to Overnite/UACL, agreeing that we
11    would represent them and be their agent to pick
12    this up and deliver in a timely fashion.
13 Q  You covered a lot in that answer, for which I
14    thank you, but let me back up and maybe we can
15    walk through this a little bit.
16 A  Sure.
17 Q  Number one, that is your signature down in the
18    bottom, correct?
19 A  That is correct.
20 Q  Okay. When would you have received -- or excuse
21    me. When would you have put your signature on
22    that in relation to when you received this
23    document?
24 A  Probably a couple days before. It looks like the
25    pickup date was 7/3, and most likely we would have

**Page 22**

1     gotten it a couple days before that. And as soon
2     as it comes through, one of us in the office would
3     sign it and fax it back so they know right away we
4     did receive it, so that they know that their
5     product will be picked up and we will act as their
6     agent and pick it up and deliver it.
7  Q  Okay. And to whom would this normally come, this
8     type of broker confirmation sheet?
9  A  This would come across the fax machine. And if it
10    was something that wasn't out of the ordinary or
11    something that I was familiar with, nine times out
12    of ten I would have signed it because that
13    alleviated the pressure of Nancy and Doreen and
14    Dave from having to do this, because they were
15    going to be on the phone with drivers.
16 Q  Okay.
17 A  My main thing was to confirm the rate.
18 Q  Okay. And what would you -- when you say "the
19    rate," is that in the middle of the page there, or
20    what are you referring to?
21 A  I'm referring to the total payment to the carrier
22    of $974.08.
23 Q  Okay. And that's set forth in the middle of the
24    page, right?
25 A  That --

**Page 23**

1  Q  Under total payments to the carrier?
2  A  Correct.
3  Q  Okay. And how would you -- you know, for example,
4     on this date -- now, this fax is dated July 3,
5     2008, at 16:23 hours, correct?
6  A  That looks correct.
7  Q  Up in the left-hand corner?
8  A  Um-hum.
9  Q  Top left, I should say?
10 A  Yes.
11 Q  And that's 4:23 p.m., correct?
12 A  Correct.
13 Q  Okay. And to the right, it says Overnite
14    Logistics on the top?
15 A  In the middle upper?
16 Q  On the top of the page. Yes.
17 A  Yes, I see that.
18 Q  And who did you understand Overnite Logistics to
19    be? Or here. Strike that.
20    Let me ask you, are you familiar with
21    Overnite -- the term Overnite Express?
22 A  I've heard of them.
23 Q  Okay. Had you heard of Overnite Logistics?
24 A  At this stage, I really don't remember.
25 Q  Okay. During your time while you were working at

**Page 24**

1     Martin's, did you ever become familiar with the
2     fact that Universal Am-Can had purchased some
3     Overnite Express entities?
4  A  No. I wasn't aware.
5  Q  Okay. The phone number on the top there, do you
6     know whose phone number that would be?
7  A  No, I do not.
8  Q  And by the way, that number is (708)331-8604,
9     correct?
10 A  Correct.
11 Q  And in the low -- beneath -- and to the far right,
12    it says, "By: Melody Hansen." Correct?
13 A  Correct.
14 Q  Okay. Had you seen or heard that name prior to
15    July 3rd?
16 A  Only on these faxes that would have come across if
17    I signed and faxed back. As far as dealing with
18    anybody from there over the phone or something, it
19    was something I never did. That was usually
20    Doreen or Dave.
21 Q  Okay. And who did you believe Melody Hansen
22    worked for?
23 A  I had no idea.
24 Q  Okay.
25 A  I would have assumed either Universal Am-Can,

