Page 37

```
 1   he wants to look at both, that's perfectly fine,
 2   but --
 3        THE WITNESS: I can see.
 4        MR. BURKE: But just for the record --
 5        MR. SCHRECK: That's fine.
 6        MR. BURKE: -- I'll ask you to take a
 7   look at what we've previously marked as
 8   Exhibit 16.
 9        Did I say that? I forget if I said
10   that.
11        MR. FISHER: Exhibit 16 or Bates No. 16?
12        MR. BURKE: Well, we've marked -- I'm
13   sorry. We've marked it as Martin Exhibit 16,
14   but --
15        MR. SCHRECK: Well, it's in Exhibit 1,
16   and it's also in Exhibit 16.
17        MR. BURKE: Yeah.
18        MR. SCHRECK: It's the same document.
19   If you want to use 16, that's fine. I'll flip
20   there.
21        MR. BURKE: Yeah. And that is also
22   contained in Exhibit No. 1, pages 19 through 27.
23        THE WITNESS: Okay.
24   BY MR. BURKE:
25   Q  Do you have Exhibit 16 in front of you, sir?
```

Page 38

```
 1   A  Yes.
 2   Q  Okay.
 3   A  I do.
 4   Q  And that appears to be entitled "Universal Am-Can,
 5      Limited, Master Brokerage Agreement"?
 6   A  That's what it says. Correct.
 7   Q  Okay. And take a look at the third page of that
 8      document, which has Bates No. 21 on the lower
 9      right.
10   A  Yes, sir.
11   Q  Okay. Is that your signature on that line there?
12   A  Yes, it is.
13   Q  Okay. Do you have any recollection of signing
14      that?
15   A  This one?
16   Q  Yeah.
17   A  I've signed many through the years, so --
18   Q  With respect to this agreement, would you have had
19      any conversations with anybody from Universal
20      Am-Can about this agreement?
21   A  I don't think so. This would have come across
22      just as -- it looks like a fairly normal
23      agreement -- brokerage agreement. They sent
24      across their motor vehicle, their authorization,
25      the typical stuff that any carrier would send or
```

Page 39

```
 1      any broker would send.
 2          And it looks like it would have come through.
 3      Most likely, whoever got it -- and it looks like
 4      it was me that signed it -- would have said, "Are
 5      we going to haul something for these guys?" Or
 6      whatever the case may be. I'd have Dave look at
 7      it, and I would have signed it then and sent it on
 8      its way.
 9   Q  In terms of the content of the agreement, it
10      sounds like you would not have discussed that at
11      all with anybody from Universal?
12   A  No. I would not have.
13   Q  Okay. This agreement is dated June 12, 2008,
14      correct? Do you see that on the top paragraph?
15   A  Oh, yeah.
16   Q  Okay.
17   A  Yes, sir.
18   Q  Now, even prior to the date of this agreement, you
19      knew that Martin's was regularly hauling paper for
20      International Paper on that run from Hammond to
21      Minneapolis from the time you first started at
22      Martin's in 2007, correct?
23          MR. FISHER: Foundation.
24          THE WITNESS: I was aware of the load
25      after I was there for a while. To say I
```

Page 40

```
 1      absolutely knew who they were hauling it for,
 2      because of not being that familiar with it, the
 3      only thing I would know would be -- from what I
 4      can see here, is seeing on the paperwork Universal
 5      Am-Can, Overnite Logistics, whatever the case may
 6      be.
 7   BY MR. BURKE:
 8   Q  Yeah. And actually, what I'm talking about is you
 9      told us that at some point in time after you
10      started working at Martin's, you became aware that
11      there was a regular run that Martin's would make
12      for International Paper, correct?
13          MR. FISHER: Objection. Foundation.
14      Mischaracterizes his previous testimony.
15          MR. SCHRECK: You can go ahead and
16      answer.
17          THE WITNESS: As far as International
18      Paper, it was a load picked up there. They were
19      actually hauling it for the Overnite, Universal
20      Am-Can, whatever the case may be.
21   BY MR. BURKE:
22   Q  Okay. And that's the load I'm referring to.
23   A  Okay.
24   Q  That there was a pickup being made at
25      International at the request of Overnite Express,
```

1  correct?
2  A  Well, whether it was Overnite or Universal Am-Can.
3     I knew we were representing one or both of those.
4  Q  Okay. And all I'm asking about now is that you
5     were aware of that -- the transportation of that
6     load and that the pickup of the International
7     goods was taking place regularly, even before this
8     date of June 12, 2008, correct?
9  A  I believe so.
10 Q  When you signed this agreement, would you have
11    read through it at all before signing it?
12 A  I would have glanced at it to see -- and that
13    would be basically it. I'd get these in, oh, one
14    to two a week, and normally they all had the same
15    standardization to them. But to read it word for
16    word, no, I would not have.
17 Q  Okay. And if I could ask you to take a look at
18    paragraph 3 on page 1, Mr. Podlena. Could you
19    glance at that?
20 A  Um-hum. Yes.
21 Q  And while you're at it, look at line 2 and line 4.
22 A  Line 2, line 4, and then paragraph 3?
23 Q  No. Line 2 and line 4 of paragraph 3.
24 A  Okay.
25 Q  And while you're at it, I'm just directing your
                                                      41

