```
 1   A   She was someone who worked there way before I did.
 2   Q   Was she in dispatch?
 3           MR. SCHRECK: When you say "there," who
 4       are you referring to?
 5           MR. FISHER: Right. Good point.
 6           THE WITNESS: Oh. Cecelia Delaney?
 7   BY MR. FISHER:
 8   Q   Yeah.
 9   A   She was there before I was.
10   Q   "There" meaning Martin's?
11   A   Correct.
12   Q   Okay.
13   A   The only reason I'm familiar with the name was
14       because when I was at Organic Valley -- I'm not
15       sure if she was a dispatcher. I was thinking she
16       had something to do with rates, and I think I
17       dealt with her or one of my associates did as far
18       as getting rates, or she came by trying to drum up
19       business and gave us rates. That's the only
20       reason I know that name.
21   Q   Do you know whether or not she would have been in
22       a position similar to yours in that she had the
23       authority and the ability to sign brokerage
24       agreements?
25   A   I don't know on that one.
                                                            77
```

```
 1   Q   All right. Look, if you would, to Exhibit 72.
 2       And this document was given to us by Martin's Bulk
 3       Milk. If you look at the second page, you'll
 4       see -- on this Overnite carrier-broker contract
 5       dated in 2002, you'll see Cecelia Delaney's name
 6       and signature.
 7           Now, in this context, do you know whether or
 8       not she had the authority to sign, you know,
 9       broker contracts like these on behalf of Martin's?
10           MR. BURKE: Objection. Asked and
11       answered.
12           MR. SCHRECK: Join. Also, form and
13       foundation.
14           Go ahead and answer if you know.
15           THE WITNESS: I don't know.
16   BY MR. FISHER:
17   Q   If you look at the page that follows after the
18       page where her signature appears, you see where
19       there's a form entitled "Carrier Profile"?
20   A   Where am I?
21   Q   See the document right there?
22   A   Oh, sure.
23   Q   Okay. In your experience, did brokers many times
24       send to motor carriers as the relationship started
25       and loads were going to be transported from
                                                            78
```

```
 1       point A to point B -- was there information that
 2       the broker would request from a carrier such as is
 3       reflected on this carrier profile sheet?
 4   A   They would ask where your strengths are, in what
 5       regions, and your rates. So something similar to
 6       this, yeah. Yes.
 7   Q   All right. If you would now go to Exhibit 73.
 8       And you see that's a dated 2004 master brokerage
 9       agreement between Universal Am-Can and Martin's
10       Bulk Milk. I know it predates your time at
11       Martin's, but I want to focus your attention on
12       the second page. Do you see where it says
13       Doreen West, and her signature appears above the
14       line "authorized signature"?
15   A   Correct.
16   Q   Do you know who Doreen is?
17   A   Yes. Yep.
18   Q   Who is she?
19   A   She was -- or still is a dispatcher at Martin's.
20   Q   To the best of your knowledge, was she, like you,
21       authorized to sign such contracts?
22           MR. SCHRECK: Objection. Form.
23       Foundation.
24           THE WITNESS: As far as like me? I
25       don't know. Anything I signed usually was on
                                                            79
```

```
 1       behalf of Dave or -- yeah. I'm sure she was
 2       authorized.
 3   BY MR. FISHER:
 4   Q   Okay.
 5   A   I don't know. I can't answer.
 6           MR. SCHRECK: He doesn't want you to
 7       speculate.
 8           THE WITNESS: Okay.
 9           MR. SCHRECK: Only speak to what you
10       know.
11           THE WITNESS: Okay.
12   BY MR. FISHER:
13   Q   The fact that -- let me ask it a different way.
14       The fact that her signature appears above the
15       line that says "authorized signature," knowing
16       what you know of how Martin's Bulk Milk operated
17       at the time you worked there for about a year, do
18       you presume that Doreen had the authority to sign
19       such a contract?
20           MR. SCHRECK: Objection. Form.
21       Foundation. Calls for speculation.
22           You can go ahead and answer.
23           THE WITNESS: That's a tough question.
24       Actual authorization probably would have been --
25       it would have had to have been flown by Dave
                                                            80
```

**Page 81**

1  first.
2  BY MR. FISHER:
3  Q  Okay. And, I mean, for example, presumably people
4     like you, people like Doreen are not going to be
5     signing documents that you're not allowed to sign;
6     fair statement?
7        MR. SCHRECK: Objection. Calls for
8     speculation.
9        THE WITNESS: After it was looked over,
10    we were signing in proxy you might say, I guess.
11    I mean, it is what it is.
12 BY MR. FISHER:
13 Q  What does that mean?
14 A  It's our signature. I mean, as far as dealing
15    with the carriers or dealing -- you know, that's
16    all I can say.
17 Q  Okay. Look at Exhibit 74. Do you recognize on
18    the second page the name Jay O'Neil? Do you know
19    who that person is?
20 A  No. I've never seen -- Jay O'Neil?
21 Q  If you don't know, just tell me you don't know.
22 A  No. I don't know Jay O'Neil.
23 Q  All right. Look at Exhibit -- now I'm going to
24    Exhibit 15. Mr. Podlena, I will represent to you
25    that other witnesses in this case have testified

