IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, | ) ) ) ) ) ) ) ) ) | Honorable James F. Holderman Magistrate Susan E. Cox |
| Defendants. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) JOINT STATEMENT OF ADDITIONAL FACTS THAT REQUIRE DENIAL OF THE MOTIONS FOR SUMMARY JUDGMENT FILED BY BOTH IPC AND UACL**

Plaintiff, MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, through his attorneys, CLIFFORD LAW OFFICES, P.C., as his Statement of Additional Facts Requiring Denial of the Motions for Summary Judgment filed by both IPC and UACL sets forth the following facts. Since many of the facts relate to both the Motion for Summary Judgment filed by IPC and the separate Motion for Summary Judgment filed by UACL, Plaintiff is filing a Joint Statement of Additional Facts numbering in excess of 40 facts but less than the combined total of 80 facts permitted in response to Defendants' two separate motions:

    1.    Defendant Overnite Express (OEI) entered into a contract with International Paper on October 1, 2007 in which OEI represented itself as the motor carrier and agreed to provide

1

transportation of International Paper's commodities pursuant to the terms of that contract. OEI represented that it was an interstate motor contract carrier of property duly licensed and authorized under the Federal Highway Administration. (Exhibit 15, p. 3)

2. In OEI's October, 2007 contract with International Paper, OEI did not ever claim to be acting as a broker, did not identify itself as a broker, and did not agree to provide truck brokerage services to International Paper. (Exhibit 15, p. 1-24)

3. On or about June 13, 2008 UACL purchased OEI, including OEI's contract with IPC; UACL agreed to accept all the terms of the October 2007 contract that OEI had with IPC. (Limback Dep., pp. 46-51)

4. On June 13, 2008 IPC and UACL agreed to AMENDMENT NO. 1 under which UACL agreed to operate as the carrier and assume all of the responsibilities of the carrier as set forth in the October 1, 2007 contract (Exhibit 16); Limback Dep., pp. 56-61)

5. Pursuant to the terms of AMENDMENT NO. 1, as of June 13, 2008 UACL contractually obligated itself to act as a motor carrier for transportation of IPC's paper products and to fulfill all of the carriers obligations and other terms of OEI's October 1, 2007 contract with IPC. (Exhibit 15, p. 1-24); Limback Dep., pp. 58-59, 86-87, Exhibit 9)

6. Under the terms of the October 1, 2007 contract assumed and accepted by UACL as of June 13, 2008, UACL represented itself to be a motor carrier, was in fact a motor carrier, and provided proof of its motor carrier operating authority to IPC. (Exhibit 15, p. 3; Limback Dep. pp. 14-17, Ex. 9).

7. Under the terms of the October 1, 2007 contract assumed and accepted by UACL as of June 13, 2008, UACL did not represent itself as a transportation broker, did not claim to be providing trucking brokerage services to IPC and did not have any broker agreement with IPC. (Ex. 15, pp. 1-24; Limback Dep. pp. 16, Ex. 9).

8. On May 21, 2008, UACL sent a letter to IPC announcing that as of June 13, 2008 OEI would be operating under UACL's insurance and operating authority, and accepting the terms of the current contract IPC had in place with OEI. (Exhibit 23)

9. In its May 21, 2008 letter UACL specifically told IPC that "All bills of lading should reflect Universal Am Can Ltd. as the carrier" and that all future "invoices for freight moved will come from Universal Am Can Ltd." so the remittance should be sent to UACL's office. (Exhibit 23).

10. As to this occurrence on July 3, 2008, IPC believed the motor carrier was UACL, and both UACL and any drivers UACL used to transport IPC's goods had to comply with the requirements of the October 2007 contract. (Anderton Dep., pp. 25-26, Exhibit 11).

11. UACL had responsibility for complying with the terms of its contract with IPC regardless of whether a UACL driver or a Martin's driver transported IPC's product. (Anderton Dep. pp. 25-26, 77-78.)

