**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MURRAY SCHEINMAN, Plenary ) | |
| Guardian of the Estate and Person of ) | |
| JEFFREY J. SCHEINMAN, a Disabled ) | |
| Person, ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | Case No.:09 cv 5340 |
| ) | |
| MARTIN'S BULK MILK SERVICE, INC., ) | Honorable James F. Holderman |
| SAMUEL G. FRANKE, INTERNATIONAL ) | |
| PAPER COMPANY, UNIVERSAL AM CAN LTD., ) | |
| CAN LTD., Successor to OVERNITE EXPRESS, INC ) | |
| EXPRESS, INC. and OX LLC, BMW of NORTH ) | |
| AMERICA, LLC, a corporation, BAYERISCHE ) | |
| MOTOREN WERKE AKTIENGESELLSCHAFT, ) | |
| a corporation ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT INTERNATIONAL PAPER COMPANY'S**
**LOCAL RULE 56.1(b)(3)(B) STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**IPC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, JEFFREY J. SCHEINMAN, through his attorneys, CLIFFORD LAW OFFICES,

P.C., submits this response and statement of material facts pursuant to Local Rule 56.1(b)(3) in

response and opposition to Defendant International Paper Company's Local Rule 56.1(b)(3)

Statement of Material Facts in Support of Their Motion for Summary Judgment. Plaintiff denies that

there is no genuine issue of fact as to all of the facts cited below. Plaintiff further denies that

Defendant's statement of material facts accurately reflects all of the relevant facts, and denies that

defendant's statement of facts supports granting a summary judgment or dismissal of Plaintiff's

Complaint. In support thereof, Plaintiff states as follows:

1

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|

**A. Background of Facts.**

1**.** Murray Scheinman, Plenary Guardian of the Estate and Person of Jeffrey J. Scheinman, a Disabled Person ("Plaintiff"), filed a Fifth Amended Complaint ("Complaint") on July 26, 2011, seeking recovery from IPC for personal injuries sustained during a highway auto accident and alleging various liability, **not** direct liability or independent tortious conduct of IPC/UACL/OEI/OX, for the acts and omissions of Samuel Franke, and specifically that: On and before July 2, 2008, defendant Franke was a duly authorized employee, agent and/or apparent agent of defendant, [MBMS, CSXI, CELTIC, TL, IPC, OEI], and at all times mentioned herein was acting in the course and scope of said employment, agency and apparent agency. (JAE 1.)

1. Defendant cites only a portion of the Plaintiff's Complaint. The entirety of the Plaintiff's Complaint is set forth as Exhibit 1 in Plaintiff's list of joint exhibits.

2. The accident involving Franke and Scheinman occurred on July 3, 2008, on Skokie Valley Road at or near its intersection with Half Day Road in Highland Park, Illinois. (JAE 1.)

2. Plaintiff agrees as to the statement of location, but not the characterization that this was an "accident" since this rear-end collision resulted from negligence by the Defendants

3. Franke was a truck driver employed by MBMS and was driving the tractor owned by MBMS on July 3, 2008, when he rear-ended the back of the vehicle driven by Plaintiff. As a result of the collision, Plaintiff sustained injuries and is disabled. (JAE 1.)

3. Plaintiff agrees that Franke was employed by MBMS, but states that he was also acting as an agent of, and performing services for IPC and UACL/OEI.

2

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

4.      Martin's Bulk Mild Service
("MBMS") was the owner of the tractor that
was driven by Franke that collided with
Plaintiff's vehicle. (JAE 1; JAE 12, pp. 8, 20,
24-24, 29, 34, 53; JAE 13, pp. 7, 16, 22, 85.)

**B.  Relationship Between UACL, OEI
     And IPC.**

5.      On May 21, 2008, at the direction of
UACL President Mark Limback, Gina Hubbs
of UACL sent a letter to IPC requesting an
assignment of the IPC-OEI agreement for OEI
to provide IPC with transportation services for
IPC products, since UACL would take over
OEI's operations in June 2008 in accordance
with an agreement UACL contemplated, but
had yet to effectuate, with OEI. (JAE 7, pp.
43, 49; JAE 9, pp. 56-57; JAE 13, pp. 37-38)

6.       Effective June 13, 2008, IPC and
UACL agreed to "Amendment No. 1" to the
IPC-OEI agreement such that IPC would
assign the 2007 agreement to UACL, and
UACL would assume the responsibilities of
the 2007 IPC-OEI transportation agreement.
(JAE 7, p. 68; JAE 9, p. 63; JAE 13, pp. 33,
41-42, 46-47, 49, 62, 99.)

**PLAINTIFF'S RESPONSE**

4.       Plaintiff agrees that MBMS was the
owner of the tractor driven by Franke, but
MBMS was not the owner of the trailer that
was attached to the tractor.

5.      Plaintiff agrees that such a letter was
sent.

6.       Plaintiff agrees that IPC and UACL
agreed to Amendment #1 effective June 13,
2008.

**DEFENDANTS ALLEGED UNCONTROVERTED FACTS**

7.    June 13, 2008, UACL acquired the trucking and brokerage operations of OEI in an Asset Purchase Agreement such that UACL took over the previous OEI trucking services and OEI, for all intents and purposes, ceased to operate.  (JAE 7, pp. 35, 42, 50, 55; JAE 9, pp. 46-47, 49-51, 55; JAE 18, pp. 6-8, 12, 16.)

8.    The amended October 2007 contract between IPC and UACL, effective June 13, 2008, contains a section entitled "Independent Contractor" which provides that UACL shall perform all services under the agreement as an independent contractor to IPC and, under no circumstances, shall PC be construed as having responsibility for UACL's safety, means or methods. (JAE 9, p. 99; JAE 11, pp. 71-72; JAE 12, p. 59; JAE 13, p. 82.)

**C.  Relationship Between UACL and MBMS**

9.    As IPC's transportation services provider beginning June 13, 2008, UACL had an obligation to fulfill the terms of the IPC/UACL contract and, in order to do so, it turned to MBMS to provide the same trucking services that MBMS had provided in the past for OEI with regard to its 2007 contract with IPC. (JAE 7, pp. 76, 102; JAE 9, pp. 17, 83-85.)

**PLAINTIFF'S RESPONSE**

7.    Plaintiff agrees the Asset Purchase Agreement sets forth the scope of the acquisition. However, Plaintiff objects to and denies the overly broad characterization that UACL took over the previous OEI trucking services. Plaintiff only has information as it pertains to IPC, and IPC had to agree to UACL's desire to take over OEI's contract with IPC before UACL could do so.

8.    Plaintiff agrees the October 2007 contract as assumed by UACL contains section #20 entitled Independent Contractor, but denies that it contains the argumentative conclusions with respect to responsibility. Plaintiff further states that the preceding paragraphs of the contract, including paragraphs 3-14 set forth multiple provisions that establish that UACL was under the control and supervision of IPC in virtually all aspects of the trucking services to be provided.

9.    Plaintiff agrees that as of June 13, 2008 UACL had an obligation to fulfill the terms of the IPC/UACL contract and agrees that UACL utilized MBMS on July 3, 2008 to perform UACL's truck transportation obligations, but objects to the overly broad characterization that MBMS was providing "the same trucking services that MBMS had provided in the past for OEI."

4

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

10.     In May 2008, in preparation for the eventual UACL purchase of OEI, UACL brokerage manager, John Moorer, sent a draft UACL Master Brokerage Agreement to MBMS.
(JAE 8, p. 64.)

10. Plaintiff agrees that John Moorer sent a draft UACL Master Brokerage Agreement to MBMS in May of 2008, and again in June of 2008, since the May copy had never been returned; However, John Moorer did not ever testify that such agreement was sent "in preparation for the eventual UACL purchase of OEI". Furthermore, UACL and MBMS had a standing Master Brokerage Agreement dating back to at least November 7, 2007, which pre-existed UACL's purchase of OEI. (Moorer dep., pp. 50-54, 64, Exhibit 8; November 7, 2007 UACL Master Brokerage Agreement with MBMS, Exhibit 22).

11.     In order for MBMS to act as a carrier on loads that UACL was brokering, UACL had several requirements for MBMS: (1) the three page Master Brokerage Agreement must be signed; (2) MBMS would have to provide a copy of its authority to operate; (3) MBMS must provide proof of insurance; (4) MBMS must provide a completed W-9; (5) MBMS must complete and return the carrier surgey form; and (6) all information has to be faxed to the UACL phone number. (JAE 7, pp. 84, 86, 135, 137; JAE 10, pp. 100-103.)

11.     Plaintiff disagrees with the statement, suggestion and/or inference that on July 3, 2008 UACL merely had brokered the transportation of IPC goods that MBMS and Franke were hauling at the time of this crash. UACL, legally and factually was not simply acting as a truck broker because UACL had a contractual obligation to actually transport IPC's paper products on July 3, 2008. However, plaintiff agrees that testimony has been presented stating that where UACL was acting solely in the capacity of a broker, it required MBMS to comply with the 6 items identified by Defendants. Plaintiff further agrees that UACL required MBMS to comply with all of these 6 items on July 3, 2008 even though UACL was not acting only as a broker for the load in question. (Anderton Dep. pp. 25-27, Ex. 11; Mundy Dep. pp. 98-100, Ex. 13.)

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

12.    MBMS signed and agreed to the UACL
Master Brokerage Agreement, effective as of
June 12, 2008 and on July 3, 2008, that
provided, among other things, that MBMS is
an independent contractor to UACL and is not
to be deemed an agent of UACL.  (JAE 7,
pp. 110-111, 124; JAE 9, pp. 107-108;
JAE 10, pp. 127-130.)

**PLAINTIFF'S RESPONSE**

12.  Plaintiff agrees that MBMS had signed
and agreed to a UACL master brokerage
agreement effective June 12, 2008, but denies
that on July 3, 2008, MBMS was hauling a
load only pursuant to such brokerage
agreement because testimony has established
that on that day UACL was not simply a
broker, but was operating as a motor carrier
and was utilizing the services of MBMS to
fulfill the truck transportation of IPC products
which it was contractually bound to provide
on that day. (Anderton dep., pp. 25-27,
Exhibit 11).

**DEFENDANTS ALLEGED UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

13. Pursuant to an agreement between UACL and IPC for delivery of IPC's products to its customers, UACL brokered the subject load to MBMS. (JAE 11, pp. 35, 78.)

13. Plaintiff denies that UACL was acting as a truck broker when it utilized MBMS and Franke to perform the transportation services to which UACL was contractually bound to provide in UACL's capacity as a motor carrier under the October 2007 amended agreement. The Federal Motor Carrier Safety Administration Regulations, 49 C.F.R. § 371.2(a) defines a broker as "a person who, for compensation, arranges, or offers to arrange the transportation of property by an authorized motor carrier. Motor carriers or persons who are employees or bonafide agents of carriers, **are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport**." Additionally under 49 U.S.C. § 13102 (2), a broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing or arranging for transportation by motor carrier for compensation. Therefore UACL cannot accurately characterize itself as a truck broker who had simply "brokered" the subject load to MBMS.

14. After June 13, 2008, when picking up IPC products and transporting them from the IPC Midwest Distribution Center, MBMS was delivering goods under the UACL Master Brokerage Agreement. (JAE 7, p. 76; JAE 9, p. 84.)

14. Plaintiff denies the statement, inference and/or suggestion that MBMS delivered IPC goods only under the UACL Master Brokerage Agreement because UACL was operating as a motor carrier rather than a transportation broker. (Anderton Dep. pp. 25-27, Ex. 11).

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| **D. Franke's Conduct Was Controlled by MBMS, Not IPC.** | D.   Plaintiff objects to Defendant's claim that Franke's conduct was controlled by MBMS, not IPC insofar as it constitutes argument and is conclusory and does not properly belong in a Statement of Material Facts. |
| 15.   Franke was employed by MBMS as a driver since 1999 and was so employed on the date of the occurrence.  (JAE 2, pp. 6, 10, 58; JAE 4, pp. 15, 153; JAE 5, pp. 307, 362, 506.) | 15.   Agreed. |
| 16.   His work was always assigned through MBMS and his supervisor was David Martin and the Martins of MBMS. (JAE 2, pp. 10, 11; JAE 3, p. 123.) | 16.   Agree other than as to "always." |
| 17.   Franke never had any conversations with anyone at UACL concerning the load he was hauling on July 3, 2008 or any of the loads he hauled before July 3, 2008. (JAE 2, p. 39-40.) | 17.   Agreed. |
| 18.   IPC never gave MBMS or Franke instructions or directions concerning Frank. (JAE 4, p. 144; JAE 5, p. 326.) | 18.   Denied since IPC's instructions and directions concerning transportation of its paper goods set forth in the October 2007 contract were to be complied with by any other company UACL used. (Mundy Dep, pp. 103-104, Ex. 13.) |

8

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

19.     IPC never directed Franke to use any particular route or measure, score or evaluate his work. (JAE 3, pp. 447.)

19.     Agree that IPC never spoke to Franke personally, but denied insofar as Joan Anderton testified that the IPC sourcing group engaged in performance reviews of its carriers. (Anderton Dep., pp. 139-144, Ex. 11.) The terms of the October 2007 contract also required 98% compliance with the delivery and performance provisions, and IPC expected compliance by UACL and any other carrier UACL used to fulfill the contract obligations. (Mundy Dep., pp. 59-60, 69-70, 103-104, Ex. 13; Crawford Dep., pp. 42-44.) IPC could cancel the contract with UACL if IPC's customers complained about the carrier making the deliveries. (Anderton Dep., pp. 125-126, Ex. 11.)

20.     Franke was instructed by MBMS to take the shortest, most direct route. (JAE 3, p. 123; JAE 6, pp. 37-38.)

20.     Objection to the overly-broad characterization of this statement. Janet Berndt, of MBMS, actually testified that a driver should take the shortest route "within reason, based on conditions". The shortest route sometimes might be the shortest distance and at other times the shortest time. MBMS had no objection to a driver traveling some extra miles if it was outweighed by eliminating a toll expense. (Berndt dep., pp. 37-39, Exhibit 6).

21.     No one from MBMS told Franke to take from Hammond to Wilton because Franke knew the route. (JAE 6, p. 42.)

21.   Denied insofar as Janet Berndt of MBMS testified that she was aware of the options Mr. Franke had for his route from Hammond, Indiana to Wilton, Wisconsin; Further, she testified that Franke was "probably not" told by MBMS what route to take since he knew the route. (Berndt dep., p. 42, Exhibit 6).

**DEFENDANTS ALLEGED UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

22.     Franke would pick up a load at the MBMS terminal in Wilton, Wisconsin, deliver it to the Chicago area, re-load, and then bring a load back to the Wilton, Wisconsin MBMS terminal. (JAE 6, p. 30.)

22.     Agreed.

23.     On the day of the occurrence, Franke transported a load from Wilton, Wisconsin to Chicago, Illinois and he was assigned that load through dispatch at MBMS.  (JAE 6, pp. 103-104.)

23.     Objection to the extent the cited testimony does not relate to the statement. However, plaintiff agrees generally Mr. Franke on the date of the occurrence transported a load from Wilton, Wisconsin to Chicago, and he was asked to do so in the most immediate sense by an employee of MBMS.

24.     David Martin and Pat Podlena of MBMS had the responsibility of coordinating Franke's pickup of a load on a day to day basis with the IPC Hammond Distribution Center.  (JAE 6, p. 39.)

24.     Agreed.

**E.  Neither Franke nor MBMS Represented Franke to be IPC's Agent, Just MBMS's Employee.**

E.     Objection and denied.   The cited deposition testimony does not support this statement. Franke was never asked, and never testified, as to whether or not he was a "agent" of IPC.  He only testified that he never told people I'm here on behalf of IPC.  (Franke dep. I, pp. 44-45, Exhibit 2). Agreed Franke did not consider himself to be an employee of IPC.  Agreed David Martin testified he did not "represent" to anyone that Franke was an agent of IPC, however, David Martin testified that MBMS was acting as an agent for IPC by transporting its paper product to Minneapolis, and that MBMS was also acting as an agent for OEI (then owned by UACL) by transporting the paper product that OEI had agreed with IPC to get transported to Minneapolis. (Martin dep. I, p. 65, Exhibit 4)
**RFB EDIT THE ABOVE ANSWER**

10

**DEFENDANTS ALLEGED**
**UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

25.     Franke never considered himself to be an employee [or agent] of UACL, OEI, or IPC. (JAE 2, p. 47.)

25.     Agree Franke testified he did not consider himself an employee of UACL, OEI or IPC.  Denied as to agency since Franke was not ever asked if he considered himself an agent of UACL, OEI or IPC.  (Franke dep. I, p. 47, Exhibit 2).

26.     Neither David Martin nor Franke ever represented to anyone that Franke was an agent of IPC and Franke did not consider himself to be an employee of IPC.  (JAE 2, pp. 44-45, 47, 58); JAE 4, pp. 142-143.)

26.     Objection and denied.  The cited deposition testimony does not support this statement. Franke was never asked, and never testified, as to whether or not he was an "agent" of IPC.  He only testified that he never told people I'm here on behalf of IPC. (Franke dep. I, pp. 44-45, Exhibit 2). Agreed Franke did not consider himself to be an employee of IPC.  Agreed David Martin testified he did not "represent" to anyone that Franke was an agent of IPC, however, David Martin testified that MBMS was acting as an agent for IPC by transporting its paper product to Minneapolis, and that MBMS was also acting as an agent for OEI (then owned by UACL) by transporting the paper product that OEI had agreed with IPC to get transported to Minneapolis.  (Martin dep. I, p. 65, Exhibit 4).

27.     David Martin represented only that Franke was an employee of MBMS and that he received direction, control, supervision and management from MBMS. (JAE 4, pp. 143, 159.)

27.     Denied insofar as the October 2007 contract sets forth in sections 3, 8, 9, 10 and 11 rules and requirements that constituted direction, control, supervision and management. (October 2007 Contract between IPC and UACl, Ex.  15).  Said terms were applicable to any company UACL used to perform the truck transportation services. (Mundy Dep., pp. 103-104, Ex. 13).

**F.  IPC Had No Involvement in the Method**
**Of Payment to MBMS/Franke.**

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

28.     Franke received a paycheck and W2 form from MBMS, and MBMS deducted his payroll taxes.  (JAE 2, p. 46; JAE 4, p. 18.)

28.     Agreed.

29.     IPC never paid Franke his salary, wages, cost of repairs or maintenance, supplies, travel expenses or health benefits including health insurance, workers compensation insurance coverage, pension plan, retirement accounts, profit sharing, vacation pay, or sick pay.  (JAE 3, p. 454; JAE 4, p. 146; JAE 5, pp. 348, 350.)

29.     Agreed.

30.     IPC would only pay UACL and not its contractor directly. (JAE 11, p. 59.)

30.     Agree IPC paid UACL, but object to the reference to the legal conclusions of "contractor."

**G.  IPC Had No Involvement With Providing Tools, Materials or Equipment to MBMS/Franke**

G.     Object to the conclusory and argumentative expression which is not a statement of fact.

31.     Franke was not required by MBMS to wear a uniform; however, on occasion, he would wear a hat or jacket that said "Martin's Bulk Milk Service." (JAE 2, p. 46.)

31.     Objection to the extent Samuel Franke testified that on occasion he would have a Martin hat or jacket.  He did not ever testify that the hat or jacket actually had any wording that said "Martin's Bulk Milk Service". (Franke dep. I, pp. 46-47).

32.     Franke never wore clothing that said "International Paper Company."  (JAE 2, p. 47.)

32.     Agreed.

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

33.    MBMS provided Franke with the equipment he needed to do his job, including his truck, generally, and the truck he was driving on the date of the occurrence.  (JAE 2, p. 10.)

33.    Agreed MBMS provided Franke with the tractor he was driving at the time of the occurrence.  However, the trailer Franke was hauling was a pool trailer that had to meet the specifications of IPC as stated in their October 2007 contract with UACL, and the trailer had been loaded by IPC.  (Mundy Dep., pp. 63-64, October 2007 Contract, Section J, Ex. 15).

34.    IPC never provided Franke with a truck or supplied the graphics, placard, stickers or logos on the tractor or trailer.  (JAE 3, p. 447; JAE 5, p. 347.)

34.    Agreed as to the tractor portion of the semi-tractor trailer truck Franke was driving.

35.    IPC did not have any requirements regarding loading the trailer and never qualified, hired, disciplines, fined, counseled or fired any of the MBMS drivers.  (JAE 11, p. 176.)

35.    Denied; IPC's October 2007 Contract with UACL had requirements for the qualifications of drivers used by UACL to haul IPC's goods.  (Ex. 15, Sec. 3(H)).

36.    IPC never inspected the tractor, trailer, chassis or container via a pre-trip inspection.  (JAE 11, p. 176.)

36.    Denied.  The cited page of Ms. Anderton's deposition does not discuss the statement.  The trailer was loaded by IPC's employees at its Hammond warehouse. (Franke Dep.  Pp. 206-207, Ex.  3).

37.    MBMS owned, and was responsible for maintenance of, the tractor Franke was driving on the date of the accident.  (JAE 2, pp. 12, 46; JAE 3, p. 139; JAE 4, pp. 18, 25, 77-79.)

37.    Agree MBMS owns the tractor and was responsible for maintaining it.  However, the maintenance was required by IPC in its contract with UACL.  (October 2007 Contract, Section 3(G), Ex. 15; Mundy Dep, pp. 59-60, Ex. 13; Crawford Dep., pp. 39-42, Ex. 12).

38.    IPC was not responsible for the maintenance of the tractor or trailer, the expenses of operation such as gas and oil, or for obtaining any licenses or permits for the tractor or trailer. (JAE, p. 347.)

38.    Agree, but further state that IPC required Universal to maintain the truck equipment. (October 2007 Contract, Section 3(G), Ex.  15; Mundy Dep, pp.  59-60, Ex. 13; Crawford Dep., pp.  39-42, Ex.  12).

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 39.   IPC never required Franke to inspect, clean, or maintain his tractor or trailer, or require him to use a designated place for the cleaning, servicing, or gassing of his tractor-trailer.  (JAE 3, p. 449; JAE 5, pp. 328, 335.) | 39.   Agreed. |
| 40.   IPC never provided him with tools or instrumentalities he needed to do his work.  (JAE 3, p. 446; JAE 4, p. 145.) | 40.   Agreed, other than IPC employees at the Hammond Warehouse loaded the trailer.  (Anderton Dep.  pp.149-159, Ex.  11). |
| 41.   IPC never provided Franke with clothing or log books, a co-driver, or money with which to purchase gas.  (JAE 3, p. 447; JAE 5, p. 328.) | 41.   Agreed. |
| 42.   IPC never provided any directions or instructions on where or how to purchase gas, supplies or services while driving the truck. (JAE 6, p. 194.) | 42.   Agreed |
| 43.   IPC never dictated to any drivers that came to the Hammond distribution center how to u se their log books, what clothing to wear, what equipment should be used, how to operate his tractor on the road, or report what was going on with their driving. (JAE 6, p. 173.) | 43.   Denied insofar as in the October 2007 Contract IPC dictated that the motor carrier hauling its paper goods had to comply with all state, municipal and federal laws and regulations; and the carrier had to follows traffic regulations and Department of Transportation regulations.  (October 2007 Contract, Section 3(H), Ex.  15; Anderton Dep., pp. 59-60; 67-68, Ex.  11; Mundy Dep., pp.  61-62, Ex.  13).  Drivers also need to report per the contract, to IPC if the driver was going to be detained more than an hour. (Mundy Dep., pp.  103-104; Ex.  13). |

**DEFENDANTS ALLEGED UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

**H. IPC Did Not Monitor or Discipline The Conduct of MBMS Driver Franke.**

H.    Denied; IPC did in fact monitor driver conduct and required 98% performance compliance with the October 2007 contract terms; IPC engaged in performance reviews of the carrier and its drivers.  IPC disciplined the conduct of any MBMS driver because IPC could terminate the contract if a customer complained during delivery.  Agree Franke was not actually disciplined by IPC. (Anderton Dep., pp.   125-126; 139-144, Ex.11; Mundy Dep., pp.  59-60; 69-70; 103-104, Ex.  13; Crawford Dep., pp.  42-44).

44.    MBMS kept a driver qualification file on Franke, reviewed his work annually, and provided him with an employee handbook which contained instructions from MBMS on how to use the fuel pump, how to fill out MBMS paperwork, what MBMS expected of him, and MBMS safety procedures, including instructions on how to do a pre-trip inspection, and what to do in the event of an accident. (JAE 3, pp. 107, 112, 118; JAE 5, pp. 282, 287, 365.)

44.    Agreed.

45.    With respect to the driver handbook and other documentation concerning safety that MBMS gave its drivers like Franke, at no time or place did any of those documents indicate that a MBMS driver should contact IPC or UACL after an accident occurred. (JAE 6, p. 132.)

45.    Object to the overly broad and vague nature of the statement without specifying what "other documentation" concerning safety, is referred to.  With respect to the Driver Handbook, Plaintiff agrees Ms.  Berndt so testified; but Plaintiff further states that the Handbook is not limited to driving performed for any particular company, including IPC and UACL.

**DEFENDANTS ALLEGED UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

46.     With respect to the operating procedures and policies that MBMS provided to its drivers like Franke, where those materials refer to dispatchers or being dispatched, the dispatchers being referenced are in the MBMS dispatchers. (JAE 6, pp. 134-35.)

46.     Plaintiff agrees Janet Berndt so testified.

47.     IPC never called to check up on Franke or to find out whether he made it back to Wilton, never required him to report in to IPC, and never required him to notify IPC of anything that was happening while he was on the road. (JAE 3, p. 450; JAE 5, pp. 336, 481.)

47.     Plaintiff denies that this is an accurate statement of all of the evidence.  Plaintiff agrees that Franke so testified.  However, the specific provisions of the October 2007 Contract assumed and adopted by UACL contained provisions in Section 9 entitled Electronic Communications, Dispatch and Reporting, as well as in Exhibit H which is an attachment to the contract and which is referenced in Section 9, that required any driver hauling IPC's goods for UACL to engage in communication with IPC concerning the tender of the load, a delivery appointment, pick up date/time, arrival time, and revised estimated time of arrival because of delays.  (Ex.  15, Section 9, including attached Ex.  H.)

48.     IPC never fined Franke for not being in compliance with any requirements or dictated what hours he needed to work. (JAE 3, p. 454; JAE 5, p. 338.)

48.     Agreed IPC never fined Franke.  However, IPC did in fact dictate that deliveries had to be made during certain hours specified on the Memo Bill that IPC created and provided to Franke.  (Memo Bills for delivery to XPEDX, Cenveo and Midland Ex.21; Anderton Dep., pp.  97-98, Ex.  11.)

16

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 49.    IPC never hired, disciplined, counseled, or qualified Franke as a driver. (JAE 3, p. 454; JAE 5, p. 340.) | 49.    Plaintiff agrees IPC never personally hired, disciplined or counseled Franke. However, IPC did set qualifications for the motor carriers and their drivers that were hauling IPC's goods in Section 3(H) of the October 2007 Contract wherein it required that "carriers personnel shall be fully qualified and shall procure and maintain such licenses and permits as are required by local, state or federal laws and regulations required to maintain and operate the motor vehicle equipment.  Carriers personnel shall comply with applicable local, state and federal laws and regulations".  (October 2007 Contract, Section 3(H), Exhibit 15.)  These contractual requirements had to be complied with by both UACL and any carrier it used to assist them in performing their transportation services for IPC. (Mundy Dep., pp. 103-104, Ex. 13). |
| 50.    IPC never had or exercises the right to discipline Franke. (JAE 3, p. 454; JAE 5, p. 346.) | 50.    Plaintiff agrees that IPC never exercised the right to discipline Franke. However, under the terms of the October 2007 contract, if IPC received complaints about a driver such as Franke, where that driver failed to comply with IPC's facility safety rules, or failed to make timely deliveries, and non-compliance with federal, state or municipal laws and regulations, Defendant IPC could terminate its contract with UACL. (October 2007 Contract, Section 8A-H.) |
| 51.    IPC never instructed Franke on his appearance or personal grooming standards, and did not maintain a personnel file on him. (JAE 3, p. 454; JAE 5, p. 327.) | 51.    Agreed.  However, IPC could reject Mr.  Franke if he was crass, inappropriately dressed, or disrespectful. (Martin Dep. II, pp. 340-341, Ex.  5.) |

**DEFENDANTS ALLEGED**
**UNCONTROVERTED FACTS**

52.    IPC never conducted safety meetings or informational meetings which Franke was required to attend. (JAE 3, p. 461.)

53.    IPC never kept track of his hours or service to ensure he was in conformity with Federal Motor Carrier Safety Regulations. (JAE 3, p. 454; JAE 5, p. 345.)

54.    IPC never required Franke to take a physical exam. (JAE 3, p. 454; JAE 5, p. 345.)

55.    IPC never directed Franke to use any particular route to use in moving IPC products and did not measure, score or evaluate his work. (JAE 6, pp. 194, 447.)

**PLAINTIFF'S RESPONSE**

52.    Agreed, however IPC required all drivers to comply with its facility safety rules and operating procedures. (October 2007 Contract, Section 8 (A), Ex. 15).

53.    Agree that IPC never personally kept track of Franke's hours, however IPC did require all drivers hauling its goods to comply with all "applicable local, state, and federal laws and regulations" which includes Federal Motor Carriers Safety Regulations. (October 2007 Contract, Section 3(H) and 8(G), Ex. 15).

54.    Plaintiff disagrees insofar as IPC required all motor carrier drivers to comply with all state, local and federal regulations, which includes Federal Motor Safety Act Regulations pertaining to periodic physical exams. (October 2007 Contract, Section 3(H) and 8(G), Ex. 15).

55.    Agree IPC did not direct Franke to use a particular route.  However, Franke's work was subject to evaluation insofar as IPC engaged in performance reviews of its carriers to ensure the motor carriers hauling IPC goods complied with the minimum service level requirement of 98% and minimum on-time delivery requirement.    (October 2007 Contract, Section 3(E) and 3(F), Ex. 15; Anderton Dep., pp. 139-144, 125-126, Ex. 11; Mundy Dep., pp. 59-60, 69-70, 103-104, Ex. 13).

**I.  IPC/UACL Did Not Learn of the Accident from MBMS/Franke.**

18

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

56.     IPC did not learn about the existence of the accident until about a year after the accident. (JAE 11, p. 17.)

56.     Denied as to IPC.  The cited testimony only states that Joan Anderton, one employee of IPC, did not learn of the collision until about 1 year after it occurred.  However, some of IPC's goods were damaged in the collision and UACL had to compensate IPC for that damaged product.  So IPC would have to have known some type of incident occurred. (Limback Dep.  pp. 96, Ex. 9; Memo Bill for Cenveo delivery July 7, 2008).

57.     Melody Hansen of UACL first learned of the July 3, 2008 collision when UACL/IPC's lawyer, Carl Fisher, called her in 2012. (JAE 10, pp. 137-138.)

57.     Plaintiff agrees Melody Hansen personally so testified.  However, UACL was notified of the collision by David Martin on the first business day after it occurred. (Martin Dep. pp. 336-337; Ex.  5).

**J.  The Facts Surrounding the Accident
    Demonstrate That Neither IPC Nor
    UACL Controlled Franke.**

J.     Plaintiff objects to the argumentative conclusory statement, which is not merely a statement of fact.   Notwithstanding said objection, the contents of the October 2007 contract established extensive control and supervision by IPC and UACL on the activities of motor carrier drivers.  (Ex.  15).

58.     IPC was unaware of how the delivery was executed and had no influence over it or any direct contact with MBMS concerning its delivery (JAE 11, pp. 20, 23, 28.)

59.     After he was hired by MBMS, he was assigned to a dedicated run from Hammond, Indiana to Wilton, Wisconsin, hauling paper products for the shipper, IPC. (JAE 3, pp. 107, 132.)

59.     Object to the conclusory terminology of "dedicated run" and "shipper", but agree Franke regularly hauled paper products from IPC's warehouse to Wisconsin.

19

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 60.  IPC did not know whether UACL was going to haul the load with its own driver or broker it out to another driver who was not an IPC employee and did not know it was Franke, in particular, who was hauling its freight. (JAE 11, pp. 16, 95, 132.) | 60.  Objection. None of the cited pages of Joan Anderton's deposition testimony, support the statement made. |
| 61.  Even though he had been doing this run for a number of years, Frank would still get a daily call from MBMS indicating where he was to go, his pickup number for the load, and his reservation number for the empty chassis he would pick up at the intermodal yard. (JAE 2, pp. 26; JAE 3, pp. 201, 377; JAE 4, pp. 56-57) | 61.  Agreed. |
| 62.  Melody Hansen of UACL, the UACL representative who faxed broker confirmation sheets to MBMS, never spoke with MBMS driver Franke about the July 3, 2008 trip or any other Franke trip. (JAE 10, p. 138.) | 62.  Agreed. |

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

63.     Melody Hansen of UACL, the
UACL representative who faxed broker
confirmation sheets to MBMS, never
provided any directions, instructions,
tools, instrumentalities, safety
instructions, driving instructions,
discipline, fines, or other indicia of
control to Franke; moreover, she did not
require Franke to stay in communication
or contact with her as a representative
of UACL. (JAE 10, pp. 140-142.)

**PLAINTIFF'S RESPONSE**

63.     Denied.  Melody Hansen regularly
provided broker confirmation sheets to Sam
Franke and MBMS with directions and
instructions for the load number, the location
date and time of the pickup at International
Paper, as well as the date, time and locations
for the delivery of IPC's paper products at
each of their customer destinations.  (Exhibit
20, Broker Confirmation Sheets).
Additionally, the Master Brokerage
Agreement between UACL and MBMS set
forth multiple requirements that MBMS had
to meet, including compliance with all federal,
state and local laws regarding the provision of
transportation services, maintaining adequate
insurance coverage and providing UACL with
billing information immediately upon
completion of loading and providing the name
of the receiver and the status of delivery
immediately upon completion of delivery.
(Master Brokerage Agreement between UACL
and MBMS dated June 12, 2008, Exhibit 14).

21

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

64.     MBMS, not IPC or UACL,
dispatched Franke to transport the subject
load. (JAE 3, pp. 23, 26; JAE 4, p. 164.)

64.     Objection to the vague meaning and
import of the expression "dispatched".
Notwithstanding said objection, MBMS told
Franke that UACL and IPC needed a pickup;
however MBMS would not do so unless and
until MBMS received instructions from
UACL/OEI to make a pickup. For the incident
in question on July 3, 2008, at approximately
4:23, Melody Hansen, an employee of
UACL/OEI, faxed to MBMS a broker
confirmation sheet in which it instructed
MBMS to make a pickup of paper goods at
IPC's Excel warehouse in Hammond, Indiana,
at 7:00 p.m. that evening. UACL/OEI further
instructed MBMS that the paper products had
to be delivered on July 7, 2008 between 7:30
a.m. and 4:00 p.m. at three different locations
in the Minneapolis area. Two of the locations
had specific delivery hours that were further
specified. IPC and OEI (UACL) told MBMS
where and when to make a pickup, and
MBMS told Franke. Thereafter, MBMS
would "dispatch", or assign one of its drivers,
Samuel Franke, to make the requested pickup
at IPC's warehouse. (Martin dep. II pp. 412-
415, Exhibit 5; Broker Confirmation Sheet,
Exhibit 20; Franke dep. II, pp. 470-471,
Exhibit 3).

65.     When he was hauling the load on
July 3, 2008, Franke considered himself
to be an employee of MBMS and he was
hauling the load on behalf of his employer.
(JAE 2, p. 44.)

65.     Agree Franke considered himself to be
an employee of MBMS; however, the only
reason Franke was hauling a load down Route
41 at the time of this crash was because IPC
and OEI (UACL) had requested MBMS to
make the pickup of paper goods at IPC.
(Franke dep. II, pp. 472-473, Exhibit 3).

22

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

66.    He received all of his instructions and directions from his employer, MBMS, with regard to the pickup and delivery he did on July 3, 2008. (JAE 2, p. 53.)

66.    Agree Franke so testified; however, Franke further testified that the only reason he made the pickup at IPC's warehouse was because OEI (UACL) and/or IPC had requested MBMS to do so, and MBMS then assigned Franke to pick up the load. (Franke dep. II, pp. 472-473, Exhibit 3). Additionally, all instructions pertaining to the pickup were communicated to MBMS by Melody Hansen of UACL via fax on July 3, 2008. (Martin dep. II, pp. 412-414, Exhibit 5).

67.    There were three Memo Bills (bills of lading) prepared by IPC for this load because the load was destined for three different places in Minneapolis. (JAE 2, p. 32; JAE 11, p. 94.)

67.    Plaintiff agrees IPC prepared three Memo Bills, also known as bills of lading, which IPC's warehouse employees gave to Franke when he made the pickup at IPC's Hammond warehouse at about 7:00 p.m. on July 3, 2008.    The Memo Bills contain specific instructions from IPC as to the procedure for making the delivery at the offices of IPC's three customers, including date, time, contact person, as well as instructions to contact IPC if Mr. Franke was detained or had delivery issues. (Exhibit 21, three Memo Bills).

68.    Melody Hansen of UACL did not receive copies of IPC Memo Bills (bills of lading); after the deliveries were made to IPC customers, the brokered carrier (MBMS) sent the executed Memo Bills to UACL for payment.    (JAE 10, pp. 54-55.)

68.    Agree Melody Hansen of UACL did not receive copies of IPC's Memo Bills because IPC prepared the Memo Bills and gave the Memo Bills directly to truck driver Franke when he arrived to make the pickup.    Agree that after MBMS' driver made the delivery to IPC's customers, MBMS submitted the Memo Bills to UACL in order for MBMS to be paid, however, IPC then issued payment to UACL. (Anderton dep., pp. 107-112).

23

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

69.     The bills of lading contained
standard information concerning
customer-required delivery instructions
for the load. (JAE 5, p. 483; JAE 11,
p. 104.)

**PLAINTIFF'S RESPONSE**

69.     The bills of lading contained some
information that was standard "boilerplate"
information; however, as described by IPC's
Joan Anderton, the Memo Bill/bills of lading
was a documented created by IPC and
contained specific instructions for
accomplishing the delivery to IPC's customer,
including delivery date, time, location and
contact person. The document also
specifically described the commodity, amount
of pallets or cartons, and the weight of the
goods as well as a shipment number.
(Anderton dep., pp. 107-113, Exhibit 11). The
standard "boilerplate" language in the IPC's
Memo Bill provided that the word "carrier" as
used on the Memo Bill meant "any person or
corporation in possession of the property
under the contract". (Three Memo Bills,
Exhibit 21).

70.     The delivery information did not
apply to Franke because he was not
delivering the load to the delivery
location, but dropping the load in Wilton,
Wisconsin, for later delivery in Minnesota
by another MBMS driver. (JAE 5, p. 486.)

70.     Objection to the vague and misleading
use of the expression "did not apply to
Franke". Agree Franke was not personally
taking the load all the way to IPC's three
customers in Minneapolis. However, the
delivery instructions given to Franke on the
Memo Bills were to be given to another
MBMS driver once Franke hauled the load to
MBMS' headquarters in Wilson, Wisconsin,
after which another MBMS driver would
continue hauling the load to the three
Minneapolis destinations. (Martin dep. II, pp.
484-486, Exhibit 5)(Franke dep. I, pp. 32-36,
Exhibit 2).

71.     Franke signed the bills of lading
after the trailer was loaded.
(JAE 2, pp. 20, 32.)

71.     Agreed.

24

**DEFENDANTS ALLEGED UNCONTROVERTED FACTS**

72. Franke's signature means that he was the driver that picked up the load and was responsible for the load until he got to Wilton. (JAE 2, p. 20.)

73. After Franke's truck was loaded, nobody from IPC gave him directions on how to drive his truck or what to do with his load once he departed the Hammond distribution center. (JAE 3, p. 442; JAE 11, p. 132.)

74. After the occurrence, David Martin had no choice but to terminate Franke from his employment at MBMS based on the severity of the collision. (JAE 6, p. 59.)

75. Neither IPC nor UACL had anything to do with the termination of Franke from MBMS. (JAE 6, pp. 138-39.)

**PLAINTIFF'S RESPONSE**

72. Agreed.

73. Denied. The October 2007 Contract contains multiple provisions in which IPC set forth requirements for compliance with all local, state and federal regulations, and on time performance. (October 2007 Contract, Exhibit 15); Additionally the Memo Bills created by IPC, and given to Franke at IPC's warehouse, contained instructions as to exactly where the load was to be taken and when, how and to whom it was to be delivered. (Three Memo Bills, Exhibit 21). (Anderton dep., pp. 107-115).

74. Agree that Janet Berndt of MBMS so testified.

75. Object to the vague and conclusory use of the expression "had anything to do with". Ms. Berndt testified that it was the decision of MBMS to terminate Franke after the collision, and that UACL and IPC had no involvement with that decision. (Berndt dep., p. 39, Exhibit 6); However, the Contract between IPC and UACL required compliance with all applicable local, state and federal laws and regulations, and non-compliance was a grounds under which IPC could terminate its Contract with UACL. IPC considered the terms of that Contract applicable to UACL and any carrier UACL used. (October 2007 Contract, Sections 3h and 8g, Exhibit 15); (Anderton dep., pp. 25-27, Exhibit 11).

25

**DEFENDANTS ALLEGED
UNCONTROVERTED FACTS**

**PLAINTIFF'S RESPONSE**

**K. MBMS and Franke Have Admitted
That There Are No Documents That
Show Franke Was the Agent of IPC
Or UACL or That Show IPC or
UACL Was the Principal of Franke.**

K.    Plaintiff denies that MBMS and Franke have admitted that there are no documents that "show" Franke was the agent of IPC or UACL or that "show" IPC or UACL was the principal of Franke. Such statement is an inaccurate and overly broad characterization of the questions asked of MBMS and Franke in the Request For Admissions. MBMS and Franke were never asked about what any documents "show".

76.    IPC and UACL served multi-item requests for admissions pertaining to documents that purport to show a principal-agent relationship between IPC and Franke or between UACL and Franke. (JAE 19.)

76.    Plaintiff denies that IPC and UACL served requests for admissions "pertaining to documents that purport to show a principal-agent relationship". In actuality, IPC and UACL's Request to Admit did not ever use the word "show" or "purport to show". Rather, they requested documents that "state or denote", or "acknowledged in writing" a principal-agent relationship.    Furthermore, defendant MBMS admitted only that they do not possess any documents that "specifically identify" MBMS as an agent of IPC or UACL.

77.    MBMS' and Franke's responses to the Requests for Admissions establish that MBMS and Franke do not believe there are any written documents memorializing a principal agent relationship between IPC and Franke or between UACL and Franke. (JAE 19.)

77.    Objection insofar as defendant's paragraph 77 is not a statement of fact, but rather is an argumentative conclusion and is based on speculation as to the mental state of MBMS and Franke, as well as conclusions and opinions of MBMS and Franke. The existence of a principal-agent relationship is a determination to be made by a jury based on evaluation of all the evidence in this case, including the October 2007 Contract between IPC and UACL, which does show that IPC maintained control over the actions of UACL and other drivers it used sufficient to form the basis for a finding that Franke, as a driver fulfilling UACL's contractual obligations to IPC, was an agent of IPC.

  s//Richard F. Burke, Jr.
Submitted By One of Plaintiff's Attorneys
Richard F. Burke, Jr.
ARDC No: 03121588

Richard F. Burke, Jr.
Shannon M. McNulty
Kimberly M.  Halvorsen
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090 / (312) 251-1160 (Fax)

**DEFENDANTS ALLEGED**        **PLAINTIFF'S RESPONSE**
**UNCONTROVERTED FACTS**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary | ) | |
| Guardian of the Estate and Person of | ) | |
| JEFFREY J. SCHEINMAN, a Disabled | ) | |
| Person, | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 09 cv 5340 |
| | ) | |
| MARTIN'S BULK MILK SERVICE, INC., | ) | Honorable James F. Holderman |
| SAMUEL G. FRANKE, INTERNATIONAL | ) | |
| PAPER COMPANY, UNIVERSAL AM CAN LTD., | ) | Magistrate Susan E. Cox |
| Successor to OVERNITE EXPRESS, INC. and | ) | |
| OX LLC, BMW of NORTH AMERICA, LLC, | ) | |
| a corporation, BAYERISCHE MOTOREN | ) | |
| WERKE AKTIENGESELLSCHAFT, a corporation, | ) | |
| | ) | |
|      Defendants. | ) | |

# CERTIFICATE OF SERVICE

     The undersigned attorney hereby certifies that on **May 28, 2013**, he caused **Plaintiff's Response to Defendant International Paper Company's Local Rule 56.1(b)(3)(B) Statement of Material Facts in Support of IPC's Motion for Summary Judgment** to be filed electronically through the CM/ECF system which will send notification of such filing to the attorneys listed on the attached Service List.

                                   s// Richard F. Burke, Jr.         
                                     Richard F. Burke, Jr. Bar Number 03121588
                                     Attorney for Plaintiff MURRAY SCHEINMAN,
                                     Plenary Guardian of the Estate and Person of
                                     JEFFREY J. SCHEINMAN, a Disabled Person

Richard F. Burke, Jr.
Shannon M. McNulty
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100

**DEFENDANTS ALLEGED**  <u>**PLAINTIFF'S RESPONSE**</u>
**<u>UNCONTROVERTED FACTS</u>**

Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160

**DEFENDANTS ALLEGED**     **PLAINTIFF'S RESPONSE**
**UNCONTROVERTED FACTS**

Scheinman v. Martins Bulk Milk Service, Inc., et al.
Our File No.: 08-0066
Case No. 1:09-cv-05340

<u>SERVICE LIST</u>

Mr. Joseph Skryd
Mr. Matthew Schreck
Mr. James Temple
Ms. Kristen C. Leppert
Mr. Jason Briesemeister
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
(630) 653-9300
(630) 653-9316 (Fax)
jskryd@mrvlaw.com
mschreck@mrvlaw.com
jtemple@mrvlaw.com
Jbriesemeister@MRVLaw.com

Mr. Robert J. Golden
Mr. Daniel Polsby
DOWD & DOWD, LTD.
617 West Fulton
Chicago, Illinois 60661
(312) 704-4400
(312) 704-4500 (Fax)
rgolden@dowdanddowd.com
dpolsby@dowdanddowd.com
***ATTORNEYS FOR DEFENDANTS: MARTIN'S BULK MILK SERVICE, INC. AND
SAMUEL G. FRANKE***

Carlton D. Fisher
William Yu
Cecilia A. Horan
HINSHAW AND CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
(312)704-3000
(312) 704-3001 (Fax)
cfisher@hinshawlaw.com

30

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |

wyu@hinshawlaw.com
choran@hinshawlaw.com
*ATTORNEY FOR DEFENDANT: INTERNATIONAL PAPER COMPANY AND UNIVERSAL AM CAN, LTD., S/B/A AND SUCCESSOR TO OVERNITE EXPRESS INC., AND OX, LLC*


Mr. James K. Toohey
Mr. Timothy R. Couture
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 (Fax)
tooheyj@jbltd.com
couturet@jbltd.com
*ATTORNEYS FOR DEFENDANTS: BMW of NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT*