**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary | ) | |
| Guardian of the Estate and Person of | ) | |
| JEFFREY J. SCHEINMAN, a Disabled | ) | |
| Person, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 09 cv 5340 |
| | ) | |
| MARTIN'S BULK MILK SERVICE, INC., | ) | Honorable James F. Holderman |
| SAMUEL G. FRANKE, INTERNATIONAL | ) | |
| PAPER COMPANY, UNIVERSAL AM CAN LTD., | ) | Magistrate Susan E. Cox |
| Successor to OVERNITE EXPRESS, INC. and | ) | |
| OX LLC, BMW of NORTH AMERICA, LLC, | ) | |
| a corporation, BAYERISCHE MOTOREN | ) | |
| WERKE AKTIENGESELLSCHAFT, a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO UNIVERSAL AM CAN LTD.'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY

J. SCHEINMAN, a Disabled Person, through his attorneys, CLIFFORD LAW OFFICES, P.C., in

response to the Motion for Summary Judgment (hereinafter the "Motion") filed by Defendant,

Universal Am Can Ltd. (hereinafter "UACL"), successor to Overnite Express Inc., states as follows:

### I.   INTRODUCTION

Plaintiff brings this action against several Defendants seeking damages arising from a motor

vehicle collision wherein a tractor-trailer operated by Defendant, Samuel G. Franke (hereinafter

"Franke"), struck a motor vehicle in which Jeffrey J. Scheinman (hereinafter "Plaintiff") was riding

on July 3, 2008. The collision caused Plaintiff's vehicle to burst into flames, resulting in catastrophic burn injuries and brain damage to Plaintiff.

Plaintiff asserts claims against Defendants Franke, Franke's employer, Martin's Bulk Milk Service, Inc. (hereinafter "MBMS"), as well as UACL, successor to OEI, and International Paper Company (hereinafter "IPC") for liability in negligence on theories of agency and respondeat superior. Contrary to Defendant UACL's attempts to characterize itself as simply a "broker of transportation services" with respect to this incident, UCAL actually was the motor carrier contractually obligated to transport IPC's paper goods, and utilized the services of MBMS/Franke to fulfill its contractual obligation. MBMS/Franke were operating as UACL's agent in performing UACL's contractual obligations as the motor carrier in transporting IPC's paper goods, and thus UACL is vicariously liable for the negligence of its agents MBMS/Franke. At a minimum, a genuine issue of material fact exists as to the agency relationship between UACL and MBMS/Franke sufficient to deny UACL's Motion for Summary Judgment.

## II. LEGAL STANDARD

Summary judgment is a drastic means of disposing of litigation which should only be allowed when the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill.2d 229, 240 (1986). A motion for summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *American National Fire Ins. v. Rose Acre Farms*, 911 F. Supp. 366, 369 (S.D. Ind. 1995), *quoting* Fed. R. Civ. Pro. 56(c). In considering a summary judgment motion, a court must

2

draw all justifiable inferences in the light most favorable to the opposing party, and must resolve any doubt against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). If doubts remain as to the existence of a material fact, then those doubts should be resolved in favor of the non-moving party and summary judgment should be denied. *Wolf v. Fitchburg*, 870 F.3d 1327, 1330 (7th Cir. 1989).

### III. ARGUMENT

**A. UACL IS VICARIOUSLY LIABLE FOR THE NEGLIGENCE OF ITS AGENTS MBMS and FRANKE.**

**1. UACL was the Motor Carrier Responsible for Transporting IPC's Goods Pursuant to the Contract Between IPC and UACL.**

It is undisputed by the plain language of the contractual agreement between UACL and IPC, that UACL was the motor carrier responsible for transporting IPC's paper goods. When UACL bought out OEI, UACL and IPC entered into an agreement known as Amendment #1 effective June 13, 2008, in which UACL agreed to replace OEI as the motor carrier under the contract and to assume all of the responsibilities that OEI had under that contract. (Ex. 16). Thereafter, UACL was operating as the motor carrier and had a contractual obligation to transport IPC's paper goods. To assist in fulfilling its contractual obligations to IPC, UACL utilized the services of another trucking company, MBMS, and its employee driver Franke, to transport IPC's paper products.

David Martin, operations manager for MBMS, testified that when UACL took over OEI in June of 2008, he continued to do exactly what he had previously done on a daily basis - Melody Hansen from UACL/OEI would notify him that IPC needed a pick-up, and Hansen would direct MBMS to go to IPC's Hammond warehouse and pick up paper products for transportation to

3

Minnesota, and would provide the details of the drop off. (Martin Dep. pp. 127-128, 222-225, Ex. 4, 5). On the day of this incident, July 3, 2008, UACL employee Melody Hanson prepared what is referred to as a "broker confirmation sheet" that instructed MBMS to make a pick-up on July 3, 2008 at 7:00 p.m. at IPC's warehouse in Hammond, Indiana, and to transport the paper goods to three separate locations in Minneapolis for delivery on July 7, 2008. (Ex. 20). Thereafter, MBMS assigned the job to its employee, Franke, who drove a load from MBMS headquarters in Wisconsin to some location in Chicago, after which Franke picked up an empty trailer, and drove it to IPC's Hammond warehouse where IPC employees, or at least employees of an IPC- owned entity referred to as Exel, loaded the truck with paper products. IPC also provided Franke with memo bills (bills of lading) for each of IPC's three customers to whom paper was to be delivered in Minnesota. (Ex. 20). Franke then departed from Hammond and was heading back to MBMS headquarters in Wisconsin hauling IPC's paper products at the time he crashed into Plaintiff's vehicle stopped at a red light.

Simply put, UACL was not a broker of freight with respect to this incident - it was the motor carrier, and under the terms of the October 2007 contract which it assumed on June 13, 2008, UACL had a contractual obligation to transport IPC's paper products. UACL's involvement in this occurrence arose initially, and primarily, from the fact that it was contractually obligated to transport IPC's goods. The mere fact that UACL also had a master brokerage agreement with MBMS does not permit UACL to evade its responsibilities under its contract with IPC. UACL always remained the motor carrier even after it sought driver assistance from MBMS employee Franke. UACL did not ask MBMS to haul IPC's goods because it was working as a freight broker. Rather, UACL was

contractually obligated to act as a motor carrier to transport IPC's paper goods and utilized the services of MBMS and Franke to fulfill its contractual obligation. Under such circumstances, MBMS and Franke were performing UACL's work in transporting IPC's paper goods, and unquestionably were operating as UACL's agents.

2.      **As a Licensed Motor Carrier UACL by Definition is Not a Broker Under Federal Law.**

UACL cannot shield itself from liability under the label of "broker" when it was actually operating as a motor carrier. The federal statutes governing corporations operating in interstate shipping can be found in Title 49, Subtitle IV, of the United States Code. Pursuant to 49 U.S.C § 13102(2) (2008), a broker is defined as a person **other than a motor carrier** that arranges for transportation by motor carriers. Moreover, under the Federal Motor Carrier Safety Regulations, motor carriers are not considered to be brokers "when they arrange the transportation of shipments for which they are authorized to transport and which they have accepted and are legally bound themselves to transport." 49 C.F.R. 371.2 (a). Under these definitions, UACL cannot be deemed a broker since it was, in fact, a motor carrier, legally bound in its contract with IPC to act as a motor carrier in the transportation of IPC's paper goods.

Furthermore, a "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Pursuant to the contract, IPC paid UACL as the motor carrier to transport its paper products, notwithstanding UACL's use of MBMS/Franke to haul its freight. (Ex. 15). Equally true, even through MBMS was actually transporting the freight for UACL, UACL profited from MBMS's work by retaining 20% of what IPC paid for transportation.

5

(Hansen Dep. pp. 75, Ex. 10). Accordingly, UACL cannot successfully maintain it was acting as a mere broker of freight when it was accepting profits as a motor carrier under its contracts with both IPC and MBMS.

### 3. UACL is Vicariously Liable for Franke's Negligence Because he was Acting on Behalf of UACL in Transporting IPC's Product and was under UACL's Direct Control.

UACL mistakenly suggests in its Motion that it is not liable for any of Plaintiff's injuries because Franke was not its employee. This statement is contrary to well settled Illinois law that a principal can be vicariously liable for the negligent acts of an agent, even where that agent is not an employee. *See, e.g.*, *York v. Rush-Presbyterian-St. Luke Medical Center*, 222 Ill.2d 147 (2006); *Davila v. Yellow Cab Co.*, 333 Ill.App.3d 592 (1st Dist. 2002); *Moy v. County of Cook*, 159 Ill.2d 519 (1994); *Gilbert v. Sycamore Municipal Hosp.*, 156 Ill.2d 511 (1993). The Illinois Supreme Court has held that, "[a]lthough the terms 'principal' and 'agent,' 'master' and 'servant,' 'employer' and 'employee' may have separate connotations for purposes of contract authority, such distinctions are immaterial for tort purposes." *Moy*, 159 Ill.2d at 523. All that is necessary for liability to attach under the doctrine of *respondeat superior* is for one of these relationships to be established and that "the wrongdoer be either the employee, the agent, or the servant." *Id.* "When there is some dispute as to the extent of the parties' relationship, the existence and scope of agency relationship are questions of fact for the jury to decide." *Pantaleo v. Our Lady of Resurrection Med. Center*, 297 Ill.App.3d 266, 277 (1st Dist. 1998)(citing *Barbour v. South Chicago Community Hosp.*, 156 Ill.App.3d 324, 329 (1st Dist. 1987)); see also *McCarthy v. Carefree Vacations Inc.*, 171 Ill.App.3d 1050, 1053 (2nd Dist. 1988); *Prodromos v. Everen Sec., Inc.*, 341 Ill.App.3d 718, 724(1st Dist.

6

2003). The existence of an agency relationship between MBMS/Franke and UACL, and its nature and extent, "may be established by circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances." *Prodromos v. Everen Sec., Inc*., 341 Ill.App.3d 718, 724-25 (1st Dist. 2003).

In determining whether a person is an agent or an independent contractor, the court's cardinal consideration is the right to control the manner of work performance, regardless of whether that right was actually exercised. *Commerce Bank v. Youth Services of Mid–Illinois, Inc*., 333 Ill.App.3d 150, 153 (4th Dist. 2002); *Bauer v. Industrial Comm'n*, 51 Ill.2d 169, 172 (1972). Also of great significance is the nature of the work performed by the alleged employee in relation to the general business of the employer." *Ware v. Industrial Comm'n*, 318 Ill.App.3d 1117, 1122 (1st Dist. 2000). Factors to consider are: (1) the method of payment; (2) the right to discharge; (3) the level of skill required; (4) which party provides the necessary tools, materials, and equipment; and (5) whether taxes are deducted from the payment. *Commerce Bank*, 333 Ill.App.3d at 153; *Ware*, 318 Ill.App.3d at 1122. However, no single factor is determinative, and the significance of these factors will change depending on the work involved. *Roberson*, 225 Ill.2d at 175.

As an initial point, an analysis of UCAL's "control" over MBMS/Franke's work is really unnecessary because MBMS/Franke were performing UACL's work. MBMS and Franke were asked by UACL to assist in performing UACL's contractual obligation to transport IPC's paper goods. UACL always had responsibility for ensuring that IPC's goods were delivered in accord with the contract. In assisting UACL, MBMS and Franke had to fulfill the terms of UACL's contract. UACL most certainly maintained control over MBMS and Franke because when MBMS/Franke

were hauling the load for UACL, MBMS/Franke necessarily had to do everything UACL was contractually obligated to do. If MBMS/Franke did not comply with the terms of the contract, UACL would be liable to IPC. (Anderton Dep. pp. 25-27, 115-188, Ex. 11).

Moreover, the deposition testimony demonstrates UACL's control and direction over MBMS and Franke's work and the ongoing, systematic and continuous business relationhip between UACL and MBMS. Gina Hubbs, Vice-President of UACL testified Franke was the driver that showed up at IPC to pick up the paper on behalf of UCAL on the date of the occurrence. (Hubbs Dep. pp. 96-97, Ex. 7). David Martin, operations manager for MBMS, testified on the date of this occurrence, he understood MBMS was performing a service for the benefit of UACL, and that MBMS was acting as an agent for IPC and UACL/OEI by transporting cargo to Minneapolis. (Martin Dep. pp. 65-66, 127-128, 190-192, Ex. 4). Martin testified that MBMS would never have gotten involved in hauling this paper unless IPC had asked OEI to arrange the transportation. (Martin Dep. pp. 63-64, Ex. 4). Martin testified that when UAC bought OEI, Martin got a call from someone at OEI and they told him that they had been bought out, but business would still operate as it had previously. (Martin Dep. pp. 97-98. Ex. 4). Martin testified that he understood MBMS to be acting as a carrier agent for UACL in performing work for UACL for a profit, and stated that MBMS was acting as an extension of UACL. (Martin Dep. pp. 226-229, Ex. 5). Martin testified that MBMS, together with IPC and UACL were "all tied into the movement of the load" that they did on a daily basis. (Martin Dep. pp. 145-146, Ex. 4).

Martin testified that although he had some contact with IPC concerning pick-up times, he would speak to Melody Hansen at UACL/OEI on a daily basis regarding the loads that needed to be

picked up from IPC's warehouse in Hammond, Indiana. According to Martin, Hansen would call to provide the details of the drop off, and then follow-up with a document that would be faxed or emailed to MBMS with the same information. (Martin Dep. pp. 127-128, 222-225, Ex. 4, 5). Martin testified that UACL and IPC dictated to Franke how the load was to be packed and what time he should pick up the load and did not allow Franke to load cargo. (Martin Dep. pp. 338-339, Ex. 5). Further, Franke was required to contact UACL and IPC if he was running late. (Martin Dep. pp. 336-337, Ex. 5). Martin testified he called UACL on July 7, 2008, the first business day after the crash, to alert them of the crash. (Martin Dep. pp. 336-337, Ex. 5).

Martin further testified that pursuant to its master brokerage agreement with UACL, UACL required MBMS to be a legally qualified contract carrier in order to transport any paper products, maintain proper equipment in terms of tractors and trailers, maintain a satisfactory safety rating from the US Department of Transportation, and to comply with all federal, state, and local laws and traffic regulations. (Martin Dep. pp. 424-429, Ex. 5). Martin testified UACL required MBMS to maintain several policies of liability insurance, produce evidence of written certificates confirming the existence of liability insurance, and relinquish exclusive control over all handling of billing freight charges to the customer to UACL. (Martin Dep. pp. 426-427, 462-467, Ex. 5). Gina Hubbs, Vice-President of UACL testified that before MBMS was dispatched a truck to haul freight, it was required to provide UACL with a signed master brokerage agreement, a copy of a contract and/or common authority to operate as a motor carrier, proof of insurance, a completed carrier's survey form, and a completed W-9. (Hubbs Dep. pp. 134-138, Ex. 7). Hubbs further testified that in order for MBMS to get paid, it was required to provide UACL with signed bills of lading from both the

9

customer and the shipper. (Hubbs Dep. pp. 84-85, Ex. 7).

Furthermore, the Master Brokerage Agreement required, and UACL's President, Mark Limback testified, that any driver UACL used to deliver IPC's goods had to do so in accord with local, state and federal traffic regulations, and without colliding with other motor vehicles. (Limback Dep. pp. 81-82; Ex. 9; also Master Brokerage Agreement, par 3, Ex. 14).

**4.** **"Independent Contractor" Language in the Brokerage Agreement Between UACL and MBMS Does Not Preclude a Finding of Agency Under Illinois Law.**

As an initial matter, UACL mistakenly attempts to use the master brokerage agreement to distance itself from MBMS and Franke, and to repudiate any suggestion of an agency relationship between the parties. In reality, the brokerage agreement was simply the conduit by which UACL paid MBMS for fulfilling UACL's own motor carrier transportation responsibilities. If anything, the brokerage agreement demonstrates UACL's control over MBMS and its driver's work. For example, the agreement required MBMS to maintain proper equipment in terms of tractors and trailers, maintain a satisfactory safety rating from the US Department of Transportation, comply with all federal, state and local laws regarding the provision of transportation services, maintain several policies of insurance and furnish UACL with copies of written certificates of coverage. UACL required MBMS to contact UACL and provide it with billing information immediately upon completion of loading, and with the name of the receiver and status of delivery immediately upon completion of delivery. Additionally, payment would only be made upon UACL's receipt of MBMS freight bill, bill of lading, clear delivery receipt, and "any other necessary billing documents enabling UACL to ascertain that services has been provided at the agreed upon charge." (Ex. 14).

10

Further, the language of the broker agreement stating that MBMS was an "independent contractor" is not dispositive on the issue of agency under Illinois law. Specific conduct can demonstrate by inference the existence of an agency relationship, despite contractual evidence that the parties intended otherwise. *Dahan v. UHS of Bethesda, Inc.*, 295 Ill.App.3d 770 , 775 (1st Dist. 1998). When making a determination as to whether an agency relationship exists, a fact finder should consider all of the surrounding circumstances and actions of the parties, without giving exclusive weight to contractual labels or provisions. *Sperl v. C.H. Robinson Worldwide, Inc.,* 408 Ill.App.3d 1051, 1057 (3rd Dist. 2011), citing *Roberson v. Industrial Comm'n*, 225 Ill.2d 159 (2007). In *Roberson*, the Illinois Supreme Court emphasized that the label given by the parties in a written agreement will not be dispositive of employment status. *Roberson*, 225 Ill.2d at 183. "Further, although a contractual agreement is a factor to consider, it does not, as a matter of law, determine an individual's agency status." *Id*. The trier of fact must also look to the facts of the case to define the relationship between UACL and MBMS/Franke. *See Petrovich v. Share Health Plan*, 188 Ill.2d 17, 46 (1999).

## B.   THE *SPERL* DECISION IS INSTRUCTIVE AND APPLICABLE TO THIS CASE.

In *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057-58 (2011) *appeal denied*, 955 N.E.2d 480 (Ill. 2011), C.H. Robinson, a freight broker, was found to be vicariously liable for the negligent conduct of a truck driver under essentially the same circumstances that exist in this case.   In *Sperl*, a truck driver was assigned by C.H. Robinson to haul a load of potatoes

11

purchased by Jewel to be delivered to C.H. Robinson's warehouse in Bolingbrook, Illinois.[1]  *Id.* at

1052.  As the truck driver was traveling on I-55, she rear-ended a number of vehicles that had been

stopped ahead of her, killing two individuals and seriously injuring a third person. *Id.*

      The driver normally hauled for a motor carrier known as Toad L. Dragonfly Express

("Dragonfly"), however, she received this particular load by calling a C.H. Robinson dispatcher

directly.  *Id.* at 1053.  Dragonfly and C.H. Robinson had entered into a contract carrier agreement

that described the relationship between the parties as follows: "The parties understand and agree that

the relationship of Carrier to Robinson [CHR] hereunder is solely that of an independent contract

and that Carrier shall and does, employ, retain or lease on its own behalf all persons operating motor

vehicles transporting commodities under this Contract." *Id.*

      The appellate court found that the jury's decision was not against the manifest weight of the

evidence because it could have reasonably concluded that the driver was the agent of C.H. Robinson

and specifically noted the following evidence as persuasive:

- C.H. Robinson required her to have a refrigerated trailer;
- The load confirmation dictated special instructions concerning the load;
- The special instructions required her to pick up the load at a specified time, make daily check calls, and stay in constant communication with C.H. Robinson dispatchers;
- She was instructed to notify C.H. Robinson if she had an accident;
- C.H. Robinson enforced its special instructions with a system of fines.

*Sperl*, 408 Ill. App. 3d at 1058.  The court found that "[t]hese extensive requirements, coupled with

[the driver]'s fine-based compliance, directed [the driver]'s conduct during the entire transportation

---

[1]     Because Jewel had been remodeling its distribution center, it essentially rented storage space from C.H. Robinson at its Bolingbrook facility.  C.H. Robinson would purchase the food for Jewel, store it, and then arrange for it to be transported to Jewel's various grocery stores, but the load belonged to Jewel.

process and support the finding that [C.H. Robinson] had the right to control the manner in which [the driver] performed her job." *Id.*

The court also found it significant that the driver's services were "closely aligned with C.H. Robinson's business" of "transportation logistics, handling the means and methods of hauling freight for its customers," which "necessarily requires the service of semi-tractor drivers." *Sperl*, 408 Ill. App. 3d at 1059-60, citing *Ware,* 318 Ill. App. 3d at 1122 ("[a]nother factor of 'great significance' is the nature of the work performed in relation to the general business of the defendant"). And obviously, "the nature of [the driver]'s work is hauling freight for customers from one location to another," so, according to the court, "[t]he work [the driver] performs is not unique; it is directly related to, if not the same as, the general transportation business conducted by C.H. Robinson." *Sperl*, 408 Ill. App. 3d at 1060.

Many of the facts noted in *Sperl* are present in this case, including but not limited to, the load confirmation dictating special instructions concerning the load, the requirement that MBMS have water-tight trailers, special instructions requiring MBMS/Franke to pick up the load at a specified time, and stay in communication UACL and IPC via the electronic data software it was required to install, and the required notification to UACL and IPC if Franke was going to be late. Likewise, similar to the driver in *Sperl* that was instructed to notify C.H. Robinson if she had an accident, David Martin of MBMS notified UACL of the incident on the next business day after this occurrence. Furthermore, the services provided by MBMS and Franke as a motor carrier are identical to those provided by the driver in *Sperl*, i.e., "hauling freight for customers from one

13

location to another." Just as the Court found in *Sperl*, those services are "closely aligned" with the business of UACL, which also was operating as a motor carrier in this case.

## C.     THE CASE LAW RELIED UPON BY UACL IS FACTUALLY DISTINGUISHABLE.

Notably, UACL never discusses in its Motion the most pertinent facts of this case including the contracts and relevant deposition testimony. Nor does UACL attempt to relate the cases it relies upon in support of its Motion to the facts of this case. Indeed, UACL mistakenly relies upon two out-of-state District Court decisions in which the court found a lack of evidence to support the plaintiff's vicarious liability claims. *See Schramm v. Foster*, 341 F. Supp. 2d 536 (D.Md.2004); *Jones v. Robinson*, 558 F. Supp. 2d 630 (W.D.Va.2008). Obviously those decisions are not binding on this Court, and, as the *Sperl* court found, they are distinguishable.

It is important to note, that unlike UACL that was the motor carrier contractually obligated to transport IPC's paper products, in both *Schramm* and *Jones*, C.H. Robinson was operating only as a freight broker. Moreover, in both *Schramm* and *Jones*, the courts based their determination that the driver was not an agent of C.H. Robinson, a freight broker, almost entirely on the contract provision which labeled the driver an "independent contractor." *Schramm*, 341 F. Supp. 2d at 543-44; *Foster*, 558 F. Supp. 2d at 638. Such a finding is contrary to Illinois law. See *Roberson,* 225 Ill. 2d at 183 (emphasizing that the label given by the parties in a written agreement will not be dispositive of the employment status).

Those courts also found that C.H. Robinson's control over the timing and location of the pick-up and drop-off of the loads, how the load was to be transported, and when the driver was to call in were mere "incidental details" of the job. *Schramm*, 341 F. Supp. 2d at 546; *Jones*, 558 F.

14

Supp. 2d at 639.  That characterization is not only incorrect, it is contrary to the *Sperl* decision, which found that those "extensive requirements, coupled with [the driver]'s fine-based compliance, directed [the driver]'s conduct during the entire transportation process and support the finding that [C.H. Robinson] had the right to control the manner in which [the driver] performed her job." *Sperl*, 408 Ill. App. 3d at 1058.

Furthermore, in *Foster*, the court noted that there was no evidence to indicate that C.H. Robinson controlled the details of the carrier's operations such as "its driver's schedules during the trip, particular routes, or compensation plans.  *Foster*, 558 F. Supp. 2d at 639.  Here, UACL controlled MBMS' schedule, dictated when and where MBMS would pick up and deliver a load, and controlled the method of payment.

To the extent UACL relies upon the "shipper" cases cited in IPC's Motion for Summary Judgment, including *Dowe v. Birmingham Steel*, 2011 IL App (1st) 091997, 963 N.E.2d 344, *Wilson-McCray v. Stokes,* 2003 WL 22901569 (N.D. Ill.) and *Boyle v. RJW Transport, Inc, et al.*, 2008 WL 4877108 (N.D. Ill.), Plaintiff submits none of these decisions have any application here because UACL was not a true freight broker in this case, neither factually nor legally.  Rather, UACL was operating as a motor carrier with direct control over its agents, MBMS/Franke, who were transporting IPC's paper products on behalf of UACL.  Plaintiff further relies upon all of the arguments set forth in Plaintiff's Response to IPC's Motion for Summary Judgment, which Plaintiff adopts and incorporates herein.

## IV.  CONCLUSION

WHERFORE, Plaintiff, MURRAY SCHEINMAN, Plenary Guardian of the Estate and

Person of JEFFREY J. SCHEINMAN, a Disabled Person, respectfully requests that this Court enter an order denying Defendant Universal Am Can Ltd.'s Motion for Summary Judgment because UACL has failed in its burden of proving an absence of genuine issues of fact as to the agency relationship between UACL and MBMS/Franke .

        s//Richard F. Burke, Jr.        

Submitted By One of Plaintiff's Attorneys
Richard F. Burke, Jr.
ARDC No: 03121588

Richard F. Burke, Jr.
Shannon M. McNulty
Kimberly M. Halvorsen
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 (Fax)

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person,    ) ) ) ) ) | |
|      Plaintiffs,    ) ) | |
| vs.    ) ) | No. 09 cv 5340 |
| MARTIN'S BULK MILK SERVICE, INC.,    ) SAMUEL G. FRANKE, INTERNATIONAL    ) PAPER COMPANY, UNIVERSAL AM CAN LTD.,    ) Successor to OVERNITE EXPRESS, INC. and    ) OX LLC, BMW of NORTH AMERICA, LLC,    ) a corporation, BAYERISCHE MOTOREN    ) WERKE AKTIENGESELLSCHAFT, a corporation,    ) ) | Honorable James F. Holderman Magistrate Susan E. Cox |
|      Defendants.    ) | |

# CERTIFICATE OF SERVICE

     The undersigned attorney hereby certifies that on **May 28, 2013**, he caused **Plaintiff's Response to Universal AM CAN Ltd.'s Motion for Summary Judgment** to be filed electronically through the CM/ECF system which will send notification of such filing to the attorneys listed on the attached Service List.

s// Richard F. Burke, Jr.
Richard F. Burke, Jr. Bar Number 03121588
Attorney for Plaintiff MURRAY SCHEINMAN,
Plenary Guardian of the Estate and Person of
JEFFREY J. SCHEINMAN, a Disabled Person

Richard F. Burke, Jr.
Shannon M. McNulty
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602

(312) 899-9090
(312) 251-1160

Scheinman v. Martins Bulk Milk Service, Inc., et al.
Our File No.: 08-0066
Case No. 1:09-cv-05340

SERVICE LIST

Mr. Joseph Skryd
Mr. Matthew Schreck
Mr. James Temple
Ms. Kristen C. Leppert
Mr. Jason Briesemeister
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
(630) 653-9300
(630) 653-9316 (Fax)
jskryd@mrvlaw.com
mschreck@mrvlaw.com
jtemple@mrvlaw.com
Jbriesemeister@MRVLaw.com

Mr. Robert J. Golden
Mr. Daniel Polsby
DOWD & DOWD, LTD.
617 West Fulton
Chicago, Illinois 60661
(312) 704-4400
(312) 704-4500 (Fax)
rgolden@dowdanddowd.com
dpolsby@dowdanddowd.com
*ATTORNEYS FOR DEFENDANTS: MARTIN'S BULK MILK SERVICE, INC. AND
SAMUEL G. FRANKE*

Carlton D. Fisher
William Yu
Cecilia A. Horan
HINSHAW AND CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
(312)704-3000
(312) 704-3001 (Fax)

19

cfisher@hinshawlaw.com
wyu@hinshawlaw.com
choran@hinshawlaw.com
*ATTORNEY FOR DEFENDANT: INTERNATIONAL PAPER COMPANY AND
UNIVERSAL AM CAN, LTD., S/B/A AND SUCCESSOR TO OVERNITE EXPRESS INC.,
AND OX, LLC*


Mr. James K. Toohey
Mr. Timothy R. Couture
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 (Fax)
tooheyj@jbltd.com
couturet@jbltd.com
*ATTORNEYS FOR DEFENDANTS: BMW of NORTH AMERICA, LLC and BAYERISCHE
MOTOREN WERKE AKTIENGESELLSCHAFT*

20