**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary | ) | |
| Guardian of the Estate and Person of | ) | |
| JEFFREY J. SCHEINMAN, a Disabled | ) | |
| Person, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 09 cv 5340 |
| | ) | |
| MARTIN'S BULK MILK SERVICE, INC., | ) | Honorable James F. Holderman |
| SAMUEL G. FRANKE, INTERNATIONAL | ) | |
| PAPER COMPANY, UNIVERSAL AM CAN LTD., | ) | Magistrate Susan E. Cox |
| Successor to OVERNITE EXPRESS, INC. and | ) | |
| OX LLC, BMW of NORTH AMERICA, LLC, | ) | |
| a corporation, BAYERISCHE MOTOREN | ) | |
| WERKE AKTIENGESELLSCHAFT, a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO INTERNATIONAL PAPER COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY

J. SCHEINMAN, a Disabled Person, through his attorneys, CLIFFORD LAW OFFICES, P.C., in

response to the Motion for Summary Judgment (hereinafter the "Motion") filed by Defendant,

INTERNATIONAL PAPER COMPANY (hereinafter "IPC") states as follows:

## I.  INTRODUCTION

Plaintiff brings this action against several Defendants seeking damages arising from a motor

vehicle collision wherein a tractor-trailer operated by Defendant, Samuel G. Franke ("Franke"),

struck a motor vehicle in which Jeffrey J. Scheinman (hereinafter "Plaintiff") was riding on July 3,

2008. The collision caused Plaintiff's vehicle to burst into flames, resulting in catastrophic burn

injuries and brain damage to Plaintiff.

Plaintiff asserts claims against Defendants Franke, Franke's employer, Martin's Bulk Milk Service, Inc. (hereinafter "MBMS"), as well as Universal Am Can Ltd. (hereinafter "UACL"), successor to Overnite Express Inc. (hereinafter "OEI"), and International Paper Company (hereinafter "IPC") for liability in negligence on theories of agency and respondeat superior.

Defendant IPC mistakenly asserts in its Motion that no genuine issue of fact exists because, as a shipper, it had no control over the transport of its paper products by UACL/OEI and/or MBMS/Franke, and is therefore entitled to summary judgment. However, IPC's Motion fails to address the plain language of the contractual agreement between IPC and UACL/OEI, which sets forth in detail IPC's control over the manner and method of shipment, the personnel and equipment used, the required policies of insurance OEI/UACL had to obtain, the mandatory data software UACL/OEI had to obtain to maintain communication with IPC, and IPC's ultimate right to terminate any UACL/OEI driver. The contract provisions and the deposition testimony in this case strongly support a finding that MBMS, and Franke were agents of IPC, and that IPC can be held vicariously liable for their negligence.

## II.  LEGAL STANDARD

Summary judgment is a drastic means of disposing of litigation which should only be allowed when the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill.2d 229, 240 (1986).  A motion for summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *American National Fire Ins. v. Rose Acre Farms*, 911 F. Supp. 366, 369 (S.D. Ind. 1995), *quoting* Fed. R. Civ. Pro. 56(c).  In considering a summary judgment motion, a court must

draw all justifiable inferences in the light most favorable to the opposing party, and must resolve any doubt against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). If doubts remain as to the existence of a material fact, then those doubts should be resolved in favor of the non-moving party and summary judgment should be denied. *Wolf v. Fitchburg*, 870 F.3d 1327, 1330 (7th Cir. 1989).

### III. ARGUMENT

**A.** **THE DRASTIC REMEDY OF SUMMARY JUDGMENT IS NOT WARRANTED BECAUSE SIGNIFICANT DIRECT AND CIRCUMSTANTIAL EVIDENCE DEMONSTRATES IPC EXERCISED CONTROL OVER OEI/ UACL DRIVERS INCLUDING FRANKE AS ITS AGENTS.**

Discovery in this case demonstrates that IPC exercised significant control over UACL/OEI drivers, including MBMS/Franke, sufficient for a reasonable jury to find MBMS/Franke was operating as IPC's agent under Illinois law. "Although the terms 'principal' and 'agent' and 'employee' may have separate connotations for the purposes of contract authority, such distinctions are immaterial for tort purposes." *Moy v. Cook County*, 159 Ill. 2d 519 (1994). The doctrine of *respondent superior* can be invoked where either relationship exists, allowing for a principal or employer to be held vicariously liable for the tortious acts committed by an agent or employee including negligent, willful, malicious, or even criminal acts of its employees when such acts are committed within the scope of employment. *Moy*, 159 Ill. 2d at 532.

Whether an employment relationship exists depends upon an analysis of all the facts and circumstances of each particular case. *Davila v. Yellow Cab Co.*, 333 Ill. App. 3d 592, 595-96 (1st Dist. 2002). There is no rigid rule for determining whether a person is an agent or an employee or an independent contractor. *Davis v. Industrial Commission*, 261 Ill. App. 3d 849, 852 (4th Dist.

1994). The question of whether one is an agent or employee or an independent contractor is generally a question of fact. *Shoemaker v. Elmhurst-Chicago Stone Co. Inc.*, 273 Ill. App. 3d 916, 920 (1st Dist. 1995). The question may be decided as a matter of law only when the relationship is so clear as to be indisputable. *Shoemaker*, 273 Ill. App. 3d. at 920-21.

A fact finder's determination of whether an agency relationship exists should be made by considering all of the surrounding circumstances and actions of the parties, without exclusive weight being given to contractual labels or provisions. *Sperl v. Robinson Worldwide, Inc.*, 408 Ill.App.3d 1117, 1122 (1st Dist. 2000), *Roberson v. Industrial Comm'n,* 225 Ill. 2d 159 (2007). In *Roberson,* the Illinois Supreme Court emphasized that the label given by the parties in a written agreement will not be dispositive of the employment status. Although a carrier agreement is a factor to consider, it does not, as a matter of law, determine an individual's agency status. *Roberson,* 225 Ill. 2d at 183. Specific conduct can demonstrate by inference the existence of an agency relationship, despite contractual evidence that the parties intended an independent contractor relationship. *Dahan v. UHS of Bethesda, Inc.,* 295 Ill. App. 3d 770 (1st Dist. 1998).

Among the factors to be considered when making the determination are: (1) the right to control the manner in which the work is to be performed; (2) the right to discharge; (3) the method of payment; (4) whether taxes are deducted from the payment; (5) the level of skill required to perform the work; and (6) the furnishing of necessary tools, materials, or equipment. *Shoemaker*, 273 Ill. App. 3d at 920. In determining whether a person is an agent or an independent contractor, the court's cardinal consideration is the right to control the manner of work performance, regardless of whether that right was actually exercised. *Commerce Bank v. Youth Services of Mid–Illinois, Inc.,* 333 Ill. App. 3d 150 (4th Dist. 2002). Another significant factor is the nature of work performed

4

*in relation to the general business of the employer. Ware v. Industrial Comm'n, 318 Ill. App. 3d 1117 (1st Dist. 2000).* No single factor is determinative, and the significance of each may change depending on the work involved. *Roberson, 225 Ill. 2d at 175.* The facts of this case, and the terms of the contract between IPC and UACL demonstrate that IPC exerted extensive control over the delivery activities of UACL and any driver utilized by UACL to haul IPC's products. Under these circumstances there is ample evidence that Franke/MBMS was acting as an agent of IPC.

       **1.**       **The Contract between IPC and UACL/OEI Demonstrates IPC's Control Over UACL/OEI and MBMS/Franke's Work and Supports a Finding of Agency.**

The plain language of the contract between IPC and UACL/OEI details IPC's direct control over the work of UACL/OEI drivers, including MBMS/Franke such that a reasonable jury could find an agency relationship and hold IPC vicariously liable for Franke's negligence on the date of this occurrence. Pursuant to the terms of the contract, IPC had direct control over the manner and method of shipment, the personnel and equipment used, required UACL/OEI to install data software to maintain communication with IPC at all times, required UACL/OEI to obtain several policies of insurance, and maintained the right to terminate any UACL/OEI driver at any time. IPC required UACL/OEI to maintain a 98% service level requirement, and 98% on-time delivery requirement. (Ex. 15). IPC controlled the mode of transportation for delivery of its products by requiring UACL/OEI to comply with standards for motor vehicle equipment including, but not limited to, trailers suitable for the safe efficient and damage-free transportation of its products, a trailer pool sufficient to meet IPC's delivery needs, and watertight trailers in an amount not less than 1.5 times the number of its daily commitments. (Ex. 15).

5

With respect to the manner and method of shipment, IPC had direct communication with the drivers and provided drivers memo bills/bills of lading, prepared and authored by IPC, with specific instructions as to the delivery of its paper products, subject only to modification by IPC.  IPC required the driver to provide IPC a copy of the delivery and/or proof of delivery no later than 24 hours after the delivery via fax, express delivery service and/or via electronic medium.(Ex. 15). Additionally, UACL/OEI was contractually obligated  to purchase software that would allow IPC to stay in constant electronic communication with drivers regarding all facets of the transportation of its goods.  Specifically, IPC required UACL/OEI to obtain the following electronic software:

> **ELECTRONIC COMPLIANCE REQUIREMENTS**
> Carriers for International Paper are required to have the ability to communicate electronically and to be able to conduct transportation operations utilizing electronic means and tools. Communication can be accomplished by EDI, XML, or a web portal provided by International Paper.
> **LOAD TENDER**  Carriers are required to respond (accept/reject) to a load tender within 2 business hours Monday through Friday 7 a.m. to 5 p.m. CST. Failure to respond will be considered a rejected tender.
> **DELIVERY APPOINTMENT** Carriers are required to establish a delivery appointment and response with the date and time for each stop within 24 hours of tender acceptance.
> **PICKUP DATE/TIME**  Immediately upon making a delivery appointment, establish a pickup date and time and transmit to International Paper. Failure to establish a pickup appointment negates the ability to claim detention at origin. Upon actual pickup, transmit the updated event within 2 hours of departure.
> **ARRIVAL**  Transmit delivery confirmation electronically within 2 business hours of arrival at Consignee's receiving dock or port.
> **DELAY/REVISED ETA**  Report revised ETA within 2 business hours of determining that a new, revised delivery time and/or date is required.
> **DELIVERY PERFORMANCE** The minimum On-Time Delivery Requirement is 98% and the Minimum Service Level Requirement is 98%. (Ex. 15, emphasis added).

IPC's mandate that UACL/OEI install this data software allowed IPC to effectively control and supervise all drivers transporting its loads by managing their dispatch, tracking their delivery schedule, and setting performance standards.  IPC also required UACL/OEI to maintain several

6

policies of insurance. (Ex. 15). At all times, IPC retained the right to terminate UACL/OEI for failure to meet any performance and/or communication requirements (Ex. 15).

As set forth above, the provisions of the contract detail the strict performance and communication responsibilities mandated by IPC which allowed it to effectively control UACL/OEI and MBMS/Franke's work and the transportation of its paper products. Accordingly, a reasonable jury could find that UACL/OEI and MBMS/Franke were all agents of IPC on the date of this occurrence, and hold IPC vicariously liable for their negligence under the doctrine of respondeat superior.

### 2. The Deposition Testimony Provides Substantial Factual Support for an Agency Relationship between IPC, UACL/OEI, MBMS and Franke.

The deposition testimony of the parties establishes that genuine issues of material fact exist as to the agency relationship between IPC, UACL/OEI, and MBMS/Franke, and precludes summary judgment in favor of Defendant IPC. William Crawford, Vice President of Global Sourcing at IPC, testified that the October 2007 contract identifies IPC as the shipper and OEI as the carrier who provided truck transportation services for IPC's shipments from their facilities to their customers. (Crawford Dep. pp. 35-36, 39-40, Ex. 12). Crawford confirmed that IPC required OEI to meet certain on-time delivery requirements and maintain their truck equipment in good, safe and lawful operating conditions in compliance with local, state, and federal laws. (Crawford Dep. pp. 39-42, Ex. 12). Crawford testified that IPC required OEI personnel to be fully qualified and have appropriate licenses and permits, and required drivers to operate their truck safely in compliance with local, state, and federal laws. (Crawford Dep. pp. 39-42, Ex. 12). Crawford testified that IPC made

the decision on what compensation they were willing to pay after the carriers proposed what they thought was appropriate. (Crawford Dep. pp. 41-42, Ex. 12).

Steve Mundy, Manager of the Motor Carrier Group for IPC testified that the purpose of the June 13, 2008 amendment was to render the terms of the October 2007 contract IPC had with OEI applicable to UACL after the acquisition. (Mundy Dep. pp. 41-42, Ex. 13). Mundy testified that as of June 13, 2008, whenever there is reference to a carrier, it refers to UACL and, as the carrier, UACL would provide transportation services. (Mundy Dep. pp. 46-47, Ex. 13). Mundy testified that it was IPC's expectation that after UACL bought OEI, UACL was going to handle the transportation commitments subject to the October 2007 agreement. (Mundy Dep. pp. 99-100, Ex. 13). According to Mundy, IPC expected UACL to fulfill all of the obligations of the contract that IPC had with UACL, and UACL was considered the carrier. (Mundy Dep. pp. 99-100, Ex. 13). Mundy testified that UACL had the right to have another trucking company make the actual delivery, but if UACL used any other trucking company, it was Mr. Mundy's expectation that the trucking company would comply with all of the terms of the contract between IPC and UACL. (Mundy Dep. pp. 99-100, 103-104, Ex. 13). Mundy testified that if there was any breach of the contract, IPC would seek satisfaction from UACL. (Mundy Dep. pp. 103-104, Ex. 13).

Joan Anderton, an enterprise distribution manager for IPC and manager of the Hammond regional distribution center on the date of this occurrence, testified that IPC products being loaded onto trucks and shipped out of the Hammond warehouse was done pursuant to the instructions of IPC. (Anderton Dep. pp. 105-106, Ex. 11). According to Anderton, IPC determined the particular customers to whom a delivery was made on any given day, and IPC had the right to cancel a shipment run on any day for any reason. (Anderton Dep. pp. 124-125, Ex. 11). Anderton testified

8

that only IPC could change or modify the type of bill of lading that was used, and IPC could have terminated its contract with UACL/OEI if the customers complained about the carrier who was making the deliveries. (Anderton Dep. pp. 67, 125, Ex. 11). Anderton confirmed that IPC required UACL/OEI to communicate electronically and required UACL/OEI drivers to report pick-up and delivery events in a format specified by IPC through IPC's EDI system. (Anderton Dep. pp. 67-69, Ex. 11). Anderton testified that drivers had to abide by facility safety rules and if the carrier's driver did not comply, IPC could tell them to leave and request another driver from the carrier. (Anderton Dep. pp. 147-148, Ex. 11).

Anderton testified that IPC communicated with its carriers, including UACL/OEI, about their contracts and performance, through its internal sourcing group. (Anderton Dep. pp. 141-142, Ex. 11). A carrier's performance would be reviewed by IPC's sourcing group and was subject to written performance evaluations. (Anderton Dep. pp. 143-144, Ex. 11). In addition, IPC facilities would review carrier performance on a daily basis and, if there was an issue, someone from IPC would contact the carrier about it immediately. (Anderton Dep. pp. 143-144, Ex. 11). Accordingly, IPC's systematic control and evaluation of its drivers far exceeds the final outcome of paper delivery.

Gina Hubbs, Vice-President of UACL testified that UCAL had a contractual obligation to deliver the freight for IPC on July 3rd, 2008. (Hubbs Dep. pp. 96-97, Ex. 7). Hubbs testified that Franke was the driver that showed up at IPC to pick up the paper on behalf of UACL on the date of the occurrence. (Hubbs Dep. pp. 96-97, Ex. 7). Melody Hansen, a transportation broker for OEI and subsequently UACL, testified that she was contacted by IPC every day concerning the Minneapolis pool truck, and she would be told the stops, weight, and pickup number for that days date. (Hansen Dep. pp. 41-42, Ex. 10). According to Hansen, IPC could modify the stops or times,

9

and often made the determination of order of delivery. (Hansen Dep. pp. 42, 71, Ex. 10). Hansen confirmed that IPC required UACL to use their "load system" computer program in order to communicate with them, and both parties would enter information about the status of deliveries including the time shipments were available, assigned, accepted, dispatched, picked-up and delivered. (Hansen Dep. pp. 89-90, Ex. 10). Hansen testified that if IPC wanted to terminate a delivery or stop a load, they could do so, and would contact UACL to let them know and UACL would comply with whatever their request was. (Hansen Dep. pp. 95, Ex. 10).

David Martin, operations manager for MBMS testified that MBMS was an agent of IPC and OEI in transporting its cargo to Minneapolis pursuant to their contract. (Martin Dep. pp. 7-8, 65, Ex. 4). According to Martin, MBMS had to follow instruction and directions given to it by IPC and/or OEI, and IPC controlled when all pick-ups would be made. (Martin Dep. pp. 69, 468, Ex. 4,5). Martin testified that IPC required all MBMS drivers to inspect the inside of the trailer. (Martin Dep. pp. 334-335, Ex. 5). Martin confirmed that all three bills of lading for Franke's Minneapolis run on the date of the occurrence had unfilled boxes at that bottom of the page for "SHIPPER PER" and "AGENT PER," and in this case, the shipper was IPC and the agent was Franke. (Martin Dep. pp. 455-57, Ex. 5). Martin testified that the driver delivering the shipment would present the appropriate bill of lading to the customer for signature upon making delivery. Martin Dep. pp. 252, Ex. 5). Martin testified that IPC had the right to reject Franke as a driver at any time if he was unprofessional, used bad language, and/or dressed inappropriately. (Martin Dep. pp. 340-341, Ex. 5).

Likewise, Franke testified that upon arrival at the IPC distribution center, he would be told where to back up his truck, and the trailer would be loaded by people in IPC warehouse. (Franke

Dep. pp. 42-43, Ex. 2). Franke testified sometimes he would be told by IPC how many stops would be on a particular load. (Franke Dep. pp. 42-43, Ex. 2). Franke testified he would receive the memo bills from IPC when the trailer was loaded, and received a memo bill for each load that was going to a different place. *(*Franke Dep. *pp.* 33-34, Ex. 2).

The testimony of IPC's own employees refutes its current suggestion that there was no relationship between IPC and Franke/MBMS. In delivering IPC's paper products, MBMS and its employee driver were providing transportation services to UACL, and those were the same transportation services UACL was obligated to provide to IPC under the amended October 2007 agreement. (Limback Dep. pp. 86-87, Ex. 9). Any driver utilized by UACL, such as Franke, was performing a service for IPC by delivering its paper products to IPC's customers. (Anderton Dep. pp. 30, Ex. 11). In reality IPC completely controlled Franke/MBMS through its contract with UACL. IPC employees Anderton and Mundy testified that IPC expected any driver transporting its product to comply with all the contract provisions regardless of which motor carrier actually employed the driver. (Mundy Dep. pp. 103, Ex 13; Anderton Dep. pp. 136-137, 188-189, Ex. 11). Furthermore, IPC specifically mandated that carriers comply with traffic regulations and avoid collisions while delivering IPC's products. (Anderton Dep. pp. 197-198, Ex. 11; Mundy Dep. pp. 62-63, Ex. 13). UACL similarly agreed any driver, including MBMS employee Franke, had to comply with all traffic rules and avoid motor vehicle collisions. (Limback Dep. pp. 81-82, Ex. 9).

### 3. UACL/OEI's Contractual Label of an "Independent Contractor" Does Not Shield IPC From Liability for the Negligence of its Agents.

The fact that the "carrier", or UACL/OEI, is identified as an "independent contractor" in the contract with IPC is not persuasive in the determination whether an agency relationship exists under

Illinois law. In *Roberson v. Industrial Commission,* 225 Ill.2d 159, 162 (2007), the Illinois Supreme Court held that an individual may be determined to be an employee despite evidence of a contract labeling the person as an independent contractor. In *Roberson*, the defendant motor carrier asserted that Roberson was an independent contractor and not an employee after he was injured while working. The carrier pointed to an "Independent Contractor Contract" which explicitly provided that no employment relationship was created, as well as evidence that Roberson was responsible for all costs and expenses associated with operating his truck, including fuel tolls and taxes. *Roberson*, at 162-63. The carrier argued Roberson could choose his own routes and where to obtain fuel or repairs, and indicated that it did not withhold taxes from Roberson's paychecks. *Id.* at 166-67. Roberson alleged he was required to communicate with the carrier regularly while transporting a load and had to adhere to a pick-up and delivery schedule. *Id.* at 172. In affirming the decision of a worker's compensation commission that Roberson was in fact an employee and not an independent contractor, the Supreme Court held that evidence of a carrier's control over a driver may be found in contractual language requiring accident reports and trailer maintenance in compliance with federal regulations, but such compliance with regulations does not diminish the control a principal exercises over a driver's work. *Id.* at 171, 188. The Court noted that the fact that the driver's services constitute a regular part of a carrier's business in its determination of employee status because, "[i]t is not as if [the driver] was an outside contractor brought in to perform a special service." *Id.* Finally, the Court noted the ability of the principal to terminate the written contract upon written notice, absent any allegation of breach, likens the relationship between the two parties to employment at-will. *Id.*

Likewise, the rationale for finding a principal not liable for the acts of an independent contractor is completely inapplicable in this case because as part of IPC's business of selling paper

and packaging products, it regularly transports and distributes its products to customers by commercial trucks, and like UACL/OEI and MBMS, IPC holds an operating authority to operate as a motor carrier and makes truck deliveries throughout the country. (Anderton Dep. pp. 24, Ex. 11). Furthermore, IPC's direct control over driver performance through its electronic system of information collection, transmission, and review refutes any suggestion that IPC is anything but extensively involved in the supervision and evaluation of the details of UACL/OEI and the MBMS driver's work.

## B.   THE CASE LAW RELIED UPON BY IPC IS FACTUALLY AND LEGALLY DISTINGUISHABLE.

IPC mistakenly relies upon *Dowe v. Birmingham Steel*, 2011 IL App (1st) 091997, 963 N.E.2d 344 and *Wilson-McCray v. Stokes,* 2003 WL 22901569 (N.D. Ill.) in support of its Motion and allegation that it lacked control over UACL/OEI and MBMS sufficient to establish vicarious liability. These cases arise from the same incident wherein a semi tractor-trailer collided with an Amtrak passenger train at a railroad crossing in Bourbonnais, Illinois. *Id.* The court held no agency relationship existed between the steel company and the driver of the tractor-trailer hauling the company's steel reinforcement bars because the steel company did not retain the right to control the manner in which the driver hauled steel from the steel mill, the driver chose his own route, controlled his own hours, the driver provided and maintained his own equipment and the steel company had no authority to discharge driver from his employment with the transportation company.

*Dowe* and *McCray* are factually distinguishable from the instant case for several reasons. As an initial point, the driver of the tractor trailer in *Dowe* and *McCray* was not an employee of the broker, but an independent contractor assigned to haul the load by the broker. This assignment was

13

done pursuant to a written agreement between the shipper and broker giving the broker the exclusive right to assign drivers and trucks. One important distinction between this case and *Dowe* and *McCray* is the absence of any true freight broker in the case at hand. IPC contracted directly with the motor carrier, UACL/OEI, and in that contract maintained extensive control over the conduct and performance of the motor carrier and its drivers. Franke was serving as UACL/OEI's driver, and was required to comply with all the terms of the IPC contract. Although Franke was not employed by UCAL, he was used by UCAL as its driver and agent for this trip in order to fulfill UACL/OEI's contractual obligations for the transportation of IPC's goods. Unlike IPC who had a direct contractual relationship with the motor carrier, UACL/OEI, in *Doe* and *McCray*, there was no direct relationship or contract between the steel company and motor carrier. Rather, the steel company's only contract was with a broker, who then assigned trucks and drivers. This delegation of control is absent in the present case as IPC maintained direct communication and control over the drivers transporting its products, MBMS/Franke, by virtue of its direct contractual relationship with the motor carrier, UACL/OEI. Moreover, there was no evidence in *Dowe* and *McCray* of contractual obligations by the steel company requiring compliance with an internet-based data and information collection and review system tracking driver performance and delivery while hauling the load. Unlike the steel company in *Dowe* and *McCray*, IPC dictated the order of delivery stops, could modify or add additional stops, established delivery times and required strict compliance by drivers, and controlled the drivers schedule by imposing strict communication and delivery deadlines. In addition, unlike IPC that regularly transports its own paper products, the driver in *Dowe* and *McCray* hauled all of the shipper's oversized rebar and that the shipper did not directly participate in commercial trucking by employing its own drivers to make deliveries.

14

IPC's reliance on *Boyle v. RJW Transport, Inc*, *et al.*, 2008 WL 4877108 (N.D. Ill.) is also misplaced as it is factually distinguishable from the case at bar. In *Boyle*, the court held the driver of the tractor trailer that struck Plaintiff's vehicle and his employer trucking firm were not agents of the shipper, and the shipper was not vicariously liable for their negligence because SFK had no control over driver routes, did not monitor drivers' conduct or discipline drivers, did not train or instruct them, did not issue them any equipment, and had no power to fire them. *Id.* at *7. Unlike the shipper in *Boyle*, IPC required its carriers, including UACL/OEI, to install IPC data software that allowed IPC to effectively control, monitor and supervise all drivers transporting its loads at all times by tracking their dispatch, route of travel, and pick-up and delivery events.

*Olivera-Brooks v. Re/Max International,* 372 Ill.App.3d 127 (1st Dist. 2007)*,* cited by IPC, has no application to this case as it involved a vehicle passenger's lawsuit for personal injuries against a real estate agent, the real estate agent's franchise, and the national real estate sales company that licensed its trademarks and assigned franchise rights to franchisor.

Lastly, despite IPC's contention, the fact that two deposed IPC employees did not promptly learn of the crash is not a valid basis for granting summary judgment. In actuality IPC had to have learned of the collision soon afterward because IPC's customer, Cenveo, reported that 12 cartons of paper were delivered in a damaged condition and IPC required UACL to pay IPC for those damaged goods. (Ex. 24; Limback Dep. pp. 96, Ex. 9).

## IV. CONCLUSION

Defendant IPC has failed in its burden of establishing an absence of any genuine issue of material fact as to agency, and therefore Plaintiff, MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, respectfully requests that

15

this Court enter an order denying Defendant International Paper Company's Motion for Summary

Judgment.

                               s//Richard F. Burke, Jr.
                               Submitted By One of Plaintiff's Attorneys
                               Richard F. Burke, Jr.
                               ARDC No: 03121588

Richard F. Burke, Jr.
Shannon M. McNulty
Kimberly M. Halvorsen
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160 (Fax)

16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary | ) | |
| Guardian of the Estate and Person of | ) | |
| JEFFREY J. SCHEINMAN, a Disabled | ) | |
| Person, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 09 cv 5340 |
| | ) | |
| MARTIN'S BULK MILK SERVICE, INC., | ) | Honorable James F. Holderman |
| SAMUEL G. FRANKE, INTERNATIONAL | ) | |
| PAPER COMPANY, UNIVERSAL AM CAN LTD., | ) | Magistrate Susan E. Cox |
| Successor to OVERNITE EXPRESS, INC. and | ) | |
| OX LLC, BMW of NORTH AMERICA, LLC, | ) | |
| a corporation, BAYERISCHE MOTOREN | ) | |
| WERKE AKTIENGESELLSCHAFT, a corporation, | ) | |
| | ) | |
| Defendants. | ) | |

# <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on **May 28, 2013**, he caused **Plaintiff's Response to International Paper Company's Motion for Summary Judgment** to be filed electronically through the CM/ECF system which will send notification of such filing to the attorneys listed on the attached Service List.

s// Richard F. Burke, Jr.
Richard F. Burke, Jr. Bar Number 03121588
Attorney for Plaintiff MURRAY SCHEINMAN,
Plenary Guardian of the Estate and Person of
JEFFREY J. SCHEINMAN, a Disabled Person

Richard F. Burke, Jr.
Shannon M. McNulty
Attorneys for Plaintiff
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090
(312) 251-1160

17

Scheinman v. Martins Bulk Milk Service, Inc., et al.
Our File No.: 08-0066
Case No. 1:09-cv-05340

<u>SERVICE LIST</u>

Mr. Joseph Skryd
Mr. Matthew Schreck
Mr. James Temple
Ms. Kristen C. Leppert
Mr. Jason Briesemeister
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
(630) 653-9300
(630) 653-9316 (Fax)
jskryd@mrvlaw.com
mschreck@mrvlaw.com
jtemple@mrvlaw.com
Jbriesemeister@MRVLaw.com


Mr. Robert J. Golden
Mr. Daniel Polsby
DOWD & DOWD, LTD.
617 West Fulton
Chicago, Illinois 60661
(312) 704-4400
(312) 704-4500 (Fax)
rgolden@dowdanddowd.com
dpolsby@dowdanddowd.com
*ATTORNEYS FOR DEFENDANTS: MARTIN'S BULK MILK SERVICE, INC. AND SAMUEL G. FRANKE*


Carlton D. Fisher
William Yu
Cecilia A. Horan
HINSHAW AND CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601
(312)704-3000
(312) 704-3001 (Fax)
cfisher@hinshawlaw.com

18

wyu@hinshawlaw.com
choran@hinshawlaw.com
*ATTORNEY FOR DEFENDANT: INTERNATIONAL PAPER COMPANY AND UNIVERSAL AM CAN, LTD., S/B/A AND SUCCESSOR TO OVERNITE EXPRESS INC., AND OX, LLC*

Mr. James K. Toohey
Mr. Timothy R. Couture
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 (Fax)
tooheyj@jbltd.com
couturet@jbltd.com
*ATTORNEYS FOR DEFENDANTS: BMW of NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT*