# EX. 2

Samuel Franke Deposition
dated, January 12, 2010

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian of the Estate and PERSON OF JEFFREY J. SCHEINMAN, a Disabled Person,

Plaintiff,

vs. ) No. 09 CV 5340

MARTIN'S BULK MILK SERVICE, INC.; SAMUEL G. FRANKE; CSX INTERMODAL, INC.; INTERNATIONAL PAPER COMPANY; and OVERNITE EXPRESS, INC.,

Defendants.

The deposition of SAMUEL G. FRANKE, called by the Plaintiff for examination pursuant to notice and pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Steven Stefanik, a notary public within and for the County of DuPage and State of Illinois, at Suite 200, 211 South Wheaton Avenue, Wheaton, Illinois on the 12th day of January 2010.

APPEARANCES:

CLIFFORD LAW OFFICES, by
MR. RICHARD F. BURKE, JR.
120 North LaSalle Street, Suite 3100
Chicago, Illinois 60602
(312) 899-9090
for the Plaintiff;

APPEARANCES: (CONT'D)

MULHERIN, REHFELDT & VARCHETTO, P.C., by
MR. JOSEPH G. SKRYD
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
(630) 653-9300
-and-
DOWD & DOWD, LTD., by
MR. ROBERT J. GOLDEN
617 West Fulton Street
Chicago, Illinois 60661
(312) 704-4400
for the Defendant Martin's Bulk Milk Service;

LEWIS, BRISBOIS, BISGAARD & SMITH, LLP, by
MR. SCOTT C. BENTIVENGA
550 West Adams Street, Suite 300
Chicago, Illinois 60661
(312) 345-1718
for the Defendant CSX Intermodal;

HINSHAW & CULBERTSON, LLP, by
MR. CARLTON D. FISHER
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000
for the Defendant International Paper Company.

INDEX

| WITNESS: | PAGE |
|---|---|
| SAMUEL G. FRANKE | |
| Examination by: | |
| Mr. Burke | 4 |
| Mr. Fisher | 23 |
| Mr. Bentivenga | 47 |
| Further Examination by: | |
| Mr. Burke | 58 |
| Mr. Fisher | 60 |
| Further Examination by: | |
| Mr. Burke | 61 |

EXHIBITS

| NUMBER | FOR IDENTIFICATION |
|---|---|
| Franke No. 26 | 24 |
| Franke No. 27 | 59 |

(Witness sworn.)

SAMUEL G. FRANKE,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY
MR. BURKE:

Q. Mr. Franke, my name again is Richard Burke. I represent Jeffrey Scheinman, and I'm going to ask you some questions on just a limited scope. And as I do so, if you want any questions repeated, you don't hear them, they don't make sense, just say so.

If you need to look at any documents, go ahead and tell me. If you don't talk at the same time as I'm talking, that helps the court reporter, because he can only take down one of us. And if you could verbalize your "yes" and "no" answers, if that happens to be your answer, even though we can see you nodding your head --

A. Yes.

Q. -- you have to give a "yes" or "no," okay?

Would you please state your name --

A. Samuel --

Q. -- and spell your last name.
A. Samuel G. Franke. Last name is spelled F-r-a-n-k-e.
Q. And by whom are you currently employed?
A. Walsh Cargo.
Q. And is it Walsh or Welsh?
A. Walsh.
Q. And how do you spell that?
A. It's W-a-l-s-h.
Q. And where are they located?
A. Lyndon Station, Wisconsin.
MR. SKRYD: London Station?
THE WITNESS: Lyndon.
BY MR. BURKE:
Q. And how do you spell Lyndon?
A. L-y-n-d-o-n, and Station.
Q. And what -- how long have you worked for Walsh Cargo?
A. Just about a year.
Q. And what type of work do you do for them?
A. I drive a truck.
Q. What type of trucks?
A. Semi-tractor trailer.
Q. When did you last work for Martin's?

5

A. It was July -- I think it was July 2nd, I think. It was the night of the accident.
Q. The day of the accident?
A. Hm-hmm.
Q. I believe that's July 3rd, 2008.
At the time of -- and if I refer to "the incident" or "the collision" or "the accident" or "the event in question," you -- can we agree you understand I'm referring to the collision between your truck and Mr. Scheinman's vehicle?
A. Yes.
Q. On that -- on the day of that incident, by whom were you employed?
A. Martin Bulk Milk.
Q. And for how long had you been employed by Martin's Bulk Milk?
A. It was two weeks shy of being ten years.
Q. And are you familiar with a company called MBM Logistics?
A. Yes.
Q. Okay. And what's your understanding of their business?
A. They're a brokerage firm. My understanding, they get loads -- they're the ones

6

that I dealt with with the rail trailers.
Q. And when you say "the rail trailers," what do you mean by that?
A. When they -- they -- they -- with the loads go -- like their Ashley account, they had that -- and that's about the only -- and then they would help -- if you needed -- they -- for getting, like, the rail trailers out of the yard, they needed help getting the number.
I mean, they have -- it was part of -- took care of that business some from our -- and... You know, they took care of the part with the rail yards and stuff like that.
Q. And what's a -- what's a rail trailer to you?
A. Oh, it's just -- it's a container. Then -- they had containers where they -- where they -- on a chassis, then they had actual -- just actual trailers as belong -- belonging to the rail yards.
Q. And when you say "they," are you referring to MBM Logistics?
A. Oh, the trailers? They're on -- their trailers are -- I mean, a rail trailer is belonging to the rail yards or -- they go to the rail yards.

7

That's my understanding what I meant by that.
MR. SKRYD: If you know something, tell us. If you don't, don't guess. We're going to be here until 3:00 o'clock in the morning.
THE WITNESS: All right.
MR. SKRYD: Just tell us what you know, okay?
THE WITNESS: All right.
BY MR. BURKE:
Q. And what I was trying to get at is, when you said something to the effect of MBM dealt with the rail trailers, I'm trying to understand --
A. Oh.
Q. -- what it is MBM did --
A. Okay.
Q. -- with regard to rail trailers.
A. They would -- they handled that account, as far as I know.
Q. And handled it in what manner? Did they haul rail trailers or --
A. No, they do -- this is a brokerage firm. They was -- was Martin's. That's -- it's -- it's -- I mean -- I mean, they -- I mean --
MR. SKRYD: Listen. Do you know what they do, fine. If you don't, don't guess.

8

THE WITNESS: All right. I don't know.
MR. SKRYD: You don't know.
BY MR. BURKE:
Q. Have you done work for MBM Logistics?
A. I worked for Martin's. And as far as -- as far as --
MR. SKRYD: That's all you know, right?
THE WITNESS: That's all I know.
MR. SKRYD: Okay. That's all you have to answer.
BY MR. BURKE:
Q. Have you done work for -- have you done work on behalf of MBM Logistics, is my question.
MR. SKRYD: Objection. Asked and answered.
Anything different than what you just said?
MR. BURKE: No, he hasn't answered that question.
MR. SKRYD: I think he did, Rich, but go ahead.
Do you understand his question?
THE WITNESS: Did I -- did I -- your question was, did I work for MBM?
BY MR. BURKE:
Q. No. Have you done work -- regardless of

who you think your employer was, even if you think you were employed by -- well, here. Let me ask you that first.
Who did you believe you were employed by in July of 2008?
A. Martin Bulk Milk.
Q. Okay. At any time in the past, have you been employed by MBM Logistics?
A. No.
Q. Regardless of who you've been employed by, what -- and even while you were employed by Martin's Bulk Milk Service, would you ever get assigned to do work for MBM Logistics?
A. It's always assigned through Martin's.
Q. And what type of work would you be assigned to do?
A. Hauling freight.
Q. And would you then be hauling freight for MBM Logistics?
A. I don't know. I mean, I don't know.
Q. But what you're -- what you're telling us is that there were times in the past that you would get assigned by Martin's to haul some freight for or at the request of MBM Logistics?

A. Yes.
Q. When you would do that, by whom would you get paid?
A. Martin Bulk Milk.
Q. Was the -- was MBM Logistics involved in the transportation of the paper products you were hauling at the time of this incident on July 3rd?
A. I don't know.
Q. Did -- on July 3rd of 2008, who did you consider to be your supervisor or boss?
A. David Martin and the Martins, the Martin Bulk Milk.
Q. Did you get assigned to do a pick-up of International Paper products on July 3rd, 2008?
A. Yes.
Q. And is that an assignment you had received on other occasions prior to that day?
A. Yes.
Q. At the time of this incident, you were driving a tract- -- on a tractor and hauling a chassis with a container on it, correct?
A. Yes.
Q. Okay. Do you know who owned the tractor you were driving?

A. Martin Bulk Milk.
Q. What -- how frequently did you work for Martin's?
Did you have a regular work schedule?
A. Yes.
Q. Okay. And what was that schedule?
A. Like Monday -- I mean, it is, like, Monday through Friday or Monday through -- you know, Monday through Friday. I mean, all week, like full-time.
Q. And at the time -- or strike that.
Would -- did you drive the same tractor each day?
A. Yes, for the most -- yes.
Q. At the time of the incident, you were hauling a chassis, correct?
A. Yes.
Q. And do you know who owned that chassis?
A. No.
Q. That -- did that chassis have a container on it?
A. Yes.
Q. And inside of the container was what type of goods or product?

A. Paper.
Q. The -- do you know -- or strike that.
Where did you get the chassis that you were hauling at the time of the collision with Mr. Scheinman's vehicle?
A. Chicago. 47th, I think -- 47th Street.
Q. And was that at a CSX facility?
A. Yes.
Q. And what did you -- or strike that.
Did you drop another trailer or chassis at CSX prior to getting the one you were --
A. Yes.
Q. -- hauling?
A. Yes.
Q. And was it a trailer that you dropped or a chassis and a container?
A. Chassis and a container.
Q. Was it a CSX trailer -- or a CSX container?
A. I don't know.
Q. Did you -- did you drop that at the CSX yard or somewhere else?
A. Yes, at the CSX yard.
Q. Okay. And what was going to happen to that trailer that you dropped?

Was someone else going to either unload it or was someone transferring it elsewhere?
A. As far as -- somebody else was going to transport it elsewhere, yes.
Q. The trailer that you left the CSX yard with -- or I'm sorry, the chassis that you left with, how did you go about deciding or determining what chassis to hook up to your tractor?
A. They -- they give you a pick-up number and you go through the yard and you -- if they got a red tag on, you can't take them out. If they got a green tag on, they're good to take out and you -- that's how you -- you determine which ones you can take and which ones you can't take.
They got a number of them you can choose from, and you just -- if it's got a green tag on, that means that it's been inspected by the yard or whatever.
Q. By CSX?
A. I don't know, but it's been inspected. It -- it means it's been inspected. I don't know if CSX does it -- or -- or, you know, it's at the yard. They -- they inspect them and they -- if it's not good to leave the yard, they'll tell you

to put it back and get a different one.
Q. Did you hook up to a chassis that already had a trailer on it or already had a container on it?
A. Yes.
Q. Where did you go once you hooked up that chassis and container?
A. Where did I -- you mean -- you go to the out gate and check it out and then I went to Hammond.
Q. Were you approved -- did it -- did anyone at CSX object to you leaving with the particular chassis and container you left with?
A. No. If they did object, you wouldn't leave with it.
Q. You then went to Hammond, you told us, correct?
A. Right.
Q. Okay. And was that to the International Paper's distribution center?
A. Yes.
Q. And what did you -- when you got there, did -- tell us what you did in terms of your truck being loaded with paper products.

A. You got there, you went in and checked in. And then you would -- they would assign you a door to back into. You would back into the door. And you'd wait until -- when you back into the door, a red light would come on. And when the green light comes on, that means you're loaded.
You go in and you sign your paperwork, and then you come back out, get in your truck, close -- you pull up from the dock, close the doors, and, you know, you do your paperwork. You know, they tell you what you got -- you know, what you picked up and all that and then go on -- then leave.
Q. And in what type of facility did you go to to get this paperwork? Is it a warehouse or how would you describe it?
Warehouse?
A. It was a big warehouse.
Q. And do you know who operates that warehouse?
A. No. I mean, the person that operates it or the name of the person?
Q. Yeah. Does it have any name -- or if you know.

A. No. It's just a paper -- it's where you go to get the paper from, you know.
Q. And who -- who loaded the container that you backed up to the dock bay?
A. I don't know the guy's name. I mean, it was -- it's some of the employees there. I mean, it was -- that worked in there -- worked in the warehouse, one of the warehouse workers.
Q. You did not personally do the loading?
A. No.
Q. Once you departed from the -- this International Paper warehouse in Hammond, where did you go then, Mr. Franke?
A. I went -- started to go back to Wilton; Wilton, Wisconsin.
Do you want exact roads, or no?
Q. No. You answered it. I think that was generally what I wanted to understand.
And we saw earlier a document that was referred to as a broker confirmation that is amongst --
MR. FISHER: No. 11.
BY MR. BURKE:
Q. -- some of these exhibits that we have



here. Thank you.
Let me tender that to you, Exhibit 11, entitled the Broker Confirmation Sheet. Are you familiar with this type of document?
A. No.
Q. Okay. Is this something that you ever see or are given?
A. No.
Q. Okay. Is this something that is dealt with or by either Mr. Martin or others at the Martin office?
A. Yes. I don't know...
Q. Okay. How did you know where to take this paper to?
A. Somebody with the dispatchers from Martin's would tell you where to -- you know, they would give you the pick-up number to -- and so it was people from Martin's told me where to go.
Q. Did you accurately fill out your logs, which are on Exhibit No. 12 here, for the day of July 3rd?
A. Yes.
Q. Can you -- Mr. Franke, can you tell us what time you arrived at the CSX yard to pick up the



trail- -- the chassis that you hooked up with?
MR. SKRYD: When he arrived at the CSX yard?
MR. BURKE: Right.
MR. SKRYD: Okay.
THE WITNESS: When I got there, it was 6:30.
BY MR. BURKE:
Q. Okay. And that's 6:30 p.m. on July 3rd, 2008?
A. Yes.
Q. Okay. And can you tell when you departed the CSX yard?
A. 7:00 o'clock.
Q. Okay. And can you tell us when you arrived at the International Paper warehouse in Hammond?
A. 7:30.
Q. Okay. And when did you depart that warehouse facility?
A. 9:30.
Q. Okay. And that's 7:30 and 9:30 p.m.?
A. Oh, no. No. 9:45.
Q. 9:45 p.m.?
A. Yes.
Q. Okay. Still on July 3rd?
A. Hm-hmm.



Q. Okay. How about these bills of lading in Exhibit 6, are you familiar with these, Mr. Franke, entitled Memo Bill?
A. Yes.
Q. Okay. And do they bear your signature on the right-hand side on each of the three pages? You can take a look at them.
A. Yes.
Q. Okay. What -- what does placement of your signature on these pages mean on this document?
A. That means that I was the driver that picked the load up and I'm -- or I was responsible for the load until I get to Wilton or... So that's just saying that I was the driver that picked it up.
Q. Okay. And this is -- this describes the load that you picked up at International Paper warehouse in Hammond and was ultimately going to Midland in Minneapolis, and XPEDX?
A. That's --
Q. And where is the last one going? Cenveo in Minneapolis, correct?
A. Yes.
Q. Okay. To you -- are you familiar with the

term "Oxen" as indicated up there?
A. No.
Q. Okay. How about are you familiar with Overnite Express or Overnite Logistics?
A. I -- only thing I knew about Overnite was that they -- they -- I guess they brokered the load to Martin's.
Q. Who at Overnite would you have contact with in the course of this transportation of --
A. I don't -- I didn't -- I don't talk to Overnite.
Q. How about -- who is -- is there anyone that you would regularly speak to in the course of doing this run of picking up paper at International Paper's warehouse in Hammond and transporting it back to Wilton?
A. Just anybody who was at the desk who I -- it wasn't the same person all the time.
Q. Okay. And when you say "at the desk," do you mean at the desk at the warehouse?
A. Right.
Q. Do you have any understanding, yourself, as to what entity, whether -- or what company or what business was contacting Martin's asking for these

paper products to be transported, or was -- or was that something that was dealt with in the Martin's office?
A. It was something that was dealt with in the Martin's office. They just tell me where to go, what number -- what the pick-up number is, and I just dealt -- Martin's dealt with all that stuff.
Q. Okay. Have you ever seen any contracts between Overnite Express or Overnite Logistics and Martin's?
A. No.
Q. Were you involved in the business relationship between Overnite and Martin's?
A. No.
Q. With respect to the paper products you were transporting on July 3rd at the time of this occurrence, did you have any understanding as to how much Martin's was being paid?
A. No.
Q. Did you have any understanding as to what companies or businesses were benefiting by that transportation in terms of -- did you have any understanding how International Paper or Universal Am-Can or Overnite or any other companies

may or may not benefit from the transportation of these products?
A. No. I was just paid per mile. I did it -- that was the business end of it. They didn't tell us none of that. You know, they just told me what I was supposed to do.
Q. If you got some instructions or directions from somebody when you were pulling away from the loading dock in terms of safe transportation or safe hauling, would you try to follow those instructions?
A. Yes.
MR. BURKE: I don't have anything else, Mr. Franke.
I will reserve my right to ask you additional questions concerning other aspects of this incident --
THE WITNESS: Okay.
MR. BURKE: -- and the collision itself.

EXAMINATION
BY
MR. FISHER:

Q. Mr. Franke, I'm -- I probably have as many questions as he does. So we can get you out of

here, okay?
A. Okay.
MR. FISHER: With your gentlemen's permission, can I just mark the next exhibit as the next number so that we don't have another --
MR. SKRYD: Sure.
(Whereupon, Franke Deposition Exhibit No. 26 was marked for identification as of this date.)
MR. SKRYD: Go ahead and take a look at that.
BY MR. FISHER:
Q. Mr. Franke, if you would please look at the next-to-last page of Exhibit 26 and tell me if you recognize your signature.
A. Yes.
Q. All right. And looking at the first page of the document, Exhibit 26, do you remember at some point at the tail end of last year, November to be precise, you were asked to answer some interrogatories? That's a fancy legal term for written questions.
And you then, with your counsel, had these answers prepared and you signed them

attesting to their completeness and truth?
A. Yes.
Q. Okay? I want to ask you a couple questions about a couple of the answers.
If you would please look at No. 6. It's on the third page.
MR. SKRYD: Hold on.
THE WITNESS: Okay.
BY MR. FISHER:
Q. Do you see the question that asks you -- and I'm just going to summarize it -- who was responsible for dispatching you on July 3rd? And do you see your answer is David Martin?
A. Yes.
Q. Okay. First of all, is that a truthful answer?
A. Well, Dave Martin is -- he's the head of the dispatch, I mean, and there's other people in there, you know.
So yes. That was to be a truthful answer.
Q. Okay. But as to this particular trip, the one that brings you here today for your deposition, the one that occurred on July 3rd with the accident

in Highland Park, was it Mr. Dave Martin, in particular, or was it some other person working under his supervision who dispatched you for this load, if you remember?
A. I don't remember. It was -- no, I don't remember if it was actual Dave or -- I don't remember.
Q. Okay. If it wasn't Dave, who would it have been?
A. Just one of the girls in the office maybe.
Q. Are the other dispatchers in July of 2008 -- were they women, all women?
A. No.
Q. So let me ask -- you got a quizzical look on your face. Let me ask it this way:
Back in July of 2008, even though you had been doing this run on a regular basis for a number of years --
A. Years.
Q. -- correct?
A. Yes.
Q. All right. Would you still receive a call from somebody at Martin's Bulk Milk Service indicating where you were to go and what you were

going to be picking up?
A. Yes.
Q. And that would occur regularly toward the tail end of an afternoon?
A. Yes.
Q. On this particular date, July 3, 2008, is it your testimony that you're not precisely sure who it was, but whoever it was would have been acting under the supervision of Dave Martin?
A. Yes.
Q. All right.
MR. SKRYD: And I think, to be fair, he said it could have been Dave Martin.
MR. FISHER: And that was going to be my next question.
MR. SKRYD: Right. Okay.
BY MR. FISHER:
Q. And if it wasn't one of the people working under the supervision of Dave Martin, it would most likely have been Dave Martin, himself?
A. Yes.
Q. As you sit here today, you don't have a memory of who it was, correct?
A. Yes.

Q. Can you say, however, without a doubt that the only person from whom you received an oral direction that day over the telephone to go pick up the load that you eventually picked up, that person was employed by Martin's Bulk Milk Service?
A. Yes.
Q. All right. Looking at the page that has Question 11 on it, do you see where that question asks for you to identify the name, address, employer and job title of all persons from whom you, Samuel Franke, received instructions, routing directions or other information concerning all legs of any trips driven by you on July 2nd or 3rd, including your trip to International Paper Company?
Do you see that question?
A. Yes.
Q. And I've fairly read it to you?
A. Yes.
Q. Is your answer to that question, as you sit here today responding to our questions under oath, that the only persons you received directions from concerning this trip was someone from Martin's Bulk Milk Service?
A. Right.

Q. That's a correct statement?
A. Yes.
Q. All right. Okay. You can set that aside.
MR. FISHER: And, Joe, do you have the exhibits that I marked at the tail end?
MR. SKRYD: Yeah.
MR. FISHER: Okay. Great. Yeah. Great.
If you could direct his attention to No. 17, please.
MR. SKRYD: 17.
MR. FISHER: It's the -- there you go. We got it.
BY MR. FISHER:
Q. Yeah. Okay. Mr. Franke, I'll -- as you can see from Exhibit 17, it's two pages. They're identical pages. They were just --
A. Okay.
Q. -- provided by each of my clients, all right?
A. All right.
Q. Do you recognize Exhibit 17?
A. Yes.
Q. Tell us what it is.
A. It's a mileage -- it tells you how many

miles -- I mean, you write down the mileage in every state. And this rates and suppose -- for Martin's, they want you to write down each -- you know, the major roads you drove on and how many miles you drove in that state.
It was for -- it's for just -- keep track of how many miles you drove. And it's not -- it's not completed -- it's not completely -- but that's what it is.
Q. Okay. So, for example, if we look down toward the bottom of that to July 3, 2008, the last four entries --
A. Yes.
Q. -- all right?
You record when you depart Wisconsin on July 3, using Route 82; is that right?
Is that the first number there?
A. Yes.
Q. Okay. And your odometer reading when you departed was 264,729?
A. Yes.
Q. And then you got to Illinois and the odometer reading was 2,006 -- excuse me, 264,854?

A. Yes.
Q. And then you briefly departed the state of Illinois, went into Indiana -- Hammond, I presume -- and that was with a departure odometer reading of 264,865. And you spent 11 miles -- or you traveled 11 miles within the state of Indiana?
A. Right.
Q. All right. And was this document prepared by you?
A. Yes.
Q. And did you stop -- strike that.
Was your entry after you departed Indiana -- strike all that.
When did you prepare this?
MR. SKRYD: Come on, Carl. We're trying to get through it.
MR. FISHER: I'm sorry. I'm sorry.
THE WITNESS: When did I leave -- I mean, I do it every day.
BY MR. FISHER:
Q. Okay. So do you literally, as you cross from Indiana back in Illinois, fill it out or do you wait to a point where you can actually stop and fill it out?

A. When I was in Indiana -- I mean, like I said, I do it every day. So I know it's, you know, basically five and a half, five -- you know, it's 11 miles. So probably when I was sitting at the -- International Paper waiting is probably when I wrote down the entry there.
Q. Okay. Thank you. You can set that aside.
Now, if you would look at Exhibits 18, 19 and 20. I will represent to you that those are collections of the three bills of lading or memo bills for the July 3rd trip.
A. Right.
Q. It so happens that each collection is multiple copies with notations on them that are recorded at different times, I think, and I want to ask you some questions, okay?
A. Okay.
Q. All right. So look at Exhibit 18.
A. Okay.
Q. On the first three pages of Exhibit 18, does that appear to be the bill of lading that has your signature on it for the commodity which weighed 7,668 pounds?
A. Yes.

Q. All right. Now, the next two pages you'll see on Exhibit 18 appears to be for the 7668 poundage, but it has your signature appearing a second time and some other notations.

Can you tell me when this would have been recorded, this additional information?

A. When -- when did I write this down? After -- after the trail- -- yeah, after the -- the trailer is loaded.

Q. Okay. So are the first three pages where you affixed your signature, that's when you're given the bill of -- the bill of lading at first and you fill it out? And then as you're leaving, that's when you affix your signature a second time as shown on Pages 4 and 5 of Exhibit 18?

A. 4 and 5?

I would -- I don't think -- this is -- I wouldn't sign -- I just come in there and I -- you asked me did I sign a paper when I first got there?

Q. Let me step back.

When you arrived at the warehouse --

A. Right.

Q. -- did you have these memo bills with you?

A. No.

Q. When did you get them?

A. When the load -- when the trailer was loaded.

Q. Okay. And you got one for -- as Mr. Burke, I think, showed you, you got one for each load that was going to three different places up in Minnesota?

A. Right.

Q. Okay. Now, my question is this:

When you -- they initially handed you one, was there an occasion when you would sign it like shown in the first three pages of Exhibit 18, and then some time would pass while the trailer was being loaded?

A. No.

Q. Okay. Then tell us when it would -- when it was that you signed what appears to be the fourth and fifth -- fourth and fifth pages of Exhibit 18.

Where would you have been and why would you have signed it a second time?

A. Well, it was after the load was loaded. What -- when it was -- you had to fill these out and then they made copies of them and gave them

back to you.

Q. Are these done in multiple, like, triplicate or quadruplicate with carbon paper?

A. No, not -- they stopped doing that when they switched over to the new system. We used to have carbon paper, then they switched to this here, so you had to sign each paper separately.

Q. Okay. All right. You can set 18 down.

You can please look at 19.

A. Okay.

Q. The last two pages.

Do you see where it has the words written in handwriting, "2,000 sheets per box, 12 boxes damaged," and then there's the signature of somebody, looks like either David or Daniel Defrance?

A. Yes.

Q. Do you know anything about the writing of that information?

A. No, I don't.

Q. And look at Exhibit 20. The last two pages.

If, for example, you had continued on with this run, if the accident had not happened --

A. Yes.

Q. -- and you got to XPEDX, the company that was to receive some of the paper, is this the type of information that would have been recorded as shown in the bottom right of the sixth page of Exhibit 20?

A. I didn't -- I never did -- I just took the loads to --

Q. Okay. My mistake. I screwed up with that question.

A. Okay.

Q. You would only take it as far as your company's location and then somebody else would take it on?

A. Right.

Q. Okay.

A. And deliver it, right.

Q. And you would do that over and over again each day --

A. Right.

Q. -- a round trip from Wisconsin, down to Chicago, Hammond, and back to Wisconsin?

A. And the other guy would do the other the next day.

Q. Okay. Look at Exhibit 21.
A. Okay.
Q. And do you recognize your signature on that?
A. Yes.
Q. And do you see where it says under the heading -- or strike that.
Do you see where it says, to the right of the heading Start Loading and End Loading, the times 8:38 and either 9:02 or 9:07?
A. Yes.
Q. Do you know which it was, 9:02 or 9:07?
A. No.
Q. All right. And do you see on the loading diagram, bottom left, it has a series of numbers in a long rectangular shape?
A. Yes.
Q. Do you know what those numbers reflect?
A. No.
Q. Look up at the side right of the document where the words "middle," "nose" and "tail" appear --
A. Yes.
Q. -- opposite some numbers. They appear to

be four, six and four?
A. Yes.
Q. Do you know what that information means?
A. That's -- that's telling you that -- where the different drops is located on the trailer.
Q. So that the -- presumably the tail is the one that's going to come off first?
A. Right.
Q. And, likewise, middle and nose?
A. Right.
Q. All right. Do you see where it says, Door 36?
A. Yes.
Q. Was that the door you always went to or did that change?
A. It was -- no, it was -- it was whatever door they had open, the door -- whichever door you would back into. Sometimes it would change. Sometimes you'd go to the same one.
Q. Okay. And now if you look at Exhibits -- I'm done with that exhibit. Thank you.
If you look at Exhibits 22 and 23.
A. Okay.
Q. Do you see Exhibit 22 is entitled an

invoice with a date of 7/17/08?
A. Yeah.
Q. Now, that's well after you left the employment of Martin's Bulk Milk, right?
A. Yeah.
Q. Okay. Did you ever get involved in the invoicing of any of the loads that you were transporting?
A. No.
Q. You see the name John Moore which appears in the bill to section of that invoice? Upper left.
A. Yes.
Q. Okay. Do you know anyone named John Moore who works with broker settlements of UACL, or Universal Am-Can, Limited?
A. No.
Q. Did you ever have any conversations with anyone at Universal Am-Can, Limited, concerning the load that you were hauling on July 3, 2008?
A. No.
Q. Before July 3, 2008, when you would routinely do these runs, these round-trip runs from Wisconsin down to Chicago and Hammond and back, did

you ever have any contact, telephonic or in person, with anybody who represented himself or herself to be associated with Universal Am-Can, Limited?
A. No.
Q. My same -- this is the same question, but I'm now going to change the name of the company.
On the day of this incident, July 3, 2008, did you ever have any conversations with anybody at Overnite Express concerning the load that you were pulling that day?
A. No. I don't -- I didn't -- I never talk to Overnite. Overnite would -- I get them -- all of my information from Martin's.
Q. Okay. And so your answer to my question is "no," correct?
A. Right.
Q. Now, I'm going to take it back.
Before July 3, 2008, did you ever have any conversations with anybody who represented himself or herself to be associated with or employed by Overnite Express concerning any of the loads that you were hauling?
A. On a regular basis or --
Q. Any contact at any time.

A. There -- there might have been one time that a number wasn't right or something. I don't remember, but --
Q. Okay. Do you know how long ago that was before July 3?
A. No.
Q. Did you discover that the number was wrong or --
A. No.
Q. -- did someone advise you the number was wrong?
A. I don't know why I had their number. It was -- it wasn't -- not wrong. Just trying to get the right number, okay? I think that's what it was.
Q. And when you say "the right number," do you mean a number associated with the load --
A. Yes.
Q. -- some type of serial number or --
A. Pick-up number. Call that a pick-up number.
Q. Okay. And apart from that one instance in the many years you were doing this run --
A. Right.

Q. -- routinely day in, day out, did you ever have any contact with anybody at Overnite Express concerning the loads that you were hauling?
A. No.
Q. And same question now about International Paper.
On the day of July 3rd, 2008, did you have any contact with anybody at International Paper concerning this particular load other than the individual you may have had contact with at the warehouse, assuming that person is associated with International Paper?
A. You mean, as far as checking in at International?
Q. Any contact for any reason.
A. The only contact I would have with those people was when you walk in and you tell them that you're there, and they tell you which door to back into. You have to give them their -- your pick-up number. And it would be the person behind the window.
I mean, it's -- I mean, sometimes it'd be the same person and sometimes it'd be somebody different. And --

Q. And they would tell you, like they did in this case, Door 36 --
A. Yes.
Q. -- or whatever the door number was?
A. Right.
Q. And other than that exchange of information, did the person at the warehouse tell you anything else concerning the loads that you were about to pick up?
A. Sometimes they'd tell you if it's -- you know, how many stops may be on it, but not normally. They would say fill the paper out, you just had to fill out each piece of paper for each stop or whatever, but that's about the only thing they would say.
Q. Once the load was filled on July 3, 2008, did you have copies of each of the bills of lading or memo bills?
A. When -- when I left there?
Q. Yes.
A. Yes.
Q. Okay. And that was because you would have to take that back to your company, right?
A. Well, they -- those bills, and I would --

when I dropped the load off at Martin's, I would either hang them on the other guy's clipboard or, if he was there, just hand them paper bills to him. And he'd take those bills up and he would have -- whoever he dropped them off, I suppose, would sign the bills. That's all.
Q. Okay. Do you know anything about a transition in company name or company ownership between Overnite Express and Universal Am-Can, Limited?
A. No.
Q. Did you ever in June or July of 2008 ever learn that those companies were changing their relationship with each other?
A. No. No, I don't -- no, I don't think so. I don't think so.
Q. Okay. When you were hauling the load on July 3, 2008, did you consider yourself to be an employee of Martin's Bulk Milk Service?
A. Yes.
Q. Did you believe that you were hauling this load on July 3, 2008 on behalf of Martin's Bulk Milk Service, your employer?
A. My employer, yeah. They're in this --

Q. Did you ever represent to anyone -- for example, when you arrived at the warehouse, did you ever represent to them, say to them something like, Hi, I'm Sam Franke, I'm here on behalf of Overnite Express, Inc.?
A. I mean, to -- I mean -- I don't know that I was over -- I would not -- I don't think I'd come in and say it like that. I don't know.
Q. Okay. Did you ever say, Hi, I'm Sam Franke, I'm here on behalf of International Paper Company?
A. No.
Q. Why wouldn't you do such a thing?
A. Because I was there to pick up. I was not there on their behalf, you know.
Q. Okay. Did you ever represent, while doing this load or any other load, to someone at the warehouse, Hi, I'm Sam Franke, I'm here on behalf of Universal Am-Can, Limited?
A. No.
Q. Did you even know that company existed?
A. No. That's the first I heard of it.
Q. Did you ever have any documents that you received from anyone that said that you were doing

the work for Overnite Express, Inc.?
A. On the bills of ladings, it's on -- I think it says -- has Overnite Express on them.
Q. All right. Other than the presence of that name on bills of lading, was there any other document that you ever saw that said anything about Overnite Express concerning any of the loads that you were hauling on your usual round-trip loads every day?
A. No, it's just that -- just that it was on the bill of ladings.
Q. Did you receive a paycheck from Martin's Bulk Milk?
A. Yes.
Q. Were your taxes deducted on a W-2 from Martin's Bulk?
A. Yes.
Q. You received a W-2 for tax deductions, right?
A. Yes.
Q. And who provided you the truck with which you did your work?
A. Martin Bulk Milk.
Q. Did you have to wear a uniform?

A. No.
Q. Did you wear anything on your person that identified you as an employee of Martin's Bulk Milk like a hat or a shirt?
A. On occasion, I'd have a hat when it was cold out. I'd wear a Martin jacket, but...
Q. Did you ever wear a Universal Am-Can jacket?
A. No.
Q. Did you ever wear an Overnite Express jacket?
A. No.
Q. Did you ever wear an International Paper jacket?
A. No.
Q. Did you ever consider yourself to be an employee of any of those companies?
A. Just Martin Bulk Milk.
MR. FISHER: Okay. That's all I have. Thanks, Mr. Franke.

EXAMINATION
BY
MR. BENTIVENGA:

Q. Hi, Mr. Franke. I'm Scott Bentivenga and I

represent CSX Intermodal.
A. Okay.
Q. And I just have a few follow-up questions for you.
Have you ever been employed by CSX Intermodal?
A. No.
Q. When you were transporting the load on July 3, 2008, you were doing that as an employee of Martin's Bulk Milk, correct?
A. Yes.
Q. You mentioned that you went down to the CSX rail yard at 47th Street on July 3, 2008, correct?
A. Yes.
Q. And is that where you picked up the chassis and the container that you were -- that you took off that property?
A. Yes.
Q. All right. Did you have any communication with anyone from CSX Intermodal on July 3, 2008?
A. No. I mean -- I didn't know they worked for that company.
It was just a person at their -- at the gate when you check in or check out. They didn't

state -- specify that, I am an employee of this company. It was just the first person that they -- you talked to at the gate, you know. A lot of times you talk to them through a little box, you know.

Q. Okay. So whether or not you talked to anyone from CSX Intermodal on July 3, 2008, you're not -- you don't know?

A. Right.

Q. Okay. You never called up, by telephone, CSX Intermodal on July 3, 2008, did you?

A. No.

Q. Okay.

A. I don't -- not to the best of my knowledge.

Q. Okay. Just explain briefly for me how it works when you go down to the CSX rail yard at 47th Street, like you did on July 3, 2008, driving on the property, picking up the chassis and the container and then driving off.

Tell me he how that works.

A. Well, 47th Street was -- it was a new place for us to go to. And when -- you would come in and you would pull up to the -- I -- you would talk -- talk to -- you know, you put -- you talk to a box

49

on the way in and you tell them your information, what load you're bringing in. You'd have to give them your driver's license number. I think you'd have to give them the load, what load you're bringing in, and your seal number.

And then when you got all that information, they would give you a card and you would take -- you would take your trailer in and park it in an empty spot.

And then if you were supposed to take a trailer out of that yard, you would take -- and they'd have -- you know, they'd have a pick-up number, a reservation number. And you would go -- either sometimes they would assign you what trailer number to take out or you would just go and look for a green tag on a trailer or -- and then you would take a trailer out, you know, walk around, see if they had lights, because people liked to steal lights out of them, and check them all out.

And then you went to the leave the yard, you had to go to an out gate and you would have to give them your reservation number and your information about who you are and all that. And then when everything checked out, you would -- you

50

would go.

But if things didn't check out, you would have to turn around, put the trailer back and go find one that did check out. You know, that's happened on occasions where you go up there and it could be a bad -- something wrong with the -- you know, but --

Q. Sure.

A. -- but it didn't -- it was not, you know, ready to go out, you know, or didn't -- wasn't inspected or didn't have a green tag on times, You could take one, you know, and -- sometimes you grab one without a green tag, you know, but -- but if it went out the out gate, they would let you know if it was -- been inspected or not, you know.

Q. Okay. For July 3, 2008, do you remember anything unusual occurring or did everything just kind of run according to plan when you went to the CSX rail yard, dropped off your load --

A. That --

Q. -- picked an empty and left?

A. It seemed everything went as planned because I was -- I was obviously on time most of the time. There was a lot of times when you go to

51

a rail yard, it don't go as planned. You --

Q. But this day, you believe, on July 3, '08, it went as planned?

A. Pretty much, yes.

Q. Okay. And when you -- when you went to the CSX rail yard when you drove -- where were you driving from, from Wisconsin to Chicago?

A. Yes.

Q. All right. And you were carrying a load for your employer, Martin's Bulk Service?

A. Right.

Q. And when you drove onto the CSX rail yard and dropped off -- you dropped off the chassis and the container that you had hauled from Wisconsin to Chicago, correct?

A. Yes.

Q. And you did that for your employer, Martin's Bulk Service?

A. Right.

Q. And then as part of your job for Martin's Bulk Service, you detached from the chassis and container that you drove there --

A. Right.

Q. -- right?

52

And then also as part of your job for Martin's Bulk Service, you then picked up an empty container on a chassis at the CSX rail yard, right?
A. Yes.
Q. And that was all part of your job for Martin's?
A. Yes.
Q. And then you would pull out of the CSX rail yard and go pick up your next load as directed by your employer, Martin's Bulk Service?
A. Yes.
Q. All right. With respect to the pick-up and delivery that you did on July 3, 2008, you received all of your instructions and directions with respect to those loads from your employer, Martin's Bulk Service, correct?
A. Right.
Q. All right.
A. That's -- yeah, as far as -- as far as pick-up numbers and stuff like that you're talking, right?
Q. For the load that you were going to pick up --
A. Right.

Q. -- at -- in Hammond, Indiana --
A. Right.
Q. -- you received all of that information regarding that pick-up from --
A. Right.
Q. -- Martin's Bulk Service?
A. Right. Yes.
Q. With respect to where you would drive, what you would drop off and what you would pick up, as a driver, you received all those instructions from Martin's Bulk Service on July 3, 2008, correct?
A. Where I would drive? You mean --
Q. Yeah, where you had to be --
A. Right.
Q. -- what you were going to pick up and what you were going to drop off.
A. Right.
Q. Am I correct that you did not receive any instruction, direction or supervision as to how to operate your tractor in hauling the load on July 3, 2008 from CSXI. Is that correct?
A. How to drive the tractor?
Q. Correct.
A. No, there was -- they would never tell me.

I -- no. I guess -- no, not how to drive the tractor, no.
Q. Okay. I don't know if this was asked before. I don't recall.
But do you know who owned the chassis or the container that you were pulling on July 3, 2008 at the time of the accident?
A. No.
Q. Okay. You have never been employed by CSX Intermodal; am I correct?
A. Yes.
Q. You have never represented to anybody that you were employed by CSX Intermodal, correct?
A. No, I never said that to anybody.
Q. Okay.
A. Just -- you just go to follow their rules when you're on their property. That's the only thing. When you're on their property, you have to follow their rules. It's not being an employee. It's just doing -- you know, that's the only thing. And then they never told you to do, you know --
Q. Okay.
A. -- don't speed, whatever, you know.
Q. So once you were off the CSX property, you

would not take any instruction, direction or supervision from CSX Intermodal; is that correct?
A. Correct.
Q. When you were driving your tractor and pulling the load from Hammond, Indiana, and going north towards Wisconsin, which was your destination, you were operating your tractor as part of your job for Martin's Bulk Service, correct?
A. Correct.
Q. And you were not driving that vehicle for anyone else or any other entity; is that correct?
MR. SKRYD: Objection. Foundation.
MR. BURKE: Objection. Form, foundation.
BY MR. BENTIVENGA:
Q. You can answer it, if you can.
MR. SKRYD: You can answer.
THE WITNESS: I was working for Martin Bulk Milk.
BY MR. BENTIVENGA:
Q. Okay. And nobody else, right?
MR. SKRYD: Objection. Foundation.
MR. BURKE: Objection. Form, foundation.
BY MR. BENTIVENGA:

Q. You can answer.
A. I mean, anybody -- no, I've been working for Martin Bulk Milk.
I don't understand who else I'd be working for.
Q. With respect to the container that was on the chassis that you were hauling on July 3, 2008, am I correct that you didn't have any problems with the container itself on July 3, 2008?
A. As far as problems, you know, no.
No. I mean, no -- as far as -- no -- as far as problems with the --like the doors or -- no, it seemed -- as far as I know, everything worked, I mean, on the container.
Q. The container had no problems, correct?
A. Close to my -- you know, yes.
MR. BENTIVENGA: Okay. That's all I have.
Thanks.
MR. SKRYD: Anybody else?
MR. BURKE: Just --
MR. SKRYD: Rich?

FURTHER EXAMINATION
BY
MR. BURKE:
Q. Mr. Franke, with respect to the circumstances or business relationships that gave rise to you transporting paper products at the time of this collision, would it be correct to say that you -- you have no knowledge or understanding of the business relationships between Martin's and International Paper, CSX, Universal, Overnite, Trac Leasing, Celtic or anyone else?
MR. SKRYD: Do you have any knowledge about that? That's what he wants to know.
THE WITNESS: No.
BY MR. BURKE:
Q. Okay. Would it be correct that Martin's did not share that information with you or did not involve you in those business details?
A. You're correct. That would be correct.
MR. BURKE: Nothing else.
Thank you.
MR. FISHER: 27.

(Whereupon, Franke Deposition Exhibit No. 27 was marked for identification as of this date.)
MR. SKRYD: All right. Go ahead. Take a look at that. I think your signature is on there.
THE WITNESS: Yes.
MR. SKRYD: Okay. Go ahead, Carl.

(Whereupon, Franke Deposition Exhibit No. 27 was marked for identification as of this date.)
MR. FISHER: Have him look at the page that has 11, 12 and 13.
MR. SKRYD: There's only eight pages.
MR. FISHER: Questions.
MR. SKRYD: Oh, Questions 11, 12 and 13. Oh. I thought you said pages.
Okay. Look at Questions 11, 12 and 13. Then he's got a -- one question for you -- that he claims he's got one question.
Look at these, man. Read them. Read the questions and the answer.
(Discussion off the record.)
FURTHER EXAMINATION
BY
MR. FISHER:
Q. Mr. Franke, I've been challenged to ask you one final question.
A. Okay.
Q. With respect to Exhibit 27, which are your responses to plaintiff's special forum

non conveniens interrogatories --
MR. SKRYD: That's what this is called.
THE WITNESS: Okay.
BY MR. FISHER:
Q. -- which you signed on the next-to-last page --
A. Right.
Q. -- were the answers that appear to Questions 11, 12, and 13 your answers then and your answers now?
A. Yes.
MR. FISHER: Thank you.
MR. SKRYD: Okay.
Reserved.
MR. BURKE: Hold on. Wait. I haven't seen the exhibit either.
MR. SKRYD: Okay. I'm sorry.

FURTHER EXAMINATION (CONT'D)
BY
MR. BURKE:

Q. Mr. Martin -- or I'm sorry.
Mr. Franke, your answers given here to these 11, 12 and 13 interrogatories consist of your own personal knowledge, correct?

A. Right.
Q. Okay. And you have no knowledge of what information Mr. David Martin has concerning these three questions, correct?
A. Right.
MR. BURKE: Nothing else.
MR. SKRYD: Okay. Now we'll reserve.

FURTHER DEPONENT SAYETH NOT. . .

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
PERSON OF JEFFREY J. SCHEINMAN,)
a Disabled Person, )
)
Plaintiff, )
)
vs. ) No. 09 CV 5340
)
MARTIN'S BULK MILK SERVICE, )
INC., et al., )
)
Defendants. )

This is to certify that I have read the transcript of my deposition taken on the 12th day of January 2010 in the foregoing cause, and that the foregoing transcript accurately states the questions asked and answers given by me, with the changes or corrections, if any, made on the Errata Sheet(s) attached hereto.

SAMUEL G. FRANKE

Subscribed and sworn to
before me this day
of 2010.

Notary Public

STATE OF ILLINOIS )
) SS:
COUNTY OF DU PAGE )

I, Steven Stefanik, a notary public in and for the County of Cook and State of Illinois, do hereby certify that SAMUEL G. FRANKE was first duly sworn to testify the whole truth, and that the above deposition was recorded stenographically by me and was reduced to computerized transcript under my personal direction.

I further certify that the said deposition was examined and read over by said deponent and was signed by him and that the said deposition constitutes a true record of the testimony given by the said witness.

I further certify that the said deposition was taken at the time and place specified and that the taking of said deposition commenced on the 12th day of January 2010 and was completed the same day.

I further certify that MR. RICHARD F. BURKE, JR., of the firm of CLIFFORD LAW OFFICES, 120 North LaSalle Street, Suite 3100, Chicago, Illinois 60602, appeared as attorney for the plaintiff; that MR. JOSEPH SKRYD of the law firm of MULHERIN, REHFELDT & VARCHETTO, P.C., 211 South

Wheaton Avenue, Suite 200, Wheaton, Illinois 60187 appeared as attorney for the defendant.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office, at Chicago, Illinois, this 28th day of January 2010.

Steven T. Stefanik, CSR
No. 084-003298

65

February 1, 2010

MULHERIN, REHFELDT & VARCHETTO, P.C.
C/O MR. JOSEPH G. SKRYD
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187

Re: Scheinman v. Martin's Bulk, et al.

Dear Mr. Skryd:

Enclosed please find the transcript of the discovery deposition of SAMUEL FRANKE, taken on January 12, 2009, in the above-entitled cause.

Since signature was reserved, please ask Mr. Franke to review his transcript from January 12, 2009, making any necessary corrections on the errata sheets, and sign and notarize the deponent's signature page.

Please send the original signed errata sheets and signed deponent's certificate to Mr. Burke, keep a copy for yourself, send a copy to All Counsel of Record, and send a copy to me for my records.

Your cooperation in this matter is greatly appreciated. Thank you.

Sincerely,

Steven Stefanik, CSR
SULLIVAN REPORTING COMPANY

CC: Mr. Burke
All Counsel of Record

66