# EX. 3

Samuel Franke Deposition
dated, February 21, 2012

**Page 68**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian )
of the Estate and Person of JEFFREY )
J. SCHEINMAN, a Disabled Person, )
    Plaintiff, )
    vs. ) No. 09 CV 5340
MARTIN'S BULK MILK SERVICE, INC., )
SAMUEL G. FRANKE, CSX INTERMODAL, )
INC., INTERNATIONAL PAPER COMPANY, )
UNIVERSAL AM CAN, LTD., Successor )
to OVERNITE EXPRESS, INC. and OX )
LLC, BMW OF NORTH AMERICA, LLC, a )
corporation, BAYERISCHE MOTOREN )
WERKE AKTIENGESELLCHAFT, a )
corporation, BMW AG, a corporation,) )
and KARL KNAUZ MOTORS, INC., a )
corporation, )
    Defendants. )

The Videotaped Deposition of SAMUEL G. FRANKE, taken in the above-entitled cause, before Cheri LeBeau Dubina, a notary public of DuPage County, Illinois, on the 21st day of February, 2012, commencing at 10:56 a.m., at 211 S. Wheaton Avenue, Suite 200, Wheaton, Illinois, pursuant to Notice.

Reported by: Cheri LeBeau Dubina, CSR
License No.: 084-002986

**Page 69**

APPEARANCES:

CLIFFORD LAW OFFICES
120 North LaSalle Street
31st Floor
Chicago, Illinois 60602
Tel: 312-899-9090
by: MR. RICHARD F. BURKE, JR.,
On behalf of the Plaintiff;

MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue
Suite 200
Wheaton, Illinois 60187
Tel: 630-653-9300
by: MR. JOSEPH G. SKRYD and
MR. MATTHEW R. SCHRECK,
On behalf of Martin's Bulk Milk
Service, Inc. and Samuel G. Franke;

DOWD & DOWD, LTD.
617 West Fulton
Chicago, Illinois 60661
Tel: 312-704-4400
by: MR. ROBERT J. GOLDEN,
On behalf of Martin's Bulk Milk
Service, Inc. and Samuel G. Franke;

**Page 70**

APPEARANCES: (Continued)
HINSHAW & CULBERTSON
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601
Tel: 312-704-3000
by: MR. CARLTON D. FISHER,
On behalf of International Paper
Company, Overnite Express, Inc., Ox
LLC, Universal Am Can, Ltd. and
Overnite Logistics, Inc.;

JOHNSON & BELL, LTD.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
Tel: 312-372-0770
by: MR. TIMOTHY R. COUTURE,
On behalf of BMW of North America,
LLC and Bayerische Motoren Werke
Aktiengesellchaft.

ALSO PRESENT: Michael Prager, Videographer

**Page 71**

I N D E X

| WITNESS | Page |
|---|---|
| SAMUEL G. FRANKE | |
| Direct Exam by Mr. Couture | 74 |
| Cross-Exam by Mr. Burke | 350 |
| Redirect Exam by Mr. Couture | 385 |
| Cross-Exam by Mr. Fisher | 407 |
| Recross Exam by Mr. Burke | 470 |
| Further Redirect Exam by Mr. Couture | 480 |

E X H I B I T S

| Franke Deposition Exhibit Nos. | Page |
|---|---|
| 79 - Photo | 186 |
| 80 - Photo | 265 |
| 81 - Photo | 269 |
| 82 - Miranda Warning | 309 |
| 83 - Interview of Mr. Franke by Mr. Fredrickson | 330 |
| 84 - Photo | 330 |
| 85 - Video to police | 344 |
| 86 - Photos | 350 |
| 87 - Photos | 350 |
| 88 - International Paper Exel Form | 381 |
| 89 - Photo | 477 |

1 (Pages 68 to 71)

1  THE VIDEOGRAPHER: My name is Michael
2  Prager, a legal video specialist with McCorkle
3  Court Reporters located at 200 North LaSalle
4  Street, Suite 300, Chicago, Illinois 60601.
5  I am the camera operator on February 21st,
6  2012 for the videotaping of the deposition of
7  Samuel Franke, being taken at 211 South Wheaton
8  Avenue, Second Floor, Wheaton, Illinois at the time
9  of 10:56 a.m. It is in the matter of Murray
10 Scheinman, plaintiff, versus Martin's Bulk Milk
11 Service Incorporated, et al., defendant, filed in
12 the United States District Court for the Northern
13 District of Illinois, Eastern Division. It is Case
14 Number 09 CV 5340.
15 This deposition is being taken on behalf
16 of the defendant as requested by Timothy Couture of
17 the Johnson & Bell Law Firm.
18 Will counsel please identify themselves
19 for the record.
20 MR. BURKE: Richard Burke for the
21 plaintiff.
22 MR. COUTURE: Timothy Couture on behalf of
23 defendants BMW AG and BMW NA.
24 MR. FISHER: Carlton Fisher on behalf of

72

1  SAMUEL G. FRANKE,
2  called as a witness herein, having been first duly
3  sworn, was examined and testified as follows:
4  DIRECT EXAMINATION
5  BY MR. COUTURE:
6  Q. Please state your full name for the
7  record, sir.
8  A. Samuel G. Franke.
9  Q. Mr. Franke, my name is Tim Couture; I
10 represent BMW, the maker of automobiles. I'm going
11 to ask you some questions today regarding your
12 involvement in an accident that occurred in July of
13 2008.
14 It's important that you understand my
15 question before you answer it. So if at any time
16 you don't understand what I'm asking you, please
17 stop me, ask me to rephrase it or restate it, okay?
18 A. Okay.
19 Q. You just made my second point. This is
20 all being taken not only by video but by a court
21 reporter and she needs to have all of your answers
22 out loud.
23 A. All right.
24 Q. Nods of the head, shrugs of the shoulders

74

1  Universal Am Can Limited, successor to Overnite
2  Express, Ox LLC and International Paper Company.
3  MR. SKRYD: Joe Skryd for Martin's Bulk
4  and Mr. Franke.
5  MR. SCHRECK: Matthew Schreck on behalf of
6  Martin's Bulk Milk Service as well as Samuel
7  Franke.
8  MR. GOLDEN: And Bob Golden on behalf of
9  Martin's Bulk Milk Service.
10 THE VIDEOGRAPHER: Will the reporter
11 please identify herself and swear in the witness.
12 (The witness was duly sworn.)
13 MR. COUTURE: One final note for the
14 record. We're starting this deposition transcript
15 at Page 68 because Mr. Franke's deposition was
16 previously taken in this case.
17 MR. SKRYD: And we should probably also
18 for the record indicate that all objections are
19 reserved except for form of the question. Okay?
20 MR. COUTURE: I agree.
21
22
23
24

73

1  are difficult for her to take down. So if you
2  could please do us all that favor, we would
3  appreciate it. As well, uh-huh, unh-uh, things
4  like that are difficult to be taken down on paper.
5  So please make your yeses "yes," your nos "no" so
6  that we understand what you're trying to say, all
7  right?
8  A. Yes.
9  Q. You might anticipate what I'm going to be
10 asking you but please wait until I complete my
11 question before you start your answer because
12 things will go a lot more smoothly if we do that.
13 A. Yes.
14 Q. All right. Thank you. Where do you
15 currently live, sir?
16 A. Mauston, Wisconsin.
17 Q. What is your complete address?
18 A. W5064 Emerson Road, Mauston, Wisconsin, at
19 zip code 53948.
20 Q. And how long have you lived at that
21 address?
22 A. About ten years.
23 Q. And with whom do you live at that address?
24 A. My wife.

75

2 (Pages 72 to 75)

1   Q.  What's your wife's name?
2   A.  Yvonne.
3   Q.  Starting with a "Y" or an "E"?
4   A.  "Y."
5   Q.  Two "n's" or one?
6   A.  One -- well, two "n's", yes.
7   Q.  Okay.  Why don't you spell Yvonne for me.
8   A.  Y-v-o-n-n-e.
9   Q.  Okay.  Anyone else living at that address
10  with you and your wife?
11  A.  No.
12  Q.  Do you have any children?
13  A.  Yes.
14  Q.  How many children do you have?
15  A.  One.
16  Q.  How old is that child?
17  A.  20.
18  Q.  What's his or her name?
19  A.  Kayla.
20  Q.  I'm sorry?
21  A.  Kayla Coleman.
22  Q.  Kayla?
23  A.  Yeah.
24      MR. SKRYD:  Why don't you spell that for
                                                    76

1   A.  It's May 17th, 1963.
2   Q.  Where were you born?
3   A.  Fillmore, Nebraska.
4   Q.  Have you ever been married to anyone other
5   than Yvonne?
6   A.  Yes.
7   Q.  How long have you been married to Yvonne?
8   A.  16 years.
9   Q.  And who else were you married to?
10  A.  Renee Fike.
11  Q.  How do you spell that last name?
12  A.  F-I-k-e.  I don't --
13  Q.  You don't know?
14  A.  I don't know exactly, no.
15  Q.  When were you married to Renee Fike?
16  A.  20 -- it was -- I don't know the exact
17  date.  It was about 20 years ago probably.
18  Q.  20 years ago.  How long were you married
19  to her?
20  A.  Six months to a year.
21  Q.  Any other marriages other than those two?
22  A.  No.
23  Q.  Any children other than Kayla?
24  A.  No.
                                                    78

1   us.
2   BY MR. COUTURE:
3   Q.  Go ahead.
4   A.  The first name or last name?
5   Q.  Kayla.
6   A.  I guess K-a-l-y --
7   Q.  K-a-y-l-a?
8   A.  Yeah.
9   Q.  All right.
10  A.  I just found out about her two years ago
11  so.
12  Q.  Oh, I'm sorry.  Okay, I understand now.
13  Kayla doesn't live with you?
14  A.  No.
15  Q.  Kayla has never lived with you?
16  A.  She lived with me for a short period of
17  time when I first met her and then she got her own
18  house in town.
19  Q.  Okay.
20  A.  Her and her two sons.
21  Q.  In July of 2008 was it just you and your
22  wife Yvonne living at your Mauston home?
23  A.  Yes.
24  Q.  What's your date of birth?
                                                    77

1   Q.  What's your highest level of education,
2   sir?
3   A.  12th grade.
4   Q.  Did you graduate high school?
5   A.  Yes.
6   Q.  What year did you graduate?
7   A.  1983.
8   Q.  And from what high school did you
9   graduate?
10  A.  Mauston High School.
11  Q.  Mauston High School?
12  A.  Yes.
13      MR. SKRYD:  Are you spelling Mauston
14  M-o-s-s-t-o-n?
15  BY MR. COUTURE:
16  Q.  M-a-u-s-t-o-n?
17  A.  Yes.
18      MR. SKRYD:  Mauston.  Got you.  Thank
19  you.
20  BY MR. COUTURE:
21  Q.  All right.  Have you ever been in the
22  military?
23  A.  No.
24  Q.  Have you ever been convicted of a crime?
                                                    79

3 (Pages 76 to 79)

1  And right now I'm not including moving violations
2  or tickets.
3      A.  No.
4      Q.  Since graduating high school in 1983 have
5  you undergone any additional training?
6      A.  I went to truck driving school prior to
7  getting my driving.  That's probably been 16 -- I'm
8  thinking probably about 16 years ago probably.
9      Q.  Okay.  What truck driving school did you
10 attend?
11     A.  The Dairyland Diesel Driving School.
12     Q.  Dairyland Diesel Driving School?
13     A.  Yes.
14     Q.  I expect that's located in Wisconsin?
15     A.  Right.
16     Q.  Where in Wisconsin?
17     A.  Outside of Wisconsin Dells.
18     Q.  Okay.  And you believe you received --
19 Strike that.
20         You attended that school approximately 16
21 years ago?
22     A.  Yes, before I started driving a truck.
23     Q.  Did you receive a certification upon
24 completion of that or a degree of any sort?

80

1      A.  I just -- you mean a special paper you
2  mean?
3      Q.  Yes, a certificate or something to say
4  that you are now qualified to drive a truck?
5      A.  I don't remember.
6      Q.  And prior -- Strike that.
7         I expect, therefore, the first time you
8  drove a truck for a living was after you completed
9  that?
10     A.  Yes.
11     Q.  Prior to completing the training at
12 Dairyland Diesel what did you do for a living?
13     A.  I worked at a cheese factory for, like,
14 ten years.
15     Q.  And what cheese factory?
16     A.  It was Elto Dairy in Waupun, Wisconsin.
17     Q.  All right.  What was the name of the
18 company?
19     A.  Elto Dairy.
20     Q.  E-l --
21     A.  T-o.
22     Q.  E-l-t-o?
23     A.  Yeah.
24     Q.  Okay.  And what town was it in?

81

1      A.  It's in -- I lost my train of thought.  I
2  just said --
3      Q.  That's fine.  If it comes to you while
4  we're in the course of this deposition, let me
5  know.
6      A.  I'm sorry.
7      Q.  What did you do for Elto Dairy?
8      A.  It was just general.  I wrapped cheese and
9  packaged cheese and put cheese in a cooler.
10     Q.  Were you doing machine work or were you
11 actually doing that by hand?
12     A.  Well, a lot of it was done by machine and
13 I operated -- I was a forklift -- operated
14 forklifts there.  So I worked inside the cooler and
15 all that.
16     Q.  And I apologize, you may have said this.
17 How long did you work for Elto Dairy?
18     A.  About ten years.
19     Q.  Do you have any medical training?
20     A.  Medical training?
21     Q.  Yes.
22     A.  No.
23     Q.  Okay.  You're not a doctor or a nurse?
24     A.  No.

82

1      Q.  You've never been a paramedic or trained
2  to be one?
3      A.  No.
4      Q.  Have you ever -- do you have a CPR
5  certification?
6      A.  No.
7      Q.  Have you ever -- do you have any training
8  or experience in engineering?
9      A.  No.
10     Q.  Have you ever worked as an automobile or
11 diesel mechanic?
12     A.  I've done my own work on my own cars but,
13 you know, as far as little stuff.
14     Q.  Okay.  Oil changes, spark plugs, things
15 like that?
16     A.  Right.  Changing headlights.
17     Q.  Sure.  But as far as your ability to
18 maintain a diesel truck beyond looking at it and
19 knowing that maybe something is wrong and you have
20 to bring it to somebody --
21     A.  Right, that's -- I don't have no
22 certifications that I'm a diesel mechanic or an
23 automotive mechanic or anything like that.
24     Q.  Okay.  No specialized knowledge in that

83

4 (Pages 80 to 83)

area, correct?
   A. No, just general.
   Q. Thank you. And I take it you have no
specialized training in fire cause and origin?
   A. Fire --
   Q. Determining how or why a fire started?
   A. No, I'm not no expert in fire.
   Q. I've got to ask. I don't want to be
surprised at some point when -- by someone
saying "let me tell you," okay?
   A. Okay.
   Q. When you -- Strike that.
      How long was your training at the
Dairyland Diesel?
   A. I think it was a six-weeks course. I'm
not really for sure, exact.
   Q. Before you started that had you ever
driven any trucks for a living?
   A. No, not for a living.
   Q. Okay. Before taking the Dairyland Diesel
Training Course -- well, strike that.
      Were you working as a truck driver while
you took the course?
   A. No.

84

arounds and, basically, do your basic checkout, you
know, to see if your lights work and all that.
   Q. And you understood both then and for the
following 16 years while working as a truck driver
that that type of pre-trip inspection was part of
your job and actually mandated by Federal
regulations?
   A. Right. You do that every -- it's called a
pre-trip inspection. So you do it before your trip
and you walk around and check to see if your lights
are working. And then most of the time you're at a
dock you can do a quick check too again, you know,
to make sure your lights and everything is working.
   Q. Okay. Thanks. Can you walk me through --
well, strike that. I'll ask you this first.
      Along with learning about a diesel tractor
you also learned about the trailers that you would
be pulling, correct?
   A. Right.
   Q. All right. And at Dairyland Diesel did
you learn both standard trailers and intermodal
chassis and boxes?
   A. At the school we just had standard
trailers there.

86

   Q. So this wasn't through an employer; you
just said I think I'm going to be a truck driver,
I'm going to go to this school?
   A. Right.
   Q. What types of trucks did you learn how to
drive at the Dairyland Diesel School?
   A. Tractor-trailers, semi-trucks,
18-wheelers. It went through air brakes. That's,
basically, what they had there.
   Q. Okay. Did you -- let me break that down.
Among the training that you received was how to
drive what most of us think of when we think of a
semi-tractor-trailer, right?
   A. Right.
   Q. So that would include the big truck with
the cab and maybe a sleeper berth?
   A. Right.
   Q. Diesel vehicle?
   A. Right.
   Q. And as part of that did you learn what a
truck driver's job was with regard to inspecting a
truck before trips?
   A. Yes. They give us training how to do a
pre-trip, what to check for, how to do your walk

85

   Q. Okay.
   A. And all the chassis and all that we pretty
much learned at -- you know, at the rail yard or
picked that up. It's pretty much the same thing;
you just got to make sure that they're hooked on
properly and all that.
   Q. Okay. So if I understand correctly, when
you were going to school at Dairyland, your
training regarding what you were going to be
pulling was limited to trailers as opposed to
chassis and boxes but you in the following 16 years
learned how to translate those skills to chassis
and boxes?
   A. Right.
   Q. Okay. And while you were at Dairyland,
you learned as well as walking around your trailer,
you also -- or, excuse me, a tractor, you had to
walk around your trailer and do a similar
pre-check?
   A. Right.
   Q. Can you walk me through what you would be
checking when you do a pre-check of a
tractor-trailer?
   A. Well, you back into the trailer and you

87

5 (Pages 84 to 87)

hook it up and you pull on it to make sure the
brakes are set and the brakes are working. You,
basically, pull on it with the truck. And you go
around and you hook your hoses up and you check and
see if your hoses are all hooked and plugged in.
And then you turn your lights on, your four-ways
on.
    Q. Let me stop you there just so I can do it
bit by bit. You're doing a great job.
       The first thing you do is you hook it up,
right?
    A. Right.
    Q. And then I think you said you pull it
forward?
    A. You pull forward to make sure the brakes
work or are locked. Sometimes you hook on to them
where you can pull ahead and the trailer will roll
along with you. And if the brakes are set, then
something is wrong with the brakes. But if you
hook on to it and you pull ahead and you can't move
it when the brakes are set, the brakes are working.
    Q. Okay. So you hook it up and when you do
it the brakes are supposed to be set?
    A. Right.

88

    Q. And so the purpose of your pulling forward
is to make sure that the brakes on the trailer are
working properly?
    A. And you're properly connected.
    Q. Thank you. And then the next thing you do
is you hookup your hoses?
    A. Right.
    Q. And those hoses control the brakes on the
trailer?
    A. Right.
    Q. And you also hookup your electrical so
that your trailer can control the electric and the
lights --
    A. Right.
    Q. -- on your trailer?
    A. Right.
    Q. Your tractor can control the lights on
your trailer?
    A. Right.
    Q. I think that's where we were when I
stopped you.
    A. Right.
    Q. What do you do next?
    A. Well, then you -- after you get that all

89

hooked up, obviously, you walk around -- well, you
go back inside the truck, you turn your four-ways
on, turn all your lights on, and you walk around
and check to see if your lights are working -- or
in a rail trailer case, if they're even there
because a lot of times they steal lights out of
them. So you check and see if all the lights are
there.
       And then you check the tires with
either -- with a thumper to make sure they're all
up and not flat. And then you just walk --
continue to walk around back just to make sure that
the container don't have no holes.
       Or, say, we pick another one up from the
rail yard, pick up a new trailer, you want to make
sure it don't have any holes or there ain't nothing
inside the trailer. That's all kind of part of
your walk-around; you open the doors and check and
see what's inside there and, obviously, if it was
in good physical condition, you know, and,
basically, just check to see if the lights work.
    Q. Okay. How do you check your brake lights?
    A. Your brake lines?
    Q. Brake lights.

90

    A. Well, inside the truck there's a -- what
they call a Johnny bar. You can pull that down and
that works, it operates the trailer brakes.
    Q. Okay.
    A. And when you do that, it also turns the
brake lights on.
    Q. So what you've just described for me is a
pre-trip that you perform every time you take a
truck on the road?
    A. Pretty much, yes.
    Q. All right. After you completed your
training at the Dairyland Diesel School where was
the first truck driving job that you had?
    A. At ITC.
    Q. Can you tell me what ITC is?
    A. It's a trucking company out of Merrill,
Wisconsin. They're no longer -- they're out of
business now though.
    Q. What town was it?
    A. Merrill, Wisconsin.
    Q. Merrill, Wisconsin. And what type of
freight did they pull?
    A. Like paper or general freight. Mostly
paper.

91

6 (Pages 88 to 91)

**Page 92**

```
 1      Q.  Have you ever pulled a tanker for a
 2   living?
 3      A.  A tanker?
 4      Q.  Yes.
 5      A.  No, sir.
 6      Q.  Have you ever transported hazardous
 7   material for a living?
 8      A.  Not very much but --
 9      Q.  Okay.
10      A.  But back when I worked for ITC I did have
11   a HazMat on my license but I didn't -- I wasn't
12   required when I worked at Martin's.
13      Q.  Okay.  So you had training for HazMat?
14      A.  Yes, sir.
15      Q.  But you didn't need it because you didn't
16   haul any HazMat?
17      A.  Right.
18      Q.  All right.  When you left the Dairyland
19   Diesel School, what driver's license rating or what
20   were you allowed to drive as a driver?
21      A.  A driver's license rating?
22      Q.  Yes.  You had a CDL, correct?
23      A.  Right.
24      Q.  A commercial driver's license?
```

**Page 93**

```
 1      A.  Yes.
 2      Q.  And what did that allow you to do versus
 3   somebody with a plain old car license?
 4      A.  You can operate a vehicle with air
 5   brakes.  You can operate a tractor-trailer.  You
 6   got a Class A class.  You can operate anything all
 7   the way up to a tractor-trailer.
 8      Q.  Okay.  And are there levels of CDL?  In
 9   other words --
10      A.  Yes.
11      Q.  -- some people can just drive a box
12   truck --
13      A.  Yes.
14      Q.  -- versus semi?
15      A.  Right.
16      Q.  Which level or rating was yours?
17      A.  I got the highest level you can operate.
18      Q.  So when you left the Dairyland Diesel
19   School, you were able to operate all types of
20   street-legal trucks?
21      A.  Right.  Except for I couldn't -- I wasn't
22   licensed for -- I didn't have an endorsement for a
23   tanker.  I didn't have one of those.  And I could
24   not pull doubles or triples.  That was extra
```

**Page 94**

```
 1   endorsements.
 2      Q.  Sure.  Have you ever since got an
 3   endorsement for a tanker?
 4      A.  No.
 5      Q.  Have you ever since got an endorsement for
 6   doubles or triples?
 7      A.  No.
 8      Q.  So to describe your licensure when you
 9   left the Dairyland Diesel, you were licensed to
10   pull all sorts of trucks except for tankers and
11   doubles and triples?
12      A.  Right.
13      Q.  And has that remained true since you left
14   the Dairyland Diesel School?
15      A.  Yes.
16      Q.  Has your driver's license ever been
17   suspended or revoked?
18      A.  No.
19      Q.  Have you ever been convicted of a DUI?
20      A.  No.
21      Q.  Not counting the accident that we're here
22   to talk about today, have you otherwise been
23   involved in any motor vehicle accidents?
24      A.  Before?
```

**Page 95**

```
 1      Q.  At any time other than July 3rd, 2008?
 2      A.  With any kind of --
 3      Q.  Any kind of accident.
 4      A.  I had an accident back when I was a kid
 5   when I first got my license but that was -- I had a
 6   car sideswipe me.
 7      Q.  That's fine.  So that would have been
 8   approximately when?
 9      A.  '81, '82, in that area.
10      Q.  That's fine.
11      A.  Yeah.
12      Q.  Anyone hurt in that accident?
13      A.  No.
14      Q.  Okay.  Is that the -- any other accidents
15   other than that one in 1981 when you just got your
16   license and the July 3rd, 2008 accident?
17      A.  You mean from there to then or any -- from
18   now --
19      Q.  Since the day you got your first driver's
20   license --
21      A.  Until now?
22      Q.  -- as a fresh-faced teen until today?
23      A.  Well, there was one accident was in
24   Michigan where a car went into the ditch and came
```

7 (Pages 92 to 95)

1 out in front of me and I hit another truck.
2 Q. I'll get to the details of it. But when
3 did that happen?
4 A. May 17th, two years ago.
5 Q. Okay. So 2010?
6 A. Right.
7 Q. So any other accidents other than one in
8 the early '80s --
9 A. No.
10 Q. -- one in 2008 that we're here to talk
11 about --
12 A. Right.
13 Q. -- and one in 2010?
14 A. Right.
15 Q. That's it?
16 A. Right.
17 Q. Those three?
18 A. Right. Nothing but -- that's all that --
19     MR. SKRYD: You've answered the question.
20 Now he's going to ask you some more. Wait for the
21 next question.
22     THE WITNESS: All right.
23 BY MR. COUTURE:
24 Q. So you started to tell me the details, and

96

1 I don't need a lot of details but I do want to
2 know, on May 17th, 2010 when you had an accident,
3 that occurred in Michigan?
4 A. Yes.
5 Q. Where in Michigan?
6 A. On Interstate 94.
7 Q. Between Chicago and Detroit?
8 A. Yes.
9 Q. And were you driving as a commercial
10 driver at the time of that occurrence?
11 A. Yes.
12 Q. And what company were you employed with at
13 the time of that accident?
14 A. With Walsh.
15 Q. Can you give me the full name of Walsh?
16 A. Walsh's Cargo. Walsh Cargo.
17 Q. And where is Walsh Cargo located out of?
18 A. Lyndon Station, Wisconsin.
19 Q. Lyndon Station?
20 A. Yes.
21 Q. And what time of day was that accident?
22 A. Mid morning.
23 Q. Did weather play any role in the accident?
24 A. It was kind of foggy, raining. There

97

1 was -- and they was doing road construction.
2 Q. Did the foggy or rainy conditions affect
3 your ability to prevent the accident?
4 A. No.
5 Q. That was just the weather conditions but
6 it didn't play a role?
7 A. No.
8 Q. And how about the road construction, did
9 that play any role in the accident?
10 A. Yes.
11 Q. Okay. Tell me what happened in that
12 accident.
13 A. I was going -- they had road construction.
14 So they had the middle lane blocked off. So you're
15 using the slow lane and the shoulder road to drive
16 on. And they had signs up there when the workers
17 are present, you're supposed to go, you know, 45
18 miles an hour.
19     So I was in the slow lane and the car
20 behind, about six car lengths behind, he jumped
21 over the median, tried passing in the construction
22 in the median, come up, he lost control of the car,
23 he slid underneath another truck, that truck
24 bounced him back into the ditch and he come up out

98

1 of the ditch and he hit my vehicle.
2 Q. Okay. Did you receive any citations for
3 that accident?
4 A. No, sir.
5 Q. Is there a lawsuit pending as a result of
6 that accident?
7 A. No, sir.
8 Q. Other than this lawsuit that we're here to
9 talk about today, have you ever been a defendant or
10 plaintiff in a lawsuit?
11 A. No, sir.
12 Q. I've asked you about accidents. Now I
13 want to ask you about moving violations.
14     Other than the tickets that you received
15 as a result of the accident involving Jeffrey
16 Scheinman's vehicle have you since receiving your
17 license way back when received any tickets?
18 A. Yes.
19 Q. I'm going to exclude the ones that you
20 received before you became a professional driver
21 approximately 16 years ago and just talk about the
22 ones since.
23     Have you ever received a ticket or moving
24 violation while operating a commercial vehicle?

99

8 (Pages 96 to 99)

1    A.  No, sir.
2    Q.  Have you received any tickets in the last
3  16 years, in other words, since you got your CDL,
4  driving any vehicle?
5    A.  No, sir.
6    Q.  So any moving violations other than the
7  ones relating to the accident with Mr. Scheinman
8  that you may have had you got before you became a
9  professional driver?
10    A.  Yes, sir.
11    Q.  And typical speeding of a kid and stuff
12  like that?
13    A.  Yes, sir.
14    Q.  When you started at ITC, did ITC provide
15  any training to you?
16    A.  Yes.
17    Q.  What did ITC train you to do or what
18  training did they offer?
19    A.  When I started there, they had you go with
20  a trainer for like --
21    MR. SKRYD:  You said trainer?
22    THE WITNESS:  Yes.
23    MR. SKRYD:  Okay.
24    THE WITNESS:  It was another -- it was one
                                                    100

1  logbooks?
2    A.  Yes.
3    Q.  And he also -- did he provide any
4  additional training regarding how you were to
5  hookup, unhook, any of those things?
6    A.  He would watch you just to make sure you
7  did it right.  And if you didn't do it right, he
8  would inform you which way you're supposed to do
9  it.
10    Q.  Is it fair to say that while you had
11  already been trained at school how to do it --
12    A.  Right.
13    Q.  -- his job was to confirm that you were
14  doing it the way he understood was correct?
15    A.  Yes.
16    Q.  So he wasn't really telling you this is
17  the new task that you're going to have to
18  accomplish more than he was confirming that you
19  were doing what was right?
20    A.  Right.
21    Q.  Okay.
22    MR. SKRYD:  Sam, just do us a favor and
23  let him finish the question fully.
24    THE WITNESS:  Sorry.
                                                    102

1  of their drivers that was licensed to train, make
2  sure that I knew what I was doing and, basically,
3  give you how to do your logbook and, basically,
4  trainer of all kinds -- you know, make sure that
5  you knew what you was doing on the road.
6  BY MR. COUTURE:
7    Q.  Okay.  A ride-along?
8    A.  Yes, he rode and drove both.  He observed
9  you while you was driving -- that's what the
10  trainer does, and make sure that -- and then he
11  goes back to report to the company and let's them
12  know that I know what I'm doing or whatever.
13    Q.  How long was it that you had a trainer
14  ride with you or drive with you with ITC?
15    A.  About four to five weeks.
16    Q.  Was ITC an over-the-road, long-range truck
17  company or were they local?
18    A.  Both.
19    Q.  When you did the four to five weeks
20  training, were you on the road away from Wisconsin
21  or were you doing local routes?
22    A.  I was on the road away from Wisconsin.
23    Q.  And along with observing how you drove,
24  this individual also trained you how to do your
                                                    101

1    MR. SKRYD:  You're doing really well but,
2  you know, just keep doing it that way.
3    THE WITNESS:  All right.
4  BY MR. COUTURE:
5    Q.  How long did you work at ITC?
6    A.  Probably a year.
7    Q.  While working at ITC, along with pulling
8  trailers, did you also pull chassis with intermodal
9  boxes on them?
10    A.  No.
11    Q.  Can you give me the approximate year that
12  you started at ITC?
13    A.  1998 or -- wait a minute.
14    Q.  Maybe this will help.
15    A.  '89.  I think it was '89.  I think it was.
16    Q.  Okay.  Maybe this will help.  I saw in
17  looking at your personnel file that you started at
18  Martin's in November of '98.
19    A.  Okay.
20    Q.  So I don't know if that gives you any hint
21  but --
22    A.  All right.
23    Q.  Now that you know that --
24    A.  Right.
                                                    103

9 (Pages 100 to 103)

1  Q. -- when did you start at ITC?
2  A. It was the previous -- I only worked there
3 for a year.
4  Q. Okay. Was your next job Martin's Bulk
5 Milk?
6  A. Yes.
7  Q. So we're looking at '96 or '97 when you
8 worked at ITC?
9  A. Yes.
10  Q. How did you obtain the job at Martin's
11 Bulk Milk?
12  A. A friend of mine told me they were looking
13 for truck drivers.
14  Q. And who was this friend?
15  A. It was just Larry -- his name is Larry
16 Olsen.
17  Q. Was Larry Olsen an employee of Martin's
18 Bulk Milk at that point?
19  A. No.
20  Q. How was it that -- if you know, how was it
21 that Larry Olsen knew that Martin's was looking for
22 a truck driver?
23  A. He did some work on one of the people's
24 vehicles over there. He just knew of the company.

104

And then I seen some of the truck -- I asked some
2 of the -- after he told me about that I seen some
3 Martin's trucks; they go through Mauston all the
4 time. So I talked to them guys so. So I got their
5 number through one of their employees.
6  Q. Okay. And who did you contact at Martin's
7 Bulk Milk, if you remember?
8  A. I think I called over there and I think I
9 talked to Dave maybe.
10  Q. David Martin?
11  A. Yes.
12  Q. David Martin was the operations manager of
13 Martin's Bulk Milk --
14  A. Yes.
15  Q. -- when you were hired?
16  A. Yes.
17  Q. He was the operations manager of Martin's
18 Bulk Milk on the day of this accident?
19  A. Yes, he -- yes.
20  Q. And he was the operations manager of
21 Martin's Bulk Milk the last day you worked for the
22 company, correct?
23  A. Yes.
24  Q. All right. Did you have to go through an

105

1 interview process in order to get hired?
2  A. The -- no. I just filled the application
3 out and they checked -- obviously checked my
4 reference that I worked for and they didn't have to
5 do no driving test. They just checked my
6 reference. I filled out an application.
7  Q. Okay. Why don't I -- why don't I ask you
8 step-by-step questions.
9    After you spoke with David Martin what did
10 he tell you that you needed to do in order to
11 become -- considered for a job at Martin's Bulk
12 Milk?
13  A. Fill out the application.
14  Q. And you did that?
15  A. Yes.
16  Q. Did you do that at the Martin's Bulk Milk
17 office or did you do that at home and provide it to
18 them?
19  A. I think I took it home.
20  Q. Okay. And after you completed that
21 application did you speak with anyone from Martin's
22 Bulk Milk, an interview?
23  A. I think I talked to Janet.
24  Q. Janet. What's Janet's last name?

106

1  A. Right now it's Baer, I'm pretty sure.
2  Q. And she was the head of personnel?
3  A. She was safety director type thing, I
4 think.
5  Q. All right. What discussion did you and
6 Janet have at that time, if you remember?
7  A. Basically, she told me I had the job. She
8 showed me around the property. She showed me how
9 to use the fuel pump. And, basically, told me what
10 I was expected to do, what time I was supposed to
11 show up, all that.
12  Q. When you applied at Martin's Bulk Milk,
13 did you have an understanding as to whether you
14 were going to be getting -- whether you were going
15 to be hired as an over-the-road, across-the-country
16 trucker, whether you were going to be driving local
17 or what you were pulling? What understanding did
18 you have?
19  A. I applied for the Chicago run and they had
20 some Chicago runs or Minnesota runs but they put me
21 on the Chicago run.
22  Q. So when you applied in '98, you
23 specifically applied for a route?
24  A. Right.

107

10 (Pages 104 to 107)

1    Q.  Or a run?
2    A.  Well, I just got employed and that's what
3  they put me on.
4    Q.  Okay.  Well, that's what I'm trying to
5  figure out.
6        When you were hired, did you think to
7  yourself -- well, strike that.
8        When you were looking for the job and
9  applying, did you specify I need to stay in a
10  certain geographic area or were you open to going
11  to California and New York, anywhere in the
12  country?
13    A.  I -- when I applied for it, they said they
14  were looking for drivers to go to Chicago so.
15    Q.  So you knew that going in?
16    A.  Right.
17    Q.  And did you understand they were going to
18  do a background check?
19    A.  Yes.
20    Q.  Did they do that?
21    A.  I don't know.
22    Q.  Not that you know of -- well, strike that.
23        MR. SKRYD:  He said he didn't know.
24        MR. COUTURE:  I know.  I don't mean to

108

1  mischaracterize.
2  BY MR. COUTURE:
3    Q.  You weren't involved in that other than
4  probably signing some documents to allow them to do
5  that background check; is that fair to say?
6    A.  Right.
7    Q.  Did they contact your former employer ITC
8  to talk about you?
9    A.  I don't know.
10    Q.  Did they have you do a road test?
11    A.  No.
12    Q.  Did they require you to show them your
13  CDL?
14    A.  Yes.
15    Q.  Can you tell me anything else that
16  Martin's Bulk Milk did in order to determine
17  whether you were going to be hired other than what
18  we've talked about?
19    A.  I mean, you had to -- just to show them
20  your CDL.
21    Q.  Did you sit down with Mr. Martin, either
22  Allan or David, and have a chat about their
23  employees, what they like their employees to be
24  like or who you are, any type of interview?

109

1    A.  I talked to -- like I said, I talked to
2  Janet when she was showing me around and she,
3  basically, told me what needs to be done and all
4  that and --
5    Q.  And I'm only interrupting you because I
6  think we're talking about two different things.  By
7  the time you talked to Janet -- that's how you
8  learned you got the job?
9    A.  Right.
10    Q.  And Janet at that point wasn't talking to
11  you as a perspective employee, she was talking to
12  you as the new guy?
13    A.  Right.
14    Q.  Okay.  And when you spoke to her, she then
15  told you what your route was going to be, right?
16    A.  Yes.
17    Q.  And she told you -- did you she tell you
18  you were going to be assigned to a specific
19  tractor?
20    A.  When I first started there, they had a --
21  I wasn't -- I wasn't really assigned to any special
22  tractor because they were trying to find one.  But
23  after a while I was accepted to -- I mean assigned
24  to one, you know.

110

1    Q.  Okay, let me ask you how that worked.  Was
2  it that when you first started there nobody has an
3  assigned tractor or was it that you're the new guy
4  and you get whatever's left over?
5    A.  Yes.
6    Q.  The second one?
7    A.  Yes.
8    Q.  And so as you were there long enough then,
9  eventually, you were able to be assigned to a
10  specific tractor?
11    A.  Yes.
12    Q.  All right.  When you first spoke to Janet
13  about the job, did she give you a specific
14  indication of what your runs to Chicago -- to and
15  from Chicago would entail as far as what you would
16  be hauling?
17    A.  When I first started there, yes.  They --
18  we was hauling furniture down to, like, the rail
19  yards and then if there was anything they could
20  get -- any kind of load they could get to haul --
21  to come back with.
22    Q.  Okay.  When you started at Martin's Bulk
23  Milk, did they provide you with any training when
24  you first started there?

111

11 (Pages 108 to 111)

1   A. No.
2   Q. You said she showed you where the fuel
3 pump was?
4   A. Right.
5   Q. That's not the type of thing I'm talking
6 about though.
7   A. Right.
8   Q. She probably showed you around the
9 facilities and said this is where the bathroom is,
10 this is the break room, this is the office?
11   A. Yeah, right.
12   Q. I'm talking a little different than that.
13   A. Right.
14   Q. Did they provide any specific training on
15 how you as a truck driver were going to be doing
16 your job for Martin's Bulk Milk?
17   A. No. I already had experience so he didn't
18 get -- I didn't have to go through any training
19 with any trainer with them guys.
20   Q. All right. Did they teach you how to use
21 or perform their paperwork?
22   A. Yes.
23   Q. Other than that sort of administrative
24 stuff they didn't provide any other training as a

112

1   A. I mean, how to check-in at the -- they
2 would give you -- you come in -- how do you mean?
3   Q. Before you started working for Martin's
4 Bulk Milk when you were hauling material, had you
5 hauled to rail yards before?
6   A. No, sir.
7   Q. Okay. Was there anything specific about
8 hauling in and out of a rail yard that required
9 additional training for you as a truck driver?
10   A. No. It's just when you came in there, you
11 just had to check-in at the rail yard, give them
12 your information, you know, what you was bringing
13 in, the trailer number, your driver's license and
14 they would check you in to the rail yard and they'd
15 tell you where to put the load.
16   Q. Okay. And would you typically leave the
17 rail yard with a trailer?
18   A. Typically, yes.
19   Q. Okay. So you had to pickup another
20 trailer?
21   A. Yes.
22   Q. Was that something you did at ITC?
23   A. No.
24   Q. So that was new for you when you started

114

1 truck driver, fair?
2   A. Yes.
3   Q. Okay. Now, you were going to be going to
4 rail yards you indicated. Was that the first time
5 you had delivered to a rail yard?
6   A. Yes.
7   Q. And correct me if I'm wrong. That would
8 include delivering intermodal boxes as opposed to
9 trailers, true?
10   A. When they first started doing it, we
11 hauled rail trailers. And then later on it started
12 gradually getting to more and more containers and
13 boxes -- and trailers.
14   Q. So when you first started, you were
15 hauling the same type of trailer you had already
16 pulled?
17   A. Right.
18   Q. They were just going on to trains?
19   A. Exactly.
20   Q. And then later on you were actually
21 pulling chassis with boxes on them?
22   A. Yes.
23   Q. All right. Did you have to learn the
24 procedures at the rail yards?

113

1 working for Martin's?
2   A. Yes.
3   Q. Did you have any training as to how you
4 were to do that?
5   A. It's the same kind of training, you
6 would -- you hooked to a trailer to make sure --
7 you would check it, walk around and check it. You
8 know, check the same kind of pre-trip inspection.
9   Q. Okay. When you eventually began hauling
10 chassis with boxes on them, did you receive any
11 additional specialized training for that type of
12 trucking?
13   A. No. It's common sense.
14   Q. When you first started working at Martin's
15 Bulk Milk, who was your direct boss?
16   A. Dave Martin.
17   Q. And was Dave Martin your direct boss on
18 the day of this accident?
19   A. Yes. Yes.
20   Q. If I understand it, you were working for
21 Martin's Bulk Milk for approximately ten years
22 before this accident took place?
23   A. Yes, just about ten years.
24   Q. Yes, November of '98?

115

12 (Pages 112 to 115)

1  A.  Two weeks shy, yes.
2  Q.  Okay.  Did you undergo any training in
3  that ten years beyond what you've already told me?
4      Did Martin's ever have someone come in and
5  give you a refresher course or play a video or
6  require you to do any follow-up continuing
7  education?
8  A.  No.  We had safety meetings but --
9  Q.  All right.  How often did you have safety
10 meetings?
11 A.  Once a year.
12 Q.  Other than the once-a-year safety
13 meetings, that would be the extent of your
14 additional training?
15 A.  Right.
16 Q.  Who ran the safety meetings?
17 A.  Dave and whoever the guest speaker was at
18 the time.
19 Q.  They would have guest speakers come in?
20 A.  Right.
21 Q.  When you were hired, did you receive an
22 employee handbook?
23 A.  Yes.
24 Q.  What type of material was in that -- well,

116

1  A.  No, I don't think so.
2  Q.  Okay.  Was there any instructions of
3  policies and procedures of Martin's Bulk Milk in
4  the event you got into an accident?
5  A.  Yes.
6  Q.  Who to call?  What to do?
7  A.  Right.
8  Q.  Yes?
9  A.  Yes.
10 Q.  Do you remember what the policy and
11 procedure was?
12 A.  Basically get a hold of either Dave or
13 Janet or -- and then they had your insurance -- all
14 your insurance records and stuff in the truck and
15 they had -- you're supposed to show them -- you
16 know, when you got in the accident, that's what
17 you're supposed to show them.
18 Q.  That's the extent that you remember?
19 A.  Right.
20 Q.  When you were hired by Martin's Bulk Milk,
21 how were they paying you?
22 A.  By the mile.
23 Q.  Do you remember what you were first making
24 when you were hired?

118

1  strike that.
2      Did you read the employee handbook?
3  A.  Yes.  Glanced through it, yes.
4  Q.  You didn't memorize it --
5  A.  No.
6  Q.  -- but you looked through it?
7  A.  Right.
8  Q.  What type of information was in the
9  employee handbook?
10 A.  Basically, how to do your paperwork, what
11 the rules and -- what they expected of you and
12 stuff like that, you know.
13 Q.  Okay.  Were there safety procedures in the
14 handbook?
15 A.  Yes, I mean, as far as -- yes, you're
16 supposed to do your pre-trip inspection and all
17 that.
18 Q.  Any other safety procedures that you
19 remember?
20 A.  No.
21 Q.  You don't still have that handbook, do
22 you?
23 A.  No, I don't have it.
24 Q.  I'm sorry?

117

1  A.  32 cents per mile.
2  Q.  And was there any additional payment along
3  with the 32 cents a mile?  In other words, did they
4  pay you for drop-offs, for pickups?
5  A.  Yes.
6  Q.  What other compensation other than 32
7  cents a mile did you get?
8  A.  They would pay you for -- if you had more
9  than one pickup, they would pay you, like, $15 for
10 that.  If you had more than one drop-off, they
11 would pay you extra for that, $15 or something like
12 that.
13 Q.  Okay.  So let me understand it.  If you
14 only had one drop-off and one pickup, they wouldn't
15 pay you any extra?
16 A.  No, sir.
17 Q.  That's correct?
18 A.  That's right.
19 Q.  But if you were driving to, for example --
20 I know it wasn't you but, for example, the load
21 that you were hauling on the day of the occurrence
22 was going eventually north to Minneapolis to three
23 different places.
24 A.  Right.

119

13 (Pages 116 to 119)

**Page 120**

```
1      Q.  If you were hauling that load, you would
2   have received additional compensation because you
3   would have been making three drop-offs?
4      A.  For the second -- the first additional one
5   you don't get one, you know, but the second two
6   yes.
7      Q.  Okay.  So the first drop-off is 32 cents a
8   mile at that time regardless?
9      A.  Right.
10     Q.  The second drop-off is an extra how much,
11  15?
12     A.  Yeah.
13     Q.  Did you get another 15 for the third
14  drop-off?
15     A.  Yes.
16     Q.  Other than your mileage rate and the
17  additional drop-off and pickup payments, did they
18  have any other compensation for you?
19     A.  They had like a safety bonus.
20     Q.  Okay.
21     A.  And you'd only get that, like, at the end
22  of the year, I think what it was.
23     Q.  And I'm not asking -- when I say
24  compensation --
```

**Page 122**

```
1      A.  I don't know.
2      Q.  You don't remember?
3      A.  I don't remember, no.
4      Q.  And you didn't complete 2008, correct?
5      A.  Right.
6      Q.  So you didn't qualify for that?
7      A.  Right.
8      Q.  All right.  Other than the drop-off
9   premium that you've told me about, other than the
10  mileage compensation and the safety bonus, is there
11  any other way that Martin's Bulk Milk paid you as a
12  truck driver?
13     A.  No, sir.
14     Q.  When you started it was 32 cents a mile.
15  Do you remember what it was that you were earning
16  per mile in July of 2008?
17     A.  I think I was up to 36 or 37 cents a mile.
18     Q.  Now, I asked you about who your direct
19  boss was at the time you starting at Martin's Bulk
20  Milk and you said David Martin.  He's the son of
21  the owner Allan Martin?
22     A.  Yes, sir.
23     Q.  Were you also -- Strike that.
24         Were your bosses also whoever was acting
```

**Page 121**

```
1      A.  Oh.
2      Q.  No, that's important but I'm just letting
3   you know I don't need to know about, like, health
4   insurance and stuff like that.  I just want to know
5   money that they're going to give you.
6          Tell me about this safety bonus.  How
7   would one at Martin's Bulk Milk earn a safety bonus
8   back in 2008?
9      A.  I think the way they did it is you started
10  out with a set amount and then if you had any
11  violations or anything, it would -- it would lower
12  your safety -- lower the bonus down.
13     Q.  Okay.  So there was an amount of money
14  that you started out with at the beginning of the
15  year and if you did anything wrong, almost like a
16  demerit, it would come off the top and at the end
17  of the year, whatever you were left with, you got?
18     A.  Right.  I'm thinking that's what it was.
19     Q.  How much was the safety bonus for 2007
20  total if you didn't have any violations?
21     A.  I think it was $200.  I'm not for sure.
22  There again, it's been a long time ago.
23     Q.  Did you lose any money from the safety
24  bonus in 2007?
```

**Page 123**

```
1   as a dispatcher at the various times that you were
2   driving?
3      A.  Yes.
4      Q.  Do you remember the names of all of the
5   dispatchers who were working at Martin's in -- July
6   of 2008?
7      A.  Not -- there was a Nancy there.
8      Q.  Dave, right?
9      A.  Dave.  And I think there was a couple
10  other ones there too.  I don't know exactly what
11  their names are.
12     Q.  Okay.  It's been a couple years so you
13  don't remember them?
14     A.  Yeah.
15     Q.  Generally, and I'll ask you more specific
16  questions about the run that you took to haul paper
17  from Hammond, Indiana north to Wilton in a bit but
18  I just want to ask you generally.
19         When you were doing your Chicago -- your
20  runs to Chicago delivering furniture, did Martin's
21  Bulk Milk dictate which roads you drove on to get
22  there?
23     A.  They just told me to take the fastest and
24  most direct route.
```

14 (Pages 120 to 123)

1    Q. So the only instruction was fastest and
2 most direct?
3    A. Right.
4    Q. So they didn't say --
5    A. They didn't want you to go out of route.
6    Q. And this is the important thing that we're
7 talking about, the purpose of my question.
8       They didn't want you to go out of route.
9 So my question then is: Did they tell you what the
10 route was?
11    A. No.
12    Q. Okay. They said you're going to Chicago,
13 this is the address you're going to, get there in
14 the best way you can?
15    A. Yes.
16    Q. They didn't say exit here, turn there, get
17 off on this expressway, go there?
18    A. No.
19    Q. Not the specifics, they left that to you?
20    A. Right.
21    Q. When you -- Strike that.
22       When you started at Martin's, you were
23 doing the Chicago run, as you've said, right?
24    A. Yes.

124

1 time when you typically started your day?
2    A. Yes.
3    Q. What time was it?
4    A. When I was doing the day shift?
5    Q. Yes, when you first started doing runs to
6 Chicago.
7    A. 4:00 or 5:00 o'clock in the morning.
8    Q. And when you would do those furniture runs
9 to Chicago, you would do those from Wilton,
10 Wisconsin?
11    A. Yes.
12    Q. And Wilton, Wisconsin is the location
13 where Martin's Bulk Milk is located?
14    A. Yes. On occasion we would go -- pick them
15 up from Ashley Furniture in Arcadia.
16    Q. Wisconsin?
17    A. Right.
18    Q. And what route would you take to get from
19 Wilton to the location in Chicago where you were
20 delivering the furniture?
21    A. I would take I think it's Highway 71 out
22 of Wilton to I think it's over to 82 into Mauston,
23 and when you get to Mauston, you got an interstate.
24    Q. Which interstate?

126

1    Q. And at that time you were hauling
2 furniture to a rail yard in Chicago?
3    A. Yes.
4    Q. Was that a daily run?
5    A. Yes.
6    Q. What days a week did you work at that
7 time?
8    A. Monday through Friday.
9    Q. And what time would you start?
10    A. It depends on what run I was doing.
11    Q. It depended on when they needed the
12 furniture?
13    A. It depended -- yes, it depended what time
14 I pickup -- if I was running the day shift or night
15 shift or it depended.
16    Q. Okay. Was there any period of time that
17 you -- like, when you first started, for any period
18 of time were you running a specific run every day
19 or did that change?
20    A. Yes, when I first started it was basically
21 have the trailer down there by a certain time in
22 the morning and then they would have time enough to
23 find you a reload back.
24    Q. Okay. Do you remember for that period of

125

1    A. 90/94.
2    Q. Okay.
3    A. And you head towards Chicago.
4    Q. There's two ways to head towards Chicago,
5 though, right?
6    A. Right. And it depends on what rail yard
7 you was going to go.
8    Q. Okay.
9    A. There's probably 20 different rail yards
10 in Chicago. So it depends on which rail yard you
11 was going to to determine which road you took to
12 get in there.
13    Q. All right. Well, let me stop you here.
14 Before you get to Chicago you have to make the
15 decision about whether you're going to stay on 90
16 or 94, right?
17    A. Yeah. 94 goes towards Milwaukee; 90 goes
18 down straight into Chicago.
19    Q. Okay. And which -- Strike that.
20       Did Martin's Bulk Milk at that time give
21 you direction as to whether they wished you to take
22 94 versus 90?
23    A. No.
24    Q. So you made that choice as to which of

127

15 (Pages 124 to 127)

1  those two expressways --
2      A.  Right.
3      Q.  -- you were going to take, correct?
4      A.  Yes.
5      Q.  And, again, we're not talking about the
6  day of the occurrence, we'll get to that, but just
7  generally.
8          How did you make the determination as to
9  whether you were going to take 94 to Chicago versus
10  90 to Chicago?
11     A.  It's to what side of Chicago where the
12  rail yard was at or where you was going to at in
13  Chicago.
14     Q.  If you were going to be going to the 47th
15  Street rail yard, which route would you take
16  typically?
17     A.  Probably down 90 into Chicago. It's, I
18  think -- I don't know, it's 290 you get off and go
19  down -- I don't know exactly where it's at.
20     Q.  That's fine. And I don't want to ask you
21  that minutia at this point because it's not
22  important to my question but I appreciate you
23  trying to answer my question.
24          But, typically, if you were going to the
                                                    128

1  47th Street rail yard, you would choose 90 instead
2  of 94?
3      A.  Right.
4      Q.  Because it's shorter distance-wise, right?
5      A.  Right. It's a more direct route.
6      Q.  A more direct route. Thank you. At some
7  point did you start picking up loads at the Exel
8  Warehouse in Hammond, Indiana?
9      A.  Exel Warehouse?
10     Q.  An International Paper's warehouse?
11     A.  Yes.
12     Q.  When did you first pickup loads at that
13  warehouse in Hammond, Indiana on 165th Street, I
14  think it is?
15     A.  When did I first start --
16     Q.  Yes.
17     A.  -- picking up loads there for Martin's
18  Bulk Milk?
19     Q.  Yes.
20     A.  Or for --
21     Q.  Did you pickup loads at that warehouse for
22  ITC?
23     A.  Yes.
24     Q.  You did, okay. How often were you at that
                                                    129

1  Hammond, Indiana warehouse for ITC?
2      A.  It wasn't a regular thing but, yes, I
3  picked up loads there too for them guys.
4      Q.  Okay. But it wasn't a regular route?
5      A.  No.
6      Q.  At some point -- Strike that.
7          When did you first go to that Hammond
8  location for Martin's Bulk Milk? Again, I don't
9  need exact dates, but when in your employment in
10  the approximate ten years?
11     A.  Probably two, three years after I started
12  working there. We went there quite often.
13     Q.  As of the day of this accident you were
14  traveling from Hammond almost every day?
15     A.  Yes.
16     Q.  In fact, was it every day?
17     A.  Yes.
18     Q.  All right. When did that run start being
19  an every day occurrence for you?
20     A.  Probably two or three years -- about three
21  years beforehand an every day thing.
22     Q.  Okay. And when you started making that
23  run every day approximately two or three years
24  before this accident, you were -- and correct me if
                                                    130

1  I'm wrong -- you were making a delivery from Wilton
2  to somewhere in the Chicago area unrelated to that
3  Hammond pickup?
4      A.  Right.
5      Q.  But then after you made your delivery of
6  your inbound trip, you then would go to Hammond and
7  make a pickup for your trip back to Wilton?
8      A.  Yes.
9      Q.  Okay. Did -- Strike that.
10          When you were making these deliveries on
11  an every day basis for two to three years before
12  July 3rd, 2008, did you have an understanding that
13  you were delivering product for a specific
14  customer?
15     A.  Which way, sir?
16     Q.  Thank you. When you were going from
17  Hammond to Wilton.
18     A.  I was --
19     Q.  I'll strike it and start over because you
20  look confused and I can be very confusing
21  sometimes.
22          When you first started doing this two- to
23  three-year -- or excuse me.
24          When you first started doing the dedicated
                                                    131

16 (Pages 128 to 131)

1 run from Hammond to Wilton every day --
2     A.  Right.
3     Q.  -- were you always hauling from that
4 warehouse in Hammond to Wilton product for the same
5 customer?
6     A.  We was always hauling paper.
7     Q.  It was always paper?
8     A.  Yes.
9     Q.  Okay.  As a truck driver did you pay
10 specific attention as to who the owner of that
11 paper was or who specifically was asking you to
12 haul it?
13     A.  No.
14     Q.  That was up to somebody else who is
15 dispatching you to go there, right?
16     A.  Right.
17     Q.  You didn't pay attention as to what names
18 were on the bills of lading and things like that?
19     A.  As far as?
20     Q.  You were picking up your load?
21     A.  Right.
22     Q.  You made sure you had the right load?
23     A.  Right.
24     Q.  You made sure you signed your name for

132

1     Q.  Okay.  Who was it at Martin's Bulk Milk
2 who told you on a day-to-day basis where you were
3 going to be going and what you were going to be
4 picking up?
5     A.  Your loads would be assigned and hanging
6 on your board.  So, I mean, nobody, per se, came up
7 and told you that you're doing this.  You come in
8 and check your board and whatever load's on your
9 board, you would deliver it.  If you had any
10 questions, you had to wait until the next day to
11 call them and ask.
12     Q.  Do you have an understanding as to who
13 prepared the paperwork to place on your board?
14     A.  No.  Just one of the girls in the office
15 probably.
16     Q.  Okay.  At some point did you -- were you
17 told that you would always be doing this run from
18 Hammond to Wilton or did it just happen that that
19 was on your paperwork every day?
20     A.  It just happened to be on my paperwork.
21     Q.  So no one said, okay, from now on this is
22 what you're going to do?
23     A.  No.  It wasn't in writing, no.
24     Q.  Was it done orally?  Did David or some of

134

1 that load?
2     A.  Right.
3     Q.  But as far as whether it was International
4 Paper or Overnite Express, Universal Am Can or Joe
5 Skryd's Trucking, it didn't matter to you?
6     A.  Right.  No.
7     Q.  You just had to pickup your load?
8     A.  Right.
9     Q.  All right.  But it was paper for those two
10 to three years that you did the dedicated run from
11 Hammond to Wilton?
12     A.  Yes.
13     Q.  For those two to three years did you have
14 a dedicated route from Wilton to Chicago, in other
15 words, the first half of that run?
16     A.  No, sir.
17     Q.  So when you first started at Martin' Bulk
18 Milk you had a dedicated furniture run to the
19 railroad yards but no dedicated run back, but later
20 on near approximately 2005 or 2006 you started
21 getting the opposite, a dedicated run from Hammond
22 every day but not knowing what you're going to haul
23 on your way there?
24     A.  Exactly.

133

1 the other dispatchers or owners of Martin's Bulk
2 Milk say from now on, Sam, you're going to be
3 hauling from Hammond?
4     A.  They -- they didn't -- they just -- it
5 could be different every day but it was under the
6 understanding that when you give out that morning,
7 when you was picking up that night or when you
8 did -- they would call in, they would tell you but
9 it wasn't like this is your run.
10     Q.  Well, you understand what I'm trying to
11 get at here.  I'm trying to figure out whether you
12 came to understand that this was a dedicated route
13 that you were going to do simply because every
14 morning when you got there it was in your paperwork
15 as opposed to someone designating Sam Franke as the
16 one who's going to make the run from Hammond to
17 Wilton.
18     Do you understand the difference between
19 the two?
20     A.  Yeah.
21     Q.  Can you tell me which of those two it was?
22     A.  It was just on my paperwork.
23     Q.  Okay.  Mr. Franke, the one thing that I
24 didn't say, I expect your lawyer told you but I

135

17 (Pages 132 to 135)

should say, if at any point you need a break --
because we're probably going to be here a long
time -- don't ever hesitate because we'll break
whenever you need to, all right?
     A.  Okay.
          MR. SKRYD:  How much time do we have on
the --
          THE VIDEOGRAPHER:  We have 24 minutes
remaining.
          (Discussion off the record.)
          MR. SKRYD:  Let's take a quick break.
          THE VIDEOGRAPHER:  We are going off the
record.  The time is 12:02 p.m.
          (A break was taken.)
          THE VIDEOGRAPHER:  We are back on the
record.  The time is 12:21 p.m.  Please proceed.
BY MR. COUTURE:
     Q.  Mr. Franke, I'm going to pause for a
second from where we were at in my questions and I
want to ask you something a little bit different
that I forgot to ask at the beginning of the
deposition.
          Before your deposition today did you
review any materials or documents?

136

     Q.  Okay.  And how about -- you told me about
two videos.  How about any still photographs of
either your vehicle, the Scheinman vehicle or of
the accident scene, did you look at any of those?
     A.  I seen some photographs, yes.
     Q.  Specifically of what?
     A.  Specifically of what?
     Q.  What photographs did you look at?  What
did they depict?
     A.  What the car looked like.
     Q.  Before or after the accident?
     A.  After.
     Q.  Okay.
     A.  And the truck.  Those are the only ones
I've seen.  That's been a while ago.
     Q.  Approximately when?
     A.  A month, month ago.
     Q.  Any other documents that you've examined
before this deposition?
     A.  No.
     Q.  Now, back to what we were talking about
before.
          We were discussing the fact that you for
two to three years before this accident you,

138

     A.  I watched my -- the interview, the
recorded interview, at the police station.  I
looked -- read my deposition from last time.
     Q.  Did you read any portion of the police
report?
     A.  No, sir.
     Q.  Have you ever read the entirety of the
police report from the Highland Park Police
Department?
     A.  No, sir.
     Q.  We'll get to portions of it, but to the
extent that officers may have written down their
conversations with you, from your answer I take it
that you don't know at this point what they've
specifically written down regarding what they heard
you say?
     A.  No.
     Q.  So at this point you can't say whether
what they wrote down was right or wrong?
     A.  Right.
     Q.  Okay.  Did you review any photographs of
any vehicles or the scene of the accident?
     A.  They had a police recording from a cruiser
that I watched.  I watched that prior to this.

137

essentially, had a dedicated run every day from
Hammond, Indiana to Wilton, right?
     A.  Yes.
     Q.  Okay.  When you first made that run from
Hammond to Wilton, did anyone tell you what route
to take to get from Hammond to Wilton?
     A.  No.
     Q.  So similar to your previous general
instructions, am I correct to say that they told
you to take the fastest or most direct route?
     A.  Yes.
     Q.  Was there any discussion either specific
to the Hammond route or in general for you as a
truck driver with anyone at Martin's Bulk Milk
regarding whether they wanted you to take the most
direct route or the fastest in the event that
one -- in the event that those two were different?
          Because sometimes less miles doesn't
necessarily mean shorter drive time-wise, right?
     A.  Right.
     Q.  Okay.  Did anyone at Martin's ever tell
you either specific to the Hammond route or in
general whether they had a preference when you were
given the choice between the longer but faster

139

18 (Pages 136 to 139)

route and the shorter distance route?
    A.  It was the most -- they always wanted you
to take the most direct route, the direct or
fastest route.
    Q.  But you understand that direct and fastest
can sometimes be two different things?
    A.  Right.
    Q.  Were you ever told as a policy of Martin's
Bulk Milk which of those two in the event that the
most direct route is not the fastest which you were
to take?
    A.  No.
    Q.  That was up to you to choose?
    A.  Right.
    Q.  When you first went from Hammond to Wilton
hauling paper, what route did you take from Hammond
to Wilton?  And you don't have to tell me exact, "I
got off on 165th and took a left." I want to talk
major roads.
    A.  When I first --
    Q.  When you first started doing that route.
    A.  I would -- when I first would -- when I
first started doing it, I went back like the toll
road, back up 90 but, you know, it's more direct

140

route going up 41.  So I went up Highway 41.
    Q.  All right.  So to answer my question, when
you first started, you took the Indiana toll road
to 90 and took 90, essentially, through Madison up
to Wilton?
    A.  Right.
    Q.  At some point you changed that procedure
and took 94 out of Indiana along and through
Chicago?
    A.  Right.
    Q.  Correct?
    A.  Yes.
    Q.  All right.  When did that change that you
decided to take 94 route from Indiana instead of
90?
    A.  About a year -- a year before, I guess.  I
don't know exactly what exact day that I decided to
take that route.  Because it was -- it was faster
and more direct because at night going through
Chicago there was no delays and stuff.  So it was a
faster route.
    Q.  I appreciate everything you're saying, but
please listen to my question.
    When was it that you first chose 94

141

instead of 90 as your route?
    A.  I don't know exact date.
    Q.  Okay.  Was it before you started the
dedicated runs for the two to three years before
the accident?
    A.  Yes.
    Q.  Okay.  Was it a -- the circumstance that
once you decided to take 94 as your route,
thereafter you always took 94 instead of 90?
    A.  Yes.
    Q.  Did you ever have any discussion with
anyone from Martin's Bulk Milk regarding which of
the two expressways you should take to Wilton from
Hammond?
    A.  No.
    Q.  Am I correct that it's actually 15 miles
shorter if you take 90 from Hammond to Wilton than
if you take 94?
    A.  Right.
    Q.  Is that correct?
    A.  Yes.
    Q.  Okay.  Did the fact that you were getting
paid by the mile enter into your choice to take the
route that was 15 miles longer from Hammond to

142

Wilton?
    A.  No.
    Q.  Did you have to get any approval from
anybody at Martin's Bulk Milk to take the route
that was longer?
    A.  No.
    Q.  And you chose 94 instead of 90 because you
believed it to be faster?
    A.  Right, more direct.
    Q.  Well, more direct usually means less
miles.
    A.  Right.
    Q.  Okay.
    A.  Yeah, probably faster, yes.
    Q.  Faster?
    A.  Right.
    Q.  So we'll agree that 90 is shorter but your
belief was 94 was faster?
    A.  Right.
    Q.  The first time you took 94 from Hammond,
Indiana to Wilton, and I think you don't remember
exactly when that was --
    A.  Right.
    Q.  -- was it more than two years before this

143

19 (Pages 140 to 143)

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 accident?
2   A. Yes.
3   Q. Did you stay on 94 all the way through
4 Illinois or did you get off somewhere?
5   A. I took 94 through Chicago and then 41
6 turned off to your left and you took 41 --
7 continued straight up to 41 and 94 went off to the
8 right.
9   Q. All right. That's the route you took on
10 the day of this accident, correct?
11   A. Correct.
12   Q. Am I correct, however, that had you stayed
13 on 94 instead of getting off on 41 when you first
14 started doing this, 94 would take you where you
15 wanted to go?
16   A. Yes.
17   Q. Because, in fact, when you took the
18 forty -- Route 41 route, you joined back up at 94,
19 essentially, at the Wisconsin border?
20   A. Yes, sir.
21   Q. Did you in your job make a calculation as
22 to what the difference in miles was between taking
23 94 all the way versus taking Route 41?
24   A. No, I didn't sit down and --

144

1   Q. Do you know which of those two routes is
2 shorter with regard to the number of miles?
3   A. Are you talking about --
4   Q. I'll be more clear. And I appreciate what
5 you're about to ask for clarification on.
6       We've already discussed the difference in
7 miles and time versus 94 and 90.
8   A. Right.
9   Q. Now I'm focusing on staying on 94 all the
10 way from Chicago into Wisconsin as opposed to
11 getting off on Route 41 for a short period of time
12 when the Edens splits.
13   A. Right.
14   Q. Okay. Did you ever do a mileage
15 determination between which was less miles, 94 all
16 the way versus 94, 41 to 94?
17   A. No, I never did exact mileage.
18   Q. Did you ever do a timing run; in other
19 words, did you ever do both and figure out which
20 was faster?
21   A. No.
22   Q. How was it that you came to the decision
23 that you were going to get off on 41, go through --
24 I guess get off -- Strike that.

145

1       How was it that you decided you were going
2 to get off a divided highway at Route 41, go
3 through an area, commercial area with stoplights
4 and such, and then get back on 94? How did you
5 make that determination?
6   A. 94 swings out and around, it comes back
7 in, and 41 is a straight shot up through.
8   Q. Did you look at a map and say I'm going to
9 take this way?
10   A. Yes.
11   Q. Did someone tell you that you should go
12 that way?
13   A. No.
14   Q. So you looked at a map?
15   A. Right.
16   Q. At any time when you were driving for
17 Martin's Bulk Milk did you have a GPS system in
18 your truck?
19   A. No.
20   Q. So you never had one actually on the truck
21 itself?
22   A. Not when I worked for Martin's.
23   Q. And you never owned a personal one that
24 you put up on your dashboard to give you a route if

146

1 you needed it?
2   A. Not when I worked for Martin's.
3   Q. You have since?
4   A. Yes, sir.
5   Q. When you first started making runs from
6 Hammond, Indiana with paper to Wilton, was there a
7 procedure in place at the Hammond warehouse as far
8 as what you were required to do?
9   A. You would come into the facility, you
10 would go in, check-in at the -- check-in at the
11 desk and ask -- and tell the lady what trailer
12 number you have, what your pickup number was, and
13 then they would assign you a door to back into.
14 And sometimes it was the same door every night and
15 other days it would be different, depends on where
16 they staged the load at.
17       So then after they assigned you the door,
18 you would go open your doors, back into that dock,
19 and you would, basically, sit there in your truck
20 until they would come up and bang on the door
21 saying that they was ready to load you.
22       And you would go inside, stand in the dock
23 and, basically, stand there while they loaded you.
24   Q. I'll stop you there just so we have it

147

20 (Pages 144 to 147)

1    piece by piece.
2        You arrived with an empty trailer or box?
3    A.  Yes.
4        Q.  And after the procedure that you've just
5    told me about "they," meaning the people from the
6    warehouse, would load your trailer or box?
7    A.  Yes, sir.
8        Q.  In general, did you participate in the
9    loading when you were in Hammond?
10   A.  No, sir.
11       Q.  On the day of the occurrence, July 3rd,
12   2008, did you participate in the loading of your
13   trailer --
14   A.  What do you mean --
15       Q.  -- at Hammond?
16   A.  What do you mean by participate?
17   A.  Thank you.  Did you use a forklift?
18   A.  No, sir.
19       Q.  Did you tell them how to load your
20   trailer?
21   A.  No, sir.
22       Q.  Did you tell them where to place any of
23   the load?
24   A.  No, sir.  He had a paper that had, like

                                              148

1        You generally just watched to see if they
2    had it all on, and then you -- the forklift driver
3    would have a paper that would have all -- you know,
4    he had to have it marked down on the paper how we
5    loaded it and you sign it and give it back to him.
6    That was, basically, for his saying what time he
7    started, what time he quit.
8        Q.  You were confirming that the load was the
9    proper load?
10   A.  Right.
11       Q.  You were confirming that you actually were
12   taking that load by signing for it?
13   A.  Right.
14       Q.  And you were confirming that these folks
15   at the warehouse loaded that in a specific time
16   period?
17   A.  Right.
18       Q.  Anything else that you did at Hammond as a
19   truck driver picking up a load?
20   A.  No.
21       Q.  Did you make a determination when you were
22   doing that as to whether the load was loaded
23   safely?
24   A.  Yes.

                                              150

1    you just said, three stops.  You would -- you know,
2    the first stop you want at the tail and the second
3    stop would be the one in the middle, and the last
4    stop would go the one at the nose.
5        Q.  Did you make the determination of where
6    all -- where the stops would be in Minnesota?
7    A.  No, sir.  They was -- they did that.
8        Q.  Who's "they"?
9    A.  The shipper.
10       Q.  So you didn't play any role in that?
11   A.  No.
12       Q.  They had instructions, meaning the shipper
13   had instructions, from somebody else as to the
14   order of the load of that vehicle?
15   A.  Right.
16       Q.  And not only was that true July 3rd, 2008,
17   but that was true every time you got there?
18   A.  Yes, sir.
19       Q.  What involvement, if any, did you have in
20   the loading of, generally, your trailer when you
21   were at Hammond picking up a load of paper?
22   A.  You just stand there to make sure that
23   things -- there was no damaged freight going on
24   your truck.

                                              149

1        Q.  Yes.  Did you at any time when you were
2    picking up from Hammond ever raise an issue with
3    any of the methods or means that they used to load
4    your trailer?
5    A.  No.
6        Q.  So while you knew that was part of your
7    job, you never found it necessary to stop them?
8    A.  No.  They knew what they were doing pretty
9    much.
10       Q.  And generally from there you would --
11   well, strike that.
12       Would you then do a pre-trip inspection?
13   A.  After it was loaded?
14   Q.  Yes.
15   A.  I'd always have the trailer checked out
16   but you would walk around your truck after you --
17   you would pull it off from the dock, close your
18   doors.  But before you did that you would go in and
19   sign your bills of lading and then, basically,
20   you -- yeah, you would do a quick walk around
21   maybe.
22       Q.  When -- again, we're talking about
23   generalities here.
24       When you would go to Hammond, Indiana on

                                              151

21 (Pages 148 to 151)

the two to three years before this accident on a
daily basis, did you always have a load going down
to Chicago?
   A.  Someplace.  It wasn't just in Chicago.  It
would be the Chicago area.
   Q.  Thank you.  I'll rephrase my question.
You make a good point.  Did you ever have an
occasion where you had to drive to Hammond without
a load for the purpose of bringing the load from
Hammond to Wilton?
   A.  Yes.
   Q.  Okay.  And on those occurrences would you
go bobtail, in other words, without a trailer or
would you bring a trailer with you?
   A.  It was different all the time.  Most of
the time you'd probably bobtail -- I have on
occasion bobtailed to Chicago and picked up an
empty trailer and I have on occasion hauled loads
for other companies and had my own trailer with me
and --
   Q.  It would depend on the day or the load?
   A.  Exactly.
   Q.  Whatever the paperwork on the board said,
right?

152

   A.  Exactly.
   Q.  All right.  So if you were picking up --
if you were -- Strike that.
       If you were driving a trailer from Wilton
to Chicago, you would do a pre-trip not only of
your tractor but also of your trailer before you
left Wilton?
   A.  Yes.
   Q.  And if you got to Chicago and switched out
containers or trailers, you would then do a new
pre-trip inspection because you have a new trailer
or container that you're hauling, correct?
   A.  Right.
   Q.  And your job was to make sure that
everything on that trailer container was -- lights,
brakes was working properly?
   A.  Right.
   Q.  On occasion when you would go down
bobtail, you would pickup a container and have to
do that as well?
   A.  Correct.
   Q.  Did you ever pickup a container at the
Hammond facility?
   A.  No.

153

   MR. COUTURE:  I've just been told I have
five minutes.  So we're going to take a break.
       THE VIDEOGRAPHER:  This is the end of
media number one.  We are going off the record.
The time is 12:41 p.m.
       (A break was taken.)
       THE VIDEOGRAPHER:  This is the beginning
of media number two.  We are back on the record.
The time is 12:43 p.m.  Please proceed.
BY MR. COUTURE:
   Q.  Mr. Franke, am I -- Strike that.
       For the two to three years before this
accident you had a dedicated run from Hammond that
terminated in Wilton that involved you hauling
paper products, correct?
   A.  Yes.
   Q.  Were those paper products always going to
end up in the same place?
   A.  No.
   Q.  Wilton was not their final destination?
   A.  No.
   Q.  Someone else -- well, strike that.
       Did you ever deliver those paper products
from Wilton to their final destination?

154

   A.  Maybe a couple times.
   Q.  Was it part of your regular duties to take
the paper products that you hauled from Hammond to
Wilton to their final destination?
   A.  No.
   Q.  On the day of this occurrence I understand
that that load that you were hauling was destined
for three places in Minnesota, correct?
   A.  Right.
   Q.  Was there someone who had a dedicated
route Wilton to Minnesota for the purpose of
delivering paper products?
   A.  Right.  Yes.
   Q.  Who was that?
   A.  I don't know the driver's name.
   Q.  All right.  So as far as you're concerned
your job was to get that paper from Hammond to
Wilton and the folks at -- someone other than you
decided how it was going to get from Wilton to
where it needed to be?
   A.  Yes.
   Q.  You didn't follow the load or figure out
if it got where it needed to go?
   A.  It wasn't my job.

155

22 (Pages 152 to 155)

1    Q.  Okay.  I'm a little confused about
2   something and I'm sure it's because of me, not
3   you.
4          When you started as a dedicated run from
5   Hammond to Wilton two to three years before this
6   accident, had you already decided on previous runs
7   from Hammond to Wilton that you were going to take
8   94 instead of 90?
9    A.  Before I started?
10   Q.  Strike that.  Before this became an every
11  day occurrence that you went from Hammond to Wilton
12  did you have occasion to go from Hammond to Wilton
13  in your job?
14   A.  Yes.
15   Q.  Okay.  So for some period of time you went
16  to Wilton sometimes and then about two to three
17  years before the accident you started going -- I'm
18  sorry, from Hammond to Wilton sometimes, and for
19  two to three years before this accident it was an
20  every day thing, right?
21   A.  Yes.
22   Q.  Okay.  So trying to differentiate between
23  those two, occasionally from Hammond to Wilton
24  versus every day, can you tell me where in that

156

1   spectrum it was that you chose to take 90 instead
2   of 94 to get to Wilton from Hammond?
3    A.  The occasional trips I was doing before I
4   did the night run you would go there during the
5   day.
6    Q.  I see.
7    A.  And you come back during the day and that
8   would determine -- going down through Chicago
9   during the day is, obviously, more congested with
10  traffic and stuff.  So coming -- that's when I
11  would go the other way.
12   Q.  Okay.  When you started your dedicated
13  daily runs from Hammond to Wilton, were you always
14  traveling at night?
15   A.  Yes.
16   Q.  And because of that you determined that 94
17  would be your chosen route over 90?
18   A.  Yes.
19   Q.  All right.  So for that two to three years
20  every day except maybe if you took a vacation or,
21  obviously, weekends, you would take 94 to 41 to 94
22  into Wisconsin and then to Wilton?
23   A.  Yes.
24   Q.  You were very familiar, therefore, with

157

1   the area of Skokie Valley Road where this accident
2   took place before the accident happened?
3    A.  Yes.
4    Q.  Am I correct that approximately two miles
5   before the intersection of Skokie Valley Road and
6   Half Day Road the Edens or 94 Expressway splits
7   such that a driver can either continue on 94 or go
8   on to Skokie Valley Road?
9    A.  Skokie Valley Road meaning 41?
10   Q.  41.  Thank you.
11   A.  Yes.
12   Q.  And just so we're clear.  If I
13  accidentally say Skokie Valley Road, I mean 41.
14   A.  Okay.
15   Q.  All right?
16   A.  All right.
17   Q.  If you say 41, I'll understand you to mean
18  what I -- Skokie Valley Road.  We're talking about
19  the same road.
20   A.  All right.
21   Q.  Okay.  I'll say it again so we're clear.
22         Am I correct that approximately two miles
23  before the intersection where this accident took
24  place the Edens Expressway or Route 94 splits such

158

1   that a driver can continue on or take Route 41
2   traveling north?
3    A.  Correct.
4    Q.  All right.  And do you know what the speed
5   limit is on 94 before that split?
6    A.  On 94?
7    Q.  Yes.
8    A.  55.
9    Q.  55 miles an hour.  And if one were to
10  continue on 94 instead of take Route 41, am I
11  correct that it would continue to be 55 miles an
12  hour through the area of Northern Illinois?
13   A.  As far as I know, yes.
14   Q.  Okay.  At the location where Route 41
15  splits from 94, the Edens Expressway I'll call
16  it -- you understand what that is, right?
17   A.  Okay.
18   Q.  So if I say the Edens, will you
19  understand --
20   A.  Yes.
21   Q.  Okay.  In the location where the Edens
22  Expressway splits from 41, am I correct that for a
23  period of time on Route 41 as one travels north it
24  continues to be a divided highway, Route 41?

159

23 (Pages 156 to 159)

A. Yes.

Q. Okay. And so we, again, understand our terms, divided highway meaning it looks like an expressway but it's Route 41?

A. Right.

Q. Okay. Do you know how -- what distance that stretch of Route 41 goes north of 94 as a divided highway?

A. How -- what distance?

Q. Yes.

A. It's a divided highway all the way through on 41.

Q. Okay.

A. That's the right answer, is it?

Q. I'm not going to tell you what the right answer is.

A. I mean, is that what you meant, is it a divided highway all the way through?

Q. Well, do you understand what I mean by divided highway?

A. Yes.

Q. When I say divided highway, I don't mean area with stoplights and businesses on the side of the road. When I say divided highway, I mean if I

160

didn't know any better I would think I was on an interstate --

A. Okay.

Q. -- with a -- so that people going north are on one side of the road and then there's a division which is usually either a wall or grass or a big median that you can't cross --

A. Right.

Q. -- where you can't just turn left into a gas station, you actually have to get off on a cloverleaf, okay?

A. Okay.

Q. So do we understand what I mean?

A. Yeah.

Q. You may have a different definition and that's fine --

A. Right.

Q. -- but for the purpose of your answering --

A. Right.

Q. -- my question it's important that you understand.

A. Yes.

MR. SKRYD: I think that's what he meant,

161

is he understanding your question by the last answer.

BY MR. COUTURE:

Q. Okay. Good. Thank you. For a period of time after getting off of 94 on to Route 41 does Route 41 north continue as a divided highway?

A. Yes.

Q. Okay. At some point it comes to a stoplight, correct?

A. Right. Yes.

Q. Do you know the name of that road?

A. Not the first stop sign -- stoplight, no.

Q. The second stop sign is Half Day Road where this accident took place?

MR. SKRYD: You said stop sign.

MR. COUTURE: I'm sorry, stop sign.

MR. SKRYD: Stoplight.

MR. COUTURE: Thank you.

BY MR. COUTURE:

Q. Where's the -- you mean stop sign or stoplight?

A. Stoplight.

Q. Thank you. So when you said stop sign, that was an error, you weren't suggesting there is

162

a red octagon there?

A. No. Sorry.

Q. No, it's okay, as long as we understand each other and your testimony is accurate we can just stop all we want.

A. All right.

Q. All right. So the first stoplight is -- you don't remember the name of the road?

A. No, sir.

Q. There's a second stoplight?

A. Yes.

Q. Half Day Road, right?

A. Right.

Q. Where this accident took place?

A. Right.

Q. I'm going to represent to you that the first stoplight is a road called Park Avenue or Park Avenue West.

A. Okay.

Q. So if I use that phrase, you'll understand what I'm talking about.

Do you know the speed limit on Route 41 immediately at the point where vehicles traveling north can exit 94 on to Route 41?

163

24 (Pages 160 to 163)

A. When you first get on to 41?
Q. If you're traveling north on 94, as you did every day, and as you exit off of 94 on to 41 for that stretch of road in Illinois, at the immediate time that you exit what's the speed limit?
A. 55.
Q. Does that speed limit change at any point as you continue north towards Wisconsin --
A. Yes.
Q. -- on Route 41?
A. Yes.
Q. And where does it change?
A. It -- when you're approaching the first stoplight, I think it changes -- it goes down to 40 -- 40 or 45 miles an hour.
Q. We've taken the deposition of a number of police officers in this case and all of them have indicated that the speed limit at that location is 50. Would you disagree with the officers or do you believe that it could be 50 instead of 40 to 45?
A. Yes.
Q. Which of those?
A. I don't know. I mean -- okay, I don't

164

disagree with them.
Q. Okay. So if it is 50 instead of 40 to 45, you're not disagreeing with the officers?
A. No.
Q. And the decrease in the speed limit from 55 to what the officers have said is 50, does that remain the speed limit at the first stoplight at Park Avenue as one is on 41 going north, the first stoplight?
A. No.
Q. Does it go down again?
A. Yes.
Q. Where does that speed limit go down again?
A. It's either by that stoplight or past the stoplight. I don't know exactly where it is.
Q. Okay. Does the speed limit decrease from 50 or from what you believe was 40 to 45 before Half Day Road?
A. Half Day -- yes.
Q. Okay. What is your understanding that the speed limit was on July 3rd, 2008 on Route 41 north for a vehicle traveling through the intersection of Half Day Road?
A. The posted speed limit, I thought it was

165

40 -- 45 miles an hour.
Q. Okay. And if the police officers in this case have said that it's 50, do you have any basis to disagree with them?
A. If it's posted as 50? No.
Q. Do you know where the sign is that you remember seeing speed limit 45 along Route 41 as you travel north?
A. Do I know exactly where it's at? No.
Q. Are you testifying that you remember seeing a speed limit sign that says 45 miles an hour somewhere along that route between where you exited 94 until where the accident occurred?
A. Yes.
Q. But do you remember where that is?
A. No, not exactly.
Q. Can you tell me how far it is from the first stoplight, which I'll represent to you is Park Avenue West, going north on Route 41 to Half Day Road where this accident took place?
A. About a mile -- or half mile, a mile.
Q. So I'm clear. Your testimony is point-five miles to one-point-0 miles?
A. (Indicating.)

166

Q. Is that a --
A. Yes.
Q. Thank you. And am I correct that at least as of July 3rd, 2008, if a vehicle going northbound on Route 41 wanted to turn on to Half Day Road, they would actually have to take an exit off to the right before they got to the intersection?
A. Correct.
Q. How far back is that exit, approximately?
A. 500 feet maybe further back. I don't know exactly.
Q. That's your best estimate?
A. Right.
Q. As I'm sure your lawyer's told you, nobody wants you to guess. I don't want you to guess.
A. Right.
Q. But if you think that's your best estimate, I'm more than happy to hear it.
A. Okay.
MR. BURKE: What was that number?
MR. COUTURE: 500 feet.
MR. SKRYD: Is that a guess or is that an estimate?
THE WITNESS: Estimate.

167

25 (Pages 164 to 167)

BY MR. COUTURE:

Q. Okay. Had you ever driven north on Route 41 before they installed those exits, in other words, such that vehicles turning right or left could actually pull up to the intersection and use a left-hand turn lane or right-hand turn lane?

A. I don't understand what you're saying.

Q. Okay. At some point years ago the intersection at Skokie Valley Road or Route 41 and Half Day Road didn't have the exits that you just described.

A. Okay.

Q. My question is: Did you ever drive on Route 41 when it didn't have those exits?

A. I don't think so.

Q. So your experience throughout your history of driving as a truck driver from Hammond to Wilton on Route 41 was that those exits were always there?

A. Yes.

Q. How many lanes were there in each direction of traffic north and south from -- on Route 41 and specifically between the stoplights at Park Avenue and Half Day Road where the accident took place?

168

actually a concrete barrier?

A. Yes.

Q. For some distance?

A. Right.

Q. As one were to travel northbound on Route 41 towards the intersection with Half Day Road is there a curb on -- or shoulder on the east side of the road?

A. East side of the road?

Q. Right. In other words, if you're traveling north, what's to your right?

A. It would be a curb.

Q. A hard concrete curb?

A. Right.

Q. As you approach the intersection of Half Day Road and Route 41 while traveling north on Route 41, can you tell me what is on the right-hand side of the road at or around that intersection, the east side of the road?

A. On the right-hand side of the road?

Q. Yes.

A. On this side of the intersection or that side of the intersection?

Q. Both.

170

A. There's two lanes going north, two lanes going south.

Q. And am I correct because nobody is turning right or left at that intersection when they're traveling north or south there's no turn lanes?

A. Correct.

Q. Correct?

A. Just a shoulder.

Q. What divides northbound traffic from southbound traffic as one travels north towards the intersection of Half Day Road and Route 41?

A. A median.

Q. A concrete median?

A. I think there is a curb of grass, I think.

Q. A curb with grass, okay.

A. I think once you get past there's a concrete median.

Q. Thank you. So to explain I think what you're saying is if you were to travel north toward the intersection, there would be a median between northbound traffic and southbound traffic as a curb with grass?

A. Right.

Q. And then north of the intersection there's

169

A. When you come up there on this -- when you come into the stoplight, it's like a grassy field.

Q. On the south to your right?

A. To your right.

Q. Thank you.

A. And then on the other side of the intersection there's a gas station and a restaurant, an old restaurant, I think.

Q. An old restaurant that had at least at the time of the accident was abandoned?

A. Right.

Q. And am I correct that -- Strike that.

For how long, if you know, before the intersection is there a grassy area on the southeast side of --

A. I think that's all grass and wooded area on that side of the road.

Q. So how far to the south does that grass and wooded area extend?

A. From one stoplight to the other stoplight.

Q. Okay. So all the way from Park Avenue West's stoplight to Half Day Road if you're going north on the right-hand side it's going to be the grass and woods off from the grass?

171

26 (Pages 168 to 171)

1    A. Yes. I think so, yes.
2      MR. SKRYD: Don't guess, okay. Just tell
3 us what you know.
4 BY MR. COUTURE:
5    Q. Nobody wants you to guess.
6    A. Okay.
7    Q. All right. I just heard what Mr. Skryd
8 said. Are you telling -- is what you're telling me
9 a guess or do you believe it to be true based on
10 driving it every day for years?
11    A. It's true.
12    Q. You believe it to be true?
13    A. Right.
14    Q. We talked about the right or the east side
15 of the road. Let's talk about the west side of the
16 road, okay.
17      As one were -- if one were to be traveling
18 northbound on Route 41 towards the intersection of
19 Half Day Road, what would be on the left-hand side
20 all the way on the other side of southbound
21 traffic?
22    A. At the intersection there's another gas
23 station. On the south side of the intersection and
24 the north side of the intersection I don't know

172

1 what kind of businesses are over there.
2    Q. Okay. Thank you. Can you tell me what's
3 south of the gas station that is on the southwest
4 corner?
5    A. No, not for sure.
6    Q. Thank you. And on the northwest corner
7 there's commercial businesses, you just don't know
8 what business they were?
9    A. Right.
10    Q. I forgot to ask you this. When you were
11 making -- for the two to three years that you were
12 making your dedicated run from Hammond to Wilton,
13 did you always take the same route from Wilton to
14 the Chicago area, in other words, your first leg?
15    A. No.
16    Q. Your route would change based on where you
17 were going?
18    A. Right.
19    Q. So sometimes you would take Route 90 and
20 sometimes you would take 94?
21    A. Most of the time it was 90 because that's
22 where the rail yards and stuff was at.
23    Q. Okay. And because that was during the day
24 when you were -- well, strike that.

173

1    A. It was just that's the side where most of
2 the loads went to, that side of Chicago.
3    Q. Okay. So I understanding -- have an
4 understanding of your knowledge of this
5 intersection. We know that every day pretty much
6 for two or three years you were at night driving
7 northbound on Route 41 through that intersection,
8 true?
9    A. True.
10    Q. Did you have occasion to drive that route
11 going north on 41 during the day through that
12 intersection?
13    A. While I worked for Martin's?
14    Q. Yes.
15    A. Not very often, no.
16    Q. And did you have occasion while you -- at
17 any time before this accident to drive south from
18 Wisconsin on 41 through this intersection?
19    A. No.
20    Q. When you drove -- well, strike that.
21      You never did or it wasn't typical?
22    A. It wasn't typical.
23    Q. Did you ever do that?
24    A. Yes, probably.

174

1    Q. But not that you specifically remember?
2    A. No.
3    Q. At any time before this accident did you
4 have an understanding that the intersection where
5 this accident took place was known as a dangerous
6 intersection?
7    A. No.
8    Q. Did you ever learn from any source before
9 or after this accident that the intersection of
10 Half Day Road and Route 41, especially for
11 northbound travel, was a safety issue because of
12 vehicles getting off of the Edens Expressway?
13    A. After the accident I was sitting at the
14 Denny's and there was some local people that was
15 there have mentioned. That's the only time that I
16 ever heard anything about that being a dangerous
17 intersection.
18    Q. Okay. So at that point after the accident
19 when it arose in conversation at the Denny's that
20 your accident had taken place, somebody whose name
21 you don't know said, oh, yeah, that's a dangerous
22 intersection or accidents always happen there?
23    A. Right.
24    Q. But that was all you knew about it?

175

27 (Pages 172 to 175)

1      A.   Right.
2      Q.   No one ever warned you or told you to take
3 a different route to stay off of that area before
4 this accident, did they?
5      A.   No.
6      Q.   Did you ever take that into account when
7 you were driving as a truck driver, in other words,
8 if you knew an area was prone to accidents, would
9 you avoid the area?
10      A.   Yeah.
11      Q.   Okay.
12      A.   You would try to be more cautious or try
13 to avoid it, yes.
14      Q.   I see our food's here.  So I'm going to
15 wrap up a couple questions and then we can stop.
16         Is there anything about that intersection
17 that you believed as a professional driver was
18 dangerous or would cause the intersection to be
19 prone to accidents?
20      A.   No.
21      Q.   Did you have any direction from Martin's
22 Bulk Milk to stay on an expressway when possible
23 versus getting off on other types of roads?
24      A.   No.

                         176

---

1         MR. COUTURE:  Why don't we stop and have
2 lunch.
3         THE VIDEOGRAPHER:  We are going off the
4 record.  The time is 1:08 p.m.
5         (A break was taken.)
6         THE VIDEOGRAPHER:  We are back on the
7 record.  The time is 1:56 p.m.  Please proceed.
8 BY MR. COUTURE:
9      Q.   When we took a break, right before we took
10 a break, we were having you describe the
11 intersection.  So I just want to ask a couple
12 follow-up questions on that and I'll move on.
13         For a vehicle traveling northbound on
14 Route 41 are there traffic lights at the
15 intersection of Half Day Road and 41?
16      A.   Yes.
17      Q.   Am I correct that because vehicles can't
18 turn right or left there are no turn lights, like
19 green arrows, at that intersection?
20      A.   Right.  Yes.
21      Q.   So it's a red, yellow, green stoplight?
22      A.   Yes.
23      Q.   Do you know where in the intersection
24 those are located for a vehicle -- visible for a

                         177

---

1 vehicle traveling northbound on 41?
2      A.   On the side of the road.
3      Q.   Okay.  So you remember there being posts
4 with the red, yellow, green lights as opposed to
5 overhanging lights?
6      A.   Right.
7      Q.   Okay.  And were the posts just on the --
8 Strike that.
9         For a vehicle traveling northbound on
10 Route 41 would there have been a post with a red,
11 yellow, green light on the southeast corner?
12      A.   Yes.
13      Q.   Would there have been a similar post on
14 the northeast corner?
15      A.   I don't know.
16      Q.   Were there lights in the center, in other
17 words, where the median was facing northbound
18 traffic?
19      A.   I don't remember.
20      Q.   I'm going to talk about the vehicle that
21 you were driving on the day of the occurrence.  I
22 understand that that tractor was designated Tractor
23 139?
24      A.   Yes.

                         178

---

1      Q.   What was the manufacture -- who
2 manufactured that tractor?
3      A.   Freightliner.
4      Q.   Am I correct that that vehicle was owned
5 by Martin's Bulk Milk Service?
6      A.   Yes.
7      Q.   Do you remember the model year?
8      A.   An '04.
9      Q.   2004?
10      A.   Yes.
11      Q.   And is there a particular model or type of
12 Freightliner that could be used to designate what
13 that vehicle was?
14      A.   A classic.
15      Q.   For how long prior to July 3rd, 2008 were
16 you driving Tractor 139?
17      A.   How long was I driving?
18      Q.   Let me ask you a different -- I understand
19 your confusion the moment I said it.
20         Was that the tractor that you had been
21 driving on a regular basis for a period of time
22 prior to July 3rd, 2008?
23      A.   Yes.
24      Q.   That was the tractor to which you were

                         179

---

28 (Pages 176 to 179)

1 assigned?
2    A. Yes.
3    Q. When were you first assigned to Tractor
4 139?
5    A. When it was new, 2004.
6    Q. So when it was purchased, it was purchased
7 and assigned to you?
8    A. Yes.
9    Q. Upon its being purchased and assigned to
10 you was that the tractor you always drove with the
11 possible exceptions of when it was in for
12 maintenance?
13    A. Yes.
14    Q. Did that tractor have anti-lock brakes?
15    A. I don't know.
16    Q. Did that tractor have cruise control?
17    A. Yes.
18    Q. Did that tractor have a sleeper berth?
19    A. Yes.
20    Q. Did that tractor have a high/low switch on
21 its gears?
22    A. Yes.
23    Q. How many gears did that tractor have?
24    A. 13.

                    180

1 were you aware before this accident that the
2 Tractor 139 had a black box?
3    A. Yes.
4    Q. Were you given any instructions by your
5 employer relative to that black box?
6    A. No.
7    Q. Did you have to do anything to maintain or
8 affect how that black box worked in your job?
9    A. No.
10    Q. For Tractor 139 -- I know you're not going
11 to know the exact number, but I'm just trying to
12 get a general understanding of how the gearing
13 works for that truck, okay.
14      So for first gear, approximately what's
15 the top speed of first gear on that truck before
16 you had to shift?
17    A. Four or five miles an hour.
18    Q. Okay. Second gear, what would be the top
19 speed be, approximately?
20    A. 10.
21    Q. Third gear?
22    A. About probably 15. I don't know for sure.
23    Q. Nobody wants you to guess for sure but you
24 drove that every day --

                    182

1    Q. To your knowledge was that tractor fitted
2 with an event data recorder or what some people
3 call a black box?
4    A. To my knowledge I have no idea.
5    Q. All right. You were never told before or
6 since this accident that the vehicle -- not
7 counting discussions you had with your lawyer, by
8 the way -- the vehicle had a black box or an
9 event data recorder?
10    A. They all do. I don't understand. I'm
11 not -- I don't know -- I don't know what you're --
12 I mean, no, I don't know for sure.
13    MR. SKRYD: Start over again.
14    MR. COUTURE: I will ask it again.
15    MR. SKRYD: I'm not quite sure what he
16 said.
17 BY MR. COUTURE:
18    Q. Okay, let me start and ask a question.
19 There is a device that is sometimes called an event
20 data recorder and in common parlance is called a
21 black box that on some vehicles can record the
22 activities of the engine and on some occasions
23 braking and acceleration of the vehicle.
24      That being the definition of a black box,

                    181

1    A. Right
2    Q. -- for a period of four years.
3    A. Right.
4    Q. So you would be qualified to give me your
5 best estimate and that's all I'm asking for, okay?
6    A. Yes.
7    Q. All right. Fourth gear, what would be
8 your best estimate of the top gear-- or the top
9 speed you would get to in fourth gear before you
10 had to shift?
11    A. About 20 miles an hour probably.
12    Q. And how about fifth gear?
13    A. Fifth gear probably 35 to 40.
14    Q. Sixth gear?
15    A. About the same.
16    Q. How about seventh?
17    A. Probably around 50 miles an hour.
18    Q. Okay. Eighth?
19    A. 55. The truck was governed at 65. So you
20 couldn't go any faster than that at the top speed.
21    Q. So gears 9 through 13, what would they be
22 used for?
23    A. 13 is your road -- your interstate gear on
24 the road.

                    183

                   29 (Pages 180 to 183)