# EX. 3

Samuel Franke Deposition
dated, February 21, 2012

Q. Okay. What about 12?

A. It was -- 12th gear is -- you can run 12th gear like if you're on slower roads, you know.

Q. Okay. What speeds, typically?

A. Probably 55 to 60.

Q. All right. And how about 10th?

A. 10th gear? 50 probably.

Q. And 9th?

A. They're so close it's probably the same.

Q. In fact, it sounds like six, seven, eight, nine are all about the same?

A. Yeah.

Q. I'm not a trucker. So why would someone use 7th gear versus 8th gear versus 9th gear?

A. You got to -- if you got a heavy load on, you got to go in steps. You can't just go from lower range 5th gear and jump to a 13. It won't move.

Q. That I understand. You have to work your way up the cycle to get to 13 --

A. Right.

Q. -- which is your road gear?

A. Right.

Q. Who was in charge of the maintenance of

184

Tractor 139?

A. Martin's Bulk Milk.

Q. If you -- Strike that.

Did they have a scheduled maintenance program for that truck, tractor?

A. Yes.

Q. Do you know what that maintenance program was?

A. After so many miles they would -- it would go in for an oil change and --

Q. Okay. Anything else that you're aware of?

A. They would fix whatever was wrong.

Q. Sure. Was there a regularly scheduled time every week, month or quarter that you knew that you were not going to have use of that tractor and would have to use another tractor?

A. No.

Q. They would just let you know today you're going to be in a different tractor because we've got to have 139?

A. Yes.

Q. On any occasion prior to September -- excuse me, July 3rd, 2008, did you have occasion to observe mechanical problems with that tractor?

185

A. No.

Q. So at all times that you used it it was operating properly according to what you understood as a truck driver?

A. Yes.

(Whereupon, Franke Deposition Exhibit No. 79 was marked for identification.)

BY MR. COUTURE:

Q. I'm going to show you what I've marked as Exhibit 79 for identification.

Am I correct that that shows the Tractor 139 and actually shows it in the condition after the accident?

A. Yes.

Q. So when we talk about your tractor today, we're going to be talking about what's shown in Exhibit 79, true?

A. Yes.

Q. And do you know whether the trailer attached to that tractor in Exhibit 79 is also the trailer that you were pulling or the chassis and box that you were pulling on the day of the occurrence?

186

A. It's not the same trailer, no.

Q. It's a different trailer?

A. Yes.

Q. Okay. Thank you. When you left every day to go to the Chicago area in the two to three years before this accident, would you -- well, strike that.

Where was Tractor 139 stored when you weren't driving it?

A. At Martin's.

Q. And that's the Wilton, Wisconsin address?

A. Yes.

Q. So you would drive from your home to Martin's at the start of your workday, correct?

A. Yes.

Q. And then you would use Tractor 139 until the end of your workday and drive home?

A. Right.

Q. I'm going to show you what was previously marked as Exhibit 12 for identification.

Am I correct that Exhibit 12 is your logs from June 12th, 2008 -- excuse me, let me get these dates right. They're not in order. I'll show you the entirety of the document. There you go.

187

30 (Pages 184 to 187)

1   Exhibit 12 are your logs from June 3rd,
2   2008 through the last day of your employment with
3   Martin's, correct?
4       A.  Yes.
5       Q.  Okay.  Specifically found in that
6   exhibit -- I want to direct your attention to the
7   days before the occurrence, 6-29-08.  Do you need
8   the logs to know what you did the days before or do
9   you generally remember?
10      A.  I can look at the logs.
11      MR. SKRYD:  Yes, let's have him look at
12  it --
13      MR. COUTURE:  That's fine.
14      MR. SKRYD:  -- so it's more accurate.  Do
15  you need them?  We can use our --
16      MR. COUTURE:  No.  No.  No.  I'll be
17  fine.  I know what they say, where I'm going.
18  BY MR. COUTURE:
19      Q.  Why don't we start at the 29th of June.
20  Did you work on June 29th?
21      A.  No.
22      Q.  It was a day off, right?
23      A.  Yes.
24      Q.  And the next day as well, if you could

                                                    188

1   look.  June 30th, did you work that day?
2       A.  No.
3       Q.  Were you on vacation or was that your
4   standard two days off during a seven-day week?
5       A.  Standard two days off.
6       Q.  Do you remember what you did that weekend
7   or during the 29th and 30th?
8       A.  No.
9       Q.  Nothing specific?  You don't remember
10  whether you traveled or went out of town or just
11  stayed home, you just don't remember?
12      A.  Just don't remember.
13      Q.  Okay.  The following day, July 1st, 2008,
14  am I correct that you drove from -- according to
15  your log -- Mauston to Wilton to Chicago to Hammond
16  to Wilton?
17      A.  It don't say Wilton on here.
18      Q.  I'm sorry?
19      A.  It don't say Wilton on here.
20      Q.  That's true because you ended up getting
21  back to Wilton the following morning on the 2nd?
22      A.  Yes.
23      Q.  Okay.  So a couple of questions.  First of
24  all, I noticed that on most of your logs they all

                                                    189

1   start at Wilton.  This one starts at Mauston.  Did
2   you have the tractor at your home?
3       A.  I parked it at the truck stop.  I grabbed
4   my load for the next day and I drove to Mauston.  I
5   live in Mauston and I spent the night in Mauston.
6       Q.  Is that at your home?
7       A.  Right.
8       Q.  So you actually had the tractor and
9   trailer at your home in Mauston?
10      A.  In a truck stop.
11      Q.  Okay.  Why did you do that?
12      A.  So that I wouldn't have to drive my
13  personal vehicle over to Wilton.
14      Q.  Okay.
15      A.  I just drive to the truck stop in Mauston
16  and either my wife would pick me up and take me
17  home.
18      Q.  Is there any particular reason why you did
19  it that way that day?
20      A.  It's just the load was ready that night
21  and --  .
22      Q.  Okay.
23      A.  -- instead of -- it just saves time.
24      Q.  How much time does it take you to get from

                                                    190

1   Mauston to Wilton?
2       A.  It's roughly 30-some miles, 31 miles.  So
3   probably 45 minutes, something like that.  I don't
4   know, half an hour.
5       Q.  Do you remember what load you carried from
6   Mauston to Chicago on the 1st of July 2008?
7       A.  It says on here it's a City Brewery load.
8   I don't know exactly what it was.  That's the
9   people who on the bill said that's what it was.
10      Q.  Okay.  Do you know where you dropped that
11  off in Chicago?
12      A.  It just says Chicago, Illinois.
13      Q.  There's a lot of different potential
14  places that could be, right?
15      A.  Yes.
16      Q.  But as you sit here you don't remember, it
17  was four years ago?
18      A.  Right.
19      Q.  And on that day you left Mauston at 11:45
20  a.m.?
21      A.  Yes.
22      Q.  Okay.  Now, I noticed that the next day
23  you left at 1:45 and on the day of the accident you
24  left at 2:30.  What would dictate when you left?

                                                    191

31 (Pages 188 to 191)

A. When my hours was time to go. Like, you have to take ten hours off. So whenever your ten hours come, that would dictate when you can leave and when you can't leave.

Q. Okay. So it's not the same time every day in part because the loads need to potentially be there at different times and because you need to be not driving for a certain amount of time in order to meet Federal regulations?

A. Right.

Q. Okay. You arrived home in Wilton or back to Wilton on actually the following day, on July 2nd at 1:00 a.m., true?

MR. SKRYD: Flip it.

THE WITNESS: True.

BY MR. COUTURE:

Q. And when you made that trip from Hammond to Wilton, did you drive through the intersection where the accident eventually occurred?

A. Yes.

Q. Did anything of note happen while you made that drive?

A. No.

Q. Do you remember if you had to stop at the

192

stoplight at the intersection of 41 and Half Day Road on the 1st of July 2008, two days before the accident?

A. July -- depends if the light was red or green.

Q. I got you. But do you remember if you had to do it?

A. No.

Q. That's fine. Now, the next day, what time did you leave Wilton or Mauston?

A. On the 3rd?

Q. 2nd.

A. You said the next day.

Q. I'm sorry. You got home on the 2nd, you went to bed and then --

A. 1:45.

Q. -- you went to work?

MR. SKRYD: Let him finish his question.

BY MR. COUTURE:

Q. I paused; it's my fault.

You got home, you went to sleep, you started back to work 1:45?

A. Yes.

Q. And you were again going to Chicago?

193

A. Yes.

Q. What were you hauling to Chicago on the 2nd?

A. It says City Brewery Corp.

Q. City Brewery?

A. Yes.

Q. So a similar load as the day prior?

A. Yes.

Q. Do you remember where you dropped that load in Chicago?

A. It just says Chicago.

Q. When you took that load to Chicago, do you remember what route you took to Chicago on the 2nd?

A. Probably took 90.

Q. That's your expectation because that would be typical for you?

A. Yes.

Q. But as far as exactly what happened on that day you can't say, fair?

A. Fair.

Q. All right. Then after dropping off your load in Chicago you went to Hammond again, true?

A. On this sheet here it says I went to Bedford Park.

194

Q. Bedford Park. And that is a rail yard?

A. Yes.

Q. Do you know why you went to a rail yard at Bedford Park on the 2nd of July?

A. A lot of times when you drop trailers at one rail yard, they don't have any empties there so they send you to another rail yard.

Q. Do you know that that was the case on the 2nd or is that your expectation of what happened?

A. It's according to the log here. That's what it says.

Q. It says that you had to go to the other rail yard to get another trailer?

A. Yes.

Q. Okay. And then you went from there to Hammond?

A. Yes.

Q. What time did you leave Hammond on the 2nd of July, 2008?

A. It says 8:15.

Q. And what route -- Strike that.

You were carrying paper products, correct?

A. Yes.

Q. And what route did you take to get from

195

32 (Pages 192 to 195)

Hammond to your final destination which, if I understand it, you completed the next morning?

A. Same route.

Q. Same route meaning 94, exit 41, get back on 94 and then complete your trip to Wilton?

A. Yes.

Q. Do you specifically remember driving through the intersection of 41 and Half Day Road the day before the occurrence?

A. No.

Q. I know you drove that every day so the likelihood is probably not but I got to ask.

You don't remember the day before what happened as you went through that intersection, do you?

A. No.

Q. Let's talk about the day of the occurrence. Well, actually, let me ask you this. When you got home from your trip that started on the 2nd of July 2008, what did you do when you got home?

A. It says here I got back at 1:00 a.m. in the morning.

Q. Right.

196

A. So you would go home, relax a little bit, go to bed about 3:30 in the morning probably. Go to bed.

Q. Okay. Was that your typical course that when you -- if you arrived home at 1:00 a.m. or around thereabouts, you'd go home, relax for a little bit and then go to bed?

A. Yes.

Q. Do you know what time you got up after sleeping from -- well, strike that.

When you relaxed a little bit in the early morning hours of July 3rd, 2008, what time did you go to bed, if you know?

A. I don't know exactly.

Q. Can you give me your best estimate?

A. 3:30.

Q. And what time did you wake up that following -- or later that morning?

A. Noon.

Q. When you went to bed that morning at 3:30 approximately, did you already know what you were going to be driving for the following -- for the next trip, in other words, later on the 3rd when you woke up? Strike that. That was a confusing

197

question because it's morning and morning.

When you went to bed on the early morning hours of July 3rd, 2008, did you already know what trips that you were going to be making when you woke up and went back to work?

A. Yes.

Q. So the papers that you get from Martin's Bulk as far as what you were going to be driving, you already had those such that you knew where you were going to be going?

A. On -- yes.

Q. I'm sorry?

A. Yes.

Q. Okay. What did you do when you woke up at approximately noon on July 3rd, 2008?

A. Got ready for my trip.

Q. Did you eat anything?

A. Yes, eat.

Q. What did you eat?

A. I don't know. I don't know.

Q. What did you drink?

A. Probably Diet Mountain Dew.

Q. A caffeinated beverage, correct?

A. Right.

198

Q. All right. Did you take any medication that morning?

A. Just my pills for my diabetic -- diabetes.

Q. Is that the only pills that you were on medically on the day of the occurrence?

A. Yes.

Q. What was the name of that medication?

A. Metformin.

Q. And how often did you take it?

A. Once in the morning, once at night.

Q. Had you ever prior to this occurrence missed a dose?

A. An occasion.

Q. Did it have any affect on your body when you missed a dose as far as how you were able to go about your life?

A. No.

Q. Did it cause you any dizziness or any nausea or anything like that?

A. No.

Q. Did you suffer from any side effects when you took Metformin?

A. No.

Q. Did you have any other medical conditions

199

33 (Pages 196 to 199)

1  on July 3rd, 2008 other than borderline diabetes?
2      A.  No.
3      Q.  After you got up, ate breakfast, took your
4  diabetes medication where did you go?
5      A.  Back to Wilton.
6      Q.  You drove your personal car to Wilton?
7      A.  Yes.
8      Q.  And according to your log you started
9  driving your truck at 2:30 p.m., correct?
10     A.  Yes.
11     Q.  What time did you arrive at Wilton?
12     A.  I don't know for sure.
13     Q.  Did you speak to anyone regarding the load
14 that you were going to be pulling either to Chicago
15 or from Hammond that day before you left?
16     A.  No.
17     Q.  Do you remember who the dispatcher was on
18 July 3rd, 2008 when you left Wilton with your load?
19     A.  There's quite a few dispatchers in there.
20     MR. SKRYD:  He asked you if you knew which
21 one it was.
22 BY MR. COUTURE:
23     Q.  How many dispatchers would have been
24 working on that day?

200

1      A.  Four.
2      Q.  Is there one that was designated to
3  dispatch you --
4      A.  No.
5      Q.  -- and your routes?
6      A.  No.
7      Q.  Do you know who those four dispatchers
8  were that were present?
9      A.  It's been four years.  No, I don't know
10 all their names.  I know there's two women and two
11 guys.
12     Q.  Do you know any of their names?
13     A.  One was Dave.
14     Q.  Dave Martin?
15     A.  Yes.  And then I'm drawing a blank.
16     Q.  Okay.  When you're driving a dedicated
17 route, for example, from Hammond to Wilton every
18 day, what role do dispatchers play in that haul?
19     A.  The role they play, they would give me my
20 pickup number for the load that I'm going to pickup
21 later on that day and they would give me my
22 reservation number when I needed an empty chassis
23 or whatever and they would tell me if the time
24 changed from my -- you know, pickup time that I had

201

1  to be down there to pickup the load.  That's about
2  it.
3      Q.  Okay.  According to your log you were
4  going to City Brewing Company in Chicago?
5      A.  No.
6      Q.  I'm sorry.  I'm looking at your log from
7  7-3-08.  When you were headed out from Wilton,
8  where were you going to?
9      A.  Chicago.
10     Q.  What were you hauling to Chicago from
11 Wilton?
12     A.  A City Brewery load.
13     Q.  Okay.  That's what I was trying to
14 understand.  Do you know where in Chicago you
15 dropped off that City Brewery load?
16     A.  No.
17     Q.  According to your log from July 3rd, 2008,
18 am I correct that it took you from 2:30 p.m. until
19 6:30 p.m. to drive to Chicago?
20     A.  Yes.
21     Q.  And then from 6:30 to 7:00 you were in
22 Chicago on duty but not driving?
23     A.  Right.  Yes.
24     Q.  Am I to understand that at that time you

202

1  were dropping off your load?
2      A.  Yes.
3      Q.  As you sit here today do you remember
4  where it was that you dropped off your load in
5  Chicago?
6      A.  47th Street.
7      Q.  And that's a rail yard?
8      A.  Yes.
9      Q.  And during that period of time you would
10 have left your trailer and had to have gotten a new
11 one, true?
12     A.  Yes.
13     Q.  You know that in part -- well, strike
14 that.
15         It says Chicago, Illinois drop hook.  Drop
16 hook, what does that mean?
17     A.  It means that you drop one trailer and you
18 hookup the other trailer.
19     Q.  That's what I thought but I wanted to make
20 sure that I wasn't wrong.  And it says P-T-I.  What
21 does that designate?
22     A.  Pre-trip inspection.
23     Q.  Okay.  Indicating that you pickup a
24 trailer and you did your required inspection?

203

34 (Pages 200 to 203)

1   A.   Right.
2   Q.   When you -- well, strike that.
3        How is it that you remember or know that
4   you were at 47th Street on July 3rd, 2008?  Is it
5   indicated in your log?
6   A.   No.
7   Q.   Do you remember from personal memory?
8   A.   Personal memory, yes.
9   Q.   When you arrived there and dropped off,
10  you had to pickup a trailer?  You said that, right?
11  A.   Yes.
12  Q.   Do you remember how -- Strike that.
13       Were you assigned a trailer or did you
14  choose one on your own?
15  A.   You're assigned a reference number and
16  then you go and they tell you where the empties are
17  at and they either have a green tag, meaning that
18  they're good to go, if they don't have any tags on,
19  you just don't pick those trailers.
20  Q.   So on the 3rd of July 2008 when you were
21  at the 47th Street yard, you weren't specifically
22  told by anyone which trailer or chassis and box to
23  pick, you were given a choice of the ones that had
24  a green tag?

204

1   A.   Yes.
2   Q.   And you chose whichever one you felt fit
3   your purpose?
4   A.   Right.
5   Q.   Were they all essentially the same size?
6   A.   Yes.
7   Q.   So, really, as long as it looked to be in
8   good shape to you, it didn't much matter?
9   A.   Correct.
10  Q.   On that day did you have to -- when you
11  did your pre-trip inspection did you find anything
12  wrong with the chassis and trailer that you first
13  chose -- chassis and box that you first chose?
14  A.   Apparently not.
15  Q.   Do you have a specific recollection?
16  A.   No.
17  Q.   Okay.  Sometimes you pick one and you do a
18  pre-trip and you realize that it's not good so you
19  pick another one?
20  A.   Correct.
21  Q.   You don't know if that happened on that
22  day?
23  A.   No.
24  Q.   But that process took a half hour

205

1   according to your log?
2   A.   Yes.
3   Q.   And then you drove for a half hour to
4   Hammond according to your log?
5   A.   Yes.
6   Q.   What route did you take to get to Hammond
7   from 47th?
8   A.   Probably down 94 and -- 94 to Hammond -- I
9   don't remember if it's 290 or it's 294.  I don't
10  know which route I took.
11  Q.   Okay.  So at 7:30 p.m. you arrived in
12  Hammond?
13  A.   Yes.
14  Q.   And then they loaded the box and container
15  that you brought with you from 47th Street?
16  A.   Yes.
17  Q.   And according to this -- well, strike
18  that.
19       How long did it take for them to load you?
20  A.   From 7:30 to 9:30 or 9:45.
21  Q.   According to your log, you're off duty
22  from 7:30 to 9:30 and then there's 15 minutes that
23  you're on duty and not driving, correct?
24  A.   Right.

206

1   Q.   What were you doing for the two hours that
2   you were off duty in Hammond?
3   A.   Either catch up on your paperwork, either
4   relax in the truck until they're ready to load you
5   and then when they're ready to load you, you go in
6   and stand on the dock and watch them load your
7   truck.
8   Q.   Okay.  If you can, explain something for
9   me.  When you're designated as off duty, does that
10  mean you're not working at all or does that mean
11  that you're not driving but you can still be
12  working?
13  A.   I'm not driving.
14  Q.   But on duty and not driving is a
15  completely separate designation on your log.  So
16  how do you differentiate between on duty and not
17  driving versus off duty?
18  A.   Well, on duty/not driving is stuff you
19  do -- you're working.  I mean, like dropping
20  trailers or -- and then when you're off duty,
21  you're not driving -- or working.
22  Q.   Okay, so hypothetical.  You're in Hammond,
23  your vehicle is stopped, you're pulled up to a
24  loading bay and they're loading you.  Would you

207

**Page 208**

1 write in your logs that you are off duty or would
2 you write in your logs that you're off duty/not
3 driving?
4 A. Until they start -- off duty until they
5 start loading me and then when you go in and stand
6 on the dock or whatever, you're on duty.
7 Q. Okay. So according to your log am I -- is
8 it correct for me to understand that there was a
9 two-hour window where they were not loading you and
10 your -- you and your truck were at Hammond?
11 A. Yes.
12 Q. And then there was a 15-minute time period
13 from 9:30 to 9:45 when they were actually loading
14 you?
15 A. Yes.
16 Q. Do you remember on the day of this
17 occurrence what you did for the hour -- excuse me,
18 two hours from 7:30 to 9:30 that you were in
19 Hammond but they weren't loading you?
20 MR. SKRYD: Objection to form. Go ahead.
21 THE WITNESS: I was sitting in my truck,
22 you know, doing my paperwork or catching my -- I do
23 my paperwork as I do it every time I stop the
24 truck, I keep current on my paperwork, and just

**Page 209**

1 basically relaxing.
2 BY MR. COUTURE:
3 Q. Is your answer based on what you typically
4 did over the period of years that you went --
5 A. Right.
6 Q. -- to Hammond or are you saying on that
7 day I remember doing what you just described?
8 A. That's what I typically do. I'm not for
9 sure exactly what I did that day.
10 Q. So do you remember if you made any phone
11 calls or texted anybody during that time period
12 while you were off duty waiting for them to load
13 you?
14 A. I don't know. It could be possible.
15 Q. And do you specifically remember watching
16 them load your truck from 9:30 to 9:45 on the day
17 of the occurrence?
18 A. Yes.
19 Q. And as they did so did you have any
20 criticisms of the way the truck was loaded?
21 A. No.
22 Q. I forgot to ask you something. When you
23 left Hammond -- excuse me. When you left 47th
24 Street with the new -- to you anyway -- box and

**Page 210**

1 chassis that day, you did a pre-trip inspection,
2 correct?
3 A. Yes.
4 Q. Did you re-inspect your tractor or did you
5 just inspect the box and chassis?
6 A. You do a complete walk around the whole
7 thing.
8 Q. Did you find any lights out?
9 A. No.
10 Q. Did you find any braking problems?
11 A. No.
12 Q. And, in fact, had you, you would have
13 written them down on your log sheet, right?
14 A. Correct.
15 Q. There's a spot specifically for that?
16 A. Correct.
17 Q. Other than the general designation "paper
18 products," can you tell me what that load was that
19 you were taking from Hammond to Wilton on July 3rd,
20 2008?
21 A. It was just general paper. I didn't know
22 exactly what it was per se.
23 Q. Did you have an understanding at that time
24 when that load had to be back to Wilton in order to

**Page 211**

1 be on time at its final destination?
2 A. Yes.
3 Q. What was your understanding regarding
4 timing of that load?
5 A. It had to be back there before Monday
6 morning.
7 Q. And this was a Thursday, correct?
8 A. Yes.
9 Q. You're looking with confused eyes. Do you
10 know that the 3rd of July, 2008, was a Thursday?
11 A. Yes.
12 Q. Okay. So you actually had, if you wanted
13 it or needed it, the rest of Thursday, all of
14 Friday, all of Saturday, all of Sunday to get that
15 load from Hammond to Wilton?
16 A. Yes.
17 Q. When you typically did Thursday runs from
18 Hammond to Wilton, when would the load from Hammond
19 be expected or required to be at Wilton?
20 A. Before Friday morning.
21 Q. So it was expected that you would drive
22 overnight and get that load there the next day?
23 A. Yes.
24 Q. Why was it that the load from July 3rd had

36 (Pages 208 to 211)

until Monday the 7th?
   A.   Because the 4th is a holiday.
   Q.   Okay.  So Friday was a holiday and then
you had the weekend?
   A.   Yes.
   Q.   Had you previously driven into a holiday
weekend, in other words, the last day before a
holiday weekend as a truck driver?
   A.   What do you mean?
   Q.   Okay.  In your experience driving from
Hammond to Wilton regularly in the three -- two or
three previous years, I expect that on occasion you
would be driving when you realized you had an
extended amount of time to bring the load because
of a holiday weekend?  Has that happened before?
   A.   Yes.
   Q.   On those occasions did you ever use all of
the allotted time to bring your load to Wilton, in
other words, take three days to bring it?
   A.   No, not normally.
   Q.   Was it your typical course of action to
drive straight to your -- to Wilton?
   A.   Yes.
   Q.   On July 3rd, 2008 when you left Hammond --

                                                  212

   A.   Yes.
   Q.   -- was it your plan to continue to drive
to Wilton all the way?
   A.   When I left, yes.
   Q.   Okay.  Thank you.  And when you left
Wilton -- excuse me.
        When you left Hammond on July 3rd, 2008,
what time was that?
   A.   9:45.
   Q.   And you're referring to your log, which is
fine, but that's the basis of your 9:45 answer,
correct?
   A.   Yes.
   Q.   Do you specifically remember as you sit
here looking at your watch and seeing 9:45?
   A.   Do I remember exactly?
   Q.   Yes.
   A.   No.
   Q.   There's nothing wrong with you
referring -- refreshing your recollection with a
document.  I just want to know whether you're doing
that.  You're using the log to get that number,
right?
   A.   Yes.

                                                  213

   Q.   Okay.  While you were -- Strike that.
        Did you receive any dispatch instructions
specifically regarding that load from anybody
either by telephone or by CB radio or other method
before you left Hammond that night?
   A.   Before I left Hammond?
   Q.   Yes.
   A.   As to where it went?
   Q.   You told me that a dispatcher from
Martin's Bulk Milk could call you and direct you
and tell you time changes or load changes, stuff
like that, right?
   A.   Yes.  Correct.
   Q.   Did any of that happen --
   A.   No.
   Q.   -- at any time on July 3rd, 2008?
   A.   No.
   Q.   When was the last time prior to your
leaving Hammond on July 3rd, 2008 that you had
spoken directly with someone from Martin's Bulk
Milk?
   A.   They -- most of the time they give you
that information before you leave.  So I probably
wouldn't have talked to them when I was down

                                                  214

there.  Because at 6:30 at night there's normally
nobody in the office.
   Q.   So your expectation is that from the time
you left Wilton until the time you got to Hammond
you probably didn't even speak to anyone from
Martin's?
   A.   Right.
   Q.   What time does the office close in Wilton
for Martin's?
   A.   5:30, 6:00 o'clock.
   Q.   Is there an emergency contact if you're
driving and it's 2:00 a.m. and you need to get a
hold of somebody?
   A.   Yes.
   Q.   And who would that be?
   A.   It would be either Dave or Janet.
   Q.   So as part of your instructions from
Martin's Bulk Milk you were told that if there was
an emergency, Dave or Janet were the people to
contact?
   A.   Yes.
   Q.   And you had their personal cell phones?
   A.   Yes.
   Q.   When you left Hammond at 9:45 on July 3rd,

                                                  215

1 your plan was to take I94 around Lake Michigan up
2 north and get off at 41, correct?
3   A.  Yes.
4   Q.  Do you know the weight of the load that
5 you were pulling at the time of this accident?
6   A.  Do I remember?
7   Q.  Yes.
8   A.  No.
9   Q.  If I were to tell you that the Illinois
10 State Police weighed your truck after the accident
11 and the gross weight of your truck was indicated to
12 be 73,750 pounds, would that sound right to you?
13   A.  Yes.
14   Q.  And I found out yesterday that that truck
15 and trailer would be rated to 80,000 pounds.  Is
16 that your understanding?
17   A.  Yes.
18   Q.  So 73,750 sounds right?
19   A.  Yes.
20   Q.  No reason to disagree if the State Police
21 say that that's what it was?
22   A.  No.
23   Q.  Did you have any plans for the 4th of
24 July, the day after this accident?

216

1   A.  Yes.
2   Q.  What were those plans?
3   A.  Going on a poker run.
4   Q.  And what's that?
5   A.  You ride your motorcycle from and you go
6 around and pickup cards from each designated area
7 and then you go back and whoever has the best hand
8 wins.
9   Q.  Okay.  So it's like an adult version of a
10 scavenger hunt?
11   A.  Basically, you go to the place they setup
12 and you ride your bike from one destination to the
13 next and every place you go you draw a card and
14 then when you get back -- they put money in the pot
15 and whoever has the winning hand wins the pot.
16   Q.  Okay.  So this was a 4th of July -- a way
17 to celebrate the 4th of July?
18   A.  For me, yes.
19   Q.  Okay.  And you owned a motorcycle at that
20 time?
21   A.  Yes.
22   Q.  What kind of motorcycle did you have?
23   A.  Harley Davidson.
24   Q.  What model?

217

1   A.  Electric glide standard.
2   Q.  What year?
3   A.  '04.
4   MR. COUTURE:  I'm going to take a quick
5 break because I'm about to get into the meat of the
6 stuff.
7   THE VIDEOGRAPHER:  This is the end of
8 Media Number two.  We're going off the record.  The
9 time is 2:47 p.m.
10   (A break was taken.)
11   THE VIDEOGRAPHER:  This is the beginning
12 of media number three.  We are back on the record.
13 The time is 3:04 p.m.
14 BY MR. COUTURE:
15   Q.  When we left off it was the 3rd of July
16 and you were leaving Hammond, Indiana, okay?
17   A.  Okay.
18   Q.  All right.  What was the traffic like on
19 94 that night?
20   A.  Going through Chicago?
21   Q.  Yes.
22   A.  Very heavy.
23   Q.  When you say heavy, stop-and-go or --
24   A.  Yes.

218

1   Q.  -- 20 miles an hour consistently?
2   A.  Stop-and-go.
3   Q.  When you left Hammond or any time before
4 that, did you consider altering your route in light
5 of the 3rd of July traffic and the baseball games
6 occurring in Chicago on that day?
7   A.  I wasn't aware of the baseball games or I
8 totally forgot about it.
9   Q.  Okay.  Did you understand that there were
10 going to be fireworks in the City of Chicago that
11 evening?
12   A.  No.
13   Q.  That actually did happen, right?
14   A.  Yes.
15   Q.  So you had a slow trip through Chicago and
16 up north to the area where 94 splits off to Route
17 41?
18   A.  Yes.
19   Q.  Did you at any time during that slow
20 moving traffic make a call to anyone to address
21 scheduling issues?
22   A.  No.
23   Q.  Because your cargo wasn't due anywhere
24 until the 7th, you didn't need to call anybody to

219

38 (Pages 216 to 219)

**Page 220**

1  say you were going to be late; fair to say?
2  A. Right.
3  Q. As you were driving on 94 but before
4  exiting on to 41 did you use your cruise control?
5  A. No.
6  Q. At any point between when you exited on to
7  41 -- well, strike that.
8  How fast were you going when you exited 94
9  on to Route 41?
10  A. How fast was I going --
11  Q. Yes.
12  A. -- when I exited 94 to 41? Probably below
13  the speed limit.
14  Q. Why were you traveling below the speed
15  limit when you got off of 94?
16  A. It was probably because of traffic.
17  Q. Do you remember what gear you were in when
18  you exited 94 on to 41?
19  A. I was on the interstate so probably 12th.
20  Q. Okay. Now, when 94 -- Strike that.
21  When you exit off of 94 on to 41, am I
22  correct that in order to do that you just stay in
23  the right-hand lane and keep going forward, right?
24  A. No.

**Page 221**

1  Q. Is there a cloverleaf?
2  A. 94 goes off to your right. 41 goes to
3  your left.
4  Q. Okay. I'm sorry. I had it wrong. So as
5  you're driving on 94 north and are going to get on
6  41 you stay in the left-hand side of the road and
7  continue straightforward?
8  A. Yes.
9  Q. Thank you. So you don't have to go
10  through a -- on a ramp in order to make that exit?
11  A. No.
12  Q. And there's no stoplight right at that
13  exit, correct?
14  A. Correct.
15  Q. As you -- Strike that.
16  After you exited off of 94 on to 41, did
17  you change your speed?
18  A. Yes.
19  Q. From what to what?
20  A. Probably -- when I first got on to 41?
21  Q. Yes.
22  A. Probably 55 to 40.
23  Q. Now, understanding that the speed limit on
24  41 north is 50 miles an hour, was it your goal to

**Page 222**

1  go 10 miles an hour under the speed limit when you
2  made that change from 55 to 40?
3  A. What do you mean by goal?
4  Q. Did you purposely lower the speed of
5  your vehicle to 40 miles an hour as you exited?
6  A. Yes.
7  Q. Okay. And why did you do that?
8  A. Because 41 is a slower -- it's not an
9  interstate.
10  Q. Okay. Did you understand that it was 50
11  miles an hour?
12  A. No.
13  Q. Did you understand that it was 45 miles an
14  hour?
15  A. Yes.
16  Q. Okay. Why is it that you lowered your
17  speed from 55, the speed limit, to 40, five less
18  than the speed limit, as you got on to 41?
19  A. I don't know.
20  Q. Do you specifically remember looking at
21  your speedometer and saying I'm going to lower my
22  speed to 40?
23  A. Yes.
24  Q. But you don't remember why you did that

**Page 223**

1  specifically?
2  A. It's just because it's not interstate.
3  Q. I understand that. Is it your practice to
4  drive five miles an hour below the speed limit when
5  you're not on an interstate?
6  A. Yes.
7  Q. So if you're in a 25-mile-an-hour zone,
8  you always go 20?
9  A. Yes.
10  Q. In order to accomplish the drop in speed
11  from 55 to 40 miles an hour did you change gears?
12  A. Probably -- I don't know.
13  Q. You don't remember?
14  A. I don't remember.
15  Q. What was the traffic like on Route 41
16  north as you entered on to 41 off of 94?
17  A. Lighter than it was -- lighter than 94.
18  Q. Can you give me any description of the
19  traffic other than lighter than 94?
20  A. Not as many cars.
21  Q. Was it stop-and-go?
22  A. No.
23  Q. You were able to travel at 40 miles an
24  hour without having to stop as a result of vehicles

39 (Pages 220 to 223)

1 in front of you?
2   A. As far as I know, yes.
3   Q. Okay. As you exited on to 41 off of 94,
4 was there a car in front of you or any vehicles in
5 front of you?
6   A. As I -- I don't remember.
7   Q. Then you wouldn't be able to tell me how
8 close the nearest vehicle in front of you was,
9 right?
10   A. Right.
11   Q. As you got on to 41 north from 94, which
12 lane were you in?
13   A. The left lane.
14   Q. On 41 is it two lanes all the way north?
15   A. Yes.
16   Q. Okay. So you were in the left -- left
17 most of two lanes?
18   A. Yes.
19   Q. And why did you choose that lane?
20   A. You have to stay to the left to get on to
21 41.
22   Q. Sure.
23   A. If you stay to the right, you'll exit on
24 to 94.

224

1   A. I don't know for sure --
2   Q. Okay.
3   A. -- no.
4   Q. From what you are saying it seems to me
5 that you're saying there may have been but you
6 don't know?
7   A. Right.
8   Q. Okay. You're not saying that there were
9 no cars anywhere around you?
10   A. No, I'm not saying that.
11   Q. There was traffic, you just don't know
12 where it was?
13   A. Right.
14   Q. At any point before you arrived at the
15 intersection of 41 and Park Avenue West, Park
16 Avenue, the first stoplight, did you change lanes
17 from the left lane?
18   A. No.
19   Q. I'm sorry?
20   A. No.
21   Q. At any time -- well, strike that.
22     Did you change your speed after lowering
23 your speed to 40 miles an hour as you were on Route
24 41?

226

1   Q. Okay. Sure. But is the exit for 41 two
2 lanes, in other words, the left two lanes go to 41
3 and the right two lanes go to 94?
4   A. Right.
5   Q. Do you know why you chose the left most of
6 the two lanes for 41?
7   A. No, I don't know for sure.
8   Q. When you say you don't know for sure, that
9 suggests you might know not for sure. Do you know
10 at all?
11   A. No.
12   Q. As you entered Route 41 north on July 3rd,
13 2008, was there -- in the left lane was there any
14 vehicle in the right lane next to you?
15   A. I don't know.
16   Q. Was there any vehicle in the right lane in
17 front of you?
18   A. I don't know.
19   Q. Was there any vehicle in the right lane to
20 the south of you or behind you as you got on to 41?
21   A. I don't remember.
22   Q. Okay. Were there any vehicles behind you
23 in the left-hand lane of 41 as you entered 41 off
24 of the interstate?

225

1   A. When I came to a stoplight, I stopped at a
2 stoplight.
3   Q. You stopped at the intersection of Park
4 Avenue and 41?
5   A. Yes.
6   Q. So in order to stop at that light you,
7 obviously, changed your speed?
8   A. Yes.
9   Q. When you came to that stoplight, where
10 were you in relationship to the stop line; in other
11 words, were you the first car in line, the second
12 car in line at the stoplight?
13   A. I think I was the first car, first
14 vehicle.
15   Q. As you stopped at the intersection of Park
16 Avenue and 41 were there any vehicles stopped in
17 the left-hand lane -- excuse me, you were in the
18 left-hand lane.
19     Were there any vehicles stopped in the
20 right-hand lane next to you?
21   A. I don't know for sure.
22   Q. As you stopped as the first vehicle in the
23 left-hand lane at the intersection of 41 and Park
24 Avenue were there any vehicles stopped behind you?

227

40 (Pages 224 to 227)

A.  I don't know.
Q.  Did you for that stop arrive at a red light or did you see it turn as you approached Park Avenue, the intersection of Park Avenue and 41?
A.  I stopped at the red light.
Q.  So it was red when you arrived?
A.  Yes.
Q.  How long did you sit at that light?
A.  A couple minutes -- two minutes.
Q.  And what, if anything, did you do in your vehicle as you sat at that light?
A.  Prepared to leave, like put the truck in a lower gear.
Q.  Anything else you do in that two minutes?
A.  Watch the light.
Q.  Did you make any calls?  Did you look at any paperwork, anything?
A.  No.
Q.  As one sits at the stoplight at Park Avenue and 41 facing north, can you see the light at Half Day Road ahead of you?
A.  No.
Q.  And I think you indicated that the intersection of Half Day Road and 41 would have

228

been a half mile to a mile ahead, correct?
A.  Right.  Yes.
Q.  Now, are there curves in the road such that you can't see the intersection of Half Day Road and Route 41 as you sit at the intersection of Park Avenue and 41 facing north?
A.  I don't know.
Q.  Is it just -- is there anything blocking your view or is it just a matter of distance?
A.  Distance.
Q.  On July 3rd, 2008 when you were stopped at Park Avenue and Route 41, it was dark out, correct?
A.  Yes.
Q.  What was the weather like?
A.  Typical night.  It wasn't raining or --
Q.  Any rain?
A.  No.
Q.  Any fog?
A.  No.
Q.  Any weather phenomenon that affected your visibility?
A.  Not as far as I know.
Q.  Any weather phenomenon that affected your ability to handle your vehicle?

229

A.  No.
Q.  Do you remember the temperature that evening?
A.  No.
Q.  Do you have an air-conditioner in your truck?
A.  Yes.
Q.  Did you have your air-conditioner on or windows down or can you tell me?
A.  I don't know.
Q.  I understand there were fireworks that evening in certain municipalities in the Chicago area; is that true?
A.  Yes.
Q.  Did you observe any of those on the roadway while you were driving from Hammond to where you got off on Route 41 -- did you see off in the distance?
A.  Yes.
Q.  As you were driving on Route 41 were there any fireworks displays going on?
A.  Not -- I don't remember.
Q.  Okay.  After the light at Park Avenue and Route 41 turned green I expect you proceeded

230

forward north, correct?
A.  Correct.
Q.  At any time before -- between the time that you started proceeding on the green light at Park Avenue and 41 until the accident did you change lanes from the left-hand lane?
A.  Yes.
Q.  How far did you go past the intersection of Park and 41 before you changed lanes?
A.  About 200 feet.
     MR. BURKE:  I couldn't hear that.
     THE WITNESS:  200 feet.
     MR. BURKE:  Thank you.
BY MR. COUTURE:
Q.  How fast were you going at the time you made the lane change from the left lane to the right-hand lane 200 feet north of the intersection with Park?
A.  30 miles an hour.
Q.  At that time were you accelerating out of your stop still?
A.  Yes.
Q.  Did you continue to accelerate when you got into the right-hand lane?

231

41 (Pages 228 to 231)

A. No.

Q. What gear were you in when you were traveling at 30 miles an hour in the right-hand lane of Route 41?

A. Fourth.

Q. And why did you stop accelerating at 30 miles an hour?

A. I don't know.

Q. You already told me you understood the speed limit to be 45?

A. Right.

Q. And you've already told me that you typically go five miles an hour under the speed limit, right?

A. Right.

Q. Okay. Is there any reason why you stopped at 30 and didn't go any faster?

A. No.

Q. Was there traffic in front of you impeding your ability to go faster than 30?

A. I don't remember.

Q. What is the highest speed your truck reached at any time between when you left the stoplight at Park Avenue until the time of the

232

accident?

A. 30 miles an hour.

Q. What's the highest gear you reached?

A. Fifth.

Q. Fifth?

A. Yeah -- fourth or fifth. I don't really actually remember.

Q. Okay. Let's make it clear.

A. Okay.

Q. I only want to know what you know.

A. Okay.

Q. Only you were there.

A. Right.

Q. What gear were you in when you reached your highest speed before the accident?

A. Fourth gear.

Q. If you don't know for sure, tell me.

A. I don't know for sure.

Q. Okay. We've already established that there's a stoplight at the intersection of Half Day Road and 41, right?

A. Right.

Q. As you approached -- Strike that.

As you were driving northbound on 41 away

233

from Park Avenue and towards Half Day Road how far away from the intersection of Half Day Road were you when you first saw the stoplight?

A. 500 feet.

Q. When you were 500 feet away and first saw the light, how fast were you going?

A. 30 miles an hour.

Q. When you were 500 feet away from the intersection and first saw the light at 30 miles an hour, which lane were you in?

A. I was in the right lane.

Q. When you were going 500 -- or excuse me. When you were going 30 miles an hour 500 feet away in the right-hand lane and first saw the light at the intersection of Half Day Road and Route 41, were there any vehicles to your rear?

A. I don't know.

Q. Were there any vehicles to your -- in the left-hand lane either next to you, behind you or in front of you?

A. I don't remember.

Q. When you saw the color of the light at the intersection of Half Day Road and 41 500 feet away, were there any vehicles in front of you between you

234

and the intersection?

A. I don't remember.

Q. When was the last time prior to your seeing the stoplight 500 feet away that you actually remember looking at the speedometer on your truck?

A. At about 500 feet I looked down and checked the -- to see how fast I was going.

Q. Before or after you saw the color of the light?

A. When I seen it was red, I looked down to see how fast I was going.

Q. Okay. So you answered something I haven't gotten to yet but I appreciate that.

You told me you first saw the light at the intersection when you were 500 feet away. Are you telling me now the color was red when you first saw it?

A. Yes.

Q. And then you looked down at your speedometer?

A. Yes.

Q. And you saw what at your speedometer?

A. 30 miles an hour.

235

42 (Pages 232 to 235)

1  Q. Forgive me for not knowing trucks. Is
2  there also an rpm meter that you can view on your
3  dash?
4  A. Yes.
5  Q. Did you look at your rpms's?
6  A. I don't remember.
7  Q. Did you have your cruise control on?
8  A. No.
9  Q. At 500 feet away from the intersection
10  when you saw the red light did you change your
11  speed?
12  A. I took my foot off the gas and slowed
13  down.
14  Q. Now, let me make sure I understand. Did
15  you do anything else to slow down other than take
16  your foot off the gas?
17  A. No.
18  Q. So you didn't down shift?
19  A. No.
20  Q. You didn't touch the brake?
21  A. No.
22  Q. You were coasting?
23  A. Exactly.
24  Q. Is that how you were trained to slow down
236

1  southbound lanes of Route 41?
2  A. I don't remember.
3  Q. Were there vehicles stopped at the
4  intersection of 41 and Half Day Road as you
5  approached the intersection?
6  A. I don't remember.
7  Q. And just so we're clear. You're not
8  saying they weren't there, if they were; you're
9  saying you don't remember?
10  A. Right.
11  Q. As you approached the intersection did you
12  see any other semi-tractor trailers anywhere in the
13  area?
14  A. As I approached it?
15  Q. Yes.
16  A. No.
17  Q. You never saw a tractor trailer in the
18  left-hand lanes of northbound?
19  A. No.
20  Q. At any time before -- Strike that.
21  At 500 feet away the light for your
22  direction of traffic was red?
23  A. Yes.
24  Q. At any time before the accident did the
238

1  your truck when approaching a red light?
2  A. When you're in a lower gear, the motor
3  will slow you down if you let off the gas.
4  Q. At any time before this accident did you
5  see the vehicle that you struck?
6  A. No.
7  Q. As you approached and got closer than 500
8  feet to the intersection did you see any vehicles
9  stopped in the left-hand lane of 41 at the
10  intersection with Half Day Road? Let me strike
11  that. I'll ask it differently.
12  As you approached and got closer than 500
13  feet from the intersection of Half Day Road and 41
14  were there any vehicles in the left-hand lane ahead
15  of you?
16  A. I don't remember.
17  Q. Did you see any vehicles stopped in that
18  lane at any point before this accident occurred?
19  A. No.
20  Q. Is it your testimony that there were no
21  vehicles in that lane?
22  A. I don't know.
23  Q. As you approached the intersection did you
24  see vehicles facing southbound on -- in the
237

1  light change?
2  A. Yes, about a hundred feet before the
3  stoplight it turned green.
4  Q. When you saw the light turn green, what
5  was your speed?
6  A. About 20 to 25 miles an hour.
7  Q. When you first saw the light turn green,
8  were there any vehicles behind you in the right
9  lane of northbound 41?
10  A. I don't remember. I don't know.
11  Q. When you saw the light turn green a
12  hundred feet away from the intersection, were there
13  any vehicles in the left-hand lane between you and
14  the intersection?
15  A. I don't remember.
16  Q. Have you ever told anyone specifically
17  that there were no vehicles in the left-hand lane
18  of northbound 41?
19  A. I don't remember if I told anybody that
20  there was nothing there, no. I don't remember
21  that.
22  Q. I want to make sure I understand. Are you
23  saying you never told anybody that or are you
24  saying you don't remember what you may have said to
239

43 (Pages 236 to 239)

other people?

1 A. I don't remember what I might have said to
2 other people.
3 Q. Is there any reason why you would have
4 told people -- well, strike that.
5 When you were going 20 to 25 miles an hour
6 a hundred feet from the intersection, what gear
7 were you in? Were you still in fourth or fifth?
8 A. I don't remember if it was 25, 20 -- I
9 don't know exactly.
10 Q. I guess what I'm asking is: In the 400
11 feet that your testimony is that you were slowing
12 down approaching a red light --
13 A. Right.
14 Q. -- and then the light turned green --
15 A. Right.
16 Q. -- in that 400 feet did you change gears?
17 A. No.
18 Q. So you coasted?
19 A. Yes.
20 Q. So whatever gear you were in when you were
21 going 30 miles an hour at 500 feet is the same gear
22 you were in at 20 to 25 when you believe you saw a
23 green light?

240

1 A. Yes.
2 Q. When you were one hundred feet away from
3 the intersection and believe you saw a green light,
4 did you see any vehicles in front of you between
5 your truck and the intersection?
6 A. I don't remember. No.
7 Q. Okay. Two different answers.
8 A. I don't remember.
9 Q. You're saying --
10 MR. SKRYD: Let him ask the question. Go
11 ahead, Tim.
12 BY MR. COUTURE:
13 Q. Are you saying you didn't see a vehicle in
14 front of you or are you saying as you sit here
15 today you don't remember whether there was?
16 A. I don't remember if there was.
17 Q. Where were you looking when you were a
18 hundred feet from the intersection?
19 A. At the light.
20 Q. Were you also observing ahead of you?
21 A. Yes.
22 Q. You understood it was your job to see if
23 there was something else in the roadway in front of
24 you so you didn't hit it, correct?

241

1 A. Yes.
2 Q. So it's your testimony that you looked
3 ahead of you when you were a hundred feet away?
4 A. Yes.
5 Q. When you looked ahead of you a hundred
6 feet away from the intersection, did you see a
7 black car?
8 A. No.
9 Q. When you were a hundred feet away from the
10 intersection, did you see whether there were any
11 vehicles stopped facing northbound or southbound on
12 41?
13 A. No.
14 Q. Are you saying that there weren't or you
15 didn't see it -- well, strike that. That was a bad
16 question.
17 Were there vehicles stopped facing
18 northbound when you were a hundred feet away?
19 A. I don't remember.
20 Q. Were there vehicles stopped facing
21 southbound on 41 when you were a hundred feet away?
22 A. I don't remember.
23 Q. Was there traffic -- Strike that.
24 Were there any vehicles stopped east or

242

1 westbound when you were a hundred feet away?
2 A. I don't remember.
3 Q. Was there traffic passing in front of you
4 when you were a hundred feet away going east and
5 west?
6 A. I don't remember.
7 Q. As you were a hundred feet away from the
8 intersection what was the nearest car to you to
9 your north?
10 A. I don't know.
11 Q. Do you remember seeing -- Strike that.
12 Did you see any brake lights ahead of you
13 on any vehicle as you were a hundred feet away?
14 A. No. I don't remember.
15 Q. Which one?
16 A. I don't remember.
17 Q. Are you saying you don't remember as you
18 sit here today?
19 A. Yes.
20 Q. Did you know four years ago?
21 A. I don't know four years ago.
22 Q. Well, I understand it's been a long time.
23 A. Yes.
24 Q. But I also understand that this is not a

243

44 (Pages 240 to 243)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois (312) 263-0052**

1 typical occurrence in one's life.
2  A. Right.
3  Q. So what I'm trying to figure out is
4 whether you're saying I don't remember because the
5 passage of time over four years has prevented you
6 now from knowing or whether you're saying if you
7 had asked me the same day I wouldn't be able to --
8 the day of the occurrence I wouldn't have been able
9 to tell you the answer. Do you understand the
10 distinction?
11  A. Yes.
12  Q. Okay. After the accident did you have a
13 recollection of whether there were vehicles in
14 front of you or not?
15  A. I was all -- after the accident I was all
16 confused and upset and I don't really remember what
17 went on.
18  Q. The "I don't remembers" as far as what was
19 in front of you, what was behind you, am I correct
20 that what you're saying is you didn't even know
21 that on the day of the accident after the accident?
22  A. Right.
23  Q. The first indication that you had that an
24 accident -- Strike that.

244

1  The first indication to you of an accident
2 was the accident itself?
3  A. Yes.
4  Q. So there was no "oh, my gosh," hitting the
5 brakes, swerving, anything like that?
6  A. No.
7  Q. Just pow?
8  A. Right.
9  Q. What was your speed at the time of the
10 impact with the Scheinman vehicle?
11  A. 25 to 30 miles an hour.
12  MR. FISHER: I'm sorry, could I have that
13 question back.
14  (Whereupon, the record was read.)
15 BY MR. COUTURE:
16  Q. I suppose I should ask. When you were one
17 hundred feet away from the intersection and saw --
18 Strike that.
19  When you were a hundred feet away from the
20 intersection and believed the light to be green,
21 did you start to speed up again?
22  A. Yes.
23  Q. Did you shift gears upwards?
24  A. No.

245

1  Q. You just accelerated using the gas pedal?
2  A. Yes.
3  Q. When was the last time before the impact
4 that you actually looked at your speedometer?
5  A. When I started to speed up when I seen the
6 light was green.
7  Q. And when you looked and were starting to
8 speed up when you saw the light was green, what was
9 your speedometer reading?
10  A. 25 to 30 miles an hour.
11  Q. Did you continue to speed up after you
12 looked at your speedometer but before the impact?
13  A. No.
14  Q. I'm sorry?
15  A. No.
16  Q. Okay. So I understand. You saw the light
17 was green a hundred feet away, you started to
18 accelerate and you looked down at the same time,
19 right?
20  A. Yes.
21  Q. And it was 20 -- 25 to 30 on your
22 speedometer?
23  A. Yes.
24  Q. Did you continue to accelerate after that?

246

1  A. No.
2  Q. It was -- so you purposefully were
3 proceeding forward at 30 miles an hour at that
4 time?
5  A. Yes.
6  Q. It wasn't your intention to speed up
7 anymore?
8  A. I mean, after I got through the
9 intersection?
10  Q. At this point you don't know that an
11 accident is about to happen, right?
12  A. Exactly.
13  Q. So you're not anticipating that?
14  A. Right.
15  Q. So what I'm trying to ask you is: As
16 you're looking at your speedometer -- and I think
17 you just told me that you had no intention of going
18 any faster?
19  A. Eventually down the road I would have.
20  Q. Okay. Is there a particular reason why
21 you were planning on stopping at 30 miles an hour
22 in a 50-mile-an-hour zone, which admittedly you
23 understood to be a 45-mile-an-hour zone, why were
24 you driving that slowly?

247

45 (Pages 244 to 247)

1  A. I was at an intersection, I was watching
2 for other cars — I mean, to see if anybody is
3 coming so if we have to stop, you can stop.
4  Q. Okay. So your plan was to proceed through
5 the intersection at 30 miles an hour?
6  A. Yes.
7  Q. How much time went by from when you saw
8 the light turn green until the impact?
9  A. A — two seconds.
10  MR. BURKE: Could I hear the answer
11 again?
12  MR. SKRYD: Two seconds.
13  MR. BURKE: Thank you.
14 BY MR. COUTURE:
15  Q. In that two seconds how far did your
16 vehicle travel?
17  A. I don't know for sure.
18  Q. If his vehicle was at the stop line of
19 Route 41 northbound, it would be a hundred feet
20 minus the length of his vehicle pretty much, right?
21  A. Yes, probably.
22  Q. At the time of the impact did you have
23 your foot on the gas?
24  A. I have no idea. I don't know.

248

1  Q. I'm going to show you what was previously
2 marked for identification Exhibit 31. The first —
3 it's a group exhibit consisting of 31A through Z.
4 Let's look at 31A.
5  Do you recognize what's shown in 31A?
6  A. Yes.
7  Q. Am I correct that 31A depicts northbound
8 Route 41 as it approaches the intersection of Half
9 Day Road?
10  A. Yes, apparently so.
11  Q. Well, I've just told you that.
12  A. Yes.
13  Q. My question is different. As a man who
14 drove it every day for years, can you tell me
15 whether that photograph shows it?
16  A. There ain't no signs saying that I'm
17 approaching Half Day Road.
18  Q. I understand. So are you saying that
19 looking at this photograph you can't recognize
20 what's shown in 31A as northbound 41 near Half Day
21 Road?
22  A. Yes.
23  Q. You cannot?
24  A. In the picture there ain't nothing stating

250

1  Q. Would it be fair for me to say that you
2 know it wasn't on the brake?
3  A. Right.
4  Q. Because you didn't see the vehicle before
5 you struck it, you didn't swerve or take any
6 evasive maneuvers?
7  A. Correct.
8  Q. Because you didn't see the vehicle before
9 you struck it, you didn't blow your horn?
10  A. Correct.
11  Q. Where were you looking in the two seconds
12 before the impact?
13  A. At the intersection ahead of me.
14  Q. So it's your testimony that you were
15 looking ahead of you but -- and didn't see a car
16 that was ahead of you?
17  A. Yes.
18  Q. Was there anything between you and what
19 you later understood to be the Scheinman vehicle
20 that was preventing you from seeing that vehicle?
21  A. I don't know.
22  Q. Were there any downed trees or overhangs
23 or viaducts?
24  A. I don't know.

249

1 in the picture that it's — it could be any road.
2  Q. Okay. Well, I need to make sure I
3 understand your answer.
4  A. Okay. All right.
5  Q. I understand it doesn't say in the
6 picture.
7  A. Right.
8  Q. My question is different.
9  A. Right.
10  Q. Are you saying it's not designated as 41
11 but I've been there, I know that's it, or are you
12 saying looking at the picture I can't say?
13  A. I can't say.
14  Q. All right. Look at the next picture, 31B,
15 which is a little bit closer to the intersection.
16 As you look at 31B, can you tell me whether this is
17 northbound 41 as you approach the intersection of
18 Half Day Road?
19  A. No.
20  Q. All right. Go to the next one, 31C.
21  MR. SKRYD: Take a look at the picture,
22 the intersection.
23  THE WITNESS: Okay.
24  MR. SKRYD: 31C, Tim?

251

46 (Pages 248 to 251)

MR. COUTURE: Yes.

BY MR. COUTURE:

Q. Sir, does that depict northbound 41 just south of the intersection of Half Day Road?

A. Yes.

Q. Go to 31C, the next one. Does that show the same intersection?

A. Yes.

Q. With the exception of the time of day, in other words, the condition of the light, these photographs were clearly taken during the day, do the two photographs that you were able to recognize accurately and correctly depict the intersection where the accident took place?

A. Yes.

Q. I'm going to direct your attention to what's previously been marked as Exhibit 30. And for the record I will state that Exhibit 30 is a group exhibit consisting of photographs two to a page marked 30A through T. And they were marked January 11, 2011.

MR. SKRYD: Okay. Take a look at those, there's quite a few, and let Mr. Couture know when you've had a chance to look at them.

252

BY MR. COUTURE:

Q. And just so we're clear right now, the only thing I'm going to ask you about are photographs of the roadway. There's other photos in there that you're free to look at but for the purposes of my current questions, that's all I'm going to be asking you about. But take your time and look at them.

Are you ready?

A. Yes.

Q. Okay. Drawing your attention to 30A, am I correct that that photograph depicts northbound Route 41 south of the intersection with Half Day Road?

A. No.

Q. It does not. Do you know what this depicts?

A. A gas station on either side of the road.

Q. Okay. So can you say, sir, whether 30A depicts the lane in which you were traveling immediately before your accident with Mr. Scheinman as it existed on the night of the occurrence?

A. What do you mean by depict? I mean, is it --

253

Q. Well --

A. Is there something on the picture that's telling me that that's where it's at?

Q. I'm not asking you that.

MR. SKRYD: He just wants to know if you know if that's the photograph.

THE WITNESS: Yes.

BY MR. COUTURE:

Q. Yes, it is? Okay, let me ask you differently.

MR. SKRYD: Let him ask it again. Sorry.

BY MR. COUTURE:

Q. When I look at a picture of my wife, I don't have to be told that's a picture of my wife on the photo; I know it's her.

A. Right.

Q. Okay. You've driven this road a lot. My question is not what the photograph says; my question is: When you look at this photograph 30A, do you recognize it as the northbound lanes of Route 41 approaching Half Day Road?

A. Yes.

Q. Okay. And do photograph 30A and B correctly and accurately depict the northbound

254

lanes of Route 31 -- excuse me, 41 as they existed on the night of your accident with Jeffrey Scheinman's vehicle?

A. Yes.

Q. And can you flip to C and D. Do photograph 30C and D accurately and correctly depict the northbound lanes of Route 41 as they existed on the night of the occurrence at the intersection with Half Day Road?

A. Yes.

Q. Am I correct that G and H actually show the rear of your chassis and box on the night of the occurrence?

A. Yes.

Q. As you approached the intersection with Half Day Road and you saw -- Strike that.

As you approached the intersection with Half Day Road and testify you saw a green light, where was it -- where was the light located that you saw was green?

A. To the right side of the road.

Q. Okay. So that would be on the east side of the road?

A. Right. Right.

255

47 (Pages 252 to 255)

Q. Do you know whether that standard holding the light was on the north side or the south side of Half Day Road?

A. I don't know.

Q. Looking at 30A for identification can you tell me, sir, whether that was -- that photograph -- is that more or less than a hundred feet away from where you're looking in this photograph?

A. I don't know.

Q. Okay. Do you see a sign on 30A on the right-hand side that looks to be white at least in the photograph?

A. Yes.

Q. Had you passed that sign before you saw the light change?

A. I don't know.

Q. Did you actually see the light turn green to red or did you just look up and see that it was -- excuse me, other way.

Did you actually see the light turn red to green or did you just look up and it was green?

A. Actually, I looked up and seen it change, yes.

256

Q. Okay. So while you were looking ahead of you approximately a hundred feet away, your testimony is you saw it red and then turn to green?

A. Yes.

Q. Now, I want to direct your attention back to 31. Now that you had an opportunity to look at the nighttime photographs, can you look at 31 and does that refresh -- the nighttime photographs refresh your recollection as to whether 31A depicts or, excuse me, shows the roadway?

A. Yes.

Q. It does?

A. Yes.

Q. Okay. And 31B, does that refresh your recollection as to the fact that 31B shows northbound Route 41?

A. Yes.

Q. Okay. And the same thing for C -- you already said you knew C and D. So I won't ask you about that. All right.

Looking at 31A, do you see on the right-hand side of the road there's two what looks like a sign with red reflectors on the back?

A. Which picture again?

257

Q. The front one. Right there.

A. Right.

Q. Do you see what I'm talking about?

A. Yes.

Q. Did you see that on the day of the occurrence?

A. I don't remember.

Q. Did you pass that before or after the light turned green, if you know?

A. I don't remember.

Q. If I were to ask you to mark on Exhibit A where the front of your truck was when you believe the light turned green, would you be able to do that without guessing?

A. No.

Q. In the last hundred feet before the accident -- well, strike that.

From the time that you say you saw the light turn green until the impact were you doing anything in your cab other than driving and facing forward?

A. I don't think -- I don't know.

Q. You don't know?

A. I mean, anything -- what do you mean?

258

Q. Well, were you playing a video game? Were you twiddling your thumbs? Were you using your phone?

A. No.

Q. Were you doing anything in your cab?

A. No.

Q. Were you looking anywhere other than directly in front of you?

A. I was checking side to side.

Q. Okay. When in relationship to that last hundred feet between you and the intersection did you turn side to side and take your -- Strike that.

When you turned side to side, did you take your eyes off the road in front of you?

A. Yes.

Q. When in that last hundred feet did you take your eyes off the road directly in front of you to look side to side?

A. After the light turned green.

Q. Okay. Do you know how much time went by -- I know you said two seconds from green to hit. So in that span of two seconds when did you take your eyes off the road in front of you and

259

48 (Pages 256 to 259)

look left to right time-wise?
   A.  When after I hit -- after the impact?
   Q.  No.  I'm trying to give us a little bit of
context here.  You told me that from the time the
light turned green until the impact was two
seconds.  So now my question is:  In that two
seconds, because you said you looked side to side
after you saw the light turn green, in that two
seconds when did you look side to side?
   A.  After the impact or --
   Q.  No.  Let's start again.  I asked you in
the last hundred feet if you looked anywhere other
than directly in front of you and you said you
looked side to side, true?
   A.  Yes.
   Q.  And that was before the impact?
   A.  Yes.
   Q.  Okay.  When in relationship to the impact
did you look side to side?
   A.  What is that again?
   Q.  When in relationship to the impact did you
look somewhere other than directly in front of you,
side to side?
   A.  Right after the -- after the initial hit I

260

looked side to side to see what happened.
   Q.  Let's stop.  I must be misunderstanding
you.
   A.  Right.
   Q.  At any time between when you saw the light
turn green and the impact did you look anywhere
other than directly in front of you?
   A.  After the light turned green?
   Q.  The light turned green but before the
impact, where were you looking for those two
seconds?
   A.  Probably straight ahead.
   Q.  Did you look side to side to see if anyone
was coming out of any other place or what the other
traffic was doing?
   A.  Just the normal thing you do when you go
through an intersection, you -- I guess I don't
know what you're trying to --
   Q.  The only reason why I'm saying that --
asking these questions over and over is because I
thought you said you looked and took your eyes off
the road.  And so I want to make sure I
understand.
   So in the last two seconds from when the

261

light turned green until the impact your eyes were
straight ahead?
   A.  Right.
   Q.  Were you asleep at the time of the impact?
   A.  No.
   Q.  Were you zoned out at the time of the
impact?
   A.  No.
   Q.  Did you ever tell anybody that you were
zoned out at the time of the impact?
   A.  I don't remember.
   Q.  Is it your testimony that if you told
somebody you were zoned out that when you said that
you would have been wrong?
   A.  If I -- if I did say that?
   Q.  Yes.
   A.  Yes.
   Q.  At impact where were your eyes?
   A.  Straight ahead.
   Q.  For how long had your eyes been straight
ahead before the impact?
   A.  I mean, at the point of impact how long?
A couple of seconds.
   Q.  Okay.  So for a couple of seconds you were

262

looking straight ahead but you didn't see the black
car in front of you?
   A.  No.
   Q.  As a truck driver do you have an
understanding of how long it takes to stop a 73,750
pound truck?
   A.  Yes.
   Q.  At 30 miles an hour can you give me an
estimate of how long you believe it would take to
stop a truck like that if you were to safely brake
and down shift?
   A.  A couple truck lengths.
       MR. FISHER:  Can I have the question
back -- just the beginning of it.
       (Whereupon, the record was read.)
BY MR. COUTURE:
   Q.  How about at 40 miles an hour?
   A.  40 miles an hour?
   Q.  Yes.
   A.  A little further probably.
   Q.  Do you know how much further?
   A.  No.
   Q.  How about 45?
   A.  The faster you are going, it's going to

263

49 (Pages 260 to 263)

take longer to stop the vehicle.
Q. When you say a couple of truck lengths, I assume when you say "a couple" you mean two?
A. Yes.
Q. And your truck on that day was a 53-foot trailer?
A. Yes.
Q. And how long was the tractor and connection?
A. Probably about 20 feet.
Q. So we're talking about 70-plus feet total nose to tail?
A. Something like that.
Q. So when you say a couple truck lengths, you mean 140 feet plus?
A. 140 -- yes.
Q. Okay. What part of your truck struck the car?
A. The front.
Q. What part of the car did the front of your truck strike?
A. The back.

264

(Whereupon, Franke Deposition Exhibit No. 80 was marked for identification.)
BY MR. COUTURE:
Q. I'm going to show you what's been marked as Exhibit 80 for identification.
Am I correct that Exhibit 80 depicts the front of your tractor as it existed on the night of the occurrence after the occurrence?
A. Yes.
Q. I'm going to show you what was previously marked as Exhibit 43 for identification.
MR. SKRYD: For the record Exhibit 43 is a group exhibit, right, Tim?
MR. COUTURE: Thank you. Yes. I'll describe it.
BY MR. COUTURE:
Q. Go ahead and look at it while I describe it for the record. It is an exhibit consisting of 43A through D.
Are you done looking, sir?
A. Yes.
Q. Okay. Am I correct that Exhibit 43A through D depicts your tractor and specifically the

265

damage that was done to your tractor as a result of this accident?
A. Yes.
Q. Can you turn to 43C -- well, actually, you know what, let's look at 43B.
A. D?
Q. B.
MR. SKRYD: B as in boy.
BY MR. COUTURE:
Q. Am I correct that the damage to your vehicle -- well, strike that.
This shows the grill of your vehicle and the front of your vehicle, true?
A. Yes.
Q. And there's damage to the lower part of the grill and to the bumper, right?
A. Yes.
Q. And also to the right headlights left as we look at it in the picture?
A. Yes.
Q. First of all, you saw this damage at some point after the accident, did you not?
A. Not -- I seen the front of the truck, yes.
Q. Okay. Does Exhibit 43B accurately and

266

correctly depict the damage to the front of your vehicle as you know it from the accident?
A. Yes.
Q. Okay. Did the front bumper of your vehicle hit square with the rear bumper of the BMW that you struck?
A. From the picture, yes.
Q. Did the front bumper of your vehicle -- well, strike that.
When I use the term "override," do you understand what that means?
A. Yes.
Q. Okay. And so we understand each other, what is it that you believe I mean when I say override?
A. Override meaning over the car or --
Q. Meaning that your bumper actually went over the bumper or above the bumper of the BMW.
A. Probably.
Q. Did that happen on the day of the occurrence?
A. I don't know.
Q. Okay. Do you -- would you expect that if you were going to rear-end the BMW, that the first

267

50 (Pages 264 to 267)

1 thing that you would strike on your vehicle would
2 be the front, the grill and this metal bumper shown
3 in B?
4    A. Right. Right.
5    Q. And the first thing as you travel towards
6 the BMW that would be closest to the front of your
7 vehicle would actually be the bumper --
8    A. Right.
9    Q. -- of the BMW, right?
10    A. Right.
11    Q. Do you believe that the bumper of your
12 truck was higher than the bumper of the BMW?
13    A. Yes.
14    Q. Okay. So based on that do you believe
15 that your truck overrode the back of the BMW; in
16 other words, hit the back of it beyond the bumper
17 and pushed it downward?
18    MR. BURKE: Objection, form, calls for
19 speculation.
20    MR. SKRYD: If you know, go ahead.
21    THE WITNESS: I don't know if it did or
22 not.
23    MR. SKRYD: Why don't we take a short
24 break.

268

1    THE VIDEOGRAPHER: We are going off the
2 record. The time is 4:12 p.m.
3         (A break was taken.)
4         (Whereupon, Franke Deposition
5         Exhibit No. 81 was marked for
6         identification.)
7    THE VIDEOGRAPHER: We are back on the
8 record. The time is 4:26 p.m. Please proceed.
9 BY MR. COUTURE:
10    Q. I'm going to show you what's been marked
11 as Exhibit 81 for identification. Sir, I'll
12 represent to you that this shows the rear of the
13 same model, make and year of the vehicle that you
14 struck on July 3rd, 2008.
15    Do you have an understanding what part of
16 the rear of that vehicle was impacted by the front
17 of your vehicle?
18    MR. SKRYD: My objection is foundation.
19    MR. COUTURE: Okay.
20    MR. SKRYD: I don't know that he can
21 identify that this is the same car, but for
22 purposes of the deposition I'll let him answer the
23 questions, okay.
24    MR. COUTURE: Thank you.

269

1 BY MR. COUTURE:
2    Q. Go ahead.
3    A. The back end of the car.
4    Q. Other than the back end you can't give me
5 any specifics as far as where on the back, can you?
6    A. No.
7    Q. Whether it was above the bumper, below the
8 bumper you don't know?
9    A. No.
10    Q. I want to go back and ask you about the
11 left-hand lane of northbound 41 in the one hundred
12 feet before the intersection. If there was an
13 SUV -- Strike that.
14         If there was testimony that there was an
15 SUV stopped in that left-hand lane in that one to
16 two seconds that you approached from a hundred feet
17 away, am I correct that you didn't see that SUV
18 first in line?
19    A. Yes.
20    Q. If there was a green Subaru behind that
21 SUV stopped in the left-hand lanes of northbound 41
22 at the intersection of Half Day Road and 41 in the
23 two seconds before the impact when you were a
24 hundred feet away, am I correct that you didn't see

270

1 that green Subaru?
2    A. I don't remember. I don't remember, no.
3    Q. You don't remember or you don't remember
4 it being there?
5    A. I don't remember it being there.
6    Q. If the testimony is that there was a
7 semi-tractor trailer truck behind that green
8 Subaru, am I correct in the one hundred feet that
9 you drove from when you saw the light turn green
10 until the intersection you didn't see that
11 semi-tractor trailer truck?
12    A. I don't remember seeing a tractor trailer.
13    Q. Okay. Are you saying you didn't see it
14 because it wasn't there or are you saying you don't
15 remember if it was there?
16    A. I don't remember if it was there.
17    Q. Okay. If there is testimony that a white
18 Chevy Impala was stopped for those same two seconds
19 facing southbound in the left-hand lanes of
20 southbound 41, in other words, headlights facing
21 you as you approached the intersection, would you
22 agree with me that according to your testimony
23 today you didn't see that?
24    A. No.

271

51 (Pages 268 to 271)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

```
 1     Q.  Is that correct?
 2     A.  Yes.
 3     Q.  And if there's testimony that a vehicle
 4  was stopped next to it in the right-hand lanes of
 5  southbound 41, your testimony today is you didn't
 6  see that either?
 7     A.  I don't remember.
 8     Q.  Can you describe for me the impact of your
 9  vehicle and the vehicle in front?
10     MR. SKRYD:  Objection, form.  You can
11  answer it if you understand it.
12     THE WITNESS:  Describe by what?
13  BY MR. COUTURE:
14     Q.  Okay.  I'll ask you a different question
15  if you don't understand that.
16     What happened to you within the vehicle at
17  the impact?
18     A.  Nothing.
19     Q.  Did you have your -- where were your hands
20  when the impact occurred?
21     A.  On the steering wheel.
22     Q.  Okay.  And you've already told me you were
23  facing forward, right?
24     A.  Right.
                                              272
```

```
 1  ordinary?
 2     A.  Yes.
 3     Q.  What was it that told you that something
 4  was out of the ordinary?
 5     A.  When I seen the flames.
 6     Q.  Okay.  How much time -- well, strike
 7  that.
 8     Did you actually feel the impact of your
 9  vehicle striking something else?
10     A.  I don't remember.
11     Q.  You indicated that there were flames?
12     A.  Yes.
13     Q.  How much time went by from the time that
14  the front of your vehicle first touched the BMW
15  until you first saw flames?
16     A.  Just about immediately after -- at impact.
17     Q.  At impact?
18     A.  Right.
19     Q.  So not a second?
20     A.  (Indicating.)
21     Q.  You're shaking your head.  So you have to
22  say yes or no.  Not a second?
23     A.  No.
24     Q.  Not a half second?
                                              274
```

```
 1     Q.  And you've told me you don't know whether
 2  your foot was on the gas or not, right?
 3     A.  Right.
 4     Q.  And you weren't on the phone?
 5     A.  No.
 6     Q.  And you weren't asleep?
 7     A.  No.
 8     Q.  And you weren't texting?
 9     A.  No.
10     Q.  When your truck struck this vehicle in
11  front of you, did your body move anywhere?
12     A.  No.
13     Q.  Shake?  Go forward?
14     A.  No.
15     Q.  Did you have a seat belt on?
16     A.  Yes.
17     Q.  Did your body press up against the seat
18  belt as a result of the impact?
19     A.  I don't remember.
20     Q.  At impact did you understand that you had
21  hit an object?
22     A.  At impact?
23     Q.  Yes.  When the impact occurred, did your
24  senses tell you that something was out of the
                                              273
```

```
 1     A.  I don't know.
 2     Q.  You don't know?
 3     A.  A half second?
 4     Q.  Don't guess.  No one wants you to guess.
 5     A.  Okay.
 6     Q.  Do you know?
 7     A.  No.
 8     Q.  Do you know how far your vehicle moved
 9  from the moment that it first touched the back of
10  the BMW until flames first appeared on the vehicle?
11     A.  Immediately.
12     Q.  Immediately?
13     A.  After the impact.
14     Q.  Okay.  So no distance?
15     A.  I don't know how --
16     Q.  When you first saw flames, where did you
17  see them?
18     A.  At the intersection, beginning of the
19  intersection.
20     Q.  Because you didn't see what you hit before
21  you hit it, when did you first realize that there
22  was something that the front of your vehicle had
23  touched?
24     A.  When I seen the flames.
                                              275
```

**52 (Pages 272 to 275)**

Q. Okay. Your testimony is you don't
remember feeling the impact but you remember seeing
the flames?
A. Well, I felt an impact and then I seen --
then I seen the flames.
Q. Okay. When you first saw the flames --
well, strike that.
Did you see the car at any point before
you saw flames?
A. No.
Q. When you saw the flames, where on the car
in front of you were the flames coming from?
A. I just seen the flames. I didn't know
exactly where the flames was coming from.
Q. As you were sitting in your cab facing
forward with your eyes straight ahead --
A. Yes.
Q. -- where were these flames that you first
visualized?
A. In front of the truck.
Q. Were they below your windshield level?
A. No. They come up above the grill of the
truck.
Q. Okay. So you saw flames in front of the

276

grill?
A. Right.
Q. Could you tell where the flames on the BMW
vehicle were originating from?
A. No.
Q. Did you see any sparks before flames?
A. No.
Q. Did you hear any grinding noises before
flames?
A. I don't remember.
Q. And your testimony is the flames were
immediate?
A. Yes.
Q. Can you describe the nature of the
impact? Was it a light impact, a medium impact, a
heavy impact?
A. Medium, probably.
Q. At impact what if anything did you do
within your cab?
A. I looked around to see. I was confused.
I didn't know what I hit or what happened. So I
looked side to side to see what was -- you know, I
was trying to figure out what was going on.
Q. Did you hit your brakes?

277

A. I don't know.
Q. At any time before your truck came to a
stop did you apply the brakes?
A. I don't know exactly when I applied the
brakes.
Q. Did you apply them at some point in that
run?
A. Well, the truck stopped.
Q. We know the truck stopped.
A. Right.
Q. Did you apply the brakes at any point
between impact and the truck stopping?
A. Yes.
Q. When in that space?
A. When I was through the intersection.
Q. Through the intersection. Do you know how
far it was from the point of impact until stop?
A. Not exactly, no.
Q. Do you understand the police have measured
that to be 358 feet?
A. This is the first I heard of that.
Q. Does that sound right, approximately,
based on what you saw and experienced?
A. I don't know what I saw and experienced.

278

Q. Well, you were there, right?
A. Yeah.
Q. And that is a football field and 20 yards,
right, 360 feet?
A. I guess.
Q. Is it your recollection that you pushed
that car a football field and 20 yards in distance?
A. I don't remember.
Q. In that football field and 20 yards --
we'll take the police as accurate and correct --
can you tell me where it was that you first applied
brakes?
A. About half -- it was all the way through
the intersection.
Q. Well, okay. I'm sorry, I misunderstood.
You were all the way through and then you hit the
brakes?
A. Yes -- I don't know exactly where. I
don't remember.
Q. Can you tell me how much time went by from
the impact until when you hit the brakes?
A. No.
Q. When -- at any point before you hit the
brakes did you hit the accelerator between impact

279

**53 (Pages 276 to 279)**

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

1 and stop?
2 A. I have no idea.
3 Q. You don't know. I think we've already
4 established you don't know if your foot was on the
5 gas or not at the time, right?
6 A. Right.
7 Q. Can you tell me how much time it took for
8 your vehicle to go that 358 feet from impact to
9 stop?
10 A. No. No, I can't.
11 Q. Did you do anything to steer your truck in
12 that 358 feet?
13 A. I don't remember.
14 Q. At any point between impact until the time
15 your vehicle came to a stop did you swerve or
16 change the direction of your steering wheel?
17 A. I don't remember swerving.
18 Q. At any point between impact and your
19 vehicle coming to the stop — well, strike that.
20 During that 358 feet were your vehicles
21 touching the entire way?
22 A. Yes.
23 Q. Did you change gears at all between the
24 time of impact and the time your vehicle came to a

280

1 A. I got out to see what I had hit and I seen
2 the car was on fire. So I got back in the truck
3 and I backed the truck up.
4 Q. Okay. Let me break that down a little
5 bit.
6 Did you take any time from the moment your
7 vehicle stopped until the time you got out? In
8 other words, did you sit in your car for a moment
9 or did you get right out?
10 A. When it stopped, I think I got right out.
11 Q. Okay. And what was the purpose of you're
12 getting right out?
13 A. To see what happened.
14 Q. Did you bring with you a fire extinguisher
15 when you exited your vehicle?
16 A. No.
17 Q. And when you got out, you exited the
18 driver's side door, correct?
19 A. Correct.
20 Q. And was there -- Strike that.
21 When you got out, what did you see?
22 A. I seen a car in front of me on fire.
23 Q. Was the front of your truck still touching
24 that car when you got out?

282

1 stop?
2 A. No.
3 Q. From — Strike that.
4 From the time you first saw fire until the
5 time your vehicle came to a stop can you tell me
6 whether the fire changed, in other words, got more,
7 less?
8 A. No.
9 Q. As you went through the intersection --
10 Strike that.
11 After you impacted the Scheinman vehicle
12 and as you proceeded through and past the
13 intersection did you — did the two vehicles pass
14 any other vehicles as they went through?
15 A. I don't remember.
16 Q. Did you see any other trucks on the side
17 of the road nearby?
18 A. When I — after the vehicle was stopped
19 there was some trucks parked in the parking lot.
20 Q. But you didn't see that until after your
21 vehicle stopped?
22 A. Yes.
23 Q. When your vehicle came to a stop, what did
24 you do?

281

1 A. Yes.
2 Q. When you got out, was there anyone
3 immediately present? Not came by in a little bit,
4 but when you got out was there someone there?
5 A. No.
6 Q. How long did you stand outside of your
7 truck before you got back in?
8 A. Not very — not very long.
9 Q. Can you give me an estimate?
10 A. I got out, seen what was going on, a
11 couple of seconds and I realized it was on fire.
12 So I — I thought it would be the best thing to get
13 my truck back out of there.
14 Q. Did you talk to anyone before you got back
15 into your car and -- or strike that.
16 Did you talk to anyone before you got back
17 into your truck and moved it?
18 A. I don't remember.
19 Q. Did you do anything to assist the
20 occupants of the vehicle you hit before you got
21 back into your truck and moved it?
22 A. No, I didn't.
23 Q. When you got back into -- Strike that.
24 When you got out of your truck to look at

283

54 (Pages 280 to 283)

what had happened, did you leave your truck
running?
   A.  No, I don't think so.
   Q.  So when you got back in, you had to start
your truck?
   A.  I mean, when I got out the first time?
   Q.  Yes.
   A.  Yes.
   Q.  Okay.  Let's go back so I can ask the
right question and you can give me the right
answer, all right?
   A.  All right.
   Q.  You've described for me that when your
vehicle came to a stop you got out of your truck?
   A.  Right.
   Q.  And then you got back in and moved it?
   A.  Right.
   Q.  I want to talk about when you got out --
   A.  Right.
   Q.  -- but before you got back in to move it,
all right?
       When you got out for the first time, did
you leave your vehicle running or turn it off?
   A.  I don't remember.

284

   Q.  When -- why did you move your truck?
   A.  I have 200 gallons of diesel fuel in my
truck and I thought it could be a real big fire if
my truck sits there in the fire.  That's why I
thought about moving my truck.
   Q.  How far did you move your truck?
   A.  I don't know exactly how many feet but I
backed away from the car.
   Q.  Can you give me any indication or
estimate?  It could be feet; it could be car
lengths; it could be truck lengths.
   A.  About a car length probably behind the
back.
   Q.  And then you -- Strike that.  After you
moved your truck back -- Strike that.
       You moved it backwards, correct?
   A.  Yes.
   Q.  Am I correct that as you proceeded forward
after the impact and before your vehicle came to a
stop, you crossed the intersection and you -- both
vehicles went over a curb or median such that when
the vehicles came to a stop both vehicles were
straddling a median?
   A.  A curb.

285

   Q.  A curb?
   A.  Yes.
   Q.  Okay.  After you backed -- Strike that.
       When you backed up your truck, did that
change the nature of the fire that was burning?
   A.  I don't know.
   Q.  Did it make it more flames, less flames?
   A.  I don't know.
       THE VIDEOGRAPHER:  This is the end of
media number three.  We are going off the record.
The time is 4:45 p.m.
             (A break was taken.)
       THE VIDEOGRAPHER:  This is the beginning
of media number four.  We are back on the record.
The time is 4:46 p.m.  Please proceed.
BY MR. COUTURE:
   Q.  Stepping back.  And I apologize, I missed
asking this.  You indicated to me earlier that at
some point while you were proceeding forward after
striking the Scheinman vehicle you applied the
brakes and I think you said it was after you were
through the intersection, correct?
   A.  Correct.
   Q.  Did you continue to apply the brakes after

286

you first did so?  Bad question, let me start
over.
       After you first applied the brakes, did
you keep the brakes depressed until your vehicle
was stopped?
   A.  Yes.
   Q.  Okay.  After you backed your car -- your
truck up what did you then do next?
   A.  I got -- when I backed it up there was
other people there --
   Q.  Okay.
   A.  -- and somebody asked me for a fire
extinguisher.  I don't know who it was.  And then
they asked me if I had a blanket or sheet,
something inside the truck.
   Q.  When that discussion or request was made,
were you still in your cab?
   A.  Yes.
   Q.  And can you describe the person who made
that request?
   A.  A black guy.
   Q.  Can you give me any description besides an
African-American man?
   A.  No.

287

55 (Pages 284 to 287)

1 Q. And what did you do based on that request?
2 A. I gave him what he wanted.
3 Q. A fire extinguisher?
4 A. Right.
5 Q. And a -- what did you give him, a shirt, a
6 sheet?
7 A. A sheet from my bed.
8 Q. After you gave him that, did you stay in
9 your cab or did you exit your vehicle?
10 A. I exited my vehicle. I was just outside
11 of my vehicle.
12 Q. Before the gentleman asked you for a fire
13 extinguisher and a sheet or clothes, did you
14 observe anyone attempting to assist the occupants
15 of the vehicle you struck?
16 A. No.
17 Q. After you gave the gentleman the fire
18 extinguisher and a sheet, what did you observe him
19 do with the fire extinguisher and sheet?
20 A. I didn't observe -- I didn't see him do
21 anything. I was kind of all just confused and I
22 don't know exactly what I did.
23 Q. Why were you confused?
24 A. Well, from the accident. I was just -- I

288

1 think you told me -- did you exit your cab?
2 A. Yes.
3 Q. Where did you go?
4 A. I just stood there beside my truck.
5 Q. And what did you look at as you stood
6 beside your truck?
7 A. I don't remember.
8 Q. Did you look at the burning vehicle?
9 A. No. No, I didn't go look at the car, no.
10 Q. At that point the car was 15 feet away
11 from you, approximately?
12 A. Right.
13 Q. Because you had backed up one car length,
14 right?
15 A. Yes.
16 Q. How many people did you see other than the
17 African-American gentleman who asked for a fire
18 extinguisher?
19 A. There must have been two or three people.
20 I'm not for sure.
21 Q. Did you see what any of them were doing?
22 A. They was -- I didn't see what they was
23 doing, no.
24 Q. Did you ever observe the inside of the car

290

1 didn't -- they was already helping him so I didn't
2 know what I was supposed to do.
3 Q. Okay. So you were confused on how you
4 could best be of assistance?
5 A. Right.
6 Q. You described this as a medium impact.
7 Had you ever had an accident before with a medium
8 impact?
9 A. I hit a deer.
10 Q. Okay. Was that a stronger than medium
11 impact?
12 A. No.
13 Q. Would you describe that as a medium
14 impact?
15 A. Probably a light impact.
16 Q. Okay. Was there anything about this
17 medium impact that led you to become confused after
18 the accident?
19 A. No. I was -- anything about it that made
20 me confused? The accident, I never had an accident
21 before and I wasn't really actually sure what to do
22 or what to go about to do.
23 Q. Okay. So after you gave this gentleman
24 the fire extinguisher and the sheet -- I'm sorry, I

289

1 that you struck while it was on fire?
2 A. While it was on fire?
3 Q. Yes.
4 A. No.
5 Q. Did you ever see Mr. Scheinman, the driver
6 of that vehicle, in the vehicle?
7 A. I don't remember.
8 Q. As you -- Strike that.
9 When you were standing outside -- and I'm
10 taking you back a little bit. I apologize for
11 jumping around.
12 As you were standing outside your vehicle
13 after first getting out, in other words, before you
14 backed up your truck, where did you see fire on the
15 BMW?
16 A. On the back.
17 Q. In the back?
18 A. Yes.
19 Q. Had it -- okay. Can you tell me where on
20 the back it was?
21 A. Just in the -- just in the back of the
22 vehicle.
23 Q. Was there fire in the passenger
24 compartment at that time?

291

56 (Pages 288 to 291)

1  A. I don't know.
2  Q. Was there fire in the front engine
3 compartment at that time?
4  A. I don't believe so, no.
5  Q. When you stepped out of your car — excuse
6 me.
7    When you stepped out of your truck before
8 you moved it, did you see in the windows and see
9 occupants of that vehicle?
10   MR. BURKE: Objection to the form which
11 refers to occupants in the plural form.
12   MR. COUTURE: At that point he probably
13 didn't know.
14   MR. BURKE: I know, but you know. So the
15 form of the question is incorrect.
16   MR. COUTURE: I disagree.
17 BY MR. COUTURE:
18  Q. Go ahead. Did you see anyone in the
19 vehicle?
20  A. I don't remember.
21  Q. Did you try to see if there was someone in
22 the vehicle at that time?
23  A. I don't remember. It happened so fast.
24  Q. So as you were standing outside of your
292

1 specifically read it but it's only fair that I give
2 this to you while I read from it, okay?
3  A. Okay.
4  Q. Before I do that I want to ask you this.
5 Did you tell Officer Bodden, the officer who told
6 you to go sit in the car, that you were going 45 —
7 40 to 45 miles an hour at the time of impact?
8  A. I don't remember.
9  Q. If Officer Bodden testified that that's
10 what you told him, would you have any reason to
11 disagree?
12  A. Yes.
13  Q. Okay.
14   MR. BURKE: I couldn't hear answer.
15   THE WITNESS: Yes.
16 BY MR. COUTURE:
17  Q. Okay. And what reason do you think
18 that — well, strike that.
19    If Officer Bodden wrote down on this
20 report that we're about to show you that you told
21 him that you were going 45 to 50 miles an hour, do
22 you have any understanding why Officer Bodden would
23 have written that?
24   MR. SKRYD: Objection, form, calls for
294

1 truck after you moved it, not looking at the
2 burning car, did anyone approach you to talk to
3 you?
4  A. They was — people was going towards the
5 burning car. Nobody — I don't remember anybody
6 approaching me and talking to me. I'm not saying
7 they didn't but I don't remember anybody actually
8 talking to me at that point.
9  Q. Who was the first person you remember
10 talking to after the accident?
11  A. The officer that told me to go sit in the
12 back of his squad car.
13  Q. Male or female?
14  A. Male.
15  Q. I'll represent to you that Officer Brian
16 Bodden testified that he spoke to you on the day of
17 the occurrence.
18    I take it you don't remember the names of
19 the police officers you spoke to; is that fair to
20 say?
21  A. Right.
22  Q. I'm going to show you what was part of
23 Exhibit No. 28 for identification, specifically
24 Pages 6 and 7, and I'm not going to ask you to
293

1 speculation.
2 BY MR. COUTURE:
3  Q. Go ahead. Other than you telling him?
4  A. I don't know.
5  Q. And the reason why you disagree with —
6 Strike that.
7    Are you saying that you didn't tell him
8 that?
9  A. No.
10  Q. And now Mr. Skryd is showing you and
11 I'll —
12   MR. SKRYD: I won't read it. There's so
13 many of these. Go ahead.
14 BY MR. COUTURE:
15  Q. I'll direct your attention to five
16 paragraphs down: I spoke to the driver of the
17 semi. And I'm only going to direct your
18 attention — you can read the whole thing if you'd
19 like, but I want to direct your attention to the
20 last line.
21   MR. SKRYD: Okay. Let him read it, Tim,
22 if you don't mind.
23   MR. COUTURE: Of course.
24   MR. BURKE: What Bates stamp page are you
295

57 (Pages 292 to 295)

on, Tim?

MR. COUTURE: 6.

MR. SKRYD: Exhibit 28, 6?

MR. COUTURE: Yes.

MR. SKRYD: You're in the paragraph that starts with "I spoke with the driver"?

MR. COUTURE: In deed I am.

MR. SKRYD: Okay. So why don't you read that paragraph and he's going to ask you a question about it.

BY MR. COUTURE:

Q. And you can read the last paragraph too.

MR. SKRYD: On that page, the first page?

MR. COUTURE: Yes.

THE WITNESS: Okay.

BY MR. COUTURE:

Q. Okay. You read it?

A. Okay.

Q. Now, first let me direct your attention to the last paragraph. It says: I placed him into the back seat of my patrol vehicle uncuffed. Does this indicate to you that it would appear that Officer Bodden was the officer who told you to go sit in his car?

296

A. Right.

Q. Is that a yes? I'm sorry, I couldn't hear you.

A. Yes. Yes.

Q. Thank you. The paragraph before, last line: I asked him how fast he thought he was going when he hit the vehicle and he said about 40 to 45.

First of all, that's what is written here, correct?

A. Right.

Q. And you've told me today that you were going 30?

A. Right.

Q. Did you tell Officer Bodden you were going 40 to 45?

MR. SKRYD: Objection, asked and answered.

THE WITNESS: I don't know.

MR. SKRYD: Go ahead.

THE WITNESS: I don't remember.

BY MR. COUTURE:

Q. Did you speak to anyone else before you went and sat in the squad car?

297

A. I don't remember speaking to anybody else. I might have.

MR. SKRYD: Actually, I have another question about that, Joe.

BY MR. COUTURE:

Q. According to, again, the second to the last paragraph: Officer Bodden indicated that you told him that there was a — the light was green and there was a vehicle stopped at the green light.

Did you tell the officer that you saw a vehicle stopped at the green light before you struck it?

A. I don't remember talking — I don't remember this conversation. I just remember him having me — take me by the arm and put me in the back of his squad car. I don't remember talking to him very much at all. I was pretty upset and shaken at the time, you know.

And I told him — the place where I was coming from was wrong too.

Q. I understand. You don't know if that was the officer's mistake or your own mistake?

A. Right.

298

Q. My question, however, is this.

A. Right.

Q. Are you saying you didn't have this conversation or are you saying that as you sit here today four years later you don't remember having this conversation?

A. I don't remember having this conversation.

Q. Thanks. Do you remember speaking with a female officer of the Highland Park Police Department while you were on the scene?

A. I remember seeing a female but I don't remember — I don't remember a conversation, no. There was a lot of officers there.

Q. I'll show you what is Exhibit 28, Bates Stamp Number 8, Page 8. And I'm specifically going to — once your lawyer is done looking at it — draw your attention to Paragraph 5 starting "I asked Samuel." Yes, I'm including the line "the fire department" as a paragraph.

MR. SKRYD: Why don't you read here through here, here through here. He's going to ask you to start here and read through here for now. If he wants to ask you more questions, he'll go further.

299

58 (Pages 296 to 299)