# EX. 4

David Martin Deposition
dated, January 12, 2010

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
PERSON OF JEFFREY J. SCHEINMAN,)
a Disabled Person, )
                              )
      Plaintiff,              )
                              )
   vs.                        ) No. 09 CV 5340
                              )
MARTIN'S BULK MILK SERVICE,   )
INC.; SAMUEL G. FRANKE; CSX   )
INTERMODAL, INC.; INTERNATIONAL)
PAPER COMPANY; and OVERNITE   )
EXPRESS, INC.,                )
                              )
      Defendants.             )

The deposition of DAVID MARTIN, called by the Plaintiff for examination pursuant to notice and pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Steven Stefanik, a notary public within and for the County of DuPage and State of Illinois, at Suite 200, 211 South Wheaton Avenue, Wheaton, Illinois on the 12th day of January 2010.

APPEARANCES:
   CLIFFORD LAW OFFICES, by
   MR. RICHARD F. BURKE, JR.
   120 North LaSalle Street, Suite 3100
   Chicago, Illinois 60602
   (312) 899-9090
      for the Plaintiff;

---

APPEARANCES: (CONT'D)
   MULHERIN, REHFELDT & VARCHETTO, P.C., by
   MR. JOSEPH G. SKRYD
   211 South Wheaton Avenue, Suite 200
   Wheaton, Illinois 60187
   (630) 653-9300
   -and-
   DOWD & DOWD, LTD., by
   MR. ROBERT J. GOLDEN
   617 West Fulton Street
   Chicago, Illinois 60661
   (312) 704-4400
      for the Defendant Martin's Bulk Milk
      Service;
   LEWIS, BRISBOIS, BISGAARD & SMITH, LLP, by
   MR. SCOTT C. BENTIVENGA
   550 West Adams Street, Suite 300
   Chicago, Illinois 60661
   (312) 345-1718
      for the Defendant CSX Intermodal;

   HINSHAW & CULBERTSON, LLP, by
   MR. CARLTON D. FISHER
   222 North LaSalle Street, Suite 300
   Chicago, Illinois 60601-1081
   (312) 704-3000
      for the Defendant International Paper
      Company.

---

INDEX

WITNESS:                          PAGE

DAVID MARTIN

   Examination by:

      Mr. Burke          6
      Mr. Fisher         89
      Mr. Bentivenga     151

   Further Examination by:
      Mr. Burke          190
      Mr. Fisher         195
      Mr. Bentivenga     196

EXHIBITS

NUMBER                    FOR IDENTIFICATION

Martin Nos. 1 and 2              4

Martin Nos. 3 - 11               27

Martin No. 12                    42

Martin No. 13                    83

Martin No. 14                    92

Martin Nos. 15 and 16            98

Martin No. 17                    110

Martin Nos. 18, 19 and 20        111

Martin No. 21                    118

Martin No. 22                    122

Martin No. 23                    124

Martin No. 24                    129

Martin No. 25                    151

---

(Whereupon, Martin Deposition
Exhibit Nos. 1 and 2 were
marked for identification
as of this date.)
(Witness sworn.)
   MR. SKRYD: Do we want to have any stipulations
on questions for the record as -- for objections,
guys?
   I mean, does anybody --
   MR. BURKE: I don't know about for objections,
but my -- it's my understanding that we are not
going into, at your request, the substantive facts
of the incident.
   MR. SKRYD: Correct.
   MR. BURKE: And you're willing to produce
Mr. Martin and Mr. Franke again on another date for
questioning that relates to this -- the specific
details of the occurrence?
   MR. SKRYD: Right.
   My only -- my only thought is, do we
want to say that all objections are reserved, if
they're not made, for purposes of the deposition
except as to maybe form of the question, or not?
It depends on the attorneys in federal court, you

---

1 (Pages 1 to 4)

1 know.
2 MR. FISHER: What the rules say.
3 MR. SKRYD: Rules say you can do it either way.
4 You can be strict and, you know -- and, for
5 whatever reason, if Mr. Martin is unavailable at
6 trial and you want to use the deposition, usually,
7 what I'll do is reserve -- all objections are
8 reserved except as to form of the question.
9 That way, if -- otherwise, we're going
10 to be making objections every 30 seconds because,
11 technically, it could be an evidence deposition in
12 federal court. And I'd prefer to have all
13 objections reserved except as to the form of the
14 question.
15 You guys agree to that?
16 MR. BURKE: I'm probably okay with that.
17 MR. FISHER: That's what the -- we have a
18 disagreement over what the rules say. You don't
19 have to make objections on relevancy ever.
20 MR. SKRYD: That's true.
21 MR. FISHER: Period.
22 MR. SKRYD: I'm not talking about that issue.
23 MR. FISHER: If something could have been
24 corrected now, you need to correct it now.

5

1 MR. SKRYD: Okay.
2 MR. BENTIVENGA: It's okay with me.
3 MR. SKRYD: Scott? Okay.
4 What we'll do is we'll -- all objections
5 are reserved except as to the form of the question
6 for purposes of the deposition today.
7 Go ahead, Rich.
8 DAVID MARTIN,
9 called as a witness herein, having been first duly
10 sworn, was examined and testified as follows:
11 EXAMINATION
12 BY
13 MR. BURKE:
14 Q. Mr. Martin, would you please state your
15 full name and spell your last name for the court
16 reporter.
17 A. David Vern Martin, M-a-r-t-i-n.
18 Q. And your middle name, is it Vern?
19 A. Vern.
20 Q. V-e-r-n?
21 A. Correct.
22 Q. Okay. Thank you.
23 What's your business or occupation, sir?
24 A. I'm operations manager for Martin's Bulk

6

1 Milk Service.
2 Q. And is the proper complete name of
3 Martin's -- Martin's Bulk Milk Service, Inc.?
4 A. Correct.
5 Q. Okay. And where are they located at?
6 A. 1101 Water Street in Wilton, Wisconsin.
7 Q. Do they have any other business locations?
8 A. We have a business location in Utah.
9 Q. And what's the nature of your business in
10 Wilton?
11 A. We run 125 trucks throughout the
12 United States delivering goods to customers.
13 Q. And do you have a particular type of goods
14 or product that you normally deliver?
15 A. Mostly food grade.
16 Q. Do you have tanker trucks that transport
17 liquids?
18 A. Not anymore.
19 Q. How about back in 2008 in July, at the time
20 of this occurrence?
21 A. No, sir.
22 Q. And what's your business out in Utah?
23 What's the nature of it out there?
24 A. It's just a brokerage company.

7

1 Q. And what do you broker?
2 A. Food-grade products.
3 Q. And transportation of them?
4 A. Yes.
5 Q. Do you have a -- does your Utah business
6 operate under the same name, Martin's Bulk Milk
7 Service, Inc.?
8 A. Yes.
9 Q. About how many employees does Martin's
10 have?
11 A. I would say approximately 160.
12 Q. In the -- by whom is Martin's owned? Is it
13 a publicly traded company?
14 A. It's owned by my parents, Al and Ruth
15 Martin.
16 Q. And your mother's name?
17 A. Al and Ruth.
18 Q. Ruth? Thank you.
19 And are they shareholders?
20 A. Yes.
21 Q. And are they the sole shareholders?
22 A. Yes.
23 Q. And how long has Martin's been in
24 existence?

8

2 (Pages 5 to 8)

1    A.  Since 1932. It goes back to my
2  grandfather.
3    Q.  And other than Martin's Bulk Milk Service,
4  Inc., is there -- or I should say, are there other
5  Martin's-related entities that your family
6  operates?
7    MR. SKRYD: Objection. Relevance.
8      You can answer.
9    THE WITNESS: Yes.
10  BY MR. BURKE:
11    Q.  Okay. And what are those, sir?
12    A.  We have MBM Logistics in Illinois and
13  Minnesota.
14    Q.  And what -- and go ahead.
15      What else?
16    A.  Martin Warehousing.
17    Q.  And where is that located?
18    A.  Wilton.
19    Q.  And what else?
20    A.  Company in Utah is Martin Refrigerated
21  Express.
22    Q.  And any others?
23    A.  No, sir.
24    Q.  And what's the business of MBM Logistics?

9

1    THE WITNESS: International Paper.
2    MR. FISHER: -- or International Paper?
3  BY MR. BURKE:
4    Q.  And when you say you pick up, in this case,
5  you weren't physically picking it up yourself, were
6  you?
7    A.  No.
8    Q.  Okay. Are you referring to the --
9    A.  Sam Franke.
10    Q.  Okay. The --
11    MR. SKRYD: Let him ask his question before you
12  answer, okay?
13    THE WITNESS: (Nodding.)
14  BY MR. BURKE:
15    Q.  When you -- what does MBM Logist- -- or
16  what does MBM Logistics do to broker freight?
17    A.  They will take a customer that they have
18  and broker to another carrier and take a portion of
19  the freight rate for profit.
20    Q.  And in those instances, who are their
21  customers, the people that want to have something
22  moved -- moved or transported?
23    A.  Yes.
24    Q.  And do they give that freight to carriers

11

1    A.  They are freight brokers.
2    Q.  And how do they differ than Martin's
3  Bulk Milk Service, Inc.?
4    A.  Martin's Bulk Milk Service is the -- owns
5  the equipment.
6    Q.  The equipment for what?
7    A.  Transporting our goods.
8    Q.  Okay. And what does MBM Logistics do?
9    A.  Broker freight.
10    Q.  And how was MBM Logistics involved in the
11  transportation of the goods that were -- was taking
12  place at the time of this incident on July 3rd,
13  2008, involving Mr. Scheinman?
14    A.  They weren't involved.
15    Q.  Did they have any role in the brokering of
16  the transportation of the goods?
17    MR. SKRYD: Involved in this accident?
18    MR. BURKE: Right.
19    THE WITNESS: The load that -- the load that I
20  pick up -- picked up from International Falls is
21  controlled by me. So no.
22  BY MR. BURKE:
23    Q.  Okay.
24    MR. FISHER: Did you say International Falls --

10

1  other than Martin's?
2    A.  Yes.
3    Q.  How come? Or why not use Martin's?
4    A.  Their volume is way too great for us. I
5  mean, their volume is more than we can handle and I
6  have my own customers.
7    Q.  Who owns MBM Logistics?
8    MR. SKRYD: Objection. Relevance.
9      Go ahead.
10    THE WITNESS: Al Martin and Randy Galewski.
11  BY MR. BURKE:
12    Q.  Did you say Gillespie?
13    A.  Galewski.
14    Q.  How do you spell that, sir?
15    A.  G-a-l-e-w-s-k-i.
16    Q.  And where -- where is MBM Logistics'
17  headquarters at?
18    A.  They're -- all the paper comes to Wilton,
19  Wisconsin. Their office is in Winona, Minnesota.
20    Q.  And why does the paperwork come to Wilton?
21    A.  That's where we hired our people to do the
22  billing.
23    Q.  And does that paperwork come to the
24  Martin's Bulk Milk Service headquarters?

12

3 (Pages 9 to 12)

1     A.  Comes to PO Box 276, Wilton, Wisconsin.
2     Q.  And did you say "PO Box"?
3     A.  276, Wilton, Wisconsin.
4     Q.  And where does it go after that, to
5 Martin's Bulk Milk Service?
6     A.  Yes.
7     Q.  And -- and what is done with that by --
8 with that paperwork by the employees of Martin's
9 Bulk Milk Service?
10     A.  Nothing's done by Martin's Bulk Milk
11 Service. It's done by the employees at MBM.
12     Q.  Does MBM have employees -- I'm sorry --
13 yeah. Does MBM have employees of its own at -- in
14 Winona -- in Wilton?
15     A.  Yes.
16     Q.  Are those persons also employees of
17 Martin's Bulk Milk Service?
18     A.  No.
19     Q.  Do they maintain their offices in the same
20 building or within the headquarters of Martin's
21 Bulk Milk Service?
22     A.  They did until last week.
23     Q.  And where did they go last week?
24     A.  They moved to a school (sic) office just in

13

1 town.
2     Q.  And how many employees does MBM Logistics
3 have?
4     MR. SKRYD: Again, relevance is the objection.
5     THE WITNESS: Somewhere around ten.
6 BY MR. BURKE:
7     Q.  And how many of them work in Wilton?
8     A.  Three.
9     Q.  And what's the general nature of their
10 work? Is it office-type work?
11     A.  Yes.
12     Q.  And then the approximately seven, are they
13 in Minneapolis, did you say?
14     A.  Winona.
15     Q.  Winona.
16     And is that -- is that where they're at,
17 Winona?
18     A.  Yes.
19     Q.  Okay. And what do they do, Mr. Martin?
20     A.  Talk to customers and move freight around
21 the world.
22     Q.  Are any of them truckdrivers, the seven in
23 Winona?
24     A.  No.

14

1     Q.  If I refer to "this incident" or "the
2 occurrence of July 3rd, 2008," you understand I'm
3 talking about the incident involving Mr. Franke and
4 Mr. Scheinman's vehicle; is that correct?
5     A.  Yes.
6     Q.  Okay. With respect to the tractor that
7 collided with Mr. Scheinman's car, was that
8 tractor -- or strike that.
9     By whom was that tractor owned?
10     A.  By Martin's Bulk Milk Service,
11 Incorporated.
12     Q.  Has that tractor prior to this incident
13 been used to transport goods for MBM Logistics?
14     MR. SKRYD: If you know. Don't guess.
15     THE WITNESS: I don't recall.
16 BY MR. BURKE:
17     Q.  Who -- who is the hierarchy of
18 MBM Logistics?
19     Is there a president?
20     A.  Al Martin.
21     Q.  And how about under that?
22     A.  Randy.
23     Q.  Gal- --
24     A.  Galewski.

15

1     Q.  Okay. And what's his position or title?
2     A.  Operations manager.
3     Q.  And underneath him?
4     A.  There are three owners: Al Martin, Ruth
5 Martin, Randy Galewski.
6     Q.  Does MBM Logistics and Martin's use the
7 same dispatcher?
8     A.  No.
9     Q.  Does -- and if I say "Martin's," can we
10 agree I'm referring to Martin's Bulk Milk Service,
11 Inc.?
12     A.  Yes.
13     Q.  Does Martin's have a dispatcher?
14     A.  We have four.
15     Q.  Four?
16     A.  (Nodding.)
17     Q.  Does MBM Logistics have a dispatcher?
18     A.  I would say around three.
19     Q.  Are any of the three dispatchers for
20 MBM Logistics also people who work as dispatchers
21 for Martin's?
22     A.  No, they move their own freight.
23     Q.  When you say "they," who do you mean?
24     A.  MBM moves their own freight. Martin's

16

4 (Pages 13 to 16)

Bulk Milk Service moves their own freight.

Q. Is -- was Overnite Express a customer or client of Martin's in July of 2008?

A. Yes.

Q. What word do you use, Mr. Martin, customer or client? Or what do you -- how do you normally refer to them --

A. They are --

Q. -- or something else?

A. They are a carrier broker.

Q. Okay. What do you consider Martin's business to be?

A. Trucking company.

Q. Is Martin's a licensed carrier?

A. Yes.

Q. Does Martin's engage in brokering of freight?

A. Yes.

Q. Did Mr. Franke sometimes drive trucks that were transporting freight on behalf of MBM Logistics?

MR. SKRYD: Again, if you know. Don't guess.

THE WITNESS: I don't recall.

BY MR. BURKE:

17

Q. How would you figure that out? What documents could you look at to determine the answer to that?

A. Franke had a dedicated run. So he would mostly pull loads out of Arcadia to Chicago for Martin's Bulk Milk.

Q. Out of Arcadia?

A. But there's more various locations. We -- we -- our business, we have, you know, quite a few customers.

So it just -- 90 percent the loads come out of Arcadia.

Q. And where is Arcadia? In what state?

A. Wisconsin.

Q. From what facility or business would he pull loads from normally in Arcadia?

A. Mostly out of Ashley Furniture.

Q. Well, was Sam Franke an employee of any of the Martin's entities?

A. He was an employee of Martin's Bulk Milk.

Q. And did he have an employment contract with Martin's, a written one?

A. He had -- he got a W-2 form from Martin's Bulk Milk.

18

Q. Did Martin's have an actual written employment agreement with him?

A. No agreement. He just -- we just have a handbook that he's -- that there's -- there's really no agreement.

MR. SKRYD: That's the question. Is there an agreement, yes or no?

Do you know?

THE WITNESS: No.

MR. SKRYD: Okay.

BY MR. BURKE:

Q. And when you say he got a W-2 from Martin's, what do you mean by that?

A. He was employed by Martin's Bulk Milk Service only.

Q. Would -- would you -- would Martin's issue a W-2 form for Mr. Franke on a yearly basis?

A. Yes.

Q. Did Mr. Franke get a W-2 form from Martin's -- or from MBM Logistics?

A. No.

Q. Did he get one from any other Martin's entities?

A. No.

19

Q. What's -- where is Martin's Warehousing located, sir?

A. Wilton, Wisconsin.

Q. And what's the nature of their business?

A. We store food-grade product.

Q. And where in Wilton is Martin's Warehousing located?

MR. SKRYD: Objection as to relevance of all this line of questioning.

Go ahead.

THE WITNESS: 602 Walker Street.

BY MR. BURKE:

Q. Is that the same location where Martin's Bulk Milk Service maintains its headquarters?

A. No.

Q. I apologize if you gave it, but what's the address of Martin's Bulk Milk Service?

A. 1101 Water Street.

Q. Who owns Martin's Warehousing?

MR. SKRYD: Objection. Relevance.

Go ahead.

THE WITNESS: Allan Martin.

BY MR. BURKE:

Q. Does your mother -- is she an owner also?

20

1  A. I don't know.
2  Q. Any other owners besides Al?
3  A. No.
4  Q. About how many employees does
5 Martin Warehousing have?
6  A. Six.
7  Q. Do they all work in -- at that
8 Walker Street location?
9  A. No.
10  Q. Where -- how many work at Walker Street,
11 about?
12  A. Three.
13  Q. And where do the others work?
14  A. Sparta, Wisconsin.
15  Q. And what's located there?
16  A. We have a warehouse there also.
17  Q. Mr. Martin, with respect to giving this
18 deposition today, could you tell me what documents
19 you looked at or reviewed.
20  A. I reviewed the bill of ladings,
21 confirmation from --
22  MR. SKRYD: That's not the stuff.
23  THE WITNESS: -- Overnite Logistics. I reviewed
24 an interchange agreement.

21

1 BY MR. BURKE:
2  Q. The Uniform Intermodal Interchange
3 Agreement?
4  A. Yes.
5  Q. What else, sir?
6  A. I reviewed -- is it --
7  MR. SKRYD: That's -- yeah, there's some -- the
8 documents are in there. You can just go through
9 there and tell him what you reviewed.
10  THE WITNESS: Samuel Franke's logs are in here.
11 There's a J-1 form from Snick's (phonetic).
12  MR. SKRYD: Let's do it this way: So you talked
13 about the logs.
14  THE WITNESS: Talked about the maintenance that
15 was done on the tractor, the J-1 again.
16  MR. SKRYD: You didn't look at that.
17  THE WITNESS: UII Agreement, invoice from Celtic
18 (phonetic) for the container, demurrage cost.
19  MR. SKRYD: You didn't look at that.
20  MR. FISHER: Joe, I'm sorry. The agreement,
21 there was an adjective he used right before --
22  (Record read as requested.)
23  MR. SKRYD: What does that stand for, for the
24 record?

22

1  THE WITNESS: Uniform Intermodal Interchange --
2  MR. SKRYD: Agreement.
3  THE WITNESS: -- agreement.
4  MR. FISHER: Thanks.
5  MR. SKRYD: Sure.
6  MR. BURKE: Joe, are there still some others he
7 looked at or not?
8  MR. SKRYD: Yeah, I'm just going to give you
9 all the stuff that he looked at.
10  MR. BURKE: Yeah. Okay.
11  THE WITNESS: I looked at an inspection from the
12 trailer from -- or actually from the chassis; the
13 registration from the chassis; the delivery bill of
14 ladings from the load, Minneapolis; and the pick-up
15 bills from Exel in Hammond, Indiana.
16  MR. BURKE: Okay. Could you maybe keep those in
17 one pile and I'll come back to them in a little
18 bit --
19  MR. SKRYD: Yeah, I will. We'll keep them
20 sticking out.
21  MR. BURKE: -- and go through them in --
22  MR. SKRYD: I'm just going to see if there's
23 anything else he reviewed.
24  MR. BURKE: -- in little bit more detail.

23

1  And if there is, you can just put it on
2 that pile and we'll go through it.
3 BY MR. BURKE:
4  Q. You -- obviously, you're familiar with the
5 occurrence in which Mr. Franke was involved in a
6 collision with Mr. Scheinman's vehicle, correct?
7  A. Yes.
8  Q. Okay. Did you go to that scene at all,
9 sir?
10  A. I did not.
11  Q. Okay. The -- Mr. Franke was operating a
12 truck tractor; is that correct?
13  A. Correct.
14  Q. Do you recall what model or -- of tractor?
15  A. It's a 2004 Freightliner.
16  Q. And I think I already asked you, but who
17 owned that Freightliner tractor?
18  A. Martin's Bulk Milk Service, Incorporated.
19  Q. And do you know for about how long Martin's
20 had owned that tractor?
21  A. Since it's been new.
22  Q. Okay. And was that a 2000, did you say?
23  A. 2004.
24  Q. 2004?

24

6 (Pages 21 to 24)

1 Who -- who performed the normal
2 maintenance on that tractor?
3 A. Our shop in Wilton.
4 Q. And when you say "our," who do you mean?
5 A. Martin's Bulk Milk Service's own shop in
6 Wilton, Wisconsin.
7 Q. Now, at the time of this incident,
8 Mr. Franke was hauling a chassis; is that right?
9 A. A box and a chassis.
10 Q. And the box was placed on top of the
11 chassis, correct?
12 A. Correct.
13 Q. How does the chassis and box that
14 Mr. Franke was hauling differ than what sometimes
15 might be referred to as a trailer?
16 A. A box and chassis -- that the box can be
17 lifted off from the chassis, whereas a regular
18 trailer cannot be. It's all one unit. His was two
19 units.
20 Q. This had a separate just flat chassis,
21 correct?
22 A. Correct.
23 Q. And onto that chassis could be placed
24 various steel box-like containers, correct?

25

1 A. Correct.
2 Q. Those type of -- the type of container that
3 Mr. Franke was hauling can also be placed onto rail
4 cars; is that right?
5 A. Yes.
6 Q. Who owned the chassis that was being
7 hauled?
8 A. I don't know.
9 Q. Have you looked at any documents or
10 attempted to make that determination?
11 A. On this form which came out of the chassis
12 of the trailer, and it says, Owner: Trac Leasing,
13 Incorporated.
14 Q. Just so we have some organization to the
15 transcript, Mr. Martin, is this -- we probably
16 should --
17 MR. SKRYD: Let me --
18 MR. BURKE: Do you want to mark these?
19 MR. SKRYD: Let's take a short break. I'll go
20 make some copies of all the things.
21 Off the record.
22 (Recess taken.)
23
24

26

1 (Whereupon, Martin Deposition
2 Exhibit Nos. 3 - 11 were
3 marked for identification
4 as of this date.)
5 BY MR. BURKE:
6 Q. Mr. Martin, I was in the process of asking
7 you who owned the trailer and I think you had just
8 started looking at an exhibit. And we have now
9 marked that exhibit as Exhibit No. 3, correct?
10 A. (Indicating.)
11 MR. SKRYD: And I think, Rich, what he said for
12 the record is he didn't know who owned the trailer,
13 but this was what was in the trailer, Exhibit 3.
14 BY MR. BURKE:
15 Q. Okay. And that's a document entitled a
16 Maine -- the State of Maine, M-a-i-n-e, Motor
17 Vehicle Registration Inquiry; is that right?
18 A. Yes.
19 Q. Okay. Do you understand what that document
20 is in your trucking business or what it's used for?
21 A. Yes.
22 Q. Okay. What -- what is that, sir?
23 A. It's the registration for the trailer. It
24 has the license plate number, the VIN number, the

27

1 year and make of the trailer -- excuse me, the year
2 and make of the chassis.
3 Q. And in actuality, this document refers to
4 it as a trailer, correct?
5 A. Yes.
6 Q. Okay. But you believe this to be referring
7 to the chassis that Mr. Franke was hauling?
8 A. Only by -- that it came out of the front of
9 the trailer. It came off the chassis on the
10 registration box.
11 Q. Okay. And do you know who retrieved --
12 A. I do not.
13 Q. -- that document?
14 And it indicates that Trac, T-r-a-c,
15 Lease, Inc., is the owner of the chassis, correct?
16 A. Correct.
17 Q. Okay. By the way, did this chassis have --
18 it has its own wheels and axles, correct?
19 A. Correct.
20 Q. Okay. Do you know how many axles?
21 A. Two axles.
22 Q. Okay. Front and back?
23 A. Yes.
24 Q. Okay. Do you know how many wheels?

28

1     A. Eight.
2     Q. How many?
3     A. Eight.
4     Q. Eight? Okay.
5       Are they duals?
6     A. Yes.
7     Q. Okay. Does this chassis have its own
8 brakes?
9     A. Yes.
10     Q. Okay. What other component parts exist on
11 this chassis other than axles, wheels, brakes?
12     A. Dollies.
13     Q. Okay. And what are the dollies used for?
14     A. To hold the trailer in place when it's
15 unhooked from a tractor.
16     Q. What else, Mr. Martin, in terms of the
17 structure of the chassis?
18     A. It holds the front end up. It's
19 underneath -- underneath the chassis toward the
20 front.
21     MR. SKRYD: He wants to know what other
22 component parts are there of the chassis.
23     THE WITNESS: Oh, okay.
24     BY MR. BURKE:

29

1     Q. You were talking about the dolly just in
2 your last answer, right?
3     A. Yes.
4     Q. Okay. And what — yeah, anything else in
5 terms of component parts of the chassis?
6     A. No, it's pretty much just a frame.
7     Q. Okay. How does a container get affixed
8 onto a chassis like this one?
9     A. With the use of a hoist.
10     Q. And how does the container get secured to
11 the chassis?
12     A. It has four locks on each side of the
13 trailer, two in the front, two in the back.
14     Q. How do those locks actually get locked?
15     A. The —
16     Q. Does it -- go ahead.
17     A. The CSX rail yard locks them in place.
18     Q. And how do they do that? Does it require
19 some equipment to do that?
20     A. It would probably require some kind of a
21 bar to put them in place.
22     Q. Okay. Okay. How about — who owned the
23 container that was on the chassis that was being
24 hauled at the time of this incident?

30

1     A. I don't know.
2     Q. Do you know who was leasing the container?
3     A. Celtic.
4     Q. And are you familiar with a company called
5 Celtic Cartage, Incorporated?
6     A. Just that they're a drayman.
7     Q. Okay. And what does that mean?
8     A. They lease the equipment from the
9 railroads.
10     MR. BENTIVENGA: If I could interject.
11       If you're answering from a document,
12 would you mind identifying what that is.
13     MR. BURKE: Yeah, I'm going to.
14     MR. BENTIVENGA: Thank you. I appreciate it.
15     MR. BURKE: I will get to that.
16     MR. BENTIVENGA: Thank you.
17     BY MR. BURKE:
18     Q. And I think you just said they lease
19 equipment from the railroad?
20     A. Correct.
21     Q. Okay. And what railroad are you referring
22 to or do you mean a specific one?
23     A. I'm not sure. All I know is that they
24 leased this container on that particular day.

31

1     Q. Okay. Let me -- I think you do have a
2 document which I'll tender to you as -- marked as
3 Martin's Exhibit No. 9.
4       What's your understanding of what this
5 document consists of, Mr. Martin?
6     A. This is a demurrage document showing that
7 we owe $8,050.
8     MR. SKRYD: How do you spell that, demurrage?
9     THE WITNESS: D-e-m-a-r-g-e (sic).
10     BY MR. BURKE:
11     Q. And is the letter -- is this letterhead
12 from Celtic?
13     A. Yes.
14     Q. Okay. And that's on Exhibit 9 I'm talking
15 about.
16     A. (Nodding.)
17     Q. Okay.
18     MR. SKRYD: Is that a "yes"?
19     THE WITNESS: Yes.
20     BY MR. BURKE:
21     Q. Did you say that this -- and this --
22 Exhibit No. 9 is entitled Accessorial Approval
23 Form; is that correct?
24     A. Yes.

32

Q. Okay. And did you say this is a document from Celtic to Martin saying that Martin's owes $8,050?

A. Yes.

Q. Okay. And there's a unit number on here that is CSXU 937987; is that correct?

A. Yes.

Q. Okay. Is that for the container?

A. Yes.

Q. Okay. And, essentially, what is this document for?

Is it for -- I mean, I'll let you -- you tell me. But what I'm getting at is, why are you being -- being billed? What are they billing you for?

A. It's out past the chargeable dates. It was engaged (phonetic) on 7/3 and then they can charge us after 7/8.

Q. Okay. And this is for the use of the container as distinguished from the chassis?

A. The unit, the whole unit.

Q. The whole unit, chassis and container?

A. (Nodding.)

MR. SKRYD: Is that a "yes"?

33

BY MR. BURKE:

Q. Is that right?

A. Yes.

Q. Okay. And now, this -- based on this document, it indicates that this chassis and container had been originally removed by MBM Logistics, correct?

A. Yes.

Q. And when did they first -- when did MBM Logistics first start using this trailer or this chassis and container?

A. 7/3.

Q. Okay. July 3rd of '08?

A. Yes.

MR. SKRYD: MBM Logistics? Can you listen to the question?

I guess my objection is, to the extent that this document is not consistent with the testimony, I object because it wasn't prepared by Martin's Bulk.

MR. BURKE: Okay.

MR. SKRYD: Do you understand --

THE WITNESS: Yeah.

MR. SKRYD: -- what I'm saying?

34

BY MR. BURKE:

Q. And the document down on the bottom and -- just direct your attention to where I'm at -- that indicates that the unit was out the gate by an MBM driver, correct?

A. Yes.

Q. Okay. And then it says the truck was involved in an accident. The unit's being held by the state police for investigation, correct?

A. Yes.

Q. Do you see where it says "authorized by"?

A. Yes.

Q. Okay. What -- and there's some numbers. Who -- what are those numbers? Where are they coming from?

A. Celtic.

Q. Okay. And is that -- is that an invoice number or an approval number for -- by Celtic to permit use of this chassis and container?

A. Approval number.

Q. Okay. And then it lists the company to whom they gave approval to use this chassis and container as MBM Logistics, correct?

MR. GOLDEN: If he knows.

35

MR. SKRYD: Okay. What was the question again, Rich?

MR. BURKE: My question is the --

MR. SKRYD: What does the document actually say?

BY MR. BURKE:

Q. Yeah, the document indicates that Celtic is saying they authorized use of this chassis and container by MBM Logistics, correct, Mr. Martin?

MR. SKRYD: I guess, Rich, my objection to that question is the form. I don't know if he would know what Celtic meant by this.

I think the document itself says, Company: MBM Logistics. I think that's what it does say.

What it means to Celtic, if you know, you can say. If you don't know, I don't want you to guess.

THE WITNESS: Yeah, I don't know why it...

MR. SKRYD: You don't know why what?

THE WITNESS: I don't know if they meant Martin's Bulk Milk.

BY MR. BURKE:

Q. On this type of document, you -- you have seen this type of document before, correct?

36

A. No.

Q. You have not?

A. No.

Q. Okay. Did -- has this bill been paid?

A. No.

Q. Has either Martin's Bulk Milk or MBM Logistics paid this bill?

A. No.

Q. The -- under -- on the very bottom, the last few lines that we've been talking about where it says "authorized by" and then it's got some numbers that you told me are Celtic's numbers or code for their authorization to use this chassis, that's your understanding of it?

A. Yes.

Q. Okay. And then immediately underneath, it has the word "company" and it says MBM Logistics, correct?

A. Yes.

Q. Did MBM Logistics use this chassis and container on July 3rd, 2008?

A. Martin's Bulk Milk used the container along with Overnite Express. Exel is where we loaded. Destined to Minneapolis.

37

Q. By the way, Exel, could you spell that for us, please.

A. E-x-e-l.

MR. SKRYD: He's referring, Richard, to Martin Exhibit 11.

BY MR. BURKE:

Q. Yeah, I was just going to ask.

You glanced at Exhibit No. 11 to find the spelling for Exel, correct?

A. Yes.

Q. Okay. I'll come back to that exhibit in a moment, Mr. Martin.

The -- well, did Martin's -- excuse me. Did MBM Logistics use this chassis-container unit on any of the two or three days immediately preceding July 3rd, 2008?

A. No.

Q. How did it come about or how did it happen that Sam Franke -- strike that.

Where did -- where did Sam Franke or someone else on behalf of Martin's first obtain possession of the container/chassis that Franke was hauling at the time of this incident?

MR. SKRYD: Objection. My only objection is to

38

form as to possession. The way that can --

MR. BURKE: I kind of mean that as physical possession or where -- where did he --

BY MR. BURKE:

Q. -- where did Mr. Franke first --

MR. SKRYD: Hook up to it.

BY MR. BURKE:

Q. -- hook up his -- or hook up that trailer that -- I'm sorry.

Where did Mr. Franke first hook up that chassis and container to the tractor he was driving on July 3rd, 2008?

A. On Exhibit 8, he picked up CSXU 937987 in Chicago.

MR. SKRYD: One thing, when you're reading from something, just to make it easier for Steve, don't talk so fast, okay?

BY MR. BURKE:

Q. Okay. And you're looking at what we've marked as Exhibit No. 8. And what's the title of that document, sir?

A. ITOPS Inspection, Detail Display.

Q. Okay. And do you know who generates or creates that document?

39

A. I do not.

Q. Okay. Do you know what -- what that document consists of or what it is supposed to be?

A. It's a release form for a container trailer.

Q. And who is releasing it?

A. CSX.

Q. And that document also indicates that the drayage company is Celtic Cartage, correct?

A. Yes.

Q. From that document, Exhibit 8 -- do I have the number right, Exhibit 8?

A. Yes.

Q. From what location -- or strike that.

Do you believe this indicates the location from which Mr. Franke picked up the con- -- the chassis?

A. The location says Chicago.

Q. And do you know where in Chicago?

A. No.

Q. And do you know -- does it indicate the approximate time he picked it up?

A. I can't tell what time he picked it up.

MR. SKRYD: From that document, correct?

40

THE WITNESS: Yes.

BY MR. BURKE:

Q. Do you know what time he -- approximately what time he picked it up from your own knowledge or from any other document?

MR. SKRYD: He's probably going to refer to the log, right? Is that what you're looking for?

THE WITNESS: Yes.

MR. SKRYD: All right. I got to get that. Hold on.

All right. He's referring to Franke's logs of July 3rd, '08; is that correct?

THE WITNESS: Yes.

MR. BURKE: Maybe we can -- we don't have to do it this moment, but what's the next number?

THE REPORTER: 12.

MR. BURKE: Maybe we can make it a Group 12.

MR. SKRYD: You're going to make me photocopy the whole thing?

THE WITNESS: According to the log, he left --

MR. SKRYD: Hold on a second. Rich?

MR. BURKE: Yeah.

BY MR. BURKE:

Q. Mr. Martin, what on the logs, which we'll

41

mark as Group 12, indicates to you the time or approximate time that Mr. Franke picked up this chassis and container?

A. 6:30.

Q. A.m. or p.m.?

A. P.m.

Q. Okay. On what date, sir?

A. 7/3/08.

Q. And is there any other information there at the specific location that he picked it up at?

A. It states Chicago.

Q. Okay. Was it a CSX facility?

A. Yes.

MR. BENTIVENGA: I'm sorry. I didn't understand your first question. Can you just say that again?

Did you say staged Chicago?

MR. SKRYD: Stated.

THE WITNESS: The document states Chicago.

MR. BENTIVENGA: States Chicago. Okay. I'm sorry. Thank you.

(Whereupon, Martin Deposition Exhibit No. 12 was marked for identification as of this date.)

42

BY MR. BURKE:

Q. Thanks, Mr. Martin.

We've been looking at a few documents. And can you tell me or can you give us an overview of what your understanding is as to how Mr. Franke came to be hauling the chassis and container containing the goods that it contained at the time of this incident?

MR. SKRYD: You mean from when he left Wilton to the time he picked it up --

MR. BURKE: Exactly.

MR. SKRYD: -- at IP all the way through the accident?

BY MR. BURKE:

Q. Yeah. If you can just give us an overview, to the extent you know that, without necessarily getting into documents. Just so we have the big picture.

A. He would leave --

MR. SKRYD: Okay. Not he would, should. What he did, to the best of your understanding.

MR. BURKE: Yes. And --

MR. SKRYD: He left Wilton, he went... You know, that's what we're looking for; not if he

43

would have done or should have done, that kind of thing.

If you know.

BY MR. BURKE:

Q. Here, let me start with a question.

Did -- did Martin's or Mr. Franke receive some assignment to pick up some goods from International Paper?

A. Yes.

Q. Okay. And from whom did they receive that assignment?

A. From Overnite Express.

Q. Okay. And what is the business of Overnite Express?

A. They are a carrier and a broker.

Q. Did Martin's have a business relationship with Overnite Express on and prior to July 3rd, 2008?

A. Yes.

Q. And for what period of time?

A. Year and a half.

Q. And what was the nature of that business relationship, Mr. Martin?

A. We would haul a load of paper from Exel

44

1  Logistics in Hammond, Indiana, to Minneapolis
2  daily.
3      Q.  From Hammond to Wilton?
4      A.  Hammond to Minneapolis.
5      Q.  Thank you.
6          How was Overnite Express involved in
7  that daily transportation of paper?
8      MR. FISHER:  Objection.  Form.
9      THE WITNESS:  They would daily dispatch a load
10 from Hammond to Minneapolis.
11 BY MR. BURKE:
12     Q.  Did you -- did Martin's have some type of
13 agreement or contract with Overnite Express?
14     A.  A carrier broker agreement.
15     Q.  And explain what you mean by that, please.
16     A.  It's an agreement to haul freight for
17 Overnite Express basically to cover
18 back-solicitation and to prove that we had
19 insurance.
20     Q.  I missed the first thing you said.
21 Basically to?
22     A.  I forgot.
23          (Record read as requested.)
24 BY MR. BURKE:

45

1      Q.  And what do you mean by the term
2  "back-solicitation"?
3      A.  International Paper is Overnite Express's
4  customer.  So I cannot back-solicit
5  International Paper and go around them.
6      Q.  And is Martin's a customer of
7  Overnite Express?
8      A.  Yes.
9      Q.  With respect to -- or strike that.
10         Do you have a -- did you have an actual
11 written contract or agreement -- did Martin's have
12 a written contract or agreement with
13 Overnite Express?
14     A.  Yes.
15     Q.  And, generally, what, to your
16 understanding, were the terms of that contract?
17     MR. FISHER:  Objection.  Form.
18     THE WITNESS:  I don't recall.
19 BY MR. BURKE:
20     Q.  Pursuant to that contract -- or strike
21 that.
22         With respect to this actual incident,
23 how was Overnite Express involved with respect to
24 Martin's as to the goods that were being hauled at

46

1  the time of this collision?
2      A.  Well, on Exhibit 11, they sent over
3  confirmation to pick up a load out of
4  International Paper Exel Warehouse, Hammond,
5  Indiana, to deliver to Minneapolis on 7/7.
6      Q.  And is that the document entitled Broker
7  Confirmation Sheet?
8      A.  Yes.
9      Q.  And I think you said Overnite faxed that to
10 Martin's, is that correct, on July 3rd, 2008?
11     A.  Yes.
12     Q.  All right.  And there -- up in the upper
13 left-hand corner of that document, there's the date
14 July 3rd, 2008 and the time 16:23.
15         Do you see that?
16     A.  Yes.
17     Q.  Okay.  Is that 4:23 --
18     A.  Yes.
19     Q.  -- p.m. in the afternoon?
20         Whose phone number is that after that,
21 the (708) 331-8604?
22     A.  Overnite Logistics.
23     Q.  Do you know where Overnite Logistics is
24 located?

47

1      A.  Chicago and Minneapolis.
2      Q.  And where in Chicago, if you know?
3      A.  I don't know.
4      Q.  Do you -- do you know the facility or
5  location -- strike that.
6          Do you know whose phone number -- strike
7  that.
8          I think you said you think it's
9  Overnite Logistics' phone number?
10     A.  I know it's Overnite Logistics' phone
11 number.
12     Q.  Okay.  Do you know the location where that
13 phone is located?
14     A.  No.
15     Q.  In response to -- or strike that.
16          If you could just walk us through this
17 document a little more slowly.  I know you already
18 mentioned it.  But, essentially, what is Overnite
19 asking Martin's to do per -- under this document,
20 Exhibit No. 11, is it?
21     MR. SKRYD:  Yeah.
22     THE WITNESS:  Asking to pick up a load on
23 7/3/08.
24 BY MR. BURKE:

48

Q. Asking Martin's to pick up a load?

A. Asking Martin's to pick up a load 7/3/08 at 19:00.

MR. SKRYD: What's that? At 19:00. The time 19:00.

BY MR. BURKE:

Q. And that would be 7:00 p.m.; is that right?

A. Yes.

Q. Okay. And where was that load to be picked up at?

A. Exel Warehouse, International Paper, Hammond, Indiana.

Q. Do you know the business that Exel Warehouse is involved in?

A. Distribution of paper.

Q. Do you know if they are owned by or affiliated with International Paper in any manner?

A. I do not.

Q. Have you been to that Exel Warehouse in Hammond, Indiana?

A. Yes.

Q. What's physically located there, Mr. Martin?

A. A big warehouse.

49

Q. And stores paper?

A. Yes.

Q. Okay. Anything else?

A. Not to my knowledge.

Q. Does Exel have trucks for their own transportation?

A. I don't know.

Q. Okay. With respect to Exhibit 11, Mr. Martin, what else was Overnite asking Martin's to do after picking up this load of paper at the Exel Warehouse?

A. To deliver the load on 7/7/08.

Q. And from this document, do you have an understanding of who owned the load of paper that was being delivered?

A. I do not.

MR. FISHER: Excuse me. Objection. Form. At what time?

BY MR. BURKE:

Q. At the time it's being picked up. Is your answer still you do not know?

A. I do not.

Q. Okay. If -- what, if anything, does the expression next to the word "shipper" where it

50

says, International Paper/Exel Warehouse, written in that manner next to "shipper," does that have any meaning to you in terms of who owns the product, who's storing the product or anything else?

A. No.

Q. Who does -- in the upper right-hand corner of this document, it's got the name Melody Hansen, H-a-n-s-e-n. Do you know who she works for?

A. She's the person from Overnite that generates this confirmation.

Q. Okay.

MR. SKRYD: Generates Exhibit 11?

THE WITNESS: Yes, 11.

BY MR. BURKE:

Q. Do you -- back in 2008, would you get these type of sheets on a daily basis from either Melody Hansen or someone else at Overnite?

A. Yes.

Q. You were starting to tell us that Overnite was asking Martin's to make delivery of this paper on July 7th, 2008, correct?

A. Yes.

Q. Okay. And to where was the paper to be

51

delivered?

A. According to Exhibit 11, it has three stops in Minneapolis.

MR. SKRYD: Three stops in Minneapolis?

THE WITNESS: Yes.

BY MR. BURKE:

Q. Okay. And what were those three stops?

A. Cenved, Midland Paper, XPEDX, Minneapolis.

MR. SKRYD: For Steve's edification, how are you spelling Cenved?

THE WITNESS: Cenved, C-e-n-v-e-d.

BY MR. BURKE:

Q. And then underneath that, it's -- there's a line that says, Total payment to the carrier inclusive of accessorial; it says $974.08, correct?

A. Yes.

Q. Okay. What does that line and that number mean?

A. That means that that is the total amount that we received from Hammond, Indiana, to Minneapolis delivering three stops.

Q. And when you say "we," you're talking about Martin's?

A. Yes.

52

13 (Pages 49 to 52)

Q. And from whom are you receiving that $974.08?

A. Overnite Logistics.

Q. Physically, how would you -- or how would Martin's get paid? Would it be by check or would there be a wire transfer or otherwise?

A. Check.

Q. And would it come on a check written on an Overnite account?

A. Yes.

Q. And then, actually, in the document itself, there's another paragraph that goes on to discuss some of the details of the payment, correct?

A. Yes.

Q. Okay. And, actually, in this document, it makes reference to UACL remitting payment. Do you see that?

A. Yes.

Q. Okay. And do you know what UACL refers to?

A. No.

Q. Did there -- are you familiar with Universal Am-Can?

A. Yes.

Q. Did there -- did there come a point in time

53

when Martin's had some relationship with -- or -- with Universal Am-Can?

A. Yes.

Q. Okay. Tell us about that.

How did that come about, sir, as you understand it?

A. The way I understand, Universal Am-Can bought out Overnite Logistics.

Q. Okay. And did that take place in approximately May or June of 2008?

A. I don't recall.

Q. Did you receive correspondence from Universal Am-Can indicating that they were honoring all contracts that you had with Overnite?

A. They sent some documentation telling us that they were bought out, is what I recall.

MR. SKRYD: Overnite sent you that or Am-Can? You said "they." What does that mean?

THE WITNESS: I don't recall the documents.

BY MR. BURKE:

Q. Is it Overnite that you believe was bought out by Universal Am-Can?

A. Yes.

Q. Did you continue doing business and

54

transporting paper from this Exel Warehouse on a regular daily basis after you believe Universal bought out Overnite?

A. Yes.

Q. Did you do so under the same terms of your agreement with Overnite?

A. Yes.

MR. SKRYD: You got to take a break, Carl?

MR. FISHER: Nope. At a certain point, I do, to my car, but that's -- off the record.

(Discussion off the record.)

(Recess taken.)

BY MR. BURKE:

Q. Mr. Martin, earlier, I -- one of the first things I asked you is what your job is. I think you told me you're the operations manager for Martin's; is that right?

A. Yes.

Q. Okay. What do you do in that position?

A. I line up freight for my trucks, find back-hauls, deal with drivers.

Q. And what's a back-haul in your business?

A. I would say leaving Wisconsin delivering to a state, or it could be within the state, and then

55

coming back to Wisconsin, back to our terminal.

Q. So making a delivery and coming back to the Martin's terminal?

A. Yes.

Q. All within a certain time period or not necessarily?

A. Not necessarily.

Q. With respect to Exhibit No. 11, the confirmation sheet you got from Overnite Logistics -- by the way, do you know the difference between -- if any -- Overnite Logistics and Overnite Express, Incorporated?

A. I do not.

Q. With respect to Exhibit 11, you had -- were telling us that this confirmation sheet got faxed to you.

What did you do in response to receipt of this document?

A. Mr. Franke is informed to pick up this load, which is Exhibit 11, and dispatch from my office contacts (sic) that information to him.

Q. Do you know where Mr. Franke physically was located when he had this information communicated to him?

56

14 (Pages 53 to 56)

A. Chicago.

Q. Okay. And was there a dispatcher at Martin's that communicated this information?

A. Yes.

Q. And pursuant to this request by Overnite, did Mr. Franke go to the Exel Warehouse?

A. Yes.

Q. Did he obtain -- did he make a pick-up of paper product?

A. He picked up paper at -- for International Paper at Exel Warehouse for Overnite Logistics.

Q. And what did he do with it after making that pick-up?

A. He made it to Highland Park, which is where he had the accident.

Q. Okay. And was he en route -- or strike that.

Where -- where was Mr. Franke heading to? Was he going to Minneapolis for these deliveries or elsewhere?

A. Wilton.

Q. Wilton?

Okay. And what would happen -- how

57

would this paper ultimately get transported to Minneapolis?

A. By another one of my drivers, Martin's drivers.

Q. And it was going to get there by -- get to Minneapolis to these three different companies by July 7th as requested by Overnite?

A. Yes.

Q. When Mr. Franke would go to International -- or go to Exel and pick up paper for International, how would -- you know what, let me -- let me strike that question.

We talked about this earlier; but in relation to Martin's receiving this request from Overnite, when did Mr. Franke pick up the chassis and container that he took to Hammond to pick up the paper in?

MR. SKRYD: Again, the witness is referring to Group Exhibit 12?

THE WITNESS: 12.

MR. SKRYD: Which are the --

MR. BURKE: The logs?

MR. SKRYD: The logs.

THE WITNESS: He picked up the container on

58

7/3/08 from CSX yard, 47th Street, 6:30 p.m.

BY MR. BURKE:

Q. And that was it.

So that's a couple hours later after Overnite sends this request to Martin's, correct?

A. Yes.

Q. And then when -- do you have anything in front of you that tells us when Mr. Franke got to the Exel Warehouse to pick up the International paper?

A. Also on Exhibit 12, 7:30 p.m. on 7/3/08.

Q. Okay. In your business and in this case in particular, when Mr. Franke would arrive at the Exel Warehouse, who would do the actual loading of the paper into the container that he brought?

A. An Exel employee.

Q. Do you know how they do that? Is it with forklifts or equipment?

A. Forklift or clamp.

Q. Or what?

A. Or a clamp.

Q. Thereafter, what do you believe Mr. Franke did after the paper was loaded into the container?

A. He proceeded northbound.

59

Q. Back into the Chicago area and through Chicago?

A. Yes.

MR. SKRYD: For the record, Rich, do you want to know what time he left Exel?

BY MR. BURKE:

Q. If you have that in front of you, if you could tell us that, please do so, Mr. Martin.

A. He left Exel distribution, load of International paper, at 9:30 p.m., 7/3/08.

MR. SKRYD: And, again, you were referring to the log on July 3rd of '08 of Exhibit -- Group Exhibit 12?

THE WITNESS: Yes.

BY MR. BURKE:

Q. And it was after that departure from the Exel Warehouse and during the return trip to Wilton that this collision occurred, correct?

A. Yes.

Q. Is it your understanding that it was International Paper that was requesting Overnite to transport its paper product to these three different locations in Minneapolis?

A. Yes.

60

MR. FISHER: Objection. Foundation, form.

BY MR. BURKE:

Q. And what, if anything, do you have either on documents or from your knowledge of industry custom and practice that causes you to say that, Mr. Martin?

A. I have a load confirmation from Overnite Logistics to pick up a load of International paper from Hammond, Indiana, at Exel Warehouse.

MR. SKRYD: What's that, for exhibit?

THE WITNESS: Exhibit 11.

And I also have the delivery bill of lading numbers -- delivery bill of ladings, Exhibit 5, going to their destinations.

BY MR. BURKE:

Q. And on Exhibit 11, the shipper is identified as International Paper/Exel Warehouse?

A. Yes.

Q. How about Exhibit 5? I think that's it right there, Mr. Martin.

Okay. That is actually a three-page exhibit, correct? There's three pages --

A. Yes.

61

Q. -- attached there?

Okay. And those are various -- they're entitled Memo Bills. Do you refer to them as anything else in your business?

A. Bill of lading.

Q. Bill of lading?

And, essentially, what do you understand those memo bills to consist of or to represent?

A. They tell the shipper, which is International Paper, Exel Warehouse. They also tell the carrier, which is Overnite Express.

Q. What's the purpose of this document, as you understand it?

A. It's a legal delivery document.

Q. Okay. And there are -- are there three separate memo bills or bills of lading for the three ultimate destinations for this paper product?

A. Yes.

Q. Okay. And there are -- all three of those are contained in Exhibit 5, correct?

A. Yes.

Q. And they -- the carrier is identified as Oxen, O-x-e-n, correct?

A. Yes.

62

Q. And it indicates that the commodity is printing paper, correct, in the middle of the --

A. Yes.

Q. Okay. And it's -- it indicates that that paper product is being received from International Paper at its distribution center in Hammond, Indiana, correct?

A. Yes.

Q. Do you see where it says "routes" and it then says "Overnite Express, Inc."?

A. Yes.

Q. What does that mean to you?

A. That means that International Paper is giving the load to Overnite Express to be delivered.

Q. And Overnite Express, in turn, gave this load of paper to Martin's to be delivered to the locations that International Paper wanted it sent to; is that correct?

A. Yes.

Q. Would it be correct that Martin's would never have become involved in transporting this paper if International Paper did not ask Overnite Express to arrange for transportation?

63

MR. FISHER: Objection to form.

THE WITNESS: Can you repeat that?

BY MR. BURKE:

Q. Sure.

Would it be true and correct that Martin's would never have gotten involved in hauling this paper unless International Paper asked Overnite to arrange for transportation of --

A. Yes.

Q. -- the paper products?

Would it also be true and correct that Martin's would not have been involved in transporting this paper on July 3rd unless Overnite Express or Overnite Logistics contacted Martin's and asked Martin's to transport this paper from the Hammond distribution center of International Paper to these three locations in Minneapolis?

A. Yes.

Q. Would it be true, Mr. Martin, that in transporting this paper, Martin's was performing a service for the benefit of International Paper by transporting their paper product to Minneapolis?

MR. FISHER: Objection --

64

16 (Pages 61 to 64)

1  THE WITNESS: Yes.
2  MR. FISHER: -- form.
3  BY MR. BURKE:
4  Q. Would it also be true and correct that
5  Martin's was performing a service for
6  Overnite Express by transporting these paper
7  products that International Paper had asked
8  Overnite to get transported?
9  A. Yes.
10  Q. Isn't it true and correct that Mr. -- or
11  excuse me -- that Martin's was acting as an agent
12  for International Paper by transporting
13  International's paper product to Minneapolis?
14  MR. FISHER: Objection to form.
15  THE WITNESS: Yes.
16  BY MR. BURKE:
17  Q. Would it also be true that Martin's was
18  acting as an agent for Overnite Express by
19  transporting the paper product that Overnite had
20  agreed with International to get transported to
21  Minneapolis?
22  A. Yes.
23  MR. FISHER: Objection to form.
24  BY MR. BURKE:

65

1  Q. What was your answer?
2  A. Yes.
3  Q. On Exhibit 5 that you have in front of you,
4  is that -- there's a -- on each of the three pages
5  on the top right, there's a signature -- there's
6  the word "signature" and then there is an actual
7  signature.
8  Do you know whose signature that is?
9  A. Samuel Franke.
10  Q. When -- what does the presence of
11  Mr. Franke's signature at that location indicate to
12  you on this memo bill or bill of lading?
13  A. It means to me that he was loaded with a
14  load of International paper from him -- from
15  Hammond, Indiana, Exel Warehouse, lined by
16  Overnite Express, going to Minneapolis.
17  Q. Am I correct that -- strike that.
18  Mr. Martin, I think, earlier, you told
19  us you -- that you believe this container and
20  chassis were owned by CSX; is that correct?
21  A. CSX's name is on the side of the trailer.
22  Q. And does that -- and when you say
23  "trailer," do you mean the container box or do you
24  mean the chassis or --

66

1  A. The container box.
2  Q. -- the container box?
3  Okay. In this type of transportation of
4  goods, does somebody have to pay for the use of
5  that container?
6  A. Yes.
7  Q. And did you get -- I think you also earlier
8  told us you got sent a bill from Celtic for about
9  $8,000, correct?
10  A. Yes.
11  Q. Insofar as -- or strike that.
12  You -- you also told us the -- this
13  container or chassis may have been owned by
14  Trac Leasing; is that correct?
15  A. I -- according to this paper, the chassis's
16  owned by Trac Lease.
17  MR. SKRYD: "This paper" is what number?
18  THE WITNESS: Exhibit No. 3.
19  BY MR. BURKE:
20  Q. Mart -- Mr. Martin, wouldn't it be true
21  that -- insofar as you were using a CSX container
22  to transport these paper products and you had to
23  pay for the use of that container, isn't it true
24  that that -- the transportation of goods here was

67

1  being conducted, in part, for the use and benefit
2  of CSX?
3  MR. BENTIVENGA: I'm going to object to the form
4  and foundation.
5  THE WITNESS: Yes.
6  BY MR. BURKE:
7  Q. Is it also true that you -- or strike that.
8  Is it also true that Martin's was acting
9  as an agent of CSX by utilizing their trailer and
10  paying them to transport goods for the use and
11  benefit of CSX?
12  MR. BENTIVENGA: I'll object to the form and
13  foundation.
14  THE WITNESS: Yes.
15  BY MR. BURKE:
16  Q. To the -- or strike that.
17  At least to the extent that either this
18  chassis and/or container is owned by or leased by
19  Trac Leasing and Celtic, isn't it also true that
20  Martin's transportation of goods using this
21  chassis-container unit was being performed for the
22  use and benefit of both Trac Leasing and Celtic?
23  MR. BENTIVENGA: I'll object to the form and to
24  foundation.

68

1  THE WITNESS: Yes.
2  BY MR. BURKE:
3      Q. Is it also true that by doing so, Martin's
4  was acting as an agent of Trac Leasing and an agent
5  of Celtic?
6      MR. BENTIVENGA: I'll object to the form and
7  foundation.
8      THE WITNESS: Yes.
9  BY MR. BURKE:
10     Q. Is it your understanding that
11 International Paper and/or Overnite determined
12 that -- the ultimate location to which this paper
13 needed to be delivered?
14     A. Yes.
15     Q. And did Overnite -- I'm sorry.
16         Did International Paper and/or Overnite
17 tell Martin's the time for both the pick-up and the
18 time for the delivery?
19     A. Yes.
20     Q. Martin's had to follow those instructions
21 and directions from -- that were faxed to you from
22 Overnite, correct?
23     A. Yes.
24     Q. Did -- did you believe that Martin's was

69

1      Q. Did Martin's believe that they had to
2  accurately and successfully complete the
3  transportation of goods in order to receive payment
4  from Overnite?
5      A. Yes.
6      Q. Did -- did Overnite require Martin's to
7  utilize a properly licensed and qualified driver to
8  transport these paper products?
9      A. Yes.
10     Q. Did Overnite also -- or strike that.
11         Isn't it correct that Overnite expected
12 and required Martin's to transport these goods in a
13 tractor-trailer unit that was safe for operation
14 and would timely accomplish the transportation of
15 goods?
16     MR. FISHER: Objection to foundation, form.
17     THE WITNESS: Yes.
18 BY MR. BURKE:
19     Q. Did Overnite -- isn't it true that Overnite
20 also required Martin's to utilize a driver and
21 trucking equipment that complied with all
22 Department of Transportation applicable regulations
23 for motor carriers?
24     A. Yes.

71

1  obligated or required to follow instructions and
2  directions given to Martin's by International Paper
3  and/or Overnite as to the transportation of this
4  paper product commodity?
5      MR. FISHER: Objection to form and foundation.
6      THE WITNESS: Yes.
7  BY MR. BURKE:
8      Q. If in the middle of this -- or strike that.
9          If, at any point prior to the collision,
10 Overnite or International Paper had told Martin's
11 to stop the trip or make some changes, would
12 Martin's and Mr. Franke have done what Overnite and
13 International Paper told them to do?
14     A. Yes.
15     Q. Would it be correct that Overnite and
16 International Paper had the right to stop or
17 terminate the transportation of these goods at any
18 point during this -- this job?
19     A. Yes.
20     Q. Mr. Martin, were there reasons or
21 circumstances under which Overnite could withhold
22 or refuse to pay Martin's for this transportation
23 of goods?
24     A. I'm not sure.

70

1      Q. If Overnite or International Paper gave
2  Martin's any specific directions or instructions
3  concerning the safe transportation of the paper
4  products involved here, would Martin's have
5  followed those instructions?
6      A. Yes.
7      Q. Did Overnite and/or International Paper
8  require Martin's to maintain liability insurance as
9  a condition of being allowed to transport this
10 paper product for them?
11     A. Yes.
12     MR. SKRYD: Objection. Relevance.
13         You can answer.
14     THE WITNESS: Yes.
15 BY MR. BURKE:
16     Q. You don't mind me standing over you,
17 Mr. Martin?
18     A. Not at all.
19     Q. Let me ask you about a few more of those
20 documents that we have marked and I don't think
21 we've quite touched on yet.
22         Are these -- is this your file of what
23 we've gone through already?
24     MR. SKRYD: That's everything. No, it's all

72

18 (Pages 69 to 72)

1  mixed up.
2  BY MR. BURKE:
3     Q.  Okay.  We talked about that.  We talked
4  about that.
5        Exhibit 11, you've referred to.  Those
6  are Mr. Franke's driver logs, correct?
7     MR. SKRYD:  12.
8     MR. BURKE:  Oh, I'm very sorry.  I misspoke.
9  BY MR. BURKE:
10    Q.  Exhibit No. 12, are those Mr. Franke's
11 driver logs?
12    A.  Yes.
13    Q.  Okay.  And those essentially -- this is a
14 log he's required to maintain on the hours for
15 which he is on duty, correct?
16    A.  Yes.
17    Q.  Okay.  And these go -- they run from
18 June 3rd to -- actually, the last one ends --
19    MR. SKRYD:  July.
20 BY MR. BURKE:
21    Q.  -- on July -- I think it's July 5th; is
22 that right?
23    A.  Yes.
24    Q.  But he was off duty, it looks like, July

73

1  4th and July 5th; isn't that correct?
2        Is that what that indicates?
3     A.  Yes.
4     Q.  Okay.  And -- okay.  And then it's got --
5  and then July 3rd, it indicates his working on what
6  hours?
7     A.  From 2:30 till 11:00 p.m.
8     Q.  So that's 2:30 p.m. on July 3rd until
9  11:30 p.m.?
10    MR. SKRYD:  No.
11    THE WITNESS:  11:00 p.m.
12 BY MR. BURKE:
13    Q.  Or -- I'm sorry.  11:00 p.m.?
14        Okay.  Thank you.
15        Martin Exhibit 10 is the Uniform
16 Intermodal Interexchange and Facilities Access
17 Agreement.  We touched on -- or you made reference
18 to it a couple of times; but, basically, what's
19 your understanding of what that document is,
20 Mr. Martin?
21    A.  This document is an agreement for which we
22 can enter railroads and do a trailer interchange.
23    Q.  Okay.  And in this instance, was CSX one of
24 the railroads or facilities that Martin's could

74

1  enter to do a trailer interchange?
2     A.  Yes.
3     Q.  Do you have a copy of the contract that
4  Martin's had with Overnite Express?  Do you have
5  that here with you?
6     A.  No.
7     Q.  Okay.  Where is that original?
8     A.  It would be in a file in Wilton.
9     Q.  And that's the contract you were talking
10 about earlier when you mentioned having an
11 agreement -- a business agreement or a business
12 arrangement with Overnite; is that correct?
13    A.  It's a broker carrier agreement.
14    Q.  How about -- Exhibit 5, we talked about
15 already.  How about Exhibit 7, what's that,
16 Mr. Martin?
17    A.  This is a copy of the repairs that was done
18 at our facility in Wilton between April 11th, '08
19 until June of '08.
20    Q.  Okay.  Repairs on what?
21    A.  On Truck 139.
22    Q.  Okay.  And --
23    MR. SKRYD:  I think it's repairs and/or
24 maintenance, Rich.

75

1     MR. BURKE:  Okay.
2  BY MR. BURKE:
3     Q.  And is Truck 139, is that the tractor
4  involved in this incident?
5     A.  Yes.
6     Q.  And how about, since this is set forth in a
7  somewhat abbreviated fashion, could you --
8     MR. SKRYD:  "This" is Exhibit 7.
9  BY MR. BURKE:
10    Q.  Could you just decipher that for us on the
11 dates and tell us what your entries mean there.
12        And, actually, I'm sorry, Mr. Martin.
13 Before you do that, who actually prepares this
14 document?
15    A.  This document is prepared by our office in
16 Wilton.  It's given from our mechanics in our shop
17 in Wilton to the secretary that does data entry for
18 maintenance.
19    Q.  Okay.  And is there -- is there a data
20 entry log main- -- kept regarding ongoing
21 maintenance to the vehicle?
22    A.  Yes.
23    Q.  Okay.  And do you have similar entries for
24 dates prior to April 11th of '08?

76

A. Yes.

Q. Okay. Okay. Did Martin's do all of the maintenance on -- on the tractor?

A. Yes.

Q. How about the chassis that was involved in this incident, had Martin's ever maintained that chassis?

A. No.

Q. Okay. If I could -- if you could go ahead and do what I was starting to ask you. Just tell us the entries there, please, sir.

A. On 4/11/08, replaced the pigtail end that bolts to truck and that plugs into the trailer.

Q. Okay. What's the pigtail end refer to?

A. The pigtail end is the light plug from the tractor that goes into the trailer that operates the lights.

Q. Okay.

A. On April '08 --

Q. Some unspecified date -- there's a question mark for the exact date in April '08; is that --

A. That's correct.

Q. -- what that means?

Okay. Go ahead, sir.

77

A. New steer tires, new studs and nuts on the right side. Changed out right duals on both axles, adjusted alignment; new hanger bearings; adjusted clutch; adjusted brakes; straightened bumper.

Q. And the mileage at that time was 240,056?

A. Yes.

Q. Okay. Go ahead.

May 10th, '08?

A. Tightened step on right side. June 2nd, mileage.

Q. You know, just in fairness, back to the unknown date in April.

Did I -- it's -- did I cut you off before you said adjusted brakes?

A. No, I believe I said that.

Q. Did you say that? Okay. I thought I interrupted you at some point.

Back to May 10th, '08.

A. The mileage on May 10th, '08 was 253,236. Service.

Q. Actually, isn't that for June 2nd, '08?

A. Yes.

Q. My -- okay.

Go ahead.

78

A. DOT inspection. Replaced right high beam; replaced right cab turn assembly; replaced two marker bulbs; replaced long hood cable; replaced alternator belt.

Q. The last entry for under the specified date in June of '08 is what?

A. Mileage on June '08 was 261,061 and a new hood cable was put on.

Q. Okay. Thank you.

All right. Exhibit -- I think Exhibit 8, we've talked about before. That's the ITOPS Inspection, Detail Display?

A. This is an end-gate out of CSX on 47th Street.

Q. Right.

And that would be where you believe Mr. Franke picked up the trailer, correct?

A. Correct.

Q. And then how about Martin Exhibit No. 4, sir, what is that?

A. This is an annual inspection done on the chassis on May 23rd of '08 from CSX.

Q. And where did you obtain a copy of this inspection form?

79

A. From CSX.

Q. And when?

A. Sometime after the accident.

Q. Okay. And for what reason did you request that or obtain it?

A. To look for defects.

Q. In the chassis?

A. Yes.

MR. BENTIVENGA: What exhibit is that?

MR. SKRYD: It is -- Scott, it is 4.

MR. BENTIVENGA: Thanks.

MR. SKRYD: Sure.

BY MR. BURKE:

Q. Did Martin's engage in any inspection of the chassis?

MR. SKRYD: Inspection or maintenance?

MR. BURKE: Inspection after the incident.

MR. SKRYD: Oh.

THE WITNESS: Yes.

MR. BURKE: Okay. I'll reserve that topic since, I guess, that's kind of getting into the liability issue.

MR. SKRYD: Little bit.

BY MR. BURKE:

80

20 (Pages 77 to 80)

Q. All right. And we've talked about 3 as
well, correct?
And then how about what we marked as
Exhibit 6, Mr. Martin, is that another copy of --
MR. SKRYD: You want to explain the difference
between 5 and 6?
BY MR. BURKE:
Q. Okay. Why don't you please do so, sir.
A. This is --
Q. Why don't you start by maybe saying what
does Exhibit 6 consist of.
A. Exhibit 6 is a copy of the three bill of
ladings from Exel, Hammond, Indiana, load of paper
from International Paper from Overnite Express,
destined to Minneapolis with three stops.
Exhibit 5 is the signed copies after the
delivery.
MR. BURKE: Okay. And --
MR. SKRYD: See, the difference, I think, Rich,
is right here.
MR. BURKE: Right.
MR. SKRYD: That there's a stamp on 5 that
doesn't exist on 6.
BY MR. BURKE:

81

Q. And so for the XPEDX copy, there's a stamp
saying received on -- is that July 7th, '08?
A. I can't read it.
Q. Okay. And then --
A. 7 -- it was all delivered the same day.
Q. Okay. And there's a -- each of the three
pages has a signature acknowledging receipt of the
goods at the three different locations, correct?
A. Yes.
Q. Okay. All right. Thank you.
Mr. Martin, as part of the
transportation of these goods or of these paper
products, other than Martin's, what other entities
or companies either were required to or did
maintain insurance coverage that might be
applicable to this occurrence?
MR. FISHER: Foundation.
THE WITNESS: International Paper,
Overnite Express; Celtic; CSX; Trac Leasing --
MR. SKRYD: Exel.
THE WITNESS: Exel.
BY MR. BURKE:
Q. And how is it you know that, Mr. Martin?
A. By the documents that we've had today.

82

MR. SKRYD: Rich, while you're looking through
your documents, are you doing anything in
particular with Group Exhibit 1 and 2 other than
just attaching them?
MR. BURKE: You know, that's exactly what I'm
looking at right now --
MR. SKRYD: Okay.
MR. BURKE: -- to see what's in there that I
would like to ask him --
MR. SKRYD: Did you want --
MR. BURKE: I have a copy. I have a copy.
MR. SKRYD: Keep them all here.
MR. BURKE: What are we on, Steve, 13?
THE REPORTER: Correct.
(Whereupon, Martin Deposition
Exhibit No. 13 was
marked for identification
as of this date.)
BY MR. BURKE:
Q. Let me tender to you what I've marked as
Exhibit 13, Mr. Martin. And it's -- the top part
is, as you can see, cut off a little bit. So I
can't tell you exactly what the heading is, if
there is even one.

83

But could you tell me what that document
is, if you know.
A. In our company, this is called a trip
sheet.
Q. Okay. And what does -- what is the purpose
of that trip sheet?
A. It tracks what the driver does day by day.
Q. Okay. And who prepares this trip sheet?
A. Our office in Wilton.
Q. Okay. And there is an entry for July 3rd,
correct?
A. Yes.
Q. Okay. Does this trip sheet pertain to
Mr. Franke?
A. Yes.
Q. Okay. And how can you tell that?
A. Only because I know what he did -- what he
does -- what he did. And I can tell. His name's
not on here, but I can tell by his writing.
Q. Okay. Is this Mr. Franke's writing on
here?
A. No.
Q. So is there any of Mr. Franke's writing on
there?

84

21 (Pages 81 to 84)

A. I'm sorry. Yes.

Q. Okay. Where -- what is -- what part of it was prepared by Mr. Franke?

A. These.

Q. The date column?

A. All of it.

Q. Oh, all of it? Okay.

And July -- what's it say for July 3rd or what do these entries mean?

I see LaCrosse, Wisconsin.

A. It means that the origin of the load was out of LaCrosse. The load was dropped in Chicago.

Q. Okay. So at some point on July 3rd, Mr. Franke took a load that had originated in LaCrosse and dropped it in Chicago?

A. Yes.

Q. Does that necessarily mean Mr. Franke started driving that load from LaCrosse or did he pick it up in Wilton?

A. It states, Load pick-up: Wilton, Wisconsin.

Q. By Mr. Franke?

A. Yes.

Q. Okay. And then how about the last line

85

which also pertains to July 3rd, what does that indicate about Mr. Franke's travels on that day?

A. It states that he picked up a load in Hammond, Indiana, destined to Minneapolis, Minnesota.

Q. Okay. And that's -- that's consistent with what you've been telling us earlier in terms of the pick-up of paper at the International warehouse, International's warehouse at the Exel facility?

A. Yes.

Q. Okay. Thank you.

MR. SKRYD: I'm just the recordkeeper over here. Just... It's a good thing you don't have any trials coming up, Scott.

MR. BENTIVENGA: This is quality. Sleep is not an option.

(Discussion off the record.)

BY MR. BURKE:

Q. Yeah, I'm almost done here, Mr. Martin.

Mr. Martin, let me tender to you what we marked as Exhibit No. 2, which by Bates stamp appears to be documents produced by International Paper.

Could you look at pages -- what begins

86

on Page 35?

MR. SKRYD: Let me just state for the record, in Group Exhibits 1 and 2, some, I think, are relevant; others are completely irrelevant, but we're reserving all those objections. I just want to say that.

There's certain things in there, if they were attached to this transcript for whatever reason and utilized, they would be inadmissible.

But that being to the side, go ahead. Do what he's asking.

BY MR. BURKE:

Q. Page 35 appears to be correspondence from International Paper to Overnite Express indicating they're attaching a copy of a contract between them; and the following pages from 36, continuing thereafter, possibly as far as 68, including attachments, appear to be a contract between International Paper and Overnite.

And my question to you is simply, is that a contract you have ever seen or that you -- let me reword that.

Is that a contract you ever saw prior to this litigation?

87

A. No.

Q. Okay. How about -- take a look at Exhibit No. 1, which is a group exhibit of some production from Universal Am-Can, Bates stamps 1 through 155.

A. Which page, sir?

Q. If you could look at Page 109, please.

That document is entitled an Asset Purchase Agreement. Do you see that?

A. Yes.

Q. Okay. It appears to relate to the -- an agreement between Universal Am-Can and Overnite Express and some other entities.

Is that a document that was ever provided to you by Overnite once you came to learn they had been bought out or purchased by Universal Am-Can?

A. No.

Q. Mr. Martin, is there any other entity that we haven't discussed that you believe was involved in either the ownership or the leasing or the operation or the maintenance of either the tractor or the trailer or the container that was involved in this incident?

A. No.

88

22 (Pages 85 to 88)

1 MR. BURKE: Okay. Okay. Subject to reserving
2 additional questions pertaining to the incident and
3 questions beyond what we've agreed will be the
4 scope of this deposition, I don't have anything
5 further.
6 Thanks for your time, Mr. Martin.
7 THE WITNESS: Thank you.
8 MR. SKRYD: Take a time-out.
9 (Recess taken.)
10 EXAMINATION
11 BY
12 MR. FISHER:
13 Q. Mr. Martin, my name is Carl Fisher. I
14 represent Universal Am-Can, Limited, doing business
15 as and as successor to Overnite Express, Inc.
16 That's a mouthful.
17 If I refer to that company as UACL, is
18 that okay?
19 A. Yes.
20 Q. All right. I may be asking you questions
21 in which I, in particular, use Universal Am-Can or
22 I, in particular, use Overnite Express or I combine
23 the two together. So I just wanted to let you know
24 that.

89

1 So please answer those questions as
2 specifically as you can when I use any of those
3 companies' names individually or together, all
4 right?
5 A. Okay.
6 Q. Okay.
7 MR. SKRYD: And if you don't understand the way
8 he asks it, you know, he doesn't want you to guess.
9 Tell him you -- wait. What did you mean? Okay?
10 MR. FISHER: Right.
11 MR. SKRYD: So we don't have to go back and fix
12 it after he's done.
13 BY MR. FISHER:
14 Q. And I mistakenly may use the wrong term.
15 And if you catch me on something like that, as your
16 counsel said, please ask me to rephrase it or ask
17 for clarification, okay?
18 A. Okay.
19 Q. All right. When was your first involvement
20 in being a company representative for Martin's
21 Bulk Milk Service as it pertains to either the
22 initial state court lawsuit that was filed against
23 your company or the amendment of that lawsuit and
24 its removal to federal court where it is now?

90

1 A. I've been involved with it since Day 1.
2 Q. Who is Janet Berndt, B-e-r-n-d-t?
3 A. Janet Berndt --
4 Q. Okay.
5 A. -- was -- she's our personnel -- she's --
6 actually, at the time of the accident, personnel
7 and safety.
8 Q. Does she still work for you?
9 A. Yes.
10 Q. Was she involved in handling matters having
11 to do with litigation concerning this accident?
12 A. Yes.
13 Q. Were you sort of on equal footing with her?
14 Did you split the tasks or was one of you more
15 supervisory to the other in terms of responding to
16 requests for information that were made as a result
17 of the lawsuit?
18 A. Janet compiled most of the information that
19 you have.
20 Q. So, to the best of your knowledge, did she
21 conduct a conscientious and complete search for
22 information as best you know?
23 A. Yes.
24 Q. What involvement, if any, did you have in

91

1 conducting a search for information when the
2 requests came in to your company and they were
3 routed to you by your counsel?
4 A. I would point them in the right direction
5 to see what entity they were looking for.
6 Q. Did you review, before they went out, the
7 answers to discovery requests that were made both
8 in the state court action and in the action once it
9 was removed to federal court?
10 A. Yes.
11 Q. And are you satisfied that -- as you sit
12 here today, that a comprehensive search was
13 conducted to collect the information that was
14 requested?
15 A. Yes.
16 Q. All right.
17 (Whereupon, Martin Deposition
18 Exhibit No. 14 was
19 marked for identification
20 as of this date.)
21 BY MR. FISHER:
22 Q. Mr. Martin, I'm showing you Martin Bulk
23 Milk Service's responses to plaintiff's special
24 forum non conveniens interrogatories.

92

23 (Pages 89 to 92)

1   And if you scroll back to Page 7, do you
2   see Janet Berndt's signature attesting to the
3   completeness and accuracy of the information being
4   requested?
5       A.  Yes.
6       Q.  Do you remember these interrogatories being
7   answered by your company when this case was venued
8   in the Circuit Court of Cook County early on after
9   the accident happened?
10      A.  Yes.
11      Q.  All right.  Now, what I want to ask you to
12  look at, if you'd look first at the top of Page 3.
13      The question asks -- and I'll just
14  paraphrase it -- for names and addresses of
15  companies that were customers of your company,
16  okay?  And it says, See attached pages.
17      I now want to refer you to a spreadsheet
18  that appears after Page 7.  It begins with a
19  handwritten note at the top, Answer, Question
20  No. 3, and then it goes on for many pages.
21      And I want you to look at the page that
22  has -- well, before you do that, do you -- are you
23  familiar with this spreadsheet?
24      A.  Yes.

93

1       Q.  Tell us how it was prepared.
2       A.  We were asked to compile a list of our
3   brokers, customers that we work for.
4       Q.  Okay.  And is that what this list is, to
5   the best of your knowledge?
6       A.  Yes.
7       Q.  All right.  Who compiled this information?
8       A.  Janet Berndt.
9       Q.  Did she do it under your direction?
10      A.  Yes.
11      Q.  And can you tell us whether or not this
12  list was intended to reflect your customers and any
13  brokers with which you dealt at any particular
14  point in time?
15      For example, was this the list that
16  would have existed on July 3rd?  Would it have
17  existed before July 3rd?  Would it have existed
18  after July 3rd, or any combination of those three
19  possibilities?
20      A.  Below -- or before July 3rd.
21      Q.  All right.  Look, if you will, at the page
22  that has the customers or brokers beginning with
23  the letter O.  It's actually two pages.  I believe
24  it begins with Ohio National Express, is the first

94

1   one with an O.
2       A.  Okay.
3       Q.  And then it ends on the next page with
4   Overland Freight.
5       Based upon your review of this
6   particular chart, does it appear that
7   Overnite Express is listed as a customer or broker
8   of Martin's Bulk Milk Service?
9       A.  No.
10      Q.  Do you know why that is?
11      A.  I do not know why.
12      Q.  Skip, if you would, to the next-to-last
13  page where the companies listed have the names
14  begin with the letter T, U or V.
15      And do you see listed at that -- on that
16  particular sheet Universal Am-Can, Limited?
17      A.  Yes.
18      Q.  To the best of your knowledge then, based
19  upon this particular chart compiled by your
20  company, does this establish that Universal Am-Can,
21  Limited, was the company with which Martin's
22  Bulk Milk Service had a relationship either as a
23  customer or a broker as of and before July 3rd,
24  2008?

95

1       A.  Can you ask me that one more time?
2       MR. SKRYD:  Or do you want him to read --
3       MR. FISHER:  I couldn't even do that.
4       I'm going to have him reread it to you.
5       MR. SKRYD:  I was going to have him do it,
6   anyway.
7       (Record read as requested.)
8       THE WITNESS:  I don't know when the time was
9   when they --
10  BY MR. FISHER:
11      Q.  And mind you, this isn't a trick question,
12  okay?  Let me assure you.
13      MR. SKRYD:  Plenty of those are coming, but...
14  BY MR. FISHER:
15      Q.  So -- so before I get to that question
16  about when they may have changed names and the way
17  they operated, my first question is, does this
18  chart appear to show that as of July 3rd, 2008 and
19  perhaps shortly before, Universal Am-Can, Limited,
20  as opposed to Overnite Express, was one of the
21  companies with which your company had a
22  relationship either as a broker or a customer?
23      A.  Yes.
24      Q.  Okay.  Now, the next question is, did

96

24 (Pages 93 to 96)

there -- did there come some time before the
accident happened when you remember, for whatever
reason you can tell me, Oh, Overnite Express, even
though they might have some paperwork that says
Overnite Express or OE on it, is now operating as
Universal Am-Can or UACL, its abbreviation?

A. Yes.

Q. Tell me what you remember about that
transition, how you came to know about it and what,
if anything, changed after that happened.

A. The owner of Overnite Express called me and
told me that he had sold out.

Q. Let me stop you for one second.

Was that a gentleman named Robert
Elsholtz (phonetic)?

A. I don't recall.

Q. Okay. Do you know that there was a father
and son, both of whom their names were Robert
Elsholtz, but they had different middle names?

A. I do recall.

Q. Okay. And was the person with whom you had
this conversation about the transition the father
or the son?

A. The son.

97

Q. And tell me how this conversation happened.

A. He had just called to explain that business
would operate as normal. We would continue to do
the loads from Exel, International Paper to
Minneapolis, as we were already doing them for
Overnite Express.

Q. So is it fair to say then that as of the
time of that telephone conversation, which I'll
represent to you, according to the records we have,
is probably sometime in June 2008 --

A. Yes.

Q. -- you -- your company, Martin's Bulk Milk
Service, had been doing business with
Overnite Express before, such that paper products
for International Paper were being picked up in the
Chicago and Indiana area and transported up to
Minnesota or elsewhere?

A. Yes.

(Whereupon, Martin Deposition
Exhibit Nos. 15 and 16 were
marked for identification
as of this date.)

MR. FISHER: Okay. Gentlemen, Exhibit 15 is
UACL Bates No. 15 through 18, and 16 is going to be

98

UACL 19 through 27.

MR. SKRYD: There's two documents here, Dave,
and take a look at those. Don't just glance at
those. Take a look at those. And when you've
reviewed them, let us know.

MR. GOLDEN: I'm sorry. I thought they were the
same one.

MR. SKRYD: Yeah, they're dated differently.

(Pause.)

MR. SKRYD: Review the pages.

THE WITNESS: Hmmm?

MR. SKRYD: Review all the pages.

BY MR. FISHER:

Q. Without reading every word on each page,
have you had a chance to skim over those documents
just to briefly familiarize yourself with them?

A. Yes.

Q. Have you ever seen those documents before
me handing them to you just a few minutes ago?

A. No.

Q. Do you remember when you were asked a
question by Mr. Burke about whether or not there is
a written contract that existed between
Overnite Express and Martin's Bulk Milk Service and

99

you said, Yes, and you also said that that document
is probably in some files in Wilton?

A. Yes.

Q. All right. I will represent to you,
Mr. Martin, that once this case came into federal
court and a disclosure document was filed on behalf
of your company identifying certain documents that
exist and your company responded to a request to
produce, neither a written agreement between
Martin's Bulk Milk Service and Overnite Express and
neither of those two agreements, Exhibits 15 and 16
that I've tendered to you, were produced by your
company in discovery.

Given the fact that you're charged with
the responsibility for responding to discovery, do
you know why it is none of those three documents
were produced in discovery in this case by your
company up to today?

A. I do not.

Q. Okay. If you were to be looking for the
Overnite Express/Martin's Bulk Milk Service
contract that existed sometime before July 3, 2008,
where would you go to find it?

A. In our broker carrier agreement file.

100

25 (Pages 97 to 100)

Q. Looking just at the form that Exhibits 15
and 16 look like, can you tell me whether or not --
if you have any memory -- and tell me if you
don't -- whether or not the
Overnite Express/Martin's Bulk Milk Service
agreement looks anything like the formatting of
this particular Universal Am-Can master brokerage
agreement?
A. I do not.
Q. Okay. Do you have any memory at all of how
many pages it was, who signed it, if it had
attachments, any memory of that?
A. No.
Q. Is that the type of document that you would
consult or anybody at Martin's Bulk Milk Service
would consult on a day-to-day operational business
in order to do your work on behalf of
Overnite Express?
A. We read through them.
Q. Okay. But once they're read through and
signed, are they consulted at all after that?
A. No.
Q. Okay. Have there ever been any disputes,
to your knowledge, between Overnite Express and

101

A. No.
Q. When did he leave Martin's Bulk Milk
Service?
You know what, let me stop. I made an
assumption.
When he would have signed this,
presumably sometime around 2007 or 2008,
respectively Exhibits 15 and 16, was he employed by
Martin's Bulk Milk Service or Martin's Logistics.
A. Martin's Bulk Milk Service.
Q. When did he leave your company's
employment?
A. I'm not sure.
Q. Did he leave on favorable terms?
A. Yes.
Q. Okay. Is he still in Central Western
Wisconsin, as best you know?
A. Yes.
Q. And would your company files have a last
known address?
A. Yes.
Q. Okay.
MR. SKRYD: Carl, I don't mean -- you're -- it's
not your deposition or anything, but both of these

103

Martin's Bulk Milk Service before July 3, 2008, on
things like, Hey, I didn't get paid for everything
I was owed, or anything like that?
A. No.
MR. SKRYD: Did you get his answer?
MR. FISHER: Yeah, I heard it.
MR. SKRYD: Sorry.
BY MR. FISHER:
Q. With respect to the Universal Am-Can,
Limited, master brokerage agreements that are there
before you as Exhibits 15 and 16, if you'll look at
the third page of Exhibit 15 and the third page of
Exhibit 16, you'll see that there's a signature
from someone purportedly from Martin Bulk Milk.
Do you recognize whose signature that
is?
A. Yes.
Q. Whose signature is it?
A. Pat Podlena (phonetic).
Q. And is that a man or a woman?
A. A man.
Q. And what is Pat's job?
A. Pat was a dispatcher.
Q. Does he still work for you?

102

documents that you produced, neither one is signed
by Universal Am-Can.
Do you have ones that are signed by
Universal Am-Can?
MR. FISHER: Those are the documents I have. I
don't understand what you mean it's not my
deposition.
MR. SKRYD: I'm asking you a question like
you're the witness or something.
MR. FISHER: Oh, okay.
MR. SKRYD: That's all I'm saying.
MR. FISHER: Because that's all I've got.
MR. SKRYD: But you don't have one signed by
Universal Am-Can?
MR. FISHER: I mean, that's not to say there
isn't one in existence --
MR. SKRYD: But that's all you got --
MR. FISHER: But this is what is told --
MR. SKRYD: But from your company.
MR. FISHER: Yeah.
MR. SKRYD: Okay. They gave you those. Okay.
BY MR. FISHER:
Q. Okay. Who would know whether or not
Exhibits 15 and 16 are agreements, contractual

104

26 (Pages 101 to 104)

agreements, in existence as of July 2008 between
Martin's Bulk Milk Service and Universal Am-Can,
Limited?

MR. SKRYD: Who would know from Martin's, if anyone?

MR. FISHER: (Nodding.)

MR. SKRYD: Go ahead.

THE WITNESS: Our dispatch office.

BY MR. FISHER:

Q. And who in the dispatch office might know?

A. I could know.

Q. You, yourself, could?

A. Yeah.

Q. Okay. Why is it you could know?

A. I just go -- I can go into the file and I can pull it up in alphabetical order.

Q. Okay. I know you haven't read every word, but do you remember entering into -- strike that.

Do you know whether or not your company has ever entered into a written contract with Universal Am-Can, Limited, before July of 2008?

MR. SKRYD: Do you have personal knowledge --

THE WITNESS: I'm not sure --

MR. SKRYD: -- that's what he's saying.

105

MR. SKRYD: An objection, yeah.

MR. FISHER: That's all you need to say.

MR. SKRYD: Well, I know, but I want to put it on the record.

The issue I have with this, it's not signed by Universal Am-Can --

MR. FISHER: Counsel -- Counsel, what's your objection? I'm not going to tolerate speaking objections --

MR. SKRYD: Well, I know.

MR. FISHER: Is your objection foundation? That's all you need to say.

MR. SKRYD: But he's never seen these documents before.

MR. FISHER: Counsel, please refrain from speaking objections.

Foundation is the only word you needed to use, okay?

MR. SKRYD: What I need to use and what I will use are maybe two different things.

BY MR. FISHER:

Q. You can go ahead and answer my question. If you need it repeated, he can repeat it for you.

(Record read as requested.)

107

THE WITNESS: I'm not sure.

BY MR. FISHER:

Q. And I'm not suggesting you should be sure, but why are you not sure?

A. We might have done business with them in another capacity.

Q. Tell me what you mean by that answer.

A. We might have brokered loads through Universal Am-Can before they bought Overnite Express.

Q. Actually, I'm glad you raised that.

Do you know whether or not this is the case:

Do you know whether or not the contract that is marked as Exhibit 15, which has a date of November 7, 2007, and is between Universal Am-Can, Limited, brokerage division and Martin Bulk Milk Service -- or excuse me, Martin Bulk Milk was the contract that your company entered into with Universal Am-Can before any transition occurred between Universal Am-Can and Overnite Express?

MR. SKRYD: I'm just going to state, Carl, for the record a foundational issue.

MR. FISHER: Is that your objection?

106

THE WITNESS: I'm not sure.

BY MR. FISHER:

Q. Who would know the answer for that question from your company, if it's not you?

A. Janet.

Q. All right. With respect to Exhibit 16, do you know whether or not this agreement is the agreement that was entered into between Universal Am-Can and Martin Bulk Milk Service after Universal Am-Can agreed to take over Overnite Express?

MR. SKRYD: Same objection. Foundation.

THE WITNESS: And I'm not sure.

BY MR. FISHER:

Q. If you don't know, who would know?

A. Janet.

Q. Okay.

MR. BENTIVENGA: What's the date?

MR. FISHER: I've got one that's June 12th, 2008.

MR. BENTIVENGA: Thank you.

BY MR. FISHER:

Q. Okay. Other than the Elsholtz that you've dealt with, do you remember ever having any other

108

27 (Pages 105 to 108)

1  contact with anyone at Overnite Express?
2  A.  Matt and Melody.
3  Q.  And is Matt an Elsholtz also?
4  A.  I'm not sure.
5  Q.  Okay.  And do you know Melody?
6  A.  Melody's from the Chicago office.
7  Q.  Is Melody the person whose name appeared at
8  the top of Exhibit 11?
9  A.  Yes.
10  Q.  Okay.  And did you understand her to be an
11  employee of Overnite Express, an employee of
12  Universal Am-Can, or perhaps an employee of both
13  companies and she simply shifted over to
14  Universal Am-Can after Overnite Express was taken
15  over by Universal Am-Can, or do you know?
16  A.  I would say for both companies.
17  MR. FISHER: Okay.  Was this the one you
18  previously marked?
19  MR. GOLDEN: Yes, sir.
20  MR. BURKE: Yes.
21  MR. SKRYD: That was -- I don't know what.
22  MR. GOLDEN: 13.
23  MR. SKRYD: You want -- you going to ask a
24  question about it?

109

1  MR. FISHER: No.
2        (Whereupon, Martin Deposition
3         Exhibit No. 17 was
4         marked for identification
5         as of this date.)
6  BY MR. FISHER:
7  Q.  Mr. Martin, I'm showing you two pages
8  marked as Exhibit 17.  I believe it's the same
9  document, just two different Bates numbers on it.
10  MR. SKRYD: Is it?  Okay.  That's what I was
11  trying to figure out.
12  BY MR. FISHER:
13  Q.  Okay.  Mr. Martin, I'm showing you two
14  pages marked as Exhibit 17.  I believe they're the
15  same document, just produced by two -- my two
16  clients, and they have Bates numbers UACL 5 and
17  IPC 24.
18        Do you recognize the document?
19  A.  Yes.
20  Q.  Tell us what it is.
21  A.  It's a mileage report that states the
22  states that we travel in, the highways, each miles
23  in each state and the odometer readings at the
24  beginning and the end of the day.

110

1  Q.  Is this for Mr. Franke?
2  A.  Yes.
3  Q.  Who filled this out, if you know?
4  A.  Sam.
5  MR. SKRYD: Sam?
6  THE WITNESS: Franke.
7  BY MR. FISHER:
8  Q.  And in the column that says "mileage" where
9  there is either hash marks and 11 or two 1s, what
10  does that mean?
11  A.  Show me.
12  Q.  Yes.  In the column under mileage, you see
13  were there on three occasions --
14  A.  On each state?
15  Q.  Yes.
16  A.  11 miles traveled in Indiana.
17  Q.  Okay.  All right.  Thank you.
18        (Whereupon, Martin Deposition
19         Exhibit Nos. 18, 19 and 20 were
20         marked for identification
21         as of this date.)
22  BY MR. FISHER:
23  Q.  For the benefit of counsel, keep track of
24  our records here, Mr. Martin, I'll represent to you

111

1  that exhibits 18, 19 and 20 are multiple
2  collections of the memo bills or bills of lading.
3  I've put them together from the documents that have
4  been produced.
5        I believe in each set, they're
6  identical, but there are some differences that I
7  want to ask you about, okay?
8  A.  Okay.
9  Q.  So that's what these are.
10  MR. SKRYD: Okay.  Why don't you spread them out
11  so you can kind of compare them side by side.  I
12  think that's what you're doing.
13  MR. FISHER: Exactly.
14  BY MR. FISHER:
15  Q.  Well, actually, we'll take them one at a
16  time.
17        If you look at Exhibit 18 and this is
18  the memo bill that has the weight of 7,668, okay?
19  A.  Yes.
20  Q.  All right.  If you just flip through each
21  of these pages, you'll see that on the first three
22  pages, Samuel Franke's name appears in handwriting
23  at the upper right-hand corner.  And then in the
24  next two pages, Franke's name plus some other --

112

28 (Pages 109 to 112)

and Franke's name appears a second time along with some other information.

And then, finally, the last two pages, Franke's name appears alone, but there's some markings by somebody else. And I just want to get an idea of how these different transportation documents are prepared and why they have different markings on them, okay?

So can you tell us with respect to the first three pages of Exhibit 18, when is it that Mr. Franke would have affixed his signature to this?

MR. SKRYD: Did you say the first page?

MR. FISHER: The first three. They're identical. The first three pages of Exhibit 18.

MR. SKRYD: Oh.

THE WITNESS: At Exel in Hammond, Indiana, when he is loaded, they produce these documents. And then before he leaves, he has to sign for them.

BY MR. FISHER:

Q. All right. Now, is this a document that the people at Exel would have given him as opposed to Mr. Franke arriving with this document?

A. They would have prepared -- Exel would have

113

prepared this for Sam Franke.

Q. Franke would not have this until they tendered it to him for his signature?

A. Correct.

Q. All right. Now, the next two pages, do you see it's the same document, but Franke's name is printed at the top. There's a carrier trailer number, there's a PCS and there's a date.

And that's the distinction between the fourth and fifth pages and the first three, right?

A. Yes.

Q. Okay. Tell me, if you know, when this additional -- these additional markings would have occurred.

A. The only thing I can see that's different is they didn't have his trailer number on there.

Q. Do you have an understanding that these documents came from a variety of different sources?

For example, the police report, from my clients. In the case of the third page, the one that has Exhibit C, that came from your company.

Do you know why it is that one collection of documents would only have Franke's signature appearing and the other documents have

114

got some more markings on them?

A. I do not.

Q. Okay. The last two pages of Exhibit 18, do you see where Franke's name or signature now appears only once again; but down in the bottom right or near the bottom right, the word "Midland," perhaps Rocky Gordon or Gorder, with a date of 7/7/08 appears.

Do you know what the vintage or the timing of this would have been?

A. That would have been on Monday when the load was delivered.

Q. So this is after the accident's occurred, the load has been offloaded from the trailer, put onto another trailer, and it makes its way up to Minnesota?

A. The day that it was delivered was 7/7/08. That's the day that Rocky signed for it at Midland Paper.

Q. Okay. All right. If you look at Exhibits 19 and 20, I'm basically going to be asking you the same questions.

If you just look -- if you just leaf through each of those, you'll see the first three

115

pages of each has got a significant -- a single signature --

MR. SKRYD: Easy for you to say, Carl.

BY MR. FISHER:

Q. -- by Mr. Franke followed by two pages that has some more handwritten information, and then -- and then a sixth and seventh page that has got some additional information on it.

And I just want to find out, if you can tell, you know --

A. I think I know why -- I think I know what happened.

Q. Oh, okay.

A. I think that when he went in there, he has to sign as he walks in the door to say that he's picking a load up.

Q. Okay.

A. After he's loaded -- because these are all three different stops -- they're asking him for his trailer number and then they're asking for his signature.

Q. Okay. And so for whatever reason, we happen to have copies of the documents both before and after the loading was accomplished?

116

29 (Pages 113 to 116)

A. Yes.

Q. Okay. All right. Look at Exhibit 19. And if you look at the sixth and seventh pages, the last two --

A. Yes.

Q. -- do you see on this one, there is a parenthetical notation and handwriting, 2,000 sheets per box, and then it says, 12 boxes damaged, and the name what appears to be David Defrance appears? Do you know why this information is recorded here?

A. It was damaged from the accident.

Q. And do you know who Daniel Defrance or David Defrance would have been?

A. I'm not...

Q. Last Exhibit is Exhibit 20. Same questions. And focusing your attention now on the sixth and seven pages.

Do you see on this one, there's what appears to be a stamp with some handwriting by it? Is this simply a stamp showing the receipt at XPEDX of the goods being delivered on or about July 7th, 2008?

A. Yes.

117

Q. Okay. That's all the questions I've got about those documents.

(Whereupon, Martin Deposition Exhibit No. 21 was marked for identification as of this date.)

MR. FISHER: For the record, Counsel, this is --

MR. SKRYD: Looks like the same thing.

MR. FISHER: -- UACL 12 and IP 1.

MR. SKRYD: Again, Carl, it looks like it's the same or similar document twice, right?

MR. FISHER: Two -- I'm sorry. Two.

MR. SKRYD: Is it the same document? There's two --

MR. FISHER: Yes. Yes. Correct.

MR. SKRYD: -- documents in here?

Okay.

MR. FISHER: Right.

BY MR. FISHER:

Q. Okay. Mr. Martin, do you see this document which has a heading Red Prairie and Digital Logistics at the top?

A. Yes.

Q. And the bottom left-hand corner, do you see

118

where it has a printed date and time of 7/3/08, 4:45:11 p.m.?

A. Yes.

Q. Are you familiar with a document like this called a loading sheet?

A. Yes.

Q. Based upon your knowledge of the industry, what would the printed time on July 3, 2008 signify, if anything?

A. What time they started picking the load.

Q. So the people at the warehouse, what time they would have gone to pick the load in anticipation of Mr. Franke arriving to have it loaded; is that what you're saying?

A. This was printed at 4:45. Sam's appointment to load is at 7:00 p.m. That was the time that they probably print this off for Exel's dock workers to put the load together.

Q. Okay. And then the loading is under the heading Loading Diagram, Nose.

What does it mean with all these three-digit numbers appearing spatially, almost like a rectangle?

A. Those are the type of product that are

119

loaded in the trailer. And when you see a single number on there, that's a single pallet in the trailer.

Q. With the information we have available to us that you've been looking at so far today, is there any way of telling, for example, what the individual weights of each pallet would be that are recorded here with different numbers?

A. No.

Q. Any way of figuring that out that you know of, and if so, where would you go to get such information?

A. Each pallet will have a weight on it, but there's no way of knowing by this document.

Q. But how about -- and I don't -- this isn't a memory game.

Any other document you've looked at so far that has such information we could deduce?

A. I have not seen any.

Q. All right. And then in the middle right of the document, do you see where it says, Start loading 8:38 and end loading, either 9:02 or 9:07?

A. Yes.

Q. Is that usual, unusual, in your knowledge

120

1  of paper products like this, for it to take
2  approximately 24 minutes?
3      MR. SKRYD: Objection. Form.
4      Go ahead. Answer the question.
5  BY MR. FISHER:
6      Q.  Or 29 minutes.
7      A.  Standard time is loading two hours. If --
8  arrive at 7:00, out at 9:00 is pretty standard.
9      Q.  You know what, I just saw something. Look
10 on the right center. Do you see where it says
11 pieces and weight, and it has the handwritten
12 sections, middle, nose and tail?
13     A.  Yes.
14     Q.  Is there any way of determining with that
15 information what the individual weights would be of
16 each of the separate numbers, such as the six that
17 are 307, the several that are 211?
18     A.  No.
19     Q.  Those numbers, 307, 211, 322, do you know
20 what those numbers signify?
21     A.  Product code.
22     Q.  Do you know what the product codes are that
23 those numbers represent?
24     A.  No.

121

1      My first question about that information
2  is, do you know who John Moore is?
3      A.  No.
4      Q.  You ever dealt with him?
5      A.  No.
6      Q.  Ever dealt with anybody at UACL in Warren,
7  Michigan?
8      A.  No.
9      Q.  Is the fact that your company, through this
10 invoice, charged UACL $974.08 an indication to you
11 today as you sit here that your company was
12 interacting contractually with UACL as opposed to
13 Overnite Express?
14     A.  Yes.
15     Q.  With respect to the load that Mr. Franke
16 was pulling?
17     A.  Yes.
18     Q.  Okay. Was your company paid for this? Let
19 me strike the question.
20     The invoice that you sent to UACL, was
21 it paid, if you know?
22     A.  I don't -- I don't know.
23     Q.  All right. You can set that aside.
24

123

1      Q.  You can set that aside.
2      MR. BENTIVENGA: 22 is next.
3      MR. FISHER: Thank you. Keeping me in line
4  here.
5      (Whereupon, Martin Deposition
6      Exhibit No. 22 was
7      marked for identification
8      as of this date.)
9      MR. FISHER: Gentleman, Exhibit 22 is UACL 14.
10 BY MR. FISHER:
11     Q.  Looking at Exhibit 22, Mr. Martin, do you
12 recognize that document?
13     A.  Yes.
14     Q.  What is it?
15     A.  It's an invoice from Martin's Bulk Milk.
16     Q.  It has a date of 7/17/2008 with an invoice
17 number of 192648.
18     Would it have been in the normal course
19 of your company's business to generate the invoice
20 after the work had been completed?
21     A.  Yes.
22     Q.  And do you see under the heading "bill to,"
23 it says, Broker settlements, UACL, Attention: John
24 Moore.

122

1      (Whereupon, Martin Deposition
2      Exhibit No. 23 was
3      marked for identification
4      as of this date.)
5  BY MR. FISHER:
6      Q.  Okay. Mr. Martin, I'm tendering to you an
7  exhibit marked as Exhibit 23. It's very similar
8  looking to the previous marked Exhibit 11 that you
9  looked at except that it has what appears to be a
10 bar code document obscuring some texts. I want to
11 ask you some questions about some of the
12 information that appears there.
13     Up at the top, the first paragraph
14 reads, quote, This rate confirmation sheet issued
15 on 5/1/06 serves to supplement the -- it says
16 matter -- I suspect it's master -- brokerage
17 agreement between the Universal Am-Can, Limited,
18 brokerage division, an ICC property broker,
19 MC167922, Sub 5, and carrier Martin's Bulk Milk.
20     Did I read that correctly?
21     A.  Yes.
22     Q.  Now, my question to you is, when it says,
23 Rate confirmation sheet issued on 5/1/06, what does
24 that tell you about the relationship between

124

31 (Pages 121 to 124)

1  Martin's Bulk Milk Service and UACL as of May 1st,
2  2006, if anything?
3     A.  I don't know.
4     Q.  Okay.  Is it common in the industry of
5  transportation that participants in the movement of
6  freight issue or respond to rate confirmation
7  sheets or tables of rates?
8     A.  Rate confirmation sheets.
9     Q.  Okay.  Is this sort of like this is the
10 document that exists that's used in the industry
11 frequently?
12    A.  The same sort, but not many the same -- not
13 the same matter.  I mean, it's -- everybody's is
14 different.
15    Q.  Okay.  So, for example, if you're dealing
16 with the ABC Brokerage Company and they've asked
17 you to have your company pull some freight for the
18 XYZ Shipping Company, it might have a form that
19 looks like this, but may be different?
20    A.  Correct.
21    Q.  All right.
22        When it says that the sheet was issued
23 on 5/1/06, does that suggest to you that that's the
24 vintage of rates that would apply to this

125

1  particular shipment in July of '08?
2     A.  Say it one more time.
3     Q.  I'm going to have him read it.
4        (Record read as requested.)
5  THE WITNESS:  No.
6  BY MR. FISHER:
7     Q.  Why not?
8     A.  Because the way fuels fluctuate and rates
9  change.
10    Q.  How would you and a broker or some other
11 participant in the transportation industry know
12 that a different fuel rate was permissible?
13    A.  Every company has their own chart that they
14 go off of.  International Paper has its own that
15 they go by.  And then -- and that's what Overnite
16 would have billed to them.
17    Q.  So, for example, for this particular
18 shipment on July 3rd, 2008, is it your testimony
19 that whatever the fuel rate was that
20 International Paper was willing to pay, that would
21 be the fuel rate that would control?
22    A.  Yes.
23    Q.  And then do you see where it says in the
24 next part of this sentence, quote, Serves to

126

1  supplement the mader -- I think that's master --
2  brokerage agreement between Universal Am-Can and
3  Martin's Bulk Milk?
4        Does that tell you, suggest to you,
5  confirm for you that as of July 3, 2008, Martin's
6  Bulk Milk Service was interacting with UACL as
7  opposed to Overnite Express for this particular
8  load?
9     A.  Yes.
10    Q.  All right.  I think you can set that down.
11        Did you ever have any contact with a
12 person at International Paper named Malcolm
13 Breland, B-r-e-l-a-n-d?
14    A.  No.
15    Q.  Did you ever have contact with anyone at
16 International Paper concerning any loads that your
17 company was involved with?
18    A.  There was times that we would check to see
19 when the -- if the load was on time to ship.
20    Q.  Why would you do that?
21    A.  To check and see if everything was on
22 schedule.
23    Q.  And why would that be important?
24    A.  Because of the hours of service with the

127

1  drivers and make sure that his schedule's going to
2  be met.  Maybe with weather.
3     Q.  So, for example, if -- because of the delay
4  in getting the load on the truck or whatever the
5  reason would be, would there be some instances in
6  which a driver employed by Martin's Bulk Milk
7  Service would not be able to continue on the road
8  because of say, for example, hours of service
9  limitations?
10    A.  Say it again.
11    Q.  I'll have him read it for us.
12        (Record read as requested.)
13 THE WITNESS:  Yes.
14 BY MR. FISHER:
15    Q.  And in that situation, let's assume that
16 you got a phone call from International Paper that
17 said, Hey, we need that paper in Minneapolis.  You
18 got to get that done.  What would happen in that
19 instance?
20    A.  We would tell them that it's not possible
21 because of hours of service.
22    Q.  So that would be an example, would it not,
23 in which the request from International Paper would
24 not be honored by your company?

128

A. Yes.

Q. Okay.

(Whereupon, Martin Deposition
Exhibit No. 24 was
marked for identification
as of this date.)

BY MR. FISHER:

Q. Look at the next-to-last page and tell me whether or not you recognize on Exhibit 24 your signature?

A. I recognize it.

Q. All right. And are -- is Exhibit 24 the Martin Bulk Milk Service's Answers to Plaintiff's Interrogatories in the federal case?

A. Yes.

Q. I want to focus your attention on Page 2, Question 2.

Do you see where it says in the response to Question No. 2, after you get through the objections, that your company's answer to that question is unknown?

MR. SKRYD: Take your time and read it over.

BY MR. FISHER:

Q. See where -- the very, very short answer at

129

the end of the sentence, Unknown, followed by the words "investigation continues"?

A. Yeah.

Q. Okay. My question to you is this:

Since the preparation and signing of this Answer to Interrogatory, are you aware of anybody at Overnite Express that has any knowledge concerning the ownership, lease, use or operation of the tractor and trailer in this case?

A. No.

Q. Okay. Look down at Question No. 5. This question asks for you to identify the name, address, job title, employer of the person most knowledgeable from your company, Defendants Martin's Bulk Milk, concerning the involvement of Martin's Bulk Milk Service or any of its employees or agents in any aspect of the ownership, lease, use or operation of the tractor-trailer, container or chassis involved in the occurrence of July 3, 2008, including the transportation of any cargo in the tractor-trailer truck.

Did I read that question correctly?

A. (Nodding.)

Q. You have to answer out loud.

130

A. Yes.

Q. Okay. And the answer refers us to a document where there's a bunch of names, presumably.

Of your own knowledge, do you know of anybody other than yourself who's employed by Martin's Bulk Milk who has any knowledge that would fit the description of this question and other than the three -- the two ladies you mentioned?

A. No.

Q. Miss Berndt. And what was the name of the other lady?

MR. SKRYD: I don't think he mentioned --

MR. FISHER: Pat, I thought.

MR. SKRYD: Oh, that's a man.

MR. FISHER: Oh, my mistake. Let me rephrase my question.

BY MR. FISHER:

Q. Anybody other than yourself, Pat and Miss Berndt?

A. No.

Q. Okay. To answer No. 5, correct? Those are the three people?

A. Yes.

131

Q. Okay. And then Question 6, is it correct, as this interrogatory answer states, that you were the person responsible for dispatching Mr. Franke for this trip on July 2nd or July 3rd, 2008?

A. Yes.

Q. With respect to Question 7, where it asks to identify the name, address, job title and employer of the person or persons responsible for the transportation of the cargo and items that were in the container being hauled by Samuel Franke at the time of the collision on July 3, 2008, your company's answer after objections is, quote, None other than those individuals identified by the parties during the course of discovery, unquote.

Can you tell me who those people are, if you know?

A. Do you mean as far as after the accident?

Q. I mean what the question asks.

MR. SKRYD: Let me see that.

BY MR. FISHER:

Q. Persons responsible for the transportation of the cargo and items that were in the container being hauled by Samuel Franke.

Your answer says, None other than

132

1  individuals identified by the parties during the
2  course of discovery, and I understand what that
3  says.
4      My question is, from your own
5  perspective, who are those people? And if you
6  don't know, tell me you don't know.
7      MR. SKRYD: I'm going to object to asked and
8  answered throughout the course of the deposition.
9      THE WITNESS: I don't know.
10     MR. SKRYD: Do you understand this question?
11     THE WITNESS: It's the same ones that -- it's
12  the ones that know about the load are Janet, Pat
13  and I.
14  BY MR. FISHER:
15     Q.  Okay. And no one else?
16     A.  Correct.
17     Q.  All right. That you know of?
18     A.  Correct.
19     Q.  Okay. Question 10 at the bottom of that
20  page and the next page asks for you to identify
21  people at Martin's Bulk Milk Service who had any
22  contact or involvement with personnel from
23  International Paper Company or Overnite Express or
24  CSX Intermodal in relation to the use, operation,

133

1  lease of the tractor-trailer, container or chassis
2  involved in the collision of July 3. And, once
3  again, your company's answer to this question is,
4  See our disclosures.
5      My question to you is, do you know who
6  those individuals might be other than the three
7  people you have mentioned, you, Pat and
8  Miss Berndt?
9      A.  Those three would be correct.
10     Q.  Okay. And did you, yourself, have any
11  contact with people at International Paper
12  concerning this load?
13     A.  No.
14     Q.  Did you have any contact with anybody at
15  Overnite Express concerning this load?
16     A.  Yes.
17     Q.  Who did you have contact with at
18  International -- excuse me, at Overnite Express
19  concerning this load?
20     A.  Melody.
21     Q.  Okay. Anyone other than Melody?
22     A.  Not that I recall.
23     Q.  Same question as to Universal Am-Can.
24  Assuming that Melody was actually employed by

134

1  Universal Am-Can, would your answer be Melody?
2      A.  Melody, yes.
3      Q.  And then how about CSX Intermodal, anybody
4  there that you had contact with concerning this
5  load?
6      A.  I don't recall.
7      Q.  Okay. Can you speak for Pat or Miss Berndt
8  as to who, if anyone, they had contact with
9  concerning this load from either
10  International Paper, Overnite Express,
11  Universal Am-Can, Limited, or CSX Intermodal?
12     A.  I would have been the one to notify.
13     Q.  Okay. And on Question 11, all right, it
14  asks, Please identify the name, address, employer
15  and job title of all persons from whom Samuel
16  Franke received any instructions, routing
17  directions or other information concerning all legs
18  of any trips driven by Samuel Franke on July 2nd
19  and July 3rd, including his trip to
20  International Paper Company.
21      Did I read that question correctly?
22     A.  Yes.
23     Q.  And is your company's answer to that,
24  quote, None other than those individuals identified

135

1  by the parties during the course of discovery,
2  unquote?
3      A.  Yes.
4      Q.  What is your personal answer to that
5  question? Who are the individuals from whom Franke
6  received instructions, routing directions or other
7  information concerning all legs of his trip for
8  this load?
9      A.  It would have been received from our office
10  in Wilton.
11     Q.  And would that have been you alone, you and
12  other persons, or other persons at the office in
13  Wilton?
14     A.  It could have been me and other people.
15     Q.  And what would the nature of those
16  instructions have been?
17     A.  Just giving him pick-up numbers in Chicago.
18     Q.  When he was in Chicago, I presume he was
19  there waiting for an assignment in the afternoon of
20  July 3rd, 2008?
21     A.  Yes.
22     Q.  Okay. And is the only person he would have
23  heard from concerning what he is next to do someone
24  from Martin's Bulk Milk Service?

136

34 (Pages 133 to 136)

MR. SKRYD: I'm going to object. Calls for
speculation and foundation as to what he did hear
from anybody.
    Go ahead.
    THE WITNESS: He -- I'm not sure who he talked
to. He did the run for a while and I know he
talked to Overnite Express/Am-Can on certain
events.
BY MR. FISHER:
    Q. How long had he been doing this run and how
frequently did he do the run?
    A. He did the run every day, five days a week.
    Q. And so is this something that would be sort
of regular, what he would expect would be the case
on each day at the tail end of the afternoon?
    A. Very much so.
    Q. All right. And so is it likely, based upon
your knowledge of how this operation occurs, that
he might just know -- be waiting in some truck stop
or somewhere just waiting for the phone call as to
where he's supposed to go or at least what time
he's supposed to go there?
    A. He had the same schedule every day.
    Q. And that schedule would have been what?

137

    A. Delivering a load from Wilton, Wisconsin,
to Chicago; taking an empty trailer from the
railroad to Exel distribution, Hammond, Indiana;
picking a load for International Paper for
Universal Am-Can; going to Minneapolis.
    Q. And would he have brought the load in each
case back to Wilton and then it would have been
transferred to another driver, or would he have
gone on from Wilton to Minneapolis?
    A. He ran the Chicago leg of the run. Another
driver took the Minneapolis end of it every day.
    Q. So his -- he's -- his round trip is Wilton
Chicago, Hammond, back to Wilton?
    A. Yes.
    Q. Okay. And that was day in, day out for
weeks and months before July 3rd, 2008?
    A. Years.
    Q. How many years?
    A. I don't recall.
    Q. We'll have to ask him. Okay. You can set
that aside.
    Was the place of pick-up predetermined
for Mr. Franke on July 3rd, 2008?
    A. Yes.

138

    Q. Was the place of delivery predetermined for
Mr. Franke on July 3rd, 2008?
    A. Yes.
    Q. Was the time of pick-up predetermined for
the July 3rd, 2008 load?
    A. Yes.
    Q. Was the time of delivery predetermined for
the load on July 3, 2008?
    A. Yes.
    Q. Was what he was to pick up predetermined or
did that depend upon whatever types of paper
products were to be shipped?
    MR. SKRYD: Objection. Foundation.
        If you know.
    THE WITNESS: Exel had until 5:00 o'clock at
night to change their order.
BY MR. FISHER:
    Q. Why was that?
    A. Orders get called in throughout the day for
whatever the customers need. They had till 5:00
o'clock that night to change the order to what went
on the truck to load at 7:00.
    Q. Was there ever an instance, to your
knowledge, in which Mr. Franke expecting there to

139

be a load, suddenly at 5:00 o'clock, there was no
load?
    A. Yes.
    Q. And what would happen in that instance --
    A. He would come home --
    Q. -- other than he'd get mad?
    A. Come home empty.
    Q. Okay. Do you know whether or not on
July 3, 2008 -- strike that.
    When he came from Wilton down to
Chicago, Hammond area, was he empty or loaded?
    A. Loaded.
    Q. What would he have brought or the types of
things he would have brought on his north to south
trip?
    A. Either furniture or beverages.
    Q. And then he would -- would the drop-off
place change day to day, week to week?
    A. Day to day.
    Q. Were there certain usual suspects of places
that he was making his deliveries to?
    A. Usually, two.
    Q. All right. And what were those places
again?

140

35 (Pages 137 to 140)

A. CSX, Bedford Park; CSX, 47th Street.

Q. And then would he remain there waiting for when he's going to go make a pick-up in Hammond?

A. No. He already was predispatched to know what to do.

Q. All right. On July 3rd, 2008, do you know whether or not at any time during that day he ever had any contact with anyone at International Paper concerning what he was to do that day?

A. Do not know.

Q. Do you know whether or not he had any contact with anybody from Universal Am-Can on that day?

A. Do not know.

Q. And do you know whether or not on that day he had any contact with anybody at Overnite Express?

A. Do not know.

Q. If Universal Am-Can had told you or Mr. Franke, We need to get -- we need you to get that product up to Minneapolis by driving a hundred miles an hour on interstate highways, what would your response have been?

MR. SKRYD: Objection to the form.

141

Go ahead.

THE WITNESS: We have to follow the rules of hours of service and speed limits.

BY MR. FISHER:

Q. And that's, I take it, independent of whatever contractual relationship you had with Universal Am-Can, correct?

A. Yes.

Q. Did you, as a representative of Martin's Bulk Milk Service, ever represent to anyone, regardless of who that person's employed by, that Mr. Franke was an agent of International Paper when he was doing his daily runs?

MR. SKRYD: Objection to the form.

THE WITNESS: No.

BY MR. FISHER:

Q. Did you ever represent to anyone concerning the daily runs that Mr. Franke would do, that he -- Mr. Franke was an agent of Universal Am-Can?

MR. SKRYD: Again, objection to form and the term "represent."

THE WITNESS: No.

BY MR. FISHER:

Q. And same question:

142

Did you ever represent to anyone else that Mr. Franke was acting as an agent on behalf of Overnite Express when he was doing his runs?

MR. SKRYD: Same objection. Form; the term "represent."

THE WITNESS: No.

BY MR. FISHER:

Q. Would it be fair to say that you would represent to individuals that Mr. Franke was an employee of your company?

A. Yes.

Q. And that he would receive direction, control, supervision and management from your company when he was doing his work on the road?

A. Yes.

Q. Did International Paper ever dictate to your company how Mr. Franke was to drive his motor vehicle?

MR. SKRYD: Objection. Calls for speculation, foundation as to what they did or didn't tell him.

THE WITNESS: Not that I recall.

BY MR. FISHER:

Q. Did Universal Am-Can ever direct Mr. Franke in the way he was to drive his vehicle?

143

MR. SKRYD: Same objections.

THE WITNESS: Not that I recall.

BY MR. FISHER:

Q. Same question as to Overnite Express.

Did they ever dictate to Mr. Franke how he was to drive his vehicle on his daily runs?

A. Not that I recall.

Q. Did Overnite -- strike that.

Did International Paper ever advise you that Mr. Franke was not to do any of these runs that he had been doing day in, day out; week in, week out; month in, month out?

A. No.

Q. Did Universal Am-Can ever make such a dictation or direction to your company about Mr. Franke?

A. No.

Q. Same question as to Overnite Express.

A. No.

Q. Did International Paper ever pay Mr. Franke directly?

A. Not to my knowledge.

Q. That would have been a violation of the agreement that existed between your company and

144

36 (Pages 141 to 144)

Overnite Express or Universal Am-Can, correct?

A. Correct.

Q. Did International Paper ever provide any tools, materials or equipment for Mr. Franke to do his job on his usual daily runs?

A. Not that I recall.

Q. And what about Universal Am-Can, did they ever provide any tools, equipment or materials for Mr. Franke to do his daily runs?

A. Not that I recall.

Q. Same question as to Overnite Express?

A. Not that I recall.

Q. Did Mr. Franke's job ever involve the brokering of loads?

A. No.

Q. Did Mr. Franke's job -- strike that.

Was Mr. Franke's income -- let me rephrase my question.

Did International Paper, Overnite Express or Universal Am-Can ever deduct withholding tax from Mr. Franke's pay --

A. No.

Q. -- because of the runs that they did -- that he did?

145

A. No.

Q. When you were asked questions by Mr. Burke before in which he suggested to you and you agreed that Mr. Franke was the agent of International Paper or Overnite Express or Universal Am-Can, why did you say "yes" to those questions?

MR. BURKE: Objection to the form of the question.

MR. SKRYD: Go ahead. Answer.

THE WITNESS: We're all tied into the movement of the load that we did day to day: CSX, Universal Am-Can, Exel, International Paper and Trac Leasing.

BY MR. FISHER:

Q. And how does that tying in or interrelationship necessarily mean that Mr. Franke is an agent as opposed to an independent contractor of any of those other entities?

MR. BURKE: Objection to the form.

BY MR. FISHER:

Q. If you know.

A. I don't know.

Q. So when you answered Mr. Burke's questions

146

before as to them being -- as to Mr. Franke being agents of any of those entities, were you basing that on just the fact that you believe these companies are related in some way in the transportation industry of moving goods from one place to another? Is that what you meant by your answers?

A. Yes.

Q. Okay. Have you ever moved from Wilton, Wisconsin?

A. No.

Q. Have you ever -- always lived there?

A. Yes.

Q. Are you -- I'll change my question then. Well, let me ask this:

Have you ever moved from one house to another?

A. Yes.

Q. In Wilton?

A. Yes.

Q. And by chance, when you did that, did you hire the services of a mover or did you do it by yourself?

A. Myself.

147

Q. Okay. Have you ever been to a fast-food restaurant?

A. Yes.

Q. And when you've -- have you ever pulled into the drive-in?

A. Yes.

Q. Ordered food?

A. Yes.

Q. And when you've ordered your lunch or whatever it was you ordered and that order was filled by somebody in the restaurant, was that person filling your order doing something at your service?

A. Yes.

Q. And for your benefit?

A. Yes.

Q. And if that person, while accomplishing that task, reached over and struck somebody, do you think that person was acting on your behalf?

MR. SKRYD: Objection. Form of the question, calls for a legal conclusion. And I think I'm going to instruct him not to answer that question. That's well beyond what I think is relevant in this case and asking him to make a tort-related

148

37 (Pages 145 to 148)

1    determination in a trucking-related case.
2         If you want to ask him something about
3    the trucking industry, go ahead.
4      MR. FISHER: I'm asking that question, and you,
5    at your peril, instruct him not to answer this
6    question.
7      MR. SKRYD: I said I think. I'm thinking about
8    it.
9      MR. FISHER: Okay. Please think. Take your
10   time.
11     MR. SKRYD: I'm thinking about it.
12     MR. FISHER: You're not contending it's a matter
13   of privilege, I take it, right?
14     MR. SKRYD: No. No, I just don't know if it's
15   an appropriate question.
16     MR. FISHER: Might not be admissible.
17     MR. SKRYD: And I don't -- no, it's not going to
18   be admissible, I'm sure, but...
19        If you understand what he's getting at,
20   then you can --
21     THE WITNESS: I wish not to answer.
22   BY MR. FISHER:
23     Q. Why's that, sir?
24     A. I don't think it has anything relevant with

149

1    what's going on.
2      Q. And why is that?
3      A. It's two different scenarios.
4      Q. Okay. So is your answer to my question,
5    you can't answer the question because you believe
6    it's too different scenarios and one is not like
7    the other?
8      A. I wish not to answer.
9      Q. I'm sorry?
10     A. I wish not to answer.
11     Q. But you may not have a choice in that,
12   okay?
13        So my question is, are you not going to
14   answer the question or are you taking the position
15   you can't answer that question because they are
16   unlike situations?
17     A. They're unlike situations.
18     MR. FISHER: Okay. That's all the questions I
19   have.
20        Thanks.
21     MR. SKRYD: Okay. Let's take a two-minute
22   break. I won't be that long, Scott.
23        (Recess taken.)
24

150

1         (Whereupon, Martin Deposition
2          Exhibit No. 25 was
3          marked for identification
4          as of this date.)
5      EXAMINATION
6      BY
7      MR. BENTIVENGA:
8      Q. Hi, Mr. Martin. I'm Scott Bentivenga. I
9    represent CSX Intermodal in the case and I've got
10   some questions for you as well.
11        I'm going to start out by showing you
12   what I've marked as your Deposition Exhibit No. 25,
13   which is entitled Answers and Objections of
14   Defendants Martin's Bulk Milk Service, Inc., and
15   Samuel G. Franke to Defendants CSX Intermodal,
16   Inc.'s First Request to Admit Facts and Genuineness
17   of Documents and Supplement Interrogatories or
18   Production Requests Pursuant to Federal Rule of
19   Civil Procedure 36, 26 and 34.
20        Do you have a copy of that in front of
21   you?
22     A. Yes.
23     Q. Okay. If you could turn to the request
24   No. 4. Request No. 4 asks whether -- well, it

151

1    states, CSXI, which is CSX Intermodal, did not
2    operate the tractor involved in the incident
3    alleged in plaintiff's third amended complaint when
4    the accident occurred on July 3, 2008.
5         Do you see that request?
6      A. Yes.
7      Q. And you see the objection that that
8    followed and the answer, correct?
9      A. Yes.
10     Q. After talking about this for the last
11   several hours, would you agree -- would you admit
12   on behalf of yourself and Martin's Bulk Service
13   (sic), that CSXI did not operate the tractor
14   involved in the accident on July 3, 2008?
15     A. Define "operate."
16     Q. How do you define operate?
17     A. Not driving the truck.
18     Q. Okay. So if we can agree that operating
19   the tractor means driving the truck, is that an
20   acceptable definition to you?
21     A. Yes.
22     Q. All right. You would agree then that CSXI
23   did not operate or drive the tractor that was
24   involved in the accident on July 3, 2008?

152

38 (Pages 149 to 152)

A. Yes.

Q. All right. And that's because Mr. Samuel Franke drove and operated the truck, correct?

A. Yes.

Q. And he did so as an employee of Martin's Bulk Service, correct?

A. Yes.

Q. And Mr. Franke was not an employee of any other entity or person other than Martin's Bulk Service on July 3, 2008 when he operated that tractor when he was involved in the accident on July 3, 2008; is that correct?

A. Correct.

Q. Can you go to No. 6, Request No. 2?

MR. SKRYD: One or two at a time. Hope we're skipping a little around. I'm just kind of teasing you there.

MR. BENTIVENGA: Well, it's just --

MR. SKRYD: I'm just teasing you.

MR. BENTIVENGA: I'm not going to ask about the ones --

MR. SKRYD: I'm just teasing you.

MR. BENTIVENGA: I'd like to get through this, too.

153

MR. SKRYD: It looked like you were going a couple -- and then, all of a sudden, you only went one or two pages.

But, anyway, go ahead. No. 6?

MR. BENTIVENGA: Sure.

BY MR. BENTIVENGA:

Q. Okay. You testified earlier today that the chassis was owned by Trac Lease; is that correct?

A. Yes.

Q. All right. And No. 6 of the request to admit, Exhibit 25, states, CSXI did not own the chassis on which the CSXI container was transported at the time of the incident alleged in plaintiff's third amended complaint, which occurred on July 3, 2008.

Do you see that statement?

A. Yes.

Q. And you would admit that based on what you know now?

A. Yes.

Q. All right. And No. 7, which also states CSXI did not lease the chassis, you would agree that CSXI did not lease the chassis involved in the accident?

154

A. That, I wouldn't know.

Q. Okay. You don't know one way or the other?

A. Correct.

Q. All right. Okay. No. 8, which states that the chassis on which the CSXI container was transported at the time of the accident on July 3, 2008 was owned by Trac Lease, you would admit that now, correct?

A. Yes.

Q. No. 9, Request No. 9 states, CSXI did not employ the driver, Samuel G. Franke, who was operating the tractor, container on chassis involved in the incident alleged in plaintiff's third amended complaint on July 3, 2008 at the time of the incident.

You would admit that at this point, correct?

A. Sam Franke was an employee of Martin's Milk Service.

I do not know any involvement -- or I don't know of any involvement he would have had with CSXI, but I don't know.

Q. Okay. Have you learned of any information at any time that Samuel Franke was employed by CSXI

155

at any time?

A. No.

Q. So based on what you know, you would agree that Samuel Franke was not employed by CSXI on July 3, 2008, or at any time, correct?

A. Yes.

Q. 10 states, CSXI did not dispatch the driver, Samuel G. Franke, to pick up or deliver the load he hauled at the time of the incident alleged in plaintiff's third amended complaint which occurred on July 3, 2008.

Do you see that?

A. Yes.

Q. You would agree and admit that CSXI did not dispatch your driver, Samuel G. Franke, on July 3, 2008, correct?

A. They would have not -- they would have not dispatched him on his next load.

Q. What do you mean by that?

A. His -- they wouldn't have told him where he had to go next.

Q. Okay. You -- I think you indicated that you dispatched Mr. Franke for the load that he was delivering at the time that he was involved in the

156

39 (Pages 153 to 156)

1    accident; is that correct?
2        A.  Yes.
3        Q.  And you would agree then that CSXI did not
4    dispatch him for that load that he was delivering
5    at the time of the accident on July 3, 2008?
6        A.  Yes.
7        Q.  No. 11 states, CSXI did not engage
8    Samuel G. Franke as an agent for CSXI on or before
9    July 3, 2008 with respect to the incident alleged
10   in plaintiff's third amended complaint.
11       Do you see that?
12       A.  Yes.
13       Q.  You would admit and agree with that
14   statement, correct?
15       A.  Yes.
16       Q.  No. 12, CSXI did not hold out Samuel G.
17   Franke as an agent of CSXI on or before July 3,
18   2008 with respect to the incident alleged in
19   plaintiff's third amended complaint.
20       Do you see that?
21       A.  Yes.
22       Q.  Would you agree and admit to that?
23       MR. SKRYD:  My objection with that -- to that
24   would stand, if that were a question, Scott, to the

157

1    extent that it lacks foundation as to what CSI
2    (sic) did or did not do.
3        But go ahead.
4        MR. BURKE:  Objection to the form of the
5    question and the term "holding out."
6        THE WITNESS:  I mean, define "hold out."
7    BY MR. BENTIVENGA:
8        Q.  Well, what does it mean to you?
9        A.  I don't know.  That's why -- I mean --
10       Q.  Well, we've established that CSXI did not
11   employ Mr. Franke, correct?
12       A.  Mr. Franke -- Mr. Franke was an employee of
13   Martin's Milk Service, but he went into the
14   railroads every day to CSXU -- CSXI.
15       Q.  Right.  Okay.
16       And he did that for Martin's Bulk
17   Service, correct?
18       A.  He did that for all the companies.  He did
19   it -- this was all -- everybody was -- I mean,
20   everybody as far as Celtic, CSXU, Overnite Express,
21   American Am-Can, Exel, Trac Leasing.  They all got
22   a piece of this puzzle.
23       Q.  I understand.  My question's a little
24   different than that.

158

1        When Mr. Franke would drive a tractor
2    and/or a tractor and trailer and/or a tractor and
3    chassis and container onto CSXI property or a CSX
4    rail yard, he did that as an employee as part of
5    his job for Martin's Bulk Service; am I right?
6        A.  Yes.
7        Q.  All right.  He did that because he was
8    making deliveries, pick-ups, drop-offs for
9    Martin's Bulk Service as part of his job, right?
10       A.  Yes.
11       Q.  And he took his instructions and his
12   direction and his jobs from Martin's Bulk Service,
13   correct?
14       A.  He took -- yeah, he took the instructions
15   from me.
16       I don't know whether -- any other
17   instructions he took from anybody else that could
18   have involved him with other than what I told him.
19       Q.  Okay.  Are you aware of any document or
20   information that would indicate that CSXI in some
21   way, shape or form indicated or held out Mr. Franke
22   as an employee of CSXI?
23       A.  No.
24       Q.  Are you aware of any document or

159

1    information that would indicate that CSXI indicated
2    or held out Mr. Franke as an agent of CSXI?
3        MR. SKRYD:  Objection to the form and calls for
4    speculation.
5        THE WITNESS:  Not that I know of.
6        I don't know if Sam had anything -- any
7    dealings besides what I dealt with him on day to
8    day.
9    BY MR. BENTIVENGA:
10       Q.  Right.  And I'm only asking you for what
11   you know today.
12       And as far as you know, CSXI did not
13   hold out Samuel Franke as an agent or employee of
14   CSXI; am I correct?
15       A.  Yes.
16       Q.  No. 13 states, CSXI did not hold out
17   Sam Franke as an -- as authorized to act on behalf
18   of CSXI on or before July 3, 2008, with respect to
19   the incident alleged in plaintiff's third amended
20   complaint.
21       Do you see that?
22       A.  Yes.
23       Q.  Would you agree and admit to that
24   statement?

160

40 (Pages 157 to 160)

MR. SKRYD: Again, with regards to the objection I made before, form, foundation as to what CSXI did or didn't do, and then whatever we've got in the document as well.

Legal conclusion.

THE WITNESS: And, again, I don't know -- other than what I know today, if Sam had any other dealings with.

BY MR. BENTIVENGA:

Q. Okay. Based on what you know -- and that's all I'm asking you for -- would you agree that CSXI did not hold out Samuel Franke as authorized to act on behalf of CSXI on or before July 3, '08 with respect to the incident alleged in this case?

MR. SKRYD: Same objections.

THE WITNESS: Yes.

BY MR. BENTIVENGA:

Q. Okay. No. 14, CSXI did not represent to any member of the public that Samuel G. Franke was authorized to act on behalf of CSXI on or before July 3, 2008 with respect to the transportation of the International Paper load which was involved in the incident alleged in plaintiff's third amended complaint.

161

Would you agree and admit to that statement?

MR. SKRYD: Same objection.

MR. BURKE: Objection to form and foundation for his knowledge of that.

MR. SKRYD: Same objections as before. How could he know that.

But go ahead.

THE WITNESS: Not that I know of.

BY MR. BENTIVENGA:

Q. Okay. No. 15, CSXI did not represent to Jeffrey Scheinman that Samuel G. Franke was authorized to act on behalf of CSXI on or before July 3, 2008 with respect to the transportation of the International Paper load which was involved in the incident alleged in plaintiff's third amended complaint.

Based on what you know, would you agree and admit to that?

MR. SKRYD: Same objections.

THE WITNESS: Not to my knowledge.

BY MR. BENTIVENGA:

Q. And since I think we have a double-negative there, based on your knowledge, you would admit

162

No. 15 as I read it based on what you know?

A. Based on what I know, they did not.

Q. Again, we have a double-negative; but based on what you know, CSXI did not represent to Jeffrey Scheinman that Samuel G. Franke was authorized to act on behalf of CSXI on or before July 3, 2008, correct?

A. Correct.

MR. GOLDEN: I was getting confused with that last one.

MR. SKRYD: That is confusing.

BY MR. BENTIVENGA:

Q. Let's go to No. 20.

No. 20 states, At the time of the incident alleged in plaintiff's third amended complaint, which occurred on July 3, 2008, CSXI had no right to direct the work of Samuel G. Franke?

Do you see that?

A. Yes.

Q. You would agree and admit that that statement in No. 20 is true and correct?

MR. SKRYD: Same objections as indicated in the answer and, further, that it calls for a legal conclusion.

163

MR. GOLDEN: Said so. Asked and answered.

THE WITNESS: I cannot say if anybody would have had any influence on Sam. I wasn't there.

BY MR. BENTIVENGA:

Q. Okay. You -- you directed the work of Mr. Franke by dispatching him for this load, correct?

A. Yes.

Q. And you did that on behalf of Martin's Bulk Service, right?

A. Yes.

Q. Are you aware of any document or information that would indicate that CSXI had a right to direct the work of Mr. Franke with respect to his delivery of that load for Martin's Bulk Service?

A. No.

Q. Do you -- are you aware of any document or information that would indicate that CSXI exercised any right to direct or control Samuel G. Franke with respect to this delivery on July 3, 2008?

A. No.

Q. So based on what you know, CSXI did not direct the work of Samuel G. Franke with respect to

164

1 this delivery on July 3, 2008; is that correct?
2    MR. SKRYD: Objection as to foundation.
3    THE WITNESS: Based on what I know -- from what
4 I know today, they had no...
5 BY MR. BENTIVENGA:
6    Q.   No direction?
7    A.   Yes.
8    Q.   That covers No. 21.
9          No. 22 states, At the time of the
10 incident alleged in plaintiff's third amended
11 complaint, which occurred on July 3, 2008, CSXI had
12 no right to supervise the work of Samuel G. Franke.
13          Do you see that?
14    A.   Yes.
15    Q.   Would you agree and admit that CSXI had no
16 right to supervise the work of Samuel G. Franke
17 with respect to the delivery of the load that he
18 was carrying at the time of the accident on July 3,
19 2008?
20    MR. SKRYD: Objection. Calls for a legal
21 conclusion and a lack of foundation.
22    THE WITNESS: Based on what I know, we still had
23 work to do on this.
24 BY MR. BENTIVENGA:

165

1    Q.   Work to do on what? I'm sorry.
2    A.   Well, how do -- we don't actually know.
3    Q.   Okay. So you can't say one way or the
4 other?
5    A.   Exactly.
6    Q.   Would you agree, though, that you're not
7 aware of any document or other information that
8 would indicate that CSXI had a right to supervise
9 the work of Samuel G. Franke in making his delivery
10 on July 3, 2008?
11    A.   I don't know of any documentation.
12    Q.   Okay. And you're not aware of any other
13 information, right?
14    A.   Correct.
15    Q.   All right. On No. 23 states, At the time
16 of the incident alleged in plaintiff's third
17 amended complaint, which occurred on July 3, 2008,
18 CSXI did not supervise the work of
19 Samuel G. Franke.
20          Would you agree with that statement?
21    MR. SKRYD: Same objections as are indicated in
22 there, Scott, and also object as to foundation. He
23 wasn't there.
24    THE WITNESS: I would say the same. We're

166

1 still looking into it and I don't know of any
2 documentation.
3 BY MR. BENTIVENGA:
4    Q.   Okay. Are you aware of any information
5 that CSXI actually supervised the work of
6 Samuel G. Franke on July 3, 2008 with respect to
7 the delivery he was making?
8    A.   I don't know of any documentation.
9    Q.   Okay. On July 3, 2008, that was when you
10 first got the order for the delivery that
11 Mr. Franke was making on July 3, '08, correct?
12    A.   On the load he was delivering?
13    Q.   Correct.
14    A.   On July 3rd, we got the load -- the
15 information on the load that he was picking up.
16    Q.   Okay. Okay. I see the distinction.
17          Exhibit No. 11 is that Broker
18 Confirmation Sheet, which is dated July 3, 2008,
19 right?
20    A.   Right.
21    Q.   And that came into your office, looks like,
22 at about 4:23 p.m., right?
23    A.   Right.
24    Q.   Now, obviously, Mr. Franke made this run

167

1 often. But with respect to the confirmation of
2 this particular pick-up that he was to make in
3 Hammond, Indiana, the first notice to Martin's Bulk
4 Service was on July 3, 2008, right?
5    A.   Correct.
6    Q.   Did you have any communication with anyone
7 from CSX Intermodal on July 3, 2008?
8    A.   I did not.
9    Q.   Are you aware of any information that
10 anyone from Martin's Bulk Service had a
11 communication with CSX Intermodal on July 3, 2008?
12    A.   Not to my knowledge.
13    Q.   Do you know whether Mr. Franke had any
14 communication with anyone from CSX Intermodal on
15 July 3, 2008?
16    A.   Not to my knowledge.
17    Q.   Were you Mr. Franke's direct supervisor?
18    A.   Yes.
19    Q.   And you were supervising his work on
20 July 3, 2008?
21    A.   Yes.
22    Q.   You would agree that CSXI was not
23 supervising his work on July 3, 2008, correct?
24    MR. SKRYD: Objection. Foundation as to what

168

they did or didn't do.

THE WITNESS: I would say that he was directed by me to deliver the load to Chicago, pick up the load in Indiana.

After -- anything that happened between there, I have no -- I don't know what could have -- if anything could have happened.

BY MR. BENTIVENGA:

Q. You're not aware of any supervision conducted by CSXI over Mr. Franke's work on July 3, 2008, correct?

A. None that I know of.

Q. Okay. No. 24, on July 3, 2008, CSXI had no right to direct the work of Martin's Bulk Service, Inc.

Would you agree with that?

MR. SKRYD: Same objections as indicated in the answer as well as calls for a legal conclusion and foundation.

THE WITNESS: They might have -- they might have told -- directed him as far as what trailer he could take in the yard.

BY MR. BENTIVENGA:

Q. Okay. Other than that, are you aware of

169

any other right that CSXI had to direct the work of Martin's Bulk Service --

A. No.

Q. -- on July 3, 2008?

A. No.

Q. Okay. By the way, with respect to the container and the chassis, do you know whether or not the container was on the chassis at the time that Mr. Franke arrived to go pick it up?

A. I do not know.

Q. Given the fact that you're not aware of any communication between CSXI and Martin's Bulk Service, Inc., on July 3, 2008, would you agree that CSXI did not direct the work of Martin's Bulk Service, Inc., on July 3, 2008 with respect to this delivery?

MR. SKRYD: My objection is foundation. I don't know how he'd know what they did or didn't.

Go ahead.

THE WITNESS: And, again, he only took the direction from -- from me to where he had to deliver it and to pick up. If anybody else had any contact with him, I don't know.

BY MR. BENTIVENGA:

170

Q. Okay. And I'm just asking based on what you know.

Are you aware of any direction by CSXI over Martin's Bulk Service, Inc.?

A. No.

Q. With respect to this job that's listed on the Broker Confirmation Sheet marked as Exhibit No. 11, you would agree that CSXI had no right to supervise the work of Martin's Bulk Service, Inc., with respect to this job, correct?

MR. SKRYD: Can you re- -- can you repeat that? I'm sorry, Steve.

MR. BENTIVENGA: Yeah, he can read it.

(Record read as requested.)

MR. SKRYD: Same objections as before. Foundation, calls for a legal conclusion.

THE WITNESS: Not to my knowledge. They wouldn't have anything to do with it.

BY MR. BENTIVENGA:

Q. And, in fact, based on what you've testified to, you would admit that CSXI did not supervise the work of Martin's Bulk Service Milk (sic) with respect to this job reflected on Exhibit 11?

171

A. Correct.

Q. The tractor that was driven by Mr. Franke on July 3, 2008 that was involved in the accident, the tractor itself did not have any decal or other identification stating CSXI on it, correct?

A. Correct.

Q. With respect to No. 35, can you go to No. 35?

35 states, CSXI did not contract with Martin's Bulk Service, Inc., or Samuel G. Franke to haul the load for International Paper which was in transit at the time of the incident alleged in plaintiff's third amended complaint on July 3, 2008?

Do you see that?

A. Yes.

Q. Based on what you know now, would you agree with that statement?

MR. SKRYD: Again, my objections are as stated in there.

Further, it calls for a legal conclusion.

THE WITNESS: We used the CSXU container to pick up the load out of International Paper like we did

172

43 (Pages 169 to 172)

1 every day.
2 BY MR. BENTIVENGA:
3    Q. Okay.
4    A. So we were contracted with CSXI as
5 everybody -- CSXI benefited in every movement that
6 we made.
7    Q. Let me ask you about that.
8       Exhibit No. 9 is that Celtic's
9 Accessorial Approval Form. Remember that?
10   A. Yes.
11   Q. That -- that was a bill -- this was the
12 bill for $8,050 --
13   A. Yes.
14   Q. -- from Celtic to Martin's Bulk Service?
15   A. Yes.
16   Q. I think you indicated this was not paid,
17 correct?
18   A. It's pending.
19   Q. But it has not been paid to date?
20   A. Correct, to my knowledge.
21   Q. All right. And is this the fee that you
22 would pay to Celtic to cover whatever the costs
23 would be of using the chassis and the container
24 that was involved in that delivery?

173

1    A. No. If you look on that document, it'll
2 tell you how many days you have.
3    Q. Okay.
4    A. And I believe it's five days without being
5 charged.
6    Q. Okay. Okay.
7       So if you just use the chassis and the
8 container for five days or less, then there's no
9 charge?
10   A. Correct.
11   Q. So under those circumstances then, the
12 owner of the chassis and the owner of the container
13 do not benefit financially since there's no charge?
14   A. Well, they're charging Celtic.
15   Q. I understand. But you're -- out of the
16 money that you're paid, you don't pay a fee if you
17 use it for five days or less, correct?
18   A. Correct.
19   Q. All right. Because you -- this chassis and
20 container was involved in the accident on July 3,
21 2008, it was not returned, right?
22   A. Correct.
23   Q. And no fee was paid by Martin's Bulk
24 Service for use of the chassis or the container to

174

1 date?
2    A. To my knowledge.
3    Q. So whatever money that Martin's Bulk
4 Service earned for that pick-up and delivery, none
5 of that benefited CSXI, who owned the container, or
6 Trac Lease, who owned the chassis, correct?
7    A. CSXI gets a profit off it somehow or they
8 wouldn't be able to just let it out for nothing.
9    Q. Are you going to -- do you understand --
10 well, first of all, do you know that?
11      I'm just asking you for what you know.
12   A. No.
13   Q. You don't know that.
14      All right. But you do know that
15 whatever money Martin's Bulk Service was paid, none
16 of that money was used to pay for the use of the
17 chassis and the container that was driven by
18 Mr. Franke on July 3, 2008?
19   A. When this is settled, we will have to pay
20 CSXI. That's where that money will go.
21   Q. But, to date, none of that money has been
22 paid?
23   A. Correct.
24   Q. CSXI was not part of the contract or

175

1 agreement reflected in the Broker Confirmation
2 Sheet marked as Exhibit 11, correct?
3    A. Correct.
4    Q. And CSXI did not contract with
5 Martin's Bulk Service to haul that paper that was
6 hauled on July 3, 2008, correct?
7    A. Correct.
8    Q. What does the word "interchange" mean to
9 you with respect to the container and chassis?
10   A. It means that when we bring a loaded
11 trailer in, we're allowed to take out an empty
12 trailer, or deliver a loaded trailer in and
13 sometimes take a loaded trailer out.
14      We can freely move about with railroad
15 equipment.
16   Q. Okay. No. 36, it says, CSXI did not
17 interchange --
18   MR. SKRYD: Can you hold on one second, Scott?
19   MR. BENTIVENGA: Oh, I'm sorry.
20   MR. SKRYD: That's all right. He's still back
21 on something else.
22   MR. BENTIVENGA: Just trying to speed it along.
23   MR. SKRYD: Go ahead. I'm sorry.
24 BY MR. BENTIVENGA:

176

44 (Pages 173 to 176)

Q. CSXI did not interchange the container on chassis hauled by Samuel G. Franke on July 3, 2008 to Martin's Bulk Milk Service, Inc., or Samuel G. Franke for use in this movement.

Would you agree with that or do you not know?

A. I do not know. You're talking about the container itself.

Q. Yes.

A. Yeah, I do not know.

Q. And why don't you know?

A. Once it's -- I have no idea what happens once in the railroad. It's a very busy place. I don't have any clue what goes on once it's in there.

Q. When Mr. Franke picked up the chassis and the container on July 3, 2008, I think you indicated the CSX rail yard at 47th Street?

A. Yes.

Q. Is there any requirement or did Mr. Franke contact CSXI to indicate that he had taken a container owned by CSXI, to your knowledge?

A. An empty one back out?

Q. Correct.

177

A. Well, when he leaves the gate, he has to report which trailer he has.

Q. Okay. And is there documentation of that?

A. Yes.

Q. Is that Exhibit 8?

MR. SKRYD: Is that the J --

THE WITNESS: J-1.

MR. SKRYD: Yeah.

THE WITNESS: Exhibit 8.

MR. SKRYD: You're right, Scott.

BY MR. BENTIVENGA:

Q. Okay. Are you familiar with this type of record?

A. Somewhat.

Q. It says driver name, Tomas Crespo, C-r-e-s-p-o, on there.

Do you know why that is?

A. We have no idea.

Q. Do you know Tomas Crespo?

A. No.

Q. There's another name on there. It says Jamie Panozzo, P-a-n-o-z-z-o. Do you know Jamie Panozzo?

A. No.

178

Q. Okay. No. 37 states, Martin's Bulk Milk Service, Inc., and Samuel G. Franke did not obtain CSXI container -- CSXU 937987 through interchange with CSXI.

Would you agree with that?

A. No, I would not.

I don't -- they would not let him out if it wasn't -- if he -- if he didn't have an agreement with CSXI.

Q. You mean, if Martin's didn't?

A. If he doesn't have a pick-up -- a confirmation number, he cannot leave the yard.

So it has to go back through the UIA --

UII interchange.

Q. Okay. And is that how it works then, that he'll go in and choose a chassis and a container and then notify on the way out what he's taking?

A. Yes.

Q. So there's no prior communication usually between Mr. Franke and CSXI as to which chassis and container he's taking?

A. Correct. But they -- there's times where he can go out, and they can deny the trailer he's taking out and tell him to go take a different one.

179

Q. And under what circumstances might that occur?

A. If it's already reserved for another company.

Q. Do you know whether or not anything like that occurred on July 3, 2008?

A. I do not.

Q. Would you agree -- I'm looking at No. 39.

Would you agree that after Mr. Franke hooked up to the container and chassis or chassis and container and took it out of the CSX rail yard, that Mr. Franke and Martin's Bulk Milk Services, Inc., controlled the container?

MR. SKRYD: Why don't you read it. You can answer.

Objection as to the form.

MR. BURKE: Objection to the form as well.

MR. SKRYD: And objection. Calls for a legal conclusion.

THE WITNESS: Sam was the driver of the truck. Container is still owned by CSXI.

BY MR. BENTIVENGA:

Q. Okay. And while Mr. Franke's driving the tractor, the chassis and the container, the

180

1    container is then in his possession, correct?
2        A.   To my knowledge.  Yes, to my knowledge.
3        Q.   All right.  And he's driving it.  So he's
4    the one that has control over it, correct?
5        MR. SKRYD:  Objection to the form, the word
6    "control."
7        THE WITNESS:  He's in control of his tractor.
8    And under other circumstances with their equipment
9    of the trailer, I mean there's things -- certain
10   things he's not in control of.
11   BY MR. BENTIVENGA:
12       Q.   You would agree that there is -- has been
13   no information or you're not aware of any
14   information that there was any problem with the
15   container that was involved in the accident on
16   July 3, 2008.
17       Would you agree with that?
18       A.   The only problem with the container that I
19   know of is what they found afterwards with some
20   brakes out of adjustment.
21       Q.   You're talking about the chassis now?
22       A.   Correct.
23       Q.   I'm talking about the container only.
24       Would you agree with me that you're not

181

1    aware of any information that there was any problem
2    with the container?
3        A.   I'm not aware of any information --
4    anything wrong with the container.
5        Q.   At the time that Mr. Franke was driving the
6    tractor and pulling the chassis and container, you
7    would agree that CSXI was not operating the
8    container or the chassis at that time, correct?
9        MR. SKRYD:  Objection as to the form and the
10   word "operate."
11       You can answer.
12       THE WITNESS:  As I said before, he was operating
13   the truck.  If anything was with -- would go wrong
14   with the trailer, would be out of his control.
15   BY MR. BENTIVENGA:
16       Q.   Okay.  And you're not aware of there being
17   any problem with the container; we've established
18   that, right?
19       A.   Correct.
20       Q.   All right.  So when he's operating the
21   tractor, he's pulling the chassis and the
22   container, correct?
23       A.   Correct.
24       Q.   There's no one else that's driving that

182

1    vehicle, correct?
2        A.   To my knowledge, no.
3        Q.   All right.  So you would agree that at the
4    time that he's driving that on July 3, 2008, CSXI
5    was not operating the container or the chassis or
6    the tractor, correct?
7        A.   Correct.
8        Q.   By the way, when Mr. Franke pulls out of
9    the -- or pulled out the CSXI or -- or CSX rail
10   yard at 47th Street on July 3, 2008 with the empty
11   container, do you know who operates the gates,
12   whether it's CSX, CSXI, or some contracted company,
13   some independent contractor?
14       A.   I do not know.
15       Q.   So whether or not CSXI was given any notice
16   on July 3, 2008 that Mr. Franke had taken its
17   container off of that yard, you don't know?
18       A.   You cannot leave the rail yard without
19   authorization.  You cannot physically leave there.
20   They'll put the gates down -- or the gates are down
21   before you leave.
22       Q.   Okay.  And my only question is then, if
23   you're not sure who was operating the gate and got
24   this information that we believe is reflected on

183

1    Exhibit 8, you don't know whether or when, if ever,
2    it was communicated to CSXI if it was taken by an
3    independent contractor, correct?
4        A.   I guess I lost you there.
5        Q.   All right.
6        A.   The only way that any truck, any carrier
7    can pull out of CSX is if you have a reservation
8    number.  You give that number to the guard.  If the
9    number is reserved within the system, they'll let
10   you leave.  If one thing's wrong, you cannot leave.
11       Q.   Okay.  You would agree that CSXI did not
12   receive this order marked as Exhibit 11 for the
13   pick-up and delivery of paper?
14       MR. SKRYD:  My objection is foundation as to
15   what they did or didn't get.
16       I don't know how he'd know, but go
17   ahead.
18   BY MR. BENTIVENGA:
19       Q.   As far as you know?
20       A.   I would agree.
21       Q.   You would agree that CSXI cannot broker the
22   shipment of that paper that Mr. Franke was
23   delivering at the time of the accident on July 3,
24   2008, correct?

184

1    MR. SKRYD: Objection. Foundation.
2    THE WITNESS: It was on the CSXU container.
3    They would have -- no, they wouldn't have had
4    anything.
5    BY MR. BENTIVENGA:
6    Q. Okay. Who brokered the load?
7    A. That load there?
8    Q. Yes.
9    A. Overnite Express and Am-Can.
10   Q. All right. So you would agree then that
11   CSXI did not broker the load that was being carried
12   by Mr. Franke on July 3, 2008?
13   A. Correct.
14   Q. You mentioned earlier that the load of the
15   paper was loaded by people at the Exel Warehouse on
16   July 3, 2008, right?
17   A. Yes.
18   Q. That load was not loaded by CSXI, correct?
19   A. Correct.
20   MR. SKRYD: I like the sound of that flipping
21   paper.
22   MR. BENTIVENGA: I'm getting there.
23   MR. SKRYD: Music to my ears.
24   MR. BENTIVENGA: Trying to speed it up.

185

1    MR. SKRYD: I gotcha. Appreciate it.
2    MR. BENTIVENGA: Okay. We're done with that
3    exhibit. And I just have a few questions based on
4    what's been --
5    MR. SKRYD: Sure.
6    MR. BENTIVENGA: -- asked previously.
7    BY MR. BENTIVENGA:
8    Q. When Mr. Franke would make a delivery for
9    his employer, Martin's Bulk Service, he would be
10   paid by Martin's Bulk Service for his work for
11   them, correct?
12   A. Correct.
13   Q. Was he on a salary?
14   A. Per mile.
15   Q. Per mile?
16   Okay. So with respect to the pick-up
17   that he was making on July 3, 2008 and the driving
18   that he was doing for Martin's Bulk Service at the
19   time of the accident, he was being paid by
20   Martin's Bulk Service?
21   A. Yes.
22   Q. And as far as you know, he was not being
23   paid by anybody else for that job that he was doing
24   at the time of the accident, correct?

186

1    A. To my knowledge, no.
2    No, he was not being paid by anybody
3    else.
4    Q. Thank you.
5    When Mr. Franke was driving for
6    Martin's Bulk Service on the road on July 3, 2008,
7    CSXI would not dictate how Mr. Franke would drive,
8    correct?
9    A. Correct.
10   Q. Any direction that he would take would be
11   from Martin's Bulk Service?
12   MR. SKRYD: Objection to the form.
13   THE WITNESS: Any direction he would take, also
14   follow the rules of the law and hours of service.
15   BY MR. BENTIVENGA:
16   Q. Right.
17   There are rules, regulations, laws that
18   he has to follow as an over-the-road driver?
19   A. Correct.
20   Q. Just about done.
21   I'm going to show you what I've had
22   marked as Exhibit 4. I didn't mark it. It was
23   marked previously as Exhibit 4.
24   Okay. That's the Federal Highway

187

1    Administration periodic inspection report from
2    May 23, '08?
3    A. Yes.
4    Q. Okay. You testified about this earlier and
5    it wasn't clear to me.
6    Was this an inspection report for the
7    chassis, the container or both, as far as you know?
8    If you know.
9    A. It would actually -- it would be for the
10   chassis and -- it could be for the -- for the
11   container also. There's reflectors and, yeah, it
12   could be both.
13   Q. Can you tell from this document whether it
14   was, in fact, an inspection of both the chassis and
15   the container or just the chassis?
16   A. Cannot tell.
17   Q. Okay. In the lower left-hand corner, it
18   says, Name of company performing repairs, and it
19   says ITR.
20   A. Yes.
21   Q. What's ITR, if you know?
22   A. I don't know.
23   Q. And the person whose name is on the bottom
24   there as the inspector, can you see what name that

188

47 (Pages 185 to 188)

1  is?
2  A. T. Jeronimo.
3  Q. Do you know who that is?
4  A. I do not.
5  Q. Do you know who employs T. Jeronimo?
6  A. I do not.
7  Q. Do you know who then performed the
8  inspection on May 23, 2008 on the chassis?
9  A. (Indicating.) That signature right there.
10  Q. T. Jeronimo.
11  A. No inspector -- inspector signature, that
12  person's signature -- that person inspected it, but
13  I do not know them.
14  Q. Okay. I thought that the inspector's name
15  on the left, T. Jeronimo, where it's printed out on
16  the left and then signed on the right --
17  A. Oh, okay. You're right.
18  Q. -- it would be the same person?
19  So you don't know who did that?
20  A. No.
21  Q. Okay. I may have asked you this, but do
22  you know when the CSXI container was placed on the
23  chassis that was involved in the accident?
24  A. No.

189

1  MR. BENTIVENGA: Thank you.
2  That's all I have.
3  MR. SKRYD: Do you have any follow-up, Rich?
4  MR. BURKE: I do have a few, yeah.
5  MR. SKRYD: Okay.
6  FURTHER EXAMINATION
7  BY
8  MR. BURKE:
9  Q. Mr. Martin, Mr. Fisher asked you some
10  questions about whether at some point shortly
11  before July 3rd, 2008, you were interacting with
12  Universal Am-Can.
13  Do you recall that line of questioning?
14  A. Yes.
15  Q. Okay. And is it also correct that,
16  literally, as of the day of this incident, you were
17  receiving faxes from Overnite Logistics on paper
18  that said Overnite Logistics on the fax information
19  at the top?
20  A. Yes.
21  Q. Okay. And that was coming from Melody --
22  what's her last name?
23  A. Hansen.
24  MR. BENTIVENGA: Hansen.

190

1  MR. FISHER: Hansen.
2  MR. SKRYD: Hansen.
3  BY MR. BURKE:
4  Q. Hansen. Thank you -- from Melody Hansen
5  who you believe to work for Overnite, correct?
6  A. Correct.
7  Q. Even if you -- you know -- well, strike
8  that.
9  I asked you some questions earlier about
10  whether you believed you were -- that Martin's was
11  performing services and acting as an agent for
12  International Paper and for Overnite. Do you
13  recall those questions?
14  A. Yes.
15  Q. Okay. And even if -- if Overnite had
16  actually been purchased or subsumed by Universal
17  and that you were transporting this paper for
18  Universal, is it true and correct that you believe
19  on July 3rd, 2008, you were performing a service
20  for the benefit of Universal Am-Can?
21  A. Yes.
22  Q. And would it also be correct to say that
23  you were -- that you believe you -- or that
24  Martin's was acting as an agent of

191

1  Universal Am-Can?
2  A. Yes.
3  Q. You know, you got asked about if you had
4  ever told anyone if -- or strike that.
5  You were asked some questions asking if
6  you had ever discussed whether International Paper
7  or Overnite or Universal or others were agents of
8  Martin's.
9  And would it be fair to say you have
10  never had occasion to have that type of
11  conversation with anyone prior to today?
12  A. Yes.
13  Q. Mr. Martin, you also were asked some
14  questions about interrogatory answers that
15  apparently got prepared by someone in your office
16  in terms of the -- identifying people involved in
17  the transportation of these paper products.
18  Do you recall those questions?
19  A. Yes.
20  Q. Okay. Would it -- in some answers that
21  made reference to no one else other than the
22  persons and entities identified in the discovery in
23  this case and the documents in this case, by that,
24  does that answer include everyone that you have

192

1    identified today and spoken about today, such as
2    International Paper and Universal and Overnite and
3    Trac Leasing and Exel and Celtic?
4        A.   Yes.
5        Q.   Okay. And all -- and those names are all
6    the names of the entities that are identified in
7    the various documents that you have both in front
8    of you and that have been produced; is that
9    correct?
10       A.   Yes.
11       Q.   And do all of the answers you've given
12   today and the testimony you have given today
13   constitute supplementation of any of the answers
14   provided on behalf of Martin's in any written
15   questions or interrogatories?
16       A.   Yes.
17       Q.   You know, you got asked -- or strike that.
18       When -- when you say you were -- I think
19   you answered a question for Mr. Fisher about
20   indicating that all of these entities were tied in
21   together when he was asking you some questions
22   about the concept of agency.
23       Do you remember that?
24       A.   Yes.

193

1        Q.   And would it be correct that -- in addition
2    to all of these entities being tied in together,
3    that when you told us earlier this afternoon that
4    Martin's was acting as an agent for the various
5    entities that you mentioned, it is true that
6    Martin's was, in fact, performing work for and
7    services for all of those entities by transporting
8    the paper products at the request of International
9    and Overnite and Universal, correct?
10       A.   Yes.
11       MR. BENTIVENGA:  Object to the form of the
12   question and foundation.
13   BY MR. BURKE:
14       Q.   You got asked a bunch of questions about
15   what CSX may have done in terms of holding out
16   Mr. Franke or holding out Martin's. Do you recall
17   that --
18       A.   Yes.
19       Q.   -- line -- okay.
20       Would it be correct that you actually
21   have no personal knowledge about what CSX -- CSXI
22   did in their own business operations relative to
23   Martin's or Mr. Franke? Would that be fair to say?
24       A.   Yes.

194

1        MR. BURKE:  I don't have anything else.
2        Thank you, sir.
3    THE WITNESS:  Thank you.
4            FURTHER EXAMINATION
5            BY
6        MR. FISHER:
7        Q.   Mr. Martin, so that I understand your
8    testimony, is it your testimony that if any company
9    or individual has its fingerprints literally on a
10   load or document in the chain of transportation for
11   the movement of goods from Point A to Point B and
12   your company was involved somewhere, that every --
13   that your company is acting at all times as the
14   agent of every other company whose fingerprints are
15   on the movement of this truckload of goods?
16       A.   Every entity had a benefit through this
17   transaction. So yes.
18       Q.   So -- and that is regardless of whether or
19   not your company has ever had any contact with
20   another company?
21       A.   Yes.
22       Q.   So your testimony is that another company
23   in the chain, no matter where they're at, would be
24   a principal to your company, acting as its agent,

195

1    even if your two companies have never corresponded
2    or communicated at any time?
3        A.   Yes.
4        Q.   Just wanted to make sure I understood that.
5        The Martin's companies that you've
6    mentioned, MBM Logistics, Martin Warehousing,
7    Martin Refrigerated Express, Martin's Bulk Milk
8    Services, is one company a parent? Are they sister
9    companies?
10       How are they related?
11       A.   They're either separate LLCs or
12   corporations.
13       Q.   I understand that. But is one of them a
14   subsidiary of another company?
15       A.   No.
16       Q.   So they're all separate entities?
17       A.   Yes.
18       MR. FISHER:  Thanks.
19       MR. BENTIVENGA:  I just have a couple of
20   follow-ups.
21           FURTHER EXAMINATION
22           BY
23       MR. BENTIVENGA:
24       Q.   You mentioned a few times in this

196

49 (Pages 193 to 196)

1 deposition that every entity had a benefit from
2 this delivery.
3        And I would like for you to identify for
4 me how CSXI benefited from Mr. Franke's and
5 Martin's delivery on July 3, 2008.
6    MR. SKRYD: To his understanding?
7    MR. BENTIVENGA: Yes.
8    MR. GOLDEN: It's been asked and answered, too.
9    THE WITNESS: Every company is in business to
10 make money. So we bring a load down. We haul a
11 load, we make money. We pick up -- I mean, we use
12 CSX equipment.
13 BY MR. BENTIVENGA:
14    Q. Can I stop you?
15        And you can answer it if you want to
16 answer it that way, but my question is very direct
17 and specific with respect to the delivery that
18 Mr. Franke was driving on July 3, 2008, at the time
19 of the accident where he was driving a Martin's
20 tractor. He was pulling a Trac Lease chassis and
21 had a CSXI container.
22        I would like to know from that delivery
23 what benefit has CSXI received as a result of that
24 job that Mr. Franke was doing for Martin's at that

                                                    197

1 time?
2    A. On that particular shipment, CSX -- CSI --
3 CSI --
4    MR. SKRYD: CSX.
5    THE WITNESS: -- CSXI would not benefit. But on
6 the load coming down on the next trip, CSXI would
7 benefit.
8 BY MR. BENTIVENGA:
9    Q. Okay. But from the load that was being
10 carried at the time of the accident, you would
11 agree that CSXI had no benefit, correct?
12    MR. SKRYD: Objection as to the form.
13    THE WITNESS: The only way I can answer is there
14 was a load on the trailer that had to have gotten
15 some revenue on that trip as soon as it leaves that
16 yard.
17 BY MR. BENTIVENGA:
18    Q. You're not aware of what revenue or if any
19 revenue was received by CSXI; am I correct?
20    A. No, I'm not aware how they do their
21 billing.
22    Q. Okay. And the CSXI container has been out
23 of service since July 3, 2008, correct?
24    A. Correct.

                                                    198

1    Q. And so it hasn't been taken on any other
2 deliveries or loads or shipments; am I right?
3    A. Correct.
4    MR. BENTIVENGA: All right. That's all I have.
5        Thank you.
6    MR. SKRYD: We done?
7    MR. BURKE: I have nothing.
8    MR. FISHER: I have nothing.
9    MR. SKRYD: Okay. We're done.
10        Reserved.
11        FURTHER DEPONENT SAYETH NOT. . .

                                                    199

1        IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION
3 MURRAY SCHEINMAN, Plenary    )
Guardian of the Estate and    )
4 PERSON OF JEFFREY J. SCHEINMAN,)
a Disabled Person,            )
5                             )
    Plaintiff,                )
6                             )
 vs.                  ) No. 09 CV 5340
7                             )
MARTIN'S BULK MILK SERVICE,   )
8 INC., et al.,               )
                             )
9    Defendants.             )
        This is to certify that I have read the
10 transcript of my deposition taken on the 12th day
11 of January 2010 in the foregoing cause, and that
12 the foregoing transcript accurately states the
13 questions asked and answers given by me, with the
14 changes or corrections, if any, made on the Errata
15 Sheet(s) attached hereto.
16
17
18
19
20        DAVID MARTIN
21    Subscribed and sworn to
    before me this     day
21 of          2010.
22
23        Notary Public
24
                                                    200

50 (Pages 197 to 200)

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF DU PAGE )

    I, Steven Stefanik, a notary public in and
for the County of Cook and State of Illinois, do
hereby certify that DAVID MARTIN was first duly
sworn to testify the whole truth, and that the
above deposition was recorded stenographically by
me and was reduced to computerized transcript under
my personal direction.

    I further certify that the said deposition
was examined and read over by said deponent and was
signed by him and that the said deposition
constitutes a true record of the testimony given by
the said witness.

    I further certify that the said deposition
was taken at the time and place specified and that
the taking of said deposition commenced on the 12th
day of January 2010 and was completed the same day.

    I further certify that MR. RICHARD F.
BURKE, JR., of the firm of CLIFFORD LAW OFFICES,
120 North LaSalle Street, Suite 3100, Chicago,
Illinois 60602, appeared as attorney for the
plaintiff; that MR. JOSEPH SKRYD of the law firm of
MULHERIN, REHFELDT & VARCHETTO, P.C., 211 South

201

Wheaton Avenue, Suite 200, Wheaton, Illinois 60187
appeared as attorney for the defendant.

    I further certify that I am not a relative
or employee or attorney or counsel of any of the
parties, or a relative or employee of such attorney
or counsel, or financially interested directly or
indirectly in this action.

    In witness whereof, I have hereunto set my
hand and affixed my seal of office, at Chicago,
Illinois, this 28th day of January 2010.




            Steven T. Stefanik, CSR
            No. 084-003298

202

                              February 1, 2010

MULHERIN, REHFELDT & VARCHETTO, P.C.
C/O MR. JOSEPH G. SKRYD
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187

Re: Scheinman v. Martin's, et al.

Dear Mr. Skryd:

    Enclosed please find the transcript of the
discovery deposition of DAVID MARTIN, taken on
January 12, 2010, in the above-entitled cause.
    Since signature was reserved, please ask
Mr. Martin to review his transcript from
January 12, 2010, making any necessary corrections
on the errata sheets, and sign and notarize the
deponent's signature page.
    Please send the original signed errata sheets
and signed deponent's certificate to Mr. Burke,
keep a copy for yourself, send a copy to All
Counsel of Record, and send a copy to me for my
records.
    Your cooperation in this matter is greatly
appreciated. Thank you.

            Sincerely,

            Steven Stefanik, CSR
            SULLIVAN REPORTING COMPANY


CC: Mr. Burke
    All Counsel of Record

203