# EX. 5

David Martin Deposition
dated, February 20, 2012

**Page 204**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian )
of the Estate and Person of JEFFREY )
J. SCHEINMAN, a Disabled Person, )
           )
     Plaintiff, )
           )
   vs. )  No. 09 CV 5340
           )
MARTIN'S BULK MILK SERVICE, INC., )
SAMUEL G. FRANKE, CSX INTERMODAL, )
INC., INTERNATIONAL PAPER COMPANY, )
UNIVERSAL AM CAN, LTD., Successor )
to OVERNITE EXPRESS, INC. and OX )
LLC, BMW OF NORTH AMERICA, LLC, a )
corporation, BAYERISCHE MOTOREN )
WERKE AKTIENGESELLCHAFT, a )
corporation, BMW AG, a corporation, )
and KARL KNAUZ MOTORS, INC., a )
corporation, )
           )
     Defendants. )

The Videotaped Deposition of DAVID V. MARTIN,
taken in the above-entitled cause, before Cheri
LeBeau Dubina, a notary public of DuPage County,
Illinois, on the 20th day of February, 2012,
commencing at 11:15 a.m., at 211 South Wheaton
Avenue, Suite 200, Wheaton, Illinois, pursuant to
Notice.
Reported by: Cheri LeBeau Dubina, CSR
License No.: 084-002986

---

**Page 205**

APPEARANCES:

     CLIFFORD LAW OFFICES
     120 North LaSalle Street
     31st Floor
     Chicago, Illinois 60602
     Tel: 312-899-9090
     by: MR. RICHARD F. BURKE, JR. and
     MS. SHANNON M. McNULTY,
         On behalf of the Plaintiff;
     MULHERIN, REHFELDT & VARCHETTO, P.C.
     211 South Wheaton Avenue, Suite 200
     Wheaton, Illinois 60187
     Tel: 630-653-9300
     by: MR. JOSEPH G. SKRYD and
     MR. MATTHEW R. SCHRECK,
         On behalf of Martin's Bulk Milk
         Service and Samuel G. Franke;
     DOWD & DOWD, LTD.
     617 West Fulton
     Chicago, Illinois 60661
     Tel: 312-704-4400
     by: MR. ROBERT J. GOLDEN,
         On behalf of Martin's Bulk Milk
         Service and Samuel G. Franke;

---

**Page 206**

APPEARANCES:   (Continued)

     HINSHAW & CULBERTSON
     222 North LaSalle Street
     Suite 300
     Chicago, Illinois 60601
     Tel: 312-704-3000
     by: MR. CARLTON D. FISHER,
         On behalf of International Paper
         Company, Overnite Express, Inc., Ox
         LLC, Universal Am Can, Ltd. and
         Overnite Logistics, Inc.;

     JOHNSON & BELL, LTD.
     33 West Monroe Street
     Suite 2700
     Chicago, Illinois 60603
     Tel: 312-372-0770
     by: MR. TIMOTHY R. COUTURE,
         On behalf of BMW of North America,
         LLC and Bayerische Motoren Werke
         Aktiengesellschaft.

ALSO PRESENT:  Dulce Rodriguez, Videographer

---

**Page 207**

INDEX

| WITNESS | Page |
|---|---|
| DAVID V. MARTIN | |
| Direct Exam by Mr. Fisher | 211 |
| Cross-Exam by Mr. Couture | 361 |
| Cross-Exam by Mr. Burke | 407 |
| Redirect Exam by Mr. Fisher | 478 |
| Recross Exam by Mr. Couture | 506 |
| Recross Exam by Mr. Burke | 512 |

EXHIBITS

| Martin Deposition Exhibit Nos. | Page |
|---|---|
| 49 - Supplemental Disclosures of Martin's Bulk Milk Service | 218 |
| 50 - Answers of Defendant Martin's Bulk Milk Service | 218 |
| 51 - Supplemental and amended answers of Martin's Bulk Milk Service | 218 |
| 52 - Response of Martin's Bulk Milk to production request | 218 |
| 53A - Supplemental and amended response of Martin's Bulk Milk Service | 218 |
| 53B - Supplemental and amended response of Martin's Bulk Milk Service | 218 |
| 54 - Second supplemental and amended response of Martin's Bulk Milk Service | 240 |
| 55 - Third supplemental and amended response of Martin's Bulk Milk Service | 240 |
| 56 - Letter regarding Mr. Franke's driver qualification records | 240 |
| 57 - Series of printouts of various invoices | 243 |
| 58 - Memo Bill, Load and Rate Confirmation and Invoice | 249 |
| 59 - Memo Bill, Load and Rate Confirmation and Invoice | 249 |
| 60 - Memo Bill, Load and Rate Confirmation and Invoice | 249 |
| 61 - Martin's Bulk Milk Invoice #100383 | 271 |
| 62 - Invoices | 272 |
| 63 - Invoices | 272 |
| 64 - Overnite Logistics Load and Rate Confirmation sheets | 272 |
| 65 - Broker Confirmation sheets | 272 |
| 66 - Memo Bills | 272 |
| 67 - Photocopies of the markings of confirmation sheets | 280 |

---

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

**EXHIBITS**

Martin Deposition Exhibits Nos.        Page

68 - Collection of documents        281
69 - Franke employment file        281
70 - Logs        281
71 - Compilation of 68, 69 and 70        281
72 - 2002 Contract        288
73 - 2004 Contract        288
74 - 2005 Contract        288
75 - 2008 Contract        288
76 - Broker Confirmation Sheet        312
77 - Copies of three memo bills        312
78 - Uniform Intermodal Interchange and
      Facilities Access Agreement        312

208

---

THE VIDEOGRAPHER: My name is Dulce Rodriguez, legal video specialist in association with McCorkle Litigation Services located at 200 North LaSalle Street, Suite 300, Chicago, Illinois 60601.

I am the camera operator on February 20th, 2012 for the videotaping of the deposition of Mr. David Martin, being taken at Mulherin, Rehfeldt & Varchetto, 211 South Wheaton Avenue in Wheaton, Illinois at the time of 11:15 a.m.

This is in the matter of Murray Scheinman, et al., versus Martin's Bulk Milk Service, Inc., et al., filed in the U.S. District Court for the Northern District of Illinois, Eastern Division, Case Number 09 CV 5340.

Will counsel please identify themselves for the record beginning with plaintiff's counsel first.

MR. BURKE: Richard Burke for the plaintiff.

MS. McNULTY: Shannon McNulty for plaintiff.

MR. COUTURE: Timothy Couture for BMW.

MR. FISHER: Carlton Fisher for Universal

209

---

Am Can, Limited, successor to Overnight Express, Inc., Ox LLC and International Paper.

MR. SKRYD: Joe Skryd for Martin's Bulk Milk Service and Samuel Franke.

MR. GOLDEN: And Bob Golden on behalf of Martin's Bulk.

MR. SCHRECK: As well as Matthew Schreck on behalf of Martin's Bulk Milk Services, Inc. and Samuel Franke.

THE VIDEOGRAPHER: Will the reporter please identify herself and swear in the witness.

(The witness was duly sworn.)

MR. SKRYD: Before we start, we have an agreement between counsel that all objections will be reserved except as to form of the question. Okay.

And we're going to pickup for the second deposition where we left off the first one and we'll probably -- Carlton, right -- just use the next page number, if you would, Miss Court Reporter. Thank you.

210

---

DAVID V. MARTIN,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FISHER:

Q. Mr. Martin, good morning.

A. Good morning.

Q. You did this before a couple years ago, didn't you?

A. Yes.

Q. All right. The same rules apply, but let me go over those rules for you so that there's no misunderstanding.

Please answer only questions you understand. If you have -- if you didn't hear the question, if you heard it but you don't understand it, if you're unsure of the question, please don't answer such a question. We want you to only answer questions you understand; is that fair?

A. Fair.

Q. Since it's being video'd this time, it's important to keep your voice up.

A. Okay.

Q. And although a video might be able to show

211

---

us what an uh-huh or unh-uh means because of your
facial expressions, the court reporter still has to
keep a record. So please try as best you can to
make your responses audible in the English language
so that she can take those responses down. Is that
fair?
    A. Fair.
    Q. And, in addition, this isn't an endurance
contest, it's going to take, I'm sure, a number of
hours because there's a lot of things to talk about
with you but if you need to take a break, please
tell us that and we'll be certain to accommodate
you, all right?
    A. Okay.
    Q. The first question I have is have you
reviewed, read, skimmed or in any fashion looked at
the first session of your deposition that took
place a couple years ago?
    A. Yes.
    Q. Based upon your review and skimming —
well, let me ask this. What was your review of
your deposition? What did you do?
    A. I read over what I had responded to in the
first deposition two years ago and that's about it.

212

    Q. All right. Based upon your reading of
your first deposition session, did you find any
testimony in that first session to be inaccurate or
in need of some type of clarification or
correction?
    A. No.
    Q. You have the right in this session of your
deposition to make corrections under the Federal
Rules of Civil Procedure. So I just — you're
aware of that right?
    A. I am now.
    Q. Okay. All right. Let me ask you a few
preliminary questions. What is your current
position now?
    A. I am operations manager at Martin's Bulk
Milk Service in Wilton, Wisconsin.
    Q. And was that the same position you had
when you gave your deposition two years ago?
    A. Yes.
    Q. With respect to Martin's Bulk Milk
Service, is that a company which is a motor
carrier?
    A. Yes.
    Q. Is that company also a broker?

213

    A. Yes.
    Q. Does the broker — Strike that. Does the
business — let me begin again.
        Does the brokering business of Martin's
Bulk Milk Service operate under a different DOT
number or motor carrier number than the business in
which Martin's Bulk Milk is a motor carrier?
    A. Martin's Bulk Milk also has broker
authority along with MBM Logistics.
    Q. I'm keeping them out of my questions for
the time being, okay. So let's just deal with
Martin's Bulk Milk Service. All right.
        Martin's Bulk Milk Service does operate as
a motor carrier?
    A. Correct.
    Q. Do you know what its DOT number or its
motor carrier number are when it is operating as a
motor carrier?
    A. I don't know it off the top of my head. I
know pretty much the numbers but I don't know them
all.
    Q. I've got some documents. We may come back
to that. Suffice it to say, is it a true statement
that when Martin's Bulk Milk Service operates as a

214

motor carrier it operates under a different motor
carrier number or DOT number than when it operates
as a broker, if you know?
    A. I'm not sure.
    Q. All right. What would you need to be able
to answer that question? What information, who
would you need to talk to, what documents would you
need to look at to be able to answer those
questions?
    A. I would have to call to the home office to
see if there's a separate government number that
belongs to that — to it.
    Q. All right. Okay. We'll come back to
that, perhaps. But to wrap up this topic — and I
don't mean to repeat areas of questioning from your
first session. I'm going to try not to do that.
        But with respect to the work that Martin's
Bulk Milk Service does when it operates as a
broker, does it deal with companies or individuals
or owner/operators that provide truck driving
services when Martin's Bulk Milk is operating as a
broker?
    A. Say it one more time.
    Q. I'm going to make my question much

215

3 (Pages 212 to 215)

1 easier. Imagine the hypothetical A-B-C Trucking
2 Company and the hypothetical John Doe truck
3 driver. When Martin's Bulk Milk Service operates
4 as a broker, does it enter into some type of a
5 relationship with the A-B-C Trucking Company or the
6 John Doe truck driver when it is working -- working
7 as a broker?
8    A. Yes, there's a carrier broker agreement.
9    Q. And is this a carrier broker agreement
10 that Martin's Bulk Milk Service has created for its
11 relationship with trucking companies,
12 owner/operators or truck drivers with which
13 Martin's Bulk Milk Service as a broker operates?
14    A. Yes.
15    Q. And is that some documentation you would
16 be able to provide us if we asked your attorneys
17 for it?
18    A. Yes.
19    Q. Okay. Now, when that occurs, does
20 Martin's Bulk Milk Service as a broker ever retain
21 Martin's Bulk Milk Service carrier driver employees
22 to do the driving work or do you go to separate
23 companies, separate owner/operators, separate truck
24 drivers?

216

1    A. Our broker side doesn't use our drivers.
2    Q. And when you say that, you mean Martin's
3 Bulk Milk Service as a broker does not use Martin's
4 Bulk Milk Service company drivers?
5    A. Correct.
6    Q. Okay. Can you give me some examples of
7 the companies with which Martin's Bulk Milk Service
8 as a broker deals when it is brokering loads and
9 using other companies or other company drivers or
10 other owner/operators?
11    A. A name of a company?
12    Q. Yes, just give me an example of one, if
13 you can remember.
14    A. We use Dave Berg out of Tomah, Wisconsin.
15    Q. And is Dave an owner/operator?
16    A. Yes.
17    Q. Does Dave have more than one truck?
18    A. No.
19    Q. So he's one truck?
20    A. Yes.
21    Q. All right. Can you think of any other
22 companies or owner/operators with which Martin's
23 Bulk Milk Service operating as a broker deals with?
24    A. Not at this time.

217

1    Q. There's a whole bunch of records that have
2 been produced since your last deposition. I'm
3 going to use the first part of the deposition to
4 principally do an inventory of these, ask you a few
5 questions and then I'll later get into sort of the
6 meat of the questions I'm going to ask you, okay?
7       (Whereupon, Martin Deposition
8       Exhibit Nos. 49, 50, 51, 52, 53A
9       and 53B were marked for
10       identification.)
11 BY MR. FISHER:
12    Q. So look, if you would, at Exhibits 49 and
13 50 which is the first set. And I'll represent to
14 everyone that Exhibit 49 is the Supplemental
15 Disclosures of Martin's Bulk Milk and Samuel Franke
16 and Exhibit 50 is Martin's Bulk Milk answers to
17 International Paper and Universal Am Can's
18 interrogatories.
19       MR. SCHRECK: Carl, do you have a master
20 book with those new ones?
21       MR. FISHER: I do. Here you go.
22 BY MR. FISHER:
23    Q. All right. First of all, are you familiar
24 with the document Exhibit 49 which is the

218

1 Supplemental Disclosures?
2    A. Yes.
3    Q. Did you have anything to do with the
4 preparation of these Supplemental Disclosures?
5    A. No.
6    Q. But you're just familiar that this is a
7 document that your counsel provided for --
8    A. Yes.
9    Q. -- everybody else, right? I want to ask
10 you to look at Page 3 of Exhibit 49. Sorry. And
11 on Exhibit 3 do you see where the names Janet
12 Berndt, David Martin, Ryan Greene, Randy Galewski
13 and Pat Podlena appear?
14    A. Yes.
15    Q. Knowing what you know about this lawsuit
16 and the issues that have been developed and the
17 discovery responses that you have worked on on
18 behalf of your employer, can you think of any other
19 persons employed by Martin's Bulk Milk Service or
20 formerly employed by Martin's Bulk Milk Service who
21 might have pertinent information for this lawsuit
22 other than the five people listed on Page 3
23 beginning with Janet Berndt and ending with Pat
24 Podlena?

219

4 (Pages 216 to 219)

A. No.

Q. Those are the key people who have the most information?

A. Yes.

Q. Is Janet still working with you?

A. Yes.

Q. And her position again is?

A. Personnel.

Q. Obviously, David, you're still working. Ryan Greene, refresh my memory on who he is.

A. Ryan Greene was a shop foreman, not with us anymore.

Q. When did he leave, approximately?

A. Two years ago.

Q. And do you know where he is now?

A. Yes.

Q. Where is he?

A. Kendall Trucking & Excavating.

Q. What was his job back in 2007, 2008 before the accident on July 3rd, 2008 occurred?

A. He was shop foreman.

Q. Randy Galewski, is he still with you?

A. Randy is an employee of Martin's Bulk Milk -- excuse me, MBM Logistics.

220

Q. Has he ever been an employee of Martin's Bulk Milk Service?

A. No.

Q. And Randy Galewski is with Martin's Bulk Logistics?

A. MBM Logistics.

Q. And is that out of Minnesota?

A. Winona, Minnesota.

Q. And is that where he currently lives?

A. Yes.

Q. And Pat Podlena, I think you told me before that he has left your company's employ?

A. Correct.

Q. And do you know -- do you have any further update on where he's at now?

A. I do not.

Q. Now, if you were to look with me, skip to Page 6, and do you see the names of the individuals above the word International Paper Company appearing in the top third of the page?

A. Yes.

Q. Have you ever spoken with any of the individuals listed there; namely, William Crawford, Lamonica Livingston, Stephen Mundy, Robert Pratt or

221

Joan Anderton?

A. No.

Q. On Page 6, a person named Rocky Gordon associated with Midland Paper, have you ever spoken with him?

A. No.

Q. And then on Page 7 there's a number of people associated with either Overnite Express or the successor Universal Am Can Limited beginning with Robert Elzholtz, father, and then Robert Elzholtz, son, Kevin Hays, Sandra Herrmann, Rory Ostgulen, Mark Limback, Melody Hansen, Gina Hubbs, and John Moore.

After reciting those names my question to you is: Have you ever had any interaction in person, over the telephone, correspondence, e-mails, any communication with any of the individuals I just listed?

A. As I recall today, I have spoken with Melody Hansen.

Q. And tell me the circumstances in which you've communicated with Melody Hansen.

A. Melody would relay the loads from International Paper out of Exel Warehouse in

222

Hammond, Indiana.

Q. And tell me how you know that.

A. She would call on the phone and she would also send documentation.

Q. When she called on the phone, would she talk with you or one of the other dispatchers?

A. It could have been amongst many of us.

Q. No, I understand that. So, typically, was this a daily event in which Melody Hansen would call up and say, hey, Dave, or your colleague dispatchers and say, we've got another load that needs to be picked up out of the Distribution Center in Hammond, is Samuel Franke going to handle it or how would the conversation go?

A. There would be -- there would be a phone call or documentation sent every day for the paperwork -- for the load to come out of Exel in Hammond, Indiana from International Paper.

Q. So is what you're -- let me make sure I understand what you're saying.

Are you saying that on a day when a load would be picked up from the Hammond Distribution Center by a Martin's Bulk Milk driver, probably Samuel Franke since that was his usual route, that

223

5 (Pages 220 to 223)

1  you would either get a telephone call from
2  Miss Hansen or a fax or an e-mail and that would be
3  the type of communication?
4      A.  Sometimes there was more communication but
5  we always would get a fax.
6      Q.  So Melody Hansen is the only person out of
7  this list of people with whom you had contact?
8      A.  As I recall today.
9      Q.  You can set 49 aside.  And on 50, on
10  page -- it's not a page.  On the answer to
11  Interrogatory Number 10 -- and I'll be showing you
12  later some contract documents -- but I'd like you
13  to look at Interrogatory Number 10 and the answer
14  that you signed on behalf of Martin's Bulk Milk to
15  Interrogatory Number 10 and tell me when you're
16  done doing that.
17      And you know what, while you're doing that
18  go ahead and look at 11 too, the question and the
19  answer.
20      Have you done that?
21      A.  Yes.
22      Q.  Okay.  My first question is:  Do you agree
23  with the answer that is set forth in response to
24  Interrogatory Number 10?

                                                    224

1      A.  Yes.
2      Q.  And do you agree with the answer that is
3  set forth in response to Interrogatory Number 11?
4      A.  Yes.
5      Q.  And let me ask this -- and I don't want
6  you to go into any attorney/client communications,
7  you know, that you would have had with your
8  attorneys.
9      But my question to this is:  Do you have
10  any personal belief, factual basis for the answers
11  you have put here or is this something on which you
12  have relied upon your attorneys' advice to respond
13  to these particular two questions?
14      A.  We have documentation that holds Overnite,
15  Universal Am Can, and Martin's Bulk Milk Service
16  showing that we are agents for those companies.
17      Q.  Okay.  And what are those documents?
18      A.  They are carrier agreements.
19      Q.  Okay.  So is it your contention that the
20  carrier agreements that exist between Martin's Bulk
21  Milk Service and Universal -- Strike that.
22      Is it your position that the carrier
23  agreement between Martin's Bulk Milk Service and
24  Universal Am Can is a contractual document that

                                                    225

1  defeats or refutes Universal Am Can's claim for
2  indemnity?
3      MR. COUTURE:  I'm sorry, can you reread
4  that question.
5      (The record was read.)
6      THE WITNESS:  The claim -- the contract
7  ties us together.
8  BY MR. FISHER:
9      Q.  What does that mean?
10      A.  It's an agreement between our two
11  companies that we work as an agent for Overnite
12  Express, Universal Am Can to perform a service for
13  these companies to make a profit.
14      Q.  And is that even though the contract
15  language specifically says that you are not to be
16  considered an agent?
17      A.  I don't know what you mean.
18      Q.  What is it you don't understand by my
19  question?
20      A.  You're saying that the contract says we
21  are not an agent?
22      Q.  It specifically says that.  And we're
23  going to get there.  So I want to make sure I
24  understand your answer.

                                                    226

1      A.  Well, we -- Martin's Bulk Milk still
2  performs a service for those two companies,
3  Universal Am Can and Overnite Express.
4      Q.  Okay.  And what is it about performing
5  that service that means in your opinion that
6  Martin's Bulk Milk Service is operating as an agent
7  for Universal Am Can when the Universal Am Can
8  contract specifically says that you are not to be
9  considered -- that is to say, Martin's Bulk Milk
10  Service is not to be considered an agent?
11      A.  Well, depending on the terminology,
12  whenever Martin's Bulk Milk Service is pulling a
13  load for Overnite Express or Universal Am Can, we
14  are doing a service for that company and we are
15  acting as a carrier agent for them.
16      Q.  What does the word "carrier agent" mean?
17      A.  We are the carrier for those companies.
18      Q.  What does --
19      A.  We are performing a service for those two
20  companies.
21      Q.  What does the word or phrase you just used
22  mean?  You used --
23      A.  Carrier agent?
24      Q.  Yes, what does that mean?

                                                    227

6 (Pages 224 to 227)

A. We were hired from these two companies to perform a service.

Q. And is that —

A. We are an extension to their companies.

Q. And is that what you mean by the phrase "carrier agent"?

A. Yes.

Q. Does the phrase "carrier agent" appear anywhere in any contract that Martin's Bulk Milk Service has with Universal Am Can — that particular phrase?

A. I don't recall.

Q. Is this, this phrase "carrier agent," a term or phrase that you have come up with, sir?

A. It's used in the industry.

Q. Where is it used in the industry?

A. A carrier agent, it's — I don't know. It's —

Q. Can you cite me in anyplace in the Federal Motor Carrier Safety Regulations where the phrase, quote, carrier agent, unquote, appears?

A. Not at this time.

Q. Can you quote me any particular language in any contract that exists that have been produced

228

by your company in which the phrase you just used, quote, carrier agent, unquote, appears anywhere?

A. Not at this time.

Q. Okay. Is it — let me see if I understand.

With respect to your answers to Interrogatories 10 and 11, is the basic position you're saying on behalf of Martin's Bulk Milk is that Universal Am Can is not entitled to indemnity from Martin's Bulk Milk because Martin's Bulk Milk entered into a contract with Universal Am Can and was pulling freight for Universal Am Can as a motor carrier?

A. Yes.

Q. Okay. We're done with that one. I'm going to show you 51 through 53. And with respect to 53 there's an A and a B.

MR. SKRYD: 51 through 53?

MR. FISHER: Yes. There's actually 51, 52 and there's a 53A and a 53B.

MR. SKRYD: Okay.

BY MR. FISHER:

Q. With respect to Exhibit 51, you'll see that that's entitled Supplemental and Amended

229

Answers of Martin's Bulk Milk and to the best of my knowledge the only changes that exist between the original answers of Martin's Bulk Milk to Universal Am Can's interrogatories that I just went over with you and this document, Exhibit 51, is contained on the page that is right before your certification signature page.

MR. SKRYD: Which is what?

MR. FISHER: One more. You guys don't number your pages so there's no page number. It's the one that begins at the top "The plaintiff's fifth amended complaint."

MR. SKRYD: And it has "investigation continues" on the bottom?

MR. FISHER: Correct.

BY MR. FISHER:

Q. So there's seven paragraphs on that page. Are you with us so far?

A. Yes.

Q. All right. I'll represent to you that this appears to be the only — this language is additional language that didn't appear in your first answer, okay?

A. Okay.

230

Q. All right. So I want to ask you some questions about some of these paragraphs.

With respect to the first paragraph that the plaintiff's fifth amended complaint alleges separate and independent negligent actions or omissions on the part of Universal Am Can and Overnite Express, can you cite to me where in the fifth amended complaint plaintiff has made any allegations of separate and independent negligent actions and omissions on the part of Universal Am Can and Overnite Express other than being allegedly vicariously liable for the actions of Samuel Franke?

A. Not at this time.

Q. Okay. Let's go to the next paragraph. That next paragraph says that the plaintiff's fifth amended complaint alleges independent tortious conduct on the part of the defendants Universal Am Can Limited and Overnite Express.

Can you cite to me anywhere in the fifth amended complaint where the plaintiffs alleged independent tortious conduct on the part of the defendants Universal Am Can and Overnite Express other than allegedly being vicariously responsible

231

7 (Pages 228 to 231)

1 for the actions of Samuel Franke?
2     A.  Not at this time.
3     Q.  With respect to the third paragraph of
4 your amended answer where it says that Universal Am
5 Can and Overnite Express did not attach or
6 reference any specific contract or agreement, is
7 what you're saying here simply that in our
8 pleading, my client's pleading against your
9 company, the contract agreement was simply not
10 attached? Is that a fair reading of that third
11 paragraph?
12     A.  I guess I don't understand that one.
13     Q.  Okay. But this is your answer, correct?
14 You signed this answer on or about December 23rd,
15 2011?
16     A.  Yes.
17     Q.  Okay. So tell me what this third
18 paragraph means.
19     A.  The only contract I know is -- that we
20 have in place is the carrier contract.
21     Q.  Okay. Would you agree with me that in
22 February of 2012 you and your counsel produced to
23 us four separate contractual documents, two for
24 Universal Am Can and two for Overnite Express?

232

1     A.  Yes.
2     Q.  Okay. Do you know whether or not any of
3 those contracts were in operation on the day of the
4 accident, July 3, 2008?
5     A.  Yes, they were. They're both signed.
6     Q.  What is both signed?
7     A.  Both contracts are signed, one from
8 Overnite Express and the other one from Universal
9 Am Can.
10     Q.  Is it your contention that with respect to
11 the Overnite Express and the Universal Am Can
12 contracts that you produced, that there were two
13 contracts in effect, two binding contracts between
14 Universal Am Can and Martin's Bulk Milk and a
15 contract between Overnite Express and Martin's Bulk
16 Milk that were in application and in operation on
17 July 3rd, 2008?
18     A.  The contract does exist.
19     Q.  We'll get to those later. But just to get
20 back to this third paragraph.
21     Is the point that you're making here on
22 behalf of your employer Martin's Bulk Milk that my
23 clients when we made our pleading against you, we
24 neither attached a copy of the applicable contract

233

1 nor did we cite specific language?
2     A.  Yes.
3     Q.  Is that the essence of this paragraph?
4     A.  Yes.
5     Q.  Okay. The fourth paragraph says that
6 Overnite Express has not produced any contract or
7 agreement between the defendants for the date
8 alleged.
9     Is that what that fourth paragraph says?
10     A.  Yes.
11     Q.  Okay. And what do you mean by that
12 paragraph?
13     A.  It might mean that there's some that
14 aren't unsigned.
15     Q.  Well, I think that's the sixth paragraph.
16 We haven't gotten to that one yet. This is the one
17 that -- the fourth paragraph says that Overnite
18 Express has not produced any contract or agreement
19 between Martin's Bulk Milk and Overnite Express for
20 the date alleged.
21     Is what you're saying here simply that my
22 client, either Universal Am Can as the successor to
23 Overnite Express or Overnite Express itself, has
24 not produced a copy of a contract or agreement

234

1 that's in application on July 3rd?
2     Is that the essence of that paragraph?
3     A.  Yes.
4     Q.  Okay. And then the 6th -- excuse me, the
5 fifth paragraph says that Universal Am Can has not
6 produced a fully executed contract or agreement
7 between Martin's Bulk Milk and Universal Am Can.
8     By that answer are you saying that my
9 client Universal Am Can has not produced a contract
10 between Martin's Bulk Milk and Universal Am Can
11 that has signatures from both parties?
12     A.  Yes.
13     Q.  And with respect to the sixth paragraph
14 where it says the agreement between the defendants
15 Martin's Bulk Milk and Universal Am Can produced by
16 Universal Am Can in discovery does not reference
17 the shipment at issue, what does that mean?
18     A.  The contract doesn't list the shipment but
19 the load confirmation does.
20     Q.  Right. I mean, you wouldn't expect a
21 contract entered into months, if not years, before
22 an accident -- Strike that.
23     You wouldn't expect a contract that's
24 entered into days, weeks, months or years before a

235

particular event to specifically mention an event
in the future that had not yet happened --
  A. No.
  Q. -- when the contract was executed, do
you?
    MR. SKRYD: I'll object to the form of
that question. You can answer.
    THE WITNESS: No.
BY MR. FISHER:
  Q. Okay. So do you know what this answer
means?
    MR. SKRYD: Objection, asked and
answered. Go ahead.
    THE WITNESS: No, I don't.
BY MR. FISHER:
  Q. Okay. All right. I'm done with 51.
Let's look at 52.
    MR. SKRYD: This right here, Dave.
BY MR. FISHER:
  Q. I'm going to be asking you some questions
later specifically about every one of the items
that are listed on this particular request for
production, but just look it over and tell me
whether or not you're familiar with this particular

236

response of your employer to a 40-item request for
production that we served on you late last year.
    MR. BURKE: What's the date of the answer,
Carl?
    MR. FISHER: November 30th, 2011.
    MR. BURKE: Thank you.
    THE WITNESS: Go ahead.
BY MR. FISHER:
  Q. Okay. Are you familiar with this
response?
  A. Yes.
  Q. Okay. And I know -- later I've got some
other supplemental and amended responses to this
very same document where I think I amend one of the
items.
    My first question to you is: With respect
to Exhibit 52, are you familiar with the answers
that appear here that were made in November of
2011?
  A. Yes.
  Q. All right. Now --
    MR. SKRYD: What are you on now, Karl?
BY MR. FISHER:
  Q. If you look at 53A. This is the

237

supplemental and amended response to the very same
40-item request for production that was served on
us on December 23rd, 2011 and I will represent to
you that the bulk of the answers that appear
basically say things like this: Well, we've -- we
object; we've looked around and there doesn't
appear to be any documents that are responsive to
this particular request. Is that your
understanding of the essence of this supplemental
response that was done in late December 2011?
  A. What do you mean we looked around? Looked
around for --
  Q. Well, here, I'll use an example. If you
look to the -- look at the response to Request
Number 30. Do you see where Request 30 asks
Martin's Bulk Milk to produce any and all written
communications from Universal Am Can to Martin's
Bulk Milk in which Universal Am Can identified
Martin's Bulk Milk Service as the agent of
Universal Am Can for purposes of the trip conducted
by Samuel Franke on July 3rd, 2008, that eventually
ended in Franke's tractor chassis container
combination making contact with the rear of Jeffrey
Scheinman's BMW and after making some objections

238

the response is: The defendant Martin's Bulk Milk
Service does not have any documents that
specifically identify Martin's Bulk Milk Service as
an agent of Universal Am Can on July 3, 2008? Do
you see that?
  A. Uh-huh. Yes.
  Q. Now, on many of the answers to these
requests an answer like this appears, that there
are no documents or the word "none" appears. So my
question to you is: In light of that -- and, once
again, I'm going to come back to this later
specifically question by question -- is it fair to
say that as of late December 2011, based upon a
search that you and any others who assisted you at
Martin's Bulk Milk, you could come up with no
documents that were responsive to these particular
requests that are contained in Exhibit 53A? Is
that a fair summarization of --
  A. Yes.
  Q. Okay. You can set that one aside. 53B
you can set aside. I'm going to ask Mr. Franke
about that tomorrow.

239

9 (Pages 236 to 239)

1  (Whereupon, Martin Deposition
2  Exhibit Nos. 54, 55 and 56 were
3  marked for identification.)
4  BY MR. FISHER:
5  Q. Now, I'm going to have you look at 54
6  through 56. Let's look first at 54. It appears
7  that Exhibit 54 -- Strike that.
8  Does Exhibit 54 appear to be the second
9  supplemental and amended response of Martin's Bulk
10  Milk to specifically Request Number 40 which asks
11  for certain dispatch documents and documents
12  prepared, generated, handled, reviewed or
13  transmitted by Pat Podiena or any other dispatcher
14  that pertain to any trip taken by Samuel Franke in
15  the 18-month period before July 3rd which involved
16  picking up from or delivering to the International
17  Paper Company facility in Hammond, Indiana? Do you
18  see that that's the request?
19  A. Yes.
20  Q. And then the response that your counsel
21  Mr. Schreck did on February 3rd, 2012 is to
22  basically say, look, we've got some invoices from
23  January '07 to June '08, we have Load and Rate
24  Confirmation Sheets from December 29, '06 to May

240

1  following documents which are attached, and then,
2  basically, there's a listing of the documents that
3  supplement your previous response from the end of
4  May, beginning of June of '08, and go right up to
5  the day of the accident on July 3, right?
6  A. Yes.
7  Q. And those documents were then produced for
8  us, correct?
9  A. Yes.
10  Q. Okay. You can set that aside. 55 --
11  MR. SKRYD: 55? 56.
12  MR. BURKE: That was 55.
13  MR. FISHER: My mistake. My mistake.
14  Thank you.
15  BY MR. FISHER:
16  Q. Now, 56, I want to make sure I understand
17  the circumstances for the production of
18  Mr. Franke's qualification file and personnel
19  file.
20  Do you see Exhibit 56 is a letter from
21  Mr. Schreck dated February 10th in which it
22  includes or references the enclosure of
23  Mr. Franke's driver qualification records for 1999
24  through 2006 and then the remainder of Franke's

242

1  of -- May 29th, 2008 and memo bills from December
2  29th, 2008 to May 29th, 2008. You see those,
3  right?
4  A. Yes.
5  Q. And I'll represent to you that that big
6  banker's box that's right down there at your
7  feet --
8  A. Okay.
9  Q. -- that contains, you know, copies of all
10  those documents, among others, that have been
11  produced. I haven't copied all those for this
12  deposition but my question to you is: Did you and
13  your colleagues conduct a thorough search to find
14  information that is responsive to this request?
15  A. Yes.
16  Q. All right. Now look at Exhibit 55.
17  That's the third supplemental response to Item 40.
18  And this was provided a week later on February
19  10th, 2012. And if you look on the second page of
20  the response right before the page containing
21  Mr. Schreck's signature, you see that that list of
22  documents has been expanded and you see that -- and
23  then it says in the middle of the response, quote,
24  in addition Martin's Bulk Milk Service has the

241

1  employment driver qualification file was previously
2  produced in discovery?
3  A. Yes.
4  Q. All right. Do you know anything about how
5  it was or why it is that the documents that you
6  provided in February of 2012 weren't previously
7  produced back in 2009 when the original request I
8  think from plaintiff's counsel was made for either
9  the driver qualification file or the employment
10  file or personnel file of Mr. Franke?
11  A. I do not.
12  Q. All right. Who would know the answer to
13  that question?
14  A. Janet Berndt.
15  Q. All right. Okay. I'm done with 56. All
16  right.
17  (Whereupon, Martin Deposition
18  Exhibit No. 57 was marked for
19  identification.)
20  BY MR. FISHER:
21  Q. Moving on to Exhibit 57. I will represent
22  to you, Mr. Martin, that Exhibit 57 which is a
23  series of charts or spread sheets or printouts of
24  various information about invoices was given to us

243

10 (Pages 240 to 243)

1 in -- I believe was given to us at the end of
2 December 2011, all right. It's possible it was
3 given at the beginning of January but it's not
4 important for the purposes of my question.
5 Do you see in the upper left-hand corner
6 of Exhibit 57 there's a run date on this document?
7 It might help you if you take the paper clip off.
8 Yes. Okay.
9 Do you see the run date that appears up at
10 the upper left-hand corner --
11 A. Yes.
12 Q. -- of January 8, 2010?
13 A. Yes.
14 Q. And then it has a run time of 2:11:50
15 p.m.?
16 A. Yes.
17 Q. And I will represent to you if you were to
18 scroll through, then, the rest of this exhibit,
19 you're going to see run dates of either February --
20 excuse me, of either January 8th, 2010 or January
21 7th, 2010 for some of this information. Do you see
22 where that appears?
23 A. Yes.
24 Q. Okay. Your deposition was taken in
                                                    244

1 Q. Do you have last names for them?
2 A. Joanne Witt.
3 Q. Spelled?
4 A. W-i-t -- actually, it's Biemier now.
5 B-i-e-m-i-e-r.
6 Q. And Julie?
7 A. Adams.
8 Q. And they're in the accounting department?
9 A. Yes.
10 Q. All right. Are you familiar with the
11 information shown on these printouts?
12 A. Somewhat. I -- not really. I'm more in
13 the dispatch; so I don't do accounting.
14 Q. Okay. Would it be better to ask somebody
15 else about how this information was tracked and
16 what these represent?
17 A. Yes.
18 Q. Before we leave this, I do want to ask you
19 this. You can see at the top left-hand corner of
20 the first page of Exhibit 57 it says Broker
21 Settlements U-A-C-L, right?
22 MR. SKRYD: Do you see that right here?
23 BY MR. FISHER:
24 Q. That little heading right there?
                                                    246

1 January of 2010, your first session of your
2 deposition. Do you know why it is this particular
3 document marked as Exhibit 57 was not originally
4 produced by Martin's Bulk Milk back in 2009?
5 A. I do not.
6 Q. At whose request were these numbers or
7 these spread sheets prepared, if you know?
8 A. Actually, I don't know.
9 Q. Okay. Going back a couple of years. In
10 2009 when some initial discovery responses were
11 prepared by Martin's Bulk Milk, were you the person
12 that was involved in the collection of that
13 information or was it you and others?
14 A. Myself and others.
15 Q. And do you know who would be the most
16 likely person that would know the circumstances of
17 the preparation of this particular exhibit, Exhibit
18 57?
19 A. It looks to me like somebody in our
20 accounting department but I don't know who the
21 person would be. It could be a couple people.
22 Q. And who would those couple people might
23 be?
24 A. It could be Joanne or Julie.
                                                    245

1 A. Uh-huh.
2 Q. Do you see that?
3 A. Yes.
4 Q. Okay. Then if you skip about six pages,
5 you get a printout that looks a little different.
6 It looks like this. It's narrower and it says
7 Invoices for Broker Settlements U-A-C-L and it has
8 a bunch of information?
9 A. Yes.
10 Q. Okay. Now, do you see where on this
11 particular page that is entitled Invoices for
12 Broker Settlements U-A-C-L in the upper left-hand
13 corner it says 2:32 p.m., the first date for
14 invoicing is June 26, 2008? Do you see that?
15 A. Yes.
16 Q. Okay. Now, skip, if you would with me
17 to -- three pages until you pickup the page that's
18 entitled Invoices for Overnite Logistics.
19 And do you see where the last date that
20 appears on this set of -- it's six pages, if you
21 go -- actually, if you go to the sixth page, you'll
22 see the first date -- keep going, you're going to
23 to see a page that has a total of 316,000.
24 A. Okay.
                                                    247

**11 (Pages 244 to 247)**

Q. Do you see where the first date that appears there is an invoicing date of January 18th, 2007?

MR. SKRYD: The last date, did you say?

BY MR. FISHER:

Q. It's the first date but it's the last date.

A. Yes.

Q. It's the bottom date. Do you see where it says invoice date, the bottom date, but the first chronological date is January 18th, 2007?

A. Yes.

Q. And then -- now going back to the first page where the date and the very first entry -- now we're on invoices for Overnite Logistics within Exhibit 57 -- do you see where the last chronological date but the first listed date on this page is June 26th, 2008?

A. Yes.

Q. Actually, I take that back -- yes. Is this the last date that Overnite was invoiced for trips that Martin's Bulk Milk did for Overnite?

A. Like I said, I'm not sure.

Q. Because this isn't your bailiwick?

248

A. No.

Q. Okay. Do you know anything about the fact that in June 2008 Overnite Logistics -- Strike that.

Do you know anything about the fact that in June of 2008 Overnite Express was bought out by Universal Am Can?

A. Yes.

Q. What is it you know about that?

A. Just like I recall from my last deposition, I remember a call coming from one of the owners, and I don't remember their names now, I know there was Matt and I just don't remember who it was, they called and said that they were being bought out by Universal Am Can.

Q. Okay. That's about the gist of your knowledge?

A. Yes.

Q. All right. I'm done with that exhibit.

(Whereupon, Martin Deposition Exhibit Nos. 58, 59 and 60 were marked for identification.)

BY MR. FISHER:

Q. Okay. I want to show you Exhibits 58

249

through 60. And let me describe what these are before you begin to look at them.

Among the materials that are in that banker's box that is to your right here is a set of records which included memo bills and load confirmation sheets and Martin's Bulk Milk invoices. And it covers that entire time frame we talked about before of January 2007 all the way up to end of May, beginning of June 2008, an approximate 18-month period, all right?

A. Okay.

Q. There's hundreds, if not thousands, of pages of those three types of documents, all right. I selected out of that collection a few random ones that I just want to ask you some questions about so that I can better understand what Martin's Bulk Milk Service's understanding is of the paperwork associated with particular loads. With me so far?

A. Yes.

Q. Okay. So let's take a look at Exhibit 58. And does it appear that Exhibit 58 contains a one-page memo bill, followed by a two-page load and rate confirmation sheet -- excuse me, three-page

250

load and rate confirmation sheet, and then a Martin's Bulk Milk Service invoice?

A. Yes.

Q. Is this the typical type of paperwork that would be associated with a particular load being pulled, for example, by Mr. Franke?

A. Yes.

Q. All right. I want to go over and make sure I understand some of the nomenclature and the information that appears on this sample one.

This is one that I drew out that's at the beginning of the time period about which we spoke, January of '07, okay. All right. Now, with respect to the memo bill that's the first page of Exhibit 58, when this document was first created, before it has any of the handwriting on it, who produces this document to the best of your knowledge?

A. This is created by International Paper.

Q. And did you understand International Paper to be the shipper?

A. Yes.

Q. So that, basically, some paper products that International Paper had at the Midwest

251

12 (Pages 248 to 251)

Distribution Center in Hammond needed to be sent to
its customer?

A. Yes.

Q. And can you look at this and find out who
International Paper's customer was?

A. Yes. Office Max.

Q. And so when this particular memo bill
would come in, how would it be received by anyone
associated with Martin's Bulk Milk?

A. This would come back to our facility after
it is signed by the consignee.

Q. So would Mr. Franke be the first
representative of Martin's Bulk Milk who would
receive this document?

A. Yes.

Q. Is this — I know it's entitled memo
bill. Is this considered in the transportation
industry a bill of lading?

A. Yes.

Q. Okay. So Mr. Franke would receive this
document where?

A. On the shipping dock at Exel in Hammond,
Indiana.

Q. And when you say Exel — and I think there

252

Q. Let's talk about that. When was it that
you were at the warehouse? Do you remember your
first visit?

A. I don't.

Q. When did the first relationship with —
Strike that.

When did Martin's Bulk Milk have its first
relationship, if you know, with International
Paper?

And by that question I mean, because of
some of the documents we saw before, I saw some
documents reflecting a relationship with
International Paper that it may have predated
Overnite Express.

So my question to you now with that as a
background is: Do you know what the circumstances
were in which Martin's Bulk Milk first had a
relationship with Exel or International Paper --

A. We had a direct —

MR. SKRYD: Let him finish his question.

BY MR. FISHER:

Q. -- or the warehouse in Hammond, Indiana?

A. Before we — before we dealt with Overnite
Express and Universal Am Can, we dealt directly

254

was a misspelling last time in the transcript — is
Exel spelled E-x-e-l?

A. Yes.

Q. Okay. Not E-x-c-e-l?

A. Correct.

Q. Okay. And what is Exel, if you know?

A. Exel to my knowledge is just a
distribution center.

Q. Do you know if Exel is a separate company
from International Paper?

A. I do not know.

Q. Okay. How is it you know it to be an
entity called Exel, E-x-e-l? How did you learn
that?

A. Just from some of the documents that I've
seen.

Q. Had you known that back in 2007, that
there was an entity called Exel?

A. Yes.

Q. And you knew that just because you were
operating as a dispatcher among your many jobs?

A. I had been down to the warehouse —

Q. Okay.

A. -- years before.

253

with International Paper.

Q. And this was at a time when International
Paper would come to Martin's Bulk Milk as a motor
carrier and say, hey, we would like you to move our
goods from Point A to Point B?

A. Yes.

Q. When did that direct shipper and motor
carrier relationship end between Martin's Bulk Milk
and International Paper?

A. Just before we started hauling -- or at
the time we started hauling for Universal Am Can
and Overnite Express.

Q. Let's me see if I can -- let me ask this
question. Did the direct relationship between
Martin's Bulk Milk and International Paper end at
about the time that Martin's Bulk Milk first had
its relationship with Overnite Express?

A. Yes, but I do not know the exact dates.

Q. That's fine. Your answer suggested
International Paper -- your answer suggested
Overnite Express and Universal Am Can at the same
time and I wanted to just sort of break that up.

So to review. Did the direct relationship
between Martin's Bulk Milk and International Paper

255

**13 (Pages 252 to 255)**

end shortly before a new relationship existed in
which Overnite Express brokered loads for
International Paper and used Martin's Bulk Milk as
the carrier?
  A.  The relationship between International
Paper and Martin's Bulk Milk ended and then the
relationship started between Overnite Express and
Universal Am Can.
  Q.  All right.  And when you add Universal Am
Can, why are you adding Universal Am Can in your
answer?
  A.  Because they're the same company.
  Q.  If I represented to you, sir, that in 2007
they were not the same company, would your answer
be any different?
  A.  If — I don't know.
  Q.  Okay.  Let me ask this.  Well, here, look
at the next page of Exhibit 58.  Do you see where
it says Overnite Logistics Load and Rate
Confirmation?
  A.  Uh-huh.
  Q.  And it's a three-page document?
    MR. SKRYD:  Yes?
    THE WITNESS:  Yes.

256

BY MR. FISHER:
  Q.  And then the last page of this exhibit
there's an invoice from Martin's Bulk Milk to
Overnite Logistics?
  A.  Yes.
  Q.  If I represented to you, sir, that in
January of 2007 there was absolutely no
relationship between Universal Am Can and either
Overnite Express or an entity referred to as
Overnite Logistics, would your — would your answer
about what the relationship was with Overnite
Express and Universal Am Can that you described
earlier change?  Would your answer be different?
    MR. SKRYD:  Objection, asked and answered
and also form of the question.  You can answer it.
    THE WITNESS:  It would not change because
I've seen both names on several pieces of paper
that have their name's on both so.
BY MR. FISHER:
  Q.  But do you know specifically when those
documents are dated?
  A.  No.
  Q.  Okay.  Let me ask this question a
different way.  Let's take International Paper out

257

of the mix of my question, okay?
  A.  Yes.
  Q.  Back in two thousand — back in 2002,
2003, 2004, 2005, 2006, that five-year period that
I've just enunciated —
  A.  Yes.
  Q.  — did Martin's Bulk Milk do any work
with — Strike that.
    Back in the time period of 2002 to 2006
did Martin's Bulk Milk have any contractual
relationships with Overnite Express that had
nothing to do with International Paper?
  A.  I don't recall.
  Q.  Back in that same five-year time frame,
2002 to 2006, did Martin's Bulk Milk have any
relationships with Universal Am Can that had
nothing to do with International Paper?
  A.  I don't recall.
  Q.  Who is the person that has the most
knowledge on behalf of Martin's Bulk Milk about the
formation of contractual or written contractual
relationships between Martin's Bulk Milk and any
shippers or brokers for the time period 2002 up
through 2008?

258

  A.  There are different people in our office
that signed the contracts.  So it could have been
multiple people in our office.
  Q.  Pat Podlena would have been such a person?
  A.  Yes.
  Q.  And Pat — refresh my memory, is Pat a man
or a woman?
  A.  Man.  Man.
  Q.  And Pat's no longer with you, right?
  A.  Correct.
  Q.  Other than Pat Podlena is there any other
person associated with Martin's Bulk Milk for the
time frame of 2002 up through 2008 who would have
knowledge or information about the formation of
contracts or written contracts with brokers or
shippers?
  A.  Like I said, it could have been myself, it
could have been Pat, it could have been Doreen.
  Q.  And who is Doreen?
  A.  In dispatch.
  Q.  What's Doreen's last name?
  A.  B-a-y-e-r.
  Q.  Is Doreen still with you?
  A.  Yes.

259

Q. All right. Getting back to Exhibit 58. If you look at the first page of Exhibit 58, do you see that there's a bunch of notes for two different loads, numbered loads?

A. Yes.

Q. And this is information coming from whom?

A. International Paper.

Q. And is this information that appears on this memo bill or bill of lading unique or unusual from a shipper?

MR. SKRYD: Objection, form. You can answer.

THE WITNESS: The only thing unusual is that it has times listed on it.

BY MR. FISHER:

Q. And by times you mean that there are times listed as to what to do if they're delayed, what time they're supposed to come in at Office Max confirming an appointment, things like that?

A. Delivery appointment.

Q. All right. Is that unusual in the transportation industry that a shipper and its customer are going to put in times when they are available to either pickup or deliver a load?

260

A. I would say it's a little unusual for the delivery side, yes.

Q. Why is that?

A. Because most shippers will rely on the carrier to make their appointments.

Q. Is that based upon your experience at Martin's?

A. Yes.

Q. If we were to go into the Martin's Bulk Milk document files, something a part from International Paper and Universal Am Can and Overnite Express, would we find memo bills or bills of lading that have delivery instructions in terms of time?

A. Not very many.

Q. But there would be some?

A. Minimal.

Q. All right. Okay. Now, look at the first page. Do you know whose signature appears here on the bottom right-hand corner with the date 1-4-07?

A. I don't recognize that.

Q. Would that, presumably, be somebody at Office Max once the delivery has been made?

A. Yes.

261

Q. And then Mr. Franke, he signs that on behalf of Martin's Bulk Milk?

A. Yes.

Q. So in terms of this document -- oh, and then down at the bottom portion with all this fine print --

A. Yes.

Q. -- is this the standard type of fine print that you're aware of exists on typical bills of lading?

A. Yes.

Q. Now, let's look at the third -- excuse me. Let's look at the second, third and fourth pages contained on Exhibit 58. Tell us what this load and rate confirmation sheet is. It's three pages.

MR. BURKE: For the same date?

MR. FISHER: Yes. I'm still talking about Exhibit 58.

THE WITNESS: This is a sheet from Overnite Logistics giving us direction to pickup a load from International Paper, Hammond, Indiana to deliver to CJ Duffey, Office Max. It looks like it's a two-stop load. And, actually, then it's --

262

it's the same load, it looks like it was amended but with more stops added to it.

BY MR. FISHER:

Q. All right. Now, on the upper right-hand portion of the first page of the load and rate confirmation sheets do you see where the name Jackie is circled?

A. Yes.

Q. Okay. You're on page -- you're on Page 1 of 3, correct?

A. Okay.

Q. Okay. So the names that appear there, Nancy, Jackie and Dave Martin, are those the names of dispatchers from Martin's Bulk Milk?

A. Yes.

Q. Do you know why it is on an Overnite Logistics load and rate confirmation sheet the names of Martin's Bulk Milk Service dispatchers appear?

A. I do not know.

Q. Who created this particular document?

A. Overnite Logistics.

Q. And is it an accurate representation that as of January of 2007 there were dispatchers at

263

15 (Pages 260 to 263)

Martin's Bulk Milk named Nancy, Jackie and
yourself, Dave Martin?
    A.  I don't believe Jackie was there at the
time.
    Q.  But do you know why it is that this
particular document has got Jackie's name circled?
    A.  I do not.
    Q.  And then if you'll look at the third of
three pages, the one that has some signatures at
the end of this three-page fax contained within
Exhibit 58, do you see an authorized signature from
someone associated with Martin's Bulk Milk?
    A.  Yes.
    Q.  Who is that -- whose signature is that?
    A.  Nancy Green.
    Q.  And refresh my memory again on who Nancy
is.
    A.  Dispatcher.
    Q.  And she would get -- when would her
signature get affixed to this confirmation
document?
    A.  This is the final form.  So after
International Paper would convey to Overnite
Logistics that this was the final shipment papers,

264

shipment request.
    Q.  Okay.  I want to make sure I understand
the processing of the paper, okay.  When the
first -- let's start with something basic.
    At the very, very top of the three-page
fax do you see where there's an Overnite Logistics
fax number?
    A.  Yes.
    Q.  All right.  Is that a fax number for
Overnite Logistics or is that a fax number from
Martin's Bulk Milk?
    A.  Overnite Logistics.
    Q.  So is this a document, a three-page
document, that at some point would have been faxed
to or faxed from Overnite Logistics?
    A.  Faxed from Overnite Logistics.
    Q.  When the document was initially faxed to
Overnite Logistics -- Strike that.
    When the document was initially faxed from
Overnite Logistics to Martin's Bulk Milk, would all
the markings that appear on this document and
handwriting, the Xs and the handwriting and the
indications of final, first stop, second stop,
third stop, would those writings have been on it

265

when it was received by Martin's Bulk Milk or would
this have been added by somebody, if you know?
    A.  This would have been the final form from
Overnite Logistics telling us what to bill for what
was on that load.  The loads change throughout the
day.
    Q.  Okay.  I understand that, but my question
is a little bit more specific.
    When you get this fax from Overnite
Logistics, would it contain all of those
handwritten markings or would those come later in
the processing of this three-page piece -- you
know, document?
    A.  I don't know, sir, how they --
    Q.  Okay.  All right.  But, eventually, this
document is going to have Nancy Green's signature
on it as a representative of Martin's Bulk Milk?
    A.  Yes.
    Q.  And you don't know why it is that with
Jackie's name circled on the first page, Nancy's
name is signed as the authorized signature?
    A.  I don't know why.
    Q.  All right.  And then under authorized
signature for Overnite Logistics there are three

266

names listed:  Matt, Brian and Melody.  Do you know
who Matt is referring to?
    A.  Matt was a dispatcher authorized by
Overnite Logistics.
    Q.  Do you know if that was Matt Elsholtz?
    A.  Only from what I can try to read on
this -- on the confirmation.
    Q.  How about Brian, do you know who Brian is?
    A.  No.
    Q.  And how about Melody?
    A.  I had spoken with Melody.
    Q.  That's the person you referenced before,
right?
    A.  Yes.  Yes.
    Q.  And then, finally, the last document as a
part of Exhibit 58, this is the invoice that then
Martin's Bulk Milk, your company, sent to Overnite
Logistics after all the other paperwork associated
with it was prepared?
    A.  Yes.
    Q.  Okay.  So that was one example in Exhibit
58.  You can set that one aside.
    MR. SKRYD:  We've got two boxes to go over
like this.  No, I'm just kidding.

267

16 (Pages 264 to 267)

BY MR. FISHER:
Q. Let me look at why it is I set aside --
look at 59. Just confirm for me that that appears
to be the same sort of collection of documentation.
A. Yes.
Q. All right.
MR. BURKE: And that's for what date, 59?
MR. FISHER: This one is February 7th,
2007, Rich.
MR. BURKE: Thank you.
BY MR. FISHER:
Q. And I've got a couple questions here on
Exhibit 59. If you'll look at the first of the two
faxed pages, which are the load and rate
confirmation sheet, do you see where the words --
the abbreviation appointment appears underlined?
A. Yes.
Q. And then the name Julie appears. Do you
know if that is the Julie that you referenced
before with Martin's Bulk Milk or is that, do you
think, a different Julie?
A. I'm thinking that's Julie that made the
appointment at Unisource Worldwide.
Q. And do you know who Julie would be?

268

A. No, I don't.
Q. Do you know if Julie would be a person
from Martin's Bulk Milk?
A. No, it's not.
Q. And you know that because such a person --
there's no Julie who's operated as a dispatcher?
A. Correct.
Q. Okay. Look at the last page. And do you
see where a 6-5-1 fax number has been changed to
7-0-8?
A. Yes.
Q. Do you know why that was?
A. Because there was times when Melody would
fax the confirmation over instead of the St. Paul
office and Melody was in Chicago.
Q. Do you know where in Chicago Melody was?
A. I do not.
Q. Okay. I'm done with 59. And let's look
at 60.
60 has an additional document on it I've
not seen before -- or additional marking. If you
look at the second page of the memo bill or the
bill of lading, do you see what appears to be a
stamp, almost like an --

269

A. Yes.
Q. -- ink stamp? Do you know what this is?
A. That would be a stamp for receiving the
product.
Q. Is this the type of thing that somebody at
the consignee or the customer would have stamped
once Mr. Franke made his delivery?
A. Yes and no.
Q. Okay.
A. It's a stamp from a delivery. Sam did not
deliver the loads of paper to Minneapolis.
Q. I was just going to get to that point. I
think you said earlier in your first session of
your deposition that Mr. Franke's typical run would
be from Wisconsin, down into Chicago but then he
would come back but only take the loads he got from
Hammond, not Chicago, as far as Wilton, Wisconsin?
A. Yes.
Q. And then someone else would deliver the
load?
A. Yes.
Q. Was that all the time?
A. Yes.
Q. Without exception?

270

A. Yes.
Q. So whenever it was that a particular load
among the many documents we've got in these boxes,
even though it would have Samuel Franke's name on
it, he would not have been the person that made the
ultimate final delivery?
A. Correct.
Q. Okay. I'm done with 60.
(Whereupon, Martin Deposition
Exhibit No. 61 was marked for
identification.)
BY MR. FISHER:
Q. Let's look at Exhibit 61. Do you see on
Exhibit 61 this is a Martin's Bulk Milk invoice
dated May 8, 2008, Invoice Number 190383 and the
description is very simply, quote, truck ordered,
not used, XL09182, unquote.
Can you tell me why it is an invoice would
have been generated like this?
A. This would have been generated because
Overnite Logistics did not have a load that day
from International Paper.
Q. Does the words -- Strike that.
Do the words "truck ordered" suggest to

271

**17 (Pages 268 to 271)**

1 you or indicate to you that someone had put an
2 order in for a truck and then Mr. Franke or whoever
3 it was showed up at Hammond and there was no load
4 for him to take?
5 A. We had an agreement with Overnite
6 Logistics that we would pickup a load of paper from
7 Hammond, Indiana at International Paper every day,
8 it was a dedicated run.
9 Q. So does that mean with this invoice, that
10 when Mr. Franke came down from Wisconsin to the
11 Chicago area, did whatever it is he may have done
12 before he headed over to Hammond, but when he got
13 to Hammond on some day in either late April or
14 early May of 2008 there was no load for him to take
15 back?
16 A. Correct.
17 Q. Okay. I'm done with that one.
18            (Whereupon, Martin Deposition
19            Exhibit Nos. 62, 63, 64, 65 and
20            66 were marked for
21            identification.)
22 BY MR. FISHER:
23 Q. Okay. The next series of documents,
24 Mr. Martin, I'm tendering to you are Exhibits 62
                                                272

1 through 66. And let me just tell you what these
2 are. These are the documents that were provided to
3 us as of February 10th, 2012. This supplements the
4 previous box of documents we got.
5 A. Okay.
6 Q. This provides the memo bills, the invoices
7 and the load confirmation sheets from both Overnite
8 and Universal Am Can for the time period of late
9 May 2008 up to or near July 3rd, 2008, all right?
10 A. Okay.
11 Q. So with that -- if you look at Exhibit 62,
12 does Exhibit 62 appear to be in chronological order
13 the invoices that Martin's Bulk Milk generated to
14 Overnite Logistics for runs made by Mr. Franke --
15 if you'd follow along with me now from the very
16 first document -- from May 30th -- first page, May
17 30th, 2008, June 2nd, 2008, June 3rd, 2008, June
18 4th, 2008, June 5th, 2008, June 6th, 2008, June
19 9th, 2008, June 10th, 2008, June 11th, 2008, June
20 12th, 2008, and June 13th, 2008?
21 A. Yes.
22 Q. All right. Then moving to Exhibit 63.
23 Does it appear that Exhibit 63 consists of the
24 Martin's Bulk Milk invoices sent to John Moore of
                                                273

1 Universal Am Can, Broker Settlements, for loads
2 taken by Mr. Franke on June 16th, '08, June 17th,
3 June 18th, June 19th, June 20th, June 23rd, June
4 24th, June 25th, June 26th, June 27th, June 30th,
5 July 1st, and July 2nd?
6 A. Yes.
7 Q. You can set that aside.
8    MR. SKRYD: Are you coming back to that,
9 Carl?
10    MR. FISHER: Pardon me?
11    MR. SKRYD: Are you coming back to 62 and
12 63 for any reason?
13    MR. FISHER: Not that I can think of right
14 now.
15    MR. SKRYD: Okay. That's fine. I'm just
16 trying to keep it organized.
17 BY MR. FISHER:
18 Q. Now, let's look at Exhibit 64. Does this
19 appear to be the Overnite Logistics load and rate
20 confirmation sheets for the loads previously
21 mentioned in the invoices to Overnite for the time
22 period of May 30th, 2008 on the first page, all the
23 way to June 13th, 2008 on the last two pages?
24 A. Yes.
                                                274

1 Q. And if you look at the very last page, do
2 you see where Melody Hansen of Overnite Logistics
3 signs?
4 A. Yes.
5 Q. And Pat Podlena signs on behalf of
6 Martin's Bulk Milk?
7 A. Yes.
8 Q. That would not have been unusual for
9 Mr. Podlena to sign these?
10 A. Correct.
11 Q. Okay. I'm done with Exhibit 64. Look at
12 Exhibit 65.
13    Does this appear to be -- first of all,
14 before we go any further, does this appear to be a
15 broker confirmation sheet that looks a little bit
16 different than the broker confirmation sheets that
17 Overnite had used --
18 A. Yes.
19 Q. -- about which we've talked the last
20 several minutes?
21 A. Yes.
22 Q. And is this the form that appears on the
23 first page of Exhibit 65 the broker confirmation
24 sheet that was used by Universal Am Can?
                                                275

18 (Pages 272 to 275)

1  A. They're different. Is that what you're
2  saying?
3  Q. My fault. Let me ask my question a
4  different way. Does it appear that the first page
5  of Exhibit 65 is a broker confirmation sheet by
6  Melody Hansen but on this occasion Melody Hansen is
7  signing on behalf of Universal Am Can Limited
8  Brokerage Division?
9  A. Yes, I see that, but what's also confusing
10  is on top it's Overnite Logistics.
11  Q. And you got to my next question. It would
12  appear, wouldn't it, Mr. Martin, based upon
13  everything you know that there was some change in
14  mid June between Overnite Express and Universal Am
15  Can?
16  A. Yes.
17  Q. All right. But, perhaps, the fax
18  transmission machines didn't catch up and they're
19  still using Overnite Logistics as the fax
20  transmission in the fax transmission machine?
21  A. Okay.
22  Q. I mean, does that appear to you to be --
23  A. Yes.
24  Q. -- an explanation for something you

276

1  pointed out was confusing?
2  A. Yes.
3  Q. Okay. Now, with respect to this broker
4  confirmation sheet that appears on the first page
5  of Exhibit 65 and goes all the way up to the last
6  broker confirmation sheet with a date of July 2nd,
7  2008, that I think is concerning the particular
8  load at issue in this case, does it appear as
9  though Miss Hansen and Pat Podiena are the people
10  who are signing on behalf of Universal Am Can and
11  Martin's Bulk Milk respectively?
12  A. Yes.
13  Q. Okay. And these particular broker
14  confirmation sheets, this is the typical type of
15  paperwork that's associated -- was associated with
16  these loads?
17  A. Yes.
18  Q. You know, this broker confirmation sheet
19  appears to be slightly different than the format
20  that was seen in Exhibit 64 for Overnite Logistics
21  in terms of the way they're laid out, but do they
22  contain basically the same type of information?
23  A. Yes.
24  Q. And is this the same -- are these examples

277

1  of load and rate confirmation sheets from Overnite
2  Logistics and from Universal Am Can the same types
3  of sheets that your business, Martin's Bulk Milk,
4  uses when it's operating as a broker?
5  A. Yes.
6  MR. BURKE: Objection, just, Carl, you may
7  have misspoke. I think you referred to July 2nd as
8  the broker confirmation sheet at issue in this case
9  and I believe it's actually July 3rd -- if I was
10  hearing your question correctly.
11  MR. FISHER: I think I intended to say
12  July 2nd because that's the load --
13  MR. BURKE: You did say July 2nd.
14  MR. FISHER: Right. I'll come back. I
15  understand your objection.
16  MR. BURKE: I just want some clarity on
17  the record.
18  MR. FISHER: Right.
19  BY MR. FISHER:
20  Q. Mr. Burke raises a good point because of a
21  different document I'm going to show you later, all
22  right.
23  Are the broker confirmation sheets from
24  UACL that comprise Exhibit 65 the broker

278

1  confirmation sheets that commence the broker
2  relationship of Universal Am Can Limited with
3  Martin's Bulk Milk Service as a carrier for
4  International Paper loads up to the day before the
5  load that's at issue in this case -- that is to
6  say, July 2nd?
7  A. Well, I have the one from July 3rd right
8  here too.
9  Q. Is it a part of exhibit --
10  A. 65.
11  Q. No, I'm not there yet -- I'm sorry, I am.
12  MR. SKRYD: You have it attached to this
13  document but not to your main one in the book.
14  MR. FISHER: Here, hang on. Hang on.
15  THE WITNESS: Oh, I'm sorry, I'm looking
16  at the delivery date.
17  BY MR. FISHER:
18  Q. Yes, here, let me come back. Yes.
19  Right. I'm going to have her reread my question to
20  you, okay, because I could not repeat that
21  question.
22  (The record was read.)
23  BY MR. FISHER:
24  Q. With that question posed to you, if you

279

could give us an answer to that question?

A. July 2nd is the last one.

Q. All right. All right. Good. You can set 65 aside. Okay. And then, finally, look at Exhibit 66. I'll represent to you, once again, these are documents that came from your company that you and your colleagues produced to us.

Do these appear to be the memo bills or bills of lading pertaining to the loads that were being driven by Mr. Franke from May 30th, 2008 up through and including the July 2nd, 2008 memo bill on the last page?

A. Yes.

Q. I'm done with that one.

A. And these still have Overnite Express on them too.

Q. In deed. Old habits die hard, I guess.

(Whereupon, Martin Deposition Exhibit No. 67 was marked for Identification.)

BY MR. FISHER:

Q. Just to keep the ball rolling in terms of numbers — I had a duplicate. Mr. Martin, I'll represent to you that Exhibit 67 is simply

280

photocopies of the markings I made on all those hundreds, if not thousands, of pages of documents you produced to us of confirmation sheets from December 29th, '06 to May 29th, '08, the invoices from January 11th, '07 to June 4th, '08 and the memo bills from December 29th, '06 to May 29th, 2008. That's the sum total of the hundreds, if not thousands, of pages of documents that you and your company supplemented its discovery responses in early 2008, all right?

A. Yes.

MR. FISHER: Okay. Why don't we take a break just for a second.

THE VIDEOGRAPHER: We're going off the video record. The time now is 12:45 p.m.

(A break was taken.)

(Whereupon, Martin Deposition Exhibit Nos. 68, 69, 70 and 71 were marked for identification.)

THE VIDEOGRAPHER: We are back on the video record. The time now is 1:05 p.m.

BY MR. FISHER:

Q. All right. I'm going to change topics a little bit, Mr. Martin. I'll tender to you what's

281

been marked as Exhibits 68, 69 and 70.

I will represent to you that Exhibit 68 is a collection of documents that was sent to us in February of this year from your attorneys' office representing sort of a supplement to the documents that had been produced as a part of Exhibit 69, which is the next document.

And if you look at 69, you'll see on the very front cover you see it's labeled Franke Employment File, received from MBMS December 2011, okay?

A. Okay.

Q. All right. And then Exhibit 70 is copies of the logs that were provided to us in December of 2011, okay?

A. Okay.

Q. Now, today we received from your counsel Exhibit 71 which, I believe, is a compilation of everything that Exhibit 68, 69 and 70 is but I haven't had a chance to double-check it, all right.

So here's what I want to ask you. Exhibit 71 was copied today and provided to all counsel. Do you know whether or not those copies that are

282

marked Exhibit 71 are copies of originals that you brought with you today?

A. Yes.

Q. Okay. And tell us what you brought with you from Wisconsin today of which copies were made and comprise Exhibit 71.

A. You had the logs before, correct?

Q. I think so, yes, but Exhibit 71 consists of the logs again, right?

A. Yes.

Q. Okay. And what else does Exhibit 71 consist of?

A. There's logs. There's pay stubs for Sam Franke. There's a copy of his medical examiner's certificate.

Q. As you leaf through there, let me ask you this. Is it fair to say that Exhibit 71 consists of the following: His logs for whatever time period the logs represent?

A. Yes.

Q. Okay. The pay stubs of which you just mentioned?

A. Yes.

Q. And then is the balance of Exhibit 71,

283

based upon what it was you brought with you, his
driver qualification file?

A. Yes.

Q. Now, you know, do you not, that the driver
qualification file, the contents of it, is defined
by Federal Motor Carrier Safety Regulations,
correct?

A. Yes.

Q. Is the information that you have provided
us as a part of Exhibit 71, the driver
qualification file plus any other documents that
might form the basis of a personnel or employment
jacket that do not technically fit under the
categories of what's required for a driver
qualification file or are there no such documents
that are a part of Exhibit 71?

A. Everything that's in here is what we -- is
required by us to carry on a driver.

Q. Does Martin's Bulk Milk keep a driver
qualification file on its drivers such as
Mr. Franke?

A. Yes.

Q. And to the best of your knowledge is the
driver qualification file contained among the

284

exhibits -- excuse me, contained among the pieces
of paper that comprise Exhibit 71?

A. Yes.

Q. Is there any other file that Martin's kept
on Mr. Franke apart from the driver qualification
file, apart from any accounting records that might
exist for his pay?

A. No.

Q. So -- and the reason I ask this is because
there's some trucking companies I'm aware of that,
you know, maintain a separate personnel file or a
separate human relations file that has maybe some
correspondence or other documents that don't fit
the technical requirements of a driver
qualification file, and I hear you saying that
Martin's Bulk Milk did not keep such a file of
Mr. Franke; is that correct?

A. Correct.

Q. Okay. By the way, while we're talking
about the driver qualification file, are there --
if you look at Exhibit now 68, because we have
68 --

MR. SKRYD: Right here. You got 68?

285

BY MR. FISHER:

Q. Okay. Do you see that the first page is
Violation and Review Record?

A. Yes.

Q. And then it has a D.A.C. -- D-A-C -- a
D.A.C. Report contained among those records?
Actually, it's entitled D.A.C. Services, MVR Report
about three or four or five pages in?

MR. SKRYD: I think it's four pages in.

BY MR. FISHER:

Q. Here we go. It looks like that.

A. Yes.

Q. Okay. Do you know what D.A.C. is?

A. I don't. I know what it is but I don't
know what the term of it is.

Q. Do you know that D.A.C. is a service
provided by a particular company that does MVR
reports?

A. Yes.

Q. And is that the service that Martin's Bulk
Milk uses to do its annual reviews of its drivers?

A. Yes.

Q. Who would have had the responsibility of
reviewing or doing the annual review of

286

Mr. Franke's file at Martin's Bulk Milk?

A. Janet Henthorn at the time, which is Janet
Berndt now, had that responsibility.

Q. And based upon -- Strike that.
What is her current title?

A. Personnel.

Q. Does she also serve in any safety
capacity?

A. Personnel and payroll.

Q. Is there someone who has the role of
safety for Martin's Bulk Milk?

A. Bob Hahn.

Q. And when did Bob Hahn take on safety
responsibilities?

A. Around September of 2008.

Q. Who took -- who had safety
responsibilities for Martin's Bulk Milk before
September of 2008?

A. Janet Berndt.

Q. Did you -- Strike that.
As of 2007 and 2008 did you know Samuel
Franke?

A. Yes, just as a driver.

Q. And when you knew him as a driver, did you

287

21 (Pages 284 to 287)

form any judgments about his abilities as a driver?
 A. No, he was a good driver.
 Q. Okay. So you did form a judgment about
him?
 A. Correct.
 Q. Correct. All right. And the opinion you
formed about Mr. Franke was that he was a good
driver?
 A. Yes.
 Q. On what did you base that conclusion?
 A. On-time deliveries, good with equipment,
no accidents, no speeding tickets, no violations.
 Q. So to the best of your knowledge as of
July 3, 2008 Mr. Franke was a qualified, safe
driver for Martin's?
 A. Yes.
 Q. I think I'm done with 68, 69, 70 and 71.
You can add them to the stack over there. See, our
pile is much smaller now.
 MR. SKRYD: A little less to carry home.
 MR. FISHER: Exactly.
 (Whereupon, Martin Deposition
 Exhibit Nos. 72, 73, 74 and 75
 were marked for identification.)

288

BY MR. FISHER:
 Q. All right. I'm going to show you what's
been marked as Exhibits 72 through 75 and they are,
for counsels' benefit, respectively a 2002
contract, a 2004 contract and a 2005 contract and a
2008 contract. And I will also represent to you,
Mr. Martin, that these are documents that were sent
to us by your counsel in February of 2012, all
right?
 A. Yes.
 Q. And are these documents that you arranged
for or someone at Martin's Bulk Milk arranged for
copying in light of a request that your counsel
made you aware of?
 A. Yes.
 Q. Now, remember at your first session of
your deposition I or maybe Mr. Burke or some other
counsel asked you some questions about contracts
and I think at that time you said, well, there
were -- you know, there were probably some
contracts back at the home office that you need to
look at.
 Are these the contracts that Martin's Bulk
Milk was able to find that were entered into

289

between Martin's Bulk Milk and either Overnite or
Universal Am Can?
 A. Yes.
 Q. All right. Now, I want to take them one
by one and then I'm going to show you a previous
contract marked at your first deposition to see if
we can get a sense of chronology here.
 Look at Exhibit 72 first. Now, do you see
on Exhibit 72 that that appears to be a -- what's
labeled a Carrier-Broker Contract dated 5th day of
September 2002 by and between Overnite Logistics
and Martin Milk Service? Do you see that on the
first page?
 A. Yes.
 Q. Feel free to take the paper clip off so
you can see the whole thing. Do you see that?
 A. Yes.
 Q. Okay. Now, remember I asked you some
questions before about what the motor carrier
number was for Martin's Bulk Milk?
 A. Yes.
 Q. And do you see on this particular contract
the number 172816 appears?
 A. Yes.

290

 Q. Leaping ahead for a second, I will
represent to you with respect to every other
contract document I'm about to show you,
specifically 73, 74, 75, that's the same number
that appears opposite the fill-in-the-blank
designation of M-C number, okay?
 A. Yes.
 Q. So with that as a backstop, do you believe
that that is Martin's Bulk Milk's motor carrier
number for the Federal Motor Carrier Safety
Administration System?
 A. Yes.
 Q. Is it your understanding that there would
be a different motor carrier number for -- Strike
that.
 Is there a different motor carrier number
for Martin's Bulk Milk when it is operating as a
broker?
 A. Yes.
 Q. Do you know what that number is?
 A. I do not.
 Q. Okay. In any event, with respect to
Exhibit 72, do you see on this particular document
on the second page there appears to be a signature

291

22 (Pages 288 to 291)

1 from a Cecelia Delaney —
2  A. Yes.
3  Q. — from Martin's and a signature of a Mark
4 Andelt for Overnite Logistics?
5  A. Yes.
6  Q. Do you know what the circumstances were
7 for the creation of this particular contract in
8 September of 2002?
9  A. I do not.
10  Q. Now, Cecelia Delaney, is that person still
11 with Martin's?
12  A. No.
13  Q. Is that a woman?
14  A. Yes.
15  Q. And do you know where Cecelia Delaney is?
16  A. Yes.
17  Q. Where is she?
18  A. Schugel Transport.
19  Q. Spell that for us.
20  A. S-c-h-u-g-e-l.
21  Q. And where is that located?
22  A. Tomah, Wisconsin.
23  Q. I'm sorry?
24  A. Tomah, T-o-m-a-h.

292

1  Q. And help me on geography. Where is that?
2  A. Do you know where Wilton is?
3  Q. Yes.
4  A. 15 miles north of Wilton where the "i"
5 divides.
6  Q. All right. And when did she leave
7 Martin's?
8  A. I don't recall.
9  Q. Was she a dispatcher?
10  A. Yes.
11  Q. And do you know Mark Andelt?
12  A. No.
13  Q. Remember I earlier showed you a bunch of
14 documentation that was in your files about Overnite
15 Logistics or Overnite Express and a variety of
16 documents that were generated related to
17 International Paper —
18  A. Yes.
19  Q. — shipments and Mr. Franke?
20  A. Yes.
21  Q. Now, as of 2002 what type of freight or
22 cargo was Martin's Bulk Milk pulling pursuant to
23 this September 5th, 2002 contract, if you know?
24  A. I don't recall what it was at that time.

293

1  Q. Who might know the answer to that question
2 at Martin's?
3  A. Me.
4  Q. Okay. Honest answer.
5  A. That far back I don't know.
6  Q. Let me ask this way. When — is it fair
7 to say that International Paper shipments were not
8 being pulled as a part of this Carrier-Broker
9 Contract in 2002?
10  A. It's very possible.
11  Q. Okay. And would that very possible answer
12 continue from 2002 up through 2006?
13  A. Yes.
14  Q. Okay. But then in 2007 you think that's
15 when — withdraw the question. Okay.
16  Other than Miss Delaney is there any other
17 person at Martin's Bulk Milk that would have any
18 knowledge or information about what went into the
19 formation and execution of this contract in 2002?
20  A. No.
21  Q. Let's look at Exhibit 73. Now, it appears
22 from Exhibit 73 that there is — this is a Master
23 Brokerage Agreement, at least by title, that is
24 dated January 14, 2004, correct?

294

1  A. Yes.
2  Q. And it has the Martin's Bulk Milk Motor
3 Carrier Number of 172816 in the first paragraph,
4 right?
5  A. Yes.
6  Q. And then it has — it refers to Universal
7 Am Can Brokerage Division as an ICC Property Broker
8 as per a Motor Carrier Number of 167922. Do you
9 see that?
10  A. Yes.
11  Q. Now, in that second line of that agreement
12 do you know what is being referred to as ICC
13 Property Broker?
14  Second line of the first paragraph, the
15 one that has the fill-in-the-blank ones, in the
16 very end of that second line it says, quote, ICC
17 Property Broker. Do you know what that means?
18  A. Universal Am Can is a licensed ICC
19 Interstate Commerce Property Broker.
20  Q. Okay. But my question is more specific.
21 Do you know that that means to be an Interstate
22 Commerce Commission Property Broker? Do you know
23 what that means?
24  A. You have a license to broker loads.

295

23 (Pages 292 to 295)

Q. Do you know whether or not there are any Federal regulations that define what a property broker is?

A. I don't know.

Q. Do you know whether Martin's Bulk Milk Service when it is operating as a broker, whether or not it constitutes an ICC property broker pursuant to applicable Federal regulations?

A. Yes.

Q. And why is it you say yes?

A. Because of the authority that we have.

Q. And when you say the authority, do you mean that there is a document that Martin's Bulk Milk Service has which confers the authority for it to operate as a property broker pursuant to Federal regulations?

A. Yes.

Q. And do you believe that on this particular document, Exhibit 73, that's what the second line is saying, that is to say, that Universal Am Can Limited Brokerage Division has authority as an ICC Property Broker?

A. Yes.

Q. Okay. With respect to this agreement, I

296

noticed that there appears to be Doreen West's signature on the second page. Who is Doreen West?

A. The same as Doreen Baer.

Q. Everybody's name is always changing here. Okay. And Doreen Baer is still with you?

A. Yes.

Q. And other than Doreen is there anybody else who might have knowledge about the circumstances leading to the entering into of this contract dated January 14th, 2004?

A. No.

Q. You earlier said that there were -- Strike that. You earlier said that there were contracts -- let me rephrase my question. Remember when I was asking you a bunch of questions before about the discovery responses of Martin's Bulk Milk and I specifically asked you some questions about contracts that were referenced in your answers?

A. Yes.

Q. All right. Is this Exhibit 73 one of the contracts to which you referred earlier?

A. Yes.

Q. And is the fact that there is no signature

297

from a person at Universal Am Can on the second page of Exhibit 73, an indication to you that this was not a contract that was in application for loads in 2004 or thereabouts or do you know?

A. I don't know why they didn't send it back.

Q. Do you know whether or not Martin's Bulk Milk Service sent to Universal Am Can a copy of this particular January 14th, 2004 dated Master Brokerage Agreement?

A. I don't know.

Q. Who would know the answer to that question?

A. Doreen.

Q. Okay. I'm done with 73. Let's look at Exhibit 74.

Do you see that this is labeled a Carrier-Broker Contract between Martin Bulk Milk and an entity referred to as Overnite Logistics?

A. Yes.

Q. By the way, do you know whether or not Overnite Logistics is the same as, a part of, a division of a company called Overnite Express, Inc.?

A. I'm assuming it's a part of it.

298

Q. Okay. When you were dealing with a company I'll refer to simply as Overnite, did it make a difference to you as to whether or not it was referred to as Overnite Express or Overnite Logistics or did you consider it to be simply Overnite?

A. I considered the company that we hauled for was Overnite Express. That was the main company.

Q. Okay. Now, with respect to this particular contract, does it appear on the second page that there is a signature from Martin Bulk Milk and that's a J. O'Neill?

A. Yes.

Q. And who is J. O'Neill?

A. Jackie O'Neill.

Q. And who is Jackie O'Neill?

A. Jackie was a dispatcher.

Q. Is Jackie still with you?

A. No.

Q. Where is Jackie O'Neill now?

A. I do not know.

Q. And who might know the answer to that question? Would HR at your company?

299

24 (Pages 296 to 299)

A. Maybe, but it's been a long time.
Q. Do you know whether or not she's still in Wisconsin?
A. I believe so. Sparta area.
Q. Has her last name changed?
A. I don't know.
Q. All right. And look at the third page of Exhibit 74. What is this document?
A. This one?
Q. Yes, third page of Exhibit 74.
A. It just tells Overnite Logistics the name of our dispatchers, the areas that we operate, our numbers and the number of equipment that we have.
Q. And this is a document that would have been sent in to Overnite as of July of 2005?
A. Whatever time the rest of the packet was sent in.
Q. All right. Now, on this document I think I know who Dave is. That's you, right?
A. Yes.
Q. I'm pretty sure I know who Doreen and Jackie are.
A. Yes.
Q. Who's Sterling?

300

A. A dispatcher.
Q. And is Sterling still with you?
A. No.
Q. Man?
A. Yes.
Q. What's Sterling's last name?
A. W-i-t-t, Witt.
Q. Witt, okay. And when did Sterling leave you?
A. I don't recall but it's been a while.
Q. And do you know if he's still in the -- in your area?
A. Yes.
Q. Do you know who he's employed by?
A. By himself.
Q. What does he do?
A. He's a truck driver.
Q. Do you know who he pulls freight for?
A. Himself, Witt Farms.
Q. And do you know what community that is?
A. Community or commodity?
Q. No. No. Community. What town, village?
A. Kendall. Kendall, Wisconsin.
Q. Okay. Now, before I ask you about Exhibit

301

75, I'm going to show you a copy of an exhibit that was marked at your first deposition.
MR. SKRYD: Are you done with 74 then?
MR. FISHER: Yes.
MR. SKRYD: Okay.
BY MR. FISHER:
Q. I'm going to show you a document that was marked as Exhibit 15 at your first deposition. And Exhibit 15 at your first deposition, do you see that this is a document marked as Universal Am Can Limited Master Brokerage Agreement dated 7 day of November 2007?
A. Yes.
Q. Now, do you know -- first of all, let's go to the third page, the one that has a Bates number down at the bottom of U-A-C-L O-E-I, a bunch of zeros, and then a 17?
A. Yes.
Q. Do you see where Pat Podiena -- that person's signature appears on that page?
A. Yes.
Q. Now, look at the bottom of this particular page and do you see the fax transmission markings?
A. Yes.

302

Q. And what do you understand those fax transmission markings to be?
A. From where the fax came from.
Q. So does it appear to you based upon looking at Exhibit 15 that this November 7, 2007 document entitled Universal Am Can Limited Master Brokerage Agreement was a multi-page document that was faxed from Martin's Bulk Milk to a fax number of 1-800-627-0706?
A. Yes.
Q. And do you know whether or not this is a Master Brokerage Agreement that Martin's Bulk Milk intended to enter into with Universal Am Can as of November 7th, 2007?
A. Yes.
Q. All right. Now, remember I asked you a bunch of questions about when it appeared that the International Paper shipments changed from Overnite to Universal Am Can and I think you agreed with me that that was mid June of 2008, correct?
A. Yes.
Q. So with respect to the freight that might have been associated with this 2007 Master Brokerage Agreement, do you know what kind of

303

25 (Pages 300 to 303)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois   (312) 263-0052**

1 freight it was that Martin's Bulk Milk was hauling
2 pursuant to this Master Brokerage Agreement with
3 Universal Am Can as of 2007 and up to the middle of
4 June of 2008?
5     A. Well, this could be for -- this could be
6 for any kind of freight.
7     Q. Okay.
8     A. I mean, for any loads that they throw by
9 us, we could have taken any load that they want to
10 broker out.
11     Q. Do you have any -- Strike that.
12         Did that happen?
13     A. I don't know.
14     Q. Hold that thought.
15         THE VIDEOGRAPHER: Going off the video
16 record. The time now is 1:33 p.m.
17             (A break was taken.)
18         THE VIDEOGRAPHER: We are back on the
19 video record. The time now is 1:37 p.m.
20 BY MR. FISHER:
21     Q. In order to answer the question of whether
22 that happened, Mr. Martin, would accounting records
23 probably need to be checked?
24     A. Yes.

304

1     A. Biemier. You got it.
2     Q. Okay. Back to Exhibit 15 again. When --
3 Strike that. I'm going to come back to Exhibit 15
4 in a second.
5         Look at Exhibit 75 but keep 15 handy.
6 Exhibit 75 is the last of the four documents that
7 were produced to us in the last month or so.
8     A. Okay.
9     Q. All right. So that if you look at
10 Exhibits 72, 73, 74 and 75, we have agreements
11 dated in September of '02, January of '04, July
12 of '05, and then June of 2008. Do you follow me so
13 far?
14     A. Yes.
15     Q. Okay. Do you know why it is Martin's Bulk
16 Milk did not come up with and produce a copy of the
17 Universal Am Can Limited Master Brokerage Agreement
18 dated November 7th, 2007 even though as Exhibit 15
19 shows it has a fax transmission from Martin's Bulk
20 Milk to a 1-800 number?
21     A. No.
22     Q. Who physically looked for the contracts at
23 Martin's Bulk Milk?
24     A. Janet and some other personnel.

306

1     Q. Okay. So if you look back at -- and I've
2 got an extra copy of it here for you to look at.
3 If you look back at Exhibit 57, which was that
4 collection of, you know, spread sheets on invoicing
5 that you said, hey, I don't know anything about
6 this, do you see where it says invoice payment
7 status for broker settlements UACL on the very,
8 very first page and it shows invoices from November
9 1st, 2008 to January 8th, 2010?
10     A. Yes.
11     Q. I presume it would be that Martin's Bulk
12 Milk would have the ability to do an invoice run
13 using this same program but go back to 2005, 2006,
14 2007 to find out if there were any loads that were
15 being pulled for Universal Am Can pursuant to such
16 an agreement, right?
17     A. Yes.
18     Q. Okay. All right. I'll just take that
19 back from you. Thanks. And the person to answer
20 such a question, who might that be if we don't
21 already have the information by just looking at
22 documents?
23     A. Joanne Biemier.
24     Q. Joanne?

305

1     Q. Did you yourself do that?
2     A. No, I did not.
3     Q. So would those be the persons, the persons
4 in the accounting or billing department, who would
5 be able to answer the questions of how information
6 is kept, where the contracts are, and how the
7 filing is done?
8     A. Yes.
9     Q. Okay. Now, would you agree with me, sir,
10 that on Exhibit 15 that there is language contained
11 on this November 7, 2007 agreement, specifically
12 numbered Paragraph 3, that says, among other
13 things, quote, carrier is an independent contractor
14 and is -- and this is all caps -- in no way to be
15 considered an agent, employee or joint venturer of
16 UACL in the providing of any services hereunder,
17 unquote?
18     A. I see it, yes.
19     Q. All right. Had you ever seen that
20 language before?
21     A. No.
22     Q. Look at Exhibit 75. And do you see on
23 Exhibit 75 that same identical language appears in
24 numbered Paragraph 3 on the June 12th, 2008 Master

307

26 (Pages 304 to 307)

Brokerage Agreement between Universal Am Can and
Martin's Bulk Milk?

A. Yes.

Q. And that language is in the June 12th,
2008 contract language that says at Subparagraph 3,
quote, carrier is an independent contractor and is
in no way to be considered an agent, employee or
joint venturer of UACL in the providing of any
services hereunder, unquote?

A. Yes.

Q. Do you see that? And this was a contract
in to which Martin's Bulk Milk entered with
Universal Am Can on June 12th, 2008?

A. Yes.

Q. And shortly thereafter that date, June
12th, 2008, that's when Martin's Bulk Milk started
to get paid by UACL instead of Overnite, correct?

A. Correct, but it's still -- some of the
documents, other documents, are kind of confusing
because there's names on both of them. That's the
confusing part. Anybody looking at that would have
a hard time distinguishing that.

Q. And I think you said that's probably
because there's some crossover between people who

308

used to work for Overnite who then suddenly found
themselves employed by Universal Am Can?

A. That's possible.

Q. That could be a possibility, okay. Now, I
want to look specifically at Exhibit 75, some other
pages.

By the way, who would be the best person
at Universal Am Can to answer -- Strike that.

Who would be the best person at Martin's
Bulk Milk to answer questions about the entering
into of this particular agreement, the one that is
marked as Exhibit 75 dated June 12th, 2008?

A. Pat Podiena would have been the one that
would have read this and sent it back.

Q. But my question is slightly different. My
question is: Who is the best person with or
associated with Martin's Bulk Milk who would be
able to testify about the entering into of this
agreement? And if it's Pat, that's fine.

A. It would be me.

Q. Okay. And did you review this contract
before you answered any of the discovery
responses -- discovery requests that were put to
you the last several months?

309

A. No.

Q. Any particular reason why you did not read
the June 12th, 2008 Master Brokerage Agreement
between Universal Am Can and Martin's Bulk Milk
before you responded to any of those discovery
requests?

A. No particular reason.

Q. Let's look at some of the documentation
attached to Exhibit 75. In particular, after the
signature page do you see the Carrier Survey page?

A. Yes.

Q. And this is like that carrier survey page
that you explained to me with regard to the
Overnite Logistics carrier survey, right?

A. Yes.

Q. Okay. Now, if you look at the next page,
do you see where it says "Welcome to the Universal
Am Can Limited Brokerage Division"?

A. Yes.

Q. And then it has a whole bunch of different
requirements that you have to complete before
you're approved to haul freight on behalf of
Universal Am Can, right?

A. Yes.

310

Q. And to the best of your knowledge -- let's
look at the numbers, the first set of numbers, and
I'm going to do them in reverse order. If you look
at Number 6, do you know whether or not the
information listed as 1 through 5 was faxed to
1-800-627-0706?

A. I do not know that.

Q. Who would know that? Would that be Pat?

A. Yes.

Q. And Number 5, it says: Complete and
return the Carrier Survey form. That appears to
have been done, correct, because it's on the
preceding page and contained within the Martin's
Bulk Milk documents?

A. Yes.

Q. Okay. And how about Number 4, do you know
if a W-9 form was filled out?

A. I do not know.

Q. And Number 3, do you know whether or not
any insurance certificates were provided?

A. I do not.

Q. And do you know if a copy of the contract
or common authority documents were provided?

A. I do not.

311

27 (Pages 308 to 311)

Q. But you do know that the three-page Master Brokerage Agreement was signed and returned, I take it, or do you know?

A. I don't know. It doesn't say if it went to the fax or not. So I'm assuming it was but I don't know for sure. I didn't do it.

Q. Okay. And then if we look at the numbered items that appear on the bottom half of the page where it says "all requirements must be met" -- strike that -- it says, quote, for prompt payment, here are some tips, do you know whether or not this is the type of information that Martin's Bulk Milk followed in order to make sure that it got paid?

A. Yes.

Q. Okay. I'm done with 75.

(Whereupon, Martin Deposition Exhibit Nos. 76, 77 and 78 were marked for identification.)

BY MR. FISHER:

Q. And the last set of documents that I'll show you before we probably take a lunch break here shortly, Mr. March, are Exhibits 76 through 78.

And looking at 76, does this appear to be the broker confirmation sheet that applied to the

312

load that Mr. Franke was hauling at the time of the accident?

A. Yes.

Q. You can set that aside.

With respect to Exhibit 77, I know there's a different collection or iteration of this one, but if you look at Exhibit 77 here, does this appear to be copies of the three memo bills or bills of lading associated with the three loads for three different customers that were being -- that were picked up by Mr. Franke on the night of July 3rd, 2008?

A. Yes.

Q. Now, I want to go back -- I'm done with that one. I want to go back to a topic that I got into initially but didn't complete.

You were down at the Hammond Distribution Center at some point?

A. Yes.

Q. More than once or just once?

A. Once.

Q. And how long did you visit that distribution center? In other words --

A. Approximately an hour.

313

Q. Hour. And what was it that took you down there?

A. I believe all the carriers had to go for some sort of orientation.

Q. Was this an orientation that occurred before 2008?

A. Yes.

Q. Did it occur before 2007?

A. Yes.

Q. Did it occur when Martin's Bulk Milk was a shipper directly for International Paper without an intervening broker?

A. We were a hauler.

Q. So there was no broker involved?

A. Correct.

Q. Okay. And can you give us any estimate time-wise? Was that in the '90s? Was that in the 2000s?

A. I would say late '90s, early 2000.

Q. Do you have a memory of what the warehouse looked like?

A. Somewhat, yes.

Q. Tell me what you remember.

A. It's -- I would say they have 50 to a

314

hundred docks, it's just a big open warehouse and it's just a place where -- you know, for the paper distribution, different sorts of papers.

Q. When you went there late '90s, early 2000s, whenever it was, do you know whether or not an entity or company named Exel, E-x-e-l, was operating at the distribution center at that time?

A. I don't recall.

Q. Did you go down there in a regular sedan, regular car?

A. Yes.

Q. Did they show you anything about the layout of the distribution center so that you could learn where it was truck drivers might report when they came there to pickup or drop off loads?

A. So I could give them directions you mean?

Q. Sure.

A. Yes, I could drive to it today if I had to.

Q. It's in Hammond?

A. Yes.

Q. How would you get there?

A. 94 down to 165th Street, make a left and go down and it's very easy to find.

315

28 (Pages 312 to 315)

Q. On the north or south side of 165th?

A. I would say it's on the east side of 165th.

Q. If 65th runs east/west, not north/south, what side would it be on? If 165th runs east/west, would it be on the north side or the south side, if you remember?

A. I don't remember.

Q. Okay. In any event, you arrived there. Was there an area in which truck drivers would report?

A. Yes.

Q. And describe for me what that was about that you remember.

A. It's a small office about the size of this room, it's what they call the shipping office and you had to go to a window to get your bills.

Q. And when a person such as a driver would go there, was it explained at that time -- I know it was many years ago -- what it was they were to do?

A. They didn't explain that to me.

MR. FISHER: Okay. You know what, now's a good time to take a break.

316

THE VIDEOGRAPHER: We're going off the video record. The time now is 1:52 p.m.

(A break was taken.)

THE VIDEOGRAPHER: We are back on the video record. The time now is 2:22 p.m.

BY MR. FISHER:

Q. Okay. Mr. Martin, just to wrap up the marked exhibits and the inventory I've been having you go through. I think this is a duplicate of a previous exhibit but this was produced to us in February of this year.

Would you identify for us what Exhibit 78 is?

A. It's a Uniform Interchange Agreement from the UIIA.

Q. And I know it's hard to read, but if you look at the second page of the document, it appears to me that Martin's Bulk Milk Service is a party to an agreement, to this agreement by this page. Is that your understanding?

A. Yes.

Q. And in a nutshell, why is it that Martin's Bulk Milk entered into this Uniform Intermodal Interchange and Facilities Access Agreement?

317

A. Because we do trucking out of Wisconsin and Minnesota to the railroads in Chicago -- truck loads.

Q. And is it your understanding that any motor carriers who want to be able to get access to the intermodal yards have to participate in this agreement?

A. Yes.

Q. Okay. You can set that aside.

You earlier in the first session of your deposition made reference to a company whose business location is in Utah. Is that Martin's Bulk Milk Service or is that the Logistics company or something else?

A. It's both.

Q. And describe what you mean by both.

A. Martin's Bulk Milk Service has an office in St. George, Utah which runs our trucks and it also has a company what's called Martin Refrigerated Express which brokers loads, like as Universal Am Can and Overnite Express.

Q. And earlier you said that the nature of the business in Utah is a brokerage company. Is that still the case?

318

A. It's both. We're a carrier and a broker.

Q. Here's what I'm trying to understand. I want to make sure that I understand what Martin's Bulk Milk or Martin's related companies are engaged in brokering.

A. Okay.

Q. Is it two companies, one that operates out of Utah and another that operates out of Minnesota?

A. Yes.

Q. And tell me again what the names of those two respective companies are, the one in Utah first and the one in Minnesota second.

A. Utah is Martin Refrigerated Express and Winona, Minnesota is MBM Logistics.

Q. And does Martin Refrigerated Express have to your knowledge a separate motor carrier number for purposes of the Department of Transportation?

A. Yes, only for brokering.

Q. And does MBM Logistics in Minnesota have a separate motor carrier number for brokering?

A. Yes.

Q. And then Martin's Bulk Milk has a motor carrier number in its capacity as a carrier?

A. Yes.

319

29 (Pages 316 to 319)

Q. Does Martin's Bulk Milk have a brokerage number?

A. Yes.

Q. And so there are three entities with the name Martin's that operate as brokers?

A. MBM, Martin Refrigerated and Martin's Bulk Milk.

Q. Right. That's why I said with the name Martin's.

A. Okay.

Q. Okay. And do they each have separate brokerage numbers?

A. Yes.

Q. Excuse me. Do they each have separate DOT motor carrier numbers in their capacity as brokers?

A. Yes.

Q. Who are the current dispatchers for Martin's Bulk Milk in Wilton, Wisconsin?

A. Tom Price, Doreen Bayer, Nancy Green, Dean Peterson, Greg Johnson, Renee Taugis, and Dave Martin.

Q. Is this an expansion of the number of dispatchers from what it had been back in the earlier 2000s?

320

A. Yes.

Q. Does Martin's Bulk Milk Service employ any auditing service to audit the logs of its drivers?

A. Yes.

Q. What company does it use?

A. Oh, we do it in-house.

Q. Oh, I'm sorry. Let me rephrase my question.

To audit the logs of your drivers do you employ some type of a software package?

A. Yes.

Q. What software package do you use?

A. I can't answer that. I don't know.

Q. Who might know that?

A. Janet.

Q. And what is your understanding of the purpose of auditing logs?

A. It will check the 11, 14 and 70-hour rule.

Q. And that's to make sure that truck drivers are running legal, so to speak, and in conformity with the Federal Motor Carrier Safety Regs?

A. Yes.

Q. Is another reason why that's done is because hours of service regulations are designed

321

to try to make sure that fatigued drivers are not on the roadway?

A. Yes.

Q. Based upon — let me start my question a different way.

In your job at Martin's Bulk Milk did it involve at all the investigation of the accident of Mr. Franke on July 3?

A. No.

Q. Who was responsible, if anyone, at Martin's Bulk Milk for doing an investigation of the July 3rd accident?

A. Janet compiled the information along with the police report.

Q. Do you know anything about what the findings were, if any, of any investigation that Martin's Bulk Milk did of the accident involving Mr. Franke?

A. The only thing I found what was wrong was there was brakes out of adjustment on the CSXU container.

Q. Do you have any idea whether or not that condition had anything to do with the cause of the accident?

322

A. I do not.

Q. With respect to a cause of the accident, in speaking with — did you ever speak with other people at Martin's Bulk Milk about the accident?

A. Only a driver that had left me a message on a voice mail the night that it happened.

Q. And who was that driver?

A. Jamie Jorgensen.

Q. And what message did Jamie Jorgensen leave for you?

A. Just that Sam was in a bad rear-end accident and the driver was burned.

Q. Do you know how it is that Jamie knew anything about this?

A. Sam tried to contact me but I didn't get the phone call. So he called Jamie to try to get a hold of me.

Q. And did Jamie reach you first with the information about the accident or did Mr. Franke reach you first?

A. Jamie.

Q. After that conversation did you have any conversations with anyone else affiliated with Martin's Bulk Milk about investigating the cause of

323

30 (Pages 320 to 323)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois   (312) 263-0052**

the accident?

1  A. Well, there was no conversation. I got it
2  off a voice mail.
3  Q. No, I understand that.
4  A. Okay. So – go ahead.
5  Q. Here's what I'm trying to find out because
6  it's going to lead to another question. I want to
7  know what conversations or interaction you had with
8  anybody at Martin's Bulk Milk having to do with
9  investigating what happened.
10  A. The only investigation we did was go
11  through the police report just to read what had
12  happened.
13  Q. Do you know whether or not based upon
14  conversations with Martin's Bulk Milk,
15  conversations with the police, or anyone for that
16  matter, excluding consultation with your company's
17  counsel, whether or not there was any evidence that
18  Mr. Franke was fatigued or tired on the night of
19  the accident?
20  A. No.
21  Q. When you say "no," do you mean by that,
22  no, there were no such conversations, or that was a
23  subject of investigation and it was determined that

324

he was not fatigued?

1  A. There was no conversations involved that
2  he was fatigued.
3  Q. Okay. I'm going through the notes from
4  your first deposition and in light of the other
5  documents, I want to just see if there's any
6  follow-up questions I've got from your first
7  deposition.
8  With respect to the distribution center in
9  Hammond to which Mr. Franke went on a regular
10  basis, did he ever share with you any information
11  about what went on at the distribution center?
12  A. No.
13  Q. Different topic now. Would you agree with
14  me that at the time of the accident Mr. Franke was
15  doing work for Martin's Bulk Milk?
16  A. Yes.
17  Q. He was Martin's Bulk Milk's employee,
18  right?
19  A. Yes.
20  Q. And would you agree with me that he was
21  driving a truck at the time of the accident?
22  A. Yes.
23  Q. That he was driving a truck with cargo?

325

A. Yes.

1  Q. He was driving a truck with cargo from
2  Point A to Point B?
3  A. Yes.
4  Q. And that his job was to drive a truck with
5  cargo from Point A to Point B in a reasonable, safe
6  fashion?
7  A. Yes.
8  Q. All right. So what I want to do for the
9  purposes of my next series of questions is to
10  define his work as follows: His work is defined as
11  driving a truck with cargo from Point A to Point B
12  in a reasonable, safe manner.
13  A. Yes.
14  Q. All right. That's my definition of the
15  word "work." With me?
16  A. Yes.
17  Q. Okay. So did Universal Am Can or Overnite
18  Express or International Paper provide any
19  instructions or directions or requirements to
20  Samuel Franke on the following: The tools he was
21  to use in doing the work?
22  A. No.
23  Q. The instrumentalities that he was to use

326

in performing the work?

1  A. No.
2  Q. The clothing he was to wear in doing the
3  work?
4  A. No.
5  Q. The equipment he was to use in doing the
6  work?
7  A. No.
8  Q. The logbooks he was to use in doing the
9  work?
10  A. No.
11  Q. The tractor he was to use in doing the
12  work?
13  A. No.
14  Q. The trailer he was to use in doing the
15  work?
16  A. No.
17  Q. The type of tractor or trailer he was to
18  use in doing the work?
19  A. He had to have a 53-foot trailer.
20  Q. And was that a requirement that
21  International Paper or Overnite Express or
22  Universal Am Can imposed?
23  A. It was a requirement of all three.

327

31 (Pages 324 to 327)

Q. And was that in writing or was that an expectation?

A. It's on the confirmation sheets, I believe, that requires a 53-foot trailer.

Q. Okay. Did Universal Am Can, Overnite Express or International Paper designate who were the drivers that were to do the work?

A. No.

Q. Does Martin's Bulk Milk use co-drivers? Do they use dual drivers?

A. We have a couple.

Q. Okay. Did Universal Am Can, Overnite Express or International Paper ever designate who the dual or co-drivers were to be in doing the work?

A. No.

Q. Did Universal Am Can or Overnite Express or International Paper tell Mr. Franke or -- tell Mr. Franke where he had to purchase his gas in doing the work?

A. No.

Q. Where he was to purchase any supplies or services in doing the work?

A. No.

328

Q. What route he was to follow in doing the work?

A. No.

Q. Did Universal Am Can, Overnite Express or International Paper ever measure, score or evaluate any of the details of Mr. Franke doing his work?

MR. SKRYD: Objection to form. I think it's vague. You can answer if you --

BY MR. FISHER:

Q. Yes, if you don't understand, tell me you don't understand and I'll be happy to rephrase it.

A. They would monitor the deliveries.

Q. Okay.

A. On-time deliveries.

Q. Tell me what you mean by monitor on-time deliveries.

A. If -- you had to report to them what -- you know, if you had a truck that was running late for a pickup or a delivery.

Q. Is that -- in answer to my question, is that the only thing you can think of in which Universal Am Can, Overnite Express or International Paper measured or scored or evaluated any details of the work as I have defined the work?

329

A. Yes.

Q. Okay. Now, with respect to that monitoring of on-time deliveries, did they issue a report on a weekly or monthly basis or what became of that monitoring?

A. There was no reports. We just -- we had to report to them if a truck was running late on a pickup or delivery.

Q. So what would happen, for example, in May of 2008 when Mr. Franke is doing his regular run and he determines that because of traffic congestion around Chicago he's never going to be able to get back to Wilton, Wisconsin in time so that he can give the load to the second driver who then makes the delivery, for example, in Minneapolis? What would happen in that instance?

A. The load would get rescheduled for the next day.

Q. What happens if he's already on route? He's on 294 on the west side of Chicago and he's stuck in, you know, an incredible traffic jam and knows he's not going to get back at his usual time?

A. When his time is up, then he needs to take his break.

330

Q. And then what would happen with the load?

A. It would just get rescheduled for the next day.

Q. So he would take a brake, take whatever hours he needed and then continue on up to Wilton and who would then reschedule the delivery?

A. Universal Am Can or Overnite Express.

Q. Would Martin's Bulk Milk get involved in that process with the eventual customer?

A. No.

Q. Okay. Did Universal Am Can, Overnite Express or International Paper train Mr. Franke in how to do the work?

A. I don't know.

Q. What type of training did Martin's Bulk Milk Service provide to Mr. Franke in terms of how to do the work, that is to say, how to drive his truck?

A. We put him through a road test in the beginning through orientation.

Q. Other than that was there any other training that Martin's Bulk Milk provided to Mr. Franke?

A. We'll help him train with his paperwork and with his logging.

331

32 (Pages 328 to 331)

Q.  So with respect to the initial on-the-road
test and what you just mentioned in terms of his
logging and things like that, did International
Paper, Ovemite Express or Universal Am Can provide
any such training to Mr. Franke?

A.  No.

Q.  Did Universal Am Can, Ovemite Express or
International Paper require Franke to inspect,
clean or maintain the truck he was driving and its
equipment?

A.  Yes.

Q.  Tell me why you say yes.

A.  They -- the driver has to inspect the
trailer.

Q.  Where was it in writing that Universal Am
Can said that the driver had to inspect the
trailer?

A.  Oh, it's not -- it's required by
International Paper when he goes to load there that
the driver has to inspect the trailer.

Q.  And by "inspect the trailer," tell me what
you mean by that.

A.  That there's no leaks or no debris in the
trailer.

332

Q.  So let me make sure I understand this.
When Mr. Franke would bring his trailer to the
distribution center in Hammond and he backs the
truck into the dock where it's going to be loaded,
say, with paper products, what would -- what do you
think Mr. Franke would do after he gets out of his
tracker?

A.  He would have to go into the dock and
inspect his trailer and also inspect his load
before they load it.

Q.  All right.  Why would he have to go into
the trailer to inspect his trailer?

A.  Just to make sure there's no debris in
there or leaks.

Q.  Okay.  And let's assume he's gone in there and
determined everything's fine inside the trailer.
What would you expect Mr. Franke to next do -- as
it pertains to the loading of the trailer?

A.  Well, he should watch them load his load
to make sure there's no damage on the product going
in.

Q.  Okay.  And what else would you expect him
to do, if anything?

A.  Make sure it's loaded right where it's not

333

over on its axles.

Q.  And how would he do that?

A.  Well, if you do the same load day in
and -- day after day, you should be able to figure
it out, but then you probably would have to go --
you'd have to go to a scale or a public scale or
something if he wasn't sure, depending on how much
weight he had in the trailer.

Q.  Was Mr. Franke as of July 3rd, 2008 a
pretty experienced driver in terms of knowing how
it is that a trailer ought to be loaded and not
loaded?

A.  Yes, and was a very good driver.

Q.  So getting back to my original question.
Did Universal Am Can, Ovemite Express or
International Paper impose any specific
requirements on inspection of the trailer?

I'm not talking about what you would
expect him to do on his own as a good truck
driver.  What I'm asking you is whether or not
Universal Am Can, Ovemite Express or International
Paper imposed any requirements on Mr. Franke for
the inspection of a trailer?

A.  They would require him to inspect the

334

inside of the trailer.

Q.  And how is it you know that?

A.  It's pretty much common for all shippers.

Q.  And how do you know that?

A.  Because I drove a truck for ten years and
it's just common that shippers want their trailers
clean.  They don't want to get to the other end and
have a bunch of debris in the trailer.

Q.  Okay.

A.  So it's part of the job.

Q.  Would you agree with me that cleanliness
of the inside of a trailer probably has nothing to
do with how this accident happened?

A.  Yes.

Q.  Okay.  With respect to maintaining the
trailer, do you know whether or not International
Paper, Ovemite Express or Universal Am Can imposed
any requirements for the maintenance of the
trailer?

A.  No.

Q.  So is your answer they made no -- they
imposed no requirements; is that correct?

A.  Correct.

Q.  And, likewise, for the tractor?

335