# EX. 5

**David Martin Deposition
dated, February 20, 2012**

A. Correct.

Q. Do you know whether or not Universal Am Can, Overnite Express or International Paper required Mr. Franke to follow any particular driving techniques when he was doing the work?

A. No.

Q. And by "no" you mean they did not, correct?

A. Correct.

Q. Did Universal Am Can, Overnite Express or International Paper provide Mr. Franke with a camera?

A. No.

Q. Did Universal Am Can, Overnite Express or International Paper require Franke to report or notify them of any accidents involving the load he was carrying?

A. Not to my knowledge.

Q. A digression here for a second. Do you know how it was Universal Am Can got any notice of an accident?

A. I called them on -- they weren't in the office. So I called them on the first business day that I could, which would have been --

336

Q. July 7th?

A. Yes.

Q. And any particular reason why you waited so long to call them? I'm not being critical; I'm just asking why you waited until July 7th.

A. Because I didn't think I'd be able to get a hold of anybody. I know they worked regular business hours, there was nobody there over the weekend and the accident happened late on that Friday night.

Q. Do you know whether or not Universal Am Can, Overnite Express or International Paper required Franke to call in while he was on route for reasons other than that he might be late?

A. No.

Q. So they did not impose such requirements, correct?

A. Correct.

Q. Did Universal Am Can, Overnite Express or International Paper require Franke to provide any status reports?

A. Just if he was running behind on his pickup or delivery schedule.

Q. Did Universal Am Can, Overnite Express or

337

International Paper require Franke to stay in constant communication with anybody?

A. No.

Q. On flat bed -- does Martin's Bulk Milk handle any flat bed?

A. No.

Q. Did you ever carry any flat bed --

A. No.

Q. -- loads? Did Universal Am Can or Overnite Express ever fine Mr. Franke for not being in compliance with any particular edict or direction?

A. No.

Q. Do you know whether or not Universal Am Can or Overnite Express or International Paper even had the authority or power to issue fines to Mr. Franke?

A. I don't recall.

Q. Did Universal Am Can, Overnite Express or International Paper dictate to Mr. Franke what his work days would be or what his hours of operation would be?

A. They would dictate what time he needed to pick the load up, which was 7:00 p.m.

338

Q. Did Universal -- to your knowledge did Universal Am Can, Overnite Express or International Paper ever dictate how the load that was to be shipped was to be packed in the trailer?

A. They were responsible for loading the load.

Q. When they loaded the load, would that be done presumably by forklift drivers at the distribution center?

A. Yes.

Q. Now, Mr. Franke would not have gotten involved in that, correct?

A. Correct.

Q. And let's assume hypothetically that Mr. Franke got on to a forklift, say, hey, I'm going to help out, I'm in a hurry. Would he have had the authority to, you know, load the cargo on to the trailer --

A. No.

Q. -- with the use of a forklift at the distribution center?

A. No.

Q. Why is that?

A. They wouldn't allow it down there.

339

34 (Pages 336 to 339)

1  Q. Did Universal Am Can, Overnite Express or
2  International Paper ever hire Mr. Franke?
3  A. Not to my knowledge.
4  Q. Did they ever discipline him?
5  A. Not to my knowledge.
6  Q. Did they ever counsel him?
7  A. Not to my knowledge.
8  Q. Did they ever qualify him to serve as a
9  driver for a motor carrier?
10 A. Not to my knowledge.
11 Q. Did they ever disqualify him for operating
12 as a driver for a motor carrier?
13 A. No.
14 Q. Did they ever fire him?
15 A. No.
16 Q. Do you know whether or not Mr. Franke ever
17 sought to be hired, disciplined, counseled, fired,
18 qualified or disqualified by Universal Am Can,
19 Overnite Express or International Paper?
20 A. I don't know.
21 Q. I need to ask Mr. Franke.
22 A. Yes.
23 Q. Okay. Did Universal Am Can, Overnite
24 Express or International Paper have the right to

340

1  International — somebody there at that
2  distribution center would have been able to call
3  somebody up, for example, you, and say, hey, he's
4  not driving for us today because he's just being a
5  whatever?
6  A. It could happen, yes.
7  Q. And what about dress, what would be the
8  line over which you would have to cross for the
9  dress of the truck driver to allow in your judgment
10 somebody at Universal Am Can, Overnite Express or
11 International Paper to say you're not driving this
12 load today?
13 A. I'm not sure, but if they just were, you
14 know, improperly dressed where -- I really can't
15 say.
16 Q. No shoes, no shirt, no service?
17 A. Exactly.
18 Q. All right. What about if he came in
19 unshaven?
20 A. I'm not sure that would matter.
21 Q. How about if he had an orange shirt on
22 instead of a blue shirt?
23 A. It shouldn't matter.
24 Q. Requirements on hair length, any problems?

342

1  your knowledge in writing or based upon anything
2  else to reject Mr. Franke as a driver?
3  A. I'm sure they hold that right.
4  Q. And why is it you believe that?
5  A. Because over the years that kind of stuff
6  happens.
7  Q. Well, under what circumstances would it
8  happen?
9  A. If they were unprofessional when they come
10 into their building or things of that nature.
11 Q. Tell me what that means, quote, unquote
12 unprofessional?
13 A. Language. Use of, you know, bad language
14 or things of that nature or the way they dressed or
15 the way they treat other people.
16 Q. So I'm going to give you, like, four
17 hypotheticals, okay. If Mr. Franke one day walked
18 in to the distribution center at Hammond and he
19 just started a profanity-laced tirade against one
20 of the gals there in the dispatch office — first
21 of all, did that ever happen involving Mr. Franke?
22 A. No.
23 Q. Okay. Assuming it would have happened, is
24 it your contention that somebody at

341

1  A. Not that I ever heard.
2  Q. Different — I think we beat this to
3  death. Let me go on to a different topic.
4      Did Universal Am Can, Overnite Express or
5  International Paper maintain a personnel file on
6  Mr. Franke?
7  A. Not to my knowledge.
8  Q. Is it fair to say given your understanding
9  of the transportation trucking industry, that
10 Universal Am Can, Overnite Express, and
11 International Paper had no obligations to keep a
12 driver qualification file on Mr. Franke? Correct
13 statement?
14     MR. SKRYD: Objection, form of the
15 question. You can answer.
16     THE WITNESS: They would have no
17 obligation.
18 BY MR. FISHER:
19 Q. Do you know if they did?
20 A. I do not.
21 Q. Did Universal Am Can, Overnite Express or
22 International Paper ever have to reprimand
23 Mr. Franke for any citations or bad driving?
24 A. No.

343

35 (Pages 340 to 343)

Q. In fact, while in the last several years Mr. Franke had no citations or bad driving, correct?

A. Correct.

Q. Did Universal Am Can, Overnite Express or International Paper even have the obligation to your knowledge to insure that Mr. Franke had a commercial driver's license?

MR. SKRYD: Same objection, form of the question. You can answer.

THE WITNESS: I believe they -- some places will make you put it on your bill of lading. I don't know if I saw it on there or not. But I believe they checked him down there.

BY MR. FISHER:

Q. Down there meaning?

A. Down at Exel at International Paper.

Q. So when Mr. Franke -- let's make it a hypothetical driver.

When John Doe, our hypothetical driver, arrives at the distribution center in Hammond, comes in, could the people there demand to see his CDL?

A. Yes.

344

Q. Do you know if they ever did that?

A. I believe they did.

Q. For Mr. Franke or for others?

A. Everybody.

Q. And was that for purposes of just identifying that he is who he claims to be or for what purpose?

A. And security of the load.

Q. Did Universal Am Can, Overnite Express or International Paper ever promulgate, publish or distribute any rules regarding Mr. Franke's personal use of his tractor?

A. Not to my knowledge.

Q. Do you know if Universal Am Can, Overnite Express or International Paper ever received any or took any complaints about Mr. Franke?

A. No.

Q. When you say "no," do you mean that there simply were no complaints to your knowledge?

A. There were no complaints to my knowledge.

Q. Did Universal Am Can, Overnite Express or International Paper keep track of Mr. Franke's driving time?

A. No.

345

Q. And I presume that they did not maintain Mr. Franke's logs, correct?

A. Correct.

Q. Did Universal Am Can or Overnite Express or International Paper to your knowledge have the right to discipline Mr. Franke?

A. Not to my knowledge.

Q. Did they have -- the same three companies I've been mentioning -- did they have the right to require Mr. Franke to take a medical exam, a physical?

A. No.

Q. Did Universal Am Can, Overnite Express or International Paper ever provide Mr. Franke with a debit card or any other card that could be used at truck stops to -- you know, as currency or, you know, payment?

A. Not to my knowledge.

Q. Did Universal Am Can, Overnite Express or International Paper own the tractor or trailer that was being used for the work?

A. No.

Q. Did they require Franke to place placards, graphics, stickers or logos of the names of

346

Universal Am Can, Overnite Express or International Paper on the tractor or trailer?

A. No.

Q. Is it fair to say that Universal Am Can, Overnite Express and International Paper were not responsible for the maintenance of the tractor and trailer?

MR. SKRYD: Objection, form. You can answer.

THE WITNESS: Correct.

BY MR. FISHER:

Q. And, likewise, they did not pay for the expenses of operation such as gas, oil, things like that?

A. Correct.

Q. And is it also fair that Universal Am Can, Overnite Express, International Paper did not obtain any licenses or permits for the tractor and trailer?

A. Correct.

Q. And is it also -- let me start again.

Was there any global positioning technology in the tractor at the time of the accident?

347

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois (312) 263-0052**

1 A. No.
2 Q. Was there an electronic control module or
3 black box in the tractor?
4 A. Yes.
5 Q. Did Universal Am Can, Overnite Express or
6 International Paper provide any such equipment as
7 I've just mentioned in the last two questions?
8 A. No.
9 Q. Did Universal Am Can, Overnite Express or
10 International Paper pay or reimburse Franke for
11 doing the work for any of the following: His
12 driver's salary or wages?
13 A. Not to my knowledge.
14 Q. Liability insurance coverage for him?
15 A. Not to my knowledge.
16 Q. Workers compensation insurance coverage
17 for him?
18 A. Not to my knowledge.
19 Q. Cost of any repairs or cost of any
20 maintenance?
21 A. Not to my knowledge.
22 Q. Supplies, travel expenses or any equipment
23 lease costs?
24 A. Not to my knowledge.

348

1 Q. Did Universal Am Can, Overnite Express or
2 International Paper ever pay Franke directly?
3 A. I don't know.
4 Q. Who would know the answer to that?
5 A. Frank -- Sam.
6 Q. In the documents that have been marked as
7 Exhibit 71, the big collection of the personnel and
8 driver qualification files, there's copies of pay
9 stubs, right?
10 A. Yes.
11 Q. Were those pay stubs pay stubs reflecting
12 payment from a Martin's Bulk Milk checking account?
13 A. Yes.
14 Q. Not a checking account from Universal Am
15 Can, Overnite Express or International Paper,
16 correct?
17 A. Correct.
18 Q. Did Martin's Bulk Milk lease its
19 tractor-trailer unit to Universal Am Can, Overnite
20 Express or International Paper?
21 A. No.
22 Q. Did Universal Am Can, Overnite Express or
23 International Paper pay for any of the following
24 employee benefits of Mr. Franke: Health insurance?

349

1 A. Not to my knowledge.
2 Q. Workers compensation insurance coverage?
3 A. Not to my knowledge.
4 Q. A pension plan?
5 A. Not to my knowledge.
6 Q. Retirement accounts?
7 A. Not to my knowledge.
8 Q. Profit sharing?
9 A. Not to my knowledge.
10 Q. Vacation pay?
11 A. Not to my knowledge.
12 Q. Or sick pay?
13 A. Not to my knowledge.
14 MR. FISHER: Can we go off the record for
15 a second.
16 THE VIDEOGRAPHER: Off the record. The
17 time now is 2:59 p.m.
18 (Discussion off the record.)
19 THE VIDEOGRAPHER: We are back on the
20 video record. The time now is 3:21 p.m.
21 BY MR. FISHER:
22 Q. Okay. Mr. Martin, we've taken a break and
23 before we took the break there was a -- I think you
24 heard -- well, there was a discussion about

350

1 expediting things for asking you questions about
2 documents and words that appear in documents, okay?
3 A. Yes.
4 Q. Now, do you remember when I showed you
5 before Exhibits in the 50s that were the requests
6 for production that my client tendered to Martin's
7 Bulk Milk asking very, very specific questions
8 about whether or not the words "principal"
9 and "agent" appeared in any documents?
10 A. Yes.
11 Q. Do you remember those requests?
12 A. Yes.
13 Q. Okay. So here's my question to you
14 because I think we can shortcut this and I'll
15 follow-up a different way.
16 Is it a fair statement to say based upon
17 your knowledge of the documents that your company
18 has produced in this litigation that the only
19 document you are aware of that has any relationship
20 to either Universal Am Can, Overnite Express, or
21 International Paper together with your company
22 Martin's Bulk Milk in which the word "agent" is
23 used, the memo bills where at the bottom of the
24 memo bills the words as follow appear: Shipper per

351

37 (Pages 348 to 351)

1 and agent per?
2     Are those the only documents you're aware
3 of that have been collected by your company,
4 produced in discovery that have any of the four
5 companies mentioned listed on them or referenced in
6 which the word "agent" or "principal" appears?
7     A. Yes.
8     Q. A part from the contract documents which
9 we talked about before?
10     A. Yes.
11     Q. Okay. So is it a fair statement then to
12 say, as best you know of, that there are no
13 documents that Martin's Bulk Milk has in which
14 representations are made specifically to Universal
15 Am Can, Overnite Express or International Paper
16 being a principal in relationship to Martin's Bulk
17 Milk?
18     MR. SKRYD: Objection to the form of the
19 question. You can answer.
20 BY MR. FISHER:
21     Q. Is that a fair statement?
22     A. Yes.
23     Q. Okay. And the only document that has the
24 word "agent" in it to your knowledge of the
352

1 documents that have been produced is the memo bill
2 or the bill of lading that has the word "agent" in
3 the bottom row?
4     A. Yes.
5     Q. Okay.
6     MR. FISHER: And, counsel, as I said, I'll
7 probably follow-up with a request for admissions to
8 get all the answers to my production requests in
9 the form of a request for admissions.
10 BY MR. FISHER:
11     Q. Okay. With that having been said, let me
12 just look at -- could you look at exhibit
13 seventy -- it's the June 2008 agreement. It will
14 be like 75, 76, 77, at the very end.
15     MR. BURKE: 75.
16     MR. SKRYD: We got it.
17 BY MR. FISHER:
18     Q. All right. I want to just end my
19 questions of you, Mr. Martin, by referencing, once
20 again, to the June 12th, '08 Master Brokerage
21 Agreement. This is an agreement, you understand,
22 to have been entered into and in full force and
23 effect between Universal Am Can and Martin's Bulk
24 Milk in June of 2008?
353

1     A. Yes.
2     Q. Okay. And I already referenced your
3 attention to Subparagraph 6, the one that talks
4 about independent contractor and MBMS not being
5 considered an agent, employee or joint venturer of
6 UACL? Do you remember I was talking about that
7 one?
8     A. Yes.
9     Q. This also contains Subparagraph 7
10 concerning liability for all loss, damage and
11 liability and that responsibility is placed upon
12 Martin's Bulk Milk?
13     A. I see it.
14     Q. And that was a provision that applied
15 between UACL and Martin's Bulk Milk as of July 3rd,
16 2008?
17     A. Yes.
18     Q. And with respect to Subparagraph 8 there's
19 a section there that talks about the carrier,
20 meaning Martin's Bulk Milk, procuring and
21 maintaining insurance coverage?
22     A. Yes.
23     Q. And did Martin's Bulk Milk procure
24 liability and property damage insurance for an
354

1 amount not less than a million dollars?
2     A. Yes.
3     Q. And through what carrier was that
4 obtained, if you know?
5     A. I don't know what it was at that time.
6     Q. All right. And then, finally, Paragraph
7 12, that's the paragraph that talks about defending
8 and indemnifying. If you could just please read
9 that paragraph out loud.
10     A. Carrier shall defend, indemnify and hold
11 UACL harmless from and against all loss, liability,
12 damage, claim, fine, cost or expense, including
13 reasonable attorney's fees, arising out of or in
14 any way related to performance or breach of this
15 Agreement by Carrier, its employees or independent
16 contractors working for the carrier, collectively
17 the claims, including, but not limited to, claims
18 for or related to personal injury, including death,
19 personal damage and Carrier's possession, use,
20 maintenance, custody or operation of the equipment;
21 provided by, however, that carrier's
22 indemnification and hold harmless obligations under
23 this paragraph will not apply to any portion of
24 such claim attributable to the tortious conduct of
355

38 (Pages 352 to 355)

UACL.

Q. And you believe that this particular provision of the contract was in application on July 3rd, 2008?

A. I don't know what contract was under. There's names on both. There's Universal Am Can's name on the bill of lading and there's also Overnite Express.

It's very complicated to know how they were doing business at that time and I have no idea what was going on.

Q. My question is a little different. My question is, just as I asked you about Paragraph 3 and paragraph -- the other paragraph numbers, Paragraph 3 meaning about agency or independent contractor and I asked you about the paragraph having to do with insurance coverage, my question now is about Paragraph 12, the indemnity provision. As best you know this contract with all of those paragraphs was in full force and effect as of July 3rd, 2008; is that a fair statement?

A. I can't answer that because it's not signed by somebody from Universal Am Can.

Q. So tell me --

356

A. I'm not so sure they even got a copy of this.

Q. So I guess I'm trying to find out -- well, then, let me ask this. Was Exhibit 15 in full force and effect as of July 3rd, 2008? Here's another copy of it.

MR. SKRYD: I got it.

BY MR. FISHER:

Q. This is an agreement dated November 7th, 2007.

A. This one's not signed either.

Q. Okay. But I thought you told me before that this contract was in effect as were the other three.

A. Well, there's several contracts that are in effect. I don't have any cancellations to any of these, of the ones from -- I don't have cancellations or anything from Overnite Express and the two from Universal Am Can were not signed.

Q. So is your point just simply that because you don't have fully executed, two signature contracts you don't know what contracts were in effect?

A. Correct.

357

Q. If these contracts provided provisions for your payment -- Strike that.

If you weren't under contract with Universal Am Can, how did you get paid?

A. That's a good question. I -- that copy came from you, correct?

Q. Yes.

A. It's not signed so -- it never came back to our company.

Q. Do you know why you were paid if there was no agreement between the two companies?

A. I do not know why they would pay us without having a signed contract.

Q. All right. So to summarize this, is the reason why you can't tell me whether or not a particular provision of a contract was in effect because you don't know whether or not the absence of a signature on a contract means that that contract was in effect?

A. Correct, and there's also bills of lading that have both names on, even to the last -- the load that we did the last day, they have Overnite Express on the bill of lading.

Q. If Overnite Express didn't exist after

358

June 13th, 2008, of what moment is it, of what issue is it if there's documentation from Overnite Express or Overnite Logistics after June 13th, 2008?

A. I can't answer that. I don't know.

Q. So is it your contention on behalf of Martin's Bulk Milk Service that there was or was not a signed contract in existence between Martin's Bulk Milk and Universal Am Can as of July 3rd, 2008?

A. There's no signed contract as of that date.

Q. And that's your position?

A. Yes.

Q. Okay. And with respect to the contracts before, are they still in existence, the ones that had two signatures on them?

A. I don't know when they expire. I don't know.

Q. Look at Exhibit 15. Do you have that in front of you?

A. Yes.

Q. Do you see the first numbered paragraph dealing with the term of the agreement?

359

39 (Pages 356 to 359)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

1     A. Yes.
2     Q. Would you agree with me that that
3 provision says that the term automatically renews
4 year after year?
5     A. It says the term of the agreement shall be
6 for a period of one year and automatically renew
7 after one year.
8     Q. Until canceled upon 30 days written
9 notice —
10     A. Yes.
11     Q. — of one party to the other, correct?
12     A. Yes.
13     Q. As of July 3, 2008 did Martin's Bulk Milk
14 ever issue a cancellation notice to Universal Am
15 Can?
16     A. Not to my knowledge.
17     Q. As of the beginning of June 2008 had
18 Martin's Bulk Milk issued a cancellation notice to
19 Universal Am Can?
20     A. Not to my knowledge.
21     Q. Would you be the person who would know the
22 answers to those two questions?
23     A. Yes.
24     MR. FISHER: That's all the questions I've

360

1 got at this time. Thank you.
2              CROSS-EXAMINATION
3 BY MR. COUTURE:
4     Q. Hello, Mr. Martin.
5     A. Hello.
6     Q. My name is Tim Couture; I represent BMW
7 AG, the manufacturer of the motor vehicle in which
8 Mr. Scheinman was sitting at the time of the
9 accident, and BMW NA, the distributor of that
10 vehicle for North America.
11     I don't have nearly as many questions for
12 you as Mr. Fisher does, but because I was not at
13 and my client was not involved in the lawsuit when
14 your deposition was first taken, there may be a
15 couple of things that I ask that are duplicative
16 and I apologize for that.
17     How long did Samuel Franke — well, strike
18 that.
19     When was Samuel Franke hired by Martin's
20 Bulk Milk?
21     A. I believe the term he was there was 1999
22 to 2008.
23     Q. Were you involved in his hiring?
24     A. Yes.

361

1     Q. What — back in 1999 what was the hiring
2 process for drivers in general and Mr. Franke in
3 particular?
4     A. We do a background check. We run the
5 MVRs. We check with his previous employers, check
6 the dates to see how long he had worked for the
7 previous employers.
8     Q. And the MVRs is to check his driving
9 record?
10     A. Yes.
11     Q. For moving violations and for accidents?
12     A. Yes.
13     Q. And the background check is his criminal
14 history and things of that nature?
15     A. Yes.
16     Q. And when you did that for Mr. Franke, what
17 did those reveal?
18     A. Sam's records were clean.
19     Q. Okay. And did you have a driver interview
20 before he was hired?
21     A. Say it again.
22     Q. Did you interview him before he was hired?
23     A. Yes.
24     Q. Who did that?

362

1     A. I did.
2     Q. And did you have an understanding for how
3 long Mr. Franke at that time had worked as a CDL
4 qualified driver?
5     A. Looking back on his — at his MVR we
6 should be able to tell how long he had his license.
7     Q. Feel free to look at what I believe is
8 Exhibit 71 for identification.
9     A. I'm looking for his MVR, which I have a
10 current one here but it only goes back to —
11     Q. Let me ask you — I don't need exact
12 numbers. So why don't I ask you a different
13 question.
14     Can you give me a ballpark figure as to
15 how long you understand Mr. Franke had been driving
16 as a truck driver before he was hired by your
17 company?
18     A. On his application he had — it looks like
19 he had been driving — the first driving job he had
20 was 11-98.
21     Q. So that would have been right before you
22 hired — within a year of you hiring him?
23     A. No. Then he's got — well, he's got
24 another job that was at a Dairy.

363

40 (Pages 360 to 363)

that, and there was some small flat rate charged?

A. Truck ordered, not used for $400.

Q. Okay. And that meant that -- or strike that.

Had a Martin's driver gone to International Paper and there was no load?

A. Yes.

Q. Okay. So in that instance -- or strike that.

You had no -- Martin's had no control over whether or not there was a pickup to be made, correct?

A. Correct.

Q. That was the decision of either -- of International Paper, apparently?

A. Correct.

Q. I'm going to switch topics on you, Mr. Martin, and ask you about a couple other topics. With respect to the trailer -- or excuse me.

With respect to the tractor that Samuel Franke was driving on this day, that tractor was owned by Martin's, correct?

A. Correct.

468

Q. When I say Martin's, is it owned by Martin's Bulk Milk Service?

A. Correct.

Q. And what business or entity had responsibility for performing the maintenance on that tractor?

A. Martin's Bulk Milk Service Incorporated.

Q. Did they also have responsibility for performing the annual inspections of the vehicle?

A. Yes.

Q. Did they have responsibility for performing inspections of the condition of the brakes on the tractor?

A. Yes.

Q. And did Martin's Bulk Milk Service in fact perform any repairs or maintenance on the tractor, including the brakes?

A. Yes.

Q. So Martin's didn't send it out to any other repair shop or maintenance shop for that work?

A. Correct, they did not.

Q. Did Martin's have personnel who were qualified under the Federal Motor Vehicle Safety

469

Administration provision to engage in inspection and repair of the brakes on the tractor?

A. Yes.

Q. Was that a particular person that did that work back in 2008?

A. It would have been Ryan Greene.

Q. And I know you mentioned his name earlier. What department did he work in?

A. In our shop in Wilton.

Q. When Mr. Franke picked up this tractor -- or strike that.

Mr. Franke drove a load from Wilton to somewhere down on 47th Street in Chicago, correct?

A. Correct.

Q. Where did he pickup that load at that morning?

A. Wilton, Wisconsin, our terminal.

Q. At the Martin's --

A. Yes.

Q. -- office? And prior to taking his tractor out on the road that day he had a responsibility to do a pre-trip inspection, correct?

A. Correct.

470

Q. And that pre-trip inspection would include checking the condition of the brakes on the tractor, correct?

A. Correct.

Q. And then he dropped that load -- or strike that.

Was that load already filled? Was that trailer already filled when he got it at Wilton?

A. Yes.

Q. Do you know what he took down there? Was it an actual trailer or was it a chassis with a box on it?

A. Chassis with a box. It was a CSX container. Actually, it was -- I'd have to pull the bill of lading. It was a container.

Q. A CSX container?

A. I don't know if it was a trailer owned by Hub or if it was owned by CSX.

Q. Was it Hallberg did you say?

A. No, it could have been a Hub trailer, H-u --

Q. Oh, okay. And then after Mr. Franke dropped that load, do you know if he picked up the chassis and box at the same yard where he

471

67 (Pages 468 to 471)

1  dropped --
2     A.  Yes.
3     Q.  -- where he dropped the trailer he brought
4  from Wilton?
5     A.  Yes.
6     Q.  Prior to departing on the road with the
7  chassis and box that he took to International Paper
8  Mr. Franke had a responsibility to do a pre-trip
9  inspection of the tractor and the trailer that he
10  had just picked up, correct?
11     MR. SKRYD:  Objection, form.  Go ahead.
12     THE WITNESS:  Correct.
13  BY MR. BURKE:
14     Q.  And that pre-trip inspection would include
15  inspecting the condition of the brakes both on the
16  tractor and on the trailer he just picked up,
17  correct?
18     A.  Well, he already did his pre-trip
19  inspection on his truck.  So at that time he should
20  do it on the trailer.
21     Q.  You know, there is -- take a look at
22  Exhibit 7, please.
23     You got that in front of you?
24     A.  Yes.
                                                   472

1     Q.  Okay.  I'll tell you what, maybe we should
2  change the tape and what I'm going to ask you is,
3  is there anything else or where did this come from
4  and are there any other maintenance records for the
5  tractor, okay?
6     THE VIDEOGRAPHER:  We are going off the
7  video record.  The time now is 7:05 p.m.
8     (A break was taken.)
9     THE VIDEOGRAPHER:  We are back on the
10  video record.  The time now is 7:09 p.m.
11  BY MR. BURKE:
12     Q.  Mr. Martin, before I ask you about that,
13  back to the issue of pre-trip inspections of brakes
14  on tractors and trailers.
15     Did you believe that Mr. Franke had the
16  experience to properly do a pre-trip inspection of
17  the brakes on both the tractor and trailer?
18     A.  Yes.
19     Q.  If brakes were out of adjustment, do you
20  believe Mr. Franke was capable of making that
21  determination?
22     A.  Yes.
23     Q.  And it would be Mr. Franke's
24  responsibility to determine if brakes were out of
                                                   473

1  adjustment prior to a trip, correct?
2     MR. SKRYD:  Objection, form.
3     THE WITNESS:  Correct.
4     MR. GOLDEN:  Did he finish his answer?
5  Because I want to talk to him.
6     THE VIDEOGRAPHER:  We're going off the
7  video record.  The time now is 7:10 p.m.
8     (A break was taken.)
9     THE VIDEOGRAPHER:  We're back on the video
10  record.  The time now is 7:16 p.m.
11  BY MR. BURKE:
12     Q.  Mr. Martin, I had just tendered to you
13  Exhibit No. 7.  That appears to be some list of
14  repairs performed on Tractor Number 139?
15     A.  Yes.
16     Q.  Is that what it is?
17     A.  Yes.
18     Q.  Do you know who prepared this list?
19     A.  I do not.
20     Q.  This appears to refer to some repairs
21  between the dates of April 11th, '08 and an
22  unspecified date in June of '08; is that correct?
23     A.  Yes.
24     Q.  Were any type of repairs performed on this
                                                   474

1  tractor at any time after this unspecified date in
2  June of '08 when the mileage was 261,061?
3     A.  I can't say.
4     Q.  Is there a logbook for the -- for repairs
5  and maintenance performed on the tractor that is
6  separate than this document?
7     A.  There are records kept track of any
8  maintenance that is done.
9     Q.  And what do those records consist of?  Are
10  they something different than this typewritten
11  sheet?
12     A.  I can't say.
13     Q.  Who keeps those records?
14     A.  An office person.
15     Q.  And in your office who would that be?
16     A.  April.
17     Q.  And what's her last name?
18     A.  Rueckheim.
19     Q.  Could you spell that for the court
20  reporter?
21     A.  R-u-e-c-k-h-e-i-m.
22     Q.  And who would fill out the records of
23  maintenance?
24     A.  The mechanics in our shop would turn them
                                                   475

68 (Pages 472 to 475)

1 in to her and she would record them.
2 Q. And report them to whom -- did you say
3 report or record?
4 A. Record.
5 Q. Okay. Sorry. And how would she record
6 them, on what type of document?
7 A. Some kind of spreadsheet, I believe.
8 Q. And to get the full maintenance history on
9 this tractor, what document would you ask her for?
10 A. I would ask to see if there's any repairs
11 that were done before and after. I don't know why
12 they started on April.
13 Q. But there would be some document that
14 exists other than this in which the mechanics would
15 make handwritten entries?
16 A. Yes.
17 Q. The mechanics don't type things into a
18 computer about maintenance or repairs, correct?
19 A. Correct.
20 Q. I believe you earlier told Mr. Couture in
21 response to some question that Mr. Franke caused
22 this collision; is that correct?
23 MR. SKRYD: Objection to the form.
24 THE WITNESS: Yes.

476

1 BY MR. BURKE:
2 Q. Okay. And it is true that Mr. Franke
3 caused this collision by driving into the back of
4 Mr. Scheinman's BMW, correct?
5 A. Correct.
6 Q. You got asked -- are you aware that this
7 vehicle caught on fire after the collision?
8 A. Yes.
9 Q. And it would be true that you do not have
10 an understanding as to whether or not there were
11 defects in the design of the BMW that resulted in
12 the spread of the fire or caused enhancement of the
13 injuries sustained by Mr. Scheinman; would that be
14 correct?
15 A. Correct.
16 Q. Have you watched what sometimes is
17 referred to as what is the squad car videotape of
18 the occurrence?
19 A. Yes.
20 Q. And did you see Mr. Franke in that tape?
21 A. I don't recall.
22 Q. You said you -- I believe you said you
23 made a call to find out how Mr. Scheinman was
24 earlier; is that correct?

477

1 A. Yes.
2 Q. Who did you call, Mr. Martin?
3 A. I called the Highland Police Department.
4 Q. Did you -- have you ever spoken to anybody
5 in the Scheinman family?
6 A. No.
7 Q. Have you seen a video of Mr. Scheinman or
8 any photographs of him after the injury?
9 A. Yes.
10 MR. BURKE: Okay. I don't think I have
11 anything else, Mr. Martin. Thank you for your
12 time.
13 REDIRECT EXAMINATION
14 BY MR. FISHER:
15 Q. It's back to me, Mr. Martin. Contained
16 within Exhibit 71 -- you don't need to get it --
17 there's a page that references Mr. Franke
18 acknowledging on March 30th, 2007 that he received
19 the company employee handbook and that he
20 understood its contents.
21 Can you tell me what the company employee
22 handbook is that Mr. Franke would have acknowledged
23 receipt of?
24 A. It's a handbook from our company but what

478

1 it all enlists I can't explain.
2 Q. Is this a handbook that Martin's Bulk Milk
3 prepared on its own or as is sometimes the case in
4 the transportation industry Martin's Bulk Milk got
5 a handbook from a company like J.J. Keller or some
6 other, you know, training materials company in the
7 transportation industry and you took it and maybe
8 adapted it in some way?
9 A. I believe it was designed with us and
10 through our insurance company H&I out of New
11 Berlin, Wisconsin.
12 Q. And is that a document you'd be able to
13 get your hands on and be able to produce to us?
14 A. Yes.
15 Q. Do you know whether or not within that
16 company employee handbook there's a section on safe
17 driving?
18 A. I do not.
19 Q. You expected, I take it, when Mr. Franke
20 or any other Martin's Bulk Milk driver went out on
21 the road, that that driver would abide by the rules
22 of the road?
23 A. Yes.
24 Q. Follow speed limits?

479

69 (Pages 476 to 479)

Page 480:

1    A.  Yes.
2    Q.  Travel safely and at reasonable speeds
3 depending upon the weather and traffic conditions?
4    A.  Yes.
5    Q.  You and Martin's Bulk Milk drivers like
6 Mr. Franke didn't need to be told that by anyone,
7 did you?
8    A.  No.
9    Q.  So the fact that there might be a
10 provision in a contract document saying that you're
11 supposed to follow the rules of the road, that
12 didn't come as new news to you, right?
13    A.  Correct.
14    Q.  And it wouldn't have come as new news to
15 Mr. Franke, would it?
16    A.  Correct.
17    Q.  With respect to the things about which
18 Mr. Burke talked to you and the things that I
19 talked to you about in terms of certain directions
20 or requirements or instructions that came from
21 Universal Am Can or International Paper, I want to
22 ask you specifically about whether or not any of
23 these conditions or events occurred with respect to
24 Mr. Franke, okay?

Page 481:

1    Did Mr. Franke have to keep in constant
2 contact, communication and contact, with anybody at
3 International Paper?
4    A.  No.
5    Q.  How about at Universal Am Can?
6    A.  Well, according to their document they
7 wanted contact every day.
8    Q.  Other than having a contact once a day --
9 by constant contact, I mean constant contact on the
10 hour, every hour, every half hour.  Was there any
11 of that type of expectation?
12    A.  No.
13    Q.  Mr. Franke did not have to ask about where
14 this load of paper products was to be picked up,
15 did he?
16    A.  No.
17    Q.  He knew exactly where the Midwest
18 Distribution Center of International Paper was in
19 Hammond, Indiana, correct?
20    A.  Correct.
21    Q.  He didn't have any fines that he had to be
22 concerned about when he was driving, did he?
23    A.  No.
24    Q.  That's a correct statement?

Page 482:

1    A.  Correct.
2    Q.  And would you have expected Mr. Franke as
3 you know him to be the type of driver that he would
4 have done absolutely anything in order to avoid
5 being late?
6    A.  Yes.
7    Q.  And by "anything" I mean break speed limit
8 laws, pass through stop signs, pass through
9 stoplights to make sure he got there on time.
10 Would you expect him to be willing to do anything
11 to get to a spot on time?
12    MR. SKRYD:  Objection, form of the
13 question.  You can answer.
14    THE WITNESS:  I would not expect that.
15 BY MR. FISHER:
16    Q.  And that's based upon your knowledge of
17 him as a driver?
18    A.  Yes.
19    Q.  And the expectations that Martin's Bulk
20 Milk Service had for its drivers?
21    A.  Correct.
22    Q.  Do you know whether or not Mr. Franke had
23 to call for directions to get to the intermodal
24 yard in Chicago?

Page 483:

1    A.  No.
2    Q.  Did he have to ask for directions to get
3 from the intermodal yard in Chicago to the Hammond
4 Distribution Center?
5    A.  No.
6    Q.  Did he have to call for directions to get
7 from the Hammond Distribution Center back to
8 Wilton, Wisconsin?
9    A.  No.
10    Q.  Is one of the reasons, perhaps, why
11 Mr. Franke chose Route 41 as opposed to going up
12 the interstate because there are tolls on the
13 interstate?
14    A.  No.  It was because it was shorter.
15    Q.  Shorter in terms of geographic distance or
16 shorter in terms of time?
17    A.  Miles.
18    Q.  So the fact that tolls would be charged on
19 a portion of the interstate highway system in
20 Illinois, that didn't have an impact upon in your
21 judgment Mr. Franke choosing 41 northbound?
22    A.  No.
23    Q.  Did Mr. Franke receive a direct deposit of
24 a check paying him for his share of this load from

International Paper or Universal Am Can?
   A. Yes.
   Q. Was the direct deposit a check from Universal Am Can?
   A. Oh, I'm sorry. No.
   Q. Okay. And he didn't receive a direct deposit check from International Paper, did he?
   A. No.
   Q. And other than the directions that he received on paperwork about where he was to pickup a load, when he was to pickup a load, and what the load would be, on July 3, 2008 were there any specific written directions he received concerning that load on July 3, 2008?
   A. No.
   Q. So the only three directions he received for the July 3, 2008 load were where to pick it up, when to pick it up and what it was?
   A. And where to take it.
   Q. I'm going to get there in a second because, see, he wasn't taking that load there, was he?
   A. No, back to Wilton. No.
   Q. But let me ask this. If the memo bill or

484

bill of lading had places where the delivery was to be made, three different places, three different loads in the Minneapolis/St. Paul area, right?
   A. Correct.
   Q. Mr. Franke already knew he was never going to make those deliveries at those three customers, correct?
   A. Correct.
   Q. So the fact that on the memo, bill of lading there's a destination place and some information about making those deliveries and times and appointment numbers, none of those directions had anything to do with what Mr. Franke was doing with respect to this load, fair statement?
   A. No, it wouldn't. He had a certain time that load had to be back. And on this night, it was a weekend. That load didn't have to be delivered until Monday.
   Q. But he was never going to make that delivery, correct?
   A. Correct.
   Q. So what he was going to do was -- since it's over a holiday weekend -- he was going to take this load with -- Strike that.

485

   He was going to take the trailer or, excuse me, he was going to take the container loaded with three different customer loads, take it as far as Wilton, drop it off and then enjoy the 4th of July weekend?
   A. Correct.
   Q. So the fact that the memo, bill of lading had information about directions where to take it, appointment times and all that, all that information meant nothing to Mr. Franke because he was never going to have to abide by any of those directions?
      MR. SKRYD: Objection, form.
BY MR. FISHER:
   Q. Fair statement?
   A. For that load only. For a weekend load only.
   Q. Right. But for any other load he never took it all -- he never went from Wilton up to Minneapolis/St. Paul if that was the destination, correct?
   A. Correct. But he had to make his deadline.
   Q. Mind you. But it wasn't much of a deadline, was it, because within the limits

486

provided for by hours of service regulations for the Federal Motor Carrier Safety Regulations, he could take his load, take his sweet time going all the way up to Wilton?
   A. Correct.
   Q. All right. Would you consider Martin's Bulk Milk Service to be a company that was pressing its employees to getting in as many miles as they could within hours?
   A. No.
   Q. Why -- I'm not suggesting it's not the case, but why wasn't that the case?
   A. That was a dedicated run; he knew what he was doing every day. He would turn 530 to 40 miles every day, which is legal under the 11-hour day.
   Q. Okay. Different topic.
      MR. SKRYD: You said legal, right?
      THE WITNESS: Yes, legal.
BY MR. FISHER:
   Q. Different topic. Remember we had some questions before about DOT numbers and motor carrier numbers and all that?
   A. Yes.
   Q. And on some of the documentation it

487

71 (Pages 484 to 487)

**Page 488**

1 appears that Martin's Bulk Milk Service, Inc.'s
2 number -- DOT numbers as a carrier was 222274 and
3 its motor carrier number was 172816?
4    A. That's correct.
5    Q. Okay. I looked at some other documents I
6 had. Does -- do you know whether or not Martin's
7 Bulk Milk Service's broker DOT number is 2247062?
8    A. That one is a new one just this last
9 year. So I do not know.
10    Q. And how about the motor carrier number for
11 Martin's Bulk Milk as a broker which is 718233?
12    A. I don't know that one.
13    Q. Why does the Department of Transportation
14 have numbers like these assigned to different
15 carriers or to different brokers, do you know?
16    MR. SKRYD: Object as to form.
17    THE WITNESS: To keep track of each entity
18 that is moving freight.
19 BY MR. FISHER:
20    Q. And how does the Federal Motor Carrier
21 Safety Admission keep track of companies with these
22 numbers?
23    MR. SKRYD: Same objection, form,
24 foundation.

**Page 489**

1    THE WITNESS: Through the CSA and whatever
2 it was before the CSA it was --
3 BY MR. FISHER:
4    Q. Safer?
5    A. Yes. Thank you.
6    Q. Safe Step?
7    A. Yes.
8    Q. Now, before 2010, before CSA 2010 came
9 into existence, is it fair to say that Martin's
10 Bulk Milk Service as a carrier had satisfactory
11 ratings?
12    A. Yes. There was a time that -- there was a
13 time where we weren't satisfactory.
14    Q. Was that back in the early 2000s?
15    A. Yes, I believe so.
16    Q. But from the mid 2000s, 2004 to be
17 specific, onward did Martin's Bulk Milk Service
18 have satisfactory safer ratings?
19    A. I believe so.
20    Q. And, in fact, nowadays does Martin's Bulk
21 Milk Service under the CSA system have a
22 satisfactory rating?
23    A. Yes.
24    Q. Would you look at Exhibit 12. Right

**Page 490**

1 there. I'm sorry, Exhibit 1, Page 12.
2    MR. SKRYD: All the way back to the
3 beginning.
4    MR. FISHER: Sorry about that.
5    MR. SKRYD: Page 12 of Exhibit 1. Go to
6 Page 12.
7 BY MR. FISHER:
8    Q. It's a loading sheet. I think Mr. Burke
9 focused your attention on it for a second or so.
10    Now, this loading sheet that has all kinds
11 of information on it, do you recognize the
12 handwriting of anybody other than Mr. Franke?
13    A. No.
14    Q. So Mr. Franke's signature appears in the
15 bottom right-hand corner, right?
16    A. Yes.
17    Q. Did you ever meet or could identify the
18 loader at the Hammond Distribution Center whose
19 scratched signature appears underneath Mr. Franke's
20 signature?
21    A. No.
22    Q. With respect to this loading, based upon
23 your experience in the trucking industry and
24 knowing what the poundage was of these various

**Page 491**

1 loads and that the numbers for the various loads is
2 depicted in that loading diagram, does that appear
3 to you to be a fairly good, tightly knit loading
4 pattern for paper products?
5    A. It looks okay to me.
6    Q. Do you have any information to suggest
7 that during the course of this accident on July
8 3rd, 2008 there was any shifting of cargo within
9 the trailer?
10    A. There --
11    Q. Let me be more specific. That there was
12 any shifting of cargo that resulted in the accident
13 as opposed to a shifting of cargo as a result of
14 the accident?
15    A. I can't answer it. All I know is that the
16 front of the trailer is pushed out.
17    Q. And that could have been because with
18 deceleration the cargo moved forward, correct?
19    A. Something might have shifted.
20    Q. All right. Remember Mr. Burke and I
21 showed you the contract documents that your company
22 produced that had single signatures on some of them
23 and double signatures on others?
24    A. Uh-huh.

72 (Pages 488 to 491)

Q. Yes?
A. Yes.
Q. Okay. And there was one that he addressed your attention to that had to do with compliance with laws or regulations, all that, right?
A. Yes.
Q. Now, you didn't write that particular provision, did you?
A. No.
Q. And you have no idea what was meant by the person who wrote that provision, do you? Is that a fair statement?
A. If I can see what it is.
Q. Sure. Rather than have you dig all the way through there, why don't you look at -- it's Subparagraph 3 of Exhibit 16.
A. You're asking if I had anything to do with the writing of it?
Q. Well, I think you confirmed for me you had nothing to do with the writing.
A. Correct.
Q. All right. But looking at the provision in Subparagraph 3 where there's a phrase or clause that deals with regulations, laws, et cetera, if

492

you'd just take a look at that and then I have a follow-up question.
MR. BURKE: Is that the June --
MR. FISHER: 2008 agreement.
THE WITNESS: Okay.
MR. BURKE: Carl, sorry to interrupt you, but I think you have given him Exhibit 16 and I had asked him about Exhibit 75.
MR. FISHER: Same document.
MR. BURKE: And it may be, and it well may be, you know, I'm just pointing that out because it wasn't the one I had tendered to him nor that you had earlier.
BY MR. FISHER:
Q. Okay. So with respect to that Subparagraph 3 of the June 12th, 2008 dated contract, is it fair to say you have no idea what was meant by the author of that paragraph on the provisions in Subparagraph 3 pertaining to applicable laws and regulations? Is that a fair statement?
A. Yes.
Q. Okay. Now, I want to make sure I understand because I'm a little bit confused from

493

your answers to my questions and your answers to Mr. Burke's questions.
Is it your contention that the contracts I showed you that came from your company's files and the one or two contracts that came from my company -- my client's files, that a contract that doesn't have two signatures on, do you know whether or not that contract is in application or do you not know if that contract is in application?
A. I do not know if it's in application.
Q. So when you were asked a lot of questions by Mr. Burke as to whether or not a particular provision applied to a particular set of circumstances and it's a contract that only had one signature, you were not meaning to suggest, were you, that that particular contract provision applied to this situation on July 3, 2008, were you?
A. You lost me.
Q. Sure. If the contract doesn't have two sets of signatures on it, is it your testimony that such a contract of the five or six contracts we've shown you today, is it your testimony you have absolutely no idea if that contract was in

494

application to the load that was being transported on July 3, 2008?
A. Yes.
Q. Okay. So if Mr. Burke asked you questions about one of those contracts that did not have a dual set of signatures, two signatures, were you meaning to suggest that the language on such a contract which only had one signature applied to July 3, 2008 or is it your testimony you don't know?
A. I do not know.
Q. So if you testified before in response to Mr. Burke's questions that a particular provision in a contract document that only had one signature and that the language in that contract applied to a particular set of circumstances, are you willing to agree with me that that testimony was in error?
MR. BURKE: Objection, vagueness, form of the question.
MR. SKRYD: Yes, I'll object as to form and the way it was asked by Mr. Burke was a little bit different than the way you're asking it. It's a long question. Do you want it read back?
THE WITNESS: Yeah. I don't really

495

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  understand it.
2  BY MR. FISHER:
3      Q.  I'm going to withdraw the question and ask
4  it a different way.
5      If I right now put before you a contract
6  among the five or six contract documents in the
7  documents we produced and have been talking about
8  for many hours today, and if you looked at the last
9  page and saw it only had one signature on it, would
10 you be willing to tell me that a particular
11 provision in that contract with only one signature
12 has application to the events of July 3, 2008 or
13 would you instead say, you know, Mr. Fisher, I'm
14 sorry, I don't even know if this contract applies
15 and, thus, I can't answer your question?
16     A.  I don't know if the contract applies so I
17 can't answer.
18     Q.  Okay.  So if you were asked questions
19 about a contract document that only had one
20 signature on it by Mr. Burke and you gave all kinds
21 of testimony about that particular provision and
22 how it applied to the events of July 3, 2008, are
23 you willing at this time in light of the answer you
24 just gave me to the last question to state to us
                                                    496

1  that your testimony in response to Mr. Burke's
2  questions was in error and you are withdrawing it?
3      MR. BURKE:  Objection, form.
4      MR. SKRYD:  Well, I'll object to the form
5  because it can be hypothetical the way he asked it,
6  which is what I understood, but you can answer it
7  if you understand.
8      THE WITNESS:  I'm still lost.
9  BY MR. FISHER:
10     Q.  Okay.  Then we're going to take you
11 through all the contracts.  Do you have Exhibit 72
12 through 75 available?  And let's look first to
13 Exhibit 72.
14     MR. SKRYD:  We have 72 through 75.
15     MR. FISHER:  So let's take them one at a
16 time.
17     MR. SKRYD:  Hold on a second.  72 through
18 75.
19     MR. FISHER:  We're going to take them one
20 at a time.  Exhibit 72.
21     MR. SKRYD:  72.  Here you go.
22 BY MR. FISHER:
23     Q.  Okay.  Mr. Martin, I'm showing you what's
24 been marked as Exhibit 72.  I'll represent to you
                                                    497

1  this is a document that came out of your company's
2  files.
3      In light of the fact that this contract
4  has a date of September 5th, 2002 and has
5  signatures from two different parties, one, your
6  company, Martin's Bulk Milk, and the other party
7  Overnite Logistics, but given its date are you able
8  to tell me whether or not any of the provisions of
9  this two-page contract applied to the July 3, 2008
10 events?
11     A.  Yes.
12     Q.  And what is your answer?
13     A.  It applied.
14     Q.  Okay.  And why did it apply?
15     A.  Because it's signed.
16     Q.  And is that notwithstanding the fact that
17 at Exhibit seventy -- that's fine.  Let's move on
18 to Exhibit 73.
19     Exhibit 73 is a two-page document,
20 correct?
21     A.  Yes.
22     Q.  It only has one signature, correct?
23     A.  Correct.
24     Q.  And is it your testimony, as I understand
                                                    498

1  it from a few minutes ago, that if the contract
2  document only has one signature, your conclusion is
3  that you do not know if this particular contract
4  has application to the events of July 3, 2008; is
5  that a fair statement?
6      A.  Yes.
7      Q.  Okay.  Let's move on to Exhibit 74.
8      Would you agree with me that Exhibit 74 is
9  a contract between Overnite Logistics or Overnite
10 Express and Martin's Bulk Milk dated July 21st,
11 2005 and it has signatures from both someone of
12 Martin's Bulk Milk and a signature from Overnite
13 Logistics?
14     A.  Yes.
15     Q.  Do you believe, sir, that this particular
16 contract has application to the events of July 3,
17 2008?
18     A.  Yes.
19     Q.  And does that mean then, if you look back
20 at Exhibit 72, that the September 5th, 2002
21 contract no longer has application to the events of
22 July 3, 2008 because it has been superseded or
23 replaced by the contract marked as Exhibit 74?
24     MR. SKRYD:  If you know.
                                                    499

74 (Pages 496 to 499)

1  THE WITNESS: Yes.
2  BY MR. FISHER:
3  Q. Okay. Let's look at now exhibit --
4  MR. SKRYD: 75?
5  MR. FISHER: No. Exhibit 15. Here's a
6  handy copy of Exhibit 15.
7  BY MR. FISHER:
8  Q. Would you agree with me that Exhibit 15 is
9  a Universal Am Can Limited Master Brokerage
10  Agreement dated November 7, 2007 and, yet, on its
11  third page it only has a signature from one person
12  and that is Pat Podiena of Martin's Bulk Milk?
13  A. Yes.
14  Q. And is it your testimony, consistent with
15  what you said before, that you have no idea whether
16  or not this particular contract has application to
17  the events of July 3, 2008?
18  A. Correct.
19  Q. So any questions -- Strike that.
20  Any answers you may have given to any of
21  the provisions contained in this contract earlier
22  in this deposition which might be construed as
23  meaning that you were saying it had application to
24  the events of July 3, 2008, would such statements
                                                    500

1  or inferences be incorrect?
2  A. Yes. It goes back to this contract.
3  Q. Okay. And by that you mean it goes back
4  to the Overnite --
5  A. Yes.
6  Q. -- Logistics contract, correct?
7  A. Yes.
8  Q. And, therefore, any language that's
9  contained in your opinion -- Strike that.
10  And, therefore, in your opinion any
11  language contained in Exhibit 15, the November 7,
12  2007 Master Brokerage Agreement from Universal Am
13  Can, this document has no application to the events
14  of July 3, 2008?
15  A. Yes.
16  Q. And then, finally, if you look at Exhibit
17  75 --
18  MR. SKRYD: This is back to you, Carl.
19  MR. FISHER: Thank you.
20  BY MR. FISHER:
21  Q. And, finally, on Exhibit 75 you'll agree
22  with me, will you not, that just like the last
23  Universal Am Can titled document I showed you, this
24  is a brokerage agreement that has the signature of
                                                    501

1  only one party and that's Martin's Bulk Milk?
2  A. Yes.
3  Q. And you have no idea whether or not this
4  particular contract has any application to the
5  events of July 3, 2008, fair statement?
6  A. Yes.
7  Q. Okay. And, therefore, any statement you
8  may have made earlier in your deposition concerning
9  application of the language contained in this
10  exhibit, you would be willing to withdraw because
11  those would have been inaccurate statements in
12  light of the statements you've made in the last
13  five minutes?
14  MR. BURKE: Objection --
15  THE WITNESS: Yes.
16  MR. BURKE: -- form.
17  BY MR. FISHER:
18  Q. You can repeat your answer.
19  A. Yes.
20  Q. Thank you. Does your company use Federal
21  Express or UPS?
22  A. Yes.
23  Q. Tell me the circumstances in which you use
24  Federal Express or UPS.
                                                    502

1  A. When our drivers that live away from home
2  or that live out west, that run out of our west
3  terminal, will send their paperwork back to our
4  company.
5  Q. By "west terminal" you mean out in Utah?
6  A. Yes.
7  Q. Okay. So is that where you send something
8  to them or they send something to you?
9  A. They send something to us.
10  Q. Okay, I'm looking for the opposite. Are
11  there circumstances in which your company in
12  Wilton, Wisconsin uses FedEx or UPS to send
13  packages or communications elsewhere?
14  A. We have.
15  Q. And on those occasions did you consider,
16  sir, the drivers employed by FedEx or UPS to be
17  your agents?
18  A. Yes. They perform a service for us.
19  Q. So that when a UPS driver gets involved in
20  an accident delivering your piece of paper in an
21  envelope, your company is responsible for that UPS
22  driver's negligence?
23  MR. SKRYD: Objection, form.
24  THE WITNESS: Not responsible but we can
                                                    503

75 (Pages 500 to 503)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois (312) 263-0052**

1  be brought in.
2  BY MR. FISHER:
3     Q.  That might very well be the case.  Anybody
4  can be sued.  But do you think that that UPS
5  driver -- you're responsible for that UPS driver's
6  negligence?
7       MR. SKRYD:  Objection, form.
8       THE WITNESS:  No.
9  BY MR. FISHER:
10     Q.  Why don't you think that your company is
11  responsible for that UPS driver's negligence?
12       MR. SKRYD:  Same objection, form.
13       THE WITNESS:  For one thing the guy is
14  not -- he's not driving a truckload.
15  BY MR. FISHER:
16     Q.  Okay.  Any other reason?
17     A.  No.
18     Q.  So you think -- well, strike that.
19  Different topic.  Who was driving at the time of
20  this accident?
21     A.  Sam Franke.
22     Q.  And it's only Samuel Franke's actions in
23  driving that day in your judgment that has brought
24  us together here for this lawsuit, fair statement?

504

RECROSS EXAMINATION
BY MR. COUTURE:
1     Q.  In that same line, sir, when Mr. Franke
2  was driving northbound on 41 at the time of this
3  accident, he was doing so as an employee of
4  Martin's Bulk Milk?
5     A.  Yes.
6     Q.  It's a legal term but I'll ask you.  Was
7  he in the course of his employment at the time of
8  the accident?
9     A.  Yes.
10     Q.  Was he within the scope of his employment
11  at the time of the accident?
12     A.  Yes.
13     Q.  Does Martin's Bulk Milk -- did they do an
14  internal accident report from this occurrence?
15     A.  No.  We just attached the police report to
16  his file.
17     Q.  Okay.  So you don't have any form
18  documents from Martin's Bulk Milk other than the
19  Highland Park Police Department to document this
20  occurrence?
21     A.  Yes.
22     Q.  Counsel asked you a question about the

506

1       MR. BURKE:  Objection, form.
2       MR. SKRYD:  Same objection, form.
3  BY MR. FISHER:
4     Q.  You can go ahead and answer.
5     A.  There could have been other scenarios that
6  I don't know about.  I wasn't there.
7     Q.  Okay.  I'm not talking about any other
8  drivers that may have been involved there at the
9  time.  I'm talking about any other entities, okay.
10  My question to you is -- and let me rephrase my
11  question.
12       Samuel Franke was driving?
13     A.  Yes.
14     Q.  Martin's Bulk Milk Service has been sued
15  alleging that it is responsible for the actions of
16  its own employee Samuel Franke?
17     A.  Yes.
18     Q.  All right.  And you have not been sued in
19  this lawsuit, have you, for anything other than the
20  actions of Mr. Franke, fair statement?
21     A.  Yes.
22       MR. FISHER:  That's all I have.  Thanks.
23       MR. COUTURE:  A couple more.

505

1  employment handbook.  And I know you don't have it
2  in front of you so you don't know the specifics of
3  it, but can you tell me, sir, does that handbook
4  tell employees a procedure or policy on steps to
5  take if they're involved in an accident?
6     A.  I can't answer that.  I don't know.
7     Q.  Let me ask you a more basic question.  I
8  understand you said you don't know if the employee
9  handbook discusses safety and you don't know if the
10  handbook discusses steps to take with regard --
11  after an accident.
12       Can you tell me what it does include?
13     A.  I'm sorry, I can't.
14     Q.  I'm going to show you what was included in
15  Exhibit No. 28 for identification, Pages 42, 43 and
16  44.  Have you ever seen that before, sir?
17       MR. SKRYD:  Can I see it for a second?
18  I'm not quite sure --
19       MR. COUTURE:  I have an extra copy.
20       MR. SKRYD:  Okay.  Got you.  I know what
21  it is.
22  BY MR. COUTURE:
23     Q.  Have you ever seen that before?
24     A.  If I have, it's been a while back.

507

76 (Pages 504 to 507)

1 Q. Have you ever seen a document like this
2 from a state police organization laying out
3 asserted violations of a trucking company?
4 A. Yes.
5 Q. All right. By this document, pages --
6 let's specifically talk about 42 of Exhibit 28.
7 Am I correct that this document is from
8 the Illinois State Police Commercial Vehicle
9 Section addressing the tractor and container and
10 chassis Mr. Franke was driving and hauling on the
11 day of this occurrence?
12 A. Yes.
13 Q. All right. And it addresses the brake
14 adjustment issue that you've already told us about
15 today, right?
16 A. Yes.
17 Q. I want to go a little further down. It
18 includes, along with the brake adjustment issue, an
19 inoperable required lamp on the tractor. Do you
20 see that under the violation section, the first
21 one?
22 A. Yes.
23 Q. And under crash it says "N." Am I correct
24 to understand that that's indicative of the fact
                                                    508

1 police are indicating that they believe it's not
2 caused by the accident by the letter "N" under
3 crash?
4 A. Does it say whether it's the truck or the
5 trailer?
6 Q. Well, Unit 1 is the truck. So we have an
7 inoperable lamp on the first citation for the
8 tractor.
9 A. Okay.
10 Q. The second citation, inoperable lamp, is
11 Unit 2 which is designated above as the container
12 or the trailer.
13 A. Correct.
14 Q. Okay. So am I correct that it would
15 appear that the State Police have cited this
16 vehicle for an inoperable lamp on the trailer as
17 well?
18 A. I think that the police could have made a
19 mistake on this from when the car hit -- when the
20 truck hit the car, it could have knocked it out.
21 Q. Do you know?
22 A. Do I know? No.
23 Q. All right. Because later on, in fact the
24 last citation, does indicate crash, the letter "Y"
                                                    510

1 that the inoperable required lamp for the first
2 citation was not related to the car accident?
3 A. Yes.
4 Q. Okay. Do you know where that lamp was?
5 A. I do not.
6 Q. Do you know if that inoperable lamp played
7 any role in this accident?
8 A. I do not.
9 Q. Would an inoperable lamp be something that
10 Mr. Franke should have seen in a pre-trip
11 inspection?
12 A. Yes.
13 Q. Okay. Let's go to the second one.
14 There's another inoperable lamp citation, correct?
15 The second one down?
16 A. Yes.
17 Q. Would your answers be the same that it
18 indicates it's not related to the accident?
19 A. Well, I wasn't at the accident. I can't
20 tell if something knocked the light out.
21 Q. I appreciate that. Your understanding of
22 these documents which you've seen before as the
23 operations manager of a trucking company would
24 indicate, would it not, however, that the state
                                                    509

1 and addresses damage, including headlights and side
2 lights of tractor as a result of the accident; is
3 that correct?
4 A. Yes.
5 Q. Okay. But the two inoperable lamps, the
6 brake adjustment that we've already discussed, the
7 inadequate brakes for safe stopping and the failure
8 to prevent cargo shifting, at least according to
9 the Illinois State Police, as you understand it as
10 the operations manager of a trucking company, are
11 indicated to be not caused by the accident?
12 A. I cannot -- I can't say.
13 Q. Have you seen these documents?
14 A. Yes.
15 Q. Do you understand that's what they mean?
16 A. Yes, but that's what the police say and I
17 might have a totally different opinion on what
18 happened.
19 Q. I appreciate what you're saying. I'm not
20 asking you to confirm that the police are always
21 accurate or in this document are accurate. I just
22 want to confirm that that's what they said.
23 A. That's what they said.
24 Q. Did Martin's Bulk Milk have to pay any
                                                    511

77 (Pages 508 to 511)

fine as a result of these violations?

A. No.

Q. Did they have to specifically repair these violations and have a signature by the -- well, strike that.

This vehicle is not yet back on the road, correct?

A. Correct.

Q. If it were to be back on the road, these items would have to be repaired?

A. Yes.

MR. COUTURE: That's all I have, sir.

MR. BURKE: Just a very few.

RECROSS EXAMINATION

BY MR. BURKE:

Q. Do you have 75 in front of you? Mr. Martin, if I could direct your attention to Paragraph 3 of Exhibit 75 which is the June 12th, 2008 Universal Master Brokerage Agreement which is unsigned.

Do you remember Mr. Fisher asking you about the phraseology complying with all Federal, state and local laws regarding the transportation services in this agreement?

512

A. Yes.

Q. And I believe you told him you didn't know everything -- you didn't know what the author meant by that, correct?

A. Correct.

Q. However, in reality, you have seen this phrase before, correct, used in different contracts in your business?

A. Yes.

Q. And certainly compliance with state and local traffic laws is one of the things that you expect is included within the meaning of that phrase, correct?

A. Yes.

MR. FISHER: Form, foundation.

BY MR. BURKE:

Q. And you know that even if you don't know everything that the author intended by that phrase, correct?

A. Correct.

Q. You know, you got asked again by Mr. Fisher about these contracts, some of which are unsigned. Do you remember that topic?

A. Yes.

513

Q. Now, when I was asking you questions about various provisions of different contracts, whether or not those contracts were signed, your testimony about what those provisions meant to you was in fact true and accurate, correct?

A. Yes.

Q. And with respect to a contract that has not been signed, I believe you said you would not deem that to be applicable to this occurrence; is that correct?

A. Correct.

Q. Therefore, in an unsigned contract it would be true that any provision about the carrier being an independent contractor would also not be applicable, correct?

A. Correct.

Q. Okay. And any provisions in an unsigned contract relating to Martin's having a responsibility to indemnify Universal or Overnite Express would not be applicable, correct?

A. Correct.

Q. And, you know, you got asked about what brought us together here. And on July 3rd, 2008 it was the working relationship you had with -- that

514

Martin's had with Overnite Express and Universal that brought Martin's and Mr. Franke together with International Paper to pickup that load, correct?

A. Correct.

Q. You know, you got asked by Mr. Fisher again about three written directions on the bills of lading or the broker confirmation sheet. Do you remember that?

A. Yes.

Q. But, as you told us earlier, in these various contracts there were other requirements set forth by Universal and/or Overnite Express with respect to the type of equipment and compliance with local and state and Federal laws and other things, correct?

A. Yes.

MR. FISHER: Form.

BY MR. BURKE:

Q. And then, lastly, you got asked whether Mr. Franke got paid by -- directly by Universal Am Can and I think your answer was no, correct?

A. Correct.

Q. However, Martin's got paid directly from Universal Am Can, correct?

515

78 (Pages 512 to 515)

1   A.   Correct.
2        MR. BURKE:  Nothing else, sir.
3        MR. SKRYD:  Give me 30 seconds.  I just
4   want to talk to Bob real quick.
5        THE VIDEOGRAPHER:  We're going off the
6   video record.  The time now is 8:11 p.m.
7        MR. SKRYD:  Reserve signature.
8             (AND FURTHER DEPONENT SAITH
9             NAUGHT.)

516

1   STATE OF ILLINOIS  )
2                      )  SS:
3   COUNTY OF DUPAGE   )
4        I, CHERI LEBEAU DUBINA, a Notary Public within
5   and for the County of DuPage and State of Illinois,
6   do hereby certify that heretofore, to-wit, on the
7   20th day of February, 2012, personally appeared
8   before me DAVID V. MARTIN, a witness in a certain
9   cause now pending and undetermined in the United
10  States District Court for the Northern District of
11  Illinois, Eastern Division, wherein Murray
12  Scheinman is the Plaintiff and Martin's Bulk Milk
13  Service, Inc., et al. are the Defendants.
14       I further certify that the said DAVID V. MARTIN
15  was by me first duly sworn to testify the truth,
16  the whole truth, and nothing but the truth in the
17  cause aforesaid; that the testimony then given by
18  said witness was reported stenographically by me in
19  the presence of said witness and afterwards reduced
20  to writing, and the foregoing is a true and
21  complete transcript of the testimony so given by
22  said witness as aforesaid.
23       I further certify that the signature to the
24  foregoing deposition was reserved by counsel for

518

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
3             EASTERN DIVISION
4   MURRAY SCHEINMAN,        )
5        Plaintiff,          )
6        vs.                 )  No. 09 CV 5340
7   MARTIN'S BULK MILK SERVICE, )
8   INC., et al.,            )
9        Defendants.         )
10       This is to certify that I have read the
11  transcript of my deposition taken in the
12  above-entitled cause by Cheri LeBeau Dubina,
13  Certified Shorthand Reporter, on February 20, 2012,
14  and that the foregoing transcript accurately states
15  the questions asked and the answers given by me as
16  they now appear.
17  _____
18            DAVID V. MARTIN
19
20  SUBSCRIBED AND SWORN TO
21  before me this _____ day
22  of _____ 2012.
23  _____
24    Notary Public

517

1   the respective parties.
2        I further certify that the taking of this
3   deposition was pursuant to Notice, and that there
4   were present at the taking of said deposition the
5   appearances heretofore noted.
6        I further certify that I am not counsel for nor
7   in any way related to any of the parties to this
8   suit, nor am I in any way interested in the outcome
9   thereof.
10       IN TESTIMONY WHEREOF:  I do hereunto set my
11  hand and affix my notarial seal this 5th day of
12  March, 2012.
13
14
15
16
17
18  _____
    NOTARY PUBLIC, DUPAGE COUNTY, ILLINOIS

519

79 (Pages 516 to 519)

**MC CORKLE LITIGATION SERVICES**
200 North LaSalle Street
Suite 2900
Chicago, Illinois 60601-2956

March 5, 2012

Mulherin, Rehfeldt & Varchetto, P.C.
Mr. Joseph G. Skryd
211 S. Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
IN RE: Scheinman vs. Martin's Bulk Milk Service
COURT NUMBER: 09 CV 5340
DATE TAKEN: February 20, 2012
DEPONENT: Mr. David V. Martin

Dear Mr. Skryd:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause. Also enclosed are additional signature
pages, if applicable, and errata sheets.
Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature. All changes or corrections must be
made on the errata sheets, not on the transcript
itself. All errata sheets should be signed and all
signature pages need to be signed and notarized.

After the deponent has completed the above, please
return all signature pages and errata sheets to me
at the above address, and I will handle
distribution to the respective parties.
If you have any questions, please call me at
(312) 263-0052.

Sincerely,

Margaret Setina        Court Reporter:
Signature Department
cc:  Mr. Carlton D. Fisher
     Mr. Timothy R. Couture
     Mr. Richard F. Burke, Jr.

520

80 (Page 520)

Q. Okay. Well, you told me you hired him around 1999. So I'm trying to figure out what his history was before he got to you. And I'll ask him that tomorrow but I just want to know what you know about that.

A. Okay. On his application it shows we hired him in 11-98 -- in 11-98. At that time we might have only needed a year's experience.

Q. Okay. Do you have an understanding as to where Mr. Franke had first been trained as a driver --

A. Yes. He --

Q. -- for tractor-trailers?

A. -- worked for MS Carriers. And, actually, he had done some of the same loads through MS that he had done -- was doing for us.

Q. MS Carriers, what company is that?

A. Based out of Memphis, Tennessee.

Q. Okay. So it's an over-the-road trucking company?

A. Yes.

Q. That you were familiar with at the time that you hired Mr. Franke?

A. I know the company.

364

Q. And you had a background check that included calling them to ask them what type of employee he was?

A. Yes.

Q. Other than a road test and the background and MVR and the face-to-face interview, did you do anything else to evaluate Mr. Franke's qualifications to drive for your company?

A. I want to make sure that he's up-to-date with paperwork as far as for his logbook and filling out our day-to-day paperwork.

Q. You trained him how to do your paperwork?

A. Yes.

Q. Logbooks are pretty standard, correct?

A. Yes.

Q. But as far as actual truck driving training, did Martin's Bulk Milk provide any truck driving training to Mr. Franke?

A. No.

Q. He already had that training when he got to you?

A. Yes.

Q. In the approximately ten years that Mr. Franke was an employee at Martin's before this

365

accident are you aware whether he had any other vehicle accidents?

A. No, he did not.

Q. And are you aware if he had any moving violations while he was employed by your company?

A. No, he did not.

Q. Was he ever disciplined by Martin's for any reason?

A. No.

Q. Was he ever the subject of any complaints by any Martin's customers?

A. No.

Q. Now, just so I'm clear, Martin's Bulk Milk is a hauler, they drive trucks for other people, correct?

A. We're an over-the-road carrier.

Q. All right. Do they -- the name implies milk. Do you guys actually do any dairy work or is that just where the company began and you keep that as an homage to what you used to do?

A. That's how we started out --

Q. Okay.

A. -- and, ironically, now we still haul milk but it's in a different capacity. We had tankers

366

at one time but now we haul packaged milk.

Q. And that's ironic because that's in your name but it's not actually -- your business is not a milk business?

A. Correct.

Q. When Mr. Franke was first hired at Martin's, how was his pay determined?

A. By the mile.

Q. At the time of this accident in July of 2008 what was his per mile rate?

MR. SKRYD: Maybe it's in here. Pay stubs?

THE WITNESS: Yes. These aren't it. Here I go. I don't have a week-to-week one in there, which I should have, though.

All I have is the ones that show year-to-date. I don't have any breakdown from week-to-week. I don't know why.

BY MR. COUTURE:

Q. I believe I saw when he was hired it was 32 cents a mile. Did that change over the ten years?

A. It would go up each year some. And we're at 38 cents a mile now.

367

41 (Pages 364 to 367)

1    Q.  All right. Do you know what it was in
2 July of 2008?
3    A.  If I was thinking right, around 35 cents a
4 mile.
5    Q.  Okay. So if he had to stop or he was at a
6 facility, such as the Exel facility in Hammond
7 loading, waiting for them to load his truck, he
8 wouldn't be paid anything for that?
9    A.  Yes. He got paid $15 for the pickup of
10 that load.
11    Q.  $15 flat?
12    A.  Yes.
13    Q.  No matter how long it took?
14    A.  Yes.
15    Q.  Okay. So as of the date of this
16 occurrence he was making somewhere around 35 cents
17 a mile, $15 for every pickup?
18    A.  Yes.
19    Q.  Does he get paid for a drop off?
20    A.  No.
21    Q.  So, for example, on the day of this
22 occurrence, I understand that he made a drop off at
23 the CSX yard on 47th Street and then drove to
24 Hammond?

368

1    A.  Correct.
2    Q.  So for that, other than the miles, the
3 only pay that he would get is the $15 for the
4 pickup?
5    A.  Yes.
6    Q.  At the first deposition both you and
7 Mr. Franke indicated -- well, strike that. I'll
8 just talk about you.
9    You indicated that Martin's Bulk Milk
10 Service dictated the route driven by Mr. Franke; is
11 that true?
12    A.  To a certain extent.
13    Q.  Okay. Can you explain what you mean by
14 that?
15    A.  He gets paid to run the shortest route.
16    Q.  He does?
17    A.  Yes.
18    Q.  All right. As you sit here today do you
19 know the route that Mr. Franke took from Hammond,
20 Indiana to Wilton on July 2nd, 2008?
21    And I don't need you to tell me when he
22 turns out of the Hammond, Indiana plant, how he
23 gets to the expressway but just --
24    A.  He would have ran I94 up to Highway 41.

369

1    Q.  Okay. Now, if he would have stayed on 94,
2 he would have ended up -- well, strike that. Let
3 me ask you this.
4    You say that he would have taken 94 to
5 Highway 41 and then he would have gotten back on 94
6 in Wisconsin, right?
7    A.  Yes.
8    Q.  Did Martin's Bulk Milk dictate that he
9 exit 94, take 41 for that last stretch in Illinois
10 before getting back on to 94?
11    A.  No.
12    Q.  Who made that decision?
13    A.  Sam.
14    Q.  Were you aware on July 2nd, 2008 that that
15 was the route that Sam took whenever he took the
16 route from Hammond to Wilton?
17    A.  I wasn't aware.
18    Q.  When did you first become aware of that?
19    A.  Somewhere in some conversation with Sam
20 when he got back.
21    Q.  I'll show you what was marked as Martin
22 Exhibit 17 previously. As I understand it, this
23 document was completed by Mr. Franke on a
24 day-to-day basis to explain what route -- highways

370

1 he took and what his odometer readings at each
2 state, true?
3    A.  Yes.
4    Q.  And this Exhibit 17 starts 7-1-08 and goes
5 through the day of the accident, correct?
6    A.  Yes.
7    Q.  All right. And am I correct that on the
8 1st and the 2nd and the 3rd it's consistent that
9 Mr. Franke exited 94, got on 41, drove a stretch to
10 41, and then got back on 94?
11    A.  Yes.
12    Q.  That was his typical course?
13    A.  According to this report, yes.
14    Q.  All right. Do you know the difference in
15 distance between 94 -- taking 94 all the way versus
16 Route 41?
17    A.  There's not much difference.
18    Q.  Do you know which one is longer or shorter
19 distance-wise?
20    A.  I would say 94.
21    Q.  Is longer or shorter?
22    A.  94 would be longer.
23    Q.  And what do you base that on?
24    A.  Because 41 runs right along the lake and

371

42 (Pages 368 to 371)

1 94 kind of swings around a little bit.
2     Q.   Okay.   But you've never actually measured
3 that, correct?
4     A.   Correct.
5     Q.   Did you -- well, strike that.
6         Were you specifically dispatching Samuel
7 Franke in the month before this occurrence for this
8 trip from Hammond to Wilton?
9     A.   A month before?
10    Q.   Any time in that month.   Is that part of
11 your job?
12    A.   It could have been but it just depends who
13 he talked to on that day.   He knew his route every
14 day.
15    Q.   Okay.   Did anyone tell him -- Strike that.
16        Did he ever raise the route option 41
17 versus 94 at any time to you?
18    A.   No.
19    Q.   Did he ever to your knowledge ask anyone
20 at Martin's which they preferred?
21    A.   No.
22    Q.   Did he ever tell you ever, either before
23 or after the accident, why he chose 41 instead of
24 94?
                                                    372

1 they are to stay on the expressway where possible?
2     A.   No.
3     Q.   Was he encouraged to exit the expressway
4 to take Route 41 instead of 94?
5     A.   That was Sam's choice.
6     Q.   And I think I asked, I apologize.   Did he
7 ever tell you why he made that choice?
8     A.   No.
9     Q.   In looking at Exhibit 71 I saw some of the
10 documents, it talks about work history and it says
11 reason for leaving, colon, accident.
12        Mr. Franke stopped working at Martin's
13 after this accident?
14    A.   Yes.
15    Q.   Was he disciplined for any reason as a
16 result of this accident involving Mr. Scheinman?
17    A.   He was let go.
18    Q.   He was fired?
19    A.   Yes.
20    Q.   And what was the specific reason that he
21 was fired for?
22    A.   Severity of the accident.
23    Q.   And in -- Strike that.
24        Did you play a role in the decision of
                                                    374

1     A.   No.
2     Q.   Have you driven personally the route taken
3 by Mr. Franke on the day of this occurrence?
4     A.   Have I ever driven that route?
5     Q.   Have you ever driven up 94, gotten off
6 Route 41, driven north on 41 and then got back on
7 94 on your way through Illinois?
8     A.   Yes.
9     Q.   How many times?
10    A.   10, 20.
11    Q.   Am I correct that -- well, strike that.
12        Do you know how many stoplights there are
13 from the time one were to exit the expressway until
14 the stoplight where this accident took place?
15    A.   I believe it was the second one.
16    Q.   Okay.   Do you know what the speed limit is
17 on this stretch of road?
18    A.   I do not.
19    Q.   Do you know, sir, that this particular
20 area is -- has a high statistical number of motor
21 vehicle accidents versus other roads in the area?
22    A.   I did not.
23    Q.   Did Martin's have a policy in place with
24 regard to routing and its drivers' choices that
                                                    373

1 letting him go?
2     A.   Yes.
3     Q.   And am I correct that it was not just the
4 severity, it was the fact that he caused the
5 accident?
6     A.   It was a bad accident for us; that's the
7 reason why he was let go.
8     Q.   I understand.   But if he was involved in
9 an accident where someone hit him, even if it was
10 severe, you wouldn't have fired him, correct?
11    A.   Correct.
12    Q.   Okay.   It was because he caused the
13 accident?
14    A.   Yes.
15    Q.   As you sit here do you know what the
16 weight of his -- the gross weight of that truck and
17 trailer was on the day of the accident?
18    A.   I do not.
19    Q.   If I were to report to you that the
20 Illinois State Police weighed it and found it to be
21 73,750 pounds, would that be consistent with your
22 general understanding about what that type of truck
23 and load should weigh?
24    A.   That truck can haul 80,000 pounds gross.
                                                    375

43 (Pages 372 to 375)

Q. So that's certainly consistent with what -- for better for worse that sounds about right, 73,750?
A. Yes.
Q. Right?
A. Yes.
Q. You would have no qualms with the State Police if that's what they found?
A. No.
Q. Had you ever driven this particular truck -- or, excuse me, tractor? I think it was Number 139. Had you ever driven this one before?
A. Not to my knowledge.
Q. Okay. Do you currently have an active CDL?
A. Yes.
Q. So you still know how to drive a tractor-trailer truck?
A. Yes.
Q. Would you agree with me that running into a stopped vehicle with 74,000 pounds driving between 40 and 45 miles an hour is not a good idea?
MR. BURKE: Objection, form, vagueness.

376

it had anti-lock brakes, would that also provide braking -- well, strike that.
This was a chassis and box as opposed to a true trailer, correct?
A. Correct.
Q. Did that chassis have anti-lock brakes to your knowledge?
A. I can't answer that.
Q. Do you have -- Strike that.
Can you tell me what the stopping distance of a 73,750 pound tractor-trailer truck would be from 40 to 45 miles an hour to stop?
A. I don't have the calculations in front of me.
Q. Do you have -- Strike that, sir. Did you know that according to the police -- well, strike that. I'll just ask you generally.
Do you know how far Mr. Franke's truck pushed the Scheinman BMW?
A. No.
Q. Did you ever learn that it was pushed 358 feet?
A. If I did, it's not on the top of my head.
Q. Okay. I want to ask you about the event

378

BY MR. COUTURE:
Q. Go ahead.
MR. SKRYD: Same. You can answer the question.
THE WITNESS: It's not a good idea.
BY MR. COUTURE:
Q. Did the tractor he was driving have a cruise control?
A. Yes.
Q. Do you know if that cruise control was activated at the time of the accident?
A. I do not.
Q. Did you ask Mr. Franke whether his cruise control was activated?
A. I did not.
Q. Did this tractor have anti-lock brakes?
A. I can't answer that, but at a certain year of truck it's mandatory. So you can get that answer.
Q. Sure. Okay. So it would depend on the year of the truck and you don't know the exact year of the truck?
A. 2004.
Q. Okay. And would the anti-lock brakes, if

377

data recorder that was in this particular -- well, strike that.
Do you know whether this truck had -- this tractor had an event data recorder in it?
A. Yes.
Q. And does Martin's have a policy with regard to the maintenance or calibration of its event data recorders?
A. No.
Q. Do you have any understanding as to what happened when data was attempted to be downloaded from Mr. Franke's event data recorder?
A. I know that the State Police tried to download it at the place where the truck was parked after the accident. I know that somebody from Rich's office has looked at it and I know that somebody from your office has looked at it.
Q. Okay. And is it your understanding that when it was attempted to download it had an odd or unusual date and it didn't seem to properly correlate to the use of the truck?
A. I don't know what was wrong with it. I know that we even had Detroit even look at it also.
Q. Okay. Were you ever able to get any

379

44 (Pages 376 to 379)

information from the event data recorder?

A. To my knowledge, no.

Q. Was there any purposeful action on the part of Martin's Bulk Milk to turn off its event data recorders or to prevent it from actually recording accurately the data from the truck?

A. No. And the State Patrol had the first chance to look at it.

Q. Okay. I'm just asking because I know some trucking companies either are very active about updating these things or trying not to have them -- try to even turn them off if they can. You don't have any policy in that regard?

A. I wouldn't even know how to even touch them.

Q. Okay. You indicated -- well, strike that.

Was Martin's Bulk cited for any reason for this truck accident -- not Mr. Franke, I'll get to that, but your company?

A. No.

Q. I saw in the police report that there was an indication -- and I think you alluded to it -- of brakes being out of alignment or not properly

380

maintained; is that true?

A. To my knowledge the only problems they found between the truck and the trailer was brakes out of adjustment on the CSXU container.

Q. The chassis?

A. Yes.

Q. You indicated -- well, strike that.

When was the first time after this accident you spoke to Mr. Franke?

A. It was the morning of the 4th of July.

Q. Where were you when this conversation took place?

A. At my office in Wilton.

Q. And where was he?

A. At our office.

Q. Okay. So the first conversation you had with him was face-to-face?

A. Yes.

Q. And other than -- I forget his name -- a gentleman from Martin's contacted you and said that Sam had been in a bad accident, other than that, had you spoken to anyone else about the accident between that -- I think it was a phone message -- and your face-to-face conversation with Mr. Franke?

381

A. No.

Q. Didn't talk to the police?

A. I talked to the police that Saturday, I believe it was, and I called down to Highland Park to ask how Mr. Scheinman was doing, if he had any reports.

Q. All right. But that was after -- was that after -- that was after you had a discussion with Samuel Franke, right?

A. Yes.

Q. Okay. I want to take it chronologically. I apologize if I wasn't clear on that.

Your first contact was a phone message with -- what was his name again?

A. Jamie Jorgensen.

Q. Jamie Jorgensen. The second conversation with anybody was Sam Franke in your office the next morning?

A. Yes.

Q. How did Mr. Franke know to come to your office the next morning?

A. I guess to come over and get his personal vehicle. Did anyone other than yourself from

382

Martin's Bulk have -- and, apparently, a discussion with Mr. Jorgensen that Samuel Franke had -- did anyone else from Martin's have a conversation with Samuel Franke about the accident before you?

A. Not to my knowledge.

Q. And who else was present, if anyone, during that conversation between he and you on the morning of the 4th of July?

A. It was him and I. And he was -- we have a window in our office and he was on one side, I was on the other.

Q. Okay. So that window is for truck drivers to come up --

A. Yes.

Q. -- and get papers and documents and stuff?

A. Yes.

Q. So you actually weren't in the same room with him; you were through a -- through a window, essentially?

A. Yes.

Q. How long was that conversation?

A. Not very long.

Q. What did he say to you and what did you say to him?

383

45 (Pages 380 to 383)

A. I was pretty shook up over the deal. Sam was also. There wasn't a lot of conversation. I told him we would have to go over things over the weekend and think about what happened and we'd talk on Monday.

Q. Okay. From your testimony it sounds like even though you only spoke to one other — actually had a phone message, you learned about the accident some other way. How did you learn other details from the accident other than through conversations with people?

A. There was a clip from the news off the Internet that somebody had told one of the dispatchers in our office about it. So we went on and looked at it that morning.

Q. And who was that? Who was that from your company that had that --

A. You know, I don't recall.

Q. How many people were with you when you saw this news clip?

A. I believe there was just two.

Q. Do you remember what the news clip indicated?

A. Just that there was an accident on Highway

384

impact?

A. No.

Q. Did he tell you the color of any traffic control lights in the area where the accident took place?

A. No.

Q. You understand that I'm talking about —

A. Yes.

Q. — at that July 4th conversation? Good. I just want to make sure we understand we're talking about the same thing.

A. Yes.

Q. All right. Did he tell you when he had last stopped his truck before the accident?

A. No, he did not.

Q. Did he tell you any observations about what he saw at the impact?

A. No.

Q. Did he tell you anything about what happened to the other car when he hit it?

A. Just — I knew what happened to the car just from what I heard, that what Jamie had told me of the car had burst.

Q. Okay. But — thank you. And as far as

386

41. Other than that I really don't remember much.

Q. Well, you obviously had an understanding at some point before talking to Mr. Franke that it was a serious accident?

A. Yes, from the message I got from Jamie, that he had told me that it was a bad accident.

Q. Do you have anymore — before speaking to Mr. Franke on the morning of the 4th did you have any other details other than it was a pretty bad accident involving one of your trucks?

A. No, I did not.

Q. When you spoke to Mr. Franke on the 4th, did you and he talk about how the accident happened?

A. We really didn't get into it too much. Just the circumstances that were already in front of me, knowing what had happened and how severe it was, I didn't really get into it too much. I was pretty upset about it happening, you know, with one of my employees and our company.

Q. Okay. Did he tell you what part of his vehicle struck the other car?

A. No.

Q. Did he tell you how fast he was going at

385

what Mr. Franke told you on the morning of the 4th, did he tell you when in the sequence of events fire started?

A. He did not.

Q. You knew there was fire but you didn't have a discussion about the exact events?

A. Correct.

Q. Did Mr. Franke tell you anything about what he did after his vehicle came to a stop at that conversation on the 4th?

A. The only thing I remember was -- from the clip was that they took blankets and bedding out of his bed and gave it to Mr. Scheinman and then also -- or, you know, wrapped him up and then they also used Sam's fire extinguisher.

Q. Okay. And I appreciate what you're saying. You learned that from the news report but not from Samuel Franke or did he tell you that?

A. I can't remember.

Q. Did Mr. Franke tell you that he was taken to the hospital for drug and alcohol testing?

A. Well, that is mandatory by our company so.

Q. I understand. But did he tell you that

387

46 (Pages 384 to 387)

1  that occurred?
2     A.  No.
3     Q.  Did he tell you what the results of it
4  was?
5     A.  He did not, but I find out from our
6  people.
7     Q.  Did you find that out before you had the
8  conversation with him on the morning of the 4th?
9     A.  Well, I already made my mind up already
10  that I was going to let him go.
11     Q.  Okay. As you can probably understand,
12  right now I'm trying to figure out what you knew
13  when you knew it.
14     A.  Right.
15     Q.  So right now we're at your office on the
16  4th. I don't want to know at this point yet what
17  else you learned later. I just want to know at
18  that moment what you knew.
19     At that moment did you know that
20  Mr. Franke had given blood and urine?
21     A.  I'm thinking that he got a hold of Janet
22  or somebody in safety and they had him go do it.
23     Q.  Okay.
24     A.  Because it's -- you know, it's recommended

388

1  after an accident we have to have it done after so
2  much time.
3     Q.  Do you know if that was done -- Strike
4  that.
5     I understand when there's truck accidents,
6  sometimes the truck company says go do it and
7  sometimes the police say come here, you're coming
8  with me.
9     Do you know whether that was done as a
10  result of the policy of your company versus the
11  police insisting on it?
12     A.  I would say both.
13     Q.  Okay. Do you know who Sam talked to at
14  Martin's before he spoke to you other than the one
15  gentleman who left you the message?
16     A.  I do not.
17     Q.  You understand that he passed his drug and
18  alcohol test?
19     A.  Yes.
20     Q.  Is it your testimony that as of the 4th of
21  July discussion with him you had already decided
22  that he was going to get fired though?
23     A.  Yes.
24     Q.  When you and he spoke on the 4th of July,

389

1  did you talk about the color of the light? I think
2  you told me no.
3     A.  No.
4     Q.  Did you have an understanding when you --
5  before you spoke to him or at the time you spoke to
6  him that there was an issue of him hitting a
7  vehicle stopped at a red light?
8     A.  No, I did not.
9     Q.  Other than you telling him we'll have to
10  talk about this later, did you have any specific
11  further discussions about the accident?
12     A.  Not to my knowledge.
13     Q.  At that time, of course?
14     A.  Yes.
15     Q.  All right. When was the next time you
16  spoke to somebody, anybody, about this accident
17  after that conversation with Mr. Franke on the
18  morning of the 4th?
19     A.  That I talked to him?
20     MR. SKRYD:  Anyone.
21  BY MR. COUTURE:
22     Q.  When you talked to anybody.
23     A.  Probably to my father.
24     Q.  Okay. And what conversation did you have

390

1  with your father regarding this?
2     A.  We just talked about, you know, that
3  because of the severity of the accident we just --
4  you know, we had to let him go.
5     Q.  Did you understand at that point when you
6  had the discussion with the father that Mr. Franke
7  had struck a stopped vehicle?
8     A.  I guess from after -- when I heard it from
9  the news.
10     Q.  Okay. And I guess what I'm saying is, you
11  were making a determination of whether he should
12  remain with your company based on his fault,
13  potential fault, in causing the accident; you
14  wouldn't just fire him just because he was involved
15  in an accident, right?
16     A.  Well, if it's a rear-end accident.
17     Q.  Okay. If it's a rear-end accident what?
18     A.  Well, it's a bad accident when it's a
19  rear-end accident so.
20     Q.  Did you speak with your father
21  specifically regarding the fault, who was at fault
22  for the accident?
23     A.  No.
24     Q.  Because it was an accident where your

391

47 (Pages 388 to 391)

truck struck the rear end of another vehicle, did
you presume or understand that it was your driver's
fault?

A. At that point I didn't know any of the
circumstances of whose fault it was. We were
waiting for the police report. We couldn't make an
assumption at that time.

Q. Have you ever specifically spoken to any
representative of the police regarding the accident
itself?

A. Just the police officer that I called on
Saturday to check on — you know, to check on
Mr. Scheinman and I asked a few questions, but the
questions I asked I don't remember at this time.

Q. Do you remember who you spoke to at the
police department?

A. I do not.

Q. And other than checking to see
Mr. Scheinman's condition, do you remember any
other details of how or why the accident took place
from that officer?

A. I don't recall.

Q. Who else from Martin's did you speak with
regarding the accident other than your father and

392

A. Him and I for sure. I don't recall if
anybody else was there or not.

Q. Where did that meeting take place?

A. In a closed office.

Q. At?

A. At Martin's, 1101 Waters Street.

Q. At any time before that meeting did you
understand that Mr. Franke had given a statement to
the police —

A. No.

Q. — that was videotaped?

A. No, I did not know that.

Q. Have you ever seen that statement?

A. I probably have but it's not fresh in my
mind.

Q. When you and Mr. Franke had the
conversation the Monday after this occurrence, how
long did that conversation take place?

A. No more than five minutes.

Q. No more than five minutes?

A. (Indicating.)

Q. Did you ask him the details of the
accident?

A. He had just vaguely told me what happened

394

Samuel Franke?

And I'm trying to go in chronological
order. So if you could do me the favor of doing
that, I'd appreciate it.

A. I believe I talked to Janet to make sure,
you know, to follow-up on the drug test.

Q. Making sure your policies and procedures
were followed?

A. Yes.

Q. And that was done, right?

A. Yes.

Q. Who else did you speak with?

A. Just somebody maybe in dispatch that was
there that morning. It was a holiday.

Q. Did you learn anything about Mr. Franke's
accident from them?

A. Just from that article — just from the
news clipping.

Q. From the news clipping, okay. Did you
then the following Monday have a meeting with
Mr. Franke —

A. Yes.

Q. — about the accident? Who was present
for that meeting?

393

and I don't recall what they were completely now.

Q. Okay. Understanding you're not going to
remember his exact words from July 2008, can you
give me your best summary of what he told you at
that time?

A. He just said that he was on Highway 41 and
then rear-ended a car.

Q. Did he tell you his speed at the time of
impact?

A. No.

Q. Did he tell you that he — Strike that.

Did he indicate whether or not he applied
his brakes before the impact?

A. I can't remember.

Q. Did he tell you what the color of the
traffic light was?

A. He did not.

Q. So did he even say there was a traffic
light nearby?

A. Well, they said it was at a stop-and-go
light.

Q. Okay. Who said that, he did or the news
clip?

A. I don't remember.

395

48 (Pages 392 to 395)

1  Q. Okay. By the time you talked with him on
2  Monday did you already know that he struck a car
3  that was stopped at a light?
4  A. I guess -- yes, I did.
5  Q. Okay. As you sit here do you remember how
6  you learned that?
7  A. I do not.
8  Q. By the time you had a conversation with
9  him the Monday after the accident did you have an
10  understanding as to what the color of the light was
11  for Mr. Franke's direction of traffic at the time
12  of the accident?
13  A. All I know is he was northbound on 41 and
14  that's all I know.
15  Q. Okay. So the answer to my question is,
16  no, you didn't know what the color of the light for
17  his northbound --
18  A. No, I do not know.
19  Q. All right.
20  MR. SKRYD: Dave, just try to answer his
21  question.
22  THE WITNESS: Okay.
23  MR. SKRYD: It will go quicker that way.
24  You're doing fine but focus on it.
396

1  A. No.
2  Q. Did he tell you about any of his
3  discussions with any bystanders or witnesses after
4  the accident?
5  A. No.
6  Q. Did he tell you about his discussions with
7  the police?
8  A. No.
9  Q. Okay. So the Monday after the occurrence
10  did you ask him what did the police do, were you
11  ticketed, anything like that?
12  A. Yes, I asked him if he got a ticket and he
13  said no, and the ticket didn't come for sometime
14  afterwards.
15  Q. So did you and he discuss how long he was
16  at the scene after the accident?
17  A. No. All I know is that one of our other
18  drivers picked him up.
19  Q. Okay. I'm just trying to figure out what
20  you know. But, as I understand it, Mr. Franke
21  after the accident was taken to the hospital, was
22  given a blood and urine test and then was taken to
23  the police station and didn't leave until like 3:00
24  or 4:00 a.m.
398

BY MR. COUTURE:
2  Q. At the time -- before you spoke to
3  Mr. Franke on the Monday after the accident, did
4  you learn from any source his speed at impact?
5  A. No.
6  Q. So other than Mr. Franke telling you that
7  he rear-ended a car while he was traveling
8  northbound on 41, did he give you any other details
9  on that Monday morning?
10  A. Just that the guy was hurt bad.
11  Q. Did he tell you what he did after the
12  impact?
13  A. No.
14  Q. Did Mr. Franke tell you -- well, strike
15  that.
16  You knew at that point there was a fire
17  involved, correct?
18  A. Yes.
19  Q. Did Mr. Franke tell you when the fire
20  started in relationship to the impact of the two
21  vehicles?
22  A. No.
23  Q. Did he tell you how far the two vehicles
24  traveled after impact?
397

1  Did he tell you about any of that?
2  A. No, because I didn't answer my phone
3  until -- I didn't get the message until the next
4  morning.
5  Q. Got you. I'm talking about when you saw
6  him on the Monday after the accident. Did you have
7  that discussion with him? Did he tell you about
8  what happened?
9  A. Somewhat but I don't recall.
10  Q. Okay. What did you say to him that
11  morning on the 5th -- or, excuse me, not the 5th
12  but the Monday after the accident?
13  A. I just said, you know, just knowing how
14  bad the accident was and severity of it and if
15  somebody is hurt that bad, I can't, you know, put a
16  guy back in the truck. So it was best that we just
17  part ways.
18  Q. And what was his response to that?
19  A. He understood.
20  Q. Had you ever before Mr. Franke fired a
21  driver as a result of an accident?
22  A. I don't recall.
23  Q. Was it the policy and procedure of
24  Martin's Bulk Milk as of July 2008 to only fire
399

49 (Pages 396 to 399)

1  drivers -- well, strike that.
2      Was it the policy and procedure of
3  Martin's Bulk Milk in 2008 when an accident
4  occurred only to fire a driver if it was determined
5  by Martin's that the driver had been in error when
6  the accident occurred?
7      A.  No.  Each accident is taken care of
8  separately.
9      Q.  Okay.  Had you not -- Strike that.
10     Did you believe at the time that you let
11 Mr. Franke go that he was at fault for this
12 accident?
13     A.  I didn't know.  I didn't have the police
14 report.
15     Q.  So your testimony is that you let
16 Mr. Franke go even though it would have been --
17 even if it was possible it wasn't his fault?
18     A.  Correct.
19     Q.  This was -- it had nothing to do with
20 fault, just that an accident had taken place?
21     A.  Just with the severity of the accident I
22 knew that I didn't want him driving for us.
23     Q.  All right.  And because it was a rear-end
24 accident?

400

1      A.  Yes.
2      Q.  Did you ever go to the scene of this
3  accident?
4      A.  No.
5      Q.  You eventually saw the police report?
6      A.  Yes.
7      Q.  Did you have any reason to disagree with
8  any of the findings on the police report?
9      MR. SKRYD:  Objection, foundation.  You
10 can answer.
11     THE WITNESS:  No.
12 BY MR. COUTURE:
13     Q.  I understand you just read a document that
14 you had no involvement in creating.  So my question
15 is -- I'm not going to ask you if it was correct,
16 but I do want to know -- and I think you've
17 answered it -- whether there was anything in there
18 that you knew personally was not true?
19     MR. SKRYD:  Same objection.  You can
20 answer.
21     THE WITNESS:  Nothing to my knowledge that
22 wasn't true.
23 BY MR. COUTURE:
24     Q.  Okay.  And Mr. Franke eventually did

401

1  receive some tickets, correct?
2      A.  Correct.
3      Q.  Did you -- Strike that.
4      Did Martin's Bulk Milk assist him in his
5  defense of those traffic tickets?
6      A.  No.
7      Q.  Did you pay any fines related to those
8  traffic tickets?
9      A.  No.
10     Q.  Do you know what his plea to those traffic
11 tickets was?
12     A.  I don't.
13     Q.  Do you know what those traffic tickets
14 were for specifically?
15     A.  No, at this time I don't.
16     Q.  At some point did you know?
17     A.  Yes.
18     Q.  Okay.  Did you attend court for those
19 tickets?
20     A.  No.
21     Q.  I understand from looking at your answers
22 to interrogatories that at the time of this
23 occurrence the -- that Martin's Bulk Milk had a one
24 million dollar liability policy; is that correct?

402

1      A.  Yes.
2      Q.  Did Martin's Bulk Milk haul hazardous
3  materials ever in 2008?
4      A.  No.
5      Q.  Who was it at Martin's Bulk Milk who was
6  in charge of or responsible for procuring and
7  maintaining insurance coverage?
8      A.  Janet.
9      Q.  Martin's didn't have any excess or
10 umbrella policies?
11     A.  At that time, no.
12     Q.  Do they now?
13     A.  Yes.
14     Q.  Do you know who it was at Martin's who
15 dispatched Samuel Franke on July 3rd to go -- well,
16 first to go to the yard on 47th Street?
17     A.  I don't.
18     Q.  Do you know who it was who dispatched
19 Mr. Franke from the yard on 47th Street to Hammond,
20 Indiana?
21     A.  No.
22     Q.  Now, I know that that was a route that
23 Mr. Franke took almost every day, if not every day,
24 but would he still officially have been dispatched

403

**50 (Pages 400 to 403)**

**404**

1 by somebody at Martin's to do that route?
2 A. He had to call in every day to get his
3 pickup number.
4 Q. Okay. And so, for example, on the 3rd if
5 he went to the 47th Street yard after he picked up
6 his container, he then -- before heading to
7 Hammond -- would have to call them and say what's
8 my pickup number?
9 A. Yes.
10 Q. So somebody at Martin's would have had a
11 conversation with him?
12 A. Yes.
13 Q. Am I correct that because Mr. Franke made
14 that pickup every day, other than giving the number
15 there wasn't a specific, "okay, you've got to go
16 here and this is what you've got to do" sort of
17 thing, right?
18 A. Correct.
19 Q. It was "this is your number"?
20 A. Yes.
21 Q. And you don't know who gave him that?
22 A. Sam would have to answer that.
23 Q. And did he call in before he left Hammond
24 with the load?

**405**

1 A. Not necessarily.
2 Q. Do you know if he did?
3 A. No.
4 Q. Do you know if Mr. Franke had any
5 conversations with anyone while he was en route
6 between Hammond and the area of the accident?
7 A. No.
8 Q. Do you know if Mr. Franke was late that
9 day, running late that day?
10 A. No.
11 Q. Did you have any discussions with
12 Mr. Franke regarding his plans to either stop
13 somewhere short of Wilton or actually continue to
14 Wilton --
15 A. No.
16 Q. -- had the accident not occurred?
17 A. No.
18 Q. Since you let Mr. Franke go as an employee
19 of Martin's, have you since had a discussion with
20 him regarding this accident or lawsuit?
21 A. No.
22 Q. Have you -- since your conversation with
23 him on the Monday after the occurrence have you
24 spoken to any other police officials regarding this

**406**

1 occurrence?
2 A. Just the time that I told you about.
3 Q. Okay. I know at some point, at least
4 according to the police department, someone from
5 Martin's called and said can we get our property
6 back, our truck, our trailer. Were you involved in
7 that?
8 A. I don't believe so.
9 Q. Do you know who was --
10 A. Janet probably would have called.
11 Q. Do you know what discussions Janet had
12 with the police other than can we get our equipment
13 back?
14 A. No.
15 Q. Do you know of anybody else at Martin's
16 who had a discussion with the police personnel
17 regarding this accident other than you and perhaps
18 Janet?
19 A. No.
20 Q. Have you ever spoken to anyone who
21 witnessed this accident?
22 A. I have not.
23 Q. My client, as I've told you, is the
24 manufacturer and the distributor of the motor

**407**

1 vehicle that Mr. Scheinman was in at the time of
2 the occurrence.
3 Do you have any knowledge or evidence that
4 the design or manufacture of that vehicle caused
5 this accident or caused Mr. Scheinman's injuries?
6 A. No.
7 MR. COUTURE: That's all I have.
8 MR. SKRYD: Okay. We'll take a break.
9 THE VIDEOGRAPHER: We are going off the
10 video record. The time now is 4:25 p.m.
11 (A break was taken.)
12 THE VIDEOGRAPHER: We are back on the
13 video record. The time now is 4:45 p.m.
14 CROSS-EXAMINATION
15 BY MR. BURKE:
16 Q. Mr. Martin, my name again is Richard
17 Burke, I represent Jeffrey Scheinman and I want to
18 ask you some additional questions.
19 Mr. Martin, you earlier this morning
20 referred to Martin's Bulk Milk Logistics or -- is
21 that the proper name or is it MBM Logistics?
22 A. Depends what entity you're looking for.
23 Are you looking for the carrier entity?
24 Q. What is the carrier -- the proper name for

**51 (Pages 404 to 407)**

the carrier entity?
  A.  Martin's Bulk Milk Service Incorporated.
  Q.  And the broker entity, what is the proper
name of that business?
  A.  The one in Winona is MBM Logistics.  The
one in Utah is Martin Refrigerated Express.
  Q.  And was there a third you told us about?
  A.  Well, we have broker authority under
Martin's Bulk Milk Service also.
  Q.  And the one in Utah, is it Martin's --
  A.  Refrigerated Express.
  Q.  With respect to the paper products that
were being transported at the time of this
occurrence on July 3rd, 2008, was MBM Logistics
involved in contracting with International Paper or
Overnite or Universal in any manner that resulted
in MBM Logistics transporting this paper product?
  A.  No.
  Q.  Was MBM Logistics -- did they employ
Franke, Mr. Franke, at this time?
  A.  No.
  Q.  Did MBM Logistics -- let me ask you this.
I want to ask you a series of questions.
      Did MBM Logistics or Martin's Refrigerated

                                              408

Express -- I'm going to ask about both of those --
did either of those entities employ Franke on July
3rd, 2008?
  A.  No.
  Q.  Did either of those entities own the
tractor that Mr. Franke was driving?
  A.  No.
  Q.  Did either of those entities own the
trailer?
  A.  No.
  Q.  Did either of those entities have any
involvement in servicing the tractor?
  A.  No.
  Q.  Or performing maintenance on it?
  A.  No.
  Q.  Did MBM Logistics have any involvement in
any of the paperwork, bills of lading, broker
confirmation sheets that were involved in the paper
products that were being hauled by Mr. Franke at
the time of this occurrence?
  A.  No.
  Q.  Would you look at Exhibit 9.  If you can
turn to that for a moment.  You have that in front
of you?

                                              409

  A.  Yes.
  Q.  Okay.  And that's referred to as an
Accessorial Approval Form?
  A.  Yes.
  Q.  Generally, what is that, sir?
  A.  Something over and above standard costs of
doing business.  This is a -- looks like an invoice
for the CSXU trailer that was in the accident.
  Q.  And it's kind of blurred at the top but
what's the name on the top of that?
  A.  Celtic.
  Q.  Are you familiar with Celtic?
  A.  Yes.
  Q.  In what manner?
  A.  Well, Celtic is the middleman between a
carrier and the railroad.  It's a company that
lines up the trailers and the involvement between
delivering a load into the railroad.
  Q.  Now, down on the bottom of Exhibit No. 9
where it says company, it says MBM Logistics.  Do
you see that?
  A.  Uh-huh.
  Q.  Why does it say MBM Logistics there --
  A.  Because --

                                              410

  Q.  -- if, as you've told me, they had no
involvement in this?
  A.  MBM Logistics will load that trailer when
it gets empty up in Minneapolis.  They're the leg
of it going back to Chicago.
  Q.  How did Celtic know MBM Logistics would
load that particular trailer?
  A.  They have to go through Celtic to get the
empty -- the reservations for the empty trailers.
  Q.  Have you resolved this issue of this
request for -- I think, if I recall correctly, it's
about $8,000 for the trailer being out of use?
  A.  Yes.
  Q.  Who did you settle that with?
  A.  We would have had to settle with CSXU
because it was their equipment.
  Q.  How much did you pay them?
  A.  I believe it's for that $8,050.
  Q.  You bought that trailer, if I recall
correctly?
  A.  Yes.
  Q.  And you have it in your yard --
  A.  Yes.
  Q.  -- in Wilton?  Then let me ask you to look

                                              411

**52 (Pages 408 to 411)**

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

**Page 412**

at Exhibit 11 that you have in front of you.

Q. And this is, am I correct, what's known as the broker confirmation sheet for the load that was being transported at the time of this incident?

A. Yes.

Q. And that Melody Hansen up in the upper right, she's from Overnite Express, correct?

A. Yes.

Q. That's who she works for --

A. Yes.

Q. -- as far as you know? Okay. Then the writing up at the top, starting in the top left, says July 3rd, 2008, 1623, correct?

A. Yes.

Q. And then there's a phone number. That's Overnite Express's phone number I believe you previously told us, correct?

A. Chicago office, yes.

Q. Their Chicago location, okay. And then it says Overnite Logistics at the top, right?

A. Yes.

Q. When you would see the name of Overnite Logistics, you would operate under the assumption they were some part of or division of Overnite

**Page 413**

Express? Would that be fair to say?

A. Yes.

Q. And Pat Podlena is your employee or was your employee, correct -- down at the lower right?

A. Yes, he was.

Q. This is the request from Overnite Express to Martin's that was sent at about 4:23 in the afternoon of July 23rd, correct?

A. July 3rd, that's correct.

Q. I'm sorry, July 3rd, 2008, correct?

A. Yes.

Q. And in this document Overnite Express is giving your company directions on where to makeup the pickup for the shipper which is identified as International Paper, correct?

A. Yes.

Q. And they're instructing Martin's to pick it up at the Exel Warehouse as indicated under pickup information, correct?

A. Yes.

Q. And Overnite instructs Martin's to pick it up at 1900 hours which is 7:00 p.m., correct?

A. Yes.

Q. And then Overnite gives you further

**Page 414**

instructions on where these -- this load is supposed to be delivered, correct?

A. Yes.

Q. And Overnite told you it had to be delivered by 7-7 of '08, correct -- July 7th?

A. Yes.

Q. And this -- Overnite wanted these paper products to be taken to three different locations in Minnesota, correct?

A. Yes.

Q. And that's under the delivery information they provided?

A. Yes.

Q. By the way, all this handwriting is from Miss Hansen other than Pat Podlena's signature; is that correct?

A. Correct.

Q. And, you know, how about down at the bottom, do you see the handwritten name Ron it looks like McGinnis?

A. Ron was a delivering carrier for the Minneapolis drops and that was written by Pat.

Q. Okay. And by whom was he employed?

A. Martin's Bulk Milk Service.

**Page 415**

Q. So he would take the load from Wilton to the Minneapolis --

A. Yes.

Q. -- destinations?

A. Yes.

Q. And then where it says -- in the middle of the page where it says -- it talks about a total payment of 974.08, do you see that?

A. Yes.

Q. Now, that was the amount Martin's was going to earn for this job, correct?

A. Yes.

Q. And who was it that was going to pay Martin's that $974.08?

A. Overnite Logistics, Universal Am Can or Overnite Express.

Q. Okay. And from your understanding and experience in the truck transportation business is it your understanding that International Paper would pay Overnite Express some amount of money greater than 974?

A. Yes.

Q. And Overnite Express in turn would give you 974 and they would keep some other amount,

correct?

A. Correct.

Q. So both Overnite Express and/or Universal as well as Martin's were both making money on the transportation of this load of paper, correct?

A. Yes.

Q. Nothing else on that, sir. Could you take a look at Exhibit 5, please. Do you have that in front of you, sir?

A. Yes, sir.

Q. Okay. Could you look at all three. There's three separate pages as part of Exhibit 5; is that correct?

A. Yes.

Q. And if I understand those correctly, I think they refer to -- well, strike that.

These are memo bills or bills of lading, correct?

A. Yes.

Q. And they are for the paper products that Mr. Franke picked up at the International Paper warehouse, correct?

A. Correct.

Q. And there's a separate one for each of the

416

three destinations, one of which was Midland Paper, the second Cenveo, C-e-n-v-e-o, and Expedx, E-x-p-e-d-x?

A. Expedx.

Q. Okay. And on each of those -- take a look at the -- on all three of them, the carrier is identified as OXEN, correct?

A. Yes.

Q. And do you understand OXEN to be another reference to Overnite Express?

A. Yes.

Q. Who prepared these three documents, Mr. Martin?

A. International Paper.

Q. And they identified OXEN as the carrier when they prepared these documents, correct?

A. Yes.

Q. And all three are dated July 3rd, '08 in the right-hand column, correct?

A. Yes.

Q. Okay. Would you take a look, sir, at what is in front of you as Exhibit No. 1. And it's a very thick, voluminous exhibit and it's got Bates stamped pages in the lower right corner.

417

And then do you see the Bates numbers in the lower right corner that say U-A-C-L, slash, O-E-I?

A. Yes.

Q. Okay. And do you have No. 1 in front of you?

A. Yes.

Q. Why don't you flip to Bates stamp number 13 -- I'm sorry, number 12. Do you have that in front of you?

A. Yes.

Q. Okay. And in the upper left it says Red Prairie and to the right Digital Logistics?

A. Yes.

Q. And what is your understanding of what this document is, sir?

A. This looks to me like it would be a loading sequence for the load out of International Paper.

Q. The appointment time is noted as July 3rd --

A. Yes.

Q. -- at 7:00 p.m., correct?

MR. SKRYD: Is that a yes?

418

THE WITNESS: Yes.

BY MR. BURKE:

Q. And the carrier again is identified as OXEN?

A. Yes.

Q. And then it's got the three different destinations in Minnesota where the paper was to go, correct?

A. Yes.

Q. And in the lower right, bottom half right side, it indicates loading started at -- is that 8:08?

A. It looks like 8:38.

Q. 8:38. Thank you. And then loading ended at -- what's that look like, 9:00 something?

A. 9:02.

Q. 9:02. And now there's a loading diagram written out there in the box, correct?

A. Yes.

Q. And I think this morning -- or earlier today you told us that International Paper would have done the loading of this truck that Mr. Franke arrived with, correct?

A. Yes.

419

Q. How about take a look at Page 14, Bates stamp 14. That's the invoice from Martin's to UACL dated July 17th, 2008, correct, for 974.08?

A. Yes.

Q. And take a look at 15, if you would, sir. 15 is -- Bates stamp Page 15 is entitled Universal Am Can Limited Master Brokerage Agreement, correct?

A. Yes.

Q. And that -- if you look at that, I believe you'll see it is a three-page agreement, correct?

A. Yes.

Q. And that's dated November 7th of 2007?

A. Yes.

Q. Now, if you look at Bates Page 17, this agreement is not signed by Universal Am Can, correct?

A. Correct.

Q. Now, I want to send you back to the front page of that. This is November 7th of 2007 -- and, by the way, this document appears to have Mr. Podlena -- how do you say his last name?

A. Podlena.

Q. Podlena, thank you. It appears to have Mr. Podlena's signature on it, correct, on Page 3

420

pages?

MR. BURKE: These three pages, this Universal Am Can Limited Master Brokerage Agreement.

THE WITNESS: Well, it's hard to tell which agreement it was actually under because this one's not -- there's a few that aren't signed.

So it can be confusing to the person that is reading it what contract it's under.

BY MR. BURKE:

Q. And this one is not signed either, correct?

A. Correct.

Q. When -- back at this time and certainly up until about the middle of June, June 13th, 2008, when you would haul paper from International Paper, was all of your contact and involvement with Overnite Express as opposed to Universal?

A. It's kind of -- it's unclear to me actually who we were hauling for because there's names on the bills of lading of OXEN, Overnite Express, and I just don't understand why those are on there.

Q. And my question was: It did not include

422

of the --

A. Yes.

Q. -- agreement? Now, at this -- back in November of 2007 were you hauling paper out of International Paper?

A. Yes.

Q. But am I correct you were doing it through an agreement with Overnite Express?

A. Yes. There's several contracts.

Q. And at that time it was Overnite Express that you were working with to haul the paper out of International Paper's Exel warehouse, correct?

A. Yes.

Q. And when I say "at that time," I mean November 7, 2007.

A. Yes.

Q. Okay. When Overnite Express directed Martin's to make the pickup on July 3rd and Martin's did so, was that pursuant to your agreement with Overnite Express -- or you know what, let me rephrase that question.

Do you know if this contract was in effect on November 7th of 2007?

MR. FISHER: By "this" do you mean those

421

the day of this incident; I'm talking about like back in November of 2007 when you would get loads at International Paper, were you dealing with Melody all the time from Overnite Express?

A. Yes.

Q. Okay. Now, I think you told me -- I mean, it's your understanding Overnite Express had agreed with International Paper to transport their paper products, correct?

A. Correct.

Q. And they in turn turned to Martin's to -- and requested Martin's to work in conjunction with Overnite to accomplish the transportation of those paper products, correct?

A. Correct.

Q. And you were doing that on a regular basis for some period of time prior to July 3rd, correct?

A. Correct.

Q. And for about how long was Mr. Franke making that regular run?

A. I don't know the exact dates but quite sometime.

Q. A number of years?

A. Yes.

423

55 (Pages 420 to 423)

Q. Do you know if Overnite -- or strike
that.
     You know, in that -- look at Page 15 of
this Master Broker Agreement in front of you,
correct?
A. Yes.
Q. Okay. Whether or not this agreement was
actually in effect at any time, if you look at
Paragraph 3, am I correct that Universal Am Can was
requiring Martin's to use duly and legally
qualified -- or strike that.
     Am I correct that Martin's had to be a
legally qualified contract carrier in order to
transport any paper products pursuant to -- any
product pursuant to this agreement?
A. Yes.
Q. And did Universal also require that
Martin's not have an unsatisfactory safety rating
from the United States Department of
Transportation?
A. Say that one more time.
Q. If you look in the middle of Paragraph 3
or the fourth line from the bottom, in this
paragraph is it true that Universal is requiring

424

that Martin have at least a satisfactory safety
rating from the United States Department of
Transportation?
A. Yes.
Q. And in that same line does it -- was
Universal requiring Martin's and their drivers to
comply with all Federal, state and local laws
regarding the provision of the transportation
services contemplated under this agreement?
A. Yes.
Q. And that means that Universal was
requiring that Martin's have drivers that would
comply with all -- not only Martin's but their
drivers had to comply with all Federal Motor
Vehicle Safety Administration provisions concerning
the type of truck and the inspection of the truck
in pre-trip inspections and things of that nature,
correct?
A. Yes.
Q. And Universal also was requiring that
Martin's and its drivers comply with all traffic
regulations that would apply to the safe operation
of a semi-tractor trailer truck, correct?
A. Yes.

425

Q. And that would -- that provision meant
that Universal was requiring that your drivers
would drive at speeds that would not result in a
collision, correct?
A. Correct.
Q. And that they would drive in a manner that
was safe and suitable for the existing traffic
conditions to avoid colliding with another vehicle,
correct?
A. Correct.
Q. And then -- now, on the next page, sir --
or strike that. You know, in Paragraph 5 Mr. -- or
it also was -- Paragraph 5 and A, B and C set forth
different requirements that Universal had for
Martin's requiring Martin's to maintain liability
insurance, correct?
A. Correct.
Q. And also workers comp insurance, correct?
A. Correct.
Q. And you even had to provide Universal with
written certificates from the insurance companies
confirming that Martin's had that insurance,
correct?
A. Correct.

426

Q. Take a look at Paragraph 6. And the first
line says that UACL agrees to pay carrier for
services provided in accordance with the rate
confirmation sheet issued by UACL and signed by the
carrier as a supplement to this agreement prior to
dispatch of the carrier's equipment, correct?
A. Correct.
Q. In the very first part of that sentence
where it says "carrier," that's referring to
Martin's, correct?
A. Correct.
Q. And it actually -- Universal actually
states there that they're agreeing to pay the
carrier for the services that Martin's was
providing to Universal, correct?
A. Correct.
Q. And I know earlier this morning when you
were asked some questions about why you believed
Martin's and Mr. Franke were an agent of Universal
and Overnite and I recall one of your reasons is
because you were providing a service to Universal
and Overnite, correct?
A. Correct.
     MR. FISHER: Excuse me. Objection to

427

56 (Pages 424 to 427)

**Page 428**

```
 1    form.
 2    BY MR. BURKE:
 3        Q.  And the services you were providing are
 4    the transportation of these paper products and --
 5    correct?
 6        A.  Correct.
 7        Q.  Okay.  And that's the services that is
 8    being referred to here in Paragraph 6 that you were
 9    getting paid for by Universal, correct?
10        A.  Correct.
11        Q.  Now, you know, if I could -- by the way,
12    you were required -- Martin's was required to have
13    proper equipment in terms of tractors and trailers
14    in order to transport the goods that Universal
15    wanted you to transport, correct?
16        A.  Correct.
17        Q.  And, you know, in Paragraph 6, down here
18    on the bottom, take a look, sir, at about seven,
19    seven lines up.  I'll give you a minute -- from the
20    bottom of Paragraph 6.  There's a line, it talks
21    about carrier agrees that UACL has the exclusive
22    right to handle all billing.  Did you find --
23        A.  Yes.
24        Q.  You've got that section, okay.  Now, am I
```

**Page 430**

```
 1    Martin's could not subcontract this work to anybody
 2    else, correct?
 3        A.  Correct.
 4        Q.  A moment ago you told us that Martin's had
 5    one million dollars in liability coverage; is that
 6    right?
 7        A.  Yes.
 8        Q.  I believe you also said that -- and I'll
 9    just say it again.
10            Did Martin's Bulk Milk Service have any
11    type of other coverage of any kind that is
12    applicable to the injuries sustained by
13    Mr. Scheinman on July 3rd, 2008?
14        A.  No.
15        Q.  Did Martin's have any type of excess
16    coverage, additional coverage, umbrella coverage?
17        A.  No.
18        Q.  Did they -- did Martin's Bulk Milk Service
19    have such excess coverage at any time prior to July
20    3rd, 2008?
21        A.  I believe years before.
22        Q.  About how many years before?
23        A.  Three to four.
24        Q.  Had that coverage been specifically
```

**Page 429**

```
 1    correct that Universal was telling Martin's that
 2    Universal was in complete control of handling all
 3    billing of freight charges to the customer for the
 4    hauling that you were doing, correct?
 5        A.  Correct.
 6        Q.  And, in fact, Universal specifically
 7    required that Martin's refrain from any type of
 8    collection efforts, correct?
 9        A.  Correct.
10        Q.  Therefore, under this agreement Martin's
11    was to get paid only by Universal, correct?
12        A.  Correct.
13        Q.  In this agreement Universal also required
14    that you refrain from any type of direct contact
15    with or solicitation of any business from any of
16    their shippers such as International Paper,
17    correct?
18        A.  Correct.
19        Q.  And if you violated that, they were going
20    to penalize you by taking part of your commissions,
21    correct?
22        A.  Correct.
23        Q.  And, by the way, in Paragraph 8 under this
24    agreement Universal directed that you -- that
```

**Page 431**

```
 1    canceled by anyone at Martin's?
 2        A.  No.
 3        Q.  How is it you no longer had that coverage
 4    on July 3rd, 2008?
 5        A.  Because it got to be unaffordable.
 6        Q.  And did someone make a decision not to
 7    renew that coverage?
 8        A.  Yes.
 9        Q.  And who made that decision?
10        A.  Probably my father.
11        Q.  And his name again -- is it Allan?
12        A.  Allan.
13        Q.  Do you know, Mr. Martin, in what year you
14    last had any kind of umbrella coverage?
15        A.  Prior to this?
16        Q.  Prior to this, yes, sir.
17        A.  Exact date I do not.
18        Q.  Does -- is Martin's involved in any -- is
19    Martin's insurance company -- Strike that.
20            Does Martin's have its coverage through
21    AIG or one of its companies?
22        A.  We did at this time.
23        Q.  Yes.  And when I say coverage, I mean
24    that's applicable to this incident.
```

57 (Pages 428 to 431)

A.   Yes.

Q.   To your knowledge is Martin's and/or AIG involved in any litigation with Universal Am Can or Overnite Express or International Paper or any of their insurance carriers concerning coverage, liability coverage, for this case?

MR. FISHER:  Can I have that question back, please.

(Whereupon, the record was read.)

THE WITNESS:  Not to my knowledge.

BY MR. BURKE:

Q.   Would you look at Bates stamp 18 which is a couple more pages.  Do you see that, sir?

A.   Yes.

Q.   And that's a carrier's survey or that's what it's entitled?

A.   Yes.

Q.   Now, I see on there -- it's a little blurry -- but it looks like a UACL logo in the upper left --

A.   Yes.

Q.   -- is that correct?  Okay.  In that black kind of starlike background?

A.   Yes.

432

---

correct?

A.   Both names are listed on this sheet.

Q.   And did someone in your office complete this and return it to them?

A.   Yes.

Q.   And who would have completed this at your office?

A.   This one was signed by a Pat Podlena.

Q.   And how do you know that?

A.   Well --

Q.   Oh, because Pat -- well, strike that.

Let me ask you.  I'm talking about the carrier survey, who filled that out, if you know?

A.   It's consistent with his writing.  It's Pat's.

Q.   Okay.  That's fine.  But his name is not on there, correct?

A.   Correct.

Q.   I just wanted to make sure I wasn't missing it someplace.  Then on Page 22, if you look at those Bates stamp numbers in the lower right-hand corner, what do you understand that page to be?

A.   It's a copy of our interstate authority.

434

---

Q.   And then right above that there's some fax information and it's got the date June 17, 2008, correct?

A.   Yes.

Q.   And then there's a phone number 708-331-8884, correct?

A.   Correct.

Q.   And do you know that number to be the Chicago area number of Overnite Express?

A.   Yes.

Q.   Then right next to that fax number is -- or I shouldn't say fax, there's a phone number. Right next to that phone number is an Overnite Logistics -- or is the name Overnite Logistics, correct?

A.   Correct.

Q.   And, basically, do you know what this document is?

A.   It's just information they're asking about our company: Owners, contacts, Federal ID number, MC number, amount of equipment that we have, asking about HazMat.

Q.   And it looks like it's Overnite Logistics and UACL that is asking that information; is that

433

---

Q.   Who operate as a commercial carrier?

A.   Motor carrier.

Q.   And was your authority in effect on July 3rd, 2008?

A.   Yes.

Q.   Has your -- has the authority of Martin's Bulk Milk Service to operate as a motor carrier ever been revoked?

A.   No.

Q.   Let me ask you to look at Page 35 for a minute.  Actually, let me have you back up to Page 28, please.  And that appears to be a letter on International Paper letterhead from an Attorney Thomas Quinlen, Q-u-i-n-l-e-n, correct?

A.   Yes.

Q.   And that's being sent from International Paper to Universal Am Can, correct?

A.   Yes.

Q.   Now, take a look at the first paragraph. At the end of the last sentence it starts with "Mr. Franke was employed"?

A.   Yes.

Q.   Okay.  And it goes on to say:  Mr. Franke was employed by Martin's Bulk Milk Service, Inc.

435

---

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 and was delivering a load of paper under a contract
2 between IP and Overnite Express, correct?
3     A. Correct.
4     Q. And that to your knowledge is correct as
5 to what was taking place on July 3rd, 2008,
6 correct?
7     A. Correct.
8     Q. And then on the next paragraph the lawyer
9 for International Paper states in this letter
10 that "it is my understanding that the contract
11 between IP and Overnite Express was assigned to
12 Universal Am Can in May of 2008," correct?
13     A. Correct.
14     Q. And was that your general understanding of
15 what had occurred when you were telling us earlier
16 that you got a phone call talking about Universal
17 having taken over the business of Overnite Express?
18     A. Yes.
19     Q. When you got that phone call, were you
20 told that your work would continue as it had in
21 terms of the picking up shipments of paper on a
22 daily basis at the Exel warehouse for International
23 Paper?
24     A. Yes.

436

1     Q. And you got the call from Mr. -- one of
2 the Eisholtzes, correct?
3     A. If I recall, yes.
4     Q. And that you knew -- you knew that to be
5 one of the owners or a member of the family that
6 owned Overnite Express, correct?
7     A. To my knowledge at that time, yes.
8     Q. Then take a look at Page 67, sir, Bates
9 stamp 67 on the lower right corner. Do you have
10 that in front of you?
11     A. Yes.
12     Q. Now, that's a letter dated May 21st, 2008
13 on UACL letterhead, correct?
14     A. Yes.
15     Q. And it's got the name of Mark Limback,
16 L-i-m-b-a-c-k, president of UACL on the upper right
17 corner?
18     A. Correct.
19     Q. And that letter is being directed to
20 International Paper in Memphis, Tennessee, correct?
21     A. Correct.
22     Q. And at that time on that day, May 21st,
23 2008, UACL wrote to International Paper and said:
24 Dear Customer, Overnite Express will be operating

437

1 under Universal Am Can Limited's insurance and
2 authority as of June 13th, 2008 based on an
3 agreement to partner with their organization,
4 correct?
5     A. Yes.
6     Q. And then in the second paragraph it went
7 on to say: Please consider this letter as an
8 assignment of the current contract you have in
9 place for Overnite Express, correct?
10     A. Yes.
11     Q. That was signed by Gina Hubbs, G-i-n-a,
12 Hubbs, H-u-b-b-s, vice president of Universal Am
13 Can Limited, correct?
14     A. Correct.
15     Q. Let me ask you to look at 35, Bates stamp
16 35 in front of you. Well, here, you should
17 probably first look at Bates stamp -- well, here,
18 look at Page 32 to put it in context. Take a
19 minute to look at that, sir, and tell me when
20 you've done so.
21     MR. SKRYD: Are you done?
22     THE WITNESS: Yes.
23     MR. BURKE: Okay.
24     MR. SKRYD: I was going to say it

438

1 shouldn't take you ten minutes to read it.
2 BY MR. BURKE:
3     Q. My mistake. I just wanted to give you
4 enough time to look at it.
5         That letter, sir, is on International
6 Paper letterhead from Mr. Quinlen and it's a letter
7 actually directed to Mr. Carl Fisher, correct?
8     A. Correct.
9     Q. And that -- Carl Fisher of Hinshaw &
10 Culbertson who is here today. And that letter
11 basically says that Mr. Quinlen was enclosing a
12 copy of the completed contract dated October 1st,
13 2007 between International Paper and Overnite
14 Express along with Amendment 1 to that contract,
15 correct?
16     A. Correct.
17     Q. And Amendment 1 is -- was dated June 9th
18 of '08 according to this letter, right?
19     A. Yes.
20     Q. And then the next page, if you look at
21 Bates stamp Page 33, that appears to be the first
22 page of what's entitled OXEN, O-X-E-N, Overnite
23 Express 2007 Outbound Contract, correct?
24     A. Correct.

439

59 (Pages 436 to 439)

Q. And it's got a table of contents there, right?
A. Yes.
Q. And then if you now go to Bates stamp Page 35, there's a section that they call Header, correct?
A. Yes.
Q. Okay. That says that this agreement is entered into and is effective this 1st day of October 2007 by and between International Paper Company with offices at 6400 Popular in Memphis, Tennessee and in parentheses identifies themselves as the shipper, correct?
A. Yes.
Q. And the other party to this contract is identified as Overnite Express and it's got Mr. Robert W. Elsholtz's name and identifies Overnite Express as the carrier, correct?
A. Correct.
Q. And then down in -- and then also in the middle of that page it discusses various terms and then it goes on to Section 2, the Carrier Status, correct?
A. Yes.

440

Q. And then the carrier in Section 2 under Carrier Status, carrier -- and when they refer to "carrier" here, it's Overnite Express, right?
A. I'm not sure.
Q. Back up to the Header. See where it said Overnite Express?
A. Yes. Yes.
Q. Carrier was Overnite Express, correct?
A. Yes.
Q. Okay. And then down in the middle of the page under Carrier Status it says that carrier represents that it is an interstate motor contract carrier of property, correct?
A. Correct.
Q. And then look at Page 36. Well, here, before you leave 35, do you see the Section 3 under Carrier's Obligations?
A. Yes.
Q. Okay. And that would be the obligations of Overnite Express, correct?
A. Correct.
Q. And under Section A it talks about the services, that the carrier has to provide the services set forth in Exhibit C, correct?

441

A. Correct.
Q. And then on the next page -- actually, it goes through letters A through K of various obligations that the carrier, meaning Overnite Express, must comply with, right?
A. Correct.
Q. And in Paragraph G it talks about the type of motor vehicle equipment the carrier must use, correct?
A. Correct.
Q. And then in H it talks about the type of personnel that the carrier must utilize, correct?
A. Correct.
Q. And then in J it talks about the type of trailer requirements that Overnite must use, correct?
A. Correct.
Q. And, in fact, there on Line 2 it talks about suitable trailers are defined as van trailers that are free of contaminants, debris, foreign substances, et cetera, right?
A. Correct.
Q. And that's an example of what you were talking about earlier when you told us that

442

Overnite required you to have a safe and suitable trailer for the transport of the goods that you were picking up, correct?
A. Correct.
MR. FISHER: Excuse me. Objection to form.
BY MR. BURKE:
Q. Is that correct, Mr. Martin?
A. Correct.
Q. Then take a look at Page 45 in front of you. That's still part of the agreement that we're talking about here between International Paper and Overnite.
Do you have Page 45 in front of you?
A. Yes.
Q. And that's a signature page, correct?
A. Yes.
Q. And that was signed by Mr. Elsholtz in his position as president of Overnite Express and in parentheses it says OXEN, correct?
A. Correct.
Q. And also signed by Kevin Hayes of Overnite Express and Sandra Herman of Overnite Express, correct?

443

**60 (Pages 440 to 443)**

1  A. Correct.
2  Q. And then on behalf of International Paper
3  it was signed by William Crawford, right?
4  A. Correct.
5  Q. And, by the way, Mr. -- it looks like
6  Ovemite Express signed that October 30th of '07
7  and International Paper signed it November 12th
8  of '07, correct?
9  A. Correct.
10 Q. And then take a look at Page 47, please.
11 Bates stamp 47. Am I correct that that is the
12 Interstate Commerce Commission's authority to
13 Ovemite Express to operate as a motor vehicle
14 contract carrier?
15 A. Yes.
16 Q. Ovemite Express was -- they had the same
17 authority to operate as a motor carrier as did
18 Martin's Bulk Milk Service, correct?
19 A. Correct.
20 Q. Would it be fair to say that in your
21 transportation of International Paper products you
22 were working in conjunction with Ovemite Express
23 in transporting the paper products?
24 MR. FISHER: Objection --
                                          444

1  Express?
2  A. Yes.
3  Q. Okay. And it starts on Page 46. It
4  starts with Exhibit A, correct?
5  A. Yes.
6  Q. And then -- and Exhibit A was the ICC
7  permit to operate as a contract carrier?
8  A. Yes.
9  Q. Okay. And then I just want you to follow
10 through to some other exhibits that are attached.
11 And, actually, you can -- go to Bates stamp Page
12 62. Do you see that?
13 A. Yes.
14 Q. That refers to an Attachment A for
15 certificate of insurance, correct?
16 A. Yes.
17 Q. And it says that International Paper must
18 be named as an additional insured, correct?
19 A. Yes.
20 Q. And then the very next page is 63,
21 correct?
22 A. Yes.
23 Q. And that is entitled Certificate of
24 Liability Insurance, correct?
                                          446

1  THE WITNESS: Yes.
2  MR. FISHER: Objection to form and
3  foundation.
4  BY MR. BURKE:
5  Q. And you had been doing so for a number of
6  years prior to July 3rd of 2008, correct?
7  A. Correct.
8  MR. FISHER: Same objections.
9  BY MR. BURKE:
10 Q. And it would also be true that on July
11 3rd, 2008 that Martin's Bulk Milk Service was
12 operating in conjunction with Ovemite Express and
13 Universal Am Can in transporting International
14 Paper's paper products to Minnesota, correct?
15 A. That's the way the documents are.
16 MR. FISHER: Form and foundation. Can you
17 just read back his question.
18 (Whereupon, the record was read.)
19 BY MR. BURKE:
20 Q. You know, Mr. Martin, after that signature
21 page that I just had you look at, which is Page 45,
22 is it correct then that in the subsequent pages
23 there are certain exhibits attached to that
24 agreement between International Paper and Ovemite
                                          445

1  A. Yes.
2  Q. And in the upper left, the insured is
3  identified as Ovemite Express, correct?
4  A. Correct.
5  Q. And in the first set of boxes under
6  General Liability there's a date period there in
7  March '07 to March '08, correct?
8  A. Yes.
9  Q. Then down on the bottom under Certificate
10 Holder -- well, strike that.
11 Do you see in the box right above that
12 says: The Certificate Holder is an additional
13 insured under the General Liability Policy with
14 respect to the operations of the above-named
15 insured?
16 A. Yes.
17 Q. And then down in the Certificate Holder
18 box it identifies International Paper, right?
19 A. Correct.
20 Q. Then I want to direct your attention to
21 Bates stamp Page 65 that you have in front of you.
22 That's Amendment Number 1, correct?
23 A. Yes.
24 Q. And the cover letter that we referred to
                                          447

61 (Pages 444 to 447)

1 earlier also referenced Amendment Number 1,
2 correct?
3 A. Yes.
4 Q. And if you read the first paragraph of
5 Amendment Number 1, part of what it says there is
6 that that amendment was entered into on June 9th of
7 2008, correct?
8 A. Yes.
9 Q. And it's being entered into between
10 International Paper in Memphis, Tennessee and
11 Overnite Express of St. Paul, Minnesota, correct?
12 A. Correct.
13 Q. And International Paper is identified as
14 company and Overnite Express is identified as
15 carrier, correct?
16 A. Correct.
17 Q. And then do you see under the section that
18 says Witnessed?
19 A. Yes.
20 Q. And it says: Whereas, the parties entered
21 into Contract Number OXEN 093009 dated October 1st,
22 2007, which they refer to as the contract, right?
23 A. Yes.
24 Q. And then it goes on to say that the

448

1 procurement, correct?
2 A. Correct.
3 Q. And it's dated -- and that's on behalf of
4 International Paper, right?
5 A. Yes.
6 Q. And it's dated June 12th of '08?
7 A. Yes.
8 Q. And then it's signed by Mr. Mark Limback
9 as president for Universal Am Can Limited on June
10 10, 2008, correct?
11 A. Correct.
12 Q. You know, from what I have just -- you
13 know, from what you have just seen in these
14 provisions of the contract that you've looked at,
15 are those provisions consistent with your
16 understanding that as of June 13th, 2008 --
17 MR. SKRYD: June what?
18 MR. BURKE: June 13th, 2008.
19 MR. SKRYD: Okay.
20 BY MR. BURKE:
21 Q. -- when Universal -- or Universal Am Can
22 apparently consummated its merger or joining of or
23 purchase of Universal Am Can that business was
24 going to continue as it had between you and

450

1 parties desire to amend the contract and that they
2 agree as follows, correct?
3 A. Yes.
4 Q. And after that it states that effective
5 June 13th, 2008 carrier will be operating under the
6 name of Universal Am Can Limited and S-C-A-C UACL,
7 correct?
8 A. Yes.
9 Q. And "carrier" we know from the opening
10 paragraph is referring to Overnite Express,
11 correct?
12 A. Yes.
13 Q. And then it says that Universal Am Can
14 agrees to honor the rates and fuel surcharge
15 established between the company and Overnite,
16 correct?
17 A. Yes.
18 Q. And then a couple lines further it says:
19 All other terms of the contract shall remain and
20 are in full force and effect, correct?
21 A. Correct.
22 Q. And then it's signed by -- I believe it's
23 a person named Munday, if I recall correctly, who's
24 identified as manager of sourcing motor

449

1 Overnite and/or Universal?
2 A. Yes.
3 MR. FISHER: Excuse me, Rich. Objection.
4 I think you said Universal Am Can assuming
5 Universal Am Can.
6 (Whereupon, the record was read.)
7 BY MR. BURKE:
8 Q. Mr. Martin, are the various provisions
9 that you've seen that I've just walked you through,
10 are they consistent with your understanding after
11 you got that phone call from Mr. Elsholtz that the
12 business relationship you had with Overnite would
13 now be operated by Universal and you would continue
14 to makeup daily -- make daily pickups at
15 International Paper?
16 A. Yes.
17 MR. FISHER: A much better question
18 notwithstanding the absence of the word
19 consummation.
20 MR. SKRYD: And joining everything else
21 you had in there.
22 BY MR. BURKE:
23 Q. Let me ask one other question and then --
24 or one other topic.

451

62 (Pages 448 to 451)

Page 70, sir, if you have that in front of
you.

A. Yes.

Q. Does that appear to be another letter from
Mark Limback, president of UACL?

A. Yes.

Q. Okay. And that's a letter he is
directing, quote, to the valued customers of
Overnite Express, Inc., end quote?

A. Yes.

Q. And Mr. Limback went on to state that: We
are proud and excited to announce Overnite Express,
Inc. has joined our team. We believe this
partnership and relationship will enhance our
ability to better serve you, our valued customers,
correct?

A. Correct.

Q. And he goes on to say: With the strength
and experience of their management team, along with
the understanding of what it takes to provide the
service you and your customers have been accustomed
to, we foresee a seamless and transparent
transition, correct?

A. Correct.

452

Q. And he also then says: As of June 13th,
2008 your bill of lading should reflect Universal
Am Can Limited as the carrier and, thus, all
invoices will reflect such along with our
remittance address, correct?

A. Correct.

Q. And it would be correct that from Martin's
standpoint you continued to work with Universal
and/or Overnite Express after June 13th in the
exact same manner as you had prior to June 13th,
2008, correct?

A. Correct.

Q. And you -- Martin's continued to provide
services to Universal and/or Overnite by way of
transporting paper products just as you had done
prior to the partnership between UACL and Overnite
Express, correct?

A. Correct.

Q. And you know -- on this document, like,
would one of the valued customers of Overnite,
would that be International Paper?

A. I would think so.

Q. And, you know, where it says -- the part I
mentioned earlier, as of June 13th your bill of

453

lading should reflect Universal Limited as the
carrier, the president of Universal is representing
Universal as a motor carrier, correct?

MR. FISHER: Objection, foundation.

THE WITNESS: Yes.

BY MR. BURKE:

Q. And probably the more appropriate way for
me to term that would be Mark Limback, the
president of Universal, is referring to Universal
as a carrier, correct?

A. Correct.

Q. And on July 3rd, 2008 you believe that
Martin's was working in conjunction with Universal
as carriers to transport paper products from
International Paper to Minnesota, correct?

A. Correct.

Q. And you, as you told us earlier, believed
you clearly were an agent of Universal and/or
Overnite Express because you were providing a
service to Universal by assisting them in the
transportation of those paper products they had
committed to International Paper to transport,
correct?

A. Correct.

454

MR. BURKE: Why don't we take that break,
sir.

THE VIDEOGRAPHER: We're going off the
video record. The time now is 6:10 p.m.

(A break was taken.)

THE VIDEOGRAPHER: We're back on the video
record. The time now is 6:31 p.m.

BY MR. BURKE:

Q. While you have that exhibit still in front
of you, sir, take a look at Bates stamp Page 73.

And am I correct that that is a copy of
the Interstate Commerce Commission's certification
of Universal Am Can as a common carrier by motor
vehicle dated October 11, 1983?

A. Yes.

Q. Similarly, on Page 74, that's their
certification as a contract carrier from the ICC;
is that correct?

A. Yes.

Q. You know, let me -- do you still have --
flip back to Exhibit 5, please.

A. The big pages?

Q. The tabbed exhibits, yes.

A. All right.

455

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Q. Actually, I should say flip forward to it.

A. I'm on it.

Q. Okay. And I think I showed those to you before. Those are the three bills of lading or memo bills, correct?

A. Correct.

Q. Now -- and there's -- as you mentioned before, there's three separate ones for the three separate designations in Minneapolis for these paper products, correct?

A. Correct.

Q. Now, I see -- if I could direct your attention to the very bottom of all three of those where it says shipper, shipper per. Do you see in the lower left?

A. Yes.

Q. Okay. Now, am I correct the shipper here is International Paper?

A. Yes.

Q. And then to the right it says agent per, correct?

A. Yes.

Q. Now, is that a spot on these bills of

456

lading where Mr. Franke -- where it would be appropriate for Mr. Franke to sign as the agent of Overnite Express to document delivery of these paper products for the shipper?

MR. FISHER: Objection to form.

THE WITNESS: Yes.

BY MR. BURKE:

Q. You know, I remember earlier today Mr. Fisher was asking you about, you know, whether Overnite Express or Universal gave Martin's directions or instructions on certain things, correct?

A. Correct.

Q. And in reality as I -- when I took you through a -- well, strike that.

In reality, Overnite or Universal did give Martin's instructions on various aspects of this transportation process, did they not?

MR. FISHER: Objection to form.

THE WITNESS: Correct.

BY MR. BURKE:

Q. And, I mean, in particular, the initial paperwork that would get faxed to Martin's, Universal or Overnite would be instructing Martin's

457

to -- literally to make this pickup at International Paper's warehouse, correct?

A. Yes.

Q. And Overnite would -- and Universal would give you instructions on the time of that pickup and the location of that pickup, correct?

A. Correct.

Q. And they'd give you instructions on where it had to be delivered, correct?

A. Correct.

Q. And also instructions on when it had to be delivered by, correct?

A. Correct.

Q. And they also required that you use a certain size trailer, which was a 53-footer, correct?

A. Correct.

Q. And they also instructed that you utilize a trailer that was clean and free of debris and tight and secure so as to be free of rain or snow, correct?

A. Correct.

Q. In actuality, Overnite and Universal did instruct Martin's and its drivers as to how to

458

drive because they said your drivers had to comply with all state and Federal and local regulations that applied to the transport of products in semi-tractor trailers, correct?

MR. FISHER: Objection to form.

THE WITNESS: Yes.

BY MR. BURKE:

Q. By the way, did Franke have to contact anyone when he would accomplish the delivery?

A. Back to Wilton? Because his delivery always came back to Wilton.

Q. No. To the ultimate recipient, to -- like in this instance Minnesota?

A. No, because Sam wouldn't deliver the Minnesota part of it.

Q. Okay. Would the Martin's driver that delivered to Minnesota, would they have to contact anyone to say the delivery was there?

A. We didn't have to contact unless there was a problem.

Q. But if there's any delay in the transport or the delivery time designated by Overnite or Universal couldn't be met, then the driver had to contact Universal or Overnite?

459

64 (Pages 456 to 459)

1  A. Correct.
2  Q. It would be correct to say that
3 Martin's would not -- that Martin's and Samuel
4 Franke would not have been involved in driving down
5 41 with this International Paper on July 3rd, 2008
6 unless Martin's had been asked to transport those
7 paper products by Universal and/or Overnite
8 Express, correct?
9     MR. FISHER: Speculation.
10    THE WITNESS: Correct.
11 BY MR. BURKE:
12  Q. You know, you got asked earlier about -- I
13 believe it's Exhibit 75.
14    MR. BURKE: Bob, could you give Mr. Martin
15 Exhibit 75?
16    MR. GOLDEN: I got it.
17 BY MR. BURKE:
18  Q. Actually, if you flip over 75 -- let me
19 use that one and then there's -- the witness's copy
20 is right there on the upside down pile.
21    Do you have that exhibit in front of you,
22 Mr. Martin?
23  A. Yes.
24  Q. That's entitled Universal Am Can Limited

460

1 there's a statement that says: The carrier is an
2 independent contractor and in no way should be
3 considered an agent, employee or joint venturer of
4 UACL, correct?
5  A. Correct.
6  Q. However, is it also correct that Universal
7 Am Can then proceeds to require that Martin's be a
8 legally qualified contract carrier?
9  A. Yes.
10  Q. And Universal also required that Martin's
11 have a satisfactory safety rating from IDOT -- or
12 from Department of Transportation?
13  A. Yes.
14  Q. And Universal also instructed that
15 Martin's had to comply with all Federal, state and
16 local laws concerning the transportation of
17 products pursuant to this agreement, correct?
18  A. Correct.
19  Q. And we talked earlier, that reference to
20 complying with Federal, state and local laws
21 includes all driving rules and regulations and
22 rules of the road that need to be followed for safe
23 operation of a tractor-trailer, correct?
24    MR. FISHER: Foundation, form.

462

1 Master Brokerage Agreement, correct?
2  A. Correct.
3  Q. And it's dated June 12th, 2008, right?
4  A. Correct.
5  Q. And that again is -- if you look on Page 3
6 of that agreement, it is apparently signed by Pat
7 Podlena on behalf of Martin's Bulk Milk but it is
8 not signed by anybody for Universal Am Can,
9 correct?
10  A. Correct.
11  Q. Now, I just want to ask you about some
12 things that are set forth in here and I just want
13 to direct your attention. These are -- if I can
14 first direct your attention to Paragraph 3. Do you
15 see that?
16  A. Yes.
17  Q. Okay. Am I correct that in Paragraph 3 --
18 and, by the way, this was being entered into
19 according to the opening paragraph between
20 Universal Am Can and Martin's Bulk Milk Services,
21 correct?
22  A. Correct.
23  Q. And then back to Paragraph 3. That's the
24 paragraph where, as Mr. Fisher pointed out earlier,

461

1    THE WITNESS: Correct.
2 BY MR. BURKE:
3  Q. And it certainly includes complying with
4 state and local laws that preclude operating a
5 tractor-trailer truck at a speed that is not safe
6 in light of the existing traffic conditions,
7 correct?
8     MR. FISHER: Same objection.
9     THE WITNESS: Correct.
10 BY MR. BURKE:
11  Q. And it precludes rear-end collisions with
12 vehicles in front of the tractor-trailer, correct?
13  A. Correct.
14    MR. FISHER: Same objections.
15 BY MR. BURKE:
16  Q. And then in Paragraph 5 Universal dictated
17 that Martin's have one million dollars in liability
18 insurance coverage, correct?
19  A. Correct.
20  Q. And it also required in 5B that Martin's
21 have a cargo liability insurance, correct?
22  A. Correct.
23  Q. And if you turn the page to the second
24 page of that agreement, it proceeds to require that

463

65 (Pages 460 to 463)

Martin's name UACL as an insured on Martin's policy
for cargo liability, correct?
   A. Correct.
   Q. And then as we -- or strike that.
      And in Paragraph 5C Universal requires
Martin's to have workers comp insurance, correct?
   A. Correct.
   Q. And in Paragraph D Universal required
Martin's to produce evidence of written
certificates confirming the existence of the
liability insurance, correct?
   A. Correct.
   Q. By the way, this is a contract prepared
by -- or strike that.
      The content of this agreement is prepared
completely by Universal, correct?
   A. Correct.
   Q. And none of these terms were negotiated,
correct?
   A. Correct.
   Q. And this contract would be completely
prepared by Universal and sent to Martin's?
   A. Yes.
   Q. And then as we discussed earlier in

464

Paragraph 6, Universal required that they have
exclusive control over all handling of billing for
freight charges to the customer, correct?
   A. Correct.
   Q. And specifically precluded Martin's from
having any contact with the shipper concerning
payment or lack of payment, correct?
   A. Correct.
   Q. And then in Paragraph 7 Universal
precluded Martin's from soliciting any work from
any shipper that you first became involved with
through Universal, correct?
   A. Correct.
   Q. And, again, has a penalty in the event
that condition or requirement was breached, right?
   A. Correct.
   Q. In Paragraph 8 Universal setup a
requirement that Martin's had to carry out the
transport of these products and that you could not
subcontract this work, correct?
   A. Correct.
   Q. Now, in Paragraph 10, in the latter half
of Paragraph 10, Universal requires Martin and its
driver to immediately upon completion of loading to

465

contact Universal with the name of the receiver and
the status of delivery immediately upon completion
of the delivery; is that true?
   A. That's what it states.
   Q. And in Paragraph 11 Universal said
Martin's was not allowed to withhold any goods of
the customers such as International Paper because
of any dispute Martin's might have or any alleged
failure by Universal to pay Martin's, correct?
   A. Correct.
   Q. In Paragraph 12 you got asked about some
indemnification language earlier today, correct?
   A. Correct.
   Q. And in the very last sentence it is
correct that it states that any indemnification and
hold harmless obligations referred to in this
paragraph do not apply to any portion of any
personal injury claim attributable to the tortious
conduct of Universal, correct?
   A. Correct.
   Q. I think you told us earlier you don't know
if Universal ever signed this contract, correct?
   A. Correct.
   Q. Am I -- do I understand that you have

466

never seen a signed copy of this that you're aware
of as you sit here?
   A. That is correct.
   Q. And then look at the next page of Exhibit
75. Do you have that? It's entitled -- it's a
welcome letter?
   A. Yes.
   Q. Okay. And that again itemized some of the
requirements that we just mentioned before about
the one million dollars in liability insurance,
correct?
   A. Correct.
   Q. Would it be correct that Universal and/or
Overnite -- I mean, they completely controlled
whether or not Martin's sent Mr. Franke up to the
International Paper warehouse to pickup a load or
not, correct?
      MR. FISHER: Form.
      THE WITNESS: Correct.
BY MR. BURKE:
   Q. And I think there was a time earlier today
you talked about -- Mr. Fisher, I believe, showed
you a bill for some amount and I forget the wording
but it was like no truck or no job, do you remember

467

66 (Pages 464 to 467)