# EX. 6

Janet Berndt Deposition
dated, September 28, 2012

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY D. SCHEINMAN, a Disabled Person
Plaintiff,
-vs- ) No. 09 CV 5340
MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, CSX INTERMODAL, INC., INTERNATIONAL PAPER COMPANY, et al.,
Defendants.

The discovery deposition of JANET BERNDT, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Janet M. Stanton, a notary public within and for the County of DuPage and State of Illinois, at 211 South Wheaton Avenue, Wheaton, Illinois, on the 28th day of September, 2012, at the hour of 10:17 o'clock a.m.

Reported by: Janet M. Stanton, CSR
License No.: 084-001905

APPEARANCES:

CLIFFORD LAW OFFICES
BY: MR. RICHARD F. BURKE, JR.
rfb@cliffordlaw.com
120 North LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090
rfb@cliffordlaw.com
Representing the Plaintiff;

MULHERIN, REHFELDT & VARCHETTO, P.C.
BY: MR. MATTHEW R. SCHRECK
mschreck@mrvlaw.com
MR. JASON M. BRIESEMEISTER
jbriesemeister@mrvlaw.com
211 South Wheaton Avenue, Suite 200
Wheaton, IL 60187
(630) 653-9316
-and-
DOWD & DOWD, LTD.
BY: MS. LARA R. LICKHALTER
llickhalter@DowdandDowd.com
617 West Fulton Street
Chicago, IL 60661
(312) 704-4400
Representing Martin's Bulk Milk Service, Inc. and Samuel G. Franke;

HINSHAW & CULBERTSON
BY: MR. WILLIAM YU
wyu@hinshawlaw.com
222 North LaSalle Street, Suite 300
Chicago, IL 60601
(312) 704-3000
Representing International Paper Company, Overnite Express, Inc., Ox, LLC, Universal Am Cam, Ltd., and Overnite Logistics, Inc.;

JOHNSON & BELL, LTD.
BY: MR. TIMOTHY R. COUTURE
couturet@jbltd.com
33 West Monroe Street, Suite 2700
Chicago, IL 60603
(312) 372-0770
Representing BMW of North America, LLC and Bayerische Motoren Werke Aktiengesellschaft.

INDEX

| WITNESS | EXAMINATION |
|---|---|
| JANET BERNDT | |
| By Mr. Couture | 5 |
| By Mr. Burke | 97 |
| By Mr. Yu | 130 |
| By Mr. Couture | 139 |
| By Mr. Schreck | 142 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Berndt Deposition Exhibit No. 122 | 88 |

(Witness duly sworn.)

MR. COUTURE: At the request of Martin's counsel we're confirming on the record that all objections are waived except for form.

Anything else you wanted to say?

MR. SCHRECK: I want to say not waived.

MR. COUTURE: I didn't use the right word.

MR. BURKE: Yes.

MR. SCHRECK: I'll say -- I'll put on the record that all objections other than form and foundation are reserved --

MR. COUTURE: Reserved, that's what I meant to say.

MR. SCHRECK: -- for purposes, as you said it, at trial or --

MR. COUTURE: We're waiving the need for you to make them during the questioning, how's that?

MR. SCHRECK: Yes.

MR. COUTURE: All right.

JANET BERNDT,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. COUTURE:

Q. Please state your full name for the record.
A. Janet Marie Berndt.
Q. How do you spell the last name?
A. B-e-r-n-d-t.
Q. Ms. Berndt, have you ever given a deposition before?
A. No.
MR. COUTURE: Let the record reflect that this is the discovery deposition of Janet Marie Berndt, taken pursuant to the Federal Rules of Civil Procedure.
Ma'am, my name is Tim Couture. I represent Bavarian Motor Works, BMW, and I'm going to ask you some questions today regarding your employment and your knowledge relative to an accident which occurred July 3rd, 2008 involving an employee of Martin's Bulk Milk.
If at any time during my questioning you

don't understand my questions, please stop me, ask me to rephrase it, and I will do so, okay?
THE WITNESS: Okay.
MR. COUTURE: It is important, in fact imperative that you only answer questions that you understand.
THE WITNESS: Okay.
MR. COUTURE: And if you do answer my questions, I will expect that you've understood them. Is that fair?
THE WITNESS: Fair.
MR. COUTURE: Fantastic.
As you can see, we have a court reporter today and she's taking down everything that's being said, so you need to make sure that all of your answers are out loud. No nods of the head, shrugs of the shoulders, and things like uh-huh, uh-uh will be difficult for her to take down, so if you could do that for us, I'd appreciate it.
And, finally, it also helps her and me if you wait until I've completed my question before you answer. You'll probably find in my questioning I have sometimes pauses in the middle, so if you could just do me a favor and wait until I'm done,

it'll go a lot more easily, okay.
BY MR. COUTURE:
Q. Where do you live, ma'am?
A. 24000 King Road, Wilton, Wisconsin.
Q. And who do you live with at that address?
A. My husband.
Q. How long have you lived there?
A. Since 2003.
Q. And where were you born?
A. Hillsboro, Wisconsin.
Q. And what's your date of birth?
A. 11/25/64.
Q. What's your highest level of education?
A. High school.
Q. You graduated from high school?
A. Graduated.
Q. What year did you do that?
A. 1982.
Q. Do you have a CDL, commercial driver's license?
A. No.
Q. Did you examine or review any materials before you -- in preparation for your deposition today?

A. Yes.
Q. What did you examine?
A. The driver qualification file, and I briefly reviewed the accident report and witness statements.
Q. When you say accident report, you mean the police report?
A. Correct.
Q. Did you review any other documents?
A. No.
Q. Not counting your lawyer -- well, strike that.
I should ask you this: Is Mr. Schreck here as your lawyer today?
A. Yes.
MR. SCHRECK: Yes.
BY MR. COUTURE:
Q. Not counting your lawyer, have you spoken to anyone else in preparation for your deposition today?
A. No.
Q. Have you spoken to any lawyers other than ones representing Martin's Bulk Milk today in preparation?

A. No.
Q. Have you ever spoken to Mr. Burke before today?
A. Yes.
Q. When did you first speak with Mr. Burke?
A. I don't know the exact date, but I was introduced to him when he did come to Martin's Bulk Milk.
Q. And when was that? Not exact date, but approximate.
A. Sometime after the accident, so I would have to say anywhere before December -- between July and December of 2008.
Q. Okay. So, for example, I came to Martin's Bulk Milk in August of 2011, but we're not talking about that, we're talking about even before -- when showed up to look at the truck.
A. Yes.
Q. Do you know for what purpose Mr. Burke was up at Martin's Bulk Milk sometime after this accident, but before December of 2008?
A. No.
Q. At that time was counsel, attorneys for Martin's Bulk Milk present?

A. Yes.
Q. Did you speak to him today before the deposition? I saw the two of you walking in.
A. In the elevator, yes.
Q. Okay. What's your current employment?
A. Clarify.
Q. Are you employed?
A. Yes.
Q. What is your job?
A. Office manager.
Q. Where?
A. Martin's Bulk Milk.
Q. How long have you held the title of office manager for Martin's Bulk Milk?
A. Since December of 1997.
Q. Do you have any family relationship with the Martins?
A. No.
Q. Did you hold any job other than office manager with Martin's Bulk Milk before December of '97?
A. Before December of '97?
Q. In other words, was your first job with Martin's Bulk Milk as office manager, or were you

employed with them before in some other capacity?
A. No. I was employed as an office manager with many hats.
Q. Okay. When did you first start working at Martin's Bulk Milk?
A. December of 1997.
Q. Okay. That's what I was trying to figure out.
A. Okay.
Q. Have your duties as office manager been essentially the same since December '97?
A. As office manager, yes.
Q. Have you ever had any job with Martin's Bulk Milk other than office manager?
A. Yes.
Q. What other jobs have you held with Martin's Bulk Milk?
A. Safety manager.
Q. And when did you become the safety manager for Martin's?
A. In 1997.
That, as well, was one of the hats I wore.
Q. Okay. Office manager, safety manager. What other hat or job title did you hold at

Martin's Bulk Milk or have you held?
A. That is it.
Q. Those two.
So you were hired in December of '97 both as the office manager and the safety manager?
A. Correct.
Q. Okay, thank you.
What training or experience did you have beginning in 1997 to act as the safety manager for a trucking company?
A. None.
Q. Since 1997, when you began your job as a safety manager for Martin's Bulk Milk, what training or experience have you had to be -- or in your capacity as safety manager?
A. I attended several conferences for safety with the National Association for Small Trucking Companies.
Q. Okay.
A. I worked closely with our insurance agents so that they could teach me the rules and regs, where to go to so -- and with the Wisconsin Motor Carriers, I went to conferences.
Q. Okay. Anything else?

A. No.
Q. How many -- and you say you attended several conferences for small motor carriers. When was the first conference you attended?
A. I don't know.
Q. When was the last conference you've attended?
A. For safety?
Q. Yes.
A. I don't know.
Q. When you say several, can you give me a range? I understand you can't say how many.
A. At least ten.
Q. And who puts on the conferences?
A. NASTC, National Association for Small Trucking Companies, Wisconsin Motor Carriers, HNI Risk Services.
Q. As a safety manager for Martin's Bulk Milk, what are your job duties?
A. My job duties as the safety manager were to make sure the employee qualification files were in place, to make sure that their physical was adequately updated, to make sure that every year they filled out their driving record qualification,

and that I ran the MVRs and compared those to that.
Q. And those are the background information for your employers?
A. No, that's past employer. This is an annual safety form that they have to fill out. It's a DOT reg.
Q. Right.
A. And we are required to run their MVR every year to compare --
Q. Motor vehicle record?
A. Right, their motor vehicle record, and compare that to their statement.
It was my job to make sure if there was an accident that I followed through with drug and alcohol testing, that I worked with the insurance company for recovery and --
Q. What do you mean by recovery?
A. Recovery -- if another company was at fault, that we recovered our money in an accident.
Q. Okay. Any other duties?
A. It was my job if we were mandated for an audit that I supply any information requested.
Q. Was it part of your job to investigate accidents that your employees -- that Martin's Bulk

Milk employees were involved in?
A. No.
Q. Was it part of your job to gather documentation when Martin's Bulk Milk personnel were involved in accidents?
A. What type of documentation?
Q. Okay. Police report?
A. Yes.
Q. Department of Transportation records of inspections of trucks --
A. Yes.
Q. -- after an accident?
A. Yes.
Q. The results of drug and alcohol testing?
A. Yes.
Q. Was it ever your job -- well, strike that.
Was it part of your job duties to take a statement from the driver involved in the accident? This is just general now.
A. No.
Q. Was it part of your job to fill out an accident report for any accidents involving Martin's Bulk Milk employees?
A. No.

Q. Was it a requirement of the safety -- well, strike that.
Were you the head of a safety department?
A. Yes.
Q. Was it part of the policy of Martin's Safety Department that when an accident occurred, an internal report had to be filled out by a driver?
A. No.
Q. I understand from your testimony today that it wasn't part of your job to get a statement from the driver when an accident took place, but was it your practice to go and speak with the driver to ask what happened when he or she was involved in an accident?
A. Yes.
Q. Is that documented anywhere in Martin's Bulk Milk's records when -- what the driver says to you and what you say to them?
A. No.
Q. Would that show up in their driver qualification materials?
A. No.
Q. Would there be a record kept of when and

where and how an accident occurred so that you can follow through on disciplinary procedures for Martin's Bulk Milk?
A. No.
Q. We'll get to it in a bit, but I -- for example, I saw the Driver's Handbook. You're familiar with that, right?
A. Yes.
Q. And in the Driver's Handbook it says things like a driver can be disciplined if they have multiple accidents that are deemed to be their fault, things like that, right?
A. Correct.
Q. How does Martin's -- how did Martin's Bulk Milk keep track of how many accidents a driver had if they didn't keep records of the accident?
A. We do have -- we do have a report that all accidents are recorded, but not my statement is in there as to what I discussed with the employee.
Q. Okay, thank you.
A. But the dates and the time and the location, the insurance file number, et cetera.
Q. So with every accident Martin's would have a file or set of papers that correspond to that

17

accident?
A. Correct.
Q. It just doesn't include anything the driver said to you or you said to the driver, nothing like that?
A. Correct.
Q. In the event -- strike that.
In the event an accident occurred with one of your drivers and someone needs to speak with the police department, who at Martin's Bulk Milk would have that job?
A. Could you repeat that, please?
Q. Sure.
When there's an accident with a driver of Martin's Bulk Milk and someone from Martin's Bulk Milk needs to speak to the police or the state or local authorities, would that be the duty of the safety manager?
MR. SCHRECK: Are you talking --
A. Yes.
MR. SCHRECK: I'm sorry --
BY MR. COUTURE:
Q. Generally.
MR. SCHRECK: When you say generally, are you

18

talking about back when she was a safety director?
BY MR. COUTURE:
Q. How about today.
A. Today? Safety director.
Q. Okay. And was that also the case in 2008?
A. Yes.
Q. Was that also the case in 2005?
A. Yes.
Q. How about in '97?
A. Yes.
Q. Okay. So as long as you've been at Martin's Bulk Milk and been the safety director, it has been part of your job, to the accident extent that it's needed, to interact with the police and local authorities relative to Martin's Bulk Milk accidents?
A. Yes.
Q. Okay. As part of your job as safety director, were you responsible for the training of the drivers?
A. No.
Q. Was there someone at Martin's Bulk Milk responsible for training of the drivers?
A. Training in what aspect?

19

Q. Does Martin's Bulk Milk provide any training to its drivers?
A. For driving or for paperwork or --
Q. Yes, any --
A. Both?
Paperwork, I did the training. Driving, we required two years of experience, and they were to be qualified.
Q. Okay. So if I understand, Martin's Bulk Milk's policy was only to hire people who already knew what they were doing?
A. Correct.
Q. So, therefore, Martin's Bulk Milk did not provide driver training?
A. Correct.
Q. Did Martin's Bulk Milk require all of their drivers to do a road test before being hired?
A. No.
Q. Now with regard to paperwork, you indicate that you did the training. Is that things like -- well, strike that.
What type of paperwork would that entail?
A. The mileage sheet recording their odometer reading at the state lines and --

20

Q. You mean their logs?
A. Logs. They had to be knowledgeable and know how to do that. I did not provide training for logs.
Q. Have you been trained on how to properly fill out logs?
A. Yes.
Q. You're -- because you don't have a CDL, you've never had to do that professionally, though, right?
A. Correct.
Q. Have you ever trained a driver at Martin's Bulk Milk how to fill out their logs?
A. No.
Q. As safety manager, were you responsible -- I'm sorry, safety manager or safety director so I'll get it right?
A. Manager, director, one --
Q. Okay.
A. -- in the same.
Q. That's fine.
So when we're talking here today, if I use one or the other, you'll understand we're talking about your job?

A. Yes.
Q. All right. As safety manager, was it your job or is it your job at Martin's Bulk Milk -- well, strike that.
I should ask this: Have your job duties been the same ever since you became safety manager at Martin's Bulk Milk?
A. No.
Q. Okay. When did those change?
A. In, I believe, 2008 or 2009.
Q. Okay. Did they change -- did they -- well, strike that.
If you say -- did they change before or after the accident involving Mr. Franke?
A. After.
Q. Did they change because of the accident involving Mr. Franke?
A. No.
Q. Okay. How did your job duties as safety manager change in 2008 or 2009?
What was different?
A. I no longer did -- handled safety, other than for backup purposes.
Q. What do you mean by that?

A. We hired a full-time person to handle our safety department, and if he is out on vacation, I am the second person in line for the calls.
Q. Okay. So like the vice safety person?
A. Sure.
Q. Okay. And that was -- who is the safety director now?
A. Robert Haun.
Q. What's his -- how do you spell that?
A. H-a-u-n.
Q. And was Robert Haun employed by Martin's in 2008 when this accident took place?
A. No.
Q. So his first job and only job with Martin's has been safety manager?
A. Correct.
Q. When I ask all the questions about what your duties as safety manager are, or were, you understood that I meant from the time you were hired as safety manager until the time that you stopped being the safety manager, right?
A. Yes.
Q. Okay, good.
As safety manager, were you -- at Martin's

Bulk Milk, were you responsible to ensure that the trucks, tractors that left the Martin's yard were safe?
A. No.
Q. Who was responsible to see that the tractors that left the Martin's yard were safe?
A. The driver.
Q. You understood that the drivers were supposed to do safety checks every morning, or pre-trip inspection?
A. Yes.
Q. Did you ever -- strike that.
Have you ever trained a driver how to properly do a pre-trip inspection?
A. No.
Q. Because you're not a driver -- well, strike that.
Have you ever been personally trained on exactly what has to go into a proper pre-trip inspection?
A. No.
Q. Does Martin's Bulk Milk have a record such that drivers are supposed to keep a written record of every pre-trip inspection every day?

A. Repeat that, please.
Q. In July of 2008, when a driver for Martin's Bulk Milk is getting ready to start his shift, he has to do a pre-trip inspection, correct?
A. Correct.
Q. Or she, excuse me.
And does that driver have to write down what he or she finds in the pre-trip inspection for each time he starts a new shift?
A. Yes.
Q. Is it your understanding that that pre-trip inspection would include checking to make sure the brakes are working properly?
A. Yes.
Q. Making sure that the lights are working properly?
A. Yes.
Q. Making sure that the blinkers are working properly?
A. Yes.
Q. Hazard lights and directional signals is what I mean. Right?
A. Correct.
Q. Okay. Was it ever your job to make sure

that your drivers properly did their pre-trip inspections?
A. Yes.
Q. And how did you do that?
A. By looking at their driver logs.
Q. Meaning that they documented an inspection?
A. Yes.
Q. Okay. Did Martin's Bulk Milk do anything to ensure that the drivers didn't just get in their truck and check off all the boxes without actually doing the inspections?
A. No.
Q. You relied on the drivers to properly write down what they saw and did?
A. Yes.
Q. Back in 2008, was there a person at Martin's -- well, strike that.
I think you said that you were the person in 2008 who would have been the contact between the insurance company and Martin's in the event of an accident?
A. Correct.
Q. And who was it at the insurance company

that you would contact in the event of an accident in 2008?
A. Either our agency, Jill Witting, she's our agent --
Q. Jill?
A. Jill.
Q. Witting?
A. Yeah, W-i -- yes, W-i-t-t-i-n-g.
Q. Okay.
A. Or if the driver failed to report an accident, I would call it in to AIG at that time with the driver information.
Q. What did your duties as office manager for Martin's Bulk Milk entail?
A. My duties entailed handling all of the accounting, payroll, HR, truck insurance, Work Comp insurance, licensing, permitting, fuel taxes.
Q. Anything else?
A. That's about it.
Q. Okay. Have we talked about all the duties that you held up through 2008 as the safety director or manager of Martin's Bulk Milk?
A. Yes.
Q. Have we talked about all the duties that

you had as the office manager?
A. Yes.
Q. All right. Who is Samuel Franke?
A. He was employed with Martin's in approximately 1999 as a truck driver, and he ran Chicagoland on a daily basis, Monday through Friday.
Q. So your recollection is that he started approximately 1999?
A. Correct.
Q. Did Martin's provide any training to Mr. Franke before he started driving for Martin's?
A. No.
Q. What did Martin's do to ensure that Mr. Franke was appropriate to drive a semi tractor-trailer?
A. We did past employer verifications, we ran his MVR, made sure that his DOT physical was legit and current.
Q. You indicate that Franke ran Chicagoland daily. When he was first hired, did he have a specific route?
A. I don't know.
Q. When he was first hired, was he assigned

to a specific tractor?
A. I don't know.
Q. Who would know those things? Other than Mr. Franke.
A. Dave, David Martin may possibly know.
Q. In your role as -- when you were safety director, who was your immediate supervisor at Martin's Bulk Milk?
A. David Martin.
Q. What's David Martin's job title?
A. Operations manager.
Q. And I expect he's the Martin of Martin's Bulk Milk, he and his father?
A. Correct.
Q. Are there any other Martins other than David Martin and his father who are involved in the operation of the company?
A. No.
Q. Is David Martin still your direct boss?
A. Yes.
Q. When you say that Samuel Franke ran Chicagoland daily, what do you mean?
A. He would leave our terminal anywhere between 12:00 o'clock and 2:00 o'clock, usually,

12:00 o'clock p.m. and 2:00 o'clock p.m. daily, and he would deliver -- this was at the time of the accident.
Q. Well, let's -- let's stop, then. I want to --
A. Okay.
Q. I want to start first defining our terms.
A. Okay.
Q. So instead of you telling me what Mr. Franke did on the day of the occurrence, I assure you we'll get there, when you say ran Chicagoland daily, generally what do you mean by those terms?
A. Pick up a load at our terminal in Wilton, Wisconsin, deliver it to the Chicagoland area, reload, and bring the load back to our terminal.
Q. Okay. Was that Mr. Franke's route, for lack of a better word, when he started?
A. Yes.
Q. Were you involved in the hiring of Samuel Franke?
A. No.
Q. Who hired him?
A. David Martin.

Q. Do you know what interview process or what employment hiring process David Martin went through in order to hire Samuel Franke?
A. Yes.
Q. And I just want to make it clear. I'm not asking you what you expect he did because he always does this with everybody. Do you know specifically what he did with Samuel Franke?
A. Yes.
Q. What did he do, David Martin, to hire Samuel Franke?
A. David Martin would have Samuel fill out an application, qualification for applicant -- employment. At that point David would have me run the MVR, motor vehicle record, complete the past employer forms, and after review, then he would decide whether or not he was material to be hired.
Q. Was there an interview?
A. I don't know.
Q. Was there a road test for Mr. Franke?
A. I don't know.
Q. Was there a drug test for Mr. Franke before he was hired?
A. Yes.

Q. And once he was hired, was he automatically -- was Mr. Franke automatically placed on the Chicagoland run?
A. I don't know.
Q. Do you know when it was that Mr. Franke first was assigned to the Chicagoland run?
A. No.
Q. Other than Mr. Franke, would I have to ask David Martin that question?
A. Yes.
Q. When Mr. Franke started making the Chicagoland run, did he always bring loads from the same customer to Chicago, or was it on a day-by-day basis?
A. I don't know.
Q. When Mr. Franke got to Chicago, did he always have a load to bring back, or was that a day-by-day basis?
A. Day by day.
Q. Depending on what the dispatcher was able to get for him?
A. Correct.
Q. When Mr. -- well, strike that.
In July of 2008, did Mr. Franke, to your

knowledge, have a regular load that he took from Wilton to Chicago?
A. Yes.
Q. And who was that load hauled for?
A. To Chicago?
Q. Yes.
A. MBM Logistics. MBM Logistics, Incorporated.
Q. And that is a different company from Martin's Bulk Milk, correct?
A. Correct.
Q. But MBM stands for Martin's Bulk Milk Logistics?
A. No.
Q. What does MBM stand for?
A. MBM.
Q. Okay. And are you -- do you know who the owner of that company is?
A. Owners.
Q. Who are the owners?
A. Allan Martin, Ruth Martin, and Randy Galewski.
Q. And do the Martins who own that company have any relationship to the Martins that run

33

Martin's Bulk Milk?
A. Yes.
Q. What is their relationship?
A. Allan and Ruth are president and vice president of Martin Bulk Milk.
Q. Okay, thank you.
Is Allan David's father?
A. Yes.
Q. And Ruth is his wife?
A. Yes.
Q. Okay. And they -- who are the owners of Martin's Bulk Milk?
A. Allan and Ruth Martin.
Q. Okay. So the people who own MBM Logistics also own Martin's Bulk Milk?
A. Correct.
Q. And so in and around July 3rd, 2008 Samuel Franke was regularly or daily bringing loads from MBM Logistics to Chicago?
A. No.
Q. Okay.
A. From Martin Bulk Milk to Chicago.
Q. Thank you.
Loads -- he was hauling loads for MBM

34

Logistics from the Martin's Bulk Milk yard to Chicago?
A. Correct.
Q. And were those MBM loads always the same product?
A. To my knowledge.
Q. And what was that product?
A. Furniture.
Q. Okay. So MBM Logistics had some agreement with a furniture company to deliver furniture, and MBM Logistics hired Martin's Bulk Milk to do that delivery?
A. Correct.
Q. Were you involved in the contracts between MBM Logistics and Martin's Bulk Milk to haul that furniture?
A. No.
Q. Were you involved, or do you have any knowledge of the contract between MBM Logistics and the furniture company for those loads?
A. No.
Q. Have you ever worked for MBM Logistics?
A. No.
Q. For how long had it been Samuel Franke's

35

daily work activity to haul furniture from Martin's Bulk Milk to Chicago?
A. I don't know.
Q. Was it a -- had it been going on for years, or was it just three days before the accident, or was it a -- do you --
A. I don't know.
Q. Okay. And I asked you if it was a regular, that's what he -- he did, and you said yes. So can you tell me for how long it was his regular load?
And if you can only give me your best estimate, that's fine.
A. My best estimate would be at least one year.
Q. Do you know what location in Chicago Samuel Franke was delivering that furniture to?
A. On that particular date?
Or any --
Q. Any of them, any time.
Was it was it always the same place or did he go different --
A. No.
Q. -- locations?

36

A. There were different rail yards. He was delivering to rail yards.
Q. Thank you.
Okay. So he would take furniture to various rail yards?
A. Correct.
Q. Do you know what route Samuel Franke would take from Wilton, Wisconsin, the Martin's Bulk Milk yard, to the rail yards?
A. Generally either I-90 or I-94.
Q. Who was it who decided what route Mr. Franke would take to get to the rail yards?
A. Mr. Franke.
Q. Did Martin's Bulk Milk ever tell Mr. Franke how to get from Wilton, Wisconsin to the rail yards?
A. I don't know.
Q. Was there a policy and procedure in place at Martin's Bulk Milk to direct the drivers to take a certain route, as opposed to letting them pick their own?
A. The shortest route.
And if they were unaware of the shortest route to a specific city, they could call for

37

routing. But from the entrance to the city to the exact location, it was their responsibility as the driver.
Q. Was it mandated that they take the shortest route?
A. Yes, with --
Q. And -- go ahead.
A. Within reason, based on conditions.
Q. Well, and that's what I was going to ask.
A. Yes.
Q. When you say shortest route, do you mean shortest route distance or shortest route time? Because those can be different.
A. Yes. Both.
Q. Both.
A. We had no preference if they ran 90 or 94 down to Chicago, because running 94 could eliminate tolls. So the factor of the extra -- fifteen extra miles outweighed a toll expense.
Q. Is the toll expense the driver's responsibility or Martin's?
A. Martin's.
Q. Was there a policy specifically to avoid tolls?

38

A. No.
Q. Was there an unwritten rule that drivers should avoid tolls?
A. No.
Q. Generally, in July of 2008, after delivering furniture to the rail yards, did Mr. Franke have a regular return load?
A. Yes.
Q. And that return load was paper products from Hammond, Indiana, right?
A. Correct.
Q. For how long had that been his regular return load as of July 2008?
A. I don't know.
Estimate, one year, at least.
Q. Were you involved in coordinating Mr. Franke's pickup of that load on a day-to-day basis with the folks in Hammond?
A. No.
Q. Who at Martin's Bulk Milk would have been responsible for that?
A. David Martin or Pat Podlena.
Q. All right. And did you ever talk to the people in Hammond, Indiana from where he was

39

picking up the load of paper?
A. No.
Q. What if any regular interaction would you have had with Samuel Franke in or around July of 2008 in your job?
A. Can you re -- say that -- repeat it.
Q. Sure.
I'm not asking you if when you saw him you said hi. I'm asking about in your employment capacity as safety director and office manager, did you have a regular interaction or involvement with Mr. Franke?
A. No.
Q. So it wasn't your job to see him in the morning or see him when he came back from his loads?
A. No.
Q. It wasn't your job to direct what he was doing out on the road?
A. No.
Q. I saw in the handbook that we'll talk about a little bit later that every driver is required to do a check-in call.
Was it part of your job to be involved in

40

that check-in call?
A. No.
Q. That would have been the dispatchers?
A. Correct.
Q. Which would have been David Martin and some other folks?
A. Yes.
Q. So you could go days or even weeks without seeing Mr. Franke?
A. Correct.
Q. Do you know when the last time prior to July 3rd, 2008 it was that you saw Mr. Franke?
A. No.
Q. Was your relationship with Mr. Franke strictly he worked for the same company you did?
A. Yes.
Q. You didn't go out socially or hang out or anything like that?
A. No.
Q. Were you personally aware of Mr. Franke's route when he drove from Hammond, Indiana back to Wilton?
And I'm not asking you what you know now, I'm asking about when -- before this accident did

you know his route?
A. After the fact?
Q. Yes.
And I know it's going to be a little hard to separate out what you know now from what you knew then but -- so I'll ask it again.
Say July 2nd, 2008, the day before this accident --
A. Um-hum.
Q. -- were you, as an employee of Martin's Bulk Milk, aware of the route that Mr. Franke typically took from Hammond to Wilton?
A. Typically took, no.
Q. Were you aware of what his options were?
A. Yes.
Q. Did you, personally, ever tell Mr. Franke which route to take from Hammond to Wilton?
A. No.
Q. Did anyone from Martin's Bulk Milk tell Mr. Franke what route to take from Hammond to Wilton?
A. Probably not.
Q. Why do you say probably?
A. He knew the route.

Q. Sure.
Have you ever seen -- well, strike that.
You said you saw the police report, correct?
A. Correct.
Q. Have you ever seen the statement that Mr. Franke gave to the police, the video statement?
A. Repeat that?
Q. After this accident on July 3rd, or perhaps July 4th in the early morning hours, Mr. Franke gave a statement to the police that was videotaped. Have you ever seen that?
A. No.
Q. Are you aware that Mr. Franke, in that statement, said that he just was authorized -- just recently was authorized to take a different route, which is Route 41?
A. No.
Q. Do you have any knowledge or understanding as to what anyone had ever said to Mr. Franke about what route to take prior to the occurrence?
A. No.
Q. Are you familiar with the area where this accident took place?

A. No.
Q. How was it that you first learned that Samuel Franke had been involved in an accident?
A. He called me at about 11:30 p.m. on Thursday, July 3rd, 2008.
Q. Do you know where he was when he called you?
A. At the scene of the accident. Highland Park, Illinois, I believe it was.
Q. Do you know when in relationship to the accident he called you?
And I know it's obviously after but --
A. I believe approximately fifteen minutes to half an hour after the time of impact.
Q. And do you know if Mr. Franke spoke to anyone else at Martin's Bulk Milk before calling you?
A. He did not.
Q. Okay. Do you know who James Jorgenson is?
A. Yes.
Q. Is he an employee -- or was he an employee of Martin's Bulk Milk at that time?
A. Yes.
Q. Is he still an employee of Martin's Bulk

Milk?
A. Yes. He's an independent contractor.
Q. Okay. Martin's has some drivers who are employees?
A. Correct.
Q. And some that are independent contractors?
A. Correct.
Q. And those are owner-operators?
A. Yes.
Q. And Mr. Jorgenson was an owner-operator?
A. At that time I don't know.
Q. But he is now?
A. He is now.
Q. Okay. Have you ever spoken to James Jorgenson regarding any conversation he had with Samuel Franke about the accident?
A. No.
Q. When Mr. Franke called you fifteen to thirty minutes after the accident, can you tell me what he said?
A. Once I could get him calmed down -- because he does have a speech impediment, so I could not understand him, he stutters very bad. He said he had hit a car, that he was sure the guy had

to be dead because the car was on fire, and he said: I never saw the car. The light was green.
And that was about it.
Q. All right.
A. But he -- what do I have to do?
Q. Let me stop you there. Now I want to ask you about the specifics about what you just told me.
First of all, let's talk about his speech impediment.
Before this accident you were aware Mr. Franke had a speech impediment, a stutter?
A. Yes.
Q. He had a particular manner of speaking that you were familiar with?
A. Yes.
Q. Okay. And that was true when he was talking normally as well as when he got excited?
A. Yes.
Q. And you -- when he called, you observed that he was having that speech impediment?
A. Yes.
Q. Okay. He indicated that he hit a car. Did he say what type of car he hit?

A. No.
Q. Did he say whether the car was stopped or moving when he hit it?
A. He said he never saw the car.
Q. Okay. Did he tell you why he didn't see the car?
A. No.
Q. Did he tell you where on the roadway he was driving when he hit the car?
A. No.
Q. Did he say whether -- well, he said the light was green, so that would indicate to you that he was at an intersection?
A. Or approaching one.
Q. Okay. Did you and he have any discussion regarding whether other vehicles were around other than the car he struck?
A. No.
Q. Did you talk about how fast he was going at the time of impact?
A. No.
Q. Did he say anything about the force of the impact, whether it was a light impact, a heavy impact?

A. No.
Q. Did he tell you what happened to the vehicles after they contacted each other?
A. He just said the other -- the car was on fire.
Q. Did he talk about how soon after the impact between the vehicles occurred the fire began?
A. No.
Q. Did he say whether there were witnesses?
A. No.
Q. At the time that you spoke to him, do you know whether he had spoken to the police or anyone else?
A. I don't know.
Q. And he then asked you: What do I do?
A. Yes.
Q. And what did you say?
A. I asked him: Have the police been called? And he says: Yes.
And I said: It is your responsibility to work with the police to get drug and alcohol tested.
Because based on his statement to me, I

was assuming there was a fatality and I wanted to make sure that that did get done due to the severity of it.
Q. Did Mr. Franke tell you why it was that he didn't see the car he struck?
A. No.
Q. Did he tell you that he had fallen asleep?
A. No.
Q. Did he tell you that he had zoned out?
A. No.
Q. Did he say anything about the condition of the truck either before or after the accident when you had this conversation with him?
A. I did ask him if the truck was drivable.
Q. And what did he say?
A. And he said he thought so.
Q. Where were you when the conversation occurred?
A. At my home.
Q. And part of your job as a safety director at that time was to field calls from drivers at any time of night when an accident took place?
A. Correct.
Q. And how long did the conversation take?

49

A. I'm guessing not more than three to four minutes.
Q. After you told him that his job was to cooperate with the police and get a drug and alcohol test, what other discussion was -- occurred between you and he?
A. I told him that he -- it would be his -- should -- it would be his responsibility to get the accident reported to the insurance company.
Q. It was his job to call the Martin's Bulk Milk's insurance agent?
A. Not agent, company.
Q. The insurance company.
A. Correct. The call line.
Q. Okay. There's like an 800 number and --
A. Yes.
Q. -- they're supposed to call?
A. Yes, correct.
Q. All right. Do you know if he did that?
A. He did not.
Q. Do you know why he did not call the insurance company?
A. No.
Q. Did you have any other discussions with

50

Mr. Franke that evening or early morning that you haven't told me about?
A. Not that I recall.
Q. Did you tell -- other than the insurance company, did you tell him he needed to call or talk to anyone else?
A. No.
Q. After you hung up the phone -- well, strike that.
Did you and Mr. Franke talk about what he was going to do to get back to Wisconsin?
A. No.
Q. After you hung up the phone -- well, strike that.
Did that conclude your conversation with him?
A. Yes.
Q. After you hung up the phone, what did you do?
A. I went back to bed.
Q. In your job as safety director, when an accident is reported to you is it your responsibility -- what is your responsibility?
What are you supposed to do with that

51

information?
A. With that information, I then relay to David Martin that there was an accident, and from there he takes care of equipment and/or cargo. In most instances if it is severe or a DOT recordable accident, I will e-mail our insurance agent, Jill Witting.
MR. SCHRECK: Jill? Joel or Jill?
THE WITNESS: Jill.
MR. SCHRECK: Okay. Because it sounded like Joel.
THE WITNESS: J-i-l-l.
BY MR. COUTURE:
Q. All right. So we're clear, typically, when there's an accident, you relay that information to David Martin so he can determine what if anything needs to be done to take care of the equipment, meaning the truck, tractor, chassis, container, and the load that's in the -- any container right?
A. Correct.
Q. And it would be your job if it's a bad accident to contact the -- your insurance agent, Jill?

52

A. Follow -- as follow-up, yes.
Q. And a follow-up.
But it's the driver's responsibility to actually call it in to AIG?
A. Yes.
Q. So you didn't call David Martin right after you got ahold of Mr. Franke, you just went to bed; or after he got ahold of you?
A. Correct.
Q. When was the next time you spoke to anyone regarding this accident?
A. The following day.
Q. When was it that you next spoke to someone regarding the accident?
A. July 4th. I don't know what time, but I would have notified David Martin.
Q. When you spoke to David Martin -- well, strike that.
It was late at night on the 3rd when you got the call?
A. Correct.
Q. What time, approximately, was it -- not exact, but approximately, was it on the 4th when you talked to David Martin?

53

A. I don't know the exact time. I would say before noon.
Q. Did you call him or did you see him face-to-face at the office?
A. I believe I called him.
Q. When you called David Martin with this information, did he already know about the accident?
A. Not to my knowledge.
Q. So your understanding is that when you told him about the accident, that was the first time he learned of it?
A. Correct.
Q. Were you aware -- strike that.
Have you ever seen anyone's deposition in this case?
A. No.
Q. You didn't see what Mr. Franke said or Mr. Martin said or anyone else?
A. No.
Q. Were you aware of any -- well, strike that.
As you sit here, are you aware that Samuel Franke had a discussion with anyone on the night --

54

from Martin's Bulk Milk other than you on July 3rd?
A. No.
Q. Do you know whether he spoke to anyone from Martin's Bulk Milk other than you before you spoke to David Martin on the 4th before noon?
A. No.
Q. When you spoke to David Martin about this accident, what did you tell him?
A. I would have told him that Sam had an accident, where it was, and as much as I knew about it, that it was severe and that a car had been rear-ended and burst into flames, and the location.
Q. At any time before having that discussion with David Martin did you see news reports of this accident?
A. No.
Q. When you told David Martin this, did he indicate to you that he had seen news reports of the accident?
A. No.
Q. What was David Martin's response to you regarding what you had said?
A. Would you repeat that, please?

55

Q. Sure.
When you told David Martin there was an accident that appeared to be serious and involved fire, what did he say?
A. I don't recall.
Q. Generally, what was his response?
A. His response would have been he'll have to get hold of the driver to find out where all of the equipment and everything, the load was taken.
Q. Did you play any role in determining where the truck was, getting the truck back, and seeing that the load got to its destination?
A. No.
Q. That was David Martin's job or somebody he directed other than you?
A. Correct.
Q. After you had this -- well, strike that.
Was that the end of the conversation you had with David Martin?
A. At that time, yes.
Q. That specific conversation, okay.
When was the next time you spoke to anyone regarding this occurrence?
A. On Monday, the following Monday.

56

Q. Did you work at the location of Martin's Bulk Milk on the 4th of July?
A. Not to my recollection.
Q. How about the 5th or the 6th, Saturday or Sunday?
A. Not to my recollection.
Q. So I understand your testimony, you spoke to David Martin on the phone on the 4th, and then the next time you had anything to do with this accident was the 7th, the following Monday?
A. Correct.
Q. Do you know what if anything was done by Martin's Bulk Milk to address this accident on the 4th, 5th, or 6th?
A. Nothing that I know of.
Q. Do you know if anyone from Martin's Bulk Milk talked to the police on the 4th, 5th, or 6th?
A. No. No, I don't know.
Q. In your role as office manager or safety director, would it be your job to know the weights of the loads that Martin's has on the road?
A. Every load?
Q. Yes.
A. No.

Q. Do you know the weight, gross weight of Mr. Franke's truck and trailer on the day of the occurrence?
A. No.
Q. Was there someone at Martin's Bulk Milk whose job it was to make sure that all of the loads were not overly heavy?
A. It was the driver's responsibility, and still is.
Q. The following Monday, July 7th, what time did you get to work that day?
A. I don't know.
Q. Do you have a typical come-and-go time at work?
A. Generally come-and-go is between 4:00 and 5:00 a.m. and my go time is between 5:00 and 6:00.
Q. You indicated that the next time you spoke to anyone about this accident was July 7th.
Who did you speak to on July 7th about the accident, the first person you spoke to?
A. David Martin.
Q. Do you remember what time that was? Approximate.
A. 7:00 a.m.

Q. And what conversation did you have with David Martin at approximately 7:00 a.m. on the 7th of July 2008?
A. I don't recall specifically, but I do recall Dave saying that we had no choice but to let Sam go based on the severity of it, of the accident, and that we just had to get following through on insurance and everything.
Q. Okay. Did Mr. Martin tell you who made the decision to fire Sam Franke?
A. No, but I know it was Dave Martin's.
Q. So when he said we have no choice, am I correct to say Dave Martin made a decision to fire Sam Franke?
A. Correct.
MR. SCHRECK: Object -- or go ahead, that's fine.
BY MR. COUTURE:
Q. Do you know anyone else who had input into that decision?
A. No.
Q. Do you -- strike that.
Have you spoken to David Martin since and found out who if anyone he spoke to between the

time of the accident and the time he told you on the 7th that Franke was going to be fired?
A. No.
Q. Did he tell you why Sam Franke was going to be fired?
A. No.
Q. Was it your understanding that Samuel Franke was going to be fired and was fired for causing an accident?
A. Yes.
MR. SCHRECK: Objection, form, foundation.
You can go ahead.
MR. COUTURE: She answered.
BY MR. COUTURE:
Q. Other than Mr. Martin telling you that Sam Franke was going to be fired, did you have a further conversation -- or discussions with him at that time regarding this accident?
A. No.
Q. At that point did you discuss how or why the accident took place with Mr. Martin?
A. No.
Q. Did you discuss the speed of the vehicles or anything like that?

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

A. No.
Q. Did he tell you what if anything he had done in follow-up of learning about the accident?
A. No.
Q. He didn't tell you whether he had talked to Samuel Franke or whether he had talked to the police anything like that?
A. No.
Q. After you spoke to David Martin approximately 7:00 a.m. on July 7th, when was the next time you had a discussion with anyone regarding the accident?
A. That day, later that day.
Q. Who else did you speak to that day?
A. Jill Witting.
Q. The insurance agent?
A. Correct.
Q. Okay.
A. And also I called the insurance company.
Q. All right. I'm not going to ask you what you told the insurance company other than obviously there was an accident, right?
A. Correct.
Q. All right. Did you speak to Samuel Franke

61

on July 7th, 2008?
A. I don't recall.
Q. Did you see Sam Franke at Martin's Bulk Milk July 7th, 2008?
A. I don't recall.
Q. Were you present in the meeting where he was fired?
A. Yes, I was --
Q. Okay.
A. -- yes. Yes.
Q. I understand it's a long time ago, but forgive me for saying that I expect you might know a little bit -- remember some of this because it wasn't an everyday occurrence.
A. Um-hum.
Q. Sam Franke came in on the 7th and was fired?
A. Correct.
Q. And you were there?
A. Yes, I was.
Q. What -- well, first of all, you were there, Sam Franke was there. Who else was there?
A. David Martin.
Q. Anyone else from Martin's Bulk Milk?

62

A. Not to my recollection.
Q. Anyone else not from Martin's Bulk Milk there?
A. Not to my recollection.
Q. So as you recollect it, the three of you were present?
A. Yes.
Q. All right. And do you know approximately what time of day that was?
A. I don't. I honestly don't, no.
Q. And what happened at that meeting?
A. All I recall is Dave telling him that there was no choice but to let him go, and that this was a very severe accident, and that it would be in his best interests to hire an attorney.
Q. At the time of that accident -- or strike that.
At the time of that meeting was it your understanding that Franke's truck had hit the rear end of a -- of a car?
A. Yes.
Q. And was -- did Samuel Franke, at that meeting, tell you, you and David Martin, what happened in the accident?

63

A. Briefly.
Q. What did he say?
A. He just said that he didn't see the car, and the last he remembered was that the light had been green.
He did state that he hadn't been talking on the phone and he didn't think he was speeding, that -- that was -- that was all that was said and he exited the office, to my recollection.
Q. All right. Did he say how far back he was when he believed he saw the light was green?
A. No.
Q. Did he -- other than saying I don't think I was speeding, did he say how fast he was going?
A. My memory says that he said he was doing the speed limit.
Q. Okay. And do you know what the speed limit was at the area where his accident took place?
A. I do not.
Q. If I were to tell you it's 45 miles an hour, would that provide any more information, or would that just be a guess?
Do you know?

64

A. I don't know.
Q. Did he tell you what speed he had indicated to the police he was driving?
A. No.
Q. Have you seen in the police report what he said?
A. Yes.
Q. Okay. At that meeting did Mr. Franke explain why he didn't see the car that he struck?
A. No.
Q. Have you since spoken to Samuel Franke?
A. Not since July of 2008.
Q. All right. Well, I'll ask you about that a little bit more, then.
Why was it that -- if you know, that David Martin told him he should get a lawyer?
A. Because of the severity of the accident.
Q. Did you understand that Mr. Franke received moving violations or tickets as a result of this accident?
A. Not immediately.
Q. Did you later come to understand that?
A. Honestly, I don't believe I recall.
Q. Okay. Did Martin's Bulk Milk hire an

attorney for Mr. Franke at any point?
A. Yes.
Q. And for what purpose -- I'm not talking about their insurance company in this lawsuit, but for what purpose did Martin's Bulk Milk hire an attorney for Mr. Franke?
A. Because the accident was exceeding our policy limits.
Q. Okay. So -- in this lawsuit you're talking about?
A. Correct.
Q. All right. Do you know if Mr. Franke had a criminal lawyer at any point related to this lawsuit -- or this accident?
A. I do not know.
Q. After being in the meeting with Samuel Franke and David Martin, what if any other discussions did you have with people regarding the accident on July 7th?
A. The only other person that I would have spoken to about the accident would have been a representative from AIG in which they wanted --
MR. SCHRECK: Hold on.
I was going to say, I don't want you

talking about any conversations you had with AIG.
THE WITNESS: Oh, okay.
MR. SCHRECK: He can't get that information. He'll ask you a question if he's got something else.
THE WITNESS: Okay.
Can you repeat your question?
BY MR. COUTURE:
Q. Yes.
Other than your lawyer and your insurance company, did you speak to anybody else on the 7th regarding this accident?
A. No.
Q. Did you speak to the police on that day?
A. I don't know if on that day.
Q. Okay. Mr. Franke testified that on the 8th, the next day, he was called by someone from Martin's Bulk Milk to come back to Martin's Bulk Milk to give a statement.
Do you know who called Mr. Franke to ask him to come back?
A. I did.
Q. And why did you have Mr. Franke come back?
A. He was to give his statement to AIG and I

wanted that statement done from our location.
Q. And did he come to Martin's Bulk Milk that day?
A. Yes, or whatever day the statement was given to AIG to -- I don't know if it was exactly that day.
Q. All right. Were you present when Mr. Franke gave a statement?
A. Yes.
Q. Who else was present?
A. No one.
Q. Okay.
A. To my knowledge.
Q. Your attorney is going to tell you that I can't ask you about the discussions that were had because he represents both of them and the insurance company is part of that, so I'm not going to ask you what was said, but I do get to ask you who.
So it was you, it was Mr. Franke, someone from the insurance company?
A. Correct.
Q. Do you know who?
A. No.

Q. Was David Martin there?
A. Not to my recollection.
Q. Was anyone else there?
A. No.
Q. Are you aware that on July 8th, 2008 Mr. Franke gave a statement to a gentleman by the name of Dennis Frederickson?
A. Yes.
Q. Was Dennis Frederickson the person who was at Martin's Bulk Milk taking the statement that you were present for?
A. No.
Q. Were you ever present when Mr. Franke gave a statement to Dennis Frederickson?
A. No.
Q. How were you aware that Dennis Frederickson took a statement from Mr. Franke?
A. When I called Sam to tell him that he needed to come in to make a statement to AIG, he said he had already given a statement to someone, but he wasn't sure who it was.
Q. At any point before that moment had you ever spoken to a representative of the Scheinman family, the injured gentleman?

A. No.
Q. Do you know whether anyone from your insurance company, or a lawyer on behalf of Martin's Bulk Milk or the insurance company had spoken to the Scheinman family or any representative of the Scheinman family?
MR. SCHRECK: Can I get the question again, please?
MR. COUTURE: You know, I'll ask it again because even as I said it I think I made a mistake.
BY MR. COUTURE:
Q. Do you know whether your insurance company or any lawyer for your insurance company before July -- the July 8th statement by Mr. Franke to Dennis Frederickson was given, had spoken to a representative of the Scheinman family?
A. I do not know.
Q. Okay. Were you aware that the day before, Monday, July 7th, 2008, Mr. Scheinman's family filed a lawsuit in Cook County against Martin's Bulk Milk and Samuel Franke?
A. Yes.
Q. When did you first become aware that the

lawsuit had been filed?
A. That Monday, July 7th.
Q. How was it that you learned that the lawsuit had been filed?
A. I believe the insurance company -- or we received -- we may have received something via hand delivery.
Q. Okay.
A. I don't remember, but -- exactly.
Q. Again, I don't want to know the content of the conversation, but I'm just trying to piece this together.
When you got the hand delivery, what did you do with it?
A. I don't recall, exactly. I'm sure I notified David Martin immediately.
Q. Okay. So on the 7th, that Monday after the accident, you knew there was a lawsuit?
A. Yes.
Q. Do you have any understanding of why an investigator for plaintiff's counsel would be contacting your employee the day after a lawsuit was filed against you and your employee?
A. Repeat that, please.

Q. Sure.
Do you have any understanding as to why Mr. Frederickson, who was hired by Mr. Burke's firm, would be contacting your employee the day after the suit was filed?
MR. SCHRECK: I don't want you to guess. If you know, you know.
A. No, I don't know why.
BY MR. COUTURE:
Q. All right. Did Martin's Bulk Milk already have a lawyer -- again, I don't want to know what you said, but as of the 7th was there already a lawyer involved from Martin's Bulk Milk?
A. No.
Q. As of the 7th -- or as of the 8th was there already a lawyer involved from Martin's Bulk Milk?
A. I don't know.
Q. Do you know if Mr. Franke had a lawyer on the 7th of July?
A. I do not know.
Q. Do you know whether Mr. Franke had a lawyer on the 8th of July?
A. I do not know.

Q. So when you called Mr. Franke and said you have to come down and give a statement, he told you that he had already given one?
A. Correct.
Q. Did you ask him who he gave it to?
A. Yes.
Q. And what did he say?
A. He said he did not know.
Q. When did you learn that that individual was Dennis Frederickson, the investigator for plaintiff, plaintiff's counsel?
A. I did not know it was for the other party until after I learned that he had not given a statement for IAG, but that it was apparently for the other party.
Q. All right.
MR. SCHRECK: When you said IAG, you meant AIG?
THE WITNESS: AIG, sorry.
MR. SCHRECK: That's all right.
BY MR. COUTURE:
Q. When was that that you learned that?
A. Sometime on the 8th of July, I'm assuming.
Q. Okay. Other than being present for

Mr. Franke's statement to his and your insurance company, did you have any other discussions with Mr. Franke on the 8th regarding this accident?
A. No.
Q. Have you since had discussions with Mr. Franke regarding this accident?
A. Only on the 10th, I believe it was.
Q. What discussions did you have with Mr. Franke on the 10th?
A. I had to have him sign to release his drug and alcohol records.
Q. I know I'm going back to something I think I just covered, but I want to make sure.
On the 8th, when you talked to Mr. Franke, you came to an understanding that he had actually given a statement to a representative of plaintiff's counsel without being represented?
A. To somebody. I didn't know who, he didn't know who.
Q. When did you learn that -- who that somebody was?
A. I only speculated. After I had been told that he had given a statement, I had only speculated that it was the other parties. I was

not sure.
Q. By the time that you learned that Mr. Franke had given this statement, you already knew that a suit had been filed against your company and against Mr. Franke?
A. I'm assuming so, yes, because I believe it was on Monday that we received the suit.
Q. Okay. Did Mr. Franke tell you why it was that he gave a statement to the investigator for the person who sued him?
A. No.
Q. Did you have any discussion about whether he should or should not have given that statement?
A. Yes.
Q. What was discussed?
A. It was discussed that he should not give out any statements unless he was directed to by David or myself.
Q. Did he say where that statement was taken?
A. No.
Q. Did he say how it was taken?
A. No.
Q. Did he say whether he had a lawyer present?

A. No.
Q. Did he say whether the investigator told him that he had been sued?
A. No.
Q. Did Mr. -- to your knowledge, did Mr. Franke know that when the investigator took the statement, Mr. Frederickson, on the 8th -- strike that, that's already getting confusing.
To your knowledge, did Mr. Franke know that he had already been sued when he gave the statement to Mr. Frederickson, a representative of the party who was suing him?
MR. BURKE: Objection, calls for hearsay, speculation, lack of foundation for this witness.
MR. SCHRECK: I'll join. I'm not sure I understood it.
Go ahead if you -- go ahead.
A. No. I --
BY MR. COUTURE:
Q. Okay. When was the -- again, I don't want to know what the discussion was, but when was the first time a lawyer was hired by Martin's Bulk Milk for this lawsuit?
A. I do not know.

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Q. Have you seen the statement that Samuel Franke gave to Mr. Frederickson?
A. Yes.
Q. Do you have any personal basis to disagree with anything he said or agree with anything he said?
MR. SCHRECK: Object to form, foundation.
BY MR. COUTURE:
Q. Go ahead.
MR. SCHRECK: Go ahead.
BY MR. COUTURE:
Q. Instead of having me go through the statement, you don't know the -- you don't know what happened that night, so you can't agree or disagree with what he said?
A. Correct. I was not there.
Q. Other than Mr. Franke, have you spoken to anyone -- and your lawyer, have you spoken to anyone who has told you what happened that night?
A. No.
Q. Did you -- I think you said at some point you spoke to the police regarding this accident?
A. Yes.
Q. When was that?

77

A. That would have been the following week. I don't know exactly the day.
Do you want me to clarify?
Q. Okay. It was the following week, you don't remember the day.
Who did you speak to?
A. A Sergeant Pfutzenheimer or some --
Q. Pfutzenrueter?
A. Pfutzenrueter, yes.
Q. Did he call you or did you call them?
A. I believe I called him.
Q. And why did you call Sergeant Pfutzenrueter?
A. To find out the exact location of the vehicles.
And he just -- it was just a conversation in general. He told me they were at Ernie's Towing, and he told me that he didn't believe drug and alcohol were a factor in the accident, and he told me that there were witnesses.
And that was it, from my recollection.
Q. Okay. Did you have any further conversations with the police at all related to this accident?

78

A. No.
Q. Were you -- did you become aware of the fact that the Illinois State Police found this tractor had inoperable signals before the accident?
MR. SCHRECK: Objection to form and foundation.
Go ahead and answer.
A. Can you repeat your question?
BY MR. COUTURE:
Q. I'll ask it a little more basically first before we get to specifics.
Did you ever speak to anyone from the Illinois State Police about this truck or tractor?
A. Not to my knowledge, no.
Q. Did you ever learn that the Illinois State Police found that there were violations on this truck that preexisted this accident?
A. No.
Q. Were you aware that before this accident, according to the Illinois State Police, the tractor had inoperable turn signals?
MR. SCHRECK: Objection to form, foundation, assumes facts not in evidence.
Go ahead.
MR. COUTURE: Actually, I disagree that

79

objection.
But go ahead.
MR. SCHRECK: Go ahead and answer.
A. Before -- I need to clarify.
Before the accident you're saying the blinkers were inoperable -- or I'm not clear -- clear on --
BY MR. COUTURE:
Q. At any point other than perhaps with conversations with your lawyer, which I'm not allowed to ask you about, at any point did you learn that the Illinois State Police determined that this truck had violations that existed before the impact with Mr. Scheinman's vehicle?
A. No.
Q. Is there someone at Martin's Bulk Milk whose responsibility it is to make sure that all of the tractors that leave are in proper mechanical shape?
A. It is primarily the driver's responsibility.
Q. Okay. And the driver does a pre-trip inspection to make sure that the truck is working?
A. Correct.

80

Q. And if there's a problem, he brings it to whose attention?
A. He has to write it up for the mechanics.
Q. Okay.
A. And if the mechanics are not available, he brings it to David Martin's attention.
Q. So if, for example, the tractor Mr. Franke was driving had inoperable turn signals or flashers, Mr. -- you agree with me that that's something that a pre-check -- a pre-trip inspection would show?
A. Correct.
Q. And it would be Mr. Franke's responsibility to write that up so the mechanics can fix it?
A. Correct.
Q. If, hypothetically, Mr. Franke did a pre-trip inspection of it, the tractor, on July 3rd, 2008, and the blinkers were out, would he be allowed to leave the yard with that tractor?
A. No.
Q. Would he get another tractor or would he wait until they fixed the blinkers?
A. One or the other.

Q. Were you aware that the state police found that the brakes on this vehicle were not working properly?
MR. SCHRECK: Same objection as previously, form, foundation.
Go ahead.
BY MR. COUTURE:
Q. Go ahead.
A. Before or after the accident?
Q. Found after the accident, but determined by the state police to have preexisted the accident.
A. No.
Q. Other than -- well, strike that.
Did you gather any other information regarding this accident other than what we've talked about?
A. No.
Q. Did you get a copy of the police report from the Highland Park police department?
A. Yes.
Q. Okay. Other than calling and saying can I have a copy of the police report, did you do anything else in that regard?

A. Not to my knowledge.
Q. Other than the description of the conversation you had with Sergeant Pfutzenrueter -- actually, I think it's Commander Pfutzenrueter, we don't want to get him upset, other than the description -- other than that conversation, did you have any other conversations with any member of the -- of any police department regarding how or why this accident took place?
A. Not to my recollection.
Q. Have you -- other than what you've described for me, did you talk to Samuel Franke ever again about how or why the accident took place?
A. No.
Q. Did you thereafter -- at any point after the 8th of July 2008 ever speak with David Martin regarding how or why the accident took place?
A. No.
Q. You don't have any training in engineering, do you?
A. No.
Q. No training in accident reconstruction?
A. No.

Q. You never know.
The tractors owned by Martin's Bulk -- well, strike that.
Did the tractor that Mr. Franke drive -- was -- I'll start again.
Did the tractor that Mr. Franke was driving the day of this accident have a black box or electronic monitoring device for the engine?
A. Yes.
Q. And do you understand that someone attempted to download that information?
A. Yes.
Q. And is there someone at Martin's Bulk Milk, before this accident, who was responsible to make sure that all of these -- all the equipment, including the black box, was operating properly?
A. The equipment, but not into the black box -- yes, the safety of the equipment. The black box itself I don't believe is the specialty of our mechanics. I believe that's more internal.
Q. Is it your understanding, or have you learned that the block box for this truck wasn't working properly such that no information could be downloaded from it?

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

A. Yes.
Q. Did Martin's Bulk Milk do anything to deactivate that black box before this accident?
A. No, not to my knowledge.
Q. Do you have any understanding why it was that that black box didn't work properly?
A. My understanding was that it was the age of it.
Q. Do you know what year that tractor was?
A. I believe a 1994.
Q. Who told you that was the age?
A. I think I got that through general conversations with -- in just hearing it with Truck Country and with --
Q. What's --
A. When Bob Golden and Mr. Burke came --
Q. Well, if Mr. Burke's there, it's not privileged.
Go ahead.
MR. SCHRECK: No, I'm saying it wouldn't be.
A. All I recall is hearing them say they can't get the information out of it.
BY MR. COUTURE:
Q. What's Truck Country?

85

A. Freight liner. It's freight liner parts, dealership.
Q. Oh, I got it.
Do you know how long Mr. Franke had been driving on the day of the accident before the accident occurred?
A. He would have left our terminal between 12:00 and 2:00.
Q. Was it part of your job to examine his logs to determine how long he had been driving before this accident?
A. Repeat that, please.
Q. Was it part of your job after this accident to look at Mr. Franke's log to see how long he had been driving?
A. Yes.
Q. And did you do that?
A. Yes.
Q. And what did you find?
A. I found that he was in compliance.
Q. Did Mr. Franke tell you what his plans were for driving if the accident had not happened?
A. No.
Q. Was it your understanding that Mr. Franke had a typical course and practice about where he stopped or how far he would drive as he took his regular route from Hammond to Wilton?

86

A. Repeat that, please.
Q. Sure.
Do you know whether Mr. Franke had a typical course and practice as far as whether he would drive all the way to Wilton from Hammond, whether he would pull over to the side of the road, whether he'd go to a Motel 6, do you know?
A. I do not know.
Q. Mr. Martin testified in his deposition that you compiled all the information regarding this accident.
What other information other than the police report did you compile?
A. The drug and alcohol results from the hospital, the driver qualification file.
Q. Okay. Anything else?
A. Not to my recollection. Whatever was requested.
MR. SCHRECK: Can we take a quick break or --
MR. COUTURE: Yes. I'm almost done, I just have a couple questions about the driver's

87

handbook, then I'll be done. I'm sure these other folks -- but if you want to take a break, that's fine.
MR. SCHRECK: Yes. We can go off the record.
(Recess taken.)
(Whereupon, Berndt Deposition Exhibit No. 122 was marked for identification.)
BY MR. COUTURE:
Q. I'm showing you what's been marked as Exhibit Number 122 for identification --
MR. SCHRECK: 122?
MR. COUTURE: 122 for identification.
BY MR. COUTURE:
Q. Now the first couple of pages are a letter from a lawyer.
I want to direct your attention to the fourth page -- no -- it looks like this.
A. Okay.
Q. It's got your signature at the bottom.
A. Yes.
Q. What is this document 122? Not just this letter, but what --
A. This is our Driver Safety Handbook.

88

Q. Okay. And describe generally what the Driver Safety Handbook is?
A. It's our mission to the driver, our expectations of what we expect out of them, what we are willing to do for them as far as benefits, and just certain rules and regulations and information regarding safety, some procedures to be followed.
Q. And who authored this driver handbook?
A. I did.
Q. You did, okay.
When did you first author it?
A. Honestly? I don't know when the first one was, if it was in '99, 2000. Somewhere in that time frame.
Q. And when you authored the handbook, did you start from scratch, or was there a handbook already in place that you altered?
A. I worked with the HNI Risk Services team. They gave me a template to work off of.
Q. Okay. I just want to draw your attention, then, to a couple of the items in here, and I'll try to go by page numbers.
A. Okay.

89

Q. The first one I want you to look at, it says page 6 at the bottom. Do you see that?
A. Yes.
Q. And it says: Safe Work Rules.
MR. SCHRECK: And just for the record, there are two page 6s.
MR. COUTURE: I know.
MR. SCHRECK: Okay.
BY MR. COUTURE:
Q. And this is the first page 6 that you will encounter as you go through the document, okay?
A. Okay.
Q. There we go.
And this gives a bullet point list of what Martin's Bulk Milk drivers are supposed to do when they're driving and being employed by Martin's Bulk Milk?
A. Yes.
Q. Okay. Including: All drivers shall operate their vehicles in a safe and courteous manner.
That's the third one down, right?
A. Correct.
Q. In the event of a motor -- the next one:

90

In the event of a motor vehicle accident, all drivers are required to contact a Director of Safety immediately.
That's you?
A. Correct.
Q. And Mr. Franke did that, in fact, in this accident, didn't he, or --
A. Yes, he did.
Q. All right. If you can go to the next page.
It says, the first bullet point there on page 7: Any driver involved in a serious, preventable accident, may upon the company's discretion, be required to attend retraining.
Now he didn't have to do that 'cause you fired him?
A. Correct.
Q. And then two more down, it says: In the event of damage incurred to Martin's Bulk Milk Services, Inc. property due to driver negligence, the driver will be charged for the cost of repair.
Was Mr. Franke ever charged for the cost of the repair of the Martin's Bulk Milk tractor?
A. No.

91

Q. Why not?
A. It has not been repaired.
Q. When it is repaired, are you planning on sending him a bill?
A. That's not my decision.
Q. Okay. But according to the handbook and the policy and procedure, Martin's Bulk Milk reserves the right to do so?
A. Correct.
Q. It says due to driver negligence.
Do you believe the damage to that truck occurred as a result of driver negligence?
MR. SCHRECK: I'm going to object, calls for a legal conclusion, form, foundation.
BY MR. COUTURE:
Q. Go ahead and answer.
A. I do not know. I was not there.
Q. You understand that he rammed a car from behind, right?
MR. SCHRECK: Object to form, foundation, calls for speculation.
Go ahead and answer.
A. I do understand that.

92

BY MR. COUTURE:
Q. Who makes the determination of whether -- or strike that.
Back in 2008, who made the determination whether an accident was a result of driver negligence for the purpose of determining that they could go after the driver for damages?
A. David Martin would make that call.
Q. Okay. Going to the bottom of that page, under the section that says Following Distance, the last -- second-to-last line says: When you lose your concentration a crash can occur. A greater following distance can mean the difference between life and death.
Am I correct that Martin's Bulk Milk employees were told that they could hurt someone if they lost concentration while driving, or kill someone?
A. Yes.
Q. And then after that there's a page 13, and then the actual driver's handbook; is that correct?
A. Yes, this is the update -- actually, this is the update on May 11th.
Q. Okay.

A. This one was written on April 2007.
Q. Okay.
A. And these updates went in May, a month later.
Q. I got it.
So the documents I've been asking you about were updates to the existing driver's manual?
A. They did not -- that part -- those parts did not change --
Q. Okay.
A. -- that you asked me about.
Q. Those were always the policy, correct?
A. Correct.
Q. All right. Maybe this will save us a little bit of time -- well, strike that.
Go to page 11 for the actual manual, which I'll tell you is four pages from the end. Do you see it?
A. Page 11, yes.
Q. Okay, great. And it's under Disciplinary Action.
Am I correct that it says: The extent of any disciplinary action to be taken by the company for violations of its rules and policies will

depend on the severity of the situation. Disciplinary action shall range from a verbal warning to immediate discharge for the most severe violations.
Generally, if a driver violates -- has a violation, they can be fired if it's bad enough?
A. Correct.
Q. Mr. Franke was fired?
A. Correct.
Q. So am I to understand that he was fired for violating policy?
A. Yes.
Q. And that policy was unsafe driving for hitting a car?
A. Correct.
Q. So I don't have to go through the rest of this, you're familiar with the entirety of the handbook, right?
A. Yes.
Q. And would you agree with me that the policies and procedures indicated in this handbook were the policies and procedures for Martin's Bulk Milk at the time of the accident?
A. Yes.

Q. So I don't have to say page 7 says this and page 8 says that. You'd agree with me that everything in this document was your policy and procedure?
A. Yes.
Q. And every employee got one of these when they joined the company?
A. Correct.
Q. And when they were amended, every employee got the amendment?
A. Yes.
Q. So Mr. Franke knew that these were the policies and procedures of Martin's Bulk Milk at the time of this accident?
A. Yes.
Q. He just failed to follow them?
MR. SCHRECK: Objection, form, foundation, calls for speculation.
Go ahead and answer.
A. I don't know. I wasn't at the accident -- scene of the accident.
BY MR. COUTURE:
Q. If he had followed these procedures, would he have struck a car, a stopped car from behind

without seeing it?
MR. SCHRECK: Same objection.
MR. COUTURE: Go ahead.
MR. SCHRECK: Go ahead.
A. No.
MR. COUTURE: I don't have any other questions for you, ma'am.
MR. YU: I've got some questions. Do you want me to go, Richard?
MR. BURKE: I can go, do it in order.

EXAMINATION

BY MR. BURKE:
Q. Is it Berndt, is that how you pronounce it?
A. Berndt.
Q. Berndt.
Ms. Berndt, my name is Rich Burke again and -- you know, by the way, when Mr. Couture was asking you when he first started, he noted you and I had walked into the room together, and you said we had been in the elevator.
It is true you and I did not have any conversation whatsoever about this occurrence or this collision or Mr. Franke's conduct in driving;

is that correct?
A. That is correct.
Q. Okay. And, in fact, you were nice enough to say we had once met, but I -- I did not -- I told you I did not actually recall meeting you, correct?
A. Yes.
Q. Okay. And whenever you noted or referred to sometime that I was up at Martin's and -- whenever that was, that was with attorneys for Martin's present, correct, including Bob Golden?
A. Correct.
Q. And there was some effort to do a download or an inspection of the truck, is that generally -- generally your recollection of what was taking place?
A. My recollection was the trailer -- the truck and the trailer were being inspected.
Q. Okay.
A. I remember something with the trailer and having to wash something under -- something with a wash bay or something.
Q. Okay.
A. That's a long time ago.

Q. Sure, okay.
Maybe just while you have it in front of you, that Exhibit Number 122.
You explained what the initial pages are, that they were certain updates issued on or about May 11th of 2007 as a supplement to the April 2011 driver handbook; is that correct?
A. The April 2007 handbook, yes.
Q. Okay. Were there any further supplements issued between May 11th of 2007 and the date of this occurrence, July 3rd, 2008?
A. No.
Q. Did Martin's provide to its drivers any other type of handbook or materials related to their job or work or operating procedures or driving records other than this driver handbook?
A. Yes.
In 2007, in the driver qualification file, there is a list of five procedures that David Martin signed that the drivers had to sign. I don't recall exactly what's on there.
But I was presented with it before, and that is the only other -- that has to do with our service, and there are requirements that they

have to -- were told to comply to and they agreed to.
Q. Okay. And what's your recollection of the general nature of those five items or procedures?
A. Just that if they are unable to carry the load for any given reason, that they are to contact dispatch, basically, and it would be re-looked-at. I -- without reviewing, I can't say.
Q. Okay. And you were asked about on page 7 in the driver handbook a section entitled: Following Distance.
Do you see that?
A. Yes.
Q. Okay. And by following distance, does that refer to the distance between a Martin's truck and a vehicle in front of it?
A. Yes.
Q. Okay. And it was the policy of Martin's that its drivers maintain a safe distance between any vehicles that it was following or approaching, correct?
A. Correct.
Q. And it was also the policy of Martin's that drivers refrain from striking or impacting

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

vehicles from the rear, correct?
A. Correct.
Q. And Martin's drivers also were expected to maintain a safe speed so as to avoid striking a vehicle in of it, correct?
A. Correct.
Q. And Martin's drivers were also expected to maintain a look-out for the traffic in front of their truck in order to make sure they were able to stop in time without striking the vehicle it was following, correct?
A. Correct.
Q. There's a section in the April portion of the driver handbook on page 5.
Do you see under operating procedures and policies?
A. Okay.
Q. Okay. And it says: It shall be the responsibility of the driver for the following, and then it lists, oh, probably -- it looks like about eleven entries with dots in front of them.
Do you see that?
A. Yes, I do.
Q. Okay. And the Martin's drivers were

expected to comply with those procedures and policies, correct?
A. Correct.
Q. Okay. And policy number -- or excuse me, the second paragraph in that section states: To comply at all times with the rules, regulations and laws of the federal, state and such other regulatory agencies having jurisdiction.
Correct?
A. Correct.
Q. Okay. And by that provision, Martin's was expecting its drivers to comply with local, state, and federal traffic regulations applicable to the operation of tractor-trailer trucks, correct?
A. Correct.
Q. And Martin's drivers were expected to comply with the provisions of the Federal Motor Vehicle Safety Act, correct?
A. Correct.
Q. I think I recall you saying part of your job was to make sure drivers got a drug and alcohol test when required; is that right?
A. Correct.
Q. Okay. Did Mr. Martin -- or did Mr. Franke

undergo alcohol and drug testing?
A. At random, or at the time of the accident?
Q. No, at the time -- after the accident.
A. Yes.
Q. Okay. And was that at your -- were you -- was that done prior to you knowing about the accident or not, or do you know?
A. No, I told him it was his responsibility to work with the police to make sure that got done.
Q. And do you have an understanding of the results of that testing?
A. Yes, I do.
Q. Okay. And what's that understanding?
A. Negative.
Q. On both alcohol and drugs?
A. Yes, both parts.
Q. On the day of this occurrence had Mr. Franke transported a load of furniture for MBM Logistics?
A. To my knowledge.
Q. And where did MBM Logistics operate from?
A. Winona, Minnesota.

Q. And who -- how was that assignment communicated to Mr. Franke to transport this load of furniture?
A. Through dispatch at Martin Bulk Milk.
Q. Okay. And how would Martin Bulk Milk receive that assignment or know it had to be done?
A. Through a confirmation from MBM Logistics.
Q. And who was the contact at MBM Logistics that would do that?
A. Randy Galewski.
Q. And what was your understanding of what Randy's job was, or position?
A. He's a load coordinator, part owner, dispatcher of the brokerage.
Q. And when you say the brokerage, what do you mean by that?
A. MBM Logistics is a load brokerage.
Q. And when you refer to dispatch at Martin's Bulk Milk, who are you referring to?
A. Our dispatch office that is overseen by David Martin, and he has anywhere from three to five people in his office at any given time that he gives orders to, to dispatch drivers here, there, wherever.

Q. Okay. And back in 2008, in July of 2008, who were those other workers?
A. Pat Podlena, Doreen Bayer -- her name now is Bayer. It was West then. Nancy Schmitts. I think that's all that was in there at that time.
Q. Okay. And of those three persons, who still works for Martin's?
A. Doreen and Nancy and Dave.
Q. And in July of 2008 -- Pat Podlena is a male, correct?
A. Correct.
Q. Okay. And what -- did he have a job title or position?
A. He was a dispatcher.
Q. And how about the other two, Ms. Bayer and Ms. Schmitts?
A. Dispatchers.
Q. You're familiar with the tractor that Mr. Franke was driving this day, correct?
A. Familiar with the looks of it? Yes.
Q. Oh, okay. And my real question is: Who owned that tractor?
A. Martin's Bulk Milk.
Q. Okay. And did Martin's Bulk Milk own the

105

trailer that Mr. Franke was hauling that day?
A. No.
Q. Do you know who owned that?
A. CSX.
Q. With respect to the tractor, who -- you mentioned drivers have a responsibility to do a pre-trip inspection, correct?
A. Correct.
Q. And as part of that inspection they have to make sure that the brakes are in proper operating condition, correct?
A. Correct.
Q. And they have to make sure that those brakes are not out of adjustment, correct?
A. Correct.
Q. Okay. And if a Martin's driver in that pre-trip inspection finds that the brakes are out of adjustment or otherwise not in proper operating condition, is it the policy of Martin's that that truck should not be taken out on the road that day until those brakes are repaired?
A. Correct.
Q. When a driver, a Martin's driver is doing a pre-trip inspection of a trailer that he's

106

hauling, regardless of who owns that trailer, and he finds that the brakes on the trailer are -- or the chassis that he's hauling are out of adjustment, is it also the policy of Martin's that he should not haul that trailer until those brakes are repaired --
A. That is correct.
Q. -- or that trailer is replaced with another one?
A. Correct.
Q. Did Martin's have a maintenance department in July of 2008?
A. Yes.
Q. Okay. And who was the head of that?
A. I believe in 2008 it was Ryan Green. I am not positive, but I believe that's who was in charge.
Q. Okay. And where was that maintenance department located?
A. It's connected right next to the offices. We're all in one building.
Q. In Wilton?
A. Wilton, yes.
Q. Okay. Did Martin's have any contract with

107

any maintenance company to regularly do inspections or maintenance on their tractors?
A. No.
Q. Were annual inspections done by Martin's?
A. Yes.
Q. Did Martin's have any brake mechanics that were qualified in accord with the provisions of the Federal Motor Carrier Safety Act?
A. Yes.
Q. Okay. And who was that?
A. In 2008 -- all of our mechanics at that time are certified -- or at all times. What mechanics exactly were working for us at the time I do not know.
Q. Okay.
A. But all mechanics are required to be certified.
Q. About how many mechanics did Martin's have in 2008?
A. Probably three in the tractor shop and three in the trailer shop, at a minimum.
Q. Were there records kept as to the maintenance of the trailer -- or tractors and trailers at Martin's?

108

A. Yes, but not the rail trailers.
Q. Not a trailer owned by a rail company, you mean?
A. Correct, or a non-owned trailer.
Q. Are there records kept of the driver's daily pre-trip inspection of the condition of the tractor?
A. For six months, yes.
Q. And what happens after six months?
A. The pre-trip is on the driver's log and it's destroyed.
Q. What do you mean, the pre-trip's on the driver's log?
What is destroyed, the whole thing or --
A. The driver's log -- we're only required by federal regs to keep driver's logs for six months, unless there's a DOT recordable accident, where then it has to stay with the accident file.
Q. Okay. And did you mean that the -- or did you say and mean that the pre-trip inspection is attached to those driver's logs, and therefore gets destroyed after six months?
A. Correct. It's on the bottom of the log.
Q. And because this was a reportable

incident, were these driver's logs maintained?
A. Yes, for one month up -- from June 1st up until the date of the accident.
Q. You at some point earlier made some reference to your insurance policy and the injuries or damages exceeding the coverage amount. Do you recall generally that topic?
A. Yes.
Q. Okay. What is your understanding of -- number one, who did Martin's have their liability insurance coverage with?
A. AIG.
Q. And what's your understanding of the exact liability coverage amount for this occurrence?
A. One million dollars.
Q. In the preceding year or two or three years, did Martin's have any greater amount of liability coverage?
A. No.
Q. Did Martin's have any what is sometimes referred to as excess coverage or umbrella coverage, in addition to the one million with AIG?
A. No.
Q. Was Mr. Franke required to obtain any

coverage on his own --
A. No.
Q. -- other than what was provided through Martin's?
A. No.
Q. Who purchased or -- or who was the named insured for the one million coverage you're referring to?
A. Martin's Bulk Milk Service, Incorporated.
Q. Did MBM Logistics have any separate policy of insurance coverage?
A. Not for liability, no.
Q. What did they have coverage for?
A. Probably excess cargo.
Q. And who at Martin's was in charge of purchasing insurance coverage?
A. I was in charge of organizing it, but the final decision was with David and Allan.
Q. And both of those are Martin, correct?
A. Yes.
Q. And was the -- or strike that.
Did you have a broker or a person or contact at AIG from whom Martin's purchased their insurance?

A. No. HNI Risk Services. The agent is Jill Witting.
Q. You did mention Jill's name.
How is it you know or believe -- or, excuse me, how is it you believe that MBM Logistics did not have liability insurance coverage?
A. I've been involved because Al is part owner of MBM Logistics, so even though I never received a paycheck through MBM Logistics, from time to time Al would have me just review what they have, and Jill also wrote the insurance for MBM Logistics, which is common -- some common ground there.
Q. Were there any policies of insurance that covered both MBM Logistics and Martin's Bulk Milk Service?
A. Yes.
Q. And what type of coverage was that for?
A. General liability.
Q. And when you say general liability, do you mean liability for drivers?
A. For anybody.
If somebody walked on the grounds of either property and fell in a hole and broke their

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

leg, that type of general liability.
Q. And what I'm getting at, was that -- did that general liability include liability coverage for Mr. Franke for this type of occurrence --
A. No.
Q. -- involved here?
A. No.
Q. How do you distinguish his driver liability from what you're referring to as general liability? I mean from your understanding of the company insurance coverage.
A. From my understanding, because he was in the truck, in the semi, the general liability does not cover him. With that respect, it would cover another party if they had stepped on the step of the truck and fell off, the truck step fell off and they were hurt, that's how general liability would work, but it does not involve collision or physical damage.
Q. So just to clarify what you said a moment ago, do you believe that MBM Logistics had any insurance coverage that applied to Mr. Franke's liability or potential liability for this collision occurrence?

113

MR. SCHRECK: Object to the form, foundation.
Go ahead and answer.
A. No, they did not.
BY MR. BURKE:
Q. Have you checked -- in your job as safety manager, have you made a search or inquiry of somebody at MBM Logistics for that, to make that determination?
A. No, I have not.
Q. Okay. What is it that makes you think that, then?
A. I just -- I know the policies they had in place.
Q. And who at MBM Logistics was most involved with those policies?
A. Randy Galewski.
Q. And is it HNI Risk Services that's your insurance broker?
A. Yes.
Q. Okay. And where are they located?
A. New Berlin, Wisconsin.
Q. New Berlin, B-e-r-l-i-n?
A. Correct.
Q. And Jill, did you spell her last name for

114

us? Do it again if you would.
A. W-i-t-t-i-n-g.
Q. W-i-t-t-i-n-g. Jill Witting, okay.
Does MBM Logistics have an office in Winona?
A. Yes, they do.
Q. Okay. What does it consist of?
A. Back then or now?
Q. Back then, July of '08.
A. It was basically in a pole shed type of a building made with offices, cubicles. Nothing fancy.
Q. And did MBM Logistics own any tractors?
A. No.
Q. Did they own any trailers?
A. At that time? Possibly half a dozen, a dozen. Dry vans.
Q. Dry vans?
A. Yeah, with no reefer units or anything.
Q. And that means refrigerated units?
A. Reefers?
Q. Yes.
A. Yes.
Q. Today is MBM Logistics still in Winona,

115

Minnesota?
A. Yes.
Q. Okay. And is their office different today?
A. Yes.
Q. Okay. In what way?
A. They moved and they are in a -- another facility. It's a bit nicer. Nothing fancy. It's still kind of a pole shed type format, but two stories. I've only been there once.
Q. And about how many employees does MBM Logistics have?
A. Probably ten or twelve.
Q. And there's the owners, Randy and Allan and Ruth, I think, correct?
A. Correct.
Q. Okay. And Randy Galewski, I should say, and Ruth and Allan Martin, correct?
A. Correct.
Q. The other employees, generally what do -- what are their jobs?
A. Dispatch or load coordinators.
And then, actually, the billing department is in Wilton in a separate building where the

116

paperwork flows through and the billing is done out -- at a different office in Wilton.

Q. Does MBM Logistics have any maintenance department?

A. No.

Q. I know you said back then MBM Logistics possibly had a half dozen trailers. Do they own trailers today?

A. Yes.

Q. Okay. And about how many?

A. I have no idea.

Q. Okay. More than a half dozen or --

A. Probably not.

They're -- I don't know.

Q. Under ten, is that --

A. I would guess, if any. I don't know today.

Q. Do they own tractors today?

A. MBM Logistics does not.

Q. Okay. At the time of this occurrence back in July of 2008, did Mr. Franke -- was he employed by MBM Logistics in any manner?

A. No.

Q. Okay. Did he get paid by MBM Logistics in

any manner?

A. No.

Q. Did MBM Logistics have a contract with Martin's Bulk Milk Service back in July of '08?

A. I don't know.

Q. Was there a broker agreement between MBM Logistics and Martin's Bulk Milk Service in July of '08?

A. I do not know.

Q. The furniture that Mr. Franke hauled from Wilton, where would he have picked up that furniture?

A. In Wilton.

Q. And from whom?

A. Another driver would have brought that from Arcadia Furniture in Arcadia, Wisconsin.

Q. Brought it to your facility in Wilton?

A. Correct.

Q. And when would that have been brought; like the day before or sometime prior?

A. Most likely the day before, or that morning, even.

Q. And back to the Driver's Handbook for a moment.

Am I correct that it was the expectation of Martin's Bulk Milk Service that all of its drivers, including Mr. Franke, adhere to and comply with all the provisions of the Driver's Handbook?

A. Yes, it was expected.

Q. Okay. And I notice on page 8 there's a section referring to Fatigue.

And it is correct that if a driver thought he was fatigued or at risk for being fatigued or falling asleep, he should pull over and not continue driving, correct?

A. Correct.

Q. Switching topics a little bit to the night of this incident when you got called.

You were asked some questions about what Mr. Martin -- or, excuse me, you were asked some questions about what Mr. Franke said to you about the occurrence. Do you remember that line of questioning?

A. Yes.

Q. Okay.

A. I've been -- I mean, to some point. I've been asked so many.

Q. Right.

And, just generally, he told you he had hit a car and he was sure the occupant was dead because the car had caught on fire, correct?

A. Correct.

Q. Okay. And during that conversation did Mr. Franke ever say whether or not he had applied his brakes prior to colliding with the car that he hit?

A. No, he did not.

Q. And to clarify that answer, did you ask him if he applied his brakes?

A. No, I did not.

Q. Okay. And did he tell you one way or another whether he applied his brakes?

A. No, he did not.

Q. And I think you earlier told us you had no conversation with him about the speed of his truck at that time?

A. Not at that time, no.

Q. I forget the word you used, but when you were talking to Mr. Franke, how did you describe his tone of voice or demeanor?

I forget what you said. Shaken or --

A. He was basically --

Q. -- confused or something.
MR. COUTURE: Objection --
BY MR. BURKE:
Q. I forget what you said.
MR. COUTURE: Objection, mischaracterizing the testimony. She didn't say those words.
MR. SCHRECK: You've got to let him finish his question.
THE WITNESS: I know. Sorry.
BY MR. BURKE:
Q. That was a bad question. I just wanted to lead you to that topic.
My question is: What was Mr. Franke's tone of his voice when you were speaking to him when he called you shortly after this occurrence?
A. He was excited, in shock, hard to understand because of his speech impediment.
Q. And when you say he seemed to be in shock, what is your recollection of what you were hearing or saying that led you to believe that about him?
A. Just a -- gibberish. I couldn't -- if you didn't listen real close to Sam, he's hard to understand, in -- in a normal situation. But that

night it took a little bit for -- slow down, take your time, take a deep breath, you know.
It -- I couldn't understand a word he was saying at first.
Q. Okay. And if I'm understanding you correctly, that wasn't due simply to his stuttering, but rather his condition and mental and emotional state; is that correct?
MR. COUTURE: Objection, mischaracterizes her testimony.
MR. YU: Join.
MR. SCHRECK: Go ahead and answer.
A. I would say so, yes.
BY MR. BURKE:
Q. Did you say he called you still from the scene of the incident?
A. Yes.
Q. Did you -- okay.
There was some subsequent day that you talked to Mr. Franke in which he told you that he was not on the phone and that he had not been speeding at the time of this crash; is that correct?
A. That is correct.

Q. Okay. And was that an in-person conversation or over the phone?
A. That was in person.
Q. Okay. And I think you initially said you thought that might have been on July 8th, but then said, well, maybe not the 8th, not necessarily right the 8th, but maybe some days thereafter. Is that correct?
A. I have no idea what date, sir. It could have been Monday through Wednesday, I don't know.
Q. Okay. So it obviously wasn't July 7th, which I think was a Monday, correct --
MR. COUTURE: Objection –
BY MR. BURKE:
Q. – and it was some day on or after July 8th, but you're not really sure which day?
A. On or after Monday, that's – of that following week.
Q. Okay. And whenever -- whenever you had that conversation, did he actually specify any speed that he was traveling at the time of the collision?
MR. COUTURE: I'll object that she already testified to exactly what he said in this regard,

but if you want to ask her to say the same thing over and over, we can do that.
Go ahead.
MR. SCHRECK: You can answer.
A. Okay. He said he was under the speed limit, and he didn't tell me what the exact speed limit was.
BY MR. BURKE:
Q. And in that conversation where he said he was going under the speed limit, did you ask him what the speed limit was?
A. I do not recall.
Q. And am I correct that in that conversation Mr. Franke -- did he tell you what the speed limit was?
A. I do not recall. I -- I would be lying if I said I did.
Q. I take it as you sit here today you have no recollection of Mr. Franke specifying any particular speed he was going, other than telling you he was traveling under the speed limit; is that correct?
A. Yes, or --
MR. COUTURE: I'll object to the extent that it

mischaracterizes her previous testimony.
Go ahead.
A. Or not speeding.
BY MR. BURKE:
Q. Okay. That he was not speeding or traveling under the speed limit –
MR. COUTURE: Same objection.
BY MR. BURKE:
Q. -- is that correct?
A. Correct.
Q. Oh, you know, you were -- some -- some of what you were telling us about -- such as, you know, this conversation, and asking Mr. Franke to come into the Martin's office. Did you make any notes or reports of any of these occurrences or conversations?
A. No.
Q. Okay. Did you make any log -- charting or reports, you know, saying at what point Mr. Martin -- or Mr. Franke came in, or who you met with with him or -- or the content of any conversations?
A. Not to my recollection, without reviewing the accident register.
Q. You know, you got asked about a

conversation that Mr. Franke had with a gentleman named Dennis Frederickson. Do you recall that question?
A. Yes, I do.
Q. Okay. And the name Dennis Frederickson, when did you first hear that name?
A. Yesterday.
Q. Okay. So there was never a time that -- and was that -- well, strike that.
There was never a time back in July of 2008 that Mr. Franke ever mentioned speaking to anybody that was identified specifically by the name of Dennis Frederickson; is that correct?
A. Not to my recollection.
Q. And I think you said at some point, whenever it is, Mr. Franke came in to your office to speak with you and David, and was it somebody from AIG?
A. AIG. He had to call to file a report.
Q. Okay.
A. Or statement.
Q. Okay. So was there a conversation -- or strike that.
Was there a statement given to someone at

AIG at your office, or was that a phone statement?
A. It was a phone statement.
Q. Okay. So when Mr. Franke came in to your office, AIG was not present, correct?
A. Correct.
Q. When he came -- when Sam Franke came in and spoke with you and -- and David Martin, was it?
A. On the day of the statement?
Q. Yes.
A. David was not in my office on the day of the statement, to my recollection.
Q. Okay. The statement you're referring to, is this the statement to AIG?
A. Correct.
Q. Okay. So he was giving -- Sam Franke was giving that statement from your office to AIG, but the AIG representative was on the telephone; is that right?
A. Correct.
Q. Okay. I think you said at some point Mr. Franke said something about already having given a statement, correct?
A. Correct.
Q. Okay. But at that time he did not say it

was a statement to Mr. Frederickson, correct?
A. Correct.
Q. Did he even say it was a statement to anybody representing the Scheinmans?
A. No, he did not.
Q. Would it be correct Mr. Franke did not ever say he was unwilling to speak with whoever it is he gave that statement to?
A. Can you repeat that, please?
Q. Bad question on my part.
With respect to that statement, whether it was to Mr. Frederickson or anybody else, Sam Franke told you that he had spoken to those people voluntarily, correct?
A. Correct.
Q. Oh, you know, you -- you got asked about -- you had a recollection of getting a package that you thought meant Martin's was being sued; is that correct?
A. Correct.
Q. Okay. Do you know the exact day you received that package?
A. No. I would say it was Monday or Tuesday.
Q. Okay. And when you say a package, do you

have any recollection -- I mean in terms of -- was it correspondence or was it actually a copy of a lawsuit, or do you know what was in that package?
A. It was a lawsuit.
Q. And do you know where or how -- when you say you received it, how was it received?
Or how did you get it, do you have any recollection?
A. In an envelope, a big envelope, I believe, if I remember right.
But how it was delivered, I do not know if it came Express Mail or UPS or FedEx, I do not know, or if it was hand delivered. I do not know. I can't recall.
Q. In your job, on a daily basis would you normally have any contact with anybody from Overnite Express or Universal Am Cam after they purchased Overnite Express?
A. No.
Q. Who at Martin's had involvement with Overnite Express or Universal?
A. David Martin and Pat Podlena.
MR. SCHRECK: Okay. I don't think I have anything else. Thank you for your time.

THE WITNESS: You're welcome.

EXAMINATION

BY MR. YU:
Q. Hi, good afternoon now. I have a few questions for you.
I represent several entities, so for the purposes of my questioning, I represent Universal Am Cam, Limited, Overnite Express, Incorporated, and Ox, LLC, and I'll refer to those group of defendants as UACL.
Have you heard of any of those entities before?
A. Two of them, yes.
Q. Okay. Which ones?
A. Overnite Express and Universal Am Cam.
Q. Okay. So for all those entities I'm going to call them just UACL, okay?
A. Pardon me? I --
Q. I'm just going to refer to those three entities as UACL?
A. UACL? Okay.
Q. Yes. Universal Am Cam, Limited.
And then I also represent International Paper Company. Have you heard of them?

A. Yes, I have.
Q. I'm going to call them IPC, okay?
A. Okay.
Q. So UACL and IPC?
A. Okay.
Q. And I'm just going to ask you some questions about Dep Exhibit Number 122, which is the company -- what did you call it, the Driver Handbook?
A. Yes.
Q. Okay. Do you have that in front of you?
A. Yes, I do.
Q. You testified earlier that you were the one that authored this document, correct?
A. Correct.
Q. Is it a correct statement that UACL and IPC have no involvement with the creation of this document?
A. That is correct.
Q. Okay. If you -- I'm just going to go in the order of the pages that I received this document, and that might be out of order.
On page 6 counsel asked you earlier about the Safe Work Rules.

Do you see that paragraph?
MR. SCHRECK: And, for the record, you're referring to the first page 6, right?
MR. YU: The first page 6 that I have, right.
A. Yes.
BY MR. YU:
Q. Safe Work Rules. Do you see that paragraph?
A. Yes, I do.
Q. Okay. And the preamble, so to speak, it says: It is the intention of Martin's Bulk Milk Service to prevent accidents and to promote and provide safe operators on the road.
And then one of the bullet points below that I think we discussed indicates: In the event of an accident such as the one in this case the driver is required to contact a director of safety, and that's either yourself, Janet Berndt, or Anna Thurston, immediately, correct?
A. Correct.
Q. Is it a correct statement that this document does not indicate that you should contact anyone from UACL or IPC after an accident occurred?
A. That is correct.

Q. Okay. Just out of curiosity, when you testified earlier, when you first learned of the accident from Mr. Franke, you testified that you were at home and received a call from him at the accident site, correct?
A. Correct.
Q. Did he have your home phone number, is that how he contacted you, or was he routed through an operator at MBMS?
How did he get in touch with you?
A. He called either my home phone number or my cell phone number, I don't recall which.
Q. Okay. So all drivers that were employed by MBMS in July of 2008 would you both your home number and your cell phone number?
A. Correct.
Q. Okay. On page 13 of the document there's a paragraph called: Handbook Amendments.
Do you see that?
A. Yes, I do.
Q. It indicates that: Our company newsletter, Martinsville News, will serve as an Employee Memo and any policy or procedure change published in the newsletter will be considered an

amendment to the Driver Handbook dated April, 2007.
So this is something again that is authored solely by Martin's Bulk Milk Service?
A. Correct.
Q. And who would author the Martinsville News?
A. At that time Anna Thurston did.
Q. Okay. Did you do that as well?
A. I never did Martinsville News. It has since been discontinued.
Q. Okay. How often would that have been published, since this document was created in April of 2007? If you know.
A. About once every other month.
Q. Okay. And the intent behind the newspaper, so to speak, is to provide updates to the drivers that were employed by your company, Martin's?
A. Correct.
Q. Okay. And, again, UACL or -- and/or IPC had no involvement with the creation of that periodical, right?
A. Correct.
Q. Okay. On page 5, under Operating

Procedures and Policies, I believe the third bullet point down, it reads: To load, transport and unload each shipment from origin to destination without delay in route unless otherwise directed by dispatch.
And dispatch refers to the dispatchers at Martin Bulk Milk Service, correct?
A. Correct.
Q. And then the last bullet point on page 5, it says: To make a minimum of one check call per day.
Can you describe to us what a check call is?
A. A check call is, for the average driver that is delivering anywhere from 7:00 o'clock a.m. to 12:00 o'clock noon, that they call in and let dispatch know we're empty, where do you want us to go, or I'm delayed because of traffic or that type of thing.
Sam was not required to make this call because he did not leave until noon or later, so he did not fall into this bullet.
Q. Okay. If he did fall into the bullet and had to make a check call, who would he make that

check call to?
A. To the dispatch office.
Q. Which dispatch office?
A. In Wilton, at our terminal.
Q. And when you say at our terminal, Martin Bulk Milk Service terminal?
A. Correct.
Q. Again, not UACL or IPC, correct?
A. I don't believe he called them, not to my knowledge. I don't know.
Q. Well, according to this document that you drafted, Mr. Franke was not required to call UACL or IPC, he was required to call you to follow your check-in requirements, correct?
A. That is correct.
Q. Okay. On page 6, I think it's the second page 6 that I have, it begins with bullet points.
The third bullet point down indicates: To submit complete paperwork every week no later than 10:00 o'clock a.m. on Tuesday. If paperwork is not submitted on time, there will be no payroll check issued, nor will an advance be issued.
Did this bullet point apply to Mr. Franke?
A. Yes, it did apply to him.

Q. Okay. And, again, this -- the intent behind this bullet point is to get the driver to submit their paperwork in order to get paid by Martin Bulk Milk Service, correct?
A. Correct.
Q. What is the intent behind the following bullet point: To fuel trucks at the terminal whenever possible and to fuel reefer units daily upon return to the terminal?
A. The point to that is fueling trucks at the terminal versus over the road averages 20 to 25 cents, on average, per gallon less in cost, and as far as fueling the reefers, we transport primarily refrigerated freight on our reefer trailers, not a dry van or a rail trailer, of course, but -- so we want the fuel levels to remain three-quarters to full at all times.
Q. Is it fair to say that this can be described as a cost control measure that was implemented by your company?
A. Yes.
Q. And, again, I think we covered this already. The final bullet point there, that kind of goes to you had an unwritten rule, so to speak,

that all the drivers should take the shortest and most direct route to their destination, correct?
A. Within -- with respect to the tolls and the cost savings, tolls versus miles, yes.
Q. Okay. On page 9, the second full paragraph is titled: Footwear Policy.
Do you see that?
A. Yes, I do.
Q. And it says: Martin's Bulk Milk Service, Inc. has implemented this policy to ensure that all personnel use adequate footwear when working in areas where there is a danger of personal injury due to slips, trips and falls.
Again, this is something -- this policy was drafted by your company and not UACL or IPC, correct?
A. That is correct.
Q. On page 12 it talks about warnings, and there's a list this, again, a bullet point list under the paragraph that indicates: The following offenses are grounds for disciplinary action ranging from verbal warnings to discharge, depending on the seriousness of the situation.

These are -- these employment rules, so to speak, were implemented by Martin Bulk Milk Service and not UACL or IPC, correct?
A. That is correct.
Q. And, finally, when you testified to the day shortly after the occurrence when Mr. Franke was brought back to Martin Bulk's office and was terminated, that decision was solely by Martin's Bulk Milk Service, and UACL and IPC had no involvement with that decision, correct?
A. Correct.
MR. YU: Thank you, that's all I have.
THE WITNESS: Thank you.
MR. SCHRECK: Any follow-ups?
MR. COUTURE: I have more questions.
MR. SCHRECK: How many -- how much time have you got just so I can get up real quick here?
MR. COUTURE: Not very long.

FURTHER EXAMINATION

BY MR. COUTURE:
Q. I'm very confused right now, ma'am.
When I asked you questions about your conversations with Mr. Franke after this accident, you told me that Mr. Franke said he was driving the

speed limit.
Do you remember saying that?
A. I don't recall exactly the speed limit.
Q. That's what you said.
A. Okay.
Q. Mr. Burke asked you the question and you said to him that Franke told you he was driving under the speed limit.
Why -- why the change?
MR. BURKE: Well, objection to the form of that question, which assumes there was a change, which this witness has not said there was.
MR. COUTURE: And there was, and it's on the transcript so --
MR. SCHRECK: I'm going to join that objection.
BY MR. COUTURE:
Q. So why the change?
A. I don't know. A lot of questions are being thrown out, a lot of recollection four years ago.
Q. So did he --
A. I --
Q. I'm sorry, go ahead. I don't want to step

on your answer.
A. If I can reiterate to your question or to Mr. Burke's, I would have to say that I recall Sam saying, period, he wasn't speeding.
Q. Okay. So at or below the speed limit?
A. Correct. If I may correct my statement. I recall him say -- saying he was not speeding.
Q. All right. With regard to Mr. Franke's demeanor on the phone when you spoke to him on the day of the occurrence, you stated that he was in shock.
Now you're not using the medical term that we all learned in grade school, where you have to put blankets on them, you turn white, and you sweat, you have to be taken to the hospital, right?
A. Correct, I was --
Q. You're talking about the fact that someone who had just rammed a stopped vehicle was upset he was in an accident?
A. Correct.
Q. Okay. Would you agree with me that even though he was upset, that he was still able to discern what's true and not true?
MR. SCHRECK: Objection, form, foundation,

141

calls for speculation.
Go ahead and answer.
MR. BURKE: Join in that.
A. Can you repeat that, please?
BY MR. COUTURE:
Q. I'll ask it in a different way.
Is it your belief that Mr. Franke wasn't able to tell you the truth when you spoke to him on the phone about what happened because of his excited condition?
A. No.
Q. Okay. You believe that what he told you was true?
A. Yes.
Q. He was just upset about it?
A. Yes.
MR. COUTURE: Thank you. That's all I've got, ma'am.
MR. SCHRECK: Any follow-up, Rich?
Anything at all?
EXAMINATION
BY MR. SCHRECK:
Q. Okay. Just two quick follow-up questions and we'll be done here.

142

Mr. Burke was asking you some questions earlier regarding documentation regarding inspections, pre-trip inspections, and I just want to make it clear for the record:
When you're referring to the form that the drivers fill out, you're actually talking about the log itself, that's where the notations recorded for the pre-trip inspection is done?
A. The pre-trip is done at the beginning of the day, yes.
Q. Okay. The actual form, it's on the log itself, the bottom of the form?
A. It's actually -- the pre-trip is actually post-trip from the day before, yes.
Q. Okay. You're saying it's on the same piece of paper?
A. Correct.
Q. Okay, that's what I was getting at.
MR. SCHRECK: I have nothing else. Anybody have any follow-ups?
We'll reserve.
MR. COUTURE: E-tran only and the exhibit.
MR. SCHRECK: Regular and mini. You can send me the transcript for signature.

143

MR. YU: Mini and e-tran.
MR. BURKE: E-tran and mini.
(The deposition concluded at 1:08 o'clock p.m.)
(FURTHER DEPONENT SAITH NOT.)

144

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY D. SCHEINMAN, )
a Disabled Person ) No. 09 CV 5340
Plaintiff, )
-vs- )
MARTIN'S BULK MILK SERVICE, )
INC., et al., )
Defendants. )

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Janet M. Stanton, Certified Shorthand Reporter, on the 28th day of September, 2012, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

____________________________
JANET BERNDT

SUBSCRIBED AND SWORN TO
before me this ______ day
of ________________ 2012.

________________________
Notary Public

145

STATE OF ILLINOIS )
) SS:
COUNTY OF DU PAGE )

I, Janet M. Stanton, a Notary Public within and for the County of DuPage and State of Illinois, do hereby certify that heretofore, to-wit, on the 28th day of September, 2012, personally appeared before me, at 211 South Wheaton Avenue, Wheaton, Illinois, JANET BERNDT, in a cause now pending and undetermined before the United States District Court for the Northern District of Illinois, Eastern Division, wherein MURRAY SCHEINMAN is the Plaintiff and MARTIN'S BULK MILK SERVICE, INC., et al., are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

146

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto affixed my signature this 19th day of October, 2012.

Janet M. Stanton

Janet Stanton, CSR
License No. 084-001905

147

McCorkle Litigation Services, Inc.
200 N. LaSalle Street, Suite 2900
Chicago, Illinois 60601-1014
(800) 622-6755
(312) 263-0052
FAX (312) 263-7494

October 22, 2012

Mr. Matthew R. Schreck
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187

IN REFERENCE: SCHEINMAN v. MARTIN'S
COURT NUMBER: 09 CV 5340
DATE TAKEN: SEPTEMBER 28, 2012
DEPONENT: JANET BERNDT

Dear Mr. Schreck:

Enclosed is the deposition transcript for the aforementioned deponent in the above-entitled cause. Also enclosed are additional signature pages, if applicable, and errata sheets.

Per your agreement to secure signature, please submit the transcript to the deponent for review and signature. All changes or corrections must be made on the errata sheets, not on the transcript itself. All errata sheets should be signed and all signature pages need to be signed and notarized.

After the deponent has completed the above, please return all signature pages and errata sheets to me at the above address, and I will handle distribution to the respective parties.

If you have any questions, please call me at the above phone number.

Sincerely,

Margaret Setina — Court Reporter Present:
Signature Department — Janet M. Stanton
cc: All Attorneys of Record

148

**A**

**able** 32:20 101:9 141:22 142:8
**above-entitled** 145:12 148:12
**accident** 5:22 8:4,6 9:11,21 14:14,19 15:12,19 15:22 16:6,12,15 17:1,16,23 18:1,8 18:14 19:13 22:14 22:16 23:12 26:22 27:1,11 30:3 36:6 41:24 42:8 43:9,24 44:3,8,11 45:16,19 46:11 49:12,22 50:9 51:22 52:3,6 52:15,23 53:11,14 54:8,11 55:9,11,16 55:20 56:3 57:10 57:13 58:18,20 59:7 60:1,9,18,21 61:3,12,22 63:14 63:16,24 64:18 65:17,20 66:7,14 66:19,21 67:12 71:18 74:3,6 77:22 78:19,24 79:4,16 79:18 80:5 82:9,10 82:12,16 83:9,13 83:18,23 84:7,14 85:3 86:5,6,11,14 86:22 87:14 91:1,7 91:13 93:5 95:23 96:14,20,21 103:3 103:4,8 109:17,18 110:3 125:23 132:16,23 133:3,5 139:23 141:19
**accidents** 14:24 15:5,22 17:11 17:15,18 19:16 132:12
**accord** 108:7
**accounting** 27:16
**accurately** 145:14
**act** 12:9 102:18 108:8
**action** 94:21,23 95:2 138:22
**activity** 36:1
**actual** 93:21 94:16 143:11
**addition** 110:22
**additional** 148:12
**address** 7:5 57:13 148:18
**adequate** 138:12
**adequately** 13:23
**adhere** 119:3
**adjustment** 106:14,18 107:4
**advance** 136:22
**affixed** 147:11
**aforementioned** 148:12
**aforesaid** 146:18,24
**afternoon** 130:4
**age** 85:7,11
**agencies** 102:8
**agency** 27:3
**agent** 27:4 50:11,12 52:6 52:23 61:16 112:1
**agents** 12:20
**ago** 62:11 98:24 113:21 140:21
**agree** 77:5,14 81:9 95:20 96:2 141:21
**agreed** 100:1
**agreement** 35:9 118:6 148:14
**ahead** 38:7 59:16 60:12 76:17,17 77:9,10 79:6,23 80:2,3 82:6,8 85:19 92:16 92:22 96:19 97:3,4 114:2 122:12 124:3 125:2 140:24 142:2
**ahold** 53:7,8
**AIG** 27:11 53:4 66:22 67:1,24 68:5 69:19 73:18,19 110:12 110:22 111:23 126:18,19 127:1,4 127:13,16,17
**Aktiengesellschaft** 2:23
**al** 1:9 112:7,10 145:7 146:14
**alcohol** 14:15 15:14 48:22 50:5 74:11 78:19 87:17 102:21 103:1,17
**Allan** 33:21 34:4,7,13 111:18 116:14,18
**allowed** 80:11 81:20
**altered** 89:18
**amended** 96:9
**amendment** 96:10 134:1
**Amendments** 133:18
**America** 2:22
**amount** 110:6,14,17
**and/or** 52:4 134:20
**Anna** 132:18 134:7
**annual** 14:5 108:4
**answer** 6:5,8,22 79:6 80:3 92:16,22 96:19 114:2 120:10 122:12 124:4 141:1 142:2
**answered** 60:13
**answers** 6:16 145:15
**anybody** 67:11 112:22 126:12 128:4,12 129:16 143:19
**anyone's** 54:15
**apparently** 73:14
**appear** 145:16
**APPEARANCES** 2:1
**appeared** 56:3 146:7
**applicable** 102:13 148:13
**applicant** 31:13
**application** 31:13
**applied** 113:22 120:6,11,14
**apply** 136:23,24
**appreciate** 6:19
**approaching** 47:14 100:20
**appropriate** 28:15
**approximate** 9:10 58:23
**approximately** 28:5,9 44:13 53:22 53:23 59:2 61:10 63:8
**April** 94:1 99:6,8 101:13 134:1,12
**Arcadia** 118:16,16
**area** 30:15 43:23 64:18
**areas** 138:13
**asked** 36:8 48:16,19 94:11 100:9 119:15,16 119:23 125:24 128:16 131:23 139:22 140:6 145:15
**asking** 31:6 40:8,9 41:23,24 94:6 97:19 125:13 143:1
**asleep** 49:7 119:10
**aspect** 19:24
**assigned** 28:24 32:6
**assignment** 104:1,6
**Association** 12:17 13:15
**assumes** 79:22 140:11
**assuming** 49:1 73:23 75:6
**assure** 30:11
**attached** 109:21
**attempted** 84:11
**attend** 91:14
**attended** 12:16 13:2,4,7
**attention** 81:2,6 88:17 89:21
**attorney** 63:15 66:1,6 68:14
**attorneys** 9:23 98:10 147:6 148:24
**audit** 14:22
**August** 9:15
**author** 89:12 134:5
**authored** 89:9,16 131:14 134:3
**authorities** 18:17 19:15
**authorized** 43:15,16
**automatically** 32:2,2
**available** 81:5
**Avenue** 1:18 2:8 146:8 148:6
**average** 135:14 137:12
**averages** 137:11
**avoid** 38:23 39:3 101:4
**aware** 41:20 42:11,14 43:14 46:11 54:14,21,23 69:5,16 70:19,24 79:2,18 82:1
**a.m** 1:20 58:16,24 59:2 61:10 135:15 136:20

**B**

**B** 3:14
**back** 19:1 26:17 30:16 32:17 40:15 41:21 51:11,20 56:11 64:10 67:18,21,23 74:12 93:4 105:1 115:8,9 117:6,20 118:4,23 126:10 139:7
**background** 14:2
**backup** 22:23
**bad** 45:23 52:22 95:6 121:11 128:10
**based** 38:8 48:24 59:6
**basically** 79:9 100:7 115:10 120:24
**basis** 28:6 32:14,18 39:18 77:4 129:15
**Bavarian** 5:19
**bay** 98:22
**Bayer** 105:3,4,15
**Bayerische** 2:23
**bed** 51:20 53:8
**began** 12:12 48:8
**beginning** 12:9 143:9
**begins** 136:17
**behalf** 70:3
**belief** 142:7
**believe** 22:10 44:9,13 54:5 65:23 71:5 74:7 75:6 78:11,18 84:19,20 85:10 92:11 107:15,16 112:4,5 113:21 121:20 129:9 135:1 136:9 142:12
**believed** 64:11
**BELL** 2:19
**benefits** 89:5
**Berlin** 114:21,22
**Berndt** 1:12 3:3,16 5:1,8,11 5:15 88:6 97:13,15 97:16,17 132:18 145:19 146:9 148:9
**best** 36:12,14 63:15
**better** 30:18
**big** 129:9
**bill** 92:4
**billing** 116:23 117:1
**birth** 7:11
**bit** 17:5 40:22 62:13 65:14 94:15 116:8 119:13 122:1
**black** 84:7,16,17,18 85:3,6
**blankets** 141:14
**blinkers** 25:18 80:6 81:19,23
**block** 84:22
**BMW** 2:22 5:19
**Bob** 85:16 98:11
**born** 7:9
**boss** 29:19
**bottom** 88:20 90:2 93:9 109:23 143:12
**box** 84:7,16,17,19,22 85:3,6
**boxes** 26:11
**brake** 108:6
**brakes** 25:13 82:2 106:10,14 106:17,21 107:2,5 120:7,11,14
**break** 87:22 88:2
**breath** 122:2
**briefly** 8:4 64:1
**BRIESEMEISTER** 2:7
**bring** 30:16 32:12,17
**bringing** 34:18
**brings** 81:1,6
**broke** 112:24
**broker** 111:22 114:18 118:6
**brokerage** 104:14,15,17
**brought** 118:15,17,19 139:7
**building** 107:21 115:11 116:24
**Bulk** 1:7 2:13 5:23 8:23 9:7,15,20,24 10:12 10:14,20,24 11:5 11:14,17 12:1,13 13:18 14:24 15:4 15:23 16:18 17:3 17:14 18:10,15,15 19:12,15,22 20:1,9 20:13,16 21:13 22:3,7 24:1,22 25:3 26:9 27:14,22 29:8,13 33:10,12 34:1,5,12,15,22 35:1,11,15 36:2 37:8,14,19 39:20 42:11,19 44:16,22 44:24 50:10 55:1,5 57:2,13,16 58:5 62:3,24 63:2 65:24 66:5 67:18,18 68:2 69:10 70:4,22 72:10,13,16 76:22 80:16 84:2,13 85:2 90:15,16 91:19,23 92:7 93:15 95:22 96:13 104:4,5,19 105:23,24 111:9 112:15 118:4,7 119:2 132:11 134:3 135:7 136:6 137:4 138:10 139:2,9 145:7 146:13
**Bulk's** 139:7
**bullet** 90:14 91:11 132:14 135:1,9,22,23 136:17,18,23 137:2,7,23 138:20
**Burke** 2:2 3:5 4:8 9:2,5,19 76:13 85:16 97:10 97:12,17 114:4 121:3,10 122:14 123:14 124:8 125:4,8 140:6,10 142:3 143:1 144:2
**Burke's** 72:3 85:17 141:3
**burst** 55:13

B-e-r-l-i-n
114:22
B-e-r-n-d-t
5:10

C

call
27:11 37:24 40:23 41:1 50:10,14,17 50:21 51:5 53:4,6 53:20 54:3 78:10 78:10,12 93:8 126:19 130:17 131:2,8 133:4 135:10,12,14,16 135:20,24 136:1 136:12,13 148:20
called
1:13 5:2 44:4,6,11 45:18 46:20 48:20 54:5,6 61:19 67:17 67:20 69:18 73:1 78:11 119:14 121:15 122:15 133:11,18 136:9
calling
44:16 82:22
calls
23:3 49:21 76:13 92:13,20 96:18 142:1
calmed
45:21
Cam
2:18 129:17 130:8,15 130:22
capacity
11:1 12:15 40:10
car
45:24 46:1,2,23,24 47:2,4,6,9,17 48:4 49:5 55:12 63:20 64:3 65:9 92:18 95:14 96:24,24 120:2,3,7
care
52:4,17
cargo
52:4 111:14
Carrier
108:8
carriers
12:23 13:3,16
carry
100:5
case
19:5,7 54:16 132:16
caught
120:3
cause
91:15 145:12 146:9 146:17 148:12
causing
60:9
cc
148:24
CDL
7:19 21:8
cell
133:12,15
cents
137:12
certain
37:20 89:6 99:5
certified
108:12,17 145:12
certify
145:10 146:6,15 147:1,4,8
cetera
17:22
change
22:9,11,13,16,20 94:9 133:23 140:9 140:11,18
changes
148:15
charge
107:17 111:15,17
charged
91:21,22
charting
125:18
chassis
52:18 107:3
check
26:11 135:10,12,14 135:24 136:1,21
checked
114:5
checking
25:12
checks
24:9
check-in
40:23 41:1 136:14
Chicago
2:4,12,16,21 32:13 32:16 33:2,5 34:19 34:22 35:2 36:2,16 38:17 148:2
Chicagoland
28:6,20 29:22 30:12 30:15 32:3,6,12
choice
59:5,12 63:13
city
37:24 38:1
Civil
1:14 5:16
clarify
10:6 78:3 80:4 113:20 120:10
clear
31:5 52:14 80:6,7 143:4
CLIFFORD
2:2
close
121:23
closely
12:20
colliding
120:7
collision
97:24 113:18,23 123:22
come
9:7 65:22 67:18,21 67:23 68:2 69:19 73:2 125:14
come-and-go
58:13,15
Commander
83:4
commercial
7:19
common
112:12,12
communicated
104:2
Comp
27:16
Companies
12:18 13:16
company
1:8 2:18 12:10 14:16 14:18 26:21,24 29:17 33:9,18,23 35:10,20 41:15 50:9,12,13,22 51:5 61:19,21 66:4 67:11 68:17,21 70:3,4,13,14 71:5 74:2 75:5 94:23 96:7 108:1 109:2 113:11 130:24 131:8 133:21 134:17 137:20 138:16
company's
91:13
compare
14:9,12
compared
14:1
compile
87:16
compiled
87:13
complete
31:15 136:19
completed
6:21 148:17
compliance
86:20
comply
100:1 102:1,6,12,17 119:3
Computer-Aided
146:21
concentration
93:12,17
conclude
51:15
concluded
144:3
conclusion
92:14
condition
49:11 106:11,19 109:6 122:7 142:10
conditions
38:8
conduct
97:24
conference
13:4,6
conferences
12:16,23 13:3,14
confirmation
104:7
confirming
4:3
confused
121:1 139:21
confusing
76:8
connected
107:20
considered
133:24
consist
115:7
contact
26:20 27:1 52:23 91:2 100:6 104:8 111:23 129:16 132:17,22
contacted
48:3 133:8
contacting
71:22 72:4
container
52:19,20
content
71:10 125:21
continue
119:11
contract
35:19 107:24 118:3
contractor
45:2
contractors
45:6
contracts
35:14
control
137:19
conversation
45:15 49:13,17,24 51:15 56:18,21 59:1 60:17 71:11 78:16 83:3,6 97:23 120:5,17 123:2,20 124:9,13 125:13 126:1,22
conversations
67:1 78:23 80:10 83:7 85:13 125:16 125:21 139:23
Cook
70:21
cooperate
50:4
coordinating
39:16
coordinator
104:13
coordinators
116:22
copy
82:19,23 129:2
correct
8:8 12:6 17:13 18:2,6 20:12,15 21:11 23:16 25:4,5,23 26:23 28:10 29:14 32:22 33:10,11 34:16 35:3,13 37:6 39:11 41:4,10 43:4 43:5 45:5,7 49:23 50:14,18 52:21 53:9,21 54:13 56:16 57:11 59:13 59:15 61:17,23 62:18 66:11 68:22 73:4 77:16 80:24 81:12,16 90:23 91:5,17 92:9 93:15 93:21 94:12,13,22 95:7,9,15 96:8 98:1,2,6,11,12 99:7 100:21,22 101:1,2,5,6,11,12 102:2,3,9,10,14,15 102:18,19,23 105:10,11,19 106:7,8,11,12,14 106:15,22 107:7 107:10 109:4,23 111:19 114:23 116:15,16,18,19 118:18 119:1,8,11 119:12 120:3,4 122:8,23,24 123:8 123:12 124:13,22 125:9,10 126:13 127:4,5,14,19,22 127:23 128:1,2,6 128:14,15,19,20 131:14,15,16,19 132:19,20,21,24 133:5,6,16 134:4 134:19,23 135:7,8 136:7,8,14,15 137:4,5 138:3,17 138:18 139:3,4,10 139:11 141:6,6,16 141:20 143:17 146:23
corrections
148:15
correctly
122:6
correspond
17:24
correspondence
129:2
cost
91:21,22 137:12,19 138:5
counsel
4:3 9:23 71:21 73:11 74:17 131:23 147:2,8
counting
8:11,18
Country
85:14,24
County
1:17 70:21 146:3,5
couple
87:24 88:15 89:22
course
87:1,7 137:15
court
1:1 6:13 145:1 146:11 148:8,22
courteous
90:20
Courts
1:15
Couture
2:20 3:4,7 4:2,7,12 4:16,19 5:5,14,18 6:4,8,12 7:2 8:17 18:22 19:2 52:13 59:18 60:13,14 67:8 70:9,12 72:9 73:21 76:19 77:8 77:11 79:8,24 80:8 82:7 85:23 87:23 88:9,13,14 90:7,9 92:15 93:1 96:22 97:3,6,18 121:2,5 122:9 123:13,23 124:24 125:7 139:15,18,20 140:13,17 142:5 142:17 143:22
couturet@jbltd.com
2:20
cover
113:14,14
coverage
110:6,11,14,18,21,22 111:1,7,11,13,16 112:6,18 113:3,11 113:22
covered
74:13 112:15 137:22
crash
93:12 122:22
created
134:12
creation
131:17 134:21
criminal
66:13
CSR
1:22 147:18
CSX
1:8 106:4
cubicles
115:11
CULBERTSON
2:14
curiosity
133:1
current
10:5 28:19
customer
32:13
CV
1:6 145:5 148:8

D

D
1:5 3:1 145:5
daily
28:6,21 29:22 30:1 30:12 34:18 36:1 109:6 129:15 137:8
damage
91:19 92:11 113:19
damages
93:7 110:6
danger
138:13
date
7:11 9:6,9 36:18 99:10 110:3 123:9 148:9
dated
134:1
dates
17:21
Dave
29:5 59:5,11,13 63:12 105:8
David
29:5,9,10,16,19 30:24 31:2,10,12 31:14 32:9 39:22 41:5 52:3,16 53:6 53:16,17,24 54:6 55:6,8,15,18,22 56:2,14,19 57:8 58:21 59:2,23 61:9 62:23 63:23 65:15 66:17 69:1 71:16 75:18 81:6 83:17 93:8 99:19 104:21 111:18 126:17 127:7,10 129:22
David's
34:7
day
1:19 24:24 30:10 32:19,19 42:7 53:12 58:2,11 61:13,13,14 63:9 67:14,15,17 68:3,4 68:6 70:19 71:22 72:4 78:2,5 84:7 86:5 103:19 105:19 106:1,20 118:20,21 122:19 123:15,16 127:8 127:10 128:21 135:11 139:6 141:10 143:10,14 145:13,21 146:7 147:12
days
36:5 41:8 123:7
day-by-day
32:13,18
day-to-day
39:17
deactivate
85:3
dead
46:1 120:2
dealership
86:2
Dear

148:10
death
93:14
December
9:12,13,21 10:15,20 10:22 11:6,11 12:4
decide
31:17
decided
37:11
decision
59:10,13,20 92:5 111:18 139:8,10
deemed
17:11
deep
122:2
defendants
1:9 130:10 145:8 146:14
defining
30:7
delay
135:4
delayed
135:18
deliver
30:2,15 35:10
delivered
129:11,13
delivering
36:17 37:2 39:6 135:15
delivery
35:12 71:7,13
demeanor
120:22 141:9
Dennis
69:7,9,14,16 70:16 73:10 126:2,5,13
Dep
131:7
department
15:9 16:3,6 18:10 23:2 82:20 83:8 107:11,19 116:23 117:4 148:23
depend
95:1
depending
32:20 138:24
deponent
144:5 148:9,12,14,17
deposition
1:12 3:16 5:12,15 7:23 8:19 10:3 54:15 87:12 88:6 144:3 145:11 147:2,5,6 148:11
depositions
1:16
describe
89:1 120:21 135:12
described
83:12 137:19
description
83:2,6
destination
56:12 135:3 138:2
destroyed
109:11,14,22
determination
93:2,4 114:8
determine
52:16 86:10
determined
80:12 82:10
determining
56:10 93:6
device
84:8
difference
93:13
different
22:21 33:9 36:22 37:1 38:13 43:16 116:3 117:2 142:6
difficult
6:18
direct
29:19 37:19 40:18 88:17 138:2
directed
56:15 75:17 135:4
directional
25:21
director
19:1,4,12,19 21:16 21:18 23:7 27:22 29:7 40:10 49:20 51:21 57:20 91:2 132:17
Disabled
1:5 145:5
disagree
77:4,15 79:24
discern
141:23
discharge
95:3 138:23
disciplinary
17:2 94:20,23 95:2 138:22
disciplined
17:10
discontinued
134:10
discovery
1:12 5:15
discretion
91:14
discuss
60:20,23
discussed
17:19 75:15,16 132:15
discussion
47:15 50:5 54:24 55:14 61:11 75:12 76:21
discussions
50:24 60:17 66:18 68:15 74:2,5,8
dispatch
100:7 104:4,18,20,23 116:22 135:5,6,17 136:2,3
dispatcher
32:20 104:14 105:14
dispatchers
41:3 105:17 135:6
distance
38:12 93:10,13 100:11,14,15,19
distinguish
113:8
distribution
148:19
District
1:1,2,15 145:1,2 146:10,11
Division
1:3 145:3 146:12
document
88:22 90:11 96:3 131:14,18,22 132:22 133:17 134:12 136:11
documentation
15:4,6 143:2
documented
16:17 26:6
documents
8:9 94:6
doing
20:11 26:12 40:19 64:15 106:23
dollars
110:15
Doreen
105:3,8
DOT
14:6 28:18 52:5 109:17
dots
101:21
DOWD
2:10,10
download
84:11 98:13
downloaded
84:24
dozen
115:16,17 117:7,12
drafted
136:12 138:16
draw
89:21
drivable
49:14
drive
28:15 84:4 87:2,8
driver
8:3 15:18 16:8,12,14 16:18,21 17:10,15 18:4,4,14 20:14 21:12 24:7,13,16 25:2,7 26:5 27:10 27:12 28:5 38:3 40:22 56:8 80:22 87:18 88:24 89:2,3 89:9 91:12,20,21 92:10,12 93:5,7 95:5 99:7,16,18 100:10 101:14,19 106:16,23,23 113:8 118:15 119:8 131:8 132:17 134:1 135:14 137:2
drivers
18:9 19:20,23 20:2 20:17 24:8,23 26:1 26:10,14 37:19 39:2 45:3 49:21 90:15,19 91:2 99:13,20 100:19 100:24 101:3,7,24 102:12,16,21 104:23 106:6 112:21 119:3 133:13 134:17 138:1 143:6
driver's
7:19 17:6,9 38:20 53:3 58:8 80:20 87:24 93:21 94:7 109:5,10,13,15,16 109:21 110:1 118:23 119:4
driving
13:24 20:3,6 28:12 47:9 65:3 81:8 84:7 86:5,10,15,22 90:16 93:17 95:13 97:24 99:16 105:19 119:11 139:24 140:7
drove
41:21
drug
14:14 15:14 31:22 48:22 50:4 74:10 78:18 87:17 102:21 103:1
drugs
103:17
dry
115:17,18 137:15
DU
146:3
due
49:2 91:20 92:10 122:6 138:14
duly
4:1 5:2 146:16
DuPage
1:17 146:5
duties
11:10 13:19,20 14:20 15:17 22:5,19 23:18 27:13,15,20 27:24
duty
18:17

E

E
3:1,14
earlier
110:4 120:16 131:13 131:23 133:2 143:2
early
43:10 51:1
easily
7:1
Eastern
1:3 145:3 146:12
education
7:13
effort
98:13
either
27:3 37:10 49:12 112:24 132:18 133:11
electronic
84:8
elevator
10:4 97:21
eleven
101:21
eliminate
38:17
emotional
122:8
employed
10:7 11:1,2 23:11 28:4 90:16 117:21 133:13 134:17
employee
5:23 13:21 17:19 42:10 44:21,21,24 71:22,23 72:4 96:6 96:9 133:23
employees
14:24 15:1,23 45:4 93:16 116:11,20
employer
14:4 28:17 31:16
employers
14:3
employment
5:21 10:5 31:2,14 40:9 139:1
empty
135:17
enclosed
148:11,12
encounter
90:11
engine
84:8
engineering
83:21
ensure
24:1 26:10 28:14 138:11
entail
20:22 27:14
entailed
27:15
entirety
95:17
entities
130:6,11,16,20
entitled
100:10
entrance
38:1
entries
101:21
envelope
129:9,9
equipment
52:4,18 56:9 84:15 84:17,18
Ernie's
78:17
errata
148:13,15,16,18
essentially
11:11
Estate
1:4 145:4
estimate
36:13,14 39:15
et
1:9 17:22 145:7 146:13
evening
51:1
event
18:7,8 26:21 27:1 90:24 91:1,19 132:15
everybody
31:7
everyday
62:14
evidence
79:22
exact
9:6,9 38:2 53:23 54:1 78:14 110:13 124:6 128:21
exactly
24:19 68:5 71:9,15 78:2 99:21 108:13 123:24 140:3
examination
1:13 3:2 5:4 97:11 130:2 139:19 142:21
examine
7:22 8:2 86:9
examined
5:3
example
9:14 17:6 81:7
exceeding
66:7 110:6
excess
110:21 111:14
excited
46:18 121:16 142:10
excuse
25:6 102:4 112:5 119:16
exhibit
3:16 88:7,11 99:3 131:7 143:22
existed
80:13
existing
94:7
exited
64:9
expect
6:9 29:12 31:6 62:12 89:4
expectation
119:1
expectations
89:4
expected
101:3,7 102:1,16 119:5
expecting
102:12
expense
38:19,20
experience
12:8,14 20:7
explain
65:9
explained
99:4
Express
2:18 129:12,17,18,21 130:8,15
extent
19:13 94:22 124:24
extra
38:18,18
e-mail
52:6
e-tran
143:22 144:1,2

F

F
2:2
face-to-face
54:4
facility
116:8 118:17
fact
6:4 42:2 79:3 91:6 98:3 141:17
factor
38:18 78:19
facts
79:22
failed
27:10 96:16
fair
6:10,11 137:18
fall
135:22,23
fallen
49:7
falling
119:10
falls
138:14
familiar
17:7 43:23 46:15 95:17 105:18,20
family
10:16 69:24 70:5,6 70:17,20
fancy
115:12 116:8
Fantastic
6:12
far
64:10 87:2,7 89:5 137:13

fast
47:19 64:14
fatality
49:1
father
29:13,16 34:7
Fatigue
119:7
fatigued
119:9,9
fault
14:19 17:12
favor
6:24
FAX
148:3
federal
5:16 102:7,13,17 108:8 109:16
FedEx
129:12
fell
112:24 113:16,16
field
49:21
fifteen
38:18 44:13 45:18
figure
11:7
file
8:3 17:22,24 87:18 99:18 109:18 126:19
filed
70:21 71:1,4,23 72:5 75:4
files
13:21
fill
14:5 15:21 21:6,13 31:12 143:6
filled
13:24 16:7
final
111:18 137:23
finally
6:20 139:5
find
6:22 56:8 78:14 86:19
finds
25:8 106:17 107:2
fine
21:21 36:13 59:17 88:3
finish
121:7
fire
46:1 48:5,7 56:4 59:10,13 120:3
fired
60:2,5,8,8,16 62:7,17 91:16 95:6,8,10
firm
72:4
first
5:2 9:5 10:23 11:4 13:4 23:14 28:21 28:24 30:7 32:6 44:2 46:9 54:11 58:20 62:21 70:24 76:22 79:9 88:15 89:12,13 90:1,10 91:11 97:19 122:4 126:6 132:3,4 133:2 146:16
five
99:19 100:4 104:22
fix
81:15
fixed
81:23
flames
55:13
flashers
81:9
flows
117:1
folks
39:18 41:6 88:2
follow
17:2 53:1 96:16 136:13
followed
14:14 89:8 96:23
following
53:12 56:24 57:10 58:10 59:7 78:1,4 93:10,13 100:11 100:14,20 101:11 101:19 123:18 137:6 138:21
follows
5:3
follow-up
53:1,2 61:3 142:19 142:23
follow-ups
139:14 143:20
footwear
138:7,12
force
47:22
foregoing
145:14 146:22 147:2
forget
120:20,23 121:4
forgive
62:12
form
4:4,10 14:5 60:11 77:7 79:5,21 82:5 92:14,20 96:17 114:1 140:10 141:24 143:5,11 143:12
format
116:9
forms
31:16
found
59:24 79:3,15 82:1 82:10 86:20
foundation
4:11 60:11 76:14 77:7 79:5,21 82:5 92:14,20 96:17 114:1 141:24
four
50:1 94:17 140:20
fourth
88:18
frame
89:15
Franke
1:7 2:14 22:14,17 28:3,12,15,20 29:4 29:21 30:10,21 31:3,8,11,20,22 32:2,5,8,11,16,24 34:18 36:17 37:7 37:12,13,15 39:7 40:4,12 41:9,12,14 42:11,16,20 43:7 43:11,14,20 44:3 44:15 45:16,18 46:12 49:4 51:1,10 53:7 54:18,24 59:10,14 60:2,4,8 60:16 61:6,24 62:3 62:16,22 63:22 65:8,11,18 66:1,6 66:12,17 67:16,20 67:23 68:8,20 69:6 69:13,17 70:15,22 72:19,22 73:1 74:3 74:6,9,14 75:3,5,8 76:6,9 77:2,17 81:7,17 83:12 84:4 84:6 86:4,21,24 87:6 91:6,22 95:8 96:12 102:24 103:20 104:2 105:19 106:1 110:24 113:4 117:21 118:10 119:3,17 120:6,21 122:20 124:14,19 125:13,20 126:1 126:11,16 127:3,6 127:15,21 128:6 128:12 133:3 136:12,23 139:6 139:23,24 140:7 142:7
Franke's
30:17 35:24 39:17 41:20 58:2 63:19 74:1 81:13 86:14 97:24 113:22 121:13 141:8
Frederickson
69:7,9,14,17 70:16 72:3 73:10 76:7,11 77:2 126:2,5,13 128:1,12
freight
86:1,1 137:14
Friday
28:7
front
99:2 100:16 101:8,21 131:11
fuel
27:17 137:7,8,16
fueling
137:10,13
full
5:6 137:17 138:6
full-time
23:1
Fulton
2:12
furniture
35:8,10,10,16,20 36:1,17 37:4 39:6 103:20 104:3 118:10,12,16
further
60:17 78:22 99:9 139:19 144:5 146:15 147:1,4,8

G

G
1:7 2:14
Galewski
33:22 104:10 114:16 116:17
gallon
137:12
gather
15:3 82:15
general
15:19 78:17 85:12 100:4 112:19,20 113:1,3,9,13,17
generally
18:23,24 30:12 37:10 39:5 56:6 58:15 89:1 95:5 98:14,15 110:7 116:20 120:1
gentleman
69:6,24 126:1
getting
25:3 56:11 76:8 113:2 128:17 143:18
gibberish
121:22
give
13:11 36:12 67:19,24 73:2 75:16
given
5:11 68:5 69:20 70:16 73:3,13 74:16,23 75:3,13 100:6 104:22 126:24 127:22 145:15 146:18,23
gives
90:14 104:23
giving
127:15,16
go
7:1 12:22 16:13 24:19 36:22 38:7 41:8,17 58:16 59:6 59:16 60:12 63:13 76:17,17 77:9,10 77:12 79:6,23 80:2 80:3 82:6,8 85:19 87:10 88:4 89:23 90:11,13 91:9 92:16,22 93:7 94:16 95:16 96:19 97:3,4,9,10 114:2 122:12 124:3 125:2 131:20 135:18 140:24 142:2
goes
137:24
going
5:19 36:4 38:9 42:4 47:19 51:11 60:2,4 60:8,16 61:20 64:14 66:24 68:14 68:17 74:12 92:13 93:9 124:10,20 130:16,19 131:2,6 131:20 140:15
Golden
85:16 98:11
good
23:23 130:4
grade
141:13
graduated
7:15,16
great
94:20
greater
93:12 110:17
green
46:2 47:12 64:5,11 107:15
gross
58:1
ground
112:12
grounds
112:23 138:22
group
130:9
Guardian
1:4 145:4
guess
64:23 72:6 117:16
guessing
50:1
guy
45:24

H

H
3:14
half
44:14 115:16 117:7 117:12
Hammond
39:10,18,24 41:21 42:12,17,20 87:3,8
hand
71:6,13 129:13
handbook
17:6,9 40:21 88:1,24 89:2,9,16,17 92:6 93:21 95:18,21 99:7,8,14,16 100:10 101:14 118:23 119:4 131:9 133:18 134:1
handle
23:1 148:18
handled
22:22
handling
27:15
hang
41:17
happened
16:14 48:2 63:11,24 77:14,19 86:22 142:9
happens
109:9
hard
42:4 121:16,23
hat
11:24
hats
11:3,22
haul
35:15 36:1 107:5
hauled
33:4 118:10
hauling
34:24 106:1 107:1,3
Haun
23:8,11
Hazard
25:21
head
6:16 16:3 107:14
hear
126:6
heard
130:11,24
hearing
85:13,21 121:20
hearsay
76:13
heavy
47:23 58:7
held
10:13 11:16 12:1 27:21
helps
6:20
hereinbefore
147:7
heretofore
146:6
hereunto
147:11
he'll
56:7 67:4
hi
40:9 130:4
high
7:14,15
highest
7:13
Highland
44:8 82:20
Hillsboro
7:10
HINSHAW
2:14
hire
20:10 31:3,10 63:15 65:24 66:5
hired
12:4 20:17 23:1,20 28:21,24 30:23 31:17,23 32:1 35:11 72:3 76:22
hiring
30:20 31:2
hit
45:24 46:23,24 47:3 47:9 63:19 120:2,8
hitting
95:14
HNI
13:16 89:19 112:1 114:17
hold
10:19 11:24 56:8 66:23
hole
112:24
home
49:19 133:4,7,11,14
honestly
63:10 65:23 89:13
hospital
87:18 141:15
hour
1:20 44:14 64:22
hours
43:10
how's
4:17
HR
27:16
hung
51:8,13,18
hurt
93:16 113:17
husband
7:6
hypothetically
81:17
H-a-u-n
23:10

I

IAG
73:14,17
ID
3:15
idea
117:11 123:9
identification
88:8,11,13
identified
126:12
IL
2:4,9,12,16,21
Illinois
1:2,18,19 44:9 79:3 79:12,14,19 80:12 145:2 146:1,5,8,11 148:2,7
immediate
29:7 95:3

immediately 65:21 71:16 91:3 132:19
impact 44:14 47:20,23,23,24 48:7 80:14
impacting 100:24
impediment 45:22 46:10,12,21 121:17
imperative 6:5
implemented 137:20 138:11 139:2
important 6:4
incident 110:1 119:14 122:16
include 18:3 25:12 113:3
including 84:16 90:19 98:11 119:3
Incorporated 33:8 111:9 130:8
incurred 91:19
independent 45:2,6
Indiana 39:10,24 41:21
indicate 20:19 28:20 47:12 55:19 132:22
indicated 46:23 58:17 65:3 95:21
indicates 132:15 133:21 136:18 138:21
individual 73:9
information 14:2,22 27:12 52:1,2 52:16 54:7 64:22 67:3 82:15 84:11 84:23 85:22 87:13 87:15 89:7
initial 99:4
initially 123:4
injured 69:24
injuries 110:5
injury 138:13
inoperable 79:4,20 80:6 81:8
input 59:19
inquiry 114:6
inspected 98:18
inspection 24:10,14,20,24 25:4 25:8,12 26:7 80:23 81:10,18 98:14 106:7,9,17,24 109:6,20 143:8
inspections 15:10 26:2,12 108:1 108:4 143:3,3
instances 52:5
insurance 12:20 14:15 17:22 26:21,24 27:16,17 50:9,11,13,22 51:4 52:6,23 59:8 61:16 61:19,21 66:4 67:10 68:17,21 70:3,4,13,14 71:5 74:1 110:5,11 111:11,16,24 112:6,11,14 113:11,22 114:18
insured 111:7
intent 134:15 137:1,6
intention 132:11
interact 19:14
interaction 40:3,11
interested 147:10
interests 63:15
INTERMODAL 1:8
internal 16:7 84:20
International 1:8 2:17 130:23
intersection 47:13
interview 31:1,18
introduced 9:7
investigate 14:23
investigator 71:21 73:10 75:9 76:2,6
involve 113:18
involved 15:1,5,18 16:15 29:16 30:20 35:14 35:18 39:16 40:24 44:3 56:3 72:13,16 91:12 112:7 113:6 114:14
involvement 40:11 129:20 131:17 134:21 139:10
involving 5:22 15:22 22:14,17
in-person 123:1
IPC 131:2,4,17 132:23 134:20 136:8,13 138:16 139:3,9
issued 99:5,10 136:22,22
items 89:22 100:4
it'll 7:1
I-90 37:10
I-94 37:10

J

James 44:19 45:14
Janet 1:12,16,22 3:3 5:1,8 5:15 132:18 145:12,19 146:4,9 147:18 148:9,23
JASON 2:7
jbriesemeister@m... 2:8
JEFFREY 1:5 145:5
Jill 27:3,5,6 52:6,8,8,9 52:24 61:15 112:1 112:11 114:24 115:3
Jill's 112:3
job 10:9,19,23 11:13,24 12:12 13:19,20 14:13,21,23 15:3 15:16,17,21 16:11 18:11 19:13,18 21:24 22:3,3,5,19 23:14,14 25:24 29:10 40:5,14,18 40:24 49:20 50:3 50:10 51:21 52:22 56:14 57:20 58:6 86:9,13 99:15 102:21 104:12 105:12 114:5 129:15
jobs 11:16 116:21
Joel 52:8,11
JOHNSON 2:19
join 76:15 122:11 140:15 142:3
joined 96:7
Jorgenson 44:19 45:10,15
JR 2:2
July 5:22 9:13 25:2 32:24 34:17 39:5,13 40:4 41:12 42:7 43:9,10 44:5 53:15 55:2 57:2 58:10,18,19 59:3 61:10 62:1,4 65:12 66:19 69:5 70:15,15,20 71:2 72:20,23 73:23 81:19 83:17 99:11 105:1,9 107:12 115:9 117:21 118:4,7 123:5,11 123:16 126:10 133:14
June 110:2
jurisdiction 102:8
J-i-l-l 52:12

K

keep 17:15,16 24:23 109:16
kept 16:24 108:22 109:5
kill 93:17
kind 116:9 137:23
King 7:4
knew 20:11 42:6,24 55:11 71:18 75:4 96:12
know 9:6,19 13:5,10 21:3 28:23 29:2,3,5 31:1,7,19,21 32:4 32:5,15 33:17 36:3 36:7,16 37:7,17 39:14 41:11,23 42:1,4,5 44:6,10 44:12,15,19 45:11 48:13,15 50:19,21 53:15 54:1,7 55:4 57:12,15,16,18,20 58:1,12 59:11,19 62:12 63:8 64:17 64:24 65:1,15 66:12,15 67:15,20 68:5,23 70:2,9,13 70:18 71:10 72:7,7 72:8,11,18,19,21 72:22,24 73:8,12 74:12,18,19 76:6,9 76:21,24 77:13,13 78:2 84:1 85:9 86:4 87:6,10,11 89:13 90:7 92:17 96:20 97:18 103:8 104:6 106:3 108:14 112:4 114:12 117:6,14 117:16 118:5,9 121:9 122:2 123:10 125:11,13 125:19,24 128:16 128:21 129:3,5,11 129:13,13 134:13 135:17 136:10 140:19
knowing 103:7
knowledge 5:21 33:1 35:6,19 43:19 54:9 68:13 76:5,9 79:13 83:1 85:4 103:22 136:10
knowledgeable 21:2

L

lack 30:18 76:14
LARA 2:11
LaSalle 2:3,16 148:1
late 53:19
LAW 2:2
laws 102:7
lawsuit 66:4,9,14 70:21 71:1 71:4,18,22 76:23 129:3,4
lawyer 8:11,14,18 65:16 66:13 67:10 70:3 70:14 72:11,13,16 72:19,23 75:23 76:22 77:18 80:10 88:16
lawyers 8:22
lead 121:12
learn 73:9 74:20 79:14 80:12
learned 44:2 54:12 71:3 73:13,22 75:2 84:22 133:2 141:13
learning 61:3
leave 29:23 80:18 81:20 135:21
led 121:20
left 24:2,6 86:7
leg 113:1
legal 92:14
legit 28:18
letter 88:15,23
letting 37:20
let's 30:4,4 46:9
level 7:13
levels 137:16
liability 110:10,14,18 111:12 112:6,19,20,21 113:1,3,3,9,10,13 113:17,23,23
license 1:23 7:20 147:18
licensing 27:17
LICKHALTER 2:11
life 93:14
light 46:2 47:12,23 64:4 64:11
lights 25:15,21
limit 64:16,18 124:6,7,10 124:11,14,21 125:6 140:1,3,8 141:5
Limited 130:8,22
limits 66:8
line 23:3 50:14 93:11 119:18
liner 86:1,1
lines 20:24
list 90:14 99:19 138:20 138:20
listen 121:23
lists 101:20
Litigation 148:1
little 40:22 42:4 62:13 65:14 79:9 94:15 119:13 122:1
live 7:3,5
lived 7:7
LLC 2:18,23 130:9
llickhalter@Dowd... 2:11
load 30:14,16 32:17 33:1 33:4 36:11 39:7,9 39:13,17 40:1 52:19 56:9,12 57:22 100:6 103:20 104:2,13 104:17 116:22 135:2
loads 32:12 34:18,24,24 35:4,20 40:16 57:21 58:6
local 18:17 19:15 102:12
located 107:19 114:20
location 17:22 36:16 38:2 55:13 57:1 68:1 78:14
locations 36:24
log 86:14 109:10,13,15 109:23 125:18 143:7,11
Logistics 2:19 33:7,7,13 34:14 34:19 35:1,9,11,15 35:19,22 103:21 103:23 104:7,8,17 111:10 112:5,8,9 112:12,15 113:21 114:7,14 115:4,13 115:24 116:12 117:3,6,19,22,24 118:3,7
logs 21:1,2,4,6,13 26:5 86:10 109:16,21 110:1
long 7:7 10:13 19:11 35:24 36:10 39:12 49:24 62:11 86:4 86:10,15 98:24 139:18
longer 22:22
look 9:17 86:14 90:1
looking 26:5
looks 88:18 101:20 105:20
look-out 101:8
lose 93:11
lost 93:17
lot 7:1 140:19,20
loud 6:16
lying 124:16

M

M 1:16,22 2:7 145:12 146:4 148:23
Mail

129:12
maintain
100:19 101:4,8
maintained
110:1
maintenance
107:11,18 108:1,2,23 117:3
making
25:15,18 32:11
male
105:10
manager
10:10,14,20,24 11:2 11:10,12,14,18,19 11:23,23 12:5,5,9 12:13,15 13:18,20 18:18 21:15,16,18 22:2,6,20 23:15,18 23:20,21,24 27:13 27:22 28:1 29:11 40:10 57:19 114:6
mandated
14:21 38:4
manner
46:14 90:21 117:22 118:1
manual
94:7,16
Margaret
148:22
Marie
5:8,15
marked
3:15 88:7,10
Martin
29:5,9,12,16,19 30:24 31:2,10,12 32:9 33:21,21 34:5 34:13,22 39:22 41:5 52:3,16 53:6 53:16,17,24 54:6 54:19 55:6,8,15,18 56:2,19 57:8 58:21 59:2,9,13,23 60:15 60:21 61:9 62:23 63:23 65:16 66:17 69:1 71:16 83:17 87:12 93:8 99:20 102:24 104:4,5,21 111:19 116:18 119:16 125:19 127:7 129:22 135:7 136:5 137:4 139:2,7
Martins
10:17 29:15 33:23,24
Martinsville
133:22 134:5,9
Martin's
1:7 2:13 4:2 5:23 8:23 9:7,14,20,24 10:12,14,20,24 11:5,13,17,20 12:1 12:13 13:18 14:24 15:4,23 16:5,17 17:3,14,14,23 18:10,15,15 19:12 19:15,22 20:1,9,13 20:16 21:12 22:3,7 23:11,15,24 24:2,6 24:22 25:3 26:9,18 26:21 27:14,22 28:4,11,12,14 29:8 29:10,12 33:10,12 34:1,12,15 35:1,11 35:15 36:1 37:8,14 37:19 38:21,22 39:20 42:10,19 44:16,22,24 45:3
50:10 55:1,5,22 56:14 57:1,13,16 57:21 58:5 59:11 62:3,24 63:2 65:24 66:5 67:18,18 68:2 69:10 70:4,21 72:10,13,16 76:22 80:16 81:6 84:2,13 85:2 90:15,16 91:19,23 92:7 93:15 95:22 96:13 98:9,11 99:13 100:15,18,23 101:3,7,24 102:11 102:16 104:18 105:7,23,24 106:16,19,23 107:4,11,24 108:4 108:6,18,24 110:10,17,20 111:4,9,15,23 112:15 118:4,7 119:2 125:14 128:18 129:20 132:11 134:3,18 138:10 139:8 145:7 146:13 148:8
material
31:17
materials
7:22 16:22 99:14
Matthew
2:6 148:5
ma'am
5:18 7:3 97:7 139:21 142:18
MBM
33:7,7,12,15,16 34:14,19,24 35:4,9 35:11,15,19,22 103:20,23 104:7,8 104:17 111:10 112:5,8,9,11,15 113:21 114:7,14 115:4,13,24 116:11 117:3,6,19 117:22,24 118:3,6
MBMS
133:9,14
McCorkle
148:1
mean
8:6 14:17 21:1 22:24 25:22 29:22 30:12 38:11 93:13 104:16 109:3,12 109:19,20 112:21 113:10 119:22 129:1
meaning
26:6 52:18
means
115:20
meant
4:12 23:19 73:17 128:18
measure
137:19
mechanical
80:18
mechanics
81:3,5,14 84:20 108:6,11,13,16,18
medical
141:12
meeting
62:6 63:11,18,23 65:8 66:16 98:5
member
83:7
Memo
133:23
memory
64:15
mental
122:7
mention
112:3
mentioned
106:6 126:11 147:7
met
98:4 125:20
middle
6:23
mileage
20:23
miles
38:19 64:21 138:5
Milk
1:7 2:13 5:23 8:23 9:8,15,20,24 10:12 10:14,20,24 11:5 11:14,17 12:1,13 13:19 15:1,4,23 17:3,15 18:10,15 18:16 19:12,15,22 20:1,13,16 21:13 22:3,7 24:1,22 25:3 26:9 27:14,22 29:8,13 33:10,12 34:1,5,12,15,22 35:1,11,15 36:2 37:8,14,19 39:20 42:11,19 44:16,22 45:1 55:1,5 57:2 57:13,17 58:5 62:4 62:24 63:2 65:24 66:5 67:18,19 68:2 69:10 70:4,22 72:10,13,17 76:22 80:16 84:14 85:2 90:15,17 91:19,23 92:7 93:15 95:23 96:13 104:4,5,19 105:23,24 111:9 112:15 118:4,7 119:2 132:11 134:3 135:7 136:6 137:4 138:10 139:2,9 145:7 146:13
Milk's
16:18 20:10 50:11
million
110:15,22 111:7
mini
143:23 144:1,2
minimum
108:21 135:10
Minnesota
103:24 116:1
minutes
44:13 45:19 50:2
mischaracterizes
122:9 125:1
mischaracterizing
121:5
mission
89:3
mistake
70:11
moment
69:22 113:20 118:24
Monday
28:6 56:24,24 57:10 58:10 70:20 71:2 71:17 75:7 123:10 123:12,17 128:23
money
14:19
monitoring
84:8
Monroe
2:21
month
94:3 110:2 134:14
months
109:8,9,16,22
morning
24:9 40:15 43:10 51:1 118:22
Motel
87:10
motor
5:19 12:22 13:3,16 14:10,11 31:15 90:24 91:1 102:17 108:8
Motoren
2:23
moved
116:7
moving
47:3 65:19
mschreck@mrvla...
2:7
MULHERIN
2:6 148:6
multiple
17:11
MURRAY
1:4 145:4 146:12
MVR
14:8 28:18 31:15
MVRs
14:1

N

N
3:1 148:1
name
5:6,9,18 69:7 97:17 105:3 112:3 114:24 126:5,6,13
named
111:6 126:2
Nancy
105:4,8
NASTC
13:15
National
12:17 13:15
nature
100:4
necessarily
123:6
need
4:16 6:15 80:4 148:16
needed
19:14 51:5 69:19
needs
18:9,16 52:17
Negative
103:16
negligence
91:20 92:10,12 93:6
never
21:9 46:2 47:4 84:1 112:8 126:8,10 134:9
new
25:9 114:21,22
news
55:15,19 133:22 134:6,9
newsletter
133:22,24
newspaper
134:16
nice
98:3
nicer
116:8
night
49:22 53:19 54:24 77:14,19 119:13 122:1
nods
6:16
non-owned
109:4
noon
54:2 55:6 135:16,21
normal
121:24
normally
46:18 129:16
North
2:3,16,22
Northern
1:2 145:2 146:11
notarized
148:16
notary
1:17 145:23 146:4
notations
143:7
noted
97:19 98:8
notes
125:15
notice
1:13 119:6 147:5
notified
53:16 71:16
number
3:15 17:22 50:15 88:11 99:3 102:4 110:10 131:7 133:7,11,12,15,15 148:8,20
numbers
89:23

O

object
59:16 77:7 92:13,20 114:1 123:23 124:24
objection
60:11 76:13 79:5,21 80:1 82:4 96:17 97:2 121:2,5 122:9 123:13 125:7 140:10,16 141:24
objections
4:4,10
observed
46:20
obtain
110:24
obviously
44:12 61:21 123:11
occupant
120:2
occur
93:12
occurred
5:22 16:6 17:1 18:8 48:7 49:18 50:5 86:6 92:12 132:23
occurrence
30:10 43:21 56:23 58:3 62:14 97:23 99:11 103:19 110:14 113:4,24 117:20 119:18 121:15 139:6
141:10
occurrences
125:15
October
147:12 148:4
odometer
20:23
offenses
138:22
office
10:10,13,19,24 11:2 11:10,12,14,23 12:5 27:13 28:1 40:10 54:4 57:19 64:9 104:20,22 115:4 116:3 117:2 125:14 126:16 127:1,4,10,16 136:2,3 139:7
offices
2:2 107:20 115:11
oh
67:2 86:3 101:20 105:21 125:11 128:16
okay
6:2,3,7 7:1 9:14 10:5 11:4,7,9,23 12:7 12:19,24 14:20 15:7 17:20 19:5,11 19:18 20:9 21:19 22:9,11,19 23:4,6 23:23 25:24 26:9 27:9,20 30:6,8,17 33:17 34:6,11,14 34:21 35:9 36:8 37:4 44:19 45:3,14 46:17,23 47:5,15 50:15 52:10 56:21 59:9 61:18 62:9 64:17 65:8,24 66:9 67:2,6,16 68:12 70:19 71:8,17 73:24 75:8 76:20 78:4,22 80:22 81:4 82:22 87:19 88:19 89:1,11,21,24 90:8 90:11,12,19 92:6 93:9,24 94:2,10,20 98:3,8,19,23 99:1 99:9 100:3,9,14,18 101:17,18,24 102:4,11,24 103:6 103:15 104:5 105:1,6,12,21,24 106:16 107:14,18 107:24 108:10,15 109:19 110:9 114:10,20 115:3,7 116:3,6,17 117:10 117:12,20,24 119:6,21 120:5,13 122:5,18 123:1,4 123:11,19 124:5 125:5,18 126:5,8 126:20,22 127:3 127:12,15,20,24 128:21,24 129:23 130:14,16,17,21 131:2,3,5,11,20 132:10 133:1,13 133:17 134:8,11 134:15,20,24 135:23 136:16 137:1 138:6 140:5 141:5,21 142:12 142:23 143:11,15 143:18
once
32:1 45:21 98:4

116:10 134:14
**ones**
8:23 130:14
**operate**
90:20 103:23
**operating**
84:16 99:15 101:15 106:11,18 134:24
**operation**
29:17 102:14
**Operations**
29:11
**operator**
133:9
**operators**
132:13
**opposed**
37:20
**options**
42:14
**order**
31:3 97:10 101:9 131:21,22 137:3
**orders**
104:23
**organizing**
111:17
**origin**
135:3
**outcome**
147:10
**outweighed**
38:19
**overly**
58:7
**Overnite**
2:18,19 129:17,18,21 130:8,15
**overseen**
104:20
**owned**
84:2 105:22 106:3 109:2
**owner**
33:18 104:13 112:8
**owners**
33:19,20 34:11 116:14
**owner-operator**
45:10
**owner-operators**
45:8
**owns**
107:1
**Ox**
2:18 130:9
**o'clock**
1:20 29:24,24 30:1,1 135:15,16 136:20 144:4

**P**

**package**
128:17,22,24 129:3
**page**
88:18 89:23 90:2,6 90:10 91:10,12 93:9,20 94:16,19 96:1,2 100:10 101:14 119:6 131:23 132:3,4 133:17 134:24 135:9 136:16,17 138:6,19 146:3
**pages**
88:15 94:17 99:4 131:21 148:13,16 148:18
**paid**
117:24 137:3
**paper**
1:8 2:17 39:9 40:1 130:24 143:16
**papers**
17:24
**paperwork**
20:3,6,19,22 117:1 136:19,20 137:3
**paragraph**
102:5 132:1,8 133:18 138:7,21
**Pardon**
130:18
**Park**
44:9 82:20
**part**
14:23 15:3,17,21 16:5,11 19:13,18 40:24 49:20 68:17 86:9,13 94:8 102:20 104:13 106:9 112:7 128:10
**particular**
36:18 46:14 124:20
**parties**
74:24 147:3,9 148:19
**parts**
86:1 94:8 103:18
**party**
73:12,15 76:12 113:15
**Pat**
39:22 105:3,9 129:22
**pauses**
6:23
**paycheck**
112:9
**payroll**
27:16 136:21
**pending**
146:9
**people**
20:10 34:14 39:24 66:18 104:22 128:13
**period**
141:4
**periodical**
134:22
**permitting**
27:17
**person**
1:5,5 23:1,3,4 26:17 26:19 58:20 66:20 69:9 75:10 111:22 123:3 145:5,5
**personal**
77:4 138:13
**personally**
24:18 41:20 42:16 146:7
**personnel**
15:4 138:12
**persons**
105:6
**pertaining**
1:15
**Pfutzenheimer**
78:7
**Pfutzenrueter**
78:8,9,13 83:3,4
**phone**
51:8,13,18 57:8 64:7 122:21 123:2 127:1,2 133:7,11 133:12,15 141:9 142:9 148:20
**physical**
13:22 28:18 113:18
**pick**
30:14 37:20
**picked**
118:11
**picking**
40:1
**pickup**
39:17
**piece**
71:11 143:16
**place**
13:22 16:12 23:12 36:21 37:18 43:24 49:22 60:21 64:19 83:9,14,18 89:18 98:16 114:13
**placed**
32:3
**plaintiff**
1:6 2:5 73:11 145:6 146:13
**plaintiff's**
71:21 73:11 74:17
**planning**
92:3
**plans**
86:21
**play**
56:10
**please**
5:6 6:1 18:12 25:1 55:24 70:8 71:24 86:12 87:4 128:9 142:4 148:14,17 148:20
**Plenary**
1:4 145:4
**Podlena**
39:22 105:3,9 129:22
**point**
31:14 60:20 66:1,13 69:22 77:21 80:9 80:11 83:16 90:14 91:11 110:4 119:22 125:19 126:15 127:20 135:2,9 136:18,23 137:2,7,10,23 138:20
**points**
132:14 136:17
**pole**
115:10 116:9
**police**
8:7 15:7 18:10,16 19:14 43:3,7,11 48:13,19,22 50:4 57:17 61:7 65:3,5 67:14 77:22 78:23 79:3,12,15,19 80:12 82:1,11,19 82:20,23 83:8 87:16 103:10
**policies**
94:24 95:21,22 96:13 101:16 102:2 112:14 114:12,15 135:1
**policy**
16:5 20:10 37:18 38:23 66:8 92:7 94:12 95:11,13 96:3 100:18,23 102:4 106:19 107:4 110:5 111:10 133:23 138:7,11,15
**portion**
101:13
**position**
104:12 105:13
**positive**
107:16
**possible**
137:8
**possibly**
29:5 115:16 117:7
**post-trip**
143:14
**potential**
113:23
**practice**
16:13 87:1,7
**preamble**
132:10
**preceding**
110:16
**preexisted**
79:16 82:11
**preference**
38:16
**preparation**
7:23 8:19,24
**presence**
146:2[illegible]
**present**
9:24 62:6 63:6 68:7 68:10 69:11,13 73:24 75:24 98:11 127:4 147:6 148:22
**presented**
99:22
**president**
34:4,5
**prevent**
132:12
**preventable**
91:13
**previous**
125:1
**previously**
82:4
**pre-check**
81:10
**pre-trip**
24:10,14,19,24 25:4 25:8,12 26:1 80:22 81:10,18 106:7,17 106:24 109:6,10 109:20 143:3,8,9 143:13
**pre-trip's**
109:12
**primarily**
80:20 137:13
**prior**
41:11 43:21 103:7 118:20 120:7
**privileged**
85:18
**probably**
6:22 42:22,23 101:20 108:20 111:14 116:13 117:13
**problem**
81:1
**procedure**
1:14 5:17 37:18 92:7 96:4 133:23
**procedures**
17:2 89:7 95:21,22 96:13,23 99:15,19 100:4 101:15 102:1 135:1
**process**
31:1,2
**product**
35:5,7
**products**
39:9
**professionally**
21:9
**promote**
132:12
**pronounce**
97:13
**proper**
24:19 80:18 106:10 106:18
**properly**
21:5 24:14 25:13,16 25:19 26:1,14 82:3 84:16,23 85:6
**property**
91:20 112:24
**provide**
20:1,14 21:3 28:11 64:22 99:13 132:13 134:16
**provided**
111:3
**provision**
102:11
**provisions**
102:17 108:7 119:4
**public**
1:17 145:23 146:4
**published**
133:24 134:12
**pull**
87:9 119:10
**purchased**
111:6,23 129:18
**purchasing**
111:16
**purpose**
9:19 66:3,5 93:6
**purposes**
4:14 22:23 130:7
**pursuant**
1:13 5:16 147:5
**put**
4:9 141:14
**puts**
13:14
**P.C**
2:6 148:6
**p.m**
30:1,1 44:4 144:4

**Q**

**qualification**
8:3 13:21,24 16:22 31:13 87:18 99:18
**qualified**
20:8 108:7
**question**
6:21 32:9 67:4,7 70:7 79:7 105:21 121:8 121:11,13 126:3 128:10 140:6,11 141:2
**questioning**
4:17 5:24 6:22 119:19 130:7
**questions**
5:20 6:1,5,9 23:17 87:24 97:6,8 119:15,17 130:5 131:7 139:15,22 140:19 142:23 143:1 145:15 148:20
**quick**
87:22 139:17 142:23

**R**

**R**
2:6,11,20 148:5
**rail**
37:1,2,5,9,12,16 39:6 109:1,2 137:15
**rammed**
92:18 141:18
**ran**
14:1 28:5,17,20 29:21 30:11 38:16
**random**
103:2
**Randy**
33:21 104:10 114:16 116:14,17
**Randy's**
104:12
**range**
13:12 95:2
**ranging**
138:23
**read**
145:10
**reading**
20:24
**reads**
135:2
**ready**
25:3
**real**
105:21 121:23 139:17
**really**
123:16
**rear**
63:19 101:1
**rear-ended**
55:13
**reason**
38:8 100:6
**recall**
51:3 56:5 59:4,5 62:2 62:5 63:12 65:23 71:15 85:21 98:5 99:21 102:20 110:7 124:12,16 126:2 129:14 133:12 140:3 141:3,7
**receive**
104:6
**received**
65:19 71:6,6 75:7 112:9 128:22 129:6,6 131:21 133:4
**Recess**
88:5
**recollect**
63:5
**recollection**
28:8 57:3,6 63:1,4 64:9 69:2 78:21 83:10 87:20 98:15 98:17 100:3 121:19 124:19 125:22 126:14 127:11 128:17 129:1,8 140:20
**reconstruction**
83:23
**record**
4:3,10 5:7,14 13:24 14:10,11 16:24 24:22,23 31:15 88:4 90:5 132:2 143:4 148:24
**recordable**
52:5 109:17
**recorded**
17:18 143:7
**recording**

20:23
records
15:9 16:18 17:16 74:11 99:16 108:22 109:5
recovered
14:19
recovery
14:16,17,18
reduced
146:21
reefer
115:19 137:8,14
reefers
115:21 137:13
refer
100:15 104:18 130:9 130:19
reference
110:5 148:8
referred
98:8 110:21
referring
104:19 111:8 113:9 119:7 127:12 132:3 143:5
refers
135:6
reflect
5:14
refrain
100:24
refrigerated
115:20 137:14
reg
14:6
regard
20:19 82:24 123:24 141:8
regarding
5:20 45:15 47:16 53:11,14 55:23 56:23 60:18 61:12 66:18 67:12 74:3,6 77:22 82:16 83:8 83:18 87:13 89:7 143:2,2
regardless
107:1
register
125:23
regs
12:21 109:16
regular
33:1 36:9,11 39:7,12 40:3,11 87:3 143:23
regularly
34:18 108:1
regulations
89:6 102:6,13
regulatory
102:8
REHFELDT
2:6 148:6
reiterate
141:2
related
66:13 78:23 99:14 147:9
relationship
10:16 33:24 34:3 41:14 44:10
relative
5:21 19:15
relay
52:2,15
release
74:10
relied
26:14
reload
30:16
remain
137:16
remember
58:22 62:13 71:9 78:5 98:20 119:18 129:10 140:2
remembered
64:4
repair
91:21,23
repaired
92:2,3 106:21 107:6
repeat
18:12 25:1 40:6 43:8 55:24 67:7 71:24 79:7 86:12 87:4 128:9 142:4
rephrase
6:2
replaced
107:8
report
8:4,6,7 15:7,22 16:7 17:17 27:10 43:3 65:5 82:19,23 87:16 126:19
reportable
109:24
reported
1:22 50:9 51:22 146:19
reporter
6:13 145:13 148:22
reports
55:15,19 125:15,19
represent
5:19 130:6,7,23
representative
66:22 69:23 70:6,17 74:16 76:11 127:17
represented
74:17
representing
2:5,13,17,22 8:23 128:4
represents
68:16
request
4:2
requested
14:22 87:21
require
20:16
required
14:8 20:7 40:23 91:2 91:14 102:22 108:16 109:15 110:24 132:17 135:20 136:12,13
requirement
16:1
requirements
99:24 136:14
reserve
143:21
reserved
4:11,12 147:2
reserves
92:8
respect
106:5 113:14 128:11 138:4
respective
147:3 148:19
response
55:22 56:6,7
responsibility
38:2,21 48:21 50:8 51:23,23 53:3 58:8 80:17,21 81:14 101:19 103:9 106:6
responsible
19:19,23 21:15 24:1 24:5 39:21 84:14
rest
95:16
result
65:19 92:12 93:5
results
15:14 87:17 103:13
retraining
91:14
return
39:7,9,13 137:9 148:18
review
7:22 8:9 31:16 112:10 148:14
reviewed
8:4
reviewing
100:8 125:22
re-looked-at
100:7
rfb@cliffordlaw.com
2:3,5
Rich
97:17 142:19
Richard
2:2 97:9
right
4:7,19 14:7,11 17:7 17:12 21:10,17 22:2 23:21 25:22 28:3 39:10,23 46:4 50:19 52:14,20 53:6 61:20,22,24 63:8 64:10 65:13 66:12 68:7 72:10 73:16,20 90:22 91:9 92:8,19 94:14 95:18 102:22 107:20 119:24 123:7 127:18 129:10 132:3,4 134:22 139:21 141:8,15
risk
13:17 89:19 112:1 114:17 119:9
road
7:4 20:17 31:20 40:19 57:21 87:9 106:20 132:13 137:11
roadway
47:8
Robert
23:8,11
role
29:6 56:10 57:19
room
97:20
route
28:22 30:17 37:7,11 37:20,22,24 38:5 38:11,12,12 41:21 42:1,11,17,20,24 43:16,17,21 87:3 135:4 138:2
routed
133:8
routing
38:1
rule
39:2 137:24
rules
1:14 5:16 12:21 89:6 90:4 94:24 102:6 131:24 132:7 139:1
run
14:8 31:14 32:3,6,12 33:24
running
38:17
Ruth
33:21 34:4,9,13 116:15,18
Ryan
107:15

S

S
3:14
safe
24:3,6 90:4,20 100:19 101:4 131:24 132:7,13
safety
11:18,19,23 12:5,9 12:13,15,16 13:8 13:18,20 14:5 16:1 16:3,6 18:18 19:1 19:4,12,18 21:15 21:16,16 22:2,6,19 22:22 23:2,4,6,15 23:18,20,21,24 24:9 27:21 29:6 40:10 49:20 51:21 57:19 84:18 88:24 89:2,7 91:3 102:18 108:8 114:5 132:17
SAITH
144:5
Sam
55:10 59:6,10,14 60:4,15 62:3,16,22 69:18 121:23 127:6,15 128:12 135:20 141:3
Samuel
1:7 2:14 28:3 29:21 30:20 31:3,8,11,12 34:17 35:24 36:17 37:7 40:4 44:3 45:16 54:23 60:7 61:6,24 63:22 65:11 66:16 70:22 77:1 83:12
Saturday
57:4
save
94:14
savings
138:5
saw
10:3 17:6 26:15 40:8 40:21 41:12 43:3 46:2 47:4 64:11
saying
59:5 62:12 64:13 80:5 82:22 85:20 102:20 121:20 122:4 125:19 140:2 141:4,7 143:15
says
16:18 17:9 48:20 64:15 90:2,4 91:11 91:18 92:10 93:10 93:11 94:22 96:1,2 101:18 132:11 135:10 138:10
scene
44:8 96:21 122:16
Scheinman
1:4,5 69:23 70:5,6,17 145:4,5 146:12 148:8
Scheinmans
128:4
Scheinman's
70:20 80:14
Schmitts
105:4,16
school
7:14,15 141:13
Schreck
2:6 3:8 4:6,9,14,18 8:13,16 18:19,21 18:24 52:8,10 59:16 60:11 66:23 67:3 70:7 72:6 73:17,20 76:15 77:7,10 79:5,21 80:3 82:4 85:20 87:22 88:4,12 90:5 90:8 92:13,20 96:17 97:2,4 114:1 121:7 122:12 124:4 129:23 132:2 139:14,16 140:15 141:24 142:19,22 143:19 143:23 148:5,10
scratch
89:17
search
114:6
second
23:3 102:5 136:16 138:6
second-to-last
93:11
section
93:10 100:10 101:13 102:5 119:7
secure
148:14
see
6:13 24:5 40:14,15 47:5 49:5 54:3,18 55:15 62:3 64:3 65:9 86:14 90:2 94:18 100:12 101:15,22 132:1,7 133:19 138:8
seeing
41:9 56:11 97:1
seen
43:2,6,12 54:15 55:19 65:5 77:1
semi
28:15 113:13
send
143:23
sending
92:4
separate
42:5 111:10 116:24
September
1:19 145:13 146:7 148:9
Sergeant
78:7,12 83:3
serious
56:3 91:12
seriousness
138:24
serve
133:22
service
1:7 2:14 99:24 111:9 112:16 118:4,7 119:2 132:12 134:3 135:7 136:6 137:4 138:10 139:2,9 145:7 146:13
Services
13:17 89:19 91:20 112:1 114:17 148:1
set
17:24
Setina
148:22
severe
52:5 55:12 63:14 95:3
severity
49:3 59:6 65:17 95:1
Shaken
120:23
shape
80:19
shed
115:10 116:9
sheet
20:23
sheets
148:13,15,16,18
shift
25:4,9
shipment
135:3
shock
121:16,19 141:11
shop
108:20,21
shortest
37:22,23 38:5,11,12 38:12 138:1
Shorthand
145:13
shortly
121:15 139:6
shoulders
6:17
show
16:21 81:11
showed
9:17
showing
88:10
shrugs
6:16
side
87:9
sign
74:10 99:20
signals
25:21 79:4,20 81:8
signature
88:20 143:24 147:1 147:12 148:12,14 148:15,16,18,23
signed
99:20 148:16,16
simply
122:6
Sincerely
148:21
sir
123:9
sit
54:23 124:18
site
133:5
situation
95:1 121:24 138:24
six
109:8,9,16,22

slips
138:14
slow
122:1
small
12:17 13:3,15
socially
41:17
solely
134:3 139:8
somebody
56:14 74:18,21
112:23 114:7
126:17
soon
48:6
sorry
18:21 21:16 73:19
121:9 140:24
sounded
52:10
South
1:18 2:8 146:8 148:6
speak
9:5 10:2 16:13 18:9
18:16 58:19 61:14
61:24 67:11,14
78:6 79:11 83:17
126:17 128:7
132:10 134:16
137:24 139:2
speaking
46:14 121:14 126:11
specialty
84:19
specific
28:22 29:1 37:24
56:21
specifically
31:7 38:23 59:4
126:12
specifics
46:7 79:10
specify
123:20
specifying
124:19
speculated
74:22,24
speculation
76:14 92:21 96:18
142:1
speech
45:22 46:9,12,21
121:17
speed
60:23 64:16,17 65:2
101:4 120:17
123:21 124:5,6,10
124:11,14,20,21
125:6 140:1,3,8
141:5
speeding
64:7,14 122:22 125:3
125:5 141:4,7
spell
5:9 23:9 114:24
spoke
44:15 48:12 53:10,13
53:17 55:4,6,8
56:22 57:7 58:17
58:20 59:24 61:9
77:22 127:7 141:9
142:8
spoken
8:18,22 9:2 45:14
48:13 59:23 65:11
66:21 69:23 70:5
70:16 77:17,18
128:13
SS
146:2
stand
33:15
stands
33:12
Stanton
1:16,22 145:12 146:4
147:18 148:23
start
11:4 25:3 30:7 84:5
89:17
started
28:8,12 30:18 32:11
97:19
starts
25:9
state
1:18 5:6 18:16 20:24
64:6 79:3,12,14,19
80:12 82:1,11
102:7,12 122:8
146:1,5
stated
141:10
statement
14:12 15:18 16:11
17:18 43:6,7,11,15
48:24 67:19,24
68:1,4,8 69:6,10
69:14,17,19,20
70:15 73:2,14 74:1
74:16,23 75:3,9,13
75:19 76:7,11 77:1
77:13 126:21,24
127:1,2,8,11,12,13
127:16,22 128:1,3
128:8,11 131:16
132:21 141:6
statements
8:5 75:17
states
1:1,14 102:5 145:1
145:15 146:10
stay
109:18
stenographically
146:19
step
113:15,16 140:24
stepped
113:15
stop
6:1 30:4 46:6 101:10
stopped
23:21 47:2 87:2
96:24 141:18
stories
116:10
Street
2:3,12,16,21 148:1
strictly
41:15
strike
8:11 15:16 16:2 18:7
20:21 22:4,12
24:12,17 26:18
32:23 43:2 51:9,14
53:18 54:14,21
56:17 59:22 63:16
76:7 82:14 84:3
93:3 94:15 111:21
126:9,23
striking
100:24 101:4,10
struck
47:17 49:5 65:9
96:24
stutter
46:12
stuttering
122:7
stutters
45:23
submit
136:19 137:3 148:14
submitted
136:21
SUBSCRIBED
145:20
subsequent
122:19
sued
75:10 76:3,10 128:18
suing
76:12
suit
72:5 75:4,7 147:9
Suite
2:3,8,16,21 148:1,6
Sunday
57:5
supervisor
29:7
supplement
99:6
supplements
99:9
supply
14:22
supposed
24:9,23 50:17 51:24
90:15
sure
6:15 13:21,22,23
14:13 18:13 23:5
25:13,15,18,24
28:18 40:7 43:1
45:24 49:2 56:1
58:6 69:21 71:15
72:1 74:13 75:1
76:15 80:17,23
84:15 87:5 88:1
99:1 101:9 102:21
103:10 106:10,13
120:2 123:16
sweat
141:15
Switching
119:13
sworn
4:1 5:3 145:20
146:16

T

T
3:14
take
6:18 15:17 37:4,8,12
37:19 38:4 42:17
42:20 43:16,21
49:24 52:17 87:22
88:2 122:1,2
124:18 138:1
taken
1:16 5:16 56:9 75:19
75:21 88:5 94:23
106:20 141:15
145:11 148:9
takes
52:4
talk
39:23 40:21 46:9
47:19 48:6 51:5,10
83:12
talked
27:20,24 53:24 57:17
61:5,6 74:14 82:17
122:20
talking
9:15,16 18:19 19:1
21:22,23 46:18
64:6 66:3,10 67:1
120:21 141:17
143:6
talks
138:19
taxes
27:17
teach
12:21
team
89:19
telephone
127:17
tell
36:10 37:14 42:16,19
45:19 47:5,8 48:2
49:4,7,9 51:4,5
55:9 59:9 60:4
61:2,5 63:23 64:21
65:2 68:14 69:18
75:8 86:21 94:17
120:13 124:6,14
142:8
telling
30:9 60:15 63:12
124:20 125:12
template
89:20
ten
13:13 116:13 117:15
term
141:12
terminal
29:23 30:14,16 86:7
136:4,5,6 137:7,9
137:11
terminated
139:8
terms
30:7,13 129:1
test
20:17 31:20,22 50:5
102:22
tested
48:23
testified
5:3 67:16 87:12
123:24 131:13
133:2,3 139:5
testify
146:16
testimony
16:10 57:7 121:6
122:10 125:1
146:18,23 147:11
testing
14:15 15:14 103:1,13
thank
12:7 17:20 34:6,23
37:3 129:24
139:12,13 142:17
thereof
147:10
thing
109:14 124:1 135:19
things
6:17 17:10,12 20:20
29:3
think
26:19 64:7,13 70:10
74:12 77:21 83:4
85:12 102:20
105:5 114:10
116:15 120:16
123:4,12 126:15
127:20 129:23
132:15 136:16
137:22
third
90:22 135:1 136:18
thirty
45:19
thought
49:16 119:8 123:5
128:18
three
36:5 50:1 63:5
104:21 105:6
108:20,21 110:16
130:19
three-quarters
137:16
thrown
140:20
Thursday
44:5
Thurston
132:19 134:7
tickets
65:19
Tim
5:18
time
5:24 9:23 17:21
23:19,20 25:9
27:11 30:2 36:20
38:12 41:11 44:14
44:22 45:11 47:20
48:12 49:21,22
53:10,15,22 54:1
54:12 55:14 56:20
56:22 57:9 58:10
58:13,16,17,22
60:1,1,18 61:11
62:11 63:9,16,18
75:2 76:22 89:15
94:15 95:23 96:14
98:24 101:10
103:2,4 104:22
105:5 108:12,13
112:10,10 115:16
117:20 120:18,19
122:2,22 123:21
126:8,10 127:24
129:24 134:7
136:21 139:16
times
102:6 108:12 137:17
TIMOTHY
2:20
title
10:13 11:24 29:10
105:12
titled
138:7
today
5:20 6:14 7:24 8:14
8:20,23 9:3 10:2
16:10 19:3,4 21:22
115:24 116:4
117:8,17,18
124:18
told
46:7 50:3,7 51:2
54:11 55:10,18
56:2 60:1 61:21
65:16 73:2 74:22
76:2 77:19 78:17
78:18,20 85:11
93:16 98:5 100:1
103:9 120:1,16
122:20 128:13
139:24 140:7
142:12
toll
38:19,20
tolls
38:18,24 39:3 138:4
138:5
tone
120:22 121:14
topic
110:7 121:12
topics
119:13
touch
133:10
Towing
78:18
to-wit
146:6
track
17:15
tractor
29:1 52:18 79:4,12
79:19 81:7,18,20
81:22 84:4,6 85:9
91:23 105:18,22
106:5 108:20
109:7
tractors
24:2,6 80:18 84:2
108:2,23 115:13
117:18
tractor-trailer
28:16 102:14
traffic
101:8 102:13 135:18
trailer
58:2 98:17,18,20
106:1,24 107:1,2,5
107:8 108:21,23
109:2,4 137:15
trailers
108:24 109:1 115:15
117:7,8 137:14
trained
21:5,12 24:13,18
training
12:8,14 19:19,23,24
20:2,6,14,20 21:3
28:11 83:20,23
transcript
140:14 143:24
145:11,14 146:23
148:11,14,15
Transcription
146:22
transport
104:2 135:2 137:13
Transportation
15:9
transported
103:20
traveling
123:21 124:21 125:6
trial
4:15
trips
138:14
truck
9:17 26:11 27:16
28:5 49:12,14
52:18 56:11,11
58:2 63:19 79:12
79:16 80:13,23
84:22 85:13,24
92:11 98:14,18
100:15 101:9
106:20 113:13,16
113:16 120:17
trucking
12:10,17 13:16
trucks
15:10 24:2 102:14
137:7,10
true
46:17 97:22 141:23

141:23 142:13
146:22
truth
142:8 146:16,17,17
try
89:23
trying
11:7 71:11
Tuesday
128:23 136:20
turn
79:20 81:8 141:14
twelve
116:13
two
10:3 12:3 20:7 90:6
91:18 105:15
110:16 116:9
130:13 142:23
type
15:6 20:22 46:24
99:14 112:18
113:1,4 115:10
116:9 135:18
typewriting
146:21
typical
58:13 87:1,7
typically
42:12,13 52:14

U

UACL
130:10,17,20,21
131:4,16 132:23
134:20 136:8,12
138:16 139:3,9
uh-huh
6:17
uh-uh
6:17
umbrella
110:21
Um-hum
42:9 62:15
unable
100:5
unaware
37:23
undergo
103:1
understand
6:1,6 13:12 16:10
20:9 21:23 45:23
57:7 62:11 65:18
65:22 84:10 92:18
92:23 95:10
121:17,24 122:3
understanding
25:11 43:19 54:10
60:7 63:19 71:20
72:2 74:15 84:21
85:5,7 86:24
103:12,15 104:11
110:9,13 113:10
113:12 122:5
understood
6:9 23:19 24:8 76:16
undetermined
146:10
United
1:1,14 145:1 146:10
units
115:19,20 137:8
Universal
2:18 129:17,21 130:7
130:15,22
unload
135:3
unsafe
95:13
unwilling
128:7
unwritten
39:2 137:24
update
93:22,23
updated
13:23
updates
94:3,7 99:5 134:16
UPS
129:12
upset
83:5 141:18,22
142:15
use
4:7 21:22 138:12
usually
29:24

V

v
148:8
vacation
23:2
van
137:15
vans
115:17,18
VARCHETTO
2:6 148:6
various
37:5
vehicle
14:10,11 31:15 80:14
82:2 91:1 100:16
101:5,10 102:18
141:18
vehicles
47:16 48:3,7 60:23
78:15 90:20
100:20 101:1
verbal
95:2 138:23
verifications
28:17
versus
137:11 138:5
vice
23:4 34:4
video
43:7
videotaped
43:12
violates
95:5
violating
95:11
violation
95:6
violations
65:19 79:15 80:13
94:24 95:4
voice
120:22 121:14
voluntarily
128:14
vs
1:6 145:6

W

wait
6:21,24 81:23
waived
4:4,6
waiving
4:16
walked
97:20 112:23
walking
10:3
want
4:6 30:4,7 31:5 46:6
66:24 71:10 72:6
72:11 74:13 76:20
78:3 83:5 88:2,17
89:21 90:1 97:8
124:1 135:17
137:16 140:24
143:3
wanted
4:5 49:1 66:22 68:1
121:11
warning
95:3
warnings
138:19,23
wash
98:21,22
wasn't
16:11 40:14,18 62:14
69:21 84:22 96:20
122:6 123:11
141:4 142:7
way
87:8 97:18 116:6
120:13 142:6
147:9,10
Wednesday
123:10
week
78:1,4 123:18 136:19
weeks
41:8
weight
58:1,1
weights
57:20
welcome
130:1
went
12:23 31:2 51:20
53:7 94:3
Werke
2:23
West
2:12,21 105:4
we'll
17:5 30:11 40:21
142:24 143:21
we're
4:3,16 9:15,16 21:22
21:23 52:14
107:21 109:15
135:17
we've
82:16
whatsoever
97:23
Wheaton
1:18,19 2:8,9 146:8,8
148:6,7
WHEREOF
147:11
white
141:14
wife
34:9
WILLIAM
2:15
willing
89:5
Wilton
7:4 30:14 33:2 37:8
37:15 41:22 42:12
42:17,21 87:3,8
107:22,23 116:24
117:2 118:11,13
118:17 136:4
Winona
103:24 115:5,24
Wisconsin
7:4,10 12:22 13:16
30:15 37:8,15
51:11 114:21
118:16
witness
3:2 4:1 5:2 6:3,7,11
8:4 52:9,12 67:2,6
73:19 76:14 121:9
130:1 139:13
140:12 146:15,19
146:20,24
witnesses
48:10 78:20
Witting
27:3,7 52:7 61:15
112:2 115:3
word
4:7 30:18 120:20
122:3
words
10:23 121:6
wore
11:22
work
27:16 36:1 48:22
57:1 58:11,14 85:6
89:20 90:4 99:15
103:10 113:18
131:24 132:7
worked
12:20 14:15 35:22
41:15 89:19
workers
105:2
working
11:4 25:13,15,18
80:23 82:2 84:23
108:13 138:12
works
5:19 105:7
wouldn't
85:20
write
25:7 26:15 81:3,14
written
24:23 94:1
wrote
112:11
wyu@hinshawlaw...
2:15
W-i
27:8
W-i-t-t-i-n-g
27:8 115:2,3

X

X
3:1,14

Y

yard
24:2,6 35:1 37:9
81:20
yards
37:1,2,5,9,12,16 39:6
Yeah
27:8 115:19
year
7:17 13:23 14:9
36:15 39:15 85:9
110:16
years
20:7 36:5 110:17
140:20
Yesterday
126:7
Yu
2:15 3:6 97:8 122:11
130:3 132:4,6
139:12 144:1

Z

zoned
49:9

0

08
115:9 118:4,8
084-001905
1:23 147:18
09
1:6 145:5 148:8

1

1st
110:2
1:08
144:4
10th
74:7,9
10:00
136:20
10:17
1:20
11
94:16,19
11th
93:23 99:6,10
11/25/64
7:12
11:30
44:4
12
138:19
12:00
29:24 30:1 86:8
135:16
120
2:3
122
3:17 88:7,11,12,13
88:22 99:3 131:7
13
93:20 133:17
130
3:6
139
3:7
142
3:8
19th
147:12
1982
7:18
1994
85:10
1997
10:15 11:6,21 12:9
12:12
1999
28:5,9

2

2nd
42:7
2:00
29:24 30:1 86:8
20
137:11
200
2:8 148:1,6
2000
89:14
2003
7:8
2005
19:7
2007
94:1 99:6,8,10,18
134:1,13
2008
5:22 9:13,21 19:5
22:10,20 23:12
25:2 26:17,20 27:2
27:21 32:24 34:17
39:5,13 40:5 41:12
42:7 44:5 59:3
62:1,4 65:12 69:5
70:20 81:19 83:17
93:4 99:11 105:1,1
105:9 107:12,15
108:11,19 117:21
126:11 133:14
2009
22:10,20
2011
9:15 99:6
2012
1:20 145:14,21 146:7
147:12 148:4,9
211
1:18 2:8 146:8 148:6
22
148:4
222
2:16
24000
7:4
25
137:11
263-0052
148:3
263-7494
148:3
2700
2:21
28
148:9
28th
1:19 145:13 146:6
2900
148:1

3

3rd
5:22 34:17 41:12
43:9 44:5 53:19
55:2 81:19 99:11
300
2:16
3100
2:3
312
2:4,13,17,22 148:3,3
33
2:21
372-0770
2:22

4

4th
43:10 53:15,23 55:6
57:2,8,14,17
4:00
58:15
41
43:17
45
64:21

5

5
3:4 101:14 134:24
135:9
5th

57:4,14,17
5:00
58:16,16
5340
1:6 145:5 148:8

6

6
87:10 90:2,10 131:23 132:3,4 136:16,17
6s
90:6
6th
57:4,14,17
6:00
58:16
60187
2:9 148:7
60601
2:16
60601-1014
148:2
60602
2:4
60603
2:21
60661
2:12
617
2:12
622-6755
148:2
630
2:9
653-9316
2:9

7

7
91:12 96:1 100:10
7th
57:10 58:10,18,19 59:2 60:2 61:10 62:1,4,16 66:19 67:11 70:20 71:2 71:17 72:12,15,20 123:11
7:00
58:24 59:2 61:10 135:15
704-3000
2:17
704-4400
2:13

8

8
96:2 119:6
8th
67:17 69:5 70:15 72:15,23 73:23 74:3,14 76:7 83:17 123:5,6,7,16
800
50:15 148:2
88
3:17
899-9090
2:4

9

9
138:6
90
38:16
94
38:16,17
97
3:5 10:21,22 11:11
12:4 19:9
99
89:14