# EX. 7

Gina Hubbs Deposition
dated, April 16, 2012

GINA HUBBS
April 16, 2012

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   MURRAY SCHEINMAN, Plenary    )
     Guardian of the Estate      )
 4   and Person of JEFFREY J.    )
     SCHEINMAN, a disabled       )
 5   person,                     )
                                 )
 6                Plaintiff,     )
     vs.                          )  Case No. 09-CV-5340
 7                               )
     MARTIN'S BULK MILK SERVICE, )
 8   INC.; SAMUEL G. FRANKE; CSX )
     INTERMODAL, INC.;           )
 9   INTERNATIONAL PAPER COMPANY;)
     UNIVERSAL AM-CAN LTD.,      )
10   successor to Overnite       )
     Express, Inc.; OX, L.L.C.;  )
11   BMW OF NORTH AMERICA,       )
     L.L.C., a corporation;      )
12   BAYERISCHE MOTOREN          )
     WERKEAKTIENGESELLSCHAFT, a  )
13   corporation; BMW AG, a      )
     corporation; and KARL KNAUZ )
14   MOTORS, INC., a corporation,)
                                 )
15                Defendants.    )

16              DEPOSITION OF GINA HUBBS

17   Taken by the Plaintiff on the 16th day of April, 2012, at
     26600 Schoenherr Road, Warren, Michigan  48089
18
     APPEARANCES:
19
     For the Plaintiff:    RICHARD F. BURKE, JR., ESQ.
20                         Clifford Law Offices, PC
                           120 North La Salle Street
21                         31st Floor
                           Chicago, Illinois  60602
22                         Telephone: (312) 899-9090

23   For the Defendant     CARLTON D. FISHER, ESQ.
     International         Hinshaw & Culbertson, LLP
24   Paper Company,        222 North La Salle Street
     Universal Am-Can,     Suite 300
25   LTD., and Ox,         Chicago, Illinois  60601
     L.L.C.:               Telephone: (312) 704-3450
```

**Page 2**

```
 1 APPEARANCES (Continued):
 2
   For the Defendants     MR. MATTHEW R. SCHRECK, ESQ.
 3 Samuel G. Franke       Mulherin, Rehfeldt & Varchetto
   and Martin's Bulk      211 South Wheaton Avenue, Suite 200
 4 Milk Service:          Wheaton, Illinois  60187
                          Telephone: (630) 517-5082
 5
   For the Defendant      MR. ROBERT J. GOLDEN, ESQ.
 6 Martin's Bulk Milk     Dowd & Dowd
   Service                617 West Fulton Street
 7 (Via Telephone):       Chicago, Illinois  60661
                          Telephone: (312) 762-9518
 8
   For the Defendant      TIMOTHY R. COUTURE, ESQ.
 9 BMW, Bayerische,       Johnson & Bell, Ltd.
   And Karl Knaus         33 West Monroe Street
10 Motors                 Suite 2700
   (Via Telephone):       Chicago, Illinois  60603
11                        Telephone: (312) 984-6651
12
13
14
15
16
17
18
19
20
21
22
23
24 Reported by:   Kathleen M. Smith (CSR-4232)
25                Certified Shorthand Reporter
```

**Page 3**

```
 1        T A B L E   O F   C O N T E N T S
 2
 3
 4
 5 WITNESS                                         PAGE
 6
 7 GINA HUBBS
 8
 9      Direct Examination by Mr. Burke          4
10      Cross-Examination by Mr. Schreck         103
11      Cross-Examination by Mr. Couture         119
12      Cross-Examination by Mr. Fisher          120
13      Redirect Examination by Mr. Burke        123
14
15
16
17              E X H I B I T S
18
19
20
21                      Marked       Admitted
22
23 Exhibit No. 104          30
24
25
```

**Page 4**

```
 1                   Warren, Michigan
 2                   Monday, April 16, 2012
 3                   At or about 11:20 a.m.
 4              ---   ---   ---
 5
 6              MR. BURKE:  Let the record reflect this is
 7      the discovery deposition of Ms. Gina Hubbs, taken
 8      pursuant to notice and in accord with the applicable
 9      rules of the United States District Court for the
10      Northern District of Illinois and the 7th Circuit.
11              G I N A   H U B B S,
12 having been duly sworn at or about 11:20 a.m., called by
13 the Plaintiff, testified as follows:
14              DIRECT EXAMINATION
15 BY MR. BURKE:
16 Q    Good morning, Ms. Hubbs.  Once again, my name is
17      Rich Burke.  I'm going to ask you some questions
18      about some of your apparent work --
19              MR. COUTURE:  I can't hear you at all.
20              MR. BURKE:  -- at, I believe, Universal
21      Am-Can, and as I do so, if you want to look at
22      anything, tell me.
23              MR. FISHER:  Are you able to hear us?
24              MR. COUTURE:  I can't hear you at all.
25              MR. BURKE:  How about now?
```

**Page 5**

```
 1              MR. COUTURE:  A little better.  Yeah, I
 2      could, at least heard that.
 3              MR. FISHER:  Hang on, Tim.  I'm going to
 4      see if there's a volume control here.  But I can
 5      tell you, the technology here is not exactly the
 6      most recent.  Here we go.  Volume.  How about now?
 7      Can you hear us now?
 8              MR. COUTURE:  Much better.
 9 BY MR. BURKE:
10 Q    As I was saying, if you want any questions
11      repeated, just tell me.  If you want to look at any
12      documents, tell me.  If you could verbalize your
13      yes and no answers, please do so.  Even though I
14      can see you nodding your head, the court reporter's
15      got to take down a yes or no if that happens to be
16      your answer, okay?
17 A    Yes.
18 Q    Would you please state your name and spell your
19      first and last name, please, for the record.
20 A    Gina, G-i-n-a, Hubbs, H-u-b-b-s.
21 Q    Okay.  And by whom are you employed?
22 A    Currently?
23 Q    Currently.
24 A    Universal Truckloading Services.
25 Q    Okay.  And what is their business address?
```

**6**

1 A   12755 East Nine Mile, and that's Warren, Michigan.
2 Q   Okay. And how is Universal Truckload Services
3     related to Universal Am-Can Limited?
4 A   They're the parent company.
5 Q   Which is the parent of which?
6 A   Universal Truckload.
7 Q   Is the parent of?
8 A   Universal Am-Can.
9 Q   Okay. And how long have you worked for any
10    Universal business?
11 A   Since March of 2004.
12 Q   And what's your current job title or position?
13 A   My current position is Vice President, Government
14    and Emergency Services.
15 Q   Government and emergency or --
16 A   Government and Emergency Services.
17 Q   And do you work at the address you gave me?
18 A   I do.
19 Q   What's your educational background? Did you go to
20    college?
21 A   Yes, I did.
22 Q   Okay. And where did you go and when did you
23    graduate?
24 A   I went to Michigan State University for my
25    undergraduate, and I graduated in 1994.

**7**

1 Q   And what was your degree in?
2 A   International relations and criminal justice.
3 Q   Okay. And did --
4 A   And I have worked on my master's at Wayne State, and
5     also Drexel in Philadelphia.
6 Q   And in what field?
7 A   General business administration.
8 Q   Okay. And at both schools?
9 A   At Drexel and at --
10 Q   At Wayne State?
11 A   Wayne State, correct.
12 Q   And how far into that master's program are you?
13 A   I believe I have eight or nine classes completed.
14 Q   Okay. And when did you last take a class?
15 A   It has been probably four years ago, roughly.
16 Q   Okay. I take it you're not taking classes now,
17    obviously?
18 A   No, sir.
19 Q   Okay. Do you have any other degrees other than
20    your undergrad that you mentioned?
21 A   I have a certification from the University of
22    Brussels.
23 Q   In what field?
24 A   It's just a class certification in European
25    security.

**8**

1 Q   Okay. And when did you get that?
2 A   1993, I believe.
3 Q   Any other certifications or --
4 A   No.
5 Q   Okay. Do you hold any CDL's or any type of truck
6     licenses?
7 A   No.
8 Q   I take it you've never worked as a truck driver?
9 A   No.
10 Q   Okay. Have you, I think you said you started at
11    Universal in 2004?
12 A   Correct.
13 Q   Okay. Generally, where did, did you work that --
14    strike that.
15        Did you work for any trucking companies
16    before that?
17 A   I did.
18 Q   And who was that?
19 A   Conway Transportation Services.
20 Q   Okay. And during what time period did you work for
21    them?
22 A   I worked for Conway from 1995 until 2004. And
23    in-between for about eight months I left there and
24    went to Preston Trucking in Philadelphia. There was
25    a brief departure and then a return to Conway.

**9**

1 Q   Okay. And about when were you at Preston,
2     approximately?
3 A   I don't, I don't remember. It was 1990. It was
4     before 2000. I would say maybe 1998 or somewhere
5     around there.
6 Q   Okay. And what did you do at Preston?
7 A   I was a sales rep.
8 Q   And what was -- are they a trucking business?
9 A   They used to be. They're out of business now.
10 Q   Okay. And as a sales rep, what did you do?
11 A   Just call on customers, make sales calls.
12 Q   And your customers were what type of businesses?
13 A   A variety of different businesses. I worked in
14    Philadelphia, so anything that Preston Trucking
15    handled in a certain geographical area are customers
16    that I called on.
17 Q   And then how about on Conway, what was your last
18    position there?
19 A   Terminal manager.
20 Q   Okay. And generally, what did you do for them?
21 A   I ran a facility for them.
22 Q   Okay. And when you say ran it, what did that
23    encompass?
24 A   I was the manager of the facility so I had drivers,
25    operational managers, clerical staff; I was in

**10**

1    charge of everything.
2 Q    Okay.  At Universal, when you -- can you walk me
3      through your basic jobs and, between 2004 and the
4      present time at Universal, please.
5 A    Sure.  When I moved to, or when I started with
6      Universal Am-Can, I was manager at their Dearborn
7      facility.  They had a company operation there and I
8      ran the company operation from 2004 through, I
9      believe it was 2000 -- let me think here -- 2008,
10     roughly.  I'm -- it's either 2007 or 8, and I was
11     promoted to vice president of Universal Am-Can, and
12     I was vice president of Universal Am-Can until 2010,
13     around August of 2010, and then I became vice
14     president of government and emergency services for
15     the truckload, parent company.  And in that time,
16     Universal, I would say somewhere around 2000,
17     beginning, either it was 2009 or '10 we split the
18     responsibilities between operations and sales for
19     vice president, so there was a VP of operations that
20     came in at Universal Am-Can and I assumed the sales
21     responsibility.
22 Q    Okay.  So your position, when you became a vice
23     president, that was vice president of sales?
24 A    It was, originally it was just VP of Universal
25     Am-Can, so it fully encompassed sales operations.

**11**

1 Q    Okay.  And so you're saying then you split between
2      operations and sales?
3 A    Correct.
4 Q    Okay.  And that was about when?
5 A    That was, oh, about 2010, maybe, the beginning of
6      2010.  It was after an acquisition and we split the
7      responsibilities, so I would say it was roughly
8      2010.  It could have been 2009.
9 Q    And between 2004 and about 2008 when you said you
10     worked at company --
11 A    Office, yes.
12 Q    -- or what was it?
13 A    It was a company office.
14 Q    A company office?
15 A    In Dearborn.
16 Q    What did you do there?
17 A    We had a book of business and we handled the
18     customer, you know, operations of picking up loads,
19     delivering loads.  We had a fleet of drivers there
20     and I was in charge of the overall operations.
21 Q    Okay.  And how would you describe the business of
22     Universal Am-Can?  I mean, what's, what's the
23     nature of their business, what do they do?
24         MR. FISHER:  Excuse me, Rich.  Excuse me.
25     Now?

**12**

1 BY MR. BURKE:
2 Q    Well, we can, why don't we say in 2008, what was
3      the business of Universal Am-Can?
4 A    When I was a terminal manager, ran the company
5      office, or when I was --
6 Q    Well, let's be, how about in June and July of 2008,
7      what was the business of Universal Am-Can?
8 A    Well, they were a trucking and logistics
9      transportation company.
10 Q    Okay.  And as that type, as a trucking and
11     logistics company, basically what did they do in
12     June and July of 2008?
13 A    Can you clarify that?  I mean, that's pretty broad.
14 Q    Sure.  I mean, did they, did they have, did they --
15     were they a motor carrier?
16 A    They're -- well, Universal Am-Can, I believe, has
17     three classifications.
18 Q    Okay.
19 A    So they can act as a motor carrier.  They can act as
20     a, what we would consider a common carrier.  They
21     can act as a broker.  They can act as a, I think the
22     actual term is common cartage and broker.
23 Q    Okay.
24 A    There's different sub-classifications.
25 Q    Okay.  And was that the case in 2008?

**13**

1 A    That's always been the case.
2 Q    Okay.  And did they, did -- and by the way, what do
3      you, what's your understanding of the difference
4      between a common carrier and a broker?
5 A    Well, a common carrier status, the way that the
6      government interprets it is that they actually
7      handle, so if someone, if take a shipment and I'm
8      acting as a common carrier, then I'm actually moving
9      that freight on my equipment.
10 Q    Okay.
11 A    Versus a broker where I hand it off to somebody
12     else.
13 Q    Okay.  And in 2008, did Universal Am-Can have a
14     fleet of trucks that they would haul goods in and
15     transport goods in?
16 A    We had -- yes, owner/operators that were through our
17     door signs that we considered were Universal Am-Can
18     contracted equipment.  They had our door signs, they
19     had our MC, they ran under our specific license as
20     well as insurance.
21 Q    Okay.  And about how many of those did you have
22     back in 2008?
23 A    Well, we went through an acquisition so those
24     numbers changed drastically.
25 Q    Okay.

5  (Pages 14-17)

GINA HUBBS
April 16, 2012

**14**

1 A   So I would say roughly somewhere around 1200.
2 Q   1200 drivers that essentially operated under the
3     Universal Am-Can's operating authority?
4 A   Under our, under our carrier authority, yes.
5 Q   Okay.  And you, just a moment ago, Gina, mentioned
6     an acquisition.  What acquisition were you
7     referring to?
8 A   The Overnight acquisition.
9 Q   Okay.  And that occurred, as I understand it,
10    effective June 13th of 2008; is that right?
11 A  I believe so.  It was in June.
12 Q  Okay.  And that number you gave me for 1200
13    drivers, was that before or after the acquisition
14    of --
15 A  I don't remember.
16 Q  -- of Overnight?
17 A  It changes.  I mean, every day the numbers change.
18    We can pull numbers this morning and they've changed
19    from yesterday because driver turnover is high in
20    the truckload industry.
21 Q  Okay.  The brokerage -- strike that.
22         Did, in June and July of 2008, did
23    Universal Am-Can also have authority to operate as
24    a broker?
25 A  Yes.

**15**

1 Q   Okay.  And what was, basically what was that, the
2     nature of that business?
3 A   Brokerage?
4 Q   Yes.
5 A   It's where we hand the load or the shipment off to
6     another carrier because we don't handle it on our
7     own equipment.
8 Q   Okay.  In that instance you, you would be handing
9     it off to another driver that would be driving
10    under their own DOT number or MC number?
11 A  I don't know about the driver, but it's handed off
12    to another company.
13 Q  Okay.  How is -- we drew a distinction between the
14    nature of the business of Universal Am-Can in 2008
15    and today; is their business any different today?
16 A  Not to my knowledge.  I don't deal, you know, in
17    their business, so to speak.  I am not heavily
18    involved in their day-to-day business, but I believe
19    so.
20 Q  Okay.  You believe it's substantially the same?
21 A  Yeah.  They still operate as a carrier as well as a
22    broker.
23 Q  Okay.  Is Universal Am-Can a publicly traded
24    corporation?
25 A  Universal Truckload is a publicly traded

**16**

1     corporation.  As a division --
2 Q   I'm sorry.  Did, go ahead, finish your --
3 A   As a division, they're, they fall under the parent
4     company.
5 Q   Okay.  Universal Am-Can Limited is a wholly-owned
6     division of Universal Truckload; is that correct?
7 A   I would assume.
8 Q   Okay.
9 A   I mean, they operate independently as far as they,
10    their motor carrier registration is recognized
11    specifically as Universal Am-Can.
12 Q   Okay.
13 A   And they have their own executive staff.
14 Q   And back in 2008, where was the headquarters of
15    Universal Am-Can?
16 A   It was in Warren at the same address.
17 Q   Is it Nine Mile Road?
18 A   Correct.
19 Q   Okay.  And is that also where their headquarters is
20    today?
21 A   Yes.
22 Q   Okay.  Other than the Warren location, what other
23    business locations does Universal Am-Can have
24    today?
25 A   Today?  Are we talking company facilities?

**17**

1 Q   We can start with that, yeah.
2 A   Company operations, they have Dearborn, Michigan;
3     they have Murrysville, Pennsylvania; they have
4     Trenton, New Jersey; Massena, New York; Conyers,
5     Georgia; Jacksonville, Florida; Birmingham, Alabama;
6     and it's Gary or Hammond, I'm not sure what the city
7     is, but that area in Indiana.  They have
8     Minneapolis; Oklahoma City; two offices in Dallas;
9     and an office in the L.A. area, I'm not sure exactly
10    where.
11 Q   Okay.
12 A   I think that's, I'm pretty sure that's all of them.
13 Q   Okay.  And then other -- and when you refer to a
14    company operation, what, what exists at those
15    various locations?
16 A   Those are actual, the operations, the managers are
17    company employees.  The drivers are still
18    owner/operators, but the people that actually do the
19    handling of the accounts, the picking up of the
20    phones, they're company employees, versus the
21    agency.
22 Q   Okay.  And then the agencies consist of what type
23    of facilities?
24 A   They could be anywhere from an actual office to
25    someone's house.  I mean, there is a wide variety.

6 (Pages 18-21)

GINA HUBBS
April 16, 2012

**18**

1 Q Okay. And the, approximately how many businesses
2 are, does Universal Am-Can have that are, that fall
3 within the agency category?
4     MR. FISHER: Objection to form. You can
5 go ahead and answer it.
6     THE WITNESS: I don't know how many. It
7 would -- 100, I would say. They all have to sign
8 agency agreements. I don't know how many.
9 BY MR. BURKE:
10 Q Okay. And the persons or entities that sign those
11 agency agreements, are those truck drivers or what
12 type of businesses?
13 A No. It would be -- no, they're not.
14 Q Okay. What are they?
15 A They're similar to a company operation, but they're
16 agency operations. They, you know, get paid at
17 commission for the loads that they handle. They
18 usually have a book of business, they get paid a
19 commission for those loads that they handle the
20 operations of.
21 Q Okay. Are they carriers?
22 A Well, they're Universal, it's not -- what do you
23 mean? Can you clarify that?
24 Q Sure. Are they a motor carrier? I mean, are they
25 a company that has an operating --

**19**

1 A No.
2 Q -- authority as a carrier?
3 A No.
4 Q Okay. What do they do for Universal?
5 A Well, they generally come with their book of
6 business. They have a customer book of business,
7 and they come to Universal Am-Can and they use
8 Universal, you know, they operate as Universal
9 Am-Can under, you know, any of the privileges that
10 Universal has. It's the same, except for they're
11 not paid a salary --
12 Q Okay.
13 A -- to an employee, they don't have benefits, those
14 types of things.
15 Q Okay. And the book of business that you referred
16 to consists of what type of business?
17 A It could be anything from auto parts to widgets. I
18 mean, there's --
19 Q And it's goods or products to be hauled or
20 transported?
21 A Yes.
22 Q Okay. And do they operate under the Universal
23 name?
24 A Yes.
25 Q Okay. And in 2008 -- or strike that.

**20**

1     Are you familiar with a company called
2 Martin's Bulk Milk Service?
3 A Yes.
4 Q Okay. Were you familiar with them prior to this
5 lawsuit?
6 A No.
7 Q Okay. In 2008, was Martin's Bulk Milk Service one
8 of these agency companies that you're referring to?
9 A No.
10 Q Do you know if in 2008 Martin's -- strike that.
11     Do you know if, in 2008, Universal Am-Can
12 had any business relationship with Martin's Bulk
13 Milk Service?
14 A Martin's Bulk Milk Service had signed a brokerage
15 agreement with Universal.
16 Q Okay. And do you, do you recall if there was more
17 than one of those agreements?
18 A I believe that there are, I mean, just from this
19 lawsuit. But working knowledge in 2008? No.
20 Q And I'm talking about as you sit here today.
21 A Right, right. Yes, I've read them.
22 Q Okay. And what is the, the latest or last-dated
23 brokerage agreement between Universal Am-Can and
24 Martin's?
25 A I don't know. I don't know what the date is.

**21**

1 Q Okay. Do you have 72 handy Carl, or --
2     MR. FISHER: I do. I've actually got a
3 collection of all the agreements, so Exhibit 72 is
4 the one?
5     MR. BURKE: Yeah, is that in there?
6     MR. FISHER: It should be. I got to find
7 the exhibit number.
8     MR. BURKE: That is page -- or actually,
9 you know, that's a non-Bates stamped --
10     MR. FISHER: I've got it.
11     MR. BURKE: You have 72?
12     MR. FISHER: That's the 2002 one?
13     MR. BURKE: September 2002, correct.
14     MR. FISHER: Yep. That's the one.
15 BY MR. BURKE:
16 Q Okay. Ms. Hubbs, take a look at what is marked as
17 Exhibit 72, and is that a broker contract between
18 -- or strike that.
19     That's actually between Overnight
20 Logistics and Martin's; is that correct?
21 A Yes.
22     MR. BURKE: Carl, have we marked your
23 packet or no?
24     MR. FISHER: This packet?
25     MR. BURKE: Yeah.

GINA HUBBS
April 16, 2012

---

**22**

1         MR. FISHER:  No.
2         MR. BURKE:  Okay.  If you don't mind, let
3    me just flip through it and I'll --
4         MR. FISHER:  Sure.  I don't think this has
5    got any marks.
6         MR. BURKE:  Okay.  Yeah.  That way I can
7    direct her to --
8         MR. FISHER:  Yeah.  Here it is.
9         MR. BURKE:  I think actually --
10        MR. FISHER:  I've got all six of them in
11   there, so just tell me which one and we'll --
12        MR. SCHRECK:  When you're referring to
13   six, you're talking about ones that were produced by
14   Martin's?
15        MR. FISHER:  I put together every contract
16   that existed that has been disclosed in discovery by
17   whoever, between Overnight and Martin's, and between
18   UACL and Martin's.
19        MR. SCHRECK:  Okay.
20        MR. FISHER:  That's in that collection
21   right there.
22        MR. SCHRECK:  Okay.  But who they came
23   from, it's kind of a mix and match?
24        MR. FISHER:  You have to look at the
25   bottom right-hand.  If it doesn't have a Bates

---

**23**

1    number, it's from me.
2         MR. SCHRECK:  Okay.  I know there were
3    some that had little skew numbers on it.
4         MR. FISHER:  Yeah, that collection that
5    Rich is looking at happens to be in chronological
6    order.
7         MR. SCHRECK:  Okay.
8         MR. BURKE:  Here, let me return this
9    packet to you.
10 BY MR. BURKE:
11 Q    And that has a variety of contracts, not just
12   between Universal and Martin's, but between
13   Overnight and Martin's.
14        Let me ask you -- and here, before I do
15   that, have you ever worked for Overnight Logistics?
16 A    No.
17 Q    Have you ever worked for Overnight Express, Inc.?
18 A    No.
19 Q    Are you familiar with them?
20 A    Yes.
21 Q    Okay.  You were a moment ago talking about some
22   brokerage agreements between Universal Am-Can and
23   Martin's, correct?
24 A    Yes.
25 Q    Okay.  And in the materials in front of you, could

---

**24**

1    you tell me how many of the agreements there are
2    between Universal Am-Can and Martin's?
3 A    How many total?
4 Q    Well, yeah.  Here, I mean, go to the first one.
5 A    Okay.
6 Q    And they're in numerical order, sequential order by
7    year.
8 A    Okay.
9 Q    What's --
10 A    2004.
11 Q    The 2004, and that's January 14th of 2004, correct?
12 A    Yes.
13 Q    And that's Exhibit 63 -- or I'm sorry -- 73 in the
14   lower right-hand corner, correct?
15 A    Correct.
16 Q    Okay.  Okay.  And then what is the next dated
17   brokerage -- or strike that.
18        That was, that copy, the copy that you
19   have, is that signed by anybody from Universal?
20 A    No.
21 Q    Okay.  Have you ever seen a copy signed by
22   Universal?
23        MR. FISHER:  Let me object to form.  Do
24   you mean a copy of this document or a copy of any
25   brokerage agreement?

---

**25**

1 BY MR. BURKE:
2 Q    Have you ever seen a copy of Exhibit 73, the
3    January 14th, 2004 brokerage agreement signed by
4    anybody on behalf of Universal?
5 A    No.
6 Q    Do you know if that was ever signed?
7 A    The Martin's one?
8 Q    The January '04 agreement, Exhibit 73.
9 A    I don't, I don't know.  I don't believe so.
10 Q    Okay.  And what makes you think it was never
11   signed?
12 A    We don't usually sign the actual copies unless they,
13   you know, request a copy, or the carrier has made a
14   change to the actual contract, and then we will have
15   our legal staff look at the changes, and if we agree
16   to them, then we sign them.
17 Q    So you never, or Universal Am-Can never sent back a
18   signed copy to Martin's of the January '04
19   agreement?
20 A    I don't think so.
21 Q    Okay.  And what's the next dated brokerage
22   agreement, if you would?
23 A    July 21st of 2005.  Oh, wait.  That's an Overnight.
24 Q    Okay.  Yeah.  Go to just the Am-Can.
25 A    November 7th, 2007.

GINA HUBBS
April 16, 2012

**26**

1 Q   And that exhibit number is, is it 14 or 15?

2      MR. FISHER:  15.  Go ahead, you can say.

3      THE WITNESS:  15.

4 BY MR. BURKE:

5 Q   Okay.  And that's dated November 7th, 2007, between

6     Universal Am-Can and Martin's Bulk Milk, correct?

7 A   Correct.

8 Q   Okay.  And that, am I correct that that contract is

9     also unsigned by Universal?

10 A   That's correct.

11 Q   Okay.  And have you ever seen a signed copy -- or

12     strike that.

13           Have you ever seen a copy signed by

14     Universal of that agreement?

15 A   No.

16 Q   Okay.  And then what's the next agreement,

17     brokerage agreement between Universal Am-Can and

18     Martin's?

19 A   June 12th, 2008.  Exhibit --

20 Q   And that is Exhibit 19 -- or?

21 A   Is it 75?

22 Q   Or 75, yes.  And that is dated June 12th of '08?

23 A   Correct.

24 Q   Okay.  And that also was unsigned by Universal,

25     correct?

**27**

1 A   Correct.

2 Q   You know, I'm done with those at the moment.  I

3     digressed for a moment since you happened to

4     mention that topic and I just wanted to clarify

5     that just what we went through.

6           Back in June, in -- well, let me say back

7     in July of 2008, did Universal Am-Can own its own

8     trailers that it would use for hauling goods?

9 A   I don't believe they, I believe it's held by another

10     company, so it's a sister company but it's under the

11     UTSI umbrella that had trailers.

12 Q   Okay.  And what was the sister company that owned

13     the trailers?

14 A   I don't know.  It's UT Leasing -- I don't know.

15 Q   Okay.  And what does UT stand for?

16 A   I would say, I don't know what -- Universal

17     Truckload, I would think.

18 Q   Okay.  And do you know about how many trailers UT

19     Leasing owned?

20 A   I can speculate hundreds.

21 Q   Okay.  Well, I don't want you to speculate, but

22     your best estimate would be --

23 A   It would be --

24 Q   -- in the hundreds?

25 A   Yes.

**28**

1 Q   Okay.

2 A   Yes.

3 Q   Okay.  So, am I correct that in 2008, July of 2008,

4     Universal Am-Can both operated as a carrier where

5     they hauled their own goods and also operated as a

6     broker where they passed on goods to another

7     carrier to transport?

8 A   Yes.

9 Q   You know, with respect to -- strike that.

10           Have you given prior depositions?

11 A   No.

12 Q   Have you testified in court at all, related to a

13     trucking matter?

14 A   No.

15 Q   Have you testified, related, in court relative to

16     any Universal business?

17 A   No.

18 Q   Okay.  Now, you, and your name appears as the

19     verification signature for some answers to

20     interrogatories and discovery requests in this

21     case; is that correct?

22 A   Yes.  I don't know.  What is that?  I don't know.

23     I'm -- can you clarify?  I don't --

24 Q   Sure.  Did you answer any questions in what we call

25     discovery requests on behalf of Universal in this

**29**

1     case?

2 A   I may have.

3 Q   Okay.

4 A   I just --

5 Q   And, for example, I can show you -- Carl, are we on

6     about 102 or 103?

7      MR. FISHER:  We are on 104.

8      MR. BURKE:  104, okay.

9      MR. FISHER:  Rich, I don't know.  I think

10     when she was still with Universal Am-Can she was the

11     signatory --

12      THE WITNESS:  Yes.

13      MR. FISHER:  -- but since that time, Doug

14     Mote has been the, has become the signatory.

15      MR. BURKE:  Okay.

16      MR. FISHER:  So I think that may have been

17     the, may have been the reason for some of the

18     confusion.

19      MR. BURKE:  Okay.

20      MR. SCHRECK:  What have you got there?

21     There's several sets, I'm just trying to make sure I

22     got the right set.

23      MR. BURKE:  Yeah, those are the first

24     supplemental ones.

25      MR. SCHRECK:  Okay.  This one right here.

**30**

1            (At or about 12:02 p.m., Exhibit No. 104
2            marked for identification)
3 BY MR. BURKE:
4 Q   These are entitled Universal Am-Can Limited's
5     Answers to Plaintiff's First Supplemental
6     Interrogatories that appear to have been provided
7     to us on or about January 18th of 2010.  So let me
8     just tender that to you, take a look at it.  I've
9     tabbed where your name is.
10      Tell me if that is, in fact, your
11     signature after you take a minute to look at it.
12 A   Yes.
13 Q   And did you participate in answering those
14     questions?
15 A   Yes.
16 Q   Okay.  And in the course of doing so, did you
17     search for or review any documents?
18 A   No.
19 Q   Okay.  Now, in those various answers there's
20     references to different documents that are, that
21     have Bates stamped numbers; are you saying that
22     you --
23 A   What are Bates stamped numbers?
24 Q   Bates stamped are where it says UACL numbers or it
25     might say IP numbers.

**31**

1 A   Mm-hmm.  Oh, okay.  Yes.
2 Q   Like it's just a method of numbering documents.
3 A   Mm-hmm.
4 Q   Okay.  And in 104, there are documents that are
5     referred to by different Bates numbers.  Did you
6     actually review any of those documents or not?
7 A   Some of them I've seen, others I have not.
8 Q   Why don't you tell me the ones that you've seen.
9 A   Well, I guess it would, I don't, when it says
10     here -- how do you know which one it is?  I guess
11     that's my question is which documents --
12 Q   So you don't know what documents the numbers are
13     referring to?
14 A   Not specifically, no.  It says "see previous."  It
15     doesn't indicate which ones, which is which.
16 Q   Okay.  Did you make a search of any documents for
17     Mr. Fisher or any other lawyer to find documents to
18     accumulate them in order to answer any
19     interrogatories?
20 A   Can you re-ask that?
21 Q   Sure.  Those interrogatories ask certain questions.
22 A   Mm-hmm.
23 Q   Did you engage in any search of Universal Am-Can
24     documents in order to find documents that were
25     responsive to those questions?

**32**

1 A   I did not pull any documents.
2 Q   Okay.  Do you know, did anybody else do so at
3     Universal Am-Can in order to produce documents that
4     were responsive to those questions?
5 A   I don't know.  I don't know.
6 Q   Is there anyone at Universal Am-Can that has that
7     job or responsibility?
8 A   To pull documents?
9 Q   For a litigation like this.
10 A   I think there's probably several people that could.
11     Mike Peterson, Doug Mote.
12 Q   Anyone else or --
13 A   Well, it depends.  On the documents, it depends,
14     specifically.  I mean, there could be a variety of
15     people.
16 Q   Okay.  What's Mike Peterson's job today?
17 A   He just changed jobs, I'm really, within the last
18     two weeks.  I'm not sure what his correct title is.
19 Q   What was his prior job?
20 A   Safety.
21 Q   And I thought Doug Mote was head of safety?
22 A   He is.
23 Q   Okay.  He is --
24 A   For Universal Am-Can.
25 Q   Okay.  And how long has he been head of safety?

**33**

1 A   I think 2010, maybe, or 2009.
2 Q   Do you know who was head of safety in July of 2008?
3          MR. FISHER:  For what entity?
4          MR. BURKE:  Universal Am-Can.
5          THE WITNESS:  I don't think they had a
6     specific safety person.  I don't remember.
7 BY MR. BURKE:
8 Q   Then Mike Peterson, you said his last job was
9     safety?
10 A   For Universal Truckload.
11 Q   Okay.
12 A   It was safety and something else.
13 Q   Okay.  Give me back that Exhibit, Ms. Hubbs.  Thank
14     you.
15      By the way, is this actually your
16     signature?
17 A   It is.  It is.
18 Q   And that's on one of the pages of Exhibit 104.
19      Have you discussed this lawsuit with other
20     people at Universal Am-Can?
21 A   No.  No.
22 Q   Okay.  How about other people at Universal
23     Truckload?
24 A   No.
25 Q   What's Mark Limback's job today?

**34**

1  A   He's the president.

2  Q   Of what?

3  A   Universal Am-Can.

4  Q   Okay.  And was he the president back in June and

5      July of 2008?

6  A   Yes.

7          MR. SCHRECK:  I apologize.  Did you say

8      president for Universal Am-Can --

9          THE WITNESS:  Yes.

10         MR. SCHRECK:  -- or Truckload?

11         THE WITNESS:  Universal Am-Can.

12         MR. SCHRECK:  Okay.

13 BY MR. BURKE:

14 Q   And have you talked to him about this case at all?

15         MR. FISHER:  Outside the presence of

16     counsel?

17         MR. BURKE:  No.  Just have you talked to

18     him at all?

19         THE WITNESS:  With?  On a sidebar or with

20     our attorneys?

21 BY MR. BURKE:

22 Q   Who do you mean by a sidebar?  I thought you told

23     me you'd never been in court.

24 A   I'm sorry.

25 Q   Here, I don't want to know --

**35**

1  A   Like are we talking at the water cooler about it?

2      No.

3  Q   Here, have you talked -- yeah, number one, have you

4      talked at all to him, whether lawyers were present

5      or not?

6  A   Yes, with lawyers present we have.

7  Q   Okay.  And I don't want to hear what any, any

8      lawyer's said, but --

9          MR. FISHER:  He doesn't mean that, he

10     would like to know but he won't ask.

11         MR. SCHRECK:  If you want to share, go

12     ahead.

13 BY MR. BURKE:

14 Q   I'm not asking you about what your lawyers said.

15         And then my next question, more

16     specifically, is have you talked to Mr. Limbeck

17     about this case or your testimony outside the

18     presence of --

19 A   No.

20 Q   -- Mr. Fisher or any other lawyers?

21 A   No.

22 Q   Okay.  Were you involved in the, in the acquisition

23     of Overnight Express by Universal?

24 A   I was involved in once the acquisition was

25     completed.

**36**

1  Q   And what did that involvement, in general terms,

2      consist of?

3  A   When we acquire a company we have to integrate their

4      business into ours, and I was the VP so I had people

5      that were going into their offices to change over

6      paper work and instruct them on how to handle the

7      operations under our business model.

8  Q   Okay.  Do you know how the acquisition came about,

9      in general terms?

10 A   No.  I don't know the specifics of it.

11 Q   Okay.  Were you involved in drafting any part of

12     the asset purchase agreement or acquisition

13     documents?

14 A   No.

15 Q   Okay.  Did you sign any of those documents?

16 A   Of the acquisition?

17 Q   Yeah.

18 A   I don't know.  I was a signer as far as the company.

19     I was an executive so I don't believe so.

20 Q   Why don't you tell me what your involvement with

21     Overnight Express was once the acquisition became

22     effective.

23 A   Mm-hmm.  Well, we take their operations and their

24     customers and integrate them into our system.  So we

25     make sure that, you know, the customers switch over

**37**

1      to the Universal billing as far as making sure that

2      the billing documents and everything such as that

3      is, is being handled.  All the documents are

4      switched from, you know, the prior company to our

5      company.  And then making sure that the operations

6      within those facilities switch over as well.

7  Q   Do you, with respect to the acquisition of

8      Overnight Express, did you have involvement with

9      any particular person or was there a contact person

10     you had at Overnight Express?

11 A   I did.  There was -- well, we had two different

12     offices that we went to; one was Minneapolis and

13     then also the one in South Holland at the time,

14     which is now in Gary or Hammond.  They've since

15     closed that office and moved it.

16 Q   Okay.  And who is it that you dealt with at those

17     offices?

18 A   Well, Rob was in Minneapolis, and there was a team

19     of Universal people that went into Minneapolis, and

20     then there was Cara Fitzpatrick that went into the

21     South Holland office, which was a Universal

22     employee.

23 Q   Okay.  Cara Fitzpatrick went into the South Holland

24     office?

25 A   Correct.

GINA HUBBS
April 16, 2012

**38**

1 Q    Of Overnight?

2 A    Overnight Express, yes.

3 Q    And then Rob, what's Rob's last name?

4 A    Elsholtz, and he was the manager, I think, manager,

5      general manager, I don't know what his title is, in

6      Minnesota.  And we had people that actually went

7      into both offices and worked --

8 Q    Okay.

9 A    -- during that transitional time.

10 Q   But Rob Elsholts, are you talking about the junior,

11     the younger --

12 A   Yes.

13 Q   -- the son?

14 A   Yes.  Mm-hmm.

15 Q   Okay.  And he, he was an employee of Overnight

16     Express, correct?

17 A   Correct.

18 Q   Okay.  But you're saying Cara Fitzpatrick was an

19     employee of Universal?

20 A   Yes.

21 Q   Did, when, did Rob Elsholts remain an employee --

22     or strike that.

23         Did Rob Elsholts become an employee of

24     Universal --

25 A   Yes.

**39**

1 Q    -- after the acquisition?

2 A    Yes.

3 Q    Okay.  Did you have any involvement with

4      International Paper after the acquisition?

5 A    No.

6 Q    Are you familiar with the name of that company --

7 A    Yes.

8 Q    -- from this case?

9 A    Yes.  And prior.

10 Q   And prior?

11 A   Mm-hmm.

12 Q   Okay.  And for what reasons were you familiar with

13     International Paper prior to this lawsuit?

14 A   I mean, you've, I've heard the name.  They're a big

15     company.

16 Q   Prior to Universal acquiring Overnight, did

17     Universal do any hauling for International Paper?

18 A   I don't know.  They may have.

19 Q   Prior to the acquisition of Overnight Express, do

20     you know if International -- I'm sorry -- do you

21     know if Universal had any contracts with

22     International Paper?

23 A   I don't believe they did.

24 Q   If Universal had done some hauling for

25     International Paper prior to the acquisition, but

**40**

1      Universal didn't have any contract with

2      International Paper, how would that hauling have

3      come about?

4 A    Through a broker.

5 Q    So a broker that was working with International

6      Paper would have given the load to Universal Am-Can

7      to haul?

8 A    Right.

9 Q    As a carrier?

10 A   Right.

11 Q   Okay.  Can you tell me who was in charge of or

12     spearheaded the acquisition of Universal Am-Can?

13     I'm sorry.

14         Can you tell me who from Universal Am-Can

15     was in charge of or substantially involved in the

16     acquisition of Overnight Express?

17 A   You mean in purchasing them --

18 Q   Correct.

19 A   -- or once it was done?

20 Q   No, no.  In purchasing them, yeah.

21 A   Oh, I don't know.  It's always hush-hush.  My boss

22     was involved in the acquisition but -- are you

23     asking me who went out to try and purchase them?

24 Q   Well, number one, when you say your boss, who do

25     you mean?

**41**

1 A    Mark Limback.

2 Q    Okay.  And that was one of the names I was

3      expecting had some involvement.

4 A    Okay.

5 Q    Yeah.  And what I'm really asking is, you know,

6      who, who was substantially involved in making that

7      acquisition happen and putting together the

8      agreement and negotiating the acquisition?

9 A    I don't know if he was involved in that much of it,

10     but, you know, usually acquisitions are hush-hush so

11     it doesn't fall down to the lower people until much

12     later, so --

13 Q   Okay.

14 A   There's another gentleman who does acquisitions, but

15     I don't know who specifically went out.

16 Q   Okay.  And the other gentleman you're thinking of

17     is whom?

18 A   Ed Brown.  Ed.

19 Q   Ed Brown, okay.  And basically what was his

20     position back in '08?

21 A   I don't know what his title was.

22 Q   What's your understanding of how Mark Limback was

23     involved in the acquisition of Overnight Express?

24 A   Well, he was the president of Universal Am-Can so he

25     was in charge of their integration into the

```
                                        42
1    Universal system.
2  Q    Okay.  Is it your understanding that acquisition
3       became effective June 13th of 2008?
4  A    It is my understanding, yes.
5  Q    Okay.  And as of June 13, 2008, do you, do you know
6       whether or not Overnight Express, Inc. continued to
7       exist as a corporation?
8            MR. FISHER:  Objection.  It calls for a
9       legal conclusion.  You can go ahead and answer it.
10           THE WITNESS:  Oh, I don't know.  I don't
11      believe so.  I believe they no longer existed.
12 BY MR. BURKE:
13 Q    Okay.  And what makes you believe that?
14 A    Because when you sell your company you generally
15      cease to exist.  We purchased them.
16 Q    Do you know whether or not, as of June 13th, 2008,
17      Overnight Express, Inc. continued to do business
18      under that name?
19 A    I don't believe so.
20 Q    Have you -- strike that.
21           I'm aware of one document that's been
22      produced to us that has your name on it, that's a
23      May 21st, 2008 letter; have you seen that document?
24 A    I have.
25 Q    Okay.  Have you seen other documents that, that
```

```
                                        43
1       bear your name or signature?
2            MR. FISHER:  Other than answers to
3       interrogatories?
4            MR. BURKE:  Other than answers to
5       interrogatories.
6            THE WITNESS:  On this case?
7  BY MR. BURKE:
8  Q    Yes.  Related -- well, related to this lawsuit,
9       related to the acquisition of Overnight Express.
10 A    Well, I believe there may be other documents I
11      signed related to the acquisition.
12 Q    What type?
13 A    Similar to that type of document that you have with
14      my signature on it.
15 Q    Okay.  And what would those documents consist of?
16 A    Just a notification to the customer.
17 Q    Okay.  And how would they differ from the May 21st
18      letter?
19 A    They probably would not.  They would probably have
20      different, be addressed to a different person.
21 Q    Okay.
22 A    But the content would be similar.
23 Q    Any other types of documents that you're thinking
24      of?
25 A    Nothing off the top of my head.
```

```
                                        44
1  Q    Okay.  Let me -- Carl, do you have a copy of,
2       Exhibit 1, page 67?
3            MR. FISHER:  Sure.
4  BY MR. BURKE:
5  Q    And I ask you to take a look at what was previously
6       marked Exhibit 1 and Bates stamped UACL 67.  Do you
7       have that in front of you?
8  A    I do.
9  Q    Okay.  And you've seen that before, correct?
10 A    Yes.
11 Q    And does that document bear your signature on the
12      lower left side?
13 A    It does.
14 Q    And that document is dated May 21st, 2008, correct?
15 A    Correct.
16 Q    It's got a UACL logo in the upper left?
17 A    Correct.
18 Q    And on the upper right it's got the name of Mark
19      Limback, L-I-M-B-A-C-K, and his title as president,
20      correct?
21 A    Correct.
22 Q    And I may have said it already, but it's dated May
23      21st, 2008, right?
24 A    That's correct.
25 Q    And it's directed to International Paper in
```

```
                                        45
1       Memphis, Tennessee, correct?
2  A    Yes.
3  Q    Okay.  And is that page 67 of Exhibit 1 that you
4       have in front of you a true and accurate copy of
5       this, of the original of the letter that you
6       signed?
7  A    Yes.
8  Q    Okay.  And for what reason did you prepare this
9       letter?
10 A    I assume the customer requested it.
11 Q    Okay.  And assumptions are bad things to lawyers.
12      What -- tell me why you assume that?
13 A    Because it's specifically dated to them and, you
14      know, it's, it indicates, you know, their name and
15      to change it over.  I would assume they requested
16      it, that's why I would have written it.
17 Q    Okay.  And for what reason would you have prepared
18      that on Mark Limback's stationary?
19 A    I didn't have my own, so, and it has, you know, our
20      logo on it and it's official.
21 Q    Okay.  Now, this letter actually was -- strike
22      that.
23           I mean, this letter was prepared on May
24      21st, 2008, which was prior to the effective date
25      of the acquisition, which was June 13th, 2008,
```

**46**

1 correct?

2 A  Yes.

3 Q  Do you believe you actually mailed out this letter

4  to International Paper on or about May 21st, 2008?

5 A  I don't know if I mailed it or if I faxed it.

6 Q  Okay.  And have -- but you believe you probably did

7  one or the other?

8 A  Yes.

9 Q  Okay.  And are, you know, in this, in the

10  salutation you refer to "dear customer," and were

11  you referring to International Paper?

12 A  Yes.

13 Q  Okay.  And did you believe at the time you wrote

14  this letter that International Paper had a business

15  relationship with Overnight Express?

16 A  Yes.

17 Q  Okay.  And did you believe that Universal was

18  taking over that business relationship with

19  International Paper as a result of acquiring or

20  purchasing Overnight Express?

21 A  Yes.

22 Q  Now, if I could direct your attention to paragraph

23  two, you wrote:  "Please consider this letter as an

24  assignment of the current contract you have in

25  place for Overnight Express," is that correct?

**47**

1 A  Yes.

2 Q  Okay.  And when you refer to a current contract,

3  you're talking about a contract between

4  International Paper and Overnight Express, right?

5 A  Yes.

6 Q  Okay.  Were, and as -- at the time you wrote this

7  letter, did you have an understanding that

8  Overnight Express had a contract with International

9  Paper in which Overnight Express was identified as

10  the carrier in that contract?

11      MR. FISHER:  Objection to form and

12  foundation.

13      THE WITNESS:  Am I supposed to answer?

14      MR. FISHER:  Yes.  I'm sorry.  Go ahead.

15      THE WITNESS:  I'm sorry.  I believe that

16  Universal, or Overnight and International Paper had

17  a contract.

18 BY MR. BURKE:

19 Q  And International Paper was the company and

20  Overnight Express was the carrier in that contract,

21  correct?

22      MR. FISHER:  Objection.  Foundation.  You

23  can go ahead and answer, if you know.

24      THE WITNESS:  Overnight was the

25  transportation.  I mean, they acted both as a

**48**

1  carrier and a broker.

2 BY MR. BURKE:

3 Q  Okay.  And were you aware that their contract

4  identified them as a carrier?

5 A  No.

6 Q  Okay.  Now, in this letter, or by virtue of this

7  letter -- well, strike that.

8      When Universal bought Overnight Express,

9  is it correct that Universal assumed and accepted

10  all the terms of the contract that existed between

11  Overnight Express and International Paper?

12      MR. FISHER:  Objection.  Competency,

13  foundation.  You can go ahead and answer.

14      THE WITNESS:  Can you repeat that?

15 BY MR. BURKE:

16 Q  Sure.  When Universal bought Overnight Express, did

17  Universal assume and accept all the terms of the

18  contract that existed between Overnight Express and

19  International Paper?

20      MR. FISHER:  Objection.  Competency and

21  foundation.  You can go ahead and answer.

22      THE WITNESS:  I don't know.  I didn't sign

23  the contract.  I, I don't know.

24 BY MR. BURKE:

25 Q  Okay.  Well --

**49**

1 A  It states they accepted the rates but --

2 Q  Okay.  Well, when, what you were telling

3  International Paper here is that this letter should

4  be considered by them as Overnight --

5 A  Changing.

6 Q  -- changing and Universal taking over all of the

7  responsibilities under the contract that Overnight

8  had with International, correct?

9 A  I don't -- no.  What it said -- no.  What it says is

10  that they assigned it.  I don't know, meaning that

11  we switched the names from Universal, or from

12  Overnight to Universal, and that we accept the rates

13  and fuel surcharge as far as the contract.  I, I

14  don't know.  If they made changes, I don't know.

15 Q  Okay.  When you say "Please consider this letter as

16  an assignment of the current contract you have in

17  place for Overnight Express," what were you telling

18  International Paper?

19 A  That Overnight was no longer going to be exist, in

20  existence in June, on June 13th, that they were

21  switching, and that, you know, we were going to be

22  changing the names.  I don't know if -- I would

23  assume the contract was sent and it was signed.

24 Q  What contract was sent?

25 A  The contract between Overnight and International

GINA HUBBS
April 16, 2012

**Page 50**

1  Paper.
2 Q  The -- say that again.  What, what --
3 A  So when you acquire a company, you notify customers
4  that you're going through an acquisition and that
5  their company name is going to be changing over to
6  Universal, so then --
7 Q  Right.
8 A  -- there is a document flow after that that
9  generally occurs.
10 Q  Okay.  And as part of Overnight being acquired by
11  Universal, did Universal agree to take the place of
12  Overnight Express in Overnight's contract with
13  International Paper?
14        MR. FISHER:  Competency, foundation.  You
15  can go ahead and answer.
16        THE WITNESS:  I think so.
17        MR. SCHRECK:  Can you repeat the question?
18        (At or about 12:39 p.m., record read)
19 BY MR. BURKE:
20 Q  And what is your basis for thinking so?
21 A  That they signed the contract or --
22 Q  No, that Universal was taking over the
23  responsibilities of Overnight Express in the
24  contract that Overnight had had with International
25  Paper?

**Page 51**

1 A  Well, there would be a new --
2        MR. FISHER:  Same objections.  Now you can
3  go ahead.
4        THE WITNESS:  There would be a contract
5  that was sent and signed with Universal and
6  International Paper.
7 BY MR. BURKE:
8 Q  Okay.  Have you ever seen such a contract?
9 A  No.
10 Q  Do you know why one was not sent?
11        MR. FISHER:  Objection.  Assumes facts not
12  in evidence.  You can go ahead and answer.
13        THE WITNESS:  Can you repeat that?
14 BY MR. BURKE:
15 Q  Sure.  Did, did you say you have never seen a
16  contract --
17 A  No.
18 Q  -- between Universal and --
19 A  I have not read the contract.
20 Q  -- Overnight -- or I'm sorry.  Let me repeat that.
21        You told me that usually there'd be a
22  contract sent between Universal and International
23  Paper after an acquisition like this?
24 A  Usually there would be a new contract signed between
25  any customer and our company.

**Page 52**

1 Q  Okay.
2 A  Therefore, I assume there was one submitted.
3 Q  Okay.  But you've never seen such a contract?
4 A  No.  I did not read it.
5 Q  Well, no.  My question is have you ever seen such a
6  contract?
7 A  I have not read it.
8 Q  Okay.
9 A  I know we have one now, going through this.
10 Q  Okay.  What, and what is, who, who is that contract
11  between?  Is it the amendment or is it an actual
12  contract?
13 A  I don't know.
14        MR. FISHER:  Objection.  Objection to
15  form.
16        THE WITNESS:  I don't know.  I know
17  there's a contract.
18 BY MR. BURKE:
19 Q  Okay.  And when is it dated?
20 A  I don't know.
21 Q  And who, who signed that contract?
22 A  I don't know.  I've not read it.
23 Q  Okay.  Where did you see it?
24 A  It was noted, or we had it -- we've had discussions
25  that there's a contract.

**Page 53**

1 Q  Okay.  Can you show me a copy of whatever contract
2  you're referring to?
3 A  No, because I haven't read it.
4 Q  Well, I don't care if you've read it.  I want, I
5  want to see a copy of whatever contract you're
6  referring to because I'm not aware of one ever
7  having been produced in this case.  And Carl, if
8  you have one --
9        MR. FISHER:  Yes, it was produced by
10  International Paper.
11        THE WITNESS:  Yes.
12        MR. BURKE:  Okay.
13        MR. FISHER:  It's page number six, it's
14  the amendment.
15        MR. BURKE:  Okay.  Well, that's what I'm
16  getting at.
17 BY MR. BURKE:
18 Q  I just asked you that, if it was the amendment or
19  if it was a separate --
20 A  No.
21 Q  -- new contract?
22 A  I don't know if it's, which one it is.
23 Q  Okay.  And the amendment I have, and is that the
24  amendment that you're referring to when you say
25  there would be a new, a contract between Universal

GINA HUBBS
April 16, 2012

54

1  and International Paper?
2 A  Am I referring to that amendment?
3 Q  Yes.
4 A  I didn't know it was considered an amendment, but,
5    yes.
6 Q  Okay.  Now, when you make reference to a current
7    contract, do you know what contract you were
8    referring to or the date of the contract that you
9    were referring to?
10 A  No.  Just the current one.
11 Q  Okay.  When you wrote this letter, had you looked
12    at what the current contract was between Overnight
13    and International Paper?
14 A  No.
15 Q  Okay.  Have you done so at any time during the
16    pendency of this case?
17 A  No.
18 Q  Let me ask you to take a look at Exhibit 30, or
19    page 33 of Exhibit 1.  Do you have that in front of
20    you in the items that you have there?
21         MR. FISHER:  33?
22         MR. BURKE:  33, yes.
23 BY MR. BURKE:
24 Q  And that's entitled OXEN Overnight Express, 2007,
25    outbound contract, correct?

55

1 A  Yes.
2 Q  Okay.  Then take a look at page 35 of that exhibit,
3    and am I correct that the header for that contract
4    identifies it as an agreement dated, or effective,
5    rather, October 1st, 2007 between International
6    Paper as shipper and Overnight Express as carrier?
7 A  That is what it states, yes.
8 Q  Okay.  Was that the contract between International
9    Paper and Overnight Express to which you made
10    reference in your letter of May 21st, 2008?
11 A  Yes.
12 Q  Okay.  And was it your understanding that when
13    Universal purchased Overnight Express, Universal
14    took over the responsibilities of Overnight Express
15    under this contract with International Paper,
16    correct?
17         MR. FISHER:  Objection.  Form, competency,
18    calls for a legal conclusion.  You can go ahead and
19    answer.
20         THE WITNESS:  I believe so.
21 BY MR. BURKE:
22 Q  Okay.  And then, back to paragraph two of your
23    letter, Ms. Hubbs -- 67, you got that there?
24 A  Mm-hmm.
25 Q  Okay.  And then you, after you said "please

56

1    consider this letter as an assignment of the
2    current contract you have in place for Overnight
3    Express," you also wrote that "Universal Am-Can
4    Limited agrees to accept the rates and fuel
5    surcharge established between your company and
6    Overnight," correct?
7 A  Yes.
8 Q  Okay.  And then you went on to say "Please sign
9    below as to your acceptance regarding the contract
10    and rate assignment"?
11 A  Yes.
12 Q  Okay.  And, you, know, when you use the expression
13    "rates," you know, as you did here, what's that
14    referring to?
15 A  That's referring to the rate to move the product
16    between the shipper and their, and Overnight --
17 Q  Okay.  So --
18 A  -- without being Universal.
19 Q  So it would have been the rate agreed upon between
20    International Paper with Overnight Express,
21    correct?
22 A  Yes.
23 Q  Okay.  And now Universal was agreeing to move the
24    product for that same rate?
25 A  Yes.

57

1 Q  Okay.  And then the reference to fuel surcharge
2    established between International Paper and
3    Overnight, what does that refer to?
4 A  Fuel surcharge is a, what we consider an accessorial
5    to move the product -- a fuel accessorial because of
6    fuel being the size it is.
7 Q  And that expression "accessorial" in your business
8    refers to what?
9 A  Extra charges above and beyond the cost to move the
10    product from point A to point B.
11 Q  Okay.  And that would be an additional charge above
12    and beyond the agreed upon rate that is referred
13    to; is that correct?
14 A  Well, it's to, it's actually to -- yes.  It's,
15    there's a rate and then there's a fuel surcharge
16    that would, based on whatever they establish in the
17    contract is how they calculate it.
18 Q  Okay.  And then back up to the first paragraph,
19    which we haven't gone through yet, but let me
20    direct your attention to that.  Your first sentence
21    to International Paper is:  "Dear customer,
22    Overnight Express will be operating under Universal
23    Am-Can Limited's insurance and authority as of June
24    13th, 2008, based on an agreement to partner with
25    their organization."

16 (Pages 58-61)

GINA HUBBS
April 16, 2012

### Page 58

1    That's what you wrote, correct?
2 A  That is correct.
3 Q  Okay. And as a, that reference to partnering, is
4    that a, did that word have any particular meaning
5    or had Universal actually completely purchased
6    Overnight Express?
7        MR. FISHER: Form. You can go ahead and
8    answer.
9        THE WITNESS: As of what date are you
10   referring to have we purchased them?
11 BY MR. BURKE:
12 Q  I'm talking about as of June 13th, 2008.
13 A  Correct. We would, at that point, it was my
14   understanding the purchase was completed.
15 Q  And then are, are you telling International Paper
16   as of June 13, 2008, Overnight Express will be
17   operating under the motor carrier authority of
18   Universal Am-Can?
19 A  Yes.
20 Q  Okay. And in your reference to insurance there
21   refers to what?
22 A  Universal's insurance that they would now, Overnight
23   would now be covered by Universal because they would
24   now be Universal.
25 Q  Okay. And then you go on to say that "all bills of

### Page 59

1    lading should reflect Universal Am-Can Limited as
2    the carrier," correct?
3 A  Yes.
4 Q  Okay. And you also say that "therefore, invoices
5    for" -- and by the way, bills of lading in your
6    business refer to what?
7 A  They are the documents that the person who picks up
8    the product moves. It's motor carrier documents.
9    It indicates who it's picked up from, who it's
10   shipped to, description of the goods. The person
11   that picks it up signs it. It's a --
12 Q  Okay.
13 A  -- contract.
14 Q  And then you also say "invoices for freight moved
15   will come from Universal Am-Can Limited," with a
16   remittance address of a P.O. Box in Cincinnati,
17   Ohio, correct?
18 A  Yes.
19 Q  Okay. And were you essentially telling
20   International Paper that now it would be Am-Can
21   sending an invoice for this transportation of
22   International Paper's products?
23 A  Yes. It would be invoiced from Universal instead of
24   Overnight.
25 Q  Am I correct that Universal now wanted the

### Page 60

1    International Paper to send them the money in
2    payment for the hauling of the goods instead of
3    sending it to Overnight Express?
4 A  Yes.
5 Q  Okay. What is -- do you know John Moorer?
6 A  Mm-hum. Yes.
7 Q  What's his job today?
8 A  Today he's the project manager for Universal
9    Logistics.
10 Q  And what did he do back in 2008? Was --
11 A  He was a broke, he was a brokerage manager for
12   Universal Am-Can.
13 Q  And what did he do in that position to the extent
14   you understand it?
15 A  Well, he oversaw the brokerage department. He had a
16   staff that reported to him and he signed up broker
17   carriers for Universal Am-Can.
18 Q  You know, in the last, what, what does it say down
19   on the bottom center of your May 21st letter?
20       MR. FISHER: Oh, way down here?
21       MR. BURKE: Yeah, the black.
22 BY MR. BURKE:
23 Q  Are you able to read that, mine is very blurry --
24   blurred print, I should say.
25 A  Mine is too. Um --

### Page 61

1 Q  I mean, do you --
2 A  I don't know. It may have been our address.
3 Q  Okay. And that's what I was going to say, do you
4    know or --
5 A  It may be our address.
6 Q  -- what it likely says?
7 A  I think it's the name at the top. I think that
8    says -- I don't know. It looks like Universal
9    Am-Can Limited with our P.O. Box, but I'm not a
10   hundred percent.
11 Q  Okay. Then there's a signature line by the, for
12   Steven Mundy, correct?
13 A  Correct.
14 Q  Okay. Did Mundy ever sign this?
15 A  I don't know.
16 Q  Do you know Steve Mundy?
17 A  No.
18 Q  Okay. Had you had any conversations with him about
19   this in the course of --
20 A  I don't remember --
21 Q  -- sending him this letter or --
22 A  -- if I did. I don't believe so.
23 Q  Okay.                  .
24       MR. SCHRECK: Could you read that, that
25   answer?

GINA HUBBS
April 16, 2012

**62**

1                    (At or about 12:59 p.m., record read)
2 BY MR. BURKE:
3 Q    Do you have Exhibit 68 in front of you?
4           MR. FISHER:  Page 68?
5           MR. BURKE:  Thank you.  Exhibit 1 --
6           THE WITNESS:  Oh, okay.
7 BY MR. BURKE:
8 Q    Exhibit 1, page 68, I should say.
9 A    Yes.
10 Q    Okay.  That's an e-mail that appears to be to Steve
11      Mundy from Rory Ostgulen, O-S-T-G-U-L-E-N, of
12      Overnight Express; is that right?
13 A    That's correct.
14 Q    Okay.  Do you know Rory?
15 A    Yes.
16 Q    And how do you know Rory?
17 A    He was the sales rep for Overnight.
18 Q    Okay.  Did you know him prior to the acquisition?
19 A    No.
20 Q    Does he still work, does he work for Universal now?
21 A    No.
22 Q    From this e-mail, does it appear he, he is sending
23      an e-mail saying "attached is a notification
24      letter, an assignment letter per your request"?
25 A    Yes.

**63**

1 Q    Do you know, is it your letter that is attached?
2 A    I would assume.
3 Q    Okay.  So had you sent your letter to Overnight
4      Express, or another comparable letter?
5 A    I would assume.
6 Q    Okay.  How about, take a look at the next page, 69
7      of Exhibit 1, do you know Cathy -- or strike that.
8      That's an e-mail apparently from Cathy Sawast,
9      S-Z-W-A-S-T; is that right?
10 A    Yes.
11 Q    Okay.  And do you know Cathy Sawast?
12 A    Yes.
13 Q    Okay.  And does she still work for Universal?
14 A    I believe so, yes.
15 Q    Okay.  And do you know what her job was back at
16      this time?
17 A    I think she worked in insurance.
18 Q    Okay.
19 A    I don't know her title.
20 Q    Okay.  And what's your understanding of the, what's
21      going on in this e-mail?
22 A    That she sent him Universal's insurance and cargo,
23      our, you know, certificate.
24 Q    Okay.  When you say "him," you're referring to
25      Steve Mundy of International Paper?

**64**

1 A    Yes.
2 Q    Okay.  But it's actually Ms. Sawast sending
3      Universal's evidence or proof of liability
4      insurance and cargo coverage, correct?
5 A    I assume, yes.
6 Q    Okay.  And one of the reasons she would do that is
7      because part of the contract between International
8      Paper and Overnight Express that, that Universal
9      took over had a provision requiring the carrier to
10      have certain levels of insurance coverage, correct?
11 A    I assume.  I -- yes, I assume.
12 Q    Okay.  Now about 70, do you have page 70 of Exhibit
13      1 in front of you when you flip one more page?
14 A    Yes.
15 Q    Okay.  That's a letter from Mark Limback on
16      Universal letterhead, correct?
17 A    Mm-hmm.
18 Q    And that letter is being sent to what is referred
19      to as, quote, "to the valued customers of Overnight
20      Express, Inc.," end quote; is that right?
21 A    That's correct.
22 Q    And then in about, in the last couple sentences of
23      paragraph one, Mr. Limback wrote "as of June 13th,
24      2008, your bill of lading should reflect Universal
25      Am-Can Limited as the carrier, and thus, all

**65**

1      invoices will reflect such along with our
2      remittance address," correct?
3 A    That's correct.
4 Q    Then he went on to say "following is a copy of
5      insurance and authority for your records"?
6 A    That's correct.
7 Q    Okay.  And -- oh, by the way, down in the center of
8      that page it appears to be a more legible address
9      that we --
10 A    Yes.
11 Q    -- that I was asking you about a moment ago.
12 A    Yes.
13 Q    It looks like the Universal Am-Can Limited P.O. Box
14      in Warren, Michigan, correct?
15 A    That's correct.
16 Q    Do you want to look at 65, page 65 of Exhibit 1,
17      and that document's entitled Amendment No. 1, am I
18      correct?
19 A    That's correct.
20 Q    Okay.  And that's a document signed by Mark Limback
21      on behalf of Universal Am-Can, correct?
22 A    Correct.
23 Q    And dated June 10th of '08, right?
24 A    Yes.
25 Q    Okay.  And on behalf of International Paper

GINA HUBBS
April 16, 2012

66

1    Company, it's also signed by S. M. Mundy on June
2    12th, '08, correct?
3  A    Correct.
4  Q    Okay.  And is this the document that you a little
5    bit ago were referring to as a contract between, or
6    I should say a new contract between Universal and
7    International Paper?
8  A    Yes.
9  Q    Okay.  Were you involved in -- or strike that.
10        And you said you had read a contract, I
11    take it this is the document you were referring to?
12  A    That I hadn't read it, but that it had been alluded
13    to that there was a contract.
14  Q    Right.  Thank you.  Yes, that is what you said.
15    Okay.  Okay.
16        And did you have any involvement in
17    creating this contract or this Amendment No. 1
18    agreement?
19  A    No.
20  Q    Okay.  In your answer, in the answers to
21    interrogatories that I showed you earlier, there
22    were -- strike that.
23        I'm going to re-tender to you Exhibit No.
24    4.  And I apologize, I've got to stand next to you
25    while I read this because I only have one copy with

67

1    me, but --
2            MR. FISHER:  This is 104?
3            MR. BURKE:  104.  And here, Gina, if you,
4    if you have a copy --
5            THE WITNESS:  Oh, I don't know.
6            MR. BURKE:  These are the interrogatories
7    again.  I don't know that you have one.
8            MR. FISHER:  Why don't you keep asking and
9    I'll see if I can find one.
10            MR. SCHRECK:  Yeah, it's not going to be
11    in the stack of --
12            MR. BURKE:  Yeah, it shouldn't be in
13    there.
14  BY MR. BURKE:
15  Q    Gina, here's what I'm going to ask you about your
16    question and answer, all I'm going to ask you about
17    is that an accurate answer that you gave there, so
18    just take a look at that and then I'll formally
19    read it.
20  A    Okay.
21  Q    Okay.  I've tendered to you Exhibit No. 4.  Am I
22    correct that one of the questions that Universal
23    was asked in this Interrogatory No. 2 is:
24        "Pursuant to the asset purchase agreement
25    between Universal and Overnight, did Universal

68

1    receive an assignment of and accept responsibility
2    for performance of all contracts entered into by
3    defendant Overnight, including Overnight's contract
4    with International Paper?"
5        The answer that you provided was:
6        "Yes, OXI agreed to sell, assign, convey,
7    transfer and send over and deliver to UACL certain
8    assets, including but not limited to, all lists of
9    customers as well as all customer contracts and
10    agreements.  UACL accepted responsibility for
11    performance of the OXI contract with International
12    Paper."
13        That is a correct answer, correct --
14  A    Yes.
15  Q    -- to that question?  Okay.
16        And is Amendment No. 1 that I have
17    tendered to you and that you have in front of you
18    as page 65 of Exhibit No. 1, is that a document in
19    which Universal agreed to accept the terms of the
20    previously existing contract between International
21    Paper and Overnight Express?
22  A    Yes.
23  Q    Okay.  And about the middle of the page where it
24    says effective, it says that "Effective June 13,
25    2008, carrier will be operating under the name of

69

1    Universal Am-Can Limited and SCACUACL," correct?
2  A    Yes.
3  Q    Okay.  And it goes on to say:
4        "Universal Am-Can Limited agrees to honor
5    the rates and fuel surcharge established between
6    company and Overnight," correct?
7  A    Yes.
8  Q    Okay.  And a couple lines down it also says:
9        "All other terms of the contract shall
10    remain and are in full force and effect," correct?
11  A    Yes.
12  Q    Okay.  And by the way, the contract that's been
13    referred to is identified up above right under the
14    word "witnessed" where it says "The parties entered
15    into contract number OXEN 093009 dated October 1st,
16    2007;" is that right?
17  A    Yes.
18  Q    Okay.  And you earlier, a moment ago told me this,
19    this Amendment No. 1 was signed by Mark Limback on
20    behalf of Universal, right?
21  A    Yes.
22  Q    Okay.  Ms. Hubbs, did -- strike that.
23        Between June 10th and June 12th, the dates
24    this Amendment No. 1 was signed by Universal and
25    International Paper respectively, and July 3rd,

**70**

1  2008, the date of the collision that's the subject
2  of this case, did Universal enter into any other
3  agreements or contracts with International Paper?
4  A  Not to my knowledge.
5  Q  Okay.
6          MR. FISHER:  Rich, would now be a good
7  time to take a break?
8          MR. BURKE:  Sure.
9          MR. FISHER:  We'll just keep you guys on
10  the line, is that all right?
11          MR. GOLDEN:  That's fine.
12          (At or about 1:18 p.m. short recess)
13          (At or about 1:40 p.m., back on record)
14  BY MR. BURKE:
15  Q  Ms. Hubbs, we were just talking about Melody
16  Hanson, do you know her?
17  A  I do.
18  Q  Okay.  And how is it you know her?
19  A  She was an employee of Overnight Express, and when
20  Universal purchased Overnight, she became an
21  employee of Universal.
22  Q  Okay.  And where did she physically work from?
23  A  She worked from the South Holland Overnight
24  facility.
25  Q  Okay.  And I think you've told us that their

**71**

1  facility no longer exists?
2  A  Correct, it's been moved.
3  Q  Okay.
4  A  It's -- yes.
5  Q  Okay.  Moved to either Hammond or Gary?
6  A  Yeah, I think.  I don't know what the exact city is,
7  but, yes.
8  Q  Okay.  What was located at the South Holland
9  location of Overnight Express and then Universal?
10  A  I know there was an office building there.
11  Q  Okay.
12  A  And I think that's, they rented it, I think.  I
13  don't believe they owned it.
14  Q  Any truck terminals?
15  A  No.
16  Q  About how many employees were there at the South
17  Holland office when, when Universal took over
18  Overnight?
19  A  I believe there were only two.
20  Q  Who was the other one?
21  A  Cheryl Lambert.
22  Q  Okay.  And what was your understanding of what each
23  of those women did out there when you took over
24  Overnight?
25  A  It was my understanding that Cheryl was a, like a,

**72**

1  handled operations with the drivers that were
2  Overnight and sort of oversaw everything.  She was
3  more the lead, I don't know what her title was.  And
4  Melody was the, handled all the brokerage, so she
5  dealt with all the broker carriers, did the paper
6  work.  And I think they both input information into
7  the system.
8  Q  Okay.  When, how long did the South Holland
9  facility remain a, remain at that location?
10  A  Hmm.  I don't think it was a year.  Maybe until the
11  end of their lease.  I'm not sure.
12  Q  Okay.  You're aware that the incident that gave
13  rise to this case occurred on July 3rd of 2008, are
14  you not?
15  A  I am.
16  Q  Okay.  On that date, July 3rd, 2008, was Melody
17  working in the South Holland office of Universal?
18  A  Do you mean was she at work that day?
19  Q  Well, my real question was, was she employed at
20  that time?
21  A  Yes.
22  Q  And was her place where she would go to work on
23  July 3rd, was that the South Holland office?
24  A  Yes.
25  Q  Okay.  And do you know if she was in fact working

**73**

1  that day?
2  A  I think she was.
3  Q  Okay.  And I'll show them to you in a moment, you
4  know, some broker, you know, broker confirmation
5  sheet that bears her name, but did, you know -- by
6  the way, when Overnight was purchased by Universal,
7  for example at the South Holland office, did
8  Universal change any sign-age on the buildings or
9  on doors to eliminate the name Overnight and
10  replace it with Universal?
11  A  I don't recall, but I would assume.
12  Q  Okay.  Do you have an understanding of what Melody
13  Hanson did or what roles she played relative to the
14  load that was being hauled at the time of this
15  collision?
16          MR. FISHER:  Objection to form.  You can
17  go ahead and answer.
18          THE WITNESS:  Prior to this or during
19  the --
20  BY MR. BURKE:
21  Q  Right now, as you sit here today.
22  A  Right.  Yes.
23  Q  Okay.  And just tell me what your understanding is?
24  A  My understanding is that she did the paper work for
25  the load and then, you know, gave it, or sent it,

20 (Pages 74-77)

GINA HUBBS
April 16, 2012

---

74

1 faxed it, I assume, to Martin's, and that she was
2 the one who interacted with the customer,
3 International Paper.
4 Q   Okay.  And when you use the word "customer," you're
5    referring to International Paper?
6 A   Correct.
7 Q   Okay.  And have you spoken to Melody Hanson at all,
8    about her involvement in --
9 A   No.
10 Q   -- in those matters that you just mentioned?
11 A   No.
12 Q   Okay.  Let me re-tender to you Exhibit No. 4.  I
13    want to --
14        MR. FISHER:  I've actually got a copy here
15    I can show her.  It's not a signed copy but it's off
16    my computer since that's where it came from.
17        MR. BURKE:  Oh, okay.
18        MR. FISHER:  Hang on.  What's the bottom
19    number?
20        MR. BURKE:  53587, or that's page two of
21    it.
22        MR. FISHER:  Oh, got you.  That's the
23    number I was looking for.  You know what, I'm not
24    convinced this is the identical, so you probably
25    need to show it to her.

---

75

1        MR. BURKE:  Okay.
2 BY MR. BURKE:
3 Q   Let me re-tender to you Exhibit No. 4 and just look
4    at your, the question and answer to --
5 A   Number four?
6 Q   No, to question and answer number three, actually.
7 A   Three, okay.
8        MR. SCHRECK:  And for the record, you're
9    referring to 104, not four, right?
10        MR. BURKE:  104, thank you.
11 BY MR. BURKE:
12 Q   And those, for the record are some answers to
13    interrogatories signed by Ms. Hubbs.
14 A   Okay.
15 Q   Okay.  And my question simply relates to your
16    answer.  Basically you indicated that at the, both
17    before and at the time of the occurrence on July
18    3rd, 2008, International Paper had contracts with
19    Overnight slash Universal for the performance of
20    transportation-related services, correct?
21        MR. FISHER:  Excuse me.  Objection to
22    form.  That portion of the answer, "it's yours,"
23    she's the signatory.  These are International's,
24    these are UACL answers.  You can go ahead and
25    answer.

---

76

1 BY MR. BURKE:
2 Q   Okay.  These are answers that were prepared by
3    Universal Am-Can and you have verified that this
4    information is true and correct on behalf of
5    Universal Am-Can, is that true?
6 A   That's correct.
7 Q   Okay.  And the, as of July 3rd, the contract
8    between International Paper was actually now with
9    Universal, an I correct, in light of the
10    acquisition and in light of the amendment, that
11    number one that was signed?
12 A   Yes.
13 Q   Okay.  And, and this, and then the paper products
14    that were being moved this day were being moved as
15    part of Universal's obligations to provide
16    transportation services pursuant to the contract
17    that they had taken over that Overnight previously
18    had with International, correct?
19 A   Yes.
20 Q   Okay.  And, and there was some, and as part of the
21    procedure that existed at that time, Melody Hanson,
22    on behalf of Overnight Express, would contact
23    Martin's Bulk Milk Service on a daily basis to give
24    them the specifics about the load that was to be
25    moved for International Paper; is that correct?

---

77

1 A   I don't know.  I, as far as her daily, how she
2    handled her activity, I don't, I don't know.
3 Q   Okay.
4 A   Melody worked for Universal at that point, not
5    Overnight.
6 Q   Okay.  And I was getting to that.  As of,
7    regardless of whether that was the practice that
8    was in place prior to this, you, from your review
9    of documents in this case, is it your understanding
10    that on July 3rd, Melody Hanson contacted somebody
11    at Martin's Bulk Milk Service to give them
12    instructions about picking up a load at
13    International Paper?
14 A   That's my understanding, after reading these
15    documents, yes.
16 Q   Okay.  And is, take a look at Exhibit 11, if you
17    have that in front of you.  And I got --
18        MR. FISHER:  You're referring to a
19    separate Exhibit 11?
20        MR. BURKE:  It's separate 11.  It's a
21    broker confirmation sheet.  If you've got another
22    handy copy, we've got multiple copies of it.  I'm
23    sure it's in --
24        MR. FISHER:  Here, I've got it.  I got all
25    my, this has all my secret notes on it, though.

21 (Pages 78-81)

GINA HUBBS
April 16, 2012

**78**

1  MR. BURKE: You can share.
2  MR. SCHRECK: You can share those with us.
3  MR. FISHER: Here, wait a minute. You
4  know what, it's --
5  MR. SCHRECK: I've got, if you want to
6  get --
7  MR. BURKE: Here, I got a million of them
8  right here, if you --
9  MR. FISHER: All right.
10 BY MR. BURKE:
11 Q  Here, if you want to look at that, that's -- now, I
12  think there are slightly different versions of
13  this, I think I've seen one with a little
14  Universal --
15  MR. FISHER: Barcode?
16 BY MR. BURKE:
17 Q  -- barcode on it, but for purposes of the content
18  of what I actually want to ask you about, I think
19  this is, you know, a copy that contains everything.
20  But Ms. Hanson, I've tendered to you a
21  copy of Exhibit 11, which is entitled a broker
22  confirmation sheet and --
23  MR. FISHER: You mean Ms. Hubbs?
24  MR. BURKE: Yeah, I'm sorry. Let me
25  repeat that.

**79**

1 BY MR. BURKE:
2 Q  Ms. Hubbs, I've tendered to you a copy of Exhibit
3  No. 11, which is a broker confirmation sheet
4  bearing the pickup date of July 3rd, '08; am I
5  correct?
6 A  Yes.
7 Q  Okay. And is this -- this is a type of document
8  you're familiar with from your business; is that
9  right?
10 A  That is correct.
11 Q  Okay. Now, Melody Hanson's name is in the upper
12  right corner, and you've already told us that as of
13  July 3rd she was an employee of Universal Am-Can,
14  correct?
15 A  Yes.
16 Q  Okay. And did Melody Hanson -- there's handwriting
17  on this document, I mean, is it your understanding
18  Melody Hanson placed this handwriting there?
19 A  Yes. That's my understanding it's her writing.
20 Q  Okay. Is -- now, the document has a date of July,
21  or a pickup time of July 3rd, and time, 19:00
22  hours, which would be 7:00 p.m., correct?
23 A  Yes.
24 Q  Okay. Now, do you see the fact information up at
25  the top?

**80**

1 A  Yes.
2 Q  The date is July 3rd, 2008, 16:23 hours, correct?
3 A  That's correct.
4 Q  And that's 4:23 p.m.?
5 A  Yes.
6 Q  Okay. And then it's got a phone number,
7  708-331-9604. Do you know whose phone number that
8  was?
9 A  I believe that was the office in South Holland,
10  their fax number.
11 Q  Okay. And it says Overnight Logistics to the right
12  of the fax number; am I correct?
13 A  Correct.
14 Q  Okay. And what, why does it say Overnight
15  Logistics there if this was several weeks after the
16  effective date of the purchase of Overnight
17  Express?
18 A  I would assume someone failed to change the name.
19 Q  They changed the name on what?
20 A  On the fax machine, or I don't know, for the phone
21  company. I don't know who does it, but --
22 Q  Okay. And am I, am I correct that Ms. Hanson faxed
23  this to somebody at the Martin's Bulk Milk?
24 A  It looks like it, yes.
25 Q  And what do you see that makes you think it looks

**81**

1  like it?
2 A  Because of that fax up on the top.
3 Q  Okay. And this, am I correct that the purpose of
4  this document is for Ms. Hanson, on behalf of
5  Universal, to be telling Martin's that they needed
6  to make a pickup of certain goods at International
7  Paper to be transported to three different
8  locations in the Minneapolis area?
9 A  This is a standard broker confirmation sheet and
10  that, I don't know where the deliveries were at as
11  far as the city, but this is what we send out when
12  we contract a broker, this confirmation sheet.
13 Q  Okay.
14 A  It's basically a binding agreement.
15 Q  Okay. And it's in this document Ms. Hanson, on
16  behalf of Universal, is giving Martin's
17  instructions on where to make the pickup, which was
18  International Paper's warehouse, correct, in
19  Hammond, Indiana?
20 A  Correct.
21 Q  Okay. And the pickup time was, she specified was
22  19:00 hours on July 3rd, correct?
23 A  Correct.
24 Q  Okay. And she identifies the commodity as paper,
25  and there's another section entitled delivery

GINA HUBBS
April 16, 2012

<table>
<tr><td colspan="2" align="right">82</td><td colspan="2" align="right">84</td></tr>
<tr><td>1</td><td>information, correct?</td><td>1</td><td>This document says that "Universal will</td></tr>
<tr><td>2 A</td><td>Correct.</td><td>2</td><td>remit payment within 30 days of receipt of original</td></tr>
<tr><td>3 Q</td><td>Okay. And in that there is a delivery date</td><td>3</td><td>signed bills of lading and clear delivery receipts</td></tr>
<tr><td>4</td><td>specified of July 7th, '08, between 7:30 a.m. and</td><td>4</td><td>with a legible signature, provide a completed W-9</td></tr>
<tr><td>5</td><td>4:00 p.m., correct?</td><td>5</td><td>form, signed master brokerage agreement and rate</td></tr>
<tr><td>6 A</td><td>Correct.</td><td>6</td><td>confirmation, contract authority and original</td></tr>
<tr><td>7 Q</td><td>And there are three different locations specified,</td><td>7</td><td>certificates of insurance naming UACL as</td></tr>
<tr><td>8</td><td>correct, for where paper is to be delivered; am I</td><td>8</td><td>certificate holder is on file for the billed move,"</td></tr>
<tr><td>9</td><td>right?</td><td>9</td><td>correct?</td></tr>
<tr><td>10 A</td><td>Yes, it appears.</td><td>10 A</td><td>Correct.</td></tr>
<tr><td>11 Q</td><td>Or to three different companies, I should say --</td><td>11 Q</td><td>Okay. So am I correct that in order for Martin's</td></tr>
<tr><td>12 A</td><td>Mm-hmm.</td><td>12</td><td>to get paid, they would have to provide Universal</td></tr>
<tr><td>13 Q</td><td>Cenveo, Midland Paper and Xpedx?</td><td>13</td><td>with signed bills of lading?</td></tr>
<tr><td>14 A</td><td>Correct.</td><td>14 A</td><td>That is correct.</td></tr>
<tr><td>15 Q</td><td>Okay. Now in this, do you see after the Midland</td><td>15 Q</td><td>And how would that normally be accomplished?</td></tr>
<tr><td>16</td><td>Paper it says MPLS?</td><td>16 A</td><td>Signed bills of lading or --</td></tr>
<tr><td>17 A</td><td>Mm-hmm.</td><td>17 Q</td><td>No, how would you get, how would they provide them</td></tr>
<tr><td>18 Q</td><td>Does that refer to Minneapolis?</td><td>18</td><td>to you?</td></tr>
<tr><td>19 A</td><td>I would assume.</td><td>19 A</td><td>Oh, they would mail them, originals.</td></tr>
<tr><td>20 Q</td><td>Okay. And then do you see in parenthesis where it</td><td>20 Q</td><td>Okay. And the clear delivery receipts with a</td></tr>
<tr><td>21</td><td>says five hyphen two; do you know what that means?</td><td>21</td><td>legible signature, how do those receipts differ</td></tr>
<tr><td>22 A</td><td>No. I would assume it's time, the delivery time.</td><td>22</td><td>from the bills of lading which sometimes have</td></tr>
<tr><td>23 Q</td><td>What do you mean?</td><td>23</td><td>signatures?</td></tr>
<tr><td>24 A</td><td>Like receiving hours five to two.</td><td>24 A</td><td>Well, usually it's one and the same. One, there's</td></tr>
<tr><td>25 Q</td><td>Between 5:00 a.m. and 2:00 p.m.?</td><td>25</td><td>several copies of those bills of lading so what</td></tr>
<tr><td colspan="2" align="right">83</td><td colspan="2" align="right">85</td></tr>
<tr><td>1 A</td><td>I would assume.</td><td>1</td><td>happens is the shipper signs it, which would be</td></tr>
<tr><td>2 Q</td><td>Okay. And that's at Midland?</td><td>2</td><td>International Paper at this point, and then the</td></tr>
<tr><td>3 A</td><td>Yes.</td><td>3</td><td>receiver would sign it. So you'd have two</td></tr>
<tr><td>4 Q</td><td>Okay. All right. And then it says: "Total</td><td>4</td><td>signatures; your bill of lading from your customer,</td></tr>
<tr><td>5</td><td>payment to the carrier inclusive of accessorial is</td><td>5</td><td>and then we consider that second copy with that</td></tr>
<tr><td>6</td><td>$974.08," correct?</td><td>6</td><td>signature from the receiver as the delivery receipt.</td></tr>
<tr><td>7 A</td><td>Yes.</td><td>7 Q</td><td>Okay. So those two things can be essentially one</td></tr>
<tr><td>8 Q</td><td>Okay. Now, would Ms. Hanson have calculated that</td><td>8</td><td>and the same that are being referred to, the bills</td></tr>
<tr><td>9</td><td>herself or somebody else?</td><td>9</td><td>of lading and the delivery receipt?</td></tr>
<tr><td>10 A</td><td>I would assume was probably her.</td><td>10 A</td><td>Provided it has both signatures on it.</td></tr>
<tr><td>11 Q</td><td>Okay. And how would she have done that?</td><td>11 Q</td><td>Okay.</td></tr>
<tr><td>12 A</td><td>She would, I would assume she would take the rates</td><td>12 A</td><td>Along with the signature of the driver.</td></tr>
<tr><td>13</td><td>that are under contract and add the fuel surcharge</td><td>13 Q</td><td>Okay. And both, when you say both signatures,</td></tr>
<tr><td>14</td><td>and whatever other accessorial's we charge the</td><td>14</td><td>signature of the company, such as International</td></tr>
<tr><td>15</td><td>customer, which is International Paper for this</td><td>15</td><td>Paper?</td></tr>
<tr><td>16</td><td>move, and then we give that broker carrier a certain</td><td>16 A</td><td>The shipper and the, what we consider the consignee,</td></tr>
<tr><td>17</td><td>percentage of the overall total.</td><td>17</td><td>meaning the receiver.</td></tr>
<tr><td>18 Q</td><td>Okay.</td><td>18 Q</td><td>Okay. And here that's Cenveo, Midland, Xpedx,</td></tr>
<tr><td>19 A</td><td>So that's how she would have calculated and whoever.</td><td>19</td><td>correct?</td></tr>
<tr><td>20 Q</td><td>Okay. And then in the next paragraph, it says: "A</td><td>20 A</td><td>Yes.</td></tr>
<tr><td>21</td><td>carrier agrees that this reflects the entire amount</td><td>21 Q</td><td>Okay. And then Universal also required that</td></tr>
<tr><td>22</td><td>due for all services provided and no other amount</td><td>22</td><td>Martin's have on file with them a W-9 form,</td></tr>
<tr><td>23</td><td>will be billed to Universal," correct?</td><td>23</td><td>correct?</td></tr>
<tr><td>24 A</td><td>Correct.</td><td>24 A</td><td>Yes.</td></tr>
<tr><td>25 Q</td><td>Okay. And then Universal -- strike that.</td><td>25 Q</td><td>And then, and then it also required a signed master</td></tr>
</table>

GINA HUBBS
April 16, 2012

| | 86 |
|---|---|
| 1 | brokerage agreement, correct? |
| 2 A | Correct. |
| 3 Q | And rate confirmation agreement? |
| 4 A | Which is this, correct. |
| 5 Q | Okay.  And -- meaning this broker confirmation |
| 6 | sheet? |
| 7 A | Yes. |
| 8 Q | And contract authority? |
| 9 A | Correct. |
| 10 Q | Okay.  So meaning -- and by that, Universal |
| 11 | required Martin's to prove they had valid operating |
| 12 | authority? |
| 13 A | Correct. |
| 14 Q | And then the original certificates of insurance |
| 15 | naming Universal as a certificate holder refers to |
| 16 | the requirement that Universal had that Martin's |
| 17 | had to show they had certain insurance coverage? |
| 18 A | Yes. |
| 19 Q | Okay.  If I recall -- strike that. |
| 20 | Do you know how much insurance Martin's |
| 21 | had to have? |
| 22 A | Which type of insurance, because they require -- |
| 23 Q | Either general liability or commercial liability. |
| 24 A | The, I believe that the master agreement required |
| 25 | that they had a million dollars in coverage. |

| | 87 |
|---|---|
| 1 Q | Okay.  And then the cargo insurance was, is it |
| 2 | 100,000? |
| 3 A | Each customer agreement is different, so dependent |
| 4 | upon what International Paper required, that would |
| 5 | be the coverage that we would require.  Each |
| 6 | customer the contract language is different. |
| 7 | Industry standard is 100,000. |
| 8 Q | Okay.  And then International Paper also had |
| 9 | certain insurance requirements that, that Universal |
| 10 | had to adhere to, correct? |
| 11 A | Yes. |
| 12 Q | Okay.  And do you remember what those amounts were? |
| 13 A | No. |
| 14 Q | And those were set forth in the October 7th -- or |
| 15 | excuse -- me the October 1st, 2007 contract? |
| 16 A | The full body contract? |
| 17 Q | Yes. |
| 18 A | I would assume that's in there, yes. |
| 19 Q | Yes.  The original contract that had been between |
| 20 | Overnight and International Paper? |
| 21 A | Right. |
| 22 Q | Okay.  And then the next sentence here on this |
| 23 | document, Exhibit 11, says:  "Terms and conditions |
| 24 | of standard truckload bill of lading and carrier |
| 25 | rules circular apply." |

| | 88 |
|---|---|
| 1 A | Mm-hmm. |
| 2 Q | What's that refer to, Ms. Hubbs? |
| 3 A | It refers to the language contained on the bill of |
| 4 | lading.  It's a standard transportation language, |
| 5 | you know, the specifics of it. |
| 6 Q | Okay.  And the next line there says:  "See |
| 7 | www.uacl.com."  I take it that's Universal's |
| 8 | website? |
| 9 A | Correct. |
| 10 Q | Okay.  When it says "see that website," for what |
| 11 | purpose? |
| 12 A | So that they could read the full terms of those, of |
| 13 | that language. |
| 14 Q | The bill of lading language? |
| 15 A | The bill of lading language, yes. |
| 16 Q | And then Universal went on to say that "Any |
| 17 | modifications to this agreement must be in writing |
| 18 | initialed by an authorized signatory of both |
| 19 | parties and dated," correct? |
| 20 A | Correct. |
| 21 Q | Okay.  And then it says:  "Sign and," or "Please |
| 22 | sign and fax to John Moorer," with a phone number. |
| 23 A | Mm-hmm. |
| 24 Q | What is it that had to be signed and faxed to John |
| 25 | Moorer?  I mean, this document? |

| | 89 |
|---|---|
| 1 A | This -- yes, this document. |
| 2 Q | Okay.  And then in the boxed section, it says: |
| 3 | "Mail to Broker Settlements, UACL, attention John |
| 4 | Moorer."  What's that referring to? |
| 5 A | All of the requested, when they got the signed bill |
| 6 | of ladings and the clear delivery receipts, along |
| 7 | with this, if they haven't already sent it, to send |
| 8 | the originals.  This is the mail address. |
| 9 Q | Okay.  And then this is dated -- or, I'm sorry. |
| 10 | This is signed by Melody Hanson and Pat Podlina, or |
| 11 | Melody Hanson for Universal and Pat Podlina for |
| 12 | Martin's; is that right? |
| 13 A | Yes. |
| 14 Q | Okay.  Now, down on the bottom there's a, the very |
| 15 | bottom there's a line that says:  "All detention, |
| 16 | layover or truck ordered not used charges will be |
| 17 | paid when UACL collects the charges." |
| 18 A | Mm-hmm. |
| 19 Q | What does that mean? |
| 20 A | It means detention, layover and truck order not used |
| 21 | are what we consider accessorial charges, so and |
| 22 | until we collect the money, we do not pay the broker |
| 23 | carrier, versus payment for this contract would be |
| 24 | paid as soon as we receive their documents versus |
| 25 | collection from the customer.  We will pay the |

**90**

1   broker carrier before we get paid so long as we have
2   these originals.
3 Q   Okay.  Except for detention, layover --
4 A   Except for detention, layover and truck order not
5   used.
6 Q   -- charges.
7 A   Because it's very hard to collect from the customer,
8   they tend to not want to pay them.
9 Q   Okay.  And the customer here would be International
10   Paper?
11 A   Yes, or any other customer, whoever the biller is of
12   those charges.
13 Q   Okay.  And what do these three expressions mean in
14   your business; what's detention refer to?
15 A   Detention means if the carrier, whoever is carrying
16   the goods, if they arrive at International Paper and
17   let's say International Paper has a long delay,
18   there's a lot of carriers in line and so they're
19   detained.  In the industry, two hours is generally
20   free, and then after that detention charges start to
21   accumulate.  And then -- and that could be what at
22   the origin or the destination, so it could be any of
23   these deliveries.
24        And generally, then, layover is when
25   you --

**91**

1 Q   If I could interrupt you, I apologize.
2 A   Sure.
3 Q   And I'll come back to it, certainly.  But with
4   respect to the detention charges, when it goes
5   beyond two hours, how is the rate determined for
6   the detention charge?
7 A   It's usually in an addendum.  If it's a customer
8   that is contractual, that detention, the free time,
9   can change, based on the contract language.  If it's
10   not a customer under contract, our rules or what we
11   have within our rules tariff dictates then, and the
12   standard in the industry is two hours, three hours,
13   it depends.  The automotive companies are four.
14 Q   Okay.
15 A   And then the rate by which you charge is usually
16   contractual as well.
17 Q   Okay.  And here International Paper was a contract
18   customer of Universal's, correct?
19 A   Yes.
20 Q   So there should be in that November -- excuse me --
21   October 2007 contract there likely is some
22   reference to detention charges?
23 A   Yes.
24 Q   And then, okay, when that amount is calculated,
25   does Universal bill International for that amount?

**92**

1 A   Whoever, usually it's whoever the paying agent is.
2   So if International Paper is paying these charges
3   for this cartage, then they would be the ones that
4   would be billed.
5 Q   Okay.  And in this instance, International Paper
6   was paying for the transportation, correct?
7 A   Mm-hmm.  Yes.
8 Q   So then Universal would bill International for that
9   detention charge?
10 A   Yes, if it occurred, yes.
11 Q   Okay.  If that occurs, then do you give some of
12   that detention charge to Martin's because they were
13   up there sitting around?
14 A   Yes.
15 Q   Okay.
16 A   It would all be, but you would get a new -- that's
17   why it stipulates on here, you know, that you can't
18   just add it, we would have to be notified.  They
19   would have to call us or, you know, there would be a
20   change to this document.
21 Q   Mm-hmm.
22 A   That's why it also says any changes has to be
23   initialed.
24 Q   Okay.  And then the next item, layover charges,
25   refers to what?

**93**

1 A   Layover is generally if a truck is laid overnight,
2   so if they get here, in this case at 7:00 o'clock,
3   and for whatever reason the people there can't load
4   them until the next morning or they have to lay
5   overnight, a layover charge is generally an
6   overnight charge, whereas detention is by the hour.
7 Q   Okay.  And would it work the same way that you
8   would then bill International Paper for that
9   layover charge?
10 A   Yes.
11 Q   And then you would, and then you would pay Martin's
12   a portion of that --
13 A   Yes.
14 Q   -- layover charge?
15 A   And it would generally be, a whole other broker
16   agreement --
17 Q   Okay.
18 A   -- would be cut.
19 Q   And then the last item, a truck ordered not used
20   charge refers to what?
21 A   If they, for instance in this case, if International
22   Paper, you know, had Universal come in to make a
23   pickup, and then we arrived and there was no load,
24   or they couldn't load it or it's basically the
25   arrival of a truck on site and there is no

**94**

1  completion of that cartage.
2  Q  Okay. And similarly in that instance, would
3  Universal bill International Paper for that charge?
4  A  Mm-hmm. Yes.
5  Q  Okay. And then does Martin's get some portion of
6  that charge?
7  A  It's assumed, yes. They would cut a whole another
8  broker confirmation sheet and --
9  Q  Okay. I think we've asked other people but who's
10  Ron McGinnis, do you know that name?
11  A  I don't know the name.
12  Q  Okay. Now, that amount, 974.08, am I correct that
13  Universal is actually charging International Paper
14  a larger sum of money for the transportation
15  services, correct?
16  A  We would hope, yes.
17  Q  I agree. And you, and then obviously, needless to
18  say, them, Universal is paying Martin's a smaller
19  portion of the overall charge or amount you have
20  received from International, correct?
21  A  Yes.
22  Q  Okay. The bills of lading that, for this load, was
23  Universal involved in their preparation?
24  A  I don't believe so, no.
25  Q  Okay. And who would have prepared those?

**95**

1  A  Generally it's the the shipper who prepares the bill
2  of lading, so in this case it would be International
3  Paper.
4  Q  Okay. In this particular situation, would
5  International Paper, somebody at International
6  Paper have contacted Melody Hanson to provide her
7  with the bills of lading?
8  MR. FISHER: Excuse me. Objection to form
9  "in this situation," vague. You can go ahead and
10  answer.
11  BY MR. BURKE:
12  Q  Well, let me give you a better question.
13  On this day for this load on July 3rd,
14  2008, would somebody from International Paper have
15  contacted Melody Hanson?
16  A  In regards to?
17  Q  To provide her with the bills of lading.
18  A  Generally -- I don't know about the specifics. I
19  can tell you about industry standards. They
20  generally, we generally don't see the bill of lading
21  from the shipper. It's given directly to the person
22  that picks up the freight because they're signing it
23  as a legal document.
24  Q  Now, here the, Universal had a contractual
25  obligation to deliver this freight for

**96**

1  International Paper on this day, correct?
2  A  Universal, yes. They were assigned, or required to
3  pick up the shipment and move it and, you know,
4  however we got it from point A to point B, whether
5  we put it on our equipment or we brokered it out.
6  Q  Okay. And the person that actually showed up at
7  International Paper to pick up the paper was a
8  driver, Samuel Franke, from Martin's Bulk Milk
9  Service, correct?
10  A  Yes.
11  Q  And Mr. Franke and Martin's, they were acting on
12  behalf of Universal when they arrived to pick up
13  that load, correct?
14  MR. FISHER: Objection to form. Vague.
15  Go ahead and answer.
16  MR. SCHRECK: I'll join.
17  THE WITNESS: Martin's were, they were
18  brokered the load from Universal.
19  BY MR. BURKE:
20  Q  And Martin's, Mr. Franke and Martin's, they were
21  acting on behalf of Universal when they went to
22  Universal's customer to pick up this load on July
23  3rd, correct?
24  MR. FISHER: Objection. Form, vague,
25  asked and answered. You can go ahead and answer.

**97**

1  THE WITNESS: Can you -- oh, okay.
2  Martin's went in and picked up, I believe
3  Universal's contracted to move the lane, so they,
4  yes, went and picked it up.
5  BY MR. BURKE:
6  Q  Okay. And Martin's picked it up on behalf of
7  Universal, correct?
8  MR. FISHER: Objection. You've now asked
9  it three times. I renew the objection. She's
10  asked, she's answered it. You can go ahead and
11  answer again. Same objections.
12  THE WITNESS: Okay. Martin's picked it
13  up, yes, and delivered it.
14  BY MR. BURKE:
15  Q  On behalf of Universal, correct?
16  MR. FISHER: Same objections. Vague,
17  form, asked and answered. You can go ahead and
18  answer again.
19  THE WITNESS: Okay. Martin's picked up
20  the freight. It's -- generally we broker it out so,
21  yes, they picked it up.
22  BY MR. BURKE:
23  Q  Okay. And it is true, is it not, that when
24  Martin's picked up that load, they were Universal's
25  representative in picking up the load that

**98**

1  Universal had contracted to transport, correct?
2          MR. FISHER:  Objection.  Form, foundation,
3  vague, calls for a legal conclusion.  You can go
4  ahead and answer.
5          THE WITNESS:  What do you mean by, like,
6  representative, but --
7  BY MR. BURKE:
8  Q   I mean exactly that.  They were representing
9  Universal when they picked up the load that
10  Universal had agreed to transport, correct?
11          MR. FISHER:  Same objections.  Form,
12  vague, calls for a legal conclusion.  You can go
13  ahead and answer.
14          THE WITNESS:  I mean, they, I don't know,
15  you know, if they were represent -- they weren't
16  saying, "I'm here, I'm Universal."  They were
17  saying, "I'm here, I'm Martin's Bulk Milk, you know,
18  picking up this load."  I think if they were to say
19  "I'm Universal An-Cam," that would be a
20  misrepresentation.
21  BY MR. BURKE:
22  Q   Okay.  They were there at your request?
23  A   Yes.
24  Q   Okay.  Universal did not send any other Universal
25  employee to pick up the load on July 3rd that

**99**

1  Universal was contracted to transport, did they?
2  A   To my knowledge, no, but Universal also doesn't have
3  employee drivers.  We -- all of them are contractors
4  and we, that's extremely significant.
5  Q   Okay.  Universal did not send one of its drivers
6  that, one of its contracted drivers that operated
7  under Universal's door placards --
8  A   I don't believe so.
9  Q   -- to pick up this, correct?
10  A   I don't believe so.
11  Q   It's correct that the only person or business that
12  transported this load that Universal had agreed to
13  transport was Martin's and Mr. Franke, correct?
14          MR. FISHER:  Excuse me.  Could you just
15  read the question back to me real quick?
16          (At or about 2:34 p.m., record read)
17          MR. BURKE:  Bad, bad question.
18          MR. FISHER:  I thought it was a good
19  question.
20  BY MR. BURKE:
21  Q   It is correct that when Universal performed the
22  fulfillment of their contract with International
23  Paper on July 3rd, they did so through Martin's and
24  Mr. Franke, correct?
25          MR. FISHER:  Objection to form,

**100**

1  foundation.  You can go ahead and answer.  And it's
2  vague.
3          THE WITNESS:  Can you repeat that?  Can
4  you read me that question?
5  BY MR. BURKE:
6  Q   You know what, I'll withdraw that one, too.  It's a
7  bad question.
8          Oh, by the way, it is correct that
9  Martin's did not have a contract with International
10  Paper, right?
11          MR. FISHER:  Foundation.
12          THE WITNESS:  I don't know if they did or
13  not outside of this.  I have no idea.
14  BY MR. BURKE:
15  Q   It's true that Martin's transportation of these
16  paper products on July 3rd occurred because
17  Universal had a contract with International Paper
18  that required Universal to haul this load, correct?
19  A   It's, the agreement with Universal and International
20  Paper is to move the load who hauls it, whether it
21  be Universal or someone that they subcontract out
22  is, you know, it varies each lane.  So generally,
23  industry practice is that you are awarded lanes and
24  you have to provide the transportation services.  So
25  as a transportation company, you either move it on

**101**

1  your equipment or you broker it out to make sure
2  that you service that customer because you've agreed
3  to service that lane, the whole lane.
4  Q   Okay.  And what you're referring to is that
5  Universal had agreed to service a whole lane of
6  transportation for International Paper, correct?
7  A   That or an origin, whatever the contract agreements
8  are.
9  Q   Okay.
10  A   And it's generally spelled out in the contract,
11  whether it be a lane, the whole warehouse.
12  Q   Okay.  And when you use that term "lane," what's
13  that mean in your business?
14  A   In our business it means, a lane is from an origin,
15  Hammond, Indiana to, let's say, Minneapolis.  We
16  consider that a lane.  It's from point A to point B.
17  Q   Okay.  And I think if I was following you a moment
18  ago, what you were saying is that Universal had the
19  contractual responsibility to provide
20  transportation services for that lane for
21  International Paper, correct?
22  A   I don't know if that's the specifics but, as far as
23  the contract, but this particular move, yes.
24  Q   Okay.  And Universal had to perform or fulfill its
25  contractual responsibility, as you said, by either

GINA HUBBS
April 16, 2012

---

**102**

1     having their own drivers do it or giving the load
2     to another carrier; is that correct?
3 A   By either having their contractors, someone under
4     the Universal umbrella or, yes, brokering it cut to
5     another company.
6 Q   Okay. Do you know what amounts of insurance
7     coverage Universal had that was applicable to this
8     occurrence?
9 A   No.
10 Q  Who do you think knows that?
11 A  I would assume whoever signed the contract.
12 Q  And what contract are you referring to there?
13 A  The --
14 Q  The amendment?
15 A  Right, yes.
16 Q  Okay. That was Mark Limback on behalf of
17     Universal?
18 A  Right, yes.
19 Q  Okay. We were talking about, you know, some of the
20     provisions on the Exhibit 11, the broker
21     confirmation sheet, about the requirements
22     Universal had in order for Martin's to get paid; do
23     you remember that?
24 A  Yes.
25 Q  Okay. If some requirement wasn't met, who or what

---

**103**

1     department makes the decision "we're not paying
2     Martin's at the moment for this load"?
3 A   It would really depend on what provision wasn't met
4     who would make the decision.
5 Q   Okay. And goods -- okay.
6           MR. BURKE: I don't think I have anything
7     else, Ms. Hubbs. Thank you for your time.
8           THE WITNESS: You're welcome.
9           MR. SCHRECK: Can we take a break real
10   quick?
11           MR. FISHER: Sure.
12           (At or about 2:44 p.m., short recess)
13           (At or about 2:51 p.m., back on record)
14           CROSS-EXAMINATION
15 BY MR. SCHRECK:
16 Q  Okay. Ms. Hubbs, I'm going to -- if I jump around,
17     I apologize, I just want to get a couple of things
18     background-wise before we get going here.
19           What is your date of birth?
20 A  5/24/1972.
21 Q  Okay. And you've indicated that you worked for
22     Universal Truck Load Services?
23 A  I currently work for them.
24 Q  Correct. And you've been with them since 2010; is
25     that right?

---

**104**

1 A   Yes.
2 Q   Okay. Other than being the parent company of
3     Universal Am-Can and presumably others, what type
4     of company is that? What do they do?
5 A   Same, transportation, logistics, warehousing,
6     international, that is the portfolio of their
7     subsidiaries.
8 Q   Okay. Are you married or single?
9 A   I'm single.
10 Q  Okay. You mentioned earlier that before you were
11     at Universal you were at Conway Transportation; is
12     that right?
13 A  That is correct.
14 Q  Okay. And then at some point in time you left
15     there and went to Preston Trucking?
16 A  That's correct.
17 Q  And that's, you say that was in the Philadelphia
18     area?
19 A  That's correct.
20 Q  I see you've got a couple of places in the
21     Philadelphia area that you either went to school or
22     worked at. Are you originally from there or are
23     you originally from the Michigan area?
24 A  I'm originally from here.
25 Q  You had indicated earlier that you were working on

---

**105**

1     your master's. Do you have any intentions to
2     continue with your education to pursue that or no?
3 A   If I have some time, yes.
4 Q   As far as your educational background is concerned,
5     is there anything, either courses that you have
6     taken or degrees that you've obtained, that's
7     specific to the transportation industry?
8 A   No, I don't believe so.
9 Q   You were describing earlier various different
10     positions you've had at the different trucking
11     companies. Have you ever been involved in your
12     role as, in any of those companies, with the
13     day-to-day transportation of goods through sending
14     out broker confirmation sheets or things of those,
15     of that like?
16 A  Yes.
17 Q  Okay. And which company did you do that for?
18 A  For Universal.
19 Q  Okay. Is that when you were at the Dearborn
20     facility?
21 A  Yes.
22 Q  Okay. And when you were at the Dearborn facility,
23     were you sending out sheets for loads that were
24     going to be hauled by other carriers as well as
25     owner/operators for Universal?

GINA HUBBS
April 16, 2012

---

**106**

1 A    Was I sending out these sheets?

2 Q    These types of sheets.

3 A    These type of sheets are usually only sent out when

4      you subcontract with a broker carrier.

5 Q    Okay.  But you -- it was a bad question.  I

6      probably combined the two.

7           You had some communications when you were

8      a manager at the Dearborn facility with

9      owner/operators regarding them and picking up

10     loads, correct?

11 A   For our Universal owner/operators?

12 Q   Yes.

13 A   Yes.  We had, at Dearborn we had owner/operators

14     that were Universal Am-Can owner/operators.

15 Q   Okay.  And when you were the manager of that

16     facility, did you also have occasion to send out

17     broker confirmation sheets or something to that

18     effect to companies that were going to haul goods

19     on behalf of Universal that were not

20     owner/operators?

21         MR. FISHER:  Objection.  Form.  You can go

22     ahead and answer.

23         THE WITNESS:  I sent out broker

24     confirmation sheets to carriers that Universal would

25     subcontract out to, not to specific owner/operators.

---

**107**

1      I don't -- it was to a company.

2 BY MR. SCHRECK:

3 Q    And I'll rephrase my question.  I'm trying to

4      exclude the owner/operators.

5           So when you were at the Dearborn facility,

6      you would send out broker confirmation sheets to

7      carriers that were going to haul goods on behalf of

8      Universal; is that right?

9          MR. FISHER:  Form.

10         THE WITNESS:  We would send out broker

11     confirmation sheets to other carriers that were

12     going to, same thing, pick up loads for Universal

13     that, you know, we couldn't handle.  So, yeah, we

14     use those.

15         MR. SCHRECK:  Okay.  Do you have Exhibit

16     75?

17         MR. FISHER:  Sure.  Do you know what date

18     that one is?

19         MR. SCHRECK:  6/12/08.

20         MR. FISHER:  Okay.

21 BY MR. SCHRECK:

22 Q    You've got Exhibit 75 in front of you?

23 A    Yes.

24 Q    Okay.  You were asked a lot of questions about that

25     earlier.  I was just wanting to clarify one thing.

---

**108**

1      That particular copy is not signed by Universal

2      Am-Can; is that correct?

3 A    Correct.

4 Q    Okay.  Have you ever seen a signed copy of Exhibit

5      75?

6 A    Of this specific one?

7 Q    That -- yeah, that particular document --

8 A    No.

9 Q    Let me finish the question so we can just get it on

10     the record here.

11          Have you ever seen a signed copy of the

12     June 12, 2008 agreement that's marked as Exhibit 75

13     that was signed by Universal Am-Can?

14 A    I have not.

15 Q    Okay.  As it concerns the agreements between

16     Martin's Bulk Milk Service and Universal Am-Can,

17     which is, there's one dated January 14th, 2004,

18     which is marked as Exhibit 73, and then there's

19     one, June 12th, 2008, marked as Exhibit 75, and

20     there's a third one, I don't remember the exact

21     Exhibit number, that is dated January 14th, 2004.

22     Did I say that right -- strike that.

23          Do I have --

24         MR. FISHER:  73, 15 and 75.

25         MR. SCHRECK:  Correct.

---

**109**

1 BY MR. SCHRECK:

2 Q    Were you involved in negotiating any of those

3      agreements?

4 A    These master broker's agreements?

5 Q    Correct.

6 A    They're not negotiated.

7 Q    Were you involved in contacting Martin's and

8      discussing the agreement and the relationship

9      between the parties when they had these documents

10     executed?

11 A   No.

12 Q   Okay.  There are several documents that are in that

13     packet, some of which apply to Overnight Express

14     and Martin's Bulk Milk, and there's other ones from

15     Universal Am-Can and Martin's Bulk, and I'm talking

16     about the brokerage agreements.

17          In light of the fact that Overnight

18     Express acquired Universal Am-Can, do you know

19     specifically which contract or agreement would have

20     been in effect in operation on July 3rd, 2008?

21         MR. FISHER:  Can I suggest you rephrase,

22     because you said Overnight acquiring Universal

23     Am-Can.

24         MR. SCHRECK:  I'll rephrase.

25         MR. FISHER:  Okay.

29 (Pages 110-113)

GINA HUBBS
April 16, 2012

---

**110**

1 BY MR. SCHRECK:

2 Q    In light of the fact that Overnight Express was

3      acquired by Universal Am-Can, and there are several

4      brokerage agreements between Martin's Bulk and

5      Overnight and Martin's Bulk and Universal Am-Can,

6      do you know which agreement would have been in

7      effect on July 3rd, 2008, or no?

8              MR. BURKE:  Objection to the form, which

9      assumes that any one of them might have been in

10     effect.  But subject to that, you can go ahead and

11     answer.

12 BY MR. SCHRECK:

13 Q    If any of them were in effect, do you know which

14     one it would be?

15 A    Well, there would only be one that would be in

16     effect, and that would be the one between Universal

17     and Martin's Bulk Milk because Overnight Express

18     ceased to exist at that point.  So based on that,

19     then, the contract that would have fallen, the

20     broker master agreement between Universal and

21     Martin's Bulk Milk during that period would be the

22     one that would prevail.

23 Q    Okay.  And the reason I'm asking you, and you may

24     not know this, there's timeframes in each of these

25     agreements, and they appear to overlap.  Do you

---

**111**

1      know which specific agreement, if any of them,

2      would have been in operation on July 3rd, 2008 or

3      no?

4 A    The one, the one that is June, dated June 12th.

5      It's titled, or it's Exhibit 75, Universal Am-Can

6      Master Brokerage Agreement, dated June 12th, June,

7      2008.

8 Q    Okay.  And had you ever seen a fully executed copy

9      of the June 12th, 2008 agreement that you're

10     referring to?

11 A    You mean signed by Universal Am-Can?

12 Q    Correct.

13 A    I have not.

14 Q    Okay.  Now, what is the basis of you saying that

15     the June 12th, 2008 agreement was in operation

16     versus some of the other agreements that are, have

17     been marked as exhibits that you've looked at

18     today?

19 A    Well, the, you're talking about the date of July

20     3rd, 2008; is that correct?

21 Q    Correct.  Okay.  Let me refer you to -- I don't

22     know what this was marked as far as a number goes.

23     Do you have Exhibit 1 Bates stamped 15?

24             MR. FISHER:  It's probably in that packet.

25             MR. SCHRECK:  This is the November 7th

---

**112**

1      one.

2              THE WITNESS:  And what number is it?

3 BY MR. SCHRECK:

4 Q    Page 15 of Exhibit 1.  It's the one that's dated

5      November 7, 2007.

6 A    Well, I would assume -- and this one is Universal,

7      because the one that I just referred to, dated June

8      2008, follows this one from 2007.  So 2007 would no

9      longer be in effect because 2008 was then signed by

10     Martin's, which is on number 19, page 19.

11             MR. FISHER:  Of Exhibit 1?

12             THE WITNESS:  Yes.

13 BY MR. SCHRECK:

14 Q    Okay.

15 A    So there's changes that go on, between, you know,

16     for carriers when they change their contract,

17     there's going to be new ones that come out, and this

18     was a new version, and I would assume with different

19     language.

20 Q    Okay.  And that's what I'm saying, you're assuming.

21     You just said, just now you said you assumed.

22 A    Well, I agreed to it, yeah.  The dates?

23 Q    Because each of the contracts talk about the time

24     period which they're going to apply, and they say

25     what they say.  I guess my question to you is do

---

**113**

1      you know if specifically which agreement, if any of

2      them, were in effect on July 3rd, 2008, or whoever

3      signed them or was dealing with them, who would be

4      the better person to ask?

5              MR. FISHER:  Objection.  Asked and

6      answered.  You can go ahead and answer.

7              THE WITNESS:  This June 8th would

8      be in effect.  It was signed after June 7th.  Or the

9      one -- I'm sorry -- in 2007.  This new contract,

10     2008, would be in effect.

11 BY MR. SCHRECK:

12 Q    Okay.  And are you saying that purely because of

13     the dates or is there something else --

14 A    Yes.

15 Q    -- that would have that?

16 A    The dates.

17 Q    Okay.  So regardless of what the attorneys argue

18     the specific agreement says from a time period of

19     when they're going to run to and from is, is --

20 A    Well, I believe, if you signed the bottom, or if you

21     read the bottom of the contract, this brokerage

22     contract, it specifies that it's in effect until --

23     I would have to reread it -- but when I was

24     performing the function of the vice president of the

25     company, that's the way in which we --

GINA HUBBS
April 16, 2012

**114**

1 Q   Have you ever entered into a master brokerage
2     agreement for Universal Am-Can and Martin's Bulk?
3 A   Have I?
4 Q   Correct.
5 A   No.
6 Q   Okay.  Other than seeing these documents in
7     preparation for your deposition, have you ever seen
8     the agreements between Martin's Bulk and Universal
9     Am-Can?
10 A  I have not, but I have seen these broker master
11    agreements.  I mean, I've read them before as part
12    of my function.
13 Q  Okay.  But my question is specifically for Martin's
14    Bulk.
15 A  I have not seen the Martin's one, no.
16 Q  Okay.  Have you read the actual Martin's master
17    brokerage agreements?
18 A  I have, yes.  I've read our documents, these
19    brokerage agreements, yes.
20 Q  Okay.  Have you read each one or do you read one --
21 A  I believe I read most of them.  I don't know if I
22    read, if, which ones they were exactly.
23 Q  Okay.  So if I'm understanding you correctly, you
24    may have read each one or you may have read parts
25    of certain ones; is that correct?

**115**

1 A   Mm-hmm.  Yes.
2 Q   So what each particular agreement says for each
3     date you don't know specifically; is that correct?
4 A   Right.  Specifically, that is correct.
5 Q   Okay.  As far as the contract agreement that was in
6     place on July 3rd, 2008 between International Paper
7     and -- strike that.
8            Prior to Universal acquiring Overnight
9     Express, did you review the contract agreement
10    between International Paper and Overnight Express?
11 A  I did not.
12 Q  Okay.  However, on May 21st, 2008, you sent a
13  .  letter to International Paper agreeing to the terms
14    of the contract; is that right?
15 A  I believe, yes, that's the, that we had signed --
16         MR. FISHER:  Why don't you look at the
17    letter to answer his question.
18         THE WITNESS:  Where is it?
19         MR. BURKE:  I think it's page 65.
20         MR. FISHER:  And Matt, if you could just
21    repose your question, since she was answering it
22    before she got to it.
23         MR. BURKE:  I think you misspoke, anyhow.
24         MR. FISHER:  Yeah, can you read it back
25    and I'll -- I think you said contract between

**116**

1     Universal and Overnight Express.
2            (At or about 3:08 p.m., record read)
3            THE WITNESS:  The terms of the Overnight
4     Express contract?
5 BY MR. SCHRECK:
6 Q   Correct.
7 A   With Universal -- or with International Paper?
8 Q   Correct.
9 A   Did I read it?
10 Q  That was not my question.  Could you read back the
11    question?
12           (At or about 3:10 p.m., record read)
13 BY MR. SCHRECK:
14 Q  Although you didn't look at the contract between
15    International Paper and Overnight Express prior to
16    May 21st, 2008, you did send a letter to
17    International Paper indicating that you're taking
18    assignment of that contract; is that correct?
19 A  Yes.  It states we will accept the assignment of the
20    current contract and accept the rates and fuel
21    surcharge.
22 Q  Okay.  Do you have Exhibit 11 in front of you, the
23    brokerage confirmation sheet?
24 A  Yes.
25 Q  Question for you, on the top of that sheet it says:

**117**

1     "This rate confirmation sheet issued on 5/1/2006
2     serves to supplement the matter."
3 A   Correct.
4 Q   It says, it looks like it's a typo there:
5     "Brokerage agreement between Universal Am-Can
6     Limited Brokerage Division and ICC Property
7     Broker," with a number in parenthesis, and it
8     doesn't have a name there, correct?
9 A   Mm-hmm.  Well, it does underneath where you fill it
10    in.
11 Q  Yeah, at that point the rest of the form gets
12    filled in by hand?
13 A  Yes.
14 Q  Okay.  My question for you is, what's the
15    significance of the May 1st, 2006 date?
16 A  I believe it is a typo.  It's, it generally is
17    changed on the, you know, the date that it's issued.
18 Q  Okay.  And as far as the load that was being
19    transported on July 3rd, 2008, is this the document
20    that would indicate what the relationship was
21    between Martin's Bulk and Universal Am-Can on that
22    date for this load?
23         MR. FISHER:  Objection.  Form, foundation,
24    vague.  You can go ahead and answer.
25         THE WITNESS:  No.  I would assume it would

---

**118**

1  be the brokerage agreement that's signed.  This is,
2  this indicates that without that signing of that
3  master brokerage agreement, that there won't be
4  payment.  This just simply is, you know, the rates
5  and the origin and destination.
6 BY MR. SCHRECK:
7 Q    Okay.  On this document, Universal Am-Can is
8  providing instructions to Martin's as to when and
9  where to pick up the load, correct?
10 A    Yes.
11 Q    Okay.  It's also giving them instructions to the
12  location where the goods are to be delivered?
13 A    Yes.
14 Q    As well as the date they're supposed to be
15  delivered?
16 A    Yes.
17 Q    As well as the time for each delivery, correct?
18 A    Yes.  Well, it looks like the first one there is no
19  time.  That's Cenveo.  It doesn't appear as though
20  there's a time in there.
21 Q    There's a time right next to the delivery date,
22  correct?  It says 7/7/2008.
23 A    Oh, yep.  Yes.
24 Q    Okay.  So this document does give instructions from
25  Universal Am-Can to Martin's as to the times for

---

**119**

1  deliveries, or at least ranges for times for
2  deliveries, correct?
3 A    Yes.
4 Q    As far as the International Paper commitment was
5  concerned, were the deliveries always the same as
6  far as locations and times?
7 A    I would have no knowledge of that.
8 Q    Okay.  And would Melody Hanson be the one that
9  would know that?
10 A    Yes.
11        MR. SCHRECK:  Okay.  That's all the
12  questions I have.  I'm going to look at my notes,
13  pass the floor.
14        MR. FISHER:  Tim?
15        MR. COUTURE:  Yes?
16        MR. FISHER:  Your turn.
17        MR. COUTURE:  My turn.  Great.  Thanks.
18           CROSS-EXAMINATION
19 BY MR. COUTURE:
20 Q    Hi, ma'am.  My name is Tim Couture.  I represent
21  BMW Company in this lawsuit that is before you.
22        Other than being aware that my clients,
23  BMW, was sued in this lawsuit, do you have any
24  specific knowledge of what role they did or did not
25  play in this accident?

---

**120**

1 A    No.
2 Q    Do you have any -- strike that.
3        I'll tell you that defendant's have
4  alleged that my client's vehicle, in which Jeffrey
5  Scheinman --
6        MR. FISHER:  We can't hear you.
7        MR. COUTURE:  Okay.  I'm trying to be as
8  loud as I can.
9 BY MR. COUTURE:
10 Q    You don't have any knowledge regarding the claim by
11  the Scheinman's and the plaintiffs that the BMW
12  vehicle that he was riding in at the time of the
13  accident was defective, do you?
14 A    I do not.
15 Q    You have no opinions regarding the vehicle that Mr.
16  Scheinman was riding in when he was struck by
17  Samuel Franke's truck, do you?
18 A    I have no opinion.
19        MR. COUTURE:  That's all I have.  Thanks.
20        MR. FISHER:  I've just got a couple.
21           CROSS-EXAMINATION
22 BY MR. FISHER:
23 Q    Ms. Hubbs, you were asked by Mr. Schreck some
24  questions about some master brokerage agreements
25  and the broker confirmation sheet.

---

**121**

1 A    Yes.
2 Q    As a follow-up to those, to those questions, I
3  think you also said that unless the brokerage
4  agreement was signed, there would be no payment.
5  Is that a fair assessment of what would have
6  happened had there been no signed brokerage
7  agreement?
8 A    Master brokerage agreement?
9 Q    Yes.
10 A    Yes.  If it wasn't signed by the broker carrier.  So
11  if they didn't sign our contract, we wouldn't pay
12  them until they signed it.
13 Q    Okay.  And so, in effect, had that not occurred by
14  June 12th or June 13th, 2008, that is to say, a
15  signed brokerage agreement, then Martin's Bulk Milk
16  would not have been involved at all by July 3rd,
17  assuming they had not later provided a signed
18  agreement?
19        MR. SCHRECK:  Object.  Form.  Misstates
20  her prior testimony.
21        MR. FISHER:  I'll rephrase the question.
22 BY MR. FISHER:
23 Q    Did Martin's Bulk Milk, to your knowledge, get paid
24  for the loads that it took from Hammond from June
25  16th, 2008 up through July 3rd, 2008?

GINA HUBBS
April 16, 2012

122

1 A   I don't know.
2 Q   Is there somebody at Universal Am-Can who might
3       know the answer to that question?
4 A   Yes.
5 Q   Who might that be?
6 A   Anyone could pull the documents and state to that
7       effect.
8 Q   Would John Noorer be a person who might know about
9       that?
10 A   If Martin's was paid?
11 Q   Yes.
12 A   Yes.
13 Q   And he knows that because why?  That was a part of
14      his job?
15 A   He was responsible for brokerage and they paid the
16      carriers.
17 Q   When you earlier said that there would be no
18      payment unless there was a signed brokerage
19      agreement, what did you mean by that conclusion?
20 A   I mean, I meant that unless they signed our broker
21      agreement, they would not have been paid.
22 Q   And can you think of any trucking company who might
23      want to haul loads if they were never going to get
24      paid?
25             MR. SCHRECK:  Objection.  Calls for

123

1      speculation.  Form.  Foundation.
2 BY MR. FISHER:
3 Q   You can go ahead and answer.
4 A   No.
5 Q   Your answer's no?
6 A   That's correct.
7 Q   And you also were asked questions about whether or
8       not you'd ever seen a signed copy by UACL of the
9       master brokerage agreement, is that because, to the
10      best of your knowledge that you testified earlier
11      in response to Mr. Burke's questions, that only if
12      a company like Martin's Bulk Milk asked for a
13      double-signed contract or they proposed counter
14      terms that required UACL legal to get involved,
15      would there then be a second signature?
16 A   There would.
17             MR. FISHER:  That's all I have.  That's
18      all I have.
19             REDIRECT EXAMINATION
20 BY MR. BURKE:
21 Q   This agreement that we're talking about and that
22      Mr. Schreck asked you about, am I, did I follow
23      you, do you, is it your belief that the June 12th,
24      2008 master broker agreement between Martin's and
25      Universal was in force and effect on July 3rd of

124

1      2008?
2 A   Yes.
3 Q   Okay.  And you, do you still have that agreement in
4       front of you?
5 A   What number is it?
6 Q   75.
7             MR. FISHER:  It's actually, grab that one
8       right there.  It's a little bit easier to pick it up
9       here.
10            MR. BURKE:  The Exhibit No. 75.
11            MR. FISHER:  Okay.  We're with you.
12 BY MR. BURKE:
13 Q   Okay.  Ms. Hubbs, did you say this type of master
14      brokerage agreement is non-negotiable or not
15      negotiated?
16 A   Yeah, it's not -- he had asked me is this something
17      that you negotiate.  It's not.  It's a standard
18      contract.  It's not like I would call Martin's Bulk
19      Milk and negotiate a broker contract.  It's a
20      standard contract that any carrier that wants to be,
21      you know, brokered, accept a brokered load from
22      Universal has to sign this contract.  It lays out
23      the terms and conditions for that, you know,
24      cartage.  And so if there are changes, if a carrier
25      proposes changes, then we would give it to our legal

125

1      team.  It's a standard contract.
2 Q   Okay.  A standard contract that's prepared by
3       Universal, correct?
4 A   Yes.
5 Q   Okay.  And basically it's given to -- and all of
6       the terms are prepared by Universal and given to
7       the carrier with the expectation the carrier is to
8       accept those terms?
9 A   Yes.
10 Q   Okay.  If they want to do hauling for Universal?
11 A   Yes.
12 Q   Okay.  In that contract there's a paragraph three,
13      do you see that?  Can you direct your attention to
14      that?  It's about the middle of the page.
15 A   Yes.
16 Q   Okay.  In paragraph three --
17 A   Yes.
18 Q   -- line three, am I correct that Universal required
19      that Martin's represent and warrant that Martin's
20      was duly and legally qualified to provide as a
21      contract carrier the transportation services
22      contemplated in this agreement?
23 A   Yes.
24 Q   Okay.  And in plain language, does that mean
25      Martin's had to prove they had valid operating

GINA HUBBS
April 16, 2012

126

```
 1      authority as a carrier?
 2 A    It would be valid operating authority as well as
 3      insurance coverage.
 4 Q    Okay.  And so they would have to have the requisite
 5      insurance coverage?
 6 A    Requisite?
 7 Q    The required insurance.
 8 A    Yes.
 9 Q    Okay.  And you know, when you make reference to
10      that, is there something in the terms I just quoted
11      that, that make you think of insurance or -- I know
12      there's a section down below that talks about
13      insurance.
14 A    Well, in order to, you know, operate on the roads,
15      the government requires that you have insurance,
16      that you, you know, have operating authority.
17 Q    Okay.  And that's, that's what I thought you might
18      be thinking of.  So they had to basically have
19      operating authority which would require them to
20      have the required insurance mandated by the Federal
21      Motor Vehicle Safety Act, correct?
22 A    Yes.  Yes.
23 Q    Okay.  And then also Universal required that
24      Martin's be able to confirm that they did not have
25      an unsatisfactory safety rating from the U.S.
```

127

```
 1      Department of Transportation?
 2 A    Yes.
 3 Q    And then you also -- or strike that.
 4              Universal required that Martin's comply
 5      with all federal, state, and local laws regarding
 6      the providing of transportation services under this
 7      agreement, correct?
 8 A    Yes.
 9 Q    Okay.  And that would include all traffic,
10      complying with all traffic regulations that
11      tractor-trailer truck drivers had to follow,
12      correct?
13              MR. SCHRECK:  Objection to form and
14      foundation.
15              MR. FISHER:  Competence, and the other
16      objections Mr. Schreck made.  You can go ahead and
17      answer.
18              THE WITNESS:  Can you re-read that
19      question?
20 BY MR. BURKE:
21 Q    Here, I'll repeat it.
22              Universal required that Martin's comply
23      with all federal, state, and local laws regarding
24      the provision of the transportation services
25      contemplated under this agreement, right?
```

128

```
 1 A    That is correct.
 2 Q    Okay.  And some of the federal, state, and local
 3      laws referred to there would include a Martin's
 4      driver complying with traffic regulations while
 5      they were hauling the load at Universal's request,
 6      correct?
 7              MR. SCHRECK:  Objection.
 8              MR. FISHER:  Objection.  Go ahead, Matt.
 9              MR. SCHRECK:  Form.  Foundation.
10              MR. FISHER:  Competence.  You can go ahead
11      and answer.
12              THE WITNESS:  Yes.
13 BY MR. BURKE:
14 Q    Okay.
15 A    Yeah.
16 Q    And you mentioned insurance a moment ago.  You have
17      a specific paragraph on page five, or in paragraph
18      five that sets forth insurance requirements that
19      Martin's had to meet; am I correct?
20 A    Yes.
21 Q    Okay.  And Martin's, or any -- Martin, yeah, this
22      is Martin.  So Martin's had to have public
23      liability insurance in an amount not less than one
24      million dollars, correct?
25 A    It says per occurrence, not less than one million
```

129

```
 1      per occurrence.
 2 Q    Okay.  And they also had to have 100,000 in cargo
 3      insurance per occurrence, correct?
 4 A    Yes.
 5 Q    Okay.  And Universal had to be named as an entity
 6      that was covered by the insurance that Martin's
 7      maintained, correct?
 8 A    Yes.  Universal had to be named as an insured, yes.
 9 Q    Okay.  And Universal also required Martin's to have
10      statutory workers' compensation insurance and
11      employee liability coverage in accord with
12      applicable state law, correct?
13 A    Yes.
14 Q    Okay.  And then you also required -- or strike
15      that.
16              Universal also required, in paragraph D,
17      that Martin's furnish Universal with written
18      certificates from their insurance carriers showing
19      they did, in fact, have the insurance coverage that
20      Universal required, correct?
21 A    Yes.
22 Q    Okay.  Now, in paragraph six, that talks about
23      payment for hauling these loads, correct?
24 A    Yes.
25 Q    Okay.  In general terms.  And why don't you look at
```

**130**

1    one, two, three, four, five, six, about six lines
2    up from the bottom, maybe seven.  It's the sentence
3    that starts with "carrier" on the right side.
4    "Carrier agrees that UACL," are you with me?
5 A  Yes.
6 Q  Okay.  Universal, as part of their agreement here,
7    required that Martin's agree that Universal had the
8    exclusive right to handle all billing of freight
9    charges to the customer for the transportation of
10   the goods that were being hauled, correct?
11 A Yes.
12 Q Okay.  And that meant that, in this case, in this
13   instance, it was Universal that had the exclusive
14   right to bill International Paper, correct?
15 A Yes.
16 Q Okay.  And Martin's, you required that Martin -- or
17   strike that.
18       Universal required that Martin's refrain
19   from any collection efforts against International
20   Paper or the consignor or the receiver or the
21   consignee or the customer, correct?
22 A Yes.
23 Q Okay.  And in the last part of paragraph six,
24   Universal required that Martin's agree that
25   Universal had a discretionary right to offset any

**131**

1    payments owed to Martin's for liability incurred by
2    Martin pursuant to the agreement, correct?
3 A  Yes.
4 Q  And then, you know -- by the way, what is that
5    last, give me an example of that last situation
6    referred to in paragraph six.  What type of, you
7    know, payments might be offset?
8 A  What type of payments are -- well, if Universal was
9    to pay Martin's Bulk Milk, they would offset that
10   payment due to some other issue.
11 Q And -- go ahead.  And what I'm getting at is an
12   example of what's that other issue.
13 A Other issue would be potentially a claim.
14 Q By?
15 A Martin's.
16 Q Martin's?
17 A Like if they damaged freight or, you know, boxes or
18   something such as that.
19 Q Okay.  So if International --
20 A And if they didn't handle their obligation to work
21   that claim, process that claim through their, you
22   know, however means they process their claims, if
23   they failed that obligation, then we have the right
24   to offset those payments.
25 Q Okay.  So you, meaning that you would reduce the

**132**

1    payment Universal makes to Martin's because of some
2    failure to comply with the terms of the contract?
3 A  Yes.
4 Q  Okay.  And for example, if the goods got damaged?
5 A  Right.
6 Q  Okay.  And then in paragraph seven, Martin's, under
7    this agreement, was not permitted to solicit any
8    loads from International Paper, correct?
9 A  Well, there's certain requirements around this.
10   It's a back-solicitation clause.
11 Q Okay.
12 A So it specifies, you know, if they weren't already
13   doing business with them, they couldn't attempt to
14   go after this piece of business that we, you know,
15   brokered out to them.
16 Q Right.  And thank you.  I did give you a kind of
17   shorthand version of that.  And that's what number
18   one is referring to, right, that Martin's had to
19   agree they wouldn't solicit traffic from any
20   shipper where the availability of such traffic
21   first became known to Martin's as a result of
22   Universal's efforts?
23 A Right.  As a result of us giving them that specific
24   load.
25 Q Right.  Okay.  And then there's other

**133**

1    circumstances, too, where they can't solicit the
2    traffic, correct --
3 A  Correct.
4 Q  -- in the rest of paragraph seven?
5 A  Correct.
6 Q  And then in paragraph eight, Universal prohibited
7    Martin's -- well, strike that.
8       Universal required that Martin's actually
9    make the delivery of the, of the load that was
10   given to them, correct?
11 A This paragraph is -- yes, that it, they can't then
12   broker this load out to another party.  We call it
13   double-brokering in the industry.
14 Q Right.  Okay.
15 A So they have to transport it under their authority.
16 Q Okay.  Martin's would have to?
17 A Yes.
18 Q Okay.  And they were precluded from, as you say --
19 A Double-brokering.
20 Q -- double-brokering or hiring another carrier --
21 A Right.
22 Q -- to actually make the delivery?
23 A Correct.
24 Q And then in paragraph ten, in line three, it starts
25   with "However, carrier," do you see that?

**134**

1 A  Yes.

2 Q  Okay.  Universal required that the carrier contact

3  Universal's designated agent with billing

4  information immediately upon completion of loading

5  and with the name of the receiver and the status of

6  delivery immediately upon completion of delivery,

7  correct?

8 A  Well, that's because of the first part of the

9  paragraph it says that the carrier is solely

10  responsible, you know, to basically dispatch that

11  load, their driver, but you still have to let

12  Universal know that, you know, the billing

13  information that confirmed that the load is picked

14  up and that it's been delivered.

15 Q  Okay.  You know, do you, in your, the copy there,

16  do you have the -- well, strike that.

17      I mean, just back to the, those, all of

18  the provisions we've been talking about and, in

19  fact, all 14 provisions here were requirements that

20  Universal required Martin's to comply with in order

21  to haul freight for them; am I correct?

22 A  Yes.

23 Q  Okay.  And then, you know, do you have this page

24  that's entitled "Welcome to the Universal Am-Can

25  Brokerage Division," is that -- do you have that

**135**

1  there in the version you have?

2 A  Yes.

3 Q  Okay.  You know, in about the middle of the page --

4      MR. SCHRECK:  What page do you have?

5      MR. BURKE:  It's not Bates stamped, but

6  it's part of Exhibit 75.

7      MR. SCHRECK:  All right.

8      MR. BURKE:  Matt, do you see it, or --

9      MR. SCHRECK:  Yeah.  I just want to glance

10  at it before you talk about it.  Okay.

11 BY MR. BURKE:

12 Q  In the middle of the page there's a line in bold

13  print with two stars next to it that says:  "All

14  requirements must be met before we can dispatch

15  your truck."

16 A  Mm-hmm.

17 Q  Okay.  And, you know, the word "dispatch" is used

18  there.  What's that mean?

19 A  It means, well, it means a bunch of different

20  things, but as far as this agreement it means

21  basically before we can assign, give you this

22  assignment of the broker confirmation sheet, so

23  before we can give you the information for the

24  pickup, you, we have to have a signed brokerage

25  agreement, you know, all of these things that we've

**136**

1  outlined.

2 Q  Okay.  And in essence, you're not, or Universal's

3  not going to give Martin's a load to haul unless

4  they have complied with these requirements,

5  correct?

6 A  Correct.

7 Q  Okay.  And we probably touched on some of these

8  before, but number one was the freight bill and all

9  paperwork has to reference the order number,

10  correct?

11 A  Yes.

12 Q  Okay.  And then number two --

13      MR. FISHER:  Wait a minute.  Rich, are you

14  now talking about before assignment or before being

15  paid?

16      MR. BURKE:  Well, I'm talking about what

17  it says here.  It must be met before we can dispatch

18  your truck.

19      MR. FISHER:  But then it says --

20      MR. BURKE:  Okay.  Here, and maybe my --

21  let me clarify.

22 BY MR. BURKE:

23 Q  Ms. Hubbs, is the reference to "all the

24  requirements must be met before we can dispatch

25  your truck," are those requirements set forth up

**137**

1  above that line?

2 A  Yes.

3 Q  Okay.  And that's, there are six requirements set

4  forth there, are there not?

5 A  Really five, and then send it in, yes.

6 Q  Okay.  And the first one is the three-page master

7  brokerage agreement has to be signed, right?

8 A  Right.

9 Q  And Martin's would have to provide a copy of a

10  contract and/or common authority to operate as a

11  motor carrier?

12 A  Yes.

13 Q  And number three, they have to provide proof of

14  proper insurance coverage, right?

15 A  Yes.

16 Q  And they have to give you a completed W-9 in number

17  four, correct?

18 A  Yes.

19 Q  And number five, they have to complete and return a

20  carrier's survey form, correct?

21 A  Yes.

22 Q  And that refers, the carrier survey is basically

23  information about Martin's?

24 A  Yes.

25 Q  Number of trucks and things like that?  And there's

GINA HUBBS
April 16, 2012

---

138

1    actually a copy --
2 A   Yes.  Yes.
3 Q   Okay.  And then, as you pointed out, all of this,
4     and the number six requirement is that all of this
5     information has to be faxed to the Universal phone
6     number provided here, correct?
7 A   Yes.
8 Q   Okay.  And then, then the next, the lower half of
9     the page sets forth various requirements for
10    getting paid.
11 A  Well, it says "tips," and it's really because
12    there's so many loads that if you don't have these
13    things, it can slow up the payment.
14 Q  Okay.  And in reality, these items have to be
15    complied with in order to get paid, correct?
16 A  Not necessarily, no.
17 Q  No?
18 A  I mean, your order number, we can dig it up, but
19    with hundreds of thousands of loads that are being
20    moved, it's going to take us some time.  So it's
21    saying, you know, for prompt payment here's some
22    tips to expedite your payment.
23 Q  Okay.
24 A  If you don't, if you don't put the order number on
25    it we're not going to not pay you, it's just going

---

139

1    to, you know, it gets pulled aside and someone has
2    to work these.
3 Q   Sure.  I got you.  Okay.  Number two, providing the
4     original paper work including bills of lading and a
5     clear delivery receipt attached to the invoice,
6     that's a requirement, correct?
7 A   That's a requirement.
8 Q   Okay.  You know, you got asked, I think with Mr.
9     Schreck, about that October 1st contract or October
10    1st, 2007, contract between International Paper and
11    Overnight Express, correct; do you remember that?
12    That's the contract that --
13 A  Is that the addendum or --
14 Q  No.  Well, that's the contract that Universal took
15    over, that you accepted the assignment of?
16 A  Right.
17 Q  Okay.  And that contract, I think I showed you
18    earlier, it's at page 33, and if you -- do you have
19    that one in your batch or not?  If that's Exhibit
20    1, look for page 33.
21 A  Okay.
22 Q  Okay.  And then page three of that -- page three of
23    the contract or Bates page 35 starts the substance
24    of the contract, right?
25 A  Yes.

---

140

1 Q   Okay.  And this is the contract plus the amendment
2     number one that gave rise to Universal's obligation
3     to transport the loads that were being transported
4     on the day of this incident, correct?
5 A   I believe so.
6 Q   Okay.  And in this contract, Overnight Express was
7     the carrier, correct?
8         MR. FISHER:  Objection.  Asked and
9     answered.  You can go ahead and answer.
10        THE WITNESS:  Well, it's, it says
11    "carrier" in quotes.  That's language typical, you
12    know, contract language where they designate
13    shipper, that's why it's in quotes, and carrier in
14    quotes.
15 BY MR. BURKE:
16 Q   Okay.  And Universal replaced Overnight Express as
17    the carrier in this agreement, correct?
18 A  Yes.
19 Q   Okay.  And then the last thing, or last of your --
20    no.
21        MR. BURKE:  I think I did cover
22    everything.  Thank you.
23        THE WITNESS:  You're welcome.
24        MR. SCHRECK:  I don't have anything else.
25        MR. FISHER:  Tim?

---

141

1         MR. COUTURE:  Yeah, what's up?
2         MR. FISHER:  No questions, right?
3         MR. COUTURE:  Nope.
4         MR. FISHER:  Signature's reserved.
5     (At or about 3:49 p.m., deposition
6     concluded)
7         - - -

GINA HUBBS
April 16, 2012

142

1                    ERRATA-READSIGN
2
3                         ERRATA
4    SCHEINMAN VS. MARTIN'S BULK MILK SERVICE, et al
5         DEPOSITION OF GINA HUBBS - 4/16/2012
6 Page/Line #                        Correction
7 _____    _____
8 _____    _____
9 _____    _____.
10 _____   _____
11 _____   _____
12 _____   _____
13 _____   _____
14 _____   _____
15 _____   _____
16 _____   _____
17 _____   _____
18 _____   _____
19 _____   _____
20 _____   _____
21 _____   _____
22 _____   _____
23 _____   _____
24 _____   _____
25 _____   _____

143

1                       AFFIDAVIT
2       I have read my deposition, and the same is true and
3 accurate, except for any changes and/or corrections, if
4 any, as indicated by me on the Errata sheet(s) attached
5 hereto.
6
7
8                  _____
9                       GINA HUBBS
10
11
12                      N O T A R Y
13 Subscribed and sworn to me this _____ day of _____,
14 2012.
15
16 My commission expires _____.
17
18 _____, NOTARY PUBLIC, in and for the
19 State of Michigan.
20
21
22
23
24
25

144

1                    CERTIFICATE OF COURT REPORTER

2        STATE OF MICHIGAN   )
                             )
3        COUNTY OF OAKLAND   )

4
                    I certify that this transcript, consisting
5        of 144 pages, is a complete, true and correct record
         of the testimony of GINA HUBBS, held in this case on
6        Monday, April 16, 2012.

7                    I also certify that prior to taking this
         deposition, GINA HUBBS, was duly sworn to tell the
8        truth.

9                    I also certify that I am not a relative or
         employee of or an attorney for a party; or a
10       relative or employee of an attorney for a party; or
         financially interested in the action.

11

12

13       _____
         KATHLEEN M. SMITH (CSR-4232)
14       Certified Shorthand Reporter
         Notary Public, Oakland County, Michigan
15       My Commission Expires:  1/2/2016

16
         Dated:  May 7, 2012
17

18

19

20

21

22

23

24

25