# EX. 8

John Moorer Deposition
dated, April 16, 2012

JOHN MOORER
April 16, 2012

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3  MURRAY SCHEINMAN, Plenary    )
    Guardian of the Estate      )
 4  and Person of JEFFREY J.    )
    SCHEINMAN, a disabled       )
 5  person,                     )
                                )
 6                Plaintiff,    )
    vs.                         )  Case No. 09-CV-5340
 7                              )
    MARTIN'S BULK MILK SERVICE, )
 8  INC.; SAMUEL G. FRANKE; CSX )
    INTERMODAL, INC.;           )
 9  INTERNATIONAL PAPER COMPANY;)
    UNIVERSAL AM-CAN LTD.,      )
10  successor to Overnite       )
    Express, Inc.; OX, L.L.C.;  )
11  BMW OF NORTH AMERICA,       )
    L.L.C., a corporation;      )
12  BAYERISCHE MOTOREN          )
    WERKEAKTIENGESELLSCHAFT, a  )
13  corporation; BMW AG, a      )
    corporation; and KARL KNAUZ )
14  MOTORS, INC., a corporation,)
                                )
15               Defendants.    )

16            DEPOSITION OF JOHN MOORER

17  Taken by the Plaintiff on the 16th day of April, 2012, at
    26600 Schoenherr Road, Warren, Michigan  48089
18
    APPEARANCES:
19
    For the Plaintiff:    RICHARD F. BURKE, JR., ESQ.
20                        Clifford Law Offices, PC
                          120 North La Salle Street
21                        31st Floor
                          Chicago, Illinois  60602
22                        Telephone: (312) 899-9090

23  For the Defendant     CARLTON D. FISHER, ESQ.
    International         Hinshaw & Culbertson, LLP
24  Paper Company,        222 North La Salle Street
    Universal Am-Can,     Suite 300
25  LTD., and Ox,         Chicago, Illinois  60601
    L.L.C.:               Telephone: (312) 704-3450
```

**Page 2**

```
 1 APPEARANCES (Continued):
 2
   For the Defendants    MR. MATTHEW R. SCHRECK, ESQ.
 3 Samuel G. Franke      Mulherin, Rehfeldt & Varchetto
   and Martin's Bulk     211 South Wheaton Avenue, Suite 200
 4 Milk Service:         Wheaton, Illinois  60187
                         Telephone: (630) 517-5082
 5
   For the Defendant     MR. ROBERT J. GOLDEN, ESQ.
 6 Martin's Bulk Milk    Dowd & Dowd
   Service               617 West Fulton Street
 7 (Via Telephone):      Chicago, Illinois  60661
                         Telephone: (312) 762-9518
 8
   For the Defendant     TIMOTHY R. COUTURE, ESQ.
 9 BMW, Bayerische,      Johnson & Bell, Ltd.
   And Karl Knauz        33 West Monroe Street
10 Motors                Suite 2700
   (Via Telephone):      Chicago, Illinois  60603
11                       Telephone: (312) 984-6651
12
13
14
15
16
17
18
19
20
21
22
23
24 Reported by:   Kathleen M. Smith (CSR-4232)
25                Certified Shorthand Reporter
```

**Page 3**

```
 1        T A B L E    O F    C O N T E N T S
 2 WITNESS
                                           PAGE
 3 JOHN MOORER
 4     Direct Examination by Mr. Burke       4
       Cross-Examination by Mr. Schreck     47
 5     Cross-Examination by Mr. Fisher      58
       Redirect Examination by Mr. Burke    67
 6     Recross-Examination by Mr. Fisher    71
       Redirect Examination by Mr. Burke    73
 7
 8
 9
10
11
12
13
14
15
16
17
18
19              E X H I B I T S
20
21
22
23                      Marked      Admitted
24
25 No exhibits offered
```

**Page 4**

```
 1                      Warren, Michigan
 2                      Monday, April 16, 2012
 3                      At or about 4:23 p.m.
 4                         —  —  —
 5
 6                  MR. BURKE:  Let the record reflect this is
 7   the discovery deposition of Mr. John Moorer, taken
 8   pursuant to notice and in accord with the rules of
 9   the United States District Court for the Northern
10   District of Illinois and the 7th Circuit.
11              J O H N   M O O R E R,
12 having been duly sworn at or about 4:23 p.m., called by
13 the Plaintiff, testified as follows:
14                  DIRECT EXAMINATION
15 BY MR. BURKE:
16 Q     Mr. Moorer, my name is Rich Burke.  Again, I
17       represent Mr. Scheinman, and I'm going to ask you
18       some questions about your work with Universal.  And
19       as I do so, if you want any questions repeated,
20       they don't make sense, just say so.  If you want to
21       look at some documents, tell me or Mr. Fisher.  And
22       if you can verbalize your yes and no answers, even
23       though we can see you nodding your head, the court
24       reporter's got to take down the answer, if that
25       happens to be your answer, okay?
```

**Page 5**

```
 1 A     Okay.
 2                  MR. COUTURE:  Can you turn the volume up
 3       again, because you're quiet again.
 4                  MR. FISHER:  It's up all the way.
 5                  MR. COUTURE:  Okay.  Thanks.
 6 BY MR. BURKE:
 7 Q     And if you and I don't talk at the same time, that
 8       helps the court reporter, too, because she can only
 9       take down one of us talking, okay?
10 A     Yes.
11 Q     Would you please state your name and spell your
12       last name for the record?
13 A     John Moorer, last name is spelled M-O-O-R-E-R.
14 Q     And how is it pronounced?
15 A     Moore.
16 Q     Moore, okay.  And what's your date of birth, sir?
17 A     12/30/1971.
18 Q     And by whom are you currently employed?
19 A     Universal Logistic Services.
20 Q     Universal Logistic Services?
21 A     Yes.
22 Q     And where is their business location?
23 A     12755 East Nine Mile Road, Warren, Michigan.
24 Q     Okay.  And are they related to Universal Am-Can in
25       some way?
```

3 (Pages 6-9)

JOHN MOORER
April 16, 2012

6

1 A    They are a sister company.
2 Q    Okay.  And who is their parent company?
3 A    UTSI.
4 Q    Okay.  And do you know what UTSI stands for?
5 A    Yes.
6 Q    And what is that, sir?
7 A    Universal Truckload Services, Incorporated.
8 Q    And what's the business of Universal Logistic
9      Services?
10 A   We're predominately a brokerage service.
11 Q   Okay.  And the non-predominant part of the business
12     involves what?
13 A   Intermodal services.
14 Q   Okay.  And for how long has Universal Logistic
15     Services been in existence, if you know?
16 A   I couldn't answer that directly because I don't know
17     how long it's been in business.
18 Q   Okay.  Do you believe it existed in 2008?
19 A   No.
20 Q   When do you think it -- it came into existence
21     sometime between 2008 and today?
22 A   If I had to make an educated guess, I would say
23     sometime around 2010.
24 Q   Okay.  And what's your understanding of what
25     prompted the creation of Universal Logistics?

7

1           MR. FISHER:  Foundation.  You can go ahead
2      and answer.
3           THE WITNESS:  I have no idea what prompted
4      it.
5 BY MR. BURKE:
6 Q    Did some division of another company get spun off
7      into Universal Logistics?
8 A    I believe Crossroad Carriers, the intermodal
9      company, was spun into Universal Logistics.
10 Q   And is Crossroads Carrier the intermodal company
11     you referred to earlier, or intermodal business, I
12     should say?
13 A   Formerly, yes.
14 Q   How long have you worked at Universal Logistics?
15 A   Since July 5th of last year.
16 Q   Of 2011?
17 A   Yes.
18 Q   And what's your position or job title, sir?
19 A   Project manager.
20 Q   Okay.  And what do you do in that job?
21 A   Currently I'm running the government portion of the
22     business.
23 Q   And that essentially entails what type of topics or
24     issues?
25 A   It covers basically transportation services that the

8

1      government is looking for us to cover for them.
2 Q    To provide transportation services?
3 A    To provide transportation services for them.
4 Q    What's your educational background, Mr. Moorer?
5 A    I have an associate's degree, currently still in
6      school.
7 Q    Okay.  Where did you get your associate's?
8 A    Oakland Community College.
9 Q    Where at, in what city?
10 A   I believe it's Bloomfield Hills, Michigan.
11 Q   Okay.  And what's that degree in?
12 A   Liberal arts.
13 Q   And when did you get that?
14 A   Back in '99.
15 Q   And do you go to school today, did you say?
16 A   Yes.
17 Q   Where at?
18 A   University of Michigan.
19 Q   And what campus or location?
20 A   Currently at the Dearborn campus.
21 Q   Okay.  And what's your course of study?
22 A   Minor criminal justice, major in psychology.
23 Q   Do you go full-time or part-time?
24 A   Currently part-time.
25 Q   Okay.  Do you have any other degrees other than

9

1      your associate's?
2 A    No.
3 Q    Do you have any certificates or --
4 A    Yes.
5 Q    In what, sir?
6 A    I'm a certified pharmacy technician and I'm also a
7      certified transportation broker.
8           MR. SCHRECK:  What was that second one?
9           MR. FISHER:  Transportation broker.
10 BY MR. BURKE:
11 Q   Certified transportation broker.
12          Where did you get that certificate from?
13 A   Which one are you referring to?
14 Q   I'm sorry.  Thank you.  The one Mr. Schreck just
15     asked about, the transportation broker?
16 A   That was from the Transportation Intermediaries
17     Association.
18 Q   When did you get that, sir?
19 A   I believe in 2008.  Don't quote me on that because I
20     don't keep up with it.
21 Q   And did you have to complete any training or course
22     of study for that certificate?
23 A   You have to complete a course of study, but I didn't
24     take the course of study because they allowed me to
25     use my experience as working in the transportation

**10**

1   industry as an equivalent to the years of study that

2   they require.

3 Q   Did you have to take any tests before getting that

4   certificate?

5 A   I took a test in order to obtain the certificate.

6 Q   Okay.  And how about the pharmacy tech certificate,

7   where did you get that from?

8 A   That was issued from the Pharmacy Transportation

9   Board.  That's out of Washington D.C.

10 Q   From the pharmacy what board?

11 A   Here, let me check my, because I don't --

12 Q   Sure.  Take your time.

13         (At or about 4:32 p.m., witness finding

14         card in wallet)

15      MR. FISHER:  Let me see it first.

16      THE WITNESS:  Pharmacy Technician

17   Certification Board.  They're located out of

18   Washington D.C.

19 BY MR. BURKE:

20 Q   Okay.  And maybe I misheard you, I thought you had

21   said Pharmacy Transportation Board.

22 A   No.

23 Q   I thought one of us is mixing our thoughts here,

24   so, okay.

25         Anything else, sir, in the way of degrees

**11**

1   or certificates?

2 A   No.

3 Q   Okay.  How long, when did you first work for any

4   Universal or Universal Am-Can related business or

5   corporation?

6 A   I started September, 2000.

7 Q   And at that time, who did you start working for?

8   What company, I mean.

9 A   Oh, it was, Universal Am-Can was the company I

10   started with.

11 Q   Okay.  And at what location?

12 A   Warren, Michigan location.

13 Q   Okay.  And what was your job when you started?

14 A   Fleet manager.

15 Q   And what did you do in that position?

16 A   I managed the fleet units for Universal Am-Can.

17   Starting at the night shift this one, though.

18 Q   And what's a fleet manager really do on a daily

19   basis?

20 A   Takes down accident reports; assist the drivers in

21   obtaining fuel money; bills loads in the system if

22   they picked up a load after hours; help them with

23   any type of breakdown or repairs, send out a

24   dispatch, a company to help them repair their

25   equipment or send a tow truck if their tractor is

**12**

1   disabled; take down any accident reports.  If

2   there's any type of freight damage, we would start

3   the freight claim, the initial process and procedure

4   for that.

5 Q   Okay.  Have you, do you have a CDL?

6 A   No.

7 Q   Have you ever had one?

8 A   No.

9 Q   Have you ever worked as a tractor-trailer truck

10   driver?

11 A   No.

12 Q   Have you, other than your work at Universal, have

13   you worked for any other trucking-related

14   businesses?

15 A   No.

16 Q   Prior to 2000 what were you doing?

17 A   Prior to 2000 I was a pharmacy tech, certified

18   pharmacy technician for St. John Health Systems.

19 Q   And for how many years, approximately?

20 A   Approximately -- nine years, approximately.

21 Q   Now moving back to Universal, Mr. Moorer, what, give

22   me, walk me through, if you would, your positions

23   you've held there.  How long did you remain a fleet

24   manager?

25 A   I believe I remained a fleet manager up until, I

**13**

1   would like to say October, 2006, if I'm not

2   mistaken.

3 Q   Okay.  And what did you do then?

4 A   I became the brokerage manager for Universal Am-Can.

5 Q   Okay.  And where did you work at physically?

6 A   Warren, Michigan, in the general office.

7 Q   And what did you do as the brokerage manager?

8 A   Particularly we made sure that the carriers were

9   qualified to haul loads for Universal, and we

10   handled their freight payments.

11 Q   Okay.  And when you say "handled freight payments,"

12   does that mean paying them for the freight that

13   they have hauled for Universal?

14 A   Paying them for services that they provided for

15   transporting loads that was brokered to them by

16   Universal Am-Can.

17 Q   Okay.  How long did you remain in that position?

18 A   From 2006 until 2009 I was the sole brokerage

19   manager for Universal Am-Can solely.  In May of 2009

20   they merged the brokerage division itself into one

21   unit, and I've had to, I was assistant manager for

22   Universal Am-Can, Great American, Louisiana

23   Transport, Mason-Dixon, Mason-Dixon Intermodal, I

24   believe that's it.  I think I've named all of them.

25 Q   Okay.  If I'm following you correctly, the

**14**

1 brokerage divisions for all those companies that
2 you just mentioned got merged, is that what you
3 were saying?
4 A  Correct.
5 Q  Okay.  In 2007 -- or I'm sorry.  In June and July
6 of 2008, were you the brokerage manager for
7 Universal Am-Can at that time?
8 A  Yes.
9 Q  Have you given any depositions before?
10 A  This is my first deposition.
11 Q  How about, have you testified in court at all?
12 A  No.
13 Q  In 2008, to whom did you report; who was your boss?
14 A  My primary boss was Mark Limback, and then the
15 second in command was Gina Hubbs, vice president.
16 Q  Is Gina Hubbs or Mark Limback a higher level
17 employee of Universal?
18 A  Yes.
19 Q  No, which of them is the higher level?
20 A  Mark Limback has the higher level, he's the
21 president.  Gina is the vice president.
22 Q  Okay.  So you reported to, Mark would be the
23 highest level, Mark Limback that you, the highest
24 level guy you reported to, and under him you'd
25 report to Gina?

**15**

1 A  Yes.
2 Q  Okay.  Have you reviewed any documents or materials
3 in anticipation of giving a deposition today?
4 A  Yes.
5 Q  Okay.  And what did you look at, sir?
6 A  The brokerage rate confirmation sheet.
7 Q  For July 3rd?
8 A  I don't recall the date, the exact date, but I
9 reviewed the rate confirmation sheet.
10 Q  Okay.  What else, or anything else?
11 A  The brokerage, master brokerage contract which I was
12 responsible for.
13 Q  Okay.  Anything else?
14 A  Not that I recollect.
15 Q  When you say the master brokerage contract, which
16 one are you talking, I mean, between what entities,
17 to begin with?
18 A  The master brokerage contract that would have been
19 between Universal and the broker carrier.
20 Q  Okay.  And do you remember who the broker carrier
21 was?
22 A  The contract I looked at was at Martin Bulk Milk.
23 Q  Okay.  And did you look at more than one contract
24 in terms of dates between Martin's and Universal?
25 A  Yes, I reviewed more than one date.

**16**

1 Q  Okay.  Do you remember the dates that you reviewed?
2 A  Not offhand.  I can give an estimate date but I
3 don't recall the exact dates, no.
4 Q  Okay.  And what estimated dates do you remember?
5 A  I believe it was an '02 document, an '06 document,
6 and on '08 document.
7 Q  Okay.  Do you, do you know if any one of those --
8 or strike that.
9          Of those three dates, or approximate dates
10 of documents you mentioned, do you believe that in
11 any one of them was in force in effect on July 3rd,
12 2008?
13 A  Yes.
14 Q  And which one or ones?
15 A  The last dated document would be the one that would
16 be in effect at that time.
17 Q  And I believe that one is dated June 12th of 2008
18 that you're referring to; does that sound familiar?
19 A  I believe that is the date.
20 Q  Okay.  And I don't mean for you to have to guess at
21 that, so let me just take a look at Exhibit
22 No. 75.  And there's a date -- or excuse me.
23          Is that a document entitled Universal
24 Am-Can Limited Master Brokerage Agreement?
25 A  Yes.

**17**

1 Q  And is the opening paragraph dated June 12th of
2 2008?
3 A  Yes.
4 Q  Okay.  And it's between Universal Am-Can Limited
5 Brokerage Division and Martin Bulk Milk Services,
6 correct?
7 A  It's between Universal Am-Can Limited under their
8 brokerage authority and Martin's Bulk Milk, yes.
9 Q  All right.  The way it's actually worded is
10 "Universal Am-Can Limited Brokerage Division,"
11 correct?
12 A  Correct.
13 Q  Was the brokerage division its own corporation --
14 or strike that.
15          Was Universal Am-Can Limited Brokerage
16 Division, was that a corporation in and of itself
17 or does that refer to a brokerage division of
18 Universal Am-Can Limited?
19 A  A brokerage division of Universal Am-Can Limited.
20 Q  Okay.  You know, take a look at the -- or strike
21 that.
22          That's a three-page document, right?
23 A  Yes.
24 Q  And on page three of the document it's got
25 signature lines for carrier, Martin's Bulk Milk,

6  (Pages 18-21)

JOHN MOORER
April 16, 2012

---

**18**

1   correct?

2 A   Yes.

3 Q   And it's signed by Pat Podlina, correct?

4 A   Yes.

5 Q   Okay.  Is there any date indicating when Mr.

6   Podlina signed this document?

7 A   There's no signatory date, but the effective date

8   would have been June 12th, 2008.

9 Q   Would I be correct that you don't know when this

10   document would have been actually signed by Mr.

11   Podlina?

12 A   I can assume that he signed it on June the 12th,

13   2008.

14 Q   And why would you assume that?

15 A   Based on the document that I'm looking at, that was

16   our practice.  It goes by the date that they sign on

17   the first sheet.  Normally when they fax the

18   documents over there's also a fax transmission that

19   also has another date when that document arrived, it

20   came over.

21 Q   Okay.  And do you have that document or have you

22   seen it?

23        MR. FISHER:  I'm sorry.  You can go ahead

24   and answer the question.  I think I know where we're

25   headed, but go ahead.

---

**19**

1        THE WITNESS:  I haven't seen it today, no.

2        MR. FISHER:  I've got something that might

3   help.

4        MR. BURKE:  So do I.  What have you got?

5        MR. FISHER:  It's like a poker game here.

6   I got marked Exhibit 16.

7        MR. BURKE:  Let me see what's --

8        MR. FISHER:  The transmission dates are on

9   there.

10        MR. BURKE:  Okay.

11        MR. FISHER:  We normally don't play cards

12   like that, Mr. Moorer.

13 BY MR. BURKE:

14 Q   Okay.  Take a look at 16, and does that appear to

15   be another copy of the Universal Am-Can Limited

16   Master Brokerage Agreement --

17 A   Yes.

18 Q   -- that we've been looking at that's marked as

19   Exhibit 75?

20        MR. FISHER:  No, 16.

21        MR. FISHER:  Yeah, I know.  16 is the same

22   as, another copy of Exhibit 75.

23        MR. FISHER:  Objection to form.  You can

24   go ahead and answer it.  You can compare both of

25   them to see if they're the same.  You need to go --

---

**20**

1   75 starts here.

2        MR. SCHRECK:  Of course you gave him

3   something that's all stapled together, right?

4        MR. FISHER:  Right.  Okay.  75 starts here

5   and then this is 16.

6 BY MR. BURKE:

7 Q   And here, let me rephrase that a little bit.

8        Is the content of the agreement in Exhibit

9   16 the same as the content of the agreement in 75?

10   And when I say that, I'm talking about content as

11   opposed to fax information, things like that?

12        MR. FISHER:  Hang on.  And you're

13   referring to the three pages that are the first

14   three pages of each exhibit?

15        MR. BURKE:  Correct.

16        MR. FISHER:  Yeah, okay.

17        THE WITNESS:  Yes, it appears that it's

18   the same content.

19 BY MR. BURKE:

20 Q   Okay.  And Exhibit 16 is unsigned as well by

21   anybody from Universal, correct?

22 A   Correct.

23 Q   And Exhibit 75 also was unsigned by anybody from

24   Universal, correct?

25 A   Correct.

---

**21**

1 Q   Have you ever seen a signed copy of this agreement

2   signed by anybody on behalf of Universal?

3 A   Yes.

4 Q   And where did you see that at?

5 A   Normally I would sign the contracts if it was

6   requested from the carrier to give them an executed

7   contract, I would sign it and provide it to them.

8 Q   Okay.  Did you, in fact, sign this agreement?

9 A   No.

10 Q   Okay.  So there is no signed agreement, or there's

11   no June 12th, 2008 agreement signed by yourself or

12   anyone else on behalf of Universal; is that

13   correct?

14 A   Martin Bulk Milk did not call and request it so I

15   didn't sign it.  That wasn't our policy at that time

16   to sign.  I believe today we still don't sign them

17   unless requested by the carrier.

18 Q   Okay.  And therefore, it is correct that Universal

19   does not have any copy of this June 12th, 2008

20   master brokerage agreement that has been signed by

21   anyone on behalf of Universal, correct?

22 A   No.  We do not have a copy that's signed by me, no.

23 Q   Okay.  We were talking a moment ago as to do you

24   know when you received this document from Martin's

25   Bulk Milk Service?

**22**

1  A   Yes.

2  Q   And when do you think you did, sir?

3  A   I believe I received it on June the 17th.

4  Q   Okay.  And are you basing that on the fact

5      information on the top of Exhibit 16?

6  A   Actually I'm basing it on -- is this document 16?

7          MR. FISHER:  That is 16, that exhibit is

8      16.

9          THE WITNESS:  Yes.

10 BY MR. BURKE:

11 Q   Okay.  The content of this June 12th, 2008 master

12     brokerage agreement has 14 paragraphs, correct?

13 A   Yes.

14 Q   Okay.  And both Exhibit 16 and Exhibit 75, are they

15     true and accurate copies of the master brokerage

16     agreement dated June 12, 2008, that you believe was

17     applicable or in existence and in force and effect

18     on July 3rd, 2008?

19 A   Yes.

20 Q   You said you were responsible for this agreement;

21     is that right?

22 A   I was responsible for obtaining the master brokerage

23     agreement, the W-9's, the carrier's authority --

24     operating authority -- and insurance having

25     Universal Am-Can as the certificate holder on their

**23**

1      insurance.

2  Q   Okay.  Did you, did you draft or prepare any of the

3      actual content of this agreement?

4  A   No.

5  Q   Do you know who did so?

6  A   I believe it would have been our in-house counsel

7      and a external source, lawyer, that would have

8      worked on the contract.

9  Q   Was this a negotiated agreement or were these terms

10     all prepared by Universal and given to Martin's?

11 A   In order for any carrier to haul, transport freight

12     for Universal, they would have to have signed this

13     brokerage agreement, and if they did not sign the

14     brokerage agreement, they would not have been able

15     to transport loads for Universal.

16 Q   And am I correct that this agreement sets forth a

17     number of requirements from Universal that Martin's

18     had to comply with in order to be given freight to

19     haul for Universal?

20 A   Could you rephrase that, because I'm, it kind of

21     sounds a little bit different.

22 Q   Sure.  Am I correct that this agreement sets forth

23     a number of different requirements that Martin's

24     had to meet in order to haul freight for Universal?

25 A   Yes.

**24**

1  Q   If Martin's could not meet these requirements, is

2      it correct that Universal would not have allowed

3      them to haul freight for Universal?

4  A   We, if they would not have fulfilled the agreement

5      and the requirements that was required per this

6      contract, insurance and operating authority, they

7      could not conduct business with Universal Am-Can,

8      that's correct.

9  Q   Okay.  And if after entering into one of these

10     agreements, Universal -- or strike that.

11         If after entering into a, into this master

12     brokerage agreement Martin's was unable to meet one

13     of their requirements in here for whatever reason,

14     would Universal terminate Martin's as a carrier of

15     freight for Universal?

16 A   If their, if their safety fitness fell outside the

17     scope of our threshold, then they would have been

18     suspended from being able to haul loads for

19     Universal.

20 Q   Okay.  And this agreement could be terminated by

21     Universal if Martin's failed to comply with the

22     requirements set forth here; is that correct?

23 A   Yes.  Also, Martin's Bulk Milk could also terminate

24     the contract.

25 Q   Are you, were you, are you familiar with the

**25**

1      purchase by Universal Am-Can of Overnight Express?

2  A   No.  I was not involved in the purchase of Overnight

3      Express.

4  Q   Okay.  My question actually was are you familiar

5      with it?

6  A   I knew of the acquisition taking place, if that's

7      your question, yes.

8  Q   Okay.  And my next question was going to be, were

9      you involved in that purchase by Universal of

10     Overnight Express?

11 A   No.

12 Q   Okay.  Did you have any role relative to Overnight

13     Express after Universal purchased them effective

14     June 13th, 2008?

15         MR. FISHER:  Excuse me.  Could I have the,

16     just the first part of the question again.

17         (At or about 5:02 p.m., record read)

18         MR. FISHER:  Form.  You can go ahead and

19     answer.

20         THE WITNESS:  No.

21 BY MR. BURKE:

22 Q   On June 12th -- or strike that.

23         In Exhibits 16 and 75, where this, where

24     the date of June 12th is written in the first

25     paragraph of the agreement -- do you see where I'm

## Page 26

1    at?

2 A  Yes.

3 Q  Okay.  Did you place that writing there?  Did you

4    place the date June 12th there?

5 A  No.

6 Q  Okay.  Do you know who did?

7 A  It looks like the signature from Martin's Bulk Milk.

8 Q  When you would send these out to a carrier, do you

9    send them out blank?

10 A  Yes.

11 Q  Do you fill in the carrier's name?

12 A  No.

13 Q  What prompted you to send Martin's this master

14    brokerage agreement on or around June 12th of 2008?

15          MR. FISHER:  Objection.  Form, foundation,

16    and assumes facts not in evidence.  You can go ahead

17    and answer.

18          THE WITNESS:  I faxed the Martin Bulk Milk

19    the brokerage agreement actually prior to June 12th,

20    2008, because they wanted to do a load for another

21    agent of ours.

22 BY MR. BURKE:

23 Q  Okay.  And who was that other agent?

24 A  I don't recall offhand.

25 Q  And how is it you remember you sent it at sometime

## Page 27

1    prior to June 12th?

2 A  Because another agent wanted to do a load with

3    Martin Bulk Milk, so I sent it over to them, and

4    during the time when this one came over, they

5    weren't set up because they, I believe, were shut

6    off at the time because our system automatically

7    terminates a carrier after, well, at the time of

8    inactivity, so I was still looking for them to send

9    back the brokerage agreement in order to get them

10    set up in the system.  And I actually had to go on

11    the FMCSA website to check their safety condition.

12 Q  Whose, Martin's?

13 A  Martin's Bulk Milk.

14 Q  Okay.  I lost some of what you said there.  You

15    said something to the effect of another agent

16    wanted to do a load with Martin's?

17 A  Correct.

18 Q  Okay.  And is that the agent that you don't recall

19    who it is?

20 A  I don't recall who it is at this time, no.

21 Q  Okay.  And when you use the term agent, Mr. Moorer,

22    what do you mean by that?

23 A  We have agents that are their own businesses, per

24    se, but they're agents for Universal Am-Can.

25 Q  Okay.  And what do they do for Universal Am-Can as

## Page 28

1    an agent of Universal?

2 A  They bring in their personal customers, shippers.

3    Some of them have their own trucks, and some of our

4    agents are primar -- they'll broker a load out, they

5    just do primarily brokerage, so some don't even have

6    trucks.

7 Q  Okay.  The ones that bring in loads from their

8    personal customers, who actually hauls those loads?

9 A  It depends on if they're sent on a company truck or

10    if they're brokering the load out to an outside

11    carrier.

12 Q  Okay.  So they might get hauled on a Universal

13    company truck, correct?

14 A  Correct.

15 Q  Or it could get brokered out to some other carrier?

16 A  Correct.

17 Q  Okay.  And then am I correct that some of those

18    agents drive their truck under Universal's

19    operating authority?

20 A  Yes.

21 Q  Do you, do you -- have you seen any other documents

22    that relate to what you've been telling us about

23    how you remember another agent wanting to do work

24    with Martin's and that's why you created this

25    agreement?

## Page 29

1 A  Well, I didn't create the agreement.

2 Q  Or why you sent it out?

3 A  I send, for every load that an agent wants to broker

4    out to an outside carrier, that carrier has to be

5    approved through the brokerage department.  So they

6    have to get qualified, they have to be deemed as a

7    fit carrier to haul loads for Universal.  Then that

8    will go, would have went through my department, and

9    then after they were qualified to haul freight for

10    Universal Am-Can Limited, then the agent would issue

11    out a rate confirmation and then they would go out

12    and pick up the load and provide the transportation

13    services.

14 Q  Okay.  From what you've -- or strike that.

15          Do you know how far in advance of June

16    12th, 2008, you sent this master brokerage

17    agreement to Martin's?

18 A  I believe initially I sent it out right before the

19    holiday.

20 Q  Before what holiday?

21 A  Is it Memorial?  It was Memorial Day.

22 Q  Okay.  Which would be about May?

23 A  The end of May.

24 Q  End of May?

25 A  Yes.

**30**

1 Q   Okay. And have you seen any other documents that
2     relate to what you are telling me as to why you
3     sent this agreement out in late May?
4 A   I'm not, I'm not understanding the question. I'm
5     sorry.
6 Q   Sure. Prior to giving your deposition today and at
7     any time in the past, have you reviewed or seen any
8     other documents that cause you to recall what it is
9     you're telling us as to why you sent this agreement
10    out around the end of May of 2008?
11 A  No.
12 Q  Okay. And how is it that you recall this scenario,
13    you know, what is now about four years later?
14 A  Because Martin's Bulk Milk has hauled loads for
15    Universal in the past, and I just recall the agent,
16    one of our agents calling me in saying, hey, we'd
17    like to get this carrier set up. I told him that
18    they had been set up before but they were turned
19    off. And a lot of times, when an agent can't broker
20    a load out they get really hot and testy with me, so
21    I just remembered this particular one. And I knew
22    it because Martin Bulk Milk was a, a good carrier.
23 Q  Okay. And when you say turned off, why, why had
24    Martin's been turned off?
25        Well, let me ask you this: What does

**31**

1     "turned off" mean?
2 A   In a system, in our system it will deactivate a
3     carrier for unconditional safety rating, inactivity,
4     so the system, they put parameters to set up to
5     automatically turn them off if there's no activity
6     or if their safety rating falls below our standards,
7     which is the FMCSA standards.
8 Q   Okay. And had Martin's safety rating fell below
9     your standards?
10 A  No, they were in great shape.
11 Q  Why had they'd been turned off?
12 A  It was due to inactivity.
13 Q  Would I be correct -- or strike that.
14        From what you've been telling us, is it
15    correct that the fact that you sent this master
16    brokerage agreement out sometime at the end of May,
17    2008, and it bears the date June 12th, 2008, has
18    nothing to do with the fact that Universal acquired
19    Overnight Express effective June 13th, 2008?
20 A  That had nothing to do with anything with Overnight
21    Express.
22 Q  Okay.
23 A  According to the documents, the '06 contract
24    probably was the last time we had did business with
25    Martin's Bulk Milk, and we had, that's the reason

**32**

1     why we had to get the new contract set up because
2     there was inactivity and that was the last contract
3     that we had signed.
4 Q   If Martin -- I'm sorry, excuse me. If Universal
5     wants to have a carrier haul some loads that
6     Universal has to get moved, does Universal always
7     have that carrier complete one of these master
8     brokerage agreements?
9 A   Yes.
10 Q  You mentioned -- and I'm not quoting you exactly --
11    but checking out a potential carrier, such as
12    Martin's, do you recall that?
13 A  Yes.
14 Q  Okay. What would you do to accomplish that, sir,
15    what --
16 A  After they would send us over their master,
17    unaltered master brokerage agreement, their W-9, and
18    the certificate of insurance naming us as the
19    certificate holder, we'd be going to safe, at the
20    time it was called Safenet, FMCSA's website, and
21    we'd check to make sure that they were a safe
22    carrier to haul loads and had operating, a valid
23    operating authority to transport loads.
24 Q  And what type of information would you get from
25    that website?

**33**

1 A   It gives you the accident history, if the carrier
2     has an accident history. It gives you all of their
3     service failures, for like brakes out of adjustment,
4     things of that nature.
5 Q   Okay. Am I correct that that website does not
6     provide you with any information about individual
7     drivers from Martin's or some other carrier?
8 A   I believe it does provide information about drivers
9     because it goes by their truck numbers so -- it
10    doesn't, per se, list the actual name of the driver,
11    but it definitely lists the name of the truck
12    that --
13 Q  That would only be if the driver was the owner of
14    that truck, correct?
15 A  No, it would list the registration and the truck,
16    information of the truck that had the failure.
17 Q  Okay. You're talking about for an incident or a
18    failure that is documented in --
19 A  By the DOT.
20 Q  By the DOT. Okay. My question is: Am I correct
21    that you, on that website, you cannot simply look
22    up an individual driver and get information about
23    that driver?
24 A  No.
25 Q  That's a true statement?

10 (Pages 34-37)

JOHN MOORER
April 16, 2012

34

1 A    That's a true statement.

2 Q    Okay.  So for example, here, if you would enter

3      into a master brokerage agreement with Martin's

4      Bulk Milk Service, you would not be able to get any

5      information about the driving experience or

6      abilities of an individual driver, correct?

7 A    Correct.

8 Q    When Universal bought Overnight Express, did you

9      have any involvement with changing the billing

10     process for Overnight's customers that now became

11     Universal's customers?

12 A   No.

13 Q   Was there anything that would have to have been

14     done relative to billing as a result of the

15     acquisition by Universal of Overnight?

16 A   In terms of the brokerage side?

17 Q   In terms of billing for freight which --

18 A   I have no involvement in the billing process.

19 Q   Let me, before I forget, in fact you got it right

20     in front of you.  Exhibit 16, you see how there's a

21     bar, a Universal Am-Can barcode on that?

22 A   Yes.

23 Q   Okay.  Where does that come from or why is that

24     there and not on the copy that's in Exhibit 75?

25 A   Because Exhibit 75 is their master brokerage

35

1      agreement that we faxed over to Martin's Bulk Milk

2      after they signed the master brokerage agreement and

3      sent us back all of these documents that we require

4      them to send us, we put our barcode, and this

5      barcode goes by U, indicating that it's Universal

6      Am-Can, and the carrier's Federal I.D. number.  So

7      this number, 391301505, is Martin's Bulk Milk's

8      number that they were using on their W-9.  And we

9      imaged that document on film to show that we had a

10     signed master brokerage agreement.

11 Q   Okay.  And then on -- do you have, in Exhibit 16,

12     look at the second page of that exhibit.

13        MR. FISHER:  Second page of the contract?

14        MR. BURKE:  Second page of the agreement,

15     yes.  And it should be Bates stamped UACL 20.

16        MR. FISHER:  Okay.

17 BY MR. BURKE:

18 Q   Do you have that, sir?

19 A   Yes.

20 Q   Are there some initials down on the lower right, it

21     likes like a JPP?

22 A   Yes.

23 Q   Whose initials are those?

24 A   JPP is J. Pat Podlina who signed the contract.  She

25     initialed the second page.

36

1        MR. BURKE:  It's actually a he.

2        THE WITNESS:  Oh.

3        MR. FISHER:  I think.  We've been told.

4 BY MR. BURKE:

5 Q    And you have the barcode on all three pages?

6 A    Yes.

7 Q    Okay.  Let me ask you to take a look at Exhibit No.

8      11, and you probably don't have a copy in there.

9        MR. FISHER:  Refresh my memory.

10       MR. BURKE:  It's the broker confirmation

11     sheet for July 3rd.  Here I've got a lot of them

12     here.

13       MR. FISHER:  Great.  Thanks.  Yep.

14 BY MR. BURKE:

15 Q    Have you had a chance to look at that, sir?

16 A    Yes.

17 Q    Okay.  Have you seen this document before?

18 A    Yes.

19 Q    And this is a brokerage confirmation sheet for July

20     3rd, 2008, correct?

21 A    Yes.

22 Q    Okay.  And it's -- is this a type of broker

23     confirmation sheet that was in use by Universal

24     Am-Can in July of 2008?

25 A    Yes.

37

1 Q    Okay.  Was this a full, a form sheet that was used

2      by Universal?

3 A    Yes.

4 Q    Okay.  This document is, it's got Melody Hanson's

5      name in the upper right; do you know her?

6 A    I don't know her, but I know that she worked as an

7      agent or worked in one of the agency offices for

8      Universal Am-Can.

9 Q    Prior to Universal purchasing Overnight Express,

10     was Overnight Express one of the agents of

11     Universal that you have referred to?

12 A    No.

13 Q    Were you familiar with Overnight Express?

14 A    I believe we actually brokered a load to them in the

15     past.

16 Q    When you say the past, obviously, before Universal

17     bought them?

18 A    Yes, like maybe 2006, 2007.  At the time I see so

19     many different carriers come through for payables

20     that we, the name was familiar with, I was familiar

21     with the name.

22 Q    Okay.  Did you have any involvement with the

23     billing process related to this load that is the

24     subject of this July 3rd broker confirmation sheet?

25 A    No.

38

1 Q    Okay.  Why is your name in the middle of this page?
2 A    Because whenever our agents brokers a load out to
3      the carriers, after they come, deliver the load and
4      completed the transportation services for us, they
5      would send the bills of lading invoice and rate
6      confirmation in to me so I can process, process it
7      for payment.
8 Q    Okay.  And would you have processed this for
9      payment?
10 A   If they would have sent in bills of lading, rate
11     confirmation and the invoice and signed a bill of
12     lading, yes, I would have processed this load for
13     payment.
14 Q   Okay.  Do you have any recollection as to whether
15     you actually were involved in processing this
16     particular load for payment?
17 A   I don't recollect, no.
18 Q   Okay.  This document indicates that Martin's Bulk
19     Milk is going to be paid $974.08 for this, for
20     hauling this load, correct?
21 A   Yes.
22 Q   Okay.  Do you know how that amount was determined?
23 A   No.  I wouldn't know how they determined that
24     amount.
25 Q   Do you know how much Universal was paid for this

39

1      load?
2 A    No.  I wouldn't have information offhand, no.  Not
3      without me being able to look at it, no.
4 Q    Okay.  Do you have any involvement in calculating
5      those numbers?
6 A    No.
7 Q    Okay.  Who does, who does that?  Like for this
8      load, who calculates how much Universal gets paid?
9 A    I can't answer that because I don't know, I don't
10     know the details for this shipment.  That would be
11     something that the agent would know.
12 Q   And when you say the agent, who are you referring
13     to?
14 A   Well, the agent number listed here is 6073, so
15     whoever is the agent for that office, they would
16     know the information.
17 Q   And the agent would be somebody different than
18     Martin's Bulk Milk?
19 A   Yes.
20 Q   Okay.  Where, how -- if you were attempting to
21     figure out whose agent number that is, what
22     document would you look at or what, where would you
23     go to do so?
24 A   Off this document, if you -- are you asking if the
25     agent number was not provided?

40

1 Q    No.  I'm saying in order for you to find out the
2      name of the agent, how would you go about doing
3      that?
4 A    We have a system called FoxPro.  I would go in, pull
5      down the agent name and enter the agent number, and
6      I would be able to obtain who the agent is and who
7      are the contacts.
8 Q    And that, that program is called?
9 A    FoxPro.
10 Q   F-o-x-P-r-o?
11 A   Yes.
12             MR. FISHER:  Rich, I have a question.  I
13     have a phone call I need to make to somebody.  I can
14     delay it, I can make it now, just to check on
15     something.  It'll be like one minute.
16             MR. BURKE:  Oh, yeah.
17             MR. FISHER:  You still got a while, right?
18             MR. BURKE:  Yeah, a little bit.  Not huge
19     amounts, but yeah, go right ahead.
20             (At or about 5:33 p.m., short recess)
21             (At or about 5:42 p.m., back on record)
22 BY MR. BURKE:
23 Q    Mr. Moorer, am I correct that your only involvement
24     with respect to billing for this July 3rd, 2008
25     load was that documents may have been sent to you

41

1      from Martin's relating to delivery of the load?
2 A    Yes.  I wouldn't have any involvement in any type of
3      billing.
4 Q    Do you make -- or back in 2008, did you issue
5      payments to carriers?
6 A    Yes.
7 Q    Do you know if you paid Martin's for this load?
8 A    I can't recall offhand, no.
9 Q    What would you look at to figure that out?
10 A   I would go into our AS400 system and I can check by
11     the pro number, which is the load number listed on
12     top, the 9000245546-7, to see if I paid this load
13     out.
14 Q   My recollection is that in, that some of these
15     goods for one of these customers got damaged or
16     were damaged at the time they were delivered, and
17     my question to you is do, are you involved in
18     holding back money from payment to a carrier like
19     Martin's if a customer has complained that they got
20     damaged goods delivered to them?
21 A   Yes.  If a customer notifies our agent or our
22     company store that their product has been damaged,
23     then they would call me and I would place the load
24     on hold until it's resolved by our claims
25     department.

**42**

1 Q  And does over -- or excuse me -- does Universal
2  make a determination as to what amount of money the
3  carrier is entitled to receive in light of that
4  claim for damaged goods?
5 A  I don't know how they proceed with the claims
6  process. Once -- I'm notified that a shipment was
7  involved in the claim and I place the load on hold
8  until it's resolved by the claims department.
9 Q  Okay. Do you have a handy copy of Exhibit 5 for
10  the witness, Carl, or if not, I got one here.
11         MR. FISHER: Tell me what five is.
12         MR. BURKE: It's the memo bills.
13         MR. FISHER: Yeah, I mean, I have it in a
14  different form. 18, 19, 20 is like every
15  combination possible.
16         MR. BURKE: Yeah, I'm not sure if that one
17  has -- here, let me use five.
18         MR. FISHER: Okay.
19 BY MR. BURKE:
20 Q  And let me give you a copy of Exhibit 5, sir. And
21  that's a three-page document, is it not? Take a
22  minute to look at it. And when you look at it, I
23  believe it will show it's a memo billed for three,
24  three separate destinations; am I correct?
25 A  Yes.

**43**

1 Q  Okay. Take the first page, "Papers to be delivered
2  to Xpedx," is that correct? Can you see, do you
3  see their name?
4 A  Yes.
5 Q  Okay. And then the second page Conveo?
6 A  Yes.
7 Q  Okay. And look down at -- stay there on the second
8  page. Look down and see where it says "twelve
9  boxes damaged"?
10 A  Yes.
11 Q  Okay. And that's what I'm referring to. I mean,
12  in this type of situation where apparently the
13  recipient is saying that the goods have been
14  damaged, am I correct Universal has the authority
15  to withhold payment to the carrier until that issue
16  is resolved?
17 A  Yes. In this case, there's a notation of damage,
18  this load would be placed on hold and referred over
19  to the claims department.
20 Q  Okay. And when you say the load, it would be
21  payment for the load would be placed on hold?
22 A  Correct.
23 Q  Okay. Does the middle -- back to Exhibit 11. You
24  can give me that back, sir. Thank you.
25         Back to Exhibit 11 that you have in front

**44**

1  of you where, you see the amount in the middle of
2  the page, $974.08?
3 A  Yes.
4 Q  Okay. Then there's a paragraph, type-written
5  paragraph, correct?
6 A  Yes.
7 Q  Okay. Does that set forth various requirements
8  that must be met before Universal will pay a
9  carrier?
10 A  Yes.
11 Q  Okay. And if the carrier has not complied with
12  those requirements, does Universal withhold
13  payment?
14 A  Well, if these requirements have not been met, a
15  carrier should never have been under the load so we
16  would have never even issued it out, unless the
17  master brokerage agreement was signed, rate
18  confirmation, contract authority and original
19  certificates of insurance. That's the purpose of us
20  qualifying the carrier to haul for us.
21 Q  Okay. So those, Universal requires those
22  requirements be met even before a carrier gets a
23  load; is that right?
24 A  Correct.
25 Q  Okay. You know, in this instance, where Martin's

**45**

1  delivers a load for Universal, do you actually send
2  a check to Martin's for this 974?
3 A  That would depend if they have a factoring company
4  or not. If they have a agreement with a factoring
5  company, then it would go, the check would be made
6  out to Martin's Bulk Milk with the factoring company
7  also assigned to it and a check would be issued to
8  the factoring company.
9 Q  Okay. And what's the purpose of the factoring
10  company in your business?
11 A  Sometimes the carriers run short on money, so
12  they'll sell their invoices for a quick access to
13  money.
14 Q  They sell future, or they sell invoices for future
15  payments?
16 A  Yes.
17 Q  Okay. Assuming the factoring company isn't
18  involved, does Universal issue checks directly to
19  the carrier?
20 A  Yes.
21 Q  Okay. Am I correct that, like for this load that
22  is from International Paper, would International
23  Paper be issuing a check to Universal?
24 A  That --
25         MR. FISHER: Could you just give me that

JOHN MOORER
April 16, 2012

46

1    question back?
2                   (At or about 5:54 p.m., record read)
3              MR. FISHER:  Thank you.  I thought I heard
4    something different.
5              THE WITNESS:  I am not under the
6    receivable's part so I wouldn't, couldn't answer
7    that question.  If you want me to guess, I can
8    assume.
9 BY MR. BURKE:
10 Q    Well, give me your, without guessing or assuming,
11    give me your best educated understanding based on
12    your experience.
13 A    If the customer has a relationship with Universal
14    Am-Can Limited, the customer would pay Universal for
15    services provided.
16 Q    Okay.  In this instance where Universal has a
17    contract with International Paper, would
18    International Paper actually send hard copy checks
19    or would there be electronic fund payments?
20 A    I don't know.  I don't even know who the customer is
21    on this load.  Just because it says shipper,
22    International Paper, it could be a third party, it
23    could be the, constantly paying for the freight
24    services.  I wouldn't know that information.
25              MR. BURKE:  You know, I don't think I have

47

1    anything else, Mr. Moorer.  Thank you.
2              MR. SCHRECK:  Just a few questions for
3    you.
4              CROSS-EXAMINATION
5 BY MR. SCHRECK:
6 Q    Earlier you were talking about some brokerage
7    agreements that you looked at, and I believe you
8    said you looked at ones that were dated 2002, 2006
9    and 2008.  Do you recall specifically over seeing a
10    2006 agreement between Martin's and Universal
11    Am-Can or could it be a different date?
12              MR. FISHER:  Let me just object to form.
13    I think he said it could have been those dates, he
14    wasn't sure.  You can go ahead and answer.
15              THE WITNESS:  I don't know the specific
16    dates.
17 BY MR. SCHRECK:
18 Q    Okay.  So you were looking at one earlier today, I
19    think it was Exhibit 75 that was dated 2008?
20 A    Yes.
21 Q    And Exhibit 16 I think was also 2008; is that
22    correct?
23 A    I believe so.
24 Q    Okay.  During this deposition you haven't looked
25    at, seen any documents that show a contract for, or

48

1    an agreement for 2002 or 2006; is that correct?
2 A    Have I seen it --
3 Q    During this deposition?
4              MR. FISHER:  During the deposition.
5              THE WITNESS:  No.
6              MR. SCHRECK:  Okay.  Do you have, is it
7    Exhibit 1?
8              MR. FISHER:  Yep.  What page?
9              MR. SCHRECK:  Well, actually I was going
10    to ask him, does that contain any agreements dated
11    2002 or 2006?
12              MR. FISHER:  I'll save some time.  It
13    doesn't.
14              MR. SCHRECK:  All right.  That's my point.
15              MR. BURKE:  Just between who, Matt, just
16    for clarification?
17              MR. SCHRECK:  Agreements between Martin's
18    Bulk and Universal Am-Can.
19              MR. FISHER:  I'll agree, Exhibit -- to
20    save time -- Exhibit 1 does not contain any such
21    additional documents.
22 BY MR. SCHRECK:
23 Q    Okay.  And could you be incorrect on the 2006 date,
24    you could have seen a different contract; is that
25    fair?

49

1 A    That's fair.
2 Q    Okay.  One of the things you were talking about
3    earlier was an entity such as Martin's being turned
4    off from the system for a couple of reasons, one
5    being inactivity; do you remember that?
6 A    Yes.
7 Q    Okay.  Tell me how that works in Universal's
8    system.  If somebody gets turned off the system or
9    taken out of the system because of inactivity,
10    what's the time frame we're talking about?
11 A    I don't know the exact time frame that they have set
12    now, but originally it was a 18-month period and
13    then we switched it to a 12-month period.
14 Q    Okay.  Back in June of 2008, do you know if it was
15    the 18-month period or the 12-month period?
16 A    I believe it was the 12-month period in 2008.
17 Q    And what would determine if an entity was inactive
18    under the system?
19 A    If there was no activity, the system, the IT
20    Department set up the system where it automatically
21    terminates the broker carrier.
22 Q    Okay.  I guess my question is what activity itself
23    has to be, goes into the system?  Is it that they
24    didn't carry any loads for Universal during that
25    time period or they didn't have any valid

**50**

1 agreements in that time period, or something else?
2 A I believe it was based off the last time that
3 Universal Am-Can paid the carrier.
4 Q Okay. So it has more to do with Universal paying
5 Martin's than Martin's actually doing anything for
6 Universal; would that, am I understanding it
7 correctly?
8 A I believe. I can't be, because I don't know how the
9 IT Department set it up.
10 Q Okay.
11 A So I don't know the structure of did they set it up
12 based upon payment, but my best guess would be it
13 was based upon the last time that we actually paid
14 them in our system.
15 Q Okay. Now, you were looking earlier at, is it
16 Exhibit 16, is that the Exhibit 16, which is the
17 June 12th, 2008 agreement you were referring to
18 earlier. I'll let counsel get that for you.
19     MR. FISHER: Mm-hmm.
20 BY MR. SCHRECK:
21 Q And I think you had indicated earlier this was a
22 form document, correct?
23 A Yes.
24 Q Okay. So do you know how long this form had been
25 in place for Universal Am-Can?

**51**

1 A This contract had been in place since 2006.
2 Q Okay. So if there was a master brokerage agreement
3 dated 2007, it would be, other than dates, the same
4 language?
5 A Yes. It would be the same language.
6 Q Okay. And looking at that document, paragraph one
7 talks about the time created being for one year; is
8 that right?
9 A Yes.
10 Q Okay. If there was a document suggesting that
11 there was a brokerage agreement between Universal
12 Am-Can and Martin's Bulk dated sometime in the fall
13 of 2007, does that change your opinion as whether
14 or not Martin's would have been on inactive status
15 or no? Inactive status as of June 2008.
16 A They could have signed the contract in 2007, but if
17 the system did not recognize any activity, it would
18 automatically terminate them in the system.
19 Q Okay. And if that were the case, how do they get
20 reactivated? Do they have to sign a new agreement
21 or does something else happen?
22 A They would have to go through the whole process of
23 getting set up again.
24 Q Okay. That would be regardless of whether or not
25 they had an agreement that was still in effect

**52**

1 based upon the time period; is that accurate?
2 A That's accurate.
3 Q Okay. Now, looking at Exhibit 16, there's some
4 dates, times, fax numbers at the top of that; do
5 you see that?
6 A Yes.
7 Q Okay. And it looks like that Exhibit 16 was faxed
8 from Overnight Logistics from 708-331-8604; do you
9 see that?
10 A Yes.
11 Q Okay. And it looks like to me, and tell me if you
12 agree, that it looks like this was faxed to
13 Martin's on June 12th initially from Overnight
14 Logistics at the 708-331-8604 number; do you see
15 that?
16 A Yes.
17 Q Okay. Do you agree with me, that that, that's
18 what, that it was faxed from that number?
19 A It appears that it was faxed.
20 Q Okay. And it looks like it was faxed again a
21 couple of days later, right?
22 A Yes.
23 Q Okay. Do you know why that would, this form would
24 have been faxed from -- strike that.
25     What, what's the fax number that you use

**53**

1 at your location in Warren, Michigan?
2 A We have an 800, at the time we had an 800 number.
3 Q Okay. So this 708-331-8604 number is not the fax
4 number you were utilizing back in June of '08; is
5 that right?
6 A Correct.
7 Q Do you know why this fax would have been sent from
8 Overnight Logistics at that number, since you were
9 the one that was in charge of getting master
10 brokerage agreements in place?
11 A Because our agents sometimes, because they're trying
12 to get a carrier set up right away, they would also
13 fax out the documents to them and then they would
14 send it back to me.
15 Q Okay.
16 A To expedite the process.
17 Q Do you know who the agent would have been in this
18 case, if anybody?
19 A No.
20     MR. FISHER: You don't know?
21     THE WITNESS: No.
22 BY MR. SCHRECK:
23 Q Actually I've got just a few more questions.
24 A Sure.
25 Q I think it's Exhibit 11. Looking at Exhibit 11,

54

```
1    which is the brokerage confirmation sheet dated
2    7/3/2008, that document is typically sent from
3    Universal to the carrier, that type of form,
4    correct?
5 A  Yes.
6 Q  And in this case, it was sent from Universal Am-Can
7    to Martin's on July 3rd, 2008, regarding the
8    shipment that was being picked up in Hammond,
9    Indiana, correct?
10 A  Yes.
11 Q  On this document, Universal Am-Can was giving
12    instructions to Martin's as to where they were
13    supposed to pick up the load; is that correct?
14 A  The pickup information, yes.  It was International
15    Paper, Hammond, Indiana, that's where the load
16    details, where they were supposed to pick the load
17    up at.
18 Q  Okay.  And Universal Am-Can was telling them the
19    date and time to pick that load up?
20 A  Yes.  The pickup date was July the 3rd, and they
21    have a time of 7:00 o'clock.
22 Q  Okay.  And then when Universal sent this to
23    Martin's, they are also providing them with
24    instructions as far as where they're supposed to
25    deliver the shipment, correct?
```

55

```
1 A  Yes.  It provides information of where they're
2    supposed to deliver the load.
3 Q  And in this case, Martin's was being told by
4    Universal that they were going to deliver three
5    separate shipments to three places in Minneapolis,
6    correct?
7 A  It appears that the rate confirmation says the
8    pickup in Hammond and deliver to Midland Paper is
9    one stop, and the second stop is Xpedx.
10 Q  Xpedx?
11 A  Xpedx.
12 Q  Okay.  And it also gives them instructions
13    regarding a third location, Cenveo, am I
14    pronouncing that right?
15         MR. FISHER:  I've been told Cenveo.
16 BY MR. SCHRECK:
17 Q  Cenveo; is that correct?
18 A  Yes.
19 Q  Okay.  In fact, Mr. Burke was asking you some
20    questions about the memo bills for that one?
21 A  Okay.
22 Q  Do you remember that?
23 A  Yes.
24 Q  Okay.  So in this document, Universal is telling
25    Martin's they have three places they had to go to
```

56

```
1    drop this load off, correct?
2 A  Well, they weren't telling them, it was just
3    basically that was the load details.  That would
4    happen with any trucking company, you provide them
5    with the shipper, where they're supposed to pick the
6    load up and where they're supposed to deliver.
7 Q  Okay.  And by doing that, they're giving them
8    instructions where to pick up the load, where to
9    drop it off, when to pick it up and when to drop it
10    off, correct?
11 A  They're giving them, they're just providing them
12    load details.  They're not, we're not giving them
13    instructions, we're just providing load details.
14 Q  Okay.  In order for Martin's to get paid for these
15    loads, they actually have to pick it up where
16    they're instructed to and then drop it off where
17    they're instructed to, correct?
18 A  They're supposed to pick it up at the shipper, yes,
19    and deliver to the consignee.
20 Q  Okay.  And if they don't follow the instructions
21    provided by Universal as far as where to pick it
22    up, when to pick it up, where to drop it off and
23    when to drop it off, they're not going to get paid;
24    is that correct?
25 A  Well, that's, that's not accurate because they can
```

57

```
1    pick the load up in Hammond, Indiana, and they can
2    deliver it however they want to deliver it as long
3    as it's delivered by the delivery date.  You know,
4    they can do it backwards.  They can drop it off at
5    Cenveo first and then go to Midland Paper and then
6    Xpedx.  It's however they so choose.
7 Q  Okay.  And they're, I'm just saying in order,
8    what Martin's is being told by Universal in this
9    document is they have to pick it up at
10    International Paper on July 3rd, 2008 at 7:00
11    o'clock, or 1900 hours, correct?
12 A  Yes.
13 Q  Okay.  And they're being told by Universal that
14    they have to make these deliveries on July 7, 2008,
15    correct?
16 A  Yes.
17 Q  They're being told by Universal that they have to
18    make one delivery to Cenveo in Minneapolis between
19    7:30 a.m. and 4:00 p.m., correct?
20 A  Yes.
21 Q  And they're also being instructed that they have to
22    deliver a load to Midland Paper in Minneapolis
23    between 5:00 a.m. and 2:00 p.m., correct, on July
24    7, 2008?
25 A  I'm assuming, yes.
```

58

1 Q   And you're making assumptions on the times, is that
2      what you're assuming?
3 A   Yeah, because I don't know the times, I don't know
4      if it was a time-sensitive load.  I don't know that.
5 Q   Okay.  And then Universal is also instructing
6      Martin's that they have a delivery they have to
7      make in Indianapolis to Xpedx at 9:00 o'clock on
8      July 7, 2008; is that correct?
9 A   Yes.
10 Q   That's all the questions I have.  Thank you.
11            MR. FISHER:  Tim, any questions?
12            MR. COUTURE:  No questions.
13            MR. FISHER:  Okay.  I just have a couple
14     follow ups.
15                  CROSS-EXAMINATION
16 BY MR. FISHER:
17 Q   On the topic, Mr. Moorer, that Mr. Schreck just
18     addressed with you, the information that appears on
19     Exhibit 11, the broker confirmation sheet, let me
20     see if I can crystalize what you've said.
21 A   Okay.
22 Q   You acknowledge and recognize that there is
23     information on the broker confirmation sheet as to
24     where the load comes from and where the load goes
25     to?

59

1 A   Yes.
2 Q   With respect to the timing, the times that
3      appear -- and I know you didn't create this
4      document --
5 A   Yes.
6 Q   -- but based upon your experience in the
7      transportation industry, are the times that are
8      reflected there, for example, 7:30 a.m. to 4:00
9      p.m., and 5:00 a.m. to 2:00 p.m., the available
10     dock time at which a truck could pull up to that
11     customer's or consignee's dock?
12 A   Yes.
13 Q   And with respect to the 9:00 a.m. time that appears
14     there, do you know whether or not that's an
15     appointment or whether or not that's an opening
16     time?
17 A   It could be an appointment or opening time.  I
18     wouldn't know.
19 Q   Okay.
20 A   And this is not an expedited load so --
21 Q   And how do you know that this is not an expedited
22     load?
23 A   Because we have to notate that it's an expedited
24     load somewhere on the documents.
25 Q   Okay.  And what you said before, to summarize some

60

1      of the answers you gave to Mr. Schreck, the
2      carrier, in this case Martin's Bulk Milk, could
3      choose to decide what times they deliver at those
4      particular three consignee's or customers of
5      International Paper so long as it's done on July
6      7th?
7            MR. BURKE:  Objection.  Competency,
8      foundation.
9            MR. SCHRECK:  I'll join.
10            MR. FISHER:  You can go ahead and answer.
11            THE WITNESS:  To be perfectly clear, they
12     can deliver the load how they so fit.  They don't
13     even have to deliver it by the delivery date of July
14     7th, 2008.  They can be late on a load.  We don't
15     have any control over how they deliver the load.
16 BY MR. FISHER:
17 Q   But in fairness, if they continued doing that as
18     their way of business, delivering on the wrong days
19     and not at the appropriate dock times, they're
20     probably going to not last very long as a carrier
21     doing work with Universal Am-Can?
22 A   Correct.
23 Q   Okay.  All right.  I'm done with that document.
24            Now, I want to go back and ask you some
25     questions about -- no, actually I'm not.  I'm still

61

1      on this document.  I have a couple other questions.
2            Up here in the upper left-hand corner of
3      Exhibit 11 where the word "agent" colon appears,
4      and there's a number; describe for us what "agent"
5      means in the context of this document.  In other
6      words, what types of numbers or designations, in
7      your experience, appears opposite the word "agent"?
8 A   Opposite are the numbers indicating if it's a
9      agent -- it could be an agency, a company store, or
10     a terminal, but we provide all of those an agency
11     number.  For example, 4812 is a company store, but
12     it still has an agency number of 4812.
13 Q   And where is 4812?
14 A   It's in Dearborn, Michigan.
15 Q   Okay.  So for example, the terminal that Universal
16     Am-Can runs in Dearborn, Michigan, that has an
17     agency number, and if this particular broker
18     confirmation sheet had been filled out for that
19     particular, having to do with that particular
20     terminal, then the 4812 number would appear?
21 A   Yes.
22 Q   And that would be an example of a company location?
23 A   Company store, yes.
24 Q   Okay.  And as you sit here today, you just don't
25     know of your own knowledge what 5511, that's

**62**

1   scratched out, or 6073 represents?

2 A   6073 I have no knowledge if they're a company store

3   or, quoto/unquote, an agency.

4 Q   Okay.  And how about 5511, the one that's scratched

5   out?

6 A   5511.  I do believe that they are a company store.

7 Q   Okay.  And do you know what that number was?

8 A   5511.

9 Q   Yeah -- no.  Do you know what company store that

10   was?

11 A   Minneapolis/St. Paul.

12 Q   Okay.  Do you know if 5511 corresponded to the

13   number that was used to describe the Overnight

14   location on Pelham Street in Minneapolis?

15 A   I don't know.

16 Q   Okay.  You just, you just associate it with

17   Minneapolis?

18 A   Yes.

19 Q   Okay.  And then getting back to Exhibit 16, the

20   version of the June 12th, 2008 master brokerage

21   agreement that has all the fax transmission numbers

22   at the top and on the bottom.

23 A   Yes.

24 Q   All right.  I want to ask you to assume the

25   following:  Assume that this particular document,

**63**

1   the master brokerage agreement, irrespective of

2   whoever filled out the printing that appears in the

3   first paragraph, just put that aside for purpose of

4   my question.  Assume that this particular document

5   was first faxed from a 708-331-8604 number to

6   Martin's Bulk Milk in Wilton, Wisconsin, and that

7   it was faxed again from that same 708 number on

8   June 17th, okay, assume that.

9 A   Okay.

10 Q   And that these fax transmissions came from the

11   South Holland office as opposed to the 1-800 number

12   that you talked about you have in Warren, Michigan.

13 A   Yes.

14 Q   All right.  And assume, likewise, that -- and

15   unfortunately, this is very difficult to figure

16   out.  Ah, here we go.

17        Assume likewise that if you look at Bates

18   number 20 of Exhibit 16, that Martin's Bulk Milk

19   faxed back to Universal Am-Can on June 17th at 1:02

20   in the afternoon, or 13:02 in the afternoon, a copy

21   of the Martin's executed contract, and that that

22   was faxed back to Universal Am-Can at the 708

23   number, okay?

24 A   Okay.

25 Q   Got all those assumptions so far?

**64**

1 A   Yes.

2 Q   All right.  How do those assumptions interact, if

3   at all, with your previous testimony that you

4   believe you had sent a copy unfilled out of the

5   Martin's -- excuse me -- of the master brokerage

6   agreement to Martin's Bulk Milk sometime before

7   June 12th or June 17th, 2008?

8 A   I sent a master brokerage agreement to Martin's Bulk

9   Milk back in May but they never returned it.

10 Q   Okay.  And, and as you sit here today, you don't

11   remember who that agent was that was anxious to be

12   able to use Martin's?

13 A   I don't know who the agent happens to be.  I could

14   probably look in the system and use if we still have

15   a record of it.

16 Q   Okay.  But suffice it to say that to summarize your

17   testimony on the topic of who and when the master

18   brokerage agreement was sent to Martin's Bulk Milk

19   in either May or June --

20 A   Yes.

21 Q   -- you believe that you sent a copy, and it appears

22   from Exhibit 16 that somebody at the 708 number

23   also sent it to Martin's Bulk Milk, and those

24   events appear to be not related to each other?

25 A   Yes.

**65**

1 Q   That's your belief?

2 A   Yes.

3 Q   Okay.

4        MR. COUTURE:  Hey guys, Tim Couture.

5   Sorry to interrupt.  I'm done for the day, so --

6        MR. FISHER:  Okay.  We're almost done,

7   so --

8        M. COUTURE:  Yeah, I figured.

9        MR. FISHER:  Do you want me to ask Mr.

10   Moorer if he likes BMW's?

11        MR. COUTURE:  No.  I don't need to know

12   that.

13        MR. FISHER:  All right.

14        MR. COUTURE:  Tomorrow at 9:00 a.m.,

15   right?

16        MR. FISHER:  9:00 a.m. your time, yes.

17        MR. COUTURE:  Same call in?

18        MR. FISHER:  Same call in.

19        MR. COUTURE:  Thanks a lot.

20        MR. FISHER:  Okay.  Thanks, Tim.

21        MR. SCHRECK:  Now we'll ask him all the

22   good questions without you, Tim.

23        MR. FISHER:  Yeah.  Now we'll ask all our

24   design questions.

25        MR. COUTURE:  Can't wait to see the

18 (Pages 66-69)

JOHN MOORER
April 16, 2012

## 66

1    transcript.
2              MR. FISHER: And we'll object, too. All
3    right. Thanks.
4              (At or about 6:22 p.m., Mr. Couture ends
5         phone connection)
6  BY MR. FISHER:
7  Q   And the final topic, completely unrelated to what
8      I've just shown you, do you believe, in terms of
9      payments, would Universal Am-Can -- and this
10     applies to Martin's Bulk Milk, but frankly to
11     anybody -- you wouldn't literally be paying one
12     check per trucker's trip, would you? Would they
13     usually be paid out in lots or groups?
14 A   Sometimes it would be, if they're doing a volume
15     with us, it would be paid out in a group sometimes.
16     But if they're doing one individual load, it would
17     be paid out individually.
18 Q   Okay. And as you sit here today, you don't know
19     what the details were of the particular payment, if
20     indeed it was even made --
21 A   Yes.
22 Q   -- to Martin's Bulk for the 974.08?
23 A   Yes. I couldn't tell you without looking.
24             MR. FISHER: Okay. Great. That's all the
25     questions I've got.

## 67

1              REDIRECT EXAMINATION
2  BY MR. BURKE:
3  Q   You know, I lost you a little bit on Exhibit 16 as
4      to what you were saying about these fax numbers.
5      You told us you sent one to Martin's same date
6      around Memorial Day, correct?
7  A   Correct.
8  Q   Okay. Are you now saying somebody else sent an
9      agreement to Martin's?
10 A   Yes. That's not uncommon for an agent also to fax
11     out a brokerage agreement so they can get them in
12     and set up fast. That's not uncommon.
13 Q   Okay. So what is it you're looking at on Exhibit
14     16 that causes you to think someone else also sent
15     one?
16 A   Looking at the Overnight --
17 Q   What Bates page number?
18 A   19.
19 Q   Of --
20             MR. FISHER: Same document. Rich, it's
21     the fax numbers.
22 BY MR. BURKE:
23 Q   Okay. Yeah. Go ahead. All right. Which is your
24     fax number -- or I'm sorry. Let's stick with my
25     question.

## 68

1              What is it you're looking at that leads
2      you to think someone else sent one of these to
3      Martin's?
4              MR. FISHER: Hang on. Let me just object
5      to form. My questions were for him to assume that.
6      But you can go ahead and answer his question.
7  BY MR. BURKE:
8  Q   Okay. Well let me give you a new question, then.
9              Do you believe someone else also sent one
10     to --
11 A   Yes.
12 Q   -- Martin's?
13 A   Yes.
14 Q   What makes you think that?
15 A   Looking at the fax transmission, it looks like this
16     was sent over to them twice. It looks like it was
17     sent on the 12th to Overnight Express, and then
18     again on the 17th to Overnight Express -- Logistics,
19     rather.
20 Q   Okay. Is it being sent to Overnight Logistics or
21     is it being sent from Overnight Logistics, or can
22     you tell?
23 A   I can't decipher.
24 Q   Okay. Do you know whether or not, prior to June
25     12th of 2008, Martin's was hauling any loads for

## 69

1      Overnight Express or Overnight Logistics?
2  A   I have no knowledge.
3  Q   With respect to the broker confirmation sheet,
4      which is Exhibit 11 that you still have in front of
5      you, are you aware that on July 3rd, 2008,
6      Universal Am-Can had a contractual agreement with
7      International Paper to haul loads for them?
8  A   I'm not aware of that.
9  Q   Okay. And my last topic is -- strike that.
10             You have no involvement in preparing
11     broker confirmation sheets such as Exhibit 11,
12     correct?
13 A   Correct.
14 Q   Okay. And you had no involvement in this case with
15     the shipper or Martin's or anybody at Universal
16     concerning this load, correct?
17 A   Correct.
18 Q   Okay. You really have no personal knowledge of any
19     of the specifics of delivery requirements for this
20     load to these three separate consignee's, correct?
21 A   Correct.
22 Q   Okay. And lastly, I showed you Exhibit 5
23     previously, and it's three memo-ed bills. Is it
24     your understanding -- or strike that.
25             Are you aware that the notes section on

**70**

1    those memo bills contains different instructions
2    and directions about delivery?
3              MR. FISHER:  Excuse me.  By notes, you
4    mean where it says notes?
5              MR. BURKE:  Where it says notes.
6              MR. FISHER:  Okay.
7              THE WITNESS:  Are you asking me do I have
8    any knowledge of it?
9  BY MR. BURKE:
10 Q   My question is are you aware that that type of
11   information is contained in the notes section of
12   memo-ed bills?
13 A   For a, different bills of lading or are you just
14   speaking in this one in general?
15 Q   Well, for those ones right there.
16             MR. FISHER:  I object to form.  Go ahead.
17             THE WITNESS:  I see notes down there now,
18   so I'm assuming that that's, problems with delivery,
19   detained more than one hour, call this number,
20   reference number.
21 BY MR. BURKE:
22 Q   And generally are you aware that bills of lading or
23   memo bills like those in Exhibit 5 contained
24   delivery instructions in the notes that the carrier
25   has to comply with in terms of making a delivery?

**71**

1  A   I don't have any knowledge of it.
2  Q   Okay.  That's outside your field?
3  A   I mean, if you -- I guess I'm not understanding the
4    question.  If you're saying, I mean, drivers picks
5    up loads to have bills of lading and they have
6    delivery instructions on where they're supposed to
7    deliver, what number they're supposed to call, if
8    they're supposed to make an appointment prior to
9    delivery, then I would say yes, I am aware that that
10   type of information is contained on the bills of
11   lading.  But for each and every one, I don't know
12   the details of each and every one, no.
13             MR. BURKE:  Okay.  That's fine.  Nothing
14   else.
15             MR. FISHER:  Matt, any?
16             MR. SCHRECK:  No.
17             MR. FISHER:  At the risk of beating a dead
18   horse --
19             MR. SCHRECK:  We don't do that.
20             MR. FISHER:  No, no, no.  Okay.
21             RECROSS-EXAMINATION
22 BY MR. FISHER:
23 Q   First question is, when you used the term "agent"
24   or "our agents," is it fair to say that what you're
25   referring to is a person or entity that has an

**72**

1    agency number?
2  A   Yes.
3  Q   Okay.  So that, for example, if 6073 actually
4    represents employees of Universal Am-Can on July
5    3rd, then in your method of speaking, that office
6    of Universal Am-Can you have referred to as an
7    agent?
8  A   Yes.
9  Q   Okay.  All right.  With regard to that, if you look
10   at the top of Exhibit 11, do you see the fax
11   transmission number with the date of July 3rd, 2008
12   at 4:23 in the afternoon?
13 A   Yes.
14 Q   And do you see that that number is 708-331-8604?
15 A   Yes.
16 Q   Does that number appear to be the same number as
17   the number that appears at the top on two places of
18   page 19 of Exhibit 16?
19 A   Yes.
20 Q   Do you happen to know whether or not that was the
21   fax transmission and receipt number of the South
22   Holland office of Overnight Express which later
23   became Universal Am-Can in June of 2008 and
24   continuing up to and including July 3, 2008?
25 A   I don't know if that's the number because --

**73**

1  Q   Okay.  You don't know who that is?
2  A   I don't know.
3  Q   All right.  That's all I've got.
4              REDIRECT EXAMINATION
5  BY MR. BURKE:
6  Q   Did you ask anybody at Overnight Express to send a
7    blank broker confirmation, or a blank master
8    brokerage agreement to Martin's in or around the
9    end of May or early June of 2008?
10 A   No.
11 Q   Okay.  With respect to that agency number from your
12   prior testimony, am I correct that Universal Am-Can
13   had many agents with whom they did business and
14   whose numbers could appear here that were making
15   deliveries for them?
16 A   Could you rephrase the question?
17 Q   Sure.  With respect to that agency number, you have
18   previously talked about Universal had many
19   different agents that either made deliveries
20   directly for Universal or brought in business that
21   got brokered out; is that correct?
22 A   We have agents and company stores that are both
23   given an agency number.
24 Q   Okay.  And one category of people that get agency
25   numbers are other motor carriers that are making

**74**

1  deliveries for Universal; is that correct?
2 A   No.  No motor carriers receive an agency number.
3 Q   Okay.  One category of an agent would be drivers
4     who make deliveries for Universal using their own
5     truck but driving under the Universal DOT number?
6 A   Yes.
7 Q   Okay.  And then is there another category of agents
8     of Universal that bring in business that gets sent
9     out to some other carrier to haul?
10 A  We do have agents that are, that are just solely
11    brokers.  That's all they do is broker out the
12    loads, yes.
13 Q  Okay.  And for that category of agent, Universal's
14    getting a portion of the freight hauling fee and
15    the agent's getting a portion and whatever carrier
16    actually makes the delivery gets a portion; is that
17    correct?
18 A  The struck -- I don't know the exact structure of
19    it, but if the agent brokers the load out, the rate
20    agreement is the rate that the agent is, enters into
21    business with the carrier, that's the rate they're
22    agreeing to pay them.  What the agent and
23    Universal's portion, that would be something that
24    you'd have to ask, like, Gina.
25 Q  Okay.  But Universal would somehow get paid for

**75**

1  working with that agent in that scenario; is that
2  correct?
3 A   Yes.
4        MR. BURKE:  Okay.  Nothing else.
5        MR. SCHRECK:  Nothing.
6        MR. FISHER:  Signature's reserved.  We're
7  done.
8        (At or about 6:36 p.m., deposition
9        concluded)
10              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**76**

1             ERRATA-READSIGN
2                .
3               ERRATA
4    SCHEINMAN VS. MARTIN'S BULK MILK SERVICE, et al
5        DEPOSITION OF JOHN MOORER - 4/16/2012
6 Page/Line #                          Correction
7 _____     _____
8 _____     _____
9 _____     _____
10 _____     _____
11 _____     _____
12 _____     _____
13 _____     _____
14 _____     _____
15 _____     _____
16 _____     _____
17 _____     _____
18 _____     _____
19 _____     _____
20 _____     _____
21 _____     _____
22 _____     _____
23 _____     _____
24 _____     _____
25 _____     _____

**77**

1             AFFIDAVIT
2        I have read my deposition, and the same is true and
3  accurate, except for any changes and/or corrections, if
4  any, as indicated by me on the Errata sheet(s) attached
5  hereto.
6
7
8        _____
9             JOHN MOORER
10
11
12           N O T A R Y
13 Subscribed and sworn to me this _____ day of _____,
14 2012.
15
16 My commission expires _____.
17
18 _____, NOTARY PUBLIC, in and for the
19 State of Michigan.
20
21
22
23
24
25

78

1                    CERTIFICATE OF COURT REPORTER

2        STATE OF MICHIGAN  )
                            )
3        COUNTY OF OAKLAND  )

4
                 I certify that this transcript, consisting
5        of 78 pages, is a complete, true and correct record
         of the testimony of JOHN MOORER, held in this case
6        on Monday, April 16, 2012.

7                 I also certify that prior to taking this
         deposition, JOHN MOORER was duly sworn to tell the
8        truth.

9                 I also certify that I am not a relative or
         employee of or an attorney for a party; or a
10       relative or employee of an attorney for a party; or
         financially interested in the action.

11

12

13       KATHLEEN M. SMITH (CSR-4232)
         Certified Shorthand Reporter
14       Notary Public, Oakland County, Michigan
         My Commission Expires:  1/2/2016
15
         Dated:  May 7, 2012
16

17

18

19

20

21

22

23

24

25