# EX. 9

Mark Limback Deposition
dated, April 17, 2012

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION

3  MURRAY SCHEINMAN, Plenary Guardian of the Estate and

4  Person of Jeffrey J. Scheinman, a disabled person,

5        Plaintiff,

6    -vs-                    Case No. 09-CV-5340

7  MARTIN'S BULK MILK SERVICE, INC.; SAMUEL G. FRANKE;

8  CSX INTERMODAL, INC.; INTERNATIONAL PAPER COMPANY;

9  UNIVERSAL AM CAN, LTD., successor to Overnite

10 Express, Inc.; OX, L.L.C.; BMW OF NORTH

11 AMERICAN, L.L.C., a corporation; BAYERISCHE

12 MOTOREN WERKEAKTIENGESELLSCHAFT, a corporation;

13 BMW AG, a corporation; and KARL KNAUZ

14 MOTORS, INC., a corporation,

15        Defendants.

16  _____/

17 The deposition of MARK LIMBACK was taken by the

18 Plaintiff on Tuesday, April 17, 2012, at 26600

19 Schoenherr Road, Warren, Michigan, at 10:15 a.m.

20 APPEARANCES:
   CLIFFORD LAW OFFICES, P.C.
21 By:  Richard F. Burke Jr.
   120 North LaSalle Street, 31st Floor
22 Chicago, Illinois  60602
   312.899.9090
23 rfb@cliffordlaw.com
   Appearing on behalf of the Plaintiff.
24
   Reported by:  Cindy A. Boedy, CSR 4696
25             Certified Court Reporter

**Page 2**

```
 1  HINSHAW & CULBERTSON, L.L.P.
      By:  Carlton D. Fisher
 2  222 North LaSalle Street, Suite 300
      Chicago, Illinois  60601
 3  312.704.3450
      cfisher@hinshawlaw.com
 4  Appearing on behalf of the Defendants
      International Paper Company, Universal
 5  Am Can, LTD., and Ox, L.L.C.
 6  JOHNSON BELL, LTD.
      By:  Timothy R. Couture
 7  33 W. Monroe Street, Suite 2700
      Chicago, Illinois  60603-5404
 8  312.372.0770
      couture@jbltd.com
 9  Appearing on behalf of the Defendants
      BMW, Bayerische, and Karl Knauz Motors.
10
      MULHERIN, REHFELDT & VARCHETTO, P.C.
11  By:  Matthew R. Schreck
      211 South Wheaton Avenue, Suite 200
12  Wheaton, Illinois  60187
      630.653.9300
13  mschreck@mrvlaw.com
      Appearing on behalf of the Defendants
14  Martin's Bulk Milk and Samuel Franke.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1               I N D E X
 2  WITNESS                              PAGE
 3  MARK LIMBACK
 4  Examination by Mr. Burke            5
 5  Examination by Mr. Couture          111
 6  Reexamination by Mr. Burke          111
 7  Examination by Mr. Schreck          112
 8  Examination by Mr. Fisher           116
 9
10
11
12
13  EXHIBITS - None marked
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                          Warren, Michigan
 2                    Tuesday, April 17, 2012
 3                              10:15 a.m.
 4
 5           - - -
 6
 7         M A R K   L I M B A C K,
 8  after having been first duly sworn to tell the
 9  truth, the whole truth, and nothing but the
10  truth, was examined and testified as follows:
11         MR. BURKE:  Let the record reflect this
12  is the deposition of Mr. Mark Limback taken
13  pursuant to notice and in accordance with the
14  applicable rules of the United States District
15  Court for the Northern District of Illinois in
16  the 7th Circuit.
17         And Mr. Limback, my name again is Rich
18  Burke; I represent Mr. Scheinman.  I'm going to
19  ask you some questions about your work at
20  Universal.  And as I do so, if you want any
21  questions repeated, just tell me.  If you want to
22  look at any documents to try and determine an
23  appropriate answer, you're welcome to do so.  If
24  you and I don't talk at the same time, that helps
25  the court reporter.  And if you could verbalize
```

**Page 5**

```
 1  your yes and no answers.  Even though we can see
 2  you nodding your head, the court reporter has to
 3  take down a verbal answer if that happens to be
 4  your answer, okay?
 5         THE WITNESS:  Okay.
 6              EXAMINATION
 7  BY MR. BURKE:
 8  Q.  Would you please state your full name and spell
 9      both your first and last name?
10  A.  Mark Limback, M-A-R-K L-I-M-B-A-C-K.
11  Q.  What's your date of birth, sir?
12  A.  10-18-60.
13  Q.  And by whom are you employed?
14  A.  Universal Am Can Limited.
15  Q.  And how long have you been employed by them?
16  A.  Twenty-seven and a half years.
17  Q.  Ands what's your business address?
18  A.  12755 East Nine Mile, Warren, Michigan  48089.
19  Q.  And what's your position or job title at
20      Universal?
21  A.  President.
22  Q.  And how long have you been president?
23  A.  Since 2011.
24  Q.  And when in 2011 approximately?
25  A.  March.
```

3 (Pages 6-9)

MARK LIMBACK
April 17, 2012

**6**

1 Q. What's your educational background?

2 A. I have a bachelor of arts in sociology from Wayne

3 State University.

4 Q. And when did you get that?

5 A. 1984.

6 Q. Any other degrees?

7 A. No, sir.

8 Q. Have you given any depositions before?

9 A. Yes.

10 Q. How many?

11 A. Three.

12 Q. And over what time period? Or let me ask you

13 this, when was the last one you gave?

14 A. Approximately two years ago.

15 Q. And how about the one before that?

16 A. That would have been in the early '90s.

17 Q. How about the one before that?

18 A. Excuse me, the late '90s, I'm sorry. And the one

19 before that would have been 1995 or so.

20 Q. Were any of those depositions given on behalf of

21 Universal?

22 A. Yes, all of them.

23 Q. Did any of those depositions involve cases which

24 involved claims of personal injury or death

25 against Universal?

**7**

1 A. Yes.

2 Q. And how many of them?

3 A. Two.

4 Q. And how about the most recent, the one about two

5 years ago, was that an injury or a death case?

6 A. It was an injury.

7 Q. And where was that case pending at?

8 A. California.

9 Q. And who was the name of the person who brought

10 the lawsuit or what was the name of the --

11 A. I don't recall that information. I apologize.

12 Q. Was Universal Am Can Limited a defendant or

13 somebody who had a claim against them?

14 A. Yes.

15 Q. And in general, what was the claim against

16 Universal?

17 A. It was based on an injury. The person that was

18 unloading the truck got hurt while unloading the

19 truck.

20 Q. And did you testify in court in that case?

21 A. No, sir.

22 Q. Was your dep given in California?

23 A. No.

24 Q. Where did your deposition proceed?

25 A. Detroit.

**8**

1 Q. Was Mr. Fisher your lawyer in that case?

2 A. No.

3 Q. How about was anyone from his office representing

4 Universal in that case?

5 A. No.

6 Q. How about the prior case? Or strike that.

7 Is that case still pending?

8 A. No, I believe it settled.

9 Q. And who at Universal would have the name of that

10 case or would have the documents about that case?

11 A. Mike Peterson.

12 Q. And what's Mike's job?

13 A. Risk manager.

14 Q. And where is his office at?

15 A. 12755 East Nine Mile.

16 Q. Same as yours?

17 A. Yes.

18 Q. In Warren, okay.

19 What corporation does Mike work for?

20 A. Universal Truckload Services.

21 Q. And the other case that involved injury or death,

22 Mr. Limback, was that the '95 case or the one in

23 the late '90s?

24 A. '95.

25 Q. '95. And where was that case pending at?

**9**

1 A. I believe Detroit.

2 Q. And in general, what was the nature of that case?

3 Was it injury or death?

4 A. Death.

5 Q. And in general, how had or what was the claim as

6 to how somebody had been killed?

7 A. Our driver pulled out into traffic and the car

8 ran into the driver.

9 Q. And had that occurred in the Greater Detroit

10 area?

11 A. Yes, the Greater Detroit area or south of Detroit

12 if I remember correctly.

13 Q. And you gave a deposition in that case?

14 A. Yes.

15 Q. And did you testify at a trial or hearing?

16 A. No.

17 Q. Is that case still pending?

18 A. I don't think so.

19 Q. Was Mr. Fisher or his firm Hinshaw Culbertson

20 involved in representing you in that case?

21 A. No.

22 Q. What was the name of the person who was killed or

23 who had brought the lawsuit in that case?

24 A. I don't recall that.

25 Q. Who do you think at Universal would have that

**10**

1  information?

2 A.  Maybe Mike Peterson, but I don't know other than

3  that.

4 Q.  How about the other case you gave a deposition

5  in, generally what did that involve?

6 A.  Damaged freight.

7 Q.  Did the damaged freight result from any type of

8  collision or accident?

9 A.  I don't recall that.  No, it did not, excuse me.

10 Q.  Did you testify at trial in that case?

11 A.  No, sir.

12 Q.  Do you have any certifications, licenses of any

13  kind?

14 A.  Personally?

15 Q.  Personally.

16 A.  No.

17 Q.  Do you presently have a CDL?

18 A.  No.

19 Q.  Have you ever had one?

20 A.  No, sir.

21 Q.  Have you ever worked as a truck driver?

22 A.  No.

23 Q.  Are you a member of any professional committees

24  or organizations or groups related to your

25  business?

**11**

1 A.  The Truckload Carriers Association.

2 Q.  Do you hold any officer position with that group?

3 A.  No.

4 Q.  Do you go to any meetings or seminars or anything

5  of that nature sponsored by the group?

6 A.  Yes.

7 Q.  And how frequently?

8 A.  I've been to one so far.

9 Q.  When was that approximately?

10 A.  Last summer.

11 Q.  And generally what's the purpose of the group or

12  organization?

13 A.  Talked about the changes in the industry and

14  support the truckload carriers out there.  They

15  kind of lobby and stuff, you know, for

16  regulations and things of that nature.

17 Q.  Does Universal have any manuals or brochures or

18  instructional information that they provide to

19  any carriers with whom they have any type of

20  brokerage agreement?

21     MR. FISHER:  Excuse me, do you mean

22  Universal Am Can by Universal as opposed

23  Universal Truckload?

24 BY MR. BURKE:

25 Q.  Why don't we start with Universal Am Can.

**12**

1 A.  No, they don't.

2 Q.  Does Universal Truckload have any similar types

3  of brochures or safety manuals or instructional

4  information they provide to carriers who are

5  hauling loads for Universal?

6 A.  No, they don't.

7 Q.  Are you familiar with the basic occurrence that's

8  the subject of this case involving

9  Mr. Schoinman's vehicle being hit by a truck

10  driven by Samuel Franke?

11 A.  Yes.

12 Q.  In this case is it correct that Universal had

13  asked Martin's to haul a load of International

14  Paper Products for Universal?

15 A.  Yes.

16 Q.  In making that request of Martin's, did Universal

17  provide Martin's with any type of manual or

18  safety booklet or brochure of any kind?

19 A.  No.

20 Q.  By the way, when I say Universal, I'll be

21  referring to Universal Am Can unless I otherwise

22  specify Universal Truckload.  Is that okay?

23 A.  Okay.

24 Q.  And if you need to specify Universal Truckload,

25  distinguish it from Universal Am Can, will you

**13**

1  please do so?

2 A.  Okay.

3 Q.  Did you review any documents in anticipation of

4  giving a deposition today, Mr. Limback?

5 A.  I reviewed the asset purchase agreement between

6  Universal and Overnite.  I reviewed the

7  International Paper contract and some bill of

8  ladings.

9 Q.  The International Paper contract you're referring

10  to, which one is that?

11 A.  2007.

12 Q.  The October 2007 contract?

13 A.  Yes.

14 Q.  And that's the contract that Universal took over

15  in place of Overnite Express when Universal

16  purchased Overnite?

17 A.  Yes.

18 Q.  The bills of lading, were they for the shipment

19  involved on July 3rd, 2008?

20 A.  Yes.

21 Q.  What's the business of Universal?

22 A.  We're a trucking company as well as a broker.  We

23  have trucks leased to us, and we use independent

24  contractors to help supplement our truck count

25  through brokerage.

**14**

1 Q. And does Universal employ truck drivers?

2 A. We do not employ them, no.

3 Q. Does Universal have truck drivers -- Strike that.

4        Does Universal have federal motor

5     vehicle safety administration authority to

6     operate as a motor carrier?

7 A. Yes.

8 Q. Do you have multiple types of authority?

9 A. Yes, we do.

10 Q. And can you tell me what all of those different

11     authorities are?

12 A. We have common carrier authority, contract

13     authority, and brokerage authority.

14 Q. When you distinguish between those three,

15     Mr. Limback, what does common carrier authority

16     permit Universal to do?

17 A. Common carrier authority would allow us to

18     utilize call for customers and utilize rates that

19     years ago were put in through the ICC, and it

20     would allow us to haul as well spot loads where

21     we can dictate the rate at the time of shipment.

22        Contract carrier would be we'd have a

23     contract with that carrier -- excuse me, with

24     that customer -- and we'd have rates in place

25     under a contract.

**15**

1        And brokerage authority would mean that

2     we'd be able to use independent contractors who

3     met certain qualifications to haul our customers'

4     freight.

5 Q. With respect to International Paper, Universal

6     had a contract to haul goods for them, correct?

7 A. Yes.

8 Q. And Universal was a contract carrier with respect

9     to International Paper?

10 A. We were both a contract carrier and a broker.

11 Q. And you were a contract carrier on the day of

12     this occurrence with respect to International

13     Paper based on the October 2007 contract that you

14     had with them, correct?

15 A. We were acting as a broker on this -- in this

16     incident.

17 Q. You had a contract on this day with International

18     Paper that you were obligated to fulfill,

19     correct?

20 A. Yes.

21 Q. And you were -- Universal on July 3rd had a duty

22     under that contract with International to haul

23     the load that Mr. Franke was hauling at the time

24     of this collision, correct?

25 A. We had a duty to supply transportation-related

**16**

1     services.

2 Q. And that duty arose from the October 2007

3     contract, correct?

4 A. Yes.

5 Q. You mentioned something about being a broker on

6     the date of this occurrence too?

7 A. Yes.

8 Q. In what way do you believe you were -- that

9     Universal was acting as a broker?

10 A. Because we used an independent contractor to haul

11     this load based on a master brokerage agreement

12     we had with them.

13 Q. And the "them" that you're referring to is

14     Martin's Bulk Milk Service?

15 A. Yes.

16 Q. You did not have any brokerage agreement with

17     International Paper, correct?

18 A. No, we did not.

19 Q. In the agreement you had with International Paper

20     in that October 2007 contract, Universal was

21     identified as a carrier, correct?

22 A. Yes. And Carrier was used -- carrier was used as

23     a label to indicate the contract, the entity,

24     with International Paper.

25 Q. And you undertook in that contract -- Universal

**17**

1     undertook in that October 2007 contract the

2     obligation to provide transportation services as

3     a carrier, correct?

4        MR. FISHER:  Excuse me, when you say

5     you, Rich, are you saying him or UACL?

6        MR. BURKE:  Let me repeat that.  And

7     when I do say "you," I do mean Universal Am Can.

8 BY MR. BURKE:

9 Q. In that October 2007 contract, Universal had

10     agreed to provide transportation services as a

11     carrier for International Paper, correct?

12 A. Yes.

13 Q. Is Universal Truckload Services a publicly traded

14     company?

15 A. Yes.

16 Q. Do you know its ticker symbol?

17 A. Yes.

18 Q. What is that?

19 A. UACL.

20 Q. Do you know for how long Universal Truckload

21     Service has been a publicly traded company?

22 A. Since 2005.

23 Q. What's your best understanding of -- Strike that.

24        With respect to Universal Am Can, do

25     you know if they are a corporation or a

MARK LIMBACK
April 17, 2012

```
                                    18
1    partnership or a limited leadership or some other
2    type of legal entity?
3 A. We're a corporation.
4 Q. Is Universal Am Can Limited a publicly traded
5    corporation?
6 A. No.
7 Q. Who owns Universal Am -- I'm sorry, who owns
8    Universal Am Can Limited?
9 A. Universal Truckload Services.
10 Q. And is Universal Truckload Services the only
11    owner of Universal Am Can Limited?
12 A. It's traded on the stock exchange, so people
13    would own shares, yes.
14 Q. Universal Truckload is traded on the exchange?
15 A. Yes.
16 Q. Does one person or corporation or partnership own
17    a majority of the shares of Universal Truckload
18    Services?
19 A. Yes.
20 Q. And who is that person or entity?
21 A. The Morouns.
22 Q. And how do you spell their name?
23 A. M-O-R-O-U-N.
24 Q. And when you say the Morouns, how many of them
25    are there?
```

```
                                    19
1 A. Matty Maroun and Matthew Maroun.
2 Q. And is Maddy as in Madeline?
3 A. That's -- excuse me.  That's a nickname.  I think
4    it's Emanuel.
5 Q. Emanuel?
6 A. Yes, is his real name.
7 Q. And Matthew?
8 A. Matthew.
9 Q. Other than the Morouns, is there any other person
10    or entity with a substantial ownership of the
11    shares of Universal Truckload Services?
12 A. I don't know that.
13 Q. Are you a shareholder of Universal Truckload
14    Services?
15 A. No.
16 Q. Who is the secretary of Universal Truckload
17    Services?
18 A. I can't tell you off the top of my head.
19 Q. Is there a board of directors for Universal
20    Truckload Services?
21 A. Yes.
22 Q. And who are the members?
23 A. Emanuel Maroun, Matthew Maroun, Dick Urban, Dan
24    Dean.  I think there's a couple more, but I can't
25    think of their names.
```

```
                                    20
1 Q. Are you a board member?
2 A. No.
3 Q. Is there a board of directors for Universal Am
4    Can?
5 A. No.
6 Q. Who are the other officers of Universal Am Can?
7    Is there a secretary?
8 A. You know, I don't know.
9 Q. Is there a treasurer?
10 A. I don't know that either.
11 Q. Are there any vice presidents?
12 A. Yes.
13 Q. How many?
14 A. One.
15 Q. And what's his or her name?
16 A. Herb Rhode.
17 Q. And how do you spell Mr. Rhode's last name?
18 A. R-H-O-D-E.
19 Q. What's his title, vice president --
20 A. -- of operations.
21       MR. SCHRECK:  Is this Universal
22    Truckload or Universal Am Can that you're talking
23    about, sir?
24 BY MR. BURKE:
25 Q. You're talking about Am Can; is that right?  Is
```

```
                                    21
1    that a yes?
2 A. Yes, I'm sorry, I apologize.  Probably won't be
3    the last time.
4 Q. I'm sure not.
5       What other companies does Universal
6    Truckload own besides Universal Am Can?
7 A. Calvary Logistics, Kratt International.
8 Q. How do you spell that?
9 A. K-R-A-T-T.
10       Universal Logistics Solutions, Mason
11    Dixon Lines, Mason Dixon Intermodal, Louisiana
12    Transport, Great American Lines.  I believe
13    that's all of them.
14 Q. I apologize if I asked you, but for how long has
15    Universal Truckload owned Universal Am Can?
16 A. I can't give you that exact date.
17 Q. Can you give me an estimate in terms of five
18    years, ten years, or more?
19 A. I'd be basically speculating, but approximately
20    ten years.
21 Q. Did Universal Truckload purchase Universal Am
22    Can -- or strike that.
23       Did Universal Truckload exist prior to
24    its owning Universal Am Can?
25 A. I don't know that.
```

**22**

1 Q.  Generally what are those other companies?  What
2     type of businesses are they involved in?  How
3     about Calvary Logistics?
4 A.  They are a brokerage company.
5 Q.  How about Kratt?
6 A.  They are an international forwarder.
7 Q.  And what does that mean in your business?
8 A.  They would ship freight that was going overseas
9     either from the United States to destinations
10    worldwide or from destinations outside of the
11    United States to the United States.
12 Q.  And how about Universal Logistics Solutions?
13 A.  They provide a brokerage business.
14 Q.  How about Mason Dixon Lines?
15 A.  They are a trucking company with brokerage
16    authority as well.
17 Q.  And Mason Dixon Intermodal?
18 A.  That's an intermodal company which they provide
19    domestic intermodal containers to and from the
20    rail or to and from a port.
21 Q.  And Louisiana -- what's the last name?
22 A.  Transport.
23 Q.  Transport, thank you.  What do they do?
24 A.  They are a trucking company that services the oil
25    field operation in Southwest.

**23**

1 Q.  How about Great American Lines?
2 A.  They are a trucking company out of Murrysville,
3     Pennsylvania.
4 Q.  Back in 2008, did Universal Am Can own any
5     tractors that were used for hauling?
6 A.  No.
7 Q.  In 2008 did Universal Am Can have drivers that
8     operated under Universal's placard and operating
9     authority?
10 A.  Yes.
11 Q.  And approximately how many of those drivers did
12    Universal have in 2008, Mr. Limback?  Let me -- I
13    take it whether it's before or after the merger
14    with Overnite might affect your answer or would
15    it not?
16 A.  Yes, it would.
17 Q.  Let me clarify that then.  After June 13th -- or
18    strike that.
19         Universal purchased Overnite Express,
20    Inc., effective June 13 of 2008; is that correct?
21 A.  Yes.
22 Q.  After Universal's purchase of Overnite Express,
23    Inc., on June 13, 2008, approximately how many
24    drivers did Universal have that operated tractor
25    trailer trucks under Universal's operating

**24**

1     authority?
2 A.  I would say between 850 and 900.
3 Q.  Did Overnite Express own tractors?
4 A.  I don't know.  I don't know that.
5 Q.  If they did, did Universal purchase those
6     tractors as part of the purchase agreement?
7 A.  No, we didn't.
8 Q.  Did you purchase any trailers from -- as part of
9     that agreement to acquire Overnite?
10 A.  Universal Am Can didn't.
11 Q.  Did some other entity?
12 A.  Yes.
13 Q.  Which was that entity?
14 A.  UT Leasing -- UTS Leasing, excuse me.
15 Q.  Is UTS Leasing owned by Universal Truckload
16    Services?
17 A.  Yes.
18 Q.  And what's the business of UTS Leasing?
19 A.  They manage -- excuse me, they own the equipment
20    that we utilize.
21 Q.  That Universal utilizes?
22 A.  Universal and our sister companies.
23 Q.  That list of companies you mentioned?
24 A.  Yes.
25 Q.  And what type of equipment are you referring to?

**25**

1 A.  Trailers and tractors.
2 Q.  Those 850 or 900 drivers that you mentioned, when
3     they drive for Universal, does Universal provide
4     them with a tractor?
5 A.  No.
6 Q.  Do they all use a tractor that they own?
7 A.  No, because some of them may be driving for a
8     fleet owner that may own ten trucks or fifteen
9     trucks.  And there's one other entity.  Can
10    I go back a moment?
11         MR. FISHER:  Oh, sure.
12         THE WITNESS:  There's one other entity,
13    S & H Leasing, and they own about fifty trucks.
14 BY MR. BURKE:
15 Q.  Fifty?
16 A.  Tractors.
17 Q.  Tractors, okay.
18 A.  Give or take a couple here or there.
19 Q.  When you say one other entity, is that another
20    one owned by Universal Truckload Services?
21 A.  Yes.
22 Q.  And where are you headquartered?
23 A.  Same address, Warren, Michigan.
24 Q.  Does Universal use trucks that are owned by
25    either UTS Leasing or S & H Leasing in order to

8  (Pages 26-29)
MARK LIMBACK
April 17, 2012

---

**26**

1 provide transportation services?

2 A. Yes.

3 Q. Does Universal use trailers that are owned by

4 either UTS Leasing or S & H Leasing to provide

5 transportation services?

6 A. Yes.

7 Q. With respect to UTS Leasing, about how many

8 tractors do they own?

9 A. Approximately a hundred.

10 Q. By the way, is UTS Leasing also headquartered at

11 the Warren address?

12 A. Yes.

13 Q. I think you said S & H owns about fifty tractors?

14 A. Yes.

15 Q. And about how many trailers does UTS own?

16 A. 1400 approximately.

17 Q. And about how many trailers does S & H own?

18 A. They don't own any.

19 Q. Of the tractors that UTS and S & H Leasing own,

20 are they used primarily by Universal as opposed

21 to the other trucking companies that you

22 mentioned that Universal Truckload Services owns?

23 A. No.

24 Q. Do some of those other companies also use the

25 tractors?

---

**27**

1 A. Yes.

2 Q. In Universal's business when they are -- when

3 they undertake a contract to provide

4 transportation services, what are all the

5 different possible means by which Universal

6 provides those services?  And what I'm getting at

7 is where Universal gets the drivers to transport

8 those goods that Universal undertakes to haul.

9 A. We would utilize drivers that are leased to

10 Universal Am Can as well as qualified trucking

11 companies as subcontractors through brokerage.

12 Q. And then back in July of 2008 after the merger or

13 after the acquisition of -- Strike that.

14 Back in July of 2008, approximately how

15 many drivers did Universal have leased to it?

16 A. Between 850 and 900.

17 Q. Thank you.  You did answer that.  Thank you.

18 Of those drivers, am I understanding

19 you correctly that when all of those drivers

20 would drive for Universal, they would do so under

21 Universal's operating authority and DOT numbers?

22 A. Yes.

23 Q. And then the other category of drivers that

24 Universal would use would be driving under their

25 own operating authority; is that right?

---

**28**

1 A. Either their own or the company they are leased

2 to.

3 Q. Gina Hubbs made reference to agency agreements

4 that Universal has with drivers or companies, and

5 are those agents of Universal, are they different

6 than the 850 to 900 drivers you were just talking

7 about?

8 A. Some agents may be drivers.  Other agents may

9 just be an office providing freight.

10 Q. And back in July of 2008, about how many agents

11 did Universal have?

12 A. Approximately 200.

13 Q. What did those agents do for Universal?

14 A. They would solicit freight on our behalf.  They

15 would broker freight, and they usually had a

16 truck following that was leased to us as well.

17 Q. Had a truck following did you say?

18 A. Yes.

19 Q. That was leased to Universal?

20 A. Yes.

21 Q. The agents that had -- Strike that.

22 So did some of the agents perform truck

23 driving services for Universal?

24 A. Yes.

25 Q. Were those agents who provided truck driving

---

**29**

1 services, are they -- about how many of them did

2 Universal have in 2008?

3 A. I can't even guess.  I'm sorry.

4 Q. Would it be more or less than a hundred?

5 A. Less than a hundred.

6 Q. Do you know more or less than fifty?

7 A. I would say it's less than twenty-five.

8 Q. What is the difference between those agents who

9 perform the truck driving services and the 850 or

10 900 drivers that were leased to Universal?

11 A. Those agents that provided truck driving services

12 may have other additional people working in their

13 office while they drive the truck but they show

14 as the owner of the agency, and they would

15 receive compensation for the loads that they move

16 through Universal Am Can.

17 Q. And how does that differ from those 850 or 900

18 drivers?

19 A. The 850 or 900 drivers would just basically be

20 driving the truck and they would get paid their

21 contractual rate for providing that service

22 whereas an agent would get a compensation for

23 moving a load, and if he was the driver or the

24 owner of the truck, he would be paid as well his

25 contractual rate.

---

**30**

1 Q. One when of the one hundred trucks that UTS owned
2 or one of the fifty trucks that S & H owned would
3 be used by Universal to transport a load for
4 Universal, where would the driver come from that
5 would operate that truck?
6 A. The driver -- the trucks are set up to be S & H
7 trucks and Universal would qualify those drivers
8 because S & H was leased to Universal Am Can. We
9 would qualify those drivers and we would pay
10 S & H their contractual rate and they in turn
11 would pay their drivers.
12 Q. Is it the same for UTS Leasing or different?
13 A. UTS, they don't have any drivers.
14 Q. When a UTS tractor would be used, who would drive
15 that?
16 A. Great American Lines has some of the tractors.
17 Q. Does Universal utilize any of the UTS tractors?
18 A. Yes, under S & H Leasing.
19 Q. And I think you told me, but of the 850 and 900
20 drivers that you had that you would permit to
21 drive under Universal's operating authority, did
22 you say they would drive their own truck or a
23 truck owned by a company that they worked for?
24 A. Yes. And that company they work for would be
25 leased to Universal Am Can.

**31**

1 Q. When you say that, Mr. Limback, what do you mean
2 by that? Would Universal enter into an actual
3 written lease agreement with that driver or that
4 driver's company?
5 A. We would enter into a lease agreement with the
6 owner of the truck.
7 Q. In essence what did that lease agreement say?
8 A. Basically that the driver was leased to Universal
9 Am Can running under our insurance and our
10 authority and we would compensate him so much
11 based on his contractual rate.
12 Q. Would Universal actually display their --
13 Universal's placard and operating authority
14 numbers on that truck?
15 A. Yes, sir.
16 Q. How would you physically do that? Would you
17 affix it to the side of the tractor?
18 A. We would overnight the placards and permits based
19 on Universal's permits and placards to the owner
20 operator, and he would put the decals on his
21 truck and the permits on his truck along with the
22 signed lease.
23 Q. Did those leases -- were they short-term,
24 long-term, or both?
25 A. They continued until somebody terminated them,

**32**

1 either the owner operator or Universal Am Can.
2 Q. How did that driver arrangement differ from the
3 circumstance where you would give a load to a
4 carrier in what you refer to as a brokerage
5 situation?
6 A. Well, a driver that was leased to Universal Am
7 Can would be directly dispatched by one of our
8 offices to pick up the load, and when we brokered
9 the load, the information regarding that load was
10 sent to the carrier after he was qualified and
11 they went ahead and dispatched their driver and
12 communicated with their driver. We didn't
13 communicate with their driver.
14 Q. The word "dispatch" that you use, does that have
15 any particular meaning to you in your business?
16 A. It has a couple different meanings. It could
17 mean giving information in regards to make a
18 pickup and it could be giving a lease driver, a
19 driver that's leased to us, instructions on where
20 to pick up.
21 Q. In this case involving the load that was being
22 hauled on July 3rd, am I correct that Melody
23 Hanson provided a written document with
24 information to Martin's Bulk Milk Service about
25 where and when to pick up the load?

**33**

1 A. Yes.
2 Q. And at that time on July 3rd, 2004, was Melody
3 Hanson an employee of Universal Am Can?
4            MR. FISHER: Excuse me, Rich, you said
5 2004.
6            MR. BURKE: Thank you.
7 BY MR. BURKE:
8 Q. On July 3rd, 2008, was Melody Hanson then an
9 employee of Universal Am Can?
10 A. Yes.
11 Q. She previously had been an employee of Overnite
12 Express; is that right?
13 A. Yes.
14 Q. I take it Universal kept her on and made her an
15 employee of Universal after Universal acquired
16 Overnite Express?
17 A. Yes.
18 Q. What was her job title or position for Universal
19 on July 3rd, 2008?
20 A. Fleet manager.
21 Q. And she worked in a South Holland office, I
22 believe?
23 A. Yes, sir.
24 Q. Had Universal purchased that office as part of
25 the acquisition?

MARK LIMBACK
April 17, 2012

---

**34**

1 A.  No, we did not.

2 Q.  Was that office leased as of July 3rd, 2008?

3 A.  Yes.

4 Q.  Had that office been owned by Overnite or had

5      Overnito been leasing that space?

6 A.  They were leasing it.

7 Q.  And as part of your purchase of Overnite, then

8      you purchased the rights to that lease; is that

9      correct?

10 A.  We just continued the lease.

11 Q.  And you had a right to do so because you acquired

12     that right under your purchase of Overnite?

13 A.  They had a lease in place and we just continued

14     the payment on the lease.

15 Q.  As part of your acquisition of Overnite, did you

16     purchase overnight's rights under pending leases

17     such as that one for the South Holland property?

18 A.  We assumed the leases that they were and the

19     properties that they owned.  That they were

20     leasing, excuse me.

21 Q.  The persons and the entities that were

22     Universal's agents in those different categories

23     of either drivers or solicitors of freight or

24     brokers of freight, did Universal have any

25     contract, written contract, or agreement with

---

**35**

1      those agents?

2 A.  Yes.  We had agency agreements.

3 Q.  And basically what did that -- Well, strike that.

4      Were there different types of agency

5      agreements depending on what type of services the

6      agent was going to perform?

7 A.  No, it's just one.

8 Q.  And what was the essence of that agreement?

9 A.  Compensation, noncompetes, soliciting freight for

10     Universal Am Can.  Basically following the

11     procedures and policies.

12 Q.  Of Universal Am Can?

13 A.  Yes, sir.

14 Q.  Does Universal still have those agency agreements

15     in place and in use?

16 A.  Yes.

17 Q.  What do you call your agency agreement document?

18 A.  Agency agreement.

19 Q.  As I was saying that, I was figuring that would

20     be your answer.

21     Who actually enters into those agency

22     agreement documents?

23 A.  Can you clarify that?

24 Q.  Sure.  Is there a department or a person from

25     Universal that normally signs those agency

---

**36**

1      agreements?

2 A.  That would be the corresponding regional manager

3      who brought that agent into our group.

4 Q.  And those regional managers, do they work for

5      Universal?

6 A.  Yes.

7 Q.  And where or what are the basic job

8      responsibilities?

9 A.  Business development and maintenance.  Not

10     maintenance in regards to repairing trucks, but

11     the business maintenance, the maintenance

12     involved around the business.

13 Q.  Is there a form number -- or strike that.

14     Are all the agency agreements the same

15     other than the parties?

16 A.  And compensation, yes, they are.

17 Q.  Is that a form type document then that's used

18     repetitively?

19 A.  Yes.

20 Q.  And where are those forms kept?

21 A.  In Warren at our location.

22 Q.  Yesterday Gina Hubbs was -- either Gina Hubbs or

23     John Moore were talking about agent numbers on a

24     broker confirmation sheet.  Are you familiar with

25     an agent number?

---

**37**

1 A.  Yes.

2 Q.  What does that number signify or represent?

3 A.  It's an agency number identifying that operation.

4 Q.  And when you say that operation, what are you

5      referring to?

6 A.  That office.

7 Q.  Like an office of whom?  You mean someone you're

8      doing business with or an internal office?

9 A.  It would be an internal -- either an agency

10     office of ours or a company office.

11 Q.  And if it's a company office, what are the

12     different company offices?

13     MR. FISHER:  Objection, form.  When?

14 BY MR. BURKE:

15 Q.  In July of 2008.

16 A.  St. Paul; South Holland; Dearborn, Michigan;

17     Grand Rapids, Michigan; Conyers, Georgia;

18     Murrysville, Pennsylvania; Massena, New York;

19     Trenton, New Jersey.  And at that time there was

20     one more.  Woodstock, Georgia, at that time.

21     MR. FISHER:  Can you read back for me

22     the question?

23     (Reporter read back requested portion.)

24     THE WITNESS:  There's one more, Los

25     Angeles.  I might have missed one.  It's a long

---

MARK LIMBACK
April 17, 2012

---

**38**

1    list.

2 BY MR. BURKE:

3 Q.   Does Universal Am Can own all of the company

4       offices?

5 A.   No.

6 Q.   Does it own any of the company offices?

7 A.   No.

8 Q.   Who owns the company offices?

9 A.   I believe they are all rented.

10 Q.  Are you talking about the physical space?

11 A.  Yes.

12 Q.  Does Universal Am Can operate all of the company

13      offices?

14 A.  Yes.

15 Q.  And when you use the expression company office,

16      are you referring to an office that is performing

17      the work of Universal with the Universal

18      employees?

19 A.  Yes.

20 Q.  And in these various company offices, what work

21      is actually done there? And what I'm getting at,

22      are these truck terminals, are they literally

23      administrative-type offices, or a variety?

24 A.  Some of them are in truck terminals, but it's

25      basically an administrative office.

---

**39**

1 Q.   And what type of work on behalf of Universal is

2       performed in these company offices?

3 A.   They solicit business for us, they dispatch

4       trucks directly, they recruit owner operators.

5 Q.   When you say solicit business, you mean try to

6       obtain loads and freight to haul?

7 A.   Yes.

8 Q.   While we're on this topic, Mr. Limback, let me

9       show you a copy of what was previously marked as

10      Exhibit No. 11 in this case. And the document is

11      entitled "Broker Confirmation Sheet." I'll give

12      you a minute to look at it, but what I want to

13      ask you about is the agent number up in the upper

14      right corner.

15            MR. FISHER:  Upper right or upper left?

16            MR. BURKE:  I'm sorry, upper left.

17 BY MR. BURKE:

18 Q.   You've seen this before, correct?

19 A.   Yes.

20 Q.   What does that agent number refer to that's in

21      upper left?

22 A.   That's the agent number that was assigned to the

23      South Holland office.

24 Q.   And which number is the South Holland office?

25 A.   6073.

---

**40**

1 Q.   How about that 5511 number that is scratched out,

2       do you know whose number that is?

3 A.   Yes. That was the office in Minneapolis. St.

4       Paul, excuse me.

5 Q.   Do you know why the 5511 number was initially

6       written and then scratched out?

7 A.   No.

8 Q.   Was the St. Paul office, was that an Overnite

9       Express office prior to Universal purchasing

10      Overnite?

11 A.  Yes.

12 Q.  And the same was true for the South Holland

13      office, it was an Overnite office?

14 A.  Yes.

15 Q.  In 2008 am I correct effective June 13th of 2008

16      Universal Am Can purchased Overnite Express,

17      Inc.?

18 A.  Yes.

19 Q.  Were you personally involved in that acquisition?

20 A.  Yes.

21 Q.  What was the nature of your involvement?

22 A.  Basically to review their operation, look at

23      their customers, talk to all their owner

24      operators that they had leased Overnite to make

25      sure they understood our program under Universal

---

**41**

1       Am Can and basically explain our operation to the

2       people at Overnite.

3 Q.   When you use that expression our program or our

4       operation, what do you really mean by that?

5 A.   Our policies and procedures, where our traffic

6       lanes went to, where we had inbound trucks coming

7       to. Our agent-based network and company offices,

8       where they could load their trucks to get loads

9       to get back to get their own customers' freight.

10 Q.  That expression lanes means what in your

11      business?

12 A.  The direction you pick up a load in a certain

13      location and it goes to a destination, go from

14      point A to point B.

15 Q.  And the policies and procedures that you just

16      mentioned, what topics or subject matters did

17      that encompass?

18 A.  How we compensate our own operators that are

19      leased to us, how we would compensate the

20      brokerage -- when we brokered loads to outside

21      carriers and basically explaining the agent

22      network and how we compensate those people and

23      things of that nature. How we advance drivers,

24      how we input into the computer system as well.

25 Q.  That expression, advance a driver, means what?

---

---

**42**

1 A.   We allow operators that are leased to us a fuel
2      advance.  Once the load is on the truck, we
3      advance them a certain percentage of the load.
4 Q.   Is the advance for fuel or is it a advance of
5      their compensation due for hauling the freight?
6 A.   It's for fuel.
7 Q.   Do you know who first proposed that Universal
8      look at Overnite for possible purchase?
9 A.   Can you clarify that?
10 Q.  Sure.  I suppose, number one, did Overnite
11     approach Universal or did Universal approach
12     Overnite?
13 A.  I don't know that.
14 Q.  Do you know who from Universal was one of the
15     first persons involved in the process that you
16     just mentioned looking at Overnite as a possible
17     acquisition?
18 A.  Yes.
19 Q.  And who was that?
20 A.  Ed Brown.
21 Q.  And what was Ed's job or position?
22 A.  Ed looked at potential acquisitions.
23 Q.  Did he have a job title?
24 A.  I don't know what it would be at that time.
25 Q.  Did he -- or strike that.

---

**43**

1          For whom did he work, Universal?
2 A.  Universal Truckload Services.
3 Q.  Truckload Services?  Okay.
4          How was it that you -- Universal Am Can
5      purchased Overnite Express as opposed to one of
6      the other trucking companies that Universal
7      Truckload Services owns?
8          MR. FISHER:  Excuse me, could you read
9      that question back for me?
10         MR. BURKE:  You know what, let me give
11     a little more clear question.
12         MR. FISHER:  All right.
13 BY MR. BURKE:
14 Q.  Once it was determined that Overnite was a
15     possible good acquisition, was there any reason
16     that it was Universal Am Can that purchased
17     Overnite Express as opposed to one of the other
18     trucking companies that Universal Truckload
19     Services owned making that acquisition?
20 A.  Overnite Express was mainly -- they hauled mainly
21     band freight -- well, 100 percent band freight --
22     and their operation fit best into the Universal
23     Am Can.  It was easier to roll them in under our
24     operation than the other ones.
25 Q.  And the term "band freight" means what to you?

---

**44**

1 A.   Freight that's hauled in a van trailer.
2 Q.   As opposed to railcars or what else?
3 A.   As opposed to a flatbed or step deck.
4 Q.   At what point did you -- Strike that.  You told
5      me.
6          Did Ed Brown get you involved in
7      evaluating Overnite Express?
8 A.   Yes.
9 Q.   As some point I take it you thought Overnite
10     Express would be a good acquisition for
11     Universal?
12 A.   Yes.
13 Q.   Who had to approve that acquisition?
14 A.   Don Cochran.
15 Q.   And who did Don Cochran work for?
16 A.   Shareholders.  Oh, Universal Truckload Services,
17     excuse me.
18 Q.   And what was his position or job title?
19 A.   President.
20 Q.   There was an asset purchase agreement prepared
21     for the acquisition, correct?
22 A.   Correct.
23 Q.   Do you know who drafted that?
24 A.   Ralph Castelli.
25 Q.   Who does Mr. Castelli work for?

---

**45**

1 A.   Kemp Klein & Associates.  There may be a longer
2      name.  I apologize.
3 Q.   Is that an outside law firm?
4 A.   Yes.
5 Q.   Was Mr. Fisher or his firm involved in
6      representing Universal in the acquisition at all?
7 A.   No.
8 Q.   Other than what you have already mentioned, did
9      you do anything else in terms of evaluating
10     Overnite that you haven't already mentioned
11     before you made the decision to purchase them?
12 A.   We looked at -- obviously we looked at revenue,
13     profit and loss statements.
14 Q.   Did you have contact with persons from Overnite
15     Express?
16 A.   Yes.
17 Q.   And with whom did you interact or discuss the
18     potential acquisition?
19 A.   Robert Elsholtz, Kevin Hayes, as well Rob
20     Eloholtz.
21 Q.   Is Rob the younger or the son?
22 A.   Yes.
23 Q.   And Robert is the father?
24 A.   Yes.
25 Q.   How about Sandra Herman, were you involved with

---

46

1      her at all?
2 A.    I had some conversations with her, but to what
3      extent I don't recall.
4            MR. FISHER:  Can we take a break?
5            MR. BURKE:  Sure.
6            (Break was taken.)
7 BY MR. BURKE:
8 Q.    Mr. Limback, let me tender to you a portion of
9      Exhibit No. 1 including Bates stamp pages 109
10     through 155, which I believe you have in front of
11     you; is that correct?
12 A.    Yes, sir.
13 Q.    Is that a true and accurate copy of the asset
14     purchase agreement for Universal's purchase of
15     Overnite Express?
16 A.    Yes, based on the first page, yes.
17 Q.    Is there any other contract or agreement that
18     relates to or was entered into as part of the
19     purchase of Overnite Express by Universal?
20 A.    Can you clarify that?
21 Q.    Sure.  Is there any other contract or agreement
22     that Universal entered into in order to purchase
23     Overnite Express?
24 A.    No.
25 Q.    From the first line here, is it actually

47

1      Universal Am Can and UTS Leasing that purchased
2      Overnite?
3 A.    Universal Am Can purchased Overnite.  UTS
4      Leasing, Inc., purchased the trailers.
5 Q.    In general, what did Universal purchase from
6      Overnite Express?
7 A.    Basically the customer base, the owner operators
8      that were associated with that office, and
9      basically goodwill.  You know, files, furniture,
10     computers.
11 Q.    Did you also or did Universal also purchase
12     contracts that Overnite Express had with
13     customers?
14 A.    Yes.
15 Q.    And is one of the contracts that was purchased by
16     Universal the October 2007 contract that Overnite
17     Express had with International Paper?
18 A.    Yes.
19 Q.    Were there other contracts that you purchased
20     other than that one where International -- where
21     Overnite Express had contracts with customers?
22 A.    Yes.
23 Q.    And about how many others?
24 A.    I'd be guessing again.  I apologize.
25 Q.    Are we talking like ten or under or fifty or

48

1      under?
2 A.    Probably ten to twenty.
3 Q.    Are those contracts identified or specifically
4      enumerated in the asset purchase agreement?
5 A.    No.
6 Q.    In paragraph -- or excuse me, on page 1 -- Strike
7      that.
8            On page 109 which is the page entitled
9      "Asset Purchase Agreement," let me direct your
10     attention to paragraph 1, which is entitled "Sale
11     and Purchase of Assets."  Do you see that?
12 A.    Yes.
13 Q.    And that identifies different -- the assets that
14     Universal is purchasing, correct?
15 A.    Yes.
16 Q.    Many of which you already mentioned, furniture
17     and fixtures, things like that in paragraph A.
18     In paragraph 1B it says you were
19     purchasing all operating authority and
20     certificates, both interstate and intrastate, as
21     applicable.  What does that refer to?
22 A.    The operating authority of Overnite to operate as
23     a trucking company, and interstate would be
24     within the 48 continental United States and intra
25     would be, if they had had any, like intra

49

1      Minnesota.
2 Q.    After you purchased Overnite as of June 13th,
3      '08, did you utilize Overnite's operating
4      authority?
5 A.    No.
6 Q.    So even though you purchased that authority, you
7      did not operate trucks under Overnite's DOT
8      numbers?
9 A.    Correct.
10 Q.    And am I correct that instead what previously had
11     been Overnite's business was conducted under
12     Universal's operating authority?
13 A.    Yes.
14 Q.    Then in paragraph C it talks about the trailers
15     that you mentioned.  Paragraph D pertains to all
16     list of customers as well as all customer
17     contracts and agreements, correct?
18 A.    Correct.
19 Q.    And does paragraph 1D include the October 2007
20     contract that Overnite Express had with
21     International Paper that we talked about earlier?
22 A.    Yes.
23 Q.    Did Universal purchase any brokerage agreements
24     that Overnite might have had with any other
25     companies?

**50**

```
 1 A.   No.
 2 Q.   Is there a reason you did not do so?
 3 A.   Because we were rolling Overnite under Universal
 4       Am Can and any agreements they had for brokerage
 5       would then come from Universal Am Can Limited and
 6       we would pay those people direct, and Overnite
 7       would no longer have that authority.
 8 Q.   After June 13, 2008, did Overnite Express, Inc.,
 9       cease to exist?
10           MR. FISHER:  You mean -- object to
11       form.  Calls for a legal conclusion.  You can go
12       ahead and answer.
13           THE WITNESS:  Yes.
14 BY MR. BURKE:
15 Q.   Do you know if the corporation Overnite Express,
16       Inc., was actually dissolved?
17 A.   I don't know that.
18 Q.   And then paragraph 1E, which is on Bates stamp
19       page 110, which is also marked as page 2 of the
20       contract on the bottom, you were purchasing all
21       lists of owner operators as well as all contracts
22       and agreements with owner operators, correct?
23 A.   Correct.
24 Q.   In F, Universal purchased the right to do
25       business with customers and owner operators doing
```

**51**

```
 1       business with the seller, correct?
 2 A.   Correct.
 3 Q.   And Universal purchased Overnite Express's right
 4       to do business with their customer International
 5       Paper as part of this agreement?
 6 A.   We purchased their contract with International
 7       Paper.
 8 Q.   And then page 133 is the signature page for the
 9       contract, correct?
10 A.   Yes.
11 Q.   And you signed the agreement on behalf of
12       Universal Am Can Limited, correct?
13 A.   Yes.
14 Q.   And is that in fact your signature there?
15 A.   Yes.
16 Q.   Who signed that on behalf of UTS Leasing?
17 A.   Thomas Welsman.
18 Q.   How do you spell his last name?
19 A.   W-E-L-S-M-A-N.
20 Q.   And he was president at the time of UTS Leasing?
21 A.   Yes.
22 Q.   Is he still?
23 A.   Yes.
24 Q.   And then on behalf of Overnite Express, Inc., the
25       contract was signed by Robert Weston Elsholtz as
```

**52**

```
 1       president, correct?
 2 A.   Correct.
 3 Q.   And you also purchased Ox, L.L.C., correct?
 4 A.   UTS Leasing purchased the trailers.
 5 Q.   And in the contract for -- what was your best
 6       understanding of why the owners were identified
 7       individually in both the opening paragraph as
 8       sellers and on the signature page as owners of
 9       Overnite Express?
10 A.   I don't know why.
11 Q.   Did you deal with Willis Elsholtz as part of your
12       acquisition?
13 A.   No.  I met him, but I didn't deal with him.
14 Q.   Do you know what his involvement or position with
15       Overnite was?
16 A.   No.
17 Q.   How about Matthew Elsholtz?
18 A.   Yes, I did deal with him.
19 Q.   And what was his job or position?
20 A.   He was brokerage manager.
21 Q.   Did any of -- Strike that.
22           How about Robert, and I don't know if
23       he's technically a junior, but Rob, the son,
24       Elsholtz, what was his position or job at
25       Overnite Express?
```

**53**

```
 1 A.   I think he was director of operations.
 2 Q.   Did he remain or become an employee I should say
 3       of Universal after the acquisition?
 4 A.   Yes.
 5 Q.   Does he still work for Universal?
 6 A.   Yes.
 7 Q.   What's his job today?
 8 A.   Same position.
 9 Q.   Director of operations?
10 A.   Yes.
11 Q.   For Universal?
12 A.   For St. Paul office.
13 Q.   Director of operations of St. Paul office.
14           How about did any of these -- did
15       Robert Weston Elsholtz become an employee of
16       Universal?
17 A.   No.
18 Q.   How about Matthew Elsholtz?
19 A.   Yes.
20 Q.   And is he still an employee?
21 A.   Yes.
22 Q.   Where does he work?
23 A.   The St. Paul office.
24 Q.   And do you know what he does there, what his job
25       is?
```

54

1 A.  Brokerage manager.

2 Q.  Did Overnite Express have other offices other

3      than the St. Paul one and the South Holland one

4      when you bought them?

5 A.  No.

6 Q.  Look at page 137 if you would, sir.  That's

7      entitled "Overnite Trailers to be Sold to

8      Universal Am Can Limited"?  Am I correct?

9 A.  That's the title on the page, yes.

10 Q.  And I thought if I was hearing you correctly

11      earlier you said that Universal didn't actually

12      buy the trailers but UTS did?

13 A.  Yes.

14 Q.  Did Universal buy any trailers?

15 A.  No.

16 Q.  Is this title inaccurate?

17 A.  Yes.

18      And it's inaccurate because the trailers were

19      actually sold to UTS Leasing instead of

20      Universal?

21 A.  Correct.

22 Q.  After the closing of the purchase agreement, were

23      you involved in assimilating Overnite Express

24      into Universal?

25 A.  Yes.

55

1 Q.  And how were you involved, Mr. Limback?

2 A.  I assigned several employees to go up there and

3      assist them in the transition.

4 Q.  When you say "up there," do you mean St. Paul?

5 A.  Yes, as well as South Holland.

6 Q.  And basically what did you want those employees

7      to do?

8 A.  We had to transition their owner operators over

9      to lease agreements with Universal Am Can and

10      then we had to train all their personnel on the

11      computer system and we had to get assignments on

12      the customer contracts and convert their

13      employees, the office personnel, administrative

14      people, into Universal Am Can employees as well.

15 Q.  I'm going to show you --

16      MR. BURKE:  Carl, do you have page 67

17      of Exhibit 1 that's Gina Hubbs' letter?

18      MR. FISHER:  All set.

19 BY MR. BURKE:

20 Q.  Mr. Limback, you have in front of you a copy of

21      Bates stamp page UACL 67, and that's a letter

22      dated May 21st, 2008, on Universal Am Can

23      letterhead, correct?

24 A.  Correct.

25 Q.  It's actually your letterhead, in fact.  Am I

56

1      right that's your name on the upper right?

2 A.  Yes.

3 Q.  This is a letter that was sent out apparently by

4      Gina Hubbs in her capacity as vice president of

5      Universal Am Can Limited, correct?

6 A.  Correct.

7 Q.  And did you ask or authorize Gina to send this

8      letter out?

9 A.  Yes.

10 Q.  And the letter was sent to International Paper,

11      correct?

12 A.  I don't know if it was directly sent to

13      International Paper or a person at Overnite.

14 Q.  It's directed to International Paper in the

15      actual letter; is that right?

16 A.  Correct.

17 Q.  In the letter it says, Dear customer, Overnite

18      Express will be operating under Universal Am Can

19      Limited's insurance and authority as of

20      June 13th, 2008, based on an agreement to partner

21      with their organization.

22          Is all of that an accurate statement?

23 A.  Yes.

24 Q.  And it actually was more than just a partnership.

25      I mean, Universal physically or actually legally

57

1      bought Overnite, correct?

2 A.  Correct.

3 Q.  And then Gina went on to say, All bill of ladings

4      should reflect Universal Am Can Limited as the

5      carrier.  Therefore, invoices for freight moved

6      will come from Universal Am Can Limited with a

7      remittance address of P.O. 71296, Cincinnati,

8      Ohio.  That also was information you wanted Gina

9      to communicate to International Paper; is that

10      correct?

11 A.  Yes.

12 Q.  In paragraph 2 Gina Hubbs told International

13      Paper, Please consider this letter as an

14      assignment of the current contract you have in

15      place for Overnite Express, and the current

16      contract referred to there is the October 7th --

17      or the October 1st, 2007, contract?

18 A.  Yes.

19 Q.  And you went on to say -- or Gina says, Universal

20      Am Can Limited agrees to accept the rates and

21      fuel surcharge established between your company

22      and Overnite, correct?

23 A.  Correct.

24 Q.  And part of the purchase agreement -- Well, the

25      last line says, "Please sign below as to your

**58**

1  acceptance regarding the contract and rate
2  assignment." And as part of the purchase
3  agreement -- Strike that.
4      As part of the purchase agreement,
5  Universal agreed to accept the terms of the
6  contract that International had with Overnite
7  Express, correct, in their October 2007 contract?
8 A.  Yes.
9 Q.  Universal as part of the purchase agreement
10  assumed both the rights and the responsibilities
11  under that October 2007 contract, correct?
12 A.  Correct.
13 Q.  And you agreed to honor the freight hauling rates
14  and the fuel surcharge rates that were part of
15  that contract?
16 A.  Correct.
17 Q.  And then there's a signature line for Steve
18  Mundy. Do you know Mr. Mundy?
19 A.  No.
20 Q.  Do you know if he ever signed this?
21 A.  No, he didn't.
22 Q.  Do you know why he did not?
23 A.  No.
24 Q.  Thereafter, did you enter into an amendment to
25  that contract?

**59**

1 A.  Yes.
2 Q.  And before I got to that, a letter also went out
3  under your name to customers of Overnite Express,
4  correct?
5 A.  Correct.
6 Q.  And do you have page 70 in front of you, sir? It
7  should be just a few pages.
8 A.  Yes.
9 Q.  Down in the pile. And that's another letter on
10  your letterhead as president, correct?
11 A.  Yes.
12 Q.  And that was entitled to the Valued Customers of
13  Overnite Express, Inc. Am I correct?
14 A.  Yes.
15 Q.  And about the third line from the bottom of the
16  first paragraph, there's a line that says as of
17  June 13, 2008, your bill of lading should reflect
18  Universal Am Limited as the carrier and thus
19  all invoices will reflect such along with our
20  remittance address, correct?
21 A.  Correct.
22 Q.  And then following is a copy of insurance and
23  authority for your records. What were you doing
24  there? Were you providing to customers a copy of
25  Universal's insurance and operating authority?

**60**

1 A.  Yes. We were announcing that Overnite was
2  joining Universal Am Can, and to try to
3  facilitate the business and to keep the business
4  after we purchased them, we sent out our
5  insurance and authority so most of the customers
6  would, you know, continue without any disrupted
7  service.
8 Q.  Is a copy of Universal's authority to operate as
9  a common carrier on page 73?
10 A.  Yes.
11 Q.  How about page 74?
12 A.  That would be our contract.
13 Q.  It's a copy of Universal's authority to operate
14  as a contract carrier, correct?
15 A.  Yes.
16 Q.  And then take a look at page 75. Can you tell me
17  what that is?
18 A.  That's Universal Am Can's insurance certificate.
19 Q.  For coverage through Cherokee Insurance Company?
20 A.  Yes.
21 Q.  And were the general liability amounts
22  $1 million?
23 A.  Yes.
24 Q.  And the insured as noted there is Universal Am
25  Can Limited, correct?

**61**

1 A.  Correct.
2 Q.  At the time of this collision on July 3rd, 2008,
3  what insurance coverage did Universal Am Can have
4  that was or might be applicable to the injuries
5  sustained by Jeffrey Scheinman?
6 A.  What's exactly noted on this page.
7 Q.  And by that are you referring to the $1 million
8  in coverage from Cherokee?
9 A.  Yes.
10 Q.  Did Universal Am Can have any other policies of
11  insurance that might or did apply to this
12  occurrence on July 3rd, 2008?
13      MR. FISHER: Excuse me, foundation and
14  competency. You can go ahead and answer.
15      THE WITNESS: Not that I'm aware of.
16 BY MR. BURKE:
17 Q.  Did Universal Am Can have any excess coverage or
18  umbrella coverage in addition to this $2 million
19  Cherokee coverage?
20 A.  No.
21 Q.  Did Universal --
22      MR. COUTURE: I'm sorry, did he answer
23  that question?
24      MR. FISHER: I think the answer was --
25      MR. BURKE: I'm not sure what question.

62

1  Which one?
2         MR. COUTURE: Was there excess
3  coverage.
4         MR. FISHER: He said no.
5  BY MR. BURKE:
6  Q.  Did Universal Am Can Limited's parent company
7       have any liability insurance coverage that did or
8       might apply to Mr. Schoinman's injuries?
9         MR. FISHER: Competency, foundation.
10      You can go ahead and answer.
11        THE WITNESS: Not that I'm aware of.
12  BY MR. BURKE:
13  Q.  In this case I've been provided with answers to
14       interrogatories that indicate that there is
15       coverage through a policy of insurance for
16       $10 million that is applicable to this incident
17       after a $9 million self-retention. Are you aware
18       of that coverage?
19  A.  No, I'm not.
20  Q.  Who would be most knowledgeable about the
21       insurance coverage that would be applicable to
22       this occurrence?
23  A.  Mike Peterson.
24  Q.  And Mike works -- he's the risk manager you said?
25  A.  Yes.

63

1  Q.  For Universal?
2  A.  Universal Truckload Services.
3  Q.  And Mike works at the Warren office, right?
4  A.  Yes, sir.
5  Q.  As part of this -- Strike that.
6         As part of Universal's purchase of
7       Overnite Express, did Universal acquire the right
8       to any insurance coverage that Overnite Express
9       had at the time of the purchase?
10  A.  No.
11  Q.  Why don't we talk a little bit about the
12       addendum, Mr. Limback, that is on page --
13        MR. FISHER: 65? You mean the
14      amendment?
15        MR. BURKE: 65, Amendment No. 1.
16  BY MR. BURKE:
17  Q.  Mr. Limback, you have in front of you Bates stamp
18       page UACL 65 which is part of Exhibit No. 1.
19       That's a document entitled "Amendment No. 1,"
20       correct?
21  A.  Correct.
22  Q.  Do you have a recollection of how it was that
23       this document came into existence?
24  A.  Well, we had been asking International Paper for
25       an assignment of the contract and this is the

64

1       agreement they've come up with for us to assume
2       that contract.
3  Q.  And the contract you're referring to is the
4       October 21st, 2007, contract between
5       International and Overnite Express?
6  A.  Yes.
7  Q.  And then this contract or this Amendment No. 1,
8       by whom was it prepared, if you recall?
9  A.  I don't know the exact person, but International
10      Paper.
11  Q.  Did it get approved by your office?
12  A.  Yes.
13  Q.  You signed this as president of Universal Am Can,
14      correct?
15  A.  Correct.
16  Q.  It actually -- on the signature portion it says
17      Universal Am Can, C-A-M. Is the proper name of
18      your company actually C-A-N?
19  A.  Yes, sir.
20  Q.  And then it was signed by International Paper by
21      Mr. Mundy, correct?
22  A.  Correct.
23  Q.  On the left. He signed June 12, '08, and you
24      signed June 10th, '08?
25  A.  Correct.

65

1  Q.  And with respect to paragraph 1 of the amendment,
2       it basically says that this amendment is entered
3       into on June 9th between International Paper and
4       Overnite Express as carrier, correct?
5  A.  Yes.
6  Q.  Why does it say Overnite Express there? Was that
7       intentional or should that have been Universal Am
8       Can?
9         MR. FISHER: Competency, foundation.
10      You can go ahead and answer.
11        THE WITNESS: I don't know why.
12  BY MR. BURKE:
13  Q.  Suffice it to say it was Universal Am Can that
14       was entering into this amendment with
15       International Paper as opposed to Overnite
16       Express?
17  A.  Yes.
18  Q.  And in the amendment, International Paper is
19       identified as the company and there's a second
20       paragraph or a paragraph that starts with the
21       word witnessed, and then you have a number of
22       whereas clauses, correct?
23  A.  Yes.
24  Q.  And it says the parties entered into Contract No.
25       OXEN 093009 dated October 1st, 2007, parentheses,

MARK LIMBACK
April 17, 2012

**66**

1 the contract. And that is referring to the
2 contract which International Paper and Overnite
3 Express originally entered into, correct?
4 A. Correct.
5 Q. And then it goes on to say that the parties agree
6 as follows, and the parties that are agreeing are
7 Universal Am Can and Universal Paper, correct?
8 A. Correct.
9 Q. And it goes on to say, Effective June 13, 2008,
10 Carrier will be operating under the name of
11 Universal Am Can Limited and SCAC UACL. What
12 does SCAC stand for?
13 A. It's a SCAC code.
14 Q. Just like OXEN?
15 A. Correct.
16 Q. What are SCAC codes used for basically in your
17 business?
18 A. Basically an abbreviation of the carrier. When
19 you get your authority, you're given a SCAC code,
20 a four-letter abbreviation, and that's usually
21 used for billing purposes as to the contracted
22 entity.
23 Q. And Universal's SCAC code was UACL?
24 A. Correct.
25 Q. This amendment goes on to say Universal Am Can

**67**

1 Limited agrees to honor the rates and fuel
2 surcharge established between company and
3 Overnite, correct?
4 A. Correct.
5 Q. And another couple lines below it says, All other
6 terms of the contract shall remain and are in
7 full force and effect, correct?
8 A. Correct.
9 Q. And that contract again that was being referred
10 to there was the October 1st, 2007, contract
11 between International Paper and Overnite Express,
12 correct?
13 A. Correct.
14 Q. After entry or signing of this amendment,
15 Universal Am Can proceeded to assume the duties
16 that Overnite previously had under that contract
17 with International Paper, correct?
18 A. Correct.
19 Q. Did part of that contract include transporting
20 International Paper's products to various
21 customers of International Paper in the
22 Minneapolis area?
23 A. I don't know if it was in the Minneapolis area.
24 Q. But it included delivering International Paper's
25 product to the various customers in a variety

**68**

1 locations?
2 A. It included providing transportation-related
3 services to International.
4 Q. And those transportation-related services
5 included hauling freight or hauling
6 International's paper products, correct?
7 A. Correct.
8 Q. And delivering their paper products to
9 International's customers?
10 A. Correct.
11 Q. How about page 66? That's an endorsement change
12 in a policy. Do you know what that is?
13 A. It's an additional insured certificate.
14 Q. And making who an additional insured?
15 A. It doesn't state on here.
16 Q. Is this an endorsement page that you provided to
17 any potential customer after you took over
18 Overnite Express?
19 A. I didn't personally, so I'm not aware of that.
20 Q. Does that endorsement relate to University's
21 [sic] policy that they had with Cherokee
22 Insurance Company?
23 A. Yes.
24 Q. Do you know Mark Dadabbo?
25 A. Yes.

**69**

1 Q. And he works for Cherokee Insurance?
2 A. Yes.
3 Q. Were they the broker insurance, broker that
4 Universal used in 2008?
5 A. Yes.
6 Q. At the time of the purchase, did International
7 Paper Express any reluctance or hesitation to
8 allow Universal to assume the rights and
9 liabilities under International Paper's contract
10 with Overnite?
11 MR. FISHER: Foundation. You can go
12 ahead and answer.
13 THE WITNESS: Not that I'm aware of.
14 BY MR. BURKE:
15 Q. Let me ask you to look at Exhibit No. 1 starting
16 with page 33. Do you have that in front of you,
17 sir? Look at the preceding page for a moment,
18 page 32, UACL 32. Do you have that in front of
19 you, sir?
20 A. Yes.
21 Q. Have you seen that letter before? And if not,
22 just take a moment to look at it.
23 A. No, I hadn't.
24 Q. You have?
25 A. I hadn't.

70

1 Q.   Oh, you had not.  Take a minute to read through
2      it then.
3 A.   Okay.
4 Q.   Do you know Tom Quinlin, an attorney at
5      International Paper?
6 A.   No.
7 Q.   I take it you did not have involvement with him
8      at any time during or after you purchased
9      Overnite Express?
10 A.   Correct.
11 Q.   This is a letter dated August 13, 2009, to Carl
12      Fisher of Hinshaw Culbertson, and basically in
13      paragraph 1 it's enclosing a copy of the complete
14      contract dated October 1st, 2007, between
15      International Paper and Overnite Express as well
16      as the Amendment No. 1 to that contract dated
17      June 9th, '08, with accompanying certificate of
18      insurance, correct?
19 A.   Correct.
20 Q.   Paragraph 2 is a discussion of the May 21st,
21      2008, letter which is Gina Hubbs' letter that we
22      looked at earlier.  Do you remember that?
23 A.   Yes.
24 Q.   Mr. Quinlin states in this letter that Mr. Mundy
25      recalls that upon receipt of the correspondence

71

1      from Universal Am Can, thereafter Amendment No. 1
2      to the contract was drafted and therefore no
3      signed version of Gina Hubbs' May 21st letter
4      exists.  Does that comport with your
5      recollection?
6 A.   Yes.
7 Q.   And then if you look at page 33 that's entitled
8      "OXEN Overnite Express 2007 Outbound Contract,"
9      correct?
10 A.   Correct.
11 Q.   And it's stamped original on the top, right?
12 A.   Correct.
13 Q.   And then if you flip to Bates stamp page UACL 45,
14      that contains the signature pages or signature
15      lines for this agreement, correct?
16 A.   Correct.
17 Q.   And then I just want to ask you to flip back to
18      the beginning if you would, sir, and look at
19      page -- page 33 is basically a table of contents,
20      correct?
21 A.   Correct.
22 Q.   And then how about page 34.  Bates stamp page 34
23      is also supposed to be page 2 of 24 pages of the
24      contract, correct?
25 A.   Correct.

72

1 Q.   Why or why -- do you know why that page is blank?
2 A.   I have no idea.
3 Q.   And then in page -- or on page 35 I should say,
4      that starts the body of the contract, correct?
5 A.   Correct.
6 Q.   And as indicated in that header, this is the
7      contract that's dated and effective -- or I
8      should say the contract is entered into and
9      effective October 1st of 2007, between
10      International Paper as shipper and Overnite
11      Express as carrier, correct?
12 A.   Correct.
13 Q.   And it goes on to refer to various introductory
14      statements in the beginning of paragraph 1,
15      correct?
16 A.   Correct.
17 Q.   And where this contract says carrier after you --
18      after Universal acquired Overnite Express, the
19      rights and responsibilities of the carrier as
20      stated in this contract are the rights and
21      responsibilities of Universal Am Can, correct?
22 A.   As the contracted entity, correct, yes.
23 Q.   The first line, for example, the carrier is
24      engaged in the business of transporting property
25      by motor vehicle.  As a contract carrier, that is

73

1      in fact true for Universal, correct?
2 A.   We are a motor carrier.
3 Q.   And you told me several different times --
4 A.   As well as brokerage.
5 Q.   And as indicated here, shipper desires carrier to
6      provide certain transportation-related services
7      pursuant to the rates and conditions set forth in
8      this agreement, and that is what Universal did in
9      fact agree to do in the amendment, correct?
10 A.   Correct.
11 Q.   And then under carrier status -- that's in
12      paragraph 2 that basically talks about Overnite
13      and then Universal having the proper
14      registrations and certificates to operate as a
15      motor carrier, correct?
16 A.   Correct.
17 Q.   And in paragraph 3, the carrier shall provide --
18      or strike that.
19          Paragraph 3 is a section that sets
20      forth carrier's obligations, correct?
21 A.   Correct.
22 Q.   And they start with service and they go through
23      letters K and onto the next page; am I right?
24 A.   Yes.
25 Q.   And those were the obligations that Universal

**74**

1  undertook after your purchase of Overnite
2  Express, right?
3 A.  Correct.
4 Q.  And under services, it says that you are agreeing
5  to provide the services set forth in Exhibit C,
6  motor carrier rate and weekly commitment schedule
7  which is attached.  And did Universal agree to
8  apply -- or excuse me.  Did Universal agree to
9  provide the exact same services that were set
10  forth in the original Exhibit C or was that
11  modified at all?
12          MR. FISHER:  Could I have the first
13  part of that question back, please?
14          (Requested portion read back.)
15          THE WITNESS:  Yes.
16 BY MR. BURKE:
17 Q.  And in the motor carrier rate and weekly
18  commitment schedule, essentially it talks about
19  how often Universal would have to provide
20  transportation services for International and
21  then the rates that you would get paid for doing
22  so, correct?
23 A.  Correct.
24 Q.  And then, you know, Section D that refers to
25  commitments, what does that expression mean in

**75**

1  your business?
2 A.  How many loads you would accept either on a daily
3  basis or a weekly basis.  I don't know what their
4  commitment was.
5 Q.  It's whatever is set forth in Exhibit C?
6 A.  Yes.
7 Q.  And then on to the next page, Mr. Limback, page
8  36.  There was a minimum service level
9  requirement that Universal had to meet, correct?
10 A.  Correct.
11 Q.  And basically it said that you had to meet a
12  minimum service level of 98 percent for the
13  commitments described in Section 7 and as set
14  forth in Exhibit C.  What does that say in -- or
15  what does that mean?
16 A.  We had to pick up and deliver loads as scheduled.
17  No excuse me, that was the commitment.  We had to
18  accept tenders on a certain number of loads based
19  on the commitment.
20 Q.  And what does the 98 percent minimum service
21  level mean?
22 A.  We had to accept a minimum 98 percent of the
23  loads --
24 Q.  That International tendered to you?
25 A.  -- that they tendered to us.

**76**

1 Q.  And that tender of the load would include making
2  the delivery to the locations and in the time
3  frames that International needed it done?
4 A.  Based on the minimum on-time delivery
5  requirement.
6 Q.  And that requirement is actually set forth in
7  paragraph 3F, correct?
8 A.  Correct.
9 Q.  And in essence what does paragraph F obligate
10  Universal to do relative to their deliveries for
11  International Paper?
12 A.  We had to deliver on time 98 percent of the time.
13 Q.  How would International -- Strike that.
14          How would Universal know what the
15  on-time delivery requirements were?
16 A.  Can you clarify that?
17 Q.  Sure.  How would Universal -- Strike that.
18          When International would tender a load,
19  how would Universal know what the time period was
20  for delivery in order for it to constitute an
21  on-time delivery?
22 A.  It was based on the delivery appointments that
23  come across on the tender.
24 Q.  And when you say on the tender, is that on a bill
25  of lading or what do you mean?

**77**

1 A.  That would come across on the electronic tender.
2 Q.  And that electronic tender consists of what?  I
3  mean what information is on there?
4 A.  The pickup location and time, the delivery
5  location and time.
6 Q.  And would International Paper send that
7  electronically to Universal?
8 A.  I don't know if it was electronically or through
9  a website, you know, portal.
10 Q.  Who at Universal would receive that tender from
11  International Paper?
12 A.  Melody.  Melody Hanson.
13 Q.  Melody Hanson, okay.
14          And after Melody Hanson would receive
15  that information from International Paper, what
16  would she do with that information?
17          MR. FISHER:  Foundation.  You can
18  answer.
19          THE WITNESS:  I would only be assuming.
20 BY MR. BURKE:
21 Q.  Without assuming, what was your expectation of
22  what should be done with that information from a
23  business standpoint?
24 A.  She would either assign it to one of our lease
25  trucks or to an independent contractor she

**78**

1  brokered to, to that company.
2 Q.  And who would make the decision as to whether or
3  not the load was tendered to one of Universal's
4  lease trucks or to some other driver to whom the
5  load was brokered?
6 A.  Melody.  Melody Hanson.
7 Q.  Did she have that authority to do so on behalf of
8  Universal?
9 A.  Yes.
10 Q.  In July of 2008?
11 A.  Yes.
12 Q.  What criteria were used to decide which of the
13  two types of drivers that it went to?
14         MR. FISHER:  Foundation.  You can go
15  ahead.
16         THE WITNESS:  Capacity.
17 BY MR. BURKE:
18 Q.  And by that you mean what?
19 A.  Whether we had a leased -- Universal Am Can
20  leased truck there.  If not, she usually looked
21  out elsewhere to cover the freight.
22 Q.  When you say there, where do you mean?
23 A.  Whatever the location of the freight may be.
24  Origin.
25 Q.  Now, for this particular case where the actual

**79**

1  freight is in -- is at International Paper's
2  warehouse in Hammond, Indiana, Universal is not
3  going to have any trucks there, correct?
4 A.  Not necessarily.
5 Q.  So where would Melody be looking to find a truck?
6 A.  A Universal truck?
7 Q.  Either one.  I mean, all I'm getting at is when
8  she's trying -- on this day, for example,
9  July 3rd when she gets tender from International
10  Paper and know there's a load to be picked up at
11  International's warehouse, you referred to her
12  looking around for a truck, and my question is
13  really just what area, what geographic location
14  is she looking in?
15 A.  Probably within a certain radius of the origin.
16  I don't know exactly what she looked at to locate
17  a truck for that.
18 Q.  Now, back to the contract.  We diverged for a
19  moment.  In paragraph G that addresses
20  Universal's obligation to maintain the motor
21  vehicle equipment required to provide
22  transportation services under this contract,
23  correct?
24 A.  Yes.
25 Q.  And then paragraph H required Universal to have

**80**

1  personnel necessary to operate motor vehicle
2  equipment required to perform the services under
3  this contract, correct?
4 A.  Correct.
5 Q.  Paragraph H required that Universal's personnel
6  be fully qualified and maintain license and
7  permits that were required by local, state, and
8  federal laws?
9 A.  Correct.
10 Q.  And the last line required that Universal's
11  personnel comply with applicable local, state,
12  and federal laws and regulations?
13 A.  Correct.
14 Q.  Under this contract, Universal was required to
15  utilize personnel who would comply with local,
16  state, and federal traffic regulations in the
17  performance of the transportation services under
18  this contract, correct?
19         MR. FISHER:  Objection, form and
20  foundation.
21         MR. SCHRECK:  Join.
22         THE WITNESS:  No.
23 BY MR. BURKE:
24 Q.  Why not?
25 A.  The contract is outside of the traffic

**81**

1  regulations.  It's in regards to local, state,
2  and federal regulations regarding the
3  transportation industry.
4 Q.  Well, it really doesn't say anything about being
5  limited to the transportation industry, does it?
6 A.  No, it doesn't.
7 Q.  When you under-- Strike that.
8         When you undertook this contract for
9  International Paper, did you believe that
10  Universal had to make deliveries of International
11  Paper's products in compliance with local, state,
12  and federal traffic regulations?
13 A.  Well, any professional legal entity would assume
14  that, yes.
15 Q.  And that would include making the deliveries
16  without having collisions with other motor
17  vehicles, correct?
18         MR. SCHRECK:  Objection, form,
19  foundation, calls for speculation.
20         THE WITNESS:  Well, that would be
21  assumed based on a professional qualified driver
22  and a legal entity based on their satisfactory
23  safety ratings that they would abide by that,
24  yes.
25 BY MR. BURKE:

**82**

1 Q. When Universal would either give a load under
2 this contract to one of its leased drivers or to
3 a brokered carrier, Universal had the expectation
4 that that driver would accomplish the delivery
5 without having a collision with another motor
6 vehicle, correct?
7 MR. SCHRECK: Same objections.
8 THE WITNESS: We would expect our
9 driver would act in every way to drive as safely
10 as possible.
11 BY MR. BURKE:
12 Q. And by driving as safely as possible, you had an
13 expectation that -- or strike that.
14 Universal had an expectation that those
15 drivers, whether it be a leased driver or a
16 brokered driver like Martin's, would make the
17 delivery without causing personal injury to
18 occupants of other vehicles, correct?
19 MR. SCHRECK: Same objection. Form and
20 foundation. You can go ahead.
21 THE WITNESS: Correct.
22 BY MR. BURKE:
23 Q. Paragraph I talks about ancillary costs.
24 Universal had to assume those costs in terms of
25 maintaining equipment for good, safe, and lawful

**83**

1 operation of equipment while carrying out this
2 contract, correct?
3 A. Unless we brokered it to another carrier, then
4 they would be responsible for those calls.
5 Q. And you would have the expectation that whoever
6 you brokered it -- Strike that.
7 Universal would have the expectation
8 that that brokered carrier would have equipment
9 that complied with this contract, correct?
10 A. Correct. Let me rephrase that. The equipment
11 that complied with our agreement within our
12 master brokerage agreement and that trucking
13 company. We would comply with our agreement with
14 International Paper.
15 Q. And for you to comply with your agreement with
16 International Paper, you had to utilize a
17 brokered carrier, if that's who you chose to use,
18 that had drivers and equipment that would make
19 the delivery in accord with the terms of your
20 contract, correct?
21 A. Well, they would make the delivery in accord with
22 the terms of our master brokerage agreement, and
23 based on their qualifications, you know, we would
24 be able to fulfill -- we would use those drivers
25 to fulfill their agreement with us and,

**84**

1 therefore, we would comply with our terms of our
2 agreement with International Paper.
3 Q. Those drivers that you utilized, whether it would
4 be a leased driver or a brokered carrier, they
5 would be acting on behalf of Universal in
6 Universal complying with their contract with
7 International Paper, correct?
8 MR. FISHER: Excuse me, could you
9 reread the question for me?
10 (Requested portion read back.)
11 BY MR. BURKE:
12 Q. In order for you to comply with the terms of your
13 contract with International Paper, you had to use
14 drivers and equipment that would also accomplish
15 the delivery of International Paper's goods in
16 accord with the terms of this contract, right?
17 A. Correct.
18 Q. And here on this day Universal utilized the
19 services of Martin's to actually physically make
20 the delivery of International's goods under your
21 contract, correct?
22 A. No, they -- Martin Bulk Milk would have delivered
23 the goods under their master brokerage agreement
24 with Universal Am Can.
25 Q. But what I'm talking about is on this day October

**85**

1 -- excuse me.
2 On this day July 3rd, 2008, Universal
3 had a duty under this October 2007 contract in
4 Amendment No. 1 to fulfill the terms of this
5 contract, correct?
6 MR. FISHER: Excuse me. By "this
7 contract," you mean the IPC UACL contract?
8 MR. BURKE: Correct.
9 THE WITNESS: Correct.
10 BY MR. BURKE:
11 Q. And on July 3rd, 2008, that involved making a
12 delivery of certain International Paper products
13 to three customers of International Paper, right?
14 A. Correct.
15 Q. And in order for Universal to fulfill its
16 obligation, it turned to Martin's and asked
17 Martin's to make that delivery, correct?
18 A. Correct.
19 Q. And that Martin's driver was acting on behalf of
20 Universal to make the delivery that Universal had
21 committed to make under this contract, correct?
22 MR. FISHER: Objection, form.
23 THE WITNESS: No, he wasn't. He was
24 acting on behalf of Martin Bulk Milk based on the
25 agreement Martin Bulk Milk has with Universal Am

**Page 86**

1      Can.
2 BY MR. BURKE:
3 Q.   Well, he made delivery at the request of
4      Universal, correct?
5           MR. FISHER:  Objection to form.  Is
6      "he" the driver?
7 BY MR. BURKE:
8 Q.   Martin's and its driver made the -- Strike that.
9           Martin's and its driver made the pickup
10     and was hauling this load at the request of
11     Universal, correct?
12 A.  Correct.
13 Q.  And it was Universal that had the contractual
14     obligation to transport those paper products for
15     International Paper, correct?
16          MR. FISHER:  Asked and answered.  You
17     can go ahead and answer.
18          THE WITNESS:  We had the obligation to
19     provide transportation-related services for
20     International Paper.
21 BY MR. BURKE:
22 Q.  And Martin's had no agreement with International
23     Paper to provide any transportation services for
24     them, correct?
25 A.  Not that I'm aware of.

**Page 87**

1 Q.   And Martin's would not have been hauling this
2      load on July 3rd, 2007, unless Universal had
3      asked them to do so in order for Universal to
4      comply with its contract obligations, correct?
5 A.   Correct.
6 Q.   In delivering those paper products for Universal,
7      Martin's and its driver were performing
8      transportation services for Universal, correct?
9           MR. FISHER:  Objection to form.
10          THE WITNESS:  Yes, based on our
11     agreement.
12 BY MR. BURKE:
13 Q.  And those transportation services were the same
14     transportation services that were set forth in
15     that agreement, correct?
16 A.  Correct.
17 Q.  We diverged again.  Mr. Limback, let me just take
18     you back to that contract on page 36 I think
19     where we were at.  I think we're on J.
20          Am I correct that Universal had to
21     comply with certain trailer requirements that
22     International Paper had for transporting their
23     products?
24 A.  Correct.
25 Q.  And in paragraph K, am I correct that you --

**Page 88**

1      Strike that.
2           In K, Universal had to commit to having
3      a certain number of trailers available to meet
4      the commitment requirements?
5 A.   Yes, unless it was a live load situation.
6 Q.   And a live load refers to what type of situation?
7 A.   Drivers physically with the trailer that's going
8      to be loaded and/or whatever type of equipment
9      that's going to be loaded.
10 Q.  And then Section 4 down on the bottom of Bates
11     stamp page 36 talks about compensation and that
12     carries over onto the next page Bates stamped 37,
13     right?
14 A.  Yeah, correct.  I'm sorry.
15 Q.  And that compensation part of it is set forth on
16     Bates stamp page 37 in paragraphs B, C, and D; am
17     I right?
18 A.  Yes.
19 Q.  And then the other aspects of compensation are
20     referred to in paragraph A which alludes to
21     Exhibit C, correct?
22 A.  Correct.
23 Q.  And that Exhibit C is the rate and fuel surcharge
24     schedule?
25 A.  It's the rate and commitment schedule.

**Page 89**

1 Q.   And then Section F -- or I'm sorry, Section 5 of
2      the contract down at the bottom of page 37
3      specifies International Paper's payment terms,
4      correct?
5 A.   Correct.
6 Q.   And am I correct under this contract
7      International Paper would pay only Universal for
8      the transportation services?
9 A.   Can you clarify that?
10 Q.  Sure.  Under this contract, regardless of what
11     driver or what carrier physically made the
12     delivery payment for that delivery would be made
13     only to Universal?
14 A.  Based on the fact that we were the contracted
15     entity, they would pay Universal.
16 Q.  And for example, in this specific situation on
17     this day, International Paper would not send
18     money directly to Martin's in payment for this
19     load, correct?
20 A.  Correct.
21 Q.  Did you have any electronic fund transfer
22     arrangement with International Paper in order for
23     you to be paid?
24 A.  I'm not sure.
25 Q.  Paragraph 6 on page 38, that's a paragraph that

90

1   talks about Universal's option to assign its
2   accounts receivable, correct?
3 A.   It says carrier's option.
4 Q.   And carrier under this contract is Universal?
5 A.   Yes, as the contracted entity, yes.
6 Q.   However, International sets forth certain
7   criteria or circumstances that had to be met
8   before International -- before Universal could
9   make an assignment of an accounts receivable,
10   correct?
11 A.   Correct.
12 Q.   And then in Section 7 on the next page 37 talks
13   about commitments, correct?
14 A.   Correct.
15 Q.   Basically under this contract Universal was
16   obligated to have a certain number of tractors
17   and trailers in order to meet the commitment
18   requirements in Exhibit C for the transportation
19   of International's goods, correct?
20 A.   Or the ability to broker.  It does say that,
21   you're right, correct.
22 Q.   It does say that?
23 A.   Yes.
24 Q.   Paragraph 8 is entitled "Default by Carrier," and
25   am I correct that that section in paragraphs 8A

91

1   through H sets forth various grounds by which
2   International Paper could terminate this contract
3   with Universal?
4 A.   Correct.
5 Q.   And it itemizes a number of different reasons,
6   and actually at the very top of Bates stamp page
7   40 it specifies that this is not a complete list
8   of the grounds for termination, correct?
9 A.   Where does it say that?
10 Q.   Last -- look at the very top line where it says a
11   continuing or substantial failure shall include
12   but is not limited to --
13 A.   I'm sorry, I don't ...
14 Q.   Are you at the top of Bates stamp page 40?  Look
15   at the top couple lines.
16 A.   Yeah, I see, I'm sorry.
17 Q.   And then in paragraph A, one of the grounds for
18   termination would be if Universal failed to
19   comply with facility's safety rules and operating
20   procedures, correct?
21 A.   That's what it states.
22 Q.   And paragraph B another grounds would be failure
23   to comply with the 98 percent minimum service
24   requirement?
25 A.   It says minimum years service, but, yeah, you're

92

1   correct.
2 Q.   C is another minimum service requirement for a
3   3-month period, correct?
4 A.   Yes, minimum service acceptance level.
5 Q.   And in paragraph D it says that International
6   could terminate this contract with Universal if
7   there were -- if they receive two or more
8   delivery service written complaints within a
9   3-month period from International's customers
10   requesting that the carrier no longer delivered
11   to their facilities?
12 A.   That's what it states.
13 Q.   And in paragraph E, International could terminate
14   their agreement if Universal DOT rating had been
15   downgraded by the Department of Transportation,
16   correct?
17 A.   Correct.
18 Q.   And similarly Universal had to maintain minimum
19   insurance coverage requirements, correct?
20 A.   Correct.
21 Q.   In paragraph G, allows International to terminate
22   the contract for noncompliance with federal,
23   state, or municipal laws and regulations,
24   correct?
25 A.   Correct.

93

1 Q.   And they could also terminate based on bankruptcy
2   or a similar insolvency of Universal?
3 A.   Correct.
4 Q.   Under paragraph 9, am I correct that that deals
5   with electronic communications, dispatch, and
6   reporting?  Am I correct that Universal was
7   required to have certain types of electronic
8   communication equipment in order to be able to
9   communicate with International Paper?
10 A.   We had to have an electronic connectivity, yes.
11 Q.   And that would be for the purposes of receiving
12   written instruction or procedures from
13   International Paper related to the transportation
14   service under this contract, correct?
15        MR. FISHER:  Objection, form, compound.
16   You can go ahead and answer.
17        THE WITNESS:  You need that to accept
18   the tender from International Paper.
19 BY MR. BURKE:
20 Q.   And the tender is International Paper specifying
21   amongst other things where and when a load needs
22   to be picked up?
23 A.   Correct.
24 Q.   And then in paragraph 9B Universal had to report
25   pickup and delivery events in the format

94

1  specified by International. What format was
2  required?
3 A.  I don't know what that format was.
4 Q.  What are the options based on your experience?
5 A.  Either through EDI or a portal, a web portal, and
6  I don't know what they were using at the time.
7 Q.  And then paragraph 10 discusses the type of bills
8  of lading and freight receipts that had to be
9  utilized, correct?
10 A.  I think it just says bill of lading. Does it say
11  delivery receipt?
12 Q.  I'm sorry. If I said delivery, I meant freight
13  receipts. It's entitled "Bills of Lading and
14  Freight Receipts"?
15 A.  Okay.
16 Q.  And then in paragraph 10B, that required that
17  Universal upon delivery of each shipment obtain a
18  delivery receipt showing the date of the
19  delivery, goods delivered, any consignee
20  exceptions to count and conditions of goods
21  delivered and a legible signature of the
22  consignee, correct?
23 A.  That's what it states.
24 Q.  And then Universal had to provide International
25  per the next sentence with a copy of any delivery

95

1  receipt or proof of delivery as soon as
2  practical, but in no event later than 24 hours
3  after requested by International or the delivery
4  of the goods, correct?
5 A.  That's what it states.
6 Q.  And Universal had to transmit that delivery
7  receipt to International Paper by facsimile,
8  express delivery service, or another electronic
9  medium as might be employed between the two of
10  you, correct?
11 A.  Correct.
12 Q.  Paragraph 11 set forth certain requirements that
13  you had to meet for transportation of any
14  hazardous materials, correct?
15 A.  Correct.
16 Q.  And then in paragraph 12, that deals with freight
17  loss or damage, correct?
18 A.  Correct.
19 Q.  And under this contract, Universal was liable to
20  International Paper for loss or damage to any
21  goods transported under this agreement, correct?
22 A.  Unless we brokered the load out, then the carrier
23  insurance would cover that, the trucking company
24  that we brokered it to.
25 Q.  Actually, what you just said, that potential for

96

1  any brokered carrier to pay is not set forth in
2  this contract, correct?
3 A.  Correct.
4 Q.  And it actually in this -- in the delivery
5  involved in this case, are you aware that some
6  goods were in fact damaged?
7 A.  Yes.
8 Q.  And as a result, International Paper -- you had
9  the responsibility to International Paper to pay
10  for those damaged goods, correct?
11 A.  Correct.
12 Q.  And then in paragraph 13 at the bottom of page 41
13  under insurance section, it sets forth certain
14  requirements that Universal had to meet with
15  respect to insurance coverage, correct?
16 A.  Correct.
17 Q.  And Section 13A refers to commercial auto
18  liability insurance with limits not less than
19  $1 million, correct?
20 A.  Correct.
21 Q.  Is that coverage applicable to this occurrence?
22       MR. FISHER: Form, foundation,
23  competence.
24       THE WITNESS: It would -- to this
25  occurrence, no. It would fall under Martin's

97

1  Bulk Milk's insurance coverage based on the fact
2  they ran under their insurance and authority.
3 BY MR. BURKE:
4 Q.  And that's not so much my question. My question
5  is really is commercial auto liability insurance
6  applicable to this type of collision?
7 A.  No.
8 Q.  And why not?
9 A.  It would fall under general liability.
10 Q.  And paragraph B talks about cargo liability
11  insurance, Universal had to have $100,000 in
12  coverage, correct?
13 A.  Correct.
14 Q.  And then paragraph C is the commercial general
15  liability insurance you just alluded to, correct?
16 A.  Correct.
17 Q.  And Universal under this policy had to have
18  $1 million in commercial general liability
19  coverage, correct?
20 A.  Correct.
21 Q.  And under paragraph 13C, that policy that
22  Universal had needed to be endorsed so as to name
23  International Paper as an additional insured; is
24  that correct?
25 A.  Correct.

26 (Pages 98-101)

MARK LIMBACK
April 17, 2012

**98**

1 Q. And you had to have worker's compensation
2 insurance as well?
3 A. Correct.
4 Q. And then paragraph 14, that placed some
5 limitations on using intermodal service, correct?
6 A. Correct.
7 Q. And paragraph 15 is entitled "Indemnification,"
8 correct?
9 A. Correct.
10 Q. And paragraph -- or strike that.
11     Under the indemnification paragraph, it
12 said that Universal had to indemnify defendant,
13 hold harmless International against any liability
14 for injury arising out of the performance of this
15 agreement by Universal's employees, agents, or
16 subcontractors, correct?
17 A. Correct. And losses/damage claims, et cetera, I
18 don't think you read that.
19 Q. I did skip over a couple portions of it, yes.
20     And then under Section 20 down at the
21 bottom of Bates stamp page 43, that's entitled
22 "Independent Contractor," correct?
23 A. Correct.
24 Q. And in this section, that says Universal was
25 performing services under this agreement as an

**99**

1 independent contractor, correct?
2 A. Correct.
3 Q. And the next sentence says that "Universal shall
4 solely direct all persons performing services
5 performed by Universal under this agreement and
6 such persons shall be and remain subject to the
7 exclusive control and direction of Universal,"
8 correct?
9 A. That's what it states.
10 Q. And under the terms of this paragraph, Universal
11 had an obligation to direct the people that were
12 performing services for Universal pursuant to
13 this contract, correct?
14     MR. FISHER: Objection, form and
15 foundation. It speaks for itself. You can go
16 ahead and answer.
17     THE WITNESS: We exercise our
18 responsibility by contracting with Martin Bulk
19 Milk, and they used their people to handle the
20 services provided.
21 BY MR. BURKE:
22 Q. And under the terms of this paragraph, those
23 persons that you utilized were supposed to remain
24 subject to Universal's exclusive control and
25 direction, correct?

**100**

1     MR. FISHER: Objection, same. Same
2 objections.
3     THE WITNESS: No, those persons we
4 utilized would have been controlled by the owner
5 of that company.
6 BY MR. BURKE:
7 Q. Well, it doesn't say that here in this paragraph,
8 does it?
9     MR. FISHER: Objection, argumentative.
10 Same objections. You can go ahead and answer.
11     THE WITNESS: No, it doesn't.
12 BY MR. BURKE:
13 Q. And then page 45 Bates stamped, that's the
14 signature pages, correct?
15 A. Correct.
16 Q. And then do you know Mr. Crawford at all?
17 A. No, sir.
18 Q. William Crawford signed on behalf of
19 International Paper on November 1st, 2007,
20 according to this page 45, correct?
21 A. Correct.
22 Q. And then on behalf of -- I think we already
23 covered this earlier, but Mr. Elsholtz and others
24 from Overnite signed on behalf of Overnite
25 Express on October 30th, 2007, right?

**101**

1 A. Correct.
2     MR. FISHER: Can I suggest, I think
3 probably the lunch ...
4     (Break was taken.)
5 BY MR. BURKE:
6 Q. Do you still have that contract in front you,
7 Mr. Limback? I just want to ask you a few
8 questions about some of the exhibits to the
9 contract. How about page -- turn to page 47.
10 A. Okay.
11 Q. You there?
12 A. Yes.
13 Q. That's Overnite's operating authority, correct?
14 A. Correct.
15 Q. How about page 48, that's a fuel index. In a
16 nutshell, what does that address?
17 A. Fuel surcharge and it fluctuates weekly based on
18 the price of fuel.
19 Q. When you took over this contract, did you -- did
20 Universal utilize this same fuel index?
21 A. Yes.
22 Q. And how about paragraph -- or C, Exhibit C,
23 that's the motor carrier rate and weekly
24 commitment schedule, right?
25 A. Yes.

27  (Pages 102-105)

MARK LIMBACK
April 17, 2012

102

1 Q.  But it's not actually attached here on this page
2      obviously.  It apparently was -- is in a PDF; is
3      that right?
4 A.  I'm not aware.
5 Q.  Do you know where that Exhibit C is today?
6 A.  No.
7 Q.  Would you have had a copy at some time after you
8      took over this contract?
9 A.  I personally, no.
10 Q.  Not you personally.  Universal would have had a
11     copy?
12 A.  Yes.
13 Q.  And that Exhibit C was used by Universal in order
14     to comply with the compensation rates and the
15     commitment schedule that had been agreed upon?
16 A.  Yes.
17 Q.  Under this contract, did Universal have to use
18     53-foot trailers?
19 A.  Yes.
20 Q.  And for what reason were the 53-foot trailers
21     required?
22 A.  To accommodate the volume of the product shipped.
23 Q.  Are you familiar with the bills of lading or memo
24     bills that got issued by companies that want to
25     have their freight hauled?

103

1 A.  I've seen bill of ladings, yes.
2 Q.  Are you familiar with the notes section of those
3      bills of lading that often have certain
4      instructions for delivery in terms of times and
5      contact people, things of that nature?
6 A.  Just based on what I've seen in the past.
7 Q.  Let me -- Instead of talking in a vacuum, let me
8      show you page 1.  Do you have Exhibit 1?
9           MR. FISHER:  Of which exhibit?
10          MR. BURKE:  Exhibit 1, page 1.
11 BY MR. BURKE:
12 Q.  On Exhibit 1, pages -- if you want to look at
13     pages 1, 2, and 3.  I mean, here, start with 1,
14     and I'll orientate you a little bit.
15          That's entitled a memo bill, correct?
16 A.  Correct.
17 Q.  And it's for -- the shipping date is July 3rd,
18     2008?
19 A.  That's the date it was made out.  I don't know if
20     that's the shipping date based on what I'm
21     seeing.
22 Q.  And the carrier -- or the carrier is identified
23     as OXEN; shipper is International Paper, correct?
24 A.  Correct.
25 Q.  Do you know that this has been identified as one

104

1      of the memo bills for the cargo being hauled at
2      the time of this collision?
3 A.  Yes.
4 Q.  And do you know that that is also true for
5      Exhibit 2 -- or I'm sorry, page 2 and page 3?
6 A.  Yes.
7 Q.  And there are those memo bills.  There's three
8      separate ones for three separate destinations:
9      Midland, Xpedx, and Conveo; is that right?
10 A.  Correct.
11 Q.  And why does this still identify the carrier as
12     OXEN?
13          MR. FISHER:  Foundation.  You can go
14     ahead.
15          THE WITNESS:  The carrier at -- OXEN
16     was the original contracted carrier, Universal
17     contracted entity.  Universal Am Can accepted the
18     amendment as the contracted entity, but there was
19     a lag which is common in a transition or an
20     acquisition, and there was a lag in International
21     Paper updating their computer system to reflect
22     such.
23 BY MR. BURKE:
24 Q.  See where it says, Route, Overnite Express, Inc.?
25 A.  Yes, sir.

105

1 Q.  What does that refer to?
2 A.  Again, that's the contracted carrier's full name.
3 Q.  And then what I started asking you about, the
4      notes section about the middle of the page.
5 A.  Okay.
6 Q.  And there's different contact information to
7      schedule a delivery between certain hours.  Do
8      you see that --
9 A.  Yes.
10 Q.  -- data there?
11          Are those notes in those instructions
12     regarding delivery, are they placed there by
13     International, the shipper?
14 A.  Whoever made out the bill of lading, yes.
15 Q.  And Universal under your contract with
16     International Paper was expected to comply with
17     these delivery requirements set forth in the
18     notes section, correct?
19 A.  I don't know that to be true as the notes or the
20     tender.
21 Q.  You don't know it to be true?
22 A.  No, I don't know if it's the tender or this --
23     which one.  If it states to call a number for
24     delivery appointment, yes, then you have to
25     comply.

28  (Pages 106-109)

MARK LIMBACK
April 17, 2012

106

1 Q.    And I wasn't trying to distinguish between the
2       tender or the name bill necessarily.  My point
3       was simply the delivery instructions that
4       International would give Universal you were
5       supposed to comply with as part of your contract,
6       correct?
7 A.    Correct.
8 Q.    Do you remember your letter that was on your
9       letterhead -- I mean one went out by you, one
10      went out by Gina Hubbs that said that future
11      invoices should now show Universal as the
12      carrier?
13 A.   Yes.
14 Q.   I take it that was so Universal would now get
15      paid?
16 A.   Exactly, for billing purposes and contracted
17      entity.
18 Q.   You didn't want the money still going to
19      Overnite?
20 A.   We would prefer it go directly to us so we don't
21      have to chase it.
22 Q.   Did Universal have any brokerage agreement that
23      you believed was in force and effect with
24      Martin's Bulk Milk Service on July 3rd, 2008?
25 A.   Yes.

107

1 Q.    Have you reviewed any brokerage agreements?
2 A.    Yes.
3 Q.    What is the date of the brokerage agreement that
4       you believe was in existence?
5 A.    June 12th, 2008.
6 Q.    You spent a lot of time talking about these --
7       that agreement yesterday.  Has Universal ever
8       signed that brokerage agreement?
9 A.    No.
10 Q.   Why not?
11 A.   Our policy was unless the trucking company wanted
12      a signed copy back us from, we expected that they
13      would abide by our contracted terms by them
14      signing it.
15 Q.   Was the July [sic] 12, 2008, brokerage agreement
16      with Martin's the only brokerage agreement with
17      Martin's that you believe was in force and effect
18      on July 3rd, 2008?
19          MR. FISHER:  Excuse me, Rich, I think
20      you misspoke.  You said July 12th as opposed to
21      June 12th.
22          MR. BURKE:  Thank you.  Let me rephrase
23      it.
24 BY MR. BURKE:
25 Q.   Was the June 12th, 2008, brokerage agreement

108

1       between Universal and Martin's the only brokerage
2       agreement between those two companies that you
3       believe was in force and effect on July 3rd,
4       2008?
5 A.    Yes.
6 Q.    Were you personally involved in brokerage
7       agreements with carriers?
8 A.    No.
9 Q.    Do you know anybody from Martin's Bulk Milk
10      Service such as David Martin?
11 A.   No.  Nobody there, sir.
12 Q.   Under that brokerage agreement you had with --
13      that Universal had with Martin's, am I correct
14      that Universal had no obligation to give Martin's
15      any loads?
16 A.   Correct.
17 Q.   You could use Martin's only when you wanted or
18      not at all, if you so desired?
19 A.   Correct.
20 Q.   I take it Universal could terminate that
21      brokerage agreement anytime they wanted to?
22 A.   Correct.
23 Q.   Did you ever talk to Melody Hanson about this
24      incident?
25 A.   No, I did not.

109

1 Q.    How did you first come to learn this
2       collision had taken place?
3 A.    I don't recall exactly.  Maybe as the court
4       proceedings started or litigation, whatever.
5 Q.    Were you aware of it back in 2008 when the
6       collision actually occurred?
7 A.    Not that I'm aware of.
8 Q.    Who at Universal would have been given notice
9       that this incident had occurred?
10          MR. FISHER:  Foundation, competence,
11      speculation.  You can go ahead.
12          THE WITNESS:  Melody Hanson dealt with
13      Martin Bulk Milk, and I would assume that she
14      would talk to somebody at Martin Bulk Milk.
15 BY MR. BURKE:
16 Q.   And then to whom would you expect Melody Hanson
17      to report the incident to within Universal?
18 A.   Dave Hummel.
19 Q.   What's Mr. Hummel's job?
20 A.   Operations manager.
21 Q.   And how does he spell his last name?
22 A.   H-U-M-M-E-L.
23 Q.   Was he operations manager back in 2008?
24 A.   Yes, sir.
25 Q.   And operations manager for Universal Am Can?

MARK LIMBACK
April 17, 2012

---

**110**

1 A.  Yes.

2 Q.  Was he in the Warrenville (sic) office?

3 A.  Yes.

4 Q.  Not Warrenville.  The Warren office.

5 A.  Yes.

6 Q.  We've got a Warrenville by us.

7       I may have asked you earlier, do you

8 know Steve Mundy?

9 A.  No, I do not.

10      MR. BURKE:  I'm just looking at my

11 notes to see what else needs to be asked here.

12      MR. FISHER:  He's about to ask the BMW

13 questions, Tim.

14      MR. COUTURE:  Sure, I might as well ask

15 my questions.

16      MR. FISHER:  No, I said Rich is about

17 to ask the BMW questions.

18      MR. COUTURE:  While he's looking, I'll

19 ask my question.

20      MR. FISHER:  Great, then you can sign

21 off.

22      MR. COUTURE:  No, I'll stay on.

23      Sir, my name is Tim Couture.  I

24 represent BMW in this lawsuit, the car

25 manufacturer, and its North American distributor.

---

**111**

1 My client is also sued by the Scheinman family.

2 I have a couple questions for you.

3            EXAMINATION

4 BY MR. COUTURE:

5 Q.  Do you have any knowledge regarding any of the

6 allegations made in this lawsuit against BMW?

7 A.  No.

8 Q.  Do you have any opinions regarding the claims

9 that the BMW vehicle which Jeffrey Scheinman was

10 sitting when he was struck by the truck of Samuel

11 Franke was in any way defective or negligent in

12 the design or manufacture?

13 A.  No.

14      MR. COUTURE:  Thank you.  I have no

15 more questions.

16            REEXAMINATION

17 BY MR. BURKE:

18 Q.  Mr. Limback, I think I touched on this topic with

19 you before, but who was in charge of purchasing

20 insurance for Universal Am Can back in 2007 or

21 2007 and 2008 time period?

22 A.  I don't know.

23 Q.  Who do you believe has the information and

24 accurate knowledge about what insurance coverage

25 Universal Am Can and Universal Load Services has

---

**112**

1 that is or might be applicable to this

2 occurrence?

3      MR. FISHER:  Could you read -- I think

4 there was a name of a company I hadn't heard of.

5      (Requested portion read back.)

6      MR. BURKE:  And I should say Universal

7 Truckload Services.

8      THE WITNESS:  I would say Mike

9 Peterson.

10 BY MR. BURKE:

11 Q.  And you did tell me before he's risk manager?

12 A.  Yes, sir.

13      MR. BURKE:  Okay.  I don't think I have

14 anything else.  Thank you for your time, sir.

15      MR. SCHRECK:  I've got a few quick

16 questions for you, sir.  I introduced myself

17 earlier.  My name is Matthew Schreck.

18            EXAMINATION

19 BY MR. SCHRECK:

20 Q.  You indicated that you've been with Universal Am

21 Can for twenty-seven and a half years or

22 thereabouts.

23 A.  Yes.

24 Q.  You're currently the president and you've been

25 the president since 2007.  What positions did you

---

**113**

1 hold before that?

2 A.  I was a fleet manager from '84 to 85, and I was

3 an assistant operation manager from 85 to '86.  I

4 was operations manager from '86 to almost '90.

5 Then I was a regional manager from '90 to '97,

6 and I was a general manager from '97 to two

7 thousand -- approximately 2004 and vice president

8 from 2004 to 2007.

9 Q.  When you were the vice president, were you the

10 vice president of any particular department or

11 just of the whole company?

12 A.  Vice president of the entire company.

13 Q.  Mr. Burke had some questions you earlier regarding

14 the relationship between Martin's and Universal

15 Am Can.  One of the things you had indicated to

16 him in his questions was that under the master

17 brokerage agreement, Universal was not obligated

18 to give Martin's any loads to hold.  Is that

19 accurate?

20 A.  Correct.

21 Q.  Under that master brokerage agreement, was

22 Universal Am Can required to do or give Martin's

23 anything?

24 A.  No.

25 Q.  So under that master brokerage agreement,

---

MARK LIMBACK
April 17, 2012

**114**

1 Universal Am Can didn't give anything to Martin's
2 as far as compensation.  Is that accurate?
3 MR. FISHER:  Foundation and form.
4 THE WITNESS:  Only if they hauled the
5 load.
6 BY MR. SCHRECK:
7 Q. But by signing the master brokerage agreement,
8 Universal Am Can didn't give anything to
9 Martin's; is that accurate?
10 A. When you say anything, does that mean
11 compensation?
12 Q. Compensation for signing the agreement.
13 A. No, they didn't.
14 Q. So if I'm understanding this correctly, Universal
15 Am Can didn't give Martin's compensation or
16 anything else in Martin's executing that
17 brokerage agreement that is dated June 12, 2008;
18 is that correct?
19 MR. FISHER:  Form.
20 THE WITNESS:  I think you need to
21 clarify "anything else."
22 MR. BURKE:  I'll try and rephrase it
23 for you.
24 BY MR. BURKE:
25 Q. In exchange for Martin's signing the master

**115**

1 brokerage agreement that's dated June 12, 2008,
2 would it be accurate that Universal Am Can didn't
3 give them any compensation or promise to give
4 Martin's anything?
5 A. Correct.
6 MR. FISHER:  Objection, form.
7 BY MR. SCHRECK:
8 Q. And I think you may have already answered this,
9 but Universal Am Can never signed that brokerage
10 agreement dated June 12, 2008; is that correct?
11 A. Correct.
12 Q. Are you aware of any master brokerage agreements
13 for Martin's and Universal Am Can that have ever
14 been executed by Universal Am Can?
15 A. If you mean signed, no.
16 Q. So you're unaware of any brokerage agreement
17 between Martin's and Universal Am Can that
18 Universal Am Can has ever actually signed,
19 correct?
20 A. Correct.
21 Q. Are you familiar with the brokerage or broker
22 confirmation sheet that's sent from Universal Am
23 Can to its carriers?
24 A. Yes.
25 Q. Are you familiar with the one that was sent from

**116**

1 Universal Am Can to Martin's bulk on July 3rd,
2 2008?
3 A. Yes, I've seen it from Mr. Burke.
4 Q. You've seen it.  Are you familiar with those --
5 did you use those on a daily basis or not?
6 A. No, I did not.
7 Q. Other than what it says, do you have any
8 information regarding the actual load that was
9 being transported on July 3rd, 2008?
10 A. No, I do not.
11 Q. Is Melody Hanson the one that is going to have
12 that information or should have this information?
13 A. She should have that information.
14 Q. Do you ever get involved with the shipment of
15 loads by a carrier other than Universal Am Can as
16 far as the day-to-day operations are concerned?
17 A. No, I do not.
18 MR. SCHRECK:  I think that's all the
19 questions I have.  Thank you very much.
20 MR. FISHER:  Mr. Limback, I have a
21 couple follow-ups.
22 EXAMINATION
23 BY MR. FISHER:
24 Q. Earlier in your deposition when Mr. Burke asked
25 you for recitation of the documents that you

**117**

1 looked at, you said among other things that you
2 had looked at bills of lading, the 2007 contract,
3 the asset purchase agreement.  Do you recall
4 giving that testimony?
5 A. Yes.
6 Q. Okay.  Did you also, even though you did not
7 respond in this way to Mr. Burke's question, say
8 that you had looked -- did you also look before
9 your deposition at the master brokerage agreement
10 of June 12, 2008, about which you gave answers to
11 both Mr. Burke and Mr. Schreck?
12 A. Yes.
13 Q. And was it based upon your review of that
14 contract that you drew the conclusions you've
15 already expressed in today's deposition?
16 A. Yes.
17 Q. Different topic now.  You were asked some
18 questions by Mr. Burke and he was asking you how
19 owner operators and other people were paid, and
20 there came a time when either you or he made
21 reference to an advance on a driver, and I think
22 you described that as a fuel advance?  Remember
23 that topic being discussed?
24 A. Yes.
25 Q. Would there ever have been a circumstance in

**118**

1 which to your knowledge Universal Am Can would
2 have done a fuel advance for a driver being used
3 by a broker carrier like Martin's Bulk Milk?
4 A. No.
5 Q. When you earlier were giving a description or an
6 answer to one of Mr. Burke's questions and you
7 were talking about the master brokerage agreement
8 and the relationship between Universal Am Can and
9 Martin's Bulk Milk, I believe you used the phrase
10 in your answer of our agreement. When you said
11 that, were you referring to the agreement that
12 existed on June 12th, 2008, between Universal Am
13 Can and Martin's Bulk Milk?
14 A. Correct.
15 Q. And finally, Mr. Schreck was asking you some
16 questions concerning whether or not under the
17 master brokerage agreement UACL was obliged to
18 give any work or any loads to Martin's Bulk Milk,
19 you gave your answer concerning that question,
20 right?
21 A. Yes.
22 Q. If, however, a load was tendered to Martin's Bulk
23 Milk by someone like Melody Hanson and the load
24 was -- and the tender or assignment was accepted
25 by Martin's Bulk Milk if a Martin's Bulk Milk

**119**

1 driver hauled the freight, Martin's Bulk Milk
2 would be paid by Universal Am Can for that
3 service?
4 A. Correct.
5 Q. Consistent with the terms of the master brokerage
6 agreement?
7 A. Correct.
8         MR. FISHER: I believe that's all I
9 have.
10        MR. BURKE: Nothing else. Signature is
11 reserved. Thank you all.
12        (Signature reserved.)
13        (Deposition concluded at 3:15 p.m.)
14           - - -
15
16
17
18
19
20
21
22
23
24
25

**120**

1              ERRATA
2   SCHEINMAN vs MARTIN'S BULK MILK SERVICE, et al
3        DEP OF MARK LIMBACK - 4/17/12
4 Page/Line #                        Correction
5 _____    _____
6 _____    _____
7 _____    _____
8 _____    _____
9 _____    _____
10 _____   _____
11 _____   _____
12 _____   _____
13 _____   _____
14 _____   _____
15 _____   _____
16 _____   _____
17 _____   _____
18 _____   _____
19 _____   _____
20 _____   _____
21 _____   _____
22 _____   _____
23 _____   _____
24 _____   _____
25 _____   _____

**121**

1              AFFIDAVIT
2        I have read my deposition, and the same is
3 true and accurate, except for any changes and/or
4 corrections, if any, as indicated by me on the
5 Errata sheet(s) attached hereto.
6
7
8        _____
9              MARK LIMBACK
10
11
12            N O T A R Y
13
14 Subscribed and sworn to me this _____ day of
15 _____, 2012.
16
17 My commission expires _____.
18
19 _____, NOTARY PUBLIC, in and for the
20 State of Michigan.
21
22
23
24
25

122

1

2     C E R T I F I C A T E     O F     N O T A R Y

3  STATE OF MICHIGAN )
                     )ss.
4  COUNTY OF OAKLAND )

5                    I, Cindy A. Boedy, do hereby

6  certify that the preceding deposition was reported by

7  me, was recorded by me stenographically and later

8  reduced to typewritten form under my supervision, and

9  is a true and complete transcript.

10                    I further certify that I am not

11 connected by blood or by marriage with any of the

12 parties, their attorney or agents; and that I am not

13 interested directly, indirectly, or financially in the

14 matter of controversy.

15                    In witness whereof, I have hereunto

16 set my hand this day in Lake Orion, Michigan, County of

17 Oakland, State of Michigan.

18

19                    _____

20                    Cindy A. Boedy, CSR 4696

21                    Certified Shorthand Reporter

22                    Oakland County, Michigan

23                    My commission expires 10-4-13

24

25