# EX. 10

Melody Hansen Deposition
dated, July 19, 2012

**MELODY HANSEN**                                        July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE



**1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
MURRAY SCHEINMAN, Plenary Guardian
of the Estate and Person of
JEFFREY J. SCHEINMAN, a Disabled
Person
                              Plaintiff,      ) Case No.
        -vs-                                  ) 09 CV 5340
MARTIN'S BULK MILK SERVICE, INC.,
SAMUEL G. FRANKE, CSX INTERMODAL,
INC., INTERNATIONAL PAPER COMPANY,            ) Hon. Judge
UNIVERSAL AM CAN LTD., Successor to           ) James F.
OVERNITE EXPRESS, INC. and OX LLC,            ) Holderman
BMW OF NORTH AMERICA, LLC,
a corporation, BAYERISCHE MOTOREN
WERKE AKTIENGESELLSCHAFT, a
corporation, BMW AG, a corporation,
and KARL KNAUZ MOTORS, INC., a
corporation,
                              Defendants.     )

    July 19, 2012 - 10:35 a.m.
THE DEPOSITION OF MELODY HANSEN

**2**

1          The deposition of MELODY HANSEN, called
2   as a witness herein for examination, taken pursuant
3   to the Federal Rules of Civil Procedure of the
4   United States District Courts pertaining to the
5   taking of depositions, taken before ROSANNE M.
6   NUZZO, a Notary Public within and for the County of
7   Will, State of Illinois, and a Certified Shorthand
8   Reporter of said state, at the law offices of
9   Hinshaw & Culbertson, Suite 201, 322 Indianapolis
10  Boulevard, Schererville, Indiana on Thursday,
11  July 19, 2012, at approximately 10:35 a.m.
12
13
14  PRESENT:
15
16      CLIFFORD LAW OFFICES, P.C.,
17      (120 North LaSalle Street, 31st Floor,
18      Chicago, Illinois 60602,
19      312-899-9090), by:
20      MR. RICHARD F. BURKE, JR.,
21      rfb@cliffordlaw.com,
22          appeared on behalf of the Plaintiff;
23
24

**3**

1   PRESENT (Continued):
2       MULHERIN, REHFELDT & VARCHETTO, P.C.,
3       (211 South Wheaton Avenue, Suite 200,
4       Wheaton, Illinois 60187,
5       630-653-9300), by:
6       MR. MATTHEW R. SCHRECK,
7       mschreck@mrvlaw.com,
8           and
9       DOWD AND DOWD, LTD.,
10      (617 West Fulton,
11      Chicago, Illinois 60661,
12      312-704-4400), by:
13      MR. ROBERT J. GOLDEN (via telephone),
14      rgolden@dowdanddowd.com,
15          appeared on behalf of the Defendants,
16          Martin's Bulk Milk Service, Inc. and
17          Samuel G. Franke;
18
19
20
21
22
23
24

**4**

1   PRESENT (Continued):
2       HINSHAW & CULBERTSON LLP,
3       (222 North LaSalle Street, Suite 300,
4       Chicago, Illinois 60601,
5       312-704-3000), by:
6       MR. CARLTON D. FISHER,
7       cfisher@hinshawlaw.com,
8           appeared on behalf of the Defendants,
9           International Paper Company, Universal
10          Am Can Ltd., Successor to Overnite
11          Express, Inc. and OX, LLC;
12
13      JOHNSON AND BELL, LTD.,
14      (33 West Monroe Street, Suite 2700,
15      Chicago, Illinois 60603-5404,
16      312-372-0770), by:
17      MR. BRIAN C. LANGS (via telephone),
18      langsb@jbltd.com,
19          appeared on behalf of the Defendants,
20          BMW of North America, LLC and Bayerische
21          Motoren Werke Aktiengesellschaft.
22
23  REPORTED BY: ROSANNE M. NUZZO, CRR, RPR,
24      CSR License No. 84-1388.

MELODY HANSEN                                                      July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

**5**

1    MR. BURKE: Are we all set, Carl? Matt, are
2  you all set?
3    MR. FISHER: Yeah, go ahead.
4    MR. BURKE: You guys all set on the phone?
5    MR. GOLDEN: We are.
6    MR. BURKE: Okay. Do you want to swear the
7  witness.
8          (WHEREUPON, the witness was duly
9          sworn.)
10   THE COURT REPORTER: Thank you.
11   MR. BURKE: Let the record reflect this is the
12 deposition of Melody Hansen, taken pursuant to
13 Notice and in accord with the applicable Rules of
14 the Seventh Circuit in the Northern District of
15 Illinois.
16         MELODY HANSEN,
17 called as a witness herein, having been first duly
18 sworn, was examined and testified as follows:
19         EXAMINATION
20 BY MR. BURKE:
21   Q.   Ms. Hansen, my name is Rich Burke.
22 As I'm sure Carl Fisher told you, I'm going to ask
23 you some questions about your work previously at
24 Overnite Express and Universal and perhaps some

**6**

1  other entities as well; and as I do so, if you
2  would like any questions repeated, let me know.
3  If you want to look at any documents, exhibits,
4  whatever you think we may have or you brought with
5  you, just say so and, you know, I'll be happy to
6  let you do so.
7          If you and I could avoid talking at the
8  same time, that helps the court reporter. And if
9  you could verbalize your "yes" and "no" answers
10 because even though we can see you nodding your
11 head a certain way, the court reporter has to
12 actually take down whatever that answer happens to
13 be, okay?
14   A.   Okay.
15   Q.   Would you please state your name and
16 spell your first and last name.
17   A.   Melody Hansen, M-e-l-o-d-y,
18 H-a-n-s-e-n.
19   Q.   What's your date of birth, Ms. Hansen?
20   A.   3-22-45.
21   Q.   Where do you currently live?
22   A.   Kouts, Indiana.
23   Q.   How do you spell that?
24   A.   K-o-u-t-s.

**7**

1    Q.   Where is that from here?
2    A.   It's --
3    Q.   Approximately.
4    A.   -- two miles south of Valparaiso.
5    Q.   Are you employed at the present time?
6    A.   No. I'm retired.
7    Q.   When did you last work full-time?
8    A.   I retired the end of October 2009.
9    Q.   Where were you working at that time?
10   A.   Universal Am Can.
11   Q.   What's your educational background?
   Did you finish high school?
13   A.   Yes. I have an Associate's Degree.
14   Q.   So after high school, you went to --
15   A.   IUN, Indiana University Northwest.
16   Q.   What was your Associate's Degree in?
17   A.   Business.
18   Q.   Business? Okay. Any other degrees
   after that?
20   A.   No.
21   Q.   Any other formal education or
   certificates of any kind after that?
23   A.   No.
24   Q.   Could you -- you work for Universal,

**8**

1  you said. And then, I believe you worked for
2  Overnite Express sometime prior to that?
3    A.   Yes, I did.
4    Q.   For about how long did you work for
5  Overnite Express?
6    A.   I believe I started with Overnite
7  Express around 1990.
8    Q.   Give me a little idea of your work
9  experience prior to Overnite Express. What were
10 you doing before you went to work with them?
11   A.   I worked for Farmland Transportation.
12   Q.   Where are they located?
13   A.   Farmland was located in South Holland.
14   Q.   Illinois?
15   A.   Yes.
16   Q.   How long were you with Farmland?
17   A.   I was with Farmland for 13 years.
18   Q.   Okay. And --
19   A.   So, you know, that 1990 is wrong
20 because I started with Farmland in '93, I think,
21 and was there for 13 years and then went to
22 Overnite.
23   Q.   And what's the business of Farmland?
24   A.   The same thing; transportation.

---

**MELODY HANSEN**                                            July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

**9**

1    Q.   Truck transportation?
2    A.   Yes.
3    Q.   What was your last job or position at
4    Farmland?
5    A.   I was a broker, transportation broker.
6    Q.   When you use that term, what does it
7    mean to you?
8    A.   We obtain outside trucks to haul
9    Farmland's freight, outside carriers.
10   Q.   Did Farmland haul any of their own
11   freight?
12   A.   Yes, but not out of our office.
13   Q.   Did you spend all of your 13 years
14   doing brokerage type work?
15   A.   Yes.
16   Q.   How about prior to Farmland, who did
17   you work for?
18   A.   Nor Transportation, N-o-r.
19   Q.   Where were they located?
20   A.   They were located in Tinley Park.
21   Q.   And how long did you work for them,
22   approximately?
23   A.   Approximately ten years.
24   Q.   What type of work did you do with them?

---

**10**

1    A.   The same thing.
2    Q.   Okay.  Brokerage?
3    A.   Um-hum.
4    THE COURT REPORTER:  Is that "yes"?
5    THE WITNESS:  Yes.
6    BY MR. BURKE:
7    Q.   Have you worked for any other trucking
8    companies?
9    A.   I also worked for ACE Trucking.
10   Q.   Do you remember when you started with
11   them, approximately?
12   A.   I believe that was 1981.
13   Q.   And for how long?
14   A.   To '84 or '85.
15   Q.   What did you do with them?
16   A.   The same thing.
17   Q.   Brokerage?
18   A.   Brokerage.
19   Q.   Any others besides ACE?
20   A.   Yes.  I worked for Prefab.
21   Q.   Were they a trucking company as well?
22   A.   They were a trucking company, too.
23   Q.   And when did you work for them?
24   A.   I believe I started with Prefab in '72.

---

**11**

1    Q.   For about how long?
2    A.   About twelve years.
3    Q.   What did you do with them?
4    A.   My official title was terminal
5    secretary.
6    Q.   And, in actuality, what did you do?
7    A.   It was a dispatch job.
8    Q.   When you say "dispatch job," what did
9    you actually do?
10   A.   Prefab had their own trucks, and
11   I dispatched them on loads.
12   Q.   Any other trucking companies other than
13   the --
14   A.   No.
15   Q.   -- several you have mentioned?  Okay.
16        Have you ever driven a truck for a
17   living?
18   A.   No.
19   Q.   I take it you do not have a CDL
20   license?
21   A.   No.
22   Q.   You said you started working for
23   Farmland Transportation in 1993 and worked there
24   for about 13 years, which would take us to about

---

**12**

1    2006, is that right?
2    A.   See, I might not have these dates all
3    exactly right.  They were continuous.
4    Q.   Okay.
5    A.   Overnite Express took over from
6    Farmland when Farmland went bankrupt, and then
7    Universal took over from Overnite.
8    Q.   Okay.
9    A.   So it's kind of hard for me to remember
10   when those takeovers occurred.
11   Q.   Sure.  Okay.  Do you -- well, do you
12   recall that the sale or takeover of Overnite
13   Express by Universal occurred on June 13th of
14   2008?
15   A.   That sounds about right.
16   Q.   For about how long prior to that had
17   you been working for Overnite Express?
18   A.   Hmm.  Probably looking at it from 2008
19   back, I probably went to Overnite Express around
20   2000.
21   Q.   And when you went to Overnite Express,
22   had you been working at Farmland?
23   A.   Yes.
24   Q.   And then you said that Overnite Express

---

MELODY HANSEN                                    July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

13

1   bought Farmland?
2       A.   Yes.
3       Q.   When you were working for Farmland at
4   that last point in time, where were you located?
5   In South Holland, Illinois?
6       A.   They were all in the same office.
7       Q.   Okay.  So when you took over -- when
8   Overnite Express took over Farmland, did you stay
9   in the same office?
10      A.   Yes.
11      Q.   Okay.  What was the address of that
12  office in South Holland?
13      A.   16901 Van Dam Road.
14      Q.   And when that office -- or was that
15  office -- do you know if that office was owned or
16  leased by Overnite when you were working there?
17      A.   It was rented.  I don't know if they
18  had a lease or not.
19      Q.   So when you first started working with
20  Overnite Express, that came about because you were
21  already an employee of Farmland, and then Overnite
22  bought Farmland?  Is that right?
23      A.   That's correct.  Now, they didn't buy
24  the whole company of Farmland, just that office.

14

1       Q.   And so when you say you went to
2   Overnite Express, I take it you stayed working in
3   the same facility, did you?
4       A.   Yes.
5       Q.   But the new owners were Overnite
6   Express?
7       A.   Exactly.
8       Q.   When you started working for Overnite
9   Express, what were your job duties over those
10  approximately eight years from about 2000 to 2008?
11      A.   Transportation broker.
12      Q.   And to whom did you report?  Who was
13  your supervisor?
14      A.   Matt Elsholtz.
15      Q.   Where was he physically located, his
16  office?
17      A.   In St. Paul, Minnesota.
18      Q.   What did you understand Matt's job
19  title or position to be?
20      A.   I don't know that he had a title, but
21  he was the head of the logistics division.
22      Q.   And --
23      A.   Which was the brokerage division.
24      Q.   Is that sometimes referred to as

15

1   Overnite Logistics?
2       A.   Correct.
3       Q.   Was that a separate business or
4   corporation, or was it just a division of Overnite
5   Express?
6       A.   Just a division.
7       Q.   And in the South Holland office,
8   after Overnite Express purchased it, about how
9   many workers were there?
10      A.   Four -- five, I'm sorry.
11      Q.   When Universal Am Can bought Overnite
12  Express, were those same five workers still --
13      A.   No.
14      Q.   Okay.
15      A.   Two.
16      Q.   Two, gotcha.  Okay.
17           Let me -- how about in June of 2008,
18  right before Overnite was sold to Universal, were
19  all five workers working then?
20      A.   No.
21      Q.   Approximately when did you last have
22  five workers in the South Holland office?
23      A.   Probably several months before that.
24      Q.   And who were those workers?

16

1       A.   Cheryl Lambert, Dorothy Conboy.
2       Q.   C-o-n-v- --
3       A.   "b."
4       Q.   "b."  Conboy, thank you.
5       A.   Lupe -- I can't remember Lu's last
6   name.  I don't recall her last name.  And Tom
7   Kite.
8       Q.   And yourself?
9       A.   Yes.
10      Q.   Okay.  Tom Kite, what was his job?
11      A.   Tom was in regional sales.
12      Q.   What was he selling?
13      A.   The services of Overnite.
14      Q.   Transportation services?
15      A.   Um-hum.
16      Q.   Trucking services?
17      A.   Yes, the trans...
18      Q.   And how about Lupe, what did he do?
19      A.   It's a female.
20      Q.   Oh, okay.
21      A.   Lu and I both worked for Matt in
22  logistics.
23      Q.   Did she do brokerage-type work?
24      A.   Yes.

ESQUIRE SOLUTIONS                         800.211.DEPO (3376)
                                          Esquiresolutions.com

MELODY HANSEN                                          July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

17

1    Q.   And how about Dorothy Conboy?
2    A.   Dorothy and Cheryl worked more for
3  Overnite Express, not Logistics. They handled
4  company trucks.
5    Q.   How about Cheryl Lambert, what did she
6  do?
7    A.   She and Dorothy did the same.
8    Q.   The same thing?
9    A.   Um-hum.
10   Q.   And then, the company trucks, those
11 were trucks that were owned by Overnite Express?
12   A.   Some of them were owned by Overnite
13 Express, and others were owner-operators signed on
14 by contract.
15   Q.   Okay. What did those trucks do?
16   A.   They hauled Overnite's freight.
17   Q.   When you say "Overnite's freight,"
18 that would be freight that Overnite had contracted
19 to haul for various shippers?
20   A.   Correct.
21   Q.   And then, what did you do on a daily
22 basis? When you say you worked in brokerage, what
23 did you actually do?
24   A.   The excess loads that -- when there

18

1  were more loads than Overnite had trucks, the
2  logistics job was to find outside carriers to haul
3  excess loads.
4    Q.   And the loads you're referring to
5  are loads that Overnite Express had contracted to
6  haul?
7    A.   That is correct.
8    Q.   And sometimes, they would be committed
9  to haul more loads than they had their own
10 equipment to handle?
11   A.   Than they had available equipment that
12 day.
13   Q.   And in that instance, you would contact
14 other haulers -- carriers?
15   A.   Correct.
16   Q.   To transport the loads that Overnite
17 Express had committed to?
18   A.   Correct.
19   Q.   When -- it sounds like -- or strike
20 that.
21        Shortly before -- while we're on that
22 topic, after you -- or, I should say, after
23 Universal bought Overnite Express, it sounds like
24 you remained in the South Holland office.

19

1    A.   Correct.
2    Q.   Did you continue working with
3  brokerage --
4    A.   Yes.
5    Q.   -- issues?
6    A.   Yes.
7    Q.   And was part of your job, did it remain
8  to arrange for transportation of excess loads that
9  Universal had committed to haul?
10   A.   Yes.
11   Q.   Was the purpose of you asking other
12 carriers to haul those excess loads to be sure
13 that Universal honored the commitments it had made
14 with shippers to haul their freight?
15   A.   Yes.
16   Q.   Are you familiar with a company called
17 Management Assistance Corporation?
18   A.   Yes.
19   Q.   Okay. And what was the business of
20 Management Assistance?
21   A.   All employees of Overnite were paid by
22 Management Assistance. That's where they held
23 employees. Whether you'd call that a holding
24 company or whatever legally it's called, I don't

20

1  know.
2    Q.   So during the time you worked at
3  Overnite Express, you were actually paid by
4  Management Assistance?
5    A.   That's correct.
6    Q.   Were you actually an employee of
7  Management Assistance?
8    A.   I'm not sure how to answer that. Our
9  paychecks were issued by Management Assistance
10 but, you know, commonly, we said we worked for
11 Overnite. So I don't know legally who we were an
12 employee of, which one.
13   Q.   In the course of your daily activities
14 when you would contact a potential freight hauler
15 for an excess load, would you represent yourself
16 as working for Overnite Express --
17   A.   Yes.
18   Q.   -- or Management Assistance?
19   A.   Overnite Express.
20   Q.   So you're familiar with Martin's Bulk
21 Milk Transport?
22   A.   Yes.
23   Q.   So when you would deal with Martin's or
24 contact them in regard to Martin's hauling freight

MELODY HANSEN                                             July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

**21**

1  for Overnite, you would actually be arranging that
2  transportation on behalf of Overnite Express as
3  opposed to Management Assistance? Is that
4  correct?
5      MR. FISHER: Excuse me. Do you mean before
6  June 13th?
7      MR. BURKE: Correct.
8      MR. FISHER: Okay. I'm sorry. Go ahead.
9  BY THE WITNESS:
10     A. Yes. Management Assistance, that term
11 was never used outside.
12 BY MR. BURKE:
13     Q. All of your activities in terms of
14 brokerage work, I take it, were being done for the
15 benefit of Overnite Express?
16     A. Correct.
17     Q. Did Management Assistance have a
18 headquarters or office?
19     A. Not that I know of.
20     Q. Were the four other employees that you
21 mentioned also employees of Management Assistance?
22     A. Yes. I believe all the employees of
23 Overnite were.
24     Q. At some point, did you become aware

---

**22**

1  of the sale of -- or, I should say, the pending or
2  potential sale of Overnite to Universal?
3      A. Yes.
4      Q. How did you come to learn about that?
5      A. We received a phone call from Bob (sic)
6  Elsholtz.
7      Q. What did Bob say?
8      A. That he had sold the assets of the
9  company to Universal Am Can, and more details
10 would be forthcoming.
11     Q. Did he say how that would affect you in
12 terms of your job?
13     A. He said it would not.
14     Q. Prior to the sale, did you have an
15 employment contract with Overnite Express?
16     A. No.
17     Q. Did you have one with Management
18 Assistance?
19     A. No.
20     Q. Did you -- did you meet anyone -- or
21 strike that.
22        Were you contacted by anyone from
23 Universal Am Can prior to the sale?
24     A. No.

---

**23**

1      Q. How about after the sale? Tell me
2  what took place in terms of any transition of
3  your job.
4      A. After the sale, a lady named Kara
5  Fitzpatrick called us and made arrangements to
6  come in and meet with us and talked to us about
7  being acquired by Universal.
8      Q. And who did Kara Fitzpatrick work for,
9  as far as you know?
10     A. UACL.
11     Q. Do you know what her job or title was?
12     A. At that time, she was a terminal
13 manager.
14     Q. Where at?
15     A. Her office was in Crown Point, Indiana.
16     Q. When she came in, basically, what did
17 she tell you?
18     A. That Universal was a good company to
19 work for, and she would be our trainer so that we
20 would become comfortable with Universal's computer
21 system and that she would be housed in our South
22 Holland office -- she didn't know for how long --
23 until, you know, we were comfortable with the new
24 systems and all that.

---

**24**

1      Q. Did she offer you a job with Universal?
2      A. No. That had already been established,
3  that we would remain in our jobs, and that would
4  be -- I'm sure it was a probationary period, but
5  that wasn't even discussed yet.
6      Q. Did you then continue working for --
7  I shouldn't say "continue." Did you start working
8  for Universal?
9      A. Yes.
10     Q. After you started working for
11 Universal, from whom did you receive your
12 paycheck?
13     A. Our first checks were from a payroll
14 staffing account, and I don't remember exactly how
15 long that was, but it was just a couple of months
16 while they got all the records and everything --
17     Q. And thereafter?
18     A. -- finished. And thereafter, then, we
19 were -- our checks came from Universal Am Can.
20     Q. At the point of the sale of Overnite to
21 Universal, did you stop receiving paychecks from
22 Management Assistance Corporation?
23     A. Yes.
24     Q. Did Ms. Fitzpatrick come in and provide

---

**MELODY HANSEN**                                      July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

### 25

1  the computer training that she mentioned?
2      A.   Yes.
3      Q.   Did you receive any other type of
4  training from them?
5      A.   Basically, just training as to
6  Universal's policies and procedures and their
7  methods and things of that nature.
8      Q.   Do you remember when that training
9  first started after the June 13th sale?
10     A.   Right away.
11     Q.   In essence, how were the policies and
12 procedures of Universal different than Overnite?
13     A.   Not very.
14     Q.   What can you recall of any changes
15 or --
16     A.   The computer system, obviously, was
17 totally different, but the policies of brokering
18 loads and things generally were the same.
19     Q.   The policies that you just referred to
20 now, did they -- did Universal provide you with
21 some written materials or training materials?
22     A.   I'm sure there were some instructional
23 sheets, but a lot of it was verbal.
24     Q.   Did you get any written policies and

### 26

1  procedures for your work that you were doing?
2      A.   I don't recall how much was actually
3  written because none of us were new brokers. We
4  all were experienced, and so we already knew the
5  drill.
6      Q.   Okay. When you --
7      A.   I mean, as Kara trained us, we would
8  write things down, but I can't recall a lot of
9  preprinted instructions except stuff that applied
10 to the computer, to the programming.
11     Q.   Did Universal provide you with any
12 personnel manual or anything of that nature?
13     A.   I don't recall one.
14     Q.   You referred to their policies and
15 procedures relating to brokerage. Essentially,
16 how would you explain or define those policies?
17     A.   Like, you never used a carrier until
18 they were approved by the home office; and if
19 we're speaking of Universal, they had to be
20 approved by Warren, Michigan. And they were given
21 a carrier code, and you couldn't load them until
22 that was done.
23     Q.   And what was the purpose of the carrier
24 code?

### 27

1      A.   To enter the carrier in the computer
2  system on a load, to assign that carrier to a
3  specific load. The computer wouldn't accept them
4  if they weren't approved.
5      Q.   Okay.
6      A.   Or if their code was expired or...
7      Q.   Do you know who was involved in
8  approving potential carriers at the Warren office?
9      A.   The brokerage department.
10     Q.   Who was in charge of that?
11     A.   John Moore.
12     Q.   Were you involved in the approval
13 process at all?
14     A.   Only to the point that we would send
15 a new carrier what was called a contract carrier
16 packet. It had a copy of the contract.
17          And we would ask them for insurance
18 certificates made out in Universal's name as
19 certificate holder; their authority, their
20 contract authority; a W-9. And, obviously, the
21 certificates of insurance had to be current.
22     Q.   And Universal required that all of
23 those items be provided by them before they could
24 potentially be approved to haul freight for

### 28

1  Universal?
2      A.   Correct.
3      Q.   Did you ever engage in any particular
4  evaluation or investigation of individual drivers
5  from a carrier?
6      A.   No.
7      Q.   Other than what you already told me,
8  any other particular policies or procedures that
9  you recall that related to brokerage?
10     A.   I'm not sure I understand the question.
11     Q.   You mentioned that Universal provided
12 some training to make sure you were familiar with
13 their policies and procedures relating to
14 brokerage, and I just -- and you mentioned, you
15 know, some of what you did and that Universal did
16 relative to obtaining approval of a carrier.
17          And all I'm asking now is, do you
18 remember any other procedures that you were taught
19 after Universal took over?
20     A.   No, I don't. I don't think that there
21 were a lot of things that changed, you know; so
22 most of my job, I was already familiar with.
23     Q.   Who remained in the South Holland
24 office? Who stayed working besides yourself?

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**29**

1  A.  Kara Fitzpatrick and Cheryl Lambert.
2  Q.  What did Cheryl Lambert do after
3  Universal took over?
4  A.  Cheryl became the terminal manager, and
5  so she dealt with the company trucks.
6  Q.  She dealt with Universal's company
7  trucks?
8  A.  Yes, and the Overnite trucks.
9  Q.  Now, when you say "the Overnite
10  trucks" --
11  A.  Well, when the sale first took place,
12  Overnite had some company equipment that was owned
13  by Overnite. That eventually was all sold, and
14  they became all owner-operators. So she dealt
15  with the Overnite owner-operators and company
16  drivers driving company equipment.
17  Q.  Okay. And those Overnite -- or strike
18  that.
19       Those company-owned trucks were now
20  owned by Universal?
21  A.  No. They were owned by Overnite. And
22  eventually, they were all let go when Bob sold the
23  equipment.
24  Q.  But Universal was using those Overnite

---

**30**

1  trucks --
2  A.  Yes.
3  Q.  -- that still remained to haul freight
4  for Universal?
5  A.  Yes. Those trucks were signed on to
6  Universal.
7  Q.  What did the facility consist of in
8  South Holland, you know, in June and July of 2008,
9  you know, right after the merger -- or after the
10  sale, I should say?
11  A.  It was a two-room office suite with
12  truck parking. The office suite was inside of a
13  large trucking facility with other suites rented
14  out to other truck lines.
15  Q.  The truck parking was for whose trucks?
16  A.  Anybody doing business in the building,
17  any of the truck lines.
18  Q.  Did Universal park trucks there?
19  A.  Yes.
20  Q.  When you say "trucks," tractors or
21  trailers or both?
22  A.  Both.
23  Q.  Both?
24  A.  Both.

---

**31**

1  Q.  Now, back in -- or back on July 3rd of
2  2008, this incident occurred. Were you engaging
3  in the same brokerage-type activities that you've
4  been telling me about?
5  A.  Yes.
6  Q.  You worked at the South Holland office
7  then --
8  A.  Now --
9  Q.  -- or no?
10  A.  I believe we were still in South
11  Holland. I think we moved to Gary around
12  Thanksgiving.
13  Q.  Of 2008?
14  A.  Um-hum.
15  THE COURT REPORTER:  "Yes"?
16  BY MR. BURKE:
17  Q.  Is that a "yes"?
18  A.  Yes.
19  Q.  Why did you leave the South Holland
20  office?
21  A.  Universal owned property in Gary, and
22  they moved us into an office trailer.
23  Q.  When you were in -- assuming you were
24  still in the South Holland office on July 3rd,

---

**32**

1  2008, what shift or hours were you working?
2  A.  The office was open from 8 to 5.
3  Q.  With respect to giving this deposition
4  today, what materials have you reviewed?
5  A.  I reviewed copies of documents that
6  have my signature on them, broker agreements.
7  Q.  The documents that have your signature
8  on them are what, what type of documents?
9  A.  Broker confirmation sheets.
10  Q.  The broker agreements you just
11  mentioned, do they have your signature?
12  A.  No. That's what I meant, the broker
13  confirmation sheets.
14  Q.  Are the ones that have your signature?
15  A.  Right.
16  Q.  Did you say you -- and, I'm sorry,
17  did you say you looked at broker agreements or
18  contracts, or were you --
19  A.  No.
20  Q.  Okay. You were --
21  A.  I meant the confirmation sheets.
22  Q.  Gotcha. Okay.
23       Do you know if, on July 3rd, 2008,
24  Universal Am Can had any master brokerage

---

33

1    agreement with Martin's Bulk Milk Service?
2         A.   I'm sure they did.
3         Q.   Have you reviewed any such agreement?
4         A.   No.
5         Q.   Were you, as part of your job, involved
6    in creating those --
7         A.   No.
8         Q.   -- agreements or contracts?
9         A.   No.
10        Q.   Were you involved in sending them to
11   carriers?
12        A.   Yes. I would send them a contract
13   carrier packet which had a copy of the contract in
14   it.
15        Q.   Okay. You did mention that. Thank
16   you.
17             Were you involved in -- before you
18   would do that, would you review the content --
19        A.   No.
20        Q.   -- of the contract?
21        A.   No.
22        Q.   And you did not negotiate any of the
23   provisions --
24        A.   No.

34

1         Q.   -- or terms of the contract, is that
2    right?
3         A.   Correct.
4         Q.   Do you have an understanding of who
5    took care of that for Universal?
6             MR. FISHER: Excuse me. Objection, form, the
7    word "that."
8             You can go ahead and answer.
9    BY MR. BURKE:
10        Q.   Well, let me ask you, do you have an
11   understanding of who was responsible for preparing
12   the contracts with carriers --
13        A.   I don't know --
14        Q.   -- on behalf of Universal?
15        A.   I don't know who prepared them, but
16   I know that they were sent to John Moore.
17        Q.   Sent to John Moore when they were
18   coming back from a carrier? Is that what you
19   mean?
20        A.   Yes.
21        Q.   In July of 2008 and during the period
22   after Universal took over in the latter part of
23   June and the first week of July -- or the first
24   part of July 2008, could you give us some idea how

35

1    you would know what amount of excess loads you had
2    to find carriers for on a given day?
3         A.   Mostly, Cheryl would let me know how
4    many -- loads would come in by phone, and they
5    were always entered into the computer and,
6    obviously, we all shared the same system.
7             Cheryl would let us know what loads she
8    could cover.
9         Q.   With Universal Am Can --
10        A.   Right, with our own equipment.
11        Q.   -- owned or controlled trucks?
12        A.   Yes.
13        Q.   And what was to be done, then, with
14   loads that she could not cover?
15        A.   We would start to try to find outside
16   carriers --
17        Q.   Okay. And --
18        A.   -- for available loads.
19        Q.   When you say loads would come in over
20   the phone, from whom?
21        A.   From shippers.
22        Q.   And would they actually telephone your
23   office?
24        A.   Some would, and some would fax them,

36

1    and some would offer them by computer system.
2         Q.   And, in general, what would the nature
3    of the information be that you would get from a
4    shipper concerning a potential load?
5         A.   Well, obviously, what shipper it was
6    from, where it was going to, and when it was to be
7    picked up.
8         Q.   Were there any rules or customs as to
9    at what point in time these calls had to come in
10   to your office?
11        A.   No.
12        Q.   Was there any rule or custom and
13   practice as to what amount of time you had to
14   attempt to arrange for transportation?
15        A.   Strictly speaking, no. But as a
16   general rule of practice, most trucking companies
17   will not keep the load for an indefinite period of
18   time without getting back to the shipper because
19   if you can't cover it and you've had it all day,
20   they're not happy.
21        Q.   And you just referred to "all day."
22   Is that about the maximum time period, one
23   business day, to --
24        A.   Well --

MELODY HANSEN                                        July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

**37**

1    Q.   -- try to cover --
2    A.   -- we had a lot of freight that was for
3  same day, yes.
4    Q.   Okay.
5    A.   You know, otherwise, you know, some
6  shippers might give you a couple days' notice.
7  Well, then you had more time to work on it.
8    MR. FISHER:  Melody, could I make a
9  suggestion?
10   THE WITNESS:  Yes.
11   MR. FISHER:  The court reporter is going to
12 have difficulty taking down when people speak over
13 each other like in normal everyday conversation.
14 Try to let finish his question.
15   THE WITNESS:  Okay.
16   MR. FISHER:  Okay?  Thanks.
17 BY MR. BURKE:
18   Q.   Back in June and July of '08, did you
19 have a list of carriers that you regularly worked
20 with?
21   A.   Yes.
22   Q.   Was Martin's Bulk Milk Service one of
23 them?
24   A.   Yes.

---

**38**

1    Q.   When you had worked for Universal --
2  I'm sorry.
3        When you had worked for Overnite
4  Express, did you also use Martin's to haul excess
5  loads?
6    A.   Yes.
7    Q.   The load that was being hauled at the
8  time of this crash was for goods owned by
9  International Paper.  You're aware of that?
10   A.   Yes.
11   Q.   Back on the day of this incident, were
12 you aware that Universal had a contract with
13 International Paper to haul a certain number of
14 loads for them?
15   A.   Yes.
16   Q.   Were you, as part of your job,
17 regularly arranging for the transportation of
18 International Paper's products?
19   A.   Yes.
20   Q.   With what frequency, Ms. Hansen, in
21 July?  I mean, was it daily or every other day?
22   A.   Daily.
23   Q.   Would some of International Paper's
24 loads sometimes be transported on Universal's

---

**39**

1  trucks if they were available?
2    A.   Yes.
3    Q.   And if Universal's trucks were not
4  available, then you'd turn to outside carriers to
5  cover the commitment to transport the
6  International Paper products, is that correct?
7    MR. FISHER:  You can go ahead and answer.
8  BY THE WITNESS:
9    A.   Yes.
10 BY MR. BURKE:
11   Q.   And, I take it, as you mentioned
12 earlier, the reason you did so was to make sure
13 that Universal honored their obligation to haul
14 International Paper's goods pursuant to the
15 contract that Universal entered into with
16 International?
17   A.   Yes.
18   Q.   With respect to the International goods
19 that you were dealing with on a daily basis, were
20 they going to a certain location, or was it a
21 certain route?
22   A.   Some of the loads were.
23   Q.   And that's a pretty bad question there.
24 Obviously, they're all going to somewhere.  Let me

---

**40**

1  rephrase that.
2        Were there specific routes or
3  destinations that you regularly dealt with for
4  International Paper's goods?
5    A.   Yes, but not exclusively.
6    Q.   And what routes did you frequently
7  arrange for transportation for?
8    A.   We had a -- what was called a pool load
9  that went to Minnesota every night.
10   Q.   And what other routes?
11   A.   At different points in time, we at one
12 time had a Cleveland, Ohio pool.  We had one that
13 went to Iowa at one point.  And then we had
14 miscellaneous loads, a load here, a load there.
15 Oh, and we had a Michigan route, too.
16   Q.   With respect to the load that was being
17 hauled at the time of this collision, was that
18 part of the pool load to Minnesota?
19   A.   Yes.
20   Q.   When you use that term, "pool load,"
21 what does that mean to you?
22   A.   It was a dedicated run.
23   Q.   And what's that mean?
24   A.   It went every night.

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE
July 19, 2012

41

1     Q.  Did it go to the three locations in
2 Minnesota that were part of the run on July 3rd,
3 or were there different Minnesota locations?
4     A.  There were different Minnesota
5 locations around Minneapolis.
6     Q.  Would Universal be contacted every day
7 by someone at International Paper concerning those
8 loads?
9     A.  Yes.
10     Q.  Who from International Paper would
11 contact you?
12     A.  Most of the time, it was Debbie.
13     Q.  Do you know Debbie's last name?
14     A.  I don't recall it.
15     Q.  Where did Debbie work?
16     A.  At Midwest Distribution Center in
17 Hammond.
18     Q.  And that's where International Paper
19 had their --
20     A.  Yes.
21     Q.  -- paper products stored?
22     A.  Correct.
23     Q.  Okay. And how would you be contacted
24 by Debbie or someone else from International

42

1 Paper?
2     A.  Either by phone call or by fax.
3     Q.  If it was by fax, what type of
4 information would you get?
5     A.  It would have the stops, the weight,
6 and the pickup number and that day's date.
7     Q.  What did you call that? Did that
8 document have a name?
9     A.  I don't recall if it had an actual
10 name, but we always called it the load sheet.
11     Q.  And that would come from International
12 Paper to Universal?
13     A.  Yes.
14     Q.  If International Paper contacted you
15 by phone, would they communicate that same
16 information, or would they follow it up with a
17 fax?
18     A.  They would communicate the same
19 information, or they would ask questions such as,
20 "Can I put this stop on it?" or "Can it load a
21 little later?" "Can it load a little earlier?"
22 And then, they would follow up by fax after
23 everything was settled.
24     Q.  Prior to Universal buying Overnite

43

1 Express, was Overnite Express transporting goods
2 for International Paper?
3     A.  Yes.
4     Q.  Were you personally involved in
5 arranging for that transportation?
6     A.  Yes.
7     Q.  Do you know for about how long Overnite
8 had used Martin's?
9     A.  No, I do not know that.
10     Q.  Do you have a recollection of for what
11 period of time you are aware that Overnite and
12 then Universal was utilizing the services of
13 Martin --
14     A.  I don't --
15     Q.  -- Martin's Bulk Milk Transport?
16     A.  I'm sorry.
17     I don't remember the date, but I know
18 that when the Minnesota pool load was originated,
19 Bob Elsholtz called and said that we would be
20 doing this load every night and Martin would be
21 the carrier, and my contact there would be Nancy
22 or Dave. And that's how it started.
23     Q.  Okay.
24     A.  Before that, Martin had been loading

44

1 for the Minnesota office.
2     Q.  The Minnesota office of whom?
3     A.  Overnite.
4     Q.  The conversation you just mentioned
5 from Bob Elsholtz, can you tell me approximately
6 what year it occurred or how soon prior to the
7 sale but -- you know, for about how many years
8 prior to the sale?
9     A.  I don't know exactly, but it was a
10 couple of years, at least.
11     Q.  Do you know the name Pat Podlena?
12     A.  That was an employee of Martin.
13     Q.  Is that someone you dealt with at
14 Martin's at all?
15     A.  Yes. I had dealings with Pat
16 sometimes.
17     Q.  What type of dealings?
18     A.  Pat would sign the broker confirmation
19 sheet, send it back to me.
20     Q.  Would you have any personal
21 conversations or fax communications --
22     A.  I probably did.
23     Q.  -- with Pat?
24     A.  He might have called me to tell me

45

1    that, you know, they were going to be late in
2    picking up or something like that.
3          Any kind of an issue that Martin was
4    having with the pool load that night, Pat or Nancy
5    or Dave would convey that to me.
6      Q.   When you say "Dave," are you referring
7    to Dave Martin?
8      A.   Yes.
9      Q.   Do you know Nancy's last name?
10     A.   I think it was Green.
11     Q.   Let me show you what --
12     MR. FISHER:  Do you need anything from me?
13   I've got copies of everything.
14     MR. BURKE:  Well, no.
15   BY MR. BURKE:
16     Q.   I'm going to show you what is marked as
17   Exhibit No. 5.
18     MR. BURKE:  Do you want to show her those,
19   Carl?
20   BY MR. BURKE:
21     Q.   Those, I believe, you will find to be
22   three memo bills.
23     MR. SCHRECK:  What number?  2?
24     MR. FISHER:  5.

46

1      MR. BURKE:  Exhibit 5.  They're in different
2    places, but --
3      MR. SCHRECK:  We've probably got ten copies in
4    here someplace.
5      MR. BURKE:  Yeah.
6    BY MR. BURKE:
7      Q.   Ms. Hansen, take a look at Exhibit 5.
8    Do you have three separate pages in front of you?
9      A.   Yes.
10     Q.   Okay.  And those documents are entitled
11   Memo Bills, is that correct?
12     A.   Correct.
13     Q.   What is that document?  When you look
14   at it, what does it mean to you?
15     A.   These three documents are copies of the
16   bills that the driver who picked up the load would
17   receive from International Paper.
18     Q.   Are these memo bills prepared by
19   International Paper?
20     A.   Yes.
21     Q.   And are they -- now, there's three --
22   well, strike that.
23          The date in the upper right corner, is
24   that a required shipping date that's identified?

47

1      A.   Yes.
2      Q.   And that's the date of July 3rd, 2008
3    for each of these, correct?
4      A.   Yes.
5      Q.   And do you have -- in the top middle
6    page, there's a Consignee identified, is that
7    correct?
8      A.   Yes.
9      Q.   Okay.  Which one do you have first?
10   What order do you have?
11     A.   XPEDX.
12     Q.   XPEDX, okay.  And what's your next one?
13   Cenveo?
14     A.   Cenveo.
15     Q.   And Midland then?
16     A.   Midland.
17     Q.   Okay.  I just wanted to make sure we're
18   looking at them in the same order.
19          With respect to the XPEDX memo bill, up
20   on the top, the carrier is identified as OXEN,
21   correct?
22     A.   Correct.
23     Q.   Is that a SCAC code for Overnite
24   Express?

48

1      A.   Correct.
2      Q.   Now, even though this was July 3rd,
3    2008, how come International -- or, strike that --
4    how come OXEN is still identified as the carrier?
5      A.   I don't know.
6      Q.   Okay.
7      A.   Probably -- I would just be guessing --
8    that it wasn't changed in their computer system.
9      Q.   That it wasn't changed to be updated to
10   show Universal?
11     A.   Correct.
12     Q.   And what was Universal's SCAC code?
13     A.   UACL.
14     Q.   And, you know, on the XPEDX memo bill,
15   it indicates that these goods are being received
16   from International Paper in Hammond, correct?
17     A.   Correct.
18     Q.   On the right side, there's a vehicle ID
19   number.  Do you see that?
20     A.   Correct.
21     Q.   What does that refer to?
22     A.   I believe that's a trailer number, the
23   937987.
24     Q.   Okay.  Whose trailer would that be?

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**49**

1      A.    That would be Martin's.
2      Q.    Now, how would International Paper know
3   what trailer number to put on this memo bill when
4   they're preparing it?
5      A.    They wouldn't prepare this until the
6   driver was there.
7      Q.    Okay. There's an IP shipping number.
8   I take it that's International Paper's shipping
9   number?
10     A.    Yes.
11     Q.    Underneath that, there's a section
12   labeled Route. Do you see that?
13     A.    Yes.
14     Q.    And it says Overnite Express Inc.,
15   correct?
16     A.    Um-hum.
17     Q.    What is meant by the route?
18     A.    It means that International Paper is
19   going to give this load to Overnite Express.
20     Q.    And is this another instance where the
21   computer isn't updated yet?
22     A.    I believe so.
23     Q.    So, in actuality, International Paper
24   was giving this load to Universal instead of

**50**

1   Overnite Express?
2      A.    Yes.
3      Q.    And do you see that number SO2 -- the
4   SO2 underneath Route?
5      A.    Oh, yes.
6      Q.    Okay. What's that mean or refer to?
7      A.    It means the second stop-off.
8      Q.    In the order of delivery to these three
9   different locations?
10     A.    Yes. The Midland Paper bill --
11     Q.    Yes.
12     A.    -- says stop-off 1.
13     Q.    Okay. And then --
14     A.    And then the Cenveo says Consignee.
15   That's the final.
16     Q.    And the "SO" stands for stop-off?
17     A.    Yes.
18     Q.    So Midland would be the first stop,
19   then XPEDX, and then Cenveo?
20     A.    Correct.
21     Q.    Back to the XPEDX memo bill, on the
22   right side, there's a signature that I believe is
23   Samuel Franke. Is that where the signature of the
24   truck driver picking up the load normally would

**51**

1   go?
2      A.    Yes.
3      MR. SCHRECK:  Object to form, foundation.
4   BY MR. BURKE:
5      Q.    By the way, did you know Samuel Franke?
6      A.    No.
7      Q.    Did you have any contact with Samuel
8   Franke?
9      A.    No.
10     Q.    The XPEDX -- or the name and address of
11   the company to whom the product is delivered is
12   then set forth in the next section, correct, where
13   it says XPEDX?
14     A.    Yes.
15     Q.    Did International Paper own XPEDX?
16     A.    I don't believe so.
17     Q.    And then there's a section called
18   Commodity, and it identifies various cartons and
19   skids of printing paper, correct?
20     A.    Correct.
21     Q.    And it has the weight there, correct?
22     A.    Correct.
23     Q.    And then there's a section for Notes.
24   How about the number there, the 211039, do you

**52**

1   know what that refers to?
2      A.    I believe it's the order number. See
3   right underneath that, it says "Order 211039."
4      Q.    Okay. Yes, correct. Thank you.
5           And then there are instructions here
6   from International Paper to Universal concerning
7   the specifics of this delivery in the Notes
8   section, is that correct?
9      A.    Um-hum.
10     Q.    Is that "yes"? You have to say --
11     A.    Yes. I'm sorry, yes.
12     Q.    For example, in this particular XPEDX
13   delivery, it says "Contact IP" -- does that mean
14   International Paper?
15     A.    Yes.
16     Q.    Okay. "Contact IP," International
17   Paper, "for delivery issues or if detained at
18   least 1 hour." And then it says "Call" a
19   specified number and reference what looks like the
20   order number. Is that right?
21     A.    Yes.
22     Q.    Are you with me on line two?
23     A.    Yes.
24     Q.    How about the next section or that next

---

**ESQUIRE SOLUTIONS**

**800.211.DEPO (3376)**
Esquiresolutions.com

53

1    line that says "PO NBR: 34" —
2        A.   That's their purchase order number.
3        Q.   Okay.  And then it indicates that
4    "Customer requested delivery date of July 7,
5    2008," correct?
6        A.   Correct.
7        Q.   And that is referring to International
8    Paper's customer which, in this instance, is
9    XPEDX, is that right?
10       A.   Correct.
11       Q.   And then it says "Delivery requested by
12   Rose."  Who would Rose work for?
13       A.   International Paper.
14       Q.   Then it says "Call" a certain number at
15   area code 612 "for delivery appointment" and
16   specifies some receiving hours.  Is the number to
17   be called for delivery appointment, is that a
18   number at XPEDX?
19       A.   Yes.
20       Q.   And then, underneath that section,
21   there's order numbers.  And what's the difference
22   between "Order Number" and "Customer Order
23   Number"?
24       A.   An order number pertains to

54

1    International Paper's order number.  The customer
2    order number is their PO when they ordered it.
3        Q.   Meaning the — meaning XPEDX?
4        A.   Yes.
5        Q.   All right.  And then, this copy of the
6    memo bill is stamped as saying "Received at XPEDX
7    subject to final count and inspection" and bears a
8    signature.  The date is July 7th, is that correct?
9        A.   Yes.
10       Q.   Would that stamp and signature normally
11   be placed by the customer who has then received
12   the goods?
13       A.   Yes.
14       Q.   Is this memo bill sometimes referred to
15   as a bill of lading?
16       A.   I believe so.
17       Q.   What involvement would you have with
18   this type of memo bill?
19       A.   Nothing.
20       Q.   Would you receive a copy of it?
21       A.   No.
22       Q.   So it would go — International Paper
23   would, in the first instance, give it to either
24   the Universal truck driver or whatever truck

55

1    driver Universal gave the load to —
2        A.   Yes.
3        Q.   — when that driver arrived at
4    International Paper?
5        A.   Yes.
6        Q.   Would you be provided with a copy of
7    the memo bill at any time?
8        A.   No.
9        Q.   What would a Martin's driver or a
10   Universal driver have to do with their copy of the
11   memo bill after they made the load?
12       MR. SCHRECK:  Object to —
13   BY MR. BURKE:
14       Q.   Or after they delivered the load,
15   I should say.
16       MR. SCHRECK:  Object to foundation.
17   BY THE WITNESS:
18       A.   Well, the procedures would be different
19   for a Universal driver or a brokered driver.
20           A Martin driver or a brokered load, he
21   would obtain this bill from International Paper.
22   When it was delivered, he would get a delivery
23   signature.  And then he would take this bill and
24   turn it in to Martin.

56

1            Then Martin would take these bills.
2    They would keep a copy, and they would send the
3    copy — most often, the original copy — with a
4    copy of the broker confirmation sheet and all
5    copies — and a copy of all stops into Warren,
6    Michigan to get paid.
7    BY MR. BURKE:
8        Q.   Into the Universal office —
9        A.   Yes.
10       Q.   — in Warren, Michigan?
11       A.   Yes, for settlements.
12       Q.   Okay.  When you use that term,
13   "settlements," in your business, that refers to
14   getting paid?
15       A.   Yes.
16       MR. FISHER:  Rich, for planning purposes and
17   because now might be a good time for a break, do
18   you have — this is not to commit you, of course,
19   at all, but I'm just wondering for, obviously,
20   Ms. Hansen's benefit and others who might want to
21   grab a bite to eat, if you think you're going to
22   be going for a while, any thoughts on how we might
23   break this up?
24       MR. BURKE:  Well, you know, probably if

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

57

1  Ms. Hansen is okay and everybody else, the court
2  reporter, I mean, you know, if we can do another
3  half hour or so, 12:30?
4      MR. FISHER: Okay.
5      MR. BURKE: Does that work for you?
6      THE WITNESS: Um-hum.
7      MR. FISHER: And I can have some stuff brought
8  in. I understand you're going to go more than a
9  half an hour, presumably?
10     MR. BURKE: Yeah, I think so, okay.
11     MR. FISHER: Okay.
12     MR. BURKE: But I don't mind taking a quick
13 little break now.
14     MR. FISHER: Yes. Just take a quick little
15 break and then go for a half an hour. In the
16 meantime, I'll see what our lunch arrangements are
17 going to be.
18     MR. GOLDEN: All right.
19         (WHEREUPON, a recess was had from
20         11:54 a.m. until 12:07 p.m.)
21 BY MR. BURKE:
22     Q. All right. Ms. Hansen, we just went
23 through the memo bill for XPEDX. There is various
24 printing at the bottom of the memo bill, correct,

58

1  that's in somewhat small print.
2      A. Um-hum.
3      Q. Do you see that?
4      A. Yes.
5      Q. That printing would be on this memo
6  bill when prepared by International Paper,
7  correct?
8      A. Correct.
9      Q. Okay. Did Universal alter or amend any
10 of that fine print on the bottom?
11     A. I don't believe so.
12     Q. And then, let me ask you to look at the
13 next memo bill for Cenveo that you have in
14 Exhibit 5, and this contains, essentially, similar
15 type of information, correct?
16     A. Correct.
17     Q. The carrier, again, is identified as
18 OXEN, even though it actually was Universal,
19 correct?
20     A. Correct.
21     Q. And "Route" also is identified as
22 Overnite Express, Inc., even though that would be
23 Universal, correct?
24     A. Correct.

59

1      Q. And the Consignee is Cenveo in
2  Minneapolis.
3          And then under Commodity, there's a
4  specified number of 175 cartons of printing paper,
5  correct?
6      A. Yes.
7      Q. In the Notes section here,
8  International Paper gave instructions that
9  "If problems with delivery or detained more than
10 1 hour, call International Paper" and again has a
11 phone number and references the order number,
12 correct?
13     A. Yes.
14     Q. And then, International Paper provided
15 Cenveo's phone number?
16     A. Correct.
17     Q. That would be for purposes of arranging
18 for the actual delivery upon arrival in the
19 Minneapolis area?
20     A. For any number of reasons. It could be
21 for the delivery, if the driver needed directions,
22 if he was detained in traffic and was just running
23 a few minutes late, just so that the driver would
24 have a delivery phone number.

60

1      Q. And then, there's the order number and
2  customer order number.
3          There's some handwriting that says
4  "12 Boxes damaged." Correct?
5      A. Correct.
6      Q. And then, how about right above that,
7  can you read what that is, what that says? It
8  looks like 200 or 2000?
9      A. "2000" -- I don't know what that second
10 word is, something -- "box." Okay. It might be
11 2000 pages in a box or something. I don't know.
12     Q. In this instance, where some of
13 International Paper's goods were damaged, who had
14 the responsibility to pay for that damage?
15     A. That's all handled up in Warren.
16     Q. What is your understanding as to who
17 would have that responsibility?
18     A. It would eventually be charged back to
19 Martin.
20     Q. In the first instance, would Universal
21 have to pay International Paper for the damage?
22     A. Most likely. Or, depending on what the
23 agreement is with International Paper, they may
24 deduct that from charges due Universal.

MELODY HANSEN                                          July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

**61**

1      Q.   And then, after you either paid
2   International or had your money owed to Universal
3   deducted if Universal thought it was the fault of
4   Martin's, did you say you would then charge
5   Martin's?
6      A.   I'm pretty sure they would.  I can't
7   answer that definitively because I'm not --
8   I didn't have anything to do with settlements.
9      Q.   All right.  And then, the last one,
10  if you'd take a look at that for a minute, the
11  last memo bill in Exhibit 5, that's for Midland
12  Paper in Minneapolis, correct?
13     A.   Yes.
14     Q.   And, again, the Carrier and Route are
15  identified as OXEN and Overnite Express,
16  respectively, even though it should be Universal
17  Am Can, correct?
18     A.   Correct.
19     Q.   And in the Notes section, there's
20  instructions provided by International Paper,
21  correct?
22     A.   Correct.
23     Q.   Indicating that the driver should
24  contact customer service at Midland Paper to

---

**62**

1   schedule a delivery by appointment only, correct?
2      A.   Yes.
3      Q.   And it gives a phone number and a
4   gentleman's name at Midland to be contacted?
5      A.   Um-hum.
6      Q.   And that's a "yes"?
7      A.   I'm sorry.  Yes.
8      Q.   And I believe you earlier said that
9   this memo bill would be given to the driver that
10  actually shows up at the International Paper
11  warehouse to make this pickup, is that right?
12     A.   That's correct.
13     Q.   If it was a Universal driver that was
14  delivering this load, this memo bill would be
15  given to him; and if it's a brokered driver, the
16  memo bill would be given to the brokered driver,
17  is that correct?
18     A.   Correct.
19     Q.   And all of International Paper's
20  requests for transportation of loads would be made
21  directly to Universal as opposed to International
22  Paper contacting Martin's, correct?
23     A.   That's correct.
24     Q.   And that was because it was Universal

---

**63**

1   that had the contract with International Paper,
2   correct?
3      A.   Correct.
4      Q.   Do you know what?  Let's see.  I'm
5   going to ask you to look at what I believe is
6   Exhibit No. 21.  Is that -- do you have that in
7   front of you?
8      A.   Yes, I do.
9      Q.   You earlier mentioned what you referred
10  to as a load sheet, correct?
11     A.   Correct.
12     Q.   Okay.  If I recall correctly, you said
13  the load sheet was information faxed to Universal
14  from International Paper concerning loads that
15  needed to be hauled?
16     A.   Correct.
17     Q.   And is Exhibit No. 21, is that a copy
18  of the load sheet for the loads that were being
19  hauled by Mr. Franke at the time of this collision
20  on July 3rd?
21     A.   Yes.
22     Q.   And up in the -- is this a document
23  that would have been faxed to Universal at the
24  South Holland office?

---

**64**

1      A.   Yes.
2      Q.   Would this document be the request by
3   International to Universal to transport these
4   particular loads to these three different
5   destinations in the Minneapolis -- or the
6   Minnesota pool run?
7      A.   Yes.
8      Q.   In the center of the document, it is
9   entitled Loading Sheet, correct?
10     A.   Um-hum.  Yes.
11     Q.   And how about "DigitaLogistix," that
12  name up in the top right corner, do you know what
13  that is or refers to?
14     A.   I believe that's Midwest Distribution's
15  computer system.
16     Q.   And the date on the left side is
17  July 3rd, correct?
18     A.   Correct.
19     Q.   And then, what is that -- does that
20  stand for appointment time underneath that,
21  "Appt"?
22     A.   Yes.  See, it says 7-3 at 7 p.m.
23     Q.   And that time is referring to what?
24     A.   The loading time.

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**65**

1     Q.  Now, is this document faxed to you
2 prior to the loading time?
3     A.  Yes.
4     Q.  Okay. So when it's faxed to you, does
5 it specify this loading time?
6     A.  Yes.
7     Q.  Okay. So International is telling
8 Universal what time they need the load to be
9 picked up?
10     A.  Yes.
11     Q.  And it identifies the carrier as OXEN,
12 correct?
13     A.  Yes.
14     Q.  But although I think, as you've
15 indicated, you believe it should be Universal
16 since it's now July 3rd, after the sale?
17     A.  I believe the reason for the delay is
18 because Universal is not in International Paper's
19 pay system yet, and that has to go all through
20 their corporate, and Universal has to get their
21 SCAC code approved and all this stuff. And so,
22 therefore, it was just easier for them to leave it
23 OXEN until they got it done.
24     Q.  How is it that Universal would

---

**66**

1 communicate to International that they would,
2 in fact, be able to have a driver picking up the
3 load by the time requested?
4     A.  Are we discussing just the Minnesota
5 pool load or any load?
6     Q.  How about this very load that we're
7 looking at --
8     A.  The Minnesota --
9     Q.  -- the Minnesota one.
10     A.  The Minnesota pool, I would speak to
11 Debbie.
12     Q.  Okay.
13     A.  And it wasn't, would it be picked up.
14 It was an established, it was going to be picked
15 up.
16     Q.  So it had to be picked up?
17     A.  It had to be picked up.
18     Q.  And that was because Universal had
19 contracted with International to make those
20 transportation of International Paper goods on a
21 certain number of --
22     A.  Yes. They had contracted for the
23 loads.
24     Q.  -- loads, okay.

---

**67**

1     And over to the right, underneath that
2 DigitaLogistix, a little bit down, there's a
3 pickup number. Whose number would that be?
4     A.  Midwest Distribution would give us that
5 number.
6     Q.  Okay. And how about the 44915, whose
7 number is that?
8     A.  I'm not sure. It's a number from
9 International Paper, but I'm not sure what it
10 pertains to.
11     Q.  And just while we're on that side,
12 Door 36, is that the door at the warehouse that --
13     A.  I believe so.
14     Q.  -- the driver should go to? Okay.
15     And the destination or load type, it
16 says "Minneapolis/Customer." I take it
17 Minneapolis is the destination.
18     And what's "CUST" mean?
19     A.  Customer pickup.
20     Q.  Meaning?
21     A.  Or Minneapolis customers.
22     Q.  Okay.
23     A.  See up at the top, International Paper
24 has written "MNPT."

---

**68**

1     Q.  Right.
2     A.  That's the Minnesota pool truck.
3     Q.  I was just going to ask you that.
4 Thank you.
5     A.  So I'm not really sure what
6 Minneapolis/CUST means.
7     Q.  And then, in the -- now, then, there's
8 a middle section to this form that has three
9 different destinations: XPEDX, Cenveo and
10 Midland, correct?
11     A.  Correct.
12     Q.  And PO numbers and order numbers and
13 amounts of product and weights of product,
14 correct?
15     A.  Correct.
16     Q.  All of that information was prepared by
17 International Paper --
18     A.  Correct.
19     Q.  -- and faxed to you?
20     A.  Yes.
21     Q.  Okay. And then, how about on the
22 far -- well, the loading diagram, who prepares
23 that?
24     A.  That's Minn-- -- International Paper

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

69

1 again.
2    Q.    What do those numbers represent?
3    A.    I have no idea.
4    Q.    Would the loading diagram be filled out
5 when you would receive this loading sheet from
6 International Paper?
7    A.    No.
8    Q.    And then there is on the far right,
9 do you see where it's designated -- or it's
10 handwritten, the words "Middle," "Nose" and
11 "Tail"?
12    A.    Yes.
13    Q.    Do you have an understanding of what
14 that means?
15    A.    How the trailer is going to be loaded,
16 in what order for those deliveries.
17    Q.    So that the goods in the back can be
18 removed at the first stop?
19    A.    Correct.
20    Q.    And then there's a "Start Loading" time
21 and "End Loading" time, correct?
22    A.    Yes.
23    Q.    And it looks like the start was 8:38,
24 and the end was, it looks like, 9:02, I think?

70

1    A.    I think so.
2    Q.    That would be p.m., correct?
3    A.    Correct.
4    Q.    And then, there's a signature that
5 appears to be Samuel Franke, correct?
6    A.    Correct.
7    Q.    And then, do you see where it says
8 "Loaded By" underneath that?
9    A.    Yes.
10    Q.    Do you know what name is there or
11 signature?
12    A.    No.
13    Q.    When this document would come to you,
14 what information would it have on it?  It would
15 have the middle portion that's typewritten,
16 correct?
17    A.    Yes.
18    Q.    Would it have the pickup time?
19    A.    Yes.
20    Q.    But it would not have the loading
21 diagram?
22    A.    No.
23    Q.    And then, I take it, it would not have
24 the start loading and end loading time?

71

1    A.    No.
2    Q.    Nor would it have the driver's
3 signature?
4    A.    Correct.
5    Q.    Nor the Middle, Nose and Tail
6 designations, correct?
7    A.    Those might be on it.
8    Q.    Oh, excuse me.  You're right.  Yeah.
9 Go ahead.
10    A.    Those might be on it.  These are
11 designated by the receiver's delivery acceptance
12 hours.
13    Q.    Does International Paper make that
14 determination of the order of delivery?
15    A.    Not always.
16    Q.    If they don't do it, does Universal do
17 it?
18    A.    I would do it.
19    Q.    And that would be based on the
20 information provided by International Paper in the
21 Notes section?
22    A.    Previously.
23    Q.    Well, actually, you don't get the memo
24 bills, so you wouldn't have those notes, correct?

72

1    A.    Not the notes off the memos, but we
2 would have notes from previous loads.
3    Q.    Okay.
4    A.    All of the receivers, I would have them
5 in the computer, in the system, with their
6 receiving hours.
7    Q.    And then, if International Paper hadn't
8 designated the order of delivery, then you would
9 make a determination of the appropriate order
10 based on location and hours?
11    A.    Based on hours.
12    Q.    Okay.
13    A.    For instance, Midland Paper, as we saw
14 in the memo bill, they start receiving at 5 a.m.,
15 so they would always be on the tail.
16    Q.    When you would receive this memo
17 bill -- or, I'm sorry -- when you would receive
18 this loading sheet, what would you do with it?
19    A.    I would then run the miles and figure
20 the pay for the brokered carrier so I could
21 generate the broker confirmation sheet.
22    Q.    And you would run the miles based on
23 the destinations?
24    A.    International Paper's.  We had the same

73

1    mileage program.
2        Q.   A computer program?
3        A.   Um-hum.
4        Q.   That's a "yes"?
5        A.   Yes.  I'm sorry.
6        Q.   That's okay.
7            Is there anything else you would do
8    with this loading sheet?
9        A.   I would fax a copy of this with the
10   broker confirmation sheet to Martin.
11       Q.   Okay.
12       A.   Because the driver does not get this
13   sheet (indicating).
14       Q.   When you say the driver doesn't get it,
15   do you mean --
16       A.   The pickup driver.
17       Q.   The driver, when he is making the
18   pickup, he is not given a copy of this?
19       A.   Not the loading sheet.
20       Q.   When you would fax it to Martin's,
21   when they were transporting the load for you,
22   would Martin's give this to the driver, if you
23   know?
24       A.   You mean would they give them the

74

1    actual sheet?
2        Q.   A copy of the loading sheet, yes.
3        A.   I don't know.
4        Q.   Okay.
5        A.   Because this sheet is the information
6    that Martin would need in order to dispatch their
7    truck because it shows what's on the tail, the
8    middle and the nose.
9        Q.   With respect to this particular load
10   that was given to Martin's on July 3rd by
11   Universal, are there documents that you can look
12   at to determine at what point in time you received
13   the request from International Paper?
14       A.   That would be hard to do because a lot
15   of -- I could look at a document and tell you when
16   it was faxed to us.  But I might have known of the
17   load earlier than that by a phone call from
18   Debbie.
19       Q.   All right.  Is there anything else you
20   do with this loading sheet other than the couple
21   things you have already mentioned to me?
22       A.   Well, a copy goes to Warren, Michigan.
23       Q.   Do you add any information on here when
24   you send it out from your office --

75

1        A.   No.
2        Q.   -- to Warren, Michigan?
3        A.   A copy of the broker confirmation goes
4    with it to Warren, so it's got the pay and all
5    that stuff on it.
6        Q.   And the pay that you said you would
7    calculate, how would you go about doing that?
8    I mean, you would use the miles, obviously?
9        A.   Right.
10       Q.   What else would you do?
11       A.   International Paper had given us a
12   rate sheet as to how much per mile each state
13   paid.  Martin had an agreement with Overnite, and
14   then Universal, that they received 80 percent.
15       Q.   So Martin's would be -- strike that.
16   So if I understand you correctly, International --
17   I'm sorry.
18           Am I correct that Universal would pay
19   Martin's 80 percent of what Universal would
20   receive from International Paper?
21       A.   That's correct.
22       Q.   And if a Universal driver delivered
23   the International load, then Universal would keep
24   100 percent of the rate sheet price?

76

1        A.   Well, they would have to pay their
2    drivers, but I don't know how much the drivers got
3    paid or anything.
4        Q.   What else -- anything else are you
5    doing with the loading sheet or the information
6    from it?
7        A.   No.
8        Q.   And then -- let's see.  When you would
9    utilize a Martin's driver, as you did on July 3rd,
10   when they would appear at the International Paper
11   warehouse, what information would they have to
12   have in order to show that they were there to
13   pick up a load for Universal?
14       A.   The pickup number.
15       Q.   Is that International's pickup number?
16       A.   Yes.
17       Q.   That is on the --
18       A.   Loading sheet.
19       Q.   -- loading sheet, okay.
20           And when you would utilize Martin's,
21   a Martin's driver, they would be transporting
22   those goods on behalf of Universal so Universal
23   fulfilled their contract obligations, correct?
24       A.   Correct.

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**77**

1    Q.   Why don't you take a look at Exhibit
2  No. 11, which should be a broker confirmation
3  sheet.
4              (WHEREUPON, there was a short
5              interruption.)
6          MR. GOLDEN:  Did you say 11, Rich?
7          MR. BURKE:  Yes, 11.  It's the Broker
8  Confirmation Sheet.
9          MR. GOLDEN:  Got it.
10         MR. BURKE:  Carl, do you want to break now
11  before I start going through this or --
12         MR. FISHER:  Now is a good time.  Sure.  That
13  makes sense.  What time have you got?  12:30?
14         MR. SCHRECK:  12:35.
15         MR. FISHER:  That sounds good.
16             Hey, guys, do we want to resume, like,
17  in, 25 minutes?  At 1:00?
18         MR. GOLDEN:  That would be fine.
19         MR. FISHER:  Okay.
20         MR. LANGS:  Fine with me.
21         MR. FISHER:  Very good.  I'll sign off, and
22  then I'll call back in.
23         MR. GOLDEN:  Sounds good to.
24         MR. FISHER:  Very good.  Right.

---

**78**

1              (WHEREUPON, at 12:35 p.m., the
2              deposition of MELODY HANSEN was
3              recessed until 1:14 p.m., this
4              date, July 19, 2012.)
5          MR. BURKE:  Everyone ready to go?
6              All right.
7  BY MR. BURKE:
8      Q.   Ms. Hansen, I have just tendered to you
9  Exhibit No. 11, which I believe is entitled the
10  Broker Confirmation Sheet.  Is that correct?
11     A.   Correct.
12     Q.   Have you seen this document before?
13     A.   Yes.
14     Q.   Was it one of the things you reviewed
15  in preparation for your deposition?
16     A.   Yes.
17     Q.   Were you involved in preparing any
18  portion of this document when it was actually
19  prepared back in July of 2008?
20     A.   Yes.
21     Q.   It bears your name on the upper right,
22  is that correct?
23     A.   Correct.
24     Q.   Is that your printing there?

---

**79**

1      A.   Yes.
2      Q.   Do you see there's some fax information
3  up at the top where it says July 3rd, 2008, 16:23,
4  correct?
5      A.   Where are you looking?
6      Q.   Right up here (indicating).
7      A.   Oh, yes.
8      Q.   And there's a phone number,
9  708-331-8604.  Whose number is that?
10     A.   That was my fax machine.
11     Q.   And then to the right, it says
12  Overnite Logistics, is that correct?
13     A.   Correct.
14     Q.   How did this fax information come to
15  exist on the top of Exhibit 11?  Is it as a result
16  of you faxing this document to someone else or
17  this document being faxed to your fax phone
18  number?
19     A.   No.  I created it; not the printed.
20  We had these printed forms.  And then all the
21  handwritten items, I did those and faxed this to
22  Martin.
23     Q.   The load number that is on the top, the
24  9000-245546-7, where does that number come from?

---

**80**

1      A.   We had a packet of sheets from
2  Universal with those numbers assigned to our
3  office, and they would be assigned to a load in
4  order.
5      Q.   Would they be loads that Universal was
6  transporting?
7      A.   Yes.
8      Q.   And then, do you see where it says
9  Agent --
10     A.   Yes.
11     Q.   -- underneath Load Number?  Okay.  What
12  does that refer to?
13     A.   The 6073 is the South Holland office.
14     Q.   And what does the term or expression
15  "Agent" mean as used there?
16     A.   Which office is brokering this load.
17     Q.   Which office of Universal?
18     A.   Of UACL, yes.
19     Q.   How about the number that's scratched
20  out, the 5511?
21     A.   That was St. Paul's number.
22     Q.   Is that your writing as well?
23     A.   Yes.
24     Q.   Okay.

---

**MELODY HANSEN**                                                                July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

81

1    A.   When the sale first transpired, we were
2   both 5511, then Universal broke us apart and gave
3   South Holland the 6073 number.
4    Q.   And in the content of the next few
5   lines in typewritten form, it says:
6         "This rate confirmation sheet issued on
7   May 1st, 2006 serves to supplement the" -- it says
8   "Mater," but I assume it means Master --
9   "Brokerage Agreement between the Universal Am-Can,
10  Ltd. Brokerage Division, an ICC property Broker
11  and" thereafter "Martin's Bulk Milk" is written
12  in. Is that correct?
13   A.   Correct.
14   Q.   There's to the left -- see in the left
15  margin --
16   A.   Um-hum.
17   Q.   -- what's that mean there, and was
18  that --
19   A.   That was Martin's approved code.
20   Q.   Okay.
21   A.   For the computer, when we would bill
22  the load or something, all we had to do was put
23  that in, and the computer would fill in Martin's
24  Bulk Milk.

---

82

1    Q.   I see. And is that 7505 or 1505?
2    A.   1505.
3    Q.   And then, how about to the right along
4   the same line, what's the FID number?
5    A.   That's Martin's Federal ID number.
6    Q.   And the fax to the right, is that
7   Martin's fax?
8    A.   Yes.
9    Q.   And the pickup date is July 3rd, '08,
10  at 19:00 hours, which is 7 p.m., correct?
11   A.   Correct.
12   Q.   And then Pickup Information is
13  identified in the next section, correct?
14   A.   Um-hum. Yes.
15   Q.   And, by the way, you said you prepared
16  this document. For what purpose were you
17  preparing it?
18   A.   To send Martin a confirmation of this
19  particular load and the money that is agreed upon.
20   Q.   In the left margin just under Pickup
21  Information, it appears to say "bill" and then the
22  member 366583 underneath it. What is that?
23   A.   That's a billing code number that would
24  fill out International Paper to pay the bill.

---

83

1    Q.   And so that's the billing number --
2   whose billing number, International Paper or your
3   number --
4    A.   UACL's --
5    Q.   UACL's --
6    A.   -- number --
7    Q.   -- number?
8    A.   -- for that shipper.
9    Q.   For International Paper?
10   A.   Yes.
11   Q.   So you would be -- Universal would
12  submit a bill to International Paper bearing
13  Universal's 366583 number?
14   A.   When I was -- in the computer when
15  I was billing the load, when it would come to the
16  field that said "Bill," I would put 366583, and
17  that would fill in International Paper, the
18  billing address, Memphis, Tennessee.
19   Q.   And that would permit Universal, then,
20  to submit a bill for this load to International
21  Paper?
22   A.   That's correct.
23   Q.   And then, in the Commodity section,
24  it's "Paper." The shipper is "International

---

84

1   Paper/EXEL Warehouse." The origin was Hammond,
2   Indiana.
3         And then there's a Delivery Information
4   section thereafter, correct?
5    A.   Um-hum.
6    Q.   And the delivery information date is
7   specified as July 7th, '08 between 7:30 a.m. and
8   4:00 p.m., correct?
9    A.   Correct.
10   Q.   Now, the delivery date, where did you
11  get that information?
12   A.   From International Paper.
13   Q.   How about the delivery time, which
14  essentially is almost an 8-hour day? What does
15  that mean?
16   A.   That, when it was written like that,
17  meant no appointment was necessary. They're open
18  from 7:30 to 4:00 p.m.; first come, first served.
19   Q.   And you then have the Consignee is
20  Cenveo. And is "MPLS" Minneapolis?
21   A.   Correct.
22   Q.   And that would be the last --
23   A.   The final stop.
24   Q.   The last stop, correct.

---

85

1     And then you have Midland marked
2  number 1 and XPEDX number 2. Is that for order of
3  delivery?
4     A.  Yes.
5     Q.  And then I see after XPEDX, you have
6  9 AM. What does that mean?
7     A.  That's an appointment.
8     Q.  That's when XPEDX expected the driver
9  to arrive with the delivery?
10    A.  Yes.
11    Q.  Would you have set up that time?
12    A.  Yes.
13    Q.  And then, in the line above on Midland
14 where it says "(5-2)," what's that refer to?
15    A.  5 a.m. to 2 p.m.
16    Q.  So you were telling the driver that
17 the delivery could be made any time between 5:00
18 and 2:00 --
19    A.  Um-hum.
20    Q.  -- is that right?
21    A.  Well, what this particular load would
22 show is, I was telling Martin, deliver Midland,
23 they're open from 5 to 2, first come, first
24 served; but you've got to be at XPEDX at 9:00.

86

1     Q.  Okay.
2     A.  And then Cenveo will receive that at
3  any time between 7:30 and 4:00.
4     Q.  Gotcha. Okay.
5     And then, Universal expected the
6  Martin's driver to comply with these delivery
7  instructions that you provided them, correct?
8     A.  Yes.
9     Q.  Do you know if, in the master broker
10 agreement between Universal and Martin's, whether
11 the Martin's driver was required to contact
12 Universal at certain times in the course of making
13 the pickup and deliveries?
14    MR. FISHER: You're -- excuse me. Form.
15 Your question is in the agreement as opposed to
16 what her knowledge might be?
17    MR. BURKE: My first question is that, yes.
18    MR. FISHER: Okay.
19 BY THE WITNESS:
20    A.  Would you repeat the question.
21 BY MR. BURKE:
22    Q.  Sure. Do you know whether or not in
23 the master brokerage agreement there are
24 requirements for -- strike that.

87

1     Do you know whether in the master
2  brokerage agreement between Universal and Martin's
3  Bulk Milk Service, there are requirements for the
4  brokered Martin's driver to contact Universal at
5  certain points in time such as when the loading
6  process has been completed and when the delivery
7  process has been completed?
8     A.  When the delivery process has been
9  completed.
10    Q.  Okay. So you are aware of that?
11 You are aware that the driver from Martin's had to
12 contact Universal when the delivery process was
13 completed?
14    A.  Yes.
15    Q.  Was that after -- in this instance,
16 was that after all three deliveries --
17    A.  Yes.
18    Q.  -- or after each one individually?
19    A.  He would call in after the final with
20 the delivery times of all three.
21    Q.  For what purpose did Universal have
22 that requirement?
23    A.  Because International Paper wanted to
24 know what time they were delivered.

88

1     Q.  And did you, in turn, have to
2  communicate that information to International
3  Paper?
4     A.  Yes. I had to put it in the load
5  system so International Paper could see it.
6     Q.  You mentioned the Martin's driver would
7  have to call in. Was that normally done by
8  telephone?
9     A.  Yes.
10    Q.  And, like, for this load here, to whom
11 would they call?
12    A.  Me.
13    Q.  How would you communicate that
14 information, that the deliveries were completed,
15 to International Paper?
16    A.  By entering it into the computer in
17 that load.
18    Q.  And would that information be
19 communicated to International Paper?
20    A.  Yes.
21    Q.  Was Universal -- did you utilize a
22 computer program that allowed communication
23 between International Paper and Universal?
24    A.  Yes.

**MELODY HANSEN**
July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

**89**

1  Q.  Do you remember the name of that
2  program?
3  A.  No, I do not.
4  Q.  Okay.  Was Universal required to have
5  that program in order to --
6  A.  Yes.
7  Q.  -- call the International's goods?
8  A.  Yes.
9  Q.  What other information did you have
10  to put into that computer, Ms. Hansen, for
11  International, other than the delivery times had
12  been completed?
13  A.  Well, the load was listed on the
14  computer as available.
15  Then, when we would go in and assign --
16  this is -- you're asking about International
17  Paper's system --
18  Q.  Correct.
19  A.  -- right?
20  Q.  Correct.
21  A.  Because we had a different one for us.
22  We would have to go in there and assign
23  Martin's Bulk Milk to that load, which would take
24  it from the available portion into the fact that

**90**

1  it was covered.
2  Q.  Um-hum.
3  A.  And then, that was called assigned.
4  And then, when --
5  Q.  Did you say "assigned" --
6  A.  Yes.
7  Q.  -- A-s-s-i-g-n-e-d?
8  A.  Right.  The load was assigned to
9  Martin's.
10  Q.  Okay.
11  A.  And then, there was the next step of
12  the load being dispatched; and then, there was
13  another step that the load was picked up; and
14  then, the final one was that the load was
15  delivered.
16  Q.  And what was the dispatch --
17  A.  Meaning that Martin's had contacted
18  their driver and told him what he was going to be
19  doing.
20  Q.  How would you know that Martin's had
21  contacted their driver?
22  A.  Just by the simple fact that it was
23  5:00, I was leaving, and I had not heard from them
24  that there was any problem.

**91**

1  Q.  So how would you communicate to
2  International Paper that the load had been
3  dispatched?  Is that something you would input
4  into the computer?
5  A.  They could see this in their system --
6  Q.  Okay.
7  A.  -- by looking up their load number,
8  their pickup number, and they could see at what
9  status this load was.
10  Q.  What I'm getting at, though, is,
11  would you affirmatively at some stage type in
12  "Dispatched" or type in a load number?
13  A.  There was an area that would say
14  "Dispatched," and then we would put that load
15  number in there.
16  Q.  So when you put the load number in,
17  it meant that it was dispatched?
18  A.  Meaning that Martin had dispatched a
19  truck onto it and everything was, you know, on
20  schedule.
21  Q.  And then, how would Martin's let you
22  know -- or how would you know that Martin's had,
23  in fact, dispatched their driver for that load?
24  A.  Just by the simple fact they hadn't

**92**

1  called me and told me there was a problem.
2  Q.  After you had requested that they --
3  strike that.
4  So if you assigned the load to Martin's
5  and they accepted, then, unless you heard
6  otherwise, you assumed Martin's had dispatched a
7  driver to cover that load at the time
8  International Paper wanted it picked up?
9  A.  Correct.
10  Q.  And that was your normal custom and
11  practice, to assume it was dispatched, unless you
12  were contacted otherwise?
13  A.  Correct.
14  Q.  And then, after dispatch, the last
15  stage was -- or the next stage, was that --
16  A.  Pickup, that it was actually picked up.
17  Q.  How would you know that it had actually
18  been picked up?
19  A.  Because the next morning when we came
20  in to work, if that load hadn't been picked up,
21  International Paper had already left several
22  messages.
23  Q.  Okay.  So --
24  A.  Things were already burning.

**MELODY HANSEN**                                                   July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

93

1      Q.    I don't doubt that.
2          But was there a point in time where you
3   affirmatively inputted something to indicate
4   that --
5      A.    As soon as we came in, we updated the
6   load to the picked up status.
7      Q.    Would you be receiving any information
8   from anyone affirmatively telling you that, or was
9   it the absence of being called?
10     A.    It was the absence of any fires.
11     Q.    From either International Paper or
12  Martin's?
13     A.    From International Paper.
14     Q.    And then, the next stage, was that
15  final delivery or not?
16     A.    The next stage was delivered.
17     Q.    And that, you would input after
18  receiving a call from the Martin's driver?
19     A.    Yes, from the delivery driver.
20     Q.    Right. Or Martin's, if it's a Martin's
21  driver?
22     A.    Um-hum.
23     THE COURT REPORTER:  "Yes"?
24     MR. SCHRECK:  That was a "yes"?

94

1   BY THE WITNESS:
2      A.    Yes. I'm sorry.
3   BY MR. BURKE:
4      Q.    If it was a Universal driver making a
5   delivery, would they also --
6      A.    Yes.
7      Q.    -- have to call in upon completing the
8   delivery process?
9      A.    Yes.
10     Q.    And you would input it to International
11  Paper that it was delivered as well?
12     A.    Most of the time, that would be Cheryl
13  because those were the drivers that she was
14  controlling.
15     Q.    But Universal -- somebody at Universal,
16  either yourself or Cheryl --
17     A.    Yes.
18     Q.    -- would advise International Paper,
19  even if it was your own driver making the
20  delivery?
21     A.    Yes.
22     Q.    Okay. You know, just back to the
23  middle of that page --
24     A.    Um-hum.

95

1      Q.    Oh, by the way, if, for some reason,
2   International Paper wanted to terminate a delivery
3   or stop a load, that they could and would contact
4   you to let you know that?
5      A.    Yes.
6      Q.    And you would comply with whatever
7   their request was?
8      A.    Yes.
9      Q.    If you then, in turn, contacted
10  Martin's and told them not to make a load or to
11  change delivery times, you would expect Martin's
12  to follow your instructions, is that correct?
13     A.    Yes.
14     Q.    I was starting to direct your attention
15  to the middle of the page, where it says:
16  "Total Payment to the Carrier - Inclusive of
17  Accessorial - $974.08."  Do you see that?
18     A.    Yes.
19     Q.    Okay. Tell me what -- that is your
20  writing for 974.08?
21     A.    Yes.
22     Q.    Okay. And what does that amount
23  represent?
24     A.    The total pay due Martin's Bulk.

96

1      Q.    For this delivery with a pickup of
2   July 3rd to these three locations to be delivered
3   by July 7th?
4      A.    That's correct.
5      Q.    And what's the -- and when you say
6   "total pay," what does that encompass or include?
7      A.    It means the pay for the load and all
8   stop-off pay, any accessorial charges, which would
9   be stop-off pay; any pay on any loads, not this
10  one, but loads where the driver is paid to unload
11  the load or anything like that; reconsignment
12  charges if the load is reconsigned to a different
13  location.
14     Q.    And that, for example, would involve
15  what? Would Universal be paying Martin's more
16  money?
17     A.    Yes.
18     Q.    Why?
19     A.    Because we would be billing
20  International Paper more money, and Martin got
21  80 percent of all charges.
22     Q.    And the term "stop-off pay," what does
23  that refer to?
24     A.    It refers to the fact of the loads

**MELODY HANSEN**                                                    July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

97

1    were billed to International Paper on mileage, and
2    that particular state's mileage rate plus so much
3    per stop-off. And I don't remember the exact
4    rates, but let's say Minneapolis was $1.30 a mile
5    plus $50 for every stop-off.
6        Q.    And when you say "stop-off," that
7    refers to —
8        A.    The other two stops.
9        Q.    Okay. So if it was — how much did you
10   say per stop-off, in your --
11       A.    50.
12       Q.    50 in your example? So there would be
13   an additional $100 because there's two stop-offs
14   here?
15       A.    That's correct.
16       Q.    The expression "accessorial" pay, what
17   does that include?
18       A.    Charges for accessorial services, which
19   would be stop-offs, reconsignments, detention.
20       Q.    And "reconsignments" refers to what?
21       A.    So say the driver got to Midland Paper,
22   and Midland Paper said, "I told International
23   Paper I didn't want this." Then International
24   Paper would be contacted, saying, "Midland Paper

---

99

1    interest to get that truck out of there so he
2    could make the rest of his deliveries.
3        Q.    All right. And then, there's a
4    typewritten paragraph then below the payment line,
5    correct?
6        A.    Um-hum. Yes.
7        Q.    Is this a form that had been — this
8    broker confirmation sheet, is this a form prepared
9    by Universal?
10       A.    Yes.
11       Q.    And the typewritten information here,
12   the first portion of that states that:
13          "Carrier agrees that this reflects the
14   entire amount due for all services provided and
15   that no other amount will be billed to UACL."
16          The amount that's referred to there, is
17   that the $974.08?
18       A.    Correct.
19       Q.    And all the services referred to are
20   the transportation services, the hauling and
21   whatever, the stop-offs --
22       A.    Correct.
23       Q.    -- and the other aspects of the haul,
24   of the job that you mentioned?

---

98

1    is refusing this." And they might say, "All
2    right. Take that part of it to CJ Duffy."
3          Well, then, he's being reconsigned to
4    CJ Duffy. He was at Midland, didn't deliver
5    anything, and got sent someplace else.
6        Q.    And then, in that instance, Universal
7    would charge International an additional fee?
8        A.    A reconsignment fee.
9        Q.    And then Martin's would be also paid
10   some additional money?
11       A.    Yes, 80 percent of it.
12       Q.    80 percent of the reconsignment?
13       A.    Of everything.
14       Q.    And "detention pay" or "detention fee"
15   refers to what?
16       A.    If the truck is unduly detained,
17   depending on what that customer's contract is with
18   the carrier, what International Paper's agreement
19   was with UACL, they get so long to empty a truck.
20   After that, the truck line can start billing
21   detention.
22          But they never charged International
23   Paper detention because there were always multiple
24   stops, and it was in International Paper's

---

100

1        A.    Correct.
2        Q.    And then UACL goes on to specify
3    certain requirements or conditions that had to be
4    met before UACL would make payment to Martin's?
5    Is that correct?
6        A.    Correct.
7        Q.    And Martin's had to provide an original
8    signed bill of lading, correct?
9        A.    Correct.
10       Q.    As well as clear delivery receipts with
11   a legible signature?
12       A.    Correct. Now, those could be one and
13   the same.
14       Q.    Yeah, I was just going to ask you that.
15   Okay.
16          So either a delivery receipt or a
17   bill of lading stamped, indicating receipt by the
18   customer?
19       A.    Yes.
20       Q.    And then, Martin's would also have to
21   have provided a W-9 form to Universal, correct?
22       A.    Correct.
23       Q.    And Martin's would have to have a
24   signed master brokerage agreement and rate

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**101**

1  confirmation agreement, correct --
2    A.  Correct.
3    Q.  -- with Universal?
4    A.  Correct.
5    Q.  And Universal required Martin's to
6  provide evidence of their contract operating
7  authority?
8    A.  Correct.
9    Q.  And also, original certificates of
10 insurance naming Universal as a certificate holder
11 for the time period of the billed transportation,
12 is that right?
13   A.  Correct.
14   Q.  Okay.  That expression, "Terms and
15 conditions of Standard Truckload Bill of Lading
16 and Carrier Rules Circular Apply," what does that
17 mean?
18   A.  To the best of my knowledge, that
19 probably refers to ICC regulations and DOT logs.
20 I don't really know.
21   Q.  Okay.  And then, there's a box that
22 says "Mail to:  Broker Settlements - UACL,
23 Attention:  John Moore" in Warren, Michigan.
24       What was to be mailed to John Moore?

---

**102**

1    A.  A copy of this broker confirmation
2  sheet and the original signed bills of lading
3  which, in International Paper's case, were the
4  memo bills; and clear delivery receipts, which
5  means a legible signed delivery receipt that the
6  material was delivered in good order.
7    Q.  And then, in the lower left, there's
8  another spot where it says:  "Please Sign and Fax
9  to:  John Moore."  Who was supposed to sign this
10 broker confirmation sheet and fax it to John
11 Moore?
12   A.  The carrier could.  But most of the
13 time, they would either fax it to John Moore or
14 fax it to me.
15   Q.  And this was signed by Pat Podlena for
16 Martin's, is that right?
17   A.  That's correct.
18   Q.  And then, it was signed by yourself as
19 well, correct?
20   A.  Correct.
21   Q.  In the lower left, okay.
22       Who is Ron McGinnes, whose name is on
23 the bottom margin?
24   A.  That's the delivery driver.

---

**103**

1    Q.  The delivery driver for?
2    A.  This load (indicating).
3    Q.  When you say that, do you mean the
4  driver who was hauling this load?
5    A.  Making the deliveries.
6    Q.  Okay.  Now, I think that was Samuel
7  Frankie.
8    A.  He was the pickup driver.
9    Q.  Okay.  Oh, do you know what?  Thank
10 you.  You're absolutely right.  He's the pickup.
11       This is the final driver that made the
12 delivery --
13   A.  Yes.
14   Q.  -- deliveries or the final dropoffs?
15   A.  Right.
16   Q.  Gotcha.  Okay.
17       And then, that last typewritten line
18 says:  "All Detention, Layover or Truck Ordered
19 Not Used charges will be paid when UACL collects
20 the charges."
21       By that, do you mean that Universal
22 will pay Martin's for those charges only after
23 Universal has collected from International Paper?
24   A.  Exactly.

---

**104**

1    Q.  What is the last thing -- or, I should
2  say -- what is the last involvement you would have
3  with this broker confirmation sheet?
4    A.  With the sheet itself, when I faxed it
5  and got it back from Pat, Martin's, I would file
6  it.
7    Q.  File it where?
8    A.  In the file of broker confirmation
9  sheets.
10   Q.  At Universal?
11   A.  Yes, in our office.
12   Q.  Would you also fax a copy to John
13 Moore?
14   A.  I did that the day it loaded.
15   Q.  Okay.
16   MR. BURKE:  Do you know what?  I don't think
17 I have any other questions right at the moment.
18 I'll see if -- I'll look at my notes and see if
19 anyone else does, but thank you for your time.
20   THE WITNESS:  Okay.  Thank you.
21   MR. SCHRECK:  Sure.  Can we take a
22 couple-minute break?
23   MR. FISHER:  Sure.
24

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**105**

1    (WHEREUPON, a recess was had from
2    1:51 p.m. until 2:00 p.m.)
3    MR. BURKE:  I do have one more question before
4  we start up again.
5    You guys set on the phone?
6    (WHEREUPON, discussion was had off
7    the record.)
8    MR. FISHER:  Okay.
9  BY MR. BURKE:
10    Q.  Ms. Hansen, one other question I do
11  have for you.
12    Have you given any other depositions?
13    A.  No.
14    Q.  Have you testified at any trials on
15  behalf of either Overnite Express or Universal?
16    A.  No.
17    MR. BURKE:  Okay.  Nothing else.  Thank you.
18    EXAMINATION
19  BY MR. SCHRECK:
20    Q.  Ms. Hansen, my name is Matthew Schreck.
21  I represent Martin's Bulk Milk Service as well as
22  Samuel Franke.  I've just got a couple questions
23  for you.
24    Before we get into all the issues

---

**106**

1  regarding this shipment, I have just a couple of
2  background questions for you.
3    What is your full address?
4    A.  687 Blackstone Court, Kouts, Indiana.
5  That's K-o-u-t-s.
6    Q.  Do you have any plans on moving in the
7  next year-and-a-half?
8    A.  No.
9    Q.  Who do you live there with?
10    A.  I have a roommate.
11    Q.  Are you married, or no?
12    A.  No.  I'm a widow.
13    Q.  Do you rent or own that home?
14    A.  I own it.
15    Q.  You may have addressed this to a
16  certain degree earlier, but you indicated you
17  worked for several trucking companies prior to
18  Overnite Express, is that right?
19    A.  Correct.
20    Q.  Okay.  One of them was Farmland
21  Transportation?
22    A.  Correct.
23    Q.  Do you know specifically when
24  Farmland Transportation merged or was acquired by

---

**107**

1  Overnite Express, or no?
2    A.  Not specifically.
3    Q.  At the time that you were with -- or
4  when you were with Farmland, did you do any work
5  with International Paper, or no?
6    A.  No.
7    Q.  We've been referring to a date in
8  June of 2008 as an acquisition date between
9  Overnite Express and Universal Am Can.  You
10  weren't involved with the acquisition, is that
11  right?
12    A.  That's correct.
13    Q.  Do you know the specific date that that
14  transaction actually occurred, or no?
15    A.  No, I don't.
16    Q.  As you sit here today, I know there
17  have been a lot of questions asked about Overnite
18  Express versus Universal Am Can.  But do you know
19  for certain one way or the other whether on
20  July 3rd, 2008, you were an employee of Universal
21  Am Can versus an employee of Overnite Express or
22  one of its affiliates?
23    A.  I believe we were employed by
24  Universal Am Can by then.

---

**108**

1    Q.  And what's the basis of your
2  understanding?
3    A.  Some of the numbers on the documents
4  I've reviewed.
5    Q.  When you're talking about the documents
6  you reviewed, are you talking about the documents
7  reviewed prior to your deposition or the ones you
8  looked at during your deposition?
9    A.  Both.
10    Q.  Are you being compensated for your time
11  here in any way?
12    A.  No.
13    Q.  Now, after the acquisition of Overnite
14  Express by Universal Am Can, you indicated that
15  there were three employees at the South Holland
16  office at that point.  Is that right?
17    A.  After the acquisition, there were three
18  employees, but one of them had been a Universal
19  employee.
20    Q.  Correct.  And that would be Kara --
21    A.  Yes.
22    Q.  -- Fitzpatrick?
23    A.  Yes.
24    Q.  Okay.  I just want to quickly go

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

**109**

1  through those. One of those would be Cheryl
2  Lambert, right?
3      A.  Yes.
4      Q.  And you indicated earlier that at that
5  point, after the acquisition, she was the terminal
6  manager?
7      A.  After the acquisition, she became
8  terminal manager, yes.
9      Q.  After the acquisition, did your title
10 change?
11     A.  No.
12     Q.  So your title after the acquisition
13 would have been what?
14     A.  Transportation specialist.
15     Q.  Did your title remain the same up until
16 the time you retired?
17     A.  Yes.
18     Q.  And then, Kara Fitzpatrick, what was
19 her title after the acquisition?
20     A.  Kara is in sales, and she was no longer
21 a terminal manager, so I believe it was regional
22 sales manager.
23     Q.  As far as the other individuals that
24 were working out of the South Holland office prior

**110**

1  to the acquisition, did they remain Universal
2  Am Can employees after the acquisition?
3      A.  No. They had been terminated before
4  the acquisition.
5      Q.  That would include Matthew Elsholtz,
6  is that right?
7      A.  Matt Elsholtz never worked in South
8  Holland. He's from St. Paul.
9      Q.  So prior to the acquisition, Dorothy
10 Conboy and Tom Kite --
11     A.  They were terminated before the
12 acquisition.
13     Q.  If you can look at Exhibit 21, which
14 you were looking at earlier today, I believe you
15 identified it as the loading sheet.
16     A.  Okay.
17     Q.  Okay? Now, as far as the shipment from
18 International Paper on July 3rd, 2008, would this
19 have been the first document that you would have
20 either received or reviewed concerning that
21 shipment?
22     A.  Yes.
23     Q.  And this document, I know you went
24 through it with Mr. Burke earlier, but this

**111**

1  document would have come from Universal -- excuse
2  me -- from International Paper, correct?
3      A.  It came from the Midwest Distribution
4  Center in Hammond. It didn't come from
5  International Paper Corporate.
6      Q.  But it came from an International Paper
7  affiliate or agent, correct?
8      A.  Correct.
9      Q.  And this document was instructing
10 Universal Am Can to pick up a load on July 3rd,
11 2008 at 7 p.m., is that right?
12     A.  That's correct.
13     Q.  And those instructions also included
14 the specific destinations of the shipment, is that
15 right?
16     A.  Correct.
17     Q.  And the instructions that you received
18 from International Paper on Exhibit 21, are those
19 the instructions that you used for the broker
20 confirmation sheet that you then in turn sent to
21 Martin's later that day?
22     A.  Some of the instructions that I sent to
23 Martin are not on this loading sheet because they
24 were in our computer system from previous loads,

**112**

1  such as hours of receiving.
2      Q.  But the information -- or, excuse me --
3  the instructions regarding the specific date and
4  time and locations, those are the instructions
5  that you used, then, to make the broker
6  confirmation sheet, is that right?
7      A.  Yes.
8      Q.  That document should be Exhibit No. 11,
9  if you can look at that.
10     MR. FISHER: Matt, next time, try to get
11 Exhibits that are farther apart, okay?
12     MR. SCHRECK: You know, I'll try. I'll try.
13 If you want to go in the order of these
14 documents --
15     MR. FISHER: I'm sorry. Which number are we
16 on?
17     MR. SCHRECK: 11.
18     MR. FISHER: Oh, I passed it up.
19     MR. SCHRECK: The next one will be a little
20 closer, if it makes you feel better.
21     MR. FISHER: Okay. Great.
22 BY MR. SCHRECK:
23     Q.  Now, in the sequence of events as far
24 as the documents are concerned, would this be the

MELODY HANSEN                                                July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

113

1   next document that would have been created
2   concerning the shipment on July 3rd, 2008 from
3   International Paper in Minneapolis?
4       A.   Yes.
5       Q.   And you had already indicated earlier
6   that this document is something you created, is
7   that right?
8       A.   Yes.
9       Q.   Is all the handwriting on this document
10  yours, except for the signature at the bottom of
11  Pat Podlena?
12      A.   Yes.
13      Q.   And the name of Ron McGinnes?
14      A.   Correct.
15      Q.   Otherwise, everything else is your
16  handwriting?
17      A.   Yes.
18      Q.   Now, when you sent this document to
19  Martin's Bulk on July 3rd, 2008 on behalf of
20  Universal Am Can, you were instructing Martin's to
21  pick up a load at the Hammond, Indiana facility on
22  July 3rd, 2008 at 7 p.m., is that correct?
23      A.   Correct.
24      Q.   You were also instructing Martin's to

---

114

1   deliver that shipment to the three destinations
2   listed on the sheet; specifically, XPEDX, Midland
3   Paper and Cenveo, is that correct?
4       A.   Correct.
5       Q.   And those instructions also included
6   the delivery date?
7       A.   Yes.
8       Q.   The instructions to Martin's also
9   included the delivery time for Midland, is that
10  correct?
11      A.   Yes.
12      Q.   The delivery time for XPEDX?
13      A.   Yes.
14      Q.   As well as instructions regarding the
15  delivery time for Cenveo, is that correct?
16      A.   Correct.
17      Q.   And this document, which is identified
18  as Broker Confirmation Sheet up at the top, are
19  the instructions that you, on behalf of Universal
20  Am Can, gave Martin's Bulk concerning the shipment
21  that was involved in the collision on July 3rd,
22  2008, is that correct?
23      A.   Correct.
24      Q.   If you had given Martin's Bulk any

---

115

1   additional instructions, such as, "I don't want
2   you to deliver the load," or "We want to change
3   the delivery site," et cetera, you would expect
4   Martin's to follow those instructions, is that
5   correct?
6       A.   Yes.
7       Q.   Because Martin's Bulk was the
8   representative -- the entity or agent that was
9   going to be delivering these goods on behalf of
10  Universal Am Can, is that correct?
11      MR. FISHER:  Objection to form, "entity or
12  agent," vague and ambiguous.
13      You can go ahead and answer.
14  BY THE WITNESS:
15      A.   Martin's Bulk Milk was the carrier that
16  I assigned to the load.
17  BY MR. SCHRECK:
18      Q.   Okay.  And looking, lastly, at
19  Exhibit 5, it's closer than the last exhibit.
20  Exhibit 5 are the memo bills or bills of lading
21  that we were talking about earlier, is that
22  correct?
23      A.   Yes.
24      Q.   This document, to your understanding,

---

116

1   was created by International Paper, is that right?
2       A.   Yes.
3       Q.   And this would be the last document
4   that would be created in sequence for this
5   shipment on July 3rd, 2008, is that right?
6       A.   Correct.
7       Q.   And I don't want to --
8       MR. FISHER:  Could you repeat his question for
9   me, please.
10      (WHEREUPON, the record was read by
11      the reporter as requested.)
12  BY THE WITNESS:
13      A.   Yes.
14  BY MR. SCHRECK:
15      Q.   And when I say "last document," I'm not
16  referring to any billing invoices.  I'm talking
17  about the documents regarding what was going to be
18  picked up and by whom.
19      A.   Okay.
20      Q.   Is that your understanding?
21      A.   Yes.
22      Q.   Now, this document provides
23  instructions from International Paper to the
24  carrier -- which in this case was Martin's --

---

**117**

1   as to delivery location and delivery times, is
2   that correct?
3     A.  That's correct.
4     Q.  And, for example, on the first page,
5   which is the one to XPEDX, there's a Notes section
6   that you went through with Mr. Burke that
7   specifically outlines International Paper's
8   instructions regarding delivery time and contact
9   information for the XPEDX delivery?
10     A.  Correct.
11     Q.  And, likewise, on the second page, the
12   Notes section contains International Paper's
13   instructions to the carrier -- in this case, they
14   identify it as OXEN, which would have been
15   Universal Am Can and Martin's Bulk who actually
16   delivered it, is that correct?
17     A.  Yes.
18     Q.  And those specific instructions
19   regarding Cenveo contained notes regarding pickup
20   times and contact information, is that correct?
21     A.  Yes.
22     Q.  And then, lastly, the Midland memo bill
23   has International Paper's instructions to
24   Universal Am Can and Martin's concerning the

**118**

1   delivery time and contact information for the
2   Midland Paper location, is that correct?
3     A.  Correct.
4     Q.  As it concerns the shipment on
5   July 3rd, 2008, were there any other documents
6   that you created or received concerning that
7   shipment?
8     A.  No.
9     Q.  Other than what you told us today
10   regarding your instructions to Martin's Bulk
11   regarding the shipment, did you provide them with
12   any additional instructions concerning that
13   shipment?
14     A.  Just what's on the two pieces of paper,
15   the broker confirmation sheet and the loading
16   sheet.
17     MR. SCHRECK:  I'm going to look at my notes.
18   I think that's all I have.  Thank you
19   very much.
20     THE WITNESS:  You're welcome.
21     MR. FISHER:  Brian, have you got your
22   questions?
23     MR. LANGS:  Yes.

**119**

1           EXAMINATION
2   BY MR. LANGS:
3     Q.  I have a couple questions for you,
4   Ms. Hansen.
5     A.  Okay.
6     Q.  Can you hear me okay?
7     A.  I can hear you.
8     Q.  Are you aware of the product liability
9   counts that Plaintiff in this case has alleged
10   against BMW?
11     A.  No.
12     Q.  So you don't have any opinions in
13   regards to any allegations that the Plaintiff may
14   have made against BMW in this case regarding
15   design defects?
16     A.  No.
17     MR. LANGS:  All right.  Thank you very much.
18   That's all I have.
19     THE WITNESS:  Thank you.
20     MR. SCHRECK:  It's starting to get shorter and
21   shorter.
22     MR. FISHER:  Right.
23
24

**120**

1           EXAMINATION
2   BY MR. FISHER:
3     Q.  Melody, I've got a few follow-up
4   questions.
5     The first question I want to ask you
6   concerns the transition from Farmland to
7   Overnite Express, when you were working for those
8   two entities, okay?
9     A.  Yes.
10     Q.  When that happened, whenever it was,
11   had, to your knowledge, Martin's Bulk Milk
12   achieved any relationship with either Farmland or
13   Overnite Express?
14     A.  Not with Farmland.
15     Q.  Okay.  So --
16     A.  I don't know when they started their
17   relationship with Overnite Express in St. Paul.
18     Q.  Whenever that date was -- but you know
19   it was sometime after the transition from Farmland
20   to Overnite Express?
21     A.  No.  I don't know that.
22     Q.  Oh, you don't know?  Okay.
23     Do you know whether or not Overnite
24   Express took on Martin's Bulk Milk as a carrier

121

1  for brokered loads -- well, let me rephrase my
2  question.
3       Do you know whether or not Martin's
4  Bulk Milk became a brokered carrier for Overnite
5  Express independently or related in some way to a
6  contractual arrangement that International Paper
7  had with another carrier that was related to
8  Martin's Bulk Milk?
9       A.   I don't know.
10      Q.   In any event, at some point during your
11 work at Overnite Express, you learned that
12 Martin's Bulk Milk was a carrier that would be
13 allowed to have brokered loads?
14      A.   Yes.  I learned that Martin Bulk Milk
15 was an approved carrier that the St. Paul office
16 were using.
17      Q.   And "the St. Paul office" is the
18 St. Paul office of Overnite Express?
19      A.   Of Overnite.
20      Q.   Now, at some point after that was,
21 whenever it was, did Martin's Bulk Milk become a
22 brokered carrier for Overnite Express such that
23 the loads that were being carried by Martin's Bulk
24 Milk came within your South Holland office

122

1  jurisdiction?
2       A.   Yes.
3       Q.   Do you remember when that was?
4       A.   No, I do not.
5       Q.   Do you know --
6       A.   It was before the acquisition by
7  Universal.
8       Q.   With respect to that -- strike that.
9       With respect to Martin's Bulk Milk
10 suddenly becoming a brokered carrier for Overnite
11 Express within the South Holland office's
12 jurisdiction, do you know anything about how that
13 came about?
14      A.   The only thing I know is that Bob
15 Elsholtz called and said that we were going to --
16 the South Holland office was going to be handling
17 the Minnesota pool load out of International
18 Paper, and Martin's Bulk Milk would be the
19 carrier.
20      Q.   Do you know whether or not the reason
21 that Mr. Elsholtz told you that was because
22 Overnite Express had inherited a relationship with
23 Martin's Bulk Milk that had previously been with
24 another motor carrier that had a relationship with

123

1  International Paper?
2       A.   I had heard that, but I don't know that
3  to be a fact.
4       Q.   All right.  Regardless of that, from
5  that moment onward, whenever it was, did there
6  come a time when there were dedicated loads that
7  were being picked up out of the Midwest
8  Distribution Center for International Paper?
9       A.   Yes.
10      Q.   Was that a few years -- two, three,
11 four years, whatever it was -- before June of
12 2008?
13      A.   Yes.
14    · Q.   And did you come to know in that 2006,
15 2007, 2008 time period that it was expected that
16 there would be a load, at least, coming from
17 Hammond that would be driven by Martin's Bulk Milk
18 drivers?
19      A.   Yes.
20      Q.   Debbie, the woman you told Mr. Burke
21 about from whom you might receive a phone call --
22      A.   Um-hum.
23      Q.   -- did you know if she was employed by
24 International Paper or employed by a company

124

1  called EXEL?
2       A.   I don't know.
3       Q.   Did you understand that she was
4  physically located in the Midwest Distribution
5  Center in Hammond?
6       A.   Yes.
7       Q.   With respect to Exhibit 21, the
8  loading sheet about which you were asked several
9  questions, do you know of what significance it is,
10 if any, that at the bottom of this particular
11 exhibit, it has the notation "Printed:  7/3/2008
12 4:45 PM"?
13      A.   That means that International Paper
14 printed that at a quarter to five and faxed it to
15 us after that.
16      Q.   Now, July 3rd, 2008, that was before a
17 holiday weekend?
18      A.   Um-hum.
19      Q.   "Yes"?
20      A.   Yes.
21      Q.   Okay.  And, presumably, based upon your
22 looking at some of these documents and your
23 putting your handwriting on it, you were working
24 your full 8-to-5 day on July 3rd?

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

125

1    A.    Yes.
2    Q.    Is there anything unusual about the
3  fact that 15 minutes before your quitting time,
4  there's a document — well, let me strike that.
5          I will tell you this document
6  (indicating) came from Universal Am Can's
7  records --
8    A.    Okay.
9    Q.    -- because it was a UACL/OEI number.
10   A.    Um-hum.
11   Q.    Did UACL — how, if you know, how would
12  UACL have obtained a copy of this loading sheet?
13   A.    I would have faxed it to them.
14   Q.    And is the fact that this document
15  shows a printing date and time of 4:45 on July 3rd
16  indicative of the fact that you probably got this
17  document sometime after 4:45 p.m.?
18   A.    Most likely, we did.
19   Q.    All right.  And when you received the
20  document, would it have been without the driver
21  and loader's signatures on it?
22   A.    Definitely.
23   Q.    It would have been without the start
24  loading and end loading handwritten times?

126

1    A.    Correct.
2    Q.    Would it have been without the
3  notations about middle, nose and tail?
4    A.    Yes.
5    Q.    Would it have been without the loading
6  diagram numbers?
7    A.    Yes.
8    Q.    And how about on the things that are
9  above the "Ship to" blackened row, on that, on the
10  top third, what information would have appeared
11  there when you got it?
12   A.    The "36" would not have been there.
13   Q.    All right.
14   A.    And the "44915" would not be there.
15   Q.    But how about "MNPT"?
16   A.    That could have been there.
17   Q.    And how about "7-3" for the appointment
18  time?
19   A.    That would have been there.
20   Q.    And the "Tender Accepted By:  7 PM,"
21  where that's filled in?
22   A.    Well, that goes with the 7-3.
23   Q.    Okay.
24   A.    The 7-3 at 7 p.m.

127

1    Q.    So that would have been there?
2    A.    Yes.
3    Q.    Okay.  Do you know who wrote that in?
4  Would that have been Debbie?
5    A.    It could have been Debbie.
6    Q.    All right.  Looking at Exhibit 11,
7  do you see where Pat Podlena's name or signature
8  appears above the word "Carrier"?
9    A.    Yes.
10   Q.    Who did you understand Pat to be?
11   A.    An employee of Martin.
12   Q.    Do you know what his capacity was?
13   A.    No.
14   Q.    I'm going to show you a series of
15  broker confirmation sheets that have been marked
16  as Exhibit 65, and they start on June 16th, '08,
17  and they go, I think, to July 2nd, '08.
18          Does it appear as though these all have
19  not only your signature, but they also have Pat
20  Podlena's signature on them?
21   A.    Yes.
22   Q.    Now, was it your understanding that
23  Pat Podlena had authority on behalf of Martin's
24  Bulk Milk to sign these documents?

128

1    A.    Yes.
2    Q.    I have to change notebooks here.
3          Earlier, you testified about some of
4  the things that were required to be sent in from
5  a brokered carrier such as Martin's Bulk Milk,
6  such as a W-9, certificates of insurance and
7  things of that like.
8    A.    Yes.
9    Q.    Do you remember that testimony?
10          Okay.  I want to show you an exhibit
11  marked 16.
12   A.    Yes.
13   Q.    Oh, wait a minute.  Let me make sure
14  that's the right number.  Yes, Exhibit 16.
15          Please, if you'd just take a chance to
16  look that over, it's just a few pages.
17   A.    Okay.
18   Q.    It might have a few more pages attached
19  to it, okay?
20   A.    Um-hum.
21   Q.    Have you had a chance to look at
22  Exhibit 16?
23   A.    Yes.
24   Q.    All right.  Now, my first question to

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

129

1  you is: Does that appear to be the master
2  brokerage agreement dated June 12th, 2008, that at
3  least according to the first paragraph, was
4  entered into by Universal Am Can and Martin's Bulk
5  Milk?
6      A.  Yes.
7      Q.  Do you recognize the signature of
8  Pat Podlena that appears on the Bates numbered
9  page 21?
10     A.  Yes.
11     Q.  All right.  To the best of your
12 knowledge, was this the same Pat Podlena with whom
13 you had been dealing when he would fill out the
14 broker confirmation sheets?
15     A.  Yes.
16     Q.  Now, do you see at the very, very top
17 of each of these pages, there appears to be a
18 series of fax transmission numbers?
19     A.  Um-hum.
20     Q.  There's upside-down fax transmission
21 numbers that appear in the bottom.
22     A.  Um-hum.
23     Q.  Take a look at those, and then I'm
24 going to have some questions to you about whether

---

130

1  or not you know what the transmission of this
2  document may have been, as evidenced by the fax
3  transmission numbers.
4      A.  Okay.
5      Q.  Okay?  Based upon your review of the
6  Overnite Logistics fax transmission numbers that
7  appear at the top, both printed and in
8  handwriting, and the fax transmission down at the
9  bottom, do you have any -- can you help us
10 interpret the sequencing of when it's likely this
11 document was faxed.
12     A.  Well, the first one says June 12th at
13 12:24, and it says this is page 3.
14     Q.  Okay.
15     A.  The second one says June 17th at 13:24,
16 and this is now page 2.
17     Q.  Okay.
18     A.  So it appears to me that it was faxed
19 twice.
20     Q.  Is there anything about the handwritten
21 number that appears, 708-331-8604?
22     A.  That's Overnite's fax number.
23     Q.  At what office?
24     A.  South Holland.

---

131

1      Q.  And then, on the bottom number where
2  the fax transmission is from --
3      A.  That's from --
4      Q.  -- Martin's?
5      A.  -- Martin's.
6      Q.  Does it have a date and time that you
7  can read?
8      A.  Not really.  It's broken up there.
9      Q.  Let's see, if we go to the next two or
10 three pages, and see if it's better.
11     A.  There.  June 17th.
12     Q.  All right.  And do you recognize --
13 well, let me rephrase my question.
14         To the best of your knowledge, did
15 Martin's Bulk Milk fax back a signed master
16 brokerage agreement in June of 2008?
17     A.  I don't specifically recall that,
18 but this is shortly after the acquisition, when
19 Kara Fitzpatrick was attempting to get all of
20 Overnite's approved carriers set up with
21 Universal.
22     Q.  So based upon what you knew Kara was
23 doing at the time, it's not unexpected to you to
24 see --

---

132

1      A.  No.
2      Q.  -- the twice transmission by Overnite
3  to Martin's and then a transmission back from
4  Martin's on June 17th?
5      A.  No.  If Martin had said something was
6  missing from the fax, she would have refaxed a
7  whole package.
8      Q.  All right.  I'm done with that.
9         And just to go over something --
10 I think it's already been emphasized with
11 Mr. Burke -- you had nothing to do with the
12 preparation of or interpretation of the master
13 brokerage agreement?
14     A.  No.
15     Q.  That's a correct statement?
16     A.  That's correct.
17     Q.  Okay.  On Exhibit 5, there's a
18 reference on these memo bills -- the second one,
19 in particular -- the Cenveo bill, it says
20 "12 Boxes damaged."
21     A.  Yes.
22     Q.  Do you know whether or not the
23 damaging of the boxes even resulted in a property
24 claim or a reduction in the rate that Martin's was

---

**MELODY HANSEN**
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

July 19, 2012

---

133

1  paid?
2      A.   I don't know.
3      Q.   Who might know that? How would we go
4  about finding out whether or not the handwritten
5  notation of, quote, "12 Boxes damaged," unquote,
6  even translated into a claim for damages or a
7  charge?
8      A.   Universal in Warren, Michigan.
9      Q.   All right.
10     A.   The claims department.
11     Q.   All right. Exhibit 11 -- and I think
12 Mr. Schreck already asked you questions that hit
13 on this, but is it fair to say that the broker
14 confirmation sheet which you filled out, that was
15 one page of information you sent on to Martin's
16 Bulk Milk with information, directions,
17 instructions concerning the subjects on which you
18 have written some information?
19     A.   Yes.
20     Q.   Such as delivery place, delivery time?
21     A.   Correct.
22     Q.   Other than delivery place and delivery
23 time, pickup place and pickup time, is there any
24 other information conveyed on Exhibit 11 that you

---

134

1  communicated to Martin's Bulk Milk?
2      A.   The pay.
3      Q.   Okay. So pickup, delivery --
4      A.   And pay amount.
5      Q.   -- and pay amounts.
6          At the tail end of the questioning that
7  Mr. Burke had of you, I think you said something
8  to the effect that "Martin's Bulk Milk was the
9  carrier to which I assigned these three loads that
10 made their way up to the Minneapolis-St. Paul
11 area." Do you recall that testimony?
12     A.   Yes.
13     Q.   Would it be equally fair to say that
14 you assigned this load or these three loads to
15 Martin's Bulk Milk because it was already a part
16 of the expected daily pool run that was being done
17 in July of 2008, just as it had been done for
18 months and years before?
19     A.   Correct.
20     Q.   Would it have been highly unusual
21 if you had suddenly assigned this load of
22 International Paper to the ABC Trucking Company?
23     A.   As far as the Minnesota pool load was
24 concerned -- there might be more than one -- the

---

135

1  first Minnesota pool load belonged to Martin's.
2  Even an Overnite truck didn't get it because there
3  was an agreement about the pool loads.
4          If there was a second Minnesota pool
5  truck, most of the time, it would go on our truck
6  because it would go to Minneapolis.
7          But the first Minnesota pool every
8  night belonged to Martin.
9      Q.   And that had been the custom and
10 practice for months and years?
11     A.   That was the agreement, yes.
12     Q.   All right. Let me ask you some
13 additional questions now.
14         Assuming that you had July 6th --
15 Monday, July 6 off as a holiday --
16     A.   Okay.
17     Q.   -- would you have come in to work on
18 Tuesday, July 7?
19     A.   Yes.
20     Q.   And when you came in on Tuesday,
21 July 7th, is some of the paperwork that you would
22 do, or computer work, checking up to see if there
23 were any problems and checking to see if all the
24 trucks that were to take their loads out on Friday

---

136

1  had accomplished their trips?
2      A.   As far as International Paper goes,
3  if there were no hot messages on our answering
4  machine from International Paper, their loads
5  picked up.
6      Q.   Okay. And on your computer screen,
7  would -- is that something the computer screen
8  would tell you?
9      A.   No.
10     Q.   All right. How would International
11 Paper receive information -- no, let me strike
12 that.
13         Since you went home at 5:00 --
14     A.   Yes.
15     Q.   -- and we now know that Mr. Franke
16 picked up this load after 5:00 and started his run
17 but didn't get it completed, and eventually it was
18 completed by a second Martin's driver, how would
19 you come to know that that load had been
20 successfully delivered?
21     A.   Shortly after we opened, I would have
22 a phone call from the second driver, giving me
23 delivery times if he was already emptied.
24     Q.   Once you get that delivery time

---

**MELODY HANSEN**                                                July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

137

1  information -- in this case, it would have been
2  three loads, so you would have been told --
3  what? -- "I delivered the tail load at this
4  time" --
5      A.  Yes.
6      Q.  -- "the middle load at this time, and
7  the nose load at this time"?
8      A.  Exactly.
9      Q.  What would you have done with that
10 information?
11     A.  Entered them into International Paper's
12 computer system as empty.
13     Q.  And if International Paper has their
14 own computer system, it should reflect
15 approximately when it was you provided that
16 information?
17     A.  Yes.
18     Q.  Okay.  When is the first time that you
19 ever knew that an accident involving this
20 July 3rd, 2008 load had happened?
21     A.  When you called me a couple months ago.
22     Q.  Okay.  Until I had called you to
23 advise you that your deposition needed to take
24 place because we knew that you had prepared some

---

138

1  documents, we knew where you lived, had you heard
2  anything from anyone --
3      A.  No.
4      Q.  -- about this accident?
5      A.  No.
6      Q.  And I think you previously said that
7  you had never, to your knowledge, ever spoken to
8  Samuel Franke?
9      A.  That's correct.
10     Q.  Would it be correct to say that you
11 provided absolutely no instructions to Samuel
12 Franke on July 3rd, 2008 concerning the loads
13 other than what he would have read on documents he
14 received that was based upon information you
15 provided to Martin's Bulk Milk?
16     A.  That's correct.
17     Q.  Okay.  I want to ask you a few
18 follow-up questions.
19     A.  Okay.
20     Q.  Did you ever provide information to
21 Mr. Franke or Martin's Bulk Milk, for that matter,
22 on how it is they were to drive their trucks?
23     A.  No.
24     Q.  How it is they were to do their work

---

139

1  when they were driving their trucks?
2      A.  No.
3      Q.  How they were to purchase supplies or
4  services in doing their work of driving a truck
5  from point A to point B?
6      A.  No.
7      Q.  Did you ever evaluate, score or measure
8  any of the work that Mr. Franke did?
9      A.  No.
10     Q.  Did you ever train Mr. Franke to do the
11 work he was doing on July 3rd?
12     A.  No.
13     Q.  Did you ever require Mr. Franke to
14 inspect, clean or maintain the truck and its
15 equipment that he was driving?
16     A.  No.
17     Q.  Did you ever -- let me rephrase this
18 question.
19         Other than checking up on information
20 about the pickup and delivery after the fact the
21 next day, the next workday, did you ever monitor
22 the pickups and deliveries?
23     A.  No.
24     Q.  Did you ever require Mr. Franke or

---

140

1  Martin's Bulk Milk to use any particular safety
2  precautions or any particular driving techniques
3  while they were moving a truckload of
4  International Paper product from point A to
5  point B?
6      A.  No.
7      Q.  Did you ever require Mr. Franke to call
8  in during his work?
9      A.  No.
10     Q.  Did you ever require Mr. Franke to
11 provide -- Mr. Franke himself to provide any
12 status reports about his transporting a load?
13     A.  No.
14     Q.  Did you ever stay in constant
15 communication with Mr. Franke?
16     A.  No.
17     Q.  And that would not only include
18 July 3rd, but it would also include all the
19 previous days, weeks and months when, presuming
20 Mr. Franke was the person who picked up the
21 loads, did his work?
22     A.  I had no knowledge of Mr. Franke at
23 all.
24     Q.  Did you ever fine or sanction

---

MELODY HANSEN                                                    July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

141

1   Mr. Franke or Martin's Bulk Milk because of
2   something they did or didn't do --
3      A.   No.
4      Q.   -- in the transporting of a load? Your
5   answer was "no"?
6      A.   No.
7      Q.   Did you ever dictate how the load in
8   the trailer was to be packed?
9      A.   Well, as we saw on the loading sheet,
10  you know, I would tell Debbie the order --
11     Q.   What the order was, and so --
12     A.   -- to load the trailer.
13     Q.   So to that extent -- well, let's assume
14  that Mr. Franke is not the one who is loading the
15  trailer. Is it fair to say that you would not
16  have told Mr. Franke how to load the trailer?
17     A.   No, but he wasn't the one loading it,
18  anyway.
19     Q.   But you did provide information from
20  which the loader at the Midwest Distribution
21  Center could infer in which order he should put
22  the loads in?
23     A.   Right. Debbie and I would discuss it,
24  and she would write it on that load -- loading

142

1   sheet.
2      Q.   Did you ever hire, discipline, counsel,
3   fire or qualify Mr. Franke for his job?
4      A.   No.
5      Q.   Did you ever reject Mr. Franke as a
6   driver because something unusual had happened?
7      A.   No.
8      Q.   Did you maintain any particular file on
9   Mr. Franke?
10     A.   No.
11     Q.   Did you ever reprimand Mr. Franke for
12  any speeding tickets, traffic citations or other
13  bad driving evidence that you became aware of?
14     A.   No.
15     Q.   Did you ever ensure that Mr. Franke was
16  actually licensed to drive a truck?
17     A.   No.
18     Q.   Did you ever receive any complaints
19  about Mr. Franke?
20     A.   No.
21     Q.   Did you ever receive any complaints
22  about any particular driver that was picking up
23  a Minnesota pool load in Hammond and taking that
24  load toward Minneapolis?

143

1      A.   Yeah.
2      Q.   Okay. What types of complaints might
3   occur?
4      A.   Oh, a driver was rude or things like
5   that, didn't show up until, you know, 1:00 in the
6   morning or something.
7      Q.   When such a complaint might be
8   evidenced to you, what would you do about it?
9      A.   Well, honestly speaking, most of the
10  time, it was one of ours.
11     Q.   Not a Martin's driver?
12     A.   Never.
13     Q.   All right. Because as best you know --
14  well, how would you characterize Martin's as a
15  carrier in terms of the service they provided?
16     A.   The best.
17     Q.   Did you ever keep track of Franke's --
18  or, for that matter, any other driver's -- driving
19  time, such as what might be required to be kept on
20  logs?
21     A.   No.
22     Q.   We have learned as a result of this
23  lawsuit that after the accident, Mr. Franke was
24  terminated by Martin's Bulk Milk.

144

1         Did you have anything to do with the
2   termination of Mr. Franke?
3      A.   No.
4      MR. FISHER: Let me just look over the rest of
5   my notes, and I think I'm done.
6         The other attorneys might have some
7   follow-up questions.
8            FURTHER EXAMINATION
9   BY MR. BURKE:
10     Q.   Ms. Hansen, just a couple.
11        Did you expect Martin's and its drivers
12  to comply with all local and state and federal
13  traffic ordinances --
14     A.   Yes.
15     Q.   -- and rules? Okay.
16        And you expected -- and Universal and
17  yourself expected Martin's to avoid getting into
18  collisions with other vehicles while they were
19  transporting goods on behalf of Universal,
20  correct?
21     A.   Yes.
22     MR. FISHER: Objection. Objection to form.
23  BY MR. BURKE:
24     Q.   You did -- actually, you did --

**MELODY HANSEN**                                                        July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

---

145

1  Universal did require a status report from the
2  Martin's driver at the conclusion of all the
3  deliveries, as you told us earlier, correct?
4      A.  Correct.
5      Q.  And I believe Mr. Fisher showed you the
6  master broker agreement between Martin's and
7  Universal. And did you say you have never read
8  through that?
9      A.  I've never specifically read the whole
10 thing.
11     Q.  So it would be fair to say you do not
12 know what requirements are in that agreement as to
13 what Universal required and expected of Martin's
14 or any of its other brokers, as set forth in that
15 agreement, correct?
16     A.  I knew the documents that they had to
17 send back so that I would look for these specific
18 documents before sending them to John Moore.
19     Q.  Okay.
20     A.  That's it.
21     Q.  You did talk about that W-9 and a copy
22 of their operating authority, and they had to
23 provide evidence that Universal had been made a
24 party covered by their insurance policy, correct?

---

146

1      A.  Correct.
2      Q.  And you may have mentioned a couple
3  others, but I know you discussed them earlier.
4          And whether a driver, whether it be
5  Martin's or anybody else, would get fined or
6  sanctioned, that wasn't your responsibility,
7  correct?
8      A.  Correct.
9      Q.  You mentioned that there was an
10 agreement under which Martin's actually got
11 priority for a Minnesota pool run even over
12 Universal's own drivers?
13     A.  Correct.
14     Q.  So that Martin's would get the first
15 load on any given day, correct?
16     A.  The first Minnesota load.
17     Q.  Yes, okay.
18     A.  Correct.
19     Q.  Who had entered into that agreement?
20     A.  Martin's and, I believe, Bob Elsholtz.
21     Q.  And that was Bob Elsholtz. He was the
22 owner and president of Overnite Express, correct?
23     A.  Correct.
24     Q.  Did that agreement — did that custom

---

147

1  and practice continue after Universal acquired
2  Overnite Express?
3      A.  Yes.
4      Q.  Okay. So even amongst -- even after
5  Universal took over, the daily custom and practice
6  within Universal was to give the first Minnesota
7  load to Martin's as opposed to even a Universal
8  in-house driver?
9      A.  Yes.
10     MR. BURKE:  Okay. Nothing else. Thanks.
11         FURTHER EXAMINATION
12 BY MR. SCHRECK:
13     Q.  Ms. Hansen, just one quick follow-up
14 question.
15         One of the instructions or requirements
16 that you gave Martin's was that the delivery
17 driver was required to contact you at Universal
18 Am Can of the delivery times for each delivery
19 that they did the night prior or the day prior,
20 correct?
21     A.  No, that morning.
22     Q.  That was a requirement and an
23 instruction that you gave Martin's Bulk regarding
24 every delivery, correct?

---

148

1      A.  Right.
2      Q.  As for July 3rd, 2008, the delivery
3  that was going to be made on July 7th, 2008, you
4  had required and instructed Martin's Bulk to have
5  the driver, Ron McGinnes, contact you regarding
6  those delivery times, correct?
7      A.  Correct.
8      MR. SCHRECK:  No further questions.
9      MR. FISHER:  I have nothing else.
10         Any other?  Brian?
11     MR. LANGS:  No, no more questions for me.
12     MR. FISHER:  Okay. Signature is reserved.
13         All right.  I just sent an e-mail to
14 Mike that we're going to start him at 3:00,
15 4:00 his time.
16     MR. LANGS:  Great.
17     MR. FISHER:  So I think, everybody, just hang
18 on the line if you want to. He will be joining us
19 soon.
20
21         FURTHER DEPONENT SAITH NAUGHT.
22
23         (Time noted:  2:56 p.m.)
24

---

MELODY HANSEN                                          July 19, 2012
SCHEINMAN -vs- MARTIN'S BULK MILK SERVICE

**149**

1   STATE OF ILLINOIS )
2           ) SS:
3   COUNTY OF W I L L )
4        I, ROSANNE M. NUZZO, a Notary Public
5   within and for the County of Will, State of
6   Illinois, and a Certified Shorthand Reporter,
7   CSR No. 84-1388, of said state, do hereby certify:
8        That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12       That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction, and constitutes a true record
16  of the testimony given and the proceedings had;
17       That the said deposition was taken
18  before me at the time and place specified;
19       That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set my

**150**

1   hand of office at Chicago, Illinois, this 25th day
2   of July, 2012.
3
4
5        Notary Public, Will County, Illinois.
6        My commission expires May 16, 2013.
7
8
9
10  C.S.R. Certificate No. 84-1388.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**151**

1              I N D E X
2   WITNESS:              PAGE:
3   MELODY HANSEN
4     BY MR. BURKE.....................  5
5     BY MR. SCHRECK...................  105
6     BY MR. LANGS.....................  119
7     BY MR. FISHER....................  120
8     BY MR. BURKE.....................  144
9     BY MR. SCHRECK...................  147
10
11              *****
12
13
14          E X H I B I T S
15      (Exhibits retained by Mr. Fisher)
16
17  EXHIBITS PREVIOUSLY MARKED    FIRST IDENTIFIED
18  DEPOSITION EXHIBITS
19  Exhibit No. 5.........................  46
20  Exhibit No. 11........................  78
21  Exhibit No. 16........................  128
22  Exhibit No. 21........................  63
23  Exhibit No. 65........................  127
24

**152**

1          DEPOSITION ERRATA SHEET
2
3   Assignment No. 355842
4   Murray Scheinman, etc. v. Martin's Bulk Milk, et al.
5
6
7      DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury that
10  I have read the entire transcript of my
11  deposition taken in the captioned matter, or the
12  same has been read to me, and the same is true
13  and accurate, save and except for changes and/or
14  corrections, if any, as indicated by me on the
15  DEPOSITION ERRATA SHEET hereof, with the
16  understanding that I offer these changes as if
17  still under oath.
18
19
20      Signed on the _____ day of
21  _____, 20_____.
22
23          MELODY HANSEN
24

ESQUIRE SOLUTIONS                    800.211.DEPO (3376)
                                     Esquiresolutions.com