# EX. 11

Joan Anderton Deposition
dated, April 10, 2012

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary
Guardian of the Estate and
Person of JEFFREY J. SCHEINMAN,
a Disabled Person,

                    Plaintiffs,

vs.                         Case No. 09 CV 5340

MARTIN'S BULK MILK SERVICE,
INC., SAMUEL G. FRANKE, CSX
INTERMODAL, INC., INTERNATIONAL
PAPER COMPANY and OVERNITE
EXPRESS, INC.,

                    Defendants.


        DEPOSITION OF JOAN ANDERTON, a witness,
taken on behalf of the Plaintiffs, pursuant to
Notice, on the 10th day of April, 2012, at the
Marriott Kansas City Airport, 775 Brasilia Avenue,
Kansas City, Missouri, before

        STACEY L. SOMMERS

for Esquire Deposition Solutions, a Registered
Professional Reporter, Certified in Missouri and
Kansas.


                APPEARANCES
        For the Plaintiffs:
            MR. RICHARD F. BURKE
            CLIFFORD LAW OFFICES
            120 North LaSalle Street, Suite 3100
            Chicago, Illinois 60602

**2**

APPEARANCES (Continued)
For Defendants Martin's Bulk Milk Service,
Inc., and Samuel G. Franke:
    MR. MATTHEW R. SCHRECK
    MULHERIN, REHFELDT & VARCHETTO, PC
    211 South Wheaton Avenue, Suite 200
    Wheaton, Illinois 60187

For Defendants Universal Am-Can, Ltd.,
s/b/a and successor to Overnite Express,
Inc.:
    MR. CARLTON D. FISHER
    HINSHAW & CULBERTSON, LLP
    222 North LaSalle, Suite 300
    Chicago, Illinois 60601

For Defendant Martin's Bulk Milk Service,
Inc., via telephone:
    MR. ROBERT J. GOLDEN
    DOWD & DOWD, LTD.
    617 West Fulton
    Chicago, Illinois 60661
For Defendants BMW of North America, LLC,
and Bayerische Motoren Werke
Aktiengesellschaft via telephone:
    MR. TIMOTHY R. COUTURE
    JOHNSON & BELL, LTD.
    33 West Monroe, Suite 2700
    Chicago, Illinois 60603

**3**

INDEX

| WITNESS: | PAGE: |
|---|---|
| JOAN ANDERTON | |
| Examination by Mr. Burke | 4 |
| Examination by Mr. Schreck | 145 |
| Examination by Mr. Fisher | 159 |
| Reexamination by Mr. Burke | 193 |
| Examination by Mr. Couture | 202 |

| EXHIBITS: | PAGE: |
|---|---|
| Deposition Exhibit 99 | 96 |
| Deposition Exhibit 100 | 166 |
| Deposition Exhibit 101 | 173 |
| Deposition Exhibit 102 | 173 |
| Deposition Exhibit 103 | 195 |

Reporter's Note:  Exhibits were retained by
counsel.

**4**

        (The deposition commenced at
9:08 a.m.)

        MR. BURKE:  Let the record reflect
this is the discovery deposition of Ms. Joan
Anderton, taken pursuant to notice, in accord
with the applicable rules of the Seventh
Circuit in the United States District Court
for the Northern District of Illinois.
        JOAN ANDERTON,
a witness, being first duly sworn, testified
under oath as follows:
        EXAMINATION
BY MR. BURKE:
Q. Ms. Anderton, again my name's Rich Burke.  I
represent Mr. Scheinman.  And I'm going to ask
you some questions about your work at
International Paper.  And as I do so, if you
don't understand my question or want anything
repeated, just tell me.  And if you want to
look at any documents, that's fine, too.
Okay?
A. Okay.
Q. And if you and I try to not talk at the same
time, that helps.  So let me get my question

## 5

1  out before you start to answer, even if you
2  know what I'm going to say. And I'll try and
3  let you finish --
4  A. I got it.
5  Q. -- your whole answer. And also if you could
6  verbalize yes and nos. Even though we can see
7  you nodding your head, the court reporter has
8  to take down a yes or no, if that happens to
9  be your answer. Okay?
10  A. I understand.
11  Q. And for the record, please state your name and
12  spell both your first and last name and middle
13  initial, if you have one.
14  A. Joan C. Anderton, J-o-a-n, C.,
15  A-n-d-e-r-t-o-n.
16  Q. Okay. And what's your date of birth,
17  Ms. Anderton?
18  A. August 8th, 1967.
19  Q. And where were you born at?
20  A. New Hyde Park, New York.
21  Q. And what's your educational background?
22  A. I have a master's in engineering from Purdue
23  University and a bachelor's in applied
24  mathematics from Rochester Institute of
25  Technology.

## 6

1  Q. Rochester did you say?
2  A. Rochester, uh-huh.
3  Q. And any other degrees, other than those two --
4  A. Nope.
5  Q. -- good accomplishments? Where do you
6  currently live? Just not your -- you don't
7  have to give me your home address, just what
8  town?
9  A. Washington state, Woodland. My address is in
10  Woodland.
11  Q. In Woodland, Washington?
12  A. Washington, uh-huh.
13  Q. And by whom are you currently employed?
14  A. International Paper.
15  Q. And how long have you been employed?
16  A. 11 years.
17  Q. By International Paper?
18  A. By International Paper? 11 years.
19  Q. Okay. And what's your current job or
20  position?
21  A. I'm a deployment lead.
22  Q. Okay. And what's that term mean in your
23  business?
24  A. We roll out a system at the box -- at box
25  plants. It's a new implementation of a supply

## 7

1  system in our box plant.
2  Q. Okay. And a box plant refers to what?
3  A. Corrugated plant, a corrugated box
4  manufacturing facility.
5  Q. How long have you held that position as --
6  A. Since February of last year.
7  Q. Okay. Prior to that, what job or position did
8  you hold at International Paper?
9  A. I was the enterprise distribution manager for
10  the central region.
11  Q. Okay. Enterprise distribution manager?
12  A. Manager, uh-huh.
13  Q. And what does that term mean or job --
14  A. I was responsible --
15  Q. -- encompass?
16  A. I was responsible for two -- for overseeing
17  the operations of two regional distribution
18  centers, one in Hammond, Indiana, and one in
19  Dallas/Forth Worth. And then I would work
20  with all of the businesses of International
21  Paper on transportation and warehousing
22  initiatives.
23  Q. And how long did you have that job, or that
24  position I should say?
25  A. I was an enterprise distribution manager for

## 8

1  just the midwest for four years. And then I
2  got the central region and expanded my region
3  for two years. So a total of six years.
4  Q. Okay. Why don't you tell me where your
5  current office is. Where do you work out of
6  today?
7  A. I travel 80 percent of the time. So if I am
8  not on the road, I work from home.
9  Q. Okay.
10  A. But I work at box plants across the country
11  now.
12  Q. Okay. And to whom do you report at the
13  moment?
14  A. Frank Lane.
15  Q. And what's Frank's job or title?
16  A. Manager -- I am not sure. Manager of business
17  optimization for container division or CTA.
18  I -- my job change last year was a significant
19  change from where I was. So it's a different
20  business.
21  Q. Okay. Where is Frank Lane's office at?
22  A. Memphis, Tennessee.
23  Q. And then why don't you tell me what -- when
24  did you first start working for International
25  Paper?

JOAN ANDERTON                                                    APRIL 10, 2012

---

**9**

1    A. I was a consultant for one year, and then
2       November 1st, 2000 ...
3    Q. Okay. And give me a little idea of the jobs
4       you've held up from your -- from your start
5       until you became the enterprise distribution
6       manager.
7    A. I was a supply chain manager in consumer
8       packaging division.
9    Q. And where did you work at? What office?
10   A. Memphis.
11   Q. And about how long did you hold that position?
12   A. A year and a half to two years. A year and a
13      half to two years.
14   Q. And then what did you do?
15   A. And then I was on a corporate project for a
16      supply chain that was called Edge. I was a
17      supply chain analyst, I would say. And then I
18      became a lead on that project.
19   Q. And that project generally encompassed what
20      type of work or project?
21   A. It was creating a strategy for a supply chain
22      for International Paper across all of our
23      business. It was a supply chain strategy
24      looking out over the next 5 to 10 years of
25      what we would be doing.

**11**

1       prior?
2    A. Yeah, '89.
3    Q. '89. Okay.
4    A. It was a year and a half for my master's.
5    Q. Okay. And then after getting your master's,
6       did you go to work at Denver, or was there
7       somewhere else --
8    A. No. I worked for IBM.
9    Q. IBM. Okay. And doing what?
10   A. I was a production control specialist,
11      inventory specialist for a manufacturer of
12      main frame computers.
13   Q. Okay. And how about after IBM, where did you
14      go?
15   A. I moved to Colorado. I left work for a while,
16      got married, and then I kind of did some
17      independent consulting. And then ended up
18      working for Book Tech Distribution, was
19      probably my first ...
20   Q. And did you go to start at Denver after that?
21   A. And then I went to, yeah, Denver Management
22      Group. Yes.
23   Q. Okay. Have you given any prior depositions?
24   A. Once for a personal reason.
25   Q. Okay. Have you given any -- I take it you

---

**10**

1    Q. When you were -- you were a consultant for
2       International Paper for one year, who were you
3       working for at that time?
4    A. Computer Sciences Corporation.
5    Q. And what was the nature of your consulting
6       work?
7    A. Supply chain consulting.
8    Q. And then prior to working at Computer
9       Sciences, where did you work?
10   A. I worked for Denver Manager Group. I was a
11      consultant there for three years. Also a
12      supply chain, primarily distribution,
13      transportation warehousing.
14   Q. Okay. And any -- did you work anywhere
15      between -- well, strike that.
16          After you graduated from college, did
17      you start working or did you continue with
18      your master's?
19   A. I went directly for my master's.
20   Q. Okay. In what year did you graduate with both
21      those degrees?
22   A. 1990. December of 1990.
23   Q. Was that your master's or undergrad?
24   A. Master's.
25   Q. Okay. And your undergrad was one or two years

**12**

1       have not given any depositions on behalf of
2       International Paper?
3    A. No, I have not.
4    Q. Okay. And how about on behalf of any of your
5       other employers?
6    A. No, I have not.
7    Q. Okay. Have you testified in court at all?
8    A. No, I have not.
9    Q. Have you worked for any trucking companies or
10      interstate motor carriers?
11   A. No, I have not.
12   Q. And, generally, what -- tell me the business
13      of International Paper. How would you
14      describe it?
15   A. We're a paper and packaging company --
16      manufacturer.
17   Q. Okay. And where are the headquarters of
18      International Paper?
19   A. Memphis, Tennessee.
20   Q. And how would you describe the number of
21      locations or facilities you have in the United
22      States?
23   A. Over 100, if not 200.
24   Q. Okay.
25   A. I'm not sure of the exact amount.

## 13

1  Q. Okay.  The ...
2  A. Can I correct that?  It's definitely over 200
3     if you include Xpedx.  Because they have their
4     own facilities, as well.
5  Q. Okay.  Does International Paper own Xpedx?
6  A. Yes.
7        MR. SCHRECK:  How do you spell that?
8        THE WITNESS:  It's X-p-e-d-x.
9        MR. SCHRECK:  Okay.  Thanks.
10 Q. (By Mr. Fisher)  And does International Paper
11    have offices outside the US?
12 A. Yes.
13 Q. Okay.  And in what countries or how many,
14    approximately?
15 A. Numerous.  Russia, India, China, South
16    America, Europe.  I do not know all of the
17    locations.
18 Q. And can you tell me what you've reviewed in
19    anticipation of giving this deposition?
20 A. I reviewed my e-mail communications after I
21    had heard of the lawsuit.  And I discussed
22    with counsel -- had discussions with counsel
23    on documents that have been produced and the
24    interrogatories that we had answered over the
25    last couple years since the first

## 14

1     communications.
2  Q. And the e-mail communications you refer to,
3     with whom were those communications?
4  A. A couple of internal communications and with
5     our counsel, internal counsel.
6  Q. Okay.  And is that Mr. Quinlen --
7  A. No.
8  Q. -- internal counsel?
9  A. No.  It would have been Gigi and -- I can't
10    recall the other woman's name.
11 Q. Okay.
12 A. I don't remember the name.
13 Q. Do you know Mr. Quinlen --
14 A. I do know Mr. Quinlen.
15 Q. -- Thomas Quinlen?  Have you spoken to him?
16 A. Not on -- not regarding this case.
17 Q. The other -- not your lawyers or not attorneys
18    for International Paper, nor Mr. Fisher, but
19    the other e-mails that you reviewed, what
20    persons were you communicating with in those
21    e-mails?
22 A. There were e-mails on -- the day that I found
23    out about the incident, there was an e-mail
24    that I sent to the operations -- what's his
25    title -- Clint Diekman at Hammond and asked

## 15

1     him to pull the file on the shipment.  And I
2     had called Steve Shores, in Memphis, who
3     supported the RDC.  And I had called Fadera
4     Carter.
5  Q. And how do you spell Fadera?
6  A. F-a-e-d-r-a, Carter -- F-a-d-e-r-a.
7  Q. Is that a woman?
8  A. Yes, a woman.
9  Q. What is her job?
10 A. She is a business analyst, is I believe what
11    her title was.
12 Q. Okay.  And why did you call her?
13 A. To find out about payment for the load.  I
14    called them in sequence.  So she had asked --
15    I had asked about payment for the shipment and
16    if there was anything unique about payment.
17 Q. Okay.  And what did she tell you?
18 A. She pulled the history of the payment.  And it
19    showed the total amount we paid to the
20    carrier, and it had the three stops on the
21    truck for that shipment.
22 Q. And when you say "the carrier," who are you
23    referring to?
24 A. Overnite -- the payment looked as though it
25    was to Overnite, but it was for Universal

## 16

1     Am-Can.
2  Q. And what do you mean when you say it looked
3     like it was to Overnite?
4  A. Because our payment would have had the SCAC
5     code of OXEN, O-X-E-N, which is Overnite
6     Express, who had been either acquired or taken
7     over by Universal Am-Can.
8  Q. So as of -- I shouldn't say as of, but on
9     July 3rd, 2008, International Paper believed
10    that the carrier they were paying for this
11    load was Universal Am-Can?
12 A. Uh-huh.
13 Q. Is that a yes?
14 A. Yes.
15 Q. Okay.
16 A. Uh-huh.
17 Q. And that's because Universal Am-Can had taken
18    over or acquired Overnite Express, to your
19    knowledge?
20 A. Yes.  I'm not sure exactly what their business
21    relationship was.  I know that prior -- prior
22    to this particular shipment that we were
23    paying Overnite Express.  And then either they
24    acquired them or what -- however.  I'm not
25    sure what the circumstances were, but we paid

17

1    Universal Am-Can.
2   Q. And were you -- how would they get paid, while
3       we're on this topic?
4   A. How would they get paid?
5   Q. Yeah.
6   A. They would submit, electronically, a
7       request -- they would submit electronically
8       that they delivered the load and the time and
9       date that they delivered the shipment. And
10      then they would get -- automatically the load
11      would get calculated, and they'd get paid
12      through the SAP, which is our transaction
13      system.
14  Q. And when you say "they," you're referring to
15      Universal?
16  A. Yes.
17  Q. And does SAP stand for anything?
18  A. It probably does.
19  Q. Not that you know?
20  A. But I do not. It's a German system, it's our
21      financial system.
22  Q. In this particular circumstance, was
23      International Paper aware of any involvement
24      by Martin's Bulk Milk Service in transporting
25      International Paper's paper products?

18

1           MR. FISHER: Could you read just the
2       first part of the question?
3           (The pending question was read by the
4       reporter.)
5           MR. FISHER: Objection to form.
6       Vague.
7           You can go ahead and answer.
8   A. I -- for this particular shipment, I don't
9       think we knew whether -- who they were going
10      to -- whether they were going to haul the load
11      with their own driver or broker it out to
12      another driver.
13  Q. (By Mr. Burke) Okay. You didn't know if
14      Universal was going to haul it themselves
15      or --
16  A. Correct.
17  Q. -- have some other driver haul it?
18  A. Uh-huh.
19  Q. And by the way, the -- by whom did you become
20      aware that there had been any collision
21      involving -- or strike that. Any collision
22      with a truck that was carrying International
23      Paper products?
24  A. We got a request for a legal hold from our
25      corporate legal group saying, "This particular

19

1       shipment, any documentation, anything related
2       to this, needs to be held in legal hold,"
3       which we get a special thing in our e-mail to
4       put things in if we have anything related to
5       it.
6           I had no awareness of any exception
7       about that shipment prior to that date. It
8       was about a year, or so, after the incident.
9       So ...
10  Q. And when did you get this e-mail about the
11      legal hold?
12  A. I don't know the exact date.
13  Q. Okay.
14  A. It was -- I don't have that document. But it
15      was the same date I contacted the three
16      individuals I mentioned contacting.
17  Q. Okay. Now, maybe I misunderstood you. That
18      wasn't one year after this incident?
19  A. I believe so.
20  Q. Oh, it was?
21  A. I believe it was approximately one year.
22  Q. Okay. And why is it you were contacted? What
23      was your job or responsibility?
24  A. Because I was the IP employee responsible for
25      the operation of the Hammond RDC. And

20

1       responsible for -- because we hired an Exel --
2       Exel Logistics to operate the facility for us,
3       and I managed our relationship with them.
4   Q. And RDC stands for?
5   A. Regional distribution center.
6   Q. Were you aware of this occurrence back in July
7       of 2008, when it happened?
8   A. No, I was not.
9   Q. I think you mentioned Clint Diekman was it?
10  A. Diekman.
11  Q. How do you spell his last name?
12  A. D-i-e-k-m-a-n.
13  Q. And what was his job?
14  A. He was -- he's the customer service
15      supervisor.
16  Q. Okay. And I believe you said you called him.
17      And for what reason did you do so?
18  A. I asked him to pull the RDC's records of that
19      shipment and see if there was any -- if it
20      delivered on time, if there was anything
21      unique about it.
22  Q. Okay.
23  A. And he confirmed that the shipment delivered
24      on time and had no -- no other information
25      about the delivery.

JOAN ANDERTON                                              APRIL 10, 2012

---

**21**

1  Q. And then how about Steve Shores? What was his
2     job?
3  A. Steve Shores worked for IP in Memphis and was
4     a transportation specialist.
5  Q. And why was it you called him or contacted
6     him?
7  A. To pull the records on that same shipment and
8     he confirmed the EDI transactions between
9     Universal Am-Can and IP about when the product
10    was picked up and when the product delivered.
11    And he also confirmed that everything
12    delivered on time.
13 Q. Okay. And the product here in question was
14    what?
15 A. Paper products, probably palletized carton
16    stock paper for three different customers in
17    the Minneapolis area.
18 Q. Okay. And when you say paper products, is
19    this computer paper, typing paper, or --
20 A. Yeah, 8 1/2 by 11 paper. It could be big
21    sheets. And then I think there might have
22    been skids of paper, as well, which would have
23    been for a printer, on a pallet. Just sheets
24    on a pallet.
25 Q. Okay. And had International Paper

**22**

1     manufactured these paper products?
2  A. I would -- 99 percent, I would say yes. But
3     there could have been some outside purchased
4     product on that truck. I would not have
5     known.
6  Q. Okay. And if it was an outside purchase, do
7     you know, would it fall into a certain
8     category or type of paper product?
9  A. It -- our product line is very broad. So it
10    could have -- it could have been. I'm pretty
11    sure we manufactured all the paper, but it
12    could have been a rare circumstance where
13    something was not manufactured by us.
14 Q. Okay. And these paper products were paper
15    that had been sold by International Paper to
16    different customers?
17 A. That's correct.
18 Q. And this paper -- or these paper products were
19    picked up at International Paper's Hammond
20    warehouse. Correct?
21 A. Yes.
22 Q. How did the paper -- or strike that. Where
23    did the paper come from before it got to your
24    Hammond warehouse?
25 A. Multiple mills and converting facilities

**23**

1     supplied paper to our regional distribution
2     center. So it could have come from any mills
3     across the country.
4  Q. Now, in July of '08, did International Paper
5     transport any of its own paper to customers?
6  A. Across the country, yes. Not from the RDC.
7  Q. Okay. So in order for paper -- like this
8     paper that was --
9  A. Uh-huh.
10 Q. -- involved here, this was being -- this was
11    not being delivered to customers by
12    International Paper trucks. Is that correct?
13 A. No.
14 Q. Okay. Does International Paper hold an
15    operating authority to operate as a common
16    carrier or a contract carrier?
17 A. Yes. I don't -- we have a private -- we have
18    private fleets in the country in different
19    parts, but not for the RDC.
20 Q. Okay. And not for the Hammond RDC?
21 A. RDC, correct.
22 Q. And the incident we're talking about here,
23    where International Paper products were on a
24    truck that was involved in a collision on
25    July 3rd of '08, that was -- that paper was

**24**

1     not being transported in an International
2     Paper truck. Is that correct?
3  A. Yes.
4  Q. Now, am I correct that for this --
5  A. Can I make one correction? Because I didn't
6     think of this before.
7  Q. Sure. Go right ahead.
8  A. Xpedx would occasionally pick up product from
9     the RDC, and Xpedx is a division of
10    International Paper so -- and they have their
11    own trucks. Not related to this set of
12    deliveries at all, but I just wanted to make
13    sure. That just came to mind.
14 Q. Okay. And in this instance, Xpedx was one of
15    the customers to whom paper was being
16    delivered. Correct?
17 A. Correct. Xpedx is a customer of the RDC, as
18    well as it is a division of International
19    Paper.
20 Q. Okay. And then one of the other delivery
21    destinations I think was Midland Paper.
22    Correct?
23 A. That is correct.
24 Q. Okay. And does International Paper own
25    Midland in any manner?

## 25

```
1    A. No.
2    Q. And the other was ...
3         MR. FISHER: Cenveo.
4    Q. (By Mr. Burke) Cenveo.
5         MR. BURKE: Thank you.
6    A. Cenveo.
7         MR. FISHER: I've been struck down
8    twice on pronunciations today.
9         MR. SCHRECK: You going for three?
10   Q. (By Mr. Burke) Does International Paper own
11   any part of Cenveo?
12   A. Not that I'm aware of.
13   Q. Okay. Now, therefore, in this circumstance,
14   International Paper was utilizing a carrier to
15   deliver its paper to its customers. Correct?
16   A. Yes.
17   Q. And in this circumstance, did International
18   Paper believe the carrier was Universal?
19   A. Yes.
20   Q. Okay. And I think you told me a moment ago
21   International Paper did not know if Martin's
22   Bulk Milk Service was doing this delivery. Is
23   that correct?
24   A. Can you clarify that question? Can you
25   restate that question?
```

## 26

```
1    Q. Sure. Did International Paper know that
2    Martin's Bulk Milk Service was transporting
3    this paper on July 3rd?
4    A. No. We -- we knew that Universal Am-Can used
5    their own drivers sometimes and occasionally
6    brokered out. But as far as that
7    particular -- on that day, how they chose to
8    execute the delivery, we were unaware of and
9    had no influence over.
10   Q. Did International Paper expect that any
11   carrier that Universal hired would comply with
12   the contract terms that existed between
13   International Paper and Universal?
14   A. We expected that Universal Am-Can complied to
15   the terms that we -- in our contract with
16   Universal Am-Can.
17   Q. And if they, in turn, had someone else
18   actually make the delivery, did International
19   Paper expect that other entity or driver to
20   also comply with the same contract provisions
21   that existed between International Paper and
22   Universal?
23   A. We expected that our product would be
24   delivered -- picked up and delivered based
25   upon the contract requirements.
```

## 27

```
1    Q. Okay. Regardless of whether it was actually
2    Universal's driver or some other driver that
3    Universal --
4    A. Chose.
5    Q. -- hired?
6    A. Yeah.
7    Q. In this -- for these -- delivery of the paper
8    products to these three customers that you
9    referred to, Universal was responsible, for
10   International Paper, the service of
11   transporting International Paper's product to
12   its actual customers. Correct?
13   A. Correct. We were --
14   Q. Okay.
15   A. Go ahead.
16   Q. Okay. And that transportation of
17   International Paper's products to its
18   customers, that was an essential part of
19   International's business. Correct?
20        MR. FISHER: Objection. Form.
21        You can go ahead and answer.
22   A. Actually can you restate that question?
23   Q. (By Mr. Burke) Sure. Getting International
24   Paper's product into the hands of its
25   customers was an essential part of
```

## 28

```
1    International Paper's business. Correct?
2    A. Our product needed to be delivered on time to
3    our customers. That was the objective.
4    Q. Sure. When -- for, you know, this scenario
5    we're talking about here, the -- these -- the
6    paper products that were in the process of
7    being shipped to these three customers of
8    International Paper, I take it at some point
9    there had been a sale made by International
10   Paper to these three separate companies?
11   A. That is correct.
12   Q. Okay. And did that -- whatever sales price
13   was quoted by International Paper, did that
14   price include delivery of the paper to the
15   customers?
16   A. We did not charge our customers separately for
17   delivery.
18   Q. Okay. So when the sale was made, part of the
19   sale agreement was that International Paper
20   would have the paper delivered to those
21   customers?
22   A. Part of the service was, yes, delivery to
23   their door.
24   Q. Okay. And the -- I take it there was no
25   International Paper person on -- on this truck
```

JOAN ANDERTON                                                   APRIL 10, 2012

---

29

1    that was making these deliveries. Right?
2    A. No.
3    Q. Okay.
4           MR. FISHER: That's correct?
5           THE WITNESS: There was no
6    International Paper person on this truck.
7           MR. FISHER: Correct?
8           THE WITNESS: Correct.
9           MR. FISHER: It was a double
10   negative.
11          THE WITNESS: Oh, I'm sorry.
12   A. Yes, there was -- there was no International
13   Paper person on that truck. Correct.
14   Q. (By Mr. Burke) Yeah. Thank you. And it's
15   just lawyer talk, but it'll come out funny, or
16   possibly even sounding contrary to what you
17   intended, when you read it on paper.
18          And when you -- therefore, when you
19   would make these deliveries, who -- either the
20   Universal personnel or whoever Universal
21   hired, they would be International Paper's
22   representative in actually delivering the
23   paper to your customers. Correct?
24          MR. FISHER: Objection. Form.
25   Vagueness as to the first part of the

---

30

1    question, when you made the deliveries.
2           You can go ahead and answer.
3    A. Yeah, actually could you restate that
4    question? Because you -- I --
5    Q. (By Mr. Burke) Sure. The -- since no
6    International Paper employee physically made
7    the delivery to your customers, either a
8    driver from Universal or a driver from whoever
9    Universal hired was the person acting on
10   behalf of International to actually accomplish
11   the delivery of the paper to International's
12   customers. Correct?
13          MR. FISHER: Objection. Form.
14   A. We -- I don't know if they were acting on
15   behalf of International Paper. They were
16   providing a service for International Paper,
17   to deliver our products to our customers.
18   Q. (By Mr. Burke) And that service obviously
19   provided a benefit to International by getting
20   its products into the hands of its customers.
21   Correct?
22   A. It was a service that we -- we needed, yes.
23   Q. And, you know, by the way, at what point did
24   International get paid in this process? Was
25   it before or after the delivery?

---

31

1    A. Paid by our customers for our product?
2    Q. Correct.
3    A. Depends on the terms of our payment with each
4    of those customers. I am not aware of what
5    each of the terms from -- with Cenveo were.
6           (Discussion off the record.)
7    Q. (By Mr. Burke) And from what you've told me
8    so far, would I be correct that International
9    Paper did not have any direct contact with
10   Martin's Bulk Milk Service concerning this
11   particular delivery?
12   A. Correct.
13   Q. Whether or not there would be delivery of your
14   paper products taking place was dependent on
15   whether International Paper had made a sale to
16   a particular customer. Correct?
17   A. Yes.
18   Q. Okay. The delivery that was taking place at
19   the time of this occurrence would not have
20   been in progress if International Paper had
21   not sold paper to those three customers.
22   Correct?
23   A. Yes.
24   Q. Did you — switching topics on you a little
25   bit here.

---

32

1    A. Uh-huh.
2    Q. I know you have answered some interrogatories
3    in the course of this case?
4    A. Uh-huh.
5    Q. And -- is that a yes?
6    A. Yes.
7    Q. Okay. And in order to do so, can you give me
8    some idea what -- how you went about looking
9    for documents that you considered might be
10   relevant to the questions that you were
11   answering?
12   A. The --
13          MR. FISHER: Excuse me. Rich, and I
14   presume since I was involved in that process,
15   you don't want her to divulge any
16   communications with me or the in-house
17   counsel.
18          MR. BURKE: Not -- not words that you
19   or they have said to Ms. Anderton.
20   Q. (By Mr. Burke) But, you know, I'd like to
21   hear about actions that, you know, that you
22   took and things that you looked at, you know,
23   without getting into --
24   A. Okay.
25   Q. -- specific things that Mr. Fisher or other

## 33

1      lawyers said to you.
2  A. Okay.
3         MR. FISHER: I'm fine with that, as
4      long as she gives a broad description and
5      that's not going to be considered a waiver of
6      any attorney/client communications.
7         MR. BURKE: Yeah. No, no.
8         MR. FISHER: Okay.
9  Q. (By Mr. Burke) And I don't want you to say,
10     "Hey, Carl told me to do this," or, you know.
11        MR. FISHER: Gigi.
12 Q. (By Mr. Burke) Gigi or any, you know, other
13     actual lawyer --
14 A. Okay.
15 Q. -- as distinguished from non-lawyers. Okay?
16 A. Okay.
17 Q. So back to my question. Just tell me what you
18     did to try and find documents you thought
19     might be relevant to, or responsive to the
20     questions that you were trying to answer or
21     that Mr. Fisher had told you that he was
22     attempting to answer.
23 A. I either reflected on my knowledge of how the
24     process worked for shipping of goods out of
25     our facility or -- there's very limited

## 34

1      information on that particular shipment, or I
2      reflect back to the same three individuals I
3      contacted the first time I heard about the
4      shipment and looked at the information that I
5      had on that particular shipment.
6         Other than that, I read over the
7      questions and worked with counsel on the
8      responses and agreed with the responses and
9      signed the documents.
10 Q. How about the -- it is correct that there was
11     a contract relationship between International
12     Paper and Overnite Express, correct, that
13     predated this July of 2008 occurrence?
14 A. Yes. It was a 2007 contract.
15 Q. Okay. And have you reviewed that contract?
16 A. Only recently.
17 Q. Okay.
18 A. Very recently.
19 Q. Okay. Is that something that you, on your
20     own, went looking for to find? Or was that --
21 A. It was one of the exhibits presented in the --
22     in the case.
23 Q. Okay. And did you find that or retrieve that
24     contract?
25 A. No, I did not.

## 35

1  Q. Okay. Who -- who did from International
2      Paper?
3  A. I'm not sure exactly who did. I know that I
4      received it in our discussions, but I don't
5      know who pulled the contract.
6         MR. FISHER: Rich, I can tell you it
7      wasn't her.
8  Q. (By Mr. Burke) And how about Mr. Crawford,
9      William Crawford, does he still work at
10     International Paper?
11 A. No, he does not.
12 Q. Okay. Where does he work today?
13 A. I don't -- I don't know. I knew he had worked
14     for Temple Inland, but I don't -- I think he's
15     retired at this time. But I don't know. I
16     don't know him personally.
17 Q. Okay. And who did he last work for?
18 A. Temple Inland.
19 Q. Temple?
20 A. Inland.
21 Q. Inland?
22 A. Uh-huh.
23 Q. When did he last work for International Paper?
24 A. I don't know.
25 Q. How about Steven Mundy? Do you know him?

## 36

1  A. I know Steve Mundy, yes.
2  Q. Okay. And does he still work at --
3  A. Yes.
4  Q. -- International Paper? And where does he --
5      strike that.
6         What's his position today?
7  A. People's titles change a lot. I don't know
8      what his current title is. He is -- he does
9      the contracts with our carriers.
10 Q. Okay.
11 A. Manages contracts with our carriers.
12 Q. Okay. And --
13 A. Today, I believe he's working for -- they
14     split this role between two positions. So I'm
15     not sure if he's working currently with the
16     RDCs, but he was working with the RDCs at the
17     time of this incident.
18 Q. Okay. And where is Mr. Mundy's office at
19     today?
20 A. Memphis, Tennessee.
21 Q. And when Mr. Crawford last worked for
22     International Paper, where was his office?
23 A. Memphis, Tennessee.
24 Q. How many RDCs were there back in July of '08?
25 A. Six.

37

1   Q. Six? Okay. And there's one in Hammond?
2   A. One in Hammond.
3   Q. Where were the others?
4   A. Fort Worth, Texas; Ontario, California;
5      Portland, Oregon; Chester, Virginia. And I
6      don't know in -- I believe Florence, New
7      Jersey, if that building had started. If not,
8      it would have been in Massachusetts. There
9      was a location in Massachusetts which was
10     moved to New Jersey.
11  Q. Okay. And, essentially, what's the purpose or
12     function of the RDCs?
13  A. It's the regional distribution center
14     responsible for servicing all of the IP
15     businesses within the region. So we did
16     next -- next-day service or local service to
17     the region.
18  Q. Okay. And when you use the expression "IP,"
19     you're talking about International Paper?
20  A. International Paper, yes.
21  Q. Okay. In our world, sometimes that refers to
22     intellectual property. So I just want to
23     clarify. But I assumed that's what you meant.
24  A. Yes. Thank you.
25  Q. You told me it was your understanding that

38

1      International Paper as of -- or strike that.
2         It was your understanding on
3      July 3rd, 2008, International Paper was
4      utilizing the services of Universal to
5      accomplish delivery of its paper products, as
6      opposed to Overnite Express. Correct?
7   A. Yes. There was a lag in the systems. So
8      that's why a lot of the paperwork still says
9      OXEN as the SCAC carrier code, which was
10     Overnite Express. But a contract was already
11     in place with Universal Am-Can.
12  Q. Okay. And what I'm getting at is how did you
13     come to know that? I mean what -- what have
14     you looked at or done to be able to sit here
15     and tell me that?
16  A. Well, I've seen the additional contract that
17     was written in the month, or so, prior to when
18     Universal Am-Can took over OXEN. And when I
19     pulled histories on the shipment, everything
20     said Overnite Express, OXEN, as the carrier.
21     So I confirmed the date prior to that.
22        And we have numerous carriers. It's
23     not unusual that one carrier's bought by
24     another, or merge with another. So the
25     carriers are regularly transitioning. And

39

1      that would have been during the time of that
2      transition period. So the facility would not
3      have been given -- yet been given directive to
4      change the SCAC code on the shipment on that
5      day.
6   Q. And when you say "the facility," you're
7      talking about the Hammond RDC?
8   A. RDC, yes.
9   Q. Okay. So you're not, you know, talking in a
10     vacuum, let me show you a couple things that I
11     think you've probably looked at.
12        MR. BURKE: Do you have the master
13     exhibits, like No. 1, Carl? Or, no, you know
14     what?
15  Q. (By Mr. Burke) Why don't we look at Exhibit 2
16     at the moment. Let me tender that to you.
17     And why don't you take a look at what I think
18     should be page -- Bates page 36, down on the
19     bottom.
20  A. (Witness complies.)
21  Q. (By Mr. Burke) Do you have that in front of
22     you?
23  A. Yes, I do.
24  Q. Okay. And, you know, take a look at whatever
25     you need to, to confirm it. But that, I

40

1      believe, actually runs up to about page 68,
2      including exhibits and attachments. Would I
3      be correct? And if I am not, tell me --
4   A. Yes.
5   Q. -- tell me so.
6   A. It appears to.
7   Q. Okay. And then am I correct that the contract
8      that begins on page 36 is the October, 2007,
9      contract between International Paper and the
10     carrier, Overnite Express?
11  A. That's what it states, yes.
12  Q. Okay. And actually on the preceding page, 35,
13     there's a letter from Mr. Mundy, sending three
14     copies of that contract to Overnite Express.
15     Correct?
16  A. Yes.
17  Q. And Mr. Mundy -- and that's in a letter dated
18     October 24th, 2007. Correct?
19  A. Uh-huh.
20  Q. And Mr. Mundy --
21  A. Yes.
22  Q. -- at that time, his title appears to be
23     manager of motor carrier transportation
24     sourcing?
25  A. Yes.

## 41

1  Q. And he was sending that to Sandy Herman at
2     Overnite Express?
3  A. Yes.
4  Q. Okay. Do you know Sandy Herman?
5  A. No.
6  Q. And then the signature pages for this
7     October -- and here, let's back up one second.
8     Look at page 37. How come that page is blank?
9     Do you know?
10 A. I do not know.
11 Q. Okay.
12       MR. FISHER: They like to use their
13    paper.
14       MR. BURKE: That's -- I appreciate
15    expanding business opportunities.
16 Q. (By Mr. Burke) Where's the original of this
17    contract?
18 A. I do not know. It's stored within Steve
19    Mundy's organization. They have document
20    repositories. If I were to require -- request
21    a copy of a contract, I would have gone to his
22    organization.
23 Q. Okay. And all I'm getting at is if we wanted
24    to figure out what's on page 2 of 24, where
25    would we find the original?

## 42

1  A. It would be in Memphis in a shared -- within
2     their organization, however they maintain
3     their documents.
4  Q. Okay.
5       MR. FISHER: Rich, if I might, if you
6     look at page 36, this is a copy of the
7     original.
8  A. That's what I thought. This should be the
9     original.
10 Q. (By Mr. Burke) I have noticed that, yes. And
11    I still --
12 A. It says 2 of 24 and 3 of 24.
13 Q. I'm not sure why -- and if it didn't
14    specifically specify 2 of 24 on a blank page,
15    I --
16 A. It just looks like the line on the bottom of
17    the table of contents took a page and then
18    there was a page break probably.
19 Q. Okay. And then on page 38, the contract is
20    entered into effective the 1st day of October,
21    2007, between International Paper and Overnite
22    Express. Correct?
23 A. Yes.
24 Q. Okay. And then the signature pages are on
25    page 52, I believe, if you look at that.

## 43

1  A. There's also signature pages on 48.
2  Q. Okay. And you know what? You are correct.
3     The -- the signature pages for the actual
4     contract agreement are on page 13 of 24, which
5     is Bates Stamped IP48. Correct?
6  A. Yes.
7  Q. Okay. And that's -- and the date that was
8     signed by Mr. Crawford, on behalf of
9     International Paper, was November 12th of '07?
10 A. Yes.
11 Q. Okay. And then there's various signatures
12    from personnel from Overnite Express,
13    Mr. Elsholtz and Sandy Herman, dated
14    October 30th, 2007. Correct?
15 A. Yes.
16 Q. And also Kevin Hays. Correct?
17 A. That's what it says, yes.
18 Q. Okay. And then while we're on it, the
19    signatures that I referred you to a moment ago
20    on page 52, that's for a Fuel Index Exhibit B.
21    Correct?
22 A. Yes.
23 Q. Okay. And essentially in your business, what
24    is the -- the Exhibit B Fuel Index that was
25    agreed to?

## 44

1  A. It's a fuel surcharge based upon the current
2     fuel index. It adjusts over -- it adjusts
3     weekly. It's published amongst our
4     organization. And that's how we pay our
5     carriers for fuel.
6  Q. And then you're familiar with an amendment
7     that was entered into. Correct?
8  A. I -- yes, I'm aware.
9  Q. Okay. What's referred to as Amendment No. 1?
10 A. Uh-huh.
11 Q. Now, I don't see that amendment in these
12    International Paper Bates Stamped documents in
13    Exhibit 2.
14 A. Uh-huh.
15 Q. Am I correct?
16 A. I didn't prepare the documents.
17 Q. Okay. Why don't you look at Exhibit 1?
18       MR. BURKE: Carl, if you could give
19    that to Ms. Anderton.
20       MR. FISHER: Uh-huh.
21 Q. (By Mr. Burke) And take a look at page 32.
22    Take your time.
23 A. (Witness complies.)
24 Q. Tell me when you are done looking at that
25    page 32.

45

1    A. Okay. I am done.
2    Q. Have you had a chance to look at it? Okay.
3       Exhibit No. 1, Bates Stamped UACL/OEI 32 is a
4       letter from Thomas Quinlen, on International
5       Paper letterhead, to Mr. Carl Fisher.
6       Correct?
7    A. Yes.
8    Q. Okay. And that's dated August 13th, 2009.
9       And essentially that letter is sending
10      Mr. Fisher a copy of the October 1st, '07,
11      contract between International Paper and
12      Overnite Express that we just looked at.
13      Correct?
14   A. That's what it states.
15   Q. Okay. And also sending a copy of what's
16      referred to as Amendment No. 1 to that
17      contract, and that amendment is dated June 9th
18      of '08, according to this letter?
19   A. Yes, that's what it states.
20   Q. Okay. And Mr. Quinlen goes on to say that
21      after Amendment No. 1 to the contract was
22      drafted, there was no signed version of — of
23      something. Is that right?
24   A. That's what it states.
25   Q. Yeah. And what is being referred to there, as

46

1       far as you understand, in terms of there's no
2       signed version of what?
3    A. What it states — I haven't seen the letter or
4       the document so.
5          It says there's no — "thus no signed
6       version exists." That's what Mr. Quinlen
7       stated.
8    Q. Is that referring to that signed version of a
9       contract between —
10   A. I was not privy —
11   Q. — or I should say do you know —
12   A. — to a part of this contract, the discussion
13      or anything. As an — overseeing the
14      facility, we would have been directed when the
15      carrier change occurred, and that we would
16      just operationally change our SCAC code at the
17      time when we had to execute. So I would not
18      have been a part of the conversations between
19      Universal Am-Can and our — our sourcing
20      department or creation of the contract.
21   Q. And then let me ask you to take a look at
22      page 65 of that Exhibit 1 that you have in
23      front of you.
24   A. (Witness complies.)
25   Q. Is that the Amendment No. 1 that —

47

1    A. It says Amendment No. 1, yes.
2    Q. Okay. And we can go through it in a moment.
3       But it — from everything you've reviewed, is
4       it your understanding that the purpose of this
5       amendment was to render the prior October,
6       2007, contract between International Paper and
7       Overnite Express, applicable to International
8       Paper and Universal?
9            MR. FISHER: Objection. Competence.
10           You can go ahead and answer.
11   A. It is my understanding that — that that was
12      the case, yes, that the 2007 contract was an
13      amendment to that.
14   Q. (By Mr. Burke) So that now International
15      Paper would be utilizing Over — or would be
16      utilizing Universal Am-Can, Limited, as the
17      carrier in place of Overnite Express?
18   A. Yes, that was my understanding.
19   Q. Okay. And that Amendment No. 1 on page 65 of
20      Exhibit 1 is — it's a one-page document.
21      Right?
22   A. Yes.
23   Q. Okay. And as it states in line one, the
24      amendment is being entered into on June 9th of
25      2008. Correct?

48

1    A. Yes.
2    Q. Okay. And it goes on to say, under the
3       witnesseth — and it's being entered into
4       between International Paper and Overnite
5       Express, as indicated in the first paragraph.
6       Right?
7    A. Universal Am-Can.
8    Q. Well, the way it reads there, it actually says
9       International Paper and Overnite Express.
10      Would I be correct? Just read that first
11      paragraph. Take a minute to do that.
12   A. (Witness complies.) Yes, it states that.
13   Q. And just so the record is clear, I mean the
14      first paragraph says, "This Amendment No. 1 is
15      made and entered into this 9th day of June by
16      and between International Paper and Overnite
17      Express as carrier." Correct?
18   A. That's what it states.
19   Q. Okay. And then under the witnesseth section,
20      it refers to the parties having previously
21      entered into a contract dated October 1st,
22      2007. Right?
23   A. Yes.
24   Q. Okay. And then there's an indication they
25      want to amend that particular contract.

## 49

1    Correct?
2    A. Because they're not working under the name of
3       Universal Am-Can, yes.
4    Q. Right. And now they go -- they go on to say,
5       "And, therefore, the parties agree as
6       follows," and it states, "effective June 13th,
7       2008, carrier will be operating under the name
8       Universal Am-Can, Limited, and SCAC UACL.
9       Correct?
10   A. Uh-huh, yes.
11   Q. And by the way, do you know what SCAC is?
12   A. It's a SCAC code that all carriers have. A
13      four-digit code. I don't know what the
14      acronym stands for.
15   Q. Okay. And is that for payment purposes?
16   A. It's -- it's how we actually name -- refer to
17      the carrier by their SCAC code quite regularly
18      for payment, for several reasons. But we use
19      the SCAC code to name the carrier.
20   Q. And Overnite Express' SCAC code was OXEN?
21   A. Yes.
22   Q. Okay. And then it goes on to say, "Universal
23      Am-Can, Limited, agrees to honor the rates and
24      fuel charge" -- "fuel surcharge established
25      between the company and Overnite." Correct?

## 50

1    A. Yes.
2    Q. Okay. And a couple lines down further it
3       says, "All other terms of the contract shall
4       remain and are in full force and effect."
5       Correct?
6    A. That's what it states.
7    Q. Okay. And the contract being referred to
8       there is the one alluded to up above, dated
9       October 1st, 2007. Correct?
10   A. Yes.
11   Q. And then it's signed by Mr. Mundy as manager
12      of sourcing motor procurement and dated
13      June 12th, 2008, on behalf of International
14      Paper. Correct?
15   A. Yes.
16   Q. And then it's signed by Mark Limback, the
17      president of Universal Am-Can, Limited, dated
18      June 10th, 2008. Correct?
19   A. Yes.
20   Q. From the materials you've reviewed, is it
21      correct that the contract that was in effect
22      on July 3rd, 2008, was the terms of the
23      contract between Overnite Express and
24      International Paper that had been entered into
25      on October 1st of 2007, as amended by this

## 51

1    Amendment No. 1?
2           MR. FISHER: Competence. Foundation.
3       You can go ahead and answer to your
4       understanding.
5    A. To my understanding, yes.
6    Q. (By Mr. Burke) From anything you've reviewed,
7       have you ever seen any other contract entered
8       into between Universal Am-Can and
9       International Paper prior to July of 2008?
10   A. There was the expired contract that occurred
11      before 2007, before the 2007 contract. No
12      other contract that I'm aware of.
13   Q. Okay. And my question referred to Universal
14      Am-Can. And are you answering --
15   A. I'm sorry.
16   Q. I think you're thinking of Overnite Express.
17   A. That's correct.
18   Q. Are you?
19   A. Yes, I'm thinking of Overnite Express.
20   Q. Okay.
21   A. I never heard of Universal Am-Can until the
22      time that they changed their name from
23      Overnite Express.
24   Q. Okay. And to your knowledge and from what
25      you've reviewed, you haven't seen any other

## 52

1       contract between International Paper and
2       Universal Am-Can that existed as of July 3rd,
3       2008, other than this October, 2007, contract
4       and the Amendment No. 1. Is that correct?
5    A. This is all I'm aware of. And from my role, I
6       would not have been privy to anything.
7    Q. Okay. And just to go back to what you alluded
8       to a moment ago. There was a -- there was a
9       2003 contract between International Paper and
10      Overnite Express that had expired prior to the
11      2007 contract. Correct?
12   A. Uh-huh, yes.
13   Q. Okay. Was there a 2005 contract, by the way?
14      Do you know?
15   A. No, not that I'm aware of. I do not know.
16   Q. Why don't I ask you to go back to the
17      International Paper Bates Stamped copy of the
18      October contract.
19   A. (Witness complies.)
20   Q. The -- let me just direct your attention to
21      page 38, which is the beginning of the
22      substance of the contract. Am I correct you
23      were not involved in actually negotiating the
24      terms of the contract?
25   A. No, I was not.

## 53

1  Q. Okay. But this was a contract that the terms
2     of which would have a bearing on the work you
3     were doing?
4  A. Yeah. We would use numerous carriers out of
5     our facility that we had, and each one had a
6     contract with them. And those would be
7     negotiated by the group in Memphis.
8  Q. Okay. And there's a -- on page 38, there's a
9     Section No. 1 that the term of the contract
10    was for two years. Correct?
11 A. Yes.
12 Q. And Section 2 there, it's entitled "Carrier
13    Status." And the carrier referred to there is
14    Overnite Express. Correct?
15 A. Yes.
16 Q. Okay. And is it your understanding that after
17    Amendment No. 1 was entered into, in June of
18    2008, that all references to carrier in this
19    contract would then refer to Universal Am-Can?
20 A. Yes.
21 Q. Okay. Then there's -- on the bottom of
22    page 38, in Section 3, there is a section that
23    talks about "Carrier's Obligations." Correct?
24 A. Yes.
25 Q. And you know, in Section A, there's a

## 54

1     reference to "Services." And it then refers
2     to the "services as set forth in Exhibit C."
3     Correct?
4  A. Yes.
5  Q. Okay. And I don't think there's an Exhibit C
6     here. Can you -- can you take a look and --
7  A. I think it just refers to another document.
8  Q. And if you look at page 53, there's a
9     reference to Exhibit C. Correct?
10 A. Yes.
11 Q. Okay. And it's entitled "Motor Carrier Rate
12    and Weekly Commitment Schedule." Correct?
13 A. Yes.
14 Q. Okay. Now, at the time -- and I guess number
15    one, what does that expression refer to?
16 A. It would be the point-to-point rate from
17    Hammond to the destination, and how many
18    shipments per week we expected the carrier to
19    commit to providing services to us for.
20 Q. Okay. And is -- and there's no actual
21    attachment of the -- of that schedule.
22    Correct?
23 A. Correct.
24 Q. Okay. And where is that schedule?
25 A. It would reside with the motor carrier group.

## 55

1     This -- I did not negotiate the contract. So
2     I would not have been involved in the document
3     itself. The facility would have received a
4     summary of the rates and the commitment
5     schedule for all of the carriers that we
6     reviewed. Usually that was done on a -- this
7     was done that year, in 2007.
8        So at that time, all the carriers
9     that serviced the Hammond distribution center,
10    I would have been given a listing of their
11    rates and weekly commitments. In the case of
12    Universal Am-Can, they serviced Minneapolis
13    for us on a standing -- what we called a pool
14    truck, standing -- standing service.
15 Q. Okay. And at the time this contract was
16    entered into with Overnite Express, would
17    there have been an actual rate and commitment
18    schedule attached to the contract?
19 A. Yes. I believe that document, that it's
20    referring to OXEN, Overnite Express, rate
21    schedule dot PDF is the attachment.
22 Q. Okay. And that's what I was getting at. Does
23    that document exist in a PDF that is not
24    actually attached to this exhibit as we have
25    it here?

## 56

1  A. I believe it would -- I am not privy to that.
2     I don't know.
3  Q. Okay. Who would know that?
4  A. Steve Mundy.
5  Q. Okay. And if you went, you know, tomorrow to
6     call Mr. Mundy and ask him for this, what
7     would you call it? How would you refer to it?
8     Exactly what's here?
9  A. Rate and commitment schedule.
10 Q. Okay.
11 A. That was negotiated with the contract.
12 Q. Okay. And then how about the size? You see
13    where it's talking about a certain size of
14    bites?
15 A. That would have been the size of the file,
16    that dot PDF file.
17 Q. That's the PDF. Okay. All right. And take a
18    look at page 39 of Exhibit 2. Do you have
19    that? And that's -- this is still part of
20    "Carrier Obligations" and it's Section 3E.
21    Correct?
22 A. Uh-huh, yes.
23 Q. Talks about minimum service level
24    requirements. Generally, what does that refer
25    to?

## 57

1   A. On time delivery to our customers.
2   Q. Okay.
3   A. And pickup.
4   Q. Well, I know F refers to on time delivery.
5       How about E? Is that any different, "Minimum
6       Service Level Requirement"?
7   A. I do not know. I did not negotiate that one.
8       It says for a commitment. It states what it
9       states. "Meet a minimum service level of
10      98 percent for the commitments described in
11      Section 7."
12          So if Overnite was -- had a
13      commitment of, say, six trucks a week going to
14      Minneapolis, they would have to be 90 percent
15      on meeting that commitment.
16  Q. 98 percent?
17  A. 98 percent. Excuse me.
18  Q. Okay. And then Section F refers to they have
19      to meet that commitment --
20  A. From an --
21  Q. -- on time --
22  A. -- on time delivery.
23  Q. Right. And then G specifies certain
24      information about the equipment that needs to
25      be used. Correct?

## 58

1   A. Yes.
2   Q. Okay. And then in Paragraph H it talks about
3       carrier personnel. Now, that carrier there is
4       referring to Overnite and then later
5       Universal. Correct?
6   A. It's -- carrier refers to Overnite and
7       Universal in the contract, throughout the
8       contract.
9   Q. Okay. And in the middle of that, in line
10      three, it states that "carrier's personnel
11      shall be fully qualified and shall procure and
12      maintain such licenses and permits as are
13      required by local, state, or federal laws and
14      regulations required to maintain and operate
15      the motor vehicle equipment." Correct?
16  A. Yes.
17  Q. And then it further states that "carrier's
18      personnel shall comply with applicable local,
19      state, and federal laws and regulations."
20      Correct?
21  A. That's what it says. Yes.
22  Q. Okay. And part of what the carrier's
23      personnel need to comply with are local,
24      state, and federal traffic regulations
25      concerning the operation of tractor-trailer

## 59

1   trucks. Correct?
2           MR. FISHER: Competence. Foundation.
3           MR. SCHRECK: I'll join in that.
4           MR. FISHER: You can answer.
5   Q. (By Mr. Burke) You can answer.
6   A. Can you restate the question?
7   Q. Sure. Part of what is referred to there is
8       the carrier's personnel shall comply with
9       applicable local, state, and federal traffic
10      laws and regulations in the operation of the
11      trucks that are hauling International Paper's
12      products. Correct?
13          MR. FISHER: Excuse me. Objection.
14      Form, competency, and foundation. And also I
15      take it you were not intending to read what
16      the words were? Instead you added an
17      adjective.
18          MR. BURKE: It wasn't a specific
19      quote.
20          MR. FISHER: Okay. All right.
21          You can go ahead and answer.
22          MR. SCHRECK: I'll join.
23  A. Yeah, it doesn't state traffic federal laws.
24      It states what it states. "Carrier's
25      personnel shall comply with applicable local,

## 60

1   state, and federal laws and regulations."
2   Q. (By Mr. Burke) Okay. And my question to you
3       is: Did International Paper believe that part
4       of what the -- this section included was that
5       the carrier's personnel would comply with
6       local traffic regulations with respect to
7       operating tractor-trailer trucks --
8   A. Any did.
9   Q. -- while hauling International Paper's
10      products?
11          MR. FISHER: Competence. Foundation.
12          You can go ahead and answer.
13  A. I think carrier -- a carrier has to follow the
14      regulations and traffic regulations and DOT
15      regulations of the road. So it would be our
16      expectation that they would, to provide -- to
17      deliver our product safely to our customers.
18  Q. (By Mr. Burke) And there's a section down in
19      J talking about that the carrier had to
20      provide International Paper with trailers that
21      were suitable for the safe and efficient and
22      damage-free transportation of your paper
23      products. Correct?
24  A. Yes.
25  Q. Okay. And if you read further, about three

## 61

1  lines down from the bottom of that same
2  paragraph, it says that those trailers have to
3  be in proper condition and have no mechanical
4  defects. Correct?
5  A. Yes.
6  Q. And then there were certain trailer pool
7  requirements, talking about the number of
8  trailers available, in Paragraph K. Correct?
9  A. Yes. And this -- it also says any live load,
10 if there's a live load.
11 Q. And what's that term mean to you,
12 Ms. Anderton?
13 A. It means that the -- the driver that's coming
14 to pick it up backs a trailer into the door
15 and we load their door while they are there
16 waiting.
17 Q. Okay.
18 A. We load -- load their trailer while they're
19 waiting.
20 Q. Okay. And a non-live load would be referred
21 to as what in your business?
22 A. A trailer is either left at the facility or
23 parked at a dock door, and we preload the
24 trailer before the driver comes with their
25 tractor to pick it up.

## 63

1  like this, where Universal apparently utilized
2  the services of Martin's, that International
3  Paper would only be paying Universal rather
4  than paying Martin's directly?
5      MR. FISHER: Excuse me. Could you
6  just repeat the first part of the question?
7      (The pending question was read by the
8  reporter.)
9      MR. FISHER: Thank you.
10 A. We would only pay Universal. Our contract was
11 with Universal. We had no dealings otherwise.
12 Q. (By Mr. Burke) Okay.
13 A. And we did -- transactionally, we paid
14 Overnite at the time because the system -- as
15 I said, we were in transition at the time. So
16 the system still said Overnite. But the
17 payment ultimately, from what I understand,
18 went to Universal. But the actual transaction
19 and bank code went to the -- to Overnite.
20 Q. Okay. And even though Martin's may have
21 physically been hauling the paper,
22 International Paper only had their contract
23 with Universal and International only paid
24 Universal?
25 A. Yes.

## 62

1  Q. In the beginning on the bottom of page 39,
2  Bates Stamped page 39, there's a section that
3  talks -- begins with "Compensation." Correct?
4  A. Yes.
5  Q. Okay. And one of the primary references there
6  is -- or initial references I should say, is
7  that the carrier will be compensated in accord
8  with Exhibit C that we've previously talked
9  about. Correct?
10 A. Yes.
11 Q. And then there's several other paragraphs that
12 talk about various types of compensation under
13 "Different Circumstances." Correct?
14 A. Yes.
15 Q. And then on -- you know, down on the bottom of
16 Bates Stamped page 40 of Exhibit 2, under
17 "Payment Terms," do you see Section 5? Are
18 you with me?
19 A. Yes.
20 Q. First paragraph, A, begins by saying, "Shipper
21 shall pay carrier such amounts as are due for
22 services performed hereunder within 45 days
23 after date of invoice." Correct?
24 A. Yes, that's what it states.
25 Q. Okay. And am I correct that in an instance

## 64

1  Q. Okay. You know, on page 41, if you could look
2  at it, Ms. Anderton, Section 6 talks about a
3  carrier's option to assign its accounts
4  receivable.
5  A. Uh-huh.
6  Q. And it can do so only with International
7  Paper's permission following a request with
8  30 days advance notice. Correct?
9  A. Yes.
10 Q. Okay. And basically what -- what circumstance
11 or situation is being referred to here?
12 A. My --
13      MR. FISHER: Excuse me. Competence.
14 Foundation.
15      You can go ahead.
16 A. I'm not absolutely certain. My understanding
17 would be is this would be in the case where a
18 carrier was using a service provider that
19 processed their payments. It would be a
20 third-party accounting service provider. So
21 if they needed our payments to go somewhere
22 else, we needed advance notice to be able to
23 accommodate that.
24 Q. (By Mr. Burke) Okay. Let me ask you to look
25 at page 42. There's a Section No. 7 called

## 65

1    "Commitments." Do you see that?
2    A. Yes.
3    Q. Okay. And "Commitments" appears to pretty
4       much be, at least in part, defined in the
5       first sentence of Section A where it says,
6       "Commitments means power units, tractors,
7       drivers, and trailer combinations"?
8    A. Yes.
9    Q. Okay. Does "Commitments," as you understand
10      it, mean both equipment, as well as personnel,
11      such as drivers?
12   A. It means that the carrier is committed to
13      providing the service so many days of the week
14      for us, doing -- for delivery.
15   Q. Okay. And throughout Sections A, B, C, and D
16      of Section 7, there are different obligations
17      set forth that the carrier must comply with in
18      terms of availability of equipment and having
19      watertight trailers. Correct?
20   A. Uh-huh.
21   Q. Amongst other things?
22   A. Yeah.
23   Q. Okay. And it's got some provisions for
24      liquidated damages in the event the carrier
25      cannot comply with the -- your requirements.

## 66

1    Correct?
2    A. Yes, they provide us, to protect our product.
3    Q. And then in Section 8, at the bottom of that
4       same page, that begins -- a section
5       entitled -- No. 8 entitled "Default by
6       Carrier." Correct?
7    A. That's what it states.
8    Q. Okay. And basically that section addresses a
9       number of different reasons for which
10      International Paper could terminate the
11      agreement with Overnite, or thereafter
12      Universal. Am I correct?
13   A. That is what it states, yes.
14   Q. Okay. And there's a number of different
15      sections set forth there, 8A through H.
16      Correct?
17   A. Yes.
18   Q. Okay. And I'm not quoting exactly, but A
19      talks about failure to comply with safety
20      rules at your facilities. Is that what that
21      is referring to?
22   A. Yes.
23   Q. Okay. And then the failure to comply with
24      on-time deliveries that we've discussed
25      earlier, correct --

## 67

1    A. Yes.
2    Q. -- in B? And F is -- refers to a failure to
3       maintain the required minimum insurance
4       coverage. Correct?
5    A. Yes.
6    Q. And G would permit Overnite -- excuse me, G
7       would permit International Paper to terminate
8       the agreement for noncompliance with federal,
9       state, or municipal laws and regulations.
10      Correct?
11   A. Yes.
12   Q. And then when you get into Section 9, that's
13      talking about various ways of -- I'm sorry.
14      Section 9 is entitled "Electronic
15      Communications Dispatch and Reporting."
16      Correct?
17   A. Yes.
18   Q. And in Section A -- or I should say in
19      Paragraph A of Section 9, the carrier, which
20      was either Overnite Express or Universal, was
21      required to have certain types of electronic
22      connectivity communications with International
23      Paper. Correct?
24   A. Yes.
25   Q. Okay. And, basically, that was for the

## 68

1       purpose of communicating and responding to
2       International Paper concerning transportation
3       of loads that you wanted delivered. Is that
4       right?
5    A. Yes.
6    Q. Okay. And then in Paragraph B, the carrier
7       was required to report pickup and delivery
8       events in a format specified by International
9       Paper. Correct?
10   A. Yes.
11   Q. Okay. And any requested reports had to be
12      sent to International Paper in a timely manner
13      and industry standard formats. Correct?
14   A. Yes.
15   Q. And then Section 10 talks about bills of
16      lading and freight receipts. Correct?
17   A. Yes.
18   Q. And that section only you -- only
19      International Paper could change or modify the
20      type of bill of lading that was used.
21      Correct?
22   A. Yes.
23   Q. Okay. And then in Section B, the carrier was
24      required to obtain a delivery receipt showing
25      the date of delivery and the goods delivered

## 69

1  and any exceptions that the customer had with
2  respect to the amount or condition of the
3  goods. Would that be correct?
4  A. Yes. In the EDI, they would report pickup and
5  delivery times to the customer. The proof of
6  delivery would be if there was a special
7  request for proof of delivery, they would have
8  to provide that within 24 hours. A POD would
9  be a special request.
10 Q. Let's just back up and explain those acronyms
11 to me again. The EDI?
12 A. That's the electronic communication between
13 our carrier and us that told -- told us when
14 they picked up the load and when they
15 delivered the load. So they needed to report
16 that to confirm on-time delivery.
17 Q. And they had to do that through the electronic
18 means that they were required to have.
19 Correct?
20 A. Yes.
21 Q. Okay. And we're talking about the carrier?
22 A. The carrier, yes.
23 Q. All right. And then -- and they had to do
24 that in any type of load. Correct?
25 A. Correct.

## 71

1  Q. Okay. And that's in Section 12 I should say,
2  under "Freight Loss or Damage." Right?
3  A. Yes.
4  Q. Okay. And then on the bottom of that Bates
5  Stamped page 44, there's a Section 13 entitled
6  "Insurance." Correct?
7  A. Yes.
8  Q. Okay. And in Section-- or the opening
9  paragraph requires the carrier to have the
10 insurance that is specified below as a minimum
11 amount. Correct?
12 A. Yes.
13 Q. Okay. And for Section A, it talks about
14 commercial auto liability insurance being
15 required in the amount of $1 million.
16 Correct?
17 A. That's what it states.
18 Q. And then on page 45, it requires cargo
19 insurance in Paragraph B. Right?
20 A. Yes.
21 Q. And then in Section C, there's a requirement
22 that the carrier have commercial general
23 liability insurance in an amount not less than
24 $1 million per occurrence. Correct?
25 A. The document states that, yes.

## 70

1  Q. And then the special circumstance would
2  require another communication to you?
3  A. A special circumstance might be the customer
4  says, "We didn't receive this pallet on the
5  truck," or they didn't get the delivery. Then
6  we'd make a special request to the carrier for
7  a proof of delivery. And they have 24 hours
8  to respond with a proof of delivery, which is
9  a signed document that has the customer's
10 signature saying that -- that shows that they
11 prove they delivered it to the customer.
12 Q. And how would that proof of delivery form be
13 communicated to you?
14 A. Electronically, typically, or a fax. E-mail
15 or a fax.
16 Q. Okay. And on page 44 of the contract, there's
17 various -- a provision about the carrier being
18 able to comply with DOT rules concerning
19 hazardous materials. Correct?
20 A. That is correct.
21 Q. Okay. And then you have some provisions
22 concerning obligations of the carrier when
23 there is a loss or a damage of your goods.
24 Correct?
25 A. Yes.

## 72

1  Q. Okay. And International Paper required that
2  the carrier also name International Paper as
3  an additional insured on that commercial
4  general liability policy. Correct?
5  A. That is what it states.
6  Q. Okay. And the carrier's policy was also to be
7  considered primary. Correct?
8  A. That's what the document states.
9  Q. Okay. And any other insurance that
10 International Paper might have was considered
11 to be excess, correct, excess to the carrier's
12 coverage?
13 A. I don't -- it says, "Recognizing any insurance
14 purchased by shipper as excess and
15 noncontributory."
16 Q. Correct. And then in Section F, there was
17 a -- there is a requirement that all insurance
18 acquired by the carrier had to be with
19 insurance carriers that had an A.M. Best
20 rating of not less than an A8. Correct?
21 A. I'm sorry, there was an ant on my page.
22 Q. Oh, okay.
23 A. Could you restate the question?
24 Q. Let me give you the question again. In
25 Paragraph F --

## 73

1    A. F.
2    Q. -- there is a requirement, as part of the
3       contract, that the insurance obtained by the
4       carrier, such as Overnite or Universal, had to
5       be obtained through an insurance carrier that
6       had an A.M. Best Rating of not less than A8.
7       Correct?
8    A. Insurance is not -- this is not my expertise
9       or area in which I would have negotiated. So
10      I can only read exactly what it says. So it
11      states with an A.M. Best Rating of not less
12      than A8.
13   Q. Okay.
14   A. I don't understand the interpretation of it
15      or ...
16   Q. Okay. Then in Paragraph G, that gave you the
17      right to withhold payments for a --
18   A. Lapse of insurance.
19   Q. -- lapse, exactly, in payments, and if they
20      did not obtain their required insurance.
21      Correct?
22   A. Yeah, this was a given, their insurance had to
23      be. And if that was handled -- if there was
24      any lapse, we would not use the carrier.
25   Q. Okay. And they had to actually attach

## 74

1       evidence of that insurance, as well. Correct?
2    A. Yes.
3    Q. Okay. And then in Section 14, it talks about
4       certain conditions of the use of intermodal
5       service. Correct?
6    A. Correct.
7    Q. Okay. What's that term intermodal service --
8    A. Intermodal is --
9    Q. -- mean to you?
10   A. -- is piggyback or it's cut -- it's a truck on
11      the rail. A truck that goes on the rail,
12      whether it's a trailer that drives on the rail
13      or it's a freight container that's on a
14      railcar. Intermodal is multiple services.
15   Q. Okay.
16   A. It would not have been applicable in this
17      instance.
18   Q. Okay. And then there's an indemnification
19      paragraph in Section 15 on page 46. Correct?
20   A. Yes.
21   Q. That, essentially, says that the carrier shall
22      indemnify defendant and hold harmless
23      International Paper from and against all
24      liability for injuries arising out of or in
25      connection with the performance of this

## 75

1       agreement by the carrier, its employees,
2       agents, or subcontractors. Correct?
3    A. Yes.
4    Q. But then it also says that that
5       indemnification obligation shall be reduced to
6       the extent of any injury to persons resulting
7       from any joint or concurrent negligence of
8       International Paper. Correct?
9    A. It says -- that's what it states.
10   Q. Okay. And then Mr. Elsholtz's name or
11      signature is contained on this page 46, as
12      well. Correct?
13   A. Yes.
14   Q. And then the contract in Paragraph 20 includes
15      a section entitled "Independent Contractor."
16      Correct?
17   A. Yes.
18   Q. And am I correct that that section reads that
19      "the carrier is and shall perform services
20      under this agreement as an independent
21      contractor"?
22   A. Yes.
23   Q. And it then states that "the carrier shall
24      solely direct all persons performing services
25      performed by carrier under this agreement and

## 76

1       such persons shall be and remain subject to
2       the exclusive control and direction of
3       carrier"?
4    A. That's what it states, yes.
5    Q. Okay. And as you've earlier told us, the
6       carrier is either referring to the Overnite
7       Express, or thereafter Universal. Correct?
8    A. Yes.
9    Q. And at the time of this instance, it would be
10      Universal?
11   A. Universal.
12   Q. And in terms of completeness, the last section
13      of that sentence says, "Under no circumstances
14      shall shipper be construed as having
15      responsibility for carrier's safety means or
16      methods"?
17   A. Yes.
18   Q. And there's a section about assignments in 21,
19      that there can't be an assignment of this
20      contract without written consent of the
21      parties. Correct?
22   A. Yes.
23   Q. But as far as you know and understand, that
24      Amendment No. 1 constituted an agreement for
25      an assignment of the terms of this contract --

JOAN ANDERTON                                                    APRIL 10, 2012

### 77

1  A.  To --
2  Q.  -- from Overnite Express to Universal --
3  A.  -- Am-Can, yes.
4  Q.  Okay.  And on the top of page 47, the sentence
5      I just quoted, that talks about carrier shall
6      solely direct all persons performing services
7      performed by carrier under this agreement and
8      such persons shall be and remain subject to
9      the exclusive control and direction of
10     carrier, that -- International Paper believed
11     that the carrier, Universal, was responsible
12     for their own employees who were making a
13     delivery or for any other persons who they
14     asked to make the delivery of your products?
15         MR. FISHER:  Objection.  Competency.
16     Form.  Foundation.
17         You can go ahead and answer.
18  A.  Yes, that would be my understanding, that they
19     took responsibility.  Yes.
20  Q.  (By Mr. Burke)  And then this is -- page 48 is
21     the signature page that I think we may have
22     already alluded to, signed by Mr. Crawford as
23     of November 12th, 2007.  Correct?
24  A.  48?  Yes.  Uh-huh.
25  Q.  Bates Stamped 48.

### 79

1  A.  The commercial contractual negotiation
2      purchasing function.
3  Q.  Okay.  And operations would refer to what?
4  A.  Execution.  Execution operations.
5  Q.  Okay.  Actually getting the product to the
6      people that --
7  A.  Yeah.
8  Q.  -- sourcing entered into agreements with?
9  A.  State that again.
10  Q.  Sure.  In very general terms, did operations
11     involve actually getting the product to the
12     customers with whom sourcing had contracted?
13  A.  Yes.
14  Q.  Okay.  And then there's various exhibits to
15     this contract.  Correct?
16  A.  Uh-huh.
17  Q.  And on 49, the carrier had to attach a copy of
18     their permit.  Correct?
19  A.  Yes.
20  Q.  And that's done so on page 50 for Overnite
21     Express?
22  A.  Yes.
23  Q.  And then B is the fuel index.  Correct?
24  A.  Index, uh-huh.
25  Q.  We talked about C before.  D is -- on page 54

### 78

1  A.  Yeah.  Bill Crawford.  Yes.
2  Q.  And then Mr. Crawford, for International
3      Paper; and then on behalf of Overnite Express,
4      Mr. Elsholtz, Kevin Hays, and Sandra Herman.
5      Correct?  On the right side of the page?
6  A.  Yes.  That's what it states, yes.
7  Q.  Okay.  And there's apparent signatures of
8      those names there.  Correct?
9  A.  Uh-huh, yes.
10  Q.  By the way, Mr. Crawford's title is described
11     as vice president of global sourcing for
12     International Paper Company.  Correct?
13  A.  Yes.
14  Q.  Okay.  Was he above or below you in the chain
15     of command?
16  A.  Different organization.
17  Q.  Different organization?
18  A.  We had a -- yeah.
19  Q.  Okay.  Just in terms of -- when you say that,
20     he would be what section or department or --
21  A.  I had a peer of his as my vice president, Bill
22     Merrigan.  So we were the operational group.
23     They were the sourcing group.
24  Q.  Okay.  And sourcing, within your company,
25     referred to what?

### 80

1      is entitled "Motor Carrier Vendor Profile."
2      What, essentially, is that?  Or what's its
3      purpose?  Page 54.
4  A.  Yeah, I know.  I'm just wondering if this is
5      actually part of that profile.
6  Q.  And is it included --
7  A.  Yes.
8  Q.  -- thereafter --
9  A.  General information about that carrier.
10  Q.  Right.  And that's set forth on pages 55 --
11  A.  Through 59.
12  Q.  -- through 59, yes.  By the way, on 59, do you
13     see that change log?  That's -- that's not --
14     that's prepared by Sandy Herman of Overnite
15     Express.  Correct?
16  A.  I do not know.  That's what it looks like, but
17     I do not know.
18  Q.  It's not an International Paper document?
19  A.  I do not -- I do not know, actually.
20  Q.  Okay.
21  A.  We do have carrier profiles.  So this could
22     have been printed from them.  I don't know.
23  Q.  Okay.  And then on page 60, the electronic
24     funds transfer, what is that and what is its
25     purpose?

81

1   A. That is who we would electronically pay for
2       the shipment, based upon the payment terms.
3   Q. All right. And —
4   A. But how — I'm sorry.
5   Q. Go ahead.
6   A. So this would be the accounts.
7   Q. Would be Overnite Express' account?
8   A. Yes.
9   Q. Okay. And then F is a sample of a bill of
10      lading. Correct?
11  A. Yes.
12  Q. But it's not actually attached here. It,
13      apparently, was a PDF?
14  A. Correct.
15  Q. Okay. And then H sets forth the electronic
16      compliance requirements that you discussed
17      earlier, which basically the electronic means
18      by which the carrier had to be able to
19      communicate with International Paper. Is that
20      right?
21  A. Yes.
22  Q. Okay. And that related the different
23      requirements about tender of a load, delivery
24      appointments, pickup date and time, arrivals,
25      reports, delays when it happens. Correct?

82

1   A. Uh-huh.
2   Q. You know on that page 63, while you have it in
3       front of you, the "Load Tender" section, do
4       you see that?
5   A. Yes.
6   Q. Okay. That "Load Tender" is referring -- or I
7       should say is that referring to International
8       Paper communicating to the Overnite or
9       Universal that there is a load available to be
10      transferred or to be delivered?
11  A. Yes.
12  Q. Okay. And the carrier was required to respond
13      within two business hours. Correct?
14  A. According to the contract, yes.
15  Q. Okay. And the carrier then had to make a
16      delivery appointment and let you know when
17      that appointment was scheduled?
18  A. These were standing deliveries. So in this
19      case, we were not involved in the
20      appointments. We gave them the delivery
21      hours, and they made the -- secured the
22      appointments with the customers. As long as
23      they delivered it that day, we were fine.
24  Q. Okay.
25  A. So it was a standing truck that was a daily

83

1       occurrence.
2   Q. Okay. For this delivery to the three
3       customers --
4   A. Yes.
5   Q. -- that was in progress at the time of this
6       crash?
7   A. Uh-huh.
8   Q. Okay. Is that yes?
9   A. Yes.
10  Q. Okay. And that standing delivery time frame
11      had previously been given from International
12      Paper to Overnite?
13  A. To Overnite.
14  Q. Okay. And do you recall what the terms of
15      that delivery time requirements were?
16  A. It was Friday for a Monday delivery or Friday
17      for a Tuesday delivery after a holiday. A
18      Thursday for Friday delivery. Wednesday for
19      Thursday delivery.
20  Q. Explain that again, if you would, please.
21  A. It was next-day delivery and pickup. Pickup
22      at the RDC for next-day delivery to our
23      customers.
24  Q. Okay. So, basically, the existing terms that
25      International Paper had given to Overnite and

84

1       were applicable to Universal were that the
2       carrier had to pick up the same day the load
3       was communicated?
4   A. Like I said, it was standing. So we only
5       would cancel with them if we weren't going to
6       use them.
7   Q. Okay.
8   A. So they were to assume that they had a load,
9       and we would cancel with them if they didn't.
10      And then we would send them specifics about
11      what the load was each day.
12  Q. Okay. And International Paper expected the
13      carrier to make that delivery within 24 hours,
14      did you say?
15  A. Yeah. Well, or for weekends it was the
16      next -- it was the next business day.
17  Q. Okay. And I think you referred to a holiday
18      situation --
19  A. This was the 4th of July weekend, my
20      understanding.
21  Q. Right. So the delivery would have to be made
22      when, then?
23  A. The next business day.
24  Q. Okay. The next business day. Okay. And then
25      under the "Arrival" section, did the carrier

JOAN ANDERTON                                          APRIL 10, 2012

---

85

1    have to transmit delivery confirmation
2    electronically within two business hours of
3    arrival at your customers?
4    A. Yes.
5    Q. And then if any other particular types of --
6    well, actually you had the right to require
7    reports to support continuous improvement
8    efforts in delivery to your customers.
9    Correct?
10   A. Yes.
11   Q. And the carrier had to provide you those
12   reports as required -- or when you requested,
13   I should say?
14   A. Yes.
15   Q. And then your on-time delivery performance
16   requirements are set forth in the bottom of
17   page 63. Correct?
18   A. Yes.
19   Q. And then in page -- on page 65, that's the
20   attachment where there is supposed to be a
21   certificate of insurance complying with
22   Article 13 in the contract. And it
23   specifically says, "International Paper must
24   be named as an additional insured." Correct?
25   A. Yes.

---

86

1    Q. Okay. And page 66, do you see that? That's a
2    certificate of -- or that's entitled
3    "Certificate of Liability Insurance."
4    Correct?
5    A. Yes.
6    Q. And the named insured, in the upper left box,
7    is Overnite Express. Correct?
8    A. Yes.
9    Q. Okay. And then now, the effective dates of
10   this policy are March 1st of '07 through
11   March 1st of '08. Correct?
12   A. Yes.
13   Q. And then down in the lower left, the
14   certificate holder box shows International --
15   or names International Paper. Correct?
16   A. Yes.
17   Q. And up above that, there's a sentence that
18   says, "The certificate holder named" -- or it
19   doesn't say that. But it says, "The
20   certificate holder is an additional insured on
21   the general liability policy." Correct?
22   A. That's what it states.
23   Q. Okay. All right. And then page 68 is --
24   appears to be a copy of an e-mail to Steve
25   Mundy of International Paper from Cathy

---

87

1    Szwast, S-z-w-a-s-t, dated June 6th, 2008. Is
2    that correct?
3    A. Yes.
4    Q. Okay. And that says -- the essence of the
5    e-mail is -- it states, "Mr. Mundy, please see
6    the attached for proof of liability and cargo
7    coverage." Correct?
8    A. Yes, that's what it states.
9    Q. And then the subject matter of the e-mail is
10   "Certificate of insurance hyphen Universal
11   Am-Can, Limited." Correct?
12   A. Yes.
13   Q. Does this e-mail appear to be one in which
14   Universal Am-Can is providing International
15   Paper with evidence of insurance, as
16   required under the contract?
17   A. Yes, that's what it appears.
18   Q. Okay. And is there any -- is there a copy of
19   that?
20   A. I don't know.
21   Q. Let me get to that. I think if we keep going,
22   it might be -- well, here let me just ask you.
23   Do you know where that -- if that insurance
24   coverage was provided?
25   A. I don't know.

---

88

1    Q. How about looking -- look at page -- pardon?
2    A. Well, there's something on page 74, but I
3    don't know if that's what that is.
4    Q. Yeah, and I was just going to take you to
5    there. Actually look at page 73 first. Do
6    you have that in front of you?
7    A. Yes.
8    Q. Okay. That's another e-mail dated June 6th,
9    2008, to Steve Mundy. Correct?
10   A. Yes.
11   Q. And it's from somebody at Overnite Express
12   named Rory Ostgulen, O-s-t-g-u-l-e-n?
13   A. Yes.
14   Q. Okay. Do you know Mr. Ostgulen?
15   A. No, I do not.
16   Q. Okay. And essentially that e-mail
17   communication says, "Steven, the attachment
18   will give you the certificates and
19   authorities. I'm having corporate send you an
20   insurance certificate naming International
21   Paper as the certificate holder." Is that
22   correct?
23   A. That is what it states.
24   Q. Okay. And then on page 74, there's a document
25   entitled "Certificate of Liability Insurance."

89

1    Do you see that?
2    A. Yes.
3    Q. Okay. And the top left producer is Cherokee
4    Insurance Company. Insured is Universal
5    Am-Can. Correct?
6    A. Yes.
7    Q. And there's a reference to a general liability
8    policy for $1 million between the effective
9    dates of January 1st, 2008, and January 1st,
10   2009. Is that correct?
11   A. Yes.
12   Q. Okay. Do you know if -- if this policy is
13   supposed to be the policy that Universal was
14   going to add International Paper as an
15   additional insured?
16      MR. FISHER: Competency. Foundation.
17   A. Yeah, I, personally, wouldn't know.
18   Q. (By Mr. Burke) Who would know that at
19   International Paper?
20   A. It was -- the e-mail was directed to Mr. Mundy
21   and whoever Rory Ostgulen states. It looks
22   like this was provided with it, but I was not
23   privy to those communications.
24   Q. Okay. And by the way, on this particular form
25   certificate, down in the lower left, the

90

1    certificate holder box it is blank. Correct?
2    A. Is blank, yes.
3    Q. Okay. Let me back you up to page 69, just
4    because we skipped over a couple of pages to
5    deal with the insurance topics we were talking
6    about. That's a letter from Mark Limback,
7    president of Universal Am-Can. Correct?
8    A. Yes.
9    Q. And it's addressed -- it's on Universal Am-Can
10   letterhead. Right?
11   A. Yes.
12   Q. Okay. And it's directed or addressed, quote,
13   To the valued customers of Overnite Express,
14   Inc., end quote. Correct?
15   A. Yes.
16   Q. And it goes on to say that Overnite Express
17   has joined their team and that they now have a
18   partnership. And then in the lower part of
19   that paragraph, am I correct Mr. Limback is
20   saying that, "As of June 13th, 2008, your bill
21   of lading should reflect Universal Am-Can,
22   Limited, as the carrier, and thus all invoices
23   will reflect such along with our remittance
24   address. And following is a copy of insurance
25   and authority for your records." Is that --

91

1    A. That is what it states.
2    Q. Okay. Was this letter being sent to
3    International Paper?
4    A. I don't know. It appears that way, yes.
5    Q. Okay.
6    A. But I don't -- I do not know. It looks like
7    they sent it to all of their customers so ...
8    Q. Okay. And then with -- and then on the
9    following page, 70, there's a W9 tax ID for
10   Universal Am-Can. Correct?
11   A. Yes.
12   Q. And did International Paper have to have those
13   from its carriers?
14   A. I don't -- I don't know.
15   Q. Okay. And then on page 71, there's a copy of
16   Universal Am-Can's carrier's authority as a
17   common carrier issued by the Interstate
18   Commerce Commission in 1983. Correct?
19   A. Yes.
20   Q. And then page 72, there's a -- that's a copy
21   of Universal Am-Can's contract carrier
22   authority issued by the Interstate Commerce
23   Commission in June of '85. Correct?
24   A. That's what it states.
25   Q. How about page 75? What is that document?

92

1    A. It looks like a transaction from our SAP
2    system, but I don't -- I do not know.
3    Q. From your what system?
4    A. SAP. It's on the top right, it says "SAP,"
5    which is our financial system, and has
6    Universal Am-Can listed as an external freight
7    carrier.
8    Q. Okay. And what's the significance of that?
9    A. This would be a -- it says, "Central vendor
10   request change." So it would be a transaction
11   in our SAP system, which I did not do. So I
12   don't know exactly what they were doing here.
13   But it looks like it's -- they're putting the
14   bank data in for Universal Am-Can.
15      MR. FISHER: Rich, is now a good
16   time --
17      MR. BURKE: Sure.
18      MR. FISHER: -- to take a break?
19      MR. BURKE: Sure. Yeah.
20      (A recess was taken.)
21   Q. (By Mr. Burke) Ms. Anderton, let me ask you
22   to look at Exhibit 1. Do you have that in
23   front of you, or no? Why don't you get
24   Exhibit 1 again. There's a few things I want
25   to ask you about there. How about page 67?

93

1    Am I correct that that's a letter from Gina,
2    G-i-n-a, Hubbs, H-u-b-b-s, vice president of
3    Universal Am-Can, to International Paper,
4    dated May 21st, 2008?
5    A. That's what it looks like.
6    Q. Okay. And that letter essentially, or at
7    least in part says, "Dear, customer, Overnite
8    Express will be operating under Universal
9    Am-Can, Limited's insurance and authority as
10   of June 13th, 2008, based on an agreement to
11   partner with their organization." Correct?
12   A. Yes.
13   Q. Okay. It goes on to say, "All bill of ladings
14   should reflect Universal Am-Can, Limited, as
15   the carrier." Correct?
16   A. That is what it states.
17   Q. And it goes on to say, "Therefore, invoices
18   for freight moved will come from Universal
19   Am-Can, Limited, with a remittance address in
20   Cincinnati, Ohio." Correct?
21   A. Yes.
22   Q. Am I correct that Overnite, and thereafter
23   Universal, would send International Paper an
24   invoice for the freight?
25   A. On these type of freights, they may send an

94

1    invoice. But we actually would auto -- auto
2    pay it.
3    Q. Okay.
4    A. So it would -- we didn't process their
5    invoices. We would process the payment. And
6    then if there was a dispute, they would ...
7    Q. And then the second paragraph of this letter,
8    which if I didn't say it, is dated May 21st,
9    2008. Am I correct it says, "Please consider
10   this letter as an assignment of the current
11   contract you have in place for Overnite
12   Express. Universal Am-Can, Limited, agrees to
13   accept the rates and fuel surcharge
14   established between your company and
15   Overnite." Is that accurate?
16   A. That's a letter that they sent, yes.
17   Q. Okay. And what I mean, is that an accurate
18   statement of what the letter says?
19   A. That's what -- that's what it says, yes.
20   Q. Okay. There's a spot where Mr. Mundy -- for
21   Mr. Mundy to sign on the right. And I -- I
22   should say the final letter -- or final line
23   of the letter says, "Please sign below as to
24   your acceptance regarding the contract and
25   rate assignment."

95

1    Do you know if Mr. Mundy signed a
2    copy of this?
3    A. I do not know.
4    Q. Okay.
5    A. The addendum was a result of that I thought.
6    Q. Okay. The --
7    A. Not necessarily signed --
8    Q. -- the addendum or ...
9    A. The addendum to the 2007 contract.
10   Q. Right. I guess I should call it Amendment --
11   A. Amendment, sorry.
12   Q. Amendment No. 1?
13   A. Amendment, yes.
14   Q. I knew what you meant. Amendment No. 1 you
15   believe resulted from this communication?
16   A. Yeah, or something -- I can't say whether -- I
17   didn't receive this letter. Steve Mundy would
18   have received it. So I cannot say what he
19   would have done. But that's -- this would be
20   the timing of it.
21   Q. Okay. And then page 68 is an e-mail from Rory
22   Ostgulen of Overnite Express to Steve Mundy,
23   referring to attachment of a notification
24   letter and assignment letter per your request.
25   Is that right?

96

1    A. Yeah. This looks similar to the other letter.
2    Q. Okay. And it also adds a line at the bottom
3    saying, "I'm working on the authority and
4    insurance certificates and will forward them
5    ASAP"?
6    A. Uh-huh.
7    Q. That's a yes?
8    A. Yes.
9    Q. Okay. And page 69 is a copy of that -- looks
10   like another copy of the June 6th e-mail we
11   talked about earlier --
12   A. Uh-huh.
13   Q. -- from Cathy Szwast to Mr. Mundy, attaching
14   proof of liability insurance coverage and
15   cargo coverage for Universal Am-Can?
16   A. Yeah.
17   MR. BURKE: Carl, do you know what
18   exhibit number we're on?
19   MR. FISHER: I do. 99's the next
20   one.
21   MR. BURKE: Thank you.
22   (Deposition Exhibit No. 99 was marked
23   for identification.)
24   Q. (By Mr. Burke) Ms. Anderton, let me tender to
25   you what I've marked as Exhibit No. 99, which

JOAN ANDERTON                                                          APRIL 10, 2012

### 97

1    purports to be International Paper's Answers
2    to Plaintiff's Interrogatories and a
3    certificate of service. Why don't you take a
4    look at that for a minute --
5   A. Uh-huh.
6   Q. -- and tell me if that's your signature page
7    on the last page when you get to it.
8   A. Yes, that's my signature.
9   Q. Okay. And are the answers you have given here
10   true and correct?
11  A. Yes, to the best of my knowledge, yes.
12  Q. Okay. And in your answer to Question No. 1,
13   am I correct that you are saying that
14   International Paper generated the bills of
15   lading or memo bills for the loads that were
16   transported by Mr. Franke at the time of this
17   occurrence, most of that's on the second page
18   of --
19  A. Yeah.
20  Q. -- your answer? Okay. Is that correct?
21  A. Can you restate your question?
22  Q. Sure. If I understand your answer, I
23   believe -- is it true that you are saying that
24   International Paper generated the bills of
25   lading or memo bills for the loads that were

### 98

1    being transported by Sam Franke?
2   A. Yeah. Actually Exel -- Exel did, as a service
3    provider for us, yes.
4   Q. And Exel did so at --
5   A. International Paper.
6   Q. -- the request of International Paper?
7   A. Yes.
8   Q. Okay. And, you know, the term "generated the
9    bills of lading," what do you mean by that?
10   Created them or --
11  A. Created them, printed them out.
12  Q. Okay. I'll come back to that in a moment.
13   Just while you have these in front of you, you
14   know, in -- take a look at your answer to
15   Question No. 7, please.
16  A. Okay. This is -- these were prepared, and
17   then I signed in agreement of them.
18  Q. Correct.
19  A. Okay.
20  Q. And they were prepared by Mr. Fisher, and his
21   name's on there?
22  A. Uh-huh, yes.
23  Q. But have you read them --
24  A. Yes.
25  Q. -- and do you agree --

### 99

1   A. Yes. And I --
2   Q. -- they are accurate?
3   A. Yes.
4   Q. Just look at your answer to No. 7, please.
5   A. Uh-huh.
6   Q. Okay. When you say this was a routine run by
7    Sam Franke, was it a routine run for a
8    delivery to all three of those -- of the
9    customers?
10  A. No. It was not -- it was a routine run to
11   Minneapolis.
12  Q. Okay.
13  A. From Hammond to Minneapolis.
14  Q. Okay. So Mr. -- or so Mr. Franke was making a
15   regular run to Minneapolis for International
16   Paper how often? Five days a week or --
17  A. Restate your question. Because the
18   question -- the statement states, "Identify
19   the name, address, job title, and employer of
20   any persons from International Paper who
21   communicated with any dispatcher or
22   representative of Martin's Bulk Milk Service."
23    And, no, nobody from International
24   Paper communicated to them.
25  Q. Nobody communicated with --

### 100

1   A. Martin -- with -- with any dispatcher or
2    representative of Martin's Bulk Milk Service
3    concerning the -- concerning the
4    transportation of the cargo.
5   Q. Okay.
6   A. Only after the fact did we find out that this
7    was a routine run by him from -- because of
8    the proceedings.
9   Q. Okay. So as far as you know, you didn't know
10   anything about Mr. Franke making this run
11   every day?
12  A. No.
13  Q. Okay. Was it a routine run or route for
14   Universal to be making for International Paper
15   to Minneapolis?
16  A. It was routine that we would have Universal
17   haul our freight from Hammond, Indiana, to
18   Minneapolis.
19  Q. Okay. And when you say "routine," what was
20   the schedule?
21  A. It was the -- based upon the commitments that
22   we had in our contract. And they had five or
23   six commitments per week to execute what we
24   called our Minneapolis pool truck.
25  Q. Minneapolis pool --

## 101

1  A. Pool truck. We called it a pool truck. We
2     had several pool truck routes, and Minneapolis
3     was one of them.
4  Q. Okay. And that commitment by Universal, to
5     make a run to Minneapolis five or six times a
6     week, was for the transportation of your
7     products to multiple different customers?
8  A. In Minneapolis.
9  Q. Okay.
10 A. Multiple. And so any given day, it could have
11    been any one of them, or up to three or four
12    of them could be on the truck.
13 Q. Okay. Including the three that happened to
14    have --
15 A. Yes. Orders that day.
16 Q. Thank you. Orders that day?
17 A. Uh-huh.
18 Q. Okay. And for how long had that regular run
19    or route been in effect?
20 A. As far as I know it was in effect from the
21    time I took the position, in 2004, and it had
22    been ongoing -- ongoing for years prior to
23    that. But different carriers would be used at
24    different times for that pool truck.
25 Q. Okay.

## 102

1  A. Based upon who our current contracted carrier
2     was that had the commitments.
3  Q. Okay. And for how long had Overnite been the
4     committed carrier for that run?
5  A. I don't -- I don't recall. And they may have
6     been a carrier prior to when I was in the
7     position. The facility has been in place
8     since '96 and probably shipped to Minneapolis
9     since '96. But I don't know who the
10    carrier -- the sequence of carriers were --
11 Q. Okay.
12 A. -- over that time.
13 Q. And but you know that it was Overnite going
14    back at least how far?
15 A. I know at this time Overnite was the carrier.
16    While I was in my position, we had two other
17    carriers at different times doing this run.
18    So I don't know how far Overnite went back.
19 Q. Okay.
20 A. They had been doing it for a while, but I
21    don't how -- how long.
22 Q. And it would be at least back to October of
23    2007?
24 A. Correct.
25 Q. Okay. And maybe even earlier because there

## 103

1     were earlier contracts?
2  A. I mean, yeah, they were a carrier for that
3     facility or IP in 2003. But I don't know if
4     they were on and off or what the history was,
5     as far as that particular route.
6  Q. Okay. And Universal took over that -- that
7     run pursuant to their assignment of the
8     contract?
9  A. That is correct.
10 Q. Okay. And the run or route had originally
11    been created by International Paper, correct,
12    for the five or six days International Paper
13    needed to have their --
14 A. Yeah, their requirement to pick up goods from
15    Hammond, Indiana, and deliver in Minneapolis
16    was specified by International Paper.
17 Q. Okay. And then the Exel company that you
18    mentioned, what did they do for International
19    again?
20 A. They operated the Hammond RDC on behalf of IP
21    for us. They were our subcontractor that
22    operated the facility.
23 Q. Okay. And International Paper owned that
24    facility. Correct?
25 A. We leased the building and the product in the

## 104

1     building was all ours. But we didn't own the
2     facility.
3  Q. Okay. You leased it from whom? Do you know
4     or --
5  A. The name just popped out of my head. We could
6     follow up with it but -- I can picture the
7     gentleman who represents them.
8  Q. Okay. If it comes to you later --
9  A. I don't know.
10 Q. -- tell me.
11 A. Uh-huh.
12 Q. So International Paper leased the facility
13    that they called International Paper's Hammond
14    warehouse?
15 A. Yes.
16 Q. In Hammond, Indiana?
17 A. Yes.
18 Q. And then International Paper subcontracted to
19    have Exel personnel --
20 A. Operate --
21 Q. -- operate --
22 A. -- the facility.
23 Q. -- the facility. And that -- what did that
24    operation actually consist of? What do you
25    mean by that?

JOAN ANDERTON                                                    APRIL 10, 2012

## 105

1    A. Primarily warehousing operations, receiving
2       and shipping of -- receiving and shipping of
3       product out. By shipping, I mean loading
4       trucks and producing documents for shipping of
5       product.
6    Q. Okay. And whatever product was shipped out
7       was being shipped out pursuant to the
8       instructions of International Paper. Correct?
9            MR. FISHER: Objection to form.
10   A. Yeah, could you restate that again?
11   Q. (By Mr. Burke) Sure. Whatever paper products
12      got shipped out or loaded onto trucks by
13      Exel personnel was done so pursuant to
14      instructions from International Paper?
15   A. Yeah. Shipping is a very broad term. So if
16      you're on the transportation side, shipping
17      means the actual transportation. By shipping
18      in the warehouse, it means the shipment
19      process, meaning I picked the goods, I load
20      the goods onto the trailer, and I produce the
21      documents for it to be ready to ship. So,
22      yes, we used the folks in Indiana to do that
23      process -- that process of shipping.
24   Q. Okay. And all -- yeah, and what I was getting
25      at is probably exactly what you described.

## 106

1       The gathering of International Paper products
2       in the Hammond warehouse and putting them onto
3       a truck for shipment to your customers, that
4       was done pursuant to instructions by -- from
5       International Paper?
6    A. Yes, pursuant to our contract with them.
7    Q. And when paper products would be brought into
8       the Hammond warehouse for storage, would they
9       be brought from International Paper mills?
10   A. Primarily at mills or converting facilities.
11   Q. Okay. And would they be brought there by
12      International Paper's own trucks?
13   A. Mostly by carriers.
14   Q. Carriers?
15   A. Our carriers. Or rail. We were about
16      40 percent inbound rail.
17   Q. You know, there's a reference to -- and look
18      at your answer to page -- the, Question
19      No. 11. There's a loading -- there's a
20      reference -- I'm sorry. You tell me when
21      you're done looking at it. Take your time.
22   A. Okay.
23   Q. Okay. It says, "After his truck was loaded,
24      Mr. Franke received a loading sheet from an
25      Exel employee, Melisio Muros."

## 107

1       The loading sheet that is referred to
2       there, what --
3    A. It's a document that's used to -- for when
4       they load the truck.
5    Q. Okay. The Digital Logistics --
6    A. From Red Prairie, uh-huh.
7    Q. From Red Prairie?
8    A. Uh-huh.
9    Q. Okay. And that, basically, designates the
10      location in the trailer for the different
11      pallets, depending on how --
12   A. Correct.
13   Q. -- it's going to be offloaded?
14   A. Correct. It's the stop sequence.
15   Q. And then that's separate than the memo bills
16      that you also referred to. The memo bills is
17      basically the same as a bill of lading?
18   A. Yes.
19   Q. Okay. It refers to a memo bill containing
20      boilerplate bill of lading delivery
21      instructions from Exel employee Crystal
22      Cousins. What's -- what's the boilerplate
23      instructions you're referring to?
24   A. If you look at them, they have standard text
25      that pretty much gave information on delivery

## 108

1       hours and when the customer was open and if
2       they should call a customer for an appointment
3       or -- it was pretty much standard how that
4       customer required their -- their service.
5    Q. Okay. And is that in the notes section of
6       those bill of ladings? Or are you talking
7       about the fine print down on the bottom? And
8       we can look at one.
9    A. Yeah, it's in ...
10   Q. In the notes section there?
11   A. Yeah, here.
12   Q. Okay. I'm going to get to that in a moment.
13      Well, while we're on that, I guess whatever
14      those notes were, that -- those are delivery
15      instructions for that particular customer of
16      International Paper. Correct?
17   A. Yes.
18   Q. And those delivery instructions pertain to
19      times of delivery when they receive shipments
20      or when their docks are open and available for
21      deliveries to be made?
22   A. Yes.
23   Q. Okay. And International Paper got that
24      information from their customers when they
25      start -- first started delivering to them.

JOAN ANDERTON                                                    APRIL 10, 2012

---

**109**

1  Correct?
2  A.  Correct.  Our customer service group would
3  have gotten them.
4  Q.  Okay.  And when you say it's boilerplate
5  language, it's -- you mean it's language that
6  was used repetitively for that particular
7  customer?
8  A.  Yeah.
9  Q.  Okay.  And that information was obtained and
10  agreed to originally by International Paper.
11  Correct?
12  A.  Yes.
13  Q.  Okay.  And then who's Crystal Cousins?
14  A.  She's an Exel employee that worked the window
15  where the drivers would come in.  She did the
16  paperwork.
17  Q.  Okay.  And she didn't make the decision on
18  these delivery instructions.  Correct?  She
19  just followed --
20  A.  She just --
21  Q.  -- the information --
22  A.  Correct.  She printed out the documents.
23  Q.  That had originally been created by
24  International Paper as to when your particular
25  customer wanted to receive deliveries?

---

**110**

1  A.  For customer requirements, yes.
2  Q.  Okay.  And just as long as we're on this --
3  these interrogatories, let's finish up with
4  No. 12.  Take a look at that and tell me when
5  you've had a chance to read --
6  A.  Okay.
7  Q.  -- your answer, please.
8  A.  Okay.
9  Q.  You make reference to -- you make reference to
10  the Overnite Express contract having been
11  assigned or taken over by UACL.  That's all
12  based on the documents we went through earlier
13  this morning.  Right?
14  A.  Yes.
15  Q.  Okay.  And when you say issued payments to
16  UACL at its newly acquired Overnite Express
17  Minnesota facility, do you mean the facility
18  that now UACL owned or had taken over, that
19  used to be --
20  A.  Yes, we paid Over --
21  Q.  -- Overnite Express?
22  A.  Yes.
23  Q.  Okay.  So you would issue payments to UACL and
24  then -- at that Minnesota address.  What do
25  you mean when you say an information and

---

**111**

1  belief UACL's Minnesota office then issued a
2  check to a UACL payment center in Ohio, that
3  included payments made by IPC to UACL's
4  Minnesota address for the transportation of
5  International Paper's goods?
6  A.  Our systems are still in transition after the
7  change from Overnite to UACL.  So we had
8  not -- for whatever reason, had not yet been
9  given direction or executed direction when we
10  needed to use the new SCAC code on the
11  paperwork.
12        So our bill of lading said OXEN on
13  it.  And the processing of the payment went to
14  the Minneapolis location.  And then it was
15  only our understanding, after producing
16  documents here, that that payment actually
17  went -- Overnite paid it to -- or Minnesota
18  then transferred it to the Cincinnati office.
19  But if you look at our SAP documents, it was
20  still set up for Overnite to make payment.
21  But we have proof of payment.
22  Q.  And I think I already asked you, but that is
23  your signature on the verification --
24  A.  Yes.
25  Q.  -- page.  Correct?

---

**112**

1  A.  Yes.
2  Q.  All right.  Let -- let's look at those bills
3  of lading for a minute.  Take a look at
4  Exhibit No. 1.  And I think page 1 is one of
5  the first -- am I correct in Exhibit 1, Bates
6  Stamped UACL/OEI page 1, is a memo bill dated
7  July 3rd, '08, for a shipment of International
8  Paper printing paper to Midland Paper Company
9  in Minneapolis?
10  A.  Yes.
11  Q.  Okay.  And, you know, let me ask you, what
12  does -- in your business, what does a bill of
13  lading or a memo bill -- I mean what -- what
14  is its intended purpose?
15  A.  It is a document that describes what -- what
16  the instructions are for delivering to a
17  customer.  And it's used -- we provide it to
18  our carrier for them to use in that process.
19  And it -- and it also must specify the weight,
20  to make sure we have proper weight on the
21  truck.
22  Q.  Okay.  And these memo bills, I think you
23  earlier told me, were created by -- or
24  generated by International Paper?
25  A.  Yes.

---

### 113

1    Q. Okay. And the paper that is being referred to
2       here, that's under "Commodity." Correct?
3    A. Correct.
4    Q. Printing paper --
5    A. Yes, printing paper.
6    Q. Okay. And that's your International Paper
7       goods that are being shipped or delivered to
8       Midland. Correct?
9    A. Yes.
10   Q. Okay. How about -- you know, after printing
11      paper, what are those numbers, the 2621345?
12   A. I do not know.
13   Q. And then in the notes --
14   A. I believe that's a standard commodity code,
15      but I do not know.
16   Q. Okay. And then as you referred to it, there's
17      a weight for that amount of paper. Correct?
18   A. Yes.
19   Q. There were 56 cartons?
20   A. Uh-huh.
21   Q. And then were those 56 cartons on five
22      different pallets? Is that what --
23   A. Pallets or skids, uh-huh.
24   Q. Okay. And then the notes section, that's the
25      delivery information that you earlier were

---

### 114

1       referring to. Correct?
2    A. Yes.
3    Q. Okay. And each customer of yours had their
4       own schedule as to when they wanted to receive
5       deliveries. Correct?
6    A. Yes.
7    Q. Okay. And you obviously tried to accommodate
8       that schedule?
9    A. We would provide that information, yes.
10   Q. Okay. And in addition to specifying receiving
11      hours, you told the carrier who to contact at
12      customer service at Midland and gave them a
13      name and a phone number. Correct?
14   A. That's what the -- yeah, that's what we did in
15      this case.
16   Q. Okay. Okay. And then as you referred to a
17      moment -- a number of times, carrier's
18      designated as OXEN, even though you considered
19      it to be Universal as of this date, July 3rd,
20      2008?
21   A. Yes.
22   Q. Okay. And now, there's Sam Franke's signature
23      is in the upper right?
24   A. Yes.
25   Q. What's that indicate?

---

### 115

1    A. The carrier takes possession of the goods at
2       the time they pick it up from the plant. So a
3       driver's signature is saying they have taken
4       possession of this load at the point that they
5       leave the facility. So he's signing to say
6       that this is -- I take possession of this
7       product.
8    Q. Okay. Under the contract that existed on
9       July 3rd, '08, with Universal, did
10      International Paper believe that Universal was
11      entitled to have some other carrier transport
12      your product, other than a Universal driver?
13         MR. FISHER: Excuse me. Is your
14      question does she believe International Paper
15      believed that? Or does she believe that, as
16      an employee of International Paper?
17   Q. (By Mr. Burke) My question was as to
18      International Paper.
19         MR. FISHER: Object to form.
20         You can go --
21   A. Yeah, I think I can only answer it as myself.
22   Q. (By Mr. Burke) Okay. And answer it on behalf
23      of yourself then.
24   A. The contract was with Universal Am-Can to --
25      for them to provide transportation services

---

### 116

1       from Hammond to Minneapolis. And we would
2       have owner operators come to our facility, and
3       we'd have different representatives of that
4       carrier come to the facility to provide the
5       service. So we hired -- we had the contract
6       with Universal Am-Can to provide the service.
7       How they chose to provide that service was
8       Universal Am-Can's decision.
9    Q. Okay. And a moment ago, when you said
10      Universal would have different representatives
11      come to your facility to pick up the loads,
12      did you mean different representatives of
13      Universal?
14         MR. FISHER: Excuse me. Objection to
15      form. I think that mischaracterizes what she
16      said. I don't think she associated it with
17      Universal Am-Can.
18         But you can go ahead and answer.
19   A. Our driver would come to the door with a
20      shipment number, which basically was the
21      authorization from the carrier. It was kind
22      of the magic password that they could use to
23      say, "Hey, I'm here for shipment number
24      so-and-so, to pick it up." That because they
25      had that number, they were hauling the freight

---

**117**

1    that Universal Am-Can had been tendered to,
2    the freight -- that it had been tendered to
3    Universal Am-Can. So they had come to pick up
4    that load for them.
5         So who they were was not -- we didn't
6    know whether they were a -- an employee,
7    whether they were another company on behalf of
8    them. We gave the load to them because they
9    had the shipment number.
10   Q. (By Mr. Burke) Okay. And whatever driver
11   appeared at the Hammond facility, as a
12   representative of Universal, would be given
13   the load if they had that shipment number?
14   A. Yes.
15   Q. Okay. And where would they get the shipment
16   number from?
17   A. I'm not sure where they -- the individual
18   would have gotten the shipment number. We
19   provided that shipment number to Universal
20   Am-Can.
21   Q. Okay. And whoever that representative was,
22   whether it be an employee of Universal or an
23   employee of Martin's or any other carrier,
24   International Paper expected that driver to
25   comply with the terms of the contract that had

---

**118**

1    been entered into between International Paper
2    and Universal. Correct?
3    A. Because that's who we tendered that freight
4    to, yes.
5    Q. Okay. How about Exhibit 2, Ms. Anderton?
6    That's the bill for Xpedx. Correct?
7         MR. SCHRECK: Are you referring to
8    Exhibit 2 or page 2 of the --
9    A. Page 2, Exhibit 1.
10   Q. (By Mr. Burke) Page 2 of Exhibit 1. Thank
11   you. You know, by the way is there a back
12   side to these bills of lading?
13   A. I -- I do not know. I have not been in the
14   facility and I haven't physically seen these.
15   So I do not know. I do know that they're just
16   printed on white paper, and I do not imagine
17   them being double-sided printed. So that's --
18   I do not know.
19   Q. Okay. Where would the original of, like, any
20   one of these bills of lading be?
21   A. I know that this file -- I know the file for
22   this was held -- is held by the person who is
23   in my former position. Exel provided it to
24   Bill Travis. He was just given the documents
25   to hold onto, is my understanding.

---

**119**

1    Q. Okay. That's Bill Travis, did you say?
2    A. Bill Travis, yeah.
3    Q. Okay. And what's his job?
4    A. He's the EDM, enterprise distribution manager,
5    currently.
6    Q. For --
7    A. Central --
8    Q. -- International Paper?
9    A. Yes.
10   Q. Which would include the Hammond warehouse?
11   A. Yes.
12   Q. Okay. Where is Mr. Travis' office?
13   A. He's based in Memphis.
14   Q. Memphis? Okay.
15   A. He took over that position mid year last year.
16   Q. Okay. And then Exhibit 3 is --
17        MR. FISHER: Excuse me, page 3?
18        MR. BURKE: Page 3. Thank you.
19        MR. SCHRECK: Exhibit 1.
20   Q. (By Mr. Burke) Page 3 of Exhibit 1 --
21   A. Oh, can I make one correction?
22   Q. Yes, you can.
23   A. You asked where the originals of this, the
24   originals of the copy for the Hammond
25   distribution center would be in Bill Travis'

---

**120**

1    recollection. But this is from -- I believe
2    these were submitted by Universal Am-Can and
3    were the carrier's copy. There's always
4    multiple copies of the bill of lading
5    produced. So I just wanted to clarify there.
6    This -- the original here, I'm not sure. I
7    assume the carrier would have that.
8    Q. Okay. But International Paper has an original
9    of their ...
10   A. Executed bill of lading, yeah.
11   Q. Executed bill of lading.
12   A. Yes.
13   Q. Okay.
14   A. I just -- I just -- when I realized that it
15   was probably -- looks a little different
16   because it may have notes on top of it --
17   Q. Yeah.
18   A. -- since then.
19   Q. No, your -- your point's well taken. And
20   there's multiple copies of these all over the
21   place, yeah, with minor variations and
22   notations.
23   A. Uh-huh.
24   Q. And then back to page 3 of Exhibit 1, that's
25   the memo bill for Cenveo. Correct?

121

1  A. Yes.
2  Q. The load going to them with printing paper?
3  A. Yep.
4  Q. How about Exhibit 4 -- I'm sorry, page 4 of
5     Exhibit 1. Is that a log created by
6     International Paper, or not?
7  A. No, I've never seen this.
8  Q. Okay. How about look at page 6, please.
9     That's -- it's another copy of the memo bill
10    for Midland Paper?
11 A. Uh-huh.
12 Q. And now, this copy on the lower right, it's
13    signed apparently by Rocky Gordon, I believe
14    is the name?
15 A. Yes.
16 Q. And it says Midland?
17 A. Yes.
18 Q. When or how does that come about?
19 A. This is what I would consider a proof of
20    delivery. This is when the product is
21    delivered to the customer and the customer
22    signs the document saying -- so the -- whoever
23    the -- whoever is delivering it to them, gives
24    them the paperwork. Customer signs it, says,
25    "Yes, I'm taking possession of this product."

122

1  Q. Okay. And then how does Universal's bar code
2     get on there, as you can see?
3  A. I do not know.
4  Q. Okay.
5  A. I don't know.
6  Q. Okay. And, similarly, page 7 is a copy of the
7     Xpedx memo bill stamped and signed as having
8     been received at Xpedx --
9  A. Yes.
10 Q. -- on July 7th of '08?
11 A. Yes.
12 Q. Okay. And page 8 is the -- a Cenveo memo
13    bill. And is -- does that signature represent
14    a receipt by somebody on the bottom line?
15 A. I believe so. I believe they've noted that
16    they observed damaged product and what they
17    were receiving.
18 Q. Okay. And they talk about 12 boxes being
19    damaged, up above?
20 A. Yes.
21 Q. And then could you look at nine, page 9,
22    please? That's the Midland memo bill.
23 A. (Witness complies.)
24 Q. Now, that has other information -- it's got
25    Mr. Franke's printed name and a carrier

123

1     number. How is page 9 different than page 1,
2     both of which are Midland memo bills? I mean
3     there's more writing on page 9. My question
4     is, like, when did it come about and why?
5  A. I do not know. I don't know.
6  Q. Okay. And then page 12 is that loading sheet
7     that you alluded to earlier?
8  A. Yeah.
9  Q. Okay.
10 A. There was another copy of this, as well, in
11    the other exhibit. Because these were all
12    ones carried -- provided by the carrier.
13 Q. Okay. By Universal?
14 A. Universal, yes.
15 Q. Okay. And then the -- what is Red Prairie?
16 A. Red Prairie is a warehouse management system
17    that Exel was using to operate the facility at
18    the time.
19 Q. Okay. Is it basically a computer --
20 A. Computer system for picking product and
21    shipping product.
22 Q. Okay. And then how about the Digital
23    Logistics?
24 A. I -- that just came out of the top of their
25    Red Prairie. It's part of the header to their

124

1     system. I don't know what the Digital
2     Logistics stands for. This is an internal
3     document.
4  Q. Okay. And then how about page 13, the broker
5     confirmation sheet? Basically what is that?
6  A. I've never seen it.
7  Q. Okay. Does International Paper have any
8     involvement in creating this document?
9  A. No.
10 Q. If -- now, you said you had this regular route
11    in place for deliveries to various customers
12    in Minneapolis. Correct?
13 A. Uh-huh.
14 Q. Okay.
15       MR. FISHER: Yes?
16 A. Yes.
17       MR. BURKE: Okay. Thanks.
18 Q. (By Mr. Burke) The particular customers to
19    whom a delivery was made on any given day was
20    determined by International Paper. Correct?
21 A. Yes.
22 Q. Okay. And that would depend on, you know,
23    which customer needed your product. Correct?
24 A. Yes, uh-huh.
25 Q. Okay. If there was some reason that

## 125

1  International Paper did not need Universal to
2  make that run on any given day, International
3  Paper had the right to cancel that run.
4  Correct?
5  A. Yes. We called it truck ordered, not used.
6  We wouldn't -- because we had a commitment,
7  but we said, "Hey, we have no orders today."
8  Q. Okay. I recall there's a section in
9  International Paper's contract with, you know,
10 originally Overnite and then Universal, where
11 International Paper could cancel their
12 contract if your customers complained about
13 the carrier who was making the delivery. Is
14 that correct?
15 A. If they didn't meet the service expectations,
16 yes, uh-huh.
17 Q. And those service expectations were developed
18 by International Paper. Correct?
19 A. The -- they were the commitments and the --
20 the on-time delivery.
21 Q. And compliance with all the other terms of the
22 contract?
23 A. Compliance, yes, uh-huh.
24 Q. Would you look at page 28 of Exhibit 1?
25 A. (Witness complies.)

## 126

1  Q. That's a letter from litigation counsel Tom
2  Quinlen of International Paper to Universal
3  Am-Can. Correct?
4  A. Yes.
5  Q. Okay. Is this a letter you have seen before?
6  A. I have not seen this letter.
7  Q. Do you want to -- take a minute to read it. I
8  don't have a lot of questions about it. But
9  go right ahead.
10 A. (Witness complies.)
11        MR. SCHRECK: What page is that?
12        MR. BURKE: 28.
13        MR. SCHRECK: Two pages, is that what
14 it is? 28 and 29?
15        MR. BURKE: Yeah.
16 A. Okay.
17 Q. (By Mr. Burke) Okay. That letter's dated
18 July 23rd, 2009. Correct?
19 A. Yes.
20 Q. Okay. And let me direct your attention to
21 page -- or Paragraph 1. The last line of that
22 sentence begins with, "Mr. Franke was employed
23 by Martin's" --
24 A. Uh-huh.
25 Q. -- "Bulk Milk Service, Inc., and was

## 127

1  delivering a load of paper under a contract
2  between IP and Overnite Express."
3        Now, you -- you believe that to be
4  correct, other than the contract had been
5  adopted by --
6  A. Universal Am-Can.
7  Q. -- Universal?
8  A. Yeah, that is my understanding.
9  Q. Okay. And the second paragraph probably
10 addresses that. You agree, as he says, that
11 the contract between IP and Overnite Express
12 was assigned to Universal Am-Can in May of
13 2008. Correct?
14 A. Yes.
15 Q. And then if you could look at page 29, the
16 first new paragraph starts with "IP's
17 position"?
18 A. Uh-huh.
19 Q. Okay. It says, "IP's position is that this
20 incident should be covered by Overnite
21 Express/UACL's general liability policy."
22        Have you made any determination as to
23 what policy of insurance should cover any
24 potential liability in this matter?
25 A. I -- I do not -- I'm not -- I told you my

## 128

1  expertise is not in insurance.
2  Q. Okay. Do you know what insurance coverage
3  International Paper had that covers this
4  occurrence or possibly covers this occurrence,
5  other than whatever Universal Am-Can had?
6  A. I'm not -- it is my understanding that IP's --
7  that Universal Am -- that this incident should
8  be covered by Overnite Express' general
9  liability policy.
10 Q. Okay. And my question's a little different.
11 Do you know what coverage International Paper
12 had, be it excess coverage --
13 A. I do not know.
14 Q. -- umbrella coverage? Okay.
15 A. I do not know.
16 Q. Who do you think knows that at International
17 Paper?
18 A. It would be in the sourcing group. I guess
19 Steve Mundy, or Bill Crawford at the time,
20 would have been involved in that.
21 Q. Okay. Oh, by the way, do you see on
22 page 29 --
23 A. Yes.
24 Q. -- down at the bottom of the letter, the
25 carbon copies, we know -- we've seen Cathy

## 129

1  Szwast's name. Do you know who Tracy Denkins
2  is or what she does?
3  A. I do not know Tracy.
4  Q. How about Lowell Blackham?
5  A. I know Lowell.
6  Q. What does Lowell do? Or, I'm sorry, who does
7  Lowell work for?
8  A. International Paper.
9  Q. And what is his job?
10  A. He's legal counsel for my organization at the
11  . time.
12  Q. Okay. And how about Eric Johansson?
13  A. I do not know.
14  Q. Do you know who Eric works for?
15  A. I do not know.
16  Q. Could you look at page 99, please, of
17  Exhibit 1 still in front of you?
18  A. (Witness complies.)
19  Q. What is that document, Ms. Anderton?
20  A. I've never seen it before. I don't know.
21  Q. Okay.
22  A. It's got an International Paper logo, but I've
23  never seen it.
24  Q. It has what kind of logo on it?
25  A. It has International Paper logo, but I've

## 131

1  A. I do not know her.
2  Q. Do you know, can you tell from this document,
3  does she work for Overnite or for
4  International Paper?
5  A. It looks like it's from Overnite. Because it
6  says Marilyn at Overnite Express, Inc., dot
7  com. I assume she is their accounts
8  receivable clerk. So it was related to
9  payment, yes.
10  MR. BURKE: How about -- do you have
11  88 with you, Carl? I have a copy if it's easy
12  enough to do. And if you don't --
13  MR. FISHER: What is it?
14  MR. BURKE: It's that Exel one.
15  MR. FISHER: The Exel one?
16  MR. BURKE: Here, I got it.
17  Q. (By Mr. Burke) Let me tender to you what
18  we've previously marked as Exhibit 88,
19  Ms. Anderton.
20  A. Uh-huh.
21  Q. Can you tell me what that form is? Is it one
22  you've seen or know anything about?
23  A. It must have been used in the facility, but I
24  am not familiar with it.
25  Q. Okay.

## 130

1  never seen it.
2  Q. Do you know Marilyn Ratay, R-a-t-a-y?
3  A. No.
4  Q. And ...
5  A. This looks like it was related to the previous
6  contract. It was dated '04.
7  Q. Okay. Previous contract between International
8  Paper and Overnite Express?
9  A. I'm not sure if that's what the document is
10  before here.
11  Q. Okay. And actually look at page 57.
12  A. (Witness complies.)
13  MR. FISHER: What page is this? 57.
14  MR. BURKE: Page 57 of Exhibit 1.
15  Q. (By Mr. Burke) Okay. That's Exhibit E to the
16  contract entitled -- and it's entitled
17  "Electronic Funds Transfer Bank Information"?
18  A. I know what it says. I'm not familiar with
19  the document. I know that -- I know what bank
20  we were set up to pay them for, but I -- I was
21  not involved in this document.
22  Q. Okay. And about the -- not quite the middle
23  of the page, there's the name Marilyn Ratay
24  again, accounts receivable clerk. You don't
25  know her?

## 132

1  A. Because it says Exel and it's ash paper, and
2  that's the facility they operate for us. But
3  I have not -- I wasn't involved in using that
4  in my role.
5  Q. Okay. Let me tender to you just one portion
6  of Exhibit 64, which is entitled "Overnite
7  Logistics Load and Rate Confirmation." And is
8  that a document you are familiar with?
9  A. No.
10  Q. No? Okay. Is it a document that
11  International Paper has any involvement in
12  preparing?
13  A. No.
14  Q. Okay. Do you know who does prepare that
15  document?
16  A. No.
17  Q. Okay. Is -- do you have any understanding of
18  the purpose of the document?
19  A. No.
20  Q. Okay. Am I correct that this -- on the day of
21  this incident, this load of paper was being
22  hauled to Minneapolis because International
23  Paper needed to deliver its product to its
24  three customers in the Minneapolis area?
25  A. Yes.

### 133

1  Q. Okay. And International Paper had asked
2     Universal to make this delivery pursuant to
3     its contract with Universal as a motor
4     carrier. Correct?
5  A. Yes.
6  Q. And Mr. Franke of Martin's was hauling this
7     load because Universal had asked Martin's to
8     perform the work that Universal had agreed to
9     do for International Paper?
10 A. I can't speculate what Universal — what
11    instruction Universal gave to Martin's Bulk
12    Milk. So I don't know what direction they
13    gave them.
14 Q. Had International Paper placed any
15    restrictions or conditions on Universal having
16    other people perform the work that Universal
17    had committed to do for International Paper?
18 A. I believe the contract mentions subcontractors
19    or agents all fall under the indemnification
20    clause. I believe in the contract there is a
21    statement that Universal — Universal —
22    anybody they choose to perform the service --
23    however they choose to execute the
24    transportation services, then they all would
25    fall under the contract.

### 134

1  Q. Okay. So if Universal had some non-Universal
2     employee, such as somebody from Martin's,
3     carry out the services they had contracted
4     with International Paper to perform, that
5     other party, whether it be an employee, an
6     agent, or anybody else, was obligated to
7     comply with the contract between International
8     and Universal?
9  A. Universal was choosing to have them execute
10    what we were contracting Universal to do.
11 Q. Uh-huh. And if Universal chose to have
12    somebody else do it, such as Martin's, then
13    you believe that under the contract that
14    Martin's employee had to comply with all the
15    conditions and terms of the contract.
16    Correct?
17         MR. FISHER: Objection. Asked and
18    answered.
19         Go ahead.
20 A. Yeah, could you restate that? Because I think
21    you just worded it funny. Can you restate
22    that?
23 Q. (By Mr. Burke) Sure. If Universal decided to
24    use some other entity, such as Martin's, to
25    perform the services they had committed to

### 135

1     perform for International Paper, it is true
2     that Martin's had to comply with the terms of
3     the contract that existed between
4     International and Universal. Correct?
5  A. Universal --
6         MR. FISHER: Objection. Excuse me.
7     Objection. Asked and answered.
8         You can go ahead.
9  A. Universal had to comply to the contract, and
10    they chose to — they would choose to use
11    Martin's Bulk Milk to do so.
12 Q. (By Mr. Burke) Okay. And do you believe that
13    whoever they chose, like Martin's, that that
14    person then had to also comply with the terms
15    of the contract and carry out the delivery in
16    the same manner that you expected from
17    Universal?
18         MR. FISHER: I object to form and
19    foundation.
20         MR. SCHRECK: I'll join.
21         MR. FISHER: You can go ahead.
22 A. Yeah, say that one more time.
23 Q. (By Mr. Burke) Sure. You gave Universal
24    certain requirements in your contract with
25    them —

### 136

1  A. Yes.
2  Q. — for how they needed to --
3  A. Yes.
4  Q. -- make deliveries for you?
5  A. Yes.
6  Q. Okay. And if Universal, in turn, used
7     Martin's to actually make that delivery,
8     International Paper expected Martin's to
9     comply with the contract terms in the same
10    manner as Universal would have to. Correct?
11         MR. FISHER: Competency, form,
12    foundation. Asked and answered.
13         MR. SCHRECK: I'll join.
14         MR. FISHER: Now, you can go ahead.
15 A. I -- we expect Universal -- the product was
16    picked up at our facility and delivered to our
17    customer, per our contract with Universal.
18    And if they sent -- whatever driver they sent
19    to our facility to execute that, that was our
20    contract with Universal.
21 Q. (By Mr. Burke) And that driver, whether he
22    was from — even if he was from Martin's, had
23    to execute the contract in the same manner as
24    it would be executed by an employee of
25    Universal. Correct?

### 137

1    MR. FISHER:  Same objections.
2    MR. SCHRECK:  Join.
3  A.  They weren't our employees.  We didn't give
4    any direction to anybody's employees.  So we
5    just held Universal accountable to the
6    contract that we had with them to provide
7    transportation services.
8  Q.  (By Mr. Burke)  Okay.  And did you have an
9    expectation that whoever carried out those
10   delivery services would do so in accord with
11   the terms of the contract?
12   MR. FISHER:  Same objections.
13 A.  To deliver the product as we directed
14   Universal Am-Can to deliver the product, yes.
15 Q.  (By Mr. Burke)  Okay.
16 A.  And pick up and deliver.
17 Q.  Okay.  And whoever that delivery person was
18   had to do so in the manner you contracted with
19   Universal to do.  Correct?
20   MR. FISHER:  Same objections.
21   MR. SCHRECK:  Join.
22 A.  Restate your question.
23 Q.  (By Mr. Burke)  Sure.  Whoever picked up the
24   product at your facility and made the
25   delivery, they had to deliver it in accord

### 138

1    with the contract, whether they worked for
2    Universal or whether they worked for Martin's.
3    Is that fair to say?
4    MR. FISHER:  Same objections.
5    MR. SCHRECK:  Join.
6  A.  We -- we held accountable Universal Am-Can to
7    be in accord with the contract.  How -- how
8    they would then hold accountable whoever they
9    chose to execute it, was their decision.  We
10   didn't manage that.
11 Q.  (By Mr. Burke)  And you're answering a little
12   different topic.  My question is really:  Did
13   you have an expectation that whoever made the
14   delivery services -- or strike that.
15   Did International Paper have an
16   expectation that the terms of the contract
17   would be carried out for delivery services,
18   regardless of by whom the delivery driver was
19   employed?
20 A.  We -- we had an expectation that we would
21   tender freight to Universal Am-Can, and that
22   the freight would then be picked up from our
23   facility and delivered to our customers per
24   the contract, and they would provide the
25   transportation services for that.

### 139

1  Q.  And that would be -- you had that expectation
2    whether it was your -- your product was
3    physically being delivered by a direct
4    employee of Universal or a direct employee of
5    some other company that Universal asked to
6    make the delivery.  Correct?
7  A.  Correct.  Correct.
8  Q.  Okay.
9    MR. GOLDEN:  Hey, Rich, this is Bob
10   Golden.  I have to leave now.  I just wanted
11   to alert you guys that I am leaving and
12   parting the deposition.  Okay?
13   MR. BURKE:  All right, Bob.  Thank
14   you.
15   MR. FISHER:  Hey, Bob --
16   MR. GOLDEN:  Have a good afternoon
17   and a safe flight back.
18   MR. FISHER:  Bob?  Bob?
19   MR. GOLDEN:  Yes, sir.
20   MR. FISHER:  You're participating by
21   phone next week?
22   MR. GOLDEN:  Yes, sir, I am.
23   MR. FISHER:  Thank you.
24   MR. GOLDEN:  Okay.  Thanks, guys.
25   MR. BURKE:  Okay.  I don't have a

### 140

1    real lot more, Bob, but ...
2    (The departure of Mr. Golden was
3    noted by the reporter.)
4    (Discussion off the record.)
5  Q.  (By Mr. Burke)  I know obviously there's all
6    the terms that exist in the contract --
7  A.  Uh-huh.
8  Q.  -- between International Paper and Universal.
9    Did -- in addition to that, did International
10   Paper provide any other information or, you
11   know, brochures, manuals of any kind, to
12   Overnite or to any of its carriers about
13   making deliveries and the proper procedures
14   for making deliveries?
15 A.  That's probably very broad.  I'm sure we had
16   other communications with our carriers.  But
17   can you be more specific?
18 Q.  Sure.  Did -- what other types of
19   communications did you have with carriers in
20   terms of any expectations from International
21   Paper of how deliveries should be made or
22   procedures that needed to be followed?
23 A.  That's just very broad.  It's just very broad
24   and there are several people that communicate
25   with carriers, and we have hundreds of

## 141

1   carriers. So I can say that there is
2   different communications, whether they be
3   e-mail, or whatever, that could have been --
4   that could fall under that category.
5   Q. And from what department would they come?
6   A. Primarily from the sourcing group.
7   Q. And what topics would they cover?
8   A. It would be the same topics that are within --
9   on the contract, but there could be general
10  communications -- for example, if a carrier
11  was having issues with on-time delivery
12  performance, either myself or the motor
13  carrier manager or one of his team would
14  communicate with that carrier on their on-time
15  delivery performance. And I might provide
16  reporting saying, "Hey, this is how we see you
17  performing."
18       I mean that would just be an example.
19  But we had a working relationship with that
20  carrier as they were fulfilling the contract
21  that we had with them.
22  Q. And they would be given further information or
23  direction from International Paper about how
24  you expected the deliveries to be made in
25  order to comply with the contract?

## 142

1   A. I don't think it was additional information.
2   It was more information enforcing what was
3   already in the contract. Or would be on
4   the -- like a bill of lading instruction for
5   them. It was very broad. I mean there were
6   probably communications back and forth between
7   the carrier and IP for different -- under
8   different circumstances.
9   Q. Okay. Would those instructions or directions,
10  communications, whatever they might be, be
11  specific to the carrier, or generally, or I
12  suppose both?
13  A. Probably both.
14  Q. Okay. Who, that we've been talking about, is
15  from sourcing. Is Mundy --
16  A. Mundy.
17  Q. Mundy, he's from sourcing?
18  A. Uh-huh. Bill Crawford. There was some
19  organizational changes where Mundy moved to
20  where he was co-reporting. But I'm not sure
21  of the timing of that. But he's always --
22  Steve Mundy has always been in the role around
23  sourcing contracts.
24  Q. Okay. And I mean did International Paper, did
25  they have, you know, any type of customer

## 143

1   service satisfaction brochures, or things like
2   that, that you would give your carriers in
3   order to assist them in carrying out the
4   contract as you saw fit?
5   A. Yes. They would get -- they had a performance
6   review with the sourcing group as to how they
7   were performing. On-time delivery was
8   typically one of the metrics that would be
9   measured.
10  Q. Okay. And how often would those performance
11  evaluations take place?
12  A. I don't -- I don't recall. It would have been
13  done with his -- with the other organization.
14  Q. With sourcing?
15  A. Sourcing, uh-huh.
16  Q. Okay.
17  A. We would review on-time delivery from our
18  facility on a daily basis. And if we had
19  exceptions, where we had a performance issue,
20  it could be daily that I would be calling a
21  carrier saying, "Why was this shipment late
22  yesterday?"
23       So at the facility level, it would --
24  might be immediate. But then long-term
25  performance would have been handled from the

## 144

1   sourcing.
2   Q. And the performance evaluations, would they be
3   communicated in writing in some manner?
4   A. Uh-huh.
5   Q. Is that a yes?
6   A. Yes.
7   Q. In addition to that, did you utilize any
8   other, you know, pamphlets or informational
9   literature that you would give to your
10  carriers to assist them in solving problems or
11  meeting the requirements of the contract?
12  A. I don't know of any, like, formal pamphlets.
13  There was general communications, I'm sure, at
14  different points over time. When you have
15  that many carriers, we do communicate with our
16  carriers. Because we're working with them on
17  a daily basis. So ...
18  Q. Did International Paper have a contract with
19  Universal prior to June of 2008 when Universal
20  took over Overnite?
21  A. I can't answer for sure. Not that I am
22  aware of. But I do not know for certain.
23       MR. BURKE: Carl, if you want, I just
24  want to glance at a couple things, and I may
25  be done. I don't know if Matt has any

## 145

1    questions or not. But go right ahead and
2    just ...
3               MR. FISHER: Okay.
4               MR. SCHRECK: I'll jump in then.
5               EXAMINATION
6    BY MR. SCHRECK:
7    Q. I'm going to try not to repeat things. So I
8       may bounce around a little bit.
9    A. Okay.
10   Q. I don't think I have too many questions. You
11      were asked some questions earlier regarding a
12      contract that International Paper had with
13      Overnite Express and then eventually had with
14      Universal Am-Can. Do you remember talking
15      about that?
16   A. Yes.
17   Q. Okay. One of the things that you were
18      discussing with Mr. Burke was regarding
19      obligations of the carrier to comply with
20      certain requirements. Do you remember that?
21   A. Uh-huh.
22   Q. Okay. Yes?
23   A. Yes.
24   Q. Okay. One of the those requirements -- or
25      actually things that could result in a default

## 146

1    was a failure to comply with facility safety
2    rules?
3    A. Yes.
4    Q. Okay. My first question is for the Hammond
5       facility, have you ever been there before?
6    A. Yes.
7    Q. Okay.
8    A. I had an office there.
9    Q. You had an office there?
10   A. I had an office there, yes.
11   Q. Okay. As of June of 2008, how often would you
12      be in that office?
13   A. Once every couple weeks. Maybe -- you know,
14      it could have been -- it could have been I'd
15      be there for a week, and then I'd be gone for
16      a while. I did a lot of traveling. So I
17      don't know.
18   Q. Okay. Were you involved in any of the
19      day-to-day aspects of the delivery of loads
20      from Hammond to Minneapolis?
21   A. I was familiar with all of the operations. We
22      hired Exel Logistics to execute those. And I
23      would be in communication with them, by phone,
24      on a daily basis about operations.
25   Q. Okay. Do you know what the safety rules were

## 147

1    for that Hammond facility, or no?
2    A. You're required to have -- if the truck was
3       under the trailer, then you were fine.
4       Otherwise, it required chocks and jacks to
5       hold the trailer up for us to be able to load
6       safely.
7    Q. Okay. Were there any other safety rules that
8       the facility had?
9    A. There were certain areas by which the driver
10      could -- could stand and couldn't stand, and
11      people walking through the facility had to
12      stay within the safety rules. Outside of
13      certain pathways, you had to wear safety
14      glasses. It was restricted areas within the
15      facility.
16   Q. Okay. And I'm sure there were others --
17   A. Probably others.
18   Q. -- as well. Is that right?
19   A. Uh-huh. Yeah.
20   Q. For example, like probably rules regarding you
21      have to have a shirt and shoes on?
22   A. Yep. And fire safety and lots of other, yes.
23   Q. And International Paper expected whatever
24      carrier would be delivering the load to comply
25      with those rules that we talked about earlier.

## 148

1    Is that right?
2    A. That's correct. Yes.
3    Q. And if they didn't comply with those rules,
4       for example, if the carrier wasn't complying
5       with the safety rules regarding how the
6       trailer was supposed to pull up to the dock
7       or -- you could -- International Paper or
8       Exel employees could refuse to deal with that
9       person because they weren't complying with the
10      rules. Is that correct?
11   A. Yes. We could tell them to leave the
12      facility, and -- and then call the carrier and
13      say, "Send another driver for this because
14      they're noncompliant."
15   Q. And that applied to anybody that Overnite
16      Express or Universal Am-Can sent to that
17      facility. Correct?
18   A. Anybody that they would send had to comply by
19      the safety -- safety rules of the building.
20   Q. Okay. And whether it be if they sent their
21      own employee, a brokered employee, or some
22      other carrier, International Paper can refuse
23      to deal with them if they're not complying
24      with the safety rules. Is that correct?
25   A. Yes, yes.

JOAN ANDERTON                                    APRIL 10, 2012

149

1    Q. Okay. You indicated earlier that the facility
2       was subcontracted and run by Exel?
3    A. Yes.
4    Q. Were the -- and if you don't know this, that's
5       fine.
6    A. Okay.
7    Q. But the employees that were working there, do
8       you know who their paychecks came from, the
9       ones that were actually getting the shipments
10      ready to be loaded onto the trucks?
11   A. It was my understanding that they came from
12      Exel Logistics. I am not sure if they were
13      temporary employees. They could have been
14      paid by a temporary agency. But Exel
15      Logistics managed the employees there.
16   Q. Managed the employees. Okay. And do you know
17      if there was any type of written contract
18      between Exel and International Paper, or no?
19   A. Yes.
20   Q. Okay. And do you know when that relationship
21      between Exel and International Paper went into
22      effect? Was it always that way at that
23      facility, or did it change over time?
24   A. They -- they -- the facility started in '96,
25      and Exel was the 3PL that provided services

150

1       for that facility since '96.
2    Q. Okay. The facility itself, did the warehouse
3       have any identification on it, as far as
4       saying "Exel" or "International Paper" on it?
5    A. It says "International Paper operated by
6       Exel."
7    Q. Okay. I want to turn your attention back to
8       the bills of lading. I'd rather use Exhibit 2
9       because those are the documents that were
10      produced by International Paper.
11   A. Yes.
12   Q. Now, first look at page 2.
13   A. (Witness complies.)
14   Q. All the memo bills -- actually page 2, 3, and
15      4, they all indicate that the shipment was
16      received from International Paper in Hammond.
17      Is that correct?
18   A. Yes.
19   Q. Okay. Is this document -- any of these three
20      pages, pages 3, 4 -- 2, 3, or 4 of Exhibit 2,
21      do they indicate Exel's name on the document
22      anywhere, or no?
23   A. No, they do not. Not that I'm aware of.
24   Q. And then these documents are indicating
25      they're received from International Paper at

151

1       Hammond, and they're going to their respective
2       locations in Minneapolis?
3    A. Yes.
4    Q. And I believe you already answered this
5       earlier for Mr. Burke, but these documents are
6       created by the people that are actually at the
7       facility?
8    A. Yes.
9    Q. Okay. And then they're, in turn, given to the
10      person that's going to be picking up the load
11      and bringing it up to Minneapolis. Is that
12      right?
13   A. Yes. The contents of the documents would have
14      been -- they produced this document, but the
15      contents of the document would have been
16      provided to them from a paper based on final
17      orders.
18   Q. Okay. I'm talking about the actual physical
19      document.
20   A. But the actual physical -- they would have
21      prepared it at the facility, yes.
22   Q. Okay. They were prepared at the facility?
23   A. Yes.
24   Q. And at some point during the process of the
25      shipment being picked up, a copy of this

152

1       document is given to whoever's picking it up.
2       Is that right?
3    A. Yes.
4    Q. And then at some point, they're signed by
5       whoever picks it up?
6    A. Yes.
7    Q. Okay. In this case, there is a signature of
8       Samuel Franke on -- on each of these pages.
9       Correct?
10   A. Yes.
11   Q. Do you know what the policy was at the
12      facility as far as where the driver that was
13      picking up the load was required to sign, or
14      not?
15   A. Where he was required to sign on the paper
16      or --
17   Q. On the paper.
18   A. -- where he was, physically, in the building?
19   Q. No, no, no. Where, on the paper, he would be
20      required to sign. Do you know what the policy
21      was, who determined where he signed?
22   A. It was where the stamp was. Where the --
23      where the print name and signature was, yes.
24   Q. Okay. I see that's where it's done on these
25      particular documents. Do you know what the

153

1    policy was behind who determined where the
2    signature was supposed to be done on that
3    page? Or you're not familiar with that
4    operation?
5            If it doesn't make sense, let me
6    know, I'll rephrase it.
7    A. Yeah, could you rephrase that, please?
8    Q. Sure. The three documents you're looking at,
9    page 2, 3, and 4 of Exhibit 2, have a
10   signature toward the top of the page.
11   Correct?
12   A. Yes.
13   Q. Okay. And there looks like there are some
14   signature lines towards the bottom of the
15   page.
16   A. Okay.
17   Q. Okay. Do you know what the policy was, at the
18   Hammond facility, as to where signatures were
19   supposed to be signed or weren't supposed to
20   be signed?
21          MR. FISHER: Objection. Assumes
22   facts not in evidence.
23          You can go ahead and answer.
24   A. I believe -- my understanding is that they
25   would sign where -- where he had signed --

154

1    indeed signed here. And these documents, this
2    was a standard International Paper bill of
3    lading. Although they produced it, the format
4    was worked with International Paper.
5    Q. (By Mr. Schreck) Okay. So that was
6    determined by International Paper through
7    Exel. Correct?
8    A. Yes.
9    Q. Who would have the most knowledge regarding
10   how the actual loads were picked up? Are you
11   that person or is somebody else --
12   A. For International Paper, I would be that
13   person.
14   Q. Okay. So you know how things are done on a
15   daily basis as far as where the people would
16   go when they get to the facility, who they
17   talk to, what papers they sign, or --
18   A. I knew the general letter. But we hired Exel
19   Logistics to actually execute that. So how
20   they choose to execute that on a daily basis,
21   there might have been scenarios. But I knew
22   the general process, yes.
23   Q. Tell us what you know about the general
24   process of how somebody comes in and picks up
25   a load and leaves International Paper's

155

1    facility.
2    A. Okay. So the driver would come in, go to
3    the -- go to the shipping office. There's a
4    window there. And they would meet somebody,
5    like Crystal Cousins, at the window. And they
6    would provide information, such as the
7    shipping number that said, "This is what
8    shipment I'm here to pick up."
9    Q. Okay.
10   A. And then they would be directed either to wait
11   in the yard, "We're not ready for you," or --
12   and "come back in an hour," or whatever. Or
13   if they had an appointment time, they'd be
14   directed to put their trailer in the door,
15   like at Door No. 27.
16          The driver would then go put the
17   trailer in the door. And then they had the
18   right -- at that facility, we gave the drivers
19   the right to watch their loads being loaded.
20   So then they could come in and there was an
21   area they could come there, or they could
22   stand right next to the dock door and watch
23   all the product come in.
24          Because the carrier, at the time that
25   they signed this document, is taking

156

1    possession of the goods. So they could
2    physically see what goods that they were
3    hauling.
4    Q. Okay. And then at some point after it's
5    loaded, then --
6    A. He would go back to the window. Yeah.
7    Q. Oh, okay. So finish.
8    A. Yeah, he would go in. And then the product
9    would be loaded. The person who loaded, the
10   dock men which would give the driver the
11   loading sheet, which is also signed by the
12   driver.
13   Q. Okay.
14   A. Okay. And it just said this is exactly how I
15   loaded it and the sequence of the stops on the
16   truck. And then once it was loaded, the
17   driver signs the load sheet. And then he
18   would also sign the bill of lading once they
19   were complete.
20   Q. Okay. Now, that day-to-day routine --
21   A. Uh-huh.
22   Q. -- for lack of a better word, of how things
23   are loaded when a driver gets there, that's
24   determined by International Paper then. Is
25   that correct?

JOAN ANDERTON                                                APRIL 10, 2012

### 157

1   A. It's a pretty standard process across the
2      board. Exel chose to operate it as they
3      chose. But it's pretty standard operating
4      procedure, yes.
5   Q. Okay. So Exel is executing –
6   A. For IP.
7   Q. -- for International Paper?
8   A. International Paper.
9   Q. But the actual process of getting -- requiring
10     them to have a shipping -- or shipment number
11     and what they're allowed to do, from a loading
12     or watching the load standpoint, that all
13     comes through International Paper. Is that
14     right?
15  A. Actually Exel likes using the load sheet as --
16     and getting additional signatures. So
17     International Paper requires a bill of lading
18     signature. And Exel has chosen, at that
19     facility, to have them sign, also, off on the
20     load sheet. Not all of our facilities do
21     that.
22  Q. Okay. And where a driver can and can't stand
23     during the loading process, is that something
24     that's directed by International Paper or is
25     that something Exel's doing on their own?

### 158

1   A. Exel is responsible for safety at the
2      facility. And so they -- they can choose to
3      execute it as they choose. Yeah.
4   Q. Okay. And the overall safety directives for
5      the facility, is that something that
6      originally comes from International Paper and
7      Exel just has to execute them?
8   A. We hire them to operate. So whether -- for
9      example, if the walk path is here or here,
10     Exel might have chosen to put it there.
11  Q. Okay.
12  A. Okay. So they -- they made some decisions on
13     safety within the facility. That's because
14     they were operating it for us.
15  Q. And all the work that Exel does at that
16     facility, that's being done on behalf of
17     International Paper. Is that right?
18  A. Yeah. They're under contract to operate the
19     facility for us.
20  Q. Okay. So they're an agent of International
21     Paper?
22         MR. FISHER: Objection. Form.
23     Foundation.
24  A. They are a contractor or a subcontractor of
25     ours. I don't know the correct terminology

### 159

1      for them. We -- we hire them to operate the
2      facility for us.
3   Q. (By Mr. Schreck) And in either event, they're
4      doing their work on behalf and at the
5      direction of International Paper?
6          MR. FISHER: Form. Foundation.
7   A. We hire them to operate the facility for us,
8      based upon the contract that we have with
9      them.
10  Q. (By Mr. Schreck) The work they're doing there
11     is being done for the benefit of
12     International --
13  A. Paper.
14  Q. -- Paper?
15  A. Yes, yes.
16         MR. SCHRECK: I think that's all the
17     questions I have. I'll pass the witness.
18             EXAMINATION
19  BY MR. FISHER:
20  Q. Ms. Anderton, on that topic, have you seen the
21     contract that exists between Exel and
22     International Paper?
23  A. Yes.
24  Q. And does that contract provide that the
25     relationship is one of independent contractor

### 160

1      relationship only? That is to say --
2   A. It's independent -- they are an independent
3      contractor, yes.
4   Q. And so whatever the language is that's in that
5      contract is the language that applies to that
6      relationship?
7   A. Yes.
8   Q. Okay. You earlier spoke -- well, actually let
9      me -- I'll go back into this. I'm going to
10     show you some collection -- you've been shown
11     lots of memo bills --
12  A. Yeah.
13  Q. -- from different sources.
14  A. Okay.
15  Q. I'm going to even -- I'm going to complicate
16     it --
17  A. Another one?
18  Q. -- even further --
19  A. And show me more?
20  Q. -- by showing another collection of these memo
21     bills that were marked as Exhibits 18, 19, and
22     20 in some of the earlier depositions.
23  A. Okay.
24  Q. So if you would look first at Exhibit -- a
25     copy of Exhibit 18.

---

**161**

1   A. Uh-huh.
2   Q. And tell me whether or not that's a collection
3      of memo bills that appears to reference the
4      Midland Paper part of the load at issue and
5      involved with the shipment being made on
6      July 3.
7   A. Yes, this is Midland Paper. And this is the
8      same copy of this as this.
9   Q. Keep looking, because there's lots of sheets
10     of paper there.
11  A. Okay.
12  Q. And as Mr. Burke alluded to earlier, there's
13     lots of different sheets of paper that have
14     got lots of different markings on them.
15  A. Yes.
16  Q. Okay. So go ahead and just look at every one
17     of them.
18  A. (Witness complies.) Yep, this would be
19     delivery. That's another -- that's the same
20     copy as that.
21  Q. Okay.
22  A. Yes.
23  Q. So you've had a chance to look at
24     Exhibit 19 --
25  A. 18.

---

**162**

1   Q. Excuse me, 18. My mistake. You've had an
2      opportunity to look at Exhibit 18, and you see
3      that every one of the sheets of paper that
4      consists of Exhibit 18 is the same memo bill
5      regarding the Midland Paper part of the
6      July 3rd load, but in some instances there are
7      International Paper or UACL or Martin's Bulk
8      Milk or no markings in the bottom of each
9      sheet?
10  A. Correct.
11  Q. And in some cases, for example, if we simply
12     compare the first three pages of this
13     document, this exhibit that is, Samuel
14     Franke's signature appears on those three
15     pages. And on the fourth page, which is
16     UACL9, that has Franke's signature and his
17     printed name along with some other
18     information?
19  A. Uh-huh.
20  Q. Do you know how it is or why it is that there
21     are different multiple copies of this same
22     memo bill, with different markings on them?
23  A. They all originate from the same point. But
24     at the time that the driver picks up the load,
25     they sign one copy that then Exel keeps as

---

**163**

1      proof that the driver picked up the load. And
2      then they typically take two copies with them,
3      one for the customer and one ultimately for
4      the carrier.
5          So when they deliver the shipment,
6      one copy would go to the carrier -- the
7      customer, and then the carrier would keep a
8      copy. And then there could have been multiple
9      copies made after that point.
10         So that's why some are -- because
11     they're different signatures. Some of them
12     the signature looks slightly different. So he
13     copied -- he must have signed different.
14  Q. And, in fact, if you look at -- I'm not asking
15     you to be a handwriting expert. But if you
16     were to look at, for example, the document
17     that is marked as a part of Exhibit 18, IP4,
18     and you look at the signature of Mr. Franke on
19     that signature line --
20  A. Yep.
21  Q. -- and then you compare it with the Universal
22     Am-Can copy, which appears as the next page in
23     Exhibit 18, which is marked UACL6, that
24     signature of Mr. Franke does not appear to be
25     the same, does it?

---

**164**

1   A. It's not exact, no.
2   Q. Okay. So would that be another reason to
3      account why various entities, who would
4      receive copies of these, might have differing
5      versions of the same document with different
6      versions of a signature?
7   A. It starts from those three -- first three,
8      yes. Because he would have signed different.
9   Q. And, likewise, does it appear the same as the
10     case with Exhibit 19, which is the memo
11     bills -- multiple copies of the memo bills
12     concerning the Cenveo?
13  A. You got it. Cenveo, yes. Same thing?
14  Q. Just skim through those and see if that -- it
15     appears that's the same case on -- on that
16     collection.
17  A. Yeah, you can see when his signature changed
18     slightly. And it's got different -- so it's
19     different versions of the same document. Same
20     originating document signed separately.
21  Q. Okay. And then finally is it the same the
22     case with Exhibit 20, which appears to be the
23     collection of the memo bills regarding the --
24  A. Uh-huh.
25  Q. -- Xpedx --

## 165

1  A. Uh-huh.
2  Q. -- memo bills?
3  A. Go to any shipping office anywhere, drivers
4     are always asked to sign several copies.
5  Q. And would it be the actual signing of separate
6     white sheets of paper, as opposed to
7     duplicate, triplicate, quadruplicate carbons?
8  A. Yes. At this point, we were -- we were not
9     using carbon paper. So it would have been
10    separate copies.
11 Q. All right. A different topic. You earlier
12    made mention of the fact that it was not until
13    a year after the July 3rd, 2008, accident,
14    that you received some notice that an accident
15    had occurred because you were put on legal
16    hold by International Paper?
17 A. Correct. I was unaware of the incident before
18    that time.
19 Q. And then you communicated with Mr. Diekman?
20 A. Yes.
21 Q. Okay.
22        (Deposition Exhibit No. 100 was
23    marked for identification.)
24        MR. FISHER: And just so the record's
25    clear, we're going to have to -- I'm going to

## 166

1     submit these as part of a supplement of
2     International Paper documents. I've got to
3     keep this one, but you can borrow that one.
4        MR. SCHRECK: Okay. I assume it
5     wasn't previously produced?
6        MR. FISHER: It was not.
7  Ms. Anderton made this available to me
8  yesterday. So let's just --
9        THE WITNESS: And I apologize for
10    that. It is -- it must have been it was a
11    two-sided copy.
12       MR. FISHER: So it's missing pages 2
13    and 4?
14       THE WITNESS: So it's missing the
15    pages behind two and four.
16       MR. FISHER: Right. So we'll get
17    those to everybody.
18       MR. BURKE: Okay.
19 Q. (By Mr. Fisher) So tell us what Exhibit 100
20    is, understanding, of course, that it's
21    missing the even-sided back sides of some of
22    these e-mails.
23 A. Okay. Well, the first e-mail I -- after
24    finding out that my -- about the legal hold,
25    the first e-mail, I had called Clint, who was

## 167

1     a customer service manager at Hammond, and I
2     said, "Can you pull the file on this shipment
3     and let me know if the product delivered on
4     time and if there was anything exceptional
5     about this shipment?"
6        So he pulled the file, and this was
7     his response. He said -- in his e-mail, it
8     says, "I searched the archived OTDs from
9     July 5th, '08, through August 1st, '08, and
10    found no lates for Orders 211039, 307039, or
11    322039."
12 Q. And what -- what do those last series of three
13    numbers mean?
14 A. Those three orders are the three orders for
15    the three different customers that were to be
16    delivered to. And it was the shipment number
17    that I was told was involved in the accident.
18       So my first thing was if there was an
19    accident, it probably didn't deliver on time,
20    what would we have done about that. And we
21    had no records at all. The shipment delivered
22    complete and on time, according to the
23    records. So that's what this first one is.
24 Q. All right. And then what's the -- you
25    mentioned Steve Shores during your earlier

## 168

1     answers to Mr. Burke's questions. Tell us
2     what the remainder of Exhibit 100 is.
3  A. Okay. So I also asked -- at the same time I
4     asked Clint, I called Steve up and I said,
5     "Steve, can you pull this shipment," which is
6     the shipment 2008, "and tell me what you have
7     as far as on-time delivery performance and any
8     information you have about that load?"
9        So he pulled the EDI transactions --
10 Q. Let me stop you there for a second. Does EDI
11    stand for electronic data interchange?
12 A. Yes.
13 Q. Okay. It's the day of acronyms.
14 A. The day of acronyms, yes.
15 Q. All right. And so tell us what this
16    document -- strike that.
17       Tell us what the chart appearance
18    after the e-mail addressee information
19    appears, what it is.
20 A. Now, I don't have access to the system that
21    did this. In fact, at first he sent me a link
22    to this -- to these transactions and I said,
23    "Steve, I don't look at the EDI transactions."
24    I said, "Can you cut and paste and show me the
25    transactions?"

### 169

1       So he pasted all of these into an
2 e-mail and sent them. And they basically --
3 and I can't interpret what every one of them
4 is, but it's -- it's basically the date and
5 time when Overnite Express reported pick up of
6 the shipment and delivery of the shipment to
7 our customers.
8 Q. Okay. Let me stop you there for a second.
9 Earlier in the deposition, Mr. Burke asked you
10 some questions when he was going through,
11 paragraph by paragraph, section by section,
12 portions of the Overnite Express or Universal
13 Am-Can and International Paper contract.
14 A. Yes.
15 Q. And he asked you some questions about the
16 portion of the contract that talked about
17 electronic communications. Right?
18 A. Uh-huh.
19 Q. Yes?
20 A. Yes.
21 Q. Okay. Is this the type of electronic
22 communication that International Paper was
23 expecting to engage in with Universal Am-Can
24 or Overnite Express --
25 A. Yes.

### 170

1 Q. -- pursuant to that section of the contract
2 with which you discussed -- that you discussed
3 with Mr. Burke?
4 A. Yes.
5 Q. All right. And so as an example, if we just
6 look at -- if we look at the entry that
7 appears on the numbered page 3, and it says,
8 "Shipment departed 3 July, 2008, 7:52 eastern
9 daylight time"?
10 A. Yes.
11 Q. All right. And then over in the right column,
12 it says -- yeah, so what would that time
13 reflect?
14 A. Yeah, the first column says the event time and
15 the last column on -- on the first page says
16 the report time -- reported time. So the
17 event time would be when Universal -- Overnite
18 Express or Universal Am-Can reported it
19 happened, the event happened. And then the
20 other one is the report time, when they
21 reported it to us. Okay?
22 Q. All right.
23 A. So this is when they stated the shipment
24 departed Hammond July 3rd, 2008, at 7:52.
25 They reported that information to us July 7th,

### 171

1 2008, at 9:03.
2 Q. All right. Anything with respect to the delay
3 between -- strike that.
4       Anything unusual, usual, with respect
5 to the date and time of July 3rd, 7:52, as
6 compared with July 7th at 9:03 a.m.?
7 A. Not at all. Because this is at night and it
8 was a holiday weekend.
9 Q. So ordinarily the expectation would have been,
10 according to the contract, that when this 7:52
11 event occurred, that that would have been
12 reported within I think it was a couple of
13 hours?
14 A. Yes. But I believe that's within business
15 days. I'm not certain, but that is my
16 understanding.
17 Q. Okay.
18 A. Nobody would be there to report it.
19 Q. All right. So this is an example of what's
20 referenced in the portion of the contract that
21 dealt with electronic communications --
22 A. Yes.
23 Q. -- as to what Universal Am-Can was obliged to
24 provide to International Paper on reporting of
25 events, departing, and arrivals?

### 172

1 A. Yes. And this was used for their on-time
2 delivery performance.
3 Q. Okay.
4       MR. FISHER: Rich, I have a
5 suggestion. When Joan goes back to her
6 office, she's going to get, you know, the
7 missing back pages. And I'm going to suggest
8 that we substitute -- that we don't substitute
9 but we actually add an Exhibit 100A
10 eventually, that I can provide to the court
11 reporter, that has the backs of it, just so
12 it's a complete record.
13       MR. BURKE: Yeah. That --
14 that's generally fine, I guess. Without
15 knowing what's on there, I don't know if it
16 generates any other --
17       MR. FISHER: Right. I mean --
18       MR. BURKE: -- questions or anything.
19       MR. FISHER: -- to the extent that it
20 might generate some more questions, we can
21 certainly arrange that --
22       MR. BURKE: Yeah.
23       MR. FISHER: -- to have that done
24 but ...
25       MR. BURKE: Yeah, that sounds fine.

173

1     MR. FISHER: Okay. Great. All
2   right. Okay. So that's 100. Now a 101 and a
3   102.
4     (Deposition Exhibit Nos. 101 and 102
5   were marked for identification.)
6     (Discussion off the record.)
7   Q. (By Mr. Fisher) Okay. Earlier, you were
8   asked questions, Ms. Anderton, about some
9   electronic funds transfers and the way that
10  payments were made by International Paper.
11  A. Yes.
12  Q. All right. Tell us what Exhibit 101 is.
13  A. Okay. Well, after I called Clint and -- Clint
14  and Steve, I was calling them about on-time
15  delivery, I called Fadera, our analyst, and
16  said, "Did we pay for this shipment and was
17  there any exception on the payment side?"
18    So I asked her to pull history on
19  Hammond's payments. And all she -- her note
20  says, "Joan, here is the information you
21  requested. Let me know if you need anything
22  else."
23    And the second page, it's a subset of
24  a much larger document. She pulled the
25  history for a long period of time, and this

174

1   was the one shipment of notes. So ...
2   Q. Okay. And so is it fair to say that this
3   electronic funds or banking document, for want
4   of a better description, shows that with
5   respect to the shipment at issue that was
6   going to Cenveo, Midland, and Xpedx, on
7   July 3rd, '08, was being paid to OXEN, the
8   SCAC code for Overnite Express, but we know on
9   July 3rd it eventually wound its way to
10  Universal Am-Can, and that the payment amounts
11  are reflected in the right column?
12  A. Okay. This is -- the other document is
13  actually the electronic funds. This is kind
14  of our internal spreadsheet that had
15  information from the system that said we would
16  have paid a total of $1,217.60 and that OXEN
17  was the SCAC code. But this wouldn't be the
18  actual financial document.
19  Q. All right. So 101 was not the actual
20  financial documents, but it's an internal
21  spreadsheet summary?
22  A. Yes. Spreadsheet of all my -- yeah, she
23  pulled all my shipments and I pulled out the
24  one that was -- all of our shipments from that
25  facility.

175

1   Q. All right. And then with respect to
2   Exhibit 102, would you take us through each of
3   the pages on Exhibit 102?
4   A. And this was pulled more recently. So those
5   two -- those two items happened in '09, 2009.
6   This I just had pulled recently to get further
7   detail on what Fadera had given me.
8   Q. Let's make sure the record's clear. What
9   you're saying is that the documents that are a
10  part of Exhibits 100, what will be marked
11  later as 100A, and 101, are documents that
12  were requested by you and created by you,
13  Fadera Carter, Clint Diekman, and Steve Shores
14  on July 21st, 2009, which was shortly after
15  you had received notice that you were on legal
16  hold because of an accident?
17  A. Yes.
18  Q. Okay. All right. Now, Exhibit 102, take us
19  through that.
20  A. And this was -- this was very recently I
21  just -- to clarify and make sure I understood
22  how the payment was made, because there was
23  some question about the Overnite versus
24  Universal Am-Can, who actually had been paid,
25  this first one says Document 1400348929 for

176

1   $1,217.60, with an invoice baseline date of
2   7/3/2008 it was for Memo Bill 128816-8658.
3   What this is saying is this particular
4   shipment was for $1,217.60.
5     The next document shows that it was
6   cleared on the electronic funds transfer,
7   which is what the EFT is, and that's the
8   electronic funds number listed there. It
9   shows that it was electronically funded to
10  Overnite Express.
11    Then that EFT number was actually for
12  a total of $17,203.75 and was paid on
13  August 20th, 2008. And that would have been
14  because our terms with them must have been a
15  net 45-day term. So it was not paid until
16  August 20th. And it shows that we paid them,
17  on that date, $17,203.
18    And then the next document shows what
19  each of those -- what comprised the 17,203.
20  So there was one -- this one shipment was one
21  of those shipments on -- out of -- that made
22  up the 17,000. So that's what that next
23  spreadsheet shows.
24  Q. And then the final two pages?
25  A. Then the final two pages are -- I did ask,

## 177

1  after that fact, because it said Overnite, I
2  asked Ron Crib -- he goes by his middle
3  name -- I said, "Hey, Ron, could you just pull
4  for me the details on that EFT?"
5      And then he said, "This is the
6  details we have on that electronic funds" --
7  "EFT payment to Overnite Express." And that's
8  the actual bank account number -- the very
9  last page shows the actual bank account number
10 that the funds would have been deposited into.
11 Q. Okay. And now, since that document, the last
12 page of Exhibit 101 --
13 A. Uh-huh.
14 Q. -- that has up at the top "Change vendor
15 payment transactions," that appears to be and
16 tell me whether it is, is that a screen print?
17 A. Yeah, I believe this is a screen print. It's
18 from SAP and it looks like a screen print to
19 me, yes. I don't work in this part of that
20 software so ...
21 Q. Okay. If you'll keep that handy. If we would
22 look, then, at a part of Exhibit 2, which is
23 Bates numbered IP75 -- and Mr. Burke asked you
24 some questions about this before -- this shows
25 a vendor which is listed as Universal Am-Can,

## 179

1  Q. How that driver was to use logbooks?
2  A. No.
3  Q. What clothing the driver should wear?
4  A. No.
5  Q. What equipment the driver should use?
6  A. No.
7  Q. How the driver was to operate his tractor once
8     he was on the roadway?
9  A. No.
10 Q. For example, how to execute a wide right turn
11    or a wide left turn when he got to an
12    intersection?
13 A. No.
14 Q. Did International Paper ever provide to that
15    driver any directions or instructions on where
16    and how to purchase gas?
17 A. No.
18 Q. Where to purchase any supplies or services
19    while he or she was driving his truck?
20 A. No.
21 Q. What route to use in moving the International
22    Paper paper products from Hammond up to -- or
23    toward Minneapolis?
24 A. No.
25 Q. Did International Paper ever train the driver

## 178

1  Limited?
2  A. Correct.
3  Q. And so eventually, at a certain point, in the
4     SAP system that was being used by
5     International Paper, Universal Am-Can was
6     substituted for Overnite Express?
7  A. That is correct. And you can see in the
8     middle there the Universal Am-Can, it has a
9     SCAC code of UACL. Once the facility
10    started -- was directed or started using the
11    UACL on their bills of lading, this would have
12    all gone directly to Universal Am-Can.
13 Q. Okay.
14 A. It just -- there was a delay in that
15    happening.
16 Q. Got it. Okay. I'm done with those. Did
17    International Paper ever dictate to Universal
18    Am-Can, Overnite Express, or any drivers that
19    came to the door at the Hammond distribution
20    center, to pick up a load with the magic, you
21    know, shipment number --
22 A. Uh-huh.
23 Q. -- thus entitling them to pick up the load,
24    any of the following. All right?
25 A. Okay.

## 180

1  who arrived at the Hammond distribution
2  center?
3  A. No.
4  Q. Did International Paper ever require the
5     driver who left the Hammond distribution
6     center to report on a regular hourly or
7     half-day time period what was going on with
8     his -- what was going on with his driving up
9     to that point?
10 A. No.
11 Q. Other than -- strike that.
12     When the driver was on the property
13     of the Hammond distribution center, what were
14     the things that the people from Exel, or if
15     you were there, would tell a driver to do or
16     not to do, when he was literally right there,
17     before the load has left?
18 A. They would be required to follow any safety
19     procedures for the facility, just like anybody
20     else that was at the facility.
21 Q. And what -- give us some examples of the
22     safety procedures that would be -- that the
23     driver, if he didn't already know it, would be
24     advised of?
25 A. If they were dropping the trailer, they'd have

## 181

1    to chock their wheels and put jack stands
2    underneath the trailer. If they were to come
3    in and wanted to observe the trailer being
4    loaded, they had to stand in certain
5    locations.
6    Q. Okay. Anything else you can think of?
7    A. No. If they needed to use the restroom, they
8    had to take a certain route to the restroom.
9    Q. All right.
10   A. We told them where the restrooms were.
11   Q. Why did International Paper want to ensure
12   that chocks were placed by the wheels?
13   A. So that for the safety of our employees when
14   they were -- for the safety of Exel's
15   employees when they were loading the trailer
16   up, that in case the trailer were to fall down
17   or roll away from the door, it would be a
18   safety hazard. So the chocks prevent the
19   trailer from moving.
20   Q. Were there any requirements that were made
21   that had anything to do with the loading of
22   the trailer with the pallets of International
23   Paper product?
24   A. Not given to the driver. Exel would have had
25   instruction on how to safely load a trailer

## 182

1    and -- and load -- load the material, but not
2    related to the driver.
3    Q. Did International Paper ever fine a driver?
4    A. No.
5    Q. Did International Paper ever hire, discipline,
6    counsel, fire, or qualify any of the drivers
7    that arrived at the Hammond distribution
8    center?
9    A. Not at this facility, no.
10   Q. Did International Paper ever reprimand any
11   driver for any, say, speeding ticket that a
12   driver had acquired that International Paper
13   would have had knowledge of?
14   A. No.
15   Q. Did International Paper ever require a driver
16   to have certain methods of payment, like a
17   debit card, or a particular method of giving
18   payments while he or she is out on the road
19   and stopping at a truck stop?
20   A. No.
21   Q. Did International Paper have anybody at its
22   facility, either its own employee or a person
23   employed by Exel, that dispatched the driver?
24   And by dispatched, I mean have communication
25   with the driver to say, "Hey, come on in for

## 183

1    the load," and that type of thing.
2    A. No, there was no dispatch to the driver.
3    Q. Did International Paper ever require a driver
4    that showed up at the Hammond distribution
5    center to place any placards, graphics,
6    stickers, or logos on any part of the tractor,
7    trailer, chassis, or container that was going
8    to be eventually loaded and leave the Hammond
9    site?
10   A. No placards or -- no, nothing.
11   Q. Did International Paper ever inspect the
12   tractor, trailer, chassis, or container, like
13   a driver would do in doing a pretrip
14   inspection?
15          MR. SCHRECK: Objection to form.
16   Q. (By Mr. Fisher) And if you don't know what a
17   pretrip inspection is, let me know.
18   A. I know what a pretrip inspection is.
19   Q. Okay.
20   A. We wouldn't -- they would not inspect it --
21   anything like a pretrip inspection. They
22   would have inspected the trailer to ensure
23   that there was not -- that the trailer was not
24   leaking and that the trailer was clean and
25   that it was in condition to protect our goods.

## 184

1    Q. And what was the reason for that? Why did
2    International Paper do that or have Exel
3    people do that?
4    A. We wanted to make sure that we weren't loading
5    a trailer -- a product in it that would get
6    water damage on it. Or if the trailer was not
7    in condition -- some carriers have come to the
8    facility and brought a trailer that was not
9    safe for our forklifts to -- to drive onto.
10   And so they could fall through the floor of
11   one that didn't have the proper weight
12   crossbeams and so forth.
13   Q. So those inspections being done were done
14   primarily for two reasons: One was to make
15   sure that the product that your customer had
16   purchased from you arrived in the condition
17   they expected; and number two, to ensure that
18   the people doing the loading could do that
19   safely while the trailer was chocked?
20   A. Yes.
21   Q. Other than making the payments for this
22   particular load and the other loads that were
23   being done, say in June or July of 2008, as
24   noted in the documents you've just described
25   to us, was there any other payment that

## 185

1    International Paper made to anyone concerning
2    the July 3rd, 2008, load?
3    A. No. That was the only payment related to that
4    load.
5    Q. And so there was no direct payment by
6    International Paper to Martin's Bulk Milk
7    Service specifically for any of the costs,
8    expenses, salary, reimbursements associated --
9    benefits, reimbursements associated with that
10   particular driver's work, on that day?
11   A. Correct. No payment was made directly to
12   Martin's Bulk Milk.
13   Q. How would International Paper receive notice
14   that a customer wanted to buy some paper
15   product from International Paper? How would
16   that typically happen?
17   A. They would either call our customer service
18   rep or they could do like an EDI. They could
19   electronically submit an order to
20   International Paper. It was either calls -- I
21   suppose e-mail or fax, as well, could have
22   been used to our customer service reps who are
23   in Poland, primarily for these customers. And
24   we would receive the order that way.
25   Q. So the customer service reps that were in

## 186

1    Poland for International Paper, they would
2    receive, what, a phone call or an e-mail or
3    some other type of electronic transmission?
4    A. Yes.
5    Q. And then what would the people in Poland do
6    after they received that information?
7    A. They would enter the order into the system.
8    And that order then, once they confirmed the
9    order, that order would be sent to the Hammond
10   RDC to fulfill it, to fulfill the order.
11   Q. And that information being sent by
12   International Paper folks in Poland would then
13   come to the Exel people in Hammond?
14   A. Yes.
15   Q. And then the Exel people in Hammond would then
16   generate what we've already looked at in great
17   detail, the memo bills?
18   A. Yes.
19   Q. Is there any typical International Paper
20   customers -- strike that.
21        Was there any typical International
22   Paper customer back in, say, June or July of
23   2008, in terms of delivery expectations? For
24   example, what I mean is would there always be
25   customers who were saying, "Hey, I want this

## 187

1    product tomorrow"? Or would there be some
2    lead time? Or how would it be that, you know,
3    things would line up nicely so that you've got
4    an even number of -- or steady number of
5    customers?
6    A. The service platform was next-day delivery.
7    So if a customer called that day, the
8    expectation was that they would deliver that
9    next -- we would deliver that next-day.
10   Unless our pool truck -- because we had
11   committed capacity going to the Minneapolis
12   market, one truck or two trucks a day,
13   depending on the day of the week.
14        If we exceeded that capacity in
15   orders, we might see if we can get another
16   truck for the day, if we so desired, or we'd
17   ask our customer, "Is it okay if this part of
18   your order delivers" -- "it takes two days to
19   deliver? We'll deliver this hot stuff
20   tomorrow, and everything else will come the
21   next day." But we would always be committed
22   to -- if they placed an order, next-day
23   delivery was our commitment.
24   Q. And was that the expectation of most of
25   International Paper's customers?

## 188

1    A. Out of this RDC, that was the -- that RDC's
2    function.
3    Q. As opposed to the ABC Printing Company is
4    always going to have a steady order on the
5    second Tuesday of the month?
6    A. Correct. Yeah. No, this was -- sometimes
7    they would order Tuesdays. Sometimes they
8    would order Thursdays. It would be whenever.
9    But when they ordered, they wanted it the next
10   day. And that's because their customers, a
11   lot of times they were doing printing runs
12   that they just needed the paper when they
13   needed the paper.
14   Q. Did you ever talk with anybody associated
15   with -- to your knowledge, with Martin's Bulk
16   Milk Service?
17   A. No.
18   Q. Did you ever meet or talk with Samuel Franke?
19   A. No. Unless -- unless I was there -- I was not
20   there at night when he would have picked up.
21   So as far as I know, I've never met him.
22   Q. You were asked several questions about what
23   you believe to be International Paper's
24   expectations of Universal Am-Can or Overnite
25   Express with regard to the contract that

### 189

1    International Paper had with those entities?
2  A. Uh-huh.
3  Q. I want to follow up on some of those
4    questions. As long as Universal Am-Can
5    delivered — made sure the deliveries were
6    made and comported with the expectations and
7    the obligations in the contract, did
8    International Paper care who was the person
9    who did that work?
10 A. No. As long as they provided — as long as
11   they fulfilled the contract, no, we did not.
12 Q. And so that could include, for example,
13   employees of Universal Am-Can?
14 A. Uh-huh.
15 Q. Yes?
16 A. Yes.
17 Q. That could include, as you've mentioned, maybe
18   an owner operator?
19 A. Yes.
20 Q. It could include an employee of a completely
21   different motor carrier?
22 A. That they chose to broker, yes, uh-huh.
23 Q. You were earlier shown a bunch of documents
24   out of the International Paper document
25   disclosure and out of the Universal Am-Can

### 190

1    document disclosure.
2  A. Yes.
3  Q. In your job back in 2008 — 2008, would your
4    job have put you in contact with any of the
5    documents that, for example, Universal Am-Can
6    would have submitted when the changeover
7    occurred in mid June?
8  A. No. They probably would have gone to the
9    sourcing group. And I might have been on copy
10   or shared with some things. But primarily,
11   since those were contractual, they were making
12   changes with a contract, they would have gone
13   to Steve Mundy directly. Is that —
14 Q. Here's the reason I ask this question. You
15   saw, and Mr. Burke addressed your attention
16   to, some ICC authorities or permits.
17 A. Okay. Yes.
18 Q. All right. Did you ever come into knowledge
19   or come to know that either Overnite Express
20   or Universal Am-Can had different authorities
21   issued by the ICC for being either a contract
22   carrier, a common carrier, or a broker?
23 A. I would not have been privy or part of that
24   discussion — that discussion.
25 Q. Or documents —

### 191

1  A. Or see the documents, no.
2  Q. Until you learned about this case and
3    participated in the collection of documents
4    and attesting to answers and verifying answers
5    to interrogatories —
6  A. Uh-huh.
7  Q. — until that occurred, did you have any
8    knowledge at all that Mr. Franke, as he
9    testified in his depositions, would leave from
10   Wilson, Wisconsin, on a, you know, Monday
11   through Friday, would come down to yards,
12   perhaps drop off a container or a trailer,
13   come to the Hammond distribution center, pick
14   up a load, and then transport it only back so
15   far as Wilson, Wisconsin, near where Martin's
16   Bulk Milk and Mr. Franke's residence were?
17 A. No. Up until this last week, I didn't know
18   that they transferred the load between two
19   drivers. I always assumed it went straight to
20   Minneapolis.
21 Q. And I mean is that example of your not knowing
22   many of the details of Mr. Franke's particular
23   work day in and day out, and on July 3rd in
24   particular?
25 A. Yes, I did not know anything about his

### 192

1    particular workday.
2  Q. And is it fair to say that your first notice
3    of this accident happening was a year after
4    the accident happened when suddenly you got
5    notice from — an internal legal hold at
6    International Paper?
7  A. Yes.
8  Q. Did you understand that that was because there
9    had been a lawsuit that was filed against
10   International Paper?
11 A. Yes.
12 Q. Up to that point, in your role as an
13   enterprise manager —
14 A. Enterprise distribution manager.
15 Q. — distribution manager for the Hammond
16   distribution center, you had absolutely no
17   knowledge, at all, of any accident that
18   occurred on July 3rd, 2008?
19 A. No.
20 Q. So that's a correct statement?
21 A. That is a correct statement, yes.
22 Q. Okay. That's all I have. There might be some
23   more questions.
24
25

193

1    REEXAMINATION
2    BY MR. BURKE:
3    Q. Just a couple things. Do you have Exhibit 2
4       in front of you there, the --
5           MR. FISHER: I think it's in there.
6       Yep.
7    Q. (By Mr. Burke) Starting with page 36, the
8       contract, the 2007 contract.
9    A. Uh-huh.
10   Q. And we've talked a little bit about this
11      before. But on page 38 starts Section 3 with
12      "Carrier's Obligations." Do you see that?
13   A. Yes.
14   Q. Okay. And then carrying over to page 39,
15      that's a continuation of that section. Right?
16   A. Yes.
17   Q. Okay. And there is a Section G for "Motor
18      Vehicle Equipment." Correct?
19   A. Yes.
20   Q. Okay. And as part of that section,
21      International Paper did require that its
22      carriers, as it says there, "maintain at its
23      own cost and expense the motor vehicle
24      equipment required to provide the
25      transportation services required hereunder,

194

1    including the commitments set forth in
2       Exhibit C in good, safe, and lawful operating
3       condition at all times and in accordance with
4       applicable local, state, and federal laws and
5       regulations." Correct?
6    A. Uh-huh, yes.
7    Q. And there were, as you've told us before,
8       certain reporting requirements that carriers
9       had, such as when they arrived at a location
10      and made a delivery, they had to confirm that
11      it was made. Correct?
12   A. Yes.
13   Q. And you actually -- or International Paper
14      retained with -- under the terms of their
15      contract, the right to terminate the agreement
16      if they were dissatisfied with the manner in
17      which deliveries were made to your customers.
18      Correct?
19   A. Yes.
20   Q. Okay. And just one other thing. Oh,
21      switching topics on you. You said you looked
22      at this contract with Exel. Where is that --
23      or where is that contract?
24   A. We have -- we have a copy if you --
25          MR. FISHER: I can -- I can submit

195

1       that, too.
2           MR. BURKE: Okay.
3           MR. FISHER: Do you want it -- do you
4       want it? I've got it right here. What's your
5       pleasure?
6           MR. BURKE: Let me -- yeah, let me
7       glance at it, Carl, just to avoid
8       unnecessary ...
9           MR. SCHRECK: Out of curiosity, Tim,
10      are you going to have any questions?
11          MR. COUTURE: Probably not.
12          (Discussion off the record.)
13          (Deposition Exhibit No. 103 was
14      marked for identification.)
15          THE WITNESS: Now, this is the copy
16      provided to me in my role.
17          MR. FISHER: Right. So I've got to
18      double-check that this is the actual contract
19      with, you know, the internal folks.
20   Q. (By Mr. Burke) The Exhibit No. 3 that has
21      been produced --
22          MR. FISHER: 103.
23   Q. (By Mr. Burke) Exhibit 103 --
24          MR. BURKE: Thank you.
25   Q. (By Mr. Burke) Exhibit 103 that Mr. Fisher

196

1       produced just now, that you have made a
2       reference to, consists of what, Ms. Anderton?
3    A. It's the -- it's -- Exel Logistics operates
4       our Hammond facility, and this was the
5       contract from 2005. I believe it was a
6       five-year contract with Exel Logistics for the
7       operation of that regional distribution
8       center.
9    Q. Okay. And I don't think this -- these pages
10      aren't Bates Stamped. But there's probably
11      maybe 75 pages, or so, here, which obviously I
12      can't read. And I guess right at the
13      moment ...
14   A. It's really -- a lot of it is around the
15      operation of the facility.
16   Q. Okay. It's fair to say the Exel -- I think as
17      you told us before, that all of your
18      agreements with International Paper's
19      customers were created by International Paper,
20      correct, in terms of --
21   A. Yes.
22   Q. -- you know, orders for sales, deliveries --
23   A. Correct. Yes, all the -- yes, all the
24      agreements were with the carriers.
25   Q. And all of your agreements with carriers,

197

1    including Overnite Express and Universal, were
2    negotiated and created by International Paper
3    and not Exel?
4    A. That is correct. Yes.
5    Q. Okay. And -- okay. The -- on -- under the
6    terms of your contract with Overnite Express
7    and then with Universal, one of the terms in
8    Paragraph H is that the carrier's personnel
9    had to comply with local, state, and federal
10   laws and regulations in the operation of their
11   tractor-trailer trucks while delivering your
12   products. Correct?
13   A. Yes.
14   Q. And as you told us earlier, that includes
15   complying with motor vehicle traffic
16   regulations while operating the
17   tractor-trailer trucks. True?
18        MR. FISHER: Object --
19   A. Yes.
20        MR. FISHER: Excuse me. Asked and
21   answered. Yeah.
22        You gave your answer. Right?
23        THE WITNESS: Yeah.
24   Q. (By Mr. Burke) Okay. And your answer was
25   yes. Correct?

199

1    see under the word "Original"?
2    A. Yes.
3    Q. Does the information or the writing there
4    start in the middle of a sentence? Or did
5    Carl just give me bad copies?
6    A. I do not know.
7    Q. Do you see what I mean?
8    A. I do not know.
9    Q. Am I correct --
10   A. I do not know.
11   Q. I mean in my version, the first line under
12   the --
13   A. It says "The property."
14   Q. -- word "original" starts with "The property"?
15   A. Yes, "The property described above."
16   Q. Okay. And I mean, you know, look at three and
17   four, pages 3 and 4. It appears to be the
18   same. Right?
19   A. It's the same, yes.
20   Q. Okay. And, you know, what I'm really getting
21   at, is there -- is that a bad copy or is -- do
22   you have any understanding of why that appears
23   to be the case, that that language is starting
24   in the middle --
25   A. I do not know.

198

1    A. Yes.
2    Q. Different topic. Who's Monica Livingston?
3    She's supposedly an administrative assistant
4    in the motor carrier intermodal procurement
5    section.
6    A. Yes.
7    Q. Do you know her?
8    A. I did know Monica. I knew her in her role
9    after that role. She worked in -- because I
10   didn't know her when she was doing -- working
11   for the procurement group. She became a
12   customer service rep, and that's how I met
13   her. So she is in one of the e-mails
14   referenced, at the time where she was working
15   for Steve Mundy I guess, and related to
16   contracts.
17   Q. Okay. And, you know, my -- this --
18        MR. BURKE: Here, Carl, hang on to
19   that so I don't lose it.
20        MR. FISHER: Sure.
21   Q. (By Mr. Burke) Take a look at one of these
22   bills of lading. Look at 2 -- look at
23   Exhibit 2, page 2 for that matter.
24   A. (Witness complies.)
25   Q. Do you see on the bottom, in the small print,

200

1    Q. -- of a phrase?
2    A. I do not know.
3    Q. Okay.
4        MR. FISHER: Can I interject a
5    question on that topic?
6        MR. BURKE: Yeah.
7        MR. FISHER: Is it your belief that
8    International Paper generated this, or did
9    Exel generate this?
10        THE WITNESS: This is -- this printed
11   out from the Red Prairie system, which was
12   Exel's warehouse management system.
13        MR. FISHER: Okay.
14        THE WITNESS: So, yes, Exel produced
15   that.
16        MR. FISHER: So is it fair to say
17   that you don't know, as you sit here today,
18   whether or not the language on this memo bill
19   is exactly in conformity with the language on
20   a standard International Paper bill of lading?
21        THE WITNESS: Yes. I don't know
22   that.
23        MR. FISHER: Okay.
24        THE WITNESS: I don't know that.
25   Q. (By Mr. Burke) Well, did -- did International

JOAN ANDERTON                                                    APRIL 10, 2012

## 201

1    Paper, I mean, authorize Exel to utilize this
2    form of a memo bill?
3    A.  Exel chose to use their warehouse management
4    system to produce a memo bill.  So the major
5    contents of the information is what we would
6    provide them, and they would print this memo
7    bill up.  I — I do not know the root of the
8    standard text that's on the bottom here.
9    Q.  Okay.  But when you say that Exel chose to use
10   a particular form of a memo bill, is it
11   correct that Exel did so with International
12   Paper's knowledge and approval and consent?
13   A.  With — yeah, with our knowledge, they used
14   their system to produce it.
15   Q.  And you were in agreement with them doing so?
16   A.  I just don't — I don't know the root of where
17   that text come from.
18   Q.  Okay.  But whatever form they used and
19   whatever language they used was agreeable to
20   International Paper?
21   A.  This is what they used for us, yes.
22   Q.  Okay.  Nothing else.  Thank you, Ms. Anderton.
23            MR. SCHRECK:  I don't have anything
24   else.
25            MR. FISHER:  Tim?

## 202

1              EXAMINATION
2    BY MR. COUTURE:
3    Q.  Yeah, I just have like three questions for
4    you, ma'am.  My name is Tim Couture.  I
5    represent BMW.
6    A.  Hi, Tim.
7    Q.  How are you?  Are you aware that BMW has been
8    sued in this lawsuit, as well?
9    A.  Yes.
10   Q.  Okay.  I take it that you have no opinions
11   regarding the product liability side of this
12   lawsuit?
13   A.  I have no opinions.
14   Q.  You don't know anything about the allegations
15   that Mr. Burke's client has levied against
16   BMW, that the vehicle was improperly designed
17   or manufactured.  Correct?
18   A.  Correct.  I have no knowledge of this.
19   Q.  Okay.  That's all I've got for you.  Thanks.
20   A.  Thank you.
21            MR. FISHER:  We'll show signature
22   reserved.
23            (The deposition concluded at
24   2:28 p.m.)
25

## 203

1           **DEPOSITION ERRATA SHEET**
2
3    Assignment No. 328300
4    Case Caption:  Scheinman
5    vs. Martin's Bulk Milk Svc., et al.
6
7       **DECLARATION UNDER PENALTY OF PERJURY**
8    I declare under penalty of perjury that I have
9    read the entire transcript of my deposition taken
10   in the captioned matter or the same has been read
11   to me, and the same is true and accurate, save and
12   except for changes and/or corrections, if any, as
13   indicated by me on the DEPOSITION ERRATA SHEET
14   hereof, with the understanding
15   that I offer these changes as if still under oath.
16   Signed on the _____ day of _____, 20_____.
17
18   _____
19        Joan Anderton
20
21
22
23
24
25

## 204

1          **DEPOSITION ERRATA SHEET**
2    Page No._____Line No._____Change to:_____
3
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25            Joan Anderton

205

1    DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
         Joan Anderton
25

206

1       C E R T I F I C A T E
2
3             I, Stacey L. Sommers, a Certified Court
4    Reporter of the State of Missouri, do hereby
5    certify:
6             That prior to being examined, the witness
7    was first duly sworn;
8             That said deposition was taken down by me
9    in shorthand at the time and place hereinbefore
10   stated and was thereafter reduced to typewriting
11   under my direction;
12            That the foregoing transcript is a true
13   record of the testimony given by said witness;
14            That I am not a relative or employee or
15   attorney or counsel of any of the parties or a
16   relative or employee of such attorney or counsel
17   or financially interested in the action.
18            Witness my hand and seal this 24th day of
19   April, 2012.
20
21
22
23            Stacey L. Sommers
24            Missouri Supreme Court
25            Certified Court Reporter

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY J. )
SCHEINMAN, a Disabled )
Person, )
                  )
      Plaintiffs, )   Case No.: 09 cv-5340
                  )
vs.              )   Honorable James F.
                  )         Holderman
MARTIN'S BULK MILK )   Magistrate Susan E. Cox
SERVICE, INC., SAMUEL G. )
FRANKE, CSX INTERMOD, )
INC., INTERNATIONAL PAPER )
COMPANY and OVERNITE )
EXPRESS, INC., )
                  )
      Defendants. )

***************************************
ORAL DEPOSITION OF
WILLIAM CRAWFORD
JUNE 6, 2012
***************************************

ANSWERS AND DEPOSITION OF WILLIAM CRAWFORD, a
witness called by Murray Scheinman, Plenary Guardian of
the Estate and Person of Jeffrey J. Scheinman, a
Disabled Person, taken before Shannon H. DeLay,
Certified Shorthand Reporter for the State of Texas, on
the 6th day of June, 2012, between the hours of
9:06 a.m. and 10:41 a.m., at Esquire Deposition
Services, 100 Congress Ave., Suite 2020, Austin, Texas,
pursuant to the agreement of counsel and the respective
parties as hereinafter set forth.

## 3

INDEX

                             PAGE

Appearances ..................................... 2
Stipulations .................................. N/A
WILLIAM CRAWFORD
   Examination by Mr. Burke ................. 4, 60
   Examination by Mr. Schreck ................. 55
   Examination by Mr. Langs ................... 57
   Examination by Mr. Fisher ................. 57

Signature and Changes ........................ N/A

Reporter's Certificate ........................ 62

## 2

APPEARANCES

FOR THE PLAINTIFF:
   Mr. Richard F. Burke, Jr.
   CLIFFORD LAW OFFICES, P.C.
   120 North LaSalle Street
   31st Floor
   Chicago, Illinois 60602

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK
SERVICE, INC., AND SAMUEL G. FRANKE:
   Mr. Robert J. Golden
   DOWD & DOWD, LTD.
   617 West Fulton
   Chicago, Illinois 60661

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK
SERVICE, INC., AND SAMUEL G. FRANKE:

   Mr. Matthew R. Schreck
   MULHERIN, REHFELDT & VARCHETTO, P.C.
   211 South Wheaton Ave., Suite 200
   Wheaton, Illinois 60187

TELEPHONICALLY FOR THE DEFENDANT(S) INTERNATIONAL PAPER
COMPANY AND UNIVERSAL AM-CAN, LTD., AND SUCCESSOR TO
OVERNITE EXPRESS, INC., AND OX, LLC.:

   Mr. Carlton D. Fisher
   HINSHAW & CULBERTSON, LLP
   222 North LaSalle Street, Suite 300
   Chicago, Illinois 60601

TELEPHONICALLY FOR THE DEFENDANT(S) BMW OF NORTH
AMERICA, LLC AND BAYERISCHE MOTOREN WERKE
AKTIENGESELLSCHAFT:

   Mr. Brian Langs
   JOHNSON & BELL, LTD.
   33 West Monroe Street, Suite 2700
   Chicago, Illinois 60603

## 4

              WILLIAM CRAWFORD,

having been first duly sworn, testified as follows:

       MR. BURKE: Let the record reflect this is
the discovery deposition of Mr. William Crawford, taken
pursuant to notice and in the accord with the
applicable rules of the United States District Court
for the Northern District of Illinois.

             EXAMINATION

BY MR. BURKE:

   Q. Mr. Crawford, my name is Rich Burke. I'm sure
Mr. Fisher told you I'm going to ask you some questions
about some of your time and work at International
Paper. And as I do so, if you want any questions
repeated, or if they don't make sense, just tell me.

       If you could verbalize your "yes" and "no"
answers because even though I can see you nodding your
head, the court reporter has to take down an answer,
and if you and I do not talk at the same time, that
helps the court reporter, as well.

       And if you want to look at a document or
something, just say so. It's not intended to, you
know, be a memory test or anything for you. Okay.

       Would you please state your full name and
spell your last name.

   A. William P. Crawford.

**5**

1    Q. And —
2    A. C-R-A-W-F-O-R-D.
3    Q. And — and what — what city do you currently
4    live in, sir?
5    A. Austin, Texas.
6    Q. Okay. And are you employed at the present
7    time?
8    A. I'm not.
9    Q. Okay. When were you last employed?
10    A. March of 2012.
11    Q. Okay. And by whom were you employed at that
12    time?
13    A. Temple-Inland.
14        UNIDENTIFIED SPEAKER: Could you say that
15    louder. I couldn't hear you.
16        THE REPORTER: Who was —
17        THE WITNESS: Temple-Inland.
18    Q. (BY MR. BURKE) And how do you spell that?
19    A. T-E-M-P-L-E, hyphen, I-N-L-A-N-D.
20    Q. Okay. And what's the nature of their
21    business?
22        UNIDENTIFIED SPEAKER: Rich?
23        MR. BURKE: Yeah.
24        UNIDENTIFIED SPEAKER: I'm having a hard
25    time hearing. Could you put the mic closer or speak up

**6**

1    or something?
2        MR. FISHER: It's pretty close.
3        MR. BURKE: Yeah. We've got it pretty
4    much as —
5        UNIDENTIFIED SPEAKER: I hear you, Rich.
6    Unfortunately, I can't hear Mr. Crawford.
7        MR. BURKE: Okay. We've got it right
8    between us. So — Is there a volume on this thing?
9    Okay. I think we have it turned up as best we can.
10        MR. FISHER: Okay.
11        MR. BURKE: All right.
12    Q. (BY MR. BURKE) What's the business of
13    Temple-Inland?
14    A. They're a paper and packaging company.
15    Q. Okay. And where are they located?
16    A. Austin, Texas.
17    Q. Okay. And during what time period were you —
18    did you work for them?
19    A. From October 2009, to March 2012.
20    Q. Okay. And what was your last position with
21    them?
22    A. I was their VP of Materials.
23    Q. Okay. And what did you do on a daily basis?
24    A. We did — we did centralized procurement for
25    the company.

**7**

1    Q. Okay. And that would be procurement of what?
2    A. Of primarily chemicals, transportation,
3    energy, equipment.
4    Q. Does Temple-Inland have any relationship with
5    International Paper?
6    A. Yes. International Paper acquired
7    Temple-Inland.
8    Q. Acquired Temple when?
9    A. In February of 2012.
10    Q. When did you last work for International
11    Paper?
12    A. Left International Paper in January of 2009.
13    Q. Did you leave on your own or were you asked to
14    leave or fired or...
15    A. I was given a severance package.
16    Q. And what prompted the severance package?
17    A. I think, just an organizational shift.
18    Q. Were you terminated for any misconduct or
19    wrongdoing in any way?
20    A. No.
21    Q. When you left in 2009, where did you go to
22    work? Was it Temple?
23    A. Yes.
24    Q. Okay. International Paper did not own Temple
25    at that time; is that correct?

**8**

1    A. That's correct.
2    Q. When you last left International Paper, what
3    was your job title or position?
4    A. VP Global Sourcing.
5    Q. Okay. And for about how long had you been in
6    that position?
7    A. 18 years.
8    Q. Okay. For how long did you work at
9    International Paper?
10    A. 18 years.
11    Q. And you started with International Paper in
12    what year?
13    A. Around April of 1990.
14    Q. Where did you work before that?
15    A. ITT Automotive.
16    Q. And where at?
17    A. Detroit.
18    Q. And for about how long?
19    A. Four years.
20    Q. And what did you do there?
21    A. VP Materials.
22    Q. What's your educational background,
23    Mr. Crawford?
24    A. I've got a mechanical engineering degree from
25    Lafayette College and an MBA from the University of

WILLIAM CRAWFORD                                              JUNE 06, 2012

## 9

1  Pittsburgh.
2      Q.  Okay.  And where is Lafayette College located?
3      A.  Eastern Pennsylvania.
4      Q.  And your MBA was?
5      A.  Pitt.
6      Q.  From Pitt.  Okay.  And when did -- what year
7  did you get the college degree?
8      A.  1967.
9      Q.  Okay.  And how about your MBA?
10     A.  '68.
11     Q.  Okay.  Any other degrees --
12     A.  No.
13     Q.  -- other than those?  Have you given any
14  depositions before?
15     A.  Yes.
16     Q.  Okay.  About how many?
17     A.  About three.
18     Q.  Okay.  And were they all given while you were
19  employed by International Paper?
20     A.  Yes.
21     Q.  Okay.  And did any of those depositions --
22  Strike that.  Were any of those depositions given in
23  cases involving personal injury or wrongful death
24  claims?
25     A.  No.

## 10

1      Q.  What types of cases were those, generally?
2      A.  One was a personnel issue.  I think, perhaps,
3  two were personnel issues.  One was a contract dispute.
4      Q.  Have you testified in court at all?
5      A.  Yes.
6      Q.  Okay.  How many times?
7      A.  Once.
8      Q.  Okay.  And in what state?
9      A.  Illinois.
10     Q.  And what type of case?
11     A.  Contract dispute.
12     Q.  And was International Paper a party?
13     A.  Yes.
14     Q.  Okay.  And about when did you testify?
15     A.  Oh, about ten years ago.
16     Q.  And was that in state court or federal court?
17     A.  Federal.
18     Q.  And was International Paper the party bringing
19  the lawsuit, or were they being sued?
20     A.  They were bringing the lawsuit.
21     Q.  Against whom?
22     A.  I -- I'm not sure I've got the name correct,
23  but it was a -- Michael Polsky, I think, was the
24  defendant.  I'm not sure I remember the name of his
25  company.  It was around a capital project at one of the

## 11

1  paper mills.
2      Q.  Okay.  Michael Polsky, did you say?
3      A.  Yeah.
4      Q.  And -- and was he sued individually, or was it
5  one of his companies?
6      A.  I'm sure, it was the company.
7      Q.  Okay.  Was it a paper product related company
8  or...
9      A.  It was a capital project that Michael
10  developed and installed at International Paper's mill
11  in Maine.  It had to do with gas turbines --
12     Q.  Okay.
13     A.  -- installed at the mill.
14     Q.  It's kind of his thing, Polsky, the windmills
15  and --
16     A.  That's the same one.
17     Q.  Yes.  Okay.  I -- I -- I took you back to your
18  time at ITT in Detroit.  Between getting your MBA and
19  going to work at ITT in Detroit, can you give me some
20  idea where you worked?
21     A.  General Electric Company.
22     Q.  Okay.  And for about how long?
23     A.  18 years.
24     Q.  And where at?
25     A.  Various places.  Primarily, Milwaukee and

## 12

1  Bridgeport, Connecticut.
2      Q.  Okay.  And, basically, what type of work did
3  you do?
4      A.  Purchasing manager.
5      Q.  Okay.  And what would you purchase on behalf
6  of GE?
7      A.  Various things.  But in Milwaukee I was buying
8  castings.  In Bridgeport, it was electronics.
9      Q.  Okay.  Have you done any work as a consultant
10  of any kind at any time while you've been at
11  International Paper?
12     A.  No.
13     Q.  Okay.  How about after you left there?
14     A.  No.
15     Q.  Okay.  Have you -- have you provided any type
16  of expert services or advice or consulting to
17  companies, either since -- while you were working at
18  International Paper or thereafter, other than to your
19  employers?
20     A.  No.
21     Q.  Do you have any private business at the
22  moment?
23     A.  No.
24     Q.  When you worked -- when you last worked at
25  International Paper, at what location did you work?

WILLIAM CRAWFORD                                              JUNE 06, 2012

## 13

1    A.  Memphis, Tennessee.
2    Q.  Okay.  And you said you worked in Global
3  Sourcing.  Was -- was that the name of your division or
4  department, or was there another name?
5    A.  That was the name of the department.
6    Q.  Okay.  And you last worked there in 2009, I
7  believe?
8    A.  Yes.
9    Q.  What have you reviewed in anticipation of
10 giving a deposition today?
11   A.  I looked at a -- a contract, and I looked at
12 some testimony from another International Paper
13 employee.
14   Q.  Okay.  And who was that?
15   A.  I don't remember her name.
16   Q.  Joan Anderton.
17   A.  Yes.
18   Q.  Do you know her?
19   A.  No.
20   Q.  Okay.  Have you spoken with her about this
21 case?
22   A.  No.
23   Q.  Okay.  Was there anything in -- in what you
24 read of Ms. Anderton's deposition that you thought was
25 incorrect or inaccurate?

## 14

1         MR. FISHER:  Excuse me.  Objection, form.
2  You can go ahead and answer.
3    A.  No.
4    Q.  (BY MR. BURKE)  Okay.  By the way, what --
5  what's your date of birth, Mr. Crawford?
6    A.  December 10th, 1945.
7    Q.  The contract that you referred to reading,
8  what contract was that?
9    A.  It's a contract with a trucking company, and
10 I'm trying to remember the name.
11   Q.  Overnite Express?
12   A.  Yes.
13   Q.  Okay.  Was it the October 27, 2007, contract?
14   A.  That sounds right.
15   Q.  Okay.
16         MR. FISHER:  Rich, that's the only one I
17 sent.
18         MR. BURKE:  Okay.
19   Q.  (BY MR. BURKE)  Have you ever been to
20 International Paper's Hammond warehouse in Hammond,
21 Indiana?
22   A.  No.
23   Q.  Okay.  Have you ever driven a tractor-trailer
24 truck?
25   A.  No.

## 15

1    Q.  Okay.  I take it you do not have a CDL
2  license, commercial driver's license?
3    A.  No.
4    Q.  Okay.  Are you -- are you familiar with the
5  incident that is the subject of this lawsuit involving
6  injuries to Jeffrey Scheinman?
7         MR. FISHER:  Rich, do you mean apart from
8  anything I might have said to him that's privileged?  I
9  will tell you I told him there's an accident, it's a
10 rear-ender, and there's certain parties in the lawsuit.
11 That...
12         MR. BURKE:  Okay.
13         MR. FISHER:  I mean, I'm going to give you
14 some leeway here, but --
15         MR. BURKE:  Yeah.
16   Q.  (BY MR. BURKE)  In general, I -- you know, I'm
17 not looking for specific things that Mr. Fisher told
18 you, your lawyer, but, generally, do you -- are you
19 familiar with the nature of the case that brings us to
20 be having a deposition today?
21   A.  Carl told me that there was an accident, and
22 that's --
23   Q.  Okay.  You know what, don't tell me what Carl
24 told you because he's your lawyer, and that's
25 privileged.  But I take it you have some understanding

## 16

1  that there was a truck collision with a -- a car,
2  resulting in injuries to Mr. Scheinman?
3    A.  Yes.
4    Q.  Okay.  Prior to you being asked to give a
5  deposition in this case, did you have any knowledge of
6  that occurrence?
7    A.  No.
8    Q.  Okay.  How did you first become aware of the
9  need for a deposition?  Was that -- was that through
10 Carl?
11   A.  Yes.  He called me.
12   Q.  Okay.  In 2007 and up through your last time
13 at International Paper in 2009, what -- how would you
14 describe the business of International Paper?
15   A.  I'm not sure I understand the question.
16   Q.  Okay.  What -- what business was International
17 Paper involved in?  What -- what did they do?
18   A.  They're a paper company.
19   Q.  Okay.  Do they manufacture paper?
20   A.  Yes.
21   Q.  And did they also transport their paper
22 products to their customers?
23   A.  I don't think they transport it directly.
24 They hire people to do it for them.
25   Q.  And they entered into contracts with various

17

1  carriers to transport paper, correct?
2      A.  Yes.
3      Q.  Okay.  Did -- if -- if there was -- are you
4  familiar with terms like operation side of a business,
5  transportation side, logistics, things like that?  Are
6  those terms you'd have any general familiarity with?
7      A.  General.  Not -- not specific.
8      Q.  Okay.  What -- with respect to your job in
9  Global Sourcing, was there a side of the business
10 that -- that -- a side of the International Paper
11 business that your -- your work fell into?
12     A.  I'm not sure I understand the question.
13     Q.  Okay.  With respect to -- did you consider
14 yourself to be involved in the operation side of the
15 business?
16     A.  No.
17     Q.  Okay.  And why -- why not?
18     A.  I was in a corporate staff role.  My
19 department was -- was -- mission in life was to engage
20 our key suppliers and -- and contract for the purchases
21 that we did with our key supporters.
22     Q.  And those suppliers would be what type of
23 businesses?
24     A.  Equipment companies, chemical companies,
25 transportation companies, energy companies.

18

1      Q.  And was the contract that Mr. Fisher sent you,
2  the October 2007 contract with Overnite Express, was
3  that a contract with a transportation company?
4      A.  Yes.
5      Q.  Okay.  And that -- and that contract was
6  generally for the purpose of transporting International
7  Paper products to the customers to whom International
8  Paper was selling?
9      A.  Yes.
10     Q.  Did International Paper do any of its own
11 deliveries or make any of its own deliveries with their
12 own trucks?
13     A.  I think one business that did some of that was
14 the distribution company, Xpedx.  I think the rest of
15 the company did not.
16     Q.  Okay.
17         MR. FISHER:  Could you spell that for the
18 court reporter.
19         THE WITNESS:  It's X-P-E-D-X.
20         MR. FISHER:  Probably wouldn't find that
21 one in the dictionary.
22     Q.  (BY MR. BURKE)  Okay.  And what was the
23 business of Xpedx?
24     A.  They were a distributor of paper products.
25     Q.  And did International Paper own Xpedx?

19

1      A.  Yes.
2      Q.  And do you know to whom Xpedx would distribute
3  paper?
4      A.  Not specifically.
5      Q.  Are -- are -- are you aware that -- that some
6  of the International Paper products on the truck at the
7  time of this collision was destined for Xpedx?
8      A.  No.  I didn't know that.
9      Q.  Okay.  Did you in your job have any
10 involvement with the -- the Hammond warehouse?
11     A.  No.
12     Q.  Would you have any contact with any person
13 from International Paper who had any managerial or
14 supervisory role at the Hammond warehouse?
15     A.  I had contact with the -- the management team
16 at Xpedx in Cincinnati, but I -- I didn't have any
17 contact with Hammond directly.
18     Q.  Did -- other than what you mentioned about
19 Xpedx, did International Paper own any of its own
20 tractors for delivery of its paper products?
21     A.  Not that I'm aware of.
22     Q.  Did they own any of their own trailers for
23 delivery of their paper products?
24     A.  Not that I'm aware of.
25     Q.  With -- with respect to -- Strike that.  With

20

1  respect to the paper that was being picked up at the
2  Hammond warehouse that's involved in this occurrence,
3  how did those paper products get to the Hammond
4  warehouse?
5      A.  I don't know, specifically.
6      Q.  Were you involved in that type of
7  transportation at all?
8      A.  We did contracts for transportation, but I
9  wasn't involved in the day-to-day operations of
10 shipments.
11     Q.  Okay.  You were -- Mr. Fisher -- or you
12 mentioned that Mr. Fisher gave you a copy of an October
13 2007 contract.  Do you -- do you have a copy of that in
14 front of you, Mr. Crawford?
15     A.  Yes.
16     Q.  Okay.
17         MR. SCHRECK:  And just for the record,
18 what -- what page are you looking at?  What Bates stamp
19 number?
20         MR. FISHER:  36.
21         MR. SCHRECK:  36.
22         MR. BURKE:  We're showing -- I'm going to
23 tender to Mr. Crawford a portion of Exhibit No. 2,
24 which is -- which contains at Page 35 -- well, starting
25 with 35.

WILLIAM CRAWFORD                                        JUNE 06, 2012

## 21

1      MR. FISHER: Matt and everybody else, you
2  need to say your name first.
3      MR. SCHRECK: Oh, I apologize. It was
4  Matthew Schreck. And just for the record, you're
5  looking at IP Exhibit 2 -- Excuse me -- Exhibit 2, IP
6  Page 36?
7      MR. BURKE: Well, I'm going to start with
8  35, but the contract itself starts --
9      MR. SCHRECK: Just making sure I had the
10  right spot. Thanks.
11      MR. BURKE: -- on Page -- contract starts
12  on Page 36 and runs, I believe, to about Page 75 of the
13  International Paper Bates stamped pages.
14      Q. (BY MR. BURKE) And, Mr. Crawford, just to --
15  there is on Page 35 -- and do you see the Bates stamped
16  numbers in the lower right corner, sir?
17      A. Yes.
18      Q. Okay. So when I refer you to a page number,
19  that's what I'm talking about. On Page 35, there's a
20  letter dated October 24, 2007, on International Paper
21  letterhead, from Steven Mundy; am I correct?
22      A. Yes.
23      Q. Okay. And at that time, it appears Mr. Mundy
24  was the manager of Motor Carrier Transportation
25  Sourcing?

## 22

1      A. Yes.
2      Q. Okay. What was -- with respect to the
3  hierarchy of personnel, where did you and Mr. Mundy
4  fit?
5      A. Steve worked for a manager who reported to me.
6      Q. Okay. So Steve was under you?
7      A. He -- he -- he reported to one of my managers.
8  So he was part of my organization.
9      Q. Okay. And was the Motor Carrier
10  Transportation Sourcing Department within Global
11  Sourcing?
12      A. Yes.
13      Q. Who was above you in Global Sourcing?
14      A. I was the top person in Global Sourcing. I
15  reported to the CFO.
16      Q. Okay. And who was that?
17      A. Marianne Parrs.
18      Q. And how do you spell her last name?
19      A. P-A-R-R-S.
20      Q. And where was she, in Memphis?
21      A. Yes.
22      Q. Okay. And am I correct that in this letter on
23  Page 35, Steve Mundy is sending a copy of a contract
24  that International Paper entered into with Overnite
25  Express; is that correct?

## 23

1      A. Yes.
2      Q. Okay. And that's identified as Motor
3  Procurement Contract No. OXEN 093009?
4      A. Yes.
5      Q. And that's being sent to Sandy Herrmann?
6      A. Yes.
7      Q. Okay. Did you know Sandy Herrmann?
8      A. No.
9      Q. Okay. Did you ask Steve Mundy to send this
10  contract to Sandy Herrmann?
11      A. I don't remember.
12      Q. And let me ask you to turn to Page 36, sir.
13      A. (Witness complies.)
14      Q. Is this the beginning of what we referred to
15  as the October 1st, 2007 contract between International
16  Paper and Overnite Express?
17      A. Yes.
18      Q. And this is the contract you've reviewed,
19  correct?
20      A. Yes.
21      Q. Okay. And this contract bears your signature;
22  am I correct?
23      A. Yes.
24      Q. Okay. And, I think, I've seen your signature
25  on two places, if I recall correctly, one of which is

## 24

1  Page 52; is that right? Or why don't you first turn to
2  page 49.
3      A. (Witness complies.)
4      Q. I'm sorry, 48.
5      A. (Witness complies.)
6      Q. Okay. And is that your signature?
7      A. Yes.
8      Q. Okay. And am I correct you signed this
9  contract on behalf of International Paper on November
10  12th, 2007?
11      A. Yes.
12      Q. And look at Page 20 -- or, I'm sorry, Page 52.
13      A. (Witness complies.)
14      Q. And is that also your signature?
15      A. Yes.
16      Q. Okay. And also dated November 12, 2007?
17      A. Yes.
18      Q. Okay. And is Page 52, are you signing an
19  exhibit to the contract?
20      A. Yes.
21      Q. Okay. And was that the Fuel Index exhibit?
22      A. Yes.
23      Q. Okay. And, in general terms, what did the
24  Fuel Index exhibit consist of, or what was its purpose?
25      A. It was to change the price of the -- of the

## 25

1　agreement up and down with the cost of fuel, diesel
2　fuel.
3　　　Q.　Okay.  And of the Bates pages in front of you,
4　sir, to what page does this contract run, including the
5　exhibits or attachments to the contract?
6　　　A.　Page 75.
7　　　Q.　Okay.  And that last exhibit is --
8　　　　　MR. FISHER:  Richard, I think that's when
9　they changed OXEN to UACL.
10　　　　　MR. BURKE:  Yeah.  That's --
11　　　　　MR. FISHER:  So when we produced this, I
12　don't think this was part of the contract.
13　　　　　MR. BURKE:  The last exhibit?
14　　　　　MR. FISHER:  Bates No. Page 75 --
15　　　　　MR. BURKE:  Right.
16　　　　　MR. FISHER:  -- I'm fairly certain is not
17　part of the contract.
18　　　　　MR. BURKE:  Okay.  And I would tend to
19　agree with you.
20　　　Q.　(BY MR. BURKE) Am I correct, Mr. Crawford,
21　that's a Central Vendor Request Change Form for
22　Universal Am-Can, Limited?
23　　　A.　Yes.
24　　　Q.　And at the time you signed this contract, the
25　contract was with Overnite Express as opposed to

## 26

1　Universal Am-Can, correct?
2　　　A.　Yes.  That's correct.
3　　　　　MR. BURKE:  And by the way, Universal
4　Am-Can is Universal, A-M, hyphen, C-A-N, Limited, LTD.
5　　　Q.　(BY MR. BURKE) Okay.  Let me direct you back
6　to the -- the beginning the contract.  Other than the
7　Page 75, would the contract -- well, Page 74, actually,
8　is for Cherokee Insurance maintained by Universal
9　Am-Can, correct?
10　　　A.　Yes.
11　　　Q.　And 73 actually deals with Am-Can, as well,
12　correct?
13　　　A.　Yes.
14　　　Q.　As does Page 72, which is their Interstate
15　Commerce Commission work --
16　　　A.　Yes.
17　　　Q.　-- or authority, I should say?
18　　　A.　I think, the contract ends around about
19　Page 66.
20　　　Q.　Page 66.  Okay.  And that -- that last exhibit
21　on Page 66 is a Certificate of Liability Insurance for
22　Overnite Express, correct?
23　　　A.　Yes.
24　　　Q.　Okay.  And it identifies International Paper
25　as another named insured or additional insured, down in

## 27

1　the lower left corner?
2　　　A.　Yes.
3　　　Q.　Okay.  While we're on that topic, was one of
4　the conditions of this contract that International
5　Paper entered into with Overnite Express, that
6　International Paper would be named as an additional
7　insured on a policy of liability insurance to be held
8　or purchased by Overnite Express?
9　　　A.　I don't know.
10　　　Q.　Who -- who -- did you see -- Strike that.  Did
11　you see that condition in the body of the contract?
12　　　A.　I don't remember.
13　　　Q.　Did you read the contract that Mr. Fisher gave
14　to -- to you?
15　　　A.　Yes.
16　　　Q.　And that contract, as you told us, did bear
17　your signature, correct?
18　　　A.　Yes.
19　　　Q.　Okay.  Is it a true and accurate copy of the
20　contract that was entered into and signed by you on
21　behalf of International Paper effective October 1st,
22　2007?
23　　　A.　I believe so.
24　　　Q.　And that -- that October 2007 contract, was
25　that made in the normal course of International Paper's

## 28

1　business?
2　　　A.　Yes.
3　　　Q.　Okay.  And was it the -- the normal business
4　of International Paper to enter into certain contracts,
5　such as this type of contract for transportation
6　services?
7　　　A.　Yes.
8　　　Q.　Okay.  And the representations made in the
9　contract and the conditions set forth therein were true
10　and accurate when they were entered into between
11　International Paper and Overnite Express in October of
12　2007, correct?
13　　　A.　I believe so.
14　　　Q.　Did you negotiate the terms of this contract?
15　　　A.　No.
16　　　Q.　Okay.  Were you involved in any manner in --
17　in the terms of the contract or creating the terms of
18　the contract?
19　　　A.　I don't think so.
20　　　Q.　Okay.  Did you review the contract before it
21　was signed?
22　　　A.　Yes.
23　　　Q.　Okay.  Signed by you, I should say?
24　　　A.　Yes.
25　　　Q.　And in your position as Vice President of

---

**29**

1    Global Sourcing, did you agree with and approve of all
2    the terms and conditions of the contract?
3        A. Yes.
4        Q. Who did negotiate the terms of the contract?
5        A. I don't know. I assume, it was Steven Mundy.
6        Q. Okay. Would that have been part of his job?
7        A. Yes.
8        Q. Was -- was this -- this October 2007 contract
9    a -- and the provisions of it a standard type of
10   contract that International Paper would have with
11   carriers who were transporting their products?
12       A. I believe so.
13       Q. Other than the fuel index and surcharges,
14   were -- were most of the provisions standard provisions
15   that International Paper would utilize with all of
16   their carriers?
17       A. I don't know.
18       Q. In the -- are you aware that an amendment to
19   this contract was entered into in June of 2008?
20       A. I don't know.
21       Q. In the -- are you aware that an amendment to
22   this contract was entered into in June of 2008?
23            THE WITNESS: I don't know if -- if you
24   sent me an amendment or not.
25            MR. FISHER: Whatever documents are in

**30**

1    there is the only thing I sent you.
2        A. Then, I guess, I don't know that.
3        Q. (BY MR. BURKE) Okay. Did -- were -- were you
4    aware that -- Strike that. Do you -- are you familiar
5    with the business, Universal Am-Can?
6        A. No.
7        Q. Okay. Were you familiar with the business
8    Overnite Express?
9        A. I've heard of them.
10       Q. Okay. And you entered into a contract with
11   Overnite Express on behalf of International Paper,
12   correct?
13       A. Correct.
14       Q. Okay. And in your work at International
15   Paper, did you ever become aware of International --
16   I'm sorry. During your work at International Paper,
17   after this October 2007 contract was entered into, did
18   you ever become aware that Overnite Express was
19   purchased by or acquired by Universal Am-Can?
20       A. I vaguely remember Steve mentioning that
21   Overnite Express had been purchased. I didn't remember
22   the name of the company.
23       Q. Okay. Were you aware that any amendments were
24   entered into to update this October 2007 contract to
25   reflect that the carrier was, now, Universal Am-Can

**31**

1    instead of Overnite Express?
2        A. I don't remember that.
3        Q. Did you have any involvement in preparing this
4    amendment?
5        A. I don't think so.
6            MR. BURKE: Guys on the phone, I'm going
7    to show Mr. Crawford Page 35 -- I'm sorry, Page 65 of
8    Exhibit No. 1, which is the -- the amendment dated June
9    10th and 12th.
10       Q. (BY MR. BURKE) Just while -- while we're on
11   this topic, sir, let me tender to you Bates stamped
12   UACL 65 from Exhibit No. 1, and it's a document
13   entitled Amendment No. 1. Just take -- take a look at
14   that for a minute and tell me if you've ever seen it
15   before, No. 1?
16       A. I don't remember seeing it before.
17       Q. Okay. And that document is signed by Steve
18   Mundy, correct?
19       A. Correct.
20       Q. From your testimony, it's -- I -- I take it
21   you have no recollection having involvement in the
22   creation of that document?
23       A. No, I don't.
24       Q. Okay. Would the -- Strike that. Was this
25   type of amendment permitted in order to continue a

**32**

1    contract with a carrier in the event of -- of a
2    purchase of a carrier by another company?
3        A. I don't remember this happening before.
4        Q. In -- in your job as part of Global Sourcing,
5    you -- you, obviously, entered into contracts with
6    transportation carriers like Overnite Express, as -- as
7    reflected in this October contract, correct?
8        A. Correct.
9        Q. Okay. In addition to the requirements and
10   terms of the contract, did International Paper provide
11   any other information or brochures to its truck
12   carriers with respect to procedures and rules to be
13   followed by them while transporting International Paper
14   products?
15       A. I don't know.
16       Q. What department from International Paper would
17   be involved in -- in doing so, if that occurred?
18       A. I think, it would be the local facility,
19   probably.
20       Q. The contract that you -- you signed was with
21   Overnite Express. Did -- did you have involvement or
22   conversations with any personnel from Overnite Express?
23       A. I don't remember.
24       Q. Do you know Mr. Al Schultz, either of them,
25   from Overnite Express?

## 33

1    A.  I don't think so.
2    Q.  Okay.  How about Mr. Kevin Hays from Overnite
3  Express, do you know him?
4    A.  I don't think so.
5    Q.  How about Sandra Herrmann, do you know her?
6    A.  No.
7    Q.  During your time working at International
8  Paper, were you familiar with a company called Martin's
9  Bulk Milk Service?
10   A.  No.
11   Q.  Had you had involvement in negotiating or
12  signing other contracts on behalf of International
13  Paper with Overnite Express?
14   A.  I don't think so.
15   Q.  Other than this October 2007 one, I should
16  say?
17   A.  I don't remember.
18   Q.  The -- was the signing of this contract on
19  behalf of International Paper, was that something you
20  had responsibility for as Vice President of Global
21  Sourcing?
22   A.  Yes.
23   Q.  And what was the purpose of International
24  Paper entering into this contract with Overnite
25  Express?

## 34

1    A.  To contract for truck service at our
2  facilities.
3    Q.  And truck service of -- Strike that.  To
4  contract with truck carriers who would provide the
5  service of delivering your International Paper products
6  to your customers?
7    A.  Yes.
8    Q.  The -- Let me ask you to go back to Page 36 of
9  Exhibit No. 2 that you have in front of you,
10  Mr. Crawford.
11   A.  (Witness complies.)
12   Q.  That's, basically, a table of contents page;
13  is that correct?
14   A.  Yes.
15   Q.  Okay.  That's actually entitled OXEN Overnite
16  Express 2007 Outbound Contract, correct?
17   A.  Yes.
18   Q.  What's that expression "outbound contract"
19  refer to?
20   A.  It means shipments from IP facilities to our
21  customers.
22   Q.  Okay.  And then how about Page 37, which is
23  also noted as Page 2 of 24 of the contract, how come
24  that page is blank?
25   A.  I don't know.

## 35

1    Q.  Okay.  Do you know what should be there?
2    A.  No.
3        MR. FISHER:  Objection to form.  Assumes
4  facts not in evidence.
5    Q.  (BY MR. BURKE)  Where's the original of -- of
6  this contract?
7    A.  I don't know.
8    Q.  Okay.  Who would know?
9    A.  I don't know.
10   Q.  Who did you give the signed version to?
11   A.  I don't remember.
12   Q.  If -- if -- if you needed to come to court
13  with a copy of this contract that you signed for
14  International Paper, to whom would you go to to find
15  the original?
16   A.  I guess, I would go to my attorney.
17   Q.  Okay.  And what would you tell Mr. Fisher
18  to --
19   A.  Find --
20   Q.  -- do or who would you tell him to talk to or
21  what department would you tell him to contact?
22   A.  Global Sourcing.
23   Q.  Who's the current head of Global Sourcing?
24   A.  David Liebetreu.
25   Q.  And how do you spell his last name?

## 36

1    A.  L-I-E-B-E-T-R-E-U.
2    Q.  Liebetreu?
3    A.  Yes.
4    Q.  Okay.  And is he also titled Vice President?
5    A.  Yes.
6    Q.  Okay.  Is his office in Memphis?
7    A.  Yes.
8    Q.  How about Page 38?  Let me direct your
9  attention to the first paragraph which, basically, says
10  that this agreement is being entered into and is
11  effective the first day of October 2007, correct, right
12  up at the top?
13   A.  Yes.
14   Q.  Okay.  And the -- the contract or agreement is
15  being entered into between International Paper, and you
16  are identified as the Shipper in -- in this agreement,
17  correct?
18   A.  Yes.
19   Q.  And International Paper was entering this
20  contract with Overnite Express, who was identified as
21  the Carrier in this contract, correct?
22   A.  Yes.
23   Q.  And the Paragraph 2 states that the Carrier is
24  engaged in the business of transporting proper by motor
25  vehicle as a contract carrier in interstate --

## 37

1    intrastate and foreign commerce, correct?
2         A.  Yes.
3         Q.  Okay.  And where Carrier is referred to in
4    this contract, that's referring to Overnite Express; is
5    that right?
6         A.  Yes.
7         Q.  And where Shipper is -- is referred to, that's
8    referring to International Paper?
9         A.  Yes.
10        Q.  And in that Paragraph 3, it says that Shipper,
11   which was International Paper, desires Carrier, which
12   was Overnite Express, to provide certain transportation
13   related services pursuant to the rates and conditions
14   set forth in the agreement, correct?
15        A.  Yes.
16        Q.  Okay.  And a little bit further down the page,
17   there's a Section 1 that is titled Term, and it says
18   that this agreement shall have a term of two years from
19   the date of the agreement, correct?
20        A.  Yes.
21        Q.  Okay.  And then under Carrier Status, Overnite
22   Express represented to International Paper that it was
23   an interstate motor contract carrier of property duly
24   registered and permitted to operate with the Federal
25   Highway Administration, correct?

## 38

1         A.  Yes.
2         Q.  Okay.  And, in fact, International Paper
3    required United -- or required Overnite Express to
4    provide a copy of their operating authority as an
5    attachment, right?
6         A.  I don't know.
7         Q.  Well, the next sentence after the one I had
8    just quoted says, "A copy of Carrier's registration or
9    permit is attached as Exhibit A", correct?
10        A.  Correct.
11        Q.  Okay.  And then under Carrier's Obligations,
12   the first section, Paragraph -- do you see where I'm
13   at -- No. 3 --
14        A.  Yes.
15        Q.  -- bottom of the page?  Okay.  Paragraph A is
16   entitled Services, correct?
17        A.  Yes.
18        Q.  Okay.  And it says that the -- the Carrier
19   will provide the services set forth in Exhibit C, which
20   was the Motor Carrier Rate and Weekly Commitment
21   Schedule, correct?
22        A.  Yes.
23        Q.  Okay.  And in general terms, Mr. Crawford,
24   what were the services that Overnite Express was
25   providing to International Paper pursuant to this

## 39

1    contract?
2         A.  Providing truck transportation for our
3    shipments from our facilities to our customers.
4         Q.  And on Page 39, International Paper sets forth
5    certain commitments that the Carrier had to meet; would
6    that be correct?
7         A.  Yes.
8         Q.  Okay.  And -- and commitments in your business
9    refers to what?
10        A.  Performance obligations.
11        Q.  Okay.  And -- and -- and -- Or strike that.
12   Overnite Express, basically, had to -- to make
13   themselves available to transport a certain amount of
14   product on a given number of trips to a designated
15   location.  Would that generally be accurate?
16        A.  Yes.
17        Q.  Was -- was this particular contract for a
18   certain route or -- or run or a certain general
19   geographic area, perhaps, is more accurate?
20        A.  I assume so.
21        Q.  And on Page 39, International Paper required
22   that Overnite Express meet certain on-time delivery
23   requirements as set forth in Paragraph F, correct?
24        A.  Yes.
25        Q.  And in Paragraph G, there's various

## 40

1    requirements for motor vehicle equipment that the
2    Carrier had to use, correct?
3         A.  Yes.
4         Q.  Okay.  And in -- take a look at G for a
5    minute, in -- in the first few sentences or first
6    couple sentences.  Let me give you a minute to read
7    that.  I just want to ask you a question about that.
8         A.  Okay.
9         Q.  Okay.  International Paper required that
10   Overnite Express maintain their truck equipment in
11   good, safe and lawful operating conditions and in
12   accord with all applicable local, state and federal
13   laws and regulations; is that correct?
14        A.  Yes.
15        Q.  And the Paragraph H, take a -- take a look at
16   that for a moment.
17        A.  Okay.
18        Q.  International Paper required that Overnite
19   Express' personnel be fully qualified and have
20   appropriate licenses and permits as required by local,
21   state and federal laws, correct?
22        A.  Yes.
23        Q.  Okay.  And International Paper also required
24   that Overnite Express and their drivers comply with all
25   applicable local, state and federal laws and

## 41

1 regulations, correct?
2     A. Yes.
3     Q. Okay. And compliance with local, state and
4 federal laws and regulations, would include complying
5 with traffic regulations in the safe operation of their
6 tractor-trailer trucks, correct?
7     A. I would assume so.
8     Q. And under the Trailer Requirements, you
9 actually required them to have safe and suitable
10 trailers that would keep your paper products in -- in
11 good, safe condition, correct?
12     A. Yes.
13     Q. And you, down in K -- actually, J and K, you
14 required them to have a certain amount of trailer
15 equipment, correct?
16     A. Yes.
17     Q. Okay. And that was to make sure that they
18 could adequately transport whatever International Paper
19 needed to have transported, correct?
20     A. Yes.
21         MR. FISHER: Excuse me. Can you just read
22 back just a portion of Rich's question. I just want to
23 make sure I heard what I thought I heard.
24         (Readback.)
25         MR. FISHER: Thank you. That's what I

## 42

1 thought I heard.
2     Q. (BY MR. BURKE) In the very bottom of Page 39,
3 Mr. Crawford, there's a Section No. 4 entitled
4 Compensation. Literally, the last line carries over to
5 the next page, 40. Are you with me?
6     A. Yes.
7     Q. Okay. In that Compensation section, there's
8 various provisions for how International Paper would
9 compensate Overnite Express; is that right?
10     A. Yes.
11     Q. Okay. Did -- did Overnite -- I'm sorry. Did
12 International Paper essentially make the decision on
13 what compensation you were willing to pay to your
14 carriers?
15     A. Well, I think -- I think, the carriers
16 proposed what they thought was appropriate
17 compensation, and, basically, the selection of Carriers
18 was competitive. So if -- if the service was good and
19 the rates were competitive, than the carrier would
20 probably get some business.
21     Q. Okay. And, ultimately, it was International
22 Paper that decided whether or not any particular
23 carrier would get International Paper's business?
24     A. Yes.
25     Q. Okay. And International Paper could decide

## 43

1 not to do business with any particular carrier that
2 they didn't want to do business with for whatever
3 reason, correct?
4     A. Right.
5     Q. Okay. And International Paper could terminate
6 the services of any carrier if International Paper was
7 unhappy with their performance, correct?
8     A. Well, they have to -- under the terms of
9 contract, if -- if that's -- if that's -- but, yes,
10 within the frame of the contract, they could certainly
11 terminate service.
12     Q. And I -- and we'll get to that in -- in a
13 moment, as well. And, basically, in Page -- on 42,
14 there's a Section 7 titled Commitments, correct?
15     A. Correct.
16     Q. Okay. That sets forth various commitments or
17 obligations that Overnite Express had to meet in order
18 to comply with the contract in terms of making
19 deliveries; is that right?
20     A. Yes.
21     Q. And then Section 8, Default by Carrier, that
22 actually is a section that sets forth various grounds
23 under which International Paper could terminate their
24 agreement with Overnite Express, correct?
25     A. Yes. It's based on continuing or substantial

## 44

1 failure.
2     Q. Okay. And on Page 43, there are various
3 examples of continuing or substantial failure that
4 are -- but those are not include -- are not intended to
5 be an exhaustive list; would that be correct?
6     A. Yes.
7     Q. Okay. And in Paragraph A, one of the grounds
8 for termination would be Overnite Express' failure to
9 comply with facility safety rules and operating
10 procedures, correct?
11     A. Yes.
12     Q. Okay. And B is the minimum service levels,
13 correct?
14     A. Yes.
15     Q. And C refers to meeting the 98-percent
16 acceptance level of deliveries within a three-month
17 period, correct?
18     A. Yes.
19     Q. And if you got complaints from a carrier --
20 Or strike that. If you got complaints from a customer
21 on two or more occasions within a three-month period,
22 you could terminate them, as well, correct?
23     A. Yes.
24     Q. Or if -- if the DOT rating -- or I should say
25 if the Department of Transportation rating for Overnite

45

1  Express was downgraded, you could terminate your
2  contract with them, correct?
3     A.  Yes.
4     Q.  Or if they -- if Overnite Express failed to
5  maintain the minimum insurance coverage, you could
6  terminate, correct?
7     A.  Yes.
8     Q.  And if Overnite Express failed to comply with
9  federal, state or municipal laws and regulations, you
10 could terminate the contract, correct?
11    A.  Yes.
12    Q.  And if the Carrier, meaning Overnite Express,
13 went into bankruptcy or some other form of insolvency,
14 you could terminate, as well, correct?
15    A.  Yes.
16    Q.  And then in Paragraph 9 -- I'm sorry,
17 Section 9 on that same Page 43, which is entitled
18 Electronic Communications, Dispatch and Reporting, am I
19 correct International Paper required Overnite Express
20 to have certain type of communication systems in order
21 for International Paper be to be able to contact them
22 and communicate with them?
23    A.  Yes.
24    Q.  And, in general, what -- what was the purpose
25 of that, Mr. Crawford?

46

1     A.  Well, the electronic communication would be
2  faster or more efficient and also keep a permanent
3  record of -- of the communication between International
4  Paper and -- and the carrier.
5     Q.  Okay.  And then in Section 10, International
6  Paper also set forth the types of bills of lading
7  and -- and freight receipts that the Carrier had to
8  utilize; is that correct?
9     A.  Yes.
10    Q.  And then let me skip down to the end of --
11 bottom of Page 44.  There's a Section No. 12 for
12 Freight Loss or Damage, correct?
13    A.  Yes.
14    Q.  Okay.  And, basically, Overnite Express under
15 this contract, was liable to International Paper for
16 loss or damage of any goods being transported under the
17 agreement; is that correct?
18    A.  Yes.
19    Q.  And in the Insurance section which is Section
20 13, International Paper required Overnite Express to
21 maintain certain amounts of liability insurance
22 coverage, correct?
23    A.  Yes.
24    Q.  And the auto liability coverage was no less
25 than $1 million, correct?

47

1     A.  Yes.
2     Q.  And there was a Cargo Liability on the next
3  page, which is Page 45, of $100,000, correct?
4     A.  Yes.
5     Q.  And then International Paper, in Section C,
6  required Overnite Express to have commercial general
7  liability coverage in the amount of $1 million,
8  correct?
9     A.  Yes.
10    Q.  And that -- that commercial general liability
11 policy also had to name International Paper as an
12 additional insured; is that right?
13    A.  Yes.
14    Q.  Do you know what coverage International
15 Paper -- Strike that.  Do you know what amount of
16 liability coverage International Paper had that does or
17 might cover International Paper for injuries sustained
18 by Jeffrey Scheinman in -- in the incident that's the
19 subject of this case?
20    A.  No.
21    Q.  Did -- did you make the determination of the
22 $1 million requirement that's set forth in this
23 contract?
24    A.  I don't remember, sir.
25    Q.  Who -- what department would -- or was it

48

1  within your responsibility to decide what amount of
2  coverage a carrier should have?
3     A.  I don't remember.
4     Q.  Who -- who do you believe, or what department
5  at International Paper do you believe would have
6  accurate information on the amount of liability
7  coverage maintained by or available to International
8  Paper for the injuries sustained by Jeffrey Scheinman?
9     A.  I guess, the insurance department.
10    Q.  Okay.  And was there an insurance department?
11    A.  I don't remember dealing with them.
12    Q.  Okay.  I mean, what -- what -- was there a
13 division or department at International Paper that
14 was -- that you believe dealt with insurance-type
15 issues like this?
16    A.  I don't remember who it was.
17    Q.  Okay.  But was there such a department?
18    A.  I assume so.
19    Q.  Who worked in that department or, you know, in
20 any capacity?
21    A.  I don't remember.
22    Q.  When you read this contract and then signed
23 it, did you ask Steve Mundy or anybody else why the
24 liability coverage amount being referred to in the
25 contract was $1 million, as opposed to some other

## 49

1  amount?
2      A.  I don't remember.
3      Q.  Did International Paper have any other
4  coverage that's sometimes referred to as excess
5  coverage or umbrella coverage that was applicable to
6  injuries like the ones Mr. Scheinman received that are
7  the subject of this case?
8      A.  I don't know.
9      Q.  And do you know who might know the answer to
10 that?
11     A.  Gigi.
12     Q.  Okay.  And you're referring to another one of
13 International Paper's attorneys who's also present
14 today; is that correct?
15     A.  Yes.
16     Q.  Take a look at Page 46, if you would.
17     A.  (Witness complies.)
18     Q.  There's a section entitled Indemnification.
19 Take a moment and just read that relatively short
20 paragraph, Mr. Crawford.
21     A.  Okay.
22     Q.  When you signed this contract, what -- what
23 was your understanding of -- of what this paragraph
24 meant?
25     A.  I don't remember.

## 50

1      Q.  How about when you read it today, what's your
2  understanding of what it means?
3      A.  It says the Carrier will indemnify the
4  Shipper.  So I interpret the Carrier to be Overnite
5  Express and the Shipper to be International Paper.
6      Q.  And, basically, that first sentence says that
7  the Carrier shall indemnify and hold harmless Shipper
8  from and against all liability, loss, damages, claims,
9  suits or expenses, including reasonable attorneys'
10 fees, by reason of an injury, including death or claim
11 of injury to person or damage to property arising out
12 of or in connection with the performance of this
13 agreement by Carrier, its employees, agents or
14 subcontractors"; is that correct?
15     A.  Yes.
16     Q.  So, basically, under this agreement, if -- if
17 Overnite Express, as the Carrier, caused an accident or
18 injury through one of its employees or agents or a
19 subcontractor, they were supposed to indemnify
20 International Paper; would that be correct?
21     A.  Yes.
22     Q.  Okay.  Take a look at Page 47, if you would,
23 sir.
24     A.  (Witness complies.)
25     Q.  The top paragraph says that the -- the

## 51

1  Carrier, which would be Overnite Express, shall solely
2  direct all persons performing services performed by the
3  Carrier under this agreement and that such person shall
4  be and remain subject to the exclusive control and
5  direction of Carrier, which would be Overnite Express;
6  is that correct?
7      A.  Yes.
8      Q.  And then Page 48, as we mentioned earlier,
9  that's the signature page bearing your signature in
10 your capacity as Vice President of Global Sourcing for
11 International Paper Company, correct?
12     A.  Yes.
13     Q.  All right.  And you -- you actually signed
14 this on November 12th, 2007, even though it actually
15 became effective October 1st of 2007; is that right?
16     A.  I certainly signed it on November 12th.  I
17 don't remember the effective date.
18     Q.  Okay.  Take a look at, I think, it's Page 3,
19 Bates stamped 3 -- I'm sorry, Bates stamped 38, which
20 is Page 3 of the contract.  Look at Bates stamp 38.
21          MR. FISHER:  Let me help you.  It's right
22 over here.  Yeah, here we go.
23     A.  Yeah, 1st day of October.
24     Q.  (BY MR. BURKE)  Okay.  And -- and why would you
25 not be signing until November if it's effective in

## 52

1  October 2007?
2      A.  I assume, the -- getting the signatures from
3  the Carrier took longer than expected.
4      Q.  Okay.  And on that same Page 48, the
5  signatures from the Carrier are -- are all dated
6  October 30th, 2007, correct?
7      A.  Yes.
8      Q.  Okay.  And those are the signatures from -- of
9  Robert L. Schultz, Kevin Hays and Sandra Herrmann from
10 Overnite Express, correct?
11     A.  Yes.
12     Q.  Okay.  From the time you signed this contract
13 in October of -- or whatever date you signed it,
14 November of 2007, until you left International Paper,
15 did you ever sign any other contracts with Overnite
16 Express?
17     A.  I don't remember.
18     Q.  Have you ever seen -- seen any, that you can
19 recall?
20     A.  No.
21     Q.  Okay.  Could -- could you -- and you did touch
22 on it, sir, but could -- could you explain a little bit
23 of the difference between what Mr. Mundy did and -- and
24 yourself in terms of job responsibilities?  You know
25 what?  That's a bad question.  Let me ask you this:

---

## 53

1  What was Mr. Mundy's job responsibilities?
2      A.  He — he was in charge of contracting with our
3  motor — motor carriers.
4      Q.  And, basically, kind of as you have alluded
5  to, contracting with motor carriers for the purpose of
6  them providing delivery service for International Paper
7  of your products to your customers?
8      A.  Yes.
9      Q.  And — and how did his job differ than -- than
10  your job in — in what both of you did on a day-to-day
11  basis?
12     A.  Mine was a little bit broader.  So his
13  department also contracted for railroad service in
14  addition to truck service and contracted for different
15  kinds of — of truck service.  And then there were
16  other departments that contracted for energy or
17  chemicals or equipment.
18     Q.  Okay.  And when -- when you say Mr. Mundy's
19  department, what was that department?
20     A.  As I remember it, it was the Transportation
21  Sourcing department.
22     Q.  Okay.  And I — I think when I showed you that
23  amendment, his title was — that Amendment No. 1 that I
24  showed you earlier, his title, at least, at — on June
25  12th, '08, when he signed that amendment, was Manager

## 54

1  Sourcing Motor Procurement —
2      A.  Yep.
3      Q.  -- would that be right?  Okay.  And in --
4  in — basically, what did that department do?
5      A.  They negotiated and established and monitored
6  contracts with our motor carriers.
7      Q.  Okay.  By the way, do you -- do you know
8  Martha Lindbeck at all from Universal Am-Can?
9      A.  No.
10     Q.  And then when you say your position was a
11  little broader, in what respect?  A little broader than
12  Steve Mundy's in what respect, sir?
13     A.  Well, the organization sourced and contracted
14  for all the outside procurement at International Paper,
15  with the exception of wood.  There was a separate
16  organization that did wood procurement.
17          MR. BURKE:  Carl, why don't you let me
18  look at my notes, and if anybody else has any
19  questions, they can go ahead and do so.
20          MR. FISHER:  Sure.  Anybody else have
21  questions on the phone?
22          MR. SCHRECK:  I've got a few, and let me
23  jump into it.
24          THE REPORTER:  Who is that?  Excuse me.
25          MR. FISHER:  Who are you?

## 55

1          MR. SCHRECK:  This is Matthew Schreck.  I
2  apologize.
3                      EXAMINATION
4  BY MR. SCHRECK:
5      Q.  Mr. Crawford, if you could turn to Page 43 of
6  Exhibit 2.
7      A.  Okay.
8      Q.  You were asked some questions earlier by
9  Mr. Burke regarding defaults under the contract.  Do
10  you remember that?
11     A.  Yes.
12     Q.  Okay.  And one of those defaults was failure
13  to comply with safety — the facility safety rules and
14  operating procedures, correct?
15     A.  Yes.
16     Q.  Okay.  And what that meant is if the carrier,
17  an entity that was picking up the product from
18  International Paper's facility, isn't complying with
19  whatever those particular safety rules were,
20  International Paper can kick them off the site and say
21  you're not going to do any work for us; is that
22  correct?
23     A.  That's what it says.
24     Q.  Okay.  And that would include any rules or
25  procedures that were in effect at the facility, whether

## 56

1  it be regarding wearing shirts, where trucks were
2  supposed to park, how they were supposed to load,
3  etcetera, correct?
4      A.  Well, it says facility safety rules and
5  operating procedures which, I assume, would be
6  documented.
7      Q.  Okay.  And those -- those type of things would
8  include things that would go to personal safety at the
9  facility, correct?
10     A.  I assume so.
11     Q.  As well as things that would go to safety in
12  loading and unloading trucks, correct?
13     A.  I assume so.
14     Q.  Okay.  How familiar are you, if at all, with
15  the safety rules that were in effect at the Hammond
16  facility back in '08?
17     A.  Not at all.
18     Q.  Do you know who would be familiar with that?
19     A.  No.
20     Q.  At any point during the time that you were
21  with International Paper, did you ever become aware of
22  Martin's Bulk Milk Service?
23     A.  No.
24          MR. SCHRECK:  Give me a moment.  I have no
25  further questions.  If anybody else has any questions,

## 57

1  feel free to jump in.
2          MR. LANGS: This is Brian Langs. I just
3  have a couple questions for you, Mr. Crawford.
4          THE WITNESS: Okay.
5          MR. LANGS: I represent BMW.
6              EXAMINATION
7  BY MR. LANGS:
8      Q. Were you aware of the product liability claims
9  that the Plaintiff has alleged against the BMW entities
10 in this case?
11     A. No.
12     Q. Is it safe to say that you don't have any
13 opinions regarding the Plaintiff's allegations as to
14 the design of the BMW Plaintiff was driving at the time
15 of the accident was defective?
16     A. I have no opinion.
17     Q. All right.
18         MR. LANGS: That's all I've got for you.
19 Thank you.
20         MR. FISHER: I just have a couple
21 follow-ups.
22             EXAMINATION
23 BY MR. FISHER:
24     Q. Mr. Crawford, if you could look at Page --
25 Page 37, I will represent to you that the documents

## 58

1  that International Paper provided to me, in particular,
2  beginning at Bates numbered Page 36 that bears the
3  stamp "Original" at the top, that these are the
4  documents as I received them from International Paper.
5  All right?
6          So focusing on Page 37, which is also
7  marked as Page 2 of 24, do you know whether or not it
8  was typical in International Paper contracts that a
9  contract would, in effect, have a cover page that looks
10 like Bates number Page 36, and then the text would
11 begin on what is the third page, with the second side
12 or page being intentionally left blank? Do you have
13 any memory or knowledge of that?
14     A. No.
15     Q. Okay. So as you sit here today, you simply
16 have no knowledge as to why it is Bates Page 37, also
17 numbered as 2 of 24, simply has a horizontal line at
18 the top?
19     A. I have no knowledge.
20     Q. Okay. Second topic that I wanted to ask you
21 about goes to some questions that Mr. Burke asked you
22 concerning the timing and why it was that your
23 signature is November 12th, when the contract is dated
24 October 1st. And to focus your attention on that
25 topic, if you'd look at Bates numbered Page 35, do you

## 59

1  see that on that particular document, Mr. Mundy's
2  electronic signature appears at the bottom of a --
3  excuse me, the bottom of an October 24th, 2007 letter,
4  to a representative of Overnite, including copies of
5  the contract that we have previously agreed to?
6      A. Yes.
7      Q. All right. So in light of that date, does the
8  timing of the Eickholtz and Hays signature in late
9  October and your signature in early to mid November
10 make sense chronologically?
11     A. Yes.
12     Q. All right. And, finally, when Mr. Burke
13 focused your attention on the language that appears at
14 the top of Page 47, he began reading to you language
15 that starts with the word "Carrier shall solely
16 direct"?
17     A. Yes.
18     Q. This language that he read to you and to which
19 you gave answers to his questions, that's part of a
20 section that begins on the previous page, Bates
21 numbered 46, entitled Section 20, Independent
22 Contractor?
23     A. Yes.
24     Q. And so was this language to indicate that the
25 contract is stating that Overnite Express is performing

## 60

1  under this agreement as an independent contractor?
2      A. Yes.
3          MR. FISHER: That's all the questions I've
4  got.
5              FURTHER EXAMINATION
6  BY MR. BURKE:
7      Q. The section on Page 46 that Mr. Fisher just
8  asked you about entitled Independent Contractor, the
9  first sentence of that Section 20 states, am I correct,
10 "Carrier is and shall perform services under this
11 agreement as an independent contractor"?
12     A. Yes.
13     Q. Okay. And the Carrier referred to there is
14 Overnite Express at the time you signed this contract?
15     A. Yes.
16     Q. Okay. And the services being provided to
17 International Paper are the transportation of your
18 paper products, as you have previously explained?
19     A. Yes.
20     Q. Okay.
21         MR. BURKE: Nothing else.
22         MR. FISHER: Any other questions?
23         MR. SCHRECK: This is Matt. None.
24         MR. GOLDEN: Rob. No.
25         MR. FISHER: Okay. Signature is reserved,

## 61

1  and I think we can go off the record now -- Oh, unless
2  you needed som info.
3          THE REPORTER:  What I need to do, since
4  everyone is on the phone, I just need to get
5  everybody's order on the record.
6          MR. FISHER:  Okay.  Great.  Sure.  The
7  court reporter needs your orders of how you want the
8  transcript.
9          MR. SCHRECK:  Are you ordering the
10  original or...
11          MR. BURKE:  Yeah.  I'm ordering a
12  e-transcript or whatever I order.
13          THE REPORTER:  Besides the original, you
14  don't want --
15          MR. SCHRECK:  This is Matt.  I'm going to
16  take a regular and a mini.
17          MR. GOLDEN:  I'm not going to order a
18  copy.  Bob Golden.
19          MR. LANGE:  And this is Brian Langs.
20  Could you just send me e-transcript, please.
21          MR. FISHER:  And I'll take an e-tran in
22  mini script format.
23          (Deposition concluded at 10:42 a.m.)
24          * * * * * SIGNATURE WAIVED * * * * *
25

## 63

1          I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this procedure was
4  taken, and further that I am not financially or
5  otherwise interested in the outcome of the action.
6          Certified to by me this _____ day of_____,
7  2012.
8
9
                        _____
10                      SHANNON H. DeLAY, CSR NO. 5481
                        Expiration Date: 12/31/2012
                        Firm Registration No. 283
11                      100 Congress Ave., Suite 2000
                        Austin, Texas  78701
12                      (512)634-1980
13
14
15
16
17
18
19
20
21
22
23
24
25

## 62

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3  MURRAY SCHEINMAN, Plenary  )
   Guardian of the Estate and )
4  Person of JEFFREY J.       )
   SCHEINMAN, a Disabled      )
5  Person,                    )
                              )
6      Plaintiffs,  )  Case No.: 09 cv-5340
                              )
7  vs.                  )  Honorable James F.
                              )       Holderman
8                              )
   MARTIN'S BULK MILK       )  Magistrate Susan E. Cox
9  SERVICE, INC., SAMUEL G.  )
   FRANKE, CSX INTERMOD.     )
10 INC., INTERNATIONAL PAPER )
   COMPANY and OVERNITE      )
11 EXPRESS, INC.,            )
                              )
12      Defendants.  )
13       REPORTER'S CERTIFICATION
          DEPOSITION OF WILLIAM CRAWFORD
14                 JUNE 6, 2012
15       I, Shannon H. DeLay, Certified Shorthand Reporter
16 in and for the State of Texas, do hereby certify to the
17 following:
18       That the Witness, WILLIAM CRAWFORD, was duly
19 sworn by the Officer and that the transcript of the
20 oral deposition is a true record of the testimony given
21 by the Witness.
22       That the examination and signature of the Witness
23 is waived by the Witness and the parties, and that the
24 original deposition was delivered to MR. RICHARD F.
25 BURKE, JR. for safekeeping on _____.