# EX. 12

William Crawford Deposition
dated, June 6, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person,

Plaintiffs,

vs.

MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, CSX INTERMOD, INC., INTERNATIONAL PAPER COMPANY and OVERNITE EXPRESS, INC.,

Defendants.

Case No.: 09 cv-5340

Honorable James F. Holderman

Magistrate Susan E. Cox

*******************************************************

ORAL DEPOSITION OF
WILLIAM CRAWFORD
JUNE 6, 2012

*******************************************************

ANSWERS AND DEPOSITION OF WILLIAM CRAWFORD, a witness called by Murray Scheinman, Plenary Guardian of the Estate and Person of Jeffrey J. Scheinman, a Disabled Person, taken before Shannon H. DeLay, Certified Shorthand Reporter for the State of Texas, on the 6th day of June, 2012, between the hours of 9:06 a.m. and 10:41 a.m., at Esquire Deposition Services, 100 Congress Ave., Suite 2020, Austin, Texas, pursuant to the agreement of counsel and the respective parties as hereinafter set forth.

APPEARANCES

FOR THE PLAINTIFF:
Mr. Richard F. Burke, Jr.
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street
31st Floor
Chicago, Illinois 60602

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK SERVICE, INC., AND SAMUEL G. FRANKE:
Mr. Robert J. Golden
DOWD & DOWD, LTD.
617 West Fulton
Chicago, Illinois 60661

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK SERVICE, INC., AND SAMUEL G. FRANKE:

Mr. Matthew R. Schreck
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Ave., Suite 200
Wheaton, Illinois 60187

TELEPHONICALLY FOR THE DEFENDANT(S) INTERNATIONAL PAPER COMPANY AND UNIVERSAL AM-CAN, LTD., AND SUCCESSOR TO OVERNITE EXPRESS, INC., AND OX, LLC.:

Mr. Carlton D. Fisher
HINSHAW & CULBERTSON, LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois 60601

TELEPHONICALLY FOR THE DEFENDANT(S) BMW OF NORTH AMERICA, LLC AND BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT:

Mr. Brian Langs
JOHNSON & BELL, LTD.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | N/A |
| WILLIAM CRAWFORD | |
| Examination by Mr. Burke | 4, 60 |
| Examination by Mr. Schreck | 55 |
| Examination by Mr. Langs | 57 |
| Examination by Mr. Fisher | 57 |
| Signature and Changes | N/A |
| Reporter's Certificate | 62 |

WILLIAM CRAWFORD,

having been first duly sworn, testified as follows:

MR. BURKE: Let the record reflect this is the discovery deposition of Mr. William Crawford, taken pursuant to notice and in the accord with the applicable rules of the United States District Court for the Northern District of Illinois.

EXAMINATION

BY MR. BURKE:

Q. Mr. Crawford, my name is Rich Burke. I'm sure Mr. Fisher told you I'm going to ask you some questions about some of your time and work at International Paper. And as I do so, if you want any questions repeated, or if they don't make sense, just tell me.

If you could verbalize your "yes" and "no" answers because even though I can see you nodding your head, the court reporter has to take down an answer, and if you and I do not talk at the same time, that helps the court reporter, as well.

And if you want to look at a document or something, just say so. It's not intended to, you know, be a memory test or anything for you. Okay.

Would you please state your full name and spell your last name.

A. William P. Crawford.

Q. And --
A. C-R-A-W-F-O-R-D.
Q. And -- and what -- what city do you currently live in, sir?
A. Austin, Texas.
Q. Okay. And are you employed at the present time?
A. I'm not.
Q. Okay. When were you last employed?
A. March of 2012.
Q. Okay. And by whom were you employed at that time?
A. Temple-Inland.
UNIDENTIFIED SPEAKER: Could you say that louder. I couldn't hear you.
THE REPORTER: Who was --
THE WITNESS: Temple-Inland.
Q. (BY MR. BURKE) And how do you spell that?
A. T-E-M-P-L-E, hyphen, I-N-L-A-N-D.
Q. Okay. And what's the nature of their business?
UNIDENTIFIED SPEAKER: Rich?
MR. BURKE: Yeah.
UNIDENTIFIED SPEAKER: I'm having a hard time hearing. Could you put the mic closer or speak up or something?

MR. FISHER: It's pretty close.
MR. BURKE: Yeah. We've got it pretty much as --
UNIDENTIFIED SPEAKER: I hear you, Rich. Unfortunately, I can't hear Mr. Crawford.
MR. BURKE: Okay. We've got it right between us. So -- Is there a volume on this thing? Okay. I think we have it turned up as best we can.
MR. FISHER: Okay.
MR. BURKE: All right.
Q. (BY MR. BURKE) What's the business of Temple-Inland?
A. They're a paper and packaging company.
Q. Okay. And where are they located?
A. Austin, Texas.
Q. Okay. And during what time period were you -- did you work for them?
A. From October 2009, to March 2012.
Q. Okay. And what was your last position with them?
A. I was their VP of Materials.
Q. Okay. And what did you do on a daily basis?
A. We did -- we did centralized procurement for the company.

Q. Okay. And that would be procurement of what?
A. Of primarily chemicals, transportation, energy, equipment.
Q. Does Temple-Inland have any relationship with International Paper?
A. Yes. International Paper acquired Temple-Inland.
Q. Acquired Temple when?
A. In February of 2012.
Q. When did you last work for International Paper?
A. Left International Paper in January of 2009.
Q. Did you leave on your own or were you asked to leave or fired or...
A. I was given a severance package.
Q. And what prompted the severance package?
A. I think, just an organizational shift.
Q. Were you terminated for any misconduct or wrongdoing in any way?
A. No.
Q. When you left in 2009, where did you go to work? Was it Temple?
A. Yes.
Q. Okay. International Paper did not own Temple at that time; is that correct?

A. That's correct.
Q. When you last left International Paper, what was your job title or position?
A. VP Global Sourcing.
Q. Okay. And for about how long had you been in that position?
A. 18 years.
Q. Okay. For how long did you work at International Paper?
A. 18 years.
Q. And you started with International Paper in what year?
A. Around April of 1990.
Q. Where did you work before that?
A. ITT Automotive.
Q. And where at?
A. Detroit.
Q. And for about how long?
A. Four years.
Q. And what did you do there?
A. VP Materials.
Q. What's your educational background, Mr. Crawford?
A. I've got a mechanical engineering degree from Lafayette College and an MBA from the University of

Pittsburgh.
Q. Okay. And where is Lafayette College located?
A. Eastern Pennsylvania.
Q. And your MBA was?
A. Pitt.
Q. From Pitt. Okay. And when did -- what year did you get the college degree?
A. 1967.
Q. Okay. And how about your MBA?
A. '68.
Q. Okay. Any other degrees --
A. No.
Q. -- other than those? Have you given any depositions before?
A. Yes.
Q. Okay. About how many?
A. About three.
Q. Okay. And were they all given while you were employed by International Paper?
A. Yes.
Q. Okay. And did any of those depositions -- Strike that. Were any of those depositions given in cases involving personal injury or wrongful death claims?
A. No.

Q. What types of cases were those, generally?
A. One was a personnel issue. I think, perhaps, two were personnel issues. One was a contract dispute.
Q. Have you testified in court at all?
A. Yes.
Q. Okay. How many times?
A. Once.
Q. Okay. And in what state?
A. Illinois.
Q. And what type of case?
A. Contract dispute.
Q. And was International Paper a party?
A. Yes.
Q. Okay. And about when did you testify?
A. Oh, about ten years ago.
Q. And was that in state court or federal court?
A. Federal.
Q. And was International Paper the party bringing the lawsuit, or were they being sued?
A. They were bringing the lawsuit.
Q. Against whom?
A. I -- I'm not sure I've got the name correct, but it was a -- Michael Polsky, I think, was the defendant. I'm not sure I remember the name of his company. It was around a capital project at one of the

paper mills.
Q. Okay. Michael Polsky, did you say?
A. Yeah.
Q. And -- and was he sued individually, or was it one of his companies?
A. I'm sure, it was the company.
Q. Okay. Was it a paper product related company or...
A. It was a capital project that Michael developed and installed at International Paper's mill in Maine. It had to do with gas turbines --
Q. Okay.
A. -- installed at the mill.
Q. It's kind of his thing, Polsky, the windmills and --
A. That's the same one.
Q. Yes. Okay. I -- I -- I took you back to your time at ITT in Detroit. Between getting your MBA and going to work at ITT in Detroit, can you give me some idea where you worked?
A. General Electric Company.
Q. Okay. And for about how long?
A. 18 years.
Q. And where at?
A. Various places. Primarily, Milwaukee and

Bridgeport, Connecticut.
Q. Okay. And, basically, what type of work did you do?
A. Purchasing manager.
Q. Okay. And what would you purchase on behalf of GE?
A. Various things. But in Milwaukee I was buying castings. In Bridgeport, it was electronics.
Q. Okay. Have you done any work as a consultant of any kind at any time while you've been at International Paper?
A. No.
Q. Okay. How about after you left there?
A. No.
Q. Okay. Have you -- have you provided any type of expert services or advice or consulting to companies, either since -- while you were working at International Paper or thereafter, other than to your employers?
A. No.
Q. Do you have any private business at the moment?
A. No.
Q. When you worked -- when you last worked at International Paper, at what location did you work?

A. Memphis, Tennessee.
Q. Okay. And you said you worked in Global Sourcing. Was -- was that the name of your division or department, or was there another name?
A. That was the name of the department.
Q. Okay. And you last worked there in 2009, I believe?
A. Yes.
Q. What have you reviewed in anticipation of giving a deposition today?
A. I looked at a -- a contract, and I looked at some testimony from another International Paper employee.
Q. Okay. And who was that?
A. I don't remember her name.
Q. Joan Anderton.
A. Yes.
Q. Do you know her?
A. No.
Q. Okay. Have you spoken with her about this case?
A. No.
Q. Okay. Was there anything in -- in what you read of Ms. Anderton's deposition that you thought was incorrect or inaccurate?

MR. FISHER: Excuse me. Objection, form. You can go ahead and answer.
A. No.
Q. (BY MR. BURKE) Okay. By the way, what -- what's your date of birth, Mr. Crawford?
A. December 10th, 1945.
Q. The contract that you referred to reading, what contract was that?
A. It's a contract with a trucking company, and I'm trying to remember the name.
Q. Overnite Express?
A. Yes.
Q. Okay. Was it the October 27, 2007, contract?
A. That sounds right.
Q. Okay.
MR. FISHER: Rich, that's the only one I sent.
MR. BURKE: Okay.
Q. (BY MR. BURKE) Have you ever been to International Paper's Hammond warehouse in Hammond, Indiana?
A. No.
Q. Okay. Have you ever driven a tractor-trailer truck?
A. No.

Q. Okay. I take it you do not have a CDL license, commercial driver's license?
A. No.
Q. Okay. Are you -- are you familiar with the incident that is the subject of this lawsuit involving injuries to Jeffrey Scheinman?
MR. FISHER: Rich, do you mean apart from anything I might have said to him that's privileged? I will tell you I told him there's an accident, it's a rear-ender, and there's certain parties in the lawsuit. That...
MR. BURKE: Okay.
MR. FISHER: I mean, I'm going to give you some leeway here, but --
MR. BURKE: Yeah.
Q. (BY MR. BURKE) In general, I -- you know, I'm not looking for specific things that Mr. Fisher told you, your lawyer, but, generally, do you -- are you familiar with the nature of the case that brings us to be having a deposition today?
A. Carl told me that there was an accident, and that's --
Q. Okay. You know what, don't tell me what Carl told you because he's your lawyer, and that's privileged. But I take it you have some understanding

that there was a truck collision with a -- a car, resulting in injuries to Mr. Scheinman?
A. Yes.
Q. Okay. Prior to you being asked to give a deposition in this case, did you have any knowledge of that occurrence?
A. No.
Q. Okay. How did you first become aware of the need for a deposition? Was that -- was that through Carl?
A. Yes. He called me.
Q. Okay. In 2007 and up through your last time at International Paper in 2009, what -- how would you describe the business of International Paper?
A. I'm not sure I understand the question.
Q. Okay. What -- what business was International Paper involved in? What -- what did they do?
A. They're a paper company.
Q. Okay. Do they manufacture paper?
A. Yes.
Q. And did they also transport their paper products to their customers?
A. I don't think they transport it directly. They hire people to do it for them.
Q. And they entered into contracts with various

carriers to transport paper, correct?
A. Yes.
Q. Okay. Did -- if -- if there was -- are you familiar with terms like operation side of a business, transportation side, logistics, things like that? Are those terms you'd have any general familiarity with?
A. General. Not -- not specific.
Q. Okay. What -- with respect to your job in Global Sourcing, was there a side of the business that -- that -- a side of the International Paper business that your -- your work fell into?
A. I'm not sure I understand the question.
Q. Okay. With respect to -- did you consider yourself to be involved in the operation side of the business?
A. No.
Q. Okay. And why -- why not?
A. I was in a corporate staff role. My department was -- was -- mission in life was to engage our key suppliers and -- and contract for the purchases that we did with our key supporters.
Q. And those suppliers would be what type of businesses?
A. Equipment companies, chemical companies, transportation companies, energy companies.

Q. And was the contract that Mr. Fisher sent you, the October 2007 contract with Overnite Express, was that a contract with a transportation company?
A. Yes.
Q. Okay. And that -- and that contract was generally for the purpose of transporting International Paper products to the customers to whom International Paper was selling?
A. Yes.
Q. Did International Paper do any of its own deliveries or make any of its own deliveries with their own trucks?
A. I think one business that did some of that was the distribution company, Xpedx. I think the rest of the company did not.
Q. Okay.
MR. FISHER: Could you spell that for the court reporter.
THE WITNESS: It's X-P-E-D-X.
MR. FISHER: Probably wouldn't find that one in the dictionary.
Q. (BY MR. BURKE) Okay. And what was the business of Xpedx?
A. They were a distributor of paper products.
Q. And did International Paper own Xpedx?

A. Yes.
Q. And do you know to whom Xpedx would distribute paper?
A. Not specifically.
Q. Are -- are -- are you aware that -- that some of the International Paper products on the truck at the time of this collision was destined for Xpedx?
A. No. I didn't know that.
Q. Okay. Did you in your job have any involvement with the -- the Hammond warehouse?
A. No.
Q. Would you have any contact with any person from International Paper who had any managerial or supervisory role at the Hammond warehouse?
A. I had contact with the -- the management team at Xpedx in Cincinnati, but I -- I didn't have any contact with Hammond directly.
Q. Did -- other than what you mentioned about Xpedx, did International Paper own any of its own tractors for delivery of its paper products?
A. Not that I'm aware of.
Q. Did they own any of their own trailers for delivery of their paper products?
A. Not that I'm aware of.
Q. With -- with respect to -- Strike that. With

respect to the paper that was being picked up at the Hammond warehouse that's involved in this occurrence, how did those paper products get to the Hammond warehouse?
A. I don't know, specifically.
Q. Were you involved in that type of transportation at all?
A. We did contracts for transportation, but I wasn't involved in the day-to-day operations of shipments.
Q. Okay. You were -- Mr. Fisher -- or you mentioned that Mr. Fisher gave you a copy of an October 2007 contract. Do you -- do you have a copy of that in front of you, Mr. Crawford?
A. Yes.
Q. Okay.
MR. SCHRECK: And just for the record, what -- what page are you looking at? What Bates stamp number?
MR. FISHER: 36.
MR. SCHRECK: 36.
MR. BURKE: We're showing -- I'm going to tender to Mr. Crawford a portion of Exhibit No. 2, which is -- which contains at Page 35 -- well, starting with 35.

MR. FISHER: Matt and everybody else, you need to say your name first.

MR. SCHRECK: Oh, I apologize. It was Matthew Schreck. And just for the record, you're looking at IP Exhibit 2 -- Excuse me -- Exhibit 2, IP Page 36?

MR. BURKE: Well, I'm going to start with 35, but the contract itself starts --

MR. SCHRECK: Just making sure I had the right spot. Thanks.

MR. BURKE: -- on Page -- contract starts on Page 36 and runs, I believe, to about Page 75 of the International Paper Bates stamped pages.

Q. (BY MR. BURKE) And, Mr. Crawford, just to -- there is on Page 35 -- and do you see the Bates stamped numbers in the lower right corner, sir?

A. Yes.

Q. Okay. So when I refer you to a page number, that's what I'm talking about. On Page 35, there's a letter dated October 24, 2007, on International Paper letterhead, from Steven Mundy; am I correct?

A. Yes.

Q. Okay. And at that time, it appears Mr. Mundy was the manager of Motor Carrier Transportation Sourcing?

A. Yes.

Q. Okay. What was -- with respect to the hierarchy of personnel, where did you and Mr. Mundy fit?

A. Steve worked for a manager who reported to me.

Q. Okay. So Steve was under you?

A. He -- he -- he reported to one of my managers. So he was part of my organization.

Q. Okay. And was the Motor Carrier Transportation Sourcing Department within Global Sourcing?

A. Yes.

Q. Who was above you in Global Sourcing?

A. I was the top person in Global Sourcing. I reported to the CFO.

Q. Okay. And who was that?

A. Marianne Parrs.

Q. And how do you spell her last name?

A. P-A-R-R-S.

Q. And where was she, in Memphis?

A. Yes.

Q. Okay. And am I correct that in this letter on Page 35, Steve Mundy is sending a copy of a contract that International Paper entered into with Overnite Express; is that correct?

A. Yes.

Q. Okay. And that's identified as Motor Procurement Contract No. OXEN 093009?

A. Yes.

Q. And that's being sent to Sandy Herrmann?

A. Yes.

Q. Okay. Did you know Sandy Herrmann?

A. No.

Q. Okay. Did you ask Steve Mundy to send this contract to Sandy Herrmann?

A. I don't remember.

Q. And let me ask you to turn to Page 36, sir.

A. (Witness complies.)

Q. Is this the beginning of what we referred to as the October 1st, 2007 contract between International Paper and Overnite Express?

A. Yes.

Q. And this is the contract you've reviewed, correct?

A. Yes.

Q. Okay. And this contract bears your signature; am I correct?

A. Yes.

Q. Okay. And, I think, I've seen your signature on two places, if I recall correctly, one of which is

Page 52; is that right? Or why don't you first turn to page 49.

A. (Witness complies.)

Q. I'm sorry, 48.

A. (Witness complies.)

Q. Okay. And is that your signature?

A. Yes.

Q. Okay. And am I correct you signed this contract on behalf of International Paper on November 12th, 2007?

A. Yes.

Q. And look at Page 20 -- or, I'm sorry, Page 52.

A. (Witness complies.)

Q. And is that also your signature?

A. Yes.

Q. Okay. And also dated November 12, 2007?

A. Yes.

Q. Okay. And is Page 52, are you signing an exhibit to the contract?

A. Yes.

Q. Okay. And was that the Fuel Index exhibit?

A. Yes.

Q. Okay. And, in general terms, what did the Fuel Index exhibit consist of, or what was its purpose?

A. It was to change the price of the -- of the

agreement up and down with the cost of fuel, diesel fuel.
Q. Okay. And of the Bates pages in front of you, sir, to what page does this contract run, including the exhibits or attachments to the contract?
A. Page 75.
Q. Okay. And that last exhibit is --
MR. FISHER: Richard, I think that's when they changed OXEN to UACL.
MR. BURKE: Yeah. That's --
MR. FISHER: So when we produced this, I don't think this was part of the contract.
MR. BURKE: The last exhibit?
MR. FISHER: Bates No. Page 75 --
MR. BURKE: Right.
MR. FISHER: -- I'm fairly certain is not part of the contract.
MR. BURKE: Okay. And I would tend to agree with you.
Q. (BY MR. BURKE) Am I correct, Mr. Crawford, that's a Central Vendor Request Change Form for Universal Am-Can, Limited?
A. Yes.
Q. And at the time you signed this contract, the contract was with Overnite Express as opposed to

Universal Am-Can, correct?
A. Yes. That's correct.
MR. BURKE: And by the way, Universal Am-Can is Universal, A-M, hyphen, C-A-N, Limited, LTD.
Q. (BY MR. BURKE) Okay. Let me direct you back to the -- the beginning the contract. Other than the Page 75, would the contract -- well, Page 74, actually, is for Cherokee Insurance maintained by Universal Am-Can, correct?
A. Yes.
Q. And 73 actually deals with Am-Can, as well, correct?
A. Yes.
Q. As does Page 72, which is their Interstate Commerce Commission work --
A. Yes.
Q. -- or authority, I should say?
A. I think, the contract ends around about Page 66.
Q. Page 66. Okay. And that -- that last exhibit on Page 66 is a Certificate of Liability Insurance for Overnite Express, correct?
A. Yes.
Q. Okay. And it identifies International Paper as another named insured or additional insured, down in

the lower left corner?
A. Yes.
Q. Okay. While we're on that topic, was one of the conditions of this contract that International Paper entered into with Overnite Express, that International Paper would be named as an additional insured on a policy of liability insurance to be held or purchased by Overnite Express?
A. I don't know.
Q. Who -- who -- did you see -- Strike that. Did you see that condition in the body of the contract?
A. I don't remember.
Q. Did you read the contract that Mr. Fisher gave to -- to you?
A. Yes.
Q. And that contract, as you told us, did bear your signature, correct?
A. Yes.
Q. Okay. Is it a true and accurate copy of the contract that was entered into and signed by you on behalf of International Paper effective October 1st, 2007?
A. I believe so.
Q. And that -- that October 2007 contract, was that made in the normal course of International Paper's

business?
A. Yes.
Q. Okay. And was it the -- the normal business of International Paper to enter into certain contracts, such as this type of contract for transportation services?
A. Yes.
Q. Okay. And the representations made in the contract and the conditions set forth therein were true and accurate when they were entered into between International Paper and Overnite Express in October of 2007, correct?
A. I believe so.
Q. Did you negotiate the terms of this contract?
A. No.
Q. Okay. Were you involved in any manner in -- in the terms of the contract or creating the terms of the contract?
A. I don't think so.
Q. Okay. Did you review the contract before it was signed?
A. Yes.
Q. Okay. Signed by you, I should say?
A. Yes.
Q. And in your position as Vice President of

Global Sourcing, did you agree with and approve of all the terms and conditions of the contract?
A. Yes.
Q. Who did negotiate the terms of the contract?
A. I don't know. I assume, it was Steven Mundy.
Q. Okay. Would that have been part of his job?
A. Yes.
Q. Was -- was this -- this October 2007 contract a -- and the provisions of it a standard type of contract that International Paper would have with carriers who were transporting their products?
A. I believe so.
Q. Other than the fuel index and surcharges, were -- were most of the provisions standard provisions that International Paper would utilize with all of their carriers?
A. I don't know.
Q. In the -- are you aware that an amendment to this contract was entered into in June of 2008?
A. I don't know.
Q. In the -- are you aware that an amendment to this contract was entered into in June of 2008?
THE WITNESS: I don't know if -- if you sent me an amendment or not.
MR. FISHER: Whatever documents are in

there is the only thing I sent you.
A. Then, I guess, I don't know that.
Q. (BY MR. BURKE) Okay. Did -- were -- were you aware that -- Strike that. Do you -- are you familiar with the business, Universal Am-Can?
A. No.
Q. Okay. Were you familiar with the business Overnite Express?
A. I've heard of them.
Q. Okay. And you entered into a contract with Overnite Express on behalf of International Paper, correct?
A. Correct.
Q. Okay. And in your work at International Paper, did you ever become aware of International -- I'm sorry. During your work at International Paper, after this October 2007 contract was entered into, did you ever become aware that Overnite Express was purchased by or acquired by Universal Am-Can?
A. I vaguely remember Steve mentioning that Overnite Express had been purchased. I didn't remember the name of the company.
Q. Okay. Were you aware that any amendments were entered into to update this October 2007 contract to reflect that the carrier was, now, Universal Am-Can

instead of Overnite Express?
A. I don't remember that.
Q. Did you have any involvement in preparing this amendment?
A. I don't think so.
MR. BURKE: Guys on the phone, I'm going to show Mr. Crawford Page 35 -- I'm sorry, Page 65 of Exhibit No. 1, which is the -- the amendment dated June 10th and 12th.
Q. (BY MR. BURKE) Just while -- while we're on this topic, sir, let me tender to you Bates stamped UACL 65 from Exhibit No. 1, and it's a document entitled Amendment No. 1. Just take -- take a look at that for a minute and tell me if you've ever seen it before, No. 1?
A. I don't remember seeing it before.
Q. Okay. And that document is signed by Steve Mundy, correct?
A. Correct.
Q. From your testimony, it's -- I -- I take it you have no recollection having involvement in the creation of that document?
A. No, I don't.
Q. Okay. Would the -- Strike that. Was this type of amendment permitted in order to continue a

contract with a carrier in the event of -- of a purchase of a carrier by another company?
A. I don't remember this happening before.
Q. In -- in your job as part of Global Sourcing, you -- you, obviously, entered into contracts with transportation carriers like Overnite Express, as -- as reflected in this October contract, correct?
A. Correct.
Q. Okay. In addition to the requirements and terms of the contract, did International Paper provide any other information or brochures to its truck carriers with respect to procedures and rules to be followed by them while transporting International Paper products?
A. I don't know.
Q. What department from International Paper would be involved in -- in doing so, if that occurred?
A. I think, it would be the local facility, probably.
Q. The contract that you -- you signed was with Overnite Express. Did -- did you have involvement or conversations with any personnel from Overnite Express?
A. I don't remember.
Q. Do you know Mr. Al Schultz, either of them, from Overnite Express?

A. I don't think so.
Q. Okay. How about Mr. Kevin Hays from Overnite Express, do you know him?
A. I don't think so.
Q. How about Sandra Herrmann, do you know her?
A. No.
Q. During your time working at International Paper, were you familiar with a company called Martin's Bulk Milk Service?
A. No.
Q. Had you had involvement in negotiating or signing other contracts on behalf of International Paper with Overnite Express?
A. I don't think so.
Q. Other than this October 2007 one, I should say?
A. I don't remember.
Q. The -- was the signing of this contract on behalf of International Paper, was that something you had responsibility for as Vice President of Global Sourcing?
A. Yes.
Q. And what was the purpose of International Paper entering into this contract with Overnite Express?

A. To contract for truck service at our facilities.
Q. And truck service of -- Strike that. To contract with truck carriers who would provide the service of delivering your International Paper products to your customers?
A. Yes.
Q. The -- Let me ask you to go back to Page 36 of Exhibit No. 2 that you have in front of you, Mr. Crawford.
A. (Witness complies.)
Q. That's, basically, a table of contents page; is that correct?
A. Yes.
Q. Okay. That's actually entitled OXEN Overnite Express 2007 Outbound Contract, correct?
A. Yes.
Q. What's that expression "outbound contract" refer to?
A. It means shipments from IP facilities to our customers.
Q. Okay. And then how about Page 37, which is also noted as Page 2 of 24 of the contract, how come that page is blank?
A. I don't know.

Q. Okay. Do you know what should be there?
A. No.
MR. FISHER: Objection to form. Assumes facts not in evidence.
Q. (BY MR. BURKE) Where's the original of -- of this contract?
A. I don't know.
Q. Okay. Who would know?
A. I don't know.
Q. Who did you give the signed version to?
A. I don't remember.
Q. If -- if -- if you needed to come to court with a copy of this contract that you signed for International Paper, to whom would you go to to find the original?
A. I guess, I would go to my attorney.
Q. Okay. And what would you tell Mr. Fisher to --
A. Find --
Q. -- do or who would you tell him to talk to or what department would you tell him to contact?
A. Global Sourcing.
Q. Who's the current head of Global Sourcing?
A. David Liebetreu.
Q. And how do you spell his last name?

A. L-I-E-B-E-T-R-E-U.
Q. Liebetreu?
A. Yes.
Q. Okay. And is he also titled Vice President?
A. Yes.
Q. Okay. Is his office in Memphis?
A. Yes.
Q. How about Page 38? Let me direct your attention to the first paragraph which, basically, says that this agreement is being entered into and is effective the first day of October 2007, correct, right up at the top?
A. Yes.
Q. Okay. And the -- the contract or agreement is being entered into between International Paper, and you are identified as the Shipper in -- in this agreement, correct?
A. Yes.
Q. And International Paper was entering this contract with Overnite Express, who was identified as the Carrier in this contract, correct?
A. Yes.
Q. And the Paragraph 2 states that the Carrier is engaged in the business of transporting proper by motor vehicle as a contract carrier in interstate --

intrastate and foreign commerce, correct?
A. Yes.
Q. Okay. And where Carrier is referred to in this contract, that's referring to Overnite Express; is that right?
A. Yes.
Q. And where Shipper is -- is referred to, that's referring to International Paper?
A. Yes.
Q. And in that Paragraph 3, it says that Shipper, which was International Paper, desires Carrier, which was Overnite Express, to provide certain transportation related services pursuant to the rates and conditions set forth in the agreement, correct?
A. Yes.
Q. Okay. And a little bit further down the page, there's a Section 1 that is titled Term, and it says that this agreement shall have a term of two years from the date of the agreement, correct?
A. Yes.
Q. Okay. And then under Carrier Status, Overnite Express represented to International Paper that it was an interstate motor contract carrier of property duly registered and permitted to operate with the Federal Highway Administration, correct?

A. Yes.
Q. Okay. And, in fact, International Paper required United -- or required Overnite Express to provide a copy of their operating authority as an attachment, right?
A. I don't know.
Q. Well, the next sentence after the one I had just quoted says, "A copy of Carrier's registration or permit is attached as Exhibit A", correct?
A. Correct.
Q. Okay. And then under Carrier's Obligations, the first section, Paragraph -- do you see where I'm at -- No. 3 --
A. Yes.
Q. -- bottom of the page? Okay. Paragraph A is entitled Services, correct?
A. Yes.
Q. Okay. And it says that the -- the Carrier will provide the services set forth in Exhibit C, which was the Motor Carrier Rate and Weekly Commitment Schedule, correct?
A. Yes.
Q. Okay. And in general terms, Mr. Crawford, what were the services that Overnite Express was providing to International Paper pursuant to this

contract?
A. Providing truck transportation for our shipments from our facilities to our customers.
Q. And on Page 39, International Paper sets forth certain commitments that the Carrier had to meet; would that be correct?
A. Yes.
Q. Okay. And -- and commitments in your business refers to what?
A. Performance obligations.
Q. Okay. And -- and -- and -- Or strike that. Overnite Express, basically, had to -- to make themselves available to transport a certain amount of product on a given number of trips to a designated location. Would that generally be accurate?
A. Yes.
Q. Was -- was this particular contract for a certain route or -- or run or a certain general geographic area, perhaps, is more accurate?
A. I assume so.
Q. And on Page 39, International Paper required that Overnite Express meet certain on-time delivery requirements as set forth in Paragraph F, correct?
A. Yes.
Q. And in Paragraph G, there's various

requirements for motor vehicle equipment that the Carrier had to use, correct?
A. Yes.
Q. Okay. And in -- take a look at G for a minute, in -- in the first few sentences or first couple sentences. Let me give you a minute to read that. I just want to ask you a question about that.
A. Okay.
Q. Okay. International Paper required that Overnite Express maintain their truck equipment in good, safe and lawful operating conditions and in accord with all applicable local, state and federal laws and regulations; is that correct?
A. Yes.
Q. And the Paragraph H, take a -- take a look at that for a moment.
A. Okay.
Q. International Paper required that Overnite Express' personnel be fully qualified and have appropriate licenses and permits as required by local, state and federal laws, correct?
A. Yes.
Q. Okay. And International Paper also required that Overnite Express and their drivers comply with all applicable local, state and federal laws and

regulations, correct?
A. Yes.
Q. Okay. And compliance with local, state and federal laws and regulations, would include complying with traffic regulations in the safe operation of their tractor-trailer trucks, correct?
A. I would assume so.
Q. And under the Trailer Requirements, you actually required them to have safe and suitable trailers that would keep your paper products in -- in good, safe condition, correct?
A. Yes.
Q. And you, down in K -- actually, J and K, you required them to have a certain amount of trailer equipment, correct?
A. Yes.
Q. Okay. And that was to make sure that they could adequately transport whatever International Paper needed to have transported, correct?
A. Yes.
MR. FISHER: Excuse me. Can you just read back just a portion of Rich's question. I just want to make sure I heard what I thought I heard.
(Readback.)
MR. FISHER: Thank you. That's what I

thought I heard.
Q. (BY MR. BURKE) In the very bottom of Page 39, Mr. Crawford, there's a Section No. 4 entitled Compensation. Literally, the last line carries over to the next page, 40. Are you with me?
A. Yes.
Q. Okay. In that Compensation section, there's various provisions for how International Paper would compensate Overnite Express; is that right?
A. Yes.
Q. Okay. Did -- did Overnite -- I'm sorry. Did International Paper essentially make the decision on what compensation you were willing to pay to your carriers?
A. Well, I think -- I think, the carriers proposed what they thought was appropriate compensation, and, basically, the selection of Carriers was competitive. So if -- if the service was good and the rates were competitive, than the carrier would probably get some business.
Q. Okay. And, ultimately, it was International Paper that decided whether or not any particular carrier would get International Paper's business?
A. Yes.
Q. Okay. And International Paper could decide

not to do business with any particular carrier that they didn't want to do business with for whatever reason, correct?
A. Right.
Q. Okay. And International Paper could terminate the services of any carrier if International Paper was unhappy with their performance, correct?
A. Well, they have to -- under the terms of contract, if -- if that's -- if that's -- but, yes, within the frame of the contract, they could certainly terminate service.
Q. And I -- and we'll get to that in -- in a moment, as well. And, basically, in Page -- on 42, there's a Section 7 titled Commitments, correct?
A. Correct.
Q. Okay. That sets forth various commitments or obligations that Overnite Express had to meet in order to comply with the contract in terms of making deliveries; is that right?
A. Yes.
Q. And then Section 8, Default by Carrier, that actually is a section that sets forth various grounds under which International Paper could terminate their agreement with Overnite Express, correct?
A. Yes. It's based on continuing or substantial

failure.
Q. Okay. And on Page 43, there are various examples of continuing or substantial failure that are -- but those are not include -- are not intended to be an exhaustive list; would that be correct?
A. Yes.
Q. Okay. And in Paragraph A, one of the grounds for termination would be Overnite Express' failure to comply with facility safety rules and operating procedures, correct?
A. Yes.
Q. Okay. And B is the minimum service levels, correct?
A. Yes.
Q. And C refers to meeting the 98-percent acceptance level of deliveries within a three-month period, correct?
A. Yes.
Q. And if you got complaints from a carrier -- Or strike that. If you got complaints from a customer on two or more occasions within a three-month period, you could terminate them, as well, correct?
A. Yes.
Q. Or if -- if the DOT rating -- or I should say if the Department of Transportation rating for Overnite

Express was downgraded, you could terminate your contract with them, correct?
A. Yes.
Q. Or if they -- if Overnite Express failed to maintain the minimum insurance coverage, you could terminate, correct?
A. Yes.
Q. And if Overnite Express failed to comply with federal, state or municipal laws and regulations, you could terminate the contract, correct?
A. Yes.
Q. And if the Carrier, meaning Overnite Express, went into bankruptcy or some other form of insolvency, you could terminate, as well, correct?
A. Yes.
Q. And then in Paragraph 9 -- I'm sorry, Section 9 on that same Page 43, which is entitled Electronic Communications, Dispatch and Reporting, am I correct International Paper required Overnite Express to have certain type of communication systems in order for International Paper be to be able to contact them and communicate with them?
A. Yes.
Q. And, in general, what -- what was the purpose of that, Mr. Crawford?

A. Well, the electronic communication would be faster or more efficient and also keep a permanent record of -- of the communication between International Paper and -- and the carrier.
Q. Okay. And then in Section 10, International Paper also set forth the types of bills of lading and -- and freight receipts that the Carrier had to utilize; is that correct?
A. Yes.
Q. And then let me skip down to the end of -- bottom of Page 44. There's a Section No. 12 for Freight Loss or Damage, correct?
A. Yes.
Q. Okay. And, basically, Overnite Express under this contract, was liable to International Paper for loss or damage of any goods being transported under the agreement; is that correct?
A. Yes.
Q. And in the Insurance section which is Section 13, International Paper required Overnite Express to maintain certain amounts of liability insurance coverage, correct?
A. Yes.
Q. And the auto liability coverage was no less than $1 million, correct?

A. Yes.
Q. And there was a Cargo Liability on the next page, which is Page 45, of $100,000, correct?
A. Yes.
Q. And then International Paper, in Section C, required Overnite Express to have commercial general liability coverage in the amount of $1 million, correct?
A. Yes.
Q. And that -- that commercial general liability policy also had to name International Paper as an additional insured; is that right?
A. Yes.
Q. Do you know what coverage International Paper -- Strike that. Do you know what amount of liability coverage International Paper had that does or might cover International Paper for injuries sustained by Jeffrey Scheinman in -- in the incident that's the subject of this case?
A. No.
Q. Did -- did you make the determination of the $1 million requirement that's set forth in this contract?
A. I don't remember, sir.
Q. Who -- what department would -- or was it

within your responsibility to decide what amount of coverage a carrier should have?
A. I don't remember.
Q. Who -- who do you believe, or what department at International Paper do you believe would have accurate information on the amount of liability coverage maintained by or available to International Paper for the injuries sustained by Jeffrey Scheinman?
A. I guess, the insurance department.
Q. Okay. And was there an insurance department?
A. I don't remember dealing with them.
Q. Okay. I mean, what -- what -- was there a division or department at International Paper that was -- that you believe dealt with insurance-type issues like this?
A. I don't remember who it was.
Q. Okay. But was there such a department?
A. I assume so.
Q. Who worked in that department or, you know, in any capacity?
A. I don't remember.
Q. When you read this contract and then signed it, did you ask Steve Mundy or anybody else why the liability coverage amount being referred to in the contract was $1 million, as opposed to some other

amount?
A. I don't remember.
Q. Did International Paper have any other coverage that's sometimes referred to as excess coverage or umbrella coverage that was applicable to injuries like the ones Mr. Scheinman received that are the subject of this case?
A. I don't know.
Q. And do you know who might know the answer to that?
A. Gigi.
Q. Okay. And you're referring to another one of International Paper's attorneys who's also present today; is that correct?
A. Yes.
Q. Take a look at Page 46, if you would.
A. (Witness complies.)
Q. There's a section entitled Indemnification. Take a moment and just read that relatively short paragraph, Mr. Crawford.
A. Okay.
Q. When you signed this contract, what -- what was your understanding of -- of what this paragraph meant?
A. I don't remember.

Q. How about when you read it today, what's your understanding of what it means?
A. It says the Carrier will indemnify the Shipper. So I interpret the Carrier to be Overnite Express and the Shipper to be International Paper.
Q. And, basically, that first sentence says that the Carrier shall indemnify and hold harmless Shipper from and against all liability, loss, damages, claims, suits or expenses, including reasonable attorneys' fees, by reason of an injury, including death or claim of injury to person or damage to property arising out of or in connection with the performance of this agreement by Carrier, its employees, agents or subcontractors"; is that correct?
A. Yes.
Q. So, basically, under this agreement, if -- if Overnite Express, as the Carrier, caused an accident or injury through one of its employees or agents or a subcontractor, they were supposed to indemnify International Paper; would that be correct?
A. Yes.
Q. Okay. Take a look at Page 47, if you would, sir.
A. (Witness complies.)
Q. The top paragraph says that the -- the

Carrier, which would be Overnite Express, shall solely direct all persons performing services performed by the Carrier under this agreement and that such person shall be and remain subject to the exclusive control and direction of Carrier, which would be Overnite Express; is that correct?
A. Yes.
Q. And then Page 48, as we mentioned earlier, that's the signature page bearing your signature in your capacity as Vice President of Global Sourcing for International Paper Company, correct?
A. Yes.
Q. All right. And you -- you actually signed this on November 12th, 2007, even though it actually became effective October 1st of 2007; is that right?
A. I certainly signed it on November 12th. I don't remember the effective date.
Q. Okay. Take a look at, I think, it's Page 3, Bates stamped 3 -- I'm sorry, Bates stamped 38, which is Page 3 of the contract. Look at Bates stamp 38.
MR. FISHER: Let me help you. It's right over here. Yeah, here we go.
A. Yeah, 1st day of October.
Q. (BY MR. BURKE) Okay. And -- and why would you not be signing until November if it's effective in

October 2007?
A. I assume, the -- getting the signatures from the Carrier took longer than expected.
Q. Okay. And on that same Page 48, the signatures from the Carrier are -- are all dated October 30th, 2007, correct?
A. Yes.
Q. Okay. And those are the signatures from -- of Robert L. Schultz, Kevin Hays and Sandra Herrmann from Overnite Express, correct?
A. Yes.
Q. Okay. From the time you signed this contract in October of -- or whatever date you signed it, November of 2007, until you left International Paper, did you ever sign any other contracts with Overnite Express?
A. I don't remember.
Q. Have you ever seen -- seen any, that you can recall?
A. No.
Q. Okay. Could -- could you -- and you did touch on it, sir, but could -- could you explain a little bit of the difference between what Mr. Mundy did and -- and yourself in terms of job responsibilities? You know what? That's a bad question. Let me ask you this:

What was Mr. Mundy's job responsibilities?
A. He -- he was in charge of contracting with our motor -- motor carriers.
Q. And, basically, kind of as you have alluded to, contracting with motor carriers for the purpose of them providing delivery service for International Paper of your products to your customers?
A. Yes.
Q. And -- and how did his job differ than -- than your job in -- in what both of you did on a day-to-day basis?
A. Mine was a little bit broader. So his department also contracted for railroad service in addition to truck service and contracted for different kinds of -- of truck service. And then there were other departments that contracted for energy or chemicals or equipment.
Q. Okay. And when -- when you say Mr. Mundy's department, what was that department?
A. As I remember it, it was the Transportation Sourcing department.
Q. Okay. And I -- I think when I showed you that amendment, his title was -- that Amendment No. 1 that I showed you earlier, his title, at least, at -- on June 12th, '08, when he signed that amendment, was Manager

Sourcing Motor Procurement --
A. Yep.
Q. -- would that be right? Okay. And in -- in -- basically, what did that department do?
A. They negotiated and established and monitored contracts with our motor carriers.
Q. Okay. By the way, do you -- do you know Martha Lindbeck at all from Universal Am-Can?
A. No.
Q. And then when you say your position was a little broader, in what respect? A little broader than Steve Mundy's in what respect, sir?
A. Well, the organization sourced and contracted for all the outside procurement at International Paper, with the exception of wood. There was a separate organization that did wood procurement.
MR. BURKE: Carl, why don't you let me look at my notes, and if anybody else has any questions, they can go ahead and do so.
MR. FISHER: Sure. Anybody else have questions on the phone?
MR. SCHRECK: I've got a few, and let me jump into it.
THE REPORTER: Who is that? Excuse me.
MR. FISHER: Who are you?

MR. SCHRECK: This is Matthew Schreck. I apologize.

EXAMINATION

BY MR. SCHRECK:
Q. Mr. Crawford, if you could turn to Page 43 of Exhibit 2.
A. Okay.
Q. You were asked some questions earlier by Mr. Burke regarding defaults under the contract. Do you remember that?
A. Yes.
Q. Okay. And one of those defaults was failure to comply with safety -- the facility safety rules and operating procedures, correct?
A. Yes.
Q. Okay. And what that meant is if the carrier, an entity that was picking up the product from International Paper's facility, isn't complying with whatever those particular safety rules were, International Paper can kick them off the site and say you're not going to do any work for us; is that correct?
A. That's what it says.
Q. Okay. And that would include any rules or procedures that were in effect at the facility, whether

it be regarding wearing shirts, where trucks were supposed to park, how they were supposed to load, etcetera, correct?
A. Well, it says facility safety rules and operating procedures which, I assume, would be documented.
Q. Okay. And those -- those type of things would include things that would go to personal safety at the facility, correct?
A. I assume so.
Q. As well as things that would go to safety in loading and unloading trucks, correct?
A. I assume so.
Q. Okay. How familiar are you, if at all, with the safety rules that were in effect at the Hammond facility back in '08?
A. Not at all.
Q. Do you know who would be familiar with that?
A. No.
Q. At any point during the time that you were with International Paper, did you ever become aware of Martin's Bulk Milk Service?
A. No.
MR. SCHRECK: Give me a moment. I have no further questions. If anybody else has any questions,

feel free to jump in.
MR. LANGS: This is Brian Langs. I just have a couple questions for you, Mr. Crawford.
THE WITNESS: Okay.
MR. LANGS: I represent BMW.

EXAMINATION

BY MR. LANGS:
Q. Were you aware of the product liability claims that the Plaintiff has alleged against the BMW entities in this case?
A. No.
Q. Is it safe to say that you don't have any opinions regarding the Plaintiff's allegations as to the design of the BMW Plaintiff was driving at the time of the accident was defective?
A. I have no opinion.
Q. All right.
MR. LANGS: That's all I've got for you. Thank you.
MR. FISHER: I just have a couple follow-ups.

EXAMINATION

BY MR. FISHER:
Q. Mr. Crawford, if you could look at Page -- Page 37, I will represent to you that the documents

that International Paper provided to me, in particular, beginning at Bates numbered Page 36 that bears the stamp "Original" at the top, that these are the documents as I received them from International Paper. All right?
So focusing on Page 37, which is also marked as Page 2 of 24, do you know whether or not it was typical in International Paper contracts that a contract would, in effect, have a cover page that looks like Bates number Page 36, and then the text would begin on what is the third page, with the second side or page being intentionally left blank? Do you have any memory or knowledge of that?
A. No.
Q. Okay. So as you sit here today, you simply have no knowledge as to why it is Bates Page 37, also numbered as 2 of 24, simply has a horizontal line at the top?
A. I have no knowledge.
Q. Okay. Second topic that I wanted to ask you about goes to some questions that Mr. Burke asked you concerning the timing and why it was that your signature is November 12th, when the contract is dated October 1st. And to focus your attention on that topic, if you'd look at Bates numbered Page 35, do you

see that on that particular document, Mr. Mundy's electronic signature appears at the bottom of a -- excuse me, the bottom of an October 24th, 2007 letter, to a representative of Overnite, including copies of the contract that we have previously agreed to?
A. Yes.
Q. All right. So in light of that date, does the timing of the Eickholtz and Hays signature in late October and your signature in early to mid November make sense chronologically?
A. Yes.
Q. All right. And, finally, when Mr. Burke focused your attention on the language that appears at the top of Page 47, he began reading to you language that starts with the word "Carrier shall solely direct"?
A. Yes.
Q. This language that he read to you and to which you gave answers to his questions, that's part of a section that begins on the previous page, Bates numbered 46, entitled Section 20, Independent Contractor?
A. Yes.
Q. And so was this language to indicate that the contract is stating that Overnite Express is performing

under this agreement as an independent contractor?
A. Yes.
MR. FISHER: That's all the questions I've got.

FURTHER EXAMINATION

BY MR. BURKE:
Q. The section on Page 46 that Mr. Fisher just asked you about entitled Independent Contractor, the first sentence of that Section 20 states, am I correct, "Carrier is and shall perform services under this agreement as an independent contractor"?
A. Yes.
Q. Okay. And the Carrier referred to there is Overnite Express at the time you signed this contract?
A. Yes.
Q. Okay. And the services being provided to International Paper are the transportation of your paper products, as you have previously explained?
A. Yes.
Q. Okay.
MR. BURKE: Nothing else.
MR. FISHER: Any other questions?
MR. SCHRECK: This is Matt. None.
MR. GOLDEN: Rob. No.
MR. FISHER: Okay. Signature is reserved,

and I think we can go off the record now -- Oh, unless you needed som info.

THE REPORTER: What I need to do, since everyone is on the phone, I just need to get everybody's order on the record.

MR. FISHER: Okay. Great. Sure. The court reporter needs your orders of how you want the transcript.

MR. SCHRECK: Are you ordering the original or...

MR. BURKE: Yeah. I'm ordering a e-transcript or whatever I order.

THE REPORTER: Besides the original, you don't want --

MR. SCHRECK: This is Matt. I'm going to take a regular and a mini.

MR. GOLDEN: I'm not going to order a copy. Bob Golden.

MR. LANGE: And this is Brian Langs. Could you just send me e-transcript, please.

MR. FISHER: And I'll take an e-tran in mini script format.

(Deposition concluded at 10:42 a.m.)

* * * * * SIGNATURE WAIVED * * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY J. )
SCHEINMAN, a Disabled )
Person, )
)
Plaintiffs, ) Case No.: 09 cv-5340
)
vs. ) Honorable James F.
) Holderman
)
MARTIN'S BULK MILK ) Magistrate Susan E. Cox
SERVICE, INC., SAMUEL G. )
FRANKE, CSX INTERMOD, )
INC., INTERNATIONAL PAPER )
COMPANY and OVERNITE )
EXPRESS, INC., )
)
Defendants. )

REPORTER'S CERTIFICATION
DEPOSITION OF WILLIAM CRAWFORD
JUNE 6, 2012

I, Shannon H. DeLay, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

That the Witness, WILLIAM CRAWFORD, was duly sworn by the Officer and that the transcript of the oral deposition is a true record of the testimony given by the Witness.

That the examination and signature of the Witness is waived by the Witness and the parties, and that the original deposition was delivered to MR. RICHARD F. BURKE, JR. for safekeeping on ________________.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this procedure was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ______ day of_________, 2012.

______________________________
SHANNON H. DeLAY, CSR NO. 5481
Expiration Date: 12/31/2012
Firm Registration No. 283
100 Congress Ave., Suite 2000
Austin, Texas 78701
(512)634-1980