# EX. 15

October 2007 Agreement between IPC and OEI



UACL/OEI_000001



**THOMAS C. QUINLEN**
COUNSEL
LITIGATION

LEGAL DEPARTMENT
6410 POPLAR AVENUE
TOWER II, 4-021
MEMPHIS, TENNESSEE 38197

TELEPHONE (901) 419-6879
FACSIMILE (901) 214-2641
THOMAS.QUINLEN@IPAPER.COM

August 13, 2009

Carl Fisher                                         Via FedEx
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, Illinois 60601

     RE:    Scheinman vs Martin's Bulk Milk Service

Dear Carl:

Per your request, enclosed please find copies of the complete Contract dated 10/1/07 between International Paper and Overnite Express, Amendment No. 1 to that Contract dated 6/9/08 (with accompanying Certificate of Insurance), and the materials received from the Highland Park Police Department.

With regard to the May 21, 2008 letter you requested, Mr. Mundy recalls that upon receipt of that correspondence from Universal Am Can Ltd., "Amendment No. 1" to the Contract was drafted. Thus, no signed version exists.

                    Very truly yours,

                    INTERNATIONAL PAPER COMPANY

                    Thomas C. Quinlen

TCQ/tpd

UACL/OEI_000032

# ORIGINAL

## OXEN Overnite Express 2007 Outbound Contract

### Table of Contents

| | |
|---|---|
| HEADER | 3 |
| 1. TERM | 3 |
| 2. CARRIER STATUS | 3 |
| 3. CARRIER'S OBLIGATIONS | 3 |
| 4. COMPENSATION | 4 |
| 5. PAYMENT TERMS | 5 |
| 6. CARRIER'S OPTION TO ASSIGN ITS ACCOUNTS RECEIVABLES | 6 |
| 7. COMMITMENTS | 7 |
| 8. DEFAULT BY CARRIER. | 7 |
| 9. ELECTRONIC COMMUNICATIONS, DISPATCH and REPORTING | 8 |
| 10. BILLS OF LADING AND FREIGHT RECEIPTS | 8 |
| 11. HAZARDOUS MATERIALS. | 9 |
| 12. FREIGHT LOSS OR DAMAGE | 9 |
| 13. INSURANCE | 9 |
| 14. CONDITIONS OF USE OF INTERMODAL SERVICE | 10 |
| 15. INDEMNIFICATION | 11 |
| 16. FORCE MAJEURE | 11 |
| 17. NOTICES. | 11 |
| 18. CONFIDENTIALITY | 11 |
| 19. NO LIEN | 11 |
| 20. INDEPENDENT CONTRACTOR. | 11 |
| 21. ASSIGNMENT | 12 |
| 22. MODIFICATION | 12 |
| 23. WAIVER | 12 |
| 24. GOVERNING LAW AND LEGAL JURISDICTION | 12 |
| 25. SEVERABILITY | 12 |
| 26. HEADINGS | 12 |
| 27. SIGNATORY AUTHORITY | 12 |
| 28. ENTIRE AGREEMENT | 13 |
| Exhibit A - Carrier Permit | 14 |
| Exhibit B - Fuel Index | 15 |
| Exhibit C - Motor Carrier Rate and Weekly Commitment Schedule | 17 |
| Exhibit D - Motor Carrier Vendor Profile | 18 |
| Exhibit E - Electronic Funds Transfer Bank Information | 19 |
| Exhibit F - Sample International Paper Bill of Lading | 21 |
| Exhibit H - Electronic Compliance Requirements | 22 |
| Attachment A - Certificate of Insurance | 24 |

UACL/OEI_000033

UACL/OEI_000034

**HEADER**

This Agreement is entered into and is effective this 1st day of October, 2007, by and between International Paper Company, with offices at 6400 Poplar Avenue, Memphis, Tennessee 38197 ("SHIPPER") and Overnite Express with offices at
_Robert W. Elprich_ ("CARRIER").

WHEREAS, CARRIER is engaged in the business of transporting property by motor vehicle as a contract carrier in interstate, intrastate, or foreign commerce within North America, and

WHEREAS, SHIPPER desires CARRIER to provide certain transportation-related services pursuant to the rates and conditions as set forth in this Agreement, and

WHEREAS, SHIPPER and CARRIER desire to enter into a contract, not a common carrier relationship, under which CARRIER shall perform transportation-related services for SHIPPER for all commodities unless covered otherwise by separate agreement between the parties,

NOW, THEREFORE, the parties agree as follows:

**1. TERM**

This Agreement shall have a term of two (2) years from the date of this Agreement. This Agreement shall automatically extend for an additional ninety (90) day term unless written notice is provided by either party at least thirty (30) days prior to the expiration of the original two (2) year term.

**2. CARRIER STATUS**

CARRIER represents that it is an interstate motor contract carrier of property, duly registered and permitted with the Federal Highway Administration. A copy of CARRIER'S registration or permit is attached as Exhibit A, CARRIER Permit, which is attached hereto and is incorporated herein. CARRIER represents that it possesses, and shall maintain for the term of this Agreement and any extensions thereto, all necessary registrations, certificates and/or authorizations required by each state in which CARRIER shall operate as a contract carrier for SHIPPER. CARRIER expressly waives any and all rights and remedies under the ICC Termination Act for the services provided under this Agreement, pursuant to 49.U.S.C. 14101(b)(1).

**3. CARRIER'S OBLIGATIONS**

CARRIER shall:

A. Services. Provide services as set forth in Exhibit C, Motor Carrier Rate and Weekly Commitment Schedule, which is attached hereto and is incorporated herein.

B. Motor Carrier Vendor Profile Form. Provide a completed Exhibit D, Motor Carrier Vendor Profile Form, which is attached hereto and is incorporated herein.

C. Coordination. Coordinate and establish delivery schedules for all services provided.

D. Commitments. Provide the number of Commitments as defined in Section 7 and as set forth in Exhibit C.

3 of 24

UACL/OEI_000035

E. Minimum Service Level Requirement. Meet a minimum service level of 98 percent for the Commitments described in Section 7 and as set forth in Exhibit C. Failure to meet the minimum service level of Commitments means that the CARRIER is not meeting the performance expectations and requirements of SHIPPER.

F. Minimum On-Time Delivery Requirement. The Minimum On-Time Delivery Requirement is 98% and the Minimum Service Level Requirement is 98%. Measurement is comprised of the following: total shipments less shipments not on-time, divided by total shipments. Shipments not on-time are those that do not meet their delivery appointment, shipments not picked up from facilities as promised, shipments not delivered with established and reasonable transit times, and transit failures en-route. Delivery failures resulting from SHIPPER actions are not included in this calculation as "not on-time."

G. Motor Vehicle Equipment. Maintain at its own cost and expense the motor vehicle equipment required to provide the transportation services required hereunder, including the Commitments set forth in Exhibit C, in good, safe and lawful operating condition at all times and in accordance with all applicable local, state, and federal laws and regulations. In no event shall SHIPPER making any visual inspection of CARRIER's equipment be construed as shifting responsibility/liability for the adequacy and condition of the equipment on to SHIPPER.

H. CARRIER Personnel. Employ at its cost and expense the personnel required to maintain and operate CARRIER'S motor vehicle equipment as required to perform the services contemplated under this Agreement. CARRIER'S personnel shall be fully qualified and shall procure and maintain such licenses and permits as are required by local, state, or federal laws and regulations required to maintain and operate the motor vehicle equipment. CARRIER'S personnel shall comply with applicable local, state, and federal laws and regulations.

I. Ancillary Costs. Bear all costs and expenses of furnishing fuel, oil, tires, parts, supplies, and all other equipment necessary or required for the good, safe and lawful operation and maintenance of the motor vehicle equipment. CARRIER shall further bear all expenses, including the expense of road service and repair, in connection with the use and operation of the motor vehicle equipment.

J. Trailer Requirements. Provide SHIPPER with trailers that are suitable for the safe, efficient and damage-free transportation of its products. Suitable trailers are defined as van trailers that (i) are clean and free of contaminants, debris, foreign substances, odors, and wall and floor protrusions; (ii) completely protect and prevent SHIPPER'S goods from coming into contact with or being exposed to water and other environmental hazards; and, (iii) are in proper condition and have no mechanical defects. CARRIER agrees to pay in full all claims filed by SHIPPER for damage to or destruction of SHIPPER'S goods which arise from unsuitable trailers.

K. Trailer Pool Requirements. CARRIER shall provide empty trailers to be maintained in SHIPPER'S trailer pool, plus any live load commitments. The number of empty trailers shall be determined by SHIPPER and agreed upon by CARRIER and shall be equal to or greater than 1½ times the number of daily or weekly Commitments.

4. COMPENSATION

UACL/OEI_000036

A. CARRIER shall be compensated for its services in accordance with Exhibit C.

B. Rates to and from points shall be construed to mean points and places as defined in Exhibit C. In the event that more than one rate from one origin to one destination is contained in any Exhibit C, or revision thereto, the more specific rate shall take precedence over the more general rate, e.g., point to point, point to short haul, point to state/split state, point to region with minimum charge, state to point, state to short haul, state to state/split state, state to region with minimum charge. The specific rate precedence levels are:

1. Point-to-point

2. Point-to-shorthaul bands

3. Point-to-state or point-to-split state

For shipments 251 miles or longer, CARRIER will be paid the greater of their Universal Minimum charge or their Point-to-state or Point-to-split state rate. Universal Minimums are not applicable for Point-to-point rates or Point-to-shorthaul bands. All rates and charges set forth in Exhibit C shall be subject to the fuel index adjustment set forth in Exhibit B, Fuel Index, or revision thereto, which is attached hereto and is incorporated herein by reference. Exhibit C may contain an alpha/numeric numbering system which uniquely identifies the CARRIER and this Agreement. The parties further agree that it is their desire to ensure that the person or company responsible for paying for the increased price of fuel above the index price set forth in this Agreement shall be fairly compensated for bearing that expense. CARRIER accordingly represents and warrants that all monies paid by SHIPPER for fuel surcharges will be distributed to the person or company ultimately responsible for absorbing that cost with respect to traffic tendered by SHIPPER, without regard to whether that person or company is a signatory to this Agreement, and CARRIER shall specifically indemnify and hold SHIPPER harmless from all costs (including attorney's fees and related costs) arising out of any claims, actions, suits or demands relating to CARRIER's alleged failure to abide by this requirement.

C. The parties agree that mileage factors, if applicable for the purpose of determining line-haul freight rates and charges, shall be determined using the Rand McNally-TDM Mile Maker System under the most current release as installed and maintained on site at SHIPPER'S computer center in Memphis, Tennessee. Computation of all mileages shall be from the point of initial origin to the point of ultimate destination through all stop-off points, if applicable, as described on the bill of lading or other written shipment instructions tendered at the point of shipment.

D. If detained at SHIPPER'S origin or destination, CARRIER shall be compensated at a rate of $60/hr, but only after 1.5 hours of free time has passed from the moment the CARRIER arrives at the gate. If the CARRIER has an appointment time prior to the time they arrive at the gate, free time will not begin until the scheduled appointment time. Detention time shall be chargeable in quarterly hour increments and shall be subject to a maximum of $600/day.

5. PAYMENT TERMS

A. SHIPPER shall pay CARRIER such amounts as are due for services performed hereunder within forty-five (45) days after date of invoice. SHIPPER may, in its sole discretion, extend alternate payment terms if requested by CARRIER in Exhibit D. If CARRIER desires to be paid via electronic funds transfer, then CARRIER must complete and submit Exhibit E, Electronic Funds Transfer Bank Information, which is attached hereto and is incorporated

UACL/OEI_000037

herein by reference.

B. CARRIER shall specify in Exhibit D where and to whom to send all payments under this Agreement. SHIPPER shall pay CARRIER by check or via electronic funds transfer as directed by CARRIER in Exhibit D. All shipments hereunder shall be "prepaid" or "collect" for account of SHIPPER unless otherwise specified. Once CARRIER provides electronic notification of proof of delivery ("POD"), payment(s) shall be released for execution within the agreed upon credit period. No interest, penalty, or other charge shall be applied for any late payment.

C. In the event of a payment dispute, the party raising the issue shall notify the other party in writing of the amount and nature of the dispute. The parties shall work expeditiously and in good faith to resolve the dispute, including providing disputed and supporting documentation to the other party on a timely basis. After the dispute is resolved, any credits due shall be applied in the next payment cycle. In the event CARRIER fails to respond to inquiries or provide requested documentation, SHIPPER shall be entitled after thirty (30) days additional written notice to deduct any overpayment previously paid by SHIPPER to CARRIER from monies due CARRIER.

D. The time limit for filing overcharge and undercharge claims on shipments moved pursuant to this Agreement shall be eighteen (18) months, except that clerical errors, mathematical errors, extension errors and duplicate payments may be corrected up to thirty-six (36) months. CARRIER specifically waives any requirement SHIPPER may have to submit a claim within the 180 day period specified in 49 U.S.C. § 13710(a)(3)(B), and shall not raise a statue of limitation defense as long as it is filed in accordance with this section, or otherwise contend that a claim is untimely or otherwise barred as long as it is filed in accordance with this Agreement.

## 6. CARRIER'S OPTION TO ASSIGN ITS ACCOUNTS RECEIVABLES

A. CARRIER may assign its accounts receivables under this Agreement to a third party. In order to so do, however, CARRIER must:

.(i) Notify SHIPPER in writing a minimum of thirty (30) days in advance of any change in the CARRIER's direction for payment, including without limitation any assignment of CARRIER's right to payments earned or to be earned under this Agreement. Notice of any such assignment by CARRIER must include a self-addressed, stamped, return acknowledgment for SHIPPER'S to execute and return. Notices to SHIPPER shall be sent to:

> Manager, Motor Carrier Sourcing
>
> International Paper Company
>
> Global Sourcing Department
>
> 6400 Poplar Avenue
>
> Memphis, TN 38197
>
> FAX #: (901) 214-1811

(ii) Inform any assignee of the terms of this Agreement, including these terms regarding notice requirements.

6 of 24

UACL/OEI_000038



B. CARRIER acknowledges and agrees that any change in CARRIER'S directions for payment or notice of assignment sent to any SHIPPER employee or location other than as set forth in Section 6(A)(i) is inadequate and defective. During the transition period from one set of CARRIER'S payment directions to another, CARRIER agrees that payments inadvertently made by SHIPPER in accordance with earlier payment directions shall constitute full satisfaction of SHIPPER'S payment obligations under this Agreement. CARRIER further agrees that in such event it is the responsibility of the CARRIER to forward, or cause to be forwarded, the payment to the correct party. CARRIER shall indemnify, defend and hold harmless SHIPPER from and against all liability, loss, damages, claims, suits or expenses, including without limitation reasonable attorney fees, caused by or arising from any failure on the part of CARRIER or any assignee to comply with the terms of this section.

### 7. COMMITMENTS

A. Commitments mean power units (tractors), drivers, and trailer combinations. As of the date of this Agreement, CARRIER shall provide the Commitments set forth in Exhibit C (either daily or weekly as appropriate). The parties acknowledge that Commitments do not impose a minimum volume requirement upon SHIPPER. CARRIER acknowledges that Exhibit C is a contractual obligation and not merely a price sheet.

B. At those SHIPPER facilities where trailer pools are maintained by CARRIER to support the facility's shipping operations, CARRIER shall, as part of its Commitment obligation as set forth in Section 7(A), provide quality, watertight trailers in an amount not less than 1.5 times the number of its daily commitments, or in the event CARRIER has a weekly commitment in an amount not less than the weekly commitment number divided by 5, or such changed number as may be agreed upon in writing by the parties from time to time. .

C. CARRIER shall be obligated to accept tenders from SHIPPER up to the Weekly or Daily Commitment Level, as appropriate. Failure by CARRIER to fulfill its Commitment obligations, provided SHIPPER has tendered the number of Commitments, shall be a default by CARRIER. CARRIER acknowledges that if CARRIER fails to meet its Commitment levels, that SHIPPER shall be damaged. It is mutually agreed that it would be difficult to calculate those damages. CARRIER agrees to pay SHIPPER, as a liquidated damage, an amount of $100 for each shipment that SHIPPER tenders to CARRIER that CARRIER fails to accept, up to the Commitment level. SHIPPER and CARRIER agree that the liquidated damages amount above to be a reasonable and good-faith estimate of SHIPPER'S damages, and not a penalty.

D. SHIPPER and CARRIER shall renegotiate the Commitment levels if significant changes occur in SHIPPER'S transportation needs during the term of this Agreement. If the adjustment would result in a one-third or greater reduction in the Commitment levels, then either party may terminate this Agreement. Any negotiated change in the Commitment levels shall be evidenced in writing, signed by both parties, dated, and labeled with the appropriate revision number. SHIPPER shall be the sole publisher of all revisions to this Agreement.

### 8. DEFAULT BY CARRIER.

Should there be a continuing or substantial failure in CARRIER'S performance under this Agreement, SHIPPER may upon fifteen (15) days written notice and an opportunity to cure, terminate this Agreement without prejudice to any other right or remedy available to SHIPPER. In such event, SHIPPER'S only liability shall be to make any net payment due for

UACL/OEI_000039

services actually performed by CARRIER prior to the date of termination. A continuing or substantial failure shall include, but is not limited to:

A. Failure to comply with facility safety rules and operating procedures, including but not limited to check in/dispatch procedures, equipment type and condition, sliding tandem axles to the rear most position for loading and unloading, hours of operations, trailer pool operations, document control, performance reporting and driver personal protective equipment. Facility safety rules and operating procedures shall be provided to CARRIER.

B. A combined calendar year minimum service acceptance level for origin equipment supply commitments and on time deliveries of less than 98 percent.

C. Three consecutive months of minimum service acceptance level below 98 percent in either origin equipment supply commitments and/or on time deliveries.

D. Two or more delivery service written complaints within a three (3) month period from SHIPPER's customers requesting that CARRIER no longer deliver to their facilities.

E. A downgrade in your DOT rating by the Department of Transportation.

F. Failure to maintain minimum insurance coverage.

G. Non-compliance with Federal, State, or Municipal laws and regulations.

H. Bankruptcy or other insolvency of CARRIER.

## 9. ELECTRONIC COMMUNICATIONS, DISPATCH and REPORTING

A. Upon delivery of written instructions or procedures from SHIPPER, CARRIER shall obtain, maintain, and utilize electronic connectivity communications (e.g. EDI, XML, FTP, Web) with SHIPPER. CARRIER shall utilize the Transportation Management System (TMS) platform engaged at served SHIPPER facilities. Costs associated with these requirements shall be borne by the CARRIER.

B. CARRIER shall report pick-up and delivery events in the format(s) specified by SHIPPER. Timeline requirements and specific events shall be as set forth in Exhibit H, Electronic Compliance Requirements, which is attached hereto and is incorporated herein by reference. CARRIER shall complete and forward to SHIPPER or its agents all requested reports in a timely manner and in industry-standard format(s).

## 10. BILLS OF LADING AND FREIGHT RECEIPTS

A. All shipments tendered to CARRIER shall be on a straight bill of lading which shall, regardless of its form, format, or content, be subject only to the terms and conditions contained in Exhibit F, Sample International Paper Bill of Lading, a copy of which is attached hereto and is incorporated herein by reference. This bill of lading may be modified by SHIPPER only. Any attempt by CARRIER to incorporate, directly or indirectly, by reference or otherwise, any other tariffs, rates, charges, rules, or terms or conditions into any bill of lading shall have no effect on the bill of lading.

B. Upon delivery of each shipment, CARRIER shall obtain a delivery receipt showing date of

UACL/OEI_000040

delivery, goods delivered, any consignee exceptions to count and conditions of goods delivered, and a legible signature of consignee. CARRIER shall provide SHIPPER with a copy of any delivery receipt or proof of delivery ("POD") as soon as practical for CARRIER, but in no event later than twenty four (24) hours after requested by SHIPPER or the delivery of goods. CARRIER shall transmit the delivery receipt copy to SHIPPER via facsimile, express delivery service, or other electronic medium as may be employed between the parties.

C. Notwithstanding any inadvertent omission by SHIPPER to sign the non-recourse provision of the bill of lading, CARRIER specifically agrees that it shall look exclusively to consignee for collection of freight charges on all "collect" shipments that may be entered into by CARRIER outside this Agreement.

## 11. HAZARDOUS MATERIALS.

Transportation of any hazardous materials pursuant to this Agreement is subject to the Hazardous Materials Regulations of the Department of Transportation as published in 49 C.F.R. Parts 171 through 177. CARRIER represents that it is familiar and in compliance with these regulations, that it is fully qualified to properly handle such hazardous materials, that is appropriately registered as a carrier of such commodities with the Department of Transportation, and agrees to maintain a DOT Emergency Response Guidebook and necessary emergency response information in the cab of each of its trucks. If CARRIER is not appropriately qualified to handle such hazardous materials, it shall so advise SHIPPER before accepting any such hazardous materials for transportation.

## 12. FREIGHT LOSS OR DAMAGE

A. CARRIER shall be liable to SHIPPER for loss or damage to any goods transported under this Agreement. CARRIER hereby assumes the liability in the same manner as provided for motor common carriers in 49 U.S.C. § 14706. Any attempt on the part of CARRIER to limit its liability by provisions, including, but not limited to those contained in any tariff, rule, condition, bill of lading, freight receipt, stamp, or otherwise, shall be null and void and have no effect on the liability terms agreed upon by the parties in this Agreement.

B. In the event of any loss or damage, CARRIER shall pay to SHIPPER the price charged by SHIPPER to its customers for the goods. CARRIER shall also pay to SHIPPER any costs incurred by SHIPPER in attempting to mitigate any loss or damage including, but not limited to, costs of inspection, grading, re-working, re-packaging, and any additional storage and handling. All such costs shall be verified by invoice or other document stating the specific services and costs incurred, and such documents shall accompany any claim filed by SHIPPER. SHIPPER shall also add to the amount claimed for loss or damage a claim processing charge of not less than sixty-five dollars ($65) nor more than one hundred dollars ($100) per claim, which CARRIER agrees is a legitimate component of SHIPPER'S monetary loss.

## 13. INSURANCE

CARRIER shall maintain at all times under this Agreement the following insurance coverage in amounts not less than those specified as follows:

A. Commercial Auto Liability insurance with limits not less than $1,000,000 combined single limit insuring Any Auto or All Owned Autos plus Hired Autos plus Non-Owned Autos.

UACL/OEI_000041

B. Cargo Liability Insurance in an amount no less than $100,000 per occurrence, with the cargo insurance deductible not to exceed $5,000. CARRIER shall amend its cargo insurance policy to extend or add the Form BMC-32 endorsement coverage to property moving under this Agreement.

C. Commercial General Liability (CGL) insurance on an Occurrence Form with limits not less than $1,000,000 per occurrence, $1,000,000 Personal and Advertising Injury, and $1,000,000 Products/Completed Operations aggregate. The CGL policy shall be endorsed to (i) name SHIPPER as Additional Insured for all losses in whole or in part arising out of CARRIER'S services or operations; (ii) make the CARRIER'S CGL policy primary for all losses for the full limits of insurance purchased by CARRIER, regardless of the minimum limits included in this contract, recognizing any insurance purchased by SHIPPER as excess and non-contributory; and (iii) include an unconditional waiver of subrogation in favor of SHIPPER.

D. Worker's Compensation insurance covering all CARRIER'S employees, including owners, partners, and officers, with limits not less than the statutory limits of the state where the work is being performed. The Worker's Compensation policy shall be endorsed to waive all rights of subrogation against SHIPPER where allowed by law, and policies shall include excess and stop-gap Worker's Compensation coverage for all contractors and subcontractors of CARRIER.

E. Employer's Liability Insurance with limits not less than $100,000 each accident, $500,000 disease – policy limits, and $100,000 disease – each employee.

F. All insurance required hereunder shall be placed with carriers with an AM Best rating of not less than A-VIII, and evidence of all insurance required hereunder acceptable to SHIPPER shall be provided prior to commencement of the work, and evidence of all renewals or replacements shall be provided at least fifteen (15) days prior to the expiration. CARRIER shall require his insurance agent or broker to provide written notice to SHIPPER immediately upon receipt of any notice of cancellation or non-renewal of any required coverage by the insurers.

G. CARRIER gives SHIPPER the right to withhold any and all payments for services provided hereunder, as well as the right to declare CARRIER in default and this agreement null and void regardless of any other provisions contained herein, if CARRIER does not procure insurance coverage, allows coverage required hereunder to lapse or be cancelled, or does not provide evidence of required insurance satisfactory to SHIPPER as required (see Exhibit G for Sample Certificate of Insurance). The Certificates of Insurance required under this Agreement are attached. This Certificate of Insurance and all renewals shall be forwarded promptly to:

International Paper Company

Insurance Compliance

P.O. Box 12010-IP

Hemet, CA 92546-8010

14. CONDITIONS OF USE OF INTERMODAL SERVICE

CARRIER shall not substitute Intermodal service for full door-to-door highway service

UACL/OEI_000042

without the prior written consent of SHIPPER. Where Intermodal service is being used, CARRIER shall be responsible for advising each of SHIPPER'S shipping facilities of any applicable Association of American Railroad blocking and bracing standards required on all Intermodal shipments.

### 15. INDEMNIFICATION

CARRIER shall indemnify, defend and hold harmless SHIPPER from and against all liability, loss, damages, claims, suits or expenses, including reasonable attorney fees by reason of an injury (including death) or claim of injury to person or damage to property arising out of or in connection with the performance of this Agreement by CARRIER, its employees, agents or subcontractors. CARRIER'S indemnity obligation hereunder shall be reduced to the extent that such injury to persons or damage to property results from the joint and concurrent negligence of SHIPPER.

### 16. FORCE MAJEURE

Neither party, upon prompt written notification, shall be liable for failure of performance under this Agreement if actual performance is prevented by fire, flood, hurricane, tornado, war (whether declared or not), acts of terrorism, government action, or civil disorder.

### 17. NOTICES.

Notices must be in writing, hand delivered or sent via a recognized overnight carrier. Notices shall be sent as follows:

Shipper:     International Paper Company

Attn: Manager, Motor Carrier Sourcing

6400 Poplar Avenue

Memphis, TN 38197

Fax #: (901) 214-1811

Carrier:     Overnite Express (OXEN)

St. Paul, Minnesota  55114

Attn: *Robert W. Elshott  /s/*

### 18. CONFIDENTIALITY

The parties shall keep confidential and not disclose the terms of this Agreement and or information pertaining to any shipment to any third party except (i) as required by law or regulations, (ii) to a parent, subsidiary or affiliated company, or (iii) to an agent of SHIPPER as required for the agent to administer SHIPPER's transportation needs. The provisions of this paragraph shall survive the termination, cancellation or expiration of this Agreement.

### 19. NO LIEN

CARRIER shall not assert, take, cause, or permit any action to claim, or perfect a lien on any shipment hereunder or portion thereof, on its own behalf or by any other person, firm or corporation.

### 20. INDEPENDENT CONTRACTOR.

CARRIER is, and shall perform services under this Agreement as, an independent contractor.

UACL/OEI_000043

CARRIER shall solely direct all persons performing services performed by CARRIER under this Agreement, and such persons shall be and remain subject to the exclusive control and direction of CARRIER. Under no circumstances shall SHIPPER be construed as having responsibility for CARRIER'S safety, means or methods.

### 21. ASSIGNMENT

This Agreement may not be assigned, transferred, subcontracted, or delegated, in whole or in part, without the written consent of the other party. Notwithstanding the above, in the event that SHIPPER sells a business or a facility to which CARRIER provides services under this Agreement, SHIPPER shall have the right to assign this Agreement (insofar as the Agreement pertains to locations identified as being serviced by CARRIER in Exhibit C) to any bona fide buyer with the ability to perform SHIPPER'S obligations hereunder.

### 22. MODIFICATION

This Agreement may only be amended in writing only, agreed to by both parties.

### 23. WAIVER

The failure by either party to insist upon the strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default, or operate as a continuing waiver of such rights.

### 24. GOVERNING LAW AND LEGAL JURISDICTION

This Agreement shall be governed and construed in accordance with the laws of the State of Tennessee, without regard to any conflict of interest laws contained therein. The courts of the State of Tennessee shall have sole and exclusive jurisdiction over any claims or disputes arising out of this Agreement. The prevailing party in any legal action between SHIPPER and CARRIER arising out of or related to this Agreement shall be entitled to recover reasonable attorney's fees and legal costs.

### 25. SEVERABILITY

If any term or provision of this Agreement is found to be invalid or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions shall continue in full force and effect.

### 26. HEADINGS

The headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of any section of this Agreement.

### 27. SIGNATORY AUTHORITY

Each person executing this Agreement represents and warrants that (i) he/she personally has authority to execute this Agreement, and (ii) the execution of this Agreement has been duly authorized by all necessary actions of his/her company.

UACL/OEI_000044

## 28. ENTIRE AGREEMENT

This Agreement and the exhibits attached hereto represent the entire understanding of the parties. There are no other parts of this Agreement whatsoever, express or implied

ACCEPTED AND AGREED TO:

By _____ 11/12/07
Authorized Signature          Date

William P. Crawford
Printed Name

Vice President Global Sourcing, International Paper Company
Title and Organization

ACCEPTED AND AGREED TO:

By _____ 10/30/07
Authorized Signature          Date

Robert W Elsholz
Printed Name

President, Overnite Express (OXEN)
Title and Organization

By _____ 10/30/07
Authorized Signature          Date

Kevin R Hays _____ 10/30/07
Printed Name

General Manager, Overnite Express (OXEN)
Title and Organization

By _____ 10/30/07
Authorized Signature          Date

Sandra J Herrmann
Printed Name

Administrative Assistant, Overnite Express (OXEN)
Title and Organization

UACL/OEI_000045

**Exhibit A - Carrier Permit**

Attach a copy of your Carrier Permit here.

14 of 24

UACL/OEI_000046

CE-AEA-31
(Rev. 12/83)

**SERVICE DATE**

**SEP 26 1984**

## INTERSTATE COMMERCE COMMISSION

### PERMIT

MC-80443 Sub 55

OVERNITE EXPRESS, INC.
NEWPORT, MN

This Permit is evidence of the carrier's authority to engage in transportation as a contract carrier by motor vehicle.

This authority will become effective only when the carrier has met the compliance requirements pertaining to insurance coverage for the protection of the public (49 CFR 1043), requirement(s) of agents upon whom process may be served (49 CFR 1044), the execution of designation of contract carriers (49 CFR 1053), and, as applicable, tariffs or schedule (49 CFR contracts for contract carriers (49 CFR 1053). The carrier shall also tender reasonably continuous and adequate service 1300 through 1310). Failure to meet these conditions will constitute sufficient grounds for the under this authority.
suspension, change, or revocation of this authority.

This authority is subject to any terms, conditions, and limitations as are now, or may later be, attached to this privilege.

The transportation service to be performed is described on the reverse side of this document and will be valid as long as the carrier maintains compliance with the above requirements.

by the Commission.

James H. Bayne
Secretary

(SEAL)

NOTE:    If there are discrepancies regarding this Permit, please notify the Commission within 30 days.

MC-80443 Sub 55

To operate a **contract carrier**, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting **general commodities** (except classes A and B explosives, household goods, and commodities in bulk), between points in the United States, under combining contract(s), with commercial shippers or receivers of such commodities.

UACL/OEI_000047

Exhibit B - Fuel Index

EXHIBIT "B"

Outbound Fuel Index

Version May 18, 2007

All schedules of rates and charges are hereby made subject to a diesel fuel index adjustment which shall remain in effect for the life of the Agreement between SHIPPER

and CARRIER unless canceled or modified by SHIPPER. Increases or decreases will take effect at one minute after midnight on each Tuesday following the scheduled D.O.E. announcement of the National U.S. Average on Monday. If a Monday is a federal holiday, increases or decreases will take place at one minute after midnight on

the following Wednesday. Increases or decreases will be determined by use of the D.O.E. National U.S. Average diesel fuel price and the following matrix:

For each $0.06 change in the DOE National U.S Average from the base rate of $2.33, the fuel index rate will adjust by $0.01

| Between | And | Fuel Index Rate Adjustment in Cents Per Mile. |
|---------|-------|----------------------------------------------|
| 3.050 | 3.109 | $0.12 |
| 2.990 | 3.049 | $0.11 |
| 2.930 | 2.989 | $0.10 |
| 2.870 | 2.929 | $0.09 |
| 2.810 | 2.869 | $0.08 |
| 2.750 | 2.809 | $0.07 |
| 2.690 | 2.749 | $0.06 |
| 2.630 | 2.689 | $0.05 |
| 2.570 | 2.629 | $0.04 |
| 2.510 | 2.569 | $0.03 |
| 2.450 | 2.509 | $0.02 |
| 2.390 | 2.449 | $0.01 |
| 2.271 | 2.389 | Base range - no adjustments |
| 2.211 | 2.270 | ($0.01) |
| 2.151 | 2.210 | ($0.02) |
| 2.091 | 2.150 | ($0.03) |
| 2.031 | 2.090 | ($0.04) |
| 1.971 | 2.030 | ($0.05) |
| 1.911 | 1.970 | ($0.06) |

The Base Rate is set at $2.33. This diesel fuel index scale will remain in effect for the specified contract period (see contract term) The fuel index will apply to all International

15 of 24

UACL/OEI_000048

Paper facilities for the 2007 National Sourcing Process and any facilities subsequently add by Global Sourcing – Memphis. The diesel fuel index will apply to all mileage factors (including minimum charges and mileage zone rates) using Rand McNally -TDM Milemaker System (version 18 shortest

miles) on site at International Paper in Memphis. Computation of all mileages will be from the point of initial origin to the point of ultimate destination through all stop-off

points, if applicable, as described on the bill of lading. This index will automatically be applied to all rates (mileage and flat charge) paid through International Paper's

Memphis Auto-pay Freight System. All payments requiring a carrier freight invoice must have the appropriate index amount added or subtracted as a separate line item

on the freight bill. Each Monday, the DOE hot line number (202) 586-6966 can be called or view the DOE posted diesel prices on the internet at http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp

to determine the appropriate fuel index applicable for the next week (Tuesday through Monday). This index extends beyond the upper and lower limits listed on the chart above.

ACCEPTED AND AGREED TO:

By _____ 11/12/07

Authorized Signature                     Date

William P. Crawford

Printed Name

Vice President Global Sourcing, International Paper Company

Title and Organization

ACCEPTED AND AGREED TO:

By _Robert W. Elsholtz Pres_ 10/30/07

Authorized Signature                     Date

Robert W Elsholtz

Printed Name

President, Overnite Express (OXEN)

Title and Organization

By _Robert W. Elsholtz Pres._ 10/30/07

Authorized Signature                     Date

Kevin R Hays _Ken Hays_ 10/30/07

Printed Name

General Manager, Overnite Express (OXEN)

Title and Organization

By _Sandra Herrmann_ 10/30/07

Authorized Signature                     Date

Sandra J Herrmann

Printed Name

Administrative Assistant, Overnite Express (OXEN)

Title and Organization

16 of 24

UACL/OEI_000049

**Exhibit C - Motor Carrier Rate and Weekly Commitment Schedule**

| Attachments | Date | Size |
|---|---|---|
| OXEN Overnight Express Rate Schedule.pdf | Fri Sep 28, 2007 | 362210Bytes |

UACL/OEI_000050

**Exhibit D – Motor Carrier Vendor Profile**

| Attachments | Date | Size |
|---|---|---|
| QXEN.pdf | Tue Sep 18, 2007 | 87459Bytes |

UACL/OEI_000051

International Paper - Carrier Profile                                    Page 1 of 5

| Home | Carrier Survey | Survey List | Survey Results | Intermodal | Profile List | View Rates |

Carrier: Overnite Express

| Please complete the following information |
|---|

### Business Address

Company Name
Overnite Express
Address
658 Pelham Blvd
City
Saint Paul                                State        Zip
                                          MN           55114
Phone #                   Toll Free Phone #
651 645 3447              800 234 6525
Fax #
651 645 9501
EMail
oxadmin@oxtrucking.com

### Remit To Address

Company Name
Overnite Express
Address
658 Pelham Blvd
City                                      State        Zip
Saint Paul                                MN           55114

NOTE: This document is made part of the Motor Carrier Truckload Van Transportation
Contract and is identified as Exhibit ____. Carrier must notify shipper in writing thirty(30) days
prior to any change in REMIT TO ADDRESS.

### Company Information

Route Code
92611
SCAC
OXEN          Standard Carrier Alpha Code obtained from the NMFTA:
              Phone# 703.838.1810
MCC#
80473
═══════ Past 3 years operating ratio (%) ═══════
3 yrs ago  94        2 yrs ago  99        Last Year  100

═══════ Past 3 years Driver Turnover ratio (%) ═══════
3 yrs ago  94        2 yrs ago  125       Last Year  92

UAGL/OEI_000092

International Paper - Carrier Profile                                    Page 2 of 5

Type of Authority                    ☑Contract  ☐Common  ☑Broker
Most Recent DOT Safety Rating        Satisfactory
Company Web Site
Is the Web site capable of tracking loads?        ◯Yes  ◉No
Is your company an ethnic minority owned enterprise
(51% controlled)?                                 ◯Yes  ◉No
Please check all that apply.
☐Black  ☐Hispanic  ☐American Indian  ☐Asian  ☐Female  ☐Handicapped

NOTE: If minority owned, you must endorse proper minority-owned business certification

| Contact Information |
|---|

**Account Manager**

| Name | Phone# |
|---|---|
| Jerry Fleet | 614 476 0333 |
| Fax | Email |
| 614 476 1174 | oxadmin@oxtrucking.com |

**Pricing Analyst**

| Name | Phone# |
|---|---|
| Walt Eggert | 651 645 3447 |
| Fax | Email |
| 651 645 9501 | walt@overniteexpressinc.com |

**EDI**

| Name | Phone# |
|---|---|
| Paul Abrass | 651 645 3447 |
| Fax | Email |
| 651 645 9501 | paul@overniteexpressinc.com |

**Claims**

| Name | Phone# |
|---|---|
| Fax | Email |

| Operating, Driver and Equipment Information |
|---|

**Summary of Claim Responsiveness**

| | |
|---|---|
| Number of Claims Filed Against Your Company Last Year | 32 |
| Number of Water Damage Claims Filed Against Your Company Last Year | 14 |
| Claim Dollars Paid Last Year | 83288 |
| Average Claim Resolution Time | |
| ( ◯Days ◯Weeks ◉Months ◯Years') 3 |

**EDI Capabilities**

| Receive 204 | ◉Yes ◯No | Format N/A |
|---|---|---|
| Send 214 | ◉Yes ◯No | Format N/A |
| Internet Access | ◉Yes ◯No | |
| Invoices | ◉Yes ◯No | |

**Holiday/Weekend Operations**

◉Yes  Weekend

International Paper – Carrier Profile         Page 3 of 5

| | | | |
|---|---|---|---|
| Saturday | ◯ No | Phone: | 800-234-6525 |
| Sunday | ◯ Yes ◉ No | Emergency Phone: | 800-234-6525 |
| Holiday | ◯ Yes ◯ No | Holiday Phone: | 800-234-6525 |

=== Driver Information ===

| | |
|---|---|
| Number of Company Drivers | 0 |
| Number of Owner Operators | 350 |
| Number of Leased Drivers | 0 |
| Number of Team Drivers | 0 |
| Number of Tractors | 0 |

=== Trailer Information ===

| | Number of Trailers | Avg Age (years) | # of Trailers Age in Years 0-3 | 3-5 | 5+ |
|---|---|---|---|---|---|
| Vans 45' | 0 | 0 | 0 | 0 | 0 |
| Vans 48' | 0 | 0 | 0 | 0 | 0 |
| Vans 53' | 750 | 3 | 350 | 0 | 400 |
| Flats 45' | 0 | 0 | 0 | 0 | 0 |
| Flats 48' | 0 | 0 | 0 | 0 | 0 |
| Flats 53' | 0 | 0 | 0 | 0 | 0 |
| Reefers 45' | 0 | 0 | 0 | 0 | 0 |
| Reefers 48' | 0 | 0 | 0 | 0 | 0 |
| Reefers 53' | 0 | 0 | 0 | 0 | 0 |

=== Maximum Weight By Percent Of Your Fleet ===

| | |
|---|---|
| % 44,000 lbs. | 100 |
| % 45,000 lbs. | 0 |
| % 46,000 lbs. | 0 |
| % 47,000 lbs. | 0 |

=== Assessorial Charges ===

| | | | |
|---|---|---|---|
| Minimum Charge | 600 | | |
| Driver Unloading Charge | 200 | Flat Rate | ☒ |
| Stop Off Charge | 100 | | |

=== On Board Communications ===

| | |
|---|---|
| On Board Communications | ◉ Yes ◯ No |
| If 'Yes', what percent of fleet? | 95 |
| If 'Yes', what type? (i.e. Satellite, Cellular Phone, etc) | Cellular Phones |

=== Other Services Offered ===

| | |
|---|---|
| Container Drayage (Export) | ◯ Yes ◉ No |
| Flats | ◯ Yes ◉ No |
| LTL | ◯ Yes ◉ No |
| Tanks | |

OACL/OEL_000054

International Paper – Carrier Profile                                    Page 4 of 5

|  | ○Yes ◉No |
| --- | --- |
| Dry Bulk (Hoppers) | ○Yes ◉No |
| Brokerage | ○Yes ◉No |
| COFC/TOFC (Domestic) | ○Yes ◉No |

**States Served**

Choose state to add

ARIZONA
CALIFORNIA
COLORADO
FLORIDA

**Add**

Choose states from the list box and click 'Add' to add them to the list. These will be the states that your company serves.

| ALABAMA | delete | ARKANSAS | delete |
| --- | --- | --- | --- |
| CONNECTICUT | delete | DELAWARE | delete |
| GEORGIA | delete | ILLINOIS | delete |
| KENTUCKY | delete | MAINE | delete |
| MARYLAND | delete | MASSACHUSETTS | delete |

**Signing Authority**

Listed below are company officials that have registered as contract signing authorities. To ADD additional signing authorities, please have them go through the registration process. To DELETE a signing authority, please contact your IP Motor Procurement representative.

Sandy Herrmann

**Optional Payment Terms**

Please select one of the following optional payment terms. If not indicated, Net 45 days will be applied.

○ 2% 10 Days
○ 1.5% 15 Days
◉ Net 45 Days

NOTE: The International Paper freight payment system can handle only one payment term per carrier, so the payment term selected will apply to all freight (regions) within International Paper.

Do you want to receive payment by electronic funds transfer?   ◉ Yes ○ No
If 'Yes', a form will be emailed to you in the near future for your completion.

International Paper - Carrier Profile                                           Page 5 of 5

**Authorized Signature**

If awarded a contract, you will be required to sign and submit this form.

Name _____

Title _____

Date _____

[ Submit ]

| CHANGE LOG | | |
|---|---|---|
| 4/11/2007 | Sandy Herrmann | Changed Vans 53' (Age > 5 yrs) from 250 to 400 |
| 4/11/2007 | Sandy Herrmann | Changed Vans 53' (Age 3-5 yrs) from 300 to 0 |
| 4/11/2007 | Sandy Herrmann | Changed Vans 53' (Age 0-3 yrs) from 200 to 350 |
| 4/11/2007 | Sandy Herrmann | Changed Claim Dollars Paid (2002) from 57980 to 83288 |
| 4/11/2007 | Sandy Herrmann | Changed # of Water Damage Claims (2002) from 6 to 14 |
| 4/11/2007 | Sandy Herrmann | Changed # of Claims filed (2002) from 62 to 32 |
| 4/11/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (1999) from 93 to 94 |
| 4/11/2007 | Sandy Herrmann | Changed Operating Ratio (1999) from 93 to 94 |
| 4/11/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (2001) from 0 to 92 |
| 4/10/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (2000) from 0 to 125 |
| 4/10/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (1999) from 0 to 93 |
| 4/10/2007 | Sandy Herrmann | Changed Operating Ratio (2001) from 99 to 100 |
| 4/10/2007 | Sandy Herrmann | Changed Operating Ratio (1999) from 99 to 93 |
| 4/10/2007 | Sandy Herrmann | Changed Holiday Phone # from blank to 800-234-6525 |
| 4/10/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (2001) from 0 to 92 |
| 4/10/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (2000) from 0 to 125 |
| 4/10/2007 | Sandy Herrmann | Changed Driver Turnover Ratio (1999) from 0 to 93 |
| 4/10/2007 | Sandy Herrmann | Changed Operating Ratio (2001) from 99 to 100 |
| 4/10/2007 | Sandy Herrmann | Changed Operating Ratio (1999) from 99 to 93 |
| 4/10/2007 | Sandy Herrmann | Changed Holiday Phone # from blank to 800-234-6525 |
| 8/11/2005 | Sandy Herrmann | Changed EDI Contact Email from paul-abrass@oxenx.com to paul@overniteexpressinc.com |
| 8/11/2005 | Sandy Herrmann | Changed Pricing Analyst Contact Email from walt-eggert@oxenx.com to walt@overniteexpressinc.com |
| 8/11/2005 | Sandy Herrmann | Changed Driver Turnover Ratio (2001) from blank to 0 |
| 8/11/2005 | Sandy Herrmann | Changed Driver Turnover Ratio (2000) from blank to 0 |
| 8/11/2005 | Sandy Herrmann | Changed Driver Turnover Ratio (1999) from blank to 0 |
| 8/11/2005 | Sandy Herrmann | Changed Operating Ratio (2001) from blank to 99 |
| 8/11/2005 | Sandy Herrmann | Changed Operating Ratio (2000) from blank to 99 |
| 8/11/2005 | Sandy Herrmann | Changed Operating Ratio (1999) from blank to 99 |
| 8/11/2005 | Sandy Herrmann | Changed Emg Phone # from blank to 800-234-6525 |
| 8/11/2005 | Sandy Herrmann | Changed Weekend Phone # from blank to 800-234-6525 |
| 3/26/2004 | Aaron Reynolds | Changed Stopoff Charge from 50 to 100 |

Home | Carrier Survey | Survey List | Survey Results | Intermodal | Profile List | View Rates | Add

INTERNATIONAL ⒶPAPER

©2004 International Paper

Exhibit E - Electronic Funds Transfer Bank Information

Exhibit E

Electronic Funds Transfer Request

Vendor Setup

BANK INFORMATION

Please complete the following Electronic Funds Transfer bank information:

Company Name:        Overnite Express, Inc

Company Address:     656 Pelham Blvd
                     St Paul, MN  55114-1767

Contact Name,        Marilyn Ratay
and Title            Accounts Receivable Clerk

Contact Phone #:     651 645-3447 x 236

Email address:       Marilyn@OverniteExpressInc.com

Optional Email address:  Janice@OverniteExpressInc.com

Bank Name:           |_____

ABA/Routing # (9 digits): |_____

Bank Account #:      |_____

For verification purposes, please provide the International Paper vendor number assigned for your business. This number is located on every check stub that International Paper sends to you.

Vendor Number:       48362

Authorized Signature  *Luy Hemmensen*    Date   October 30, 2007

Send completed form to:

International Paper

Attn: EFT Request

4049 Willow Lake Blvd

Memphis, TN 38118

Fax: 901-419-1466

Attachments              Date              Size

19 of 24

UACL/OEI_000057

Exhibit E - Electronic Funds Transfer  Fri Sep 07, 2007        44544Bytes
Form.doc

UACL/OEI_000058

**Exhibit F - Sample International Paper Bill of Lading**

See Attached.

| Attachments | Date | Size |
|---|---|---|
| Exhibit F - IP Bill of Lading Sample.pdf | Fri Sep 07, 2007 | 70563Bytes |

UACL/OEI_000059

Exhibit H - Electronic Compliance Requirements

EXHIBIT H

ELECTRONIC COMPLIANCE REQUIREMENTS

Carriers for International Paper are required to have the ability to communicate electronically and to be able to conduct transportation operations utilizing electronic means and tools. Communication can be accomplished by EDI, XML, or a web portal provided by International Paper. The following messages and timelines are established for International Paper carriers (truck, intermodal, and drayage) using electronic means. Carriers are required to adhere to these timelines and provide the information specified:

LOAD TENDER       Response (accept/reject) is required within 2 business hours Monday through Friday 7 a.m. to 5 p.m. CST. Failure to respond

will be considered a rejected tender.

DELIVERY
APPOINTMENT       Establishment of a delivery appointment and response

with the date and time for each stop is required within 24 hours

of tender acceptance. If a delivery appointment is not required,

carrier must transmit the expected delivery date and time.

PICKUP DATE/TIME       Immediately upon making a delivery appointment, establish a pickup date and time and transmit to International Paper. Failure to establish a pickup appointment negates the ability to claim detention at origin. Upon actual pickup, transmit the updated event within 2 hours of departure.

ARRIVAL       Transmit delivery confirmation electronically within 2 business hours of arrival at Consignee's receiving dock or port

DELAY/REVISED ETA       Report revised ETA within 2 business hours of determining that a new, revised delivery time and/or date is required

REPORTS       SHIPPER may require reports to support continuous improvement efforts and to manage shipments to customers. CARRIER will provide these reports as requested by SHIPPER. The magnitude and complexity of these reports will be consistent with the reports normally generated by CARRIER during the course of business.

DELIVERY
PERFORMANCE       The Minimum On-Time Delivery Requirement is 98% and the Minimum Service Level Requirement is 98%. Measurement is comprised of the following: total shipments less orders not on-time, divided by total shipments. Shipments not on-time are those that do not meet their delivery appointment, shipments not picked up from facilities as promised, shipments not delivered with established and reasonable transit times, and transit failures en-route. Delivery failures resulting from SHIPPER actions are not included in this calculation as "not on-time."

UACL/OEI_000060

**ELECTRONIC COMMERCE**    The Minimum On-Time Electronic Commerce Rules Requirement is 98%.

ACCEPTED AND AGREED.TO:

By _____ 11/14/07

Authorized Signature                    Date

William P. Crawford

Printed Name

Vice President Global Sourcing, International Paper Company

Title and Organization

ACCEPTED AND AGREED TO:

By _____ 10/30/07

Authorized Signature                    Date

Robert W Elsholtz

Printed Name

President, Overnite Express (OXEN)

Title and Organization

By _____ 10/30/07

Authorized Signature                    Date

Kevin R Hays

Printed Name

General Manager, Overnite Express (OXEN)

Title and Organization

By _____ 10/30/07

Authorized Signature                    Date

Sandra J Herrmann

Printed Name

Administrative Assistant, Overnite Express (OXEN)

Title and Organization

23 of 24

UACL/OEI_000061

Attachment A - Certificate of Insurance

Attach copies of your Certificates of Insurance in compliance with Article 13. International Paper must be named as an Additonal Insured.

UACL/OEI_000062

**ACORD** **CERTIFICATE OF LIABILITY INSURANCE**  DATE (MM/DD/YYYY)

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | | |
|---|---|---|---|
| Cottingham & Butler, Inc. 300 SECURITY BUILDING PO BX 2B DUBUQUE IA 52001 Phone:563-587-5000 Fax:563-583-7339 | | | |
| | INSURERS AFFORDING COVERAGE | | NAIC # |
| INSURED | INSURER A: Discover Property & Casualty | | 36463 |
| Overnite Express Inc. 868 Palben Boulevard St Paul MN 55114-1005 | INSURER B: Hartford Casualty Ins Co. | | 29424 |
| | INSURER C: Hanover Insurance Companies | | 22292 |
| | INSURER D: | | |
| | INSURER E: | | |

**COVERAGES**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| C | | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS MADE X OCCUR | LHC8603528 | 03/01/07 | 03/01/08 | EACH OCCURRENCE | $ 1000000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100000 |
| | | | | | | MED EXP (Any one person) | $ 5000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1000000 |
| | | | | | | GENERAL AGGREGATE | $ 3000000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY PROJECT LOC | | | | PRODUCTS - COMP/OP AGG | $ 3000000 |
| A | | **AUTOMOBILE LIABILITY** X ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS HIRED AUTOS NON-OWNED AUTOS | D200A00S12 TRAILER INTERCHANGE LIMIT ACTUAL CASH VALUE/ TRUCKERS UNIFORM INTERMODAL INTERCHANGE ENDORSEMENT INCLUDED | 03/01/07 | 03/01/08 | COMBINED SINGLE LIMIT (Ea accident) | $ 1000000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY AGG | $ |
| | | **EXCESS/UMBRELLA LIABILITY** OCCUR CLAIMS MADE DEDUCTIBLE RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU- TORY LIMITS OTH- ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | | **OTHER** Cargo | 82MSRZ7422 | 03/01/07 | 03/01/08 | per vehic | 500000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
The certificate holder is additional insured on the general liability policy with respect to the operations of the above named insured.

fax: 901-214-1811

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| INPAIN1 International Paper 6400 Poplar Avenue Memphis TN 38197 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE Christopher D. Patrick |

ACORD 25 (2001/08)                                              © ACORD CORPORATION



**brac**
Berkley Risk Administrators Company, LLC

**Minnesota Workers' Compensation Assigned Risk Plan**
Standard Workers' Compensation and Employers' Liability Policy
Contract Administrator
**Berkley Risk Administrators Company, LLC**
P.O. Box 59143 Minneapolis, Minnesota 55459-0143
Phone (612) 766-3000          NCCI Carrier Code 21466

## CERTIFICATE OF INSURANCE
### WCIP

1. The Insured:

Overnite Express Inc
656 Pelham Blvd
St Paul, MN 55114

Policy Number: WC-22-04-152204-03
Association File Number: 3182659
Interstate ID: 910194437
Tax ID#: F-410687633
UIC #: EXEMPT
Policy Period: From: 3/30/2007
To: 3/30/2008

Date of Mailing: 10/17/2007

The Certificate is issued as a matter of information only and confers no rights upon the Certificate Holder. This Certificate does not amend, extend or alter the coverage afforded by the Policy listed below.

This is to certify that the Policy of Insurance described herein has been issued to the Insured named above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this Certificate may be issued or may pertain, the insurance afforded by the Policy described herein is subject to all the terms, exclusions and conditions of such Policy.

| TYPE OF INSURANCE | LIMITS OF LIABILITY | | |
|---|---|---|---|
| Part One<br>Workers' Compensation | Statutory | | |
| Part Two<br>Employers' Liability | Bodily Injury by Accident | $1,000,000 | each accident |
| | Bodily Injury by Disease | $1,000,000 | policy limit |
| | Bodily Injury by Disease | $1,000,000 | each employee |

Should the above Policy be canceled before the expiration date thereof, the Company will endeavor to mail 30 days written notice to the below named Certificate Holder, but failure to mail such notice shall impose no obligation or liability of any kind upon the Company.

Certificate Holder's Name and Address:          **OFFICERS NOT COVERED.**
International Paper
6400 Poplar Ave
Memphis, TN 38197

Agency Name and Address                Date Issued: 10/17/2007

Wells Fargo Ins Svcs of Minnesota Inc
4300 MarketPointe Dr Ste 600
Bloomington, MN  55435-5238

BA3140
UACL/OEI_000064

# JAE # 15 - 2

# Excerpts of Deposition Exhibit 2

130547293v1 0903067



IP000001



**INTERNATIONAL PAPER**

STEPHEN M. MUNDY
MANAGER - MOTOR CARRIER TRANSPORTATION SOURCING
GLOBAL SOURCING

6400 POPLAR AVE.
T1, 4-019
MEMPHIS, TN 38197

T 901.419.4800
F 901.214.1811
stephen.mundy@lpaper.com

10/24/2007

Overnite Express
656 Pelham Blvd
Saint Paul, MN 55114

RE: Motor Procurement Contract Number OXEN093009

Dear Sandy Herrmann,

Enclosed are three (3) copies of the truckload contract that we have previously agreed to. Please have all copies of the Contract, Fuel Index and Electronic Business Requirements signed in the areas indicated. In addition, please complete and sign Exhibit E, Electronic Funds Transfer Request.

Please return all documents to my attention no later than 11/07/07. I will have all documents signed by the IP representative and return a fully executed set to your attention.

Thank you for your interest in working with International Paper.

Sincerely,

*S M Mundy*

Stephen M. Mundy
Manager – Motor Carrier Transportation Sourcing

IP000035

# ORIGINAL

## OXEN Overnite Express 2007 Outbound Contract

### Table of Contents

| | |
|---|---|
| HEADER | 3 |
| 1. TERM | 3 |
| 2. CARRIER STATUS | 3 |
| 3. CARRIER'S OBLIGATIONS | 3 |
| 4. COMPENSATION | 4 |
| 5. PAYMENT TERMS | 5 |
| 6. CARRIER'S OPTION TO ASSIGN ITS ACCOUNTS RECEIVABLES | 6 |
| 7. COMMITMENTS | 7 |
| 8. DEFAULT BY CARRIER. | 7 |
| 9. ELECTRONIC COMMUNICATIONS, DISPATCH and REPORTING | 8 |
| 10. BILLS OF LADING AND FREIGHT RECEIPTS | 8 |
| 11. HAZARDOUS MATERIALS. | 9 |
| 12. FREIGHT LOSS OR DAMAGE | 9 |
| 13. INSURANCE | 9 |
| 14. CONDITIONS OF USE OF INTERMODAL SERVICE | 10 |
| 15. INDEMNIFICATION | 11 |
| 16. FORCE MAJEURE | 11 |
| 17. NOTICES. | 11 |
| 18. CONFIDENTIALITY | 11 |
| 19. NO LIEN | 11 |
| 20. INDEPENDENT CONTRACTOR. | 11 |
| 21. ASSIGNMENT | 12 |
| 22. MODIFICATION | 12 |
| 23. WAIVER | 12 |
| 24. GOVERNING LAW AND LEGAL JURISDICTION | 12 |
| 25. SEVERABILITY | 12 |
| 26. HEADINGS | 12 |
| 27. SIGNATORY AUTHORITY | 12 |
| 28. ENTIRE AGREEMENT | 13 |
| Exhibit A - Carrier Permit | 14 |
| Exhibit B - Fuel Index | 15 |
| Exhibit C - Motor Carrier Rate and Weekly Commitment Schedule | 17 |
| Exhibit D - Motor Carrier Vendor Profile | 18 |
| Exhibit E - Electronic Funds Transfer Bank Information | 19 |
| Exhibit F - Sample International Paper Bill of Lading | 21 |
| Exhibit H - Electronic Compliance Requirements | 22 |
| Attachment A - Certificate of Insurance | 24 |

IP000036

IP000037

**HEADER**

This Agreement is entered into and is effective this 1st day of October, 2007, by and between International Paper Company, with offices at 6400 Poplar Avenue, Memphis, Tennessee 38197 ("SHIPPER") and Overnite Express with offices at
*Robert W. Elmore* ("CARRIER").

WHEREAS, CARRIER is engaged in the business of transporting property by motor vehicle as a contract carrier in interstate, intrastate, or foreign commerce within North America, and

WHEREAS, SHIPPER desires CARRIER to provide certain transportation-related services pursuant to the rates and conditions as set forth in this Agreement, and

WHEREAS, SHIPPER and CARRIER desire to enter into a contract, not a common carrier relationship, under which CARRIER shall perform transportation-related services for SHIPPER for all commodities unless covered otherwise by separate agreement between the parties,

NOW, THEREFORE, the parties agree as follows:

**1. TERM**

This Agreement shall have a term of two (2) years from the date of this Agreement. This Agreement shall automatically extend for an additional ninety (90) day term unless written notice is provided by either party at least thirty (30) days prior to the expiration of the original two (2) year term.

**2. CARRIER STATUS**

CARRIER represents that it is an interstate motor contract carrier of property, duly registered and permitted with the Federal Highway Administration. A copy of CARRIER'S registration or permit is attached as Exhibit A, CARRIER Permit, which is attached hereto and is incorporated herein. CARRIER represents that it possesses, and shall maintain for the term of this Agreement and any extensions thereto, all necessary registrations, certificates and/or authorizations required by each state in which CARRIER shall operate as a contract carrier for SHIPPER. CARRIER expressly waives any and all rights and remedies under the ICC Termination Act for the services provided under this Agreement, pursuant to 49.U.S.C. 14101(b)(1).

**3. CARRIER'S OBLIGATIONS**

CARRIER shall:

A. Services. Provide services as set forth in Exhibit C, Motor Carrier Rate and Weekly Commitment Schedule, which is attached hereto and is incorporated herein.

B. Motor Carrier Vendor Profile Form. Provide a completed Exhibit D, Motor Carrier Vendor Profile Form, which is attached hereto and is incorporated herein.

C. Coordination. Coordinate and establish delivery schedules for all services provided.

D. Commitments. Provide the number of Commitments as defined in Section 7 and as set forth in Exhibit C.

3 of 24

IP000038

E. Minimum Service Level Requirement. Meet a minimum service level of 98 percent for the Commitments described in Section 7 and as set forth in Exhibit C. Failure to meet the minimum service level of Commitments means that the CARRIER is not meeting the performance expectations and requirements of SHIPPER.

F. Minimum On-Time Delivery Requirement. The Minimum On-Time Delivery Requirement is 98% and the Minimum Service Level Requirement is 98%. Measurement is comprised of the following: total shipments less shipments not on-time, divided by total shipments. Shipments not on-time are those that do not meet their delivery appointment, shipments not picked up from facilities as promised, shipments not delivered with established and reasonable transit times, and transit failures en-route. Delivery failures resulting from SHIPPER actions are not included in this calculation as "not on-time."

G. Motor Vehicle Equipment. Maintain at its own cost and expense the motor vehicle equipment required to provide the transportation services required hereunder, including the Commitments set forth in Exhibit C, in good, safe and lawful operating condition at all times and in accordance with all applicable local, state, and federal laws and regulations. In no event shall SHIPPER making any visual inspection of CARRIER's equipment be construed as shifting responsibility/liability for the adequacy and condition of the equipment on to SHIPPER.

H. CARRIER Personnel. Employ at its cost and expense the personnel required to maintain and operate CARRIER'S motor vehicle equipment as required to perform the services contemplated under this Agreement. CARRIER'S personnel shall be fully qualified and shall procure and maintain such licenses and permits as are required by local, state, or federal laws and regulations required to maintain and operate the motor vehicle equipment. CARRIER'S personnel shall comply with applicable local, state, and federal laws and regulations.

I. Ancillary Costs. Bear all costs and expenses of furnishing fuel, oil, tires, parts, supplies, and all other equipment necessary or required for the good, safe and lawful operation and maintenance of the motor vehicle equipment. CARRIER shall further bear all expenses, including the expense of road service and repair, in connection with the use and operation of the motor vehicle equipment.

J. Trailer Requirements. Provide SHIPPER with trailers that are suitable for the safe, efficient and damage-free transportation of its products. Suitable trailers are defined as van trailers that (i) are clean and free of contaminants, debris, foreign substances, odors, and wall and floor protrusions; (ii) completely protect and prevent SHIPPER'S goods from coming into contact with or being exposed to water and other environmental hazards; and, (iii) are in proper condition and have no mechanical defects. CARRIER agrees to pay in full all claims filed by SHIPPER for damage to or destruction of SHIPPER'S goods which arise from unsuitable trailers.

K. Trailer Pool Requirements. CARRIER shall provide empty trailers to be maintained in SHIPPER'S trailer pool, plus any live load commitments. The number of empty trailers shall be determined by SHIPPER and agreed upon by CARRIER and shall be equal to or greater than 1½ times the number of daily or weekly Commitments.

4. COMPENSATION

IP000039

A. CARRIER shall be compensated for its services in accordance with Exhibit C.

B. Rates to and from points shall be construed to mean points and places as defined in Exhibit C. In the event that more than one rate from one origin to one destination is contained in any Exhibit C, or revision thereto, the more specific rate shall take precedence over the more general rate, e.g., point to point, point to short haul, point to state/split state, point to region with minimum charge, state to point, state to short haul, state to state/split state, state to region with minimum charge. The specific rate precedence levels are:

1. Point-to-point

2. Point-to-shorthaul bands

3. Point-to-state or point-to-split state

For shipments 251 miles or longer, CARRIER will be paid the greater of their Universal Minimum charge or their Point-to-state or point-to-split state rate. Universal Minimums are not applicable for Point-to-point rates or Point-to-shorthaul bands. All rates and charges set forth in Exhibit C shall be subject to the fuel index adjustment set forth in Exhibit B, Fuel Index, or revision thereto, which is attached hereto and is incorporated herein by reference. Exhibit C may contain an alpha/numeric numbering system which uniquely identifies the CARRIER and this Agreement. The parties further agree that it is their desire to ensure that the person or company responsible for paying for the increased price of fuel above the index price set forth in this Agreement shall be fairly compensated for bearing that expense. CARRIER accordingly represents and warrants that all monies paid by SHIPPER for fuel surcharges will be distributed to the person or company ultimately responsible for absorbing that cost with respect to traffic tendered by SHIPPER, without regard to whether that person or company is a signatory to this Agreement, and CARRIER shall specifically indemnify and hold SHIPPER harmless from all costs (including attorney's fees and related costs) arising out of any claims, actions, suits or demands relating to CARRIER's alleged failure to abide by this requirement.

C. The parties agree that mileage factors, if applicable for the purpose of determining line-haul freight rates and charges, shall be determined using the Rand McNally-TDM Mile Maker System under the most current release as installed and maintained on site at SHIPPER'S computer center in Memphis, Tennessee. Computation of all mileages shall be from the point of initial origin to the point of ultimate destination through all stop-off points, if applicable, as described on the bill of lading or other written shipment instructions tendered at the point of shipment.

D. If detained at SHIPPER'S origin or destination, CARRIER shall be compensated at a rate of $60/hr, but only after 1.5 hours of free time has passed from the moment the CARRIER arrives at the gate. If the CARRIER has an appointment time prior to the time they arrive at the gate, free time will not begin until the scheduled appointment time. Detention time shall be chargeable in quarterly hour increments and shall be subject to a maximum of $600/day.

5. PAYMENT TERMS

A. SHIPPER shall pay CARRIER such amounts as are due for services performed hereunder within forty-five (45) days after date of invoice. SHIPPER may, in its sole discretion, extend alternate payment terms if requested by CARRIER in Exhibit D. If CARRIER desires to be paid via electronic funds transfer, then CARRIER must complete and submit Exhibit E, Electronic Funds Transfer Bank Information, which is attached hereto and is incorporated

5 of 24

IP000040

herein by reference.

B. CARRIER shall specify in Exhibit D where and to whom to send all payments under this Agreement. SHIPPER shall pay CARRIER by check or via electronic funds transfer as directed by CARRIER in Exhibit D. All shipments hereunder shall be "prepaid" or "collect" for account of SHIPPER unless otherwise specified. Once CARRIER provides electronic notification of proof of delivery ("POD"), payment(s) shall be released for execution within the agreed upon credit period. No interest, penalty, or other charge shall be applied for any late payment.

C. In the event of a payment dispute, the party raising the issue shall notify the other party in writing of the amount and nature of the dispute. The parties shall work expeditiously and in good faith to resolve the dispute, including providing disputed and supporting documentation to the other party on a timely basis. After the dispute is resolved, any credits due shall be applied in the next payment cycle. In the event CARRIER fails to respond to inquiries or provide requested documentation, SHIPPER shall be entitled after thirty (30) days additional written notice to deduct any overpayment previously paid by SHIPPER to CARRIER from monies due CARRIER.

D. The time limit for filing overcharge and undercharge claims on shipments moved pursuant to this Agreement shall be eighteen (18) months, except that clerical errors, mathematical errors, extension errors and duplicate payments may be corrected up to thirty-six (36) months. CARRIER specifically waives any requirement SHIPPER may have to submit a claim within the 180 day period specified in 49 U.S.C. § 13710(a)(3)(B), and shall not raise a statue of limitation defense as long as it is filed in accordance with this section, or otherwise contend that a claim is untimely or otherwise barred as long as it is filed in accordance with this Agreement.

**6. CARRIER'S OPTION TO ASSIGN ITS ACCOUNTS RECEIVABLES**

A. CARRIER may assign its accounts receivables under this Agreement to a third party. In order to so do, however, CARRIER must:

   (i) Notify SHIPPER in writing a minimum of thirty (30) days in advance of any change in the CARRIER's direction for payment, including without limitation any assignment of CARRIER's right to payments earned or to be earned under this Agreement. Notice of any such assignment by CARRIER must include a self-addressed, stamped, return acknowledgment for SHIPPER'S to execute and return. Notices to SHIPPER shall be sent to:

   Manager, Motor Carrier Sourcing

   International Paper Company

   Global Sourcing Department

   6400 Poplar Avenue

   Memphis, TN 38197

   FAX #: (901) 214-1811

   (ii) Inform any assignee of the terms of this Agreement, including these terms regarding notice requirements.

IP000041

B. CARRIER acknowledges and agrees that any change in CARRIER'S directions for payment or notice of assignment sent to any SHIPPER employee or location other than as set forth in Section 6(A)(i) is inadequate and defective. During the transition period from one set of CARRIER'S payment directions to another, CARRIER agrees that payments inadvertently made by SHIPPER in accordance with earlier payment directions shall constitute full satisfaction of SHIPPER'S payment obligations under this Agreement. CARRIER further agrees that in such event it is the responsibility of the CARRIER to forward, or cause to be forwarded, the payment to the correct party. CARRIER shall indemnify, defend and hold harmless SHIPPER from and against all liability, loss, damages, claims, suits or expenses, including without limitation reasonable attorney fees, caused by or arising from any failure on the part of CARRIER or any assignee to comply with the terms of this section.

## 7. COMMITMENTS

A. Commitments mean power units (tractors), drivers, and trailer combinations. As of the date of this Agreement, CARRIER shall provide the Commitments set forth in Exhibit C (either daily or weekly as appropriate). The parties acknowledge that Commitments do not impose a minimum volume requirement upon SHIPPER. CARRIER acknowledges that Exhibit C is a contractual obligation and not merely a price sheet.

B. At those SHIPPER facilities where trailer pools are maintained by CARRIER to support the facility's shipping operations, CARRIER shall, as part of its Commitment obligation as set forth in Section 7(A), provide quality, watertight trailers in an amount not less than 1.5 times the number of its daily commitments, or in the event CARRIER has a weekly commitment in an amount not less than the weekly commitment number divided by 5, or such changed number as may be agreed upon in writing by the parties from time to time. .

C. CARRIER shall be obligated to accept tenders from SHIPPER up to the Weekly or Daily Commitment Level, as appropriate. Failure by CARRIER to fulfill its Commitment obligations, provided SHIPPER has tendered the number of Commitments, shall be a default by CARRIER. CARRIER acknowledges that if CARRIER fails to meet its Commitment levels, that SHIPPER shall be damaged. It is mutually agreed that it would be difficult to calculate those damages. CARRIER agrees to pay SHIPPER, as a liquidated damage, an amount of $100 for each shipment that SHIPPER tenders to CARRIER that CARRIER fails to accept, up to the Commitment level. SHIPPER and CARRIER agree that the liquidated damages amount above to be a reasonable and good-faith estimate of SHIPPER'S damages, and not a penalty.

D. SHIPPER and CARRIER shall renegotiate the Commitment levels if significant changes occur in SHIPPER'S transportation needs during the term of this Agreement. If the adjustment would result in a one-third or greater reduction in the Commitment levels, then either party may terminate this Agreement. Any negotiated change in the Commitment levels shall be evidenced in writing, signed by both parties, dated, and labeled with the appropriate revision number. SHIPPER shall be the sole publisher of all revisions to this Agreement.

## 8. DEFAULT BY CARRIER.

Should there be a continuing or substantial failure in CARRIER'S performance under this Agreement, SHIPPER may upon fifteen (15) days written notice and an opportunity to cure, terminate this Agreement without prejudice to any other right or remedy available to SHIPPER. In such event, SHIPPER'S only liability shall be to make any net payment due for

IP000042

services actually performed by CARRIER prior to the date of termination. A continuing or substantial failure shall include, but is not limited to:

A. Failure to comply with facility safety rules and operating procedures, including but not limited to check in/dispatch procedures, equipment type and condition, sliding tandem axles to the rear most position for loading and unloading, hours of operations, trailer pool operations, document control, performance reporting and driver personal protective equipment. Facility safety rules and operating procedures shall be provided to CARRIER.

B. A combined calendar year minimum service acceptance level for origin equipment supply commitments and on time deliveries of less than 98 percent.

C. Three consecutive months of minimum service acceptance level below 98 percent in either origin equipment supply commitments and/or on time deliveries.

D. Two or more delivery service written complaints within a three (3) month period from SHIPPER's customers requesting that CARRIER no longer deliver to their facilities.

E. A downgrade in your DOT rating by the Department of Transportation.

F. Failure to maintain minimum insurance coverage.

G. Non-compliance with Federal, State, or Municipal laws and regulations.

H. Bankruptcy or other insolvency of CARRIER.

## 9. ELECTRONIC COMMUNICATIONS, DISPATCH and REPORTING

A. Upon delivery of written instructions or procedures from SHIPPER, CARRIER shall obtain, maintain, and utilize electronic connectivity communications (e.g. EDI, XML, FTP, Web) with SHIPPER. CARRIER shall utilize the Transportation Management System (TMS) platform engaged at served SHIPPER facilities. Costs associated with these requirements shall be borne by the CARRIER.

B. CARRIER shall report pick-up and delivery events in the format(s) specified by SHIPPER. Timeline requirements and specific events shall be as set forth in Exhibit H. Electronic Compliance Requirements, which is attached hereto and is incorporated herein by reference. CARRIER shall complete and forward to SHIPPER or its agents all requested reports in a timely manner and in industry-standard format(s).

## 10. BILLS OF LADING AND FREIGHT RECEIPTS

A. All shipments tendered to CARRIER shall be on a straight bill of lading which shall, regardless of its form, format, or content, be subject only to the terms and conditions contained in Exhibit F, Sample International Paper Bill of Lading, a copy of which is attached hereto and is incorporated herein by reference. This bill of lading may be modified by SHIPPER only. Any attempt by CARRIER to incorporate, directly or indirectly, by reference or otherwise, any other tariffs, rates, charges, rules, or terms or conditions into any bill of lading shall have no effect on the bill of lading.

B. Upon delivery of each shipment, CARRIER shall obtain a delivery receipt showing date of

8 of 24

IP000043

delivery, goods delivered, any consignee exceptions to count and conditions of goods delivered, and a legible signature of consignee. CARRIER shall provide SHIPPER with a copy of any delivery receipt or proof of delivery ("POD") as soon as practical for CARRIER, but in no event later than twenty four (24) hours after requested by SHIPPER or the delivery of goods. CARRIER shall transmit the delivery receipt copy to SHIPPER via facsimile, express delivery service, or other electronic medium as may be employed between the parties.

C. Notwithstanding any inadvertent omission by SHIPPER to sign the non-recourse provision of the bill of lading, CARRIER specifically agrees that it shall look exclusively to consignee for collection of freight charges on all "collect" shipments that may be entered into by CARRIER outside this Agreement.

## 11. HAZARDOUS MATERIALS.

Transportation of any hazardous materials pursuant to this Agreement is subject to the Hazardous Materials Regulations of the Department of Transportation as published in 49 C.F.R. Parts 171 through 177. CARRIER represents that it is familiar and in compliance with these regulations, that it is fully qualified to properly handle such hazardous materials, that is appropriately registered as a carrier of such commodities with the Department of Transportation, and agrees to maintain a DOT Emergency Response Guidebook and necessary emergency response information in the cab of each of its trucks. If CARRIER is not appropriately qualified to handle such hazardous materials, it shall so advise SHIPPER before accepting any such hazardous materials for transportation.

## 12. FREIGHT LOSS OR DAMAGE

A. CARRIER shall be liable to SHIPPER for loss or damage to any goods transported under this Agreement. CARRIER hereby assumes the liability in the same manner as provided for motor common carriers in 49 U.S.C. § 14706. Any attempt on the part of CARRIER to limit its liability by provisions, including, but not limited to those contained in any tariff, rule, condition, bill of lading, freight receipt, stamp, or otherwise, shall be null and void and have no effect on the liability terms agreed upon by the parties in this Agreement.

B. In the event of any loss or damage, CARRIER shall pay to SHIPPER the price charged by SHIPPER to its customers for the goods. CARRIER shall also pay to SHIPPER any costs incurred by SHIPPER in attempting to mitigate any loss or damage including, but not limited to, costs of inspection, grading, re-working, re-packaging, and any additional storage and handling. All such costs shall be verified by invoice or other document stating the specific services and costs incurred, and such documents shall accompany any claim filed by SHIPPER. SHIPPER shall also add to the amount claimed for loss or damage a claim processing charge of not less than sixty-five dollars ($65) nor more than one hundred dollars ($100) per claim, which CARRIER agrees is a legitimate component of SHIPPER'S monetary loss.

## 13. INSURANCE

CARRIER shall maintain at all times under this Agreement the following insurance coverage in amounts not less than those specified as follows:

A. Commercial Auto Liability insurance with limits not less than $1,000,000 combined single limit insuring Any Auto or All Owned Autos plus Hired Autos plus Non-Owned Autos.

IP000044

B. Cargo Liability Insurance in an amount no less than $100,000 per occurrence, with the cargo insurance deductible not to exceed $5,000. CARRIER shall amend its cargo insurance policy to extend or add the Form BMC-32 endorsement coverage to property moving under this Agreement.

C. Commercial General Liability (CGL) insurance on an Occurrence Form with limits not less than $1,000,000 per occurrence, $1,000,000 Personal and Advertising Injury, and $1,000,000 Products/Completed Operations aggregate. The CGL policy shall be endorsed to (i) name SHIPPER as Additional Insured for all losses in whole or in part arising out of CARRIER'S services or operations; (ii) make the CARRIER'S CGL policy primary for all losses for the full limits of insurance purchased by CARRIER, regardless of the minimum limits included in this contract, recognizing any insurance purchased by SHIPPER as excess and non-contributory; and (iii) include an unconditional waiver of subrogation in favor of SHIPPER.

D. Worker's Compensation insurance covering all CARRIER'S employees, including owners, partners, and officers, with limits not less than the statutory limits of the state where the work is being performed. The Worker's Compensation policy shall be endorsed to waive all rights of subrogation against SHIPPER where allowed by law, and policies shall include excess and stop-gap Worker's Compensation coverage for all contractors and subcontractors of CARRIER.

E. Employer's Liability Insurance with limits not less than $100,000 each accident, $500,000 disease – policy limits, and $100,000 disease – each employee.

F. All insurance required hereunder shall be placed with carriers with an AM Best rating of not less than A-VIII, and evidence of all insurance required hereunder acceptable to SHIPPER shall be provided prior to commencement of the work, and evidence of all renewals or replacements shall be provided at least fifteen (15) days prior to the expiration. CARRIER shall require his insurance agent or broker to provide written notice to SHIPPER immediately upon receipt of any notice of cancellation or non-renewal of any required coverage by the insurers.

G. CARRIER gives SHIPPER the right to withhold any and all payments for services provided hereunder, as well as the right to declare CARRIER in default and this agreement null and void regardless of any other provisions contained herein. if CARRIER does not procure insurance coverage, allows coverage required hereunder to lapse or be cancelled, or does not provide evidence of required insurance satisfactory to SHIPPER as required (see Exhibit G for Sample Certificate of Insurance). The Certificates of Insurance required under this Agreement are attached. This Certificate of Insurance and all renewals shall be forwarded promptly to:

> International Paper Company
>
> Insurance Compliance
>
> P.O. Box 12010-IP
>
> Hemet, CA 92546-8010

14. CONDITIONS OF USE OF INTERMODAL SERVICE

CARRIER shall not substitute Intermodal service for full door-to-door highway service

IP000045

without the prior written consent of SHIPPER. Where Intermodal service is being used, CARRIER shall be responsible for advising each of SHIPPER'S shipping facilities of any applicable Association of American Railroad blocking and bracing standards required on all Intermodal shipments.

15. INDEMNIFICATION

CARRIER shall indemnify, defend and hold harmless SHIPPER from and against all liability, loss, damages, claims, suits or expenses, including reasonable attorney fees by reason of an injury (including death) or claim of injury to person or damage to property arising out of or in connection with the performance of this Agreement by CARRIER, its employees, agents or subcontractors. CARRIER'S indemnity obligation hereunder shall be reduced to the extent that such injury to persons or damage to property results from the joint and concurrent negligence of SHIPPER.

16. FORCE MAJEURE

Neither party, upon prompt written notification, shall be liable for failure of performance under this Agreement if actual performance is prevented by fire, flood, hurricane, tornado, war (whether declared or not), acts of terrorism, government action, or civil disorder.

17. NOTICES.

Notices must be in writing, hand delivered or sent via a recognized overnight carrier. Notices shall be sent as follows:

Shipper:  International Paper Company

Attn: Manager, Motor Carrier Sourcing

6400 Poplar Avenue

Memphis, TN 38197

Fax #: (901) 214-1811

Carrier:  Overnite Express (OXEN)

St. Paul, Minnesota 55114
Attn: Robert W. Elchott /kt

18. CONFIDENTIALITY

The parties shall keep confidential and not disclose the terms of this Agreement and or information pertaining to any shipment to any third party except (i) as required by law or regulations, (ii) to a parent, subsidiary or affiliated company, or (iii) to an agent of SHIPPER as required for the agent to administer SHIPPER's transportation needs. The provisions of this paragraph shall survive the termination, cancellation or expiration of this Agreement.

19. NO LIEN

CARRIER shall not assert, take, cause, or permit any action to claim, or perfect a lien on any shipment hereunder or portion thereof, on its own behalf or by any other person, firm or corporation.

20. INDEPENDENT CONTRACTOR.

CARRIER is, and shall perform services under this Agreement as, an independent contractor.

IP000046

CARRIER shall solely direct all persons performing services performed by CARRIER under this Agreement, and such persons shall be and remain subject to the exclusive control and direction of CARRIER. Under no circumstances shall SHIPPER be construed as having responsibility for CARRIER'S safety, means or methods.

### 21. ASSIGNMENT

This Agreement may not be assigned, transferred, subcontracted, or delegated, in whole or in part, without the written consent of the other party. Notwithstanding the above, in the event that SHIPPER sells a business or a facility to which CARRIER provides services under this Agreement, SHIPPER shall have the right to assign this Agreement (insofar as the Agreement pertains to locations identified as being serviced by CARRIER in Exhibit C) to any bona fide buyer with the ability to perform SHIPPER'S obligations hereunder.

### 22. MODIFICATION

This Agreement may only be amended in writing only, agreed to by both parties.

### 23. WAIVER

The failure by either party to insist upon the strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default, or operate as a continuing waiver of such rights.

### 24. GOVERNING LAW AND LEGAL JURISDICTION

This Agreement shall be governed and construed in accordance with the laws of the State of Tennessee, without regard to any conflict of interest laws contained therein. The courts of the State of Tennessee shall have sole and exclusive jurisdiction over any claims or disputes arising out of this Agreement. The prevailing party in any legal action between SHIPPER and CARRIER arising out of or related to this Agreement shall be entitled to recover reasonable attorney's fees and legal costs.

### 25. SEVERABILITY

If any term or provision of this Agreement is found to be invalid or unenforceable by a court of competent jurisdiction, then the remaining terms and provisions shall continue in full force and effect.

### 26. HEADINGS

The headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of any section of this Agreement.

### 27. SIGNATORY AUTHORITY

Each person executing this Agreement represents and warrants that (i) he/she personally has authority to execute this Agreement, and (ii) the execution of this Agreement has been duly authorized by all necessary actions of his/her company.

IP000047

28. ENTIRE AGREEMENT

This Agreement and the exhibits attached hereto represent the entire understanding of the parties. There are no other parts of this Agreement whatsoever, express or implied

ACCEPTED AND AGREED TO:

By: [signature] 11/12/07
Authorized Signature Date

William P. Crawford
Printed Name

Vice President Global Sourcing, International Paper Company
Title and Organization

ACCEPTED AND AGREED TO:

By [signature] Pres 10/30/07
Authorized Signature Date

Robert W Elsholtz
Printed Name

President, Overnite Express (OXEN)
Title and Organization

By [signature] Pres 10/30/07
Authorized Signature Date

Kevin R Hays [signature] 10/30/07
Printed Name

General Manager, Overnite Express (OXEN)
Title and Organization

By [signature]
Authorized Signature Date 10/30/07

Sandra J Herrmann
Printed Name

Administrative Assistant, Overnite Express (OXEN)
Title and Organization

**Exhibit A - Carrier Permit**

Attach a copy of your Carrier Permit here.

IP000049

CP-AEA-31
(Rev. 12/83)

# INTERSTATE COMMERCE COMMISSION

## PERMIT

### MC-80443 Sub 55

SERVICE DATE
SEP 2 6 1984

## OVERNITE EXPRESS, INC.
### NEWPORT, MN

This Permit is evidence of the carrier's authority to engage in transportation as a contract carrier by motor vehicle.

This authority will become effective only when the carrier has met the compliance requirements pertaining to insurance coverage for the protection of the public (49 CFR 1043), designation of agents upon whom process may be served (49 CFR 1044), the execution of contracts for contract carriers (49 CFR 1053), and, as applicable, tariffs or schedule (49 CFR 1300 through 1310). The carrier shall also render reasonably continuous and adequate service under this authority. Failure to meet these conditions will constitute sufficient grounds for the suspension, change, or revocation of this authority.

This authority is subject to any terms, conditions, and limitations as are now, or may later be attached to this privilege.

The transportation service to be performed is described on the reverse side of this document and will be valid as long as the carrier maintains compliance with the above requirements.

by the Commission.

James H. Bayne
Secretary

(SEAL)

NOTE.    If there are discrepancies regarding this Permit, please notify the Commission within 30 days.

MC-80443 Sub 55

To operate as a contract carrier, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting general commodities (except classes A and B explosives, household goods, and commodities in bulk), between points in the United States, under continuing contract(s) with commercial shippers or receivers of such commodities.

IP000050

Exhibit B - Fuel Index

EXHIBIT "B"

Outbound Fuel Index

Version May 18, 2007

All schedules of rates and charges are hereby made subject to a diesel fuel index adjustment which shall remain in effect for the life of the Agreement between SHIPPER

and CARRIER unless canceled or modified by SHIPPER. Increases or decreases will take effect at one minute after midnight on each Tuesday following the scheduled D.O.E. announcement of the National U.S. Average on Monday. If a Monday is a federal holiday, increases or decreases will take place at one minute after midnight on

the following Wednesday. Increases or decreases will be determined by use of the D.O.E. National U.S. Average diesel fuel price and the following matrix:

For each $0.06 change in the DOE National U.S Average from the base rate of $2.33, the fuel index rate will adjust by $0.01

| Between | And | Fuel Index Rate Adjustment in Cents Per Mile. |
|---------|-------|-----------------------------------------------|
| 3.050   | 3.109 | $0.12                                         |
| 2.990   | 3.049 | $0.11                                         |
| 2.930   | 2.989 | $0.10                                         |
| 2.870   | 2.929 | $0.09                                         |
| 2.810   | 2.869 | $0.08                                         |
| 2.750   | 2.809 | $0.07                                         |
| 2.690   | 2.749 | $0.06                                         |
| 2.630   | 2.689 | $0.05                                         |
| 2.570   | 2.629 | $0.04                                         |
| 2.510   | 2.569 | $0.03                                         |
| 2.450   | 2.509 | $0.02                                         |
| 2.390   | 2.449 | $0.01                                         |
| 2.271   | 2.389 | Base range - no adjustments                   |
| 2.211   | 2.270 | ($0.01)                                       |
| 2.151   | 2.210 | ($0.02)                                       |
| 2.091   | 2.150 | ($0.03)                                       |
| 2.031   | 2.090 | ($0.04)                                       |
| 1.971   | 2.030 | ($0.05)                                       |
| 1.911   | 1.970 | ($0.06)                                       |

The Base Rate is set at $2.33. This diesel fuel index scale will remain in effect for the specified contract period (see contract term) The fuel index will apply to all International

15 of 24

IP000051

Paper facilities for the 2007 National Sourcing Process and any facilities subsequently add by Global Sourcing – Memphis. The diesel fuel index will apply to all mileage factors (including minimum charges and mileage zone rates) using Rand McNally -TDM Milemaker System (version 18 shortest

miles) on site at International Paper in Memphis. Computation of all mileages will be from the point of initial origin to the point of ultimate destination through all stop-off

points, if applicable, as described on the bill of lading. This index will automatically be applied to all rates (mileage and flat charge) paid through International Paper's

Memphis Auto-pay Freight System. All payments requiring a carrier freight invoice must have the appropriate index amount added or subtracted as a separate line item

on the freight bill. Each Monday, the DOE hot line number (202) 586-6966 can be called or view the DOE posted diesel prices on the Internet at http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp

to determine the appropriate fuel index applicable for the next week (Tuesday through Monday). This index extends beyond the upper and lower limits listed on the chart above.

ACCEPTED AND AGREED TO:

By _____ 11/12/07

Authorized Signature                    Date

William P. Crawford

Printed Name

Vice President Global Sourcing, International Paper Company

Title and Organization


ACCEPTED AND AGREED TO:

By _Robert W. Elsholtz, Pres.__ 10/30/07

Authorized Signature                    Date

Robert W Elsholtz

Printed Name

President, Overnite Express (OXEN)

Title and Organization

By _Robert W. Elsholtz, Pres.__ 10/30/07

Authorized Signature                    Date

Kevin R Hays _Kevin Hays_ 10/30/07

Printed Name

General Manager, Overnite Express (OXEN)

Title and Organization

By _Sandra J Herrmann_ 10/30/07

Authorized Signature                    Date

Sandra J Herrmann

Printed Name

Administrative Assistant, Overnite Express (OXEN)

Title and Organization

16 of 24

IP000052

**Exhibit C - Motor Carrier Rate and Weekly Commitment Schedule**

| Attachments | Date | Size |
|---|---|---|
| OXEN Overnight Express Rate Schedule.pdf | Fri Sep 28, 2007 | 362210Bytes |

IP000053

**Exhibit D - Motor Carrier Vendor Profile**

| Attachments | Date | Size |
|---|---|---|
| OXEN.pdf | Tue Sep 18, 2007 | 87459Bytes |

IP000054

International Paper - Carrier Profile                                    Page 1 of 5

| Home | Carrier Survey | Survey List | Survey Results | Intermodal | Profile List | View Rates |

## Carrier: Overnite Express

| Please complete the following information |
| --- |

| **Business Address** |
| --- |

Company Name
 Overnite Express
Address
 656 Pelham Blvd

| City | State | Zip |
| --- | --- | --- |
| Saint Paul | MN | 55114 |

| Phone # | Toll Free Phone # |
| --- | --- |
| 651 645 3447 | 800 234 6525 |

Fax #
 651 645 9501
EMail
 oxadmin@oxtrucking.com

| **Remit To Address** |
| --- |

Company Name
 Overnite Express
Address
 656 Pelhamm Blvd

| City | State | Zip |
| --- | --- | --- |
| Saint Paul | MN | 55114 |

NOTE: This document is made part of the Motor Carrier Truckload Van Transportation Contract and is identified as Exhibit _____. Carrier must notify shipper in writing thirty(30) days prior to any change in REMIT TO ADDRESS.

| **Company Information** |
| --- |

Route Code
 92611
SCAC
 OXEN          Standard Carrier Alpha Code obtained from the NMFTA:
               Phone# 703.838.1810
MCC#
 80473

============= Past 3 years operating ratio (%) =============

| 3 yrs ago | 94 | 2 yrs ago | 99 | Last Year | 100 |
| --- | --- | --- | --- | --- | --- |

============= Past 3 years Driver Turnover ratio (%) =============

| 3 yrs ago | 94 | 2 yrs ago | 125 | Last Year | 92 |
| --- | --- | --- | --- | --- | --- |

IP000055

International Paper - Carrier Profile                                    Page 2 of 5

| Type of Authority | ☑Contract ☐Common ☑Broker |
| Most Recent DOT Safety Rating | Satisfactory |
| Company Web Site | |
| Is the Web site capable of tracking loads? | ☐Yes ☉No |
| Is your company an ethnic minority owned enterprise (51% controlled)? | ☐Yes ☉No |

Please check all that apply.
☐Black  ☐Hispanic  ☐American Indian  ☐Asian  ☐Female  ☐Handicapped

NOTE: If minority owned, you must endorse proper minority owned business certification

### Contact Information

==================== Account Manager ====================

| Name | Phone# |
| Jerry Fleet | 614 476 0333 |
| Fax | Email |
| 614 476 1174 | oxadmin@oxtrucking.com |

==================== Pricing Analyst ====================

| Name | Phone# |
| Walt Eggert | 651 645 3447 |
| Fax | Email |
| 651 645 9501 | walt@overniteexpressinc.com |

==================== EDI ====================

| Name | Phone# |
| Paul Abrass | 651 645 3447 |
| Fax | Email |
| 651 645 9501 | paul@overniteexpressinc.com |

==================== Claims ====================

| Name | Phone# |
| | |
| Fax | Email |

### Operating, Driver and Equipment Information

==================== Summary of Claim Responsiveness ====================

| Number of Claims Filed Against Your Company Last Year | 32 |
| Number of Water Damage Claims Filed Against Your Company Last Year | 14 |
| Claim Dollars Paid Last Year | 83288 |
| Average Claim Resolution Time | |
| ( ☐Days  ☐Weeks  ☉Months  ☐Years ) | 3 |

==================== EDI Capabilities ====================

| Receive 204 | ☉Yes  ☐No | Format N/A |
| Send 214 | ☉Yes  ☐No | Format N/A |
| Internet Access | ☉Yes  ☐No | |
| Invoices | ☉Yes  ☐No | |

==================== Holiday/Weekend Operations ====================

☉Yes  Weekend

International Paper - Carrier Profile                                      Page 3 of 5

| | | Phone: | 800-234-6525 |
|---|---|---|---|
| Saturday | No | | |
| Sunday | Yes / No | Emergency Phone: | 800-234-6525 |
| Holiday | Yes / No | Holiday Phone: | 800-234-6525 |

**Driver Information**

| | |
|---|---|
| Number of Company Drivers | 0 |
| Number of Owner Operators | 350 |
| Number of Leased Drivers | 0 |
| Number of Team Drivers | 0 |
| Number of Tractors | 0 |

**Trailer Information**

| | Number of Trailers | Avg Age (years) | # of Trailers Age in Years | | |
|---|---|---|---|---|---|
| | | | 0-3 | 3-5 | 5+ |
| Vans 45' | 0 | 0 | 0 | 0 | 0 |
| Vans 48' | 0 | 0 | 0 | 0 | 0 |
| Vans 53' | 750 | 3 | 350 | 0 | 400 |
| Flats 45' | 0 | 0 | 0 | 0 | 0 |
| Flats 48' | 0 | 0 | 0 | 0 | 0 |
| Flats 53' | 0 | 0 | 0 | 0 | 0 |
| Reefers 45' | 0 | 0 | 0 | 0 | 0 |
| Reefers 48' | 0 | 0 | 0 | 0 | 0 |
| Reefers 53' | 0 | 0 | 0 | 0 | 0 |

**Maximum Weight By Percent Of Your Fleet**

| | |
|---|---|
| % 44,000 lbs. | 100 |
| % 45,000 lbs. | 0 |
| % 46,000 lbs. | 0 |
| % 47,000 lbs. | 0 |

**Assessorial Charges**

| | | | |
|---|---|---|---|
| Minimum Charge | 600 | | |
| Driver Unloading Charge | 200 | Flat Rate | |
| Stop Off Charge | 100 | | |

**On Board Communications**

| | |
|---|---|
| On Board Communications | Yes / No |
| If 'Yes', what percent of fleet? | 95 |
| If 'Yes', what type? (i.e. Satellite, Cellular Phone, etc) | Cellular Phones |

**Other Services Offered**

| | |
|---|---|
| Container Drayage (Export) | Yes / No |
| Flats | Yes / No |
| LTL | Yes / No |
| Tanks | |

International Paper - Carrier Profile

Page 4 of 5

Dry Bulk (Hoppers)      .. Yes  ⊙ No
Brokerage               · Yes  ⊙ No
COFC/TOFC (Domestic)    · Yes  ⊙ No

| States Served | | |
|---|---|---|

Choose state to add

ARIZONA
CALIFORNIA
COLORADO
FLORIDA

[ Add ]

Choose states from the list
box and click 'Add' to add
them to the list. These will
be the states that your
company serves.

| | | | | |
|---|---|---|---|---|
| ALABAMA | delete | ARKANSAS | delete |
| CONNECTICUT | delete | DELAWARE | delete |
| GEORGIA | delete | ILLINOIS | delete |
| KENTUCKY | delete | MAINE | delete |
| MARYLAND | delete | MASSACHUSETTS | delet |

| Signing Authority | |
|---|---|

Listed below are company officials that have registered as contract signing authorities.
To ADD additional signing authorities, please have them go through the registration
process. To DELETE a signing authority, please contact your IP Motor Procurement
representative.

Sandy Herrmann

| Optional Payment Terms | |
|---|---|

Please select one of the following optional payment terms. If not indicated, Net 45 days
will be applied.
· 2% 10 Days
· 1.5% 15 Days
⊙ Net 45 Days

NOTE: The International Paper freight payment system can handle only one payment
term per carrier, so the payment term selected will apply to all freight (regions) within
International Paper.

Do you want to receive payment by electronic funds transfer?    ⊙ Yes  · No
If 'Yes', a form will be emailed to you in the near future for your completion.

IP000058

**International Paper - Carrier Profile**                                              **Page 5 of 5**

| | |
|---|---|
| **Authorized Signature** | |
| If awarded a contract, you will be required to sign and submit this form. | |

Name _____

Title _____

Date _____

[ Submit ]

| CHANGE LOG |
|---|
| 4/11/2007  Sandy Herrmann | Changed Vans 53' (Age > 5 yrs) from 250 to 400 |
| 4/11/2007  Sandy Herrmann | Changed Vans 53' (Age 3-5 yrs) from 300 to 0 |
| 4/11/2007  Sandy Herrmann | Changed Vans 53' (Age 0-3 yrs) from 200 to 350 |
| 4/11/2007  Sandy Herrmann | Changed Claim Dollars Paid (2002) from 57980 to 83288 |
| 4/11/2007  Sandy Herrmann | Changed # of Water Damage Claims (2002) from 6 to 14 |
| 4/11/2007  Sandy Herrmann | Changed # of Claims filed (2002) from 62 to 32 |
| 4/11/2007  Sandy Herrmann | Changed Driver Turnover Ratio (1999) from 93 to 94 |
| 4/11/2007  Sandy Herrmann | Changed Operating Ratio (1999) from 93 to 94 |
| 4/10/2007  Sandy Herrmann | Changed Driver Turnover Ratio (2001) from 0 to 92 |
| 4/10/2007  Sandy Herrmann | Changed Driver Turnover Ratio (2000) from 0 to 125 |
| 4/10/2007  Sandy Herrmann | Changed Driver Turnover Ratio (1999) from 0 to 93 |
| 4/10/2007  Sandy Herrmann | Changed Operating Ratio (2001) from 99 to 100 |
| 4/10/2007  Sandy Herrmann | Changed Operating Ratio (1999) from 99 to 93 |
| 4/10/2007  Sandy Herrmann | Changed Holiday Phone # from blank to 800-234-6525 |
| 4/10/2007  Sandy Herrmann | Changed Driver Turnover Ratio (2001) from 0 to 92 |
| 4/10/2007  Sandy Herrmann | Changed Driver Turnover Ratio (2000) from 0 to 125 |
| 4/10/2007  Sandy Herrmann | Changed Driver Turnover Ratio (1999) from 0 to 93 |
| 4/10/2007  Sandy Herrmann | Changed Operating Ratio (2001) from 99 to 100 |
| 4/10/2007  Sandy Herrmann | Changed Operating Ratio (1999) from 99 to 93 |
| 4/10/2007  Sandy Herrmann | Changed Holiday Phone # from blank to 800-234-6525 |
| 8/11/2005  Sandy Herrmann | Changed EDI Contact Email from paul-abrass@oxenx.com to paul@overniteexpressinc.com |
| 8/11/2005  Sandy Herrmann | Changed Pricing Analyst Contact Email from walt-eggert@oxenx.com to walt@overniteexpressinc.com |
| 8/11/2005  Sandy Herrmann | Changed Driver Turnover Ratio (2001) from blank to 0 |
| 8/11/2005  Sandy Herrmann | Changed Driver Turnover Ratio (2000) from blank to 0 |
| 8/11/2005  Sandy Herrmann | Changed Driver Turnover Ratio (1999) from blank to 0 |
| 8/11/2005  Sandy Herrmann | Changed Operating Ratio (2001) from blank to 99 |
| 8/11/2005  Sandy Herrmann | Changed Operating Ratio (2000) from blank to 99 |
| 8/11/2005  Sandy Herrmann | Changed Operating Ratio (1999) from blank to 99 |
| 8/11/2005  Sandy Herrmann | Changed Emg Phone # from blank to 800-234-6525 |
| 8/11/2005  Sandy Herrmann | Changed Weekend Phone # from blank to 800-234-6525 |
| 3/25/2004  Aaron Reynolds | Changed Stopoff Charge from 50 to 100 |

Home  |  Carrier Survey  |  Survey List  |  Survey Results  |  Intermodal  |  Profile List  |  View Rates  |  Add



INTERNATIONAL (Ⓐ) PAPER

2004 International Paper

Exhibit E - Electronic Funds Transfer Bank Information

Exhibit E

Electronic Funds Transfer Request

Vendor Setup

BANK INFORMATION

Please complete the following Electronic Funds Transfer bank information:

| | |
|---|---|
| Company Name: | Overnite Express, Inc |
| Company Address: | 656 Pelham Blvd<br>St Paul, MN 55114-1767 |
| Contact Name,<br>and Title | Marilyn Ratay<br>Accounts Receivable Clerk |
| Contact Phone #: | 651 645-3447 x 236 |
| Email address: | Marilyn@OverniteExpressInc.com |
| Optional Email address: | Janice@OverniteExpressInc.com |
| Bank Name: | |
| ABA/Routing # (9 digits): | |
| Bank Account #: | |

For verification purposes, please provide the International Paper vendor number assigned for your business. This number is located on every check stub that International Paper sends to you.

Vendor Number:    48362

Authorized Signature    _Suzy Himmelsen_    Date    October 30, 2007

Send completed form to:

International Paper

Attn: EFT Request

4049 Willow Lake Blvd

Memphis, TN 38118

Fax: 901-419-1466

| Attachments | Date | Size |
|---|---|---|

19 of 24

IP000060

Exhibit E - Electronic Funds Transfer  Fri Sep 07, 2007          44544Bytes
Form.doc

20 of 24

**IP000061**

**Exhibit F - Sample International Paper Bill of Lading**

**See Attached.**

| Attachments | Date | Size |
|---|---|---|
| Exhibit F - IP Bill of Lading Sample.pdf | Fri Sep 07, 2007 | 70563Bytes |

IP000062

Exhibit H - Electronic Compliance Requirements

**EXHIBIT H**

**ELECTRONIC COMPLIANCE REQUIREMENTS**

Carriers for International Paper are required to have the ability to communicate electronically and to be able to conduct transportation operations utilizing electronic means and tools. Communication can be accomplished by EDI, XML, or a web portal provided by International Paper. The following messages and timelines are established for International Paper carriers (truck, intermodal, and drayage) using electronic means. Carriers are required to adhere to these timelines and provide the information specified:

**LOAD TENDER**     Response (accept/reject) is required within 2 business hours Monday through Friday 7 a.m. to 5 p.m. CST. Failure to respond will be considered a rejected tender.

**DELIVERY**
**APPOINTMENT**          Establishment of a delivery appointment and response with the date and time for each stop is required within 24 hours of tender acceptance. If a delivery appointment is not required, carrier must transmit the expected delivery date and time.

**PICKUP DATE/TIME**     Immediately upon making a delivery appointment, establish a pickup date and time and transmit to International Paper. Failure to establish a pickup appointment negates the ability to claim detention at origin. Upon actual pickup, transmit the updated event within 2 hours of departure.

**ARRIVAL**     Transmit delivery confirmation electronically within 2 business hours of arrival at Consignee's receiving dock or port

**DELAY/REVISED ETA**     Report revised ETA within 2 business hours of determining that a new, revised delivery time and/or date is required

**REPORTS**     SHIPPER may require reports to support continuous improvement efforts and to manage shipments to customers. CARRIER will provide these reports as requested by SHIPPER. The magnitude and complexity of these reports will be consistent with the reports normally generated by CARRIER during the course of business.

**DELIVERY**
**PERFORMANCE**     The Minimum On-Time Delivery Requirement is 98% and the Minimum Service Level Requirement is 98%. Measurement is comprised of the following: total shipments less orders not on-time, divided by total shipments. Shipments not on-time are those that do not meet their delivery appointment, shipments not picked up from facilities as promised, shipments not delivered with established and reasonable transit times, and transit failures en-route. Delivery failures resulting from SHIPPER actions are not included in this calculation as "not on-time."

IP000063

**ELECTRONIC**

**COMMERCE**    The Minimum On-Time Electronic Commerce Rules Requirement is 98%.

ACCEPTED AND AGREED TO:                    ACCEPTED AND AGREED TO:

By _____ 11/14/07            By _____ 10/30/07
Authorized Signature         Date         Authorized Signature         Date

William P. Crawford                       Robert W Elsholtz
Printed Name                              Printed Name

Vice President Global Sourcing, International Paper    President, Overnite Express (OXEN)
Company
Title and Organization                    Title and Organization

                                          By _____ 10/30/07
                                          Authorized Signature         Date

                                          Kevin R Hays _____ 10/30/07
                                          Printed Name

                                          General Manager, Overnite Express (OXEN)
                                          Title and Organization

                                          By _____ 10/30/07
                                          Authorized Signature         Date

                                          Sandra J Herrmann
                                          Printed Name

                                          Administrative Assistant, Overnite Express (OXEN)
                                          Title and Organization

23 of 24

IP000064

Attachment A - Certificate of Insurance

Attach copies of your Certificates of Insurance in compliance with Article 13. International Paper must be named as an Additonal Insured.

IP000065



# ACORD. CERTIFICATE OF LIABILITY INSURANCE

OP ID OVEREXP1 | DATE (MM/DD/YYYY) 10/16/07

PRODUCER
Cottingham & Butler, Inc.
300 SECURITY BUILDING PO BX 28
DUBUQUE IA 52001
Phone: 563-587-5000 Fax: 563-583-7339

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| INSURERS AFFORDING COVERAGE | | NAIC # |
|---|---|---|
| INSURER A: | Discover Property & Casualty | 36463 |
| INSURER B: | Hartford Casualty Ins Co. | 29424 |
| INSURER C: | Hanover Insurance Companies | 22292 |
| INSURER D: | | |
| INSURER E: | | |

INSURED
Cyoraito Express Inc.
555 Polhan Boulevard
St Paul MN 55114-1086

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| C | | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE X OCCUR<br>GEN'L AGGREGATE LIMIT APPLIES PER: POLICY PROJECT LOC | LHC8603528 | 03/01/07 | 03/01/08 | EACH OCCURRENCE | $ 1000000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $ 100000 |
| | | | | | | MED EXP (Any one person) | $ 5000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1000000 |
| | | | | | | GENERAL AGGREGATE | $ 3000000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 3000000 |
| A | | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>HIRED AUTOS<br>NON-OWNED AUTOS | D200A00512<br>TRAILER INTERCHANGE LIMIT<br>ACTUAL CASH VALUE/<br>TRUCKERS UNIFORM<br>INTERMODAL INTERCHANGE<br>ENDORSEMENT INCLUDED | 03/01/07 | 03/01/08 | COMBINED SINGLE LIMIT (Ea accident) | $ 1000000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN AUTO ONLY: EA ACC | $ |
| | | | | | | AGG | $ |
| | | EXCESS/UMBRELLA LIABILITY<br>OCCUR CLAIMS MADE<br>DEDUCTIBLE<br>RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATUTORY LIMITS / OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | | OTHER<br>Cargo | 83MSRZ7422 | 03/01/07 | 03/01/08 | per vehic | 500000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
The certificate holder is additional insured on the general liability policy with respect to the operations of the above named insured.

Fax: 901-214-1811

## CERTIFICATE HOLDER

INTPAPI

International Paper
6400 Poplar Avenue
Memphis TN 38197

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 10 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE
Christopher D. Patrick

ACORD 25 (2001/08)

© ACORD CORPORATION 1

IP000066

**Minnesota Workers' Compensation Assigned Risk Plan**
Standard Workers' Compensation and Employers' Liability Policy

Contract Administrator
**Berkley Risk Administrators Company, LLC**
P.O. Box 59143 Minneapolis, Minnesota 55459-0143
Phone (612) 766-3000          NCCI Carrier Code 21466

**CERTIFICATE OF INSURANCE**
**WCIP**

1. The Insured:

Overnite Express Inc
656 Pelham Blvd
St Paul, MN 55114

Policy Number: WC-22-04-152204-03
Association File Number: 3182659
Interstate ID: 910194437
Tax ID#: F 410687633
UIC #: EXEMPT
Policy Period: From: 3/30/2007
To: 3/30/2008

Date of Mailing: 10/17/2007

The Certificate is issued as a matter of information only and confers no rights upon the Certificate Holder. This Certificate does not amend, extend or alter the coverage afforded by the Policy listed below.

This is to certify that the Policy of Insurance described herein has been issued to the Insured named above for the policy period indicated. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this Certificate may be issued or may pertain, the insurance afforded by the Policy described herein is subject to all the terms, exclusions and conditions of such Policy.

| TYPE OF INSURANCE | LIMITS OF LIABILITY | | |
|---|---|---|---|
| Part One<br>Workers' Compensation | Statutory | | |
| Part Two<br>Employers' Liability | Bodily Injury by Accident | $1,000,000 | each accident. |
| | Bodily Injury by Disease | $1,000,000 | policy limit. |
| | Bodily Injury by Disease | $1,000,000 | each employee. |

Should the above Policy be canceled before the expiration date thereof, the Company will endeavor to mail 30 days written notice to the below named Certificate Holder, but failure to mail such notice shall impose no obligation or liability of any kind upon the Company.

Certificate Holder's Name and Address:
International Paper
6400 Poplar Ave
Memphis, TN 38197

**OFFICERS NOT COVERED.**

Agency Name and Address

Wells Fargo Ins Svcs of Minnesota Inc
4300 MarketPointe Dr Ste 600
Bloomington, MN  55435-5238

Date Issued: 10/17/2007

BA3140

IP000067



"Kathy Szwast"
<kszwast@uacl.com>
06/06/2008 12:22 PM

To  <stephen.mundy@ipaper.com>

cc

bcc

Subject  Certificate of insurance - Universal Am-Can Ltd

Mr. Mundy: please see the attached for proof of liability and cargo coverage.

Thank you,

Kathy Szwast

-----Original Message-----
From: do_not_reply@goutsi.com [mailto:do_not_reply@goutsi.com]
Sent: Friday, June 06, 2008 1:18 PM
To: kszwast@uacl.com
Subject: Scanned image from im3512

DEVICE NAME: Not Set
DEVICE MODEL: im3512
LOCATION: Not Set

FILE FORMAT: TIFF MMR(G4)
RESOLUTION: 300dpi x 300dpi

Attached file is scanned image in TIFF format.

do_not_reply@goutsi.com_20080606_121755.tif

IP000068