# EX. 17

Asset Purchase Agreement between UACL and OEI/OX LLC

Execution Copy

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into this 13th day of June, 2008, between Universal Am-Can, Ltd. ("UACL"), a Delaware corporation, and UTS Leasing, Inc. ("UTSL"), a Wyoming corporation (UACL and UTSL shall sometimes collectively be referred to as "Purchasers" and may be sometimes referred to singularly as a "Purchaser"), Overnite Express, Inc., a Minnesota corporation ("Overnite") and OX, LLC, a Minnesota limited liability company ("OXL") (Overnite and OXL being referred to for convenience herein, jointly and severally, as "Sellers"), W. E. Elsholtz, Jr., a/k/a Willis E. Elsholtz, individually and as Trustee of the W. E. Elsholtz, Jr. Revocable Trust Agreement dated July 23, 2007, Robert W. Elsholtz, a/k/a Robert Weston Elsholtz, individually and as Trustee of the Robert Weston Elsholtz Revocable Trust Agreement dated December 2, 1996, Robert Willis Elsholtz, individually and as Trustee of the Robert Willis Elsholtz Revocable Trust Agreement dated August 31, 2005, and Matthew Weston Elsholtz (which individuals, who are the shareholders of Overnite and two (2) of them are the members of OXL, shall sometimes be collectively referred to as the "Owners"). Sellers and the Owners shall sometimes, jointly and severally, be referred to as "Seller Parties."

In consideration of the mutual promises and agreements contained herein, the parties hereto agree as follows:

1.  <u>Sale and Purchase of Assets</u>.  Sellers hereby agree to sell, assign, convey, transfer, set over and deliver to the Purchasers all of the following assets of Sellers:

    (a)     certain items of furniture, fixtures and office equipment owned by the respective Sellers and all other miscellaneous assets selected by Purchasers used in connection with each Seller's business which are listed on Exhibit A;

    (b)     all operating authority and certificates (both interstate and intrastate, as applicable);

    (c)     (i) all trailers listed on Exhibit A, but excluding those that have been sold prior to Closing or which have a security interest attached thereto which is not discharged at Closing and (ii) all contracts either Purchaser desires to assume, subject to such Purchaser's right of approval thereof, as listed on the Asset List attached as Exhibit A or hereafter referenced or identified in writing by such Purchaser (provided copier leases shall not be assigned or assumed);

    (d)     all lists of customers ("Customers"), as well as all Customer contracts and agreements;

EXHIBIT
107
VL 7/6/12

(e)     all lists of owner/operators, as well as all contracts and agreements with owner/operators;

(f)     the right to do business with Customers and owner/operators doing business with either Seller and the right to interview and hire employees of Sellers or their affiliate, Management Assistance Corporation of St. Paul, without interference from Seller or Management Assistance Corporation of St. Paul;

(g)     all actual, trade, assumed and marketing names and all logos of each Seller selected by the relevant Purchaser;

(h)     all trade secrets, trade dress, copyrights, patents and other proprietary rights and information, and ownership of all internet domain names, web sites and email addresses;

(i)     all intangible assets;

(j)     all Customer and owner/operator files and materials;

(k)     all records, excluding tax returns;

(l)     goodwill;

(m)     any other assets identified on the asset list attached hereto as Exhibit A.

Hereinafter, the foregoing assets shall be referred to as the "Purchased Assets." The Purchased Assets include the unrestricted right to use all telephone and fax numbers of Overnite, including toll free numbers, at all locations occupied by Overnite. Sellers shall be provided with continued access to such toll free lines, after Closing and until OXL has sold all of its company owned tractors, for the purpose of recruiting drivers and owner/operators.  The Purchased Assets described in Section 1 (c) (i), consisting of the trailers to be purchased, shall be purchased from OXL and paid for by UTSL, and the remainder of the Purchased Assets shall be purchased and paid for by UACL. The Purchased Assets described on Section 1(c)(i) shall include a fully paid and irrevocable license to use all plates and permits in connection therewith through the expiration date thereof. Sellers shall, at the Closing and from time to time thereafter, execute and deliver to the relevant Purchaser such bills of sale, assignments and other conveyance documents as such Purchaser may request, from time to time, to convey good and marketable title to the Purchased Assets to such Purchaser and all parties shall take such further steps as are necessary or appropriate to fulfill their obligations under this Agreement. At the Closing, Sellers shall also deliver releases of any and all security interests covering any of the Purchased Assets and the consents of third parties necessary to effectuate the assignment and assumption of any lease or contract which is to be assigned and/or assumed.  In the event that any Seller Party, or any affiliate of

2

any Seller Party or any entity of which any of Seller Party has an interest, has or could be construed as having any direct or indirect ownership or other interest in any of the Purchased Assets, the Seller Parties shall cause such ownership or other interest to be conveyed and assigned to the relevant Purchaser at such Purchaser's request (at Closing or at any time thereafter) without additional consideration therefor. In the event that either Purchaser shall purchase any additional assets from either Seller after Closing, such as trailers not purchased at Closing, the same shall be deemed to be within the definition of "Purchased Assets," and the subsequent purchase shall be deemed to be pursuant to this Agreement. To the extent appropriate, further bills of sale and assignment documents will be in form substantially comparable to those signed at the Closing. UACL shall only assume those leases and contracts which it specifically approves, and then such assumption shall be limited as set forth in this Agreement. UACL shall have the right to use the computers owned by Sellers (or either of them) rent free after Closing for a period of sixty (60) days.

In the event that any of the Purchased Assets cannot be located by Purchasers within forty five (45) days after Closing ("Lost Items") or are not in proper condition as required by this Agreement when title and possession are delivered to such Purchaser ("Defective Items"), or in the event that any of the Purchased Assets are damaged or destroyed prior to the Possession Date ("Damaged Items"), then the Purchaser involved may give Seller Parties written notice thereof within ten (10) days, for office equipment, and sixty (60) days, for all other Purchased Assets, following the Possession Date, whereupon the Lost Items, Defective Items or Damaged Items involved shall be excluded from the Purchased Assets, the Purchaser involved shall receive a refund of the portion of the Purchase Price allocable thereto and title to the Lost Item, Defective Item or Damaged Item involved shall be reconveyed to Seller. Provided, however, that Seller Parties shall have a cure period of fifteen (15) days following notice of Lost Items in which to locate (and notify Purchasers of the location of) Lost Items (in which event those items so located shall not be treated as Lost Items).

2.  <u>Purchase Price for Purchased Assets; Seller Retained Receivables.</u>

(a)  (i)  The purchase price ("Purchase Price") for the Purchased Assets shall consist of (y) a fixed portion of the Purchase Price ("Fixed Portion of the Purchase Price") plus (z) an amount (the "Additional Payment") equal to two percent (2%) of adjusted line haul revenue (excluding "Pass Through Amounts," as hereafter defined) billed each month from business operations of the business unit established by UACL to operate using the Purchased Assets (the "Division") during the two (2) year period after July 1, 2008. The Fixed Portion of the Purchase Price shall equal two percent (2%) of adjusted line haul revenue, excluding "Pass Through Amounts," as hereafter defined, billed by Overnite for the one (1) year period ended April 30, 2008 (the "Trailing Twelve Month Revenue"), plus the amount of the Purchase Price allocable to the purchase of trailers (the "Trailer Price"). As used herein, the term "Pass Through Amounts" shall mean any charge of any nature, including, without limitation,

3

UACL/OEI_000111

fuel surcharge, accessorials, permits, escorts and other amounts, which are subject to a one hundred percent pass through payment to a contractor, owner/operator, vendor or other third party involved (except that such term shall not include fuel surcharge amounts with respect to the calculation of the Fixed Portion of the Purchase Price). For example, if a $100 expense reimbursement from a customer is subject to 100% pass through payment to a contractor, owner/operator, vendor or other third party, it is subject to such exclusion. But if, in the same example, only 80% of the $100 is subject to such pass through payment, then there is no exclusion of such $100 expense reimbursement. The "Additional Payment" shall be paid monthly by the 20th day of the month following the month of billing, and shall be accompanied by UACL's report of its calculation thereof, which report shall be deemed correct absent demonstrable error. Overnite shall have ninety (90) days after receipt of such report as to any monthly payment of Additional Payment in which to challenge same (stating specifically the basis of such challenge). Each such report which is not so challenged in a timely manner shall be conclusively deemed to be correct.

Seller Parties represent and warrant that the Trailing Twelve Month Revenue was $31,638,249.95. In reliance thereon, the portion of the Fixed Portion of the Purchase Price based upon the Trailing Twelve Month Revenue is established as $632,765.

The Trailer Price shall be calculated based upon the unit price for each trailer purchased as set forth on Exhibit A (as to the trailers actually purchased only). The portion of the total Trailer Price to be paid at Closing (subject to the next paragraph) is $1,343,600. Thus, the portion of the Fixed Portion of the Purchase Price to be paid at Closing (subject to the next paragraph) is $1,976,365.

The payment of the portion of the Fixed Portion of the Purchase Price payable at Closing will occur upon the Closing (or as soon thereafter as the security interests covering the trailers involved are released and other items remaining outstanding at Closing have been delivered). The Trailer Price shall be paid by UTSL, and the balance of the Fixed Portion of the Purchase Price and the Additional Payment shall be paid by UACL. Trailers purchased after Closing, as security interests are released, shall also be purchased at such unit price therefor set forth on Exhibit A. UACL shall be allowed to use the trailers which are not purchased at Closing by UTSL, rent free, until the security interests against same are discharged and UTSL purchases same. UTSL shall not be obligated to purchase any trailer with respect to which the security interest therein is not released and discharged within three (3) months after Closing. Provided, however, that if the debt secured by any such security interest has been paid in full by the expiration of such three (3) month period, and OXL has requested but not yet received authority to file (or a copy of a filed) UCC-3 termination statement (and other appropriate security interest discharge documentation) by such date, then such three (3) month period shall be extended for a reasonable time, not to exceed another month, to procure the documentation of the release and termination of such security interest.

4

UACL/OEI_000112

(ii)    The Trailer Price shall be allocated as set forth on Exhibit A. The Fixed Portion of the Purchase Price (other than the Trailer Price) and the Additional Payment shall be allocated among the Purchased Assets, other than trailers, as UACL shall reasonably determine.  Purchasers and Sellers shall use such Purchase Price allocations for all applicable income tax purposes, and shall execute and deliver all appropriate Internal Revenue Code forms with respect thereto at Closing or such other date as Purchasers may request (including Form 8594, in duplicate).

(b)    Sellers shall retain all land (and buildings), tractors, trailers which are not purchased at Closing or thereafter, deposits with GE Financial and insurance related deposits, cash in banks, amounts due from owner/operators and accounts receivable that are of record for shipments with a pick up date before 12:01 AM on the Possession Date.  UACL shall collect and remit to Overnite any receipts received by UACL for any Retained Receivables.  UACL will provide support and staffing in the collection of Retained Receivables for a period of one hundred eighty (180) days after the Possession Date.  UACL shall not be responsible to pursue collection actions on behalf of Overnite through collection agencies, litigation, or otherwise, nor shall UACL be responsible for uncollected Retained Receivables.  UACL shall separate proceeds from collection of Retained Receivables from proceeds from collection of its own accounts receivable, and shall be entitled to retain the proceeds from its own accounts receivable. UACL shall be entitled to honor any requirements of Seller's lender(s) with a security interest in the Retained Receivables which it receives. Sellers shall promptly remit to UACL the proceeds from any UACL accounts receivable that either may collect. Sellers shall, prior to Closing and thereafter, take such steps as are necessary to facilitate Customers paying UACL directly for shipments made by UACL, including causing the discontinuance of instructions to Customers to pay any factor or secured party with an interest in the accounts receivable of either Seller. Sellers and UACL shall meet monthly, or more frequently as either may request, to reconcile accounts receivable collection and to resolve any issues, and make any adjustments and payments, with respect thereto.  If, subsequent to the Closing, UTSL purchases additional assets, including trailers, from OXL, such subsequent purchase(s) shall be deemed to be made pursuant to this Agreement (but shall be effective as of the date of such subsequent Purchase and not as of the Possession Date).

Seller Parties shall have access to all records of Sellers that relate to business conducted prior to the Possession Date for legal and tax purposes.

(c)    The Purchasers (and each of them) shall, subject to the notice provisions hereafter set forth, have the right, without limitation, to deduct and offset, from its or their obligations to pay any portion of the Purchase Price, and other amounts otherwise payable pursuant to the transactions contemplated hereunder, an amount equal to those charges incurred by the Purchasers, or either of them, that are determined to have occurred with respect to the business operations of either Seller (including shipments booked and shipped) prior to the Possession Date (or arising by

5

UACL/OEI_000113

virtue of the Closing), including, but not limited to, Customer claims, owner/operator claims, employee claims, claims by or amounts due to any taxing authority (whether federal, state or local) or any charge or debt that will effect the operational or administrative ability of the division of either Purchaser doing business utilizing any of the Purchased Assets ("Pre-Closing Liabilities"), in the manner described below. It is expressly agreed and understood, however, that either Purchaser's right to deduct and offset Pre-Closing Liabilities shall be conditioned upon such Purchaser first giving the Seller Parties written notice of each such Pre-Closing Liability (including the amount thereof, if known, and if not known, then a reasonable estimate thereof). The Seller Parties shall then have thirty (30) days in which to pay or satisfy such Pre-Closing Liability and furnish documentation of such payment or satisfaction to the Purchaser involved, in which case such Pre-Closing Liability shall not be deducted and offset from the Purchase Price, or other amounts due hereunder or otherwise payable pursuant to the transactions contemplated hereby. In the event the Seller Parties are either unwilling or unable to pay or satisfy such Pre-Closing Liability within said thirty (30) day period, the right of such Purchaser to deduct and offset same from the Purchase Price, or other amounts due hereunder or otherwise payable pursuant to the transactions contemplated hereby, shall then become absolute and may be exercised by such Purchaser by written notice to Seller Parties. In the event that the right of offset arises in favor of a Purchaser who is not then indebted to a Seller, such right of offset may be exercised by the other Purchaser who shall pay the amount offset to the Purchaser suffering the damage involved and/or otherwise affected by such Pre-Closing Liability. Provided, however, that if Sellers are contesting a Pre-Closing Liability claim in good faith, then such thirty (30) day period set forth above shall be extended for such reasonable time as is necessary to resolve the issues involved (except that if UACL reasonably believes that continued lack of resolution of the dispute will cause customer or other relationships to be jeopardized or will cause interruptions or interference with the ability of UACL's Division to conduct business, then such extension shall be limited to an additional thirty (30) days).

      (d)    The right to receive Additional Payments may not be assigned by Overnite.

      3.    **Employment of Certain Individuals.** Purchaser's obligations to close this transaction is contingent upon UACL being able to employ, on mutually agreeable terms (which shall include a covenant not to compete), Kevin Hays (Overnite's General Manager), Matthew W. Elsholtz (Overnite's VP Logistics) and R. Willis Elsholtz (Overnite's Operations Director), failing which Purchasers may elect to terminate its obligations under this Agreement by written notice to Seller Parties.

      4.    **Sublease Arrangement; Leases; Real Estate Lease; Fleet Owner.**

      (a)    **Subleased Trailers.** As to leased trailers, the leases involved will not be assigned or assumed. Rather, OXL and Overnite, on the one hand, and UACL,

6

on the other hand, shall enter into Equipment Sublease Agreements (the "Sublease Agreements") through June 30, 2008, as to the trailers covered by the Vehicle Lease Agreement with Trudell Trailers of Minnesota, Inc., and for varying time periods, not to exceed approximately three to five months following Closing (but in no event to exceed the remaining term of the primary lease involved), as to the trailers leased from XTRALease, under separate documentation as mutually agreeable to the parties (with rent and other charges thereunder payable by UACL to OXL not to exceed the amount of rent and other charges under the primary lease involved allocable to the sublease term) in order to allow Sellers to arrange for termination of the leases involved and to surrender the trailers. UACL shall be responsible to return the trailers to the primary lessor thereof, Trudell Trailers of Minnesota, Inc. or XTRA Lease LLC (as the case may be), upon expiration of the sublease term with respect thereto, and shall be responsible for the transportation cost involved to turn in such trailers. All other leased trailer turn in costs shall be borne and paid by Sellers (excluding only costs attributable to physical damage incurred after the Closing). Provided, however, that if a trailer is not timely returned to a primary lessor due to actions or inaction of UACL, then UACL shall be responsible to pay (or reimburse the relevant Seller for) any holdover rent for the trailer(s) involved. UACL shall not be responsible, however, for any sublease rent or costs, or costs associated with the failure to turn in a trailer, with respect to any trailer which cannot be located. It shall be Seller Parties' responsibility to negotiate the right to turn in trailers prior to expiration of the lease terms currently contracted for.

(b)     Intentionally omitted.

(c)     Real Estate Lease.  UACL shall lease from Pelham Properties, LLC ("Pelham Properties"), with rights of renewal and an option to purchase, facilities at Seller's terminal located at 656 Pelham Road, St. Paul, Minnesota 55114 (the "Real Property"), which shall consist of office space and non-exclusive use, with access to, a fenced in portion of the yard pursuant to a Lease Agreement, upon mutually agreeable terms, to be signed at the Closing (the "St. Paul Lease"). The St. Paul Lease shall expressly recite that UACL shall not be leasing any portion of the property where above or below ground storage tanks are located. Sellers shall assign the leases covering the following properties (the "Assigned Real Estate Leases") to UACL (subject to UACL's right to review and to approve same): 16901 Van Dam Road, South Holland, IL 60473; 4285 Moreland Avenue S., Conley, GA 30288; 2800 Nicholson, Kansas City, MO 64120; and 617 Waughtown Street, Winston Salem, NC 27107. Alternatively, as a condition of Closing, UACL shall have the right to negotiate direct leases with the owners of such properties ("Alternative Direct Leases"). Seller Parties represent and warrant that true copies of all of the Assigned Leases (and accurate and complete summaries of any oral lease arrangements) are attached hereto as Schedule 4(c).

(d)     Assumption. The Purchaser involved agrees that it shall assume the responsibility for the executory obligations under (y) the Assigned Real Estate Leases (if any), and (z) any assumed postage meter leases (collectively, "office

7

equipment leases"). Any Assigned Real Estate Leases and office equipment leases shall sometimes be collectively referred to as the "Assumed Leases". The Seller Parties acknowledge that the Purchaser involved shall not have any responsibility whatsoever for obligations under the Assumed Leases arising prior to the Possession Date and the Sellers shall assign to the relevant Purchaser, as of the Possession Date, its rights in such Assumed Leases, and represents and warrants to each Purchaser that Sellers have performed and will perform all obligations under the Assumed Leases through the Possession Date and is not in default thereunder.

(e)     The Sellers shall provide all requisite lessor and other consents to the sublease arrangements and lease and contract assignments at or prior to Closing.

(f)     <u>Fleet Owner</u>. At Closing, OXL and Overnite will become a fleet owner (with OXL's company owned tractors and the trailers of Overnite which are subleased) under exclusive contract with UACL or an affiliated operating company pursuant to UACL's (or such affiliates) standard fleet owner agreement (the "Fleet Owner Agreement"), as to tractors, and under the Sublease Agreements, as to trailers. Tractors will be provided under the Fleet Owner Agreement upon the following terms:

(i)     Power only at 75% for a period of 6 months following Closing on all units;

(ii)     Power only at 75% for 50 units for the period after 6 months to 9 months following Closing, all other units at 68%;

(iii)     Power only at 75% for 25 units for the period after 9 months to 12 months following Closing, all other units at 68%;

(iv)     All units convert to 68% on the one year anniversary of the Closing.

UACL acknowledges that OXL will be entitled to sell all or any of the tractors involved upon reasonable prior notice to UACL (and all tractors sold will be released from the coverage of the fleet owner agreement documents.)

5.     <u>No Liabilities Assumed</u>. The Seller Parties acknowledge and agree that the Purchasers are purchasing only certain assets of the Sellers. Without limitation, UACL shall not assume the obligation of a Seller to refund escrows or plate account fees to owner/operators ("Owner/Operator Escrows"). All Owner/Operator Escrows shall be refunded to the owner/operators involved by Seller Parties. Except as expressly set forth in this Agreement in connection with any Assumed Leases and any other contracts either Purchaser elects in writing to assume (the "Assumed Contracts"), neither Purchaser is assuming any liabilities of or claims against either Seller of whatsoever kind or nature, whether accrued, absolute, contingent, known, unknown, presently existing or hereafter arising, unliquidated or otherwise, including, without

8

UACL/OEI_000116

limitation, all Pre-Closing Liabilities, any claims of any creditors (including without limitation, taxing authorities, whether federal, state or local), employees, claimants, Customers or owners of either Seller (collectively the "Excluded Liabilities"). As between UACL and Customer Best Buy Purchasing, LLC ("Best Buy"), UACL shall assume responsibility for certain cargo claims with respect to shipments prior to the Possession Date as set forth in separate documents between Overnite, UACL and Best Buy ("Best Buy Cargo Claims"); provided, however, that notwithstanding such assumption, as between Sellers and UACL, Best Buy Cargo Claims shall remain an Excluded Liability. The Seller Parties, jointly and severally, agree to pay the Excluded Liabilities as due and to defend, indemnify and hold harmless the Purchasers with respect to the Excluded Liabilities, specifically including, without limitation, the Best Buy Cargo Claims, and the parties shall jointly and reasonably coordinate litigation defense planning and choice of legal counsel. As to the Assumed Contracts and Assumed Leases, the Purchaser involved shall assume only those executory obligations of the Seller involved thereunder which shall accrue from and after the Possession Date. Claims for refunds of Owner/Operator Escrows shall be an Excluded Liability. As to any obligation under any Assumed Contract or Assumed Lease attributable to a period of time which straddles the Possession Date, the same shall be equitably prorated. The Seller involved shall be reimbursed by the Purchaser involved for any amounts previously paid by the Seller involved regarding any Assumed Contract or Assumed Lease attributable to periods of time from and after the Possession Date. The Purchaser involved shall be reimbursed by the Seller involved for any amounts paid by such Purchaser regarding any Assumed Contract or Assumed Lease attributable to periods of time prior to the Possession Date. Sellers shall continue liability insurance coverage with respect to the coverage carried by them in full force and effect for periods after the Possession Date equal to the statutes of limitation for the risks insured against. The foregoing can be satisfied by continuing to carry coverage, having had coverage provided on an occurrence basis, or by purchasing tail coverage. Proof of such insurance coverage shall be provided to Purchasers upon request.

6.     **Delivery Free of Encumbrances.** Sellers shall deliver (and cause to be delivered) good title to the Purchased Assets, free, clear and discharged of all mortgages, liens, claims, demands, charges, options, equity interests, leases, tenancies, easements, pledges, security interests and other encumbrances of whatsoever kind or nature, and the Seller Parties, jointly and severally, agree to defend, indemnify and hold harmless the Purchasers with respect thereto.

7.     **Governing Law/Jurisdiction.** This Agreement shall be governed by Michigan law. All parties consent and agree that any litigation arising out of this Agreement or any transaction contemplated hereby shall take place, exclusively, in the state courts located in Macomb County, Michigan, or if it has jurisdiction, in the United States District Court for the Eastern District of Michigan, Southern Division, except to the extent litigation regarding any of the Real Property must be brought in the state and

9

UACL/OEI_000117

county where such Real Property is located as a matter of law, and all parties consent to such forum selection, and jurisdiction and venue, of the state courts located in Macomb County, Michigan, and the United States District Court for the Eastern District of Michigan, Southern Division.

8. **Confidential Information.** The Seller Parties, jointly and severally, agree to keep secret and confidential all confidential information of each Seller, as well as any confidential information of the Purchasers and affiliates of the Purchasers, of which they have or obtain knowledge, and shall not use or disclose this confidential information at any time hereafter, without the express prior written consent of the Purchaser involved. For the purposes of this paragraph: (a) "Confidential Information" shall mean information not generally known to the public, including, but not limited to, matters of a technical nature, such as "know how," innovations, research projects and methods; matters of a business nature, such as information about customers, costs, profits, markets, sales, business processes, computer programs, accounting methods, information systems and business or financial plans and reports; and any other information of a similar nature; and (b) "affiliate" shall mean any corporation or other entity controlled by, under common control with or otherwise related by common ownership to either Purchaser. Further, no Seller Party shall use the name of either Seller, the Purchasers (or any affiliate thereof) or any assumed names or identity of any of such entities to its or his own personal advantage (excluding only for the purpose of collecting Retained Receivables). Upon the request of either Purchaser, Sellers and each Owner shall deliver to such Purchaser all records or documents, including all copies thereof, which contain Confidential Information of such Purchaser or its affiliates, including, but not limited to, documents such as memoranda, notes, records and manuals in whatsoever medium stored.

9. **Noncompetition.** During the period of five (5) years following the Possession Date (the "Covenant Term"), each Seller and each Owner agrees that each will not, directly or indirectly (a) compete with the trucking, transportation, consulting, brokerage or other business (the "Covered Business") conducted by either Purchaser, or any of its divisions, subsidiaries or affiliates, within the United States and/or any other geographic territory in which the same do business; or (b) contact any customer or agent of either Purchaser, its divisions, subsidiaries or affiliates, on behalf of himself or itself or any other person, firm, company, corporation or other entity, for the purpose of selling any Covered Business service which is similar to, or competes with, any Covered Business service offered by either Purchaser, or such division, subsidiary or affiliate. Performance under the Fleet Owner Agreement shall not be deemed a violation of the foregoing covenant. Actions by any of the entities disclosed on Schedule 15(a) shall constitute indirect actions of the Seller Parties. Provided, however, that the term "Covenant Term" with respect to an Owner who is employed by or renders services as an independent contractor for UACL (or any division, subsidiary or affiliate thereof) shall be the longer of (y) five (5) years following the Possession Date or (z) the period of

UACL/OEI_000118

such employment and/or independent contractor status plus two (2) years. For example, as to Matthew W. Elsholtz, if his engagement as an employee ends at the expiration of three (3) years (and he does not thereafter establish a further employment or independent contractor relationship with UACL, or any division, subsidiary or affiliate thereof), the Covenant Term as to him shall remain as five (5) years. By way of further example, however, if the term of his employment continues in effect for five (5) years following the Possession Date, and thereafter he has no further employment or independent contractor relationship with UACL (or any division, subsidiary or affiliate thereof), then the Covenant Term as to him will be extended for an additional two (2) years. For the purposes of this paragraph, "customer" shall include any person, firm, company, corporation or other entity that has purchased any Covered Business services from either Seller or from either Purchaser (or from any division, subsidiary or affiliate thereof) prior to the Possession Date or during the Covenant Term.

The Sellers and the Owners acknowledge that by entering into this Agreement they are limiting their right to compete herein only to the extent reasonably necessary to protect the respective Purchasers, their respective divisions, subsidiaries and affiliates, from unfair competition, and acknowledge that each will be able to do business and/or to earn a living without violating the foregoing restrictions. However, the parties agree that if a court of competent jurisdiction determines this restrictive covenant to be unenforceable as to any of them, the court shall modify and enforce the covenant to the fullest extent permitted under applicable law.

10. **Nonsolicitation/Nonrecruitment of Employees, Agents and Contractors.** Seller Parties, jointly and severally, agree that during the Covenant Term they shall not, severally or jointly, solicit, recruit or contact the employees, agents or contractors of either Seller (including any owner/operators and other contracted trucks) or of either Purchaser (or any division, subsidiary or affiliate thereof) for the purpose of employment or other business relationships.

11. **Injunctive Relief.** Seller Parties acknowledge and agree that a breach or threatened breach of the provisions of Sections 8, 9, or 10 may result in irreparable injury for which there is no adequate remedy provided by law, and that the aggrieved party shall be entitled to an injunction to prevent a breach or threatened breach of any obligations contained therein.

12. **Notices.** All notices, requests, demands and other communications hereunder shall be in writing, and shall be deemed to have been duly given if delivery or mailed, first class, postage prepaid, certified mail return receipt requested, to the Seller Parties at: 55 Peninsula Road, Dellwood, Minnesota 55110; and to the Purchasers at: 12755 E. Nine Mile Road, Warren, Michigan 48089, Attention: Robert Sigler. Any party, including any individual Seller Party, may change the address to which notices are to be sent by proper written notice to the other parties.

11

UACL/OEI_000119

13. <u>Entire Agreement</u>. This Agreement and the other documents and agreements referenced in Section 19(e) or otherwise signed or delivered at Closing contain the entire agreement of the parties with respect to the subject matter hereof, and all other prior agreements shall be deemed to be merged herein.

14. <u>Assignability</u>. The Purchasers may assign their respective rights and obligations under this Agreement to any division, subsidiary, affiliate or other business unit designated by the said Purchaser for the purpose of operating a business utilizing the Purchased Assets, provided that the assignee assumes all obligations under this Agreement of such Purchaser.

15. <u>Representations and Warranties of the Seller Parties</u>. The Seller Parties, jointly and severally, hereby represent and warrant to the Purchasers as of the date hereof, the Closing Date and the Possession Date, and acknowledge that the Purchasers are relying on each such representation and warranty in entering into this Agreement (and establishment of the Purchase Price), as follows:

(a)    The Owners, collectively, own, legally and beneficially, 100% of the stock in Overnite. Willis E. Elsholtz and Robert Weston Elsholtz, legally and beneficially (directly or in the trusts identified on page 1), collectively own 100% of the member interests in OXL. Overnite is a corporation, and OXL is a limited liability company, in each case duly formed and in good standing under the laws of the State of Minnesota, and in good standing in every other jurisdiction in which the nature or location of their respective assets and/or business activities or other factors require such qualification. Willis E. Elsholtz and Robert Weston Elsholtz are the sole members of the board of directors of Overnite, and are the sole governors of OXL. There are no other business entities, whether operating or not operating, affiliated with the operations of either Seller that are owned by Owners or any of them (except as disclosed on Schedule 15(a)). None of such affiliated entities disclosed on Schedule 15(a) are conducting business operations except as disclosed on Schedule 15(a). To the extent that the stockholding interests in Overnite, or the member interests in OXL, owned by each Owner is the community property of such Owner and his spouse, the Owner shall deliver to Purchasers, at and as a condition of Closing, a Consent of Spouse in the form attached hereto as Exhibit B. The Sellers and the Owners shall cause the names of the Sellers to be changed to a name that does not contain the words "Overnite Express," "OX" or any derivation thereof within one (1) year after Closing, and shall not thereafter use the name "Overnite Express" or "OX" (or any derivation thereof), and shall discontinue use of any assumed name of each Seller on the Possession Date. After Closing, Sellers shall only use the names "Overnite Express" and "OX" for the purpose of collecting Retained Receivables. Sellers shall coordinate the change of their respective names with UACL, who shall have the right to simultaneously or thereafter reserve such names. All of the Purchased Assets are included in the transaction, regardless if titled in the name of Overnite Express, OXL or in any other name. Pelham

UACL/OEI_000120

Properties is owned, legally and beneficially, by Robert Weston Elsholtz and Willis E. Elsholtz (directly or in the trusts identified on page 1).

(b)    This Agreement, and the consummation of the transactions contemplated hereby, has been duly and properly approved and authorized by the unanimous affirmative vote of the Owners (individually and as the sole shareholders and members of the respective Sellers), as well as all members of the board of directors of Overnite and all of the governors of OXL. This Agreement constitutes the legal, valid and binding obligation of each Seller and each Owner, enforceable against each of them in accordance with its terms. Upon the execution and delivery by Sellers and the Owners of each agreement or instrument to be executed or delivered by any or all of Sellers and the Owners at the Closing (collectively, the "Sellers' Closing Documents"), each of Sellers' Closing Documents will constitute the legal, valid and binding obligation of each of the Sellers and the Owners who are parties thereto, enforceable against each of them in accordance with its terms. Each Seller has the corporate or limited liability company, as the case may be, right, power and authority to execute and deliver this Agreement and the Sellers' Closing Documents to which it is a party and to perform its obligations under this Agreement and the Sellers' Closing Documents. Each Owner has all necessary legal capacity to enter into this Agreement and the Sellers' Closing Documents to which such Owner is a party and to perform his obligations hereunder and thereunder.

Neither the execution and delivery of this Agreement nor the consummation or performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time):

(i)    Breach (A) any provision of any of the organizational documents of either Seller or (B) any resolution adopted by the board of directors or the shareholders of Overnite or of the members or the governors of OXL;

(ii)    Breach or give any governmental body or other person or entity the right to challenge any of the contemplated transactions or to exercise any remedy or obtain any relief under any legal requirement or any judgment, order, arbitration award, licenses, permit or other instrument, to which either Seller or any Owner, or any of the Purchased Assets, may be subject;

(iii)    contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any governmental body the right to revoke, withdraw, suspend, cancel, terminate or modify, any governmental authorization, license or permit that is held by either Seller or that otherwise relates to the Purchased Assets or to the business of either Seller;

(iv)    cause Purchasers to become subject to, or to become liable for the payment of, any tax otherwise imposed upon either Seller;

13

(v) Breach of any provision of, or give any person or entity the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any contract to which either Seller is a party;

(vi) result in the imposition or creation of any lien, security interest or encumbrance upon or with respect to any of the Purchased Assets.

(c) They have made, in writing, disclosure to the Purchaser of all of the known liabilities of each Seller (including, without limitation, under any federal, state or local health, safety or environmental law), and there are no known liabilities or pending or known threatened claims or lawsuits, applicable to either Seller except as has been disclosed to the Purchasers in writing and set forth on Schedule 15(c), if any such schedule is attached. In particular, and without limitation, there is no known litigation pending against either Seller or the Owners except as disclosed on Schedule 15(c) (including, without limitation, any litigation involving injury or death in connection with motor vehicle accidents).

(d) (1) All financial and business information as to each Seller which has been presented to Purchasers is true and accurate in all material respects, and presents fairly the financial and business position of each Seller for the periods of time covered. In particular, and without limitation, all information provided by Overnite on its customer reports and lists of owner/operators is, to Seller's knowledge after reasonably diligent review and appropriate inquiry, true, accurate and complete in all material respects. Overnite does not utilize agents in the conduct of its business. Seller Parties have no actual knowledge or reason to believe that particular customers (excluding Malt-O-Meal) or owner/operators doing business with either Seller will decline to do business and/or contract with UACL after Closing. Overnite has delivered to Purchaser: (a) a balance sheet of Overnite as at December 31, 2007 (including the notes thereto, the "Balance Sheet"), and the related statements of income, changes in shareholders' equity and cash flows for the fiscal year then ended, including in each case the notes thereto, together with the report thereon of Overnite's certified public accountants; (b) balance sheets of Overnite as at December 31 of each of the fiscal years 2005 through 2007, and the related statements of income, changes in shareholders' equity and cash flows for each of the fiscal years then ended, including in each case the notes thereto (together with the report thereon of Overnite's certified public accountants); and (c) a balance sheet of Overnite as at the end of March, 2008 (the "Interim Balance Sheet"), and the related statement of income, changes in shareholders' equity, and cash flows for the period then ended, which is hereby certified by the Sellers and the Owners. Such financial statements fairly present the financial condition and the results of operations, changes in shareholders' equity and cash flows of Overnite as at the respective dates of and for the periods referred to in such financial statements in all material respects, all in accordance with Generally Accepted Accounting Principles ("GAAP") consistently applied. The financial statements referred to above reflect the

14

UACL/OEI_000122

consistent application of such accounting principles throughout the periods involved in all material respects, except as disclosed in the notes to such financial statements. The financial statements have been prepared from and are in accordance with the accounting records of Overnite. Since the date of the Balance Sheet, there has not been any material adverse change in the business, operations, prospects, assets, results of operations or condition (financial or otherwise) of Overnite, and no event has occurred or circumstance exists that may result in such a material adverse change.

(2)     The financial statements referred to in Section 15(d)(1), copies of which have been delivered to Purchasers, and all financial records generated thereafter, are complete and correct in all material respects and represent actual, bona fide transactions and have been maintained in accordance with sound business practices and all requirements of law, including the maintenance of an adequate system of internal controls.

(3)     Sellers have timely filed or caused to be filed all tax returns, reports or other documents with respect to all taxes of any kind or nature for which either Seller is liable or responsible, and there are no liens or encumbrances on any assets of either Seller with respect to any taxes (nor will any such lien or encumbrance arise as the result of closing the transactions contemplated hereby). Overnite has delivered true and complete copies of all of each of Overnite's tax returns to Purchaser for its fiscal years ended December 31, 2005 through December 31, 2007 (and, with respect to IFTA filings, for the years 2005-2007 and for the first calendar quarter of 2008).

As used herein, the term "tax" shall include any tax (including any income tax, capital gains tax, value-added tax, sales tax, fuel tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest or addition to tax), imposed, assessed, or collected by or under the authority of any governmental body or authority or payable pursuant to any tax-sharing agreement or any other contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

As used herein, the term "tax return" shall include any return (including any information return), report, statement, schedule, notice, form, filing or other document or information filed with or submitted to, or required to be filed with or submitted to, any governmental body or authority in connection with the determination, assessment, collection, or payment of any tax or in connection with the administration, implementation, or enforcement of or compliance with any legal requirement relating to any tax.

(4)     Neither Seller is insolvent nor will either Seller be rendered insolvent by any of the contemplated transactions, and Seller Parties further represent

15

UACL/OEI_000123

that the Purchase Price provides for fair consideration for the Purchased Assets. As used in this section, "insolvent" means that the sum of one's debts (including, without limitation, probable liabilities) exceeds the present fair value of one's assets or that one is not generally able to pay its debts as they become due. Immediately after giving effect to the consummation of the contemplated transactions: (i) each Seller will be able to pay its debts as they become due in the usual course of its business; (ii) each Seller will not have unreasonably small capital; (iii) each Seller will have assets (calculated at fair market value) that exceed its debts; and (iv) taking into account all pending and known threatened litigation, final judgments against either Seller are not reasonably anticipated to be rendered at a time when, or in amounts such that, such Seller will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of such Seller. The cash available to each Seller, after taking into account all other anticipated uses of the cash, will be sufficient to pay all such debts and judgments promptly in accordance with their terms. Neither Seller shall liquidate or dissolve until all of its debts, including, without limitation, judgments against it, have been fully paid and satisfied.

(e)     All information set forth on any Exhibit or Schedule hereto or any document or instrument executed contemporaneously herewith, or delivered in connection with this Agreement, including, without limitation, all representations and warranties as to the environmental and other condition of the Real Property, is true, accurate and complete in all material respects.

(f)     Title to the Purchased Assets shall be delivered in the condition required hereunder, free, clear and discharged of all security interests, liens and encumbrances (and the possibility thereof).

(g)     With respect to the Assumed Contracts and the Assumed Leases, neither Seller is in default thereunder, nor, to the knowledge of the Seller Parties, is any other party in default thereunder.

(h)     On or before the Possession Date, Seller Parties shall be responsible for the termination of each Seller's employment, co-employer or other pertinent relationships with employees, including any engaged on a so-called lease basis or employed by Management Assistance Corporation of St. Paul, but excluding the shop employees, as of that date ("Termination Date") in full compliance with all applicable law. Seller Parties represent and warrant that all salaries due any such employees as of the Termination Date, together with all accrued benefits, including, without limitation, accrued vacation and sick leave pay (in each case, through the Termination Date), as well as reimbursement for any and all outstanding expenses otherwise due an employee, shall have been paid in full to each employee (or that, to

16

the extent it has not, that Seller Parties shall be solely responsible therefor), and that Seller Parties (and Management Assistance Corporation of St. Paul):

(1) Are in material compliance with all applicable laws and regulations relating to the employment of employees, including those related to the terms and conditions of employment, wages, hours, discrimination, and payment of FICA or similar taxes;

(2) Have not and are not engaged in any unfair labor practice, nor are there any unfair labor practice claims or charges pending involving any Seller Party or Management Assistance Corporation of St. Paul;

(3) Are not, nor is Management Assistance Corporation of St. Paul, a party to any collective bargaining agreement or bound by any other agreement with a labor union and there are no proceedings pending for certification or representation before the National Labor Relations Board nor has there been any attempt within the past three (3) years to organize the employees of either Seller, or Management Assistance Corporation of St. Paul, into a collective bargaining unit;

(4) Are not subject to any labor strike, dispute, slowdown or stoppage;

(5) Have no labor grievances pending or, to their knowledge, threatened;

(6) Have paid in full any and all federal and state payroll taxes related to the salaries of such employees. In addition, Seller Parties and Management Assistance Corporation of St. Paul have complied with any and all employee benefit plans (as defined in Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended, known as "ERISA") and each other employment benefit arrangement, contract, agreement and/or policy applicable to the employees of either Seller or Management Assistance Corporation of St. Paul. Each Seller and Management Assistance Corporation of St. Paul have complied in all material respects with all applicable requirements of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), and all other applicable laws;

(7) Neither Seller nor Management Assistance Corporation of St. Paul are subject to or a participant in, nor have any of them ever been subject to or a participant in, any so-called Multi-Employer Plan under Section 3(37) of ERISA; and

(8) Will be solely responsible for the obligations owed to any employee leasing company with respect to any leased employees or otherwise through the Possession Date.

17

UACL/OEI_000125

Seller Parties acknowledge that either Purchaser, in its sole discretion, or a so-called temporary staffing company with which they do business, may employ any former employee of any Seller or Management Assistance Corporation of St. Paul on any terms and conditions which any of them may offer to any such employee, consistent with the terms and conditions of the new employer's own employment policies, including those related to employee salaries and benefits. With respect to such former employees who are employed by either Purchaser or such temporary staffing company who elect to continue health benefits provided by either Seller or Management Assistance Corporation of St. Paul, UACL shall cause the cost thereof, not to exceed current actual premium cost, to be reimbursed to the Sellers or Management Assistance Corporation of St. Paul, as the case may be, for the first sixty (60) days of such period of new employment so long as the former employee involved remains so re-employed for such period.

(i)     The Purchased Assets, and all assets leased or subleased to UACL, are, and will be when title thereto and/or possession thereof is delivered to the Purchaser involved, in useable operating condition and repair (and, in the case of transportation equipment, roadworthy), subject to reasonable and customary wear and tear and cosmetic imperfections (but otherwise free from defects or damage that renders any such Purchased Asset or leased or subleased asset not useable or operable without risks to safety or, as to transportation equipment, not roadworthy).

(j)     Regarding the Real Property:  (a) The Real Property is in material compliance with all local, state and federal environmental laws and regulations; (b) no hazardous substances, including petroleum products, have been stored, released, or disposed of on or beneath the Real Property in violation of any local, state or federal law or regulation or in a manner which would constitute an environmental or safety hazard; and (c) there have been no releases from any underground or above ground storage tanks on or in the vicinity of the Real Property in violation of any local, state or federal law, and there are no above ground storage tanks at the Real Property and there are only two (2) underground storage tanks at the Real Property (with 10,000 and 12,000 gallon capacities).

Except as disclosed in Schedule 15(j), Seller Parties are, and at all times have been, in compliance, in all material respects, with, and have not been and is not in violation of or liable under, any Environmental Law.  As used herein, the term "Environmental Law" shall mean any and all federal, state or local laws (whether under common law, by legislative action, or otherwise), rules, policies, ordinances, directives, orders, statutes or regulations, an object of which is to protect the public health, safety, or the environment, including, but not limited to, the Comprehensive Environmental response, Compensation and Liability Act, as amended (42 USC 9601 *et seq.*) and the Resource Conservation and Recovery Act, as amended (42 USC 6901 *et seq.*).  No Seller Party has knowledge of any fact or circumstance which would lead him or it to have any basis to expect to receive, nor have any of them received, any actual or threatened

18

UACL/OEI_000126

order, notice or other communication from (i) any governmental body or private citizen acting in the public interest or (ii) the current or prior owner or operator of the Real Property of any actual or alleged violation or failure to comply with any Environmental Law, or of any actual or alleged obligation to undertake or bear the cost of any remediation or other liability thereunder with respect to any property or asset (whether real, personal or mixed) in which a Seller or Pelham Properties has or had an interest, or with respect to any property at or to which Hazardous Substances were generated, manufactured, refined, transferred, imported, used or processed by either Seller or any other person or entity for whose conduct either of them is or may be held responsible or from which Hazardous Substances have been transported, treated, stored, handled, transferred, disposed, recycled or received. As used herein the term "Hazardous Substances" shall mean any or all of the following: hazardous materials and/or substances as defined in any Environmental Law, petroleum, petroleum by-products, natural gas, flammable explosives, radioactive materials, and toxic materials.

Seller Parties shall not be responsible for a breach of the foregoing representation and warranty with respect to any particular Hazardous Substance to the extent that Purchaser's due diligence regarding the Real Property disclosed the existence of any such Hazardous Substance.

(k)     They have not omitted to disclose in this Agreement (or in any of the financial, tax or other information they have provided to Purchasers) any known material fact, or knowingly, after due inquiry, made a misstatement or untrue statement of any material fact, that would be deemed relevant for consideration by any reasonable purchaser in entering into an agreement of this type. No Seller Party has knowledge of any fact that has specific application to any of them that may materially adversely affect the Purchased Assets, the Real Property or the business of either Seller (including, without limitation, as to its relationships with Customers, owner/operators and others with which such Seller does business) or the transactions contemplated hereby, that is not set forth in this Agreement or in a Disclosure Letter attached as Schedule 15(k), if any.

16.     **Indemnification by Seller Parties**. The Seller Parties shall, jointly and severally, defend, indemnify and hold harmless Purchasers, and their respective officers, directors, employees and agents, from any and all claims, liabilities, damages, losses, costs, expenses and other pecuniary detriment (including attorney fees, on a time and charges basis) [collectively, "Losses"] arising from (x) any breach of any representation or warranty contained in this Agreement (y) any other default under any covenant or agreement under this Agreement; or (z) any and all Losses caused by or related to any (i) Excluded Liability [including, without limitation, any and all liability under any litigation of whatsoever kind or nature (including, without limitation, litigation involving injuries or death in connection with motor vehicle accidents) pending, threatened or hereafter filed against either Seller or any Owner]; (ii) the

19

UACL/OEI_000127

operation of business by either Seller (including, without limitation, during any period between the Closing and the Possession Date); (iii) Hazardous Substances, including petroleum products, located or released on or beneath the Real Property, and with respect to any violation by any of the Owners or either Seller or any current or prior owner or occupant of the Real Property of any local, state or federal Environmental Law; or (iv) the surrender and return of any leased equipment (including, without limitation, leased trailers). The foregoing indemnification obligation, in addition to surviving the Closing, shall, as to the Real Property, survive the expiration or termination of any tenancy of UACL, and any purchase of any portion of the Real Property by UACL or its assignee (and shall extend to and be enforceable by such assignee). In addition to all other damages, such liability shall include the obligation to pay to the Purchaser(s) or other indemnified party involved an amount equal to all reasonable attorney fees and costs incurred by such Purchaser or other indemnified party as a result of such breach or default (including those attorney fees and costs incurred in enforcing this Section 16). Each Purchaser shall have, in addition to all other remedies, the right to offset and deduct the amount of any liability of either Seller or any Owner under this Section 16 from any amounts otherwise due under this Agreement (including, without limitation, the Additional Payments) or under any other agreement executed and delivered in connection herewith (excluding, however, the St. Paul Lease) by written notice of its intention to do so to such Seller or Owner, as the case may be (the "Offset Notice"). In the event that the right of offset arises in favor of a Purchaser who is not then indebted to a Seller or the Owners, such right of offset may be exercised by the other Purchaser who shall pay the amount offset to the Purchaser suffering the Losses involved. In the event that the exercise of such offset right under this Section 16 is contested by the Seller or Owner involved, the contesting party shall have thirty (30) days following the giving of such Offset Notice to give the Purchaser involved written notice that the exercise of such right of offset is contested (the "Offset Contest Notice"). The Offset Contest Notice must state with specificity the reason the exercise of such offset right is contested. If an Offset Contest Notice is not timely given to the Purchaser involved, then the exercise of such right of offset shall be absolute and can be exercised upon written notice to the Seller or Owner involved. If an Offset Contest Notice is timely received, then the Purchaser involved may deposit the sum(s) otherwise subject to such proposed offset, as and when otherwise due, into the client trust account of its outside corporate counsel (without being in default hereunder, under the Fleet Owner Agreement or any other document involved), to be held pending such counsel's receipt of joint written instructions from the Purchaser(s) and such Seller or Owner involved, or a final order of a court of competent jurisdiction, directing to whom such funds shall be disbursed. Interest earned with respect to such client trust deposit shall be allocated in accordance with the portion of the principal thereof distributed to each party. As used in this Agreement, the term "material", as to any matter or matters, shall mean a matter or matters where the amount involved exceeds $5,000 individually, or $15,000 in the aggregate, for all such matters involved.

20

UACL/OEI_000128

Notwithstanding any language set forth above to the contrary, absent intentional misrepresentation or fraud, indemnification liability of the Seller Parties for breach of the representations and warranties contained in Section 15 (excluding subsections (a), (b) and (f) thereof) shall not exceed the amount of Five Hundred Thousand Dollars (the "Indemnification Cap"). It is acknowledged by the Seller Parties that there is no limit on their indemnification obligation for, and the foregoing Indemnification Cap provision shall not be applicable to, other breaches of this Agreement including, without limitation, with respect to Excluded Liabilities (including, without limitation, those arising as the result of claims for injury or death, or property damage, arising by virtue of motor vehicle accidents, or for Best Buy Cargo Claims or other cargo claims).

17. <u>Representatives and Warranties by Purchasers</u>. The Purchasers each represent and warrant to Seller Parties as follows (acknowledging that Seller Parties are relying thereon in entering into this Agreement):

(a) Each Purchaser is a corporation duly formed and in good standing under the laws of the state of its formation (as set forth on page 1) and every other jurisdiction in which the nature or location of its assets and/or business activities or other factors require such qualification.

(b) This Agreement, and the consummation of the transactions contemplated hereby, have been duly and properly approved and authorized by the unanimous resolution of the board of directors of each Purchaser.

(c) Neither the execution and delivery of this Agreement, nor the consummation or performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time):

(i) Breach (A) any provision of any of the organizational documents of either Purchaser or (B) any resolution adopted by the board of directors or the shareholders of either Purchaser;

(ii) Breach or give any governmental body or other person or entity the right to challenge any of the contemplated transactions or to exercise any remedy or obtain any relief under any legal requirement or any judgment, order, arbitration award, licenses, permit or other instrument, to which either Purchaser may be subject;

(iii) contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any governmental body the right to revoke, withdraw, suspend, cancel, terminate or modify, any governmental authorization, license or permit that is held by either Purchaser or that otherwise relates to the business of either Purchaser;

21

UACL/OEI_000129

(iv)    cause Sellers to become subject to, or to become liable for the payment of, any tax otherwise imposed upon either Purchaser;

(v)    Breach of any provision of, or give any person or entity the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any contract to which either Purchaser is a party.

18.    **Indemnification by Purchasers.**

Purchasers shall defend, indemnify and hold harmless the Sellers and their respective officers, directors, governors, shareholders and members in such capacities, from any losses, claims, liabilities, damages, losses, costs, and expenses (including reasonable attorney fees, on a time and charges basis) [collectively, "Losses"] arising from:

(a)    Any breach of any representation or warranty of the Purchasers contained in this Agreement;

(b)    The failure of a Purchaser to discharge its obligations with respect to any Assumed Lease or Assumed Contract; or

(c)    Any liabilities incurred by either Purchaser in connection with its conduct, after the Possession Date, of a business utilizing the Purchased Assets (excluding only those liabilities for which any of the Seller Parties are responsible for under this Agreement).

19.    **Closing; Survival.**

(a)    The obligation of Purchasers to close and consummate the transaction contemplated hereby, and to perform their respective obligations hereunder, is conditioned upon the representations and warranties of the Seller Parties being true as of the Closing Date, all requisite consents to the transaction (or any portion thereof) being procured and delivered to Purchasers (or waived in writing by Purchasers), arrangements satisfactory to Purchasers having been made for the discharge of any security interest or lien encumbering any of the Purchased Assets and none of the Purchased Assets, or assets to be leased or subleased, having been subject to damage or destruction on or before the Closing Date to an extent not satisfactory to Purchasers. All risk of loss shall be borne by Sellers until the Possession Date. Until the Possession Date, Sellers shall operate their businesses consistent with past practices, and shall not sell or encumber the Purchased Assets, excluding only trailers (provided there shall be a price reduction for each trailer sold) or discontinue or impair any substantial or important Customer, owner/operator or other business relationships. From and after the date of execution hereof, Seller Parties shall cooperate with Purchaser in making preparation for and effectuating a smooth transition of the

22

UACL/OEI_000130

Purchased Assets, including Customer, owner/operator, and other relationships, to the respective Purchasers.

(b)     The Closing shall take place on June 13, 2008 ("**Closing Date**") and shall be effective at 12:01 a.m. on June 14, 2008 (the "**Possession Date**").

(c)     All agreements, covenants, representations and warranties contained in this Agreement shall be true upon and shall survive both the Closing and Possession Dates. Notwithstanding the foregoing, the parties hereto agree that, absent intentional misrepresentation or fraud, the representations and warranties made by Seller Parties in Section 15 or by Purchasers in Section 17 of this Agreement or any related schedule, excluding the representations and warranties made with respect to title to the Purchased Assets and Environmental Law compliance, or pursuant to Section 15(a) and (b) and 17(a) and (b), each of which shall survive in perpetuity, and 15(d)(3), which shall survive for the statute of limitations (an "Expiration Date"), shall survive for a period of twenty one (21) months after the Possession Date (an "Expiration Date"). In the event that Seller Parties are not given written notice by either Purchaser, or Purchasers are not given written notice by any Seller Party, of a claim with respect to a representation or warranty that is subject to expiration on an Expiration Date on or prior to the Expiration Date involved, then such claim shall be time barred and may not be pursued.

(d)     Title and possession of the Purchased Assets, and possession of the Real Property and leased or subleased personal property, shall be delivered effective on the Possession Date.

(e)     At the Closing, the relevant respective parties shall execute and/or deliver, as the case may be, the following documents:

(1)     Warranty Bill of Sale and Assignment from Overnite (and/or third parties) to UACL;

(2)     Warranty Bill of Sale and Assignment from OXL (and/or third parties) to UTSL;

(3)     The St. Paul Lease (with accompanying certified unanimous resolution of the members and if applicable, governors of Pelham Properties authorizing same);

(4)     The Fleet Owner Agreement and Sublease Agreements;

(5)     Documents necessary to assign the Assigned Real Estate Leases or documents with respect to the Alternative Direct Leases (which will also call for execution by the third party landlords involved);

23

(6) Employment Agreements between UACL and the individuals identified in Section 3;

(7) Certified Articles of Incorporation and Bylaws, as to Overnite, and Certified Articles of Organization and the Operating Agreement (or a certificate from the members that there is no operating agreement), as to OXL, together with a Certificate of Good Standing for each Seller from the state of Minnesota, and certified copies of appropriate authorizing resolutions by the shareholders and directors of Overnite and the members and governors of OXL with respect to this Agreement.

(f) Any sales, transfer or other taxes payable as the result of the transaction contemplated hereby shall be payable by Sellers and Owners.

20. <u>Miscellaneous.</u> In the event any provision of this Agreement shall be determined by a court of competent jurisdiction to be unenforceable (in whole or in part) then (y) such provision shall remain enforceable to the extent determined by such court and (z) such determination shall not impair the enforceability of the remainder of the provisions of this Agreement. No party shall be deemed to have waived any provision of this Agreement unless such waiver is contained in a writing signed by such party. No waiver of any provision of this Agreement shall be construed as a waiver of any other or further provision of this Agreement. The parties each agree that they shall each pay their own fees, expenses and other costs incurred in connection with the proposed transaction, whether or not the transaction is consummated. Neither Sellers or Purchasers shall be responsible for any broker fees with respect to brokers retained by the other. Executed counterparts of this Agreement transmitted by facsimile machine or email shall be as fully binding as though bearing original signatures of the parties.

21. <u>Removal of Sky Bitz Equipment.</u> Certain of the trailers that are to be purchased, and certain of the trailers subleased to UACL (where the primary lessor is Trudell Trailers of Minnesota, Inc.) are equipped with Sky Bitz communication equipment (the "Sky Bitz Equipped Trailers"). Each Sky Bitz Equipped Trailer shall be returned to the St. Paul terminal to be operated by UACL at least once during the 120 days following Closing to allow Sellers to remove, at Seller's expense, the Sky Bitz communication equipment installed thereon. UACL shall reimburse Sellers for the monthly charge attributable to the Sky Bitz communication equipment allocable, as to each unit, to the period between the Possession Date and the date of removal thereof (with proration for any partial month of usage).

24

"Purchasers"

Universal Am-Can, Ltd.

By: _____
    Mark Limback
    Its: President

UTS LEASING, INC.

By: _____

Its: _____

"Sellers"

Overnite Express, Inc.

By: _____
    Robert Weston Elsholtz
    Its: President

OX, LLC

By: _____
    Robert Weston Elsholtz
    Its: Governor

"Owners"

_____
Robert Willis Elsholtz, individually and
as Trustee of the Robert Willis Elsholtz
Revocable Trust Agreement dated
August 31, 2005, by Robert Weston
Elsholtz, his agent and attorney in fact

_____
W. E. Elsholtz, Jr., a/k/a Willis E.
Elsholtz, individually and as Trustee
of the W. E. Elsholtz, Jr. Revocable Trust
Agreement dated July 23, 2007

_____
Robert W. Elsholtz, a/k/a Robert
Weston Elsholtz, individually and as
Trustee of the Robert Weston Elsholtz
Revocable Trust Agreement dated
December 2, 1996

_____
Matthew Weston Elsholtz, by Robert
Weston Elsholtz, his agent and attorney
in fact

25

UACL/OEI_000133

## Joinder by Affiliates

The undersigned affiliate of the Sellers has joined into this Agreement for the purpose of joining into this Agreement, and being bound by, Sections 1(f) and 15(h) hereof.

Management Assistance Corporation of St. Paul

By: _____

Its: _V.P._

The undersigned affiliate of the Sellers has joined into this Agreement to join in the representations and warranties as to the environmental condition of the Real Property covered by the St. Paul Lease as set forth in Section 15(j).

Pelham Properties, LLC

By: _____

Its: _Gov_

593348v11a

26

**EXHIBIT A**

**See Attached**

UACL/OEI_000135

Exhibit A

Certain Purchased Assets

File Cabinets (37)

Operations Desks and Cubicles

Operations Chairs (50)

All assets located in Upstairs Office and Kitchen

All assets located in Downstairs Office and Drivers Room

See Trailer lists attached

UACL/OEI_000136

## Overnite Trailers to be Sold to Universal Am Can Ltd.

| | | Trailers Overnite - Free and Clear - Purchased at Closing | | | |
|---|---|---|---|---|---|
| | Unit Number | Year | Make | Vin # | Price |
| 1 | 63541 | 1999 | Wabash-Dura | 1JJV532W2XL550844 | $5,900 |
| 2 | 63542 | 1999 | Wabash-Dura | 1JJV532W6XL616781 | $5,900 |
| 3 | 62543 | 1999 | Wabash-Dura | 1JJV532W8XL616782 | $5,900 |
| 4 | 63544 | 1999 | Wabash-Dura | 1JJV532WXXL616783 | $5,900 |
| 5 | 63545 | 1999 | Wabash-Dura | 1JJV532W1XL616784 | $5,900 |
| 6 | 63546 | 1999 | Wabash-Dura | 1JJV532W3XL616785 | $5,900 |
| 7 | 63547 | 1999 | Wabash-Dura | 1JJV532W5XL616786 | $5,900 |
| 8 | 63548 | 1999 | Wabash-Dura | 1JJV532W7XL616787 | $5,900 |
| 9 | 63549 | 1999 | Wabash-Dura | 1JJV532W9XL616788 | $5,900 |
| 10 | 63550 | 1999 | Wabash-Dura | 1JJV532W0XL616789 | $5,900 |
| 11 | 63551 | 1999 | Wabash-Dura | 1JJV532W7XL616790 | $5,900 |
| 12 | 63552 | 1999 | Wabash-Dura | 1JJV532W9XL616791 | $5,900 |
| 13 | 63554 | 1999 | Wabash-Dura | 1JJV532W2XL616793 | $5,900 |
| 14 | 63555 | 1999 | Wabash-Dura | 1JJV532W4XL616794 | $5,900 |
| 15 | 63556 | 1999 | Wabash-Dura | 1JJV532W6XL616795 | $5,900 |
| 16 | 63557 | 1999 | Wabash-Dura | 1JJV532W8XL616796 | $5,900 |
| 17 | 63558 | 1999 | Wabash-Dura | 1JJV532WXXL616797 | $5,900 |
| 18 | 63559 | 1999 | Wabash-Dura | 1JJV532W1XL616798 | $5,900 |
| 19 | 63560 | 1999 | Wabash-Dura | 1JJV532W3XL616799 | $6,900 |
| 20 | 63561 | 1999 | Wabash-Dura | 1JJV532W6XL616800 | $5,900 |
| 21 | 63562 | 1999 | Wabash-Dura | 1JJV532W8XL616801 | $5,900 |
| 22 | 63563 | 1999 | Wabash-Dura | 1JJV532WXXL616802 | $5,900 |
| 23 | 63564 | 1999 | Wabash-Dura | 1JJV532W1XL616803 | $5,900 |
| 24 | 63565 | 1999 | Wabash-Dura | 1JJV532W3XL616804 | $5,900 |
| 25 | 63566 | 1999 | Wabash-Dura | 1JJV532W5XL616805 | $5,900 |
| 26 | 63567 | 1999 | Wabash-Dura | 1JJV532W7XL616806 | $5,900 |
| 27 | 63568 | 1999 | Wabash-Dura | 1JJV532W9XL616807 | $5,900 |
| 28 | 63569 | 1999 | Wabash-Dura | 1JJV532W0XL616808 | $5,900 |
| 29 | 63570 | 1999 | Wabash-Dura | 1JJV532W2XL616809 | $5,900 |
| 30 | 63571 | 1999 | Wabash-Dura | 1JJV532W9XL616810 | $5,900 |
| 31 | 63572 | 1999 | Wabash-Dura | 1JJV532W0XL616811 | $5,900 |
| 32 | 63573 | 1999 | Wabash-Dura | 1JJV532W2XL616812 | $5,900 |
| 33 | 63574 | 1999 | Wabash-Dura | 1JJV532W4XL616813 | $5,900 |
| 34 | 63575 | 1999 | Wabash-Dura | 1JJV532W6XL616814 | $5,900 |
| 35 | 63576 | 1999 | Wabash-Dura | 1JJV532W8XL616815 | $5,900 |
| 36 | 63577 | 1999 | Wabash-Dura | 1JJV532WXXL616816 | $5,900 |
| 37 | 63578 | 1999 | Wabash-Dura | 1JJV532W1XL616817 | $5,900 |
| 38 | 63579 | 1999 | Wabash-Dura | 1JJV532W3XL616818 | $5,900 |
| 39 | 63580 | 1999 | Wabash-Dura | 1JJV532W5XL616819 | $5,900 |
| 40 | 63581 | 1999 | Wabash-Dura | 1JJV532W1XL616820 | $5,900 |
| 41 | 63582 | 1999 | Wabash-Dura | 1JJV532W3XK616821 | $5,900 |
| 42 | 63583 | 1999 | Wabash-Dura | 1JJV532W5XL616822 | $5,900 |
| 43 | 63584 | 1999 | Wabash-Dura | 1JJV532W7XL616823 | $5,900 |
| 44 | 63585 | 1999 | Wabash-Dura | 1JJV532W9XL616824 | $5,900 |
| 45 | 63586 | 1999 | Wabash-Dura | 1JJV532W0XK616825 | $5,900 |
| 46 | 63587 | 1999 | Wabash-Dura | 1JJV532W2XL616826 | $5,900 |
| 47 | 63588 | 1999 | Wabash-Dura | 1JJV532W4XL616827 | $5,900 |

1

UACL/OEI_000137

## Overnite Trailers to be Sold to Universal Am Can Ltd.

| | | | | | |
|---|---|---|---|---|---|
| 48 | 63589 | 1999 | Wabash-Dura | 1JJV532W8XL616828 | $5,900 |
| 49 | 63590 | 1999 | Wabash-Dura | 1JJV532W8XL616829 | $5,900 |
| 50 | 63591 | 2000 | Wabash-Dura | 1JJV532W2YL616830 | $7,750 |
| 51 | 63592 | 2000 | Wabash-Dura | 1JJV532W4YL616831 | $7,750 |
| 52 | 63593 | 2000 | Wabash-Dura | 1JJV532W6YL616832 | $7,750 |
| 53 | 63595 | 2000 | Wabash-Dura | 1JJV532WXYL616834 | $7,750 |
| 54 | 63596 | 2000 | Wabash-Dura | 1JJV532W1YL616835 | $7,750 |
| 55 | 63597 | 2000 | Wabash-Dura | 1JJV532W3YL616836 | $7,750 |
| 56 | 63598 | 2000 | Wabash-Dura | 1JJV532W5YL616837 | $7,750 |
| 57 | 63601 | 2000 | Wabash-Dura | 1JJV532W5YL616840 | $7,750 |
| 58 | 63603 | 2000 | Wabash-Dura | 1JJV532W9YL616842 | $7,750 |
| 59 | 63605 | 2000 | Wabash-Dura | 1JJV532W2YL616844 | $7,750 |
| 60 | 63606 | 2000 | Wabash-Dura | 1JJV532W4YL616845 | $7,750 |
| 61 | 63607 | 2000 | Wabash-Dura | 1JJV532W6YL616846 | $7,750 |
| 62 | 63608 | 2000 | Wabash-Dura | 1JJV532W8YL616847 | $7,750 |
| 63 | 63609 | 2000 | Wabash-Dura | 1JJV532WXYL616848 | $7,750 |
| 64 | 63610 | 2000 | Wabash-Dura | 1JJV532W1YL616849 | $7,750 |
| 65 | 63611 | 2000 | Wabash-Dura | 1JJV532W8YL616850 | $7,750 |
| 66 | 63612 | 2000 | Wabash-Dura | 1JJV532WXYL616851 | $7,750 |
| 67 | 63614 | 2000 | Wabash-Dura | 1JJV532W3YL616853 | $7,750 |
| 68 | 63616 | 2000 | Wabash-Dura | 1JJV532W7YL616855 | $7,750 |
| 69 | 63620 | 2000 | Wabash-Dura | 1JJV532W4YL616859 | $7,750 |
| 70 | 63621 | 2000 | Wabash-Dura | 1JJV532W0YL616860 | $7,750 |
| 71 | 63622 | 2000 | Wabash-Dura | 1JJV532W2YL616861 | $7,750 |
| 72 | 63623 | 2000 | Wabash-Dura | 1JJV532W4YL616862 | $7,750 |
| 73 | 63626 | 2000 | Wabash-Dura | 1JJV532WXYL616865 | $7,750 |
| 74 | 63627 | 2000 | Wabash-Dura | 1JJV532W1YL616866 | $7,750 |
| 75 | 63628 | 2000 | Wabash-Dura | 1JJV532W3YL616867 | $7,750 |
| 76 | 63630 | 2000 | Wabash-Dura | 1JJV532W7YL616869 | $7,750 |
| 77 | 63632 | 2000 | Wabash-Dura | 1JJV532W5YL616871 | $7,750 |
| 78 | 63633 | 2000 | Wabash-Dura | 1JJV532W7YL616872 | $7,750 |
| 79 | 63636 | 2000 | Wabash-Dura | 1JJV532W2YL616875 | $7,750 |
| 80 | 63637 | 2000 | Wabash-Dura | 1JJV532W4YL616876 | $7,750 |
| 81 | 63638 | 2000 | Wabash-Dura | 1JJV532W6YL616877 | $7,750 |
| 82 | 63800 | 2000 | Wabash-Dura | 1JJV532W9YL679262 | $7,750 |
| 83 | 63802 | 2000 | Wabash-Dura | 1JJV532W2YL679264 | $7,750 |
| 84 | 63803 | 2000 | Wabash-Dura | 1JJV532W4YL679265 | $7,750 |
| 85 | 63804 | 2000 | Wabash-Dura | 1JJV532W6YL679266 | $7,750 |
| 86 | 63805 | 2000 | Wabash-Dura | 1JJV532W8YL679267 | $7,750 |
| 87 | 63806 | 2000 | Wabash-Dura | 1JJV532WXYL679268 | $7,750 |
| 88 | 63807 | 2000 | Wabash-Dura | 1JJV532W1YL679269 | $7,750 |
| 89 | 63808 | 2000 | Wabash-Dura | 1JJV532W8YL679270 | $7,750 |
| 90 | 63809 | 2000 | Wabash-Dura | 1JJV532WXYL679271 | $7,750 |
| 91 | 63810 | 2000 | Wabash-Dura | 1JJV532W1YL679272 | $7,750 |
| 92 | 63811 | 2000 | Wabash-Dura | 1JJV532W3YL679273 | $7,750 |
| 93 | 63812 | 2000 | Wabash-Dura | 1JJV532W5YL679274 | $7,750 |
| 94 | 63813 | 2000 | Wabash-Dura | 1JJV532W7YL679275 | $7,750 |
| 95 | 63814 | 2000 | Wabash-Dura | 1JJV532W9YL679276 | $7,750 |
| 96 | 63815 | 2000 | Wabash-Dura | 1JJV532W0YL679277 | $7,750 |
| 97 | 63817 | 2000 | Wabash-Dura | 1JJV532W4YL679279 | $7,750 |
| 98 | 63818 | 2000 | Wabash-Dura | 1JJV532W0YL679280 | $7,750 |
| 99 | 63819 | 2000 | Wabash-Dura | 1JJV532W2YL679281 | $7,750 |

UACL/OEI_000138

## Overnite Trailers to be Sold to Universal Am Can Ltd.

| 100 | 63820 | 2000 | Wabash-Dura | 1JJV532W4YL679282 | $7,750 |
|-----|-------|------|-------------|-------------------|--------|
| 101 | 63821 | 2000 | Wabash-Dura | 1JJV532W6YL679283 | $7,750 |
| 102 | 63822 | 2000 | Wabash-Dura | 1JJV532W8YL679284 | $7,750 |
| 103 | 63823 | 2000 | Wabash-Dura | 1JJV532WXYL679285 | $7,750 |
| 104 | 63824 | 2000 | Wabash-Dura | 1JJV532W1YL679286 | $7,750 |
| 105 | 63825 | 2000 | Wabash-Dura | 1JJV532W3YL679287 | $7,750 |
| 106 | 63826 | 2000 | Wabash-Dura | 1JJV532W5YL679288 | $7,750 |
| 107 | 63827 | 2000 | Wabash-Dura | 1JJV532W7YL679289 | $7,750 |
| 108 | 63828 | 2000 | Wabash-Dura | 1JJV532W3YL679290 | $7,750 |
| 109 | 63829 | 2000 | Wabash-Dura | 1JJV532W5YL679291 | $7,750 |
| 110 | 63830 | 2000 | Wabash-Dura | 1JJV532W7YL679292 | $7,750 |
| 111 | 63831 | 2000 | Wabash-Dura | 1JJV532W9YL679293 | $7,750 |
| 112 | 63832 | 2000 | Wabash-Dura | 1JJV532W0YL679294 | $7,750 |
| 113 | 63833 | 2000 | Wabash-Dura | 1JJV532W2YL679295 | $7,750 |
| 114 | 63834 | 2000 | Wabash-Dura | 1JJV532W4YL679296 | $7,750 |
| 115 | 63835 | 2000 | Wabash-Dura | 1JJV532W6YL679297 | $7,750 |
| 116 | 63836 | 2000 | Wabash-Dura | 1JJV532W8YL679298 | $7,750 |
| 117 | 63837 | 2000 | Wabash-Dura | 1JJV532WXYL679299 | $7,750 |
| 118 | 63838 | 2000 | Wabash-Dura | 1JJV532W2YL679300 | $7,750 |
| 119 | 63839 | 2000 | Wabash-Dura | 1JJV532W4YL679301 | $7,750 |
| 120 | 63840 | 2000 | Wabash-Dura | 1JJV532W6YL670302 | $7,750 |
| 121 | 63841 | 2000 | Wabash-Dura | 1JJV532W8YL679303 | $7,750 |
| 122 | 63842 | 2000 | Wabash-Dura | 1JJV532WXYL679304 | $7,750 |
| 123 | 63843 | 2000 | Wabash-Dura | 1JJV532W1YL679305 | $7,750 |
| 124 | 63846 | 2000 | Wabash-Dura | 1JJV532W7YL679308 | $7,750 |
| 125 | 63847 | 2000 | Wabash-Dura | 1JJV532W9YL679309 | $7,750 |
| 126 | 63848 | 2000 | Wabash-Dura | 1JJV532W6YL679310 | $7,750 |
| 127 | 63849 | 2000 | Wabash-Dura | 1JJV532W7YL679311 | $7,750 |
| 128 | 63850 | 2000 | Wabash-Dura | 1JJV532W9YL679312 | $7,750 |
| 129 | 63851 | 2000 | Wabash-Dura | 1JJV532W0YL679313 | $7,750 |
| 130 | 63852 | 2000 | Wabash-Dura | 1JJV532W2YL679314 | $7,750 |
| 131 | 63853 | 2000 | Wabash-Dura | 1JJV532W4YK679315 | $7,750 |
| 132 | 63854 | 2000 | Wabash-Dura | 1JJV532W6YK679316 | $7,750 |
| 133 | 63855 | 2000 | Wabash-Dura | 1JJV532W8YL679317 | $7,750 |
| 134 | 64856 | 2000 | Wabash-Dura | 1JJV532WXYL679318 | $7,750 |
| 135 | 63857 | 2000 | Wabash-Dura | 1JJV532W1YL679319 | $7,750 |
| 136 | 63858 | 2000 | Wabash-Dura | 1JJV532W8YL679320 | $7,750 |
| 137 | 63859 | 2000 | Wabash-Dura | 1JJV532WXYL679321 | $7,750 |
| 138 | 63860 | 2000 | Wabash-Dura | 1JJV532W1YL679322 | $7,750 |
| 139 | 63861 | 2000 | Wabash-Dura | 1JJV532W3YL679323 | $7,750 |
| 140 | 63862 | 2000 | Wabash-Dura | 1JJV532W5YL679324 | $7,750 |
| 141 | 63863 | 2000 | Wabash-Dura | 1JJV532W7YL679325 | $7,750 |
| 142 | 63864 | 2000 | Wabash-Dura | 1JJV532W9YL679326 | $7,750 |
| 143 | 63665 | 2000 | Wabash-Dura | 1JJV532W0YL679327 | $7,750 |
| 144 | 63966 | 2000 | Wabash-Dura | 1JJV632W2YL679328 | $7,750 |
| 145 | 63867 | 2000 | Wabash-Dura | 1JJV532W4YL679329 | $7,750 |
| 146 | 63868 | 2000 | Wabash-Dura | 1JJV532W0YL679330 | $7,750 |
| 147 | 63869 | 2000 | Wabash-Dura | 1JJV532W2YL679331 | $7,750 |
| 148 | 63870 | 2000 | Wabash-Dura | 1JJV532W4YL679332 | $7,750 |
| 149 | 63872 | 2000 | Wabash-Dura | 1JJV532W8YL679334 | $7,750 |
| 150 | 63874 | 2000 | Wabash-Dura | 1JJV532W1YL679336 | $7,750 |
| 151 | 73426 | 1997 | Wabash-Heated | 1JJV532UXVL349623 | $7,100 |

3

UACL/OEI_000139

## Overnite Trailers to be Sold to Universal Am Can Ltd.

| | | | | | |
|---|---|---|---|---|---|
| 152 | 73427 | 1997 | Wabash-Heated | 1JJV532U3VL349625 | $7,100 |
| 153 | 73428 | 1997 | Wabash-Heated | 1JJV532U6VL349627 | $7,100 |
| 154 | 73429 | 1997 | Wabash-Heated | 1JJV532U5VL349628 | $7,100 |
| 155 | 73432 | 1997 | Wabash-Heated | 1JJV532U5VL349631 | $7,100 |
| 156 | 73433 | 1997 | Wabash-Heated | 1JJV532U7VL349632 | $7,100 |
| 157 | 73434 | 1997 | Wabash-Heated | 1JJV532U0VL349634 | $7,100 |
| 158 | 73435 | 1997 | Wabash-Heated | 1JJV532U2VL349635 | $7,100 |
| 159 | 73436 | 1997 | Wabash-Heated | 1JJV532U4VL349636 | $7,100 |
| 160 | 73437 | 1997 | Wabash-Heated | 1JJV532U6VL349637 | $7,100 |
| 161 | 73464 | 1999 | Monon Heated | 1NNVA5325XM309934 | $7,100 |
| 162 | 73465 | 1999 | Monon Heated | 1NNVA5327XM309935 | $7,100 |
| 163 | 73466 | 1999 | Monon Heated | 1NNVA5329XM309936 | $7,100 |
| 164 | 73467 | 1999 | Monon Heated | 1NNVA5320XM309937 | $7,100 |
| 165 | 73468 | 1999 | Monon Heated | 1NNVA5322XM309938 | $7,100 |
| 166 | 73469 | 1999 | Monon Heated | 1NNVA5324XM309939 | $7,100 |
| 167 | 73470 | 1999 | Monon Heated | 1NNVA5320XM309940 | $7,100 |
| 168 | 73471 | 1999 | Monon Heated | 1NNVA5322XM309941 | $7,100 |
| 169 | 73472 | 1999 | Monon Heated | 1NNVA5324XM309942 | $7,100 |
| 170 | 73473 | 1999 | Monon Heated | 1NNVA5326XM309943 | $7,100 |
| 171 | 73474 | 1999 | Monon Heated | 1NNVA5328XM309944 | $7,100 |
| 172 | 73475 | 1999 | Monon Heated | 1NNVA532XXM309945 | $7,100 |
| 173 | 73476 | 1999 | Monon Heated | 1NNVA5321XM309946 | $7,100 |
| 174 | 73477 | 1999 | Monon Heated | 1NNVA5323XM309947 | $7,100 |
| 175 | 73478 | 1999 | Monon Heated | 1NNVA5325XM309948 | $7,100 |
| 176 | 73479 | 1999 | Monon Heated | 1NNVA5327XM309949 | $7,100 |
| 177 | 73480 | 1999 | Monon Heated | 1NNVA5323XM309950 | $7,100 |
| 178 | 73481 | 1999 | Monon Heated | 1NNVA5325XM309951 | $7,100 |
| 179 | 73482 | 1999 | Monon Heated | 1NNVA5327XM309952 | $7,100 |
| 180 | 73483 | 1999 | Monon Heated | 1NNVA5329XM309953 | $7,100 |
| 181 | 73484 | 1999 | Monon Heated | 1NNVA5320XM309954 | $7,100 |
| 182 | 73485 | 1999 | Monon Heated | 1NNVA5322XM309955 | $7,100 |
| 183 | 73486 | 1999 | Monon Heated | 1NNVA5324XM309956 | $7,100 |
| 184 | 73487 | 1999 | Monon Heated | 1NNVA5328XM309957 | $7,100 |
| 185 | 73488 | 1999 | Monon Heated | 1NNVA5328XM309958 | $7,100 |
| 186 | 63878 | 2001 | Wabash-Dura | 1JJV532W61L678340 | $7,750 |
| 187 | 63889 | 2001 | Wabash-Dura | 1JJV532W01L679351 | $7,750 |
| 188 | 63896 | 2001 | Wabash-Dura | 1JJV532W31L679358 | $7,750 |
| | | | | | |
| | | | | | |
| | | | | Total | $1,343,600 |

4

UACL/OEI_000140

| | Unit # | Year | Make | Vin# | Price |
|---|---|---|---|---|---|
| | | Trailers Overnite Believes | | | |
| | | have a Security Interest | | | |
| | | To be Purchased After Closing | | | |
| | | | | | |
| | Unit # | Year | Make | Vin# | Price |
| 1 | 73430 | 1997 | Wabash-Heated | 1JJV532U7VL349629 | $7,100 |
| 2 | 73431 | 1997 | Wabash-Heated | 1JJV532U3VL349630 | $7,100 |
| 3 | 73438 | 1997 | Wabash-Heated | 1JJV532U0VL349620 | $7,100 |
| 4 | 73439 | 1999 | Monon-Heated | 1NNVA5326XM309909 | $7,100 |
| 5 | 73440 | 1999 | Monon-Heated | 1NNVA5322XM309910 | $7,100 |
| 6 | 73441 | 1999 | Monon-Heated | 1NNVA5324XM309911 | $7,100 |
| 7 | 73442 | 1999 | Monon-Heated | 1NNVA5326XM309912 | $7,100 |
| 8 | 73443 | 1999 | Monon-Heated | 1NNVA5328XM309913 | $7,100 |
| 9 | 73444 | 1999 | Monon-Heated | 1NNVA532XXM309914 | $7,100 |
| 10 | 73445 | 1999 | Monon-Heated | 1NNVA5321XM309915 | $7,100 |
| 11 | 73446 | 1999 | Monon-Heated | 1NNVA5323XM309916 | $7,100 |
| 12 | 73447 | 1999 | Monon-Heated | 1NNVA5325XM309917 | $7,100 |
| 13 | 73448 | 1999 | Monon-Heated | 1NNVA5327XM309918 | $7,100 |
| 14 | 73449 | 1999 | Monon-Heated | 1NNVA5329XM309919 | $7,100 |
| 15 | 73450 | 1999 | Monon-Heated | 1NNVA5325XM309920 | $7,100 |
| 16 | 73451 | 1999 | Monon-Heated | 1NNVA5327XM309921 | $7,100 |
| 17 | 73452 | 1999 | Monon-Heated | 1NNVA5329XM309922 | $7,100 |
| 18 | 73453 | 1999 | Monon-Heated | 1NNVA5320XM309923 | $7,100 |
| 19 | 73454 | 1999 | Monon-Heated | 1NNVA5322XM309924 | $7,100 |
| 20 | 73455 | 1999 | Monon-Heated | 1NNVA5324XM309925 | $7,100 |
| 21 | 73456 | 1999 | Monon-Heated | 1NNVA5326XM309926 | $7,100 |
| 22 | 73457 | 1999 | Monon-Heated | 1NNVA5328XM309927 | $7,100 |
| 23 | 73458 | 1999 | Monon-Heated | 1NNVA532XXM309928 | $7,100 |
| 24 | 73459 | 1999 | Monon-Heated | 1NNVA5321XM309929 | $7,100 |
| 25 | 73460 | 1999 | Monon-Heated | 1NNVA5328XM309930 | $7,100 |
| 26 | 73461 | 1999 | Monon-Heated | 1NNVA532XXM309931 | $7,100 |
| 27 | 73462 | 1999 | Monon-Heated | 1NNVA5321XM309932 | $7,100 |
| 28 | 73463 | 1999 | Monon-Heated | 1NNVA5323XM309933 | $7,100 |
| 29 | 63873 | 2000 | Wabash-Dura | 1JJV532WXYL679335 | $7,750 |
| | | | | | |
| | | | | Total | $206,550 |

## Agreements To Be Assigned

1. Best Buy Purchasing, LLC Transportation Services Agreement dated June 1, 2006

## Leases to be Assigned

A decision by UACL as to whether the telephone equipment lease will be assigned and assumed will be made post-closing. Until a decision is made, and if the telephone lease is not assigned and assumed, a replacement system is installed and operational, UACL will be allowed use of the telephone system/equipment and will reimburse to Overnite the monthly expenses incurred allocable to UACL's use.

UACL/OEI_000142

EXHIBIT B

Spousal Consent

## SPOUSAL CONSENT
## TO ASSET PURCHASE AGREEMENT

I, _____, certify and declare that I am the spouse of
_____ ("Spouse"), one of the persons who executed the foregoing
Asset Purchase Agreement between Universal Am-Can, Ltd. and UTS Leasing, Inc., on
the one hand, and Overnite Express, Inc. and OX, LLC (and their shareholders and
members), on the other hand, dated or to be dated June 13, 2008 ("Agreement"), and for
purposes of said Agreement only, I hereby:

1. Agree to be bound by and accept my rights under the provisions of the
Agreement in lieu of all community property or other interests, if any, I may have in
any of the assets ("Assets") subject to the terms of the Agreement;

2. Grant to my Spouse an irrevocable special power of attorney, which is
coupled with the interest of my Spouse and myself under the Agreement, to deal with
the subject matter of the Agreement and to modify, amend, and add to the Agreement
without further signature, acknowledgment, agreement or consent on my part;

3. Agree not to take any action at any time which might interfere with
or hinder the operation of the Agreement and any interest or rights now or later
acquired by me or my Spouse arising from or related to the Agreement, and any
modifications, amendments, or additions to the Agreement;

4. Confirm that I have been afforded the opportunity to seek
independent legal and tax counsel of my own choosing regarding the Agreement and
this Spousal Consent and have done so to the extent I have judged desirable;

5. Confirm that I have read, understand, and agree to have my legal
rights in the assets determined by the Agreement; and

6. With respect to any conveyance of real estate to be made by my
spouse as contemplated under the Agreement (and any real estate leases to be executed
in connection therewith), to join in the execution of the documents of conveyance for
the purpose of barring any dower or other marital interests (including any elective
share under _____ law), with such documents of conveyance to
include language substantially as follows:

UACL/OEI_000143

"_____, spouse of Grantor, for considerations aforesaid, joins herein for the purpose of granting, bargaining, selling, conveying and confirming, and does hereby grant, bargain, sell, convey and confirm unto Grantee, its successors and assigns, all rights, claims and interest of every kind, character and description whatsoever which the said _____ now has or hereafter may acquire by virtue by his/her marriage in the real estate hereinabove conveyed to Grantee, including but not limited to homestead and any interest in the aforedescribed real estate as all or part of any elective share of a surviving spouse as provided under the laws of the state of _____, but the said _____ does not join in the covenants and warranties of this indenture."

Executed in the City of _____, County of _____, State of _____.

Dated: _____      _____

UACL/OEI_000144

**Schedule 4(c)**

**True Copies of Assigned Real Estate Leases and Accurate Summaries of Oral Real Estate Leases Attached**

UACL/OEI_000145

Schedule 4(c)
Assigned Leases

| | |
|---|---|
| Lease: | Unwritten month-to-month lease<br>4285 Moreland Avenue South<br>Conley, Georgia 30288 |
| Rent: | $600.00 per month |
| Landlord: | Bestway<br>4285 Moreland Avenue South<br>Route 42<br>Conley, Georgia 30288 |
| Lease: | Unwritten month-to-month lease<br>16901 Van Dam Road<br>South Holland, Illinois 60473 |
| Rent: | $825.00 per month |
| Landlord: | WG Duncil Co., Inc.<br>16901 Van Dam Road<br>South Holland, Illinois 60473 |
| Lease: | Unwritten month-to-month lease<br>617 Waughtown Street<br>Winston-Salem, North Carolina 27117 |
| Rent: | $250.00 per month |
| Landlord: | Shore Real Estate<br>P.O. Box 5005<br>Winston-Salem, North Carolina 27113 |
| Lease: | Lease Agreement, dated July 9, 2004        (copy attached)<br>2800 Nicholson Road<br>Kansas City, Missouri 64120 |
| Rent: | $750.00 per month |
| Landlord: | C & C Holdings<br>c/o Great Central Truck Service<br>2800 Nicholson Road<br>Kansas City, Missouri 64120 |

Doc 3015804  Ver 1

JUN. 11. 2008  6:31PM    651-645-9501                                      NO. 0378   P. 9

## PROPERTY LEASE
2800 Nicholson Road, Kansas City , Missouri

THIS LEASE, made and entered into this ___9th___ day of ___JULY___ ___2004___, by and between C & C Holdings, hereinafter called "Lessor", and Overnite Express hereinafter called "Lessee".

### WITNESSETH

Lessor, for and in consideration of the rents, covenants and agreements herein mentioned and hereby agreed to be paid, kept and performed by Lessee, its successors and assigns, does hereby lease to Lessee, the premises located in the City of Kansas City, State of Missouri which shall include Ten Trailer Spaces, shown on the attached Exhibit A, incorporated by reference, hereinafter refered to as the "Leased Premises".

To have and to hold the same term of one year, commencing on the 1st day of August, 2004, and ending on the 31st day of July 2005.

1. RENT. During the term of this lease, Lessee agrees and covenants to pay Lessor the annual rent of Nine Thousand Dollars, in lawful money of the United States, in equal monthly installments of Seven Hundred Fifty Dollars, in advance, on the first day of each month throughout the term of this Lease. The rent and other monies due Lessor under this Lease shall be payable to the Lessor at C & C Holdings, % Great Central Truck Service, 2800 Nicholson Road, Kansas City, Missouri 64120. The burden of proof of payment in case of controversy shall be upon Lessee.

2. INSURANCE. Lessee shall carry and pay for comprehensive liability insurance on the leased premises for the full term of this lease, which names Lessor as an additional insured, with combined bodily injury and property damage limits of not less than One Million Dollars (1,000,000.00) per occurrence. Lessee will furnish Lessor with evidence of such insurance.

3. INDEMNIFICATION. The Lessee will hold the Lessor harmless and indemnify the Lessor from any and all claims for damage of goods, wares and merchandise, and any claims for injury to any person by reason thereof unless caused by the negligence of Lessor or a breach of Lessor's obligation hereunder. Lessor shall have no interest in nor claim to any proceeds from any insurance which the Lessee carries on Lessee's goods, wares, merchandise, equipment, and personal property.

4. LATE PAYMENT. If the rent to be paid by the Lessee has not been received by the Lessor by the tenth of each month, the rent shall be delinquent. If such delinquency continues for five calendar days thereafter, this Lease shall be in default and Lessor may declare this Lease to be terminated.

UACL/OEI_000147

JUN. 11. 2008   6:32PM    651-645-9501                    NO. 0378   P. 10

5. LEASE CANCELLATION or EXTENTION. If the Lessee / Lessor desires to cancell the Lease or extend beyond the initial term, it shall notify in writing, Thirty Days prior to the expiration date. Any extension of the term shall be on such terms as mutually agreed upon by Lessor and Lessee at such time.

6. LOT MAINTENANCE. Lessee shall pay and be responsible for his share of Snow Removel and Trailer Trash/ Debris, costs.

IN WITNESS WHEREOF;, the Lessor and Lessee have excuted this instrument on the day and date first above written.

LESSOR:

C & C Holdings
2800 Nicholson Road
Kansas City, Mo. 64120

BY: _____  5/4/04

LESSEE:

OVERNITE EXPRESS

656 Pelham Blvd.
Saint Paul, MN 55115

BY: _____

UACL/OEI_000148

JUN. 11. 2008   6:32PM    651-645-9501                    NO. 0378   P. 11



UACL/OEI_000149

JUN. 11. 2008  6:31PM    651-645-9501                        NO. 0378   P. 8

# C & C Holdings            816-231-1736

% Great Central Truck Service    2800 Nicholson Road · Kansas City Mo. 64120

August 4, 2004

Mr. Kevin Hays
Overnite Express
656 Pelham Blvd.
Saint Paul, MN 55115

Dear Mr. Hays:

First, thanks so much for your years of occupancy
in our offices. Steff and her staff have been great
to work with and maintaning the property.

Find enclosed completed "Drop Lot" property lease,
effective August 1st. I have included the Exhibit A
sheet for your parking area. You probably should
send me a current Certificate of Liability Insurance.

The new lease indicates 10 trailer spaces only, as I
discussed with Steff. We are adding to our present
shop building and we will loose some parking. Since
you closed the office here, they have been running up
to 15 trailers during the week and week-ends. Perhaps
your dispatch people are not aware of this, and we
really can't accommodate overnight tractor parking.
You might alert the drivers on this.

Thanks again for this lease, if your people need
anything, let us know. I am

Sincerely,

Jack Colvin, property manager
C & C Holdings

I enclosed a work sheet to show you what we're doing.
Just through it away.

UACL/OEI_000150

Schedule 15(a)

See Attached

UACL/OEI_000151

Schedule 15(a)

**Affiliates**

1. Pelham Properties, LLC:  ownership of land and buildings in St. Paul, MN.

2. Road Ready, Inc.:  ownership of maintenance facility

3. Management Assistance Corporation of St. Paul:  management services

4. E & E Leasing:  purchases and leases trailers

5. Quail Trucking, Ltd.:  fleet operator of power units

UACL/OEI_000152

Schedule 15(c)

None

UACL/OEI_000153

Schedule 15(j)

None

UACL/OEI_000154

Schedule 15(k)

None

UACL/OEI_000155