# EXHIBIT 25

(Deposition Transcript of Jeremiah Podlena, dated March 22, 2013)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary
Guardian of the Estate
and Person of JEFFREY D. SCHEINMAN,
a Disabled Person,

    Plaintiff,

-vs-    Case No. 09-CV-5340

MARTIN'S BULK MILK SERVICE, INC.;
SAMUEL G. FRANKE;
CSX INTERMODAL, INC.;
INTERNATIONAL PAPER COMPANY, et al.,
    Defendants.

Deposition of JEREMIAH PATRICK PODLENA
Friday, March 22, 2013
11:02 a.m.
at
CHULA VISTA RESORT
2501 River Road
Wisconsin Dells, Wisconsin

Reported by Lindsay DeWaide, RPR/CRR

**Page 2**

1    Deposition of JEREMIAH PATRICK PODLENA, a
2 witness in the above-entitled action, taken at the
3 instance of the Defendants, pursuant to the Federal
4 Rules of Civil Procedure, pursuant to notice, before
5 Lindsay DeWaide, Registered Professional Reporter,
6 Certified Realtime Reporter, and Notary Public in and
7 for the State of Wisconsin, at CHULA VISTA RESORT, 2501
8 River Road, Wisconsin Dells, Wisconsin, on the 22nd day
9 of March, 2013, commencing at 11:02 a.m. and concluding
10 at 1:58 p.m.

12 APPEARANCES:

14    CLIFFORD LAW OFFICES, by
    Mr. Richard F. Burke, Jr.
15    120 North LaSalle Street, Suite 3100
    Chicago, Illinois 60602
16    Appeared on behalf of Plaintiff.

17    MULHERIN, REHFELDT & VARCHETTO, P.C., by
    Mr. Matthew R. Schreck
18    211 South Wheaton Avenue, Suite 200
    Wheaton, Illinois 60187
19    -and-
20    DOWD & DOWD, LTD., by
    Mr. Robert J. Golden (telephonically)
21    617 West Fulton Street
    Chicago, Illinois 60661
22    Appeared on behalf of Martin's Bulk Milk
    Service, Inc., and Samuel G. Franke.

**Page 3**

1  A P P E A R A N C E S: (continued)
2
3 HINSHAW & CULBERTSON LLP, by
    Mr. Carlton D. Fisher
    222 North LaSalle Street, Suite 300
4    Chicago, Illinois 60601
    Appeared on behalf of International Paper
5    Company; Overnite Express, Inc.; Ox, LLC;
    Universal Am-Can, Ltd.; and Overnite Logistics,
6    Inc.
7 JOHNSON & BELL, LTD., by
    Mr. Timothy R. Couture
8    33 West Monroe Street, Suite 2700
    Chicago, Illinois 60603
9    Appeared on behalf of BMW of North America,
    LLC, and Bayerische Motoren Werke
10    Aktiengesellschaft.

**Page 4**

E X A M I N A T I O N
PAGE
BY MR. BURKE    5
BY MR. FISHER    50
BY MR. COUTURE    105
BY MR. FISHER    111
BY MR. BURKE    113
BY MR. SCHRECK    114
BY MR. FISHER    115

E X H I B I T S
(No exhibits were marked.)

PREVIOUSLY MARKED EXHIBITS

| NUMBER | | PAGE IDENTIFIED |
|---|---|---|
| No. 1 | Memo Bills | 33 |
| No. 11 | Broker Confirmation Sheet | 21 |
| No. 15 | Master Brokerage Agreement | 81 |
| No. 16 | Universal Am-Can, Ltd., Master Brokerage Agreement | 37 |
| No. 23 | Broker Confirmation Sheet | 20 |
| No. 64 | Load and Rate Confirmations | 67 |
| No. 65 | Broker Confirmation Sheet | 71 |
| No. 72 | Carrier-Broker Contract | 78 |
| No. 73 | Master Brokerage Agreement | 79 |
| No. 75 | Master Brokerage Agreement | 85 |

1 TRANSCRIPT OF PROCEEDINGS
2 (Witness is sworn.)
3 MR. BURKE: Let the record reflect this
4 is the deposition of Mr. Pat Podlena taken
5 pursuant to notice and in accord with the
6 applicable rules of the Northern District of
7 Illinois.
8 JEREMIAH PATRICK PODLENA, called as a
9 witness herein, having been first duly sworn on
10 oath, was examined and testified as follows:
11 E X A M I N A T I O N
12 BY MR. BURKE:
13 Q Mr. Podlena, as I'm sure your attorney told you,
14 I'm going to ask you some questions about your
15 work at Martin's and the incident involving my
16 client, Mr. Jeffrey Scheinman. And as I do so, if
17 you need any questions repeated or they don't make
18 sense, just tell me. If you want to take a look
19 at some document that would help you answer a
20 question, just say so.
21 If you could please keep all your answers
22 verbal as opposed to nodding your head, because --
23 A Yes.
24 Q -- even though we can see you nodding your head,
25 the court reporter has to take down an actual

5

1 answer. And similarly, if you could verbalize
2 yeses and noes.
3 A Okay.
4 Q And if you and I don't talk at the same time, that
5 helps the court reporter, so try and let me get my
6 whole question out even though you may think you
7 know the full extent of the question; and I'll try
8 and let you finish your whole answer before I
9 start a new question. Okay?
10 A Okay.
11 Q Would you please state your full name and spell
12 your last name for us.
13 A Jeremiah Patrick Podlena. Last name is
14 P-O-D-L-E-N-A.
15 Q Okay. And where do you currently live, sir?
16 A La Crescent, Minnesota.
17 Q Okay. And at what address?
18 A 212 South Hill Street.
19 Q And what's your date of birth?
20 A 4/28/1957.
21 Q Okay. And tell me a little bit about your
22 educational background. Did you finish high
23 school?
24 A Yes, I finished high school. I attended Kansas
25 State University for one year, Washburn University

6

1 for about four years part-time. And in the
2 meantime, I went to work for Fleming Food
3 Companies, and that's why I was going part-time.
4 Q Okay. Did you receive any degree from either of
5 the --
6 A No, I did not --
7 Q -- universities?
8 A -- receive a degree.
9 Q Did not?
10 A Did not.
11 Q Okay. At Washburn, did you have any particular
12 course of study that you --
13 A Business communications.
14 Q Okay. Do you have any experience or background
15 driving a truck?
16 A Not driving.
17 Q Okay. Do you have a CDL license?
18 A No, I do not.
19 Q Have you ever had one?
20 A No.
21 Q You mentioned you went to work for a food company.
22 I didn't catch the name.
23 A Fleming Companies.
24 Q Okay. And about when was that?
25 A That was in 1976 part-time right out of high

7

1 school. Then I went to Kansas State full-time and
2 went back to Fleming, and I was with them for 23
3 years --
4 Q Okay.
5 A -- in Topeka, Joplin, Oklahoma City, and
6 La Crosse.
7 Q And what's the nature of their business, Fleming?
8 A Distributing food products to independent grocery
9 stores.
10 Q And when you last -- what year did you last work
11 for Fleming?
12 A For Fleming, it was 1999.
13 Q Okay. And what was your job title or position
14 then?
15 A I was backhaul coordinator in La Crosse.
16 MR. FISHER: I didn't catch the word.
17 THE WITNESS: Backhaul. Backhaul
18 coordinator.
19 MR. FISHER: Thank you.
20 BY MR. BURKE:
21 Q Okay. And for La Crosse did you --
22 A Correct.
23 Q Okay. And basically, that term in your business
24 means what?
25 A That means all of our empty trucks that were out

8

2 (Pages 5 to 8)

1  on a day-to-day basis in about a four-state area,
2  it was my job to try and fill them with product
3  coming back and make money, keep empty miles to a
4  minimum.
5  Q  Okay.  In general, can you give us a little
6  overview of the different types of jobs that you
7  did at Fleming?
8  A  Sure.  Initially started out as an order selector,
9  working full-time, going to school part-time.
10  Then I went into management and was a grocery
11  supervisor, progressing up the ladder to
12  superintendent and assistant warehouse manager in
13  Oklahoma City.  That took me from Topeka, Kansas,
14  to Joplin, Missouri, to Oklahoma City, to
15  La Crosse.
16  Q  And at some point did you start another type of
17  assignment?  When you said you were the backhaul
18  coordinator, is that a different type of work or
19  was that encompassed in your --
20  A  It's --
21  Q  -- grocery supervisory jobs?
22  A  It's encompassed in the warehouse.  Each warehouse
23  had them, primarily.  La Crosse was a much bigger
24  operation, and so it was more challenging, more
25  fun.

9

1  Q  Okay.  Were the Fleming Companies -- were they
2  basically a trucking company?
3  A  They were a food distribution company, primarily
4  warehousing.  They had their own semis which they
5  delivered product with.
6  Q  Okay.  Did they manufacture any of the food
7  product?
8  A  No.
9  Q  Okay.  Did they store any of the food product?
10  A  Yes.
11  Q  Did they have a motor carrier license?
12  A  Yes.
13  Q  When you left Fleming in 1999, where did you go to
14  work then?
15  A  Went to Organic Valley in La Farge, Wisconsin, as
16  their logistics manager.
17  Q  And how long did you work there?
18  A  Approximately eight years.  '99 to 2007.
19  Q  Okay.  And in that position, basically what did
20  you do?
21  A  I covered all of their loads that were processed
22  across the United States, set up trucking with
23  individual carriers to act as a representative and
24  deliver the goods.  They grew from -- initial,
25  when I started with them, they had about five

10

1  truckloads going out a week; and when I -- when I
2  quit, they were putting out about 150 semi loads a
3  week.
4  Q  Okay.  And how would you describe their -- the
5  business of Organic Valley?
6  A  Organic food products that had to be maintained a
7  certain temperature, cleanliness, and there was a
8  time frame because it was dated product.  So it
9  had to deliver primarily on time or by a certain
10  date.  And we had to keep a chain of command along
11  the logistics line.
12  Q  Did they manufacture these food products?
13  A  Yes, they did.
14  Q  Okay.  Did they have a motor carrier license?
15  A  No.  No.  They did not have their own trucks.
16  Q  Okay.  When you left there in 2007, where did you
17  go to work?
18  A  I went to Martin's.
19  Q  Okay.  And at what location of Martin's?
20  A  That was in Wilton, Wisconsin.
21  Q  And when did you last work at Martin's?
22  A  Would have been in November of 2008, I believe.  I
23  was there for almost exactly one year.
24  Q  And why did you leave?
25  A  I was driving 100 miles a day to work, 50 miles

11

1  one way.  And I got a job more so to my liking in
2  warehousing in La Crosse, and I only had to drive
3  about five miles, so that's primarily why.
4  Q  Did you get fired or --
5  A  No.
6  Q  -- terminated for any reason?
7  A  I've never been fired or terminated anywhere.
8  Q  Okay.  Including at Martin's?
9  A  That's correct.
10  Q  When you started at Martin's in 2007, what was
11  your job?
12  A  Primarily looking for backhauls out of -- from a
13  distance, trucks they sent out to East or
14  West Coast.
15  Q  And did you have a particular title or position at
16  Martin's?
17  A  No.  Uh-uh.
18  Q  Did that remain your job duty during the one year
19  that you worked there?
20  A  That's correct.
21  Q  Do you know Samuel Franke?
22  A  I do not believe so.
23  Q  Okay.  Did you have any involvement with training
24  drivers?
25  A  No.

12

3 (Pages 9 to 12)

1  Q   Did you have any job responsibilities related to
2      safety for Martin's?
3  A   No.
4  Q   During the time that you worked at Martin's, did
5      you have any contact with any people from
6      Overnite Express or Overnite Logistics?
7  A   I don't recall ever dealing with anyone from those
8      places verbally. Possibly getting their paperwork
9      and faxing back to them the confirmation sheets,
10     which I did for, you know, a number of different
11     companies. But none -- not verbally, no.
12 Q   Okay. In 2007 -- between 2007 and 2008, were you
13     involved in signing any contracts for or on behalf
14     of Martin's?
15 A   I would assume I probably was.
16 Q   Okay. And what type of contracts?
17 A   It would have been just rate confirmation sheets
18     possibly for trucking companies that -- or for
19     companies that we were going to haul -- make
20     backhaul for, return load, things like that.
21 Q   Okay. Did you have any involvement in purchasing
22     or acquiring liability insurance coverage for
23     Martin's?
24 A   No, I did not.
25 Q   Did you ever talk to Sam Franke after this

13

1  A   Just a couple pieces of paperwork. The bill of
2      lading, I believe, and I'm not even sure what the
3      names of them were. They look familiar, but
4      that's about it.
5  Q   Okay. Did you review anything that had your name
6    · or signature on it?
7  A   Yes, I did.
8  Q   Okay. And what were those items?
9  A   I'm not sure what they were called. I mean, one
10     was a rate confirmation, and I'm not sure what the
11     other one was.
12 Q   Okay.
13 A   One would have been the contract, I guess, with
14     Overnite/Al-Cam [sic], and then the other one was
15     a rate confirmation, I believe.
16 Q   I missed part of what you said. One was the --
17     might have been the contract with Overnite?
18 A   Overnite -- Overnite Express/Al-Cam.
19 Q   Oh, okay. Universal Am-Can?
20 A   Yeah. Um-hum.
21 Q   Okay. Do you know the name Melody Hansen?
22 A   No, I do not.
23 Q   During the time that you worked for Martin's, was
24     Martin's doing any hauling directly for -- or
25     strike that.

15

1      occurrence?
2  A   I don't ever recall talking to Sam.
3  Q   Okay. Do you have any knowledge as to what
4      liability insurance coverage Martin's had related
5      to this occurrence?
6  A   No, I do not.
7  Q   Who handled insurance coverage at Martin's?
8  A   I don't know for sure on that one.
9  Q   To whom did you report when you were working at
10     Martin's?
11 A   Dave Martin.
12 Q   And what was his position?
13 A   Owner, I believe.
14 Q   Did you ever go to -- or strike that.
15     Was all of your work at Martin's Wilton
16     location?
17 A   Correct.
18 Q   Did Martin's have any other location?
19 A   Not that I'm familiar with. People got confused
20     sometimes. There's a Marten, M-A-R-T-E-N, out of
21     Mondovi, and then at one time Dan had an uncle out
22     of Tomah that had a Martin Trucking. But those
23     weren't anything to do with his company.
24 Q   What have you reviewed in anticipation of giving a
25     deposition today?

14

1      Was Martin's in contact with International
2      Paper concerning any hauling for International
3      Paper?
4  A   They would have hauled for International as a
5      representative for Overnite Express -- whatever
6      that -- but not directly with -- they were acting
7      as a representative, I believe.
8  Q   Okay. Were you familiar -- during the time you
9      worked at Martin's, did you ever learn that there
10     was a point in time when Martin's used to haul
11     directly for International Paper?
12 A   Not that I'm aware of. It would have been as a
13     representative.
14 Q   In 2007 -- well, strike that.
15     Well, during the time you were there, 2007 to
16     2008, was Martin's regularly involved in hauling
17     paper for International Paper up to Minneapolis?
18 A   I believe so. My field of expertise was more on
19     the refrigerated loads coming back, so that's
20     where I concentrated more on, getting rates and
21     things like that. But I believe they did that as
22     a regular load.
23 Q   Okay. And were you involved in any discussions or
24     agreements related to Martin's making that regular
25     haul of International goods?

16

4 (Pages 13 to 16)

1 A No. I would have not been involved in that, with
2 the exception of just seeing -- as I'd check the
3 fax machine daily, signing loads and sending them
4 back. But as far as setting those loads up,
5 agreeing to them, that would have gone through
6 Dave.
7 Q Okay. During the time that you worked there, did
8 Martin's regularly have a driver available every
9 day for the purpose of making that pickup of
10 International Paper goods?
11 MR. FISHER: Foundation.
12 THE WITNESS: Say what?
13 MR. SCHRECK: You can go ahead and
14 answer.
15 BY MR. BURKE:
16 Q You can answer. He's just making a legal
17 objection, but you can go ahead and answer.
18 A Whether it was on a daily basis, I don't know. As
19 far as being that familiar with the load, I'm not.
20 Q Okay. A moment ago, you mentioned that it was
21 your knowledge that Martin's was regularly hauling
22 a load for International Paper to Minneapolis
23 during the year that you were working there,
24 correct?
25 A That would be correct.

17

1 Q Okay. And was it also your knowledge that
2 Martin's would, you know, regularly make a driver
3 available for the purpose of making that regular
4 haul for International Paper?
5 A If it was a scheduled load, then they would have
6 someone available, I would assume. Yeah.
7 Q Was Dave Martin -- or excuse me.
8 Was Samuel Franke the driver that regularly
9 made that run of the International Paper goods to
10 Minneapolis?
11 A That, I do not know.
12 Q Okay. Did you engage in any dispatching duties or
13 responsibilities at Martin's during your year
14 there?
15 A Rarely. Usually it was answer the phone, put on
16 hold until Dave, Doreen, or Nancy did that. My
17 job was more or less to arrange the loads from
18 East or West Coast.
19 Q Okay. Who did the dispatching work?
20 A That would have been Dave, Doreen, or Nancy.
21 Q Okay. And what's Nancy's last name?
22 A I do not know. I can describe her, but I don't
23 know what her last name is.
24 Q Does she still work there?
25 A I believe so.

18

1 Q And was it Doreen, did you say?
2 A Correct.
3 Q Okay. And what's Doreen's last name?
4 A I'm not sure. She was married and divorced, and I
5 believe her married name was P-I-C-H-A or E. And
6 the only reason I know that is because I coached
7 AAU boys' basketball, and her son played against
8 my son's team and beat us on a last-second shot.
9 MR. SCHRECK: Not that you're bitter or
10 anything, right?
11 THE WITNESS: It was my fault. Dumb
12 coach mistake. I should've had him foul him.
13 BY MR. BURKE:
14 Q And when was that?
15 A That -- what? You mean coaching or --
16 Q The game you're thinking of.
17 A Oh. That was actually before I went to work for
18 Dave. I found out afterwards that -- he walked in
19 one day, and I thought, "You're the kid who beat
20 my team."
21 Q Okay. Well, Matt's right. You haven't forgotten
22 that.
23 Okay. What was your understanding what
24 dispatchers did at Martin's?
25 A They would instruct the driver as to where to go

19

1 and give him confirmation numbers to pick up as
2 the representative agent for whoever they were
3 picking up for. Normally you can't pick up a load
4 without a confirmation number.
5 Q Okay. Let me tender to you what was previously
6 marked as Exhibit 23, and take a look at that for
7 a moment.
8 A Um-hum.
9 Q Mr. Podlena --
10 MR. SCHRECK: Rich, was there another
11 copy of that that was marked that doesn't have
12 that sticker thing on top of it? I don't know if
13 you want to use that one instead.
14 MR. BURKE: That's probably 11 --
15 MR. SCHRECK: Yeah.
16 MR. BURKE: -- that you're thinking of.
17 MR. SCHRECK: Yeah. I think that's
18 probably what I was thinking of. I don't know
19 what you were going to ask him about it, but --
20 MR. BURKE: I have both. I have both,
21 actually. And, in fact, here. I'll tender you
22 Exhibit 11 as well.
23 BY MR. BURKE:
24 Q And, I guess, number one, first with respect to --
25 take a look at 11. That's entitled "Broker

20

5 (Pages 17 to 20)

1  Confirmation Sheet." Am I correct?
2  A  Correct.
3  Q  Okay. What's your understanding of what that
4     document is?
5  A  That would be a typical confirmation sheet between
6     the -- sending in a rate confirmation and the
7     pickup location and the drop location with the
8     confirmation number to Martin's, which come
9     through the fax. And since I usually check that,
10    I sent it back to Overnite/UACL, agreeing that we
11    would represent them and be their agent to pick
12    this up and deliver in a timely fashion.
13 Q  You covered a lot in that answer, for which I
14    thank you, but let me back up and maybe we can
15    walk through this a little bit.
16 A  Sure.
17 Q  Number one, that is your signature down in the
18    bottom, correct?
19 A  That is correct.
20 Q  Okay. When would you have received -- or excuse
21    me. When would you have put your signature on
22    that in relation to when you received this
23    document?
24 A  Probably a couple days before. It looks like the
25    pickup date was 7/3, and most likely we would have

21

1     gotten it a couple days before that. And as soon
2     as it comes through, one of us in the office would
3     sign it and fax it back so they know right away we
4     did receive it, so that they know that their
5     product will be picked up and we will act as their
6     agent and pick it up and deliver it.
7  Q  Okay. And to whom would this normally come, this
8     type of broker confirmation sheet?
9  A  This would come across the fax machine. And if it
10    was something that wasn't out of the ordinary or
11    something that I was familiar with, nine times out
12    of ten I would have signed it because that
13    alleviated the pressure of Nancy and Doreen and
14    Dave from having to do this, because they were
15    going to be on the phone with drivers.
16 Q  Okay.
17 A  My main thing was to confirm the rate.
18 Q  Okay. And what would you -- when you say "the
19    rate," is that in the middle of the page there, or
20    what are you referring to?
21 A  I'm referring to the total payment to the carrier
22    of $974.08.
23 Q  Okay. And that's set forth in the middle of the
24    page, right?
25 A  That --

22

1  Q  Under total payments to the carrier?
2  A  Correct.
3  Q  Okay. And how would you -- you know, for example,
4     on this date -- now, this fax is dated July 3,
5     2008, at 16:23 hours, correct?
6  A  That looks correct.
7  Q  Up in the left-hand corner?
8  A  Um-hum.
9  Q  Top left, I should say?
10 A  Yes.
11 Q  And that's 4:23 p.m., correct?
12 A  Correct.
13 Q  Okay. And to the right, it says Overnite
14    Logistics on the top?
15 A  In the middle upper?
16 Q  On the top of the page. Yes.
17 A  Yes, I see that.
18 Q  And who did you understand Overnite Logistics to
19    be? Or here. Strike that.
20    Let me ask you, are you familiar with
21    Overnite -- the term Overnite Express?
22 A  I've heard of them.
23 Q  Okay. Had you heard of Overnite Logistics?
24 A  At this stage, I really don't remember.
25 Q  Okay. During your time while you were working at

23

1     Martin's, did you ever become familiar with the
2     fact that Universal Am-Can had purchased some
3     Overnite Express entities?
4  A  No. I wasn't aware.
5  Q  Okay. The phone number on the top there, do you
6     know whose phone number that would be?
7  A  No, I do not.
8  Q  And by the way, that number is (708)331-8604,
9     correct?
10 A  Correct.
11 Q  And in the low -- beneath -- and to the far right,
12    it says, "By: Melody Hansen." Correct?
13 A  Correct.
14 Q  Okay. Had you seen or heard that name prior to
15    July 3rd?
16 A  Only on these faxes that would have come across if
17    I signed and faxed back. As far as dealing with
18    anybody from there over the phone or something, it
19    was something I never did. That was usually
20    Doreen or Dave.
21 Q  Okay. And who did you believe Melody Hansen
22    worked for?
23 A  I had no idea.
24 Q  Okay.
25 A  I would have assumed either Universal Am-Can,

24

6 (Pages 21 to 24)

Page 25

1 Overnite Logistics — or Overnite Express,
2 whatever -- we were acting as an agent for the
3 people that sent the fax over.
4 Q How did you go about making sure the payment was
5 correct, that the amount here was correct?
6 A Well, regionally there are rates that you expect
7 coming out of different areas, especially for one,
8 two, or three drop-loads, which is what this was.
9 So you could look at it and know that they were in
10 the ballpark. And, you know, if it would have
11 shown $400, I would have known right away,
12 [descriptive sound] no. Or if it would have been
13 12 to 14, I would have known that was a very good,
14 high-paying load.
15 Q Okay. Is any of the information on this sheet
16 other than your signature prepared by you?
17 A No. None of it is.
18 Q Okay. Would this have come to Martin's with
19 Melody Hansen's signature on it?
20 A She -- correct. It looks like she was the one
21 that was brokering the load.
22 Q Okay. And did you have any knowledge of what
23 agreement or contract that either Overnite Express
24 or Universal Am-Can had with International Paper
25 with respect to providing transportation services

Page 26

1 to International Paper?
2 A No. They -- no.
3 Q That was not — was that a contract you had ever
4 seen?
5 A No. I mean, I — the contract would have been --
6 no. That was something I would have never seen.
7 Q Okay.
8 A No.
9 MR. SCHRECK: Can you read back the
10 question, please?
11 (Page 25, Line 22 to Page 26, Line 1 read back.)
12 BY MR. BURKE:
13 Q Mr. Podlena, back to Exhibit 11 in front of you,
14 the load number that's referred to there,
15 9000-245546-7, what's your understanding of whose
16 load number that is?
17 A That would be the account -- that would be the
18 pickup number they used at the International Paper
19 warehouse to be able to get through the gate to
20 pick up that load. And we could not have received
21 that except through Universal Am-Can, Overnite
22 Logistics, whatever you want to call it, giving
23 that to us.
24 Q Okay. And right underneath that, it says "agent,"
25 and then there's a number 5511 crossed out, and

Page 27

1 then there's another number, 6073. What does that
2 number refer to, if you know?
3 A I do not know.
4 Q Okay. Now, with respect to the — under Pickup
5 Information, the pickup date is July 3rd of '08 at
6 1900 hours, correct?
7 A 7:00 p.m. Correct.
8 Q Okay. And am I correct that through this
9 document, Overnite Express or Universal is
10 instructing Martin's to pick up paper goods at
11 International Paper's warehouse in Hammond,
12 Indiana, on July 3rd at 7:00 p.m.?
13 MR. FISHER: Form.
14 THE WITNESS: That would be correct.
15 Acting as their agent.
16 BY MR. BURKE:
17 Q Okay. And then additionally, under the Delivery
18 Information then on this document, is
19 Overnite Express or Universal instructing Martin's
20 to make these deliveries in the locations set
21 forth here on July 7 between 7:30 a.m. and
22 4:00 p.m.? Is that correct?
23 A That would be correct.
24 Q And there's three different deliveries set forth
25 here at three different locations, correct?

Page 28

1 Cenveo, Midland, and xpedx?
2 A That looks correct.
3 Q Okay. There's numbers 1 and 2. Like, there's a
4 No. 1 in front of Midland and a 2 in front of
5 xpedx. Is that the order of dropoff, or do you
6 know?
7 A Looking at it, it looks like it would be the order
8 of dropoff.
9 Q Okay. And when would you have signed this? If
10 this came in at about 4:23 on July 3rd, when would
11 you have signed this, Mr. Podlena?
12 A Probably within a few minutes. For all I know,
13 they could have been waiting for that, for this
14 confirmation from them.
15 Q Okay. And would you have faxed it back to
16 somebody?
17 A Correct.
18 Q At United — or at Universal or Overnite Express?
19 A Correct.
20 Q Okay. How would you know where to fax it back to?
21 A That, I do not know. That's what I'm looking for
22 right now. There would have been a fax number,
23 whether it would have been right on the fax
24 machine with these people listed or on this sheet
25 of paper. Oh, here. Here's another name. Please

7 (Pages 25 to 28)

1 sign and fax to John Moore, 800-67[sic]-0706,
2 so --
3 Q Okay. That's in the lower left there?
4 A That is correct.
5 Q Do you see the name Ron McGinnes handwritten or
6 printed on the lower left?
7 A Yes, I do.
8 Q Who was he?
9 A I believe he was the driver that took it up to the
10 cities, to Minneapolis, and delivered.
11 Q Okay. From Martin's up to Minneapolis, you mean?
12 A Correct.
13 Q So are you referring to -- would Mr. Franke bring
14 this load from Hammond back to Wilton and then
15 Ron McGinnes take it to Minneapolis?
16 A That would be correct.
17 Q Who did Ron McGinnes work for?
18 A Martin's. Dave has a number of drivers that
19 primarily ran The Cities and others that primarily
20 ran Chicago, and that's the way they liked it.
21 Some left earlier; some left later. So -- and
22 Ron, from what I can recall, primarily was a
23 Minneapolis driver.
24 Q You know, I also gave you Exhibit 23. Could you
25 take a look at that and --

29

1 know.
2 THE WITNESS: Okay.
3 MR. SCHRECK: Only give what you know.
4 Don't make any assumptions.
5 THE WITNESS: I do not know then.
6 BY MR. BURKE:
7 Q Okay. Do you have any conscious recollection of
8 actually signing this document?
9 A No.
10 Q Okay. Is this the type of document that you would
11 regularly sign when you'd see these things come
12 through the fax machine, as you told us earlier,
13 to try and relieve the others of some work?
14 A That is correct.
15 Q When you would have seen this on July 3rd of 2008,
16 would you recognize the location of this pickup at
17 International Paper's warehouse as one of the
18 regular assignments that Martin's was involved in?
19 A I'm not sure.
20 Q Okay. Well, you said you knew that regularly
21 Martin's transported International Paper's goods
22 on a regular basis, correct?
23 A Okay. Correct.
24 Q Yeah.
25 A I just wasn't -- whether it was day to day, twice

31

1 A Sure.
2 Q -- tell me, is there any difference between that
3 document and Exhibit 11, other than on 23 there's
4 a Universal Am-Can stamp or sticker of some kind
5 that blocks out some of the typewritten content?
6 A That looks -- well, that sticker is actually the
7 load number. After he picked it up, it looks like
8 that's what -- they stamped it on there.
9 Q Okay. So the number -- on Exhibit 23, there's,
10 like, a bar code number, correct?
11 A Correct.
12 Q Okay. And that load number actually
13 corresponds -- or strike that.
14 Underneath the bar code, there's a typed load
15 number of 9000-245546-7; is that correct?
16 A That looks correct, sir.
17 Q And that load number corresponds with the load
18 number that's handwritten up at the top of the
19 broker confirmation sheet, correct?
20 A Correct.
21 Q Okay. And when would this sticker or stamp have
22 been affixed to Exhibit 23?
23 A I would think when it was picked up.
24 Q Picked up --
25 MR. SCHRECK: If you don't know, let him

30

1 a week. I knew it happened --
2 Q Pretty regularly?
3 A Correct.
4 Q With respect to this load and these two documents,
5 did you have any other involvement with this
6 transportation of International Paper goods other
7 than what you've told us?
8 A No.
9 Q Did you ultimately learn that Mr. Franke had been
10 involved in a collision with an automobile?
11 A No. I did not know anything until I was called
12 concerning this deposition in November a year ago
13 or whenever. So no, I was not aware of any
14 accidents whatsoever.
15 Q Okay.
16 MR. SCHRECK: One thing, keep your voice
17 up. I don't know if --
18 THE WITNESS: Oh, I'm sorry.
19 MR. SCHRECK: You tend to fade out.
20 THE WITNESS: Okay.
21 MR. SCHRECK: So keep it up this way
22 he can hear on the phone and --
23 THE WITNESS: Okay.
24 BY MR. BURKE:
25 Q During the days after July 3rd of 2008, did you

32

8 (Pages 29 to 32)

1 ever hear at Martin's or anywhere else that there
2 had been a bad collision involving a Martin's
3 driver and a vehicle in suburban Chicago?
4 A No, I hadn't.
5 Q Did you ever learn of Mr. Franke getting fired or
6 terminated from Martin's?
7 A No, I had not.
8 Q Did you ever speak with Mr. Franke concerning this
9 occurrence?
10 A No. I don't believe I ever spoke with Mr. Franke.
11 I did not really deal with the drivers much at
12 all.
13 Q Did you ever speak to anybody about how this
14 occurrence happened?
15 A No.
16 Q Did you ever learn, you know, other than through
17 your lawyer about any of the facts or details of
18 this occurrence?
19 A No. I didn't know anything about it.
20 Q Okay. What month in 2008 did you leave Martin's?
21 A Would have been November -- probably November 8th.
22 First or second week of November.
23 Q Okay. Take a look at a portion of Exhibit 1 that
24 I will tender to you, sir, which are marked with
25 some -- what we call Bates numbers in the lower

33

1 Q And then it refers to -- or underneath that, it
2 says, "Received from: International
3 Paper - Hammond." Correct?
4 A Yes. It does say that.
5 Q Okay. And the shipment date on these is, in the
6 right, July 3, 2008, correct?
7 A That looks correct.
8 Q Okay. And then there is -- on each of the three I
9 gave you, there's a separate location for the
10 delivery; is that correct? One's for
11 Midland Paper in Minneapolis, one for xpedx, and
12 one for Cenveo?
13 A That's correct.
14 Q Okay. And, for example, on page 1, sir, the memo
15 bill for Midland Paper, do you see the note
16 section?
17 A Yes, sir.
18 Q Okay. And there's some instructions there about
19 contact customer service at Midland, and it gives
20 a phone number and a name to schedule a delivery,
21 and it specifies the delivery hours of 5:00 to
22 2:30. Do you see that?
23 A Yes.
24 Q Okay. Now, what's your understanding of what
25 those instructions are for?

35

1 right corner of UACL/OEI_1, 2, and 3.
2 MR. FISHER: Rich, if it's any help, 18,
3 19, and 20 are probably the ones you're looking
4 for.
5 MR. BURKE: No. I want to show him
6 these at the moment.
7 MR. FISHER: Okay.
8 BY MR. BURKE:
9 Q Here's a copy I have for you there. And those are
10 entitled "Memo Bill," correct?
11 A That's what it says at the top. Correct.
12 Q Okay. And what's your understanding of what a
13 memo bill is?
14 A It looks like they're copies of the bills of
15 lading on those.
16 Q Okay. And what's the purpose of this memo bill?
17 A If the driver would be stopped -- well, like I
18 said, these are copies, but it shows what he's
19 hauling.
20 Q Okay. And, you know, up at the top there, it says
21 the carrier is Oxen. Do you see that?
22 A I do now.
23 Q Okay. Do you know what that designation "Oxen"
24 refers to?
25 A I would say Overnite Express.

34

1 A Those are to the carrier to schedule deliveries if
2 the -- if the broker -- or if they're not made
3 already. That would be up to the carrier to make
4 the appointments between those hours and confirm.
5 Q Okay. With respect to the Midland Paper one that
6 you have here on page 1, are those delivery
7 instructions being given by International Paper to
8 the carrier, Overnite Express, about delivery?
9 A That would be correct.
10 Q And then similarly, on page 2 and 3, there's
11 delivery instructions for the xpedx delivery and
12 the Cenveo, respectively; is that correct?
13 A That is correct.
14 Q Mr. Podlena, could I ask you to take a look at
15 Exhibit 1, pages 19 -- or beginning at page 19
16 through 27?
17 MR. BURKE: If you have that there,
18 Matt.
19 MR. SCHRECK: Yeah. I've got it here.
20 MR. BURKE: Could you please show it to
21 Mr. Podlena?
22 MR. SCHRECK: There's another copy.
23 It's not as shrunk down. I don't know if you want
24 to -- it's in the 60s.
25 MR. BURKE: Let me use this. I mean, if

36

9 (Pages 33 to 36)

1  he wants to look at both, that's perfectly fine,
2  but --
3      THE WITNESS: I can see.
4      MR. BURKE: But just for the record --
5      MR. SCHRECK: That's fine.
6      MR. BURKE: -- I'll ask you to take a
7  look at what we've previously marked as
8  Exhibit 16.
9      Did I say that? I forget if I said
10 that.
11     MR. FISHER: Exhibit 16 or Bates No. 16?
12     MR. BURKE: Well, we've marked -- I'm
13 sorry. We've marked it as Martin Exhibit 16,
14 but --
15     MR. SCHRECK: Well, it's in Exhibit 1,
16 and it's also in Exhibit 16.
17     MR. BURKE: Yeah.
18     MR. SCHRECK: It's the same document.
19 If you want to use 16, that's fine. I'll flip
20 there.
21     MR. BURKE: Yeah. And that is also
22 contained in Exhibit No. 1, pages 19 through 27.
23     THE WITNESS: Okay.
24 BY MR. BURKE:
25 Q  Do you have Exhibit 16 in front of you, sir?

37

1  A  Yes.
2  Q  Okay.
3  A  I do.
4  Q  And that appears to be entitled "Universal Am-Can,
5     Limited, Master Brokerage Agreement"?
6  A  That's what it says. Correct.
7  Q  Okay. And take a look at the third page of that
8     document, which has Bates No. 21 on the lower
9     right.
10 A  Yes, sir.
11 Q  Okay. Is that your signature on that line there?
12 A  Yes, it is.
13 Q  Okay. Do you have any recollection of signing
14    that?
15 A  This one?
16 Q  Yeah.
17 A  I've signed many through the years, so --
18 Q  With respect to this agreement, would you have had
19    any conversations with anybody from Universal
20    Am-Can about this agreement?
21 A  I don't think so. This would have come across
22    just as -- it looks like a fairly normal
23    agreement -- brokerage agreement. They sent
24    across their motor vehicle, their authorization,
25    the typical stuff that any carrier would send or

38

1  any broker would send.
2      And it looks like it would have come through.
3  Most likely, whoever got it -- and it looks like
4  it was me that signed it -- would have said, "Are
5  we going to haul something for these guys?" Or
6  whatever the case may be. I'd have Dave look at
7  it, and I would have signed it then and sent it on
8  its way.
9  Q  In terms of the content of the agreement, it
10    sounds like you would not have discussed that at
11    all with anybody from Universal?
12 A  No. I would not have.
13 Q  Okay. This agreement is dated June 12, 2008,
14    correct? Do you see that on the top paragraph?
15 A  Oh, yeah.
16 Q  Okay.
17 A  Yes, sir.
18 Q  Now, even prior to the date of this agreement, you
19    knew that Martin's was regularly hauling paper for
20    International Paper on that run from Hammond to
21    Minneapolis from the time you first started at
22    Martin's in 2007, correct?
23     MR. FISHER: Foundation.
24     THE WITNESS: I was aware of the load
25  after I was there for a while. To say I

39

1  absolutely knew who they were hauling it for,
2  because of not being that familiar with it, the
3  only thing I would know would be -- from what I
4  can see here, is seeing on the paperwork Universal
5  Am-Can, Overnite Logistics, whatever the case may
6  be.
7  BY MR. BURKE:
8  Q  Yeah. And actually, what I'm talking about is you
9     told us that at some point in time after you
10    started working at Martin's, you became aware that
11    there was a regular run that Martin's would make
12    for International Paper, correct?
13     MR. FISHER: Objection. Foundation.
14  Mischaracterizes his previous testimony.
15     MR. SCHRECK: You can go ahead and
16  answer.
17     THE WITNESS: As far as International
18  Paper, it was a load picked up there. They were
19  actually hauling it for Overnite, Universal
20  Am-Can, whatever the case may be.
21 BY MR. BURKE:
22 Q  Okay. And that's the load I'm referring to.
23 A  Okay.
24 Q  That there was a pickup being made at
25    International at the request of Overnite Express,

40

10 (Pages 37 to 40)

correct?

A  Well, whether it was Overnite or Universal Am-Can. I knew we were representing one or both of those.

Q  Okay. And all I'm asking about now is that you were aware of that -- the transportation of that load and that the pickup of the International goods was taking place regularly, even before this date of June 12, 2008, correct?

A  I believe so.

Q  When you signed this agreement, would you have read through it at all before signing it?

A  I would have glanced at it to see -- and that would be basically it. I'd get these in, oh, one to two a week, and normally they all had the same standardization to them. But to read it word for word, no, I would not have.

Q  Okay. And if I could ask you to take a look at paragraph 3 on page 1, Mr. Podlena. Could you glance at that?

A  Um-hum. Yes.

Q  And while you're at it, look at line 2 and line 4.

Q  Line 2, line 4, and then paragraph 3?

Q  No. Line 2 and line 4 of paragraph 3.

A  Okay.

Q  And while you're at it, I'm just directing your

41

attention to where it refers to providing transportation services.

A  Okay.

MR. SCHRECK: Read that paragraph. Then he'll ask you a question.

THE WITNESS: Okay.

BY MR. BURKE:

Q  Okay. And the subject of that paragraph is that Martin's was going to be providing transportation services for Universal Am-Can; is that correct?

A  That looks correct.

Q  And then let me ask you to look at the last few lines of that paragraph where it talks about complying with federal, state, and local laws. Take a look at that for a moment, please.

A  Here? Okay.

Q  Am I correct that under the terms of paragraph 3, that Universal Am-Can was requiring Martin's to comply with all federal, state, and local laws regarding the provision of transportation services?

A  I would agree.

Q  Okay. And that meant that the truck drivers for Martin's had to comply with all federal, state, and local traffic laws while providing trucking

42

transportation services, correct?

MR. SCHRECK: I'm going to object to foundation. Calls for speculation.

You can go ahead and answer if you know.

THE WITNESS: You would expect the drivers to obey all the rules and regulations of the road. Yes.

BY MR. BURKE:

Q  Okay. And, in fact, under this agreement, Universal was actually requiring the Martin drivers to comply with driving -- local, state, and federal driving laws, correct, as part of this agreement?

MR. SCHRECK: Same objection.

You can go ahead and answer if you know.

THE WITNESS: We would expect all drivers, whether -- to obey the laws, so --

BY MR. BURKE:

Q  And I know and agree that, yes, Martin's would expect all of its drivers to obey those laws.

My question here is that under this agreement, Universal was specifically saying that the Martin drivers had to comply with all federal, state, and local laws, correct?

A  Correct.

43

Q  Okay.

A  As any other company. One thing, if I could add --

MR. SCHRECK: No. No. No. He'll ask you a question.

MR. BURKE: That's up to your lawyer.

MR. SCHRECK: He'll ask you a question, and if it comes up, it comes up.

BY MR. BURKE:

Q  How about under paragraph 5? Take a look at that for a minute, and in particular 5A and -- actually, 5A through D while we're at it.

A  Um-hum. Got it.

Q  Okay. Under this agreement, Universal was requiring that Martin's have certain levels of insurance coverage; is that correct?

A  That is correct.

Q  Okay. And under 5A, Martin's had to have not less than $1 million in public liability and property damage insurance; is that right?

A  That's correct.

Q  And there's other insurance requirements set forth in paragraphs A through -- excuse me, in paragraphs B and C, correct?

A  Correct.

44

11 (Pages 41 to 44)

Q   Okay.  For example, in C, Martin's had to have
workers' comp insurance, correct?

A   Correct.

Q   All right.  And in paragraph D, Martin's was
required to provide Universal with written
certificates confirming that they had such
insurance coverage, correct?

A   That's correct.

Q   Now, paragraph 6 sets forth rules for payment by
Universal to Martin's; is that right?

A   That looks correct.

Q   Okay.  And under -- take a look at the bottom,
about the bottom third.  And I guess more
specifically, seven lines up from the bottom, that
starts with, "Carrier agrees that UACL has the
exclusive right to handle all billing of freight
charges."
        Do you see that, sir?

A   Yes, I see that.

Q   Okay.  Now, under that provision, Universal was
keeping control of all billing procedures,
correct?

A   From the way it looks, yes.

Q   Okay.  And, in fact, it goes on to say that
Martin's had to refrain from any collection

45

efforts against anybody, a shipper or receiver or
consignee, correct?

A   I do not know.  At this point, I'm not a lawyer,
so for me to interpret that --

Q   Okay.  Take a look at the phrase.  It does say
there, "Carrier agrees to refrain from all
collection efforts against the shipper, receiver,
consignor, consignee, or the customer."  Is that
right?

A   Correct.  I see that.

Q   Okay.  And then also in paragraph 7, Martin's
could not solicit any traffic from any shipper or
customer of Universal if the availability of that
traffic first became known to Martin's as a result
of Universal's efforts, correct?

A   That's correct.  That's what I would --

Q   Okay.  And then in paragraph 8, it refers to --
that all the shipments that are the subject of
this agreement are being transported by Martin's
on behalf Universal, correct?

        MR. FISHER:  Objection to form.

        THE WITNESS:  Could you repeat that?

BY MR. BURKE:

Q   Sure.  In paragraph 8, it says that "Carrier
warrants that all shipments transported by carrier

46

on behalf of UACL will be transported under its
motor carrier authority."  Correct?

A   Correct.

Q   Okay.  And this contract refers to Martin's
transporting goods on behalf of Universal,
correct?

A   That actually clarifies so Martin wouldn't
third-party it out and broker it themselves.

Q   Okay.  That's what it goes on to say in the
remainder of the paragraph, correct?

A   That they wouldn't broker it themselves.  That's
correct.

Q   Right.  But whatever shipments are being
transported by Martin's here are being transported
on behalf of Universal, correct?

        MR. FISHER:  Objection.  Form.

        THE WITNESS:  Universal or Overnite.

BY MR. BURKE:

Q   Right.  Depending --

A   Right.

Q   Up until the point in time when Universal
purchased them?

A   Correct.

Q   Okay.  However, in actuality, though, this
agreement is actually entered into with Universal,

47

correct?

A   Well --

        MR. SCHRECK:  Look at what he's pointing
at.

        THE WITNESS:  Where?

BY MR. BURKE:

Q   Just on the front page.

A   Oh, okay.  Correct.

Q   Could you take a look at the third page, Bates
No. 21, sir, paragraph 10?

A   Um-hum.  Okay.

Q   Okay.  And the first part of that says the carrier
will be -- will do the dispatching, correct?

A   Correct.

Q   And then in line 3, am I correct that it states
that the carrier -- which here would be Martin's
under this particular contract, right?

A   Correct.

Q   So am I correct that this says that Martin's
agrees to contact UACL's designated agent with
billing information immediately upon completion of
leaving and with the name of receiver and --

A   Loading?

Q   Or excuse me.  Thank you -- upon completion of
loading and with the name of receiver and status

48

12 (Pages 45 to 48)

1  of delivery immediately upon completion of
2  delivery. Is that correct?
3  A  Yeah. That's exactly what it says.
4  Q  Okay. And those were requirements imposed by
5     Universal on Martin's pursuant to this agreement,
6     correct?
7  A  Correct, which --
8  Q  Okay. And then in paragraph 12 -- let's see.
9     Actually, take a look at the next page, rather,
10    page 22. Is that a copy -- let's see. Not 22.
11    23. How about 24? That's what I'm looking for,
12    sir.
13       Is that a copy of a certificate of liability
14    insurance for Martin's?
15 A  That's correct.
16 Q  Okay. And would this have been provided to
17    Universal in response to their requirement that
18    Martin's provide evidence of the amount of
19    liability insurance that Universal required
20    Martin's to have?
21 A  That's correct.
22 Q  Okay. And here, this certificate refers to
23    $1 million in coverage; is that correct?
24 A  That looks correct.
25 Q  Do you know if Martin's had any other insurance

49

1  coverage other than this $1 million?
2  A  I would have no idea.
3  Q  How about any -- what's sometimes referred to as
4     excess or umbrella coverage?
5  A  I would have no idea. I was not privy to anything
6     like that.
7  Q  Earlier we talked about on that broker
8     confirmation sheet, there was -- $974 was the
9     rate?
10 A  Yeah.
11 Q  Was that -- you would not have -- or strike that.
12       Did you negotiate that rate?
13 A  No, I did not.
14 Q  Okay. Would that rate have been predetermined by
15    some agreement between Dave Martin or somebody
16    else at Martin's and Universal?
17 A  It would have gone through Dave and -- yeah.
18    Something like that.
19       MR. BURKE: Okay. I don't think I have
20    anything else at the moment, Mr. Podlena.
21       MR. FISHER: Take a quick break?
22       MR. SCHRECK: Yeah.
23 (A recess is taken from 12:16 p.m. to 12:28 p.m.)
24       E X A M I N A T I O N
25

50

1  BY MR. FISHER:
2  Q  Mr. Podlena, my name is Carl Fisher. I represent
3     Universal Am-Can, Limited, as the successor to
4     Overnite Express. I also represent International
5     Paper and a company called Ox, LLC.
6        Let's start with that last named company.
7     Does that name mean anything to you, Ox, LLC?
8  A  No.
9  Q  Okay. I want to go back a little bit in your
10    experience when you were describing for us the
11    work you did for other companies --
12 A  Sure.
13 Q  -- and ask you a few questions. Organic Valley.
14    You said they didn't have any trucks, correct?
15 A  That's correct.
16 Q  And your work was as a logistics manager, and you
17    described, you know, what you did.
18       In that capacity as logistics manager for a
19    little under ten years at Organic Valley, did you
20    have to ever deal with any trucking companies or
21    delivery companies?
22 A  Positively.
23 Q  Okay. Let's separate them out. With respect to
24    the trucking companies, describe for me briefly
25    what your relationship was with the trucking

51

1  companies with which Organic Valley had a
2  relationship to get their business, you know,
3  done.
4  A  Totally, I probably dealt with over 50 to 60
5     trucking companies, which were delivery. They did
6     our deliveries for us, to the tune of about
7     $100 million a year.
8  Q  And do you remember the names of any of these
9     trucking companies?
10 A  Sure.
11 Q  Okay.
12 A  Minn-Tex, which is out of Brainerd, Minnesota, I
13    believe it was. KCX, which is Kansas Continental
14    Express, which was a broker. I can give you phone
15    numbers if you'd like.
16 Q  No.
17 A  Walbon out of Minneapolis. Darby, I dealt with
18    him a lot. All these guys. I'm trying to think
19    of others. Well, Marten hauled some for us.
20 Q  And when you say "Marten," do you mean Martin's
21    Bulk Milk or do you mean Marten with an E?
22 A  Both, actually. I was as familiar with Marten
23    with an E out of Mondovi. The brokerage manager
24    up there is a good friend of mine. I knew him way
25    before I knew Dave Martin.

52

13 (Pages 49 to 52)

1  Q  Okay. And with respect to those companies, a few
2     of which you gave me examples, were there written
3     contracts with those companies?
4  A  Yes.
5  Q  And were they written contracts in which Organic
6     Valley was acting as the shipper?
7  A  Yes. We were acting as the shipper, and they had
8     to adhere to our organic policies and provide
9     proof of insurance.
10 Q  All right. And were there written contracts in
11    which Organic Valley indicated to the trucking
12    companies that Organic Valley was using language
13    like what was contained in the brokerage agreement
14    that Mr. Burke showed you, which specifically in
15    paragraph 15 said that under no circumstances was
16    the trucking company or the carrier supposed to be
17    considered an agent, but instead was an
18    independent contractor? Did your Organic Valley
19    contracts with trucking companies have such
20    language in them?
21 A  I'm not sure I followed that.
22 Q  Sure. Why don't you look at one of the exhibits
23    that Mr. Burke showed you. I believe it was the
24    brokerage agreement, and I think it was Exhibit --
25       MR. SCHRECK: 16?

53

1        MR. SCHRECK: I'll join.
2        MR. FISHER: You can go ahead and answer
3     now.
4        MR. SCHRECK: If you know.
5        THE WITNESS: Okay. Actually, the
6     wording with Organic Valley was they did act as an
7     agent. Because of the organic industry, they had
8     to adhere to just hauling certain things in their
9     trailers so that there was no contamination.
10       And they were graded on their
11    deliveries, the mannerisms of the drivers. And
12    that is what either kept them delivering for us or
13    why we got rid of them, if their drivers were
14    rude, anything like that.
15 BY MR. FISHER:
16 Q  So let me make sure I understand this. So in
17    these contracts that Organic Valley had with its
18    trucking companies, there was language in these
19    contracts that you have personal knowledge of that
20    said, in effect, ABC Trucking Company, you are the
21    agent of Organic Valley?
22 A  That is correct.
23 Q  Okay.
24 A  That wording at Organic Valley.
25 Q  All right.

55

1        MR. FISHER: Yeah. Go to that one.
2  BY MR. FISHER:
3  Q  And if you look at the -- there's a bunch of
4     whereas, you know, preamble paragraphs at the
5     beginning, and then there's some numbered
6     paragraphs.
7  A  Yes, sir.
8  Q  And do you see where in paragraph 3, it says,
9     "Carrier" -- referring to Martin's Bulk Milk --
10    "is an independent contractor and is in no way to
11    be considered an agent, employee, or joint venture
12    of UACL"?
13 A  Yes.
14 Q  Do you see that language?
15 A  I see that.
16 Q  Was that the typical type of language that was
17    contained in the contracts that you saw that
18    Organic Valley had with the trucking companies
19    that it did business with?
20 A  No.
21 Q  That is to say, that Organic Valley did not want
22    to have those trucking companies considered to be
23    its agents?
24       MR. BURKE: Objection. Vagueness.
25    Form.

54

1  A  Because it was literally starting -- when I first
2     got there, they had about five trucks going out a
3     week. And when I left, we were pushing over 200.
4     So as the company grew, the wording evolved.
5  Q  Okay. And when that wording evolved, is it your
6     understanding that Organic Valley then took on the
7     responsibility of every trucking accident, every
8     accident that any of those truck drivers had when
9     they were on the road?
10       MR. SCHRECK: Objection to form.
11    Foundation.
12       You can go ahead and answer if you know.
13       THE WITNESS: They didn't take on the
14    responsibility -- you know, I don't know as far as
15    that. I don't think they would have taken on
16    responsibility. They were -- we were concerned
17    about the cost of the load and us getting
18    reimbursed for it. That's where -- if that's what
19    you're getting at.
20 BY MR. FISHER:
21 Q  I'm trying to get at an understanding of the words
22    you used in answer to Mr. Burke's questions, and
23    we're going to be returning to this subject in
24    many different settings.
25 A  Okay.

56

14 (Pages 53 to 56)

1  Q   I'm trying to find out what you did for Organic
2      Valley.
3          Is it your testimony, sir, that Organic
4      Valley had contracts with their trucking
5      companies, Organic Valley considered those
6      trucking companies and their drivers to be agents
7      of Organic Valley, and that therefore, when one of
8      those truck drivers for a trucking company -- the
9      ABC Trucking Company or Martin's -- had an
10     accident and killed somebody, Organic Valley was
11     responsible for that because the trucking company
12     was its agent out on the roadways? Is that your
13     testimony, sir?
14  A   No, it would not be.
15  Q   Then what do you mean by the word "agent"?
16  A   Agent as far as delivering, representing -- agent
17     representative, delivery, how they acted. They
18     were representing and acting as an agent of
19     Organic Valley as far as rudeness, things like
20     that. You know, that's what I'm --
21  Q   Well, why wouldn't this truck driver of the
22     hypothetical ABC Trucking Company driving loads
23     for Organic Valley -- why wouldn't that driver's
24     negligence, for example, and driving through a
25     stop sign and killing somebody be Organic Valley's

57

1      responsibility if that trucking company and its
2      employee driver were Organic Valley's agents?
3          MR. SCHRECK: Object. Form.
4      Foundation. Calls for a legal conclusion.
5          You can answer if you know.
6          THE WITNESS: On that one, I couldn't
7      answer. I mean, I would be speculating as far
8      as -- you know, that's -- I don't have an answer
9      to that.
10  BY MR. FISHER:
11  Q   Why were you then so willing to tell Mr. Burke in
12     response to his questions that Martin's Bulk Milk
13     or Mr. Franke were acting as the agent or the
14     representative of Universal Am-Can or
15     Overnite Express, sir?
16         MR. BURKE: Objection to form.
17     Argumentative.
18         MR. SCHRECK: Join.
19         THE WITNESS: That was the terminology
20     I've just always seen in the warehousing/trucking
21     industry. The wording, agent representative, you
22     were representing the company. And I dealt more
23     with the deliveries and the procedures -- the
24     deliveries and the trucking companies dealing with
25     the customers. That's what I'm speaking of.

58

BY MR. FISHER:
1
2  Q   So when this Universal Am-Can, Limited, master
3      brokerage agreement came across your desk for
4      signature in June of 2008 -- and I acknowledge you
5      said you glanced at it or skimmed it -- this
6      language in paragraph 3, "Carrier is an
7      independent contractor and in no way to be
8      considered an agent of UACL," that language didn't
9      come as a surprise to you in light of your
10     experience?
11  A   No. Truthfully, what most of these -- this paper
12     was for was to keep -- lots of times was to keep
13     companies from coming in and hauling a load for a
14     broker and then undercutting the broker so that
15     they could come to Organic Valley and undercut the
16     broker and get ten loads and the broker's left
17     out.
18  Q   Back solicitation?
19  A   That would be a good example.
20  Q   And that's something you wouldn't want to happen?
21  A   Well --
22  Q   Or excuse me. That's something that the broker or
23     the shipper might not want to have?
24  A   It was unethical. I mean, if somebody would do
25     that, what's to say they wouldn't drop 15 of your

59

1      loads in one week and say, we don't want to haul
2      these because we've got 5 cents more a mile from
3      another company?
4          So if they're going to do that, undercut
5      somebody to get your business, how do you know
6      they won't -- like I said, it's just unethical.
7      And that's what I'm speaking of in that respect,
8      acting as an agent. And that's my familiarity
9      with it.
10  Q   Okay. So to summarize this point and I'll move on
11     to a different perspective on this, when you used
12     the phrase "acting as an agent" in the context of
13     a company who's either a shipper or a broker and
14     wants to have some product moved somewhere with a
15     carrier or trucking company, your use of the word
16     "agent" is simply intended to reflect that the
17     trucking company is moving goods on behalf of the
18     broker or the shipper?
19         MR. BURKE: Objection to the form of the
20     question. His testimony speaks for itself.
21         MR. SCHRECK: I'll join.
22         You can answer.
23         THE WITNESS: I'd have to hear the
24     question again.
25         MR. FISHER: She'll be able to reread it

60

15 (Pages 57 to 60)

1  for us.
2        (Previous question read back.)
3        THE WITNESS: From my perspective at
4  this time.
5  BY MR. FISHER:
6  Q   Okay. Now, I want to talk about a different
7      delivery service. Okay?
8        When you were at Organic Valley, would you in
9      your work occasionally use a company like FedEx or
10     UPS to send letters or correspondence or some type
11     of paperwork out?
12 A   If we did, it wasn't through me because I dealt
13     with trucking companies. I mean, through the
14     offices they may have, but I had nothing to do
15     with FedEx or anything like that.
16 Q   Have you yourself ever sent out a UPS or FedEx
17     envelope personally?
18 A   Yeah.
19 Q   Yes?
20 A   Yes. Yes.
21 Q   Okay. And when you did that, would you have
22     expected that in that situation, knowing what you
23     know about the words "on behalf of,"
24     "representative agent" as you're using those
25     words, would you expect that someone who's injured

61

1  by a FedEx or a UPS driver who's transporting your
2  package to its intended delivery point, that the
3  injured person could come to you and claim you're
4  responsible for the UPS or FedEx driver's
5  negligence?
6        MR. BURKE: Objection. Form.
7  Vagueness. Speculation.
8        MR. SCHRECK: I'm going to join. Also,
9  form.
10       MR. BURKE: Relevance.
11       MR. SCHRECK: Form. Incomplete
12 hypothetical.
13       You can go ahead and answer if you know.
14       THE WITNESS: I don't know. With the
15 laws the way they are, I would believe anything
16 now. But I wouldn't think that by me sending a
17 letter through the -- or through FedEx, that
18 someone could come back and sue me if that driver
19 had a wreck. I don't know.
20 BY MR. FISHER:
21 Q   Think of the U.S. Postal Service. You pop
22     letters -- I know snail mail isn't used very much
23     anymore, but you pop things in the mail, right?
24 A   Sure.
25 Q   And if a United States Postal Service driver was

62

1  negligent and killed somebody, do you think,
2  understanding your use of the words "agent
3  representative," "on behalf of," that that Postal
4  service driver, his negligence you are responsible
5  for?
6        MR. BURKE: Objection. Form.
7  Vagueness. Calls for speculation. Lack of proper
8  hypothetical.
9        MR. SCHRECK: Join.
10       THE WITNESS: I don't know.
11       MR. SCHRECK: Also form, if that wasn't
12 raised.
13       Go ahead.
14       THE WITNESS: I don't know, because my
15 feelings would be different than what the law is.
16 McDonald's getting sued for a million dollars for
17 spilling a cup of coffee. I mean, I don't know.
18 I don't really have an answer. What I think and
19 what has happened, I don't know.
20 BY MR. FISHER:
21 Q   So when you used the words, as you did repeatedly
22     in answer to some of Mr. Burke's questions, you
23     used the phrases "acted as a representative of" or
24     "acted as their agent" or "acted as the agent of"
25     or "acted as a representative agent of," when you

63

1  used those terms and phrases, were you saying,
2  sir, that -- were you making any conclusion that
3  International Paper or Universal Am-Can or
4  Overnite Express was legally responsible for the
5  actions of Mr. Franke on the evening of July 3,
6  2008?
7        MR. BURKE: Objection. Lack of
8  foundation. Calls for legal conclusions beyond
9  the scope of this gentleman's experience to the
10 extent you request legal liability opinions of
11 this man.
12       MR. SCHRECK: I'll join. Also, I don't
13 know if he used all of those terms, but join.
14       MR. FISHER: He used every one of them.
15 I can guarantee you that.
16       MR. SCHRECK: You can answer.
17       THE WITNESS: My knowledge is -- from
18 previous experience would be that as far as acting
19 as a company representative, I don't know what the
20 legal ramifications would be, but you would be
21 acting as a -- as an agent. I mean, I've never
22 had any -- my God. In eight years, nine years, we
23 never had any real accidents as far as the
24 carriers that I used, so I've never -- I would not
25 know. But they all acted -- and that was one

64

16 (Pages 61 to 64)

1 thing we talked about, was they were acting as
2 agents, so we expected them to act as we would
3 hope they would.
4 BY MR. FISHER:
5 Q What was Mr. Franke doing on the evening of
6 July 3, 2008?
7 A I have no idea.
8 Q What was Mr. Franke's -- what were Mr. Franke's
9 interactions with Universal Am-Can?
10 A I would have no idea.
11 Q What were Mr. Franke's interactions with
12 International Paper Company?
13 A I would have no idea.
14 Q What were Mr. Franke's interactions with
15 Overnite Express?
16 A Now, excuse me. Are you talking him personally?
17 I mean, he was going to pick up a load, but I
18 don't know if --
19 Q Yeah. Him personally.
20 A As far as conversations, I would have no idea. I
21 mean, it looks like he was dispatched to pick up
22 the load.
23 Q But other than you're reading some papers --
24 strike that.
25 Since you have absolutely no personal

65

1 knowledge of what Mr. Franke was doing on July 3,
2 2008, or for that matter any other day since you
3 never met him, never talked with him, can you tell
4 me what it is Mr. Franke was doing on July 3,
5 2008, of your own personal knowledge?
6 A Only from what I can see. He was dispatched to
7 pick up the truck, or the load.
8 Q And tell me what it is you see that from your own
9 personal knowledge that you had on July 3, 2008.
10 A On the paperwork, that he was dispatch -- sorry.
11 Q Let me see if I can clarify. I'm not asking you,
12 Mr. Podlena, to tell me what it is you figured out
13 now, all right, after perhaps having had a chance
14 to look at some documents.
15 I'm asking you to go back to July 3, 2008,
16 when you were an employee of Martin's Bulk Milk
17 and tell me, at that time frame, what was it
18 Mr. Franke was doing on that day? What knowledge
19 would you have had of what Franke was doing?
20 A I would probably have no knowledge.
21 Q Okay. Would you have had any knowledge of what
22 Mr. Franke was doing in the days and weeks before
23 then?
24 A No.
25 Q And would you have had any knowledge of whether or

66

1 not anybody from Martin's Bulk Milk was involved
2 at all with any loads for International Paper in,
3 say, the month of June and the first couple days
4 of July 2008?
5 A I saw the faxes come across, so I know we were
6 hauling some loads for them.
7 Q But you wouldn't have known who the driver was
8 that was going from Wilton down to Hammond,
9 Indiana; is that a fair statement?
10 A No. That's a fair statement.
11 Q If you wouldn't look at Exhibit 64. I'll tell you
12 that we've had a chance in this case to get
13 documents -- exchange documents between the
14 parties.
15 A Sure.
16 Q And Exhibit 64 is a collection of Overnite load
17 and rate confirmations from May 30, 2008, until
18 June 13, 2008. So if you could just look at those
19 documents --
20 A Sure.
21 Q -- and just familiarize yourself with them by
22 glancing through them and see if you recognize
23 those documents, Exhibit 64.
24 A These are the ones that I'd see come across on the
25 fax.

67

1 Q Okay. And so if we look at the first page of
2 Exhibit 64 -- actually, the second page of
3 Exhibit 64, that's a two-page load and rate
4 confirmation sheet?
5 A That looks correct.
6 Q All right. And on the first page -- before we go
7 to your signature on the second page, is there any
8 handwriting on the first page of the May 30th load
9 and rate confirmation sheet that is yours?
10 A No. None of that is.
11 Q On the second page, does your signature appear?
12 A Yes, it does.
13 Q Now, do you see where it says up above
14 Melody Hansen's signature that there is a
15 different fax number to send it to?
16 A Yes. I see that.
17 Q And the fax number is (708)331-8604?
18 A Yeah. I see that.
19 Q Do you see that?
20 A Correct.
21 Q Okay. And do you remember when you were asked
22 questions before about the UACL broker
23 confirmation sheets and you didn't know what that
24 particular fax number was?
25 A Okay.

68

17 (Pages 65 to 68)

Q   I'll represent to you that if you look at the UACL
ones, that particular fax number appears. Okay?
A   Okay.
Q   All right. So in light of the fact that you've
signed this one on May 30th and then all of the
remainder -- and skim through them with me if you
would. All the remainder of the load and rate
confirmation sheets from May 31st up through
June 13th have your signature on them?
A   That doesn't surprise me.
Q   And do you see your signature on all of those,
stretching right out to June 13th?
A   Yeah. Yeah, I see it.
Q   Okay. So for that approximate two-week time
period, you are faxing back to Ms. Hansen at the
(708)331-8604 number these two-page Overnite load
and confirmation sheets?
A   Sure.
Q   All right. Earlier you said in response to
one of Mr. Burke's questions -- or at least I got
the impression that you might be called in to do
this, sort of, if there was some help needed.
    Does the fact that your signature appears on
every one of these suggest to you now, several
years later, that this was a part of your regular

69

job as opposed to just by happenstance, Dave might
say, "Hey, handle this one"?
A   No. As far as handling this load and dispatching
drivers, that was not my job. I had nothing to do
with that. I got this paperwork along with
another 10 to 20 pages every couple hours off the
fax, went through them. The majority of those
were loads coming back from Kroger in Indiana or
Lubbock, Texas. And these would be in there, and
I would sign them and fax them off.
Q   So that was a part of your regular job, or it was
just coincidence that you had a two-week span of
doing all of these -- concerning these particular
loads?
A   If you went back, I probably went through these
for -- off and on for a couple months, if not
longer.
Q   Okay. So it was a regular part of your job, or
was it just random that Dave Martin would have you
handle these?
A   It was random.
    MR. SCHRECK: I think you have a
disconnect with him. I think what Mr. Fisher is
asking you is about the actual fax that you signed
and sent back, not necessarily any other

70

involvement.
    MR. FISHER: Right. Right.
    THE WITNESS: This was still relatively
random, because Nancy handled this as opposed
to -- probably as much as anybody. If it was
there, you'd confirm, sign it, and fax.
BY MR. FISHER:
Q   Okay. Do you see in the upper right-hand corner
the word "dispatcher"?
A   Um-hum.
Q   And then the words "Nancy/Dave Martin/Pat"?
A   Um-hum.
Q   Is Pat you?
A   I believe so.
Q   Okay. All right. Now, if you would skip to
Exhibit 65. And do you see that on the first page
of Exhibit 65, this is the first broker
confirmation sheet that is coming from Universal
Am-Can, notwithstanding the fact that Overnite
Logistics' name appears on the documents? Do you
recall that being the transition time, middle of
June, where you're now filling out and signing
broker confirmation sheets that are only one page
as opposed to two pages?
    MR. SCHRECK: I'll object to the extent

71

you're asking him about filling it out. Lack of
foundation then.
    THE WITNESS: As far as recalling that
it went from one -- or two pages to one, no.
BY MR. FISHER:
Q   You don't have a memory of that?
A   No.
Q   Okay. And you see your signature that appears on
the rest of the broker confirmation sheets that
appear as a part of Exhibit 65?
A   Sure.
    MR. SCHRECK: Well, look at them first
before you answer the question.
    THE WITNESS: Well, I mean, every page
looks like -- yeah. You're probably talking 100
pages every couple days.
BY MR. FISHER:
Q   All right. So was it a part of your job routinely
then to fill out these broker confirmation sheets?
    MR. SCHRECK: Object to form. Misstates
his prior testimony.
    THE WITNESS: To fill them out?
BY MR. FISHER:
Q   Let me rephrase.
    Was it a part of your job -- a routine part

72

18 (Pages 69 to 72)

1  of your job in June of 2008 to sign the broker
2  confirmation sheets that came from Melody Hansen
3  of Universal Am-Can?
4  A  It was something I would have done after I
5  confirmed with a dispatcher and then faxed it on.
6  Q  And when you confirm with the dispatcher, to whom
7  are you referring?
8  A  Either Dave or Nancy.
9  Q  Do you know whether or not this was a dedicated
10  load that was being done by somebody from Martin's
11  Bulk Milk?
12  A  I would -- I don't know how many times a week, but
13  I know we were doing it, like, on a weekly basis
14  at least.
15  Q  Okay. Look, if you would, at the broker
16  confirmation sheet that -- it's about seven or
17  eight back. I'll get you the date. It has two
18  dates on the top, 6/23 and 6/24. Do you see the
19  one that has --
20  A  Oh, sure.
21  Q  -- two fax transmissions up at the top?
22  A  Um-hum.
23  Q  Yes?
24  A  Yes, I do. I'm sorry.
25  Q  And do you see -- halfway down, do you see where

73

1  that the broker confirmation sheets were sent to?
2  A  Yes, I do see that.
3  Q  Do you know why it is that these -- this
4  particular signed master broker agreement has two
5  fax transmission dates on it?
6  A  No, I do not.
7  Q  Do you know whether or not the changeover from
8  Overnite Express to Universal Am-Can was June 12th
9  or June 13th?
10  A  I have no idea what day it was.
11  Q  Do you know whether or not on June 17th, you sent
12  this document to Universal Am-Can with your
13  signature as it appears on the third page, as
14  opposed to it being sent on June 12th?
15  A  Do I know why?
16  Q  No. Do you know if that's the case? And to help
17  you out, if you look at the bottom of the
18  document, you'll see upside down the fax
19  transmission from Martin's Bulk Milk with a date.
20  A  I see that.
21  Q  Okay.
22  A  But why, I do not know.
23  Q  All right. So you don't know whether or not,
24  perhaps with June 12th I think being a Friday,
25  whether or not the following week, Universal

75

1  there's an initial number 891.69 that's struck and
2  then a 1226.18 with the initials TT, it appears?
3  A  I see that.
4  Q  Do you know the circumstances of why something
5  like this would happen?
6  A  No, I do not.
7  Q  Do you know whether or not perhaps after the
8  broker confirmation sheet was faxed, if perhaps an
9  additional load was added?
10  A  That is possible. That would be one reason it
11  would jump up.
12  Q  Okay. I'm done with 64 and 65.
13  Let's go back, if we could, to Martin's
14  Exhibit 16. A few minutes ago, I showed you a
15  broker confirmation sheet that had two fax
16  transmissions on the top. Do you see on
17  Exhibit 16 that this particular copy of the
18  Universal Am-Can, Limited, master brokerage
19  agreement dated June 12, 2008, has two fax
20  transmission --
21  A  Yep.
22  Q  -- dates and times at the top?
23  A  Yes, I do.
24  Q  Do you also see that the number (708)331-8604
25  appears to be the same number that was the fax

74

1  Am-Can said, "Hey, you haven't sent us this signed
2  master brokerage agreement. In order to continue
3  doing business with us, you need to send this
4  signed brokerage agreement"? Do you know if that
5  happened?
6  A  No, I do not.
7  MR. BURKE: Objection to the form.
8  Go ahead.
9  MR. SCHRECK: I'll join.
10  THE WITNESS: I have no idea.
11  BY MR. FISHER:
12  Q  With respect to the memo bills or bills of lading
13  that you were shown earlier in the deposition --
14  A  Yes, sir.
15  Q  -- is that the type of documentation you would
16  have seen or not seen in the ordinary normal
17  course of your business day? I'm just talking in
18  general, not these in specifics.
19  A  Those look like a normal bill of lading that would
20  come through from any company.
21  Q  I understand that, but would you have had contact
22  with them, or would the drivers instead have had
23  contacts with them?
24  A  The drivers would have.
25  Q  Do you know who Cecelia Delaney was?

76

19 (Pages 73 to 76)

1 A  She was someone who worked there way before I did.
2 Q  Was she in dispatch?
3    MR. SCHRECK: When you say "there," who
4 are you referring to?
5    MR. FISHER: Right. Good point.
6    THE WITNESS: Oh. Cecelia Delaney?
7 BY MR. FISHER:
8 Q  Yeah.
9 A  She was there before I was.
10 Q  "There" meaning Martin's?
11 A  Correct.
12 Q  Okay.
13 A  The only reason I'm familiar with the name was
14 because when I was at Organic Valley -- I'm not
15 sure if she was a dispatcher. I was thinking she
16 had something to do with rates, and I think I
17 dealt with her or one of my associates did as far
18 as getting rates, or she came by trying to drum up
19 business and gave us rates. That's the only
20 reason I know that name.
21 Q  Do you know whether or not she would have been in
22 a position similar to yours in that she had the
23 authority and the ability to sign brokerage
24 agreements?
25 A  I don't know on that one.

77

1 Q  All right. Look, if you would, to Exhibit 72.
2 And this document was given to us by Martin's Bulk
3 Milk. If you look at the second page, you'll
4 see -- on this Overnite carrier-broker contract
5 dated in 2002, you'll see Cecelia Delaney's name
6 and signature.
7    Now, in this context, do you know whether or
8 not she had the authority to sign, you know,
9 broker contracts like these on behalf of Martin's?
10    MR. BURKE: Objection. Asked and
11 answered.
12    MR. SCHRECK: Join. Also, form and
13 foundation.
14    Go ahead and answer if you know.
15    THE WITNESS: I don't know.
16 BY MR. FISHER:
17 Q  If you look at the page that follows after the
18 page where her signature appears, you see where
19 there's a form entitled "Carrier Profile"?
20 A  Where am I?
21 Q  See the document right there?
22 A  Oh, sure.
23 Q  Okay. In your experience, did brokers many times
24 send to motor carriers as the relationship started
25 and loads were going to be transported from

78

1    point A to point B -- was there information that
2 the broker would request from a carrier such as is
3 reflected on this carrier profile sheet?
4 A  They would ask where your strengths are, in what
5 regions, and your rates. So something similar to
6 this, yeah. Yes.
7 Q  All right. If you would now go to Exhibit 73.
8 And you see that's a dated 2004 master brokerage
9 agreement between Universal Am-Can and Martin's
10 Bulk Milk. I know it predates your time at
11 Martin's, but I want to focus your attention on
12 the second page. Do you see where it says
13 Doreen West, and her signature appears above the
14 line "authorized signature"?
15 A  Correct.
16 Q  Do you know who Doreen is?
17 A  Yes. Yep.
18 Q  Who is she?
19 A  She was -- or still is a dispatcher at Martin's.
20 Q  To the best of your knowledge, was she, like you,
21 authorized to sign such contracts?
22    MR. SCHRECK: Objection. Form.
23 Foundation.
24    THE WITNESS: As far as like me? I
25 don't know. Anything I signed usually was on

79

1    behalf of Dave or -- yeah. I'm sure she was
2 authorized.
3 BY MR. FISHER:
4 Q  Okay.
5 A  I don't know. I can't answer.
6    MR. SCHRECK: He doesn't want you to
7 speculate.
8    THE WITNESS: Okay.
9    MR. SCHRECK: Only speak to what you
10 know.
11    THE WITNESS: Okay.
12 BY MR. FISHER:
13 Q  The fact that -- let me ask it a different way.
14    The fact that her signature appears above the
15 line that says "authorized signature," knowing
16 what you know of how Martin's Bulk Milk operated
17 at the time you worked there for about a year, do
18 you presume that Doreen had the authority to sign
19 such a contract?
20    MR. SCHRECK: Objection. Form.
21 Foundation. Calls for speculation.
22    You can go ahead and answer.
23    THE WITNESS: That's a tough question.
24 Actual authorization probably would have been --
25 it would have had to have been flown by Dave

80

20 (Pages 77 to 80)

first.

BY MR. FISHER:

Q   Okay. And, I mean, for example, presumably people like you, people like Doreen are not going to be signing documents that you're not allowed to sign; fair statement?

MR. SCHRECK: Objection. Calls for speculation.

THE WITNESS: After it was looked over, we were signing in proxy you might say, I guess. I mean, it is what it is.

BY MR. FISHER:

Q   What does that mean?

A   It's our signature. I mean, as far as dealing with the carriers or dealing -- you know, that's all I can say.

Q   Okay. Look at Exhibit 74. Do you recognize on the second page the name Jay O'Neil? Do you know who that person is?

A   No. I've never seen -- Jay O'Neil?

Q   If you don't know, just tell me you don't know.

A   No. I don't know Jay O'Neil.

Q   All right. Look at Exhibit -- now I'm going to Exhibit 15. Mr. Podlena, I will represent to you that other witnesses in this case have testified

81

and have referenced some documents that show the purchase -- the asset purchase of Overnite Express by Universal Am-Can on either June 12th or June 13, 2008. Okay?

So with that as a point in time, do you see on Exhibit 15, this appears to be a Universal Am-Can, Limited, master brokerage agreement dated November 7, 2007, which is before, obviously, June of '08, which bears your signature on the third page?

A   Yeah. I see that.

Q   Okay. Now, do you have any knowledge of what business relationship Martin's Bulk Milk had with Universal Am-Can's brokerage division in November of 2007 that would have caused you to sign this particular agreement in November of '07? Does this bring back any memories?

A   No, it doesn't.

Q   All right. But is it fair to say that when you signed this agreement, as reflected by your signature on the third page of Exhibit 15, you had the authority to sign that agreement?

A   Yeah.

Q   And that authority would most likely have come from Dave Martin?

82

A   Correct.

Q   I'm not suggesting this is the case. Is it possible the authority came from his parents?

A   I couldn't answer that. I've never really been involved with his parents, so I don't know.

Q   So Dave Martin is the person you would have gotten authority to sign this document from?

A   Most likely. Either him or Doreen would have looked at it.

Q   Okay. Now, do you see on the next page of Exhibit 15, after your signature page, there's a carrier survey. Do you see that?

A   Um-hum.

Q   Now, do you see, however, that on this carrier survey, it has transmissions up at the top of June 12, 2008, June 17, 2008, and then upside down on the bottom, it has the transmission from Martin's Bulk Milk of June 17th at a time that follows the times that are reflected at the top from Overnite, or we know Universal Am-Can? Do you see those dates and times?

A   Yeah. I see those.

Q   Did you fill this out or did somebody else fill this out, if you know?

A   This looks -- it looks like my handwriting.

83

Q   Okay. And in light of the fact that I previously showed you that master brokerage agreement, Exhibit 16, that had the double transmission, you know, dates and times at the top --

A   Um-hum.

Q   -- is it likely that this survey form was sent in at the same time by you on June 17, 2008?

A   I would, most likely. At that time they were filling out -- we had this form, which we didn't send. We stopped shortly after that. I would think that would have gone with it.

Q   Okay. And give me one second here. And pardon me for flipping back and forth, but is 16 next? Just hold that page. We'll come back to it.

But do you see on Exhibit 16 -- do you see how the June 17th time is 13:24, or 1:24 in the afternoon, and then at the bottom, the time reply is -- appears to be 15-something, or 3:00 in the afternoon? Either 15 or 13.

A   That's 13:02.

MR. SCHRECK: You gotta speak up.

THE WITNESS: I see 13:02 on there. Is that what --

BY MR. FISHER:

Q   Okay. Well, look at the bottom of Exhibit 15, the

84

21 (Pages 81 to 84)

1  page that is the carrier survey.
2  A  Okay.
3  Q  And do you see at the bottom of that upside down,
4     June 17, 2008, 13:03?
5  A  Yes.
6  Q  Okay.
7  A  I see that.
8  Q  So in light of me showing you this survey in your
9     handwriting and Exhibit 16, which is the completed
10    June 12, 2008, master brokerage agreement, is it
11    likely, sir, that on the afternoon of June 17,
12    2008, you not only returned to Universal Am-Can
13    the signed master brokerage agreement dated
14    June 12th, but you also returned the filled-out
15    carrier survey?
16 A  Yeah.  That would be appropriate.
17 Q  All right.  Now, I want to move on from the
18    carrier survey document to Exhibit 75. I will
19    represent to you, sir, that Exhibit 75 is produced
20    also by Martin's Bulk Milk.  And as you can see on
21    the first three pages, in much, much, you know,
22    larger type font, the three-page June 12, 2008,
23    master brokerage agreement appears there as those
24    first three pages of Exhibit 75, correct?
25 A  Correct.

85

1  Q  All right.  And then the next page of Exhibit 75
2     is the carrier survey?
3  A  Correct.
4  Q  And that's in your handwriting?
5  A  Yes.
6  Q  And then the next page is entitled "Welcome to the
7     Universal Am-Can, Limited, Brokerage Division."
8        Do you see that document?
9  A  Yes, sir.
10 Q  Do you remember receiving this document, since it
11    comes from the Martin's Bulk Milk files,
12    explaining what it is a company such as Martin's
13    Bulk Milk was to do in order to engage in
14    transportation services with Universal Am-Can?
15       And feel free to read the whole page, because
16    I'm going to be asking you questions about the
17    whole page.
18 A  Okay.  Could you repeat that?
19 Q  Sure.  In light of my representation to you, sir,
20    that this document entitled "Welcome to the
21    Universal Am-Can, Limited, Brokerage Division" is
22    a document that came from your former employer and
23    was attached as the next page after this carrier
24    survey you filled out, my question is, is this a
25    document that in all likelihood you would have

86

1  seen before you signed the agreement, filled out
2  the survey, and sent documents back to Universal
3  Am-Can via fax?
4     And feel free to look at the whole document
5  to see if that helps jog your memory.
6  A  This part does.  This looks like normal paperwork
7     we'd get, welcoming to your -- you know, as a new
8     carrier for a broker.  But to say that I remember
9     this specific one, no.
10 Q  Right.  So is it fair to say you're saying, I
11    don't have a memory of this document, but it
12    certainly looks similar to the types of documents
13    I might get from -- you might get from a broker?
14 A  Correct.  Correct.
15 Q  Okay.  All right.  Skip a few more pages until you
16    get to a document that has Melody Hansen's
17    handwritten name near the top.
18 A  Okay.
19 Q  Do you see where this document on its face appears
20    to be from Melody Hansen with the reference to the
21    fax number of (708)331-8604, to the attention of
22    Nancy or Dave Martin, dated June 12, 2008?
23 A  Yes.  I see that.
24 Q  And do you see right below that, it references
25    finding attached the broker packet for Universal

87

1  Am-Can?
2  A  I see that.
3  Q  All right.  And it references the fact that
4     there's an introduction letter, a three-page
5     contract for signature, a blank W-9 form, a copy
6     of a UACL surety bond and broker authority, and
7     carrier survey and carrier references.  Do you see
8     that?
9  A  I see that.
10 Q  And do you see in the preceding pages to this
11    document, which is a part of Exhibit 75 -- do you
12    see that there was a welcome letter?  Go back
13    about four pages.  There's a welcome letter?
14 A  Oh, yes.  I see that.
15 Q  Okay.  Then there's a blank W-9?
16 A  Correct.
17 Q  By the way, what's the purpose for the blank W-9?
18    To make sure Martin's gets paid?
19 A  Well, you have to have an ID number, tax number to
20    haul, so --
21 Q  Okay.  And then there's the property brokers
22    surety bond, two-page document?
23 A  Okay.  I see that.
24 Q  All right.  So in light of all of these documents
25    I've just shown you, several different exhibits,

88

22 (Pages 85 to 88)

1 fixing your attention on the fax transmission
2 dates and times, in all likelihood, sir, on or
3 about June 17, 2008, did you return to Universal
4 Am-Can the signed contract with whatever other
5 documents were required?
6 A It looks like I did.
7 Q Okay. You don't have any memory of ever dealing
8 with Melody Hansen?
9 A No, I do not.
10 Q If I were to use the phrase "pool load," does that
11 mean anything?
12 A Not really.
13 Q If I were to say International Paper Corporation's
14 loads were pool loads, does that phrase or term
15 mean anything to you?
16 A No, it doesn't.
17 Q Ms. Hansen told us in her deposition that if
18 Martin's had any issue with a pool load, that you,
19 Dave, or Nancy would contact Melody.
20 A Okay.
21 Q Assume that's true. All right?
22 A Okay.
23 Q Do you ever recall contacting Melody Hansen about
24 an issue with a pool load?
25 A No, I do not.

89

1 that it was not unusual for you to sign various
2 documents in the conduct of Martin's business on
3 behalf of Martin's Bulk Milk. Would you agree
4 with that statement?
5 A Correct.
6 Q You yourself never required Universal Am-Can to
7 send back a double-signed copy of the master
8 brokerage agreement, did you?
9 A I have no idea.
10 Q Earlier, when you said that Fleming had a motor
11 carrier license, did you mean that it had
12 authority under the Department of Transportation?
13 A That is correct.
14 Q Since you don't know Mr. Franke, is it fair to say
15 you don't have any idea of how it is he related to
16 Universal Am-Can or International Paper, if at
17 all, in the conduct of his driving on a daily
18 basis? Is that a fair statement?
19     MR. BURKE: Objection. Overly broad.
20 Calls for speculation.
21     MR. SCHRECK: Join. Also, asked and
22 answered.
23     You can answer. Go ahead.
24     THE WITNESS: I have no idea.
25

91

1 Q And remember that one I showed you where it
2 appears that maybe the load started off with, you
3 know, so much and something was added to it? Do
4 you remember anything about that instance?
5 A No, I don't.
6 Q Do you know whether or not on July 3, 2008, the
7 load at issue in this case, the accident that
8 happened later that night — do you know whether
9 or not there were any issues attended to that
10 particular load?
11 A No, I do not.
12 Q Mr. Martin told us at his deposition that the
13 June 12, 2008, master brokerage agreement was in
14 full force and effect on July 3rd. Do you have
15 any reason to dispute that conclusion of his?
16 A No.
17 Q Mr. Martin also told us that either you or
18 Doreen Bayer had knowledge or information about
19 how contracts would be formed with brokers and
20 shippers. Do you know what he would be referring
21 to in making that — such a statement?
22 A In general, maybe. I mean, I dealt with
23 refrigerated brokers a lot, but — so typically
24 getting this paperwork faxed.
25 Q He also said — Mr. Martin, that is. He also said

90

1 BY MR. FISHER:
2 Q So you have no idea whether or not Mr. Franke,
3 when he was driving his truck, for example, on
4 July 3rd — that you have no idea whether or not
5 he considered himself or did not consider himself
6 driving the load on behalf of Universal Am-Can or
7 International Paper; is that a fair statement?
8 A I have no idea.
9 Q I'll represent to you that sometime during the
10 course of this litigation, I sent a series of
11 written questions — we lawyers call them request
12 for admissions — to Martin's Bulk Milk, asking
13 them to tell me whether or not there's any
14 document in all the documents they've got in
15 their — you know, documents in their business —
16 A Okay.
17 Q — that said at any time Samuel Franke was
18 acting as the agent of Universal Am-Can or
19 International Paper. And Martin's Bulk Milk's
20 response was they have no such documents. Okay?
21 A Okay.
22 Q So that's a fact that they have admitted.
23     Are you, sir, aware of any document that
24 exists that says that Samuel Franke, in writing,
25 was the agent of Universal Am-Can on July 3, 2008?

92

23 (Pages 89 to 92)

1    MR. BURKE: Objection to the form of the
2  question.
3         MR. SCHRECK: Join.
4         MR. BURKE: Lack of foundation basis.
5         MR. SCHRECK: Join.
6         Go ahead and answer.
7         THE WITNESS: I would have no idea.
8  BY MR. FISHER:
9  Q   And I presume your answer will be the same, that
10     you have no idea if I were to ask that question
11     about any statement being made by Mr. Franke that
12     he was the agent of International Paper. Is that
13     a fair statement also, that you have no idea?
14 A   Correct. Correct.
15 Q   When did you first begin speaking with any counsel
16     for Martin's Bulk Milk?
17 A   It would have been in November, and I never really
18     spoke except when that dude called me.
19         MR. SCHRECK: You can't talk about any
20     conversation you had with any attorney, so --
21         THE WITNESS: Oh.
22         MR. FISHER: I haven't asked that
23     question.
24         MR. SCHRECK: I know. I know. He's
25     looking at me like -- so --
                                              93

1  BY MR. FISHER:
2  Q   My question is, when did you first start talking
3      with any counsel for Martin's Bulk Milk?
4  A   It would have been --
5         THE WITNESS: Is that something I can
6      answer?
7         MR. FISHER: I'm only asking when.
8         MR. SCHRECK: When is fine. If you
9      remember.
10        THE WITNESS: Yeah. Actually, it would
11     have been about November, because I got a call out
12     of the blue talking about a deposition.
13 BY MR. FISHER:
14 Q   Is that the first time you were ever contacted by
15     anyone?
16 A   That's correct.
17 Q   Anyone --
18 A   That's correct.
19 Q   -- concerning giving a deposition?
20 A   That is correct.
21 Q   All right. And since that time in November of
22     2012, how many conversations have you had with any
23     counsel for Martin's Bulk Milk? And by
24     "conversations," I mean on the phone or in person.
25 A   Strictly by phone, just trying to set up a
                                              94

1      meeting.
2  Q   Okay. And, I mean, a couple of those types of
3      telephone conversations, talking about logistics?
4  A   Probably -- probably three maybe.
5  Q   All right.
6  A   I can't remember. It's two or three.
7  Q   And had you ever met any of the counsel for
8      Martin's Bulk Milk before today?
9  A   No.
10 Q   Is today the first time you talked with counsel
11     for Martin's Bulk Milk?
12 A   That's correct.
13 Q   Okay. And what did you and he talk about?
14        MR. SCHRECK: Objection.
15     Attorney-client privilege.
16 BY MR. FISHER:
17 Q   Are you going to answer my question?
18        MR. SCHRECK: I'm going to instruct him
19     not to answer the question.
20        THE WITNESS: Okay.
21 BY MR. FISHER:
22 Q   Are you going to answer my question?
23 A   On behalf of counsel, I guess not.
24 Q   Okay. When did you and Mr. Schreck form an
25     attorney-client relationship?
                                              95

1         MR. SCHRECK: You can answer it to the
2      best you can.
3         THE WITNESS: Would have been today, I
4      guess. I mean, I -- I'm not under the impression
5      I would be an actual client.
6  BY MR. FISHER:
7  Q   And why is it you're not under the impression that
8      you would be a client of Mr. Schreck?
9         MR. SCHRECK: If you don't understand
10     the question, you can tell him.
11        THE WITNESS: I don't. Yeah.
12 BY MR. FISHER:
13 Q   My question was very clear. Why do you not
14     believe --
15        MR. SCHRECK: Let's take a quick break
16     real quick.
17        MR. FISHER: No. We're not going to
18     take a break. I'll let you take a break after he
19     answers this question.
20 BY MR. FISHER:
21 Q   Why do you believe that you do not consider
22     yourself a client of Mr. Schreck?
23        MR. BURKE: Objection to the form.
24     Calls for legal conclusions beyond the scope and
25     knowledge of this witness.
                                              96

24 (Pages 93 to 96)

1  MR. SCHRECK: I'll join. And it's
2  specifically asking for attorney-client privilege.
3  MR. FISHER: I haven't asked for any
4  communication on that question.
5  BY MR. FISHER:
6  Q  I've asked him, why do you consider, as you just
7  said -- and I'll be happy to have the court
8  reporter reread your testimony.
9  Why do you believe you don't consider
10  yourself a client of Mr. Schreck?
11  MR. BURKE: Same objection.
12  MR. SCHRECK: Same objection. I don't
13  think it's what he said.
14  THE WITNESS: I would like to have it
15  reread.
16  MR. FISHER: I'd be happy to do that.
17  I'm going to ask the court reporter to go back to
18  whatever that question was and have her reread
19  your answer. Okay?
20  THE WITNESS: That's fine.
21  MR. FISHER: Okay.
22  (Page 95, Lines 24-25 and Page 96, Lines 3-5
23  read back.)
24  BY MR. FISHER:
25  Q  Have you listened to your answer to that question?

97

1  Q  And did you have an opportunity to speak with
2  Mr. Schreck?
3  A  Yes, I did.
4  Q  Did you speak with Mr. Schreck?
5  A  Yes, I did.
6  Q  And are you willing to answer questions I will
7  have of you now concerning the conversations you
8  had with Mr. Schreck outside of the deposition
9  room?
10  MR. SCHRECK: Object. Attorney-client
11  privilege.
12  THE WITNESS: No. I won't speak to you
13  about it.
14  BY MR. FISHER:
15  Q  Okay. All right. I'm going to ask a series of
16  questions that I'll explain to you that may be the
17  subject of a hearing in front of the federal judge
18  in Chicago that has this case to determine whether
19  or not I have a right to ask you these questions
20  and you would be compelled to give me answers.
21  Okay?
22  So, you know, it might be that when I ask you
23  a question, you will choose to answer the
24  question, or you may just say, "I'm not going to
25  answer that question because I'm claiming an

99

1  A  Um-hum. I said it.
2  Q  Yes?
3  A  Yes, I did.
4  MR. FISHER: Okay. And now I'm going to
5  have the court reporter reread my last question,
6  the why question.
7  MR. SCHRECK: And after he answers this,
8  we'll take a break.
9  MR. FISHER: Yeah. That's fine.
10  (Page 97, Lines 9-10 read back.)
11  THE WITNESS: I don't know. I guess
12  he -- I guess I am. I guess he is representing
13  me.
14  Is that correct?
15  MR. SCHRECK: You can give your answer,
16  and then we'll take a break.
17  THE WITNESS: I guess. Okay. I hadn't
18  really thought about it.
19  MR. FISHER: Okay. If you want to take
20  a break, we can do that now.
21  (A recess is taken from 1:32 p.m. to 1:39 p.m.)
22  BY MR. FISHER:
23  Q  Mr. Podlena, did you just take a break from the
24  deposition?
25  A  Yes, I did.

98

1  attorney-client privilege." Okay? So you just
2  tell me that, express it however you want. Okay?
3  A  Okay.
4  Q  All right. Did you talk with Mr. Schreck about
5  the testimony you were to give in this case?
6  MR. SCHRECK: Object to form.
7  Attorney-client privilege. You can --
8  MR. COUTURE: You mean during the break?
9  MR. FISHER: At any time. I'll be
10  clear. Let me be clear.
11  BY MR. FISHER:
12  Q  This morning -- I'm not asking you now what you
13  talked about. How long did you speak with
14  Mr. Schreck this morning?
15  A  A short time.
16  Q  What's your best estimate of the time?
17  A  Let's see. 30, 35 minutes.
18  Q  Did Mr. Schreck show you any documents?
19  A  Yeah.
20  Q  And did he show you documents that had your name
21  or signature on them?
22  A  Correct.
23  Q  Did he show you any other documents?
24  A  Not -- no.
25  Q  Did Mr. Schreck explain to you what the testimony

100

**Page 101**

1 of other witnesses was in this case?
2     MR. SCHRECK: Objection.
3 Attorney-client privilege.
4     I'm going to tell you not to answer.
5 Whether or not you follow my advice, it's up to
6 you.
7     THE WITNESS: Nothing else was discussed
8 as far as -- so really, that's -- I mean, nothing
9 else was discussed.
10 BY MR. FISHER:
11 Q  What do you mean, nothing else was discussed?
12 A  Well, we didn't talk about other people. I mean,
13 he just talked to me.
14 Q  Did he tell you and give you his theory of the
15 case?
16     MR. SCHRECK: Objection. Calls for
17 attorney-client privilege. I'm going to instruct
18 him not to answer.
19     You can answer as you so choose and
20 follow my advice or not follow my advice.
21     THE WITNESS: I'll follow your advice.
22 BY MR. FISHER:
23 Q  Did he tell you that when you answered questions,
24 you should use such phrases as "acted as a
25 representative of"?

**Page 102**

1     MR. SCHRECK: Objection. Calls for
2 attorney-client privilege.
3     I'll instruct you not to answer. You
4 can either take my advice or not take my advice.
5     THE WITNESS: I'll take your advice.
6 BY MR. FISHER:
7 Q  Did he advise you to testify that Martin's Bulk
8 Milk or Franke acted as the agent of Universal
9 Am-Can or International Paper?
10     MR. SCHRECK: Objection.
11 Attorney-client privilege. I'm going to advise
12 him not to answer.
13     You can --
14     THE WITNESS: I refuse -- or I won't
15 answer it.
16 BY MR. FISHER:
17 Q  Did Mr. Schreck advise you or suggest to you that
18 you should testify that Martin's Bulk Milk or
19 Samuel Franke acted as a representative agent of
20 Universal Am-Can or International Paper?
21     MR. SCHRECK: Objection. Calls for
22 attorney-client privilege. I'm going to instruct
23 him not to answer.
24     THE WITNESS: And I'll accept.

**Page 103**

1 BY MR. FISHER:
2 Q  And finally, did he suggest to you or advise you
3 that you should testify words to the effect of you
4 knew or you had personal knowledge that Martin's
5 Bulk Milk or its driver, Samuel Franke, was
6 representing Universal Am-Can or International
7 Paper?
8     MR. SCHRECK: Objection. Calls for
9 attorney-client privilege.
10     I'm going to instruct you not to answer.
11     THE WITNESS: And I agree.
12 BY MR. FISHER:
13 Q  Earlier in the deposition, I asked you some
14 questions about why it is you believed there was
15 an attorney-client relationship or there was not
16 an attorney-client relationship between you and
17 Mr. Schreck. Do you wish to add any other answers
18 to your -- to those questions other than what you
19 have testified so far?
20 A  Just that we talked over the phone trying to set
21 up -- and I hadn't really talked to him, but
22 trying to set up the deposition.
23     And being new to anything like this, after I
24 found out I was going to get to do this, I asked
25 if this was something he could do, and that's when

**Page 104**

1 I guess we -- that's when we -- he agreed to be my
2 lawyer.
3 Q  And what amount did you agree to pay him as your
4 lawyer?
5     MR. SCHRECK: Object. Attorney-client
6 privilege.
7     You can answer if you choose.
8 BY MR. FISHER:
9 Q  Answer or no answer?
10 A  No answer.
11 Q  Okay. And what consideration or thing of value
12 did you give as a part of his agreement to serve
13 as your counsel?
14     MR. SCHRECK: Same objection.
15     You can answer if you choose.
16     THE WITNESS: What do you mean?
17 BY MR. FISHER:
18 Q  Is there anything of value that you gave to him in
19 return for him agreeing to serve as your attorney?
20 A  You mean monetarily or what?
21 Q  Any value.
22 A  Not that I'm aware of.
23     MR. FISHER: I have no other questions.
24 Thank you.
25     To the extent that I have to make some

26 (Pages 101 to 104)

1  declaration that I want these questions to be
2  certified under the federal rules, I am so doing
3  that.
4         MR. COUTURE: I'll join in the
5  certification.
6       E X A M I N A T I O N
7  BY MR. COUTURE:
8  Q   Your testimony is that you asked him to be your
9  lawyer?
10 A   Correct.
11 Q   So why did you ask him to be your lawyer?
12 A   Because after finding out that I was going to have
13     to come down for a deposition and them
14     arranging -- telling me what time and everything,
15     I thought maybe I better have some legal
16     representation.
17 Q   Were you ever on the board of directors of
18     Martin's Bulk Milk?
19 A   Me?
20 Q   Yes.
21 A   No.
22 Q   Were you ever on the risk management team?
23 A   No.
24 Q   Were you ever directing how insurance was
25     purchased or how claims were administered?

                                              105

1  A   No.
2  Q   Were you ever responsible for investigating
3      accidents?
4  A   No.
5  Q   Were you ever on something called control group at
6      Martin's Bulk Milk?
7  A   No.
8  Q   You're not an officer of the corporation?
9  A   No.
10 Q   What were your regular hours of work, sir, back
11     in --
12 A   Usually --
13 Q   Excuse me. I'm sorry. That wasn't a complete
14     question. Let me start again. I'll strike that
15     and start over.
16        As of July 2008, what were your regular hours
17     of work?
18 A   From day one, 6:30 to 7:00 a.m. until about
19     5:00 to 5:30 p.m.
20 Q   Was that five days a week?
21 A   Correct. Monday through Friday. Occasionally a
22     Saturday morning.
23 Q   Did you work always in the office in Wilton for
24     Martin's Bulk Milk?
25 A   Correct.

                                              106

1  Q   So you didn't work from home or some satellite
2      office?
3  A   No.
4  Q   That was a bad question. Am I correct when I say
5      you didn't work anywhere other than Martin's?
6  A   That is correct.
7  Q   Thank you.
8  A   Strictly in the office.
9  Q   Were you working on the 4th of July, 2008?
10 A   I doubt it. If it was the 4th of July, I would
11     probably have that off, I would think.
12 Q   Okay. Would you have worked the following Monday,
13     the 7th?
14 A   Probably.
15 Q   Okay. And if I understand it, it's your testimony
16     that on that day, the Monday after this accident,
17     you did not hear anyone discussing the fact that
18     one of the truck drivers had rammed a stopped car
19     and caused the car to burst into flames?
20 A   No. I never heard.
21 Q   I understand your testimony to be that you didn't
22     even know who Mr. Franke was? Well, strike that.
23        I want to figure this out. Did you know that
24     a person by the name of Sam Franke was employed by
25     Martin's Bulk Milk back when you were working for

                                              107

1      them in July of 2008?
2  A   Not that I can recall, because of my lack of
3      dealings with the drivers.
4  Q   Okay. So not only did you not deal with drivers
5      face-to-face, you wouldn't recognize the names of
6      the drivers on any of the documents. Is that what
7      you're saying?
8  A   Correct. Very few.
9  Q   Did you see a large, bald man come in the office
10     on July 7, 2008?
11 A   Not that I can recall.
12 Q   Were you ever present when someone took a
13     statement of Mr. Franke?
14 A   Not that I'm aware of.
15 Q   Did anyone ever tell you what Mr. Franke has said
16     about this accident?
17 A   No.
18 Q   Were you involved in the purchasing of Truck 139,
19     which is the truck involved in this accident?
20 A   No.
21 Q   Who was involved in purchasing trucks for Martin's
22     Bulk Milk?
23 A   That would -- I'm sure probably would have been
24     Dave.
25 Q   Okay. Dave Martin?

                                              108

27 (Pages 105 to 108)

1    A    Correct.
2    Q    And I think you said you were not involved in the
3         maintenance of the truck?
4    A    That's correct.
5    Q    Was it part of your job, as you did the paperwork
6         for loads, to determine how heavy the load was?
7    A    Well, with some of them dealing with refrigerated
8         loads.
9    Q    Okay.
10   A    Like, dealing with Kraft or Great Lakes Cheese,
11        those. But that's where most of my involvement
12        was, was with refrigerated loads with Kraft, Great
13        Lakes Cheese, and there's another cheese company.
14        Sargento.
15   Q    Do you know how heavy the load was that -- the
16        gross weight of the vehicle involved in this
17        accident was?
18   A    You mean how much weight was on the truck or what
19        he was capable of hauling or what?
20   Q    I understand how -- the capacity. My question is
21        different.
22             Do you understand the gross weight of the
23        truck and contents, in other words, if you put the
24        truck and chassis and container on a big scale,
25        how much it would weigh? I'm not asking you to

                                                         109

1         guess.
2    A    I'm not --
3    Q    Do you know?
4    A    No.
5    Q    Okay.
6    A    Depends on the trailer and the tractor.
7    Q    Yeah. It depends on the tractor, the trailer, the
8         load. My question is whether you know the answers
9         to all of those questions for what Mr. Franke was
10        driving on the day of this accident.
11   A    No. I would have no idea.
12   Q    Did you see anything on the news from the 3rd of
13        July or anytime thereafter about a Martin's Bulk
14        Milk truck being in an accident?
15   A    No.
16   Q    So you have no knowledge as to the details of what
17        happened?
18   A    None. That's why I'm --
19   Q    And you're not aware that Mr. Franke struck a
20        BMW 3 Series convertible?
21   A    No, I am not.
22   Q    You have no knowledge regarding claims that the
23        BMW was somehow defective after being struck by a
24        74,000-pound truck?
25   A    No.

                                                         110

1    Q    I take it then you have no opinions about those
2         claims?
3    A    No.
4    Q    Okay. Were you involved in any way at Martin's
5         Bulk Milk in the hiring and firing of drivers?
6    A    None. No.
7    Q    I think Mr. Fisher may have asked this question,
8         but I just want to make sure. At any point did
9         you come to understand that Mr. Franke was fired
10        as a result of this accident?
11   A    No.
12   Q    Were you ever present while Martin's Bulk Milk's
13        attorneys spoke to anybody about this accident?
14   A    No.
15             MR. COUTURE: I don't have any other
16        questions for you.
17             MR. FISHER: I do have some follow-up,
18        but I'll wait until Rich is done. Or do you want
19        me to pop in?
20             MR. BURKE: Sure. Go ahead.
21             E X A M I N A T I O N
22   BY MR. FISHER:
23   Q    Okay. I should have asked these questions before
24        of you. I'm going to try to group them in an
25        efficient way. I have a hunch I know what all

                                                         111

1         your answers are going to be. Okay?
2    A    Okay.
3    Q    It has nothing to do with attorney-client
4         privilege. Okay?
5    A    Okay.
6    Q    Assume that the work that Mr. Franke was doing on
7         July 3, 2008, was to pick up a load and drive a
8         truck to carry that load from point A to point B.
9         Okay? Assume that's the work he's doing.
10             Here's my series of questions for you. Do
11        you have any knowledge as to whether or not
12        Universal Am-Can or International Paper ever gave
13        any directions or instructions to Mr. Franke on
14        how to drive his truck?
15   A    I would have no idea.
16   Q    What tools, equipment, or other implements of him
17        doing his job as a truck driver, did they impose
18        any directions about that?
19   A    I would have no idea.
20   Q    Where to purchase gas?
21   A    No, I don't.
22   Q    What route to take?
23   A    I have no idea.
24   Q    So if I were to ask you any series of questions
25        that might ask the relationship between Universal

                                                         112

                                            28 (Pages 109 to 112)

1 Am-Can and Mr. Franke, is it fair that you would
2 have no knowledge of any of that?
3 A That would be correct.
4 Q And likewise, if I were to ask you a series of
5 questions about what relationship, if any, that
6 International Paper had with Mr. Franke, you would
7 have no knowledge about that?
8 A That would be correct.
9 Q The only thing you do know, as reflected in some
10 of the questions that Mr. Burke asked you, is that
11 on some of the -- like, on the broker confirmation
12 sheet or on the memo bills, there is information
13 about where the load is coming from, where the
14 load is going, and other notations that might me
15 pertinent for the delivery of that load?
16 A That would be correct.
17 MR. FISHER: That's all. I tried to
18 condense them all into a few. Thanks.
19 E X A M I N A T I O N
20 BY MR. BURKE:
21 Q Mr. Podleno, during the time you were working at
22 Martin's, did you know that Universal Am-Can had a
23 motor carrier license and could operate as a motor
24 carrier?
25 A No, I did not.

113

1 MR. BURKE: Okay. Nothing else.
2 E X A M I N A T I O N
3 BY MR. SCHRECK:
4 Q The only question I have for you is, when were you
5 first contacted for purposes of scheduling your
6 deposition? Do you recall?
7 A Yeah. Actually, it was November -- right before
8 Thanksgiving, but it was of 2011.
9 Q Okay. And prior to your deposition today, did you
10 request that my office represent you for the
11 purposes of your deposition?
12 A No. Or I'm sorry. Repeat that.
13 MR. SCHRECK: Can you read the question
14 back?
15 (Previous question read back.)
16 MR. FISHER: Excuse me. Excuse me. Can
17 I hear you read the answer that he gave?
18 (Previous answer read back.)
19 BY MR. SCHRECK:
20 Q You can go ahead and answer.
21 A Okay. It would have been two phone calls. It
22 would have been, like, three weeks ago when I
23 believe it was Jason from your office said that it
24 sounds like we're definitely going to have to
25 do -- you know, we'll set this up.

114

1 Q I'll ask my question again.
2 Prior to today, did you request that my
3 office represent you for the purposes of your
4 deposition?
5 A That is correct.
6 Q And that was accepted; is that correct?
7 A That's correct.
8 MR. SCHRECK: No further questions.
9 E X A M I N A T I O N
10 BY MR. FISHER:
11 Q In writing or orally?
12 A That was oral, strictly. That's all I've ever --
13 MR. FISHER: Nothing else. Thanks.
14 THE WITNESS: Sure.
15 MR. SCHRECK: Any other questions?
16 MR. BURKE: Nothing else.
17 MR. SCHRECK: Reserve.
18 (Deposition concluded at 1:58 p.m.)

115

1 STATE OF WISCONSIN )
) SS:
2 COUNTY OF MILWAUKEE )
3 I, Lindsay DeWaide, a Registered Professional
4 Reporter, Certified Realtime Reporter, and Notary
5 Public in and for the State of Wisconsin, do hereby
6 certify that the preceding deposition was reported by
7 me and reduced to writing under my personal direction.
8 I further certify that said deposition was
9 taken at CHULA VISTA RESORT, 2501 River Road, Wisconsin
0 Dells, Wisconsin, on the 22nd day of March, 2013,
commencing at 11:02 a.m.
2 I further certify that I am not a relative or
employee or attorney or counsel of any of the parties,
4 or a relative or employee of such attorney or counsel,
or financially interested directly or indirectly in
6 this action.
In witness whereof, I have hereunto set my
8 hand and affixed my seal of office at Milwaukee,
Wisconsin, this 1st day of April, 2013.
0
1

2 _____
LINDSAY DEWAIDE, RPR
Notary Public, State of Wisconsin
3
My Commission Expires: January 22, 2017.
4
5

116

29 (Pages 113 to 116)

STATE OF WISCONSIN )
              ) SS:
COUNTY OF _____ )


      I, Jeremiah Patrick Podlena, do hereby certify
that I have read the foregoing transcript of
proceedings, taken on the 22nd day of March, 2013, at
Chula Vista Resort, 2501 River Road, Wisconsin Dells,
Wisconsin, and that the same is true and correct except
for the list of corrections, if any, noted on the
annexed errata sheet.


        _____
        Jeremiah Patrick Podlena



Dated at _____, _____.
       (City)      (State)

this _____ day of _____, 2013.

117

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052