Page 1

1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   MURRAY SCHEINMAN, Plenary      )
    Guardian of the Estate and     )
4   PERSON OF JEFFREY J. SCHEINMAN,)
    a Disabled Person,             )
5                                  )
            Plaintiff,             )
6                                  )
       vs.                         )  No. 09 CV 5340
7                                  )
    MARTIN'S BULK MILK SERVICE,    )
8   INC.; SAMUEL G. FRANKE; CSX    )
    INTERMODAL, INC.; INTERNATIONAL)
9   PAPER COMPANY; and OVERNITE    )
    EXPRESS, INC.,                 )
10                                 )
            Defendants.            )
11          The deposition of DAVID MARTIN, called by

12  the Plaintiff for examination pursuant to notice

13  and pursuant to the Rules of Civil Procedure for

14  the United States District Courts pertaining to the

15  taking of depositions, taken before Steven

16  Stefanik, a notary public within and for the County

17  of DuPage and State of Illinois, at Suite 200, 211

18  South Wheaton Avenue, Wheaton, Illinois on the 12th

19  day of January 2010.

20      APPEARANCES:

21          CLIFFORD LAW OFFICES, by
            MR. RICHARD F. BURKE, JR.
22          120 North LaSalle Street, Suite 3100
            Chicago, Illinois 60602
23          (312) 899-9090
                for the Plaintiff;
24

EXHIBIT

B

Page 2

```
 1    APPEARANCES: (CONT'D)
 2    MULHERIN, REHFELDT & VARCHETTO, P.C., by
      MR. JOSEPH G. SKRYD
 3    211 South Wheaton Avenue, Suite 200
      Wheaton, Illinois 60187
 4    (630) 653-9300
           -and-
 5    DOWD & DOWD, LTD., by
      MR. ROBERT J. GOLDEN
 6    617 West Fulton Street
      Chicago, Illinois 60661
 7    (312) 704-4400
           for the Defendant Martin's Bulk Milk
 8         Service;
 9    LEWIS, BRISBOIS, BISGAARD & SMITH, LLP, by
      MR. SCOTT C. BENTIVENGA
10    550 West Adams Street, Suite 300
      Chicago, Illinois 60661
11    (312) 345-1718
           for the Defendant CSX Intermodal;
12
      HINSHAW & CULBERTSON, LLP, by
13    MR. CARLTON D. FISHER
      222 North LaSalle Street, Suite 300
14    Chicago, Illinois 60601-1081
      (312) 704-3000
15         for the Defendant International Paper
           Company.
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1        I N D E X
      WITNESS:              PAGE
 2
      DAVID MARTIN
 3
      Examination by:
 4
      Mr. Burke            6
 5    Mr. Fisher           89
      Mr. Bentivenga       151
 6
 7    Further Examination by:
      Mr. Burke            190
 8    Mr. Fisher           195
      Mr. Bentivenga       196
 9
10
11        E X H I B I T S
      NUMBER          FOR IDENTIFICATION
12
      Martin Nos. 1 and 2        4
13
      Martin Nos. 3 - 11         27
14
      Martin No. 12              42
15
      Martin No. 13              83
16
      Martin No. 14              92
17
      Martin Nos. 15 and 16      98
18
      Martin No. 17              110
19
      Martin No. 18, 19 and 20   111
20
      Martin No. 21              118
21
      Martin No. 22              122
22
      Martin No. 23              124
23
      Martin No. 24              129
24
      Martin No. 25              151
```

Page 4

```
 1              (Whereupon, Martin Deposition
 2         Exhibit Nos. 1 and 2 were
 3         marked for identification
 4         as of this date.)
 5              (Witness sworn.)
 6      MR. SKRYD:  Do we want to have any stipulations
 7    on questions for the record as -- for objections,
 8    guys?
 9         I mean, does anybody --
10      MR. BURKE:  I don't know about for objections,
11    but my -- it's my understanding that we are not
12    going into, at your request, the substantive facts
13    of the incident.
14      MR. SKRYD:  Correct.
15      MR. BURKE:  And you're willing to produce
16    Mr. Martin and Mr. Franke again on another date for
17    questioning that relates to this -- the specific
18    details of the occurrence?
19      MR. SKRYD:  Right.
20         My only -- my only thought is, do we
21    want to say that all objections are reserved, if
22    they're not made, for purposes of the deposition
23    except as to maybe form of the question, or not?
24    It depends on the attorneys in federal court, you
```

Page 5

```
 1    know.
 2      MR. FISHER:  What the rules say.
 3      MR. SKRYD:  Rules say you can do it either way.
 4    You can be strict and, you know -- and, for
 5    whatever reason, if Mr. Martin is unavailable at
 6    trial and you want to use the deposition, usually,
 7    what I'll do is reserve -- all objections are
 8    reserved except as to form of the question.
 9         That way, if -- otherwise, we're going
10    to be making objections every 30 seconds because,
11    technically, it could be an evidence deposition in
12    federal court.  And I'd prefer to have all
13    objections reserved except as to the form of the
14    question.
15         You guys agree to that?
16      MR. BURKE:  I'm probably okay with that.
17      MR. FISHER:  That's what the -- we have a
18    disagreement over what the rules say.  You don't
19    have to make objections on relevancy ever.
20      MR. SKRYD:  That's true.
21      MR. FISHER:  Period.
22      MR. SKRYD:  I'm not talking about that issue.
23      MR. FISHER:  If something could have been
24    corrected now, you need to correct it now.
```

Page 6

1  MR. SKRYD: Okay.
2  MR. BENTIVENGA: It's okay with me.
3  MR. SKRYD: Scott? Okay.
4       What we'll do is we'll -- all objections
5  are reserved except as to the form of the question
6  for purposes of the deposition today.
7       Go ahead, Rich.
8       DAVID MARTIN,
9  called as a witness herein, having been first duly
10  sworn, was examined and testified as follows:
11       EXAMINATION
12       BY
13       MR. BURKE:
14  Q.  Mr. Martin, would you please state your
15  full name and spell your last name for the court
16  reporter.
17  A.  David Vern Martin, M-a-r-t-i-n.
18  Q.  And your middle name, is it Vern?
19  A.  Vern.
20  Q.  V-e-r-n?
21  A.  Correct.
22  Q.  Okay. Thank you.
23       What's your business or occupation, sir?
24  A.  I'm operations manager for Martin's Bulk

Page 7

1  Milk Service.
2  Q.  And is the proper complete name of
3  Martin's -- Martin's Bulk Milk Service, Inc.?
4  A.  Correct.
5  Q.  Okay. And where are they located at?
6  A.  1101 Water Street in Wilton, Wisconsin.
7  Q.  Do they have any other business locations?
8  A.  We have a business location in Utah.
9  Q.  And what's the nature of your business in
10  Wilton?
11  A.  We run 125 trucks throughout the
12  United States delivering goods to customers.
13  Q.  And do you have a particular type of goods
14  or product that you normally deliver?
15  A.  Mostly food grade.
16  Q.  Do you have tanker trucks that transport
17  liquids?
18  A.  Not anymore.
19  Q.  How about back in 2008 in July, at the time
20  of this occurrence?
21  A.  No, sir.
22  Q.  And what's your business out in Utah?
23  What's the nature of it out there?
24  A.  It's just a brokerage company.

Page 8

1  Q.  And what do you broker?
2  A.  Food-grade products.
3  Q.  And transportation of them?
4  A.  Yes.
5  Q.  Do you have a -- does your Utah business
6  operate under the same name, Martin's Bulk Milk
7  Service, Inc.?
8  A.  Yes.
9  Q.  About how many employees does Martin's
10  have?
11  A.  I would say approximately 160.
12  Q.  In the -- by whom is Martin's owned? Is it
13  a publicly traded company?
14  A.  It's owned by my parents, Al and Ruth
15  Martin.
16  Q.  And your mother's name?
17  A.  Al and Ruth.
18  Q.  Ruth? Thank you.
19       And are they shareholders?
20  A.  Yes.
21  Q.  And are they the sole shareholders?
22  A.  Yes.
23  Q.  And how long has Martin's been in
24  existence?

Page 9

1  A.  Since 1932. It goes back to my
2  grandfather.
3  Q.  And other than Martin's Bulk Milk Service,
4  Inc., is there -- or I should say, are there other
5  Martin's-related entities that your family
6  operates?
7  MR. SKRYD: Objection. Relevance.
8       You can answer.
9  THE WITNESS: Yes.
10  BY MR. BURKE:
11  Q.  Okay. And what are those, sir?
12  A.  We have MBM Logistics in Illinois and
13  Minnesota.
14  Q.  And what -- and go ahead.
15       What else?
16  A.  Martin Warehousing.
17  Q.  And where is that located?
18  A.  Wilton.
19  Q.  And what else?
20  A.  Company in Utah is Martin Refrigerated
21  Express.
22  Q.  And any others?
23  A.  No, sir.
24  Q.  And what's the business of MBM Logistics?

Page 10

1    A.   They are freight brokers.
2    Q.   And how do they differ than Martin's
3  Bulk Milk Service, Inc.?
4    A.   Martin's Bulk Milk Service is the -- owns
5  the equipment.
6    Q.   The equipment for what?
7    A.   Transporting our goods.
8    Q.   Okay.  And what does MBM Logistics do?
9    A.   Broker freight.
10    Q.   And how was MBM Logistics involved in the
11  transportation of the goods that were -- was taking
12  place at the time of this incident on July 3rd,
13  2008, involving Mr. Scheinman?
14    A.   They weren't involved.
15    Q.   Did you have any role in the brokering of
16  the transportation of the goods?
17    MR. SKRYD:  Involved in this accident?
18    MR. BURKE:  Right.
19    THE WITNESS:  The load that -- the load that I
20  pick up -- picked up from International Falls is
21  controlled by me.  So no.
22  BY MR. BURKE:
23    Q.   Okay.
24    MR. FISHER:  Did you say International Falls --

Page 11

1    THE WITNESS:  International Paper.
2    MR. FISHER:  -- or International Paper?
3  BY MR. BURKE:
4    Q.   And when you say you pick up, in this case,
5  you weren't physically picking it up yourself, were
6  you?
7    A.   No.
8    Q.   Okay.  Are you referring to the --
9    A.   Sam Franke.
10    Q.   Okay.  The --
11    MR. SKRYD:  Let him ask his question before you
12  answer, okay?
13    THE WITNESS:  (Nodding.)
14  BY MR. BURKE:
15    Q.   When you -- what does MBM Logist- -- or
16  what does MBM Logistics do to broker freight?
17    A.   They will take a customer that they have
18  and broker to another carrier and take a portion of
19  the freight rate for profit.
20    Q.   And in those instances, who are their
21  customers, the people that want to have something
22  moved -- moved or transported?
23    A.   Yes.
24    Q.   And do they give that freight to carriers

Page 12

1  other than Martin's?
2    A.   Yes.
3    Q.   How come?  Or why not use Martin's?
4    A.   Their volume is way too great for us.  I
5  mean, their volume is more than we can handle and I
6  have my own customers.
7    Q.   Who owns MBM Logistics?
8    MR. SKRYD:  Objection.  Relevance.
9      Go ahead.
10    THE WITNESS:  Al Martin and Randy Galewski.
11  BY MR. BURKE:
12    Q.   Did you say Gillespie?
13    A.   Galewski.
14    Q.   How do you spell that, sir?
15    A.   G-a-l-e-w-s-k-i.
16    Q.   And where -- where is MBM Logistics'
17  headquarters at?
18    A.   They're -- all the paper comes to Wilton,
19  Wisconsin.  Their office is in Winona, Minnesota.
20    Q.   And why does the paperwork come to Wilton?
21    A.   That's where we hired our people to do the
22  billing.
23    Q.   And does that paperwork come to the
24  Martin's Bulk Milk Service headquarters?

Page 13

1    A.   Comes to PO Box 276, Wilton, Wisconsin.
2    Q.   And did you say "PO Box"?
3    A.   276, Wilton, Wisconsin.
4    Q.   And where does it go after that, to
5  Martin's Bulk Milk Service?
6    A.   Yes.
7    Q.   And -- and what is done with that by --
8  with that paperwork by the employees of Martin's
9  Bulk Milk Service?
10    A.   Nothing's done by Martin's Bulk Milk
11  Service.  It's done by the employees at MBM.
12    Q.   Does MBM have employees -- I'm sorry --
13  yeah.  Does MBM have employees of its own at -- in
14  Winona -- in Wilton?
15    A.   Yes.
16    Q.   Are those persons also employees of
17  Martin's Bulk Milk Service?
18    A.   No.
19    Q.   Do they maintain their offices in the same
20  building or within the headquarters of Martin's
21  Bulk Milk Service?
22    A.   They did until last week.
23    Q.   And where did they go last week?
24    A.   They moved to a school (sic) office just in

Page 14

1　town.

2　　Q.　And how many employees does MBM Logistics

3　have?

4　　MR. SKRYD:　Again, relevance is the objection.

5　　THE WITNESS:　Somewhere around ten.

6　BY MR. BURKE:

7　　Q.　And how many of them work in Wilton?

8　　A.　Three.

9　　Q.　And what's the general nature of their

10　work?　Is it office-type work?

11　　A.　Yes.

12　　Q.　And then the approximately seven, are they

13　in Minneapolis, did you say?

14　　A.　Winona.

15　　Q.　Winona.

16　　　And is that -- is that where they're at,

17　Winona?

18　　A.　Yes.

19　　Q.　Okay.　And what do they do, Mr. Martin?

20　　A.　Talk to customers and move freight around

21　the world.

22　　Q.　Are any of them truckdrivers, the seven in

23　Winona?

24　　A.　No.

Page 15

1　　Q.　If I refer to "this incident" or "the

2　occurrence of July 3rd, 2008," you understand I'm

3　talking about the incident involving Mr. Franke and

4　Mr. Scheinman's vehicle; is that correct?

5　　A.　Yes.

6　　Q.　Okay.　With respect to the tractor that

7　collided with Mr. Scheinman's car, was that

8　tractor -- or strike that.

9　　　By whom was that tractor owned?

10　　A.　By Martin's Bulk Milk Service,

11　Incorporated.

12　　Q.　Has that tractor prior to this incident

13　been used to transport goods for MBM Logistics?

14　　MR. SKRYD:　If you know.　Don't guess.

15　　THE WITNESS:　I don't recall.

16　BY MR. BURKE:

17　　Q.　Who -- who is the hierarchy of

18　MBM Logistics?

19　　　Is there a president?

20　　A.　Al Martin.

21　　Q.　And how about under that?

22　　A.　Randy.

23　　Q.　Gal- --

24　　A.　Galewski.

Page 16

1　　Q.　Okay.　And what's his position or title?

2　　A.　Operations manager.

3　　Q.　And underneath him?

4　　A.　There are three owners:　Al Martin, Ruth

5　Martin, Randy Galewski.

6　　Q.　Does MBM Logistics and Martin's use the

7　same dispatcher?

8　　A.　No.

9　　Q.　Does -- and if I say "Martin's," can we

10　agree I'm referring to Martin's Bulk Milk Service,

11　Inc.?

12　　A.　Yes.

13　　Q.　Does Martin's have a dispatcher?

14　　A.　We have four.

15　　Q.　Four?

16　　A.　(Nodding.)

17　　Q.　Does MBM Logistics have a dispatcher?

18　　A.　I would say around three.

19　　Q.　Are any of the three dispatchers for

20　MBM Logistics also people who work as dispatchers

21　for Martin's?

22　　A.　No, they move their own freight.

23　　Q.　When you say "they," who do you mean?

24　　A.　MBM moves their own freight.　Martin's

Page 17

1　Bulk Milk Service moves their own freight.

2　　Q.　Is -- was Overnite Express a customer or

3　client of Martin's in July of 2008?

4　　A.　Yes.

5　　Q.　What word do you use, Mr. Martin, customer

6　or client?　Or what do you -- how do you normally

7　refer to them --

8　　A.　They are --

9　　Q.　-- or something else?

10　　A.　They are a carrier broker.

11　　Q.　Okay.　What do you consider Martin's

12　business to be?

13　　A.　Trucking company.

14　　Q.　Is Martin's a licensed carrier?

15　　A.　Yes.

16　　Q.　Does Martin's engage in brokering of

17　freight?

18　　A.　Yes.

19　　Q.　Did Mr. Franke sometimes drive trucks that

20　were transporting freight on behalf of

21　MBM Logistics?

22　　MR. SKRYD:　Again, if you know.　Don't guess.

23　　THE WITNESS:　I don't recall.

24　BY MR. BURKE:

Page 18

1    Q.   How would you figure that out?  What
2  documents could you look at to determine the answer
3  to that?
4    A.   Franke had a dedicated run.  So he would
5  mostly pull loads out of Arcadia to Chicago for
6  Martin's Bulk Milk.
7    Q.   Out of Arcadia?
8    A.   But there's more various locations.  We --
9  we -- our business, we have, you know, quite a few
10  customers.
11       So it just -- 90 percent the loads come
12  out of Arcadia.
13    Q.   And where is Arcadia?  In what state?
14    A.   Wisconsin.
15    Q.   From what facility or business would he
16  pull loads from normally in Arcadia?
17    A.   Mostly out of Ashley Furniture.
18    Q.   Well, was Sam Franke an employee of any of
19  the Martin's entities?
20    A.   He was an employee of Martin's Bulk Milk.
21    Q.   And did he have an employment contract with
22  Martin's, a written one?
23    A.   He had -- he got a W-2 form from Martin's
24  Bulk Milk.

Page 19

1    Q.   Did Martin's have an actual written
2  employment agreement with him?
3    A.   No agreement.  He just -- we just have a
4  handbook that he's -- that there's -- there's
5  really no agreement.
6    MR. SKRYD:  That's the question.  Is there an
7  agreement, yes or no?
8       Do you know?
9    THE WITNESS:  No.
10    MR. SKRYD:  Okay.
11  BY MR. BURKE:
12    Q.   And when you say he got a W-2 from
13  Martin's, what do you mean by that?
14    A.   He was employed by Martin's Bulk Milk
15  Service only.
16    Q.   Would -- would you -- would Martin's issue
17  a W-2 form for Mr. Franke on a yearly basis?
18    A.   Yes.
19    Q.   Did Mr. Franke get a W-2 form from
20  Martin's -- or from MBM Logistics?
21    A.   No.
22    Q.   Did he get one from any other Martin's
23  entities?
24    A.   No.

Page 20

1    Q.   What's -- where is Martin's Warehousing
2  located, sir?
3    A.   Wilton, Wisconsin.
4    Q.   And what's the nature of their business?
5    A.   We store food-grade product.
6    Q.   And where in Wilton is Martin's Warehousing
7  located?
8    MR. SKRYD:  Objection as to relevance of all
9  this line of questioning.
10       Go ahead.
11    THE WITNESS:  602 Walker Street.
12  BY MR. BURKE:
13    Q.   Is that the same location where Martin's
14  Bulk Milk Service maintains its headquarters?
15    A.   No.
16    Q.   I apologize if you gave it, but what's the
17  address of Martin's Bulk Milk Service?
18    A.   1101 Water Street.
19    Q.   Who owns Martin's Warehousing?
20    MR. SKRYD:  Objection.  Relevance.
21       Go ahead.
22    THE WITNESS:  Allan Martin.
23  BY MR. BURKE:
24    Q.   Does your mother -- is she an owner also?

Page 21

1    A.   I don't know.
2    Q.   Any other owners besides Al?
3    A.   No.
4    Q.   About how many employees does
5  Martin Warehousing have?
6    A.   Six.
7    Q.   Do they all work in -- at that
8  Walker Street location?
9    A.   No.
10    Q.   Where -- how many work at Walker Street,
11  about?
12    A.   Three.
13    Q.   And where do the others work?
14    A.   Sparta, Wisconsin.
15    Q.   And what's located there?
16    A.   We have a warehouse there also.
17    Q.   Mr. Martin, with respect to giving this
18  deposition today, could you tell me what documents
19  you looked at or reviewed.
20    A.   I reviewed the bill of ladings,
21  confirmation from --
22    MR. SKRYD:  That's not the stuff.
23    THE WITNESS:  -- Overnite Logistics.  I reviewed
24  an interchange agreement.

Page 22

1  BY MR. BURKE:
2    Q.  The Uniform Intermodal Interchange
3  Agreement?
4    A.  Yes.
5    Q.  What else, sir?
6    A.  I reviewed -- is it --
7    MR. SKRYD:  That's -- yeah, there's some -- the
8  documents are in there.  You can just go through
9  there and tell him what you reviewed.
10   THE WITNESS:  Samuel Franke's logs are in here.
11 There's a J-1 form from Snick's (phonetic).
12   MR. SKRYD:  Let's do it this way:  So you talked
13 about the logs.
14   THE WITNESS:  Talked about the maintenance that
15 was done on the tractor, the J-1 again.
16   MR. SKRYD:  You didn't look at that.
17   THE WITNESS:  UII Agreement, invoice from Celtic
18 (phonetic) for the container, demurrage cost.
19   MR. SKRYD:  You didn't look at that.
20   MR. FISHER:  Joe, I'm sorry.  The agreement,
21 there was an adjective he used right before --
22       (Record read as requested.)
23   MR. SKRYD:  What does that stand for, for the
24 record?

Page 23

1    THE WITNESS:  Uniform Intermodal Interchange --
2    MR. SKRYD:  Agreement.
3    THE WITNESS:  -- agreement.
4    MR. FISHER:  Thanks.
5    MR. SKRYD:  Sure.
6    MR. BURKE:  Joe, are there still some others he
7  looked at or not?
8    MR. SKRYD:  Yeah, I'm just going to give you
9  all the stuff that he looked at.
10   MR. BURKE:  Yeah.  Okay.
11   THE WITNESS:  I looked at an inspection from the
12 trailer from -- or actually from the chassis; the
13 registration from the chassis; the delivery bill of
14 ladings from the load, Minneapolis; and the pick-up
15 bills from Exel in Hammond, Indiana.
16   MR. BURKE:  Okay.  Could you maybe keep those in
17 one pile and I'll come back to them in a little
18 bit --
19   MR. SKRYD:  Yeah, I will.  We'll keep them
20 sticking out.
21   MR. BURKE:  -- and go through them in --
22   MR. SKRYD:  I'm just going to see if there's
23 anything else he reviewed.
24   MR. BURKE:  -- in little bit more detail.

Page 24

1       And if there is, you can just put it on
2  that pile and we'll go through it.
3  BY MR. BURKE:
4    Q.  You -- obviously, you're familiar with the
5  occurrence in which Mr. Franke was involved in a
6  collision with Mr. Scheinman's vehicle, correct?
7    A.  Yes.
8    Q.  Okay.  Did you go to that scene at all,
9  sir?
10   A.  I did not.
11   Q.  Okay.  The -- Mr. Franke was operating a
12 truck tractor; is that correct?
13   A.  Correct.
14   Q.  Do you recall what model or -- of tractor?
15   A.  It's a 2004 Freightliner.
16   Q.  And I think I already asked you, but who
17 owned that Freightliner tractor?
18   A.  Martin's Bulk Milk Service, Incorporated.
19   Q.  And do you know for about how long Martin's
20 had owned that tractor?
21   A.  Since it's been new.
22   Q.  Okay.  And was that a 2000, did you say?
23   A.  2004.
24   Q.  2004?

Page 25

1       Who -- who performed the normal
2  maintenance on that tractor?
3    A.  Our shop in Wilton.
4    Q.  And when you say "our," who do you mean?
5    A.  Martin's Bulk Milk Service's own shop in
6  Wilton, Wisconsin.
7    Q.  Now, at the time of this incident,
8  Mr. Franke was hauling a chassis; is that right?
9    A.  A box and a chassis.
10   Q.  And the box was placed on top of the
11 chassis, correct?
12   A.  Correct.
13   Q.  How does the chassis and box that
14 Mr. Franke was hauling differ than what sometimes
15 might be referred to as a trailer?
16   A.  A box and chassis -- that the box can be
17 lifted off from the chassis, whereas a regular
18 trailer cannot be.  It's all one unit.  His was two
19 units.
20   Q.  This had a separate just flat chassis,
21 correct?
22   A.  Correct.
23   Q.  And onto that chassis could be placed
24 various steel box-like containers, correct?

Page 26

1    A.   Correct.
2    Q.   Those type of -- the type of container that
3  Mr. Franke was hauling can also be placed onto rail
4  cars; is that right?
5    A.   Yes.
6    Q.   Who owned the chassis that was being
7  hauled?
8    A.   I don't know.
9    Q.   Have you looked at any documents or
10  attempted to make that determination?
11    A.   On this form which came out of the chassis
12  of the trailer, and it says, Owner:  Trac Leasing,
13  Incorporated.
14    Q.   Just so we have some organization to the
15  transcript, Mr. Martin, is this -- we probably
16  should --
17    MR. SKRYD:  Let me --
18    MR. BURKE:  Do you want to mark these?
19    MR. SKRYD:  Let's take a short break.  I'll go
20  make some copies of all the things.
21         Off the record.
22         (Recess taken.)
23
24

Page 27

1         (Whereupon, Martin Deposition
2         Exhibit Nos. 3 - 11 were
3         marked for identification
4         as of this date.)
5  BY MR. BURKE:
6    Q.   Mr. Martin, I was in the process of asking
7  you who owned the trailer and I think you had just
8  started looking at an exhibit.  And we have now
9  marked that exhibit as Exhibit No. 3, correct?
10    A.   (Indicating.)
11    MR. SKRYD:  And I think, Rich, what he said for
12  the record is he didn't know who owned the trailer,
13  but this was what was in the trailer, Exhibit 3.
14  BY MR. BURKE:
15    Q.   Okay.  And that's a document entitled a
16  Maine -- the State of Maine, M-a-i-n-e, Motor
17  Vehicle Registration Inquiry; is that right?
18    A.   Yes.
19    Q.   Okay.  Do you understand what that document
20  is in your trucking business or what it's used for?
21    A.   Yes.
22    Q.   Okay.  What -- what is that, sir?
23    A.   It's the registration for the trailer.  It
24  has the license plate number, the VIN number, the

Page 28

1  year and make of the trailer -- excuse me, the year
2  and make of the chassis.
3    Q.   And in actuality, this document refers to
4  it as a trailer, correct?
5    A.   Yes.
6    Q.   Okay.  But you believe this to be referring
7  to the chassis that Mr. Franke was hauling?
8    A.   Only by -- that it came out of the front of
9  the trailer.  It came off the chassis on the
10  registration box.
11    Q.   Okay.  And do you know who retrieved --
12    A.   I do not.
13    Q.   -- that document?
14         And it indicates that Trac, T-r-a-c,
15  Lease, Inc., is the owner of the chassis, correct?
16    A.   Correct.
17    Q.   Okay.  By the way, did this chassis have --
18  it has its own wheels and axles, correct?
19    A.   Correct.
20    Q.   Okay.  Do you know how many axles?
21    A.   Two axles.
22    Q.   Okay.  Front and back?
23    A.   Yes.
24    Q.   Okay.  Do you know how many wheels?

Page 29

1    A.   Eight.
2    Q.   How many?
3    A.   Eight.
4    Q.   Eight?  Okay.
5         Are they duals?
6    A.   Yes.
7    Q.   Okay.  Does this chassis have its own
8  brakes?
9    A.   Yes.
10    Q.   Okay.  What other component parts exist on
11  this chassis other than axles, wheels, brakes?
12    A.   Dollies.
13    Q.   Okay.  And what are the dollies used for?
14    A.   To hold the trailer in place when it's
15  unhooked from a tractor.
16    Q.   What else, Mr. Martin, in terms of the
17  structure of the chassis?
18    A.   It holds the front end up.  It's
19  underneath -- underneath the chassis toward the
20  front.
21    MR. SKRYD:  He wants to know what other
22  component parts are there of the chassis.
23    THE WITNESS:  Oh, okay.
24  BY MR. BURKE:

Page 30

1    Q.   You were talking about the dolly just in
2  your last answer, right?
3    A.   Yes.
4    Q.   Okay.  And what -- yeah, anything else in
5  terms of component parts of the chassis?
6    A.   No, it's pretty much just a frame.
7    Q.   Okay.  How does a container get affixed
8  onto a chassis like this one?
9    A.   With the use of a hoist.
10    Q.   And how does the container get secured to
11  the chassis?
12    A.   It has four locks on each side of the
13  trailer, two in the front, two in the back.
14    Q.   How do those locks actually get locked?
15    A.   The --
16    Q.   Does it -- go ahead.
17    A.   The CSX rail yard locks them in place.
18    Q.   And how do they do that?  Does it require
19  some equipment to do that?
20    A.   It would probably require some kind of a
21  bar to put them in place.
22    Q.   Okay.  Okay.  How about -- who owned the
23  container that was on the chassis that was being
24  hauled at the time of this incident?

Page 31

1    A.   I don't know.
2    Q.   Do you know who was leasing the container?
3    A.   Celtic.
4    Q.   And are you familiar with a company called
5  Celtic Cartage, Incorporated?
6    A.   Just that they're a drayman.
7    Q.   Okay.  And what does that mean?
8    A.   They lease the equipment from the
9  railroads.
10    MR. BENTIVENGA:  If I could interject.
11        If you're answering from a document,
12  would you mind identifying what that is.
13    MR. BURKE:  Yeah, I'm going to.
14    MR. BENTIVENGA:  Thank you.  I appreciate it.
15    MR. BURKE:  I will get to that.
16    MR. BENTIVENGA:  Thank you.
17  BY MR. BURKE:
18    Q.   And I think you just said they lease
19  equipment from the railroad?
20    A.   Correct.
21    Q.   Okay.  And what railroad are you referring
22  to or do you mean a specific one?
23    A.   I'm not sure.  All I know is that they
24  leased this container on that particular day.

Page 32

1    Q.   Okay.  Let me -- I think you do have a
2  document which I'll tender to you as -- marked as
3  Martin's Exhibit No. 9.
4        What's your understanding of what this
5  document consists of, Mr. Martin?
6    A.   This is a demurrage document showing that
7  we owe $8,050.
8    MR. SKRYD:  How do you spell that, demurrage?
9    THE WITNESS:  D-e-m-a-r-g-e (sic).
10  BY MR. BURKE:
11    Q.   And is the letter -- is this letterhead
12  from Celtic?
13    A.   Yes.
14    Q.   Okay.  And that's on Exhibit 9 I'm talking
15  about.
16    A.   (Nodding.)
17    Q.   Okay.
18    MR. SKRYD:  Is that a "yes"?
19    THE WITNESS:  Yes.
20  BY MR. BURKE:
21    Q.   Did you say that this -- and this --
22  Exhibit No. 9 is entitled Accessorial Approval
23  Form; is that correct?
24    A.   Yes.

Page 33

1    Q.   Okay.  And did you say this is a document
2  from Celtic to Martin saying that Martin's owes
3  $8,050?
4    A.   Yes.
5    Q.   Okay.  And there's a unit number on here
6  that is CSXU 937987; is that correct?
7    A.   Yes.
8    Q.   Okay.  Is that for the container?
9    A.   Yes.
10    Q.   Okay.  And, essentially, what is this
11  document for?
12        Is it for -- I mean, I'll let you -- you
13  tell me.  But what I'm getting at is, why are you
14  being -- being billed?  What are they billing you
15  for?
16    A.   It's out past the chargeable dates.  It was
17  engaged (phonetic) on 7/3 and then they can charge
18  us after 7/8.
19    Q.   Okay.  And this is for the use of the
20  container as distinguished from the chassis?
21    A.   The unit, the whole unit.
22    Q.   The whole unit, chassis and container?
23    A.   (Nodding.)
24    MR. SKRYD:  Is that a "yes"?

Page 34

1    BY MR. BURKE:
2    Q.  Is that right?
3    A.  Yes.
4    Q.  Okay.  And now, this -- based on this
5    document, it indicates that this chassis and
6    container had been originally removed by
7    MBM Logistics, correct?
8    A.  Yes.
9    Q.  And when did they first -- when did
10   MBM Logistics first start using this trailer or
11   this chassis and container?
12   A.  7/3.
13   Q.  Okay.  July 3rd of '08?
14   A.  Yes.
15   MR. SKRYD:  MBM Logistics?  Can you listen to
16   the question?
17       I guess my objection is, to the extent
18   that this document is not consistent with the
19   testimony, I object because it wasn't prepared by
20   Martin's Bulk.
21   MR. BURKE:  Okay.
22   MR. SKRYD:  Do you understand --
23   THE WITNESS:  Yeah.
24   MR. SKRYD:  -- what I'm saying?

Page 35

1    BY MR. BURKE:
2    Q.  And the document down on the bottom and --
3    just direct your attention to where I'm at -- that
4    indicates that the unit was out the gate by an MBM
5    driver, correct?
6    A.  Yes.
7    Q.  Okay.  And then it says the truck was
8    involved in an accident.  The unit's being held by
9    the state police for investigation, correct?
10   A.  Yes.
11   Q.  Do you see where it says "authorized by"?
12   A.  Yes.
13   Q.  Okay.  What -- and there's some numbers.
14   Who -- what are those numbers?  Where are they
15   coming from?
16   A.  Celtic.
17   Q.  Okay.  And is that -- is that an invoice
18   number or an approval number for -- by Celtic to
19   permit use of this chassis and container?
20   A.  Approval number.
21   Q.  Okay.  And then it lists the company to
22   whom they gave approval to use this chassis and
23   container as MBM Logistics, correct?
24   MR. GOLDEN:  If he knows.

Page 36

1    MR. SKRYD:  Okay.  What was the question again,
2    Rich?
3    MR. BURKE:  My question is the --
4    MR. SKRYD:  What does the document actually say?
5    BY MR. BURKE:
6    Q.  Yeah, the document indicates that Celtic is
7    saying they authorized use of this chassis and
8    container by MBM Logistics, correct, Mr. Martin?
9    MR. SKRYD:  I guess, Rich, my objection to that
10   question is the form.  I don't know if he would
11   know what Celtic meant by this.
12       I think the document itself says,
13   Company:  MBM Logistics.  I think that's what it
14   does say.
15       What it means to Celtic, if you know,
16   you can say.  If you don't know, I don't want you
17   to guess.
18   THE WITNESS:  Yeah, I don't know why it...
19   MR. SKRYD:  You don't know why what?
20   THE WITNESS:  I don't know if they meant
21   Martin's Bulk Milk.
22   BY MR. BURKE:
23   Q.  On this type of document, you -- you have
24   seen this type of document before, correct?

Page 37

1    A.  No.
2    Q.  You have not?
3    A.  No.
4    Q.  Okay.  Did -- has this bill been paid?
5    A.  No.
6    Q.  Has either Martin's Bulk Milk or
7    MBM Logistics paid this bill?
8    A.  No.
9    Q.  The -- under -- on the very bottom, the
10   last few lines that we've been talking about where
11   it says "authorized by" and then it's got some
12   numbers that you told me are Celtic's numbers or
13   code for their authorization to use this chassis,
14   that's your understanding of it?
15   A.  Yes.
16   Q.  Okay.  And then immediately underneath, it
17   has the word "company" and it says MBM Logistics,
18   correct?
19   A.  Yes.
20   Q.  Did MBM Logistics use this chassis and
21   container on July 3rd, 2008?
22   A.  Martin's Bulk Milk used the container along
23   with Overnite Express.  Exel is where we loaded.
24   Destined to Minneapolis.

Page 38

1    Q.  By the way, Exel, could you spell that for
2  us, please.
3    A.  E-x-e-l.
4    MR. SKRYD:  He's referring, Richard, to Martin
5  Exhibit 11.
6  BY MR. BURKE:
7    Q.  Yeah, I was just going to ask.
8        You glanced at Exhibit No. 11 to find
9  the spelling for Exel, correct?
10    A.  Yes.
11    Q.  Okay.  I'll come back to that exhibit in a
12  moment, Mr. Martin.
13        The -- well, did Martin's -- excuse me.
14  Did MBM Logistics use this chassis-container unit
15  on any of the two or three days immediately
16  preceding July 3rd, 2008?
17    A.  No.
18    Q.  How did it come about or how did it happen
19  that Sam Franke -- strike that.
20        Where did -- where did Sam Franke or
21  someone else on behalf of Martin's first obtain
22  possession of the container/chassis that Franke was
23  hauling at the time of this incident?
24    MR. SKRYD:  Objection.  My only objection is to

Page 39

1  form as to possession.  The way that can --
2    MR. BURKE:  I kind of mean that as physical
3  possession or where -- where did he --
4  BY MR. BURKE:
5    Q.  -- where did Mr. Franke first --
6    MR. SKRYD:  Hook up to it.
7  BY MR. BURKE:
8    Q.  -- hook up his -- or hook up that trailer
9  that -- I'm sorry.
10        Where did Mr. Franke first hook up that
11  chassis and container to the tractor he was driving
12  on July 3rd, 2008?
13    A.  On Exhibit 8, he picked up CSXU 937987 in
14  Chicago.
15    MR. SKRYD:  One thing, when you're reading from
16  something, just to make it easier for Steve, don't
17  talk so fast, okay?
18  BY MR. BURKE:
19    Q.  Okay.  And you're looking at what we've
20  marked as Exhibit No. 8.  And what's the title of
21  that document, sir?
22    A.  ITOPS Inspection, Detail Display.
23    Q.  Okay.  And do you know who generates or
24  creates that document?

Page 40

1    A.  I do not.
2    Q.  Okay.  Do you know what -- what that
3  document consists of or what it is supposed to be?
4    A.  It's a release form for a container
5  trailer.
6    Q.  And who is releasing it?
7    A.  CSX.
8    Q.  And that document also indicates that the
9  drayage company is Celtic Cartage, correct?
10    A.  Yes.
11    Q.  From that document, Exhibit 8 -- do I have
12  the number right, Exhibit 8?
13    A.  Yes.
14    Q.  From what location -- or strike that.
15        Do you believe this indicates the
16  location from which Mr. Franke picked up the
17  con- -- the chassis?
18    A.  The location says Chicago.
19    Q.  And do you know where in Chicago?
20    A.  No.
21    Q.  And do you know -- does it indicate the
22  approximate time he picked it up?
23    A.  I can't tell what time he picked it up.
24    MR. SKRYD:  From that document, correct?

Page 41

1    THE WITNESS:  Yes.
2  BY MR. BURKE:
3    Q.  Do you know what time he -- approximately
4  what time he picked it up from your own knowledge
5  or from any other document?
6    MR. SKRYD:  He's probably going to refer to the
7  log, right?  Is that what you're looking for?
8    THE WITNESS:  Yes.
9    MR. SKRYD:  All right.  I got to get that.  Hold
10  on.
11        All right.  He's referring to Franke's
12  logs of July 3rd, '08; is that correct?
13    THE WITNESS:  Yes.
14    MR. BURKE:  Maybe we can -- we don't have to do
15  it this moment, but what's the next number?
16    THE REPORTER:  12.
17    MR. BURKE:  Maybe we can make it a Group 12.
18    MR. SKRYD:  You're going to make me photocopy
19  the whole thing?
20    THE WITNESS:  According to the log, he left --
21    MR. SKRYD:  Hold on a second.  Rich?
22    MR. BURKE:  Yeah.
23  BY MR. BURKE:
24    Q.  Mr. Martin, what on the logs, which we'll

Page 42

1    mark as Group 12, indicates to you the time or
2    approximate time that Mr. Franke picked up this
3    chassis and container?
4        A.  6:30.
5        Q.  A.m. or p.m.?
6        A.  P.m.
7        Q.  Okay.  On what date, sir?
8        A.  7/3/08.
9        Q.  And is there any other information there at
10   the specific location that he picked it up at?
11       A.  It states Chicago.
12       Q.  Okay.  Was it a CSX facility?
13       A.  Yes.
14       MR. BENTIVENGA:  I'm sorry.  I didn't understand
15   your first question.  Can you just say that again?
16           Did you say staged Chicago?
17       MR. SKRYD:  Stated.
18       THE WITNESS:  The document states Chicago.
19       MR. BENTIVENGA:  States Chicago.  Okay.  I'm
20   sorry.  Thank you.
21               (Whereupon, Martin Deposition
22               Exhibit No. 12 was
23               marked for identification
24               as of this date.)

Page 43

1    BY MR. BURKE:
2        Q.  Thanks, Mr. Martin.
3           We've been looking at a few documents.
4    And can you tell me or can you give us an overview
5    of what your understanding is as to how Mr. Franke
6    came to be hauling the chassis and container
7    containing the goods that it contained at the time
8    of this incident?
9        MR. SKRYD:  You mean from when he left Wilton to
10   the time he picked it up --
11       MR. BURKE:  Exactly.
12       MR. SKRYD:  -- at IP all the way through the
13   accident?
14       BY MR. BURKE:
15       Q.  Yeah.  If you can just give us an overview,
16   to the extent you know that, without necessarily
17   getting into documents.  Just so we have the big
18   picture.
19       A.  He would leave --
20       MR. SKRYD:  Okay.  Not he would, should.  What
21   he did, to the best of your understanding.
22       MR. BURKE:  Yes.  And --
23       MR. SKRYD:  He left Wilton, he went... You
24   know, that's what we're looking for; not if he

Page 44

1    would have done or should have done, that kind of
2    thing.
3           If you know.
4    BY MR. BURKE:
5        Q.  Here, let me start with a question.
6           Did -- did Martin's or Mr. Franke
7    receive some assignment to pick up some goods from
8    International Paper?
9        A.  Yes.
10       Q.  Okay.  And from whom did they receive that
11   assignment?
12       A.  From Overnite Express.
13       Q.  Okay.  And what is the business of
14   Overnite Express?
15       A.  They are a carrier and a broker.
16       Q.  Did Martin's have a business relationship
17   with Overnite Express on and prior to July 3rd,
18   2008?
19       A.  Yes.
20       Q.  And for what period of time?
21       A.  Year and a half.
22       Q.  And what was the nature of that business
23   relationship, Mr. Martin?
24       A.  We would haul a load of paper from Exel

Page 45

1    Logistics in Hammond, Indiana, to Minneapolis
2    daily.
3        Q.  From Hammond to Wilton?
4        A.  Hammond to Minneapolis.
5        Q.  Thank you.
6           How was Overnite Express involved in
7    that daily transportation of paper?
8        MR. FISHER:  Objection.  Form.
9        THE WITNESS:  They would daily dispatch a load
10   from Hammond to Minneapolis.
11       BY MR. BURKE:
12       Q.  Did you -- did Martin's have some type of
13   agreement or contract with Overnite Express?
14       A.  A carrier broker agreement.
15       Q.  And explain what you mean by that, please.
16       A.  It's an agreement to haul freight for
17   Overnite Express basically to cover
18   back-solicitation and to prove that we had
19   insurance.
20       Q.  I missed the first thing you said.
21   Basically to?
22       A.  I forgot.
23               (Record read as requested.)
24       BY MR. BURKE:

1    Q.   And what do you mean by the term
2    "back-solicitation"?
3    A.   International Paper is Overnite Express's
4    customer.  So I cannot back-solicit
5    International Paper and go around them.
6    Q.   And is Martin's a customer of
7    Overnite Express?
8    A.   Yes.
9    Q.   With respect to -- or strike that.
10        Do you have a -- did you have an actual
11   written contract or agreement -- did Martin's have
12   a written contract or agreement with
13   Overnite Express?
14   A.   Yes.
15   Q.   And, generally, what, to your
16   understanding, were the terms of that contract?
17   MR. FISHER:  Objection.  Form.
18   THE WITNESS:  I don't recall.
19   BY MR. BURKE:
20   Q.   Pursuant to that contract -- or strike
21   that.
22        With respect to this actual incident,
23   how was Overnite Express involved with respect to
24   Martin's as to the goods that were being hauled at

1    the time of this collision?
2    A.   Well, on Exhibit 11, they sent over
3    confirmation to pick up a load out of
4    International Paper Exel Warehouse, Hammond,
5    Indiana, to Minneapolis on 7/7.
6    Q.   And is that the document entitled Broker
7    Confirmation Sheet?
8    A.   Yes.
9    Q.   And I think you said Overnite faxed that to
10   Martin's, is that correct, on July 3rd, 2008?
11   A.   Yes.
12   Q.   All right.  And there -- up in the upper
13   left-hand corner of that document, there's the date
14   July 3rd, 2008 and the time 16:23.
15        Do you see that?
16   A.   Yes.
17   Q.   Okay.  Is that 4:23 --
18   A.   Yes.
19   Q.   -- p.m. in the afternoon?
20        Whose phone number is that after that,
21   the (708) 331-8604?
22   A.   Overnite Logistics.
23   Q.   Do you know where Overnite Logistics is
24   located?

1    A.   Chicago and Minneapolis.
2    Q.   And where in Chicago, if you know?
3    A.   I don't know.
4    Q.   Do you -- do you know the facility or
5    location -- or strike that.
6        Do you know whose phone number -- strike
7    that.
8        I think you said you think it's
9    Overnite Logistics' phone number?
10   A.   I know it's Overnite Logistics' phone
11   number.
12   Q.   Okay.  Do you know the location where that
13   phone is located?
14   A.   No.
15   Q.   In response to -- or strike that.
16        If you could just walk us through this
17   document a little more slowly.  I know you already
18   mentioned it.  But, essentially, what is Overnite
19   asking Martin's to do per -- under this document,
20   Exhibit No. 11, is it?
21   MR. SKRYD:  Yeah.
22   THE WITNESS:  Asking to pick up a load on
23   7/3/08.
24   BY MR. BURKE:

1    Q.   Asking Martin's to pick up a load?
2    A.   Asking Martin's to pick up a load 7/3/08 at
3    19:00.
4    MR. SKRYD:  What's that?  At 19:00.  The time
5    19:00.
6    BY MR. BURKE:
7    Q.   And that would be 7:00 p.m.; is that right?
8    A.   Yes.
9    Q.   Okay.  And where was that load to be picked
10   up at?
11   A.   Exel Warehouse, International Paper,
12   Hammond, Indiana.
13   Q.   Do you know the business that
14   Exel Warehouse is involved in?
15   A.   Distribution of paper.
16   Q.   Do you know if they are owned by or
17   affiliated with International Paper in any manner?
18   A.   I do not.
19   Q.   Have you been to that Exel Warehouse in
20   Hammond, Indiana?
21   A.   Yes.
22   Q.   What's physically located there,
23   Mr. Martin?
24   A.   A big warehouse.

Page 50

1    Q.   And stores paper?
2    A.   Yes.
3    Q.   Okay.  Anything else?
4    A.   Not to my knowledge.
5    Q.   Does Exel have trucks for their own
6    transportation?
7    A.   I don't know.
8    Q.   Okay.  With respect to Exhibit 11,
9    Mr. Martin, what else was Overnite asking Martin's
10   to do after picking up this load of paper at the
11   Exel Warehouse?
12   A.   To deliver the load on 7/7/08.
13   Q.   And from this document, do you have an
14   understanding of who owned the load of paper that
15   was being delivered?
16   A.   I do not.
17   MR. FISHER:  Excuse me.  Objection.  Form.
18        At what time?
19   BY MR. BURKE:
20   Q.   At the time it's being picked up.
21        Is your answer still you do not know?
22   A.   I do not.
23   Q.   Okay.  If -- what, if anything, does the
24   expression next to the word "shipper" where it

Page 51

1    says, International Paper/Exel Warehouse, written
2    in that manner next to "shipper," does that have
3    any meaning to you in terms of who owns the
4    product, who's storing the product or anything
5    else?
6    A.   No.
7    Q.   Who does -- in the upper right-hand corner
8    of this document, it's got the name Melody Hansen,
9    H-a-n-s-e-n.  Do you know who she works for?
10   A.   She's the person from Overnite that
11   generates this confirmation.
12   Q.   Okay.
13   MR. SKRYD:  Generates Exhibit 11?
14   THE WITNESS:  Yes, 11.
15   BY MR. BURKE:
16   Q.   Do you -- back in 2008, would you get these
17   type of sheets on a daily basis from either Melody
18   Hansen or someone else at Overnite?
19   A.   Yes.
20   Q.   You were starting to tell us that Overnite
21   was asking Martin's to make delivery of this paper
22   on July 7th, 2008, correct?
23   A.   Yes.
24   Q.   Okay.  And to where was the paper to be

Page 52

1    delivered?
2    A.   According to Exhibit 11, it has three stops
3    in Minneapolis.
4    MR. SKRYD:  Three stops in Minneapolis?
5    THE WITNESS:  Yes.
6    BY MR. BURKE:
7    Q.   Okay.  And what were those three stops?
8    A.   Cenved, Midland Paper, XPEDX, Minneapolis.
9    MR. SKRYD:  For Steve's edification, how are you
10   spelling Cenved?
11   THE WITNESS:  Cenved, C-e-n-v-e-d.
12   BY MR. BURKE:
13   Q.   And then underneath that, it's -- there's a
14   line that says, Total payment to the carrier
15   inclusive of accessorial; it says $974.08, correct?
16   A.   Yes.
17   Q.   Okay.  What does that line and that number
18   mean?
19   A.   That means that that is the total amount
20   that we received from Hammond, Indiana, to
21   Minneapolis delivering three stops.
22   Q.   And when you say "we," you're talking about
23   Martin's?
24   A.   Yes.

Page 53

1    Q.   And from whom are you receiving that
2    $974.08?
3    A.   Overnite Logistics.
4    Q.   Physically, how would you -- or how would
5    Martin's get paid?  Would it be by check or would
6    there be a wire transfer or otherwise?
7    A.   Check.
8    Q.   And would it come on a check written on an
9    Overnite account?
10   A.   Yes.
11   Q.   And then, actually, in the document itself,
12   there's another paragraph that goes on to discuss
13   some of the details of the payment, correct?
14   A.   Yes.
15   Q.   Okay.  And, actually, in this document, it
16   makes reference to UACL remitting payment.  Do you
17   see that?
18   A.   Yes.
19   Q.   Okay.  And do you know what UACL refers to?
20   A.   No.
21   Q.   Did there -- are you familiar with
22   Universal Am-Can?
23   A.   Yes.
24   Q.   Did there -- did there come a point in time

Page 54

1  when Martin's had some relationship with -- or --
2  with Universal Am-Can?
3      A.  Yes.
4      Q.  Okay.  Tell us about that.
5          How did that come about, sir, as you
6  understand it?
7      A.  The way I understand, Universal Am-Can
8  bought out Overnite Logistics.
9      Q.  Okay.  And did that take place in
10  approximately May or June of 2008?
11      A.  I don't recall.
12      Q.  Did you receive correspondence from
13  Universal Am-Can indicating that they were honoring
14  all contracts that you had with Overnite?
15      A.  They sent some documentation telling us
16  that they were bought out, is what I recall.
17      MR. SKRYD:  Overnite sent you that or Am-Can?
18  You said "they."  What does that mean?
19      THE WITNESS:  I don't recall the documents.
20  BY MR. BURKE:
21      Q.  Is it Overnite that you believe was bought
22  out by Universal Am-Can?
23      A.  Yes.
24      Q.  Did you continue doing business and

Page 55

1  transporting paper from this Exel Warehouse on a
2  regular daily basis after you believe Universal
3  bought out Overnite?
4      A.  Yes.
5      Q.  Did you do so under the same terms of your
6  agreement with Overnite?
7      A.  Yes.
8      MR. SKRYD:  You got to take a break, Carl!
9      MR. FISHER:  Nope.  At a certain point, I do, to
10  my car, but that's -- off the record.
11          (Discussion off the record.)
12          (Recess taken.)
13  BY MR. BURKE:
14      Q.  Mr. Martin, earlier, I -- one of the first
15  things I asked you is what your job is.  I think
16  you told me you're the operations manager for
17  Martin's; is that right?
18      A.  Yes.
19      Q.  Okay.  What do you do in that position?
20      A.  I line up freight for my trucks, find
21  back-hauls, deal with drivers.
22      Q.  And what's a back-haul in your business?
23      A.  I would say leaving Wisconsin delivering to
24  a state, or it could be within the state, and then

Page 56

1  coming back to Wisconsin, back to our terminal.
2      Q.  So making a delivery and coming back to the
3  Martin's terminal?
4      A.  Yes.
5      Q.  All within a certain time period or not
6  necessarily?
7      A.  Not necessarily.
8      Q.  With respect to Exhibit No. 11, the
9  confirmation sheet you got from
10  Overnite Logistics -- by the way, do you know the
11  difference between -- if any -- Overnite Logistics
12  and Overnite Express, Incorporated?
13      A.  I do not.
14      Q.  With respect to Exhibit 11, you had -- were
15  telling us that this confirmation sheet got faxed
16  to you.
17          What did you do in response to receipt
18  of this document?
19      A.  Mr. Franke is informed to pick up this
20  load, which is Exhibit 11, and dispatch from my
21  office contacts (sic) that information to him.
22      Q.  Do you know where Mr. Franke physically was
23  located when he had this information communicated
24  to him?

Page 57

1      A.  Chicago.
2      Q.  Okay.  And was there a dispatcher at
3  Martin's that communicated this information?
4      A.  Yes.
5      Q.  And pursuant to this request by Overnite,
6  did Mr. Franke go to the Exel Warehouse?
7      A.  Yes.
8      Q.  Did he obtain -- did he make a pick-up of
9  paper product?
10      A.  He picked up paper at -- for
11  International Paper at Exel Warehouse for
12  Overnite Logistics.
13      Q.  And what did he do with it after making
14  that pick-up?
15      A.  He made it to Highland Park, which is where
16  he had the accident.
17      Q.  Okay.  And was he en route -- or strike
18  that.
19          Where -- where was Mr. Franke heading
20  to?  Was he going to Minneapolis for these
21  deliveries or elsewhere?
22      A.  Wilton.
23      Q.  Wilton?
24          Okay.  And what would happen -- how

Page 58

1  would this paper ultimately get transported to
2  Minneapolis?
3      A.  By another one of my drivers, Martin's
4  drivers.
5      Q.  And it was going to get there by -- get to
6  Minneapolis to these three different companies by
7  July 7th as requested by Overnite?
8      A.  Yes.
9      Q.  When Mr. Franke would go to
10  International -- or go to Exel and pick up paper
11  for International, how would -- you know what, let
12  me -- let me strike that question.
13      We talked about this earlier; but in
14  relation to Martin's receiving this request from
15  Overnite, when did Mr. Franke pick up the chassis
16  and container that he took to Hammond to pick up
17  the paper in?
18      MR. SKRYD:  Again, the witness is referring to
19  Group Exhibit 12?
20      THE WITNESS:  12.
21      MR. SKRYD:  Which are the --
22      MR. BURKE:  The logs?
23      MR. SKRYD:  The logs.
24      THE WITNESS:  He picked up the container on

Page 59

1  7/3/08 from CSX yard, 47th Street, 6:30 p.m.
2  BY MR. BURKE:
3      Q.  And that was it.
4      So that's a couple hours later after
5  Overnite sends this request to Martin's, correct?
6      A.  Yes.
7      Q.  And then when -- do you have anything in
8  front of you that tells us when Mr. Franke got to
9  the Exel Warehouse to pick up the
10  International paper?
11      A.  Also on Exhibit 12, 7:30 p.m. on 7/3/08.
12      Q.  Okay.  In your business and in this case in
13  particular, when Mr. Franke would arrive at the
14  Exel Warehouse, who would do the actual loading of
15  the paper into the container that he brought?
16      A.  An Exel employee.
17      Q.  Do you know how they do that?  Is it with
18  forklifts or equipment?
19      A.  Forklift or clamp.
20      Q.  Or what?
21      A.  Or a clamp.
22      Q.  Thereafter, what do you believe Mr. Franke
23  did after the paper was loaded into the container?
24      A.  He proceeded northbound.

Page 60

1      Q.  Back into the Chicago area and through
2  Chicago?
3      A.  Yes.
4      MR. SKRYD:  For the record, Rich, do you want to
5  know what time he left Exel?
6  BY MR. BURKE:
7      Q.  If you have that in front of you, if you
8  could tell us that, please do so, Mr. Martin.
9      A.  He left Exel distribution, load of
10  International paper, at 9:30 p.m., 7/03/08.
11      MR. SKRYD:  And, again, you were referring to
12  the log on July 3rd of '08 of Exhibit -- Group
13  Exhibit 12?
14      THE WITNESS:  Yes.
15  BY MR. BURKE:
16      Q.  And it was after that departure from the
17  Exel Warehouse and during the return trip to Wilton
18  that this collision occurred, correct?
19      A.  Yes.
20      Q.  Is it your understanding that it was
21  International Paper that was requesting Overnite to
22  transport its paper product to these three
23  different locations in Minneapolis?
24      A.  Yes.

Page 61

1      MR. FISHER:  Objection.  Foundation, form.
2  BY MR. BURKE:
3      Q.  And what, if anything, do you have either
4  on documents or from your knowledge of industry
5  custom and practice that causes you to say that,
6  Mr. Martin?
7      A.  I have a load confirmation from
8  Overnite Logistics to pick up a load of
9  International paper from Hammond, Indiana, at
10  Exel Warehouse.
11      MR. SKRYD:  What's that, for exhibit?
12      THE WITNESS:  Exhibit 11.
13      And I also have the delivery bill of
14  lading numbers -- delivery bill of ladings,
15  Exhibit 5, going to their destinations.
16  BY MR. BURKE:
17      Q.  And on Exhibit 11, the shipper is
18  identified as International Paper/Exel Warehouse?
19      A.  Yes.
20      Q.  How about Exhibit 5?  I think that's it
21  right there, Mr. Martin.
22      Okay.  That is actually a three-page
23  exhibit, correct?  There's three pages --
24      A.  Yes.

Page 62

1    Q.  -- attached there?
2        Okay.  And those are various -- they're
3    entitled Memo Bills.  Do you refer to them as
4    anything else in your business?
5    A.  Bill of lading.
6    Q.  Bill of lading?
7        And, essentially, what do you understand
8    those memo bills to consist of or to represent?
9    A.  They tell the shipper, which is
10   International Paper, Exel Warehouse.  They also
11   tell the carrier, which is Overnite Express.
12   Q.  What's the purpose of this document, as you
13   understand it?
14   A.  It's a legal delivery document.
15   Q.  Okay.  And there are -- are there three
16   separate memo bills or bills of lading for the
17   three ultimate destinations for this paper product?
18   A.  Yes.
19   Q.  Okay.  And there are -- all three of those
20   are contained in Exhibit 5, correct?
21   A.  Yes.
22   Q.  And they -- the carrier is identified as
23   Oxen, O-x-e-n, correct?
24   A.  Yes.

Page 63

1    Q.  And it indicates that the commodity is
2    printing paper, correct, in the middle of the --
3    A.  Yes.
4    Q.  Okay.  And it's -- it indicates that that
5    paper product is being received from
6    International Paper at its distribution center in
7    Hammond, Indiana, correct?
8    A.  Yes.
9    Q.  Do you see where it says "routes" and it
10   then says "Overnite Express, Inc."?
11   A.  Yes.
12   Q.  What does that mean to you?
13   A.  That means that International Paper is
14   giving the load to Overnite Express to be
15   delivered.
16   Q.  And Overnite Express, in turn, gave this
17   load of paper to Martin's to be delivered to the
18   locations that International Paper wanted it sent
19   to; is that correct?
20   A.  Yes.
21   Q.  Would it be correct that Martin's would
22   never have become involved in transporting this
23   paper if International Paper did not ask
24   Overnite Express to arrange for transportation?

Page 64

1    MR. FISHER:  Objection to form.
2    THE WITNESS:  Can you repeat that?
3    BY MR. BURKE:
4    Q.  Sure.
5        Would it be true and correct that
6    Martin's would never have gotten involved in
7    hauling this paper unless International Paper asked
8    Overnite to arrange for transportation of --
9    A.  Yes.
10   Q.  -- the paper products?
11       Would it also be true and correct that
12   Martin's would not have been involved in
13   transporting this paper on July 3rd unless
14   Overnite Express or Overnite Logistics contacted
15   Martin's and asked Martin's to transport this paper
16   from the Hammond distribution center of
17   International Paper to these three locations in
18   Minneapolis?
19   A.  Yes.
20   Q.  Would it be true, Mr. Martin, that in
21   transporting this paper, Martin's was performing a
22   service for the benefit of International Paper by
23   transporting their paper product to Minneapolis?
24   MR. FISHER:  Objection --

Page 65

1    THE WITNESS:  Yes.
2    MR. FISHER:  -- form.
3    BY MR. BURKE:
4    Q.  Would it also be true and correct that
5    Martin's was performing a service for
6    Overnite Express by transporting these paper
7    products that International Paper had asked
8    Overnite to get transported?
9    A.  Yes.
10   Q.  Isn't it true and correct that Mr. -- or
11   excuse me -- that Martin's was acting as an agent
12   for International Paper by transporting
13   International's paper product to Minneapolis?
14   MR. FISHER:  Objection to form.
15   THE WITNESS:  Yes.
16   BY MR. BURKE:
17   Q.  Would it also be true that Martin's was
18   acting as an agent for Overnite Express by
19   transporting the paper product that Overnite had
20   agreed with International to get transported to
21   Minneapolis?
22   A.  Yes.
23   MR. FISHER:  Objection to form.
24   BY MR. BURKE:

17 (Pages 62 to 65)

Page 66

1  Q.  What was your answer?
2  A.  Yes.
3  Q.  On Exhibit 5 that you have in front of you,
4  is that -- there's a -- on each of the three pages
5  on the top right, there's a signature -- there's
6  the word "signature" and then there is an actual
7  signature.
8      Do you know whose signature that is?
9  A.  Samuel Franke.
10  Q.  When -- what does the presence of
11  Mr. Franke's signature at that location indicate to
12  you on this memo bill or bill of lading?
13  A.  It means to me that he was loaded with a
14  load of International paper from him -- from
15  Hammond, Indiana, Exel Warehouse, lined by
16  Overnite Express, going to Minneapolis.
17  Q.  Am I correct that -- strike that.
18      Mr. Martin, I think, earlier, you told
19  us you -- that you believe this container and
20  chassis were owned by CSX; is that correct?
21  A.  CSX's name is on the side of the trailer.
22  Q.  And does that -- and when you say
23  "trailer," do you mean the container box or do you
24  mean the chassis or --

Page 67

1  A.  The container box.
2  Q.  -- the container box?
3      Okay.  In this type of transportation of
4  goods, does somebody have to pay for the use of
5  that container?
6  A.  Yes.
7  Q.  And did you get -- I think you also earlier
8  told us you got sent a bill from Celtic for about
9  $8,000, correct?
10  A.  Yes.
11  Q.  Insofar as -- or strike that.
12      You -- you also told us the -- this
13  container or chassis may have been owned by
14  Trac Leasing; is that correct?
15  A.  I -- according to this paper, the chassis's
16  owned by Trac Lease.
17  MR. SKRYD:  "This paper" is what number?
18  THE WITNESS:  Exhibit No. 3.
19  BY MR. BURKE:
20  Q.  Mart -- Mr. Martin, wouldn't it be true
21  that -- insofar as you were using a CSX container
22  to transport these paper products and you had to
23  pay for the use of that container, isn't it true
24  that that -- the transportation of goods here was

Page 68

1  being conducted, in part, for the use and benefit
2  of CSX?
3  MR. BENTIVENGA:  I'm going to object to the form
4  and foundation.
5  THE WITNESS:  Yes.
6  BY MR. BURKE:
7  Q.  Is it also true that you -- or strike that.
8      Is it also true that Martin's was acting
9  as an agent of CSX by utilizing their trailer and
10  paying them to transport goods for the use and
11  benefit of CSX?
12  MR. BENTIVENGA:  I'll object to the form and
13  foundation.
14  THE WITNESS:  Yes.
15  BY MR. BURKE:
16  Q.  To the -- or strike that.
17      At least to the extent that either this
18  chassis and/or container is owned by or leased by
19  Trac Leasing and Celtic, isn't it also true that
20  Martin's transportation of goods using this
21  chassis-container unit was being performed for the
22  use and benefit of both Trac Leasing and Celtic?
23  MR. BENTIVENGA:  I'll object to the form and to
24  foundation.

Page 69

1  THE WITNESS:  Yes.
2  BY MR. BURKE:
3  Q.  Is it also true that by doing so, Martin's
4  was acting as an agent of Trac Leasing and an agent
5  of Celtic?
6  MR. BENTIVENGA:  I'll object to the form and
7  foundation.
8  THE WITNESS:  Yes.
9  BY MR. BURKE:
10  Q.  Is it your understanding that
11  International Paper and/or Overnite determined
12  that -- the ultimate location to which this paper
13  needed to be delivered?
14  A.  Yes.
15  Q.  And did Overnite -- I'm sorry.
16      Did International Paper and/or Overnite
17  tell Martin's the time for both the pick-up and the
18  time for the delivery?
19  A.  Yes.
20  Q.  Martin's had to follow those instructions
21  and directions from -- that were faxed to you from
22  Overnite, correct?
23  A.  Yes.
24  Q.  Did -- did you believe that Martin's was

Page 70

1 obligated or required to follow instructions and
2 directions given to Martin's by International Paper
3 and/or Overnite as to the transportation of this
4 paper product commodity?
5 MR. FISHER: Objection to form and foundation.
6 THE WITNESS: Yes. ·
7 BY MR. BURKE:
8 Q. If in the middle of this -- or strike that.
9 If, at any point prior to the collision,
10 Overnite or International Paper had told Martin's
11 to stop the trip or make some changes, would
12 Martin's and Mr. Franke have done what Overnite and
13 International Paper told them to do?
14 A. Yes.
15 Q. Would it be correct that Overnite and
16 International Paper had the right to stop or
17 terminate the transportation of these goods at any
18 point during this -- this job?
19 A. Yes.
20 Q. Mr. Martin, were there reasons or
21 circumstances under which Overnite could withhold
22 or refuse to pay Martin's for this transportation
23 of goods?
24 A. I'm not sure.

Page 71

1 Q. Did Martin's believe that they had to
2 accurately and successfully complete the
3 transportation of goods in order to receive payment
4 from Overnite?
5 A. Yes.
6 Q. Did -- did Overnite require Martin's to
7 utilize a properly licensed and qualified driver to
8 transport these paper products?
9 A. Yes.
10 Q. Did Overnite also -- or strike that.
11 Isn't it correct that Overnite expected
12 and required Martin's to transport these goods in a
13 tractor-trailer unit that was safe for operation
14 and would timely accomplish the transportation of
15 goods?
16 MR. FISHER: Objection to foundation, form.
17 THE WITNESS: Yes.
18 BY MR. BURKE:
19 Q. Did Overnite -- isn't it true that Overnite
20 also required Martin's to utilize a driver and
21 trucking equipment that complied with all
22 Department of Transportation applicable regulations
23 for motor carriers?
24 A. Yes.

Page 72

1 Q. If Overnite or International Paper gave
2 Martin's any specific directions or instructions
3 concerning the safe transportation of the paper
4 products involved here, would Martin's have
5 followed those instructions?
6 A. Yes.
7 Q. Did Overnite and/or International Paper
8 require Martin's to maintain liability insurance as
9 a condition of being allowed to transport this
10 paper product for them?
11 A. Yes.
12 MR. SKRYD: Objection. Relevance.
13 You can answer.
14 THE WITNESS: Yes.
15 BY MR. BURKE:
16 Q. You don't mind me standing over you,
17 Mr. Martin?
18 A. Not at all.
19 Q. Let me ask you about a few more of those
20 documents that we have marked and I don't think
21 we've quite touched on yet.
22 Are these -- is this your file of what
23 we've gone through already?
24 MR. SKRYD: That's everything. No, it's all

Page 73

1 mixed up.
2 BY MR. BURKE:
3 Q. Okay. We talked about that. We talked
4 about that.
5 Exhibit 11, you've referred to. Those
6 are Mr. Franke's driver logs, correct?
7 MR. SKRYD: 12.
8 MR. BURKE: Oh, I'm very sorry. I misspoke.
9 BY MR. BURKE:
10 Q. Exhibit No. 12, are those Mr. Franke's
11 driver logs?
12 A. Yes.
13 Q. Okay. And those essentially -- this is a
14 log he's required to maintain on the hours for
15 which he is on duty, correct?
16 A. Yes.
17 Q. Okay. And these go -- they run from
18 June 3rd to -- actually, the last one ends --
19 MR. SKRYD: July.
20 BY MR. BURKE:
21 Q. -- on July -- I think it's July 5th; is
22 that right?
23 A. Yes.
24 Q. But he was off duty, it looks like, July

Page 74

1  4th and July 5th; isn't that correct?
2      Is that what that indicates?
3  A. Yes.
4  Q. Okay. And -- okay. And then it's got --
5  and then July 3rd, it indicates his working on what
6  hours?
7  A. From 2:30 till 11:00 p.m.
8  Q. So that's 2:30 p.m. on July 3rd until
9  11:30 p.m.?
10  MR. SKRYD: No.
11  THE WITNESS: 11:00 p.m.
12  BY MR. BURKE:
13  Q. Or -- I'm sorry. 11:00 p.m.?
14      Okay. Thank you.
15      Martin Exhibit 10 is the Uniform
16  Intermodal Interexchange and Facilities Access
17  Agreement. We touched on -- or you made reference
18  to it a couple of times; but, basically, what's
19  your understanding of what that document is,
20  Mr. Martin?
21  A. This document is an agreement for which we
22  can enter railroads and do a trailer interchange.
23  Q. Okay. And in this instance, was CSX one of
24  the railroads or facilities that Martin's could

Page 75

1  enter to do a trailer interchange?
2  A. Yes.
3  Q. Do you have a copy of the contract that
4  Martin's had with Overnite Express? Do you have
5  that here with you?
6  A. No.
7  Q. Okay. Where is that original?
8  A. It would be in a file in Wilton.
9  Q. And that's the contract you were talking
10  about earlier when you mentioned having an
11  agreement -- a business agreement or a business
12  arrangement with Overnite; is that correct?
13  A. It's a broker carrier agreement.
14  Q. How about -- Exhibit 5, we talked about
15  already. How about Exhibit 7, what's that,
16  Mr. Martin?
17  A. This is a copy of the repairs that was done
18  at our facility in Wilton between April 11th, '08
19  until June of '08.
20  Q. Okay. Repairs on what?
21  A. On Truck 139.
22  Q. Okay. And --
23  MR. SKRYD: I think it's repairs and/or
24  maintenance, Rich.

Page 76

1  MR. BURKE: Okay.
2  BY MR. BURKE:
3  Q. And is Truck 139, is that the tractor
4  involved in this incident?
5  A. Yes.
6  Q. And how about, since this is set forth in a
7  somewhat abbreviated fashion, could you --
8  MR. SKRYD: "This" is Exhibit 7.
9  BY MR. BURKE:
10  Q. Could you just decipher that for us on the
11  dates and tell us what your entries mean there.
12      And, actually, I'm sorry, Mr. Martin.
13  Before you do that, who actually prepares this
14  document?
15  A. This document is prepared by our office in
16  Wilton. It's given from our mechanics in our shop
17  in Wilton to the secretary that does data entry for
18  maintenance.
19  Q. Okay. And is there -- is there a data
20  entry log main- -- kept regarding ongoing
21  maintenance to the vehicle?
22  A. Yes.
23  Q. Okay. And do you have similar entries for
24  dates prior to April 11th of '08?

Page 77

1  A. Yes.
2  Q. Okay. Okay. Did Martin's do all of the
3  maintenance on -- on the tractor?
4  A. Yes.
5  Q. How about the chassis that was involved in
6  this incident, had Martin's ever maintained that
7  chassis?
8  A. No.
9  Q. Okay. If I could -- if you could go ahead
10  and do what I was starting to ask you. Just tell
11  us the entries there, please, sir.
12  A. On 4/11/08, replaced the pigtail end that
13  bolts to truck and that plugs into the trailer.
14  Q. Okay. What's the pigtail end refer to?
15  A. The pigtail end is the light plug from the
16  tractor that goes into the trailer that operates
17  the lights.
18  Q. Okay.
19  A. On April '08 --
20  Q. Some unspecified date -- there's a question
21  mark for the exact date in April '08; is that --
22  A. That's correct.
23  Q. -- what that means?
24      Okay. Go ahead, sir.

Page 78

1    A.   New steer tires, new studs and nuts on the
2  right side.  Changed out right duals on both axles,
3  adjusted alignment; new hanger bearings; adjusted
4  clutch; adjusted brakes; straightened bumper.
5    Q.   And the mileage at that time was 240,056?
6    A.   Yes.
7    Q.   Okay.  Go ahead.
8         May 10th, '08?
9    A.   Tightened step on right side.  June 2nd,
10  mileage.
11    Q.   You know, just in fairness, back to the
12  unknown date in April.
13         Did I -- it's -- did I cut you off
14  before you said adjusted brakes?
15    A.   No, I believe I said that.
16    Q.   Did you say that?  Okay.  I thought I
17  interrupted you at some point.
18         Back to May 10th, '08.
19    A.   The mileage on May 10th, '08 was 253,236.
20  Service.
21    Q.   Actually, isn't that for June 2nd, '08?
22    A.   Yes.
23    Q.   My -- okay.
24         Go ahead.

Page 79

1    A.   DOT inspection.  Replaced right high beam;
2  replaced right cab turn assembly; replaced two
3  marker bulbs; replaced long hood cable; replaced
4  alternator belt.
5    Q.   The last entry for under the specified date
6  in June of '08 is what?
7    A.   Mileage on June '08 was 261,061 and a new
8  hood cable was put on.
9    Q.   Okay.  Thank you.
10         All right.  Exhibit -- I think
11  Exhibit 8, we've talked about before.  That's the
12  ITOPS Inspection, Detail Display?
13    A.   This is an end-gate out of CSX on
14  47th Street.
15    Q.   Right.
16         And that would be where you believe
17  Mr. Franke picked up the trailer, correct?
18    A.   Correct.
19    Q.   And then how about Martin Exhibit No. 4,
20  sir, what is that?
21    A.   This is an annual inspection done on the
22  chassis on May 23rd of '08 from CSX.
23    Q.   And where did you obtain a copy of this
24  inspection form?

Page 80

1    A.   From CSX.
2    Q.   And when?
3    A.   Sometime after the accident.
4    Q.   Okay.  And for what reason did you request
5  that or obtain it?
6    A.   To look for defects.
7    Q.   In the chassis?
8    A.   Yes.
9    MR. BENTIVENGA:  What exhibit is that?
10    MR. SKRYD:  It is -- Scott, it is 4.
11    MR. BENTIVENGA:  Thanks.
12    MR. SKRYD:  Sure.
13  BY MR. BURKE:
14    Q.   Did Martin's engage in any inspection of
15  the chassis?
16    MR. SKRYD:  Inspection or maintenance?
17    MR. BURKE:  Inspection after the incident.
18    MR. SKRYD:  Oh.
19    THE WITNESS:  Yes.
20    MR. BURKE:  Okay.  I'll reserve that topic
21  since, I guess, that's kind of getting into the
22  liability issue.
23    MR. SKRYD:  Little bit.
24  BY MR. BURKE:

Page 81

1    Q.   All right.  And we've talked about 3 as
2  well, correct?
3         And then how about what we marked as
4  Exhibit 6, Mr. Martin, is that another copy of --
5    MR. SKRYD:  You want to explain the difference
6  between 5 and 6?
7  BY MR. BURKE:
8    Q.   Okay.  Why don't you please do so, sir.
9    A.   This is --
10    Q.   Why don't you start by maybe saying what
11  does Exhibit 6 consist of.
12    A.   Exhibit 6 is a copy of the three bill of
13  ladings from Exel, Hammond, Indiana, load of paper
14  from International Paper from Overnite Express,
15  destined to Minneapolis with three stops.
16         Exhibit 5 is the signed copies after the
17  delivery.
18    MR. BURKE:  Okay.  And --
19    MR. SKRYD:  See, the difference, I think, Rich,
20  is right here.
21    MR. BURKE:  Right.
22    MR. SKRYD:  That there's a stamp on 5 that
23  doesn't exist on 6.
24  BY MR. BURKE:

Page 82

1    Q.  And so for the XPEDX copy, there's a stamp
2    saying received on -- is that July 7th, '08?
3    A.  I can't read it.
4    Q.  Okay.  And then --
5    A.  7 -- it was all delivered the same day.
6    Q.  Okay.  And there's a -- each of the three
7    pages has a signature acknowledging receipt of the
8    goods at the three different locations, correct?
9    A.  Yes.
10   Q.  Okay.  All right.  Thank you.
11       Mr. Martin, as part of the
12   transportation of these goods or of these paper
13   products, other than Martin's, what other entities
14   or companies either were required to or did
15   maintain insurance coverage that might be
16   applicable to this occurrence?
17   MR. FISHER:  Foundation.
18   THE WITNESS:  International Paper,
19   Overnite Express; Celtic; CSX; Trac Leasing --
20   MR. SKRYD:  Exel.
21   THE WITNESS:  Exel.
22   BY MR. BURKE:
23   Q.  And how is it you know that, Mr. Martin?
24   A.  By the documents that we've had today.

Page 83

1    MR. SKRYD:  Rich, while you're looking through
2    your documents, are you doing anything in
3    particular with Group Exhibit 1 and 2 other than
4    just attaching them?
5    MR. BURKE:  You know, that's exactly what I'm
6    looking at right now --
7    MR. SKRYD:  Okay.
8    MR. BURKE:  -- to see what's in there that I
9    would like to ask him --
10   MR. SKRYD:  Did you want --
11   MR. BURKE:  I have a copy.  I have a copy.
12   MR. SKRYD:  Keep them all here.
13   MR. BURKE:  What are we on, Steve, 13?
14   THE REPORTER:  Correct.
15          (Whereupon, Martin Deposition
16           Exhibit No. 13 was
17           marked for identification
18           as of this date.)
19   BY MR. BURKE:
20   Q.  Let me tender to you what I've marked as
21   Exhibit 13, Mr. Martin.  And it's -- the top part
22   is, as you can see, cut off a little bit.  So I
23   can't tell you exactly what the heading is, if
24   there is even one.

Page 84

1        But could you tell me what that document
2    is, if you know.
3    A.  In our company, this is called a trip
4    sheet.
5    Q.  Okay.  And what does -- what is the purpose
6    of that trip sheet?
7    A.  It tracks what the driver does day by day.
8    Q.  Okay.  And who prepares this trip sheet?
9    A.  Our office in Wilton.
10   Q.  Okay.  And there is an entry for July 3rd,
11   correct?
12   A.  Yes.
13   Q.  Okay.  Does this trip sheet pertain to
14   Mr. Franke?
15   A.  Yes.
16   Q.  Okay.  And how can you tell that?
17   A.  Only because I know what he did -- what he
18   does -- what he did.  And I can tell.  His name's
19   not on here, but I can tell by his writing.
20   Q.  Is this Mr. Franke's writing on
21   here?
22   A.  No.
23   Q.  So is there any of Mr. Franke's writing on
24   there?

Page 85

1    A.  I'm sorry.  Yes.
2    Q.  Okay.  Where -- what is -- what part of it
3    was prepared by Mr. Franke?
4    A.  These.
5    Q.  The date column?
6    A.  All of it.
7    Q.  Oh, all of it?  Okay.
8        And July -- what's it say for July 3rd
9    or what do these entries mean?
10       I see LaCrosse, Wisconsin.
11   A.  It means that the origin of the load was
12   out of LaCrosse.  The load was dropped in Chicago.
13   Q.  Okay.  So at some point on July 3rd,
14   Mr. Franke took a load that had originated in
15   LaCrosse and dropped it in Chicago?
16   A.  Yes.
17   Q.  Does that necessarily mean Mr. Franke
18   started driving that load from LaCrosse or did he
19   pick it up in Wilton?
20   A.  It states, Load pick-up:  Wilton,
21   Wisconsin.
22   Q.  By Mr. Franke?
23   A.  Yes.
24   Q.  Okay.  And then how about the last line

Page 86

1  which also pertains to July 3rd, what does that
2  indicate about Mr. Franke's travels on that day?
3      A.  It states that he picked up a load in
4  Hammond, Indiana, destined to Minneapolis,
5  Minnesota.
6      Q.  Okay.  And that's -- that's consistent with
7  what you've been telling us earlier in terms of the
8  pick-up of paper at the International warehouse,
9  International's warehouse at the Exel facility?
10     A.  Yes.
11     Q.  Okay.  Thank you.
12     MR. SKRYD:  I'm just the recordkeeper over here.
13  Just...  It's a good thing you don't have any
14  trials coming up, Scott.
15     MR. BENTIVENGA:  This is quality.  Sleep is not
16  an option.
17         (Discussion off the record.)
18  BY MR. BURKE:
19     Q.  Yeah, I'm almost done here, Mr. Martin.
20         Mr. Martin, let me tender to you what we
21  marked as Exhibit No. 2, which by Bates stamp
22  appears to be documents produced by
23  International Paper.
24         Could you look at pages -- what begins

Page 87

1  on Page 35?
2      MR. SKRYD:  Let me just state for the record, in
3  Group Exhibits 1 and 2, some, I think, are
4  relevant; others are completely irrelevant, but
5  we're reserving all those objections.  I just want
6  to say that.
7          There's certain things in there, if they
8  were attached to this transcript for whatever
9  reason and utilized, they would be inadmissible.
10         But that being to the side, go ahead.
11  Do what he's asking.
12  BY MR. BURKE:
13     Q.  Page 35 appears to be correspondence from
14  International Paper to Overnite Express indicating
15  they're attaching a copy of a contract between
16  them; and the following pages from 36, continuing
17  thereafter, possibly as far as 68, including
18  attachments, appear to be a contract between
19  International Paper and Overnite.
20         And my question to you is simply, is
21  that a contract you have ever seen or that you --
22  let me reword that.
23         Is that a contract you ever saw prior to
24  this litigation?

Page 88

1      A.  No.
2      Q.  Okay.  How about -- take a look at Exhibit
3  No. 1, which is a group exhibit of some production
4  from Universal Am-Can, Bates stamps 1 through 155.
5      A.  Which page, sir?
6      Q.  If you could look at Page 109, please.
7          That document is entitled an Asset
8  Purchase Agreement.  Do you see that?
9      A.  Yes.
10     Q.  Okay.  It appears to relate to the -- an
11  agreement between Universal Am-Can and
12  Overnite Express and some other entities.
13         Is that a document that was ever
14  provided to you by Overnite once you came to learn
15  they had been bought out or purchased by
16  Universal Am-Can?
17     A.  No.
18     Q.  Mr. Martin, is there any other entity that
19  we haven't discussed that you believe was involved
20  in either the ownership or the leasing or the
21  operation or the maintenance of either the tractor
22  or the trailer or the container that was involved
23  in this incident?
24     A.  No.

Page 89

1      MR. BURKE:  Okay.  Okay.  Subject to reserving
2  additional questions pertaining to the incident and
3  questions beyond what we've agreed will be the
4  scope of this deposition, I don't have anything
5  further.
6          Thanks for your time, Mr. Martin.
7      THE WITNESS:  Thank you.
8      MR. SKRYD:  Take a time-out.
9          (Recess taken.)
10         EXAMINATION
11         BY
12         MR. FISHER:
13     Q.  Mr. Martin, my name is Carl Fisher.  I
14  represent Universal Am-Can, Limited, doing business
15  as and as successor to Overnite Express, Inc.
16  That's a mouthful.
17         If I refer to that company as UACL, is
18  that okay?
19     A.  Yes.
20     Q.  All right.  I may be asking you questions
21  in which I, in particular, use Universal Am-Can or
22  I, in particular, use Overnite Express or I combine
23  the two together.  So I just wanted to let you know
24  that.

Page 90

1    So please answer those questions as
2 specifically as you can when I use any of those
3 companies' names individually or together, all
4 right?
5    A.   Okay.
6    Q.   Okay.
7    MR. SKRYD:   And if you don't understand the way
8 he asks it, you know, he doesn't want you to guess.
9 Tell him you -- wait.  What did you mean?  Okay?
10    MR. FISHER:   Right.
11    MR. SKRYD:   So we don't have to go back and fix
12 it after he's done.
13 BY MR. FISHER:
14    Q.   And I mistakenly may use the wrong term.
15 And if you catch me on something like that, as your
16 counsel said, please ask me to rephrase it or ask
17 for clarification, okay?
18    A.   Okay.
19    Q.   All right.  When was your first involvement
20 in being a company representative for Martin's
21 Bulk Milk Service as it pertains to either the
22 initial state court lawsuit that was filed against
23 your company or the amendment of that lawsuit and
24 its removal to federal court where it is now?

Page 91

1    A.   I've been involved with it since Day 1.
2    Q.   Who is Janet Berndt, B-e-r-n-d-t?
3    A.   Janet Berndt --
4    Q.   Okay.
5    A.   -- was -- she's our personnel -- she's --
6 actually, at the time of the accident, personnel
7 and safety.
8    Q.   Does she still work for you?
9    A.   Yes.
10    Q.   Was she involved in handling matters having
11 to do with litigation concerning this accident?
12    A.   Yes.
13    Q.   Were you sort of on equal footing with her?
14 Did you split the tasks or was one of you more
15 supervisory to the other in terms of responding to
16 requests for information that were made as a result
17 of the lawsuit?
18    A.   Janet compiled most of the information that
19 you have.
20    Q.   So, to the best of your knowledge, did she
21 conduct a conscientious and complete search for
22 information as best you know?
23    A.   Yes.
24    Q.   What involvement, if any, did you have in

Page 92

1 conducting a search for information when the
2 requests came in to your company and they were
3 routed to you by your counsel?
4    A.   I would point them in the right direction
5 to see what entity they were looking for.
6    Q.   Did you review, before they went out, the
7 answers to discovery requests that were made both
8 in the state court action and in the action once it
9 was removed to federal court?
10    A.   Yes.
11    Q.   And are you satisfied that -- as you sit
12 here today, that a comprehensive search was
13 conducted to collect the information that was
14 requested?
15    A.   Yes.
16    Q.   All right.
17    (Whereupon, Martin Deposition
18    Exhibit No. 14 was
19    marked for identification
20    as of this date.)
21 BY MR. FISHER:
22    Q.   Mr. Martin, I'm showing you Martin Bulk
23 Milk Service's responses to plaintiff's special
24 forum non conveniens interrogatories.

Page 93

1    And if you scroll back to Page 7, do you
2 see Janet Berndt's signature attesting to the
3 completeness and accuracy of the information being
4 requested?
5    A.   Yes.
6    Q.   Do you remember these interrogatories being
7 answered by your company when this case was venued
8 in the Circuit Court of Cook County early on after
9 the accident happened?
10    A.   Yes.
11    Q.   All right.  Now, what I want to ask you to
12 look at, if you'd look first at the top of Page 3.
13    The question asks -- and I'll just
14 paraphrase it -- for names and addresses of
15 companies that were customers of your company,
16 okay?  And it says, See attached pages.
17    I now want to refer you to a spreadsheet
18 that appears after Page 7.  It begins with a
19 handwritten note at the top, Answer, Question
20 No. 3, and then it goes on for many pages.
21    And I want to look at the page that
22 has -- well, before you do that, do you -- are you
23 familiar with this spreadsheet?
24    A.   Yes.

1    Q.  Tell us how it was prepared.
2    A.  We were asked to compile a list of our
3  brokers, customers that we work for.
4    Q.  Okay.  And is that what this list is, to
5  the best of your knowledge?
6    A.  Yes.
7    Q.  All right.  Who compiled this information?
8    A.  Janet Berndt.
9    Q.  Did she do it under your direction?
10    A.  Yes.
11    Q.  And can you tell us whether or not this
12  list was intended to reflect your customers and any
13  brokers with which you dealt at any particular
14  point in time?
15      For example, was this the list that
16  would have existed on July 3rd?  Would it have
17  existed before July 3rd?  Would it have existed
18  after July 3rd, or any combination of those three
19  possibilities?
20    A.  Below -- or before July 3rd.
21    Q.  All right.  Look, if you will, at the page
22  that has the customers or brokers beginning with
23  the letter O.  It's actually two pages.  I believe
24  it begins with Ohio National Express, is the first

1  one with an O.
2    A.  Okay.
3    Q.  And then it ends on the next page with
4  Overland Freight.
5      Based upon your review of this
6  particular chart, does it appear that
7  Overnite Express is listed as a customer or broker
8  of Martin's Bulk Milk Service?
9    A.  No.
10    Q.  Do you know why that is?
11    A.  I do not know why.
12    Q.  Skip, if you would, to the next-to-last
13  page where the companies listed have the names
14  begin with the letter T, U or V.
15      And do you see listed at that -- on that
16  particular sheet Universal Am-Can, Limited?
17    A.  Yes.
18    Q.  To the best of your knowledge then, based
19  upon this particular chart compiled by your
20  company, does this establish that Universal Am-Can,
21  Limited, was the company with which Martin's
22  Bulk Milk Service had a relationship either as a
23  customer or a broker as of and before July 3rd,
24  2008?

1    A.  Can you ask me that one more time?
2  MR. SKRYD:  Or do you want him to read --
3  MR. FISHER:  I couldn't even do that.
4      I'm going to have him reread it to you.
5  MR. SKRYD:  I was going to have him do it,
6  anyway.
7      (Record read as requested.)
8  THE WITNESS:  I don't know when the time was
9  when they --
10  BY MR. FISHER:
11    Q.  And mind you, this isn't a trick question,
12  okay?  Let me assure you.
13  MR. SKRYD:  Plenty of those are coming, but...
14  BY MR. FISHER:
15    Q.  So -- so before I get to that question
16  about when they may have changed names and the way
17  they operated, my first question is, does this
18  chart appear to show that as of July 3rd, 2008 and
19  perhaps shortly before, Universal Am-Can, Limited,
20  as opposed to Overnite Express, was one of the
21  companies with which your company had a
22  relationship either as a broker or a customer?
23    A.  Yes.
24    Q.  Okay.  Now, the next question is, did

1  there -- did there come some time before the
2  accident happened when you remember, for whatever
3  reason you can tell me, Oh, Overnite Express, even
4  though they might have some paperwork that says
5  Overnite Express or OE on it, is now operating as
6  Universal Am-Can or UACL, its abbreviation?
7    A.  Yes.
8    Q.  Tell me what you remember about that
9  transition, how you came to know about it and what,
10  if anything, changed after that happened.
11    A.  The owner of Overnite Express called me and
12  told me that he had sold out.
13    Q.  Let me stop you for one second.
14      Was that a gentleman named Robert
15  Elsholtz (phonetic)?
16    A.  I don't recall.
17    Q.  Okay.  Do you know that there was a father
18  and son, both of whom their names were Robert
19  Elsholtz, but they had different middle names?
20    A.  I do recall.
21    Q.  Okay.  And was the person with whom you had
22  this conversation about the transition the father
23  or the son?
24    A.  The son.

Page 98

1   Q.   And tell me how this conversation happened.
2   A.   He had just called to explain that business
3   would operate as normal.  We would continue to do
4   the loads from Exel, International Paper to
5   Minneapolis, as we were already doing them for
6   Overnite Express.
7   Q.   So is it fair to say then that as of the
8   time of that telephone conversation, which I'll
9   represent to you, according to the records we have,
10  is probably sometime in June 2008 --
11  A.   Yes.
12  Q.   -- you -- your company, Martin's Bulk Milk
13  Service, had been doing business with
14  Overnite Express before, such that paper products
15  for International Paper were being picked up in the
16  Chicago and Indiana area and transported up to
17  Minnesota or elsewhere?
18  A.   Yes.
19          (Whereupon, Martin Deposition
20          Exhibit Nos. 15 and 16 were
21          marked for identification
22          as of this date.)
23  MR. FISHER:  Okay.  Gentlemen, Exhibit 15 is
24  UACL Bates No. 15 through 18, and 16 is going to be

Page 99

1   UACL 19 through 27.
2   MR. SKRYD:  There's two documents here, Dave,
3   and take a look at those.  Don't just glance at
4   those.  Take a look at those.  And when you've
5   reviewed them, let us know.
6   MR. GOLDEN:  I'm sorry.  I thought they were the
7   same one.
8   MR. SKRYD:  Yeah, they're dated differently.
9          (Pause.)
10  MR. SKRYD:  Review the pages.
11  THE WITNESS:  Hmmm?
12  MR. SKRYD:  Review all the pages.
13  BY MR. FISHER:
14  Q.   Without reading every word on each page,
15  have you had a chance to skim over those documents
16  just to briefly familiarize yourself with them?
17  A.   Yes.
18  Q.   Have you ever seen those documents before
19  me handing them to you just a few minutes ago?
20  A.   No.
21  Q.   Do you remember when you were asked a
22  question by Mr. Burke about whether or not there is
23  a written contract that existed between
24  Overnite Express and Martin's Bulk Milk Service and

Page 100

1   you said, Yes, and you also said that that document
2   is probably in some files in Wilton?
3   A.   Yes.
4   Q.   All right.  I will represent to you,
5   Mr. Martin, that once this case came into federal
6   court and a disclosure document was filed on behalf
7   of your company identifying certain documents that
8   exist and your company responded to a request to
9   produce, neither a written agreement between
10  Martin's Bulk Milk Service and Overnite Express and
11  neither of those two agreements, Exhibits 15 and 16
12  that I've tendered to you, were produced by your
13  company in discovery.
14          Given the fact that you're charged with
15  the responsibility for responding to discovery, do
16  you know why it is none of those three documents
17  were produced in discovery in this case by your
18  company up to today?
19  A.   I do not.
20  Q.   Okay.  If you were to be looking for the
21  Overnite Express/Martin's Bulk Milk Service
22  contract that existed sometime before July 3, 2008,
23  where would you go to find it?
24  A.   In our broker carrier agreement file.

Page 101

1   Q.   Looking just at the form that Exhibits 15
2   and 16 look like, can you tell me whether or not --
3   if you have any memory -- and tell me if you
4   don't -- whether or not the
5   Overnite Express/Martin's Bulk Milk Service
6   agreement looks anything like the formatting of
7   this particular Universal Am-Can master brokerage
8   agreement?
9   A.   I do not.
10  Q.   Okay.  Do you have any memory at all of how
11  many pages it was, who signed it, if it had
12  attachments, any memory of that?
13  A.   No.
14  Q.   Is that the type of document that you would
15  consult or anybody at Martin's Bulk Milk Service
16  would consult on a day-to-day operational business
17  in order to do your work on behalf of
18  Overnite Express?
19  A.   We read through them.
20  Q.   Okay.  But once they're read through and
21  signed, are they consulted at all after that?
22  A.   No.
23  Q.   Okay.  Have there ever been any disputes,
24  to your knowledge, between Overnite Express and

Page 102

```
 1   Martin's Bulk Milk Service before July 3, 2008, on
 2   things like, Hey, I didn't get paid for everything
 3   I was owed, or anything like that?
 4       A.   No.
 5       MR. SKRYD:  Did you get his answer?
 6       MR. FISHER:  Yeah, I heard it.
 7       MR. SKRYD:  Sorry.
 8   BY MR. FISHER:
 9       Q.   With respect to the Universal Am-Can,
10   Limited, master brokerage agreements that are there
11   before you as Exhibits 15 and 16, if you'll look at
12   the third page of Exhibit 15 and the third page of
13   Exhibit 16, you'll see that there's a signature
14   from someone purportedly from Martin Bulk Milk.
15            Do you recognize whose signature that
16   is?
17       A.   Yes.
18       Q.   Whose signature is it?
19       A.   Pat Podlena (phonetic).
20       Q.   And is that a man or a woman?
21       A.   A man.
22       Q.   And what is Pat's job?
23       A.   Pat was a dispatcher.
24       Q.   Does he still work for you?
```

Page 103

```
 1       A.   No.
 2       Q.   When did he leave Martin's Bulk Milk
 3   Service?
 4            You know what, let me stop.  I made an
 5   assumption.
 6            When he would have signed this,
 7   presumably sometime around 2007 or 2008,
 8   respectively Exhibits 15 and 16, was he employed by
 9   Martin's Bulk Milk Service or Martin's Logistics.
10       A.   Martin's Bulk Milk Service.
11       Q.   When did he leave your company's
12   employment?
13       A.   I'm not sure.
14       Q.   Did he leave on favorable terms?
15       A.   Yes.
16       Q.   Okay.  Is he still in Central Western
17   Wisconsin, as best you know?
18       A.   Yes.
19       Q.   And would your company files have a last
20   known address?
21       A.   Yes.
22       Q.   Okay.
23       MR. SKRYD:  Carl, I don't mean -- you're -- it's
24   not your deposition or anything, but both of these
```

Page 104

```
 1   documents that you produced, neither one is signed
 2   by Universal Am-Can.
 3            Do you have ones that are signed by
 4   Universal Am-Can?
 5       MR. FISHER:  Those are the documents I have.  I
 6   don't understand what you mean it's not my
 7   deposition.
 8       MR. SKRYD:  I'm asking you a question like
 9   you're the witness or something.
10       MR. FISHER:  Oh, okay.
11       MR. SKRYD:  That's all I'm saying.
12       MR. FISHER:  Because that's all I've got.
13       MR. SKRYD:  But you don't have one signed by
14   Universal Am-Can?
15       MR. FISHER:  I mean, that's not to say there
16   isn't one in existence --
17       MR. SKRYD:  But that's all you got --
18       MR. FISHER:  But this is what is told --
19       MR. SKRYD:  But from your company.
20       MR. FISHER:  Yeah.
21       MR. SKRYD:  Okay.  They gave you those.  Okay.
22   BY MR. FISHER:
23       Q.   Okay.  Who would know whether or not
24   Exhibits 15 and 16 are agreements, contractual
```

Page 105

```
 1   agreements, in existence as of July 2008 between
 2   Martin's Bulk Milk Service and Universal Am-Can,
 3   Limited?
 4       MR. SKRYD:  Who would know from Martin's, if
 5   anyone?
 6       MR. FISHER:  (Nodding.)
 7       MR. SKRYD:  Go ahead.
 8       THE WITNESS:  Our dispatch office.
 9   BY MR. FISHER:
10       Q.   And who in the dispatch office might know?
11       A.   I could know.
12       Q.   You, yourself, could?
13       A.   Yeah.
14       Q.   Okay.  Why is it you could know?
15       A.   I just go -- I can go into the file and I
16   can pull it up in alphabetical order.
17       Q.   I know you haven't read every word,
18   but do you remember entering into -- strike that.
19            Do you know whether or not your company
20   has ever entered into a written contract with
21   Universal Am-Can, Limited, before July of 2008?
22       MR. SKRYD:  Do you have personal knowledge --
23       THE WITNESS:  I'm not sure --
24       MR. SKRYD:  -- that's what he's saying.
```

Page 106

1    THE WITNESS: I'm not sure.
2  BY MR. FISHER:
3    Q. And I'm not suggesting you should be sure,
4  but why are you not sure?
5    A. We might have done business with them in
6  another capacity.
7    Q. Tell me what you mean by that answer.
8    A. We might have brokered loads through
9  Universal Am-Can before they bought
10  Overnite Express.
11    Q. Actually, I'm glad you raised that.
12    Do you know whether or not this is the
13  case:
14    Do you know whether or not the contract
15  that is marked as Exhibit 15, which has a date of
16  November 7, 2007, and is between Universal Am-Can,
17  Limited, brokerage division and Martin Bulk Milk
18  Service -- or excuse me, Martin Bulk Milk was the
19  contract that your company entered into with
20  Universal Am-Can before any transition occurred
21  between Universal Am-Can and Overnite Express?
22    MR. SKRYD: I'm just going to state, Carl, for
23  the record a foundational issue.
24    MR. FISHER: Is that your objection?

Page 107

1    MR. SKRYD: An objection, yeah.
2    MR. FISHER: That's all you need to say.
3    MR. SKRYD: Well, I know, but I want to put it
4  on the record.
5    The issue I have with this, it's not
6  signed by Universal Am-Can --
7    MR. FISHER: Counsel -- Counsel, what's your
8  objection? I'm not going to tolerate speaking
9  objections --
10    MR. SKRYD: Well, I know.
11    MR. FISHER: Is your objection foundation?
12  That's all you need to say.
13    MR. SKRYD: But he's never seen these documents
14  before.
15    MR. FISHER: Counsel, please refrain from
16  speaking objections.
17    Foundation is the only word you needed
18  to use, okay?
19    MR. SKRYD: What I need to use and what I will
20  use are maybe two different things.
21  BY MR. FISHER:
22    Q. You can go ahead and answer my question.
23  If you need it repeated, he can repeat it for you.
24    (Record read as requested.)

Page 108

1    THE WITNESS: I'm not sure.
2  BY MR. FISHER:
3    Q. Who would know the answer for that question
4  from your company, if it's not you?
5    A. Janet.
6    Q. All right. With respect to Exhibit 16, do
7  you know whether or not this agreement is the
8  agreement that was entered into between
9  Universal Am-Can and Martin Bulk Milk Service after
10  Universal Am-Can agreed to take over
11  Overnite Express?
12    MR. SKRYD: Same objection. Foundation.
13    THE WITNESS: And I'm not sure.
14  BY MR. FISHER:
15    Q. If you don't know, who would know?
16    A. Janet.
17    Q. Okay.
18    MR. BENTIVENGA: What's the date?
19    MR. FISHER: I've got one that's June 12th,
20  2008.
21    MR. BENTIVENGA: Thank you.
22  BY MR. FISHER:
23    Q. Okay. Other than the Elsholtz that you've
24  dealt with, do you remember ever having any other

Page 109

1  contact with anyone at Overnite Express?
2    A. Matt and Melody.
3    Q. And is Matt an Elsholtz also?
4    A. I'm not sure.
5    Q. Okay. And do you know Melody?
6    A. Melody's from the Chicago office.
7    Q. Is Melody the person whose name appeared at
8  the top of Exhibit 11?
9    A. Yes.
10    Q. Okay. And did you understand her to be an
11  employee of Overnite Express, an employee of
12  Universal Am-Can, or perhaps an employee of both
13  companies and she simply shifted over to
14  Universal Am-Can after Overnite Express was taken
15  over by Universal Am-Can, or do you know?
16    A. I would say for both companies.
17    MR. FISHER: Okay. Was this the one you
18  previously marked?
19    MR. GOLDEN: Yes, sir.
20    MR. BURKE: Yes.
21    MR. SKRYD: That was -- I don't know what.
22    MR. GOLDEN: 13.
23    MR. SKRYD: You want -- you going to ask a
24  question about it?

Page 110

1    MR. FISHER: No.
2            (Whereupon, Martin Deposition
3            Exhibit No. 17 was
4            marked for identification
5            as of this date.)
6    BY MR. FISHER:
7    Q.   Mr. Martin, I'm showing you two pages
8    marked as Exhibit 17. I believe it's the same
9    document, just two different Bates numbers on it.
10   MR. SKRYD: Is it? Okay. That's what I was
11   trying to figure out.
12   BY MR. FISHER:
13   Q.   Okay. Mr. Martin, I'm showing you two
14   pages marked as Exhibit 17. I believe they're the
15   same document, just produced by two -- my two
16   clients, and they have Bates numbers UACL 5 and
17   IPC 24.
18           Do you recognize the document?
19   A.   Yes.
20   Q.   Tell us what it is.
21   A.   It's a mileage report that states the
22   states that we travel in, the highways, each miles
23   in each state and the odometer readings at the
24   beginning and the end of the day.

Page 111

1    Q.   Is this for Mr. Franke?
2    A.   Yes.
3    Q.   Who filled this out, if you know?
4    A.   Sam.
5    MR. SKRYD: Sam?
6    THE WITNESS: Franke.
7    BY MR. FISHER:
8    Q.   And in the column that says "mileage" where
9    there is either hash marks and 11 or two 1s, what
10   does that mean?
11   A.   Show me.
12   Q.   Yes. In the column under mileage, you see
13   were there on three occasions --
14   A.   On each state?
15   Q.   Yes.
16   A.   11 miles traveled in Indiana.
17   Q.   Okay. All right. Thank you.
18           (Whereupon, Martin Deposition
19           Exhibit Nos. 18, 19 and 20 were
20           marked for identification
21           as of this date.)
22   BY MR. FISHER:
23   Q.   For the benefit of counsel, keep track of
24   our records here, Mr. Martin, I'll represent to you

Page 112

1    that exhibits 18, 19 and 20 are multiple
2    collections of the memo bills or bills of lading.
3    I've put them together from the documents that have
4    been produced.
5            I believe in each set, they're
6    identical, but there are some differences that I
7    want to ask you about, okay?
8    A.   Okay.
9    Q.   So that's what these are.
10   MR. SKRYD: Okay. Why don't you spread them out
11   so you can kind of compare them side by side. I
12   think that's what you're doing.
13   MR. FISHER: Exactly.
14   BY MR. FISHER:
15   Q.   Well, actually, we'll take them one at a
16   time.
17           If you look at Exhibit 18 and this is
18   the memo bill that has the weight of 7,668, okay?
19   A.   Yes.
20   Q.   All right. If you just flip through each
21   of these pages, you'll see that on the first three
22   pages, Samuel Franke's name appears in handwriting
23   at the upper right-hand corner. And then in the
24   next two pages, Franke's name plus some other --

Page 113

1    and Franke's name appears a second time along with
2    some other information.
3            And then, finally, the last two pages,
4    Franke's name appears alone, but there's some
5    markings by somebody else. And I just want to get
6    an idea of how these different transportation
7    documents are prepared and why they have different
8    markings on them, okay?
9            So can you tell us with respect to the
10   first three pages of Exhibit 18, when is it that
11   Mr. Franke would have affixed his signature to
12   this?
13   MR. SKRYD: Did you say the first page?
14   MR. FISHER: The first three. They're
15   identical. The first three pages of Exhibit 18.
16   MR. SKRYD: Oh.
17   THE WITNESS: At Exel in Hammond, Indiana, when
18   he is loaded, they produce these documents. And
19   then before he leaves, he has to sign for them.
20   BY MR. FISHER:
21   Q.   All right. Now, is this a document that
22   the people at Exel would have given him as opposed
23   to Mr. Franke arriving with this document?
24   A.   They would have prepared -- Exel would have

Page 114

1   prepared this for Sam Franke.
2       Q.  Franke would not have this until they
3   tendered it to him for his signature?
4       A.  Correct.
5       Q.  All right.  Now, the next two pages, do you
6   see it's the same document, but Franke's name is
7   printed at the top.  There's a carrier trailer
8   number, there's a PCS and there's a date.
9           And that's the distinction between the
10  fourth and fifth pages and the first three, right?
11      A.  Yes.
12      Q.  Okay.  Tell me, if you know, when this
13  additional -- these additional markings would have
14  occurred.
15      A.  The only thing I can see that's different
16  is they didn't have his trailer number on there.
17      Q.  Do you have an understanding that these
18  documents came from a variety of different sources?
19          For example, the police report, from my
20  clients.  In the case of the third page, the one
21  that has Exhibit C, that came from your company.
22          Do you know why it is that one
23  collection of documents would only have Franke's
24  signature appearing and the other documents have

Page 115

1   got some more markings on them?
2       A.  I do not.
3       Q.  Okay.  The last two pages of Exhibit 18, do
4   you see where Franke's name or signature now
5   appears only once again; but down in the bottom
6   right or near the bottom right, the word "Midland,"
7   perhaps Rocky Gordon or Gorder, with a date of
8   7/7/08 appears.
9           Do you know what the vintage or the
10  timing of this would have been?
11      A.  That would have been on Monday when the
12  load was delivered.
13      Q.  So this is after the accident's occurred,
14  the load has been offloaded from the trailer, put
15  onto another trailer, and it makes its way up to
16  Minnesota?
17      A.  The day that it was delivered was 7/7/08.
18  That's the day that Rocky signed for it at Midland
19  Paper.
20      Q.  Okay.  All right.  If you look at Exhibits
21  19 and 20, I'm basically going to be asking you the
22  same questions.
23          If you just look -- if you just leaf
24  through each of those, you'll see the first three

Page 116

1   pages of each has got a significant -- a single
2   signature --
3       MR. SKRYD:  Easy for you to say, Carl.
4   BY MR. FISHER:
5       Q.  -- by Mr. Franke followed by two pages that
6   has some more handwritten information, and then --
7   and then a sixth and seventh page that has got some
8   additional information on it.
9           And I just want to find out, if you can
10  tell, you know --
11      A.  I think I know why -- I think I know what
12  happened.
13      Q.  Oh, okay.
14      A.  I think that when he went in there, he has
15  to sign as he walks in the door to say that he's
16  picking a load up.
17      Q.  Okay.
18      A.  After he's loaded -- because these are all
19  three different stops -- they're asking him for his
20  trailer number and then they're asking for his
21  signature.
22      Q.  Okay.  And so for whatever reason, we
23  happen to have copies of the documents both before
24  and after the loading was accomplished?

Page 117

1       A.  Yes.
2       Q.  Okay.  All right.  Look at Exhibit 19.  And
3   if you look at the sixth and seventh pages, the
4   last two --
5       A.  Yes.
6       Q.  -- do you see on this one, there is a
7   parenthetical notation and handwriting, 2,000
8   sheets per box, and then it says, 12 boxes damaged,
9   and the name what appears to be David Defrance
10  appears?  Do you know why this information is
11  recorded here?
12      A.  It was damaged from the accident.
13      Q.  And do you know who Daniel Defrance or
14  David Defrance would have been?
15      A.  I'm not...
16      Q.  Last Exhibit is Exhibit 20.  Same
17  questions.  And focusing your attention now on the
18  sixth and seven pages.
19          Do you see on this one, there's what
20  appears to be a stamp with some handwriting by it?
21  Is this simply a stamp showing the receipt at XPEDX
22  of the goods being delivered on or about July 7th,
23  2008?
24      A.  Yes.

Page 118

1    Q.   Okay.  That's all the questions I've got
2   about those documents.
3           (Whereupon, Martin Deposition
4           Exhibit No. 21 was
5           marked for identification
6           as of this date.)
7   MR. FISHER:  For the record, Counsel, this is --
8   MR. SKRYD:  Looks like the same thing.
9   MR. FISHER:  -- UACL 12 and IP 1.
10  MR. SKRYD:  Again, Carl, it looks like it's the
11  same or similar document twice, right?
12  MR. FISHER:  Two -- I'm sorry.  Two.
13  MR. SKRYD:  Is it the same document?  There's
14  two --
15  MR. FISHER:  Yes.  Yes.  Correct.
16  MR. SKRYD:  -- documents in here?
17          Okay.
18  MR. FISHER:  Right.
19  BY MR. FISHER:
20   Q.   Okay.  Mr. Martin, do you see this document
21  which has a heading Red Prairie and
22  Digital Logistics at the top?
23   A.   Yes.
24   Q.   And the bottom left-hand corner, do you see

Page 119

1   where it has a printed date and time of 7/3/08,
2   4:45:11 p.m.?
3    A.   Yes.
4    Q.   Are you familiar with a document like this
5   called a loading sheet?
6    A.   Yes.
7    Q.   Based upon your knowledge of the industry,
8   what would the printed time on July 3, 2008
9   signify, if anything?
10   A.   What time they started picking the load.
11   Q.   So the people at the warehouse, what time
12  they would have gone to pick the load in
13  anticipation of Mr. Franke arriving to have it
14  loaded; is that what you're saying?
15   A.   This was printed at 4:45.  Sam's
16  appointment to load is at 7:00 p.m.  That was the
17  time that they probably print this off for Exel's
18  dock workers to put the load together.
19   Q.   Okay.  And then the loading is under the
20  heading Loading Diagram, Nose.
21          What does it mean with all these
22  three-digit numbers appearing spatially, almost
23  like a rectangle?
24   A.   Those are the type of product that are

Page 120

1   loaded in the trailer.  And when you see a single
2   number on there, that's a single pallet in the
3   trailer.
4    Q.   With the information we have available to
5   us that you've been looking at so far today, is
6   there any way of telling, for example, what the
7   individual weights of each pallet would be that are
8   recorded here with different numbers?
9    A.   No.
10   Q.   Any way of figuring that out that you know
11  of, and if so, where would you go to get such
12  information?
13   A.   Each pallet will have a weight on it, but
14  there's no way of knowing by this document.
15   Q.   But how about -- and I don't -- this isn't
16  a memory game.
17          Any other document you've looked at so
18  far that has such information we could deduce?
19   A.   I have not seen any.
20   Q.   All right.  And then in the middle right of
21  the document, do you see where it says, Start
22  loading 8:38 and end loading, either 9:02 or 9:07?
23   A.   Yes.
24   Q.   Is that usual, unusual, in your knowledge

Page 121

1   of paper products like this, for it to take
2   approximately 24 minutes?
3   MR. SKRYD:  Objection.  Form.
4           Go ahead.  Answer the question.
5   BY MR. FISHER:
6    Q.   Or 29 minutes.
7    A.   Standard time is loading two hours.  If --
8   arrive at 7:00, out at 9:00 is pretty standard.
9    Q.   You know what, I just saw something.  Look
10  on the right center.  Do you see where it says
11  pieces and weight, and it has the handwritten
12  sections, middle, nose and tail?
13   A.   Yes.
14   Q.   Is there any way of determining with that
15  information what the individual weights would be of
16  each of the separate numbers, such as the six that
17  are 307, the several that are 211?
18   A.   No.
19   Q.   Those numbers, 307, 211, 322, do you know
20  what those numbers signify?
21   A.   Product code.
22   Q.   Do you know what the product codes are that
23  those numbers represent?
24   A.   No.

Page 122

1   Q.  You can set that aside.
2   MR. BENTIVENGA:  22 is next.
3   MR. FISHER:  Thank you.  Keeping me in line
4   here.
5          (Whereupon, Martin Deposition
6          Exhibit No. 22 was
7          marked for identification
8          as of this date.)
9   MR. FISHER:  Gentleman, Exhibit 22 is UACL 14.
10  BY MR. FISHER:
11  Q.  Looking at Exhibit 22, Mr. Martin, do you
12  recognize that document?
13  A.  Yes.
14  Q.  What is it?
15  A.  It's an invoice from Martin's Bulk Milk.
16  Q.  It has a date of 7/17/2008 with an invoice
17  number of 192648.
18         Would it have been in the normal course
19  of your company's business to generate the invoice
20  after the work had been completed?
21  A.  Yes.
22  Q.  And do you see under the heading "bill to,"
23  it says, Broker settlements, UACL, Attention:  John
24  Moore.

Page 123

1          My first question about that information
2   is, do you know who John Moore is?
3   A.  No.
4   Q.  You ever dealt with him?
5   A.  No.
6   Q.  Ever dealt with anybody at UACL in Warren,
7   Michigan?
8   A.  No.
9   Q.  Is the fact that your company, through this
10  invoice, charged UACL $974.08 an indication to you
11  today as you sit here that your company was
12  interacting contractually with UACL as opposed to
13  Overnite Express?
14  A.  Yes.
15  Q.  With respect to the load that Mr. Franke
16  was pulling?
17  A.  Yes.
18  Q.  Okay.  Was your company paid for this?  Let
19  me strike the question.
20         The invoice that you sent to UACL, was
21  it paid, if you know?
22  A.  I don't -- I don't know.
23  Q.  All right.  You can set that aside.
24

Page 124

1          (Whereupon, Martin Deposition
2          Exhibit No. 23 was
3          marked for identification
4          as of this date.)
5   BY MR. FISHER:
6   Q.  Okay.  Mr. Martin, I'm tendering to you an
7   exhibit marked as Exhibit 23.  It's very similar
8   looking to the previous marked Exhibit 11 that you
9   looked at except that it has what appears to be a
10  bar code document obscuring some texts.  I want to
11  ask you some questions about some of the
12  information that appears there.
13         Up at the top, the first paragraph
14  reads, quote, This rate confirmation sheet issued
15  on 5/1/06 serves to supplement the -- it says
16  matter -- I suspect it's master -- brokerage
17  agreement between the Universal Am-Can, Limited,
18  brokerage division, an ICC property broker,
19  MC167922, Sub 5, and carrier Martin's Bulk Milk.
20         Did I read that correctly?
21  A.  Yes.
22  Q.  Now, my question to you is, when it says,
23  Rate confirmation sheet issued on 5/1/06, what does
24  that tell you about the relationship between

Page 125

1   Martin's Bulk Milk Service and UACL as of May 1st,
2   2006, if anything?
3   A.  I don't know.
4   Q.  Okay.  Is it common in the industry of
5   transportation that participants in the movement of
6   freight issue or respond to rate confirmation
7   sheets or tables of rates?
8   A.  Rate confirmation sheets.
9   Q.  Okay.  Is this sort of like this is the
10  document that exists that's used in the industry
11  frequently?
12  A.  The same sort, but not many the same -- not
13  the same matter.  I mean, it's -- everybody's is
14  different.
15  Q.  Okay.  So, for example, if you're dealing
16  with the ABC Brokerage Company and they've asked
17  you to have your company pull some freight for the
18  XYZ Shipping Company, it might have a form that
19  looks like this, but may be different?
20  A.  Correct.
21  Q.  All right.
22         When it says that the sheet was issued
23  on 5/1/06, does that suggest to you that that's the
24  vintage of rates that would apply to this

Page 126

1  particular shipment in July of '08?
2  A.  Say it one more time.
3  Q.  I'm going to have him read it.
4  (Record read as requested.)
5  THE WITNESS:  No.
6  BY MR. FISHER:
7  Q.  Why not?
8  A.  Because the way fuels fluctuate and rates
9  change.
10  Q.  How would you and a broker or some other
11  participant in the transportation industry know
12  that a different fuel rate was permissible?
13  A.  Every company has their own chart that they
14  go off of.  International Paper has its own that
15  they go by.  And then -- and that's what Overnite
16  would have billed to them.
17  Q.  So, for example, for this particular
18  shipment on July 3rd, 2008, is it your testimony
19  that whatever the fuel rate was that
20  International Paper was willing to pay, that would
21  be the fuel rate that would control?
22  A.  Yes.
23  Q.  And then do you see where it says in the
24  next part of this sentence, quote, Serves to

Page 127

1  supplement the mader -- I think that's master --
2  brokerage agreement between Universal Am-Can and
3  Martin's Bulk Milk?
4  Does that tell you, suggest to you,
5  confirm for you that as of July 3, 2008, Martin's
6  Bulk Milk Service was interacting with UACL as
7  opposed to Overnite Express for this particular
8  load?
9  A.  Yes.
10  Q.  All right.  I think you can set that down.
11  Did you ever have any contact with a
12  person at International Paper named Malcolm
13  Breland, B-r-e-l-a-n-d?
14  A.  No.
15  Q.  Did you ever have contact with anyone at
16  International Paper concerning any loads that your
17  company was involved with?
18  A.  There was times that we would check to see
19  when the -- if the load was on time to ship.
20  Q.  Why would you do that?
21  A.  To check and see if everything was on
22  schedule.
23  Q.  And why would that be important?
24  A.  Because of the hours of service with the

Page 128

1  drivers and make sure that his schedule's going to
2  be met.  Maybe with weather.
3  Q.  So, for example, if -- because of the delay
4  in getting the load on the truck or whatever the
5  reason would be, would there be some instances in
6  which a driver employed by Martin's Bulk Milk
7  Service would not be able to continue on the road
8  because of say, for example, hours of service
9  limitations?
10  A.  Say it again.
11  Q.  I'll have him read it for us.
12  (Record read as requested.)
13  THE WITNESS:  Yes.
14  BY MR. FISHER:
15  Q.  And in that situation, let's assume that
16  you got a phone call from International Paper that
17  said, Hey, we need that paper in Minneapolis.  You
18  got to get that done.  What would happen in that
19  instance?
20  A.  We would tell them that it's not possible
21  because of hours of service.
22  Q.  So that would be an example, would it not,
23  in which the request from International Paper would
24  not be honored by your company?

Page 129

1  A.  Yes.
2  Q.  Okay.
3  (Whereupon, Martin Deposition
4  Exhibit No. 24 was
5  marked for identification
6  as of this date.)
7  BY MR. FISHER:
8  Q.  Look at the next-to-last page and tell me
9  whether or not you recognize on Exhibit 24 your
10  signature?
11  A.  I recognize it.
12  Q.  All right.  And are -- is Exhibit 24 the
13  Martin Bulk Milk Service's Answers to Plaintiff's
14  Interrogatories in the federal case?
15  A.  Yes.
16  Q.  I want to focus your attention on Page 2,
17  Question 2.
18  Do you see where it says in the response
19  to Question No. 2, after you get through the
20  objections, that your company's answer to that
21  question is unknown?
22  MR. SKRYD:  Take your time and read it over.
23  BY MR. FISHER:
24  Q.  See where -- the very, very short answer at

Page 130

1    the end of the sentence, Unknown, followed by the
2    words "investigation continues"?
3        A.   Yeah.
4        Q.   Okay.  My question to you is this:
5            Since the preparation and signing of
6    this Answer to Interrogatory, are you aware of
7    anybody at Overnite Express that has any knowledge
8    concerning the ownership, lease, use or operation
9    of the tractor and trailer in this case?
10       A.   No.
11       Q.   Okay.  Look down at Question No. 5.  This
12   question asks for you to identify the name,
13   address, job title, employer of the person most
14   knowledgeable from your company, Defendants
15   Martin's Bulk Milk, concerning the involvement of
16   Martin's Bulk Milk Service or any of its employees
17   or agents in any aspect of the ownership, lease,
18   use or operation of the tractor-trailer, container
19   or chassis involved in the occurrence of July 3,
20   2008, including the transportation of any cargo in
21   the tractor-trailer truck.
22           Did I read that question correctly?
23       A.   (Nodding.)
24       Q.   You have to answer out loud.

Page 131

1        A.   Yes.
2        Q.   Okay.  And the answer refers us to a
3    document where there's a bunch of names,
4    presumably.
5            Of your own knowledge, do you know of
6    anybody other than yourself who's employed by
7    Martin's Bulk Milk who has any knowledge that would
8    fit the description of this question and other than
9    the three -- the two ladies you mentioned?
10       A.   No.
11       Q.   Miss Berndt.  And what was the name of the
12   other lady?
13       MR. SKRYD:  I don't think he mentioned --
14       MR. FISHER:  Pat, I thought.
15       MR. SKRYD:  Oh, that's a man.
16       MR. FISHER:  Oh, my mistake.  Let me rephrase my
17   question.
18       BY MR. FISHER:
19       Q.   Anybody other than yourself, Pat and
20   Miss Berndt?
21       A.   No.
22       Q.   Okay.  To answer No. 5, correct?  Those are
23   the three people?
24       A.   Yes.

Page 132

1        Q.   Okay.  And then Question 6, is it correct,
2    as this interrogatory answer states, that you were
3    the person responsible for dispatching Mr. Franke
4    for this trip on July 2nd or July 3rd, 2008?
5        A.   Yes.
6        Q.   With respect to Question 7, where it asks
7    to identify the name, address, job title and
8    employer of the person or persons responsible for
9    the transportation of the cargo and items that were
10   in the container being hauled by Samuel Franke at
11   the time of the collision on July 3, 2008, your
12   company's answer after objections is, quote, None
13   other than those individuals identified by the
14   parties during the course of discovery, unquote.
15           Can you tell me who those people are, if
16   you know?
17       A.   Do you mean as far as after the accident?
18       Q.   I mean what the question asks.
19       MR. SKRYD:  Let me see that.
20       BY MR. FISHER:
21       Q.   Persons responsible for the transportation
22   of the cargo and items that were in the container
23   being hauled by Samuel Franke.
24           Your answer says, None other than

Page 133

1    individuals identified by the parties during the
2    course of discovery, and I understand what that
3    says.
4            My question is, from your own
5    perspective, who are those people?  And if you
6    don't know, tell me you don't know.
7        MR. SKRYD:  I'm going to object to asked and
8    answered throughout the course of the deposition.
9        THE WITNESS:  I don't know.
10       MR. SKRYD:  Do you understand this question?
11       THE WITNESS:  It's the same ones that -- it's
12   the ones that know about the load are Janet, Pat
13   and I.
14       BY MR. FISHER:
15       Q.   Okay.  And no one else?
16       A.   Correct.
17       Q.   All right.  That you know of?
18       A.   Correct.
19       Q.   Okay.  Question 10 at the bottom of that
20   page and the next page asks for you to identify
21   people at Martin's Bulk Milk Service who had any
22   contact or involvement with personnel from
23   International Paper Company or Overnite Express or
24   CSX Intermodal in relation to the use, operation,

Page 134

1  lease of the tractor-trailer, container or chassis
2  involved in the collision of July 3. And, once
3  again, your company's answer to this question is,
4  See our disclosures.
5          My question to you is, do you know who
6  those individuals might be other than the three
7  people you have mentioned, you, Pat and
8  Miss Berndt?
9    A.  Those three would be correct.
10   Q.  Okay. And did you, yourself, have any
11  contact with people at International Paper
12  concerning this load?
13   A.  No.
14   Q.  Did you have any contact with anybody at
15  Overnite Express concerning this load?
16   A.  Yes.
17   Q.  Who did you have contact with at
18  International -- excuse me, at Overnite Express
19  concerning this load?
20   A.  Melody.
21   Q.  Okay. Anyone other than Melody?
22   A.  Not that I recall.
23   Q.  Same question as to Universal Am-Can.
24  Assuming that Melody was actually employed by

Page 135

1  Universal Am-Can, would your answer be Melody?
2    A.  Melody, yes.
3    Q.  And then how about CSX Intermodal, anybody
4  there that you had contact with concerning this
5  load?
6    A.  I don't recall.
7    Q.  Okay. Can you speak for Pat or Miss Berndt
8  as to who, if anyone, they had contact with
9  concerning this load from either
10  International Paper, Overnite Express,
11  Universal Am-Can, Limited, or CSX Intermodal?
12   A.  I would have been the one to notify.
13   Q.  Okay. And on Question 11, all right, it
14  asks, Please identify the name, address, employer
15  and job title of all persons from whom Samuel
16  Franke received any instructions, routing
17  directions or other information concerning all legs
18  of any trips driven by Samuel Franke on July 2nd
19  and July 3rd, including his trip to
20  International Paper Company.
21          Did I read that question correctly?
22   A.  Yes.
23   Q.  And is your company's answer to that,
24  quote, None other than those individuals identified

Page 136

1  by the parties during the course of discovery,
2  unquote?
3    A.  Yes.
4    Q.  What is your personal answer to that
5  question? Who are the individuals from whom Franke
6  received instructions, routing directions or other
7  information concerning all legs of his trip for
8  this load?
9    A.  It would have been received from our office
10  in Wilton.
11   Q.  And would that have been you alone, you and
12  other persons, or other persons at the office in
13  Wilton?
14   A.  It could have been me and other people.
15   Q.  And what would the nature of those
16  instructions have been?
17   A.  Just giving him pick-up numbers in Chicago.
18   Q.  When he was in Chicago, I presume he was
19  there waiting for an assignment in the afternoon of
20  July 3rd, 2008?
21   A.  Yes.
22   Q.  Okay. And is the only person he would have
23  heard from concerning what he is next to do someone
24  from Martin's Bulk Milk Service?

Page 137

1    MR. SKRYD:  I'm going to object. Calls for
2  speculation and foundation as to what he did hear
3  from anybody.
4          Go ahead.
5    THE WITNESS:  He -- I'm not sure who he talked
6  to. He did the run for a while and I know he
7  talked to Overnite Express/Am-Can on certain
8  events.
9  BY MR. FISHER:
10   Q.  How long had he been doing this run and how
11  frequently did he do the run?
12   A.  He did the run every day, five days a week.
13   Q.  And so is this something that would be sort
14  of regular, what he would expect would be the case
15  on each day at the tail end of the afternoon?
16   A.  Very much so.
17   Q.  All right. And so is it likely, based upon
18  your knowledge of how this operation occurs, that
19  he might just know -- be waiting in some truck stop
20  or somewhere just waiting for the phone call as to
21  where he's supposed to go or at least what time
22  he's supposed to go there?
23   A.  He had the same schedule every day.
24   Q.  And that schedule would have been what?

Page 138

1    A.   Delivering a load from Wilton, Wisconsin,
2    to Chicago; taking an empty trailer from the
3    railroad to Exel distribution, Hammond, Indiana;
4    picking a load for International Paper for
5    Universal Am-Can; going to Minneapolis.
6    Q.   And would he have brought the load in each
7    case back to Wilton and then it would have been
8    transferred to another driver, or would he have
9    gone on from Wilton to Minneapolis?
10   A.   He ran the Chicago leg of the run.  Another
11   driver took the Minneapolis end of it every day.
12   Q.   So his -- he's -- his round trip is Wilton
13   Chicago, Hammond, back to Wilton?
14   A.   Yes.
15   Q.   Okay.  And that was day in, day out for
16   weeks and months before July 3rd, 2008?
17   A.   Years.
18   Q.   How many years?
19   A.   I don't recall.
20   Q.   We'll have to ask him.  Okay.  You can set
21   that aside.
22        Was the place of pick-up predetermined
23   for Mr. Franke on July 3rd, 2008?
24   A.   Yes.

Page 139

1    Q.   Was the place of delivery predetermined for
2    Mr. Franke on July 3rd, 2008?
3    A.   Yes.
4    Q.   Was the time of pick-up predetermined for
5    the July 3rd, 2008 load?
6    A.   Yes.
7    Q.   Was the time of delivery predetermined for
8    the load on July 3, 2008?
9    A.   Yes.
10   Q.   Was what he was to pick up predetermined or
11   did that depend upon whatever types of paper
12   products were to be shipped?
13   MR. SKRYD:  Objection.  Foundation.
14        If you know.
15   THE WITNESS:  Exel had until 5:00 o'clock at
16   night to change their order.
17   BY MR. FISHER:
18   Q.   Why was that?
19   A.   Orders get called in throughout the day for
20   whatever the customers need.  They had till 5:00
21   o'clock that night to change the order to what went
22   on the truck to load at 7:00.
23   Q.   Was there ever an instance, to your
24   knowledge, in which Mr. Franke expecting there to

Page 140

1    be a load, suddenly at 5:00 o'clock, there was no
2    load?
3    A.   Yes.
4    Q.   And what would happen in that instance --
5    A.   He would come home --
6    Q.   -- other than he'd get mad?
7    A.   Come home empty.
8    Q.   Okay.  Do you know whether or not on
9    July 3, 2008 -- strike that.
10        When he came from Wilton down to
11   Chicago, Hammond area, was he empty or loaded?
12   A.   Loaded.
13   Q.   What would he have brought or the types of
14   things he would have brought on his north to south
15   trip?
16   A.   Either furniture or beverages.
17   Q.   And then he would -- would the drop-off
18   place change day to day, week to week?
19   A.   Day to day.
20   Q.   Were there certain usual suspects of places
21   that he was making his deliveries to?
22   A.   Usually, two.
23   Q.   All right.  And what were those places
24   again?

Page 141

1    A.   CSX, Bedford Park; CSX, 47th Street.
2    Q.   And then would he remain there waiting for
3    when he's going to go make a pick-up in Hammond?
4    A.   No.  He already was predispatched to know
5    what to do.
6    Q.   All right.  On July 3rd, 2008, do you know
7    whether or not at any time during that day he ever
8    had any contact with anyone at International Paper
9    concerning what he was to do that day?
10   A.   Do not know.
11   Q.   Do you know whether or not he had any
12   contact with anybody from Universal Am-Can on that
13   day?
14   A.   Do not know.
15   Q.   And do you know whether or not on that day
16   he had any contact with anybody at
17   Overnite Express?
18   A.   Do not know.
19   Q.   If Universal Am-Can had told you or
20   Mr. Franke, We need to get -- we need you to get
21   that product up to Minneapolis by driving a hundred
22   miles an hour on interstate highways, what would
23   your response have been?
24   MR. SKRYD:  Objection to the form.

Page 142

1    Go ahead.
2    THE WITNESS: We have to follow the rules of
3 hours of service and speed limits.
4 BY MR. FISHER:
5    Q. And that's, I take it, independent of
6 whatever contractual relationship you had with
7 Universal Am-Can, correct?
8    A. Yes.
9    Q. Did you, as a representative of Martin's
10 Bulk Milk Service, ever represent to anyone,
11 regardless of who that person's employed by, that
12 Mr. Franke was an agent of International Paper when
13 he was doing his daily runs?
14    MR. SKRYD: Objection to the form.
15    THE WITNESS: No.
16 BY MR. FISHER:
17    Q. Did you ever represent to anyone concerning
18 the daily runs that Mr. Franke would do, that he --
19 Mr. Franke was an agent of Universal Am-Can?
20    MR. SKRYD: Again, objection to form and the
21 term "represent."
22    THE WITNESS: No.
23 BY MR. FISHER:
24    Q. And same question:

Page 143

1    Did you ever represent to anyone else
2 that Mr. Franke was acting as an agent on behalf of
3 Overnite Express when he was doing his runs?
4    MR. SKRYD: Same objection. Form; the term
5 "represent."
6    THE WITNESS: No.
7 BY MR. FISHER:
8    Q. Would it be fair to say that you would
9 represent to individuals that Mr. Franke was an
10 employee of your company?
11    A. Yes.
12    Q. And that he would receive direction,
13 control, supervision and management from your
14 company when he was doing his work on the road?
15    A. Yes.
16    Q. Did International Paper ever dictate to
17 your company how Mr. Franke was to drive his motor
18 vehicle?
19    MR. SKRYD: Objection. Calls for speculation,
20 foundation as to what they did or didn't tell him.
21    THE WITNESS: Not that I recall.
22 BY MR. FISHER:
23    Q. Did Universal Am-Can ever direct Mr. Franke
24 in the way he was to drive his vehicle?

Page 144

1    MR. SKRYD: Same objections.
2    THE WITNESS: Not that I recall.
3 BY MR. FISHER:
4    Q. Same question as to Overnite Express.
5    Did they ever dictate to Mr. Franke how
6 he was to drive his vehicle on his daily runs?
7    A. Not that I recall.
8    Q. Did Overnite -- strike that.
9    Did International Paper ever advise you
10 that Mr. Franke was not to do any of these runs
11 that he had been doing day in, day out; week in,
12 week out; month in, month out?
13    A. No.
14    Q. Did Universal Am-Can ever make such a
15 dictation or direction to your company about
16 Mr. Franke?
17    A. No.
18    Q. Same question as to Overnite Express.
19    A. No.
20    Q. Did International Paper ever pay Mr. Franke
21 directly?
22    A. Not to my knowledge.
23    Q. That would have been a violation of the
24 agreement that existed between your company and

Page 145

1 Overnite Express or Universal Am-Can, correct?
2    A. Correct.
3    Q. Did International Paper ever provide any
4 tools, materials or equipment for Mr. Franke to do
5 his job on his usual daily runs?
6    A. Not that I recall.
7    Q. And what about Universal Am-Can, did they
8 ever provide any tools, equipment or materials for
9 Mr. Franke to do his daily runs?
10    A. Not that I recall.
11    Q. Same question as to Overnite Express?
12    A. Not that I recall.
13    Q. Did Mr. Franke's job ever involve the
14 brokering of loads?
15    A. No.
16    Q. Did Mr. Franke's job -- strike that.
17    Was Mr. Franke's income -- let me
18 rephrase my question.
19    Did International Paper,
20 Overnite Express or Universal Am-Can ever deduct
21 withholding tax from Mr. Franke's pay --
22    A. No.
23    Q. -- because of the runs that they did --
24 that he did?

Page 146

1     A.   No.
2     Q.   When you were asked questions by Mr. Burke
3   before in which he suggested to you and you agreed
4   that Mr. Franke was the agent of
5   International Paper or Overnite Express or
6   Universal Am-Can, why did you say "yes" to those
7   questions?
8     MR. BURKE:  Objection to the form of the
9   question.
10    MR. SKRYD:  Go ahead.  Answer.
11    THE WITNESS:  We're all tied into the movement
12  of the load that we did day to day:  CSX,
13  Universal Am-Can, Exel, International Paper and
14  Trac Leasing.
15  BY MR. FISHER:
16    Q.   And how does that tying in or
17  interrelationship necessarily mean that Mr. Franke
18  is an agent as opposed to an independent contractor
19  of any of those other entities?
20    MR. BURKE:  Objection to the form.
21  BY MR. FISHER:
22    Q.   If you know.
23    A.   I don't know.
24    Q.   So when you answered Mr. Burke's questions

Page 147

1   before as to them being -- as to Mr. Franke being
2   agents of any of those entities, were you basing
3   that on just the fact that you believe these
4   companies are related in some way in the
5   transportation industry of moving goods from one
6   place to another?  Is that what you meant by your
7   answers?
8     A.   Yes.
9     Q.   Okay.  Have you ever moved from Wilton,
10  Wisconsin?
11    A.   No.
12    Q.   Have you ever -- always lived there?
13    A.   Yes.
14    Q.   Are you -- I'll change my question then.
15  Well, let me ask this:
16         Have you ever moved from one house to
17  another?
18    A.   Yes.
19    Q.   In Wilton?
20    A.   Yes.
21    Q.   And by chance, when you did that, did you
22  hire the services of a mover or did you do it by
23  yourself?
24    A.   Myself.

Page 148

1     Q.   Okay.  Have you ever been to a fast-food
2   restaurant?
3     A.   Yes.
4     Q.   And when you've -- have you ever pulled
5   into the drive-in?
6     A.   Yes.
7     Q.   Ordered food?
8     A.   Yes.
9     Q.   And when you've ordered your lunch or
10  whatever it was you ordered and that order was
11  filled by somebody in the restaurant, was that
12  person filling your order doing something at your
13  service?
14    A.   Yes.
15    Q.   And for your benefit?
16    A.   Yes.
17    Q.   And if that person, while accomplishing
18  that task, reached over and struck somebody, do you
19  think that person was acting on your behalf?
20    MR. SKRYD:  Objection.  Form of the question,
21  calls for a legal conclusion.  And I think I'm
22  going to instruct him not to answer that question.
23  That's well beyond what I think is relevant in this
24  case and asking him to make a tort-related

Page 149

1   determination in a trucking-related case.
2         If you want to ask him something about
3   the trucking industry, go ahead.
4     MR. FISHER:  I'm asking that question, and you,
5   at your peril, instruct him not to answer this
6   question.
7     MR. SKRYD:  I said I think.  I'm thinking about
8   it.
9     MR. FISHER:  Okay.  Please think.  Take your
10  time.
11    MR. SKRYD:  I'm thinking about it.
12    MR. FISHER:  You're not contending it's a matter
13  of privilege, I take it, right?
14    MR. SKRYD:  No.  No, I just don't know if it's
15  an appropriate question.
16    MR. FISHER:  Might not be admissible.
17    MR. SKRYD:  And I don't -- no, it's not going to
18  be admissible, I'm sure, but...
19         If you understand what he's getting at,
20  then you can --
21    THE WITNESS:  I wish not to answer.
22  BY MR. FISHER:
23    Q.   Why's that, sir?
24    A.   I don't think it has anything relevant with

Page 150

1    what's going on.
2        Q.  And why is that?
3        A.  It's two different scenarios.
4        Q.  Okay.  So is your answer to my question,
5    you can't answer the question because you believe
6    it's too different scenarios and one is not like
7    the other?
8        A.  I wish not to answer.
9        Q.  I'm sorry?
10       A.  I wish not to answer.
11       Q.  But you may not have a choice in that,
12   okay?
13           So my question is, are you not going to
14   answer the question or are you taking the position
15   you can't answer that question because they are
16   unlike situations?
17       A.  They're unlike situations.
18   MR. FISHER:  Okay.  That's all the questions I
19   have.
20           Thanks.
21   MR. SKRYD:  Okay.  Let's take a two-minute
22   break.  I won't be that long, Scott.
23           (Recess taken.)
24

Page 151

1                (Whereupon, Martin Deposition
2                Exhibit No. 25 was
3                marked for identification
4                as of this date.)
5    EXAMINATION
6    BY
7    MR. BENTIVENGA:
8        Q.  Hi, Mr. Martin.  I'm Scott Bentivenga.  I
9    represent CSX Intermodal in the case and I've got
10   some questions for you as well.
11           I'm going to start out by showing you
12   what I've marked as your Deposition Exhibit No. 25,
13   which is entitled Answers and Objections of
14   Defendants Martin's Bulk Milk Service, Inc., and
15   Samuel G. Franke to Defendants CSX Intermodal,
16   Inc.'s First Request to Admit Facts and Genuineness
17   of Documents and Supplement Interrogatories or
18   Production Requests Pursuant to Federal Rule of
19   Civil Procedure 36, 26 and 34.
20           Do you have a copy of that in front of
21   you?
22       A.  Yes.
23       Q.  Okay.  If you could turn to the request
24   No. 4.  Request No. 4 asks whether -- well, it

Page 152

1    states, CSXI, which is CSX Intermodal, did not
2    operate the tractor involved in the incident
3    alleged in plaintiff's third amended complaint when
4    the accident occurred on July 3, 2008.
5            Do you see that request?
6        A.  Yes.
7        Q.  And you see the objection that that
8    followed and the answer, correct?
9        A.  Yes.
10       Q.  After talking about this for the last
11   several hours, would you agree -- would you admit
12   on behalf of yourself and Martin's Bulk Service
13   (sic), that CSXI did not operate the tractor
14   involved in the accident on July 3, 2008?
15       A.  Define "operate."
16       Q.  How do you define operate?
17       A.  Not driving the truck.
18       Q.  Okay.  So if we can agree that operating
19   the tractor means driving the truck, is that an
20   acceptable definition to you?
21       A.  Yes.
22       Q.  All right.  You would agree then that CSXI
23   did not operate or drive the tractor that was
24   involved in the accident on July 3, 2008?

Page 153

1        A.  Yes.
2        Q.  All right.  And that's because Mr. Samuel
3    Franke drove and operated the truck, correct?
4        A.  Yes.
5        Q.  And he did so as an employee of
6    Martin's Bulk Service, correct?
7        A.  Yes.
8        Q.  And Mr. Franke was not an employee of any
9    other entity or person other than Martin's Bulk
10   Service on July 3, 2008 when he operated that
11   tractor when he was involved in the accident on
12   July 3, 2008; is that correct?
13       A.  Correct.
14       Q.  Can you go to No. 6, Request No. 2?
15   MR. SKRYD:  One or two at a time.  Hope we're
16   skipping a little around.  I'm just kind of teasing
17   you there.
18   MR. BENTIVENGA:  Well, it's just --
19   MR. SKRYD:  I'm just teasing you.
20   MR. BENTIVENGA:  I'm not going to ask about the
21   ones --
22   MR. SKRYD:  I'm just teasing you.
23   MR. BENTIVENGA:  I'd like to get through this,
24   too.

Page 154

1    MR. SKRYD: It looked like you were going a
2 couple -- and then, all of a sudden, you only went
3 one or two pages.
4       But, anyway, go ahead. No. 6?
5    MR. BENTIVENGA: Sure.
6 BY MR. BENTIVENGA:
7    Q. Okay. You testified earlier today that the
8 chassis was owned by Trac Lease; is that correct?
9    A. Yes.
10   Q. All right. And No. 6 of the request to
11 admit, Exhibit 25, states, CSXI did not own the
12 chassis on which the CSXI container was transported
13 at the time of the incident alleged in plaintiff's
14 third amended complaint, which occurred on July 3,
15 2008.
16      Do you see that statement?
17   A. Yes.
18   Q. And you would admit that based on what you
19 know now?
20   A. Yes.
21   Q. All right. And No. 7, which also states
22 CSXI did not lease the chassis, you would agree
23 that CSXI did not lease the chassis involved in the
24 accident?

Page 155

1    A. That, I wouldn't know.
2    Q. Okay. You don't know one way or the other?
3    A. Correct.
4    Q. All right. Okay. No. 8, which states that
5 the chassis on which the CSXI container was
6 transported at the time of the accident on July 3,
7 2008 was owned by Trac Lease, you would admit that
8 now, correct?
9    A. Yes.
10   Q. No. 9, Request No. 9 states, CSXI did not
11 employ the driver, Samuel G. Franke, who was
12 operating the tractor, container on chassis
13 involved in the incident alleged in plaintiff's
14 third amended complaint on July 3, 2008 at the time
15 of the incident.
16      You would admit that at this point,
17 correct?
18   A. Sam Franke was an employee of Martin's Milk
19 Service.
20      I do not know any involvement -- or I
21 don't know of any involvement he would have had
22 with CSXI, but I don't know.
23   Q. Okay. Have you learned of any information
24 at any time that Samuel Franke was employed by CSXI

Page 156

1 at any time?
2    A. No.
3    Q. So based on what you know, you would agree
4 that Samuel Franke was not employed by CSXI on
5 July 3, 2008, or at any time, correct?
6    A. Yes.
7    Q. 10 states, CSXI did not dispatch the
8 driver, Samuel G. Franke, to pick up or deliver the
9 load he hauled at the time of the incident alleged
10 in plaintiff's third amended complaint which
11 occurred on July 3, 2008.
12      Do you see that?
13   A. Yes.
14   Q. You would agree and admit that CSXI did not
15 dispatch your driver, Samuel G. Franke, on July 3,
16 2008, correct?
17   A. They would have not -- they would have not
18 dispatched him on his next load.
19   Q. What do you mean by that?
20   A. His -- they wouldn't have told him where he
21 had to go next.
22   Q. Okay. You -- I think you indicated that
23 you dispatched Mr. Franke for the load that he was
24 delivering at the time that he was involved in the

Page 157

1 accident; is that correct?
2    A. Yes.
3    Q. And you would agree then that CSXI did not
4 dispatch him for that load that he was delivering
5 at the time of the accident on July 3, 2008?
6    A. Yes.
7    Q. No. 11 states, CSXI did not engage
8 Samuel G. Franke as an agent for CSXI on or before
9 July 3, 2008 with respect to the incident alleged
10 in plaintiff's third amended complaint.
11      Do you see that?
12   A. Yes.
13   Q. You would admit and agree with that
14 statement, correct?
15   A. Yes.
16   Q. No. 12, CSXI did not hold out Samuel G.
17 Franke as an agent of CSXI on or before July 3,
18 2008 with respect to the incident alleged in
19 plaintiff's third amended complaint.
20      Do you see that?
21   A. Yes.
22   Q. Would you agree and admit to that?
23   MR. SKRYD: My objection with that -- to that
24 would stand, if that were a question, Scott, to the

Page 158

1  extent that it lacks foundation as to what CSI
2  (sic) did or did not do.
3     But go ahead.
4     MR. BURKE:  Objection to the form of the
5  question and the term "holding out."
6     THE WITNESS:  I mean, define "hold out."
7  BY MR. BENTIVENGA:
8     Q.  Well, what does it mean to you?
9     A.  I don't know.  That's why -- I mean --
10    Q.  Well, we've established that CSXI did not
11 employ Mr. Franke, correct?
12    A.  Mr. Franke -- Mr. Franke was an employee of
13 Martin's Milk Service, but he went into the
14 railroads every day to CSXU -- CSXI.
15    Q.  Right.  Okay.
16       And he did that for Martin's Bulk
17 Service, correct?
18    A.  He did that for all the companies.  He did
19 it -- this was all -- everybody was -- I mean,
20 everybody as far as Celtic, CSXU, Overnite Express,
21 American Am-Can, Exel, Trac Leasing.  They all got
22 a piece of this puzzle.
23    Q.  I understand.  My question's a little
24 different than that.

Page 159

1       When Mr. Franke would drive a tractor
2  and/or a tractor and trailer and/or a tractor and
3  chassis and container onto CSXI property or a CSX
4  rail yard, he did that as an employee as part of
5  his job for Martin's Bulk Service; am I right?
6     A.  Yes.
7     Q.  All right.  He did that because he was
8  making deliveries, pick-ups, drop-offs for
9  Martin's Bulk Service as part of his job, right?
10    A.  Yes.
11    Q.  And he took his instructions and his
12 direction and his jobs from Martin's Bulk Service,
13 correct?
14    A.  He took -- yeah, he took the instructions
15 from me.
16       I don't know whether -- any other
17 instructions he took from anybody else that could
18 have involved him with other than what I told him.
19    Q.  Okay.  Are you aware of any document or
20 information that would indicate that CSXI in some
21 way, shape or form indicated or held out Mr. Franke
22 as an employee of CSXI?
23    A.  No.
24    Q.  Are you aware of any document or

Page 160

1  information that would indicate that CSXI indicated
2  or held out Mr. Franke as an agent of CSXI?
3     MR. SKRYD:  Objection to the form and calls for
4  speculation.
5     THE WITNESS:  Not that I know of.
6       I don't know if Sam had anything -- any
7  dealings besides what I dealt with him on day to
8  day.
9  BY MR. BENTIVENGA:
10    Q.  Right.  And I'm only asking you for what
11 you know today.
12       And as far as you know, CSXI did not
13 hold out Samuel Franke as an agent or employee of
14 CSXI; am I correct?
15    A.  Yes.
16    Q.  No. 13 states, CSXI did not hold out
17 Sam Franke as an -- as authorized to act on behalf
18 of CSXI on or before July 3, 2008, with respect to
19 the incident alleged in plaintiff's third amended
20 complaint.
21       Do you see that?
22    A.  Yes.
23    Q.  Would you agree and admit to that
24 statement?

Page 161

1     MR. SKRYD:  Again, with regards to the objection
2  I made before, form, foundation as to what CSXI did
3  or didn't do, and then whatever we've got in the
4  document as well.
5       Legal conclusion.
6     THE WITNESS:  And, again, I don't know -- other
7  than what I know today, if Sam had any other
8  dealings with.
9  BY MR. BENTIVENGA:
10    Q.  Okay.  Based on what you know -- and that's
11 all I'm asking you for -- would you agree that CSXI
12 did not hold out Samuel Franke as authorized to act
13 on behalf of CSXI on or before July 3, '08 with
14 respect to the incident alleged in this case?
15    MR. SKRYD:  Same objections.
16    THE WITNESS:  Yes.
17 BY MR. BENTIVENGA:
18    Q.  Okay.  No. 14, CSXI did not represent to
19 any member of the public that Samuel G. Franke was
20 authorized to act on behalf of CSXI on or before
21 July 3, 2008 with respect to the transportation of
22 the International Paper load which was involved in
23 the incident alleged in plaintiff's third amended
24 complaint.

Page 162

1    Would you agree and admit to that
2  statement?
3    MR. SKRYD:  Same objection.
4    MR. BURKE:  Objection to form and foundation for
5  his knowledge of that.
6    MR. SKRYD:  Same objections as before.  How
7  could he know that.
8    But go ahead.
9    THE WITNESS:  Not that I know of.
10  BY MR. BENTIVENGA:
11    Q.  Okay.  No. 15, CSXI did not represent to
12  Jeffrey Scheinman that Samuel G. Franke was
13  authorized to act on behalf of CSXI on or before
14  July 3, 2008 with respect to the transportation of
15  the International Paper load which was involved in
16  the incident alleged in plaintiff's third amended
17  complaint.
18    Based on what you know, would you agree
19  and admit to that?
20    MR. SKRYD:  Same objections.
21    THE WITNESS:  Not to my knowledge.
22  BY MR. BENTIVENGA:
23    Q.  And since I think we have a double-negative
24  there, based on your knowledge, you would admit

Page 163

1  No. 15 as I read it based on what you know?
2    A.  Based on what I know, they did not.
3    Q.  Again, we have a double-negative; but based
4  on what you know, CSXI did not represent to Jeffrey
5  Scheinman that Samuel G. Franke was authorized to
6  act on behalf of CSXI on or before July 3, 2008,
7  correct?
8    A.  Correct.
9    MR. GOLDEN:  I was getting confused with that
10  last one.
11    MR. SKRYD:  That is confusing.
12  BY MR. BENTIVENGA:
13    Q.  Let's go to No. 20.
14    No. 20 states, At the time of the
15  incident alleged in plaintiff's third amended
16  complaint, which occurred on July 3, 2008, CSXI had
17  no right to direct the work of Samuel G. Franke?
18    Do you see that?
19    A.  Yes.
20    Q.  You would agree and admit that that
21  statement in No. 20 is true and correct?
22    MR. SKRYD:  Same objections as indicated in the
23  answer and, further, that it calls for a legal
24  conclusion.

Page 164

1    MR. GOLDEN:  Said so.  Asked and answered.
2    THE WITNESS:  I cannot say if anybody would have
3  had any influence on Sam.  I wasn't there.
4  BY MR. BENTIVENGA:
5    Q.  Okay.  You -- you directed the work of
6  Mr. Franke by dispatching him for this load,
7  correct?
8    A.  Yes.
9    Q.  And you did that on behalf of Martin's Bulk
10  Service, right?
11    A.  Yes.
12    Q.  Are you aware of any document or
13  information that would indicate that CSXI had a
14  right to direct the work of Mr. Franke with respect
15  to his delivery of that load for Martin's Bulk
16  Service?
17    A.  No.
18    Q.  Do you -- are you aware of any document or
19  information that would indicate that CSXI exercised
20  any right to direct or control Samuel G. Franke
21  with respect to this delivery on July 3, 2008?
22    A.  No.
23    Q.  So based on what you know, CSXI did not
24  direct the work of Samuel G. Franke with respect to

Page 165

1  this delivery on July 3, 2008; is that correct?
2    MR. SKRYD:  Objection as to foundation.
3    THE WITNESS:  Based on what I know -- from what
4  I know today, they had no...
5  BY MR. BENTIVENGA:
6    Q.  No direction?
7    A.  Yes.
8    Q.  That covers No. 21.
9    No. 22 states, At the time of the
10  incident alleged in plaintiff's third amended
11  complaint, which occurred on July 3, 2008, CSXI had
12  no right to supervise the work of Samuel G. Franke.
13    Do you see that?
14    A.  Yes.
15    Q.  Would you agree and admit that CSXI had no
16  right to supervise the work of Samuel G. Franke
17  with respect to the delivery of the load that he
18  was carrying at the time of the accident on July 3,
19  2008?
20    MR. SKRYD:  Objection.  Calls for a legal
21  conclusion and a lack of foundation.
22    THE WITNESS:  Based on what I know, we still had
23  work to do on this.
24  BY MR. BENTIVENGA:

Page 166

1    Q.   Work to do on what?  I'm sorry.
2    A.   Well, how do -- we don't actually know.
3    Q.   Okay.  So you can't say one way or the
4    other?
5    A.   Exactly.
6    Q.   Would you agree, though, that you're not
7    aware of any document or other information that
8    would indicate that CSXI had a right to supervise
9    the work of Samuel G. Franke in making his delivery
10   on July 3, 2008?
11   A.   I don't know of any documentation.
12   Q.   Okay.  And you're not aware of any other
13   information, right?
14   A.   Correct.
15   Q.   All right.  On No. 23 states, At the time
16   of the incident alleged in plaintiff's third
17   amended complaint, which occurred on July 3, 2008,
18   CSXI did not supervise the work of
19   Samuel G. Franke.
20        Would you agree with that statement?
21   MR. SKRYD:  Same objections as are indicated in
22   there, Scott, and also object as to foundation.  He
23   wasn't there.
24   THE WITNESS:  I would say the same.  We're

Page 167

1    still looking into it and I don't know of any
2    documentation.
3    BY MR. BENTIVENGA:
4    Q.   Okay.  Are you aware of any information
5    that CSXI actually supervised the work of
6    Samuel G. Franke on July 3, 2008 with respect to
7    the delivery he was making?
8    A.   I don't know of any documentation.
9    Q.   Okay.  On July 3, 2008, that was when you
10   first got the order for the delivery that
11   Mr. Franke was making on July 3, '08, correct?
12   A.   On the load he was delivering?
13   Q.   Correct.
14   A.   On July 3rd, we got the load -- the
15   information on the load that he was picking up.
16   Q.   Okay.  Okay.  I see the distinction.
17        Exhibit No. 11 is that Broker
18   Confirmation Sheet, which is dated July 3, 2008,
19   right?
20   A.   Right.
21   Q.   And that came into your office, looks like,
22   at about 4:23 p.m., right?
23   A.   Right.
24   Q.   Now, obviously, Mr. Franke made this run

Page 168

1    often.  But with respect to the confirmation of
2    this particular pick-up that he was to make in
3    Hammond, Indiana, the first notice to Martin's Bulk
4    Service was on July 3, 2008, right?
5    A.   Correct.
6    Q.   Did you have any communication with anyone
7    from CSX Intermodal on July 3, 2008?
8    A.   I did not.
9    Q.   Are you aware of any information that
10   anyone from Martin's Bulk Service had a
11   communication with CSX Intermodal on July 3, 2008?
12   A.   Not to my knowledge.
13   Q.   Do you know whether Mr. Franke had any
14   communication with anyone from CSX Intermodal on
15   July 3, 2008?
16   A.   Not to my knowledge.
17   Q.   Were you Mr. Franke's direct supervisor?
18   A.   Yes.
19   Q.   And you were supervising his work on
20   July 3, 2008?
21   A.   Yes.
22   Q.   You would agree that CSXI was not
23   supervising his work on July 3, 2008, correct?
24   MR. SKRYD:  Objection.  Foundation as to what

Page 169

1    they did or didn't do.
2    THE WITNESS:  I would say that he was directed
3    by me to deliver the load to Chicago, pick up the
4    load in Indiana.
5         After -- anything that happened between
6    there, I have no -- I don't know what could have --
7    if anything could have happened.
8    BY MR. BENTIVENGA:
9    Q.   You're not aware of any supervision
10   conducted by CSXI over Mr. Franke's work on July 3,
11   2008, correct?
12   A.   None that I know of.
13   Q.   Okay.  No. 24, on July 3, 2008, CSXI had no
14   right to direct the work of Martin's Bulk Service,
15   Inc.
16        Would you agree with that?
17   MR. SKRYD:  Same objections as indicated in the
18   answer as well as calls for a legal conclusion and
19   foundation.
20   THE WITNESS:  They might have -- they might have
21   told -- directed him as far as what trailer he
22   could take in the yard.
23   BY MR. BENTIVENGA:
24   Q.   Okay.  Other than that, are you aware of

Page 170

1   any other right that CSXI had to direct the work of
2   Martin's Bulk Service --
3       A.  No.
4       Q.  -- on July 3, 2008?
5       A.  No.
6       Q.  Okay.  By the way, with respect to the
7   container and the chassis, do you know whether or
8   not the container was on the chassis at the time
9   that Mr. Franke arrived to go pick it up?
10      A.  I do not know.
11      Q.  Given the fact that you're not aware of any
12  communication between CSXI and Martin's Bulk
13  Service, Inc., on July 3, 2008, would you agree
14  that CSXI did not direct the work of Martin's Bulk
15  Service, Inc., on July 3, 2008 with respect to this
16  delivery?
17      MR. SKRYD:  My objection is foundation.  I don't
18  know how he'd know what they did or didn't.
19          Go ahead.
20      THE WITNESS:  And, again, he only took the
21  direction from -- from me to where he had to
22  deliver it and to pick up.  If anybody else had any
23  contact with him, I don't know.
24  BY MR. BENTIVENGA:

Page 171

1       Q.  Okay.  And I'm just asking based on what
2   you know.
3           Are you aware of any direction by CSXI
4   over Martin's Bulk Service, Inc.?
5       A.  No.
6       Q.  With respect to this job that's listed on
7   the Broker Confirmation Sheet marked as
8   Exhibit No. 11, you would agree that CSXI had no
9   right to supervise the work of Martin's Bulk
10  Service, Inc., with respect to this job, correct?
11      MR. SKRYD:  Can you re- -- can you repeat that?
12  I'm sorry, Steve.
13      MR. BENTIVENGA:  Yeah, he can read it.
14          (Record read as requested.)
15      MR. SKRYD:  Same objections as before.
16  Foundation, calls for a legal conclusion.
17      THE WITNESS:  Not to my knowledge.  They
18  wouldn't have anything to do with it.
19  BY MR. BENTIVENGA:
20      Q.  And, in fact, based on what you've
21  testified to, you would admit that CSXI did not
22  supervise the work of Martin's Bulk Service Milk
23  (sic) with respect to this job reflected on
24  Exhibit 11?

Page 172

1       A.  Correct.
2       Q.  The tractor that was driven by Mr. Franke
3   on July 3, 2008 that was involved in the accident,
4   the tractor itself did not have any decal or other
5   identification stating CSXI on it, correct?
6       A.  Correct.
7       Q.  With respect to No. 35, can you go to
8   No. 35?
9           35 states, CSXI did not contract with
10  Martin's Bulk Service, Inc., or Samuel G. Franke to
11  haul the load for International Paper which was in
12  transit at the time of the incident alleged in
13  plaintiff's third amended complaint on July 3,
14  2008?
15          Do you see that?
16      A.  Yes.
17      Q.  Based on what you know now, would you agree
18  with that statement?
19      MR. SKRYD:  Again, my objections are as stated
20  in there.
21          Further, it calls for a legal
22  conclusion.
23      THE WITNESS:  We used the CSXU container to pick
24  up the load out of International Paper like we did

Page 173

1   every day.
2   BY MR. BENTIVENGA:
3       Q.  Okay.
4       A.  So we were contracted with CSXI as
5   everybody -- CSXI benefited in every movement that
6   we made.
7       Q.  Let me ask you about that.
8           Exhibit No. 9 is that Celtic's
9   Accessorial Approval Form.  Remember that?
10      A.  Yes.
11      Q.  That -- that was a bill -- this was the
12  bill for $8,050 --
13      A.  Yes.
14      Q.  -- from Celtic to Martin's Bulk Service?
15      A.  Yes.
16      Q.  I think you indicated this was not paid,
17  correct?
18      A.  It's pending.
19      Q.  But it has not been paid to date?
20      A.  Correct, to my knowledge.
21      Q.  All right.  And is this the fee that you
22  would pay to Celtic to cover whatever the costs
23  would be of using the chassis and the container
24  that was involved in that delivery?

Page 174

1    A.  No.  If you look on that document, it'll
2  tell you how many days you have.
3    Q.  Okay.
4    A.  And I believe it's five days without being
5  charged.
6    Q.  Okay.  Okay.
7      So if you just use the chassis and the
8  container for five days or less, then there's no
9  charge?
10   A.  Correct.
11   Q.  So under those circumstances then, the
12  owner of the chassis and the owner of the container
13  do not benefit financially since there's no charge?
14   A.  Well, they're charging Celtic.
15   Q.  I understand.  But you're -- out of the
16  money that you're paid, you don't pay a fee if you
17  use it for five days or less, correct?
18   A.  Correct.
19   Q.  All right.  Because you -- this chassis and
20  container was involved in the accident on July 3,
21  2008, it was not returned, right?
22   A.  Correct.
23   Q.  And no fee was paid by Martin's Bulk
24  Service for use of the chassis or the container to

Page 175

1  date?
2    A.  To my knowledge.
3    Q.  So whatever money that Martin's Bulk
4  Service earned for that pick-up and delivery, none
5  of that benefited CSXI, who owned the container, or
6  Trac Lease, who owned the chassis, correct?
7    A.  CSXI gets a profit off it somehow or they
8  wouldn't be able to just let it out for nothing.
9    Q.  Are you going to -- do you understand --
10  well, first of all, do you know that?
11     I'm just asking you for what you know.
12   A.  No.
13   Q.  You don't know that.
14     All right.  But you do know that
15  whatever money Martin's Bulk Service was paid, none
16  of that money was used to pay for the use of the
17  chassis and the container that was driven by
18  Mr. Franke on July 3, 2008?
19   A.  When this is settled, we will have to pay
20  CSXI.  That's where that money will go.
21   Q.  But, to date, none of that money has been
22  paid?
23   A.  Correct.
24   Q.  CSXI was not part of the contract or

Page 176

1  agreement reflected in the Broker Confirmation
2  Sheet marked as Exhibit 11, correct?
3    A.  Correct.
4    Q.  And CSXI did not contract with
5  Martin's Bulk Service to haul that paper that was
6  hauled on July 3, 2008, correct?
7    A.  Correct.
8    Q.  What does the word "interchange" mean to
9  you with respect to the container and chassis?
10   A.  It means that when we bring a loaded
11  trailer in, we're allowed to take out an empty
12  trailer, or deliver a loaded trailer in and
13  sometimes take a loaded trailer out.
14     We can freely move about with railroad
15  equipment.
16   Q.  Okay.  No. 36, it says, CSXI did not
17  interchange --
18   MR. SKRYD:  Can you hold on one second, Scott?
19   MR. BENTIVENGA:  Oh, I'm sorry.
20   MR. SKRYD:  That's all right.  He's still back
21  on something else.
22   MR. BENTIVENGA:  Just trying to speed it along.
23   MR. SKRYD:  Go ahead.  I'm sorry.
24  BY MR. BENTIVENGA:

Page 177

1    Q.  CSXI did not interchange the container on
2  chassis hauled by Samuel G. Franke on July 3, 2008
3  to Martin's Bulk Milk Service, Inc., or Samuel G.
4  Franke for use in this movement.
5      Would you agree with that or do you not
6  know?
7    A.  I do not know.  You're talking about the
8  container itself.
9    Q.  Yes.
10   A.  Yeah, I do not know.
11   Q.  And why don't you know?
12   A.  Once it's -- I have no idea what happens
13  once in the railroad.  It's a very busy place.  I
14  don't have any clue what goes on once it's in
15  there.
16   Q.  When Mr. Franke picked up the chassis and
17  the container on July 3, 2008, I think you
18  indicated the CSX rail yard at 47th Street?
19   A.  Yes.
20   Q.  Is there any requirement or did Mr. Franke
21  contact CSXI to indicate that he had taken a
22  container owned by CSXI, to your knowledge?
23   A.  An empty one back out?
24   Q.  Correct.

Page 178

1    A.   Well, when he leaves the gate, he has to
2    report which trailer he has.
3    Q.   Okay.  And is there documentation of that?
4    A.   Yes.
5    Q.   Is that Exhibit 8?
6    MR. SKRYD:  Is that the J --
7    THE WITNESS:  J-1.
8    MR. SKRYD:  Yeah.
9    THE WITNESS:  Exhibit 8.
10   MR. SKRYD:  You're right, Scott.
11   BY MR. BENTIVENGA:
12   Q.   Okay.  Are you familiar with this type of
13   record?
14   A.   Somewhat.
15   Q.   It says driver name, Tomas Crespo,
16   C-r-e-s-p-o, on there.
17        Do you know why that is?
18   A.   We have no idea.
19   Q.   Do you know Tomas Crespo?
20   A.   No.
21   Q.   There's another name on there.  It says
22   Jamie Panozzo, P-a-n-o-z-z-o.  Do you know Jamie
23   Panozzo?
24   A.   No.

Page 179

1    Q.   Okay.  No. 37 states, Martin's Bulk Milk
2    Service, Inc., and Samuel G. Franke did not obtain
3    CSXI container -- CSXU 937987 through interchange
4    with CSXI.
5         Would you agree with that?
6    A.   No, I would not.
7         I don't -- they would not let him out if
8    it wasn't -- if he -- if he didn't have an
9    agreement with CSXI.
10   Q.   You mean, if Martin's didn't?
11   A.   If he doesn't have a pick-up -- a
12   confirmation number, he cannot leave the yard.
13        So it has to go back through the UIA --
14   UII interchange.
15   Q.   Okay.  And is that how it works then, that
16   he'll go in and choose a chassis and a container
17   and then notify on the way out what he's taking?
18   A.   Yes.
19   Q.   So there's no prior communication usually
20   between Mr. Franke and CSXI as to which chassis and
21   container he's taking?
22   A.   Correct.  But they -- there's times where
23   he can go out, and they can deny the trailer he's
24   taking out and tell him to go take a different one.

Page 180

1    Q.   And under what circumstances might that
2    occur?
3    A.   If it's already reserved for another
4    company.
5    Q.   Do you know whether or not anything like
6    that occurred on July 3, 2008?
7    A.   I do not.
8    Q.   Would you agree -- I'm looking at No. 39.
9         Would you agree that after Mr. Franke
10   hooked up to the container and chassis or chassis
11   and container and took it out of the CSX rail yard,
12   that Mr. Franke and Martin's Bulk Milk Services,
13   Inc., controlled the container?
14   MR. SKRYD:  Why don't you read it.  You can
15   answer.
16        Objection as to the form.
17   MR. BURKE:  Objection to the form as well.
18   MR. SKRYD:  And objection.  Calls for a legal
19   conclusion.
20   THE WITNESS:  Sam was the driver of the truck.
21   Container is still owned by CSXI.
22   BY MR. BENTIVENGA:
23   Q.   Okay.  And while Mr. Franke's driving the
24   tractor, the chassis and the container, the

Page 181

1    container is then in his possession, correct?
2    A.   To my knowledge.  Yes, to my knowledge.
3    Q.   All right.  And he's driving it.  So he's
4    the one that has control over it, correct?
5    MR. SKRYD:  Objection to the form, the word
6    "control."
7    THE WITNESS:  He's in control of his tractor.
8    And under other circumstances with their equipment
9    of the trailer, I mean there's things -- certain
10   things he's not in control of.
11   BY MR. BENTIVENGA:
12   Q.   You would agree that there is -- has been
13   no information or you're not aware of any
14   information that there was any problem with the
15   container that was involved in the accident on
16   July 3, 2008.
17        Would you agree with that?
18   A.   The only problem with the container that I
19   know of is what they found afterwards with some
20   brakes out of adjustment.
21   Q.   You're talking about the chassis now?
22   A.   Correct.
23   Q.   I'm talking about the container only.
24        Would you agree with me that you're not

Page 182

1  aware of any information that there was any problem
2  with the container?
3      A.  I'm not aware of any information --
4  anything wrong with the container.
5      Q.  At the time that Mr. Franke was driving the
6  tractor and pulling the chassis and container, you
7  would agree that CSXI was not operating the
8  container or the chassis at that time, correct?
9      MR. SKRYD:  Objection as to the form and the
10  word "operate."
11          You can answer.
12      THE WITNESS:  As I said before, he was operating
13  the truck.  If anything was with -- would go wrong
14  with the trailer, would be out of his control.
15  BY MR. BENTIVENGA:
16      Q.  Okay.  And you're not aware of there being
17  any problem with the container; we've established
18  that, right?
19      A.  Correct.
20      Q.  All right.  So when he's operating the
21  tractor, he's pulling the chassis and the
22  container, correct?
23      A.  Correct.
24      Q.  There's no one else that's driving that

Page 183

1  vehicle, correct?
2      A.  To my knowledge, no.
3      Q.  All right.  So you would agree that at the
4  time that he's driving that on July 3, 2008, CSXI
5  was not operating the container or the chassis or
6  the tractor, correct?
7      A.  Correct.
8      Q.  By the way, when Mr. Franke pulls out of
9  the -- or pulled out the CSXI or -- or CSX rail
10  yard at 47th Street on July 3, 2008 with the empty
11  container, do you know who operates the gates,
12  whether it's CSX, CSXI, or some contracted company,
13  some independent contractor?
14      A.  I do not know.
15      Q.  So whether or not CSXI was given any notice
16  on July 3, 2008 that Mr. Franke had taken its
17  container off of that yard, you don't know?
18      A.  You cannot leave the rail yard without
19  authorization.  You cannot physically leave there.
20  They'll put the gates down -- or the gates are down
21  before you leave.
22      Q.  Okay.  And my only question is then, if
23  you're not sure who was operating the gate and got
24  this information that we believe is reflected on

Page 184

1  Exhibit 8, you don't know whether or when, if ever,
2  it was communicated to CSXI if it was taken by an
3  independent contractor, correct?
4      A.  I guess I lost you there.
5      Q.  All right.
6      A.  The only way that any truck, any carrier
7  can pull out of CSX is if you have a reservation
8  number.  You give that number to the guard.  If the
9  number is reserved within the system, they'll let
10  you leave.  If one thing's wrong, you cannot leave.
11      Q.  Okay.  You would agree that CSXI did not
12  receive this order marked as Exhibit 11 for the
13  pick-up and delivery of paper?
14      MR. SKRYD:  My objection is foundation as to
15  what they did or didn't get.
16          I don't know how he'd know, but go
17  ahead.
18  BY MR. BENTIVENGA:
19      Q.  As far as you know?
20      A.  I would agree.
21      Q.  You would agree that CSXI cannot broker the
22  shipment of that paper that Mr. Franke was
23  delivering at the time of the accident on July 3,
24  2008, correct?

Page 185

1      MR. SKRYD:  Objection.  Foundation.
2      THE WITNESS:  It was on the CSXU container.
3  They would have -- no, they wouldn't have had
4  anything.
5  BY MR. BENTIVENGA:
6      Q.  Okay.  Who brokered the load?
7      A.  That load there?
8      Q.  Yes.
9      A.  Overnite Express and Am-Can.
10      Q.  All right.  So you would agree then that
11  CSXI did not broker the load that was being carried
12  by Mr. Franke on July 3, 2008?
13      A.  Correct.
14      Q.  You mentioned earlier that the load of the
15  paper was loaded by people at the Exel Warehouse on
16  July 3, 2008, right?
17      A.  Yes.
18      Q.  That load was not loaded by CSXI, correct?
19      A.  Correct.
20      MR. SKRYD:  I like the sound of that flipping
21  paper.
22      MR. BENTIVENGA:  I'm getting there.
23      MR. SKRYD:  Music to my ears.
24      MR. BENTIVENGA:  Trying to speed it up.

Page 186

1    MR. SKRYD: I gotcha. Appreciate it.
2    MR. BENTIVENGA: Okay. We're done with that
3    exhibit. And I just have a few questions based on
4    what's been --
5    MR. SKRYD: Sure.
6    MR. BENTIVENGA: -- asked previously.
7    BY MR. BENTIVENGA:
8    Q.   When Mr. Franke would make a delivery for
9    his employer, Martin's Bulk Service, he would be
10   paid by Martin's Bulk Service for his work for
11   them, correct?
12   A.   Correct.
13   Q.   Was he on a salary?
14   A.   Per mile.
15   Q.   Per mile?
16       Okay. So with respect to the pick-up
17   that he was making on July 3, 2008 and the driving
18   that he was doing for Martin's Bulk Service at the
19   time of the accident, he was being paid by
20   Martin's Bulk Service?
21   A.   Yes.
22   Q.   And as far as you know, he was not being
23   paid by anybody else for that job that he was doing
24   at the time of the accident, correct?

Page 187

1    A.   To my knowledge, no.
2        No, he was not being paid by anybody
3    else.
4    Q.   Thank you.
5        When Mr. Franke was driving for
6    Martin's Bulk Service on the road on July 3, 2008,
7    CSXI would not dictate how Mr. Franke would drive,
8    correct?
9    A.   Correct.
10   Q.   Any direction that he would take would be
11   from Martin's Bulk Service?
12   MR. SKRYD: Objection to the form.
13   THE WITNESS: Any direction he would take, also
14   follow the rules of the law and hours of service.
15   BY MR. BENTIVENGA:
16   Q.   Right.
17       There are rules, regulations, laws that
18   he has to follow as an over-the-road driver?
19   A.   Correct.
20   Q.   Just about done.
21       I'm going to show you what I've had
22   marked as Exhibit 4. I didn't mark it. It was
23   marked previously as Exhibit 4.
24       Okay. That's the Federal Highway

Page 188

1    Administration periodic inspection report from
2    May 23, '08?
3    A.   Yes.
4    Q.   Okay. You testified about this earlier and
5    it wasn't clear to me.
6        Was this an inspection report for the
7    chassis, the container or both, as far as you know?
8        If you know.
9    A.   It would actually -- it would be for the
10   chassis and -- it could be for the -- for the
11   container also. There's reflectors and, yeah, it
12   could be both.
13   Q.   Can you tell from this document whether it
14   was, in fact, an inspection of both the chassis and
15   the container or just the chassis?
16   A.   Cannot tell.
17   Q.   Okay. In the lower left-hand corner, it
18   says, Name of company performing repairs, and it
19   says ITR.
20   A.   Yes.
21   Q.   What's ITR, if you know?
22   A.   I don't know.
23   Q.   And the person whose name is on the bottom
24   there as the inspector, can you see what name that

Page 189

1    is?
2    A.   T. Jeronimo.
3    Q.   Do you know who that is?
4    A.   I do not.
5    Q.   Do you know who employs T. Jeronimo?
6    A.   I do not.
7    Q.   Do you know who then performed the
8    inspection on May 23, 2008 on the chassis?
9    A.   (Indicating.) That signature right there.
10   Q.   T. Jeronimo.
11   A.   No inspector -- inspector signature, that
12   person's signature -- that person inspected it, but
13   I do not know them.
14   Q.   Okay. I thought that the inspector's name
15   on the left, T. Jeronimo, where it's printed out on
16   the left and then signed on the right --
17   A.   Oh, okay. You're right.
18   Q.   -- it would be the same person?
19       So you don't know who did that?
20   A.   No.
21   Q.   Okay. I may have asked you this, but do
22   you know when the CSXI container was placed on the
23   chassis that was involved in the accident?
24   A.   No.

Page 190

1    MR. BENTIVENGA:  Thank you.
2        That's all I have.
3    MR. SKRYD:  Do you have any follow-up, Rich?
4    MR. BURKE:  I do have a few, yeah.
5    MR. SKRYD:  Okay.
6        FURTHER EXAMINATION
7        BY
8        MR. BURKE:
9    Q.   Mr. Martin, Mr. Fisher asked you some
10   questions about whether at some point shortly
11   before July 3rd, 2008, you were interacting with
12   Universal Am-Can.
13       Do you recall that line of questioning?
14   A.   Yes.
15   Q.   Okay.  And is it also correct that, you
16   literally, as of the day of this incident, you were
17   receiving faxes from Overnite Logistics on paper
18   that said Overnite Logistics on the fax information
19   at the top?
20   A.   Yes.
21   Q.   Okay.  And that was coming from Melody --
22   what's her last name?
23   A.   Hansen.
24   MR. BENTIVENGA:  Hansen.

Page 191

1    MR. FISHER:  Hansen.
2    MR. SKRYD:  Hansen.
3    BY MR. BURKE:
4    Q.   Hansen.  Thank you -- from Melody Hansen
5    who you believe to work for Overnite, correct?
6    A.   Correct.
7    Q.   Even if you -- you know -- well, strike
8    that.
9        I asked you some questions earlier about
10   whether you believed you were -- that Martin's was
11   performing services and acting as an agent for
12   International Paper and for Overnite.  Do you
13   recall those questions?
14   A.   Yes.
15   Q.   Okay.  And even if -- if Overnite had
16   actually been purchased or subsumed by Universal
17   and that you were transporting this paper for
18   Universal, is it true and correct that you believe
19   on July 3rd, 2008, you were performing a service
20   for the benefit of Universal Am-Can?
21   A.   Yes.
22   Q.   And would it also be correct to say that
23   you were -- that you believe you -- or that
24   Martin's was acting as an agent of

Page 192

1    Universal Am-Can?
2    A.   Yes.
3    Q.   You know, you got asked about if you had
4    ever told anyone if -- or strike that.
5        You were asked some questions asking if
6    you had ever discussed whether International Paper
7    or Overnite or Universal or others were agents of
8    Martin's.
9        And would it be fair to say you have
10   never had occasion to have that type of
11   conversation with anyone prior to today?
12   A.   Yes.
13   Q.   Mr. Martin, you also were asked some
14   questions about interrogatory answers that
15   apparently got prepared by someone in your office
16   in terms of the -- identifying people involved in
17   the transportation of these paper products.
18       Do you recall those questions?
19   A.   Yes.
20   Q.   Okay.  Would it -- in some answers that
21   made reference to no one else other than the
22   persons and entities identified in the discovery in
23   this case and the documents in this case, by that,
24   does that answer include everyone that you have

Page 193

1    identified today and spoken about today, such as
2    International Paper and Universal and Overnite and
3    Trac Leasing and Exel and Celtic?
4    A.   Yes.
5    Q.   Okay.  And all -- and those names are all
6    the names of the entities that are identified in
7    the various documents that you have both in front
8    of you and that have been produced; is that
9    correct?
10   A.   Yes.
11   Q.   And do all of the answers you've given
12   today and the testimony you have given today
13   constitute supplementation of any of the answers
14   provided on behalf of Martin's in any written
15   questions or interrogatories?
16   A.   Yes.
17   Q.   You know, you got asked -- or strike that.
18       When -- when you say you were -- I think
19   you answered a question for Mr. Fisher about
20   indicating that all of these entities were tied in
21   together when he was asking you some questions
22   about the concept of agency.
23       Do you remember that?
24   A.   Yes.

Page 194

1    Q.  And would it be correct that -- in addition
2  to all of these entities being tied in together,
3  that when you told us earlier this afternoon that
4  Martin's was acting as an agent for the various
5  entities that you mentioned, it is true that
6  Martin's was, in fact, performing work for and
7  services for all of those entities by transporting
8  the paper products at the request of International
9  and Overnite and Universal, correct?
10   A.  Yes.
11   MR. BENTIVENGA:  Object to the form of the
12  question and foundation.
13  BY MR. BURKE:
14   Q.  You got asked a bunch of questions about
15  what CSX may have done in terms of holding out
16  Mr. Franke or holding out Martin's.  Do you recall
17  that --
18   A.  Yes.
19   Q.  -- line -- okay.
20       Would it be correct that you actually
21  have no personal knowledge about what CSX -- CSXI
22  did in their own business operations relative to
23  Martin's or Mr. Franke?  Would that be fair to say?
24   A.  Yes.

Page 195

1    MR. BURKE:  I don't have anything else.
2    Thank you, sir.
3    THE WITNESS:  Thank you.
4        FURTHER EXAMINATION
5        BY
6        MR. FISHER:
7    Q.  Mr. Martin, so that I understand your
8  testimony, is it your testimony that if any company
9  or individual has its fingerprints literally on a
10  load or document in the chain of transportation for
11  the movement of goods from Point A to Point B and
12  your company was involved somewhere, that every --
13  that your company is acting at all times as the
14  agent of every other company whose fingerprints are
15  on the movement of this truckload of goods?
16   A.  Every entity had a benefit through this
17  transaction.  So yes.
18   Q.  So -- and that is regardless of whether or
19  not your company has ever had any contact with
20  another company?
21   A.  Yes.
22   Q.  So your testimony is that another company
23  in the chain, no matter where they're at, would be
24  a principal to your company, acting as its agent,

Page 196

1  even if your two companies have never corresponded
2  or communicated at any time?
3    A.  Yes.
4    Q.  Just wanted to make sure I understood that.
5        The Martin's companies that you've
6  mentioned, MBM Logistics, Martin Warehousing,
7  Martin Refrigerated Express, Martin's Bulk Milk
8  Services, is one company a parent?  Are they sister
9  companies?
10       How are they related?
11   A.  They're either separate LLCs or
12  corporations.
13   Q.  I understand that.  But is one of them a
14  subsidiary of another company?
15   A.  No.
16   Q.  So they're all separate entities?
17   A.  Yes.
18   MR. FISHER:  Thanks.
19   MR. BENTIVENGA:  I just have a couple of
20  follow-ups.
21       FURTHER EXAMINATION
22       BY
23       MR. BENTIVENGA:
24   Q.  You mentioned a few times in this

Page 197

1  deposition that every entity had a benefit from
2  this delivery.
3        And I would like for you to identify for
4  me how CSXI benefited from Mr. Franke's and
5  Martin's delivery on July 3, 2008.
6    MR. SKRYD:  To his understanding?
7    MR. BENTIVENGA:  Yes.
8    MR. GOLDEN:  It's been asked and answered, too.
9    THE WITNESS:  Every company is in business to
10  make money.  So we bring a load down.  We haul a
11  load, we make money.  We pick up -- I mean, we use
12  CSX equipment.
13  BY MR. BENTIVENGA:
14   Q.  Can I stop you?
15       And you can answer it if you want to
16  answer it that way, but my question is very direct
17  and specific with respect to the delivery that
18  Mr. Franke was driving on July 3, 2008, at the time
19  of the accident where he was driving a Martin's
20  tractor.  He was pulling a Trac Lease chassis and
21  had a CSXI container.
22       I would like to know from that delivery
23  what benefit has CSXI received as a result of that
24  job that Mr. Franke was doing for Martin's at that

## Page 198

1   time?

2     A. On that particular shipment, CSX -- CSI --

3   CSI --

4     MR. SKRYD: CSX.

5     THE WITNESS: -- CSXI would not benefit. But on

6   the load coming down on the next trip, CSXI would

7   benefit.

8   BY MR. BENTIVENGA:

9     Q. Okay. But from the load that was being

10   carried at the time of the accident, you would

11   agree that CSXI had no benefit, correct?

12     MR. SKRYD: Objection as to the form.

13     THE WITNESS: The only way I can answer is there

14   was a load on the trailer that had to have gotten

15   some revenue on that trip as soon as it leaves that

16   yard.

17   BY MR. BENTIVENGA:

18     Q. You're not aware of what revenue or if any

19   revenue was received by CSXI; am I correct?

20     A. No, I'm not aware how they do their

21   billing.

22     Q. Okay. And the CSXI container has been out

23   of service since July 3, 2008, correct?

24     A. Correct.

## Page 199

1     Q. And so it hasn't been taken on any other

2   deliveries or loads or shipments; am I right?

3     A. Correct.

4     MR. BENTIVENGA: All right. That's all I have.

5        Thank you.

6     MR. SKRYD: We done?

7     MR. BURKE: I have nothing.

8     MR. FISHER: I have nothing.

9     MR. SKRYD: Okay. We're done.

10       Reserved.

11        FURTHER DEPONENT SAYETH NOT. . .

## Page 200

1     IN THE UNITED STATES DISTRICT COURT

        NORTHERN DISTRICT OF ILLINOIS

2          EASTERN DIVISION

3   MURRAY SCHEINMAN, Plenary  )

    Guardian of the Estate and  )

4   PERSON OF JEFFREY J. SCHEINMAN,)

    a Disabled Person,       )

5                 )

      Plaintiff,     )

6                 )

    vs.         ) No. 09 CV 5340

7                 )

  MARTIN'S BULK MILK SERVICE,  )

8   INC., et al.,       )

9     Defendants.    )

10     This is to certify that I have read the

11   transcript of my deposition taken on the 12th day

12   of January 2010 in the foregoing cause, and that

13   the foregoing transcript accurately states the

14   questions asked and answers given by me, with the

15   changes or corrections, if any, made on the Errata

16   Sheet(s) attached hereto.

17

18

19

            DAVID MARTIN

20

    Subscribed and sworn to

21   before me this    day

    of      2010.

22

23     Notary Public

24

## Page 201

1   STATE OF ILLINOIS )

            ) SS:

2   COUNTY OF DU PAGE )

3     I, Steven Stefanik, a notary public in and

4   for the County of Cook and State of Illinois, do

5   hereby certify that DAVID MARTIN was first duly

6   sworn to testify the whole truth, and that the

7   above deposition was recorded stenographically by

8   me and was reduced to computerized transcript under

9   my personal direction.

10     I further certify that the said deposition

11   was examined and read over by said deponent and was

12   signed by him and that the said deposition

13   constitutes a true record of the testimony given by

14   the said witness.

15     I further certify that the said deposition

16   was taken at the time and place specified and that

17   the taking of said deposition commenced on the 12th

18   day of January 2010 and was completed the same day.

19     I further certify that MR. RICHARD F.

20   BURKE, JR., of the firm of CLIFFORD LAW OFFICES,

21   120 North LaSalle Street, Suite 3100, Chicago,

22   Illinois 60602, appeared as attorney for the

23   plaintiff; that MR. JOSEPH SKRYD of the law firm of

24   MULHERIN, REHFELDT & VARCHETTO, P.C., 211 South

Page 202

1  Wheaton Avenue, Suite 200, Wheaton, Illinois 60187

2  appeared as attorney for the defendant.

3      I further certify that I am not a relative

4  or employee or attorney or counsel of any of the

5  parties, or a relative or employee of such attorney

6  or counsel, or financially interested directly or

7  indirectly in this action.

8      In witness whereof, I have hereunto set my

9  hand and affixed my seal of office, at Chicago,

10  Illinois, this 28th day of January 2010.

11

12

13

14

            Steven T. Stefanik, CSR

15           No. 084-003298

16

17

18

19

20

21

22

23

24

Page 203

February 1, 2010

MULHERIN, REHFELDT & VARCHETTO, P.C.
C/O MR. JOSEPH G. SKRYD
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187

Re: Scheinman v. Martin's, et al.

Dear Mr. Skryd:

  Enclosed please find the transcript of the
discovery deposition of DAVID MARTIN, taken on
January 12, 2010, in the above-entitled cause.
  Since signature was reserved, please ask
Mr. Martin to review his transcript from
January 12, 2010, making any necessary corrections
on the errata sheets, and sign and notarize the
deponent's signature page.
  Please send the original signed errata sheets
and signed deponent's certificate to Mr. Burke,
keep a copy for yourself, send a copy to All
Counsel of Record, and send a copy to me for my
records.
  Your cooperation in this matter is greatly
appreciated. Thank you.

      Sincerely,

      Steven Stefanik, CSR
      SULLIVAN REPORTING COMPANY

CC: Mr. Burke
  All Counsel of Record