IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian )
of the Estate and Person of JEFFREY )
J. SCHEINMAN, a Disabled Person, )
)
    Plaintiff, )
)
    vs. ) No. 09 CV 5340
)
MARTIN'S BULK MILK SERVICE, INC., )
SAMUEL G. FRANKE, CSX INTERMODAL, )
INC., INTERNATIONAL PAPER COMPANY, )
UNIVERSAL AM CAN, LTD., Successor )
to OVERNITE EXPRESS, INC. and OX )
LLC, BMW OF NORTH AMERICA, LLC, a )
corporation, BAYERISCHE MOTOREN )
WERKE AKTIENGESELLCHAFT, a )
corporation, BMW AG, a corporation, )
and KARL KNAUZ MOTORS, INC., a )
corporation, )
)
    Defendants. )

    The Videotaped Deposition of DAVID V. MARTIN,
taken in the above-entitled cause, before Cheri
LeBeau Dubina, a notary public of DuPage County,
Illinois, on the 20th day of February, 2012,
commencing at 11:15 a.m., at 211 South Wheaton
Avenue, Suite 200, Wheaton, Illinois, pursuant to
Notice.
    Reported by: Cheri LeBeau Dubina, CSR
    License No.: 084-002986

204

---

1    APPEARANCES:
2    CLIFFORD LAW OFFICES
3    120 North LaSalle Street
4    31st Floor
5    Chicago, Illinois 60602
6    Tel: 312-899-9090
7    by: MR. RICHARD F. BURKE, JR. and
8    MS. SHANNON M. McNULTY;
9    On behalf of the Plaintiff;
10    MULHERIN, REHFELDT & VARCHETTO, P.C.
11    211 South Wheaton Avenue, Suite 200
12    Wheaton, Illinois 60187
13    Tel: 630-653-9300
14    by: MR. JOSEPH G. SKRYD and
15    MR. MATTHEW R. SCHRECK;
16    On behalf of Martin's Bulk Milk
17    Service and Samuel G. Franke;
18    DOWD & DOWD, LTD.
19    617 West Fulton
20    Chicago, Illinois 60661
21    Tel: 312-704-4400
22    by: MR. ROBERT J. GOLDEN,
23    On behalf of Martin's Bulk Milk
24    Service and Samuel G. Franke;

205

---

1    APPEARANCES: (Continued)
2
3    HINSHAW & CULBERTSON
4    222 North LaSalle Street
5    Suite 300
6    Chicago, Illinois 60601
7    Tel: 312-704-3000
8    by: MR. CARLTON D. FISHER,
9    On behalf of International Paper
10    Company, Overnite Express, Inc., Ox
11    LLC, Universal Am Can, Ltd. and
12    Overnite Logistics, Inc.;
13
14    JOHNSON & BELL, LTD.
15    33 West Monroe Street
16    Suite 2700
17    Chicago, Illinois 60603
18    Tel: 312-372-0770
19    by: MR. TIMOTHY R. COUTURE,
20    On behalf of BMW of North America,
21    LLC and Bayerische Motoren Werke
22    Aktiengesellschaft.
23
24    ALSO PRESENT: Dulce Rodriguez, Videographer

206

---

    I N D E X
WITNESS    Page
DAVID V. MARTIN
  Direct Exam by Mr. Fisher    211
  Cross-Exam by Mr. Couture    361
  Cross-Exam by Mr. Burke    407
  Redirect Exam by Mr. Fisher    478
  Recross Exam by Mr. Couture    506
  Recross Exam by Mr. Burke    512
    E X H I B I T S
Martin Deposition Exhibit Nos.    Page
49 - Supplemental Disclosures of Martin's
    Bulk Milk Service    218
50 - Answers of Defendant Martin's Bulk
    Milk Service    218
51 - Supplemental and amended answers of
    Martin's Bulk Milk Service    218
52 - Response of Martin's Bulk Milk to
    production request    218
53A - Supplemental and amended response of
    Martin's Bulk Milk Service    218
53B - Supplemental and amended response of
    Martin's Bulk Milk Service    218
54 - Second supplemental and amended
    response of Martin's Bulk Milk Service    240
55 - Third supplemental and amended
    response of Martin's Bulk Milk Service    240
56 - Letter regarding Mr. Franke's driver
    qualification records    240
57 - Series of printouts of various invoices 243
58 - Memo Bill, Load and Rate Confirmation
    and invoice    249
59 - Memo Bill, Load and Rate Confirmation
    and invoice    249
60 - Memo Bill, Load and Rate Confirmation
    and invoice    249
61 - Martin's Bulk Milk invoice #190363    271
62 - Invoices    272
63 - Invoices    272
64 - Overnite Logistics Load and Rate
    Confirmation sheets    272
65 - Broker Confirmation sheets    272
66 - Memo Bills    272
67 - Photocopies of the markings of
    confirmation sheets    280

207

---

1 (Pages 204 to 207)

EXHIBIT

C

McCorkle ......ices, Inc.
Chicago, ...... 263-0052

E X H I B I T S

Martin Deposition Exhibits Nos.                Page

68 - Collection of documents           281
69 - Franke employment file           281
70 - Logs                       281
71 - Compilation of 68, 69 and 70      281
72 - 2002 Contract              288
73 - 2004 Contract              288
74 - 2005 Contract              288
75 - 2008 Contract              288
76 - Broker Confirmation Sheet     312
77 - Copies of three memo bills      312
78 - Uniform Intermodal Interchange and
     Facilities Access Agreement     312

208

---

Am Can, Limited, successor to Overnight Express, Inc., Ox LLC and International Paper.

MR. SKRYD: Joe Skryd for Martin's Bulk Milk Service and Samuel Franke.

MR. GOLDEN: And Bob Golden on behalf of Martin's Bulk.

MR. SCHRECK: As well as Matthew Schreck on behalf of Martin's Bulk Milk Services, Inc. and Samuel Franke.

THE VIDEOGRAPHER: Will the reporter please identify herself and swear in the witness.

(The witness was duly sworn.)

MR. SKRYD: Before we start, we have an agreement between counsel that all objections will be reserved except as to form of the question. Okay.

And we're going to pickup for the second deposition where we left off the first one and we'll probably -- Carlton, right -- just use the next page number, if you would, Miss Court Reporter. Thank you.

210

---

THE VIDEOGRAPHER: My name is Dulce Rodriguez, legal video specialist in association with McCorkle Litigation Services located at 200 North LaSalle Street, Suite 300, Chicago, Illinois 60601.

I am the camera operator on February 20th, 2012 for the videotaping of the deposition of Mr. David Martin, being taken at Mulherin, Rehfeldt & Varchetto, 211 South Wheaton Avenue in Wheaton, Illinois at the time of 11:15 a.m.

This is in the matter of Murray Scheinman, et al., versus Martin's Bulk Milk Service, Inc., et al., filed in the U.S. District Court for the Northern District of Illinois, Eastern Division, Case Number 09 CV 5340.

Will counsel please identify themselves for the record beginning with plaintiff's counsel first.

MR. BURKE: Richard Burke for the plaintiff.

MS. McNULTY: Shannon McNulty for plaintiff.

MR. COUTURE: Timothy Couture for BMW.

MR. FISHER: Carlton Fisher for Universal

209

---

DAVID V. MARTIN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FISHER:

Q.  Mr. Martin, good morning.

A.  Good morning.

Q.  You did this before a couple years ago, didn't you?

A.  Yes.

Q.  All right.  The same rules apply, but let me go over those rules for you so that there's no misunderstanding.

Please answer only questions you understand.  If you have -- if you didn't hear the question, if you heard it but you don't understand it, if you're unsure of the question, please don't answer such a question.  We want you to only answer questions you understand; is that fair?

A.  Fair.

Q.  Since it's being video'd this time, it's important to keep your voice up.

A.  Okay.

Q.  And although a video might be able to show

211

---

2 (Pages 208 to 211)

1  us what an uh-huh or unh-uh means because of your
2  facial expressions, the court reporter still has to
3  keep a record. So please try as best you can to
4  make your responses audible in the English language
5  so that she can take those responses down. Is that
6  fair?
7      A.  Fair.
8      Q.  And, in addition, this isn't an endurance
9  contest, it's going to take, I'm sure, a number of
10 hours because there's a lot of things to talk about
11 with you but if you need to take a break, please
12 tell us that and we'll be certain to accommodate
13 you, all right?
14     A.  Okay.
15     Q.  The first question I have is have you
16 reviewed, read, skimmed or in any fashion looked at
17 the first session of your deposition that took
18 place a couple years ago?
19     A.  Yes.
20     Q.  Based upon your review and skimming --
21 well, let me ask this. What was your review of
22 your deposition? What did you do?
23     A.  I read over what I had responded to in the
24 first deposition two years ago and that's about it.

212

1      Q.  All right. Based upon your reading of
2  your first deposition session, did you find any
3  testimony in that first session to be inaccurate or
4  in need of some type of clarification or
5  correction?
6      A.  No.
7      Q.  You have the right in this session of your
8  deposition to make corrections under the Federal
9  Rules of Civil Procedure. So I just -- you're
10 aware of that right?
11     A.  I am now.
12     Q.  Okay. All right. Let me ask you a few
13 preliminary questions. What is your current
14 position now?
15     A.  I am operations manager at Martin's Bulk
16 Milk Service in Wilton, Wisconsin.
17     Q.  And was that the same position you had
18 when you gave your deposition two years ago?
19     A.  Yes.
20     Q.  With respect to Martin's Bulk Milk
21 Service, is that a company which is a motor
22 carrier?
23     A.  Yes.
24     Q.  Is that company also a broker?

213

1      A.  Yes.
2      Q.  Does the broker -- Strike that. Does the
3  business -- let me begin again.
4          Does the brokering business of Martin's
5  Bulk Milk Service operate under a different DOT
6  number or motor carrier number than the business in
7  which Martin's Bulk Milk is a motor carrier?
8      A.  Martin's Bulk Milk also has broker
9  authority along with MBM Logistics.
10     Q.  I'm keeping them out of my questions for
11 the time being, okay. So let's just deal with
12 Martin's Bulk Milk Service. All right.
13         Martin's Bulk Milk Service does operate as
14 a motor carrier?
15     A.  Correct.
16     Q.  Do you know what its DOT number or its
17 motor carrier number are when it is operating as a
18 motor carrier?
19     A.  I don't know it off the top of my head. I
20 know pretty much the numbers but I don't know them
21 all.
22     Q.  I've got some documents. We may come back
23 to that. Suffice it to say, is it a true statement
24 that when Martin's Bulk Milk Service operates as a

214

1  motor carrier it operates under a different motor
2  carrier number or DOT number than when it operates
3  as a broker, if you know?
4      A.  I'm not sure.
5      Q.  All right. What would you need to be able
6  to answer that question? What information, who
7  would you need to talk to, what documents would you
8  need to look at to be able to answer those
9  questions?
10     A.  I would have to call to the home office to
11 see if there's a separate government number that
12 belongs to that -- to it.
13     Q.  All right. Okay. We'll come back to
14 that, perhaps. But to wrap up this topic -- and I
15 don't mean to repeat areas of questioning from your
16 first session. I'm going to try not to do that.
17         But with respect to the work that Martin's
18 Bulk Milk Service does when it operates as a
19 broker, does it deal with companies or individuals
20 or owner/operators that provide truck driving
21 services when Martin's Bulk Milk is operating as a
22 broker?
23     A.  Say it one more time.
24     Q.  I'm going to make my question much

215

3 (Pages 212 to 215)

```
 1    easier.  Imagine the hypothetical A-B-C Trucking
 2    Company and the hypothetical John Doe truck
 3    driver.  When Martin's Bulk Milk Service operates
 4    as a broker, does it enter into some type of a
 5    relationship with the A-B-C Trucking Company or the
 6    John Doe truck driver when it is working -- working
 7    as a broker?
 8       A.  Yes, there's a carrier broker agreement.
 9       Q.  And is this a carrier broker agreement
10    that Martin's Bulk Milk Service has created for its
11    relationship with trucking companies,
12    owner/operators or truck drivers with which
13    Martin's Bulk Milk Service as a broker operates?
14       A.  Yes.
15       Q.  And is that some documentation you would
16    be able to provide us if we asked your attorneys
17    for it?
18       A.  Yes.
19       Q.  Okay.  Now, when that occurs, does
20    Martin's Bulk Milk Service as a broker ever retain
21    Martin's Bulk Milk Service carrier driver employees
22    to do the driving work or do you go to separate
23    companies, separate owner/operators, separate truck
24    drivers?
                                                      216
```

```
 1       A.  Our broker side doesn't use our drivers.
 2       Q.  And when you say that, you mean Martin's
 3    Bulk Milk Service as a broker does not use Martin's
 4    Bulk Milk Service company drivers?
 5       A.  Correct.
 6       Q.  Okay.  Can you give me some examples of
 7    the companies with which Martin's Bulk Milk Service
 8    as a broker deals when it is brokering loads and
 9    using other companies or other company drivers or
10    other owner/operators?
11       A.  A name of a company?
12       Q.  Yes, just give me an example of one, if
13    you can remember.
14       A.  We use Dave Berg out of Tomah, Wisconsin.
15       Q.  And is Dave an owner/operator?
16       A.  Yes.
17       Q.  Does Dave have more than one truck?
18       A.  No.
19       Q.  So he's one truck?
20       A.  Yes.
21       Q.  All right.  Can you think of any other
22    companies or owner/operators with which Martin's
23    Bulk Milk Service operating as a broker deals with?
24       A.  Not at this time.
                                                      217
```

```
 1       Q.  There's a whole bunch of records that have
 2    been produced since your last deposition.  I'm
 3    going to use the first part of the deposition to
 4    principally do an inventory of these, ask you a few
 5    questions and then I'll later get into sort of the
 6    meat of the questions I'm going to ask you, okay?
 7             (Whereupon, Martin Deposition
 8              Exhibit Nos. 49, 50, 51, 52, 53A
 9              and 53B were marked for
10              identification.)
11    BY MR. FISHER:
12       Q.  So look, if you would, at Exhibits 49 and
13    50 which is the first set.  And I'll represent to
14    everyone that Exhibit 49 is the Supplemental
15    Disclosures of Martin's Bulk Milk and Samuel Franke
16    and Exhibit 50 is Martin's Bulk Milk answers to
17    International Paper and Universal Am Can's
18    interrogatories.
19          MR. SCHRECK:  Carl, do you have a master
20    book with those new ones?
21          MR. FISHER:  I do.  Here you go.
22    BY MR. FISHER:
23       Q.  All right.  First of all, are you familiar
24    with the document Exhibit 49 which is the
                                                      218
```

```
 1    Supplemental Disclosures?
 2       A.  Yes.
 3       Q.  Did you have anything to do with the
 4    preparation of these Supplemental Disclosures?
 5       A.  No.
 6       Q.  But you're just familiar that this is a
 7    document that your counsel provided for --
 8       A.  Yes.
 9       Q.  -- everybody else, right?  I want to ask
10    you to look at Page 3 of Exhibit 49.  Sorry.  And
11    on Exhibit 3 do you see where the names Janet
12    Berndt, David Martin, Ryan Greene, Randy Galewski
13    and Pat Podlena appear?
14       A.  Yes.
15       Q.  Knowing what you know about this lawsuit
16    and the issues that have been developed and the
17    discovery responses that you have worked on on
18    behalf of your employer, can you think of any other
19    persons employed by Martin's Bulk Milk Service or
20    formerly employed by Martin's Bulk Milk Service who
21    might have pertinent information for this lawsuit
22    other than the five people listed on Page 3
23    beginning with Janet Berndt and ending with Pat
24    Podlena?
                                                      219
```

4 (Pages 216 to 219)

1    A.   No.
2    Q.   Those are the key people who have the most
3 information?
4    A.   Yes.
5    Q.   Is Janet still working with you?
6    A.   Yes.
7    Q.   And her position again is?
8    A.   Personnel.
9    Q.   Obviously, David, you're still working.
10 Ryan Greene, refresh my memory on who he is.
11   A.   Ryan Greene was a shop foreman, not with
12 us anymore.
13   Q.   When did he leave, approximately?
14   A.   Two years ago.
15   Q.   And do you know where he is now?
16   A.   Yes.
17   Q.   Where is he?
18   A.   Kendall Trucking & Excavating.
19   Q.   What was his job back in 2007, 2008 before
20 the accident on July 3rd, 2008 occurred?
21   A.   He was shop foreman.
22   Q.   Randy Galewski, is he still with you?
23   A.   Randy is an employee of Martin's Bulk
24 Milk -- excuse me, MBM Logistics.

                                            220

1    Q.   Has he ever been an employee of Martin's
2 Bulk Milk Service?
3    A.   No.
4    Q.   And Randy Galewski is with Martin's Bulk
5 Logistics?
6    A.   MBM Logistics.
7    Q.   And is that out of Minnesota?
8    A.   Winona, Minnesota.
9    Q.   And is that where he currently lives?
10   A.   Yes.
11   Q.   And Pat Podlena, I think you told me
12 before that he has left your company's employ?
13   A.   Correct.
14   Q.   And do you know -- do you have any further
15 update on where he's at now?
16   A.   I do not.
17   Q.   Now, if you were to look with me, skip to
18 Page 6, and do you see the names of the individuals
19 above the word International Paper Company
20 appearing in the top third of the page?
21   A.   Yes.
22   Q.   Have you ever spoken with any of the
23 individuals listed there; namely, William Crawford,
24 Lamonica Livingston, Stephen Mundy, Robert Pratt or

                                            221

1 Joan Anderton?
2    A.   No.
3    Q.   On Page 6, a person named Rocky Gordon
4 associated with Midland Paper, have you ever spoken
5 with him?
6    A.   No.
7    Q.   And then on Page 7 there's a number of
8 people associated with either Overnite Express or
9 the successor Universal Am Can Limited beginning
10 with Robert Elzholtz, father, and then Robert
11 Elzholtz, son, Kevin Hays, Sandra Herrmann, Rory
12 Ostgulen, Mark Limback, Melody Hansen, Gina Hubbs,
13 and John Moore.
14        After reciting those names my question to
15 you is:  Have you ever had any interaction in
16 person, over the telephone, correspondence,
17 e-mails, any communication with any of the
18 individuals I just listed?
19   A.   As I recall today, I have spoken with
20 Melody Hansen.
21   Q.   And tell me the circumstances in which
22 you've communicated with Melody Hansen.
23   A.   Melody would relay the loads from
24 International Paper out of Exel Warehouse in

                                            222

1 Hammond, Indiana.
2    Q.   And tell me how you know that.
3    A.   She would call on the phone and she would
4 also send documentation.
5    Q.   When she called on the phone, would she
6 talk with you or one of the other dispatchers?
7    A.   It could have been amongst many of us.
8    Q.   No, I understand that.  So, typically, was
9 this a daily event in which Melody Hansen would
10 call up and say, hey, Dave, or your colleague
11 dispatchers and say, we've got another load that
12 needs to be picked up out of the Distribution
13 Center in Hammond, is Samuel Franke going to handle
14 it or how would the conversation go?
15   A.   There would be -- there would be a phone
16 call or documentation sent every day for the
17 paperwork -- for the load to come out of Exel in
18 Hammond, Indiana from International Paper.
19   Q.   So is what you're -- let me make sure I
20 understand what you're saying.
21        Are you saying that on a day when a load
22 would be picked up from the Hammond Distribution
23 Center by a Martin's Bulk Milk driver, probably
24 Samuel Franke since that was his usual route, that

                                            223

                        5 (Pages 220 to 223)

1 you would either get a telephone call from
2 Miss Hansen or a fax or an e-mail and that would be
3 the type of communication?
4   A.  Sometimes there was more communication but
5 we always would get a fax.
6   Q.  So Melody Hansen is the only person out of
7 this list of people with whom you had contact?
8   A.  As I recall today.
9   Q.  You can set 49 aside.  And on 50, on
10 page -- it's not a page.  On the answer to
11 Interrogatory Number 10 -- and I'll be showing you
12 later some contract documents -- but I'd like you
13 to look at Interrogatory Number 10 and the answer
14 that you signed on behalf of Martin's Bulk Milk to
15 Interrogatory Number 10 and tell me when you're
16 done doing that.
17       And you know what, while you're doing that
18 go ahead and look at 11 too, the question and the
19 answer.
20       Have you done that?
21   A.  Yes.
22   Q.  Okay.  My first question is:  Do you agree
23 with the answer that is set forth in response to
24 Interrogatory Number 10?

224

1 defeats or refutes Universal Am Can's claim for
2 indemnity?
3       MR. COUTURE:  I'm sorry, can you reread
4 that question.
5       (The record was read.)
6       THE WITNESS:  The claim -- the contract
7 ties us together.
8 BY MR. FISHER:
9   Q.  What does that mean?
10   A.  It's an agreement between our two
11 companies that we work as an agent for Overnite
12 Express, Universal Am Can to perform a service for
13 these companies to make a profit.
14   Q.  And is that even though the contract
15 language specifically says that you are not to be
16 considered an agent?
17   A.  I don't know what you mean.
18   Q.  What is it you don't understand by my
19 question?
20   A.  You're saying that the contract says we
21 are not an agent?
22   Q.  It specifically says that.  And we're
23 going to get there.  So I want to make sure I
24 understand your answer.

226

1   A.  Yes.
2   Q.  And do you agree with the answer that is
3 set forth in response to Interrogatory Number 11?
4   A.  Yes.
5   Q.  And let me ask this -- and I don't want
6 you to go into any attorney/client communications,
7 you know, that you would have had with your
8 attorneys.
9       But my question to this is:  Do you have
10 any personal belief, factual basis for the answers
11 you have put here or is this something on which you
12 have relied upon your attorneys' advice to respond
13 to these particular two questions?
14   A.  We have documentation that holds Overnite,
15 Universal Am Can, and Martin's Bulk Milk Service
16 showing that we are agents for those companies.
17   Q.  Okay.  And what are those documents?
18   A.  They are carrier agreements.
19   Q.  Okay.  So is it your contention that the
20 carrier agreements that exist between Martin's Bulk
21 Milk Service and Universal -- Strike that.
22       Is it your position that the carrier
23 agreement between Martin's Bulk Milk Service and
24 Universal Am Can is a contractual document that

225

1   A.  Well, we -- Martin's Bulk Milk still
2 performs a service for those two companies,
3 Universal Am Can and Overnite Express.
4   Q.  Okay.  And what is it about performing
5 that service that means in your opinion that
6 Martin's Bulk Milk Service is operating as an agent
7 for Universal Am Can when the Universal Am Can
8 contract specifically says that you are not to be
9 considered -- that is to say, Martin's Bulk Milk
10 Service is not to be considered an agent?
11   A.  Well, depending on the terminology,
12 whenever Martin's Bulk Milk Service is pulling a
13 load for Overnite Express or Universal Am Can, we
14 are doing a service for that company and we are
15 acting as a carrier agent for them.
16   Q.  What does the word "carrier agent" mean?
17   A.  We are the carrier for those companies.
18   Q.  What does --
19   A.  We are performing a service for those two
20 companies.
21   Q.  What does the word or phrase you just used
22 mean?  You used --
23   A.  Carrier agent?
24   Q.  Yes, what does that mean?

227

6  (Pages 224 to 227)

1    A.  We were hired from these two companies to
2  perform a service.
3    Q.  And is that --
4    A.  We are an extension to their companies.
5    Q.  And is that what you mean by the
6  phrase "carrier agent"?
7    A.  Yes.
8    Q.  Does the phrase "carrier agent" appear
9  anywhere in any contract that Martin's Bulk Milk
10  Service has with Universal Am Can -- that
11  particular phrase?
12    A.  I don't recall.
13    Q.  Is this, this phrase "carrier agent," a
14  term or phrase that you have come up with, sir?
15    A.  It's used in the industry.
16    Q.  Where is it used in the industry?
17    A.  A carrier agent, it's -- I don't know.
18  It's --
19    Q.  Can you cite me in anyplace in the Federal
20  Motor Carrier Safety Regulations where the phrase,
21  quote, carrier agent, unquote, appears?
22    A.  Not at this time.
23    Q.  Can you quote me any particular language
24  in any contract that exists that have been produced
                      228

1  by your company in which the phrase you just used,
2  quote, carrier agent, unquote, appears anywhere?
3    A.  Not at this time.
4    Q.  Okay.  Is it -- let me see if I
5  understand.
6        With respect to your answers to
7  Interrogatories 10 and 11, is the basic position
8  you're saying on behalf of Martin's Bulk Milk is
9  that Universal Am Can is not entitled to indemnity
10  from Martin's Bulk Milk because Martin's Bulk Milk
11  entered into a contract with Universal Am Can and
12  was pulling freight for Universal Am Can as a motor
13  carrier?
14    A.  Yes.
15    Q.  Okay.  We're done with that one.  I'm
16  going to show you 51 through 53.  And with respect
17  to 53 there's an A and a B.
18        MR. SKRYD:  51 through 53?
19        MR. FISHER:  Yes.  There's actually 51, 52
20  and there's a 53A and a 53B.
21        MR. SKRYD:  Okay.
22  BY MR. FISHER:
23    Q.  With respect to Exhibit 51, you'll see
24  that that's entitled Supplemental and Amended
                      229

1  Answers of Martin's Bulk Milk and to the best of my
2  knowledge the only changes that exist between the
3  original answers of Martin's Bulk Milk to Universal
4  Am Can's interrogatories that I just went over with
5  you and this document, Exhibit 51, is contained on
6  the page that is right before your certification
7  signature page.
8        MR. SKRYD:  Which is what?
9        MR. FISHER:  One more.  You guys don't
10  number your pages so there's no page number.  It's
11  the one that begins at the top "The plaintiff's
12  fifth amended complaint."
13        MR. SKRYD:  And it has "investigation
14  continues" on the bottom?
15        MR. FISHER:  Correct.
16  BY MR. FISHER:
17    Q.  So there's seven paragraphs on that page.
18  Are you with us so far?
19    A.  Yes.
20    Q.  All right.  I'll represent to you that
21  this appears to be the only -- this language is
22  additional language that didn't appear in your
23  first answer, okay?
24    A.  Okay.
                      230

1    Q.  All right.  So I want to ask you some
2  questions about some of these paragraphs.
3        With respect to the first paragraph that
4  the plaintiff's fifth amended complaint alleges
5  separate and independent negligent actions or
6  omissions on the part of Universal Am Can and
7  Overnite Express, can you cite to me where in the
8  fifth amended complaint the plaintiff has made any
9  allegations of separate and independent negligent
10  actions and omissions on the part of Universal Am
11  Can and Overnite Express other than being allegedly
12  vicariously liable for the actions of Samuel
13  Franke?
14    A.  Not at this time.
15    Q.  Okay.  Let's go to the next paragraph.
16  That next paragraph says that the plaintiff's fifth
17  amended complaint alleges independent tortious
18  conduct on the part of the defendants Universal Am
19  Can Limited and Overnite Express.
20        Can you cite to me anywhere in the fifth
21  amended complaint where the plaintiffs alleged
22  independent tortious conduct on the part of the
23  defendants Universal Am Can and Overnite Express
24  other than allegedly being vicariously responsible
                      231

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0051

1    for the actions of Samuel Franke?
2        A.   Not at this time.
3        Q.   With respect to the third paragraph of
4    your amended answer where it says that Universal Am
5    Can and Overnite Express did not attach or
6    reference any specific contract or agreement, is
7    what you're saying here simply that in our
8    pleading, my client's pleading against your
9    company, the contract agreement was simply not
10   attached?  Is that a fair reading of that third
11   paragraph?
12       A.   I guess I don't understand that one.
13       Q.   Okay.  But this is your answer, correct?
14   You signed this answer on or about December 23rd,
15   2011?
16       A.   Yes.
17       Q.   Okay.  So tell me what this third
18   paragraph means.
19       A.   The only contract I know is -- that we
20   have in place is the carrier contract.
21       Q.   Okay.  Would you agree with me that in
22   February of 2012 you and your counsel produced to
23   us four separate contractual documents, two for
24   Universal Am Can and two for Overnite Express?

232

1        A.   Yes.
2        Q.   Okay.  Do you know whether or not any of
3    those contracts were in operation on the day of the
4    accident, July 3, 2008?
5        A.   Yes, they were.  They're both signed.
6        Q.   What is both signed?
7        A.   Both contracts are signed, one from
8    Overnite Express and the other one from Universal
9    Am Can.
10       Q.   Is it your contention that with respect to
11   the Overnite Express and the Universal Am Can
12   contracts that you produced, that there were two
13   contracts in effect, two binding contracts between
14   Universal Am Can and Martin's Bulk Milk and a
15   contract between Overnite Express and Martin's Bulk
16   Milk that were in application and in operation on
17   July 3rd, 2008?
18       A.   Yes.
19       Q.   We'll get to those later.  But just to get
20   back to this third paragraph.
21            Is the point that you're making here on
22   behalf of your employer Martin's Bulk Milk that my
23   clients when we made our pleading against you, we
24   neither attached a copy of the applicable contract

233

1    nor did we cite specific language?
2        A.   Yes.
3        Q.   Is that the essence of this paragraph?
4        A.   Yes.
5        Q.   Okay.  The fourth paragraph says that
6    Overnite Express has not produced any contract or
7    agreement between the defendants for the date
8    alleged.
9            Is that what that fourth paragraph says?
10       A.   Yes.
11       Q.   Okay.  And what do you mean by that
12   paragraph?
13       A.   It might mean that there's some that
14   aren't unsigned.
15       Q.   Well, I think that's the sixth paragraph.
16   We haven't gotten to that one yet.  This is the one
17   that -- the fourth paragraph says that Overnite
18   Express has not produced any contract or agreement
19   between Martin's Bulk Milk and Overnite Express for
20   the date alleged.
21            Is what you're saying here simply that my
22   client, either Universal Am Can as the successor to
23   Overnite Express or Overnite Express itself, has
24   not produced a copy of a contract or agreement

234

1    that's in application on July 3rd?
2            Is that the essence of that paragraph?
3        A.   Yes.
4        Q.   Okay.  And then the 6th -- excuse me, the
5    fifth paragraph says that Universal Am Can has not
6    produced a fully executed contract or agreement
7    between Martin's Bulk Milk and Universal Am Can.
8            By that answer are you saying that my
9    client Universal Am Can has not produced a contract
10   between Martin's Bulk Milk and Universal Am Can
11   that has signatures from both parties?
12       A.   Yes.
13       Q.   And with respect to the sixth paragraph
14   where it says the agreement between the defendants
15   Martin's Bulk Milk and Universal Am Can produced by
16   Universal Am Can in discovery does not reference
17   the shipment at issue, what does that mean?
18       A.   The contract doesn't list the shipment but
19   the load confirmation does.
20       Q.   Right.  I mean, you wouldn't expect a
21   contract entered into months, if not years, before
22   an accident -- Strike that.
23            You wouldn't expect a contract that's
24   entered into days, weeks, months or years before a

235

8  (Pages 232 to 235)

| | |
|---|---|
| 1   particular event to specifically mention an event | 1   supplemental and amended response to the very same |
| 2   in the future that had not yet happened -- | 2   40-item request for production that was served on |
| 3      A. No. | 3   us on December 23rd, 2011 and I will represent to |
| 4      Q. -- when the contract was executed, do | 4   you that the bulk of the answers that appear |
| 5   you? | 5   basically say things like this: Well, we've -- we |
| 6      MR. SKRYD: I'll object to the form of | 6   object; we've looked around and there doesn't |
| 7   that question. You can answer. | 7   appear to be any documents that are responsive to |
| 8      THE WITNESS: No. | 8   this particular request. Is that your |
| 9   BY MR. FISHER: | 9   understanding of the essence of this supplemental |
| 10      Q. Okay. So do you know what this answer | 10   response that was done in late December 2011? |
| 11   means? | 11      A. What do you mean we looked around? Looked |
| 12      MR. SKRYD: Objection, asked and | 12   around for -- |
| 13   answered. Go ahead. | 13      Q. Well, here, I'll use an example. If you |
| 14      THE WITNESS: No, I don't. | 14   look to the -- look at the response to Request |
| 15   BY MR. FISHER: | 15   Number 30. Do you see where Request 30 asks |
| 16      Q. Okay. All right. I'm done with 51. | 16   Martin's Bulk Milk to produce any and all written |
| 17   Let's look at 52. | 17   communications from Universal Am Can to Martin's |
| 18      MR. SKRYD: This right here, Dave. | 18   Bulk Milk in which Universal Am Can identified |
| 19   BY MR. FISHER: | 19   Martin's Bulk Milk Service as the agent of |
| 20      Q. I'm going to be asking you some questions | 20   Universal Am Can for purposes of the trip conducted |
| 21   later specifically about every one of the items | 21   by Samuel Franke on July 3rd, 2008, that eventually |
| 22   that are listed on this particular request for | 22   ended in Franke's tractor chassis container |
| 23   production, but just look it over and tell me | 23   combination making contact with the rear of Jeffrey |
| 24   whether or not you're familiar with this particular | 24   Scheinman's BMW and after making some objections |
|                     236 |                     238 |
| 1   response of your employer to a 40-item request for | 1   the response is: The defendant Martin's Bulk Milk |
| 2   production that we served on you late last year. | 2   Service does not have any documents that |
| 3      MR. BURKE: What's the date of the answer, | 3   specifically identify Martin's Bulk Milk Service as |
| 4   Carl? | 4   an agent of Universal Am Can on July 3, 2008? Do |
| 5      MR. FISHER: November 30th, 2011. | 5   you see that? |
| 6      MR. BURKE: Thank you. | 6      A. Uh-huh. Yes. |
| 7      THE WITNESS: Go ahead. | 7      Q. Now, on many of the answers to these |
| 8   BY MR. FISHER: | 8   requests an answer like this appears, that there |
| 9      Q. Okay. Are you familiar with this | 9   are no documents or the word "none" appears. So my |
| 10   response? | 10   question to you is: In light of that -- and, once |
| 11      A. Yes. | 11   again, I'm going to come back to this later |
| 12      Q. Okay. And I know -- later I've got some | 12   specifically question by question -- is it fair to |
| 13   other supplemental and amended responses to this | 13   say that as of late December 2011, based upon a |
| 14   very document where I think you amend one of the | 14   search that you and any others who assisted you at |
| 15   items. | 15   Martin's Bulk Milk, you could come up with no |
| 16      My first question to you is: With respect | 16   documents that were responsive to these particular |
| 17   to Exhibit 52, are you familiar with the answers | 17   requests that are contained in Exhibit 53A? Is |
| 18   that appear here that were made in November of | 18   that a fair summarization of -- |
| 19   2011? | 19      A. Yes. |
| 20      A. Yes. | 20      Q. Okay. You can set that one aside. 53B |
| 21      Q. All right. Now -- | 21   you can set aside. I'm going to ask Mr. Franke |
| 22      MR. SKRYD: What are you on now, Karl? | 22   about that tomorrow. |
| 23   BY MR. FISHER: | 23 |
| 24      Q. If you look at 53A. This is the | 24 |
|                     237 |                     239 |

9 (Pages 236 to 239)

1    (Whereupon, Martin Deposition
2        Exhibit Nos. 54, 55 and 56 were
3        marked for identification.)
4  BY MR. FISHER:
5    Q.  Now, I'm going to have you look at 54
6  through 56.  Let's look first at 54.  It appears
7  that Exhibit 54 -- Strike that.
8        Does Exhibit 54 appear to be the second
9  supplemental and amended response of Martin's Bulk
10 Milk to specifically Request Number 40 which asks
11 for certain dispatch documents and documents
12 prepared, generated, handled, reviewed or
13 transmitted by Pat Podlena or any other dispatcher
14 that pertain to any trip taken by Samuel Franke in
15 the 18-month period before July 3rd which involved
16 picking up from or delivering to the International
17 Paper Company facility in Hammond, Indiana?  Do you
18 see that that's the request?
19   A.  Yes.
20   Q.  And then the response that your counsel
21 Mr. Schreck did on February 3rd, 2012 is to
22 basically say, look, we've got some invoices from
23 January '07 to June '08, we have Load and Rate
24 Confirmation Sheets from December 29, '06 to May

240

1  of -- May 29th, 2008 and memo bills from December
2  29th, 2006 to May 29th, 2008.  You see those,
3  right?
4    A.  Yes.
5    Q.  And I'll represent to you that that big
6  banker's box that's right down there at your
7  feet --
8    A.  Okay.
9    Q.  -- that contains, you know, copies of all
10 those documents, among others, that have been
11 produced.  I haven't copied all those for this
12 deposition but my question to you is:  Did you and
13 your colleagues conduct a thorough search to find
14 information that is responsive to this request?
15   A.  Yes.
16   Q.  All right.  Now look at Exhibit 55.
17 That's the third supplemental response to item 40.
18 And this was provided a week later on February
19 10th, 2012.  And if you look on the second page of
20 the response right before the page containing
21 Mr. Schreck's signature, you see that that list of
22 documents has been expanded and you see that -- and
23 then it says in the middle of the response, quote,
24 in addition Martin's Bulk Milk Service has the

241

1  following documents which are attached, and then,
2  basically, there's a listing of the documents that
3  supplement your previous response from the end of
4  May, beginning of June of '08, and go right up to
5  the day of the accident on July 3, right?
6    A.  Yes.
7    Q.  And those documents were then produced for
8  us, correct?
9    A.  Yes.
10   Q.  Okay.  You can set that aside.  55 --
11       MR. SKRYD:  55?  56.
12       MR. BURKE:  That was 55.
13       MR. FISHER:  My mistake.  My mistake.
14 Thank you.
15 BY MR. FISHER:
16   Q.  Now, 56, I want to make sure I understand
17 the circumstances for the production of
18 Mr. Franke's qualification file and personnel
19 file.
20       Do you see Exhibit 56 is a letter from
21 Mr. Schreck dated February 10th in which it
22 includes or references the enclosure of
23 Mr. Franke's driver qualification records for 1999
24 through 2006 and then the remainder of Franke's

242

1  employment driver qualification file was previously
2  produced in discovery?
3    A.  Yes.
4    Q.  All right.  Do you know anything about how
5  it was or why it is that the documents that you
6  provided in February of 2012 weren't previously
7  produced back in 2009 when the original request I
8  think from plaintiff's counsel was made for either
9  the driver qualification file or the employment
10 file or personnel file of Mr. Franke?
11   A.  I do not.
12   Q.  All right.  Who would know the answer to
13 that question?
14   A.  Janet Berndt.
15   Q.  All right.  Okay.  I'm done with 56.  All
16 right.
17       (Whereupon, Martin Deposition
18        Exhibit No. 57 was marked for
19        identification.)
20 BY MR. FISHER:
21   Q.  Moving on to Exhibit 57.  I will represent
22 to you, Mr. Martin, that Exhibit 57 which is a
23 series of charts or spread sheets or printouts of
24 various information about invoices was given to us

243

10 (Pages 240 to 243)

1  in -- I believe was given to us at the end of
2  December 2011, all right. It's possible it was
3  given at the beginning of January but it's not
4  important for the purposes of my question.
5      Do you see in the upper left-hand corner
6  of Exhibit 57 there's a run date on this document?
7  It might help you if you take the paper clip off.
8  Yes. Okay.
9      Do you see the run date that appears up at
10 the upper left-hand corner --
11     A. Yes.
12     Q. -- of January 8, 2010?
13     A. Yes.
14     Q. And then it has a run time of 2:11:50
15 p.m.?
16     A. Yes.
17     Q. And I will represent to you if you were to
18 scroll through, then, the rest of this exhibit,
19 you're going to see run dates of either February --
20 excuse me, of either January 8th, 2010 or January
21 7th, 2010 for some of this information. Do you see
22 where that appears?
23     A. Yes.
24     Q. Okay. Your deposition was taken in

244

1  January of 2010, your first session of your
2  deposition. Do you know why it is this particular
3  document marked as Exhibit 57 was not originally
4  produced by Martin's Bulk Milk back in 2009?
5      A. I do not.
6      Q. At whose request were these numbers or
7  these spread sheets prepared, if you know?
8      A. Actually, I don't know.
9      Q. Okay. Going back a couple of years. In
10 2009 when some initial discovery responses were
11 prepared by Martin's Bulk Milk, were you the person
12 that was involved in the collection of that
13 information or was it you and others?
14     A. Myself and others.
15     Q. And do you know who would be the most
16 likely person that would know the circumstances of
17 the preparation of this particular exhibit, Exhibit
18 57?
19     A. It looks to me like somebody in our
20 accounting department but I don't know who the
21 person would be. It could be a couple people.
22     Q. And who would those couple people might
23 be?
24     A. It could be Joanne or Julie.

245

1      Q. Do you have last names for them?
2      A. Joanne Witt.
3      Q. Spelled?
4      A. W-i-t -- actually, it's Biemier now.
5  B-i-e-m-i-e-r.
6      Q. And Julie?
7      A. Adams.
8      Q. And they're in the accounting department?
9      A. Yes.
10     Q. All right. Are you familiar with the
11 information shown on these printouts?
12     A. Somewhat. I -- not really. I'm more in
13 the dispatch; so I don't do accounting.
14     Q. Okay. Would it be better to ask somebody
15 else about how this information was tracked and
16 what these represent?
17     A. Yes.
18     Q. Before we leave this, I do want to ask you
19 this. You can see at the top left-hand corner of
20 the first page of Exhibit 57 it says Broker
21 Settlements U-A-C-L, right?
22     MR. SKRYD: Do you see that right here?
23 BY MR. FISHER:
24     Q. That little heading right there?

246

1      A. Uh-huh.
2      Q. Do you see that?
3      A. Yes.
4      Q. Okay. Then if you skip about six pages,
5  you get a printout that looks a little different.
6  It looks like this. It's narrower and it says
7  Invoices for Broker Settlements U-A-C-L and it has
8  a bunch of information?
9      A. Yes.
10     Q. Okay. Now, do you see where on this
11 particular page that is entitled Invoices for
12 Broker Settlements U-A-C-L in the upper left-hand
13 corner it says 2:32 p.m., the first date for
14 invoicing is June 26, 2008? Do you see that?
15     A. Yes.
16     Q. Okay. Now, skip, if you would with me
17 to -- three pages until you pickup the page that's
18 entitled Invoices for Overnite Logistics.
19     And do you see where the last date that
20 appears on this set of -- it's six pages, if you
21 go -- actually, if you go to the sixth page, you'll
22 see the first date -- keep going, you're going to
23 to see a page that has a total of 316,000.
24     A. Okay.

247

11 (Pages 244 to 247)

1    Q.  Do you see where the first date that
2  appears there is an invoicing date of January 18th,
3  2007?
4        MR. SKRYD:  The last date, did you say?
5  BY MR. FISHER:
6    Q.  It's the first date but it's the last
7  date.
8    A.  Yes.
9    Q.  It's the bottom date.  Do you see where it
10  says invoice date, the bottom date, but the first
11  chronological date is January 18th, 2007?
12    A.  Yes.
13    Q.  And then -- now going back to the first
14  page where the date and the very first entry -- now
15  we're on invoices for Overnite Logistics within
16  Exhibit 57 -- do you see where the last
17  chronological date but the first listed date on
18  this page is June 26th, 2008?
19    A.  Yes.
20    Q.  Actually, I take that back -- yes.  Is
21  this the last date that Overnite was invoiced for
22  trips that Martin's Bulk Milk did for Overnite?
23    A.  Like I said, I'm not sure.
24    Q.  Because this isn't your bailiwick?

248

1    A.  No.
2    Q.  Okay.  Do you know anything about the fact
3  that in June 2008 Overnite Logistics -- Strike
4  that.
5        Do you know anything about the fact that
6  in June of 2008 Overnite Express was bought out by
7  Universal Am Can?
8    A.  Yes.
9    Q.  What is it you know about that?
10    A.  Just like I recall from my last
11  deposition, I remember a call coming from one of
12  the owners, and I don't remember their names now, I
13  know there was Matt and I just don't remember who
14  it was, they called and said that they were being
15  bought out by Universal Am Can.
16    Q.  Okay.  That's about the gist of your
17  knowledge?
18    A.  Yes.
19    Q.  All right.  I'm done with that exhibit.
20        (Whereupon, Martin Deposition
21         Exhibit Nos. 58, 59 and 60 were
22         marked for identification.)
23  BY MR. FISHER:
24    Q.  Okay.  I want to show you Exhibits 58

249

1  through 60.  And let me describe what these are
2  before you begin to look at them.
3        Among the materials that are in that
4  banker's box that is to your right here is a set of
5  records which included memo bills and load
6  confirmation sheets and Martin's Bulk Milk
7  invoices.  And it covers that entire time frame we
8  talked about before of January 2007 all the way up
9  to end of May, beginning of June 2008, an
10  approximate 18-month period, all right?
11    A.  Okay.
12    Q.  There's hundreds, if not thousands, of
13  pages of those three types of documents, all
14  right.  I selected out of that collection a few
15  random ones that I just want to ask you some
16  questions about so that I can better understand
17  what Martin's Bulk Milk Service's understanding is
18  of the paperwork associated with particular loads.
19  With me so far?
20    A.  Yes.
21    Q.  Okay.  So let's take a look at Exhibit
22  58.  And does it appear that Exhibit 58 contains a
23  one-page memo bill, followed by a two-page load and
24  rate confirmation sheet -- excuse me, three-page

250

1  load and rate confirmation sheet, and then a
2  Martin's Bulk Milk Service invoice?
3    A.  Yes.
4    Q.  Is this the typical type of paperwork that
5  would be associated with a particular load being
6  pulled, for example, by Mr. Franke?
7    A.  Yes.
8    Q.  All right.  I want to go over and make
9  sure I understand some of the nomenclature and the
10  information that appears on this sample one.
11        This is one that I drew out that's at the
12  beginning of the time period about which we spoke,
13  January of '07, okay.  All right.  Now, with
14  respect to the memo bill that's the first page of
15  Exhibit 58, when this document was first created,
16  before it has any of the handwriting on it, who
17  produces this document to the best of your
18  knowledge?
19    A.  This is created by International Paper.
20    Q.  And did you understand International Paper
21  to be the shipper?
22    A.  Yes.
23    Q.  So that, basically, some paper products
24  that International Paper had at the Midwest

251

12 (Pages 248 to 251)

1 Distribution Center in Hammond needed to be sent to
2 its customer?
3     A. Yes.
4     Q. And can you look at this and find out who
5 International Paper's customer was?
6     A. Yes. Office Max.
7     Q. And so when this particular memo bill
8 would come in, how would it be received by anyone
9 associated with Martin's Bulk Milk?
10     A. This would come back to our facility after
11 it is signed by the consignee.
12     Q. So would Mr. Franke be the first
13 representative of Martin's Bulk Milk who would
14 receive this document?
15     A. Yes.
16     Q. Is this -- I know it's entitled memo
17 bill. Is this considered in the transportation
18 industry a bill of lading?
19     A. Yes.
20     Q. Okay. So Mr. Franke would receive this
21 document where?
22     A. On the shipping dock at Exel in Hammond,
23 Indiana.
24     Q. And when you say Exel -- and I think there
252

1 was a misspelling last time in the transcript -- is
2 Exel spelled E-x-e-l?
3     A. Yes.
4     Q. Okay. Not E-x-c-e-l?
5     A. Correct.
6     Q. Okay. And what is Exel, if you know?
7     A. Exel to my knowledge is just a
8 distribution center.
9     Q. Do you know if Exel is a separate company
10 from International Paper?
11     A. I do not know.
12     Q. Okay. How is it you know it to be an
13 entity called Exel, E-x-e-l? How did you learn
14 that?
15     A. Just from some of the documents that I've
16 seen.
17     Q. Had you known that back in 2007, that
18 there was an entity called Exel?
19     A. Yes.
20     Q. And you knew that just because you were
21 operating as a dispatcher among your many jobs?
22     A. I had been down to the warehouse --
23     Q. Okay.
24     A. -- years before.
253

1     Q. Let's talk about that. When was it that
2 you were at the warehouse? Do you remember your
3 first visit?
4     A. I don't.
5     Q. When did the first relationship with --
6 Strike that.
7     When did Martin's Bulk Milk have its first
8 relationship, if you know, with International
9 Paper?
10     And by that question I mean, because of
11 some of the documents we saw before, I saw some
12 documents reflecting a relationship with
13 International Paper that it may have predated
14 Overnite Express.
15     So my question to you now with that as a
16 background is: Do you know what the circumstances
17 were in which Martin's Bulk Milk first had a
18 relationship with Exel or International Paper --
19     A. We had a direct --
20     MR. SKRYD: Let him finish his question.
21 BY MR. FISHER:
22     Q. -- or the warehouse in Hammond, Indiana?
23     A. Before we -- before we dealt with Overnite
24 Express and Universal Am Can, we dealt directly
254

1 with International Paper.
2     Q. And this was at a time when International
3 Paper would come to Martin's Bulk Milk as a motor
4 carrier and say, hey, we would like you to move our
5 goods from Point A to Point B?
6     A. Yes.
7     Q. When did that direct shipper and motor
8 carrier relationship end between Martin's Bulk Milk
9 and International Paper?
10     A. Just before we started hauling -- or at
11 the time we started hauling for Universal Am Can
12 and Overnite Express.
13     Q. Let's see me see if I can -- let me ask this
14 question. Did the direct relationship between
15 Martin's Bulk Milk and International Paper end at
16 about the time that Martin's Bulk Milk first had
17 its relationship with Overnite Express?
18     A. Yes, but I do not know the exact dates.
19     Q. That's fine. Your answer suggested
20 International Paper -- your answer suggested
21 Overnite Express and Universal Am Can at the same
22 time and I wanted to just sort of break that up.
23     So to review. Did the direct relationship
24 between Martin's Bulk Milk and International Paper
255

13 (Pages 252 to 255)

1  end shortly before a new relationship existed in
2  which Overnite Express brokered loads for
3  International Paper and used Martin's Bulk Milk as
4  the carrier?
5      A.  The relationship between International
6  Paper and Martin's Bulk Milk ended and then the
7  relationship started between Overnite Express and
8  Universal Am Can.
9      Q.  All right.  And when you add Universal Am
10 Can, why are you adding Universal Am Can in your
11 answer?
12     A.  Because they're the same company.
13     Q.  If I represented to you, sir, that in 2007
14 they were not the same company, would your answer
15 be any different?
16     A.  If -- I don't know.
17     Q.  Okay.  Let me ask this.  Well, here, look
18 at the next page of Exhibit 58.  Do you see where
19 it says Overnite Logistics Load and Rate
20 Confirmation?
21     A.  Uh-huh.
22     Q.  And it's a three-page document?
23         MR. SKRYD:  Yes?
24         THE WITNESS:  Yes.

256

BY MR. FISHER:
2      Q.  And then the last page of this exhibit
3  there's an invoice from Martin's Bulk Milk to
4  Overnite Logistics?
5      A.  Yes.
6      Q.  If I represented to you, sir, that in
7  January of 2007 there was absolutely no
8  relationship between Universal Am Can and either
9  Overnite Express or an entity referred to as
10 Overnite Logistics, would your -- would your answer
11 about what the relationship was with Overnite
12 Express and Universal Am Can that you described
13 earlier change?  Would your answer be different?
14         MR. SKRYD:  Objection, asked and answered
15 and also form of the question.  You can answer it.
16         THE WITNESS:  It would not change because
17 I've seen both names on several pieces of paper
18 that their name's on both so.
19 BY MR. FISHER:
20     Q.  But do you know specifically when those
21 documents are dated?
22     A.  No.
23     Q.  Okay.  Let me ask this question a
24 different way.  Let's take International Paper out

257

of the mix of my question, okay?
2      A.  Yes.
3      Q.  Back in two thousand -- back in 2002,
4  2003, 2004, 2005, 2006, that five-year period that
5  I've just enunciated --
6      A.  Yes.
7      Q.  -- did Martin's Bulk Milk do any work
8  with -- Strike that.
9          Back in the time period of 2002 to 2006
10 did Martin's Bulk Milk have any contractual
11 relationships with Overnite Express that had
12 nothing to do with International Paper?
13     A.  I don't recall.
14     Q.  Back in that same five-year time frame,
15 2002 to 2006, did Martin's Bulk Milk have any
16 relationships with Universal Am Can that had
17 nothing to do with International Paper?
18     A.  I don't recall.
19     Q.  Who is the person that has the most
20 knowledge on behalf of Martin's Bulk Milk about the
21 formation of contractual or written contractual
22 relationships between Martin's Bulk Milk and any
23 shippers or brokers for the time period 2002 up
24 through 2008?

258

A.  There are different people in our office
2  that signed the contracts.  So it could have been
3  multiple people in our office.
4      Q.  Pat Podlena would have been such a person?
5      A.  Yes.
6      Q.  And Pat -- refresh my memory, is Pat a man
7  or a woman?
8      A.  Man.  Man.
9      Q.  And Pat's no longer with you, right?
10     A.  Correct.
11     Q.  Other than Pat Podlena is there any other
12 person associated with Martin's Bulk Milk for the
13 time frame of 2002 up through 2008 who would have
14 knowledge or information about the formation of
15 contracts or written contracts with brokers or
16 shippers?
17     A.  Like I said, it could have been myself, it
18 could have been Pat, it could have been Doreen.
19     Q.  And who is Doreen?
20     A.  In dispatch.
21     Q.  What's Doreen's last name?
22     A.  B-a-y-e-r.
23     Q.  Is Doreen still with you?
24     A.  Yes.

259

14 (Pages 256 to 259)

1    Q. All right. Getting back to Exhibit 58.
2  If you look at the first page of Exhibit 58, do you
3  see that there's a bunch of notes for two different
4  loads, numbered loads?
5    A. Yes.
6    Q. And this is information coming from whom?
7    A. International Paper.
8    Q. And is this information that appears on
9  this memo bill or bill of lading unique or unusual
10 from a shipper?
11     MR. SKRYD: Objection, form. You can
12 answer.
13     THE WITNESS: The only thing unusual is
14 that it has times listed on it.
15 BY MR. FISHER:
16    Q. And by times you mean that there are times
17 listed as to what to do if they're delayed, what
18 time they're supposed to come in at Office Max
19 confirming an appointment, things like that?
20    A. Delivery appointment.
21    Q. All right. Is that unusual in the
22 transportation industry that a shipper and its
23 customer are going to put in times when they are
24 available to either pickup or deliver a load?

260

1    A. I would say it's a little unusual for the
2  delivery side, yes.
3    Q. Why is that?
4    A. Because most shippers will rely on the
5  carrier to make their appointments.
6    Q. Is that based upon your experience at
7  Martin's?
8    A. Yes.
9    Q. If we were to go into the Martin's Bulk
10 Milk document files, something a part from
11 International Paper and Universal Am Can and
12 Overnite Express, would we find memo bills or bills
13 of lading that have delivery instructions in terms
14 of time?
15    A. Not very many.
16    Q. But there would be some?
17    A. Minimal.
18    Q. All right. Okay. Now, look at the first
19 page. Do you know whose signature appears here on
20 the bottom right-hand corner with the date 1-4-07?
21    A. I don't recognize that.
22    Q. Would that, presumably, be somebody at
23 Office Max once the delivery has been made?
24    A. Yes.

261

1    Q. And then Mr. Franke, he signs that on
2  behalf of Martin's Bulk Milk?
3    A. Yes.
4    Q. So in terms of this document -- oh, and
5  then down at the bottom portion with all this fine
6  print --
7    A. Yes.
8    Q. -- is this the standard type of fine print
9  that you're aware of exists on typical bills of
10 lading?
11    A. Yes.
12    Q. Now, let's look at the third -- excuse
13 me. Let's look at the second, third and fourth
14 pages contained on Exhibit 58. Tell us what this
15 load and rate confirmation sheet is. It's three
16 pages.
17     MR. BURKE: For the same date?
18     MR. FISHER: Yes. I'm still talking about
19 Exhibit 58.
20     THE WITNESS: This is a sheet from
21 Overnite Logistics giving us direction to pickup a
22 load from International Paper, Hammond, Indiana to
23 deliver to CJ Duffey, Office Max. It looks like
24 it's a two-stop load. And, actually, then it's --

262

1  it's the same load, it looks like it was amended
2  but with more stops added to it.
3  BY MR. FISHER:
4    Q. All right. Now, on the upper right-hand
5  portion of the first page of the load and rate
6  confirmation sheets do you see where the name
7  Jackie is circled?
8    A. Yes.
9    Q. Okay. You're on page -- you're on Page 1
10 of 3, correct?
11    A. Okay.
12    Q. Okay. So the names that appear there,
13 Nancy, Jackie and Dave Martin, are those the names
14 of dispatchers from Martin's Bulk Milk?
15    A. Yes.
16    Q. Do you know why it is on an Overnite
17 Logistics load and rate confirmation sheet the
18 names of Martin's Bulk Milk Service dispatchers
19 appear?
20    A. I do not know.
21    Q. Who created this particular document?
22    A. Overnite Logistics.
23    Q. And is it an accurate representation that
24 as of January of 2007 there were dispatchers at

263

15 (Pages 260 to 263)

1  Martin's Bulk Milk named Nancy, Jackie and
2  yourself, Dave Martin?
3      A.  I don't believe Jackie was there at the
4  time.
5      Q.  But do you know why it is that this
6  particular document has got Jackie's name circled?
7      A.  I do not.
8      Q.  And then if you'll look at the third of
9  three pages, the one that has some signatures at
10 the end of this three-page fax contained within
11 Exhibit 58, do you see an authorized signature from
12 someone associated with Martin's Bulk Milk?
13     A.  Yes.
14     Q.  Who is that -- whose signature is that?
15     A.  Nancy Green.
16     Q.  And refresh my memory again on who Nancy
17 is.
18     A.  Dispatcher.
19     Q.  And she would get -- when would her
20 signature get affixed to this confirmation
21 document?
22     A.  This is the final form.  So after
23 International Paper would convey to Overnite
24 Logistics that this was the final shipment papers,

264

1  shipment request.
2      Q.  Okay.  I want to make sure I understand
3  the processing of the paper, okay.  When the
4  first -- let's start with something basic.
5          At the very, very top of the three-page
6  fax do you see where there's an Overnite Logistics
7  fax number?
8      A.  Yes.
9      Q.  All right.  Is that a fax number for
10 Overnite Logistics or is that a fax number from
11 Martin's Bulk Milk?
12     A.  Overnite Logistics.
13     Q.  So is this a document, a three-page
14 document, that at some point would have been faxed
15 to or faxed from Overnite Logistics?
16     A.  Faxed from Overnite Logistics.
17     Q.  When the document was initially faxed to
18 Overnite Logistics -- Strike that.
19         When the document was initially faxed from
20 Overnite Logistics to Martin's Bulk Milk, would all
21 the markings that appear on this document and
22 handwriting, the Xs and the handwriting and the
23 indications of final, first stop, second stop,
24 third stop, would those writings have been on it

265

1  when it was received by Martin's Bulk Milk or would
2  this have been added by somebody, if you know?
3      A.  This would have been the final form from
4  Overnite Logistics telling us what to bill for what
5  was on that load.  The loads change throughout the
6  day.
7      Q.  Okay.  I understand that, but my question
8  is a little bit more specific.
9          When you get this fax from Overnite
10 Logistics, would it contain all of these
11 handwritten markings or would those come later in
12 the processing of this three-page piece -- you
13 know, document?
14     A.  I don't know, sir, how they --
15     Q.  Okay.  All right.  But, eventually, this
16 document is going to have Nancy Green's signature
17 on it as a representative of Martin's Bulk Milk?
18     A.  Yes.
19     Q.  And you don't know why it is that with
20 Jackie's name circled on the first page, Nancy's
21 name is signed as the authorized signature?
22     A.  I don't know why.
23     Q.  All right.  And then under authorized
24 signature for Overnite Logistics there are three

266

1  names listed:  Matt, Brian and Melody.  Do you know
2  who Matt is referring to?
3      A.  Matt was a dispatcher authorized by
4  Overnite Logistics.
5      Q.  Do you know if that was Matt Elsholtz?
6      A.  Only from what I can try to read on
7  this -- on the confirmation.
8      Q.  How about Brian, do you know who Brian is?
9      A.  No.
10     Q.  And how about Melody?
11     A.  I had spoken with Melody.
12     Q.  That's the person you referenced before,
13 right?
14     A.  Yes.  Yes.
15     Q.  And then, finally, the last document as a
16 part of Exhibit 58, this is the invoice that then
17 Martin's Bulk Milk, your company, sent to Overnite
18 Logistics after all the other paperwork associated
19 with it was prepared?
20     A.  Yes.
21     Q.  Okay.  So that was one example in Exhibit
22 58.  You can set that one aside.
23         MR. SKRYD:  We've got two boxes to go over
24 like this.  No, I'm just kidding.

267

16 (Pages 264 to 267)

BY MR. FISHER:

Q. Let me look at why it is I set aside -- look at 59. Just confirm for me that that appears to be the same sort of collection of documentation.

A. Yes.

Q. All right.

MR. BURKE: And that's for what date, 59?

MR. FISHER: This one is February 7th, 2007, Rich.

MR. BURKE: Thank you.

BY MR. FISHER:

Q. And I've got a couple questions here on Exhibit 59. If you'll look at the first of the two faxed pages, which are the load and rate confirmation sheet, do you see where the words -- the abbreviation appointment appears underlined?

A. Yes.

Q. And then the name Julie appears. Do you know if that is the Julie that you referenced before with Martin's Bulk Milk or is that, do you think, a different Julie?

A. I'm thinking that's Julie that made the appointment at Unisource Worldwide.

Q. And do you know who Julie would be?

268

A. No, I don't.

Q. Do you know if Julie would be a person from Martin's Bulk Milk?

A. No, it's not.

Q. And you know that because such a person -- there's no Julie who's operated as a dispatcher?

A. Correct.

Q. Okay. Look at the last page. And do you see where a 6-5-1 fax number has been changed to 7-0-8?

A. Yes.

Q. Do you know why that was?

A. Because there was times when Melody would fax the confirmation over instead of the St. Paul office and Melody was in Chicago.

Q. Do you know where in Chicago Melody was?

A. I do not.

Q. Okay. I'm done with 59. And let's look at 60.

60 has an additional document on it I've not seen before -- or additional marking. If you look at the second page of the memo bill or the bill of lading, do you see what appears to be a stamp, almost like an --

269

A. Yes.

Q. -- ink stamp? Do you know what this is?

A. That would be a stamp for receiving the product.

Q. Is this the type of thing that somebody at the consignee or the customer would have stamped once Mr. Franke made his delivery?

A. Yes and no.

Q. Okay.

A. It's a stamp from a delivery. Sam did not deliver the loads of paper to Minneapolis.

Q. I was just going to get to that point. I think you said earlier in your first session of your deposition that Mr. Franke's typical run would be from Wisconsin, down into Chicago but then he would come back but only take the loads he got from Hammond, not Chicago, as far as Wilton, Wisconsin?

A. Yes.

Q. And then someone else would deliver the load?

A. Yes.

Q. Was that all the time?

A. Yes.

Q. Without exception?

270

A. Yes.

Q. So whenever it was that a particular load among the many documents we've got in these boxes, even though it would have Samuel Franke's name on it, he would not have been the person that made the ultimate final delivery?

A. Correct.

Q. Okay. I'm done with 60.

(Whereupon, Martin Deposition Exhibit No. 61 was marked for identification.)

BY MR. FISHER:

Q. Let's look at Exhibit 61. Do you see on Exhibit 61 this is a Martin's Bulk Milk invoice dated May 8, 2008, Invoice Number 190383 and the description is very simply, quote, truck ordered, XL09182, unquote. Can you tell me why it is an invoice would have been generated like this?

A. This would have been generated because Overnite Logistics did not have a load that day from International Paper.

Q. Does the words -- Strike that.

Do the words "truck ordered" suggest to

271

17 (Pages 268 to 271)

1   you or indicate to you that someone had put an
2   order in for a truck and then Mr. Franke or whoever
3   it was showed up at Hammond and there was no load
4   for him to take?
5        A.   We had an agreement with Overnite
6   Logistics that we would pickup a load of paper from
7   Hammond, Indiana of International Paper every day,
8   it was a dedicated run.
9        Q.   So does that mean with this invoice, that
10  when Mr. Franke came down from Wisconsin to the
11  Chicago area, did whatever it is he may have done
12  before he headed over to Hammond, but when he got
13  to Hammond on some day in either late April or
14  early May of 2008 there was no load for him to take
15  back?
16       A.   Correct.
17       Q.   Okay.  I'm done with that one.
18            (Whereupon, Martin Deposition
19            Exhibit Nos. 62, 63, 64, 65 and
20            66 were marked for
21            identification.)
22  BY MR. FISHER:
23       Q.   Okay.  The next series of documents,
24  Mr. Martin, I'm tendering to you are Exhibits 62

                                              272

1   through 66.  And let me just tell you what these
2   are.  These are the documents that were provided to
3   us as of February 10th, 2012.  This supplements the
4   previous box of documents we got.
5        A.   Okay.
6        Q.   This provides the memo bills, the invoices
7   and the load confirmation sheets from both Overnite
8   and Universal Am Can for the time period of late
9   May 2008 up to or near July 3rd, 2008, all right?
10       A.   Okay.
11       Q.   So with that -- if you look at Exhibit 62,
12  does Exhibit 62 appear to be in chronological order
13  the invoices that Martin's Bulk Milk generated to
14  Overnite Logistics for runs made by Mr. Franke --
15  if you'd follow along with me now from the very
16  first document -- from May 30th -- first page, May
17  30th, 2008, June 2nd, 2008, June 3rd, 2008, June
18  4th, 2008, June 5th, 2008, June 6th, 2008, June
19  9th, 2008, June 10th, 2008, June 11th, 2008, June
20  12th, 2008, and June 13th, 2008?
21       A.   Yes.
22       Q.   All right.  Then moving to Exhibit 63.
23  Does it appear that Exhibit 63 consists of the
24  Martin's Bulk Milk invoices sent to John Moore of

                                              273

1   Universal Am Can, Broker Settlements, for loads
2   taken by Mr. Franke on June 16th, '08, June 17th,
3   June 18th, June 19th, June 20th, June 23rd, June
4   24th, June 25th, June 26th, June 27th, June 30th,
5   July 1st, and July 2nd?
6        A.   Yes.
7        Q.   You can set that aside.
8            MR. SKRYD:  Are you coming back to that,
9   Carl?
10           MR. FISHER:  Pardon me?
11           MR. SKRYD:  Are you coming back to 62 and
12  63 for any reason?
13           MR. FISHER:  Not that I can think of right
14  now.
15           MR. SKRYD:  Okay.  That's fine.  I'm just
16  trying to keep it organized.
17  BY MR. FISHER:
18       Q.   Now, let's look at Exhibit 64.  Does this
19  appear to be the Overnite Logistics load and rate
20  confirmation sheets for the loads previously
21  mentioned in the invoices to Overnite for the time
22  period of May 30th, 2008 on the first page, all the
23  way to June 13th, 2008 on the last two pages?
24       A.   Yes.

                                              274

1        Q.   And if you look at the very last page, do
2   you see where Melody Hansen of Overnite Logistics
3   signs?
4        A.   Yes.
5        Q.   And Pat Podlena signs on behalf of
6   Martin's Bulk Milk?
7        A.   Yes.
8        Q.   That would not have been unusual for
9   Mr. Podlena to sign these?
10       A.   Correct.
11       Q.   Okay.  I'm done with Exhibit 64.  Look at
12  Exhibit 65.
13            Does this appear to be -- first of all,
14  before we go any further, does this appear to be a
15  broker confirmation sheet that looks a little bit
16  different than the broker confirmation sheets that
17  Overnite had used --
18       A.   Yes.
19       Q.   -- about which we've talked the last
20  several minutes?
21       A.   Yes.
22       Q.   And is this the form that appears on the
23  first page of Exhibit 65 the broker confirmation
24  sheet that was used by Universal Am Can?

                                              275

18  (Pages 272 to 275)

1    A. They're different. Is that what you're
2 saying?
3    Q. My fault. Let me ask my question a
4 different way. Does it appear that the first page
5 of Exhibit 65 is a broker confirmation sheet by
6 Melody Hansen but on this occasion Melody Hansen is
7 signing on behalf of Universal Am Can Limited
8 Brokerage Division?
9    A. Yes, I see that, but what's also confusing
10 is on top it's Overnite Logistics.
11    Q. And you got to my next question. It would
12 appear, wouldn't it, Mr. Martin, based upon
13 everything you know that there was some change in
14 mid June between Overnite Express and Universal Am
15 Can?
16    A. Yes.
17    Q. All right. But, perhaps, the fax
18 transmission machines didn't catch up and they're
19 still using Overnite Logistics as the fax
20 transmission in the fax transmission machine?
21    A. Okay.
22    Q. I mean, does that appear to you to be --
23    A. Yes.
24    Q. -- an explanation for something you

276

1 pointed out was confusing?
2    A. Yes.
3    Q. Okay. Now, with respect to this broker
4 confirmation sheet that appears on the first page
5 of Exhibit 65 and goes all the way up to the last
6 broker confirmation sheet with a date of July 2nd,
7 2008, that I think is concerning the particular
8 load at issue in this case, does it appear as
9 though Miss Hansen and Pat Podlena are the people
10 who are signing on behalf of Universal Am Can and
11 Martin's Bulk Milk respectively?
12    A. Yes.
13    Q. Okay. And these particular broker
14 confirmation sheets, this is the typical type of
15 paperwork that's associated -- was associated with
16 these loads?
17    A. Yes.
18    Q. You know, this broker confirmation sheet
19 appears to be slightly different than the format
20 that was in Exhibit 64 for Overnite Logistics
21 in terms of the way they're laid out, but do they
22 contain basically the same type of information?
23    A. Yes.
24    Q. And is this the same -- are these examples

277

1 of load and rate confirmation sheets from Overnite
2 Logistics and from Universal Am Can the same types
3 of sheets that your business, Martin's Bulk Milk,
4 uses when it's operating as a broker?
5    A. Yes.
6    MR. BURKE: Objection, just, Carl, you may
7 have misspoke. I think you referred to July 2nd as
8 the broker confirmation sheet at issue in this case
9 and I believe it's actually July 3rd -- if I was
10 hearing your question correctly.
11    MR. FISHER: I think I intended to say
12 July 2nd because that's the load --
13    MR. BURKE: You did say July 2nd.
14    MR. FISHER: Right. I'll come back. I
15 understand your objection.
16    MR. BURKE: I just want some clarity on
17 the record.
18    MR. FISHER: Right.
19 BY MR. FISHER:
20    Q. Mr. Burke raises a good point because of a
21 different document I'm going to show you later, all
22 right.
23    Are the broker confirmation sheets from
24 UACL that comprise Exhibit 65 the broker

278

1 confirmation sheets that commence the broker
2 relationship of Universal Am Can Limited with
3 Martin's Bulk Milk Service as a carrier for
4 International Paper loads up to the day before the
5 load that's at issue in this case -- that is to
6 say, July 2nd?
7    A. Well, I have the one from July 3rd right
8 here too.
9    Q. Is it a part of exhibit --
10    A. 65.
11    Q. No, I'm not there yet -- I'm sorry, I am.
12    MR. SKRYD: You have it attached to this
13 document but not to your main one in the book.
14    MR. FISHER: Here, hang on. Hang on.
15    THE WITNESS: Oh, I'm sorry, I'm looking
16 at the delivery date.
17 BY MR. FISHER:
18    Q. Yes, here, let me come back. Yes.
19 Right. I'm going to have her reread my question to
20 you, okay, because I could not repeat that
21 question.
22    (The record was read.)
23 BY MR. FISHER:
24    Q. With that question posed to you, if you

279

19 (Pages 276 to 279)

1  could give us an answer to that question?
2      A.  July 2nd is the last one.
3      Q.  All right.  All right.  Good.  You can set
4  65 aside.  Okay.  And then, finally, look at
5  Exhibit 66.  I'll represent to you, once again,
6  these are documents that came from your company
7  that you and your colleagues produced to us.
8          Do these appear to be the memo bills or
9  bills of lading pertaining to the loads that were
10  being driven by Mr. Franke from May 30th, 2008 up
11  through and including the July 2nd, 2008 memo bill
12  on the last page?
13      A.  Yes.
14      Q.  I'm done with that one.
15      A.  And these still have Overnite Express on
16  them too.
17      Q.  In deed.  Old habits die hard, I guess.
18              (Whereupon, Martin Deposition
19              Exhibit No. 67 was marked for
20              identification.)
21  BY MR. FISHER:
22      Q.  Just to keep the ball rolling in terms of
23  numbers -- I had a duplicate.  Mr. Martin, I'll
24  represent to you that Exhibit 67 is simply
                                                    280

1  photocopies of the markings I made on all those
2  hundreds, if not thousands, of pages of documents
3  you produced to us of confirmation sheets from
4  December 29th, '06 to May 29th, '08, the invoices
5  from January 11th, '07 to June 4th, '08 and the
6  memo bills from December 29th, '06 to May 29th,
7  2008.  That's the sum total of the hundreds, if not
8  thousands, of pages of documents that you and your
9  company supplemented its discovery responses in
10  early 2008, all right?
11      A.  Yes.
12      MR. FISHER:  Okay.  Why don't we take a
13  break just for a second.
14      THE VIDEOGRAPHER:  We're going off the
15  video record.  The time now is 12:45 p.m.
16          (A break was taken.)
17          (Whereupon, Martin Deposition
18          Exhibit Nos. 68, 69, 70 and 71
19          were marked for identification.)
20      THE VIDEOGRAPHER:  We are back on the
21  video record.  The time now is 1:05 p.m.
22  BY MR. FISHER:
23      Q.  All right.  I'm going to change topics a
24  little bit, Mr. Martin.  I'll tender to you what's
                                                    281

1  been marked as Exhibits 68, 69 and 70.
2          I will represent to you that Exhibit 68 is
3  a collection of documents that was sent to us in
4  February of this year from your attorneys' office
5  representing sort of a supplement to the documents
6  that had been produced as a part of Exhibit 69,
7  which is the next document.
8          And if you look at 69, you'll see on the
9  very front cover you see it's labeled Franke
10  Employment File, received from MBMS December 2011,
11  okay?
12      A.  Okay.
13      Q.  All right.  And then Exhibit 70 is copies
14  of the logs that were provided to us in December of
15  2011, okay?
16      A.  Okay.
17      Q.  Now, today we received from your counsel
18  Exhibit 71 which, I believe, is a compilation of
19  everything that Exhibit 68, 69 and 70 is but I
20  haven't had a chance to double-check it, all
21  right.
22          So here's what I want to ask you.  Exhibit
23  71 was copied today and provided to all counsel.
24  Do you know whether or not those copies that are
                                                    282

1  marked Exhibit 71 are copies of originals that you
2  brought with you today?
3      A.  Yes.
4      Q.  Okay.  And tell us what you brought with
5  you from Wisconsin today of which copies were made
6  and comprise Exhibit 71.
7      A.  You had the logs before, correct?
8      Q.  I think so, yes, but Exhibit 71 consists
9  of the logs again, right?
10      A.  Yes.
11      Q.  Okay.  And what else does Exhibit 71
12  consist of?
13      A.  There's logs.  There's pay stubs for Sam
14  Franke.  There's a copy of his medical examiner's
15  certificate.
16      Q.  As you leaf through there, let me ask you
17  this.  Is it fair to say that Exhibit 71 consists
18  of the following:  His logs for whatever time
19  period the logs represent?
20      A.  Yes.
21      Q.  Okay.  The pay stubs of which you just
22  mentioned?
23      A.  Yes.
24      Q.  And then is the balance of Exhibit 71,
                                                    283

20 (Pages 280 to 283)

1  based upon what it was you brought with you, his
2  driver qualification file?
3      A.  Yes.
4      Q.  Now, you know, do you not, that the driver
5  qualification file, the contents of it, is defined
6  by Federal Motor Carrier Safety Regulations,
7  correct?
8      A.  Yes.
9      Q.  Is the information that you have provided
10  us as a part of Exhibit 71, the driver
11  qualification file plus any other documents that
12  might form the basis of a personnel or employment
13  jacket that do not technically fit under the
14  categories of what's required for a driver
15  qualification file or are there no such documents
16  that are a part of Exhibit 71?
17      A.  Everything that's in here is what we -- is
18  required by us to carry on a driver.
19      Q.  Does Martin's Bulk Milk keep a driver
20  qualification file on its drivers such as
21  Mr. Franke?
22      A.  Yes.
23      Q.  And to the best of your knowledge is the
24  driver qualification file contained among the

284

1  exhibits -- excuse me, contained among the pieces
2  of paper that comprise Exhibit 71?
3      A.  Yes.
4      Q.  Is there any other file that Martin's kept
5  on Mr. Franke apart from the driver qualification
6  file, apart from any accounting records that might
7  exist for his pay?
8      A.  No.
9      Q.  So -- and the reason I ask this is because
10  there's some trucking companies I'm aware of that,
11  you know, maintain a separate personnel file or a
12  separate human relations file that has maybe some
13  correspondence or other documents that don't fit
14  the technical requirements of a driver
15  qualification file, and I hear you saying that
16  Martin's Bulk Milk did not keep such a file of
17  Mr. Franke; is that correct?
18      A.  Correct.
19      Q.  Okay.  By the way, while we're talking
20  about the driver qualification file, are there --
21  if you look at Exhibit now 68, because we have
22  68 --
23      MR. SKRYD:  Right here.  You got 68?
24

285

1  BY MR. FISHER:
2      Q.  Okay.  Do you see that the first page is
3  Violation and Review Record?
4      A.  Yes.
5      Q.  And then it has a D.A.C. -- D-A-C -- a
6  D.A.C. Report contained among those records?
7  Actually, it's entitled D.A.C. Services, MVR Report
8  about three or four or five pages in?
9      MR. SKRYD:  I think it's four pages in.
10  BY MR. FISHER:
11      Q.  Here we go.  It looks like that.
12      A.  Yes.
13      Q.  Okay.  Do you know what D.A.C. is?
14      A.  I don't.  I know what it is but I don't
15  know what the term of it is.
16      Q.  Do you know that D.A.C. is a service
17  provided by a particular company that does MVR
18  reports?
19      A.  Yes.
20      Q.  And is that the service that Martin's Bulk
21  Milk uses to do its annual reviews of its drivers?
22      A.  Yes.
23      Q.  Who would have had the responsibility of
24  reviewing or doing the annual review of

286

1  Mr. Franke's file at Martin's Bulk Milk?
2      A.  Janet Henthorn at the time, which is Janet
3  Berndt now, had that responsibility.
4      Q.  And based upon -- Strike that.
5          What is her current title?
6      A.  Personnel.
7      Q.  Does she also serve in any safety
8  capacity?
9      A.  Personnel and payroll.
10      Q.  Is there someone who has the role of
11  safety for Martin's Bulk Milk?
12      A.  Bob Hahn.
13      Q.  And when did Bob Hahn take on safety
14  responsibilities?
15      A.  Around September of 2008.
16      Q.  Who took -- who had safety
17  responsibilities for Martin's Bulk Milk before
18  September of 2008?
19      A.  Janet Berndt.
20      Q.  Did you -- Strike that.
21          As of 2007 and 2008 did you know Samuel
22  Franke?
23      A.  Yes, just as a driver.
24      Q.  And when you knew him as a driver, did you

287

21 (Pages 284 to 287)

1   form any judgments about his abilities as a driver?
2       A.   No, he was a good driver.
3       Q.   Okay.  So you did form a judgment about
4   him?
5       A.   Correct.
6       Q.   Correct.  All right.  And the opinion you
7   formed about Mr. Franke was that he was a good
8   driver?
9       A.   Yes.
10      Q.   On what did you base that conclusion?
11      A.   On-time deliveries, good with equipment,
12  no accidents, good speeding tickets, no violations.
13      Q.   So to the best of your knowledge as of
14  July 3, 2008 Mr. Franke was a qualified, safe
15  driver for Martin's?
16      A.   Yes.
17      Q.   I think I'm done with 68, 69, 70 and 71.
18  You can add them to the stack over there.  See, our
19  pile is much smaller now.
20      MR. SKRYD:  A little less to carry home.
21      MR. FISHER:  Exactly.
22          (Whereupon, Martin Deposition
23          Exhibit Nos. 72, 73, 74 and 75
24          were marked for identification.)

                                                    288

1   between Martin's Bulk Milk and either Overnite or
2   Universal Am Can?
3       A.   Yes.
4       Q.   All right.  Now, I want to take them one
5   by one and then I'm going to show you a previous
6   contract marked at your first deposition to see if
7   we can get a sense of chronology here.
8           Look at Exhibit 72 first.  Now, do you see
9   on Exhibit 72 that that appears to be a -- what's
10  labeled a Carrier-Broker Contract dated 5th day of
11  September 2002 by and between Overnite Logistics
12  and Martin Milk Service?  Do you see that on the
13  first page?
14      A.   Yes.
15      Q.   Feel free to take the paper clip off so
16  you can see the whole thing.  Do you see that?
17      A.   Yes.
18      Q.   Okay.  Now, remember I asked you some
19  questions before about what the motor carrier
20  number was for Martin's Bulk Milk?
21      A.   Yes.
22      Q.   And do you see on this particular contract
23  the number 172816 appears?
24      A.   Yes.

                                                    290

1   BY MR. FISHER:
2       Q.   All right.  I'm going to show you what's
3   been marked as Exhibits 72 through 75 and they are,
4   for counsels' benefit, respectively a 2002
5   contract, a 2004 contract, a 2005 contract and a
6   2008 contract.  And I will also represent to you,
7   Mr. Martin, that these are documents that were sent
8   to us by your counsel in February of 2012, all
9   right?
10      A.   Yes.
11      Q.   And are these documents that you arranged
12  for or someone at Martin's Bulk Milk arranged for
13  copying in light of a request that your counsel
14  made you aware of?
15      A.   Yes.
16      Q.   Now, remember at your first session of
17  your deposition I or maybe Mr. Burke or some other
18  counsel asked you some questions about contracts
19  and I think at that time you said, well, there
20  were -- you know, there were probably some
21  contracts back at the home office that you need to
22  look at.
23          Are these the contracts that Martin's Bulk
24  Milk was able to find that were entered into

                                                    289

1       Q.   Leaping ahead for a second, I will
2   represent to you with respect to every other
3   contract document I'm about to show you,
4   specifically 73, 74, 75, that's the same number
5   that appears opposite the fill-in-the-blank
6   designation of M-C number, okay?
7       A.   Yes.
8       Q.   So with that as a backstop, do you believe
9   that that is Martin's Bulk Milk's motor carrier
10  number for the Federal Motor Carrier Safety
11  Administration System?
12      A.   Yes.
13      Q.   Is it your understanding that there would
14  be a different motor carrier number for -- Strike
15  that.
16          Is there a different motor carrier number
17  for Martin's Bulk Milk when it is operating as a
18  broker?
19      A.   Yes.
20      Q.   Do you know what that number is?
21      A.   I do not.
22      Q.   Okay.  In any event, with respect to
23  Exhibit 72, do you see on this particular document
24  on the second page there appears to be a signature

                                                    291

                            22 (Pages 288 to 291)

1    from a Cecelia Delaney --
2    A. Yes.
3    Q. -- from Martin's and a signature of a Mark
4    Andelt for Overnite Logistics?
5    A. Yes.
6    Q. Do you know what the circumstances were
7    for the creation of this particular contract in
8    September of 2002?
9    A. I do not.
10    Q. Now, Cecelia Delaney, is that person still
11    with Martin's?
12    A. No.
13    Q. Is that a woman?
14    A. Yes.
15    Q. And do you know where Cecelia Delaney is?
16    A. Yes.
17    Q. Where is she?
18    A. Schugel Transport.
19    Q. Spell that for us.
20    A. S-c-h-u-g-e-l.
21    Q. And where is that located?
22    A. Tomah, Wisconsin.
23    Q. I'm sorry?
24    A. Tomah, T-o-m-a-h.

292

1    Q. And help me on geography. Where is that?
2    A. Do you know where Wilton is.
3    Q. Yes.
4    A. 15 miles north of Wilton where the "I"
5    divides.
6    Q. All right. And when did she leave
7    Martin's?
8    A. I don't recall.
9    Q. Was she a dispatcher?
10    A. Yes.
11    Q. And do you know Mark Andelt?
12    A. No.
13    Q. Remember I earlier showed you a bunch of
14    documentation that was in your files about Overnite
15    Logistics or Overnite Express and a variety of
16    documents that were generated related to
17    International Paper --
18    A. Yes.
19    Q. -- shipments and Mr. Franke?
20    A. Yes.
21    Q. Now, as of 2002 what type of freight or
22    cargo was Martin's Bulk Milk pulling pursuant to
23    this September 5th, 2002 contract, if you know?
24    A. I don't recall what it was at that time.

293

1    Q. Who might know the answer to that question
2    at Martin's?
3    A. Me.
4    Q. Okay. Honest answer.
5    A. That far back I don't know.
6    Q. Let me ask this way. When -- is it fair
7    to say that International Paper shipments were not
8    being pulled as a part of this Carrier-Broker
9    Contract in 2002?
10    A. It's very possible.
11    Q. Okay. And would that very possible answer
12    continue from 2002 up through 2006?
13    A. Yes.
14    Q. Okay. But then in 2007 you think that's
15    when -- withdraw the question. Okay.
16    Other than Miss Delaney is there any other
17    person at Martin's Bulk Milk that would have any
18    knowledge or information about what went into the
19    formation and execution of this contract in 2002?
20    A. No.
21    Q. Let's look at Exhibit 73. Now, it appears
22    from Exhibit 73 that there is -- this is a Master
23    Brokerage Agreement, at least by title, that is
24    dated January 14, 2004, correct?

294

1    A. Yes.
2    Q. And it has the Martin's Bulk Milk Motor
3    Carrier Number of 172816 in the first paragraph,
4    right?
5    A. Yes.
6    Q. And then it has -- it refers to Universal
7    Am Can Brokerage Division as an ICC Property Broker
8    as per a Motor Carrier Number of 167922. Do you
9    see that?
10    A. Yes.
11    Q. Now, in that second line of that agreement
12    do you know what is being referred to as ICC
13    Property Broker?
14    Second line of the first paragraph, the
15    one that has the fill-in-the-blank ones, the
16    very end of that second line it says, quote, ICC
17    Property Broker. Do you know what that means?
18    A. Universal Am Can is a licensed ICC
19    Interstate Commerce Property Broker.
20    Q. Okay. But my question is more specific.
21    Do you know what that means to be an Interstate
22    Commerce Commission Property Broker? Do you know
23    what that means?
24    A. You have a license to broker loads.

295

23 (Pages 292 to 295)

1   Q.  Do you know whether or not there are any
2   Federal regulations that define what a property
3   broker is?
4   A.  I don't know.
5   Q.  Do you know whether Martin's Bulk Milk
6   Service when it is operating as a broker, whether
7   or not it constitutes an ICC property broker
8   pursuant to applicable Federal regulations?
9   A.  Yes.
10  Q.  And why is it you say yes?
11  A.  Because of the authority that we have.
12  Q.  And when you say the authority, do you
13  mean that there is a document that Martin's Bulk
14  Milk Service has which confers the authority for it
15  to operate as a property broker pursuant to Federal
16  regulations?
17  A.  Yes.
18  Q.  And do you believe that on this particular
19  document, Exhibit 73, that's what the second line
20  is saying, that is to say, that Universal Am Can
21  Limited Brokerage Division has authority as an ICC
22  Property Broker?
23  A.  Yes.
24  Q.  Okay.  With respect to this agreement, I

296

1   from a person at Universal Am Can on the second
2   page of Exhibit 73, an indication to you that this
3   was not a contract that was in application for
4   loads in 2004 or thereabouts or do you know?
5   A.  I don't know why they didn't send it back.
6   Q.  Do you know whether or not Martin's Bulk
7   Milk Service sent to Universal Am Can a copy of
8   this particular January 14th, 2004 dated Master
9   Brokerage Agreement?
10  A.  I don't know.
11  Q.  Who would know the answer to that
12  question?
13  A.  Doreen.
14  Q.  Okay.  I'm done with 73.  Let's look at
15  Exhibit 74.
16      Do you see that this is labeled a
17  Carrier-Broker Contract between Martin Bulk Milk
18  and an entity referred to as Overnite Logistics?
19  A.  Yes.
20  Q.  By the way, do you know whether or not
21  Overnite Logistics is the same as, a part of, a
22  division of a company called Overnite Express,
23  Inc.?
24  A.  I'm assuming it's a part of it.

298

1   noticed that there appears to be Doreen West's
2   signature on the second page.  Who is Doreen West?
3   A.  The same as Doreen Baer.
4   Q.  Everybody's name is always changing here.
5   Okay.  And Doreen Baer is still with you?
6   A.  Yes.
7   Q.  And other than Doreen is there anybody
8   else who might have knowledge about the
9   circumstances leading to the entering into of this
10  contract dated January 14th, 2004?
11  A.  No.
12  Q.  You earlier said that there were -- Strike
13  that.  You earlier said that there were
14  contracts -- let me rephrase my question.
15      Remember when I was asking you a bunch of
16  questions before about the discovery responses of
17  Martin's Bulk Milk and I specifically asked you
18  some questions about contracts that were referenced
19  in your answers?
20  A.  Yes.
21  Q.  All right.  Is this Exhibit 73 one of the
22  contracts to which you referred earlier?
23  A.  Yes.
24  Q.  And is the fact that there is no signature

297

1   Q.  Okay.  When you were dealing with a
2   company I'll refer to simply as Overnite, did it
3   make a difference to you as to whether or not it
4   was referred to as Overnite Express or Overnite
5   Logistics or did you consider it to be simply
6   Overnite?
7   A.  I considered the company that we hauled
8   for was Overnite Express.  That was the main
9   company.
10  Q.  Okay.  Now, with respect to this
11  particular contract, does it appear on the second
12  page that there is a signature from Martin Bulk
13  Milk and that's a J. O'Neill?
14  A.  Yes.
15  Q.  And who is J. O'Neill?
16  A.  Jackie O'Neill.
17  Q.  And who is Jackie O'Neill?
18  A.  Jackie was a dispatcher.
19  Q.  Is Jackie still with you?
20  A.  No.
21  Q.  Where is Jackie O'Neill now?
22  A.  I do not know.
23  Q.  And who might know the answer to that
24  question?  Would HR at your company?

299

24 (Pages 296 to 299)

1    A.  Maybe, but it's been a long time.
2    Q.  Do you know whether or not she's still in
3  Wisconsin?
4    A.  I believe so.  Sparta area.
5    Q.  Has her last name changed?
6    A.  I don't know.
7    Q.  All right.  And look at the third page of
8  Exhibit 74.  What is this document?
9    A.  This one?
10    Q.  Yes, third page of Exhibit 74.
11    A.  It just tells Overnite Logistics the name
12  of our dispatchers, the areas that we operate, our
13  numbers and the number of equipment that we have.
14    Q.  And this is a document that would have
15  been sent in to Overnite as of July of 2005?
16    A.  Whatever time the rest of the packet was
17  sent in.
18    Q.  All right.  Now, on this document I think
19  I know who Dave is.  That's you, right?
20    A.  Yes.
21    Q.  I'm pretty sure I know who Doreen and
22  Jackie are.
23    A.  Yes.
24    Q.  Who's Sterling?

300

1    A.  A dispatcher.
2    Q.  And is Sterling still with you?
3    A.  No.
4    Q.  Man?
5    A.  Yes.
6    Q.  What's Sterling's last name?
7    A.  W-i-t-t, Witt.
8    Q.  Witt, okay.  And when did Sterling leave
9  you?
10    A.  I don't recall but it's been a while.
11    Q.  And do you know if he's still in the -- in
12  your area?
13    A.  Yes.
14    Q.  Do you know who he's employed by?
15    A.  By himself.
16    Q.  What does he do?
17    A.  He's a truck driver.
18    Q.  Do you know who he pulls freight for?
19    A.  Himself, Witt Farms.
20    Q.  And do you know what community that is?
21    A.  Community or commodity?
22    Q.  No.  No.  Community.  What town, village?
23    A.  Kendall.  Kendall, Wisconsin.
24    Q.  Okay.  Now, before I ask you about Exhibit

301

1  75, I'm going to show you a copy of an exhibit that
2  was marked at your first deposition.
3    MR. SKRYD:  Are you done with 74 then?
4    MR. FISHER:  Yes.
5    MR. SKRYD:  Okay.
6  BY MR. FISHER:
7    Q.  I'm going to show you a document that was
8  marked as Exhibit 15 at your first deposition.  And
9  Exhibit 15 at your first deposition, do you see
10  that this is a document marked as Universal Am Can
11  Limited Master Brokerage Agreement dated 7 day of
12  November 2007?
13    A.  Yes.
14    Q.  Now, do you know -- first of all, let's go
15  to the third page, the one that has a Bates number
16  down at the bottom of U-A-C-L O-E-I, a bunch of
17  zeros, and then a 17?
18    A.  Yes.
19    Q.  Do you see where Pat Podlena -- that
20  person's signature appears on that page?
21    A.  Yes.
22    Q.  Now, look at the bottom of this particular
23  page and do you see the fax transmission markings?
24    A.  Yes.

302

1    Q.  And what do you understand those fax
2  transmission markings to be?
3    A.  From where the fax came from.
4    Q.  So does it appear to you based upon
5  looking at Exhibit 15 that this November 7, 2007
6  document entitled Universal Am Can Limited Master
7  Brokerage Agreement was a multi-page document that
8  was faxed from Martin's Bulk Milk to a fax number
9  of 1-800-627-0706?
10    A.  Yes.
11    Q.  And do you know whether or not this is a
12  Master Brokerage Agreement that Martin's Bulk Milk
13  intended to enter into with Universal Am Can as of
14  November 7th, 2007?
15    A.  Yes.
16    Q.  All right.  Now, remember I asked you a
17  bunch of questions about when it appeared that the
18  International Paper shipments changed from Overnite
19  to Universal Am Can and I think you agreed with me
20  that that was mid June of 2008, correct?
21    A.  Yes.
22    Q.  So with respect to the freight that might
23  have been associated with this 2007 Master
24  Brokerage Agreement, do you know what kind of

303

25  (Pages 300 to 303)

**Page 304**

1  freight it was that Martin's Bulk Milk was hauling
2  pursuant to this Master Brokerage Agreement with
3  Universal Am Can as of 2007 and up to the middle of
4  June of 2008?
5      A.  Well, this could be for -- this could be
6  for any kind of freight.
7      Q.  Okay.
8      A.  I mean, for any loads that they throw by
9  us, we could have taken any load that they want to
10  broker out.
11      Q.  Do you have any -- Strike that.
12          Did that happen?
13      A.  I don't know.
14      Q.  Hold that thought.
15          THE VIDEOGRAPHER:  Going off the video
16  record.  The time now is 1:33 p.m.
17          (A break was taken.)
18          THE VIDEOGRAPHER:  We are back on the
19  video record.  The time now is 1:37 p.m.
20  BY MR. FISHER:
21      Q.  In order to answer the question of whether
22  that happened, Mr. Martin, would accounting records
23  probably need to be checked?
24      A.  Yes.

**Page 305**

1      Q.  Okay.  So if you look back at -- and I've
2  got an extra copy of it here for you to look at.
3  If you look back at Exhibit 57, which was that
4  collection of, you know, spread sheets on invoicing
5  that you said, hey, I don't know anything about
6  this, do you see where it says invoice payment
7  status for broker settlements UACL on the very,
8  very first page and it shows invoices from November
9  1st, 2008 to January 8th, 2010?
10      A.  Yes.
11      Q.  I presume it would be that Martin's Bulk
12  Milk would have the ability to do an invoice run
13  using this same program but go back to 2005, 2006,
14  2007 to find out if there were any loads that were
15  being pulled for Universal Am Can pursuant to such
16  an agreement, right?
17      A.  Yes.
18      Q.  Okay.  All right.  I'll just take that
19  back from you.  Thanks.  And the person to answer
20  such a question, who might that be if we don't
21  already have the information by just looking at
22  documents?
23      A.  Joanne Biemier.
24      Q.  Joanne?

**Page 306**

1      A.  Biemier.  You got it.
2      Q.  Okay.  Back to Exhibit 15 again.  When --
3  Strike that.  I'm going to come back to Exhibit 15
4  in a second.
5          Look at Exhibit 75 but keep 15 handy.
6  Exhibit 75 is the last of the four documents that
7  were produced to us in the last month or so.
8      A.  Okay.
9      Q.  All right.  So that if you look at
10  Exhibits 72, 73, 74 and 75, we have agreements
11  dated in September of '02, January of '04, July
12  of '05, and then June of 2008.  Do you follow me so
13  far?
14      A.  Yes.
15      Q.  Okay.  Do you know why it is Martin's Bulk
16  Milk did not come up with and produce a copy of the
17  Universal Am Can Limited Master Brokerage Agreement
18  dated November 7th, 2007 even though as Exhibit 15
19  shows it has a fax transmission from Martin's Bulk
20  Milk to a 1-800 number?
21      A.  No.
22      Q.  Who physically looked for the contracts at
23  Martin's Bulk Milk?
24      A.  Janet and some other personnel.

**Page 307**

1      Q.  Did you yourself do that?
2      A.  No, I did not.
3      Q.  So would those be the persons, the persons
4  in the accounting or billing department, who would
5  be able to answer the questions of how information
6  is kept, where the contracts are, and how the
7  filing is done?
8      A.  Yes.
9      Q.  Okay.  Now, would you agree with me, sir,
10  that on Exhibit 15 that there is language contained
11  on this November 7, 2007 agreement, specifically
12  numbered Paragraph 3, that says, among other
13  things, quote, carrier is an independent contractor
14  and is -- and this is all caps -- in no way to be
15  considered an agent, employee or joint venturer of
16  UACL in the providing of any services hereunder,
17  unquote?
18      A.  I see it, yes.
19      Q.  All right.  Had you ever seen that
20  language before?
21      A.  No.
22      Q.  Look at Exhibit 75.  And do you see on
23  Exhibit 75 that same identical language appears in
24  numbered Paragraph 3 on the June 12th, 2008 Master

26 (Pages 304 to 307)

1 Brokerage Agreement between Universal Am Can and
2 Martin's Bulk Milk?
3     A.   Yes.
4     Q.   And that language is in the June 12th,
5 2008 contract language that says at Subparagraph 3,
6 quote, carrier is an independent contractor and is
7 in no way to be considered an agent, employee or
8 joint venturer of UACL in the providing of any
9 services hereunder, unquote?
10     A.   Yes.
11     Q.   Do you see that?  And this was a contract
12 in to which Martin's Bulk Milk entered with
13 Universal Am Can on June 12th, 2008?
14     A.   Yes.
15     Q.   And shortly thereafter that date, June
16 12th, 2008, that's when Martin's Bulk Milk started
17 to get paid by UACL instead of Overnite, correct?
18     A.   Correct, but it's still -- some of the
19 documents, other documents, are kind of confusing
20 because there's names on both of them.  That's the
21 confusing part.  Anybody looking at that would have
22 a hard time distinguishing that.
23     Q.   And I think you said that's probably
24 because there's some crossover between people who

                                                          308

1 used to work for Overnite who then suddenly found
2 themselves employed by Universal Am Can?
3     A.   That's possible.
4     Q.   That could be a possibility, okay.  Now, I
5 want to look specifically at Exhibit 75, some other
6 pages.
7         By the way, who would be the best person
8 at Universal Am Can to answer -- Strike that.
9         Who would be the best person at Martin's
10 Bulk Milk to answer questions about the entering
11 into of this particular agreement, the one that is
12 marked as Exhibit 75 dated June 12th, 2008?
13     A.   Pat Podlena would have been the one that
14 would have read this and sent it back.
15     Q.   But my question is slightly different.  My
16 question is:  Who is the best person with or
17 associated with Martin's Bulk Milk who would be
18 able to testify about the entering into of this
19 agreement?  And if it's Pat, that's fine.
20     A.   It would be me.
21     Q.   Okay.  And did you review this contract
22 before you answered any of the discovery
23 responses -- discovery requests that were put to
24 you the last several months?

                                                          309

1     A.   No.
2     Q.   Any particular reason why you did not read
3 the June 12th, 2008 Master Brokerage Agreement
4 between Universal Am Can and Martin's Bulk Milk
5 before you responded to any of those discovery
6 requests?
7     A.   No particular reason.
8     Q.   Let's look at some of the documentation
9 attached to Exhibit 75.  In particular, after the
10 signature page do you see the Carrier Survey page?
11     A.   Yes.
12     Q.   And this is like that carrier survey page
13 that you explained to me with regard to the
14 Overnite Logistics carrier survey, right?
15     A.   Yes.
16     Q.   Okay.  Now, if you look at the next page,
17 do you see where it says "Welcome to the Universal
18 Am Can Limited Brokerage Division"?
19     A.   Yes.
20     Q.   And then it has a whole bunch of different
21 requirements that you have to complete before
22 you're approved to haul freight on behalf of
23 Universal Am Can, right?
24     A.   Yes.

                                                          310

1     Q.   And to the best of your knowledge -- let's
2 look at the numbers, the first set of numbers, and
3 I'm going to do them in reverse order.  If you look
4 at Number 6, do you know whether or not the
5 information listed as 1 through 5 was faxed to
6 1-800-627-0706?
7     A.   I do not know that.
8     Q.   Who would know that?  Would that be Pat?
9     A.   Yes.
10     Q.   And Number 5, it says:  Complete and
11 return the Carrier Survey form.  That appears to
12 have been done, correct, because it's on the
13 preceding page and contained within the Martin's
14 Bulk Milk documents?
15     A.   Yes.
16     Q.   Okay.  And how about Number 4, do you know
17 if a W-9 form was filled out?
18     A.   I do not know.
19     Q.   And Number 3, do you know whether or not
20 any insurance certificates were provided?
21     A.   I do not.
22     Q.   And do you know if a copy of the contract
23 or common authority documents were provided?
24     A.   I do not.

                                                          311

27 (Pages 308 to 311)

1    Q.  But you do know that the three-page Master
2  Brokerage Agreement was signed and returned, I take
3  it, or do you know?
4    A.  I don't know.  It doesn't say if it went
5  to the fax or not.  So I'm assuming it was but I
6  don't know for sure.  I didn't do it.
7    Q.  Okay.  And then if we look at the numbered
8  items that appear on the bottom half of the page
9  where it says "all requirements must be met" --
10  strike that -- it says, quote, for prompt payment,
11  here are some tips, do you know whether or not this
12  is the type of information that Martin's Bulk Milk
13  followed in order to make sure that it got paid?
14    A.  Yes.
15    Q.  Okay.  I'm done with 75.
16        (Whereupon, Martin Deposition
17        Exhibit Nos. 76, 77 and 78 were
18        marked for identification.)
19  BY MR. FISHER:
20    Q.  And the last set of documents that I'll
21  show you before we probably take a lunch break here
22  shortly, Mr. March, are Exhibits 76 through 78.
23        And looking at 76, does this appear to be
24  the broker confirmation sheet that applied to the

312

1    Q.  Hour.  And what was it that took you down
2  there?
3    A.  I believe all the carriers had to go for
4  some sort of orientation.
5    Q.  Was this an orientation that occurred
6  before 2008?
7    A.  Yes.
8    Q.  Did it occur before 2007?
9    A.  Yes.
10    Q.  Did it occur when Martin's Bulk Milk was a
11  shipper directly for International Paper without an
12  intervening broker?
13    A.  We were a hauler.
14    Q.  So there was no broker involved?
15    A.  Correct.
16    Q.  Okay.  And can you give us any estimate
17  time-wise?  Was that in the '90s?  Was that in the
18  2000s?
19    A.  I would say late '90s, early 2000.
20    Q.  Do you have a memory of what the warehouse
21  looked like?
22    A.  Somewhat, yes.
23    Q.  Tell me what you remember.
24    A.  It's -- I would say they have 50 to a

314

1  load that Mr. Franke was hauling at the time of the
2  accident?
3    A.  Yes.
4    Q.  You can set that aside.
5        With respect to Exhibit 77, I know there's
6  a different collection or iteration of this one,
7  but if you look at Exhibit 77 here, does this
8  appear to be copies of the three memo bills or
9  bills of lading associated with the three loads for
10  three different customers that were being -- that
11  were picked up by Mr. Franke on the night of July
12  3rd, 2008?
13    A.  Yes.
14    Q.  Now, I want to go back -- I'm done with
15  that one.  I want to go back to a topic that I got
16  into initially but didn't complete.
17        You were down at the Hammond Distribution
18  Center at some point?
19    A.  Yes.
20    Q.  More than once or just once?
21    A.  Once.
22    Q.  And how long did you visit that
23  distribution center?  In other words --
24    A.  Approximately an hour.

313

1  hundred docks, it's just a big open warehouse and
2  it's just a place where -- you know, for the paper
3  distribution, different sorts of papers.
4    Q.  When you went there late '90s, early
5  2000s, whenever it was, do you know whether or not
6  an entity or company named Exel, E-x-e-l, was
7  operating at the distribution center at that time?
8    A.  I don't recall.
9    Q.  Did you go down there in a regular sedan,
10  regular car?
11    A.  Yes.
12    Q.  Did they show you anything about the
13  layout of the distribution center so that you could
14  learn where it was truck drivers might report when
15  they came there to pickup or drop off loads?
16    A.  So I could give them directions you mean?
17    Q.  Sure.
18    A.  Yes, I could drive to it today if I had
19  to.
20    Q.  It's in Hammond?
21    A.  Yes.
22    Q.  How would you get there?
23    A.  94 down to 165th Street, make a left and
24  go down and it's very easy to find.

315

28  (Pages 312 to 315)

1    Q.   On the north or south side of 165th?
2    A.   I would say it's on the east side of
3  165th.
4    Q.   If 65th runs east/west, not north/south,
5  what side would it be on?  If 165th runs east/west,
6  would it be on the north side or the south side, if
7  you remember?
8    A.   I don't remember.
9    Q.   Okay.  In any event, you arrived there.
10  Was there an area in which truck drivers would
11  report?
12    A.   Yes.
13    Q.   And describe for me what that was about
14  that you remember.
15    A.   It's a small office about the size of this
16  room, it's what they call the shipping office and
17  you had to go to a window to get your bills.
18    Q.   And when a person such as a driver would
19  go there, was it explained at that time -- I know
20  it was many years ago -- what it was they were to
21  do?
22    A.   They didn't explain that to me.
23        MR. FISHER:  Okay.  You know what, now's a
24  good time to take a break.

316

1        THE VIDEOGRAPHER:  We're going off the
2  video record.  The time now is 1:52 p.m.
3        (A break was taken.)
4        THE VIDEOGRAPHER:  We are back on the
5  video record.  The time now is 2:22 p.m.
6  BY MR. FISHER:
7    Q.   Okay.  Mr. Martin, just to wrap up the
8  marked exhibits and the inventory I've been having
9  you go through.  I think this is a duplicate of a
10  previous exhibit but this was produced to us in
11  February of this year.
12        Would you identify for us what Exhibit 78
13  is?
14    A.   It's a Uniform Interchange Agreement from
15  the UIIA.
16    Q.   And I know it's hard to read, but if you
17  look at the second page of the document, it appears
18  to me that Martin's Bulk Milk Service is a party to
19  an agreement, to this agreement by this page.  Is
20  that your understanding?
21    A.   Yes.
22    Q.   And in a nutshell, why is it that Martin's
23  Bulk Milk entered into this Uniform Intermodal
24  Interchange and Facilities Access Agreement?

317

1    A.   Because we do trucking out of Wisconsin
2  and Minnesota to the railroads in Chicago -- truck
3  loads.
4    Q.   And is it your understanding that any
5  motor carriers who want to be able to get access to
6  the intermodal yards have to participate in this
7  agreement?
8    A.   Yes.
9    Q.   Okay.  You can set that aside.
10        You earlier in the first session of your
11  deposition made reference to a company whose
12  business location is in Utah.  Is that Martin's
13  Bulk Milk Service or is that the Logistics company
14  or something else?
15    A.   It's both.
16    Q.   And describe what you mean by both.
17    A.   Martin's Bulk Milk Service has an office
18  in St. George, Utah which runs our trucks and it
19  also has a company what's called Martin
20  Refrigerated Express which brokers loads, like as
21  Universal Am Can and Overnite Express.
22    Q.   And earlier you said that the nature of
23  the business in Utah is a brokerage company.  Is
24  that still the case?

318

1    A.   It's both.  We're a carrier and a broker.
2    Q.   Here's what I'm trying to understand.  I
3  want to make sure that I understand what Martin's
4  Bulk Milk or Martin's related companies are engaged
5  in brokering.
6    A.   Okay.
7    Q.   Is it two companies, one that operates out
8  of Utah and another that operates out of Minnesota?
9    A.   Yes.
10    Q.   And tell me again what the names of those
11  two respective companies are, the one in Utah first
12  and the one in Minnesota second.
13    A.   Utah is Martin Refrigerated Express and
14  Winona, Minnesota is MBM Logistics.
15    Q.   And does Martin Refrigerated Express have
16  to your knowledge a separate motor carrier number
17  for purposes of the Department of Transportation?
18    A.   Yes, only for brokering.
19    Q.   And does MBM Logistics in Minnesota have a
20  separate motor carrier number for brokering?
21    A.   Yes.
22    Q.   And then Martin's Bulk Milk has a motor
23  carrier number in its capacity as a carrier?
24    A.   Yes.

319

29 (Pages 316 to 319)

1    Q.   Does Martin's Bulk Milk have a brokerage
2  number?
3    A.   Yes.
4    Q.   And so there are three entities with the
5  name Martin's that operate as brokers?
6    A.   MBM, Martin Refrigerated and Martin's Bulk
7  Milk.
8    Q.   Right.  That's why I said with the name
9  Martin's.
10    A.   Okay.
11    Q.   Okay.  And do they each have separate
12  brokerage numbers?
13    A.   Yes.
14    Q.   Excuse me.  Do they each have separate DOT
15  motor carrier numbers in their capacity as brokers?
16    A.   Yes.
17    Q.   Who are the current dispatchers for
18  Martin's Bulk Milk in Wilton, Wisconsin?
19    A.   Tom Price, Doreen Bayer, Nancy Green, Dean
20  Peterson, Greg Johnson, Renee Taugis, and Dave
21  Martin.
22    Q.   Is this an expansion of the number of
23  dispatchers from what it had been back in the
24  earlier 2000s?

320

1  to try to make sure that fatigued drivers are not
2  on the roadway?
3    A.   Yes.
4    Q.   Based upon -- let me start my question a
5  different way.
6      In your job at Martin's Bulk Milk did it
7  involve at all the investigation of the accident of
8  Mr. Franke on July 3?
9    A.   No.
10    Q.   Who was responsible, if anyone, at
11  Martin's Bulk Milk for doing an investigation of
12  the July 3rd accident?
13    A.   Janet compiled the information along with
14  the police report.
15    Q.   Do you know anything about what the
16  findings were, if any, of any investigation that
17  Martin's Bulk Milk did of the accident involving
18  Mr. Franke?
19    A.   The only thing I found what was wrong was
20  there was brakes out of adjustment on the CSXU
21  container.
22    Q.   Do you have any idea whether or not that
23  condition had anything to do with the cause of the
24  accident?

322

1    A.   Yes.
2    Q.   Does Martin's Bulk Milk Service employ any
3  auditing service to audit the logs of its drivers?
4    A.   Yes.
5    Q.   What company does it use?
6    A.   Oh, we do it in-house.
7    Q.   Oh, I'm sorry.  Let me rephrase my
8  question.
9      To audit the logs of your drivers do you
10  employ some type of a software package?
11    A.   Yes.
12    Q.   What software package do you use?
13    A.   I can't answer that.  I don't know.
14    Q.   Who might know that?
15    A.   Janet.
16    Q.   And what is your understanding of the
17  purpose of auditing logs?
18    A.   It will check the 11, 14 and 70-hour rule.
19    Q.   And that's to make sure that truck drivers
20  are running legal, so to speak, and in conformity
21  with the Federal Motor Carrier Safety Regs?
22    A.   Yes.
23    Q.   Is another reason why that's done is
24  because hours of service regulations are designed

321

1    A.   I do not.
2    Q.   With respect to a cause of the accident,
3  in speaking with -- did you ever speak with other
4  people at Martin's Bulk Milk about the accident?
5    A.   Only a driver that had left me a message
6  on a voice mail the night that it happened.
7    Q.   And who was that driver?
8    A.   Jamie Jorgensen.
9    Q.   And what message did Jamie Jorgensen leave
10  for you?
11    A.   Just that Sam was in a bad rear-end
12  accident and the driver was burned.
13    Q.   Do you know how it is that Jamie knew
14  anything about this?
15    A.   Sam tried to contact me but I didn't get
16  the phone call.  So he called Jamie to try to get a
17  hold of me.
18    Q.   And did Jamie reach you first with the
19  information about the accident or did Mr. Franke
20  reach you first?
21    A.   Jamie.
22    Q.   After that conversation did you have any
23  conversations with anyone else affiliated with
24  Martin's Bulk Milk about investigating the cause of

323

30  (Pages 320 to 323)

1   the accident?
2     A.  Well, there was no conversation.  I got it
3   off a voice mail.
4     Q.  No, I understand that.
5     A.  Okay.  So -- go ahead.
6     Q.  Here's what I'm trying to find out because
7   it's going to lead to another question.  I want to
8   know what conversations or interaction you had with
9   anybody at Martin's Bulk Milk having to do with
10  investigating what happened.
11     A.  The only investigation we did was go
12  through the police report just to read what had
13  happened.
14     Q.  Do you know whether or not based upon
15  conversations with Martin's Bulk Milk,
16  conversations with the police, or anyone for that
17  matter, excluding consultation with your company's
18  counsel, whether or not there was any evidence that
19  Mr. Franke was fatigued or tired on the night of
20  the accident?
21     A.  No.
22     Q.  When you say "no," do you mean by that,
23  no, there were no such conversations, or that was a
24  subject of investigation and it was determined that

324

1   he was not fatigued?
2     A.  There was no conversations involved that
3   he was fatigued.
4     Q.  Okay.  I'm going through the notes from
5   your first deposition and in light of the other
6   documents, I want to just see if there's any
7   follow-up questions I've got from your first
8   deposition.
9      With respect to the distribution center in
10  Hammond to which Mr. Franke went on a regular
11  basis, did he ever share with you any information
12  about what went on at the distribution center?
13     A.  No.
14     Q.  Different topic now.  Would you agree with
15  me that at the time of the accident Mr. Franke was
16  doing work for Martin's Bulk Milk?
17     A.  Yes.
18     Q.  He was Martin's Bulk Milk's employee,
19  right?
20     A.  Yes.
21     Q.  And would you agree with me that he was
22  driving a truck at the time of the accident?
23     A.  Yes.
24     Q.  That he was driving a truck with cargo?

325

1     A.  Yes.
2     Q.  He was driving a truck with cargo from
3   Point A to Point B?
4     A.  Yes.
5     Q.  And that his job was to drive a truck with
6   cargo from Point A to Point B in a reasonable, safe
7   fashion?
8     A.  Yes.
9     Q.  All right.  So what I want to do for the
10  purposes of my next series of questions is to
11  define his work as follows:  His work is defined as
12  driving a truck with cargo from Point A to Point B
13  in a reasonable, safe manner.
14     A.  Yes.
15     Q.  All right.  That's my definition of the
16  word "work."  With me?
17     A.  Yes.
18     Q.  Okay.  So did Universal Am Can or Overnite
19  Express or International Paper provide any
20  instructions or directions or requirements to
21  Samuel Franke on the following:  The tools he was
22  to use in doing the work?
23     A.  No.
24     Q.  The instrumentalities that he was to use

326

1   in performing the work?
2     A.  No.
3     Q.  The clothing he was to wear in doing the
4   work?
5     A.  No.
6     Q.  The equipment he was to use in doing the
7   work?
8     A.  No.
9     Q.  The logbooks he was to use in doing the
10  work?
11     A.  No.
12     Q.  The tractor he was to use in doing the
13  work?
14     A.  No.
15     Q.  The trailer he was to use in doing the
16  work?
17     A.  No.
18     Q.  The type of tractor or trailer he was to
19  use in doing the work?
20     A.  He had to have a 53-foot trailer.
21     Q.  And was that a requirement that
22  International Paper or Overnite Express or
23  Universal Am Can imposed?
24     A.  It was a requirement of all three.

327

31 (Pages 324 to 327)

1     Q.   And was that in writing or was that an
2 expectation?
3     A.   It's on the confirmation sheets, I
4 believe, that requires a 53-foot trailer.
5     Q.   Okay. Did Universal Am Can, Overnite
6 Express or International Paper designate who were
7 the drivers that were to do the work?
8     A.   No.
9     Q.   Does Martin's Bulk Milk use co-drivers?
10 Do they use dual drivers?
11     A.   We have a couple.
12     Q.   Okay. Did Universal Am Can, Overnite
13 Express or International Paper ever designate who
14 the dual or co-drivers were to be in doing the
15 work?
16     A.   No.
17     Q.   Did Universal Am Can or Overnite Express
18 or International Paper tell Mr. Franke or -- tell
19 Mr. Franke where he had to purchase his gas in
20 doing the work?
21     A.   No.
22     Q.   Where he was to purchase any supplies or
23 services in doing the work?
24     A.   No.

         328

1     Q.   What route he was to follow in doing the
2 work?
3     A.   No.
4     Q.   Did Universal Am Can, Overnite Express or
5 International Paper ever measure, score or evaluate
6 any of the details of Mr. Franke doing his work?
7        MR. SKRYD: Objection to form. I think
8 it's vague. You can answer if you --
9 BY MR. FISHER:
10     Q.   Yes, if you don't understand, tell me you
11 don't understand and I'll be happy to rephrase it.
12     A.   They would monitor the deliveries.
13     Q.   Okay.
14     A.   On-time deliveries.
15     Q.   Tell me what you mean by monitor on-time
16 deliveries.
17     A.   If -- you had to report to them what --
18 you know, if you had a truck that was running late
19 for a pickup or a delivery.
20     Q.   Is that -- in answer to my question, is
21 that the only thing you can think of in which
22 Universal Am Can, Overnite Express or International
23 Paper measured or scored or evaluated any details
24 of the work as I have defined the work?

         329

1     A.   Yes.
2     Q.   Okay. Now, with respect to that
3 monitoring of on-time deliveries, did they issue a
4 report on a weekly or monthly basis or what became
5 of that monitoring?
6     A.   There was no reports. We just -- we had
7 to report to them if a truck was running late on a
8 pickup or delivery.
9     Q.   So what would happen, for example, in May
10 of 2008 when Mr. Franke is doing his regular run
11 and he determines that because of traffic
12 congestion around Chicago he's never going to be
13 able to get back to Wilton, Wisconsin in time so
14 that he can give the load to the second driver who
15 then makes the delivery, for example, in
16 Minneapolis? What would happen in that instance?
17     A.   The load would get rescheduled for the
18 next day.
19     Q.   What happens if he's already on route?
20 He's on 294 on the west side of Chicago and he's
21 stuck in, you know, an incredible traffic jam and
22 knows he's not going to get back at his usual time?
23     A.   When his time is up, then he needs to take
24 his break.

         330

1     Q.   And then what would happen with the load?
2     A.   It would get rescheduled for the next day.
3     Q.   So he would take a brake, take whatever
4 hours he needed and then continue on up to Wilton
5 and who would then reschedule the delivery?
6     A.   Universal Am Can or Overnite Express.
7     Q.   Would Martin's Bulk Milk get involved in
8 that process with the eventual customer?
9     A.   No.
10     Q.   Okay. Did Universal Am Can, Overnite
11 Express or International Paper train Mr. Franke in
12 how to do the work?
13     A.   I don't know.
14     Q.   What type of training did Martin's Bulk
15 Milk Service provide to Mr. Franke in terms of how
16 to do the work, that is to say, how to drive his
17 truck?
18     A.   We put him through a road test in the
19 beginning through orientation.
20     Q.   Other than that was there any other
21 training that Martin's Bulk Milk provided to
22 Mr. Franke?
23     A.   We'll help him train with his paperwork
24 and with his logging.

         331

                   32 (Pages 328 to 331)

1    Q. So with respect to the initial on-the-road
2  test and what you just mentioned in terms of his
3  logging and things like that, did International
4  Paper, Overnite Express or Universal Am Can provide
5  any such training to Mr. Franke?
6    A. No.
7    Q. Did Universal Am Can, Overnite Express or
8  International Paper require Franke to inspect,
9  clean or maintain the truck he was driving and its
10  equipment?
11    A. Yes.
12    Q. Tell me why you say yes.
13    A. They -- the driver has to inspect the
14  trailer.
15    Q. Where was it in writing that Universal Am
16  Can said that the driver had to inspect the
17  trailer?
18    A. Oh, it's not -- it's required by
19  International Paper when he goes to load there that
20  the driver has to inspect the trailer.
21    Q. And by "inspect the trailer," tell me what
22  you mean by that.
23    A. That there's no leaks or no debris in the
24  trailer.

332

1  over on its axles.
2    Q. And how would he do that?
3    A. Well, if you do the same load day in
4  and -- day after day, you should be able to figure
5  it out, but then you probably would have to go --
6  you'd have to go to a scale or a public scale or
7  something if he wasn't sure, depending on how much
8  weight he had in the trailer.
9    Q. Was Mr. Franke as of July 3rd, 2008 a
10  pretty experienced driver in terms of knowing how
11  it is that a trailer ought to be loaded and not
12  loaded?
13    A. Yes, and was a very good driver.
14    Q. So getting back to my original question.
15  Did Universal Am Can, Overnite Express or
16  International Paper impose any specific
17  requirements on inspection of the trailer?
18       I'm not talking about what you would
19  expect him to do on his own as a good truck
20  driver. What I'm asking you is whether or not
21  Universal Am Can, Overnite Express or International
22  Paper imposed any requirements on Mr. Franke for
23  the inspection of a trailer?
24    A. They would require him to inspect the

334

1    Q. So let me make sure I understand this.
2  When Mr. Franke would bring his trailer to the
3  distribution center in Hammond and he backs the
4  truck into the dock where it's going to be loaded,
5  say, with paper products, what would -- what do you
6  think Mr. Franke would do after he gets out of his
7  tracker?
8    A. He would have to go into the dock and
9  inspect his trailer and also inspect his load
10  before they load it.
11    Q. All right. Why would he have to go into
12  the trailer to inspect his trailer?
13    A. Just to make sure there's no debris in
14  there or leaks.
15    Q. And let's assume he's gone in there and
16  determined everything's fine inside the trailer.
17  What would you expect Mr. Franke to next do -- as
18  it pertains to the loading of the trailer?
19    A. Well, he should watch them load his load
20  to make sure there's no damage on the product going
21  in.
22    Q. Okay. And what else would you expect him
23  to do, if anything?
24    A. Make sure it's loaded right where it's not

333

1  inside of the trailer.
2    Q. And how is it you know that?
3    A. It's pretty much common for all shippers.
4    Q. And how do you know that?
5    A. Because I drove a truck for ten years and
6  it's just common that shippers want their trailers
7  clean. They don't want to get to the other end and
8  have a bunch of debris in the trailer.
9    Q. Okay.
10    A. So it's part of the job.
11    Q. Would you agree with me that cleanliness
12  of the inside of a trailer probably has nothing to
13  do with how this accident happened?
14    A. Yes.
15    Q. Okay. With respect to maintaining the
16  trailer, do you know whether or not International
17  Paper, Overnite Express or Universal Am Can imposed
18  any requirements for the maintenance of the
19  trailer?
20    A. No.
21    Q. So is your answer they made no -- they
22  imposed no requirements; is that correct?
23    A. Correct.
24    Q. And, likewise, for the tractor?

335

33 (Pages 332 to 335)

1    A.   Correct.

2    Q.   Do you know whether or not Universal Am

3  Can, Overnite Express or International Paper

4  required Mr. Franke to follow any particular

5  driving techniques when he was doing the work?

6    A.   No.

7    Q.   And by "no" you mean they did not,

8  correct?

9    A.   Correct.

10    Q.   Did Universal Am Can, Overnite Express or

11  International Paper provide Mr. Franke with a

12  camera?

13    A.   No.

14    Q.   Did Universal Am Can, Overnite Express or

15  International Paper require Franke to report or

16  notify them of any accidents involving the load he

17  was carrying?

18    A.   Not to my knowledge.

19    Q.   A digression here for a second.  Do you

20  know how it was Universal Am Can got any notice of

21  an accident?

22    A.   I called them on -- they weren't in the

23  office.  So I called them on the first business day

24  that I could, which would have been --

336

1  International Paper require Franke to stay in

2  constant communication with anybody?

3    A.   No.

4    Q.   On flat bed -- does Martin's Bulk Milk

5  handle any flat bed?

6    A.   No.

7    Q.   Did you ever carry any flat bed --

8    A.   No.

9    Q.   -- loads?  Did Universal Am Can or

10  Overnite Express ever fine Mr. Franke for not being

11  in compliance with any particular edict or

12  direction?

13    A.   No.

14    Q.   Do you know whether or not Universal Am

15  Can or Overnite Express or International Paper even

16  had the authority or power to issue fines to

17  Mr. Franke?

18    A.   I don't recall.

19    Q.   Did Universal Am Can, Overnite Express or

20  International Paper dictate to Mr. Franke what his

21  work days would be or what his hours of operation

22  would be?

23    A.   They would dictate what time he needed to

24  pick the load up, which was 7:00 p.m.

338

1    Q.   July 7th?

2    A.   Yes.

3    Q.   And any particular reason why you waited

4  so long to call them?  I'm not being critical; I'm

5  just asking why you waited until July 7th.

6    A.   Because I didn't think I'd be able to get

7  a hold of anybody.  I know they worked regular

8  business hours, there was nobody there over the

9  weekend and the accident happened late on that

10  Friday night.

11    Q.   Do you know whether or not Universal Am

12  Can, Overnite Express or International Paper

13  required Franke to call in while he was on route

14  for reasons other than that he might be late?

15    A.   No.

16    Q.   So they did not impose such requirements,

17  correct?

18    A.   Correct.

19    Q.   Did Universal Am Can, Overnite Express or

20  International Paper require Franke to provide any

21  status reports?

22    A.   Just if he was running behind on his

23  pickup or delivery schedule.

24    Q.   Did Universal Am Can, Overnite Express or

337

1    Q.   Did Universal -- to your knowledge did

2  Universal Am Can, Overnite Express or International

3  Paper ever dictate how the load that was to be

4  shipped was to be packed in the trailer?

5    A.   They were responsible for loading the

6  load.

7    Q.   When they loaded the load, would that be

8  done presumably by forklift drivers at the

9  distribution center?

10    A.   Yes.

11    Q.   Now, Mr. Franke would not have gotten

12  involved in that, correct?

13    A.   Correct.

14    Q.   And let's assume hypothetically that

15  Mr. Franke got on to a forklift, say, hey, I'm

16  going to help out, I'm in a hurry.  Would he have

17  had the authority to, you know, load the cargo on

18  to the trailer --

19    A.   No.

20    Q.   -- with the use of a forklift at the

21  distribution center?

22    A.   No.

23    Q.   Why is that?

24    A.   They wouldn't allow it down there.

339

34 (Pages 336 to 339)

1    Q.   Did Universal Am Can, Overnite Express or
2  International Paper ever hire Mr. Franke?
3    A.   Not to my knowledge.
4    Q.   Did they ever discipline him?
5    A.   Not to my knowledge.
6    Q.   Did they ever counsel him?
7    A.   Not to my knowledge.
8    Q.   Did they ever qualify him to serve as a
9  driver for a motor carrier?
10    A.   Not to my knowledge.
11    Q.   Did they ever disqualify him for operating
12  as a driver for a motor carrier?
13    A.   No.
14    Q.   Did they ever fire him?
15    A.   No.
16    Q.   Do you know whether or not Mr. Franke ever
17  sought to be hired, disciplined, counseled, fired,
18  qualified or disqualified by Universal Am Can,
19  Overnite Express or International Paper?
20    A.   I don't know.
21    Q.   I need to ask Mr. Franke?
22    A.   Yes.
23    Q.   Okay.  Did Universal Am Can, Overnite
24  Express or International Paper have the right to
                                                    340

1  International -- somebody there at that
2  distribution center would have been able to call
3  somebody up, for example, you, and say, hey, he's
4  not driving for us today because he's just being a
5  whatever?
6    A.   It could happen, yes.
7    Q.   And what about dress, what would be the
8  line over which you would have to cross for the
9  dress of the truck driver to allow in your judgment
10  somebody at Universal Am Can, Overnite Express or
11  International Paper to say you're not driving this
12  load today?
13    A.   I'm not sure, but if they just were, you
14  know, improperly dressed where -- I really can't
15  say.
16    Q.   No shoes, no shirt, no service?
17    A.   Exactly.
18    Q.   All right.  What about if he came in
19  unshaven?
20    A.   I'm not sure that would matter.
21    Q.   How about if he had an orange shirt on
22  instead of a blue shirt?
23    A.   It shouldn't matter.
24    Q.   Requirements on hair length, any problems?
                                                    342

1  your knowledge in writing or based upon anything
2  else to reject Mr. Franke as a driver?
3    A.   I'm sure they hold that right.
4    Q.   And why is it you believe that?
5    A.   Because over the years that kind of stuff
6  happens.
7    Q.   Well, under what circumstances would it
8  happen?
9    A.   If they were unprofessional when they come
10  into their building or things of that nature.
11    Q.   Tell me what that means, quote, unquote
12  unprofessional?
13    A.   Language.  Use of, you know, bad language
14  or things of that nature or the way they dressed or
15  the way they treat other people.
16    Q.   So I'm going to give you, like, four
17  hypotheticals, okay.  If Mr. Franke one day walked
18  in to the distribution center at Hammond and he
19  just started a profanity-laced tirade against one
20  of the gals there in the dispatch office -- first
21  of all, did that ever happen involving Mr. Franke?
22    A.   No.
23    Q.   Okay.  Assuming it would have happened, is
24  it your contention that somebody at
                                                    341

1    A.   Not that I ever heard.
2    Q.   Different -- I think we beat this to
3  death.  Let me go on to a different topic.
4        Did Universal Am Can, Overnite Express or
5  International Paper maintain a personnel file on
6  Mr. Franke?
7    A.   Not to my knowledge.
8    Q.   Is it fair to say given your understanding
9  of the transportation trucking industry, that
10  Universal Am Can, Overnite Express, and
11  International Paper had no obligations to keep a
12  driver qualification file on Mr. Franke?  Correct
13  statement?
14        MR. SKRYD:  Objection, form of the
15  question.  You can answer.
16        THE WITNESS:  They would have no
17  obligation.
18  BY MR. FISHER:
19    Q.   Do you know if they did?
20    A.   I do not.
21    Q.   Did Universal Am Can, Overnite Express or
22  International Paper ever have to reprimand
23  Mr. Franke for any citations or bad driving?
24    A.   No.
                                                    343

35 (Pages 340 to 343)

1    Q.  In fact, while in the last several years
2  Mr. Franke had no citations or bad driving,
3  correct?
4    A.  Correct.
5    Q.  Did Universal Am Can, Overnite Express or
6  International Paper even have the obligation to
7  your knowledge to insure that Mr. Franke had a
8  commercial driver's license?
9    MR. SKRYD:  Same objection, form of the
10  question.  You can answer.
11    THE WITNESS:  I believe they -- some
12  places will make you put it on your bill of
13  lading.  I don't know if I saw it on there or not.
14  But I believe they checked him down there.
15  BY MR. FISHER:
16    Q.  Down there meaning?
17    A.  Down at Exel at International Paper.
18    Q.  So when Mr. Franke -- let's make it a
19  hypothetical driver.
20    When John Doe, our hypothetical driver,
21  arrives at the distribution center in Hammond,
22  comes in, could the people there demand to see his
23  CDL?
24    A.  Yes.

344

1    Q.  Do you know if they ever did that?
2    A.  I believe they did.
3    Q.  For Mr. Franke or for others?
4    A.  Everybody.
5    Q.  And was that for purposes of just
6  identifying that he is who he claims to be or for
7  what purpose?
8    A.  And security of the load.
9    Q.  Did Universal Am Can, Overnite Express or
10  International Paper ever promulgate, publish or
11  distribute any rules regarding Mr. Franke's
12  personal use of his tractor?
13    A.  Not to my knowledge.
14    Q.  Do you know if Universal Am Can, Overnite
15  Express or International Paper ever received any or
16  took any complaints about Mr. Franke?
17    A.  No.
18    Q.  When you say "no," do you mean that there
19  simply were no complaints to your knowledge?
20    A.  There were no complaints to my knowledge.
21    Q.  Did Universal Am Can, Overnite Express or
22  International Paper keep track of Mr. Franke's
23  driving time?
24    A.  No.

345

1    Q.  And I presume that they did not maintain
2  Mr. Franke's logs, correct?
3    A.  Correct.
4    Q.  Did Universal Am Can or Overnite Express
5  or International Paper to your knowledge have the
6  right to discipline Mr. Franke?
7    A.  Not to my knowledge.
8    Q.  Did they have -- the same three companies
9  I've been mentioning -- did they have the right to
10  require Mr. Franke to take a medical exam, a
11  physical?
12    A.  No.
13    Q.  Did Universal Am Can, Overnite Express or
14  International Paper ever provide Mr. Franke with a
15  debit card or any other card that could be used at
16  truck stops to -- you know, as currency or, you
17  know, payment?
18    A.  Not to my knowledge.
19    Q.  Did Universal Am Can, Overnite Express or
20  International Paper own the tractor or trailer that
21  was being used for the work?
22    A.  No.
23    Q.  Did they require Franke to place placards,
24  graphics, stickers or logos of the names of

346

1  Universal Am Can, Overnite Express or International
2  Paper on the tractor or trailer?
3    A.  No.
4    Q.  Is it fair to say that Universal Am Can,
5  Overnite Express and International Paper were not
6  responsible for the maintenance of the tractor and
7  trailer?
8    MR. SKRYD:  Objection, form.  You can
9  answer.
10    THE WITNESS:  Correct.
11  BY MR. FISHER:
12    Q.  And, likewise, they did not pay for the
13  expenses of operation such as gas, oil, things like
14  that?
15    A.  Correct.
16    Q.  And is it also fair that Universal Am Can,
17  Overnite Express, International Paper did not
18  obtain any licenses or permits for the tractor and
19  trailer?
20    A.  Correct.
21    Q.  And is it also -- let me start again.
22    Was there any global positioning
23  technology in the tractor at the time of the
24  accident?

347

36 (Pages 344 to 347)

1    A. No.
2    Q. Was there an electronic control module or
3 black box in the tractor?
4    A. Yes.
5    Q. Did Universal Am Can, Overnite Express or
6 International Paper provide any such equipment as
7 I've just mentioned in the last two questions?
8    A. No.
9    Q. Did Universal Am Can, Overnite Express or
10 International Paper pay or reimburse Franke for
11 doing the work for any of the following: His
12 driver's salary or wages?
13    A. Not to my knowledge.
14    Q. Liability insurance coverage for him?
15    A. Not to my knowledge.
16    Q. Workers compensation insurance coverage
17 for him?
18    A. Not to my knowledge.
19    Q. Cost of any repairs or cost of any
20 maintenance?
21    A. Not to my knowledge.
22    Q. Supplies, travel expenses or any equipment
23 lease costs?
24    A. Not to my knowledge.

348

1    A. Not to my knowledge.
2    Q. Workers compensation insurance coverage?
3    A. Not to my knowledge.
4    Q. A pension plan?
5    A. Not to my knowledge.
6    Q. Retirement accounts?
7    A. Not to my knowledge.
8    Q. Profit sharing?
9    A. Not to my knowledge.
10    Q. Vacation pay?
11    A. Not to my knowledge.
12    Q. Or sick pay?
13    A. Not to my knowledge.
14    MR. FISHER: Can we go off the record for
15 a second.
16    THE VIDEOGRAPHER: Off the record. The
17 time now is 2:59 p.m.
18    (Discussion off the record.)
19    THE VIDEOGRAPHER: We are back on the
20 video record. The time now is 3:21 p.m.
21 BY MR. FISHER:
22    Q. Okay. Mr. Martin, we've taken a break and
23 before we took the break there was a -- I think you
24 heard -- well, there was a discussion about

350

1    Q. Did Universal Am Can, Overnite Express or
2 International Paper ever pay Franke directly?
3    A. I don't know.
4    Q. Who would know the answer to that?
5    A. Frank -- Sam.
6    Q. In the documents that have been marked as
7 Exhibit 71, the big collection of the personnel and
8 driver qualification files, there's copies of pay
9 stubs, right?
10    A. Yes.
11    Q. Were those pay stubs pay stubs reflecting
12 payment from a Martin's Bulk Milk checking account?
13    A. Yes.
14    Q. Not a checking account from Universal Am
15 Can, Overnite Express or International Paper,
16 correct?
17    A. Correct.
18    Q. Did Martin's Bulk Milk lease its
19 tractor-trailer unit to Universal Am Can, Overnite
20 Express or International Paper?
21    A. No.
22    Q. Did Universal Am Can, Overnite Express or
23 International Paper pay for any of the following
24 employee benefits of Mr. Franke: Health insurance?

349

1 expediting things for asking you questions about
2 documents and words that appear in documents, okay?
3    A. Yes.
4    Q. Now, do you remember when I showed you
5 before Exhibits in the 50s that were the requests
6 for production that my client tendered to Martin's
7 Bulk Milk asking very, very specific questions
8 about whether or not the words "principal"
9 and "agent" appeared in any documents?
10    A. Yes.
11    Q. Do you remember those requests?
12    A. Yes.
13    Q. Okay. So here's my question to you
14 because I think we can shortcut this and I'll
15 follow-up a different way.
16    Is it a fair statement to say based upon
17 your knowledge of the documents that your company
18 has produced in this litigation that the only
19 document you are aware of that has any relationship
20 to either Universal Am Can, Overnite Express, or
21 International Paper together with your company
22 Martin's Bulk Milk in which the word "agent" is
23 used, the memo bills where at the bottom of the
24 memo bills the words as follow appear: Shipper per

351

37 (Pages 348 to 351)

1 and agent per?
2    Are those the only documents you're aware
3 of that have been collected by your company,
4 produced in discovery that have any of the four
5 companies mentioned listed on them or referenced in
6 which the word "agent" or "principal" appears?
7    A.  Yes.
8    Q.  A part from the contract documents which
9 we talked about before?
10    A.  Yes.
11    Q.  Okay.  So is it a fair statement then to
12 say, as best you know of, that there are no
13 documents that Martin's Bulk Milk has in which
14 representations are made specifically to Universal
15 Am Can, Overnite Express or International Paper
16 being a principal in relationship to Martin's Bulk
17 Milk?
18    MR. SKRYD:  Objection to the form of the
19 question.  You can answer.
20 BY MR. FISHER:
21    Q.  Is that a fair statement?
22    A.  Yes.
23    Q.  Okay.  And the only document that has the
24 word "agent" in it to your knowledge of the

                                                    352

1 documents that have been produced is the memo bill
2 or the bill of lading that has the word "agent" in
3 the bottom row?
4    A.  Yes.
5    Q.  Okay.
6    MR. FISHER:  And, counsel, as I said, I'll
7 probably follow-up with a request for admissions to
8 get all the answers to my production requests in
9 the form of a request for admissions.
10 BY MR. FISHER:
11    Q.  Okay.  With that having been said, let me
12 just look at -- could you look at exhibit
13 seventy -- it's the June 2008 agreement.  It will
14 be like 75, 76, 77, at the very end.
15    MR. BURKE:  75.
16    MR. SKRYD:  We got it.
17 BY MR. FISHER:
18    Q.  All right.  I want to just end my
19 questions of you, Mr. Martin, by referencing, once
20 again, to the June 12th, '08 Master Brokerage
21 Agreement.  This is an agreement, you understand,
22 to have been entered into and in full force and
23 effect between Universal Am Can and Martin's Bulk
24 Milk in June of 2008?

                                                    353

1    A.  Yes.
2    Q.  Okay.  And I already referenced your
3 attention to Subparagraph 6, the one that talks
4 about independent contractor and MBMS not being
5 considered an agent, employee or joint venturer of
6 UACL?  Do you remember I was talking about that
7 one?
8    A.  Yes.
9    Q.  This also contains Subparagraph 7
10 concerning liability for all loss, damage and
11 liability and that responsibility is placed upon
12 Martin's Bulk Milk?
13    A.  I see it.
14    Q.  And that was a provision that applied
15 between UACL and Martin's Bulk Milk as of July 3rd,
16 2008?
17    A.  Yes.
18    Q.  And with respect to Subparagraph 8 there's
19 a section there that talks about the carrier,
20 meaning Martin's Bulk Milk, procuring and
21 maintaining insurance coverage?
22    A.  Yes.
23    Q.  And did Martin's Bulk Milk procure
24 liability and property damage insurance for an

                                                    354

1 amount not less than a million dollars?
2    A.  Yes.
3    Q.  And through what carrier was that
4 obtained, if you know?
5    A.  I don't know what it was at that time.
6    Q.  All right.  And then, finally, Paragraph
7 12, that's the paragraph that talks about defending
8 and indemnifying.  If you could just please read
9 that paragraph out loud.
10    A.  Carrier shall defend, indemnify and hold
11 UACL harmless from and against all loss, liability,
12 damage, claim, fine, cost or expense, including
13 reasonable attorney's fees, arising out of or in
14 any way related to performance or breach of this
15 Agreement by Carrier, its employees or independent
16 contractors working for the carrier, collectively
17 the claims, including, but not limited to, claims
18 for or related to personal injury, including death,
19 personal damage and carrier's possession, use,
20 maintenance, custody or operation of the equipment;
21 provided by, however, that carrier's
22 indemnification and hold harmless obligations under
23 this paragraph will not apply to any portion of
24 such claim attributable to the tortious conduct of

                                                    355

1    UACL.
2        Q.   And you believe that this particular
3    provision of the contract was in application on
4    July 3rd, 2008?
5        A.   I don't know what contract was under.
6    There's names on both.  There's Universal Am Can's
7    name on the bill of lading and there's also
8    Overnite Express.
9        It's very complicated to know how they
10   were doing business at that time and I have no idea
11   what was going on.
12       Q.   My question is a little different.  My
13   question is, just as I asked you about Paragraph 3
14   and paragraph -- the other paragraph numbers,
15   Paragraph 3 meaning about agency or independent
16   contractor and I asked you about the paragraph
17   having to do with insurance coverage, my question
18   now is about Paragraph 12, the indemnity
19   provision.  As best you know this contract with all
20   of those paragraphs was in full force and effect as
21   of July 3rd, 2008; is that a fair statement?
22       A.   I can't answer that because it's not
23   signed by somebody from Universal Am Can.
24       Q.   So tell me --

356

1        Q.   If these contracts provided provisions for
2    your payment -- Strike that.
3        If you weren't under contract with
4    Universal Am Can, how did you get paid?
5        A.   That's a good question.  I -- that copy
6    came from you, correct?
7        Q.   Yes.
8        A.   It's not signed so -- it never came back
9    to our company.
10       Q.   Do you know why you were paid if there was
11   no agreement between the two companies?
12       A.   I do not know why they would pay us
13   without having a signed contract.
14       Q.   All right.  So to summarize this, is the
15   reason why you can't tell me whether or not a
16   particular provision of a contract was in effect
17   because you don't know whether or not the absence
18   of a signature on a contract means that that
19   contract was in effect?
20       A.   Correct, and there's also bills of lading
21   that have both names on, even to the last -- the
22   load that we did the last day, they have Overnite
23   Express on the bill of lading.
24       Q.   If Overnite Express didn't exist after

358

1        A.   I'm not so sure they even got a copy of
2    this.
3        Q.   So I guess I'm trying to find out -- well,
4    then, let me ask this.  Was Exhibit 15 in full
5    force and effect as of July 3rd, 2008?  Here's
6    another copy of it.
7        MR. SKRYD:  I got it.
8    BY MR. FISHER:
9        Q.   This is an agreement dated November 7th,
10   2007.
11       A.   This one's not signed either.
12       Q.   Okay.  But I thought you told me before
13   that this contract was in effect as were the other
14   three.
15       A.   Well, there's several contracts that are
16   in effect.  I don't have any cancellations to any
17   of these, of the ones from -- I don't have
18   cancellations or anything from Overnite Express and
19   the two from Universal Am Can were not signed.
20       Q.   So is your point just simply that because
21   you don't have fully executed, two signature
22   contracts you don't know what contracts were in
23   effect?
24       A.   Correct.

357

1    June 13th, 2008, of what moment is it, of what
2    issue is it if there's documentation from Overnite
3    Express or Overnite Logistics after June 13th,
4    2008?
5        A.   I can't answer that.  I don't know.
6        Q.   So is it your contention on behalf of
7    Martin's Bulk Milk Service that there was or was
8    not a signed contract in existence between Martin's
9    Bulk Milk and Universal Am Can as of July 3rd,
10   2008?
11       A.   There's no signed contract as of that
12   date.
13       Q.   And that's your position?
14       A.   Yes.
15       Q.   Okay.  And with respect to the contracts
16   before, are they still in existence, the ones that
17   had two signatures on them?
18       A.   I don't know when they expire.  I don't
19   know.
20       Q.   Look at Exhibit 15.  Do you have that in
21   front of you?
22       A.   Yes.
23       Q.   Do you see the first numbered paragraph
24   dealing with the term of the agreement?

359

39 (Pages 356 to 359)

1    A.  Yes.
2    Q.  Would you agree with me that that
3  provision says that the term automatically renews
4  year after year?
5    A.  It says the term of the agreement shall be
6  for a period of one year and automatically renew
7  after one year.
8    Q.  Until canceled upon 30 days written
9  notice --
10    A.  Yes.
11    Q.  -- of one party to the other, correct?
12    A.  Yes.
13    Q.  As of July 3, 2008 did Martin's Bulk Milk
14  ever issue a cancellation notice to Universal Am
15  Can?
16    A.  Not to my knowledge.
17    Q.  As of the beginning of June 2008 had
18  Martin's Bulk Milk issued a cancellation notice to
19  Universal Am Can?
20    A.  Not to my knowledge.
21    Q.  Would you be the person who would know the
22  answers to those two questions?
23    A.  Yes.
24    MR. FISHER:  That's all the questions I've

360

1    Q.  What -- back in 1999 what was the hiring
2  process for drivers in general and Mr. Franke in
3  particular?
4    A.  We do a background check.  We run the
5  MVRs.  We check with his previous employers, check
6  the dates to see how long he had worked for the
7  previous employers.
8    Q.  And the MVRs is to check his driving
9  record?
10    A.  Yes.
11    Q.  For moving violations and for accidents?
12    A.  Yes.
13    Q.  And the background check is his criminal
14  history and things of that nature?
15    A.  Yes.
16    Q.  And when you did that for Mr. Franke, what
17  did those reveal?
18    A.  Sam's records were clean.
19    Q.  Okay.  And did you have a driver interview
20  before he was hired?
21    A.  Say it again.
22    Q.  Did you interview him before he was hired?
23    A.  Yes.
24    Q.  Who did that?

362

1  got at this time.  Thank you.
2            CROSS-EXAMINATION
3  BY MR. COUTURE:
4    Q.  Hello, Mr. Martin.
5    A.  Hello.
6    Q.  My name is Tim Couture; I represent BMW
7  AG, the manufacturer of the motor vehicle in which
8  Mr. Scheinman was sitting at the time of the
9  accident, and BMW NA, the distributor of that
10  vehicle for North America.
11      I don't have nearly as many questions for
12  you as Mr. Fisher does, but because I was not at
13  and my client was not involved in the lawsuit when
14  your deposition was first taken, there may be a
15  couple of things that I ask that are duplicative
16  and I apologize for that.
17      How long did Samuel Franke -- well, strike
18  that.
19      When was Samuel Franke hired by Martin's
20  Bulk Milk?
21    A.  I believe the term he was there was 1999
22  to 2008.
23    Q.  Were you involved in his hiring?
24    A.  Yes.

361

1    A.  I did.
2    Q.  And did you have an understanding for how
3  long Mr. Franke at that time had worked as a CDL
4  qualified driver?
5    A.  Looking back on his -- at his MVR we
6  should be able to tell how long he had his license.
7    Q.  Feel free to look at what I believe is
8  Exhibit 71 for identification.
9    A.  I'm looking for his MVR, which I have a
10  current one here but it only goes back to --
11    Q.  Let me ask you -- I don't need exact
12  numbers.  So why don't I ask you a different
13  question.
14      Can you give me a ballpark figure as to
15  how long you understand Mr. Franke had been driving
16  as a truck driver before he was hired by your
17  company?
18    A.  On his application he had -- it looks like
19  he had been driving -- the first driving job he had
20  was 11-98.
21    Q.  So that would have been right before you
22  hired -- within a year of you hiring him?
23    A.  No.  Then he's got -- well, he's got
24  another job that was at a Dairy.

363

40 (Pages 360 to 363)