```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   MURRAY SCHEINMAN, Plenary      )
     Guardian of the Estate and     )
 4   PERSON OF JEFFREY J. SCHEINMAN,)
     a Disabled Person,             )
 5                                  )
             Plaintiff,             )
 6                                  )
        vs.                         ) No. 09 CV 5340
 7                                  )
     MARTIN'S BULK MILK SERVICE,    )
 8   INC.; SAMUEL G. FRANKE; CSX    )
     INTERMODAL, INC.; INTERNATIONAL)
 9   PAPER COMPANY; and OVERNITE    )
     EXPRESS, INC.,                 )
10                                  )
             Defendants.            )
11           The deposition of SAMUEL G. FRANKE, called

12   by the Plaintiff for examination pursuant to notice

13   and pursuant to the Rules of Civil Procedure for

14   the United States District Courts pertaining to the

15   taking of depositions, taken before Steven

16   Stefanik, a notary public within and for the County

17   of DuPage and State of Illinois, at Suite 200, 211

18   South Wheaton Avenue, Wheaton, Illinois on the 12th

19   day of January 2010.

20       APPEARANCES:

21          CLIFFORD LAW OFFICES, by
            MR. RICHARD F. BURKE, JR.
22          120 North LaSalle Street, Suite 3100
            Chicago, Illinois 60602
23          (312) 899-9090
                 for the Plaintiff;
24
```

EXHIBIT D

Page 2

```
 1   APPEARANCES: (CONT'D)
 2      MULHERIN, REHFELDT & VARCHETTO, P.C., by
         MR. JOSEPH G. SKRYD
 3       211 South Wheaton Avenue, Suite 200
         Wheaton, Illinois 60187
 4       (630) 653-9300
              -and-
 5      DOWD & DOWD, LTD., by
         MR. ROBERT J. GOLDEN
 6       617 West Fulton Street
         Chicago, Illinois 60661
 7       (312) 704-4400
             for the Defendant Martin's Bulk Milk
 8           Service;
 9      LEWIS, BRISBOIS, BISGAARD & SMITH, LLP, by
         MR. SCOTT C. BENTIVENGA
10       550 West Adams Street, Suite 300
         Chicago, Illinois 60661
11       (312) 345-1718
             for the Defendant CSX Intermodal;
12
        HINSHAW & CULBERTSON, LLP, by
13       MR. CARLTON D. FISHER
         222 North LaSalle Street, Suite 300
14       Chicago, Illinois 60601-1081
         (312) 704-3000
15           for the Defendant International Paper
             Company.
```

Page 3

```
 1              I N D E X
        WITNESS:                    PAGE
 2
        SAMUEL G. FRANKE
 3
          Examination by:
 4
            Mr. Burke              4
 5          Mr. Fisher             23
            Mr. Bentivenga         47
 6
 7
          Further Examination by:
 8
            Mr. Burke              58
 9          Mr. Fisher             60
10
11        Further Examination by:
            Mr. Burke              61
12
13
14             E X H I B I T S
        NUMBER          FOR IDENTIFICATION
15
        Franke No. 26           24
16
        Franke No. 27           59
```

Page 4

 1            (Witness sworn.)
 2            SAMUEL G. FRANKE,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5            EXAMINATION
 6            BY
 7            MR. BURKE:
 8       Q.   Mr. Franke, my name again is Richard Burke.
 9   I represent Jeffrey Scheinman, and I'm going to ask
10   you some questions on just a limited scope.  And as
11   I do so, if you want any questions repeated, you
12   don't hear them, they don't make sense, just say
13   so.
14            If you need to look at any documents, go
15   ahead and tell me.  If you don't talk at the same
16   time as I'm talking, that helps the court reporter,
17   because he can only take down one of us.  And if
18   you could verbalize your "yes" and "no" answers, if
19   that happens to be your answer, even though we can
20   see you nodding your head --
21       A.   Yes.
22       Q.   -- you have to give a "yes" or "no," okay?
23            Would you please state your name --
24       A.   Samuel --

Page 5

 1       Q.   -- and spell your last name.
 2       A.   Samuel G. Franke.  Last name is spelled
 3   F-r-a-n-k-e.
 4       Q.   And by whom are you currently employed?
 5       A.   Walsh Cargo.
 6       Q.   And is it Walsh or Welsh?
 7       A.   Walsh.
 8       Q.   And how do you spell that?
 9       A.   It's W-a-l-s-h.
10       Q.   And where are they located?
11       A.   Lyndon Station, Wisconsin.
12       MR. SKRYD:  London Station?
13       THE WITNESS:  Lyndon.
14   BY MR. BURKE:
15       Q.   And how do you spell Lyndon?
16       A.   L-y-n-d-o-n, and Station.
17       Q.   And what -- how long have you worked for
18   Walsh Cargo?
19       A.   Just about a year.
20       Q.   And what type of work do you do for them?
21       A.   I drive a truck.
22       Q.   What type of trucks?
23       A.   Semi-tractor trailer.
24       Q.   When did you last work for Martin's?

Page 6

1   A.  It was July -- I think it was July 2nd, I
2   think.  It was the night of the accident.
3   Q.  The day of the accident?
4   A.  Hm-hmm.
5   Q.  I believe that's July 3rd, 2008.
6       At the time of -- and if I refer to "the
7   incident" or "the collision" or "the accident" or
8   "the event in question," you -- can we agree you
9   understand I'm referring to the collision between
10  your truck and Mr. Scheinman's vehicle?
11  A.  Yes.
12  Q.  On that -- on the day of that incident, by
13  whom were you employed?
14  A.  Martin Bulk Milk.
15  Q.  And for how long had you been employed by
16  Martin's Bulk Milk?
17  A.  It was two weeks shy of being ten years.
18  Q.  And are you familiar with a company called
19  MBM Logistics?
20  A.  Yes.
21  Q.  Okay.  And what's your understanding of
22  their business?
23  A.  They're a brokerage firm.  My
24  understanding, they get loads -- they're the ones

Page 7

1   that I dealt with with the rail trailers.
2   Q.  And when you say "the rail trailers," what
3   do you mean by that?
4   A.  When they -- they -- they -- with the loads
5   go -- like their Ashley account, they had that --
6   and that's about the only -- and then they
7   would help -- if you needed -- they -- for getting,
8   like, the rail trailers out of the yard, they
9   needed help getting the number.
10      I mean, they have -- it was part of --
11  took care of that business some from our -- and...
12  You know, they took care of the part with the rail
13  yards and stuff like that.
14  Q.  And what's a -- what's a rail trailer to
15  you?
16  A.  Oh, it's just -- it's a container.  Then --
17  they had containers where they -- where they -- on
18  a chassis, then they had actual -- just actual
19  trailers as belong -- belonging to the rail yards.
20  Q.  And when you say "they," are you referring
21  to MBM Logistics?
22  A.  Oh, the trailers?  They're on -- their
23  trailers are -- I mean, a rail trailer is belonging
24  to the rail yards or -- they go to the rail yards.

Page 8

1   That's my understanding what I meant by that.
2   MR. SKRYD:  If you know something, tell us.  If
3   you don't, don't guess.  We're going to be here
4   until 3:00 o'clock in the morning.
5   THE WITNESS:  All right.
6   MR. SKRYD:  Just tell us what you know, okay?
7   THE WITNESS:  All right.
8   BY MR. BURKE:
9   Q.  And what I was trying to get at is, when
10  you said something to the effect of MBM dealt with
11  the rail trailers, I'm trying to understand --
12  A.  Oh.
13  Q.  -- what it is MBM did --
14  A.  Okay.
15  Q.  -- with regard to rail trailers.
16  A.  They would -- they handled that account, as
17  far as I know.
18  Q.  And handled it in what manner?  Did they
19  haul rail trailers or --
20  A.  No, they do -- this is a brokerage firm.
21  They was -- was Martin's.  That's -- it's --
22  it's -- I mean -- I mean, they -- I mean --
23  MR. SKRYD:  Listen.  Do you know what they do,
24  fine.  If you don't, don't guess.

Page 9

1   THE WITNESS:  All right.  I don't know.
2   MR. SKRYD:  You don't know.
3   BY MR. BURKE:
4   Q.  Have you done work for MBM Logistics?
5   A.  I worked for Martin's.  And as far as -- as
6   far as --
7   MR. SKRYD:  That's all you know, right?
8   THE WITNESS:  That's all I know.
9   MR. SKRYD:  Okay.  That's all you have to
10  answer.
11  BY MR. BURKE:
12  Q.  Have you done work for -- have you done
13  work on behalf of MBM Logistics, is my question.
14  MR. SKRYD:  Objection.  Asked and answered.
15      Anything different than what you just
16  said?
17  MR. BURKE:  No, he hasn't answered that
18  question.
19  MR. SKRYD:  I think he did, Rich, but go ahead.
20      Do you understand his question?
21  THE WITNESS:  Did I -- did I -- your question
22  was, did I work for MBM?
23  BY MR. BURKE:
24  Q.  No.  Have you done work -- regardless of

Page 10

1 who you think your employer was, even if you think
2 you were employed by -- well, here. Let me ask you
3 that first.
4     Who did you believe you were employed by
5 in July of 2008?
6 A. Martin Bulk Milk.
7 Q. Okay. At any time in the past, have you
8 been employed by MBM Logistics?
9 A. No.
10 Q. Regardless of who you've been employed by,
11 what -- and even while you were employed by
12 Martin's Bulk Milk Service, would you ever get
13 assigned to do work for MBM Logistics?
14 A. It's always assigned through Martin's.
15 Q. And what type of work would you be assigned
16 to do?
17 A. Hauling freight.
18 Q. And would you then be hauling freight for
19 MBM Logistics?
20 A. I don't know. I mean, I don't know.
21 Q. But what you're -- what you're telling us
22 is that there were times in the past that you would
23 get assigned by Martin's to haul some freight for
24 or at the request of MBM Logistics?

Page 11

1 A. Yes.
2 Q. When you would do that, by whom would you
3 get paid?
4 A. Martin Bulk Milk.
5 Q. Was the -- was MBM Logistics involved in
6 the transportation of the paper products you were
7 hauling at the time of this incident on July 3rd?
8 A. I don't know.
9 Q. Did -- on July 3rd of 2008, who did you
10 consider to be your supervisor or boss?
11 A. David Martin and the Martins, the Martin
12 Bulk Milk.
13 Q. Did you get assigned to do a pick-up of
14 International Paper products on July 3rd, 2008?
15 A. Yes.
16 Q. And is that an assignment you had received
17 on other occasions prior to that day?
18 A. Yes.
19 Q. At the time of this incident, you were
20 driving a tract- -- on a tractor and hauling a
21 chassis with a container on it, correct?
22 A. Yes.
23 Q. Okay. Do you know who owned the tractor
24 you were driving?

Page 12

1 A. Martin Bulk Milk.
2 Q. What -- how frequently did you work for
3 Martin's?
4     Did you have a regular work schedule?
5 A. Yes.
6 Q. Okay. And what was that schedule?
7 A. Like Monday -- I mean, it is, like, Monday
8 through Friday or Monday through -- you know,
9 Monday through Friday. I mean, all week, like
10 full-time.
11 Q. And at the time -- or strike that.
12     Would -- did you drive the same tractor
13 each day?
14 A. Yes, for the most -- yes.
15 Q. At the time of the incident, you were
16 hauling a chassis, correct?
17 A. Yes.
18 Q. And do you know who owned that chassis?
19 A. No.
20 Q. That -- did that chassis have a container
21 on it?
22 A. Yes.
23 Q. And inside of the container was what type
24 of goods or product?

Page 13

1 A. Paper.
2 Q. The -- do you know -- or strike that.
3     Where did you get the chassis that you
4 were hauling at the time of the collision with
5 Mr. Scheinman's vehicle?
6 A. Chicago. 47th, I think -- 47th Street.
7 Q. And was that at a CSX facility?
8 A. Yes.
9 Q. And what did you -- or strike that.
10     Did you drop another trailer or chassis
11 at CSX prior to getting the one you were --
12 A. Yes.
13 Q. -- hauling?
14 A. Yes.
15 Q. And was it a trailer that you dropped or a
16 chassis and a container?
17 A. Chassis and a container.
18 Q. Was it a CSX trailer -- or a CSX container?
19 A. I don't know.
20 Q. Did you -- did you drop that at the CSX
21 yard or somewhere else?
22 A. Yes, at the CSX yard.
23 Q. Okay. And what was going to happen to that
24 trailer that you dropped?

Page 14

1  Was someone else going to either unload
2  it or was someone transferring it elsewhere?
3  A. As far as -- somebody else was going to
4  transport it elsewhere, yes.
5  Q. The trailer that you left the CSX yard
6  with -- or I'm sorry, the chassis that you left
7  with, how did you go about deciding or determining
8  what chassis to hook up to your tractor?
9  A. They -- they give you a pick-up number and
10 you go through the yard and you -- if they got a
11 red tag on, you can't take them out. If they got a
12 green tag on, they're good to take out and you --
13 that's how you -- you determine which ones you can
14 take and which ones you can't take.
15     They got a number of them you can choose
16 from, and you just -- if it's got a green tag on,
17 that means that it's been inspected by the yard or
18 whatever.
19 Q. By CSX?
20 A. I don't know, but it's been inspected.
21 It -- it means it's been inspected. I don't know
22 if CSX does it -- or -- or, you know, it's at the
23 yard. They -- they inspect them and they -- if
24 it's not good to leave the yard, they'll tell you

Page 15

1  to put it back and get a different one.
2  Q. Did you hook up to a chassis that already
3  had a trailer on it or already had a container on
4  it?
5  A. Yes.
6  Q. Where did you go once you hooked up that
7  chassis and container?
8  A. Where did I -- you mean -- you go to the
9  out gate and check it out and then I went to
10 Hammond.
11 Q. Were you approved -- did it -- did anyone
12 at CSX object to you leaving with the particular
13 chassis and container you left with?
14 A. No. If they did object, you wouldn't leave
15 with it.
16 Q. You then went to Hammond, you told us,
17 correct?
18 A. Right.
19 Q. Okay. And was that to the International
20 Paper's distribution center?
21 A. Yes.
22 Q. And what did you -- when you got there,
23 did -- tell us what you did in terms of your truck
24 being loaded with paper products.

Page 16

1  A. You got there, you went in and checked in.
2  And then you would -- they would assign you a door
3  to back into. You would back into the door. And
4  you'd wait until -- when you back into the door, a
5  red light would come on. And when the green light
6  comes on, that means you're loaded.
7     You go in and you sign your paperwork,
8  and then you come back out, get in your truck,
9  close -- you pull up from the dock, close the
10 doors, and, you know, you do your paperwork. You
11 know, they tell you what you got -- you know, what
12 you picked up and all that and then go on -- then
13 leave.
14 Q. And in what type of facility did you go to
15 to get this paperwork? Is it a warehouse or how
16 would you describe it?
17     Warehouse?
18 A. It was a big warehouse.
19 Q. And do you know who operates that
20 warehouse?
21 A. No. I mean, the person that operates it or
22 the name of the person?
23 Q. Yeah. Does it have any name -- or if you
24 know.

Page 17

1  A. No. It's just a paper -- it's where you go
2  to get the paper from, you know.
3  Q. And who -- who loaded the container that
4  you backed up to the dock bay?
5  A. I don't know the guy's name. I mean, it
6  was -- it's some of the employees there. I mean,
7  it was -- that worked in there -- worked in the
8  warehouse, one of the warehouse workers.
9  Q. You did not personally do the loading?
10 A. No.
11 Q. Once you departed from the -- this
12 International Paper warehouse in Hammond, where did
13 you go then, Mr. Franke?
14 A. I went -- started to go back to Wilton;
15 Wilton, Wisconsin.
16     Do you want exact roads, or no?
17 Q. No. You answered it. I think that was
18 generally what I wanted to understand.
19     And we saw earlier a document that was
20 referred to as a broker confirmation that is
21 amongst --
22 MR. FISHER: No. 11.
23 BY MR. BURKE:
24 Q. -- some of these exhibits that we have

Page 18

1  here. Thank you.
2       Let me tender that to you, Exhibit 11,
3  entitled the Broker Confirmation Sheet. Are you
4  familiar with this type of document?
5    A. No.
6    Q. Okay. Is this something that you ever see
7  or are given?
8    A. No.
9    Q. Okay. Is this something that is dealt with
10 or by either Mr. Martin or others at the Martin
11 office?
12   A. Yes. I don't know...
13   Q. Okay. How did you know where to take this
14 paper to?
15   A. Somebody with the dispatchers from Martin's
16 would tell you where to -- you know, they would
17 give you the pick-up number to -- and so it was
18 people from Martin's told me where to go.
19   Q. Did you accurately fill out your logs,
20 which are on Exhibit No. 12 here, for the day of
21 July 3rd?
22   A. Yes.
23   Q. Can you -- Mr. Franke, can you tell us what
24 time you arrived at the CSX yard to pick up the

Page 19

1  trail- -- the chassis that you hooked up with?
2    MR. SKRYD: When he arrived at the CSX yard?
3    MR. BURKE: Right.
4    MR. SKRYD: Okay.
5    THE WITNESS: When I got there, it was 6:30.
6  BY MR. BURKE:
7    Q. Okay. And that's 6:30 p.m. on July 3rd,
8  2008?
9    A. Yes.
10   Q. Okay. And can you tell when you departed
11 the CSX yard?
12   A. 7:00 o'clock.
13   Q. Okay. And can you tell us when you arrived
14 at the International Paper warehouse in Hammond?
15   A. 7:30.
16   Q. Okay. And when did you depart that
17 warehouse facility?
18   A. 9:30.
19   Q. Okay. And that's 7:30 and 9:30 p.m.?
20   A. Oh, no. No. 9:45.
21   Q. 9:45 p.m.?
22   A. Yes.
23   Q. Okay. Still on July 3rd?
24   A. Hm-hmm.

Page 20

1    Q. Okay. How about these bills of lading in
2  Exhibit 6, are you familiar with these, Mr. Franke,
3  entitled Memo Bill?
4    A. Yes.
5    Q. Okay. And do they bear your signature on
6  the right-hand side on each of the three pages?
7  You can take a look at them.
8    A. Yes.
9    Q. Okay. What -- what does placement of your
10 signature on these pages mean on this document?
11   A. That means that I was the driver that
12 picked the load up and I'm -- or I was responsible
13 for the load until I get to Wilton or... So that's
14 just saying that I was the driver that picked it
15 up.
16   Q. Okay. And this is -- this describes the
17 load that you picked up at International Paper
18 warehouse in Hammond and was ultimately going to
19 Midland in Minneapolis, and XPEDX?
20   A. That's --
21   Q. And where is the last one going? Cenveo in
22 Minneapolis, correct?
23   A. Yes.
24   Q. Okay. To you -- are you familiar with the

Page 21

1  term "Oxen" as indicated up there?
2    A. No.
3    Q. Okay. How about are you familiar with
4  Overnite Express or Overnite Logistics?
5    A. I -- only thing I knew about Overnite was
6  that they -- they -- I guess they brokered the load
7  to Martin's.
8    Q. Who at Overnite would you have contact with
9  in the course of this transportation of --
10   A. I don't -- I didn't -- I don't talk to
11 Overnite.
12   Q. How about -- who is -- is there anyone that
13 you would regularly speak to in the course of doing
14 this run of picking up paper at International
15 Paper's warehouse in Hammond and transporting it
16 back to Wilton?
17   A. Just anybody who was at the desk who I --
18 it wasn't the same person all the time.
19   Q. Okay. And when you say "at the desk," do
20 you mean at the desk at the warehouse?
21   A. Right.
22   Q. Do you have any understanding, yourself, as
23 to what entity, whether -- or what company or what
24 business was contacting Martin's asking for these

Page 22

1  paper products to be transported, or was -- or was
2  that something that was dealt with in the Martin's
3  office?
4      A.  It was something that was dealt with in the
5  Martin's office.  They just tell me where to go,
6  what number -- what the pick-up number is, and I
7  just dealt -- Martin's dealt with all that stuff.
8      Q.  Okay.  Have you ever seen any contracts
9  between Overnite Express or Overnite Logistics and
10 Martin's?
11     A.  No.
12     Q.  Were you involved in the business
13 relationship between Overnite and Martin's?
14     A.  No.
15     Q.  With respect to the paper products you were
16 transporting on July 3rd at the time of this
17 occurrence, did you have any understanding as to
18 how much Martin's was being paid?
19     A.  No.
20     Q.  Did you have any understanding as to what
21 companies or businesses were benefiting by that
22 transportation in terms of -- did you have any
23 understanding how International Paper or
24 Universal Am-Can or Overnite or any other companies

Page 23

1  may or may not benefit from the transportation of
2  these products?
3      A.  No.  I was just paid per mile.  I did it --
4  that was the business end of it.  They didn't tell
5  us none of that.  You know, they just told me what
6  I was supposed to do.
7      Q.  If you got some instructions or directions
8  from somebody when you were pulling away from the
9  loading dock in terms of safe transportation or
10 safe hauling, would you try to follow those
11 instructions?
12     A.  Yes.
13     MR. BURKE:  I don't have anything else,
14 Mr. Franke.
15         I will reserve my right to ask you
16 additional questions concerning other aspects of
17 this incident --
18     THE WITNESS:  Okay.
19     MR. BURKE:  -- and the collision itself.
20         EXAMINATION
21         BY
22         MR. FISHER:
23     Q.  Mr. Franke, I'm -- I probably have as many
24 questions as he does.  So we can get you out of

Page 24

1  here, okay?
2      A.  Okay.
3      MR. FISHER:  With your gentlemen's permission,
4  can I just mark the next exhibit as the next number
5  so that we don't have another --
6      MR. SKRYD:  Sure.
7              (Whereupon, Franke Deposition
8              Exhibit No. 26 was
9              marked for identification
10             as of this date.)
11     MR. SKRYD:  Go ahead and take a look at that.
12 BY MR. FISHER:
13     Q.  Mr. Franke, if you would please look at the
14 next-to-last page of Exhibit 26 and tell me if you
15 recognize your signature.
16     A.  Yes.
17     Q.  All right.  And looking at the first page
18 of the document, Exhibit 26, do you remember at
19 some point at the tail end of last year, November
20 to be precise, you were asked to answer some
21 interrogatories?  That's a fancy legal term for
22 written questions.
23         And you then, with your counsel, had
24 these answers prepared and you signed them

Page 25

1  attesting to their completeness and truth?
2      A.  Yes.
3      Q.  Okay?  I want to ask you a couple questions
4  about a couple of the answers.
5          If you would please look at No. 6.  It's
6  on the third page.
7      MR. SKRYD:  Hold on.
8      THE WITNESS:  Okay.
9  BY MR. FISHER:
10     Q.  Do you see the question that asks you --
11 and I'm just going to summarize it -- who was
12 responsible for dispatching you on July 3rd?  And
13 do you see your answer is David Martin?
14     A.  Yes.
15     Q.  Okay.  First of all, is that a truthful
16 answer?
17     A.  Well, Dave Martin is -- he's the head of
18 the dispatch, I mean, and there's other people in
19 there, you know.
20         So yes.  That was to be a truthful
21 answer.
22     Q.  Okay.  But as to this particular trip, the
23 one that brings you here today for your deposition,
24 the one that occurred on July 3rd with the accident

Page 26

1 in Highland Park, was it Mr. Dave Martin, in
2 particular, or was it some other person working
3 under his supervision who dispatched you for this
4 load, if you remember?
5    A. I don't remember. It was -- no, I don't
6 remember if it was actual Dave or -- I don't
7 remember.
8    Q. Okay. If it wasn't Dave, who would it have
9 been?
10   A. Just one of the girls in the office maybe.
11   Q. Are the other dispatchers in July of
12 2008 -- were they women, all women?
13   A. No.
14   Q. So let me ask -- you got a quizzical look
15 on your face. Let me ask it this way:
16      Back in July of 2008, even though you
17 had been doing this run on a regular basis for a
18 number of years --
19   A. Years.
20   Q. -- correct?
21   A. Yes.
22   Q. All right. Would you still receive a call
23 from somebody at Martin's Bulk Milk Service
24 indicating where you were to go and what you were

Page 27

1 going to be picking up?
2   A. Yes.
3   Q. And that would occur regularly toward the
4 tail end of an afternoon?
5   A. Yes.
6   Q. On this particular date, July 3, 2008, is
7 it your testimony that you're not precisely sure
8 who it was, but whoever it was would have been
9 acting under the supervision of Dave Martin?
10   A. Yes.
11   Q. All right.
12   MR. SKRYD: And I think, to be fair, he said it
13 could have been Dave Martin.
14   MR. FISHER: And that was going to be my next
15 question.
16   MR. SKRYD: Right. Okay.
17 BY MR. FISHER:
18   Q. And if it wasn't one of the people working
19 under the supervision of Dave Martin, it would most
20 likely have been Dave Martin, himself?
21   A. Yes.
22   Q. As you sit here today, you don't have a
23 memory of who it was, correct?
24   A. Yes.

Page 28

1   Q. Can you say, however, without a doubt that
2 the only person from whom you received an oral
3 direction that day over the telephone to go pick up
4 the load that you eventually picked up, that person
5 was employed by Martin's Bulk Milk Service?
6   A. Yes.
7   Q. All right. Looking at the page that has
8 Question 11 on it, do you see where that question
9 asks for you to identify the name, address,
10 employer and job title of all persons from whom
11 you, Samuel Franke, received instructions, routing
12 directions or other information concerning all legs
13 of any trips driven by you on July 2nd or 3rd,
14 including your trip to International Paper Company?
15      Do you see that question?
16   A. Yes.
17   Q. And I've fairly read it to you?
18   A. Yes.
19   Q. Is your answer to that question, as you sit
20 here today responding to our questions under oath,
21 that the only persons you received directions from
22 concerning this trip was someone from Martin's Bulk
23 Milk Service?
24   A. Right.

Page 29

1   Q. That's a correct statement?
2   A. Yes.
3   Q. All right. Okay. You can set that aside.
4   MR. FISHER: And, Joe, do you have the exhibits
5 that I marked at the tail end?
6   MR. SKRYD: Yeah.
7   MR. FISHER: Okay. Great. Yeah. Great.
8      If you could direct his attention to
9 No. 17, please.
10   MR. SKRYD: 17.
11   MR. FISHER: It's the -- there you go. We got
12 it.
13 BY MR. FISHER:
14   Q. Yeah. Okay. Mr. Franke, I'll -- as you
15 can see from Exhibit 17, it's two pages. They're
16 identical pages. They were just --
17   A. Okay.
18   Q. -- provided by each of my clients, all
19 right?
20   A. All right.
21   Q. Do you recognize Exhibit 17?
22   A. Yes.
23   Q. Tell us what it is.
24   A. It's a mileage -- it tells you how many

Page 30

1   miles -- I mean, you write down the mileage in
2   every state. And this rates and suppose -- for
3   Martin's, they want you to write down each -- you
4   know, the major roads you drove on and how many
5   miles you drove in that state.
6          It was for -- it's for just -- keep
7   track of how many miles you drove. And it's not --
8   it's not completed -- it's not completely -- but
9   that's what it is.
10  Q.   Okay. So, for example, if we look down
11  toward the bottom of that to July 3, 2008, the last
12  four entries --
13  A.   Yes.
14  Q.   -- all right?
15         You record when you depart Wisconsin on
16  July 3, using Route 82; is that right?
17         Is that the first number there?
18  A.   Yes.
19  Q.   Okay. And your odometer reading when you
20  departed was 264,729?
21  A.   Yes.
22  Q.   And then you got to Illinois and
23  the odometer reading was 2,006 -- excuse me,
24  264,854?

Page 31

1   A.   Yes.
2   Q.   And then you briefly departed the state of
3   Illinois, went into Indiana -- Hammond, I
4   presume -- and that was with a departure odometer
5   reading of 264,865. And you spent 11 miles -- or
6   you traveled 11 miles within the state of Indiana?
7   A.   Right.
8   Q.   All right. And was this document prepared
9   by you?
10  A.   Yes.
11  Q.   And did you stop -- strike that.
12         Was your entry after you departed
13  Indiana -- strike all that.
14         When did you prepare this?
15  MR. SKRYD:  Come on, Carl. We're trying to get
16  through it.
17  MR. FISHER:  I'm sorry. I'm sorry.
18  THE WITNESS:  When did I leave -- I mean, I do
19  it every day.
20  BY MR. FISHER:
21  Q.   Okay. So do you literally, as you cross
22  from Indiana back in Illinois, fill it out or do
23  you wait to a point where you can actually stop and
24  fill it out?

Page 32

1   A.   When I was in Indiana -- I mean, like I
2   said, I do it every day. So I know it's, you know,
3   basically five and a half, five -- you know, it's
4   11 miles. So probably when I was sitting at the --
5   International Paper waiting is probably when I
6   wrote down the entry there.
7   Q.   Okay. Thank you. You can set that aside.
8         Now, if you would look at Exhibits 18,
9   19 and 20. I will represent to you that those are
10  collections of the three bills of lading or memo
11  bills for the July 3rd trip.
12  A.   Right.
13  Q.   It so happens that each collection is
14  multiple copies with notations on them that are
15  recorded at different times, I think, and I want to
16  ask you some questions, okay?
17  A.   Okay.
18  Q.   All right. So look at Exhibit 18.
19  A.   Okay.
20  Q.   On the first three pages of Exhibit 18,
21  does that appear to be the bill of lading that has
22  your signature on it for the commodity which
23  weighed 7,668 pounds?
24  A.   Yes.

Page 33

1   Q.   All right. Now, the next two pages you'll
2   see on Exhibit 18 appears to be for the 7668
3   poundage, but it has your signature appearing a
4   second time and some other notations.
5         Can you tell me when this would have
6   been recorded, this additional information?
7   A.   When -- when did I write this down?
8   After -- after the trail- -- yeah, after the -- the
9   trailer is loaded.
10  Q.   Okay. So are the first three pages where
11  you affixed your signature, that's when you're
12  given the bill of -- the bill of lading at first
13  and you fill it out? And then as you're leaving,
14  that's when you affix your signature a second time
15  as shown on Pages 4 and 5 of Exhibit 18?
16  A.   4 and 5?
17         I would -- I don't think -- this is -- I
18  wouldn't sign -- I just come in there and I -- you
19  asked me did I sign a paper when I first got there?
20  Q.   Let me step back.
21         When you arrived at the warehouse --
22  A.   Right.
23  Q.   -- did you have these memo bills with you?
24  A.   No.

Page 34

1  Q. When did you get them?
2  A. When the load -- when the trailer was
3  loaded.
4  Q. Okay. And you got one for -- as Mr. Burke,
5  I think, showed you, you got one for each load that
6  was going to three different places up in
7  Minnesota?
8  A. Right.
9  Q. Okay. Now, my question is this:
10     When you -- they initially handed you
11 one, was there an occasion when you would sign it
12 like shown in the first three pages of Exhibit 18,
13 and then some time would pass while the trailer was
14 being loaded?
15 A. No.
16 Q. Okay. Then tell us when it would -- when
17 it was that you signed what appears to be the
18 fourth and fifth -- fourth and fifth pages of
19 Exhibit 18.
20    Where would you have been and why would
21 you have signed it a second time?
22 A. Well, it was after the load was loaded.
23 What -- when it was -- you had to fill these out
24 and then they made copies of them and gave them

Page 35

1  back to you.
2  Q. Are these done in multiple, like,
3  triplicate or quadruplicate with carbon paper?
4  A. No, not -- they stopped doing that when
5  they switched over to the new system. We used to
6  have carbon paper, then they switched to this here,
7  so you had to sign each paper separately.
8  Q. Okay. All right. You can set 18 down.
9     You can please look at 19.
10 A. Okay.
11 Q. The last two pages.
12    Do you see where it has the words
13 written in handwriting, "2,000 sheets per box, 12
14 boxes damaged," and then there's the signature of
15 somebody, looks like either David or Daniel
16 Defrance?
17 A. Yes.
18 Q. Do you know anything about the writing of
19 that information?
20 A. No, I don't.
21 Q. And look at Exhibit 20. The last two
22 pages.
23    If, for example, you had continued on
24 with this run, if the accident had not happened --

Page 36

1  A. Yes.
2  Q. -- and you got to XPEDX, the company that
3  was to receive some of the paper, is this the type
4  of information that would have been recorded as
5  shown in the bottom right of the sixth page of
6  Exhibit 20?
7  A. I didn't -- I never did -- I just took the
8  loads to --
9  Q. Okay. My mistake. I screwed up with that
10 question.
11 A. Okay.
12 Q. You would only take it as far as your
13 company's location and then somebody else would
14 take it on?
15 A. Right.
16 Q. Okay.
17 A. And deliver it, right.
18 Q. And you would do that over and over again
19 each day --
20 A. Right.
21 Q. -- a round trip from Wisconsin, down to
22 Chicago, Hammond, and back to Wisconsin?
23 A. And the other guy would do the other the
24 next day.

Page 37

1  Q. Okay. Look at Exhibit 21.
2  A. Okay.
3  Q. And do you recognize your signature on
4  that?
5  A. Yes.
6  Q. And do you see where it says under the
7  heading -- or strike that.
8     Do you see where it says, to the right
9  of the heading Start Loading and End Loading, the
10 times 8:38 and either 9:02 or 9:07?
11 A. Yes.
12 Q. Do you know which it was, 9:02 or 9:07?
13 A. No.
14 Q. All right. And do you see on the loading
15 diagram, bottom left, it has a series of numbers in
16 a long rectangular shape?
17 A. Yes.
18 Q. Do you know what those numbers reflect?
19 A. No.
20 Q. Look up at the side right of the document
21 where the words "middle," "nose" and "tail"
22 appear --
23 A. Yes.
24 Q. -- opposite some numbers. They appear to

Page 38

1  be four, six and four?
2  A. Yes.
3  Q. Do you know what that information means?
4  A. That's -- that's telling you that -- where
5  the different drops is located on the trailer.
6  Q. So that the -- presumably the tail is the
7  one that's going to come off first?
8  A. Right.
9  Q. And, likewise, middle and nose?
10 A. Right.
11 Q. All right. Do you see where it says,
12 Door 36?
13 A. Yes.
14 Q. Was that the door you always went to or did
15 that change?
16 A. It was -- no, it was -- it was whatever
17 door they had open, the door -- whichever door you
18 would back into. Sometimes it would change.
19 Sometimes you'd go to the same one.
20 Q. Okay. And now if you look at Exhibits --
21 I'm done with that exhibit. Thank you.
22    If you look at Exhibits 22 and 23.
23 A. Okay.
24 Q. Do you see Exhibit 22 is entitled an

Page 39

1  invoice with a date of 7/17/08?
2  A. Yeah.
3  Q. Now, that's well after you left the
4  employment of Martin's Bulk Milk, right?
5  A. Yeah.
6  Q. Okay. Did you ever get involved in the
7  invoicing of any of the loads that you were
8  transporting?
9  A. No.
10 Q. You see the name John Moore which appears
11 in the bill to section of that invoice? Upper
12 left.
13 A. Yes.
14 Q. Okay. Do you know anyone named John Moore
15 who works with broker settlements of UACL, or
16 Universal Am-Can, Limited?
17 A. No.
18 Q. Did you ever have any conversations with
19 anyone at Universal Am-Can, Limited, concerning the
20 load that you were hauling on July 3, 2008?
21 A. No.
22 Q. Before July 3, 2008, when you would
23 routinely do these runs, these round-trip runs from
24 Wisconsin down to Chicago and Hammond and back, did

Page 40

1  you ever have any contact, telephonic or in person,
2  with anybody who represented himself or herself to
3  be associated with Universal Am-Can, Limited?
4  A. No.
5  Q. My same -- this is the same question, but
6  I'm now going to change the name of the company.
7     On the day of this incident, July 3,
8  2008, did you ever have any conversations with
9  anybody at Overnite Express concerning the load
10 that you were pulling that day?
11 A. No. I don't -- I didn't -- I never talk to
12 Overnite. Overnite would -- I get them -- all of
13 my information from Martin's.
14 Q. Okay. And so your answer to my question is
15 "no," correct?
16 A. Right.
17 Q. Now, I'm going to take it back.
18    Before July 3, 2008, did you ever have
19 any conversations with anybody who represented
20 himself or herself to be associated with or
21 employed by Overnite Express concerning any of the
22 loads that you were hauling?
23 A. On a regular basis or --
24 Q. Any contact at any time.

Page 41

1  A. There -- there might have been one time
2  that a number wasn't right or something. I don't
3  remember, but --
4  Q. Okay. Do you know how long ago that was
5  before July 3?
6  A. No.
7  Q. Did you discover that the number was wrong
8  or --
9  A. No.
10 Q. -- did someone advise you the number was
11 wrong?
12 A. I don't know why I had their number. It
13 was -- it wasn't -- not wrong. Just trying to get
14 the right number, okay? I think that's what it
15 was.
16 Q. And when you say "the right number," do you
17 mean a number associated with the load --
18 A. Yes.
19 Q. -- some type of serial number or --
20 A. Pick-up number. Call that a pick-up
21 number.
22 Q. Okay. And apart from that one instance in
23 the many years you were doing this run --
24 A. Right.

Page 42

1  Q.  -- routinely day in, day out, did you ever
2  have any contact with anybody at Overnite Express
3  concerning the loads that you were hauling?
4  A.  No.
5  Q.  And same question now about International
6  Paper.
7      On the day of July 3rd, 2008, did you
8  have any contact with anybody at International
9  Paper concerning this particular load other than
10 the individual you may have had contact with at the
11 warehouse, assuming that person is associated with
12 International Paper?
13 A.  You mean, as far as checking in at
14 International?
15 Q.  Any contact for any reason.
16 A.  The only contact I would have with those
17 people was when you walk in and you tell them that
18 you're there, and they tell you which door to back
19 into.  You have to give them their -- your pick-up
20 number.  And it would be the person behind the
21 window.
22     I mean, it's -- I mean, sometimes it'd
23 be the same person and sometimes it'd be somebody
24 different.  And --

Page 43

1  Q.  And they would tell you, like they did in
2  this case, Door 36 --
3  A.  Yes.
4  Q.  -- or whatever the door number was?
5  A.  Right.
6  Q.  And other than that exchange of
7  information, did the person at the warehouse tell
8  you anything else concerning the loads that you
9  were about to pick up?
10 A.  Sometimes they'd tell you if it's -- you
11 know, how many stops may be on it, but not
12 normally.  They would say fill the paper out, you
13 just had to fill out each piece of paper for each
14 stop or whatever, but that's about the only thing
15 they would say.
16 Q.  Once the load was filled on July 3, 2008,
17 did you have copies of each of the bills of lading
18 or memo bills?
19 A.  When -- when I left there?
20 Q.  Yes.
21 A.  Yes.
22 Q.  Okay.  And that was because you would have
23 to take that back to your company, right?
24 A.  Well, they -- those bills, and I would --

Page 44

1  when I dropped the load off at Martin's, I would
2  either hang them on the other guy's clipboard or,
3  if he was there, just hand them paper bills to him.
4  And he'd take those bills up and he would have --
5  whoever he dropped them off, I suppose, would sign
6  the bills.  That's all.
7  Q.  Okay.  Do you know anything about a
8  transition in company name or company ownership
9  between Overnite Express and Universal Am-Can,
10 Limited?
11 A.  No.
12 Q.  Did you ever in June or July of 2008 ever
13 learn that those companies were changing their
14 relationship with each other?
15 A.  No.  No, I don't -- no, I don't think so.
16 I don't think so.
17 Q.  Okay.  When you were hauling the load on
18 July 3, 2008, did you consider yourself to be an
19 employee of Martin's Bulk Milk Service?
20 A.  Yes.
21 Q.  Did you believe that you were hauling this
22 load on July 3, 2008 on behalf of Martin's Bulk
23 Milk Service, your employer?
24 A.  My employer, yeah.  They're in this --

Page 45

1  Q.  Did you ever represent to anyone -- for
2  example, when you arrived at the warehouse, did you
3  ever represent to them, say to them something like,
4  Hi, I'm Sam Franke, I'm here on behalf of
5  Overnite Express, Inc.?
6  A.  I mean, to -- I mean -- I don't know that I
7  was over -- I would not -- I don't think I'd come
8  in and say it like that.  I don't know.
9  Q.  Okay.  Did you ever say, Hi, I'm Sam
10 Franke, I'm here on behalf of International Paper
11 Company?
12 A.  No.
13 Q.  Why wouldn't you do such a thing?
14 A.  Because I was there to pick up.  I was not
15 there on their behalf, you know.
16 Q.  Okay.  Did you ever represent, while doing
17 this load or any other load, to someone at the
18 warehouse, Hi, I'm Sam Franke, I'm here on behalf
19 of Universal Am-Can, Limited?
20 A.  No.
21 Q.  Did you even know that company existed?
22 A.  No.  That's the first I heard of it.
23 Q.  Did you ever have any documents that you
24 received from anyone that said that you were doing

Page 46

1  the work for Overnite Express, Inc.?
2      A.  On the bills of ladings, it's on -- I think
3  it says -- has Overnite Express on them.
4      Q.  All right.  Other than the presence of that
5  name on bills of lading, was there any other
6  document that you ever saw that said anything about
7  Overnite Express concerning any of the loads that
8  you were hauling on your usual round-trip loads
9  every day?
10     A.  No, it's just that -- just that it was on
11 the bill of ladings.
12     Q.  Did you receive a paycheck from Martin's
13 Bulk Milk?
14     A.  Yes.
15     Q.  Were your taxes deducted on a W-2 from
16 Martin's Bulk?
17     A.  Yes.
18     Q.  You received a W-2 for tax deductions,
19 right?
20     A.  Yes.
21     Q.  And who provided you the truck with which
22 you did your work?
23     A.  Martin Bulk Milk.
24     Q.  Did you have to wear a uniform?

Page 47

1      A.  No.
2      Q.  Did you wear anything on your person that
3  identified you as an employee of Martin's Bulk Milk
4  like a hat or a shirt?
5      A.  On occasion, I'd have a hat when it was
6  cold out.  I'd wear a Martin jacket, but...
7      Q.  Did you ever wear a Universal Am-Can
8  jacket?
9      A.  No.
10     Q.  Did you ever wear an Overnite Express
11 jacket?
12     A.  No.
13     Q.  Did you ever wear an International Paper
14 jacket?
15     A.  No.
16     Q.  Did you ever consider yourself to be an
17 employee of any of those companies?
18     A.  Just Martin Bulk Milk.
19     MR. FISHER:  Okay.  That's all I have.
20          Thanks, Mr. Franke.
21              EXAMINATION
22              BY
23              MR. BENTIVENGA:
24     Q.  Hi, Mr. Franke.  I'm Scott Bentivenga and I

Page 48

1  represent CSX Intermodal.
2      A.  Okay.
3      Q.  And I just have a few follow-up questions
4  for you.
5          Have you ever been employed by
6  CSX Intermodal?
7      A.  No.
8      Q.  When you were transporting the load on
9  July 3, 2008, you were doing that as an employee of
10 Martin's Bulk Milk, correct?
11     A.  Yes.
12     Q.  You mentioned that you went down to the CSX
13 rail yard at 47th Street on July 3, 2008, correct?
14     A.  Yes.
15     Q.  And is that where you picked up the chassis
16 and the container that you were -- that you took
17 off that property?
18     A.  Yes.
19     Q.  All right.  Did you have any communication
20 with anyone from CSX Intermodal on July 3, 2008?
21     A.  No.  I mean -- I didn't know they worked
22 for that company.
23         It was just a person at their -- at the
24 gate when you check in or check out.  They didn't

Page 49

1  state -- specify that, I am an employee of this
2  company.  It was just the first person that they --
3  you talked to at the gate, you know.  A lot of
4  times you talk to them through a little box, you
5  know.
6      Q.  Okay.  So whether or not you talked to
7  anyone from CSX Intermodal on July 3, 2008, you're
8  not -- you don't know?
9      A.  Right.
10     Q.  Okay.  You never called up, by telephone,
11 CSX Intermodal on July 3, 2008, did you?
12     A.  No.
13     Q.  Okay.
14     A.  I don't -- not to the best of my knowledge.
15     Q.  Okay.  Just explain briefly for me how it
16 works when you go down to the CSX rail yard at 47th
17 Street, like you did on July 3, 2008, driving on
18 the property, picking up the chassis and the
19 container and then driving off.
20         Tell me he how that works.
21     A.  Well, 47th Street was -- it was a new place
22 for us to go to.  And when -- you would come in and
23 you would pull up to the -- I -- you would talk --
24 talk to -- you know, you put -- you talk to a box

Page 50

1  on the way in and you tell them your information,
2  what load you're bringing in. You'd have to give
3  them your driver's license number. I think you'd
4  have to give them the load, what load you're
5  bringing in, and your seal number.
6      And then when you got all that
7  information, they would give you a card and you
8  would take -- you would take your trailer in and
9  park it in an empty spot.
10     And then if you were supposed to take a
11 trailer out of that yard, you would take -- and
12 they'd have -- you know, they'd have a pick-up
13 number, a reservation number. And you would go --
14 either sometimes they would assign you what trailer
15 number to take out or you would just go and look
16 for a green tag on a trailer or -- and then you
17 would take a trailer out, you know, walk around,
18 see if they had lights, because people liked to
19 steal lights out of them, and check them all out.
20     And then you went to the leave the yard,
21 you had to go to an out gate and you would have to
22 give them your reservation number and your
23 information about who you are and all that. And
24 then when everything checked out, you would -- you

Page 51

1  would go.
2      But if things didn't check out, you
3  would have to turn around, put the trailer back and
4  go find one that did check out. You know, that's
5  happened on occasions where you go up there and it
6  could be a bad -- something wrong with the -- you
7  know, but --
8  Q. Sure.
9  A. -- but it didn't -- it was not, you know,
10 ready to go out, you know, or didn't -- wasn't
11 inspected or didn't have a green tag on times, You
12 could take one, you know, and -- sometimes you grab
13 one without a green tag, you know, but -- but if it
14 went out the out gate, they would let you know if
15 it was -- been inspected or not, you know.
16 Q. Okay. For July 3, 2008, do you remember
17 anything unusual occurring or did everything just
18 kind of run according to plan when you went to the
19 CSX rail yard, dropped off your load --
20 A. That --
21 Q. -- picked an empty and left?
22 A. It seemed everything went as planned
23 because I was -- I was obviously on time most of
24 the time. There was a lot of times when you go to

Page 52

1  a rail yard, it don't go as planned. You --
2  Q. But this day, you believe, on July 3, '08,
3  it went as planned?
4  A. Pretty much, yes.
5  Q. Okay. And when you -- when you went to the
6  CSX rail yard when you drove -- where were you
7  driving from, from Wisconsin to Chicago?
8  A. Yes.
9  Q. All right. And you were carrying a load
10 for your employer, Martin's Bulk Service?
11 A. Right.
12 Q. And when you drove onto the CSX rail yard
13 and dropped off -- you dropped off the chassis and
14 the container that you had hauled from Wisconsin to
15 Chicago, correct?
16 A. Yes.
17 Q. And you did that for your employer,
18 Martin's Bulk Service?
19 A. Right.
20 Q. And then as part of your job for Martin's
21 Bulk Service, you detached from the chassis and
22 container that you drove there --
23 A. Right.
24 Q. -- right?

Page 53

1      And then also as part of your job for
2  Martin's Bulk Service, you then picked up an empty
3  container on a chassis at the CSX rail yard, right?
4  A. Yes.
5  Q. And that was all part of your job for
6  Martin's?
7  A. Yes.
8  Q. And then you would pull out of the CSX rail
9  yard and go pick up your next load as directed by
10 your employer, Martin's Bulk Service?
11 A. Yes.
12 Q. All right. With respect to the pick-up and
13 delivery that you did on July 3, 2008, you received
14 all of your instructions and directions with
15 respect to those loads from your employer, Martin's
16 Bulk Service, correct?
17 A. Right.
18 Q. All right.
19 A. That's -- yeah, as far as -- as far as
20 pick-up numbers and stuff like that you're talking,
21 right?
22 Q. For the load that you were going to pick
23 up --
24 A. Right.

Page 54

1  Q.  -- at -- in Hammond, Indiana --
2  A.  Right.
3  Q.  -- you received all of that information
4  regarding that pick-up from --
5  A.  Right.
6  Q.  -- Martin's Bulk Service?
7  A.  Right. Yes.
8  Q.  With respect to where you would drive, what
9  you would drop off and what you would pick up, as a
10 driver, you received all those instructions from
11 Martin's Bulk Service on July 3, 2008, correct?
12 A.  Where I would drive?  You mean --
13 Q.  Yeah, where you had to be --
14 A.  Right.
15 Q.  -- what you were going to pick up and what
16 you were going to drop off.
17 A.  Right.
18 Q.  Am I correct that you did not receive any
19 instruction, direction or supervision as to how to
20 operate your tractor in hauling the load on July 3,
21 2008 from CSXI.  Is that correct?
22 A.  How to drive the tractor?
23 Q.  Correct.
24 A.  No, there was -- they would never tell me.

Page 55

1  I -- no.  I guess -- no, not how to drive the
2  tractor, no.
3  Q.  Okay.  I don't know if this was asked
4  before.  I don't recall.
5       But do you know who owned the chassis or
6  the container that you were pulling on July 3, 2008
7  at the time of the accident?
8  A.  No.
9  Q.  Okay.  You have never been employed by CSX
10 Intermodal; am I correct?
11 A.  Yes.
12 Q.  You have never represented to anybody that
13 you were employed by CSX Intermodal, correct?
14 A.  No, I never said that to anybody.
15 Q.  Okay.
16 A.  Just -- you just go to follow their rules
17 when you're on their property.  That's the only
18 thing.  When you're on their property, you have to
19 follow their rules.  It's not being an employee.
20 It's just doing -- you know, that's the only thing.
21 And then they never told you to do, you know --
22 Q.  Okay.
23 A.  -- don't speed, whatever, you know.
24 Q.  So once you were off the CSX property, you

Page 56

1  would not take any instruction, direction or
2  supervision from CSX Intermodal; is that correct?
3  A.  Correct.
4  Q.  When you were driving your tractor and
5  pulling the load from Hammond, Indiana, and going
6  north towards Wisconsin, which was your
7  destination, you were operating your tractor as
8  part of your job for Martin's Bulk Service,
9  correct?
10 A.  Correct.
11 Q.  And you were not driving that vehicle for
12 anyone else or any other entity; is that correct?
13 MR. SKRYD:  Objection.  Foundation.
14 MR. BURKE:  Objection.  Form, foundation.
15 BY MR. BENTIVENGA:
16 Q.  You can answer it, if you can.
17 MR. SKRYD:  You can answer.
18 THE WITNESS:  I was working for Martin Bulk
19 Milk.
20 BY MR. BENTIVENGA:
21 Q.  Okay.  And nobody else, right?
22 MR. SKRYD:  Objection.  Foundation.
23 MR. BURKE:  Objection.  Form, foundation.
24 BY MR. BENTIVENGA:

Page 57

1  Q.  You can answer.
2  A.  I mean, anybody -- no, I've been working
3  for Martin Bulk Milk.
4       I don't understand who else I'd be
5  working for.
6  Q.  With respect to the container that was on
7  the chassis that you were hauling on July 3, 2008,
8  am I correct that you didn't have any problems with
9  the container itself on July 3, 2008?
10 A.  As far as problems, you know, no.
11      No.  I mean, no -- as far as -- no -- as
12 far as problems with the --like the doors or --
13 no, it seemed -- as far as I know, everything
14 worked, I mean, on the container.
15 Q.  The container had no problems, correct?
16 A.  Close to my -- you know, yes.
17 MR. BENTIVENGA:  Okay.  That's all I have.
18      Thanks.
19 MR. SKRYD:  Anybody else?
20 MR. BURKE:  Just --
21 MR. SKRYD:  Rich?

## Page 58

```
 1        FURTHER EXAMINATION
 2             BY
 3        MR. BURKE:
 4   Q.  Mr. Franke, with respect to the
 5  circumstances or business relationships that gave
 6  rise to you transporting paper products at the time
 7  of this collision, would it be correct to say that
 8  you -- you have no knowledge or understanding of
 9  the business relationships between Martin's and
10  International Paper, CSX, Universal, Overnite,
11  Trac Leasing, Celtic or anyone else?
12     MR. SKRYD:  Do you have any knowledge about
13  that?  That's what he wants to know.
14     THE WITNESS:  No.
15  BY MR. BURKE:
16   Q.  Okay.  Would it be correct that Martin's
17  did not share that information with you or did not
18  involve you in those business details?
19   A.  You're correct.  That would be correct.
20     MR. BURKE:  Nothing else.
21        Thank you.
22     MR. FISHER:  27.
```

## Page 59

```
 1        (Whereupon, Franke Deposition
 2         Exhibit No. 27 was
 3         marked for identification
 4         as of this date.)
 5     MR. SKRYD:  All right.  Go ahead.  Take a look
 6  at that.  I think your signature is on there.
 7     THE WITNESS:  Yes.
 8     MR. SKRYD:  Okay.  Go ahead, Carl.
```

## Page 60

```
 1        (Whereupon, Franke Deposition
 2         Exhibit No. 27 was
 3         marked for identification
 4         as of this date.)
 5     MR. FISHER:  Have him look at the page that has
 6  11, 12 and 13.
 7     MR. SKRYD:  There's only eight pages.
 8     MR. FISHER:  Questions.
 9     MR. SKRYD:  Oh, Questions 11, 12 and 13.  Oh.  I
10  thought you said pages.
11        Okay.  Look at Questions 11, 12 and 13.
12  Then he's got a -- one question for you -- that he
13  claims he's got one question.
14        Look at these, man.  Read them.  Read
15  the questions and the answer.
16          (Discussion off the record.)
17        FURTHER EXAMINATION
18             BY
19        MR. FISHER:
20   Q.  Mr. Franke, I've been challenged to ask you
21  one final question.
22   A.  Okay.
23   Q.  With respect to Exhibit 27, which are your
24  responses to plaintiff's special forum
```

## Page 61

```
 1  non conveniens interrogatories --
 2     MR. SKRYD:  That's what this is called.
 3     THE WITNESS:  Okay.
 4  BY MR. FISHER:
 5   Q.  -- which you signed on the next-to-last
 6  page --
 7   A.  Right.
 8   Q.  -- were the answers that appear to
 9  Questions 11, 12, and 13 your answers then and your
10  answers now?
11   A.  Yes.
12     MR. FISHER:  Thank you.
13     MR. SKRYD:  Okay.
14        Reserved.
15     MR. BURKE:  Hold on.  Wait.  I haven't seen the
16  exhibit either.
17     MR. SKRYD:  Okay.  I'm sorry.
18        FURTHER EXAMINATION (CONT'D)
19             BY
20        MR. BURKE:
21   Q.  Mr. Martin -- or I'm sorry.
22        Mr. Franke, your answers given here to
23  these 11, 12 and 13 interrogatories consist of your
24  own personal knowledge, correct?
```

Page 62

1   A.  Right.
2   Q.  Okay.  And you have no knowledge of what
3   information Mr. David Martin has concerning these
4   three questions, correct?
5   A.  Right.
6   MR. BURKE:  Nothing else.
7   MR. SKRYD:  Okay.  Now we'll reserve.
8       FURTHER DEPONENT SAYETH NOT. . .

Page 63

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2         EASTERN DIVISION
3   MURRAY SCHEINMAN, Plenary    )
    Guardian of the Estate and   )
4   PERSON OF JEFFREY J. SCHEINMAN,)
    a Disabled Person,           )
5                                )
         Plaintiff,              )
6                                )
         vs.                     ) No. 09 CV 5340
7                                )
    MARTIN'S BULK MILK SERVICE,  )
8   INC., et al.,                )
                                 )
9        Defendants.             )
10      This is to certify that I have read the
11  transcript of my deposition taken on the 12th day
12  of January 2010 in the foregoing cause, and that
13  the foregoing transcript accurately states the
14  questions asked and answers given by me, with the
15  changes or corrections, if any, made on the Errata
16  Sheet(s) attached hereto.
17
18
19
            SAMUEL G. FRANKE
20
         Subscribed and sworn to
21       before me this    day
             of         2010.
22
23       Notary Public
24

Page 64

1   STATE OF ILLINOIS )
                      ) SS:
2   COUNTY OF DU PAGE )
3       I, Steven Stefanik, a notary public in and
4   for the County of Cook and State of Illinois, do
5   hereby certify that SAMUEL G. FRANKE was first duly
6   sworn to testify the whole truth, and that the
7   above deposition was recorded stenographically by
8   me and was reduced to computerized transcript under
9   my personal direction.
10      I further certify that the said deposition
11  was examined and read over by said deponent and was
12  signed by him and that the said deposition
13  constitutes a true record of the testimony given by
14  the said witness.
15      I further certify that the said deposition
16  was taken at the time and place specified and that
17  the taking of said deposition commenced on the 12th
18  day of January 2010 and was completed the same day.
19      I further certify that MR. RICHARD F.
20  BURKE, JR., of the firm of CLIFFORD LAW OFFICES,
21  120 North LaSalle Street, Suite 3100, Chicago,
22  Illinois 60602, appeared as attorney for the
23  plaintiff; that MR. JOSEPH SKRYD of the law firm of
24  MULHERIN, REHFELDT & VARCHETTO, P.C., 211 South

Page 65

1   Wheaton Avenue, Suite 200, Wheaton, Illinois 60187
2   appeared as attorney for the defendant.
3       I further certify that I am not a relative
4   or employee or attorney or counsel of any of the
5   parties, or a relative or employee of such attorney
6   or counsel, or financially interested directly or
7   indirectly in this action.
8       In witness whereof, I have hereunto set my
9   hand and affixed my seal of office, at Chicago,
10  Illinois, this 28th day of January 2010.
11
12
13
14
            Steven T. Stefanik, CSR
15              No. 084-003298
16
17
18
19
20
21
22
23
24

Page 66

February 1, 2010

MULHERIN, REHFELDT & VARCHETTO, P.C.
C/O MR. JOSEPH G. SKRYD
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187

Re: Scheinman v. Martin's Bulk, et al.

Dear Mr. Skryd:

    Enclosed please find the transcript of the discovery deposition of SAMUEL FRANKE, taken on January 12, 2009, in the above-entitled cause.
    Since signature was reserved, please ask Mr. Franke to review his transcript from January 12, 2009, making any necessary corrections on the errata sheets, and sign and notarize the deponent's signature page.
    Please send the original signed errata sheets and signed deponent's certificate to Mr. Burke, keep a copy for yourself, send a copy to All Counsel of Record, and send a copy to me for my records.
    Your cooperation in this matter is greatly appreciated. Thank you.

        Sincerely,

        Steven Stefanik, CSR
        SULLIVAN REPORTING COMPANY

CC: Mr. Burke
    All Counsel of Record

Page 66