IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary Guardian )
of the Estate and Person of JEFFREY )
J. SCHEINMAN, a Disabled Person,      )
                                       )
            Plaintiff,                 )
                                       )
      vs.                              )  No. 09 CV 5340
                                       )
MARTIN'S BULK MILK SERVICE, INC.,      )
SAMUEL G. FRANKE, CSX INTERMODAL,      )
INC., INTERNATIONAL PAPER COMPANY,     )
UNIVERSAL AM CAN, LTD., Successor      )
to OVERNITE EXPRESS, INC. and OX       )
LLC, BMW OF NORTH AMERICA, LLC, a      )
corporation, BAYERISCHE MOTOREN        )
WERKE AKTIENGESELLCHAFT, a             )
corporation, BMW AG, a corporation,)
and KARL KNAUZ MOTORS, INC., a         )
corporation,                           )
                                       )
            Defendants.                )

      The Videotaped Deposition of SAMUEL G. FRANKE,
taken in the above-entitled cause, before Cheri
LeBeau Dubina, a notary public of DuPage County,
Illinois, on the 21st day of February, 2012,
commencing at 10:56 a.m., at 211 S. Wheaton Avenue,
Suite 200, Wheaton, Illinois, pursuant to Notice.

      Reported by:  Cheri LeBeau Dubina, CSR
      License No.:  084-002986

68

---

1   APPEARANCES:
2   CLIFFORD LAW OFFICES
3   120 North LaSalle Street
4   31st Floor
5   Chicago, Illinois 60602
6   Tel: 312-899-9090
7   by: MR. RICHARD F. BURKE, JR.,
8         On behalf of the Plaintiff;
9   MULHERIN, REHFELDT & VARCHETTO, P.C.
10  211 South Wheaton Avenue
11  Suite 200
12  Wheaton, Illinois 60187
13  Tel: 630-653-9300
14  by: MR. JOSEPH G. SKRYD and
15  MR. MATTHEW R. SCHRECK,
16        On behalf of Martin's Bulk Milk
17        Service, Inc. and Samuel G. Franke;
18  DOWD & DOWD, LTD.
19  617 West Fulton
20  Chicago, Illinois 60661
21  Tel: 312-704-4400
22  by: MR. ROBERT J. GOLDEN,
23        On behalf of Martin's Bulk Milk
24        Service, Inc. and Samuel G. Franke;

69

---

1   APPEARANCES:    (Continued)
2   HINSHAW & CULBERTSON
3   222 North LaSalle Street
4   Suite 300
5   Chicago, Illinois 60601
6   Tel: 312-704-3000
7   by: MR. CARLTON D. FISHER,
8         On behalf of International Paper
9         Company, Overnite Express, Inc., Ox
10        LLC, Universal Am Can, Ltd. and
11        Overnite Logistics, Inc.;
12
13  JOHNSON & BELL, LTD.
14  33 West Monroe Street
15  Suite 2700
16  Chicago, Illinois 60603
17  Tel: 312-372-0770
18  by: MR. TIMOTHY R. COUTURE,
19        On behalf of BMW of North America,
20        LLC and Bayerische Motoren Werke
21        Aktiengesellschaft.
22
23  ALSO PRESENT: Michael Prager, Videographer
24

70

---

1                    I N D E X
2   WITNESS                        Page
3   SAMUEL G. FRANKE
4   Direct Exam by Mr. Couture         74
5   Cross-Exam by Mr. Burke           350
6   Redirect Exam by Mr. Couture      385
7   Cross-Exam by Mr. Fisher          407
8   Recross Exam by Mr. Burke         470
9   Further Redirect Exam by Mr. Couture   480
10
11                E X H I B I T S
12  Franke Deposition Exhibit Nos.        Page
13  79 - Photo                        186
14  80 - Photo                        265
15  81 - Photo                        269
16  82 - Miranda Warning              309
17  83 - Interview of Mr. Franke by
18        Mr. Fredrickson             330
19  84 - Photo                        330
20  85 - Video to police              344
21  86 - Photos                       350
22  87 - Photos                       350
23  88 - International Paper Exel Form   381
24  89 - Photo                        477

71

EXHIBIT

E

1  (Pages 68 to 71)

McCorkle Lit...            s, Inc.
Chicago, Ill           3-0052

V604

1    THE VIDEOGRAPHER:  My name is Michael
2  Prager, a legal video specialist with McCorkle
3  Court Reporters located at 200 North LaSalle
4  Street, Suite 300, Chicago, Illinois 60601.
5    I am the camera operator on February 21st,
6  2012 for the videotaping of the deposition of
7  Samuel Franke, being taken at 211 South Wheaton
8  Avenue, Second Floor, Wheaton, Illinois at the time
9  of 10:56 a.m.  It is in the matter of Murray
10  Scheinman, plaintiff, versus Martin's Bulk Milk
11  Service Incorporated, et al., defendant, filed in
12  the United States District Court for the Northern
13  District of Illinois, Eastern Division.  It is Case
14  Number 09 CV 5340.
15    This deposition is being taken on behalf
16  of the defendant as requested by Timothy Couture of
17  the Johnson & Bell Law Firm.
18    Will counsel please identify themselves
19  for the record.
20    MR. BURKE:  Richard Burke for the
21  plaintiff.
22    MR. COUTURE:  Timothy Couture on behalf of
23  defendants BMW AG and BMW NA.
24    MR. FISHER:  Carlton Fisher on behalf of

72

1  Universal Am Can Limited, successor to Overnite
2  Express, Ox LLC and International Paper Company.
3    MR. SKRYD:  Joe Skryd for Martin's Bulk
4  and Mr. Franke.
5    MR. SCHRECK:  Matthew Schreck on behalf of
6  Martin's Bulk Milk Service as well as Samuel
7  Franke.
8    MR. GOLDEN:  And Bob Golden on behalf of
9  Martin's Bulk Milk Service.
10    THE VIDEOGRAPHER:  Will the reporter
11  please identify herself and swear in the witness.
12    (The witness was duly sworn.)
13    MR. COUTURE:  One final note for the
14  record.  We're starting this deposition transcript
15  at Page 68 because Mr. Franke's deposition was
16  previously taken in this case.
17    MR. SKRYD:  And we should probably also
18  for the record indicate that all objections are
19  reserved except for form of the question.  Okay?
20    MR. COUTURE:  I agree.
21
22
23
24

73

1    SAMUEL G. FRANKE,
2  called as a witness herein, having been first duly
3  sworn, was examined and testified as follows:
4    DIRECT EXAMINATION
5  BY MR. COUTURE:
6    Q.  Please state your full name for the
7  record, sir.
8    A.  Samuel G. Franke.
9    Q.  Mr. Franke, my name is Tim Couture; I
10  represent BMW, the maker of automobiles.  I'm going
11  to ask you some questions today regarding your
12  involvement in an accident that occurred in July of
13  2008.
14    It's important that you understand my
15  question before you answer it.  So if at any time
16  you don't understand what I'm asking you, please
17  stop me, ask me to rephrase it or restate it, okay?
18    A.  Okay.
19    Q.  You just made my second point.  This is
20  all being taken not only by video but by a court
21  reporter and she needs to have all of your answers
22  out loud.
23    A.  All right.
24    Q.  Nods of the head, shrugs of the shoulders

74

1  are difficult for her to take down.  So if you
2  could please do us all that favor, we would
3  appreciate it.  As well, uh-huh, unh-uh, things
4  like that are difficult to be taken down on paper.
5  So please make your yeses "yes", your nos "no" so
6  that we understand what you're trying to say, all
7  right?
8    A.  Yes.
9    Q.  You might anticipate what I'm going to be
10  asking you but please wait until I complete my
11  question before you start your answer because
12  things will go a lot more smoothly if we do that.
13    A.  Yes.
14    Q.  All right.  Thank you.  Where do you
15  currently live, sir?
16    A.  Mauston, Wisconsin.
17    Q.  What is your complete address?
18    A.  W5064 Emerson Road, Mauston, Wisconsin, at
19  zip code 53948.
20    Q.  And how long have you lived at that
21  address?
22    A.  About ten years.
23    Q.  And with whom do you live at that address?
24    A.  My wife.

75

2 (Pages 72 to 75)

**Page 76**

1    Q.   What's your wife's name?
2    A.   Yvonne.
3    Q.   Starting with a "Y" or an "E"?
4    A.   "Y."
5    Q.   Two "n's" or one?
6    A.   One -- well, two "n's", yes.
7    Q.   Okay.  Why don't you spell Yvonne for me.
8    A.   Y-v-o-n-n-e.
9    Q.   Okay.  Anyone else living at that address
10   with you and your wife?
11   A.   No.
12   Q.   Do you have any children?
13   A.   Yes.
14   Q.   How many children do you have?
15   A.   One.
16   Q.   How old is that child?
17   A.   20.
18   Q.   What's his or her name?
19   A.   Kayla.
20   Q.   I'm sorry?
21   A.   Kayla Coleman.
22   Q.   Kayla?
23   A.   Yeah.
24        MR. SKRYD:  Why don't you spell that for

**Page 77**

1    us.
2    BY MR. COUTURE:
3    Q.   Go ahead.
4    A.   The first name or last name?
5    Q.   Kayla.
6    A.   I guess K-a-l-y --
7    Q.   K-a-y-l-a?
8    A.   Yeah.
9    Q.   All right.
10   A.   I just found out about her two years ago
11   so.
12   Q.   Oh, I'm sorry.  Okay, I understand now.
13   Kayla doesn't live with you?
14   A.   No.
15   Q.   Kayla has never lived with you?
16   A.   She lived with me for a short period of
17   time when I first met her and then she got her own
18   house in town.
19   Q.   Okay.
20   A.   Her and her two sons.
21   Q.   In July of 2008 was it just you and your
22   wife Yvonne living at your Mauston home?
23   A.   Yes.
24   Q.   What's your date of birth?

**Page 78**

1    A.   It's May 17th, 1963.
2    Q.   Where were you born?
3    A.   Fillmore, Nebraska.
4    Q.   Have you ever been married to anyone other
5    than Yvonne?
6    A.   Yes.
7    Q.   How long have you been married to Yvonne?
8    A.   16 years.
9    Q.   And who else were you married to?
10   A.   Renee Fike.
11   Q.   How do you spell that last name?
12   A.   F-i-k-e.  I don't --
13   Q.   You don't know?
14   A.   I don't know exactly, no.
15   Q.   When were you married to Renee Fike?
16   A.   20 -- it was -- I don't know the exact
17   date.  It was about 20 years ago probably.
18   Q.   20 years ago.  How long were you married
19   to her?
20   A.   Six months to a year.
21   Q.   Any other marriages other than those two?
22   A.   No.
23   Q.   Any children other than Kayla?
24   A.   No.

**Page 79**

1    Q.   What's your highest level of education,
2    sir?
3    A.   12th grade.
4    Q.   Did you graduate high school?
5    A.   Yes.
6    Q.   What year did you graduate?
7    A.   1983.
8    Q.   And from what high school did you
9    graduate?
10   A.   Mauston High School.
11   Q.   Mauston High School?
12   A.   Yes.
13        MR. SKRYD:  Are you spelling Mauston
14   M-o-s-s-t-o-n?
15   BY MR. COUTURE:
16   Q.   M-a-u-s-t-o-n?
17   A.   Yes.
18        MR. SKRYD:  Mauston.  Got you.  Thank
19   you.
20   BY MR. COUTURE:
21   Q.   All right.  Have you ever been in the
22   military?
23   A.   No.
24   Q.   Have you ever been convicted of a crime?

3 (Pages 76 to 79)

1    And right now I'm not including moving violations
2  or tickets.
3      A.  No.
4      Q.  Since graduating high school in 1983 have
5  you undergone any additional training?
6      A.  I went to truck driving school prior to
7  getting my driving.  That's probably been 16 -- I'm
8  thinking probably about 16 years ago probably.
9      Q.  Okay.  What truck driving school did you
10  attend?
11     A.  The Dairyland Diesel Driving School.
12     Q.  Dairyland Diesel Driving School?
13     A.  Yes.
14     Q.  I expect that's located in Wisconsin?
15     A.  Right.
16     Q.  Where in Wisconsin?
17     A.  Outside of Wisconsin Dells.
18     Q.  Okay.  And you believe you received --
19  Strike that.
20        You attended that school approximately 16
21  years ago?
22     A.  Yes, before I started driving a truck.
23     Q.  Did you receive a certification upon
24  completion of that or a degree of any sort?

                                                    80

1      A.  I just -- you mean a special paper you
2  mean?
3      Q.  Yes, a certificate or something to say
4  that you are now qualified to drive a truck?
5      A.  I don't remember.
6      Q.  And prior -- Strike that.
7         I expect, therefore, the first time you
8  drove a truck for a living was after you completed
9  that?
10     A.  Yes.
11     Q.  Prior to completing the training at
12  Dairyland Diesel what did you do for a living?
13     A.  I worked at a cheese factory for, like,
14  ten years.
15     Q.  And what cheese factory?
16     A.  It was Elto Dairy in Waupun, Wisconsin.
17     Q.  All right.  What was the name of the
18  company?
19     A.  Elto Dairy.
20     Q.  E-l --
21     A.  T-o.
22     Q.  E-l-t-o?
23     A.  Yeah.
24     Q.  Okay.  And what town was it in?

                                                    81

1      A.  It's in -- I lost my train of thought.  I
2  just said --
3      Q.  That's fine.  If it comes to you while
4  we're in the course of this deposition, let me
5  know.
6      A.  I'm sorry.
7      Q.  What did you do for Elto Dairy?
8      A.  It was just general.  I wrapped cheese and
9  packaged cheese and put cheese in a cooler.
10     Q.  Were you doing machine work or were you
11  actually doing that by hand?
12     A.  Well, a lot of it was done by machine and
13  I operated -- I was a forklift -- operated
14  forklifts there.  So I worked inside the cooler and
15  all that.
16     Q.  And I apologize, you may have said this.
17  How long did you work for Elto Dairy?
18     A.  About ten years.
19     Q.  Do you have any medical training?
20     A.  Medical training?
21     Q.  Yes.
22     A.  No.
23     Q.  Okay.  You're not a doctor or a nurse?
24     A.  No.

                                                    82

1      Q.  You've never been a paramedic or trained
2  to be one?
3      A.  No.
4      Q.  Have you ever -- do you have a CPR
5  certification?
6      A.  No.
7      Q.  Have you ever -- do you have any training
8  or experience in engineering?
9      A.  No.
10     Q.  Have you ever worked as an automobile or
11  diesel mechanic?
12     A.  I've done my own work on my own cars but,
13  you know, as far as little stuff.
14     Q.  Okay.  Oil changes, spark plugs, things
15  like that?
16     A.  Right.  Changing headlights.
17     Q.  Sure.  But as far as your ability to
18  maintain a diesel truck beyond looking at it and
19  knowing that maybe something is wrong and you have
20  to bring it to somebody?
21     A.  Right, that's -- I don't have no
22  certifications that I'm a diesel mechanic or an
23  automotive mechanic or anything like that.
24     Q.  Okay.  No specialized knowledge in that

                                                    83

                                4  (Pages 80 to 83)

| | |
|---|---|
| 1 area, correct? | 1 arounds and, basically, do your basic checkout, you |
| 2    A. No, just general. | 2 know, to see if your lights work and all that. |
| 3    Q. Thank you. And I take it you have no | 3    Q. And you understood both then and for the |
| 4 specialized training in fire cause and origin? | 4 following 16 years while working as a truck driver |
| 5    A. Fire -- | 5 that that type of pre-trip inspection was part of |
| 6    Q. Determining how or why a fire started? | 6 your job and actually mandated by Federal |
| 7    A. No, I'm not no expert in fire. | 7 regulations? |
| 8    Q. I've got to ask. I don't want to be | 8    A. Right. You do that every -- it's called a |
| 9 surprised at some point when -- by someone | 9 pre-trip inspection. So you do it before your trip |
| 10 saying "let me tell you," okay? | 10 and you walk around and check to see if your lights |
| 11    A. Okay. | 11 are working. And then most of the time you're at a |
| 12    Q. When you -- Strike that. | 12 dock you can do a quick check too again, you know, |
| 13      How long was your training at the | 13 to make sure your lights and everything is working. |
| 14 Dairyland Diesel? | 14    Q. Okay. Thanks. Can you walk me through -- |
| 15    A. I think it was a six-weeks course. I'm | 15 well, strike that. I'll ask you this first. |
| 16 not really for sure, exact. | 16      Along with learning about a diesel tractor |
| 17    Q. Before you started that had you ever | 17 you also learned about the trailers that you would |
| 18 driven any trucks for a living? | 18 be pulling, correct? |
| 19    A. No, not for a living. | 19    A. Right. |
| 20    Q. Okay. Before taking the Dairyland Diesel | 20    Q. All right. And at Dairyland Diesel did |
| 21 Training Course -- well, strike that. | 21 you learn both standard trailers and intermodal |
| 22      Were you working as a truck driver while | 22 chassis and boxes? |
| 23 you took the course? | 23    A. At the school we just had standard |
| 24    A. No. | 24 trailers there. |
|                          84 |                          86 |
| 1    Q. So this wasn't through an employer; you | 1    Q. Okay. |
| 2 just said I think I'm going to be a truck driver, | 2    A. And all the chassis and all that we pretty |
| 3 I'm going to go to this school? | 3 much learned at -- you know, at the rail yard or |
| 4    A. Right. | 4 picked that up. It's pretty much the same thing; |
| 5    Q. What types of trucks did you learn how to | 5 you just got to make sure that they're hooked on |
| 6 drive at the Dairyland Diesel School? | 6 properly and all that. |
| 7    A. Tractor-trailers, semi-trucks, | 7    Q. Okay. So if I understand correctly, when |
| 8 18-wheelers. It went through air brakes. That's, | 8 you were going to school at Dairyland, your |
| 9 basically, what they had there. | 9 training regarding what you were going to be |
| 10    Q. Okay. Did you -- let me break that down. | 10 pulling was limited to trailers as opposed to |
| 11 Among the training that you received was how to | 11 chassis and boxes but you in the following 16 years |
| 12 drive what most of us think of when we think of a | 12 learned how to translate those skills to chassis |
| 13 semi-tractor-trailer, right? | 13 and boxes? |
| 14    A. Right. | 14    A. Right. |
| 15    Q. So that would include the big truck with | 15    Q. Okay. And while you were at Dairyland, |
| 16 the cab and maybe a sleeper berth? | 16 you learned as well as walking around your trailer, |
| 17    A. Right. | 17 you also -- or, excuse me, a tractor, you had to |
| 18    Q. Diesel vehicle? | 18 walk around your trailer and do a similar |
| 19    A. Right. | 19 pre-check? |
| 20    Q. And as part of that did you learn what a | 20    A. Right. |
| 21 truck driver's job was with regard to inspecting a | 21    Q. Can you walk me through what you would be |
| 22 truck before trips? | 22 checking when you do a pre-check of a |
| 23    A. Yes. They give us training how to do a | 23 tractor-trailer? |
| 24 pre-trip, what to check for, how to do your walk | 24    A. Well, you back into the trailer and you |
|                          85 |                          87 |

5 (Pages 84 to 87)

1    hook it up and you pull on it to make sure the
2    brakes are set and the brakes are working. You,
3    basically, pull on it with the truck. And you go
4    around and you hook your hoses up and you check and
5    see if your hoses are all hooked and plugged in.
6    And then you turn your lights on, your four-ways
7    on.
8        Q.  Let me stop you there just so I can do it
9    bit by bit. You're doing a great job.
10       The first thing you do is you hook it up,
11   right?
12       A.  Right.
13       Q.  And then I think you said you pull it
14   forward?
15       A.  You pull forward to make sure the brakes
16   work or are locked. Sometimes you hook on to them
17   where you can pull ahead and the trailer will roll
18   along with you. And if the brakes are set, then
19   something is wrong with the brakes. But if you
20   hook on to it and you pull ahead and you can't move
21   it when the brakes are set, the brakes are working.
22       Q.  Okay. So you hook it up and when you do
23   it the brakes are supposed to be set?
24       A.  Right.

88

1        Q.  And so the purpose of your pulling forward
2    is to make sure that the brakes on the trailer are
3    working properly?
4        A.  And you're properly connected.
5        Q.  Thank you. And then the next thing you do
6    is you hookup your hoses?
7        A.  Right.
8        Q.  And those hoses control the brakes on the
9    trailer?
10       A.  Right.
11       Q.  And you also hookup your electrical so
12   that your trailer can control the electric and the
13   lights --
14       A.  Right.
15       Q.  -- on your trailer?
16       A.  Right.
17       Q.  Your tractor can control the lights on
18   your trailer?
19       A.  Right.
20       Q.  I think that's where we were when I
21   stopped you.
22       A.  Right.
23       Q.  What do you do next?
24       A.  Well, then you -- after you get that all

89

1    hooked up, obviously, you walk around -- well, you
2    go back inside the truck, you turn your four-ways
3    on, turn all your lights on, and you walk around
4    and check to see if your lights are working -- or
5    in a rail trailer case, if they're even there
6    because a lot of times they steal lights out of
7    them. So you check and see if all the lights are
8    there.
9        And then you check the tires with
10   either -- with a thumper to make sure they're all
11   up and not flat. And then you just walk --
12   continue to walk around back just to make sure that
13   the container don't have no holes.
14       Or, say, we pick another one up from the
15   rail yard, pick up a new trailer, you want to make
16   sure it don't have any holes or there ain't nothing
17   inside the trailer. That's all kind of part of
18   your walk-around; you open the doors and check and
19   see what's inside there and, obviously, if it was
20   in good physical condition, you know, and,
21   basically, just check to see if the lights work.
22       Q.  Okay. How do you check your brake lights?
23       A.  Your brake lines?
24       Q.  Brake lights.

90

1        A.  Well, inside the truck there's a -- what
2    they call a Johnny bar. You can pull that down and
3    that works, it operates the trailer brakes.
4        Q.  Okay.
5        A.  And when you do that, it also turns the
6    brake lights on.
7        Q.  So what you've just described for me is a
8    pre-trip that you perform every time you take a
9    truck on the road?
10       A.  Pretty much, yes.
11       Q.  All right. After you completed your
12   training at the Dairyland Diesel School where was
13   the first truck driving job that you had?
14       A.  At ITC.
15       Q.  Can you tell me what ITC is?
16       A.  It's a trucking company out of Merrill,
17   Wisconsin. They're no longer -- they're out of
18   business now though.
19       Q.  What town was it?
20       A.  Merrill, Wisconsin.
21       Q.  Merrill, Wisconsin. And what type of
22   freight did they pull?
23       A.  Like paper or general freight. Mostly
24   paper.

91

6 (Pages 88 to 91)

1    Q.   Have you ever pulled a tanker for a
2  living?
3    A.   A tanker?
4    Q.   Yes.
5    A.   No, sir.
6    Q.   Have you ever transported hazardous
7  material for a living?
8    A.   Not very much but --
9    Q.   Okay.
10   A.   But back when I worked for ITC I did have
11  a HazMat on my license but I didn't -- I wasn't
12  required when I worked at Martin's.
13   Q.   Okay.  So you had training for HazMat?
14   A.   Yes, sir.
15   Q.   But you didn't need it because you didn't
16  haul any HazMat?
17   A.   Right.
18   Q.   All right.  When you left the Dairyland
19  Diesel School, what driver's license rating or what
20  were you allowed to drive as a driver?
21   A.   A driver's license rating?
22   Q.   Yes.  You had a CDL, correct?
23   A.   Right.
24   Q.   A commercial driver's license?
                                              92

1    A.   Yes.
2    Q.   And what did that allow you to do versus
3  somebody with a plain old car license?
4    A.   You can operate a vehicle with air
5  brakes.  You can operate a tractor-trailer.  You
6  got a Class A class.  You can operate anything all
7  the way up to a tractor-trailer.
8    Q.   Okay.  And are there levels of CDL?  In
9  other words --
10   A.   Yes.
11   Q.   -- some people can just drive a box
12  truck --
13   A.   Yes.
14   Q.   -- versus semi?
15   A.   Right.
16   Q.   Which level or rating was yours?
17   A.   I got the highest level you can operate.
18   Q.   So when you left the Dairyland Diesel
19  School, you were able to operate all types of
20  street-legal trucks?
21   A.   Right.  Except for I couldn't -- I wasn't
22  licensed for -- I didn't have an endorsement for a
23  tanker.  I didn't have one of those.  And I could
24  not pull doubles or triples.  That was extra
                                              93

1  endorsements.
2    Q.   Sure.  Have you ever since got an
3  endorsement for a tanker?
4    A.   No.
5    Q.   Have you ever since got an endorsement for
6  doubles or triples?
7    A.   No.
8    Q.   So to describe your licensure when you
9  left the Dairyland Diesel, you were licensed to
10  pull all sorts of trucks except for tankers and
11  doubles and triples?
12   A.   Right.
13   Q.   And has that remained true since you left
14  the Dairyland Diesel School?
15   A.   Yes.
16   Q.   Has your driver's license ever been
17  suspended or revoked?
18   A.   No.
19   Q.   Have you ever been convicted of a DUI?
20   A.   No.
21   Q.   Not counting the accident that we're here
22  to talk about today, have you otherwise been
23  involved in any motor vehicle accidents?
24   A.   Before?
                                              94

1    Q.   At any time other than July 3rd, 2008?
2    A.   With any kind of --
3    Q.   Any kind of accident.
4    A.   I had an accident back when I was a kid
5  when I first got my license but that was -- I had a
6  car sideswipe me.
7    Q.   That's fine.  So that would have been
8  approximately when?
9    A.   '81, '82, in that area.
10   Q.   That's fine.
11   A.   Yeah.
12   Q.   Anyone hurt in that accident?
13   A.   No.
14   Q.   Okay.  Is that the -- any other accidents
15  other than that one in 1981 when you just got your
16  license and the July 3rd, 2008 accident?
17   A.   You mean from there to then or any -- from
18  now --
19   Q.   Since the day you got your first driver's
20  license --
21   A.   Until now?
22   Q.   -- as a fresh-faced teen until today?
23   A.   Well, there was one accident was in
24  Michigan where a car went into the ditch and came
                                              95

7 (Pages 92 to 95)

1   out in front of me and I hit another truck.
2     Q.  I'll get to the details of it.  But when
3   did that happen?
4     A.  May 17th, two years ago.
5     Q.  Okay.  So 2010?
6     A.  Right.
7     Q.  So any other accidents other than one in
8   the early '80s --
9     A.  No.
10     Q.  -- one in 2008 that we're here to talk
11   about --
12     A.  Right.
13     Q.  -- and one in 2010?
14     A.  Right.
15     Q.  That's it?
16     A.  Right.
17     Q.  Those three?
18     A.  Right.  Nothing but -- that's all that --
19     MR. SKRYD:  You've answered the question.
20   Now he's going to ask you some more.  Wait for the
21   next question.
22     THE WITNESS:  All right.
23   BY MR. COUTURE:
24     Q.  So you started to tell me the details, and

96

1   I don't need a lot of details but I do want to
2   know, on May 17th, 2010 when you had an accident,
3   that occurred in Michigan?
4     A.  Yes.
5     Q.  Where in Michigan?
6     A.  On Interstate 94.
7     Q.  Between Chicago and Detroit?
8     A.  Yes.
9     Q.  And were you driving as a commercial
10   driver at the time of that occurrence?
11     A.  Yes.
12     Q.  And what company were you employed with at
13   the time of that accident?
14     A.  With Walsh.
15     Q.  Can you give me the full name of Walsh?
16     A.  Walsh's Cargo.  Walsh Cargo.
17     Q.  And where is Walsh Cargo located out of?
18     A.  Lyndon Station, Wisconsin.
19     Q.  Lyndon Station?
20     A.  Yes.
21     Q.  And what time of day was that accident?
22     A.  Mid morning.
23     Q.  Did weather play any role in the accident?
24     A.  It was kind of foggy, raining.  There

97

1   was -- and they was doing road construction.
2     Q.  Did the foggy or rainy conditions affect
3   your ability to prevent the accident?
4     A.  No.
5     Q.  That was just the weather conditions but
6   it didn't play a role?
7     A.  No.
8     Q.  And how about the road construction, did
9   that play any role in the accident?
10     A.  Yes.
11     Q.  Okay.  Tell me what happened in that
12   accident.
13     A.  I was going -- they had road construction.
14   So they had the middle lane blocked off.  So you're
15   using the slow lane and the shoulder road to drive
16   on.  And they had signs up there when the workers
17   are present, you're supposed to go, you know, 45
18   miles an hour.
19     So I was in the slow lane and the car
20   behind, about six car lengths behind, he jumped
21   over the median, tried passing in the construction
22   in the median, come up, he lost control of the car,
23   he slid underneath another truck, that truck
24   bounced him back into the ditch and he come up out

98

1   of the ditch and he hit my vehicle.
2     Q.  Okay.  Did you receive any citations for
3   that accident?
4     A.  No, sir.
5     Q.  Is there a lawsuit pending as a result of
6   that accident?
7     A.  No, sir.
8     Q.  Other than this lawsuit that we're here to
9   talk about today, have you ever been a defendant or
10   plaintiff in a lawsuit?
11     A.  No, sir.
12     Q.  I've asked you about accidents.  Now I
13   want to ask you about moving violations.
14     Other than the tickets that you received
15   as a result of the accident involving Jeffrey
16   Scheinman's vehicle have you since receiving your
17   license way back when received any tickets?
18     A.  Yes.
19     Q.  I'm going to exclude the ones that you
20   received before you became a professional driver
21   approximately 16 years ago and just talk about the
22   ones since.
23     Have you ever received a ticket or moving
24   violation while operating a commercial vehicle?

99

8  (Pages 96 to 99)

```
 1    A.  No, sir.
 2    Q.  Have you received any tickets in the last
 3  16 years, in other words, since you got your CDL,
 4  driving any vehicle?
 5    A.  No, sir.
 6    Q.  So any moving violations other than the
 7  ones relating to the accident with Mr. Scheinman
 8  that you may have had you got before you became a
 9  professional driver?
10    A.  Yes, sir.
11    Q.  And typical speeding of a kid and stuff
12  like that?
13    A.  Yes, sir.
14    Q.  When you started at ITC, did ITC provide
15  any training to you?
16    A.  Yes.
17    Q.  What did ITC train you to do or what
18  training did they offer?
19    A.  When I started there, they had you go with
20  a trainer for like --
21        MR. SKRYD:  You said trainer?
22        THE WITNESS:  Yes.
23        MR. SKRYD:  Okay.
24        THE WITNESS:  It was another -- it was one
                                                    100
```

```
 1  of their drivers that was licensed to train, make
 2  sure that I knew what I was doing and, basically,
 3  give you how to do your logbook and, basically,
 4  trainer of all kinds -- you know, make sure that
 5  you knew what you was doing on the road.
 6  BY MR. COUTURE:
 7    Q.  Okay.  A ride-along?
 8    A.  Yes, he rode and drove both.  He observed
 9  you while you was driving -- that's what the
10  trainer does, and make sure that -- and then he
11  goes back to report to the company and let's them
12  know that I know what I'm doing or whatever.
13    Q.  How long was it that you had a trainer
14  ride with you or drive with you with ITC?
15    A.  About four to five weeks.
16    Q.  Was ITC an over-the-road, long-range truck
17  company or were they local?
18    A.  Both.
19    Q.  When you did the four to five weeks
20  training, were you on the road away from Wisconsin
21  or were you doing local routes?
22    A.  I was on the road away from Wisconsin.
23    Q.  And along with observing how you drove,
24  this individual also trained you how to do your
                                                    101
```

```
 1  logbooks?
 2    A.  Yes.
 3    Q.  And he also -- did he provide any
 4  additional training regarding how you were to
 5  hookup, unhook, any of those things?
 6    A.  He would watch you just to make sure you
 7  did it right.  And if you didn't do it right, he
 8  would inform you which way you're supposed to do
 9  it.
10    Q.  Is it fair to say that while you had
11  already been trained at school how to do it --
12    A.  Right.
13    Q.  -- his job was to confirm that you were
14  doing it the way he understood was correct?
15    A.  Yes.
16    Q.  So he wasn't really telling you this is
17  the new task that you're going to have to
18  accomplish more than he was confirming that you
19  were doing what was right?
20    A.  Right.
21    Q.  Okay.
22        MR. SKRYD:  Sam, just do us a favor and
23  let him finish the question fully.
24        THE WITNESS:  Sorry.
                                                    102
```

```
 1        MR. SKRYD:  You're doing really well but,
 2  you know, just keep doing it that way.
 3        THE WITNESS:  All right.
 4  BY MR. COUTURE:
 5    Q.  How long did you work at ITC?
 6    A.  Probably a year.
 7    Q.  While working at ITC, along with pulling
 8  trailers, did you also pull chassis with intermodal
 9  boxes on them?
10    A.  No.
11    Q.  Can you give me the approximate year that
12  you started at ITC?
13    A.  1998 or -- wait a minute.
14    Q.  Maybe this will help.
15    A.  '89.  I think it was '89.  I think it was.
16    Q.  Okay.  Maybe this will help.  I saw in
17  looking at your personnel file that you started at
18  Martin's in November of '98.
19    A.  Okay.
20    Q.  So I don't know if that gives you any hint
21  but --
22    A.  All right.
23    Q.  Now that you know that --
24    A.  Right.
                                                    103
```

9 (Pages 100 to 103)

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1    Q.  -- when did you start at ITC?
2    A.  It was the previous -- I only worked there
3    for a year.
4    Q.  Okay.  Was your next job Martin's Bulk
5    Milk?
6    A.  Yes.
7    Q.  So we're looking at '96 or '97 when you
8    worked at ITC?
9    A.  Yes.
10   Q.  How did you obtain the job at Martin's
11   Bulk Milk?
12   A.  A friend of mine told me they were looking
13   for truck drivers.
14   Q.  And who was this friend?
15   A.  It was just Larry -- his name is Larry
16   Olsen.
17   Q.  Was Larry Olsen an employee of Martin's
18   Bulk Milk at that point?
19   A.  No.
20   Q.  How was it that -- if you know, how was it
21   that Larry Olsen knew that Martin's was looking for
22   a truck driver?
23   A.  He did some work on one of the people's
24   vehicles over there.  He just knew of the company.

104

1    interview process in order to get hired?
2    A.  The -- no.  I just filled the application
3    out and they checked -- obviously checked my
4    reference that I worked for and they didn't have to
5    do no driving test.  They just checked my
6    reference.  I filled out an application.
7    Q.  Okay.  Why don't I -- why don't I ask you
8    step-by-step questions.
9        After you spoke with David Martin what did
10   he tell you that you needed to do in order to
11   become -- considered for a job at Martin's Bulk
12   Milk?
13   A.  Fill out the application.
14   Q.  And you did that?
15   A.  Yes.
16   Q.  Did you do that at the Martin's Bulk Milk
17   office or did you do that at home and provide it to
18   them?
19   A.  I think I took it home.
20   Q.  Okay.  And after you completed that
21   application did you speak with anyone from Martin's
22   Bulk Milk, an interview?
23   A.  I think I talked to Janet.
24   Q.  Janet.  What's Janet's last name?

106

1    And then I seen some of the truck -- I asked some
2    of the -- after he told me about that I seen some
3    Martin's trucks; they go through Mauston all the
4    time.  So I talked to them guys so.  So I got their
5    number through one of their employees.
6    Q.  Okay.  And who did you contact at Martin's
7    Bulk Milk, if you remember?
8    A.  I think I called over there and I think I
9    talked to Dave maybe.
10   Q.  David Martin?
11   A.  Yes.
12   Q.  David Martin was the operations manager of
13   Martin's Bulk Milk --
14   A.  Yes.
15   Q.  -- when you were hired?
16   A.  Yes.
17   Q.  He was the operations manager of Martin's
18   Bulk Milk on the day of this accident?
19   A.  Yes, he -- yes.
20   Q.  And he was the operations manager of
21   Martin's Bulk Milk the last day you worked for the
22   company, correct?
23   A.  Yes.
24   Q.  All right.  Did you have to go through an

105

1    A.  Right now it's Baer, I'm pretty sure.
2    Q.  And she was the head of personnel?
3    A.  She was safety director type thing, I
4    think.
5    Q.  All right.  What discussion did you and
6    Janet have at that time, if you remember?
7    A.  Basically, she told me I had the job.  She
8    showed me around the property.  She showed me how
9    to use the fuel pump.  And, basically, told me what
10   I was expected to do, what time I was supposed to
11   show up, all that.
12   Q.  When you applied at Martin's Bulk Milk,
13   did you have an understanding as to whether you
14   were going to be getting -- whether you were going
15   to be hired as an over-the-road, across-the-country
16   trucker, whether you were going to be driving local
17   or what you were pulling?  What understanding did
18   you have?
19   A.  I applied for the Chicago run and they had
20   some Chicago runs or Minnesota runs but they put me
21   on the Chicago run.
22   Q.  So when you applied in '98, you
23   specifically applied for a route?
24   A.  Right.

107

10 (Pages 104 to 107)

1    Q. Or a run?
2    A. Well, I just got employed and that's what
3  they put me on.
4    Q. Okay. Well, that's what I'm trying to
5  figure out.
6       When you were hired, did you think to
7  yourself -- well, strike that.
8       When you were looking for the job and
9  applying, did you specify I need to stay in a
10 certain geographic area or were you open to going
11 to California and New York, anywhere in the
12 country?
13   A. I -- when I applied for it, they said they
14 were looking for drivers to go to Chicago so.
15   Q. So you knew that going in?
16   A. Right.
17   Q. And did you understand they were going to
18 do a background check?
19   A. Yes.
20   Q. Did they do that?
21   A. I don't know.
22   Q. Not that you know of -- well, strike that.
23      MR. SKRYD: He said he didn't know.
24      MR. COUTURE: I know. I don't mean to
                                              108

1  mischaracterize.
2  BY MR. COUTURE:
3    Q. You weren't involved in that other than
4  probably signing some documents to allow them to do
5  that background check; is that fair to say?
6    A. Right.
7    Q. Did they contact your former employer ITC
8  to talk about you?
9    A. I don't know.
10   Q. Did they have you do a road test?
11   A. No.
12   Q. Did they require you to show them your
13 CDL?
14   A. Yes.
15   Q. Can you tell me anything else that
16 Martin's Bulk Milk did in order to determine
17 whether you were going to be hired other than what
18 we've talked about?
19   A. I mean, you had to -- just to show them
20 your CDL.
21   Q. Did you sit down with Mr. Martin, either
22 Allan or David, and have a chat about their
23 employees, what they like their employees to be
24 like or who you are, any type of interview?
                                              109

1    A. I talked to -- like I said, I talked to
2  Janet when she was showing me around and she,
3  basically, told me what needs to be done and all
4  that and --
5    Q. And I'm only interrupting you because I
6  think we're talking about two different things. By
7  the time you talked to Janet you -- that's how you
8  learned you got the job?
9    A. Right.
10   Q. And Janet at that point wasn't talking to
11 you as a perspective employee, she was talking to
12 you as the new guy?
13   A. Right.
14   Q. Okay. And when you spoke to her, she then
15 told you what your route was going to be, right?
16   A. Yes.
17   Q. And she told you -- did you she tell you
18 you were going to be assigned to a specific
19 tractor?
20   A. When I first started there, they had a --
21 I wasn't -- I wasn't really assigned to any special
22 tractor because they was trying to find one. But
23 after a while I was accepted to -- I mean assigned
24 to one, you know.
                                              110

1    Q. Okay, let me ask you how that worked. Was
2  it that when you first started there nobody has an
3  assigned tractor or was it that you're the new guy
4  and you get whatever's left over?
5    A. Yes.
6    Q. The second one?
7    A. Yes.
8    Q. And so as you were there long enough then,
9  eventually, you were able to be assigned to a
10 specific tractor?
11   A. Yes.
12   Q. All right. When you first spoke to Janet
13 about the job, did she give you a specific
14 indication of what your runs to Chicago -- to and
15 from Chicago would entail as far as what you would
16 be hauling?
17   A. When I first started there, yes. They --
18 we was hauling furniture down to, like, the rail
19 yards and then if there was anything they could
20 get -- any kind of load they could get to haul --
21 to come back with.
22   Q. Okay. When you started at Martin's Bulk
23 Milk, did they provide you with any training when
24 you first started there?
                                              111

11 (Pages 108 to 111)

1    A.  No.
2    Q.  You said she showed you where the fuel
3  pump was?
4    A.  Right.
5    Q.  That's not the type of thing I'm talking
6  about though.
7    A.  Right.
8    Q.  She probably showed you around the
9  facilities and said this is where the bathroom is,
10  this is the break room, this is the office?
11    A.  Yeah, right.
12    Q.  I'm talking a little different than that.
13    A.  Right.
14    Q.  Did they provide any specific training on
15  how you as a truck driver were going to be doing
16  your job for Martin's Bulk Milk?
17    A.  No.  I already had experience so he didn't
18  get -- I didn't have to go through any training
19  with any trainer with them guys.
20    Q.  All right.  Did they teach you how to use
21  or perform their paperwork?
22    A.  Yes.
23    Q.  Other than that sort of administrative
24  stuff they didn't provide any other training as a

112

1  truck driver, fair?
2    A.  Yes.
3    Q.  Okay.  Now, you were going to be going to
4  rail yards you indicated.  Was that the first time
5  you had delivered to a rail yard?
6    A.  Yes.
7    Q.  And correct me if I'm wrong.  That would
8  include delivering intermodal boxes as opposed to
9  trailers, true?
10    A.  When they first started doing it, we
11  hauled rail trailers.  And then later on it started
12  gradually getting to more and more containers and
13  boxes -- and trailers.
14    Q.  So when you first started, you were
15  hauling the same type of trailer you had already
16  pulled?
17    A.  Right.
18    Q.  They were just going on to trains?
19    A.  Exactly.
20    Q.  And then later on you were actually
21  pulling chassis with boxes on them?
22    A.  Yes.
23    Q.  All right.  Did you have to learn the
24  procedures at the rail yards?

113

1    A.  I mean, how to check-in at the -- they
2  would give you -- you come in -- how do you mean?
3    Q.  Before you started working for Martin's
4  Bulk Milk when you were hauling material, had you
5  hauled to rail yards before?
6    A.  No, sir.
7    Q.  Okay.  Was there anything specific about
8  hauling in and out of a rail yard that required
9  additional training for you as a truck driver?
10    A.  No.  It's just when you came in there, you
11  just had to check-in at the rail yard, give them
12  your information, you know, what you was bringing
13  in, the trailer number, your driver's license and
14  they would check you in to the rail yard and they'd
15  tell you where to put the load.
16    Q.  Okay.  And would you typically leave the
17  rail yard with a trailer?
18    A.  Typically, yes.
19    Q.  Okay.  So you had to pickup another
20  trailer?
21    A.  Yes.
22    Q.  Was that something you did at ITC?
23    A.  No.
24    Q.  So that was new for you when you started

114

1  working for Martin's?
2    A.  Yes.
3    Q.  Did you have any training as to how you
4  were to do that?
5    A.  It's the same kind of training, you
6  would -- you hooked to a trailer to make sure --
7  you would check it, walk around and check it.  You
8  know, check the same kind of pre-trip inspection.
9    Q.  Okay.  When you eventually began hauling
10  chassis with boxes on them, did you receive any
11  additional specialized training for that type of
12  trucking?
13    A.  No.  It's common sense.
14    Q.  When you first started working at Martin's
15  Bulk Milk, who was your direct boss?
16    A.  Dave Martin.
17    Q.  And was Dave Martin your direct boss on
18  the day of this accident?
19    A.  Yes.  Yes.
20    Q.  If I understand it, you were working for
21  Martin's Bulk Milk for approximately ten years
22  before this accident took place?
23    A.  Yes, just about ten years.
24    Q.  Yes, November of '98?

115

12 (Pages 112 to 115)

1    A.  Two weeks shy, yes.
2    Q.  Okay.  Did you undergo any training in
3  that ten years beyond what you've already told me?
4        Did Martin's ever have someone come in and
5  give you a refresher course or play a video or
6  require you to do any follow-up continuing
7  education?
8    A.  No.  We had safety meetings but --
9    Q.  All right.  How often did you have safety
10 meetings?
11   A.  Once a year.
12   Q.  Other than the once-a-year safety
13 meetings, that would be the extent of your
14 additional training?
15   A.  Right.
16   Q.  Who ran the safety meetings?
17   A.  Dave and whoever the guest speaker was at
18 the time.
19   Q.  They would have guest speakers come in?
20   A.  Right.
21   Q.  When you were hired, did you receive an
22 employee handbook?
23   A.  Yes.
24   Q.  What type of material was in that -- well,

116

1  strike that.
2        Did you read the employee handbook?
3    A.  Yes.  Glanced through it, yes.
4    Q.  You didn't memorize it --
5    A.  No.
6    Q.  -- but you looked through it?
7    A.  Right.
8    Q.  What type of information was in the
9  employee handbook?
10   A.  Basically, how to do your paperwork, what
11 the rules and -- what they expected of you and
12 stuff like that, you know.
13   Q.  Okay.  Were there safety procedures in the
14 handbook?
15   A.  Yes, I mean, as far as -- yes, you're
16 supposed to do your pre-trip inspection and all
17 that.
18   Q.  Any other safety procedures that you
19 remember?
20   A.  No.
21   Q.  You don't still have that handbook, do
22 you?
23   A.  No, I don't have it.
24   Q.  I'm sorry?

117

1    A.  No, I don't think so.
2    Q.  Okay.  Was there any instructions of
3  policies and procedures of Martin's Bulk Milk in
4  the event you got into an accident?
5    A.  Yes.
6    Q.  Who to call?  What to do?
7    A.  Right.
8    Q.  Yes?
9    A.  Yes.
10   Q.  Do you remember what the policy and
11 procedure was?
12   A.  Basically get a hold of either Dave or
13 Janet or -- and then they had your insurance -- all
14 your insurance records and stuff in the truck and
15 they had -- you're supposed to show them -- you
16 know, when you got in the accident, that's what
17 you're supposed to show them.
18   Q.  That's the extent that you remember?
19   A.  Right.
20   Q.  When you were hired by Martin's Bulk Milk,
21 how were they paying you?
22   A.  By the mile.
23   Q.  Do you remember what you were first making
24 when you were hired?

118

1    A.  32 cents per mile.
2    Q.  And was there any additional payment along
3  with the 32 cents a mile?  In other words, did they
4  pay you for drop-offs, for pickups?
5    A.  Yes.
6    Q.  What other compensation other than 32
7  cents a mile did you get?
8    A.  They would pay you for -- if you had more
9  than one pickup, they would pay you, like, $15 for
10 that.  If you had more than one drop-off, they
11 would pay you extra for that, $15 or something like
12 that.
13   Q.  Okay.  So let me understand it.  If you
14 only had one drop-off and one pickup, they wouldn't
15 pay you any extra?
16   A.  No, sir.
17   Q.  That's correct?
18   A.  That's right.
19   Q.  But if you were driving to, for example --
20 I know it wasn't you but, for example, the load
21 that you were hauling on the day of the occurrence
22 was going eventually north to Minneapolis to three
23 different places.
24   A.  Right.

119

13 (Pages 116 to 119)

Q. If you were hauling that load, you would
have received additional compensation because you
would have been making three drop-offs?

A. For the second -- the first additional one
you don't get one, you know, but the second two
yes.

Q. Okay. So the first drop-off is 32 cents a
mile at that time regardless?

A. Right.

Q. The second drop-off is an extra how much,
15?

A. Yeah.

Q. Did you get another 15 for the third
drop-off?

A. Yes.

Q. Other than your mileage rate and the
additional drop-off and pickup payments, did they
have any other compensation for you?

A. They had like a safety bonus.

Q. Okay.

A. And you'd only get that, like, at the end
of the year, I think what it was.

Q. And I'm not asking -- when I say
compensation --

120

A. Oh.

Q. No, that's important but I'm just letting
you know I don't need to know about, like, health
insurance and stuff like that. I just want to know
money that they're going to give you.

Tell me about this safety bonus. How
would one at Martin's Bulk Milk earn a safety bonus
back in 2008?

A. I think the way they did it is you started
out with a set amount and then if you had any
violations or anything, it would -- it would lower
your safety -- lower the bonus down.

Q. Okay. So there was an amount of money
that you started out with at the beginning of the
year and if you did anything wrong, almost like a
demerit, it would come off the top and at the end
of the year, whatever you were left with, you got?

A. Right. I'm thinking that's what it was.

Q. How much was the safety bonus for 2007
total if you didn't have any violations?

A. I think it was $200. I'm not for sure.
There again, it's been a long time ago.

Q. Did you lose any money from the safety
bonus in 2007?

121

A. I don't know.

Q. You don't remember?

A. I don't remember, no.

Q. And you didn't complete 2008, correct?

A. Right.

Q. So you didn't qualify for that?

A. Right.

Q. All right. Other than the drop-off
premium that you've told me about, other than the
mileage compensation and the safety bonus, is there
any other way that Martin's Bulk Milk paid you as a
truck driver?

A. No, sir.

Q. When you started it was 32 cents a mile.
Do you remember what it was that you were earning
per mile in July of 2008?

A. I think I was up to 36 or 37 cents a mile.

Q. Now, I asked you about who your direct
boss was at the time you starting at Martin's Bulk
Milk and you said David Martin. He's the son of
the owner Allan Martin?

A. Yes, sir.

Q. Were you also -- Strike that.

Were your bosses also whoever was acting

122

as a dispatcher at the various times that you were
driving?

A. Yes.

Q. Do you remember the names of all of the
dispatchers who were working at Martin's in -- July
of 2008?

A. Not -- there was a Nancy there.

Q. Dave, right?

A. Dave. And I think there was a couple
other ones there too. I don't know exactly what
their names are.

Q. Okay. It's been a couple years so you
don't remember them?

A. Yeah.

Q. Generally, and I'll ask you more specific
questions about the run that you took to haul paper
from Hammond, Indiana north to Wilton in a bit but
I just want to ask you generally.

When you were doing your Chicago -- your
runs to Chicago delivering furniture, did Martin's
Bulk Milk dictate which roads you drove on to get
there?

A. They just told me to take the fastest and
most direct route.

123

14 (Pages 120 to 123)

1      Q.   So the only instruction was fastest and
2    most direct?
3      A.   Right.
4      Q.   So they didn't say --
5      A.   They didn't want you to go out of route.
6      Q.   And this is the important thing that we're
7    talking about, the purpose of my question.
8           They didn't want you to go out of route.
9    So my question then is:  Did they tell you what the
10   route was?
11     A.   No.
12     Q.   Okay.  They said you're going to Chicago,
13   this is the address you're going to, get there in
14   the best way you can?
15     A.   Yes.
16     Q.   They didn't say exit here, turn there, get
17   off on this expressway, go there?
18     A.   No.
19     Q.   Not the specifics, they left that to you?
20     A.   Right.
21     Q.   When you -- Strike that.
22          When you started at Martin's, you were
23   doing the Chicago run, as you've said, right?
24     A.   Yes.

                                                    124

1    time when you typically started your day?
2      A.   Yes.
3      Q.   What time was it?
4      A.   When I was doing the day shift?
5      Q.   Yes, when you first started doing runs to
6    Chicago.
7      A.   4:00 or 5:00 o'clock in the morning.
8      Q.   And when you would do those furniture runs
9    to Chicago, you would do those from Wilton,
10   Wisconsin?
11     A.   Yes.
12     Q.   And Wilton, Wisconsin is the location
13   where Martin's Bulk Milk is located?
14     A.   Yes.  On occasion we would go -- pick them
15   up from Ashley Furniture in Arcadia.
16     Q.   Wisconsin?
17     A.   Right.
18     Q.   And what route would you take to get from
19   Wilton to the location in Chicago where you were
20   delivering the furniture?
21     A.   I would take I think it's Highway 71 out
22   of Wilton to I think it's over to 82 into Mauston,
23   and when you get to Mauston, you got an interstate.
24     Q.   Which interstate?

                                                    126

1      Q.   And at that time you were hauling
2    furniture to a rail yard in Chicago?
3      A.   Yes.
4      Q.   Was that a daily run?
5      A.   Yes.
6      Q.   What days a week did you work at that
7    time?
8      A.   Monday through Friday.
9      Q.   And what time would you start?
10     A.   It depends on what run I was doing.
11     Q.   It depended on when they needed the
12   furniture?
13     A.   It depended -- yes, it depended what time
14   I pickup -- if I was running the day shift or night
15   shift or it depended.
16     Q.   Okay.  Was there any period of time that
17   you -- like, when you first started, for any period
18   of time were you running a specific run every day
19   or did that change?
20     A.   Yes, when I first started it was basically
21   have the trailer down there by a certain time in
22   the morning and then they would have time enough to
23   find you a reload back.
24     Q.   Okay.  Do you remember for that period of

                                                    125

1      A.   90/94.
2      Q.   Okay.
3      A.   And you head towards Chicago.
4      Q.   There's two ways to head towards Chicago,
5    though, right?
6      A.   Right.  And it depends on what rail yard
7    you was going to go.
8      Q.   Okay.
9      A.   There's probably 20 different rail yards
10   in Chicago.  So it depends on which rail yard you
11   was going to to determine which road you took to
12   get in there.
13     Q.   All right.  Well, let me stop you here.
14   Before you get to Chicago you have to make the
15   decision about whether you're going to stay on 90
16   or 94, right?
17     A.   Yeah.  94 goes towards Milwaukee; 90 goes
18   down straight into Chicago.
19     Q.   Okay.  And what -- Strike that.
20          Did Martin's Bulk Milk at that time give
21   you direction as to whether they wished you to take
22   94 versus 90?
23     A.   No.
24     Q.   So you made that choice as to which of

                                                    127

15 (Pages 124 to 127)

**Page 128**

1  those two expressways --
2      A.  Right.
3      Q.  -- you were going to take, correct?
4      A.  Yes.
5      Q.  And, again, we're not talking about the
6  day of the occurrence, we'll get to that, but just
7  generally.
8          How did you make the determination as to
9  whether you were going to take 94 to Chicago versus
10  90 to Chicago?
11      A.  It's to what side of Chicago where the
12  rail yard was at or where you was going at in
13  Chicago.
14      Q.  If you were going to be going to the 47th
15  Street rail yard, which route would you take
16  typically?
17      A.  Probably down 90 into Chicago.  It's, I
18  think -- I don't know, it's 290 you get off and go
19  down -- I don't know exactly where it's at.
20      Q.  That's fine.  And I don't want to ask you
21  that minutia at this point because it's not
22  important to my question but I appreciate you
23  trying to answer my question.
24          But, typically, if you were going to the

**Page 129**

1  47th Street rail yard, you would choose 90 instead
2  of 94?
3      A.  Right.
4      Q.  Because it's shorter distance-wise, right?
5      A.  Right.  It's a more direct route.
6      Q.  A more direct route.  Thank you.  At some
7  point did you start picking up loads at the Exel
8  Warehouse in Hammond, Indiana?
9      A.  Exel Warehouse?
10      Q.  An International Paper's warehouse?
11      A.  Yes.
12      Q.  When did you first pickup loads at that
13  warehouse in Hammond, Indiana on 165th Street, I
14  think it is?
15      A.  When did I first start --
16      Q.  Yes.
17      A.  -- picking up loads there for Martin's
18  Bulk Milk?
19      Q.  Yes.
20      A.  Or for --
21      Q.  Did you pickup loads at that warehouse for
22  ITC?
23      A.  Yes.
24      Q.  You did, okay.  How often were you at that

**Page 130**

1  Hammond, Indiana warehouse for ITC?
2      A.  It wasn't a regular thing but, yes, I
3  picked up loads there too for them guys.
4      Q.  Okay.  But it wasn't a regular route?
5      A.  No.
6      Q.  At some point -- Strike that.
7          When did you first go to that Hammond
8  location for Martin's Bulk Milk?  Again, I don't
9  need exact dates, but when in your employment in
10  the approximate ten years?
11      A.  Probably two, three years after I started
12  working there.  We went there quite often.
13      Q.  As of the day of this accident you were
14  traveling from Hammond almost every day.
15      A.  Yes.
16      Q.  In fact, was it every day?
17      A.  Yes.
18      Q.  All right.  When did that run start being
19  an every day occurrence for you?
20      A.  Probably two or three years -- about three
21  years beforehand an every day thing.
22      Q.  Okay.  And when you started making that
23  run every day approximately two or three years
24  before this accident, you were -- and correct me if

**Page 131**

1  I'm wrong -- you were making a delivery from Wilton
2  to somewhere in the Chicago area unrelated to that
3  Hammond pickup?
4      A.  Right.
5      Q.  But then after you made your delivery of
6  your inbound trip, you then would go to Hammond and
7  make a pickup for your trip back to Wilton?
8      A.  Yes.
9      Q.  Okay.  Did -- Strike that.
10          When you were making these deliveries on
11  an every day basis for two to three years before
12  July 3rd, 2008, did you have an understanding that
13  you were delivering product for a specific
14  customer?
15      A.  Which way, sir?
16      Q.  Thank you.  When you were going from
17  Hammond to Wilton.
18      A.  I was --
19      Q.  I'll strike it and start over because you
20  look confused and I can be very confusing
21  sometimes.
22          When you first started doing this two- to
23  three-year -- or excuse me.
24          When you first started doing the dedicated

16 (Pages 128 to 131)

1   run from Hammond to Wilton every day --
2       A.  Right.
3       Q.  -- were you always hauling from that
4   warehouse in Hammond to Wilton product for the same
5   customer?
6       A.  We was always hauling paper.
7       Q.  It was always paper?
8       A.  Yes.
9       Q.  Okay.  As a truck driver did you pay
10  specific attention as to who the owner of that
11  paper was or who specifically was asking you to
12  haul it?
13      A.  No.
14      Q.  That was up to somebody else who is
15  dispatching you to go there, right?
16      A.  Right.
17      Q.  You didn't pay attention as to what names
18  were on the bills of lading and things like that?
19      A.  As far as?
20      Q.  You were picking up your load?
21      A.  Right.
22      Q.  You made sure you had the right load?
23      A.  Right.
24      Q.  You made sure you signed your name for

132

1   that load?
2       A.  Right.
3       Q.  But as far as whether it was International
4   Paper or Overnite Express, Universal Am Can or Joe
5   Skryd's Trucking, it didn't matter to you?
6       A.  Right.  No.
7       Q.  You just had to pickup your load?
8       A.  Right.
9       Q.  All right.  But it was paper for those two
10  to three years that you did the dedicated run from
11  Hammond to Wilton?
12      A.  Yes.
13      Q.  For those two to three years did you have
14  a dedicated route from Wilton to Chicago, in other
15  words, the first half of that run?
16      A.  No, sir.
17      Q.  So when you first started at Martin' Bulk
18  Milk you had a dedicated furniture run to the
19  railroad yards but no dedicated run back, but later
20  on near approximately 2005 or 2006 you started
21  getting the opposite, a dedicated run from Hammond
22  every day but not knowing what you're going to haul
23  on your way there?
24      A.  Exactly.

133

1       Q.  Okay.  Who was it at Martin's Bulk Milk
2   who told you on a day-to-day basis where you were
3   going to be going and what you were going to be
4   picking up?
5       A.  Your loads would be assigned and hanging
6   on your board.  So, I mean, nobody, per se, came up
7   and told you that you're doing this.  You come in
8   and check your board and whatever load's on your
9   board, you would deliver it.  If you had any
10  questions, you had to wait until the next day to
11  call them and ask.
12      Q.  Do you have an understanding as to who
13  prepared the paperwork to place on your board?
14      A.  No.  Just one of the girls in the office
15  probably.
16      Q.  Okay.  At some point did you -- were you
17  told that you would always be doing this run from
18  Hammond to Wilton or did it just happen that that
19  was on your paperwork every day?
20      A.  It just happened to be on my paperwork.
21      Q.  So no one said, okay, from now on this is
22  what you're going to do?
23      A.  No.  It wasn't in writing, no.
24      Q.  Was it done orally?  Did David or some of

134

1   the other dispatchers or owners of Martin's Bulk
2   Milk say from now on, Sam, you're going to be
3   hauling from Hammond?
4       A.  They -- they didn't -- they just -- it
5   could be different every day but it was under the
6   understanding that when you give out that morning,
7   when you was picking up that night or when you
8   did -- they would call in, they would tell you but
9   it wasn't like this is your run.
10      Q.  Well, you understand what I'm trying to
11  get at here.  I'm trying to figure out whether you
12  came to understand that this was a dedicated route
13  that you were going to do simply because every
14  morning when you got there it was in your paperwork
15  as opposed to someone designating Sam Franke as the
16  one who's going to make the run from Hammond to
17  Wilton.
18      Do you understand the difference between
19  the two?
20      A.  Yeah.
21      Q.  Can you tell me which of those two it was?
22      A.  It was just on my paperwork.
23      Q.  Okay.  Mr. Franke, the one thing that I
24  didn't say, I expect your lawyer told you but I

135

17  (Pages 132 to 135)

1  should say, if at any point you need a break --
2  because we're probably going to be here a long
3  time -- don't ever hesitate because we'll break
4  whenever you need to, all right?
5    A.  Okay.
6        MR. SKRYD:  How much time do we have on
7  the --
8        THE VIDEOGRAPHER:  We have 24 minutes
9  remaining.
10         (Discussion off the record.)
11       MR. SKRYD:  Let's take a quick break.
12       THE VIDEOGRAPHER:  We are going off the
13  record.  The time is 12:02 p.m.
14         (A break was taken.)
15       THE VIDEOGRAPHER:  We are back on the
16  record.  The time is 12:21 p.m.  Please proceed.
17  BY MR. COUTURE:
18    Q.  Mr. Franke, I'm going to pause for a
19  second from where we were at in my questions and I
20  want to ask you something a little bit different
21  that I forgot to ask at the beginning of the
22  deposition.
23       Before your deposition today did you
24  review any materials or documents?

136

1    A.  I watched my -- the interview, the
2  recorded interview, at the police station.  I
3  looked -- read my deposition from last time.
4    Q.  Did you read any portion of the police
5  report?
6    A.  No, sir.
7    Q.  Have you ever read the entirety of the
8  police report from the Highland Park Police
9  Department?
10    A.  No, sir.
11    Q.  We'll get to portions of it, but to the
12  extent that officers may have written down their
13  conversations with you, from your answer I take it
14  that you don't know at this point what they've
15  specifically written down regarding what they heard
16  you say?
17    A.  No.
18    Q.  So at this point you can't say whether
19  what they wrote down was right or wrong?
20    A.  Right.
21    Q.  Okay.  Did you review any photographs of
22  any vehicles or the scene of the accident?
23    A.  They had a police recording from a cruiser
24  that I watched.  I watched that prior to this.

137

1    Q.  Okay.  And how about -- you told me about
2  two videos.  How about any still photographs of
3  either your vehicle, the Scheinman vehicle or of
4  the accident scene, did you look at any of those?
5    A.  I seen some photographs, yes.
6    Q.  Specifically of what?
7    A.  Specifically and what?
8    Q.  What photographs did you look at?  What
9  did they depict?
10    A.  What the car looked like.
11    Q.  Before or after the accident?
12    A.  After.
13    Q.  Okay.
14    A.  And the truck.  Those are the only ones
15  I've seen.  That's been a while ago.
16    Q.  Approximately when?
17    A.  A month, month ago.
18    Q.  Any other documents that you've examined
19  before this deposition?
20    A.  No.
21    Q.  Now, back to what we were talking about
22  before.
23       We were discussing the fact that you for
24  two to three years before this accident you,

138

1  essentially, had a dedicated run every day from
2  Hammond, Indiana to Wilton, right?
3    A.  Yes.
4    Q.  Okay.  When you first made that run from
5  Hammond to Wilton, did anyone tell you what route
6  to take to get from Hammond to Wilton?
7    A.  No.
8    Q.  So similar to your previous general
9  instructions, am I correct to say that they told
10  you to take the fastest or most direct route?
11    A.  Yes.
12    Q.  Was there any discussion either specific
13  to the Hammond route or in general for you as a
14  truck driver with anyone at Martin's Bulk Milk
15  regarding whether they wanted you to take the most
16  direct route or the fastest in the event that
17  one -- in the event that those two were different?
18       Because sometimes less miles doesn't
19  necessarily mean shorter drive time-wise, right?
20    A.  Right.
21    Q.  Okay.  Did anyone at Martin's ever tell
22  you either specific to the Hammond route or in
23  general whether they had a preference when you were
24  given the choice between the longer but faster

139

18 (Pages 136 to 139)

**Page 140**

1  route and the shorter distance route?
2      A. It was the most -- they always wanted you
3  to take the most direct route, the direct or
4  fastest route.
5      Q. But you understand that direct and fastest
6  can sometimes be two different things?
7      A. Right.
8      Q. Were you ever told as a policy of Martin's
9  Bulk Milk which of those two in the event that the
10  most direct route is not the fastest which you were
11  to take?
12      A. No.
13      Q. That was up to you to choose?
14      A. Right.
15      Q. When you first went from Hammond to Wilton
16  hauling paper, what route did you take from Hammond
17  to Wilton? And you don't have to tell me exact, "I
18  got off on 165th and took a left." I want to talk
19  major roads.
20      A. When I first --
21      Q. When you first started doing that route.
22      A. I would -- when I first I would -- when I
23  first started doing it, I went back like the toll
24  road, back up 90 but, you know, it's more direct

**Page 141**

1  route going up 41. So I went up Highway 41.
2      Q. All right. So to answer my question, when
3  you first started, you took the Indiana toll road
4  to 90 and took 90, essentially, through Madison up
5  to Wilton?
6      A. Right.
7      Q. At some point you changed that procedure
8  and took 94 out of Indiana along and through
9  Chicago?
10      A. Right.
11      Q. Correct?
12      A. Yes.
13      Q. All right. When did that change that you
14  decided to take 94 route from Indiana instead of
15  90?
16      A. About a year -- a year before, I guess. I
17  don't know exactly what exact day that I decided to
18  take that route. Because it was -- it was faster
19  and more direct because at night going through
20  Chicago there was no delays and stuff. So it was a
21  faster route.
22      Q. I appreciate everything you're saying, but
23  please listen to my question.
24          When was it that you first chose 94

**Page 142**

1  instead of 90 as your route?
2      A. I don't know exact date.
3      Q. Okay. Was it before you started the
4  dedicated runs for the two to three years before
5  the accident?
6      A. Yes.
7      Q. Okay. Was it a -- the circumstance that
8  once you decided to take 94 as your route,
9  thereafter you always took 94 instead of 90?
10      A. Yes.
11      Q. Did you ever have any discussion with
12  anyone from Martin's Bulk Milk regarding which of
13  the two expressways you should take to Wilton from
14  Hammond?
15      A. No.
16      Q. Am I correct that it's actually 15 miles
17  shorter if you take 90 from Hammond to Wilton than
18  if you take 94?
19      A. Right.
20      Q. Is that correct?
21      A. Yes.
22      Q. Okay. Did the fact that you were getting
23  paid by the mile enter into your choice to take the
24  route that was 15 miles longer from Hammond to

**Page 143**

1  Wilton?
2      A. No.
3      Q. Did you have to get any approval from
4  anybody at Martin's Bulk Milk to take the route
5  that was longer?
6      A. No.
7      Q. And you chose 94 instead of 90 because you
8  believed it to be faster?
9      A. Right, more direct.
10      Q. Well, more direct usually means less
11  miles.
12      A. Right.
13      Q. Okay.
14      A. Yeah, probably faster, yes.
15      Q. Faster?
16      A. Right.
17      Q. So we'll agree that 90 is shorter but your
18  belief was 94 was faster?
19      A. Right.
20      Q. The first time you took 94 from Hammond,
21  Indiana to Wilton, and I think you don't remember
22  exactly when that was --
23      A. Right.
24      Q. -- was it more than two years before this

19 (Pages 140 to 143)

1 accident?

2    A.  Yes.

3    Q.  Did you stay on 94 all the way through

4 Illinois or did you get off somewhere?

5    A.  I took 94 through Chicago and then 41

6 turned off to your left and you took 41 --

7 continued straight up to 41 and 94 went off to the

8 right.

9    Q.  All right.  That's the route you took on

10 the day of this accident, correct?

11    A.  Correct.

12    Q.  Am I correct, however, that had you stayed

13 on 94 instead of getting off on 41 when you first

14 started doing this, 94 would take you where you

15 wanted to go?

16    A.  Yes.

17    Q.  Because, in fact, when you took the

18 forty -- Route 41 route, you joined back up at 94,

19 essentially, at the Wisconsin border?

20    A.  Yes, sir.

21    Q.  Did you in your job make a calculation as

22 to what the difference in miles was between taking

23 94 all the way versus taking Route 41?

24    A.  No, I didn't sit down and --

144

1    Q.  Do you know which of those two routes is

2 shorter with regard to the number of miles?

3    A.  Are you talking about --

4    Q.  I'll be more clear.  And I appreciate what

5 you're about to ask for clarification on.

6        We've already discussed the difference in

7 miles and time versus 94 and 90.

8    A.  Right.

9    Q.  Now I'm focusing on staying on 94 all the

10 way from Chicago into Wisconsin as opposed to

11 getting off on Route 41 for a short period of time

12 when the Edens splits.

13    A.  Right.

14    Q.  Okay.  Did you ever do a mileage

15 determination between which was less miles, 94 all

16 the way versus 94, 41 to 94?

17    A.  No, I never did exact mileage.

18    Q.  Did you ever do a timing run; in other

19 words, did you ever do both and figure out which

20 was faster?

21    A.  No.

22    Q.  How was it that you came to the decision

23 that you were going to get off on 41, go through --

24 I guess get off -- Strike that.

145

1        How was it that you decided you were going

2 to get off a divided highway at Route 41, go

3 through an area, commercial area with stoplights

4 and such, and then get back on 94?  How did you

5 make that determination?

6    A.  94 swings out and around, it comes back

7 in, and 41 is a straight shot up through.

8    Q.  Did you look at a map and say I'm going to

9 take this way?

10    A.  Yes.

11    Q.  Did someone tell you that you should go

12 that way?

13    A.  No.

14    Q.  So you looked at a map?

15    A.  Right.

16    Q.  At any time when you were driving for

17 Martin's Bulk Milk did you have a GPS system in

18 your truck?

19    A.  No.

20    Q.  So you never had one actually on the truck

21 itself?

22    A.  Not when I worked for Martin's.

23    Q.  And you never owned a personal one that

24 you put up on your dashboard to give you a route if

146

1 you needed it?

2    A.  Not when I worked for Martin's.

3    Q.  You have since?

4    A.  Yes, sir.

5    Q.  When you first started making runs from

6 Hammond, Indiana with paper to Wilton, was there a

7 procedure in place at the Hammond warehouse as far

8 as what you were required to do?

9    A.  You would come into the facility, you

10 would go in, check-in at the -- check-in at the

11 desk and ask -- and tell the lady what trailer

12 number you have, what your pickup number was, and

13 then they would assign you a door to back into.

14 And sometimes it was the same door every night and

15 other days it would be different, depends on where

16 they staged the load at.

17        So then after they assigned you the door,

18 you would go open your doors, back into that dock,

19 and you would, basically, sit there in your truck

20 until they would come up and bang on the door

21 saying that they was ready to load you.

22        And you would go inside, stand in the dock

23 and, basically, stand there while they loaded you.

24    Q.  I'll stop you there just so we have it

147

20 (Pages 144 to 147)

1    piece by piece.
2        You arrived with an empty trailer or box?
3    A.  Yes.
4    Q.  And after the procedure that you've just
5    told me about "they," meaning the people from the
6    warehouse, would load your trailer or box?
7    A.  Yes, sir.
8    Q.  In general, did you participate in the
9    loading when you were in Hammond?
10   A.  No, sir.
11   Q.  On the day of the occurrence, July 3rd,
12   2008, did you participate in the loading of your
13   trailer --
14   A.  What do you mean --
15   Q.  -- at Hammond?
16   A.  What do you mean by participate?
17   Q.  Thank you.  Did you use a forklift?
18   A.  No, sir.
19   Q.  Did you tell them how to load your
20   trailer?
21   A.  No, sir.
22   Q.  Did you tell them where to place any of
23   the load?
24   A.  No, sir.  He had a paper that had, like

                                                148

1    You generally just watched to see if they
2    had it all on, and then you -- the forklift driver
3    would have a paper that would have all -- you know,
4    he had to have it marked down on the paper how we
5    loaded it and you sign it and give it back to him.
6    That was, basically, for his saying what time he
7    started, what time he quit.
8    Q.  You were confirming that the load was the
9    proper load?
10   A.  Right.
11   Q.  You were confirming that you actually were
12   taking that load by signing for it?
13   A.  Right.
14   Q.  And you were confirming that these folks
15   at the warehouse loaded that in a specific time
16   period?
17   A.  Right.
18   Q.  Anything else that you did at Hammond as a
19   truck driver picking up a load?
20   A.  No.
21   Q.  Did you make a determination when you were
22   doing that as to whether the load was loaded
23   safely?
24   A.  Yes.

                                                150

1    you just said, three stops.  You would -- you know,
2    the first stop you want at the tail and the second
3    stop would be the one in the middle, and the last
4    stop would go the one at the nose.
5    Q.  Did you make the determination of where
6    all -- where the stops would be in Minnesota?
7    A.  No, sir.  They was -- they did that.
8    Q.  Who's "they"?
9    A.  The shipper.
10   Q.  So you didn't play any role in that?
11   A.  No.
12   Q.  They had instructions, meaning the shipper
13   had instructions, from somebody else as to the
14   order of the load of that vehicle?
15   A.  Right.
16   Q.  And not only was that true July 3rd, 2008,
17   but that was true every time you got there?
18   A.  Yes, sir.
19   Q.  What involvement, if any, did you have in
20   the loading of, generally, your trailer when you
21   were at Hammond picking up a load of paper?
22   A.  You just stand there to make sure that
23   things -- there was no damaged freight going on
24   your truck.

                                                149

1    Q.  Yes.  Did you at any time when you were
2    picking up from Hammond ever raise an issue with
3    any of the methods or means that they used to load
4    your trailer?
5    A.  No.
6    Q.  So while you knew that was part of your
7    job, you never found it necessary to stop them?
8    A.  No.  They knew what they was doing pretty
9    much.
10   Q.  And generally from there you would --
11   well, strike that.
12       Would you then do a pre-trip inspection?
13   A.  After it was loaded?
14   Q.  Yes.
15   A.  I'd always have the trailer checked out
16   but you would walk around your truck after you --
17   you would pull it off from the dock, close your
18   doors.  But before you did that you would go in and
19   sign your bills of lading and then, basically,
20   you -- yeah, you would do a quick walk around
21   maybe.
22   Q.  When -- again, we're talking about
23   generalities here.
24       When you would go to Hammond, Indiana on

                                                151

21 (Pages 148 to 151)

1    the two to three years before this accident on a
2    daily basis, did you always have a load going down
3    to Chicago?
4       A.  Someplace.  It wasn't just in Chicago.  It
5    would be the Chicago area.
6       Q.  Thank you.  I'll rephrase my question.
7    You make a good point.  Did you ever have an
8    occasion where you had to drive to Hammond without
9    a load for the purpose of bringing the load from
10   Hammond to Wilton?
11      A.  Yes.
12      Q.  Okay.  And on those occurrences would you
13   go bobtail, in other words, without a trailer or
14   would you bring a trailer with you?
15      A.  It was different all the time.  Most of
16   the time you'd probably bobtail -- I have on
17   occasion bobtailed to Chicago and picked up an
18   empty trailer and I have on occasion hauled loads
19   for other companies and had my own trailer with me
20   and --
21      Q.  It would depend on the day or the load?
22      A.  Exactly.
23      Q.  Whatever the paperwork on the board said,
24   right?

152

1      A.  Exactly.
2      Q.  All right.  So if you were picking up --
3    if you were -- Strike that.
4       If you were driving a trailer from Wilton
5    to Chicago, you would do a pre-trip not only of
6    your tractor but also of your trailer before you
7    left Wilton?
8      A.  Yes.
9      Q.  And if you got to Chicago and switched out
10   containers or trailers, you would then do a new
11   pre-trip inspection because you have a new trailer
12   or container that you're hauling, correct?
13      A.  Right.
14      Q.  And your job was to make sure that
15   everything on that trailer container was -- lights,
16   brakes was working properly?
17      A.  Right.
18      Q.  On occasion when you would go down
19   bobtail, you would pickup a container and have to
20   do that as well?
21      A.  Correct.
22      Q.  Did you ever pickup a container at the
23   Hammond facility?
24      A.  No.

153

1      MR. COUTURE:  I've just been told I have
2    five minutes.  So we're going to take a break.
3      THE VIDEOGRAPHER:  This is the end of
4    media number one.  We are going off the record.
5    The time is 12:41 p.m.
6         (A break was taken.)
7      THE VIDEOGRAPHER:  This is the beginning
8    of media number two.  We are back on the record.
9    The time is 12:43 p.m.  Please proceed.
10   BY MR. COUTURE:
11      Q.  Mr. Franke, am I -- Strike that.
12       For the two to three years before this
13   accident you had a dedicated run from Hammond that
14   terminated in Wilton that involved you hauling
15   paper products, correct?
16      A.  Yes.
17      Q.  Were those paper products always going to
18   end up in the same place?
19      A.  No.
20      Q.  Wilton was not their final destination?
21      A.  No.
22      Q.  Someone else -- well, strike that.
23       Did you ever deliver those paper products
24   from Wilton to their final destination?

154

1      A.  Maybe a couple times.
2      Q.  Was it part of your regular duties to take
3    the paper products that you hauled from Hammond to
4    Wilton to their final destination?
5      A.  No.
6      Q.  On the day of this occurrence I understand
7    that that load that you were hauling was destined
8    for three places in Minnesota, correct?
9      A.  Right.
10      Q.  Was there someone who had a dedicated
11   route Wilton to Minnesota for the purpose of
12   delivering paper products?
13      A.  Right.  Yes.
14      Q.  Who was that?
15      A.  I don't know the driver's name.
16      Q.  All right.  So as far as you're concerned
17   your job was to get that paper from Hammond to
18   Wilton and the folks at -- someone other than you
19   decided how it was going to get from Wilton to
20   where it needed to be?
21      A.  Yes.
22      Q.  You didn't follow the load or figure out
23   if it got where it needed to go?
24      A.  It wasn't my job.

155

22 (Pages 152 to 155)

1    Q.  Okay.  I'm a little confused about
2  something and I'm sure it's because of me, not
3  you.
4        When you started as a dedicated run from
5  Hammond to Wilton two to three years before this
6  accident, had you already decided on previous runs
7  from Hammond to Wilton that you were going to take
8  94 instead of 90?
9    A.  Before I started?
10    Q.  Strike that.  Before this became an every
11  day occurrence that you went from Hammond to Wilton
12  did you have occasion to go from Hammond to Wilton
13  in your job?
14    A.  Yes.
15    Q.  Okay.  So for some period of time you went
16  to Wilton sometimes and then about two to three
17  years before the accident you started going -- I'm
18  sorry, from Hammond to Wilton sometimes, and for
19  two to three years before this accident it was an
20  every day thing, right?
21    A.  Yes.
22    Q.  Okay.  So trying to differentiate between
23  those two, occasionally from Hammond to Wilton
24  versus every day, can you tell me where in that

156

1  spectrum it was that you chose to take 90 instead
2  of 94 to get to Wilton from Hammond?
3    A.  The occasional trips I was doing before I
4  did the night run you would go there during the
5  day.
6    Q.  I see.
7    A.  And you come back during the day and that
8  would determine -- going down through Chicago
9  during the day is, obviously, more congested with
10  traffic and stuff.  So coming -- that's when I
11  would go the other way.
12    Q.  Okay.  When you started your dedicated
13  daily runs from Hammond to Wilton, were you always
14  traveling at night?
15    A.  Yes.
16    Q.  And because of that you determined that 94
17  would be your chosen route over 90?
18    A.  Yes.
19    Q.  All right.  So for that two to three years
20  every day except maybe if you took a vacation or,
21  obviously, weekends, you would take 94 to 41 to 94
22  into Wisconsin and then to Wilton?
23    A.  Yes.
24    Q.  You were very familiar, therefore, with

157

1  the area of Skokie Valley Road where this accident
2  took place before the accident happened?
3    A.  Yes.
4    Q.  Am I correct that approximately two miles
5  before the intersection of Skokie Valley Road and
6  Half Day Road the Edens or 94 Expressway splits
7  such that a driver can either continue on 94 or go
8  on to Skokie Valley Road?
9    A.  Skokie Valley Road meaning 41?
10    Q.  41.  Thank you.
11    A.  Yes.
12    Q.  And just so we're clear.  If I
13  accidentally say Skokie Valley Road, I mean 41.
14    A.  Okay.
15    Q.  All right?
16    A.  All right.
17    Q.  If you say 41, I'll understand you to mean
18  what I -- Skokie Valley Road.  We're talking about
19  the same road.
20    A.  All right.
21    Q.  Okay.  I'll say it again so we're clear.
22        Am I correct that approximately two miles
23  before the intersection where this accident took
24  place the Edens Expressway or Route 94 splits such

158

1  that a driver can continue on 94 or take Route 41
2  traveling north?
3    A.  Correct.
4    Q.  All right.  And do you know what the speed
5  limit is on 94 before that split?
6    A.  On 94?
7    Q.  Yes.
8    A.  55.
9    Q.  55 miles an hour.  And if one were to
10  continue on 94 instead of take Route 41, am I
11  correct that it would continue to be 55 miles an
12  hour through the area of Northern Illinois?
13    A.  As far as I know, yes.
14    Q.  Okay.  At the location where Route 41
15  splits from 94, the Edens Expressway I'll call
16  it -- you understand what that is, right?
17    A.  Okay.
18    Q.  So if I say the Edens, will you
19  understand --
20    A.  Yes.
21    Q.  Okay.  In the location where the Edens
22  Expressway splits from 41, am I correct that for a
23  period of time on Route 41 as one travels north it
24  continues to be a divided highway, Route 41?

159

23  (Pages 156 to 159)

1  A.  Yes.
2  Q.  Okay.  And so we, again, understand our
3  terms, divided highway meaning it looks like an
4  expressway but it's Route 41?
5  A.  Right.
6  Q.  Okay.  Do you know how -- what distance
7  that stretch of Route 41 goes north of 94 as a
8  divided highway?
9  A.  How -- what distance?
10  Q.  Yes.
11  A.  It's a divided highway all the way through
12  on 41.
13  Q.  Okay.
14  A.  That's the right answer, is it?
15  Q.  I'm not going to tell you what the right
16  answer is.
17  A.  I mean, is that what you meant, is it a
18  divided highway all the way through?
19  Q.  Well, do you understand what I mean by
20  divided highway?
21  A.  Yes.
22  Q.  When I say divided highway, I don't mean
23  area with stoplights and businesses on the side of
24  the road.  When I say divided highway, I mean if I
160

1  is he understanding your question by the last
2  answer.
3  BY MR. COUTURE:
4  Q.  Okay.  Good.  Thank you.  For a period of
5  time after getting off of 94 on to Route 41 does
6  Route 41 north continue as a divided highway?
7  A.  Yes.
8  Q.  Okay.  At some point it comes to a
9  stoplight, correct?
10  A.  Right.  Yes.
11  Q.  Do you know the name of that road?
12  A.  Not the first stop sign -- stoplight, no.
13  Q.  The second stop sign is Half Day Road
14  where this accident took place?
15  MR. SKRYD:  You said stop sign.
16  MR. COUTURE:  I'm sorry, stop sign.
17  MR. SKRYD:  Stoplight.
18  MR. COUTURE:  Thank you.
19  BY MR. COUTURE:
20  Q.  Where's the -- you mean stop sign or
21  stoplight?
22  A.  Stoplight.
23  Q.  Thank you.  So when you said stop sign,
24  that was an error, you weren't suggesting there is
162

1  didn't know any better I would think I was on an
2  interstate --
3  A.  Okay.
4  Q.  -- with a -- so that people going north
5  are on one side of the road and then there's a
6  division which is usually either a wall or grass or
7  a big median that you can't cross --
8  A.  Right.
9  Q.  -- where you can't just turn left into a
10  gas station, you actually have to get off on a
11  cloverleaf, okay?
12  A.  Okay.
13  Q.  So do we understand what I mean?
14  A.  Yeah.
15  Q.  You may have a different definition and
16  that's fine --
17  A.  Right.
18  Q.  -- but for the purpose of your
19  answering --
20  A.  Right.
21  Q.  -- my question it's important that you
22  understand.
23  A.  Yes.
24  MR. SKRYD:  I think that's what he meant,
161

1  a red octagon there?
2  A.  No.  Sorry.
3  Q.  No, it's okay, as long as we understand
4  each other and your testimony is accurate we can
5  just stop all we want.
6  A.  All right.
7  Q.  All right.  So the first stoplight is --
8  you don't remember the name of the road?
9  A.  No, sir.
10  Q.  There's a second stoplight?
11  A.  Yes.
12  Q.  Half Day Road, right?
13  A.  Right.
14  Q.  Where this accident took place?
15  A.  Right.
16  Q.  I'm going to represent to you that the
17  first stoplight is a road called Park Avenue or
18  Park Avenue West.
19  A.  Okay.
20  Q.  So if I use that phrase, you'll understand
21  what I'm talking about.
22  Do you know the speed limit on Route 41
23  immediately at the point where vehicles traveling
24  north can exit 94 on to Route 41?
163

24 (Pages 160 to 163)

1    A.   When you first get on to 41?
2    Q.   If you're traveling north on 94, as you
3  did every day, and as you exit off of 94 on to 41
4  for that stretch of road in Illinois, at the
5  immediate time that you exit what's the speed
6  limit?
7    A.   55.
8    Q.   Does that speed limit change at any point
9  as you continue north towards Wisconsin --
10   A.   Yes.
11   Q.   -- on Route 41?
12   A.   Yes.
13   Q.   And where does it change?
14   A.   It -- when you're approaching the first
15  stoplight, I think it changes -- it goes down to
16  40 -- 40 or 45 miles an hour.
17   Q.   We've taken the deposition of a number of
18  police officers in this case and all of them have
19  indicated that the speed limit at that location is
20  50.  Would you disagree with the officers or do you
21  believe that it could be 50 instead of 40 to 45?
22   A.   Yes.
23   Q.   Which of those?
24   A.   I don't know.  I mean -- okay, I don't
                                                    164

1  40 -- 45 miles an hour.
2    Q.   Okay.  And if the police officers in this
3  case have said that it's 50, do you have any basis
4  to disagree with them?
5    A.   If it's posted as 50?  No.
6    Q.   Do you know where the sign is that you
7  remember seeing speed limit 45 along Route 41 as
8  you travel north?
9    A.   Do I know exactly where it's at?  No.
10   Q.   Are you testifying that you remember
11  seeing a speed limit sign that says 45 miles an
12  hour somewhere along that route between where you
13  exited 94 until where the accident occurred?
14   A.   Yes.
15   Q.   But do you remember where that is?
16   A.   No, not exactly.
17   Q.   Can you tell me how far it is from the
18  first stoplight, which I'll represent to you is
19  Park Avenue West, going north on Route 41 to Half
20  Day Road where this accident took place?
21   A.   About a mile -- or half mile, a mile.
22   Q.   So I'm clear.  Your testimony is
23  point-five miles to one-point-0 miles?
24   A.   (Indicating.)
                                                    166

1  disagree with them.
2    Q.   Okay.  So if it is 50 instead of 40 to 45,
3  you're not disagreeing with the officers?
4    A.   No.
5    Q.   And the decrease in the speed limit from
6  55 to what the officers have said is 50, does that
7  remain the speed limit at the first stoplight at
8  Park Avenue as one is on 41 going north, the first
9  stoplight?
10   A.   No.
11   Q.   Does it go down again?
12   A.   Yes.
13   Q.   Where does that speed limit go down again?
14   A.   It's either by that stoplight or past the
15  stoplight.  I don't know exactly where it is.
16   Q.   Okay.  Does the speed limit decrease from
17  50 or from what you believe was 40 to 45 before
18  Half Day Road?
19   A.   Half Day -- yes.
20   Q.   Okay.  What is your understanding that the
21  speed limit was on July 3rd, 2008 on Route 41 north
22  for a vehicle traveling through the intersection of
23  Half Day Road?
24   A.   The posted speed limit, I thought it was
                                                    165

1    Q.   Is that a --
2    A.   Yes.
3    Q.   Thank you.  And am I correct that at least
4  as of July 3rd, 2008, if a vehicle going northbound
5  on Route 41 wanted to turn on to Half Day Road,
6  they would actually have to take an exit off to the
7  right before they got to the intersection?
8    A.   Correct.
9    Q.   How far back is that exit, approximately?
10   A.   500 feet maybe further back.  I don't know
11  exactly.
12   Q.   That's your best estimate?
13   A.   Right.
14   Q.   As I'm sure your lawyer's told you, nobody
15  wants you to guess.  I don't want you to guess.
16   A.   Right.
17   Q.   But if you think that's your best
18  estimate, I'm more than happy to hear it.
19   A.   Okay.
20        MR. BURKE:  What was that number?
21        MR. COUTURE:  500 feet.
22        MR. SKRYD:  Is that a guess or is that an
23  estimate?
24        THE WITNESS:  Estimate.
                                                    167

                              25 (Pages 164 to 167)

BY MR. COUTURE:

Q. Okay. Had you ever driven north on Route 41 before they installed those exits, in other words, such that vehicles turning right or left could actually pull up to the intersection and use a left-hand turn lane or right-hand turn lane?

A. I don't understand what you're saying.

Q. Okay. At some point years ago the intersection at Skokie Valley Road or Route 41 and Half Day Road didn't have the exits that you just described.

A. Okay.

Q. My question is: Did you ever drive on Route 41 when it didn't have those exits?

A. I don't think so.

Q. So your experience throughout your history of driving as a truck driver from Hammond to Wilton on Route 41 was that those exits were always there?

A. Yes.

Q. How many lanes were there in each direction of traffic north and south from -- on Route 41 and specifically between the stoplights at Park Avenue and Half Day Road where the accident took place?

168

A. There's two lanes going north, two lanes going south.

Q. And am I correct because nobody is turning right or left at that intersection when they're traveling north or south there's no turn lanes?

A. Correct.

Q. Correct?

A. Just a shoulder.

Q. What divides northbound traffic from southbound traffic as one travels north towards the intersection of Half Day Road and Route 41?

A. A median.

Q. A concrete median?

A. I think there is a curb of grass, I think.

Q. A curb with grass, okay.

A. I think once you get past there's a concrete median.

Q. Thank you. So to explain I think what you're saying is if you were to travel north toward the intersection, there would be a median between northbound traffic and southbound traffic as a curb with grass?

A. Right.

Q. And then north of the intersection there's

169

actually a concrete barrier?

A. Yes.

Q. For some distance?

A. Right.

Q. As one were to travel northbound on Route 41 towards the intersection with Half Day Road is there a curb on -- or shoulder on the east side of the road?

A. East side of the road?

Q. Right. In other words, if you're traveling north, what's to your right?

A. It would be a curb.

Q. A hard concrete curb?

A. Right.

Q. As you approach the intersection of Half Day Road and Route 41 while traveling north on Route 41, can you tell me what is on the right-hand side of the road at or around that intersection, the east side of the road?

A. On the right-hand side of the road?

Q. Yes.

A. On this side of the intersection or that side of the intersection?

Q. Both.

170

A. When you come up there on this -- when you come into the stoplight, it's like a grassy field.

Q. On the south to your right?

A. To your right.

Q. Thank you.

A. And then on the other side of the intersection there's a gas station and a restaurant, an old restaurant, I think.

Q. An old restaurant that had at least at the time of the accident was abandoned?

A. Right.

Q. And am I correct that -- Strike that. For how long, if you know, before the intersection is there a grassy area on the southeast side of --

A. I think that's all grass and wooded area on that side of the road.

Q. So how far to the south does that grass and wooded area extend?

A. From one stoplight to the other stoplight.

Q. Okay. So all the way from Park Avenue West's stoplight to Half Day Road if you're going north on the right-hand side it's going to be the grass and woods off from the grass?

171

26 (Pages 168 to 171)

1    A.  Yes.  I think so, yes.
2        MR. SKRYD:  Don't guess, okay.  Just tell
3    us what you know.
4    BY MR. COUTURE:
5    Q.  Nobody wants you to guess.
6    A.  Okay.
7    Q.  All right.  I just heard what Mr. Skryd
8    said.  Are you telling -- is what you're telling me
9    a guess or do you believe it to be true based on
10   driving it every day for years?
11   A.  It's true.
12   Q.  You believe it to be true?
13   A.  Right.
14   Q.  We talked about the right or the east side
15   of the road.  Let's talk about the west side of the
16   road, okay.
17       As one were -- if one were to be traveling
18   northbound on Route 41 towards the intersection of
19   Half Day Road, what would be on the left-hand side
20   all the way on the other side of southbound
21   traffic?
22   A.  At the intersection there's another gas
23   station.  On the south side of the intersection and
24   the north side of the intersection I don't know
                                                    172

1    what kind of businesses are over there.
2    Q.  Okay.  Thank you.  Can you tell me what's
3    south of the gas station that is on the southwest
4    corner?
5    A.  No, not for sure.
6    Q.  Thank you.  And on the northwest corner
7    there's commercial businesses, you just don't know
8    what business they were?
9    A.  Right.
10   Q.  I forgot to ask you this.  When you were
11   making -- for the two to three years that you were
12   making your dedicated run from Hammond to Wilton to
13   did you always take the same route from Wilton to
14   the Chicago area, in other words, your first leg?
15   A.  No.
16   Q.  Your route would change based on where you
17   were going?
18   A.  Right.
19   Q.  So sometimes you would take Route 90 and
20   sometimes you would take 94?
21   A.  Most of the time it was 90 because that's
22   where the rail yards and stuff was at.
23   Q.  Okay.  And because that was during the day
24   when you were -- well, strike that.
                                                    173

1    A.  It was just that's the side where most of
2    the loads went to, that side of Chicago.
3    Q.  Okay.  So I understanding -- have an
4    understanding of your knowledge of this
5    intersection.  We know that every day pretty much
6    for two or three years you were at night driving
7    northbound on Route 41 through that intersection,
8    true?
9    A.  True.
10   Q.  Did you have occasion to drive that route
11   going north on 41 during the day through that
12   intersection?
13   A.  While I worked for Martin's?
14   Q.  Yes.
15   A.  Not very often, no.
16   Q.  And did you have occasion while you -- at
17   any time before this accident to drive south from
18   Wisconsin on 41 through this intersection?
19   A.  No.
20   Q.  When you drove -- well, strike that.
21       You never did or it wasn't typical?
22   A.  It wasn't typical.
23   Q.  Did you ever do that?
24   A.  Yes, probably.
                                                    174

1    Q.  But not that you specifically remember?
2    A.  No.
3    Q.  At any time before this accident did you
4    have an understanding that the intersection where
5    this accident took place was known as a dangerous
6    intersection?
7    A.  No.
8    Q.  Did you ever learn from any source before
9    or after this accident that the intersection of
10   Half Day Road and Route 41, especially for
11   northbound travel, was a safety issue because of
12   vehicles getting off of the Edens Expressway?
13   A.  After the accident I was sitting at the
14   Denny's and there was some local people that was
15   there have mentioned.  That's the only time that I
16   ever heard anything about that being a dangerous
17   intersection.
18   Q.  Okay.  So at that point after the accident
19   when it arose in conversation at the Denny's that
20   your accident had taken place, somebody whose name
21   you don't know said, oh, yeah, that's a dangerous
22   intersection or accidents always happen there?
23   A.  Right.
24   Q.  But that was all you knew about it?
                                                    175

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1    A.  Right.
2    Q.  No one ever warned you or told you to take
3  a different route to stay off of that area before
4  this accident, did they?
5    A.  No.
6    Q.  Did you ever take that into account when
7  you were driving as a truck driver, in other words,
8  if you knew an area was prone to accidents, would
9  you avoid the area?
10    A.  Yeah.
11    Q.  Okay.
12    A.  You would try to be more cautious or try
13  to avoid it, yes.
14    Q.  I see our food's here. So I'm going to
15  wrap up a couple questions and then we can stop.
16    Is there anything about that intersection
17  that you believed as a professional driver was
18  dangerous or would cause the intersection to be
19  prone to accidents?
20    A.  No.
21    Q.  Did you have any direction from Martin's
22  Bulk Milk to stay on an expressway when possible
23  versus getting off on other types of roads?
24    A.  No.

176

1  vehicle traveling northbound on 41?
2    A.  On the side of the road.
3    Q.  Okay. So you remember there being posts
4  with the red, yellow, green lights as opposed to
5  overhanging lights?
6    A.  Right.
7    Q.  Okay. And were the posts just on the --
8  Strike that.
9    For a vehicle traveling northbound on
10  Route 41 would there have been a post with a red,
11  yellow, green light on the southeast corner?
12    A.  Yes.
13    Q.  Would there have been a similar post on
14  the northeast corner?
15    A.  I don't know.
16    Q.  Were there lights in the center, in other
17  words, where the median was facing northbound
18  traffic?
19    A.  I don't remember.
20    Q.  I'm going to talk about the vehicle that
21  you were driving on the day of the occurrence. I
22  understand that that tractor was designated Tractor
23  139?
24    A.  Yes.

178

1    MR. COUTURE:  Why don't we stop and have
2  lunch.
3    THE VIDEOGRAPHER:  We are going off the
4  record. The time is 1:08 p.m.
5    (A break was taken.)
6    THE VIDEOGRAPHER:  We are back on the
7  record. The time is 1:56 p.m. Please proceed.
8  BY MR. COUTURE:
9    Q.  When we took a break, right before we took
10  a break, we were having you describe the
11  intersection. So I just want to ask a couple
12  follow-up questions on that and I'll move on.
13    For a vehicle traveling northbound on
14  Route 41 are there traffic lights at the
15  intersection of Half Day Road and 41?
16    A.  Yes.
17    Q.  Am I correct that because vehicles can't
18  turn right or left there are no turn lights, like
19  green arrows, at that intersection?
20    A.  Right. Yes.
21    Q.  So it's a red, yellow, green stoplight?
22    A.  Yes.
23    Q.  Do you know where in the intersection
24  those are located for a vehicle -- visible for a

177

1    Q.  What was the manufacture -- who
2  manufactured that tractor?
3    A.  Freightliner.
4    Q.  Am I correct that that vehicle was owned
5  by Martin's Bulk Milk Service?
6    A.  Yes.
7    Q.  Do you remember the model year?
8    A.  An '04.
9    Q.  2004?
10    A.  Yes.
11    Q.  And is there a particular model or type of
12  Freightliner that could be used to designate what
13  that vehicle was?
14    A.  A classic.
15    Q.  For how long prior to July 3rd, 2008 were
16  you driving Tractor 139?
17    A.  How long was I driving?
18    Q.  Let me ask you a different -- I understand
19  your confusion the moment I said it.
20    Was that the tractor that you had been
21  driving on a regular basis for a period of time
22  prior to July 3rd, 2008?
23    A.  Yes.
24    Q.  That was the tractor to which you were

179

28 (Pages 176 to 179)

1  assigned?
2      A.  Yes.
3      Q.  When were you first assigned to Tractor
4  139?
5      A.  When it was new, 2004.
6      Q.  So when it was purchased, it was purchased
7  and assigned to you?
8      A.  Yes.
9      Q.  Upon its being purchased and assigned to
10  you was that the tractor you always drove with the
11  possible exceptions of when it was in for
12  maintenance?
13      A.  Yes.
14      Q.  Did that tractor have anti-lock brakes?
15      A.  I don't know.
16      Q.  Did that tractor have cruise control?
17      A.  Yes.
18      Q.  Did that tractor have a sleeper berth?
19      A.  Yes.
20      Q.  Did that tractor have a high/low switch on
21  its gears?
22      A.  Yes.
23      Q.  How many gears did that tractor have?
24      A.  13.

180

1      Q.  To your knowledge was that tractor fitted
2  with an event data recorder or what some people
3  call a black box?
4      A.  To my knowledge I have no idea.
5      Q.  All right.  You were never told before or
6  since this accident that the vehicle -- not
7  counting discussions you had with your lawyer, by
8  the way -- that the vehicle had a black box or an
9  event data recorder?
10      A.  They all do.  I don't understand.  I'm
11  not -- I don't know -- I don't know what you're --
12  I mean, no, I don't know for sure.
13      MR. SKRYD:  Start over again.
14      MR. COUTURE:  I will ask it again.
15      MR. SKRYD:  I'm not quite sure what he
16  said.
17  BY MR. COUTURE:
18      Q.  Okay, let me start and ask a question.
19  There is a device that is sometimes called an event
20  data recorder and in common parlance is called a
21  black box that on some vehicles can record the
22  activities of the engine and on some occasions
23  braking and acceleration of the vehicle.
24      That being the definition of a black box,

181

1  were you aware before this accident that the
2  Tractor 139 had a black box?
3      A.  Yes.
4      Q.  Were you given any instructions by your
5  employer relative to that black box?
6      A.  No.
7      Q.  Did you have to do anything to maintain or
8  affect how that black box worked in your job?
9      A.  No.
10      Q.  For Tractor 139 -- I know you're not going
11  to know the exact number, but I'm just trying to
12  get a general understanding of how the gearing
13  works for that truck, okay.
14      So for first gear, approximately what's
15  the top speed of first gear on that truck before
16  you had to shift?
17      A.  Four or five miles an hour.
18      Q.  Okay.  Second gear, what would the top
19  speed be, approximately?
20      A.  10.
21      Q.  Third gear?
22      A.  About probably 15.  I don't know for sure.
23      Q.  Nobody wants you to guess for sure but you
24  drove that every day --

182

1      A.  Right
2      Q.  -- for a period of four years.
3      A.  Right.
4      Q.  So you would be qualified to give me your
5  best estimate and that's all I'm asking for, okay?
6      A.  Yes.
7      Q.  All right.  Fourth gear, what would be
8  your best estimate of the top gear-- or the top
9  speed you would get to in fourth gear before you
10  had to shift?
11      A.  About 20 miles an hour probably.
12      Q.  And how about fifth gear?
13      A.  Fifth gear probably 35 to 40.
14      Q.  Sixth gear?
15      A.  About the same.
16      Q.  How about seventh?
17      A.  Probably around 50 miles an hour.
18      Q.  Okay.  Eighth?
19      A.  55.  The truck was governed at 65.  So you
20  couldn't go any faster than that at the top speed.
21      Q.  So gears 9 through 13, what would they be
22  used for?
23      A.  13 is your road -- your interstate gear on
24  the road.

183

29 (Pages 180 to 183)

1    Q.   Okay.  What about 12?
2    A.   It was -- 12th gear is -- you can run 12th
3  gear like if you're on slower roads, you know.
4    Q.   Okay.  What speeds, typically?
5    A.   Probably 55 to 60.
6    Q.   All right.  And how about 10th?
7    A.   10th gear?  50 probably.
8    Q.   And 9th?
9    A.   They're so close it's probably the same.
10    Q.   In fact, it sounds like six, seven, eight,
11  nine are all about the same?
12    A.   Yeah.
13    Q.   I'm not a trucker.  So why would someone
14  use 7th gear versus 8th gear versus 9th gear?
15    A.   You got to -- if you got a heavy load on,
16  you got to go in steps.  You can't just go from
17  lower range 5th gear and jump to a 13.  It won't
18  move.
19    Q.   That I understand.  You have to work your
20  way up the cycle to get to 13 --
21    A.   Right.
22    Q.   -- which is your road gear?
23    A.   Right.
24    Q.   Who was in charge of the maintenance of
                                                        184

1  Tractor 139?
2    A.   Martin's Bulk Milk.
3    Q.   If you -- Strike that.
4         Did they have a scheduled maintenance
5  program for that truck, tractor?
6    A.   Yes.
7    Q.   Do you know what that maintenance program
8  was?
9    A.   After so many miles they would -- it would
10  go in for an oil change and --
11    Q.   Okay.  Anything else that you're aware of?
12    A.   They would fix whatever was wrong.
13    Q.   Sure.  Was there a regularly scheduled
14  time every week, month or quarter that you knew
15  that you were not going to have use of that tractor
16  and would have to use another tractor?
17    A.   No.
18    Q.   They would just let you know today you're
19  going to be in a different tractor because we've
20  got to have 139?
21    A.   Yes.
22    Q.   On any occasion prior to September --
23  excuse me, July 3rd, 2008, did you have occasion to
24  observe mechanical problems with that tractor?
                                                        185

1    A.   No.
2    Q.   So at all times that you used it it was
3  operating properly according to what you understood
4  as a truck driver?
5    A.   Yes.
6         (Whereupon, Franke Deposition
7         Exhibit No. 79 was marked for
8         identification.)
9  BY MR. COUTURE:
10    Q.   I'm going to show you what I've marked as
11  Exhibit 79 for identification.
12         Am I correct that that shows the Tractor
13  139 and actually shows it in the condition after
14  the accident?
15    A.   Yes.
16    Q.   So when we talk about your tractor today,
17  we're going to be talking about what's shown in
18  Exhibit 79, true?
19    A.   Yes.
20    Q.   And do you know whether the trailer
21  attached to that tractor in Exhibit 79 is also the
22  trailer that you were pulling or the chassis and
23  box that you were pulling on the day of the
24  occurrence?
                                                        186

1    A.   It's not the same trailer, no.
2    Q.   It's a different trailer?
3    A.   Yes.
4    Q.   Okay.  Thank you.  When you left every day
5  to go to the Chicago area in the two to three years
6  before this accident, would you -- well, strike
7  that.
8         Where was Tractor 139 stored when you
9  weren't driving it?
10    A.   At Martin's.
11    Q.   And that's the Wilton, Wisconsin address?
12    A.   Yes.
13    Q.   So you would drive from your home to
14  Martin's at the start of your workday, correct?
15    A.   Right.
16    Q.   And then you would use Tractor 139 until
17  the end of your workday and drive home?
18    A.   Right.
19    Q.   I'm going to show you what was previously
20  marked as Exhibit 12 for identification.
21         Am I correct that Exhibit 12 is your logs
22  from June 12th, 2008 -- excuse me, let me get these
23  dates right.  They're not in order.  I'll show you
24  the entirety of the document.  There you go.
                                                        187

30 (Pages 184 to 187)

1    Exhibit 12 are your logs from June 3rd,
2  2008 through the last day of your employment with
3  Martin's, correct?
4    A.  Yes.
5    Q.  Okay.  Specifically found in that
6  exhibit -- I want to direct your attention to the
7  days before the occurrence, 6-29-08.  Do you need
8  the logs to know what you did the days before or do
9  you generally remember?
10    A.  I can look at the logs.
11    MR. SKRYD:  Yes, let's have him look at
12  it --
13    MR. COUTURE:  That's fine.
14    MR. SKRYD:  -- so it's more accurate.  Do
15  you need them?  We can use our --
16    MR. COUTURE:  No.  No.  No.  I'll be
17  fine.  I know what they say, where I'm going.
18  BY MR. COUTURE:
19    Q.  Why don't we start at the 29th of June.
20  Did you work on June 29th?
21    A.  No.
22    Q.  It was a day off, right?
23    A.  Yes.
24    Q.  And the next day as well, if you could

188

look.  June 30th, did you work that day?
2    A.  No.
3    Q.  Were you on vacation or was that your
4  standard two days off during a seven-day week?
5    A.  Standard two days off.
6    Q.  Do you remember what you did that weekend
7  or during the 29th and 30th?
8    A.  No.
9    Q.  Nothing specific?  You don't remember
10  whether you traveled or went out of town or just
11  stayed home, you just don't remember?
12    A.  Just don't remember.
13    Q.  Okay.  The following day, July 1st, 2008,
14  am I correct that you drove from -- according to
15  your log -- Mauston to Wilton to Chicago to Hammond
16  to Wilton?
17    A.  It don't say Wilton on here.
18    Q.  I'm sorry?
19    A.  It don't say Wilton on here.
20    Q.  That's true because you ended up getting
21  back to Wilton the following morning on the 2nd?
22    A.  Yes.
23    Q.  Okay.  So a couple of questions.  First of
24  all, I noticed that on most of your logs they all

189

start at Wilton.  This one starts at Mauston.  Did
2  you have the tractor at your home?
3    A.  I parked it at the truck stop.  I grabbed
4  my load for the next day and I drove to Mauston.  I
5  live in Mauston and I spent the night in Mauston.
6    Q.  Is that at your home?
7    A.  Right.
8    Q.  So you actually had the tractor and
9  trailer at your home in Mauston?
10    A.  In a truck stop.
11    Q.  Okay.  Why did you do that?
12    A.  So that I wouldn't have to drive my
13  personal vehicle over to Wilton.
14    Q.  Okay.
15    A.  I just drive to the truck stop in Mauston
16  and either my wife would pick me up and take me
17  home.
18    Q.  Is there any particular reason why you did
19  it that way that day?
20    A.  It's just the load was ready that night
21  and --
22    Q.  Okay.
23    A.  -- instead of -- it just saves time.
24    Q.  How much time does it take you to get from

190

Mauston to Wilton?
2    A.  It's roughly 30-some miles, 31 miles.  So
3  probably 45 minutes, something like that.  I don't
4  know, half an hour.
5    Q.  Do you remember what load you carried from
6  Mauston to Chicago on the 1st of July 2008?
7    A.  It says on here it's a City Brewery load.
8  I don't know exactly what it was.  That's the
9  people who on the bill said that's what it was.
10    Q.  Okay.  Do you know where you dropped that
11  off in Chicago?
12    A.  It just says Chicago, Illinois.
13    Q.  There's a lot of different potential
14  places that could be, right?
15    A.  Yes.
16    Q.  But as you sit here you don't remember, it
17  was four years ago?
18    A.  Right.
19    Q.  And on that day you left Mauston at 11:45
20  a.m.?
21    A.  Yes.
22    Q.  Okay.  Now, I noticed that the next day
23  you left at 1:45 and on the day of the accident you
24  left at 2:30.  What would dictate when you left?

191

1    A.   When my hours was time to go.  Like, you
2  have to take ten hours off.  So whenever your ten
3  hours come, that would dictate when you can leave
4  and when you can't leave.
5    Q.   Okay.  So it's not the same time every day
6  in part because the loads need to potentially be
7  there at different times and because you need to be
8  not driving for a certain amount of time in order
9  to meet Federal regulations?
10    A.   Right.
11    Q.   Okay.  You arrived home in Wilton or back
12  to Wilton on actually the following day, on July
13  2nd at 1:00 a.m., true?
14        MR. SKRYD:  Flip it.
15        THE WITNESS:  True.
16  BY MR. COUTURE:
17    Q.   And when you made that trip from Hammond
18  to Wilton, did you drive through the intersection
19  where the accident eventually occurred?
20    A.   Yes.
21    Q.   Did anything of note happen while you made
22  that drive?
23    A.   No.
24    Q.   Do you remember if you had to stop at the
                                              192

1    A.   Yes.
2    Q.   What were you hauling to Chicago on the
3  2nd?
4    A.   It says City Brewery Corp.
5    Q.   City Brewery?
6    A.   Yes.
7    Q.   So a similar load as the day prior?
8    A.   Yes.
9    Q.   Do you remember where you dropped that
10  load in Chicago?
11    A.   It just says Chicago.
12    Q.   When you took that load to Chicago, do you
13  remember what route you took to Chicago on the 2nd?
14    A.   Probably took 90.
15    Q.   That's your expectation because that would
16  be typical for you?
17    A.   Yes.
18    Q.   But as far as exactly what happened on
19  that day you can't say, fair?
20    A.   Fair.
21    Q.   All right.  Then after dropping off your
22  load in Chicago you went to Hammond again, true?
23    A.   On this sheet here it says I went to
24  Bedford Park.
                                              194

1  stoplight at the intersection of 41 and Half Day
2  Road on the 1st of July 2008, two days before the
3  accident?
4    A.   July -- depends if the light was red or
5  green.
6    Q.   I got you.  But do you remember if you had
7  to do it?
8    A.   No.
9    Q.   That's fine.  Now, the next day, what time
10  did you leave Wilton or Mauston?
11    A.   On the 3rd?
12    Q.   2nd.
13    A.   You said the next day.
14    Q.   I'm sorry.  You got home on the 2nd, you
15  went to bed and then --
16    A.   1:45.
17    Q.   -- you went to work?
18        MR. SKRYD:  Let him finish his question.
19  BY MR. COUTURE:
20    Q.   I paused; it's my fault.
21        You got home, you went to sleep, you
22  started back to work 1:45?
23    A.   Yes.
24    Q.   And you were again going to Chicago?
                                              193

1    Q.   Bedford Park.  And that is a rail yard?
2    A.   Yes.
3    Q.   Do you know why you went to a rail yard at
4  Bedford Park on the 2nd of July?
5    A.   A lot of times when you drop trailers at
6  one rail yard, they don't have any empties there so
7  they send you to another rail yard.
8    Q.   Do you know that that was the case on the
9  2nd or is that your expectation of what happened?
10    A.   It's according to the log here.  That's
11  what it says.
12    Q.   It says that you had to go to the other
13  rail yard to get another trailer?
14    A.   Yes.
15    Q.   Okay.  And then you went from there to
16  Hammond?
17    A.   Yes.
18    Q.   What time did you leave Hammond on the 2nd
19  of July, 2008?
20    A.   It says 8:15.
21    Q.   And what route -- Strike that.
22        You were carrying paper products, correct?
23    A.   Yes.
24    Q.   And what route did you take to get from
                                              195

32 (Pages 192 to 195)

1  Hammond to your final destination which, if I
2  understand it, you completed the next morning?
3      A.  Same route.
4      Q.  Same route meaning 94, exit 41, get back
5  on 94 and then complete your trip to Wilton?
6      A.  Yes.
7      Q.  Do you specifically remember driving
8  through the intersection of 41 and Half Day Road
9  the day before the occurrence?
10     A.  No.
11     Q.  I know you drove that every day so the
12 likelihood is probably not but I got to ask.
13         You don't remember the day before what
14 happened as you went through that intersection, do
15 you?
16     A.  No.
17     Q.  Let's talk about the day of the
18 occurrence.  Well, actually, let me ask you this.
19 When you got home from your trip that started on
20 the 2nd of July 2008, what did you do when you got
21 home?
22     A.  It says here I got back at 1:00 a.m. in
23 the morning.
24     Q.  Right.

196

1      A.  So you would go home, relax a little bit,
2  go to bed about 3:30 in the morning probably.  Go
3  to bed.
4      Q.  Okay.  Was that your typical course that
5  when you -- if you arrived home at 1:00 a.m. or
6  around thereabouts, you'd go home, relax for a
7  little bit and then go to bed?
8      A.  Yes.
9      Q.  Do you know what time you got up after
10 sleeping from -- well, strike that.
11         When you relaxed a little bit in the early
12 morning hours of July 3rd, 2008, what time did you
13 go to bed, if you know?
14     A.  I don't know exactly.
15     Q.  Can you give me your best estimate?
16     A.  3:30.
17     Q.  And what time did you wake up that
18 following -- or later that morning?
19     A.  Noon.
20     Q.  When you went to bed that morning at 3:30
21 approximately, did you already know what you were
22 going to be driving for the following -- for the
23 next trip, in other words, later on the 3rd when
24 you woke up?  Strike that.  That was a confusing

197

1  question because it's morning and morning.
2          When you went to bed on the early morning
3  hours of July 3rd, 2008, did you already know what
4  trips that you were going to be making when you
5  woke up and went back to work?
6      A.  Yes.
7      Q.  So the papers that you get from Martin's
8  Bulk as far as what you were going to be driving,
9  you already had those such that you knew where you
10 were going to be going?
11     A.  On -- yes.
12     Q.  I'm sorry?
13     A.  Yes.
14     Q.  Okay.  What did you do when you woke up at
15 approximately noon on July 3rd, 2008?
16     A.  Got ready for my trip.
17     Q.  Did you eat anything?
18     A.  Yes, eat.
19     Q.  What did you eat?
20     A.  I don't know.  I don't know.
21     Q.  What did you drink?
22     A.  Probably Diet Mountain Dew.
23     Q.  A caffeinated beverage, correct?
24     A.  Right.

198

1      Q.  All right.  Did you take any medication
2  that morning?
3      A.  Just my pills for my diabetic -- diabetes.
4      Q.  Is that the only pills that you were on
5  medically on the day of the occurrence?
6      A.  Yes.
7      Q.  What was the name of that medication?
8      A.  Metformin.
9      Q.  And how often did you take it?
10     A.  Once in the morning, once at night.
11     Q.  Had you ever prior to this occurrence
12 missed a dose?
13     A.  An occasion.
14     Q.  Did it have any affect on your body when
15 you missed a dose as far as how you were able to go
16 about your life?
17     A.  No.
18     Q.  Did it cause you any dizziness or any
19 nausea or anything like that?
20     A.  No.
21     Q.  Did you suffer from any side effects when
22 you took Metformin?
23     A.  No.
24     Q.  Did you have any other medical conditions

199

33 (Pages 196 to 199)

1    on July 3rd, 2008 other than borderline diabetes?
2        A.   No.
3        Q.   After you got up, ate breakfast, took your
4    diabetes medication where did you go?
5        A.   Back to Wilton.
6        Q.   You drove your personal car to Wilton?
7        A.   Yes.
8        Q.   And according to your log you started
9    driving your truck at 2:30 p.m., correct?
10       A.   Yes.
11       Q.   What time did you arrive at Wilton?
12       A.   I don't know for sure.
13       Q.   Did you speak to anyone regarding the load
14   that you were going to be pulling either to Chicago
15   or from Hammond that day before you left?
16       A.   No.
17       Q.   Do you remember who the dispatcher was on
18   July 3rd, 2008 when you left Wilton with your load?
19       A.   There's quite a few dispatchers in there.
20           MR. SKRYD:  He asked you if you knew which
21   one it was.
22   BY MR. COUTURE:
23       Q.   How many dispatchers would have been
24   working on that day?

200

1        A.   Four.
2        Q.   Is there one that was designated to
3    dispatch you --
4        A.   No.
5        Q.   -- and your routes?
6        A.   No.
7        Q.   Do you know who those four dispatchers
8    were that were present?
9        A.   It's been four years.  No, I don't know
10   all their names.  I know there's two women and two
11   guys.
12       Q.   Do you know any of their names?
13       A.   One was Dave.
14       Q.   Dave Martin?
15       A.   Yes.  And then I'm drawing a blank.
16       Q.   Okay.  When you're driving a dedicated
17   route, for example, from Hammond to Wilton every
18   day, what role do dispatchers play in that haul?
19       A.   The role they play, they would give me my
20   pickup number for the load that I'm going to pickup
21   later on that day and they would give me my
22   reservation number when I needed an empty chassis
23   or whatever and they would tell me if the time
24   changed from my -- you know, pickup time that I had

201

1    to be down there to pickup the load.  That's about
2    it.
3        Q.   Okay.  According to your log you were
4    going to City Brewing Company in Chicago?
5        A.   No.
6        Q.   I'm sorry.  I'm looking at your log from
7    7-3-08.  When you were headed out from Wilton,
8    where were you going to?
9        A.   Chicago.
10       Q.   What were you hauling to Chicago from
11   Wilton?
12       A.   A City Brewery load.
13       Q.   Okay.  That's what I was trying to
14   understand.  Do you know where in Chicago you
15   dropped off that City Brewery load?
16       A.   No.
17       Q.   According to your log from July 3rd, 2008,
18   am I correct that it took you from 2:30 p.m. until
19   6:30 p.m. to drive to Chicago?
20       A.   Yes.
21       Q.   And then from 6:30 to 7:00 you were in
22   Chicago on duty but not driving?
23       A.   Right.  Yes.
24       Q.   Am I to understand that at that time you

202

1    were dropping off your load?
2        A.   Yes.
3        Q.   As you sit here today do you remember
4    where it was that you dropped off your load in
5    Chicago?
6        A.   47th Street.
7        Q.   And that's a rail yard?
8        A.   Yes.
9        Q.   And during that period of time you would
10   have left your trailer and had to have gotten a new
11   one, true?
12       A.   Yes.
13       Q.   You know that in part -- well, strike
14   that.
15           It says Chicago, Illinois drop hook.  Drop
16   hook, what does that mean?
17       A.   It means that you drop one trailer and you
18   hookup the other trailer.
19       Q.   That's what I thought but I wanted to make
20   sure that I wasn't wrong.  And it says P-T-I.  What
21   does that designate?
22       A.   Pre-trip inspection.
23       Q.   Okay.  Indicating that you pickup a
24   trailer and you did your required inspection?

203

1    A.  Right.
2    Q.  When you -- well, strike that.
3        How is it that you remember or know that
4  you were at 47th Street on July 3rd, 2008?  Is it
5  indicated in your log?
6    A.  No.
7    Q.  Do you remember from personal memory?
8    A.  Personal memory, yes.
9    Q.  When you arrived there and dropped off,
10  you had to pickup a trailer?  You said that, right?
11    A.  Yes.
12    Q.  Do you remember how -- Strike that.
13        Were you assigned a trailer or did you
14  choose one on your own?
15    A.  You're assigned a reference number and
16  then you go and they tell you where the empties are
17  at and they either have a green tag, meaning that
18  they're good to go, if they don't have any tags on,
19  you just don't pick those trailers.
20    Q.  So on the 3rd of July 2008 when you were
21  at the 47th Street yard, you weren't specifically
22  told by anyone which trailer or chassis and box to
23  pick, you were given a choice of the ones that had
24  a green tag?

204

1    A.  Yes.
2    Q.  And you chose whichever one you felt fit
3  your purpose?
4    A.  Right.
5    Q.  Were they all essentially the same size?
6    A.  Yes.
7    Q.  So, really, as long as it looked to be in
8  good shape to you, it didn't much matter?
9    A.  Correct.
10    Q.  On that day did you have to -- when you
11  did your pre-trip inspection did you find anything
12  wrong with the chassis and trailer that you first
13  chose -- chassis and box that you first chose?
14    A.  Apparently not.
15    Q.  Do you have a specific recollection?
16    A.  No.
17    Q.  Okay.  Sometimes you pick one and you do a
18  pre-trip and you realize that it's not good so you
19  pick another one?
20    A.  Correct.
21    Q.  You don't know if that happened on that
22  day?
23    A.  No.
24    Q.  But that process took a half hour

205

1  according to your log?
2    A.  Yes.
3    Q.  And then you drove for a half hour to
4  Hammond according to your log?
5    A.  Yes.
6    Q.  What route did you take to get to Hammond
7  from 47th?
8    A.  Probably down 94 and -- 94 to Hammond -- I
9  don't remember if it's 290 or it's 294.  I don't
10  know which route I took.
11    Q.  Okay.  So at 7:30 p.m. you arrived in
12  Hammond?
13    A.  Yes.
14    Q.  And then they loaded the box and container
15  that you brought with you from 47th Street?
16    A.  Yes.
17    Q.  And according to this -- well, strike
18  that.
19        How long did it take for them to load you?
20    A.  From 7:30 to 9:30 or 9:45.
21    Q.  According to your log, you're off duty
22  from 7:30 to 9:30 and then there's 15 minutes that
23  you're on duty and not driving, correct?
24    A.  Right.

206

1    Q.  What were you doing for the two hours that
2  you were off duty in Hammond?
3    A.  Either catch up on your paperwork, either
4  relax in the truck until they're ready to load you
5  and then when they're ready to load you, you go in
6  and stand on the dock and watch them load your
7  truck.
8    Q.  Okay.  If you can, explain something for
9  me.  When you're designated as off duty, does that
10  mean you're not working at all or does that mean
11  that you're not driving but you can still be
12  working?
13    A.  I'm not driving.
14    Q.  But on duty and not driving is a
15  completely separate designation on your log.  So
16  how do you differentiate between on duty and not
17  driving versus off duty?
18    A.  Well, on duty/not driving is stuff you
19  do -- you're working.  I mean, like dropping
20  trailers or -- and then when you're off duty,
21  you're not driving -- or working.
22    Q.  Okay, so hypothetical.  You're in Hammond,
23  your vehicle is stopped, you're pulled up to a
24  loading bay and they're loading you.  Would you

207

35 (Pages 204 to 207)

1  write in your logs that you are off duty or would
2  you write in your logs that you're off duty/not
3  driving?
4      A.  Until they start -- off duty until they
5  start loading and then when you go in and stand
6  on the dock or whatever, you're on duty.
7      Q.  Okay.  So according to your log am I -- is
8  it correct for me to understand that there was a
9  two-hour window where they were not loading you and
10  your -- you and your truck were at Hammond?
11      A.  Yes.
12      Q.  And then there was a 15-minute time period
13  from 9:30 to 9:45 when they were actually loading
14  you?
15      A.  Yes.
16      Q.  Do you remember on the day of this
17  occurrence what you did for the hour -- excuse me,
18  two hours from 7:30 to 9:30 that you were in
19  Hammond but they weren't loading you?
20      MR. SKRYD:  Objection to form.  Go ahead.
21      THE WITNESS:  I was sitting in my truck,
22  you know, doing my paperwork or catching my -- I do
23  my paperwork as I do it every time I stop the
24  truck, I keep current on my paperwork, and just
                                                    208

1  basically relaxing.
2  BY MR. COUTURE:
3      Q.  Is your answer based on what you typically
4  did over the period of years that you went --
5      A.  Right.
6      Q.  -- to Hammond or are you saying on that
7  day I remember doing what you just described?
8      A.  That's what I typically do.  I'm not for
9  sure exactly what I did that day.
10      Q.  So do you remember if you made any phone
11  calls or texted anybody during that time period
12  while you were off duty waiting for them to load
13  you?
14      A.  I don't know.  It could be possible.
15      Q.  And do you specifically remember watching
16  them load your truck from 9:30 to 9:45 on the day
17  of the occurrence?
18      A.  Yes.
19      Q.  And as they did so did you have any
20  criticisms of the way the truck was loaded?
21      A.  No.
22      Q.  I forgot to ask you something.  When you
23  left Hammond -- excuse me.  When you left 47th
24  Street with the new -- to you anyway -- box and
                                                    209

1  chassis that day, you did a pre-trip inspection,
2  correct?
3      A.  Yes.
4      Q.  Did you re-inspect your tractor or did you
5  just inspect the box and chassis?
6      A.  You do a complete walk around the whole
7  thing.
8      Q.  Did you find any lights out?
9      A.  No.
10      Q.  Did you find any braking problems?
11      A.  No.
12      Q.  And, in fact, had you, you would have
13  written them down on your log sheet, right?
14      A.  Correct.
15      Q.  There's a spot specifically for that?
16      A.  Correct.
17      Q.  Other than the general designation "paper
18  products," can you tell me what that load was that
19  you were taking from Hammond to Wilton on July 3rd,
20  2008?
21      A.  It was just general paper.  I didn't know
22  exactly what it was per se.
23      Q.  Did you have an understanding at that time
24  when that load had to be back to Wilton in order to
                                                    210

1  be on time at its final destination?
2      A.  Yes.
3      Q.  What was your understanding regarding
4  timing of that load?
5      A.  It had to be back there before Monday
6  morning.
7      Q.  And this was a Thursday, correct?
8      A.  Yes.
9      Q.  You're looking with confused eyes.  Do you
10  know that the 3rd of July, 2008, was a Thursday?
11      A.  Yes.
12      Q.  Okay.  So you actually had, if you wanted
13  it or needed it, the rest of Thursday, all of
14  Friday, all of Saturday, all of Sunday to get that
15  load from Hammond to Wilton?
16      A.  Yes.
17      Q.  When you typically did Thursday runs from
18  Hammond to Wilton, when would the load from Hammond
19  be expected or required to be at Wilton?
20      A.  Before Friday morning.
21      Q.  So it was expected that you would drive
22  overnight and get that load there the next day?
23      A.  Yes.
24      Q.  Why was it that the load from July 3rd had
                                                    211

36 (Pages 208 to 211)

1 until Monday the 7th?
2    A. Because the 4th is a holiday.
3    Q. Okay. So Friday was a holiday and then
4 you had the weekend?
5    A. Yes.
6    Q. Had you previously driven into a holiday
7 weekend, in other words, the last day before a
8 holiday weekend as a truck driver?
9    A. What do you mean?
10    Q. Okay. In your experience driving from
11 Hammond to Wilton regularly in the three -- two or
12 three previous years, I expect that on occasion you
13 would be driving when you realized you had an
14 extended amount of time to bring the load because
15 of a holiday weekend? Has that happened before?
16    A. Yes.
17    Q. On those occasions did you ever use all of
18 the allotted time to bring your load to Wilton, in
19 other words, take three days to bring it?
20    A. No, not normally.
21    Q. Was it your typical course of action to
22 drive straight to your -- to Wilton?
23    A. Yes.
24    Q. On July 3rd, 2008 when you left Hammond --

212

1    A. Yes.
2    Q. -- was it your plan to continue to drive
3 to Wilton all the way?
4    A. When I left, yes.
5    Q. Okay. Thank you. And when you left
6 Wilton -- excuse me.
7       When you left Hammond on July 3rd, 2008,
8 what time was that?
9    A. 9:45.
10    Q. And you're referring to your log, which is
11 fine, but that's the basis of your 9:45 answer,
12 correct?
13    A. Yes.
14    Q. Do you specifically remember as you sit
15 here looking at your watch and seeing 9:45?
16    A. Do I remember exactly?
17    Q. Yes.
18    A. No.
19    Q. There's nothing wrong with you
20 referring -- refreshing your recollection with a
21 document. I just want to know whether you're doing
22 that. You're using the log to get that number,
23 right?
24    A. Yes.

213

1    Q. Okay. While you were -- Strike that.
2       Did you receive any dispatch instructions
3 specifically regarding that load from anybody
4 either by telephone or by CB radio or other method
5 before you left Hammond that night?
6    A. Before I left Hammond?
7    Q. Yes.
8    A. As to where it went?
9    Q. You told me that a dispatcher from
10 Martin's Bulk Milk could call you and direct you
11 and tell you time changes or load changes, stuff
12 like that, right?
13    A. Yes. Correct.
14    Q. Did any of that happen --
15    A. No.
16    Q. -- at any time on July 3rd, 2008?
17    A. No.
18    Q. When was the last time prior to your
19 leaving Hammond on July 3rd, 2008 that you had
20 spoken directly with someone from Martin's Bulk
21 Milk?
22    A. They -- most of the time they give you
23 that information before you leave. So I probably
24 wouldn't have talked to them when I was down

214

1 there. Because at 6:30 at night there's normally
2 nobody in the office.
3    Q. So your expectation is that from the time
4 you left Wilton until the time you got to Hammond
5 you probably didn't even speak to anyone from
6 Martin's?
7    A. Right.
8    Q. What time does the office close in Wilton
9 for Martin's?
10    A. 5:30, 6:00 o'clock.
11    Q. Is there an emergency contact if you're
12 driving and it's 2:00 a.m. and you need to get a
13 hold of somebody?
14    A. Yes.
15    Q. And who would that be?
16    A. It would be either Dave or Janet.
17    Q. So as part of your instructions from
18 Martin's Bulk Milk you were told that if there was
19 an emergency, Dave or Janet were the people to
20 contact?
21    A. Yes.
22    Q. And you had their personal cell phones?
23    A. Yes.
24    Q. When you left Hammond at 9:45 on July 3rd,

215

37 (Pages 212 to 215)

1   your plan was to take I94 around Lake Michigan up
2   north and get off at 41, correct?
3       A.  Yes.
4       Q.  Do you know the weight of the load that
5   you were pulling at the time of this accident?
6       A.  Do I remember?
7       Q.  Yes.
8       A.  No.
9       Q.  If I were to tell you that the Illinois
10  State Police weighed your truck after the accident
11  and the gross weight of your truck was indicated to
12  be 73,750 pounds, would that sound right to you?
13      A.  Yes.
14      Q.  And I found out yesterday that that truck
15  and trailer would be rated to 80,000 pounds.  Is
16  that your understanding?
17      A.  Yes.
18      Q.  So 73,750 sounds right?
19      A.  Yes.
20      Q.  No reason to disagree if the State Police
21  say that that's what it was?
22      A.  No.
23      Q.  Did you have any plans for the 4th of
24  July, the day after this accident?

216

1       A.  Electric glide standard.
2       Q.  What year?
3       A.  '04.
4           MR. COUTURE:  I'm going to take a quick
5   break because I'm about to get into the meat of the
6   stuff.
7           THE VIDEOGRAPHER:  This is the end of
8   Media Number two.  We're going off the record.  The
9   time is 2:47 p.m.
10          (A break was taken.)
11          THE VIDEOGRAPHER:  This is the beginning
12  of media number three.  We are back on the record.
13  The time is 3:04 p.m.
14  BY MR. COUTURE:
15      Q.  When we left off it was the 3rd of July
16  and you were leaving Hammond, Indiana, okay?
17      A.  Okay.
18      Q.  All right.  What was the traffic like on
19  94 that night?
20      A.  Going through Chicago?
21      Q.  Yes.
22      A.  Very heavy.
23      Q.  When you say heavy, stop-and-go or --
24      A.  Yes.

218

1       A.  Yes.
2       Q.  What were those plans?
3       A.  Going on a poker run.
4       Q.  And what's that?
5       A.  You ride your motorcycle from and you go
6   around and pickup cards from each designated area
7   and then you go back and whoever has the best hand
8   wins.
9       Q.  Okay.  So it's like an adult version of a
10  scavenger hunt?
11      A.  Basically, you go to the place they setup
12  and you ride your bike from one destination to the
13  next and every place you go you draw a card and
14  then when you get back -- they put money in the pot
15  and whoever has the winning hand wins the pot.
16      Q.  Okay.  So this was a 4th of July -- a way
17  to celebrate the 4th of July?
18      A.  For me, yes.
19      Q.  Okay.  And you owned a motorcycle at that
20  time?
21      A.  Yes.
22      Q.  What kind of motorcycle did you have?
23      A.  Harley Davidson.
24      Q.  What model?

217

1       Q.  -- 20 miles an hour consistently?
2       A.  Stop-and-go.
3       Q.  When you left Hammond or any time before
4   that, did you consider altering your route in light
5   of the 3rd of July traffic and the baseball games
6   occurring in Chicago on that day?
7       A.  I wasn't aware of the baseball games or I
8   totally forgot about it.
9       Q.  Okay.  Did you understand that there were
10  going to be fireworks in the City of Chicago that
11  evening?
12      A.  No.
13      Q.  That actually did happen, right?
14      A.  Yes.
15      Q.  So you had a slow trip through Chicago and
16  up north to the area where 94 splits off to Route
17  41?
18      A.  Yes.
19      Q.  Did you at any time during that slow
20  moving traffic make a call to anyone to address
21  scheduling issues?
22      A.  No.
23      Q.  Because your cargo wasn't due anywhere
24  until the 7th, you didn't need to call anybody to

219

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1    say you were going to be late; fair to say?
2        A.  Right.
3        Q.  As you were driving on 94 but before
4    exiting on to 41 did you use your cruise control?
5        A.  No.
6        Q.  At any point between when you exited on to
7    41 -- well, strike that.
8            How fast were you going when you exited 94
9    on to Route 41?
10       A.  How fast was I going --
11       Q.  Yes.
12       A.  -- when I exited 94 to 41?  Probably below
13   the speed limit.
14       Q.  Why were you traveling below the speed
15   limit when you got off of 94?
16       A.  It was probably because of traffic.
17       Q.  Do you remember what gear you were in when
18   you exited 94 on to 41?
19       A.  I was on the interstate so probably 12th.
20       Q.  Okay.  Now, when 94 -- Strike that.
21           When you exit off of 94 on to 41, am I
22   correct that in order to do that you just stay in
23   the right-hand lane and keep going forward, right?
24       A.  No.

                                            220

1        Q.  Is there a cloverleaf?
2        A.  94 goes off to your right.  41 goes to
3    your left.
4        Q.  Okay.  I'm sorry.  I had it wrong.  So as
5    you're driving on 94 north and are going to get on
6    41 you stay in the left-hand side of the road and
7    continue straightforward?
8        A.  Yes.
9        Q.  Thank you.  So you don't have to go
10   through a -- on a ramp in order to make that exit?
11       A.  No.
12       Q.  And there's no stoplight right at that
13   exit, correct?
14       A.  Correct.
15       Q.  As you -- Strike that.
16           After you exited off of 94 on to 41, did
17   you change your speed?
18       A.  Yes.
19       Q.  From what to what?
20       A.  Probably -- when I first got on to 41?
21       Q.  Yes.
22       A.  Probably 55 to 40.
23       Q.  Now, understanding that the speed limit on
24   41 north is 50 miles an hour, was it your goal to

                                            221

1    go 10 miles an hour under the speed limit when you
2    made that change from 55 to 40?
3        A.  What do you mean by goal?
4        Q.  Did you purposefully lower the speed of
5    your vehicle to 40 miles an hour as you exited?
6        A.  Yes.
7        Q.  Okay.  And why did you do that?
8        A.  Because 41 is a slower -- it's not an
9    interstate.
10       Q.  Okay.  Did you understand that it was 50
11   miles an hour?
12       A.  No.
13       Q.  Did you understand that it was 45 miles an
14   hour?
15       A.  Yes.
16       Q.  Okay.  Why is it that you lowered your
17   speed from 55, the speed limit, to 40, five less
18   than the speed limit, as you got on to 41?
19       A.  I don't know.
20       Q.  Do you specifically remember looking at
21   your speedometer and saying I'm going to lower my
22   speed to 40?
23       A.  Yes.
24       Q.  But you don't remember why you did that

                                            222

1    specifically?
2        A.  It's just because it's not interstate.
3        Q.  I understand that.  Is it your practice to
4    drive five miles an hour below the speed limit when
5    you're not on an interstate?
6        A.  Yes.
7        Q.  So if you're in a 25-mile-an-hour zone,
8    you always go 20?
9        A.  Yes.
10       Q.  In order to accomplish the drop in speed
11   from 55 to 40 miles an hour did you change gears?
12       A.  Probably -- I don't know.
13       Q.  You don't remember?
14       A.  I don't remember.
15       Q.  What was the traffic like on Route 41
16   north as you entered on to 41 off of 94?
17       A.  Lighter than it was -- lighter than 94.
18       Q.  Can you give me any description of the
19   traffic other than lighter than 94?
20       A.  Not as many cars.
21       Q.  Was it stop-and-go?
22       A.  No.
23       Q.  You were able to travel at 40 miles an
24   hour without having to stop as a result of vehicles

                                            223

                            39  (Pages 220 to 223)

1    in front of you?
2        A.   As far as I know, yes.
3        Q.   Okay.  As you exited on to 41 off of 94,
4    was there a car in front of you or any vehicles in
5    front of you?
6        A.   As I -- I don't remember.
7        Q.   Then you wouldn't be able to tell me how
8    close the nearest vehicle in front of you was,
9    right?
10       A.   Right.
11       Q.   As you got on to 41 north from 94, which
12   lane were you in?
13       A.   The left lane.
14       Q.   On 41 is it two lanes all the way north?
15       A.   Yes.
16       Q.   Okay.  So you were in the left -- left
17   most of two lanes?
18       A.   Yes.
19       Q.   And why did you choose that lane?
20       A.   You have to stay to the left to get on to
21   41.
22       Q.   Sure.
23       A.   If you stay to the right, you'll exit on
24   to 94.
                                                    224

1        Q.   Okay.  Sure.  But is the exit for 41 two
2    lanes, in other words, the left two lanes go to 41
3    and the right two lanes go to 94?
4        A.   Right.
5        Q.   Do you know why you chose the left most of
6    the two lanes for 41?
7        A.   No, I don't know for sure.
8        Q.   When you say you don't know for sure, that
9    suggests you might know not for sure.  Do you know
10   at all?
11       A.   No.
12       Q.   As you entered Route 41 north on July 3rd,
13   2008, was there -- in the left lane was there any
14   vehicle in the right lane next to you?
15       A.   I don't know.
16       Q.   Was there any vehicle in the right lane in
17   front of you?
18       A.   I don't know.
19       Q.   Was there any vehicle in the right lane to
20   the south of you or behind you as you got on to 41?
21       A.   I don't remember.
22       Q.   Okay.  Were there any vehicles behind you
23   in the left-hand lane of 41 as you entered 41 off
24   of the interstate?
                                                    225

1        A.   I don't know for sure --
2        Q.   Okay.
3        A.   -- no.
4        Q.   From what you are saying it seems to me
5    that you're saying there may have been but you
6    don't know?
7        A.   Right.
8        Q.   Okay.  You're not saying that there were
9    no cars anywhere around you?
10       A.   No, I'm not saying that.
11       Q.   There was traffic, you just don't know
12   where it was?
13       A.   Right.
14       Q.   At any point before you arrived at the
15   intersection of 41 and Park Avenue West, Park
16   Avenue, the first stoplight, did you change lanes
17   from the left lane?
18       A.   No.
19       Q.   I'm sorry?
20       A.   No.
21       Q.   At any time -- well, strike that.
22           Did you change your speed after lowering
23   your speed to 40 miles an hour as you were on Route
24   41?
                                                    226

1        A.   When I came to a stoplight, I stopped at a
2    stoplight.
3        Q.   You stopped at the intersection of Park
4    Avenue and 41?
5        A.   Yes.
6        Q.   So in order to stop at that light you,
7    obviously, changed your speed?
8        A.   Yes.
9        Q.   When you came to that stoplight, where
10   were you in relationship to the stop line; in other
11   words, were you the first car in line, the second
12   car in line at the stoplight?
13       A.   I think I was the first car, first
14   vehicle.
15       Q.   As you stopped at the intersection of Park
16   Avenue and 41 were there any vehicles stopped in
17   the left-hand lane -- excuse me, you were in the
18   left-hand lane.
19           Were there any vehicles stopped in the
20   right-hand lane next to you?
21       A.   I don't know for sure.
22       Q.   As you stopped as the first vehicle in the
23   left-hand lane at the intersection of 41 and Park
24   Avenue were there any vehicles stopped behind you?
                                                    227

                                  40 (Pages 224 to 227)

1    A.  I don't know.
2    Q.  Did you for that stop arrive at a red
3  light or did you see it turn as you approached Park
4  Avenue, the intersection of Park Avenue and 41?
5    A.  I stopped at the red light.
6    Q.  So it was red when you arrived?
7    A.  Yes.
8    Q.  How long did you sit at that light?
9    A.  A couple minutes -- two minutes.
10   Q.  And what, if anything, did you do in your
11 vehicle as you sat at that light?
12   A.  Prepared to leave, like put the truck in a
13 lower gear.
14   Q.  Anything else you do in that two minutes?
15   A.  Watch the light.
16   Q.  Did you make any calls?  Did you look at
17 any paperwork, anything?
18   A.  No.
19   Q.  As one sits at the stoplight at Park
20 Avenue and 41 facing north, can you see the light
21 at Half Day Road ahead of you?
22   A.  No.
23   Q.  And I think you indicated that the
24 intersection of Half Day Road and 41 would have
                                                    228

1    A.  No.
2    Q.  Do you remember the temperature that
3  evening?
4    A.  No.
5    Q.  Do you have an air-conditioner in your
6  truck?
7    A.  Yes.
8    Q.  Did you have your air-conditioner on or
9  windows down or can you tell me?
10   A.  I don't know.
11   Q.  I understand there were fireworks that
12 evening in certain municipalities in the Chicago
13 area; is that true?
14   A.  Yes.
15   Q.  Did you observe any of those on the
16 roadway while you were driving from Hammond to
17 where you got off on Route 41 -- did you see off in
18 the distance?
19   A.  Yes.
20   Q.  As you were driving on Route 41 were there
21 any fireworks displays going on?
22   A.  Not -- I don't remember.
23   Q.  Okay.  After the light at Park Avenue and
24 Route 41 turned green I expect you proceeded
                                                    230

1  been a half mile to a mile ahead, correct?
2    A.  Right.  Yes.
3    Q.  Now, are there curves in the road such
4  that you can't see the intersection of Half Day
5  Road and Route 41 as you sit at the intersection of
6  Park Avenue and 41 facing north?
7    A.  I don't know.
8    Q.  Is it just -- is there anything blocking
9  your view or is it just a matter of distance?
10   A.  Distance.
11   Q.  On July 3rd, 2008 when you were stopped at
12 Park Avenue and Route 41, it was dark out, correct?
13   A.  Yes.
14   Q.  What was the weather like?
15   A.  Typical night.  It wasn't raining or --
16   Q.  Any rain?
17   A.  No.
18   Q.  Any fog?
19   A.  No.
20   Q.  Any weather phenomenon that affected your
21 visibility?
22   A.  Not as far as I know.
23   Q.  Any weather phenomenon that affected your
24 ability to handle your vehicle?
                                                    229

1  forward north, correct?
2    A.  Correct.
3    Q.  At any time before -- between the time
4  that you started proceeding on the green light at
5  Park Avenue and 41 until the accident did you
6  change lanes from the left-hand lane?
7    A.  Yes.
8    Q.  How far did you go past the intersection
9  of Park and 41 before you changed lanes?
10   A.  About 200 feet.
11       MR. BURKE:  I couldn't hear that.
12       THE WITNESS:  200 feet.
13       MR. BURKE:  Thank you.
14 BY MR. COUTURE:
15   Q.  How fast were you going at the time you
16 made the lane change from the left lane to the
17 right-hand lane 200 feet north of the intersection
18 with Park?
19   A.  30 miles an hour.
20   Q.  At that time were you accelerating out of
21 your stop still?
22   A.  Yes.
23   Q.  Did you continue to accelerate when you
24 got into the right-hand lane?
                                                    231

41 (Pages 228 to 231)

1    A.   No.
2    Q.   What gear were you in when you were
3  traveling at 30 miles an hour in the right-hand
4  lane of Route 41?
5    A.   Fourth.
6    Q.   And why did you stop accelerating at 30
7  miles an hour?
8    A.   I don't know.
9    Q.   You already told me you understood the
10  speed limit to be 45?
11    A.   Right.
12    Q.   And you've already told me that you
13  typically go five miles an hour under the speed
14  limit, right?
15    A.   Right.
16    Q.   Okay.  Is there any reason why you stopped
17  at 30 and didn't go any faster?
18    A.   No.
19    Q.   Was there traffic in front of you impeding
20  your ability to go faster than 30?
21    A.   I don't remember.
22    Q.   What is the highest speed your truck
23  reached at any time between when you left the
24  stoplight at Park Avenue until the time of the

232

1  from Park Avenue and towards Half Day Road how far
2  away from the intersection of Half Day Road were
3  you when you first saw the stoplight?
4    A.   500 feet.
5    Q.   When you were 500 feet away and first saw
6  the light, how fast were you going?
7    A.   30 miles an hour.
8    Q.   When you were 500 feet away from the
9  intersection and first saw the light at 30 miles an
10  hour, which lane were you in?
11    A.   I was in the right lane.
12    Q.   When you were going 500 -- or excuse me.
13  When you were going 30 miles an hour 500 feet away
14  in the right-hand lane and first saw the light at
15  the intersection of Half Day Road and Route 41,
16  were there any vehicles to your rear?
17    A.   I don't know.
18    Q.   Were there any vehicles to your -- in the
19  left-hand lane either next to you, behind you or in
20  front of you?
21    A.   I don't remember.
22    Q.   When you saw the color of the light at the
23  intersection of Half Day Road and 41 500 feet away,
24  were there any vehicles in front of you between you

234

1  accident?
2    A.   30 miles an hour.
3    Q.   What's the highest gear you reached?
4    A.   Fifth.
5    Q.   Fifth?
6    A.   Yeah -- fourth or fifth.  I don't really
7  actually remember.
8    Q.   Okay.  Let's make it clear.
9    A.   Okay.
10    Q.   I only want to know what you know.
11    A.   Okay.
12    Q.   Only you were there.
13    A.   Right.
14    Q.   What gear were you in when you reached
15  your highest speed before the accident?
16    A.   Fourth gear.
17    Q.   If you don't know for sure, tell me.
18    A.   I don't know for sure.
19    Q.   Okay.  We've already established that
20  there's a stoplight at the intersection of Half Day
21  Road and 41, right?
22    A.   Right.
23    Q.   As you approached -- Strike that.
24       As you were driving northbound on 41 away

233

1  and the intersection?
2    A.   I don't remember.
3    Q.   When was the last time prior to your
4  seeing the stoplight 500 feet away that you
5  actually remember looking at the speedometer on
6  your truck?
7    A.   At about 500 feet I looked down and
8  checked the -- to see how fast I was going.
9    Q.   Before or after you saw the color of the
10  light?
11    A.   When I seen it was red, I looked down to
12  see how fast I was going.
13    Q.   Okay.  So you answered something I haven't
14  gotten to yet but I appreciate that.
15       You told me you first saw the light at the
16  intersection when you were 500 feet away.  Are you
17  telling me now the color was red when you first saw
18  it?
19    A.   Yes.
20    Q.   And then you looked down at your
21  speedometer?
22    A.   Yes.
23    Q.   And you saw what at your speedometer?
24    A.   30 miles an hour.

235

42 (Pages 232 to 235)

1    Q.   Forgive me for not knowing trucks.  Is
2  there also an rpm meter that you can view on your
3  dash?
4    A.   Yes.
5    Q.   Did you look at your rpms's?
6    A.   I don't remember.
7    Q.   Did you have your cruise control on?
8    A.   No.
9    Q.   At 500 feet away from the intersection
10 when you saw the red light did you change your
11 speed?
12   A.   I took my foot off the gas and slowed
13 down.
14   Q.   Now, let me make sure I understand.  Did
15 you do anything else to slow down other than take
16 your foot off the gas?
17   A.   No.
18   Q.   So you didn't down shift?
19   A.   No.
20   Q.   You didn't touch the brake?
21   A.   No.
22   Q.   You were coasting?
23   A.   Exactly.
24   Q.   Is that how you were trained to slow down
                                              236

1  your truck when approaching a red light?
2    A.   When you're in a lower gear, the motor
3  will slow you down if you let off the gas.
4    Q.   At any time before this accident did you
5  see the vehicle that you struck?
6    A.   No.
7    Q.   As you approached and got closer than 500
8  feet to the intersection did you see any vehicles
9  stopped in the left-hand lane of 41 at the
10 intersection with Half Day Road?  Let me strike
11 that.  I'll ask it differently.
12        As you approached and got closer than 500
13 feet from the intersection of Half Day Road and 41
14 were there any vehicles in the left-hand lane ahead
15 of you?
16   A.   I don't remember.
17   Q.   Did you see any vehicles stopped in that
18 lane at any point before this accident occurred?
19   A.   No.
20   Q.   Is it your testimony that there were no
21 vehicles in that lane?
22   A.   I don't know.
23   Q.   As you approached the intersection did you
24 see vehicles facing southbound on -- in the
                                              237

1  southbound lanes of Route 41?
2    A.   I don't remember.
3    Q.   Were there vehicles stopped at the
4  intersection of 41 and Half Day Road as you
5  approached the intersection?
6    A.   I don't remember.
7    Q.   And just so we're clear.  You're not
8  saying they weren't there, if they were; you're
9  saying you don't remember?
10   A.   Right.
11   Q.   As you approached the intersection did you
12 see any other semi-tractor trailers anywhere in the
13 area?
14   A.   As I approached it?
15   Q.   Yes.
16   A.   No.
17   Q.   You never saw a tractor trailer in the
18 left-hand lanes of northbound?
19   A.   No.
20   Q.   At any time before -- Strike that.
21        At 500 feet away the light for your
22 direction of traffic was red?
23   A.   Yes.
24   Q.   At any time before the accident did the
                                              238

1  light change?
2    A.   Yes, about a hundred feet before the
3  stoplight it turned green.
4    Q.   When you saw the light turn green, what
5  was your speed?
6    A.   About 20 to 25 miles an hour.
7    Q.   When you first saw the light turn green,
8  were there any vehicles behind you in the right
9  lane of northbound 41?
10   A.   I don't remember.  I don't know.
11   Q.   When you saw the light turn green a
12 hundred feet away from the intersection, were there
13 any vehicles in the left-hand lane between you and
14 the intersection?
15   A.   I don't remember.
16   Q.   Have you ever told anyone specifically
17 that there were no vehicles in the left-hand lane
18 of northbound 41?
19   A.   I don't remember if I told anybody that
20 there was nothing there, no.  I don't remember
21 that.
22   Q.   I want to make sure I understand.  Are you
23 saying you never told anybody that or are you
24 saying you don't remember what you may have said to
                                              239

43 (Pages 236 to 239)

1   other people?
2       A.  I don't remember what I might have said to
3   other people.
4       Q.  Is there any reason why you would have
5   told people -- well, strike that.
6           When you were going 20 to 25 miles an hour
7   a hundred feet from the intersection, what gear
8   were you in?  Were you still in fourth or fifth?
9       A.  I don't remember if it was 25, 20 -- I
10  don't know exactly.
11      Q.  I guess what I'm asking is:  In the 400
12  feet that your testimony is that you were slowing
13  down approaching a red light --
14      A.  Right.
15      Q.  -- and then the light turned green --
16      A.  Right.
17      Q.  -- in that 400 feet did you change gears?
18      A.  No.
19      Q.  So you coasted?
20      A.  Yes.
21      Q.  So whatever gear you were in when you were
22  going 30 miles an hour at 500 feet is the same gear
23  you were in at 20 to 25 when you believe you saw a
24  green light?
                                                    240

1       A.  Yes.
2       Q.  When you were one hundred feet away from
3   the intersection and believe you saw a green light,
4   did you see any vehicles in front of you between
5   your truck and the intersection?
6       A.  I don't remember.  No.
7       Q.  Okay.  Two different answers.
8       A.  I don't remember.
9       Q.  You're saying --
10          MR. SKRYD:  Let him ask the question.  Go
11  ahead, Tim.
12  BY MR. COUTURE:
13      Q.  Are you saying you didn't see a vehicle in
14  front of you or are you saying as you sit here
15  today you don't remember whether there was?
16      A.  I don't remember if there was.
17      Q.  Where were you looking when you were a
18  hundred feet from the intersection?
19      A.  At the light.
20      Q.  Were you also observing ahead of you?
21      A.  Yes.
22      Q.  You understood it was your job to see if
23  there was something else in the roadway in front of
24  you so you didn't hit it, correct?
                                                    241

1       A.  Yes.
2       Q.  So it's your testimony that you looked
3   ahead of you when you were a hundred feet away?
4       A.  Yes.
5       Q.  When you looked ahead of you a hundred
6   feet away from the intersection, did you see a
7   black car?
8       A.  No.
9       Q.  When you were a hundred feet away from the
10  intersection, did you see whether there were any
11  vehicles stopped facing northbound or southbound on
12  41?
13      A.  No.
14      Q.  Are you saying that there weren't or you
15  didn't see it -- well, strike that.  That was a bad
16  question.
17          Were there vehicles stopped facing
18  northbound when you were a hundred feet away?
19      A.  I don't remember.
20      Q.  Were there vehicles stopped facing
21  southbound on 41 when you were a hundred feet away?
22      A.  I don't remember.
23      Q.  Was there traffic -- Strike that.
24          Were there any vehicles stopped east or
                                                    242

1   westbound when you were a hundred feet away?
2       A.  I don't remember.
3       Q.  Was there traffic passing in front of you
4   when you were a hundred feet away going east and
5   west?
6       A.  I don't remember.
7       Q.  As you were a hundred feet away from the
8   intersection what was the nearest car to you to
9   your north?
10      A.  I don't know.
11      Q.  Do you remember seeing -- Strike that.
12          Did you see any brake lights ahead of you
13  on any vehicle as you were a hundred feet away?
14      A.  No.  I don't remember.
15      Q.  Which one?
16      A.  I don't remember.
17      Q.  Are you saying you don't remember as you
18  sit here today?
19      A.  Yes.
20      Q.  Did you know four years ago?
21      A.  I don't know four years ago.
22      Q.  Well, I understand it's been a long time.
23      A.  Yes.
24      Q.  But I also understand that this is not a
                                                    243

                              44 (Pages 240 to 243)

1    typical occurrence in one's life.
2        A.   Right.
3        Q.   So what I'm trying to figure out is
4    whether you're saying I don't remember because the
5    passage of time over four years has prevented you
6    now from knowing or whether you're saying if you
7    had asked me the same day I wouldn't be able to --
8    the day of the occurrence I wouldn't have been able
9    to tell you the answer.  Do you understand the
10   distinction?
11       A.   Yes.
12       Q.   Okay.  After the accident did you have a
13   recollection of whether there were vehicles in
14   front of you or not?
15       A.   I was all -- after the accident I was all
16   confused and upset and I don't really remember what
17   went on.
18       Q.   The "I don't remembers" as far as what was
19   in front of you, what was behind you, am I correct
20   that what you're saying is you didn't even know
21   that on the day of the accident after the accident?
22       A.   Right.
23       Q.   The first indication that you had that an
24   accident -- Strike that.

244

1        Q.   You just accelerated using the gas pedal?
2        A.   Yes.
3        Q.   When was the last time before the impact
4    that you actually looked at your speedometer?
5        A.   When I started to speed up when I seen the
6    light was green.
7        Q.   And when you looked and were starting to
8    speed up when you saw the light was green, what was
9    your speedometer reading?
10       A.   25 to 30 miles an hour.
11       Q.   Did you continue to speed up after you
12   looked at your speedometer but before the impact?
13       A.   No.
14       Q.   I'm sorry?
15       A.   No.
16       Q.   Okay.  So I understand.  You saw the light
17   was green a hundred feet away, you started to
18   accelerate and you looked down at the same time,
19   right?
20       A.   Yes.
21       Q.   And it was 20 -- 25 to 30 on your
22   speedometer?
23       A.   Yes.
24       Q.   Did you continue to accelerate after that?

246

1        The first indication to you of an accident
2    was the accident itself?
3        A.   Yes.
4        Q.   So there was no "oh, my gosh," hitting the
5    brakes, swerving, anything like that?
6        A.   No.
7        Q.   Just pow?
8        A.   Right.
9        Q.   What was your speed at the time of the
10   impact with the Scheinman vehicle?
11       A.   25 to 30 miles an hour.
12       MR. FISHER:  I'm sorry, could I have that
13   question back.
14            (Whereupon, the record was read.)
15   BY MR. COUTURE:
16       Q.   I suppose I should ask.  When you were one
17   hundred feet away from the intersection and saw --
18   Strike that.
19       When you were a hundred feet away from the
20   intersection and believed the light to be green,
21   did you start to speed up again?
22       A.   Yes.
23       Q.   Did you shift gears upwards?
24       A.   No.

245

1        A.   No.
2        Q.   It was -- so you purposefully were
3    proceeding forward at 30 miles an hour at that
4    time?
5        A.   Yes.
6        Q.   It wasn't your intention to speed up
7    anymore?
8        A.   I mean, after I got through the
9    intersection?
10       Q.   At this point you don't know that an
11   accident is about to happen, right?
12       A.   Exactly.
13       Q.   So you're not anticipating that?
14       A.   Right.
15       Q.   So what I'm trying to ask you is:  As
16   you're looking at your speedometer -- and I think
17   you just told me that you had no intention of going
18   any faster?
19       A.   Eventually down the road I would have.
20       Q.   Okay.  Is there a particular reason why
21   you were planning on stopping at 30 miles an hour
22   in a 50-mile-an-hour zone, which admittedly you
23   understood to be a 45-mile-an-hour zone, why were
24   you driving that slowly?

247

45 (Pages 244 to 247)

1    A.  I was at an intersection, I was watching
2 for other cars -- I mean, to see if anybody is
3 coming so if we have to stop, you can stop.
4    Q.  Okay.  So your plan was to proceed through
5 the intersection at 30 miles an hour?
6    A.  Yes.
7    Q.  How much time went by from when you saw
8 the light turn green until the impact?
9    A.  A -- two seconds.
10       MR. BURKE:  Could I hear the answer
11 again?
12       MR. SKRYD:  Two seconds.
13       MR. BURKE:  Thank you.
14 BY MR. COUTURE:
15    Q.  In that two seconds how far did your
16 vehicle travel?
17    A.  I don't know for sure.
18    Q.  If his vehicle was at the stop line of
19 Route 41 northbound, it would be a hundred feet
20 minus the length of his vehicle pretty much, right?
21    A.  Yes, probably.
22    Q.  At the time of the impact did you have
23 your foot on the gas?
24    A.  I have no idea.  I don't know.

248

1    Q.  I'm going to show you what was previously
2 marked for identification Exhibit 31.  The first --
3 it's a group exhibit consisting of 31A through Z.
4 Let's look at 31A.
5       Do you recognize what's shown in 31A?
6    A.  Yes.
7    Q.  Am I correct that 31A depicts northbound
8 Route 41 as it approaches the intersection of Half
9 Day Road?
10    A.  Yes, apparently so.
11    Q.  Well, I've just told you that.
12    A.  Yes.
13    Q.  My question is different.  As a man who
14 drove it every day for years, can you tell me
15 whether that photograph shows it?
16    A.  There ain't no signs saying that I'm
17 approaching Half Day Road.
18    Q.  I understand.  So are you saying that
19 looking at this photograph you can't recognize
20 what's shown in 31A as northbound 41 near Half Day
21 Road?
22    A.  Yes.
23    Q.  You cannot?
24    A.  In the picture there ain't nothing stating

250

1    Q.  Would it be fair for me to say that you
2 know it wasn't on the brake?
3    A.  Right.
4    Q.  Because you didn't see the vehicle before
5 you struck it, you didn't swerve or take any
6 evasive maneuvers?
7    A.  Correct.
8    Q.  Because you didn't see the vehicle before
9 you struck it, you didn't blow your horn?
10    A.  Correct.
11    Q.  Where were you looking in the two seconds
12 before the impact?
13    A.  At the intersection ahead of me.
14    Q.  So it's your testimony that you were
15 looking ahead of you but -- and didn't see a car
16 that was ahead of you?
17    A.  Yes.
18    Q.  Was there anything between you and what
19 you later understood to be the Scheinman vehicle
20 that was preventing you from seeing that vehicle?
21    A.  I don't know.
22    Q.  Were there any downed trees or overhangs
23 or viaducts?
24    A.  I don't know.

249

1 in the picture that it's -- it could be any road.
2    Q.  Okay.  Well, I need to make sure I
3 understand your answer.
4    A.  Okay.  All right.
5    Q.  I understand it doesn't say in the
6 picture.
7    A.  Right.
8    Q.  My question is different.
9    A.  Right.
10    Q.  Are you saying it's not designated as 41
11 but I've been there, I know that's it, or are you
12 saying looking at the picture I can't say?
13    A.  I can't say.
14    Q.  All right.  Look at the next picture, 31B,
15 which is a little bit closer to the intersection.
16 As you look at 31B, can you tell me whether this is
17 northbound 41 as you approach the intersection of
18 Half Day Road?
19    A.  No.
20    Q.  All right.  Go to the next one, 31C.
21       MR. SKRYD:  Take a look at the picture,
22 the intersection.
23       THE WITNESS:  Okay.
24       MR. SKRYD:  31C, Tim?

251

46 (Pages 248 to 251)

Page 252

```
1        MR. COUTURE:  Yes.
2   BY MR. COUTURE:
3      Q.  Sir, does that depict northbound 41 just
4   south of the intersection of Half Day Road?
5      A.  Yes.
6      Q.  Go to 31C, the next one.  Does that show
7   the same intersection?
8      A.  Yes.
9      Q.  With the exception of the time of day, in
10  other words, the condition of the light, these
11  photographs were clearly taken during the day, do
12  the two photographs that you were able to recognize
13  accurately and correctly depict the intersection
14  where the accident took place?
15     A.  Yes.
16     Q.  I'm going to direct your attention to
17  what's previously been marked as Exhibit 30.  And
18  for the record I will state that Exhibit 30 is a
19  group exhibit consisting of photographs two to a
20  page marked 30A through T.  And they were marked
21  January 11, 2011.
22       MR. SKRYD:  Okay.  Take a look at those,
23  there's quite a few, and let Mr. Couture know when
24  you've had a chance to look at them.
```

Page 253

```
1   BY MR. COUTURE:
2      Q.  And just so we're clear right now, the
3   only thing I'm going to ask you about are
4   photographs of the roadway.  There's other photos
5   in there that you're free to look at but for the
6   purposes of my current questions, that's all I'm
7   going to be asking you about.  But take your time
8   and look at them.
9        Are you ready?
10     A.  Yes.
11     Q.  Okay.  Drawing your attention to 30A, am I
12  correct that that photograph depicts northbound
13  Route 41 south of the intersection with Half Day
14  Road?
15     A.  No.
16     Q.  It does not.  Do you know what this
17  depicts?
18     A.  A gas station on either side of the road.
19     Q.  Okay.  So can you say, sir, whether 30A
20  depicts the lane in which you were traveling
21  immediately before your accident with Mr. Scheinman
22  as it existed on the night of the occurrence?
23     A.  What do you mean by depict?  I mean, is
24  it --
```

Page 254

```
1      Q.  Well --
2      A.  Is there something on the picture that's
3   telling me that that's where it's at?
4      Q.  I'm not asking you that.
5        MR. SKRYD:  He just wants to know if you
6   know if that's the photograph.
7        THE WITNESS:  Yes.
8   BY MR. COUTURE:
9      Q.  Yes, it is?  Okay, let me ask you
10  differently.
11       MR. SKRYD:  Let him ask it again.  Sorry.
12  BY MR. COUTURE:
13     Q.  When I look at a picture of my wife, I
14  don't have to be told that's a picture of my wife
15  on the photo; I know it's her.
16     A.  Right.
17     Q.  Okay.  You've driven this road a lot.  My
18  question is not what the photograph says; my
19  question is:  When you look at this photograph 30A,
20  do you recognize it as the northbound lanes of
21  Route 41 approaching Half Day Road?
22     A.  Yes.
23     Q.  Okay.  And do photograph 30A and B
24  correctly and accurately depict the northbound
```

Page 255

```
1   lanes of Route 31 -- excuse me, 41 as they existed
2   on the night of your accident with Jeffrey
3   Scheinman's vehicle?
4      A.  Yes.
5      Q.  And can you flip to C and D.  Do
6   photograph 30C and D accurately and correctly
7   depict the northbound lanes of Route 41 as they
8   existed on the night of the occurrence at the
9   intersection with Half Day Road?
10     A.  Yes.
11     Q.  Am I correct that G and H actually show
12  the rear of your chassis and box on the night of
13  the occurrence?
14     A.  Yes.
15     Q.  As you approached the intersection with
16  Half Day Road and you saw -- Strike that.
17       As you approached the intersection with
18  Half Day Road and testify you saw a green light,
19  where was it -- where was the light located that
20  you saw was green?
21     A.  To the right side of the road.
22     Q.  Okay.  So that would be on the east side
23  of the road?
24     A.  Right.  Right.
```

47 (Pages 252 to 255)

1  Q. Do you know whether that standard holding
2  the light was on the north side or the south side
3  of Half Day Road?
4  A. I don't know.
5  Q. Looking at 30A for identification can you
6  tell me, sir, whether that was -- that
7  photograph -- is that more or less than a hundred
8  feet away from where you're looking in this
9  photograph?
10  A. I don't know.
11  Q. Okay. Do you see a sign on 30A on the
12  right-hand side that looks to be white at least in
13  the photograph?
14  A. Yes.
15  Q. Had you passed that sign before you saw
16  the light change?
17  A. I don't know.
18  Q. Did you actually see the light turn green
19  to red or did you just look up and see that it
20  was -- excuse me, other way.
21  Did you actually see the light turn red to
22  green or did you just look up and it was green?
23  A. Actually, I looked up and seen it change,
24  yes.

256

1  Q. Okay. So while you were looking ahead of
2  you approximately a hundred feet away, your
3  testimony is you saw it red and then turn to green?
4  A. Yes.
5  Q. Now, I want to direct your attention back
6  to 31. Now that you had an opportunity to look at
7  the nighttime photographs, can you look at 31 and
8  does that refresh -- the nighttime photographs
9  refresh your recollection as to whether 31A depicts
10  or, excuse me, shows the roadway?
11  A. Yes.
12  Q. It does?
13  A. Yes.
14  Q. Okay. And 31B, does that refresh your
15  recollection as to the fact that 31B shows
16  northbound Route 41?
17  A. Yes.
18  Q. Okay. And the same thing for C -- you
19  already said you knew C and D. So I won't ask you
20  about that. All right.
21  Looking at 31A, do you see on the
22  right-hand side of the road there's two what looks
23  like a sign with red reflectors on the back?
24  A. Which picture again?

257

1  Q. The front one. Right there.
2  A. Right.
3  Q. Do you see what I'm talking about?
4  A. Yes.
5  Q. Did you see that on the day of the
6  occurrence?
7  A. I don't remember.
8  Q. Did you pass that before or after the
9  light turned green, if you know?
10  A. I don't remember.
11  Q. If I were to ask you to mark on Exhibit A
12  where the front of your truck was when you believe
13  the light turned green, would you be able to do
14  that without guessing?
15  A. No.
16  Q. In the last hundred feet before the
17  accident -- well, strike that.
18  From the time that you say you saw the
19  light turn green until the impact were you doing
20  anything in your cab other than driving and facing
21  forward?
22  A. I don't think -- I don't know.
23  Q. You don't know?
24  A. I mean, anything -- what do you mean?

258

1  Q. Well, were you playing a video game? Were
2  you twiddling your thumbs? Were you using your
3  phone?
4  A. No.
5  Q. Were you doing anything in your cab?
6  A. No.
7  Q. Were you looking anywhere other than
8  directly in front of you?
9  A. I was checking side to side.
10  Q. Okay. When in relationship to that last
11  hundred feet between you and the intersection did
12  you turn side to side and take your -- Strike
13  that.
14  When you turned side to side, did you take
15  your eyes off the road in front of you?
16  A. Yes.
17  Q. When in that last hundred feet did you
18  take your eyes off the road directly in front of
19  you to look side to side?
20  A. After the light turned green.
21  Q. Okay. Do you know how much time went
22  by -- I know you said two seconds from green to
23  hit. So in that span of two seconds when did you
24  take your eyes off the road in front of you and

259

48 (Pages 256 to 259)

1  look left to right time-wise?
2      A.  When after I hit -- after the impact?
3      Q.  No.  I'm trying to give us a little bit of
4  context here.  You told me that from the time the
5  light turned green until the impact was two
6  seconds.  So now my question is:  In that two
7  seconds, because you said you looked side to side
8  after you saw the light turn green, in that two
9  seconds when did you look side to side?
10      A.  After the impact or --
11      Q.  No.  Let's start again.  I asked you in
12  the last hundred feet if you looked anywhere other
13  than directly in front of you and you said you
14  looked side to side, true?
15      A.  Yes.
16      Q.  And that was before the impact?
17      A.  Yes.
18      Q.  Okay.  When in relationship to the impact
19  did you look side to side?
20      A.  What is that again?
21      Q.  When in relationship to the impact did you
22  look somewhere other than directly in front of you,
23  side to side?
24      A.  Right after the -- after the initial hit I

260

1  looked side to side to see what happened.
2      Q.  Let's stop.  I must be misunderstanding
3  you.
4      A.  Right.
5      Q.  At any time between when you saw the light
6  turn green and the impact did you look anywhere
7  other than directly in front of you?
8      A.  After the light turned green?
9      Q.  The light turned green but before the
10  impact, where were you looking for those two
11  seconds?
12      A.  Probably straight ahead.
13      Q.  Did you look side to side to see if anyone
14  was coming out of any other place or what the other
15  traffic was doing?
16      A.  Just the normal thing you do when you go
17  through an intersection, you -- I guess I don't
18  know what you're trying to --
19      Q.  The only reason why I'm saying that --
20  asking these questions over and over is because I
21  thought you said you looked and took your eyes off
22  the road.  And so I want to make sure I
23  understand.
24      So in the last two seconds from when the

261

1  light turned green until the impact your eyes were
2  straight ahead?
3      A.  Right.
4      Q.  Were you asleep at the time of the impact?
5      A.  No.
6      Q.  Were you zoned out at the time of the
7  impact?
8      A.  No.
9      Q.  Did you ever tell anybody that you were
10  zoned out at the time of the impact?
11      A.  I don't remember.
12      Q.  Is it your testimony that if you told
13  somebody you were zoned out that when you said that
14  you would have been wrong?
15      A.  If I -- if I did say that?
16      Q.  Yes.
17      A.  Yes.
18      Q.  At impact where were your eyes?
19      A.  Straight ahead.
20      Q.  For how long had your eyes been straight
21  ahead before the impact?
22      A.  I mean, at the point of impact how long?
23  A couple of seconds.
24      Q.  Okay.  So for a couple of seconds you were

262

1  looking straight ahead but you didn't see the black
2  car in front of you?
3      A.  No.
4      Q.  As a truck driver do you have an
5  understanding of how long it takes to stop a 73,750
6  pound truck?
7      A.  Yes.
8      Q.  At 30 miles an hour can you give me an
9  estimate of how long you believe it would take to
10  stop a truck like that if you were to safely brake
11  and down shift?
12      A.  A couple truck lengths.
13      MR. FISHER:  Can I have the question
14  back -- just the beginning of it.
15          (Whereupon, the record was read.)
16  BY MR. COUTURE:
17      Q.  How about at 40 miles an hour?
18      A.  40 miles an hour?
19      Q.  Yes.
20      A.  A little further probably.
21      Q.  Do you know how much further?
22      A.  No.
23      Q.  How about 45?
24      A.  The faster you are going, it's going to

263

49 (Pages 260 to 263)

1    take longer to stop the vehicle.
2        Q.   When you say a couple of truck lengths, I
3    assume when you say "a couple" you mean two?
4        A.   Yes.
5        Q.   And your truck on that day was a 53-foot
6    trailer?
7        A.   Yes.
8        Q.   And how long was the tractor and
9    connection?
10       A.   Probably about 20 feet.
11       Q.   So we're talking about 70-plus feet total
12   nose to tail?
13       A.   Something like that.
14       Q.   So when you say a couple truck lengths,
15   you mean 140 feet plus?
16       A.   140 -- yes.
17       Q.   Okay.  What part of your truck struck the
18   car?
19       A.   The front.
20       Q.   What part of the car did the front of your
21   truck strike?
22       A.   The back.
23
24
                                                  264

1    damage that was done to your tractor as a result of
2    this accident?
3        A.   Yes.
4        Q.   Can you turn to 43C -- well, actually, you
5    know what, let's look at 43B.
6        A.   D?
7        Q.   B.
8            MR. SKRYD:  B as in boy.
9    BY MR. COUTURE:
10       Q.   Am I correct that the damage to your
11   vehicle -- well, strike that.
12           This shows the grill of your vehicle and
13   the front of your vehicle, true?
14       A.   Yes.
15       Q.   And there's damage to the lower part of
16   the grill and to the bumper, right?
17       A.   Yes.
18       Q.   And also to the right headlights left as
19   we look at it in the picture?
20       A.   Yes.
21       Q.   First of all, you saw this damage at some
22   point after the accident, did you not?
23       A.   Not -- I seen the front of the truck, yes.
24       Q.   Okay.  Does Exhibit 43B accurately and
                                                  266

1            (Whereupon, Franke Deposition
2            Exhibit No. 80 was marked for
3            identification.)
4    BY MR. COUTURE:
5        Q.   I'm going to show you what's been marked
6    as Exhibit 80 for identification.
7            Am I correct that Exhibit 80 depicts the
8    front of your tractor as it existed on the night of
9    the occurrence after the occurrence?
10       A.   Yes.
11       Q.   I'm going to show you what was previously
12   marked as Exhibit 43 for identification.
13           MR. SKRYD:  For the record Exhibit 43 is a
14   group exhibit, right, Tim?
15           MR. COUTURE:  Thank you.  Yes.  I'll
16   describe it.
17   BY MR. COUTURE:
18       Q.   Go ahead and look at it while I describe
19   it for the record.  It is an exhibit consisting of
20   43A through D.
21           Are you done looking, sir?
22       A.   Yes.
23       Q.   Okay.  Am I correct that Exhibit 43A
24   through D depicts your tractor and specifically the
                                                  265

1    correctly depict the damage to the front of your
2    vehicle as you know it from the accident?
3        A.   Yes.
4        Q.   Okay.  Did the front bumper of your
5    vehicle hit square with the rear bumper of the BMW
6    that you struck?
7        A.   From the picture, yes.
8        Q.   Did the front bumper of your vehicle --
9    well, strike that.
10           When I use the term "override," do you
11   understand what that means?
12       A.   Yes.
13       Q.   Okay.  And so we understand each other,
14   what is it that you believe I mean when I say
15   override?
16       A.   Override meaning over the car or --
17       Q.   Meaning that your bumper actually went
18   over the bumper or above the bumper of the BMW.
19       A.   Probably.
20       Q.   Did that happen on the day of the
21   occurrence?
22       A.   I don't know.
23       Q.   Okay.  Do you -- would you expect that if
24   you were going to rear-end the BMW, that the first
                                                  267

50 (Pages 264 to 267)

1 thing that you would strike on your vehicle would
2 be the front, the grill and this metal bumper shown
3 in B?
4    A. Right. Right.
5    Q. And the first thing as you travel towards
6 the BMW that would be closest to the front of your
7 vehicle would actually be the bumper --
8    A. Right.
9    Q. -- of the BMW, right?
10    A. Right.
11    Q. Do you believe that the bumper of your
12 truck was higher than the bumper of the BMW?
13    A. Yes.
14    Q. Okay. So based on that do you believe
15 that your truck overrode the back of the BMW; in
16 other words, hit the back of it beyond the bumper
17 and pushed it downward?
18    MR. BURKE: Objection, form, calls for
19 speculation.
20    MR. SKRYD: If you know, go ahead.
21    THE WITNESS: I don't know if it did or
22 not.
23    MR. SKRYD: Why don't we take a short
24 break.
268

1    THE VIDEOGRAPHER: We are going off the
2 record. The time is 4:12 p.m.
3       (A break was taken.)
4       (Whereupon, Franke Deposition
5       Exhibit No. 81 was marked for
6       identification.)
7    THE VIDEOGRAPHER: We are back on the
8 record. The time is 4:26 p.m. Please proceed.
9 BY MR. COUTURE:
10    Q. I'm going to show you what's been marked
11 as Exhibit 81 for identification. Sir, I'll
12 represent to you that this shows the rear of the
13 same model, make and year of the vehicle that you
14 struck on July 3rd, 2008.
15    Do you have an understanding what part of
16 the rear of that vehicle was impacted by the front
17 of your vehicle?
18    MR. SKRYD: My objection is foundation.
19    MR. COUTURE: Okay.
20    MR. SKRYD: I don't know that he can
21 identify that this is the same car, but for
22 purposes of the deposition I'll let him answer the
23 questions, okay.
24    MR. COUTURE: Thank you.
269

1 BY MR. COUTURE:
2    Q. Go ahead.
3    A. The back end of the car.
4    Q. Other than the back end you can't give me
5 any specifics as far as where on the back, can you?
6    A. No.
7    Q. Whether it was above the bumper, below the
8 bumper you don't know?
9    A. No.
10    Q. I want to go back and ask you about the
11 left-hand lane of northbound 41 in the one hundred
12 feet before the intersection. If there was an
13 SUV -- Strike that.
14    If there was testimony that there was an
15 SUV stopped in that left-hand lane in that one to
16 two seconds that you approached from a hundred feet
17 away, am I correct that you didn't see that SUV
18 first in line?
19    A. Yes.
20    Q. If there was a green Subaru behind that
21 SUV stopped in the left-hand lanes of northbound 41
22 at the intersection of Half Day Road and 41 in the
23 two seconds before the impact when you were a
24 hundred feet away, am I correct that you didn't see
270

1 that green Subaru?
2    A. I don't remember. I don't remember, no.
3    Q. You don't remember or you don't remember
4 it being there?
5    A. I don't remember it being there.
6    Q. If the testimony is that there was a
7 semi-tractor trailer truck behind that green
8 Subaru, am I correct in the one hundred feet that
9 you drove from when you saw the light turn green
10 until the intersection you didn't see that
11 semi-tractor trailer truck?
12    A. I don't remember seeing a tractor trailer.
13    Q. Okay. Are you saying you didn't see it
14 because it wasn't there or are you saying you don't
15 remember if it was there?
16    A. I don't remember if it was there.
17    Q. Okay. If there is testimony that a white
18 Chevy Impala was stopped for those same two seconds
19 facing southbound in the left-hand lanes of
20 southbound 41, in other words, headlights facing
21 you as you approached the intersection, would you
22 agree with me that according to your testimony
23 today you didn't see that?
24    A. No.
271

51 (Pages 268 to 271)

1    Q.  Is that correct?
2    A.  Yes.
3    Q.  And if there's testimony that a vehicle
4  was stopped next to it in the right-hand lanes of
5  southbound 41, your testimony today is you didn't
6  see that either?
7    A.  I don't remember.
8    Q.  Can you describe for me the impact of your
9  vehicle and the vehicle in front?
10        MR. SKRYD:  Objection, form.  You can
11  answer it if you understand it.
12        THE WITNESS:  Describe by what?
13  BY MR. COUTURE:
14    Q.  Okay.  I'll ask you a different question
15  if you don't understand that.
16        What happened to you within the vehicle at
17  the impact?
18    A.  Nothing.
19    Q.  Did you have your -- where were your hands
20  when the impact occurred?
21    A.  On the steering wheel.
22    Q.  Okay.  And you've already told me you were
23  facing forward, right?
24    A.  Right.

272

1  ordinary?
2    A.  Yes.
3    Q.  What was it that told you that something
4  was out of the ordinary?
5    A.  When I seen the flames.
6    Q.  Okay.  How much time -- well, strike
7  that.
8        Did you actually feel the impact of your
9  vehicle striking something else?
10    A.  I don't remember.
11    Q.  You indicated that there were flames?
12    A.  Yes.
13    Q.  How much time went by from the time that
14  the front of your vehicle first touched the BMW
15  until you first saw flames?
16    A.  Just about immediately after -- at impact.
17    Q.  At impact?
18    A.  Right.
19    Q.  So not a second?
20    A.  (Indicating.)
21    Q.  You're shaking your head.  So you have to
22  say yes or no.  Not a second?
23    A.  No.
24    Q.  Not a half second?

274

1    Q.  And you've told me you don't know whether
2  your foot was on the gas or not, right?
3    A.  Right.
4    Q.  And you weren't on the phone?
5    A.  No.
6    Q.  And you weren't asleep?
7    A.  No.
8    Q.  And you weren't texting?
9    A.  No.
10    Q.  When your truck struck this vehicle in
11  front of you, did your body move anywhere?
12    A.  No.
13    Q.  Shake?  Go forward?
14    A.  No.
15    Q.  Did you have a seat belt on?
16    A.  Yes.
17    Q.  Did your body press up against the seat
18  belt as a result of the impact?
19    A.  I don't remember.
20    Q.  At impact did you understand that you had
21  hit an object?
22    A.  At impact?
23    Q.  Yes.  When the impact occurred, did your
24  senses tell you that something was out of the

273

1    A.  I don't know.
2    Q.  You don't know?
3    A.  A half second?
4    Q.  Don't guess.  No one wants you to guess.
5    A.  Okay.
6    Q.  Do you know?
7    A.  No.
8    Q.  Do you know how far your vehicle moved
9  from the moment that it first touched the back of
10  the BMW until flames first appeared on the vehicle?
11    A.  Immediately.
12    Q.  Immediately?
13    A.  After the impact.
14    Q.  Okay.  So no distance?
15    A.  I don't know how --
16    Q.  When you first saw flames, where did you
17  see them?
18    A.  At the intersection, beginning of the
19  intersection.
20    Q.  Because you didn't see what you hit before
21  you hit it, when did you first realize that there
22  was something that the front of your vehicle had
23  touched?
24    A.  When I seen the flames.

275

52 (Pages 272 to 275)

1    Q.  Okay.  Your testimony is you don't
2  remember feeling the impact but you remember seeing
3  the flames?
4    A.  Well, I felt an impact and then I seen --
5  then I seen the flames.
6    Q.  Okay.  When you first saw the flames --
7  well, strike that.
8        Did you see the car at any point before
9  you saw flames?
10   A.  No.
11   Q.  When you saw the flames, where on the car
12  in front of you were the flames coming from?
13   A.  I just seen the flames.  I didn't know
14  exactly where the flames was coming from.
15   Q.  As you were sitting in your cab facing
16  forward with your eyes straight ahead --
17   A.  Yes.
18   Q.  -- where were these flames that you first
19  visualized?
20   A.  In front of the truck.
21   Q.  Were they below your windshield level?
22   A.  No.  They come up above the grill of the
23  truck.
24   Q.  Okay.  So you saw flames in front of the

276

1    A.  I don't know.
2    Q.  At any time before your truck came to a
3  stop did you apply the brakes?
4    A.  I don't know exactly when I applied the
5  brakes.
6    Q.  Did you apply them at some point in that
7  run?
8    A.  Well, the truck stopped.
9    A.  We know the truck stopped.
10   A.  Right.
11   Q.  Did you apply the brakes at any point
12  between impact and the truck stopping?
13   A.  Yes.
14   Q.  When in that space?
15   A.  When I was through the intersection.
16   Q.  Through the intersection.  Do you know how
17  far it was from the point of impact until stop?
18   A.  Not exactly, no.
19   Q.  Do you understand the police have measured
20  that to be 358 feet?
21   A.  This is the first I heard of that.
22   Q.  Does that sound right, approximately,
23  based on what you saw and experienced?
24   A.  I don't know what I saw and experienced.

278

1  grill?
2    A.  Right.
3    Q.  Could you tell where the flames on the BMW
4  vehicle were originating from?
5    A.  No.
6    Q.  Did you see any sparks before flames?
7    A.  No.
8    Q.  Did you hear any grinding noises before
9  flames?
10   A.  I don't remember.
11   Q.  And your testimony is the flames were
12  immediate?
13   A.  Yes.
14   Q.  Can you describe the nature of the
15  impact?  Was it a light impact, a medium impact, a
16  heavy impact?
17   A.  Medium, probably.
18   Q.  At impact what if anything did you do
19  within your cab?
20   A.  I looked around to see.  I was confused.
21  I didn't know what I hit or what happened.  So I
22  looked side to side to see what was -- you know, I
23  was trying to figure out what was going on.
24   Q.  Did you hit your brakes?

277

1    Q.  Well, you were there, right?
2    A.  Yeah.
3    Q.  And that is a football field and 20 yards,
4  right, 360 feet?
5    A.  I guess.
6    Q.  Is it your recollection that you pushed
7  that car a football field and 20 yards in distance?
8    A.  I don't remember.
9    Q.  In that football field and 20 yards --
10  we'll take the police as accurate and correct --
11  can you tell me where it was that you first applied
12  brakes?
13   A.  About half -- it was all the way through
14  the intersection.
15   Q.  Well, okay.  I'm sorry, I misunderstood.
16  You were all the way through and then you hit the
17  brakes?
18   A.  Yes -- I don't know exactly where.  I
19  don't remember.
20   Q.  Can you tell me how much time went by from
21  the impact until when you hit the brakes?
22   A.  No.
23   Q.  When -- at any point before you hit the
24  brakes did you hit the accelerator between impact

279

53 (Pages 276 to 279)