1   and stop?
2     A.  I have no idea.
3     Q.  You don't know.  I think we've already
4   established you don't know if your foot was on the
5   gas or not at the time, right?
6     A.  Right.
7     Q.  Can you tell me how much time it took for
8   your vehicle to go that 358 feet from impact to
9   stop?
10    A.  No.  No, I can't.
11    Q.  Did you do anything to steer your truck in
12  that 358 feet?
13    A.  I don't remember.
14    Q.  At any point between impact until the time
15  your vehicle came to a stop did you swerve or
16  change the direction of your steering wheel?
17    A.  I don't remember swerving.
18    Q.  At any point between impact and your
19  vehicle coming to the stop -- well, strike that.
20     During that 358 feet were your vehicles
21  touching the entire way?
22    A.  Yes.
23    Q.  Did you change gears at all between the
24  time of impact and the time your vehicle came to a
                                            280

1   stop?
2     A.  No.
3     Q.  From -- Strike that.
4     From the time you first saw fire until the
5  time your vehicle came to a stop can you tell me
6  whether the fire changed, in other words, got more,
7  less?
8    A.  No.
9    Q.  As you went through the intersection --
10  Strike that.
11     After you impacted the Scheinman vehicle
12  and as you proceeded through and past the
13  intersection did you -- did the two vehicles pass
14  any other vehicles as they went through?
15    A.  I don't remember.
16    Q.  Did you see any other trucks on the side
17  of the road nearby?
18    A.  When I -- after the vehicle was stopped
19  there was some trucks parked in the parking lot.
20    Q.  But you didn't see that until after your
21  vehicle stopped?
22    A.  Yes.
23    Q.  When your vehicle came to a stop, what did
24  you do?
                                            281

1     A.  I got out to see what I had hit and I seen
2  the car was on fire.  So I got back in the truck
3  and I backed the truck up.
4    Q.  Okay.  Let me break that down a little
5  bit.
6     Did you take any time from the moment your
7  vehicle stopped until the time you got out?  In
8  other words, did you sit in your car for a moment
9  or did you get right out?
10    A.  When it stopped, I think I got right out.
11    Q.  Okay.  And what was the purpose of you're
12  getting right out?
13    A.  To see what happened.
14    Q.  Did you bring with you a fire extinguisher
15  when you exited your vehicle?
16    A.  No.
17    Q.  And when you got out, you exited the
18  driver's side door, correct?
19    A.  Correct.
20    Q.  And was there -- Strike that.
21     When you got out, what did you see?
22    A.  I seen a car in front of me on fire.
23    Q.  Was the front of your truck still touching
24  that car when you got out?
                                            282

1     A.  Yes.
2    Q.  When you got out, was there anyone
3  immediately present?  Not came by in a little bit,
4  but when you got out was there someone there?
5    A.  No.
6    Q.  How long did you stand outside of your
7  truck before you got back in?
8    A.  Not very -- not very long.
9    Q.  Can you give me an estimate?
10    A.  I got out, seen what was going on, a
11  couple of seconds and I realized it was on fire.
12  So I -- I thought it would be the best thing to get
13  my truck back out of there.
14    Q.  Did you talk to anyone before you got back
15  into your car and -- or strike that.
16     Did you talk to anyone before you got back
17  into your truck and moved it?
18    A.  I don't remember.
19    Q.  Did you do anything to assist the
20  occupants of the vehicle you hit before you got
21  back into your truck and moved it?
22    A.  No, I didn't.
23    Q.  When you got back into -- Strike that.
24     When you got out of your truck to look at
                                            283

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1  what had happened, did you leave your truck
2  running?
3     A.  No, I don't think so.
4     Q.  So when you got back in, you had to start
5  your truck?
6     A.  I mean, when I got out the first time?
7     Q.  Yes.
8     A.  Yes.
9     Q.  Okay.  Let's go back so I can ask the
10  right question and you can give me the right
11  answer, all right?
12     A.  All right.
13     Q.  You've described for me that when your
14  vehicle came to a stop you got out of your truck?
15     A.  Right.
16     Q.  And then you got back in and moved it?
17     A.  Right.
18     Q.  I want to talk about when you got out --
19     A.  Right.
20     Q.  -- but before you got back in to move it,
21  all right?
22        When you got out for the first time, did
23  you leave your vehicle running or turn it off?
24     A.  I don't remember.

                                                284

1     Q.  When -- why did you move your truck?
2     A.  I have 200 gallons of diesel fuel in my
3  truck and I thought it could be a real big fire if
4  my truck sits there in the fire.  That's why I
5  thought about moving my truck.
6     Q.  How far did you move your truck?
7     A.  I don't know exactly how many feet but I
8  backed away from the car.
9     Q.  Can you give me any indication or
10  estimate?  It could be feet; it could be car
11  lengths; it could be truck lengths.
12     A.  About a car length probably behind the
13  back.
14     Q.  And then you -- Strike that.  After you
15  moved your truck back -- Strike that.
16        You moved it backwards, correct?
17     A.  Yes.
18     Q.  Am I correct that as you proceeded forward
19  after the impact and before your vehicle came to a
20  stop, you crossed the intersection and you -- both
21  vehicles went over a curb or median such that when
22  the vehicles came to a stop both vehicles were
23  straddling a median?
24     A.  A curb.

                                                285

1     Q.  A curb?
2     A.  Yes.
3     Q.  Okay.  After you backed -- Strike that.
4        When you backed up your truck, did that
5  change the nature of the fire that was burning?
6     A.  I don't know.
7     Q.  Did it make it more flames, less flames?
8     A.  I don't know.
9        THE VIDEOGRAPHER:  This is the end of
10  media number three.  We are going off the record.
11  The time is 4:45 p.m.
12        (A break was taken.)
13        THE VIDEOGRAPHER:  This is the beginning
14  of media number four.  We are back on the record.
15  The time is 4:46 p.m.  Please proceed.
16  BY MR. COUTURE:
17     Q.  Stepping back.  And I apologize, I missed
18  asking this.  You indicated to me earlier that at
19  some point while you were proceeding forward after
20  striking the Scheinman vehicle you applied the
21  brakes and I think you said it was after you were
22  through the intersection, correct?
23     A.  Correct.
24     Q.  Did you continue to apply the brakes after

                                                286

1  you first did so?  Bad question, let me start
2  over.
3        After you first applied the brakes, did
4  you keep the brakes depressed until your vehicle
5  was stopped?
6     A.  Yes.
7     Q.  Okay.  After you backed your car -- your
8  truck up what did you then do next?
9     A.  I got -- when I backed it up there was
10  other people there --
11     Q.  Okay.
12     A.  -- and somebody asked me for a fire
13  extinguisher.  I don't know who it was.  And then
14  they asked me if I had a blanket or sheet,
15  something inside the truck.
16     Q.  When that discussion or request was made,
17  were you still in your cab?
18     A.  Yes.
19     Q.  And can you describe the person who made
20  that request?
21     A.  A black guy.
22     Q.  Can you give me any description besides an
23  African-American man?
24     A.  No.

                                                287

55 (Pages 284 to 287)

1    Q.  And what did you do based on that request?
2    A.  I gave him what he wanted.
3    Q.  A fire extinguisher?
4    A.  Right.
5    Q.  And a -- what did you give him, a shirt, a
6  sheet?
7    A.  A sheet from my bed.
8    Q.  After you gave him that, did you stay in
9  your cab or did you exit your vehicle?
10    A.  I exited my vehicle.  I was just outside
11  of my vehicle.
12    Q.  Before the gentleman asked you for a fire
13  extinguisher, a sheet or clothes, did you
14  observe anyone attempting to assist the occupants
15  of the vehicle you struck?
16    A.  No.
17    Q.  After you gave the gentleman the fire
18  extinguisher and a sheet, what did you observe him
19  do with the fire extinguisher and sheet?
20    A.  I didn't observe -- I didn't see him do
21  anything.  I was kind of all just confused and I
22  don't know exactly what I did.
23    Q.  Why were you confused?
24    A.  Well, from the accident.  I was just -- I
                                                    288

1  think you told me -- did you exit your cab?
2    A.  Yes.
3    Q.  Where did you go?
4    A.  I just stood there beside my truck.
5    Q.  And what did you look at as you stood
6  beside your truck?
7    A.  I don't remember.
8    Q.  Did you look at the burning vehicle?
9    A.  No.  No, I didn't go look at the car, no.
10    Q.  At that point the car was 15 feet away
11  from you, approximately?
12    A.  Right.
13    Q.  Because you had backed up one car length,
14  right?
15    A.  Yes.
16    Q.  How many people did you see other than the
17  African-American gentleman who asked for a fire
18  extinguisher?
19    A.  There must have been two or three people.
20  I'm not for sure.
21    Q.  Did you see what any of them were doing?
22    A.  They was -- I didn't see what they was
23  doing, no.
24    Q.  Did you ever observe the inside of the car
                                                    290

1  didn't -- they was already helping him so I didn't
2  know what I was supposed to do.
3    Q.  Okay.  So you were confused on how you
4  could best be of assistance?
5    A.  Right.
6    Q.  You described this as a medium impact.
7  Had you ever had an accident before with a medium
8  impact?
9    A.  I hit a deer.
10    Q.  Okay.  Was that a stronger than medium
11  impact?
12    A.  No.
13    Q.  Would you describe that as a medium
14  impact?
15    A.  Probably a light impact.
16    Q.  Okay.  Was there anything about this
17  medium impact that led you to become confused after
18  the accident?
19    A.  No.  I was -- anything about it that made
20  me confused?  The accident, I never had an accident
21  before and I wasn't really actually sure what to do
22  or what to go about to do.
23    Q.  Okay.  So after you gave this gentleman
24  the fire extinguisher and the sheet -- I'm sorry, I
                                                    289

1  that you struck while it was on fire?
2    A.  While it was on fire?
3    Q.  Yes.
4    A.  No.
5    Q.  Did you ever see Mr. Scheinman, the driver
6  of that vehicle, in the vehicle?
7    A.  I don't remember.
8    Q.  As you -- Strike that.
9        When you were standing outside -- and I'm
10  taking you back a little bit.  I apologize for
11  jumping around.
12        As you were standing outside your vehicle
13  after first getting out, in other words, before you
14  backed up your truck, where did you see fire on the
15  BMW?
16    A.  On the back.
17    Q.  In the back?
18    A.  Yes.
19    Q.  Had it -- okay.  Can you tell me where on
20  the back it was?
21    A.  Just in the -- just in the back of the
22  vehicle.
23    Q.  Was there fire in the passenger
24  compartment at that time?
                                                    291

56 (Pages 288 to 291)

1    A.  I don't know.

2    Q.  Was there fire in the front engine
3  compartment at that time?

4    A.  I don't believe so, no.

5    Q.  When you stepped out of your car -- excuse
6  me.

7        When you stepped out of your truck before
8  you moved it, did you see in the windows and see
9  occupants of that vehicle?

10       MR. BURKE:  Objection to the form which
11  refers to occupants in the plural form.

12       MR. COUTURE:  At that point he probably
13  didn't know.

14       MR. BURKE:  I know, but you know.  So the
15  form of the question is incorrect.

16       MR. COUTURE:  I disagree.

17  BY MR. COUTURE:

18    Q.  Go ahead.  Did you see anyone in the
19  vehicle?

20    A.  I don't remember.

21    Q.  Did you try to see if there was someone in
22  the vehicle at that time?

23    A.  I don't remember.  It happened so fast.

24    Q.  So as you were standing outside of your

292

1  truck after you moved it, not looking at the
2  burning car, did anyone approach you to talk to
3  you?

4    A.  They was -- people was going towards the
5  burning car.  Nobody -- I don't remember anybody
6  approaching me and talking to me.  I'm not saying
7  they didn't but I don't remember anybody actually
8  talking to me at that point.

9    Q.  Who was the first person you remember
10  talking to after the accident?

11    A.  The officer that told me to go sit in the
12  back of his squad car.

13    Q.  Male or female?

14    A.  Male.

15    Q.  I'll represent to you that Officer Brian
16  Bodden testified that he spoke to you on the day of
17  the occurrence.

18       I take it you don't remember the names of
19  the police officers you spoke to; is that fair to
20  say?

21    A.  Right.

22    Q.  I'm going to show you what was part of
23  Exhibit No. 28 for identification, specifically
24  Pages 6 and 7, and I'm not going to ask you to

293

1  specifically read it but it's only fair that I give
2  this to you while I read from it, okay?

3    A.  Okay.

4    Q.  Before I do that I want to ask you this.
5  Did you tell Officer Bodden, the officer who told
6  you to go sit in the car, that you were going 45 --
7  40 to 45 miles an hour at the time of impact?

8    A.  I don't remember.

9    Q.  If Officer Bodden testified that that's
10  what you told him, would you have any reason to
11  disagree?

12    A.  Yes.

13    Q.  Okay.

14       MR. BURKE:  I couldn't hear answer.

15       THE WITNESS:  Yes.

16  BY MR. COUTURE:

17    Q.  Okay.  And what reason do you think
18  that -- well, strike that.

19       If Officer Bodden wrote down on this
20  report that we're about to show you that you told
21  him that you were going 45 to 50 miles an hour, do
22  you have any understanding why Officer Bodden would
23  have written that?

24       MR. SKRYD:  Objection, form, calls for

294

1  speculation.

2  BY MR. COUTURE:

3    Q.  Go ahead.  Other than you telling him?

4    A.  I don't know.

5    Q.  And the reason why you disagree with --
6  Strike that.

7       Are you saying that you didn't tell him
8  that?

9    A.  No.

10    Q.  And now Mr. Skryd is showing you and
11  I'll --

12       MR. SKRYD:  I won't read it.  There's so
13  many of these.  Go ahead.

14  BY MR. COUTURE:

15    Q.  I'll direct your attention to five
16  paragraphs down:  I spoke to the driver of the
17  semi.  And I'm only going to direct your
18  attention -- you can read the whole thing if you'd
19  like, but I want to direct your attention to the
20  last line.

21       MR. SKRYD:  Okay.  Let him read it, Tim,
22  if you don't mind.

23       MR. COUTURE:  Of course.

24       MR. BURKE:  What Bates stamp page are you

295

57 (Pages 292 to 295)

1  on, Tim?
2          MR. COUTURE: 6.
3          MR. SKRYD: Exhibit 28, 6?
4          MR. COUTURE: Yes.
5          MR. SKRYD: You're in the paragraph that
6  starts with "I spoke with the driver"?
7          MR. COUTURE: In deed I am.
8          MR. SKRYD: Okay. So why don't you read
9  that paragraph and he's going to ask you a question
10 about it.
11 BY MR. COUTURE:
12     Q.  And you can read the last paragraph too.
13         MR. SKRYD: On that page, the first page?
14         MR. COUTURE: Yes.
15         THE WITNESS: Okay.
16 BY MR. COUTURE:
17     Q.  Okay. You read it?
18     A.  Okay.
19     Q.  Now, first let me direct your attention to
20 the last paragraph. It says: I placed him into
21 the back seat of my patrol vehicle uncuffed. Does
22 this indicate to you that it would appear that
23 Officer Bodden was the officer who told you to go
24 sit in his car?

                                              296

1      A.  Right.
2      Q.  Is that a yes? I'm sorry, I couldn't hear
3  you.
4      A.  Yes. Yes.
5      Q.  Thank you. The paragraph before, last
6  line: I asked him how fast he thought he was going
7  when he hit the vehicle and he said about 40 to
8  45.
9          First of all, that's what is written here,
10 correct?
11     A.  Right.
12     Q.  And you've told me today that you were
13 going 30?
14     A.  Right.
15     Q.  Did you tell Officer Bodden you were going
16 40 to 45?
17         MR. SKRYD: Objection, asked and
18 answered.
19         THE WITNESS: I don't know.
20         MR. SKRYD: Go ahead.
21         THE WITNESS: I don't remember.
22 BY MR. COUTURE:
23     Q.  Did you speak to anyone else before you
24 went and sat in the squad car?

                                              297

1      A.  I don't remember speaking to anybody
2  else. I might have.
3          MR. COUTURE: Actually, I have another
4  question about that, Joe.
5  BY MR. COUTURE:
6      Q.  According to, again, the second to the
7  last paragraph: Officer Bodden indicated that you
8  told him that there was a -- the light was green
9  and there was a vehicle stopped at the green
10 light.
11         Did you tell the officer that you saw a
12 vehicle stopped at the green light before you
13 struck it?
14     A.  I don't remember talking -- I don't
15 remember this conversation. I just remember him
16 having me -- take me by the arm and put me in the
17 back of his squad car. I don't remember talking to
18 him very much at all. I was pretty upset and
19 shaken at the time, you know.
20         And I told him -- the place where I was
21 coming from was wrong too.
22     Q.  I understand. You don't know if that was
23 the officer's mistake or your own mistake?
24     A.  Right.

                                              298

1      Q.  My question, however, is this.
2      A.  Right.
3      Q.  Are you saying you didn't have this
4  conversation or are you saying that as you sit here
5  today four years later you don't remember having
6  this conversation?
7      A.  I don't remember having this conversation.
8      Q.  Thanks. Do you remember speaking with a
9  female officer of the Highland Park Police
10 Department while you were on the scene?
11     A.  I remember seeing a female but I don't
12 remember -- I don't remember a conversation, no.
13 There was a lot of officers there.
14     Q.  I'll show you what is Exhibit 28, Bates
15 Stamp Number 8, Page 8. And I'm specifically going
16 to -- once your lawyer is done looking at it --
17 draw your attention to Paragraph 5 starting "I
18 asked Samuel." Yes, I'm including the line "the
19 fire department" as a paragraph.
20         MR. SKRYD: Why don't you read here
21 through here, here through here. He's going to ask
22 you to start here and read through here for now.
23 If he wants to ask you more questions, he'll go
24 further.

                                              299

                          58  (Pages 296 to 299)

1    THE WITNESS:  Read the whole thing?
2    MR. SKRYD:  No.  Stop where I said.
3    THE WITNESS:  Okay.  All right, I did.
4  All right, I did.  Right here.
5    MR. SKRYD:  Go ahead, Tim.
6  BY MR. COUTURE:
7    Q.  Did you -- I apologize.  Did you read the
8  big paragraph here too?
9    A.  Yes.
10    Q.  Okay.  Let me ask you first.  In that
11  paragraph Officer Dorsey says that she saw you
12  visibly shaking and believed you to be in shock.
13  That's what it says, correct?
14    A.  Yes.
15    Q.  All right.  Do you believe you were in
16  shock?
17    A.  Yes.
18    Q.  Can you tell me what about a medium impact
19  that didn't throw you around in your tractor caused
20  you to be in shock?
21    A.  It was because of the accident and it was
22  a bad accident and I was, you know, basically,
23  didn't know what to do.  I was -- you know.  So as
24  far as the impact itself, I mean, because -- I was
                                                    300

1  in shock because it was an accident and I never
2  been involved in a bad accident before and I
3  didn't -- I was concerned for -- I was just worried
4  about what was going on, you know.
5    Q.  You understand the difference between
6  being surprised and a little bit shaken because an
7  accident had occurred versus medical shock?
8    A.  No.  I mean, medical shock, I don't --
9    Q.  Okay.  According to Officer Dorsey you
10  told her you saw a car stopped at a green light and
11  you could not stop in time and rear-ended the car
12  and pushed it across the intersection, right?
13    A.  That's what it says, yes.
14    Q.  Did you have that conversation with
15  Officer Dorsey?
16    A.  I don't remember.
17    Q.  Did you have a conversation with any other
18  officers at the scene other than who we now
19  understand to be Officer Bodden and potentially
20  Officer Dorsey who's now Duchek?
21    A.  I don't remember talking to anybody on the
22  scene.
23    Q.  Did you speak to a driver of a truck at
24  the scene?
                                                    301

1    A.  I think so.
2    Q.  Are you aware that there's an individual
3  by the name of Angela Mitchell who was a truck
4  driver who has indicated that she spoke to you on
5  the scene?
6    A.  Yes.  I mean, I remember a truck driver
7  coming up to me and talking to me, yes.
8    Q.  Did you tell her "I didn't see the red
9  light"?  Did you tell her that?
10    A.  I don't remember.  I just remember -- I
11  just remember seeing her and talking to her but I
12  don't know what my conversation was with her.
13    Q.  Did you tell her "I've lost my CDL, I've
14  lost my job, I've lost everything"?
15    A.  I don't remember.  I don't know.  I could
16  have said that, yes.
17    Q.  Okay.  Thank you.  If Angela Mitchell
18  testifies under oath that that's what you said,
19  would you have any reason to refute that?
20    A.  No.
21    Q.  Did you speak to anybody else on the scene
22  other than Officer Bodden, potentially Officer
23  Dorsey and the driver of the truck Angela Mitchell?
24    A.  I don't remember.
                                                    302

1    Q.  Did you make any calls to anybody while
2  you were present on the scene?
3    A.  When I got in the back of the squad car, I
4  made a phone call to -- I tried to call my numbers
5  for -- you know, at Martin's and didn't reach
6  nobody.  And so I called a friend of mine, Jamie
7  Jorgensen, and he seen that I was shooken up and
8  couldn't -- so I give him a brief rundown of what
9  happened and he called and got a hold of Janet and
10  she called me back.
11    Q.  Okay.  So I understand what you're
12  saying.  You tried to call David and he wasn't
13  available?
14    A.  Right.
15    Q.  And you called Mr. Jursack --
16    MR. SKRYD:  Jorgensen.
17    THE WITNESS:  Jorgensen.
18  BY MR. COUTURE:
19    Q.  Jorgensen?
20    A.  Yeah.
21    Q.  Sorry.  For two days I've got that name
22  wrong.  Is he an employee at Martin's?
23    A.  Yes.
24    Q.  And did you talk to him?
                                                    303

59  (Pages 300 to 303)

1    A.  Yes.
2    Q.  What did you say?
3    A.  I told him that I was involved in an
4  accident, it was a bad accident, and I told him I
5  tried to get a hold of Martin's and couldn't,
6  failed to do so, and he said just -- that he would
7  try to contact them for me.
8    Q.  Did you give Mr. -- gosh, I can't believe
9  I'm getting this wrong --
10   A.  Jorgensen.
11   Q.  -- Jorgensen any details about how the
12 accident happened?
13   A.  No, I don't believe so.
14   Q.  When you spoke to Janet, were you still on
15 the scene in the police car?
16   A.  Yes.
17   Q.  What conversation did you have with Janet?
18   A.  I just give her what happened roughly,
19 that I had hit a car in the back end and I was just
20 giving her the rough breakdown.  I didn't go into a
21 lot of details.  I don't remember.
22   Q.  Did you tell her how fast you were going?
23   A.  I don't believe so.
24   Q.  Did you tell her what the color of the

304

1  light was?
2    A.  I don't remember the conversation with
3  Janet.  I just know I talked to her.
4    Q.  Did you speak with anyone else while you
5  were on the scene of this accident?
6    A.  I don't believe so.
7    Q.  Sir, I'm going to show you again what's
8  marked as Exhibit 30 for identification.  We've
9  already had you look at these photographs once,
10 right?
11   A.  Yes.
12   Q.  Okay.  I'm now going to call your
13 attention not to the photographs of the road but
14 specifically to photographs of the vehicles.
15      Exhibit 30J, did you ever observe the BMW
16 that you struck in that condition after the
17 accident --
18   A.  No.
19   Q.  -- as depicted in J?
20   A.  No.
21   Q.  You did not?
22   A.  No.
23   Q.  At any point after you got out of your
24 car -- your truck the second time did you go and

305

1  look at the BMW vehicle?
2    A.  No.
3    Q.  Drawing your attention to 30K and L.  Am I
4  correct that that shows the scene of the accident
5  after the accident with the BMW and then your
6  vehicle behind it?
7    A.  Yes.
8    Q.  Is that in -- are those vehicles in the
9  position you remember them being after the
10 accident?
11   A.  Yes.
12   Q.  I'm going to show you 30N.  First of all,
13 does it show your truck in the right-hand side of
14 that vehicle -- your tractor?
15   A.  Yes.
16      MR. SKRYD:  You said on the right-hand
17 side of the vehicle.
18      MR. COUTURE:  I'm sorry.  Thank you, Joe.
19 Strike it and I'll restate it.  I've only been
20 talking for six-and-a-half hours.  I should shut
21 up, right?
22 BY MR. COUTURE:
23   Q.  Looking at 30N, the right-hand side of the
24 photograph there's a tractor.  That is your

306

1  tractor?
2    A.  Yes.
3    Q.  This is taken on the day of the
4  occurrence, right?
5    A.  Yes.
6    Q.  On the left-hand side of the photograph do
7  you recognize that woman?
8    A.  No.
9    Q.  Is that the truck driver you spoke to?
10   A.  Could have been.  I don't know.
11   Q.  Do you know?
12   A.  No, not for sure.
13   Q.  Exhibits O and P also show a vehicle that
14 looks smashed from behind and has burn damage.
15      Do you recognize this to be the BMW that
16 you struck?
17   A.  I didn't see it in that condition, no.
18   Q.  Then finally Q, 30Q, is again a photograph
19 of your truck?
20   A.  Right.
21   Q.  All right.  When you left the scene, how
22 did you leave the scene?
23   A.  In a squad car.
24   Q.  Where were you taken in the squad car?

307

60  (Pages 304 to 307)

1    A.  I was taken to the police department I
2  think, I believe.
3    Q.  Did you go to the hospital at any point?
4    A.  After -- after the -- after I went to the
5  police department they took me to the hospital.
6    Q.  Okay.  Thank you.  So you were in the
7  squad; you went to the police department.  Did you
8  do anything at the police department before you
9  went to the hospital?
10    A.  I think I walked in and they was trying to
11  determine what hospital to take me to.
12    Q.  So nothing substantive?  You stood there
13  while they made decisions?
14    A.  Yes.
15    Q.  Then you went to the hospital and they
16  took urine samples and blood samples?
17    A.  Yes.
18    Q.  Both of which you understand were
19  negative, right?
20    A.  Yes.
21    Q.  No drugs or alcohol in your system?
22    A.  Yes.
23    Q.  All right.  Then you went back to the
24  police station?

                                          308

1    A.  Yes.
2    Q.  At that time did they ask you for -- if
3  you would do a video statement?
4    A.  Yes.
5    Q.  You agreed to that?
6    A.  Yes.
7        (Whereupon, Franke Deposition
8         Exhibit No. 82 was marked for
9         identification.)
10  BY MR. COUTURE:
11    Q.  I'll show you what's marked as 82 for
12  identification which also, by the way, part of
13  Exhibit 28, Page 37.
14      That is a Miranda Warning document that
15  you initialed and signed on July 4th, 2008 at 2:52
16  a.m., true?
17    A.  True.
18    Q.  And then you gave a statement to the
19  police?
20    A.  True.
21    Q.  They videotaped that statement, correct?
22    A.  Correct.
23    Q.  You saw that videotape?
24    A.  Yes.

                                          309

1    Q.  In a moment I'm going to show you a part
2  of it just to make sure that I've got the same
3  statement that you gave.
4      You've reviewed that statement in
5  preparation of this deposition?
6    A.  Yes, I watched it.  Yes.
7    Q.  Okay.  Am I correct that you told -- there
8  were two officers present --
9    A.  Yes.
10    Q.  -- O'Neill and Hernandez, right?
11    A.  Yes.
12    Q.  Am I correct that you told Officers
13  O'Neill and Hernandez that you were going the speed
14  limit at the time of this accident?
15    A.  I don't remember saying that.
16    Q.  Okay.  If it's in the video, though, you
17  wouldn't dispute it, right?
18    A.  Right.
19    Q.  Am I correct that later in the statement
20  you told them you were going 40 and then 35 miles
21  an hour?
22    A.  I thought it was 40 and 30 miles -- 30
23  miles an hour.
24    Q.  Okay.  Okay.  But whatever is in the

                                          310

1  statement is there, right?
2    A.  Right.
3    Q.  You don't have any reason to dispute that?
4    A.  No.
5    Q.  And your testimony is you believe you said
6  30?
7    A.  Yes.
8    Q.  If in fact you said 35 -- if at 17:18 on
9  the video you said you were going 40 or 35 miles an
10  hour, if that's what the video says, you wouldn't
11  have any reason to dispute that?
12    A.  If that's what it says.
13    Q.  Okay.  If in fact that's what it says, can
14  you explain to me why according to Officer Bodden
15  you said 40 to 45 and then according to Officer
16  O'Neill and Hernandez you said first the speed
17  limit and then 40 and 35, and today you're saying
18  30?
19      MR. BURKE:  Objection as to form.  I think
20  today he said 25 to 30, if I recall correctly.
21  BY MR. COUTURE:
22    Q.  Good enough for me.  Can you explain why
23  we've got a drop of 15 to 25 miles an hour in your
24  description of how fast you were going?

                                          311

61 (Pages 308 to 311)

1    A. After, you know, thinking about it and I
2  even remember that I looked at the speedometer and
3  said I was doing 30 miles an hour and when --
4  probably when they asked me at the scene, I must
5  have been confused and just asked me the speed
6  limit or -- I didn't know.
7    Q. Okay. So actually at the time of the
8  accident while you were standing and talking to
9  Officer Bodden, according to him you actually told
10  him you were going 5 to 10 under the speed limit
11  and now you're saying you were going 20 miles an
12  hour under the speed limit? You understand that,
13  right?
14    A. Yes.
15    Q. In fact, your reporting of speed has
16  gotten slower every time it's shown up: First time
17  it was 40 to 45, then it was speed limit which is
18  50 but 40 to 35, and today it's 30 to 25?
19    A. Yes.
20    Q. And your explanation is because now you've
21  had more time to think about it and you think you
22  were going slower?
23    A. Yes.
24    Q. Did you also tell Sergeant O'Neill and

312

1  that there were no vehicles stopped in the left
2  lane?
3    A. I don't remember. I don't know. I don't
4  remember if I said that or not.
5    Q. If it's in the report, though, you'll
6  agree that that's what you said?
7    A. Yes.
8    Q. Now, today you're saying you don't
9  remember whether a vehicle was stopped in the left
10  lane.
11      Do you have anything to explain why then
12  you said there were no vehicles in the left lane
13  and today you're saying "I don't remember"?
14    A. No.
15    Q. Okay. Did you speak to anyone else before
16  you left the police station that day?
17    A. Before I left --
18    Q. After giving your statement to the
19  officers?
20    A. After the video statement?
21    Q. Yes.
22    A. I was trying just to find somebody to find
23  a charger for my cell phone and there was an
24  officer that gave me a ride to the Denny's.

314

1  Officer Hernandez that you believed you were zoned
2  out such that you didn't see the vehicle that you
3  struck?
4    A. I told them I didn't see the vehicle that
5  I struck but I don't remember saying the
6  words "zoned out."
7    Q. But if it's in the statement, you won't
8  deny it?
9    A. Right.
10    Q. When you use the words "zoned out" -- have
11  you ever used that phrase before?
12    A. It's not a common phrase, no.
13    Q. Okay. I'm sorry, it's not a common
14  phrase?
15    A. I don't remember using it much.
16    Q. And you don't remember whether you used it
17  on the day of the occurrence to describe your
18  condition at the time of impact?
19    A. Right.
20    Q. Did you tell Officer Hernandez and O'Neill
21  that the vehicle that you struck was stopped at
22  impact?
23    A. I don't know.
24    Q. Did you tell Officer O'Neill and Hernandez

313

1    Q. Okay. So no one else specifically about
2  the accident?
3    A. Right.
4    Q. Who picked you up at the Denny's?
5    A. It was another one of Martin's drivers.
6    Q. What was his name?
7    A. I couldn't -- I don't know exactly what --
8  I don't know what his name is. It was a new
9  driver. I didn't know exactly who.
10    Q. Did you have a discussion with that driver
11  regarding the accident?
12    A. He asked me what had happened and I told
13  him I had an accident.
14    Q. Did you tell him how fast you were going?
15    A. I don't know.
16    Q. Did you tell him the color of the light?
17    A. I don't remember.
18    Q. When you were speaking with the police
19  officers, did they tell you that a woman by the
20  name of Lucy Michael stopped in the left-hand
21  lane for seven to eight or more seconds of
22  northbound 41 when she saw you drive essentially by
23  her and strike the stopped vehicle?
24    A. No.

315

62 (Pages 312 to 315)

1    Q.  Did you tell you that Miss Michaels said
2  the light was red for northbound?
3    A.  No.
4    Q.  Have you since learned that Miss Michael
5  has said the light was red?
6    A.  No.
7    Q.  Are you aware that there are seven
8  witnesses who have said that the light was red for
9  your direction of traffic?
10    A.  No.
11    Q.  Have you spoken to any of those witnesses?
12    A.  No.
13    Q.  Do you know why they would have said the
14  light for your direction of traffic was red?
15    MR. SKRYD:  Objection, calls for
16  speculation, form.
17  BY MR. COUTURE:
18    Q.  Go ahead.
19    A.  No.
20    Q.  You got a ticket eventually, did you not,
21  for failing to heed a traffic signal?
22    A.  Yes.
23    Q.  In fact, you got three tickets, I'll talk
24  about all of them in a little bit, but one of them

316

1  was failure to heed a traffic signal, correct?
2    A.  I believe so, yes.
3    Q.  Was it your understanding that the police
4  was saying -- the police department was saying that
5  you ran a -- or failed to stop at a red light?
6    A.  Yes.
7    Q.  Yes. Okay. But your testimony is that it
8  was green?
9    A.  Yes.
10    Q.  Did you continue to watch that light as
11  you traveled the last hundred feet from when it
12  turned green until the impact? I'll strike that
13  because that mischaracterizes your testimony.
14    You told me that from watching the light
15  turn green until impact was two seconds. Did you
16  continue to visualize the light for your direction
17  of traffic the entire time that you drove forward
18  that 200 feet?
19    MR. SKRYD:  You said 200 feet.
20    MR. COUTURE:  Sorry. Thank you, Joe.
21  I've got to do it again.
22  BY MR. COUTURE:
23    Q.  Did you continue to visualize or see the
24  color of that light as you drove for two seconds

317

1  between the time you saw it turn green until the
2  impact?
3    A.  Yes.
4    Q.  And it was green the whole way?
5    A.  Yes.
6    Q.  Did any vehicles travel southbound during
7  those two seconds by you going the other way?
8    A.  I don't remember.
9    Q.  Did any vehicles pass you going northbound
10  in that two seconds through the green light?
11    A.  I don't remember.
12    Q.  You don't know what east or westbound
13  traffic did during that time?
14    A.  No.
15    Q.  I think you're shaking your head.
16    A.  No. I'm sorry.
17    Q.  That's all right. You've been at this for
18  a while. Do you need a break?
19    A.  No.
20    Q.  Okay. Do you have any understanding as to
21  why Mr. Scheinman's vehicle was stopped if he
22  wasn't stopped at a red light?
23    A.  No.
24    Q.  In fact, when you were asked by the police

318

1  department, specifically Officer Hernandez and
2  Sergeant O'Neill, what caused the accident -- or
3  strike that.
4    You said -- they asked you if the accident
5  could be avoided and you said in your video
6  statement it could have been avoided and they asked
7  you, well, what caused it, and you said that
8  vehicle shouldn't have been stopped at a green
9  light. Do you remember that?
10    A.  Yes.
11    Q.  Do you believe that your actions played
12  any role in causing this accident?
13    A.  Yes.
14    Q.  Okay. What actions of yours played a role
15  in causing the accident?
16    A.  I hit him.
17    Q.  Okay. Am I correct that when you're
18  trained as a truck driver, even if a light is
19  green, you're still -- and if you see something in
20  front of you, you're not supposed to run into it?
21    A.  Right. Yes.
22    Q.  And supposing he was stopped and supposing
23  the light was green, would you agree with me that
24  as a truck driver you should still see what's in

319

63 (Pages 316 to 319)

1    front of you and not hit it?
2        A.  Yes.
3        Q.  What did Mr. Scheinman, the driver of the
4    BMW, do to cause this accident?
5        A.  I don't know.
6            MR. BURKE:  Objection, form, assumes facts
7    not in evidence.
8            MR. COUTURE:  That's why we're here.
9    BY MR. COUTURE:
10       Q.  Do you believe his vehicle was stopped on
11   a green light?
12       A.  I don't know.  I mean -- I mean, do I
13   believe it was stopped?
14       Q.  Well, let me ask you differently.  Do you
15   know whether his vehicle was stopped or moving when
16   you hit it?
17       A.  I didn't see the vehicle so how could I
18   know if it was stopped.
19       Q.  If his vehicle was stopped and your light
20   was green, do you believe that Mr. Scheinman did
21   something to cause or contribute to the cause of
22   this accident?
23       A.  I don't know.
24       Q.  You told the police when they asked you on

320

1    the day of the occurrence or actually the morning
2    after the occurrence when they asked you about the
3    cause, you said that he shouldn't have been stopped
4    on a green light, right?
5        A.  Right.
6        Q.  Did you believe then that Mr. Scheinman
7    caused this accident?
8        A.  I don't know.
9        Q.  Do you believe now that he caused this
10   accident?
11       A.  I don't know.
12       Q.  Why would you tell the police that he
13   caused the accident if you didn't know then?
14       A.  I have no idea why -- I don't have no idea
15   why I stated that.
16       Q.  Okay.  You understand the police were
17   trying to ask you questions about what happened?
18       A.  Yes.
19       Q.  And you understood you were trying to
20   answer them correctly, right?
21       A.  Yes.
22       Q.  And you're under oath today.  So you know
23   you're testifying under oath and you have to
24   testify truthfully, true?

321

1        A.  Yes.
2        Q.  Okay.  After you were picked up where did
3    this driver from Martin's whose name you don't
4    remember take you?
5        A.  Back to Wilton
6        Q.  Okay.
7        A.  I'm pretty sure that's where he took me.
8    I don't know.  It's pretty obvious he took me
9    probably back to the yard.
10       Q.  To get your personal car?
11       A.  Right.
12       Q.  And you went home, right?
13       A.  Right.
14       Q.  Did you speak to your wife on the phone at
15   any time between the time that the police took you
16   to the station to the time you got home?
17       A.  My phone -- my cell phone was dead.  So I
18   don't know if I charged the phone up.  I don't
19   remember talking to her before I got home, no.
20       Q.  Okay.  Have we exhausted all of the
21   discussions that you had between the time of the
22   accident and the time you got home?  Have we talked
23   about all those?
24       A.  Right.

322

1        Q.  Yes?
2        A.  Yes.
3        Q.  Did you talk to your wife about this
4    accident?
5        A.  After I got home, yes.
6        Q.  Did you tell her how fast you were going?
7        A.  I don't think so, no.  No.
8        Q.  Did you tell her the color of the light?
9        A.  I don't remember.
10       Q.  Other than your wife who's the next person
11   you spoke to about this accident?
12       A.  I don't remember.
13       Q.  Did you speak to anyone else from Martin's
14   Bulk Milk between the time that you were dropped
15   off -- strike that -- between the time you were
16   dropped off at the yard and the next day, the 4th?
17       A.  Possibility.
18       Q.  Do you know what was said?
19       A.  No.
20       Q.  David Martin testified yesterday that on
21   the 4th you and he had a very short discussion.  Do
22   you remember that?
23       A.  No.
24       Q.  He indicated that you came to the Wilton

323

64 (Pages 320 to 323)

1   office, he was behind the glass and he said let's
2   talk about this Monday.  Do you remember that?
3        A.   I don't remember talking or ever seeing
4   him.
5        Q.   Did you have any other discussions with
6   anyone from Martin's before the following Monday
7   which would be July 7th, 2008?
8        A.   The weekend?
9        Q.   Yes.
10       A.   I might have talked to another employee
11  that weekend.  He was at the same place where I
12  was.  I might have told him what -- that I had an
13  accident.
14       Q.   Did you participate in your poker thing?
15       A.   Yes.
16       Q.   Who is the employee you may have spoken
17  to?
18       A.   Jim Larsen.  His name is Jim Larsen.
19       Q.   What discussion did you have with Jim
20  Larsen about the accident?
21       A.   Just that I had an accident.
22       Q.   Did you tell him the color of the light?
23       A.   I don't remember telling him.
24       Q.   Did you tell him the speed of your

                                                    324

1   vehicle?
2        A.   I don't remember.
3        Q.   Did you tell him that the other car caught
4   on fire?
5        A.   Yes.  .
6        Q.   Before you left the police station did you
7   have an understanding of the condition that
8   Mr. Scheinman was in?
9        A.   No.
10       Q.   At any time that weekend did you learn
11  Mr. Scheinman's physical condition?
12       A.   No.
13       Q.   Did you watch any news reports of your
14  accident after your accident?
15       A.   No.
16       Q.   When was the next time you spoke to
17  someone about the accident -- well, strike that.
18  That's too general.
19            Did you have a conversation with David
20  Martin on Monday, the 7th?
21       A.   Yes.
22       Q.   Where was that?
23       A.   In his -- at Martin's in one of the
24  offices.

                                                    325

1        Q.   Was it just him and you or was someone
2   else there?
3        A.   It was -- at one time it was just me and
4   him and then there was -- I think there was
5   somebody else there.
6        Q.   Do you know who?
7        A.   I think it was somebody from their
8   insurance company or something.
9        Q.   What discussion did you have with David
10  Martin in his office on July 7th, 2008, the
11  following Monday?
12       A.   He told me that due to the insurance
13  company they had to let me go.
14       Q.   He told you that the insurance company
15  directed them to let you go?
16       A.   That's what I think he said, yes.
17       Q.   Did he say that because you ran into
18  another vehicle such that a fire occurred they had
19  to let you go or did they say it was an insurance
20  issue?
21       A.   I think he said it was an insurance issue
22  and because of the accident.
23       Q.   Did Mr. Martin indicate that he blamed you
24  for this accident?

                                                    326

1        A.   Not at that point, no.
2        Q.   Did he ever tell you that he blamed you
3   for this accident?
4        A.   I don't remember.  No, I don't remember
5   him saying that.
6        Q.   Did you tell him what happened when you
7   spoke with him on the 7th?
8        A.   Yes, I think so.
9        Q.   Did you tell him the color of the light
10  for your direction of traffic?
11       A.   I have no idea.
12       Q.   Did you tell him how fast you were going
13  at impact?
14       A.   I don't remember.
15       Q.   At any time -- not counting your lawyers,
16  of course; I don't want to hear what you said to
17  your lawyers.
18            At any time since the day of the accident
19  have you told anyone else how fast you were going
20  at impact?
21       A.   I don't remember.
22       Q.   Have you ever told anyone before today,
23  not counting your lawyers, that you were going 25
24  to 30 at impact?

                                                    327

                                 65  (Pages 324 to 327)

**328**

1    A.  Anybody else?
2    Q.  Anybody else or is today the first time
3  that you've told anybody but your lawyers 25 to 30?
4    A.  I don't remember.
5    Q.  Did you speak to the police again after
6  you gave your statement?
7    A.  What do you mean?
8    Q.  Did any officer call you and say we need
9  more information?
10    A.  No.
11    Q.  Did you receive a ticket?
12    A.  Yes.
13    Q.  How did you receive that?
14    A.  They mailed it to me.
15    Q.  Actually, you had three tickets, right?
16    A.  Yes.
17    Q.  One of them was failure to reduce speed,
18  correct -- to avoid an accident, right?
19    A.  I don't remember exactly what they said.
20    Q.  I'll represent to you that's what one of
21  them was.
22    A.  Okay.
23    Q.  One of them was failing to heed a traffic
24  signal, a red light.  Do you remember that?

**329**

1    A.  Yes.
2    Q.  And one of them was negligent driving.
3  Did you go to court for those?
4    A.  Yes.
5    Q.  Were you represented by an attorney for
6  those?
7    A.  Yes.
8    Q.  Did you pay for that lawyer?
9    A.  Yes.
10    Q.  How did you plead to those charges?
11    A.  Not guilty.
12    Q.  What was the verdict -- well, strike
13  that.  Let me ask you this.  After you pled not
14  guilty was there a trial?
15    A.  Like in front of a lawyer -- like a bench
16  trial thing?
17    Q.  Yes.  Did somebody come and explain to the
18  judge their side of the story, whether it was you
19  or the police?
20    A.  Yes.
21    Q.  Okay.  Let's talk about the police.  Do
22  you know who the police officer was that gave the
23  police side of the story?
24    A.  No.

**330**

1    Q.  Am I correct that they said that you ran
2  the red light?
3    A.  I don't remember.  I don't remember exact
4  what they said.
5    Q.  And what did you tell the judge?
6    A.  My lawyer did all the talking.  I didn't
7  talk to the judge.
8    Q.  You didn't talk at all?
9    A.  No.
10    Q.  Didn't give any testimony?
11    A.  No.
12    Q.  Didn't tell him how fast you were going?
13    A.  No.
14    Q.  Didn't tell him the color of the light?
15    A.  I didn't talk to the judge.
16    Q.  Okay.  You just said "not guilty" or your
17  lawyer said "not guilty"?
18    A.  Yes.
19    Q.  What was the verdict?
20    A.  Guilty or --
21        (Whereupon, Franke Deposition
22        Exhibit Nos. 83 and 84 were
23        marked for identification.)
24

**331**

1  BY MR. COUTURE:
2    Q.  Do you remember the day after you were
3  fired by Martin's you were visited by an
4  investigator who took a statement from you?
5    A.  Visited -- visited me where at?
6    Q.  Well, I'll withdraw it because it doesn't
7  say whether it was in person or not.
8    Did you speak to an investigator on July
9  8, 2008 about this accident?
10    A.  I believe so, yes.
11    Q.  A gentleman by the name of Dennis
12  Fredrickson?
13    A.  Yes.
14    Q.  Do you understand that he was hired by the
15  Scheinman family to take your statement?
16    A.  No.
17    Q.  Have you ever seen a transcript of that
18  statement?
19    A.  No.
20    Q.  I'll show you what's been marked as
21  Exhibit 83 for identification.  Go ahead and look
22  at that.  Have you ever seen this before?
23    MR. SKRYD:  Why don't you go ahead and
24  read it.

66 (Pages 328 to 331)

1    MR. COUTURE:  Do you want to take a break
2  while he reads it?
3    MR. SKRYD:  Yes, let's take a break, he
4  can read it.
5    THE VIDEOGRAPHER:  We are going off the
6  record.  The time is 5:40 p.m.
7    (A break was taken.)
8    THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 6:03 p.m.  Please proceed.
10  BY MR. COUTURE:
11    Q.  You've had an opportunity during the break
12  to review Exhibit 83 for identification?
13    A.  Yes.
14    Q.  I am told that that depicts a statement
15  that you gave to an individual by the name of
16  Dennis Fredrickson on July 8, 2008.  Is that your
17  understanding?
18    A.  Yes.
19    Q.  Did you -- were you asked these questions
20  on that date and did you give these answers?
21    A.  Yes.
22    Q.  This accurately and correctly depicts what
23  you said three or four days -- well, five days
24  after the accident, right?

332

1    A.  Yes.
2    Q.  Almost four days because it was late at
3  night, right?
4    A.  Yes.
5    Q.  Where did you give this statement?  Where
6  were you?
7    A.  At Martin's Bulk Milk.
8    Q.  Was this statement in person or on the
9  phone?
10    A.  In person.
11    Q.  Someone came to Martin's Bulk Milk?
12    A.  Yes.
13    Q.  If you had been let go by Martin's Bulk
14  Milk the day before, why were you there?
15    A.  I was asked to come back.
16    Q.  Who asked you to do that?
17    A.  Somebody from Martin's.  I don't
18  understand -- I don't remember who asked me to come
19  back.
20    Q.  At the end of this document, Page 6,
21  Mr. Fredrickson identifies himself as someone who
22  is investigating on behalf of Mr. Scheinman and his
23  attorney, correct?
24    A.  Right.  Yes.

333

1    Q.  Did you speak to Mr. Scheinman's attorney
2  before you gave this statement?
3    A.  No.
4    Q.  Now, I'm not going to ask you about all of
5  this, just a little bit here and there.
6    On Page 3 you indicate at the top that you
7  believe the speed limit slows down to about 40
8  miles an hour, right?
9    A.  Yes.
10    Q.  Okay.  And then the next answer you
11  indicate that you were driving -- you were checking
12  to see if anyone was coming the other way and you
13  hit him -- meaning the car -- in the back, true?
14    A.  True.
15    Q.  Okay.  Am I correct that at the bottom of
16  3 and the beginning of Page 4 you were asked if
17  there were any other vehicles on the road in the
18  lane next to you and you said there was nothing on
19  the road?
20    A.  Yes, that's what I said.  That's what it
21  says, yes.
22    Q.  All right.  And then a little bit later he
23  asked:  Were there two other cars in the lane to
24  the left of you.  And the answer was:  I mean, I

334

1  was, the light was green so I didn't see any other
2  cars stopped, right?
3    A.  Right.
4    Q.  Okay.  Today you have said a number of
5  times when I asked you if there were vehicles in
6  that lane and you said I don't know.
7    A.  Right.
8    Q.  But four or five days after the accident
9  you said you looked and you saw no vehicles in
10  those lanes?
11    A.  Okay.
12    Q.  Right?
13    A.  Yes.
14    Q.  Okay.  If witnesses are going to testify
15  that they were actually sitting there, stopped in
16  that lane, do you have any reason to disagree with
17  that?
18    A.  No.
19    Q.  And then a little bit further he says:  So
20  you were a ways back.  And you said:  I was
21  looking -- I don't know how far the light --
22  turning green so it was -- it was green, that's why
23  I didn't slow down for the, and then he interrupted
24  you, right?

335

67 (Pages 332 to 335)

**Page 336**

1    A.  Yes.  Right.

2    Q.  Indicating that you saw a green light and

3  you didn't slow down?

4    A.  Right.

5    Q.  You indicated today that as you approached

6  the intersection your eyes were on the green light?

7    A.  Right.

8    Q.  And ahead of you, true?

9    A.  Yes.

10    Q.  A little further down he asked you if you

11  were making any adjustments on your CB or radio and

12  you indicated instead that you were probably

13  checking driveways.

14        Were you looking at the road and the

15  stoplight or were you checking driveways as you

16  approached the intersection?

17    A.  I was just looking -- yeah, I was looking

18  around, checking like you always do when you

19  approach an intersection, you scan the area and --

20    Q.  Did you take your eyes off the light at

21  any time between when you saw it turn to green and

22  when the accident happened?

23    A.  Probably, yes.

24    Q.  When?

**Page 337**

1    A.  When?

2    Q.  Yes.

3    A.  I don't remember.

4    Q.  For how long?

5    A.  I don't remember that.

6    Q.  The last sentence -- last answer -- well,

7  strike that.

8        Page 4, bottom: Okay. Did you hit your

9  brake at all before the impact. That's the

10  question posed to you by Mr. Fredrickson. And you

11  said: I hit the brakes probably right before, I

12  mean, period.

13    A.  Right.

14    Q.  Okay. So a couple of days after the

15  accident you told Mr. Fredrickson you hit the brake

16  before the impact?

17    A.  That's what it says, yes.

18    Q.  Okay. Well, you don't dispute that this

19  is a transcript of what you said, do you?

20    A.  No.

21    Q.  All right. And today you said you didn't

22  see the car so you didn't apply the brakes?

23    A.  Right.

24    Q.  Which is it?

**Page 338**

1    A.  I didn't -- I didn't see the -- I didn't

2  apply the brakes until I was through the

3  intersection.

4    Q.  After you hit him?

5    A.  Right.

6    Q.  Why did you tell Mr. Fredrickson you hit

7  the brakes before impact?

8    A.  I have no idea.

9    Q.  He -- well, strike that. Those are the

10  only questions I have on that.

11        I forgot to ask you a question or two --

12  and I know it's hard to believe that after this

13  much time I could have forgotten anything. But I

14  was listening to your statement to the police or

15  watching it, actually, and if I understood

16  correctly, one of the things that you told Officers

17  Hernandez and O'Neill was that most of the time I

18  go the other way; I just got okay'd to go this way,

19  discussing the route you were taking.

20        Do you remember telling O'Neill and

21  Hernandez that?

22    A.  Not - not exactly, no.

23    Q.  Okay. Do you remember telling them that

24  you had just received the okay to go up 94 and 41

**Page 339**

1  as opposed to a different route?

2    A.  No, I don't remember -- I don't remember

3  discussing the route with them guys.

4    Q.  Do you have any explanation as to why you

5  said that in your statement to the police?

6    A.  No.

7    Q.  I'm going to show you what was also marked

8  previously as part of Exhibit 28 and it's Pages 42,

9  43 and 44, but just so you know I'm only going to

10  ask you about the first page.

11        MR. SKRYD: Can I see that for a second?

12        MR. COUTURE: Sure. I'm sorry. I've got

13  another copy if you want one. There you go.

14        MR. SKRYD: You're going to the first

15  page?

16        MR. COUTURE: Yes, just the first page.

17        MR. SKRYD: All right. Go ahead. Have

18  you seen this before?

19        THE WITNESS: No.

20        MR. COUTURE: That was going to be my

21  first question.

22  BY MR. COUTURE:

23    Q.  Have you ever seen this before?

24    A.  No, sir.

68 (Pages 336 to 339)

1    Q.  All right.  Have you ever seen this type
2  of document before?
3    A.  No.
4    Q.  Okay.  I will tell you that this is part
5  of the police report and specifically a document
6  created by the Illinois State Police.  Do you see
7  in the middle in the box that says violations --
8    A.  Yes.
9    Q.  Okay.  The first one says Unit 1, which is
10  referred to above as your tractor, it indicates
11  that you or the tractor was cited for having an
12  inoperable required lamp.  Were you ever told after
13  this accident that the truck failed the inspection
14  and it didn't have a proper lamp?
15    A.  No.
16    Q.  The tractor?
17    A.  No.
18    Q.  The second one is inoperable required lamp
19  on the chassis and trailer.  Were you ever told
20  that there was lights out on the trailer?
21    A.  No.
22    Q.  Did you ever observe lights out on the
23  tractor or trailer before this accident?
24    A.  No.

340

1    Q.  The next item is the chassis' brakes out
2  of adjustment, inadequate brakes for safe
3  stopping.  Were you ever told that the brakes on
4  the chassis were out of adjustment?
5    A.  No.
6    Q.  Did the brakes have anything to do with
7  this accident?
8    A.  Yes.
9    Q.  Let me ask you this.  You said you didn't
10  brake before the accident.
11    A.  Right.
12    Q.  So out of adjustment or not it wouldn't
13  matter, right?
14    A.  Right.  Exactly.
15    Q.  But this document appears to indicate that
16  the brakes were not in proper shape?
17    A.  Okay.  No.
18    Q.  Did you observe any bad brakes when you
19  did your pre-trip inspection?
20    A.  No.
21    Q.  Have you ever heard of an individual by
22  the name of Julie Mulligan?
23    A.  No.
24    Q.  Did you ever learn that a Julie Mulligan

341

1  talked to the police about what she witnessed on
2  the day of the occurrence?
3    A.  I don't remember that -- I don't remember
4  that name.
5    Q.  If Miss Mulligan told the police that she
6  observed you going 55 miles an hour while you were
7  driving between Park Avenue and Half Day Road,
8  would you disagree with her statement?
9    A.  Yes.
10    Q.  Do you have any reason to believe
11  Miss Mulligan would lie to the police about what
12  she saw?
13      MR. SKRYD:  Objection, form.  You can
14  answer.
15      THE WITNESS:  No, I have no reason.
16  BY MR. COUTURE:
17    Q.  At the time of this accident you were
18  driving a truck for your employer Martin's Bulk
19  Milk Service?
20    A.  Yes.
21    Q.  You were in the course of doing your job
22  when this accident happened?
23    A.  Yes.
24    Q.  You were at the time of this accident

342

1  headed towards your destination which was Wilton,
2  correct?
3    A.  Yes.
4    Q.  So you weren't off going to the Dells or
5  stopping for drinks; you were doing your job?
6    A.  Right.
7    Q.  So am I correct that you were in the
8  course and scope of your employment when this
9  accident took place?
10    A.  Yes.
11    Q.  Mr. Scheinman's family has sued the
12  manufacturer of the vehicle, the car, he was riding
13  in when you struck his car.  You understand that,
14  don't you?
15    A.  Yes.
16    Q.  Okay.  That's my client.  Do you have any
17  knowledge or evidence that the BMW vehicle in which
18  he was riding that you struck with your truck was
19  defective in any way?
20    A.  No.
21    Q.  Do you have any evidence to indicate that
22  the BMW somehow caused this accident?
23    A.  No.
24    Q.  Do you have any evidence to indicate that

343

69 (Pages 340 to 343)

1  the BMW somehow contributed to Mr. Scheinman's
2  injuries?
3      A.  No evidence, no.
4      Q.  Okay.  I'm now going to take a laptop and
5  I'm going to show you a couple of things, okay?  So
6  it will take a second but I've got it booted up.
7          MR. COUTURE:  And just so we're clear,
8  this first item is his witness statement to the
9  police.  I'm not going to run through it with him;
10  I'm just going to ask him if it's him.
11         MR. SKRYD:  Why don't you make sure it
12  works first.
13 BY MR. COUTURE:
14     Q.  All right.  You see now this video,
15  correct -- and we'll mark this disk from the video
16  as exhibit -- actually, 85 because I have something
17  else marked 84.
18         (Whereupon, Franke Deposition
19          Exhibit No. 85 was marked for
20          identification.)
21 BY MR. COUTURE:
22     Q.  I'm just going to hit play and I'm going
23 to ask you a few questions, a couple questions.
24     Is this what you saw and reviewed before

                                                344

1          MR. COUTURE:  Okay.  I got this disk from
2  plaintiff's counsel.  Are you willing to stipulate
3  that this disk is the same disk that he saw in your
4  office so I don't have to run him through the whole
5  thing?
6          MR. SKRYD:  I would say that assuming it's
7  the disk that we received from plaintiff --
8          MR. COUTURE:  Yes.
9          MR. SKRYD:  -- and assuming it's the --
10  maybe we can skim through maybe half and you can
11  show him the middle and then an end.
12         MR. COUTURE:  Okay.
13         MR. SKRYD:  But assuming that's true, you
14  know, then we'd stipulate to that.  Because, I
15  mean, I don't know what you have but I'm assuming
16  it's the same one plaintiff produced.
17         MR. COUTURE:  Yeah, it says Highland Park
18  Police.
19         MR. SKRYD:  Okay.
20         MR. COUTURE:  And I'll go to the middle.
21         MR. SKRYD:  Yes, let's do that.
22         MR. COUTURE:  Do you want to run it
23 through or --
24         MR. SKRYD:  Oh, no.  No.  No, no way.  We

                                                346

1  this deposition?
2      A.  Yes.
3      Q.  Okay.  Did you look at the entire video?
4      A.  Yes.
5      Q.  The gentleman with the shaved head and an
6  orange shirt, is that you?
7      A.  Yes.
8      Q.  When you watch this video, do you have any
9  reason to believe that the video was altered or
10  changed?
11     A.  No.
12         MR. SKRYD:  Objection, foundation.  You
13  can answer.  He answered.
14 BY MR. COUTURE:
15     Q.  Does the statement that you reviewed
16  accurately and correctly depict the statement that
17  you gave to the police after the accident and the
18  morning of the 4th of July, 2008?
19     A.  You mean what I said here?
20     Q.  Yeah.  The question is pretty simple.  I
21  just need to know if you believe that -- if you
22  believe what is on this disk is actually what you
23  said that day?
24     A.  Yes.

                                                345

1  don't have to do that.
2  BY MR. COUTURE:
3      Q.  Okay.  I've skipped ahead to 27:48.  It
4  still shows you, Officer Hernandez and Sergeant
5  O'Neill, right?
6      A.  Right.
7      Q.  You were there; you said the things that
8  you're hearing?
9      A.  Right.
10     Q.  Okay.  And at the end, which we'll get to,
11  Sergeant O'Neill asked if you want to give a
12  written statement; you say I really don't want to
13  because you've been through a lot already that day,
14  right?
15     A.  Yes.
16     Q.  And that's what we're looking at here on
17  this video?
18     A.  Right.
19     Q.  Do you have any reason to believe that the
20  disk that was marked Exhibit 85 for identification
21  is anything other than a video of what you said in
22  response to the police questions that day?
23     A.  It's the same thing, yes.
24     Q.  Okay.  Thank you.  That's all I need to

                                                347

70 (Pages 344 to 347)

1 ask you in that regard.
2     What I'm going to show you now, sir, and
3 what was previously marked in this case as an
4 exhibit -- I'll tell the court reporter what the
5 exhibit is, number is, in a bit -- is the squad
6 video that you said you've already seen.
7     A. Right.
8     Q. Okay. I just want to ask you some
9 questions.
10     First of all, while I'm booting this up,
11 when you saw the squad video, did you see yourself
12 at any point in the video?
13     A. I don't remember, no.
14     Q. Okay. You don't remember?
15     MR. SKRYD: This is 86, Tim? Is this 86?
16     MR. COUTURE: No. It's previously been
17 marked.
18     MR. SCHRECK: Like 34 or something like
19 that.
20     MR. SKRYD: Okay.
21     MR. COUTURE: While we're doing this, I
22 might as well --
23     MR. SKRYD: Make sure.
24     MR. COUTURE: I know it was marked because

                                        348

1 I lost it after I marked it. 34.
2     MR. SKRYD: Okay.
3     MR. COUTURE: You know what we'll do?
4 I'll defer to these other folks and I'll work on
5 this while they're asking questions. So let me
6 finish my questions -- I'm going to pass the
7 witness for now. You guys can go ahead while I try
8 to figure out what I'm missing.
9     MR. SKRYD: Sure. Who's next?
10     MR. BURKE: I'll go.
11     MR. COUTURE: You know what? While you're
12 doing that, I do, I just realized have one more.
13 BY MR. COUTURE:
14     Q. I'm going to show you what we've
15 previously marked 30Q for identification. Am I
16 correct that that shows your truck at the scene as
17 it existed after the accident?
18     A. Yes.
19     Q. I'm going to show you what I've marked as
20 84 for identification. Am I correct that that
21 shows the back of the car that you hit at the
22 scene?
23     A. Yes.
24     MR. COUTURE: Okay. That's all I've got.

                                        349

1     MR. SKRYD: Okay.
2     (Whereupon, Franke Deposition
3     Exhibit Nos. 86 and 87 were
4     marked for identification.)
5     CROSS-EXAMINATION
6 BY MR. BURKE:
7     Q. Good evening, Mr. Franke. My name is Rich
8 Burke, I represent Jeffrey Scheinman and I have a
9 few additional questions for you.
10     If I recall correctly, you said that at
11 the time of impact you were -- your best estimate
12 of the speed your truck was going was between 25
13 and 30 miles per hour; is that correct?
14     A. Yes.
15     Q. Now, you were asked about having gone --
16 or having told the police that you were going some
17 other speeds at different times that evening,
18 correct?
19     A. Correct.
20     Q. And do I understand you correctly that you
21 are saying you do not have any recollection of
22 making those statements to the police about
23 whatever speed you were going that evening?
24     A. Right.

                                        350

1     Q. I noticed in a number of spots you -- the
2 police or some witnesses indicated that you
3 looked -- and I'm not quoting exactly -- but shaken
4 up or confused. Do you recall seeing that in the
5 portions of the police report that --
6     A. Yes.
7     Q. -- Mr. Couture gave you?
8     A. Yes.
9     Q. Okay. Were you in fact shaken up and
10 confused after this collision?
11     A. Yes.
12     Q. Now, I know you mentioned -- you got asked
13 a question about whether you were in shock and I
14 think you said that you thought you were in shock;
15 is that right?
16     A. Yes.
17     Q. But when you say "in shock," you were not
18 referring to what constitutes medical shock from a
19 physician's standpoint --
20     A. Right. Right.
21     Q. -- is that correct?
22     A. Correct.
23     Q. Because, I mean, you were walking around
24 at the scene, correct?

                                        351

71 (Pages 348 to 351)

1    A.   Right.
2    Q.   You weren't knocked unconscious at all?
3    A.   No, sir.
4    Q.   In fact, you did not receive any injuries
5    as a result of this collision, correct?
6    A.   Correct.
7    Q.   And you didn't -- I think you even said
8    you weren't even moved forward really; is that
9    correct?
10   A.   Correct.
11   Q.   So you did not impact the steering wheel?
12   A.   Correct.
13   Q.   And your head did not hit any interior
14   part of the cab?
15   A.   Correct.
16   Q.   But when you saw the fire and realized
17   that you had -- had in fact rear-ended
18   Mr. Scheinman's BMW, you were confused and stunned,
19   if you would?
20   A.   Yes.
21   Q.   Is that fair to say?
22   A.   Yes.
23   Q.   You know, today you were asked a number of
24   questions in great detail about the specific

                                            352

1    movements of your truck literally from the moment
2    you turned on to northbound Route 41, correct?
3    A.   Correct.
4    Q.   Okay.  And you were asked questions and
5    gave answers about the operation of your truck as
6    you first got on 41 up to Park Avenue and a change
7    of lanes up to that point, correct?
8    A.   Correct.
9    Q.   And then thereafter you were asked about
10   the driving of your truck from Park Avenue up to
11   the location of the collision at Half Day Road,
12   correct?
13   A.   Correct.
14   Q.   And you were asked various questions about
15   what you did as you started to move your truck from
16   when you had been at a stop at Park Avenue and what
17   gears you went through, correct?
18   A.   Correct.
19   Q.   And you were asked questions about what
20   speed your truck would be going when you were in a
21   particular gear, correct?
22   A.   Correct.
23   Q.   And you were also asked about when you
24   could first see what you believe and have told us

                                            353

1    was a green light in front of you at Half Day Road,
2    correct?
3    A.   Correct.
4    Q.   Okay.  And you told us about looking at
5    your speedometer at some point, correct?
6    A.   Yes.
7    Q.   And is the fact that you were taken
8    through those -- that -- those maneuvers in such
9    detail and on a step-by-step basis, is that
10   something that helps you make a determination as to
11   what speed you were traveling at the time of
12   impact?
13   A.   Correct.
14   Q.   When you were asked about on the evening
15   of this incident -- and I know you said you don't
16   really recall some of these conversations or saying
17   what may be written in the police report, but would
18   it be fair to say that prior to speaking to the
19   police that evening you did not engage in a
20   step-by-step analysis and review of the driving of
21   your truck from Park Avenue up to the area of the
22   collision?
23        MR. COUTURE:   Objection, form.
24        THE WITNESS:   At the scene you mean?

                                            354

1    BY MR. BURKE:
2    Q.   Correct, at the scene at any time that
3    night you had not analyzed --
4    A.   No.
5    Q.   -- what you had done; is that correct?
6    A.   Yeah.  Right.
7    Q.   So whatever speeds you mentioned to the
8    police or anybody else that evening were mentioned
9    without having engaged in the type of analysis and
10   detail that you were taken through today; is that
11   correct?
12        MR. COUTURE:   Same objection.
13        THE WITNESS:   Correct.
14   BY MR. BURKE:
15   Q.   Now, you were asked about the collision
16   between the front of your truck and the rear end of
17   Mr. Scheinman's BMW vehicle, correct?
18   A.   Right.
19   Q.   Now -- and I know you said the front of
20   your truck hit the back of his vehicle,
21   Mr. Scheinman's vehicle, correct?
22   A.   Correct.
23   Q.   It would be correct to say that prior to
24   impact you told us you had not actually even seen

                                            355

72 (Pages 352 to 355)

1    Mr. Scheinman's BMW, true?
2    A.  True.
3    Q.  Okay.  And, therefore, it would be correct
4  that you do not know exactly what part of your
5  tractor came into what part of Mr. -- the rear of
6  Mr. Scheinman's BMW, correct?
7    A.  Correct.
8      MR. COUTURE:  Object to form and that
9  mischaracterizes his testimony and the record.
10 BY MR. BURKE:
11   Q.  You can answer.
12   A.  Yes.  Correct.  Correct.
13   Q.  Okay.  You were shown a couple
14 photographs, I remember --
15   A.  Right.
16   Q.  -- a while back and it would be true that
17 even from looking at photographs you have no
18 training or ability to make any determination as to
19 what part of your vehicle struck what part of the
20 BMW simply by virtue of looking at those photos,
21 correct?
22     MR. COUTURE:  Same objection.
23     THE WITNESS:  Correct.
24

356

1  to trying to quantify by "immediately" was that one
2  half of a second or one second and I said you -- I
3  think you told us you couldn't tell us with that
4  degree of certainty, correct?
5    A.  Correct.
6    Q.  But would it be fair to say that it was
7  immediately -- in your terms it was immediately
8  after impact and that the car was -- the BMW had
9  flames coming from it --
10     MR. COUTURE:  Same objection.
11 BY MR. BURKE:
12   Q.  -- while the BMW was still moving through
13 the intersection right after impact?
14   A.  Correct.
15     MR. SKRYD:  Why don't we just stop.
16     MR. BURKE:  Yeah.  Sure.
17     THE VIDEOGRAPHER:  This is the end of tape
18 number four.  We are going off the record.  The
19 time is 6:36 p.m.
20     (A break was taken.)
21     THE VIDEOGRAPHER:  This is the beginning
22 of media number five.  We are back on the record.
23 The time is 6:41 p.m.  Please proceed.
24

358

1  BY MR. BURKE:
2    Q.  You also -- you got asked a couple
3  questions a moment ago about whether you had any
4  evidence about defects in the BMW vehicle causing
5  or contributing to this incident or Mr. Scheinman's
6  injuries, correct?
7    A.  Correct.
8    Q.  And it is true that you have no training
9  in vehicle design or as a mechanical engineer,
10 correct?
11   A.  Correct.
12   Q.  Okay.  And you do not -- you do not know
13 one way or another whether there were any defects
14 in the design of the BMW or its fuel system or its
15 seats that contributed to the extent of the fire or
16 contributed to Mr. Scheinman's injuries, true?
17   A.  True.
18   Q.  You got -- I think you told us earlier
19 that you saw flames essentially immediately after
20 the impact, correct?
21     MR. COUTURE:  Same objection.
22     THE WITNESS:  Correct.
23 BY MR. BURKE:
24   Q.  And I know you seemed to be struggling as

357

1  BY MR. BURKE:
2    Q.  Mr. Franke, let me tender to you what is
3  already in front of you as previously marked
4  Exhibit No. 8.
5      Can you tell me generally what that
6  document is?
7    A.  It looks like a card you get when you
8  check-in at a rail yard.
9    Q.  Okay.  Is that the type of card that you
10 would get when you dropped off the trailer that you
11 were delivering on this day and picking up a new
12 one?
13   A.  Sure.  Yes.
14   Q.  Okay.  And up at the top it says I-TOPS
15 inspection detail display.  Do you see that?
16   A.  Yes.
17   Q.  Do you know what ITOPS stands for?
18   A.  No.
19   Q.  Do you know who they are?
20   A.  No.
21   Q.  Anything about -- okay.  Do you see that
22 trailer -- well, do you see Equipment in Line 3 on
23 the left?
24   A.  Yes.

359

73 (Pages 356 to 359)

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

1    Q.   Okay.  And it's got a CSXU number of
2  937987?
3    A.   Yes.
4    Q.   Now, is that the trailer number you were
5  hauling that day?
6    A.   I don't know for sure.
7    Q.   Now -- or I should say the container
8  number.  Do you know if it's the container number?
9    A.   Not for sure, no.
10    Q.   Okay.  To the right there's a TSXZ number
11  of 902801.  Do you see that?
12    A.   Yes.
13    Q.   Do you know what that refers to?
14    A.   I'm thinking the chassis.
15    Q.   Okay.  And then in the lines below that
16  where it says Inspector and across the way it says
17  Name, Jamie Pinazzo, do you see that?
18    A.   Yes.
19    Q.   Whose name would that be?
20    A.   I have no idea.
21    Q.   Is that the person -- what does that
22  person do, do you know?
23    A.   No.
24    Q.   And I don't mean them in particular but

360

1  that -- I mean, does it appear to you that this
2  Exhibit 8 does not pertain to you, number one?
3    A.   Right, because it's not my name on there.
4    Q.   And also it appears it relates to a pickup
5  that occurred on July 1st of 2008, correct?
6    A.   Correct.
7    Q.   From your -- now, assuming this container
8  number of 937987 is correct and the chassis number
9  of 902801 is correct, which I believe is true --
10    A.   Okay.
11    Q.   -- would it appear to you that this
12  document does not relate to your picking up of this
13  trailer -- or of this chassis and container on July
14  3rd of 2008 because of the dates on here and the
15  name of the driver?
16    A.   Right, it don't -- it has the wrong date
17  on it and it has the wrong driver on it.
18    Q.   When you leave a yard -- like on this day,
19  when you left with a chassis and a container, did
20  you leave the yard with a copy of something similar
21  to this?
22    A.   Yes.
23    Q.   Okay.  What do you do with it then in the
24  normal course of your job?

362

1  when there's a name for an inspector on this type
2  of document, do you know what their job has been
3  relative to the chassis or the container?
4    A.   Probably to inspect it to see if it's
5  road-worthy.  Seeing it's inspectors, they probably
6  inspect it.  I don't know.
7    Q.   Up on the top right it appears to say
8  Inspection Date.  Do you see that line?
9    A.   Okay.
10    Q.   And then it says -- does that say July
11  1st, 2008 after that?
12    A.   Yes.
13    Q.   And then down below do you see where it
14  says Driver on one of the lower lines on the left
15  side?
16    A.   Yes.
17    Q.   And it's got Tomas Crespo, C-r-e-s-p-o?
18    A.   Yes.
19    Q.   Now, when you personally go in to a CSX
20  yard or any CSX, rail yard, to drop off or pickup
21  a trailer, does your name normally appear on this
22  type of document?
23    A.   I think so, yes.
24    Q.   Okay.  So, I mean, would it be correct

361

1    A.   I put it in my paperwork and when I turn
2  my paperwork in at the end of the week into
3  Martin's.
4    Q.   So you turn it into Martin's?
5    A.   Right.
6    Q.   Now, I think you told us that you drove
7  down from Wilton with a load that you dropped
8  somewhere -- did you say on 47th Street?
9    A.   Yes.
10    Q.   Do you know who owned or operated that
11  yard?
12    A.   It was just a rail yard.  I don't know
13  exactly who owned it or who -- I don't know who --
14  that's just where they told me to go with the
15  load.  So I don't know exactly who owned it, no.
16    Q.   Who gave you that direction to go there
17  with that particular load?
18    A.   Martin's did.
19    Q.   Was your load already at the Martin's
20  yard, did you say?
21    A.   Yes.
22    Q.   That morning?
23    A.   Yes.
24    Q.   Was it ready the night before?  Did I here

363

74 (Pages 360 to 363)

1  you say that?
2    A.  Sometimes they can be ready the night
3  before, it depends.  It's not consistently but if
4  it's ready the night before, I would take it back
5  to Mauston but --
6    Q.  How about on this very day, though, July
7  3rd, did you pickup the load at Martin's?
8    A.  Yes.
9    Q.  Okay.  And that was going to, I think,
10  City Brewery you told us?
11    A.  It came from City Brewery.
12    Q.  Okay.  And do you know what you were
13  hauling?
14    A.  No.  Not for sure, no.
15    Q.  Do you have any idea or --
16    A.  No.
17    Q.  And whatever you were hauling you were
18  transporting for City Brewery and depositing it in
19  this yard?
20    A.  Yes.
21    Q.  At 47th Street?
22    A.  Yes.
23    Q.  Okay.  So you did not make a delivery to
24  any business --

364

1    A.  No.
2    Q.  -- other than this yard, correct?
3    A.  Correct.
4    Q.  And whatever you dropped -- did you take a
5  regular trailer down there or a box on a chassis?
6    A.  A box on a chassis.
7    Q.  Now, was the load that you took from
8  Wilton down to this yard at 47th Street, had
9  that -- the transportation of that load been
10  arranged by MBM Logistics?
11    A.  I don't know.
12    Q.  Who would know that or how would you find
13  that out?
14    A.  Martin's would know that.
15    Q.  Now, you took the -- then you get a -- or
16  you get a box on a chassis, you go to the
17  International Paper Warehouse and they load it up
18  with paper, correct?
19    A.  Correct.
20    Q.  Okay.  And then you are driving that load
21  back to Wilton, correct?
22    A.  Correct.
23    Q.  And from Wilton some other driver was
24  going to transport it to three different locations

365

1  in Minnesota, correct?
2    A.  Correct.
3    Q.  And what was going to happen to that
4  chassis and container after the paper products got
5  delivered to the three locations in Minnesota?
6    A.  I don't know.  Sometimes they would go
7  back to, like -- probably back to City Brewery.  I
8  don't know exactly where that one was going after
9  it was going to be emptied.  I was not part of that
10  process.
11    Q.  Who would take care of that process or who
12  would make that determination?
13    A.  Martin's.
14    Q.  Was it MBM Logistics?
15    A.  I don't know.
16    Q.  Just on that topic I wanted to ask you one
17  other thing.
18       By the way, Mr. Franke, would it be
19  correct that you have never read or reviewed any
20  contracts that may have existed between Martin's
21  Bulk Milk Service and Overnite Express or Universal
22  Am Can; is that correct?
23    A.  Correct.
24    Q.  And you have no knowledge of the contents

366

1  of those contracts or the meaning of any of those
2  contracts, correct?
3    A.  Correct.
4    Q.  Would it be fair to say you knew Martin's
5  as a motor carrier -- or Martin's Bulk Milk Service
6  as a motor carrier and in the trucking business,
7  correct?
8    A.  Correct.
9    Q.  And you knew that Overnite Express was
10  also involved in the trucking business, correct?
11    A.  Correct.
12    Q.  And you knew that the two of you -- the
13  Overnite Express and Martin's were involved in
14  getting paper transported from International Paper
15  to wherever they wanted to have it delivered; is
16  that fair to say?
17    A.  Yes.
18    Q.  I apologize and correct me -- and maybe
19  you did not say this, but were you familiar with
20  Universal Am Can?  Is that a business you knew back
21  at the time on this day, July 3rd, 2008?
22    A.  No.
23    Q.  You know, let me show you what I'll tender
24  out of order that's been marked as Exhibit No. 87

367

75 (Pages 364 to 367)

1    which -- take a look at that, sir.
2        It's, basically, a document that has four
3    photographs and my question to you simply is does
4    that photograph depict the container that you were
5    hauling which bears the number of CSX 937987?
6      A.  Say that again, the number again.
7      Q.  Sure.  Does that photograph show a portion
8    of the container, the CSX box or container, bearing
9    number 937987 that you were hauling at the time of
10   this --
11     A.  Yes.
12     Q.  -- crash?  Okay.  And then in the photo
13   there's also a chassis with a number of TSXZ
14   902801.  Is that a photograph of the --
15     A.  Yes.
16     Q.  -- chassis that you were pulling at the
17   time of this incident?
18     A.  Yes.
19     Q.  Okay.  And -- okay.  Thank you, sir.  And
20   maybe --
21        MR. SKRYD:  Is this a new exhibit never
22   previously marked?
23        MR. BURKE:  Correct.  So I'll have to make
24   a copy of it.

368

1        MR. SKRYD:  Do you want to put a sticker
2    on it?
3        MR. FISHER:  87?
4        MR. BURKE:  You know what, that's an
5    original.  So that's why I marked it -- I'll make a
6    laser copy and then give it to Carl.
7        MR. FISHER:  Do you want to put it on the
8    back?
9        MR. BURKE:  Yes, we can do that if you
10   want.  But I still want to make a laser copy of the
11   original.  Thank you.
12        MR. FISHER:  Do you have an 88 coming up?
13        MR. BURKE:  No, I have an 86.  I said they
14   were out of order.
15   BY MR. BURKE:
16     Q.  Mr. Franke, I have some photos that I have
17   marked as ones that you took on the night of this
18   incident.  Do you have a recollection of doing so?
19     A.  Me taking pictures myself?
20     Q.  Yes.
21     A.  No.
22     Q.  I mean, did the police -- did you take any
23   photos with a camera phone?
24     A.  I don't remember.

369

1        MR. COUTURE:  Are these the photographs
2    marked Witness Photographs on the Highland Park
3    Police Department records?
4        MR. BURKE:  I thought they were marked as
5    taken by Mr. Franke from the Highland Park Police
6    Department.  If you want to look at them.
7        MR. COUTURE:  I know which one you're
8    talking about.
9   BY MR. BURKE:
10     Q.  Mr. Franke, let me tender to you what I've
11   marked as Group Exhibit No. 86.  They consist of
12   five photographs and could you just take a look at
13   those and tell me if they are in fact photographs
14   that you took and if looking at them refreshes your
15   recollection on that at all?
16     A.  I don't remember taking these photos.
17     Q.  Okay.  Did you have a camera phone with
18   you that night?
19     A.  Yes, I did but I don't remember taking any
20   photos.
21     Q.  Okay.  In looking at those photographs can
22   you recognize any portions of the scene or the
23   occurrence that was taking place that night?
24     A.  In the first photo I recognize it's the

370

1    side of my truck.
2     Q.  Okay.  Hold on.
3        MR. COUTURE:  I'll object to the extent
4    that he's already said that after getting out of
5    his truck he didn't look at any of the vehicles and
6    that's what these photos show.  So it
7    mischaracterizes his prior testimony.
8   BY MR. BURKE:
9     Q.  Let me -- since we need to really talk
10   about these individually, let me make that a 5A and
11   I think you were starting to -- or, I'm sorry, not
12   5.
13        MR. COUTURE:  We're on 86.  86A.
14        MR. BURKE:  86A.  Thank you.
15   BY MR. BURKE:
16     Q.  86A, and I think you were starting to say
17   what that shows?
18     A.  It shows a picture of my truck and a fire
19   in front of it.
20     Q.  Okay.  And do you believe that to be the
21   BMW on fire in front of your truck?
22        MR. COUTURE:  Same objection.
23        THE WITNESS:  Yes.
24

371

76 (Pages 368 to 371)

BY MR. BURKE:

1   Q.  And then how about what I'll mark as 86B,
2   could you take a look at that, Mr. Franke, and tell
3   us what you recognize in that photo?
4   A.  I recognize my truck and there's some
5   police cars or something over here.  I don't know
6   what that is.
7   Q.  Okay.  And then how about 86C?
8   A.  It's a very dark picture --
9   Q.  Yes, they are.
10  A.  -- of my truck.
11  Q.  And what part of your truck?  Is that --
12  A.  This is the tractor up here.
13  Q.  And then how about 86D?
14  A.  It's a picture of my tractor and something
15  on fire in front of it.
16  Q.  And your tractor as it's depicted on the
17  left of this photo, does that -- does this photo
18  accurately depict the approximate distance between
19  your tractor and the BMW after you had backed it up
20  as you told us you did?
21  A.  Yes.
22       MR. COUTURE:  Objection, form,
23  foundation.

372

BY MR. BURKE:

1   Q.  And then 86E, sir, what do you recognize
2   there?
3   A.  I recognize --
4       MR. COUTURE:  Objection, form.
5       THE WITNESS:  -- the trailer.
6   BY MR. BURKE:
7   Q.  The trailer you were hauling --
8   A.  Right.  It's a similar trailer that I was
9   hauling.  I don't know if it's the same one or
10  not.  I don't see the numbers on there.
11  Q.  But it's a CSX --
12  A.  Container, correct.
13  Q.  -- container, correct?  Or you can
14  actually see the letters C-S-X on the side of the
15  trailer -- or container, right?
16  A.  Right.
17  Q.  Okay.  Thank you.  You know, I know you
18  told us you looked at the video of you talking to
19  the police in the station.  Did you look -- you
20  know, in anticipation of your deposition, did you
21  look at the video from the -- that was taken from a
22  police squad car?
23  A.  Yes.

373

1   Q.  Have you looked at any videos or
2   photographs of Mr. Scheinman in the hospital or in
3   any nursing home at all?
4   A.  Before this?
5   Q.  Correct, at any time.
6   A.  No.
7   Q.  Did you have an understanding that your
8   employer Martin's Bulk Milk Service had some
9   liability insurance that was applicable to this
10  occurrence?
11  A.  Yes.
12  Q.  Did you yourself personally have any
13  liability insurance that you believe might be
14  applicable to this occurrence?
15  A.  No.
16  Q.  Did you -- what type of vehicles did you
17  own?  Did you have a car or truck or -- on July
18  3rd, 2008?
19  A.  My personal vehicles?
20  Q.  Personal vehicles.
21  A.  I have a '97 Blazer.  And I have my -- I
22  got an '04 Harley Davidson.
23  Q.  And I'm not talking now; I'm talking back
24  on the day this happened.

374

1   A.  Yes, I'm trying to think.  That's the only
2   ones I owned at that time.
3   Q.  Okay.  You had a '97 blazer and a Harley?
4   A.  Right.
5   Q.  Did you personally own a tractor, a truck,
6   a tractor that pulls semi --
7   A.  No.
8   Q.  Or that pulls --
9   A.  No.
10  Q.  -- trailers?
11  A.  No.
12  Q.  Did you have any type of personal policy
13  of insurance, sometimes called an umbrella policy
14  or excess coverage, that --
15  A.  No.
16  Q.  -- under any stretch of the imagination
17  might apply to this incident?
18  A.  No, sir.
19  Q.  Right in front of you, I think, if you --
20  flip ahead to Exhibit No. 9, would you, sir.
21       Take a minute to look at that and I'm
22  going to ask you what it is and a couple other
23  things about it, okay.  Just tell me when you're
24  ready.

375

77  (Pages 372 to 375)

1   A.   Okay.
2   Q.   Okay.  That appears to be entitled
3   Celtic -- a document on a Celtic letterhead,
4   correct?
5   A.   Yes.
6   Q.   Is that a business you're familiar with?
7   A.   No.
8   Q.   And it says Accessorial Approval Form,
9   correct?
10  A.   Yes.
11  Q.   And it's got a unit number CSXU 937987?
12  A.   Yes.
13  Q.   And that number is the same number as the
14  container that you were hauling?
15  A.   Yes.
16  Q.   Okay.  And, you know, in the middle it
17  talks about trailer storage origin and it talks
18  about it going out on July 3rd, correct?
19  A.   Yes.
20  Q.   Okay.  And do you see down on the bottom
21  where it says MBM Logistics?
22  A.   Yes.
23  Q.   Now, why is the name of MBM Logistics down
24  on the bottom of that form?

376

1   A.   I've never seen this form -- this type of
2   form before.  But MBM Logistics is part of Martin's
3   Bulk Milk but I've never seen this form until
4   today.
5   Q.   And what's your understanding from -- or
6   what is your understanding of what MBM Logistics
7   does?
8   A.   MBM Logistics is a brokerage firm, I
9   think, for Martin's.
10  Q.   Was MBM Logistics involved in arranging
11  for you to pickup the paper products at
12  International Paper on July 3rd, 2008?
13  A.   No, it was Martin's Bulk Milk.  Martin's
14  gave me the number to pickup -- Martin's Bulk Milk
15  is the ones that gave me the pickup number for the
16  load.
17  Q.   In your work did you ever do any driving
18  for -- did you ever do any driving that had been
19  arranged by Martin's -- I'm sorry, by MBM
20  Logistics?
21  A.   What do you mean?  Did they pay me for
22  working for them?
23  Q.   No.  Let me give you that again.  In the
24  course of your normal work did you sometimes haul

377

1   freight that had been arranged by MBM Logistics?
2   A.   Yes.
3   Q.   And how often would you do that?
4   A.   Not -- I mean, it would vary from one week
5   to week.
6   Q.   I'm sorry, go ahead.  I didn't mean to cut
7   you off.
8   A.   I think they was in charge of getting the
9   containers in and out of the rail yards because you
10  had to call -- if you had a question or problem
11  with a number, you would call MBM Logistics.
12  Q.   You know, in your cab that night the
13  police report refers to a bottle of medication with
14  a label of Simvastatin.  Are you familiar with
15  that?
16  A.   No.
17  Q.   I think you said you were taking a drug
18  for diabetes, correct?
19  A.   Yes.
20  Q.   And you did mention it but what were you
21  taking?
22  A.   Metformin.
23  Q.   Pardon?
24  A.   Metformin.

378

1   Q.   Okay.  Metformin?
2   A.   Yes.
3   Q.   Had you taken any other medication that
4   day?
5   A.   No.
6   Q.   Okay.  Do you know why you had -- why
7   there was a bottle labeled Simvastatin in your
8   truck?
9   A.   My wife would ride with me occasionally
10  and she had -- it could have fell out of her
11  pocket.  That's the only other place it would have
12  came from.  It probably belonged to my wife.
13  Q.   Is that a drug you're familiar with?
14  A.   No.
15  Q.   Does your wife take any -- or strike
16  that.  Did your wife at this time take any
17  medication?
18  A.   Yes, she took some medication but I don't
19  know exactly what it was called or whatever.
20  Q.   And for what type of medical condition?
21  A.   My wife has got MS and she takes
22  medication for that but I don't know exactly what
23  the name it is, the name of the medication is.
24  Q.   And did she have the MS back then --

379

78 (Pages 376 to 379)

1    A.  Yes.
2    Q.  -- in July of '08?
3    A.  Yes.
4    Q.  The police report refers to recovering a
5  can of an adrenaline rush drink called SoBe.  Are
6  you familiar with that?
7    A.  Yes.  An energy drink?
8    Q.  Yes.
9    A.  Yes.
10    Q.  Is that something you were drinking on
11  this day?
12    A.  If they found -- yes.  Probably if they
13  found it in my truck, yes.
14    Q.  You have glasses on today.  Do you -- did
15  you wear glasses back at the time of this incident?
16    A.  Yes.
17    Q.  Were you required to wear them when you
18  were driving?
19    A.  Yes.
20    Q.  Did you have them on at the time of this
21  collision?
22    A.  Yes.
23    MR. BURKE:  Okay.  I may have another
24  question or two but why don't I -- while I'm

380

1  looking for that, why don't I pass the witness and
2  thank you for your time, Mr. Franke.
3    MR. SKRYD:  Let's take five, guys.
4    THE VIDEOGRAPHER:  We are going off the
5  record.  The time is 7:15 p.m.
6    (A break was taken.)
7    (Whereupon, Franke Deposition
8    Exhibit No. 88 was marked for
9    identification.)
10    THE VIDEOGRAPHER:  We are back on the
11  record.  The time is 7:34 p.m.  Please proceed.
12  BY MR. BURKE:
13    Q.  Mr. Franke, I recall you being asked some
14  questions earlier about your statement to the
15  police and being asked whether you told the police
16  you had been going 45 miles an hour or 40 miles an
17  hour and my recollection is that at some point you
18  told the police you were going 30 miles an hour.
19  Do you have a recollection one way or another of
20  that?
21    A.  Yes.
22    MR. COUTURE:  Objection, mischaracterizes
23  his testimony.
24

381

1  BY MR. BURKE:
2    Q.  Have you reviewed this tape --
3    A.  Yes.
4    Q.  -- of your statement given to the police?
5    A.  Yes.
6    Q.  Okay.  And --
7    MR. SKRYD:  For purposes of identification
8  what exhibit is it?
9    MR. BURKE:  It's --
10    MR. COUTURE:  85.
11  BY MR. BURKE:
12    Q.  Right, we previously marked it as Exhibit
13  85.  And I think what's depicted on the screen
14  right now shows you in the lower portion of the
15  picture, correct?
16    A.  Correct.
17    Q.  Okay.  Let me -- let me play this and I'd
18  like you to listen to it and tell us if you hear
19  yourself telling the police that you were going 30
20  miles an hour during your conversation with them
21  that evening.  And maybe so I don't mess up your
22  computer --
23    MR. COUTURE:  I object to form.
24    MR. SKRYD:  Is it turned up as loud as it

382

1  can be?
2    MR. COUTURE:  It's up as loud as it can
3  go.
4    MR. SKRYD:  Okay.  Go ahead.
5    MR. BURKE:  Would you please go ahead and
6  hit the play button.
7    MR. COUTURE:  I heard what he said.
8  BY MR. BURKE:
9    Q.  What is your recollection or what is your
10  understanding of what you hear on the tape as to
11  what speed you told the police you were going?
12    A.  40 to 30.
13    Q.  And that's at the time of impact?
14    A.  Yes.
15    Q.  Okay.  That statement to the police about
16  you going 30 miles an hour, would it be fair to say
17  that is consistent with the speed that -- or range
18  of speed that you mentioned today, that you believe
19  you were going 25 or 30 miles per hour at the time
20  of impact?
21    MR. COUTURE:  Objection,
22  mischaracterizes --
23    THE WITNESS:  Yes.
24    MR. COUTURE:  -- both his testimony and

383

79 (Pages 380 to 383)

1   what the tape says.
2       THE WITNESS:  Yes.
3   BY MR. BURKE:
4       Q.  And is your review -- you told us you
5   reviewed this tape prior to today, correct?
6       A.  Correct.
7       Q.  Or I should say reviewed it, you watched
8   it and listened to it, correct?
9       A.  Correct.
10      Q.  And that's one of the other reasons or
11  bases that you have told us today that you were
12  going between 25 and 30 miles per hour at the time
13  of impact?
14      MR. COUTURE:  Objection, form.
15      THE WITNESS:  Yes.
16      MR. BURKE:  Okay.  I don't think I have
17  anything else at the moment.
18      MR. COUTURE:  Can I go next?  I know it's
19  your turn.
20      First, Mr. Videographer, do you know if we
21  got the audio?
22      THE VIDEOGRAPHER:  It's really not that
23  clear even with the sound all the way up.
24      MR. COUTURE:  I'm going to use this, which

384

1   is headphones, so I can take another listen before
2   I ask a question because I didn't hear that.
3       Do you want to listen to it on my
4   headphone before I ask you a question?
5       THE WITNESS:  No, sir.
6       MR. COUTURE:  No?  Okay.
7           REDIRECT EXAMINATION
8   BY MR. COUTURE:
9       Q.  Am I correct that when you were your
10  speed, the first thing you say is I was going the
11  speed limit?
12      A.  Correct.
13      Q.  Then the next thing you say is 40?
14      A.  Correct.
15      Q.  And then you say "th, I don't know"?
16      A.  I said 40, "th",  probably 30 miles.
17      Q.  Okay.  Your testimony is this disk says
18  30?
19      A.  Yes.
20      Q.  Okay.  I can live with that.  So you
21  didn't tell the police 30; you said the speed limit
22  40 -- I say "th" but we'll go with you -- 30?  So
23  the speed limit 40/30?
24      A.  Right.

385

1       Q.  Can I finish that line of questioning?
2       Mr. Burke asked you earlier if before you
3   spoke to the police you had the opportunity to have
4   a lawyer like me walk you through everything and
5   you said no, right?
6       A.  Right.
7       Q.  Okay.  Are you now claiming that what you
8   told the police on the day of the accident is
9   wrong?
10      A.  Pertaining to what?
11      Q.  Speed.
12      A.  I'm just claiming today that I was doing
13  30 miles an hour.
14      Q.  When did you first decide you were going
15  30 miles an hour?
16      A.  When I looked at my speedometer in my
17  truck.
18      Q.  When after this accident did you first
19  decide that you were going 30 miles an hour at
20  impact?
21      A.  When after the accident?
22      Q.  Yes.
23      A.  When I seen the video.
24      Q.  Okay.  When did you first see the video?

386

1       A.  Here lately, within the last couple of
2   weeks.
3       Q.  So am I correct that you for the first
4   time decided that you were going 30 miles an hour
5   after seeing the video four years after the
6   accident?
7       A.  Right.
8       MR. COUTURE:  Carl, do you want me to just
9   keep going?
10      MR. FISHER:  Yes.
11  BY MR. COUTURE:
12      Q.  All right.  Did you have another lawyer
13  before me walk you through step by step such that
14  Mr. Burke has suggested has not jogged your
15  memory --
16      A.  No.
17      Q.  -- before you saw the video?
18      A.  No.
19      Q.  Did my walking you step by step, using his
20  language, make you decide you were going 30 miles
21  an hour?
22      A.  No.
23      Q.  No.  Because you decided that a couple
24  weeks ago when you first saw the video, right?

387

80 (Pages 384 to 387)

1    A.   Right.
2    Q.   And when you say the video, you're talking
3  about the video you just looked at where you said
4  speed limit 40, "th" or 30 depending on how you
5  look at it?  Is that the video you're talking
6  about?
7    A.   Yes.
8    Q.   Did you use your cruise control at any
9  time on the day of the occurrence before the
10  accident?
11    A.   Not that I know of.
12    Q.   Did you typically use your cruise control
13  when you were driving 94 to 41 to Wilton?
14    A.   At times, yes.
15    Q.   Do you know when the last time you did
16  before this occurrence?
17    A.   No.
18    Q.   I think you told me that you first hit
19  your brakes after you passed through the
20  intersection; is that true?
21    A.   Correct.  Yes.
22    Q.   Okay.  Do you know how far past the
23  intersection you were when you hit the brakes?
24    A.   No.

388

1    Q.   When you hit the brakes, did your vehicle
2  and the BMW vehicle separate at all?
3    A.   I don't know.
4    Q.   When you backed up your vehicle after the
5  accident -- got out, got back in your truck, backed
6  it up, did you hear any noise of the BMW vehicle
7  follow your truck so as to indicate that the two
8  were connected by metal or some parts of the
9  vehicle?
10    A.   I have no idea.
11    Q.   Referring to Photograph 86.  Did you take
12  that photograph?
13    A.   I don't know.
14    Q.   Did you see what is depicted in this
15  photograph on the day of the occurrence?
16    A.   I didn't take this picture.
17    Q.   Can you say that this photograph
18  accurately and correctly depicts anything that
19  occurred on the day of this accident?
20    A.   Yes.
21    Q.   You know there's a truck there?
22    A.   Right.
23    Q.   You know there's what looks to be a fire?
24    A.   Right.

389

1    Q.   Did you see what is shown in this video --
2  or excuse me -- shown in Exhibit 86A on the day of
3  the occurrence?
4    A.   Not from this angle.
5    Q.   Okay.  In fact, you told me that after you
6  got out of your car you turned and you didn't look
7  at the BMW burning?
8    A.   Right.
9    Q.   So you didn't see what's shown in Exhibit
10  86A?
11    A.   Right.
12    Q.   86B, you didn't take that?
13    A.   No.
14    Q.   Did you see what's shown in 86B when you
15  were there?
16    A.   I seen squad cars --
17    Q.   Sure.
18    A.   -- and emergency vehicles and stuff, yes.
19    Q.   I understand that.  You've seen squad cars
20  other places other than the accident that injured
21  Mr. Scheinman though, right?
22    A.   Right.
23    Q.   Okay.  Can you truly say that this
24  photograph accurately and correctly depicts

390

1  anything on the scene of this occurrence on the
2  night of the occurrence?
3    A.   Yes.
4    Q.   When was it taken?
5    A.   From the looks of the picture after the
6  accident.
7    Q.   What time?
8    A.   I don't know.
9    Q.   Who took it?
10    A.   I don't know.
11    Q.   From what location?
12    A.   From what location?
13    Q.   From what location was the photographer
14  standing?
15    A.   It looks like the photographer was
16  standing in front of the truck.
17    Q.   And do you know specifically what
18  direction he was pointing the photograph -- or the
19  camera, excuse me?
20    A.   At the front of the truck.
21    Q.   Did you see this photograph being taken?
22    A.   No.
23    Q.   Do you know that these squad cars are
24  specifically the squad cars that you saw on the

391

81 (Pages 388 to 391)

1    scene?
2        A.  Specifically?  Again, I don't -- no.
3        Q.  Okay.  Exhibit 86C, did you take this
4    photo?
5        A.  No.
6        Q.  Do you know what it depicts?
7        A.  Picture of a semi-truck.
8        Q.  Okay.  Do you know if it was yours?
9        A.  It's dark.  It looks like my truck.
10       Q.  Lots of trucks look like your truck?
11       A.  Right.
12       Q.  Is this your truck?
13       A.  There ain't no apparent marking on the
14   truck stating that it's mine.  I don't know for
15   sure.
16       Q.  Okay.  There's lots of CSX containers in
17   this world, correct?
18       A.  Yes.
19       Q.  I'm not saying it wasn't taken there, but
20   I'm trying to ask you whether you can say under
21   oath that this photograph accurately and correctly
22   depicts anything at the scene of your accident?
23       MR. BURKE:  Objection, asked and
24   answered.

                                                    392

1        MR. COUTURE:  I didn't ask about this
2    photograph.
3    BY MR. COUTURE:
4        Q.  Go ahead.
5        A.  It's a picture of a truck.
6        Q.  Okay.  86D, did you take that photograph?
7        A.  I don't know.
8        Q.  Do you know who did?
9        A.  No.
10       Q.  Do you know where they were standing when
11   the photograph was taken?
12       A.  It was standing --
13       Q.  Without guessing?
14       A.  No.
15       Q.  Do you know when -- what time of day
16   exactly this was taken?
17       A.  No.
18       Q.  Do you know specifically what this
19   depicts?
20       A.  It depicts a truck and something on fire
21   in front of the truck.
22       Q.  Can you specifically and say under oath
23   that this photograph accurately and correctly
24   depicts something that was present on the day of

                                                    393

1    your occurrence after the accident?
2        A.  Yes.
3        Q.  Did you -- you saw this just like this?
4        A.  No.
5        Q.  Okay.  86E, what does that depict?  I'm
6    sorry, strike that.  That was asked and answered.
7    Did you take that photograph?
8        A.  No.
9        Q.  Do you know who did?
10       A.  No.
11       Q.  Do you know when it was taken?
12       A.  No.
13       Q.  Okay.  Did you see exactly on the scene
14   what's shown in this photograph?
15       A.  No.
16       Q.  Do you know if -- can you say under oath
17   that it accurately and correctly depicts any part
18   of the scene of your accident?
19       A.  The only thing accurate about it is the
20   CSXU container.  No.
21       Q.  Did you have insurance coverage for your
22   automobile and your motorcycle?
23       A.  Yes.
24       Q.  Who is it through?

                                                    394

1        A.  It's through --
2        MR. SKRYD:  And you mean at the time of
3    the accident?
4        MR. COUTURE:  I'm sorry.  Thank you.
5    BY MR. COUTURE:
6        Q.  July 3rd, 2008 did you have insurance on
7    your Blazer and/or your motorcycle?
8        A.  Yes.
9        Q.  Did your wife also own a car?
10       A.  No.
11       Q.  And who was your insurance carrier at that
12   time for either or both of those?
13       A.  It was Elroy, Wisconsin.  I'm not really
14   sure.  The bike was insured through Dairyland
15   Insurance Company and that was through an office in
16   Elroy, Wisconsin.
17       Q.  How about the car?
18       A.  Same.  It was insured through the same
19   office, different insurance company.
20       Q.  It was a broker that got you the
21   insurance?
22       A.  Yes.
23       Q.  All right.  What's the name of the
24   broker?  Is that Dairyland?

                                                    395

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

1    A.   Dairyland was the insurance company that I
2    had insurance for the bike.  It was brokered
3    through an office in Elroy and right now I can't
4    remember the name.
5    Q.   Did you ever make -- put your auto
6    insurer, motorcycle insurer on notice of a
7    potential claim for you driving a vehicle?
8        I'll preface this by saying I understand
9    some -- most insurance policies exclude work by
10   employer.  But I want to know did you ever submit
11   this claim of injury to your personal insurance
12   carrier?
13   A.   No.
14   Q.   Do you know whether your policies of
15   insurance for your car or your motorcycle
16   specifically excluded accidents in the course and
17   scope of your employment?
18   A.   I don't know, no.
19   Q.   All right.  Do you know when in
20   relationship to this accident you drank the SoBe
21   energy drink?
22   A.   No.
23   Q.   Were you feeling -- well, strike that.
24       You told me you also had a Mountain Dew

396

earlier in the day, right?
1
2    A.   Right.
3    Q.   Did you have any other caffeinated
4    beverages during the course of the day?
5    A.   No.
6    Q.   Did either the energy drink or the
7    Mountain Dew affect your ability of alert --
8    your -- Strike that.
9        Did the energy drink or the Mountain Dew
10   affect your alertness at any point during the day?
11   A.   No.
12   Q.   Have you ever experienced a caffeine crash
13   where after you got -- you drank a bunch of
14   caffeine then you become tired?
15   A.   No.
16   Q.   You're not familiar with that phenomenon?
17   A.   No, I never -- that didn't happen.
18   Q.   Do you smoke?
19   A.   Now, yes.
20   Q.   Were you smoking -- were you a smoker as
21   of July 3rd, 2008?
22   A.   No.  I had quit.
23   Q.   You were not smoking in your vehicle at
24   the time of this accident?  Is that what you're

397

1    saying?
2    A.   Yes.
3        MR. COUTURE:  Do you want me to show that
4    video?  Do you got that up?
5    BY MR. COUTURE:
6    Q.   I'm going to show you the video that was
7    marked as the squad video and I'm just going to ask
8    you some questions as the video moves along, okay?
9        You indicated you've seen this before?
10   A.   The video, yes.
11   Q.   Okay.  Instead of stopping and asking you
12   every time someone comes in to the screen shot, I'm
13   going to ask you, if you will, if your lawyer
14   agrees to this, to tell me at any point you
15   recognize somebody or see yourself in the video.
16   Is that fair?
17   A.   Okay.
18       MR. SKRYD:  That's fine with me.
19       MR. COUTURE:  Okay.  You got audio.  I
20   don't have audio.
21       MR. SCHRECK:  I didn't realize it had
22   audio either.  This is the first time.  You can
23   hear the siren.
24

398

1    BY MR. COUTURE:
2    Q.   Am I correct now that at 23:16:20 the
3    officer is approaching northbound on Route 41 to
4    the scene of the accident, sir?
5    A.   Yes.
6    Q.   Route 41?
7    A.   Yes.
8    Q.   Okay.  And he's at 23:16:34 passing
9    through the intersection -- 36, actually; is that
10   true?
11   A.   Yes.
12   Q.   All right.  Now, I'm going to stop it
13   right here.  23:16:44, am I correct that there are
14   two rears of container or semi-trailers shown at
15   that point of the video?
16   A.   Yes.
17   Q.   Which one was yours?
18   A.   (Indicating.)
19   Q.   The left of the two?
20   A.   Yes.
21   Q.   Okay.  Do you know who was the driver of
22   the right -- the container or trailer shown on the
23   right?
24   A.   No.

399

83  (Pages 396 to 399)

1    Q.   Was that vehicle present in the location
2  shown in this video at the time of the accident?
3    A.   No.
4    Q.   No?
5    A.   I mean at the time of the accident?
6    Q.   At the time of the impact do you know
7  whether that truck and trailer was located in the
8  location shown at 23:16:44 on this video?
9    A.   I don't know.
10    Q.   As you -- after you struck the BMW and as
11  your vehicles moved together for 358 feet did you
12  recall passing a truck on the right side of the
13  road in the location as indicated in 23:16:44?
14    A.   No.
15    Q.   As the two vehicles were moving forward
16  through the intersection did you see any other
17  vehicles in the area that you were concerned the
18  two of you were going to strike?
19    A.   No.
20    Q.   Now a police officer is arriving to the
21  scene, correct?
22    A.   Correct.
23    Q.   Do you recognize that police officer as an
24  officer you spoke to?

400

1    A.   No.
2    Q.   Because she was running the other way,
3  right?
4    A.   Yes.
5    Q.   Now I'm going to stop it at 23:17:03 and I
6  will tell you that Mr. Cotton who is one of the
7  witnesses on the scene has testified that this
8  group of people shown immediately to the left of
9  your vehicle are actually carrying Mr. Scheinman.
10  Did you see anyone carrying Mr. Scheinman or
11  dragging him --
12    A.   Yes.
13    Q.   -- on the scene?  Where were you when you
14  saw them do this?
15    A.   By my truck.
16    Q.   I'm sorry?
17    A.   By the side of my truck.
18    Q.   Okay.  So when you say by the side of your
19  truck, how far from your cab door were you
20  standing?
21    A.   Right beside of it.  I don't know how far
22  away.
23    Q.   That's fine.  So front to back of your
24  truck and trailer or container, you were by the

401

1  door?
2    A.   Right.
3    Q.   Near enough to touch your trailer -- or,
4  excuse me, your tractor?
5    A.   Right.
6    Q.   All right.  And at that point where were
7  you facing?
8    A.   I don't remember.
9    Q.   Well, we know you were facing away from
10  the fire because you said you didn't look at the
11  fire?
12    A.   Right.
13    Q.   All right.  And how close did the
14  gentleman moving Mr. Scheinman get to you?
15    A.   Within four or five feet.
16    Q.   Did you talk to any of them as they went
17  by?
18    A.   No.
19    Q.   Did you observe Mr. Scheinman's physical
20  condition as he went by?
21    A.   I seen him -- they had him wrapped in a
22  sheet and they drug him past.
23    Q.   That was your sheet, right?
24    A.   Right.

402

1    Q.   So you didn't see any part of his body;
2  you saw a sheet?
3    A.   Yes.
4    Q.   At this point at 23:17:14 have you seen
5  yourself in the video?
6    A.   No.
7    Q.   Okay.  Now we've got a couple of people
8  who have brought Mr. Scheinman towards the squad
9  car video, true?
10    A.   True.
11    Q.   Do you recognize any of those
12  individuals?  And I'll replay it so you can get a
13  better look.
14    A.   One of them I know was the individual that
15  came up to the truck and asked for the sheet.
16    Q.   And fire extinguisher?
17    A.   Yes.
18    Q.   Do you know which one that would be?
19    A.   Not exact, no.
20    Q.   Okay.  So you believe that one of them was
21  the requester of the fire extinguisher and the
22  sheet but you don't know which one?
23    A.   Exactly.
24    Q.   Okay.  Did you see the gentleman in the

403

84 (Pages 400 to 403)

1   shorts any time on the scene that you remember?
2       A.  No.  I don't remember seeing him, no.
3       Q.  Other than the gentleman asking for a fire
4   extinguisher and a sheet, did you talk to him
5   anymore?
6       A.  No.
7       Q.  Did he ask you for a crowbar?
8       A.  I don't remember.
9       Q.  Now at 23:18:01 a woman appears to have
10  come into the scene.  Do you agree with me that
11  that woman looks like the woman I showed you in the
12  other photograph next to your truck?
13      A.  I don't know.
14      Q.  Do you know who that person is?
15      A.  No, I don't.
16      Q.  Now, right around this time as well it
17  looks like the fire is flaring up significantly
18  more than it was previous.  Do you know what caused
19  that flare-up?
20      A.  No.
21      Q.  Am I correct that as of 23:18:27 you still
22  haven't seen yourself in the video?
23      A.  I -- I can't exactly see -- I mean depict
24  myself.

404

1       Q.  Do you remember -- well, we know you were
2   wearing an orange sleeveless shirt that day, right?
3       A.  Right.
4       Q.  We haven't seen anybody in an orange
5   sleeveless shirt so far on the video, right?
6       A.  So far, no.
7       Q.  Okay.  Do you know what anyone was doing
8   for Mr. Scheinman as they are showing this as
9   23:19:14?
10      A.  Do I know what they was doing?
11      Q.  Yes.
12      A.  In the picture it looks like they was
13  covering him up.
14      Q.  Did you observe anyone attending to him on
15  the scene?
16      A.  No.
17      Q.  It looks like some additional individuals
18  came in to the screen shot, not you, though, right?
19      A.  No.
20      Q.  Was Mr. Scheinman still on the scene when
21  you left in the police car?
22      A.  I'm not sure.
23      Q.  Did you see him when he was -- Strike
24  that.

405

1       Other than the time that -- the moment
2   that he was brought past you by the group of people
3   did you see him otherwise at the scene?
4       A.  No.
5       Q.  And now we have an ambulance showing up on
6   the scene, correct?
7       A.  Correct.
8       MR. COUTURE:  I believe I'm correct in
9   this regard but I'd like a little corroboration.  I
10  don't think there's much more on this now that the
11  ambulance shows up.  Does anyone have any knowledge
12  of him being on the video?
13      MR. SCHRECK:  I'm not aware of it.
14      MR. COUTURE:  Okay.  All right.  I'm going
15  to stop this then.
16  BY MR. COUTURE:
17      Q.  Now, at some point you watched the whole
18  video, true?
19      A.  True.
20      Q.  At any point did you say, hey, that's me
21  and recognize specifically that it was you
22  depicted?
23      A.  No.
24      Q.  Okay.

406

1       MR. SKRYD:  Did you mark that as an
2   exhibit?
3       MR. COUTURE:  It was previously marked as
4   Exhibit 34.  And I have no more questions at this
5   time.
6       MR. FISHER:  We're going to change tapes.
7       THE VIDEOGRAPHER:  This is the end of
8   media number five.  We're going off the record.
9   The time is 8:01 p.m.
10      (A break was taken.)
11      THE VIDEOGRAPHER:  This is the beginning
12  of media number six.  We are back on the record.
13  The time is 8:05 p.m.  Please proceed.
14          CROSS-EXAMINATION
15  BY MR. FISHER:
16      Q.  Mr. Franke, my name is Carl Fisher.  Do
17  you recall that I asked you questions a couple of
18  years ago when you gave the first session of your
19  deposition?
20      A.  Yes.
21      Q.  All right.  Earlier I believe you said you
22  had a chance to review the transcript of your first
23  deposition?
24      A.  Yes.

407

85 (Pages 404 to 407)

1    Q.  That's correct?
2    A.  Yes.
3    Q.  All right.  In reading the first
4  transcript of your deposition, the first session,
5  did you find anything in reading it that suggested
6  to you that your previous testimony was in any way
7  inaccurate or untruthful?
8    A.  No, I don't think so.
9    Q.  Phrased another way:  After you reviewed
10  the transcript of the first session of your
11  deposition did you decide that everything you had
12  said in the first session of your deposition was
13  truthful and accurate?
14    A.  Yes.
15    Q.  Meaning, you did not need to make any
16  changes or corrections to your previous testimony;
17  is that a fair statement?
18    A.  Yes.
19    Q.  So, basically, after review -- after you
20  reviewed the first session of your deposition you
21  decided that the court reporter had taken down
22  accurately your truthful testimony; is that a fair
23  statement?
24    A.  Yes.

                                               408

1    Q.  All right.  I'm now going to be asking you
2  some questions about a variety of documents.  The
3  first document I think you have in front of you and
4  that is exhibit --
5    MR. SKRYD:  28?
6  BY MR. FISHER:
7    Q.  Exhibit 28.
8    A.  It says on here 32.
9    Q.  Do you have that in front of you?
10    MR. SKRYD:  Was it previously marked 32?
11    MR. FISHER:  I'm sorry, exhibit -- my
12  mistake, Exhibit 32.
13    MR. SKRYD:  Okay.
14  BY MR. FISHER:
15    Q.  Do you have Exhibit 32 there?
16    A.  Yes.
17    Q.  All right.  I'll represent to you, sir,
18  that this is a diagram that was prepared by a
19  police officer in the northern suburbs of Chicago
20  and he was marking down the path of your
21  tractor-trailer after it struck Mr. Scheinman's
22  BMW, all right?
23    A.  Okay.
24    Q.  Are you with me so far?

                                               409

1    A.  Yes.
2    Q.  Now, you had been through this
3  intersection before?
4    A.  Yes.
5    Q.  And if you just skip ahead for a second
6  and look at Exhibit 33, which is an overhead color
7  photograph, does that appear to be an overhead view
8  of the intersection where this accident happened?
9    A.  Appears to be.
10    Q.  And do you see on the northeast corner of
11  the intersection there is a gasoline station, upper
12  right-hand corner?
13    MR. SKRYD:  Can you tell that's a gas
14  station?
15    THE WITNESS:  Not from the top view you
16  can't.
17    MR. SKRYD:  It's hard to see what that is
18  from here.
19    MR. COUTURE:  The second page of that
20  exhibit is easier to look at.
21    MR. SKRYD:  Is there a better picture?
22    MR. FISHER:  If you want to look at 33B.
23  You know what, I'm going to rephrase my question.
24

                                               410

1  BY MR. FISHER:
2    Q.  Look at 33A, which is the first photo.
3    A.  Right.
4    Q.  Does that appear to be the intersection
5  where this accident happened?
6    A.  That appears to be, yes.
7    Q.  And do you see where there is a series of
8  dashed diagonal short little lines that appears to
9  be a crosswalk?
10    A.  The white lines?
11    Q.  Yes, sir.
12    A.  Yes.
13    Q.  All right.  And to the best of your
14  knowledge is that near the area where your
15  tractor-trailer rig struck Mr. Scheinman's vehicle?
16    A.  Yes.
17    Q.  Okay.  Now, do you see once again in
18  Exhibit 33A, the overhead Google earth photograph,
19  do you see center top on the photograph there
20  appears to be the top of a building that's got two
21  trees on the upper left and upper right corners?
22    A.  Yes.
23    Q.  Was it opposite that building where your
24  tractor-trailer rig came to a stop?

                                               411

86 (Pages 408 to 411)

1    A.   That -- yeah -- I mean out here on the
2   street you mean?
3    Q.   Yes.  Yes.  Next to it.
4    A.   Yes.
5    Q.   All right.  And now, if you'll flip back
6   to Exhibit 32, having just looked at the overhead
7   Google earth satellite photograph and looking at
8   the Exhibit 32 which I'll represent to you is the
9   reconstruction diagram --
10   A.   Okay.
11   Q.   -- done by a north suburban police
12  officer, do you see where he's got a
13  tractor-trailer depicted on the right-hand side --
14   A.   Yes.
15   Q.   -- of the highway in the upper center
16  portion of this exhibit?
17   A.   Yes.
18   Q.   And do you see that there's a -- what
19  appears to be a small rectangle representing a car
20  that is further to the north of the tractor-trailer
21  depicted in this diagram?
22   A.   Yes.
23   Q.   Knowing the dimensions of a car and the
24  dimensions of a tractor-trailer, would you agree

412

1    MR. SKRYD:  Got you.  39B?
2    MR. FISHER:  39B.
3    MR. SKRYD:  Got you.
4  BY MR. FISHER:
5    Q.   All right.  Now, you don't need to look at
6  that yet, Mr. Franke.
7    Do you remember when Mr. Couture asked you
8  some questions about a truck driver named Angela
9  Mitchell and whether or not you recalled any
10  conversations with her?
11   A.   Right.
12   Q.   And my question now is this:  I'm going to
13  read to you a portion of Exhibit 39B and I want to
14  ask you if you have a memory of any of this, okay?
15   A.   Okay.
16   Q.   This -- for your benefit, this is a
17  handwritten statement that Miss Angela Mitchell
18  filled out and sent back in to the police
19  department after Miss Mitchell had made
20  conversations with somebody at the scene to say
21  that she was a witness, okay?
22   A.   Okay.
23   Q.   Are you with me?
24   A.   Yes.

414

1  that the way that diagram is shown, that's the
2  approximate distance between the rear of the BMW
3  and the front of your tractor after you backed the
4  tractor up?
5    A.   Yes.
6    Q.   But before it had been backed up, the
7  front of your bumper was in contact with the rear
8  of the BMW?
9    A.   Correct.
10   Q.   And so is it fair to say then that the
11  path that your tractor-trailer took with the BMW
12  attached to its front is the path that is noted by
13  this double set of lines shown in the diagram done
14  by the investigating police officer based upon your
15  memory and your view of the Google earth
16  photographs and your view of Exhibit 32?
17   A.   Yes.
18   Q.   Okay.  I'm done with that.  If you'll skip
19  now to Exhibit 39.  I'll represent to you that
20  these are additional pages from the police report.
21   MR. FISHER:  And, Joe, if you look ahead,
22  you're going to see a Bates numbered Page 189 and
23  it has an exhibit sticker of 39B.  It's about five,
24  six, seven pages in.

413

1    Q.   All right.  So a portion of the
2  statement -- and if you want to follow along, I'm
3  going to start in the cursive writing portion about
4  12, 15 lines down where it says, quote, they laid
5  the man down.  Then I met the driver of the truck.
6  He asked me who was the truck driver of that truck
7  beside him.  I replied, quote, I am, what happened,
8  unquote.  He then told me, quote, I didn't see the
9  light was red.  I've lost my CDL, I lost my job and
10  I've lost everything, unquote.
11   Have I read accurately what is written
12  here by Miss Angela Mitchell?
13   A.   Yes.
14   Q.   Do you have any memory of saying any of
15  the words that she has in quotation marks in this
16  statement, namely, quote, I didn't see the light
17  was red, I've lost my CDL, I lost my job, and I've
18  lost everything, unquote?
19   A.   No, I don't remember saying that.
20   Q.   Earlier in this deposition you have
21  occasionally said in response to questions by some
22  counsel that you had no memory of what it is the
23  lawyer asked you about.  Do you remember
24  occasionally saying that?

415

87 (Pages 412 to 415)

1    A.   Yes.
2    Q.   All right.  With respect to this
3  particular point about which I just asked you
4  questions, is there anything that would refresh
5  your memory as to whether or not this is what you
6  told Miss Mitchell?
7       Is there anything that would refresh your
8  memory, for example, another document, some notes
9  you kept --
10   A.   No.
11   Q.   -- a police report, a report you gave to
12  the company, anything --
13   A.   No.
14   Q.   -- that would refresh your memory?
15   A.   No.
16   Q.   All right.  And, now, with respect to all
17  the questions before that you were asked to which
18  you said you don't have a memory, do you know
19  whether or not there is any document or any object
20  or anything else that would refresh your memory
21  about those topics about which you said you had no
22  memory?
23   A.   No.
24   Q.   Okay, I'm done with that notebook.  All

416

1  right.  Let's move now to -- all right.  Yesterday
2  we took the second deposition of Mr. David Martin
3  and there were some documents that he was shown
4  that I want to ask you some questions about, okay?
5    A.   Okay.
6    Q.   Let's look first at Exhibit 64.  I'll
7  represent to you that these are documents that
8  Mr. Martin explained are called, as they say at the
9  top, a Load and Rate Confirmation Sheets?
10   A.   Okay.
11   Q.   And if you just sort of skim through them
12  very quickly just to see what's on them -- you can
13  just flip through them.
14       MR. SKRYD:  The entire exhibit?
15       MR. FISHER:  Yes, just the entire
16  exhibit.
17  BY MR. FISHER:
18   Q.   What I'm going to ask you after you've had
19  a chance to look through it is tell me whether
20  you've ever seen these documents before.
21       So just look through them and see if this
22  is something that in your course of work when you
23  were working for Martin's Bulk, is this the type of
24  document you would have had contact with.  So take

417

1  your time.
2       MR. SKRYD:  Take your time but skim
3  through them.  Just teasing you.  Are they all the
4  same, Carl?
5       MR. FISHER:  Yes, they are.
6  BY MR. FISHER:
7    Q.   Okay.  First of all, have you had a chance
8  to skim through --
9    A.   Yes, I have.
10   Q.   -- these Load and Rate Confirmation
11  Sheets?
12   A.   Right.
13   Q.   Is it a fair statement to say, sir, that
14  when you were doing your job in June and July of
15  2008 these are not the type of documents that you
16  would have had contact with; is that a correct
17  statement?
18   A.   Correct.
19   Q.   All right.  Now, quickly, let's look at
20  Exhibit 65, which I'll represent to you are Broker
21  Confirmation Sheets from Universal Am Can Limited.
22       Why don't you skim through those and tell
23  me whether or not your answer is going to be same,
24  which is, no, Mr. Fisher, that's right, I never had

418

1  contact with these types of documents.
2    A.   No, Mr. Fisher, I have never had contact
3  with these kind of documents.
4    Q.   Excellent.  All right.  Let's look at
5  Exhibit 66.  I have a hunch your answer is going to
6  be different to these, okay?
7    A.   Okay.
8    Q.   So just look at the first couple pages and
9  move this along.  Does it appear as though from the
10  first page -- and I'll represent to you that this
11  is a whole collection of memo bills --
12   A.   Okay.
13   Q.   -- for the month of June 2008 and into the
14  first few days for July 2008, okay?
15   A.   Okay.
16   Q.   These are the type of documents that you
17  would have contact with, right?
18   A.   Yes.
19   Q.   And you would have contact with these
20  documents for the first time when you would get to
21  Hammond?
22   A.   No.  After I get loaded.
23   Q.   Let me rephrase my question.
24   A.   Okay.

419

88  (Pages 416 to 419)

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

1    Q.  I'll represent to you that these are all
2  memo bills that pertain to cargo shipments picked
3  up at the Midwest Distribution Center at 2501 165th
4  Street in Hammond, Indiana.
5    A.  Correct.
6    Q.  You had been there before, right?
7    A.  Yes.
8    Q.  As you testified before?
9    A.  Yes.
10   Q.  So when -- and, in fact, if you look at
11  the very, very first page for this one dated May
12  30th, it's got your John Hancock, your signature?
13   A.  Yes.
14   Q.  Is it fair to say that you would receive
15  these memo bills for the first time when you
16  arrived at the Hammond Distribution Center?
17   A.  When I first arrived there?
18   Q.  Let me rephrase it.  Very, very good
19  point.
20       The first time you would receive these
21  memo bills is after you arrived at the Hammond
22  Distribution Center, you pulled your truck up to
23  the dock, it got loaded, then you would be
24  presented with this memo bill?

420

1  I'd probably hand them right directly to him.
2    Q.  Would that happen very often where the
3  actual driver who was going to take the load up to
4  wherever it was going would actually be there and
5  you could personally hand it over?
6    A.  On occasion.
7    Q.  All right.  I'm done with that.
8       MR. FISHER:  Now, Tim, if you could hand
9  him Exhibit 71.  And, actually, you know what,
10  before you do that, can I just grab that.  There's
11  one particular page that I think I can find real
12  quick.
13  BY MR. FISHER:
14   Q.  While I'm finding it, Mr. Franke,
15  yesterday I asked Mr. Martin some questions about a
16  particular form in here.  Of course, unfortunately,
17  there's not page numbers.  So I'll see if I can
18  find it.  There's a page in here in these documents
19  from your personnel file that say --
20       MR. SKRYD:  The handbook one?
21  BY MR. FISHER:
22   Q.  -- that you received a company employee
23  handbook, all right.  So while I'm looking for this
24  document -- and I'll show it to you -- do you

422

1    A.  Correct.
2    Q.  Okay.  And then you would sign it and
3  leave a copy with the people there at Hammond?
4    A.  Correct.
5    Q.  And then you would take these memo bills
6  with you back up to Wilton and turn them over to
7  whoever it was you needed to turn them into when
8  you got to Wilton?
9    A.  Right.
10   Q.  And who would that be that you would turn
11  them back into?
12   A.  The driver that would be taking a load on
13  to Minnesota would need these bills in his
14  possession to take the load up there.  And when he
15  delivered a load, they would sign these bills and
16  they would come back to Martin's.
17   Q.  Right.  But with respect to your
18  transportation, so to speak, of these memo bills,
19  these bills of lading, you only took them as far as
20  Wilton?
21   A.  Correct.
22   Q.  And where would you put them?
23   A.  Either on the guy's clip board or if he
24  was -- the other driver was present at the time,

421

1  remember receiving a company employee handbook?
2    A.  Yes.
3    Q.  I know Mr. Couture asked you some
4  questions about it?
5    A.  Yes.
6    Q.  Pardon me while I try to find t his.  I
7  should have marked it before.
8       MR. SKRYD:  Hey, Carl, I'll look for it if
9  you want to ask him some questions about it.
10       MR. FISHER:  Actually, I sort of need
11  it --
12       MR. SKRYD:  Okay.  No problem.
13       MR. FISHER:  -- to ask that question.
14  Thank you, though.
15  BY MR. FISHER:
16   Q.  While I'm still looking for it, did this
17  company employee -- there you go.  All right.
18       First of all, do you see as a part of
19  Exhibit 71 the page which is entitled
20  Acknowledgment and Receipt of the Company Employee
21  Handbook?
22   A.  Yes.
23   Q.  What is the title?  Just read it.
24   A.  It says Acknowledgment and Receipt of

423

89 (Pages 420 to 423)

1  Handbook.
2      Q.  Okay.  And with respect to this handbook,
3  did it have advice in it to you as an employee of
4  Martin's Bulk Milk such as, hey, make sure you keep
5  so many seconds following distance, obey local, you
6  know, traffic laws, you know, look out ahead, leave
7  yourself a -- did it have advice about driving in
8  it?
9      A.  Not to my recollection.
10     Q.  Was it basically information --
11         MR. SKRYD:  Hold on.  Did you say not to
12  your recollection?
13         THE WITNESS:  Yes.
14  BY MR. FISHER:
15     Q.  Was it basically information about how to
16  do your job?
17     A.  Right.
18     Q.  And is it fair to say that the only
19  directions that were in the company employee
20  handbook were directions you understood to be
21  coming from your employer Martin's Bulk Milk
22  Service?
23     A.  Correct.
24     Q.  Okay.  We don't have a copy of it.  So I

424

1  can't ask you.  We'll get them later, but you'll be
2  spared having to answer questions about it orally,
3  okay?  All right.  I'm done with that one.
4      Okay.  In your answers to interrogatories
5  propounded to you by BMW there is a question in
6  which you were asked -- strike that -- in which
7  Martin's Bulk Milk was asked if you had ever been
8  involved in a motor vehicle accident in the ten
9  years preceding the accident and the answer I'll
10  read to you, quote:  Samuel Franke was involved in
11  a minor automobile accident in Hammond, Indiana
12  approximately three days prior to the occurrence at
13  issue.  There was no damage to either vehicle and
14  no police report or documentation was filed.
15     So by my count, if the accident happens on
16  July 3, 2008, three days before is either July 1st
17  or June 30th.  Would you agree with my counting of
18  three days before?
19     A.  Right.
20     Q.  All right.  First of all, were you ever
21  involved in a motor vehicle accident in Hammond,
22  Indiana on either June 30th or July 1st?
23     A.  No.
24     Q.  Do you know why Martin's Bulk Milk would

425

1  have given an answer to that affect?
2      A.  It happened in the rail -- it happened in
3  a rail yard.
4      Q.  So there was an accident in the rail yard?
5      A.  Right.
6      Q.  Tell us about that.
7      A.  I was in the rail yard and I was -- the
8  truck was parked and another truck come up behind
9  me and -- I was parked in the rail yard and another
10  truck come up behind me and hit the back of the
11  trailer I was pulling.
12     Q.  Which rail yard?
13     A.  It was 47th Street.
14     Q.  Let me make sure I understand.  I mean,
15  this says -- this answer says minor automobile
16  accident.
17     A.  Right.
18     Q.  Sometimes "automobile" refers to motor
19  vehicle?
20     A.  Right.
21     Q.  So let's find out from you.  Were you in a
22  Martin's Bulk Milk tractor at the time?
23     A.  Yes.
24     Q.  Did you have a chassis container or a

426

1  trailer attached to the tractor?
2      A.  It was a chassis.
3      Q.  And had you -- was this a chassis that you
4  had just picked up from the intermodal rail yard or
5  you were delivering to the intermodal rail yard?
6      A.  I think it was one I just picked up.
7      Q.  And some other truck driver accidentally
8  struck you in the rear?
9      A.  Right.
10     Q.  Was there any paperwork that was needed
11  for that particular accident?
12     A.  No.
13     Q.  Did you suffer any injuries?
14     A.  No.
15     Q.  Okay.  All right.  Now to the large
16  notebook right there.  I'd like you to look at
17  Exhibit 11.  And I think I already know the answer
18  to this in light of a previous exhibit I showed
19  you.
20     Does Exhibit 11 appear to be a document
21  entitled Broker Confirmation Sheet --
22     A.  Yes.
23     Q.  -- like the ones I showed you before?
24     A.  Yes.

427

90  (Pages 424 to 427)

1    Q.  All right.  And you said before this is
2  not the type of document that you would have had
3  any contact with, fair?
4    A.  Fair.
5    Q.  But do you see that it appears to be
6  dealing with the load that you were picking up at
7  Hammond to be transported back up to Wilton?
8    A.  Yes, it appears that way.
9    Q.  And is that because you recognize the
10  names of the customers, the International Paper
11  customers whose International Paper paper products
12  were going to be delivered up in the Minneapolis
13  area?
14    A.  I see that it says Martin's Bulk Milk on
15  there.
16    Q.  Right.
17    A.  And it says -- and it has shipper
18  International Paper.  That would be the place that
19  it was at.
20    Q.  Okay.  Let me be more specific.  I'm
21  sorry.  I think you were shown earlier -- maybe you
22  weren't and I apologize if you weren't.  I think
23  you were shown the memo bills for the load that you
24  picked up on July 3rd in the evening, all right?

428

1    A.  The memo bills?
2    Q.  Yes, the bills of lading?
3    A.  Yes.
4    Q.  All right.  I think you were shown those
5  earlier in your deposition.  Maybe it was the first
6  session of your deposition, okay?
7    A.  Okay.
8    Q.  All right.  I will represent to you that
9  on those memo bills the -- that the names of the
10  companies that appear on this document, Exhibit 11,
11  under the heading Delivery Information, Sendvio,
12  Midland Paper and Xpedx --
13    A.  Xpedx.
14    Q.  Right.  That those are the customers that
15  appear on the memo bills, all right?
16    A.  Okay.
17    Q.  Now, here's my question:  This document,
18  Exhibit 11, your hands would never have touched
19  this, right?
20    A.  Right.
21    Q.  Okay.  Now, the people whose name appear
22  on here at the very upper right-hand corner, Melody
23  Hanson --
24    A.  Yes.

429

1    Q.  -- did you ever have contact with a person
2  named Melody Hanson?
3    A.  No.
4    Q.  Do you even know who Melody Hanson worked
5  for as of July 3, 2008?
6    A.  No.
7    Q.  Do you know who Melody Hanson worked for
8  as of June 12th or June 13th, 2008?
9    A.  No.
10    Q.  Do you know who she worked for as of May
11  30th, 2008?
12    A.  No.
13    Q.  And then Pat Podlena -- excuse me, Pat
14  Podlena whose signature appears bottom right, you
15  know who that is, right?
16    A.  No.
17    Q.  Oh, you don't.  Okay.  So where Pat
18  Podlena's name appears, that's a name associated
19  with Martin's Bulk Milk Service that you have no
20  knowledge of; is that a fair statement?
21    A.  Yes.
22    Q.  Okay.  And then just up above Melody
23  Hanson's signature do you see the name John Moore?
24    A.  Yes.

430

1    Q.  I think I may have asked you this question
2  at your first session.  You don't know who John
3  Moore is, right?
4    A.  No.
5    Q.  In fact, if I were to represent to you
6  that John Moore is associated with or employed by
7  at the time Universal Am Can Limited out of Warren,
8  Michigan, that would mean nothing to you?
9    A.  Right.
10    Q.  Okay.  All right, we're done with that
11  one.  But if you'd now move to Exhibit 21.  And I
12  think you were asked some questions about this at
13  the first session of your deposition, but I've got
14  a few more particular questions to ask you.
15      First of all, do you have any memory of
16  the Hammond Distribution Center and the way the
17  docks were laid out at that center?
18    A.  Yes.
19    Q.  Tell us what you remember.
20    A.  You -- there's an office in the middle and
21  there was ten or so docks on one side of the office
22  and docks on the other side of the office and they
23  was all facing the road.  It was a large building.
24  There was -- I don't know.

431

91  (Pages 428 to 431)

1    Q.  All right.  Let me take it from there.
2    A.  All right.
3    Q.  Is it fair to say that that distribution
4  center was on the north side of 156th Street?
5    A.  Yes.
6    Q.  So that the office was right in the center
7  and that would mean that there were docks to the
8  east and docks to the west?
9    A.  Correct.
10   Q.  On the day that you made this pickup, July
11  3rd, 2008, do you remember what dock number you
12  went to?
13   A.  No.
14   Q.  Somewhere on this document, I haven't been
15  able to find it, there's a 36.
16   A.  Right here.
17   Q.  Where is that?
18   A.  It's right --
19   Q.  Oh, yes, right there on the side.  I
20  thought it was my handwriting.  And do you remember
21  where dock number 36 was, whether or not it was to
22  the east or to the west?
23   A.  It would probably be to the --
24   Q.  To the right or east, to the west or left?
                                                    432

1  if you knew what these numbers corresponded to and
2  you said you did not, all right?
3    A.  In the loading diagram?
4    Q.  Yes.  In other words, 307, 307, 307, et
5  cetera, then 211 and then the bottom a series of
6  322s?
7    A.  That's the loading diagram that they put
8  them on the truck.
9    Q.  Do the numbers 307, 211 and 322 correspond
10  to the three customers whose paper products they
11  were going to receive, if you know?
12   A.  I don't know for sure but no.
13   Q.  Okay.  Based upon your recollection of the
14  loading that was done at the Midwest Distribution
15  Center in Hammond, Indiana and the way these
16  numbers are lined up for the loading of the
17  trailer --
18   A.  Yes.
19   Q.  -- or, excuse me, the container you were
20  pulling --
21   A.  Yes.
22   Q.  -- does that appear to be a pretty tight
23  configuration and alignment of paper products --
24   A.  Yes.
                                                    434

1    A.  To the --
2    Q.  To the right?
3    A.  To the left.
4    Q.  To the left facing which direction?
5    A.  Looking at it -- looking at it -- standing
6  in front of the building and looking at it it would
7  be to the left.
8    Q.  Was this particular dock that you loaded
9  up on on July 3rd, 2008 close to the office center
10  in the center?
11   A.  Within about three or four doors, yes.
12   Q.  Look at -- Strike that.
13       On this particular exhibit is Samuel
14  Franke, the signature that appears in the block
15  entitled Driver, is that the only bit of
16  handwriting of yours?
17   A.  Yes.
18   Q.  Do you see under the heading Loading
19  Diagram?
20   A.  Yes.
21   Q.  You did not put those numbers in there,
22  right?
23   A.  Right.
24   Q.  Earlier at your first session I asked you
                                                    433

1    Q.  -- based upon your experience?
2    A.  Yes.
3    Q.  Do you have any reason to believe,
4  Mr. Franke, that anything having to do with how
5  this load of paper products was loaded in position
6  has anything to do with the mechanics of how this
7  accident happened on the evening of July 3rd?
8    A.  No.
9    Q.  You have no knowledge, right?
10   A.  Right.
11   Q.  And have you ever been in a
12  tractor-trailer rig or tractor chassis container
13  rig where you have felt a load shift behind you?
14   A.  Yes.
15   Q.  You didn't feel that on the night of July
16  3, did you?
17   A.  No.
18   Q.  Okay.  And then do you see the signature
19  that appears under the heading Loaded By --
20   A.  Yes.
21   Q.  -- right underneath your signature?  It
22  looks like my signature.  Do you know who signed
23  that?
24   A.  I can't read the writing but it's probably
                                                    435

92 (Pages 432 to 435)

1   one of the forklift operators, I'm assuming.
2        Q.   Since you had been there several years --
3        A.   Right.
4        Q.   -- did you come to know any of the
5   forklift operators by name or recognition?
6        A.   By recognition.
7        Q.   If I were to tell you that that's the
8   signature of a gentleman named Malissio Miros, does
9   that mean anything to you?  Malissio Miros.
10       A.   Not the name but --
11       MR. SKRYD:  Are you kidding me, Malissio.
12       MR. COUTURE:  Someone you know?
13       MR. SKRYD:  I do now.
14       THE WITNESS:  I don't know exactly what
15  his name was.  I just know him by appearance when I
16  walked in the door.
17  BY MR. FISHER:
18       Q.   Did you usually get the same forklift
19  operator?
20       A.   Not always.
21       Q.   Let me rattle off a few names to you and
22  see if you recognize the names of any of these
23  people at the distribution center in Hammond and if
24  you ever had any contact with them.
                                                    436

1        Joan Anderton?
2        A.   No.
3        Q.   No?  Flint Diekman?
4        A.   I don't recognize the name.
5        Q.   I've already asked you Malissio Miros.
6   You don't remember, right?
7        A.   Right.
8        Q.   Debbie Marquard?
9        A.   Not for sure, no.
10       Q.   A woman named Cheryl?  I don't have a last
11  name.
12       A.   No.
13       Q.   Crystal Cousins?
14       A.   Yes.
15       Q.   What do you remember about Crystal
16  Cousins?
17       A.   She was the lady -- you came in and she
18  would tell you what door to back into and she
19  handled all the paperwork and stuff.
20       Q.   And then Rochelle Smith?
21       A.   No.
22       MR. SKRYD:  Is that a no?
23       THE WITNESS:  No.
24
                                                    437

1   BY MR. FISHER:
2        Q.   When you said that she handled all the
3   paperwork and everything, what did you mean by
4   that, paperwork and everything?
5        A.   When you showed up at the facility, you
6   went in and checked in and she told you what door
7   to back into.
8             And when you backed into the door, after
9   you got loaded, she would give you the bill of
10  lading and you would sign the bill of lading.
11       Q.   I'm going to show you a document I've
12  marked as Exhibit 88.  And I'll actually show you
13  the document from which I made that copy, okay.  It
14  looks like this.  Do you see it's an abbreviated,
15  you know, shorter version?
16       A.   Okay.
17       Q.   All right.  When you would go to the
18  office there in the center of the distribution
19  center, would you receive a document like this
20  that's marked as Exhibit 88 from Crystal or anybody
21  else?
22       A.   Yes.
23       Q.   Do you remember anything about it?
24       A.   It was -- the way you checked in, you gave
                                                    438

1   your trailer number, your carrier -- the pickup
2   number, the driver's name and the destination.  I
3   didn't do this all the time but they would just
4   ask -- they would ask you to write it down but,
5   yes, I have seen a document like this before, yes.
6        Q.   Do you know whether or not you used a
7   document like Exhibit 88 on July 3rd, 2008?
8        A.   I don't know for sure.
9        Q.   Okay.  All right.  You can set that
10  aside.  Okay, Exhibit 53B.
11       MR. SKRYD:  53B?
12       MR. FISHER:  Oh, I'm sorry, Matt's got it
13  right there.
14       MR. SKRYD:  Are you done with this folder
15  do you think?  Are you done with this folder?
16       MR. FISHER:  We're done with that one,
17  yes.  Thanks.
18  BY MR. FISHER:
19       Q.   All right.  Mr. Franke, I'm showing you
20  what's previously been marked as Exhibit 53B.  I
21  will represent to you that this is a series of
22  discovery responses that your lawyers prepared on
23  your behalf responding to 40 separate requests for
24  documents that I made of you and your former
                                                    439

                              93 (Pages 436 to 439)

1 employer Martin's Bulk Milk, all right?
2     A.  Okay.
3     Q.  Many of the questions or requests on this
4 particular form ask whether or not in particular
5 you have any documents in your possession that say
6 something like this: I was an agent of Universal
7 Am Can; I was an agent of Overnite Express; I was
8 an agent of International Paper, or vice versa,
9 International Paper was my principal and I served
10 as its agent or Overnite Express was my principal
11 and I served as its agent or Universal Am Can was
12 my principal and I served as its agent.  With me so
13 far?
14     A.  Okay.
15     Q.  That's what I'm asking to find if there's
16 any documents that have those words on them.  With
17 me so far?
18     A.  Yes.
19     Q.  So here's my question.  Your lawyers
20 responded to this and basically said, no, we don't
21 have any such documents, or that is to say, you
22 don't have any such documents.  So my question is,
23 is that a correct statement --
24     A.  Yes.

440

1     Q.  -- that you have absolutely no documents
2 that say on them you were acting as the agent of a
3 principal named International Paper or a principal
4 named Overnite Express or a principal named
5 Universal Am Can Limited?  Is that a fair
6 statement?
7     A.  Yes.
8     Q.  Okay.  I'm done with that one.  In light
9 of some documents that had been produced since your
10 first deposition, I have gone back to your
11 deposition to find certain sections in it where you
12 gave answers and I want to make sure certain things
13 are still the case, okay?
14     A.  Okay.
15     Q.  So when you went to the distribution
16 center in Hammond, did the people there, Crystal,
17 for example, or a forklift operator who had just,
18 you know, filled up your trailer with loads, did
19 any of those individuals ever give you directions
20 on how to drive your load or what to do with your
21 load once you departed the Hammond Distribution
22 Center?
23     A.  No.
24     Q.  Did you ever receive any instructions,

441

1 directions, communications from International Paper
2 Corporation, Universal Am Can Limited or Overnite
3 Express or Overnite Logistics regarding what you
4 were doing at the intermodal yard?
5     A.  No.  No.
6     Q.  Did you ever receive any instructions or
7 directions from International Paper Corporation,
8 Universal Am Can or Overnite Express or Overnite
9 Logistics for the work you would be doing once you
10 left the Hammond Distribution Center?
11     A.  No.
12     Q.  If I told you that people who worked at
13 the distribution center in Hammond were employed by
14 a company called Exel spelled E-x-e-l, would you be
15 able to say yea or nay to that statement?
16     A.  No.
17     Q.  You have no idea who those people were
18 technically employed by, do you?
19     A.  No.
20     Q.  That's a correct statement?
21     A.  Right.
22     Q.  Okay.  Was there ever an occasion when at
23 the Hammond Distribution Center you loaded a
24 trailer?

442

1     A.  Myself?
2     Q.  By yourself or to help somebody there?
3     A.  No.
4     Q.  Do you know why that is?
5     A.  Safety, and I think they have a
6 forklift -- you've got to have forklift operators.
7 You can't drive their forklifts to load on their
8 facilities.
9     Q.  On Page 21 of your first deposition you
10 said -- you were asked questions about your
11 familiarity with Overnite Express or Overnite
12 Logistics and your answer was the only thing you
13 knew about Overnite was that they -- I guess they
14 brokered the load to Martin's.
15         When you said that by guessing, did you
16 mean literally that that was a guess?
17     A.  Yes.
18     Q.  You don't have any personal knowledge of
19 what the relationship was between Overnite Express
20 and Martin's Bulk Milk, fair statement?
21     A.  The only thing I know about Overnite
22 Express and Martin's, they're both trucking
23 companies and they helped each other as far as
24 moving the loads, you know, any loads and they

443

94 (Pages 440 to 443)

1    helped each other as far as moving loads.
2        Q.  When you say they helped each other, what
3    do you mean by that and on what do you base that
4    conclusion?
5        A.  They helped each other if Overnite had a
6    load that they couldn't cover, they would probably
7    give it to Martin's and Martin's would haul it.
8    That's what I'm thinking.
9        Q.  Did that happen to your knowledge after
10   June 12th, 2008, that helping relationship?
11       A.  Yes.  I mean --
12       Q.  Here's the reason I ask that.  Is because
13   I'll represent to you that on June 12th, 2008
14   Overnite Express technically didn't exist anymore
15   because it was bought out by Universal Am Can.
16       A.  Oh.
17       Q.  So in light of that and my representation
18   to you of that, do you remember whether or not
19   after June 12th, 2008 up to July 3, 2008 Overnite
20   was doing any of this --
21       A.  No.
22       Q.  -- you know, trading with Martin's Bulk
23   Milk?
24       A.  Not for sure, no.
                                              444

1        Q.  And by "not for sure" does that mean you
2    don't know?
3        A.  I don't know.
4        Q.  Okay.  Bear with me as I ask you a whole
5    bunch of questions that are all going to sound the
6    same, okay?
7        A.  All right.
8        Q.  And that will end my questioning of you.
9    First of all, at the time of the accident were you
10   driving a truck?
11       A.  Yes.
12       Q.  At the time of the accident were you
13   driving a truck that had cargo in it?
14       A.  Yes.
15       Q.  At the time of the accident were you
16   driving a truck with cargo that was to go from
17   Hammond up as far as Wilton?
18       A.  Yes.
19       Q.  And you understood that after you dropped
20   it off that load was going to go on but be driven
21   by somebody else?
22       A.  Right.
23       Q.  And do you understand that at the time you
24   were driving the truck with cargo from Hammond up
                                              445

1    toward Wilton you were supposed to be doing that in
2    a safe manner consistent with whatever would be
3    reasonable driving and abiding with traffic laws?
4        A.  Yes.
5        Q.  Okay.  I'm going to use that, what I've
6    just described to you which is driving a truck,
7    driving a truck with cargo, driving a truck with
8    cargo from one place to another and doing it
9    safely, I'm going to use that -- I'm going to, you
10   know, condense that into what I will call the work
11   you were doing.
12       A.  Yes.
13       Q.  Okay?  So is it fair to say that when you
14   were doing your work on July 3, 2008, Universal Am
15   Can, Overnite Express and International Paper did
16   not provide the tools you were using to do your
17   work?  Is that a fair statement?
18       A.  Yes.
19       Q.  Is it a fair statement that those people
20   did not provide the instrumentalities you needed to
21   do your work?
22           Instrumentalities is a fancy word to say
23   things you need to do your work.
24       A.  The truck -- right.  Yes.
                                              446

1        Q.  Okay.  And, in fact, let's break it down.
2    As far as you know the only entity that provided
3    the truck to you was Martin's Bulk Milk?
4        A.  Right.
5        Q.  Universal Am Can, International Paper,
6    Overnite Express, they didn't provide a truck for
7    you to do your work, did they?
8        A.  No.
9        Q.  That's a correct statement?
10       A.  Correct.
11       Q.  Did they provide the clothing -- those
12   three entities -- to you to do your work?
13       A.  No.
14       Q.  Did they provide the logbooks for you to
15   use in doing your work?
16       A.  No.
17       Q.  Was there ever an instance in which you
18   had co-drivers?
19       A.  No.
20       Q.  Did they provide the money for you to
21   purchase gas?
22       A.  Yes.
23       Q.  What do you mean by that?
24       A.  They would give you a fuel card.
                                              447

95  (Pages  444 to 447)

1    Q.  Who is "they"?
2    A.  Oh, Martin's Bulk Milk.
3    Q.  Let me go back.  It was not a good
4  question.  Did Universal Am Can, International
5  Paper or Overnite Express provide a fuel card to
6  you?
7    A.  No.
8    Q.  That was Martin's Bulk Milk?
9    A.  Right.
10    Q.  Did Universal Am Can, Overnite Express or
11  International Paper provide to you or direct you on
12  what particular route for you to use in doing your
13  work?
14    A.  No.
15    Q.  Did Universal Am Can, Overnite Express or
16  International Paper to the best of your knowledge
17  measure or score or evaluate the work you were
18  doing?
19    A.  No.
20    Q.  Remember when I asked you questions about
21  your work and whether or not you might have some
22  interaction with a shipper or somebody else because
23  of something you did and -- do you remember that
24  when I talked about that in your earlier

448

1  deposition?
2      You have a quizzical look on your face.
3  Let me ask a different question.
4      Was there ever a time when you were doing
5  a load, pulling a load, when a customer or somebody
6  had a complaint?
7    A.  No.
8    Q.  All right.  Did Universal Am Can, Overnite
9  Express or International Paper ever require you to
10  inspect, clean or maintain your tractor or trailer?
11    A.  No.
12    Q.  Did Universal Am Can, Overnite Express or
13  International Paper ever tell you to use a
14  designated place for the cleaning, servicing or
15  gassing up of your tractor-trailer?
16    A.  No.
17    Q.  Did Universal Am Can, Overnite Express or
18  International Paper ever monitor to your knowledge
19  your deliveries?
20    A.  I don't know.
21    Q.  In fact, the only thing you would ever do,
22  I take it, was after you left Hammond, you would
23  simply take the load to Wilton?
24    A.  Correct.

449

1    Q.  After you arrived at Wilton did you ever
2  come into any knowledge in which you found out that
3  somebody at Universal Am Can, International Paper
4  or Overnite Express ever called to check up on you
5  to find out, hey, did Franke make it back up to
6  Wilton tonight?
7    A.  No.
8    Q.  That never happened, right?
9    A.  No.
10    Q.  Correct?
11    A.  Correct.
12    Q.  Okay.  Did Universal Am Can, Overnite
13  Express or International Paper ever require you to
14  report in to them or notify them of anything that
15  was happening when you were doing your work?
16    A.  No.
17    Q.  Did Universal Am Can, Overnite Express or
18  International Paper ever require you to provide
19  status reports?
20    A.  No.
21    Q.  Did Universal Am Can, Overnite Express or
22  International Paper ever require you to call in at
23  any particular set time?
24    A.  No.

450

1    Q.  Were there occasions, sir, when you
2  arrived at Martin's Bulk -- Strike that.
3      Were there occasions when you arrived at
4  the Hammond Distribution Center at different times
5  of the afternoon or evening?
6    A.  Yes.
7    Q.  Tell me what the -- since this was a
8  regular run for you, tell me what the range of time
9  was.
10      What was the earliest time you typically
11  might get to the Hammond Distribution Center and
12  what would be the latest time you might get to the
13  Hammond Distribution Center?
14    A.  Earliest time could be, like, 5:00 o'clock
15  and it depends on what kind of day you're having.
16  It could be as late as, like, you know, real late
17  at night, you know, like at 9:00 o'clock probably.
18    Q.  And, in fact, on this occasion, the July
19  3rd load, you didn't leave until shortly after 9:00
20  o'clock, right?
21    A.  Right.
22    Q.  Leave Hammond?
23    A.  Right.
24    Q.  Because, in fact, I think one of the

451

96  (Pages 448 to 451)

1   document shows 8:38 was when the loading started
2   and either 9:02 or 9:07 was when the loading ended,
3   right?
4       A.  Yes.
5       Q.  I want to use that to talk a little bit
6   about logging.
7           When a trucker like yourself does logging,
8   you log in 15-minute intervals, right?
9       A.  Correct.
10      Q.  What do you do, what are you instructed to
11  do if the event that has occurred ended at 9:07?
12  Do you log that as 9:00 o'clock or do you log that
13  as 9:15?
14      A.  9:15.
15      Q.  At 9:07 you log it at 9:15?
16      A.  Yes.
17      Q.  You don't employ a method where you don't
18  log to 9:15 unless you reach 9:08 or go beyond
19  halfway?
20      A.  I mean, it's normally -- it's usually --
21  if it's after 9:00 o'clock, I would go to 9:15
22  probably.
23      Q.  Okay.
24      A.  Is that -- that's the answer?  I mean,

452

1   your question --
2       Q.  I'll ask my question another way.  If --
3   let's assume you stopped for the night driving for
4   whatever reason --
5       A.  Okay.
6       Q.  -- and the time that you stopped was 8:46,
7   okay.  Would you log that on a log as
8   three-quarters of an hour after 8:00 or would you
9   log that as four-quarters of an hour all the way up
10  to 9:00?
11      A.  I'd probably log it at eight forty -- at
12  three-quarters probably.
13      Q.  Okay.  So I'll come back to my question.
14  Is this -- and you tell me if this is not something
15  you've heard of.
16          Have you ever heard of a situation where
17  if it's, you know, 9:07, you log it back to 9:00
18  but 9:08 you log it to 9:15 and then if it's, say,
19  9:22, you log it at 9:15 and 9:23 gets logged up to
20  9:30?
21      A.  Yes.  That happens, yes.
22      Q.  Okay.  Did Universal Am Can, Overnite
23  Express, International Paper ever fine you for not
24  being in compliance with something?

453

1       A.  No.
2       Q.  Did Universal Am Can, Overnite Express,
3   International Paper ever dictate to you what hours
4   you needed to work?
5       A.  No.
6       Q.  Did Universal Am Can, Overnite Express, or
7   International Paper ever hire, discipline, counsel,
8   or qualify you as a driver?
9       A.  No.
10      Q.  When you were terminated from Universal --
11  Strike that.
12          When you were terminated from Martin's
13  Bulk Milk, did you ever find out that Universal Am
14  Can, Overnite Express or International Paper were
15  an entity or entities that fired you?
16      A.  No.
17      Q.  You only knew it was Martin's Bulk Milk
18  that was terminating your relationship?
19      A.  Yes.
20      Q.  Did Universal Am Can, Overnite Express or
21  International Paper instruct you on your appearance
22  in terms of what uniform to wear, what clothing to
23  wear, how -- personal grooming standards, like can
24  you have facial hair or shaving, anything like

454

1   that?
2       A.  No.
3       Q.  Did Universal Am Can, Overnite Express or
4   International Paper to your knowledge ever maintain
5   a personnel file on you?
6       A.  Not that I know of, no.
7       Q.  Do you know what a driver qualification
8   file is?
9       A.  A driver qualification file?
10      Q.  Right.  Do you know what that is?
11      A.  Not exactly.
12      Q.  Do you know if Universal Am Can, Overnite
13  Express or International Paper ever kept track of
14  your driving time and in particular ever kept track
15  of your hours of service to see if you were in
16  conformity with Federal Motor Carrier Safety Regs?
17      A.  No.
18      Q.  Did Universal Am Can, Overnite Express or
19  International Paper have the right or ever exercise
20  the right to discipline you?
21      A.  No.
22      Q.  Did Universal Am Can, Overnite Express or
23  International Paper ever have the right or exercise
24  the right to require you to take a medical exam or

455

97 (Pages 452 to 455)

1 physical?
2 A. No.
3 Q. Did you ever receive direct deposit
4 payments for wages earned from Universal Am Can,
5 Overnite Express or International Paper?
6 A. No.
7 Q. To your knowledge did Universal Am Can,
8 Overnite Express or International Paper ever pay
9 you or reimburse you for any of the following
10 things: Your salary?
11 A. No.
12 Q. Your wages?
13 A. No.
14 Q. Liability insurance coverage?
15 A. No.
16 Q. Workers compensation insurance coverage?
17 A. No.
18 Q. Cost of repairs?
19 A. No.
20 Q. Maintenance costs?
21 A. No.
22 Q. Supplies?
23 A. No.
24 Q. Travel expenses?

456

1 A. No.
2 Q. Did Universal Am Can, Overnite Express or
3 International Paper ever pay for any of the
4 following employee benefits: Health insurance?
5 A. No.
6 Q. Workers compensation insurance coverage?
7 A. No.
8 Q. A pension plan?
9 A. No.
10 Q. Retirement accounts?
11 A. No.
12 Q. Profit sharing?
13 A. No.
14 Q. Vacation pay?
15 A. No.
16 Q. Sick pay?
17 A. No.
18 Q. When you drove on July 3, 2008, was there
19 anything about that run you were doing that night
20 that led you to the conclusion that you needed to
21 get your tractor-trailer rig back to Wilton as
22 quickly as possible and dam the torpedoes, full
23 speed ahead, you don't care about any of the
24 traffic laws?

457

1 A. No.
2 Q. Let me look at my notes. I think I'm
3 done.
4     When you were -- answered a previous
5 question about your license never being suspended,
6 were you referring to your CDL?
7 A. Yes.
8 Q. Was your license ever suspended -- Strike
9 that.
10     Did you ever have a time when you did not
11 have a CDL and you had just a regular
12 garden-variety driver's license?
13 A. Yes.
14 Q. On that occasion was that license ever
15 suspended or revoked?
16 A. Yes.
17 Q. Pardon me?
18 A. Yes.
19 Q. Okay. Why was it suspended or revoked?
20 A. For I think traffic violations or -- I
21 forget what it was. It was just points. It was a
22 long time ago.
23 Q. Tell me what you mean by a long time ago.
24 A. What year or --

458

1 Q. Yes. Was it in the '80s?
2 A. Yes.
3     MR. SKRYD: How old were you?
4     THE WITNESS: Yes.
5 BY MR. FISHER:
6 Q. 1980s?
7 A. Yes.
8 Q. This is before you began driving a truck?
9 A. Yes.
10 Q. Okay. And eventually was your license
11 reinstated?
12 A. Yes.
13 Q. What did you have to do to get your
14 license reinstated?
15 A. They revoked them for a certain period of
16 time and when that period of time was up, you get
17 to pay for reinstatement fee on them.
18 Q. Was this a situation in which the
19 license -- the word revocation was used as opposed
20 to suspended?
21 A. I don't know.
22 Q. Here's the reason I ask. I think I had my
23 license suspended sometime in the past because I
24 didn't do the vehicle emission test on time, all

459

98 (Pages 456 to 459)

Page 460

```
 1   right?
 2      A.  Right.
 3      Q.  Okay.  And then I got the vehicle emission
 4   test squared away and then my license was
 5   automatically reinstated or taken out of
 6   suspension, okay?
 7      A.  Okay.
 8      Q.  So was your situation one in which your
 9   license was suspended because you had acquired too
10   many points?
11      A.  Yes.
12      Q.  And then did you have to do, like, a
13   driver's education school?
14      A.  No.
15      Q.  It was just after a certain amount of time
16   you got your license back?
17      A.  Correct.
18      Q.  And after that occurred have you ever had
19   any problems with your license being suspended or
20   revoked?
21      A.  No.
22      Q.  Okay.  Did Universal Am Can, Overnite
23   Express or International Paper ever come in and
24   conduct any safety meetings or informational
```

Page 461

```
 1   meetings at Martin's Bulk Milk that you attended?
 2      A.  No.
 3      Q.  Do you know if those entities ever came in
 4   and did any meeting like that to your knowledge?
 5      A.  No, not to my knowledge.
 6      Q.  You were asked questions before about the
 7   movement of your vehicle that night and you said
 8   something about the motor will slow you down.  Do
 9   you remember being asked questions about that?
10      A.  Yes.
11      Q.  What is a Jake brake?
12      A.  A Jake brake is -- it reduces -- it's like
13   something to do with the cylinders on your valves
14   on the motor, that they won't open as far or
15   something like that.
16      Q.  Is it a way of slowing a vehicle down?
17      A.  Yes.
18      Q.  Have you ever traveled on the highways of
19   the United States where you've seen, you know, like
20   no engine brake or no Jake brake?
21      A.  Yes.
22      Q.  Did you have one in this tractor?
23      A.  Yes.
24      Q.  Did you use it that night?
```

Page 462

```
 1      A.  Not to --
 2      Q.  Strike that.  Let me rephrase my
 3   question.  From --
 4         MR. FISHER:  Is it street?  Is it Park
 5   Avenue?
 6         MR. COUTURE:  Park Avenue West.
 7   BY MR. FISHER:
 8      Q.  From Park Avenue north to the eventual
 9   site of the accident did you ever employ the Jake
10   brake in your tractor?
11      A.  No.
12      Q.  When you were traveling northbound between
13   Park and the eventual accident scene, did your
14   engine of your tractor emit any sound because you
15   were allowing the engine to slow or keep the speed
16   of your vehicle constant?
17      A.  You mean as my -- was my Jake brake on?
18      Q.  No, this is completely different than the
19   Jake brake.
20      A.  Okay.
21      Q.  You told me you didn't use the Jake brake,
22   right?
23      A.  Right.  Exactly.
24      Q.  Okay.  I think what you said in response
```

Page 463

```
 1   to Mr. Couture's questions is that you coasted or
 2   allowed the engine to either keep a constant speed
 3   or slow the tractor down --
 4      A.  Right.
 5      Q.  -- before you saw whatever the light color
 6   was and you were going to proceed forward, correct?
 7      A.  Correct.
 8      Q.  So my question is:  In doing that process
 9   would the engine emit a sound that would be audible
10   to people outside?
11      A.  Yes.
12      Q.  Can you characterize that sound for us?
13   What would it sound like if someone were to hear a
14   tractor you're driving emit a sound because you're
15   either coasting or you're using the engine to slow
16   the tractor-trailer down?
17      A.  Probably like a whiney noise probably.
18      Q.  Was there a whining noise that night as
19   you moved from Park toward the eventual accident
20   site driving the vehicle as you previously
21   described?
22      A.  Yes, it would be.
23      Q.  Can you characterize for us how loud that
24   was?
```

99 (Pages 460 to 463)

1    A.   I don't know how loud it would be on the
2  outside of the truck.  I was inside it.  So I don't
3  know how loud it would be.
4    Q.   From inside the truck could you hear it?
5    A.   You can hear it inside the truck, yes.
6    Q.   But you've never -- let me ask this.  Have
7  you ever been a passenger -- you know, a pedestrian
8  somewhere and heard a tractor-trailer do what you
9  thought was what you just described to me?
10   A.   Yes.
11   Q.   Is that something you can hear from a
12  hundred feet away?
13   A.   Maybe.
14   Q.   How about 300 feet away, the distance of a
15  football field?
16   A.   Probably not.
17   Q.   Mr. Franke, you have been asked a lot of
18  questions.
19   A.   Yes.
20   Q.   All right.  Okay.  As you sit here today
21  after being asked and pestered with lots of
22  questions from lots of attorneys and having your
23  activity the focus of a lot of attention, as you
24  sit here today and you recollect what happened that

464

1  night, do you have any explanation for why it is
2  you didn't see the BMW in front of you?
3    A.   No.
4    Q.   Have you ever heard of the word
5  conspicuity?
6    A.   No.
7    Q.   Have you ever heard of the word
8  conspicuous?
9    A.   Yes.
10   Q.   Okay.  Have you ever pulled trailers that
11  have what's called conspicuity tape on them, tape
12  that has reflectors?
13   A.   Oh, yes.
14   Q.   What do you refer to that tape as on a
15  trailer or on a container?  What do you call that
16  tape?
17   A.   Reflect -- I mean, reflective tape.
18   Q.   Okay.  What is your understanding of what
19  the purpose of that reflective tape is?
20   A.   So it's visible.  It reflects light.
21   Q.   Were your headlights on as you drove your
22  vehicle from Park toward the eventual accident
23  site?
24   A.   Yes.

465

1    Q.   Do you believe that the headlights on your
2  tractor had the capability to illuminate things
3  ahead of you?
4    A.   Yes.
5    Q.   Such as cars?
6    A.   Right.
7    Q.   Such as other tractor-trailers?
8    A.   Yes.
9    Q.   But as you drove forward that night with
10  your headlights on is it your testimony you never
11  saw the reflection of your tractor headlights on
12  the rear of any vehicle ahead of you?  Is that a
13  fair statement?
14   A.   Yes.
15   Q.   I know you said you've never been in an
16  accident like this before --
17   A.   Correct.
18   Q.   -- correct?  But has there been a
19  circumstance before where you had your conduct as a
20  driver investigated?
21   A.   Not to my knowledge, no.
22   Q.   All right.  When you went to -- back to
23  Martin's Bulk Milk, was it on July 7th following
24  the accident?

466

1    A.   Yes.
2        MR. FISHER:  Tim, do you have the
3  statement?
4        THE WITNESS:  The statement was on July
5  8th.
6  BY MR. FISHER:
7    Q.   Okay.  Great.  Then we don't need it.
8  Fine.  Thank you.  So on July 8th, which would have
9  been I think a Tuesday if we have our dates
10  correct, you went in to Martin's Bulk Milk in
11  Wilton, Wisconsin, correct?
12   A.   Correct.
13   Q.   And it was at that place that you were
14  interviewed by somebody named Fredrickson?
15   A.   Correct.
16   Q.   And was anybody from Martin's Bulk Milk
17  present when you were interviewed by
18  Mr. Fredrickson?
19   A.   I don't remember.  I don't remember.
20   Q.   All right.  You understood that
21  Mr. Fredrickson was representing the interests of a
22  man who was very seriously injured?
23   A.   Yes.
24   Q.   Okay.  I mean, when you left the scene

467

100 (Pages 464 to 467)

1    that night and the police took you to wherever it
2    was they took you and you got processed for a bunch
3    of stuff, you understood when you left that
4    Mr. Scheinman, the occupant of the BMW struck, he
5    had very, very serious personal injuries?
6        A.   Yes.
7        Q.   All right.  Did it strike you as odd on
8    July 8th that Martin's Bulk Milk was allowing an
9    investigator on behalf of Mr. Scheinman to
10   interview you and take a statement of you?
11       MR. SKRYD:  Objection.
12   BY MR. FISHER:
13       Q.   Does that strike you as odd?
14       MR. SKRYD:  Objection to the form.  You
15   can answer it.
16       THE WITNESS:  Yes.
17   BY MR. FISHER:
18       Q.   Why did it strike you as odd?
19       A.   Because he was representing the other guy.
20       Q.   Did you understand why it was that either
21   your employer or your soon-to-be former employer or
22   your former employer, whenever it was the
23   termination occurred, was offering you up to give a
24   statement to a representative of the Scheinman

468

1    did not believe that to be the case, that you
2    believed you were alert as you drove down the
3    highway?
4        A.   Yes.
5        Q.   Do you have -- as you sit here now
6    today -- I don't want to belabor this point -- but
7    as you sit here today can you think of any reason
8    why it was you missed seeing the BMW?
9        MR. SKRYD:  Objection, asked and
10   answered.  You can answer it one more time.
11       THE WITNESS:  I don't know.
12       MR. FISHER:  Okay.  Thanks.
13       MR. SKRYD:  That's it, Carl?
14       MR. FISHER:  That's it for me.
15       MR. SKRYD:  Okay.  Are we done?  Do you
16   have any questions?
17       MR. BURKE:  Just a few.
18       RECROSS EXAMINATION
19   BY MR. BURKE:
20       Q.   Mr. Franke, just a few questions on the
21   topics about -- that you were asked concerning
22   Overnite Express and International Paper, on that
23   subject.
24       It is true that it was International Paper

470

1    family?  Did that strike you as odd?
2        MR. SKRYD:  Object to the form of the
3    question.  You can answer it.
4        THE WITNESS:  Yes.
5    BY MR. FISHER:
6        Q.   On the night of July 3, 2008 did you
7    consider yourself to be fatigued as you were
8    driving on the highway?
9        A.   No.
10       Q.   Were you alert?
11       A.   Yes.
12       Q.   In your judgment based upon the number of
13   years you have been driving -- you've experienced,
14   I take it, in the number of years circumstances in
15   which you're tired, right?
16       A.   Right.
17       Q.   And were there circumstances you had
18   experienced in the past in which you would truly
19   have to have honestly said, if you were asked, you
20   know, I was pretty tired and fatigued at that time?
21       A.   Yes.
22       Q.   I needed to take a rest?
23       A.   Right.
24       Q.   Is it fair to say that on that night you

469

1    and Overnite Express that determined the location
2    where you would pickup the paper products, correct?
3        A.   Who did you say it was?
4        Q.   International Paper and Overnite Express,
5    they were the ones that determined where you would
6    pickup the paper products, not yourself, correct?
7        A.   Correct.
8        Q.   And Overnite Express and/or International
9    Paper, they were the ones that told you what time
10   to come and makeup that -- and make that pickup,
11   correct?
12       A.   They told Martin's and Martin's told me?
13       Q.   Correct.  Exactly.
14       A.   Correct.
15       Q.   And they also told Martin's who told you
16   what type of equipment had to be used, that you had
17   to have a 53-foot trailer, correct?
18       A.   Correct.
19       MR. FISHER:  Excuse me.  Foundation.
20   BY MR. BURKE:
21       Q.   And you know that you were required to
22   have a clean container or clean trailer in to which
23   to put the International Paper products, right?
24       A.   Correct.

471

101 (Pages 468 to 471)

1    Q.  Okay.  And you would not have gone out to
2  make the pickup at International Paper's warehouse
3  unless you had been requested to do so by either
4  International Paper or Overnite Express, correct?
5       MR. FISHER:  Foundation.
6       THE WITNESS:  I was told by Martin's to go
7  out there.  They -- so, yes, I wouldn't have went
8  out there unless they told me to, right.
9  BY MR. BURKE:
10    Q.  And you knew that Martin's told you to go
11  out there because International Paper and Overnite
12  Express had contacted them to say they had a pickup
13  for you, right?
14    A.  Correct.
15    Q.  Okay.  And the only reason you were
16  driving down Route 41 that night is because
17  Martin's and yourself had been asked to transport
18  paper for International Paper and Overnite Express,
19  correct?
20    A.  Correct.
21    Q.  And, by the way, if you had gotten out to
22  the warehouse and International Paper said, hey, we
23  don't have a load for you, you couldn't do anything
24  about that, right?

472

1    A.  Right.
2    Q.  You'd turn around and go home, right?
3    A.  Right.
4    Q.  They had the authority -- International
5  Paper had the authority to cancel that trip,
6  correct?
7    A.  Correct.
8    Q.  And, by the way, you told us earlier you
9  don't know what information exists in the contracts
10  between Overnite Express and Martin's, correct?
11    A.  Correct.
12       MR. COUTURE:  Objection, asked and
13  answered.
14  BY MR. BURKE:
15    Q.  And, therefore, you have no knowledge of
16  what other requirements may exist in those
17  contracts that Overnite imposed on Martin's in
18  order to do the type of hauling you were doing,
19  correct?
20    A.  Correct.
21    Q.  Do you still have that Exhibit 21 in front
22  of you?  If you don't --
23       MR. SKRYD:  What's 21?
24

473

1  BY MR. BURKE:
2    Q.  It's -- that Mr. Fisher asked you about.
3  Do you remember Mr. Fisher asking you --
4    A.  Yes.
5    Q.  -- questions about this?  Okay.  And on
6  this document it actually -- do you see in the
7  upper left where it says Carrier?
8       MR. SKRYD:  Right here.
9       THE WITNESS:  Yes.
10  BY MR. BURKE:
11    Q.  Okay.  And the carrier is identified as
12  OXEN, correct?
13    A.  Right.
14    Q.  And you know from your experience OXEN is
15  a reference to Overnite Express, correct?
16    A.  Correct.
17       MR. FISHER:  Foundation.
18  BY MR. BURKE:
19    Q.  And also that you know -- or, by the way,
20  this is dated July 3rd, correct?
21    A.  Yes.
22    Q.  Okay.  And, therefore, it's clear there
23  was still business going on involving Overnite
24  Express as of July 3rd, correct?

474

1       MR. FISHER:  Foundation.
2       THE WITNESS:  From what it says on here,
3  yes.
4  BY MR. BURKE:
5    Q.  Okay.  And this Exhibit 88 you were shown
6  a sample form that would be completed when you
7  would arrive at the International Paper warehouse?
8    A.  Correct.
9    Q.  Okay.  This form here is entitled
10  International Paper and Exel underneath it,
11  correct?
12    A.  Correct.
13    Q.  Now, would the contents of the Carrier,
14  Trailer, would that be filled in by the people at
15  the warehouse or by yourself?
16    A.  By myself, I think.
17    Q.  But you would get this piece of paper,
18  this International Paper Exel Form, when you
19  arrived at the warehouse; is that right?
20    A.  Yes.
21    Q.  I'm switching topics.
22       That whining noise that you just got asked
23  about, are you saying when you would be coasting an
24  engine, a truck engine may make what you referred

475

102 (Pages 472 to 475)

1    to as a whining noise?
2    A.  Yes, when you're slowing down and the
3    motor is holding the load back, yes, it would make
4    some kind of whiney noise, yes.
5    Q.  Okay.  And you are aware of that because
6    you've been driving trucks for how many years now?
7    A.  Yes.
8    Q.  How many years have you been driving
9    semis?
10    A.  About 16, probably.
11    Q.  And would you agree that more likely than
12    not an average person who does not regularly drive
13    and is not regularly around semi-tractor trailer
14    trucks won't necessarily recognize what that sound
15    means if they were to hear that whining sound from
16    a truck engine?
17    A.  Correct.
18    MR. COUTURE:  Form, foundation.
19    THE WITNESS:  Correct.  Correct, they
20    wouldn't.
21    MR. BURKE:  What are we on, 89?
22    MR. FISHER:  Yes.
23
24
                        476

1    me tender to you previously marked Exhibit 36.
2    Does this photograph reasonably depict the
3    intersection of Half Day Road and Route 41 where
4    Mr. Scheinman's car was located at the time of the
5    impact?
6    A.  Yes.
7    Q.  And then, last -- I'm switching gears on
8    you now away from photos.
9    And my last topic is you -- I know earlier
10    you told us as part of your duties as a driver you
11    had to refrain from having a rear-end collision
12    with a car in front of you, correct?
13    A.  Correct.
14    Q.  Okay.  And it would be true that you had a
15    responsibility to maintain a proper lookout in
16    front of you for any vehicles that would be in
17    front of you, correct?
18    A.  Correct.
19    Q.  And --
20    MR. SKRYD:  Objection to the form but he
21    already answered.
22    BY MR. BURKE:
23    Q.  And you also had a responsibility to
24    refrain from following any vehicle that was in
                        478

1    (Whereupon, Franke Deposition
2    Exhibit No. 89 was marked for
3    identification.)
4    BY MR. BURKE:
5    Q.  You know, you were shown a diagram by
6    Mr. Fisher and I just want to tender to you this
7    Exhibit No. 89 which is a photograph.  Just take a
8    moment to look at that.
9    Earlier, Mr. Franke, I remember you saying
10    that you -- as you were going northbound on Route
11    41 you described a grassy or wooded area to the
12    right and then -- that would be on the south side
13    of the intersection -- and then a gas station on
14    the north side of the intersection; is that
15    correct?
16    A.  Correct.
17    Q.  And does that photograph in Exhibit 89,
18    does that reasonably, accurately depict the
19    northbound direction of 41 with that grassy area
20    and gas station as you referred to?
21    A.  Yes.
22    Q.  Okay.  And then the last photo.  I recall
23    Mr. Fisher asking you about some white lines at the
24    intersection of Half Day Road and Route 41, and let
                        477

1    front of you too closely so as to possibly cause a
2    collision, right?
3    MR. SKRYD:  Objection, form.  Answer.
4    THE WITNESS:  Correct.
5    BY MR. BURKE:
6    Q.  And it is true that there's nothing that
7    Mr. Scheinman, the driver of the BMW, did that
8    caused you to strike his car from the rear,
9    correct?
10    MR. COUTURE:  Objection to form,
11    argumentative, mischaracterizes his previous
12    testimony.
13    THE WITNESS:  I don't know.  Anything he
14    did that made me hit him?
15    BY MR. BURKE:
16    Q.  Correct.
17    A.  No.
18    Q.  Okay.  There's nothing he did that made
19    you hit him, correct?
20    A.  Correct.
21    MR. BURKE:  Okay.  Nothing else.  Thank
22    you.
23
24
                        479

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

FURTHER REDIRECT EXAMINATION
BY MR. COUTURE:
Q.  You didn't see his car before you hit it so you don't know if he did something to make you hit him, do you?
A.  Right.
Q.  All right.  When you went to Martin's Bulk Milk on the 8th to give this statement, you had already been fired, right?
A.  I don't know whether I was.
Q.  Did someone tell you you had to come and give a statement to Mr. Fredrickson, plaintiff's counsel's investigator?
A.  Yes, they called -- somebody from Martin's called me and said that I was supposed to come over.
Q.  Okay.  Let me explain what I'm asking so it's clear.
Were you told -- were you asked could you please come over, that would be a good idea, or were you told as an employee of Martin's you must come and give a statement?
A.  I don't -- I think they asked if I would please come over.

480

back end of his car?
A.  I didn't see him.
MR. COUTURE:  That's all I have.
MR. SKRYD:  Okay.  We'll reserve.
THE VIDEOGRAPHER:  That concludes this deposition and it is the end of Media Number six.  We are going off the record.  The time is 9:27 p.m.
(AND FURTHER DEPONENT SAITH NAUGHT.)

482

Q.  At the time did you believe it was your obligation as an employee of Martin's to respond to that and go and give a statement?
A.  Yes.
Q.  Were you ever given a safety manual -- we talked about an employee handbook.  Was there a safety manual to your knowledge from Martin's Bulk Milk?
A.  I don't know.
Q.  After this accident did you have to fill out any accident report information with your employer?
A.  I don't know.  I don't remember.
Q.  You don't remember?
A.  Right.
Q.  Okay.  Did you keep any personal records relating to this accident after the accident?
A.  No.
Q.  Sir, do you have an opinion as to what caused this accident?
A.  What caused the accident?
Q.  Yes.
A.  My truck hit the back end of his car.
Q.  Okay.  What caused your truck to hit the

481

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
MURRAY SCHEINMAN,          )
        Plaintiff,          )
        vs.                 ) No. 09 CV 5340
MARTIN'S BULK MILK SERVICE, )
INC., et al.,               )
        Defendants.         )
        This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Cheri LeBeau Dubina, Certified Shorthand Reporter, on February 21, 2012, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

        _____
                SAMUEL G. FRANKE

SUBSCRIBED AND SWORN TO
before me this _____ day
of _____ 2012.
        _____
        Notary Public

483

104 (Pages 480 to 483)

```
 1      STATE OF ILLINOIS  )
 2                         ) SS:
 3      COUNTY OF DUPAGE   )
 4          I, CHERI LEBEAU DUBINA, a Notary Public within
 5      and for the County of DuPage and State of Illinois,
 6      do hereby certify that heretofore, to-wit, on the
 7      21st day of February, 2012, personally appeared
 8      before me SAMUEL G. FRANKE, a witness in a certain
 9      cause now pending and undetermined in the United
10      States District Court for the Northern District of
11      Illinois, Eastern Division, wherein Murray
12      Scheinman is the Plaintiff and Martin's Bulk Milk
13      Service, Inc., et al. are the Defendants.
14          I further certify that the said SAMUEL G.
15      FRANKE was by me first duly sworn to testify the
16      truth, the whole truth, and nothing but the truth
17      in the cause aforesaid; that the testimony then
18      given by said witness was reported stenographically
19      by me in the presence of said witness and
20      afterwards reduced to writing, and the foregoing is
21      a true and complete transcript of the testimony so
22      given by said witness as aforesaid.
23          I further certify that the signature to the
24      foregoing deposition was reserved by counsel for
                                                      484
```

```
 1      the respective parties.
 2          I further certify that the taking of this
 3      deposition was pursuant to Notice, and that there
 4      were present at the taking of said deposition the
 5      appearances heretofore noted.
 6          I further certify that I am not counsel for nor
 7      in any way related to any of the parties to this
 8      suit, nor am I in any way interested in the outcome
 9      thereof.
10          IN TESTIMONY WHEREOF:  I do hereunto set my
11      hand and affix my notarial seal this 1st day of
12      March, 2012.
13
14
15
16
17
        _____
18      NOTARY PUBLIC, DUPAGE COUNTY, ILLINOIS
19
20
21
22
23
24
                                                      485
```

```
 1      MC CORKLE LITIGATION SERVICES
        200 North LaSalle Street
 2            Suite 2900
        Chicago, Illinois 60601-2956
 3
                    March 2, 2012
 4
        Mulherin, Rehfeldt & Varchetto, P.C.
 5      Mr. Joseph G. Skryd
        211 S. Wheaton Avenue, Suite 200
 6      Wheaton, Illinois 60187
        IN RE: Scheinman vs. Martin's Bulk Milk Service
 7      COURT NUMBER: 09 CV 5340
        DATE TAKEN:  February 21, 2012
 8      DEPONENT:  Samuel G. Franke
 9
        Dear Mr. Skryd:
10
        Enclosed is the deposition transcript for the
11      aforementioned deponent in the above-entitled
        cause.  Also enclosed are additional signature
12      pages, if applicable, and errata sheets.
        Per your agreement to secure signature, please
13      submit the transcript to the deponent for review
        and signature.  All changes or corrections must be
14      made on the errata sheets, not on the transcript
        itself.  All errata sheets should be signed and all
15      signature pages need to be signed and notarized.
16
        After the deponent has completed the above, please
17      return all signature pages and errata sheets to me
        at the above address, and I will handle
18      distribution to the respective parties.
        If you have any questions, please call me at
19      (312) 263-0052.
20
        Sincerely,
21
        Margaret Setina          Court Reporter:
22      Signature Department
        cc: Mr. Timothy R. Couture
23          Mr. Carlton D. Fisher
            Mr. Richard F. Burke, Jr.
24
                                                      486
```