STEPHEN M. MUNDY     June 12, 2012

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY J. )
SCHEINMAN, a Disabled Person. )
)
)
Plaintiffs, )
)
VS. ) No. 09-cv-5340
)
MARTIN'S BULK MILK SERVICE, )
INC., SAMUEL G. FRANKE, CSX )
INTERMODAL, INC., )
INTERNATIONAL PAPER COMPANY )
and OVERNITE EXPRESS, INC., )
)
Defendants. )

DEPOSITION
OF
STEPHEN M. MUNDY

JUNE 12, 2012

**Page 2**

STIPULATIONS

The deposition of Stephen M. Mundy is taken on this, the 12th day of June, 2012, on behalf of the Plaintiffs, pursuant to notice and consent of counsel, beginning at approximately 9:36 a.m. in the offices of International Paper, 6400 Poplar Avenue, Memphis, Tennessee 38197.

This deposition is taken pursuant to the terms and provisions of the Illinois Rules of Civil Procedure.

The signature of the witness is not waived.

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

RICHARD F. BURKE, JR., ESQ.
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street
Thirty-First Floor
Chicago, Illinois 60602
Phone: (312) 899-9090

ON BEHALF OF INTERNATIONAL PAPER COMPANY and UNIVERSAL AM CAN, LTD., S/B/A and SUCCESSOR TO OVERNITE EXPRESS, INC., and OX, LLC:

CARLTON D. FISHER, ESQ.
HINSHAW & CULBERTSON, LLP
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601
Phone: (312) 704-3000

ON BEHALF OF INTERNATIONAL PAPER:

GIGI MCGOWN, ESQ.
INTERNATIONAL PAPER
6400 Poplar Avenue
Tower 2, 4-025
Memphis, Tennessee 38197
Phone: (901) 419-3946

**Page 4**

ON BEHALF OF MARTIN'S BULK MILK SERVICE, INC. VIA TELECONFERENCE:

MATTHEW SCHRECK, ESQ.
JIM TEMPLE, ESQ.
MULHERIN, REHFELDT
& VARCHETTO, P.C.
211 South Wheaton Avenue
Suite 200
Wheaton, Illinois 60187
Phone: (630) 653-9300

ON BEHALF OF MARTIN'S BULK MILK SERVICE, INC., and SAMUEL G. FRANKE VIA TELECONFERENCE:

ROBERT GOLDEN, ESQ.
DOWD & DOWD, LTD
617 West Fulton
Chicago, Illinois 60661
Phone: (312) 704-4400

ON BEHALF OF BMW OF NORTH AMERICA, LLC, and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT VIA TELECONFERENCE:

BRIAN LANGS, ESQ.
JOHNSON & BELL, LTD.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
Phone: (312) 372-0770





EXHIBIT

H

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                         June 12, 2012

5

      E X A M I N A T I O N   I N D E X

STEPHEN M. MUNDY
    EXAMINATION BY MR. BURKE              6
    EXAMINATION BY MR. SCHRECK           95
    EXAMINATION BY MR. BURKE             98
    EXAMINATION BY MR. LANGS            113
    EXAMINATION BY MR. FISHER           114

7

1    time, that helps the court reporter if you let
2    me get out my whole question even if you
3    pretty much know where I am going.  And I will
4    try and let you finish your answer before I
5    start a new question.
6        That helps the court reporter as
7    well.  Okay?
8    A    Okay.
9    Q    Would you please state your name and
10   spell both your first and last name.
11   A    Stephen Michael Mundy.  S-T-E-P-H-E-N
12   M-U-N-D-Y.
13   Q    By whom are you employed, sir?
14   A    International Paper.
15   Q    How long have you worked for them?
16   A    Since October 1985.
17   Q    What is your current job title?
18   A    Manager of Motor Carrier Group.
19   Q    How long have you had that position?
20   A    Since December, 2006.
21   Q    What is your educational background?
22   Did you go to college?
23   A    I did.
24   Q    Where at?
25   A    University of South Alabama.

6

1            STEPHEN M. MUNDY,
2    having been first duly sworn, was examined
3    and testified as follows:
4            EXAMINATION
5    BY MR. BURKE:
6    Q    Let the record reflect this is the
7    deposition of Mr. Stephen Mundy taken pursuant
8    to notice and in accordance with the
9    applicable rules of the Northern District of
10   Illinois, United States District Court.
11       Mr. Mundy, again, my name is Rich
12   Burke.  I represent Mr. Scheinman.  I'm going
13   to ask you some questions about your work at
14   International Paper.
15       As I do so, if you want to look at
16   any documents that are either in front of you
17   or some others that come to mind that are not
18   currently in front of you, just say so.
19       If you would, verbalize your yes and
20   no answers.  Even though we can see you
21   nodding your head one way or the other, the
22   court reporter has to take down a verbal
23   answer.
24   A    Okay.
25   Q    If you and I do not talk at the same

8

1    Q    Did you get a degree?
2    A    I did.
3    Q    What kind?
4    A    Bachelors in business administration.
5    Q    What year?
6    A    1985.
7    Q    Any other schooling after that?
8    A    No.
9    Q    Have you gone to any courses or
10   partake in any programs that led to any type
11   of certificates or something not quite a
12   degree but some type of diploma or
13   certificate?
14   A    No.
15   Q    Do you have a commercial driver's
16   license?
17   A    Yes.
18   Q    Okay.  And --
19   A    I'm sorry.  Explain commercial
20   driver's licenses.
21   Q    A CDL.  Are you able to drive a
22   truck?
23   A    No.  I'm sorry.
24   Q    Do you have a license to drive a
25   tractor trailer truck?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

9

1   A    No.
2   Q    Do you have a license that permits
3   you to drive some type of truck?
4   A    No.
5   Q    So you were referring just to your
6   regular driver's license?
7   A    I was.
8   Q    Okay.  No problem.
9        And I take it you have not ever
10  worked as a truck driver then.
11  A    That is correct.
12  Q    Just give me a little idea of your
13  background after you got out of college.
14       Did you come to work for
15  International Paper at that time?
16  A    I did.
17  Q    So your entire work life has been
18  employed by International Paper?
19  A    That's correct.
20  Q    In December 2006, you became manager
21  of Motor Carrier Group.  Maybe you could back
22  me up prior to that.
23       What was your position?
24  A    Start from when I hired with
25  International Paper?

11

1   refer to what generally?
2   A    Products used in the paper making
3   process.
4   Q    Chemicals would be?
5   A    Chemicals used in the paper making
6   process.
7   Q    International Paper.  How would you
8   describe their business?  What do they do?
9   A    We are a pulp and paper company.
10  Q    Do you manufacture paper?
11  A    We do.
12  Q    After that corporate purchasing
13  position here, what did you do next?
14  A    I went to work for a subsidiary at
15  International Paper owned called Masonite
16  Corporation in Chicago, Illinois.
17       MR. SCHRECK:  Could you say that
18  one more time.  I couldn't hear you.
19  BY MR. BURKE:
20  Q    And spell Masonite too, please.
21  A    I went to work for Masonite
22  Corporation, M-A-S-O-N-I-T-E.  They were a
23  company that International Paper owned, and
24  they were headquartered out of Chicago,
25  Illinois.

10

1   Q    Well, I was going to go backwards.
2   But, yeah.  It is probably easier to go when
3   you got hired.  Just walk me through some of
4   your jobs, if you would.
5   A    I started with International Paper at
6   the Vicksburg, Mississippi paper mill in the
7   purchasing department.  I later transferred to
8   the Mobile, Alabama mill in the purchasing
9   department.
10       I then transferred to corporate
11  purchasing in Mobile, Alabama and then
12  transferred to corporate purchasing in
13  Memphis, Tennessee.
14  Q    When you first came to Memphis, that
15  was about what year?
16  A    I don't remember exactly.
17  Q    '80s?  '90s?
18  A    '90s.  Early '90s.
19  Q    I think you said you worked in
20  corporate purchasing.
21  A    Correct.
22  Q    Generally, what did you do in that
23  position?
24  A    Buying chemicals and raw materials.
25  Q    Raw materials.  Raw materials would

12

1   Q    How long were you in Chicago?
2   A    Approximately three years.
3   Q    What did you do in that position
4   generally?
5   A    Purchasing related activities.
6   Q    When you left Chicago, where did you
7   go?
8   A    Transferred back to Memphis,
9   Tennessee.
10  Q    That would be about what year?
11  A    2001.
12  Q    Into what job?
13  A    Raw material purchasing.
14  Q    How long did you hold that position?
15  A    I held that position for
16  approximately one year.
17  Q    And then what, sir?
18  A    I moved into our transportation
19  department as a project manager.
20  Q    What did you do in that position?
21  A    Transportation related activities.
22  Q    That would encompass what?
23  A    It would encompass -- I ran a
24  national truckload sourcing event for the
25  transportation department.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                           June 12, 2012

13

1  Q       That involved doing what?
2  A       It involved getting bids for the IT
3  facilities for their outbound transportation
4  needs.
5  Q       Meaning getting bids from carrier --
6  or strike that.
7          Did that include getting bids from
8  carriers, motor carriers?
9  A       Yes.
10 Q       To transport or make pick-ups and
11 deliveries of International Paper's products?
12 A       Yes.
13 Q       For about how long did you do that?
14 A       For approximately two years.
15 Q       Then where did you go?
16 A       Into our supply chain organization as
17 a project manager.
18 Q       How does supply chain -- well, strike
19 that.
20         What does the supply chain
21 organization do?
22 A       I'm not sure. Could you ask the
23 question again.
24 Q       Sure. As opposed to -- I mean,
25 transportation -- you explained you

14

1  essentially were lining up motor carriers.
2          What aspect of International Paper's
3  business is the supply chain organization
4  involved in?
5  A       In the specific job that I was in in
6  supply chain, we were in the process of moving
7  to an SAP-based operating model. I played a
8  role in the purchasing activities as it
9  related to moving to SAP.
10 Q       That stands for what?
11 A       I do not know.
12 Q       Essentially, how do you describe that
13 model? I mean, what is it used for?
14 A       It has centralized some of the
15 procurement and operational and production
16 activities of International Paper.
17 Q       Did that involve the procurement of
18 transportation services?
19 A       It did not specifically involve that,
20 no.
21 Q       Then you did that for about how long?
22 A       Approximately two years.
23 Q       Then your next position was what?
24 A       The manager of the Motor Carrier
25 Group.

15

1  Q       You began that, I think you told me,
2  in 2006.
3  A       December of '06. Yes.
4  Q       Your office at that time was here in
5  Memphis?
6  A       Yes.
7  Q       What does the Motor Carrier Group do
8  for International Paper?
9  A       We are responsible for doing the bids
10 or sourcing events for the outbound
11 transportation of our facility's finished
12 products.
13 Q       Did that include -- well, strike
14 that.
15         When you used the term "outbound
16 transportation of your products," what does
17 that encompass?
18 A       Finished products that are shipped
19 out of the facility going to a customer or --
20 to customers.
21 Q       That would include paper products
22 like we are involved in in this case that were
23 onboard the truck that was involved in this
24 collision. Correct?
25 A       Correct.

16

1  Q       In that position as manager of the
2  Motor Carrier Group, did you have involvement
3  in entering into contracts with any motor
4  carriers for transportation services of
5  International Paper's products?
6  A       Yes.
7  Q       Have you reviewed the October 20,
8  2007 contract that International Paper entered
9  into with Overnite Express?
10 A       Yes.
11 Q       Were you involved in that contract in
12 any manner?
13 A       Yes.
14 Q       In what manner?
15 A       It was a result of the sourcing
16 events that my team ran in 2007.
17 Q       You know, when you use that word
18 "sourcing," what do you mean by that in your
19 business?
20 A       A bid.
21 Q       A bid. Okay.
22         Would you make a bid for a specific
23 dollar amount to the carrier, or would you ask
24 the carrier what they are willing to accept in
25 payment for transportation services?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                         June 12, 2012

17

1    A    Neither of those.
2    Q    What would you do then?
3    A    We would aggregate all of the
4    projected outbound volume from our facilities,
5    submit that to carriers who would, in turn,
6    submit back to International Paper rights for
7    lanes they were interested in and the capacity
8    volume that they were interested in handling.
9    Q    Lanes refers, in your business, to a
10   geographic area usually.  Is that correct?
11   A    That's correct.
12   Q    The lane that was involved in this
13   case were products heading to Minnesota.  Does
14   that lane have a particular name?
15   A    That lane does not have a particular
16   name.
17   Q    How would you refer to it?
18   A    I'm sorry.  Could you ask that again.
19   Q    Sure.  If you wanted to refer to that
20   route that these paper products were supposed
21   to be delivered to in Minnesota, would you
22   utilize a particular term or expression to
23   characterize that route or that lane?
24   A    We would.  It would -- at that time,
25   it was to a geographic region.  I do not

18

1    remember if Minnesota -- which specific region
2    they were in at that time.
3    Q    Then you remained as the -- you are
4    still the manager of Motor Carrier Group.
5    Correct?
6    A    Correct.
7    Q    In 2007 and 2008, did International
8    Paper make any of its own deliveries of paper
9    products to customers?
10   A    What do you mean by "own deliveries"?
11   Q    Well, did International Paper have
12   their own tractors and trailers and drivers
13   for the purpose of delivering their paper
14   products to customers?
15   A    I'm not sure.
16   Q    Whether or not they did,
17   International Paper utilized the
18   transportation services of other motor
19   carriers to make deliveries of their -- and
20   pick-ups of their paper products.  Correct?
21   In 2007 and 2008?
22   A    Yes.
23   Q    Have you ever been to the Hammond
24   warehouse?
25   A    No, I have not.

19

1    Q    Am I correct that International Paper
2    had a number of regional distribution centers
3    around the country, to which they would send
4    finished paper products for further delivery
5    to customers?
6    A    Yes.
7    Q    Was the Hammond warehouse one of
8    International Paper's regional distribution
9    centers?
10   A    Yes.
11   Q    How would paper products get from an
12   International Paper manufacturing plant to the
13   Hammond warehouse?
14   A    Either by truck or by rail.
15   Q    If it went by truck, would that be
16   with a carrier hired by International Paper;
17   or would it be through International Paper's
18   own truck drivers?
19   A    It would be by carriers hired by
20   International Paper.
21   Q    You mentioned you were involved in a
22   sourcing event that culminated in a contract
23   in October of 2007 with Overnite Express.
24   Correct?
25   A    Correct.

20

1    Q    What was the nature of your
2    involvement in that contract?
3    A    I don't specifically recall any --
4    what my involvement was.
5    Q    How about what was -- when you refer
6    to a "sourcing event," what were you doing as
7    part of your job in that sourcing event that
8    led to this contract?
9    A    In that sourcing event, I was the
10   manager of the group.  I had a project manager
11   that was running the bid sourcing event for
12   me.
13   Q    Who was that project manager?
14   A    Mark Fraprie.
15   Q    Could you spell his last name.
16   A    F-R-A-P-R-I-E.
17   Q    Does Mark still work for
18   International Paper?
19   A    No, he does not.
20   Q    Where does he work today?
21   A    I do not know.
22   Q    When did he last work for
23   International Paper?
24   A    I'm not sure.
25   Q    The contract that ultimately got



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                          June 12, 2012

21

1    entered into -- was that one which you
2    approved the terms of?
3    A    I don't recall.
4    Q    You ultimately -- or strike that.
5         Did you work with Mr. Crawford,
6    William Crawford?
7    A    I did work for Bill Crawford. Yes.
8    Q    Was he your supervisor?
9    A    Yes.
10   Q    That --
11   A    I'm sorry. Can I back up?
12        At the beginning, when they took over
13   the position, he was not my direct supervisor.
14   Subsequently, at some point, he did become my
15   direct supervisor.
16   Q    The contract that got approved or --
17   or strike that.
18        The contract that got entered into
19   with Overnite Express in October 2007 -- who
20   approved the terms of that contract for
21   International Paper?
22   A    Bill Crawford executed the contract
23   for International Paper.
24   Q    Was a contract entered into with your
25   agreement and consent as the manager of the

22

1    Motor Carrier Group?
2    A    Yes.
3    Q    Was the purpose of that October 2007
4    contract with Overnite Express to provide --
5    well, strike that.
6         Was the purpose of the October 2007
7    contract that International Paper entered into
8    with Overnite Express to have Overnite Express
9    provide transportation services for the
10   pick-up and delivery of International Paper's
11   finished products?
12   A    I'm sorry. I didn't understand the
13   question.
14   Q    Was the purpose of the October 2007
15   contract that got entered into with Overnite
16   Express to have Overnite Express provide
17   transportation services to International Paper
18   for pick-up and delivery of International
19   Paper's products?
20   A    Yes.
21   Q    International Paper sold paper to
22   customers at a price that included delivery of
23   the paper products to them. Correct?
24   A    Yes.
25   Q    The delivery of International Paper's

23

1    finished product to its customers was
2    certainly an essential component of
3    International Paper's business. Correct?
4    A    I would think so.
5    Q    Let me ask you to look at the
6    contract that we have already been talking
7    about. Let me ask you to look at Exhibit
8    Number 2, probably starting at about Page 36
9    at the moment. Look at the preceding page,
10   Page 35. International Paper Bates Number 35
11   of Exhibit 2.
12        That is a letter from yourself.
13   Correct?
14        MR. SCHRECK: Rich, which page
15   was that?
16        MR. BURKE: Thirty-five of
17   Exhibit 2, of International Paper Bates
18   stamped.
19        MR. SCHRECK: Thank you.
20        THE WITNESS: I'm sorry. Your
21   question again?
22   BY MR. BURKE:
23   Q    That document on Page 35 is a letter
24   bearing your stamped signature. Correct?
25   A    Correct.

24

1    Q    It is on International Paper
2    letterhead dated October 24, 2007?
3    A    Correct.
4    Q    Sent to -- or directed to Overnite
5    Express in Saint Paul, Minnesota. Correct?
6    A    Correct.
7    Q    It is referring to Motor Procurement
8    Contract Number OXEN093009. Correct?
9    A    Correct.
10   Q    Is Oxen a designation for Overnite
11   Express?
12   A    Yes.
13   Q    Is the contract number the
14   identifying number for the contract that
15   International Paper entered into in October of
16   2007 with Overnite Express?
17   A    Yes.
18   Q    This letter is directed to Sandy
19   Herman. Do you know her?
20   A    I do not.
21   Q    Did you have any contact with her?
22   A    Not that I recall.
23   Q    In your letter, you essentially are
24   saying you are enclosing three copies of the
25   truckload contract previously agreed to.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

25

1    Correct?
2    A    Yes. That is what it says.
3    Q    And attached to the contract were a
4    fuel index and an electronic business
5    requirements page as well. Correct?
6    A    That is what the letter indicates.
7    Yes.
8    Q    Basically, you were sending this
9    letter to Overnite Express to have them sign.
10   Is that right?
11   A    That is what the letter indicates.
12   Yes.
13   Q    From the content of your letter, it
14   indicates that International Paper has already
15   signed this contract. Is that right?
16   A    No. I do not see that.
17   Q    I'm sorry. You are correct.
18   You are asking them to sign in the
19   areas indicated. Correct?
20   A    Correct.
21   Q    From the content of your letter, this
22   contract had already orally been agreed to.
23   Right?
24   A    I don't recall an oral confirmation
25   of this.

26

1    Q    Well, the first line of your letter
2    says, enclosed are three copies of the
3    truckload contract that we have previously
4    agreed to.
5    And my question is simply: Had you
6    previously agreed to the contents of this
7    contract that you were enclosing?
8    A    That is what the letter indicates.
9    Q    Then you sent this in your capacity
10   as manager of Motor Carrier Transportation
11   Sourcing. Correct?
12   A    Correct.
13   Q    You have used the term Motor Carrier
14   Group.
15   Was there any technical difference
16   back in 2007 and 2008 between Motor Carrier
17   Group and Motor Carrier Transportation
18   Sourcing?
19   A    No. There is not.
20   Q    Look at Page 36, sir, that you also
21   have in front of you. If you look on the
22   Bates stamped pages, could you tell me what is
23   the last page of the contract plus its
24   attachments.
25   A    I am sorry. If I look on the what?

27

1    Q    Sure. In the lower right corner is
2    what we call Bates stamped numbers. It says,
3    IP, a bunch of zeros, and then starts with 36.
4    You have the page there in front of you.
5    To what number does the contract
6    extend? I think it goes into somewhere around
7    64, 65, maybe 67. Could you look, sir, and
8    tell me.
9    A    It looks to extend to 67.
10   Q    Page 67 -- that is confirmation that
11   Overnite Express had workers' comp insurance
12   coverage. Is that right?
13   A    Yes.
14   Q    Had you reviewed this 2007 contract
15   prior to the deposition today?
16   A    Yes.
17   Q    Is what is contained in Exhibit 2
18   Bates Stamped Pages 36 through 67 a true and
19   accurate copy of the contract that
20   International Paper entered into in October of
21   2007 with Overnite Express?
22   A    Yes.
23   Q    That contract was made in the normal
24   course of International Paper's business.
25   Correct?

28

1    A    Correct.
2    Q    And the terms were true and accurate
3    when they were entered into. Correct?
4    A    What do you mean by "true and
5    accurate"?
6    Q    I mean, the content of what you said
7    you would do and wanted done and what you --
8    the contract says that Overnite Express was
9    going to do for International Paper was
10   accurately set forth in the contract. Is that
11   right?
12   A    Yes.
13   Q    It was part of International Paper's
14   normal business to enter into this type of
15   contract, was it not?
16   A    Yes.
17   MR. BURKE: Do you have the
18   original, Carl, that we talked about?
19   MR. FISHER: No. I have this
20   copy of the original. I don't know that
21   I have the original. We could continue
22   looking to find the so-called original.
23   BY MR. BURKE:
24   Q    Mr. Mundy, do you know where the
25   original of this contract is?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                          June 12, 2012

29

1    A    I do not.
2    Q    What would be the department that
3    would be your best estimate as to where it
4    might be?
5    A    My best estimate would be it would be
6    within my department.
7    Q    Is there a particular type of file or
8    location in your department that would contain
9    the original?
10   A    We have an area where we keep our
11   contracts filed.
12   Q    What do you call that area?  Anything
13   in particular?
14   A    Nothing in particular.
15   Q    If you had to go find it, how would
16   you look it up?  Under Overnite Express or
17   something else?
18   A    I would look it up under Overnite
19   Express for the 2007 contract term.
20   Q    Look at Page 37.  Well, actually,
21   before you do that, in addition to the Bates
22   stamped numbers, those IP black bold numbers,
23   can you see there is another set of numbers
24   that starts on page -- Bates Stamped Page 36?
25   There is another set of numbers starting with

30

1    1 of 24.  Is that right?
2    A    Yes.
3    Q    Are those the numbers that were
4    placed on the contract when it was prepared?
5    A    It appears so.  Yes.
6    Q    It goes up to 24 of 24 with that last
7    page ending on Bates Stamped, I think, IP65.
8    Correct?
9    A    Correct.
10   Q    By the way, who actually typed up
11   this contract?
12   A    (No audible response.)
13   Q    Let me make it easier.  Did
14   International Paper prepare it, or did
15   Overnite Express prepare it?
16   A    International Paper prepared it.
17   Q    Somebody within your group would have
18   prepared it.  Is that correct?
19   A    Yes.
20   Q    Look at Bates Stamped Page 37, which
21   is also noted as 2 of 24.
22       Is that page blank in the copy you
23   have before you?
24   A    Other than the 2 of 24 and the Bates
25   Stamped Number 37 and a line across the top,

31

1    yes.
2    Q    Is there some content on Page 2 of
3    the original of this contract?
4    A    I don't know.
5    Q    Do you know why this page is blank?
6    A    No, I don't.
7    Q    Is there something, from your
8    experience in doing these contracts, that
9    would normally appear on the second page of
10   the contract?
11   A    I am sorry.  Could you say that
12   again.
13   Q    Sure.  From your experience in
14   entering into a lot of these type of
15   contracts, after the table of contents page,
16   which is Page 1, is there a section that
17   normally International Paper would include on
18   the second page of such a contract?
19   A    No.
20       MR. FISHER:  Want my latest
21   theory?  We came up with another theory.
22       MR. BURKE:  All right.  Give us
23   some guess, conjecture, and speculation.
24   Go ahead.  From you.  From you, Carl.
25   Not from Mr. Mundy.

32

1        MR. FISHER:  That the standard
2    format for the first page has this line
3    in.  And when it got down to the bottom,
4    whatever -- whoever prepared it, the
5    word processing function advanced to a
6    second page with a standard format of a
7    line.  But there was no text.  That is
8    our latest theory.
9        MR. BURKE:  Of course, if you
10   look at the bottom of Page 1, there is
11   also what appears to be a very faint
12   line down on the bottom, very bottom of
13   Page 1 of 2 -- or I should say Page 1
14   also, which kind of serves the same
15   purpose that you are talking about.
16       MR. FISHER:  All right.  We have
17   two competing lawyers' guesses and
18   conjectures.
19   BY MR. BURKE:
20   Q    How about you?  Mr. Mundy, you got
21   any -- even though we don't engage in
22   speculation, do you have any other thoughts or
23   hypotheses on why that page is blank or if
24   there is something that normally should be
25   there?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                        June 12, 2012

33

1    A    I do not.
2    Q    Now, am I correct that you
3    subsequently -- or strike that.
4         Am I correct that International Paper
5    subsequently entered into Amendment Number One
6    of this contract?
7    A    We did enter into an amendment. I'm
8    not sure of the numbering.
9    Q    For what purpose was an amendment
10   entered into?
11   A    For this particular contract?
12   Q    Correct.
13   A    We were notified that Overnite
14   Express was selling or had been bought -- I
15   forget specifically -- by another company.
16   Q    Was that other company Universal
17   Am-Can?
18   A    Yes.
19   Q    Were you familiar with Universal
20   Am-Can when you heard they had purchased
21   Overnite Express?
22   A    No.
23   Q    Had you previously had any contracts
24   with Universal Am-Can?
25   A    Not that I recall.

34

1    Q    Prior to this October 2007 contract
2    with Overnite Express, you had entered into
3    prior contracts with Overnite Express.
4    Correct?
5    A    I don't recall.
6    Q    Have you reviewed any prior contracts
7    as part of your preparation for this
8    deposition?
9    A    Yes.
10   Q    There were some prior contracts in
11   prior years. Correct?
12   A    That is correct. I need to back up.
13   I did review one yesterday that was prior to
14   this one with Overnite. So, yes, we did.
15   Q    What year was that contract? Was it
16   a 2005?
17   A    I don't remember.
18   Q    Do you know for about how long
19   International Paper had been doing business
20   with Overnite Express as of October of 2007
21   when you entered into that contract?
22   A    I'm sorry. Could you repeat the
23   question.
24   Q    Yeah. Do you know when Overnite
25   Express and International Paper -- strike

35

1    that.
2    Q    Do you know when International Paper
3    first started using Overnite Express to
4    provide transportation services to them?
5    A    No, I don't.
6    Q    It is fair to say that it certainly
7    was some number of years prior to October 7th
8    because you had at least one prior contract
9    with them. Would that be correct?
10   A    I don't know what "fair to say"
11   means.
12   Q    I just mean accurate.
13   A    We did have a prior contract with
14   them.
15   Q    Take a look at page -- actually, I am
16   switching exhibits on you, sir. Look at
17   Exhibit Number 1 and look at page -- why don't
18   you look at Page 32 first.
19        Do you know Tom Quinlan from
20   International Paper? He is in the legal
21   department.
22   A    I don't know him personally.
23   Q    Take a moment. Read that letter. It
24   is a letter from Thomas Quinlan to Carl
25   Fisher, one of your lawyers here. And just

36

1    take a minute to read it. Tell me when you
2    are done reading it.
3    A    (Witness complies.) Okay.
4    Q    Essentially, Mr. Quinlan was sending
5    Carl Fisher a copy of the October 1, 2007
6    contract between International Paper and
7    Overnite Express, along with Amendment Number
8    One to the contract that was dated June 9th
9    '08. Correct?
10   A    That is what this letter says. Yeah.
11   Q    Then in the second paragraph,
12   Mr. Quinlan says that you apparently told him
13   that you recall that upon receiving
14   correspondence from Universal Am-Can Amendment
15   Number One to the contract was drafted.
16        Do you have that same recollection?
17   A    I don't recall this correspondence
18   with Thomas Quinlan.
19   Q    Obviously, you were not a part of
20   this, but is it correct that you recall that
21   International -- or strike that. That
22   Overnite Express got purchased by Universal
23   Am-Can?
24   A    Yes.
25   Q    And subsequent to that purchase, an



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY        June 12, 2012

**37**

1 amendment was entered into that amended the
2 terms of the contract with Overnite Express.
3 Is that correct?
4     A     Yes.
5     Q     Do you know Gina Hubbs at Overnite
6 Express -- or at Universal Am-Can?
7     A     No.
8     Q     Do you know Mark Limback, the
9 president?
10     A     No.
11     Q     Take a look at Exhibit 1 that you are
12 currently in, I think, and look at Page 67.
13 Okay. And that would be Bates Stamped UACL67.
14     A     Okay.
15     Q     And that is a letter dated May 21,
16 2008. Correct?
17     A     Correct.
18     Q     Take a minute. It is from
19 International -- or it is from Mark Limback on
20 his letterhead at Universal Am-Can, and it is
21 signed by Gina Hubbs down on the bottom lower
22 left at Universal Am-Can. Is that right?
23     A     Yes.
24     Q     Take a minute to read that, sir.
25 Tell me when you are done.

**38**

1     A     (Witness complies.) Okay.
2     Q     Am I correct that that letter was
3 informing you -- strike that.
4     Am I correct this letter was
5 informing International Paper that Overnite
6 Express will be operating under Universal
7 Am-Can Limited's insurance and authority as of
8 June 13, 2008 and that all bills of lading
9 should reflect Universal Am-Can Limited as the
10 carrier?
11     A     That is what it says.
12     Q     And then it goes on to say that all
13 invoices for freight moved will come from
14 Universal Am-Can and told you to send your
15 remittance to an address in Cincinnati.
16 Right?
17     A     That is what it says.
18     Q     And then it says, please consider
19 this letter as an assignment of the current
20 contract you have in place for Overnite
21 Express, and Universal Am-Can agrees to accept
22 the rates and fuel surcharges established
23 between your company and Overnite. Correct?
24     A     That is what it says.
25     Q     Then it asks International Paper in

**39**

1 the last paragraph to sign as International
2 Paper's acceptance regarding the contract and
3 rate assignment. Right?
4     A     That is what it says.
5     Q     Then it has a line on the right with
6 your name Stephen Mundy for signature.
7 Correct?
8     A     It has my typed name. Yes.
9     Q     Yes. Your typed name. Not your
10 signature.
11     A     Correct.
12     Q     Did you ever sign this? This letter.
13     A     It does not appear that I did.
14     Q     Do you have any recollection of
15 signing the letter?
16     A     No.
17     Q     Now, go back to Mr. Quinland's letter
18 on Page 32. Do you have that there, sir?
19     A     Yes.
20     Q     In Paragraph Two, Mr. Quinlan appears
21 to be referring to the May 21, 2008 letter
22 that we were just looking at. Is that right?
23     A     This letter does reference a May 21,
24 2008 letter. Yes.
25     Q     And then, as Mr. Quinlan goes on to

**40**

1 say, Mr. Mundy recalls that upon receipt of
2 the correspondence from Universal Am-Can,
3 Amendment Number One to the contract was
4 drafted; and thus no signed version exists.
5 Is that correct?
6     A     That is what it says.
7     Q     From just a procedural standpoint,
8 does it appear that you did not sign this
9 May 21, 2008 letter and send it back to
10 Universal Am-Can but instead International
11 Paper prepared Amendment Number One?
12     A     That is correct.
13     Q     Why don't we look at Amendment Number
14 One.
15     MR. FISHER: I got it handy
16 here.
17     MR. BURKE: Do you want to look
18 at the IP copy, or I could give you the
19 -- what is the IP number?
20     MR. FISHER: Six.
21     MR. BURKE: Right. Okay.
22 BY MR. BURKE:
23     Q     Do you have the International Paper
24 copy in front of you --
25     A     I do.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

41

1  Q    -- or a copy of Amendment Number One?
2        Look at Bates Stamped Page 6 then.
3  And this same amendment is found at Page 65 of
4  Exhibit 1, which are the Universal Am-Can
5  Bates Stamped documents.
6        You have read this amendment, have
7  you not, sir?
8  A    Yes.
9  Q    And it bears your signature on the
10 bottom. Is that right?
11 A    Yes.
12 Q    You signed it June 12, 2008?
13 A    Yes.
14 Q    In your capacity as manager of
15 Sourcing Motor Procurement. Correct?
16 A    Yes.
17 Q    The copy you have before you is also
18 signed by Mark Limback on June 10, 2008 in his
19 capacity as president of Universal Am-Can?
20 A    It appears so. Yes.
21 Q    Was the purpose of this amendment to
22 render the terms of the October 2007 contract
23 applicable to Universal Am-Can as of the date
24 that Universal's purchase of Overnite Express
25 became effective?

42

1  A    I'm sorry. Could you repeat that.
2  Q    Was the purpose of this amendment to
3  render the terms of the October 2007 contract
4  International Paper had with Overnite Express
5  applicable to Universal Am-Can once Universal
6  had purchased Overnite Express?
7  A    Yes.
8  Q    In the very first paragraph -- by the
9  way, did International Paper prepare this
10 Amendment Number One as opposed to Universal
11 Am-Can?
12 A    Yes.
13 Q    The contents that are in this
14 Amendment Number One -- who actually prepared
15 them for International Paper?
16 A    I don't recall.
17 Q    Were you involved in that process?
18 A    I don't recall.
19 Q    It would be correct that you reviewed
20 and approved the contents prior to signing it
21 on behalf of International Paper. Correct?
22 A    Yes.
23 Q    Look at the very first top line. It
24 says, this Amendment Number One is made and
25 entered into this 9th day of June, 2008, by

43

1  and between International Paper Company and
2  Overnite Express as carrier. Correct?
3  A    Yes. That is what it says.
4  Q    This contract was actually being
5  entered into by Universal Am-Can as opposed to
6  Overnite Express. Is that right?
7  A    Could you repeat that.
8  Q    Sure. I mean, the contract is signed
9  by Universal Am-Can, president Mark Limback.
10       And my question is simply: Is the
11 contract being entered into between
12 International Paper and Universal or
13 International Paper and Overnite Express?
14 A    This amendment was signed by
15 Universal Am-Can and International Paper.
16 Q    In the opening paragraph where it
17 says, the contract is being entered into
18 between International Paper and Overnite
19 Express -- is that an error? Or was that
20 intentionally worded that way?
21 A    I'm sorry. Could you repeat that.
22 Q    Sure. In the very first paragraph,
23 do you see how it says that the -- that this
24 amendment is being entered into between
25 International Paper and Overnite Express?

44

1        And my question is: Did you intend
2  to say Overnite Express there, or was that an
3  error?
4        MR. FISHER: Objection to form.
5  You can go ahead and answer.
6        THE WITNESS: I don't recall
7  what the intent was at that time.
8  BY MR. BURKE:
9  Q    With respect to the next paragraph
10 that starts with "whereas the parties entered
11 into Contract Number Oxen 093009 dated
12 October 1, 2007 and whereas the parties
13 desire to amend the contract" -- that was what
14 International Paper wanted to do. Is that
15 correct? To amend the terms of the 2007
16 contract to make them applicable to Universal?
17 A    Yes. That is what that says.
18 Q    And then it goes on to say, now,
19 therefore, the parties do agree as follows:
20 Effective June 13, 2008, carrier will be
21 operating under the name of Universal Am-Can
22 Limited and SCAC -- that's S-C-A-C -- UACL.
23 Correct?
24 A    Yes. That is what it says.
25 Q    That SCAC is a code or designation



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                          June 12, 2012

45

1   for UACL as opposed to an Oxen designation for
2   Overnite Express. Correct?
3   A     Correct.
4   Q     This amendment goes on to say
5   Universal Am-Can Limited agrees to honor the
6   rates and fuel surcharge established between
7   Company and Overnite. Correct?
8   A     Yes. That is what it says.
9   Q     "Company" was International Paper.
10  Right?
11  A     Correct.
12  Q     The next paragraph states that this
13  amendment in every respect meets the
14  requirements set forth in the contract
15  regarding change, modification, acceptance,
16  incorporation, and the like. Correct?
17  A     That is what it says.
18  Q     And the next paragraph states that
19  all other terms of the contract shall remain
20  and are in full force and effect. Correct?
21  A     That is what it says.
22  Q     The contract being referred to there
23  is the October 2007 contract that
24  International Paper had with Overnite Express.
25  Correct?

46

1   A     Correct.
2   Q     And then it is, as we mentioned
3   earlier, signed by you for International Paper
4   and Mr. Limback for Universal Am-Can.
5   Correct?
6   A     Yes.
7   Q     After this amendment was entered
8   into, is it correct that the obligations and
9   responsibilities of Overnite Express as a
10  carrier under the October 2007 contract were
11  now the obligations and responsibilities of
12  Universal as the carrier?
13  A     Effective June 13, 2008. That is
14  correct.
15  Q     About a month later on July -- not
16  even a month.
17        A few weeks later when this incident
18  occurred involving injuries to Mr. Scheinman
19  on July 3, 2008, am I correct that
20  International Paper believed they had a
21  contract with Universal Am-Can as the carrier
22  for transportation services?
23  A     When you say International Paper, I
24  believe I can speak to what I believe.
25  Q     Okay. What --

47

1   A     Effective June 13, 2008, Universal
2   Am-Can was the carrier.
3   Q     Universal Am-Can, as the carrier, had
4   to comply with the terms and provisions of
5   that October 7th contract that had been
6   entered into between International Paper and
7   Overnite Express. Correct?
8   A     That is what this amendment says.
9   Yes.
10  Q     Between the time this Amendment
11  Number One was signed by you on June 12, 2008
12  and July 3rd of 2008, just a few weeks later,
13  did International Paper enter into any other
14  contract with Universal Am-Can concerning
15  transportation services?
16  A     Not that I'm aware of.
17  Q     Then do you want to turn to Page 38
18  of Exhibit 2, the International Paper Bates
19  stamped number, Mr. Mundy.
20  A     Okay.
21  Q     That is the third -- I am sorry.
22  That is Page 3 of 24 of the contract.
23  Correct?
24  A     Correct.
25  Q     The opening paragraph of that refers

48

1   to a contract that is effective October 1,
2   2007 between International Paper, as shipper,
3   and Overnite Express, as carrier. Correct?
4   A     Yes. That is what it says.
5   Q     Now, you have reviewed this contract
6   in anticipation of your deposition today.
7   Correct?
8   A     Yes.
9   Q     Throughout the contract, there are
10  many places where it says -- refers to
11  carrier. Correct?
12  A     Yes.
13  Q     As of June 13, 2008, the reference to
14  carrier meant Universal Am-Can. Correct?
15  A     Yes.
16  Q     In that second paragraph, if you look
17  at that, sir, it says that the carrier is
18  engaged in the business of transporting
19  property by motor vehicle as a contract
20  carrier in intrastate or foreign commerce
21  within North America. Correct?
22  A     That is what it says.
23  Q     Then that next paragraph says,
24  shipper, which would be you, International
25  Paper. Right?


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

49

```
 1    A    Correct.
 2    Q    Desires "carrier," which would be
 3  Universal, to provide certain transportation
 4  related services pursuant to the rates and
 5  conditions in this agreement.  Correct?
 6    A    At the time it was signed, it was for
 7  Overnite.
 8    Q    Right.  Okay.  Then as of the time --
 9  as of June 13, after the Amendment Number One
10  was signed, then International Paper, as
11  shipper, desired Universal, as carrier, to
12  provide transportation related services.
13  Correct?
14    A    As of the time of the amendment.
15  Yes.
16    Q    That amendment was effective as of
17  June 13, 2008.  Right?
18    A    I believe that is correct.
19    Q    Now, was this contract that you
20  earlier told me runs from, I think, Page 36 up
21  to about Page 67 -- was that contract
22  physically prepared by International Paper?
23    A    Yes.
24    Q    And the terms and conditions set
25  forth in the contract were also prepared by
```

51

```
 1  and weekly commitment schedule.
 2    Q    Essentially, what requirements are
 3  set forth in that motor carrier rate and
 4  weekly commitment schedule?
 5    A    In this specific one for this
 6  contract?  Could you rephrase the question.
 7    Q    Sure.
 8    A    Or re-ask the question.
 9    Q    In general terms, what information is
10  set forth in the motor carrier rate and weekly
11  commitment schedule that would be attached as
12  Exhibit C?
13    A    It shows the rates that the carrier
14  submitted and the weekly commitments that they
15  were awarded through the sourcing events.
16    Q    Those weekly commitments refer to
17  pick-ups and deliveries through a certain lane
18  of traffic for International Paper.  Correct?
19    A    No.  Not to a specific lane.  It
20  refers to weekly shipments to a geographic
21  region.
22    Q    Those weekly commitments had been
23  awarded by International Paper originally to
24  Overnite Express.  Correct?
25    A    Correct.
```

50

```
 1  International Paper.  Is that right?
 2    A    That's correct.
 3    Q    Then there is a Section Three on Page
 4  38 that is entitled Carrier's Obligation.
 5  Correct?
 6    A    Yes.
 7    Q    Does this section set forth
 8  requirements and obligations that
 9  International Paper expected Universal to
10  fulfill?
11    A    It sets forth the obligations of the
12  carrier.  Yes.
13    Q    And those obligations are set forth
14  in paragraphs designated by letters A through
15  K.  Is that right?
16    A    That is correct.
17    Q    Section A refers to -- is entitled
18  Services.  Is that right?
19    A    Yes, it is.
20    Q    International Paper expected
21  Universal to provide services set forth in
22  Exhibit C.  Is that correct?
23    A    That is what it says.
24    Q    What would Exhibit C be?
25    A    Exhibit C is the motor carrier rate
```

52

```
 1    Q    Those commitments then now were the
 2  obligation of Universal, as you have
 3  indicated.  Correct?
 4    A    Correct.
 5    Q    By the way, is Exhibit C actually
 6  attached?
 7    A    I don't know.
 8    Q    Look at Page 53.
 9    A    Okay.
10    Q    The content of Exhibit 3 is not
11  actually included there, is it?
12    A    I'm sorry.  Exhibit --
13    Q    I'm sorry.  I made a mistake.
14    The content of Exhibit C is not
15  included there.  Correct?
16    A    Correct.
17    Q    And why not?
18    A    It is shown to be as an attachment on
19  this document.
20    Q    Is it attached anywhere in the
21  documents you have in front of you in Exhibit
22  2?
23    A    I do not see it.
24    Q    You know, there is a reference in the
25  right column to it being a certain number of
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

53

1  bytes. Do you see that?
2  A    I'm sorry. What page are we on?
3  Q    Fifty-three.
4  A    I do see that.
5  Q    Do you know how lengthy the
6  commitment schedule is that is referred to
7  here as Exhibit C in terms of the number of
8  pages?
9  A    No, I don't.
10  Q    Do you have any estimate?
11  A    No, I don't.
12  Q    Where would you find Exhibit C today?
13  A    It is in a software program, a web
14  based software program, where we keep our
15  rates and commitments.
16  Q    That commitment schedule could be
17  printed out by somebody in your department.
18  Is that correct?
19  A    That is correct.
20  Q    Is there any other designation or
21  name you would need to find it other than
22  motor carrier rate and weekly commitment
23  schedule, Exhibit C, to the October 2007
24  contract between Overnite Express and
25  International Paper?

54

1  A    I'm sorry. Could you repeat the
2  question.
3  Q    Sure. If you were looking for it or
4  if I was asking you to go get it, do you need
5  any other title or name or designation for it
6  other than, you know, what we have right here?
7  Exhibit C, motor carrier rate and weekly
8  commitment schedule.
9  A    I would have enough information from
10  this to know what to go look for.
11       MR. BURKE: I will ask
12  Mr. Fisher -- give him a formal request
13  for that.
14  BY MR. BURKE:
15  Q    How about back to where we were, sir,
16  on Page 38.
17  A    Okay.
18  Q    Am I correct that, in that sourcing
19  event that your department conducted Overnite
20  Express had to agree to be able to transport a
21  certain volume of paper products for
22  International Paper in order to be awarded the
23  contract?
24  A    Could you restate the question.
25  Q    Sure. In your sourcing event, you

55

1  indicated International Paper had awarded
2  certain commitments to Overnite Express.
3  Correct?
4  A    Correct.
5  Q    What did Overnite Express have to
6  show you or agree to in order for you to give
7  them that award?
8  A    We gave them the award based on the
9  rates they submitted and the capacity that
10  they submitted.
11  Q    When you use the term "capacity,"
12  that refers to what?
13  A    Number of shipments they could handle
14  in a weekly timeframe.
15       (Whereupon, there was a discussion off
16       the record, and the deposition
17       continued as follows:)
18  BY MR. BURKE:
19  Q    When you refer to the number of
20  shipments that they could handle, you are
21  talking about the number of different loads
22  they could haul with different tractor trailer
23  units. Is that correct?
24  A    Yes.
25       MR. BURKE: We will take a

56

1  break.
2       (A recess was taken, and the
3       deposition continued as follows:)
4  BY MR. BURKE:
5  Q    On that Page 38 -- we were on
6  Paragraph B -- that refers to a motor carrier
7  vendor profile. Correct?
8  A    Yes.
9  Q    The carrier had to submit a vendor
10  profile to you with certain information about
11  their business and their size. Correct?
12  A    Correct.
13  Q    Why did International Paper want that
14  information?
15  A    Various reasons. Contact
16  information, names, phone numbers, e-mails,
17  addresses.
18  Q    And then Section C is entitled
19  Coordination. The carrier had the obligation
20  to coordinate and establish delivery schedules
21  for all services provided. Correct?
22  A    Yes. That is what it says.
23  Q    With whom were you requiring the
24  carrier to coordinate delivery schedules?
25  A    I don't know specifically.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                                June 12, 2012

57

1   Q       Was it with International Paper's
2   customers?  I mean, to whom products were
3   being delivered?
4   A       It could have been International
5   Paper's customers.
6   Q       Then there is a commitment section
7   that, again, you have alluded to already.
8           You required the carrier to provide a
9   certain number of commitments that would be
10  set forth in the motor carrier rate and weekly
11  commitment schedule that we already discussed.
12  Correct?
13  A       We did not require them to provide a
14  certain number of commitments.  They offered a
15  certain number of commitments that we
16  accepted.  We did not have a requirement as to
17  a certain amount.
18  Q       But you would not have accepted -- or
19  you would not have awarded the carrier a
20  contract unless they could meet the number of
21  commitments that International Paper needed to
22  make delivery of their product.  Correct?
23          MR. FISHER:  Objection to form.
24          Overbroad.  You can go ahead and answer.
25          THE WITNESS:  Could you repeat

58

1       the question.
2   BY MR. BURKE:
3   Q       Sure.  You would not -- strike that.
4           International Paper would not have
5   awarded a contract to a carrier such as
6   Overnite Express or Universal unless they were
7   able to meet the commitments that you deemed
8   necessary in order to ship to your customers
9   in a certain geographic area.  Is that
10  correct?
11  A       We would not have awarded them a
12  contract if they did not offer us the capacity
13  and rates that met our needs.
14  Q       We may have discussed it; but when
15  you say "capacity," that refers to what?
16  A       Number of shipments they could handle
17  in a weekly period.
18  Q       Okay.  Thank you.  You did mention
19  that.
20          And then look at Page 39, the next
21  page, sir, Paragraph E entitled Minimum
22  Service Level Requirement.  What is that
23  requirement referring to?
24  A       It is referring to the minimal
25  service level requirements of this contract.

59

1   Q       International Paper required the
2   carrier to meet a minimum service level of
3   98 percent for the commitments set forth in
4   Exhibit C.  What does that really mean?
5   A       They would handle a minimum of
6   98 percent of the loads, shipments that was in
7   Section Seven, Exhibit C.
8   Q       Then how about F, the minimum on-time
9   delivery requirement.  What was International
10  Paper requiring in that paragraph?
11  A       This is stating that the carrier must
12  meet a minimum on-time delivery requirement of
13  98 percent.
14  Q       Does that mean the carrier had to
15  make timely deliveries 98 percent of the time?
16  A       Yes.
17  Q       Then in Section G, International
18  Paper set forth certain motor vehicle
19  equipment conditions.  Is that correct?
20  A       That is what it says.  Yes.
21  Q       The carrier was required to maintain
22  at their own cost the motor vehicles they used
23  to provide transportation services under this
24  contract.  Correct?
25  A       That is what it says, yes.

60

1   Q       They had to maintain those motor
2   vehicles in good, safe, and lawful operating
3   conditions at all times and in accord with all
4   applicable local, state, and federal laws and
5   regulations.  Correct?
6   A       That is what it says.  Yes.
7   Q       And then in Paragraph Eight, there is
8   a section entitled Carrier Personnel.  Is that
9   right?
10  A       Eight?
11  Q       I am sorry.  H.
12  A       Yes.  H.  Carrier Personnel.
13  Q       The carrier was required to employ,
14  at its own cost, the personnel required to
15  maintain the carrier's motor vehicle equipment
16  so as to fully perform the services of this
17  agreement.  Correct?
18  A       Yes.  That is what it says.
19  Q       International Paper also required
20  that the carrier's personnel be fully
21  qualified and shall have the licenses and
22  permits required by local, state, and federal
23  laws and regulations required to maintain and
24  operate the motor vehicle equipment used for
25  the transportation services.  Correct?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

61

1   A    That is what it says.  Yes.
2   Q    It also states that the carrier's
3   personnel shall comply with applicable local,
4   state, and federal laws and regulations.
5   Correct?
6   A    That is what it says.  Yes.
7   Q    It was the expectation of
8   International Paper that the carriers comply
9   with all applicable traffic regulations that
10  would be included in local, state, and federal
11  laws.  Correct?
12  A    It does not say "traffic
13  regulations."  So I don't know what
14  International Paper's interpretation of this
15  is.
16  Q    Well, it does not exclude traffic
17  regulations.  Correct?
18  A    It does not mention traffic
19  regulations.
20  Q    Did International Paper expect its
21  carriers to operate their trucks in accord
22  with all applicable traffic rules while making
23  delivery of International Paper's products to
24  International Paper's customers?
25  A    That is what this says.  Yes.

62

1   Q    And International Paper did, in fact,
2   expect that traffic laws would be complied
3   with when International Paper's carrier was
4   delivering their products to International
5   Paper's customers.  Correct?
6   A    I cannot speak for International
7   Paper.
8   Q    Well, that was certainly your
9   expectation, was it not, when you signed the
10  amendment that incorporated the terms of this
11  contract?
12  A    My expectations were that the carrier
13  that we were amending the contract to would
14  follow this contract.
15  Q    Did you believe that included
16  complying with traffic regulations?
17  A    I don't recall.
18  Q    Did International Paper require its
19  carriers to adhere to and follow the federal
20  regulations related to the operation of
21  tractor trailer trucks in a safe manner while
22  delivering International Paper's products to
23  its customers?
24  A    Yes.  It does say that.
25  Q    Did International Paper expect its

63

1   carriers to avoid colliding with cars while
2   they were making deliveries for International
3   Paper?
4   A    I would expect them to avoid
5   collisions.
6   Q    This reference to trailer
7   requirements in Paragraph G, did -- I'm sorry.
8   I misspoke again.
9        In Paragraph J, this reference to
10  trailer requirements -- am I correct that
11  International Paper required the carrier to
12  utilize trailers that were suitable for safe
13  and efficient and damage-free transportation
14  of its products?
15  A    Yes.  That is what it says.
16  Q    Those trailers had to be in proper
17  condition without any mechanical defects.
18  Correct?
19  A    (No audible response.)
20  Q    It is down towards the bottom.
21  A    Yes.  That is what it says.
22  Q    It also notes in the last line, sir,
23  that International Paper required the carrier
24  to agree to pay for all claims for damage or
25  destruction of International Paper's goods

64

1   that resulted from unsuitable trailers.
2   Correct?
3   A    Yes.  That is what it says.
4   Q    In Paragraph K, am I correct that
5   International Paper set forth certain trailer
6   pool requirements that the carrier had to be
7   able to meet?
8   A    Yes.  That is what that says.
9   Q    Basically, does the obligation in K
10  mean that the carrier had to have enough empty
11  trailers available to meet International
12  Paper's deliveries and pick-ups that were the
13  subject of the awards given to them?
14  A    Yes.  That is what that says.
15  Q    Paragraph Section Four addresses
16  compensation.  Correct?
17  A    Yes.
18  Q    In Paragraphs A through D,
19  International Paper sets forth various
20  provisions relating to the compensation that
21  you were willing to pay to the carrier.  Is
22  that right?
23  A    Yes.  That is what it says.
24  Q    In addition to what is set forth
25  here, the compensation was also reflected in



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

STEPHEN M. MUNDY                                            June 12, 2012

65

1     Exhibit C, the motor carrier rate and
2     commitment schedule. Is that right?
3     A     That is correct.
4     Q     In deciding whether or not to award
5     contracts to any carrier, I mean, it was
6     International Paper that ultimately decided
7     what rates you were willing to pay. Is that
8     correct?
9     A     Yes.
10    Q     Then you set forth various payment
11    terms in Section Five. Correct?
12    A     Sets forth section -- terms in
13    Paragraph Five. Yes. That is correct.
14    Q     Section Five on Page 5 of 24 deals
15    with payment terms. Right?
16    A     That's correct.
17    Q     Section Six sets forth the
18    circumstances under which you would permit the
19    carrier to assign an account receivable after
20    giving you sufficient notice.
21         Is that basically what is addressed
22    there?
23    A     That is what is addressed there.
24    Yes.
25    Q     Then Paragraph Seven addresses

67

1     and had to be a certain number, which would be
2     1.5 times the number of daily commitments. Is
3     that correct?
4     A     Yes. That is what it says.
5     Q     Now, even though International Paper
6     didn't have to give the carrier a certain
7     volume of shipments, the carrier was obliged
8     to accept shipments from International Paper
9     up to the weekly or daily commitment level
10    that had been agreed upon.
11         Is that essentially what is set forth
12    in Paragraph 7C?
13    A     Yes, it is.
14    Q     There were certain liquidated damages
15    agreed to if the carrier failed to comply or
16    accept the agreed upon commitment tenders.
17    Correct?
18    A     Yes. That is what it says.
19    Q     Section Eight -- that is entitled
20    Defaults by the Carrier. Correct? That is at
21    the bottom of Bates Stamped IP42?
22    A     Yes, it is.
23    Q     In Paragraphs 8A through 8H, that
24    sets forth various grounds under which
25    International Paper could terminate the

66

1     commitments. Correct?
2     A     Yes, it does.
3     Q     And incorporated into that commitment
4     section in Paragraph Seven is Exhibit C. The
5     motor carrier rate and commitment schedule.
6     Correct?
7     A     Yes, it is.
8     Q     As you state in Paragraph 7A,
9     commitments meaning power units, tractors,
10    drivers, and trailer combinations. Correct?
11    A     Yes. That is what it says.
12    Q     Under Paragraph A, International
13    Paper was not required to give the carrier a
14    certain volume of shipments. Would that be
15    correct?
16    A     Yes. That is what it says.
17    Q     So the amount of transportation
18    services or shipments given to the carrier was
19    up to International Paper, depending on what
20    orders they had from customers. Is that
21    accurate?
22    A     That's correct.
23    Q     Then in Paragraph B, there are some
24    other requirements concerning the fact that
25    the trailers had to be water tight trailers

68

1     contract with the carrier. Correct?
2     A     Yes. That is what that says.
3     Q     This list was not devised to be
4     completely inclusive. Correct? These are
5     some of the grounds for terminating the
6     contract?
7     A     This does list some grounds for
8     potentially terminating the contract. Yes.
9     Q     In Paragraph A, one of those grounds
10    was failure to comply with facility safety
11    rules and operating procedures?
12    A     Yes. That is what it says.
13    Q     Then in the last line of that
14    paragraph, 8A, do you see where it says,
15    facility safety rules and operating procedures
16    shall be provided to carrier?
17    A     Yes. I see that.
18    Q     Did International Paper provide
19    safety rules and operating procedures to their
20    carriers?
21    A     I don't know if we did or not.
22    Q     Have you seen any brochure or list of
23    these safety rules and operating procedures
24    that are referred to here in your contract?
25    A     For any facility?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

69

1   Q      Correct.
2   A      I had seen IP safety rules in the
3   past.  Yes.
4   Q      What department has those safety
5   rules?  I mean, is that your department?
6   A      No.  That would be at the facility
7   department level.
8   Q      The safety rules that you have seen
9   -- how are they compiled?  Are they in a book
10  or a pamphlet?
11  A      The ones I recall seeing were like a
12  Word document.
13  Q      What department of International
14  Paper was responsible for providing the safety
15  rules and operating procedures to carriers?
16  A      I don't know.
17  Q      If you were to make a request for
18  those safety rules today, what would you refer
19  to them as?  Exactly this?  Facility safety
20  rules and operating procedures?
21  A      That is correct.
22  Q      I'm sorry.  Did you say that was the
23  facility's department?
24  A      Correct.
25  Q      And then back to Page 43 here, sir,

70

1   where we were.
2       In Paragraph B, another grounds for
3   termination was failure to comply with the
4   98 percent on-time delivery requirement.
5   Correct?
6   A      Yes.  That is what it says.
7   Q      Or in C, if the carrier for three
8   consecutive months did not meet the 98 percent
9   requirement, that was also a ground for
10  termination.  Is that right?
11  A      That is what it says.  Yes.
12  Q      And D.  International Paper could
13  terminate the contract if they received two or
14  more delivery service written complaints
15  within a three-month period from one of
16  International -- from International Paper's
17  customers requesting that the carrier no
18  longer delivered to their facilities.
19  A      Yes.  That is what it says.
20  Q      Then also in E, if the carrier got
21  downgraded in their department of
22  transportation rating, that could be a basis
23  for termination of the contract.  Correct?
24  A      Yes.  That is what it says.
25  Q      And F, failure to maintain minimum

71

1   insurance coverage was also a basis for
2   termination.  Correct?
3   A      Correct.  That is what it says.
4   Q      In G, noncompliance with federal,
5   state, or municipal laws and regulations is
6   also a basis for terminating the contract?
7   A      Yes.  That is what it says.
8   Q      Then in Paragraph Nine, am I
9   understanding correctly that International
10  Paper required the carrier to have a certain
11  ability to engage in electronic communications
12  dispatched in reporting?
13  A      Yes.  That is what it says.
14  Q      Then it goes on to say that upon
15  delivery -- in Section A, 9A, it says that,
16  upon delivery of written instructions or
17  procedures from the shipper, the carrier shall
18  obtain, maintain, and utilize electronic
19  connectivity communications such as EDI, XML,
20  FTP, or web with the shipper.  Correct?
21  A      Yes.  That is what it says.
22  Q      Generally, what are those
23  communication devices referring to?
24  A      (No audible response.)
25  Q      I mean like XML, for example.

72

1   A      I don't know.
2   Q      Then International Paper also
3   required that the carrier utilize a
4   transportation management system platform
5   engaged at served shipper's facilities.
6       What does that refer to, Mr. Mundy?
7   A      It is referring to a transportation
8   management system at the facility.  That is
9   what it says.
10  Q      Do you know what that is alluding to?
11  A      No, I don't.
12  Q      In Paragraph B, Section Nine, am I
13  correct that International Paper required the
14  carrier to report pick-up and delivery events
15  in the format specified by International
16  Paper?
17  A      Yes.  That is what it says.
18  Q      And timeline requirements and
19  specific events shall be as set forth in
20  Exhibit H.  If you look at Exhibit H on Page
21  63 -- would you do that, please.
22  A      (Witness complies.)  Yes.
23  Q      That exhibit is entitled Electronic
24  Compliance Requirements.  Correct?
25  A      Yes.  It is.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                          June 12, 2012

73

1  Q      The first paragraph states that
2  carriers for International Paper are required
3  to have the ability to communicate
4  electronically and to be able to conduct
5  transportation operations utilizing electronic
6  means and tools and that such communications
7  can be accomplished by EDI, XML, or web portal
8  provided by International Paper.  Is that
9  correct?
10 A      Yes.  That is what it says.
11 Q      Then it sets forth below various
12 messages and timelines that carriers for
13 International Paper have to comply with.
14 Correct?
15 A      Yes, it does.
16 Q      It further states that carriers are
17 required to adhere to these timelines and
18 provide the information specified.  Correct?
19 A      Yes.  That is what it says.
20 Q      Then there are different categories
21 such as low tender.  A carrier has to accept
22 or reject a tender within two business hours.
23 Correct?
24 A      Yes.  That is what it says.
25 Q      And the next section for delivery and

74

1  -- or delivery appointment.  Once a tender is
2  accepted, the carrier has to establish a
3  delivery appointment and response with a date
4  and time for each stop within 24 hours of
5  accepting that tender from you.  Correct?
6  A      Yes.  That is what it says.
7  Q      If a delivery appointment is not
8  required, a carrier must transmit the expected
9  delivery date and time.  Correct?
10 A      Yes.  That is what it says.
11 Q      Then in the next section for pick-up
12 date and time, the carrier was required to
13 immediately upon making a delivery appointment
14 establish a pick-up date and time and transmit
15 it to International Paper.  Correct?
16 A      Yes.  That is what it says.
17 Q      Then upon actual pick-up the carrier
18 had to transmit the updated event within two
19 hours of departure.  Correct?
20 A      Yes.  That is what it says.
21 Q      Then in the next section under
22 Arrival, International Paper required the
23 carrier to transmit delivery confirmation
24 electronically within two business hours of
25 arrival at the co-signee's receiving dock or

75

1  port.  Is that correct?
2  A      Yes.  That is what it says.
3  Q      There had to be a revised arrival
4  time.  The carrier had to report to
5  International Paper what that revised time was
6  within two business hours of determining that
7  a new date -- or new delivery time was
8  necessary.  Is that correct?
9  A      Yes.  That is what it says.
10 Q      Then in the next section under
11 Reports, it states that the -- that
12 International Paper may require reports to
13 support continuous improvement efforts and to
14 manage shipments to customers and that the
15 carrier will provide these reports as
16 requested by you.  Correct?
17 A      Yes.  That is what it says.
18 Q      Then delivery performances as to the
19 98 percent requirement is described in the
20 last section of Exhibit H.  Correct?
21 A      Yes.  That is correct.
22 Q      Then back to Paragraph B.  The last
23 line of that after -- referring to Exhibit H
24 that we just went through notes that the
25 carrier was required to complete and forward

76

1  to International Paper or its agents all
2  requested reports in a timely manner in
3  industry standard formats.  Correct?
4  A      I'm sorry.  B?  Where are we?
5  Q      We are on Page IP43 and in Paragraph
6  9B.
7  A      Okay.
8  Q      And that discussed Exhibit H that we
9  just went through.  I was referring your
10 attention to the very last sentence, talking
11 about completing and forwarding.
12 A      Yes.  That is what it says.
13 Q      The carrier has to timely submit
14 reports to International Paper as requested.
15 Correct?
16 A      Yes.
17 Q      Then Paragraph Ten is a section in
18 which International Paper sets forth the type
19 of bills of lading and freight receipts that
20 the carrier was required to use.  Is that
21 correct?
22 A      Yes.  That is what it is.
23 Q      A sample International Paper bill of
24 lading is attached as Exhibit F.  Correct?
25 According to Paragraph A.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                     June 12, 2012

**77**

1   A   Yes. That is what it says.
2   Q   But in reality -- Exhibit F is at
3   Page 62. There is actually no copy attached
4   to Exhibit 2. Is that right?
5   A   Page 62 does reference an attachment
6   of an IP bill of lading sample.
7   Q   As Exhibit F?
8   A   Yes.
9   Q   But the actual content is not
10  included in the document you have before you.
11  Correct?
12  A   That is correct.
13  Q   Is that something that exists in
14  electronic form?
15  A   Yes.
16  Q   Have you seen it yourself?
17  A   Yes.
18  Q   Do you know how lengthy it is or how
19  many pages?
20  A   I believe it is one page.
21  Q   That is something you could print out
22  if need be. Correct?
23  A   The sample bill of lading?
24  Q   Yeah.
25  A   Yes.

**79**

1   than 24 hours after requested by the shipper
2   for the delivery of the goods. Is that
3   accurate?
4   A   Yes. That is what it says.
5   Q   Then there are certain requirements
6   set forth for delivery, hazardous materials in
7   Section 11. Correct?
8   A   Yes. That is what it says.
9   Q   Then in Section 12, it sets forth the
10  obligations relating to freight loss or
11  damage. Correct?
12  A   Yes, it does.
13  Q   In Paragraph 12A, under this
14  agreement, the carrier was liable to the
15  shipper for loss or damage to any goods
16  transported under this agreement. Correct?
17  A   Yes. That is what it says.
18  Q   The carrier assumes liability in the
19  same manner as provided under Section 14706 of
20  Title 49 of the United States Code. Correct?
21  A   Yes. That is what it says.
22  Q   And then in Paragraph B, it states
23  that, in the event of any loss or damage, the
24  carrier shall pay to International Paper the
25  price charged by International Paper to its

**78**

1   Q   Then back to the bottom of Bates
2   Stamped 43 in Section 10A.
3       In the middle of the page -- in the
4   middle of the paragraph, sir, it specifies
5   that the bill of lading may be modified only
6   by International Paper. Correct?
7   A   Yes. That is what it says.
8   Q   It goes on to say that, any attempt
9   by a carrier to somehow modify that bill of
10  lading has no affect on the actual bill of
11  lading. Correct?
12  A   Yes. That is correct.
13  Q   Then in Section B of Paragraph Ten,
14  there is a -- it states that, upon delivery of
15  each shipment, the carrier shall obtain a
16  delivery receipt showing the date of the
17  delivery, the goods that were delivered, and
18  any consignee exceptions to the counter
19  condition of the goods and a legible signature
20  of the consignee. Correct?
21  A   Yes. That is what it says.
22  Q   It goes on to say that the carrier
23  has to provide International Paper with a copy
24  of any delivery receipt or proof of delivery
25  as soon as practical but in no event later

**80**

1   customers for the goods. Correct?
2   A   Yes. That is what it says.
3   Q   Now, down in the insurance section in
4   Paragraph 13, International Paper required
5   that the carrier maintain at all times certain
6   insurance coverage amounts. Is that right?
7   A   Yes. That is what it says.
8   Q   And in Paragraph A, there are certain
9   commercial, auto liability coverage
10  requirements of $1 million set forth. Is that
11  right?
12  A   Yes. That is correct.
13  Q   Then on to the next page, sir, which
14  is Bates Stamped 45 in Section 13B, a shipper
15  -- or excuse me.
16      A carrier had to have cargo liability
17  insurance of $100,000 or more. Correct?
18  A   That is correct.
19  Q   In Section C, International Paper
20  required that any carrier have commercial
21  general liability insurance in the amount of
22  at least $1 million. Correct?
23  A   Yes. That is what it says.
24  Q   And the carrier was required to name
25  International Paper as an additional insured



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                          June 12, 2012

81

1    on that general liability policy of insurance.
2    Correct?
3        A    Yes. That is what it says.
4        Q    In Paragraph F, International Paper
5    required that the insurance be obtained by the
6    carrier through insurance companies that had
7    certain designations or classifications as to
8    their reliability as rated by the A.M. Best
9    Company. Correct?
10       A    Yes. That is what it says.
11       Q    In Paragraph G, International Paper
12   could withhold payments for transportation
13   services if the carrier did not procure the
14   proper insurance coverage or allowed it to
15   lapse or to be cancelled or failed to provide
16   evidence of such insurance. Is that correct?
17       A    Yes. That is what it says.
18       Q    In fact, any carrier such as Overnite
19   or Universal -- they actually had to provide
20   International -- I may have misspoke.
21            Any carrier such as Overnite or
22   Universal had to provide International Paper
23   with a face sheet or evidence of insurance
24   coverage. Correct?
25       A    That's correct.

82

1        Q    Look at Page 46, sir. In Paragraph
2    15, there is a section entitled
3    Indemnification. Correct?
4        A    Yes. That is what it is entitled.
5        Q    International Paper in that section
6    required that the carrier indemnify
7    International Paper from all liability for any
8    loss or damages, claims, or suits resulting
9    from injury to any person or damage to
10   property arising out of the performance of the
11   transportation services referred to in this
12   agreement. Is that correct?
13       A    Yes. That is what it says.
14       Q    That indemnity obligation was reduced
15   to the extent that any injury to a person or
16   property resulted from the joint or concurrent
17   negligence of International Paper. Correct?
18       A    Yes. That is what it says.
19       Q    Down in Page 120, there is a section
20   entitled Independent Contractor. Do you see
21   that?
22       A    Page 20?
23       Q    I'm sorry. Section 20 on the very
24   bottom of Page iP46.
25       A    Yes. That is what it says.

83

1        Q    In that section, it states that the
2    carrier is and shall perform services under
3    this agreement as an independent contractor.
4    Correct?
5        A    Yes. That is what it says.
6        Q    It goes on to say that the carrier
7    shall solely direct all persons performing
8    services performed by the carrier under this
9    agreement and that all such persons shall be
10   and remain subject to the exclusive control
11   and direction of carrier. Correct?
12       A    Yes. That is what it says.
13       Q    That section meant that the carrier
14   was responsible for giving direction to all
15   persons who were performing transportation
16   services contemplated by this agreement?
17            MR. FISHER: Objection to form.
18   You can go ahead and answer.
19            THE WITNESS: Can you ask the
20   question again, please.
21   BY MR. BURKE:
22       Q    Sure. In the very top of Bates
23   Stamped 47, that paragraph essentially states
24   that the carrier was responsible for directing
25   all persons who were performing services under

84

1    this agreement. Correct?
2            MR. FISHER: Object to form.
3            THE WITNESS: It says that the
4    carrier is responsible for directing all
5    persons for services performed by the
6    carrier.
7    BY MR. BURKE:
8        Q    And the services that are referred to
9    here are the transportation of International
10   Paper's paper products. Correct?
11       A    Yes.
12       Q    Then there is an assignment section
13   in Section 21. Correct?
14       A    Yes.
15       Q    By the way, in Paragraph 22 or
16   Section 22, that is entitled Modification. It
17   says, this agreement may only be amended in
18   writing only agreed to by both parties.
19   Correct?
20       A    Yes. That is what it says.
21       Q    That Amendment Number One that we
22   spoke about earlier -- that is an example of
23   the type of amendment that was contemplated
24   under this agreement. Correct?
25       A    Yes.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

85

1  Q     I don't think we asked about it, but
2  Page 48 sets forth the signature pages -- or
3  signature lines, I should say, where this was
4  signed by William Crawford on November 12,
5  2007 on behalf of International Paper in his
6  capacity as vice president of Global Sourcing.
7  Correct?
8  A     That is correct.
9  Q     The contract is also signed on
10 October 30, 2007 by Mr. Elsholtz and Mr. Hayes
11 and Ms. Herman from Overnite Express.
12 Correct?
13 A     That is correct.
14        MR. FISHER: Elsholtz is
15 E-L-S-H-O-L-T-Z.
16 BY MR. BURKE:
17 Q     How about Page 49, sir?
18 International Paper required a copy of any
19 carrier's permit or operating authority to be
20 attached. Correct?
21 A     Yes. That is what it says.
22 Q     Then on Page 50, there is, in fact, a
23 copy of Overnite Express's operating
24 authority?
25 A     Yes. That is what it is.

86

1  Q     Then Exhibit B on Page 51 -- that is
2  a fuel index, essentially what is set forth
3  there.
4  A     I am sorry. What is the question?
5  Q     Essentially, what information is set
6  forth in that fuel index and what is the
7  purpose of that exhibit?
8  A     This indicates the fuel surcharge
9  that we paid our carriers each week based on
10 the price of diesel fuel.
11 Q     That is an amount paid in addition to
12 the agreed upon rates in Exhibit C?
13 A     That is correct.
14 Q     And then -- oh, by the way, on Page
15 52, Mr. Crawford also signed that fuel
16 surcharge agreement. Correct?
17 A     Yes, he did. That's correct.
18 Q     In Amendment Number One that we
19 talked about earlier on Page 6, one of the
20 provisions of that amendment specifically
21 noted that Universal Am-Can agreed to honor
22 the rates in fuel surcharge that had been
23 established between the Company and Overnite
24 Express. Correct?
25 A     Yes. That is what it says.

87

1  Q     We have talked about Exhibit C and
2  Exhibit D. Actually, on Page 55, is that a
3  member profile form on Page 55?
4  A     Yes, it is.
5  Q     That runs through Page 59?
6  A     That's correct.
7  Q     Page 66 contains a certificate of
8  insurance from Overnite Express. Is that
9  correct? From --
10 A     Yes. That is correct.
11 Q     And down in the lower left, it means
12 International Paper as well as an additional
13 insured?
14 A     The lower left names us as a
15 certificate holder.
16 Q     Then in the box right above that, it
17 says that the certificate holder is an
18 additional insured on the general liability
19 policy with respect to the operation of the
20 above named insured?
21 A     That's correct.
22 Q     And that above named insured, if you
23 go to the top left, is Overnite Express.
24 Correct?
25 A     That's correct.

88

1  Q     Now, after the amendment was entered
2  into and after Universal bought Overnite, it
3  appears you requested a copy of Universal's
4  operating authority and evidence of insurance
5  coverage. Is that correct?
6  A     Where does it appear that -- where
7  does it say that?
8  Q     It looks like on Page 68.
9  A     Sixty-eight is an email from --
10 Q     A woman named Kathy Szwast,
11 S-Z-W-A-S-T, to you. Is that correct?
12 A     That's correct.
13 Q     And after that amendment, did you
14 request from Universal a copy of their
15 insurance coverage and operating authority?
16 A     I don't specifically recall.
17 Q     That was a requirement that Universal
18 had to meet, however, pursuant to the
19 contract. Correct?
20 A     That is correct.
21 Q     And this email appears -- or strike
22 that.
23        This email is dated June 6, 2008.
24 And it appears to be an email letter from
25 Kathy Szwast saying, Mr. Mundy, please see the



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                              June 12, 2012

89

1    attached for proof of liability and cargo
2    coverage. Correct?
3    A     Yes. That is what it says.
4    Q     If you go to Page 74, there is a copy
5    of a certificate of insurance from Cherokee
6    Insurance Company naming Universal Am-Can
7    Limited. Correct?
8    A     Yes. That is what it is.
9    Q     If you look in -- can you see the
10   boxes, sir, where it says "effective dates"?
11   Are you able to read that where it says,
12   "policy effective" and "policy expiration"?
13   A     Yes. I can read that.
14   Q     Does it indicate that the effective
15   policy date is January 1, 2008 and the
16   expiration date is January 1st of 2009?
17   A     Yes. That is what it says.
18   Q     Then in the limits column for general
19   aggregate, it has $1 million?
20   A     Yes, it does.
21   Q     In the lower left corner of that
22   page, 74, do you see that empty box where
23   International Paper had been named as an
24   additional insured on the Overnite Express
25   policy?

90

1    A     I do see an empty box in the lower
2    left-hand corner.
3    Q     Did Universal ever provide you with
4    evidence that they had named International
5    Paper as an additional insured to this policy
6    of insurance they had with Cherokee Insurance
7    Company?
8    A     I don't remember.
9    Q     Aside from any insurance that
10   International Paper may have had by being
11   named as an additional insured on a policy
12   with Overnite or Universal, what liability
13   insurance coverage did International Paper
14   have that was or might be applicable to this
15   occurrence in which Jeffrey Scheinman was
16   injured?
17   A     Could you repeat the question.
18   Q     Sure. Other than any insurance
19   International Paper might be entitled to by
20   being named as an additional insured on a
21   Universal policy or an Overnite Express
22   policy, what insurance coverage did
23   International Paper have that is or might be
24   applicable to the injuries sustained by
25   Jeffrey Scheinman?

91

1    A     I'm not familiar with what other
2    insurance International Paper may have had.
3    Q     Who would know what those insurance
4    coverage information is -- well, strike that.
5    Who would know what insurance
6    coverage International Paper had?
7    A     Specifically, I don't know.
8    Q     Is there a department that you think
9    would deal with that?
10   A     I would think our risk management
11   department would have that.
12   Q     Are they located here in Memphis?
13   A     I believe so.
14   Q     Who is the current head of risk
15   management?
16   A     I don't know.
17   Q     Look at Page 69, if you would, sir.
18   A     Okay.
19   Q     Is that a letter from Mark Limback as
20   president of Universal Am-Can?
21   A     Yes, it is.
22   Q     In that letter, they -- Universal
23   Am-Can is announcing that Overnite Express has
24   joined their team and that they have a
25   partnership. Correct?

92

1    A     That is what it says. Yes.
2    Q     In about the middle of the page,
3    sir -- or paragraph, it says that, as of
4    June 13, 2008, your bill of lading should
5    reflect Universal Am-Can Limited as the
6    carrier; and thus all invoices will reflect
7    such, along with our remittance address.
8    Correct?
9    A     Yes. That is what it says.
10   Q     It goes on to say, following is a
11   copy of insurance and authority for your
12   records. Correct?
13   A     That's correct.
14   Q     The bills of lading were prepared by
15   International Paper. Correct?
16   A     Correct.
17   Q     Are those sometimes also referred to
18   as memo bills?
19   A     I've heard that terminology.
20   Q     In this letter, Mr. Limback was
21   basically saying that in the bills of lading,
22   the carrier should now be identified as
23   Universal rather than Overnite Express. Is
24   that accurate?
25   A     It says that the bill of lading



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                        June 12, 2012

93

1    should reflect Universal Am-Can as the
2    carrier.
3    Q       And that they would be submitting
4    invoices to you that would reflect that, and
5    they were asking to have payments sent to the
6    address they were going to provide you. Is
7    that correct?
8    A       Yes.
9    Q       Then at Page 71, that is a copy of an
10   interstate commerce commission operating
11   authority for Universal Am-Can, permitting
12   them to operate as a common carrier. Correct?
13   A       Yes, it is.
14   Q       And then on Page 72, they also sent
15   International Paper a copy of a permit
16   evidencing their authority to operate as a
17   contract carrier. Correct?
18   A       That is correct.
19   Q       Could you look at 734, sir.
20   A       Yes.
21   Q       Am I correct that that appears to be
22   a June 6th -- strike that.
23          Am I correct that Page IP73 is a copy
24   of an email dated June 6, 2008 to you from
25   Lori Osculand from Overnite Express?

94

1    A       Yes, it is.
2    Q       It says, Stephen, the attachment will
3    give you the certificates and authorities.
4    And he says, I'm having corporate send you an
5    insurance certificate naming International
6    Paper as the certificate holder. Correct?
7    A       Yes. That is what it says.
8    Q       What did you understand was being
9    referred to as -- in the reference to
10   certificate holder?
11   A       I don't recall.
12   Q       I think you told me you don't ever
13   remember getting an insurance certificate
14   reflecting -- well, strike that. I don't want
15   to misspeak.
16          Did you ever get any evidence from
17   Universal reflecting that International Paper
18   was an additional insured?
19   A       I don't remember.
20   Q       If you had that, where would that
21   document be?
22   A       It would -- it would be within the
23   contract file.
24          MR. SCHRECK: Rich, do you have
25   a lot more?

95

1          MR. BURKE: It is a relative
2    term, Matt. That is exactly what I was
3    just looking at. I got a little more.
4    I mean, I'm sure I have got about a half
5    hour, I bet. But maybe not too much
6    more than that. Kind of hard to say.
7    Half hour. You know, 45 minutes.
8          THE WITNESS: Can we take
9    another break?
10         MR. BURKE: Yes, sir. No
11   problem.
12         MR. SCHRECK: Rich, do you mind
13   if I ask two or three quick questions.
14         MR. BURKE: Perfectly fine with
15   me. Either before or after the break,
16   whatever Carl wants.
17         MR. FISHER: Why don't you ask
18   him right now, and then we will take a
19   break.
20         MR. SCHRECK: Sounds good.
21             EXAMINATION
22   BY MR. SCHRECK:
23   Q       Mr. Mundy, this is Matthew Schreck.
24   I have just got a couple of quick questions
25   for you. Do you still have Exhibit 2 in front

96

1    of you? If you could look at Page 41.
2          That should be Page 6 of the contract
3    between Overnite Express and International
4    Paper. Is that correct?
5    A       Yes.
6    Q       You were asked some questions earlier
7    regarding default provisions in the contract.
8    One of those provisions is -- actually, strike
9    that.
10         If you could look at Page 43. I have
11   got the wrong page there.
12   A       Okay.
13   Q       The default provision includes the
14   carrier's failure to comply with facility
15   safety rules and operating procedures.
16   Correct?
17   A       Yes. That is what it says.
18   Q       Does that mean, Mr. Mundy, that, if
19   the carrier or its driver was not complying
20   with the facility's safety rules, that
21   International Paper could advise that driver
22   to leave and inform the carrier that they are
23   not going to be able to do the shipment at
24   that particular time?
25   A       Could you repeat your question.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                        June 12, 2012

97

1    Q    I think you indicated earlier you are
2    not familiar with the specific safety rules
3    and operating procedures for each facility.
4    Is that correct?
5    A    That is correct.
6    Q    If a driver or the carrier was not
7    complying with the facility safety rules and
8    operating procedures, would it be accurate
9    that International Paper can tell them to
10   leave and that they are not going to be able
11   to have that particular shipment?
12   A    That is not the way I understand Item
13   8A.
14   Q    The facility safety rules and
15   operating procedures -- would they vary from
16   facility to facility; or would they be the
17   same throughout all of International Paper's
18   facilities?
19   A    They would vary between facilities.
20   Q    And the purpose of those safety rules
21   and procedures is for the safety of those that
22   work for International Paper and those that
23   come on to the property such as carriers.
24   Correct?
25   A    Correct.

98

1    Q    Would it be correct then, if somebody
2    at the facility saw that the carrier or driver
3    was not complying with the safety rules and
4    operating procedures, that they could stop
5    them from whatever they were doing?
6    A    That would be my understanding.  Yes.
7    Q    That would also include, if they are
8    doing something that is not following the
9    safety rules and operating procedures -- not
10   in all cases but in some cases -- they could
11   tell them they are not going to be able to go
12   forward with that shipment on that particular
13   day because they are not complying with
14   whatever particular safety rule or procedure
15   that was in place?
16   A    Yes.  That could be correct.
17        MR. SCHRECK:  That is all the
18   questions I have, sir.  Thank you.
19        MR. FISHER:  Okay.  We will take
20   a quick break here.
21        (A recess was taken, and the
22        deposition continued as follows:)
23        EXAMINATION
24   BY MR. BURKE:
25   Q    Mr. Mundy, after Universal bought

99

1    Overnite and after you entered into this
2    amendment with Universal, was it International
3    Paper's expectation that Universal Am-Can was
4    going to handle the transportation commitments
5    which were the subject of the October
6    agreement and the June 2008 amendment?
7    A    Yes.  That is correct.
8    Q    Under International Paper's agreement
9    with Universal, did Universal have the right
10   to have some other truck driving company make
11   the actual deliveries for them?
12   A    Could you repeat that.
13   Q    Sure.
14        Under the agreement that you had with
15   Universal as of June 13, 2008, did Universal
16   have the right to have another trucking
17   company make the actual deliveries of
18   International Paper products?
19   A    Yes.
20   Q    And even if Overnite -- strike that.
21        Even if Universal had the right to do
22   so, International Paper expected Universal to
23   fulfill all of the obligations of the contract
24   that International had with Universal.
25   Correct?

100

1    A    That is correct.
2    Q    And Universal was considered to be
3    the carrier under the terms of the contract
4    International Paper had with Universal.
5    Correct?
6    A    That is correct.
7    Q    For the deliveries that were the
8    subject of this contract, which were going to
9    some locations in Minnesota, prior to this
10   crash, did International Paper know that
11   Universal was using Martin's Bulk Milk
12   Services to make delivery of your products?
13        MR. FISHER:  Let me just pose an
14   objection.  Is your question to him
15   personally or International Paper in
16   total?
17        MR. BURKE:  The first question
18   is International Paper.
19        MR. FISHER:  Okay.  Go ahead.
20        THE WITNESS:  I can't speak for
21   International Paper.
22   BY MR. BURKE:
23   Q    How about you personally?
24   A    I was not aware that Universal Am-Can
25   was using another carrier for our shipments.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

101

1   Q     Are you aware of anybody else at
2   International Paper that was aware Universal
3   was using Martin's for your shipments?
4   A     Yes. As a result of preparing for
5   this yesterday, I'm aware.
6   Q     You are aware that that was taking
7   place, or you are aware that other people at
8   International knew that?
9   A     I am aware that others at
10  International Paper knew Martin's Bulk Milk
11  was being used.
12  Q     Who at International knew that?
13  A     Joan Anderton.
14  Q     Do you know Joan?
15  A     I do.
16  Q     By the way, did you talk to her about
17  her deposition?
18  A     Not specifically about her
19  deposition, no. She made me aware that she
20  gave a deposition.
21  Q     Did you read her deposition?
22  A     No, I did not.
23  Q     Did you learn what she testified to
24  in her deposition?
25  A     No.

102

1   Q     I was going to come back to this; but
2   while we are on this topic, have you given
3   other depositions?
4   A     As it relates to this matter?
5   Q     No. Ever in your life.
6   A     Yes. Once.
7   Q     On behalf of International Paper?
8   A     That's correct.
9   Q     In what type of case?
10  A     International Paper was suing a motor
11  carrier for not honoring their commitment
12  obligations that were in the contract with
13  that carrier.
14  Q     Have you testified in court?
15  A     Yes.
16  Q     How many times?
17  A     Once.
18  Q     On behalf of International Paper?
19  A     No. Had nothing to do with
20  International Paper.
21  Q     Why do you believe that Universal had
22  the right to utilize another trucking company
23  to make the deliveries for which Universal had
24  contracted with International?
25  A     The contract does not prohibit a

103

1   carrier from using another carrier.
2   Q     Any other reasons, or is that
3   essentially it?
4   A     That is essentially it.
5   Q     If Universal used any other trucking
6   company such as Martin's to make one of
7   International's deliveries, was it the
8   expectation that that trucking company would
9   comply with all the terms of the contract
10  between International and Universal?
11  A     That would be my expectation.
12  Q     Regardless of whether Martin's made
13  the actual delivery of your goods under the
14  terms of your contract with Universal, if
15  there was any breach or failure of the
16  contract terms, you would seek satisfaction
17  from Universal as opposed to Martin's.
18        Would that be correct?
19  A     That would be correct.
20  Q     And that was because Universal was
21  the designated carrier in your contract with
22  whom International Paper had contracted?
23  A     That would be correct.
24  Q     Do you have Exhibit 2 in front of
25  you? Take a look at some of these memo bills.

104

1   Look at Page 2 of Exhibit 2.
2   A     Okay.
3   Q     This is entitled Memo Bill. Correct?
4   A     Yes, it is.
5   Q     Is this an International Paper
6   document?
7   A     I'm not sure.
8   Q     Is this the same as a bill of lading?
9   A     That would be my understanding. Yes.
10  Q     Do you have an understanding from
11  your review of materials in this case that the
12  truck involved in this collision was found
13  paper bound for three destinations or three
14  different customers of International Paper?
15  A     I was not -- I don't recall three
16  different customers of International Paper.
17  Q     Look at this memo bill, this first
18  one. The consignee is Cenbayo of Minneapolis.
19  Correct?
20  A     Correct.
21  Q     Is that an International Paper
22  customer?
23  A     I believe that is correct.
24  Q     Did International Paper own Cenbayo?
25  A     Not to my knowledge.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                June 12, 2012

105

1 Q    The shipping date in the upper right
2 is July 3, 2008.  Correct?
3 A    That's correct.
4 Q    The carrier is identified as Oxen?
5 A    That is correct.
6 Q    And it says "received from
7 International Paper, Hammond."  Correct?
8 A    Yes, it does.
9 Q    That is referring to the packages of
10 printing paper, the 175 cartons that are
11 designated a little below?
12 A    That is correct.
13 Q    Now, the direction -- do you see the
14 note section?
15 A    Yes.
16 Q    It specifies that, if there is
17 problems with the delivery or the driver is
18 detained more than one hour, call
19 International Paper at a specific phone
20 number.  Correct?
21 A    It says, call that phone number.
22 Call IP.  Yes.
23 Q    IP stands for International Paper.
24 Right?
25 A    Yes.

106

1 Q    It says to reference the specific
2 order number.  Correct?
3 A    Correct.
4 Q    And basically that meant, if this
5 driver was going to be detained more than an
6 hour, he was supposed to report that to
7 International Paper.  Correct?
8 A    That is correct.
9 Q    Then how about the next page, Page 4.
10 Oh, no.  I'm sorry.  Three.  Page 3.  It is
11 another memo bill also dated July 3, '08.
12 Correct?
13 A    That's correct.
14 Q    And by the way, this one, as did the
15 prior one for Cenbayo -- they contain Sam
16 Franke's signature on the top right?
17 A    Yes.  That is what it looks like.
18 Q    Do you know Mr. Franke to be the
19 driver of this truck?
20 A    Yes.  I did hear that.
21 Q    You know that only from this case.
22 Correct?
23 A    That's correct.
24 Q    This is a memo bill for Xpedx, for
25 paper to be delivered to Xpedx.  Correct?

107

1 A    That's correct.
2 Q    International Paper did own Xpedx,
3 did they not?
4 A    We do own Xpedx.  That is correct.
5 Q    Did you own them back in July of '08?
6 A    I believe that would be correct.
7 Q    Then in the note section, there is
8 some directions to contact International Paper
9 for delivery issues or if detained at least
10 one hour.  Correct?
11 A    Correct.
12 Q    And it indicates that the customer
13 has requested a delivery date of July 7, 2008.
14 Correct?
15 A    That's correct.
16 Q    Then it sets forth further directions
17 to call Rose at a specific number for delivery
18 appointments and specifies the receiving
19 hours.
20      Is that your customer?  Correct?
21 A    That's correct.
22 Q    These memo bills are prepared by
23 International Paper.  Correct?
24 A    I believe that is correct.  Yes.
25 Q    And then the last one, sir, on Page

108

1 4.  Look at -- it is directed to Midland Paper
2 in Minneapolis.
3 A    Yes.
4 Q    Also dated July 3, '08?
5 A    Yes.
6 Q    And it has Franke's name on the upper
7 right -- or signature, I should say?
8 A    Yes.
9 Q    The carrier is identified as Oxen.
10 Correct?
11 A    That is correct.
12 Q    Upper left?
13 A    That's correct.
14 Q    These are for 56 cartons of printing
15 paper to be delivered to Midland Paper.
16 Correct?
17 A    Yes.
18 Q    And in the note section, the
19 directions are to contact customer service at
20 Midland Paper and schedule a delivery with a
21 gentleman named Mike Whitten.  Correct?
22 A    That is correct.
23 Q    And specifies the receiving hours as
24 well.  Right?
25 A    Yes, it does.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY          June 12, 2012

109

1    Q     But the way, do you know why the
2  carrier is identified as Oxen rather than
3  Universal if these are for deliveries after
4  June 13, 2008?
5    A     No, I don't know.
6    Q     Would it be correct that, in your
7  involvement with the October 2007 contract and
8  your involvement in the June 2008 amendment to
9  that contract, you at no time had any contact
10  with Martin's Bulk Milk Service?
11    A     No. I did not.
12    Q     There is no mention of Martin's Bulk
13  Milk Service in the contract or the amendment.
14  Correct?
15    A     That is correct.
16    Q     Whether or not there was a delivery
17  going to be made to an International Paper
18  customer was determined by International
19  Paper. Correct?
20    A     I don't understand your question.
21    Q     Sure. I mean, there would be no
22  products given to Universal or to Martin's
23  unless International Paper told them we have a
24  delivery we need you to make. Correct?
25    A     Yes.

110

1    Q     And International Paper provided the
2  identity of your customer to whom that
3  delivery should be made. Correct?
4    A     Yes.
5    Q     International Paper also identified
6  the location and the time for delivery.
7  Correct?
8    A     I believe the location, yes. Not
9  necessarily the time for delivery.
10    Q     You would -- or International Paper,
11  as indicated on these memo bills, would give
12  information about the delivery window and tell
13  the carrier to make an appointment with your
14  customer for a specific delivery time.
15  Correct?
16    A     That is correct.
17    Q     And as we talked earlier,
18  International also specified the type of
19  trailer that needed to be used for hauling
20  these goods to protect them and keep them
21  secure. Correct?
22    A     The contract talked about the
23  condition of the trailer. Yes.
24    Q     Do you know Eric Johansen?
25    A     I recognize the name.

111

1    Q     What does he do? What is his job
2  there?
3    A     I recognize his name of being in the
4  IP legal department. I don't know what he
5  does.
6    Q     How about Lyle Blackman?
7    A     Yes. I know Lyle Blackman.
8    Q     What department does he work in?
9    A     IP legal department.
10    Q     How about Tracy Denkins?
11    A     Recognize the name.
12    Q     Legal department or elsewhere?
13    A     I'm not sure.
14    Q     Man or woman?
15    A     I'm not sure.
16    Q     And Kathy Szwast -- we already talked
17  about her. She doesn't work for International
18  Paper, does she?
19    A     Not that I know of.
20    Q     Did International Paper have any
21  process by which they investigated or
22  evaluated the driving qualifications of the
23  carrier -- or strike that. Of the drivers for
24  Universal?
25        MR. FISHER: Objection to form.

112

1        Vague. You can go ahead and answer.
2        THE WITNESS: Of the specific
3  drivers, no.
4  BY MR. BURKE:
5    Q     Did International Paper engage in any
6  evaluation or investigation of Universal with
7  respect to their safety performance by any of
8  their drivers or agents?
9    A     We looked at the DOT safety rating
10  for the carrier as a whole. Not individual
11  drivers.
12    Q     The carrier here would be Universal?
13    A     Yes.
14    Q     Now, would it be correct that
15  International Paper did not ever investigate
16  or evaluate the safety record of Martin's Bulk
17  Milk Service or any of its drivers?
18    A     I did not do that.
19    Q     You are not aware of anyone else at
20  International Paper having done so. Correct?
21    A     That is correct.
22    Q     Okay.
23        MR. BURKE: Let me just look at
24  my notes. I may not have anything else,
25  sir. I don't know if anyone else has



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                    June 12, 2012

113

1    any questions. Thank you for your time.
2          MR. FISHER: Any BMW questions?
3          MR. LANGS: I have a couple of
4    questions. Brian Langs.
5          MR. FISHER: Please identify
6    yourself.
7          MR. LANGS: This is Brian Langs.
8    I represent BMW. I have like two
9    questions.
10         EXAMINATION
11   BY MR. LANGS:
12   Q      Are you aware of the plaintiffs'
13   products liability claims against BMW in this
14   case?
15   A      Could you ask that again or rephrase
16   that.
17   Q      Do you have any claims against BMW in
18   this case?
19   A      I'm aware that BMW is involved in
20   this case.
21   Q      Is it fair to say that you don't have
22   any opinions regarding the plaintiffs' claims
23   against BMW in this case alleging design and
24   defects in the car that the plaintiff was
25   driving?

114

1    A      That is fair to say.
2          MR. LANGS: That is all I have
3    for you. Thank you very much.
4          THE WITNESS: Thank you.
5          MR. FISHER: I just have a few
6    follow-ups.
7          EXAMINATION
8    BY MR. FISHER:
9    Q      Mr. Mundy, you were asked some
10   questions by Mr. Burke concerning traffic laws
11   in the context of one of the provisions in the
12   contract. Do you remember that discussion?
13   A      Yes.
14   Q      I think he asked you whether or not
15   you expected that vehicles hauling
16   International Paper product -- you wouldn't
17   expect them to be colliding with other
18   vehicles. Correct?
19   A      Correct.
20   Q      Would the converse be likely -- would
21   the converse be exactly the same? That you
22   wouldn't expect other vehicles to run into a
23   tractor trailer rig that has International
24   Paper products in it?
25   A      That is correct.

115

1    Q      Different subject towards the end of
2    Mr. Burke's questions of you.
3          He asked you some questions about
4    whether or not the contract prohibited -- that
5    is to say International Paper and Universal
6    Am-Can's contract prohibited Universal Am-Can
7    from using another carrier.
8          And I believe you said that UACL had
9    that right. Remember that topic?
10   A      Yes, I do. I remember the topic.
11   Q      But you also said that you personally
12   were not aware of that actually happening in
13   the case of Universal Am-Can.
14   A      That's correct.
15   Q      Was it also the case that you were
16   not aware that Overnite Express, the
17   predecessor company to Universal Am-Can, was
18   using another motor carrier to effectuate
19   deliveries of International Paper product?
20   A      That is correct. I was not aware.
21   Q      Joan Anderton, though, based upon
22   your knowledge of her, was aware of that.
23   A      Yes.
24   Q      Where did Joan Anderton fit in the
25   organization that you were a part of? Did she

116

1    report to you? Was she a part of your group?
2    A      No. She did not report to me. She
3    was not part of my group.
4    Q      Okay.
5          MR. FISHER: That is all the
6    questions I have.
7          MR. BURKE: Nothing else.
8          MR. FISHER: Signature reserved.
9    (Deposition ended at 12:37 p.m.)



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

STEPHEN M. MUNDY                                      June 12, 2012

117

1
2
3          C E R T I F I C A T E
           STATE OF TENNESSEE:
           COUNTY OF SHELBY:
4
5              I, Takiyah Sanders, Court Reporter and
           Notary Public, Shelby County, Tennessee,
6          CERTIFY:
               The foregoing proceedings were taken
7          before me at the time and place stated in the
           foregoing styled cause with the appearances
8          as noted.

9              Being a Court Reporter, I then reported
10         the proceeding in Stenotype, and the
           foregoing pages contain a true and correct
11         transcript of my said Stenotype notes then
           and there taken.
12
               I am not in the employ of and am not
13         related to any of the parties or their
           counsel, and I have no interest in the matter
14         involved.
15             I FURTHER CERTIFY that this transcript
           is the work product of this court reporting
16         agency and any unauthorized reproduction and
           or transfer of it will be in violation of
17         Tennessee Code Annotated 39-14-104, Theft of
           Services.
18
               Witness my signature, this 27th
19         day of June, 2012.
20

21         Takiyah Sanders, CSR, LCR
           License No. 486
22
23
24
25

118

1              DEPOSITION ERRATA SHEET
2
3
4          Our Assignment No. 343628
5          Case Caption: SCHEINMAN
6          vs. MARTIN'S BULK MILK SERVICE
7
8              DECLARATION UNDER PENALTY OF PERJURY
9              I declare under penalty of perjury
10         that I have read the entire transcript of
11         my Deposition taken in the captioned matter
12         or the same has been read to me, and
13         the same is true and accurate, save and
14         except for changes and/or corrections, if
15         any, as indicated by me on the DEPOSITION
16         ERRATA SHEET hereof, with the understanding
17         that I offer these changes as if still under
18         oath.
19             Signed on the _____ day of
20         _____, 20___.
21
22         _____
23             STEPHEN M. MUNDY
24
25

119

1              DEPOSITION ERRATA SHEET
2          Page No._____Line No._____Change to:_____
3          _____
4          Reason for change:_____
5          Page No._____Line No._____Change to:_____
6          _____
7          Reason for change:_____
8          Page No._____Line No._____Change to:_____
9          _____
10         Reason for change:_____
11         Page No._____Line No._____Change to:_____
12         _____
13         Reason for change:_____
14         Page No._____Line No._____Change to:_____
15         _____
16         Reason for change:_____
17         Page No._____Line No._____Change to:_____
18         _____
19         Reason for change:_____
20         Page No._____Line No._____Change to:_____
21         _____
22         Reason for change:_____
23
24         SIGNATURE:_____DATE:_____
25             STEPHEN M. MUNDY

120

1              DEPOSITION ERRATA SHEET
2          Page No._____Line No._____Change to:_____
3          _____
4          Reason for change:_____
5          Page No._____Line No._____Change to:_____
6          _____
7          Reason for change:_____
8          Page No._____Line No._____Change to:_____
9          _____
10         Reason for change:_____
11         Page No._____Line No._____Change to:_____
12         _____
13         Reason for change:_____
14         Page No._____Line No._____Change to:_____
15         _____
16         Reason for change:_____
17         Page No._____Line No._____Change to:_____
18         _____
19         Reason for change:_____
20         Page No._____Line No._____Change to:_____
21         _____
22         Reason for change:_____
23
24         SIGNATURE:_____DATE:_____
25             STEPHEN M. MUNDY



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com