COPY

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY D. SCHEINMAN, )
a Disabled Person )
    Plaintiff, )
  -vs- ) No. 09 CV 5340
MARTIN'S BULK MILK SERVICE, )
INC., SAMUEL G. FRANKE, )
CSX INTERMODAL, INC., )
INTERNATIONAL PAPER COMPANY, )
et al., )
    Defendants. )

    The discovery deposition of JANET BERNDT,
called for examination pursuant to Notice and the
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, taken before Janet M. Stanton, a
notary public within and for the County of DuPage
and State of Illinois, at 211 South Wheaton Avenue,
Wheaton, Illinois, on the 28th day of September,
2012, at the hour of 10:17 o'clock a.m.

Reported by: Janet M. Stanton, CSR
License No.: 084-001905

**Page 2**

APPEARANCES:
CLIFFORD LAW OFFICES
  BY: MR. RICHARD F. BURKE, JR.
    rfb@cliffordlaw.com
  120 North LaSalle Street, Suite 3100
  Chicago, IL 60602
  (312) 899-9090
  rfb@cliffordlaw.com
    Representing the Plaintiff;
MULHERIN, REHFELDT & VARCHETTO, P.C.
  BY: MR. MATTHEW R. SCHRECK
    mschreck@mrvlaw.com
    MR. JASON M. BRIESEMEISTER
    jbriesemeister@mrvlaw.com
  211 South Wheaton Avenue, Suite 200
  Wheaton, IL 60187
  (630) 653-9316
    -and-
DOWD & DOWD, LTD.
  BY: MS. LARA R. LICKHALTER
    llickhalter@DowdandDowd.com
  617 West Fulton Street
  Chicago, IL 60661
  (312) 704-4400
    Representing Martin's Bulk Milk
    Service, Inc. and Samuel G. Franke;
HINSHAW & CULBERTSON
  BY: MR. WILLIAM YU
    wyu@hinshawlaw.com
  222 North LaSalle Street, Suite 300
  Chicago, IL 60601
  (312) 704-3000
    Representing International Paper
    Company, Overnite Express, Inc., Ox,
    LLC, Universal Am Cam, Ltd., and
    Overnite Logistics, Inc.;
JOHNSON & BELL, LTD
  BY: MR. TIMOTHY R. COUTURE
    couturet@jbltd.com
  33 West Monroe Street, Suite 2700
  Chicago, IL 60603
  (312) 372-0770
    Representing BMW of North America,
    LLC and Bayerische Motoren Werke
    Aktiengesellschaft.

**Page 3**

INDEX

WITNESS          EXAMINATION
JANET BERNDT
  By Mr. Couture        5
  By Mr. Burke         97
  By Mr. Yu           130
  By Mr. Couture        139
  By Mr. Schreck       142

EXHIBITS

NUMBER         MARKED FOR ID
Berndt Deposition Exhibit
No. 122............................ 88

**Page 4**

    (Witness duly sworn.)
    MR. COUTURE: At the request of Martin's
counsel we're confirming on the record that all
objections are waived except for form.
    Anything else you wanted to say?
    MR. SCHRECK: I want to say not waived.
    MR. COUTURE: I didn't use the right word.
    MR. BURKE: Yes.
    MR. SCHRECK: I'll say -- I'll put on the
record that all objections other than form and
foundation are reserved --
    MR. COUTURE: Reserved, that's what I meant to
say.
    MR. SCHRECK: -- for purposes, as you said it,
at trial or --
    MR. COUTURE: We're waiving the need for you to
make them during the questioning, how's that?
    MR. SCHRECK: Yes.
    MR. COUTURE: All right.

EXHIBIT
J

McCork... ...s, Inc.
Chicag... ...263-0052

JANET BERNDT,
called as a witness herein, having been first duly
sworn, was examined and testified as follows:
EXAMINATION
BY MR. COUTURE:
Q. Please state your full name for the
record.
A. Janet Marie Berndt.
Q. How do you spell the last name?
A. B-e-r-n-d-t.
Q. Ms. Berndt, have you ever given a
deposition before?
A. No.
MR. COUTURE: Let the record reflect that this
is the discovery deposition of Janet Marie Berndt,
taken pursuant to the Federal Rules of Civil
Procedure.
Ma'am, my name is Tim Couture. I
represent Bavarian Motor Works, BMW, and I'm going
to ask you some questions today regarding your
employment and your knowledge relative to an
accident which occurred July 3rd, 2008 involving an
employee of Martin's Bulk Milk.
If at any time during my questioning you

don't understand my questions, please stop me, ask
me to rephrase it, and I will do so, okay?
THE WITNESS: Okay.
MR. COUTURE: It is important, in fact
imperative that you only answer questions that you
understand.
THE WITNESS: Okay.
MR. COUTURE: And if you do answer my
questions, I will expect that you've understood
them. Is that fair?
THE WITNESS: Fair.
MR. COUTURE: Fantastic.
As you can see, we have a court reporter
today and she's taking down everything that's being
said, so you need to make sure that all of your
answers are out loud. No nods of the head, shrugs
of the shoulders, and things like uh-huh, uh-uh
will be difficult for her to take down, so if you
could do that for us, I'd appreciate it.
And, finally, it also helps her and me if
you wait until I've completed my question before
you answer. You'll probably find in my questioning
I have sometimes pauses in the middle, so if you
could just do me a favor and wait until I'm done,

it'll go a lot more easily, okay.
BY MR. COUTURE:
Q. Where do you live, ma'am?
A. 24000 King Road, Wilton, Wisconsin.
Q. And who do you live with at that address?
A. My husband.
Q. How long have you lived there?
A. Since 2003.
Q. And where were you born?
A. Hillsboro, Wisconsin.
Q. And what's your date of birth?
A. 11/25/64.
Q. What's your highest level of education?
A. High school.
Q. You graduated from high school?
A. Graduated.
Q. What year did you do that?
A. 1982.
Q. Do you have a CDL, commercial driver's
license?
A. No.
Q. Did you examine or review any materials
before you -- in preparation for your deposition
today?

A. Yes.
Q. What did you examine?
A. The driver qualification file, and I
briefly reviewed the accident report and witness
statements.
Q. When you say accident report, you mean the
police report?
A. Correct.
Q. Did you review any other documents?
A. No.
Q. Not counting your lawyer -- well, strike
that.
I should ask you this: Is Mr. Schreck
here as your lawyer today?
A. Yes.
MR. SCHRECK: Yes.
BY MR. COUTURE:
Q. Not counting your lawyer, have you spoken
to anyone else in preparation for your deposition
today?
A. No.
Q. Have you spoken to any lawyers other than
ones representing Martin's Bulk Milk today in
preparation?

2 (Pages 5 to 8)

1    A.  No.
2    Q.  Have you ever spoken to Mr. Burke before
3  today?
4    A.  Yes.
5    Q.  When did you first speak with Mr. Burke?
6    A.  I don't know the exact date, but I was
7  introduced to him when he did come to Martin's Bulk
8  Milk.
9    Q.  And when was that?  Not exact date, but
10  approximate.
11    A.  Sometime after the accident, so I would
12  have to say anywhere before December -- between
13  July and December of 2008.
14    Q.  Okay.  So, for example, I came to Martin's
15  Bulk Milk in August of 2011, but we're not talking
16  about that, we're talking about even before -- when
17  showed up to look at the truck.
18    A.  Yes.
19    Q.  Do you know for what purpose Mr. Burke was
20  up at Martin's Bulk Milk sometime after this
21  accident, but before December of 2008?
22    A.  No.
23    Q.  At that time was counsel, attorneys for
24  Martin's Bulk Milk present?

9

1    A.  Yes.
2    Q.  Did you speak to him today before the
3  deposition?  I saw the two of you walking in.
4    A.  In the elevator, yes.
5    Q.  Okay.  What's your current employment?
6    A.  Clarify.
7    Q.  Are you employed?
8    A.  Yes.
9    Q.  What is your job?
10    A.  Office manager.
11    Q.  Where?
12    A.  Martin's Bulk Milk.
13    Q.  How long have you held the title of office
14  manager for Martin's Bulk Milk?
15    A.  Since December of 1997.
16    Q.  Do you have any family relationship with
17  the Martins?
18    A.  No.
19    Q.  Did you hold any job other than office
20  manager with Martin's Bulk Milk before December of
21  '97?
22    A.  Before December of '97?
23    Q.  In other words, was your first job with
24  Martin's Bulk Milk as office manager, or were you

10

1  employed with them before in some other capacity?
2    A.  No.  I was employed as an office manager
3  with many hats.
4    Q.  Okay.  When did you first start working at
5  Martin's Bulk Milk?
6    A.  December of 1997.
7    Q.  Okay.  That's what I was trying to figure
8  out.
9    A.  Okay.
10    Q.  Have your duties as office manager been
11  essentially the same since December '97?
12    A.  As office manager, yes.
13    Q.  Have you ever had any job with Martin's
14  Bulk Milk other than office manager?
15    A.  Yes.
16    Q.  What other jobs have you held with
17  Martin's Bulk Milk?
18    A.  Safety manager.
19    Q.  And when did you become the safety manager
20  for Martin's?
21    A.  In 1997.
22      That, as well, was one of the hats I wore.
23    Q.  Okay.  Office manager, safety manager.
24  What other hat or job title did you hold at

11

1  Martin's Bulk Milk or have you held?
2    A.  That is it.
3    Q.  Those two.
4      So you were hired in December of '97 both
5  as the office manager and the safety manager?
6    A.  Correct.
7    Q.  Okay, thank you.
8      What training or experience did you have
9  beginning in 1997 to act as the safety manager for
10  a trucking company?
11    A.  None.
12    Q.  Since 1997, when you began your job as a
13  safety manager for Martin's Bulk Milk, what
14  training or experience have you had to be -- or in
15  your capacity as safety manager?
16    A.  I attended several conferences for safety
17  with the National Association for Small Trucking
18  Companies.
19    Q.  Okay.
20    A.  I worked closely with our insurance agents
21  so that they could teach me the rules and regs,
22  where to go to so -- and with the Wisconsin Motor
23  Carriers, I went to conferences.
24    Q.  Okay.  Anything else?

12

3 (Pages 9 to 12)

1    A. No.
2    Q. How many -- and you say you attended
3  several conferences for small motor carriers. When
4  was the first conference you attended?
5    A. I don't know.
6    Q. When was the last conference you've
7  attended?
8    A. For safety?
9    Q. Yes.
10    A. I don't know.
11    Q. When you say several, can you give me a
12  range? I understand you can't say how many.
13    A. At least ten.
14    Q. And who puts on the conferences?
15    A. NASTC, National Association for Small
16  Trucking Companies, Wisconsin Motor Carriers, HNI
17  Risk Services.
18    Q. As a safety manager for Martin's Bulk
19  Milk, what are your job duties?
20    A. My job duties as the safety manager were
21  to make sure the employee qualification files were
22  in place, to make sure that their physical was
23  adequately updated, to make sure that every year
24  they filled out their driving record qualification,

13

and that I ran the MVRs and compared those to that.
2    Q. And those are the background information
3  for your employers?
4    A. No, that's past employer. This is an
5  annual safety form that they have to fill out.
6  It's a DOT reg.
7    Q. Right.
8    A. And we are required to run their MVR every
9  year to compare --
10    Q. Motor vehicle record?
11    A. Right, their motor vehicle record, and
12  compare that to their statement.
13    It was my job to make sure if there was an
14  accident that I followed through with drug and
15  alcohol testing, that I worked with the insurance
16  company for recovery and --
17    Q. What do you mean by recovery?
18    A. Recovery -- if another company was at
19  fault, that we recovered our money in an accident.
20    Q. Okay. Any other duties?
21    A. It was my job if we were mandated for an
22  audit that I supply any information requested.
23    Q. Was it part of your job to investigate
24  accidents that your employees -- that Martin's Bulk

14

1  Milk employees were involved in?
2    A. No.
3    Q. Was it part of your job to gather
4  documentation when Martin's Bulk Milk personnel
5  were involved in accidents?
6    A. What type of documentation?
7    Q. Okay. Police report?
8    A. Yes.
9    Q. Department of Transportation records of
10  inspections of trucks --
11    A. Yes.
12    Q. -- after an accident?
13    A. Yes.
14    Q. The results of drug and alcohol testing?
15    A. Yes.
16    Q. Was it ever your job -- well, strike that.
17    Was it part of your job duties to take a
18  statement from the driver involved in the
19  accident? This is just general now.
20    A. No.
21    Q. Was it part of your job to fill out an
22  accident report for any accidents involving
23  Martin's Bulk Milk employees?
24    A. No.

15

1    Q. Was it a requirement of the safety --
2  well, strike that.
3    Were you the head of a safety department?
4    A. Yes.
5    Q. Was it part of the policy of Martin's
6  Safety Department that when an accident occurred,
7  an internal report had to be filled out by a
8  driver?
9    A. No.
10    Q. I understand from your testimony today
11  that it wasn't part of your job to get a statement
12  from the driver when an accident took place, but
13  was it your practice to go and speak with the
14  driver to ask what happened when he or she was
15  involved in an accident?
16    A. Yes.
17    Q. Is that documented anywhere in Martin's
18  Bulk Milk's records when -- what the driver says to
19  you and what you say to them?
20    A. No.
21    Q. Would that show up in their driver
22  qualification materials?
23    A. No.
24    Q. Would there be a record kept of when and

16

4 (Pages 13 to 16)

1  where and how an accident occurred so that you can
2  follow through on disciplinary procedures for
3  Martin's Bulk Milk?
4      A.  No.
5      Q.  We'll get to it in a bit, but I -- for
6  example, I saw the Driver's Handbook.  You're
7  familiar with that, right?
8      A.  Yes.
9      Q.  And in the Driver's Handbook it says
10  things like a driver can be disciplined if they
11  have multiple accidents that are deemed to be their
12  fault, things like that, right?
13     A.  Correct.
14     Q.  How does Martin's -- how did Martin's Bulk
15  Milk keep track of how many accidents a driver had
16  if they didn't keep records of the accident?
17     A.  We do have -- we do have a report that
18  all accidents are recorded, but not my statement is
19  in there as to what I discussed with the employee.
20     Q.  Okay, thank you.
21     A.  But the dates and the time and the
22  location, the insurance file number, et cetera.
23     Q.  So with every accident Martin's would have
24  a file or set of papers that correspond to that

17

1  talking about back when she was a safety director?
2  BY MR. COUTURE:
3      Q.  How about today.
4      A.  Today?  Safety director.
5      Q.  Okay.  And was that also the case in 2008?
6      A.  Yes.
7      Q.  Was that also the case in 2005?
8      A.  Yes.
9      Q.  How about in '97?
10     A.  Yes.
11     Q.  Okay.  So as long as you've been at
12  Martin's Bulk Milk and been the safety director, it
13  has been part of your job, to the accident extent
14  that it's needed, to interact with the police and
15  local authorities relative to Martin's Bulk Milk
16  accidents?
17     A.  Yes.
18     Q.  Okay.  As part of your job as safety
19  director, were you responsible for the training of
20  the drivers?
21     A.  No.
22     Q.  Was there someone at Martin's Bulk Milk
23  responsible for training of the drivers?
24     A.  Training in what aspect?

19

1  accident?
2      A.  Correct.
3      Q.  It just doesn't include anything the
4  driver said to you or you said to the driver,
5  nothing like that?
6      A.  Correct.
7      Q.  In the event -- strike that.
8          In the event an accident occurred with one
9  of your drivers and someone needs to speak with the
10  police department, who at Martin's Bulk Milk would
11  have that job?
12     A.  Could you repeat that, please?
13     Q.  Sure.
14         When there's an accident with a driver of
15  Martin's Bulk Milk and someone from Martin's Bulk
16  Milk needs to speak to the police or the state or
17  local authorities, would that be the duty of the
18  safety manager?
19     MR. SCHRECK:  Are you talking --
20     A.  Yes.
21     MR. SCHRECK:  I'm sorry --
22  BY MR. COUTURE:
23     Q.  Generally.
24     MR. SCHRECK:  When you say generally, are you

18

1      Q.  Does Martin's Bulk Milk provide any
2  training to its drivers?
3      A.  For driving or for paperwork or --
4      Q.  Yes, any --
5      A.  Both?
6          Paperwork, I did the training.  Driving,
7  we required two years of experience, and they were
8  to be qualified.
9      Q.  Okay.  So if I understand, Martin's Bulk
10  Milk's policy was to only to hire people who already
11  knew what they were doing?
12     A.  Correct.
13     Q.  So, therefore, Martin's Bulk Milk did not
14  provide driver training?
15     A.  Correct.
16     Q.  Did Martin's Bulk Milk require all of
17  their drivers to do a road test before being hired?
18     A.  No.
19     Q.  Now with regard to paperwork, you indicate
20  that you did the training.  Is that things like --
21  well, strike that.
22         What type of paperwork would that entail?
23     A.  The mileage sheet recording their odometer
24  reading at the state lines and --

20

5  (Pages 17 to 20)

1    Q.  You mean their logs?
2    A.  Logs.  They had to be knowledgeable and
3  know how to do that.  I did not provide training
4  for logs.
5    Q.  Have you been trained on how to properly
6  fill out logs?
7    A.  Yes.
8    Q.  You're -- because you don't have a CDL,
9  you've never had to do that professionally, though,
10  right?
11    A.  Correct.
12    Q.  Have you ever trained a driver at Martin's
13  Bulk Milk how to fill out their logs?
14    A.  No.
15    Q.  As safety manager, were you responsible --
16  I'm sorry, safety manager or safety director so
17  I'll get it right?
18    A.  Manager, director, one --
19    Q.  Okay.
20    A.  -- in the same.
21    Q.  That's fine.
22        So when we're talking here today, if I use
23  one or the other, you'll understand we're talking
24  about your job?

                                           21

1    A.  We hired a full-time person to handle our
2  safety department, and if he is out on vacation, I
3  am the second person in line for the calls.
4    Q.  Okay.  So like the vice safety person?
5    A.  Sure.
6    Q.  Okay.  And that was -- who is the safety
7  director now?
8    A.  Robert Haun.
9    Q.  What's his -- how do you spell that?
10    A.  H-a-u-n.
11    Q.  And was Robert Haun employed by Martin's
12  in 2008 when this accident took place?
13    A.  No.
14    Q.  So his first job and only job with
15  Martin's has been safety manager?
16    A.  Correct.
17    Q.  When I ask all the questions about what
18  your duties as safety manager are, or were, you
19  understood that I meant from the time you were
20  hired as safety manager until the time that you
21  stopped being the safety manager, right?
22    A.  Yes.
23    Q.  Okay, good.
24        As safety manager, were you -- at Martin's

                                           23

1    A.  Yes.
2    Q.  All right.  As safety manager, was it your
3  job or is it your job at Martin's Bulk Milk --
4  well, strike that.
5        I should ask this:  Have your job duties
6  been the same ever since you became safety manager
7  at Martin's Bulk Milk?
8    A.  No.
9    Q.  Okay.  When did those change?
10    A.  In, I believe, 2008 or 2009.
11    Q.  Okay.  Did they change -- did they --
12  well, strike that.
13        If you say -- did they change before or
14  after the accident involving Mr. Franke?
15    A.  After.
16    Q.  Did they change because of the accident
17  involving Mr. Franke?
18    A.  No.
19    Q.  Okay.  How did your job duties as safety
20  manager change in 2008 or 2009?
21        What was different?
22    A.  I no longer did -- handled safety, other
23  than for backup purposes.
24    Q.  What do you mean by that?

                                           22

1  Bulk Milk, were you responsible to ensure that the
2  trucks, tractors that left the Martin's yard were
3  safe?
4    A.  No.
5    Q.  Who was responsible to see that the
6  tractors that left the Martin's yard were safe?
7    A.  The driver.
8    Q.  You understood that the drivers were
9  supposed to do safety checks every morning, or
10  pre-trip inspection?
11    A.  Yes.
12    Q.  Did you ever -- strike that.
13        Have you ever trained a driver how to
14  properly do a pre-trip inspection?
15    A.  No.
16    Q.  Because you're not a driver -- well,
17  strike that.
18        Have you ever been personally trained on
19  exactly what has to go into a proper pre-trip
20  inspection?
21    A.  No.
22    Q.  Does Martin's Bulk Milk have a record such
23  that drivers are supposed to keep a written record
24  of every pre-trip inspection every day?

                                           24

McCorkle Litigation Services, Inc.
Chicago, Illinois    (312) 263-0052

**Page 25**

1    A.  Repeat that, please.

2    Q.  In July of 2008, when a driver for

3  Martin's Bulk Milk is getting ready to start his

4  shift, he has to do a pre-trip inspection, correct?

5    A.  Correct.

6    Q.  Or she, excuse me.

7    And does that driver have to write down

8  what he or she finds in the pre-trip inspection for

9  each time he starts a new shift?

10    A.  Yes.

11    Q.  Is it your understanding that that

12  pre-trip inspection would include checking to make

13  sure the brakes are working properly?

14    A.  Yes.

15    Q.  Making sure that the lights are working

16  properly?

17    A.  Yes.

18    Q.  Making sure that the blinkers are working

19  properly?

20    A.  Yes.

21    Q.  Hazard lights and directional signals is

22  what I mean.  Right?

23    A.  Correct.

24    Q.  Okay.  Was it ever your job to make sure

**Page 26**

1  that your drivers properly did their pre-trip

2  inspections?

3    A.  Yes.

4    Q.  And how did you do that?

5    A.  By looking at their driver logs.

6    Q.  Meaning that they documented an

7  inspection?

8    A.  Yes.

9    Q.  Okay.  Did Martin's Bulk Milk do anything

10  to ensure that the drivers didn't just get in their

11  truck and check off all the boxes without actually

12  doing the inspections?

13    A.  No.

14    Q.  You relied on the drivers to properly

15  write down what they saw and did?

16    A.  Yes.

17    Q.  Back in 2008, was there a person at

18  Martin's -- well, strike that.

19    I think you said that you were the person

20  in 2008 who would have been the contact between the

21  insurance company and Martin's in the event of an

22  accident?

23    A.  Correct.

24    Q.  And who was it at the insurance company

**Page 27**

1  that you would contact in the event of an accident

2  in 2008?

3    A.  Either our agency, Jill Witting, she's our

4  agent --

5    Q.  Jill?

6    A.  Jill.

7    Q.  Witting?

8    A.  Yeah, W-i -- yes, W-i-t-t-i-n-g.

9    Q.  Okay.

10    A.  Or if the driver failed to report an

11  accident, I would call it in to AIG at that time

12  with the driver information.

13    Q.  What did your duties as office manager for

14  Martin's Bulk Milk entail?

15    A.  My duties entailed handling all of the

16  accounting, payroll, HR, truck insurance, Work Comp

17  insurance, licensing, permitting, fuel taxes.

18    Q.  Anything else?

19    A.  That's about it.

20    Q.  Okay.  Have we talked about all the duties

21  that you held up through 2008 as the safety

22  director or manager of Martin's Bulk Milk?

23    A.  Yes.

24    Q.  Have we talked about all the duties that

**Page 28**

1  you had as the office manager?

2    A.  Yes.

3    Q.  All right.  Who is Samuel Franke?

4    A.  He was employed with Martin's in

5  approximately 1999 as a truck driver, and he ran

6  Chicagoland on a daily basis, Monday through

7  Friday.

8    Q.  So your recollection is that he started

9  approximately 1999?

10    A.  Correct.

11    Q.  Did Martin's provide any training to

12  Mr. Franke before he started driving for Martin's?

13    A.  No.

14    Q.  What did Martin's do to ensure that

15  Mr. Franke was appropriate to drive a semi

16  tractor-trailer?

17    A.  We did past employer verifications, we ran

18  his MVR, made sure that his DOT physical was legit

19  and current.

20    Q.  You indicate that Franke ran Chicagoland

21  daily.  When he was first hired, did he have a

22  specific route?

23    A.  I don't know.

24    Q.  When he was first hired, was he assigned

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

1  to a specific tractor?
2      A.  I don't know.
3      Q.  Who would know those things?  Other than
4  Mr. Franke.
5      A.  Dave, David Martin may possibly know.
6      Q.  In your role as -- when you were safety
7  director, who was your immediate supervisor at
8  Martin's Bulk Milk?
9      A.  David Martin.
10     Q.  What's David Martin's job title?
11     A.  Operations manager.
12     Q.  And I expect he's the Martin of Martin's
13 Bulk Milk, he and his father?
14     A.  Correct.
15     Q.  Are there any other Martins other than
16 David Martin and his father who are involved in the
17 operation of the company?
18     A.  No.
19     Q.  Is David Martin still your direct boss?
20     A.  Yes.
21     Q.  When you say that Samuel Franke ran
22 Chicagoland daily, what do you mean?
23     A.  He would leave our terminal anywhere
24 between 12:00 o'clock and 2:00 o'clock, usually,

29

1      Q.  Do you know what interview process or what
2  employment hiring process David Martin went through
3  in order to hire Samuel Franke?
4      A.  Yes.
5      Q.  And I just want to make it clear.  I'm not
6  asking you what you expect he did because he always
7  does this with everybody.  Do you know specifically
8  what he did with Samuel Franke?
9      A.  Yes.
10     Q.  What did he do, David Martin, to hire
11 Samuel Franke?
12     A.  David Martin would have Samuel fill out an
13 application, qualification for applicant --
14 employment.  At that point David would have me run
15 the MVR, motor vehicle record, complete the past
16 employer forms, and after review, then he would
17 decide whether or not he was material to be hired.
18     Q.  Was there an interview?
19     A.  I don't know.
20     Q.  Was there a road test for Mr. Franke?
21     A.  I don't know.
22     Q.  Was there a drug test for Mr. Franke
23 before he was hired?
24     A.  Yes.

31

1  12:00 o'clock p.m. and 2:00 o'clock p.m. daily, and
2  he would deliver -- this was at the time of the
3  accident.
4      Q.  Well, let's -- let's stop, then.  I want
5  to --
6      A.  Okay.
7      Q.  I want to start first defining our terms.
8      A.  Okay.
9      Q.  So instead of you telling me what
10 Mr. Franke did on the day of the occurrence, I
11 assure you we'll get there, when you say ran
12 Chicagoland daily, generally what do you mean by
13 those terms?
14     A.  Pick up a load at our terminal in Wilton,
15 Wisconsin, deliver it to the Chicagoland area,
16 reload, and bring the load back to our terminal.
17     Q.  Okay.  Was that Mr. Franke's route, for
18 lack of a better word, when he started?
19     A.  Yes.
20     Q.  Were you involved in the hiring of Samuel
21 Franke?
22     A.  No.
23     Q.  Who hired him?
24     A.  David Martin.

30

1      Q.  And once he was hired, was he
2  automatically -- was Mr. Franke automatically
3  placed on the Chicagoland run?
4      A.  I don't know.
5      Q.  Do you know when it was that Mr. Franke
6  first was assigned to the Chicagoland run?
7      A.  No.
8      Q.  Other than Mr. Franke, would I have to ask
9  David Martin that question?
10     A.  Yes.
11     Q.  When Mr. Franke started making the
12 Chicagoland run, did he always bring loads from the
13 same customer to Chicago, or was it on a day-by-day
14 basis?
15     A.  I don't know.
16     Q.  When Mr. Franke got to Chicago, did he
17 always have a load to bring back, or was that a
18 day-by-day basis?
19     A.  Day by day.
20     Q.  Depending on what the dispatcher was able
21 to get for him?
22     A.  Correct.
23     Q.  When Mr. -- well, strike that.
24        In July of 2008, did Mr. Franke, to your

32

8 (Pages 29 to 32)

1 knowledge, have a regular load that he took from
2 Wilton to Chicago?
3    A. Yes.
4    Q. And who was that load hauled for?
5    A. To Chicago?
6    Q. Yes.
7    A. MBM Logistics. MBM Logistics,
8 Incorporated.
9    Q. And that is a different company from
10 Martin's Bulk Milk, correct?
11    A. Correct.
12    Q. But MBM stands for Martin's Bulk Milk
13 Logistics?
14    A. No.
15    Q. What does MBM stand for?
16    A. MBM.
17    Q. Okay. And are you -- do you know who the
18 owner of that company is?
19    A. Owners.
20    Q. Who are the owners?
21    A. Allan Martin, Ruth Martin, and Randy
22 Galewski.
23    Q. And do the Martins who own that company
24 have any relationship to the Martins that run

33

1 Logistics from the Martin's Bulk Milk yard to
2 Chicago?
3    A. Correct.
4    Q. And were those MBM loads always the same
5 product?
6    A. To my knowledge.
7    Q. And what was that product?
8    A. Furniture.
9    Q. Okay. So MBM Logistics had some agreement
10 with a furniture company to deliver furniture, and
11 MBM Logistics hired Martin's Bulk Milk to do that
12 delivery?
13    A. Correct.
14    Q. Were you involved in the contracts between
15 MBM Logistics and Martin's Bulk Milk to haul that
16 furniture?
17    A. No.
18    Q. Were you involved, or do you have any
19 knowledge of the contract between MBM Logistics and
20 the furniture company for those loads?
21    A. No.
22    Q. Have you ever worked for MBM Logistics?
23    A. No.
24    Q. For how long had it been Samuel Franke's

35

1 Martin's Bulk Milk?
2    A. Yes.
3    Q. What is their relationship?
4    A. Allan and Ruth are president and vice
5 president of Martin Bulk Milk.
6    Q. Okay, thank you.
7      Is Allan David's father?
8    A. Yes.
9    Q. And Ruth is his wife?
10    A. Yes.
11    Q. Okay. And they -- who are the owners of
12 Martin's Bulk Milk?
13    A. Allan and Ruth Martin.
14    Q. Okay. So the people who own MBM Logistics
15 also own Martin's Bulk Milk?
16    A. Correct.
17    Q. And so in and around July 3rd, 2008 Samuel
18 Franke was regularly or daily bringing loads from
19 MBM Logistics to Chicago?
20    A. No.
21    Q. Okay.
22    A. From Martin Bulk Milk to Chicago.
23    Q. Thank you.
24      Loads -- he was hauling loads for MBM

34

1 daily work activity to haul furniture from Martin's
2 Bulk Milk to Chicago?
3    A. I don't know.
4    Q. Was it a -- had it been going on for
5 years, or was it just three days before the
6 accident, or was it a -- do you --
7    A. I don't know.
8    Q. Okay. And I asked you if it was a
9 regular, that's what he -- he did, and you said
10 yes. So can you tell me for how long it was his
11 regular load?
12      And if you can only give me your best
13 estimate, that's fine.
14    A. My best estimate would be at least one
15 year.
16    Q. Do you know what location in Chicago
17 Samuel Franke was delivering that furniture to?
18    A. On that particular date?
19      Or any --
20    Q. Any of them, any time.
21      Was it was it always the same place or did
22 he go different --
23    A. No.
24    Q. -- locations?

36

9 (Pages 33 to 36)

1    A.  There were different rail yards.  He was
2  delivering to rail yards.
3    Q.  Thank you.
4        Okay.  So he would take furniture to
5  various rail yards?
6    A.  Correct.
7    Q.  Do you know what route Samuel Franke would
8  take from Wilton, Wisconsin, the Martin's Bulk Milk
9  yard, to the rail yards?
10   A.  Generally either I-90 or I-94.
11   Q.  Who was it who decided what route
12  Mr. Franke would take to get to the rail yards?
13   A.  Mr. Franke.
14   Q.  Did Martin's Bulk Milk ever tell
15  Mr. Franke how to get from Wilton, Wisconsin to the
16  rail yards?
17   A.  I don't know.
18   Q.  Was there a policy and procedure in place
19  at Martin's Bulk Milk to direct the drivers to take
20  a certain route, as opposed to letting them pick
21  their own?
22   A.  The shortest route.
23       And if they were unaware of the shortest
24  route to a specific city, they could call for

                                                    37

1    A.  No.
2    Q.  Was there an unwritten rule that drivers
3  should avoid tolls?
4    A.  No.
5    Q.  Generally, in July of 2008, after
6  delivering furniture to the rail yards, did
7  Mr. Franke have a regular return load?
8    A.  Yes.
9    Q.  And that return load was paper products
10  from Hammond, Indiana, right?
11   A.  Correct.
12   Q.  For how long had that been his regular
13  return load as of July 2008?
14   A.  I don't know.
15       Estimate, one year, at least.
16   Q.  Were you involved in coordinating
17  Mr. Franke's pickup of that load on a day-to-day
18  basis with the folks in Hammond?
19   A.  No.
20   Q.  Who at Martin's Bulk Milk would have been
21  responsible for that?
22   A.  David Martin or Pat Podlena.
23   Q.  All right.  And did you ever talk to the
24  people in Hammond, Indiana from where he was

                                                    39

1  routing.  But from the entrance to the city to the
2  exact location, it was their responsibility as the
3  driver.
4    Q.  Was it mandated that they take the
5  shortest route?
6    A.  Yes, with --
7    Q.  And -- go ahead.
8    A.  Within reason, based on conditions.
9    Q.  Well, and that's what I was going to ask.
10   A.  Yes.
11   Q.  When you say shortest route, do you mean
12  shortest route distance or shortest route time?
13  Because those can be different.
14   A.  Yes.  Both.
15   Q.  Both.
16   A.  We had no preference if they ran 90 or 94
17  down to Chicago, because running 94 could eliminate
18  tolls.  So the factor of the extra -- fifteen extra
19  miles outweighed a toll expense.
20   Q.  Is the toll expense the driver's
21  responsibility or Martin's?
22   A.  Martin's.
23   Q.  Was there a policy specifically to avoid
24  tolls?

                                                    38

1  picking up the load of paper?
2    A.  No.
3    Q.  What if any regular interaction would you
4  have had with Samuel Franke in or around July of
5  2008 in your job?
6    A.  Can you re -- say that -- repeat it.
7    Q.  Sure.
8        I'm not asking you if when you saw him you
9  said hi.  I'm asking about in your employment
10  capacity as safety director and office manager, did
11  you have a regular interaction or involvement with
12  Mr. Franke?
13   A.  No.
14   Q.  So it wasn't your job to see him in the
15  morning or see him when he came back from his
16  loads?
17   A.  No.
18   Q.  It wasn't your job to direct what he was
19  doing out on the road?
20   A.  No.
21   Q.  I saw in the handbook that we'll talk
22  about a little bit later that every driver is
23  required to do a check-in call.
24       Was it part of your job to be involved in

                                                    40

10 (Pages 37 to 40)

1 that check-in call?
2    A. No.
3    Q. That would have been the dispatchers?
4    A. Correct.
5    Q. Which would have been David Martin and
6 some other folks?
7    A. Yes.
8    Q. So you could go days or even weeks without
9 seeing Mr. Franke?
10    A. Correct.
11    Q. Do you know when the last time prior to
12 July 3rd, 2008 it was that you saw Mr. Franke?
13    A. No.
14    Q. Was your relationship with Mr. Franke
15 strictly he worked for the same company you did?
16    A. Yes.
17    Q. You didn't go out socially or hang out or
18 anything like that?
19    A. No.
20    Q. Were you personally aware of Mr. Franke's
21 route when he drove from Hammond, Indiana back to
22 Wilton?
23       And I'm not asking you what you know now,
24 I'm asking about when -- before this accident did

41

1    Q. Sure.
2       Have you ever seen -- well, strike that.
3       You said you saw the police report,
4 correct?
5    A. Correct.
6    Q. Have you ever seen the statement that
7 Mr. Franke gave to the police, the video statement?
8    A. Repeat that?
9    Q. After this accident on July 3rd, or
10 perhaps July 4th in the early morning hours,
11 Mr. Franke gave a statement to the police that was
12 videotaped. Have you ever seen that?
13    A. No.
14    Q. Are you aware that Mr. Franke, in that
15 statement, said that he just was authorized -- just
16 recently was authorized to take a different route,
17 which is Route 41?
18    A. No.
19    Q. Do you have any knowledge or understanding
20 as to what anyone had ever said to Mr. Franke about
21 what route to take prior to the occurrence?
22    A. No.
23    Q. Are you familiar with the area where this
24 accident took place?

43

1 you know his route?
2    A. After the fact?
3    Q. Yes.
4       And I know it's going to be a little hard
5 to separate out what you know now from what you
6 knew then but -- so I'll ask it again.
7       Say July 2nd, 2008, the day before this
8 accident --
9    A. Um-hum.
10    Q. -- were you, as an employee of Martin's
11 Bulk Milk, aware of the route that Mr. Franke
12 typically took from Hammond to Wilton?
13    A. Typically took, no.
14    Q. Were you aware of what his options were?
15    A. Yes.
16    Q. Did you, personally, ever tell Mr. Franke
17 which route to take from Hammond to Wilton?
18    A. No.
19    Q. Did anyone from Martin's Bulk Milk tell
20 Mr. Franke what route to take from Hammond to
21 Wilton?
22    A. Probably not.
23    Q. Why do you say probably?
24    A. He knew the route.

42

1    A. No.
2    Q. How was it that you first learned that
3 Samuel Franke had been involved in an accident?
4    A. He called me at about 11:30 p.m. on
5 Thursday, July 3rd, 2008.
6    Q. Do you know where he was when he called
7 you?
8    A. At the scene of the accident. Highland
9 Park, Illinois, I believe it was.
10    Q. Do you know when in relationship to the
11 accident he called you?
12       And I know it's obviously after but --
13    A. I believe approximately fifteen minutes to
14 half an hour after the time of impact.
15    Q. And do you know if Mr. Franke spoke to
16 anyone else at Martin's Bulk Milk before calling
17 you?
18    A. He did not.
19    Q. Okay. Do you know who James Jorgenson is?
20    A. Yes.
21    Q. Is he an employee -- or was he an employee
22 of Martin's Bulk Milk at that time?
23    A. Yes.
24    Q. Is he still an employee of Martin's Bulk

44

11 (Pages 41 to 44)

1  Milk?
2    A.  Yes.  He's an independent contractor.
3    Q.  Okay.  Martin's has some drivers who are
4  employees?
5    A.  Correct.
6    Q.  And some that are independent contractors?
7    A.  Correct.
8    Q.  And those are owner-operators?
9    A.  Yes.
10    Q.  And Mr. Jorgenson was an owner-operator?
11    A.  At that time I don't know.
12    Q.  But he is now?
13    A.  He is now.
14    Q.  Okay.  Have you ever spoken to James
15  Jorgenson regarding any conversation he had with
16  Samuel Franke about the accident?
17    A.  No.
18    Q.  When Mr. Franke called you fifteen to
19  thirty minutes after the accident, can you tell me
20  what he said?
21    A.  Once I could get him calmed down --
22  because he does have a speech impediment, so I
23  could not understand him, he stutters very bad.  He
24  said he had hit a car, that he was sure the guy had
      45

1  to be dead because the car was on fire, and he
2  said:  I never saw the car.  The light was green.
3      And that was about it.
4    Q.  All right.
5    A.  But he -- what do I have to do?
6    Q.  Let me stop you there.  Now I want to ask
7  you about the specifics about what you just told
8  me.
9      First of all, let's talk about his speech
10  impediment.
11      Before this accident you were aware
12  Mr. Franke had a speech impediment, a stutter?
13    A.  Yes.
14    Q.  He had a particular manner of speaking
15  that you were familiar with?
16    A.  Yes.
17    Q.  Okay.  And that was true when he was
18  talking normally as well as when he got excited?
19    A.  Yes.
20    Q.  And you -- when he called, you observed
21  that he was having that speech impediment?
22    A.  Yes.
23    Q.  Okay.  He indicated that he hit a car.
24  Did he say what type of car he hit?
      46

1    A.  No.
2    Q.  Did he say whether the car was stopped or
3  moving when he hit it?
4    A.  He said he never saw the car.
5    Q.  Okay.  Did he tell you why he didn't see
6  the car?
7    A.  No.
8    Q.  Did he tell you where on the roadway he
9  was driving when he hit the car?
10    A.  No.
11    Q.  Did he say whether -- well, he said the
12  light was green, so that would indicate to you that
13  he was at an intersection?
14    A.  Or approaching one.
15    Q.  Okay.  Did you and he have any discussion
16  regarding whether other vehicles were around other
17  than the car he struck?
18    A.  No.
19    Q.  Did you talk about how fast he was going
20  at the time of impact?
21    A.  No.
22    Q.  Did he say anything about the force of the
23  impact, whether it was a light impact, a heavy
24  impact?
      47

1    A.  No.
2    Q.  Did he tell you what happened to the
3  vehicles after they contacted each other?
4    A.  He just said the other -- the car was on
5  fire.
6    Q.  Did he talk about how soon after the
7  impact between the vehicles occurred the fire
8  began?
9    A.  No.
10    Q.  Did he say whether there were witnesses?
11    A.  No.
12    Q.  At the time that you spoke to him, do you
13  know whether he had spoken to the police or anyone
14  else?
15    A.  I don't know.
16    Q.  And he then asked you:  What do I do?
17    A.  Yes.
18    Q.  And what did you say?
19    A.  I asked him:  Have the police been
20  called?  And he says:  Yes.
21      And I said:  It is your responsibility to
22  work with the police to get drug and alcohol
23  tested.
24      Because based on his statement to me, I
      48

12  (Pages 45 to 48)

1 was assuming there was a fatality and I wanted to
2 make sure that that did get done due to the
3 severity of it.
4     Q.  Did Mr. Franke tell you why it was that he
5 didn't see the car he struck?
6     A.  No.
7     Q.  Did he tell you that he had fallen asleep?
8     A.  No.
9     Q.  Did he tell you that he had zoned out?
10     A.  No.
11     Q.  Did he say anything about the condition of
12 the truck either before or after the accident when
13 you had this conversation with him?
14     A.  I did ask him if the truck was drivable.
15     Q.  And what did he say?
16     A.  And he said he thought so.
17     Q.  Where were you when the conversation
18 occurred?
19     A.  At my home.
20     Q.  And part of your job as a safety director
21 at that time was to field calls from drivers at any
22 time of night when an accident took place?
23     A.  Correct.
24     Q.  And how long did the conversation take?

49

1     A.  I'm guessing not more than three to four
2 minutes.
3     Q.  After you told him that his job was to
4 cooperate with the police and get a drug and
5 alcohol test, what other discussion was -- occurred
6 between you and he?
7     A.  I told him that he -- it would be his --
8 should -- it would be his responsibility to get the
9 accident reported to the insurance company.
10     Q.  It was his job to call the Martin's Bulk
11 Milk's insurance agent?
12     A.  Not agent, company.
13     Q.  The insurance company.
14     A.  Correct.  The call line.
15     Q.  Okay.  There's like an 800 number and --
16     A.  Yes.
17     Q.  -- they're supposed to call?
18     A.  Yes, correct.
19     Q.  All right.  Do you know if he did that?
20     A.  He did not.
21     Q.  Do you know why he did not call the
22 insurance company?
23     A.  No.
24     Q.  Did you have any other discussions with

50

1 Mr. Franke that evening or early morning that you
2 haven't told me about?
3     A.  Not that I recall.
4     Q.  Did you tell -- other than the insurance
5 company, did you tell him he needed to call or talk
6 to anyone else?
7     A.  No.
8     Q.  After you hung up the phone -- well,
9 strike that.
10         Did you and Mr. Franke talk about what he
11 was going to do to get back to Wisconsin?
12     A.  No.
13     Q.  After you hung up the phone -- well,
14 strike that.
15         Did that conclude your conversation with
16 him?
17     A.  Yes.
18     Q.  After you hung up the phone, what did you
19 do?
20     A.  I went back to bed.
21     Q.  In your job as safety director, when an
22 accident is reported to you is it your
23 responsibility -- what is your responsibility?
24         What are you supposed to do with that

51

1 information?
2     A.  With that information, I then relay to
3 David Martin that there was an accident, and from
4 there he takes care of equipment and/or cargo.  In
5 most instances if it is severe or a DOT recordable
6 accident, I will e-mail our insurance agent, Jill
7 Witting.
8         MR. SCHRECK:  Jill?  Joel or Jill?
9         THE WITNESS:  Jill.
10         MR. SCHRECK:  Okay.  Because it sounded like
11 Joel.
12         THE WITNESS:  J-i-l-l.
13 BY MR. COUTURE:
14     Q.  All right.  So we're clear, typically,
15 when there's an accident, you relay that
16 information to David Martin so he can determine
17 what if anything needs to be done to take care of
18 the equipment, meaning the truck, tractor, chassis,
19 container, and the load that's in the -- any
20 container right?
21     A.  Correct.
22     Q.  And it would be your job if it's a bad
23 accident to contact the -- your insurance agent,
24 Jill?

52

13  (Pages 49 to 52)

**Page 53**

1    A.  Follow -- as follow-up, yes.
2    Q.  And a follow-up.
3        But it's the driver's responsibility to
4  actually call it in to AIG?
5    A.  Yes.
6    Q.  So you didn't call David Martin right
7  after you got ahold of Mr. Franke, you just went to
8  bed; or after he got ahold of you?
9    A.  Correct.
10    Q.  When was the next time you spoke to anyone
11  regarding this accident?
12    A.  The following day.
13    Q.  When was it that you next spoke to someone
14  regarding the accident?
15    A.  July 4th.  I don't know what time, but I
16  would have notified David Martin.
17    Q.  When you spoke to David Martin -- well,
18  strike that.
19        It was late at night on the 3rd when you
20  got the call?
21    A.  Correct.
22    Q.  What time, approximately, was it -- not
23  exact, but approximately, was it on the 4th when
24  you talked to David Martin?

**Page 54**

1    A.  I don't know the exact time.  I would say
2  before noon.
3    Q.  Did you call him or did you see him
4  face-to-face at the office?
5    A.  I believe I called him.
6    Q.  When you called David Martin with this
7  information, did he already know about the
8  accident?
9    A.  Not to my knowledge.
10    Q.  So your understanding is that when you
11  told him about the accident, that was the first
12  time he learned of it?
13    A.  Correct.
14    Q.  Were you aware -- strike that.
15        Have you ever seen anyone's deposition in
16  this case?
17    A.  No.
18    Q.  You didn't see what Mr. Franke said or
19  Mr. Martin said or anyone else?
20    A.  No.
21    Q.  Were you aware of any -- well, strike
22  that.
23        As you sit here, are you aware that Samuel
24  Franke had a discussion with anyone on the night --

**Page 55**

1  from Martin's Bulk Milk other than you on
2  July 3rd?
3    A.  No.
4    Q.  Do you know whether he spoke to anyone
5  from Martin's Bulk Milk other than you before you
6  spoke to David Martin on the 4th before noon?
7    A.  No.
8    Q.  When you spoke to David Martin about this
9  accident, what did you tell him?
10    A.  I would have told him that Sam had an
11  accident, where it was, and as much as I knew about
12  it, that it was severe and that a car had been
13  rear-ended and burst into flames, and the location.
14    Q.  At any time before having that discussion
15  with David Martin did you see news reports of this
16  accident?
17    A.  No.
18    Q.  When you told David Martin this, did he
19  indicate to you that he had seen news reports of
20  the accident?
21    A.  No.
22    Q.  What was David Martin's response to you
23  regarding what you had said?
24    A.  Would you repeat that, please?

**Page 56**

1    Q.  Sure.
2        When you told David Martin there was an
3  accident that appeared to be serious and involved
4  fire, what did he say?
5    A.  I don't recall.
6    Q.  Generally, what was his response?
7    A.  His response would have been he'll have to
8  get hold of the driver to find out where all of the
9  equipment and everything, the load was taken.
10    Q.  Did you play any role in determining where
11  the truck was, getting the truck back, and seeing
12  that the load got to its destination?
13    A.  No.
14    Q.  That was David Martin's job or somebody he
15  directed other than you?
16    A.  Correct.
17    Q.  After you had this -- well, strike that.
18        Was that the end of the conversation you
19  had with David Martin?
20    A.  At that time, yes.
21    Q.  That specific conversation, okay.
22        When was the next time you spoke to anyone
23  regarding this occurrence?
24    A.  On Monday, the following Monday.

14 (Pages 53 to 56)

1    Q.  Did you work at the location of Martin's
2 Bulk Milk on the 4th of July?
3    A.  Not to my recollection.
4    Q.  How about the 5th or the 6th, Saturday or
5 Sunday?
6    A.  Not to my recollection.
7    Q.  So I understand your testimony, you spoke
8 to David Martin on the phone on the 4th, and then
9 the next time you had anything to do with this
10 accident was the 7th, the following Monday?
11    A.  Correct.
12    Q.  Do you know what if anything was done by
13 Martin's Bulk Milk to address this accident on the
14 4th, 5th, or 6th?
15    A.  Nothing that I know of.
16    Q.  Do you know if anyone from Martin's Bulk
17 Milk talked to the police on the 4th, 5th, or 6th?
18    A.  No. No, I don't know.
19    Q.  In your role as office manager or safety
20 director, would it be your job to know the weights
21 of the loads that Martin's has on the road?
22    A.  Every load?
23    Q.  Yes.
24    A.  No.

   57

1    Q.  Do you know the weight, gross weight of
2 Mr. Franke's truck and trailer on the day of the
3 occurrence?
4    A.  No.
5    Q.  Was there someone at Martin's Bulk Milk
6 whose job it was to make sure that all of the loads
7 were not overly heavy?
8    A.  It was the driver's responsibility, and
9 still is.
10    Q.  The following Monday, July 7th, what time
11 did you get to work that day?
12    A.  I don't know.
13    Q.  Do you have a typical come-and-go time at
14 work?
15    A.  Generally come-and-go is between 4:00 and
16 5:00 a.m. and my go time is between 5:00 and 6:00.
17    Q.  You indicated that the next time you spoke
18 to anyone about this accident was July 7th.
19    Who did you speak to on July 7th about the
20 accident, the first person you spoke to?
21    A.  David Martin.
22    Q.  Do you remember what time that was?
23 Approximate.
24    A.  7:00 a.m.

   58

1    Q.  And what conversation did you have with
2 David Martin at approximately 7:00 a.m. on the 7th
3 of July 2008?
4    A.  I don't recall specifically, but I do
5 recall Dave saying that we had no choice but to let
6 Sam go based on the severity of it, of the
7 accident, and that we just had to get following
8 through on insurance and everything.
9    Q.  Okay. Did Mr. Martin tell you who made
10 the decision to fire Sam Franke?
11    A.  No, but I know it was Dave Martin's.
12    Q.  So when he said we have no choice, am I
13 correct to say Dave Martin made a decision to fire
14 Sam Franke?
15    A.  Correct.
16    MR. SCHRECK:  Object -- or go ahead, that's
17 fine.
18 BY MR. COUTURE:
19    Q.  Do you know anyone else who had input into
20 that decision?
21    A.  No.
22    Q.  Do you -- strike that.
23    Have you spoken to David Martin since and
24 found out who if anyone he spoke to between the

   59

1 time of the accident and the time he told you on
2 the 7th that Franke was going to be fired?
3    A.  No.
4    Q.  Did he tell you why Sam Franke was going
5 to be fired?
6    A.  No.
7    Q.  Was it your understanding that Samuel
8 Franke was going to be fired and was fired for
9 causing an accident?
10    A.  Yes.
11    MR. SCHRECK:  Objection, form, foundation.
12    You can go ahead.
13    MR. COUTURE:  She answered.
14 BY MR. COUTURE:
15    Q.  Other than Mr. Martin telling you that Sam
16 Franke was going to be fired, did you have a
17 further conversation -- or discussions with him at
18 that time regarding this accident?
19    A.  No.
20    Q.  At that point did you discuss how or why
21 the accident took place with Mr. Martin?
22    A.  No.
23    Q.  Did you discuss the speed of the vehicles
24 or anything like that?

   60

15 (Pages 57 to 60)

1    A. No.
2    Q. Did he tell you what if anything he had
3  done in follow-up of learning about the accident?
4    A. No.
5    Q. He didn't tell you whether he had talked
6  to Samuel Franke or whether he had talked to the
7  police anything like that?
8    A. No.
9    Q. After you spoke to David Martin
10  approximately 7:00 a.m. on July 7th, when was the
11  next time you had a discussion with anyone
12  regarding the accident?
13    A. That day, later that day.
14    Q. Who else did you speak to that day?
15    A. Jill Witting.
16    Q. The insurance agent?
17    A. Correct.
18    Q. Okay.
19    A. And also I called the insurance company.
20    Q. All right. I'm not going to ask you what
21  you told the insurance company other than obviously
22  there was an accident, right?
23    A. Correct.
24    Q. All right. Did you speak to Samuel Franke

                                                    61

1    A. Not to my recollection.
2    Q. Anyone else not from Martin's Bulk Milk
3  there?
4    A. Not to my recollection.
5    Q. So as you recollect it, the three of you
6  were present?
7    A. Yes.
8    Q. All right. And do you know approximately
9  what time of day that was?
10    A. I don't. I honestly don't, no.
11    Q. And what happened at that meeting?
12    A. All I recall is Dave telling him that
13  there was no choice but to let him go, and that
14  this was a very severe accident, and that it would
15  be in his best interests to hire an attorney.
16    Q. At the time of that accident -- or strike
17  that.
18       At the time of that meeting was it your
19  understanding that Franke's truck had hit the rear
20  end of a -- of a car?
21    A. Yes.
22    Q. And was -- did Samuel Franke, at that
23  meeting, tell you, you and David Martin, what
24  happened in the accident?

                                                    63

1  on July 7th, 2008?
2    A. I don't recall.
3    Q. Did you see Sam Franke at Martin's Bulk
4  Milk July 7th, 2008?
5    A. I don't recall.
6    Q. Were you present in the meeting where he
7  was fired?
8    A. Yes, I was --
9    Q. Okay.
10    A. -- yes. Yes.
11    Q. I understand it's a long time ago, but
12  forgive me for saying that I expect you might know
13  a little bit -- remember some of this because it
14  wasn't an everyday occurrence.
15    A. Um-hum.
16    Q. Sam Franke came in on the 7th and was
17  fired?
18    A. Correct.
19    Q. And you were there?
20    A. Yes, I was.
21    Q. What -- well, first of all, you were
22  there, Sam Franke was there. Who else was there?
23    A. David Martin.
24    Q. Anyone else from Martin's Bulk Milk?

                                                    62

1    A. Briefly.
2    Q. What did he say?
3    A. He just said that he didn't see the car,
4  and the last he remembered was that the light had
5  been green.
6       He did state that he hadn't been talking
7  on the phone and he didn't think he was speeding,
8  that -- that was -- that was all that was said and
9  he exited the office, to my recollection.
10    Q. All right. Did he say how far back he was
11  when he believed he saw the light was green?
12    A. No.
13    Q. Did he -- other than saying I don't think
14  I was speeding, did he say how fast he was going?
15    A. My memory says that he said he was doing
16  the speed limit.
17    Q. Okay. And do you know what the speed
18  limit was at the area where his accident took
19  place?
20    A. I do not.
21    Q. If I were to tell you it's 45 miles an
22  hour, would that provide any more information, or
23  would that just be a guess?
24       Do you know?

                                                    64

                                      16 (Pages 61 to 64)

1    A.  I don't know.
2    Q.  Did he tell you what speed he had
3  indicated to the police he was driving?
4    A.  No.
5    Q.  Have you seen in the police report what he
6  said?
7    A.  Yes.
8    Q.  Okay.  At that meeting did Mr. Franke
9  explain why he didn't see the car that he struck?
10    A.  No.
11    Q.  Have you since spoken to Samuel Franke?
12    A.  Not since July of 2008.
13    Q.  All right.  Well, I'll ask you about that
14  a little bit more, then.
15      Why was it that -- if you know, that David
16  Martin told him he should get a lawyer?
17    A.  Because of the severity of the accident.
18    Q.  Did you understand that Mr. Franke
19  received moving violations or tickets as a result
20  of this accident?
21    A.  Not immediately.
22    Q.  Did you later come to understand that?
23    A.  Honestly, I don't believe I recall.
24    Q.  Okay.  Did Martin's Bulk Milk hire an

65

1  attorney for Mr. Franke at any point?
2    A.  Yes.
3    Q.  And for what purpose -- I'm not talking
4  about their insurance company in this lawsuit, but
5  for what purpose did Martin's Bulk Milk hire an
6  attorney for Mr. Franke?
7    A.  Because the accident was exceeding our
8  policy limits.
9    Q.  Okay.  So -- in this lawsuit you're
10  talking about?
11    A.  Correct.
12    Q.  All right.  Do you know if Mr. Franke had
13  a criminal lawyer at any point related to this
14  lawsuit -- or this accident?
15    A.  I do not know.
16    Q.  After being in the meeting with Samuel
17  Franke and David Martin, what if any other
18  discussions did you have with people regarding the
19  accident on July 7th?
20    A.  The only other person that I would have
21  spoken to about the accident would have been a
22  representative from AIG in which they wanted --
23    MR. SCHRECK:  Hold on.
24      I was going to say, I don't want you

66

1  talking about any conversations you had with AIG.
2    THE WITNESS:  Oh, okay.
3    MR. SCHRECK:  He can't get that information.
4  He'll ask you a question if he's got something
5  else.
6    THE WITNESS:  Okay.
7      Can you repeat your question?
8  BY MR. COUTURE:
9    Q.  Yes.
10      Other than your lawyer and your insurance
11  company, did you speak to anybody else on the 7th
12  regarding this accident?
13    A.  No.
14    Q.  Did you speak to the police on that day?
15    A.  I don't know if on that day.
16    Q.  Okay.  Mr. Franke testified that on the
17  8th, the next day, he was called by someone from
18  Martin's Bulk Milk to come back to Martin's Bulk
19  Milk to give a statement.
20      Do you know who called Mr. Franke to ask
21  him to come back?
22    A.  I did.
23    Q.  And why did you have Mr. Franke come back?
24    A.  He was to give his statement to AIG and I

67

1  wanted that statement done from our location.
2    Q.  And did he come to Martin's Bulk Milk that
3  day?
4    A.  Yes, or whatever day the statement was
5  given to AIG to -- I don't know if it was exactly
6  that day.
7    Q.  All right.  Were you present when
8  Mr. Franke gave a statement?
9    A.  Yes.
10    Q.  Who else was present?
11    A.  No one.
12    Q.  Okay.
13    A.  To my knowledge.
14    Q.  Your attorney is going to tell you that I
15  can't ask you about the discussions that were had
16  because he represents both of them and the
17  insurance company is part of that, so I'm not going
18  to ask you what was said, but I do get to ask you
19  who.
20      So it was you, it was Mr. Franke, someone
21  from the insurance company?
22    A.  Correct.
23    Q.  Do you know who?
24    A.  No.

68

17 (Pages 65 to 68)

1    Q.  Was David Martin there?
2    A.  Not to my recollection.
3    Q.  Was anyone else there?
4    A.  No.
5    Q.  Are you aware that on July 8th, 2008
6  Mr. Franke gave a statement to a gentleman by the
7  name of Dennis Frederickson?
8    A.  Yes.
9    Q.  Was Dennis Frederickson the person who was
10  at Martin's Bulk Milk taking the statement that you
11  were present for?
12   A.  No.
13   Q.  Were you ever present when Mr. Franke gave
14  a statement to Dennis Frederickson?
15   A.  No.
16   Q.  How were you aware that Dennis
17  Frederickson took a statement from Mr. Franke?
18   A.  When I called Sam to tell him that he
19  needed to come in to make a statement to AIG, he
20  said he had already given a statement to someone,
21  but he wasn't sure who it was.
22   Q.  At any point before that moment had you
23  ever spoken to a representative of the Scheinman
24  family, the injured gentleman?

                                                      69

1    A.  No.
2    Q.  Do you know whether anyone from your
3  insurance company, or a lawyer on behalf of
4  Martin's Bulk Milk or the insurance company had
5  spoken to the Scheinman family or any
6  representative of the Scheinman family?
7        MR. SCHRECK:  Can I get the question again,
8  please?
9        MR. COUTURE:  You know, I'll ask it again
10  because even as I said it I think I made a
11  mistake.
12  BY MR. COUTURE:
13   Q.  Do you know whether your insurance company
14  or any lawyer for your insurance company before
15  July -- the July 8th statement by Mr. Franke to
16  Dennis Frederickson was given, had spoken to a
17  representative of the Scheinman family?
18   A.  I do not know.
19   Q.  Okay.  Were you aware that the day before,
20  Monday, July 7th, 2008, Mr. Scheinman's family
21  filed a lawsuit in Cook County against Martin's
22  Bulk Milk and Samuel Franke?
23   A.  Yes.
24   Q.  When did you first become aware that the

                                                      70

1  lawsuit had been filed?
2    A.  That Monday, July 7th.
3    Q.  How was it that you learned that the
4  lawsuit had been filed?
5    A.  I believe the insurance company -- or we
6  received -- we may have received something via hand
7  delivery.
8    Q.  Okay.
9    A.  I don't remember, but -- exactly.
10   Q.  Again, I don't want to know the content of
11  the conversation, but I'm just trying to piece this
12  together.
13       When you got the hand delivery, what did
14  you do with it?
15   A.  I don't recall, exactly.  I'm sure I
16  notified David Martin immediately.
17   Q.  Okay.  So on the 7th, that Monday after
18  the accident, you knew there was a lawsuit?
19   A.  Yes.
20   Q.  Do you have any understanding of why an
21  investigator for plaintiff's counsel would be
22  contacting your employee the day after a lawsuit
23  was filed against you and your employee?
24   A.  Repeat that, please.

                                                      71

1    Q.  Sure.
2        Do you have any understanding as to why
3  Mr. Frederickson, who was hired by Mr. Burke's
4  firm, would be contacting your employee the day
5  after the suit was filed?
6        MR. SCHRECK:  I don't want you to guess.  If
7  you know, you know.
8    A.  No, I don't know why.
9  BY MR. COUTURE:
10   Q.  All right.  Did Martin's Bulk Milk already
11  have a lawyer -- again, I don't want to know what
12  you said, but as of the 7th was there already a
13  lawyer involved from Martin's Bulk Milk?
14   A.  No.
15   Q.  As of the 7th -- or as of the 8th was
16  there already a lawyer involved from Martin's Bulk
17  Milk?
18   A.  I don't know.
19   Q.  Do you know if Mr. Franke had a lawyer on
20  the 7th of July?
21   A.  I do not know.
22   Q.  Do you know whether Mr. Franke had a
23  lawyer on the 8th of July?
24   A.  I do not know.

                                                      72

18 (Pages 69 to 72)

1    Q.  So when you called Mr. Franke and said you
2    have to come down and give a statement, he told you
3    that he had already given one?
4    A.  Correct.
5    Q.  Did you ask him who he gave it to?
6    A.  Yes.
7    Q.  And what did he say?
8    A.  He said he did not know.
9    Q.  When did you learn that that individual
10   was Dennis Frederickson, the investigator for
11   plaintiff, plaintiff's counsel?
12   A.  I did not know it was for the other party
13   until after I learned that he had not given a
14   statement for IAG, but that it was apparently for
15   the other party.
16   Q.  All right.
17   MR. SCHRECK:  When you said IAG, you meant
18   AIG?
19   THE WITNESS:  AIG, sorry.
20   MR. SCHRECK:  That's all right.
21   BY MR. COUTURE:
22   Q.  When was that that you learned that?
23   A.  Sometime on the 8th of July, I'm assuming.
24   Q.  Okay.  Other than being present for

73

1    not sure.
2    Q.  By the time that you learned that
3    Mr. Franke had given this statement, you already
4    knew that a suit had been filed against your
5    company and against Mr. Franke?
6    A.  I'm assuming so, yes, because I believe it
7    was on Monday that we received the suit.
8    Q.  Okay.  Did Mr. Franke tell you why it was
9    that he gave a statement to the investigator for
10   the person who sued him?
11   A.  No.
12   Q.  Did you have any discussion about whether
13   he should or should not have given that statement?
14   A.  Yes.
15   Q.  What was discussed?
16   A.  It was discussed that he should not give
17   out any statements unless he was directed to by
18   David or myself.
19   Q.  Did he say where that statement was taken?
20   A.  No.
21   Q.  Did he say how it was taken?
22   A.  No.
23   Q.  Did he say whether he had a lawyer
24   present?

75

1    Mr. Franke's statement to his and your insurance
2    company, did you have any other discussions with
3    Mr. Franke on the 8th regarding this accident?
4    A.  No.
5    Q.  Have you since had discussions with
6    Mr. Franke regarding this accident?
7    A.  Only on the 10th, I believe it was.
8    Q.  What discussions did you have with
9    Mr. Franke on the 10th?
10   A.  I had to have him sign to release his drug
11   and alcohol records.
12   Q.  I know I'm going back to something I think
13   I just covered, but I want to make sure.
14   On the 8th, when you talked to Mr. Franke,
15   you came to an understanding that he had actually
16   given a statement to a representative of
17   plaintiff's counsel without being represented?
18   A.  To somebody.  I didn't know who, he didn't
19   know who.
20   Q.  When did you learn that -- who that
21   somebody was?
22   A.  I only speculated.  After I had been told
23   that he had given a statement, I had only
24   speculated that it was the other parties.  I was

74

1    A.  No.
2    Q.  Did he say whether the investigator told
3    him that he had been sued?
4    A.  No.
5    Q.  Did Mr. -- to your knowledge, did
6    Mr. Franke know that when the investigator took the
7    statement, Mr. Frederickson, on the 8th -- strike
8    that, that's already getting confusing.
9    To your knowledge, did Mr. Franke know
10   that he had already been sued when he gave the
11   statement to Mr. Frederickson, a representative of
12   the party who was suing him?
13   MR. BURKE:  Objection, calls for hearsay,
14   speculation, lack of foundation for this witness.
15   MR. SCHRECK:  I'll join.  I'm not sure I
16   understood it.
17   Go ahead if you -- go ahead.
18   A.  No.  I --
19   BY MR. COUTURE:
20   Q.  Okay.  When was the -- again, I don't want
21   to know what the discussion was, but when was the
22   first time a lawyer was hired by Martin's Bulk Milk
23   for this lawsuit?
24   A.  I do not know.

76

19 (Pages 73 to 76)

| | |
|---|---|
| 1   Q. Have you seen the statement that Samuel | 1   A. No. |

**Column 1 (Page 77):**

1     Q. Have you seen the statement that Samuel
2 Franke gave to Mr. Frederickson?
3     A. Yes.
4     Q. Do you have any personal basis to disagree
5 with anything he said or agree with anything he
6 said?
7     MR. SCHRECK: Object to form, foundation.
8 BY MR. COUTURE:
9     Q. Go ahead.
10     MR. SCHRECK: Go ahead.
11 BY MR. COUTURE:
12     Q. Instead of having me go through the
13 statement, you don't know the -- you don't know
14 what happened that night, so you can't agree or
15 disagree with what he said?
16     A. Correct. I was not there.
17     Q. Other than Mr. Franke, have you spoken to
18 anyone -- and your lawyer, have you spoken to
19 anyone who has told you what happened that night?
20     A. No.
21     Q. Did you -- I think you said at some point
22 you spoke to the police regarding this accident?
23     A. Yes.
24     Q. When was that?

                       77

**Column 2 (Page 79):**

1     A. No.
2     Q. Were you -- did you become aware of the
3 fact that the Illinois State Police found this
4 tractor had inoperable signals before the accident?
5     MR. SCHRECK: Objection to form and foundation.
6     Go ahead and answer.
7     A. Can you repeat your question?
8 BY MR. COUTURE:
9     Q. I'll ask it a little more basically first
10 before we get to specifics.
11     Did you ever speak to anyone from the
12 Illinois State Police about this truck or tractor?
13     A. Not to my knowledge, no.
14     Q. Did you ever learn that the Illinois State
15 Police found that there were violations on this
16 truck that preexisted this accident?
17     A. No.
18     Q. Were you aware that before this accident,
19 according to the Illinois State Police, the tractor
20 had inoperable turn signals?
21     MR. SCHRECK: Objection to form, foundation,
22 assumes facts not in evidence.
23     Go ahead.
24     MR. COUTURE: Actually, I disagree that

                       79

**Column 3 (Page 78):**

1     A. That would have been the following week.
2 I don't know exactly the day.
3     Do you want me to clarify?
4     Q. Okay. It was the following week, you
5 don't remember the day.
6     Who did you speak to?
7     A. A Sergeant Pfutzenheimer or some --
8     Q. Pfutzenrueter?
9     A. Pfutzenrueter, yes.
10     Q. Did he call you or did you call them?
11     A. I believe I called him.
12     Q. And why did you call Sergeant
13 Pfutzenrueter?
14     A. To find out the exact location of the
15 vehicles.
16     And he just -- it was just a conversation
17 in general. He told me they were at Ernie's
18 Towing, and he told me that he didn't believe drug
19 and alcohol were a factor in the accident, and he
20 told me that there were witnesses.
21     And that was it, from my recollection.
22     Q. Okay. Did you have any further
23 conversations with the police at all related to
24 this accident?

                       78

**Column 4 (Page 80):**

1 objection.
2     But go ahead.
3     MR. SCHRECK: Go ahead and answer.
4     A. Before -- I need to clarify.
5     Before the accident you're saying the
6 blinkers were inoperable -- or I'm not clear --
7 clear on --
8 BY MR. COUTURE:
9     Q. At any point other than perhaps with
10 conversations with your lawyer, which I'm not
11 allowed to ask you about, at any point did you
12 learn that the Illinois State Police determined
13 that this truck had violations that existed before
14 the impact with Mr. Scheinman's vehicle?
15     A. No.
16     Q. Is there someone at Martin's Bulk Milk
17 whose responsibility it is to make sure that all of
18 the tractors that leave are in proper mechanical
19 shape?
20     A. It is primarily the driver's
21 responsibility.
22     Q. Okay. And the driver does a pre-trip
23 inspection to make sure that the truck is working?
24     A. Correct.

                       80

20 (Pages 77 to 80)

1    Q.   And if there's a problem, he brings it to
2  whose attention?
3    A.   He has to write it up for the mechanics.
4    Q.   Okay.
5    A.   And if the mechanics are not available, he
6  brings it to David Martin's attention.
7    Q.   So if, for example, the tractor Mr. Franke
8  was driving had inoperable turn signals or
9  flashers, Mr. -- you agree with me that that's
10  something that a pre-check -- a pre-trip inspection
11  would show?
12    A.   Correct.
13    Q.   And it would be Mr. Franke's
14  responsibility to write that up so the mechanics
15  can fix it?
16    A.   Correct.
17    Q.   If, hypothetically, Mr. Franke did a
18  pre-trip inspection of it, the tractor, on
19  July 3rd, 2008, and the blinkers were out, would he
20  be allowed to leave the yard with that tractor?
21    A.   No.
22    Q.   Would he get another tractor or would he
23  wait until they fixed the blinkers?
24    A.   One or the other.
                                              81

1    A.   Not to my knowledge.
2    Q.   Other than the description of the
3  conversation you had with Sergeant Pfutzenrueter --
4  actually, I think it's Commander Pfutzenrueter, we
5  don't want to get him upset, other than the
6  description -- other than that conversation, did
7  you have any other conversations with any member of
8  the -- of any police department regarding how or
9  why this accident took place?
10    A.   Not to my recollection.
11    Q.   Have you -- other than what you've
12  described for me, did you talk to Samuel Franke
13  ever again about how or why the accident took
14  place?
15    A.   No.
16    Q.   Did you thereafter -- at any point after
17  the 8th of July 2008 ever speak with David Martin
18  regarding how or why the accident took place?
19    A.   No.
20    Q.   You don't have any training in
21  engineering, do you?
22    A.   No.
23    Q.   No training in accident reconstruction?
24    A.   No.
                                              83

1    Q.   Were you aware that the state police found
2  that the brakes on this vehicle were not working
3  properly?
4    MR. SCHRECK:  Same objection as previously,
5  form, foundation.
6         Go ahead.
7  BY MR. COUTURE:
8    Q.   Go ahead.
9    A.   Before or after the accident?
10    Q.   Found after the accident, but determined
11  by the state police to have preexisted the
12  accident.
13    A.   No.
14    Q.   Other than -- well, strike that.
15         Did you gather any other information
16  regarding this accident other than what we've
17  talked about?
18    A.   No.
19    Q.   Did you get a copy of the police report
20  from the Highland Park police department?
21    A.   Yes.
22    Q.   Okay.  Other than calling and saying can I
23  have a copy of the police report, did you do
24  anything else in that regard?
                                              82

1    Q.   You never know.
2         The tractors owned by Martin's Bulk --
3  well, strike that.
4         Did the tractor that Mr. Franke drive --
5  was -- I'll start again.
6         Did the tractor that Mr. Franke was
7  driving the day of this accident have a black box
8  or electronic monitoring device for the engine?
9    A.   Yes.
10    Q.   And do you understand that someone
11  attempted to download that information?
12    A.   Yes.
13    Q.   And is there someone at Martin's Bulk
14  Milk, before this accident, who was responsible to
15  make sure that all of these -- all the equipment,
16  including the black box, was operating properly?
17    A.   The equipment, but not into the black box
18  -- yes, the safety of the equipment.  The black
19  box itself I don't believe is the specialty of our
20  mechanics.  I believe that's more internal.
21    Q.   Is it your understanding, or have you
22  learned that the block box for this truck wasn't
23  working properly such that no information could be
24  downloaded from it?
                                              84

                          21  (Pages  81 to 84)

1   A.   Yes.
2   Q.   Did Martin's Bulk Milk do anything to
3   deactivate that black box before this accident?
4   A.   No, not to my knowledge.
5   Q.   Do you have any understanding why it was
6   that that black box didn't work properly?
7   A.   My understanding was that it was the age
8   of it.
9   Q.   Do you know what year that tractor was?
10  A.   I believe a 1994.
11  Q.   Who told you that was the age?
12  A.   I think I got that through general
13  conversations with -- in just hearing it with Truck
14  Country and with --
15  Q.   What's --
16  A.   When Bob Golden and Mr. Burke came --
17  Q.   Well, if Mr. Burke's there, it's not
18  privileged.
19      Go ahead.
20  MR. SCHRECK:  No, I'm saying it wouldn't be.
21  A.   All I recall is hearing them say they
22  can't get the information out of it.
23  BY MR. COUTURE:
24  Q.   What's Truck Country?

                                            85

1   A.   Freight liner.  It's freight liner parts,
2   dealership.
3   Q.   Oh, I got it.
4       Do you know how long Mr. Franke had been
5   driving on the day of the accident before the
6   accident occurred?
7   A.   He would have left our terminal between
8   12:00 and 2:00.
9   Q.   Was it part of your job to examine his
10  logs to determine how long he had been driving
11  before this accident?
12  A.   Repeat that, please.
13  Q.   Was it part of your job after this
14  accident to look at Mr. Franke's log to see how
15  long he had been driving?
16  A.   Yes.
17  Q.   And did you do that?
18  A.   Yes.
19  Q.   And what did you find?
20  A.   I found that he was in compliance.
21  Q.   Did Mr. Franke tell you what his plans
22  were for driving if the accident had not happened?
23  A.   No.
24  Q.   Was it your understanding that Mr. Franke

                                            86

1   had a typical course and practice about where he
2   stopped or how far he would drive as he took his
3   regular route from Hammond to Wilton?
4   A.   Repeat that, please.
5   Q.   Sure.
6       Do you know whether Mr. Franke had a
7   typical course and practice as far as whether he
8   would drive all the way to Wilton from Hammond,
9   whether he would pull over to the side of the road,
10  whether he'd go to a Motel 6, do you know?
11  A.   I do not know.
12  Q.   Mr. Martin testified in his deposition
13  that you compiled all the information regarding
14  this accident.
15      What other information other than the
16  police report did you compile?
17  A.   The drug and alcohol results from the
18  hospital, the driver qualification file.
19  Q.   Okay.  Anything else?
20  A.   Not to my recollection.  Whatever was
21  requested.
22  MR. SCHRECK:  Can we take a quick break or --
23  MR. COUTURE:  Yes.  I'm almost done, I just
24  have a couple questions about the driver's

                                            87

1   handbook, then I'll be done.  I'm sure these other
2   folks -- but if you want to take a break, that's
3   fine.
4   MR. SCHRECK:  Yes.  We can go off the record.
5           (Recess taken.)
6           (Whereupon, Berndt Deposition
7            Exhibit No. 122 was marked for
8            identification.)
9   BY MR. COUTURE:
10  Q.   I'm showing you what's been marked as
11  Exhibit Number 122 for identification --
12  MR. SCHRECK:  122?
13  MR. COUTURE:  122 for identification.
14  BY MR. COUTURE:
15  Q.   Now the first couple of pages are a letter
16  from a lawyer.
17      I want to direct your attention to the
18  fourth page -- no -- it looks like this.
19  A.   Okay.
20  Q.   It's got your signature at the bottom.
21  A.   Yes.
22  Q.   What is this document 122?  Not just this
23  letter, but what --
24  A.   This is our Driver Safety Handbook.

                                            88

                            22  (Pages 85 to 88)

1    Q.  Okay.  And describe generally what the
2  Driver Safety Handbook is?
3    A.  It's our mission to the driver, our
4  expectations of what we expect out of them, what
5  we are willing to do for them as far as benefits,
6  and just certain rules and regulations and
7  information regarding safety, some procedures to be
8  followed.
9    Q.  And who authored this driver handbook?
10    A.  I did.
11    Q.  You did, okay.
12      When did you first author it?
13    A.  Honestly?  I don't know when the first one
14  was, if it was in '99, 2000.  Somewhere in that
15  time frame.
16    Q.  And when you authored the handbook, did
17  you start from scratch, or was there a handbook
18  already in place that you altered?
19    A.  I worked with the HNI Risk Services team.
20  They gave me a template to work off of.
21    Q.  Okay.  I just want to draw your attention,
22  then, to a couple of the items in here, and I'll
23  try to go by page numbers.
24    A.  Okay.

                                           89

1    Q.  The first one I want you to look at, it
2  says page 6 at the bottom.  Do you see that?
3    A.  Yes.
4    Q.  And it says:  Safe Work Rules.
5    MR. SCHRECK:  And just for the record, there
6  are two page 6s.
7    MR. COUTURE:  I know.
8    MR. SCHRECK:  Okay.
9  BY MR. COUTURE:
10    Q.  And this is the first page 6 that you will
11  encounter as you go through the document, okay?
12    A.  Okay.
13    Q.  There we go.
14      And this gives a bullet point list of what
15  Martin's Bulk Milk drivers are supposed to do when
16  they're driving and being employed by Martin's Bulk
17  Milk?
18    A.  Yes.
19    Q.  Okay.  Including:  All drivers shall
20  operate their vehicles in a safe and courteous
21  manner.
22      That's the third one down, right?
23    A.  Correct.
24    Q.  In the event of a motor -- the next one:

                                           90

1  In the event of a motor vehicle accident, all
2  drivers are required to contact a Director of
3  Safety immediately.
4      That's you?
5    A.  Correct.
6    Q.  And Mr. Franke did that, in fact, in this
7  accident, didn't he, or --
8    A.  Yes, he did.
9    Q.  All right.  If you can go to the next
10  page.
11      It says, the first bullet point there on
12  page 7:  Any driver involved in a serious,
13  preventable accident, may upon the company's
14  discretion, be required to attend retraining.
15      Now he didn't have to do that 'cause you
16  fired him?
17    A.  Correct.
18    Q.  And then two more down, it says:  In the
19  event of damage incurred to Martin's Bulk Milk
20  Services, Inc. property due to driver negligence,
21  the driver will be charged for the cost of repair.
22      Was Mr. Franke ever charged for the cost
23  of the repair of the Martin's Bulk Milk tractor?
24    A.  No.

                                           91

1    Q.  Why not?
2    A.  It has not been repaired.
3    Q.  When it is repaired, are you planning on
4  sending him a bill?
5    A.  That's not my decision.
6    Q.  Okay.  But according to the handbook and
7  the policy and procedure, Martin's Bulk Milk
8  reserves the right to do so?
9    A.  Correct.
10    Q.  It says due to driver negligence.
11      Do you believe the damage to that truck
12  occurred as a result of driver negligence?
13    MR. SCHRECK:  I'm going to object, calls for a
14  legal conclusion, form, foundation.
15  BY MR. COUTURE:
16    Q.  Go ahead and answer.
17    A.  I do not know.  I was not there.
18    Q.  You understand that he rammed a car from
19  behind, right?
20    MR. SCHRECK:  Object to form, foundation, calls
21  for speculation.
22      Go ahead and answer.
23    A.  I do understand that.
24

                                           92

23 (Pages 89 to 92)

1    BY MR. COUTURE:
2        Q.   Who makes the determination of whether --
3    or strike that.
4            Back in 2008, who made the determination
5    whether an accident was a result of driver
6    negligence for the purpose of determining that they
7    could go after the driver for damages?
8        A.   David Martin would make that call.
9        Q.   Okay.  Going to the bottom of that page,
10   under the section that says Following Distance, the
11   last -- second-to-last line says:  When you lose
12   your concentration a crash can occur.  A greater
13   following distance can mean the difference between
14   life and death.
15           Am I correct that Martin's Bulk Milk
16   employees were told that they could hurt someone if
17   they lost concentration while driving, or kill
18   someone?
19       A.   Yes.
20       Q.   And then after that there's a page 13, and
21   then the actual driver's handbook; is that correct?
22       A.   Yes, this is the update -- actually, this
23   is the update on May 11th.
24       Q.   Okay.
                                                    93

1    depend on the severity of the situation.
2    Disciplinary action shall range from a verbal
3    warning to immediate discharge for the most severe
4    violations.
5            Generally, if a driver violates -- has a
6    violation, they can be fired if it's bad enough?
7        A.   Correct.
8        Q.   Mr. Franke was fired?
9        A.   Correct.
10       Q.   So am I to understand that he was fired
11   for violating policy?
12       A.   Yes.
13       Q.   And that policy was unsafe driving for
14   hitting a car?
15       A.   Correct.
16       Q.   So I don't have to go through the rest of
17   this, you're familiar with the entirety of the
18   handbook, right?
19       A.   Yes.
20       Q.   And would you agree with me that the
21   policies and procedures indicated in this handbook
22   were the policies and procedures for Martin's Bulk
23   Milk at the time of the accident?
24       A.   Yes.
                                                    95

1        A.   This one was written on April 2007.
2        Q.   Okay.
3        A.   And these updates went in May, a month
4    later.
5        Q.   I got it.
6            So the documents I've been asking you
7    about were updates to the existing driver's manual?
8        A.   They did not -- that part -- those parts
9    did not change --
10       Q.   Okay.
11       A.   -- that you asked me about.
12       Q.   Those were always the policy, correct?
13       A.   Correct.
14       Q.   All right.  Maybe this will save us a
15   little bit of time -- well, strike that.
16           Go to page 11 for the actual manual, which
17   I'll tell you is four pages from the end.  Do you
18   see it?
19       A.   Page 11, yes.
20       Q.   Okay, great.  And it's under Disciplinary
21   Action.
22           Am I correct that it says:  The extent of
23   any disciplinary action to be taken by the company
24   for violations of its rules and policies will
                                                    94

1        Q.   So I don't have to say page 7 says this
2    and page 8 says that.  You'd agree with me that
3    everything in this document was your policy and
4    procedure?
5        A.   Yes.
6        Q.   And every employee got one of these when
7    they joined the company?
8        A.   Correct.
9        Q.   And when they were amended, every employee
10   got the amendment?
11       A.   Yes.
12       Q.   So Mr. Franke knew that these were the
13   policies and procedures of Martin's Bulk Milk at
14   the time of this accident?
15       A.   Yes.
16       Q.   He just failed to follow them?
17       MR. SCHRECK:  Objection, form, foundation,
18   calls for speculation.
19           Go ahead and answer.
20       A.   I don't know.  I wasn't at the accident --
21   scene of the accident.
22       BY MR. COUTURE:
23       Q.   If he had followed these procedures, would
24   he have struck a car, a stopped car from behind
                                                    96

                              24 (Pages 93 to 96)

1   without seeing it?
2     MR. SCHRECK: Same objection.
3     MR. COUTURE: Go ahead.
4     MR. SCHRECK: Go ahead.
5     A. No.
6     MR. COUTURE: I don't have any other questions
7   for you, ma'am.
8     MR. YU: I've got some questions. Do you want
9   me to go, Richard?
10     MR. BURKE: I can go, do it in order.
11       EXAMINATION
12   BY MR. BURKE:
13     Q. Is it Berndt, is that how you pronounce
14   it?
15     A. Berndt.
16     Q. Berndt.
17     Ms. Berndt, my name is Rich Burke again
18   and -- you know, by the way, when Mr. Couture was
19   asking you when he first started, he noted you and
20   I had walked into the room together, and you said
21   we had been in the elevator.
22     It is true you and I did not have any
23   conversation whatsoever about this occurrence or
24   this collision or Mr. Franke's conduct in driving;
        97

1   is that correct?
2     A. That is correct.
3     Q. Okay. And, in fact, you were nice enough
4   to say we had once met, but I -- I did not -- I
5   told you I did not actually recall meeting you,
6   correct?
7     A. Yes.
8     Q. Okay. And whenever you noted or referred
9   to sometime that I was up at Martin's and --
10   whenever that was, that was with attorneys for
11   Martin's present, correct, including Bob Golden?
12     A. Correct.
13     Q. And there was some effort to do a download
14   or an inspection of the truck, is that generally --
15   generally your recollection of what was taking
16   place?
17     A. My recollection was the trailer -- the
18   truck and the trailer were being inspected.
19     Q. Okay.
20     A. I remember something with the trailer and
21   having to wash something under -- something with a
22   wash bay or something.
23     Q. Okay.
24     A. That's a long time ago.
        98

1     Q. Sure, okay.
2     Maybe just while you have it in front of
3   you, that Exhibit Number 122.
4     You explained what the initial pages are,
5   that they were certain updates issued on or about
6   May 11th of 2007 as a supplement to the April 2011
7   driver handbook; is that correct?
8     A. The April 2007 handbook, yes.
9     Q. Okay. Were there any further supplements
10   issued between May 11th of 2007 and the date of
11   this occurrence, July 3rd, 2008?
12     A. No.
13     Q. Did Martin's provide to its drivers any
14   other type of handbook or materials related to
15   their job or work or operating procedures or
16   driving records other than this driver handbook?
17     A. Yes.
18     In 2007, in the driver qualification file,
19   there is a list of five procedures that David
20   Martin signed that the drivers had to sign. I
21   don't recall exactly what's on there.
22     But I was presented with it before, and
23   that is the only other -- that has to do with our
24   service, and there are requirements that they
        99

1   have to -- were told to comply to and they agreed
2   to.
3     Q. Okay. And what's your recollection of the
4   general nature of those five items or procedures?
5     A. Just that if they are unable to carry the
6   load for any given reason, that they are to contact
7   dispatch, basically, and it would be re-looked-at.
8   I -- without reviewing, I can't say.
9     Q. Okay. And you were asked about on
10   page 7 in the driver handbook a section entitled:
11   Following Distance.
12     Do you see that?
13     A. Yes.
14     Q. Okay. And by following distance, does
15   that refer to the distance between a Martin's truck
16   and a vehicle in front of it?
17     A. Yes.
18     Q. Okay. And it was the policy of Martin's
19   that its drivers maintain a safe distance between
20   any vehicles that it was following or approaching,
21   correct?
22     A. Correct.
23     Q. And it was also the policy of Martin's
24   that drivers refrain from striking or impacting
        100

        25 (Pages 97 to 100)

1 vehicles from the rear, correct?
2     A. Correct.
3     Q. And Martin's drivers also were expected to
4 maintain a safe speed so as to avoid striking a
5 vehicle in of it, correct?
6     A. Correct.
7     Q. And Martin's drivers were also expected to
8 maintain a look-out for the traffic in front of
9 their truck in order to make sure they were able to
10 stop in time without striking the vehicle it was
11 following, correct?
12     A. Correct.
13     Q. There's a section in the April portion of
14 the driver handbook on page 5.
15         Do you see under operating procedures and
16 policies?
17     A. Okay.
18     Q. Okay. And it says: It shall be the
19 responsibility of the driver for the following, and
20 then it lists, oh, probably -- it looks like about
21 eleven entries with dots in front of them.
22         Do you see that?
23     A. Yes, I do.
24     Q. Okay. And the Martin's drivers were
                                                    101

1 expected to comply with those procedures and
2 policies, correct?
3     A. Correct.
4     Q. Okay. And policy number -- or excuse me,
5 the second paragraph in that section states:  To
6 comply at all times with the rules, regulations and
7 laws of the federal, state and such other
8 regulatory agencies having jurisdiction.
9         Correct?
10     A. Correct.
11     Q. Okay. And by that provision, Martin's was
12 expecting its drivers to comply with local, state,
13 and federal traffic regulations applicable to the
14 operation of tractor-trailer trucks, correct?
15     A. Correct.
16     Q. And Martin's drivers were expected to
17 comply with the provisions of the Federal Motor
18 Vehicle Safety Act, correct?
19     A. Correct.
20     Q. I think I recall you saying part of your
21 job was to make sure drivers got a drug and alcohol
22 test when required; is that right?
23     A. Correct.
24     Q. Okay. Did Mr. Martin -- or did Mr. Franke
                                                    102

1 undergo alcohol and drug testing?
2     A. At random, or at the time of the
3 accident?
4     Q. No, at the time -- after the accident.
5     A. Yes.
6     Q. Okay. And was that at your -- were you --
7 was that done prior to you knowing about the
8 accident or not, or do you know?
9     A. No, I told him it was his responsibility
10 to work with the police to make sure that got
11 done.
12     Q. And do you have an understanding of the
13 results of that testing?
14     A. Yes, I do.
15     Q. Okay. And what's that understanding?
16     A. Negative.
17     Q. On both alcohol and drugs?
18     A. Yes, both parts.
19     Q. On the day of this occurrence had
20 Mr. Franke transported a load of furniture for MBM
21 Logistics?
22     A. To my knowledge.
23     Q. And where did MBM Logistics operate from?
24     A. Winona, Minnesota.
                                                    103

1     Q. And who -- how was that assignment
2 communicated to Mr. Franke to transport this load
3 of furniture?
4     A. Through dispatch at Martin Bulk Milk.
5     Q. Okay. And how would Martin Bulk Milk
6 receive that assignment or know it had to be done?
7     A. Through a confirmation from MBM Logistics.
8     Q. And who was the contact at MBM Logistics
9 that would do that?
10     A. Randy Galewski.
11     Q. And what was your understanding of what
12 Randy's job was, or position?
13     A. He's a load coordinator, part owner,
14 dispatcher of the brokerage.
15     Q. And when you say the brokerage, what do
16 you mean by that?
17     A. MBM Logistics is a load brokerage.
18     Q. And when you refer to dispatch at Martin's
19 Bulk Milk, who are you referring to?
20     A. Our dispatch office that is overseen by
21 David Martin, and he has anywhere from three to
22 five people in his office at any given time that he
23 gives orders to, to dispatch drivers here, there,
24 wherever.
                                                    104

26  (Pages 101 to 104)

1     Q.   Okay. And back in 2008, in July of 2008,
2   who were those other workers?
3     A.   Pat Podlena, Doreen Bayer -- her name now
4   is Bayer. It was West then. Nancy Schmitts. I
5   think that's all that was in there at that time.
6     Q.   Okay. And of those three persons, who
7   still works for Martin's?
8     A.   Doreen and Nancy and Dave.
9     Q.   And in July of 2008 -- Pat Podlena is a
10   male, correct?
11     A.   Correct.
12     Q.   Okay. And what -- did he have a job title
13   or position?
14     A.   He was a dispatcher.
15     Q.   And how about the other two, Ms. Bayer and
16   Ms. Schmitts?
17     A.   Dispatchers.
18     Q.   You're familiar with the tractor that
19   Mr. Franke was driving this day, correct?
20     A.   Familiar with the looks of it? Yes.
21     Q.   Oh, okay. And my real question is: Who
22   owned that tractor?
23     A.   Martin's Bulk Milk.
24     Q.   Okay. And did Martin's Bulk Milk own the

                              105

1   trailer that Mr. Franke was hauling that day?
2     A.   No.
3     Q.   Do you know who owned that?
4     A.   CSX.
5     Q.   With respect to the tractor, who -- you
6   mentioned drivers have a responsibility to do a
7   pre-trip inspection, correct?
8     A.   Correct.
9     Q.   And as part of that inspection they have
10   to make sure that the brakes are in proper
11   operating condition, correct?
12     A.   Correct.
13     Q.   And they have to make sure that those
14   brakes are not out of adjustment, correct?
15     A.   Correct.
16     Q.   Okay. And if a Martin's driver in that
17   pre-trip inspection finds that the brakes are out
18   of adjustment or otherwise not in proper operating
19   condition, is it the policy of Martin's that that
20   truck should not be taken out on the road that day
21   until those brakes are repaired?
22     A.   Correct.
23     Q.   When a driver, a Martin's driver is doing
24   a pre-trip inspection of a trailer that he's

                              106

1   hauling, regardless of who owns that trailer, and
2   he finds that the brakes on the trailer are -- or
3   the chassis that he's hauling are out of
4   adjustment, is it also the policy of Martin's that
5   he should not haul that trailer until those brakes
6   are repaired --
7     A.   That is correct.
8     Q.   -- or that trailer is replaced with
9   another one?
10     A.   Correct.
11     Q.   Did Martin's have a maintenance department
12   in July of 2008?
13     A.   Yes.
14     Q.   Okay. And who was the head of that?
15     A.   I believe in 2008 it was Ryan Green. I am
16   not positive, but I believe that's who was in
17   charge.
18     Q.   Okay. And where was that maintenance
19   department located?
20     A.   It's connected right next to the offices.
21   We're all in one building.
22     Q.   In Wilton?
23     A.   Wilton, yes.
24     Q.   Okay. Did Martin's have any contract with

                              107

1   any maintenance company to regularly do inspections
2   or maintenance on their tractors?
3     A.   No.
4     Q.   Were annual inspections done by Martin's?
5     A.   Yes.
6     Q.   Did Martin's have any brake mechanics that
7   were qualified in accord with the provisions of the
8   Federal Motor Carrier Safety Act?
9     A.   Yes.
10     Q.   Okay. And who was that?
11     A.   In 2008 -- all of our mechanics at that
12   time are certified -- or at all times. What
13   mechanics exactly were working for us at the time I
14   do not know.
15     Q.   Okay.
16     A.   But all mechanics are required to be
17   certified.
18     Q.   About how many mechanics did Martin's have
19   in 2008?
20     A.   Probably three in the tractor shop and
21   three in the trailer shop, at a minimum.
22     Q.   Were there records kept as to the
23   maintenance of the trailer -- or tractors and
24   trailers at Martin's?

                              108

                    27 (Pages 105 to 108)

1    A.  Yes, but not the rail trailers.
2    Q.  Not a trailer owned by a rail company, you
3  mean?
4    A.  Correct, or a non-owned trailer.
5    Q.  Are there records kept of the driver's
6  daily pre-trip inspection of the condition of the
7  tractor?
8    A.  For six months, yes.
9    Q.  And what happens after six months?
10    A.  The pre-trip is on the driver's log and
11  it's destroyed.
12    Q.  What do you mean, the pre-trip's on the
13  driver's log?
14        What is destroyed, the whole thing --
15    A.  The driver's log -- we're only required by
16  federal regs to keep driver's logs for six months,
17  unless there's a DOT recordable accident, where
18  then it has to stay with the accident file.
19    Q.  Okay.  And did you mean that the -- or did
20  you say and mean that the pre-trip inspection is
21  attached to those driver's logs, and therefore gets
22  destroyed after six months?
23    A.  Correct.  It's on the bottom of the log.
24    Q.  And because this was a reportable

109

1  incident, were these driver's logs maintained?
2    A.  Yes, for one month up -- from June 1st up
3  until the date of the accident.
4    Q.  You at some point earlier made some
5  reference to your insurance policy and the injuries
6  or damages exceeding the coverage amount.  Do you
7  recall generally that topic?
8    A.  Yes.
9    Q.  Okay.  What is your understanding of --
10  number one, who did Martin's have their liability
11  insurance coverage with?
12    A.  AIG.
13    Q.  And what's your understanding of the exact
14  liability coverage amount for this occurrence?
15    A.  One million dollars.
16    Q.  In the preceding year or two or three
17  years, did Martin's have any greater amount of
18  liability coverage?
19    A.  No.
20    Q.  Did Martin's have any what is sometimes
21  referred to as excess coverage or umbrella
22  coverage, in addition to the one million with AIG?
23    A.  No.
24    Q.  Was Mr. Franke required to obtain any

110

1  coverage on his own --
2    A.  No.
3    Q.  -- other than what was provided through
4  Martin's?
5    A.  No.
6    Q.  Who purchased or -- or who was the named
7  insured for the one million coverage you're
8  referring to?
9    A.  Martin's Bulk Milk Service, Incorporated.
10    Q.  Did MBM Logistics have any separate policy
11  of insurance coverage?
12    A.  Not for liability, no.
13    Q.  What did they have coverage for?
14    A.  Probably excess cargo.
15    Q.  And who at Martin's was in charge of
16  purchasing insurance coverage?
17    A.  I was in charge of organizing it, but the
18  final decision was with David and Allan.
19    Q.  And both of those are Martin, correct?
20    A.  Yes.
21    Q.  And was the -- or strike that.
22        Did you have a broker or a person or
23  contact at AIG from whom Martin's purchased their
24  insurance?

111

1    A.  No.  HNI Risk Services.  The agent is Jill
2  Witting.
3    Q.  You did mention Jill's name.
4        How is it you know or believe -- or,
5  excuse me, how is it you believe that MBM Logistics
6  did not have liability insurance coverage?
7    A.  I've been involved because Al is part
8  owner of MBM Logistics, so even though I never
9  received a paycheck through MBM Logistics, from
10  time to time Al would have me just review what they
11  have, and Jill also wrote the insurance for MBM
12  Logistics, which is common -- some common ground
13  there.
14    Q.  Were there any policies of insurance that
15  covered both MBM Logistics and Martin's Bulk Milk
16  Service?
17    A.  Yes.
18    Q.  And what type of coverage was that for?
19    A.  General liability.
20    Q.  And when you say general liability, do you
21  mean liability for drivers?
22    A.  For anybody.
23        If somebody walked on the grounds of
24  either property and fell in a hole and broke their

112

28  (Pages 109 to 112)

1   leg, that type of general liability.

2     Q.  And what I'm getting at, was that -- did

3   that general liability include liability coverage

4   for Mr. Franke for this type of occurrence --

5     A.  No.

6     Q.  -- involved here?

7     A.  No.

8     Q.  How do you distinguish his driver

9   liability from what you're referring to as general

10   liability? I mean from your understanding of the

11   company insurance coverage.

12     A.  From my understanding, because he was in

13   the truck, in the semi, the general liability does

14   not cover him. With that respect, it would cover

15   another party if they had stepped on the step of

16   the truck and fell off, the truck step fell off and

17   they were hurt, that's how general liability would

18   work, but it does not involve collision or physical

19   damage.

20     Q.  So just to clarify what you said a moment

21   ago, do you believe that MBM Logistics had any

22   insurance coverage that applied to Mr. Franke's

23   liability or potential liability for this collision

24   occurrence?

113

1     MR. SCHRECK: Object to the form, foundation.

2     Go ahead and answer.

3     A.  No, they did not.

4   BY MR. BURKE:

5     Q.  Have you checked -- in your job as safety

6   manager, have you made a search or inquiry of

7   somebody at MBM Logistics for that, to make that

8   determination?

9     A.  No, I have not.

10     Q.  Okay. What is it that makes you think

11   that, then?

12     A.  I just -- I know the policies they had in

13   place.

14     Q.  And who at MBM Logistics was most involved

15   with those policies?

16     A.  Randy Galewski.

17     Q.  And is it HNI Risk Services that's your

18   insurance broker?

19     A.  Yes.

20     Q.  Okay. And where are they located?

21     A.  New Berlin, Wisconsin.

22     Q.  New Berlin, B-e-r-l-i-n?

23     A.  Correct.

24     Q.  And Jill, did you spell her last name for

114

1   us? Do it again if you would.

2     A.  W-i-t-t-i-n-g.

3     Q.  W-i-t-t-i-n-g. Jill Witting, okay.

4     Does MBM Logistics have an office in

5   Winona?

6     A.  Yes, they do.

7     Q.  Okay. What does it consist of?

8     A.  Back then or now?

9     Q.  Back then, July of '08.

10     A.  It was basically in a pole shed type of a

11   building made with offices, cubicles. Nothing

12   fancy.

13     Q.  And did MBM Logistics own any tractors?

14     A.  No.

15     Q.  Did they own any trailers?

16     A.  At that time? Possibly half a dozen, a

17   dozen. Dry vans.

18     Q.  Dry vans?

19     A.  Yeah, with no reefer units or anything.

20     Q.  And that means refrigerated units?

21     A.  Reefers?

22     Q.  Yes.

23     A.  Yes.

24     Q.  Today is MBM Logistics still in Winona,

115

1   Minnesota?

2     A.  Yes.

3     Q.  Okay. And is their office different

4   today?

5     A.  Yes.

6     Q.  Okay. In what way?

7     A.  They moved and they are in a -- another

8   facility. It's a bit nicer. Nothing fancy. It's

9   still kind of a pole shed type format, but two

10   stories. I've only been there once.

11     Q.  And about how many employees does MBM

12   Logistics have?

13     A.  Probably ten or twelve.

14     Q.  And there's the owners, Randy and Allan

15   and Ruth, I think, correct?

16     A.  Correct.

17     Q.  Okay. And Randy Galewski, I should say,

18   and Ruth and Allan Martin, correct?

19     A.  Correct.

20     Q.  The other employees, generally what do --

21   what are their jobs?

22     A.  Dispatch or load coordinators.

23     And then, actually, the billing department

24   is in Wilton in a separate building where the

116

29 (Pages 113 to 116)

**Page 117**

1  paperwork flows through and the billing is done out
2  -- at a different office in Wilton.
3  Q.  Does MBM Logistics have any maintenance
4  department?
5  A.  No.
6  Q.  I know you said back then MBM Logistics
7  possibly had a half dozen trailers.  Do they own
8  trailers today?
9  A.  Yes.
10  Q.  Okay.  And about how many?
11  A.  I have no idea.
12  Q.  Okay.  More than a half dozen or --
13  A.  Probably not.
14  They're -- I don't know.
15  Q.  Under ten, is that --
16  A.  I would guess, if any.  I don't know
17  today.
18  Q.  Do they own tractors today?
19  A.  MBM Logistics does not.
20  Q.  Okay.  At the time of this occurrence back
21  in July of 2008, did Mr. Franke -- was he employed
22  by MBM Logistics in any manner?
23  A.  No.
24  Q.  Okay.  Did he get paid by MBM Logistics in

**Page 118**

1  any manner?
2  A.  No.
3  Q.  Did MBM Logistics have a contract with
4  Martin's Bulk Milk Service back in July of '08?
5  A.  I don't know.
6  Q.  Was there a broker agreement between MBM
7  Logistics and Martin's Bulk Milk Service in July of
8  '08?
9  A.  I do not know.
10  Q.  The furniture that Mr. Franke hauled from
11  Wilton, where would he have picked up that
12  furniture?
13  A.  In Wilton.
14  Q.  And from whom?
15  A.  Another driver would have brought that
16  from Arcadia Furniture in Arcadia, Wisconsin.
17  Q.  Brought it to your facility in Wilton?
18  A.  Correct.
19  Q.  And when would that have been brought;
20  like the day before or sometime prior?
21  A.  Most likely the day before, or that
22  morning, even.
23  Q.  And back to the Driver's Handbook for a
24  moment.

**Page 119**

1  Am I correct that it was the expectation
2  of Martin's Bulk Milk Service that all of its
3  drivers, including Mr. Franke, adhere to and comply
4  with all the provisions of the Driver's Handbook?
5  A.  Yes, it was expected.
6  Q.  Okay.  And I notice on page 8 there's a
7  section referring to Fatigue.
8  And it is correct that if a driver thought
9  he was fatigued or at risk for being fatigued or
10  falling asleep, he should pull over and not
11  continue driving, correct?
12  A.  Correct.
13  Q.  Switching topics a little bit to the night
14  of this incident when you got called.
15  You were asked some questions about what
16  Mr. Martin -- or, excuse me, you were asked some
17  questions about what Mr. Franke said to you about
18  the occurrence.  Do you remember that line of
19  questioning?
20  A.  Yes.
21  Q.  Okay.
22  A.  I've been -- I mean, to some point.  I've
23  been asked so many.
24  Q.  Right.

**Page 120**

1  And, just generally, he told you he had
2  hit a car and he was sure the occupant was dead
3  because the car had caught on fire, correct?
4  A.  Correct.
5  Q.  Okay.  And during that conversation did
6  Mr. Franke ever say whether or not he had applied
7  his brakes prior to colliding with the car that he
8  hit?
9  A.  No, he did not.
10  Q.  And to clarify that answer, did you ask
11  him if he applied his brakes?
12  A.  No, I did not.
13  Q.  Okay.  And did he tell you one way or
14  another whether he applied his brakes?
15  A.  No, he did not.
16  Q.  And I think you earlier told us you had no
17  conversation with him about the speed of his truck
18  at that time?
19  A.  Not at that time, no.
20  Q.  I forget the word you used, but when you
21  were talking to Mr. Franke, how did you describe
22  his tone of voice or demeanor?
23  I forget what you said.  Shaken or --
24  A.  He was basically --

30 (Pages 117 to 120)

1    Q. -- confused or something.
2    MR. COUTURE: Objection --
3  BY MR. BURKE:
4    Q. I forget what you said.
5    MR. COUTURE: Objection, mischaracterizing the
6  testimony. She didn't say those words.
7    MR. SCHRECK: You've got to let him finish his
8  question.
9    THE WITNESS: I know. Sorry.
10  BY MR. BURKE:
11    Q. That was a bad question. I just wanted to
12  lead you to that topic.
13    My question is: What was Mr. Franke's
14  tone of his voice when you were speaking to him
15  when he called you shortly after this occurrence?
16    A. He was excited, in shock, hard to
17  understand because of his speech impediment.
18    Q. And when you say he seemed to be in
19  shock, what is your recollection of what you were
20  hearing or saying that led you to believe that
21  about him?
22    A. Just a -- gibberish. I couldn't -- if you
23  didn't listen real close to Sam, he's hard to
24  understand, in -- in a normal situation. But that

121

1    Q. Okay. And was that an in-person
2  conversation or over the phone?
3    A. That was in person.
4    Q. Okay. And I think you initially said you
5  thought that might have been on July 8th, but then
6  said, well, maybe not the 8th, not necessarily
7  right the 8th, but maybe some days thereafter. Is
8  that correct?
9    A. I have no idea what date, sir. It could
10  have been Monday through Wednesday, I don't know.
11    Q. Okay. So it obviously wasn't July 7th,
12  which I think was a Monday, correct --
13    MR. COUTURE: Objection --
14  BY MR. BURKE:
15    Q. -- and it was some day on or after
16  July 8th, but you're not really sure which day?
17    A. On or after Monday, that's -- of that
18  following week.
19    Q. Okay. And whenever -- whenever you had
20  that conversation, did he actually specify any
21  speed that he was traveling at the time of the
22  collision?
23    MR. COUTURE: I'll object that she already
24  testified to exactly what he said in this regard,

123

1  night it took a little bit for -- slow down, take
2  your time, take a deep breath, you know.
3    It -- I couldn't understand a word he was
4  saying at first.
5    Q. Okay. And if I'm understanding you
6  correctly, that wasn't due simply to his
7  stuttering, but rather his condition and mental and
8  emotional state; is that correct?
9    MR. COUTURE: Objection, mischaracterizes her
10  testimony.
11    MR. YU: Join.
12    MR. SCHRECK: Go ahead and answer.
13    A. I would say so, yes.
14  BY MR. BURKE:
15    Q. Did you say he called you still from the
16  scene of the incident?
17    A. Yes.
18    Q. Did you -- okay.
19    There was some subsequent day that you
20  talked to Mr. Franke in which he told you that he
21  was not on the phone and that he had not been
22  speeding at the time of this crash; is that
23  correct?
24    A. That is correct.

122

1  but if you want to ask her to say the same thing
2  over and over, we can do that.
3    Go ahead.
4    MR. SCHRECK: You can answer.
5    A. Okay. He said he was under the speed
6  limit, and he didn't tell me what the exact speed
7  limit was.
8  BY MR. BURKE:
9    Q. And in that conversation where he said he
10  was going under the speed limit, did you ask him
11  what the speed limit was?
12    A. I do not recall.
13    Q. And am I correct that in that conversation
14  Mr. Franke -- did he tell you what the speed limit
15  was?
16    A. I do not recall. I -- I would be lying if
17  I said I did.
18    Q. I take it as you sit here today you have
19  no recollection of Mr. Franke specifying any
20  particular speed he was going, other than telling
21  you he was traveling under the speed limit; is that
22  correct?
23    A. Yes, or --
24    MR. COUTURE: I'll object to the extent that it

124

31 (Pages 121 to 124)

```
 1    mischaracterizes her previous testimony.
 2        Go ahead.
 3        A.  Or not speeding.
 4    BY MR. BURKE:
 5        Q.  Okay.  That he was not speeding or
 6    traveling under the speed limit --
 7        MR. COUTURE:  Same objection.
 8    BY MR. BURKE:
 9        Q.  -- is that correct?
10        A.  Correct.
11        Q.  Oh, you know, you were -- some -- some of
12    what you were telling us about -- such as, you
13    know, this conversation, and asking Mr. Franke to
14    come into the Martin's office.  Did you make any
15    notes or reports of any of these occurrences or
16    conversations?
17        A.  No.
18        Q.  Okay.  Did you make any log -- charting or
19    reports, you know, saying at what point Mr. Martin
20    -- or Mr. Franke came in, or who you met with with
21    him or -- or the content of any conversations?
22        A.  Not to my recollection, without reviewing
23    the accident register.
24        Q.  You know, you got asked about a
                                                    125
```

```
 1    conversation that Mr. Franke had with a gentleman
 2    named Dennis Frederickson.  Do you recall that
 3    question?
 4        A.  Yes, I do.
 5        Q.  Okay.  And the name Dennis Frederickson,
 6    when did you first hear that name?
 7        A.  Yesterday.
 8        Q.  Okay.  So there was never a time that --
 9    and was that -- well, strike that.
10        There was never a time back in July of
11    2008 that Mr. Franke ever mentioned speaking to
12    anybody that was identified specifically by the
13    name of Dennis Frederickson; is that correct?
14        A.  Not to my recollection.
15        Q.  And I think you said at some point,
16    whenever it is, Mr. Franke came in to your office
17    to speak with you and David, and was it somebody
18    from AIG?
19        A.  AIG.  He had to call to file a report.
20        Q.  Okay.
21        A.  Or statement.
22        Q.  Okay.  So was there a conversation -- or
23    strike that.
24        Was there a statement given to someone at
                                                    126
```

```
 1    AIG at your office, or was that a phone statement?
 2        A.  It was a phone statement.
 3        Q.  Okay.  So when Mr. Franke came in to your
 4    office, AIG was not present, correct?
 5        A.  Correct.
 6        Q.  When he came -- when Sam Franke came in
 7    and spoke with you and -- and David Martin, was it
 8        A.  On the day of the statement?
 9        Q.  Yes.
10        A.  David was not in my office on the day of
11    the statement, to my recollection.
12        Q.  Okay.  The statement you're referring to,
13    is this the statement to AIG?
14        A.  Correct.
15        Q.  Okay.  So he was giving -- Sam Franke was
16    giving that statement from your office to AIG, but
17    the AIG representative was on the telephone; is
18    that right?
19        A.  Correct.
20        Q.  Okay.  I think you said at some point
21    Mr. Franke said something about already having
22    given a statement, correct?
23        A.  Correct.
24        Q.  Okay.  But at that time he did not say it
                                                    127
```

```
 1    was a statement to Mr. Frederickson, correct?
 2        A.  Correct.
 3        Q.  Did he even say it was a statement to
 4    anybody representing the Scheinmans?
 5        A.  No, he did not.
 6        Q.  Would it be correct Mr. Franke did not
 7    ever say he was unwilling to speak with whoever it
 8    is he gave that statement to?
 9        A.  Can you repeat that, please?
10        Q.  Bad question on my part.
11        With respect to that statement, whether it
12    was to Mr. Frederickson or anybody else, Sam Franke
13    told you that he had spoken to those people
14    voluntarily, correct?
15        A.  Correct.
16        Q.  Oh, you know, you -- you got asked about
17    -- you had a recollection of getting a package
18    that you thought meant Martin's was being sued; is
19    that correct?
20        A.  Correct.
21        Q.  Okay.  Do you know the exact day you
22    received that package?
23        A.  No.  I would say it was Monday or Tuesday.
24        Q.  Okay.  And when you say a package, do you
                                                    128
```

```
1    have any recollection -- I mean in terms of -- was
2    it correspondence or was it actually a copy of a
3    lawsuit, or do you know what was in that package?
4        A.  It was a lawsuit.
5        Q.  And do you know where or how -- when you
6    say you received it, how was it received?
7            Or how did you get it, do you have any
8    recollection?
9        A.  In an envelope, a big envelope, I believe,
10   if I remember right.
11           But how it was delivered, I do not know if
12   it came Express Mail or UPS or FedEx, I do not
13   know, or if it was hand delivered.  I do not know.
14   I can't recall.
15       Q.  In your job, on a daily basis would you
16   normally have any contact with anybody from
17   Overnite Express or Universal Am Cam after they
18   purchased Overnite Express?
19       A.  No.
20       Q.  Who at Martin's had involvement with
21   Overnite Express or Universal?
22       A.  David Martin and Pat Podlena.
23       MR. SCHRECK:  Okay.  I don't think I have
24   anything else.  Thank you for your time.
```
                                                  129

```
1        THE WITNESS:  You're welcome.
2                    EXAMINATION
3    BY MR. YU:
4        Q.  Hi, good afternoon now.  I have a few
5    questions for you.
6            I represent several entities, so for the
7    purposes of my questioning, I represent Universal
8    Am Cam, Limited, Overnite Express, Incorporated,
9    and Ox, LLC, and I'll refer to those group of
10   defendants as UACL.
11           Have you heard of any of those entities
12   before?
13       A.  Two of them, yes.
14       Q.  Okay.  Which ones?
15       A.  Overnite Express and Universal Am Cam.
16       Q.  Okay.  So for all those entities I'm going
17   to call them just UACL, okay?
18       A.  Pardon me?  I --
19       Q.  I'm just going to refer to those three
20   entities as UACL?
21       A.  UACL?  Okay.
22       Q.  Yes.  Universal Am Cam, Limited.
23           And then I also represent International
24   Paper Company.  Have you heard of them?
```
                                                  130

```
1        A.  Yes, I have.
2        Q.  I'm going to call them IPC, okay?
3        A.  Okay.
4        Q.  So UACL and IPC?
5        A.  Okay.
6        Q.  And I'm just going to ask you some
7    questions about Dep Exhibit Number 122, which is
8    the company -- what did you call it, the Driver
9    Handbook?
10       A.  Yes.
11       Q.  Okay.  Do you have that in front of you?
12       A.  Yes, I do.
13       Q.  You testified earlier that you were the
14   one that authored this document, correct?
15       A.  Correct.
16       Q.  Is it a correct statement that UACL and
17   IPC have no involvement with the creation of this
18   document?
19       A.  That is correct.
20       Q.  Okay.  If you -- I'm just going to go in
21   the order of the pages that I received this
22   document, and that might be out of order.
23           On page 6 counsel asked you earlier about
24   the Safe Work Rules.
```
                                                  131

```
1            Do you see that paragraph?
2        MR. SCHRECK:  And, for the record, you're
3    referring to the first page 6, right?
4        MR. YU:  The first page 6 that I have, right.
5        A.  Yes.
6    BY MR. YU:
7        Q.  Safe Work Rules.  Do you see that
8    paragraph?
9        A.  Yes, I do.
10       Q.  Okay.  And the preamble, so to speak, it
11   says:  It is the intention of Martin's Bulk Milk
12   Service to prevent accidents and to promote and
13   provide safe operators on the road.
14           And then one of the bullet points below
15   that I think we discussed indicates:  In the event
16   of an accident such as the one in this case the
17   driver is required to contact a director of safety,
18   and that's either yourself, Janet Berndt, or Anna
19   Thurston, immediately, correct?
20       A.  Correct.
21       Q.  Is it a correct statement that this
22   document does not indicate that you should contact
23   anyone from UACL or IPC after an accident occurred?
24       A.  That is correct.
```
                                                  132

                                33 (Pages 129 to 132)

1    Q.  Okay.  Just out of curiosity, when you
2  testified earlier, when you first learned of the
3  accident from Mr. Franke, you testified that you
4  were at home and received a call from him at the
5  accident site, correct?
6    A.  Correct.
7    Q.  Did he have your home phone number, is
8  that how he contacted you, or was he routed through
9  an operator at MBMS?
10      How did he get in touch with you?
11    A.  He called either my home phone number or
12  my cell phone number, I don't recall which.
13    Q.  Okay.  So all drivers that were employed
14  by MBMS in July of 2008 would you both your home
15  number and your cell phone number?
16    A.  Correct.
17    Q.  Okay.  On page 13 of the document there's
18  a paragraph called:  Handbook Amendments.
19      Do you see that?
20    A.  Yes, I do.
21    Q.  It indicates that:  Our company
22  newsletter, Martinsville News, will serve as an
23  Employee Memo and any policy or procedure change
24  published in the newsletter will be considered an

133

1  Procedures and Policies, I believe the third bullet
2  point down, it reads:  To load, transport and
3  unload each shipment from origin to destination
4  without delay in route unless otherwise directed by
5  dispatch.
6      And dispatch refers to the dispatchers at
7  Martin Bulk Milk Service, correct?
8    A.  Correct.
9    Q.  And then the last bullet point on page 5,
10  it says:  To make a minimum of one check call per
11  day.
12      Can you describe to us what a check call
13  is?
14    A.  A check call is, for the average driver
15  that is delivering anywhere from 7:00 o'clock a.m.
16  to 12:00 o'clock noon, that they call in and let
17  dispatch know we're empty, where do you want us to
18  go, or I'm delayed because of traffic or that type
19  of thing.
20      Sam was not required to make this call
21  because he did not leave until noon or later, so he
22  did not fall into this bullet.
23    Q.  Okay.  If he did fall into the bullet and
24  had to make a check call, who would he make that

135

1  amendment to the Driver Handbook dated April, 2007.
2      So this is something again that is
3  authored solely by Martin's Bulk Milk Service?
4    A.  Correct.
5    Q.  And who would author the Martinsville
6  News?
7    A.  At that time Anna Thurston did.
8    Q.  Okay.  Did you do that as well?
9    A.  I never did Martinsville News.  It has
10  since been discontinued.
11    Q.  Okay.  How often would that have been
12  published, since this document was created in April
13  of 2007?  If you know.
14    A.  About once every other month.
15    Q.  Okay.  And the intent behind the
16  newspaper, so to speak, is to provide updates to
17  the drivers that were employed by your company,
18  Martin's?
19    A.  Correct.
20    Q.  Okay.  And, again, UACL or -- and/or IPC
21  had no involvement with the creation of that
22  periodical, right?
23    A.  Correct.
24    Q.  Okay.  On page 5, under Operating

134

1  check call to?
2    A.  To the dispatch office.
3    Q.  Which dispatch office?
4    A.  In Wilton, at our terminal.
5    Q.  And when you say at our terminal, Martin
6  Bulk Milk Service terminal?
7    A.  Correct.
8    Q.  Again, not UACL or IPC, correct?
9    A.  I don't believe he called them, not to my
10  knowledge.  I don't know.
11    Q.  Well, according to this document that you
12  drafted, Mr. Franke was not required to call UACL
13  or IPC, he was required to call you to follow your
14  check-in requirements, correct?
15    A.  That is correct.
16    Q.  Okay.  On page 6, I think it's the second
17  page 6 that I have, it begins with bullet points.
18      The third bullet point down indicates:  To
19  submit complete paperwork every week no later than
20  10:00 o'clock a.m. on Tuesday.  If paperwork is not
21  submitted on time, there will be no payroll check
22  issued, nor will an advance be issued.
23      Did this bullet point apply to Mr. Franke?
24    A.  Yes, it did apply to him.

136

34 (Pages 133 to 136)

1    Q.  Okay.  And, again, this -- the intent
2  behind this bullet point is to get the driver to
3  submit their paperwork in order to get paid by
4  Martin Bulk Milk Service, correct?
5    A.  Correct.
6    Q.  What is the intent behind the following
7  bullet point:  To fuel trucks at the terminal
8  whenever possible and to fuel reefer units daily
9  upon return to the terminal?
10    A.  The point to that is fueling trucks at the
11  terminal versus over the road averages 20 to 25
12  cents, on average, per gallon less in cost, and as
13  far as fueling the reefers, we transport primarily
14  refrigerated freight on our reefer trailers, not a
15  dry van or a rail trailer, of course, but -- so we
16  want the fuel levels to remain three-quarters to
17  full at all times.
18    Q.  Is it fair to say that this can be
19  described as a cost control measure that was
20  implemented by your company?
21    A.  Yes.
22    Q.  And, again, I think we covered this
23  already.  The final bullet point there, that kind
24  of goes to you had an unwritten rule, so to speak,

137

1  that all the drivers should take the shortest
2  and most direct route to their destination,
3  correct?
4    A.  Within -- with respect to the tolls and
5  the cost savings, tolls versus miles, yes.
6    Q.  Okay.  On page 9, the second full
7  paragraph is titled:  Footwear Policy.
8      Do you see that?
9    A.  Yes, I do.
10    Q.  And it says:  Martin's Bulk Milk Service,
11  Inc. has implemented this policy to ensure that all
12  personnel use adequate footwear when working in
13  areas where there is a danger of personal injury
14  due to slips, trips and falls.
15      Again, this is something -- this policy
16  was drafted by your company and not UACL or IPC,
17  correct?
18    A.  That is correct.
19    Q.  On page 12 it talks about warnings, and
20  there's a list this, again, a bullet point list
21  under the paragraph that indicates:  The following
22  offenses are grounds for disciplinary action
23  ranging from verbal warnings to discharge,
24  depending on the seriousness of the situation.

138

1    These are -- these employment rules, so to
2  speak, were implemented by Martin Bulk Milk Service
3  and not UACL or IPC, correct?
4    A.  That is correct.
5    Q.  And, finally, when you testified to the
6  day shortly after the occurrence when Mr. Franke
7  was brought back to Martin Bulk's office and was
8  terminated, that decision was solely by Martin's
9  Bulk Milk Service, and UACL and IPC had no
10  involvement with that decision, correct?
11    A.  Correct.
12    MR. YU:  Thank you, that's all I have.
13    THE WITNESS:  Thank you.
14    MR. SCHRECK:  Any follow-ups?
15    MR. COUTURE:  I have more questions.
16    MR. SCHRECK:  How many -- how much time have
17  you got just so I can get up real quick here?
18    MR. COUTURE:  Not very long.
19      FURTHER EXAMINATION
20  BY MR. COUTURE:
21    Q.  I'm very confused right now, ma'am.
22      When I asked you questions about your
23  conversations with Mr. Franke after this accident,
24  you told me that Mr. Franke said he was driving the

139

1  speed limit.
2      Do you remember saying that?
3    A.  I don't recall exactly the speed limit.
4    Q.  That's what you said.
5    A.  Okay.
6    Q.  Mr. Burke asked you the question and you
7  said to him that Franke told you he was driving
8  under the speed limit.
9      Why -- why the change?
10    MR. BURKE:  Well, objection to the form of that
11  question, which assumes there was a change, which
12  this witness has not said there was.
13    MR. COUTURE:  And there was, and it's on the
14  transcript so --
15    MR. SCHRECK:  I'm going to join that
16  objection.
17  BY MR. COUTURE:
18    Q.  So why the change?
19    A.  I don't know.  A lot of questions are
20  being thrown out, a lot of recollection four years
21  ago.
22    Q.  So did he --
23    A.  I --
24    Q.  I'm sorry, go ahead.  I don't want to step

140

35  (Pages 137 to 140)

1  on your answer.
2  A. If I can reiterate to your question or to
3  Mr. Burke's, I would have to say that I recall Sam
4  saying, period, he wasn't speeding.
5  Q. Okay. So at or below the speed limit?
6  A. Correct. If I may correct my statement,
7  I recall him say -- saying he was not speeding.
8  Q. All right. With regard to Mr. Franke's
9  demeanor on the phone when you spoke to him on
10  the day of the occurrence, you stated that he was
11  in shock.
12  Now you're not using the medical term that
13  we all learned in grade school, where you have to
14  put blankets on them, you turn white, and you
15  sweat, you have to be taken to the hospital, right?
16  A. Correct, I was --
17  Q. You're talking about the fact that someone
18  who had just rammed a stopped vehicle was upset he
19  was in an accident?
20  A. Correct.
21  Q. Okay. Would you agree with me that even
22  though he was upset, that he was still able to
23  discern what's true and not true?
24  MR. SCHRECK: Objection, form, foundation,

141

1  calls for speculation.
2  Go ahead and answer.
3  MR. BURKE: Join in that.
4  A. Can you repeat that, please?
5  BY MR. COUTURE:
6  Q. I'll ask it in a different way.
7  Is it your belief that Mr. Franke wasn't
8  able to tell you the truth when you spoke to him on
9  the phone about what happened because of his
10  excited condition?
11  A. No.
12  Q. Okay. You believe that what he told you
13  was true?
14  A. Yes.
15  Q. He was just upset about it?
16  A. Yes.
17  MR. COUTURE: Thank you. That's all I've got,
18  ma'am.
19  MR. SCHRECK: Any follow-up, Rich?
20  Anything at all?
21  EXAMINATION
22  BY MR. SCHRECK:
23  Q. Okay. Just two quick follow-up questions
24  and we'll be done here.

142

1  Mr. Burke was asking you some questions
2  earlier regarding documentation regarding
3  inspections, pre-trip inspections, and I just want
4  to make it clear for the record:
5  When you're referring to the form that the
6  drivers fill out, you're actually talking about the
7  log itself, that's where the notations recorded for
8  the pre-trip inspection is done?
9  A. The pre-trip is done at the beginning of
10  the day, yes.
11  Q. Okay. The actual form, it's on the log
12  itself, the bottom of the form?
13  A. It's actually -- the pre-trip is actually
14  post-trip from the day before, yes.
15  Q. Okay. You're saying it's on the same
16  piece of paper?
17  A. Correct.
18  Q. Okay, that's what I was getting at.
19  MR. SCHRECK: I have nothing else. Anybody
20  have any follow-ups?
21  We'll reserve.
22  MR. COUTURE: E-tran only and the exhibit.
23  MR. SCHRECK: Regular and mini. You can send
24  me the transcript for signature.

143

1  MR. YU: Mini and e-tran.
2  MR. BURKE: E-tran and mini.
3  (The deposition concluded at
4  1:08 o'clock p.m.)
5  (FURTHER DEPONENT SAITH NOT.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

144

36 (Pages 141 to 144)

**Page 145**

```
         IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION
MURRAY SCHEINMAN, Plenary      )
Guardian of the Estate and     )
Person of JEFFREY D. SCHEINMAN, )
a Disabled Person              ) No. 09 CV 5340
       Plaintiff,              )
       -vs-                    )
MARTIN'S BULK MILK SERVICE,    )
INC., et al.,                  )
       Defendants.             )

       This is to certify that I have read the
transcript of my deposition taken in the
above-entitled cause by Janet M. Stanton, Certified
Shorthand Reporter, on the 28th day of September,
2012, and that the foregoing transcript accurately
states the questions asked and the answers given by
me as they now appear.


       _____
            JANET BERNDT

SUBSCRIBED AND SWORN TO
before me this _____ day
of _____ 2012.

       _____
       Notary Public
```

**Page 146**

```
STATE OF ILLINOIS )
                  ) SS:
COUNTY OF DU PAGE )
     I, Janet M. Stanton, a Notary Public within and
for the County of DuPage and State of Illinois, do
hereby certify that heretofore, to-wit, on the 28th
day of September, 2012, personally appeared before
me, at 211 South Wheaton Avenue, Wheaton, Illinois,
JANET BERNDT, in a cause now pending and
undetermined before the United States District
Court for the Northern District of Illinois,
Eastern Division, wherein MURRAY SCHEINMAN is the
Plaintiff and MARTIN'S BULK MILK SERVICE, INC., et
al., are the Defendants.
     I further certify that the said witness was
first duly sworn to testify the truth, the whole
truth and nothing but the truth in the cause
aforesaid; that the testimony then given by said
witness was reported stenographically by me in the
presence of the said witness, and afterwards
reduced to typewriting by Computer-Aided
Transcription, and the foregoing is a true and
correct transcript of the testimony so given by
said witness as aforesaid.
```

**Page 147**

```
     I further certify that the signature to the
foregoing deposition was reserved by counsel for
the respective parties.
     I further certify that the taking of this
deposition was pursuant to Notice, and that there
were present at the deposition the attorneys
hereinbefore mentioned.
     I further certify that I am not counsel for nor
in any way related to the parties to this suit, nor
am I in any way interested in the outcome thereof.
     IN TESTIMONY WHEREOF:  I have hereunto affixed
my signature this 19th day of October, 2012.




       _____
       Janet Stanton, CSR
       License No. 084-001905
```

**Page 148**

```
McCorkle Litigation Services, Inc.
200 N. LaSalle Street, Suite 2900
Chicago, Illinois  60601-1014
       (800) 622-6755
       (312) 263-0052
       FAX (312) 263-7494

October 22, 2012

Mr. Matthew R. Schreck
MULHERIN, REHFELDT & VARCHETTO, P.C.
211 South Wheaton Avenue, Suite 200
Wheaton, Illinois 60187
IN REFERENCE: SCHEINMAN v. MARTIN'S
COURT NUMBER:  09 CV 5340
DATE TAKEN: SEPTEMBER 28, 2012
DEPONENT: JANET BERNDT

Dear Mr. Schreck:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause. Also enclosed are additional signature
pages, if applicable, and errata sheets.
Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature. All changes or corrections must be
made on the errata sheet, not on the transcript
itself. All errata sheets should be signed and all
signature pages need to be signed and notarized.

After the deponent has completed the above, please
return all signature pages and errata sheets to me
at the above address, and I will handle
distribution to the respective parties.
If you have any questions, please call me at the
above phone number.

Sincerely,

Margaret Setina     Court Reporter Present:
Signature Department    Janet M. Stanton
cc:  All Attorneys of Record
```

37 (Pages 145 to 148)