Joan Anderton                                          April 10, 2012

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary
Guardian of the Estate and
Person of JEFFREY J. SCHEINMAN,
a Disabled Person,

Plaintiffs,

vs.                          Case No. 09 CV 5340

MARTIN'S BULK MILK SERVICE,
INC., SAMUEL G. FRANKE, CSX
INTERMODAL, INC., INTERNATIONAL
PAPER COMPANY and OVERNITE
EXPRESS, INC.,

Defendants.

DEPOSITION OF JOAN ANDERTON, a witness,
taken on behalf of the Plaintiffs, pursuant to
Notice, on the 10th day of April, 2012, at the
Marriott Kansas City Airport, 775 Brasilia Avenue,
Kansas City, Missouri, before

STACEY L. SOMMERS

for Esquire Deposition Solutions, a Registered
Professional Reporter, Certified in Missouri and
Kansas.

APPEARANCES
For the Plaintiffs:
     MR. RICHARD F. BURKE
     CLIFFORD LAW OFFICES
     120 North LaSalle Street, Suite 3100
     Chicago, Illinois 60602

---

**Page 2**

APPEARANCES (Continued)
For Defendants Martin's Bulk Milk Service,
Inc., and Samuel G. Franke:
     MR. MATTHEW R. SCHRECK
     MULHERIN, REHFELDT & VARCHETTO, PC
     211 South Wheaton Avenue, Suite 200
     Wheaton, Illinois 60187

For Defendants Universal Am-Can, Ltd.,
s/b/a and successor to Overnite Express,
Inc.:
     MR. CARLTON D. FISHER
     HINSHAW & CULBERTSON, LLP
     222 North LaSalle, Suite 300
     Chicago, Illinois 60601

For Defendant Martin's Bulk Milk Service,
Inc., via telephone:
     MR. ROBERT J. GOLDEN
     DOWD & DOWD, LTD.
     617 West Fulton
     Chicago, Illinois 60661
For Defendants BMW of North America, LLC,
and Bayerische Motoren Werke
Aktiengesellschaft via telephone:
     MR. TIMOTHY R. COUTURE
     JOHNSON & BELL, LTD.
     33 West Monroe, Suite 2700
     Chicago, Illinois 60603

---

**Page 3**

INDEX

WITNESS:                              PAGE:
JOAN ANDERTON
Examination by Mr. Burke                  4
Examination by Mr. Schreck              145
Examination by Mr. Fisher              159
Reexamination by Mr. Burke             193
Examination by Mr. Couture             202

EXHIBITS:                             PAGE:
Deposition Exhibit 99                   96
Deposition Exhibit 100                 166
Deposition Exhibit 101                 173
Deposition Exhibit 102                 173
Deposition Exhibit 103                 195

Reporter's Note: Exhibits were retained by
counsel.

---

**Page 4**

          (The deposition commenced at
9:08 a.m.)

          MR. BURKE: Let the record reflect
this is the discovery deposition of Ms. Joan
Anderton, taken pursuant to notice, in accord
with the applicable rules of the Seventh
Circuit in the United States District Court
for the Northern District of Illinois.

          JOAN ANDERTON,
a witness, being first duly sworn, testified
under oath as follows:

          EXAMINATION

BY MR. BURKE:

Q. Ms. Anderton, again my name's Rich Burke. I
represent Mr. Scheinman. And I'm going to ask
you some questions about your work at
International Paper. And as I do so, if you
don't understand my question or want anything
repeated, just tell me. And if you want to
look at any documents, that's fine, too.
Okay?

A. Okay.

Q. And if you and I try to not talk at the same
time, that helps. So let me get my question

---





EXHIBIT
K

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

**5**

1  out before you start to answer, even if you
2  know what I'm going to say. And I'll try and
3  let you finish --
4  A. I got it.
5  Q. -- your whole answer. And also if you could
6  verbalize yes and nos. Even though we can see
7  you nodding your head, the court reporter has
8  to take down a yes or no, if that happens to
9  be your answer. Okay?
10 A. I understand.
11 Q. And for the record, please state your name and
12 spell both your first and last name and middle
13 initial, if you have one.
14 A. Joan C. Anderton, J-o-a-n, C.,
15 A-n-d-e-r-t-o-n.
16 Q. Okay. And what's your date of birth,
17 Ms. Anderton?
18 A. August 8th, 1967.
19 Q. And where were you born at?
20 A. New Hyde Park, New York.
21 Q. And what's your educational background?
22 A. I have a master's in engineering from Purdue
23 University and a bachelor's in applied
24 mathematics from Rochester Institute of
25 Technology.

**6**

1  Q. Rochester did you say?
2  A. Rochester, uh-huh.
3  Q. And any other degrees, other than those two --
4  A. Nope.
5  Q. -- good accomplishments? Where do you
6  currently live? Just not your -- you don't
7  have to give me your home address, just what
8  town?
9  A. Washington state, Woodland. My address is in
10 Woodland.
11 Q. In Woodland, Washington?
12 A. Washington, uh-huh.
13 Q. And by whom are you currently employed?
14 A. International Paper.
15 Q. And how long have you been employed?
16 A. 11 years.
17 Q. By International Paper?
18 A. By International Paper? 11 years.
19 Q. Okay. And what's your current job or
20 position?
21 A. I'm a deployment lead.
22 Q. Okay. And what's that term mean in your
23 business?
24 A. We roll out a system at the box -- at box
25 plants. It's a new implementation of a supply

**7**

1  system in our box plant.
2  Q. Okay. And a box plant refers to what?
3  A. Corrugated plant, a corrugated box
4  manufacturing facility.
5  Q. How long have you held that position as --
6  A. Since February of last year.
7  Q. Okay. Prior to that, what job or position did
8  you hold at International Paper?
9  A. I was the enterprise distribution manager for
10 the central region.
11 Q. Okay. Enterprise distribution manager?
12 A. Manager, uh-huh.
13 Q. And what does that term mean or job --
14 A. I was responsible --
15 Q. -- encompass?
16 A. I was responsible for two -- for overseeing
17 the operations of two regional distribution
18 centers, one in Hammond, Indiana, and one in
19 Dallas/Forth Worth. And then I would work
20 with all of the businesses of International
21 Paper on transportation and warehousing
22 initiatives.
23 Q. And how long did you have that job, or that
24 position I should say?
25 A. I was an enterprise distribution manager for

**8**

1  just the midwest for four years. And then I
2  got the central region and expanded my region
3  for two years. So a total of six years.
4  Q. Okay. Why don't you tell me where your
5  current office is. Where do you work out of
6  today?
7  A. I travel 80 percent of the time. So if I am
8  not on the road, I work from home.
9  Q. Okay.
10 A. But I work at box plants across the country
11 now.
12 Q. Okay. And to whom do you report at the
13 moment?
14 A. Frank Lane.
15 Q. And what's Frank's job or title?
16 A. Manager -- I am not sure. Manager of business
17 optimization for container division or CTA.
18 I -- my job change last year was a significant
19 change from where I was. So it's a different
20 business.
21 Q. Okay. Where is Frank Lane's office at?
22 A. Memphis, Tennessee.
23 Q. And then why don't you tell me what -- when
24 did you first start working for International
25 Paper?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

9

1   A. I was a consultant for one year, and then
2       November 1st, 2000 ...
3   Q. Okay. And give me a little idea of the jobs
4       you've held up from your -- from your start
5       until you became the enterprise distribution
6       manager.
7   A. I was a supply chain manager in consumer
8       packaging division.
9   Q. And where did you work at? What office?
10  A. Memphis.
11  Q. And about how long did you hold that position?
12  A. A year and a half to two years. A year and a
13      half to two years.
14  Q. And then what did you do?
15  A. And then I was on a corporate project for a
16      supply chain that was called Edge. I was a
17      supply chain analyst, I would say. And then I
18      became a lead on that project.
19  Q. And that project generally encompassed what
20      type of work or project?
21  A. It was creating a strategy for a supply chain
22      for International Paper across all of our
23      business. It was a supply chain strategy
24      looking out over the next 5 to 10 years of
25      what we would be doing.

10

1   Q. When you were -- you were a consultant for
2       International Paper for one year, who were you
3       working for at that time?
4   A. Computer Sciences Corporation.
5   Q. And what was the nature of your consulting
6       work?
7   A. Supply chain consulting.
8   Q. And then prior to working at Computer
9       Sciences, where did you work?
10  A. I worked for Denver Manager Group. I was a
11      consultant there for three years. Also a
12      supply chain, primarily distribution,
13      transportation warehousing.
14  Q. Okay. And any -- did you work anywhere
15      between -- well, strike that.
16          After you graduated from college, did
17      you start working or did you continue with
18      your master's?
19  A. I went directly for my master's.
20  Q. Okay. In what year did you graduate with both
21      those degrees?
22  A. 1990. December of 1990.
23  Q. Was that your master's or undergrad?
24  A. Master's.
25  Q. Okay. And your undergrad was one or two years

11

1       prior?
2   A. Yeah, '89.
3   Q. '89. Okay.
4   A. It was a year and a half for my master's.
5   Q. Okay. And then after getting your master's,
6       did you go to work at Denver, or was there
7       somewhere else --
8   A. No. I worked for IBM.
9   Q. IBM. Okay. And doing what?
10  A. I was a production control specialist,
11      inventory specialist for a manufacturer of
12      main frame computers.
13  Q. Okay. And how about after IBM, where did you
14      go?
15  A. I moved to Colorado. I left work for a while,
16      got married, and then I kind of did some
17      independent consulting. And then ended up
18      working for Book Tech Distribution, was
19      probably my first ...
20  Q. And did you go to start at Denver after that?
21  A. And then I went to, yeah, Denver Management
22      Group. Yes.
23  Q. Okay. Have you given any prior depositions?
24  A. Once for a personal reason.
25  Q. Okay. Have you given any -- I take it you

12

1       have not given any depositions on behalf of
2       International Paper?
3   A. No, I have not.
4   Q. Okay. And how about on behalf of any of your
5       other employers?
6   A. No, I have not.
7   Q. Okay. Have you testified in court at all?
8   A. No, I have not.
9   Q. Have you worked for any trucking companies or
10      interstate motor carriers?
11  A. No, I have not.
12  Q. And, generally, what -- tell me the business
13      of International Paper. How would you
14      describe it?
15  A. We're a paper and packaging company --
16      manufacturer.
17  Q. Okay. And where are the headquarters of
18      International Paper?
19  A. Memphis, Tennessee.
20  Q. And how would you describe the number of
21      locations or facilities you have in the United
22      States?
23  A. Over 100, if not 200.
24  Q. Okay.
25  A. I'm not sure of the exact amount.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

13

1  Q. Okay. The ...
2  A. Can I correct that? It's definitely over 200
3     if you include Xpedx. Because they have their
4     own facilities, as well.
5  Q. Okay. Does International Paper own Xpedx?
6  A. Yes.
7        MR. SCHRECK: How do you spell that?
8        THE WITNESS: It's X-p-e-d-x.
9        MR. SCHRECK: Okay. Thanks.
10 Q. (By Mr. Fisher) And does International Paper
11    have offices outside the US?
12 A. Yes.
13 Q. Okay. And in what countries or how many,
14    approximately?
15 A. Numerous. Russia, India, China, South
16    America, Europe. I do not know all of the
17    locations.
18 Q. And can you tell me what you've reviewed in
19    anticipation of giving this deposition?
20 A. I reviewed my e-mail communications after I
21    had heard of the lawsuit. And I discussed
22    with counsel -- had discussions with counsel
23    on documents that have been produced and the
24    interrogatories that we had answered over the
25    last couple years since the first

14

1     communications.
2  Q. And the e-mail communications you refer to,
3     with whom were those communications?
4  A. A couple of internal communications and with
5     our counsel, internal counsel.
6  Q. Okay. And is that Mr. Quinlen --
7  A. No.
8  Q. -- internal counsel?
9  A. No. It would have been Gigi and -- I can't
10    recall the other woman's name.
11 Q. Okay.
12 A. I don't remember the name.
13 Q. Do you know Mr. Quinlen --
14 A. I do know Mr. Quinlen.
15 Q. -- Thomas Quinlen? Have you spoken to him?
16 A. Not on -- not regarding this case.
17 Q. The other -- not your lawyers or not attorneys
18    for International Paper, nor Mr. Fisher, but
19    the other e-mails that you reviewed, what
20    persons were you communicating with in those
21    e-mails?
22 A. There were e-mails on -- the day that I found
23    out about the incident, there was an e-mail
24    that I sent to the operations -- what's his
25    title -- Clint Diekman at Hammond and asked

15

1     him to pull the file on the shipment. And I
2     had called Steve Shores, in Memphis, who
3     supported the RDC. And I had called Fadera
4     Carter.
5  Q. And how do you spell Fadera?
6  A. F-a-e-d-r-a, Carter -- F-a-d-e-r-a.
7  Q. Is that a woman?
8  A. Yes, a woman.
9  Q. What is her job?
10 A. She is a business analyst, is I believe what
11    her title was.
12 Q. Okay. And why did you call her?
13 A. To find out about payment for the load. I
14    called them in sequence. So she had asked --
15    I had asked about payment for the shipment and
16    if there was anything unique about payment.
17 Q. Okay. And what did she tell you?
18 A. She pulled the history of the payment. And it
19    showed the total amount we paid to the
20    carrier, and it had the three stops on the
21    truck for that shipment.
22 Q. And when you say "the carrier," who are you
23    referring to?
24 A. Overnite -- the payment looked as though it
25    was to Overnite, but it was for Universal

16

1     Am-Can.
2  Q. And what do you mean when you say it looked
3     like it was to Overnite?
4  A. Because our payment would have had the SCAC
5     code of OXEN, O-X-E-N, which is Overnite
6     Express, who had been either acquired or taken
7     over by Universal Am-Can.
8  Q. So as of -- I shouldn't say as of, but on
9     July 3rd, 2008, International Paper believed
10    that the carrier they were paying for this
11    load was Universal Am-Can?
12 A. Uh-huh.
13 Q. Is that a yes?
14 A. Yes.
15 Q. Okay.
16 A. Uh-huh.
17 Q. And that's because Universal Am-Can had taken
18    over or acquired Overnite Express, to your
19    knowledge?
20 A. Yes. I'm not sure exactly what their business
21    relationship was. I know that prior -- prior
22    to this particular shipment that we were
23    paying Overnite Express. And then either they
24    acquired them or what -- however. I'm not
25    sure what the circumstances were, but we paid



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

17

1    Universal Am-Can.
2    Q. And were you -- how would they get paid, while
3    we're on this topic?
4    A. How would they get paid?
5    Q. Yeah.
6    A. They would submit, electronically, a
7    request -- they would submit electronically
8    that they delivered the load and the time and
9    date that they delivered the shipment. And
10   then they would get -- automatically the load
11   would get calculated, and they'd get paid
12   through the SAP, which is our transaction
13   system.
14   Q. And when you say "they," you're referring to
15   Universal?
16   A. Yes.
17   Q. And does SAP stand for anything?
18   A. It probably does.
19   Q. Not that you know?
20   A. But I do not. It's a German system, it's our
21   financial system.
22   Q. In this particular circumstance, was
23   International Paper aware of any involvement
24   by Martin's Bulk Milk Service in transporting
25   International Paper's paper products?

18

1    MR. FISHER: Could you read just the
2    first part of the question?
3    (The pending question was read by the
4    reporter.)
5    MR. FISHER: Objection to form.
6    Vague.
7    You can go ahead and answer.
8    A. I -- for this particular shipment, I don't
9    think we knew whether -- who they were going
10   to -- whether they were going to haul the load
11   with their own driver or broker it out to
12   another driver.
13   Q. (By Mr. Burke) Okay. You didn't know if
14   Universal was going to haul it themselves
15   or --
16   A. Correct.
17   Q. -- have some other driver haul it?
18   A. Uh-huh.
19   Q. And by the way, the -- by whom did you become
20   aware that there had been any collision
21   involving -- or strike that. Any collision
22   with a truck that was carrying International
23   Paper products?
24   A. We got a request for a legal hold from our
25   corporate legal group saying, "This particular

19

1    shipment, any documentation, anything related
2    to this, needs to be held in legal hold,"
3    which we get a special thing in our e-mail to
4    put things in if we have anything related to
5    it.
6    I had no awareness of any exception
7    about that shipment prior to that date. It
8    was about a year, or so, after the incident.
9    So ...
10   Q. And when did you get this e-mail about the
11   legal hold?
12   A. I don't know the exact date.
13   Q. Okay.
14   A. It was -- I don't have that document. But it
15   was the same date I contacted the three
16   individuals I mentioned contacting.
17   Q. Okay. Now, maybe I misunderstood you. That
18   wasn't one year after this incident?
19   A. I believe so.
20   Q. Oh, it was?
21   A. I believe it was approximately one year.
22   Q. Okay. And why is it you were contacted? What
23   was your job or responsibility?
24   A. Because I was the IP employee responsible for
25   the operation of the Hammond RDC. And

20

1    responsible for -- because we hired an Exel --
2    Exel Logistics to operate the facility for us,
3    and I managed our relationship with them.
4    Q. And RDC stands for?
5    A. Regional distribution center.
6    Q. Were you aware of this occurrence back in July
7    of 2008, when it happened?
8    A. No, I was not.
9    Q. I think you mentioned Clint Diekman was it?
10   A. Diekman.
11   Q. How do you spell his last name?
12   A. D-i-e-k-m-a-n.
13   Q. And what was his job?
14   A. He was -- he's the customer service
15   supervisor.
16   Q. Okay. And I believe you said you called him.
17   And for what reason did you do so?
18   A. I asked him to pull the RDC's records of that
19   shipment and see if there was any -- if it
20   delivered on time, if there was anything
21   unique about it.
22   Q. Okay.
23   A. And he confirmed that the shipment delivered
24   on time and had no -- no other information
25   about the delivery.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                        April 10, 2012

21

1  Q. And then how about Steve Shores? What was his
2     job?
3  A. Steve Shores worked for IP in Memphis and was
4     a transportation specialist.
5  Q. And why was it you called him or contacted
6     him?
7  A. To pull the records on that same shipment and
8     he confirmed the EDI transactions between
9     Universal Am-Can and IP about when the product
10    was picked up and when the product delivered.
11    And he also confirmed that everything
12    delivered on time.
13 Q. Okay. And the product here in question was
14    what?
15 A. Paper products, probably palletized carton
16    stock paper for three different customers in
17    the Minneapolis area.
18 Q. Okay. And when you say paper products, is
19    this computer paper, typing paper, or --
20 A. Yeah, 8 1/2 by 11 paper. It could be big
21    sheets. And then I think there might have
22    been skids of paper, as well, which would have
23    been for a printer, on a pallet. Just sheets
24    on a pallet.
25 Q. Okay. And had International Paper

22

1     manufactured these paper products?
2  A. I would -- 99 percent, I would say yes. But
3     there could have been some outside purchased
4     product on that truck. I would not have
5     known.
6  Q. Okay. And if it was an outside purchase, do
7     you know, would it fall into a certain
8     category or type of paper product?
9  A. It -- our product line is very broad. So it
10    could have -- it could have been. I'm pretty
11    sure we manufactured all the paper, but it
12    could have been a rare circumstance where
13    something was not manufactured by us.
14 Q. Okay. And these paper products were paper
15    that had been sold by International Paper to
16    different customers?
17 A. That's correct.
18 Q. And this paper -- or these paper products were
19    picked up at International Paper's Hammond
20    warehouse. Correct?
21 A. Yes.
22 Q. How did the paper -- or strike that. Where
23    did the paper come from before it got to your
24    Hammond warehouse?
25 A. Multiple mills and converting facilities

23

1     supplied paper to our regional distribution
2     center. So it could have come from any mills
3     across the country.
4  Q. Now, in July of '08, did International Paper
5     transport any of its own paper to customers?
6  A. Across the country, yes. Not from the RDC.
7  Q. Okay. So in order for paper -- like this
8     paper that was --
9  A. Uh-huh.
10 Q. -- involved here, this was being -- this was
11    not being delivered to customers by
12    International Paper trucks. Is that correct?
13 A. No.
14 Q. Okay. Does International Paper hold an
15    operating authority to operate as a common
16    carrier or a contract carrier?
17 A. Yes. I don't -- we have a private -- we have
18    private fleets in the country in different
19    parts, but not for the RDC.
20 Q. Okay. And not for the Hammond RDC?
21 A. RDC, correct.
22 Q. And the incident we're talking about here,
23    where International Paper products were on a
24    truck that was involved in a collision on
25    July 3rd of '08, that was -- that paper was

24

1     not being transported in an International
2     Paper truck. Is that correct?
3  A. Yes.
4  Q. Now, am I correct that for this --
5  A. Can I make one correction? Because I didn't
6     think of this before.
7  Q. Sure. Go right ahead.
8  A. Xpedx would occasionally pick up product from
9     the RDC, and Xpedx is a division of
10    International Paper so -- and they have their
11    own trucks. Not related to this set of
12    deliveries at all, but I just wanted to make
13    sure. That just came to mind.
14 Q. Okay. And in this instance, Xpedx was one of
15    the customers to whom paper was being
16    delivered. Correct?
17 A. Correct. Xpedx is a customer of the RDC, as
18    well as it is a division of International
19    Paper.
20 Q. Okay. And then one of the other delivery
21    destinations I think was Midland Paper.
22    Correct?
23 A. That is correct.
24 Q. Okay. And does International Paper own
25    Midland in any manner?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

25

1  A. No.
2  Q. And the other was ...
3          MR. FISHER: Cenveo.
4  Q. (By Mr. Burke) Cenveo.
5          MR. BURKE: Thank you.
6  A. Cenveo.
7          MR. FISHER: I've been struck down
8      twice on pronunciations today.
9          MR. SCHRECK: You going for three?
10 Q. (By Mr. Burke) Does International Paper own
11     any part of Cenveo?
12 A. Not that I'm aware of.
13 Q. Okay. Now, therefore, in this circumstance,
14     International Paper was utilizing a carrier to
15     deliver its paper to its customers. Correct?
16 A. Yes.
17 Q. And in this circumstance, did International
18     Paper believe the carrier was Universal?
19 A. Yes.
20 Q. Okay. And I think you told me a moment ago
21     International Paper did not know if Martin's
22     Bulk Milk Service was doing this delivery. Is
23     that correct?
24 A. Can you clarify that question? Can you
25     restate that question?

26

1  Q. Sure. Did International Paper know that
2      Martin's Bulk Milk Service was transporting
3      this paper on July 3rd?
4  A. No. We -- we knew that Universal Am-Can used
5      their own drivers sometimes and occasionally
6      brokered out. But as far as that
7      particular -- on that day, how they chose to
8      execute the delivery, we were unaware of and
9      had no influence over.
10 Q. Did International Paper expect that any
11     carrier that Universal hired would comply with
12     the contract terms that existed between
13     International Paper and Universal?
14 A. We expected that Universal Am-Can complied to
15     the terms that we -- in our contract with
16     Universal Am-Can.
17 Q. And if they, in turn, had someone else
18     actually make the delivery, did International
19     Paper expect that other entity or driver to
20     also comply with the same contract provisions
21     that existed between International Paper and
22     Universal?
23 A. We expected that our product would be
24     delivered -- picked up and delivered based
25     upon the contract requirements.

27

1  Q. Okay. Regardless of whether it was actually
2      Universal's driver or some other driver that
3      Universal --
4  A. Chose.
5  Q. -- hired?
6  A. Yeah.
7  Q. In this -- for these -- delivery of the paper
8      products to these three customers that you
9      referred to, Universal was performing, for
10     International Paper, the service of
11     transporting International Paper's product to
12     its actual customers. Correct?
13 A. Correct. We were --
14 Q. Okay.
15 A. Go ahead.
16 Q. Okay. And that transportation of
17     International Paper's products to its
18     customers, that was an essential part of
19     International's business. Correct?
20         MR. FISHER: Objection. Form.
21         You can go ahead and answer.
22 A. Actually can you restate that question?
23 Q. (By Mr. Burke) Sure. Getting International
24     Paper's product into the hands of its
25     customers was an essential part of

28

1      International Paper's business. Correct?
2  A. Our product needed to be delivered on time to
3      our customers. That was the objective.
4  Q. Sure. When -- for, you know, this scenario
5      we're talking about here, the -- these -- the
6      paper products that were in the process of
7      being shipped to these three customers of
8      International Paper, I take it at some point
9      there had been a sale made by International
10     Paper to these three separate companies?
11 A. That is correct.
12 Q. Okay. And did that -- whatever sales price
13     was quoted by International Paper, did that
14     price include delivery of the paper to the
15     customers?
16 A. We did not charge our customers separately for
17     delivery.
18 Q. Okay. So when the sale was made, part of the
19     sale agreement was that International Paper
20     would have the paper delivered to those
21     customers?
22 A. Part of the service was, yes, delivery to
23     their door.
24 Q. Okay. And the -- I take it there was no
25     International Paper person on -- on this truck

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joan Anderton                                                    April 10, 2012

29

1    that was making these deliveries. Right?
2    A. No.
3    Q. Okay.
4         MR. FISHER: That's correct?
5         THE WITNESS: There was no
6    International Paper person on this truck.
7         MR. FISHER: Correct?
8         THE WITNESS: Correct.
9         MR. FISHER: It was a double
10   negative.
11        THE WITNESS: Oh, I'm sorry.
12   A. Yes, there was -- there was no International
13   Paper person on that truck. Correct.
14   Q. (By Mr. Burke) Yeah. Thank you. And it's
15   just lawyer talk, but it'll come out funny, or
16   possibly even sounding contrary to what you
17   intended, when you read it on paper.
18        And when you -- therefore, when you
19   would make these deliveries, who -- either the
20   Universal personnel or whoever Universal
21   hired, they would be International Paper's
22   representative in actually delivering the
23   paper to your customers. Correct?
24        MR. FISHER: Objection. Form.
25   Vagueness as to the first part of the

30

1    question, when you made the deliveries.
2         You can go ahead and answer.
3    A. Yeah, actually could you restate that
4    question? Because you -- I --
5    Q. (By Mr. Burke) Sure. The -- since no
6    International Paper employee physically made
7    the delivery to your customers, either a
8    driver from Universal or a driver from whoever
9    Universal hired was the person acting on
10   behalf of International to actually accomplish
11   the delivery of the paper to International's
12   customers. Correct?
13        MR. FISHER: Objection. Form.
14   A. We -- I don't know if they were acting on
15   behalf of International Paper. They were
16   providing a service for International Paper,
17   to deliver our products to our customers.
18   Q. (By Mr. Burke) And that service obviously
19   provided a benefit to International by getting
20   its products into the hands of its customers.
21   Correct?
22   A. It was a service that we -- we needed, yes.
23   Q. And, you know, by the way, at what point did
24   International get paid in this process? Was
25   it before or after the delivery?

31

1    A. Paid by our customers for our product?
2    Q. Correct.
3    A. Depends on the terms of our payment with each
4    of these customers. I am not aware of what
5    each of the terms from -- with Cenveo were.
6         (Discussion off the record.)
7    Q. (By Mr. Burke) And from what you've told me
8    so far, would I be correct that International
9    Paper did not have any direct contact with
10   Martin's Bulk Milk Service concerning this
11   particular delivery?
12   A. Correct.
13   Q. Whether or not there would be delivery of your
14   paper products taking place was dependent on
15   whether International Paper had made a sale to
16   a particular customer. Correct?
17   A. Yes.
18   Q. Okay. The delivery that was taking place at
19   the time of this occurrence would not have
20   been in progress if International Paper had
21   not sold paper to those three customers.
22   Correct?
23   A. Yes.
24   Q. Did you -- switching topics on you a little
25   bit here.

32

1    A. Uh-huh.
2    Q. I know you have answered some interrogatories
3    in the course of this case?
4    A. Uh-huh.
5    Q. And -- is that a yes?
6    A. Yes.
7    Q. Okay. And in order to do so, can you give me
8    some idea what -- how you went about looking
9    for documents that you considered might be
10   relevant to the questions that you were
11   answering?
12   A. The --
13        MR. FISHER: Excuse me. Rich, and I
14   presume since I was involved in that process,
15   you don't want her to divulge any
16   communications with me or the in-house
17   counsel.
18        MR. BURKE: Not -- not words that you
19   or they have said to Ms. Anderton.
20   Q. (By Mr. Burke) But, you know, I'd like to
21   hear about actions that, you know, that you
22   took and things that you looked at, you know,
23   without getting into --
24   A. Okay.
25   Q. -- specific things that Mr. Fisher or other



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

33

1   lawyers said to you.
2   A. Okay.
3        MR. FISHER: I'm fine with that, as
4   long as she gives a broad description and
5   that's not going to be considered a waiver of
6   any attorney/client communications.
7        MR. BURKE: Yeah. No, no.
8        MR. FISHER: Okay.
9   Q. (By Mr. Burke) And I don't want you to say,
10  "Hey, Carl told me to do this," or, you know.
11       MR. FISHER: Gigi.
12  Q. (By Mr. Burke) Gigi or any, you know, other
13  actual lawyer --
14  A. Okay.
15  Q. -- as distinguished from non-lawyers. Okay?
16  A. Okay.
17  Q. So back to my question. Just tell me what you
18  did to try and find documents you thought
19  might be relevant to, or responsive to the
20  questions that you were trying to answer or
21  that Mr. Fisher had told you that he was
22  attempting to answer.
23  A. I either reflected on my knowledge of how the
24  process worked for shipping of goods out of
25  our facility or -- there's very limited

34

1   information on that particular shipment, or I
2   reflect back to the same three individuals I
3   contacted the first time I heard about the
4   shipment and looked at the information that I
5   had on that particular shipment.
6        Other than that, I read over the
7   questions and worked with counsel on the
8   responses and agreed with the responses and
9   signed the documents.
10  Q. How about the -- it is correct that there was
11  a contract relationship between International
12  Paper and Overnite Express, correct, that
13  predated this July of 2008 occurrence?
14  A. Yes. It was a 2007 contract.
15  Q. Okay. And have you reviewed that contract?
16  A. Only recently.
17  Q. Okay.
18  A. Very recently.
19  Q. Okay. Is that something that you, on your
20  own, went looking for to find? Or was that --
21  A. It was one of the exhibits presented in the --
22  in the case.
23  Q. Okay. And did you find that or retrieve that
24  contract?
25  A. No, I did not.

35

1   Q. Okay. Who -- who did from International
2   Paper?
3   A. I'm not sure exactly who did. I know that I
4   received it in our discussions, but I don't
5   know who pulled the contract.
6        MR. FISHER: Rich, I can tell you it
7   wasn't her.
8   Q. (By Mr. Burke) And how about Mr. Crawford,
9   William Crawford, does he still work at
10  International Paper?
11  A. No, he does not.
12  Q. Okay. Where does he work today?
13  A. I don't -- I don't know. I knew he had worked
14  for Temple Inland, but I don't -- I think he's
15  retired at this time. But I don't know. I
16  don't know him personally.
17  Q. Okay. And who did he last work for?
18  A. Temple Inland.
19  Q. Temple?
20  A. Inland.
21  Q. Inland?
22  A. Uh-huh.
23  Q. When did he last work for International Paper?
24  A. I don't know.
25  Q. How about Steven Mundy? Do you know him?

36

1   A. I know Steve Mundy, yes.
2   Q. Okay. And does he still work at --
3   A. Yes.
4   Q. -- International Paper? And where does he --
5        strike that.
6        What's his position today?
7   A. People's titles change a lot. I don't know
8   what his current title is. He is -- he does
9   the contracts with our carriers.
10  Q. Okay.
11  A. Manages contracts with our carriers.
12  Q. Okay. And --
13  A. Today, I believe he's working for -- they
14  split this role between two positions. So I'm
15  not sure if he's working currently with the
16  RDCs, but he was working with the RDCs at the
17  time of this incident.
18  Q. Okay. And where is Mr. Mundy's office at
19  today?
20  A. Memphis, Tennessee.
21  Q. And when Mr. Crawford last worked for
22  International Paper, where was his office?
23  A. Memphis, Tennessee.
24  Q. How many RDCs were there back in July of '08?
25  A. Six.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                   April 10, 2012

37

1  Q. Six? Okay. And there's one in Hammond?
2  A. One in Hammond.
3  Q. Where were the others?
4  A. Fort Worth, Texas; Ontario, California;
5     Portland, Oregon; Chester, Virginia. And I
6     don't know in -- I believe Florence, New
7     Jersey, if that building wasn't. If not,
8     it would have been in Massachusetts. There
9     was a location in Massachusetts which was
10    moved to New Jersey.
11 Q. Okay. And, essentially, what's the purpose or
12    function of the RDCs?
13 A. It's the regional distribution center
14    responsible for servicing all of the IP
15    businesses within the region. So we did
16    next -- next-day service or local service to
17    the region.
18 Q. Okay. And when you use the expression "IP,"
19    you're talking about International Paper?
20 A. International Paper, yes.
21 Q. Okay. In our world, sometimes that refers to
22    intellectual property. So I just want to
23    clarify. But I assumed that's what you meant.
24 A. Yes. Thank you.
25 Q. You told me it was your understanding that

38

1     International Paper as of -- or strike that.
2        It was your understanding that on
3     July 3rd, 2008, International Paper was
4     utilizing the services of Universal to
5     accomplish delivery of its paper products, as
6     opposed to Overnite Express. Correct?
7  A. Yes. There was a lag in the systems. So
8     that's why a lot of the paperwork still says
9     OXEN as the SCAC carrier code, which was
10    Overnite Express. But a contract was already
11    in place with Universal Am-Can.
12 Q. Okay. And what I'm getting at is how did you
13    come to know that? I mean what -- what have
14    you looked at or done to be able to sit here
15    and tell me that?
16 A. Well, I've seen the additional contract that
17    was written in the month, or so, prior to when
18    Universal Am-Can took over OXEN. And when I
19    pulled histories on the shipment, everything
20    said Overnite Express, OXEN, as the carrier.
21    So I confirmed the date prior to that.
22       And we have numerous carriers. It's
23    not unusual that one carrier's bought by
24    another, or merge with another. So the
25    carriers are regularly transitioning. And

39

1     that would have been during the time of that
2     transition period. So the facility would not
3     have been given -- yet been given directive to
4     change the SCAC code on the shipment on that
5     day.
6  Q. And when you say "the facility," you're
7     talking about the Hammond RDC?
8  A. RDC, yes.
9  Q. Okay. So you're not, you know, talking in a
10    vacuum, let me show you a couple things that I
11    think you've probably looked at.
12       MR. BURKE: Do you have the master
13    exhibits, like No. 1, Carl? Or, no, you know
14    what?
15 Q. (By Mr. Burke) Why don't we look at Exhibit 2
16    at the moment. Let me tender that to you.
17    And why don't you take a look at what I think
18    should be page -- Bates page 36, down on the
19    bottom.
20 A. (Witness complies.)
21 Q. (By Mr. Burke) Do you have that in front of
22    you?
23 A. Yes, I do.
24 Q. Okay. And, you know, take a look at whatever
25    you need to, to confirm it. But that, I

40

1     believe, actually runs up to about page 68,
2     including exhibits and attachments. Would I
3     be correct? And if I am not, tell me --
4  A. Yes.
5  Q. -- tell me so.
6  A. It appears to.
7  Q. Okay. And then am I correct that the contract
8     that begins on page 36 is the October, 2007,
9     contract between International Paper and the
10    carrier, Overnite Express?
11 A. That's what it states, yes.
12 Q. Okay. And actually on the preceding page, 35,
13    there's a letter from Mr. Mundy, sending three
14    copies of that contract to Overnite Express.
15    Correct?
16 A. Yes.
17 Q. And Mr. Mundy -- and that's in a letter dated
18    October 24th, 2007. Correct?
19 A. Uh-huh.
20 Q. And Mr. Mundy --
21 A. Yes.
22 Q. -- at that time, his title appears to be
23    manager of motor carrier transportation
24    sourcing?
25 A. Yes.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

41

1   Q.  And he was sending that to Sandy Herman at
2       Overnite Express?
3   A.  Yes.
4   Q.  Okay.  Do you know Sandy Herman?
5   A.  No.
6   Q.  And then the signature pages for this
7       October -- and here, let's back up one second.
8       Look at page 37.  How come that page is blank?
9       Do you know?
10  A.  I do not know.
11  Q.  Okay.
12          MR. FISHER:  They like to use their
13      paper.
14          MR. BURKE:  That's -- I appreciate
15      expanding business opportunities.
16  Q.  (By Mr. Burke)  Where's the original of this
17      contract?
18  A.  I do not know.  It's stored within Steve
19      Mundy's organization.  They have document
20      repositories.  If I were to require -- request
21      a copy of a contract, I would have gone to his
22      organization.
23  Q.  Okay.  And all I'm getting at is if we wanted
24      to figure out what's on page 2 of 24, where
25      would we find the original?

42

1   A.  It would be in Memphis in a shared -- within
2       their organization, however they maintain
3       their documents.
4   Q.  Okay.
5           MR. FISHER:  Rich, if I might, if you
6       look at page 36, this is a copy of the
7       original.
8   A.  That's what I thought.  This should be the
9       original.
10  Q.  (By Mr. Burke)  I have noticed that, yes.  And
11      I still --
12  A.  It says 2 of 24 and 3 of 24.
13  Q.  I'm not sure why -- and if it didn't
14      specifically specify 2 of 24 on a blank page,
15      I --
16  A.  It just looks like the line on the bottom of
17      the table of contents took a page and then
18      there was a page break probably.
19  Q.  Okay.  And then on page 38, the contract is
20      entered into effective the 1st day of October,
21      2007, between International Paper and Overnite
22      Express.  Correct?
23  A.  Yes.
24  Q.  Okay.  And then the signature pages are on
25      page 52, I believe, if you look at that.

43

1   A.  There's also signature pages on 48.
2   Q.  Okay.  And you know what?  You are correct.
3       The -- the signature pages for the actual
4       contract agreement are on page 13 of 24, which
5       is Bates Stamped IP48.  Correct?
6   A.  Yes.
7   Q.  Okay.  And that's -- and the date that was
8       signed by Mr. Crawford, on behalf of
9       International Paper, was November 12th of '07?
10  A.  Yes.
11  Q.  Okay.  And then there's various signatures
12      from personnel from Overnite Express,
13      Mr. Elsholtz and Sandy Herman, dated
14      October 30th, 2007.  Correct?
15  A.  Yes.
16  Q.  And also Kevin Hays.  Correct?
17  A.  That's what it says, yes.
18  Q.  Okay.  And then while we're on it, the
19      signatures that I referred you to a moment ago
20      on page 52, that's for a Fuel Index Exhibit B.
21      Correct?
22  A.  Yes.
23  Q.  Okay.  And essentially in your business, what
24      is the -- the Exhibit B Fuel Index that was
25      agreed to?

44

1   A.  It's a fuel surcharge based upon the current
2       fuel index.  It adjusts over -- it adjusts
3       weekly.  It's published amongst our
4       organization.  And that's how we pay our
5       carriers for fuel.
6   Q.  And then you're familiar with an amendment
7       that was entered into.  Correct?
8   A.  I -- yes, I'm aware.
9   Q.  Okay.  What's referred to as Amendment No. 1?
10  A.  Uh-huh.
11  Q.  Now, I don't see that amendment in these
12      International Paper Bates Stamped documents in
13      Exhibit 2.
14  A.  Uh-huh.
15  Q.  Am I correct?
16  A.  I didn't prepare the documents.
17  Q.  Okay.  Why don't you look at Exhibit 1?
18          MR. BURKE:  Carl, if you could give
19      that to Ms. Anderton.
20          MR. FISHER:  Uh-huh.
21  Q.  (By Mr. Burke)  And take a look at page 32.
22      Take your time.
23  A.  (Witness complies.)
24  Q.  Tell me when you are done looking at that
25      page 32.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                                April 10, 2012

45

1   A. Okay. I am done.
2   Q. Have you had a chance to look at it? Okay.
3       Exhibit No. 1, Bates Stamped UACL/OEI 32 is a
4       letter from Thomas Quinlen, on International
5       Paper letterhead, to Mr. Carl Fisher.
6       Correct?
7   A. Yes.
8   Q. Okay. And that's dated August 13th, 2009.
9       And essentially that letter is sending
10      Mr. Fisher a copy of the October 1st, '07,
11      contract between International Paper and
12      Overnite Express that we just looked at.
13      Correct?
14  A. That's what it states.
15  Q. Okay. And also sending a copy of what's
16      referred to as Amendment No. 1 to that
17      contract, and that amendment is dated June 9th
18      of '08, according to this letter?
19  A. Yes, that's what it states.
20  Q. Okay. And Mr. Quinlen goes on to say that
21      after Amendment No. 1 to the contract was
22      drafted, there was no signed version of -- of
23      something. Is that right?
24  A. That's what it states.
25  Q. Yeah. And what is being referred to there, as

46

1       far as you understand, in terms of there's no
2       signed version of what?
3   A. What it states -- I haven't seen the letter or
4       the document so.
5           It says there's no -- "thus no signed
6       version exists." That's what Mr. Quinlen
7       stated.
8   Q. Is that referring to that signed version of a
9       contract between --
10  A. I was not privy --
11  Q. -- or I should say do you know --
12  A. -- to a part of this contract, the discussion
13      or anything. As an -- overseeing the
14      facility, we would have been directed when the
15      carrier change occurred, and that we would
16      just operationally change our SCAC code at the
17      time when we had to execute. So I would not
18      have been a part of the conversations between
19      Universal Am-Can and our -- our sourcing
20      department or creation of the contract.
21  Q. And then let me ask you to take a look at
22      page 65 of that Exhibit 1 that you have in
23      front of you.
24  A. (Witness complies.)
25  Q. Is that the Amendment No. 1 that --

47

1   A. It says Amendment No. 1, yes.
2   Q. Okay. And we can go through it in a moment.
3       But it -- from everything you've reviewed, is
4       it your understanding that the purpose of this
5       amendment was to render the prior October,
6       2007, contract between International Paper and
7       Overnite Express, applicable to International
8       Paper and Universal?
9           MR. FISHER: Objection. Competence.
10          You can go ahead and answer.
11  A. It is my understanding that -- that that was
12      the case, yes, that the 2007 contract was an
13      amendment to that.
14  Q. (By Mr. Burke) So that now International
15      Paper would be utilizing Over -- or would be
16      utilizing Universal Am-Can, Limited, as the
17      carrier in place of Overnite Express?
18  A. Yes, that was my understanding.
19  Q. Okay. And that Amendment No. 1 on page 65 of
20      Exhibit 1 is -- it's a one-page document.
21      Right?
22  A. Yes.
23  Q. Okay. And as it states in line one, the
24      amendment is being entered into on June 9th of
25      2008. Correct?

48

1   A. Yes.
2   Q. Okay. And it goes on to say, under the
3       witnesseth -- and it's being entered into
4       between International Paper and Overnite
5       Express, as indicated in the first paragraph.
6       Right?
7   A. Universal Am-Can.
8   Q. Well, the way it reads there, it actually says
9       International Paper and Overnite Express.
10      Would I be correct? Just read that first
11      paragraph. Take a minute to do that.
12  A. (Witness complies.) Yes, it states that.
13  Q. And just so the record is clear, I mean the
14      first paragraph says, "This Amendment No. 1 is
15      made and entered into this 9th day of June by
16      and between International Paper and Overnite
17      Express as carrier." Correct?
18  A. That's what it states.
19  Q. Okay. And then under the witnesseth section,
20      it refers to the parties having previously
21      entered into a contract dated October 1st,
22      2007. Right?
23  A. Yes.
24  Q. Okay. And then there's an indication they
25      want to amend that particular contract.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton        April 10, 2012

49

1  Correct?
2  A. Because they're not working under the name of
3  Universal Am-Can, yes.
4  Q. Right. And now they go -- they go on to say,
5  "And, therefore, the parties agree as
6  follows," and it states, "effective June 13th,
7  2008, carrier will be operating under the name
8  Universal Am-Can, Limited, and SCAC UACL.
9  Correct?
10  A. Uh-huh, yes.
11  Q. And by the way, do you know what SCAC is?
12  A. It's a SCAC code that all carriers have. A
13  four-digit code. I don't know what the
14  acronym stands for.
15  Q. Okay. And is that for payment purposes?
16  A. It's -- it's how we actually name -- refer to
17  the carrier by their SCAC code quite regularly
18  for payment, for several reasons. But we use
19  the SCAC code to name the carrier.
20  Q. And Overnite Express' SCAC code was OXEN?
21  A. Yes.
22  Q. Okay. And then it goes on to say, "Universal
23  Am-Can, Limited, agrees to honor the rates and
24  fuel charge" -- "fuel surcharge established
25  between the company and Overnite." Correct?

50

1  A. Yes.
2  Q. Okay. And a couple lines down further it
3  says, "All other terms of the contract shall
4  remain and are in full force and effect."
5  Correct?
6  A. That's what it states.
7  Q. Okay. And the contract being referred to
8  there is the one alluded to up above, dated
9  October 1st, 2007. Correct?
10  A. Yes.
11  Q. And then it's signed by Mr. Mundy as manager
12  of sourcing motor procurement and dated
13  June 12th, 2008, on behalf of International
14  Paper. Correct?
15  A. Yes.
16  Q. And then it's signed by Mark Limback, the
17  president of Universal Am-Can, Limited, dated
18  June 10th, 2008. Correct?
19  A. Yes.
20  Q. From the materials you've reviewed, is it
21  correct that the contract that was in effect
22  on July 3rd, 2008, was the terms of the
23  contract between Overnite Express and
24  International Paper that had been entered into
25  on October 1st of 2007, as amended by this

51

1  Amendment No. 1?
2  MR. FISHER: Competence. Foundation.
3  You can go ahead and answer to your
4  understanding.
5  A. To my understanding, yes.
6  Q. (By Mr. Burke) From anything you've reviewed,
7  have you ever seen any other contract entered
8  into between Universal Am-Can and
9  International Paper prior to July of 2008?
10  A. There was the expired contract that occurred
11  before 2007, before the 2007 contract. No
12  other contract that I'm aware of.
13  Q. Okay. And my question referred to Universal
14  Am-Can. And are you answering --
15  A. I'm sorry.
16  Q. I think you're thinking of Overnite Express.
17  A. That's correct.
18  Q. Are you?
19  A. Yes, I'm thinking of Overnite Express.
20  Q. Okay.
21  A. I never heard of Universal Am-Can until the
22  time that they changed their name from
23  Overnite Express.
24  Q. Okay. And to your knowledge and from what
25  you've reviewed, you haven't seen any other

52

1  contract between International Paper and
2  Universal Am-Can that existed as of July 3rd,
3  2008, other than this October, 2007, contract
4  and the Amendment No. 1. Is that correct?
5  A. This is all I'm aware of. And from my role, I
6  would not have been privy to anything.
7  Q. Okay. And just to go back to what you alluded
8  to a moment ago. There was a -- there was a
9  2003 contract between International Paper and
10  Overnite Express that had expired prior to the
11  2007 contract. Correct?
12  A. Uh-huh, yes.
13  Q. Okay. Was there a 2005 contract, by the way?
14  Do you know?
15  A. No, not that I'm aware of. I do not know.
16  Q. Why don't I ask you to go back to the
17  International Paper Bates Stamped copy of the
18  October contract.
19  A. (Witness complies.)
20  Q. The -- let me just direct your attention to
21  page 38, which is the beginning of the
22  substance of the contract. Am I correct you
23  were not involved in actually negotiating the
24  terms of the contract?
25  A. No, I was not.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

53

1  Q. Okay. But this was a contract that the terms
2     of which would have a bearing on the work you
3     were doing?
4  A. Yeah. We would use numerous carriers out of
5     our facility that we had, and each one had a
6     contract with them. And those would be
7     negotiated by the group in Memphis.
8  Q. Okay. And there's a -- on page 38, there's a
9     Section No. 1 that the term of the contract
10    was for two years. Correct?
11 A. Yes.
12 Q. And Section 2 there, it's entitled "Carrier
13    Status." And the carrier referred to there is
14    Overnite Express. Correct?
15 A. Yes.
16 Q. Okay. And is it your understanding that after
17    Amendment No. 1 was entered into, in June of
18    2008, that all references to carrier in this
19    contract would then refer to Universal Am-Can?
20 A. Yes.
21 Q. Okay. Then there's -- on the bottom of
22    page 38, in Section 3, there is a section that
23    talks about "Carrier's Obligations." Correct?
24 A. Yes.
25 Q. And you know, in Section A, there's a

54

1     reference to "Services." And it then refers
2     to the "services as set forth in Exhibit C."
3     Correct?
4  A. Yes.
5  Q. Okay. And I don't think there's an Exhibit C
6     here. Can you -- can you take a look and --
7  A. I think it just refers to another document.
8  Q. And if you look at page 53, there's a
9     reference to Exhibit C. Correct?
10 A. Yes.
11 Q. Okay. And it's entitled "Motor Carrier Rate
12    and Weekly Commitment Schedule." Correct?
13 A. Yes.
14 Q. Now, at the time -- and I guess number
15    one, what does that expression refer to?
16 A. It would be the point-to-point rate from
17    Hammond to the destination, and how many
18    shipments per week we expected the carrier to
19    commit to providing services to us for.
20 Q. Okay. And is -- and there's no actual
21    attachment of the -- of that schedule.
22    Correct?
23 A. Correct.
24 Q. Okay. And where is that schedule?
25 A. It would reside with the motor carrier group.

55

1     This -- I did not negotiate the contract. So
2     I would not have been involved in the document
3     itself. The facility would have received a
4     summary of the rates and the commitment
5     schedule for all of the carriers that we
6     reviewed. Usually that was done on a -- this
7     was done that year, in 2007.
8          So at that time, all the carriers
9     that serviced the Hammond distribution center,
10    I would have been given a listing of their
11    rates and weekly commitments. In the case of
12    Universal Am-Can, they serviced Minneapolis
13    for us on a standing -- what we called a pool
14    truck, standing -- standing service.
15 Q. Okay. And at the time this contract was
16    entered into with Overnite Express, would
17    there have been an actual rate and commitment
18    schedule attached to the contract?
19 A. Yes. I believe that document, that it's
20    referring to OXEN, Overnite Express, rate
21    schedule dot PDF is the attachment.
22 Q. Okay. And that's what I was getting at. Does
23    that document exist in a PDF that is not
24    actually attached to this exhibit as we have
25    it here?

56

1  A. I believe it would -- I am not privy to that.
2     I don't know.
3  Q. Okay. Who would know that?
4  A. Steve Mundy.
5  Q. Okay. And if you went, you know, tomorrow to
6     call Mr. Mundy and ask him for this, what
7     would you call it? How would you refer to it?
8     Exactly what's here?
9  A. Rate and commitment schedule.
10 Q. Okay.
11 A. That was negotiated with the contract.
12 Q. Okay. And then how about the size? You see
13    where it's talking about a certain size of
14    bites?
15 A. That would have been the size of the file,
16    that dot PDF file.
17 Q. That's the PDF. Okay. All right. And take a
18    look at page 39 of Exhibit 2. Do you have
19    that? And that's -- this is still part of
20    "Carrier Obligations" and it's Section 3E.
21    Correct?
22 A. Uh-huh, yes.
23 Q. Talks about minimum service level
24    requirements. Generally, what does that refer
25    to?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                          April 10, 2012

57

1   A. On time delivery to our customers.
2   Q. Okay.
3   A. And pickup.
4   Q. Well, I know F refers to on time delivery.
5       How about E? Is that any different, "Minimum
6       Service Level Requirement"?
7   A. I do not know. I did not negotiate that one.
8       It says for a commitment. It states what it
9       states. "Meet a minimum service level of
10      98 percent for the commitments described in
11      Section 7."
12          So if Overnite was -- had a
13      commitment of, say, six trucks a week going to
14      Minneapolis, they would have to be 90 percent
15      on meeting that commitment.
16  Q. 98 percent?
17  A. 98 percent. Excuse me.
18  Q. Okay. And then Section F refers to they have
19      to meet that commitment --
20  A. From an --
21  Q. -- on time --
22  A. -- on time delivery.
23  Q. Right. And then G specifies certain
24      information about the equipment that needs to
25      be used. Correct?

58

1   A. Yes.
2   Q. Okay. And then in Paragraph H it talks about
3       carrier personnel. Now, that carrier there is
4       referring to Overnite and then later
5       Universal. Correct?
6   A. It's -- carrier refers to Overnite and
7       Universal in the contract, throughout the
8       contract.
9   Q. Okay. And in the middle of that, in line
10      three, it states that "carrier's personnel
11      shall be fully qualified and shall procure and
12      maintain such licenses and permits as are
13      required by local, state, or federal laws and
14      regulations required to maintain and operate
15      the motor vehicle equipment." Correct?
16  A. Yes.
17  Q. And then it further states that "carrier's
18      personnel shall comply with applicable local,
19      state, and federal laws and regulations."
20      Correct?
21  A. That's what it says. Yes.
22  Q. Okay. And part of what the carrier's
23      personnel need to comply with are local,
24      state, and federal traffic regulations
25      concerning the operation of tractor-trailer

59

1   trucks. Correct?
2       MR. FISHER: Competence. Foundation.
3       MR. SCHRECK: I'll join in that.
4       MR. FISHER: You can answer.
5   Q. (By Mr. Burke) You can answer.
6   A. Can you restate the question?
7   Q. Sure. Part of what is referred to there is
8       the carrier's personnel shall comply with
9       applicable local, state, and federal traffic
10      laws and regulations in the operation of the
11      trucks that are hauling International Paper's
12      products. Correct?
13          MR. FISHER: Excuse me. Objection.
14      Form, competency, and foundation. And also I
15      take it you were not intending to read what
16      the words were? Instead you added an
17      adjective.
18          MR. BURKE: It wasn't a specific
19      quote.
20          MR. FISHER: Okay. All right.
21      You can go ahead and answer.
22          MR. SCHRECK: I'll join.
23  A. Yeah, it doesn't state traffic federal laws.
24      It states what it states. "Carrier's
25      personnel shall comply with applicable local,

60

1   state, and federal laws and regulations."
2   Q. (By Mr. Burke) Okay. And my question to you
3       is: Did International Paper believe that part
4       of what the -- this section included was that
5       the carrier's personnel would comply with
6       local traffic regulations with respect to
7       operating tractor-trailer trucks --
8   A. Any did.
9   Q. -- while hauling International Paper's
10      products?
11          MR. FISHER: Competence. Foundation.
12      You can go ahead and answer.
13  A. I think carrier -- a carrier has to follow the
14      regulations and traffic regulations and DOT
15      regulations of the road. So it would be our
16      expectation that they would, to provide -- to
17      deliver our product safely to our customers.
18  Q. (By Mr. Burke) And there's a section down in
19      J talking about that the carrier had to
20      provide International Paper with trailers that
21      were suitable for the safe and efficient and
22      damage-free transportation of your paper
23      products. Correct?
24  A. Yes.
25  Q. Okay. And if you read further, about three



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                              April 10, 2012

**61**

1    lines down from the bottom of that same
2    paragraph, it says that those trailers have to
3    be in proper condition and have no mechanical
4    defects. Correct?
5  A. Yes.
6  Q. And then there were certain trailer pool
7    requirements, talking about the number of
8    trailers available, in Paragraph K. Correct?
9  A. Yes. And this -- it also says any live load,
10   if there's a live load.
11 Q. And what's that term mean to you,
12   Ms. Anderton?
13 A. It means that the -- the driver that's coming
14   to pick it up backs a trailer into the door
15   and we load their door while they are there
16   waiting.
17 Q. Okay.
18 A. We load -- load their trailer while they're
19   waiting.
20 Q. Okay. And a non-live load would be referred
21   to as what in your business?
22 A. A trailer is either left at the facility or
23   parked at a dock door, and we preload the
24   trailer before the driver comes with their
25   tractor to pick it up.

**62**

1  Q. In the beginning on the bottom of page 39,
2    Bates Stamped page 39, there's a section that
3    talks -- begins with "Compensation." Correct?
4  A. Yes.
5  Q. Okay. And one of the primary references there
6    is -- or initial references I should say, is
7    that the carrier will be compensated in accord
8    with Exhibit C that we've previously talked
9    about. Correct?
10 A. Yes.
11 Q. And then there's several other paragraphs that
12   talk about various types of compensation under
13   "Different Circumstances." Correct?
14 A. Yes.
15 Q. And then on -- you know, down on the bottom of
16   Bates Stamped page 40 of Exhibit 2, under
17   "Payment Terms," do you see Section 5? Are
18   you with me?
19 A. Yes.
20 Q. First paragraph, A, begins by saying, "Shipper
21   shall pay carrier such amounts as are due for
22   services performed hereunder within 45 days
23   after date of invoice." Correct?
24 A. Yes, that's what it states.
25 Q. Okay. And am I correct that in an instance

**63**

1    like this, where Universal apparently utilized
2    the services of Martin's, that International
3    Paper would only be paying Universal rather
4    than paying Martin's directly?
5        MR. FISHER: Excuse me. Could you
6    just repeat the first part of the question?
7        (The pending question was read by the
8    reporter.)
9        MR. FISHER: Thank you.
10 A. We would only pay Universal. Our contract was
11   with Universal. We had no dealings otherwise.
12 Q. (By Mr. Burke) Okay.
13 A. And we did -- transactionally, we paid
14   Overnite at the time because the system -- as
15   I said, we were in transition at the time. So
16   the system still said Overnite. But the
17   payment ultimately, from what I understand,
18   went to Universal. But the actual transaction
19   and bank code went to the -- to Overnite.
20 Q. Okay. And even though Martin's may have
21   physically been hauling the paper,
22   International Paper only had their contract
23   with Universal and International only paid
24   Universal?
25 A. Yes.

**64**

1  Q. Okay. You know, on page 41, if you could look
2    at it, Ms. Anderton, Section 6 talks about a
3    carrier's option to assign its accounts
4    receivable.
5  A. Uh-huh.
6  Q. And it can do so only with International
7    Paper's permission following a request with
8    30 days advance notice. Correct?
9  A. Yes.
10 Q. Okay. And basically what -- what circumstance
11   or situation is being referred to here?
12 A. My --
13       MR. FISHER: Excuse me. Competence.
14   Foundation.
15       You can go ahead.
16 A. I'm not absolutely certain. My understanding
17   would be is this would be in the case where a
18   carrier was using a service provider that
19   processed their payments. It would be a
20   third-party accounting service provider. So
21   if they needed our payments to go somewhere
22   else, we needed advance notice to be able to
23   accommodate that.
24 Q. (By Mr. Burke) Okay. Let me ask you to look
25   at page 42. There's a Section No. 7 called



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

65

1    "Commitments." Do you see that?
2    A. Yes.
3    Q. Okay. And "Commitments" appears to pretty
4        much be, at least in part, defined in the
5        first sentence of Section A where it says,
6        "Commitments means power units, tractors,
7        drivers, and trailer combinations"?
8    A. Yes.
9    Q. Okay. Does "Commitments," as you understand
10       it, mean both equipment, as well as personnel,
11       such as drivers?
12   A. It means that the carrier is committed to
13       providing the service so many days of the week
14       for us, doing -- for delivery.
15   Q. Okay. And throughout Sections A, B, C, and D
16       of Section 7, there are different obligations
17       set forth that the carrier must comply with in
18       terms of availability of equipment and having
19       watertight trailers. Correct?
20   A. Uh-huh.
21   Q. Amongst other things?
22   A. Yeah.
23   Q. Okay. And it's got some provisions for
24       liquidated damages in the event the carrier
25       cannot comply with the -- your requirements.

66

1    Correct?
2    A. Yes, they provide us, to protect our product.
3    Q. And then in Section 8, at the bottom of that
4        same page, that begins -- a section
5        entitled -- No. 8 entitled "Default by
6        Carrier." Correct?
7    A. That's what it states.
8    Q. Okay. And basically that section addresses a
9        number of different reasons for which
10       International Paper could terminate the
11       agreement with Overnite, or thereafter
12       Universal. Am I correct?
13   A. That is what it states, yes.
14   Q. Okay. And there's a number of different
15       sections set forth there, 8A through H.
16       Correct?
17   A. Yes.
18   Q. Okay. And I'm not quoting exactly, but A
19       talks about failure to comply with safety
20       rules at your facilities. Is that what that
21       is referring to?
22   A. Yes.
23   Q. Okay. And then the failure to comply with
24       on-time deliveries that we've discussed
25       earlier, correct --

67

1    A. Yes.
2    Q. -- in B? And F is -- refers to a failure to
3        maintain the required minimum insurance
4        coverage. Correct?
5    A. Yes.
6    Q. And G would permit Overnite -- excuse me, G
7        would permit International Paper to terminate
8        the agreement for noncompliance with federal,
9        state, or municipal laws and regulations.
10       Correct?
11   A. Yes.
12   Q. And then when you get into Section 9, that's
13       talking about various ways of -- I'm sorry.
14       Section 9 is entitled "Electronic
15       Communications Dispatch and Reporting."
16       Correct?
17   A. Yes.
18   Q. And in Section A -- or I should say in
19       Paragraph A of Section 9, the carrier, which
20       was either Overnite Express or Universal, was
21       required to have certain types of electronic
22       connectivity communications with International
23       Paper. Correct?
24   A. Yes.
25   Q. Okay. And, basically, that was for the

68

1    purpose of communicating and responding to
2    International Paper concerning transportation
3    of loads that you wanted delivered. Is that
4    right?
5    A. Yes.
6    Q. Okay. And then in Paragraph B, the carrier
7        was required to report pickup and delivery
8        events in a format specified by International
9        Paper. Correct?
10   A. Yes.
11   Q. Okay. And any requested reports had to be
12       sent to International Paper in a timely manner
13       and industry standard formats. Correct?
14   A. Yes.
15   Q. And then Section 10 talks about bills of
16       lading and freight receipts. Correct?
17   A. Yes.
18   Q. And that section only you -- only
19       International Paper could change or modify the
20       type of bill of lading that was used.
21       Correct?
22   A. Yes.
23   Q. Okay. And then in Section B, the carrier was
24       required to obtain a delivery receipt showing
25       the date of delivery and the goods delivered

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                        April 10, 2012

69

1    and any exceptions that the customer had with
2    respect to the amount or condition of the
3    goods. Would that be correct?
4    A. Yes. In the EDI, they would report pickup and
5    delivery times to the customer. The proof of
6    delivery would be if there was a special
7    request for proof of delivery, they would have
8    to provide that within 24 hours. A POD would
9    be a special request.
10   Q. Let's just back up and explain those acronyms
11   to me again. The EDI?
12   A. That's the electronic communication between
13   our carrier and us that told -- told us when
14   they picked up the load and when they
15   delivered the load. So they needed to report
16   that to confirm on-time delivery.
17   Q. And they had to do that through the electronic
18   means that they were required to have.
19   Correct?
20   A. Yes.
21   Q. Okay. And we're talking about the carrier?
22   A. The carrier, yes.
23   Q. All right. And then -- and they had to do
24   that in any type of load. Correct?
25   A. Correct.

70

1    Q. And then the special circumstance would
2    require another communication to you?
3    A. A special circumstance might be the customer
4    says, "We didn't receive this pallet on the
5    truck," or they didn't get the delivery. Then
6    we'd make a special request to the carrier for
7    a proof of delivery. And they have 24 hours
8    to respond with a proof of delivery, which is
9    a signed document that has the customer's
10   signature saying that -- that shows that they
11   prove they delivered it to the customer.
12   Q. And how would that proof of delivery form be
13   communicated to you?
14   A. Electronically, typically, or a fax. E-mail
15   or a fax.
16   Q. Okay. And on page 44 of the contract, there's
17   various -- a provision about the carrier being
18   able to comply with DOT rules concerning
19   hazardous materials. Correct?
20   A. That is correct.
21   Q. Okay. And then you have some provisions
22   concerning obligations of the carrier when
23   there is a loss or a damage of your goods.
24   Correct?
25   A. Yes.

71

1    Q. Okay. And that's in Section 12 I should say,
2    under "Freight Loss or Damage." Right?
3    A. Yes.
4    Q. Okay. And then on the bottom of that Bates
5    Stamped page 44, there's a Section 13 entitled
6    "Insurance." Correct?
7    A. Yes.
8    Q. Okay. And in Section-- or the opening
9    paragraph requires the carrier to have the
10   insurance that is specified below as a minimum
11   amount. Correct?
12   A. Yes.
13   Q. Okay. And for Section A, it talks about
14   commercial auto liability insurance being
15   required in the amount of $1 million.
16   Correct?
17   A. That's what it states.
18   Q. And then on page 45, it requires cargo
19   insurance in Paragraph B. Right?
20   A. Yes.
21   Q. And then in Section C, there's a requirement
22   that the carrier have commercial general
23   liability insurance in an amount not less than
24   $1 million per occurrence. Correct?
25   A. The document states that, yes.

72

1    Q. Okay. And International Paper required that
2    the carrier also name International Paper as
3    an additional insured on that commercial
4    general liability policy. Correct?
5    A. That is what it states.
6    Q. Okay. And the carrier's policy was also to be
7    considered primary. Correct?
8    A. That's what the document states.
9    Q. Okay. And any other insurance that
10   International Paper might have was considered
11   to be excess, correct, excess to the carrier's
12   coverage?
13   A. I don't -- it says, "Recognizing any insurance
14   purchased by shipper as excess and
15   noncontributory."
16   Q. Correct. And then in Section F, there was
17   a -- there is a requirement that all insurance
18   acquired by the carrier had to be with
19   insurance carriers that had an A.M. Best
20   rating of not less than an A8. Correct?
21   A. I'm sorry, there was an ant on my page.
22   Q. Oh, okay.
23   A. Could you restate the question?
24   Q. Let me give you the question again. In
25   Paragraph F --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                             April 10, 2012

73

1   A. F.
2   Q. -- there is a requirement, as part of the
3       contract, that the insurance obtained by the
4       carrier, such as Overnite or Universal, had to
5       be obtained through an insurance carrier that
6       had an A.M. Best Rating of not less than A8.
7       Correct?
8   A. Insurance is not -- this is not my expertise
9       or area in which I would have negotiated. So
10      I can only read exactly what it says. So it
11      states with an A.M. Best Rating of not less
12      than A8.
13  Q. Okay.
14  A. I don't understand the interpretation of it
15      or ...
16  Q. Okay. Then in Paragraph G, that gave you the
17      right to withhold payments for a --
18  A. Lapse of insurance.
19  Q. -- lapse, exactly, in payments, and if they
20      did not obtain their required insurance.
21      Correct?
22  A. Yeah, this was a given, their insurance had to
23      be. And if that was handled -- if there was
24      any lapse, we would not use the carrier.
25  Q. Okay. And they had to actually attach

74

1       evidence of that insurance, as well. Correct?
2   A. Yes.
3   Q. Okay. And then in Section 14, it talks about
4       certain conditions of the use of intermodal
5       service. Correct?
6   A. Correct.
7   Q. Okay. What's that term intermodal service --
8   A. Intermodal is --
9   Q. -- mean to you?
10  A. -- is piggyback or it's cut -- it's a truck on
11      the rail. A truck that goes on the rail,
12      whether it's a trailer that drives on the rail
13      or it's a freight container that's on a
14      railcar. Intermodal is multiple services.
15  Q. Okay.
16  A. It would not have been applicable in this
17      instance.
18  Q. Okay. And then there's an indemnification
19      paragraph in Section 15 on page 46. Correct?
20  A. Yes.
21  Q. That, essentially, says that the carrier shall
22      indemnify defendant and hold harmless
23      International Paper from and against all
24      liability for injuries arising out of or in
25      connection with the performance of this

75

1       agreement by the carrier, its employees,
2       agents, or subcontractors. Correct?
3   A. Yes.
4   Q. But then it also says that that
5       indemnification obligation shall be reduced to
6       the extent of any injury to persons resulting
7       from any joint or concurrent negligence of
8       International Paper. Correct?
9   A. It says -- that's what it states.
10  Q. Okay. And then Mr. Elsholtz's name or
11      signature is contained on this page 46, as
12      well. Correct?
13  A. Yes.
14  Q. And then the contract in Paragraph 20 includes
15      a section entitled "Independent Contractor."
16      Correct?
17  A. Yes.
18  Q. And am I correct that that section reads that
19      "the carrier is and shall perform services
20      under this agreement as an independent
21      contractor"?
22  A. Yes.
23  Q. And it then states that "the carrier shall
24      solely direct all persons performing services
25      performed by carrier under this agreement and

76

1       such persons shall be and remain subject to
2       the exclusive control and direction of
3       carrier"?
4   A. That's what it states, yes.
5   Q. Okay. And as you've earlier told us, the
6       carrier is either referring to the Overnite
7       Express, or thereafter Universal. Correct?
8   A. Yes.
9   Q. And at the time of this instance, it would be
10      Universal?
11  A. Universal.
12  Q. And in terms of completeness, the last section
13      of that sentence says, "Under no circumstances
14      shall shipper be construed as having
15      responsibility for carrier's safety means or
16      methods"?
17  A. Yes.
18  Q. And there's a section about assignments in 21,
19      that there can't be an assignment of this
20      contract without written consent of the
21      parties. Correct?
22  A. Yes.
23  Q. But as far as you know and understand, that
24      Amendment No. 1 constituted an agreement for
25      an assignment of the terms of this contract --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

77

1  A. To --
2  Q. -- from Overnite Express to Universal --
3  A. -- Am-Can, yes.
4  Q. Okay. And on the top of page 47, the sentence
5     I just quoted, that talks about carrier shall
6     solely direct all persons performing services
7     performed by carrier under this agreement and
8     such persons shall be and remain subject to
9     the exclusive control and direction of
10    carrier, that -- International Paper believed
11    that the carrier, Universal, was responsible
12    for their own employees who were making a
13    delivery or for any other persons who they
14    asked to make the delivery of your products?
15       MR. FISHER: Objection. Competency.
16    Form. Foundation.
17       You can go ahead and answer.
18 A. Yes, that would be my understanding, that they
19    took responsibility. Uh-huh.
20 Q. (By Mr. Burke) And then this is -- page 48 is
21    the signature page that I think we may have
22    already alluded to, signed by Mr. Crawford as
23    of November 12th, 2007. Correct?
24 A. 48? Yes. Uh-huh.
25 Q. Bates Stamped 48.

78

1  A. Yeah. Bill Crawford. Yes.
2  Q. And then Mr. Crawford, for International
3     Paper; and then on behalf of Overnite Express,
4     Mr. Elsholtz, Kevin Hays, and Sandra Herman.
5     Correct? On the right side of the page?
6  A. Yes. That's what it states, yes.
7  Q. Okay. And there's apparent signatures of
8     those names there. Correct?
9  A. Uh-huh, yes.
10 Q. By the way, Mr. Crawford's title is described
11    as vice president of global sourcing for
12    International Paper Company. Correct?
13 A. Yes.
14 Q. Okay. Was he above or below you in the chain
15    of command?
16 A. Different organization.
17 Q. Different organization?
18 A. We had a -- yeah.
19 Q. Okay. Just in terms of -- when you say that,
20    he would be what section or department or --
21 A. I had a peer of his as my vice president, Bill
22    Merrigan. So we were the operational group.
23    They were the sourcing group.
24 Q. Okay. And sourcing, within your company,
25    referred to what?

79

1  A. The commercial contractual negotiation
2     purchasing function.
3  Q. Okay. And operations would refer to what?
4  A. Execution. Execution operations.
5  Q. Okay. Actually getting the product to the
6     people that --
7  A. Yeah.
8  Q. -- sourcing entered into agreements with?
9  A. State that again.
10 Q. Sure. In very general terms, did operations
11    involve actually getting the product to the
12    customers with whom sourcing had contracted?
13 A. Yes.
14 Q. Okay. And then there's various exhibits to
15    this contract. Correct?
16 A. Uh-huh.
17 Q. And on 49, the carrier had to attach a copy of
18    their permit. Correct?
19 A. Yes.
20 Q. And that's done so on page 50 for Overnite
21    Express?
22 A. Yes.
23 Q. And then B is the fuel index. Correct?
24 A. Index, uh-huh.
25 Q. We talked about C before. D is -- on page 54

80

1  is entitled "Motor Carrier Vendor Profile."
2  What, essentially, is that? Or what's its
3  purpose? Page 54.
4  A. Yeah, I know. I'm just wondering if this is
5     actually part of that profile.
6  Q. And is it included --
7  A. Yes.
8  Q. -- thereafter --
9  A. General information about that carrier.
10 Q. Right. And that's set forth on pages 55 --
11 A. Through 59.
12 Q. -- through 59, yes. By the way, on 59, do you
13    see that change log? That's -- that's not --
14    that's prepared by Sandy Herman of Overnite
15    Express. Correct?
16 A. I do not know. That's what it looks like, but
17    I do not know.
18 Q. It's not an International Paper document?
19 A. I do not -- I do not know, actually.
20 Q. Okay.
21 A. We do have carrier profiles. So this could
22    have been printed from them. I don't know.
23 Q. Okay. And then on page 60, the electronic
24    funds transfer, what is that and what is its
25    purpose?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

81

1   A. That is who we would electronically pay for
2      the shipment, based upon the payment terms.
3   Q. All right. And --
4   A. But how -- I'm sorry.
5   Q. Go ahead.
6   A. So this would be the accounts.
7   Q. Would be Overnite Express' account?
8   A. Yes.
9   Q. Okay. And then F is a sample of a bill of
10     lading. Correct?
11  A. Yes.
12  Q. But it's not actually attached here. It,
13     apparently, was a PDF?
14  A. Correct.
15  Q. Okay. And then H sets forth the electronic
16     compliance requirements that you discussed
17     earlier, which basically the electronic means
18     by which the carrier had to be able to
19     communicate with International Paper. Is that
20     right?
21  A. Yes.
22  Q. Okay. And that related the different
23     requirements about tender of a load, delivery
24     appointments, pickup date and time, arrivals,
25     reports, delays when it happens. Correct?

82

1   A. Uh-huh.
2   Q. You know on that page 63, while you have it in
3      front of you, the "Load Tender" section, do
4      you see that?
5   A. Yes.
6   Q. Okay. That "Load Tender" is referring -- or I
7      should say is that referring to International
8      Paper communicating to the Overnite or
9      Universal that there is a load available to be
10     transferred or to be delivered?
11  A. Yes.
12  Q. Okay. And the carrier was required to respond
13     within two business hours. Correct?
14  A. According to the contract, yes.
15  Q. Okay. And the carrier then had to make a
16     delivery appointment and let you know when
17     that appointment was scheduled?
18  A. These were standing deliveries. So in this
19     case, we were not involved in the
20     appointments. We gave them the delivery
21     hours, and they made the -- secured the
22     appointments with the customers. As long as
23     they delivered it that day, we were fine.
24  Q. Okay.
25  A. So it was a standing truck that was a daily

83

1      occurrence.
2   Q. Okay. For this delivery to the three
3      customers --
4   A. Yes.
5   Q. -- that was in progress at the time of this
6      crash?
7   A. Uh-huh.
8   Q. Okay. Is that yes?
9   A. Yes.
10  Q. Okay. And that standing delivery time frame
11     had previously been given from International
12     Paper to Overnite?
13  A. To Overnite.
14  Q. Okay. And do you recall what the terms of
15     that delivery time requirements were?
16  A. It was Friday for a Monday delivery or Friday
17     for a Tuesday delivery after a holiday. A
18     Thursday for Friday delivery. Wednesday for
19     Thursday delivery.
20  Q. Explain that again, if you would, please.
21  A. It was next-day delivery and pickup. Pickup
22     at the RDC for next-day delivery to our
23     customers.
24  Q. Okay. So, basically, the existing terms that
25     International Paper had given to Overnite and

84

1      were applicable to Universal were that the
2      carrier had to pick up the same day the load
3      was communicated?
4   A. Like I said, it was standing. So we only
5      would cancel with them if we weren't going to
6      use them.
7   Q. Okay.
8   A. So they were to assume that they had a load,
9      and we would cancel with them if they didn't.
10     And then we would send them specifics about
11     what the load was each day.
12  Q. Okay. And International Paper expected the
13     carrier to make that delivery within 24 hours,
14     did you say?
15  A. Yeah. Well, or for weekends it was the
16     next -- it was the next business day.
17  Q. Okay. And I think you referred to a holiday
18     situation --
19  A. This was the 4th of July weekend, my
20     understanding.
21  Q. Right. So the delivery would have to be made
22     when, then?
23  A. The next business day.
24  Q. Okay. The next business day. Okay. And then
25     under the "Arrival" section, did the carrier


ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                            April 10, 2012

85

1    have to transmit delivery confirmation
2    electronically within two business hours of
3    arrival at your customers?
4    A. Yes.
5    Q. And then if any other particular types of --
6    well, actually you had the right to require
7    reports to support continuous improvement
8    efforts in delivery to your customers.
9    Correct?
10   A. Yes.
11   Q. And the carrier had to provide you those
12   reports as required -- or when you requested,
13   I should say?
14   A. Yes.
15   Q. And then your on-time delivery performance
16   requirements are set forth in the bottom of
17   page 63. Correct?
18   A. Yes.
19   Q. And then in page -- on page 65, that's the
20   attachment where there is supposed to be a
21   certificate of insurance complying with
22   Article 13 in the contract. And it
23   specifically says, "International Paper must
24   be named as an additional insured." Correct?
25   A. Yes.

86

1    Q. Okay. And page 66, do you see that? That's a
2    certificate of -- or that's entitled
3    "Certificate of Liability Insurance."
4    Correct?
5    A. Yes.
6    Q. And the named insured, in the upper left box,
7    is Overnite Express. Correct?
8    A. Yes.
9    Q. Okay. And then now, the effective dates of
10   this policy are March 1st of '07 through
11   March 1st of '08. Correct?
12   A. Yes.
13   Q. And then down in the lower left, the
14   certificate holder box shows International --
15   or names International Paper. Correct?
16   A. Yes.
17   Q. And up above that, there's a sentence that
18   says, "The certificate holder named" -- or it
19   doesn't say that. But it says, "The
20   certificate holder is an additional insured on
21   the general liability policy." Correct?
22   A. That's what it states.
23   Q. Okay. All right. And then page 68 is --
24   appears to be a copy of an e-mail to Steve
25   Mundy of International Paper from Cathy

87

1    Szwast, S-z-w-a-s-t, dated June 6th, 2008. Is
2    that correct?
3    A. Yes.
4    Q. Okay. And that says -- the essence of the
5    e-mail is -- it states, "Mr. Mundy, please see
6    the attached for proof of liability and cargo
7    coverage." Correct?
8    A. Yes, that's what it states.
9    Q. And then the subject matter of the e-mail is
10   "Certificate of insurance hyphen Universal
11   Am-Can, Limited." Correct?
12   A. Yes.
13   Q. Does this e-mail appear to be one in which
14   Universal Am-Can is providing International
15   Paper with their evidence of insurance, as
16   required under the contract?
17   A. Yes, that's what it appears.
18   Q. Okay. And is there any -- is there a copy of
19   that?
20   A. I don't know.
21   Q. Let me get to that. I think if we keep going,
22   it might be -- well, here let me just ask you.
23   Do you know where that -- if that insurance
24   coverage was provided?
25   A. I don't know.

88

1    Q. How about looking -- look at page -- pardon?
2    A. Well, there's something on page 74, but I
3    don't know if that's what that is.
4    Q. Yeah, and I was just going to take you to
5    there. Actually look at page 73 first. Do
6    you have that in front of you?
7    A. Yes.
8    Q. Okay. That's another e-mail dated June 6th,
9    2008, to Steve Mundy. Correct?
10   A. Yes.
11   Q. And it's from somebody at Overnite Express
12   named Rory Ostgulen, O-s-t-g-u-l-e-n?
13   A. Yes.
14   Q. Okay. Do you know Mr. Ostgulen?
15   A. No, I do not.
16   Q. Okay. And essentially that e-mail
17   communication says, "Steven, the attachment
18   will give you the certificates and
19   authorities. I'm having corporate send you an
20   insurance certificate naming International
21   Paper as the certificate holder." Is that
22   correct?
23   A. That is what it states.
24   Q. Okay. And then on page 74, there's a document
25   entitled "Certificate of Liability Insurance."



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                           April 10, 2012

89

1      Do you see that?
2   A. Yes.
3   Q. Okay. And the top left producer is Cherokee
4      Insurance Company. Insured is Universal
5      Am-Can. Correct?
6   A. Yes.
7   Q. And there's a reference to a general liability
8      policy for $1 million between the effective
9      dates of January 1st, 2008, and January 1st,
10     2009. Is that correct?
11  A. Yes.
12  Q. Okay. Do you know if -- if this policy is
13     supposed to be the policy that Universal was
14     going to add International Paper as an
15     additional insured?
16        MR. FISHER: Competency. Foundation.
17  A. Yeah, I, personally, wouldn't know.
18  Q. (By Mr. Burke) Who would know that at
19     International Paper?
20  A. It was -- the e-mail was directed to Mr. Mundy
21     and whoever Rory Ostgulen states. It looks
22     like this was provided with it, but I was not
23     privy to those communications.
24  Q. Okay. And by the way, on this particular form
25     certificate, down in the lower left, the

91

1   A. That is what it states.
2   Q. Okay. Was this letter being sent to
3      International Paper?
4   A. I don't know. It appears that way, yes.
5   Q. Okay.
6   A. But I don't -- I do not know. It looks like
7      they sent it to all of their customers so ...
8   Q. Okay. And then with -- and then on the
9      following page, 70, there's a W9 tax ID for
10     Universal Am-Can. Correct?
11  A. Yes.
12  Q. And did International Paper have to have those
13     from its carriers?
14  A. I don't -- I don't know.
15  Q. Okay. And then on page 71, there's a copy of
16     Universal Am-Can's carrier's authority as a
17     common carrier issued by the Interstate
18     Commerce Commission in 1983. Correct?
19  A. Yes.
20  Q. And then page 72, there's a -- that's a copy
21     of Universal Am-Can's contract carrier
22     authority issued by the Interstate Commerce
23     Commission in June of '85. Correct?
24  A. That's what it states.
25  Q. How about page 75? What is that document?

90

1      certificate holder box it is blank. Correct?
2   A. Is blank, yes.
3   Q. Okay. Let me back you up to page 69, just
4      because we skipped over a couple of pages to
5      deal with the insurance topics we were talking
6      about. That's a letter from Mark Limback,
7      president of Universal Am-Can. Correct?
8   A. Yes.
9   Q. And it's addressed -- it's on Universal Am-Can
10     letterhead. Right?
11  A. Yes.
12  Q. Okay. And it's directed or addressed, quote,
13     To the valued customers of Overnite Express,
14     Inc., end quote. Correct?
15  A. Yes.
16  Q. And it goes on to say that Overnite Express
17     has joined their team and that they now have a
18     partnership. And then in the lower part of
19     that paragraph, am I correct Mr. Limback is
20     saying that, "As of June 13th, 2008, your bill
21     of lading should reflect Universal Am-Can,
22     Limited, as the carrier, and thus all invoices
23     will reflect such along with our remittance
24     address. And following is a copy of insurance
25     and authority for your records." Is that --

92

1   A. It looks like a transaction from our SAP
2      system, but I don't -- I do not know.
3   Q. From your what system?
4   A. SAP. It's on the top right, it says "SAP,"
5      which is our financial system, and has
6      Universal Am-Can listed as an external freight
7      carrier.
8   Q. Okay. And what's the significance of that?
9   A. This would be a -- it says, "Central vendor
10     request change." So it would be a transaction
11     in our SAP system, which I did not do. So I
12     don't know exactly what they were doing here.
13     But it looks like it's -- they're putting the
14     bank data in for Universal Am-Can.
15        MR. FISHER: Rich, is now a good
16     time --
17        MR. BURKE: Sure.
18        MR. FISHER: -- to take a break?
19        MR. BURKE: Sure. Yeah.
20        (A recess was taken.)
21  Q. (By Mr. Burke) Ms. Anderton, let me ask you
22     to look at Exhibit 1. Do you have that in
23     front of you, or no? Why don't you get
24     Exhibit 1 again. There's a few things I want
25     to ask you about there. How about page 67?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                            April 10, 2012

93

1  Am I correct that's a letter from Gina,
2  G-i-n-a, Hubbs, H-u-b-b-s, vice president of
3  Universal Am-Can, to International Paper,
4  dated May 21st, 2008?
5  A. That's what it looks like.
6  Q. Okay. And that letter essentially, or at
7  least in part says, "Dear, customer, Overnite
8  Express will be operating under Universal
9  Am-Can, Limited's insurance and authority as
10  of June 13th, 2008, based on an agreement to
11  partner with their organization." Correct?
12  A. Yes.
13  Q. Okay. It goes on to say, "All bill of ladings
14  should reflect Universal Am-Can, Limited, as
15  the carrier." Correct?
16  A. That is what it states.
17  Q. And it goes on to say, "Therefore, invoices
18  for freight moved will come from Universal
19  Am-Can, Limited, with a remittance address in
20  Cincinnati, Ohio." Correct?
21  A. Yes.
22  Q. Am I correct that Overnite, and thereafter
23  Universal, would send International Paper an
24  invoice for the freight?
25  A. On these type of freights, they may send an

94

1  invoice. But we actually would auto -- auto
2  pay it.
3  Q. Okay.
4  A. So it would -- we didn't process their
5  invoices. We would process the payment. And
6  then if there was a dispute, they would ...
7  Q. And then the second paragraph of this letter,
8  which if I didn't say it, is dated May 21st,
9  2008. Am I correct it says, "Please consider
10  this letter as an assignment of the current
11  contract you have in place for Overnite
12  Express. Universal Am-Can, Limited, agrees to
13  accept the rates and fuel surcharge
14  established between your company and
15  Overnite." Is that accurate?
16  A. That's a letter that they sent, yes.
17  Q. Okay. And what I mean, is that an accurate
18  statement of what the letter says?
19  A. That's what -- that's what it says, yes.
20  Q. Okay. There's a spot where Mr. Mundy -- for
21  Mr. Mundy to sign on the right. And I -- I
22  should say the final letter -- or final line
23  of the letter says, "Please sign below as to
24  your acceptance regarding the contract and
25  rate assignment."

95

1  Do you know if Mr. Mundy signed a
2  copy of this?
3  A. I do not know.
4  Q. Okay.
5  A. The addendum was a result of that I thought.
6  Q. Okay. The --
7  A. Not necessarily signed --
8  Q. -- the addendum or ...
9  A. The addendum to the 2007 contract.
10  Q. Right. I guess I should call it Amendment --
11  A. Amendment, sorry.
12  Q. Amendment No. 1?
13  A. Amendment, yes.
14  Q. I knew what you meant. Amendment No. 1 you
15  believe resulted from this communication?
16  A. Yeah, or something -- I can't say whether -- I
17  didn't receive this letter. Steve Mundy would
18  have received it. So I cannot say what he
19  would have done. But that's -- this would be
20  the timing of it.
21  Q. Okay. And then page 68 is an e-mail from Rory
22  Ostgulen of Overnite Express to Steve Mundy,
23  referring to attachment of a notification
24  letter and assignment letter per your request.
25  Is that right?

96

1  A. Yeah. This looks similar to the other letter.
2  Q. Okay. And it also adds a line at the bottom
3  saying, "I'm working on the authority and
4  insurance certificates and will forward them
5  ASAP"?
6  A. Uh-huh.
7  Q. That's a yes?
8  A. Yes.
9  Q. Okay. And page 69 is a copy of that -- looks
10  like another copy of the June 6th e-mail we
11  talked about earlier --
12  A. Uh-huh.
13  Q. -- from Cathy Szwast to Mr. Mundy, attaching
14  proof of liability insurance coverage and
15  cargo coverage for Universal Am-Can?
16  A. Yeah.
17      MR. BURKE: Carl, do you know what
18  exhibit number we're on?
19      MR. FISHER: I do. 99's the next
20  one.
21      MR. BURKE: Thank you.
22      (Deposition Exhibit No. 99 was marked
23  for identification.)
24  Q. (By Mr. Burke) Ms. Anderton, let me tender to
25  you what I've marked as Exhibit No. 99, which



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                              April 10, 2012

97

1    purports to be International Paper's Answers
2    to Plaintiff's Interrogatories and a
3    certificate of service. Why don't you take a
4    look at that for a minute --
5    A. Uh-huh.
6    Q. -- and tell me if that's your signature page
7    on the last page when you get to it.
8    A. Yes, that's my signature.
9    Q. Okay. And are the answers you have given here
10   true and correct?
11   A. Yes, to the best of my knowledge, yes.
12   Q. Okay. And in your answer to Question No. 1,
13   am I correct that you are saying that
14   International Paper generated the bills of
15   lading or memo bills for the loads that were
16   transported by Mr. Franke at the time of this
17   occurrence, most of that's on the second page
18   of --
19   A. Yeah.
20   Q. -- your answer? Okay. Is that correct?
21   A. Can you restate your question?
22   Q. Sure. If I understand your answer, I
23   believe -- is it true that you are saying that
24   International Paper generated the bills of
25   lading or memo bills for the loads that were

98

1    being transported by Sam Franke?
2    A. Yeah. Actually Exel -- Exel did, as a service
3    provider for us, yes.
4    Q. And Exel did so at --
5    A. International Paper.
6    Q. -- the request of International Paper?
7    A. Yes.
8    Q. Okay. And, you know, the term "generated the
9    bills of lading," what do you mean by that?
10   Created them or --
11   A. Created them, printed them out.
12   Q. Okay. I'll come back to that in a moment.
13   Just while you have these in front of you, you
14   know, in -- take a look at your answer to
15   Question No. 7, please.
16   A. Okay. This is -- these were prepared, and
17   then I signed in agreement of them.
18   Q. Correct.
19   A. Okay.
20   Q. And they were prepared by Mr. Fisher, and his
21   name's on there?
22   A. Uh-huh, yes.
23   Q. But have you read them --
24   A. Yes.
25   Q. -- and do you agree --

99

1    A. Yes. And I --
2    Q. -- they are accurate?
3    A. Yes.
4    Q. Just look at your answer to No. 7, please.
5    A. Uh-huh.
6    Q. Okay. When you say this was a routine run by
7    Sam Franke, was it a routine run for a
8    delivery to all three of those -- of the
9    customers?
10   A. No. It was not -- it was a routine run to
11   Minneapolis.
12   Q. Okay.
13   A. From Hammond to Minneapolis.
14   Q. Okay. So Mr. -- or so Mr. Franke was making a
15   regular run to Minneapolis for International
16   Paper how often? Five days a week or --
17   A. Restate your question. Because the
18   question -- the statement states, "Identify
19   the name, address, job title, and employer of
20   any persons from International Paper who
21   communicated with any dispatcher or
22   representative of Martin's Bulk Milk Service."
23   And, no, nobody from International
24   Paper communicated to them.
25   Q. Nobody communicated with --

100

1    A. Martin -- with -- with any dispatcher or
2    representative of Martin's Bulk Milk Service
3    concerning the -- concerning the
4    transportation of the cargo.
5    Q. Okay.
6    A. Only after the fact did we find out that this
7    was a routine run by him from -- because of
8    the proceedings.
9    Q. Okay. So as far as you know, you didn't know
10   anything about Mr. Franke making this run
11   every day?
12   A. No.
13   Q. Okay. Was it a routine run or route for
14   Universal to be making for International Paper
15   to Minneapolis?
16   A. It was routine that we would have Universal
17   haul our freight from Hammond, Indiana, to
18   Minneapolis.
19   Q. Okay. And when you say "routine," what was
20   the schedule?
21   A. It was the -- based upon the commitments that
22   we had in our contract. And they had five or
23   six commitments per week to execute what we
24   called our Minneapolis pool truck.
25   Q. Minneapolis pool --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

101

1  A. Pool truck. We called it a pool truck. We
2     had several pool truck routes, and Minneapolis
3     was one of them.
4  Q. Okay. And that commitment by Universal, to
5     make a run to Minneapolis five or six times a
6     week, was for the transportation of your
7     products to multiple different customers?
8  A. In Minneapolis.
9  Q. Okay.
10 A. Multiple. And so any given day, it could have
11    been any one of them, or up to three or four
12    of them could be on the truck.
13 Q. Okay. Including the three that happened to
14    have --
15 A. Yes. Orders that day.
16 Q. Thank you. Orders that day?
17 A. Uh-huh.
18 Q. Okay. And for how long had that regular run
19    or route been in effect?
20 A. As far as I know it was in effect from the
21    time I took the position, in 2004, and it had
22    been ongoing -- ongoing for years prior to
23    that. But different carriers would be used at
24    different times for that pool truck.
25 Q. Okay.

102

1  A. Based upon who our current contracted carrier
2     was that had the commitments.
3  Q. Okay. And for how long had Overnite been the
4     committed carrier for that run?
5  A. I don't -- I don't recall. And they may have
6     been a carrier prior to when I was in the
7     position. The facility has been in place
8     since '96 and probably shipped to Minneapolis
9     since '96. But I don't know who the
10    carrier -- the sequence of carriers were --
11 Q. Okay.
12 A. -- over that time.
13 Q. And but you know that it was Overnite going
14    back at least how far?
15 A. I know at this time Overnite was the carrier.
16    While I was in my position, we had two other
17    carriers at different times doing this run.
18    So I don't know how far Overnite went back.
19 Q. Okay.
20 A. They had been doing it for a while, but I
21    don't how -- how long.
22 Q. And it would be at least back to October of
23    2007?
24 A. Correct.
25 Q. Okay. And maybe even earlier because there

103

1     were earlier contracts?
2  A. I mean, yeah, they were a carrier for that
3     facility or IP in 2003. But I don't know if
4     they were on and off or what the history was,
5     as far as that particular route.
6  Q. Okay. And Universal took over that -- that
7     run pursuant to their assignment of the
8     contract?
9  A. That is correct.
10 Q. Okay. And the run or route had originally
11    been created by International Paper, correct,
12    for the five or six days International Paper
13    needed to have their --
14 A. Yeah, their requirement to pick up goods from
15    Hammond, Indiana, and deliver in Minneapolis
16    was specified by International Paper.
17 Q. Okay. And then the Exel company that you
18    mentioned, what did they do for International
19    again?
20 A. They operated the Hammond RDC on behalf of IP
21    for us. They were our subcontractor that
22    operated the facility.
23 Q. Okay. And International Paper owned that
24    facility. Correct?
25 A. We leased the building and the product in the

104

1     building was all ours. But we didn't own the
2     facility.
3  Q. Okay. You leased it from whom? Do you know
4     or --
5  A. The name just popped out of my head. We could
6     follow up with it but -- I can picture the
7     gentleman who represents them.
8  Q. Okay. If it comes to you later --
9  A. I don't know.
10 Q. -- tell me.
11 A. Uh-huh.
12 Q. So International Paper leased the facility
13    that they called International Paper's Hammond
14    warehouse?
15 A. Yes.
16 Q. In Hammond, Indiana?
17 A. Yes.
18 Q. And then International Paper subcontracted to
19    have Exel personnel --
20 A. Operate --
21 Q. -- operate --
22 A. -- the facility.
23 Q. -- the facility. And that -- what did that
24    operation actually consist of? What do you
25    mean by that?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joan Anderton                                                    April 10, 2012

105

1  A. Primarily warehousing operations, receiving
2     and shipping of -- receiving and shipping of
3     product out. By shipping, I mean loading
4     trucks and producing documents for shipping of
5     product.
6  Q. Okay. And whatever product was shipped out
7     was being shipped out pursuant to the
8     instructions of International Paper. Correct?
9        MR. FISHER: Objection to form.
10 A. Yeah, could you restate that again?
11 Q. (By Mr. Burke) Sure. Whatever paper products
12    got shipped out or loaded onto trucks by
13    Exel personnel was done so pursuant to
14    instructions from International Paper?
15 A. Yeah. Shipping is a very broad term. So if
16    you're on the transportation side, shipping
17    means the actual transportation. By shipping
18    in the warehouse, it means the shipment
19    process, meaning I picked the goods, I load
20    the goods onto the trailer, and I produce the
21    documents for it to be ready to ship. So,
22    yes, we used the folks in Indiana to do that
23    process -- that process of shipping.
24 Q. Okay. And all -- yeah, and what I was getting
25    at is probably exactly what you described.

106

1     The gathering of International Paper products
2     in the Hammond warehouse and putting them onto
3     a truck for shipment to your customers, that
4     was done pursuant to instructions by -- from
5     International Paper?
6  A. Yes, pursuant to our contract with them.
7  Q. And when paper products would be brought into
8     the Hammond warehouse for storage, would they
9     be brought from International Paper mills?
10 A. Primarily at mills or converting facilities.
11 Q. Okay. And would they be brought there by
12    International Paper's own trucks?
13 A. Mostly by carriers.
14 Q. Carriers?
15 A. Our carriers. Or rail. We were about
16    40 percent inbound rail.
17 Q. You know, there's a reference to -- and look
18    at your answer to page -- I'm sorry, Question
19    No. 11. There's a loading -- there's a
20    reference -- I'm sorry. You tell me when
21    you're done looking at it. Take your time.
22 A. Okay.
23 Q. Okay. It says, "After his truck was loaded,
24    Mr. Franke received a loading sheet from an
25    Exel employee, Melisio Muros."

107

1     The loading sheet that is referred to
2     there, what --
3  A. It's a document that's used to -- for when
4     they load the truck.
5  Q. Okay. The Digital Logistics --
6  A. From Red Prairie, uh-huh.
7  Q. From Red Prairie?
8  A. Uh-huh.
9  Q. Okay. And that, basically, designates the
10    location in the trailer for the different
11    pallets, depending on how --
12 A. Correct.
13 Q. -- it's going to be offloaded?
14 A. Correct. It's the stop sequence.
15 Q. And then that's separate than the memo bills
16    that you also referred to. The memo bills is
17    basically the same as a bill of lading?
18 A. Yes.
19 Q. Okay. It refers to a memo bill containing
20    boilerplate bill of lading delivery
21    instructions from Exel employee Crystal
22    Cousins. What's -- what's the boilerplate
23    instructions you're referring to?
24 A. If you look at them, they have standard text
25    that pretty much gave information on delivery

108

1     hours and when the customer was open and if
2     they should call a customer for an appointment
3     or -- it was pretty much standard how that
4     customer required their -- their service.
5  Q. Okay. And is that in the notes section of
6     those bill of ladings? Or are you talking
7     about the fine print down on the bottom? And
8     we can look at one.
9  A. Yeah, it's in ...
10 Q. In the notes section there?
11 A. Yeah, here.
12 Q. Okay. I'm going to get to that in a moment.
13    Well, while we're on that, I guess whatever
14    those notes were, that -- those are delivery
15    instructions for that particular customer of
16    International Paper. Correct?
17 A. Yes.
18 Q. And those delivery instructions pertain to
19    times of delivery when they receive shipments
20    or when their docks are open and available for
21    deliveries to be made?
22 A. Yes.
23 Q. Okay. And International Paper got that
24    information from their customers when they
25    start -- first started delivering to them.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                      April 10, 2012

109

1    Correct?
2    A. Correct. Our customer service group would
3       have gotten them.
4    Q. Okay. And when you say it's boilerplate
5       language, it's -- you mean it's language that
6       was used repetitively for that particular
7       customer?
8    A. Yeah.
9    Q. Okay. And that information was obtained and
10      agreed to originally by International Paper.
11      Correct?
12   A. Yes.
13   Q. Okay. And then who's Crystal Cousins?
14   A. She's an Exel employee that worked the window
15      where the drivers would come in. She did the
16      paperwork.
17   Q. Okay. And she didn't make the decision on
18      these delivery instructions. Correct? She
19      just followed --
20   A. She just --
21   Q. -- the information --
22   A. Correct. She printed out the documents.
23   Q. Okay. That had originally been created by
24      International Paper as to when your particular
25      customer wanted to receive deliveries?

110

1    A. For customer requirements, yes.
2    Q. Okay. And just as long as we're on this --
3       these interrogatories, let's finish up with
4       No. 12. Take a look at that and tell me when
5       you've had a chance to read --
6    A. Okay.
7    Q. -- your answer, please.
8    A. Okay.
9    Q. You make reference to -- you make reference to
10      the Overnite Express contract having been
11      assigned or taken over by UACL. That's all
12      based on the documents we went through earlier
13      this morning. Right?
14   A. Yes.
15   Q. Okay. And when you say issued payments to
16      UACL at its newly acquired Overnite Express
17      Minnesota facility, do you mean the facility
18      that now UACL owned or had taken over, that
19      used to be --
20   A. Yes, we paid Over --
21   Q. -- Overnite Express?
22   A. Yes.
23   Q. Okay. So you would issue payments to UACL and
24      then -- at that Minnesota address. What do
25      you mean when you say an information and

111

1    belief UACL's Minnesota office then issued a
2    check to a UACL payment center in Ohio, that
3    included payments made by IPC to UACL's
4    Minnesota address for the transportation of
5    International Paper's goods?
6    A. Our systems were still in transition after the
7       change from Overnite to UACL. So we had
8       not -- for whatever reason, had not yet been
9       given direction or executed direction that we
10      needed to use the new SCAC code on the
11      paperwork.
12         So our bill of lading said OXEN on
13      it. And the processing of the payment went to
14      the Minneapolis location. And then it was
15      only our understanding, after producing
16      documents here, that that payment actually
17      went -- Overnite paid it to -- or Minnesota
18      then transferred it to the Cincinnati office.
19      But if you look at our SAP documents, it was
20      still set up for Overnite to make payment.
21      But we have proof of payment.
22   Q. And I think I already asked you, but that is
23      your signature on the verification --
24   A. Yes.
25   Q. -- page. Correct?

112

1    A. Yes.
2    Q. All right. Let -- let's look at those bills
3       of lading for a minute. Take a look at
4       Exhibit No. 1. And I think page 1 is one of
5       the first -- am I correct in Exhibit 1, Bates
6       Stamped UACL/OEI page 1, is a memo bill dated
7       July 3rd, '08, for a shipment of International
8       Paper printing paper to Midland Paper Company
9       in Minneapolis?
10   A. Yes.
11   Q. Okay. And, you know, let me ask you, what
12      does -- in your business, what does a bill of
13      lading or a memo bill -- I mean what -- what
14      is its intended purpose?
15   A. It is a document that describes what -- what
16      the instructions are for delivering to a
17      customer. And it's used -- we provide it to
18      our carrier for them to use in that process.
19      And it -- and it also must specify the weight,
20      to make sure we have proper weight on the
21      truck.
22   Q. Okay. And these memo bills, I think you
23      earlier told me, were created by -- or
24      generated by International Paper?
25   A. Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                    April 10, 2012

---

**113**

1  Q.  Okay.  And the paper that is being referred to
2      here, that's under "Commodity."  Correct?
3  A.  Correct.
4  Q.  Printing paper --
5  A.  Yes, printing paper.
6  Q.  Okay.  And that's your International Paper
7      goods that are being shipped or delivered to
8      Midland.  Correct?
9  A.  Yes.
10  Q.  Okay.  How about -- you know, after printing
11      paper, what are those numbers, the 2621345?
12  A.  I do not know.
13  Q.  And then in the notes --
14  A.  I believe that's a standard commodity code,
15      but I do not know.
16  Q.  Okay.  And then as you referred to it, there's
17      a weight for that amount of paper.  Correct?
18  A.  Yes.
19  Q.  There were 56 cartons?
20  A.  Uh-huh.
21  Q.  And then were those 56 cartons on five
22      different pallets?  Is that what --
23  A.  Pallets or skids, uh-huh.
24  Q.  Okay.  And then the notes section, that's the
25      delivery information that you earlier were

---

**114**

1      referring to.  Correct?
2  A.  Yes.
3  Q.  Okay.  And each customer of yours had their
4      own schedule as to when they wanted to receive
5      deliveries.  Correct?
6  A.  Yes.
7  Q.  Okay.  And you obviously tried to accommodate
8      that schedule?
9  A.  We would provide that information, yes.
10  Q.  Okay.  And in addition to specifying receiving
11      hours, you told the carrier who to contact at
12      customer service at Midland and gave them a
13      name and a phone number.  Correct?
14  A.  That's what the -- yeah, that's what we did in
15      this case.
16  Q.  Okay.  Okay.  And then as you referred to a
17      moment -- a number of times, carrier's
18      designated as OXEN, even though you considered
19      it to be Universal as of this date, July 3rd,
20      2008?
21  A.  Yes.
22  Q.  Okay.  And now, there's Sam Franke's signature
23      is in the upper right?
24  A.  Yes.
25  Q.  What's that indicate?

---

**115**

1  A.  The carrier takes possession of the goods at
2      the time they pick it up from the plant.  So a
3      driver's signature is saying they have taken
4      possession of this load at the point that they
5      leave the facility.  So he's signing to say
6      that this is -- I take possession of this
7      product.
8  Q.  Okay.  Under the contract that existed on
9      July 3rd, '08, with Universal, did
10      International Paper believe that Universal was
11      entitled to have some other carrier transport
12      your product, other than a Universal driver?
13          MR. FISHER:  Excuse me.  Is your
14      question does she believe International Paper
15      believed that?  Or does she believe that, as
16      an employee of International Paper?
17  Q.  (By Mr. Burke)  My question was as to
18      International Paper.
19          MR. FISHER:  Object to form.
20          You can go --
21  A.  Yeah, I think I can only answer it as myself.
22  Q.  (By Mr. Burke)  Okay.  And answer it on behalf
23      of yourself then.
24  A.  The contract was with Universal Am-Can to --
25      for them to provide transportation services

---

**116**

1      from Hammond to Minneapolis.  And we would
2      have owner operators come to our facility, and
3      we'd have different representatives of that
4      carrier come to the facility to provide the
5      service.  So we hired -- we had the contract
6      with Universal Am-Can to provide the service.
7      How they chose to provide that service was
8      Universal Am-Can's decision.
9  Q.  Okay.  And a moment ago, when you said
10      Universal would have different representatives
11      come to your facility to pick up the loads,
12      did you mean different representatives of
13      Universal?
14          MR. FISHER:  Excuse me.  Objection to
15      form.  I think that mischaracterizes what she
16      said.  I don't think she associated it with
17      Universal Am-Can.
18          But you can go ahead and answer.
19  A.  Our driver would come to the door with a
20      shipment number, which basically was the
21      authorization from the carrier.  It was kind
22      of the magic password that they could use to
23      say, "Hey, I'm here for shipment number
24      so-and-so, to pick it up."  That because they
25      had that number, they were hauling the freight

---

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joan Anderton                                                    April 10, 2012

117

1    that Universal Am-Can had been tendered to,
2    the freight -- that it had been tendered to
3    Universal Am-Can. So they had come to pick up
4    that load for them.
5          So who they were was not -- we didn't
6    know whether they were a -- an employee,
7    whether they were another company on behalf of
8    them. We gave the load to them because they
9    had the shipment number.
10   Q. (By Mr. Burke) Okay. And whatever driver
11   appeared at the Hammond facility, as a
12   representative of Universal, would be given
13   the load if they had that shipment number?
14   A. Yes.
15   Q. Okay. And where would they get the shipment
16   number from?
17   A. I'm not sure where they -- the individual
18   would have gotten the shipment number. We
19   provided that shipment number to Universal
20   Am-Can.
21   Q. Okay. And whoever that representative was,
22   whether it be an employee of Universal or an
23   employee of Martin's or any other carrier,
24   International Paper expected that driver to
25   comply with the terms of the contract that had

118

1    been entered into between International Paper
2    and Universal. Correct?
3    A. Because that's who we tendered that freight
4    to, yes.
5    Q. Okay. How about Exhibit 2, Ms. Anderton?
6    That's the bill for Xpedx. Correct?
7          MR. SCHRECK: Are you referring to
8    Exhibit 2 or page 2 of the --
9    A. Page 2, Exhibit 1.
10   Q. (By Mr. Burke) Page 2 of Exhibit 1. Thank
11   you. You know, by the way is there a back
12   side to these bills of lading?
13   A. I -- I do not know. I have not been in the
14   facility and I haven't physically seen these.
15   So I do not know. I do know that they're just
16   printed on white paper, and I do not imagine
17   them being double-sided printed. So that's --
18   I do not know.
19   Q. Okay. Where would the original of, like, any
20   one of these bills of lading be?
21   A. I know that this file -- I know the file for
22   this was held -- is held by the person who is
23   in my former position. Exel provided it to
24   Bill Travis. He was just given the documents
25   to hold onto, is my understanding.

119

1    Q. Okay. That's Bill Travis, did you say?
2    A. Bill Travis, yeah.
3    Q. Okay. And what's his job?
4    A. He's the EDM, enterprise distribution manager,
5    currently.
6    Q. For --
7    A. Central --
8    Q. -- International Paper?
9    A. Yes.
10   Q. Which would include the Hammond warehouse?
11   A. Yes.
12   Q. Okay. Where is Mr. Travis' office?
13   A. He's based in Memphis.
14   Q. Memphis? Okay.
15   A. He took over that position mid year last year.
16   Q. Okay. And then Exhibit 3 is --
17         MR. FISHER: Excuse me, page 3?
18         MR. BURKE: Page 3. Thank you.
19         MR. SCHRECK: Exhibit 1.
20   Q. (By Mr. Burke) Page 3 of Exhibit 1 --
21   A. Oh, can I make one correction?
22   Q. Yes, you can.
23   A. You asked where the originals of this, the
24   originals of the copy for the Hammond
25   distribution center would be in Bill Travis'

120

1    recollection. But this is from -- I believe
2    these were submitted by Universal Am-Can and
3    were the carrier's copy. There's always
4    multiple copies of the bill of lading
5    produced. So I just wanted to clarify there.
6    This -- the original here, I'm not sure. I
7    assume the carrier would have that.
8    Q. Okay. But International Paper has an original
9    of their ...
10   A. Executed bill of lading, yeah.
11   Q. Executed bill of lading.
12   A. Yes.
13   Q. Okay.
14   A. I just -- I just -- when I realized that it
15   was probably -- looks a little different
16   because it may have notes on top of it --
17   Q. Yeah.
18   A. -- since then.
19   Q. No, your -- your point's well taken. And
20   there's multiple copies of these all over the
21   place, yeah, with minor variations and
22   notations.
23   A. Uh-huh.
24   Q. And then back to page 3 of Exhibit 1, that's
25   the memo bill for Cenveo. Correct?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                          April 10, 2012

121

1   A. Yes.
2   Q. The load going to them with printing paper?
3   A. Yep.
4   Q. How about Exhibit 4 -- I'm sorry, page 4 of
5      Exhibit 1. Is that a log created by
6      International Paper, or not?
7   A. No, I've never seen this.
8   Q. Okay. How about look at page 6, please.
9      That's -- it's another copy of the memo bill
10     for Midland Paper?
11  A. Uh-huh.
12  Q. And now, this copy on the lower right, it's
13     signed apparently by Rocky Gordon, I believe
14     is the name?
15  A. Yes.
16  Q. And it says Midland?
17  A. Yes.
18  Q. When or how does that come about?
19  A. This is what I would consider a proof of
20     delivery. This is when the product is
21     delivered to the customer and the custorner
22     signs the document saying -- so the -- whoever
23     the -- whoever is delivering it to them, gives
24     them the paperwork. Customer signs it, says,
25     "Yes, I'm taking possession of this product."

122

1   Q. Okay. And then how does Universal's bar code
2      get on there, as you can see?
3   A. I do not know.
4   Q. Okay.
5   A. I don't know.
6   Q. Okay. And, similarly, page 7 is a copy of the
7      Xpedx memo bill stamped and signed as having
8      been received at Xpedx --
9   A. Yes.
10  Q. -- on July 7th of '08?
11  A. Yes.
12  Q. Okay. And page 8 is the -- a Cenveo memo
13     bill. And is -- does that signature represent
14     a receipt by somebody on the bottom line?
15  A. I believe so. I believe they've noted that
16     they observed damaged product and what they
17     were receiving.
18  Q. Okay. And they talk about 12 boxes being
19     damaged, up above?
20  A. Yes.
21  Q. And then could you look at nine, page 9,
22     please? That's the Midland memo bill.
23  A. (Witness complies.)
24  Q. Now, that has other information -- it's got
25     Mr. Franke's printed name and a carrier

123

1   number. How is page 9 different than page 1,
2   both of which are Midland memo bills? I mean
3   there's more writing on page 9. My question
4   is, like, when did it come about and why?
5   A. I do not know. I don't know.
6   Q. Okay. And then page 12 is that loading sheet
7      that you alluded to earlier?
8   A. Yeah.
9   Q. Okay.
10  A. There was another copy of this, as well, in
11     the other exhibit. Because these were all
12     ones carried -- provided by the carrier.
13  Q. Okay. By Universal?
14  A. Universal, yes.
15  Q. Okay. And then the -- what is Red Prairie?
16  A. Red Prairie is a warehouse management system
17     that Exel was using to operate the facility at
18     the time.
19  Q. Okay. Is it basically a computer --
20  A. Computer system for picking product and
21     shipping product.
22  Q. Okay. And then how about the Digital
23     Logistics?
24  A. I -- that just came out of the top of their
25     Red Prairie. It's part of the header to their

124

1   system. I don't know what the Digital
2   Logistics stands for. This is an internal
3   document.
4   Q. Okay. And then how about page 13, the broker
5      confirmation sheet? Basically what is that?
6   A. I've never seen it.
7   Q. Okay. Does International Paper have any
8      involvement in creating this document?
9   A. No.
10  Q. If -- now, you said you had this regular route
11     in place for deliveries to various customers
12     in Minneapolis. Correct?
13  A. Uh-huh.
14  Q. Okay.
15     MR. FISHER: Yes?
16  A. Yes.
17     MR. BURKE: Okay. Thanks.
18  Q. (By Mr. Burke) The particular customers to
19     whom a delivery was made on any given day were
20     determined by International Paper. Correct?
21  A. Yes.
22  Q. Okay. And that would depend on, you know,
23     which customer needed your product. Correct?
24  A. Yes, uh-huh.
25  Q. Okay. If there was some reason that



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                                April 10, 2012

125

1. International Paper did not need Universal to
2. make that run on any given day, International
3. Paper had the right to cancel that run.
4. Correct?
5. A. Yes. We called it truck ordered, not used.
6. We wouldn't -- because we had a commitment,
7. but we said, "Hey, we have no orders today."
8. Q. Okay. I recall there's a section in
9. International Paper's contract with, you know,
10. originally Overnite and then Universal, where
11. International Paper could cancel their
12. contract if your customers complained about
13. the carrier who was making the delivery. Is
14. that correct?
15. A. If they didn't meet the service expectations,
16. yes, uh-huh.
17. Q. And those service expectations were developed
18. by International Paper. Correct?
19. A. The -- they were the commitments and the --
20. the on-time delivery.
21. Q. And compliance with all the other terms of the
22. contract?
23. A. Compliance, yes, uh-huh.
24. Q. Would you look at page 28 of Exhibit 1?
25. A. (Witness complies.)

126

1. Q. That's a letter from litigation counsel Tom
2. Quinlen of International Paper to Universal
3. Am-Can. Correct?
4. A. Yes.
5. Q. Okay. Is this a letter you have seen before?
6. A. I have not seen this letter.
7. Q. Do you want to -- take a minute to read it. I
8. don't have a lot of questions about it. But
9. go right ahead.
10. A. (Witness complies.)
11. MR. SCHRECK: What page is that?
12. MR. BURKE: 28.
13. MR. SCHRECK: Two pages, is that what
14. it is? 28 and 29?
15. MR. BURKE: Yeah.
16. A. Okay.
17. Q. (By Mr. Burke) Okay. That letter's dated
18. July 23rd, 2009. Correct?
19. A. Yes.
20. Q. Okay. And let me direct your attention to
21. page -- or Paragraph 1. The last line of that
22. sentence begins with, "Mr. Franke was employed
23. by Martin's" --
24. A. Uh-huh.
25. Q. -- "Bulk Milk Service, Inc., and was

127

1. delivering a load of paper under a contract
2. between IP and Overnite Express."
3. Now, you -- you believe that to be
4. correct, other than the contract had been
5. adopted by --
6. A. Universal Am-Can.
7. Q. -- Universal?
8. A. Yeah, that is my understanding.
9. Q. Okay. And the second paragraph probably
10. addresses that. You agree, as he says, that
11. the contract between IP and Overnite Express
12. was assigned to Universal Am-Can in May of
13. 2008. Correct?
14. A. Yes.
15. Q. And then if you could look at page 29, the
16. first new paragraph starts with "IP's
17. position"?
18. A. Uh-huh.
19. Q. Okay. It says, "IP's position is that this
20. incident should be covered by Overnite
21. Express/UACL's general liability policy."
22. Have you made any determination as to
23. what policy of insurance should cover any
24. potential liability in this matter?
25. A. I -- I do not -- I'm not -- I told you my

128

1. expertise is not in insurance.
2. Q. Okay. Do you know what insurance coverage
3. International Paper had that covers this
4. occurrence or possibly covers this occurrence,
5. other than whatever Universal Am-Can had?
6. A. I'm not -- it is my understanding that IP's --
7. that Universal Am -- that this incident should
8. be covered by Overnite Express' general
9. liability policy.
10. Q. Okay. And my question's a little different.
11. Do you know what coverage International Paper
12. had, be it excess coverage --
13. A. I do not know.
14. Q. -- umbrella coverage? Okay.
15. A. I do not know.
16. Q. Who do you think knows that at International
17. Paper?
18. A. It would be in the sourcing group. I guess
19. Steve Mundy, or Bill Crawford at the time,
20. would have been involved in that.
21. Q. Okay. Oh, by the way, do you see on
22. page 29 --
23. A. Yes.
24. Q. -- down at the bottom of the letter, the
25. carbon copies, we know -- we've seen Cathy



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

129
1   Szwast's name. Do you know who Tracy Denkins
2   is or what she does?
3   A. I do not know Tracy.
4   Q. How about Lowell Blackham?
5   A. I know Lowell.
6   Q. What does Lowell do? Or, I'm sorry, who does
7   Lowell work for?
8   A. International Paper.
9   Q. And what is his job?
10  A. He's legal counsel for my organization at the
11  time.
12  Q. Okay. And how about Eric Johansson?
13  A. I do not know.
14  Q. Do you know who Eric works for?
15  A. I do not know.
16  Q. Could you look at page 99, please, of
17  Exhibit 1 still in front of you?
18  A. (Witness complies.)
19  Q. What is that document, Ms. Anderton?
20  A. I've never seen it before. I don't know.
21  Q. Okay.
22  A. It's got an International Paper logo, but I've
23  never seen it.
24  Q. It has what kind of logo on it?
25  A. It has International Paper logo, but I've

130
1   never seen it.
2   Q. Do you know Marilyn Ratay, R-a-t-a-y?
3   A. No.
4   Q. And ...
5   A. This looks like it was related to the previous
6   contract. It was dated '04.
7   Q. Okay. Previous contract between International
8   Paper and Overnite Express?
9   A. I'm not sure if that's what the document is
10  before here.
11  Q. Okay. And actually look at page 57.
12  A. (Witness complies.)
13          MR. FISHER: What page is this? 57.
14          MR. BURKE: Page 57 of Exhibit 1.
15  Q. (By Mr. Burke) Okay. That's Exhibit E to the
16  contract entitled -- and it's entitled
17  "Electronic Funds Transfer Bank Information"?
18  A. I know what it says. I'm not familiar with
19  the document. I know that -- I know what bank
20  we were set up to pay them for, but I -- I was
21  not involved in this document.
22  Q. Okay. And about the -- not quite the middle
23  of the page, there's the name Marilyn Ratay
24  again, accounts receivable clerk. You don't
25  know her?

131
1   A. I do not know her.
2   Q. Do you know, can you tell from this document,
3   does she work for Overnite or for
4   International Paper?
5   A. It looks like it's from Overnite. Because it
6   says Marilyn at Overnite Express, Inc., dot
7   com. I assume she is their accounts
8   receivable clerk. So it was related to
9   payment, yes.
10          MR. BURKE: How about -- do you have
11  88 with you, Carl? I have a copy if it's easy
12  enough to you. And if you don't --
13          MR. FISHER: What is it?
14          MR. BURKE: It's that Exel one.
15          MR. FISHER: The Exel one?
16          MR. BURKE: Here, I got it.
17  Q. (By Mr. Burke) Let me tender to you what
18  we've previously marked as Exhibit 88,
19  Ms. Anderton.
20  A. Uh-huh.
21  Q. Can you tell me what that form is? Is it one
22  you've seen or know anything about?
23  A. It must have been used in the facility, but I
24  am not familiar with it.
25  Q. Okay.

132
1   A. Because it says Exel and it's ash paper, and
2   that's the facility they operate for us. But
3   I have not -- I wasn't involved in using that
4   in my role.
5   Q. Okay. Let me tender to you just one portion
6   of Exhibit 64, which is entitled "Overnite
7   Logistics Load and Rate Confirmation." And is
8   that a document you are familiar with?
9   A. No.
10  Q. No? Okay. Is it a document that
11  International Paper has any involvement in
12  preparing?
13  A. No.
14  Q. Okay. Do you know who does prepare that
15  document?
16  A. No.
17  Q. Okay. Is -- do you have any understanding of
18  the purpose of the document?
19  A. No.
20  Q. Okay. Am I correct that this -- on the day of
21  this incident, this load of paper was being
22  hauled to Minneapolis because International
23  Paper needed to deliver its product to its
24  three customers in the Minneapolis area?
25  A. Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

133

1  Q. Okay. And International Paper had asked
2     Universal to make this delivery pursuant to
3     its contract with Universal as a motor
4     carrier. Correct?
5  A. Yes.
6  Q. And Mr. Franke of Martin's was hauling this
7     load because Universal had asked Martin's to
8     perform the work that Universal had agreed to
9     do for International Paper?
10 A. I can't speculate what Universal -- what
11    instruction Universal gave to Martin's Bulk
12    Milk. So I don't know what direction they
13    gave them.
14 Q. Had International Paper placed any
15    restrictions or conditions on Universal having
16    other people perform the work that Universal
17    had committed to do for International Paper?
18 A. I believe the contract mentions subcontractors
19    or agents all fall under the indemnification
20    clause. I believe in the contract there is a
21    statement that Universal -- Universal --
22    anybody they choose to perform the service --
23    however they choose to execute the
24    transportation services, then they all would
25    fall under the contract.

134

1  Q. Okay. So if Universal had some non-Universal
2     employee, such as somebody from Martin's,
3     carry out the services they had contracted
4     with International Paper to perform, that
5     other party, whether it be an employee, an
6     agent, or anybody else, was obligated to
7     comply with the contract between International
8     and Universal?
9  A. Universal was choosing to have them execute
10    what we were contracting Universal to do.
11 Q. Uh-huh. And if Universal chose to have
12    somebody else do it, such as Martin's, then
13    you believe that under the contract that
14    Martin's employee had to comply with all the
15    conditions and terms of the contract.
16    Correct?
17       MR. FISHER: Objection. Asked and
18    answered.
19       Go ahead.
20 A. Yeah, could you restate that? Because I think
21    you just worded it funny. Can you restate
22    that?
23 Q. (By Mr. Burke) Sure. If Universal decided to
24    use some other entity, such as Martin's, to
25    perform the services they had committed to

135

1     perform for International Paper, it is true
2     that Martin's had to comply with the terms of
3     the contract that existed between
4     International and Universal. Correct?
5  A. Universal --
6        MR. FISHER: Objection. Excuse me.
7     Objection. Asked and answered.
8        You can go ahead.
9  A. Universal had to comply to the contract, and
10    they chose to -- they would choose to use
11    Martin's Bulk Milk to do so.
12 Q. (By Mr. Burke) And do you believe that
13    whoever they chose, like Martin's, that that
14    person then had to also comply with the terms
15    of the contract and carry out the delivery in
16    the same manner that you expected from
17    Universal?
18       MR. FISHER: I object to form and
19    foundation.
20       MR. SCHRECK: I'll join.
21       MR. FISHER: You can go ahead.
22 A. Yeah, say that one more time.
23 Q. (By Mr. Burke) Sure. You gave Universal
24    certain requirements in your contract with
25    them --

136

1  A. Yes.
2  Q. -- for how they needed to --
3  A. Yes.
4  Q. -- make deliveries for you?
5  A. Yes.
6  Q. Okay. And if Universal, in turn, used
7     Martin's to actually make that delivery,
8     International Paper expected Martin's to
9     comply with the contract terms in the same
10    manner as Universal would have to. Correct?
11       MR. FISHER: Competency, form,
12    foundation. Asked and answered.
13       MR. SCHRECK: I'll join.
14       MR. FISHER: Now, you can go ahead.
15 A. I -- we expect Universal -- the product was
16    picked up at our facility and delivered to our
17    customer, per our contract with Universal.
18    And if they sent -- whatever driver they sent
19    to our facility to execute that, that was our
20    contract with Universal.
21 Q. (By Mr. Burke) And that driver, whether he
22    was from -- even if he was from Martin's, had
23    to execute the contract in the same manner as
24    it would be executed by an employee of
25    Universal. Correct?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                          April 10, 2012

137

1      MR. FISHER: Same objections.
2      MR. SCHRECK: Join.
3   A. They weren't our employees. We didn't give
4      any direction to anybody's employees. So we
5      just held Universal accountable to the
6      contract that we had with them to provide
7      transportation services.
8   Q. (By Mr. Burke) Okay. And did you have an
9      expectation that whoever carried out those
10     delivery services would do so in accord with
11     the terms of the contract?
12     MR. FISHER: Same objections.
13  A. To deliver the product as we directed
14     Universal Am-Can to deliver the product, yes.
15  Q. (By Mr. Burke) Okay.
16  A. And pick up and deliver.
17  Q. Okay. And whoever that delivery person was
18     had to do so in the manner you contracted with
19     Universal to do. Correct?
20     MR. FISHER: Same objections.
21     MR. SCHRECK: Join.
22  A. Restate your question.
23  Q. (By Mr. Burke) Sure. Whoever picked up the
24     product at your facility and made the
25     delivery, they had to deliver it in accord

138

1      with the contract, whether they worked for
2      Universal or whether they worked for Martin's.
3      Is that fair to say?
4      MR. FISHER: Same objections.
5      MR. SCHRECK: Join.
6   A. We -- we held accountable Universal Am-Can to
7      be in accord with the contract. How -- how
8      they would then hold accountable whoever they
9      chose to execute it, was their decision. We
10     didn't manage that.
11  Q. (By Mr. Burke) And you're answering a little
12     different topic. My question is really: Did
13     you have an expectation that whoever made the
14     delivery services -- or strike that.
15         Did International Paper have an
16     expectation that the terms of the contract
17     would be carried out for delivery services,
18     regardless of by whom the delivery driver was
19     employed?
20  A. We -- we had an expectation that we would
21     tender freight to Universal Am-Can, and that
22     the freight would then be picked up from our
23     facility and delivered to our customers per
24     the contract, and they would provide the
25     transportation services for that.

139

1   Q. And that would be -- you had that expectation
2      whether it was your -- your product was
3      physically being delivered by a direct
4      employee of Universal or a direct employee of
5      some other company that Universal asked to
6      make the delivery. Correct?
7   A. Correct. Correct.
8   Q. Okay.
9      MR. GOLDEN: Hey, Rich, this is Bob
10     Golden. I have to leave now. I just wanted
11     to alert you guys that I am leaving and
12     parting the deposition. Okay?
13     MR. BURKE: All right, Bob. Thank
14     you.
15     MR. FISHER: Hey, Bob --
16     MR. GOLDEN: Have a good afternoon
17     and a safe flight back.
18     MR. FISHER: Bob? Bob?
19     MR. GOLDEN: Yes, sir.
20     MR. FISHER: You're participating by
21     phone next week?
22     MR. GOLDEN: Yes, sir, I am.
23     MR. FISHER: Thank you.
24     MR. GOLDEN: Okay. Thanks, guys.
25     MR. BURKE: Okay. I don't have a

140

1      real lot more, Bob, but ...
2          (The departure of Mr. Golden was
3      noted by the reporter.)
4          (Discussion off the record.)
5   Q. (By Mr. Burke) I know obviously there's all
6      the terms that exist in the contract --
7   A. Uh-huh.
8   Q. -- between International Paper and Universal.
9      Did -- in addition to that, did International
10     Paper provide any other information or, you
11     know, brochures, manuals of any kind, to
12     Overnite or to any of its carriers about
13     making deliveries and the proper procedures
14     for making deliveries?
15  A. That's probably very broad. I'm sure we had
16     other communications with our carriers. But
17     can you be more specific?
18  Q. Sure. Did -- what other types of
19     communications did you have with carriers in
20     terms of any expectations from International
21     Paper of how deliveries should be made or
22     procedures that needed to be followed?
23  A. That's just very broad. It's just very broad
24     and there are several people that communicate
25     with carriers, and we have hundreds of



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

141

1  carriers. So I can say that there is
2  different communications, whether they be
3  e-mail, or whatever, that could have been --
4  that could fall under that category.
5  Q. And from what department would they come?
6  A. Primarily from the sourcing group.
7  Q. And what topics would they cover?
8  A. It would be the same topics that are within --
9  on the contract, but there could be general
10  communications -- for example, if a carrier
11  was having issues with on-time delivery
12  performance, either myself or the motor
13  carrier manager or one of his team would
14  communicate with that carrier on their on-time
15  delivery performance. And I might provide
16  reporting saying, "Hey, this is how we see you
17  performing."
18      I mean that would just be an example.
19  But we had a working relationship with that
20  carrier as they were fulfilling the contract
21  that we had with them.
22  Q. And they would be given further information or
23  direction from International Paper about how
24  you expected the deliveries to be made in
25  order to comply with the contract?

143

1  service satisfaction brochures, or things like
2  that, that you would give your carriers in
3  order to assist them in carrying out the
4  contract as you saw fit?
5  A. Yes. They would get -- they had a performance
6  review with the sourcing group as to how they
7  were performing. On-time delivery was
8  typically one of the metrics that would be
9  measured.
10  Q. Okay. And how often would those performance
11  evaluations take place?
12  A. I don't -- I don't recall. It would have been
13  done with his -- with the other organization.
14  Q. With sourcing?
15  A. Sourcing, uh-huh.
16  Q. Okay.
17  A. We would review on-time delivery from our
18  facility on a daily basis. And if we had
19  exceptions, where we had a performance issue,
20  it could be daily that I would be calling a
21  carrier saying, "Why was this shipment late
22  yesterday?"
23      So at the facility level, it would --
24  might be immediate. But then long-term
25  performance would have been handled from the

142

1  A. I don't think it was additional information.
2  It was more information enforcing what was
3  already in the contract. Or would be on
4  the -- like a bill of lading instruction for
5  them. It was very broad. I mean there were
6  probably communications back and forth between
7  the carrier and IP for different -- under
8  different circumstances.
9  Q. Okay. Would those instructions or directions,
10  communications, whatever they might be, be
11  specific to the carrier, or generally, or I
12  suppose both?
13  A. Probably both.
14  Q. Okay. Who, that we've been talking about, is
15  from sourcing. Is Mundy --
16  A. Mundy.
17  Q. Mundy, he's from sourcing?
18  A. Uh-huh. Bill Crawford. There was some
19  organizational changes where Mundy moved to
20  where he was co-reporting. But I'm not sure
21  of the timing of that. But he's always --
22  Steve Mundy has always been in the role around
23  sourcing contracts.
24  Q. Okay. And I mean did International Paper, did
25  they have, you know, any type of customer

144

1  sourcing.
2  Q. And the performance evaluations, would they be
3  communicated in writing in some manner?
4  A. Uh-huh.
5  Q. Is that a yes?
6  A. Yes.
7  Q. In addition to that, did you utilize any
8  other, you know, pamphlets or informational
9  literature that you would give to your
10  carriers to assist them in solving problems or
11  meeting the requirements of the contract?
12  A. I don't know of any, like, formal pamphlets.
13  There was general communications, I'm sure, at
14  different points over time. When you have
15  that many carriers, we do communicate with our
16  carriers. Because we're working with them on
17  a daily basis. So ...
18  Q. Did International Paper have a contract with
19  Universal prior to June of 2008 when Universal
20  took over Overnite?
21  A. I can't answer that for sure. Not that I am
22  aware of. But I do not know for certain.
23      MR. BURKE: Carl, if you want, I just
24  want to glance at a couple things, and I may
25  be done. I don't know if Matt has any



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

---

**145**

1  questions or not. But go right ahead and
2  just ...
3         MR. FISHER: Okay.
4         MR. SCHRECK: I'll jump in then.
5            EXAMINATION
6  BY MR. SCHRECK:
7  Q. I'm going to try not to repeat things. So I
8  may bounce around a little bit.
9  A. Okay.
10 Q. I don't think I have too many questions. You
11 were asked some questions earlier regarding a
12 contract that International Paper had with
13 Overnite Express and then eventually had with
14 Universal Am-Can. Do you remember talking
15 about that?
16 A. Yes.
17 Q. Okay. One of the things that you were
18 discussing with Mr. Burke was regarding
19 obligations of the carrier to comply with
20 certain requirements. Do you remember that?
21 A. Uh-huh.
22 Q. Okay. Yes?
23 A. Yes.
24 Q. Okay. One of the those requirements -- or
25 actually things that could result in a default

**146**

1  was a failure to comply with facility safety
2  rules?
3  A. Yes.
4  Q. Okay. My first question is for the Hammond
5  facility, have you ever been there before?
6  A. Yes.
7  Q. Okay.
8  A. I had an office there.
9  Q. You had an office there?
10 A. I had an office there, yes.
11 Q. Okay. As of June of 2008, how often would you
12 be in that office?
13 A. Once every couple weeks. Maybe -- you know,
14 it could have been -- it could have been I'd
15 be there for a week, and then I'd be gone for
16 a while. I did a lot of traveling. So I
17 don't know.
18 Q. Okay. Were you involved in any of the
19 day-to-day aspects of the delivery of loads
20 from Hammond to Minneapolis?
21 A. I was familiar with all of the operations. We
22 hired Exel Logistics to execute those. And I
23 would be in communication with them, by phone,
24 on a daily basis about operations.
25 Q. Okay. Do you know what the safety rules were

**147**

1  for that Hammond facility, or no?
2  A. You're required to have -- if the truck was
3  under the trailer, then you were fine.
4  Otherwise, it required chocks and jacks to
5  hold the trailer up for us to be able to load
6  safely.
7  Q. Okay. Were there any other safety rules that
8  the facility had?
9  A. There were certain areas by which the driver
10 could -- could stand and couldn't stand, and
11 people walking through the facility had to
12 stay within the safety rules. Outside of
13 certain pathways, you had to wear safety
14 glasses. It was restricted areas within the
15 facility.
16 Q. Okay. And I'm sure there were others --
17 A. Probably others.
18 Q. -- as well. Is that right?
19 A. Uh-huh. Yeah.
20 Q. For example, like probably rules regarding you
21 have to have a shirt and shoes on?
22 A. Yep. And fire safety and lots of other, yes.
23 Q. And International Paper expected whatever
24 carrier would be delivering the load to comply
25 with those rules that we talked about earlier.

**148**

1  Is that right?
2  A. That's correct. Yes.
3  Q. And if they didn't comply with those rules,
4  for example, if the carrier wasn't complying
5  with the safety rules regarding how the
6  trailer was supposed to pull up to the dock
7  or -- you could -- International Paper or
8  Exel employees could refuse to deal with that
9  person because they weren't complying with the
10 rules. Is that correct?
11 A. Yes. We could tell them to leave the
12 facility, and -- and then call the carrier and
13 say, "Send another driver for this because
14 they're noncompliant."
15 Q. And that applied to anybody that Overnite
16 Express or Universal Am-Can sent to that
17 facility. Correct?
18 A. Anybody that they would send had to comply by
19 the safety -- safety rules of the building.
20 Q. Okay. And whether it be if they sent their
21 own employee, a brokered employee, or some
22 other carrier, International Paper can refuse
23 to deal with them if they're not complying
24 with the safety rules. Is that correct?
25 A. Yes, yes.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                              April 10, 2012

149

1   Q. Okay. You indicated earlier that the facility
2       was subcontracted and run by Exel?
3   A. Yes.
4   Q. Were the -- and if you don't know this, that's
5       fine.
6   A. Okay.
7   Q. But the employees that were working there, do
8       you know who their paychecks came from, the
9       ones that were actually getting the shipments
10      ready to be loaded onto the trucks?
11  A. It was my understanding that they came from
12      Exel Logistics. I am not sure if they were
13      temporary employees. They could have been
14      paid by a temporary agency. But Exel
15      Logistics managed the employees there.
16  Q. Managed the employees. Okay. And do you know
17      if there was any type of written contract
18      between Exel and International Paper, or no?
19  A. Yes.
20  Q. Okay. And do you know when that relationship
21      between Exel and International Paper went into
22      effect? Was it always that way at that
23      facility, or did it change over time?
24  A. They -- they -- the facility started in '96,
25      and Exel was the 3PL that provided services

150

1       for that facility since '96.
2   Q. Okay. The facility itself, did the warehouse
3       have any identification on it, as far as
4       saying "Exel" or "International Paper" on it?
5   A. It says "International Paper operated by
6       Exel."
7   Q. Okay. I want to turn your attention back to
8       the bills of lading. I'd rather use Exhibit 2
9       because those are the documents that were
10      produced by International Paper.
11  A. Yes.
12  Q. Now, first look at page 2.
13  A. (Witness complies.)
14  Q. All the memo bills -- actually page 2, 3, and
15      4, they all indicate that the shipment was
16      received from International Paper in Hammond.
17      Is that correct?
18  A. Yes.
19  Q. Okay. Is this document -- any of these three
20      pages, pages 3, 4 -- 2, 3, or 4 of Exhibit 2,
21      do they indicate Exel's name on the document
22      anywhere, or no?
23  A. No, they do not. Not that I'm aware of.
24  Q. And then these documents are indicating
25      they're received from International Paper at

151

1       Hammond, and they're going to their respective
2       locations in Minneapolis?
3   A. Yes.
4   Q. And I believe you already answered this
5       earlier for Mr. Burke, but these documents are
6       created by the people that are actually at the
7       facility?
8   A. Yes.
9   Q. Okay. And then they're, in turn, given to the
10      person that's going to be picking up the load
11      and bringing it up to Minneapolis. Is that
12      right?
13  A. Yes. The contents of the documents would have
14      been -- they produced this document, but the
15      contents of the document would have been
16      provided to them from a paper based on final
17      orders.
18  Q. Okay. I'm talking about the actual physical
19      document.
20  A. But the actual physical -- they would have
21      prepared it at the facility, yes.
22  Q. Okay. They were prepared at the facility?
23  A. Yes.
24  Q. And at some point during the process of the
25      shipment being picked up, a copy of this

152

1       document is given to whoever's picking it up.
2       Is that right?
3   A. Yes.
4   Q. And then at some point, they're signed by
5       whoever picks it up?
6   A. Yes.
7   Q. Okay. In this case, there is a signature of
8       Samuel Franke on -- on each of these pages.
9       Correct?
10  A. Yes.
11  Q. Do you know what the policy was at the
12      facility as far as where the driver that was
13      picking up the load was required to sign, or
14      not?
15  A. Where he was required to sign on the paper
16      or --
17  Q. On the paper.
18  A. -- where he was, physically, in the building?
19  Q. No, no, no. Where, on the paper, he would be
20      required to sign. Do you know what the policy
21      was, who determined where he signed?
22  A. It was where the stamp was. Where the --
23      where the print name and signature was, yes.
24  Q. Okay. I see that's where it's done on these
25      particular documents. Do you know what the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                         April 10, 2012

153

1     policy was behind who determined where the
2     signature was supposed to be done on that
3     page? Or you're not familiar with that
4     operation?
5            If it doesn't make sense, let me
6     know, I'll rephrase it.
7     A. Yeah, could you rephrase that, please?
8     Q. Sure. The three documents you're looking at,
9     page 2, 3, and 4 of Exhibit 2, have a
10    signature toward the top of the page.
11    Correct?
12    A. Yes.
13    Q. Okay. And there looks like there are some
14    signature lines towards the bottom of the
15    page.
16    A. Okay.
17    Q. Okay. Do you know what the policy was, at the
18    Hammond facility, as to where signatures were
19    supposed to be signed or weren't supposed to
20    be signed?
21           MR. FISHER: Objection. Assumes
22    facts not in evidence.
23           You can go ahead and answer.
24    A. I believe -- my understanding is that they
25    would sign where -- where he had signed --

154

1     indeed signed here. And these documents, this
2     was a standard International Paper bill of
3     lading. Although they produced it, the format
4     was worked with International Paper.
5     Q. (By Mr. Schreck) Okay. So that was
6     determined by International Paper through
7     Exel. Correct?
8     A. Yes.
9     Q. Who would have the most knowledge regarding
10    how the actual loads were picked up? Are you
11    that person or is somebody else --
12    A. For International Paper, I would be that
13    person.
14    Q. Okay. So you know how things are done on a
15    daily basis as far as where the people would
16    go when they get to the facility, who they
17    talk to, what papers they sign, or --
18    A. I knew the general letter. But we hired Exel
19    Logistics to actually execute that. So how
20    they choose to execute that on a daily basis,
21    there might have been scenarios. But I knew
22    the general process, yes.
23    Q. Tell us what you know about the general
24    process of how somebody comes in and picks up
25    a load and leaves International Paper's

155

1     facility.
2     A. Okay. So the driver would come in, go to
3     the -- go to the shipping office. There's a
4     window there. And they would meet somebody,
5     like Crystal Cousins, at the window. And they
6     would provide information, such as the
7     shipping number that said, "This is what
8     shipment I'm here to pick up."
9     Q. Okay.
10    A. And then they would be directed either to wait
11    in the yard, "We're not ready for you," or --
12    and "come back in an hour," or whatever. Or
13    if they had an appointment time, they'd be
14    directed to put their trailer in the door,
15    like at Door No. 27.
16           The driver would then go put the
17    trailer in the door. And then they had the
18    right -- at that facility, we gave the drivers
19    the right to watch their loads being loaded.
20    So then they could come in and there was an
21    area they could come there, or they could
22    stand right next to the dock door and watch
23    all the product come in.
24           Because the carrier, at the time that
25    they signed this document, is taking

156

1     possession of the goods. So they could
2     physically see what goods that they were
3     hauling.
4     Q. Okay. And then at some point after it's
5     loaded, then --
6     A. He would go back to the window. Yeah.
7     Q. Oh, okay. So finish.
8     A. Yeah, he would go in. And then the product
9     would be loaded. The person who loaded, the
10    dock men which would give the driver the
11    loading sheet, which is also signed by the
12    driver.
13    Q. Okay.
14    A. Okay. And it just said this is exactly how I
15    loaded it and the sequence of the stops on the
16    truck. And then once it was loaded, the
17    driver signs the load sheet. And then he
18    would also sign the bill of lading once they
19    were complete.
20    Q. Okay. Now, that day-to-day routine --
21    A. Uh-huh.
22    Q. -- for lack of a better word, of how things
23    are loaded when a driver gets there, that's
24    determined by International Paper then. Is
25    that correct?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                        April 10, 2012

157

1   A. It's a pretty standard process across the
2      board. Exel chose to operate it as they
3      chose. But it's pretty standard operating
4      procedure, yes.
5   Q. Okay. So Exel is executing --
6   A. For IP.
7   Q. -- for International Paper?
8   A. International Paper.
9   Q. But the actual process of getting -- requiring
10     them to have a shipping -- or shipment number
11     and what they're allowed to do, from a loading
12     or watching the load standpoint, that all
13     comes through International Paper. Is that
14     right?
15  A. Actually Exel likes using the load sheet as --
16     and getting additional signatures. So
17     International Paper requires a bill of lading
18     signature. And Exel has chosen, at that
19     facility, to have them sign, also, off on the
20     load sheet. Not all of our facilities do
21     that.
22  Q. Okay. And where a driver can and can't stand
23     during the loading process, is that something
24     that's directed by International Paper or is
25     that something Exel's doing on their own?

158

1   A. Exel is responsible for safety at the
2      facility. And so they -- they can choose to
3      execute it as they choose. Yeah.
4   Q. Okay. And the overall safety directives for
5      the facility, is that something that
6      originally comes from International Paper and
7      Exel just has to execute them?
8   A. We hire them to choose. So whether -- for
9      example, if the walk path is here or here,
10     Exel might have chosen to put it there.
11  Q. Okay.
12  A. Okay. So they -- they made some decisions on
13     safety within the facility. That's because
14     they were operating it for us.
15  Q. And all the work that Exel does at that
16     facility, that's being done on behalf of
17     International Paper. Is that right?
18  A. Yeah. They're under contract to operate the
19     facility for us.
20  Q. Okay. So they're an agent of International
21     Paper?
22         MR. FISHER: Objection. Form.
23     Foundation.
24  A. They are a contractor or a subcontractor of
25     ours. I don't know the correct terminology

159

1      for them. We -- we hire them to operate the
2      facility for us.
3   Q. (By Mr. Schreck) And in either event, they're
4      doing their work on behalf and at the
5      direction of International Paper?
6         MR. FISHER: Form. Foundation.
7   A. We hire them to operate the facility for us,
8      based upon the contract that we have with
9      them.
10  Q. (By Mr. Schreck) The work they're doing there
11     is being done for the benefit of
12     International --
13  A. Paper.
14  Q. -- Paper?
15  A. Yes, yes.
16         MR. SCHRECK: I think that's all the
17     questions I have. I'll pass the witness.
18            EXAMINATION
19  BY MR. FISHER:
20  Q. Ms. Anderton, on that topic, have you seen the
21     contract that exists between Exel and
22     International Paper?
23  A. Yes.
24  Q. And does that contract provide that the
25     relationship is one of independent contractor

160

1      relationship only? That is to say --
2   A. It's independent -- they are an independent
3      contractor, yes.
4   Q. And so whatever the language is that's in that
5      contract is the language that applies to that
6      relationship?
7   A. Yes.
8   Q. Okay. You earlier spoke -- well, actually let
9      me -- I'll go back into this. I'm going to
10     show you some collection -- you've been shown
11     lots of memo bills --
12  A. Yeah.
13  Q. -- from different sources.
14  A. Okay.
15  Q. I'm going to even -- I'm going to complicate
16     it --
17  A. Another one?
18  Q. -- even further --
19  A. And show me more?
20  Q. -- by showing another collection of these memo
21     bills that were marked as Exhibits 18, 19, and
22     20 in some of the earlier depositions.
23  A. Okay.
24  Q. So if you would look first at Exhibit -- a
25     copy of Exhibit 18.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                         April 10, 2012

161

1  A. Uh-huh.
2  Q. And tell me whether or not that's a collection
3     of memo bills that appears to reference the
4     Midland Paper part of the load at issue and
5     involved with the shipment being made on
6     July 3.
7  A. Yes, this is Midland Paper. And this is the
8     same copy of this as this.
9  Q. Keep looking, because there's lots of sheets
10    of paper there.
11 A. Okay.
12 Q. And as Mr. Burke alluded to earlier, there's
13    lots of different sheets of paper that have
14    got lots of different markings on them.
15 A. Yes.
16 Q. Okay. So go ahead and just look at every one
17    of them.
18 A. (Witness complies.) Yep, this would be
19    delivery. That's another -- that's the same
20    copy as that.
21 Q. Okay.
22 A. Yes.
23 Q. So you've had a chance to look at
24    Exhibit 19 --
25 A. 18.

162

1  Q. Excuse me, 18. My mistake. You've had an
2     opportunity to look at Exhibit 18, and you see
3     that every one of the sheets of paper that
4     consists of Exhibit 18 is the same memo bill
5     regarding the Midland Paper part of the
6     July 3rd load, but in some instances there are
7     International Paper or UACL or Martin's Bulk
8     Milk or no markings in the bottom of each
9     sheet?
10 A. Correct.
11 Q. And in some cases, for example, if we simply
12    compare the first three pages of this
13    document, this exhibit that is, Samuel
14    Franke's signature appears on those three
15    pages. And on the fourth page, which is
16    UACL9, that has Franke's signature and his
17    printed name along with some other
18    information?
19 A. Uh-huh.
20 Q. Do you know how it is or why it is that there
21    are different multiple copies of this same
22    memo bill, with different markings on them?
23 A. They all originate from the same point. But
24    at the time that the driver picks up the load,
25    they sign one copy that then Exel keeps as

163

1  proof that the driver picked up the load. And
2  then they typically take two copies with them,
3  one for the customer and one ultimately for
4  the carrier.
5      So when they deliver the shipment,
6  one copy would go to the carrier -- the
7  customer, and then the carrier would keep a
8  copy. And then there could have been multiple
9  copies made after that point.
10     So that's why some are -- because
11 they're different signatures. Some of them
12 the signature looks slightly different. So he
13 copied -- he must have signed different.
14 Q. And, in fact, if you look at -- I'm not asking
15 you to be a handwriting expert. But if you
16 were to look at, for example, the document
17 that is marked as a part of Exhibit 18, IP4,
18 and you look at the signature of Mr. Franke on
19 that signature line --
20 A. Yep.
21 Q. -- and then you compare it with the Universal
22 Am-Can copy, which appears as the next page in
23 Exhibit 18, which is marked UACL6, that
24 signature of Mr. Franke does not appear to be
25 the same, does it?

164

1  A. It's not exact, no.
2  Q. Okay. So would that be another reason to
3     account why various entities, who would
4     receive copies of these, might have differing
5     versions of the same document with different
6     versions of a signature?
7  A. It starts from those three -- first three,
8     yes. Because he would have signed different.
9  Q. And, likewise, does it appear the same as the
10    case with Exhibit 19, which is the memo
11    bills -- multiple copies of the memo bills
12    concerning the Cenveo?
13 A. You got it. Cenveo, yes. Same thing?
14 Q. Just skim through those and see if that -- it
15    appears that's the same case on -- on that
16    collection.
17 A. Yeah, you can see when his signature changed
18    slightly. And it's got different -- so it's
19    different versions of the same document. Same
20    originating document signed separately.
21 Q. Okay. And then finally is it the same the
22    case with Exhibit 20, which appears to be the
23    collection of the memo bills regarding the --
24 A. Uh-huh.
25 Q. -- Xpedx --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joan Anderton                                        April 10, 2012

165

1  A. Uh-huh.
2  Q. -- memo bills?
3  A. Go to any shipping office anywhere, drivers
4     are always asked to sign several copies.
5  Q. And would it be the actual signing of separate
6     white sheets of paper, as opposed to
7     duplicate, triplicate, quadruplicate carbons?
8  A. Yes. At this point, we were -- we were not
9     using carbon paper. So it would have been
10    separate copies.
11 Q. All right. A different topic. You earlier
12    made mention of the fact that it was not until
13    a year after the July 3rd, 2008, accident,
14    that you received some notice that an accident
15    had occurred because you were put on legal
16    hold by International Paper?
17 A. Correct. I was unaware of the incident before
18    that time.
19 Q. And then you communicated with Mr. Diekman?
20 A. Yes.
21 Q. Okay.
22       (Deposition Exhibit No. 100 was
23    marked for identification.)
24       MR. FISHER: And just so the record's
25    clear, we're going to have to -- I'm going to

166

1     submit these as part of a supplement of
2     International Paper documents. I've got to
3     keep this one, but you can borrow that one.
4        MR. SCHRECK: Okay. I assume it
5     wasn't previously produced?
6        MR. FISHER: It was not.
7     Ms. Anderton made this available to me
8     yesterday. So let's just --
9        THE WITNESS: And I apologize for
10    that. It is -- it must have been it was a
11    two-sided copy.
12       MR. FISHER: So it's missing pages 2
13    and 4?
14       THE WITNESS: So it's missing the
15    pages behind two and four.
16       MR. FISHER: Right. So we'll get
17    those to everybody.
18       MR. BURKE: Okay.
19 Q. (By Mr. Fisher) So tell us what Exhibit 100
20    is, understanding, of course, that it's
21    missing the even-sided back sides of some of
22    these e-mails.
23 A. Okay. Well, the first e-mail I -- after
24    finding out that my -- about the legal hold,
25    the first e-mail, I had called Clint, who was

167

1     a customer service manager at Hammond, and I
2     said, "Can you pull the file on this shipment
3     and let me know if the product delivered on
4     time and if there was anything exceptional
5     about this shipment?"
6        So he pulled the file, and this was
7     his response. He said -- in his e-mail, it
8     says, "I searched the archived OTDs from
9     July 5th, '08, through August 1st, '08, and
10    found no lates for Orders 211039, 307039, or
11    322039."
12 Q. And what -- what do those last series of three
13    numbers mean?
14 A. Those three orders are the three orders for
15    the three different customers that were to be
16    delivered to. And it was the shipment number
17    that I was told was involved in the accident.
18       So my first thing was if there was an
19    accident, it probably didn't deliver on time,
20    what would we have done about that. And we
21    had no records at all. The shipment delivered
22    complete and on time, according to the
23    records. So that's what this first one is.
24 Q. All right. And then what's the -- you
25    mentioned Steve Shores during your earlier

168

1     answers to Mr. Burke's questions. Tell us
2     what the remainder of Exhibit 100 is.
3  A. Okay. So I also asked -- at the same time I
4     asked Clint, I called Steve up and I said,
5     "Steve, can you pull this shipment," which is
6     the shipment 2008, "and tell me what you have
7     as far as on-time delivery performance and any
8     information you have about that load?"
9        So he pulled the EDI transactions --
10 Q. Let me stop you there for a second. Does EDI
11    stand for electronic data interchange?
12 A. Yes.
13 Q. Okay. It's the day of acronyms.
14 A. The day of acronyms, yes.
15 Q. All right. And so tell us what this
16    document -- strike that.
17       Tell us what the chart appearance
18    after the e-mail addressee information
19    appears, what it is.
20 A. Now, I don't have access to the system that
21    did this. In fact, at first he sent me a link
22    to this -- to these transactions and I said,
23    "Steve, I don't look at the EDI transactions."
24    I said, "Can you cut and paste and show me the
25    transactions?"



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                April 10, 2012

169

1    So he pasted all of these into an
2    e-mail and sent them. And they basically --
3    and I can't interpret what every one of them
4    is, but it's -- it's basically the date and
5    time when Overnite Express reported pick up of
6    the shipment and delivery of the shipment to
7    our customers.
8    Q. Okay. Let me stop you there for a second.
9    Earlier in the deposition, Mr. Burke asked you
10   some questions when he was going through,
11   paragraph by paragraph, section by section,
12   portions of the Overnite Express or Universal
13   Am-Can and International Paper contract.
14   A. Yes.
15   Q. And he asked you some questions about the
16   portion of the contract that talked about
17   electronic communications. Right?
18   A. Uh-huh.
19   Q. Yes?
20   A. Yes.
21   Q. Okay. Is this the type of electronic
22   communication that International Paper was
23   expecting to engage in with Universal Am-Can
24   or Overnite Express --
25   A. Yes.

170

1    Q. -- pursuant to that section of the contract
2    with which you discussed -- that you discussed
3    with Mr. Burke?
4    A. Yes.
5    Q. All right. And so as an example, if we just
6    look at -- if we look at the entry that
7    appears on the numbered page 3, and it says,
8    "Shipment departed 3 July, 2008, 7:52 eastern
9    daylight time"?
10   A. Yes.
11   Q. All right. And then over in the right column,
12   it says -- yeah, so what would that time
13   reflect?
14   A. Yeah, the first column says the event time and
15   the last column on -- on the first page says
16   the report time -- reported time. So the
17   event time would be when Universal -- Overnite
18   Express or Universal Am-Can reported it
19   happened, the event happened. And then the
20   other one is the report time, when they
21   reported it to us. Okay?
22   Q. All right.
23   A. So this is when they stated the shipment
24   departed Hammond July 3rd, 2008, at 7:52.
25   They reported that information to us July 7th,

171

1    2008, at 9:03.
2    Q. All right. Anything with respect to the delay
3    between -- strike that.
4    Anything unusual, usual, with respect
5    to the date and time of July 3rd, 7:52, as
6    compared with July 7th at 9:03 a.m.?
7    A. Not at all. Because this is at night and it
8    was a holiday weekend.
9    Q. So ordinarily the expectation would have been,
10   according to the contract, that when this 7:52
11   event occurred, that that would have been
12   reported within I think it was a couple of
13   hours?
14   A. Yes. But I believe that's within business
15   days. I'm not certain, but that is my
16   understanding.
17   Q. Okay.
18   A. Nobody would be there to report it.
19   Q. All right. So this is an example of what's
20   referenced in the portion of the contract that
21   dealt with electronic communications --
22   A. Yes.
23   Q. -- as to what Universal Am-Can was obliged to
24   provide to International Paper on reporting of
25   events, departing, and arrivals?

172

1    A. Yes. And this was used for their on-time
2    delivery performance.
3    Q. Okay.
4    MR. FISHER: Rich, I have a
5    suggestion. When Joan goes back to her
6    office, she's going to get, you know, the
7    missing back pages. And I'm going to suggest
8    that we substitute -- that we don't substitute
9    but we actually add an Exhibit 100A
10   eventually, that I can provide to the court
11   reporter, that has the backs of it, just so
12   it's a complete record.
13   MR. BURKE: Yeah. That --
14   that's generally fine, I guess. Without
15   knowing what's on there, I don't know if it
16   generates any other --
17   MR. FISHER: Right. I mean --
18   MR. BURKE: -- questions or anything.
19   MR. FISHER: -- to the extent that it
20   might generate some more questions, we can
21   certainly arrange that --
22   MR. BURKE: Yeah.
23   MR. FISHER: -- to have that done
24   but ...
25   MR. BURKE: Yeah, that sounds fine.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                            April 10, 2012

173

1      MR. FISHER: Okay. Great. All
2   right. Okay. So that's 100. Now a 101 and a
3   102.
4      (Deposition Exhibit Nos. 101 and 102
5   were marked for identification.)
6      (Discussion off the record.)
7   Q. (By Mr. Fisher) Okay. Earlier, you were
8   asked questions, Ms. Anderton, about some
9   electronic funds transfers and the way that
10  payments were made by International Paper.
11  A. Yes.
12  Q. All right. Tell us what Exhibit 101 is.
13  A. Okay. Well, after I called Clint and -- Clint
14  and Steve, I was calling them about on-time
15  delivery, I called Fadera, our analyst, and
16  said, "Did we pay for this shipment and was
17  there any exception on the payment side?"
18     So I asked her to pull history on
19  Hammond's payments. And all she -- her note
20  says, "Joan, here is the information you
21  requested. Let me know if you need anything
22  else."
23     And the second page, it's a subset of
24  a much larger document. She pulled the
25  history for a long period of time, and this

174

1   was the one shipment of notes. So ...
2   Q. Okay. And so is it fair to say that this
3   electronic funds or banking document, for want
4   of a better description, shows that with
5   respect to the shipment at issue that was
6   going to Cenveo, Midland, and Xpedx, on
7   July 3rd, '08, was being paid to OXEN, the
8   SCAC code for Overnite Express, but we know on
9   July 3rd it eventually made its way to
10  Universal Am-Can, and that the payment amounts
11  are reflected in the right column?
12  A. Okay. This is -- the other document is
13  actually the electronic funds. This is kind
14  of our internal spreadsheet that had
15  information from the system that said we would
16  have paid a total of $1,217.60 and that OXEN
17  was the SCAC code. But this wouldn't be the
18  actual financial document.
19  Q. All right. So 101 was not the actual
20  financial documents, but it's an internal
21  spreadsheet summary?
22  A. Yes. Spreadsheet of all my -- yeah, she
23  pulled all my shipments and I pulled out the
24  one that was -- all of our shipments from that
25  facility.

175

1   Q. All right. And then with respect to
2   Exhibit 102, would you take us through each of
3   the pages on Exhibit 102?
4   A. And this was pulled more recently. So those
5   two -- those two items happened in '09, 2009.
6   This I just had pulled recently to get further
7   detail on what Fadera had given me.
8   Q. Let's make sure the record's clear. What
9   you're saying is that the documents that are a
10  part of Exhibits 100, what will be marked
11  later as 100A, and 101, are documents that
12  were requested by you and created by you,
13  Fadera Carter, Clint Diekman, and Steve Shores
14  on July 21st, 2009, which was shortly after
15  you had received notice that you were on legal
16  hold because of an accident?
17  A. Yes.
18  Q. Okay. All right. Now, Exhibit 102, take us
19  through that.
20  A. And this was -- this was very recently I
21  just -- to clarify and make sure I understood
22  how the payment was made, because there was
23  some question about the Overnite versus
24  Universal Am-Can, who actually had been paid,
25  this first one says Document 1400348929 for

176

1   $1,217.60, with an invoice baseline date of
2   7/3/2008 it was for Memo Bill 128816-8658.
3   What this is saying is this particular
4   shipment was for $1,217.60.
5      The next document shows that it was
6   cleared on the electronic funds transfer,
7   which is what the EFT is, and that's the
8   electronic funds number listed there. It
9   shows that it was electronically funded to
10  Overnite Express.
11     Then that EFT number was actually for
12  a total of $17,203.75 and was paid on
13  August 20th, 2008. And that would have been
14  because our terms with them must have been a
15  net 45-day term. So it was not paid until
16  August 20th. And it shows that we paid them,
17  on that date, $17,203.
18     And then the next document shows what
19  each of those -- what comprised the 17,203.
20  So there was one -- this one shipment was one
21  of those shipments on -- out of -- that made
22  up the 17,000. So that's what that next
23  spreadsheet shows.
24  Q. And then the final two pages?
25  A. Then the final two pages are -- I did ask,


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                      April 10, 2012

177

1 after that fact, because it said Overnite, I
2 asked Ron Crib -- he goes by his middle
3 name -- I said, "Hey, Ron, could you just pull
4 for me the details on that EFT?"
5     And then he said, "This is the
6 details we have on that electronic funds" --
7 "EFT payment to Overnite Express."  And that's
8 the actual bank account number -- the very
9 last page shows the actual bank account number
10 that the funds would have been deposited into.
11 Q. Okay.  And now, since that document, the last
12 page of Exhibit 101 --
13 A. Uh-huh.
14 Q. -- that has up at the top "Change vendor
15 payment transactions," that appears to be and
16 tell me whether it is, is that a screen print?
17 A. Yeah, I believe this is a screen print.  It's
18 from SAP and it looks like a screen print to
19 me, yes.  I don't work in this part of that
20 software so ...
21 Q. Okay.  If you'll keep that handy.  If we would
22 look, then, at a part of Exhibit 2, which is
23 Bates numbered IP75 -- and Mr. Burke asked you
24 some questions about this before -- this shows
25 a vendor which is listed as Universal Am-Can,

178

1 Limited?
2 A. Correct.
3 Q. And so eventually, at a certain point, in the
4 SAP system that was being used by
5 International Paper, Universal Am-Can was
6 substituted for Overnite Express?
7 A. That is correct.  And you can see in the
8 middle there the Universal Am-Can, it has a
9 SCAC code of UACL.  Once the facility
10 started -- was directed or started using the
11 UACL on their bills of lading, this would have
12 all gone directly to Universal Am-Can.
13 Q. Okay.
14 A. It just -- there was a delay in that
15 happening.
16 Q. Got it.  Okay.  I'm done with those.  Did
17 International Paper ever dictate to Universal
18 Am-Can, Overnite Express, or any drivers that
19 came to the door at the Hammond distribution
20 center, to pick up a load with the magic, you
21 know, shipment number --
22 A. Uh-huh.
23 Q. -- thus entitling them to pick up the load,
24 any of the following.  All right?
25 A. Okay.

179

1 Q. How that driver was to use logbooks?
2 A. No.
3 Q. What clothing the driver should wear?
4 A. No.
5 Q. What equipment the driver should use?
6 A. No.
7 Q. How the driver was to operate his tractor once
8 he was on the roadway?
9 A. No.
10 Q. For example, how to execute a wide right turn
11 or a wide left turn when he got to an
12 intersection?
13 A. No.
14 Q. Did International Paper ever provide to that
15 driver any directions or instructions on where
16 and how to purchase gas?
17 A. No.
18 Q. Where to purchase any supplies or services
19 while he or she was driving his truck?
20 A. No.
21 Q. What route to use in moving the International
22 Paper paper products from Hammond up to -- or
23 toward Minneapolis?
24 A. No.
25 Q. Did International Paper ever train the driver

180

1 who arrived at the Hammond distribution
2 center?
3 A. No.
4 Q. Did International Paper ever require the
5 driver who left the Hammond distribution
6 center to report on a regular hourly or
7 half-day time period what was going on with
8 his -- what was going on with his driving up
9 to that point?
10 A. No.
11 Q. Other than -- strike that.
12     When the driver was on the property
13 of the Hammond distribution center, what were
14 the things that the people from Exel, or if
15 you were there, would tell a driver to do or
16 not to do, when he was literally right there,
17 before the load has left?
18 A. They would be required to follow any safety
19 procedures for the facility, just like anybody
20 else that was at the facility.
21 Q. And what -- give us some examples of the
22 safety procedures that would be -- that the
23 driver, if he didn't already know it, would be
24 advised of?
25 A. If they were dropping the trailer, they'd have



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                          April 10, 2012

181

1    to chock their wheels and put jack stands
2    underneath the trailer. If they were to come
3    in and wanted to observe the trailer being
4    loaded, they had to stand in certain
5    locations.
6    Q. Okay. Anything else you can think of?
7    A. No. If they needed to use the restroom, they
8    had to take a certain route to the restroom.
9    Q. All right.
10   A. We told them where the restrooms were.
11   Q. Why did International Paper want to ensure
12   that chocks were placed by the wheels?
13   A. So that for the safety of our employees when
14   they were -- for the safety of Exel's
15   employees when they were loading the trailer
16   up, that in case the trailer were to fall down
17   or roll away from the door, it would be a
18   safety hazard. So the chocks prevent the
19   trailer from moving.
20   Q. Were there any requirements that were made
21   that had anything to do with the loading of
22   the trailer with the pallets of International
23   Paper product?
24   A. Not given to the driver. Exel would have had
25   instruction on how to safely load a trailer

182

1    and -- and load -- load the material, but not
2    related to the driver.
3    Q. Did International Paper ever fine a driver?
4    A. No.
5    Q. Did International Paper ever hire, discipline,
6    counsel, fire, or qualify any of the drivers
7    that arrived at the Hammond distribution
8    center?
9    A. Not at this facility, no.
10   Q. Did International Paper ever reprimand any
11   driver for any, say, speeding ticket that a
12   driver had acquired that International Paper
13   would have had knowledge of?
14   A. No.
15   Q. Did International Paper ever require a driver
16   to have certain methods of payment, like a
17   debit card, or a particular method of giving
18   payments while he or she is out on the road
19   and stopping at a truck stop?
20   A. No.
21   Q. Did International Paper have anybody at its
22   facility, either its own employee or a person
23   employed by Exel, that dispatched the driver?
24   And by dispatched, I mean have communication
25   with the driver to say, "Hey, come on in for

183

1    the load," and that type of thing.
2    A. No, there was no dispatch to the driver.
3    Q. Did International Paper ever require a driver
4    that showed up at the Hammond distribution
5    center to place any placards, graphics,
6    stickers, or logos on any part of the tractor,
7    trailer, chassis, or container that was going
8    to be eventually loaded and leave the Hammond
9    site?
10   A. No placards or -- no, nothing.
11   Q. Did International Paper ever inspect the
12   tractor, trailer, chassis, or container, like
13   a driver would do in doing a pretrip
14   inspection?
15       MR. SCHRECK: Objection to form.
16   Q. (By Mr. Fisher) And if you don't know what a
17   pretrip inspection is, let me know.
18   A. I know what a pretrip inspection is.
19   Q. Okay.
20   A. We wouldn't -- they would not inspect it --
21   anything like a pretrip inspection. They
22   would have inspected the trailer to ensure
23   that there was not -- that the trailer was not
24   leaking and that the trailer was clean and
25   that it was in condition to protect our goods.

184

1    Q. And what was the reason for that? Why did
2    International Paper do that or have Exel
3    people do that?
4    A. We wanted to make sure that we weren't loading
5    a trailer -- a product in it that would get
6    water damage on it. Or if the trailer was not
7    in condition -- some carriers have come to the
8    facility and brought a trailer that was not
9    safe for our forklifts to -- to drive onto.
10   And so they could fall through the floor of
11   one that didn't have the proper weight
12   crossbeams and so forth.
13   Q. So those inspections being done were done
14   primarily for two reasons: One was to make
15   sure that the product that your customer had
16   purchased from you arrived in the condition
17   they expected; and number two, to ensure that
18   the people doing the loading could do that
19   safely while the trailer was chocked?
20   A. Yes.
21   Q. Other than making the payments for this
22   particular load and the other loads that were
23   being done, say in June or July of 2008, as
24   noted in the documents you've just described
25   to us, was there any other payment that

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joan Anderton                                                    April 10, 2012

185

1   International Paper made to anyone concerning
2   the July 3rd, 2008, load?
3   A.  No.  That was the only payment related to that
4   load.
5   Q.  And so there was no direct payment by
6   International Paper to Martin's Bulk Milk
7   Service specifically for any of the costs,
8   expenses, salary, reimbursements associated --
9   benefits, reimbursements associated with that
10  particular driver's work, on that day?
11  A.  Correct.  No payment was made directly to
12  Martin's Bulk Milk.
13  Q.  How would International Paper receive notice
14  that a customer wanted to buy some paper
15  product from International Paper?  How would
16  that typically happen?
17  A.  They would either call our customer service
18  rep or they could do like an EDI.  They could
19  electronically submit an order to
20  International Paper.  It was either calls -- I
21  suppose e-mail or fax, as well, could have
22  been used to our customer service reps who are
23  in Poland, primarily for these customers.  And
24  we would receive the order that way.
25  Q.  So the customer service reps that were in

186

1   Poland for International Paper, they would
2   receive, what, a phone call or an e-mail or
3   some other type of electronic transmission?
4   A.  Yes.
5   Q.  And then what would the people in Poland do
6   after they received that information?
7   A.  They would enter the order into the system.
8   And that order then, once they confirmed the
9   order, that order would be sent to the Hammond
10  RDC to fulfill it, to fulfill the order.
11  Q.  And that information being sent by
12  International Paper folks in Poland would then
13  come to the Exel people in Hammond?
14  A.  Yes.
15  Q.  And then the Exel people in Hammond would then
16  generate what we've already looked at in great
17  detail, the memo bills?
18  A.  Yes.
19  Q.  Is there any typical International Paper
20  customers -- strike that.
21       Was there any typical International
22  Paper customer back in, say, June or July of
23  2008, in terms of delivery expectations?  For
24  example, what I mean is would there always be
25  customers who were saying, "Hey, I want this

187

1   product tomorrow"?  Or would there be some
2   lead time?  Or how would it be that, you know,
3   things would line up nicely so that you've got
4   an even number of -- or steady number of
5   customers?
6   A.  The service platform was next-day delivery.
7   So if a customer called that day, the
8   expectation was that they would deliver that
9   next -- we would deliver that next-day.
10  Unless our pool truck -- because we had
11  committed capacity going to the Minneapolis
12  market, one truck or two trucks a day,
13  depending on the day of the week.
14       If we exceeded that capacity in
15  orders, we might see if we can get another
16  truck for the day, if we so desired, or we'd
17  ask our customer, "Is it okay if this part of
18  your order delivers" -- "it takes two days to
19  deliver?  We'll deliver this hot stuff
20  tomorrow, and everything else will come the
21  next day."  But we would always be committed
22  to -- if they placed an order, next-day
23  delivery was our commitment.
24  Q.  And was that the expectation of most of
25  International Paper's customers?

188

1   A.  Out of this RDC, that was the -- that RDC's
2   function.
3   Q.  As opposed to the ABC Printing Company is
4   always going to have a steady order on the
5   second Tuesday of the month?
6   A.  Correct.  Yeah.  No, this was -- sometimes
7   they would order Tuesdays.  Sometimes they
8   would order Thursdays.  It would be whenever.
9   But when they ordered, they wanted it the next
10  day.  And that's because their customers, a
11  lot of times they were doing printing runs
12  that they just needed the paper when they
13  needed the paper.
14  Q.  Did you ever talk with anybody associated
15  with -- to your knowledge, with Martin's Bulk
16  Milk Service?
17  A.  No.
18  Q.  Did you ever meet or talk with Samuel Franke?
19  A.  No.  Unless -- unless I was there -- I was not
20  there at night when he would have picked up.
21  So as far as I know, I've never met him.
22  Q.  You were asked several questions about what
23  you believe to be International Paper's
24  expectations of Universal Am-Can or Overnite
25  Express with regard to the contract that

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joan Anderton                                         April 10, 2012

189

1   International Paper had with those entities?
2   A. Uh-huh.
3   Q. I want to follow up on some of those
4     questions. As long as Universal Am-Can
5     delivered -- made sure the deliveries were
6     made and comported with the expectations and
7     the obligations in the contract, did
8     International Paper care who was the person
9     who did that work?
10   A. No. As long as they provided -- as long as
11     they fulfilled the contract, no, we did not.
12   Q. And so that could include, for example,
13     employees of Universal Am-Can?
14   A. Uh-huh.
15   Q. Yes?
16   A. Yes.
17   Q. That could include, as you've mentioned, maybe
18     an owner operator?
19   A. Yes.
20   Q. It could include an employee of a completely
21     different motor carrier?
22   A. That they chose to broker, yes, uh-huh.
23   Q. You were earlier shown a bunch of documents
24     out of the International Paper document
25     disclosure and out of the Universal Am-Can

190

1     document disclosure.
2   A. Yes.
3   Q. In your job back in 2008 -- 2008, would your
4     job have put you in contact with any of the
5     documents that, for example, Universal Am-Can
6     would have submitted when the changeover
7     occurred in mid June?
8   A. No. They probably would have gone to the
9     sourcing group. And I might have been on copy
10     or shared with some things. But primarily,
11     since these were contractual, they were making
12     changes with a contract, they would have gone
13     to Steve Mundy directly. Is that --
14   Q. Here's the reason I ask this question. You
15     saw, and Mr. Burke addressed your attention
16     to, some ICC authorities or permits.
17   A. Okay. Yes.
18   Q. All right. Did you ever come into knowledge
19     or come to know that either Overnite Express
20     or Universal Am-Can had different authorities
21     issued by the ICC for being either a contract
22     carrier, a common carrier, or a broker?
23   A. I would not have been privy or part of that
24     discussion -- that discussion.
25   Q. Or documents --

191

1   A. Or see the documents, no.
2   Q. Until you learned about this case and
3     participated in the collection of documents
4     and attesting to answers and verifying answers
5     to interrogatories --
6   A. Uh-huh.
7   Q. -- until that occurred, did you have any
8     knowledge at all that Mr. Franke, as he
9     testified in his depositions, would leave from
10     Wilson, Wisconsin, on a, you know, Monday
11     through Friday, would come down to yards,
12     perhaps drop off a container or a trailer,
13     come to the Hammond distribution center, pick
14     up a load, and then transport it only back so
15     far as Wilson, Wisconsin, near where Martin's
16     Bulk Milk and Mr. Franke's residence were?
17   A. No. Up until this last week, I didn't know
18     that they transferred the load between two
19     drivers. I always assumed it went straight to
20     Minneapolis.
21   Q. And I mean is that example of your not knowing
22     many of the details of Mr. Franke's particular
23     work day in and day out, and on July 3rd in
24     particular?
25   A. Yes, I did not know anything about his

192

1     particular workday.
2   Q. And is it fair to say that your first notice
3     of this accident happening was a year after
4     the accident happened when suddenly you got
5     notice from -- an internal legal hold at
6     International Paper?
7   A. Yes.
8   Q. Did you understand that that was because there
9     had been a lawsuit that was filed against
10     International Paper?
11   A. Yes.
12   Q. Up to that point, in your role as an
13     enterprise manager --
14   A. Enterprise distribution manager.
15   Q. -- distribution manager for the Hammond
16     distribution center, you had absolutely no
17     knowledge, at all, of any accident that
18     occurred on July 3rd, 2008?
19   A. No.
20   Q. So that's a correct statement?
21   A. That is a correct statement, yes.
22   Q. Okay. That's all I have. There might be some
23     more questions.
24
25



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                    April 10, 2012

193

1         REEXAMINATION
2    BY MR. BURKE:
3    Q.  Just a couple things.  Do you have Exhibit 2
4         in front of you there, the --
5              MR. FISHER:  I think it's in there.
6         Yep.
7    Q.  (By Mr. Burke)  Starting with page 36, the
8         contract, the 2007 contract.
9    A.  Uh-huh.
10   Q.  And we've talked a little bit about this
11        before.  But on page 38 starts Section 3 with
12        "Carrier's Obligations."  Do you see that?
13   A.  Yes.
14   Q.  Okay.  And then carrying over to page 39,
15        that's a continuation of that section.  Right?
16   A.  Yes.
17   Q.  Okay.  And there is a Section G for "Motor
18        Vehicle Equipment."  Correct?
19   A.  Yes.
20   Q.  Okay.  And as part of that section,
21        International Paper did require that its
22        carriers, as it says there, "maintain at its
23        own cost and expense the motor vehicle
24        equipment required to provide the
25        transportation services required hereunder,

194

1         including the commitments set forth in
2         Exhibit C in good, safe, and lawful operating
3         condition at all times and in accordance with
4         applicable local, state, and federal laws and
5         regulations."  Correct?
6    A.  Uh-huh, yes.
7    Q.  And there were, as you've told us before,
8         certain reporting requirements that carriers
9         had, such as when they arrived at a location
10        and made a delivery, they had to confirm that
11        it was made.  Correct?
12   A.  Yes.
13   Q.  And you actually -- or International Paper
14        retained with -- under the terms of their
15        contract, the right to terminate the agreement
16        if they were dissatisfied with the manner in
17        which deliveries were made to your customers.
18        Correct?
19   A.  Yes.
20   Q.  Okay.  And just one other thing.  Oh,
21        switching topics on you.  You said you looked
22        at this contract with Exel.  Where is that --
23        or where is that contract?
24   A.  We have -- we have a copy if you --
25             MR. FISHER:  I can -- I can submit

195

1         that, too.
2              MR. BURKE:  Okay.
3              MR. FISHER:  Do you want it -- do you
4         want it?  I've got it right here.  What's your
5         pleasure?
6              MR. BURKE:  Let me -- yeah, let me
7         glance at it, Carl, just to avoid
8         unnecessary ...
9              MR. SCHRECK:  Out of curiosity, Tim,
10        are you going to have any questions?
11             MR. COUTURE:  Probably not.
12             (Discussion off the record.)
13             (Deposition Exhibit No. 103 was
14        marked for identification.)
15             THE WITNESS:  Now, this is the copy
16        provided to me in my role.
17             MR. FISHER:  Right.  So I've got to
18        double-check that this is the actual contract
19        with, you know, the internal folks.
20   Q.  (By Mr. Burke)  The Exhibit No. 3 that has
21        been produced --
22             MR. FISHER:  103.
23   Q.  (By Mr. Burke)  Exhibit 103 --
24             MR. BURKE:  Thank you.
25   Q.  (By Mr. Burke)  Exhibit 103 that Mr. Fisher

196

1         produced just now, that you have made a
2         reference to, consists of what, Ms. Anderton?
3    A.  It's the -- it's -- Exel Logistics operates
4         our Hammond facility, and this was the
5         contract from 2005.  I believe it was a
6         five-year contract with Exel Logistics for the
7         operation of that regional distribution
8         center.
9    Q.  Okay.  And I don't think this -- these pages
10        aren't Bates Stamped.  But there's probably
11        maybe 75 pages, or so, here, which obviously I
12        can't read.  And I guess right at the
13        moment ...
14   A.  It's really -- a lot of it is around the
15        operation of the facility.
16   Q.  Okay.  It's fair to say the Exel -- I think as
17        you told us before, that all of your
18        agreements with International Paper's
19        customers were created by International Paper,
20        correct, in terms of --
21   A.  Yes.
22   Q.  -- you know, orders for sales, deliveries --
23   A.  Correct.  Yes, all the -- yes, all the
24        agreements were with the carriers.
25   Q.  And all of your agreements with carriers,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                      April 10, 2012

197

1   including Overnite Express and Universal, were
2   negotiated and created by International Paper
3   and not Exel?
4   A. That is correct. Yes.
5   Q. Okay. And -- okay. The -- on -- under the
6   terms of your contract with Overnite Express
7   and then with Universal, one of the terms in
8   Paragraph H is that the carrier's personnel
9   had to comply with local, state, and federal
10  laws and regulations in the operation of their
11  tractor-trailer trucks while delivering your
12  products. Correct?
13  A. Yes.
14  Q. And as you told us earlier, that includes
15  complying with motor vehicle traffic
16  regulations while operating the
17  tractor-trailer trucks. True?
18      MR. FISHER: Object --
19  A. Yes.
20      MR. FISHER: Excuse me. Asked and
21  answered. Form.
22      You gave your answer. Right?
23      THE WITNESS: Yeah.
24  Q. (By Mr. Burke) Okay. And your answer was
25  yes. Correct?

198

1   A. Yes.
2   Q. Different topic. Who's Monica Livingston?
3   She's supposedly an administrative assistant
4   in the motor carrier intermodal procurement
5   section.
6   A. Yes.
7   Q. Do you know her?
8   A. I did know Monica. I knew her in her role
9   after that role. She worked in -- because I
10  didn't know her when she was doing -- working
11  for the procurement group. She became a
12  customer service rep, and that's how I met
13  her. So she is in one of the e-mails
14  referenced, at the time where she was working
15  for Steve Mundy I guess, and related to
16  contracts.
17  Q. Okay. And, you know, my -- this --
18      MR. BURKE: Here, Carl, hang on to
19  that so I don't lose it.
20      MR. FISHER: Sure.
21  Q. (By Mr. Burke) Take a look at one of these
22  bills of lading. Look at 2 -- look at
23  Exhibit 2, page 2 for that matter.
24  A. (Witness complies.)
25  Q. Do you see on the bottom, in the small print,

199

1   see under the word "Original"?
2   A. Yes.
3   Q. Does the information or the writing there
4   start in the middle of a sentence? Or did
5   Carl just give me bad copies?
6   A. I do not know.
7   Q. Do you see what I mean?
8   A. I do not know.
9   Q. Am I correct --
10  A. I do not know.
11  Q. I mean in my version, the first line under
12  the --
13  A. It says "The property."
14  Q. -- word "original" starts with "The property"?
15  A. Yes, "The property described above."
16  Q. Okay. And I mean, you know, look at three and
17  four, pages 3 and 4. It appears to be the
18  same. Right?
19  A. It's the same, yes.
20  Q. Okay. And, you know, what I'm really getting
21  at, is there -- is that a bad copy or is -- do
22  you have any understanding of why that appears
23  to be the case, that that language is starting
24  in the middle --
25  A. I do not know.

200

1   Q. -- of a phrase?
2   A. I do not know.
3   Q. Okay.
4       MR. FISHER: Can I interject a
5   question on that topic?
6       MR. BURKE: Yeah.
7       MR. FISHER: Is it your belief that
8   International Paper generated this, or did
9   Exel generate this?
10      THE WITNESS: This is -- this printed
11  out from the Red Prairie system, which was
12  Exel's warehouse management system.
13      MR. FISHER: Okay.
14      THE WITNESS: So, yes, Exel produced
15  that.
16      MR. FISHER: So is it fair to say
17  that you don't know, as you sit here today,
18  whether or not the language on this memo bill
19  is exactly in conformity with the language on
20  a standard International Paper bill of lading?
21      THE WITNESS: Yes. I don't know
22  that.
23      MR. FISHER: Okay.
24      THE WITNESS: I don't know that.
25  Q. (By Mr. Burke) Well, did -- did International



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

201

1    Paper, I mean, authorize Exel to utilize this
2    form of a memo bill?
3    A.  Exel chose to use their warehouse management
4    system to produce a memo bill.  So the major
5    contents of the information is what we would
6    provide them, and they would print this memo
7    bill up.  I -- I do not know the root of the
8    standard text that's on the bottom here.
9    Q.  Okay.  But when you say that Exel chose to use
10   a particular form of a memo bill, is it
11   correct that Exel did so with International
12   Paper's knowledge and approval and consent?
13   A.  With -- yeah, with our knowledge, they used
14   their system to produce it.
15   Q.  And you were in agreement with them doing so?
16   A.  I just don't -- I don't know the root of where
17   that text come from.
18   Q.  Okay.  But whatever form they used and
19   whatever language they used was agreeable to
20   International Paper?
21   A.  This is what they used for us, yes.
22   Q.  Okay.  Nothing else.  Thank you, Ms. Anderton.
23        MR. SCHRECK:  I don't have anything
24   else.
25        MR. FISHER:  Tim?

202

1         EXAMINATION
2    BY MR. COUTURE:
3    Q.  Yeah, I just have like three questions for
4    you, ma'am.  My name is Tim Couture.  I
5    represent BMW.
6    A.  Hi, Tim.
7    Q.  How are you?  Are you aware that BMW has been
8    sued in this lawsuit, as well?
9    A.  Yes.
10   Q.  Okay.  I take it that you have no opinions
11   regarding the product liability side of this
12   lawsuit?
13   A.  I have no opinions.
14   Q.  You don't know anything about the allegations
15   that Mr. Burke's client has levied against
16   BMW, that the vehicle was improperly designed
17   or manufactured.  Correct?
18   A.  Correct.  I have no knowledge of this.
19   Q.  Okay.  That's all I've got for you.  Thanks.
20   A.  Thank you.
21        MR. FISHER:  We'll show signature
22   reserved.
23        (The deposition concluded at
24   2:28 p.m.)
25

203

1         DEPOSITION ERRATA SHEET
2
3    Assignment No. 328300
4    Case Caption:  Scheinman
5    vs. Martin's Bulk Milk Svc., et al.
6
7         DECLARATION UNDER PENALTY OF PERJURY
8    I declare under penalty of perjury that I have
9    read the entire transcript of my deposition taken
10   in the captioned matter or the same has been read
11   to me, and the same is true and accurate, save and
12   except for changes and/or corrections, if any, as
13   indicated by me on the DEPOSITION ERRATA SHEET
14   hereof, with the understanding
15   that I offer these changes as if still under oath.
16   Signed on the _____ day of _____, 20_____.
17
18   _____
19        Joan Anderton
20
21
22
23
24
25

204

1         DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25        Joan Anderton



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Joan Anderton                                                    April 10, 2012

                                                                              205
1       DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
         Joan Anderton
25

                                                                              206
1         C E R T I F I C A T E
2
3         I, Stacey L. Sommers, a Certified Court
4    Reporter of the State of Missouri, do hereby
5    certify:
6         That prior to being examined, the witness
7    was first duly sworn;
8         That said deposition was taken down by me
9    in shorthand at the time and place hereinbefore
10   stated and was thereafter reduced to typewriting
11   under my direction;
12        That the foregoing transcript is a true
13   record of the testimony given by said witness;
14        That I am not a relative or employee or
15   attorney or counsel of any of the parties or a
16   relative or employee of such attorney or counsel
17   or financially interested in the action.
18        Witness my hand and seal this 24th day of
19   April, 2012.
20
21
22
23        Stacey L. Sommers
24        Missouri Supreme Court
25        Certified Court Reporter



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

                    Suite 1200
311 West Monroe Street
        Chicago, IL 60606
www.esquiresolutions.com