Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 1 of 19 PageID #:5243

ROBERT ELSHOLTZ
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012
1–4

Page 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS
2       EASTERN DIVISION
3  ------------------------
4        CASE NO: 09 cv 5340
   MURRAY SCHEINMAN,
5  Plenary Guardian of the
   Estate and Person of
6  JEFFREY J. SCHEINMAN,
   a Disabled Person,
7
        Plaintiffs,
8
        vs
9
   MARTIN'S BULK MILK SERVICE, INC.;
10 SAMUEL G. FRANKE;
   CSX INTERMODAL, INC.;
11 INTERNATIONAL PAPER COMPANY and
   OVERNITE EXPRESS, INC.;
12
        Defendants.
13 ------------------------
14
15
16
17     The Deposition of ROBERT WESTON ELSHOLTZ
18  taken pursuant to Notice of Taking
19  Deposition, taken before Vicki A. Lesewski, a
20  Notary Public in and for the County of
21  Ramsey, State of Minnesota, taken on July 17,
22  2012, at 333 South Seventh Street, Suite
23  2000, Minneapolis, Minnesota, commencing at
24  approximately 10:00 a.m.
25

Page 2

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFFS:
       Richard Burke, Jr.
4      Clifford Law Offices
       120 North LaSalle Street
5      31st Floor
       Chicago, Illinois 60602
6
7  ON BEHALF OF INTERNATIONAL PAPER COMPANY
   AND UNIVERSAL AM-CAN, LTD, S/B/A AND
8  SUCCESSOR TO OVERNITE EXPRESS, INC.:
       Carlton Fisher
9      Hinshaw and Culbertson
       222 North LaSalle Street
10     Suite 300
       Chicago, Illinois 60601
11
12
13 ON BEHALF OF BMW OF NORTH AMERICA, LLC
   AND BAYERISCHE MOTOREN WERKE
14 AKTIENGESELLSCHAFT:
       Bryan Langs
15     Johnson & Bell
       33 West Monroe Street
16     Suite 2700
       Chicago, Illinois 60603
17
18 ON BEHALF OF MARTIN'S BULK MILK SERVICE,
   INC. AND SAMUEL G. FRANKE VIA TELEPHONE:
19     Matthew Schreck
       Mulherin, Rehfeldi & Varchetto
20     211 South Wheaton Avenue
       Suite 200
21     Wheaton, Illinois 60187
22     Robert Golden
23     Dowd & Dowd
       617 West Fulton
24     Chicago, Illinois 60661
25

Page 3

1                    ***
2
3                  INDEX
4
5
6   DEPOSITION OF ROBERT WESTON ELSHOLTZ
7
8
9   Examination       Page
10  Mr. Burke           4
    Mr. Langs          66
11  Mr. Fisher         68
    Mr. Shreck         71
12
13
14  Exhibits:
15  107               54
16
17
...
25

Page 4

1            PROCEEDINGS
2       ROBERT WESTON ELSHOLTZ,
3   called as a witness, being first duly sworn,
4       was examined and testified as follows:
5                    * * *
6            EXAMINATION
7                    * * *
8   BY MR. BURKE:
9   Mr. Elsholtz, my name, again, is Rich Burke
10  and I represent Mr. Scheinman. I'm going to
11  ask you some questions about Overnite Express
12  and some other related topics.
13       And as I do so, if you want to look
14  at any documents or materials, just say so.
15  I'm not trying to have you do things solely
16  by memory.
17       And if you and I do not talk at the
18  same time, that will help the court reporter.
19  So if you will try and let me get my question
20  out, I will let you finish your answer before
21  I give you a new one.
22       If you could verbalize your yes and
23  nos for the court reporter, even though we
24  can see you nodding with your head, she has
25  to take down an answer, okay?




Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 2 of 19 PageID #:5244

ROBERT ELSHOLTZ  April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE  5–8

Page 5

1  A. Yep.
2  Q. Would you please state your full name and
3     spell your middle name and last name, please?
4  A. Robert Weston, W-e-s-t-o-n, Elsholtz,
5     E-l-s-h-o-l-t-z.
6  Q. Generally, where do you live, sir?
7  A. 55 Peninsula Road, Dellwood, Minnesota. Zip
8     55110.
9  Q. Dellwood, you said?
10 A. Dellwood, yes. Suburb.
11 Q. What is your son's name, who I believe is
12    also a Robert? What's his middle name?
13 A. He is Robert Willis. He is not a junior.
14 Q. Is that W-i-l-l-i-s?
15 A. Correct.
16 Q. Are you employed today, Mr. Elsholtz?
17 A. No.
18 Q. Are you working?
19 A. I am retired. Every day is Saturday.
20 Q. When did you last work or when were you last
21    employed regularly?
22 A. Well, up until we sold.
23 Q. When you sold?
24 A. On Friday the 13th, 2008. It was just a few
25    months after that.

Page 6

1  Q. June 13th?
2  A. Finished out the year or something.
3  Q. When you say you sold, what business are you
4     referring to? What company?
5  A. Overnite Express.
6  Q. Were you one of the owners of Overnite
7     Express?
8  A. Yes.
9  Q. Were you the majority owner?
10 A. Yes.
11 Q. How many other owners were there?
12 A. One.
13 Q. Who was that?
14 A. My brother.
15 Q. What was his name?
16 A. Willis E. Elsholtz. My father is dead so he
17    is no longer a junior.
18 Q. In general terms, what agreement did you
19    reach with Universal Am-Can? And what I'm
20    really getting at, did you sell them your
21    business or did they -- was there an
22    assumption or merger or what's your
23    understanding?
24 A. They bought most of the assets, including the
25    operating authorities. They just left the

Page 7

1     shell.
2  Q. When you say "left the shell," what was left
3     then?
4  A. Debt.
5  Q. What happened to that debt? What happened to
6     it? Who had responsibility for paying that
7     debt?
8  A. The corporation.
9  Q. Overnite Express?
10 A. Yeah.
11 Q. The assets that were sold to Universal
12    consisted of what, generally?
13 A. Trailers, primarily. Book of business.
14    Operating authorities. That's about it.
15 Q. Did you sell them any land or buildings?
16 A. No. We had leased facilities. They assumed
17    the leases in Kansas City and Chicago. They
18    were just very small operations there.
19    Couple people.
20 Q. Where were your headquarters for Overnite
21    Express?
22 A. 656 Pelham Boulevard.
23 Q. What type of property did you have located
24    there?
25 A. It was a terminal. LTL terminal. A shop.

Page 8

1     Offices. Parking space.
2  Q. Did Overnite Express own that property? Or
3     was that all leased, as well?
4  A. Leased, yes.
5  Q. The operating authorities that you refer to,
6     could you describe what those were?
7  A. General commodities. All points and places.
8     Between all points and places in the United
9     States. Contract authority. Same thing.
10    U.S. And permit authorities. U.S.
11    Deregulation, there isn't any value for the
12    authorities other than the fact that you got
13    to have them.
14 Q. And then about approximately how many
15    trailers did you sell, do you remember?
16 A. I don't have the exact count, but probably
17    450. Just a rough guess.
18 Q. Which corporate entity owned the trailers?
19    Was it Overnite Express or another one?
20 A. No, it was another entity.
21 Q. Which was that, sir?
22 A. O.X.LLC.
23 Q. Does O.X. stand for anything? Or is that the
24    full name of the corporation?
25 A. That's the full name of the corporation.



Page 9

1  Q. Did Overnite Express or -- did you call it OX
2     or O.X.? How did you refer to it?
3  A. Overnight.
4  Q. With respect to O.X.LLC --
5  A. We called it O.X.LLC.
6  Q. Did either O.X.LLC or Overnite Express own
7     any tractors --
8  A. Yes.
9  Q. -- at the time of the sale?
10 A. Yes, yes.
11 Q. About how many?
12 A. Well, unfortunately, it was about a hundred.
13 Q. What makes you say "unfortunately"?
14 A. Well, because we lost money on every one of
15    them. We had to sell them.
16 Q. Why, because they were just old?
17 A. No, unfortunately, they were newer. They had
18    no depreciation hardly on them.
19 Q. Which entity owned the tractors?
20 A. O.X.LLC.
21 Q. What was the business of O.X.LLC?
22 A. Leasing equipment.
23 Q. To whom or what type of entities was that
24    equipment leased by O.X.LLC?
25 A. Overnite Express.

Page 10

1  Q. Did O.X lease to any other entity other than
2     Overnite Express?
3  A. I have to think. I don't think so, no.
4  Q. Do you know approximately when O.X.LLC was
5     formed?
6  A. Golly. 20 years ago. That's just rough. I
7     don't know. Around the late '80s, early
8     '90s. Right in there.
9  Q. Did O.X.LLC have any contracts to provide
10    transportation services --
11 A. No.
12 Q. -- for any shippers?
13 A. No.
14 Q. Did O.X.LLC have any contract with
15    International Paper at the time of the sale
16    of your company?
17 A. No, no.
18 Q. Was O.X.LLC still in existence on June 13,
19    2008?
20 A. Yes.
21 Q. Was it purchased by Universal?
22 A. No.
23 Q. Did you sell O.X.LLC to anyone else?
24 A. No.
25 Q. What became of O.X.LLC?

Page 11

1  A. It became -- we filed for termination. It
2     doesn't exist as a corporation now through
3     the State of Minnesota.
4  Q. Do you know approximately when you filed for
5     that termination in terms of perhaps time
6     after June 13th?
7  A. A year or two ago.
8  Q. So year or two prior to today's date, which
9     is July 17, 2012. Sometime in either 2010 or
10    2011?
11 A. Yeah.
12 Q. The accident and injuries sustained by Mr.
13    Scheinman occurred on July 3, 2008, that's
14    the subject of this case. It sounds like
15    O.X.LLC was still in existence on July 3,
16    2008, is that right?
17 A. Yes, sure it was.
18 Q. What was the nature of its business at that
19    time?
20 A. Selling up equipment that Am-Can didn't buy.
21 Q. Who was handling the sale of that equipment?
22 A. I primarily was.
23 Q. Are you familiar with a company Martin's Bulk
24    Milk Service?
25 A. I am familiar with the name. I don't know

Page 12

1     the any of the owners or anything.
2  Q. Did you sell any of the O.X. tractors or
3     trailers to Martin's Bulk Milk Service?
4  A. No, it was totally arms' length.
5  Q. All I mean is, is that an entity to whom you
6     happened to sell any of the tractors or
7     trailers?
8  A. Zero. I wouldn't know them if they walked
9     through the door.
10 Q. I take it you did not sell any of the O.X.
11    tractors or trailers to Martin's?
12 A. No.
13       MR. FISHER: That's a correct
14    statement?
15       THE WITNESS: Correct.
16    BY MR. BURKE:
17 Q. So if I am understanding you correctly,
18    Universal did not acquire or purchase
19    O.X.LLC?
20 A. Correct.
21 Q. Did Universal purchase some of the tractors
22    or trailers that O.X.LLC owned at the time of
23    the sale in June of 2008?
24 A. No tractors, but trailers.
25 Q. So it purchased some trailers and then left



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 4 of 19 PageID #:5246

ROBERT ELSHOLTZ                                         April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE                      13–16

Page 13

1  additional trailers that were still owned by
2  O.X. that you then gradually sold off?
3  A. Some older ones, yeah.
4  Q. How about Overnite Logistics, Mr. Elsholtz?
5     Is that a business or a company or a name you
6     are familiar with?
7  A. Yeah, it's a part of Overnite Express. I
8     should say it was.
9  Q. Was it a separate corporation? Or a
10    partnership?
11 A. No, no.
12 Q. When you say it was part of Overnite Express,
13    can you tell me what Overnite Logistics was?
14 A. Overnite Logistics, they arranged for
15    movement of freight in LTL, truckload. Any
16    type of thing. Rail. Barge. But primarily,
17    truckload traffic. They brokered it.
18 Q. Was Overnite Logistics a separate division of
19    Overnite Express?
20 A. No, no legal accounting division or anything
21    like that. It was part of Overnite Express
22    but -- it was that room and this is this room
23    (indicating).
24 Q. Okay. Did it have its own president or --
25 A. No, no, no.

Page 14

1  Q. Was there a particular person who was in
2     charge of or the head of Overnite Logistics?
3  A. It was just part of the company. That's all.
4     It was a much smaller part of the company.
5  Q. Where was it -- was it at the Pelham Street
6     address?
7  A. Yeah, yes.
8  Q. Did Overnite Logistics own any equipment?
9  A. No. Just two people.
10 Q. Who were those two people?
11 A. Matthew Elsholtz and we had a couple
12    different people. They would come in and go
13    out. But basically about two people.
14 Q. Do you know Melody Hanson (ph)? Or do you
15    know that name?
16 A. Melody is out of South Holland.
17 Q. Correct. By whom was she employed up until
18    June 13th?
19 A. Management Assistance Corporation.
20 Q. What was the business of Management
21    Assistance Corporation?
22 A. To provide employees and management people
23    for Overnite Express.
24 Q. Who was the owner of Management Assistance
25    Corp?

Page 15

1  A. I was. And my brother.
2  Q. Your brother, Willis?
3  A. Yes.
4  Q. Who was the president of Management
5     Assistance?
6  A. I believe I was.
7  Q. Where was its headquarters?
8  A. Pelham Boulevard.
9  Q. About how many employees did Management
10    Assistance Corporation have?
11 A. At that time, probably 40-plus.
12 Q. You are talking June 2008, when you say that?
13 A. Yeah.
14 Q. What were the categories of employees?
15 A. Well, all the different categories that go
16    into operating a corporation. You know, you
17    got your accounts receivable, your accounts
18    payable. Dispatch. They were in charge of
19    managing it.
20 Q. So if I am understanding you correctly, those
21    employees including Melody Hanson (ph) were
22    not employees of Overnite Express?
23 A. Correct. They managed but it wasn't -- they
24    weren't employees of Overnite.
25 Q. From whom did they receive a paycheck?

Page 16

1  A. Management Assistance Corporation.
2  Q. Did Management Assistance Corporation enter
3     into any contracts with any companies or
4     shippers for the transportation of goods?
5  A. No.
6  Q. Did Management Assistance Corporation enter
7     into any brokerage contracts with any
8     carriers?
9  A. No, no. They had no authority.
10 Q. Did Overnite -- by the way, they did not have
11    any operating authorities?
12 A. No.
13 Q. Did O.X.LLC have any motor carrier operating
14    authority?
15 A. No.
16 Q. Did Overnite Logistics have any motor carrier
17    operating authority?
18 A. No. I mean, Overnite held all the
19    authorities.
20 Q. Overnite Express?
21 A. Yeah.
22 Q. Okay. Did Overnite Logistics enter into any
23    contracts with shippers or brokers?
24 A. No. It would be Overnite Express. They just
25    managed it.



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 5 of 19 PageID #:5247

ROBERT ELSHOLTZ April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE 17–20

### Page 17

1 Q. How about OXEN? Are you familiar with that
2 term, O-X-E-N?
3 A. Yes. That's the SCAC code for Overnite
4 Express.
5 Q. Was there any corporation that operated under
6 the name or acronym of OXEN?
7 A. OXEN --
8 Q. I know --
9 A. -- OXEN is a SCAC code that's assigned to
10 Overnite Express by the federal government.
11 It's just a code.
12 Q. It's the SCAC code for your corporation,
13 Overnite Express?
14 A. Right.
15 Q. Okay. But am I correct there was no separate
16 corporation or business being operated under
17 the name or title OXEN?
18 A. No. Huh-uh. It's just designated alpha code
19 for the Corporation.
20 Q. Melody Hanson (ph), for example, after the
21 sale on June 13th of Overnite Express to
22 Universal, by whom was Melody Hanson (ph)
23 employed?
24 A. That would be Universal Am-Can.
25 Q. I digressed a little bit, Mr. Elsholtz, but

### Page 18

1 back to your company, Overnite Express. In
2 June of 2008, right before its sale, what was
3 your position with the company?
4 A. President.
5 Q. Did your brother have a title?
6 A. Vice President.
7 Q. What was the business of Overnite Express?
8 A. Hauling freight from point A to point B.
9 Q. Motor carrier transportation services?
10 A. Yeah. That's all we did, yeah.
11 Q. For about how long was Overnite Express in
12 existence?
13 A. It was -- my father purchased it in 1947.
14 And it was incorporated in 1949.
15 Q. When did you first start working for Overnite
16 Express?
17 A. Overnite Express never had any employees,
18 even from 1949 on, it didn't have any
19 employees and whatnot.
20 At that time, it was a company
21 called Twin City Freight that I worked for.
22 That was an LTL company.
23 MR. SCHRECK: Mr. Elsholtz, could
24 you keep your voice up a little bit? It
25 fades.

### Page 19

1 A. I forgot about the people in the clouds.
2 BY MR. BURKE:
3 Q. No problem. It's a little harder for them to
4 hear. I'm sorry, you worked for Twin -- what
5 was the name of it?
6 A. Twin City Freight.
7 Q. What was the relationship between Twin City
8 Freight and Overnite Express?
9 A. The key one was my father owned both of them
10 at the time.
11 Q. In June of 2008, by whom were you employed?
12 A. By Management Assistance.
13 Q. So even as of June of 2008, Overnite Express
14 did not have any employees?
15 A. No.
16 Q. Generally, what's your educational
17 background?
18 A. I graduated from University of Minnesota.
19 Q. In what year?
20 A. 1960.
21 Q. What degree did you receive?
22 A. Economics.
23 Q. Any other degrees after that?
24 A. No.
25 Q. Have you ever had CDL, commercial driver's

### Page 20

1 license?
2 A. I did.
3 Q. When was that? During what time period?
4 A. During college. I drove for Twin City
5 Freight and loaded trucks out -- child labor
6 laws -- for the family. And then, I had it
7 up until the Department of Transportation
8 changed some laws where you had to redo it
9 and whatnot. I just let it go.
10 Q. That would have been about what year?
11 A. Oh, my. I have no idea. I think it was in
12 the '70s or '80s. To me, it was not a
13 significant situation.
14 Q. Did you ever drive tractor trailer trucks?
15 A. Yes.
16 Q. Did you do so locally?
17 A. Primarily locally, yeah.
18 Q. Did you do any interstate trips?
19 A. I don't think I ever got into that. I think
20 it was all intra. That would be for Twin
21 City Freight.
22 Q. What documents or materials have you reviewed
23 in anticipation of giving a deposition today?
24 A. I think I looked at one International Paper
25 contract. I can't think of anything else.



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 6 of 19 PageID #:5248

ROBERT ELSHOLTZ  
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012  
21–24

Page 21

1 THE WITNESS: Do you know of
2 anything else?
3 MR. FISHER: I think we went over
4 the asset purchase agreement.
5 BY MR. BURKE:
6 Q. And was the contract with International
7 Paper, was that the October 2007 contract?
8 A. It would have to be. I mean, they changed
9 their contracts every so often. It didn't
10 matter to us what was in it. We were more
11 interested in the rate changes.
12 The contract was basically
13 International Paper's boilerplate contract.
14 Q. You did have lawyers review those contracts,
15 such as contracts with International Paper,
16 correct?
17 A. No.
18 Q. Did you review them as president before you
19 signed them?
20 A. Generally, I would read them. Didn't read
21 them all. We had hundreds of contracts.
22 Q. The contract with International Paper, the
23 one that you reviewed, that was signed by
24 yourself?
25 A. Yes.

Page 22

1 Q. Let me tender to you what we previously
2 marked as Exhibit No. 2. I think you will
3 find, if you look at pages 36 through 75, a
4 copy of a 2007 contract between International
5 Paper and Overnite Express.
6 Take a look at that for a moment,
7 Mr. Elsholtz.
8 A. Take a look at what, this (indicating)?
9 Q. Glance --
10 A. It's 24 pages.
11 Q. Right. I will direct you through a few
12 spots. For example, page 1 of those 24 pages
13 is entitled: OXEN Overnite Express 2007
14 outbound contract, is that correct?
15 A. Correct.
16 Q. Let me direct your attention to -- why don't
17 you look at, when I say "Bates stamp page,"
18 do you see the dark black numbers that say
19 "IP" and then a number in the lower, right
20 corner?
21 A. Yes.
22 Q. Why don't you look at Bates stamp 48.
23 A. Uh-huh.
24 Q. That's a signature page for the substance of
25 the contract, is that correct?

Page 23

1 A. Yes.
2 Q. Was that contract accepted and agreed to and
3 signed by you on October 30, 2007?
4 A. Yes.
5 Q. That's your signature there, is that correct?
6 A. Yes.
7 Q. As president?
8 A. Yes.
9 Q. And then, Kevin Hayes (ph) also signed in his
10 job. Appears to be general manager of
11 Overnite Express, is that correct?
12 A. Yes.
13 Q. And Sandra Herman (ph), she was an
14 administrative assistant?
15 A. She was my secretary.
16 Q. And then, the contract was signed on behalf
17 of International Paper by Mr. William
18 Crawford on November 12, 2007, correct?
19 A. That's what it says. His initial is on
20 there. I never met the man.
21 Q. The contract on page -- if I could ask you to
22 flip back to the beginning, Bates stamp page
23 38. Do you see the first paragraph that says
24 "header"?
25 A. Uh-huh.

Page 24

1 Q. Am I correct that it states there this
2 agreement is entered into and is effective
3 this first day of October 2007, by and
4 between International Paper as shipper and
5 Overnite Express, Robert W. Elsholtz as
6 carrier?
7 A. Yes.
8 Q. Is this the contract that you reviewed with
9 Mr. Fisher?
10 A. Yes.
11 Q. This is a true and accurate copy of the
12 contract Overnite Express entered into with
13 International Paper on October 1st of 2007,
14 is that correct?
15 A. Yes.
16 Q. Was this contract entered into in the normal
17 course of business at Overnite Express?
18 A. Yes.
19 Q. Was it the normal business practice of
20 Overnite Express to enter into this type of
21 contract with shippers?
22 A. Yes.
23 Q. Was the information represented in here true
24 and correct at the time the contract was
25 entered into?



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 7 of 19 PageID #:5249

ROBERT ELSHOLTZ  
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012  
25–28

Page 25

1  A.  As far as I know. These are pretty much
2      boilerplate.
3  Q.  Overnite Express agreed to all of the terms
4      and provisions of this contract, correct?
5  A.  They had no choice. You signed it or you
6      didn't haul it.
7  Q.  In order to be able to haul for International
8      Paper, Overnite Express agreed to all of the
9      provisions and terms, is that correct?
10 A.  Yes.
11 Q.  You and Mr. Hayes and Ms. Herman signed on
12     behalf of Overnite Express to undertake those
13     responsibilities for International Paper,
14     correct?
15 A.  Yes.
16 Q.  I'm going to direct your attention to a few
17     portions of the contract here, Mr. Elsholtz.
18     Maybe just below where we were, the second
19     paragraph of page 38.
20         It is correct that where it refers
21     to carrier here, that's referring to Overnite
22     Express, is that right?
23 A.  Yes. Could be anybody, but.
24 Q.  In this particular contract, it was referring
25     to Overnite Express, correct?

Page 26

1  A.  Yes.
2  Q.  That is specified in the very first
3      paragraph, right?
4  A.  Yep.
5  Q.  It is true that Overnite Express was engaged
6      in the business of transporting property by
7      motor vehicle as a contract carrier, correct?
8  A.  Yes.
9  Q.  In paragraph three, it was also true that the
10     shipper, International Paper, desired
11     Overnite Express to provide certain
12     transportation-related services for them as
13     set forth in this contract, correct?
14 A.  Yes.
15 Q.  Then just down a little bit, middle of the
16     page -- section two, I should say -- carrier
17     status.
18         International Paper -- I'm sorry.
19     Overnite Express, as represented there, was
20     in fact an interstate motor contract carrier
21     of property that was duly registered and
22     permitted with the Federal Highway
23     Administration, correct?
24 A.  Inter and intra.
25 Q.  Both interstate and intrastate?

Page 27

1  A.  Uh-huh.
2  Q.  In section three, this contract sets forth
3      various obligations that Overnite Express
4      undertook as the carrier, is that correct?
5  A.  Yes.
6  Q.  In section 3A, Overnite Express was agreeing
7      to provide certain transportation services as
8      set forth in Exhibit C, which was the motor
9      carrier rate and weekly commitment schedule,
10     is that correct?
11 A.  Correct.
12 Q.  And then, pages 38 and 39 onto the next page
13     set forth different obligations in this
14     section 3A through 3K, am I correct?
15 A.  Yes, I assume so.
16         MR. FISHER: If I might, let me
17     just interject an objection that I told you I
18     would make at some point during the
19     deposition.
20         With all due respect to Mr.
21     Elsholtz, since the contract from which he is
22     reading at the time of the accident on
23     July 3, 2008, was not being performed by the
24     entity, Overnite Express, I think that Mr.
25     Elsholtz's testimony or opinions, other than

Page 28

1  simply affirming that what particular words
2  exist, would be irrelevant and immaterial
3  since Overnite Express didn't exist as of
4  July 3rd.
5         So, I just, to the extent that any
6  of those questions are being used or would
7  later be used to indicate the opinions of
8  this witness as to what they mean, I
9  respectfully object.
10        But I'm not going to continually
11 object on that basis.
12        MR. BURKE: Okay. I respectfully
13 disagree with your thinking and objection
14 because there has been ample testimony in
15 this case from other witnesses that the
16 provisions and obligations of this contract
17 were adopted and assumed and taken over by
18 Universal Am-Can and that Universal Am-Can
19 committed to International Paper that they
20 would perform the same services as set forth
21 in this contract and comply with the terms of
22 this contract just as Overnite Express had
23 obligated itself to do so when it entered
24 into the contract with International Paper.
25        MR. FISHER: That was a nice



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 8 of 19 PageID #:5250

ROBERT ELSHOLTZ                                                April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE                       29-32

Page 29

1 gentlemanly lawyer exchange of disagreement.
2     BY MR. BURKE:
3  Q. Back to the contract --
4         THE WITNESS: But you are correct.
5         MR. FISHER: I doubt he will ask
6     you that question.
7     BY MR. BURKE:
8  Q. Only -- I think only a few sections here on
9     page 39 I want to bring your attention to,
10    Mr. Elsholtz.
11        As you can see, on page 39, that's
12    a carryover of the list of carrier's
13    obligations. Do you see where it picks up
14    with letter E?
15 A. Yes.
16 Q. At the top?
17 A. Yes.
18 Q. Under this contract, Overnite Express agreed
19    certain minimum service level requirements
20    and agreed to certain on time delivery
21    requirements, correct?
22 A. Yes.
23 Q. In paragraph G, take a look at that.
24    Overnite Express had to maintain its own
25    motor vehicle equipment in good, safe and

Page 30

1     lawful operating condition at all times and
2     in accordance with all applicable local,
3     state and federal laws and regulations,
4     correct?
5  A. That's what it says.
6  Q. Under section H, Overnite Express was
7     required to have personnel that were fully
8     qualified and maintain licenses and permits
9     as required by local, state and federal law
10    and regulations that were required to
11    maintain and operate the motor vehicle
12    equipment, correct?
13 A. Correct.
14 Q. The last line of paragraph eight required
15    Overnite Express personnel to comply with all
16    applicable local, state and federal laws and
17    regulations, correct?
18 A. Right.
19 Q. Overnite Express, in carrying out this
20    contract, was required to operate their
21    tractor trailer trucks in accord with the
22    traffic laws and motor vehicle regulations
23    applicable to truck traffic, correct?
24 A. Right.
25 Q. Overnite Express had the responsibility to

Page 31

1     operate their tractor trailer trucks in a
2     safe manner so as to avoid collisions with
3     other vehicles on the road, correct?
4  A. Yes. Yep. That would be brokeraged also.
5  Q. So, if Overnite Express brokered a load to
6     another carrier, Overnite Express had the
7     expectation that the carrier would also
8     comply with local, state and federal truck
9     operation laws and provisions, correct?
10 A. We had copies of their insurance on file.
11    The legal requirements of the other carriers'
12    insurance and whatnot. We had all that on
13    file before we used anybody.
14 Q. Those carriers that Overnite Express brokered
15    a load to were also required to drive their
16    trucks in a safe manner and to avoid
17    collisions with other vehicles?
18 A. All companies were required to do that.
19 Q. Including the companies to whom you brokered
20    loads, correct?
21 A. I mean, they had to have the authority and
22    the insurance and everything else. In order
23    to do that, they had to comply with the
24    federal laws.
25 Q. Under this contract that Overnite Express had

Page 32

1     with International Paper, did you believe
2     that Overnite Express could broker a load to
3     some other driver or carrier in order to
4     fulfill your transportation services?
5  A. Absolutely. We inherited Martin Transport
6     from International Paper. They were hauling
7     the freight before for another company, such
8     as ours. Martin was brokering from another
9     company and doing very good service for many
10    years.
11        They were a very smooth operation
12    and International Paper asked if we would
13    continue on with them. We said okay.
14 Q. International Paper asked if you would
15    continue on with whom?
16 A. With Martin. If we didn't, you know, they
17    would say okay, fine. But they suggested
18    that they were a good carrier and we wanted
19    to contact them, go ahead.
20 Q. So you believed you were permitted to broker
21    a load to Martin's, for example, as part of
22    your responsibility under this contract with
23    International Paper, is that right?
24 A. Oh, sure. I mean, we had operating authority
25    for brokerage.



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 9 of 19 PageID #:5251

ROBERT ELSHOLTZ  April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE  33–36

Page 33

1 Q. And in those instances where you utilized
2    Martin's or some other carrier, the ultimate
3    responsibility for complying with the
4    contract belonged to Overnite Express, is
5    that correct?
6       MR. FISHER: Objection to form.
7    Incomplete hypothetical. You can go ahead
8    and answer.
9 A. Say that again.
10      BY MR. BURKE:
11 Q. You had a contract with International Paper
12   that we are looking at.
13 A. Right.
14 Q. So even if you brokered a load to some other
15   carrier, like Martin's, it was Overnite
16   Express that had ultimate responsibility to
17   comply with the terms of this contract,
18   correct?
19      MR. FISHER: Same objection.
20 A. The carrier we broker to had to comply with
21   those things. We had to have all the same
22   things in file, what not.
23      BY MR. BURKE:
24 Q. So the broker, such as Martin's, had to
25   comply with --

Page 34

1 A. Overnite was the broker.
2 Q. Right. Excuse me, the carrier to --
3 A. Martin was the carrier.
4 Q. The carrier to whom a load was brokered had
5    to comply, in your mind, with these same
6    provisions of the contract?
7 A. Well, they are federal law, yeah.
8 Q. My question is, even though you expected
9    Martin's or some other carrier to comply with
10   the provisions of this contract, Overnite
11   Express also still had a contractual
12   obligation with International Paper to comply
13   with the terms of this contract, correct?
14 A. It's all arranged to haul the freight, yes.
15 Q. And to perform all the provisions of this
16   contract, correct?
17 A. Some of them don't apply.
18 Q. When you say some don't apply, do you mean in
19   certain instances?
20 A. I guess I would have to read over this whole
21   contract to see what the points are. But in
22   general, yes. But, I mean, there are some
23   things that don't even apply to us.
24 Q. But all of these provisions set forth in this
25   contract were terms that Overnite Express

Page 35

1    agreed to with International Paper when you
2    signed the contract, correct?
3 A. Sure.
4 Q. Back to that page 39, Mr. Elsholtz. Under
5    trailer requirements. For example, Overnite
6    Express had to provide certain trailers as
7    specified here that were safe and suitable
8    and clean and in good condition for
9    transportation of International Paper's
10   goods, is that correct?
11 A. Well --
12 Q. Paragraph J, I mean. That's where I am at.
13 A. It was a broker that was hauling it, not
14   Overnite Express. But the carrier that we
15   would broker to, we would have to have their
16   compliance and insurance and whatnot to
17   follow all the rules and regulations.
18      Everywhere -- hundreds of thousands
19   of carriers in the U.S. They all have to
20   have it.
21 Q. What I'm talking about though is in paragraph
22   J. You undertook and committed to
23   International Paper to provide and transport
24   their goods in safe and suitable trailers
25   that would protect their equipment or their

Page 36

1    products, correct?
2 A. We brokered to -- I mean, we hauled freight
3    in our own trailers, we brokered other loads.
4    This particular carrier came highly
5    recommended by International Paper. We
6    brokered to them.
7       We assumed that they were following
8    all the rules and regulations. But we had
9    their insurance on file and we had the safety
10   stuff. That was all on file.
11 Q. Take a look, how about page 42, Mr. Elsholtz,
12   under commitments. Do you see that section
13   seven? Are you there?
14 A. Yeah.
15 Q. What does that term "commitments" mean in
16   your business?
17 A. Basically, to provide this equipment whether
18   it's our own equipment, broker's equipment.
19   To provide the equipment. Rental equipment,
20   whether it be a rental trailer, an extra
21   trailer, what not. But had to be safe.
22 Q. And Overnite Express undertook to either
23   through their own equipment or some carrier
24   to whom you brokered sufficient tractors and
25   trailers to be able to transport a certain



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 10 of 19 PageID #:5252

ROBERT ELSHOLTZ                                                         April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE                                      37–40

Page 37

1   number of loads for International Paper, is
2   that fair to say?
3   A. By law, any carrier we broker to had to be
4     safe. Had to have proper insurance. We had
5     the insurance on file. There's not much else
6     you can do.
7   Q. By the way, while you are on that topic in
8     section 13 on page 44, there are set forth
9     various insurance requirements that Overnite
10    Express had to comply with, is that correct?
11  A. Correct.
12  Q. Onto page 45, sir, there is a reference to
13    commercial general liability insurance. You
14    had to have $1,000,000 in coverage, correct?
15  A. Correct.
16  Q. Up until the time you sold the company in
17    June of 2008, did Overnite Express have
18    liability coverage?
19  A. Overnite Express had liability coverage?
20    Martin Transport had liability coverage.
21    Martin Transport, with their -- their
22    insurance was responsible for any problems.
23    That's the law.
24  Q. What amount of coverage did Overnite Express
25    have in June of 2008 for liability?

Page 38

1   A. Overnite Express had a million dollars.
2     Martin, I believe, had a million dollars.
3     It's Martin's insurance company that's
4     liable.
5   Q. Did Overnite Express have any additional
6     coverage beyond the one million that
7     sometimes is referred to as excess coverage
8     or umbrella coverage?
9   A. No, no.
10  Q. Do you know if Martin's -- I know you said
11    Martin's had a million dollar's coverage,
12    correct? Or that was your understanding or
13    at least the requirement --
14  A. My understanding.
15  Q. By the way, who did Overnite Express -- what
16    insurance company did they have their
17    coverage with in June of 2008?
18  A. Traffic Insurance.
19  Q. Traffic insurance?
20  A. Yeah.
21  Q. Did Martin's have any coverage beyond the
22    $1 million when you were last dealing with
23    them in June of 2008?
24  A. There would be no way of me knowing because
25    they had proper insurance as far as the law

Page 39

1   goes, so that was fine. What they had above
2   and beyond, we would have no idea and weren't
3   required to.
4   Q. If I could direct your attention back to page
5     42 for a minute. Go backwards for a second,
6     sir.
7           Do you see paragraph eight or
8     section eight entitled "default by carrier"?
9     Down about very last paragraph.
10  A. Which page?
11  Q. The bold print, Bates stamped IP 42. Are you
12    on 42?
13  A. I am on 43. That makes a difference.
14  Q. Very last paragraph, entitled "section
15    eight." Default by carrier. Do you see
16    that?
17  A. Yep.
18  Q. Starting there and then going onto the next
19    page, which is 43. There is various
20    paragraphs labeled A through H which set
21    forth various reasons that International
22    Paper could terminate this agreement if
23    Overnite Express didn't comply with various
24    requirements, is that correct?
25  A. Well, I have to go through and read these

Page 40

1   now.
2   Q. Sure. Do what you need to. I don't want you
3     guessing.
4   A. Let me read it.
5   Q. All I am generally talking about is the
6     subject matter of what I said, does this set
7     forth reasons that the shipper could
8     terminate the contract?
9           Take a moment. I understand that
10    there has to be certain notice provisions as
11    stated in the first paragraph.
12  A. Let me read it.
13  Q. Go ahead.
14  A. Yes.
15  Q. My question basically was that section eight
16    sets forth various reasons that the contract
17    could be terminated by International Paper if
18    Overnite Express failed to comply with
19    certain provisions of the contract, correct?
20  A. Right.
21  Q. In section A, for example, one of those was
22    failure to comply with facility safety rules
23    and operating procedures, correct?
24  A. That's correct.
25  Q. Down in G, the contract could be terminated



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 11 of 19 PageID #:5253

ROBERT ELSHOLTZ  April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE  41–44

Page 41

1 if Overnite Express failed to comply with
2 federal, state or municipal laws and
3 regulations, correct?
4 A. Yes.
5 Q. I am moving onto section nine. There were
6 various communications --
7 A. All of these rules are applicable to any
8 carrier we brokered to, also.
9 Q. Okay.
10 A. Because we had brokerage permit under the
11 contract.
12 Q. Understood.
13 A. Okay.
14 Q. When you say that, what you mean is that
15 anyone that Overnite Express brokered to,
16 such as Martin's, had to comply with these
17 various provisions in the contract, as well,
18 correct?
19 A. Correct.
20 Q. I think if you take a look at page 46, sir,
21 section 17. That appears to be your
22 signature.
23 A. Yes.
24 Q. You were signing there indicating you were
25 the person to whom notices should be sent

Page 42

1 pertaining to this contract, is that correct?
2 A. Correct.
3 Q. Then in section 20 entitled "independent
4 contractor," do you see that? Bottom of page
5 46?
6 A. Yep.
7 Q. Carrying onto page 47. Am I correct it says
8 the carrier shall direct all persons
9 performing services under this agreement and
10 such persons are subject to the exclusive
11 control and direction of the carrier, is that
12 correct?
13 A. That's correct.
14 Q. On page 48, that's the signature page we
15 already went through, am I correct?
16 A. Uh-huh.
17 Q. And then, this contract had various
18 attachments to it, or exhibits, is that
19 right?
20 A. Yes.
21 Q. Was this contract in force and effect up to
22 and including June 13, 2008, when Universal
23 Am-Can purchased Overnite Express?
24 A. It was until we signed.
25 Q. I don't think I asked you, but as of June 13,

Page 43

1 2008, did Overnite Express cease to exist?
2 A. The corporation didn't cease, no. They
3 didn't buy the corporation, they bought the
4 assets.
5 Q. Did Overnite Express continue to operate
6 after June 13, 2008?
7 A. No. We didn't have any authority. We sold
8 it. We were out totally. The insurance, the
9 authority, everything. They bought that in
10 the terms of the contract.
11 Q. Did the corporation, Overnite Express, still
12 exist after June 13th?
13 A. The shell did, yes.
14 Q. Does it still exist?
15 A. Overnite Express?
16 Q. Yes.
17 A. It does, under the terms of the agreement.
18 It's not the name anymore, because that was
19 also sold. But they didn't buy everything.
20 So what they didn't buy, the
21 corporation still owned and as a consequence
22 has sold off, trailers and whatnot, to pay
23 for the tractors.
24 And then finally there wasn't
25 enough money and the tractors that were left,

Page 44

1 we just turned it back to Freightliner and
2 said, "Sorry, we're done."
3 Q. Turned it back to Freightliner, did you say?
4 A. Yeah.
5 Q. That was the manufacturer?
6 A. Yeah.
7 Q. Did Overnite Express continue to exist under
8 that name as a corporation after June 13,
9 2008?
10 MR. FISHER: Up to today?
11 BY MR. BURKE:
12 Q. No, for any amount of time?
13 A. We operated in the terms of the buy/sell
14 agreement, that we were allowed to use the
15 name up to one year because that would help
16 in the accounts receivable with the
17 customers. They would know.
18 If we changed the name, they would
19 say, "We don't know who this is. They didn't
20 haul for us. Overnite Express hauled for
21 us."
22 We were allowed to use the name for
23 one year. We were given one year to change
24 the name.
25 Q. Was the name ultimately changed at some



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 12 of 19 PageID #:5254

ROBERT ELSHOLTZ  April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE  45–48

Page 45

1 point?
2 A. Yes.
3 Q. To what name?
4 A. I believe that one was Grebe.
5 Q. How do you spell that?
6 A. G-r-e-b-e. It was one of the few names not
7   taken by the state.
8 Q. Does Grebe still exist?
9 A. It does.
10 Q. What's the business of Grebe today?
11 A. Nothing.
12 Q. Did Grebe come into existence approximately a
13   year after June 13th of 2008?
14 A. Yeah, we had to. We had to change the name.
15   They didn't buy the corporation. They bought
16   the assets. The customer base. All that.
17 Q. Did you tell me they bought the name or did
18   not buy the name?
19 A. They bought the name.
20 Q. That's what I thought.
21 A. But we were allowed to use it for one year
22   for collections and what not. Part of the
23   contract.
24 Q. For those collections, who was receiving
25   those revenue? Who did that belong to after

Page 46

1   June 13th, '08?
2 A. Am-Can. Who did the receivables belong to?
3 Q. Correct.
4 A. The receivables belonged to Overnite Express
5   up to the thirteenth. Any load that was
6   delivered prior to the thirteenth, actually
7   12:01, 14. Thirteenth we had it. That was
8   our revenue. We were responsible to pay for
9   carriers and contractors and vendors and
10   whatnot up to that point.
11       Also responsible to collect their
12   own money. So we were allowed to use the
13   name, Overnite Express, for one year for the
14   purposes of the business handled prior to
15   that.
16 Q. For collecting receivables for work performed
17   prior to June 13th?
18 A. Correct.
19 Q. Got it. And then after June 13th, 2008, did
20   Overnite Express engage in transportation
21   services?
22 A. Zero.
23 Q. Am I correct that Overnite Express then did
24   not have an operating authority?
25 A. Correct. They bought the operating

Page 47

1   authority.
2 Q. Universal bought it?
3 A. Yes.
4 Q. The corporation, Grebe, that you mentioned,
5   did it engage in any business at any time
6   between 2008 and the present time?
7 A. You mean the hauling of any freight?
8 Q. We can start with that.
9 A. No.
10 Q. Did not haul freight?
11 A. No.
12 Q. Grebe did not have an operating authority?
13 A. No.
14 Q. Does Grebe have an operating authority today?
15 A. No.
16 Q. Did Grebe engage in any other business?
17 A. They sold off what assets they had that
18   Universal didn't buy.
19 Q. What would those assets have been?
20 A. Some older trailers. There is a few older
21   trailers that they didn't buy. What else?
22   Not a heck of a lot.
23       Tractors. They didn't own those
24   tractors either but they didn't -- basically
25   accounts receivable is all they did. And

Page 48

1   they paid off vendors as best they could.
2 Q. When you say they sold off trailers and some
3   tractors --
4 A. They didn't really sell -- Grebe didn't but
5   O.X.LLC did.
6 Q. And that's what I was getting at. I thought
7   you told me --
8 A. Grebe didn't do anything. Didn't do
9   anything.
10 Q. Because O.X. actually owned those tractors
11   and trailers --
12 A. O.X.LLC did.
13 Q. -- if I heard you correctly earlier?
14 A. Yes.
15 Q. There is a few other pages that have your
16   signature. Could you look at -- that was
17   your signature on page 48 at the end of the
18   agreement.
19       And then if you flip to page 52.
20   Probably look at page 51 first for Exhibit B.
21   That's a fuel index schedule, is that
22   correct?
23 A. Correct.
24 Q. On page 52, you were signing that to indicate
25   agreement with the schedule set forth in



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 13 of 19 PageID #:5255

ROBERT ELSHOLTZ  
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012  
49–52

Page 49

1  Exhibit B, is that correct?
2  A. Correct.
3  Q. That's your signature on page 16 of 24 of the
4     contract?
5  A. Page 16?
6  Q. Of 24.
7  A. Yes. 16 of 24, yes. Correct.
8  Q. How about if you flip to Bates stamp page 64,
9     which is also page 23 of 24 on the contract.
10 A. Page 60?
11 Q. 64. The bold print IP64?
12 A. Okay.
13 Q. That's your signature there, as well, is that
14    correct?
15 A. Yes.
16 Q. You were signing to indicate acceptance of
17    Exhibit H, which was electronic compliance
18    requirements, correct?
19 A. Yes.
20 Q. In general, what did that refer to, Mr.
21    Elsholtz?
22 A. I have to go back through and read it.
23 Q. Take your time. I think it starts on page
24    63.
25 A. Yeah, that's electronic tendering of traffic.

Page 50

1     We agreed to accept the loads electronically.
2  Q. This contract that you had with International
3     Paper, was it purchased by Universal as part
4     of the sale on June 13, 2008?
5  A. All of our customer base was. For contracts,
6     whatever they continued with, it was their
7     responsibility to continue the contracts. I
8     am assuming that they did.
9  Q. Were you involved in any discussions with
10    International Paper and/or Universal
11    concerning Universal's representation to
12    International Paper that they would comply
13    with the terms of this contract?
14 A. I'm not sure. I know Universal had thousands
15    of contracts, too. They may have had one
16    with International Paper I was not aware of,
17    whether they did or didn't.
18       Really didn't care. They got the
19    contract. What they wanted to do with it,
20    that's up to them. We were out of it.
21       MR. FISHER: Could you repeat the
22    question for me?
23       (The requested portion was read back
24    by the Court Reporter).
25

Page 51

1  BY MR. BURKE:
2  Q. Mr. Elsholtz, I'm going to show you what is
3     marked as Exhibit 1, Bates stamp page UACL67.
4     I don't think you have that in front of you
5     but I'll give you a copy.
6  A. Are we done with this now (indicating)?
7  Q. I think so. At the moment. You can flip it
8     over, yes.
9        MR. FISHER: I can pop up a copy of
10    this.
11 BY MR. BURKE:
12 Q. This page 67 of Exhibit 1 I am tendering to
13    you is a letter on Mark Linback's (ph)
14    letterhead at UACL and signed by Gina Hubbs
15    (ph).
16       Do you know either of those people?
17 A. I know Mark Linback (ph).
18 Q. Do you know him other than through your sale
19    of your company to him?
20 A. No.
21 Q. Just take a look at that letter. Was that a
22    letter you had any involvement in approving
23    or drafting? Or was it shown to you?
24 A. I have never seen this before.
25 Q. Okay.

Page 52

1  A. But it's fine. I mean, you know.
2  Q. That all sounds accurate?
3  A. Yeah.
4  Q. As to what was taking place upon the sale of
5     business?
6  A. Yeah. Everything had to be prepared ahead of
7     time so it wasn't a Chinese fire drill. And
8     I don't mean to be biassed there.
9  Q. No problem. Did you go to work for Universal
10    Am-Can at any time?
11 A. No, never.
12 Q. Did your son do so?
13 A. Yes.
14 Q. I should say your son, Robert?
15 A. Yes.
16 Q. Who did he go to work for?
17 A. Universal Am-Can.
18 Q. Does he still work for them?
19 A. Yes.
20 Q. I know I have heard it, but where is he
21    located and what's his position, as best you
22    understand it?
23 A. Where is he located? The address?
24 Q. Where is he working at, yes?
25 A. I don't know if it's Woodbury or what it is.



Page 53

1   I don't know the address. One of the metro
2   suburbs.
3   Q. Still for Universal Am-Can?
4   A. Yes.
5   Q. What's his job or position or title?
6   A. I'm not sure what his title is. Titles can
7      be anything, you know?
8   Q. I know. Did any other members of your family
9      go to work for Universal Am-Can?
10  A. Matthew.
11  Q. Does he still work for them?
12  A. Yes.
13  Q. What's his position or type of work does he
14     do?
15  A. Same thing. Arranging for loads and what
16     not. Really didn't change.
17  Q. At the time of the sale, did Universal Am-Can
18     purchase any rights to insurance liability
19     coverage that Overnite Express had?
20  A. No. They didn't have anything to do with our
21     insurance.
22  Q. And did International Paper have liability
23     insurance coverage for any injuries that
24     might occur during the performance of
25     transportation services under the contract of

Page 54

1   October 2007?
2   A. I don't --
3        MR. FISHER: Foundation.
4   A. -- be aware of anything of International
5      Paper's.
6   BY MR. BURKE:
7   Q. Do you have the asset purchase agreement in
8      front of you, sir?
9        (Discussion held off the record.)
10       MR. BURKE: We're going to take a
11     five minute break.
12       (A short break was taken.)
13       (Deposition Exhibit No. 107 was
14       marked for identification.)
15  BY MR. BURKE:
16  Q. Mr. Elsholtz, I have tendered to you what we
17     have marked as Exhibit 107, which is Bates
18     stamped in the lower, right-hand corner pages
19     UACL/OEI109 through 155. This is entitled
20     an asset purchase agreement on the first
21     page, which is page 109. Am I correct?
22  A. Yes.
23  Q. Have you seen this document recently?
24  A. I guess we looked at it.
25  Q. That's all -- that's all I am getting at.

Page 55

1      You reviewed it --
2   A. My memory is good but it's short.
3   Q. Is this a true and accurate copy of the asset
4      purchase agreement for the --
5   A. I believe it to be.
6   Q. And it's the asset purchase agreement for
7      the, in general terms, the sale of Overnite
8      Express, Inc., to Universal Am-Can Limited,
9      is that correct?
10  A. Correct.
11  Q. Am I correct that on page 109, paragraph one,
12     more specifically sets forth an explanation
13     of the transaction that is taking place, is
14     that correct?
15  A. Yes.
16  Q. If I could direct your attention just to that
17     front page, that first paragraph on the front
18     page just to see if there is any further
19     clarification needed beyond what you have
20     already explained.
21       Let me direct you down to about --
22     if you start reading, it describes the
23     purchasers and then what I want to direct you
24     to is where it starts describing the sellers,
25     starting with Overnite Express.

Page 56

1   A. Okay.
2   Q. Tell me when you are there. Should be in
3      line five. It describes the sellers as
4      Overnite Express, Inc. And then also
5      O.X.LLC, correct?
6   A. Correct.
7   Q. You have already explained the involvement of
8      O.X.LLC in the transaction with United (sic),
9      correct, when we first started talking?
10  A. Yes.
11       MR. FISHER: You mean Universal?
12     You said United.
13       MR. BURKE: Universal, thank you.
14  BY MR. BURKE:
15  Q. The other sellers, in addition to Overnite
16     Express and O.X. start with name and some
17     persons and some trusts. The first name is
18     W. E. Elsholtz, Junior, a/k/a Willis Elsholtz
19     individually and as trustee of the W. E.
20     Elsholtz, Junior, revokable trust.
21  A. Yes.
22  Q. Is that your brother?
23  A. Yes.
24  Q. And then, where it goes onto say Robert W.
25     Elsholtz, a/k/a Robert Weston Elsholtz



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 15 of 19 PageID #:5257

ROBERT ELSHOLTZ  April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE  57–60

Page 57

1     individually and as trustee of the Robert
2     Weston Elsholtz revocable trust agreement, is
3     that you?
4 A. Yes.
5 Q. Then it goes onto say Robert Willis Elsholtz.
6     Is that a different person?
7 A. Yeah. His son.
8 Q. Pardon?
9 A. His son.
10 Q. Whose son?
11 A. My son.
12 Q. And then Matthew Weston Elsholtz is also your
13     son, correct?
14 A. Yes.
15 Q. It goes onto say toward the bottom who are
16     the shareholders of Overnite. And my
17     question to you is which of those entities
18     were the shareholders of Overnite Express?
19 A. They all were.
20 Q. Including your sons and the trusts?
21 A. Yeah, they had a small -- very small portion,
22     yeah.
23 Q. And then it goes onto say two of them are
24     members of O.X.L. Which two are referred to
25     there, which --

Page 58

1 A. Myself and Willis E.
2 Q. Is Willis E. your brother?
3 A. Yes.
4 Q. Then I direct your attention a little further
5     down, paragraph one of page 109 where it sets
6     forth sale and purchase of assets.
7     Do you see that?
8 A. Yes.
9 Q. That goes on to identify the assets that are
10     being purchased, is that correct?
11 A. Yes.
12 Q. As you told us earlier, in paragraph 1B, all
13     operating authority and certificates both
14     interstate and intrastate were purchased by
15     Universal, correct?
16 A. Correct.
17 Q. Down on paragraph D, does that indicate all
18     lists of customers, as well as all customer
19     contracts and agreements were purchased by
20     Universal?
21 A. Yes.
22 Q. That would include the October 7, 2008,
23     contract between International Paper and
24     Overnite Express that we have been going
25     through earlier, is that correct?

Page 59

1 A. Correct. That's up to International to
2     agree.
3 Q. Was it your understanding they ultimately did
4     agree, or do you know?
5 A. Well, I am assuming they did. They wouldn't
6     have been hauling the freight if they hadn't.
7 Q. You mean Universal wouldn't be hauling the
8     freight --
9 A. Martin Transport wouldn't have been hauling
10     the freight.
11 Q. Okay. In paragraph -- on page 110, the large
12     paragraph that begins about midway down the
13     page. Do you see that, sir?
14 A. Yep, Exhibit A?
15 Q. Yes. Thereafter, that's starting with
16     hereinafter --
17 A. Yep.
18 Q. That discusses some of what you were
19     explaining earlier about the sale of
20     O.X.L.-owned tractors, is that correct?
21 A. Yes.
22 Q. Okay. Let me direct your attention to page
23     114. Very bottom. Section four. Starts
24     with sublease arrangement. Do you see that?
25 A. Yep.

Page 60

1 Q. It says that as to lease trailers, the leases
2     involved will not be assigned or assumed and
3     that rather O.X.L. and Overnite on the one
4     hand and UACL on the other hand shall enter
5     into equipment sublease agreements.
6     What was that dealing with?
7 A. Overnite Express leased about 200 trailers
8     from Extra. A trailer leasing company. In
9     fact, it's owned by Warren Buffet. His
10     company.
11     It's just a commercial leasing,
12     trailer leasing company. Nationwide.
13 Q. That Overnite Express had been leasing
14     trailers from?
15 A. Yes.
16 Q. Am I understanding correctly, Universal was
17     not assuming those leases?
18 A. Correct.
19 Q. If I ask you to take a look at page 133, this
20     is -- which is page 25 of the asset purchase
21     agreement?
22 A. Uh-huh.
23 Q. That's a signature page, correct?
24 A. Yes.
25 Q. On the right side, it's got the column for



ROBERT ELSHOLTZ  
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012  
61-64

### Page 61

1. sellers and is it signed by you in your
2. capacity as president?
3. A. Yes.
4. Q. Of Overnite Express, Inc?
5. A. Yep.
6. Q. You also signed on behalf of O.X.LLC,
7. correct? In the second signature block?
8. A. On page 134?
9. Q. No. 133. Right under your --
10. A. Yeah, that's my signature.
11. Q. You were signing on behalf of O.X.LLC, as
12. well, right?
13. A. Yeah.
14. Q. And you indicated your title at O.X.LLC was
15. governor?
16. A. Right.
17. Q. What position or responsibility did you have
18. as governor of O.X.LLC?
19. A. Bought the equipment.
20. Q. And then there is also a signature line for
21. owners and you signed, again, correctly,
22. individually and on behalf of your trust?
23. A. Yeah.
24. Q. And then it looks like, is that your
25. brother's signature below you, your brother,

### Page 62

1. Willis?
2. A. Where are you on that page?
3. Q. In the owners' section, the fourth signature
4. block down.
5. A. That would be my brother's.
6. Q. The next signature block where it says Robert
7. W. Elsholtz, is that your son's signature?
8. A. The third one down?
9. Q. Fifth one down. Robert W. Elsholtz, a/k/a
10. Robert Weston --
11. A. That's me.
12. Q. Yes, I'm sorry. Lastly, your son, Matthew,
13. then he signed, as well, correct?
14. A. Correct.
15. Q. Then actually, the third signature line down
16. under "owners," do you see where that is?
17. A. That's me.
18. Q. I think the third one is Robert Willis
19. Elsholtz, am I correct?
20. A. You mean from the very top?
21. Q. Yeah.
22. A. I thought you meant owners.
23. Q. No.
24. A. Number one on owners, number three on top of
25. the page.

### Page 63

1. Q. Robert Willis is your son, correct?
2. A. Correct.
3. Q. I just went back to that because I may have
4. misspoken myself earlier.
5.    Then take a look at page 134. What
6. is your understanding of the purpose of that
7. page and the signatures there? It's entitled
8. joinder by affiliates.
9. A. That's just some legal mumbo jumbo. Sorry
10. about that, but that's what I refer to it as.
11. Q. That affiliate being referred to, one of them
12. is Management Assistance Corporation of St.
13. Paul, correct?
14. A. I suppose, yeah. I'm not sure really what
15. that was all about.
16. Q. Well, the company Management Assistance
17. Corporation of St. Paul is typed out there
18. though, correct? On the far right?
19. A. Yeah. Right.
20. Q. Somebody signed as VP. And is that yourself
21. or is it possibly your brother's signature?
22. A. It's my brother.
23. Q. There is a second affiliate referred to as
24. Pelham Properties, LLC. What was the
25. business of Pelham Properties?

### Page 64

1. A. They owned real estate.
2. Q. What real estate did they own related to the
3. business of Overnite Express?
4. A. 656 Pelham Boulevard.
5. Q. Headquarters?
6. A. Right.
7. Q. I thought earlier you had said that property
8. was leased?
9. A. It was.
10. Q. Oh, it was leased from Pelham Properties?
11. A. Right.
12. Q. I got you. Who owned Pelham Properties?
13. A. I did. And my brother did.
14. Q. What was your position or title with Pelham
15. Properties?
16. A. It was LLC, so I had to be a governor.
17. Q. Looks like, did your brother sign on behalf
18. of Pelham Properties?
19. A. Yes.
20. Q. Your brother, Willis?
21. A. Yes.
22. Q. The South Holland, Illinois, office of
23. Overnite Express where Melody Hanson (ph)
24. worked, did Pelham Properties own that
25. location?



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 17 of 19 PageID #:5259

ROBERT ELSHOLTZ  April 17, 2012
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE  65–68

Page 65

1 A. No.
2 Q. From whom did Overnite Express rent or lease
3    that business location?
4 A. Whoever owned the property down there. I
5    don't know what that name was.
6 Q. That was not leased from a company that you
7    had an ownership interest in?
8 A. Not at all. None of the others. All the
9    other terminals were owned by other people.
10    I do not know who they are.
11       MR. BURKE: Okay. I don't think I
12    have anything else right at the moment, sir.
13    Thank you for your time.
14       THE WITNESS: Okay.
15       MR. FISHER: Anybody on the line
16    have any questions?
17       MR. SCHRECK: Can we take a few
18    minutes break?
19       MR. BURKE: Sure.
20    (A short break was taken.)
21       MR. SCHRECK: I'm back. Is
22    everybody else back? Ready to go?
23       THE WITNESS: Nobody left.
24       MR. SCHRECK: I think Carlton may
25    find this very strange, but I don't think I'm

Page 66

1    going to ask any questions.
2       MR. FISHER: No, I don't consider
3    it strange.
4       MR. GOLDEN: No more than usual.
5       MR. BURKE: We won't call you
6    strange.
7       MR. FISHER: Brian, any questions?
8       MR. LANGS: I just have a couple
9    questions probably.
10       MR. FISHER: You are a little
11    muffled.
12       * * *
13       EXAMINATION
14       * * *
15 BY MR. LANGS:
16 Q. Mr. Elsholtz, can you hear me?
17 A. Yes.
18 Q. I just have a couple questions of you. My
19    name is Bryan Langs. I represent BMW. Are
20    you aware of the product liability --
21 A. Start again. We can't understand it.
22 Q. Mr. Elsholtz, are you aware of the product
23    liability --
24 A. I believe he said are you aware of the
25    liability case that is pending against

Page 67

1    Universal Am-Can. I believe that's --
2       MR. FISHER: Actually, I think he
3    -- why don't you just pose it again very
4    slowly?
5 BY MR. LANGS:
6 Q. Are you aware of the product liability counts
7    the plaintiff in the case has alleged against
8    BMW?
9 A. I heard that they were reaching out there. I
10    have no idea what your liability is. As a
11    broker --
12 Q. Is it fair to say that you do not have any
13    opinions in regards to any allegation related
14    to the effect or design of BMW product?
15 A. No. I have none.
16 Q. I'm sorry I couldn't hear you.
17       MR. FISHER: He said, "I have
18    none."
19 A. We don't have anything to do with this either
20    because according to the broker --
21       MR. LANGS: Perfect. That's all
22    the questions I have.
23 A. -- case of the brokers law. We don't have
24    anything to do with it either.
25       MR. FISHER: Bob, you have no

Page 68

1    questions?
2       MR. GOLDEN: No, sir.
3       MR. FISHER: Okay, I just have a
4    couple.
5       * * *
6       EXAMINATION
7       * * *
8 BY MR. FISHER:
9 Q. Mr. Elsholtz, with respect to Exhibit 107,
10    this is the asset purchase agreement that was
11    entered into by you and others on behalf of
12    the sellers with Universal Am-Can for the
13    assets that are listed in the agreement?
14 A. Yes.
15 Q. Is it fair to say, to summarize your
16    testimony in response to questions raised by
17    Mr. Burke, that as of July 3, 2008, the
18    corporation known as Overnite Express had
19    nothing to do with any International Paper
20    freight that was being moved from point A to
21    point B by a Martin's Bulk Milk driver?
22       MR. BURKE: Objection just to the
23    form of that question in the summary fashion,
24    but go ahead and answer, Mr. Elsholtz.
25       MR. SCHRECK: I will join, as well.



Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 18 of 19 PageID #:5260

ROBERT ELSHOLTZ
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012
69–72

Page 69

1 A. No, we had sold the assets. They were
2 operating them. We had no responsibility at
3 all. As a matter of fact, Universal doesn't
4 have any responsibility, according to the
5 brokerage laws of the United States. Martin
6 Transport --
7       MR. BURKE: Objection. Just a lack
8 of foundation basis. Calls for legal
9 conclusions. Ask to strike the volunteered
10 portion.
11 A. It's the law.
12 BY MR. BURKE:
13 Q. Let me, without expressing your opinion about
14 what Universal Am-Can's responsibilities may
15 or may not be, is it a fair statement to say
16 that as of July 3, 2008, Overnite Express had
17 no responsibility for the movement of
18 International Paper freight because, among
19 other reasons, you had sold the operating
20 authority of Overnite Express to Universal
21 Am-Can and that went into effect as of
22 June 13, 2008, correct?
23 A. That's correct.
24 Q. Okay. And with respect to O.X.LLC, its only
25 involvement both before June 13th and after

Page 70

1 June 13, 2008, had to do with the ownership
2 of certain tractors and trailers?
3 A. Correct.
4 Q. And to the best of your knowledge, is it
5 correct that none of the O.X.LLC tractors or
6 trailers were involved in the accident of
7 July 3, 2008?
8 A. Absolutely. It's all Martin's.
9 Q. You were asked some questions by Mr. Burke
10 about various parts of the contract that
11 existed between International Paper and
12 Overnite Express.
13       Do you remember him asking you
14 those questions?
15 A. Correct.
16 Q. Rather than go over each one of those
17 questions again, on those questions in which
18 he drew your attention to certain legal
19 obligations of a carrier, a trucking company,
20 is it fair to say that as of June 13, 2008, a
21 company such as Martin's Bulk Milk had an
22 independent responsibility to abide by
23 whatever laws apply to it, regardless of what
24 may have been expressed in any contract that
25 existed?

Page 71

1       MR. BURKE: Object --
2       MR. SCHRECK: I am going to object
3 on foundation. Calls for speculation. Calls
4 for a legal conclusion.
5       MR. BURKE: Objection. Lack of
6 foundation basis. Calls for conclusions and
7 speculation.
8 A. But it's the truth.
9       MR. BURKE: Just for the record, I
10 object to the volunteered portion of Mr.
11 Elsholtz's responses here and other places.
12       MR. FISHER: We'll disclose him as
13 our expert later.
14       MR. SCHRECK: I'll join.
15       (Discussion held off the record.)
16       MR. FISHER: I don't have any other
17 questions. Assuming there is no other
18 questions of him --
19       MR. SCHRECK: Actually, I have one
20 or two quick questions.
21
22              * * *
23           EXAMINATION
24              * * *
25 BY MR. SCHRECK:

Page 72

1 Q. Mr. Elsholtz, what's your date of birth?
2 A. 12/2/1937. I am an old fellow.
3 Q. You weren't involved with the tractor and
4 trailer that were used to July 3, 2008, for
5 the shipment from International Paper, were
6 you?
7 A. We have nothing to do with this whole case.
8 Q. My question is, you don't know who
9 specifically owned the tractor or container
10 or the trailer that was used on July 8, 2008?
11 A. None of it.
12 Q. Is that correct?
13 A. None of it.
14       MR. BURKE: I didn't want to
15 interrupt you, but objection to the
16 volunteered earlier response to the preceding
17 question and having nothing to do with the
18 whole case.
19 A. True statement.
20       MR. SCHRECK: I will join that.
21 That's all the question I have.
22       MR. FISHER: Matt, a friendly
23 amendment, I presume by your question you
24 meant July 3rd, not July 8th?
25       MR. SCHRECK: That's correct. If I



800.211.DEPO (3376)
EsquireSolutions.com

Case: 1:09-cv-05340 Document #: 334-14 Filed: 05/28/13 Page 19 of 19 PageID #:5261

ROBERT ELSHOLTZ
SCHEINMAN vs. MARTIN'S BULK MILK SERVICE

April 17, 2012
73–76

Page 73

1  said July 8th, I meant July 3rd.
2       MR. FISHER: With no other
3  questions, I think we will show signature is
4  reserved.
5       MR. BURKE: We can go off the
6  record.
7       (Deposition concluded at 1:00 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 74

1  DEPOSITION ERRATA SHEET
   Our Assignment No. 344706
2  Case Caption: MURRAY SCHEINMAN, ET AL
             vs.
3      MARTIN'S BULK MILK SERVICE,
       ET AL
4
   DECLARATION UNDER PENALTY OF PERJURY
5      I declare under penalty of perjury
   that I have read the entire transcript of
6  my Deposition taken in the captioned matter
   or the same has been read to me, and
7  the same is true and accurate, save and
   except for changes and/or corrections, if
8  any, as indicated by me on the DEPOSITION
   ERRATA SHEET hereof, with the understanding
9  that I offer these changes as if still under
   oath.
10     Signed on the ____ day of _____, 2012.
11     _____
           ROBERT WESTON ELSHOLTZ
12
13
14
   DEPOSITION ERRATA SHEET
15 Page No._____Line No.___Change
   to:_____
16 Reason for change:_____
17 _____
18 Page No._____Line No.___Change
   to:_____
19 Reason for change_____
20
   Page No._____Line No.___Change
21 to:_____
22 Reason for change_____
23 Page No._____Line No.___Change
   to:_____
24 Reason for change:_____
25 Page No._____Line No.___Change

Page 75

1  to:_____
2  Reason for change:_____
3  Page No._____Line No.___Change
   to:_____
4  Reason for change:_____
5
   Page No._____Line No.___Change
6  to:_____
7  Reason for change:_____
8  Page No._____Line No.___Change
   to:_____
9
   Page No._____Line No.___Change
10 to:_____
11
12
13     SIGNATURE:_____
14         ROBERT WESTON ELSHOLTZ
15
16     DATE:_____
17
18
19
20
21
22
23
24
25

Page 76

1  STATE OF MINNESOTA )
2                     
   COUNTY OF RAMSEY   )
3
4       Be it known that I took the
   deposition of ROBERT WESTON ELSHOLTZ on July
5  17, 2012;
6       That I was then and there a
   notary public in and for the County of
7  Ramsey, State of Minnesota, and that by
   virtue thereof I was duly authorized to
8  administer an oath;
9       That the witness before
   testifying was by me first duly sworn to
10 testify the whole truth and nothing but the
   truth relative to said cause;
11
        That the testimony of said
12 witness was recorded in stenotype by myself
   and transcribed into typewriting under my
13 direction, and that the deposition is a true
   record of the testimony given by the witness
14 to the best of my ability;
15      That I am not related to any of
   the parties hereto nor interested in the
16 outcome of the action;
17      That the reading and signing by
   the witness and Notice of Filing were not
18 waived;
19
        Witness my hand and seal this 24th
20 day of July, 2012.
21
22          _____
23              Vicki A. Lesewski
                COURT REPORTER
24
25

