## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MURRAY SCHEINMAN, Plenary )
Guardian of the Estate and )
Person of JEFFREY J. )
SCHEINMAN, a Disabled )
Person, )
      Plaintiffs, ) Case No.: 09 cv-5340
)
vs. ) Honorable James F.
) Holderman
MARTIN'S BULK MILK ) Magistrate Susan E. Cox
SERVICE, INC., SAMUEL G. )
FRANKE, CSX INTERMOD, )
INC., INTERNATIONAL PAPER )
COMPANY and OVERNITE )
EXPRESS, INC., )
      Defendants. )

ORAL DEPOSITION OF
WILLIAM CRAWFORD
JUNE 6, 2012

ANSWERS AND DEPOSITION OF WILLIAM CRAWFORD, a witness called by Murray Scheinman, Plenary Guardian of the Estate and Person of Jeffrey J. Scheinman, a Disabled Person, taken before Shannon E. DeLay, Certified Shorthand Reporter for the State of Texas, on the 6th day of June, 2012, between the hours of 9:06 a.m. and 10:41 a.m., at Esquire Deposition Services, 100 Congress Ave., Suite 2020, Austin, Texas, pursuant to the agreement of counsel and the respective parties as hereinafter set forth.

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
  Mr. Richard F. Burke, Jr.
  CLIFFORD LAW OFFICES, P.C.
  120 North LaSalle Street
  31st Floor
  Chicago, Illinois 60602

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK SERVICE, INC., AND SAMUEL G. FRANKE:
  Mr. Robert J. Golden
  DOWD & DOWD, LTD.
  617 West Fulton
  Chicago, Illinois 60661

TELEPHONICALLY FOR THE DEFENDANT(S) MARTIN'S BULK MILK SERVICE, INC., AND SAMUEL G. FRANKE:
  Mr. Matthew R. Schreck
  MULHERIN, REHFELDT & VARCHETTO, P.C.
  211 South Wheaton Ave., Suite 200
  Wheaton, Illinois 60187

TELEPHONICALLY FOR THE DEFENDANT(S) INTERNATIONAL PAPER COMPANY AND UNIVERSAL AM-CAN, LTD., AND SUCCESSOR TO OVERNITE EXPRESS, INC., AND OX, LLC.:
  Mr. Carlton D. Fisher
  HINSHAW & CULBERTSON, LLP
  222 North LaSalle Street, Suite 300
  Chicago, Illinois 60601

TELEPHONICALLY FOR THE DEFENDANT(S) BMW OF NORTH AMERICA, LLC AND BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT:
  Mr. Brian Langs
  JOHNSON & BELL, LTD.
  33 West Monroe Street, Suite 2700
  Chicago, Illinois 60603

## Page 3

INDEX
                              PAGE
Appearances ................................. 2
Stipulations ................................. N/A
WILLIAM CRAWFORD
  Examination by Mr. Burke .............. 4, 60
  Examination by Mr. Schreck ............... 55
  Examination by Mr. Langs ................. 57
  Examination by Mr. Fisher ................ 57

Signature and Changes ........................ N/A

Reporter's Certificate ....................... 62

## Page 4

WILLIAM CRAWFORD,
having been first duly sworn, testified as follows:
      MR. BURKE: Let the record reflect this is the discovery deposition of Mr. William Crawford, taken pursuant to notice and in the accord with the applicable rules of the United States District Court for the Northern District of Illinois.
      EXAMINATION
BY MR. BURKE:
  Q. Mr. Crawford, my name is Rich Burke. I'm sure Mr. Fisher told you I'm going to ask you some questions about some of your time and work at International Paper. And as I do so, if you want any questions repeated, or if they don't make sense, just tell me.
      If you could verbalize your "yes" and "no" answers because even though I can see you nodding your head, the court reporter has to take down an answer, and if you and I do not talk at the same time, that helps the court reporter, as well.
      And if you want to look at a document or something, just say so. It's not intended to, you know, be a memory test or anything for you. Okay.
      Would you please state your full name and spell your last name.
  A. William P. Crawford.





EXHIBIT M

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD  JUNE 06, 2012

### Page 5

1  Q. And --
2  A. C-R-A-W-F-O-R-D.
3  Q. And -- and what -- what city do you currently
4  live in, sir?
5  A. Austin, Texas.
6  Q. Okay. And are you employed at the present
7  time?
8  A. I'm not.
9  Q. Okay. When were you last employed?
10 A. March of 2012.
11 Q. Okay. And by whom were you employed at that
12 time?
13 A. Temple-Inland.
14    UNIDENTIFIED SPEAKER: Could you say that
15 louder. I couldn't hear you.
16    THE REPORTER: Who was --
17    THE WITNESS: Temple-Inland.
18 Q. (BY MR. BURKE) And how do you spell that?
19 A. T-E-M-P-L-E, hyphen, I-N-L-A-N-D.
20 Q. Okay. And what's the nature of their
21 business?
22    UNIDENTIFIED SPEAKER: Rich?
23    MR. BURKE: Yeah.
24    UNIDENTIFIED SPEAKER: I'm having a hard
25 time hearing. Could you put the mic closer or speak up

### Page 6

1  or something?
2     MR. FISHER: It's pretty close.
3     MR. BURKE: Yeah. We've got it pretty
4  much as --
5     UNIDENTIFIED SPEAKER: I hear you, Rich.
6  Unfortunately, I can't hear Mr. Crawford.
7     MR. BURKE: Okay. We've got it right
8  between us. So -- Is there a volume on this thing?
9  Okay. I think we have it turned up as best we can.
10    MR. FISHER: Okay.
11    MR. BURKE: All right.
12 Q. (BY MR. BURKE) What's the business of
13 Temple-Inland?
14 A. They're a paper and packaging company.
15 Q. Okay. And where are they located?
16 A. Austin, Texas.
17 Q. Okay. And during what time period were you --
18 did you work for them?
19 A. From October 2009, to March 2012.
20 Q. Okay. And what was your last position with
21 them?
22 A. I was their VP of Materials.
23 Q. Okay. And what did you do on a daily basis?
24 A. We did -- we did centralized procurement for
25 the company.

### Page 7

1  Q. Okay. And that would be procurement of what?
2  A. Of primarily chemicals, transportation,
3  energy, equipment.
4  Q. Does Temple-Inland have any relationship with
5  International Paper?
6  A. Yes. International Paper acquired
7  Temple-Inland.
8  Q. Acquired Temple when?
9  A. In February of 2012.
10 Q. When did you last work for International
11 Paper?
12 A. Left International Paper in January of 2009.
13 Q. Did you leave on your own or were you asked to
14 leave or fired or...
15 A. I was given a severance package.
16 Q. And what prompted the severance package?
17 A. I think, just an organizational shift.
18 Q. Were you terminated for any misconduct or
19 wrongdoing in any way?
20 A. No.
21 Q. When you left in 2009, where did you go to
22 work? Was it Temple?
23 A. Yes.
24 Q. Okay. International Paper did not own Temple
25 at that time; is that correct?

### Page 8

1  A. That's correct.
2  Q. When you last left International Paper, what
3  was your job title or position?
4  A. VP Global Sourcing.
5  Q. Okay. And for about how long had you been in
6  that position?
7  A. 18 years.
8  Q. Okay. For how long did you work at
9  International Paper?
10 A. 18 years.
11 Q. And you started with International Paper in
12 what year?
13 A. Around April of 1990.
14 Q. Where did you work before that?
15 A. ITT Automotive.
16 Q. And where at?
17 A. Detroit.
18 Q. And for about how long?
19 A. Four years.
20 Q. And what did you do there?
21 A. VP Materials.
22 Q. What's your educational background,
23 Mr. Crawford?
24 A. I've got a mechanical engineering degree from
25 Lafayette College and an MBA from the University of



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                                                JUNE 06, 2012

### Page 9

1 Pittsburgh.
2    Q. Okay. And where is Lafayette College located?
3    A. Eastern Pennsylvania.
4    Q. And your MBA was?
5    A. Pitt.
6    Q. From Pitt. Okay. And when did -- what year
7 did you get the college degree?
8    A. 1967.
9    Q. Okay. And how about your MBA?
10    A. '68.
11    Q. Okay. Any other degrees --
12    A. No.
13    Q. -- other than those? Have you given any
14 depositions before?
15    A. Yes.
16    Q. Okay. About how many?
17    A. About three.
18    Q. Okay. And were they all given while you were
19 employed by International Paper?
20    A. Yes.
21    Q. Okay. And did any of those depositions --
22 Strike that. Were any of those depositions given in
23 cases involving personal injury or wrongful death
24 claims?
25    A. No.

### Page 10

1    Q. What types of cases were those, generally?
2    A. One was a personnel issue. I think, perhaps,
3 two were personnel issues. One was a contract dispute.
4    Q. Have you testified in court at all?
5    A. Yes.
6    Q. Okay. How many times?
7    A. Once.
8    Q. Okay. And in what state?
9    A. Illinois.
10    Q. And what type of case?
11    A. Contract dispute.
12    Q. And was International Paper a party?
13    A. Yes.
14    Q. Okay. And about when did you testify?
15    A. Oh, about ten years ago.
16    Q. And was that in state court or federal court?
17    A. Federal.
18    Q. And was International Paper the party bringing
19 the lawsuit, or were they being sued?
20    A. They were bringing the lawsuit.
21    Q. Against whom?
22    A. I -- I'm not sure I've got the name correct,
23 but it was a -- Michael Polsky, I think, was the
24 defendant. I'm not sure I remember the name of his
25 company. It was around a capital project at one of the

### Page 11

1 paper mills.
2    Q. Okay. Michael Polsky, did you say?
3    A. Yeah.
4    Q. And -- and was he sued individually, or was it
5 one of his companies?
6    A. I'm sure, it was the company.
7    Q. Okay. Was it a paper product related company
8 or...
9    A. It was a capital project that Michael
10 developed and installed at International Paper's mill
11 in Maine. It had to do with gas turbines --
12    Q. Okay.
13    A. -- installed at the mill.
14    Q. It's kind of his thing, Polsky, the windmills
15 and --
16    A. That's the same one.
17    Q. Yes. Okay. I -- I -- I took you back to your
18 time at ITT in Detroit. Between getting your MBA and
19 going to work at ITT in Detroit, can you give me some
20 idea where you worked?
21    A. General Electric Company.
22    Q. Okay. And for about how long?
23    A. 18 years.
24    Q. And where at?
25    A. Various places. Primarily, Milwaukee and

### Page 12

1 Bridgeport, Connecticut.
2    Q. Okay. And, basically, what type of work did
3 you do?
4    A. Purchasing manager.
5    Q. Okay. And what would you purchase on behalf
6 of GE?
7    A. Various things. But in Milwaukee I was buying
8 castings. In Bridgeport, it was electronics.
9    Q. Okay. Have you done any work as a consultant
10 of any kind at any time while you've been at
11 International Paper?
12    A. No.
13    Q. Okay. How about after you left there?
14    A. No.
15    Q. Okay. Have you -- have you provided any type
16 of expert services or advice or consulting to
17 companies, either since -- while you were working at
18 International Paper or thereafter, other than to your
19 employers?
20    A. No.
21    Q. Do you have any private business at the
22 moment?
23    A. No.
24    Q. When you worked -- when you last worked at
25 International Paper, at what location did you work?



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                          JUNE 06, 2012

### Page 13

1  A. Memphis, Tennessee.
2  Q. Okay. And you said you worked in Global
3  Sourcing. Was -- was that the name of your division or
4  department, or was there another name?
5  A. That was the name of the department.
6  Q. Okay. And you last worked there in 2009, I
7  believe?
8  A. Yes.
9  Q. What have you reviewed in anticipation of
10 giving a deposition today?
11 A. I looked at a -- a contract, and I looked at
12 some testimony from another International Paper
13 employee.
14 Q. Okay. And who was that?
15 A. I don't remember her name.
16 Q. Joan Anderton.
17 A. Yes.
18 Q. Do you know her?
19 A. No.
20 Q. Okay. Have you spoken with her about this
21 case?
22 A. No.
23 Q. Okay. Was there anything in -- in what you
24 read of Ms. Anderton's deposition that you thought was
25 incorrect or inaccurate?

### Page 14

1  MR. FISHER: Excuse me. Objection, form.
2  You can go ahead and answer.
3  A. No.
4  Q. (BY MR. BURKE) Okay. By the way, what --
5  what's your date of birth, Mr. Crawford?
6  A. December 10th, 1945.
7  Q. The contract that you referred to reading,
8  what contract was that?
9  A. It's a contract with a trucking company, and
10 I'm trying to remember the name.
11 Q. Overnite Express?
12 A. Yes.
13 Q. Okay. Was it the October 27, 2007, contract?
14 A. That sounds right.
15 Q. Okay.
16 MR. FISHER: Rich, that's the only one I
17 sent.
18 MR. BURKE: Okay.
19 Q. (BY MR. BURKE) Have you ever been to
20 International Paper's Hammond warehouse in Hammond,
21 Indiana?
22 A. No.
23 Q. Okay. Have you ever driven a tractor-trailer
24 truck?
25 A. No.

### Page 15

1  Q. Okay. I take it you do not have a CDL
2  license, commercial driver's license?
3  A. No.
4  Q. Okay. Are you -- are you familiar with the
5  incident that is the subject of this lawsuit involving
6  injuries to Jeffrey Scheinman?
7  MR. FISHER: Rich, do you mean apart from
8  anything I might have said to him that's privileged? I
9  will tell you I told him there's an accident, it's a
10 rear-ender, and there's certain parties in the lawsuit.
11 That...
12 MR. BURKE: Okay.
13 MR. FISHER: I mean, I'm going to give you
14 some leeway here, but --
15 MR. BURKE: Yeah.
16 Q. (BY MR. BURKE) In general, I -- you know, I'm
17 not looking for specific things that Mr. Fisher told
18 you, your lawyer, but, generally, do you -- are you
19 familiar with the nature of the case that brings us to
20 be having a deposition today?
21 A. Carl told me that there was an accident, and
22 that's --
23 Q. Okay. You know what, don't tell me what Carl
24 told you because he's your lawyer, and that's
25 privileged. But I take it you have some understanding

### Page 16

1  that there was a truck collision with a -- a car,
2  resulting in injuries to Mr. Scheinman?
3  A. Yes.
4  Q. Okay. Prior to you being asked to give a
5  deposition in this case, did you have any knowledge of
6  that occurrence?
7  A. No.
8  Q. Okay. How did you first become aware of the
9  need for a deposition? Was that -- was that through
10 Carl?
11 A. Yes. He called me.
12 Q. Okay. In 2007 and up through your last time
13 at International Paper in 2009, what -- how would you
14 describe the business of International Paper?
15 A. I'm not sure I understand the question.
16 Q. Okay. What -- what business was International
17 Paper involved in? What -- what did they do?
18 A. They're a paper company.
19 Q. Okay. Do they manufacture paper?
20 A. Yes.
21 Q. And did they also transport their paper
22 products to their customers?
23 A. I don't think they transport it directly.
24 They hire people to do it for them.
25 Q. And they entered into contracts with various



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                                       JUNE 06, 2012

**17**

1  carriers to transport paper, correct?
2  A. Yes.
3  Q. Okay. Did -- if -- if there was -- are you
4  familiar with terms like operation side of a business,
5  transportation side, logistics, things like that? Are
6  those terms you'd have any general familiarity with?
7  A. General. Not -- not specific.
8  Q. Okay. What -- with respect to your job in
9  Global Sourcing, was there a side of the business
10 that -- that -- a side of the International Paper
11 business that your -- your work fell into?
12 A. I'm not sure I understand the question.
13 Q. Okay. With respect to -- did you consider
14 yourself to be involved in the operation side of the
15 business?
16 A. No.
17 Q. Okay. And why -- why not?
18 A. I was in a corporate staff role. My
19 department was -- was -- mission in life was to engage
20 our key suppliers and -- and contract for the purchases
21 that we did with our key supporters.
22 Q. And those suppliers would be what type of
23 businesses?
24 A. Equipment companies, chemical companies,
25 transportation companies, energy companies.

**18**

1  Q. And was the contract that Mr. Fisher sent you,
2  the October 2007 contract with Overnite Express, was
3  that a contract with a transportation company?
4  A. Yes.
5  Q. Okay. And that -- and that contract was
6  generally for the purpose of transporting International
7  Paper products to the customers to whom International
8  Paper was selling?
9  A. Yes.
10 Q. Did International Paper do any of its own
11 deliveries or make any of its own deliveries with their
12 own trucks?
13 A. I think one business that did some of that was
14 the distribution company, Xpedx. I think the rest of
15 the company did not.
16 Q. Okay.
17    MR. FISHER: Could you spell that for the
18 court reporter.
19    THE WITNESS: It's X-P-E-D-X.
20    MR. FISHER: Probably wouldn't find that
21 one in the dictionary.
22 Q. (BY MR. BURKE) Okay. And what was the
23 business of Xpedx?
24 A. They were a distributor of paper products.
25 Q. And did International Paper own Xpedx?

**19**

1  A. Yes.
2  Q. And do you know to whom Xpedx would distribute
3  paper?
4  A. Not specifically.
5  Q. Are -- are -- are you aware that -- that some
6  of the International Paper products on the truck at the
7  time of this collision was destined for Xpedx?
8  A. No. I didn't know that.
9  Q. Okay. Did you in your job have any
10 involvement with the -- the Hammond warehouse?
11 A. No.
12 Q. Would you have any contact with any person
13 from International Paper who had any managerial or
14 supervisory role at the Hammond warehouse?
15 A. I had contact with the -- the management team
16 at Xpedx in Cincinnati, but I -- I didn't have any
17 contact with Hammond directly.
18 Q. Did -- other than what you mentioned about
19 Xpedx, did International Paper own any of its own
20 tractors for delivery of its paper products?
21 A. Not that I'm aware of.
22 Q. Did they own any of their own trailers for
23 delivery of their paper products?
24 A. Not that I'm aware of.
25 Q. With -- with respect to -- Strike that. With

**20**

1  respect to the paper that was being picked up at the
2  Hammond warehouse that's involved in this occurrence,
3  how did those paper products get to the Hammond
4  warehouse?
5  A. I don't know, specifically.
6  Q. Were you involved in that type of
7  transportation at all?
8  A. We did contracts for transportation, but I
9  wasn't involved in the day-to-day operations of
10 shipments.
11 Q. Okay. You were -- Mr. Fisher -- or you
12 mentioned that Mr. Fisher gave you a copy of an October
13 2007 contract. Do you -- do you have a copy of that in
14 front of you, Mr. Crawford?
15 A. Yes.
16 Q. Okay.
17    MR. SCHRECK: And just for the record,
18 what -- what page are you looking at? What Bates stamp
19 number?
20    MR. FISHER: 36.
21    MR. SCHRECK: 36.
22    MR. BURKE: We're showing -- I'm going to
23 tender to Mr. Crawford a portion of Exhibit No. 2,
24 which is -- which contains at Page 35 -- well, starting
25 with 35.



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                              JUNE 06, 2012

### Page 21

1  MR. FISHER: Matt and everybody else, you
2  need to say your name first.
3  MR. SCHRECK: Oh, I apologize. It was
4  Matthew Schreck. And just for the record, you're
5  looking at IP Exhibit 2 -- Excuse me -- Exhibit 2, IP
6  Page 36?
7  MR. BURKE: Well, I'm going to start with
8  35, but the contract itself starts --
9  MR. SCHRECK: Just making sure I had the
10 right spot. Thanks.
11 MR. BURKE: -- on Page -- contract starts
12 on Page 36 and runs, I believe, to about Page 75 of the
13 International Paper Bates stamped pages.
14 Q. (BY MR. BURKE) And, Mr. Crawford, just to --
15 there is on Page 35 -- and do you see the Bates stamped
16 numbers in the lower right corner, sir?
17 A. Yes.
18 Q. Okay. So when I refer you to a page number,
19 that's what I'm talking about. On Page 35, there's a
20 letter dated October 24, 2007, on International Paper
21 letterhead, from Steven Mundy; am I correct?
22 A. Yes.
23 Q. Okay. And at that time, it appears Mr. Mundy
24 was the manager of Motor Carrier Transportation
25 Sourcing?

### Page 22

1  A. Yes.
2  Q. Okay. What was -- with respect to the
3  hierarchy of personnel, where did you and Mr. Mundy
4  fit?
5  A. Steve worked for a manager who reported to me.
6  Q. Okay. So Steve was under you?
7  A. He -- he -- he reported to one of my managers.
8  So he was part of my organization.
9  Q. Okay. And was the Motor Carrier
10 Transportation Sourcing Department within Global
11 Sourcing?
12 A. Yes.
13 Q. Who was above you in Global Sourcing?
14 A. I was the top person in Global Sourcing. I
15 reported to the CFO.
16 Q. Okay. And who was that?
17 A. Marianne Parrs.
18 Q. And how do you spell her last name?
19 A. P-A-R-R-S.
20 Q. And where was she, in Memphis?
21 A. Yes.
22 Q. Okay. And am I correct that in this letter on
23 Page 35, Steve Mundy is sending a copy of a contract
24 that International Paper entered into with Overnite
25 Express; is that correct?

### Page 23

1  A. Yes.
2  Q. Okay. And that's identified as Motor
3  Procurement Contract No. OXEN 093009?
4  A. Yes.
5  Q. And that's being sent to Sandy Herrmann?
6  A. Yes.
7  Q. Okay. Did you know Sandy Herrmann?
8  A. No.
9  Q. Okay. Did you ask Steve Mundy to send this
10 contract to Sandy Herrmann?
11 A. I don't remember.
12 Q. And let me ask you to turn to Page 36, sir.
13 A. (Witness complies.)
14 Q. Is this the beginning of what we referred to
15 as the October 1st, 2007 contract between International
16 Paper and Overnite Express?
17 A. Yes.
18 Q. And this is the contract you've reviewed,
19 correct?
20 A. Yes.
21 Q. Okay. And this contract bears your signature;
22 am I correct?
23 A. Yes.
24 Q. Okay. And, I think, I've seen your signature
25 on two places, if I recall correctly, one of which is

### Page 24

1  Page 52; is that right? Or why don't you first turn to
2  page 49.
3  A. (Witness complies.)
4  Q. I'm sorry, 48.
5  A. (Witness complies.)
6  Q. Okay. And is that your signature?
7  A. Yes.
8  Q. Okay. And am I correct you signed this
9  contract on behalf of International Paper on November
10 12th, 2007?
11 A. Yes.
12 Q. And look at Page 20 -- or, I'm sorry, Page 52.
13 A. (Witness complies.)
14 Q. And is that also your signature?
15 A. Yes.
16 Q. Okay. And also dated November 12, 2007?
17 A. Yes.
18 Q. Okay. And is Page 52, are you signing an
19 exhibit to the contract?
20 A. Yes.
21 Q. Okay. And was that the Fuel Index exhibit?
22 A. Yes.
23 Q. Okay. And, in general terms, what did the
24 Fuel Index exhibit consist of, or what was its purpose?
25 A. It was to change the price of the -- of the



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                              JUNE 06, 2012

### 25

1  agreement up and down with the cost of fuel, diesel
2  fuel.
3     Q. Okay. And of the Bates pages in front of you,
4  sir, to what page does this contract run, including the
5  exhibits or attachments to the contract?
6     A. Page 75.
7     Q. Okay. And that last exhibit is --
8        MR. FISHER: Richard, I think that's when
9  they changed OXEN to UACL.
10       MR. BURKE: Yeah. That's --
11       MR. FISHER: So when we produced this, I
12 don't think this was part of the contract.
13       MR. BURKE: The last exhibit?
14       MR. FISHER: Bates No. Page 75 --
15       MR. BURKE: Right.
16       MR. FISHER: -- I'm fairly certain is not
17 part of the contract.
18       MR. BURKE: Okay. And I would tend to
19 agree with you.
20    Q. (BY MR. BURKE) Am I correct, Mr. Crawford,
21 that's a Central Vendor Request Change Form for
22 Universal Am-Can, Limited?
23    A. Yes.
24    Q. And at the time you signed this contract, the
25 contract was with Overnite Express as opposed to

### 26

1  Universal Am-Can, correct?
2     A. Yes. That's correct.
3        MR. BURKE: And by the way, Universal
4  Am-Can is Universal, A-M, hyphen, C-A-N, Limited, LTD.
5     Q. (BY MR. BURKE) Okay. Let me direct you back
6  to the -- the beginning the contract. Other than the
7  Page 75, would the contract -- well, Page 74, actually,
8  is for Cherokee Insurance maintained by Universal
9  Am-Can, correct?
10    A. Yes.
11    Q. And 73 actually deals with Am-Can, as well,
12 correct?
13    A. Yes.
14    Q. As does Page 72, which is their Interstate
15 Commerce Commission work --
16    A. Yes.
17    Q. -- or authority, I should say?
18    A. I think, the contract ends around about
19 Page 66.
20    Q. Page 66. Okay. And that -- that last exhibit
21 on Page 66 is a Certificate of Liability Insurance for
22 Overnite Express, correct?
23    A. Yes.
24    Q. Okay. And it identifies International Paper
25 as another named insured or additional insured, down in

### 27

1  the lower left corner?
2     A. Yes.
3     Q. Okay. While we're on that topic, was one of
4  the conditions of this contract that International
5  Paper entered into with Overnite Express, that
6  International Paper would be named as an additional
7  insured on a policy of liability insurance to be held
8  or purchased by Overnite Express?
9     A. I don't know.
10    Q. Who -- who -- did you see -- Strike that. Did
11 you see that condition in the body of the contract?
12    A. I don't remember.
13    Q. Did you read the contract that Mr. Fisher gave
14 to -- to you?
15    A. Yes.
16    Q. And that contract, as you told us, did bear
17 your signature, correct?
18    A. Yes.
19    Q. Okay. Is it a true and accurate copy of the
20 contract that was entered into and signed by you on
21 behalf of International Paper effective October 1st,
22 2007?
23    A. I believe so.
24    Q. And that -- that October 2007 contract, was
25 that made in the normal course of International Paper's

### 28

1  business?
2     A. Yes.
3     Q. Okay. And was it the -- the normal business
4  of International Paper to enter into certain contracts,
5  such as this type of contract for transportation
6  services?
7     A. Yes.
8     Q. Okay. And the representations made in the
9  contract and the conditions set forth therein were true
10 and accurate when they were entered into between
11 International Paper and Overnite Express in October of
12 2007, correct?
13    A. I believe so.
14    Q. Did you negotiate the terms of this contract?
15    A. No.
16    Q. Okay. Were you involved in any manner in --
17 in the terms of the contract or creating the terms of
18 the contract?
19    A. I don't think so.
20    Q. Okay. Did you review the contract before it
21 was signed?
22    A. Yes.
23    Q. Okay. Signed by you, I should say?
24    A. Yes.
25    Q. And in your position as Vice President of



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                              JUNE 06, 2012

| 29 | 31 |
|---|---|
| 1  Global Sourcing, did you agree with and approve of all | 1  instead of Overnite Express? |
| 2  the terms and conditions of the contract? | 2       A.  I don't remember that. |
| 3       A.  Yes. | 3       Q.  Did you have any involvement in preparing this |
| 4       Q.  Who did negotiate the terms of the contract? | 4  amendment? |
| 5       A.  I don't know.  I assume, it was Steven Mundy. | 5       A.  I don't think so. |
| 6       Q.  Okay.  Would that have been part of his job? | 6            MR. BURKE:  Guys on the phone, I'm going |
| 7       A.  Yes. | 7  to show Mr. Crawford Page 35 -- I'm sorry, Page 65 of |
| 8       Q.  Was -- was this -- this October 2007 contract | 8  Exhibit No. 1, which is the -- the amendment dated June |
| 9  a -- and the provisions of it a standard type of | 9  10th and 12th. |
| 10  contract that International Paper would have with | 10      Q.  (BY MR. BURKE) Just while -- while we're on |
| 11  carriers who were transporting their products? | 11  this topic, sir, let me tender to you Bates stamped |
| 12      A.  I believe so. | 12  UACL 65 from Exhibit No. 1, and it's a document |
| 13      Q.  Other than the fuel index and surcharges, | 13  entitled Amendment No. 1.  Just take -- take a look at |
| 14  were -- were most of the provisions standard provisions | 14  that for a minute and tell me if you've ever seen it |
| 15  that International Paper would utilize with all of | 15  before, No. 1? |
| 16  their carriers? | 16      A.  I don't remember seeing it before. |
| 17      A.  I don't know. | 17      Q.  Okay.  And that document is signed by Steve |
| 18      Q.  In the -- are you aware that an amendment to | 18  Mundy, correct? |
| 19  this contract was entered into in June of 2008? | 19      A.  Correct. |
| 20      A.  I don't know. | 20      Q.  From your testimony, it's -- I -- I take it |
| 21      Q.  In the -- are you aware that an amendment to | 21  you have no recollection having involvement in the |
| 22  this contract was entered into in June of 2008? | 22  creation of that document? |
| 23           THE WITNESS:  I don't know if -- if you | 23      A.  No, I don't. |
| 24  sent me an amendment or not. | 24      Q.  Okay.  Would the -- Strike that.  Was this |
| 25           MR. FISHER:  Whatever documents are in | 25  type of amendment permitted in order to continue a |

| 30 | 32 |
|---|---|
| 1  there is the only thing I sent you. | 1  contract with a carrier in the event of -- of a |
| 2       A.  Then, I guess, I don't know that. | 2  purchase of a carrier by another company? |
| 3       Q.  (BY MR. BURKE) Okay.  Did -- were -- were you | 3       A.  I don't remember this happening before. |
| 4  aware that -- Strike that.  Do you -- are you familiar | 4       Q.  In -- in your job as part of Global Sourcing, |
| 5  with the business, Universal Am-Can? | 5  you -- you, obviously, entered into contracts with |
| 6       A.  No. | 6  transportation carriers like Overnite Express, as -- as |
| 7       Q.  Okay.  Were you familiar with the business | 7  reflected in this October contract, correct? |
| 8  Overnite Express? | 8       A.  Correct. |
| 9       A.  I've heard of them. | 9       Q.  Okay.  In addition to the requirements and |
| 10      Q.  Okay.  And you entered into a contract with | 10  terms of the contract, did International Paper provide |
| 11  Overnite Express on behalf of International Paper, | 11  any other information or brochures to its truck |
| 12  correct? | 12  carriers with respect to procedures and rules to be |
| 13      A.  Correct. | 13  followed by them while transporting International Paper |
| 14      Q.  Okay.  And in your work at International | 14  products? |
| 15  Paper, did you ever become aware of International -- | 15      A.  I don't know. |
| 16  I'm sorry.  During your work at International Paper, | 16      Q.  What department from International Paper would |
| 17  after this October 2007 contract was entered into, did | 17  be involved in -- in doing so, if that occurred? |
| 18  you ever become aware that Overnite Express was | 18      A.  I think, it would be the local facility, |
| 19  purchased by or acquired by Universal Am-Can? | 19  probably. |
| 20      A.  I vaguely remember Steve mentioning that | 20      Q.  The contract that you -- you signed was with |
| 21  Overnite Express had been purchased.  I didn't remember | 21  Overnite Express.  Did -- did you have involvement or |
| 22  the name of the company. | 22  conversations with any personnel from Overnite Express? |
| 23      Q.  Okay.  Were you aware that any amendments were | 23      A.  I don't remember. |
| 24  entered into to update this October 2007 contract to | 24      Q.  Do you know Mr. Al Schultz, either of them, |
| 25  reflect that the carrier was, now, Universal Am-Can | 25  from Overnite Express? |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                                                 JUNE 06, 2012

### Page 33

1. A. I don't think so.
2. Q. Okay. How about Mr. Kevin Hays from Overnite
3. Express, do you know him?
4. A. I don't think so.
5. Q. How about Sandra Herrmann, do you know her?
6. A. No.
7. Q. During your time working at International
8. Paper, were you familiar with a company called Martin's
9. Bulk Milk Service?
10. A. No.
11. Q. Had you had involvement in negotiating or
12. signing other contracts on behalf of International
13. Paper with Overnite Express?
14. A. I don't think so.
15. Q. Other than this October 2007 one, I should
16. say?
17. A. I don't remember.
18. Q. The -- was the signing of this contract on
19. behalf of International Paper, was that something you
20. had responsibility for as Vice President of Global
21. Sourcing?
22. A. Yes.
23. Q. And what was the purpose of International
24. Paper entering into this contract with Overnite
25. Express?

### Page 34

1. A. To contract for truck service at our
2. facilities.
3. Q. And truck service of -- Strike that. To
4. contract with truck carriers who would provide the
5. service of delivering your International Paper products
6. to your customers?
7. A. Yes.
8. Q. The -- Let me ask you to go back to Page 36 of
9. Exhibit No. 2 that you have in front of you,
10. Mr. Crawford.
11. A. (Witness complies.)
12. Q. That's, basically, a table of contents page;
13. is that correct?
14. A. Yes.
15. Q. Okay. That's actually entitled OXEN Overnite
16. Express 2007 Outbound Contract, correct?
17. A. Yes.
18. Q. What's that expression "outbound contract"
19. refer to?
20. A. It means shipments from IP facilities to our
21. customers.
22. Q. Okay. And then how about Page 37, which is
23. also noted as Page 2 of 24 of the contract, how come
24. that page is blank?
25. A. I don't know.

### Page 35

1. Q. Okay. Do you know what should be there?
2. A. No.
3.     MR. FISHER: Objection to form. Assumes
4. facts not in evidence.
5. Q. (BY MR. BURKE) Where's the original of -- of
6. this contract?
7. A. I don't know.
8. Q. Okay. Who would know?
9. A. I don't know.
10. Q. Who did you give the signed version to?
11. A. I don't remember.
12. Q. If -- if -- if you needed to come to court
13. with a copy of this contract that you signed for
14. International Paper, to whom would you go to to find
15. the original?
16. A. I guess, I would go to my attorney.
17. Q. Okay. And what would you tell Mr. Fisher
18. to --
19. A. Find --
20. Q. -- do or who would you tell him to talk to or
21. what department would you tell him to contact?
22. A. Global Sourcing.
23. Q. Who's the current head of Global Sourcing?
24. A. David Liebetreu.
25. Q. And how do you spell his last name?

### Page 36

1. A. L-I-E-B-E-T-R-E-U.
2. Q. Liebetreu?
3. A. Yes.
4. Q. Okay. And is he also titled Vice President?
5. A. Yes.
6. Q. Okay. Is his office in Memphis?
7. A. Yes.
8. Q. How about Page 38? Let me direct your
9. attention to the first paragraph which, basically, says
10. that this agreement is being entered into and is
11. effective the first day of October 2007, correct, right
12. up at the top?
13. A. Yes.
14. Q. Okay. And the -- the contract or agreement is
15. being entered into between International Paper, and you
16. are identified as the Shipper in -- in this agreement,
17. correct?
18. A. Yes.
19. Q. And International Paper was entering this
20. contract with Overnite Express, who was identified as
21. the Carrier in this contract, correct?
22. A. Yes.
23. Q. And the Paragraph 2 states that the Carrier is
24. engaged in the business of transporting proper by motor
25. vehicle as a contract carrier in interstate --



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                                JUNE 06, 2012

### 37

1  intrastate and foreign commerce, correct?
2     A. Yes.
3     Q. Okay. And where Carrier is referred to in
4  this contract, that's referring to Overnite Express; is
5  that right?
6     A. Yes.
7     Q. And where Shipper is -- is referred to, that's
8  referring to International Paper?
9     A. Yes.
10    Q. And in that Paragraph 3, it says that Shipper,
11 which was International Paper, desires Carrier, which
12 was Overnite Express, to provide certain transportation
13 related services pursuant to the rates and conditions
14 set forth in the agreement, correct?
15    A. Yes.
16    Q. Okay. And a little bit further down the page,
17 there's a Section 1 that is titled Term, and it says
18 that this agreement shall have a term of two years from
19 the date of the agreement, correct?
20    A. Yes.
21    Q. Okay. And then under Carrier Status, Overnite
22 Express represented to International Paper that it was
23 an interstate motor contract carrier of property duly
24 registered and permitted to operate with the Federal
25 Highway Administration, correct?

### 38

1     A. Yes.
2     Q. Okay. And, in fact, International Paper
3  required United -- or required Overnite Express to
4  provide a copy of their operating authority as an
5  attachment, right?
6     A. I don't know.
7     Q. Well, the next sentence after the one I had
8  just quoted says, "A copy of Carrier's registration or
9  permit is attached as Exhibit A", correct?
10    A. Correct.
11    Q. Okay. And then under Carrier's Obligations,
12 the first section, Paragraph -- do you see where I'm
13 at -- No. 3 --
14    A. Yes.
15    Q. -- bottom of the page? Okay. Paragraph A is
16 entitled Services, correct?
17    A. Yes.
18    Q. Okay. And it says that the -- the Carrier
19 will provide the services set forth in Exhibit C, which
20 was the Motor Carrier Rate and Weekly Commitment
21 Schedule, correct?
22    A. Yes.
23    Q. Okay. And in general terms, Mr. Crawford,
24 what were the services that Overnite Express was
25 providing to International Paper pursuant to this

### 39

1  contract?
2     A. Providing truck transportation for our
3  shipments from our facilities to our customers.
4     Q. And on Page 39, International Paper sets forth
5  certain commitments that the Carrier had to meet; would
6  that be correct?
7     A. Yes.
8     Q. Okay. And -- and commitments in your business
9  refers to what?
10    A. Performance obligations.
11    Q. Okay. And -- and -- and -- Or strike that.
12 Overnite Express, basically, had to -- to make
13 themselves available to transport a certain amount of
14 product on a given number of trips to a designated
15 location. Would that generally be accurate?
16    A. Yes.
17    Q. Was -- was this particular contract for a
18 certain route or -- or run or a certain general
19 geographic area, perhaps, is more accurate?
20    A. I assume so.
21    Q. And on Page 39, International Paper required
22 that Overnite Express meet certain on-time delivery
23 requirements as set forth in Paragraph F, correct?
24    A. Yes.
25    Q. And in Paragraph G, there's various

### 40

1  requirements for motor vehicle equipment that the
2  Carrier had to use, correct?
3     A. Yes.
4     Q. Okay. And in -- take a look at G for a
5  minute, in -- in the first few sentences or first
6  couple sentences. Let me give you a minute to read
7  that. I just want to ask you a question about that.
8     A. Okay.
9     Q. Okay. International Paper required that
10 Overnite Express maintain their truck equipment in
11 good, safe and lawful operating conditions and in
12 accord with all applicable local, state and federal
13 laws and regulations; is that correct?
14    A. Yes.
15    Q. And the Paragraph H, take a -- take a look at
16 that for a moment.
17    A. Okay.
18    Q. International Paper required that Overnite
19 Express' personnel be fully qualified and have
20 appropriate licenses and permits as required by local,
21 state and federal laws, correct?
22    A. Yes.
23    Q. Okay. And International Paper also required
24 that Overnite Express and their drivers comply with all
25 applicable local, state and federal laws and


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD                                                              JUNE 06, 2012

### Page 41

1    regulations, correct?
2        A. Yes.
3        Q. Okay. And compliance with local, state and
4    federal laws and regulations, would include complying
5    with traffic regulations in the safe operation of their
6    tractor-trailer trucks, correct?
7        A. I would assume so.
8        Q. And under the Trailer Requirements, you
9    actually required them to have safe and suitable
10   trailers that would keep your paper products in -- in
11   good, safe condition, correct?
12       A. Yes.
13       Q. And you, down in K -- actually, J and K, you
14   required them to have a certain amount of trailer
15   equipment, correct?
16       A. Yes.
17       Q. Okay. And that was to make sure that they
18   could adequately transport whatever International Paper
19   needed to have transported, correct?
20       A. Yes.
21           MR. FISHER: Excuse me. Can you just read
22   back just a portion of Rich's question. I just want to
23   make sure I heard what I thought I heard.
24           (Readback.)
25           MR. FISHER: Thank you. That's what I

### Page 42

1    thought I heard.
2        Q. (BY MR. BURKE) In the very bottom of Page 39,
3    Mr. Crawford, there's a Section No. 4 entitled
4    Compensation. Literally, the last line carries over to
5    the next page, 40. Are you with me?
6        A. Yes.
7        Q. Okay. In that Compensation section, there's
8    various provisions for how International Paper would
9    compensate Overnite Express; is that right?
10       A. Yes.
11       Q. Okay. Did -- did Overnite -- I'm sorry. Did
12   International Paper essentially make the decision on
13   what compensation you were willing to pay to your
14   carriers?
15       A. Well, I think -- I think, the carriers
16   proposed what they thought was appropriate
17   compensation, and, basically, the selection of Carriers
18   was competitive. So if -- if the service was good and
19   the rates were competitive, than the carrier would
20   probably get some business.
21       Q. Okay. And, ultimately, it was International
22   Paper that decided whether or not any particular
23   carrier would get International Paper's business?
24       A. Yes.
25       Q. Okay. And International Paper could decide

### Page 43

1    not to do business with any particular carrier that
2    they didn't want to do business with for whatever
3    reason, correct?
4        A. Right.
5        Q. Okay. And International Paper could terminate
6    the services of any carrier if International Paper was
7    unhappy with their performance, correct?
8        A. Well, they have to -- under the terms of
9    contract, if -- if that's -- if that's -- but, yes,
10   within the frame of the contract, they could certainly
11   terminate service.
12       Q. And I -- and we'll get to that in -- in a
13   moment, as well. And, basically, in Page -- on 42,
14   there's a Section 7 titled Commitments, correct?
15       A. Correct.
16       Q. Okay. That sets forth various commitments or
17   obligations that Overnite Express had to meet in order
18   to comply with the contract in terms of making
19   deliveries; is that right?
20       A. Yes.
21       Q. And then Section 8, Default by Carrier, that
22   actually is a section that sets forth various grounds
23   under which International Paper could terminate their
24   agreement with Overnite Express, correct?
25       A. Yes. It's based on continuing or substantial

### Page 44

1    failure.
2        Q. Okay. And on Page 43, there are various
3    examples of continuing or substantial failure that
4    are -- but those are not include -- are not intended to
5    be an exhaustive list; would that be correct?
6        A. Yes.
7        Q. Okay. And in Paragraph A, one of the grounds
8    for termination would be Overnite Express' failure to
9    comply with facility safety rules and operating
10   procedures, correct?
11       A. Yes.
12       Q. Okay. And B is the minimum service levels,
13   correct?
14       A. Yes.
15       Q. And C refers to meeting the 98-percent
16   acceptance level of deliveries within a three-month
17   period, correct?
18       A. Yes.
19       Q. And if you got complaints from a carrier --
20   Or strike that. If you got complaints from a customer
21   on two or more occasions within a three-month period,
22   you could terminate them, as well, correct?
23       A. Yes.
24       Q. Or if -- if the DOT rating -- or I should say
25   if the Department of Transportation rating for Overnite



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

## 45

1  Express was downgraded, you could terminate your
2  contract with them, correct?
3      A. Yes.
4      Q. Or if they -- if Overnite Express failed to
5  maintain the minimum insurance coverage, you could
6  terminate, correct?
7      A. Yes.
8      Q. And if Overnite Express failed to comply with
9  federal, state or municipal laws and regulations, you
10 could terminate the contract, correct?
11     A. Yes.
12     Q. And if the Carrier, meaning Overnite Express,
13 went into bankruptcy or some other form of insolvency,
14 you could terminate, as well, correct?
15     A. Yes.
16     Q. And then in Paragraph 9 -- I'm sorry,
17 Section 9 on that same Page 43, which is entitled
18 Electronic Communications, Dispatch and Reporting, am I
19 correct International Paper required Overnite Express
20 to have certain type of communication systems in order
21 for International Paper be to be able to contact them
22 and communicate with them?
23     A. Yes.
24     Q. And, in general, what -- what was the purpose
25 of that, Mr. Crawford?

## 46

1      A. Well, the electronic communication would be
2  faster or more efficient and also keep a permanent
3  record of -- of the communication between International
4  Paper and -- and the carrier.
5      Q. Okay. And then in Section 10, International
6  Paper also set forth the types of bills of lading
7  and -- and freight receipts that the Carrier had to
8  utilize; is that correct?
9      A. Yes.
10     Q. And then let me skip down to the end of --
11 bottom of Page 44. There's a Section No. 12 for
12 Freight Loss or Damage, correct?
13     A. Yes.
14     Q. Okay. And, basically, Overnite Express under
15 this contract, was liable to International Paper for
16 loss or damage of any goods being transported under the
17 agreement; is that correct?
18     A. Yes.
19     Q. And in the Insurance section which is Section
20 13, International Paper required Overnite Express to
21 maintain certain amounts of liability insurance
22 coverage, correct?
23     A. Yes.
24     Q. And the auto liability coverage was no less
25 than $1 million, correct?

## 47

1      A. Yes.
2      Q. And there was a Cargo Liability on the next
3  page, which is Page 45, of $100,000, correct?
4      A. Yes.
5      Q. And then International Paper, in Section C,
6  required Overnite Express to have commercial general
7  liability coverage in the amount of $1 million,
8  correct?
9      A. Yes.
10     Q. And that -- that commercial general liability
11 policy also had to name International Paper as an
12 additional insured; is that right?
13     A. Yes.
14     Q. Do you know what coverage International
15 Paper -- Strike that. Do you know what amount of
16 liability coverage International Paper had that does or
17 might cover International Paper for injuries sustained
18 by Jeffrey Scheinman in -- in the incident that's the
19 subject of this case?
20     A. No.
21     Q. Did -- did you make the determination of the
22 $1 million requirement that's set forth in this
23 contract?
24     A. I don't remember, sir.
25     Q. Who -- what department would -- or was it

## 48

1  within your responsibility to decide what amount of
2  coverage a carrier should have?
3      A. I don't remember.
4      Q. Who -- who do you believe, or what department
5  at International Paper do you believe would have
6  accurate information on the amount of liability
7  coverage maintained by or available to International
8  Paper for the injuries sustained by Jeffrey Scheinman?
9      A. I guess, the insurance department.
10     Q. Okay. And was there an insurance department?
11     A. I don't remember dealing with them.
12     Q. Okay. I mean, what -- what -- was there a
13 division or department at International Paper that
14 was -- that you believe dealt with insurance-type
15 issues like this?
16     A. I don't remember who it was.
17     Q. Okay. But was there such a department?
18     A. I assume so.
19     Q. Who worked in that department or, you know, in
20 any capacity?
21     A. I don't remember.
22     Q. When you read this contract and then signed
23 it, did you ask Steve Mundy or anybody else why the
24 liability coverage amount being referred to in the
25 contract was $1 million, as opposed to some other



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

| 49 | 51 |
|---|---|
| 1  amount? | 1  Carrier, which would be Overnite Express, shall solely |
| 2      A. I don't remember. | 2  direct all persons performing services performed by the |
| 3      Q. Did International Paper have any other | 3  Carrier under this agreement and that such person shall |
| 4  coverage that's sometimes referred to as excess | 4  be and remain subject to the exclusive control and |
| 5  coverage or umbrella coverage that was applicable to | 5  direction of Carrier, which would be Overnite Express; |
| 6  injuries like the ones Mr. Scheinman received that are | 6  is that correct? |
| 7  the subject of this case? | 7      A. Yes. |
| 8      A. I don't know. | 8      Q. And then Page 48, as we mentioned earlier, |
| 9      Q. And do you know who might know the answer to | 9  that's the signature page bearing your signature in |
| 10 that? | 10 your capacity as Vice President of Global Sourcing for |
| 11     A. Gigi. | 11 International Paper Company, correct? |
| 12     Q. Okay. And you're referring to another one of | 12     A. Yes. |
| 13 International Paper's attorneys who's also present | 13     Q. All right. And you -- you actually signed |
| 14 today; is that correct? | 14 this on November 12th, 2007, even though it actually |
| 15     A. Yes. | 15 became effective October 1st of 2007; is that right? |
| 16     Q. Take a look at Page 46, if you would. | 16     A. I certainly signed it on November 12th. I |
| 17     A. (Witness complies.) | 17 don't remember the effective date. |
| 18     Q. There's a section entitled Indemnification. | 18     Q. Okay. Take a look at, I think, it's Page 3, |
| 19 Take a moment and just read that relatively short | 19 Bates stamped 3 -- I'm sorry, Bates stamped 38, which |
| 20 paragraph, Mr. Crawford. | 20 is Page 3 of the contract. Look at Bates stamp 38. |
| 21     A. Okay. | 21         MR. FISHER: Let me help you. It's right |
| 22     Q. When you signed this contract, what -- what | 22 over here. Yeah, here we go. |
| 23 was your understanding of -- of what this paragraph | 23     A. Yeah, 1st day of October. |
| 24 meant? | 24     Q. (BY MR. BURKE) Okay. And -- and why would you |
| 25     A. I don't remember. | 25 not be signing until November if it's effective in |

| 50 | 52 |
|---|---|
| 1      Q. How about when you read it today, what's your | 1  October 2007? |
| 2  understanding of what it means? | 2      A. I assume, the -- getting the signatures from |
| 3      A. It says the Carrier will indemnify the | 3  the Carrier took longer than expected. |
| 4  Shipper. So I interpret the Carrier to be Overnite | 4      Q. Okay. And on that same Page 48, the |
| 5  Express and the Shipper to be International Paper. | 5  signatures from the Carrier are -- are all dated |
| 6      Q. And, basically, that first sentence says that | 6  October 30th, 2007, correct? |
| 7  the Carrier shall indemnify and hold harmless Shipper | 7      A. Yes. |
| 8  from and against all liability, loss, damages, claims, | 8      Q. Okay. And those are the signatures from -- of |
| 9  suits or expenses, including reasonable attorneys' | 9  Robert L. Schultz, Kevin Hays and Sandra Herrmann from |
| 10 fees, by reason of an injury, including death or claim | 10 Overnite Express, correct? |
| 11 of injury to person or damage to property arising out | 11     A. Yes. |
| 12 of or in connection with the performance of this | 12     Q. Okay. From the time you signed this contract |
| 13 agreement by Carrier, its employees, agents or | 13 in October of -- or whatever date you signed it, |
| 14 subcontractors"; is that correct? | 14 November of 2007, until you left International Paper, |
| 15     A. Yes. | 15 did you ever sign any other contracts with Overnite |
| 16     Q. So, basically, under this agreement, if -- if | 16 Express? |
| 17 Overnite Express, as the Carrier, caused an accident or | 17     A. I don't remember. |
| 18 injury through one of its employees or agents or a | 18     Q. Have you ever seen -- seen any, that you can |
| 19 subcontractor, they were supposed to indemnify | 19 recall? |
| 20 International Paper; would that be correct? | 20     A. No. |
| 21     A. Yes. | 21     Q. Okay. Could -- could you -- and you did touch |
| 22     Q. Okay. Take a look at Page 47, if you would, | 22 on it, sir, but could -- could you explain a little bit |
| 23 sir. | 23 of the difference between what Mr. Mundy did and -- and |
| 24     A. (Witness complies.) | 24 yourself in terms of job responsibilities? You know |
| 25     Q. The top paragraph says that the -- the | 25 what? That's a bad question. Let me ask you this: |



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD						JUNE 06, 2012

### 53

1  What was Mr. Mundy's job responsibilities?
2  A.  He -- he was in charge of contracting with our
3  motor -- motor carriers.
4  Q.  And, basically, kind of as you have alluded
5  to, contracting with motor carriers for the purpose of
6  them providing delivery service for International Paper
7  of your products to your customers?
8  A.  Yes.
9  Q.  And -- and how did his job differ than -- than
10 your job in -- in what both of you did on a day-to-day
11 basis?
12 A.  Mine was a little bit broader.  So his
13 department also contracted for railroad service in
14 addition to truck service and contracted for different
15 kinds of -- of truck service.  And then there were
16 other departments that contracted for energy or
17 chemicals or equipment.
18 Q.  Okay.  And when -- when you say Mr. Mundy's
19 department, what was that department?
20 A.  As I remember it, it was the Transportation
21 Sourcing department.
22 Q.  Okay.  And I -- I think when I showed you that
23 amendment, his title was -- that Amendment No. 1 that I
24 showed you earlier, his title, at least, at -- on June
25 12th, '08, when he signed that amendment, was Manager

### 54

1  Sourcing Motor Procurement --
2  A.  Yep.
3  Q.  -- would that be right?  Okay.  And in --
4  in -- basically, what did that department do?
5  A.  They negotiated and established and monitored
6  contracts with our motor carriers.
7  Q.  Okay.  By the way, do you -- do you know
8  Martha Lindbeck at all from Universal Am-Can?
9  A.  No.
10 Q.  And then when you say your position was a
11 little broader, in what respect?  A little broader than
12 Steve Mundy's in what respect, sir?
13 A.  Well, the organization sourced and contracted
14 for all the outside procurement at International Paper,
15 with the exception of wood.  There was a separate
16 organization that did wood procurement.
17    MR. BURKE:  Carl, why don't you let me
18 look at my notes, and if anybody else has any
19 questions, they can go ahead and do so.
20    MR. FISHER:  Sure.  Anybody else have
21 questions on the phone?
22    MR. SCHRECK:  I've got a few, and let me
23 jump into it.
24    THE REPORTER:  Who is that?  Excuse me.
25    MR. FISHER:  Who are you?

### 55

1        MR. SCHRECK:  This is Matthew Schreck.  I
2  apologize.
3            EXAMINATION
4  BY MR. SCHRECK:
5  Q.  Mr. Crawford, if you could turn to Page 43 of
6  Exhibit 2.
7  A.  Okay.
8  Q.  You were asked some questions earlier by
9  Mr. Burke regarding defaults under the contract.  Do
10 you remember that?
11 A.  Yes.
12 Q.  Okay.  And one of those defaults was failure
13 to comply with safety -- the facility safety rules and
14 operating procedures, correct?
15 A.  Yes.
16 Q.  Okay.  And what that meant is if the carrier,
17 an entity that was picking up the product from
18 International Paper's facility, isn't complying with
19 whatever those particular safety rules were,
20 International Paper can kick them off the site and say
21 you're not going to do any work for us; is that
22 correct?
23 A.  That's what it says.
24 Q.  Okay.  And that would include any rules or
25 procedures that were in effect at the facility, whether

### 56

1  it be regarding wearing shirts, where trucks were
2  supposed to park, how they were supposed to load,
3  etcetera, correct?
4  A.  Well, it says facility safety rules and
5  operating procedures which, I assume, would be
6  documented.
7  Q.  Okay.  And those -- those type of things would
8  include things that would go to personal safety at the
9  facility, correct?
10 A.  I assume so.
11 Q.  As well as things that would go to safety in
12 loading and unloading trucks, correct?
13 A.  I assume so.
14 Q.  Okay.  How familiar are you, if at all, with
15 the safety rules that were in effect at the Hammond
16 facility back in '08?
17 A.  Not at all.
18 Q.  Do you know who would be familiar with that?
19 A.  No.
20 Q.  At any point during the time that you were
21 with International Paper, did you ever become aware of
22 Martin's Bulk Milk Service?
23 A.  No.
24    MR. SCHRECK:  Give me a moment.  I have no
25 further questions.  If anybody else has any questions,



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

## 57

1  feel free to jump in.
2      MR. LANGS: This is Brian Langs. I just
3  have a couple questions for you, Mr. Crawford.
4      THE WITNESS: Okay.
5      MR. LANGS: I represent BMW.
6          EXAMINATION
7  BY MR. LANGS:
8   Q. Were you aware of the product liability claims
9  that the Plaintiff has alleged against the BMW entities
10 in this case?
11  A. No.
12  Q. Is it safe to say that you don't have any
13 opinions regarding the Plaintiff's allegations as to
14 the design of the BMW Plaintiff was driving at the time
15 of the accident was defective?
16  A. I have no opinion.
17  Q. All right.
18      MR. LANGS: That's all I've got for you.
19 Thank you.
20      MR. FISHER: I just have a couple
21 follow-ups.
22          EXAMINATION
23 BY MR. FISHER:
24  Q. Mr. Crawford, if you could look at Page --
25 Page 37, I will represent to you that the documents

## 58

1  that International Paper provided to me, in particular,
2  beginning at Bates numbered Page 36 that bears the
3  stamp "Original" at the top, that these are the
4  documents as I received them from International Paper.
5  All right?
6      So focusing on Page 37, which is also
7  marked as Page 2 of 24, do you know whether or not it
8  was typical in International Paper contracts that a
9  contract would, in effect, have a cover page that looks
10 like Bates number Page 36, and then the text would
11 begin on what is the third page, with the second side
12 or page being intentionally left blank? Do you have
13 any memory or knowledge of that?
14  A. No.
15  Q. Okay. So as you sit here today, you simply
16 have no knowledge as to why it is Bates Page 37, also
17 numbered as 2 of 24, simply has a horizontal line at
18 the top?
19  A. I have no knowledge.
20  Q. Okay. Second topic that I wanted to ask you
21 about goes to some questions that Mr. Burke asked you
22 concerning the timing and why it was that your
23 signature is November 12th, when the contract is dated
24 October 1st. And to focus your attention on that
25 topic, if you'd look at Bates numbered Page 35, do you

## 59

1  see that on that particular document, Mr. Mundy's
2  electronic signature appears at the bottom of a --
3  excuse me, the bottom of an October 24th, 2007 letter,
4  to a representative of Overnite, including copies of
5  the contract that we have previously agreed to?
6   A. Yes.
7   Q. All right. So in light of that date, does the
8  timing of the Eickholtz and Hays signature in late
9  October and your signature in early to mid November
10 make sense chronologically?
11  A. Yes.
12  Q. All right. And, finally, when Mr. Burke
13 focused your attention on the language that appears at
14 the top of Page 47, he began reading to you language
15 that starts with the word "Carrier shall solely
16 direct"?
17  A. Yes.
18  Q. This language that he read to you and to which
19 you gave answers to his questions, that's part of a
20 section that begins on the previous page, Bates
21 numbered 46, entitled Section 20, Independent
22 Contractor?
23  A. Yes.
24  Q. And so was this language to indicate that the
25 contract is stating that Overnite Express is performing

## 60

1  under this agreement as an independent contractor?
2   A. Yes.
3      MR. FISHER: That's all the questions I've
4  got.
5          FURTHER EXAMINATION
6  BY MR. BURKE:
7   Q. The section on Page 46 that Mr. Fisher just
8  asked you about entitled Independent Contractor, the
9  first sentence of that Section 20 states, am I correct,
10 "Carrier is and shall perform services under this
11 agreement as an independent contractor"?
12  A. Yes.
13  Q. Okay. And the Carrier referred to there is
14 Overnite Express at the time you signed this contract?
15  A. Yes.
16  Q. Okay. And the services being provided to
17 International Paper are the transportation of your
18 paper products, as you have previously explained?
19  A. Yes.
20  Q. Okay.
21     MR. BURKE: Nothing else.
22     MR. FISHER: Any other questions?
23     MR. SCHRECK: This is Matt. None.
24     MR. GOLDEN: Rob. No.
25     MR. FISHER: Okay. Signature is reserved,



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM CRAWFORD						JUNE 06, 2012

---

**Page 61**

1  and I think we can go off the record now -- Oh, unless
2  you needed som info.
3      THE REPORTER: What I need to do, since
4  everyone is on the phone, I just need to get
5  everybody's order on the record.
6      MR. FISHER: Okay. Great. Sure. The
7  court reporter needs your orders of how you want the
8  transcript.
9      MR. SCHRECK: Are you ordering the
10 original or...
11     MR. BURKE: Yeah. I'm ordering a
12 e-transcript or whatever I order.
13     THE REPORTER: Besides the original, you
14 don't want —
15     MR. SCHRECK: This is Matt. I'm going to
16 take a regular and a mini.
17     MR. GOLDEN: I'm not going to order a
18 copy. Bob Golden.
19     MR. LANGE: And this is Brian Langs.
20 Could you just send me e-transcript, please.
21     MR. FISHER: And I'll take an e-tran in
22 mini script format.
23     (Deposition concluded at 10:42 a.m.)
24     * * * * * SIGNATURE WAIVED * * * * *
25

---

**Page 62**

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3  MURRAY SCHEINMAN, Plenary )
   Guardian of the Estate and )
4  Person of JEFFREY J.      )
   SCHEINMAN, a Disabled     )
5  Person,                   )
                             )
6         Plaintiffs,  ) Case No.: 09 cv-5340
                             )
7  vs.              ) Honorable James F.
                    )       Holderman
8                   )
   MARTIN'S BULK MILK    ) Magistrate Susan E. Cox
9  SERVICE, INC., SAMUEL G. )
   FRANKE, CSX INTERMOD,    )
10 INC., INTERNATIONAL PAPER )
   COMPANY and OVERNITE     )
11 EXPRESS, INC.,           )
                            )
12       Defendants.  )
13       REPORTER'S CERTIFICATION
         DEPOSITION OF WILLIAM CRAWFORD
14              JUNE 6, 2012
15     I, Shannon H. DeLay, Certified Shorthand Reporter
16 in and for the State of Texas, do hereby certify to the
17 following:
18     That the Witness, WILLIAM CRAWFORD, was duly
19 sworn by the Officer and that the transcript of the
20 oral deposition is a true record of the testimony given
21 by the Witness.
22     That the examination and signature of the Witness
23 is waived by the Witness and the parties, and that the
24 original deposition was delivered to MR. RICHARD F.
25 BURKE, JR. for safekeeping on

---

**Page 63**

1     I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this procedure was
4  taken, and further that I am not financially or
5  otherwise interested in the outcome of the action.
6      Certified to by me this _____ day of_____,
7  2012.
8
9      _____
       SHANNON H. DeLAY, CSR No. 5481
10     Expiration Date: 12/31/2012
       Firm Registration No. 283
11     100 Congress Ave., Suite 2000
       Austin, Texas 78701
12     (512)634-1980

---



Toll Free: 800.211.DEPO
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com