IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person,<br><br>            Plaintiffs,<br>vs.<br><br>MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., CAN LTD., Successor to OVERNITE EXPRESS, INC EXPRESS, INC. and OX LLC, BMW of NORTH AMERICA, LLC, a corporation, BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a corporation<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.:09 cv 5340<br>)<br>) Honorable James F. Holderman<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S RESPONSE TO DEFENDANT INTERNATIONAL PAPER COMPANY'S LOCAL RULE 56.1(b)(3)(B) STATEMENT OF MATERIAL FACTS IN SUPPORT OF IPC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, JEFFREY J. SCHEINMAN, through his attorneys, CLIFFORD LAW OFFICES, P.C., submits this response and statement of material facts pursuant to Local Rule 56.1(b)(3) in response and opposition to Defendant International Paper Company's Local Rule 56.1(b)(3) Statement of Material Facts in Support of Their Motion for Summary Judgment. Plaintiff denies that there is no genuine issue of fact as to all of the facts cited below. Plaintiff further denies that Defendant's statement of material facts accurately reflects all of the relevant facts, and denies that defendant's statement of facts supports granting a summary judgment or dismissal of Plaintiff's Complaint. In support thereof, Plaintiff states as follows:

*[handwritten: EXHIBIT "1" WITH HIGHLIGHTING]*

1

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 7. June 13, 2008, UACL acquired the trucking and brokerage operations of OEI in an Asset Purchase Agreement such that UACL took over the previous OEI trucking services and OEI, for all intents and purposes, ceased to operate. (JAE 7, pp. 35, 42, 50, 55; JAE 9, pp. 46-47, 49-51, 55; JAE 18, pp. 6-8, 12, 16.) | 7. Plaintiff agrees the Asset Purchase Agreement sets forth the scope of the acquisition. However, Plaintiff objects to and denies the overly broad characterization that UACL took over the previous OEI trucking services. Plaintiff only has information as it pertains to IPC, and IPC had to agree to UACL's desire to take over OEI's contract with IPC before UACL could do so. |
| 8. The amended October 2007 contract between IPC and UACL, effective June 13, 2008, contains a section entitled "Independent Contractor" which provides that UACL shall perform all services under the agreement as an independent contractor to IPC and, under no circumstances, shall PC be construed as having responsibility for UACL's safety, means or methods. (JAE 9, p. 99; JAE 11, pp. 71-72; JAE 12, p. 59; JAE 13, p. 82.) | 8. Plaintiff agrees the October 2007 contract as assumed by UACL contains section #20 entitled Independent Contractor, but denies that it contains the argumentative conclusions with respect to responsibility. Plaintiff further states that the preceding paragraphs of the contract, including paragraphs 3-14 set forth multiple provisions that establish that UACL was under the control and supervision of IPC in virtually all aspects of the trucking services to be provided. |

**C. Relationship Between UACL and MBMS**

| | |
|---|---|
| 9. As IPC's transportation services provider beginning June 13, 2008, UACL had an obligation to fulfill the terms of the IPC/UACL contract and, in order to do so, it turned to MBMS to provide the same trucking services that MBMS had provided in the past for OEI with regard to its 2007 contract with IPC. (JAE 7, pp. 76, 102; JAE 9, pp. 17, 83-85.) | 9. Plaintiff agrees that as of June 13, 2008 UACL had an obligation to fulfill the terms of the IPC/UACL contract and agrees that UACL utilized MBMS on July 3, 2008 to perform UACL's truck transportation obligations, but objects to the overly broad characterization that MBMS was providing "the same trucking services that MBMS had provided in the past for OEI." |

4

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 10. In May 2008, in preparation for the eventual UACL purchase of OEI, UACL brokerage manager, John Moorer, sent a draft UACL Master Brokerage Agreement to MBMS. (JAE 8, p. 64.) | 10. Plaintiff agrees that John Moorer sent a draft UACL Master Brokerage Agreement to MBMS in May of 2008, and again in June of 2008, since the May copy had never been returned; However, John Moorer did not ever testify that such agreement was sent "in preparation for the eventual UACL purchase of OEI". Furthermore, UACL and MBMS had a standing Master Brokerage Agreement dating back to at least November 7, 2007, which pre-existed UACL's purchase of OEI. (Moorer dep., pp. 50-54, 64, Exhibit 8; November 7, 2007 UACL Master Brokerage Agreement with MBMS, Exhibit 22). |
| 11. In order for MBMS to act as a carrier on loads that UACL was brokering, UACL had several requirements for MBMS: (1) the three page Master Brokerage Agreement must be signed; (2) MBMS would have to provide a copy of its authority to operate; (3) MBMS must provide proof of insurance; (4) MBMS must provide a completed W-9; (5) MBMS must complete and return the carrier surgey form; and (6) all information has to be faxed to the UACL phone number. (JAE 7, pp. 84, 86, 135, 137; JAE 10, pp. 100-103.) | 11. Plaintiff disagrees with the statement, suggestion and/or inference that on July 3, 2008 UACL merely had brokered the transportation of IPC goods that MBMS and Franke were hauling at the time of this crash. UACL, legally and factually was not simply acting as a truck broker because UACL had a contractual obligation to actually transport IPC's paper products on July 3, 2008. However, plaintiff agrees that testimony has been presented stating that where UACL was acting solely in the capacity of a broker, it required MBMS to comply with the 6 items identified by Defendants. Plaintiff further agrees that UACL required MBMS to comply with all of these 6 items on July 3, 2008 even though UACL was not acting only as a broker for the load in question. (Anderton Dep. pp. 25-27, Ex. 11; Mundy Dep. pp. 98-100, Ex. 13.) |

5

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 12. MBMS signed and agreed to the UACL Master Brokerage Agreement, effective as of June 12, 2008 and on July 3, 2008, that provided, among other things, that MBMS is an independent contractor to UACL and is not to be deemed an agent of UACL. (JAE 7, pp. 110-111, 124; JAE 9, pp. 107-108; JAE 10, pp. 127-130.) | 12. Plaintiff agrees that MBMS had signed and agreed to a UACL master brokerage agreement effective June 12, 2008, but denies that on July 3, 2008, MBMS was hauling a load only pursuant to such brokerage agreement because testimony has established that on that day UACL was not simply a broker, but was operating as a motor carrier and was utilizing the services of MBMS to fulfill the truck transportation of IPC products which it was contractually bound to provide on that day. (Anderton dep., pp. 25-27, Exhibit 11). |

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 13. Pursuant to an agreement between UACL and IPC for delivery of IPC's products to its customers, UACL brokered the subject load to MBMS. (JAE 11, pp. 35, 78.) | 13. Plaintiff denies that UACL was acting as a truck broker when it utilized MBMS and Franke to perform the transportation services to which UACL was contractually bound to provide in UACL's capacity as a motor carrier under the October 2007 amended agreement. The Federal Motor Carrier Safety Administration Regulations, 49 C.F.R. § 371.2(a) defines a broker as "a person who, for compensation, arranges, or offers to arrange the transportation of property by an authorized motor carrier. Motor carriers or persons who are employees or bonafide agents of carriers, **are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.**" Additionally under 49 U.S.C. § 13102 (2), a broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing or arranging for transportation by motor carrier for compensation. Therefore UACL cannot accurately characterize itself as a truck broker who had simply "brokered" the subject load to MBMS. |
| 14. After June 13, 2008, when picking up IPC products and transporting them from the IPC Midwest Distribution Center, MBMS was delivering goods under the UACL Master Brokerage Agreement. (JAE 7, p. 76; JAE 9, p. 84.) | 14. Plaintiff denies the statement, inference and/or suggestion that MBMS delivered IPC goods only under the UACL Master Brokerage Agreement because UACL was operating as a motor carrier rather than a transportation broker. (Anderton Dep. pp. 25-27, Ex. 11). |

7

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| **D. Franke's Conduct Was Controlled by MBMS, Not IPC.** | D. Plaintiff objects to Defendant's claim that Franke's conduct was controlled by MBMS, not IPC insofar as it constitutes argument and is conclusory and does not properly belong in a Statement of Material Facts. |
| 15. Franke was employed by MBMS as a driver since 1999 and was so employed on the date of the occurrence. (JAE 2, pp. 6, 10, 58; JAE 4, pp. 15, 153; JAE 5, pp. 307, 362, 506.) | 15. Agreed. |
| 16. His work was always assigned through MBMS and his supervisor was David Martin and the Martins of MBMS. (JAE 2, pp. 10, 11; JAE 3, p. 123.) | 16. Agree other than as to "always." |
| 17. Franke never had any conversations with anyone at UACL concerning the load he was hauling on July 3, 2008 or any of the loads he hauled before July 3, 2008. (JAE 2, p. 39-40.) | 17. Agreed. |
| 18. IPC never gave MBMS or Franke instructions or directions concerning Frank. (JAE 4, p. 144; JAE 5, p. 326.) | 18. Denied since IPC's instructions and directions concerning transportation of its paper goods set forth in the October 2007 contract were to be complied with by any other company UACL used. (Mundy Dep, pp. 103-104, Ex. 13.) |

8

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 22. Franke would pick up a load at the MBMS terminal in Wilton, Wisconsin, deliver it to the Chicago area, re-load, and then bring a load back to the Wilton, Wisconsin MBMS terminal. (JAE 6, p. 30.) | 22. Agreed. |
| 23. On the day of the occurrence, Franke transported a load from Wilton, Wisconsin to Chicago, Illinois and he was assigned that load through dispatch at MBMS. (JAE 6, pp. 103-104.) | 23. Objection to the extent the cited testimony does not relate to the statement. However, plaintiff agrees generally Mr. Franke on the date of the occurrence transported a load from Wilton, Wisconsin to Chicago, and he was asked to do so in the most immediate sense by an employee of MBMS. |
| 24. David Martin and Pat Podlena of MBMS had the responsibility of coordinating Franke's pickup of a load on a day to day basis with the IPC Hammond Distribution Center. (JAE 6, p. 39.) | 24. Agreed. |
| **E. Neither Franke nor MBMS Represented Franke to be IPC's Agent, Just MBMS's Employee.** | E. Objection and denied. The cited deposition testimony does not support this statement. Franke was never asked, and never testified, as to whether or not he was a "agent" of IPC. He only testified that he never told people I'm here on behalf of IPC. (Franke dep. I, pp. 44-45, Exhibit 2). Agreed Franke did not consider himself to be an employee of IPC. Agreed David Martin testified he did not "represent" to anyone that Franke was an agent of IPC, however, David Martin testified that MBMS was acting as an agent for IPC by transporting its paper product to Minneapolis, and that MBMS was also acting as an agent for OEI (then owned by UACL) by transporting the paper product that OEI had agreed with IPC to get transported to Minneapolis. (Martin dep. I, p. 65, Exhibit 4) **RFB EDIT THE ABOVE ANSWER** |

10

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 25. Franke never considered himself to be an employee [or agent] of UACL, OEI, or IPC. (JAE 2, p. 47.) | 25. Agree Franke testified he did not consider himself an employee of UACL, OEI or IPC. Denied as to agency since Franke was not ever asked if he considered himself an agent of UACL, OEI or IPC. (Franke dep. I, p. 47, Exhibit 2). |
| 26. Neither David Martin nor Franke ever represented to anyone that Franke was an agent of IPC and Franke did not consider himself to be an employee of IPC. (JAE 2, pp. 44-45, 47, 58); JAE 4, pp. 142-143.) | 26. Objection and denied. The cited deposition testimony does not support this statement. Franke was never asked, and never testified, as to whether or not he was an "agent" of IPC. He only testified that he never told people I'm here on behalf of IPC. (Franke dep. I, pp. 44-45, Exhibit 2). Agreed Franke did not consider himself to be an employee of IPC. Agreed David Martin testified he did not "represent" to anyone that Franke was an agent of IPC, however David Martin testified that MBMS was acting as an agent for IPC by transporting its paper product to Minneapolis, and that MBMS was also acting as an agent for OEI (then owned by UACL) by transporting the paper product that OEI had agreed with IPC to get transported to Minneapolis. (Martin dep. I, p. 65, Exhibit 4). |
| 27. David Martin represented only that Franke was an employee of MBMS and that he received direction, control, supervision and management from MBMS. (JAE 4, pp. 143, 159.) | 27. Denied insofar as the October 2007 contract sets forth in sections 3, 8, 9, 10 and 11 rules and requirements that constituted direction, control, supervision and management. (October 2007 Contract between IPC and UACl, Ex. 15). Said terms were applicable to any company UACL used to perform the truck transportation services. (Mundy Dep., pp. 103-104, Ex. 13). |

**F. IPC Had No Involvement in the Method Of Payment to MBMS/Franke.**

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 33. MBMS provided Franke with the equipment he needed to do his job, including his truck, generally, and the truck he was driving on the date of the occurrence. (JAE 2, p. 10.) | 33. Agreed MBMS provided Franke with the tractor he was driving at the time of the occurrence. However, the trailer Franke was hauling was a pool trailer that had to meet the specifications of IPC as stated in their October 2007 contract with UACL, and the trailer had been loaded by IPC. (Mundy Dep., pp. 63-64, October 2007 Contract, Section J, Ex. 15). |
| 34. IPC never provided Franke with a truck or supplied the graphics, placard, stickers or logos on the tractor or trailer. (JAE 3, p. 447; JAE 5, p. 347.) | 34. Agreed as to the tractor portion of the semi-tractor trailer truck Franke was driving. |
| 35. IPC did not have any requirements regarding loading the trailer and never qualified, hired, disciplines, fined, counseled or fired any of the MBMS drivers. (JAE 11, p. 176.) | 35. Denied; IPC's October 2007 Contract with UACL had requirements for the qualifications of drivers used by UACL to haul IPC's goods. (Ex. 15, Sec. 3(H)). |
| 36. IPC never inspected the tractor, trailer, chassis or container via a pre-trip inspection. (JAE 11, p. 176.) | 36. Denied. The cited page of Ms. Anderton's deposition does not discuss the statement. The trailer was loaded by IPC's employees at its Hammond warehouse. (Franke Dep. Pp. 206-207, Ex. 3). |
| 37. MBMS owned, and was responsible for maintenance of, the tractor Franke was driving on the date of the accident. (JAE 2, pp. 12, 46; JAE 3, p. 139; JAE 4, pp. 18, 25, 77-79.) | 37. Agree MBMS owns the tractor and was responsible for maintaining it. However, the maintenance was required by IPC in its contract with UACL. (October 2007 Contract, Section 3(G), Ex. 15; Mundy Dep, pp. 59-60, Ex. 13; Crawford Dep., pp. 39-42, Ex. 12). |
| 38. IPC was not responsible for the maintenance of the tractor or trailer, the expenses of operation such as gas and oil, or for obtaining any licenses or permits for the tractor or trailer. (JAE, p. 347.) | 38. Agree, but further state that IPC required Universal to maintain the truck equipment. (October 2007 Contract, Section 3(G), Ex. 15; Mundy Dep, pp. 59-60, Ex. 13; Crawford Dep., pp. 39-42, Ex. 12). |

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 39. IPC never required Franke to inspect, clean, or maintain his tractor or trailer, or require him to use a designated place for the cleaning, servicing, or gassing of his tractor-trailer. (JAE 3, p. 449; JAE 5, pp. 328, 335.) | 39. Agreed. |
| 40. IPC never provided him with tools or instrumentalities he needed to do his work. (JAE 3, p. 446; JAE 4, p. 145.) | 40. Agreed, other than IPC employees at the Hammond Warehouse loaded the trailer. (Anderton Dep. pp.149-159, Ex. 11). |
| 41. IPC never provided Franke with clothing or log books, a co-driver, or money with which to purchase gas. (JAE 3, p. 447; JAE 5, p. 328.) | 41. Agreed. |
| 42. IPC never provided any directions or instructions on where or how to purchase gas, supplies or services while driving the truck. (JAE 6, p. 194.) | 42. Agreed |
| 43. IPC never dictated to any drivers that came to the Hammond distribution center how to use their log books, what clothing to wear, what equipment should be used, how to operate his tractor on the road, or report what was going on with their driving. (JAE 6, p. 173.) | 43. Denied insofar as in the October 2007 Contract IPC dictated that the motor carrier hauling its paper goods had to comply with all state, municipal and federal laws and regulations; and the carrier had to follows traffic regulations and Department of Transportation regulations. (October 2007 Contract, Section 3(H), Ex. 15; Anderton Dep., pp. 59-60; 67-68, Ex. 11; Mundy Dep., pp. 61-62, Ex. 13). Drivers also need to report per the contract, to IPC if the driver was going to be detained more than an hour. (Mundy Dep., pp. 103-104; Ex. 13). |

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| **H. IPC Did Not Monitor or Discipline The Conduct of MBMS Driver Franke.** | H. Denied; IPC did in fact monitor driver conduct and required 98% performance compliance with the October 2007 contract terms; IPC engaged in performance reviews of the carrier and its drivers. IPC disciplined the conduct of any MBMS driver because IPC could terminate the contract if a customer complained during delivery. Agree Franke was not actually disciplined by IPC. (Anderton Dep., pp. 125-126; 139-144, Ex.11; Mundy Dep., pp. 59-60; 69-70; 103-104, Ex. 13; Crawford Dep., pp. 42-44). |
| 44. MBMS kept a driver qualification file on Franke, reviewed his work annually, and provided him with an employee handbook which contained instructions from MBMS on how to use the fuel pump, how to fill out MBMS paperwork, what MBMS expected of him, and MBMS safety procedures, including instructions on how to do a pre-trip inspection, and what to do in the event of an accident. (JAE 3, pp. 107, 112, 118; JAE 5, pp. 282, 287, 365.) | 44. Agreed. |
| 45. With respect to the driver handbook and other documentation concerning safety that MBMS gave its drivers like Franke, at no time or place did any of those documents indicate that a MBMS driver should contact IPC or UACL after an accident occurred. (JAE 6, p. 132.) | 45. Object to the overly broad and vague nature of the statement without specifying what "other documentation" concerning safety, is referred to. With respect to the Driver Handbook, Plaintiff agrees Ms. Berndt so testified, but Plaintiff further states that the Handbook is not limited to driving performed for any particular company, including IPC and UACL. |

15

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 49. IPC never hired, disciplined, counseled, or qualified Franke as a driver. (JAE 3, p. 454; JAE 5, p. 340.) | 49. Plaintiff agrees IPC never personally hired, disciplined or counseled Franke. However, IPC did set qualifications for the motor carriers and their drivers that were hauling IPC's goods in Section 3(H) of the October 2007 Contract wherein it required that "carriers personnel shall be fully qualified and shall procure and maintain such licenses and permits as are required by local, state or federal laws and regulations required to maintain and operate the motor vehicle equipment. Carriers personnel shall comply with applicable local, state and federal laws and regulations". (October 2007 Contract, Section 3(H), Exhibit 15.) These contractual requirements had to be complied with by both UACL and any carrier it used to assist them in performing their transportation services for IPC. (Mundy Dep., pp. 103-104, Ex. 13). |
| 50. IPC never had or exercises the right to discipline Franke. (JAE 3, p. 454; JAE 5, p. 346.) | 50. Plaintiff agrees that IPC never exercised the right to discipline Franke. However, under the terms of the October 2007 contract, if IPC received complaints about a driver such as Franke, where that driver failed to comply with IPC's facility safety rules, or failed to make timely deliveries, and non-compliance with federal, state or municipal laws and regulations, Defendant IPC could terminate its contract with UACL. (October 2007 Contract, Section 8A-H.) |
| 51. IPC never instructed Franke on his appearance or personal grooming standards, and did not maintain a personnel file on him. (JAE 3, p. 454; JAE 5, p. 327.) | 51. Agreed. However, IPC could reject Mr. Franke if he was crass, inappropriately dressed, or disrespectful. (Martin Dep. II, pp. 340-341, Ex. 5.) |

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 52. IPC never conducted safety meetings or informational meetings which Franke was required to attend. (JAE 3, p. 461.) | 52. Agreed, however IPC required all drivers to comply with its facility safety rules and operating procedures. (October 2007 Contract, Section 8 (A), Ex. 15). |
| 53. IPC never kept track of his hours or service to ensure he was in conformity with Federal Motor Carrier Safety Regulations. (JAE 3, p. 454; JAE 5, p. 345.) | 53. Agree that IPC never personally kept track of Franke's hours, however IPC did require all drivers hauling its goods to comply with all "applicable local, state, and federal laws and regulations" which includes Federal Motor Carriers Safety Regulations. (October 2007 Contract, Section 3(H) and 8(G), Ex. 15). |
| 54. IPC never required Franke to take a physical exam. (JAE 3, p. 454; JAE 5, p. 345.) | 54. Plaintiff disagrees insofar as IPC required all motor carrier drivers to comply with all state, local and federal regulations, which includes Federal Motor Safety Act Regulations pertaining to periodic physical exams. (October 2007 Contract, Section 3(H) and 8(G), Ex. 15). |
| 55. IPC never directed Franke to use any particular route to use in moving IPC products and did not measure, score or evaluate his work. (JAE 6, pp. 194, 447.) | 55. Agree IPC did not direct Franke to use a particular route. However, Franke's work was subject to evaluation insofar as IPC engaged in performance reviews of its carriers to ensure the motor carriers hauling IPC goods complied with the minimum service level requirement of 98% and minimum on-time delivery requirement. (October 2007 Contract, Section 3(E) and 3(F), Ex. 15; Anderton Dep., pp. 139-144, 125-126, Ex. 11; Mundy Dep., pp. 59-60, 69-70, 103-104, Ex. 13). |

**I. IPC/UACL Did Not Learn of the Accident from MBMS/Franke.**

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 56. IPC did not learn about the existence of the accident until about a year after the accident. (JAE 11, p. 17.) | 56. Denied as to IPC. The cited testimony only states that Joan Anderton, one employee of IPC, did not learn of the collision until about 1 year after it occurred. However, some of IPC's goods were damaged in the collision and UACL had to compensate IPC for that damaged product. So IPC would have to have known some type of incident occurred. (Limback Dep. pp. 96, Ex. 9; Memo Bill for Cenveo delivery July 7, 2008). |
| 57. Melody Hansen of UACL first learned of the July 3, 2008 collision when UACL/IPC's lawyer, Carl Fisher, called her in 2012. (JAE 10, pp. 137-138.) | 57. Plaintiff agrees Melody Hansen personally so testified. However, UACL was notified of the collision by David Martin on the first business day after it occurred. (Martin Dep. pp. 336-337; Ex. 5). |
| **J. The Facts Surrounding the Accident Demonstrate That Neither IPC Nor UACL Controlled Franke.** | J. Plaintiff objects to the argumentative conclusory statement, which is not merely a statement of fact. Notwithstanding said objection, the contents of the October 2007 contract established extensive control and supervision by IPC and UACL on the activities of motor carrier drivers. (Ex. 15). |
| 58. IPC was unaware of how the delivery was executed and had no influence over it or any direct contact with MBMS concerning its delivery (JAE 11, pp. 20, 23, 28.) | |
| 59. After he was hired by MBMS, he was assigned to a dedicated run from Hammond, Indiana to Wilton, Wisconsin, hauling paper products for the shipper, IPC. (JAE 3, pp. 107, 132.) | 59. Object to the conclusory terminology of "dedicated run" and "shipper", but agree Franke regularly hauled paper products from IPC's warehouse to Wisconsin. |

19

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 63. Melody Hansen of UACL, the UACL representative who faxed broker confirmation sheets to MBMS, never provided any directions, instructions, tools, instrumentalities, safety instructions, driving instructions, discipline, fines, or other indicia of control to Franke; moreover, she did not require Franke to stay in communication or contact with her as a representative of UACL. (JAE 10, pp. 140-142.) | 63. Denied. Melody Hansen regularly provided broker confirmation sheets to Sam Franke and MBMS with directions and instructions for the load number, the location date and time of the pickup at International Paper, as well as the date, time and locations for the delivery of IPC's paper products at each of their customer destinations. (Exhibit 20, Broker Confirmation Sheets). Additionally, the Master Brokerage Agreement between UACL and MBMS set forth multiple requirements that MBMS had to meet, including compliance with all federal, state and local laws regarding the provision of transportation services, maintaining adequate insurance coverage and providing UACL with billing information immediately upon completion of loading and providing the name of the receiver and the status of delivery immediately upon completion of delivery. (Master Brokerage Agreement between UACL and MBMS dated June 12, 2008, Exhibit 14). |

21

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 64. MBMS, not IPC or UACL, dispatched Franke to transport the subject load. (JAE 3, pp. 23, 26; JAE 4, p. 164.) | 64. Objection to the vague meaning and import of the expression "dispatched". Notwithstanding said objection, MBMS told Franke that UACL and IPC needed a pickup; however MBMS would not do so unless and until MBMS received instructions from UACL/OEI to make a pickup. For the incident in question on July 3, 2008, at approximately 4:23, Melody Hansen, an employee of UACL/OEI, faxed to MBMS a broker confirmation sheet in which it instructed MBMS to make a pickup of paper goods at IPC's Excel warehouse in Hammond, Indiana, at 7:00 p.m. that evening. UACL/OEI further instructed MBMS that the paper products had to be delivered on July 7, 2008 between 7:30 a.m. and 4:00 p.m. at three different locations in the Minneapolis area. Two of the locations had specific delivery hours that were further specified. IPC and OEI (UACL) told MBMS where and when to make a pickup, and MBMS told Franke. Thereafter, MBMS would "dispatch", or assign one of its drivers, Samuel Franke, to make the requested pickup at IPC's warehouse. (Martin dep. II pp. 412-415, Exhibit 5; Broker Confirmation Sheet, Exhibit 20; Franke dep. II, pp. 470-471, Exhibit 3). |
| 65. When he was hauling the load on July 3, 2008, Franke considered himself to be an employee of MBMS and he was hauling the load on behalf of his employer. (JAE 2, p. 44.) | 65. Agree Franke considered himself to be an employee of MBMS; however, the only reason Franke was hauling a load down Route 41 at the time of this crash was because IPC and OEI (UACL) had requested MBMS to make the pickup of paper goods at IPC. (Franke dep. II, pp. 472-473, Exhibit 3). |

22

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 66. He received all of his instructions and directions from his employer, MBMS, with regard to the pickup and delivery he did on July 3, 2008. (JAE 2, p. 53.) | 66. Agree Franke so testified, however, Franke further testified that the only reason he made the pickup at IPC's warehouse was because OEI (UACL) and/or IPC had requested MBMS to do so, and MBMS then assigned Franke to pick up the load. (Franke dep. II, pp. 472-473, Exhibit 3). Additionally, all instructions pertaining to the pickup were communicated to MBMS by Melody Hansen of UACL via fax on July 3, 2008. (Martin dep. II, pp. 412-414, Exhibit 5). |
| 67. There were three Memo Bills (bills of lading) prepared by IPC for this load because the load was destined for three different places in Minneapolis. (JAE 2, p. 32; JAE 11, p. 94.) | 67. Plaintiff agrees IPC prepared three Memo Bills, also known as bills of lading, which IPC's warehouse employees gave to Franke when he made the pickup at IPC's Hammond warehouse at about 7:00 p.m. on July 3, 2008. The Memo Bills contain specific instructions from IPC as to the procedure for making the delivery at the offices of IPC's three customers, including date, time, contact person, as well as instructions to contact IPC if Mr. Franke was detained or had delivery issues. (Exhibit 21, three Memo Bills). |
| 68. Melody Hansen of UACL did not receive copies of IPC Memo Bills (bills of lading); after the deliveries were made to IPC customers, the brokered carrier (MBMS) sent the executed Memo Bills to UACL for payment. (JAE 10, pp. 54-55.) | 68. Agree Melody Hansen of UACL did not receive copies of IPC's Memo Bills because IPC prepared the Memo Bills and gave the Memo Bills directly to truck driver Franke when he arrived to make the pickup. Agree that after MBMS' driver made the delivery to IPC's customers, MBMS submitted the Memo Bills to UACL in order for MBMS to be paid, however, IPC then issued payment to UACL. (Anderton dep., pp. 107-112). |

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 69. The bills of lading contained standard information concerning customer-required delivery instructions for the load. (JAE 5, p. 483; JAE 11, p. 104.) | 69. The bills of lading contained some information that was standard "boilerplate" information; however, as described by IPC's Joan Anderton, the Memo Bill/bills of lading was a documented created by IPC and contained specific instructions for accomplishing the delivery to IPC's customer, including delivery date, time, location and contact person. The document also specifically described the commodity, amount of pallets or cartons, and the weight of the goods as well as a shipment number. (Anderton dep., pp. 107-113, Exhibit 11). The standard "boilerplate" language in the IPC's Memo Bill provided that the word "carrier" as used on the Memo Bill meant "any person or corporation in possession of the property under the contract". (Three Memo Bills, Exhibit 21). |
| 70. The delivery information did not apply to Franke because he was not delivering the load to the delivery location, but dropping the load in Wilton, Wisconsin, for later delivery in Minnesota by another MBMS driver. (JAE 5, p. 486.) | 70. Objection to the vague and misleading use of the expression "did not apply to Franke". Agree Franke was not personally taking the load all the way to IPC's three customers in Minneapolis. However, the delivery instructions given to Franke on the Memo Bills were to be given to another MBMS driver once Franke hauled the load to MBMS' headquarters in Wilson, Wisconsin, after which another MBMS driver would continue hauling the load to the three Minneapolis destinations. (Martin dep. II, pp. 484-486, Exhibit 5)(Franke dep. I, pp. 32-36, Exhibit 2). |
| 71. Franke signed the bills of lading after the trailer was loaded. (JAE 2, pp. 20, 32.) | 71. Agreed. |

24

| **DEFENDANTS ALLEGED UNCONTROVERTED FACTS** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 72. Franke's signature means that he was the driver that picked up the load and was responsible for the load until he got to Wilton. (JAE 2, p. 20.) | 72. Agreed. |
| 73. After Franke's truck was loaded, nobody from IPC gave him directions on how to drive his truck or what to do with his load once he departed the Hammond distribution center. (JAE 3, p. 442; JAE 11, p. 132.) | 73. Denied. The October 2007 Contract contains multiple provisions in which IPC set forth requirements for compliance with all local, state and federal regulations, and on time performance. (October 2007 Contract, Exhibit 15); Additionally the Memo Bills created by IPC, and given to Franke at IPC's warehouse, contained instructions as to exactly where the load was to be taken and when, how and to whom it was to be delivered. (Three Memo Bills, Exhibit 21). (Anderton dep., pp. 107-115). |
| 74. After the occurrence, David Martin had no choice but to terminate Franke from his employment at MBMS based on the severity of the collision. (JAE 6, p. 59.) | 74. Agree that Janet Berndt of MBMS so testified. |
| 75. Neither IPC nor UACL had anything to do with the termination of Franke from MBMS. (JAE 6, pp. 138-39.) | 75. Object to the vague and conclusory use of the expression "had anything to do with". Ms. Berndt testified that it was the decision of MBMS to terminate Franke after the collision, and that UACL and IPC had no involvement with that decision. (Berndt dep., p. 39, Exhibit 6). However, the Contract between IPC and UACL required compliance with all applicable local, state and federal laws and regulations, and non-compliance was a grounds under which IPC could terminate its Contract with UACL. IPC considered the terms of that Contract applicable to UACL and any carrier UACL used. (October 2007 Contract, Sections 3h and 8g, Exhibit 15); (Anderton dep., pp. 25-27, Exhibit 11). |

| DEFENDANTS ALLEGED UNCONTROVERTED FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| **K. MBMS and Franke Have Admitted That There Are No Documents That Show Franke Was the Agent of IPC Or UACL or That Show IPC or UACL Was the Principal of Franke.** | K. Plaintiff denies that MBMS and Franke have admitted that there are no documents that "show" Franke was the agent of IPC or UACL or that "show" IPC or UACL was the principal of Franke. Such statement is an inaccurate and overly broad characterization of the questions asked of MBMS and Franke in the Request For Admissions. MBMS and Franke were never asked about what any documents "show". |
| 76. IPC and UACL served multi-item requests for admissions pertaining to documents that purport to show a principal-agent relationship between IPC and Franke or between UACL and Franke. (JAE 19.) | 76. Plaintiff denies that IPC and UACL served requests for admissions "pertaining to documents that purport to show a principal-agent relationship". In actuality, IPC and UACL's Request to Admit did not ever use the word "show" or "purport to show". Rather, they requested documents that "state or denote", or "acknowledged in writing" a principal-agent relationship. Furthermore, defendant MBMS admitted only that they do not possess any documents that "specifically identify" MBMS as an agent of IPC or UACL. |
| 77. MBMS' and Franke's responses to the Requests for Admissions establish that MBMS and Franke do not believe there are any written documents memorializing a principal agent relationship between IPC and Franke or between UACL and Franke. (JAE 19.) | 77. Objection insofar as defendant's paragraph 77 is not a statement of fact, but rather is an argumentative conclusion and is based on speculation as to the mental state of MBMS and Franke, as well as conclusions and opinions of MBMS and Franke. The existence of a principal-agent relationship is a determination to be made by a jury based on evaluation of all the evidence in this case, including the October 2007 Contract between IPC and UACL, which does show that IPC maintained control over the actions of UACL and other drivers it used sufficient to form the basis for a finding that Franke, as a driver fulfilling UACL's contractual obligations to IPC, was an agent of IPC. |