IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person,<br><br>    Plaintiff,<br><br>v.<br><br>MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, UNIVERSAL AM CAN LTD., Successor to OVERNITE EXPRESS, INC., and OX LLC,<br><br>    Defendants. | Case No.: 09 cv 5340<br><br>Judge James F. Holderman<br><br>Magistrate Susan E. Cox |

**UNIVERSAL AM-CAN LTD.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST THE PLAINTIFF**

NOW COMES the defendant, Universal Am-Can Ltd. ("UACL"), d/b/a and successor to Overnite Express Inc., ("OEI"), by and through its attorneys, Carlton D. Fisher, William Yu and Cecilia A. Horan of HINSHAW & CULBERTSON LLP, and for its Reply in Support of Its Motion for Summary Judgment against the plaintiff, it states as follows:

**SUMMARY OF PLAINTIFF'S RESPONSIVE FACTS AND ARGUMENTS**

The essence of the facts and arguments in Plaintiff's Response to UACL's Motion for Summary Judgment, Responses to UACL's Statements of Material Facts, and Joint Statement of Additional Facts is fivefold:

    (a) UACL was acting as a "motor carrier" not a "broker" under both the IPC-OEI/UACL agreement and applicable Federal Motor Carrier Safety Regulations;

    (b) as attested to by deposition testimony, UACL is vicariously liable for FRANKE's negligence since he was acting on behalf of UACL under Illinois principles of agency law;

    (c) notwithstanding the non-dispositive "label" of independent contractor given to UACL in the IPC-OEI/UACL contract, the language of the agreement demonstrates UACL's ability to control MBMS driver (FRANKE) who was transporting IPC's paper products;

(d) application of the *Sperl v. C.H. Robinson* case to this case should preclude summary judgment for UACL; and

(e) the case law relied upon by UACL is distinguishable.

As is explained below, none of these arguments should preclude summary judgment for UACL.

## UACL'S STATUS AS A "BROKER" OR "CARRIER" OR "MOTOR CARRIER" IS NOT MATERIAL TO DETERMINING THIS PERSONAL INJURY, NOT CARMACK AMENDMENT, CASE

Plaintiff accurately quotes definitional language from a federal statute and an enabling regulation about brokers and motor carriers. His analysis is incomplete and out of context for a personal injury lawsuit. To adopt plaintiff's theory of liability, one must accept his implicit conclusion that anyone in the transportation system (shipper, broker, freight forwarder, 3PL, coordinator, arranger) is liable in a personal injury case for the wayward acts of a truck driver.

As Judge Coar pointed out in *Mach Mold Inc. v. Clover Associates*, 2004 WL 2005812 (N.D. Ill.), the Carmack Amendment "provides shippers with the statutory right to recover for actual losses to their property caused by carriers. *Am. Nat'l Fire Ins. Co. v. Yellow Freight Systems, Inc.*, 325 F.3d 924, 928-29 (7th Cir. 2003)." The underlying purpose of the Carmack Amendment is to clarify the "carrier's liability when damage occurs to a shipper's interstate shipment." *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987).

Under the Carmack Amendment, when a shipper's cargo is damaged or lost, it has a federal statutory claim against a "carrier" but not against a "broker." 49 U.S.C. 14706(a)(1). "Brokers are 'middle men' in the surface transportation industry 'who arrange transportation services between motor carriers and shippers of various products'." *Milan Express Co., Inc. v. Western Surety Company*, 886 F.2d 783, 784 (6th Cir. 1989).

Although a transportation entity may have authority to operate as both a broker and a carrier, *Global Van Lines, Inc. v. I.C.C.*, 691 F.2d 773, 774 (5th Cir. 1982), courts have observed

130592491v1 0903067

that at times the "difference between a carrier and a broker is often blurry." *Mach Mold Inc. v Clover Associates,* 2004 WL 2005812 (N.D. Il.). One thing is certain though, "[w]hat a party labels itself and what a party is registered as is not controlling [in determining Carmack Amendment liability]." *Custom Cartage v. Motorola*, 1999 WL 965686 (N.D. Ill.) *11. The gravamen of determining a putative broker's or carrier's status is its relationship with the shipper for purposes of the Carmack Amendment. *Travelers Insurance v. Panalpina*, *Inc.*, 2010 WL 3894105 (N.D. Ill.). [A party's] status as a "carrier" or "broker" of the damaged shipment focuses on the nature of the relationship between the "shipper" and the "purported carrier" or "broker", not the label put on [the purported carrier's or broker's] services. *See e.g.*, *Custom Cartage, Inc. v. Motorola, Inc.*, 1999 WL 965686, at *9 (N.D. Ill.); *Lumbermen's Mutual Casualty Co. v. GES Exposition Services, Inc.*, 303 F.Supp. 2d 920, 921 (N.D. Ill. 2003) (Bucklow, J.) ("Carrier" or "broker" analysis governed by how defendant "holds itself out to the world and its relationship to the shipper.")

As evidenced in this case, it is common for participants in the transportation industry to hold different authorities or permits to act in different capacities, e.g. motor carrier, broker, common carrier, freight forwarder. MBMS had authority to act as a motor carrier/contract carrier and broker. (Doc. No. 330-8, pps. 213-15). Both OEI and its successor UACL had authority to act as a motor carrier/contract carrier and as a broker. (Doc. No. 330-11, p. 12). In addition, although IPC is a shipper of its own products, it also had authority to act as its own motor carrier. (Doc. No. 330-15, p. 20). Moreover, what one party calls another, e.g. broker, carrier, "carrier agent," is not outcome determinative in a personal injury tort action. Instead, one must look at the actual relationship to determine if there is an agency relationship.

### THE APPLICATION OF THE IPC-UACL/OEI CONTRACT LANGUAGE AND UACL-MBMS MASTER BROKERAGE AGREEMENT LANGUAGE TO THE FACTS OF THIS CASE ALSO SUPPORTS SUMMARY JUDGMENT

Although plaintiff argues that the word "CARRIER" in the IPC-UACL/OEI contract is outcome determinative since it places the sole responsibility on UACL to transport IPC's products,[1] it is important to note that the language of the UACL-MBMS Master Brokerage Agreement characterizes MBMS and its employees as the carrier and UACL as the broker. One must examine the underlying facts to see whether these labels are accurate in describing the actual relationship between IPC, UACL and MBMS' driver Franke.

First, it is without doubt that there was no UACL employee or owner operator driver pulling the load which collided with plaintiff on July 3, 2008. The driver, Samuel Franke ("Franke"), was a direct employee of MBMS. Second, the testimony of Melody Hansen, the key point of contact for UACL on July 3, 2008, highlights she did not even know who the MBMS driver was for this load or any previous load. She never spoke with Franke and never had any interaction with Franke. Third, despite the language contained in the IPC-UACL/OEI contract about fleet requirements of UACL, no UACL tractor was used on July 3, 2008. Fourth, despite the IPC-UACL/OEI contract language concerning tractors and trailers committed for IPC paper product transport, no UACL tractor or trailer was used in the movement of IPC paper products on July 3, 2008. Instead, as the court is aware, the tractor was a MBMS tractor and the chassis and container that was picked up by Franke at the intermodal yard in Chicago before going to the Hammond distribution center belonged to other parties, CSXI and the entities who were dismissed from this case during the removal and remand arguments. See Doc. Nos. 148-49.

---

[1] In addition, plaintiff's counsel repeatedly interchanges the word "CARRIER" from the IPC-UACL-OEI contract with the statutory and regulatory term of art "motor carrier" when asserting his view of the facts. Once again, labels are not important in determining questions of agency.

### JUST AS OEI ACTED AS A BROKER IN CARRYING OUT ITS IPC CONTRACTUAL RESPONSIBILITIES BY CONTRACTING WITH MBMS, UACL CONTINUED THIS COURSE OF CONDUCT WITH IPC WHEN IT CONTINUED TO ACT AS A BROKER WITH MBMS

Although the law sometimes recognizes the difference between a carrier and a broker can be blurry, there is nothing blurry about what happened on July 3, 2008. UACL itself did not do the carriage or movement of the IPC paper product with its own employee drivers or owner-operators. As can sometimes be the case, what contracts say and what the parties to those contracts actually do can turn out to be incongruous or different; simply put, contracting parties may not require strict adherence to contractual terms when they operate on a day to day basis. This does not mean anything inappropriate has occurred, nor does it mean an accident occurred because the tasks sought to be accomplished were done in a manner not in keeping with the literal terms and conditions of contracts.

In this case, the shipper IPC allowed its initial contractor OEI to use other subcontractors to accomplish the transportation of the shipper's goods. In its Additional Fact #35, plaintiff acknowledged this "fact" which IPC and UACL gladly admitted. See cited testimony of IPC employees Anderton and Mundy. (Doc No. 325,¶35). Moreover, as OEI's former president testified at his deposition, OEI was "[a]bsolutely" allowed to "broker a load to some other driver or carrier in order to fulfill [its] transportation services" obligation under the IPC contract. Elsholtz deposition, pp. 31-32. Attached as Exhibit #18 in the Plaintiff's collection of exhibits.

In fact, IPC had asked OEI to "continue on" with MBMS, which had been a previous contractor through a broker to haul IPC products. Id. at p. 32. This practice continued throughout the term of the 2007 IPC-OEI contract up to June 12, 2008. After June 12, 2008, when UACL took over and stepped into the shoes of OEI, the practice continued with UACL acting as the broker. All three contracting parties (IPC, OEI and UACL) believed that OEI and its successor UACL had the authority and right to broker a load to MBMS "as part of [the CARRIER's]

130592491v1 0903067

responsibility under [the] contract with International Paper." Id. at p. 32. With this joint agreement, IPC, UACL and MBMS continued the course of conduct that had been adopted before June 12, 2008. This practice was in place on July 3, 2008, and has been admitted by plaintiff.

In addition, there is an important distinction to observe between the IPC-UACL/OEI contract and the UACL-MBMS Master Brokerage Agreement. On page 11 of 24 of the IPC-UACL/OEI contract, IPC specified that UACL shall perform its services as an independent contractor. (Doc No. 330-19,¶20). UACL was to solely direct all persons performing services performed by the carrier under the agreement and those persons shall remain subject to the exclusive control and direction of the carrier. When UACL (and OEI before it) decided to subcontract with MBMS, as permitted by IPC, no contract provision required MBMS to operate under UACL's or MBMS's authority.

In contrast, under UACL's Master Brokerage Agreement with MBMS, UACL required MBMS to operate under MBMS's motor carrier authority. (Doc No. 330-18,¶8). These two different contractual provisions highlight how IPC, UACL and MBMS operated within the context of a relationship designed to move IPC products from point A to point B.

Why is this important? It is important because there is nothing in this record that shows UACL ever carried products for IPC between June 13, 2008 and July 3, 2008 using UACL's own drivers, owner operator drivers, tractors, or trailers and operating under its authority as a contract motor carrier. What was actually happening, notwithstanding the contractual terms highlighted by the plaintiff's counsel, demonstrates what the expectations of the companies were for the movement of IPC paper products, namely, it was alright for UACL to subcontract these loads to another carrier in the same manner that OEI had been doing this with MBMS before June 13, 2008.

6

As the Court pointed out in its April 2011 decision, the question of agency will be based on "the contours of IPC's business relationship with UACL." Examining and evaluating the contours do not require wearing blinders. These contours are not defined by the labels that statutes and regulations define, contracts dictate or witnesses suggest; instead, they are shaped by the way in which the contracting parties relate to each other. The labels may inform the decision but they do not dictate the result. The contours of the relationship do not include an agency relationship between IPC and FRANKE.

**APPLYING PRINCIPLES OF ILLINOIS AGENCY LAW TO THE MATERIAL DEPOSITION TESTIMONY SUPPORTS SUMMARY JUDGMENT FOR UACL**

In opposing UACL's Motion for Summary Judgment, plaintiff refers to the testimony of only three witnesses. None of that testimony helps the plaintiff. UACL Vice-President Gina Hubbs' testimony that FRANKE showed up "on behalf" of UACL is subject to the same criticism that plaintiff wages against the label of "independent contractor" in the IPC-UACL/OEI contract.

"On behalf of" is a phrase that is devoid of legal or factual meaning. If a bellman at the apartment building of a tenant opens a door "on behalf of" an elderly tenant, does that make the bellman the agent of the elderly person? To paraphrase this Court's April 2011 decision, while one can reasonably assume that UACL received an 'economic benefit' from Franke picking up the load at Hammond for eventual delivery to IPC customers in Minneapolis-St. Paul, the assumption that FRANKE showed up "on behalf of" UACL does not further plaintiff's argument that Franke was UACL's agent." *Scheinman v. Martin's Bulk Milk Service*, 2011 WL 1399260 *5 (N.D.Ill.)

Hubbs' testimony that UACL required a (1) signed brokerage agreement from MBMS and (2) a signed bill of lading in order to be paid does not create a question of fact; instead, these "requirements" only highlight what was required by UACL before MBMS could be paid.

7

Dictation of how payment will be accomplished has nothing to do with how FRANKE operated his vehicle on July 3, 2008.

UACL President Mark Limback's testimony that any driver UACL used had to perform in accordance with local, state and federal laws or regulations and the terms of the Master Brokerage Agreement does not create a question of fact since (a) Judge Kennelly's analysis in *Boyle* dispenses with the first argument (and see the additional cases cited on page 13 of Document 311, UACL's Legal Memorandum) and (b) the terms of the brokerage agreement are subject to the same analysis.

Plaintiff relies almost exclusively on the testimony of David Martin of MBMS. First, his self-serving "conclusions" and "labels" are either inadmissible (see IPC/UACL Joint Motion to Strike) or devoid of significance. Saying that MBMS was acting as the "agent" or "extension" of UACL, was "performing a service," or was "all tied into the movement" are labels or phrases that constitute inadmissible legal conclusions or "sound bites" that do not shape the "contours of the relationship" between UACL and FRANKE.

Second, Martin did not stop there; he insisted that MBMS was the "carrier agent" of UACL, notwithstanding the fact that he could not identify the source of such an unusual label. Dave Martin deposition, pp.226-229. [2] When asked a hypothetical about whether a UPS or FED EX driver delivering his employer's package would be his "carrier agent" such that MBMS would be vicariously liable for an accident involving a UPS driver, Martin said "No." Dave Martin Deposition, p. 504.

Third, plaintiff claims that (a) MBMS never would have gotten involved unless IPC had previously asked OEI to arrange transport and (b) when UACL took over for OEI business

---

[2] There is no term "carrier agent" that exists anywhere in any federal or state statute or regulation or contract in this case that uses or defines the term "carrier agent."

8

continued as usual. These facts actually support UACL's position that the way IPC, UACL and MBMS operated on a daily basis - without strict adherence to the terms of their contracts - is indicative of how the contours of their relationship indicate no agency relationship between UACL and FRANKE.

Fourth, plaintiff points out that MBMS spoke to UACL representative Melody Hansen on a daily basis, Hansen called with details of drop off and follow up with documents, and UACL and IPC dictated how the load was to be picked up. All of these facts constitute "ancillary facts" as discussed on pages 12-13 of UACL's Memorandum of Law, Doc. No. 311, which do not create a question of fact.

Fifth, as previously discussed in UACL's Memorandum of Law at page 13, UACL's requirements that MBMS must complying with federal, state and local laws and maintain insurance "do not render an independent contractor an agent," *Boyle,* id., anymore than IPC's similar contractual provisions in its contract with UACL.

Finally, despite the fact that Martin said he spoke with UACL representative Hansen on a daily basis and that he called UACL on July 7, 2008 to advise it of the FRANKE-Scheinman crash of July 3, 2008, Ms. Hansen unequivocally denied learning about the crash until years after the accident when she learned she was to be deposed. Hansen deposition at p. 137. This disputed fact does not preclude summary judgment for UACL. Martin's notice or lack of notice to UACL about the accident is unimportant to the issue of whether UACL controlled FRANKE, especially since FRANKE has admitted he never called UACL to report the accident. The failure of FRANKE to call UACL or IPC certainly suggests that he did not feel he "reported" to UACL.

9

130592491v1 0903067

**IN CONTRAST TO THE CLEARLY APPLICABLE CASES CITED BY UACL SUCH AS *SCHRAMM* AND *JONES*, THE *SPERL* CASE IS DISTINGUISHABLE FROM THE FACTS OF THIS CASE**

Intoning the mantra of "*Sperl* Controls," plaintiff's counsel attempts to entice the reader off-course like a modern day siren in claiming *Sperl's* tenets preclude summary judgment. Although the close knit inter-relationship between the broker, C.H. Robinson, and the driver from DragonFly could have justified the jury result and appellate affirmation in *Sperl,* FRANKE did not have a relationship with UACL – in fact, he didn't even know who or what UACL was in late June and early July 2008. Franke deposition, pp. 44-45. Moreover, Melody Hansen, the UACL employee who sent "broker confirmation sheets" about IPC paper product loads on a daily basis, not only never spoke with FRANKE at any time, she did not even know of plaintiff's accident until years after it happened. Hansen deposition at p. 137.

The following chart is a continuation of the chart contained in IPC's reply brief highlighting the "**Facts Asserted by Plaintiff or Held by Court in Certain Illinois Appellate and Federal District Court Cases That *Did Not Preclude* Summary Judgment for the [Shipper] or Putative Principal.**" This continuation chart shows the key facts asserted by the plaintiffs or held by the Maryland and Virginia district courts in the *Schramm* and *Jones* cases that did not preclude summary judgment for the broker/putative principal.

| | |
|---|---|
| Contract between broker and driver purported to control driver's performance. | ***Schramm*** |
| Broker required driver to call in to receive dispatch information. | ***Schramm*** |
| Broker directed driver to pick up load at specific times. | ***Schramm*** |
| Broker provided driver with instructions to and from delivery location. | ***Schramm*** |
| Broker required driver to inspect load on pick-up. | ***Schramm*** |
| Broker required driver to use load locks. | ***Schramm*** |

130592491v1 0903067

| | |
|---|---|
| Broker required driver to call when he had successfully picked up the load and periodically throughout the trip. | ***Schramm*** |
| Broker arranged pick up and delivery dates and times. | ***Jones*** |
| Broker provided pick up and delivery addresses to the carrier. | ***Jones*** |
| Broker communicated directions regarding the loading and unloading of cargo and time sensitivity issues for the load. | ***Jones*** |
| Broker provided other directions for transportation of the load. | ***Jones*** |
| Broker required drivers to call in when dispatched, when he arrived at the pick-up address, when the trailer was loaded and the freight was checked by the driver, during the transportation of the shipment, and when the driver arrived at the delivery location. | ***Jones*** |
| Broker required driver to call in to report any problems with the load or equipment. | ***Jones*** |
| Broker could terminate a carrier's right to transport a load or could "bounce" a load (transfer it to another carrier). | ***Jones*** |
| Broker could control driver's access to advances for costs of fuel or other necessities. | ***Jones*** |

What is clear from these charts is that the facts that might appear facially to create a question of fact about agency were insufficient to create such a question and did not preclude summary judgment.

Since the plaintiff spends a great deal of time citing to *Sperl* in suggesting to this Court that there must be a question of fact about a putative agency relationship between UACL and either FRANKE or MBMS, UACL believes another chart will help demonstrate how the absence of the key facts from *Sperl* in the Scheinman case should result in the Court granting summary judgment to UACL:

11

| Facts Asserted by Plaintiff or Held by Court That *Precluded Summary Judgment and Judgment N.O.V.* for C.H. Robinson in the *Sperl v. C.H. Robinson* case | Application to Universal Am Can Ltd.? |
|---|---|
| Broker owned product being transported | NO |
| Load delivered to broker's warehouse | NO |
| Broker imposed fines on driver to ensure schedule followed | NO |
| Broker's special instructions had potential for multiple fines to the driver from the broker | NO |
| Broker's special instructions forced driver to violate Federal Motor Carrier Safety Regulations | NO |
| Broker required trailer provided by driver to have a reefer unit of specific length | NO, FRANKE obtained chassis and container at Chicago intermodal yard |
| Driver familiar with requirements based on previous runs as opposed to actual knowledge of written rules | NO, although FRANKE had done this run repeatedly when OEI was and UACL became the broker |
| Broker required driver to make daily check calls | NO |
| Broker required driver to stay in constant communication about transport and delivery | NO |
| Broker required driver to notify about an accident | NO, in fact FRANKE never notified UACL |
| Broker required driver to continuously measure temperature of load | NO |
| Broker controlled the method of payment to driver | NO |
| Broker dispatched the driver | NO |

12

| Broker's work "closely aligned with transportation work" of the driver | No, see reply brief |

Given the dearth of similarities between the facts in the *Sperl* decision and the facts of the Scheinman case, only the last factor on the chart - "closely aligned with" or "integral part" of the transportation work – requires more detailed attention given the lengthy treatment of this factor in the *Sperl* opinion. With all due respect to the appellate court's articulation of this factor in the *Sperl* decision, and before repeating the persuasive analysis of Judge Kennelly on this factor in the *Boyle* decision, simple logic should dispense with the so-called "veto" power of this factor.

It goes without saying that many manufacturers and distributors have enjoyed increased sales to the average American consumer with the advent of internet sales. These shippers' businesses are dependent upon the rapid delivery of their purchased goods to their customers. The logic of the *Sperl* argument, when extended to its fallacious *reductio ad absurdum* conclusion, would dictate that these shippers would automatically be vicariously responsible for the negligent actions of the UPS or Fed Ex driver as he speeds toward or away from the customer's house, blowing a stop sign along the way. Delivery of the shipper's product to its customers is clearly by definition an "integral part" of the shipper's business; however, this factor does not rise to the level that a factor like "control" has in the equation of determining agency. If it did, then all shippers and all brokers would be principals of the truck drivers who deliver the products they seek to distribute.

It is unfortunate that the *Sperl* opinion did not consider Judge Kennelly's analysis on the so-called "integral part of the business" factor. The "integral part of the business" factor is flawed in many respects, not the least of which is that the logic of the workers compensation setting on which this factor is based does not apply neatly in a situation like the Scheinman case. As Judge Kennelly pointed out in *Boyle v. RJW Transport*, 2008 WL 4877108 (N.D.Ill. June 20,

13

2008), '[t]his inquiry [about whether a trucker is an 'integral part' of a broker/shipper's business] is ill-suited to the trucking context. . . .[T]rucking is a readily identifiable separate business and thus a 'distinct channel through which the cost of an accident may flow.'" *Id.* at *10. It is clear from the discovery in this case that MBMS had insurance and thus has financial responsibility for this accident.

Just as Judge Kennelly discussed when reciting his research about the workers' compensation cases on which the "integral part of the business" factor was based, when one analyzes the *Ware*, *Peesel*, *Earley*, *Ragler* and *Sperl* decisions on the factor of "integral part of business," the key language is contained in the *Ragler* decision. If "the work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow," then that activity is an integral part of the business and in the context of the workers compensation system presumptively falls "within the protection of the [Workers] Compensation Act." *Ragler, Id.*

As pointed out by Judge Kennelly, this concept from workers compensation law (applied in a setting such as the Illinois Industrial Commission where it must sometimes decide if a person is an employee of a respondent putative employer) does not neatly translate into the world of third party litigation. But assuming it does transpose itself into the world of civil liability as Plaintiffs' counsel suggests from the language of *Sperl*, MBMS is a certificated motor carrier "through which the cost of an accident may flow." *Ragler, Id.* MBMS was required to obtain at least $750,000 in insurance coverage in order to operate as a motor carrier in the United States. As attested by the exhibits attached to the summary judgment motions and plaintiff's responses, MBMS obtained a $1,000,000 insurance policy and stands before this Court with the financial responsibility that the law expects and demands. The fact that such a policy does not have as

14

much coverage as Plaintiffs' counsel might want does not determine how a summary judgment motion should be decided.

Since this is not a situation where FRANKE himself claims injury and seeks workers compensation or where UACL had direct contact with FRANKE as in the *Sperl* case, the "integral part of the business" factor can be relegated to a position much lower than plaintiff wishes or that *Sperl* seems to suggest is required or warranted.

## CONCLUSION

All of the facts indicate that at the time of the occurrence, Franke and MBMS were independent contractors of UACL, which in turn was an independent contractor of IPC. UACL is entitled to summary judgment on Plaintiff's Fifth Amended Complaint.

                                              Respectfully submitted,

                                              HINSHAW & CULBERTSON LLP

                                              By: s/Carlton D. Fisher

Carlton D. Fisher
William Yu
Cecilia A. Horan
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3450