IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY SCHEINMAN, Plenary Guardian of the Estate and Person of JEFFREY J. SCHEINMAN, a Disabled Person, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 09 C 5340 |
| MARTIN'S BULK MILK SERVICE, INC., SAMUEL G. FRANKE, INTERNATIONAL PAPER COMPANY, and UNIVERSAL AM-CAN LTD., Successor to OVERNIGHT EXPRESS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

CORRECTED MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On July 3, 2008, Jeffrey Scheinman was severely injured, and became permanently disabled, when his stopped BMW convertible was rear-ended at a red light at the intersection of Skokie Valley Road and Half Day Road in Highland Park, Illinois. In this lawsuit, plaintiff Murray Scheinman ("Plaintiff"), Jeffrey Scheinman's guardian, brings negligence claims against: (1) the driver of the truck that struck Jeffrey Scheinman's car, Samuel G. Franke ("Franke"); (2) Franke's employer, motor carrier Martin's Bulk Milk Service, Inc. ("MBMS"); (3) the shipper of the load carried by Franke on July 3, 2008, International Paper Company ("IPC"); and (4) the company that arranged for MBMS to handle IPC's deliveries, Universal Am-Can Ltd. ("UACL").

Plaintiff's claims against IPC and UACL are based on vicarious liability, and Plaintiff has alleged that Franke was acting as IPC's and UACL's agent at the time of the July 3, 2008,

1

collision. (Dkt. No. 168 ("5th Am. Compl.") Count III, ¶ 5; Count IV, ¶ 5.) Pending before the

court are "International Paper Company's Motion for Summary Judgment Against the Plaintiff"

(Dkt. No. 313) and "Universal Am-Can Ltd.'s Motion for Summary Judgment Against the

Plaintiff" (Dkt. No. 314).[1] For the reasons set forth below, IPC's motion for summary judgment

is granted and UACL's motion for summary judgment is granted.

BACKGROUND[2]

A.     Background of the Parties

Franke was employed by MBMS as a truck driver beginning in 1999, and was working as

an MBMS truck driver on July 3, 2008, when the truck he was driving collided with Jeffrey

Scheinman's vehicle. (Dkt. No. 307 ("IPC's SMF")[3] ¶¶ 3, 15.) MBMS owned the "tractor" or

cab portion of the truck driven by Franke on July 3, 2008, and MBMS personnel gave Franke his

---

[1] Defendant OX LLC has been dismissed as a defendant in this lawsuit. (Dkt. No. 360.) OX LLC's motion for summary judgment (Dkt. No. 303) is therefore denied as moot.

[2] The court acknowledges that, in response to IPC's and UACL's objection and motion to strike, this court has denied Franke and MBMS the opportunity to respond to the pending summary judgment motions. (*See* Dkt. No. 339.) The court hereby clarifies that its recitation of the undisputed facts in the Background section and throughout this Memorandum Opinion and Order is for purposes of its analysis in adjudicating the claims and defenses addressed in this Memorandum Opinion and Order only.

IPC and UACL have also filed motions to strike certain of Plaintiff's responses to their 56.1(a)(3) statements of undisputed material facts and certain paragraphs of Plaintiff's 56.1(b)(3)(C) statement of additional undisputed material facts, alleging that these items fail to comply with N.D. Ill. Local Rule 56.1. (See Dkt. Nos. 343, 345, and 346.) This court has the discretion to strictly enforce Local Rule 56.1 or to overlook transgressions of the rule, as long as it does so with an even hand. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). The court has reviewed the Defendants' concerns, and has carefully scrutinized Plaintiff's responses and assertions of fact—along with those of Defendants—to avoid the inclusion of any unsupported facts in this Background section. Consequently, exercising the court's discretion, Defendants' motions to strike are denied.

[3] Where IPC and UACL have set forth the same fact in their respective Rule 56.1(a)(3) statements of material fact, the court cites only to IPC's statement for purposes of efficiency.

driving assignment that day. (*Id.* ¶¶ 4, 16, 64; *see also* Dkt. No. 327 ("Pl.'s Resp. to IPC's SMF") ¶ 4.)

The box container being hauled by Franke on July 3, 2008, contained a load of paper products being shipped by IPC from its regional distribution center in Hammond, Indiana, to three of IPC's customers in Minneapolis, Minnesota. (IPC's SMF ¶ 67; Dkt. No. 325 ("Pl.'s Add'l Facts") ¶ 27; *see also* 5th Am. Compl. at Count III, ¶ 7.) In his capacity as an MBMS truck driver, Franke regularly hauled paper products from IPC's regional distribution center in Hammond, Indiana, to the MBMS terminal in Wilton, Wisconsin. (IPC's SMF ¶¶ 22, 59; *see also* Pl.'s Resp. to IPC's SMF ¶ 59.) IPC did not contract directly with MBMS for these trucking services; rather, IPC contracted with UACL, and UACL, in turn, contracted with MBMS. (IPC's SMF ¶ 9; Pl.'s Resp. to IPC's SMF ¶ 9.)

B.   <u>Relevant Contracts</u>

Two general contracts govern the relationships between MBMS, IPC, and UACL, and are potentially relevant to the court's analysis:

- the "OXEN Overnite Express 2007 Outbound Contract," originally executed between IPC and Overnight Express, Inc. ("OEI") on October 1, 2007, and assumed by UACL on behalf of OEI pursuant to Amendment No. 1, effective June 13, 2008 (hereinafter the "IPC-UACL Agreement"), and

- the "Universal Am-Can Ltd. Master Brokerage Agreement" between UACL and MBMS, effective June 12, 2008 (hereinafter the "UACL-MBMS Master Brokerage Agreement").

1.    <u>The IPC-UACL Agreement</u>

The IPC-UACL Agreement itself consists of two parts: the October 1, 2007 contract between IPC and OEI (Defs.' & Pl.'s Ex. 15 ("IPC-OEI Contract")) and Amendment No. 1 to the IPC-OEI Contract (Defs.' & Pl.'s Ex. 16 ("Amendment No. 1.")). It is undisputed that, pursuant to Amendment No. 1 to the IPC-OEI Contract, UACL assumed OEI's responsibilities under the

IPC-OEI Contract effective June 13, 2008. (IPC's SMF ¶ 6; *see also* Amendment No. 1 at IP000006 ("*Effective June 13, 2008 CARRIER will be operating under the name of [UACL]. . . . All other terms of the [IPC-OEI] Contract shall remain and are in full force and effect.*") (italics in original).) In accordance with this assumption of responsibility, and with the approach taken by the parties in their briefing before the court, the court replaces "OEI" with "UACL" in the following recitation of the relevant contract terms.

The IPC-UACL Agreement identifies UACL as the "CARRIER" and IPC as the "SHIPPER," and states the parties' mutual intent "to enter into a contract, not a common carrier relationship, under which CARRIER shall perform transportation-related services for SHIPPER for all commodities unless covered otherwise by separate agreement between the parties." (IPC-UACL Agreement at UACL/OEI_000035.) Although the record is missing the specific document describing the "Services" that UACL was obligated to perform for IPC under the terms of the IPC-UACL Agreement,[4] the IPC-UACL Agreement elsewhere states UACL's obligation to provide IPC with tractors, drivers, and trailer combinations on a daily or weekly basis. (*See* IPC-UACL Agreement § 7.A.) Under a section labeled "CARRIER Personnel," the IPC-UACL Agreement requires UACL to provide IPC with qualified, licensed drivers who shall "comply with applicable local, state, and federal laws and regulations." (IPC-UACL Agreement § 3.H.) UACL is also required to provide IPC with clean, water-tight, and safe trailers, and to maintain all tractors and trailers in safe operating condition. (IPC-UACL Agreement §§ 3.G., 3.J.)

The IPC-UACL Agreement further states that "[a]ll shipments tendered to [UACL]" are subject to the terms and conditions contained in IPC's sample bill of lading, that UACL shall

---

[4] *See* IPC-UACL Agreement § 3.A. ("CARRIER shall . . . [p]rovide services as set forth in Exhibit C, Motor Carrier Rate and Weekly Commitment Schedule."); Exhibit C to the IPC-UACL Agreement is not part of either Defendants' Exhibit 15 or Plaintiff's Exhibit 15.

obtain a delivery receipt "[u]pon delivery of each shipment," and that UACL shall provide IPC with a copy of any such delivery receipt. (IPC-UACL Agreement § 10; *see also* Pl.'s Add'l Facts ¶ 17.) Pursuant to Section 9 and Exhibit H of the IPC-UACL Agreement, UACL was required to have the ability to communicate electronically with IPC regarding the acceptance of a load tender, the anticipated pick-up date/time, any unexpected delays, and other similar "delivery events." (IPC-UACL Agreement § 9; *id.* at UACL/OEI_000060-61 ("Ex. H"); *see also* Pl.'s Add'l Facts ¶¶ 18-25.)

The IPC-UACL Agreement also sets forth additional "CARRIER" obligations, including UACL's obligation:

- to "[c]oordinate and establish delivery schedules for all services provided,"

- to meet a "Minimum On-Time Delivery Requirement" of 98% (defining as "not on-time" shipments that "do not meet their delivery appointment, shipments not picked up from facilities as promised, shipments not delivered with established and reasonable transit times, and transit failures en-route"), and

- to "[e]mploy at its cost and expense the personnel required to maintain and operate CARRIER'S motor vehicle equipment as required to perform the services contemplated under this Agreement."

(IPC-UACL Agreement §§ 3.C., 3.F., 3.H.; *see also* Pl.'s Add'l Facts ¶ 12.) As noted above, the IPC-UACL Agreement further states that "CARRIER'S personnel shall be fully qualified and shall procure and maintain such licenses and permits as are required by local, state, or federal laws and regulations required to maintain and operate the motor vehicle equipment" and that "CARRIER'S personnel shall comply with applicable local, state, and federal laws and regulations." (IPC-UACL Agreement § 3.H.)

Section 20 of the IPC-UACL Agreement, labeled "Independent Contractor," states:

CARRIER is, and shall perform services under this Agreement as, an independent contractor.

> CARRIER shall solely direct all persons performing services performed by CARRIER under this Agreement, and such persons shall be and remain subject to the exclusive control and direction of CARRIER. Under no circumstances shall SHIPPER be construed as having responsibility for CARRIER'S safety, means or methods.

(IPC-UACL Agreement § 20; *see also* IPC's SMF ¶ 8.)

IPC had the right to terminate its agreement with UACL "[s]hould there be a continuing or substantial failure in [UACL's] performance" under the IPC-UACL Agreement, if IPC first provided UACL an opportunity to cure. (IPC-UACL Agreement § 8; *see also* Pl.'s Add'l Facts ¶ 26.) Events constituting a "continuing substantial failure" include, but are not limited to:

- Failure to comply with facility safety rules and operating procedures [specific examples omitted];

- A combined calendar year minimum service acceptance level for origin equipment supply commitments and on-time deliveries of less than 98 percent;

- Three consecutive months of minimum service acceptance level below 98 percent in either origin equipment supply commitments and/or on-time deliveries;

- Two or more delivery service written complaints within a three (3) month period from [IPC's] customers requesting that [UACL] no longer deliver to their facilities;

- A downgrade in [UACL's] DOT rating by the Department of Transportation;

- Failure to maintain minimum insurance coverage;

- Non-compliance with Federal, State, or Municipal laws and regulations; and

- Bankruptcy or other insolvency of [UACL].

(IPC-UACL Agreement § 8.)

The parties dispute whether UACL acted as a "broker" or a "carrier" with respect to IPC's shipment on July 3, 2008. (*See* IPC's SMF ¶ 13; Pl.'s Resp. to IPC's SMF ¶ 13.) It is undisputed, however, that UACL contracted with MBMS to fulfill UACL's obligations under the IPC-UACL Agreement, as discussed in detail below. (IPC's SMF ¶ 9.)

Joan Anderton ("Anderton"), manager of IPC's Hammond, Indiana, regional distribution center, testified that IPC "expected that [its] product would be . . . picked up and delivered based upon the contract requirements" in the IPC-UACL Agreement, regardless of whether UACL provided the driver or hired "some other driver" to complete the delivery. (Defs.' & Pl.'s Ex. 11 ("Anderton Dep.") at 26:17-27:6; Pl.'s Add'l Facts ¶¶ 35-36.) Similarly, Steve Mundy ("Mundy"), Manager of IPC's Motor Carrier Group, testified that the IPC-UACL Agreement "does not prohibit a carrier from using another carrier," and that he would expect that, if UACL used any other trucking company to make one of IPC's deliveries, this second trucking company would also comply with the terms of the IPC-UACL Agreement. (Defs.' & Pl.'s Ex. 13 ("Mundy Dep.") at 102:21-103:11; Pl.'s Add'l Facts ¶¶ 35-36.) Mundy further testified that, "regardless of whether [MBMS] made the actual delivery of [IPC's] goods," in the event of a breach of the IPC-UACL Agreement, he would seek satisfaction from UACL. (Mundy Dep. at 103:12-19; Pl.'s Add'l Facts ¶ 37; *see also* Dkt. No. 346 ("UACL's Resp. to Pl.'s Add'l Facts") ¶ 34 ("UACL admits that UACL had the responsibility to fulfill the terms of the IPC-UACL/OEI agreement.").) Mundy's testimony is consistent with that of Mark Limback ("Limback"), President of UACL, who testified that UACL was permitted to act as "both a contract carrier and a broker" with respect to IPC shipments, and could "use[ ] an independent contractor to haul" IPC shipments as a means of fulfilling UACL's contractual obligations. (Pl.'s Add'l Facts ¶ 41; Dkt. No. 345 ("IPC's Resp. to Pl.'s Add'l Facts") ¶ 41; *see also* Defs.' & Pl.'s Ex. 9 ("Limback Dep.") at 15:5-17:12.)

2.     The UACL-MBMS Master Brokerage Agreement

Various UACL employees testified that UACL contracted with MBMS to transport IPC paper products. (*See generally* IPC's SMF ¶¶ 12, 14 (citing Defs.' & Pl.'s Ex. 7 ("Hubbs Dep.");

Defs.' & Pl.'s Ex. 10 ("Hansen Dep."); and Limback Dep.)   Gina Hubbs ("Hubbs"), Vice President of UACL, stated that the June 12, 2008, UACL-MBMS Master Brokerage Agreement was the effective contract governing the relationship between UACL and MBMS at the time of the July 3, 2008, collision, and she agreed that "the paper products that were being moved [on July 3, 2008] were being moved as part of [UACL's] obligations to provide transportation services pursuant to [the IPC-UACL Agreement]."   (Hubbs Dep. at 76:13-19, 110:2-111:7.) Limback similarly testified that MBMS "would have delivered the goods under their master brokerage agreement" with UACL, and he identified the relevant contract as the June 12, 2008, UACL-MBMS Master Brokerage Agreement.  (Limback Dep. at 84:22-24, 107:3-5.)

Both Hubbs and Limback acknowledged at their depositions that the UACL-MBMS Master Brokerage Agreement is not signed by UACL.  (Hubbs Dep. at 111:8-13; Limback Dep. at 107:[6-9.)  As explained by Limback, "[o]ur policy was unless the trucking company wanted a signed copy back [from us], we expected that they would abide by our contracted terms by them signing it."  (Limback Dep. at 107:11-14.)   It is undisputed that the June 12, 2008, UACL-MBMS Master Brokerage Agreement was signed by an MBMS representative named J. Pat Podlena.  (IPC's SMF ¶ 12; *see also* UACL-MBMS Master Brokerage Agreement at 3.)

Pursuant to the June 12, 2008, UACL-MBMS Master Brokerage Agreement, MBMS agreed to "comply with all federal, state and local laws regarding the provision of the transportation services contemplated under this Agreement," to procure and maintain specific amounts and types of insurance coverage, and "to contact UACL's designated agent with billing information immediately upon completion of loading and with the name of receiver and status of delivery immediately upon completion of delivery."   (UACL-MBMS Master Brokerage

Agreement ¶¶ 3, 5, 10; (Dkt. No. 326 ("Pl.'s Resp. to UACL's SMF") ¶ 18.)  The UACL-MBMS

Master Brokerage Agreement also includes a clause stating, in relevant part:

> [MBMS] is an independent contractor and is IN NO WAY TO BE
> CONSIDERED AN AGENT, EMPLOYEE OR JOINT VENTURER OF UACL,
> in the providing of any services hereunder.

(UACL-MBMS Master Brokerage Agreement ¶ 3 (capitalization in original); *see also* IPC's

SMF ¶ 12.)

C.     MBMS's Relationship with Franke and MBMS's Relevant Conduct with Respect to the
       July 3, 2008, Shipment of IPC Paper Products

As noted above, MBMS owed the tractor portion of the truck driven by Franke on July 3,

2008.  (IPC's SMF ¶¶ 4, 33.)  MBMS personnel were responsible for giving Franke his driving

assignments, both generally and on July 3, 2008.  (*Id.* ¶¶ 16, 24, 64.)  Franke received his

paycheck and W-2 form from MBMS, and MBMS deducted his payroll taxes.  (*Id.* ¶ 28.)

MBMS was responsible for maintenance of the tractor driven by Franke.  (*Id.* ¶ 37.)

MBMS also kept a driver qualification file on Franke, reviewed his work annually, and

provided him with an employee handbook which contained instructions from MBMS on how to

use the fuel pump, how to fill out MBMS paperwork, MBMS's expectations of its drivers, and

MBMS's safety procedures, including instructions on how to do a pre-trip inspection and what to

do in the event of an accident.  (*Id.* ¶ 44.)

As an MBMS employee, Franke hauled deliveries from IPC's Hammond, Indiana,

regional distribution center to MBMS's terminal in Wilton, Wisconsin, every day starting about

two to three years before the accident.  (*Id.* ¶ 59; *see also* Defs.' & Pl.'s Ex. 3 ("Franke Dep.

(2d)") at 130:6-21.)  MBMS generally directed its drivers to take the shortest route, in terms of

either distance or time, within reason and based on conditions.  (IPC's SMF ¶ 20; Pl.'s Resp. to

IPC's SMF ¶ 20.)  Otherwise, the specific route taken was left to the discretion of each driver.

(*See* Franke Dep. (2d) 123:15-124:20; Defs.' & Pl.'s Ex. 6 ("Berndt Dep.") at 37:18-38:3.)  Janet Berndt, MBMS's Safety Director and Office Manager, testified that she did not personally tell Franke which route to take from Hammond to Wilton, and that Franke "knew the route." (Berndt Dep. at 42:16-24.)

On July 3, 2008, either David Martin ("Martin"), Operations Manager for MBMS, or one of the MBMS dispatchers whom Martin supervised called Franke and directed him to go to IPC's Hammond, Indiana, regional distribution center to pick-up a load of IPC paper products for delivery.  (IPC's SMF ¶¶ 16, 24, 61, 64; *see also* Defs.' & Pl.'s Ex. 2 ("Franke Dep. (1st)") at 25:10-28:6.)  Franke was given this assignment after MBMS personnel received a Broker Confirmation Sheet faxed by UACL employee Melody Hansen on July 3, 2008, discussed below. (*See* Pl.'s Resp. to IPC's SMF ¶ 64.)

According to Berndt, Martin terminated Franke's employment with MBMS as a result of the July 3, 2008, collision.  (IPC's SMF ¶ 74.)

D.    IPC's Relationship with Franke and MBMS and IPC's Relevant Conduct with Respect to the July 3, 2008, Shipment of IPC Paper Products

IPC's Hammond, Indiana, regional distribution center was managed by its subcontractor, Exel Logistics ("Exel"), and Exel employees were responsible for loading trailers with IPC paper products.  (Anderton Dep. at 149:1-15; 181:20-182:2; *see also* Pl.'s Resp. to IPC's SMF ¶ 40.) Anderton testified that—at the request of IPC—Exel also prepared three bills of lading, or "Memo Bills," for the loads that were being transported by Franke on July 3, 2008.  (Pl.'s Add'l Facts ¶ 27; *see also* IPC's Resp. to Pl.'s Add'l Facts ¶ 27; *see* Pl.'s Ex. 21 ("7/3/08 Memo Bills").)

The 7/3/08 Memo Bills specified the product being shipped, the number of pallets or cartons being shipped, the weight of the shipment, and the name and address of IPC's customers

to whom the goods were to be delivered. (Pl.'s Add'l Facts ¶ 30.) In addition to the customers' addresses and contact information, the 7/3/08 Memo Bills also included a precise time frame or "delivery window" during which delivery had to be made. (*Id.* ¶ 31; *see also* Mundy Dep. at 110:5-16.) Two pages of the 7/3/08 Memo Bills included instructions to call IPC if there were problems with the delivery or if the driver was detained for more than one hour. (Pl.'s Add'l Facts ¶¶ 32-33.)[5] Franke signed the 7/3/08 Memo Bills after the trailer was loaded at IPC's Hammond, Indiana, regional distribution center on July 3, 2008, above a blank line labeled "Carrier/TRL#." (IPC's SMF ¶ 71; *see also* 7/3/08 Memo Bills.) Boilerplate language at the bottom of the 7/3/08 Memo Bills defines "carrier" as meaning "any person or corporation in possession of the property under contract." (Pl.'s Add'l Facts ¶ 29; *see also* 7/3/08 Memo Bills.)

After Franke arrived in Wilton, he usually would drop off his load of IPC paper products for later delivery in Minnesota by another MBMS driver. (IPC's SMF ¶ 70.) As a general practice, after an MBMS driver made a delivery to one of IPC's customers, MBMS would submit the relevant memo bill to UACL in order for MBMS to be paid. (*Id.* ¶ 68.) IPC did not make payments directly to Franke or MBMS, but instead paid UACL for carrier services. (*Id.* ¶¶ 29-30; Pl.'s Add'l Facts ¶ 48.)

IPC did not direct Franke to use any particular route and did not instruct him on how to drive his truck. (IPC's SMF ¶¶ 19, 55, 73.) IPC also did not require Franke to inspect, clean, or maintain his tractor or trailer, or require him to use a designated place for the cleaning, servicing, or gassing of his tractor-trailer. (*Id.* ¶¶ 39, 42.) IPC was not responsible for the maintenance of the tractor, for expenses such as gas and oil, or for obtaining licenses or permits for the tractor. (*Id.* ¶¶ 29, 38.) IPC did not pay Franke his salary or wages, nor did IPC provide Franke any

---

[5] According to Franke, however, IPC did not require him to provide status reports or to notify IPC of anything that was happening while he was on the road. (*Compare* IPC's SMF ¶ 47; Pl.'s Resp. to IPC's SMF ¶ 47.)

employee benefits, including health insurance, workers compensation insurance coverage, pension plans, retirement accounts, profit sharing, vacation pay, or sick pay. (*Id.* ¶ 29.) IPC never provided Franke with clothing or log books, a co-driver, or money with which to purchase gas. (*Id.* ¶ 41.) Franke never wore any clothing that said "International Paper Company," nor did IPC supply any graphics, placard, stickers, or logos for the tractor driven by Franke. (*Id.* ¶¶ 32, 34.)

Other than requiring delivery within the time frame specified in the 7/3/08 Memo Bills, IPC did not dictate what hours Franke needed to work, and IPC did not keep track of Franke's hours or service to ensure he was in conformity with Federal Motor Carrier Safety Regulations. (*Id.* ¶¶ 48, 53.) IPC never required Franke to take a physical exam. (*Id.* ¶ 54.) IPC did not hire, discipline, fine, counsel, or fire any of MBMS's drivers, although it was Martin's understanding that IPC had the right to reject an MBMS driver if he or she used "bad language," was improperly dressed, or treated others with disrespect. (*Id.* ¶¶ 35, 48-50; *see also* Pl.'s Resp. to IPC's SMF ¶ 51.) IPC never instructed Franke on his appearance or personal grooming standards, and did not maintain a personnel file on Franke. (IPC's SMF ¶ 51.) IPC did not conduct any safety meetings or informational meetings which Franke was required to attend. (*Id.* ¶ 52.)

There is no evidence in the record that IPC gave MBMS or Franke any specific instructions regarding compliance with the IPC-UACL Agreement, other than the information contained in the 7/3/08 Memo Bills. (*See* IPC's SMF ¶ 18; Pl.'s Resp. to IPC's SMF ¶ 18.) Although IPC generally tracked its on-time deliveries, (Pl.'s Resp. to IPC's SMF ¶ 55; *see also* Anderton Dep. at 143:17-18 ("We would review on-time delivery from our facility on a daily basis.")), the parties have not cited any evidence that IPC ever tracked Franke's performance

specifically, or that Franke or MBMS received performance evaluations from IPC. Anderton testified that IPC was "unaware of and had no influence over" UACL's decision to contract with MBMS for purposes of executing the July 3, 2008, delivery. (Anderton Dep. at 26:4-9.)

E.   UACL's Relationship with Franke, MBMS, and IPC and UACL's Relevant Conduct with Respect to the July 3, 2008, Shipment of IPC Paper Products

As noted above, UACL was contractually obligated under the IPC-UACL Agreement to provide IPC with qualified, licensed, and lawful drivers; to provide IPC with clean, water-tight, and safe trailers; to maintain tractors and trailers in safe operating condition; and to satisfy a minimum on-time delivery requirement of 98% on IPC shipments. (IPC-UACL Agreement § 3; Pl.'s Add'l Facts ¶¶ 12, 50-55; *see also* Pl.'s Resp. to UACL's SMF ¶¶ 19, 33, 35, 37-39, 43, 49, 53-55, 73.) Any drivers supplied by UACL to IPC under the IPC-UACL Agreement were also required to communicate with IPC regarding the acceptance of a load tender, the anticipated pick-up date/time, any unexpected delays, and other similar delivery events. (IPC-UACL Agreement § 9 and Ex. H; Pl.'s Add'l Facts ¶¶ 18-25; Pl.'s Resp. to UACL's SMF ¶ 47.) Again, as discussed above, UACL and IPC representatives testified that UACL was permitted to hire the services of another trucking company to satisfy these obligations, and it is undisputed that UACL contracted with MBMS for this purpose. (Pl.'s Add'l Facts ¶¶ 35, 38; Dkt. No. 308 ("UACL's SMF") ¶ 9.) Specifically, it is undisputed that Franke would not have been hauling the load of IPC paper products on July 3, 2008, unless UACL had asked MBMS to do so pursuant to UACL's contractual obligations under the IPC-UACL Agreement. (Pl.'s Add'l Facts ¶ 43.) Other than the information contained in the UACL-MBMS Master Brokerage Agreement and the 7/3/08 Broker Confirmation Sheet, there is no evidence in the record that UACL gave MBMS or Franke any specific instructions regarding compliance with the IPC-UACL Agreement. (*See* UACL's SMF ¶ 18; Pl.'s Resp. to UACL's SMF ¶ 18.)

On July 3, 2008, UACL representative Melody Hansen faxed to MBMS a "Broker Confirmation Sheet" instructing MBMS to make a pick-up of paper goods at IPC's Hammond, Indiana, regional distribution center at 7:00 p.m. that night. (Pl.'s Resp. to IPC's SMF ¶ 64; *see also* Pl.'s Ex. 20 ("7/3/08 Broker Confirmation Sheet").). The 7/3/08 Broker Confirmation Sheet stated that IPC's shipment had to be delivered on July 7, 2008, between 7:30 a.m. and 4:00 p.m. at three different locations in the Minneapolis area. (*Id.*) MBMS personnel dispatched Franke to IPC's Hammond, Indiana, regional distribution center after receiving the 7/3/08 Broker Confirmation Sheet faxed by Hansen. (Pl.'s Resp. to IPC's SMF ¶ 64.)

Hansen regularly provided similar broker confirmation sheets to MBMS as part of her duties for UACL. (UACL's SMF ¶ 63.) MBMS drivers were required to provide executed IPC memo bills to UACL upon completion of any delivery made pursuant to this arrangement, whereupon UACL would pay MBMS for services rendered. (*Id.* ¶ 68.)

Franke never had any conversations with anyone at UACL concerning the load he was hauling on July 3, 2008, or any of the loads he hauled before July 3, 2008. (UACL's SMF ¶¶ 17, 62, 66.) Other than through broker confirmation sheets, Hansen never provided Franke with any additional directions, instructions, tools, instrumentalities, safety instructions, or driving instructions. (IPC's SMF ¶ 63.) Hansen did not discipline or fine Franke, or require Franke to stay in communication or contact with her as a representative of UACL. (*Id.*)

No one from UACL gave MBMS or Franke any additional instructions or directions, beyond those contained in the broker confirmation sheets and the Master Brokerage Agreement. (*See* UACL's SMF ¶ 18; *see also* Pl.'s Resp. to UACL's SMF ¶ 18.) UACL did not direct Franke to use any particular route, nor did UACL dictate what hours Franke needed to work—although UACL did communicate to MBMS the pick-up and delivery schedules established by

IPC.  (UACL's SMF ¶¶ 19, 48, 55; Pl.'s Resp. to UACL's SMF ¶ 48.)  UACL did not pay Franke his salary or wages, nor did UACL provide Franke any employee benefits, including health insurance, workers compensation insurance coverage, pension plans, retirement accounts, profit sharing, vacation pay, or sick pay.  (UACL's SMF ¶ 29.)  UACL did not cover the cost of Franke's repairs, maintenance, supplies, or travel expenses.  (*Id.*)  UACL did not provide Franke with clothing or log books, a co-driver, or money with which to purchase gas.  (*Id.* ¶ 41.)  UACL did not supply any graphics, placard, stickers or logos for the tractor driven by Franke and owned by MBMS.  (*Id.* ¶ 34.)

UACL never fined Franke for not being in compliance with any requirements.  (*Id.* ¶ 48.)  UACL did not keep track of Franke's hours or service to ensure he was in conformity with Federal Motor Carrier Safety Regulations.  (*Id.* ¶ 53.)  UACL never required Franke to take a physical exam.  (*Id.* ¶ 54.)  UACL did not hire, discipline, counsel, or fire any of MBMS's drivers.  (*Id.* ¶¶ 35, 48-50.)  UACL did not instruct Franke on his appearance or personal grooming standards.  (*Id.* ¶ 51.)  UACL did not maintain a personnel file on Franke.  (*Id.*)  UACL never required Franke to inspect, clean, or maintain his tractor or trailer, nor did UACL require Franke to use a designated place for the cleaning, servicing, or gassing of his tractor-trailer.  (*Id.* ¶¶ 39, 42.)  UACL never dictated to any drivers that came to the Hammond distribution center how to use their log books, what clothing to wear, what equipment should be used, how to operate his tractor on the road, or report what was going on with their driving.  (*Id.* ¶ 43.)  UACL did not conduct any safety meetings or informational meetings which Franke was required to attend.  (*Id.* ¶ 52.)

LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial responsibility of identifying materials in the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); see also Fed. R. Civ. P. 56(c)(1). "To survive a motion for summary judgment, 'the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in [its] favor.'" *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (quoting *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012)). When ruling on a motion for summary judgment, the court views all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Id.*

As a federal court sitting in diversity, this court applies the substantive law of the forum state, Illinois, to Plaintiff's claims, in cases such as this one where the parties have not identified any choice-of-law issue. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). Under Illinois law, "[t]he general rule is that a party injured by the negligence of another must seek his remedy against the person who caused his injury." *Perkinson v. Manion*, 516 N.E.2d 977, 980 (Ill. App. Ct. 5th Dist. 1987). "An exception is the doctrine of *respondeat superior*." *Id*. "Under the doctrine of *respondeat superior*, a principal may be held liable for the negligent actions of an agent that caused a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff." *Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E.2d 463, 470 (Ill. App. Ct. 3d Dist. 2011)). "An agency is a consensual relationship in which a principal has the right to control an agent's conduct and an agent has the power to affect a

principal's legal relations." *Id.* An independent contractor, by comparison, "undertakes to produce a given result but, in the actual exercise of the work, is not under the order or control of the person for whom he does the work." *Id.*

Whether a principal-agent relationship exists is a question of fact that "should be made by considering all of the surrounding circumstances and actions of the parties, without exclusive weight being given to contractual labels or provisions." *Id.* "Among the factors to be considered in determining this issue are: the right to control the manner in which the work is performed; the right to discharge; the method of payment; who provides the tools, materials, or equipment; the level of skill required to perform the work; and who deducts or pays for insurance, social security, and taxes on the employee's behalf." *Dowe v. Birmingham Steel Corp.*, 963 N.E.2d 344, 398 (Ill. App. Ct. 1st Dist. 2011). "Another significant factor is the nature of work performed in relation to the general business of the employer." *Sperl*, 946 N.E.2d at 471. "No single factor is determinative, but the right to control the manner in which the work is performed is considered to be the most important factor" and is the "hallmark of agency." *Dowe*, 963 N.E.2d at 398 (quoting *Simich v. Edgewater Beach Apartments Corp.*, 857 N.E.2d 934, 940 (Ill. App. Ct. 1st Dist. 2006)). "The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal." *Krickl v. Girl Scouts, Ill. Crossroads Council, Inc.*, 930 N.E.2d 1096, 1100 (Ill. App. Ct. 1st Dist. 2010).

As noted above, "[t]he test of whether an individual is an agent or independent contractor is generally a question of fact for the trier of fact." *Dowe*, 963 N.E.2d at 398. "However, when the facts are not in dispute, the trial court is permitted to decide the issue as a matter of law and grant summary judgment." *Id.*; *accord Krickl*, 930 N.E.2d at 1100; *see also Perkinson*, 516 N.E.2d at 980 ("Whether the relationship of principal and agent or owner and independent

17

contractor exists is a question of fact for the jury unless the relationship is so clear as to be indisputable."); *Tansey v. Robinson*, 164 N.E.2d 272, 275 (Ill. App. Ct. 1st Dist. 1960) ("unless those facts [relevant to establishing a principal-agent relationship] clearly appear, the relationship cannot become purely a question of law.") (citing *Thiel v. Material Service Corp.*, 5 N.E.2d 88, 91 (Ill. 1936)).

<u>ANALYSIS</u>

I.    <u>International Paper Company's Motion for Summary Judgment</u>

The majority of the factors relevant to establishing a principal-agent relationship are not present in the relationship between IPC and Franke. It is undisputed that IPC did not pay Franke directly, withhold taxes from Franke's earnings, insure either Franke or the truck he was driving, pay Franke's expenses, or furnish tools, materials, or equipment for Franke to utilize when hauling IPC's paper products. IPC did not have the right to terminate Franke's employment as an MBMS truck driver, although IPC did retain the right to request a different driver from UACL, which would have the effect of terminating Franke's assignment only to that portion of MBMS's business. *See Boyle v. RJW Transport, Inc.*, No. 05 C 1082, 2008 WL 4877108, at *11 (N.D. Ill. June 20, 2008) (Kennelly, J.) ("a shipper's right to reject—but not fire—a driver does not create an agency relationship"); *accord Dowe*, 963 N.E.2d at 352 (finding no principal-agent relationship as a matter of law despite the fact that the shipper "had the right to terminate the services of a driver if it believed the driver was not performing the work in a safe manner, he was impaired, or it received a customer's complaint"). The hauling services provided by Franke also did not go to the heart of IPC's business, but were instead the type of generic delivery services utilized by many manufacturers, retailers, and distributors. *Compare Sperl*, 946 N.E.2d at 1058-59 ("The work [driver] performs . . . is directly related to, if not the same as, the general

transportation business conducted by [the alleged principal]."). Neither party has argued that Franke's occupational skills as a truck driver weigh in favor of, or against, a finding of agency.

The most important factor, and only remaining factor, is whether IPC had the right to control the manner in which Franke hauled IPC's paper products. Plaintiff argues the undisputed facts demonstrate that "IPC exerted extensive control over the delivery activities of UACL and any driver utilized by UACL to haul IPC's products" through the IPC-UACL Agreement, or that there is at least a genuine issue of material fact as to whether an agency relationship exists between IPC and Franke. (Dkt. No. 329 ("Pl.'s IPC Resp.") at 5, 7.) The court disagrees.

The court first addresses the relevance of the IPC-UACL Agreement. Plaintiff has argued that "the plain language of the contractual agreement between IPC and UACL/OEI . . . strongly support[s] a finding that MBMS, and Franke were agents of IPC." (Pl.'s IPC Resp. at 2.) In response to Plaintiff's Statement of Additional Facts, IPC generally "denies that the IPC-UACL/OEI contract gave rise to any duties or responsibilities on FRANKE," although IPC does not further develop this argument in its reply brief. (IPC's Resp. to Pl.'s Add'l Facts ¶¶ 15-25.) The plain language of the IPC-UACL Agreement does not mention MBMS or Franke, either by name or by inference, instead referring to UACL as the only "CARRIER." Additionally, neither the UACL-MBMS Master Brokerage Agreement nor the 7/3/08 Broker Confirmation Sheet contains language stating that UACL—rather than IPC—required MBMS or Franke to comply with the terms of the IPC-UACL Agreement. In short, there is no evidence of a direct contractual relationship or obligation between IPC and MBMS or Franke. On the other hand, representatives from both IPC and UACL agreed that UACL was permitted to hire another driver or trucking company to haul IPC's shipments on behalf of UACL, thereby satisfying UACL's obligations under the IPC-UACL Agreement, and in its briefing before the court IPC has

analyzed various requirements of the IPC-UACL Agreement as though they apply to MBMS and Franke. (*See* Dkt. No. 344 ("IPC's Reply") at 8-10 (analyzing "[a] contractual provision that requires a driver to have a CDL" and "a contractual provision 'requiring' safe operation of a truck in compliance with traffic laws").) The court need not determine whether the terms of the IPC-UACL Agreement actually applied to MBMS and Franke for purposes of deciding IPC's pending motion for summary judgment. Even assuming that the terms of the IPC-UACL Agreement did apply to MBMS and Franke, as discussed in detail below, the court concludes that no reasonable jury could find that IPC exercised sufficient control over the manner in which Franke performed his work for purposes of establishing a principal-agent relationship.

Both Plaintiff and IPC agree that "[t]he actual conduct of the parties, and not the language of any agreement between them, typically controls in the analysis of whether a principal-agent relationship exists." *Boyle*, 2008 WL 4877108, at *6. A contract's statement of employment status is accordingly considered a relevant—but not dispositive—factor in determining whether an individual is an independent contractor, insofar as it is "indicative of the intent of the parties." *Earley v. Industrial Comm'n*, 553 N.E.2d 1112, 1118 (Ill. App. Ct. 4th Dist. 1990) (noting that the employment status designated in a contract "may swing the balance" in a close case). Section 20 of the IPC-UACL Agreement, titled "Independent Contractor," states in relevant part, "[u]nder no circumstances shall [IPC] be construed as having responsibility for [UACL's] safety, means or methods." (IPC-UACL Agreement § 20.) On its face, Section 20 of the IPC-UACL Agreement is evidence of IPC's and UACL's mutual intent to establish an independent contractor relationship, which in turn suggests that IPC did not intend to create a principal-agent relationship with Franke or any other driver supplied by UACL pursuant

to the IPC-UACL Agreement. A reasonable jury would consider this factor to weigh in favor of IPC's position on the question of agency.

As for other potential indicia of control, it is undisputed that IPC did not determine the route that Franke took from Hammond, Indiana, to Wilton, Wisconsin; that IPC did not require Franke to work any specific hours; that IPC did not train or instruct Franke in how to drive his tractor or how to haul loads for IPC; that IPC did not specifically request that Franke be assigned to the July 3, 2008, shipment; and that IPC did not discipline Franke.

Plaintiff argues that IPC nevertheless exerted significant control over the manner in which Franke performed his work by (1) issuing specific delivery instructions in the 7/3/08 Memo Bills, including the location and time frame for deliveries; (2) requiring UACL to purchase electronic software that "would allow IPC to stay in constant electronic communication with drivers regarding all facets of the transportation of its goods" and "to effectively control and supervise all drivers transporting its loads"; (3) setting a performance standard of 98% "on-time deliveries"; and (4) requiring drivers "to be fully qualified and have appropriate licenses and permits" and "to operate their truck safely in compliance with local, state, and federal laws." (*See generally* Pl.'s IPC Resp. at 5-11.)[6]  None of these undisputed facts, either alone or together, is sufficient to establish a genuine dispute of material fact as to whether a principal-agent relationship existed between IPC and Franke.

First, courts have routinely held that a requirement of timely delivery does not "impose any particular route or other methods for making the delivery." *Boyle*, 2008 WL 4877108, at *8;

_____

[6] Plaintiff also argues that IPC controlled the mode of transportation, insofar as the IPC-UACL Agreement required UACL to satisfy certain "Trailer Requirements" and "Trailer Pool Requirements." (IPC-UACL Agreement at § 3.J and § 3.K.) No party has taken the position that IPC or UACL required Franke—as opposed to MBMS—to provide a tractor or trailer as part of his hauling responsibilities. The court therefore finds these contractual provisions to be irrelevant to the question of whether IPC controlled Franke's actions when hauling IPC's July 3, 2008, shipment.

*see also Wilson-McCray v. Stokes*, No. 01 C 1929, No. 01 C 5808, 2003 WL 22901569, at *5 (N.D. Ill. Dec. 9, 2003) (Kennelly, J.) (contract provisions requiring the timely delivery of goods "merely specified the particular hauling task—i.e. delivery in a timely fashion—and did not control the manner in which this task is to be completed"); *Shoemaker v. Elmhurst-Chicago Stone, Inc.*, 652 N.E.2d 1037, 1041 (Ill. App. 3d 1st Dist. 1994) ("Elmhurst's instructing Anderson where he should deliver the load did not control the manner in which the job was done but rather specified the particular hauling task for which Lawrence Trucking was hired."); *Manahan v. Daily News-Tribune*, 365 N.E.2d 1045, 1047 (Ill. App. Ct. 3d Dist. 1977) (finding no principal-agent relationship where contract required newspaper deliveryperson to make deliveries "at the times and to the persons and placed designated by [the newspaper company]"). IPC's instructions in the 7/3/08 Memo Bills regarding where and when to deliver its July 3, 2008, shipment do not reasonably suggest that IPC had the ability to control the means by which Franke accomplished this desired result.[7]

Second, IPC's requirement that MBMS and Franke maintain communication with IPC[8] does not suggest that IPC had control over the manner in which Franke hauled IPC's shipment.

---

[7] Plaintiff notes that the boilerplate language on each Memo Bill includes blank boxes stating "SHIPPER PER" and "AGENT PER." (Pl.'s IPC Resp. at 10; *see also* 7/3/08 Memo Bills.) This vague allusion to agency does not create a genuine dispute of material fact regarding Franke's legal relationship with IPC, as the word "agent" by itself does not establish any particular form of control over Franke's conduct or actions. Similarly, the deposition testimony of David Martin and Pat Podlena concluding that Franke was acting as an agent of IPC and UACL when hauling IPC's July 3, 2008, shipment is a bare legal conclusion that is inadmissible under Federal Rule of Evidence 701(c). Defendants' "Motion to Strike and Bar Testimony of David Martin and Pat Podlena Pursuant to [FRE] 701 and 702" (Dkt. No. 342) is accordingly granted.

[8] The court acknowledges that this is a disputed question of fact, insofar as Franke testified that IPC did not require drivers to provide status reports, call in, or otherwise "notify them of anything that was happening while [Franke] was doing his work." (IPC's SMF ¶ 47 (citing

The specific obligations set forth in Exhibit H to the IPC-UACL Agreement require carriers hauling for IPC to report, through the use of designated electronic software, when a load tender is accepted or rejected, the expected pick-up date and time, the actual pick-up date and time, the expected delivery date and time, any revised expected delivery date and time, and the actual delivery date and time. (IPC-UACL Agreement, Ex. H; *see also* Pl.'s IPC Resp. at 10 (citing Hansen Dep. at 89-90).) Similarly, two pages of the 7/3/08 Memo Bills explicitly required the driver to "contact IP" or "call IP" if the driver experienced problems with the delivery or was detained for more than one hour. (*See* 7/3/08 Memo Bills.) Requiring reports on a driver's progress, however, does not signify that the shipper has any ability to direct or control the driver's actions in hauling the assigned load. As Judge Kennelly stated in *Wilson-McCray*, shippers have "an interest in making sure that [their] customers received their goods in a timely manner; and the fact that [the shipper] monitored this process to ensure prompt delivery no more creates an agency relationship than does the designation of overnight delivery on a Federal Express package." *Wilson-McCray*, 2003 WL 22901569, at *6.

The fact that IPC set a performance standard of 98% "on-time deliveries" likewise does not reasonably suggest that IPC had the ability to control *how* Franke hauled his assigned load. IPC's performance goal, like its delivery instructions, is a manifestation of its desired end result, and does not reasonably suggest that IPC had control over Franke's preferred method of getting from Point A to Point B within the established time frame. IPC did offer performance evaluations of its carriers, in which "[o]n-time delivery was typically one of the metrics that would be measured." (Anderton Dep. at 142:24-123:9.) As in *Boyle*, however, Anderton's testimony on this point "does not present these discussions as an occasion for mandates by [IPC]

___

Franke Dep. (2d) at 450:12-24).) The court views this disputed fact in the light most favorable to Plaintiff for purposes of its analysis.

regarding the particulars of delivery operations." *Boyle*, 2008 WL 4877108, at *8. Anderton testified that, on a daily basis, IPC resolved any "performance issue" by contacting the carrier and asking "Why was this shipment late yesterday?" (Anderton Dep. at 143:17-144:1.) Again, this type of communication does not suggest that IPC was giving "marching orders" to MBMS or Franke, *Boyle*, 2008 WL 4877108, at *8, especially when it is undisputed that IPC did not have any knowledge of or input regarding Franke's individual assignment to haul IPC's shipment.

The fact that IPC required drivers to "comply with applicable local, state, and federal laws and regulations" is a closer call. (IPC-UACL Agreement § 3.H.) On its face, this contract provision applied to all UACL personnel "required to perform the services contemplated under this Agreement," (*id.*), and therefore had the potential to directly address the manner in which Franke hauled IPC's load of paper goods. Moreover, IPC stood to benefit from Franke's compliance with this contact term. *See Nat'l Cont'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 157 F.3d 610, 613 (8th Cir. 1998) (service contract requiring compliance with federal safety regulations benefitted both owner and lessee). As IPC notes, however, Franke also had an independent duty to comply with all applicable laws, and at least one court has found that "[l]anguage requiring compliance with laws and regulations does not render an independent contractor an agent or employee." *Boyle*, 2008 WL 4877108, at *9; *see also United States v. Mutual Trucking Co.*, 141 F.2d 655, 657 n.1, 658-69 (6th Cir. 1944) (contract between shipper and carrier requiring carrier's compliance with applicable licensing and insurance regulations did not create principal-agent relationship). Section 3.H. of the IPC-UACL Agreement does not specify any particular laws or regulations with which IPC expected UACL's personnel to comply, nor does Section 3.H. refer to any specific traffic laws, rules-of-the-road, or other

similar regulations. Without more, the court concludes that no reasonable jury could find that Section 3.H. established IPC's ability to control Franke's actions in hauling the assigned load on July 3, 2008.

For the reasons set forth above, viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the court concludes that no reasonable jury could find that IPC exerted control over how Franke performed his hauling duties on July 3, 2008. As a matter of law, the court holds that no principal-agent relationship existed between IPC and Franke, and IPC therefore cannot be liable for Franke's alleged negligence under a theory of *respondeat superior*. IPC's motion for summary judgment is granted accordingly.

II.   Universal Am-Can Ltd.'s Motion for Summary Judgment

Plaintiff argues that, as a matter of law, "MBMS/Franke were operating as UACL's agent in performing UACL's contractual obligations as the motor carrier in transporting IPC's paper goods," or that, in the alternative, "a genuine issue of material fact exists as to the agency relationship between UACL and MBMS/Franke." (Dkt. No. 328 ("Pl.'s UACL Resp.") at 2.) Again, the court disagrees.

As with IPC, the majority of the factors relevant to establishing a principal-agent relationship are not present in the relationship between UACL and Franke. It is undisputed that UACL did not pay Franke directly, withhold taxes from Franke's earnings, insure either Franke or the truck he was driving, pay Franke's expenses, or furnish tools, materials, or equipment for Franke to utilize when hauling loads pursuant to the UACL-MBMS Master Brokerage Agreement. UACL did not have the right to terminate Franke's employment as an MBMS truck driver, and neither party has argued that Franke's occupational skills as a truck driver weigh in favor of, or against, a finding of agency.

25

On the question of control, Plaintiff relies on the IPC-UACL Agreement in arguing that "UACL most certainly maintained control over MBMS and Franke because when MBMS/Franke were hauling the load for UACL, MBMS/Franke necessarily had to do everything UACL was contractually obligated to do." (Pl.'s UACL Resp. at 7-8.) This argument by Plaintiff goes too far. While it may have been in UACL's best interest to explicitly require MBMS and Franke to comply with the terms of the IPC-UACL Agreement, there is no evidence that UACL took this step. The relationship between UACL and MBMS is governed by the UACL-MBMS Master Brokerage Agreement and the 7/3/08 Broker Confirmation Sheet. Neither of these contracts refers to the IPC-UACL Agreement or explicitly incorporates its provisions. Moreover, Plaintiff does not cite or rely on any particular provisions of the IPC-UACL Agreement in support of his argument that UACL controlled Franke's actions. In the court's above analysis of IPC's motion for summary judgment, the court has explained why many of the contract terms in the IPC-UACL Agreement do not establish the contours of a principal-agent relationship, even if this contract did apply to Franke.

Most of Plaintiff's other arguments are likewise materially indistinguishable from the arguments considered and rejected above, including Plaintiff's argument that a principal-agent relationship is established by: (1) the requirement in the UACL-MBMS Master Brokerage Agreement that MBMS comply with all applicable federal, state and local laws (Pl.'s UACL Resp. at 9-10); (2) the requirement in the UACL-MBMS Master Brokerage Agreement that MBMS contact UACL with billing information and information regarding the status of delivery, and Martin's testimony that UACL required Franke to contact UACL if he was running behind on his pick-up or delivery schedule (Pl.'s UACL Resp. at 9); and (3) the fact that Hansen provided MBMS certain delivery details, both over the phone and through the 7/3/08 Broker

Confirmation Sheet (Pl.'s UACL Resp. at 9). For the reasons set forth above, these undisputed facts do not permit a reasonable jury to conclude that UACL controlled Franke's actions in hauling the assigned load on July 3, 2008.

The only significant difference between Franke's relationship with IPC and his relationship with UACL is the fact that the hauling services Franke provided on July 3, 2008, *did* go to the heart of UACL's business. *See Sperl*, 946 N.E.2d at 1058-59 ("The work [driver] performs . . . is directly related to, if not the same as, the general transportation business conducted by [the alleged principal]."). In this case, UACL's "business" was its obligation to transport IPC's paper goods pursuant to the IPC-UACL Agreement. This is the specific task that MBMS and Franke performed at UACL's request. The fact that UACL's clearly stood to benefit from its arrangement with MBMS is not enough, however, to establish a principal-agent relationship when there is no evidence that UACL controlled Franke's actions in hauling the assigned load on July 3, 2008. *See also Boyle*, 2008 WL 4877108, at *11 (concluding that this factor [the nature of the work performed in relation to the general business of the purported principal] "is ill-suited to the trucking context . . . [and] does not translate well from worker's compensation law").

Plaintiff relies exclusively on *Sperl* to argue that a transportation broker[9] can be held liable for a driver's negligence. In *Sperl*, however, the nature of the broker's business was one of two "pivotal" factors that the court relied on. *Sperl*, 946 N.E.2d at 472. The court also

---

[9] The court recognizes that the parties dispute whether UACL acted as a "broker" or a "carrier" with respect to the July 3, 2008, shipment. It is undisputed, however, that UACL had a contractual obligation to haul or carry IPC's shipment on July 3, 2008, and that UACL contracted with MBMS to fulfill this obligation. The transportation broker in *Sperl* similarly contracted with carriers to provide transportation services for its (shipper) customers. *Sperl*, 946 N.E.2d at 467. The fact that UACL was contractually obligated to haul IPC's load, rather than to broker it, is immaterial to the court's analysis of and reliance on the *Sperl* decision. For ease of discussion, the court uses the term "broker" to apply to UACL's actions in contracting with MBMS, while acknowledging Plaintiff's position on this point.

concluded that the broker "directed [the driver's] conduct during the entire transportation process" through "extensive requirements," such as the broker's requirements that the driver provide a refrigerated trailer of a specified length, that the driver continuously measure the temperature of the load during the trip, and that the driver stay in "constant communication" with the broker during the trip. *Sperl*, 946 N.E.2d at 471-72. The broker also enforced these requirements by imposing a system of fines. *Id.* at 472. Additionally, the delivery instructions provided by the broker put pressure on the driver to violate federal driving regulations. *Id.* As the driver testified, "given the amount of time she had to get to Illinois, she would not have been able to deliver the load to the Bolingbrook warehouse within [the broker's] schedule without violating federal regulations" that only allowed the driver to drive ten hours each day. *Id.* at 469. In addition to these indicia of control in *Sperl*, other factors supporting the jury's finding of agency included the fact that the broker communicated directly with the driver to tender and dispatch the load, the broker paid the driver directly by depositing money in her bank account, and the broker owned the load being delivered to its own warehouse facility. *Id.* at 472. None of these factors are present in the factual record in this case.

For the reasons explained above, viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the court concludes that no reasonable jury could find that UACL exerted control over how Franke performed his hauling duties on July 3, 2008. In light of this lack of evidence, as a matter of law, the court holds that no principal-agent relationship existed between UACL and Franke, and UACL therefore cannot be liable for Franke's alleged negligence under a theory of *respondeat superior*. UACL's motion for summary judgment is granted accordingly.

## CONCLUSION

For the reasons set forth above, Defendants' "Motion to Strike Superfluous Argument Contained in Plaintiff's Responses to UACL's and IPC's Statement of Facts" (Dkt. No. 343) and Defendants' motions to strike embedded in IPC's and UACL's Local Rule 56.1(a) responses (Dkt. Nos. 345, 346) are denied. Defendants' "Motion to Strike and Bar Testimony of David Martin and Pat Podlena Pursuant to [FRE] 701 and 702" (Dkt. No. 342) is granted. "International Paper Company's Motion for Summary Judgment Against the Plaintiff" (Dkt. No. 313) is granted. "Universal Am-Can Ltd.'s Motion for Summary Judgment Against the Plaintiff" (Dkt. No. 314) is granted. "Ox LLC's Motion for Summary Judgment" (Dkt. No. 303) is denied as moot. Judgment is entered in favor of IPC and UACL on all claims alleged against them, and Counts III and IV of the Fifth Amended Complaint are dismissed with prejudice. The parties' schedule entered by the court on September 5, 2013 (Dkt. No. 364) remains in effect. Parties are encouraged to discuss settlement. The case is set for a status report on the progress of the parties' settlement discussions at 10:00 a.m. on 12/17/13.


ENTER:


JAMES F. HOLDERMAN
United States District Court Judge

Date: December 9, 2013