McCorkle Litigation Services, Inc.
Chicago, Illinois    (312) 263-0052

```
 1      Overnite Logistics -- or Overnite Express,
 2      whatever -- we were acting as an agent for the
 3      people that sent the fax over.
 4   Q  How did you go about making sure the payment was
 5      correct, that the amount here was correct?
 6   A  Well, regionally there are rates that you expect
 7      coming out of different areas, especially for one,
 8      two, or three drop-loads, which is what this was.
 9      So you could look at it and know that they were in
10      the ballpark. And, you know, if it would have
11      shown $400, I would have known right away,
12      [descriptive sound] no. Or if it would have been
13      12 to 14, I would have known that was a very good,
14      high-paying load.
15   Q  Okay. Is any of the information on this sheet
16      other than your signature prepared by you?
17   A  No. None of it is.
18   Q  Okay. Would this have come to Martin's with
19      Melody Hansen's signature on it?
20   A  She -- correct. It looks like she was the one
21      that was brokering the load.
22   Q  Okay. And did you have any knowledge of what
23      agreement or contract that either Overnite Express
24      or Universal Am-Can had with International Paper
25      with respect to providing transportation services
                                                         25
```

```
 1      to International Paper?
 2   A  No. They -- no.
 3   Q  That was not -- was that a contract you had ever
 4      seen?
 5   A  No. I mean, I -- the contract would have been --
 6      no. That was something I would have never seen.
 7   Q  Okay.
 8   A  No.
 9          MR. SCHRECK: Can you read back the
10      question, please?
11      (Page 25, Line 22 to Page 26, Line 1 read back.)
12   BY MR. BURKE:
13   Q  Mr. Podlena, back to Exhibit 11 in front of you,
14      the load number that's referred to there,
15      9000-245546-7, what's your understanding of whose
16      load number that is?
17   A  That would be the account -- that would be the
18      pickup number they used at the International Paper
19      warehouse to be able to get through the gate to
20      pick up that load. And we could not have received
21      that except through Universal Am-Can, Overnite
22      Logistics, whatever you want to call it, giving
23      that to us.
24   Q  Okay. And right underneath that, it says "agent,"
25      and then there's a number 5511 crossed out, and
                                                         26
```

```
 1      then there's another number, 6073. What does that
 2      number refer to, if you know?
 3   A  I do not know.
 4   Q  Okay. Now, with respect to the -- under Pickup
 5      Information, the pickup date is July 3rd of '08 at
 6      1900 hours, correct?
 7   A  7:00 p.m. Correct.
 8   Q  Okay. And am I correct that through this
 9      document, Overnite Express or Universal is
10      instructing Martin's to pick up paper goods at
11      International Paper's warehouse in Hammond,
12      Indiana, on July 3rd at 7:00 p.m.?
13          MR. FISHER: Form.
14          THE WITNESS: That would be correct.
15      Acting as their agent.
16   BY MR. BURKE:
17   Q  Okay. And then additionally, under the Delivery
18      Information then on this document, is
19      Overnite Express or Universal instructing Martin's
20      to make these deliveries in the locations set
21      forth here on July 7 between 7:30 a.m. and
22      4:00 p.m.? Is that correct?
23   A  That would be correct.
24   Q  And there's three different deliveries set forth
25      here at three different locations, correct?
                                                         27
```

```
 1      Cenveo, Midland, and xpedx?
 2   A  That looks correct.
 3   Q  Okay. There's numbers 1 and 2. Like, there's a
 4      No. 1 in front of Midland and a 2 in front of
 5      xpedx. Is that the order of dropoff, or do you
 6      know?
 7   A  Looking at it, it looks like it would be the order
 8      of dropoff.
 9   Q  Okay. And when would you have signed this? If
10      this came in at about 4:23 on July 3rd, when would
11      you have signed this, Mr. Podlena?
12   A  Probably within a few minutes. For all I know,
13      they could have been waiting for that, for this
14      confirmation from them.
15   Q  Okay. And would you have faxed it back to
16      somebody?
17   A  Correct.
18   Q  At United -- or at Universal or Overnite Express?
19   A  Correct.
20   Q  Okay. How would you know where to fax it back to?
21   A  That, I do not know. That's what I'm looking for
22      right now. There would have been a fax number,
23      whether it would have been right on the fax
24      machine with these people listed or on this sheet
25      of paper. Oh, here. Here's another name. Please
                                                         28
```

**Page 29**

1   sign and fax to John Moore, 800-67[sic]-0706,
2   so --
3 Q Okay. That's in the lower left there?
4 A That is correct.
5 Q Do you see the name Ron McGinnes handwritten or
6   printed on the lower left?
7 A Yes, I do.
8 Q Who was he?
9 A I believe he was the driver that took it up to the
10  cities, to Minneapolis, and delivered.
11 Q Okay. From Martin's up to Minneapolis, you mean?
12 A Correct.
13 Q So are you referring to -- would Mr. Franke bring
14  this load from Hammond back to Wilton and then
15  Ron McGinnes take it to Minneapolis?
16 A That would be correct.
17 Q Who did Ron McGinnes work for?
18 A Martin's. Dave has a number of drivers that
19  primarily ran The Cities and others that primarily
20  ran Chicago, and that's the way they liked it.
21  Some left earlier; some left later. So -- and
22  Ron, from what I can recall, primarily was a
23  Minneapolis driver.
24 Q You know, I also gave you Exhibit 23. Could you
25  take a look at that and --

**Page 30**

1 A Sure.
2 Q -- tell me, is there any difference between that
3   document and Exhibit 11, other than on 23 there's
4   a Universal Am-Can stamp or sticker of some kind
5   that blocks out some of the typewritten content?
6 A That looks -- well, that sticker is actually the
7   load number. After he picked it up, it looks like
8   that's what -- they stamped it on there.
9 Q Okay. So the number -- on Exhibit 23, there's,
10  like, a bar code number, correct?
11 A Correct.
12 Q Okay. And that load number actually
13  corresponds -- or strike that.
14      Underneath the bar code, there's a typed load
15  number of 9000-245546-7; is that correct?
16 A That looks correct, sir.
17 Q And that load number corresponds with the load
18  number that's handwritten up at the top of the
19  broker confirmation sheet, correct?
20 A Correct.
21 Q Okay. And when would this sticker or stamp have
22  been affixed to Exhibit 23?
23 A I would think when it was picked up.
24 Q Picked up --
25      MR. SCHRECK: If you don't know, let him

**Page 31**

1   know.
2       THE WITNESS: Okay.
3       MR. SCHRECK: Only give what you know.
4   Don't make any assumptions.
5       THE WITNESS: I do not know then.
6 BY MR. BURKE:
7 Q Okay. Do you have any conscious recollection of
8   actually signing this document?
9 A No.
10 Q Okay. Is this the type of document that you would
11  regularly sign when you'd see these things come
12  through the fax machine, as you told us earlier,
13  to try and relieve the others of some work?
14 A That is correct.
15 Q When you would have seen this on July 3rd of 2008,
16  would you recognize the location of this pickup at
17  International Paper's warehouse as one of the
18  regular assignments that Martin's was involved in?
19 A I'm not sure.
20 Q Okay. Well, you said you knew that regularly
21  Martin's transported International Paper's goods
22  on a regular basis, correct?
23 A Okay. Correct.
24 Q Yeah.
25 A I just wasn't -- whether it was day to day, twice

**Page 32**

1   a week. I knew it happened --
2 Q Pretty regularly?
3 A Correct.
4 Q With respect to this load and these two documents,
5   did you have any other involvement with this
6   transportation of International Paper goods other
7   than what you've told us?
8 A No.
9 Q Did you ultimately learn that Mr. Franke had been
10  involved in a collision with an automobile?
11 A No. I did not know anything until I was called
12  concerning this deposition in November a year ago
13  or whenever. So no, I was not aware of any
14  accidents whatsoever.
15 Q Okay.
16     MR. SCHRECK: One thing, keep your voice
17  up. I don't know if --
18     THE WITNESS: Oh, I'm sorry.
19     MR. SCHRECK: You tend to fade out.
20     THE WITNESS: Okay.
21     MR. SCHRECK: So keep it up so this way
22  he can hear on the phone and --
23     THE WITNESS: Okay.
24 BY MR. BURKE:
25 Q During the days after July 3rd of 2008, did you

8 (Pages 29 to 32)

**Page 33**

| | | |
|---|---|---|
| 1 | | ever hear at Martin's or anywhere else that there |
| 2 | | had been a bad collision involving a Martin's |
| 3 | | driver and a vehicle in suburban Chicago? |
| 4 | A | No, I hadn't. |
| 5 | Q | Did you ever learn of Mr. Franke getting fired or |
| 6 | | terminated from Martin's? |
| 7 | A | No, I had not. |
| 8 | Q | Did you ever speak with Mr. Franke concerning this |
| 9 | | occurrence? |
| 10 | A | No. I don't believe I ever spoke with Mr. Franke. |
| 11 | | I did not really deal with the drivers much at |
| 12 | | all. |
| 13 | Q | Did you ever speak to anybody about how this |
| 14 | | occurrence happened? |
| 15 | A | No. |
| 16 | Q | Did you ever learn, you know, other than through |
| 17 | | your lawyer about any of the facts or details of |
| 18 | | this occurrence? |
| 19 | A | No. I didn't know anything about it. |
| 20 | Q | Okay. What month in 2008 did you leave Martin's? |
| 21 | A | Would have been November -- probably November 8th. |
| 22 | | First or second week of November. |
| 23 | Q | Okay. Take a look at a portion of Exhibit 1 that |
| 24 | | I will tender to you, sir, which are marked with |
| 25 | | some -- what we call Bates numbers in the lower |

**Page 34**

| | | |
|---|---|---|
| 1 | | right corner of UACL/OEI_1, 2, and 3. |
| 2 | | MR. FISHER: Rich, if it's any help, 18, |
| 3 | | 19, and 20 are probably the ones you're looking |
| 4 | | for. |
| 5 | | MR. BURKE: No. I want to show him |
| 6 | | these at the moment. |
| 7 | | MR. FISHER: Okay. |
| 8 | | BY MR. BURKE: |
| 9 | Q | Here's a copy I have for you there. And those are |
| 10 | | entitled "Memo Bill," correct? |
| 11 | A | That's what it says at the top. Correct. |
| 12 | Q | Okay. And what's your understanding of what a |
| 13 | | memo bill is? |
| 14 | A | It looks like they're copies of the bills of |
| 15 | | lading on those. |
| 16 | Q | Okay. And what's the purpose of this memo bill? |
| 17 | A | If the driver would be stopped -- well, like I |
| 18 | | said, these are copies, but it shows what he's |
| 19 | | hauling. |
| 20 | Q | Okay. And, you know, up at the top there, it says |
| 21 | | the carrier is Oxen. Do you see that? |
| 22 | A | I do now. |
| 23 | Q | Okay. Do you know what that designation "Oxen" |
| 24 | | refers to? |
| 25 | A | I would say Overnite Express. |

**Page 35**

| | | |
|---|---|---|
| 1 | Q | And then it refers to -- or underneath that, it |
| 2 | | says, "Received from: International |
| 3 | | Paper - Hammond." Correct? |
| 4 | A | Yes. It does say that. |
| 5 | Q | Okay. And the shipment date on these is, in the |
| 6 | | right, July 3, 2008, correct? |
| 7 | A | That looks correct. |
| 8 | Q | Okay. And then there is -- on each of the three I |
| 9 | | gave you, there's a separate location for the |
| 10 | | delivery; is that correct? One's for |
| 11 | | Midland Paper in Minneapolis, one for xpedx, and |
| 12 | | one for Cenveo? |
| 13 | A | That's correct. |
| 14 | Q | Okay. And, for example, on page 1, sir, the memo |
| 15 | | bill for Midland Paper, do you see the note |
| 16 | | section? |
| 17 | A | Yes, sir. |
| 18 | Q | Okay. And there's some instructions there about |
| 19 | | contact customer service at Midland, and it gives |
| 20 | | a phone number and a name to schedule a delivery, |
| 21 | | and it specifies the delivery hours of 5:00 to |
| 22 | | 2:30. Do you see that? |
| 23 | A | Yes. |
| 24 | Q | Okay. Now, what's your understanding of what |
| 25 | | those instructions are for? |

**Page 36**

| | | |
|---|---|---|
| 1 | A | Those are to the carrier to schedule deliveries if |
| 2 | | the -- if the broker -- or if they're not made |
| 3 | | already. That would be up to the carrier to make |
| 4 | | the appointments between those hours and confirm. |
| 5 | Q | Okay. With respect to the Midland Paper one that |
| 6 | | you have here on page 1, are those delivery |
| 7 | | instructions being given by International Paper to |
| 8 | | the carrier, Overnite Express, about delivery? |
| 9 | A | That would be correct. |
| 10 | Q | And then similarly, on page 2 and 3, there's |
| 11 | | delivery instructions for the xpedx delivery and |
| 12 | | the Cenveo, respectively; is that correct? |
| 13 | A | That is correct. |
| 14 | Q | Mr. Podlena, could I ask you to take a look at |
| 15 | | Exhibit 1, pages 19 -- or beginning at page 19 |
| 16 | | through 27? |
| 17 | | MR. BURKE: If you have that there, |
| 18 | | Matt. |
| 19 | | MR. SCHRECK: Yeah. I've got it here. |
| 20 | | MR. BURKE: Could you please show it to |
| 21 | | Mr. Podlena? |
| 22 | | MR. SCHRECK: There's another copy. |
| 23 | | It's not as shrunk down. I don't know if you want |
| 24 | | to -- it's in the 60s. |
| 25 | | MR. BURKE: Let me use this. I mean, if |