1     attention to where it refers to providing
2     transportation services.
3  A  Okay.
4        MR. SCHRECK: Read that paragraph. Then
5     he'll ask you a question.
6        THE WITNESS: Okay.
7  BY MR. BURKE:
8  Q  Okay. And the subject of that paragraph is that
9     Martin's was going to be providing transportation
10    services for Universal Am-Can; is that correct?
11 A  That looks correct.
12 Q  And then let me ask you to look at the last few
13    lines of that paragraph where it talks about
14    complying with federal, state, and local laws.
15    Take a look at that for a moment, please.
16 A  Here? Okay.
17 Q  Am I correct that under the terms of paragraph 3,
18    that Universal Am-Can was requiring Martin's to
19    comply with all federal, state, and local laws
20    regarding the provision of transportation
21    services?
22 A  I would agree.
23 Q  Okay. And that meant that the truck drivers for
24    Martin's had to comply with all federal, state,
25    and local traffic laws while providing trucking
                                                      42

1     transportation services, correct?
2        MR. SCHRECK: I'm going to object to
3     foundation. Calls for speculation.
4        You can go ahead and answer if you know.
5        THE WITNESS: You would expect the
6     drivers to obey all the rules and regulations of
7     the road. Yes.
8  BY MR. BURKE:
9  Q  Okay. And, in fact, under this agreement,
10    Universal was actually requiring the Martin
11    drivers to comply with driving -- local, state,
12    and federal driving laws, correct, as part of this
13    agreement?
14       MR. SCHRECK: Same objection.
15       You can go ahead and answer if you know.
16       THE WITNESS: We would expect all
17    drivers, whether -- to obey the laws, so --
18 BY MR. BURKE:
19 Q  And I know and agree that, yes, Martin's would
20    expect all of its drivers to obey those laws.
21    My question here is that under this
22    agreement, Universal was specifically saying that
23    the Martin drivers had to comply with all federal,
24    state, and local laws, correct?
25 A  Correct.
                                                      43

1  Q  Okay.
2  A  As any other company. One thing, if I could
3     add --
4        MR. SCHRECK: No. No. No. He'll ask
5     you a question.
6        MR. BURKE: That's up to your lawyer.
7        MR. SCHRECK: He'll ask you a question,
8     and if it comes up, it comes up.
9  BY MR. BURKE:
10 Q  How about under paragraph 5? Take a look at that
11    for a minute, and in particular 5A and --
12    actually, 5A through D while we're at it.
13 A  Um-hum. Got it.
14 Q  Okay. Under this agreement, Universal was
15    requiring that Martin's have certain levels of
16    insurance coverage; is that correct?
17 A  That is correct.
18 Q  Okay. And under 5A, Martin's had to have not less
19    than $1 million in public liability and property
20    damage insurance; is that right?
21 A  That's correct.
22 Q  And there's other insurance requirements set forth
23    in paragraphs A through -- excuse me, in
24    paragraphs B and C, correct?
25 A  Correct.
                                                      44

**Page 45**

1  Q  Okay. For example, in C, Martin's had to have
2     workers' comp insurance, correct?
3  A  Correct.
4  Q  All right. And in paragraph D, Martin's was
5     required to provide Universal with written
6     certificates confirming that they had such
7     insurance coverage, correct?
8  A  That's correct.
9  Q  Now, paragraph 6 sets forth rules for payment by
10    Universal to Martin's; is that right?
11 A  That looks correct.
12 Q  Okay. And under -- take a look at the bottom,
13    about the bottom third. And I guess more
14    specifically, seven lines up from the bottom, that
15    starts with, "Carrier agrees that UACL has the
16    exclusive right to handle all billing of freight
17    charges."
18    Do you see that, sir?
19 A  Yes, I see that.
20 Q  Okay. Now, under that provision, Universal was
21    keeping control of all billing procedures,
22    correct?
23 A  From the way it looks, yes.
24 Q  Okay. And, in fact, it goes on to say that
25    Martin's had to refrain from any collection

**Page 46**

1     efforts against anybody, a shipper or receiver or
2     consignee, correct?
3  A  I do not know. At this point, I'm not a lawyer,
4     so for me to interpret that --
5  Q  Okay. Take a look at the phrase. It does say
6     there, "Carrier agrees to refrain from all
7     collection efforts against the shipper, receiver,
8     consignor, consignee, or the customer." Is that
9     right?
10 A  Correct. I see that.
11 Q  Okay. And then also in paragraph 7, Martin's
12    could not solicit any traffic from any shipper or
13    customer of Universal if the availability of that
14    traffic first became known to Martin's as a result
15    of Universal's efforts, correct?
16 A  That's correct. That's what I would --
17 Q  Okay. And then in paragraph 8, it refers to --
18    that all the shipments that are the subject of
19    this agreement are being transported by Martin's
20    on behalf Universal, correct?
21    MR. FISHER: Objection to form.
22    THE WITNESS: Could you repeat that?
23 BY MR. BURKE:
24 Q  Sure. In paragraph 8, it says that "Carrier
25    warrants that all shipments transported by carrier

**Page 47**

1     on behalf of UACL will be transported under its
2     motor carrier authority." Correct?
3  A  Correct.
4  Q  Okay. And this contract refers to Martin's
5     transporting goods on behalf of Universal,
6     correct?
7  A  That actually clarifies so Martin wouldn't
8     third-party it out and broker it themselves.
9  Q  Okay. That's what it goes on to say in the
10    remainder of the paragraph, correct?
11 A  That they wouldn't broker it themselves. That's
12    correct.
13 Q  Right. But whatever shipments are being
14    transported by Martin's here are being transported
15    on behalf of Universal, correct?
16    MR. FISHER: Objection. Form.
17    THE WITNESS: Universal or Overnite.
18 BY MR. BURKE:
19 Q  Right. Depending --
20 A  Right.
21 Q  Up until the point in time when Universal
22    purchased them?
23 A  Correct.
24 Q  Okay. However, in actuality, though, this
25    agreement is actually entered into with Universal,

**Page 48**

1     correct?
2  A  Well --
3     MR. SCHRECK: Look at what he's pointing
4     at.
5     THE WITNESS: Where?
6  BY MR. BURKE:
7  Q  Just on the front page.
8  A  Oh, okay. Correct.
9  Q  Could you take a look at the third page, Bates
10    No. 21, sir, paragraph 10?
11 A  Um-hum. Okay.
12 Q  Okay. And the first part of that says the carrier
13    will be -- will do the dispatching, correct?
14 A  Correct.
15 Q  And then in line 3, am I correct that it states
16    that the carrier -- which here would be Martin's
17    under this particular contract, right?
18 A  Correct.
19 Q  So am I correct that this says that Martin's
20    agrees to contact UACL's designated agent with
21    billing information immediately upon completion of
22    leaving and with the name of receiver and --
23 A  Loading?
24 Q  Or excuse me. Thank you -- upon completion of
25    loading and with the name of receiver and status

McCorkle Litigation Services, Inc.
Chicago, Illinois    (312) 263-0052

**Page 49**

1 of delivery immediately upon completion of
2 delivery. Is that correct?
3 A Yeah. That's exactly what it says.
4 Q Okay. And those were requirements imposed by
5 Universal on Martin's pursuant to this agreement,
6 correct?
7 A Correct, which --
8 Q Okay. And then in paragraph 12 -- let's see.
9 Actually, take a look at the next page, rather,
10 page 22. Is that a copy -- let's see. Not 22.
11 23. How about 24? That's what I'm looking for,
12 sir.
13     Is that a copy of a certificate of liability
14 insurance for Martin's?
15 A That's correct.
16 Q Okay. And would this have been provided to
17 Universal in response to their requirement that
18 Martin's provide evidence of the amount of
19 liability insurance that Universal required
20 Martin's to have?
21 A That's correct.
22 Q Okay. And here, this certificate refers to
23 $1 million in coverage; is that correct?
24 A That looks correct.
25 Q Do you know if Martin's had any other insurance

**Page 50**

1 coverage other than this $1 million?
2 A I would have no idea.
3 Q How about any -- what's sometimes referred to as
4 excess or umbrella coverage?
5 A I would have no idea. I was not privy to anything
6 like that.
7 Q Earlier we talked about on that broker
8 confirmation sheet, there was -- $974 was the
9 rate?
10 A Yeah.
11 Q Was that -- you would not have -- or strike that.
12     Did you negotiate that rate?
13 A No, I did not.
14 Q Okay. Would that rate have been predetermined by
15 some agreement between Dave Martin or somebody
16 else at Martin's and Universal?
17 A It would have gone through Dave and -- yeah.
18 Something like that.
19     MR. BURKE: Okay. I don't think I have
20 anything else at the moment, Mr. Podlena.
21     MR. FISHER: Take a quick break?
22     MR. SCHRECK: Yeah.
23 (A recess is taken from 12:16 p.m. to 12:28 p.m.)
24     E X A M I N A T I O N
25

**Page 51**

1 BY MR. FISHER:
2 Q Mr. Podlena, my name is Carl Fisher. I represent
3 Universal Am-Can, Limited, as the successor to
4 Overnite Express. I also represent International
5 Paper and a company called Ox, LLC.
6     Let's start with that last named company.
7 Does that name mean anything to you, Ox, LLC?
8 A No.
9 Q Okay. I want to go back a little bit in your
10 experience when you were describing for us the
11 work you did for other companies --
12 A Sure.
13 Q -- and ask you a few questions. Organic Valley.
14 You said they didn't have any trucks, correct?
15 A That's correct.
16 Q And your work was as a logistics manager, and you
17 described, you know, what you did.
18     In that capacity as logistics manager for a
19 little under ten years at Organic Valley, did you
20 have to ever deal with any trucking companies or
21 delivery companies?
22 A Positively.
23 Q Okay. Let's separate them out. With respect to
24 the trucking companies, describe for me briefly
25 what your relationship was with the trucking

**Page 52**

1 companies with which Organic Valley had a
2 relationship to get their business, you know,
3 done.
4 A Totally, I probably dealt with over 50 to 60
5 trucking companies, which were delivery. They did
6 our deliveries for us, to the tune of about
7 $100 million a year.
8 Q And do you remember the names of any of these
9 trucking companies?
10 A Sure.
11 Q Okay.
12 A Minn-Tex, which is out of Brainerd, Minnesota, I
13 believe it was. KCX, which is Kansas Continental
14 Express, which was a broker. I can give you phone
15 numbers if you'd like.
16 Q No.
17 A Walbon out of Minneapolis. Darby, I dealt with
18 him a lot. All these guys. I'm trying to think
19 of others. Well, Marten hauled some for us.
20 Q And when you say "Marten," do you mean Martin's
21 Bulk Milk or do you mean Marten with an E?
22 A Both, actually. I was as familiar with Marten
23 with an E out of Mondovi. The brokerage manager
24 up there is a good friend of mine. I knew him way
25 before I knew Dave Martin.

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

```
 1  Q  Okay. And with respect to those companies, a few
 2     of which you gave me examples, were there written
 3     contracts with those companies?
 4  A  Yes.
 5  Q  And were they written contracts in which Organic
 6     Valley was acting as the shipper?
 7  A  Yes. We were acting as the shipper, and they had
 8     to adhere to our organic policies and provide
 9     proof of insurance.
10  Q  All right. And were there written contracts in
11     which Organic Valley indicated to the trucking
12     companies that Organic Valley was using language
13     like what was contained in the brokerage agreement
14     that Mr. Burke showed you, which specifically in
15     paragraph 3 said that under no circumstances was
16     the trucking company or the carrier supposed to be
17     considered an agent, but instead was an
18     independent contractor? Did your Organic Valley
19     contracts with trucking companies have such
20     language in them?
21  A  I'm not sure I followed that.
22  Q  Sure. Why don't you look at one of the exhibits
23     that Mr. Burke showed you. I believe it was the
24     brokerage agreement, and I think it was Exhibit --
25        MR. SCHRECK: 16?
                                                     53
```

```
 1        MR. FISHER: Yeah. Go to that one.
 2  BY MR. FISHER:
 3  Q  And if you look at the -- there's a bunch of
 4     whereas, you know, preamble paragraphs at the
 5     beginning, and then there's some numbered
 6     paragraphs.
 7  A  Yes, sir.
 8  Q  And do you see where in paragraph 3, it says,
 9     "Carrier" -- referring to Martin's Bulk Milk --
10     "is an independent contractor and is in no way to
11     be considered an agent, employee, or joint venture
12     of UACL"?
13  A  Yes.
14  Q  Do you see that language?
15  A  I see that.
16  Q  Was that the typical type of language that was
17     contained in the contracts that you saw that
18     Organic Valley had with the trucking companies
19     that it did business with?
20  A  No.
21  Q  That is to say, that Organic Valley did not want
22     to have those trucking companies considered to be
23     its agents?
24        MR. BURKE: Objection. Vagueness.
25     Form.
                                                     54
```

```
 1        MR. SCHRECK: I'll join.
 2        MR. FISHER: You can go ahead and answer
 3  now.
 4        MR. SCHRECK: If you know.
 5        THE WITNESS: Okay. Actually, the
 6  wording with Organic Valley was they did act as an
 7  agent. Because of the organic industry, they had
 8  to adhere to just hauling certain things in their
 9  trailers so that there was no contamination.
10        And they were graded on their
11  deliveries, the mannerisms of the drivers. And
12  that is what either kept them delivering for us or
13  why we got rid of them, if their drivers were
14  rude, anything like that.
15  BY MR. FISHER:
16  Q  So let me make sure I understand this. So in
17     these contracts that Organic Valley had with its
18     trucking companies, there was language in these
19     contracts that you have personal knowledge of that
20     said, in effect, ABC Trucking Company, you are the
21     agent of Organic Valley?
22  A  That is correct.
23  Q  Okay.
24  A  That wording at Organic Valley.
25  Q  All right.
                                                     55
```

```
 1  A  Because it was literally starting -- when I first
 2     got there, they had about five trucks going out a
 3     week. And when I left, we were pushing over 200.
 4     So as the company grew, the wording evolved.
 5  Q  Okay. And when that wording evolved, is it your
 6     understanding that Organic Valley then took on the
 7     responsibility of every trucking accident, every
 8     accident that any of those truck drivers had when
 9     they were on the road?
10        MR. SCHRECK: Objection to form.
11  Foundation.
12        You can go ahead and answer if you know.
13        THE WITNESS: They didn't take on the
14  responsibility -- you know, I don't know as far as
15  that. I don't think they would have taken on
16  responsibility. They were -- we were concerned
17  about the cost of the load and us getting
18  reimbursed for it. That's where -- if that's what
19  you're getting at.
20  BY MR. FISHER:
21  Q  I'm trying to get at an understanding of the words
22     you used in answer to Mr. Burke's questions, and
23     we're going to be returning to this subject in
24     many different settings.
25  A  Okay.
                                                     56
```

**Page 57**

1  Q  I'm trying to find out what you did for Organic
2     Valley.
3        Is it your testimony, sir, that Organic
4     Valley had contracts with their trucking
5     companies, Organic Valley considered those
6     trucking companies and their drivers to be agents
7     of Organic Valley, and that therefore, when one of
8     those truck drivers for a trucking company -- the
9     ABC Trucking Company or Martin's -- had an
10    accident and killed somebody, Organic Valley was
11    responsible for that because the trucking company
12    was its agent out on the roadways? Is that your
13    testimony, sir?
14 A  No, it would not be.
15 Q  Then what do you mean by the word "agent"?
16 A  Agent as far as delivering, representing -- agent
17    representative, delivery, how they acted. They
18    were representing and acting as an agent of
19    Organic Valley as far as rudeness, things like
20    that. You know, that's what I'm --
21 Q  Well, why wouldn't this truck driver of the
22    hypothetical ABC Trucking Company driving loads
23    for Organic Valley -- why wouldn't that driver's
24    negligence, for example, and driving through a
25    stop sign and killing somebody be Organic Valley's

**Page 58**

1     responsibility if that trucking company and its
2     employee driver were Organic Valley's agents?
3        MR. SCHRECK: Object. Form.
4     Foundation. Calls for a legal conclusion.
5        You can answer if you know.
6        THE WITNESS: On that one, I couldn't
7     answer. I mean, I would be speculating as far
8     as -- you know, that's -- I don't have an answer
9     to that.
10 BY MR. FISHER:
11 Q  Why were you then so willing to tell Mr. Burke in
12    response to his questions that Martin's Bulk Milk
13    or Mr. Franke were acting as the agent or the
14    representative of Universal Am-Can or
15    Overnite Express, sir?
16       MR. BURKE: Objection to form.
17    Argumentative.
18       MR. SCHRECK: Join.
19       THE WITNESS: That was the terminology
20    I've just always seen in the warehousing/trucking
21    industry. The wording, agent representative, you
22    were representing the company. And I dealt more
23    with the deliveries and the procedures -- the
24    deliveries and the trucking companies dealing with
25    the customers. That's what I'm speaking of.

**Page 59**

1  BY MR. FISHER:
2  Q  So when this Universal Am-Can, Limited, master
3     brokerage agreement came across your desk for
4     signature in June of 2008 -- and I acknowledge you
5     said you glanced at it or skimmed it -- this
6     language in paragraph 3, "Carrier is an
7     independent contractor and in no way to be
8     considered an agent of UACL," that language didn't
9     come as a surprise to you in light of your
10    experience?
11 A  No. Truthfully, what most of these -- this paper
12    was for was to keep -- lots of times was to keep
13    companies from coming in and hauling a load for a
14    broker and then undercutting the broker so that
15    they could come to Organic Valley and undercut the
16    broker and get ten loads and the broker's left
17    out.
18 Q  Back solicitation?
19 A  That would be a good example.
20 Q  And that's something you wouldn't want to happen?
21 A  Well --
22 Q  Or excuse me. That's something that the broker or
23    the shipper might not want to have?
24 A  It was unethical. I mean, if somebody would do
25    that, what's to say they wouldn't drop 15 of your

**Page 60**

1     loads in one week and say, we don't want to haul
2     these because we've got 5 cents more a mile from
3     another company?
4        So if they're going to do that, undercut
5     somebody to get your business, how do you know
6     they won't -- like I said, it's just unethical.
7     And that's what I'm speaking of in that respect,
8     acting as an agent. And that's my familiarity
9     with it.
10 Q  Okay. So to summarize this point and I'll move on
11    to a different perspective on this, when you used
12    the phrase "acting as an agent" in the context of
13    a company who's either a shipper or a broker and
14    wants to have some product moved somewhere with a
15    carrier or trucking company, your use of the word
16    "agent" is simply intended to reflect that the
17    trucking company is moving goods on behalf of the
18    broker or the shipper?
19       MR. BURKE: Objection to the form of the
20    question. His testimony speaks for itself.
21       MR. SCHRECK: I'll join.
22       You can answer.
23       THE WITNESS: I'd have to hear the
24    question again.
25       MR. FISHER: She'll be able to reread it

```
 1   for us.
 2        (Previous question read back.)
 3        THE WITNESS: From my perspective at
 4   this time.
 5   BY MR. FISHER:
 6   Q  Okay. Now, I want to talk about a different
 7      delivery service. Okay?
 8        When you were at Organic Valley, would you in
 9      your work occasionally use a company like FedEx or
10      UPS to send letters or correspondence or some type
11      of paperwork out?
12   A  If we did, it wasn't through me because I dealt
13      with trucking companies. I mean, through the
14      offices they may have, but I had nothing to do
15      with FedEx or anything like that.
16   Q  Have you yourself ever sent out a UPS or FedEx
17      envelope personally?
18   A  Yeah.
19   Q  Yes?
20   A  Yes. Yes.
21   Q  Okay. And when you did that, would you have
22      expected that in that situation, knowing what you
23      know about the words "on behalf of,"
24      "representative agent" as you're using those
25      words, would you expect that someone who's injured
                                                         61
```

```
 1      by a FedEx or a UPS driver who's transporting your
 2      package to its intended delivery point, that the
 3      injured person could come to you and claim you're
 4      responsible for the UPS or FedEx driver's
 5      negligence?
 6        MR. BURKE: Objection. Form.
 7      Vagueness. Speculation.
 8        MR. SCHRECK: I'm going to join. Also,
 9      form.
10        MR. BURKE: Relevance.
11        MR. SCHRECK: Form. Incomplete
12      hypothetical.
13        You can go ahead and answer if you know.
14        THE WITNESS: I don't know. With the
15      laws the way they are, I would believe anything
16      now. But I wouldn't think that by me sending a
17      letter through the -- or through FedEx, that
18      someone could come back and sue me if that driver
19      had a wreck. I don't know.
20   BY MR. FISHER:
21   Q  Think of the U.S. Postal Service. You pop
22      letters -- I know snail mail isn't used very much
23      anymore, but you pop things in the mail, right?
24   A  Sure.
25   Q  And if a United States Postal Service driver was
                                                         62
```

```
 1      negligent and killed somebody, do you think,
 2      understanding your use of the words "agent
 3      representative," "on behalf of," that that Postal
 4      service driver, his negligence you are responsible
 5      for?
 6        MR. BURKE: Objection. Form.
 7      Vagueness. Calls for speculation. Lack of proper
 8      hypothetical.
 9        MR. SCHRECK: Join.
10        THE WITNESS: I don't know.
11        MR. SCHRECK: Also form, if that wasn't
12      raised.
13        Go ahead.
14        THE WITNESS: I don't know, because my
15      feelings would be different than what the law is.
16      McDonald's getting sued for a million dollars for
17      spilling a cup of coffee. I mean, I don't know.
18      I don't really have an answer. What I think and
19      what has happened, I don't know.
20   BY MR. FISHER:
21   Q  So when you used the words, as you did repeatedly
22      in answer to some of Mr. Burke's questions, you
23      used the phrases "acted as a representative of" or
24      "acted as their agent" or "acted as the agent of"
25      or "acted as a representative agent of," when you
                                                         63
```

```
 1      used those terms and phrases, were you saying,
 2      sir, that -- were you making any conclusion that
 3      International Paper or Universal Am-Can or
 4      Overnite Express was legally responsible for the
 5      actions of Mr. Franke on the evening of July 3,
 6      2008?
 7        MR. BURKE: Objection. Lack of
 8      foundation. Calls for legal conclusions beyond
 9      the scope of this gentleman's experience to the
10      extent you request legal liability opinions of
11      this man.
12        MR. SCHRECK: I'll join. Also, I don't
13      know if he used all of those terms, but join.
14        MR. FISHER: He used every one of them.
15      I can guarantee you that.
16        MR. SCHRECK: You can answer.
17        THE WITNESS: My knowledge is -- from
18      previous experience would be that as far as acting
19      as a company representative, I don't know what the
20      legal ramifications would be, but you would be
21      acting as a -- as an agent. I mean, I've never
22      had any -- my God. In eight years, nine years, we
23      never had any real accidents as far as the
24      carriers that I used, so I've never -- I would not
25      know. But they all acted -- and that was one
                                                         64
```

```
 1    thing we talked about, was they were acting as
 2    agents, so we expected them to act as we would
 3    hope they would.
 4    BY MR. FISHER:
 5  Q What was Mr. Franke doing on the evening of
 6    July 3, 2008?
 7  A I have no idea.
 8  Q What was Mr. Franke's -- what were Mr. Franke's
 9    interactions with Universal Am-Can?
10  A I would have no idea.
11  Q What were Mr. Franke's interactions with
12    International Paper Company?
13  A I would have no idea.
14  Q What were Mr. Franke's interactions with
15    Overnite Express?
16  A Now, excuse me. Are you talking him personally?
17    I mean, he was going to pick up a load, but I
18    don't know if --
19  Q Yeah. Him personally.
20  A As far as conversations, I would have no idea. I
21    mean, it looks like he was dispatched to pick up
22    the load.
23  Q But other than you're reading some papers --
24    strike that.
25    Since you have absolutely no personal
                                                    65
```

```
 1    knowledge of what Mr. Franke was doing on July 3,
 2    2008, or for that matter any other day since you
 3    never met him, never talked with him, can you tell
 4    me what it is Mr. Franke was doing on July 3,
 5    2008, of your own personal knowledge?
 6  A Only from what I can see. He was dispatched to
 7    pick up the truck, or the load.
 8  Q And tell me where it is you see that from your own
 9    personal knowledge that you had on July 3, 2008.
10  A On the paperwork, that he was dispatch -- sorry.
11  Q Let me see if I can clarify. I'm not asking you,
12    Mr. Podlena, to tell me what it is you figured out
13    now, all right, after perhaps having had a chance
14    to look at some documents.
15    I'm asking you to go back to July 3, 2008,
16    when you were an employee of Martin's Bulk Milk
17    and tell me, at that time frame, what was it
18    Mr. Franke was doing on that day? What knowledge
19    would you have had of what Franke was doing?
20  A I would probably have no knowledge.
21  Q Okay. Would you have had any knowledge of what
22    Mr. Franke was doing in the days and weeks before
23    then?
24  A No.
25  Q And would you have had any knowledge of whether or
                                                    66
```

```
 1    not anybody from Martin's Bulk Milk was involved
 2    at all with any loads for International Paper in,
 3    say, the month of June and the first couple days
 4    of July 2008?
 5  A I saw the faxes come across, so I know we were
 6    hauling some loads for them.
 7  Q But you wouldn't have known who the driver was
 8    that was going from Wilton down to Hammond,
 9    Indiana; is that a fair statement?
10  A No. That's a fair statement.
11  Q If you could look at Exhibit 64. I'll tell you
12    that we've had a chance in this case to get
13    documents -- exchange documents between the
14    parties.
15  A Sure.
16  Q And Exhibit 64 is a collection of Overnite load
17    and rate confirmations from May 30, 2008, until
18    June 13, 2008. So if you could just look at those
19    documents --
20  A Sure.
21  Q -- and just familiarize yourself with them by
22    glancing through them and see if you recognize
23    those documents, Exhibit 64.
24  A These are the ones that I'd see come across on the
25    fax.
                                                    67
```

```
 1  Q Okay. And so if we look at the first page of
 2    Exhibit 64 -- actually, the second page of
 3    Exhibit 64, that's a two-page load and rate
 4    confirmation sheet?
 5  A That looks correct.
 6  Q All right. And on the first page -- before we go
 7    to your signature on the second page, is there any
 8    handwriting on the first page of the May 30th load
 9    and rate confirmation sheet that is yours?
10  A No. None of that is.
11  Q On the second page, does your signature appear?
12  A Yes, it does.
13  Q Now, do you see where it says up above
14    Melody Hansen's signature that there is a
15    different fax number to send it to?
16  A Yes. I see that.
17  Q And the fax number is (708)331-8604?
18  A Yeah. I see that.
19  Q Do you see that?
20  A Correct.
21  Q Okay. And do you remember when you were asked
22    questions before about the UACL broker
23    confirmation sheets and you didn't know what that
24    particular fax number was?
25  A Okay.
                                                    68
```

**Page 69**

1 Q I'll represent to you that if you look at the UACL
2 ones, that particular fax number appears. Okay?
3 A Okay.
4 Q All right. So in light of the fact that you've
5 signed this one on May 30th and then all of the
6 remainder -- and skim through them with me if you
7 would. All the remainder of the load and rate
8 confirmation sheets from May 31st up through
9 June 13th have your signature on them?
10 A That doesn't surprise me.
11 Q And do you see your signature on all of those,
12 stretching right out to June 13th?
13 A Yeah. Yeah, I see it.
14 Q Okay. So for that approximate two-week time
15 period, you are faxing back to Ms. Hansen at the
16 (708)331-8604 number these two-page Overnite load
17 and confirmation sheets?
18 A Sure.
19 Q All right. Earlier you said in response to
20 one of Mr. Burke's questions -- or at least I got
21 the impression that you might be called in to do
22 this, sort of, if there was some help needed.
23     Does the fact that your signature appears on
24 every one of these suggest to you now, several
25 years later, that this was a part of your regular

**Page 70**

1 job as opposed to just by happenstance, Dave might
2 say, "Hey, handle this one"?
3 A No. As far as handling this load and dispatching
4 drivers, that was not my job. I had nothing to do
5 with that. I got this paperwork along with
6 another 10 to 20 pages every couple hours off the
7 fax, went through them. The majority of those
8 were loads coming back from Kroger in Indiana or
9 Lubbock, Texas. And these would be in there, and
10 I would sign them and fax them off.
11 Q So that was a part of your regular job, or it was
12 just coincidence that you had a two-week span of
13 doing all of these -- concerning these particular
14 loads?
15 A If you went back, I probably went through these
16 for -- off and on for a couple months, if not
17 longer.
18 Q Okay. So it was a regular part of your job, or
19 was it just random that Dave Martin would have you
20 handle these?
21 A It was random.
22     MR. SCHRECK: I think you have a
23 disconnect with him. I think what Mr. Fisher is
24 asking you is about the actual fax that you signed
25 and sent back, not necessarily any other

**Page 71**

1 involvement.
2     MR. FISHER: Right. Right.
3     THE WITNESS: This was still relatively
4 random, because Nancy handled this as opposed
5 to -- probably as much as anybody. If it was
6 there, you'd confirm, sign it, and fax.
7 BY MR. FISHER:
8 Q Okay. Do you see in the upper right-hand corner
9 the word "dispatcher"?
10 A Um-hum.
11 Q And then the words "Nancy/Dave Martin/Pat"?
12 A Um-hum.
13 Q Is Pat you?
14 A I believe so.
15 Q Okay. All right. Now, if you would skip to
16 Exhibit 65. And do you see that on the first page
17 of Exhibit 65, this is the first broker
18 confirmation sheet that is coming from Universal
19 Am-Can, notwithstanding the fact that Overnite
20 Logistics' name appears on the documents? Do you
21 recall that being the transition time, middle of
22 June, where you're now filling out and signing
23 broker confirmation sheets that are only one page
24 as opposed to two pages?
25     MR. SCHRECK: I'll object to the extent

**Page 72**

1 you're asking him about filling it out. Lack of
2 foundation then.
3     THE WITNESS: As far as recalling that
4 it went from one -- or two pages to one, no.
5 BY MR. FISHER:
6 Q You don't have a memory of that?
7 A No.
8 Q Okay. And you see your signature that appears on
9 the rest of the broker confirmation sheets that
10 appear as a part of Exhibit 65?
11 A Sure.
12     MR. SCHRECK: Well, look at them first
13 before you answer the question.
14     THE WITNESS: Well, I mean, every page
15 looks like -- yeah. You're probably talking 100
16 pages every couple days.
17 BY MR. FISHER:
18 Q All right. So was it a part of your job routinely
19 then to fill out these broker confirmation sheets?
20     MR. SCHRECK: Object to form. Misstates
21 his prior testimony.
22     THE WITNESS: To fill them out?
23 BY MR. FISHER:
24 Q Let me rephrase.
25     Was it a part of your job -- a routine part

Page 73

1  of your job in June of 2008 to sign the broker
2  confirmation sheets that came from Melody Hansen
3  of Universal Am-Can?
4  A  It was something I would have done after I
5  confirmed with a dispatcher and then faxed it on.
6  Q  And when you confirm with the dispatcher, to whom
7  are you referring?
8  A  Either Dave or Nancy.
9  Q  Do you know whether or not this was a dedicated
10 load that was being done by somebody from Martin's
11 Bulk Milk?
12 A  I would -- I don't know how many times a week, but
13 I know we were doing it, like, on a weekly basis
14 at least.
15 Q  Okay.  Look, if you would, at the broker
16 confirmation sheet that -- it's about seven or
17 eight back.  I'll get you the date.  It has two
18 dates on the top, 6/23 and 6/24.  Do you see the
19 one that has --
20 A  Oh, sure.
21 Q  -- two fax transmissions up at the top?
22 A  Um-hum.
23 Q  Yes?
24 A  Yes, I do.  I'm sorry.
25 Q  And do you see -- halfway down, do you see where

Page 74

1  there's an initial number 891.69 that's struck and
2  then a 1226.18 with the initials TT, it appears?
3  A  I see that.
4  Q  Do you know the circumstances of why something
5  like this would happen?
6  A  No, I do not.
7  Q  Do you know whether or not perhaps after the
8  broker confirmation sheet was faxed, if perhaps an
9  additional load was added?
10 A  That is possible.  That would be one reason it
11 would jump up.
12 Q  Okay.  I'm done with 64 and 65.
13    Let's go back, if we could, to Martin's
14 Exhibit 16.  A few minutes ago, I showed you a
15 broker confirmation sheet that had two fax
16 transmissions on the top.  Do you see on
17 Exhibit 16 that this particular copy of the
18 Universal Am-Can, Limited, master brokerage
19 agreement dated June 12, 2008, has two fax
20 transmission --
21 A  Yep.
22 Q  -- dates and times at the top?
23 A  Yes, I do.
24 Q  Do you also see that the number (708)331-8604
25 appears to be the same number that was the fax

Page 75

1  that the broker confirmation sheets were sent to?
2  A  Yes, I do see that.
3  Q  Do you know why it is that these -- this
4  particular signed master broker agreement has two
5  fax transmission dates on it?
6  A  No, I do not.
7  Q  Do you know whether or not the changeover from
8  Overnite Express to Universal Am-Can was June 12th
9  or June 13th?
10 A  I have no idea what day it was.
11 Q  Do you know whether or not on June 17th, you sent
12 this document to Universal Am-Can with your
13 signature as it appears on the third page, as
14 opposed to it being sent on June 12th?
15 A  Do I know why?
16 Q  No.  Do you know if that's the case?  And to help
17 you out, if you look at the bottom of the
18 document, you'll see upside down the fax
19 transmission from Martin's Bulk Milk with a date.
20 A  I see that.
21 Q  Okay.
22 A  But why, I do not know.
23 Q  All right.  So you don't know whether or not,
24 perhaps with June 12th I think being a Friday,
25 whether or not the following week, Universal

Page 76

1  Am-Can said, "Hey, you haven't sent us this signed
2  master brokerage agreement.  In order to continue
3  doing business with us, you need to send this
4  signed brokerage agreement"?  Do you know if that
5  happened?
6  A  No, I do not.
7     MR. BURKE:  Objection to the form.
8     Go ahead.
9     MR. SCHRECK:  I'll join.
10    THE WITNESS:  I have no idea.
11 BY MR. FISHER:
12 Q  With respect to the memo bills or bills of lading
13 that you were shown earlier in the deposition --
14 A  Yes, sir.
15 Q  -- is that the type of documentation you would
16 have seen or not seen in the ordinary normal
17 course of your business day?  I'm just talking in
18 general, not these in specifics.
19 A  Those look like a normal bill of lading that would
20 come through from any company.
21 Q  I understand that, but would you have had contact
22 with them, or would the drivers instead have had
23 contacts with them?
24 A  The drivers would have.
25 Q  Do you know who Cecelia Delaney was?