**Page 82**

1   and have referenced some documents that show the
2   purchase -- the asset purchase of Overnite Express
3   by Universal Am-Can on either June 12th or
4   June 13, 2008. Okay?
5      So with that as a point in time, do you see
6   on Exhibit 15, this appears to be a Universal
7   Am-Can, Limited, master brokerage agreement dated
8   November 7, 2007, which is before, obviously, June
9   of '08, which bears your signature on the third
10  page.
11 A  Yeah. I see that.
12 Q  Okay. Now, do you have any knowledge of what
13    business relationship Martin's Bulk Milk had with
14    Universal Am-Can's brokerage division in November
15    of 2007 that would have caused you to sign this
16    particular agreement in November of '07? Does
17    this bring back any memories?
18 A  No, it doesn't.
19 Q  All right. But is it fair to say that when you
20    signed this agreement, as reflected by your
21    signature on the third page of Exhibit 15, you had
22    the authority to sign that agreement?
23 A  Yeah.
24 Q  And that authority would most likely have come
25    from Dave Martin?

**Page 83**

1  A  Correct.
2  Q  I'm not suggesting this is the case. Is it
3     possible the authority came from his parents?
4  A  I couldn't answer that. I've never really been
5     involved with his parents, so I don't know.
6  Q  So Dave Martin is the person you would have gotten
7     authority to sign this document from?
8  A  Most likely. Either him or Doreen would have
9     looked at it.
10 Q  Okay. Now, do you see on the next page of
11    Exhibit 15, after your signature page, there's a
12    carrier survey. Do you see that?
13 A  Um-hum.
14 Q  Now, do you see, however, that on this carrier
15    survey, it has transmissions up at the top of
16    June 12, 2008, June 17, 2008, and then upside down
17    on the bottom, it has the transmission from
18    Martin's Bulk Milk of June 17th at a time that
19    follows the times that are reflected at the top
20    from Overnite, or we know Universal Am-Can? Do
21    you see those dates and times?
22 A  Yeah. I see those.
23 Q  Did you fill this out or did somebody else fill
24    this out, if you know?
25 A  This looks -- it looks like my handwriting.

**Page 84**

1  Q  Okay. And in light of the fact that I previously
2     showed you that master brokerage agreement,
3     Exhibit 16, that had the double transmission, you
4     know, dates and times at the top --
5  A  Um-hum.
6  Q  -- is it likely that this survey form was sent in
7     at the same time by you on June 17, 2008?
8  A  I would, most likely. At that time they were
9     filling out -- we had this form, which we didn't
10    send. We stopped shortly after that. I would
11    think that would have gone with it.
12 Q  Okay. And give me one second here. And pardon me
13    for flipping back and forth, but is 16 next? Just
14    hold that page. We'll come back to it.
15       But do you see on Exhibit 16 -- do you see
16    how the June 17th time is 13:24, or 1:24 in the
17    afternoon, and then at the bottom, the time reply
18    is -- appears to be 15-something, or 3:00 in the
19    afternoon? Either 15 or 13.
20 A  That's 13:02.
21       MR. SCHRECK: You gotta speak up.
22       THE WITNESS: I see 13:02 on there. Is
23    that what --
24 BY MR. FISHER:
25 Q  Okay. Well, look at the bottom of Exhibit 15, the

```
 1     page that is the carrier survey.
 2  A  Okay.
 3  Q  And do you see at the bottom of that upside down,
 4     June 17, 2008, 13:03?
 5  A  Yes.
 6  Q  Okay.
 7  A  I see that.
 8  Q  So in light of me showing you this survey in your
 9     handwriting and Exhibit 16, which is the completed
10     June 12, 2008, master brokerage agreement, is it
11     likely, sir, that on the afternoon of June 17,
12     2008, you not only returned to Universal Am-Can
13     the signed master brokerage agreement dated
14     June 12th, but you also returned the filled-out
15     carrier survey?
16  A  Yeah. That would be appropriate.
17  Q  All right. Now, I want to move on from the
18     carrier survey document to Exhibit 75. I will
19     represent to you, sir, that Exhibit 75 is produced
20     also by Martin's Bulk Milk. And as you can see on
21     the first three pages, in much, much, you know,
22     larger type font, the three-page June 12, 2008,
23     master brokerage agreement appears there as those
24     first three pages of Exhibit 75, correct?
25  A  Correct.
                                                      85

 1  Q  All right. And then the next page of Exhibit 75
 2     is the carrier survey?
 3  A  Correct.
 4  Q  And that's in your handwriting?
 5  A  Yes.
 6  Q  And then the next page is entitled "Welcome to the
 7     Universal Am-Can, Limited, Brokerage Division."
 8     Do you see that document?
 9  A  Yes, sir.
10  Q  Do you remember receiving this document, since it
11     comes from the Martin's Bulk Milk files,
12     explaining what it is a company such as Martin's
13     Bulk Milk was to do in order to engage in
14     transportation services with Universal Am-Can?
15     And feel free to read the whole page, because
16     I'm going to be asking you questions about the
17     whole page.
18  A  Okay. Could you repeat that?
19  Q  Sure. In light of my representation to you, sir,
20     that this document entitled "Welcome to the
21     Universal Am-Can, Limited, Brokerage Division" is
22     a document that came from your former employer and
23     was attached as the next page after this carrier
24     survey you filled out, my question is, is this a
25     document that in all likelihood you would have
                                                      86

 1     seen before you signed the agreement, filled out
 2     the survey, and sent documents back to Universal
 3     Am-Can via fax?
 4     And feel free to look at the whole document
 5     to see if that helps jog your memory.
 6  A  This part does. This looks like normal paperwork
 7     we'd get, welcoming to your -- you know, as a new
 8     carrier for a broker. But to say that I remember
 9     this specific one, no.
10  Q  Right. So is it fair to say you're saying, I
11     don't have a memory of this document, but it
12     certainly looks similar to the types of documents
13     I might get from -- you might get from a broker?
14  A  Correct. Correct.
15  Q  Okay. All right. Skip a few more pages until you
16     get to a document that has Melody Hansen's
17     handwritten name near the top.
18  A  Okay.
19  Q  Do you see where this document on its face appears
20     to be from Melody Hansen with the reference to the
21     fax number of (708)331-8604, to the attention of
22     Nancy or Dave Martin, dated June 12, 2008?
23  A  Yes. I see that.
24  Q  And do you see right below that, it references
25     finding attached the broker packet for Universal
                                                      87

 1     Am-Can?
 2  A  I see that.
 3  Q  All right. And it references the fact that
 4     there's an introduction letter, a three-page
 5     contract for signature, a blank W-9 form, a copy
 6     of a UACL surety bond and broker authority, and
 7     carrier survey and carrier references. Do you see
 8     that?
 9  A  I see that.
10  Q  And do you see in the preceding pages to this
11     document, which is a part of Exhibit 75 -- do you
12     see that there was a welcome letter? Go back
13     about four pages. There's a welcome letter?
14  A  Oh, yes. I see that.
15  Q  Okay. Then there's a blank W-9?
16  A  Correct.
17  Q  By the way, what's the purpose for the blank W-9?
18     To make sure Martin's gets paid?
19  A  Well, you have to have an ID number, tax number to
20     haul, so --
21  Q  Okay. And then there's the property brokers
22     surety bond, two-page document?
23  A  Okay. I see that.
24  Q  All right. So in light of all of these documents
25     I've just shown you, several different exhibits,
                                                      88
```

**Page 89**

1 fixing your attention on the fax transmission
2 dates and times, in all likelihood, sir, on or
3 about June 17, 2008, did you return to Universal
4 Am-Can the signed contract with whatever other
5 documents were required?
6 A It looks like I did.
7 Q Okay. You don't have any memory of ever dealing
8 with Melody Hansen?
9 A No, I do not.
10 Q If I were to use the phrase "pool load," does that
11 mean anything?
12 A Not really.
13 Q If I were to say International Paper Corporation's
14 loads were pool loads, does that phrase or term
15 mean anything to you?
16 A No, it doesn't.
17 Q Ms. Hansen told us in her deposition that if
18 Martin's had any issue with a pool load, that you,
19 Dave, or Nancy would contact Melody.
20 A Okay.
21 Q Assume that's true. All right?
22 A Okay.
23 Q Do you ever recall contacting Melody Hansen about
24 an issue with a pool load?
25 A No, I do not.

**Page 90**

1 Q And remember that one I showed you where it
2 appears that maybe the load started off with, you
3 know, so much and something was added to it? Do
4 you remember anything about that instance?
5 A No, I don't.
6 Q Do you know whether or not on July 3, 2008, the
7 load at issue in this case, the accident that
8 happened later that night -- do you know whether
9 or not there were any issues attended to that
10 particular load?
11 A No, I do not.
12 Q Mr. Martin told us at his deposition that the
13 June 12, 2008, master brokerage agreement was in
14 full force and effect on July 3rd. Do you have
15 any reason to dispute that conclusion of his?
16 A No.
17 Q Mr. Martin also told us that either you or
18 Doreen Bayer had knowledge or information about
19 how contracts would be formed with brokers and
20 shippers. Do you know what he would be referring
21 to in making that -- such a statement?
22 A In general, maybe. I mean, I dealt with
23 refrigerated brokers a lot, but -- so typically
24 getting this paperwork faxed.
25 Q He also said -- Mr. Martin, that is. He also said

**Page 91**

1 that it was not unusual for you to sign various
2 documents in the conduct of Martin's business on
3 behalf of Martin's Bulk Milk. Would you agree
4 with that statement?
5 A Correct.
6 Q You yourself never required Universal Am-Can to
7 send back a double-signed copy of the master
8 brokerage agreement, did you?
9 A I have no idea.
10 Q Earlier, when you said that Fleming had a motor
11 carrier license, did you mean that it had
12 authority under the Department of Transportation?
13 A That is correct.
14 Q Since you don't know Mr. Franke, is it fair to say
15 you don't have any idea of how it is he related to
16 Universal Am-Can or International Paper, if at
17 all, in the conduct of his driving on a daily
18 basis? Is that a fair statement?
19 MR. BURKE: Objection. Overly broad.
20 Calls for speculation.
21 MR. SCHRECK: Join. Also, asked and
22 answered.
23 You can answer. Go ahead.
24 THE WITNESS: I have no idea.
25

**Page 92**

1 BY MR. FISHER:
2 Q So you have no idea whether or not Mr. Franke,
3 when he was driving his truck, for example, on
4 July 3rd -- that you have no idea whether or not
5 he considered himself or did not consider himself
6 driving the load on behalf of Universal Am-Can or
7 International Paper; is that a fair statement?
8 A I have no idea.
9 Q I'll represent to you that sometime during the
10 course of this litigation, I sent a series of
11 written questions -- we lawyers call them request
12 for admissions -- to Martin's Bulk Milk, asking
13 them to tell me whether or not there's any
14 document in all the documents they've got in
15 their -- you know, documents in their business --
16 A Okay.
17 Q -- that said at any time that Samuel Franke was
18 acting as the agent of Universal Am-Can or
19 International Paper. And Martin's Bulk Milk's
20 response was they have no such documents. Okay?
21 A Okay.
22 Q So that's a fact that they have admitted.
23 Are you, sir, aware of any document that
24 exists that says that Samuel Franke, in writing,
25 was the agent of Universal Am-Can on July 3, 2008?

**Page 93**

```
 1         MR. BURKE: Objection to the form of the
 2     question.
 3         MR. SCHRECK: Join.
 4         MR. BURKE: Lack of foundation basis.
 5         MR. SCHRECK: Join.
 6         Go ahead and answer.
 7         THE WITNESS: I would have no idea.
 8   BY MR. FISHER:
 9   Q  And I presume your answer will be the same, that
10      you have no idea if I were to ask that question
11      about any statement being made by Mr. Franke that
12      he was the agent of International Paper. Is that
13      a fair statement also, that you have no idea?
14   A  Correct. Correct.
15   Q  When did you first begin speaking with any counsel
16      for Martin's Bulk Milk?
17   A  It would have been in November, and I never really
18      spoke except when that dude called me.
19         MR. SCHRECK: You can't talk about any
20      conversation you had with any attorney, so --
21         THE WITNESS: Oh.
22         MR. FISHER: I haven't asked that
23      question.
24         MR. SCHRECK: I know. I know. He's
25      looking at me like -- so --
```

**Page 94**

```
 1   BY MR. FISHER:
 2   Q  My question is, when did you first start talking
 3      with any counsel for Martin's Bulk Milk?
 4   A  It would have been --
 5         THE WITNESS: Is that something I can
 6      answer?
 7         MR. FISHER: I'm only asking when.
 8         MR. SCHRECK: When is fine. If you
 9      remember.
10         THE WITNESS: Yeah. Actually, it would
11      have been about November, because I got a call out
12      of the blue talking about a deposition.
13   BY MR. FISHER:
14   Q  Is that the first time you were ever contacted by
15      anyone?
16   A  That's correct.
17   Q  Anyone --
18   A  That's correct.
19   Q  -- concerning giving a deposition?
20   A  That is correct.
21   Q  All right. And since that time in November of
22      2012, how many conversations have you had with any
23      counsel for Martin's Bulk Milk? And by
24      "conversations," I mean on the phone or in person.
25   A  Strictly by phone, just trying to set up a
```

**Page 95**

```
 1      meeting.
 2   Q  Okay. And, I mean, a couple of those types of
 3      telephone conversations, talking about logistics?
 4   A  Probably -- probably three maybe.
 5   Q  All right.
 6   A  I can't remember. It's two or three.
 7   Q  And had you ever met any of the counsel for
 8      Martin's Bulk Milk before today?
 9   A  No.
10   Q  Is today the first time you talked with counsel
11      for Martin's Bulk Milk?
12   A  That's correct.
13   Q  Okay. And what did you and he talk about?
14         MR. SCHRECK: Objection.
15      Attorney-client privilege.
16   BY MR. FISHER:
17   Q  Are you going to answer my question?
18         MR. SCHRECK: I'm going to instruct him
19      not to answer the question.
20         THE WITNESS: Okay.
21   BY MR. FISHER:
22   Q  Are you going to answer my question?
23   A  On behalf of counsel, I guess not.
24   Q  Okay. When did you and Mr. Schreck form an
25      attorney-client relationship?
```

**Page 96**

```
 1         MR. SCHRECK: You can answer it to the
 2      best you can.
 3         THE WITNESS: Would have been today, I
 4      guess. I mean, I -- I'm not under the impression
 5      I would be an actual client.
 6   BY MR. FISHER:
 7   Q  And why is it you're not under the impression that
 8      you would be a client of Mr. Schreck?
 9         MR. SCHRECK: If you don't understand
10      the question, you can tell him.
11         THE WITNESS: I don't. Yeah.
12   BY MR. FISHER:
13   Q  My question was very clear. Why do you not
14      believe --
15         MR. SCHRECK: Let's take a quick break
16      real quick.
17         MR. FISHER: No. We're not going to
18      take a break. I'll let you take a break after he
19      answers this question.
20   BY MR. FISHER:
21   Q  Why do you believe that you do not consider
22      yourself a client of Mr. Schreck?
23         MR. BURKE: Objection to the form.
24      Calls for legal conclusions beyond the scope and
25      knowledge of this witness.
```

**Page 97**

1  MR. SCHRECK: I'll join. And it's
2  specifically asking for attorney-client privilege.
3  MR. FISHER: I haven't asked for any
4  communication on that question.
5  BY MR. FISHER:
6  Q  I've asked him, why do you consider, as you just
7  said -- and I'll be happy to have the court
8  reporter reread your testimony.
9  Why do you believe you don't consider
10  yourself a client of Mr. Schreck?
11  MR. BURKE: Same objection.
12  MR. SCHRECK: Same objection. I don't
13  think it's what he said.
14  THE WITNESS: I would like to have it
15  reread.
16  MR. FISHER: I'd be happy to do that.
17  I'm going to ask the court reporter to go back to
18  whatever that question was and have her reread
19  your answer. Okay?
20  THE WITNESS: That's fine.
21  MR. FISHER: Okay.
22  (Page 95, Lines 24-25 and Page 96, Lines 3-5
23  read back.)
24  BY MR. FISHER:
25  Q  Have you listened to your answer to that question?

**Page 98**

1  A  Um-hum. I said it.
2  Q  Yes?
3  A  Yes, I did.
4  MR. FISHER: Okay. And now I'm going to
5  have the court reporter reread my last question,
6  the why question.
7  MR. SCHRECK: And after he answers this,
8  we'll take a break.
9  MR. FISHER: Yeah. That's fine.
10  (Page 97, Lines 9-10 read back.)
11  THE WITNESS: I don't know. I guess
12  he -- I guess I am. I guess he is representing
13  me.
14  Is that correct?
15  MR. SCHRECK: You can give your answer,
16  and then we'll take a break.
17  THE WITNESS: I guess. Okay. I hadn't
18  really thought about it.
19  MR. FISHER: Okay. If you want to take
20  a break, we can do that now.
21  (A recess is taken from 1:32 p.m. to 1:39 p.m.)
22  BY MR. FISHER:
23  Q  Mr. Podlena, did you just take a break from the
24  deposition?
25  A  Yes, I did.

**Page 99**

1  Q  And did you have an opportunity to speak with
2  Mr. Schreck?
3  A  Yes, I did.
4  Q  Did you speak with Mr. Schreck?
5  A  Yes, I did.
6  Q  And are you willing to answer questions I will
7  have of you now concerning the conversations you
8  had with Mr. Schreck outside of the deposition
9  room?
10  MR. SCHRECK: Object. Attorney-client
11  privilege.
12  THE WITNESS: No. I won't speak to you
13  about it.
14  BY MR. FISHER:
15  Q  Okay. All right. I'm going to ask a series of
16  questions that I'll explain to you that may be the
17  subject of a hearing in front of the federal judge
18  in Chicago that has this case to determine whether
19  or not I have a right to ask you these questions
20  and you would be compelled to give me answers.
21  Okay?
22  So, you know, it might be that when I ask you
23  a question, you will choose to answer the
24  question, or you may just say, "I'm not going to
25  answer that question because I'm claiming an

**Page 100**

1  attorney-client privilege." Okay? So you just
2  tell me that, express it however you want. Okay?
3  A  Okay.
4  Q  All right. Did you talk with Mr. Schreck about
5  the testimony you were to give in this case?
6  MR. SCHRECK: Object to form.
7  Attorney-client privilege. You can --
8  MR. COUTURE: You mean during the break?
9  MR. FISHER: At any time. I'll be
10  clear. Let me be clear.
11  BY MR. FISHER:
12  Q  This morning -- I'm not asking you now what you
13  talked about. How long did you speak with
14  Mr. Schreck this morning?
15  A  A short time.
16  Q  What's your best estimate of the time?
17  A  Let's see. 30, 35 minutes.
18  Q  Did Mr. Schreck show you any documents?
19  A  Yeah.
20  Q  And did he show you documents that had your name
21  or signature on them?
22  A  Correct.
23  Q  Did he show you any other documents?
24  A  Not -- no.
25  Q  Did Mr. Schreck explain to you what the testimony

McCorkle Litigation Services, Inc.
Chicago, Illinois    (312) 263-0052

**Page 101**

1 of other witnesses was in this case?
2     MR. SCHRECK: Objection.
3 Attorney-client privilege.
4     I'm going to tell you not to answer.
5 Whether or not you follow my advice, it's up to
6 you.
7     THE WITNESS: Nothing else was discussed
8 as far as -- so really, that's -- I mean, nothing
9 else was discussed.
10 BY MR. FISHER:
11 Q What do you mean, nothing else was discussed?
12 A Well, we didn't talk about other people. I mean,
13 he just talked to me.
14 Q Did he tell you and give you his theory of the
15 case?
16     MR. SCHRECK: Objection. Calls for
17 attorney-client privilege. I'm going to instruct
18 him not to answer.
19     You can answer as you so choose and
20 follow my advice or not follow my advice.
21     THE WITNESS: I'll follow your advice.
22 BY MR. FISHER:
23 Q Did he tell you that when you answered questions,
24 you should use such phrases as "acted as a
25 representative of"?

**Page 102**

1     MR. SCHRECK: Objection. Calls for
2 attorney-client privilege.
3     I'll instruct you not to answer. You
4 can either take my advice or not take my advice.
5     THE WITNESS: I'll take your advice.
6 BY MR. FISHER:
7 Q Did he advise you to testify that Martin's Bulk
8 Milk or Franke acted as the agent of Universal
9 Am-Can or International Paper?
10     MR. SCHRECK: Objection.
11 Attorney-client privilege. I'm going to advise
12 him not to answer.
13     You can --
14     THE WITNESS: I refuse -- or I won't
15 answer it.
16 BY MR. FISHER:
17 Q Did Mr. Schreck advise you or suggest to you that
18 you should testify that Martin's Bulk Milk or
19 Samuel Franke acted as a representative agent of
20 Universal Am-Can or International Paper?
21     MR. SCHRECK: Objection. Calls for
22 attorney-client privilege. I'm going to instruct
23 him not to answer.
24     THE WITNESS: And I'll accept.
25

**Page 103**

1 BY MR. FISHER:
2 Q And finally, did he suggest to you or advise you
3 that you should testify words to the effect of you
4 knew or you had personal knowledge that Martin's
5 Bulk Milk or its driver, Samuel Franke, was
6 representing Universal Am-Can or International
7 Paper?
8     MR. SCHRECK: Objection. Calls for
9 attorney-client privilege.
10     I'm going to instruct you not to answer.
11     THE WITNESS: And I agree.
12 BY MR. FISHER:
13 Q Earlier in the deposition, I asked you some
14 questions about why it is you believed there was
15 an attorney-client relationship or there was not
16 an attorney-client relationship between you and
17 Mr. Schreck. Do you wish to add any other answers
18 to your -- to those questions other than what you
19 have testified so far?
20 A Just that we talked over the phone trying to set
21 up -- and I hadn't really talked to him, but
22 trying to set up the deposition.
23     And being new to anything like this, after I
24 found out I was going to get to do this, I asked
25 if this was something he could do, and that's when

**Page 104**

1 I guess we -- that's when we -- he agreed to be my
2 lawyer.
3 Q And what amount did you agree to pay him as your
4 lawyer?
5     MR. SCHRECK: Object. Attorney-client
6 privilege.
7     You can answer if you choose.
8 BY MR. FISHER:
9 Q Answer or no answer?
10 A No answer.
11 Q Okay. And what consideration or thing of value
12 did you give as a part of his agreement to serve
13 as your counsel?
14     MR. SCHRECK: Same objection.
15     You can answer if you choose.
16     THE WITNESS: What do you mean?
17 BY MR. FISHER:
18 Q Is there anything of value that you gave to him in
19 return for him agreeing to serve as your attorney?
20 A You mean monetarily or what?
21 Q Any value.
22 A Not that I'm aware of.
23     MR. FISHER: I have no other questions.
24 Thank you.
25     To the extent that I have to make some

```
1    declaration that I want these questions to be
2    certified under the federal rules, I am so doing
3    that.
4         MR. COUTURE: I'll join in the
5    certification.
6         E X A M I N A T I O N
7    BY MR. COUTURE:
8  Q  Your testimony is that you asked him to be your
9    lawyer?
10 A  Correct.
11 Q  So why did you ask him to be your lawyer?
12 A  Because after finding out that I was going to have
13   to come down for a deposition and them
14   arranging -- telling me what time and everything,
15   I thought maybe I better have some legal
16   representation.
17 Q  Were you ever on the board of directors of
18   Martin's Bulk Milk?
19 A  Me?
20 Q  Yes.
21 A  No.
22 Q  Were you ever on the risk management team?
23 A  No.
24 Q  Were you ever directing how insurance was
25   purchased or how claims were administered?
                                              105
```

```
1  A  No.
2  Q  Were you ever responsible for investigating
3    accidents?
4  A  No.
5  Q  Were you ever on something called control group at
6    Martin's Bulk Milk?
7  A  No.
8  Q  You're not an officer of the corporation?
9  A  No.
10 Q  What were your regular hours of work, sir, back
11   in --
12 A  Usually --
13 Q  Excuse me. I'm sorry. That wasn't a complete
14   question. Let me start again. I'll strike that
15   and start over.
16      As of July 2008, what were your regular hours
17   of work?
18 A  From day one, 6:30 to 7:00 a.m. until about
19   5:00 to 5:30 p.m.
20 Q  Was that five days a week?
21 A  Correct. Monday through Friday. Occasionally a
22   Saturday morning.
23 Q  Did you work always in the office in Wilton for
24   Martin's Bulk Milk?
25 A  Correct.
                                              106
```

```
1  Q  So you didn't work from home or some satellite
2    office?
3  A  No.
4  Q  That was a bad question. Am I correct when I say
5    you didn't work anywhere other than Martin's?
6  A  That is correct.
7  Q  Thank you.
8  A  Strictly in the office.
9  Q  Were you working on the 4th of July, 2008?
10 A  I doubt it. If it was the 4th of July, I would
11   probably have that off, I would think.
12 Q  Okay. Would you have worked the following Monday,
13   the 7th?
14 A  Probably.
15 Q  Okay. And if I understand it, it's your testimony
16   that on that day, the Monday after this accident,
17   you did not hear anyone discussing the fact that
18   one of the truck drivers had rammed a stopped car
19   and caused the car to burst into flames?
20 A  No. I never heard.
21 Q  I understand your testimony to be that you didn't
22   even know who Mr. Franke was? Well, strike that.
23      I want to figure this out. Did you know that
24   a person by the name of Sam Franke was employed by
25   Martin's Bulk Milk back when you were working for
                                              107
```

```
1    them in July of 2008?
2  A  Not that I can recall, because of my lack of
3    dealings with the drivers.
4  Q  Okay. So not only did you not deal with drivers
5    face-to-face, you wouldn't recognize the names of
6    the drivers on any of the documents. Is that what
7    you're saying?
8  A  Correct. Very few.
9  Q  Did you see a large, bald man come in the office
10   on July 7, 2008?
11 A  Not that I can recall.
12 Q  Were you ever present when someone took a
13   statement of Mr. Franke?
14 A  Not that I'm aware of.
15 Q  Did anyone ever tell you what Mr. Franke has said
16   about this accident?
17 A  No.
18 Q  Were you involved in the purchasing of Truck 139,
19   which is the truck involved in this accident?
20 A  No.
21 Q  Who was involved in purchasing trucks for Martin's
22   Bulk Milk?
23 A  That would -- I'm sure probably would have been
24   Dave.
25 Q  Okay. Dave Martin?
                                              108
```

**Page 109**

1    A   Correct.
2    Q   And I think you said you were not involved in the
3        maintenance of the truck?
4    A   That's correct.
5    Q   Was it part of your job, as you did the paperwork
6        for loads, to determine how heavy the load was?
7    A   Well, with some of them dealing with refrigerated
8        loads.
9    Q   Okay.
10   A   Like, dealing with Kraft or Great Lakes Cheese,
11       those. But that's where most of my involvement
12       was, was with refrigerated loads with Kraft, Great
13       Lakes Cheese, and there's another cheese company.
14       Sargento.
15   Q   Do you know how heavy the load was that -- the
16       gross weight of the vehicle involved in this
17       accident was?
18   A   You mean how much weight was on the truck or what
19       he was capable of hauling or what?
20   Q   I understand how -- the capacity. My question is
21       different.
22          Do you understand the gross weight of the
23       truck and contents, in other words, if you put the
24       truck and chassis and container on a big scale,
25       how much it would weigh? I'm not asking you to

**Page 110**

1        guess.
2    A   I'm not --
3    Q   Do you know?
4    A   No.
5    Q   Okay.
6    A   Depends on the trailer and the tractor.
7    Q   Yeah. It depends on the tractor, the trailer, the
8        load. My question is whether you know the answers
9        to all of those questions for what Mr. Franke was
10       driving on the day of this accident.
11   A   No. I would have no idea.
12   Q   Did you see anything on the news from the 3rd of
13       July or anytime thereafter about a Martin's Bulk
14       Milk truck being in an accident?
15   A   No.
16   Q   So you have no knowledge as to the details of what
17       happened?
18   A   None. That's why I'm --
19   Q   And you're not aware that Mr. Franke struck a
20       BMW 3 Series convertible?
21   A   No, I am not.
22   Q   You have no knowledge regarding claims that the
23       BMW was somehow defective after being struck by a
24       74,000-pound truck?
25   A   No.

**Page 111**

1    Q   I take it then you have no opinions about those
2        claims?
3    A   No.
4    Q   Okay. Were you involved in any way at Martin's
5        Bulk Milk in the hiring and firing of drivers?
6    A   None. No.
7    Q   I think Mr. Fisher may have asked this question,
8        but I just want to make sure. At any point did
9        you come to understand that Mr. Franke was fired
10       as a result of this accident?
11   A   No.
12   Q   Were you ever present while Martin's Bulk Milk's
13       attorneys spoke to anybody about this accident?
14   A   No.
15          MR. COUTURE: I don't have any other
16       questions for you.
17          MR. FISHER: I do have some follow-up,
18       but I'll wait until Rich is done. Or do you want
19       me to pop in?
20          MR. BURKE: Sure. Go ahead.
21          E X A M I N A T I O N
22   BY MR. FISHER:
23   Q   Okay. I should have asked these questions before
24       of you. I'm going to try to group them in an
25       efficient way. I have a hunch I know what all

**Page 112**

1        your answers are going to be. Okay?
2    A   Okay.
3    Q   It has nothing to do with attorney-client
4        privilege. Okay?
5    A   Okay.
6    Q   Assume that the work that Mr. Franke was doing on
7        July 3, 2008, was to pick up a load and drive a
8        truck to carry that load from point A to point B.
9        Okay? Assume that's the work he's doing.
10          Here's my series of questions for you. Do
11       you have any knowledge as to whether or not
12       Universal Am-Can or International Paper ever gave
13       any directions or instructions to Mr. Franke on
14       how to drive his truck?
15   A   I would have no idea.
16   Q   What tools, equipment, or other implements of him
17       doing his job as a truck driver, did they impose
18       any directions about that?
19   A   I would have no idea.
20   Q   Where to purchase gas?
21   A   No, I don't.
22   Q   What route to take?
23   A   I have no idea.
24   Q   So if I were to ask you any series of questions
25       that might ask the relationship between Universal

**Page 113**

1  Am-Can and Mr. Franke, is it fair that you would
2  have no knowledge of any of that?
3  A  That would be correct.
4  Q  And likewise, if I were to ask you a series of
5  questions about what relationship, if any, that
6  International Paper had with Mr. Franke, you would
7  have no knowledge about that?
8  A  That would be correct.
9  Q  The only thing you do know, as reflected in some
10  of the questions that Mr. Burke asked you, is that
11  on some of the -- like, on the broker confirmation
12  sheet or on the memo bills, there is information
13  about where the load is coming from, where the
14  load is going, and other notations that might me
15  pertinent for the delivery of that load?
16  A  That would be correct.
17       MR. FISHER: That's all. I tried to
18  condense them all into a few. Thanks.
19              EXAMINATION
20  BY MR. BURKE:
21  Q  Mr. Podlena, during the time you were working at
22  Martin's, did you know that Universal Am-Can had a
23  motor carrier license and could operate as a motor
24  carrier?
25  A  No, I did not.

**Page 114**

1       MR. BURKE: Okay. Nothing else.
2              EXAMINATION
3  BY MR. SCHRECK:
4  Q  The only question I have for you is, when were you
5  first contacted for purposes of scheduling your
6  deposition? Do you recall?
7  A  Yeah. Actually, it was November -- right before
8  Thanksgiving, but it was of 2011.
9  Q  Okay. And prior to your deposition today, did you
10  request that my office represent you for the
11  purposes of your deposition?
12  A  No. Or I'm sorry. Repeat that.
13       MR. SCHRECK: Can you read the question
14  back?
15       (Previous question read back.)
16       MR. FISHER: Excuse me. Excuse me. Can
17  I hear you read the answer that he gave?
18       (Previous answer read back.)
19  BY MR. SCHRECK:
20  Q  You can go ahead and answer.
21  A  Okay. It would have been two phone calls. It
22  would have been, like, three weeks ago when I
23  believe it was Jason from your office said that it
24  sounds like we're definitely going to have to
25  do -- you know, we'll set this up.

**Page 115**

1  Q  I'll ask my question again.
2       Prior to today, did you request that my
3  office represent you for the purposes of your
4  deposition?
5  A  That is correct.
6  Q  And that was accepted; is that correct?
7  A  That's correct.
8       MR. SCHRECK: No further questions.
9              EXAMINATION
10  BY MR. FISHER:
11  Q  In writing or orally?
12  A  That was oral, strictly. That's all I've ever --
13       MR. FISHER: Nothing else. Thanks.
14       THE WITNESS: Sure.
15       MR. SCHRECK: Any other questions?
16       MR. BURKE: Nothing else.
17       MR. SCHRECK: Reserve.
18       (Deposition concluded at 1:58 p.m.)

**Page 116**

STATE OF WISCONSIN )
                   ) SS:
COUNTY OF MILWAUKEE )

   I, Lindsay DeWaide, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the State of Wisconsin, do hereby certify that the preceding deposition was reported by me and reduced to writing under my personal direction.
   I further certify that said deposition was taken at CHULA VISTA RESORT, 2501 River Road, Wisconsin Dells, Wisconsin, on the 22nd day of March, 2013, commencing at 11:02 a.m.
   I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.
   In witness whereof, I have hereunto set my hand and affixed my seal of office at Milwaukee, Wisconsin, this 1st day of April, 2013.

_____
LINDSAY DEWAIDE, RPR
Notary Public, State of Wisconsin

My Commission Expires: January 22, 2017.

```
1
    STATE OF WISCONSIN )
2                      ) SS:
    COUNTY OF _____ )
3
4
5
6       I, Jeremiah Patrick Podlena, do hereby certify
7   that I have read the foregoing transcript of
8   proceedings, taken on the 22nd day of March, 2013, at
9   Chula Vista Resort, 2501 River Road, Wisconsin Dells,
10  Wisconsin, and that the same is true and correct except
11  for the list of corrections, if any, noted on the
12  annexed errata sheet.
13
14
15       _____
             Jeremiah Patrick Podlena
16
17
18
19       Dated at _____, _____,
                    (City)        (State)
20
         this _____ day of _____, 2013.
21
22
23
24
25
                                            117
```

McCorkle Litigation Services, Inc.
Chicago, Illinois    (312) 263-0052