12. Under the terms of the October, 2007 contract, as assumed by UACL on June 13, 2008, IPC set forth a list of Carrier's Obligations in section 3 of the contract under which IPC controlled UACL's provision of transportation services with respect to:

    a. The weekly commitment of services and the rate of compensation;
    b. Completion of a motor carrier vendor profile;
    c. Coordination of delivery schedules;
    d. Guaranteeing a certain number of commitments for transportation services;
    e. Meeting a minimum service level of 98%;
    f. Meeting a minimum on-time delivery requirement of 98%;
    g. Maintaining the requisite motor vehicle equipment needed to provide the amount of transportation services to which UACL committed;
    h. Employing the requisite number of personnel, including ensuring that the carrier's personnel comply with all applicable local, state and federal laws and regulations;
    I. Payment of ancillary costs with respect to fuel, oil, tires, parts and other supplies and equipment;
    j. Providing trailers that were suitably clean and water tight;
    k. Providing an adequate number of empty trailers to meet the number of transportation commitments to which UACL agreed; (Exhibit 15, pgs. 3-4)

13. Under the terms of the October 1, 2007 contract adopted and assumed by UACL, Defendant IPC controlled the terms of Compensation, payment terms, assignment of accounts receivable, commitments, termination of the contract, the use of electronic communications for dispatching and reporting to IPC, the format for bills of lading and freight receipts, responsibility for damage or lost freight, the insurance limits, and the use of intermodal service. (Exhibit 15, pgs. 4-11)

14. In the October 1, 2007 contract adopted and assumed by UACL, in section 20 titled Independent Contractor, UACL, as the motor carrier, agreed to "solely direct all persons performing services performed by Carrier under the Agreement, and such persons shall be and remain subject to the exclusive control and direction of CARRIER." Under this provision UACL as the carrier accepted an obligation to direct and control Martin's and Franke, insofar as Martin and Franke performed the transportation services for UACL. (Exhibit 15, pgs. 11-12)

15. Under the October 2007 contract, IPC required that UACL, and MBMS' employee driver Franke, had to comply with the following contractual provisions:

3

    J.    Trailer Requirements

CARRIER shall provide SHIPPER with trailers that are suitable for the safe efficient and damage-free transportation of its products. Suitable trailers are defined as van trailers that (I) are clean and free of contaminants, debris, foreign substances, odors, and wall and floor protrusions; (ii) completely protect and prevent SHIPPER'S good from coming into contact with or being exposed to water and other environmental hazards; and, (iii) are in proper condition and have no mechanical defects. CARRIER agrees to pay in full all claims filed by SHIPPER for damage to or destruction of SHIPPER'S good which arise from unsuitable trailers. (Exhibit 15, p. 4, Sec. 3J)

16. Under the October 2007 contract, IPC required that UACL, and MBMS' employee driver Franke, had to comply with the following contractual provisions:

    K.    Trailer Pool Requirements

CARRIER shall provide empty trailers to be maintained in SHIPPER'S trailer pool, plus any live load commitments. The number of empty trailers shall be determined by SHIPPER and agreed upon by CARRIER and shall be equal to or greater than 1 ½ times the number of daily or weekly Commitments. (Exhibit 15, p. 4, Sec. 3K)

17. Under the October 2007 contract, IPC required that UACL, and MBMS' employee driver Franke, had to comply with the following contractual provisions:

    10.    Bills of Lading and Freight Receipts.

    A.    All shipments tendered to CARRIER shall be on a straight bill of lading which shall, regardless of its form, format, or content, be subject only to the terms and conditions contained in Exhibit F, Sample International Paper Bill of Lading, a copy of which is attached hereto and is incorporated herein by reference. This bill of lading may be modified by SHIPPER only. Any attempt by CARRIER to incorporate, directly or indirectly, by reference or otherwise, any other tariffs, rates, charges, rules, or terms or conditions into any bill of lading shall have no effect on the bill of lading. (Exhibit 15, p. 8, Sec. 10)

    B.    Upon delivery of each shipment, CARRIER shall obtain a delivery receipt showing date of delivery, goods delivered, any consignee exceptions to count and conditions of goods delivered, and a legible signature of consignee. CARRIER shall provide SHIPPER with a copy of any delivery receipt or proof of delivery ("POD") as soon as practical for CARRIER, but in no event later than twenty four (24) hours after requested by SHIPPER or the delivery of goods. CARRIER shall transmit the delivery receipt copy to SHIPPER via

4

facsimile, express delivery service, or other electronic medium as may be employed between the parties. (Exhibit 15, p. 8, Sec. 10)

18. Under the October 2007 contract, IPC required that UACL, and MBMS' employee driver Franke, had to comply with the following contractual provisions regarding communication equipment that would allow IPC to stay in constant electronic communication with drivers regarding all facets of the transportation of its goods:

> 9. Electronic Communications, Dispatch and Reporting.
>
> A. Upon delivery of written instructions or procedures from SHIPPER, CARRIER shall obtain, maintain, and utilize electronic connectivity communications (e.g. EDI, XML, FTP, Web) with SHIPPER. CARRIER shall utilize the Transportation Management System (TMS) platform engaged at served SHIPPER facilities.
>
> B. CARRIER shall report pick-up and delivery events in the format(s) specified by SHIPPER. Timeline requirements and specific events shall be as set forth in Exhibit H. Electronic Compliance Requirements, which is attached hereto and is incorporated herein by reference. CARRIER shall complete and forward to SHIPPER or its agents all requested reports in a timely manner and in industry-standard format(s).

19. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

> **ELECTRONIC COMPLIANCE REQUIREMENTS**
> Carriers for International Paper are required to have the ability to communicate electronically and to be able to conduct transportation operations utilizing electronic means and tools. Communication can be accomplished by EDI, XML, or a web portal provided by International Paper. (Exhibit 15, attachment Exhibit H to October 2007 contract)

20. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

> **LOAD TENDER** Carriers are required to respond (accept/reject) to a load tender within 2 business hours Monday through Friday 7 a.m. to 5 p.m. CST. Failure to respond will be considered a rejected tender. (Exhibit 15, attachment Exhibit H to October 2007 contract)

21. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

>**DELIVERY APPOINTMENT** Carriers are required to establish a delivery appointment and response with the date and time for each stop within 24 hours of tender acceptance. (Exhibit 15, attachment Exhibit H to October 2007 contract)

22. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

>**PICKUP DATE/TIME** Immediately upon making a delivery appointment, establish a pickup date and time and transmit to International Paper. Failure to establish a pickup appointment negates the ability to claim detention at origin. Upon actual pickup, transmit the updated event within 2 hours of departure. (Exhibit 15, attachment Exhibit H to October 2007 contract)

23. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

>**ARRIVAL** Transmit delivery confirmation electronically within 2 business hours of arrival at Consignee's receiving dock or port. (Exhibit 15, attachment Exhibit H to October 2007 contract)

24. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

>**DELAY/REVISED ETA** Report revised ETA within 2 business hours of determining that a new, revised delivery time and/or date is required. (Exhibit 15, attachment Exhibit H to October 2007 contract)

25. Under Exhibit H of the October 2007 contract, IPC required that UACL and MBMS' employee-driver Franke communicate electronically in the following manner:

>**DELIVERY PERFORMANCE** The minimum On-Time Delivery Requirement is 98% and the Minimum Service Level Requirement is 98%. (Exhibit 15, attachment Exhibit H to October 2007 contract)

26. IPC could terminate its contract with UACL if UACL or its carrier drivers, including MBMS employee driver Franke, caused a continuing or substantial failure in the performance of the contract by:
>A. Failure to comply with facility safety rules and operating procedures, including but not limited to check in/dispatch procedures, equipment type and condition, sliding tandem axles to the rear most position for loading and unloading, hours of operation, trailer pool operations, document control, performance reporting and driver personal protective equipment.

B. A combined calendar year minimum service acceptance level for origin equipment supply commitments and on time deliveries of less than 98 percent.

C. Three consecutive months of minimum service acceptance level below 98 percent in either origin equipment supply commitments and/or on time deliveries.

D. Two or more delivery service written complaints within a three (3) month period from SHIPPER's customers requesting that CARRIER no longer deliver to their facilities.

E. A downgrade in your DOT rating by the Department of Transportation.

F. Failure to maintain minimum insurance coverage.

G. Non-compliance with Federal, State, or Municipal laws and regulations.

H. Bankruptcy or other insolvency of CARRIER. (Exhibit 15, pp. 7-8, Section 8(A-H))

**Re: IPC's Memo Bills/Bills of Lading**

27. IPC, through its Hammond Warehouse personnel, prepared and gave to MBMS truck driver Franke three (3) memo bills when he made the pickup of IPC's paper products on July 3, 2008. All three of the memo bills contain Franke's signature. (3 Memo Bills, Exhibit 21; Anderton Dep. pp. 97-98, Ex. 11).

28. On IPC's three memo bills the "Carrier" was identified as OXEN, which was a code for OEI, since the paperwork had not yet been updated to reflect UACL's purchase of OEI. The "Carrier" actually was UACL on July 3, 2008. (Exhibit 21; Mundy Dep., p. 109, Exhibit 13)

29. On the bottom of IPC's three memo bills it specified that the word "Carrier" as used in that contract was understood "as meaning any person or corporation in possession of the property under the contract . . ." (Exhibit 21)

30. IPC's three memo bills specified the type of product as printing paper, the amount of cartons, the weight of the goods, and the name and address of IPC's customer to whom the goods were to be delivered by the carrier's driver. (Exhibit 21; Mundy Dep., pp. 103-110, Exhibit 13)

31. IPC's three Memo Bills also contained IPC's specific, and separate, instructions to truck driver Franke for delivery of paper goods to IPC's three customers in Minneapolis: Cenveo, Midland Paper and XPEDX, including the name and phone number of the contact person for IPC's

customers and the precise time frame during which delivery had to be made. (Exhibit 21; Mundy Dep., pp. 103-110, Exhibit 13)

32. In the "Notes" section of its Memo Bill for the Cenveo delivery, IPC specifically instructed MBMS driver Franke that if there were problems with the delivery or if he was detained more than 1 hour, he was to call IPC at a specified phone number to report those problems and identify the order number for the Cenveo delivery. (Exhibit 21; Mundy Dep., pp. 104-106, Exhibit 13)

33. In the "Notes" section of the Memo Bill for the XPEDX delivery, IPC specifically instructed MBMS driver Franke that if he experienced delivery issues or if he was detained at least 1 hour, Franke was to report those problems to IPC by calling them at a specified phone number and identifying the XPEDX order number. (Exhibit 21; Mundy Dep., pp. 106-107, Exhibit 13)

### Re: **Under the Amended October 2007 Contract, UACL Was The Motor Carrier Obligated To Transport IPC's Paper Products**

34. Under the terms of the amended October 2007 contract, IPC considered UACL to be the motor carrier, and UACL had the responsibility of fulfilling all the transportation commitments and terms which were the subject of this agreement. (Mundy Dep., pp. 98-100, Exhibit. 13; Anderton Dep., pp. 25-27, Exhibit 11).

35. Even though UACL had a right under the amended October 2007 contract to have another trucking company make deliveries of IPC's products, IPC expected UACL to fulfill all its obligations under the contract. (Mundy Dep., pp. 99-100, Exhibit 13; Anderton Dep., p. 26, Exhibit 11).

36. If UACL used another trucking company to make the deliveries for which UACL had contracted, IPC expected that other carrier, such as MBMS and its drivers, to comply with all the terms of the contract between IPC and UACL. (Mundy Dep., p. 103, Exhibit 13; Anderton Dep. pp. 25-27, 116-118, Ex. 11).

37. Even though MBMS was the motor carrier actually transporting the paper goods, for any breach of the contract terms between IPC and UACL, IPC would seek satisfaction from UACL rather than MBMS because UACL was the designated carrier with whom IPC had contracted. (Mundy Dep., pp. 102-103, Exhibit 13)

38. At the time of this incident on July 3, 2008, IPC's paper was being hauled to Minneapolis because IPC had asked UACL to make the deliveries pursuant to IPC's contract with UACL as a motor carrier. (Anderton Dep., pp. 132-133, Exhibit 11)

39. Under the terms of the contract with UACL, IPC would tender the freight to UACL and IPC expected UACL to provide the transportation services to have the freight delivered to its customers in accord with the contract; IPC had this expectation regardless of whether their product

8

was delivered by a direct employee of UACL or a direct employee of some other company that UACL asked to make the delivery. (Anderton Dep., pp. 136-137, Exhibit 11)

40. Regardless of who actually made the delivery of IPC's products, UACL had to make sure the driver made the deliveries in a manner that fulfilled the expectations and obligations under the contract. (Anderton Dep., pp. 188-189, Exhibit 11)

41. On July 3, 2008, UACL was obligated to fulfill the terms of its contract as a motor carrier in which it had agreed to provide transportation services to IPC and to haul IPC's goods for them. (Limback Dep., pp. 14-17, 85-86, Exhibit 9)

42. UACL did not have a brokerage agreement with IPC, and in its amended October 2007 contract with IPC, UACL was identified as the carrier, not as a broker. (Limback Dep., p. 16, Exhibit 9)

43. MBMS/Franke would not have been hauling the load of IPC paper on July 3, 2008 unless UACL had asked MBMS to do so in order for UACL to comply with its contractual obligations to provide transportation services to IPC. (Limback Dep., p. 87, Exhibit 9)

44. By delivering paper products for UACL, MBMS and its driver Franke were providing transportation services to UACL, and these were the same transportation services UACL was obligated to provide to IPC under the amended October 2007 agreement. (Limback Dep., p. 86-87, Exhibit 9)

45. UACL's driver, or any driver UACL hired, was performing a service for IPC by delivering its paper products to IPC's customers. (Anderton Dep., p. 30, Exhibit 11)

46. MBMS employee Pat Podlena, who accepted and signed the broker confirmation sheet sent to them by UACL on July 3, 2008 for the load in transit at the time of the crash, believed that Franke/MBMS were acting as agents of UACL in the transportation of IPC's goods. (Podlena Dep I, pp. 25-27, Exhibit 25)

47. David Martin, operations manager for MBMS believed that Franke/MBMS were acting as agents of, and providing a service to, both IPC and UACl by transporting IPC's paper products that UACL had agreed to haul to Minneapolis. (Martin Dep I, pp. 64-65, Exhibit 4)

48. Even though UACL utilized the services of a MBMS driver to physically haul the paper products, IPC only made payment to UACL since it was UACL with whom IPC had contracted. (Anderton Dep., pp. 62-63, Exhibit 11)

49. In the collision of July 3, 2008 some of IPC's paper products were damaged so UACL had to pay IPC for those damage goods. (Limback Dep., p. 96, Exhibit 9; Memo Bill for Cenveo delivery, Exhibit 24)

**Re: <u>Compliance With Traffic Regulations and Avoiding Collisions</u>**

50. Under the amended October 2007 contract signed by Stephen Mundy for IPC and signed by Mark Limback for UACL, IPC required that the carrier's personnel comply with the applicable local, state, and federal laws and regulations and non-compliance was a basis for under which IPC could terminate the contract. (Exhibit 15, Sec. 3(H); Mundy Dep., pp. 61, 71; Anderton Dep., pp. 58-60, 67)

51. Pursuant to the amended October 2007 contract signed by Stephen Mundy for IPC, and signed by Mark Limback for UACL, IPC expected its motor carriers to operate their trucks in accord with all applicable traffic rules while making delivery of IPC's products to IPC's customers. (Mundy Dep., pp. 61-63, Exhibit 13; Anderton Dep., pp. 58-60)

52. The provision of Section 3(H) of the amended October 2007 contract requiring the carrier's personnel to comply with local, state and federal laws and regulations includes complying with motor vehicle traffic regulations while operating their tractor trailer trucks to deliver IPC's products. (Anderton Dep., pp. 197-198, Exhibit 11)

53. Pursuant to the amended October 2007 contract signed by Stephen Mundy for IPC, and signed by Mark Limback for UACL, IPC required its carriers to adhere to and follow the federal regulations related to the operation of tractor trailer trucks in a safe manner while delivering IPC's products to its customers. (Mundy Dep., p. 62, Exhibit 13)

54. IPC expected its motor carriers to avoid colliding with cars while they were making deliveries for IPC. (Mundy Dep., pp. 62-63, Exhibit 13)

55. Under the amended October 2007 contract, UACL had to make deliveries of IPC's products in compliance with local, state, and federal traffic regulations, and without colliding with other motor vehicles, whether the driver was a UACL driver or a MBMS driver. (Limback Dep., pp. 81-82, Exhibit 9)

s//Richard F. Burke, Jr.
Submitted By One of Plaintiff's Attorneys
Richard F. Burke, Jr.
ARDC No: 03121588

Richard F. Burke, Jr.
Shannon M. McNulty
Kimberly M. Halvorsen
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090/(312) 251-1160 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation, | ) ) ) ) ) ) ) ) ) | Honorable James F. Holderman<br><br>Magistrate Susan E. Cox |
| Defendants. | ) | |

# **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on **May 28, 2013**, he caused **Plaintiff's Local 56.1(b)(3)(C) Joint Statement of Additional Facts that Require Denial of the Motions for Summary Judgment Filed by Both IPC and UACL** to be filed electronically through the CM/ECF system which will send notification of such filing to the attorneys listed on the attached Service List.

                      s// Richard F. Burke, Jr.
                      Richard F. Burke, Jr. Bar Number 03121588
                      Attorney for Plaintiff MURRAY SCHEINMAN,
                      Plenary Guardian of the Estate and Person of
                      JEFFREY J. SCHEINMAN, a Disabled Person

Richard F. Burke, Jr.
Shannon M. McNulty
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160

Scheinman v. Martins Bulk Milk Service, Inc., et al.
Our File No.: 08-0066
Case No. 1:09-cv-05340

SERVICE LIST

Mr. Joseph Skryd
Mr. Matthew Schreck
Mr. James Temple
Ms. Kristen C. Leppert
Mr. Jason Briesemeister
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
(630) 653-9300
(630) 653-9316 (Fax)
jskryd@mrvlaw.com
mschreck@mrvlaw.com
jtemple@mrvlaw.com
Jbriesemeister@MRVLaw.com

Mr. Robert J. Golden
Mr. Daniel Polsby
DOWD & DOWD, LTD.
617 West Fulton
Chicago, Illinois 60661
(312) 704-4400
(312) 704-4500 (Fax)
rgolden@dowdanddowd.com
dpolsby@dowdanddowd.com
*ATTORNEYS FOR DEFENDANTS: MARTIN'S BULK MILK SERVICE, INC. AND SAMUEL G. FRANKE*

Carlton D. Fisher
William Yu
Cecilia A. Horan
HINSHAW AND CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
(312)704-3000
(312) 704-3001 (Fax)
cfisher@hinshawlaw.com
wyu@hinshawlaw.com
choran@hinshawlaw.com

*ATTORNEY FOR DEFENDANT: INTERNATIONAL PAPER COMPANY AND UNIVERSAL AM CAN, LTD., S/B/A AND SUCCESSOR TO OVERNITE EXPRESS INC., AND OX, LLC*

Mr. James K. Toohey
Mr. Timothy R. Couture
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 (Fax)
tooheyj@jbltd.com
couturet@jbltd.com
*ATTORNEYS FOR DEFENDANTS: BMW of NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT*